ORIGINAL

# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL AND                    :
SANDRA Y. CORNEAL            **FILED** CASE NO. 1:00-CV-1192
                                     HARRISBURG, PA

vs.                         JUN 0 7 2002
                                              JURY TRIAL DEMANDED
JACKSON TOWNSHIP, ET AL. MARY E. D'ANDREA, CLERK
                        Per _____
                                Deputy Clerk

## DEFENDANTS' JACKSON TOWNSHIP, W. THOMAS WILSON, MICHAEL YODER, RALPH WEILER, BARRY PARKS, DAVID VAN DOMMELEN AND ANN I. WIRTH'S MEMORANDUM OF LAW IN SUPPORT THEIR MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

In this purported civil rights action, Plaintiffs claim that the Board of Supervisors of Jackson Township somehow violated their federally protected rights by allegedly failing to approve a subdivision plan and other permit applications. Plaintiffs purport to assert state law claims including civil conspiracy, intentional interference with performance of a contract and state constitutional claims. However, the undisputed material facts of record demonstrate that Plaintiffs were not deprived of any federally protected rights, nor did they commit conspiracy, interfere with any performance of a contract or violate the Pennsylvania Constitution. Moreover, the individual Defendants are entitled to qualified immunity. Accordingly, Defendants' Motion for Summary Judgment must be granted.

## II.    PROCEDURAL HISTORY

On June 30, 2000, Plaintiffs, ("Corneal") filed a Complaint in the United States District Court for the Middle District of Pennsylvania. On August 3, 2000, Defendants filed a Motion to Dismiss. The Motion was granted in part and denied it in part.  Count I was dismissed against all Defendants. Count III was dismissed against the against the Township.  Plaintiffs' Motion for Reconsideration of the Order was denied. On October 18, 2001, this Court granted Plaintiffs' Motion for Leave to Amend their Complaint with regard to state law constitutional claims.  On November 6, 2001, Plaintiffs filed an Amended Complaint including a fourth count purportedly based on state constitutional claims.

## III.    STATEMENT OF THE CASE

On May 23, 2002, Defendants filed a Motion for Summary Judgment. Defendants' respectfully incorporate by reference that Motion, including the recitation of facts herein, as if more fully set forth herein.

Jackson Township is a second class Township of approximately 816 residents located in Huntingdon County, Pennsylvania.[1] The Board of Supervisors of Jackson Township meet monthly and the members include Defendants, W. Thomas Wilson,

---

[1] A true and correct copy of Plaintiffs' Amended Complaint is contained in the Appendix as Exhibit "1", see ¶3; a true and correct copy of the deposition testimony of W. Thomas Wilson is contained in the Appendix as Exhibit "2", see p. 114.

2

Michael Yoder and Ralph Weiler.  The Township Secretary is Defendant, Ann I. Wirth.  The Township Sewage Enforcement Officer is Defendant, Barry Parks; the Building Permit Officer is Defendant, David Van Dommelen.   The Township Solicitor is Larry Newton.

The Corneals purchased a tract of land in Jackson Township in 1998.[2]  In approximately 1997 or 1998, the Board began discussions with regard to the development of a subdivision and land development ordinance (hereinafter referred to as SALDO).[3]   Thereafter, a two year process ensued wherein a proposed ordinance was drafted and revised.[4] (Exhibit "2", p. 104).  The Township obtained subdivision ordinances from different townships and tailored bits and pieces of each to meet the unique needs of Jackson Township; the Board held informal workshops in order to gather "subdivision" information.  (Exhibit "4", pp. 101, 102).  The Board of Supervisors relied on Richard Stahl of the Huntingdon County Planning Commission (hereinafter referred to as "HCPC"), the Pennsylvania Association of Township Supervisors (hereinafter referred to as PSAT) and its Solicitor, Larry Newton for assistance and advice in drafting the SALDO.  (Exhibit "2", p. 32,

---

[2] A true and correct copy of the deposition testimony of Plaintiff, David Corneal is contained in the Appendix as Exhibit "3", see p. 21.

[3] A true and correct copy of the deposition testimony of Ann I. Wirth  is contained in the Appendix as Exhibit "4", see p. 59.

[4] A true and correct copy of the deposition testimony of Larry Newton is contained in the Appendix as Exhibit "5", see p. 22.

Exhibit "4", p. 23, Exhibit "5", p. 37). The SALDO was passed at the July 10, 2000 meeting, along with privy and driveway ordinances.    The meeting was advertised prior to July and copies of the proposed ordinance were available at the Daily News, the County Law Library and the Office of the Township Secretary, Ann I. Wirth.[5]     In January 2000, prior to the adoption of the SALDO, the Board imposed a moratorium on subdivision development.[6] Attorney Newton advised the Township that he believed that the Township could impose a moratorium.  (Exhibit "5", p. 45).  Mr. Newton testified that he believed this to be true, even though there was no subdivision ordinance in effect.  (Exhibit "5", p. 45).

Plaintiffs alleged that in the fall of 1999, they hired Mr. David Simpson to perform a survey of the property and to prepare sewage modules.  (Exhibit "1", ¶16; Exhibit "3", pp. 31, 35, 57-58). Mr. Corneal testified that he thought that Mr. Simpson was aware of the requirement to develop property in the Township and that he relied upon Simpson.  (Exhibit "3", p. 57).  The Corneals contacted Defendant, Barry Parks, the Sewage Enforcement Officer of Jackson Township in order to perform tests to identify the portions of their property, if any, which were suitable for an on-lot septic tank.  (Exhibit "1", ¶17; Exhibit "3", p. 33).

---

[5] A true and correct copy of the Daily News ad is contained in the Appendix as Exhibit "6".
[6] A true and correct copy of the Minutes of the January 2000 meeting of the Board of Supervisors of Jackson Township is contained in the Appendix as Exhibit "7".

During the time when the test pits were being dug, Mr. Corneal testified that Mr. Wilson advised him that while there were no subdivision requirements in the Township, Mr. Corneal needed the SEO's approval on the sewage pit locations, which then had to be submitted to the Township. (Exhibit "3", pp. 56-57). Mr. Wilson testified that at some point, he advised Mr. Corneal that if he was going to subdivide, he should do it before the year 2000 because the Township had been working on an ordinance. (Exhibit "2", p. 50).

Mr. Parks testified that he signed the percolation tests and after receiving the proposed sewage modules from Mr. Simpson reviewed them and signed them. [7]

Mr. Simpson was also retained to prepare a subdivision proposal for the Corneals.[8] Initially, Mr. Corneal expressed a desire to lay out approximately nine lots. (Exhibit "9", p. 14). On or about January 25, 2000, Mr. Simpson contacted Ms. Wirth who may have informed him that the Township was working on adopting a Township subdivision ordinance and there was a moratorium on new subdivisions within the Township. (Exhibit "9", p. 16). Mr. Simpson testified that the earliest date that there was a completed subdivision plan is February 4, 2000. (Exhibit "9", p. 17). Mr. Corneal presented the initial set of subdivision plans or sketches to the

---

[7] A true and correct copy of the Notes of Testimony of Barry Parks, Township Sewage Enforcement Officer is contained in the Appendix as Exhibit "8", see p. 57.

[8] A true and correct copy of the Notes of Testimony of David Allen Simpson is contained in the Appendix as Exhibit "9", see p. 6.

5

Board of Supervisors at the February 2000 Township meeting and was advised that there was a moratorium on subdivision development in the Township. (Exhibit "2", p. 81; Exhibit "3", p. 59).

After learning of the moratorium, Corneal submitted the initial subdivision plans or sketches to the Huntingdon County Planning Commission. By letter dated February 24, 2000, the Huntingdon County Planning Commission recommended denial of Plaintiffs' initial plans or sketches.[9]

Mr. Corneal's plans were revised by Simpson at Corneal's request on April 7, 2000. Mr. Simpson testified that in his experience, "... the creation on the February 4 plan of such an extended right of way to serve Lot No. 3 generally raises eyebrows at the Planning Commission." (Exhibit "9", pp. 20-21). The new draft proposed only two lots. (Exhibit "5", pp. 85-86).

On April 3, 2000, at the meeting of the Township Supervisors, Mr. Corneal requested that the Supervisors sign sewage modules.[10] Mr. Corneal did not provide revised subdivision plans at that time. With respect to the sewage modules, "... the Supervisors would not sign them [the sewage modules] because we didn't have the

---

[9] A true and correct copy of the letter dated February 24, 2000 from the Huntingdon County Planning Commission to Ms. Ann Wirth is contained in the Appendix as Exhibit "10".

[10] A true and correct copy of the Minutes of the Jackson Township Board of Supervisor's meeting dated April 3, 2000 is contained in the Appendix as Exhibit "11". A true and correct copy of the Minutes of the Jackson Township BOS meeting dated March 7, 2000 is contained in the Appendix as Exhibit "12".

subdivision plan or anything." (Exhibit "2", p. 121). Mr. Wilson stated that the Supervisors, "... were not signing five sewer modules for one house." (Exhibit "2", p. 127). Mr. Corneal claims he requested a permit for a privy and a building permit on that date; the Supervisors advised Mr. Corneal that they were not issuing any building permits for a property that they believed was going to be subdivided. (Exhibit "11").

Parks, the SEO told Mr. Corneal he could not use a privy on his property at that time because the Corneals had piped water on the property and water under pressure. (Exhibit "8", pp. 64-66). Under DEP regulations, this precluded use of a privy. (Exhibit "8", pp. 64-65).

By letter dated April 20, 2000, the Huntingdon County Planning Commission "recommended" conditional approval of the revised plan pending adoption of the subdivision and land development ordinance by the Township.[11]

On or about April 27, 2000, Mr. Corneal requested a building permit from the Township Permit Officer, Mr. David Van Dommelen.[12] Mr. Van Dommelen testified that previously the Supervisors had instructed him not to give Mr. Corneal a building permit because Mr. Corneal had not done the "proper steps for

---

[11] A true and correct copy of the letter dated April 20, 2000 from the Huntingdon County Planning Commission to Ms. Ann Wirth is contained in the Appendix as Exhibit "13".

[12] A true and correct copy of the Notes of Testimony of Mr. David Van Dommelen is contained in the Appendix as Exhibit "14".

subdividing and he also had not obtained the correct permission for septic systems."

Mr. Van Dommelen further testified that he called Tom Wilson while Mr. Corneal

was at his home. (Exhibit "14", pp. 47, 49). Mr. Van Dommelen reported that he

was advised not to issue a building permit since Mr. Corneal had not subdivided

properly and he had not gotten the correct septic tank approval. Mr. Van

Dommelen reiterated that even if Corneal wanted to build one structure on one piece

of property, it is still a subdivision because of the existing farmhouse structure.

(Exhibit "14", p. 49; Exhibit "8", pp. 21-23, 28-38). Mr. Van Dommelen recalled

receiving a letter from Mr. Corneal dated May 5, 2000.[13] Mr. Van Dommelen did

not forward this to the Township, although he may have mentioned it to Ann Wirth.

(Exhibit "14", p. 71).

Mr. Van Dommelen admitted that he referred to Mr. Corneal as a "trouble

making yuppie from over the mountain", but testified that this was based on Mr.

Van Dommelen's belief that Mr. Corneal, "... behaves like someone who wants to

get their own way and his age group." (Exhibit "14", pp. 72-73). Mr. Van

Dommelen testified that he would have issued a permit given the proper

documentation for a subdivision and sewage. (Exhibit "14", p. 119). Essentially,

as Mr. Van Dommelen stated, "... we would assist him if he did the proper things."

---

[13] A true and correct copy of this letter is contained in the Appendix as Exhibit "15".

8

(Exhibit "14", p. 114).[14]

On July 28, 2000, Township Solicitor Lawrence Newton forwarded a letter to the Corneals advising them that they were in violation of Township's building permit ordinance since they had begun construction on their property without first obtaining the requisite building permits.[15]

By letter dated August 3, 2000, Mr. Corneal requested the appropriate applications from Mr. Newton.[16] On August 18, 2000, Mr. Corneal again requested the appropriate application forms for building permits as well as a schedule of permit fees required for the building permits.[17]  On August 29, 2000, Mr. Newton forwarded the Jackson Township building permit application to Mr. Corneal.[18]  On August 31, 2000, Mr. Corneal forwarded a letter to the Township Secretary, Ann Wirth enclosing three building permit applications along with a check for each.[19] On September 1, 2000, Mr. Corneal forwarded the rough drawings of the art studio and

---

[14] A true and correct copy of the Jackson Township SALDO is contained in the Appendix as Exhibit "16"; a true and correct copy of Jackson Township Board of Supervisors Minutes dated July 10, 2000 is contained in the Appendix as Exhibit "17".

[15] A true and correct copy of the letter dated July 28, 2000 is contained in the Appendix as Exhibit "18".

[16] A true and correct copy of the letter dated August 3, 2000 from David Corneal to Lawrence Newton is contained in the Appendix as Exhibit "19".

[17] A true and correct copy of the letter from David Corneal, Esquire to Larry Newton, Esquire dated August 18, 2000 is contained in the Appendix as Exhibit "20".

[18] A true and correct copy of this correspondence from Larry Newton to David Corneal dated August 29, 2000 is contained in the Appendix as Exhibit "21".

[19] A true and correct copy of this correspondence from Corneal to Wirth dated August 31, 2000 is contained in the Appendix as Exhibit "22".

the house, which were not enclosed with the previous building permit applications.[20]

On October 10, 2000, Mr. Corneal's applications were denied because a building

permit cannot be issued without a sewage permit and because he failed to comply

with the Township subdivision and land development ordinance, as well as for other

inadequacies.[21]  On November 10, 2000, the Corneals appealed the building Permit

Officer's decision of October 10, 2000.[22]  Mr. Corneal began construction of his

driveway in the spring of 2000.  Mr. Corneal completed construction of a garage

and house, with on lot sewage. (Exhibits "2", p. 132, "4", pp. 78, 88, "26", pp.

10, 14, 26).

IV.   **ARGUMENT**

   A.   **LEGAL STANDARD**

   Summary Judgment is proper where there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law.   Fed.R.Civ. 56(c).

However, "(t)he mere existence of some alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact".  Anderson v. Liberty

---

[20] A true and correct copy of the letter from Corneal to Wirth dated September 1, 2000 is contained in the Appendix as Exhibit "23".

[21] A true and correct copy of the letter from David Van Dommelen to Mr. and Mrs. Corneal dated October 10, 2000 is contained in the Appendix as Exhibit "24".

[22] A true and correct copy of the letter from Terry J. Williams, Esquire to the Jackson Township Board of Supervisors is contained in the Appendix as Exhibit "25"; a true and copy of the deposition transcript of Terry Williams is contained in the Appendix as Exhibit "26".

Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2511, 91 (1986). The non-moving party must offer sufficient evidence such that a reasonable jury could return a verdict in favor of that party. Anderson, 477 U.S. at 248. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted". Anderson, 477 U.S. at 250-51 (citations omitted). Rule 56(c) mandates the entry of Summary Judgment against a party who fails to produce evidence sufficient to establish an essential element of its case, on which he will bear the burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

**B.  THE UNDISPUTED MATERIAL FACTS OF RECORD DEMONSTRATE THAT PLAINTIFFS HAVE NOT BEEN DEPRIVED OF THEIR SUBSTANTIVE DUE PROCESS RIGHTS**

A federal court is not a forum for remedying violations of state law. Midnight Sessions Ltd. v. City of Phila., 945 F.2d 667, 684 (3d Cir. 1991). A violation of state law in itself does not constitute a denial of substantive due process. Midnight Sessions, 945 F.2d at 684; Smith v. Spina, 477 F.2d 1140, 1143 (3d Cir. 1973) (citations omitted). Recovery under §1983 is strictly limited to deprivations of federally protected rights. Id.

In order to impose liability under §1983, Plaintiffs must demonstrate that the

11

Defendants, acting under the color of state law violated a right secured by the Constitution or laws of the United States. <u>Groman v. Township of Manalapan</u>, 47 F.2d 628, 638 (3d Cir. 1995); <u>Shaw by Strain v. Strackhouse</u>, 920 F.2d 1135, 1142-43 (3d Cir. 1990).

In order to establish a substantive due process claim, a Plaintiff must prove that he or she was deprived of a protected property interest by "arbitrary or capricious government action." <u>Taylor Investment Ltd. v. Upper Darby Twp.</u>, 983 F.2d 1285, 1290 (3d Cir. 1993). Economic and social legislation is subject to rational basis review, wherein a law need only be rationally related to a legitimate state interest in order to be constitutional. <u>Shumaker v. Nix</u>, 965 F.2d 1262, 1266 (3d Cir. 1992). In other words, a substantive due process violation is demonstrated if, "... the government's actions were not rationally related to a legitimate government interest or were in fact motivated by bias, bad faith or improper motive." <u>Midnight Sessions Ltd. v. City of Phila.</u>, 945 F.2d 667, 682-683 (3d Cir. 1991).

In this case, the law or regulation at issue is the moratorium on new development. At the time the Jackson Township Board of Supervisors imposed the moratorium on new subdivisions, moratoriums were endorsed by the Pennsylvania

Courts. <u>See</u> <u>Naylor v. Township of Hellam</u>, 717 A.2d 629, 633 (Pa. Cmwlth.

1998), <u>reversed</u> 565 Pa. 397, 773 A.2d 770 (2001). In <u>Naylor</u>, the moratorium was

rationally related to a legitimate government interest, which the Commonwealth

Court defined as, "... maintaining the status quo as to protect the health and welfare

of the municipalities' citizens by insuring that proposed development conforms to

rather than defeats the revised plans and regulations." <u>Naylor</u>, 717 A.2d at 633.

Indeed, Mr. Van Dommelen testified that the Supervisors wanted to have better

planning in the Township so that it was not "helter skelter." (Exhibit "14", p. 53).

As such, the Supervisors, "... wanted to make sure that they had a better

understanding of the whole subdivision process" and they enacted the moratorium

since, "... they were trying to rewrite the whole question of subdivision." (Exhibit

"14", p. 53). The proposed ordinance was drafted and revised over a two year

period. In this regard, at the relevant time period, this legislative scheme or

regulation, clearly comported with notions of substantive due process.

There is no evidence, which demonstrates that Defendants' actions were

motivated by bias, bad faith or improper motive. The record evidence demonstrates

that the moratorium and SALDO were enacted and put in place for legitimate

reasons. Defendants sought the advice of their Solicitor, Lawrence Newton,

(Exhibit "5", pp. 22, 25), who advised the Township that he believed that the Township could impose the moratorium; he testified that he believed this to be true, even though there was no subdivision ordinance in effect. (Exhibit "5", p. 45). There is absolutely no record evidence that the moratorium was enacted for any improper purpose.

The record evidence also demonstrates that there were no improper actions taken by the Township officials, which in any way interfered with Plaintiffs' land development.[23]  There were no subdivisions approved during the moratorium; indeed, others, besides Mr. Corneal were held in abeyance. (Exhibit "4", pp. 124-125, Exhibit "8", pp. 123-124). While Mr. Corneal testified that he believed the Township improperly advised him to submit his plans or sketches to the HCPC, the undisputed testimony is that the Board was acting in accordance with the practice and procedure utilized in Huntingdon County.  (Exhibit "3", p. 80; Exhibit "5", p. 93).  Furthermore, Ms. Wirth testified that since she has been with the Township, approximately five years, every proposed subdivision has been taken to the County or Richard Stahl at the HCPC.  (Exhibit "4", pp. 118-119).  There is no record evidence that this purported practice of County review was arbitrarily required only

---

[23] It bears noting that Corneal went ahead with developing his property notwithstanding the fact that he lacked legal authority to do so.

14

of Mr. Corneal. Rather, the record evidence demonstrates that Jackson Township relied heavily on the advice of the Huntingdon County Planning Commission as well as of that of the Department of Environmental Protection.

DEP, by way of the Sewage Facilities Act, requires review and approval of proposed subdivisions regardless of local regulation. (See 35 P.S. §§750.2 and 750.7). Simpson testified, "... that in any subdivision, the Township Supervisors were required by the Pennsylvania DEP to review and approve subdivision plans whether or not they had an ordinance. This was strictly in compliance with the Department of Environmental Protection policies." (Exhibit "9", p. 23). In this regard then, the Township's insistence on proper sewage tests, modules and permits was not capricious, but rather was mandated by DEP standard and regulations. (Exhibit "8", pp. 21-23, 28-30, 35 P.S. 750.7 et seq.).

When Mr. Corneal purchased the property, it included an already existing house and a barn. (Exhibit "3", p. 24). Mr. Corneal originally intended to subdivide his property into five or six lots. (Exhibit "3", p. 41). Mr. Simpson testified that initially Mr. Corneal expressed the desire to lay out approximately nine lots, but the initial subdivision plan was revised on or about April 7, 2000 and included only two proposed lots. Mr. Wilson testified, the Supervisors were unsure

as to what Mr. Corneal's plans were at any given time because he had "several stories." (Exhibit "2", pp. 127-128).

While the initial proposed sewage modules were approved by Mr. Parks, the Supervisors did not sign the proposed sewage modules, as Mr. Corneal requested, at their April 3, 2000 meeting. The Supervisors did not sign them [the sewage modules] because they did not have the subdivision plan or anything. (Exhibit "2", p. 121). Wilson testified that the Supervisors, "... were not signing five sewer modules for one house." (Exhibit "2", p. 127). While Mr. Corneal apparently also requested a permit for a privy and a building permit on April 3, 2000, the Supervisors advised Mr. Corneal that they were not issuing any building permits for a property they believed was going to be subdivided. (Exhibit "11"). As noted, the Supreme Court did not hold otherwise until almost one year after the instant moratorium was lifted. See Naylor v. Township of Hellam, 773 A.2d at 770 (June 20, 2001). As the record evidence demonstrates, the Supervisors' refusal to sign the proposed sewage modules at this juncture is neither arbitrary nor capricious and, in fact, had a rational factual basis.

The Township's purported refusal to issue a privy permit and/or to issue a building permit is not motivated by any improper purpose or ill will. With regard

to the privy permit, Mr. Parks testified that Mr. Corneal could not use a privy on his property at that time because the Corneals had piped water on the property and also, water under pressure, presumably due to the existing farmhouse. (Exhibit "8", pp. 64-66). Mr. Parks determined that under DEP regulations, this precluded use of a privy. (Exhibit "8", pp. 64-65). Certainly, this denial has a rational factual basis. Still, Mr. Park's own testimony demonstrates that there was no ill will towards Mr. Corneal nor was there any improper motive to thwart his land development. Mr. Parks testified that he may have told Mr. Corneal that Parks would try to think of a way in which Corneal could use a privy under the regulations. (Exhibit "8", pp. 66-67). Also, Mr. Parks testified that neither the Supervisors nor Ann Wirth ever instructed him not to assist the Corneals in developing their property. (Exhibit "8", p. 159).

With regard to the building permit, Mr. Corneal approached David Van Dommelen, the Building Permit Officer and requested a permit. Mr. Van Dommelen testified that he inquired of Mr. Corneal what he was building and Mr. Corneal reportedly said "a garage and a house." (Exhibit "14", pp. 46-47). At that time, Mr. Corneal's plans apparently included an apartment and/or art studio, above a garage. In any case, when Mr. Corneal came to Mr. Van Dommelen's home, the

17

only drawings Mr. Corneal had with him were for a four stall garage, with a second story for a studio. (Exhibit "14", p. 66). Mr. Van Dommelen believed that the art studio required septic use. (Exhibit "14", pp. 66-67). While Mr. Van Dommelen testified that previously the Supervisors instructed him not to give Mr. Corneal a building permit because Mr. Corneal had not done the "proper steps for subdividing and he also had not gotten the correct permission for septic systems," Mr. Van Dommelen did call Supervisor Wilson while Mr. Corneal was at his home. (Exhibit "14", pp. 47-49). Again, however, Mr. Van Dommelen reportedly was advised not to issue a building permit since Mr. Corneal had not subdivided properly and he had not obtained the correct septic tank approval. Notably, as Mr. Van Dommelen testified, even if Mr. Corneal wanted to build one structure on one piece of property, such would constitute a subdivision because of the existing farmhouse structure. (Exhibit "14", p. 49). While Mr. Corneal forwarded a letter to Mr. Van Dommelen, dated May 5, 2000, which purportedly requested a permit only for a garage which presumably would not include septic use, Mr. Van Dommelen testified that essentially, "... it was difficult to keep track of when he [Mr. Corneal] was saying what."

The undisputed testimony that the Supervisors, as well as the various

18

Township Enforcement Officers, believed that the second lot would require septic use and, as such, required both that approval as well as appropriate subdivision approval. In fact, Mr. Corneal ultimately did construct an apartment on top of the garage, without the requisite permits and/or approval. (Exhibits "22" and "23"). On this basis, the Supervisors' and/or the Officers' decisions with regard to Mr. Corneal's requests were not without a rational factual basis.

While Mr. Van Dommelen admitted that he referred to Mr. Corneal as a "trouble making yuppie from over the mountain", he testified that this was based on the fact that Mr. Van Dommelen believed that Mr. Corneal, "... behaves like someone who wants to get their own way in his age group." Mr. Van Dommelen stated, "... we would assist him [Mr. Corneal] if he did the proper things." Mr. Van Dommelen testified that he would have issued a permit given the proper documentation for a subdivision and sewage. (Exhibit "14", p. 119). Finally, with regard to the subsequent alleged failure to sign Mr. Corneal's second proposed sewage modules, as Mr. Parks testified, the original sites were no longer adequate. (Exhibit "8", p. 72). Due to the installation of the driveway on Mr. Corneal's property, the soil compacted and disturbed the proposed sewage modules; Mr. Corneal's soil scientist similarly agreed that the previous sites were no longer good.

19

(Exhibit "8", p. 72).

In sum, the record evidence fails to demonstrate that Defendants' actions were improperly motivated by bias or bad faith such that Plaintiffs can demonstrate a claim for a substantive due process violation. Again, Mr. Corneal sought approval for his initial subdivision plan in February 2000, during a moratorium, which the Supervisors believed was lawfully imposed. While Mr. Corneal's plans changed from time to time, all of his plans presumably required some sort of sewage and, as such, required a lawful subdivision, which, again, at the time was precluded by the moratorium. Defendants' actions were not taken in bad faith or specifically directed at Mr. Corneal. The first proposed sewage modules were not signed at the April meeting because, at that time, as Supervisor Wilson stated, they did not have Mr. Corneal's revised plans. Ultimately, the revised plans included designs for a garage with an apartment and/or art studio. Again, based on the Supervisors' understanding, this structure required sewage and, as such, constituted a subdivision of the property. (Exhibit "5", pp. 82, 85). Ultimately, in fact, Mr. Corneal did construct a garage with an apartment on top of it.

The Supervisors and Municipal Ordinance Officers did not act arbitrarily, but rather their actions were always rationally based on legitimate governmental

concerns.   Therefore, the undisputed material facts of record demonstrate that

Defendants' actions were not taken in bad faith, and, as such, Defendants' Motion

for Summary Judgment must be granted.

### C.   INDIVIDUAL DEFENDANTS ARE ENTITLED TO ABSOLUTE AND QUALIFIED IMMUNITY

The Supreme Court held, in Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982),

that "government officials performing discretionary functions generally are shielded

from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known."  In Anderson v. Creighton, 483 U.S. 635, 640 (1987), the Court

explained that to defeat immunity it is not sufficient that the right at issue be clearly

established as a general matter.  The question is whether a reasonable official could

have believed his conduct was lawful in light of clearly established law and the

information the official possessed.  483 U.S. at 641.  The Court of Appeals for the

Third Circuit interpreted the Anderson standard in Brown v. Grabowski, 922 F.2d

1097, 1111 (3d Cir. 1990), cert. denied 501 U.S. 1218 (1991), to require the Court

to examine the specific conduct of each Defendant claiming qualified immunity.

Essentially, qualified immunity protects all but the plainly incompetent or those who

knowingly violate the law.  Malley v. Briggs, 475 U.S. 335, 341 (1986).  Qualified

immunity is a question of law, which should be determined at the earliest stages of litigation.  Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996).  "The entitlement is an immunity from suit rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1995).

There is absolutely no evidence of record that the individual Defendants, including the members of the Board of Supervisors, the Township Building Permit Officer, Sewage Enforcement Officer and the Township Secretary acted in anyway other than reasonably in this matter.  The information possessed by these individuals would lead a reasonable person to believe that their conduct was lawful.  Again, at the time, the Township Board of Supervisors had enacted a moratorium on new development. Moratoria were permissible under the Municipality Planning Code. See Naylor v. Township of Hellam, 717 A.2d 629 (Pa. Cmwlth. 1998).  Indeed, the Supreme Court did not reverse the Commonwealth's decision in Naylor, supra, until June 2001, which was almost one year after the Jackson Township moratorium was lifted with the adoption of the SALDO.  See Naylor v. Hellam, 565 Pa. 397, 773 A.2d 770 (2001). Defendants did not violate a known right of Plaintiffs' knowingly or improperly.  There is absolutely no record evidence that other developers and/or

22

individual property owners were given subdivision approval or allowed to begin development of subdivided property. All of the Supervisors' actions stem from their reasonable belief that the moratorium in effect was lawful.  As the April 3, 2000 Minutes of the Jackson Township Board of Supervisors indicate, the Supervisors advised Mr. Corneal that they were not issuing any building permits for a property that they believed was going to be subdivided. (Exhibit "11").

With regard to the Sewage Enforcement Officer, Defendant, Barry Parks, the record evidence demonstrates only that he acted reasonably.  Mr. Parks testified that he signed the initial percolation test.  Eventually, Mr. Parks received the proposed sewage modules from Mr. Simpson and after reviewing them, signed the same. (Exhibit "8", p. 57).  Although Mr. Parks denied Mr. Corneal's request for a privy permit, he testified that he did so because under DEP regulations, a use of a privy was precluded.  (Exhibit "8", pp. 64-66).  While some of the proposed sewage modules at some point were no longer valid due to soil disturbance in or around the driveway, which Mr. Corneal installed on his property, even Plaintiffs' own soil scientist agreed that they were no longer appropriate at that time.  Based on the foregoing, the record evidence demonstrates only that Mr. Parks acted in a reasonable and lawful manner in this matter entitling him to qualified immunity.

23

Mr. Van Dommelen's testimony indicates, Mr. Corneal was without proper documentation for a building permit. (Exhibit "14", pp. 17, 45, 55). From Mr. Van Dommelen's perspective, "... it was difficult to keep track of when [Mr. Corneal] was saying what." (Exhibit "14", p. 113). Also, Mr. Van Dommelen believed that Mr. Corneal's most recent plans included a garage with an apartment and/or studio, which he believed required septic use. As such, under the Sewage Facilities Act, subdivision approval would be required. 35 P.S. 750.1 et seq. Mr. Van Dommelen denied that he advised Mr. Corneal that had it been any other property owner, Mr. Van Dommelen would have issued the requested permit. (Exhibit "14", p. 119). Rather, Mr. Van Dommelen testified that he would have issued a permit given the proper documentation for a subdivision and sewage. (Exhibit "14", p. 119). Essentially, as Mr. Van Dommelen stated, "... we would assist him [Mr. Corneal] if he did the proper things." (Exhibit "14", p. 114). At the time, based on the moratorium, and the facts known to Mr. Van Dommelen, the evidence demonstrates that he acted reasonably and is entitled to qualified immunity.

Based on the foregoing and particularly in light of the fact that each of the individual Defendants believed that the building moratorium was lawful, there is no record evidence from which a jury could conclude that the reasonable officials in the

Supervisors', Secretary's, Mr. Park's and Mr. Van Dommelen's position at the relevant time could have believed that their conduct was unlawful. See Good v. Dauphin County Social Services, 891 F.2d 1087, 1092 (3d Cir. 1989). Accordingly, based on the reasonable behavior under the circumstances, Defendants are entitled to qualified immunity, and must be dismissed from this action with prejudice.

With respect to the enactment of the moratorium, the Supervisors are entitled to absolute immunity. Aitchison v. Raffiani, 708 F.2d 96, 98-100 (3d Cir. 1983). Clearly, the Supervisors were performing legislative functions in enacting the moratorium. Therefore, any claims based upon the enactment must necessarily fail.

## D.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW CLAIMS

Because the federal claims against the Defendants must be dismissed, the decision to entertain or dismiss the supplemental state law claims is within this Honorable Court's discretion. 28 U.S.C. §1367(c)(3). Courts should ordinarily decline to exercise supplemental jurisdiction over state claims when the federal claims are dismissed. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); Bibby v. Phila. Coca Cola Bottling Co., 85 F. Supp. 2d 509, 519 (E.D. Pa. 2000). This Honorable Court should exercise its discretion to dismiss Plaintiffs'

state law claims.

Alternatively, should this Court consider Plaintiffs' state law claims, they are not viable. With regard to Plaintiffs' state law civil conspiracy claim, the Complaint must allege the following:

(1) Combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose;

(2) Overt act done in pursuance of common purpose;

(3) Actual legal damage.

McKeeman v. CoreStates Bank, 751 A.2d 655, 659 (Pa. Super. 2000). Additionally, "... absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." McKeeman, 751 A.2d at 659, citing Pellagatti v. Cohen, 536 A.2d 1337, 1342 (Pa. Super. 1987). Proof of malice or an intent to injure is essential to the proof of a conspiracy. Skipworth by Williams v. Lead Industries Assoc., 547 Pa. 224, 690 A.2d 169, 174 (1997).

Initially, as outlined in Argument B above, Defendants' actions do not constitute an unlawful act. As alleged, they acted in accordance with a brief Township moratorium on new development, which they believe was lawfully imposed. Indeed, at the time, the Commonwealth Court had held that a Township was authorized, under the Municipalities Planning Code, to enact a moratorium

26

ordinance and such an ordinance was a valid and reasonable exercise of municipal power.  See Naylor v. Township of Hellam, 717 A.2d 629, 633 (Pa. Cmwlth. 1998).  The Supreme Court did not reverse the Commonwealth Court's decision until June 20, 2001, almost one year after the instant moratorium was lifted by adoption of the Jackson Township Subdivision and Land Development Ordinance. Notably, Plaintiffs did not challenge the constitutionality of this specific moratorium in a separate count.  Absent a civil cause of action, there can be no conspiracy based on the same.  As argued above, Plaintiffs substantive due process rights were not violated in this case, and any conspiracy based on the same fails.  Finally, the record evidence fails to demonstrate that any of the Defendants acted maliciously in this matter.  Accordingly, Defendants' Motion for Summary Judgment on Count II of Plaintiffs' Complaint must be granted.

Count III of Plaintiffs' Complaint purportedly alleges a state law claim for intentional interference with performance of a contract.  Although this was initially alleged against all Defendants, this Honorable Court granted Defendants' Motion to Dismiss with regard to the Township as barred by the Governmental Immunity Act, 42 Pa. C.S. §8541 et seq. Although the general grant of immunity applies to all local agencies for damages caused by acts of the agency or its employees, the Act

provides that negligent acts, "… shall not include acts or conduct which constitute a crime, actual fraud, actual malice or willful misconduct." 42 Pa. C.S. §8541 et seq.; Kearney v. City of Phila., 150 Pa. Cmwlth. 517, 616 A.2d 72 (1992). While the tort of intentional interference with performance of a contract involves obviously intentional conduct, the record evidence as outlined above fails to demonstrate that any of the individuals' conduct constitutes actual fraud, actual malice or willful misconduct such that they are not protected by the general blanket of immunity. On this basis, Defendants' Motion for Summary Judgment must be granted.

Alternatively, assuming arguendo that somehow Plaintiffs can overcome the general blanket of immunity of the Township employees, the record evidence fails to demonstrate evidence of intentional interference with performance of a contract. In order to state a claim for intentional interference of contractual relations, Plaintiffs must demonstrate the following:

(1)  the existence of a contractual relationship;
(2)  an intent on the part of Defendants to harm the Plaintiffs by interfering with that contractual relationship;
(3)  the absence of a privilege or justification for such interference; and
(4)  damages resulting from the Defendants' conduct.

Triffin v. Janssen, 426 Pa. Super. 57, 626 A.2d 571, 573 (1993). In Pennsylvania,

28

courts require Plaintiff as part of his *prima facie* case, to show that the Defendants' conduct was not justified. <u>Triffin</u>, 626 A.2d at 573, note 3.

In their Complaint, Plaintiffs allege that Defendants, "… continued to take the position that a moratorium was in effect in the Township … and … that no development would be permitted in the Township until such unspecified time that the moratorium was lifted." (Exhibit "1", ¶¶126-127). This belies any claim that Plaintiffs may have with regard to selective enforcement or allegations of specific intent to injure Plaintiffs. Rather, it demonstrates that Defendants all engaged in the proper enforcement of the moratorium and did not make special exceptions with regard to it. The record evidence does not demonstrate an intent on the part of Defendants to harm the Plaintiffs by interfering with their contractual relationship with the Hewitts. As such, the record evidence fails to support a claim for intentional interference with contractual relations. Accordingly, Defendants' Motion for Summary Judgment on this Count must be granted.

In Count IV of Plaintiffs' Amended Complaint, they purportedly allege state constitutional claims. However, the Commonwealth Constitution does not grant a cause of action for alleged violations of its provisions and there is no state court analog to 42 U.S.C. §1983 under which Plaintiffs may proceed; therefore,

Defendants' Motion for Summary Judgment on the state constitutional claims must be granted.

## V.    <u>CONCLUSION</u>

For all the foregoing reasons, Defendants, Jackson Township, W. Thomas Wilson, Michael Yoder, Ralph Weiler, Barry Parks, David Van Dommelen and Ann I. Wirth respectfully request that this Honorable Court grant their Motion for Summary Judgment and dismiss this action with prejudice.

Respectfully submitted,

**MAYERS, MENNIES & SHERR, LLP**

BY: _____
ANTHONY R. SHERR, ESQUIRE
Attorney for Defendants

3031 Walton Road, Building A
Suite 330, P.O. Box 1547
Blue Bell, PA 19422-0440
(610) 835-0300
Fax (610) 825-6555

## CERTIFICATE OF SERVICE

I, Cheryl Zeigler, hereby certify that on the 6th day of June, 2002, a true and correct copy of Defendants, Jackson Township, W. Thomas Wilson, Michael Yoder, Ralph Weiler, Barry Parks, David Van Dommelen and Ann I. Wirth's Memorandum of Law in Support of their Motion for Summary Judgment was served by first class regular mail, postage prepaid upon the following:

Bridget E. Montgomery, Esquire
Adam Sheinvold, Esquire
Eckert, Seamans Cherin & Mellott
213 Market Street, 8th Floor
Harrisburg, PA 17101

Michele J. Thorp, Esquire
**Thomas, Thomas & Hafer, LLP**
305 North Front Street, 6th Floor
P.O. Box 999
Harrisburg, PA 17108

BY: _Cheryl Zeigler_
Cheryl Zeigler
Legal Assistant to Anthony R. Sherr