ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID B. CORNEAL AND SANDRA Y. CORNEAL | : | CASE NO. 1:00-CV-1192 |
| vs. | : | |
| JACKSON TOWNSHIP, Huntingdon County, Pennsylvania, W. THOMAS WILSON, Individually and in his Official Capacity as Supervisor of Jackson Township, MICHAEL YODER, Individually and in his Official Capacity as Supervisor of Jackson Township, RALPH WEILER, Individually and in his Official Capacity as Supervisor of Jackson Township, BARRY PARKS, Individually and in His Official Capacity as Sewage Enforcement Officer of Jackson Township, DAVID VAN DOMMELEN, Individually and in his Official Capacity as Building Permit Officer, ANN I. WIRTH, Individually and in her Official Capacity as Secretary of Jackson Township, and | : | JURY TRIAL DEMANDED |

FILED
HARRISBURG, PA
JUN 0 7 2002
MARY E. D'ANDREA, CLERK
Per Deputy Clerk

DEFENDANTS' JACKSON TOWNSHIP, W. THOMAS WILSON, MICHAEL YODER, RALPH WEILER, BARRY PARKS, DAVID VAN DOMMELEN AND ANN I. WIRTH'S APPENDIX I OF EXHIBITS 1 THROUGH 5 IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

DEFENDANT'S EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HARRISBURG
NOV 06 2001
MARY E. D'ANDREA, CLERK
Per ______ DEPUTY CLERK

NOV 08 2001

DAVID B. CORNEAL and SANDRA Y. CORNEAL, Plaintiffs

v.

JACKSON TOWNSHIP, Huntingdon County, Pennsylvania, *et al.* Defendants

Civil Action No. 1: CV-00-1192

(Rambo, J.)

## AMENDED COMPLAINT

The Plaintiffs, David B. Corneal and Sandra Y. Corneal (collectively, the "Corneals"), by and through their attorneys, Eckert Seamans Cherin & Mellott, LLC, file this Amended Complaint, pursuant to this Court's Order of October 18, 2001. In that Order, the Court granted leave for the Corneals to amend their original pleading to remove the state law constitutional claims from where they had been mistakenly placed, under the heading of Count I, entitled "VIOLATION OF 42 U.S.C. §1983," and to place them properly under a separate pendant state count. The parties, however, all understand that the Court, by its March 29, 2001 Memorandum and Order and subsequent Orders with respect to the Corneals' requests for reconsideration, dismissed, as to the Township only, the state law claim for intentional interference with performance of contract, and further has dismissed Defendant Larry Newton from the action altogether, denied the Corneals' motion for reconsideration as to Newton and will not allow amendment as to Newton.

As the Court's Order and proper pleading practice seems to require, this Amended Complaint changes the text of the original complaint only as necessary to accomplish the amendment permitted by the Court, i.e., that the state constitutional claims have been removed from Count I and placed under a new and separate count labeled Count IV. The amended complaint does not add additional facts uncovered in discovery, or correct typographical errors, as the Court had already held that the Corneals had sufficiently stated the claims remaining after the Court's ruling on the motions to dismiss. With this background, and without waiving their right to appeal the dismissal of Defendant Newton from this case, the Corneals amend their complaint and aver as follows:

# I.

# INTRODUCTION

This is a §1983 Civil Rights Action, as well as an action asserting other pendent state supplemental claims, brought by the Corneals against Jackson Township and various elected and appointed officials to redress the violation of the Corneals' Constitutional rights. The Defendants have engaged in a constant and concerted course of conduct to deprive the Corneals of their right to develop, build upon and sell a parcel of real estate owned by the Corneals and located in Jackson Township.

The Defendants, acting in concert and under color of state law, have engaged in, and pursued their unlawful objective by: (1) imposing a "moratorium" on the development of land in Jackson Township where neither the County of Huntingdon, Pennsylvania (the "County") nor Jackson Township, Huntingdon County, Pennsylvania (the "Township") have an ordinance regulating the subdivision of land; (2) prohibiting the Corneals from developing, selling, and

building upon their Property (defined herein); (3) refusing to execute sewage modules which must be submitted to the Commonwealth of Pennsylvania, Department of Environmental Protection ("DEP"), which refusal is premised upon the Defendants' unlawful attempt to preclude the development and sale of the Property; (4) using and abusing their office to halt the development and sale of the Property by the Corneals; (5) denying the Corneals access to applications to apply for, and the issuance of, certain permits to which the Corneals are so entitled; (6) abusing their office and taking affirmative steps to wrongfully interfere with a contract for the sale of land by and between the Corneals and third parties; and (7) subjecting the Corneals and their Property to requirements which the Defendants have not adopted or enacted, and premising the denial of needed permits based on such requirements.

## II.

## THE PARTIES

1. David B. Corneal is an adult individual who resides at 505 East Fairmount Avenue, State College, PA 16801.

2. Sandra Y. Corneal is an adult individual, and the wife of David B. Corneal, who resides at 505 East Fairmount Avenue, State College, PA 16801.

3. Defendant Jackson Township (the "Township") is a second class township organized and existing under the laws of the Commonwealth of Pennsylvania with a principle place of business at R. D. 1, Box 390, Petersburg, PA 16669, and operates through a Board of Supervisors.

4. Defendant W. Thomas Wilson is an adult individual and is a member of the Board of Supervisors of the Township. Defendant Wilson resides at R. D. 1, Box 730, Petersburg, Pennsylvania.

5. Defendant Michael Yoder is an adult individual and is a member of the Board of Supervisors of the Township. Defendant Yoder resides at R. D. 2, Box 134, Huntingdon, Pennsylvania.

6. Defendant Ralph Weiler is an adult individual and is a member of the Board of Supervisors of the Township. Defendant Weiler resides at R. D. 1, Box 651, Petersburg, Pennsylvania.

7. Defendant Ann L. Wirth is an adult individual and is the Secretary of the Township. Defendant Wirth resides at R. D. 1, Box 390, Petersburg, Pennsylvania.

8. Defendant David Van Dommelen is an adult individual and is the Building Permit Officer of the Township. Defendant Dommelen resides at R. D. 1, Box 631, Petersburg, Pennsylvania.

9. Defendant Barry Parks is an adult individual and is the Sewage Enforcement Officer of the Township. Defendant Parks resides in Huntingdon, Pennsylvania.

10. Defendant Larry Newton, Esquire, is an adult individual and is Solicitor to the Township. Defendant Newton's last known address is 504 Penn Street, Huntingdon, Pennsylvania.

11. At all times relevant hereto, all Defendants acted under color of state law as defined in 42 U.S.C. §1983, knowing that their actions were clearly in violation of the Corneals' established Constitutional rights.

12. All Defendants are sued in their official capacity and in their individual capacities.

III.

JURISDICTION AND VENUE

13. This Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1343, in that the Corneals' cause of action involves a federal question and/or involves a violation of civil rights arising under the Constitution and laws of the United States, and pursuant to the doctrine of supplemental jurisdiction under 28 U.S.C. §1367.

14. Venue in the United States District Court for the Middle District of Pennsylvania is proper under Title 28, U.S.C. §1343.

IV.

BACKGROUND

15. The Corneals are the owners of an approximately ninety-five (95) acre tract of land situate in Jackson Township, Huntingdon County, Pennsylvania (the "Property"). The Property was acquired by the Corneals in October, 1998.

16. The Corneals desired to subdivide and sell a portion of the Property. Believing that subdivision approval by the County was required, in the fall of 1999, the Corneals hired a surveyor to perform a survey of the Property and to prepare a subdivision plan.

17. The Corneals subsequently contacted Defendant Parks, the Township's Sewage Enforcement Officer, to perform tests to identify those portions of the Property which were suitable for an on-lot septic system. Suitable sites were located by Defendant Parks.

18. The Corneals were required to pay to the Defendant Township over One Thousand Four Hundred ($1,400) Dollars for Defendant Parks' services and proper compensation was, in fact, paid by the Corneals for Defendant Parks' efforts.

19. After Defendant Parks identified the suitable sites for on-lot septic, the Corneals contacted Defendant Wilson and engaged Defendant Wilson's private business, Eagle Excavating, to do percolation tests at the Property. The percolation tests were successful and Defendant Wilson's private business, Eagle Excavating, was compensated for its services.

20. As a result of the percolation tests, a subdivision plan was prepared, at the Corneals' expense. The subdivision plan depicted the division of the Property into four (4) separate lots (the "Initial Plan").

21. In August-September, 1999, the Corneals commenced the marketing of one of the lots, a twenty-five (25) acre tract of land, upon which a house and barn were situate.

22. On October 7, 1999, the Corneals entered into a contract with John Hewett, Jr., and Joann Smith, pursuant to which Hewett and Smith agreed to purchase said twenty-five (25) acre lot for One Hundred Fifty Thousand ($150,000) Dollars (the "Contract"). A true and correct copy of the Contract is attached hereto as Exhibit "A." Pursuant to the terms of the Contract, Hewett and Smith placed a down payment of Four Thousand ($4,000) Dollars and agreed to pay Five Hundred ($500) Dollars per month against the purchase price until the date of settlement. Settlement was to be on June 30, 2000.

23. As referenced above, the Corneals believed that they were required to obtain subdivision approval for the division of the Property from the County. Although the Defendant Township had not enacted a subdivision and land development ordinance pursuant

to the provisions of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, as re-enacted and amended, 53 P.S. §10101 et seq. (the "MPC"), to govern the subdivision and development of land within the Township, the Corneals were advised by Defendant Wilson that, insofar as the Township was "required" to sign the plan, "good politics" suggested that the Initial Plan should be presented to the Board of Supervisors for review.

24. Indeed, these comments were made by Defendant Wilson at the time that Defendant Wilson's company was doing work for, and collecting money from, the Corneals. At no point did Defendant Wilson inform the Corneals that neither the County nor the Township had a subdivision and land development ordinance; rather, at all times, Defendant Wilson indicated that submission of subdivision plans, and approval by the County, with the "blessing" of the Township, was required.

25. The Corneals presented the Initial Plan to the Defendant Township on February 7, 2000. At the time of plan submission to the Defendant Township, the Corneals were not advised that subdivision approval was <u>not</u> required.

26. Instead, the Corneals were advised that the Township passed a "resolution" at their January, 2000, meeting through which a moratorium on new development was imposed by the Township, pending the Township's enactment of a subdivision and land development ordinance. The Corneals were advised that they were prohibited from subdividing the Property.

27. Despite the fact that the Defendant Township did not have a subdivision and land development ordinance, and that there was nothing upon which a moratorium could be

placed, Defendant Township, Defendant Wilson, Defendant Yoder and Defendant Weiler refused to review the Initial Plan.

28. Despite the fact that the Township had not enacted an ordinance pursuant to the MPC to regulate the development of land within the Township, the Defendants have taken action to prohibit the development of the Property.

29. In addition to the foregoing, the purported moratorium was not adopted pursuant to a proper resolution. Rather, Township minutes reflect that Defendants Wilson, Yoder and Weiler merely made a statement indicating that "no more sub-divisions will be approved until after the proposed Sub-Division ordinance for the Township has been approved." The "moratorium" effectively was imposed for an indefinite period of time. A true and correct copy of said minutes are attached hereto as Exhibit "B."

30. The purported moratorium imposed by Defendants Township, Wilson, Yoder and Weiler on the development of land within the Township is not valid, is procedurally defective, is substantively defective and is constitutionally infirm.

31. At best, the purported "moratorium" is nothing but a "policy" of the Defendant Township, which "policy" prohibits the development of land within the Township.

32. As more fully set forth herein, the application of this "policy" to the Property violates those liberty and property rights which the Corneals possess pursuant to the Constitutions of the United States and of the Commonwealth of Pennsylvania and exacts a deprivation of those fundamental rights.

33. The Board and its members, Defendants Wilson, Yoder and Weiler, are the "final policy makers" of the Township.

34. The actions of Defendants Wilson, Yoder and Weiler in adopting a policy which unreasonably and indefinitely prohibits the Corneals from developing, selling, conveying and enjoying the "bundle of rights" which accompany their ownership of the Property violates the clearly established rights of the Corneals as guaranteed by the Constitutions of the United States and of the Commonwealth of Pennsylvania.

35. Within several days of presenting the Initial Plan to the Defendant Township, the Initial Plan was presented to the County Planning Commission for review.

36. The County of Huntingdon has never enacted a subdivision and land development ordinance pursuant to the provisions of the MPC. Rather, the County has merely caused to be prepared a "Land Development Guide" which purports to govern land development within the County.

37. The Land Development Guide is not an ordinance.

38. The Land Development Guide was not prepared pursuant to the provisions of the MPC.

39. The Land Development Guide provides no legal basis for denying approval of a land development plan.

40. Although the County Planning Commission had no authority to deny approval of the Initial Plan, the County provided comments on the Initial Plan and, by way of letter dated February 24, 2000, recommended that the Township deny approval of the Initial Plan. A true and correct copy of said letter is attached hereto as Exhibit "C."

41.     The County Planning Commission recommended that the Initial Plan be "denied" even though neither the County nor the Defendant Township has a duly enacted ordinance upon which a denial could be lawfully based.

42.     The County Planning Commission's rationale for recommending denial of the Initial Plan was based, in part, on the unlawful policy to prohibit the development, subdivision and conveyance of land and was based, in part, on certain perceived inconsistencies between the Initial Plan and a proposed subdivision and land development ordinance which was being reviewed for enactment by the Township.

43.     The aforementioned bases for recommending that the Initial Plan be denied were insufficient as a matter of law.

44.     Attempting to cooperate with the County and the Defendants, the Corneals revised the Initial Plan to address the purported "concerns" expressed by the County Planning Commission.

45.     The revised plan depicted the division of the Property into two lots, consisting of a 25.80-acre parcel of land which was to be conveyed to Hewett and Smith pursuant to the Contract and a residual 68.87-acre parcel of land (approximately) upon which the Corneals intended to construct a house, an art studio and a garage (the "Revised Plan").

46.     The Revised Plan was submitted to the County Planning Commission for review.

47.     By way of letter dated April 20, 2000, the County Planning Commission "recommended" "conditional approval of this proposal pending adoption of the subdivision and land development ordinance" by the Township.  A true and correct copy of said letter is

attached hereto as Exhibit "D." The letter notes that the Revised Plan appears to be in compliance with the regulations of the draft ordinance.

48. Despite the "recommendation" of the County Planning Commission, Defendants Township, Wilson, Yoder and Weiler refused even to review the Revised Plan, continued to deceive the Corneals with the belief that subdivision approval was required, and advised that the "moratorium" precluded the Corneals from subdividing, developing and conveying the Property.

49. Subsequent to the submission of the Revised Plan to the Defendant Township, the Defendants conspired to commit, and engaged in, a concerted scheme and course of conduct to preclude the Corneals from obtaining approvals, applications and permits to which they were so entitled and which were necessary to further the development of the Property.

50. The Defendants conspired to commit and engaged in such conduct with the intent to deprive the Corneals of approvals, applications and permits to which they were entitled, to interfere with the lawful development of the Property, and to preclude the lawful development of the Property, including the conveyance of a portion of the Property to Hewett and Smith pursuant to the Contract.

51. To illustrate, at the March, 2000, meeting, Defendants Wilson, Yoder and Weiler refused to approve and sign certain sewage modules which were required by DEP and for which Defendant Parks, the Township's own SEO, had approved. The aforementioned Defendants refused to approve and sign the modules even though the modules were in compliance with law.

52. Defendants Wilson, Yoder and Weiler refused to approve the modules based on the illegal "moratorium."

53. In an effort to at least begin developing a portion of the sixty-nine (69) acres, Plaintiff David B. Corneal presented himself to the Defendants at a Township meeting and requested a building permit for the art studio. Defendants Wilson, Yoder and Weiler refused, stating that the art studio would require sewer and that they refused to sign the sewer modules for DEP. At that time, Plaintiff David B. Corneal requested a "privy permit," which is permitted by Township ordinances, to satisfy the demands of Defendants Wilson, Yoder and Weiler that the art studio have sewer access. Plaintiff David B. Corneal was advised that the privy permit was to be issued by Defendant Parks, as SEO.

54. It is believed, and therefore averred that, realizing that an avenue existed for the Corneals to commence the development of the Property, Defendant Wirth, with the consent of Defendants Wilson, Yoder and Weiler, immediately contacted Defendant Parks and instructed Defendant Parks to refuse to issue any permit to the Corneals and to not assist the Corneals in any way.

55. Although Defendant Wirth is the Secretary of the Township and Board, Defendant Wirth functions as a "manager" and is actively involved in the day-to-day operations of the Defendant Township.

56. That same evening, Plaintiff David B. Corneal contacted Defendant Parks for the privy permit.

57. At the time that Plaintiff David B. Corneal contacted Defendant Parks for the privy permit, Defendant Parks advised Plaintiff David B. Corneal that he had been "directed"

by Defendant Wirth, who called him that evening, not to issue any permits to the Corneals and not to provide any help to the Corneals. Defendant Parks advised that he would talk to Defendant Wilson concerning the same and, thereafter, contact Plaintiff David B. Corneal. Defendant Parks, however, has never responded accordingly, despite several calls and answering machine messages from Plaintiff David B. Corneal.

58. Pursuant to applicable ordinances, the Corneals were entitled to the issuance of the privy permit.

59. Instead of complying with the law and issuing the permit to which the Corneals were entitled, Defendant Parks fostered and engaged in the conspiracy to prohibit the Corneals from lawfully developing the Property and refused to issue the permit.

60. Plaintiff David B. Corneal made efforts to contact Defendant Newton to discuss the issues associated with the development of the Corneals' Property and the issuance of the permits; no substantive response was ever provided by Defendant Newton.

61. In a continuing effort to lawfully develop the sixty-nine (69) acre portion of the Property, the Corneals commenced the construction of a one and a half (1½) mile drive through the Property to their home site. Although a private business, Eagle Construction Company, which is owned by Defendant Wilson, was initially approached to do the roadwork, another contractor was hired.

62. During the course of constructing the driveway, the Corneals' contractor was approached by the Army Corps of Engineers and DEP, the Department of Water and Conservation Enforcement, to investigate a "private complaint" that the Corneals were violating wetlands regulations. The complaint was found to be without merit.

63. It is believed, and therefore averred, that Defendant Wilson and/or Defendant Wirth filed the complaint because of personal animus toward the Corneals.

64. At the end of April, 2000, after the driveway was completed, the Corneals desired to construct a garage which was to be separate from the house and art studio.

65. Pursuant to the Township Building Ordinance, Plaintiff David B. Corneal approached Defendant Van Dommelen, the Building Permit Officer, to obtain an application for the issuance of a building permit for the garage.

66. Section 3.02A of the Building Permit Ordinance requires an individual who desires that a building permit be issued to him or her complete an application for the permit <u>on forms supplied by the Township</u>.

67. At the time that the application was requested, the Corneals had appropriate drawings to present to Defendant Van Dommelen, as well as all information necessary to fully complete the application, which information would have required Defendant Van Dommelen to issue the permit.

68. Upon learning that the person requesting the application was Plaintiff David B. Corneal, Defendant Van Dommelen refused to provide to David B. Corneal even an <u>application</u> for a building permit and indicated that he would not issue a building permit.

69. Defendant Van Dommelen advised Plaintiff David B. Corneal that he would not issue a building permit to the Corneals because he was instructed by the Township, through its governing Board, to not issue <u>any</u> permits to the Corneals. In Plaintiff David B. Corneal's presence, Defendant Van Dommelen called Defendant Wilson, who instructed Defendant Van Dommelen not to give the Corneals any permits.

70. The Corneals complied with all objective provisions of the Building Permit Ordinance for the issuance of a building permit for the garage and were entitled to the issuance of the building permit.

71. Indeed, Defendant Van Dommelen advised Plaintiff David B. Corneal that had any other property owner within the Township requested the permit, the permit would have been issued.

72. Instead of acting in accordance with his obligations under the Building Ordinance, Defendant Van Dommelen fostered and engaged in the conspiracy with Defendants Township, Wilson, Yoder, Weiler and Wirth to not issue a building permit to the Corneals and to unlawfully prevent the Corneals from lawfully developing the Property.

73. On May 1, 2000, the Corneals called Defendant Newton concerning the unlawful refusal of Defendant Van Dommelen to issue the building permit. Although Defendant Newton advised that he would "look into it" and call Plaintiff David B. Corneal back, no call was forthcoming.

74. Instead, on May 1, 2000, the Corneals received a letter from counsel for Hewett and Smith. A true and correct copy of said letter is attached hereto as Exhibit "E." Counsel for Hewett and Smith opined:

> It is my understanding that there are some difficulties with the Township in obtaining subdivision approval. It is quite obvious to me that final settlement will not be able to take place on or before June 30, 2000.
>
> My clients are not interested in any addendum to this Agreement and desire that the Agreement be terminated.

See Exhibit "E."

75. Through said letter, counsel for Hewett and Smith requested that the down payment of Four Thousand ($4,000) Dollars, in addition to monthly payments totaling Three Thousand ($3,000) Dollars, be returned.

76. It is believed, and therefore averred, that Hewett and Smith had spoken to the Defendants concerning the subdivision of the Property, during which Hewett and Smith advised the Defendants of the adverse impact of the Defendants' actions on Hewett and Smith.

77. The Corneals also told the Defendants at the February and March, 2000, meeting of the Township of the financial difficulty that they were causing Hewett and Smith by delaying the subdivision approval.

78. It is believed, and therefore averred, that the Defendants provided information to Hewett and Smith which reflected and/or suggested that a moratorium on development in the Township was in place, that the Revised Plan would not be approved and that no permits for the development of the Property, or any division of the same, would be forthcoming.

79. It is believed, and therefore averred, that Defendant Newton and counsel to Hewett and Smith are situate in the same office, use the same secretaries, use the same lobby and jointly own the building.

80. It is believed, and therefore averred, that Defendant Newton, acting alone or in concert with the other Defendants, advised counsel for Hewett and Smith that the Defendants would not grant subdivision approval for the parcel of land which Hewett and Smith were contracted to acquire.

81. It is believed, and therefore averred, that Defendant Newton, acting alone or in concert with the other Defendants, advised counsel for Hewett and Smith of the Defendants'

position that subdivision approval would not be forthcoming, even though no legal basis existed for the Defendants to impose a moratorium on the subdivision of property in the Township.

82. The concerted conduct of Defendants has interfered with the contractual relationship between the Corneals and Hewett and Smith.

83. As of the date hereof, the Defendants, acting in concert, have refused to issue a building permit for the construction of a garage to the Corneals even though the construction of the same is in compliance with applicable ordinances of the Township.

84. As of the date hereof, the Defendants, acting in concert, have refused to sign a total of five (5) sewage modules for the development of the Property, even though the modules were in accord with applicable law.

85. As of the date hereof, the Defendants, acting in concert, have refused to issue a privy permit for the Property even though the issuance of the same is mandated by applicable ordinances of the Township.

86. The Defendants, acting under color of state law and in concert, have taken affirmative action to effectuate an illegal and unconstitutional "moratorium" or "policy" on the development and use of the Property.

87. At all times, all actions of the Defendants have been condoned and, at a minimum, acquiesced in by the Township as an accepted course of conduct.

88. The Defendants, acting under color of state law, engaged in deceptive action to cause the Corneals to believe that subdivision approval was required even though the

Defendants were well aware that neither the Township nor the County had a validly existing subdivision ordinance.

89.    Even though the Defendants had no authority to regulate the subdivision and development of land in the Township by failing to enact a subdivision and land development ordinance pursuant to the MPC, the Defendants engaged in a concerted course of conduct, as set forth above, to prevent the Corneals from conveying and developing their Property, including imposing an unlawful and constitutionally infirm moratorium on the development of land within the Township and applying the same to the Property, by wrongfully refusing to approve sewage modules, and by engaging in a conspiracy to deny and, in fact, denying, certain applications and permits to which the Corneals were entitled by law.

90.    The Corneals have a constitutionally protected liberty and property interest in the Property and have a constitutionally protected right to dispose, develop and convey the same.

91.    The Defendants' actions and/or omissions as alleged herein are in violation of the Corneals' clearly established constitutional rights and they have deprived the Corneals of the "bundle of rights" which accompany their ownership of the Property and the Corneals have been financially injured by the same.

92.    The acts and/or omissions committed by the Defendants were done in an arbitrary, capricious and malicious manner.  No legitimate governmental purpose was served by their actions which were committed only to deny the Corneals of their constitutionally protected property rights and liberty interests.

93. It is believed, and therefore averred, that Defendant Wilson's conduct was motivated, in part, by a personal animus toward the Corneals insofar as the Corneals chose to use a contractor other than Defendant Wilson's contracting company to construct their one and one-half (1½) mile driveway.

**COUNT I**

**VIOLATION OF 42 U.S.C. §1983**

94. Paragraphs one (1) through ninety-three (93) are incorporated herein by reference as if set forth in full.

95. The Defendants, at all times material hereto, have acted and continue to act under color of state law.

96. The Corneals enjoy a constitutionally protected right in proceeding with the lawful use of their Property, as well as in proceeding with the development and sale of the same.

97. As a result of the Defendants' conduct, the Defendants, acting under the color of state law, have deprived the Corneals of their clearly established constitutional right and privilege to own, use, dispose and develop the Property, which rights are protected by the Constitution of the United States of America.

98. As a result of the conduct set forth herein, the Defendants, acting under the color of state law, have deprived the Corneals of their procedural and substantive due process rights guaranteed by the Constitution of the United States of America: (1) through the flagrant abuse of office; (2) by enforcing ordinances in an arbitrary and selective manner; (3) by refusing to issue permits to the Corneals where the Corneals are in compliance with all

provisions of all applicable ordinances; (4) by taking action through the abuse of their office to impede the development of the Property where the Defendants have not enacted a subdivision and land development ordinance to regulate the same; (5) by interfering with the contractual relationship between the Corneals and Hewett and Smith, which Contract involved significant property interest; (6) by abusing their office and engaging in conduct so as to deceive the Corneals into believing that subdivision approval was required; and (7) by depriving the Corneals of an avenue to appeal their unlawful action by refusing to even review the Initial Plan or to even provide necessary applications for permits.

99.     In violation of the Corneals' rights and entitlement under the due process clause of the United States Constitution, the Defendants, acting individually and in concert, deliberately, arbitrarily, capriciously, by abuse of governmental powers and in bad faith, which was premised, in part, on personal animus toward the Corneals, have deprived, and continue to deprive, for illegitimate, non-governmental and arbitrary reasons, the Corneals of their protected interest in proceeding with the use and development of their Property.

100.    The actions and conduct of the Defendants, as set forth herein, violate the Corneals' due process rights as guaranteed by the United States Constitution.

101.    The Defendants' violation of the Corneals' constitutional rights is continuing.

102.    The Corneals believe, and therefore aver, that the conduct of the Defendants, by reason of the Defendants' intentional, willful and flagrant violation of 42 U.S.C. §1983, will continue in the future.

103.    No adequate remedy at law exists to redress these violations of the Corneals' constitutional rights.

104. The Defendants' actions herein were intentional, flagrant and malicious so as to warrant the imposition of punitive damages against the Defendants in their individual capacities.

WHEREFORE, the Plaintiffs, David B. Corneal and Sandra Y. Corneal, respectfully request that this Court:

(a) Enter judgment in their favor and against each Defendant, individually, jointly and severally, holding and declaring that the Defendants violated the Corneals' federal due process constitutional rights while, at all times, acting under color of state law;

(b) Enter an order directing the Defendants, in their official capacity, to cause to be issued any and all permits so that the Property may be developed and conveyed;

(c) Enter an order declaring that the purported moratorium is invalid and constitutionally infirm;

(d) Enter an order restraining the Defendants from impeding and interfering with the development and sale of the Property;

(e) Enter an order awarding compensatory damages against the Defendants which were suffered, and are being suffered, as a result of the Defendants' illegal conduct;

(f) Enter an award of punitive damages against the Defendants, in their individual capacities, for the intentional, flagrant and malicious conduct;

(g) Enter an order directing the Defendants to pay the Corneals' costs, including reasonable attorney's fees; and

(h) Such further relief as this Court deems just and proper.

**COUNT II**

**STATE LAW CIVIL CONSPIRACY**

105. Paragraphs one (1) through one hundred four (104) hereof are incorporated herein by reference as if set forth in full.

106. Defendant Parks was contacted by other Defendants and was instructed not to issue to the Corneals a privy permit and not to assist the Corneals in any way.

107. Defendant Parks agreed with the Defendant(s) who contacted him to instruct him not to issue a privy permit and complied with their request.

108. Defendant Van Dommelen was contacted by other Defendants and was instructed not to issue to the Corneals a building permit.

109. Defendant Van Dommelen agreed with the Defendant(s) who contacted him to instruct him not to issue a building permit and complied with their request.

110. The Defendants entered into agreements to deprive the Corneals of the aforementioned permits.

111. The Defendants entered into agreements to deprive the Corneals of the aforementioned permits even though the Corneals were entitled to such permits under applicable ordinances.

112. The Defendants entered into such agreements with the intent of depriving the Corneals of their constitutional right to use and to develop their Property.

113. The Defendants entered into such agreement with full knowledge that the Corneals' constitutional rights would be infringed.

114.   The Defendants entered into an agreement to preclude development within the Township by imposing a "moratorium."

115.   The moratorium imposed by the Township was invalid and constitutionally infirm.

116.   The Defendants entered into an agreement to prohibit and impede development in the Township and, specifically, to prohibit the development of the Corneals' Property, by premising such on the constitutionally infirm moratorium.

117.   The Defendants were well aware that prohibiting development of the Property violated the Corneals' constitutional right.

118.   The Defendants' conduct herein was arbitrary, malicious, capricious, unlawful and/or carried out in an unlawful manner.

WHEREFORE, the Plaintiffs, David B. Corneal and Sandra Y. Corneal, respectfully request that this Court:

(a)   Enter judgment in their favor and against each Defendant, individually, jointly and severally, holding and declaring that the Defendants violated the Corneals' common law and constitutional rights while, at all times, acting under color of state law;

(b)   Enter an order declaring that the purported moratorium is invalid and constitutionally infirm;

(c)   Enter an order awarding compensatory damages against the Defendants which were suffered, and are being suffered, as a result of the Defendants' illegal conduct;

(d)   Enter an order directing the Defendants to pay the Corneals' costs, including reasonable attorney's fees to the extent permitted by law; and

(e) Such further relief as this Court deems just and proper.

COUNT III

STATE LAW INTENTIONAL INTERFERENCE WITH PERFORMANCE OF CONTRACT

119. Paragraphs one (1) through one hundred eighteen (118) hereof are incorporated herein by reference.

120. The Corneals were to receive from Hewett and Smith One Hundred Fifty Thousand ($150,000) Dollars for the purchase by Hewett and Smith of the 25.8-acre portion of the Property subject to the Contract.

121. The Corneals intended to use the One Hundred Fifty Thousand ($150,000) Dollars received from Hewett and Smith through the Contract to construct a home, art studio, garage and other amenities at the remaining portion of the Property.

122. The availability of the One Hundred Fifty Thousand ($150,000) Dollars from the Contract would permit the Corneals to engage in a cash transaction for the construction at the Property, as opposed to financing such construction, with the concomitant payment of interest, fees and costs.

123. The Defendants were aware of the existence of the Contract between the Corneals and Hewett and Smith.

124. The Defendants were aware that the Corneals believed (albeit erroneously) that subdivision approval was required to satisfy the terms of the Contract.

125. It is believed, and therefore averred, that Hewett and Smith presented themselves to the Defendants to advise of the significant adverse impact that the Defendants' actions had upon Hewett and Smith.

126. Despite the fact the Defendants were aware of the existence of the Contract, the Defendants continued to take the position that a moratorium was in effect in the Township.

127. Despite the fact the Defendants were aware of the existence of the Contract, the Defendants advised the Corneals and Hewett and Smith that no development would be permitted in the Township until such unspecified time that the moratorium was lifted.

128. It is believed, and therefore averred, that the actions and conduct of the Defendants were intentional and willful.

129. It is believed, and therefore averred, that Defendant Newton advised counsel for Hewett and Smith that subdivision approval of the Property would not be forthcoming and that there would be problems with the conveyance of a portion of the Property to Hewett and Smith.

130. It is believed, and therefore averred, that the actions and comments of the Defendants caused Hewett and Smith to send the letter dated May 1, 2000, through counsel, advising the Corneals that they would not perform the Contract.

131. It is believed, and therefore averred, that the actions of the Defendants were intentional and interfered with the performance of the Contract.

132. As a result of the Defendants' intentional and willful interference with the Corneals' contractual relationship with Hewett and Smith, Hewett and Smith have refused to perform the Contract and the Corneals will not only lose the One Hundred Fifty Thousand ($150,000) Dollars owed thereunder, but will also be forced to finance the construction of a home, art studio, garage and other amenities which are proposed to be constructed at the Property.

COUNT IV

STATE CONSTITUTIONAL CLAIMS

133. Paragraphs one (1) through ninety-three (132) are incorporated herein by reference as if set forth in full.

134. The Defendants, at all times material hereto, have acted and continue to act under color of state law.

135. The Corneals enjoy a state constitutional protected right in proceeding with the lawful use of their Property, as well as in proceeding with the development and sale of the same.

136. As a result of the Defendants' conduct, the Defendants have deprived the Corneals of their clearly established state constitutional rights and privileges to own, use, dispose and develop the Property, which rights are protected by the Constitution of the Commonwealth of Pennsylvania.

137. As a result of the conduct set forth herein, the Defendants have deprived the Corneals of their state procedural and substantive due process rights: (1) through the flagrant abuse of office; (2) by enforcing ordinances in an arbitrary and selective manner; (3) by refusing to issue permits to the Corneals where the Corneals are in compliance with all provisions of all applicable ordinances; (4) by taking action through the abuse of their office to impede the development of the Property where the Defendants have not enacted a subdivision and land development ordinance to regulate the same; (5) by interfering with the contractual relationship between the Corneals and Hewett and Smith, which Contract involved significant property interest; (6) by abusing their office and engaging in conduct so as to deceive the

Corneals into believing that subdivision approval was required; and (7) by depriving the Corneals of an avenue to appeal their unlawful action by refusing to even review the Initial Plan or to even provide necessary applications for permits.

138. In violation of the Corneals' rights and entitlement to substantive and procedural due process under the Pennsylvania Constitution, the Defendants, acting individually and in concert, deliberately, arbitrarily, capriciously, by abuse of governmental powers and in bad faith, which was premised, in part, on personal animus toward the Corneals, have deprived, and continue to deprive, for illegitimate, non-governmental and arbitrary reasons, the Corneals of their protected interest in proceeding with the use and development of their Property.

139. The actions and conduct of the Defendants, as set forth herein violate the Corneals' rights as guaranteed by the Constitution of the Commonwealth of Pennsylvania, including, but not limited to, Article I, §§1, 17 and 26.

140. No adequate remedy at law exists to redress these violations of the Corneals' constitutional rights.

141. The Defendants' actions herein were intentional, flagrant and malicious so as to warrant the imposition of punitive damages against the Defendants in their individual capacities.

WHEREFORE, the Plaintiffs, David B. Corneal and Sandra Y. Corneal, respectfully request that this Court:

(a) Enter judgment in their favor and against each Defendant, individually, jointly and severally, holding and declaring that the Defendants violated the Corneals' rights to substantive and procedural due process under the Pennsylvania Constitution;

(b)    Enter an order directing the Defendants, in their official capacity, to cause to be issued any and all permits so that the Property may be developed and conveyed;

(c)    Enter an order declaring that the purported moratorium is invalid and constitutionally infirm;

(d)    Enter an order restraining the Defendants from impeding and interfering with the development and sale of the Property;

(e)    Enter an order awarding compensatory damages against the Defendants which were suffered, and are being suffered, as a result of the Defendants' illegal conduct;

(f)    Enter an award of punitive damages against the Defendants, in their individual capacities, for the intentional, flagrant and malicious conduct;

(g)    Enter an order directing the Defendants to pay the Corneals' costs, including reasonable attorney's fees; and

(h)    Such further relief as this Court deems just and proper.

WHEREFORE, the Plaintiffs, David B. Corneal and Sandra Y. Corneal, respectfully request this Court to award damages against the Defendants in the amount of One Hundred Fifty Thousand ($150,000) Dollars, plus interest, to award other compensatory damages, including, but not limited to, those damages which will be suffered through the

financing of the construction, to impose costs of this litigation, including reasonable attorney's fees to the extent permitted by law, to impose punitive damages and for such other relief as this Court deems just and reasonable.

Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Bridget E. Montgomery, Esquire
Supreme Ct. I.D. #56105
Adam M. Shienvold, Esquire
Supreme Ct. I.D. #18343
213 Market Street
Eighth Floor
Harrisburg, PA 17101
(717) 237-6000

Attorneys for Plaintiffs

Date: 11-05-01

*L0219803*

**CERTIFICATE OF SERVICE**

I, Bridget E. Montgomery, Esq., hereby certify that I am this day serving a copy of the foregoing document via First Class U.S. Mail, which service satisfies the requirements of the Federal Rules of Civil Procedure and Middle District Local Rules of Court, addressed as follows:

Anthony R. Sherr, Esq.
Mayers Mennies & Sherr, LLP
3031 Walton Road, Building A, Suite 330
P. O. Box 1547
Blue Bell, PA 19422-0440

Michelle J. Thorp, Esq.
Thomas Thomas & Hafer, LLP
305 North Front Street
Harrisburg, PA 17101

Bridget E. Montgomery
Bridget E. Montgomery, Esquire

Dated: 11-6-01

# Article of Agreement,

**Made the** 7th *day of* October *in the year one thousand nine hundred* ninty nine (1999).

**Between** DAVID B. CORNEAL and SANDRA Y. CORNEAL , parties *of the first part.*

**and** JOHN B. HEWETT, JR. and JoANN F. SMITH, parties *of the second part,*

**Witnesseth,** *that the said part* ies *of the first part, for the consideration hereinafter mentioned and contained, agree to sell and convey unto the said part* ies *of the second part,* their *heirs or assigns, all* Farm House, Barn and 25.8 acres, more or less, located in Jackson Township, Huntingdon County, more fully described in a proposed subdivision survey prepared by David A. Simpson for David B. and Sandra Y. Corneal. Being a portion of a larger fram tract owned by the parties of the first part. Said subdivision to be finalized and recorded prior to settlement by the parties herein.

THIS CONTRACT IS SUBJECT TO THE ADDITIONAL TERMS SETFORTH IN AN ADDENDUM ATTACHED HERETO.

**In Consideration Whereof,** *the said part*ies *of the second part* agree *to purchase said premises and to pay said part of the first part therefor, the sum of* one hundred and fifty thousand ($150,000.00) and xx/00 ---------------- *Dollars, in the manner following, to-wit*

1. Four thousand and xx/00 ($4,000.00) dollars downpayment.
2. Monthly payments of five hundred and xx/00($500.00) dollars beginning on November 7, 1999 and continuing each month thereafter until final settlement on or about JUne 30th,2000. Said monthly payments to be applied to principle against the purchase price.
3. The balance in full at the time of settlement.
4. Buyers to pay 1% transfer tax and a proration of the real estate taxes.
5. No personal property is included in this sale.

*and upon the payment of the said sum, the said par*ties *of the first part will, at* their *own proper cost and charge, make, execute and deliver to the said part* ies *of the second part a good and sufficient Deed for the proper conveying and assuring of the said premises in fee simple, free from all incumbrance, and dower and right of dower, such conveyance to contain the usual covenants of* Special *warranty*

RE: PROPERTY 25.8 acres with house and b...
SELLERS DAVID B. CORNEAL and SANDRA Y. CORNEAL
BUYERS JOHN B. HEWETT, JR. and JoANN F. SMITH
DATE OF AGREEMENT 10-7 1999 SETTLEMENT DATE 6-30 2000 SALE PRICE $150,000

1. Buyers acknowledge that a present tenant, Scott Page, needs to be relocated by Sellers to a property they are constructing on another portion of the farm and that they will be flexable in the settlement date to accommodate this transition.
2. Sellers grant to the Buyers, upon the signing of this agreement the right to begin preparation of flower beds for Spring planting. Sellers have the right to approve or disapprove the numbers and locations of the flower beds.
3. Sellers shall retain the right to occupy the upper level of the barn for a period of two years or until their home is finished on the remainder of the farm, which ever comes first.
4. The deed will contain restrictive covenants that the land may not be further subdivided, that there may not be mobile homes of any nature put on the property permanently or temporarily. That any home constructed on the property shall contain a minimum of ~~2,000~~ sq. feet of living space.

DBC 1,300+or-

All other terms and conditions of the said agreement shall remain unchanged and in full force and effect.

WITNESS ______ BUYER [signature] (S)
WITNESS ______ BUYER [signature] (S)
DATE October 7 1999
WITNESS ______ SELLER [signature] (S)
WITNESS ______ SELLER [signature] (S)
AGENT ______ DATE ______ 19__

COPIES: WHITE: SELLER, YELLOW: AGENT, PINK: BUYER, BLUE: MORTGAGEE, GOLD: ______, GREEN: BUYER'S AT TIME OF SIGNING 4/89

PENNSYLVANIA ASSOCIATION OF REALTORS® SPEED PAK FORMS

*be delivered to the parties of the second part, their heirs or assigns, on the 30th day of* June 19xx2000, *until which time the parties of the first part shall be entitled to receive the rents, issues and profits thereof.*

*And it is further understood and agreed, that in case default shall be made in the payment of any installment of principal or interest hereby agreed to be paid, for a period of* ten (10) *days after the same shall have become due and payable by the terms hereof, then and in that case the whole of the principal sum and interest shall, at the option of the said parties of the first part, become forthwith due and payable, without defalcation or stay of execution; said part of the second part do hereby empower any attorney of any Court of Record of Pennsylvania or elsewhere, to appear and confess judgment against* them *for the above sum, or so much thereof as remains unpaid, together with the interest, with costs of suit, release of errors, attorney's commission of* 10% *per cent., waiving inquisition and exemption.*

**In Witness Whereof,** *the parties to this agreement have hereunto set their hands and seals, the day and year first above written.*

SEALED AND DELIVERED IN THE PRESENCE OF

DAVID B. CORNEAL (SEAL)

SANDRA A. CORNEAL (SEAL)

JOHN B. HEWETT, JR. (SEAL)

JOANN F. SMITH (SEAL)

**State of** , **County of** , *ss,*

*On this* 7th *day of* October *19* , *before me, the subscriber, personally came the above named*

*who in due form of law acknowledged the foregoing Indenture to be act and deed, and desired that the same might be recorded as such.*

*Witness my hand and seal the day and year aforesaid.*

(SEAL)

*My Commission Expires*

**Agreement.** FORM B-1

WITH

*Dated*

*For*

Entered for record in the Recorder's Office of ........ County, the ........ day of ........ 19 ........ Recorder.

Tax $........ Fees $........

*To Recorder of Deeds:*

**Certificate of Residence**

*I, hereby certify that the correct address and place of residence of the grantee herein as follows:*

*Attorney or Agent for Grantee*

**Recorded** *in the Office for Recording of Deeds, &c., in and for said County, in Deed Book No. Vol. , Page*

**Witness** *my Hand and Official Seal this day of , 19*

Recorder of Deeds

January 4, 2000

Regular Meeting Opened at 7:10PM

Meeting called to order by Chairman Weiler at 7:00 PM

Minutes approved

Treasurer report approved as read

The Supervisor's stated that no more sub-divisions will be approved until after the proposed Sub-Division ordinance for the Township has been approved. As soon as we get the review from the Planning commission and any changes that the Supervisors feel need to be made copies will be made available to the Public and a Public meeting will be held.   It was stated that the County is now doing a " boiler plate" sub-division ordinance for those Township's who want it, but Jackson Township has already put a lot of time into the purpose ordinance and it was felt it was in the best interest of the Township to proceed with the  ordinance that the Supervisor's have decided on.

Tom Wilson the Roadmaster stated that New Enterprise would fix Miller road
To our satisfaction in the spring.  He hopes to get bids on  Sawmill & Yoder for sealing this summer depending on the price and how much money we have at the time.

Meeting was adj. at 7:35PM



# HUNTINGDON COUNTY PLANNING COMMISSION

(814) 643-5091

Court House - Huntingdon, Pennsylvania 16652

February 24, 2000

Mrs. Ann L. Wirth
Jackson Township Secretary
R.D 1, Box 390
Petersburg, PA 16669

RE: David and Sandra Corneal Minor Subdivision

Dear Mrs. Wirth:

The Huntingdon County Planning Commission has reviewed the above referenced proposal to subdivide a property containing 94.67 acres into three lots. Lot 2 (the residue) contains 64.12 acres; Lot 3 contains 4.75 acres and Lot 4 contains 25.80 acres. Lot 1 was previously subdivided and is not included in this proposal. The property is located on the east side of Saw Mill Road (T-527) in Jackson Township. It is our understanding that Jackson Township has placed a moratorium on new subdivisions pending the adoption of a Subdivision and Land Development Ordinance.

The staff of the Planning Commission offers the following comments for your consideration:

1. The proposal is consistent with the draft Huntingdon County Comprehensive Plan. The land use proposed by the Plan for this area is Low Intensity Residential Use.

2. There are several physical limitations evident at the location of this proposal. Steep slopes (over 15%) can be found near the eastern boundary of the property in this proposal. No building construction should take place in steep slope areas. The soil types At, Atkins Silt Loam, and Ph, Philo and Basher Silt Loam, exist along Laurel Run, which runs through all the proposed lots. These are hydric soils and are typically found in wetland areas and near streams. The proposed house, studio, and sewage system for Lot 2 are within these soil types.

Blazosky Associates, Inc conducted a Wetlands Investigation of the project area for the developer. Further investigation should be done prior to approval to identify if wetland areas exist at the proposed construction site due to the snow cover during the

recycled paper

investigation and because maps submitted with the investigation did not identify the areas studied. No construction should take place in wetlands areas. No floodplains exist in the area of this proposal.

3. The Jackson Township Supervisors are in the process of adopting a Subdivision and Land Development Ordinance. The following comments are based on the draft Jackson Township Subdivision and Land Development Ordinance:

4. A new street is proposed on the plat to provide access to the lots in this development. Private streets (streets not offered for dedication to the Township) are prohibited unless they meet the design standards of the Ordinance (Section 502.A.6). This proposal would not be classified as a minor subdivision by the Ordinance. The definition of a Minor Subdivision in Section 204 is any subdivision containing not more than 4 lots fronting an existing street.

5. The proposal must comply with all requirements of Section 402, Preliminary Plan, and Section 403, Final Plan.

6. The following information required by Section 402 does not appear on the plat submitted:

    Existing contour lines (Section 402.A.9).

    Location and width of all streets, easements, right-of-ways, with a statement of any conditions governing their use (Section 402.A.14.a).

    Building Setback lines along each street (Section 402.A.14.b). Building Setbacks are as follows: 40' from all right-of-way lines, 15' from property lines (Section 504.C 4,5).

    Stormwater management information (Section 402.A.17.a through c).

    Supplementary data as applicable (Section 402.B).

    Section 403 requirements A through B.

7. The proposed street must also comply with Section 502 of the Ordinance. This section contains the required widths and specifications for a minor street. The Huntingdon County Planning Commission proposed a private driveway standard to Jackson Township in comments of the draft Ordinance on February 4, 2000. This standard, if adopted, in the Ordinance would provide a minimum standard for streets of this type.

8. A stream crossing will be necessary for the street to provide access to the lots as proposed. The developer indicated that he acquired the permit for this crossing. A copy of this permit must be submitted with other data to the Township prior to approval.

9. A sewage easement is proposed for Lot 3 to use a portion of Lot 2 for the installation of a sewage system. The easement should be described on the submitted plat (bearings, distances, acreage) so that a description can be included in each lot deed affected.

10. The developer's surveyor indicated on the plat that a boundary discrepancy exists between the residual lot (Lot 2) and the adjacent property owner. The Township's Solicitor may want to identify if any legal issues exist if the plan is approved without this boundary issue being resolved.

11. A DEP Sewage Facilities Planning Module Component 1 was submitted as part of this proposal. This module and accompanying data indicate soils suitable for on-lot sewage disposal.

12. The Huntingdon County Planning Commission recommends disapproval of this proposal due to both the moratorium and the above comments.

Please contact this office with any questions concerning these comments. As always, the local municipality is encouraged to carefully review the subdivision/sewage module for compliance with Township and State requirements.

Sincerely,

Richard E. Stahl
Planning Director

DBY
File GC,Sub,Mtg,C
Pc:     Corneal
        Simpson
        Rouzer

HUNTINGDON COUNTY PLANNING COMMISSION

(814) 643-5091

Court House - Huntingdon, Pennsylvania 16652

April 20, 2000

Mrs. Ann L. Wirth
Jackson Township Secretary
R.D 1, Box 390
Petersburg, PA 16669

RE: David B. and Sandra Y. Corneal Minor Subdivision

Dear Mrs. Wirth:

The Huntingdon County Planning Commission has reviewed the above referenced proposal to subdivide a property containing 94.67 acres into two lots. A proposal was submitted at the March 22, 2000 Planning Commission meeting for this property as a three lot subdivision. This proposal is a resubmission. Lot 2 (the residue) contains 68.87 acres and Lot 3 contains 25.80 acres. Lot 1 was previously subdivided and is not included in this proposal. The property in this proposal is located on the east side of Saw Mill Road (T-527) in Jackson Township. It is our understanding that Jackson Township has placed a moratorium on new subdivisions pending the adoption of a Subdivision and Land Development Ordinance.

The staff of the Planning Commission offers the following comments for your consideration:

1. The proposal is consistent with the draft Huntingdon County Comprehensive Plan. The land use proposed by the Plan for this area is Low Intensity Residential Use.

2. There are several physical limitations evident at the location of this proposal. Steep slopes (over 15%) can be found near the eastern boundary of the property in this proposal. No building construction should take place in these steep slope areas. The soil types At, Atkins Silt Loam, and Ph, Philo and Basher Silt Loam, exist along Laurel Run, which runs through the proposed lots. These are hydric soils and are typically found in wetland areas and near streams. The proposed house, studio, and sewage system for Lot 2 are within these soil types.

recycled paper

Blazosky Associates, Inc conducted a Wetlands Investigation of the project area for the developer. A detailed map and study data identifying the investigation area was submitted and indicates that no wetlands are present at the location of the lots in this proposal. The Huntingdon County Conservation District has noted that widening of the existing lane to access the new dwelling on Lot 2 may impact potential wetland areas. Road improvements should be limited to existing cartway widths.

3. The Jackson Township Supervisors are in the process of adopting a Subdivision and Land Development Ordinance. The proposal appears to be in compliance with the regulations of the draft ordinance. The building setbacks shown on the plat are in compliance with the draft ordinance. The title certificate on the plat should be completed and notarized prior to recording of the plat.

4. A stream crossing will be necessary for the driveway for Lot 2 to provide access to the proposed structures shown on the plat. The developer indicated that he acquired the permit for this crossing. A copy of this permit must be submitted with other data to the Township prior to approval.

9. The developer's surveyor indicated on the plat that a boundary discrepancy exists between the residual lot (Lot 2) and the adjacent property owner. The Municipal Solicitor may want to identify the existence of any legal issues if the plan is approved without resolution of these boundary issues.

10. A DEP Sewage Facilities Planning Module Component 1 was submitted as part of this proposal. This module and accompanying data indicate soils suitable for on-lot sewage disposal.

11. The Huntingdon County Planning Commission recommends conditional approval of this proposal pending adoption of the Subdivision and Land Development Ordinance.

Please contact this office with any questions concerning these comments. As always, the local municipality is encouraged to carefully review the subdivision/sewage module for compliance with Township and State requirements.

Sincerely,

Richard E. Stahl
Planning Director

DBY
File:GC,Sub,Mtg,C
Pc:     Corneal
        Simpson
        Rouzer

*Law Office*
HARVEY B. REEDER

504 Penn Street
Huntingdon, PA 16652

*Phone: 814/643-3821*

May 1, 2000

David B. Corneal, Esquire
1445 West College Avenue
State College, PA 16801

Re: John B. Hewett, Jr. and JoAnn F. Smith

Dear Mr. Corneal:

I am in receipt of your fax dated April 28, 2000. Please be advised that I represent John B. Hewett, Jr. and JoAnn F. Smith.

It is my understanding that there are some difficulties with the Township in obtaining subdivision approval. It is quite obvious to me that final settlement will not be able to take place on or before June 30, 2000.

My clients are not interested in any addendum to this Agreement and desire that the Agreement be terminated.

Accordingly, we would request that you return to us the down payment of $4,000.00, together with the monthly payments totaling $3,000.00 which have been made since November 7, 1999. We are returning the original map which you left with Mr. Hewett.

Should you have any questions, please feel free to contact me.

Sincerely yours,

Harvey B. Reeder

HBR:klb

Enclosure

cc: Mr. John B. Hewett, Jr.

DEFENDANT'S EXHIBIT 2

IN THE UNITED STATES DISTRICT COUR[T]
FOR THE MIDDLE DISTRICT OF PENNSYLVA[NIA]

DAVID B. CORNEAL and SANDRA Y. CORNEAL, PLAINTIFFS

VS

NO. 1:CV-00-1192

JACKSON TOWNSHIP, HUNTINGDON COUNTY, PENNSYLVANIA; W. THOMAS WILSON, individually and in his official capacity as Supervisor of Jackson Township; MICHAEL YODER, individually and in his official capacity as Supervisor of Jackson Township; RALPH WEILER, individually and in his official capacity as Supervisor of Jackson Township; BARRY PARKS, individually and in his official capacity as Sewage Enforcement Officer of Jackson Township; DAVID VAN DOMMELEN, individually and in his official capacity as Building Permit Officer; ANN L. WIRTH, individually and in her official capacity as Secretary of Jackson Township; and LARRY NEWTON, individually and in his official capacity as Solicitor to Jackson Township, DEFENDANTS

DEPOSITION OF: W. THOMAS WILSON
TAKEN BY: PLAINTIFFS
BEFORE: TERESA K. BEAR, REPORTER NOTARY PUBLIC

DATE: MAY 18, 2001, 8:43 A.M.

PLACE: ECKERT SEAMANS
213 MARKET STREET
HARRISBURG, PENNSYLVANIA

APPEARANCES:
ECKERT SEAMANS
BY: BRIDGET E. MONTGOMERY, ESQUIRE
LESLIE A. MALADY, ESQUIRE
FOR - PLAINTIFFS
MAYERS, MENNIES & SHERR, LLP
BY: ANTHONY R. SHERR, ESQUIRE
FOR - ALL DEFENDANTS EXCEPT NEWTON
METTE, EVANS & WOODSIDE
BY: JENNIFER YANKANICH, ESQUIRE
FOR - DEFENDANT - LARRY NEWTON
ALSO PRESENT:
DAVID B. CORNEAL

TABLE OF CONTENTS

WITNESS

| FOR PLAINTIFFS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| W. Thomas Wilson | | | | |
| By Ms. Montgomery | 4 | -- | 191 | -- |
| By Ms. Yankanich | -- | 189 | -- | 192 |

EXHIBITS

| WILSON EXHIBIT NO. | PRODUCED AND MARKED |
|---|---|
| 1 - Order | 20 |
| 2 - Sewage facilities planning module | 62 |
| 3 - Subdivisions reviewed by HCPC | 120 |
| 4 - Minutes dated 4/3/00 | 134 |
| 5 - Packet of documents | 143 |
| 6 - Subdivision plan | 143 |
| 7 - Subdivision and land development ordinance Jackson Township | 146 |

W. THOMAS WILSON, called as a witness, being sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MONTGOMERY:
Q Mr. Wilson, would you state your name for the record.
**A W. Thomas Wilson.**
Q I don't think we've met except briefly the other day.
**A Yeah, just upstairs, yes.**
Q I'm Bridget Montgomery and I think, as you know, I represent the Corneals in this case. We're here to take your deposition today and ask you a -- have you ever had your deposition taken before?
**A No.**
Q I'll just give you a little bit of the ground rules then. I'm just going to ask you a series of questions designed to get some facts. If you don't understand any question, I want you to ask me to clarify it and I'll be happy to do that.
You should feel free to take a break whenever you feel that you need to. Not to confer with your counsel, but if you need to go to the men's room or something like

that, or if you get really tired -- sometimes these things can go on for a long time and we want you to be comfortable.
For the court reporter's sake, you need to keep your voice up. You need to speak clearly, keep your voice up and let me finish my sentence and then I'll try to let you finish your sentence because she can't take down two people at once -- she can't take down two people talking at once. She also needs you to use verbal responses.
**A I didn't think she could do that. (Indicating.)**
Q She can't do that.
**A Right.**
Q You can't do that. So the other thing is I want to make sure that there's no reason why you can't give testimony today. For example, are you on any kind of medication that would prevent you from understanding the questions or anything like that?
**A None.**
Q Where do you live?
**A R.D. 1, Box 420, Petersburg, Pennsylvania.**
Q Is Petersburg in Jackson Township?
**A Yes.**
Q How long have you lived there?
**A Approximately 20 years at that location.**
Q Where did you live prior to that?

A I don't -- it's R.D. 1, Petersburg, but I don't know what the box -- they've changed box numbers so I don't know what it would be. Approximately three miles from where I live now.

Q Also in Jackson Township?

A Yes.

Q And how long did you live there?

A Twenty-five years.

Q Have you lived in Jackson Township all your life?

A Yes.

Q And I don't want to be too nosey but how old are you?

A Fifty-eight.

Q I'm going to ask you a question about a document that's been marked before, but we'll mark it again.

MS. MONTGOMERY: This is going to be Wilson Exhibit 1. I'm going to mark that and hand it to the witness.

(Order produced and marked as Wilson Exhibit No. 1.)

BY MS. MONTGOMERY:

Q Mr. Wilson, have you seen this court order before?

A No.

Q Do you want to take a moment and look at it.

A Okay.

Q Do you understand the order?

A Yes.

Q What do you understand it to say?

A I'm not supposed to talk to any of the other defendants.

Q About?

A This proceeding.

Q About your testimony or about their testimony?

A Yes.

Q You're also not supposed to talk to your counsel and your counsel is not supposed to talk to you about their testimony. Do you understand that?

A Right.

Q Did you become aware of this order on the day it was entered, on May 16, 2001?

A Yes.

Q Just two days ago?

A Yeah.

Q Have you complied with the order to date?

A Yes.

Q Have you talked with any of the other defendants about their testimony?

A No.

Q Did you have an opportunity to talk with any of the other defendants about their testimony?

A No.

Q Who did you drive down here with today?

A Ann Wirth and Mike Yoder.

Q So Ann Wirth came back today for these proceedings?

A Yes, she knows Harrisburg. We -- so she got us into the parking garage.

Q So she drove down with you today and she's going to wait all day and drive back with you today?

A Yes.

Q Mr. Wilson, in connection with this litigation have you performed a search for documents?

A No.

Q Did anybody ask you to perform a search for documents?

A No.

Q Do you keep any documents at your home --

A No.

Q -- related to -- I'm sorry, related to township business?

A No.

Q Have you ever seen a request for production of

documents? Let me just show it to you. I'm not going to make this part of the record, but anybody that wants to look at it can look at it. Have you ever seen this document?

MS. MONTGOMERY: Let the record reflect --

THE WITNESS: I can't see quite as well as I used to.

MS. MONTGOMERY: Sure. Let the record reflect I'm showing him the request for production of documents that was served upon the defendants in this case by plaintiffs.

THE WITNESS: I never seen this.

BY MS. MONTGOMERY:

Q Did you know about it? Did you know that there was a request for production of documents outstanding in this case?

A No.

Q Not until this moment?

A No.

Q Is that a yes, not until this moment?

A No, I didn't know.

Q Until this very moment?

A Right.

Q Did Miss Wirth talk to you about the fact that she needed to gather documents in this case?

A No.

Q Did you bring any documents with you?

A No.
Q Did you discuss with anybody whether you should bring any documents with you?
A No.
Q Did you talk to Barry Parks about whether or not he ought to bring any documents to his deposition?
A No.
Q Now, I'm going to represent to you that Mr. Parks testified that the supervisors told him he shouldn't bring any documents to his deposition. Do you know who told him that?
A No.
Q I'm going to talk to you a little bit about your educational background. What's your last -- the highest degree of education that you completed?
A **High school.**
Q Did you finish high school?
A **Yes.**
Q You attended up there in Jackson Township?
A **Huntingdon.**
Q In Huntingdon?
A **Yes.**
Q Have you had any post high school education?
A **Two years at Penn State in turf management, agronomy department.**

Q When did you do that?
A **Seventy-eight, '79.**
Q Did you receive any sort of degree from that?
A **No.**
Q Do you hold any certificates or licenses of any other type -- of any type, I should say?
A **No.**
Q Have you done any other training of any sort?
A **No.**
Q What do you do for a living?
A **Excavating.**
Q Excavating?
A **Yeah.**
Q Do you have your own company?
A **I work for Eagle Excavation.**
Q Who owns Eagle Excavation?
A **It is a corporation and my son and I have control of the stock.**
Q So do you own equal shares of the stock?
A **Yes.**
Q Are you the president?
A **Yes.**
Q Is your son the vice-president?
A **No, secretary/treasurer.**
Q Do you have a vice-president?

A **No.**
Q How many people work for you?
A **Five.**
Q Five people other than the two of you?
A **Yes.**
Q How long have you been performing excavating work?
A **Twelve years.**
Q What did you do prior to that?
A **I was the golf course superintendent at the Elk's Country Club in Boalsburg.**
Q Boalsburg?
A **Yes.**
Q Is that in Huntingdon County?
A **No, Centre County.**
Q And how long did you hold that position?
A **Twenty-one years.**
Q So that would take you back to the time that you were about 25, right?
A **In that -- in that area. A long time ago, yes.**
Q What did you do prior to that?
A **I lived in Colorado for eight months. Not long enough to become a resident, but I took courses through the extension service of Colorado State and that's where I**

**got into turf management.**
Q So you started your education at Colorado State?
A **Yes.**
Q Did you attend any other colleges or universities or --
A **No.**
Q -- secondary schooling of any type?
A **No.**
Q Just in the course of your life, really, have you taken any other -- even initiated any other training of any type in any field in -- you know, even just as a hobby?
A **No.**
Q Now, are you a township supervisor in Jackson Township?
A **Yes.**
Q How long have you held that position?
A **A little over five years.**
Q Had you held any other position with Jackson Township prior to that?
A **None.**
Q Did you run for township supervisor or were you initially appointed or what?
A **I ran for the office.**
Q You ran for the office?

A **Yes.**
Q And the first time you ran for the office was five years ago?
A **Yes.**
Q How long is the term of appointment?
A **Six years.**
Q Are you going to run again?
A **I submitted a petition. I will be on the ballot in the fall.**
Q What are your duties as a township supervisor?
A **To look out for the welfare of the citizens of that township.**
Q How many supervisors are there in the township?
A **Three.**
Q Is that the full complement? Are there any missing or open seats or anything?
A **No.**
Q Who's the chairman of the board of supervisors?
A **Mike Yoder.**
Q Have you ever been the chairman?
A **No.**
Q How long is the term of the chairman?
A **That is set annually, each year.**

Q Has Mike Yoder been the chairman right along since you've been on the board?
A **No.**
Q Who else was the chairman?
A **Ralph Weiler.**
Q Can you give me the names of the other two township supervisors currently?
A **Yes, Ralph Weiler and Mike Yoder.**
Q And how long have they held those positions, their positions?
A **I can't say on Ralph. All I know is it's a long time. I have no -- but Mike's been on for six years.**
Q Were you on the -- were they both on the board of supervisors when you joined the board?
A **No.**
Q Who came second, Weiler?
A **No.**
Q Who came after you?
A **No, Mike.**
Q Mike came after you. So you gave me the general description of your responsibility as a township supervisor. Can you now give me a detailed description of the types of duties that you have to fulfill?
A **I was appointed at the annual meeting, which is a reorganization meeting in January, to be road master.**

**So my primary duties are taking care of the roads and bridges in the township.**
Q So you're the road master as well as a township supervisor?
A **Yes.**
Q What is the -- is the road master an office within the township or what is it?
A **It is a position that has been on the books as long as I can remember in townships, rural townships.**
Q Is it a paid position?
A **Hourly.**
Q It's hourly. So whenever the township needs work on the roads, you do it on behalf of the township --
A **Yes.**
Q -- and you just bill the township?
A **(Witness nods head affirmatively.)**
Q What about your job as township supervisor, how does that pay?
A **$125 a month.**
Q How much time do you put into your job as township supervisor?
A **I don't know the exact hours.**
Q Does it vary?
A **Yes.**
Q So you're the road master. What else do you

have to do as a township supervisor?
A **Attend meetings, overview on land development and subdivisions, answer questions from the citizens.**
Q Let's take the first one. What was the first one you said?
A **Overview of subdivision and land use.**
Q What do you do in your role as a township supervisor in connection with subdivision and land use, is that what you said?
A **Yes. The paperwork usually -- subdivision or land use usually comes to the supervisors by an engineer or a surveyor, that type of thing, and is laid out on the table to -- for the township to review.**
Q When do you do that review, at the township meetings or in your spare time or what?
A **We review them at the meeting.**
Q Just during the meeting?
A **Yes.**
Q Do you sometimes come early to the meeting to review them or anything or they just get opened up at the meeting?
A **No, they get opened at the meeting.**
Q What does an application for a subdivision look like? What does it consist of? What is every document that it consists of?

A Well, there's only -- the application, there's one sheet of what is required. And then the engineer or architect or surveyor, they're familiar with our county and the things that are on there that come in, all the necessary things for our subdivision are on there.
Q Like what?
A The landmarks, wetlands, streams, highways, trails, all these things are on there.
Q What else is in -- I mean, if you're at a meeting and you are handed a proposed subdivision plan, what all are you going to have to look at at that meeting at that time?
A The plan.
Q Just the --
A Yeah, one of those, a big sheet, yes.
Q So a map basically?
A And the presenter usually asks if there are any questions that he can answer while he's there.
Q Are there any attachments to it?
A Yes.
Q Like what?
A There's -- they have to have the modules, the location, seven and a half minute quad angle map which determines the location. It's a government map.
Q For the sewer modules you mean?

A For the plan, the subdivision.
Q What else? Anything else?
A Usually once that's done there's a -- a procedure that the surveyor or engineer brings in which is the narrative and all these things contained -- concerning the subdivision.
Q Well, what are all these things concerning the subdivision?
A All the -- all the lots that are proposed and the roads that are proposed. All the things pertaining to that development.
Q Let's talk about the sewer module for a minute. What do you expect to see with the sewer module?
A The sewer module will have on there the proposed dwellings with the amount of gallon each per day generated for the site.
Q And would it have markings on it to show where possible sewage sites could be?
A Well, the map will show all the probes and percs on the whole property that were done.
Q Are these approved probes and percs, you mean?
A Yes.
Q So when the subdivision plan comes to you, it's already -- it already has a sewer module attached to it. And in order for you to approve it, it has to have an

approved sewer module, correct, an approved -- I'm sorry, approved sewage sites, correct?
A Yes.
Q How do you tell that there's an approved sewage site?
A The work is done by the SEO.
Q And the SEO, for the record, is?
A Barry Parks. And he generates -- there has to be an application and then he generates from the field work what the perc rates are for each site and these are given to the designer to design a system for each site.
Q I'm going to show you a document that we're going to mark as Wilson Exhibit 2.

(Sewage facilities planning module produced and marked as Wilson Exhibit No. 2.)

BY MS. MONTGOMERY:
Q I'd ask you to look at that, Mr. Wilson. Do you know what this document is?
A Yeah, it's a sewer planning module.
Q As you look through this document, does it have everything on there that you would need to see with respect to the sewage sites for purposes of approving a subdivision plan?
A If this was setting in front of me at the meeting, questions would be raised of why a new sewage

module wasn't generated because this has been reworked.
Q Because what's been reworked?
A It's been reworked.
Q I'm not sure I understand what you mean. What has been reworked?
A Well, there's things on here that have been changed.
Q Well, what do you see that's been changed?
A Well, the number of lots.
Q Okay. So it went from a higher number of lots to a lower number of lots, right?
A Yeah, if I was looking at this, I would want to see the map too, of which I assume there's one that ...
Q Well, let's look at page 5. Do you see up in Section H where you have the signature of Barry Parks?
A Um-hum.
Q Is that one of the things you'd look for to see whether or not there's -- whether the lot is suitable for on-site sewage, look for his signature up in that --
A Yes.
Q Let's look at page -- well, there's some attachments so you'll have to go after page 9 to the site investigation and percolation test reports. Would you look at each one of these site investigation and percolation test reports for the signature of the sewage enforcement officer?

A **No.**
Q You wouldn't look at that?
A **No.**
Q Why not?
A **If it's gone that far, it has been through his process. And he's hired by the township to take care of these things. And when these things come in, this sheet will come with a design for him to either approve or disapprove.**
Q A design of what?
A **An on-lot sewage system.**
Q When they come into -- when the subdivision plan comes to you, it comes with the design of an on-lot sewage system?
A **No.**
Q As long as you see that he signed off back here, is that what you're concerned with, when we went back here to page 5?
A **These modules -- when the plans come in and the modules are there, Parks says -- I'm sorry, Barry Parks, the sewage officer, is at the meeting to explain the soil modules in reference to the subdivision.**
Q Let me ask you this: Do you understand the process to be that the sewer modules -- sewage modules have to be approved first and then you get an on-lot sewage

system designed? Do you understand that to be the process?
A **I don't remember.**
Q That's fine if you don't remember. That's fine. The document that you're looking at right now, Wilson Exhibit 2, is a sewage facilities planning module for the Corneal property, correct?
A **That's what it states, yes.**
Q When you said it was reworked, are you looking at Section 2 of page 1?
A **Yes.**
Q And how was it reworked there?
A **Creation of a different amount of lots.**
Q So it went from what?
A **I'm sorry. Apparently that's a three under there to a two.**
Q How else was it reworked that would raise questions for you?
A **That question right there I would pose to our sewage officer.**
Q Would you be concerned that it went to fewer lots or would you be concerned if it went to more lots?
A **Not concerned as long as the sewage work was there.**
Q Now, let's talk a little bit more about your work in excavation. Do you perform excavation work in

connection with the installation of septic systems?
A **We install -- the company Eagle installs on-lot sewage systems.**
Q Is that primarily what Eagle Excavation does or is there other types of excavating work that it does?
A **Other types.**
Q What else does it do?
A **Land clearing, road building, foundation digging, water sewer lines and we repair septic systems.**
Q So let me ask you this question: If you had a site that was contemplated for a septic system and it had in some way been disturbed, do you know what you would do in order to bring the site back to the way it had been before it had been disturbed? Do you re-excavate, that's really my question?
A **No.**
Q What do you do?
A **I don't know.**
Q Say that you had an approved sewage site -- have you ever had the situation where you've had an approved sewage site and somebody drove over it, drove over the site --
A **No.**
Q -- and you said, oh, the soil is compacted. You never had a soil compaction problem for a sewage site

before?
A **No.**
Q Ever?
A **Ever.**
Q You never faced it?
A **Never.**
Q So do you know as an excavator and somebody who excavates for the installation of septic systems what you would do if a site was compacted by having been driven over a few times? Do you know what you would do?
A **If I had a contractor construct a site there, the sewage officer would be informed right away.**
Q But do you know what an excavation company would do to fix it?
MR. SHERR: Objection.
BY MS. MONTGOMERY:
Q Do you have any idea?
MR. SHERR: It's been asked and answered.
MS. MONTGOMERY: I'm asking if he knows what he would do.
MR. SHERR: And he said he didn't already. You can answer her question.
THE WITNESS: I don't know.
BY MS. MONTGOMERY:
Q You wouldn't know how to fix it?

MR. SHERR: Objection, asked and answered for the fourth time. You can answer it again.

THE WITNESS: My experience in 12 years is that it can't be fixed.

BY MS. MONTGOMERY:

Q So you do think you know whether or not it could be fixed? What is your experience in 12 years?

A **My experience in --**

MR. SHERR: Objection. It's a compound question. Which question would you like him to answer?

BY MS. MONTGOMERY:

Q So you do think it can't be fixed?

A **That's -- yes.**

Q Why is that?

A **Whenever I go to the sewage seminars, that is one of the things that's drilled into us as contractors, don't touch a site, don't get near it.**

Q But then do they tell you -- if somebody does get near it, do they tell you what to do?

A **Yes.**

Q What's that?

A **The sewage officer rejects it.**

Q That's what they taught you in the seminar?

A **Yes.**

Q Going one step further, you said in my

experience in 12 years -- I think this was your testimony. It can't be fixed, is that what you said?

A **Yes.**

Q I'm just going to ask you a little bit more about what you know about the whole process for approval of a sewage system. Now, in your work as an excavator are you expected to understand the process for sewage system approval for on-lot sewage systems?

A **No.**

Q In your work as a supervisor are you expected to know the process?

A **Yes.**

Q So do you understand the process and can you explain it to me?

A **Initially the property owner calls -- they usually call a contractor and we recommend that we can't do anything till the sewage officer is called. And then the sewage officer will set up a schedule where the backhoe can meet there with the sewage officer and usually the property owner and soil probes -- soil logs are dug.**

Q And then what?

A **Once the -- there's verification from the sewage officer that there's suitable soil there for on-lot, there's a direction made to do perc tests.**

Q And who does the perc tests?

A **That's up to the land owner.**

Q What kind of professional does the perc tests?

A **The perc test is done by the sewage officer.**

Q All right. And then what?

A **Once that's done, the -- that sheet is generated like back here with his -- with his results.**

Q With the sewage officer's results?

A **Yes.**

Q So let the record reflect that you're referring to the percolation test report, site investigation and percolation test reports on Wilson Exhibit 2, correct?

A **Yes.**

Q So those are generated next and then what happens?

A **The property owner takes these to a designer and has a design constructed for bidding purposes to put a system in there.**

Q So the property owner takes the approved sewage facilities planning module to somebody for design, correct?

A **That I don't know. The only -- my experience is that the soil -- the application for on-lot sewage and the soil work-up sheet from the sewage officer is all I've ever seen from designers to use.**

Q The application you're -- tell me that again.

I'm sorry, I missed it.

A **Application for on-lot sewage.**

Q And?

A **On there it has proposed bedrooms of the house and location of the house -- proposed location of the house, proposed well. All these things are taken into consideration by the designer.**

Q And then he designs a septic system suitable for the property?

A **That site.**

Q For that site?

A **(Witness nods head affirmatively.)**

Q Now, if there's more than one approved site investigation -- well, I should say if there's more than one approved sewage site, could you expect that the septic system designer could design one for any one of those approved sites?

A **With the proper material.**

Q With the proper material. What do you mean by material?

A **The application with the proposed building, the size of the building, the wells, the location, all those things, and the slopes.**

Q Well, I'll ask it to you slightly differently. If there are a number of approved by Barry

Parks, site investigation and percolation test reports, is it permissible -- is it your understanding that it's permissible to place a septic system at any one of those approved sites?
A **No.**
Q Why is that?
A **Not except where the site is specific, where that building is going to go.**
Q Right.
A **Yes.**
Q It's your understanding that it has to be a specific site for where the building is going to be? I'm not sure I understand you.
A **Where there's a proposed site, usually there's a proposed home going to be there and a well and everything with that.**
Q So could there be more than one site approved by the sewage officer for the proposed building?
A **All the approved sites that he approves are suitable for a building.**
Q Prior to joining the board of supervisors, were you under contract to the township for any work at any time?
A **No.**
Q No?

A **No.**
Q Prior to becoming the road master, did you perform any roadwork for the township?
A **No.**
Q In your capacity as a township supervisor, are you familiar with the requirements for enacting ordinances?
A **I don't understand.**
Q As a township supervisor, do you know what you have to do to enact an ordinance for the township?
A **Yes.**
Q What do you have to do?
A **The ordinance is drawn up and discussed, the supervisors discuss this, and it's -- and when it's pulled together, typed up and ready for adoption, there's an ad put in the newspaper to advertise it. And there's so many days, and I -- I don't know what that -- off the top I don't know what that is.**
**So many days that that has to be open for public review and then there will be a -- once that's done, there is another notice put in that the ordinance will be adopted a certain time and date.**
Q How do you know how to enact an ordinance? Who did you consult with to figure out how to enact an ordinance?
A **Those things come out of the state**

**association, PSATS.**
Q The Pennsylvania Association of Township Supervisors?
A **Yes.**
Q Do you consult with anybody else about enacting ordinances?
A **I believe now things are -- I believe that the township solicitor is asked to look at it to see if it meets legal requirements.**
Q The township solicitor is?
A **Larry Newton.**
Q How long has he been the township solicitor?
A **I don't know.**
Q Has he been there since you've been there?
A **Yes.**
Q As a township supervisor?
A **Yes.**
Q So if you have any questions about whether or not an ordinance is appropriate, you consult the solicitor?
A **Yes.**
Q Do you know whether or not you are supposed to make copies of the ordinances available for the public?
A **Yes.**
Q You are supposed to?
A **Yes.**

Q Where do you keep them?
A **There's -- I'm going back here now. There was copies made of the subdivision and land use ordinance and it was advertised in the paper that they were available for -- I think it was five dollars. And we -- we don't have the money that we went out and made lots of those things. Usually people would call and we would have to go to someplace that does that for us because we don't have those facilities.**
Q Like a copy center you mean?
A **Yes, yes, and run them off, but there -- as far as I know there is no reserve. It's a --**
Q Do you know how they're kept? Do you know how the ordinances are kept? In what form, is really what I'm asking you?
A **I think just in the filing cabinet in folders.**
Q In folders in Ann Wirth's office?
A **Yes.**
Q What about the proposed ordinances, do you make them available to the public?
A **Proposed ordinance.**
Q Before the ordinance is actually enacted.
A **Yes, we -- that's law.**
Q So if somebody wants to see it, you make arrangements for them to get a copy of it?

A **Yes.**
Q Do you think that that's -- they're entitled to it?
A **Yes.**
Q Do you hold any hearings on the proposed ordinances when you -- I know you haven't had a lot of ordinances in your township, but to the extent you have, do you hold public hearings on the ordinances?
A **There again, it's advertised in the paper that the ordinance is available for review.**
Q And then what would you expect, if the public has anything to say about it they would come to the township meetings?
A **Or call.**
Q Or call?
A **Yes.**
Q And give their comments or what?
A **Call to ask to see it, yes.**
Q And who would they call?
A **The secretary of the township.**
Q Anybody else they could call?
A **They could call any of the supervisors.**
Q How about the township solicitor, could they call him?
A **I don't know.**

Q So going back to my question about a public hearing, is it your testimony that the public hearing that you hold consists of publishing it in the paper and making the proposed ordinances available if people want to see it?
A **I haven't been involved in many. I haven't been a supervisor that long, but the -- it was advertised in the paper of a public meeting and the citizens were informed of what was transpiring in the township for that -- that meeting was a special for that.**
Q A public township supervisor's meeting?
A **A public meeting, yes.**
Q But was the public meeting -- you mean a meeting of the board of supervisors?
A **No, a public meeting. Everybody's -- it's a public meeting.**
Q And who would be at that meeting?
A **Any citizen.**
Q So you think that it was advertised in the paper -- with respect to the subdivision and land use ordinance that was passed by Jackson Township, you believe there was an advertisement for a public meeting?
A **Yes.**
Q I'm going to show you what we're going to mark as Wilson Exhibit 3.
(Interruption.)

BY MS. MONTGOMERY:
Q I'm going to show you -- well, I was going to show you some documents. Unfortunately, when we handed Miss Wirth this document yesterday, she wrote on it, it appears. We won't make this an exhibit in this deposition so strike that. We'll just show you the original that was part of Miss Wirth's deposition.
MS. MONTGOMERY: Let the record reflect that we are showing Mr. Wilson Wirth Exhibit 1.
BY MS. MONTGOMERY:
Q Is that the newspaper advertisement, notice of a public meeting that you're referring to?
A **Yes.**
MS. MONTGOMERY: Apparently my secretary has an emergency and I'm going to have to take a very short break. I will be right back.
(Break taken at 9:28 a.m. until 9:33 a.m.)
BY MS. MONTGOMERY:
Q Just so I'm clear about your testimony on public hearings for the proposed ordinances, if there was going to be a public hearing would it be held at the township supervisor's meeting house, meeting room, the office there with the board of supervisors present?
A **No.**
Q Where would it be held?

A **At the fire hall.**
Q Oh, in the fire hall. Okay, all right. With the board of supervisors present, right?
A **Yes.**
Q And would it be at a special meeting called by the township supervisors precisely for that purpose?
A **Can you -- can you bring that back. I -- something jogged there.**
Q Okay. It would be at a meeting called by the township supervisors, either a regular meeting or a special meeting advertised by the township supervisors where everybody would come so they could have a public meeting about it; is that correct?
A **Yes.**
Q We talked a little bit about ordinances and how you enact proposed ordinances in the township. What about a moratorium? Have you ever done any other moratorium other than the one that's at issue in this lawsuit?
A **No.**
Q So there has only been one moratorium and that was a moratorium on proposed subdivisions, correct?
A **Yes.**
Q How did that come about?
A **It came about from information that we were -- we had the county reviewing our ordinance and from the**

**emergency people in our area, fire company, EMS, all these people had concerns that the subdivision and land use ordinance was going to cover safety issues to the fullest extent because of the rural area. So a decision was made by the supervisors to stop subdivisions until the ordinance was enacted.**

Q Subdivisions of any type, even dividing a hundred acres into two lots?

A **Yes.**

Q You decided you couldn't do that for public safety reasons?

A **No, it was to stop -- as I stated, I believe, to stop all subdivisions until the ordinance was in place.**

Q Whose idea was the moratorium?

A **The supervisors.**

Q Which supervisor first mentioned it?

A **I don't remember.**

Q Were you all in agreement on it, that this was the thing to do?

A **Yes.**

Q Did you consult with somebody about it?

A **I don't believe.**

Q Did you consult with Larry Newton about it?

A **I don't remember.**

Q Did you tell Larry Newton you were going to

put the moratorium in place?

A **Yes, and I believe that there was a public notice put in the newspaper.**

Q You believe there was a public notice put in the newspaper about the moratorium?

A **Yes.**

Q Who do you think put that public notice in the newspaper?

A **Either the solicitor or the secretary.**

Q So if the solicitor put it in the newspaper, he would have to have known about the moratorium, correct?

A **Yes. I can't recall discussing it with him till we did it.**

Q You can't recall discussing the moratorium with him until after you did it?

A **Yes.**

Q How soon after you did it did you discuss it with him?

A **I don't know.**

Q Do you remember when the moratorium was put in place?

A **January 2000.**

Q Did you hold any public meetings on the moratorium?

A **No.**

Q Did you place the moratorium in any sort of writing, written document?

A **Not that I recall.**

Q In other words, there's a written document that reflects the ultimate subdivision plan that you all drafted up and enacted, correct?

MR. SHERR: Object to the form of the question, subdivision plan.

MS. MONTGOMERY: Subdivision ordinance. Well, just strike it and I'll start again.

BY MS. MONTGOMERY:

Q There is a written document that comprises the subdivision ordinance that the Jackson Township Board of Supervisors enacted, correct?

A **Yes.**

Q Is there a similar written document that comprises a moratorium on subdivision?

A **No.**

Q Now, you said you know that you informed Mr. Newton at least after the moratorium was put in place and I think you testified you're not sure exactly when, but now that you've said that it was January 2000 when you enacted -- or when you, I should say, put in place the moratorium, does that help you recall when you told Larry Newton about it?

A **No.**

Q Do you think you waited until the summer to tell him about it?

A **No. No, it wasn't that long. I -- I don't know -- I don't know days or weeks or -- that should be -- that should be available.**

Q When you told him?

A **No, when it was in the newspaper.**

Q Let me ask you this: How does Larry Newton bill the township for his time?

A **Hours of service.**

Q So he sends you monthly bills?

A **No.**

Q Does he send you quarterly bills?

A **No.**

Q What does he send you?

A **Whenever he has some time. I guess in theory he's a full-time solicitor but his services aren't used every month or something like that. It's just on an as -- as-needed basis.**

Q Is he on a salary or he's on an hourly?

A **Hourly.**

Q So if he performs work for you, then he writes it down somehow, describes what the work is and sends it to you in an invoice?

42

A **He sends it to the township secretary and it's shown to us at the meeting, yes.**
Q So she shows you that?
A **Yes.**
Q Do you recall seeing some time on a township -- on your township solicitor's bill for discussing the moratorium or reviewing the moratorium or anything like that?
A **No.**
Q No?
A **(Witness shook his head negatively.)**
Q You don't recall it?
A **I don't recall it.**
Q Well, you said you don't think you waited until the summer, right? Do you think that you told him about the moratorium within a few weeks?
A **I don't know.**
Q Well, you don't have to know the exact date. I mean, that's not what we're looking for at all. We just need an approximate time frame. Do you think it was still winter when you told him about it?
A **Yes.**
Q What makes you think that?
A **I -- I wish I could remember when the item was in the newspaper. I just ...**

43

Q You think the item went into the newspaper after the moratorium was in place?
A **Yes.**
Q I see. What makes you think the item went in the newspaper after the moratorium was in place?
A **I don't know.**
Q Did you all decide, well, now we have the moratorium, we better post it in the newspaper so everybody knows about it?
A **Yes.**
Q So who did you discuss that with?
A **The solicitor.**
Q Did he tell you that now that you have a moratorium you better put it in the paper so the public knows about it?
A **No.**
Q But you discussed it with him, right? What was the nature of the discussion?
A **He was informed that the Jackson Township supervisors enacted by unanimous vote at the meeting and set into motion the moratorium for subdivisions and land use in Jackson Township until the ordinance was adopted.**
Q So whose idea was it to put it in the paper?
A **I don't know.**
Q You don't know?

44

A **No.**
Q That's okay. It's okay if you don't remember. I'm just asking you. Did you discuss it with Ann Wirth?
A **Discuss --**
Q Putting the notice of the moratorium in the paper with Ann Wirth after the moratorium was put in place.
A **No.**
Q You didn't discuss it with her?
A **What would the need be, she's right at the meeting taking down the information.**
Q I'm just trying to get to the point of who decided to put the notice in the paper. At the January 2000 meeting when you put the moratorium in place, did you go through a process of making a motion? Did somebody make a motion to put a moratorium in place and was it approved and all that or did you just all decide to stick it in the minutes that there was a moratorium in place?
A **I don't remember.**
Q If you did that, if you made a motion, if you said we now move -- somebody moves that there's a moratorium to be put in place on subdivisions and somebody else seconds it and somebody else says, you know, all in favor, would that be in the minutes?
A **Yes.**

45

Q It should be in the minutes if you did it?
A **Yes.**
Q Let's talk about the first time that you met David Corneal. Do you recall it?
A **Yes.**
Q When was that?
A **I don't remember the day.**
Q What was the occasion?
A **I believe he pulled into my business establishment.**
Q For what purpose?
A **If I remember correctly, it was to do some work for him.**
Q What kind of work?
A **Clean up a site.**
Q Clean up a site in what -- for what, do you know?
MR. SHERR: Objection. Did you say clean off the site?
THE WITNESS: Clean up the site.
MR. SHERR: Clean up?
THE WITNESS: Up. Yes, up.
BY MS. MONTGOMERY:
Q Clean up a site for what?
A **It was some litter that deposited over the**

**years and he -- David wanted it cleaned up.**
Q So it was some trash on his property you mean?
A **Yes.**
Q And so did you perform that work for him?
A **No.**
Q Why is that?
A **I just never got to it. It was a --**
Q It was a busy time?
A **Well, it was weather related and I didn't make it.**
Q So then did you have occasion to meet him another time after that?
A **Yes, and I -- I can't recall the dates, but he needed a backhoe.**
Q For what?
A **Soil probes.**
Q For his soil probes. So did he come again to your business establishment?
A **I think so.**
Q Well, in any event, you agreed to go out and do excavation work in connection with the soil probes?
A **Yes.**
Q When you agreed to do that, did Mr. Corneal explain to you what he intended to do with his property?
A **I don't recall.**

Q Did he tell you that he wanted a number of lots on his property?
A **I remember the part that he wanted various probes dug, but I -- I don't recall of him saying exactly how many lots he was looking for or anything like that.**
Q Did you understand he was looking for at least another lot to build a building for himself, a dwelling for himself?
A **Yes.**
Q Did you understand that he was also looking for at least another lot perhaps for his -- for family members?
A **No.**
Q So did you understand he wanted to subdivide his property at least into two lots?
A **I under -- I was under -- under the understanding that he was going to split it up into lots, yeah.**
Q You were under that when you went out to do that work?
A **Yes.**
Q Is it your understanding that Mr. Corneal also knew at that point that you were also a township supervisor?
A **I don't -- I don't know that.**
Q So you went out and you performed the

excavation work for Mr. Corneal?
A **Yes.**
Q What did that involve?
A **Driving a backhoe all over the property and the sewage officer -- and I can't even remember if Mr. Corneal was there -- deciding we're going to try this soil, this site here and move on, that type of thing.**
Q Did you make reference to a plot plan at that point or a plan or a survey of any type?
A **I don't recall.**
Q Do you recall whether there was a map, a survey map or anything like that that accompanied you in your work that day?
A **No.**
Q Did you have a written contract with him for the services?
A **No.**
Q You just agreed on a price or was it on an hourly or what?
A **Hourly rate.**
Q Did you actually do the work yourself?
A **No.**
Q Who did it?
A **I believe Mike Foster was on the backhoe.**
Q Mike Foster?

A **Yes.**
Q Is Mike Foster your nephew?
A **No.**
Q Do you have a nephew who works for you?
A **Yes.**
Q What's his name?
A **Matt Armstrong.**
Q Matt Armstrong. Do you think maybe he was at that project?
A **I'm sure that Matt was there at one time or another. I just can't recall -- I have more than one hoe operator and ...**
Q Do you know how Mr. Corneal came to hire you for this project? Did somebody recommend him, do you know?
A **I don't know.**
Q Do you know whether you'd ever seen Mr. Corneal at a township meeting prior to the time that Eagle Excavation did the work?
A **I don't recall.**
Q But you said that you had met Mr. Corneal prior to the time you did the excavation work in connection with his request that you do other work on his property, correct?
A **Yes.**
Q Do you recall how long you talked to him at

that meeting?
A **It was sort of a walk around chatty type and that could be the -- the time that I said that I was a township supervisor. I just -- it's been a while.**
Q Did you ever mention -- when Mr. Corneal first contacted you to do the work on the property either removing his debris or digging the test pits, did you mention a proposed moratorium to him at that time?
A **I advised Mr. Corneal at one of the times we were there working on the sewage that if he was going to subdivide his property he should do it this year because there's -- the township is working on ordinances for 2000.**
Q So that would indicate that you did understand he was trying to subdivide his property --
A **Well --**
Q -- when you were doing that work for him, correct?
A **These things sort of evolved in the days that we were there working. I can't ...**
Q Did you come out to the property at some point when somebody else was running the backhoe in connection with digging the test pits?
A **I was in and out -- that's what I do. I -- I have various jobs going and I'm here, there and everywhere.**
Q So you just go out to oversee it and that sort

of thing?
A **See if everything is okay.**
Q So you advised him that he ought to subdivide his property at the point that you were doing his excavation because you were going to put a subdivision ordinance in the next year, right?
A **Yes.**
Q Do you recall what Mr. Corneal said back to you about that?
A **No.**
Q At the time that you were out there working on his property, or that Eagle Excavation was out there working on his property was the township considering a moratorium at that point?
A **No.**
Q After you dug the test pits, did the Corneals ask you to do any other work on their property in your capacity as Eagle Excavation?
A **Yes.**
Q What was that?
A **To shale a road.**
Q And what road was that?
A **The old logging road that went down to -- and crossed the power line and actually got to where it crossed the stream, Laurel Run.**

Q So did you shale that road?
A **No.**
Q Why not?
A **I came back to the office this one day and there was a slip of paper there from David that McClintic had said that it will take X amount of shale -- loads of shale to do this road and I just -- I just didn't get to it.**
Q So you intended to do it but you just didn't get to it?
A **Well, the length of time that had transpired there, the next thing I knew somebody else was doing it.**
Q So Mr. --
A **It's not that I -- I had my shale pits right there across the road from his house.**
Q So you intended to do it but he got somebody else to do it?
A **I intended to do it, but I -- I was busy.**
Q Okay. Did you have any problem with where -- you know, any concerns at all about where he was putting that road that he wanted you to shale -- was that road already there?
A **It was an existing log road.**
Q So did you have any problem with shaling that road? Did you think there was anything wrong with that?
A **No.**

Q Did Mr. Corneal ask you then to do any other work on his property?
A **No.**
Q So you dug the test pits. Did you help at all in any way with the perc tests?
A **Yes.**
Q What did you do there?
A **We dug the holes and supplied the water for the sewage officer.**
Q And that was a different day than actually digging the test pits, right?
A **Yes.**
Q So you did actually perform some other work for him?
A **Yes.**
Q That's all right. Did you do the perc tests after he asked you to shale the road or before?
A **Before.**
Q So asking you to shale the road, was that the last thing he asked you to do for him on his property?
A **Yes.**
Q Did you know why Mr. Corneal was asking you to help with the perc tests on the property?
A **No.**
Q You didn't know what he was looking for there?

A Well, that was -- that was to get -- for the sewage officer to set the perc rates, is all --
Q So he was looking for on-lot septic system?
A Yes.
Q On a variety of lots, right?
A Yeah.
Q Did you understand that at the time?
A Yes, yes.
Q Did you actually perform the perc test yourself?
A No.
Q Who did it?
A My crew.
Q Do you recall who from your crew went out and did it?
A No.
MS. MONTGOMERY: Well, let me just consult for one second.
(Break taken from 10:01 a.m. until 10:02 a.m.)
BY MS. MONTGOMERY:
Q Did Mr. Corneal pay you for doing the work on his property, pay Eagle Excavation for doing that work?
A Yes.
Q He paid all his bills?
A Yes.

Q Do you recall how much the work was --
A No.
Q How much the work cost?
A No.
Q Do you recall when you finished up the work on the property with the perc tests?
A June, July, August, late -- it was late summer. It was dry. July, August, in that area.
Q Was it your understanding that the sewage enforcement officer had found a number of good sites for on-lot sewage systems on that property?
A Yes.
Q Now, the property itself, the Corneal property, are you familiar with that property from before you knew Mr. Corneal?
A Yes.
Q And how are you familiar with that property?
A That was my grandfather's farm so I ran around there a lot as a tyke.
Q Did you ever live there yourself?
A No.
Q Your grandfather owned the farm -- the farmhouse that exists on the property now --
A Yes.
Q -- is that correct? Did he also own the whole

piece of land that Mr. Corneal owns there?
A Yes.
Q So there's approximately 95 acres, is that what it is? Is that what your grandfather owned?
A No.
Q What did he own?
A He owned on the other side of the road, too, clear across Route 26, which over the -- through the fifties and stuff it was chopped up.
Q He sold it off through the fifties?
A Mostly to his children, yeah.
Q Do you live near Mr. Corneal's property?
A No.
Q How far from it do you live?
A Approximately three miles.
Q When did your grandfather sell the farmhouse?
A Unfortunately he didn't. I believe it was an estate sale.
Q Oh, he passed away?
A Yes.
Q I'm sorry. Did you -- I didn't mean to ask you the question like that, I apologize. Did he sell -- well, when the estate sale occurred, was it for the entire 95-acre piece?
A No.

Q What was it for?
A It was -- and I don't know the acreage. Across the township road from the farmhouse and barn, there was acreage there that went with it.
Q So there was still --
A It was a bigger plot, yeah.
Q And who bought the property at that point?
A Taylor Wilson.
Q Is that a relative of yours?
A Yes.
Q How is he related or she related to you?
A He's deceased too. He was a second cousin.
Q I see. So the property -- when did the estate sale occur?
A I believe I was a senior in high school, '59, '60, along there somewhere.
Q And then your second cousin bought the property and how long did he own it?
A Up until -- I don't know when he sold that half off. I don't know. He split the property.
Q He split the 95 acres that Mr. Corneal owns?
A And kept everything on the west side of Miller Road -- I mean Sawmill Road.
Q Do you have any interest in purchasing the old Wilson homestead there?

A **I -- I think at -- in our -- no. I was wandering there. I was thinking of -- we were walking around and David and McClintic -- I don't remember who was around, but I was sort of reminiscing about my grandkids, it would be nice to have a place away from the highway that the kids could go, but, geez, I couldn't afford to buy the property.**
Q Are you aware of whether or not your nephew approached Mr. Corneal about buying the property?
A **I am aware.**
Q And what happened?
A **He came back to me all excited and wanted me to lend him money and I didn't have the money to lend him.**
Q He wanted to buy the old homestead?
A **Yeah.**
Q Did you and he discuss whether or not you could buy it together or anything like that?
A **No.**
Q Did you ever discuss with him any way that you could keep the property in the family?
A **No. What I might say is I advised him to go to Kish Bank and see if he could get a mortgage set up, that's what I advised him.**
Q Well, what your nephew was interested in buying, was that the 26-acre piece with the farmhouse on it?

A **Yes.**
Q How did you become aware that the Corneals were interested in selling that 26-acre piece off?
A **I don't recall.**
Q Did you ever try to help your nephew or anybody else find the money to acquire that 26-acre piece since Mr. Corneal has owned it?
A **No.**
Q Did you ever request that anybody assist your nephew in purchasing it?
A **No.**
Q Now, at what point do you recall your nephew coming to you all excited and talking about buying the property?
A **I don't remember.**
Q Was it around the time you were doing the excavating work?
A **I don't believe.**
Q You think it was later than that?
A **Yes.**
Q Do you think it was -- was it before the winter, does that help?
A **I don't know.**
Q Well, correct me if I'm wrong, the excavation work was done in 1999; isn't that correct?

A **Yes.**
Q Do you think it was before January 2000 when you put the moratorium in place?
A **I -- I really don't know.**
Q Do you recall what your nephew was wearing? Was he wearing a coat when he came to talk to you?
A **I -- I can remember him come flying -- I was at the shop. He come flying in all excited that there was a -- he had maybe a chance to get the property, but I -- I can't recall when.**
Q Let me ask you this: We talked a moment ago or so about Mr. Newton's bills. You said you review the bills at the township meetings?
A **Did I say that?**
Q I believe you did.
A **I think I said that the -- the bills were brought to the township meeting to be looked at by the supervisors and -- which authorize payment, yes.**
Q Do you know where the bills are kept then?
A **I assume the township office.**
Q So they're kept by Ms. Wirth?
A **Yes.**
Q Does she have a file, do you know? Does she keep a collapsible folder or something like that or --
A **What I know is the supervisors paid for two, I**

**believe they're four-drawer, filing cabinets because whenever we go into all the flood issues we had no storage room for records, to keep all the flood records and things and -- we had no place to keep those.**
Q I see.
A **Which was -- geez, I forget. How could I forget that? The flood when we lost the bridges, five years ago.**
Q Ninety-six?
A **Yes.**
Q The big flood that came through here as well --
A **Yes, yes.**
Q -- in '96, the winter, February?
A **Exactly. I had been a supervisor one month and disaster hit, yes. What a learning experience.**
Q That's right. Now, at the time you were doing the excavation work for Mr. Corneal, did you discuss Mr. Corneal's intent to subdivide with the other township supervisors?
A **I don't recall.**
Q Did you discuss it with Miss Wirth?
A **I don't believe.**
Q Even in passing, even just casually?
A **It's possible that it -- I said something**

62

**about it because as soon as people see me coming with a backhoe -- it's a small community and -- what are you doing over there. And it's possible that I said in passing to somebody that, well, I think Mr. Corneal is going to subdivide his property. I -- I think -- if that happened, it happened that way, just as a casual thing. I don't -- I don't really recall.**

Q Mr. Wilson, you subdivided some property not too long ago; isn't that correct?

A **Yeah, I had approximately 12 acres that was subdivided before I became a supervisor. My -- I have two sons and for sons to get mortgages to build homes for their families they have to own land so I had the property subdivided.**

Q So you divided your 12 acres into how many lots?

A **Three.**

Q Now, I think you testified that that was subdivided before you became a supervisor, correct?

A **Yes.**

Q But you also said you became a supervisor in 1996, correct?

A **Yes.**

Q Well, I'm going to show you a document that we will mark as Wilson 3 and I'll just ask you to look it over.

63

(Subdivisions reviewed by HCPC produced and marked as Wilson Exhibit No. 3.)

BY MS. MONTGOMERY:

Q Do you see about two-thirds of the way down this document -- which is a list of subdivisions reviewed by the Huntingdon County Planning Commission, correct?

A **Yes.**

Q Do you see your name, W. Thomas Wilson there?

A **Yes.**

Q And the date is September 3rd, 1997?

A **Yes.**

Q So maybe you were just mistaken about when you subdivided?

A **A mistake?**

Q Well, I think you said you subdivided it prior to --

A **To becoming a supervisor.**

Q Right. But this is a list of subdivisions reviewed by the Huntingdon County Planning Commission which has you dated -- the date is September 3rd, 1997. Is it possible that you began the process of subdivision prior to becoming a supervisor and finished it afterwards?

A **Oh, no, that was all complete before I became a supervisor.**

Q Now, it's my understanding that the Huntingdon

64

County Planning Commission has to review every subdivision --

A **Right.**

Q -- proposed subdivision within Jackson Township before the supervisors will approve it; is that correct?

A **Yes.**

Q Well, let's look back further on this document. Two Corneal entries are on this document. Do you see them on the second page, one is --

A **Yes.**

Q -- dated February 10, 2000 and one is dated April 11, 2000, right?

A **Yes.**

Q Are those the dates of the submission of the subdivision plan to the township?

A **I don't know.**

Q Is this the date they were reviewed by the county, do you know?

A **I don't know.**

MS. MONTGOMERY: Just let the record reflect that there was some discussion going on between Mr. Wilson and his counsel.

MR. SHERR: And for the record, I was showing Mr. Wilson my doodles and my pad.

65

MS. MONTGOMERY: For the record, he was showing Mr. Wilson his yellow legal pad.

MR. SHERR: I was showing him the doodles on my legal pad, that's correct.

BY MS. MONTGOMERY:

Q So when you say that the subdivision was completed before you became a township supervisor, you mean that you'd already recorded the deeds and all that?

A **I don't know when the -- my son's recorded their deeds.**

Q But you'd already conveyed the deeds to them, that's what you mean by the subdivision being completed?

A **Well, I know it was before I was a supervisor because I had to deal with Koch, Wilson and Weiler as supervisors when I submitted my subdivision plan.**

Q So you submitted it to them and they approved it?

A **No. Well, they approved it, but it -- I didn't -- it didn't happen right away. DEP and county, every --**

Q So did your sons begin to build their homes before you became a township supervisor?

A **Yes.**

Q They did. Were they completed before you became a township supervisor?

A **No.**
Q No?
A **They're still not done.**
Q Were they living -- I understand.
A **Yes.**
Q Were they living in them before you became a township supervisor?
A **Yes.**
Q Both of them?
A **Yes.**
Q Now, you were talking earlier about the fact that it's a small community and people saw you with the backhoe and they'd say, you know, what are you doing up there. So that's what makes you think you probably told people what you were doing up on the Corneal property, right?
A **I guess that, yes. I --**
Q Is it your belief that people generally knew that Mr. Corneal was looking to subdivide his property up there around that 1999 time frame?
A **I don't think so.**
Q You don't think so. Do you think the township supervisors generally knew it?
A **I don't know that.**
Q Do you think the sewage enforcement officer

knew it?
A **Well, he did the sewage work. I'm assuming, yeah. I ...**
Q What about Ann Wirth, do you think she knew it?
A **I don't know.**
Q During that period of time that you were doing the test pits up there and the perc tests, do you recall anybody expressing any concern about Mr. Corneal's intent to subdivide?
A **No.**
Q Do you recall anybody saying anything about -- anything about it, like, you know, oh, there's another property owner here, he's going to break his property up into some lots or anything like that?
A **No.**
Q Let's go back to when you subdivided your property and you submitted a plan, right, to the township --
A **Yes.**
Q -- supervisors? Were there sewer modules attached to your plan?
A **I don't remember.**
Q Do you recall whether Barry Parks came out and did -- was Barry Parks the sewage enforcement officer at the time?

A **Yes.**
Q Did he come out and look at the property that you subdivided?
A **Yes.**
Q Did he perform the perc tests?
A **Probes and percs.**
Q So Eagle Excavating did the probes and percs and all that as well?
A **I don't remember.**
Q You don't remember the process?
A **No. The only thing that comes to mind is Judy Passmore did the designs for the septic systems.**
Q Did she do that after you got an approved sewage module?
A **I don't remember.**
Q Did she do it after you got approved test sites?
A **I'm sure because she had to have the work-up sheets to do that.**
Q She had to have approved test sites in order to make the design, correct?
A **Yes.**
Q Do you recall talking with Larry Newton at all about Mr. Corneal's intent to subdivide the property around the time that you were performing the excavation work out

there?
A **No.**
Q You don't think you talked to him about it?
A **No.**
Q Does your nephew work for anybody besides you?
A **I believe so.**
Q Who else does he work for?
A **Mr. Powell has a dairy farm on Powell Road. I -- he spends a lot of time there so I assume he's a part-time helper. I -- I'm speculating. I shouldn't do that.**
Q That's okay. Do you know how much money your nephew needed to come up with to buy the Corneal -- the 26-acre piece from the Corneals with the farmhouse on it?
A **He told me but I don't remember.**
Q Do you know if he discussed it with anybody else in your family?
A **No.**
Q Do you know John Hewett?
A **Yes.**
Q How do you know John Hewett?
A **John Hewett had me do some work at his property.**
Q Where is his property?
A **Property in Mooresville.**

Q Mooresville, is that in Jackson Township?
A **No.**
Q It's in --
A **West, I believe.**
Q Is it in Huntingdon County?
A **Yes.**
Q Is he a native of that area?
A **I don't know.**
Q So he had you perform his work -- some work at his property there. When was that?
A **A couple years.**
Q Did you have occasion to discuss with John Hewett the fact that Mr. Corneal was looking to sell off a piece of his property with the farmhouse on it?
A **In working at his property down there digging out -- he raises flowers. And digging those things out, I may have discussed with him -- because he was asking about where can he find a place where he can grow flowers, open fields, you know, and I may -- I may have said something that there's a possibility that there's going to be some property for sale in Jackson Township. I --**
Q Do you think you had that conversation with him?
A **It could have happened. It could have happened.**

Q When would that have been?
A **I don't remember.**
Q Was it around the time you were doing the work for Mr. Corneal at his property, the excavation work?
A **I believe before that.**
Q So you knew that Mr. Corneal was looking to sell off that 26-acre piece before you did the excavation work?
A **No, I -- other than my nephew checking that, I don't know how he became aware that he had that up for sale. I don't remember that, but that sort of led me onto the idea, I guess, that maybe Hewett would be interested in raising his flowers there in those open fields.**
Q So in any event, at some point John Hewett became interested in Mr. Corneal's 26-acre piece and farmhouse, correct?
A **Yeah, I -- I don't recall if I told him to give David a call. I just don't -- I don't remember.**
Q Do you recall when you first became aware that John Hewett did in fact enter into an agreement with Mr. Corneal to purchase that piece of property?
A **I don't -- I don't recall when.**
Q Do you recall whether it was before or after your nephew expressed his interest in the property?
A **After.**

Q So then after your nephew expressed his interest, then the Hewetts -- then you found out the Hewetts had entered into an agreement to purchase it?
A **Well, I didn't -- I didn't know they -- that they had gone into an agreement to purchase that.**
Q When did you find out that they had gone into an agreement to purchase it?
A **When they started coming to supervisor's meetings.**
Q When they started coming to supervisor's meetings?
A **Yes.**
Q Do you know when that was?
A **No, I don't.**
Q Was it before or after you put the moratorium in place in January?
A **I don't remember.**
Q So you testified that the Hewetts started to come to township meetings and you think that that was after they became interested in buying that piece of property from Mr. Corneal, correct?
A **I believe that.**
Q Did you have occasion to talk with the Hewetts about their interest in the property then around the time they were coming to the township meetings?

A **No.**
Q Even at the township meetings you didn't talk to them?
A **I may have talked to John and -- I forget her name. They introduced themselves with the pretense that they hoped to be citizens of Jackson Township and wanted to know the local officials and things like that, but I -- I can't -- I can't say right now that I knew at that time that he had some kind of a work-up with Mr. Corneal. I -- I don't know that.**
Q Well, was it your understanding when they introduced themselves as people who were probably going to be citizens of Jackson Township that that was going to be in connection with the Corneal property?
A **I assumed that.**
Q Do you recall Mr. Hewett speaking at the township meetings other than introducing himself?
A **No.**
Q Not ever?
A **Never.**
Q Did he ever speak to you outside the township meeting about anything in connection with his intent to purchase the Corneal property?
A **I don't remember that.**
Q What about his -- I guess girlfriend or

partner, whatever you would call her, do you recall speaking with her at all?

A **Just shook her hand at a meeting. I -- if she'd walk in here, I wouldn't even know her.**

Q Do you know how many meetings they came to?

A **No.**

Q Did you ever discuss the moratorium with the Hewetts? We call them the Hewetts, even though it's been represented to us that they are not married, but they are a couple, I think everybody agrees.

A **No.**

Q You never discussed the moratorium with them?

A **No.**

Q Did you ever discuss the proposed subdivision ordinance with them before it was enacted?

A **No.**

Q What about the completed subdivision ordinance after it was enacted?

A **They were at the meetings when those things were discussed, which was when the moratorium was on and the subdivision was being -- through its final stages in early 2000.**

Q Do you recall when the subdivision ordinance was enacted?

A **10th of July, 2000.**

Q So the moratorium was put in place January 4th, 2000 and what's that, seven months later the proposed ordinance -- the ordinance was actually enacted?

A **Yes.**

Q And they were at meetings, are you saying, between January 4th and the date that the proposed ordinance was actually enacted?

A **Yes.**

Q Did they come to any meetings after that?

A **I don't believe.**

Q Did they ever make a phone call to you and say, hey, what's going on with the proposed subdivision ordinance?

A **No.**

Q Did they ever make -- to your knowledge did they ever call any of the other township supervisors to express any concern about the moratorium?

A **I don't know.**

Q Did anybody call them and tell them, hey, there is going to be a moratorium in place so don't count on purchasing Mr. Corneal's property?

A **No.**

Q Do you know whether Ann Wirth called them and talked to them?

A **I don't know that.**

MS. MALADY: Could we take a break?

MS. MONTGOMERY: Yes.

(Break taken at 10:35 a.m. until 10:45 a.m.)

BY MS. MONTGOMERY:

Q Do you recall, Mr. Wilson, whether or not the Hewetts complained directly to you about the effect that the moratorium was having on their ability to purchase the Corneal property?

A **No.**

Q Do you recall offering them a farmhouse that you had that they could perhaps rent, a farmhouse that you had?

A **That discussion was at a meeting, when Mr. Corneal at the township meeting said that there was a problem there and he needed -- those people needed to get in there and I suggested why don't you rent them the farmhouse.**

Q Oh, I see. You mean why doesn't --

A **He rent his farmhouse.**

Q -- Mr. Corneal rent the farmhouse to them?

A **Yes.**

Q Until what?

A **Until the ordinances and stuff were in place and his subdivision was approved.**

Q Do you recall what meeting that was?

A **No.**

Q Was that last year, was it like in -- after the moratorium went in place obviously so it was after January 2000?

A **It was sometime in that -- that span, moratorium until enactment of the ordinance.**

Q Well, that just goes to my earlier question which was whether or not you became aware of the fact that Mr. Hewett was concerned about the effect the moratorium was having on him. Does that help you remember that you were aware that Mr. Hewett was concerned?

A **That discussion was at the meeting.**

Q It was at a township meeting?

A **Yes.**

Q Do you recall any more details about that discussion?

A **They were concerned of losing their -- what word do I want to use, their --**

Q Sales agreement?

A **Sales agreement or agreement they had with Mr. Corneal because they were afraid that the ordinance wasn't going to get passed in time.**

Q For them to go through with the purchase of the farmhouse --

A **Yes.**

Q -- and 26 acres? Do you know what eventually

did happen with respect to that sales agreement?

A The only thing I know is they bought property somewhere else. I don't know what happened with --

Q Do you know why they didn't purchase Mr. Corneal's property?

A Someone said that -- and I -- I shouldn't do that. No, I don't know.

Q Well, this is a discovery deposition so any facts or information or memory that you have is useful.

A Well, I don't -- I don't know who told me that they had taken their agreement away or something from Mr. Corneal and were going to buy the Rosdil property, I believe.

Q Is that in Jackson Township?

A Yes.

Q Did they tell you -- did that person tell you why they were taking that property -- or they were, as you said, taking the agreement away from Mr. Corneal?

A No.

Q Do you have any idea why they decided not to go through with that sale?

A The only thing I got from -- John called me whenever he was buying another piece of property and wanted to know if I could do some work for him there so he could get his flowers planted. I --

Q Did he talk with you at that time about the Corneal property?

A No.

Q Did he talk with you about the subdivision ordinance?

A I don't remember.

Q I'm not sure if I asked you this before, but I need to ask you now. Is it your understanding that before the board of supervisors can approve a subdivision ordinance -- I'm sorry, a subdivision plan, that that plan has to go to the Huntingdon County Planning Commission first?

A Absolutely.

Q Then it comes back to the board of supervisors and then they can approve it finally?

A It has a stint with the DEP too.

Q After the board of supervisors approves it, then the property owner can complete the subdivision and begin building, assuming all the permits are in place, correct?

A Can record the subdivision in the office in the courthouse in Huntingdon and proceed on.

Q If the subdivision has already occurred, can they go ahead and -- can the property owner go ahead and apply for building permits and get moving on it?

A That was the sticking point, I believe, at

some of the meetings because the subdivision had never been approved and Mr. Corneal wanted building permits and he had no sewage permits. So there was nothing issued.

Q Let me just go back a second. If the property had already been subdivided prior to the time that you had your subdivision ordinance in place, could then Mr. Corneal have gone and applied for his sewage permits and his building permits?

A If Mr. Corneal would have brought his subdivision in before the end of '99, as I had suggested to him, that it would be easier to get it before the new regulations were in place, everything would have gone right through, but things are -- things are a little different now with an ordinance.

Q But when he brought his subdivision plan in there wasn't any ordinance, was there?

A When he brought his subdivision plan in?

Q When he brought his subdivision plan into the board of supervisors there wasn't any subdivision ordinance, was there?

A No subdivision ordinance, right.

Q Did you want to look at that document for some reason?

A No, just to clarify my mind.

Q On the date that Mr. Corneal brought his

subdivision ordinance to --

MR. SHERR: That document being what has been previously marked as Wilson Number 3.

BY MS. MONTGOMERY:

Q Are you satisfied that you're correct in your earlier statement?

A There was no subdivision in Jackson Township. I'm satisfied with that.

Q No subdivision ordinance you mean?

A No subdivision ordinance, yes.

Q When Mr. Corneal brought his subdivision plan to the township?

A No, when he brought it to the township there was a moratorium on.

Q But no subdivision ordinance?

A Right.

Q I have a question for you about -- I want to go back for just a second to the sequestration order that's in place. This morning did you have an opportunity to speak with anybody about these depositions?

A No.

Q About your deposition?

A No. Well --

Q You said no. Okay, fine. When you got here this morning, what did you do?

MR. SHERR: If you need to explain your prior answer, feel free to do that.

MS. MONTGOMERY: I'm sorry, I didn't mean to cut you off.

THE WITNESS: Well, I discussed when I left the shop this morning with my son that I had -- I was probably going to be gone all day at depositions. And of course coming down here, as soon as I come in, I set down and then Tony showed up and we asked to have a conference with our attorney and we did that and then it was time to come down here.

BY MS. MONTGOMERY:

Q Who was all involved in that conference?

A **Ann Wirth, Mike Yoder and myself and counsel.**

Q That was this morning here in this office?

A **Yes.**

Q Where did you go to have that conference?

A **A-3? Yeah.**

Q Into a conference room?

A **Yes.**

Q And did you discuss your deposition at that conference?

MR. SHERR: Objection as to anything that was discussed at that meeting.

MS. MONTGOMERY: Well, you're under a court

order not to discuss the depositions with the other defendants.

MR. SHERR: Attorney/client privilege. I'm under a court order not to discuss the substance of depositions and we're following the court order. So if you think --

MS. MONTGOMERY: Well, you don't need to coach the witness.

MR. SHERR: -- that that abrogates the attorney/client privilege, then let's go talk to the judge about it.

MS. MONTGOMERY: We shall.

MR. SHERR: All right, let's do it right now. That will be the end of this deposition until we talk to the judge. Come on.

MS. MONTGOMERY: Are you going to call the judge?

MR. SHERR: Well, let's go over -- I'll call.

MS. MONTGOMERY: You can ask her.

MR. SHERR: You want -- if you want to abrogate the attorney/client privilege --

MS. MONTGOMERY: You want to call. What's your question going to be?

MR. SHERR: My question is going to be whether or not it was proper to assert the attorney/client privilege

where I just did.

MS. MONTGOMERY: Go ahead and call her.

MR. SHERR: I don't need to call her. If you don't need to call her, I don't need to call her.

MS. MONTGOMERY: You just said you wanted to call her.

MR. SHERR: No, if you question whether or not it was proper for me to assert the attorney/client privilege or if you were going to ask him more questions about what was discussed --

MS. MONTGOMERY: Could you read back the last say three questions. You have to go back to when -- can you do that? Would that be too much of a problem?

(The reporter read back as follows:

"QUESTION: I have a question for you about -- I want to go back for just a second to the sequestration order that's in place. This morning did you have an opportunity to speak with anybody about these depositions?

ANSWER: No.

QUESTION: About your deposition?

ANSWER: No. Well --

QUESTION: You said no. Okay, fine. When you got here this morning, what did you do?

MR. SHERR: If you need to explain your prior answer, feel free to do that.

QUESTION: I'm sorry, I didn't mean to cut you off.

ANSWER: Well, I discussed when I left the shop this morning with my son that I had -- I was probably going to be gone all day at depositions. And of course coming down here, as soon as I come in, I set down and Tony showed up and we asked to have a conference with our attorney and we did that and it was time to come down here.

QUESTION: Who was all involved in that conference?

ANSWER: Ann Wirth, Mike Yoder and myself and counsel.

QUESTION: That was this morning here in this office?

ANSWER: Yes.

QUESTION: Where did you go to have that conference?

ANSWER: A-3? Yeah.

QUESTION: Into a conference room?

ANSWER: Yes.

QUESTION: And did you discuss your deposition at that conference?"

MS. MONTGOMERY: And the objection is?

MR. SHERR: I stated the basis for it, didn't I?

MS. MONTGOMERY: I just wanted to hear it so we're clear about it. Can you tell me what the objection was?

MR. SHERR: Just so we're clear, since we were talking over each other, the objection was based on attorney/client privilege.

BY MS. MONTGOMERY:

Q Who asked for that court conference?

MR. SHERR: Excuse me? Objection. Who asked for what conference?

BY MS. MONTGOMERY:

Q I'm sorry, who asked for that conference here this morning in this office?

A **I did.**

Q You did?

A **Yes.**

# APPENDIX - I

## TABLE OF CONTENTS

Exhibit "1"  Plaintiffs' Amended Complaint

Exhibit "2"  Deposition Testimony of W. Thomas Wilson

Exhibit "3"  Deposition Testimony of David Corneal

Exhibit "4"  Deposition Testimony of Ann I. Wirth

Exhibit "5"  Deposition Testimony of Larry Newton

86

Q All right. Do you know why Miss Wirth accompanied you into that conference?
A **Yes.**
Q Why?
MR. SHERR: I'll caution you not to discuss anything that was discussed during the conference in my presence because it's privileged by the attorney/client privilege.
THE WITNESS: No comment.
BY MS. MONTGOMERY:
Q Did you discuss with Miss Wirth prior to your attorney being here why she would come into the conference with you?
A **Yes.**
Q And what was the nature of that discussion?
A **We're concerned about the welfare of one of our supervisors that's -- and we'd like to see him dismissed.**
Q From this case?
A **From deposition, that's ...**
Q You're talking about Mr. Weiler?
A **Yes. He's not well and that's why I called that this morning because I'm afraid the man will die and I don't want to do that.**
Q And what is wrong with Mr. Weiler?

87

A **He's got a bad heart and he's trying to take care of his sister, too, and she's dying of cancer.**
Q How old is Mr. Weiler?
A **Seventy-two.**
Q Does he work?
A **No.**
Q Is he retired?
A **Yes.**
Q Does he still attend township supervisor meetings?
A **Yes.**
Q When was your last township supervisor meeting?
A **They're always the first Monday of the month. I -- I don't know.**
Q Was there any kind of a meeting this week of the township supervisors?
A **If it was the first Monday -- I'm sorry.**
Q You don't recall?
A **I don't recall.**
Q Did you have some sort of a meeting with Barry Parks this week?
A **No.**
Q Was Mr. Weiler at the last township meeting?
A **Yes.**

88

Q Where does he live?
A **Up Allan Seegar Road, approximately five miles from the fire hall.**
Q So he travels to the fire hall for the township meetings?
A **Yes.**
Q In the evenings?
A **Yes.**
Q And what's the matter with Mr. Weiler's heart?
A **He's had two heart attacks and he's got a lot of fluid and he has to wear oxygen at night because they're afraid he's going to have a --**
Q I'm sorry, he has to wear what at night?
A **Oxygen.**
Q Oxygen?
A **Yeah, for -- to sustain him through the night. They think he'll just die. So I'm concerned.**
Q Having told me that, I still need to ask you the question why you decided that Miss Wirth had to accompany you to that meeting?
A **All three of us were in that meeting.**
Q That still doesn't explain why Miss Wirth had to accompany you into the meeting.
A **Miss Wirth calls him several times a day to make sure he's okay and his sister is okay.**

89

Q With respect to Miss Wirth's interaction with the township supervisors, does she pretty much do everything with the township supervisors? Does she accompany you on all of your say outings and jaunts, wherever you have to go, if you have to go up and see the township solicitor and stuff like that?
A **Yes.**
Q Does she come to every meeting with the township solicitor that you can think of?
A **Yes.**
Q Why is that?
A **Because I can't remember things and I -- we -- I'm sorry, we depend on her to take notes and keep us apprised of what I said or did or something I --**
Q Is she pretty much involved in every event or task or undertaking that occurs among the township supervisors then?
A **We burden her with all the letters, correspondence, calls that have to be made. We -- that is her duty, we assume, yes.**
Q Do you recall whether you discussed the agreement of sale between John Hewett and the Corneals -- well, I should say the Hewetts and the Corneals with Larry Newton?
A **No.**

Q You don't think you discussed that with them?

A **No.**

Q Did you ever tell them anything about the fact that the Hewetts had abandoned that agreement of sale at any time?

A **No.**

Q Do you know anything about a Department of Environmental Protection or any other governmental complaint that was filed against the Corneals in connection with their property?

A **I know of no formal complaint.**

Q Do you know of an investigation that was performed by any governmental entity in connection with wetlands on their property?

A **Yes.**

Q What do you know about it?

A **When the -- Mr. Corneal took his subdivision into county planning to have it reviewed to get his -- as we suggested, as a jump ahead, a letter is -- comes out of there from the review and on that letter it's noted -- which is why the township uses the county planning to oversee the county and how it goes to the comprehensive plan. It was listed that there were steep slopes and hydric soils in association -- those are usually associated with wetlands.**

**This is standard procedure with all our**

**subdivisions. Those readouts come to us and I'm sure Mr. Corneal got one too because on the carbon at the bottom -- there's carbon copies of who all it got too.**

**And those things we have to investigate as a township because of the situation we're in. We're in a high quality stream area, prominent trout streams, and we work closely with the soil conservation district. And every chance we get, we get money from them to help with our roads and stuff and we need -- we need to keep that cooperation going because we need that money. So we look after our environment, that's ...**

Q What about -- let's see, who do you typically rely upon to tell you whether or not there's wetlands on a property that an individual seeks to build --

A **The conservation district.**

Q What about the sewage enforcement officer?

A **He may say that there's some there, but that isn't our final authority to clear -- to satisfy us. The conservation district does that.**

Q So typically if you get a -- say a request for a building permit or a proposed subdivision plan in which the sewage enforcement officer has already done a site investigation and percolation test report, okay, and on that test report there's an indication that there aren't any wetlands, do you then always go and ask somebody else for a

second opinion on that?

A **There aren't any, is that what you asked me?**

Q Yes.

A **I'm sorry.**

Q If the sewage enforcement officer says there's no wetlands on the property, do you always go and get somebody else to tell you whether that's correct or do you accept his word for it?

A **No. No, that report will come from the county.**

Q Well, let's look a second. I mean, as you understand it, is there an entry on the form sewage facilities planning module that comes from the Commonwealth for checking off whether or not there are wetlands, as you understand it?

A **I believe that you -- the sewage officer checks that off.**

Q Right. So that's really what I'm asking you.

A **That's correct, he checks that off, but when -- the whole subdivision plan comes from just the areas that he has done his site work, he sees no wetlands, okay, but whenever the overall plan is reviewed by the county, where they have the big maps, if they see that there's something there that was walked by or around or there's a hollow or something there that the sewage officer really**

**didn't have any business in there, he isn't looking for suitable sites, then it's handled by the conservation district.**

Q So why don't you hold on to that exhibit which is Wilson Exhibit 2, right?

A **Yes.**

Q And let's look at the place on there where there's a place for the sewage enforcement officer to check on whether or not there's going to be any wetlands affected by the construction of a proposed -- construction of a sewage system at a proposed site, okay. So we have a space for that on here, right, on page 2; isn't that correct? Do you see that?

A **Yes.**

Q It's Question 1.3, right?

A **Yes.**

Q Actually that wasn't the one, I'm sorry. When you looked at this sewage module for the Corneal's property and under those questions it says -- for example, 1.3, will any work associated with this project take place within 50 feet of a stream, waterway or wetland and it's checked yes, correct?

A **Yes.**

Q Now, it says stream, right, on the other side of it?

94

A Um-hum.
Q Correct? Did you express any concern to the SEO about that?
A **I never seen this before today.**
Q You never saw this before today?
A **No.**
Q It wasn't submitted with Mr. Corneal's initial --
MR. SHERR: I'm going to object to both attorneys asking questions.
MS. MALADY: I'm sorry.
MS. MONTGOMERY: She's talking to me.
MR. SHERR: Well, she's talking out loud and I think that has to be placed on the record if she's thinking out loud at a deposition.
BY MS. MONTGOMERY:
Q The sewage facilities planning module was not attached to any subdivision plan that Mr. Corneal submitted to the township?
A **I've never seen the subdivision plan.**
Q Did Mr. Corneal try to hand you a subdivision plan at a township meeting one time?
A **He laid a subdivision plan on the desk on the table at our meeting -- oh boy, February? And he was informed that there was no subdivisions being reviewed at**

95

**this time because of the moratorium and he suggested that -- someone suggested to him, one of the supervisors or -- that if he -- it had to go to the -- the Huntingdon County Planning to be reviewed anyhow and if he wanted to have a step up while we're working on the ordinance to take it in. I -- I seen it. I couldn't even tell you what it looks like. He laid it down there and he picked it up and took off with it.**
Q Are you saying that he took the plan back with him?
A **Yes.**
Q Did he try to get you to keep the plan?
A **No.**
Q He put it in front of you and you said we don't want this plan right now, take it to the Huntingdon County Planning Commission?
MR. SHERR: Object to the form of the question. You're trying to misstate his testimony at this time.
BY MS. MONTGOMERY:
Q You can correct me if I'm wrong, Mr. Wilson. You told him we're not going to take your plan right now, you should take it to the Huntingdon County Planning Commission; is that correct?
A **No.**

96

Q What was correct?
A **It was -- it was suggested -- he wondered about the procedure. It was suggested that to save time he take it to Huntingdon County to have it reviewed, but still no action can be taken on it until the supervisors sign it.**
Q So I think what you're telling me is that it may or may not have been attached to the subdivision plan but you didn't look at the subdivision plan on the day that he gave it to you; is that correct?
MR. SHERR: Objection. The question is ambiguous and you didn't define what it is. You can answer the question.
BY MS. MONTGOMERY:
Q Do you understand my question?
MR. SHERR: You can answer the question if you understand the question.
THE WITNESS: There were no items attached to that plan that he laid on the table and took off. I -- I think he told us at the meeting when he laid it down it's for five lots. I can't -- and that's -- that's ...
BY MS. MONTGOMERY:
Q So is what you're calling a plan just a map?
A **Subdivision plan, a layout with all the details, sewage, probes, percs, everything is on there, wetlands, everything, streams, roads, yes.**

97

Q And you're saying that there were -- there was nothing attached to that the day that he came to the meeting?
A **No, it was just a -- a piece of paper.**
Q Just one piece of paper?
A **Yes.**
Q In any event, if the sewage enforcement officer tells you that there are no wetlands on a piece of property on which an individual is seeking to build and place an on-lot septic system, do you accept his word for it?
A **Not if the county sends out its referral that there's wetlands on that property.**
Q Is that what happened with Mr. Corneal's property?
A **Yes.**
Q The county came back and said there are wetlands on that property?
A **Yes.**
Q Then did you call and file a complaint against Mr. Corneal about an attempt to construct on property with wetlands?
A **No.**
Q Did Ms. Wirth to your knowledge?
A **No.**

Q Do you know how the Army Corps of Engineers came to go out and do an investigation on Mr. Corneal's property?
A **I don't know.**
Q Do you know that they did an investigation on Mr. Corneal's property?
A **Yes.**
Q Do you know why they did an investigation on his property?
A **I talked to the director of the Huntingdon County Conservation District after that because I got a -- I personally received a call from the conservation district and I asked Andy what happened, because we refer these to Andy. He's in charge of the county.**
**Well, he was concerned because they'd already issued -- which we didn't know. They told us at that time issued a permit for a stream crossing and then we had this wetland issue. So he assumed -- he didn't go out to look at the -- he just issued the permit to -- I think he told me it was McClintic. And after this alarm went off, he decided to call in someone else to assist them with the evaluation of that property.**
Q So is it your belief, your understanding that the Army Corps of Engineers showed up there because of something the county did?

A **No, something that the conservation district asked them to do.**
Q You think the conservation district called the Army Corps of Engineers and said you need to go do an investigation?
A **I assume that. I didn't call them.**
Q Who did you talk to from the conservation district about this?
A **Andy Patterson.**
Q And who is Andy Patterson?
A **Director.**
Q Director of -- what's your conservation district?
A **Huntingdon County.**
Q Is that a county district or is it a federal district or what?
A **County.**
Q And so you think that Andy Patterson called the U.S. Army Corps of Engineers and had them come out?
A **I don't know.**
Q Do you know whether Miss Wirth called anybody in connection with possible wetlands on Mr. Corneal's property?
A **I don't know.**
Q Did you call anybody in connection with

possible wetlands on Mr. Corneal's property?
A **No.**
Q Do you have any -- can you think of any other instance wherein a sewage enforcement officer in Jackson Township has been unconcerned about wetlands and the county has expressed some concern about wetlands?
A **No.**
Q Can you think of another instance?
A **No.**
Q Just Mr. Corneal's instance?
A **That's -- that's the only one I can think of.**
Q Do you know of any instance at all when anybody called any government agency and filed a complaint about Mr. Corneal?
A **No.**
Q Did you ever discuss with Larry Newton the denial of the Corneal -- or the refusal of the Corneal subdivision plan?
A **No.**
Q Not ever, not even to this day?
A **We're in litigation with Mr. Corneal, the township.**
Q You mean up in the county?
A **Yes.**
Q So you've discussed it with him in connection

with that?
A **Mr. Newton is aware that the subdivision is not approved.**
Q When did he become aware of that?
A **I don't know.**
Q If you're going to ask Mr. Newton for advice on behalf of the township supervisors, do you call him or does Miss Wirth call him?
A **It depends.**
Q Do you sometimes call him?
A **Yes.**
Q Have you ever called him for advice in connection with the Corneal property?
A **No.**
Q Have you ever called him with a group of other people for advice in connection with the Corneal property?
A **No.**
Q Have you ever directed anybody to call him for advice in connection with the Corneal property?
A **No.**
Q Do you know whether anybody among the township supervisors or Miss Wirth or the sewage enforcement officer or anybody else connected with the township has called Mr. Newton for advice in connection with the Corneal property?

102

A No.
Q You don't know or you think they haven't?
A **I don't know.**
Q What about in connection with the subdivision ordinance, did you call him personally and ask him how you ought to go about enacting a subdivision ordinance?
A No.
Q Do you know whether anybody else did?
A **I don't know.**
Q Do you know whether you heard from any of the others in your group, your township supervisors, the township secretary, Ann Wirth, the sewage enforcement officer, anybody in the township governing body whether they had gotten advice from Larry Newton about the subdivision ordinance?
A **I don't know.**
Q What about the moratorium?
A **I'm sorry?**
Q What about the moratorium? Do you know whether any of the township supervisors or the secretary or the sewage enforcement officer or any other township official sought advice from Mr. Newton about the moratorium?
A **I don't know.**
Q When you were going through with enacting the ordinance, did you believe that you were doing it in

103

accordance with the law?
A **Yes.**
Q How did you believe that?
A **The Township Code and the Municipal Planning Act.**
Q Who studied that for you?
A **Who studied that?**
Q Yes.
A **We have it. We read it.**
Q So you read it and you thought that you were doing the right thing?
A **We did the right thing.**
Q Did you actually sit down and open it up at some point and say, gee, I better make sure I'm doing the subdivision ordinance procedures correctly? Is that what you did, or you just thought you knew them in your head or what?
A **Oh, no. Used the law to formulate what we did, the code.**
Q Let me ask you this: How long were you considering enacting the subdivision ordinance as a body, the township board of supervisors?
A **We've been working on it for pretty near two years.**
Q So that means you've been working on it since

104

-- well, you mean before it was passed you had been working on it for two years?
A **(Witness nods head affirmatively.)**
Q So that would be sometime in 1998, correct?
A **Yes.**
Q What all did you do in connection with working on enacting the subdivision ordinance?
A **Attended -- attended all the sessions that were available at the state convention, discussed with other townships as to the procedure they followed and just kept working at it and working at it and put it -- it finally got to the county and they reviewed it and then they wanted some changes. So it wasn't easy. It wasn't easy, but we have it.**
Q Did you make successive drafts of it?
A **I think the -- the draft that was up that went to the county -- the answer is yes, that's -- I'm sorry, I'm a little slow.**
Q Who typed up the drafts for you?
A **I believe they were done in the township office.**
Q You think Miss Wirth typed them?
A **If she didn't, she had somebody do it. I -- I believe that. I didn't ask.**
Q Did you send the draft ordinances to Larry

105

Newton as they were being considered?
A **No.**
Q Do you know if anybody else sent the draft ordinances to Larry Newton as they were being considered?
A **I don't know.**
Q Did you keep copies of the draft ordinances available for the public to look at as it was under consideration for that two year period?
A **At several of our meetings the drafts were available for the citizens and they were reviewed and they had the opportunity to come to the township office to review them as we were progressing along because we have some citizens in the township that are very concerned with heritage and they wanted to make sure that everything was covered in there because of our quaint little villages and buildings that are around there.**
Q Now, if the draft ordinances were taken to a township meeting and made available for the public, that would be reflected in the minutes, correct?
A **It should be reflected in -- yes.**
Q Would you have put an advertisement or anything in the paper to say at the township meeting we're going to be circulating the proposed draft subdivision ordinance so the public can come look at it?
A **No.**

Q So how would the public know that it was there to come look at it?
A **Public meeting every month.**
Q Just because it's a monthly public meeting?
A **Yes.**
Q So if there is something special going on at a public meeting, don't you usually put a notice in the paper?
A **Yes.**
Q But you didn't consider the circulation of a proposed draft subdivision ordinance something special that you needed to put the public on special notice of?
A **Not at those stages.**
Q Ultimately when you got your final subdivision ordinance completed in the form that you thought you could enact, did you then send it to Larry Newton --
A **Yes.**
Q -- for review? Do you know when you did that?
A **No.**
Q Do you know who did it?
A **Who delivered it to him?**
Q Yes.
A **I don't know.**
Q Do you have any memory whatsoever of which township supervisor first asked the board to consider a moratorium on development in the township?

MR. SHERR: Objection. It's been asked and answered. Sorry, I thought you were done. Objection, it's been asked and answered. You can answer it again.
THE WITNESS: No.
BY MS. MONTGOMERY:
Q Did you send your proposal or a proposal for a moratorium to the Huntingdon County Planning Commission?
A **I don't know.**
Q Do you recall discussing it with the Huntingdon County Planning Commission at all prior to the time that you put it in place in January 2000?
A **No.**
Q Do you recall when you sent the final subdivision ordinance to the Huntingdon County Planning Commission for its review?
A **No.**
Q Do you recall that you did send it to the Huntingdon County Planning Commission for review? Do you recall sending it to the Huntingdon County Planning Commission for review at all?
A **Yes.**
Q When did you do that?
A **I don't remember.**
Q You just didn't remember exactly when?
A **(Witness shook his head negatively.)**

Q Was it after it was passed?
A **No.**
Q Do you think it was before it was passed?
A **We had to have their input to get the final draft.**
Q You did get some input from the Huntingdon County Planning Commission on that final draft?
A **Oh, yes.**
Q How much input did you get?
A **Pages I'm --**
Q Do you know what happened to those pages -- what, was it comments or something written on the drafts that you sent?
A **They sent back the copy with recommendations of changes to the ordinance, additions, deletions, that type of thing.**
Q Do you know what happened to those drafts with the notes of the Huntingdon County Planning Commission?
A **No.**
Q Do you think they still exist somewhere?
A **I don't know.**
Q What about the driveway ordinance that you put in place in the township, did you send that to the Huntingdon County Planning Commission for its review?
A **No.**

Q Why not?
A **I don't know.**
Q Prior to enacting the ordinance did the township charge residents fees when they put in a driveway, when the residents put in a driveway?
A **No.**
Q Was there any kind of a charge at all imposed upon a resident in connection with their construction of a driveway?
A **Before the ordinance?**
Q Before the ordinance.
A **None.**
Q Now, that wasn't -- you're saying the township didn't do it. Do you know whether anybody else did it?
A **No one else did it.**
Q Correct me if I'm wrong, you're saying that no one at all charged any sort of a fee in connection with the right to construct a driveway?
A **Before the ordinance?**
Q Before the ordinance.
A **No fee.**
Q In your capacity as Eagle Excavation Company, did you ever go out and inspect driveways after they were constructed?
A **I don't understand.**

Q Did you ever go out and inspect a driveway just to see whether it was constructed properly through Eagle construction?
A **I'm --**
Q Did you go out and inspect a driveway for proper construction in the township through Eagle construction?
A **No.**
Q Did you ever get involved at all in inspecting driveways in the township?
A **Not before I was a supervisor.**
Q Well, since you were a supervisor, did you ever get involved in inspecting driveways?
A **I do them all. I'm the road master.**
Q You do it all?
A **Yes.**
Q So as the road master did you go out and inspect driveways?
A **Yes.**
Q Did you charge a fee in connection with that inspection?
A **No.**
Q Did you charge anything for doing that?
A **No.**
Q So you just went out as the road master and

said, well, I think your driveway is okay?
A **And make suggestions of what they should do to it, yeah.**
Q Was that prior to the ordinance?
A **Yes.**
Q What authority -- I mean, I'm really just trying to understand. What was the authority for your going to inspect driveways as the road master?
A **We live in a rural area. Everybody is -- knows everybody and everybody wants things as smooth as possible. So if someone is putting in a driveway, they come to the supervisor's meeting and say, you know, I want to put a driveway in here. And we as a unit -- two or three of the supervisors will go out to that site and look to see if it's safe or not to have a driveway there. It was -- it wasn't any law or anything. It's just -- it was just common courtesy. We just -- it was a service.**
Q Well, if you didn't think that the driveway was okay, did you tell them they couldn't construct it as the board of supervisors?
A **No, we told them how they had to construct it.**
Q So you told them how. And this was before the ordinance, correct?
A **Yes.**
Q Did you let it be known that if a resident

wanted to construct a driveway that they had to come to the board of supervisors for inspection of the driveway to make sure it was satisfactory?
A **There was no rule that that was done. If the property owner didn't come to the meeting, their neighbor soon was on the phone calling and saying, hey, there's something going on over here and it should be checked. That's the --**
Q So what would you do, go out and check it?
A **Yes.**
Q So you'd say, okay, I got a call from a neighbor, I better go out and check that driveway to make sure it's being constructed properly, right?
A **Yes.**
Q And you did that prior to the enactment of the driveway ordinance, correct?
A **Yes.**
Q You never charged any sort of fee or anything in connection -- to anybody --
A **No.**
Q -- in connection with those inspections? Did Eagle construction ever charge any sort of fee in connection with those inspections?
A **Not unless they were asked by the property owner to install a pipe or put stone or something on there.**

**Not for -- not for looking at the site.**
Q So if you went out and you said, okay, this driveway isn't being constructed properly, would you direct the resident to stop construction of the driveway?
A **He was advised to construct it properly or the next time the grader would come by he would lose his driveway if it wasn't done to a standard.**
Q Did you ever talk to your solicitor about whether the township had the authority to oversee the way people constructed their driveways without the enactment of a driveway ordinance?
A **No.**
Q You never discussed it with Larry Newton?
A **Never.**
Q What about when you put your driveway ordinance in place, did you send that to him for review?
A **I don't remember.**
Q So were you present at the meeting -- you were present, I think you said, at the meeting of the board of supervisors in January 2000 when the moratorium was put in place, correct?
A **Yes.**
Q Who else was there?
A **I'm lost. What do you -- do you mean in the audience or --**

114

Q All --
A **All three supervisors, the secretary, and I don't recall who else. It would have to be -- it should be in the -- on the minutes.**
Q Do you recall what members of the public were there? Were the Hewetts there?
A **I don't recall.**
Q Was Mr. Corneal there?
A **No.**
Q Do you recall whether there was any member of the public there?
A **Oh, yes, there was people there. I --**
Q Can you estimate how many?
A **Eight or 10.**
Q You think there were eight or 10 people there. And how many residents are there in the township?
A **816.**
Q I think you indicated earlier that Mr. Corneal had brought a subdivision plan in initially and you told him he had to take it to the Huntingdon County Planning Commission, there was a moratorium in place, correct?
A **Correct.**
Q Who spoke those words, you?
MR. SHERR: I'm going to object to the form of the question in that there's never been any testimony that

115

those words were spoken.
MS. MONTGOMERY: Well, he just said yes to the answer to my question.
MR. SHERR: And his prior testimony was different from that, that -- and that may have been the gist of what was said, but I don't think he's ever testified --
MS. MONTGOMERY: I'm not --
MR. SHERR: Please just let me finish so we don't talk over each other so she can get us both down. Thank you.
MS. MONTGOMERY: I'm not going to allow you to coach your witness on the record.
MR. SHERR: And I'm not coaching my witness. All I'm asking you to do is let me finish making my statement so the court reporter can take it down and then you can say whatever you have to say.
MS. MONTGOMERY: Are you finished?
MR. SHERR: I think I am.
BY MS. MONTGOMERY:
Q I believe you testified earlier that when Mr. Corneal came and first presented his subdivision plan to the board of supervisors that he was told that there was a moratorium in place and that he should take his plan to the Huntingdon County Planning Commission; is that correct?
A **I don't believe -- I could correct it by**

116

**saying it was suggested to save him time he could take it to the county.**
Q Who told Mr. Corneal that?
A **Maybe I did. I -- I don't know.**
Q You don't recall which supervisor actually talked?
A **We all talk. We have a small community and we all talk.**
Q Was Miss Wirth talking, do you recall?
A **I'm sure. Everybody --**
Q Does Miss Wirth usually talk at the township meetings a lot?
A **When she's asked to.**
Q When she's asked to by whom?
A **The supervisors or if it's a question concerning some correspondence or something, then somebody from the audience might say, Ann, did you get my letter or did you -- you know, that type of thing.**
Q Does Miss Wirth give advice to the township residents or the people in attendance at the township meetings regarding what's proper and what isn't proper about township business?
A **Well, if she does, I -- I don't know what it is because she's not an elected official. She's our secretary.**

117

Q Did you need to get some water?
A **Please.**
Q Go right ahead.
(Pause.)
BY MS. MONTGOMERY:
Q Do you recall Mr. Corneal asking you at the meeting in which he was told that there was a moratorium in place for any copy that existed -- of any written copy that existed of the moratorium, do you recall that?
A **No.**
Q Do you recall Mr. Corneal asking for a copy of the draft subdivision plan?
A **No.**
Q You don't recall him asking at any time for a copy of the draft subdivision plan?
A **No.**
Q Did you ever learn from anybody else that he asked for a copy of a draft subdivision plan -- I'm sorry, I keep using plan and I apologize, a draft subdivision ordinance.
A **No.**
Q So if you misunderstood my prior questions, I will repeat them to you. I was asking whether you understood -- whether you heard from anybody else that Mr. Corneal had asked for a copy of the draft subdivision

ordinance at any time.
A No.
Q You never heard about that?
A **(Witness shook his head negatively.)**
Q Do you recall whether the Corneals ever submitted a revised subdivision plan after their -- they were initially told that there was a moratorium in place?
A **No.**
Q You don't recall them ever doing that?
A **No.**
Q Do you recall the March 2000 meeting of the board of supervisors?
A **Unless there was something that happened.**
Q I'm sorry?
A **Unless there was something that happened that would stick in my mind. Maybe it was a routine meeting. I -- I don't know. I'd have to look at the minutes.**
Q I'll get you the March minutes and maybe that will help you recall. Just give us a second.
A **While you're doing -- while you're searching for that, can I go to the rest room?**
Q Men's room?
A **Yes.**
Q Sure.
(Break taken at 11:47 a.m. until 12:01 p.m.)

BY MS. MONTGOMERY:
Q Mr. Wilson, we're back on the record. I'm going to ask you, did you review any documents in preparation for this deposition?
A **No.**
Q Have you reviewed any documents at all in connection with the filing of this lawsuit?
A **No, I just keep going over the last -- that thing I received on July 4th. I just keep looking at that. I have it laying on my freezer.**
Q What did you receive on July 4th?
A **I was served with a lawsuit.**
Q With the complaint?
A **Yeah.**
Q Now, I think you testified a moment ago that you don't recall whether the Corneals submitted a revised subdivision plan?
A **Not that I know of.**
Q Do you recall the April 2000 meeting of the board of supervisors?
A **No.**
Q Do you recall whether -- well, do you recall whether there was any meeting after the January meeting in which the moratorium was announced and then the February meeting in which you -- Mr. Corneal was told his subdivision

plan couldn't be approved? Do you recall him coming to a meeting and asking for a copy of the proposed subdivision ordinance?
A **No.**
Q Do you recall Mr. Corneal coming to the April meeting -- or to any meeting and asking that the supervisors sign his sewage modules?
A **Yes.**
Q Could you tell me what you recall about that meeting?
A **Do you have the minutes?**
Q Yes, I do.
A **I'm sorry.**
Q Sure.
MS. MONTGOMERY: We'll mark this as Wilson Exhibit 4.
(Minutes dated 4/3/00 produced and marked as Wilson Exhibit No. 4.)
BY MS. MONTGOMERY:
Q When you're finished, Mr. Wilson, just let me know.
A **Okay.**
Q Now, you asked to review the April 3rd minutes. Why did you need to review them?
A **I can't remember the meetings.**

Q Now that you've reviewed the minutes do you think you can remember the meeting a little better?
A **Yes.**
Q Now, tell me what you recall about the April 3rd, 2000 meeting.
A **Mr. Corneal had a handful of sewage modules that he wanted the township supervisors to sign and the supervisors would not sign them because we didn't have the subdivision plan or anything.**
Q So the reason you wouldn't sign the sewage modules is because you didn't have what, a map, a plan?
A **Yes, and we -- and we have no -- we had no idea all these months what Mr. Corneal's plans were. He kept changing things.**
Q Well, how did you know he kept changing things?
A **I had a call from Attorney Newton that Mr. Corneal had dropped off a subdivision plan at his office. Well, he had to -- and I don't remember who went in and picked it up, that's 16 miles away, but brought it out. But these are the -- these are the kind of things we had no idea, no continuity of what was happening here.**
Q So going back to your testimony about Mr. Newton, I think you'd indicated that you didn't recall discussing Mr. Corneal's subdivision plan with Mr. Newton.

Now do you recall discussing --
A **Well, I didn't discuss it with him. He called and said he dropped it off here and assumed that we needed it. I didn't discuss anything with Larry.**
Q Well, when I say discussion, I guess I'm just talking about any conversation, any contact, any words exchanged whatsoever about Mr. Corneal's subdivision or his property. That's what I'm trying to get to.
So we don't need to limit ourselves to what you might consider to be a discussion. I'm talking about any contact, written, verbal, telephone call, meeting along the street, formal, informal, anything.
A **That's what it was.**
Q And do you have any idea why Mr. Corneal took the subdivision plan to Mr. Newton's office and dropped it off?
A **No, I don't.**
Q Did Mr. Newton tell you why Mr. Corneal dropped the subdivision plan off at his office?
A **No.**
Q Did somebody go out and pick it up, you said, from Mr. Newton?
A **Yeah, and I don't even know who.**
Q And what did you do with it then?
A **Well, it should be at the township office.**



**That's the one with the orange lines on it. There's -- there's been various pieces of -- and designs and cut down the lots and stuff. I -- I don't even know where it's at. I don't even know what the -- what the last plan is.**
Q Do you understand why Mr. Corneal went from proposing five or more lots to proposing fewer lots?
A **I don't know.**
Q You understand that he did, though, go from proposing more lots to proposing fewer lots, correct?
A **Yes, I ...**
Q And do you understand as well that the sewage enforcement officer had approved sewage modules for at least five lots and later Mr. Corneal only wanted to take it down to two of those lots; isn't that correct? Do you understand that?
A **Yes.**
Q Do you understand also that the latest sewage module that Mr. Corneal brought to you really only related to one lot, the 95 -- the whole 95-acre piece?
A **Yes.**
Q So he was really only asking you to approve the sewage module so he could build his house on his property, correct?
A **No.**
Q What do you understand?



A **I don't understand that. He hired another attorney and his attorney and I have been working to try to get this resolved. And we went into a land development plan, not a subdivision, and that's what we've been working on with Terry Williams, and it still isn't -- they're working on -- they're meeting on that lot today to discuss the sewage problem. So I -- I'm at a loss. I'm still at a loss as a supervisor as to what's happening at the Corneal property.**
Q Well, this is May 2001. We're going back to the last time that David Corneal came in and the April 2000 meeting with these modules that you wouldn't sign. Do you understand at that point that he had said, okay, all I really want to do now is build my house?
A **No.**
Q What do the minutes say?
A **It says he's no longer subdividing them and would like to build a -- we had no idea the way things have been changing that -- what was going to happen the next day.**
Q Did Mr. Corneal ever change the site of the approved -- the approved septic sites that your sewage enforcement officer had approved, did he change those sites?
A **I'm sorry, I --**
Q Did he move them? Did he say I want -- I want a new -- I want a new test site approved or --



A **No.**
Q -- was he just using the already approved test sites and saying I want to build and use one of them?
A **That's what I understand.**
Q So he had approved test sites from the sewage enforcement officer and what he was doing was just changing down the number of possible buildings that he might ever put on that property; isn't that correct?
A **Possible.**
Q Now, it reads in the April 3, 2000 minutes that the supervisors told him that they weren't going to issue a building permit for a property that they know is going to be subdivided, correct?
A **Correct.**
Q So despite the fact that Mr. Corneal came and said, okay, fine, I'm not going to subdivide, you said I can't subdivide, I just want to build my house, you said he can't even have a building permit for his house because you think he might subdivide later, correct?
A **He needed a sewage permit to get a building permit for his house.**
Q Right, but he couldn't get a sewage permit until you signed the sewage module, correct?
A **Right.**
Q So you wouldn't sign the sewage module because

you thought he might want to subdivide later, correct?
A **My -- and this is my opinion at that meeting, not to sign those five modules because Mr. Corneal could do whatever he wanted on that property without any okay from the township, any plan.**
Q Well, that's not accurate, is it, because he still had to go get a sewage permit?
MR. SHERR: Objection, argumentative. You can answer.
BY MS. MONTGOMERY:
Q He still had to go get the permit for the sewage, right, but he needed the sewage module first, correct?
A **For the land -- for the land development why would he need the sewage module. It's just like --**
Q Go ahead. I don't mean to --
A **The property, okay, wasn't being split, okay, so he was going with a land improvement. All he had to have was an approved site there for a new house and everything would have been fine, but we've cluttered the landscape so bad over there we don't know what Mr. Corneal is doing.**
Q Mr. Corneal, as you testified a moment ago, told you at this April 3, 2000 meeting that he just wanted to build a house on the property, correct?
A **Yeah, but he's -- we've had several stories**

**from Mr. Corneal, what he was doing, and we didn't know what was happening.**
Q Didn't Mr. Corneal's stories change only as he received refusals from the township for permission to do what it was that he wanted to do?
A **Yes.**
Q Right?
A **Yes.**
Q So the last thing he came and said is I'd like -- I just want to build my house. Can you please sign these sewage modules and I'll get my septic system in for my house, one house, right?
A **Well, that's what he said.**
Q But you wouldn't sign them because you thought, well, he really wants a subdivision so I'm not going to open this door for him; isn't that correct?
A **We were not signing five sewer modules for one house.**
Q Well, it just gives him an option where he wants to place his house, doesn't it?
A **He already had a house started, didn't he.**
Q I don't know if he had a house started on April 3, 2000.
MR. CORNEAL: No.
BY MS. MONTGOMERY:

Q Did he?
A **I don't know. Of course, I wasn't allowed on that property.**
Q Let's talk about the building permit. Did you have any discussions with your building permit officer about whether or not Mr. Corneal ought to have a building permit?
A **Yeah, the day Mr. Corneal was at the building officer's house, yes. Dave called me.**
Q He called you from his house?
A **Yes.**
Q And what did you tell Dave?
A **I told him don't you dare issue him a permit.**
Q Well, Mr. Corneal came to -- and when you say Dave, you're talking about Mr. Van Dommelen, right?
A **Yes.**
Q Mr. Corneal actually came and just asked for an application for a permit, correct?
A **That isn't what I heard on the phone.**
Q Well, he couldn't get a permit if he didn't have an application, right?
A **Well, I'm -- I'm telling you what -- the conversation I had on the phone. He was -- I was asked if there was to be a permit issued to Mr. Corneal and I told him no way, we don't have the thing signed.**
Q So was it your understanding that he had gone

out and asked for a building permit for a house?
A **No, a five-bay garage with an over-study.**
Q So he had gone out and asked for a building permit for a garage. And does a garage require sewage?
A **If you have an over-study on it, there's going to be water in there.**
Q What's an over-study?
A **Apartments, a living space up there.**
Q I thought you said you hadn't seen any, you know, plans or anything for what Mr. Corneal wanted to build.
A **No, Dave -- Dave told me that's what it was when he called me.**
Q Dave Van Dommelen told you he wanted a five-bay garage with apartments over it and you said don't you dare issue him a building permit?
A **And he knows better than to issue a permit without a sewage permit because there's potential -- there's -- that building has potential for human habitat.**
Q So did you tell Mr. Van Dommelen not to even give him the application?
MR. SHERR: Objection, asked and answered.
THE WITNESS: No.
BY MS. MONTGOMERY:
Q No? Are you aware that Mr. Van Dommelen

refused to even give him an application?
A No.
Q You didn't know that?
A No.
Q So do you believe that it was appropriate for you at the April 3, 2000 township meeting to tell Mr. Corneal that he couldn't have a building permit for -- I'm sorry, that you couldn't sign the sewage module for one building because you thought he might subdivide?
A **Right.**
Q You think that was appropriate?
A **Yes.**
Q Even though he told you he wasn't going to subdivide?
A **Yes.**
Q You didn't have an approved subdivision plan at that point, right?
A **We didn't have anything except his handful of sewer modules.**
Q Because you told him there was a moratorium so he said, okay, I won't subdivide, right?
A **I'm sorry, my --**
Q I said when you had told him that there was a moratorium, he said, okay, I won't subdivide right?
A **Right.**

Q Now, I understand that you told Mr. Van Dommelen not to issue him a building permit for his garage?
A **That's right.**
Q Are you aware that Mr. Van Dommelen told Mr. Corneal that there was going to be a meeting about his property the next day?
A **No.**
Q Was there a meeting about his property the day after he went out there and asked him -- Mr. Corneal went out and asked Mr. Van Dommelen for a building permit?
A **No.**
Q There was no meeting?
A **Not that I know of.**
Q Well, do you recall what day of the week it was when Mr. Van Dommelen called you about Mr. Corneal's request for a building permit application?
A **No.**
Q Do you recall whether or not the supervisors -- or any supervisor and Mr. Van Dommelen did in fact meet the next day or soon thereafter about Mr. Corneal and his property?
A **I don't know.**
Q Do you recall any meeting other than a formal monthly township supervisor's meeting or a special meeting that was called by the board of township supervisors during

which Mr. Corneal and his property were discussed by you and the other township supervisors?
A **No.**
Q Well, I want to make sure that we're not unnecessarily limiting this information. So understand that I'm asking you whether there was any informal meeting whatsoever between any supervisor and anybody else, any township official about Mr. Corneal's property after he went out there and had that conversation with Mr. Van Dommelen about his building permit?
A **Not that I can recall.**
Q You talked a moment ago about Larry Newton calling you up and saying, well, I've got this subdivision application that Mr. Corneal dropped off. Now, was there any other telephone calls from or to Larry Newton about Mr. Corneal around that same time frame that you recall?
A **Not that I recall.**
Q Not necessarily that you took part in but that Miss Wirth or you or any other township supervisor or the building permit officer or the sewage enforcement officer.
A **Not that I recall.**
Q That's the only telephone call you can recall from or to Larry Newton about Mr. Corneal?
A **Yes.**
Q What about any other meeting, contact,

conference, conversation, discussion, anything after that time when Mr. Newton called about Mr. Corneal's subdivision plan?
A **I don't recall.**
Q But I think you testified, and you correct me if I'm wrong, that the call came from Larry Newton prior to the point that Mr. Corneal came in and asked to have his sewage modules signed at the April 3, 2000 meeting; isn't that correct?
A **I don't know that.**
Q You had indicated that you didn't have the subdivision plan in front of you when he brought the sewage modules in in April 2000?
A **(Witness nods head affirmatively.)**
Q And you also indicated that you knew that Larry Newton had them, had gotten a copy and that somebody had gone out and picked them up but you didn't know what happened to them, correct?
A **Exactly. I don't -- I don't know what the dates were on this, when -- when we had the call that there was a plan dropped off at Larry's office. I suppose it was the same -- at the Daily News, but I don't know what that day was and I don't know where that got to.**
Q Who talked to Larry Newton, who took that call from Larry Newton?

134

A **That there was a plan in there? I assume the township office.**
Q Ann Wirth?
A **I'm assuming that.**
Q Well, you'd indicated that you didn't have the plot plan in front of you, but does an individual need a plot plan if they're not subdividing?
A **No. If they're doing land development, they do.**
Q I'm going to show you some documents. We'll just put them together as Wilson Exhibit 5. These are the February 24, 2000 and April 20, 2000 letters from the Huntingdon County Planning Commission.
(Packet of documents produced and marked as Wilson Exhibit No. 5.)
BY MS. MONTGOMERY:
Q Take a moment to review them, Mr. Wilson. Have you seen these documents in the past?
A **Yes.**
MR. SHERR: Have you finished reviewing them?
THE WITNESS: Yes.
BY MS. MONTGOMERY:
Q Have you seen the documents in the past? Are you ready? I think you testified you have seen the documents in the past, correct?

135

A **Yes.**
Q Did you see them at the time that they were first generated, like around the February 2000 time frame and around the April 2000 time frame?
A **When they came from the county, yes.**
Q Miss Wirth turned them over to you when they came from the county?
A **Yes.**
Q I'm going to draw your attention to the April 20, 2000 letter from the Huntingdon County Planning Commission. Do you understand that letter to say that the commission found Mr. Corneal's property suitable for on-lot sewage disposal and --
A **Yes.**
Q -- for the -- yes, right?
A **Yes.**
Q I just want to make sure the court reporter understood that you said yes. Did you understand that the Huntingdon County Planning Commission found the property suitable for division into two lots?
A **Yes.**
Q Do you recall whether the subdivision plan for the two lots was returned to the township supervisors along with this letter?
A **I never seen it.**

136

Q So you don't know whether it was because it went to Miss Wirth, right?
A **Well, if it -- if it came, I should have it -- the supervisors should have it. I'm curious if the plan came back.**
Q But this letter indicates that there was a subdivision plan for the two lots, correct?
A **Well, the proposal is a resubmission, Lot 1 the residue and Lot 3 contains 25 acres.**
Q Let's read the first sentence, the Huntingdon County Planning Commission.
A **Has reviewed the above-referenced property.**
Q Proposal. Did you read that first sentence, Mr. Wilson?
A **Has reviewed the above-referenced proposal to subdivide a property containing 94.67 acres into two lots.**
Q Now, as you testified earlier, Mr. Corneal was directed or told that he had to submit his plan to the Huntingdon County Planning Commission first, correct?
A **For review.**
Q For review?
A **Yeah.**
Q So they reviewed it and sent it back to you, correct?
A **Yes.**

137

Q And said they found it suitable, correct?
A **Yes.**
Q So at what point do you believe that Mr. Corneal had not taken the proper steps to obtain permission to build a house on his property?
A **I -- I don't think -- and this is my opinion. I don't think that has anything to do with building a house here. This is approval of a subdivision, nothing about building a house.**
MR. SHERR: You're referring to the April 20th letter?
THE WITNESS: Yes.
BY MS. MONTGOMERY:
Q Right, but didn't you indicate earlier that Mr. Corneal couldn't build because he didn't have -- hadn't submitted all the right plans, you didn't have a plan in front of you?
MR. SHERR: I'm going to object to the form of the question because this is completely confusing. Are you discussing now in your question what you asked him about the April township meeting which occurred before the date of this letter that he has in front of him?
MS. MONTGOMERY: That's what I'm asking him.
MR. SHERR: Okay.
THE WITNESS: Okay, I still haven't seen the

subdivision thing that is discussed here, but regenerated now into a new land development certificate, okay. It's being processed by Terry Williams, his other attorney, and we are -- we've had two hearings in the Huntingdon County Courthouse that these things were supposed to be in order to the satisfaction of Jackson Township by our judge.

And the last time we were in there the judge said that we had 30 days to get this in order or we would be back in. Well, we're way past the 30 days and I don't know what's going on.

So I'm -- my thing is that I will -- when I get back, I want to call our solicitor and have him call Mr. Corneal's solicitor, new solicitor, and see what's happening because Williams and I have met on several occasions to try to get these things resolved and we don't seem to be getting any further. It's just like it stopped.

BY MS. MONTGOMERY:

Q But the April 20, 2000 letter from the Huntingdon County Planning Commission was written before this lawsuit was initiated, correct?

A **Yeah.**

Q Before the Huntingdon County Commission lawsuit, not the Huntingdon County lawsuit, was initiated by the township, correct?

A **Yes.**

Q So we're just talking about this period of time here where you indicated that you had not seen and still have not seen a subdivision plan, right?

A **Right.**

MR. SHERR: And just to be clear, again, you're saying he indicated as of that April meeting he had not seen a subdivision plan.

MS. MONTGOMERY: No, he indicated he still has not seen the subdivision plan, that's what I'm questioning him about.

MR. SHERR: Well, I think it's completely ambiguous and I don't really understand what you're saying and --

MS. MONTGOMERY: Well, then I'll just clarify it.

MR. SHERR: That would be great.

MS. MONTGOMERY: And I don't think that your witness is confused.

MR. SHERR: Well, I --

BY MS. MONTGOMERY:

Q What you testified was that you hadn't yet seen an April -- I mean, you hadn't yet seen a subdivision plan. Right now, today, you haven't seen one, correct?

A **Correct.**

Q I showed you an April 20, 2000 letter from the

Huntingdon County Planning Commission indicating that they had reviewed and were sending back to you with approval --

A **Um-hum.**

Q -- a two lot subdivision plan, right?

A **Yeah.**

Q And so I'm asking you why you hadn't seen the plan, the Huntingdon --

A **I still haven't seen it.**

Q But you don't know why you haven't seen it?

A **No.**

Q That's all I'm trying to get to.

MR. SHERR: And did your question assume that this letter somewhere said that they were sending the plan back to the township?

MS. MONTGOMERY: Actually it's based on the testimony from prior witnesses and this witness that the Huntingdon County Planning Commission reviews the plan and sends it back.

MR. SHERR: I don't remember any such testimony.

MS. MONTGOMERY: Well, the record will speak for itself.

MR. SHERR: It absolutely will.

BY MS. MONTGOMERY:

Q Let me ask you this, Mr. Wilson: When the

Huntingdon County Planning Commission sends a letter like this back, right, saying we've reviewed a plan, do they send the plan back to the township?

A **Not always.**

Q Do they --

A **They keep --**

Q -- sometimes?

A **They keep one on file. It depends on how -- maybe I should back up. Most of these things are submitted to the county by either the owner or his representative. So we don't know how many he drops in there. If they have an extra one there, they'll send it back, but we still should have one at the township and we don't -- well, it may be there now. Things are so ...**

Q Do you know whether or not Miss Wirth produced to us a copy of this plot plan that was referenced in the April 20, 2000 Huntingdon County Planning Commission letter, if she produced it back to us in connection with this litigation?

A **I don't know. Is it possible to ask if we could break? I have to go again and maybe we could eat.**

Q Okay, sure.

(Luncheon recess taken at 12:36 p.m. until 1:30 p.m.)

BY MS. MONTGOMERY:

Q Back on the record, Mr. Wilson. You're still under oath.
**A Okay.**
Q Do you recall whether at the February 2000 meeting when Mr. Corneal brought his subdivision plan in the first time and you told him there was a moratorium, do you recall whether he told you and the supervisors at that meeting that the moratorium was illegal?
**A I don't recall that.**
Q Do you recall at any time hearing from anybody that Mr. Corneal thought that the moratorium was illegal, invalid?
**A If my memory serves me right, I -- it was at the next meeting he came that he said that.**
Q But you recall him saying it at one meeting or another?
**A Yes. Yes, I heard him say that.**
Q What did you say? Did you say anything back to him?
**A It is legal.**
Q According to who?
**A According to the township regulations.**
Q Do you recall anybody saying to him when he said it was illegal, not according to our solicitor?
**A No.**

Q You don't recall anybody answering him that way?
**A No.**
Q Well, once he said it was illegal, did you go check with your solicitor to find out whether he was --
**A No.**
Q -- correct or not?
**A No.**
Q You didn't?
**A No.**
Q Because you thought you knew yourself?
**A As I had testified before, there's been other townships in the county that had to do -- and surrounding areas that had to do the same thing and they're legal. I guess we'll find out. The law says it is.**
Q I'm going to show you a document that we'll mark as Wilson Exhibit 6. We'll have the court reporter mark it and then you can take a look at it.
(Subdivision plan produced and marked as Wilson Exhibit No. 6.)
BY MS. MONTGOMERY:
Q Take a moment and look at it, Mr. Wilson, and I just want to ask you a couple questions about it. Just let me know when you're finished.
**A Okay.**

Q Have you seen this document before?
**A I seen a document that resembles this, but I don't remember the black lines that are through there.**
Q When you say it resembles this, do you mean that you saw a document where this property, the Corneal property, was broken up into these lots?
**A Yes.**
Q But you don't recall which black lines?
**A No. What I observe here is some of them -- some of them aren't -- have been whited out or something. They're not continuous.**
Q Oh, I see.
**A I -- I recall seeing a document like this but it had different features on it. I mean, the lines don't seem to ring a bell.**
Q Okay. But just to be clear, do you recall seeing a document like this mapping out the Corneal property broken up into five lots?
**A I don't remember.**
Q In what context do you recall seeing a document that looked like this but maybe had somewhat different lines?
**A This -- this reminds me of the copy that I seen that came from Larry Newton that was dropped off he told me by Mr. Corneal, but it had bright orange lines on**

**it. So it's -- the contrast of my eyes, it doesn't look -- overall it looks the same, but it looks different inside.**
Q Maybe because that was the original and these are copies?
**A I ...**
Q She's going to go get the original, if she can find it. I mean, is that what's bothering you, that just the lines are a different color?
**A Well, yeah, and there's like three and a half that are -- that look like they've been whited out or something.**
Q Right, that might just be a copy problem, but we'll figure it out. So you say you think it might have been part of the materials that had gotten dropped off to Larry Newton?
**A That's my recollection, yeah.**
Q When did you see those materials that were dropped off to Larry Newton?
**A I don't recall.**
Q But you did see a plot plan in connection with the materials that were dropped off to Larry Newton?
**A The only thing I seen was a plan like this that had orange lines on it. I assume somebody reworked --**
Q Well, as we discussed earlier, Mr. Corneal's property has been reworked a number of times in terms of how

many lots it's going to be in, right?
A **Yeah.**
Q Well, while we're waiting for her to bring back the original, let's just have you look at this -- what we're going to mark as Wilson Exhibit 7.
(Subdivision and land development ordinance Jackson Township produced and marked as Wilson Exhibit No. 7.)
MS. MONTGOMERY: You guys already have a copy of this, the subdivision plan.
MS. YANKANICH: Yes.
MS. MONTGOMERY: You can look at your client's copy if you like.
BY MS. MONTGOMERY:
Q I just want you to look at that and identify it for the record, Mr. Wilson, if you will.
A **It looks like the -- a copy of the ordinance -- subdivision and land use development ordinance of Jackson Township.**
Q Can you turn to page 71 of the ordinance, to the signatures on page 71.
A **Yes.**
Q Is that your signature there?
A **Yes.**
Q In the middle?

A **Yes.**
Q So this is a copy of the subdivision and land development ordinance that you passed as a township supervisor for Jackson Township, correct?
A **Correct.**
Q Now, let me ask you this: Do you see -- you testified the ordinance was passed on July 10, at a July 10, 2000 meeting, correct?
A **Correct.**
Q Do you know why this is dated July 7, 2000?
A **No idea.**
Q But you're quite certain that the meeting occurred on July 10th, which is I believe a Monday, right?
A **I believe so.**
Q So the subdivision ordinance was actually passed after this lawsuit was initiated, correct?
A **I don't know.**
Q I think you said you recall being served with the papers on July 3rd, right?
A **4th.**
MR. SHERR: He said July 4th.
BY MS. MONTGOMERY:
Q July 4th?
A **Yeah, it was a holiday.**
Q So the subdivision ordinance was passed then

after you were served with the papers, correct, for this lawsuit?
A **Yes.**
MS. MONTGOMERY: She doesn't have the original. Well, all right then.
(Discussion held off the record.)
BY MS. MONTGOMERY:
Q Well, unfortunately we don't have the original in the office of this plan, but I think you've answered enough questions about it for right now. We're going to move on to another one, okay.
I'm going to take you to a plan that actually -- we have plans in the record from before, right, old exhibits there? I think we'll just use them instead of making new ones.
I'm going to show you what has previously been marked as Parks Exhibit 2. This is a February 4, 2000 plan of proposed subdivision and I'm going to ask you to look at that and tell me whether or not you've seen that in the past.
(Pause.)
BY MS. MONTGOMERY:
Q Do you recall seeing that document in the past, Mr. Wilson?
A **I recall seeing a document that looked like**

**this, but here -- I don't recall the changes.**
Q You recall seeing a subdivision plan, in other words, for the Corneal property but maybe the lines were different at some point or what?
A **The only -- I don't understand the -- it looks like someone tried to take these out and they added a garage or something here.**
Q Take what out, when you say tried to take these out?
A **The lines. See, they're -- somebody took a pen or something and tried to scribble them out.**
Q So it looks like it was a plan that was somehow redrawn, is that what you mean?
A **Well, it's been altered, yes.**
Q Well, let me show you another document that's been previously marked as Parks Exhibit 1, the April 7, 2000 subdivision plan for the Corneal property and ask you whether you recall seeing that document.
A **There again, it resembles something that I have seen. I don't know -- it looks like all the probes and percs and everything that -- well, there isn't any percs on here. All the soil logs and everything are established, but there should have been a later one that I seen that -- where the percs were done for these sites, and those aren't on there. So apparently this is an earlier one.**

150

Q Now, there are perc numbers on that map, aren't there?
**A Where?**
Q Eight, 9, 10. Do you see that one circled with the red ink?
**A No, those are soil logs.**
Q Okay. Those aren't perc numbers?
MR. CORNEAL: They're perc numbers.
BY MS. MONTGOMERY:
Q What makes you think they're not perc numbers?
**A They're soil logs. Percs are done between the soil logs to see if the site is approved.**
Q Well, if I represent that your sewage enforcement officer told us yesterday that they were perc numbers, would that change your view of it?
**A No.**
MR. SHERR: Object to the form of the question.
BY MS. MONTGOMERY:
Q I'm sorry, go ahead.
MR. SHERR: He answered the question.
BY MS. MONTGOMERY:
Q What did you answer?
MR. SHERR: He answered it no.
BY MS. MONTGOMERY:

151

Q Is that what you answered, no?
**A No, they aren't percs.**
**(Discussion held off the record.)**
**BY MS. MONTGOMERY:**
Q I'm going to ask you to look at the site investigation and percolation test reports that are part of Wilson 2 and just refer to the graph that's in the middle of this perc test here, this perc test report. There's some handwriting at the top.
MS. MONTGOMERY: And let the record reflect I'm pointing to the words that start out perked between.
BY MS. MONTGOMERY:
Q Do you see that?
**A Yeah, perked between 3 and 4.**
Q So what do you take those numbers 3 and 4 to mean?
**A Soil logs. Right here.**
Q So those are soil logs?
**A That's a log, yes. That perc was done right along Sawmill Road.**
Q So you think the numbers are -- so there would be separate perc numbers, are you saying, on a new map?
**A Perc -- I don't know that. It's whatever the surveyor draws up.**
Q In any event, putting that aside for right

152

now, I've now shown you three maps and in response to each of them you've said I've seen something that looks like that.
**A (Witness nods head affirmatively.)**
Q But you think maybe the lines were a little bit different or there was more or less detail, correct?
**A They all look -- all the ones I've seen here look altered.**
Q Altered from the one that you saw?
**A Yes.**
Q When did you see the one that you saw?
**A I've -- I don't know a date.**
Q Have you only seen one?
**A I glanced at the one Mr. Corneal brought into the -- what meeting was it?**
Q The February 2000?
**A February. I glanced at it and then the next one I seen was the one that came from the attorney which had all the orange lines and changes or --**
Q The one that had gotten dropped off to Larry Newton --
**A Yes.**
Q -- and you didn't know how and somehow it came back to you?
**A Yes.**

153

Q When did you see that one -- or where did you see it, I should say? Where were you when you saw it?
**A I don't know. I don't -- I don't know about these legal things. I was going to say probably, but that -- that is -- that's flirty.**
Q That's good enough for a deposition for right now. If you don't know the exact date, then you can tell me as close as you can possibly tell me.
MR. SHERR: Right, as long as you're not guessing at it you can give --
THE WITNESS: Yeah, I don't know. I would be guessing.
BY MS. MONTGOMERY:
Q Can you take a look at Wilson 5, the April 20th letter from the Huntingdon County Planning Commission. Do you have it?
**A Yes.**
Q Can you look at the second page of that letter. Do you see at the top where it says a detailed map and study data, the second line?
**A The second line of mine says investigation and because maps submitted with the investigation did not --**
Q No, you're looking at the wrong letter. Look at the April 20th letter which is the second part of that.
**A That's February.**

Q No, it's going to be on the same document, I believe.

A **Okay.**

Q There you go. Now, look at the second page of that letter, second line. Can you read that for me, please, starting with the detailed map and study.

A **A detailed map and study data identifying the investigation area was submitted and indicates no wetlands are present at the location of the lots in this proposal.**

Q Do you recall reading that line before today?

A **No.**

Q Now, you testified earlier that you got these letters when they come in, right?

A **Yes.**

Q You don't recall this letter telling you that there aren't any wetlands implicated by Mr. Corneal's proposed subdivision?

MR. SHERR: Object to the form of the question. The letter speaks for itself, but I believe it's talking about what the Blazosky Associates said.

THE WITNESS: I'm sure that I -- I've read it, but I don't know when. That's what I'm -- I see lots of these and I -- I just can't give a date.

BY MS. MONTGOMERY:

Q Well, with this letter in hand would you have

any reason to believe that there was any problem with wetlands on Mr. Corneal's property?

A **Yes.**

Q Why is that?

A **A detailed map and study identifying the investigation area was submitted and indicates no wetlands are present at the location of the lots in this proposal. Well, I -- I read in that the location of the lots, his proposed house development, where the house is going to set, because Mr. Corneal knows as well as anybody that there are wetlands on that property.**

Q So that's your concern?

A **Well, no, it's addressed -- it was addressed on -- a little further down by the conservation district noting that widening of the road could impact potential wetland areas.**

Q On Lot 2, correct?

A **Well, the map I have here, the potential was for Lot 4 and Lot 2, potential for widening of roads which -- it describes there, is on Lot 4 till it goes across the power right-of-way.**

Q But did you have any indication that there was an intent to widen the road to access a new dwelling on Lot 2?

A **No, the only --**

Q Okay, that's good.

MR. SHERR: You can finish your answer.

BY MS. MONTGOMERY:

Q Are you finished with your answer?

A **Well, the -- I -- the only -- I didn't know how wide the road was going to be put in there. I know what would be required under a subdivision ordinance, how wide it would have to be, but I have no idea what Mr. Corneal was going to do for a width of the road there, if it was 10 feet, 12 feet, 14 feet, I don't know.**

Q But if you're going to concern yourself with that sentence that began with the Huntingdon County Conservation District, then let's also read the last sentence in that paragraph.

A **The Huntingdon County Conservation District?**

Q The last sentence that begins road improvements.

A **Right, road improvements should be limited to existing cartway widths.**

Q So do you take that to mean that's how the Huntingdon County Planning Commission was telling you you could deal with that concern about widening of roads?

A **If the road -- I believe I personally talked with Andy and his thought was that the road was existing and as long as the road wasn't built wider than it was it would**

**be permissible through there, yeah.**

Q Did Mr. Corneal ever come and ask you to build that road wider than it was?

A **No.**

Q Thank you. Now, you had testified that when you got the letter back from the Huntingdon County Planning Commission that there wasn't any plan attached to it, correct?

A **That's what I recall.**

Q That's what you recall, or at least the letter you got didn't have a plan attached to it, right?

A **Right.**

Q The letter went to Ann Wirth, though, of course, right?

A **All letters go to the township office and then they're disseminated from there.**

Q Did you then say, well, you know, if I'm going to consider this letter, maybe I need to look at the plan? Did you ask for a plan? Did you ask anybody for a plan?

A **No, no actions are being taken on this.**

Q No action has been taken on this?

A **Right. We weren't taking no action on that. It just laid. I -- all I did was for my information look at what the county was recommending.**

Q Now, if the county was reviewing his

subdivision plan -- and I think you testified earlier that that was the first step that was necessary in reviewing -- in getting subdivision approval in the township, right?

A **Yes.**

Q So the process was actually underway, correct, because the county had finished its review and sent it back to you, correct?

A **No, we didn't have a copy of what was going on.**

Q So did you ask for a copy of what was going on, now that you got this back from the county planning commission?

A **There could have been an extra copy come back from the county, but I -- I don't know.**

Q All I'm really asking you is, you know, why didn't you ask for one? If your copy of the letter didn't have one, why didn't you ask to see it? Why didn't you ask to see a copy of the plan?

A **Because at the time there was no action being taken on his subdivision.**

Q No action has ever been taken, right?

A **Right.**

Q Other than to deny it?

A **Well, it wasn't -- it wasn't denied.**

Q Okay.

A **It was being held up by a moratorium and then things changed. Now we're into a land improvement.**

Q But things didn't change at the point we filed this lawsuit, right? We weren't in land improvement when we filed this lawsuit, were we?

A **No, no.**

Q Does that mean, I guess, that that plan is still pending, the subdivision plan that was --

A **No, his other attorney said there will be no subdivision. It was a land development and that is out.**

Q Okay.

A **No subdivision.**

Q And in fact at that April 2000 meeting Mr. Corneal told you there was no subdivision, right?

A **Right.**

Q Now, I think you had indicated that the conservation district had expressed some concern about wetlands, right?

A **That concern came when they became aware of that, which I'm assuming I initiated with Andy, because he had sent us a letter that they had issued a stream crossing permit and he wasn't familiar with the area.**

**And when him and I talked, he sent one of his representatives out, I believe Dave Kreamer, one of his associates, to check it out, but I -- I have -- to this day**

**I have never seen a permit for a stream crossing, other than the letter from the county conservation district.**

Q So you're indicating that they had issued a stream crossing permit to Mr. Corneal?

A **Mr. McClintic was on -- the name on it.**

Q So are you saying now that you initiated the complaint with the conservation district?

MR. SHERR: Object to the form of the question. Misstating his testimony.

MS. MONTGOMERY: I'm asking him what he said.

MR. SHERR: Misstating -- you're stating what he said and that's incorrect what he said.

BY MS. MONTGOMERY:

Q I said are you saying now -- do you understand my question? You just used the word I'm assuming I initiated the complaint and I'm trying to get you to tell me what you meant by that.

MR. SHERR: And I'm going to have to object again because it's not what he said and the record will reflect what he said --

MS. MONTGOMERY: What did he say?

MR. SHERR: -- and he did not say that.

MS. MONTGOMERY: What did he say?

MR. SHERR: The record will reflect what he said.

MS. MONTGOMERY: Well, what did he say? You know that's not what he said so you must know what he did say. What did he say?

MR. SHERR: I do, but I'm not going to answer your questions.

MS. MONTGOMERY: Well, then don't object.

MR. SHERR: I'm --

MS. MONTGOMERY: Don't object. Keep going, Mr. --

MR. SHERR: I'll absolutely object.

BY MS. MONTGOMERY:

Q Mr. Wilson, are you confused by my question at all?

A **Yeah. I said that maybe -- I don't recall, but maybe I initiated the call to Andy Patterson at the conservation district because I was shocked that they had issued a stream crossing permit for a high quality trout stream.**

**And he said, well, we just normally do those things unless there's a problem and then we deal with it. Well, then when the wetland issue came up, that struck a light with him and he sent those guys out. And from what I gather, when they came out they came with the Corps of Engineers too. I -- I assume that.**

Q Have you ever done that in the past, called

the conservation district when you hear that they've issued a permit for a stream crossing?
A I call the -- yes.
Q You have. In what instance did you do that?
A On occasions that I had to have a permit to cross streams with my business.
Q Who issues -- is it the conservation district that issues the stream crossing permit?
A Yes.
Q So that's a little bit different than the question that I asked you. My question is: Did you ever call to inquire or express a concern to the conservation district after hearing that they had issued a stream crossing permit to somebody else? Did you ever do that?
A We have never had one.
Q You never had one?
A There's never been another stream crossing permit issued in our township.
Q Other than the ones that are issued to you for your business?
A And for McClintic.
Q And for McClintic, I see.
A Well, I -- let me clarify that. I'm only one contractor, okay. I'm -- I'm trying to -- I'm trying to juggle these things of my work and what we're talking about

here, but I was under the impression the way you talked of how familiar I was with the conservation district and their permits.
Q Well, really I was just saying -- it sounds to me like in response to the conservation district issuing McClintic a stream crossing permit you called the conservation district --
A No, I didn't --
Q -- to express a concern.
A -- know he issued that until they sent a letter out and then we got the feedback from the county about the potential wetlands. That's when it tied together.
Q I see. So when you got the feedback from the county and you knew about the stream crossing permit because the conservation district had issued you a letter on that --
A Yes.
Q -- then you called them up and said do you know about these wetlands on the Corneal property?
A Yes.
Q Is that what you did?
A And the answer was they'd never been on the property, they didn't know. So they came out to investigate to see if they had to pull the stream crossing permit.
Q From McClintic?
A Right, because if he was going to infringe

upon wetlands -- see, they issue these on trust in there, which surprised me with high quality water, but if there is a problem attached with that that they find out later, they'll pull the permit.
Q Well, who's McClintic?
A I don't -- a friend of Mr. Corneal's, I believe.
Q So Mr. McClintic that you're talking about got a stream crossing permit in connection with Mr. Corneal's property, right?
A Yes.
Q To cross a stream on Mr. Corneal's property?
A Yes.
Q Now, let me ask you something. Have you performed some work on some property owned by a gentleman named Weaver or a family named Weaver --
A Bob?
Q -- close to Mr. Corneal's property?
A Yes.
Q You've performed some work on his property, on Weaver's property?
A Yes.
Q Did you get a stream crossing permit in connection with that job?
A That wasn't near a stream.

Q You weren't near a stream. You didn't have to cross a stream?
A No.
Q Did you have to cross wetlands in connection with that job?
A No. Well, hold it, who are you talking about? Are you talking about Bob or are you talking about Adam?
Q Well, if there's a different Weaver that we're talking about, then we'll talk about --
A I've done work for the son and the father.
Q In connection with either of the Weavers and their properties --
A Well, clarify. Adam Weaver, we put a three or four foot culvert across a ditch and, yes, I did contact the conservation district for that.
Q Did you get a stream crossing permit?
A I didn't need one, the stream was dry. He come out and looked at it and said to put it in.
Q Did you have to go near any wetlands to do that?
A No. I work --
Q Go ahead.
A I work closely with the conservation district. They've told me if we have to come out you're

166

**going to pay money, call us first.**
Q So once you got that letter from the Huntingdon County Planning Commission that indicated there were some wetlands around the Corneal property, although none of the lots, the proposed lots were on the wetlands, correct?
A **(Witness nods head affirmatively.)**
Q And once you called the Huntingdon -- once you called the conservation district and said, you know, you issued a stream crossing permit on the Corneal property, did you know there was wetlands, did you have any concerns after that that there was any problem with Mr. Corneal's wetlands or with -- I should say did you have any concerns after that that there were problems with wetlands being affected on Mr. Corneal's property?
A **Once I talked to the conservation district, it's whatever their determination is satisfies the township.**
Q What did they decide, do you know?
A **I never got a letter.**
Q Did you get a report from the Army Corps of Engineers?
A **No.**
Q You didn't get a letter from the conservation district either?
A **There may have been a letter come in from**

167

**Andy, but I don't recall.**
Q Did you call them back and say, hey, what did you figure out out there on the Corneal property?
A **No.**
Q Do you know whether the conservation district found it necessary to pull the stream crossing permit?
A **No.**
Q To be clear, are you saying you don't know or no, they didn't find it necessary?
A **I don't know.**
Q You don't know. Did you call them back to find out whether they had to pull that permit or not?
A **I have to talk to them on Monday. I haven't -- I didn't call them back.**
Q You have to talk to him on this Monday you mean?
A **This coming Monday, yes.**
Q But how long ago did you call him about that wetland concern of yours?
A **Well, apparently it was after this letter.**
Q So it was like a year ago?
A **Yeah.**
Q Did you ever talk to the sewage enforcement officer about any concern over wetlands on the Corneal property?

168

A **No.**
Q And I did say talk with so maybe I should say did you ever communicate with him in any way or did he communicate with you in any way about a concern over wetlands on the Corneal's property?
A **No.**
Q Do you know whether he communicated or anybody else -- do you know whether he communicated with anybody in the township government or anybody in the township government communicated with him about a concern over wetlands?
A **I don't know.**
Q Did any of the other supervisors express any concern to you about it?
A **No.**
Q How about Ann Wirth, did she express any concern to you about wetlands?
A **No.**
Q So you didn't refuse to sign the sewage modules because of a concern over wetlands, right?
A **Rephrase, please.**
Q You didn't refuse to sign Mr. Corneal's sewage modules because of a concern over wetlands?
A **No.**
Q Let me ask you this: I hope I didn't ask you

169

this before, and I apologize if I did, but has the board of township supervisors ever refused to sign sewage modules that had been approved by the sewage enforcement officer other than Mr. Corneal's?
A **No, not that I know of.**
Q Now, did you have any involvement at all with anybody concerning Mr. Corneal's request for a privy permit?
A **I called the sewage officer. I said you do your job, that's what I told him.**
Q Did you have some reason to believe he wasn't going to do his job?
A **Well, I know how persuasive some individuals can be so I just reminded him he was an employee of the township and he should do his job.**
Q Did you have some experience where Mr. Parks didn't do his job in the past?
A **No.**
Q So when you told him to do his job, what did you mean by that?
A **Make sure that he did his job, the regulations, DEP.**
Q Did you tell him not to issue a privy permit to Mr. Corneal?
A **I don't know.**
Q Did you tell him not to help Mr. Corneal in

170

any way with respect to his attempt to get a privy permit on his property?
A **No, as I said, I told him to do his job.**
Q Did you tell him not to cut him any breaks?
A **No exceptions. We don't give anybody else exceptions, none here.**
Q Do you ever recall advising Mr. Parks not to make any exceptions for anybody else?
A **No.**
Q Do you ever recall telling Mr. Parks maybe you could make an exception for somebody?
A **No.**
Q Let me ask you this: Did you ever find it necessary in the past to call up Mr. Parks and say don't make any exceptions?
A **No. Ask me one more.**
Q What?
A **Ask me one more.**
Q Well, I can't guess what question you want me to ask. If you want to clarify your answer --
A **Well, I'd like to clarify my answer there.**
Q Okay.
A **Ninety-eight percent of the sewage work done in Jackson Township I'm with the sewage officer so I know what he does, but I wasn't privy to being involved with more**

171

**work at Corneals. That's why I wanted to make sure.**
Q Oh, I see. So initially you had been doing the work on the Corneal property, but then Mr. Corneal got somebody else to do the property --
A **Yes.**
Q To do the work?
A **Yes.**
Q Do you know why Mr. Corneal got somebody else to do the work?
A **Well, I assume it was because I didn't get his road done.**
Q So you felt that nobody else could really work with the sewage officer appropriately on Mr. Corneal's property but you?
A **Well, I'll tell you something, he wouldn't have the trouble he has now if he had a competent contractor. The first thing you do when you go in there with equipment is you rope the area off that says sewage on it so nobody can get on it. That's the first thing you do. That's how he lost it. They drove over it.**
**But experienced contractors know this because they've dealt with sewage officers that have had these rejections before. You can't -- you can't work that area. That's a -- that's a sacred area.**
Q So is it your testimony that Mr. Corneal's

172

subsequent contractor drove over a test pit or something?
A **Well, from what I -- was conveyed by the sewage officer and Terry Williams the area has been driven on and filled. There's maintenance roads or construction roads or something in that area.**
Q Did they tell you there's no other suitable test site for Mr. Corneal to install a septic system for a house?
A **No.**
Q Did they tell you there is another suitable test site?
A **There's lots.**
Q There's lots. Okay, thanks. Did you ever tell Mr. Parks that you weren't going to issue Mr. Corneal -- or you weren't going to approve Mr. Corneal's sewage modules?
A **I'm sorry?**
Q Did you ever tell Mr. Parks that you weren't going to approve Mr. Corneal's sewage modules despite the fact that he'd approved them?
A **I don't recall.**
Q Did you ever discuss with Mr. Parks that he shouldn't issue a sewage permit because you weren't going to approve -- the board of supervisors wasn't going to approve the sewage module?

173

A **I don't recall.**
Q Did you ever discuss the board's refusal to sign Mr. Corneal's sewage module with Mr. Parks at all?
A **I don't recall.**
Q Did you ever discuss the board's refusal to sign the sewage module with anybody else?
A **No.**
Q How about with Larry Newton?
A **No.**
Q Has the board ever approved any other applications for privy permits?
A **Yes.**
Q How many, do you recall?
A **I don't know.**
Q Do you think you do one or two a year, more?
A **I don't know.**
Q What's your understanding of why the sewage enforcement officer wouldn't issue Mr. Corneal a privy permit?
A **I -- I don't know. I assume that there was concern of water.**
Q Are you aware of whether or not the Corneals sought the issuance of a privy permit just so that they could build -- finish their art studio and have something up there to use while they were up there? Do you know anything

174

about that?
A **No.**
Q Did you ever instruct anybody not to issue a privy permit no matter what Mr. Corneal asked for it for?
A **No.**
Q How long was your conversation with Mr. Parks when you called him and said you do your job?
A **I don't know. I don't know.**
Q What did Mr. Parks say back to you?
A **Okay.**
Q He said okay?
A **Yeah.**
Q Do you know whether anybody else called Mr. Parks in connection with the privy permit or the request for a privy permit?
A **I don't know.**
Q How did the privy permit come to your attention? Did Mr. Corneal come into the township supervisors and ask for it initially?
A **I -- I believe the meeting that he was at -- the last meeting he was at he asked for a privy permit.**
Q Is that the meeting in April 2000?
A **I believe.**
Q So was it after that meeting that you called Barry Parks and told him to do his job?

175

A **It would have to have been, yes.**
Q Was it that night?
A **I don't recall.**
Q Well, isn't it -- I mean, did you understand that Mr. Corneal was asking you for a privy permit because you wouldn't sign the sewage modules?
A **Yes.**
Q So he was just looking for something so he could use his property, correct?
A **Yeah.**
Q And you said no? You told Mr. Parks to say no, right?
A **I told Mr. Parks to do his job.**
MR. SHERR: Object to the form.
BY MS. MONTGOMERY:
Q Did you ever interfere or oversee Mr. Parks in his work in connection with anybody else's requests for a privy permit?
MR. SHERR: Object to the form of the question. It assumes facts not in evidence. You can answer.
THE WITNESS: I don't know how many privy permits have been issued in Jackson Township. We deal with them all the time because of the camps, the hunting lodges, the fishing lodges that are back in the mountain. DEP

176

requires those. So we had to update our ordinance to get some uniformity in the regulation of the township concerning the maintenance of these privies and holding tanks.
BY MS. MONTGOMERY:
Q Well, let me just clarify now. Mr. Parks is the one who issues privy permits, right?
A **Yes.**
Q My question is: Did you ever find it necessary to contact Mr. Parks personally about anybody else's request for a privy permit?
A **No.**
Q Now, after that time that you talked to Mr. Van Dommelen on the telephone when he called you because Mr. Corneal had come out and asked for an application for a building permit, have you talked to Mr. Van Dommelen since then in any conversation, in any telephone discussion, chance meeting, formal meeting, any way whatsoever about Mr. Corneal's property?
A **No.**
Q Has he contacted you to ask you any questions about it?
A **No.**
Q Has he contacted the township supervisors generally?
A **Not unless there's a question with the**

177

**regulations.**
Q What do you mean by that?
A **Something that he doesn't understand with the regulation to issue a permit and -- and you just said permit -- no, I'm sorry, you said application.**
Q Yes.
A **When the phone call came in, it was to give Mr. Corneal a building permit. Nothing was said about an application.**
Q But Mr. Corneal didn't have an application; isn't that correct?
A **He could have -- he should have been issued an application.**
Q Do you know who Mr. Corneal has to go to for an application?
A **Yeah, Dave Van Dommelen.**
Q Do you think it would be appropriate for Mr. Van Dommelen to say no, I'm not going to give you an application?
A **That wouldn't be appropriate, but we're doing a play on words here. You're talking about a permit.**
Q But he can't --
A **He can't have --**
Q He can't get a permit without an application, correct?

A Right, but I never heard anything about application, all I heard was permit.
Q But you told him not to -- you told Mr. Van Dommelen not to issue him a permit, correct?
A Correct.
Q Does that mean Mr. Van Dommelen should have said no, you can't even have an application?
A I don't know what -- what he would do in that situation.
Q Well, would it have been right for him to say no, I'm not even going to give you an application?
A No.
Q Do you hire Mr. Van Dommelen? Is it the township supervisors who --
A The township board of supervisors hires him.
Q So you're his boss?
A One of them, yes.
Q So as his boss you think it wouldn't be appropriate for him to refuse to just give the application, correct?
A I don't know. Something seems strange.
Q What seems strange?
A Well, there's this -- I got a call about a permit and you're talking about the application. He should -- an application should be issued to anybody and then it's

-- then it's checked out. If it conforms with the regulations, then the permit is issued.
Q Is this the first time that you ever heard that Mr. Van Dommelen refused to give an application to Mr. Corneal?
A Today?
Q Yes.
A Yes.
Q This is the first time you ever heard it?
A Application. That was the keyword, right?
Q Yes.
A Yes, okay.
Q Did you say you read the complaint in this matter?
A Huh?
Q Did you say you read the complaint in this matter, in this lawsuit?
MR. SHERR: Do you understand what a complaint -- what she's talking about?
THE WITNESS: The July -- the July 4th delivery? I've read it a couple times and I -- honestly I can't tell you what it says, I'm sorry.
BY MS. MONTGOMERY:
Q It's the document that you keep sitting on your freezer and keep looking at?

A On my freezer and I keep glancing at it every time I go back the hall, yeah.
MS. MONTGOMERY: I'm going to take just a three minute break here with my colleagues and I think we may be finished with you, but we'll check it out and get right back to you.
(Break taken at 2:27 p.m. until 2:32 p.m.)
BY MS. MONTGOMERY:
Q Mr. Wilson, I'm just going to take you through a few documents that have already been marked at prior depositions. The first has been marked Wirth 4. It's the July 10, 2000 minutes, I believe, and I'll let you look at them and tell me if you recognize those minutes.
A That looks correct.
Q So those minutes reflect that it was on July 10, 2000 at the board of supervisor's meeting that you passed your subdivision and land development ordinance for Jackson Township, correct?
A Plus the others, yes.
Q Plus the other ordinances?
A Yes.
Q The driveway ordinance and which other one?
A Holding tank and privy.
Q Thank you. Now I'm going to show you a document that has been marked as Wirth Exhibit 3 in the past

and ask you to look at that. Look at it and then tell me whether you've seen that document before.
A No.
Q You have not seen it before?
A No.
Q Well, I'm going to represent to you -- well, actually ask you to look at it and tell me what is it. Now that you're looking at it, do you know what it is?
A Well, it says it's an application for a building permit.
Q By whom?
A There's no signature on it.
Q Is it filled out, in any event?
A Yes.
Q Who's it filled out by, does it look like?
A I don't know.
Q Let me see it, please. When you say that it's not signed, what's that on the bottom left-hand -- bottom right-hand corner?
A Well, that's not signed where the permit officer is supposed to sign. I don't know what that is. That's -- it looks like Mrs. Corneal's signature.
Q Mrs. Corneal or Mr. Corneal?
A Well, I don't know. I can make out Corneal. It looks like Sandy or Sandra or something, Y.

182

Q What's the date on the application?
A **8/31/00.**
Q At the time that -- around August 31, 2000 did you become aware that the Corneals had submitted applications for building permits on their property?
A **I don't remember.**
Q I'm going to show you another document that has been marked as Wirth Exhibit 14 and ask you to look at that. There's a series of documents attached there.
(Pause.)
BY MS. MONTGOMERY:
Q You've finished reviewing Wirth Exhibit 14, correct?
A **Yes.**
Q Do you recall seeing those documents in the past?
A **No.**
Q Now, the cover letters that are part of that Wirth Exhibit 14 are addressed to the township, correct?
A **Yes.**
Q Do you normally get documents addressed to the township passed on to you once Miss Wirth gets them?
A **Not unless there's a problem.**
Q Did anybody tell you that the Corneals had submitted applications for building permits for their

183

property on the date of those letters -- around the time of the date of the letters which is 8/31/2000?
A **I don't remember that date.**
Q It's accurate, isn't it, that those applications for building permits are for a garage, an art studio and a house, correct?
A **Yes.**
Q Do you know how those building applications -- or those applications for building permits were handled, treated?
A **No, I don't.**
Q Do you know what the result was of the applications?
A **I don't know that either.**
Q Were they granted?
A **I don't know if Terry has them or not.**
Q I show you a document --
A **See, I'm -- I'm trying to keep between what Terry has been doing and what we're doing now and I'm -- I hope I'm okay -- I'm doing okay. I tried to explain.**
Q This is quite a long time before Terry was doing anything so let's try and take -- stick with this time frame. I want to show you a document that has been marked Wirth Exhibit 13.
MR. SHERR: I don't know if that

184

representation you made is true but --
MS. MONTGOMERY: What's that?
MR. SHERR: I don't think that representation you made is true. I think he was involved at least in the fall of 2000, which would have been --
MS. MONTGOMERY: August 31, 2000 is the fall?
THE WITNESS: Yes.
MR. SHERR: It's pretty much ...
BY MS. MONTGOMERY:
Q Have you seen that document before, what's been previously marked as Wirth 13?
A **No.**
Q What is that document?
A **Well, it looks like a letter to the Corneals from Dave Van Dommelen.**
Q And what does it do?
A **Denies the application.**
Q Denies their building permit applications?
A **Their applications have been denied, applications.**
Q Now, I note that this letter was written on Jackson Township Board of Supervisor's letterhead, correct? Does Mr. Van Dommelen have Jackson Township Board of Supervisor's letterhead?
A **He should have.**

185

Q Does he type his own letters, do you know?
A **I think so.**
Q Do you know -- he types them himself? He actually gets on the computer or typewriter or something and types it himself?
A **I believe so.**
Q Let me show you another document that's been marked as Wirth 12 in the past. Have you seen that document in the past?
A **No, until I got to the meeting.**
Q What is that document?
A **It's an appeal.**
Q Request for appeal?
A **For a hearing for -- by the permits ordinance and I believe that was one of the meetings held in the Huntingdon County Courthouse to get things together or it was generated from that with Terry.**
Q So building appeal -- this is an appeal of the denial of the building permit, right?
A **That's what it says.**
Q And this is signed by Terry Williams?
A **Yes.**
Q So is it your recollection that this is about the time Terry Williams got involved in this matter?
A **Apparently.**

186

Q That's November 10, 2000, correct?
A **I'm -- yeah, I'm -- if my memory serves me right, I think it was earlier than that. I -- because we were supposed to have all this work cleaned up, everything -- he said he wanted to have everything of Corneals in order by the end of December and we didn't make that. So we've had another hearing -- well, anyhow.**
Q Well, in any event, have you ever had an appeal of a refusal of a building permit in Jackson Township?
A **I'm not aware.**
Q Do you know of any building permits that have been denied in Jackson Township?
A **I don't know.**
Q Now, do you understand this to be a request for a hearing on an appeal of the building permit -- a denial of the building permit, right?
A **Yes.**
Q Was there ever a hearing conducted on this appeal?
A **I don't know.**
Q Did you contact Larry Newton about this request for an appeal of the denial of Mr. Corneal's application for a building permit?
A **I don't recall.**

187

Q You mentioned something about a meeting in the courthouse up in Huntingdon County. When was that meeting?
A **I'm trying to get the date on that. The first time I think it was Terry and Larry corresponded to set this up but -- to get this thing moving.**
Q Well, was that after the township sued the Corneals in Huntingdon County Court?
A **Yes.**
Q So any meeting that you had in the Huntingdon County Court offices or the courthouse didn't have anything to do with their request for an appeal of their denial of the application for building permits, did it?
A **I don't know. All I -- all I can remember is that Attorney Williams made several requests to try to get these things altogether to get the Corneal land improvement gone and completed and I -- I don't -- I just don't know the dates.**
Q Was that after say Christmas of 2000?
A **It was before Christmas of 2000.**
Q Did you bring an action against Mr. Corneal after he requested an appeal of the denial of his application for a building permit?
A **I don't know the time frame there.**
Q But just so we're clear, the township supervisors did not actually get together and schedule a

188

hearing to hear Mr. Corneal's appeal of the denial of his application for a building permit, correct?
A **As far as I know. I was never a party to that.**
Q Is it your understanding that it is the township supervisors who would hear that appeal?
A **Yes.**
Q Do you ever recall Mr. Van Dommelen referring to Mr. Corneal as a trouble-making yuppy from over the mountain?
A **I -- the first I knew about that was in the complaint or on one of the -- one of the papers. I seen it written down. It was the first I had seen that.**
Q Did you ever refer to Mr. Corneal in that fashion?
A **I hope I'm a better person than that. Mr. -- even though Mr. Corneal and I don't talk much anymore, I think we're still both gentlemen enough to talk to each other.**
MS. MONTGOMERY: I don't have any other questions for you right now.
MS. YANKANICH: I have a couple questions for you.

CROSS-EXAMINATION

189

BY MS. YANKANICH:
Q In case I haven't introduced myself, I am Jennifer Yankanich and I represent Larry Newton.
My first question is: There were several times that Mr. Corneal came before the Jackson County Board of Supervisors, the first being to get his subdivision plan approved by the board and then he came for a -- to get his sewer modules approved and the privy permit and so forth. Do you remember those times?
A **Yes.**
Q During any of those meetings did you ever temporarily stop the meeting or adjourn those meetings and call Larry Newton to ask his advice on how to proceed?
A **I don't recall doing that.**
Q Do you recall any of the other supervisors possibly calling Mr. Newton and asking his advice?
A **No.**
Q Do you recall at any time with respect to Mr. Corneal's property calling Larry Newton and asking him on how to proceed with respect to Mr. Corneal?
A **I called -- when I say I called -- it may not have been me. The board of supervisors called Larry to get proceedings started against Mr. Corneal, some action from Jackson Township. We were being pushed this way and there**

were violations of things in Jackson Township and we wanted to know what we had to do so -- to get that lawsuit going.

Q So that was at the end when the lawsuit was initiated?

A Yes.

Q Before that you don't remember any times that you called Larry Newton to seek advice regarding Mr. Corneal?

A No, normally we don't -- unless there's a potential problem at a meeting -- because we don't have any money, okay. We don't have Larry come out unless we expect some problems. We can't afford him.

Q Do you recall ever asking Miss Wirth, Ann Wirth, to make any calls to Larry Newton with respect to Mr. Corneal?

A I may have. I don't know. I just -- I don't recall, but if I was tied up, it's possible that I did that, you know, find out when I could see him or something like that.

Q Would that be with respect to filing a lawsuit against Mr. Corneal?

A Well, any problems that we have. I'm usually out -- gone all day and I'll -- I think that's -- maybe I'm wrong, but I think that's what secretaries do. You call them and say would you set this up for me or, you know,

would you find out when I can talk to so and so and these type of things.

Q But her role there would be to set up a meeting between you and Mr. Newton, not to seek Mr. Newton's advice?

A Right.

Q Is that correct?

A Right.

Q Is it customary after the board meetings, the regular board meetings the first Monday of each month, to inform Mr. Newton of what happened during the meeting?

A No.

MS. YANKANICH: I don't have any further questions.

MR. SHERR: No questions.

MS. MONTGOMERY: I just have one follow-up question.

REDIRECT EXAMINATION

BY MS. MONTGOMERY:

Q Just to be sure that I understand your testimony in response to Mr. Newton's counsel's inquiry here, are there instances in which the secretary, Miss Wirth, will call Larry Newton and seek advice on behalf of

the township supervisors?

A There could be. That could be. I can't -- I can't think of an instance, but as I -- as I said, I -- I think the supervisors utilize that lady to the fullest extent when she's trying to run her own business and we appreciate her services. And it could be seven, eight o'clock at night till -- I have some things on my mind and I'll call and say, you know, did you know this or did you hear anything about this, things that happen in the township to keep me -- sort of keep me informed of what's going on. There's 816 people, it's tough.

Q Well, then the answer is it could be that Miss Wirth sometimes calls Larry Newton and seeks advice on behalf of the township supervisors?

A Yes, yes.

MS. YANKANICH: I have a follow-up if you're finished.

RECROSS-EXAMINATION

BY MS. YANKANICH:

Q Does Ms. Wirth have the authority to make a phone call to Mr. Newton on your behalf without asking -- without being directed by you or any of the other supervisors?

A No.

Q To your knowledge has there ever been an instance that Ms. Wirth called Mr. Newton without being told by you or one of the supervisors to do so with respect to Mr. Corneal?

A Not that I know of.

Q So would you say that you're aware of any conversations that Ms. Wirth has had with Mr. Newton regarding Mr. Corneal?

A Any conversations between Larry's office and the Jackson Township office would be available to the supervisors.

Q How so?

A Written up or if we asked her to call in there and find something out and then she would have a reply for us, she would have it written down or say that, well, he couldn't explain it all, you'll have to call him or go to his office and those type of things.

Q Do you recall seeing any of these notes that she made from a telephone call with Mr. Newton?

A No, she usually -- most of the time it's -- she'll call all supervisors and tell them what the conversation was as soon as she's done. And with me it's usually -- I'm usually the last one because I'm coming home late in the evenings. So it's nothing for her at 8:30, nine

**o'clock to call and tell me this is what -- you know, the information you wanted from Larry or something like that.**

Q The phone calls that you're referring to, would these be phone calls -- and I may have already asked you this. In reference to the litigation that was filed against Mr. Corneal?

A **Township business.**

Q Township business in general?

A **Yes.**

Q And my final question is do you have any specific recollection of a phone call that you asked Ms. Wirth to make to Mr. Newton regarding David Corneal and his property before litigation was commenced?

A **No.**

MS. YANKANICH: I don't have anything further.

MS. MONTGOMERY: Okay, thanks.

(The deposition was concluded at 2:54 p.m.)

COUNTY OF DAUPHIN :
: SS
COMMONWEALTH OF PENNSYLVANIA :

I, Teresa K. Bear, Reporter-Notary Public, authorized to administer oaths within and for the Commonwealth of Pennsylvania and take depositions in the trial of causes, do hereby certify that the foregoing is the testimony of W. THOMAS WILSON.

I further certify that before the taking of said deposition, the witness was duly sworn; that the questions and answers were taken down stenographically by the said Teresa K. Bear, a Reporter-Notary Public, approved and agreed to, and afterwards reduced to typewriting under the direction of the said Reporter.

I further certify that the proceedings and evidence are contained fully and accurately to the best of my ability in the notes taken by me on the within deposition, and that this copy is a correct transcript of the same.

In testimony whereof, I have hereunto subscribed my hand this 31st day of May, 2001.

__________________________
Teresa K. Bear, Reporter
Notary Public
My commission expires
on April 13, 2003

DEFENDANT'S EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL AND SANDRA Y. CORNEAL,
PLAINTIFFS

VS

NO. 1:CV-00-1192

JACKSON TOWNSHIP, HUNTINGDON COUNTY, PENNSYLVANIA, W. THOMAS WILSON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SUPERVISOR OF JACKSON TOWNSHIP, MICHAEL YODER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SUPERVISOR OF JACKSON TOWNSHIP, RALPH WEILER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SUPERVISOR OF JACKSON TOWNSHIP, BARRY PARKS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SEWAGE ENFORCEMENT OFFICER OF JACKSON TOWNSHIP, DAVID VAN DOMMELEN, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS BUILDING PERMIT OFFICER, ANN L. WIRTH, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS SECRETARY OF JACKSON TOWNSHIP, AND LARRY NEWTON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SOLICITOR TO JACKSON TOWNSHIP,
DEFENDANTS

DEPOSITION OF: DAVID B. CORNEAL

TAKEN BY: DEFENDANTS

BEFORE: PATRICIA C. BARRETT, REPORTER - NOTARY PUBLIC

DATE: FEBRUARY 22, 2001, 10:45 A.M.

PLACE: ECKERT SEAMANS
213 MARKET STREET, 8TH FLOOR
HARRISBURG, PENNSYLVANIA

APPEARANCES:

ECKERT SEAMANS
BY: BRIDGET E. MONTGOMERY, ESQUIRE
CHARLES M. SUHR, ESQUIRE

FOR - PLAINTIFF

MAYERS, MENNIES & SHERR LLP
BY: ANTHONY R. SHERR, ESQUIRE
FOR - ALL DEFENDANTS EXCEPT NEWTON

METTE, EVANS & WOODSIDE
BY: KATHRYN LEASE SIMPSON, ESQUIRE

FOR - DEFENDANT LARRY NEWTON

THOMAS, THOMAS & HAFER, LLP
BY: MICHELE J. THORP, ESQUIRE
FOR - DEFENDANT RALPH WEILER

ALSO PRESENT:
SANDRA Y. CORNEAL

TABLE OF CONTENTS

WITNESS

| FOR DEFENDANT | DIRECT | CROSS |
|---|---|---|
| David B. Corneal | | |
| By Mr. Sherr | 4 | |
| By Ms. Simpson | | 144 |

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are waived; and that all objections except as to the form of the question are reserved to the time of the trial.

DAVID B. CORNEAL, called as a witness, being sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SHERR:

Q Mr. Corneal, good morning.

**A Good morning.**

Q As you know, we are here today to take your deposition in a matter which is currently pending in the U.S. District Court for the Middle District of Pennsylvania, in which you and your wife have brought an action against Jackson Township, its supervisors and other individuals.

Have you ever had your deposition taken before?

**A I don't think so. I can't remember.**

Q I just want to go over a couple ground

rules. I know that you are familiar with depositions, but just to go over a couple ground rules so we are sure of things.

You have been placed under oath, you are expected to answer truthfully. I ask that you wait until I am finished asking my question before giving your response. Likewise, I will try to wait until your response is completed before I ask you another question.

If you don't understand my question, please, ask me to clarify it. If you don't hear my question, please, ask me to repeat it. If you answer the question, we are going to assume that you both heard and understood the question.

You are represented here today by counsel, if you need to take to have a conference with your attorney, please, indicate that and we will accommodate it. If you need to take a break for any other reason, please, let us know that.

We are here today to take your deposition to find out your recollection in the events surrounding your complaint and the allegations within your complaint.

If you don't know something, please, let us know that, otherwise, give the response to the best of your knowledge. I ask that you give all your responses out loud orally, so that the court reporter can take it

down. She can't take down nods of the head and that sort of thing.

Did you review anything in preparation for today's deposition?

A **I looked at some of the documents, yes.**

Q What documents did you look at?

A **The complaint and some letters.**

Q Do you know specially what letters you looked at?

A **No, it was about a week ago.**

Q Anything else other than the complaint and some letters?

A **That I reviewed?**

Q That you specifically reviewed in preparation for today's deposition?

A **No.**

Q Other than any discussions which you had with your attorneys, did you discuss today's deposition with anyone?

A **My wife.**

Q Other than your wife, anybody else?

A **No.**

Q Are you currently taking any medications?

A **20 milligrams of Zestril for high blood pressure.**

Q Would that effect in any way your ability to give testimony here today?

A **I am not aware of it.**

Q Is there any other reason that you are aware of that you are somehow impeded from giving us the best recollection that you can concerning the events surrounding your complaint?

A **Not that I am aware of.**

Q Where do you currently reside?

A **5205 East Fairmount, F-A-I-R-M-O-U-N-T, Avenue, State College, Pennsylvania.**

Q How long have you resided there?

A **Since 1983.**

Q Who do you reside there with?

A **My wife.**

Q Anybody else?

A **Our children, until they grew up and moved out.**

Q How many children do you have?

A **Three.**

Q They are all out of the house?

A **Yes, they are all adults.**

Q What is your social security number?

A **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.**

Q Your wife's full name?

A **Sandy Cornell.**

Q She is in the room with us today?

A **Yes.**

Q How long have you been married?

A **We were married in 1968.**

Q What is the highest level of formal education that you completed?

A **I completed a law degree.**

Q When was that?

A **In 1973.**

Q Where was that from?

A **Stetson University College of Law.**

Q Have you had any formal education since the completion of your law degree in 1973?

A **Not any more than continuing education courses for the law.**

Q Do you currently practice law?

A **No.**

Q When did you stop practicing?

A **Say 4 or 5 years ago.**

Q Are you currently employed?

A **Yes.**

Q How are you employed?

A **I teach Business Law and Entrepreneurship at Penn State University.**

Q How long have you been teaching at Penn State?

A **Since I think 1982, approximately, I am not sure of the exact date.**

Q Have you been teaching both Business Law and Entrepreneurship since 1982?

A **Initially Business Law and then Entrepreneurship that started a few years later.**

Q What is your position at the university?

A **Assistant professor.**

Q Do you consider this a full-time position?

A **They consider it a full-time position, they, meaning Penn State.**

Q Very briefly, Business Law is a broad subject, obviously, what specifically do you teach about?

A **I teach an undergraduate course, with an introductory course to what law is all about.**

Q Do you have a textbook for that course?

A **No.**

Q How about Entrepreneurship, what does that entail?

A **It entails starting your own business.**

Q What do you teach specifically?

A **Starting your own business and picking a business organization, financing the business.**

Q Is there a textbook for that course?
A **No.**
Q Are there written materials that are used in either of these courses?
A **Written materials? No, not really, I have some handouts in one or two of the courses, but.**
Q Are the students asked to read anything?
A **No.**
Q How many courses do you currently teach?
A **Three.**
Q What are the titles of those courses?
A **Business Law 243, Business Administration 250 and Business Administration 497-A.**
Q When you practiced law, were you a member of the firm?
A **I was a member of several firms during the period I practiced law.**
Q Most recently, what firm were you a member of?
A **I was a sole practitioner.**
Q Prior to that, were you a member of the firm?
A **We had our own firm, three or four guys.**
Q What was the name of that firm?
A **Well, the last name would have Kalman,**

**Corneal, Mason, I think Mason, that was the last name.**
Q What type of law did you practice at the time that you were practicing law?
A **It was general, business mainly.**
Q Did you consider yourself to have a specialty?
A **Not really. In a small town you really can't. I would say the specialty was, if you had to say a specialty, it was contract law, business-related contracts.**
Q Did you ever practice in the area of land use?
A **The only time I ever did that was a case of a friend of mine that you were involved in and that was Wesley Young.**
Q It was the Young versus Harris Township case?
A **Right.**
Q So would I be correct then in stating you did not get involved with land use matters while you practiced law, other than to the extent you got involved with them in that Young case?
A **I wouldn't say that. I had business clients that had questions about land use; and generally at that time that we would have done anything, Ron Lucas was a**

**partner and that was his specialty so he would handle -- it would be referred to him.**
Q So you, yourself, wouldn't handle matters dealing with land use, you would refer them to a partner or to another attorney, is that correct?
A **Right.**
**If it was a simple question that you heard an answer to before or knew the answer to before, you would answer it; but if it was more complicated, it would be referred to somebody else that did that.**
Q How about other areas of municipal law, did you consider yourself to be practicing in other areas of municipal law other than land use?
A **As I said, I didn't really practice in land use. I would say not, no.**
Q Are you familiar with the Pennsylvania Municipal Planning Code?
A **I know of it.**
Q When you say you know of it --
A **I know it exists.**
Q Other than knowing it exists, do you know any of the details contained within it or the cases decided thereunder, are you familiar with them?
A **Well, the only thing that I -- no, the answer would be basically not, except, I recently had**

**discussions about the Naylor case, which affects things or could affect things. Other than that, no, I have never read the Municipal Planning Code.**
Q In the discussion that you recently had concerning the Naylor case --
MS. MONTGOMERY: Objection.
MR. SHERR: That is what I was going to get to. Give me a chance.
BY MR. SHERR:
Q Did you have those discussions with anyone other than your attorneys?
A **No.**
Q Other than your residence and the property which forms the basis of the lawsuit that we are here about today, do you own other properties?
A **Yes.**
Q How many other properties do you own?
A **You would have to ask me -- it would be easier to tell you where they are.**
Q Do it that way then. Can you tell me what other properties you own other than your residence and the property that forms the basis of this lawsuit?
A **I own a property at 1445 West College Avenue, I own a property at -- my wife and I, when I say I, my wife and I, I own a property at 1510 Martin Street.**

**I own a property in -- outside Hershey, Pennsylvania, which is in Lower -- I forget the name of the Township. It is just a tract of land, but near Hershey; and we own a property in Key West, Florida at 816 Eaton Street; I jointly own a property with my youngest son at 822 Eaton Street, Key West. I think that is it.**

Q Just taking these properties one at a time.

MS. MONTGOMERY: I am going to object. I have given you some leeway, considered that this is a discovery deposition, but what does that have to do with this case? This is his personal information, I don't think you are entitled to ask him about all this stuff.

MR. SHERR: One of the reasons I am going to get into the other properties, I am not going to get into them in great length, is to find out whether or not he has been involved in developing other properties.

MS. MONTGOMERY: Ask him that question, then.

MR. SHERR: I will.

MS. MONTGOMERY: Maybe it is an appropriate question, maybe not, but it is beyond the scope of this lawsuit for you to be asking him about his other business affairs and that sort of thing, you have got to tie it in and tie it in pretty quickly, or, you know.

BY MR. SHERR:

Q The property at 1445 West College Avenue, is that property developed?

A **Commercial building.**

Q When you purchased it, did you purchase it with a commercial building on it?

A **No.**

Q The commercial building that is on it, did you have to receive approval from any local authorities to build that building on the property?

A **I hired an architect.**

Q I don't know if that was responsive to my question.

My question was, did you have to get any approval from any local authorities?

A **Obviously, whenever you build a building, you have to have approvals, the approvals were obtained by the architect.**

Q Judging by that answer, you had nothing to do with obtaining the approvals other than hiring an architect?

A **No, of course, I discussed it with the architect. It was in 1979, I don't remember exactly what transpired between us or my involvement in that, I don't remember.**

Q How about the property at 1510 Martin

Street, is there anything --

A **It is an existing commercial building.**

Q The question was: Is there anything on that property and your answer was that you purchased it with a building on that property?

A **Right.**

Q Did you ever go through any kind of approval process with respect to a local authority on that property?

A **What do you mean, a local authority?**

Q A municipality.

A **Well, we put an addition on that property and so we hired an engineering firm to do that; but it was just a matter of expanding a building that was already existing.**

Q You indicated that you owned a property outside of Hershey and I believe in giving your answer you said it was a tract of land.

A **206 acres.**

Q That is undeveloped?

A **Right.**

Q Have you made attempts to develop that land?

A **No. I have made attempts to sell the land.**

Q Is there a reason you haven't sold the land?

A **I just put it on the market a month ago.**

Q When did you purchase it?

A **A long time ago. It was probably somewhere in the late '70s.**

Q With respect to these three properties, you indicated that you own them with your wife, is that correct?

A **Yes.**

Q Do you have ownership interests in any other properties, excluding the ones in Florida, with any other entity?

A **No, not that I can remember right now. I am trying to think. I don't believe so, aside from the properties we are talking about here. You said excluding Florida, you also exclude the properties in Jackson Township?**

Q Yes.

A **No.**

Q Do you have any ownership interest in any corporation or other business entity which owns property?

MS. MONTGOMERY: Objection, just way beyond the scope of this lawsuit. This isn't hunting season on his entire personal life and business life, this is a lawsuit about Jackson Township property.

MR. SHERR: Are you instructing him not to answer?

MS. MONTGOMERY: I am objecting to it and I am asking you not to do this in this deposition, not to make it contentious, asking him questions that don't have anything to do with the lawsuit. If you can explain what it has to do with the lawsuit, I will be reasonable about it, I am very willing to do that.

MR. SHERR: Depending upon whether he owns any other property and had made attempts to develop any other property --

MS. MONTGOMERY: He said, no. He gave you the answer to those questions.

MR. SHERR: He hasn't given me the answer to this yet, so I don't know.

MS. MONTGOMERY: Like I said earlier, this may be marginally somehow likely to lead to developing discoverable evidence that he may have developed other property. Ask him that question and stay out of his private business affairs, otherwise, that don't have anything to do with the development of Jackson Township

BY MR. SHERR:

Q If you could answer my question.

A **The question was?**

Q Do you have an ownership in any corporation or other entity which owns property?

A **Other than Florida you said, is that right?**

Q Yes, I am only interested -- to limit this, I am only interested in properties in Pennsylvania and your attempts to develop or be involved with developments in Pennsylvania.

A **No.**

**Let me rephrase it. No, not that I can recall. As you asked the question, I can't think of anything at this moment that I have an interest in.**

**We have several corporations that operate the properties that are identified, they don't own the properties.**

Q Other than the property which forms the basis of this lawsuit and excluding properties outside of this Commonwealth and other than what you have already talked about, have you been involved in the development of any other properties?

A **We had a property in Boalsburg that we had the engineer subdivide and we sold that off.**

Q Again, excluding the property that forms the basis of this lawsuit, have you ever personally applied with any local municipality for building permits?

A **Well, you have to apply. Obviously, the owner of the property has to sign the application, so the applications were normally prepared by the engineer or architect and, obviously, the owner signed them, which**

**would have been myself and my wife.**

Q What I am searching for here is involvement by you other than just signing it, where you actually went to the Township or other municipality and had involvement with the local officials, are there any instances like that?

A **I have been in townships before, I mean the borough, where we were -- in our home we were building a fence around an area and we needed to get approval for that.**

**I probably accompanied an architect or engineer on these two properties that I identified previously to a Township meeting or two; but like I said, that was a long time ago.**

Q Have you ever been the party to a lawsuit other than this one?

A **I want to say, yes, and I am trying to think of what it was. You said other than this one. For example, I just got served by Old Guard Insurance, who is representing one of the supervisors who is asking for a declaratory judgment as to whether they have coverage or not.**

**You mean in Pennsylvania, parties to a lawsuit?**

Q We could limit it to Pennsylvania -- no,

let's just expand that to any lawsuit.

A **Well, we have had a family fight in Florida over some properties and that ended up in litigation.**

Q That litigation was in Florida?

A **Yes. That family fight then got extended here in Pennsylvania, just slightly.**

Q Was there a lawsuit in Pennsylvania?

A **There was a lawsuit regarding my mother's will.**

Q Any other lawsuits to which you were a party other than what you have mentioned?

A **Not that I can remember.**

Q Turning to the property which forms the basis of this lawsuit which is located in Jackson Township. This property was purchased jointly, you and your wife?

A **Yes.**

Q When did you purchase the property?

A **I believe it was around October of '98.**

Q How much did you purchase it for?

A **$160,000. Total price was actually $170,000, but 10 was attributable to personal property.**

Q Who did you purchase it from?

A **Paul and Catherine Michael.**

Q How did you first hear about the property?

A **They were friends of mine and indicated they were going to sell what they referred to as their farm.**
Q What was your purpose for purchasing the property?
A **I was thinking that it would be a nice place, my wife and I were both artists at that point and still are, and it would be a nice place maybe to do painting and put perhaps a summer house on it or something like that.**
Q At the time that you were considering purchasing the property, did you have any other purposes for the property in mind other than to do some painting and to put a summer home on it?
A **Other purposes at that moment?**
Q At the time that you were considering purchasing the property.
A **Obviously, I was looking at a 95 acre tract of ground and I didn't think I needed all of that.**
Q I am not sure that that is really responsive though.
Were you thinking about doing anything else with the property when you were considering purchasing it, other than using it as a nice place to paint and as a summer home?
A **Well, as I said, we didn't need 95 acres,**

**and it was naturally divided by a power line; and so without having investigated it, certainly the thought ran through my mind that perhaps I would sell off a piece of it or two or even divide it up for lots for my children. I didn't have any real plan, there was a lot of things that were possible.**
Q Do you recall what the asking price for the property was?
A **I paid them what their asking price was.**
Q So there was no negotiations over the price?
A **No negotiations. I thought it was a fair price.**
Q How did you make that determination that it was a fair price?
A **They gave me an appraisal that they had done.**
Q Do you still have that appraisal?
A **I will say probably, somewhere in the file.**
Q Do you know what Paul and Catherine Michael used this property for?
A **They had their children living there at different times and they used it as a weekend retreat for themselves.**
**(Recess.)**
**BY MR. SHERR:**

Q Other than reviewing the appraisal, which was provided to you by the Michaels, did you do any other investigation prior to purchasing the property?
A **Aside from walking on the property, that is all I did.**
Q Were there any structures on the property when you were considering purchasing it?
A **A house and a barn.**
Q Did the property consist of one solitary lot to your knowledge at the time that you were considering purchasing it?
A **One tract of ground.**
Q Were you aware as to whether there were any attempts to subdivide the property prior to you purchasing it?
A **Well, I was aware that -- no, there was no attempts to subdivide it. I was aware that a single lot had been subdivided off by a previous owner, but I don't know who that owner was.**
Q The single lot which had been subdivided off of the property, was that still part of the property that you were going to purchase or had that been sold already?
A **That was developed into a homesite years ago.**
Q Were you aware that a lot had been

subdivided off of this tract of ground prior to your purchase?
A **Yes, sure.**
Q How did you become aware?
A **It was obvious, there was somebody living there with their three or four unused cars in the yard.**
Q How did you know that that was part of the same tract of land?
A **Because it was obvious that it was cornered out; and somebody told me, I don't remember whether the Michaels told me or somebody, it was rather are obvious.**
Q Other than walking the property and reviewing the appraisal, did you do anything else, any other investigation into the property prior to purchasing it?
A **No.**
Q Was there a real estate broker and/or agent involved with the sale to you of this property?
A **No.**
Q Were you represented in the sale of this property?
A **Was I represented?**
Q Yes.
A **No.**
Q Were the Michaels represented?

A No.
Q Did you sign an agreement of sale?
A Yes.
Q Do you still have a copy of that agreement of sale?
A I don't remember if I have it or not, probably somewhere.
Q Did the agreement of sale have any conditions in it?
A What kind of conditions?
Q Any conditions?
A No conditions.
Q Did the agreement of sale provide for anything other than you would be purchasing the property and the Michaels would be selling the property?
A Not really, no. There was a tractor involved. That is why I said part -- it was a John Deer tractor involved. Prorated taxes and the typical things that we do with properties.
Q You indicated that you purchased this property in October of '98, is that when you closed on the property?
A Yes.
Q Had you ever purchased property in Jackson Township prior to October of '98?

A No.
Q Had you ever had any dealings with Jackson Township officials and/or employees prior to October of '98?
A I don't believe so, I can't remember ever having.
Q Prior to purchasing the property in October of '98, did you personally know W. Thomas Wilson?
A No.
Q Prior to purchasing the property, had you had any prior dealings with Huntingdon County?
A Well, I don't know what you mean prior dealings.
Before I went to law school, I went over and I clerked for James Himes and his father, who was the judge, Swirls Himes, but that was back in 1969, '68. Of course, I am sure over the years every once in a great while I was in Huntingdon County on some minor law thing but I don't think very often. Most of the time if I had something over there, I referred it to Jim Himes.
Q After you purchased the property in October of '98, did you take any actions with respect to the property?
A What do you mean actions?
Q Well, let's break that down, that was not a

very good question.
When did you first decide to subdivide the property?
A As I said, I contemplated that the possibility was there at the beginning, because we didn't really want the house and the barn. So probably in the spring of the year, 1999, we started seriously thinking about that. I am just guessing, a ballpark.
Q So am I accurate in stating that prior to purchasing the property or at or around the time that you purchased the property, you intended to build something on the property?
A Yes.
Q Was that before you purchased the property?
A That we contemplated building?
Q Yes.
A Yes.
Q What did you contemplate building?
A As I said, we are both artists, and we were thinking of a summer home and an art studio.
This was a vague thought at that time, it wasn't a plan.
Q When did it become more than a vague thought and moved into a plan?
A In the spring of '99 we started thinking

seriously about recovering some of our investment and using that money to build something.
Q The thoughts about recovering some of your investment and building something with that money is the contemplation that you would subdivide and sell part of the property off?
A Yes.
Q What is the first action that you took with respect to selling part of the property?
A Well, we decided that it needed a survey, current survey.
Q Prior to getting a current survey, did you personally do any research with respect to what you needed to do to sell part of the property off?
A No, that is part of the discussion I had with the surveyor.
Q So who was the surveyor that you had a discussion with?
A David Simpson.
Q How was it that you got Mr. Simpson?
A Because Michaels had used him before.
Q So then you had a discussion with Mr. Michaels about --
A No, some of the documents --
Q Let me finish the question.

A **Sorry.**
Q Did you have a discussion with Mr. Michaels about subdividing the property?
A **No.**
Q How was it then that you got to Mr. Simpson through Mr. Michael?
A **Mr. Michael had used Mr. Simpson before and recommended him.**
Q Do you know why he recommended Mr. Simpson to you, he, being Mr. Michael?
A **Obviously, he was pleased with Mr. Simpson's work.**
Q Do you know why he felt the need or even wanted to recommend the surveyor to you?
A **I don't know if I asked him or -- I don't know. I know that he had -- when I bought the property, he had given me documentation of things that related to the property about planting trees and things that he had -- and his tractor manual and all this other stuff. Part of that was some work, survey work that Simpson had done. I don't know if that is what stimulated Simpson or it was a discussion with Michael.**
Q Where is Mr. Simpson located?
A **He lives in Huntingdon, outside of Huntingdon.**

Q Do you recall when you first contacted Mr. Simpson?
A **As I said, sometime in the spring of '99 I believe.**
Q When you first contacted him, did you indicate to Mr. Simpson why you were contacting him?
A **Yes, I said I wanted him to survey the land and I wanted to divide off the farm, the acreage. At that time I was contemplating some lots for my children.**
Q What did he tell you?
A **He said, sure, he would be happy to do it.**
Q Did you have a conversation with Mr. Simpson at or around that time with respect to what would have to be done to subdivide the property?
A **Well, what he said was, if you are going to subdivide it, you are going to need to find sewage locations, on-site sewage.**
Q Other than telling you that you needed to find on-site sewage locations, did he tell you anything else that you would need to do with respect to subdividing the property?
A **No.**
Q Do you have an understanding as to why he told you, you needed to find on-site sewage locations?
A **Well, my understanding was that if you had a**

**lot, you had to be able to provide on-site sewage for that lot. So if I was going to divide something off, I needed on-site sewage.**
Q Did you have an understanding at that time what required you to have on-site sewage on a lot?
A **What do you mean?**
Q What rule or regulation or statute?
A **He said that the SEO, which is the sewage enforcement officer, needed to do test pits at different locations where we were contemplating lots.**
Q Did you inquire as to why you had to have areas where you could have on-site sewage on a particular lot?
A **Well, you can't build a house on a lot that doesn't have on-site sewage.**
Q You had that knowledge that you couldn't build a house on a lot without on-site sewage?
A **You had to have sewage disposal, either public or on-site, and there was no public available, so we had to have sites that were approved for on-site sewage.**
Q Again, did you have any understanding as to where those requirements were contained, what required you to have those on-site sewage on any particular lot?
A **He said, DEP, Department of Environmental**

**Protection, he told me had those regulations.**
Q Did you have familiarity with those regulations prior to this conversation with Mr. Simpson?
A **No, I never had on-site septic on any property I ever owned.**
Q Did you make any inquiries at that time as to the requirements of on-site sewage?
A **He said that the SEO officer would be the one that would meet me on the site or meet us on the site and dig test pits and would decide whether the soil was appropriate for on-site systems.**
Q Prior to this time, this conversation with Mr. Simpson, had you ever been involved in any way with on-site sewage systems?
A **No.**
Q Did Mr. Simpson tell you who the sewage enforcement officer was?
A **Probably. I think he did.**
Q Do you recall that he did?
A **I would say that he probably told me who it was. I don't remember, but I would suspect that that is where the information came from.**
Q Who did he tell you the sewage enforcement officer was?
A **Barry Parks.**

34

Q Other than finding sewage locations, did Mr. Simpson tell you, you would have to do anything else in order to divide the property and sell part of it?
A **He said that we would submit those things, the sewage things to the Township.**
Q Did he tell you why you would have to submit them to the Township?
A **No, but that was the procedure.**
Q He told you that was the procedure?
A **That was the procedure that he used he said.**
Q Did he indicate that he had other dealings with the Jackson Township officials with respect to dividing lots?
A **Never talked to him about that.**
Q Did you understand that you would have to be involved with the process or was it your understanding that Mr. Simpson would take care of this for you?
A **No. He had indicated that he would do the drawings, but he didn't want to go to the meetings or do anything to walk things through, that I would have to do it.**
Q Did he tell you about any other requirements for dividing property in Jackson Township, other than finding sewage locations?
A **No. I say no, not that I recall, I can't**

35

**recall that he had said anything about that.**
Q What was your understanding as to what Mr. Simpson would do for you?
A **A survey.**
Q Anything else?
A **A boundary survey and then eventually divide things up into lots, whatever lots we decided on based on the SEO's finding of on-site septic suitability.**
Q Other than doing a boundary survey and drawing up lots once you divided what lots you wanted, did you have expectations that Mr. Simpson was going to do anything else with respect to this property?
A **I didn't have expectations, because I didn't know exactly what was required with on-site septic, but he did prepare the sewer modules, he called them sewer modules, for the SEO's findings that would fit with the map that he would prepare.**
Q At what point did you learn that he was going to prepare sewage modules?
A **I think when he prepared them.**
Q Did you ask him to prepare sewage modules?
A **I didn't know about sewage modules.**
Q So then you didn't ask him to prepare them?
A **No, I didn't; but he did it as I guess a standard operating procedure as what he did as part of his**

36

**function.**
Q Did you make any inquiry to Mr. Simpson as to why you needed sewage modules?
A **The answer was obvious, because the SEO had checked the sites and you needed DEP approval and my understanding was from Simpson, the sewer modules would be signed by the Township and then submitted to DEP for final approval.**
Q Who contacted the SEO?
A **Probably, I did. He had given me the guy's name, probably I did. He could have contracted him first, I don't know.**
Q Do you recall contacting Mr. Parks?
A **I know that I called Mr. Parks on several occasions. I can't remember if the initial contact was by myself or Mr. Simpson. I would suspect it was probably by me.**
Q How did you get in touch with him? How did you learn how to get in touch with him?
A **I don't remember. I would be guessing as to how it happened, I don't remember how it happened.**
Q I don't want you to guess.
Do you remember the first contact that you had with Mr. Parks?
A **No. It was a telephone conversation, but I**

37

**don't remember it exactly.**
Q Do you recall telling Mr. Parks what you intended to do with the property?
A **I said we were going to do some subdividing and needed to find suitable spaces for on-site septic.**
Q The reason that you told him you needed to find suitable spaces for on-site septic was because Mr. Simpson told you, you needed that?
A **Yes.**
Q Did you contact anybody else other than Mr. Parks and Mr. Simpson with respect to these initials efforts to subdivide the property?
A **Yes.**
Q Who else did you contact?
A **I contacted Eagle Construction and Mr. Wilson.**
Q How was it that you came to contact Eagle Construction and Mr. Wilson?
A **Well, it is a very small area over there and he had a construction site less than a half mile from the site. And I don't know if Simpson recommended him or Parks recommended him; but I knew I needed a backhoe, so he was the guy with a backhoe nearby.**
Q Would you have any records and/or document which would reflect who referred you to Mr. Wilson and

Eagle Construction?
A **No.**
Q Who initially contacted Eagle Construction and/or Mr. Wilson?
A **I would suspect I did.**
Q Do you recall when it was that you contacted Mr. Wilson?
A **It would have been probably the late spring, early summer of '99.**
Q Was this a phone conversation, your first contact?
A **I don't know.**
Q Can you tell me the gist of this first contact that you had with Mr. Wilson?
A **I said we wanted to do some work on the property and whether he would be available to provide that work.**
Q What did he indicate?
A **Sure.**
Q When did you become aware that Mr. Wilson was a supervisor in Jackson Township?
A **I don't think it was until a month or two later.**
Q How did you become aware?
A **I think he told me.**

Q Do you recall in the context of what conversation you were having at the time that he told you?
A **We were on-site, and I don't know, it came up that he was a supervisor at Jackson Township.**
Q Do you recall Mr. Wilson telling you that there was going to be a moratorium on development in Jackson Township?
A **Absolutely not.**
Q So it is your testimony that Mr. Wilson never told you that there was going to be a moratorium on development in Jackson Township?
A **Absolutely not.**
Q What is your testimony then?
A **My testimony is that. I said he absolutely did not tell me that.**
Q Just so we are clear, I believe you may have misheard me or something. My question to you was: Is it your testimony that Mr. Wilson did not tell you about a moratorium on development in Jackson Township?
A **That is absolutely correct. He did not tell me about a moratorium or any proposed moratoriums in Jackson Township.**
Q Did Mr. Wilson tell you that Jackson Township was working on a subdivision ordinance?
A **No.**

Q Did you enter into a written agreement with Mr. Simpson?
A **I don't believe so.**
Q Did you enter into a written agreement with Mr. Wilson?
A **No.**
Q Did you enter into a written agreement with Eagle Construction?
A **No, not that I can recall. I don't remember, I think it was -- when outside contractors give you prices and you say, okay, go ahead, that was, I think -- I don't remember anything in writing about it, about a contract.**
Q What was it that you hired Mr. Wilson and Eagle Construction to do?
A **Well, initially there was some debris that I wanted him to remove from the property where some farmers had thrown stuff over a hill into a gully. That never came about, he never completed that task.**
Q Why not?
A **I don't know, but he didn't get to it and we kind of ignored that after awhile.**
**Then I hired him really to send a backhoe in to dig the test pits with the SEO and myself present.**
Q Did he operate the backhoe?

A **No.**
Q Who was operating the backhoe?
A **I believe that it was his nephew; but I don't know the man's name, I don't recall his name.**
Q When was this done?
A **It was done probably the summer, sometime in the summer of '99, I don't recall exactly when.**
Q Was anybody else present, other than Mr. Parks, who is the SEO, yourself, and the backhoe operator at the time you were digging these test pits?
A **Not that I know of, not that I recall.**
Q Who made the determination where the test pits would be dug?
A **It was kind of a combination of Simpson and I, because what we were contemplating subdividing, the lots, kind of dictated where you try to find on-site septic.**
Q At the time that you were digging test pits, how many lots did you contemplate you would be dividing the property into?
A **I think that it was five or six, because we had the farmhouse and barn and three lots, one for each of our children, the residue for ourselves and another lot along the road. That was all tentative.**
Q What was the result to your knowledge of

42

these test pits?
A **Well, we did, I don't know, I forget how many we dug; but we ended up with five or six approved sites.**
Q Were there any records indicating how many test pits were dug and how many sites were approved?
A **Well, there is a record of all the sites that were approved and the Township has that and so do you on the sewer modules.**
Q Is there any record of sites which were not approved?
A **Not that I know of. You dug a hole, and if it didn't look good, then you covered it up and moved on. There is no point of making a record of one that didn't pass.**
Q Were you present the entire time that the test pits were being dug?
A **I think I was present for all of them, except one. I think I was called away on the property for something when one was dug and came back when they were still there after the fact.**
Q Who were you called away by?
A **I don't know, I don't remember.**
Q What were you called away to do?
A **I don't know, I don't remember. I just**

43

**remember I went away and then I came back and they had already dug the test pit, so I wasn't present when they dug that.**
Q Prior to this time, had you ever witnessed test pits being dug or anything to do with test pits?
A **No.**
Q Did you learn at the time you were on the property and the test pits were being dug that these sites were being approved or did you learn sometime thereafter?
A **They are not approved when you dig a site pit.**
Q What happens?
A **Well, they told me that once you found suitable soil, then they had to come back and do a perk test in those locations.**
Q Who told you that?
A **I think it may have been Wilson.**
Q Was this during the original conversation you had with Mr. Wilson or at some subsequent conversation?
A **No, it was probably a subsequent conversation afterward, I don't recall exactly when that took place.**
Q How many conversations do you recall having with Mr. Wilson prior to being out on the property and

44

digging these test pits?
A **I don't know, I don't recall how many. I would be guessing if I gave you a number.**
Q Was it more than five?
A **No.**
Q Who performed the perk tests?
A **Wilson's crew did.**
Q Were you present during the performance of the perk tests?
A **No.**
Q Do you know when they were performed?
A **No, I am not positive of when that was -- I would say within, here again, I am guessing, estimating, 6 weeks of when we dug the -- 6 to 8 weeks from when we dug the test pits.**
Q Between the time that the test pits were dug and the perk tests were performed, which you are indicating about a 6 week period, did you do anything else, you personally do anything else with respect to subdividing the property?
A **Well, we couldn't subdivide the property until we knew whether a site had perked, so there was nothing to do.**
Q So your answer to my question was you did nothing in the 6 weeks between when you dug the test pits

45

and when the perk tests were done?
A **I may have been -- again, it is speculation -- talking to a builder friend of mine for design of an art studio and a house; but at some point in there, that would be the fall of '99, this started to evolve.**
Q Who would this builder friend have been?
A **McClintic.**
Q That is the name of an individual or a company?
A **It is an individual, Max McClintic.**
Q Where is Mr. McClintic located?
A **He is in State College, Pennsylvania.**
Q Was it your intent at the time that you had conversations with him to have him build the structure that you contemplated on the property?
A **It was my intention that he would help design it and help build it. His brother, Fred McClintic, actually had the construction crew.**
Q Did you enter into a written contract with Max McClintic with respect to the design of the building?
A **No, Max and I have always operated on a handshake.**
Q How about with his brother with respect to building it, did you enter into a contract?
A **We entered in a contract where he agreed --**

Q Did you enter into a written contract?
A **No.**
Q What contract did you enter into with the builder?
A **The time and material, construction and that we set aside or he set aside the -- as soon as the weather broke in the year 2000, that he would begin construction on a garage, an art studio and a house.**
Q Anything else that you recall doing toward developing the property or building on the property during this 6 week period between when the test pits were done and the perk tests?
A **Well, we had put the -- we had put feelers out for the house and -- see, the house and barn already had a sewage system existing, so we didn't need to worry about whether we perked or probed there. So we put feelers out to find a buyer for about a little less than 26 acres and the house and the barn.**
Q How did you determine what acreage you would sell with the house and barn?
A **Because of Simpson's survey; and as I said, there is a main power line going down through the property and it acted as a natural divider.**
Q Did Simpson do a survey?
A **Yes.**

Q When did he do the survey?
A **That spring and summer.**
Q The spring and summer of '99?
A **Yes.**
Q Do you still have that survey?
A **A copy of that survey was provided to you.**
Q Did you take any other action, I am just going to limit it to the 6 week period --
A **You are calling it 6 weeks, I said, 6 to 8 weeks, I don't remember.**
Q Whatever that period was, that is why I am relating it to the test pits being dug and the perk tests being performed, whatever time period that was, understanding that we don't have the exact time period; but did you take any other action toward developing building on the property and/or subdividing the property?
A **Well, we started to look at the possibility -- we had to get a road back to where we wanted to build and it was already a base road back there but it crossed the stream.**
Q How did it cross the stream?
A **It didn't, it came to the stream and it would have had to cross the stream to get to the property where we were going to build or the land that we were going to build on, so Max McClintic was exploring getting**

**a permit. I am not sure from whom, Forest and Waters or somebody, for a stream crossing, for a bridge.**
Q He was exploring the permit at your behest?
A **Yes.**
Q Did you tell him specifically to get a permit or did you just tell him that you wanted this road and do what is necessary, how did that work?
A **Well, I never got a permit to cross the stream, so he was exploring what it took. He is the kind of guy that just takes charge and before I knew it, he had applied for a permit and gotten it.**
Q Who did he apply with --
A **As I said, I don't remember if it was Forest and Waters or -- I forget the people that issue -- the Township has a copy of the permit that was a copy of the permit that was issued by whatever department was required for a bridge to be put across the stream.**
Q When you said there was already a base road, what do you mean by that, what is --
A **There was already an obvious cartway that went all the way back into the woods, through the woods, to the stream.**
Q Was this cartway being used in any fashion to service either the barn or existing house?
A **No.**

Q Was there any roadway being used or any on the property?
A **The house and the barn were already right along the paved road.**
Q They had access to the paved road how?
A **Right there it was -- the house was within 20 feet of the paved road and the barn was 20 feet from the -- all there was in front of the house and the paved road was a parking space, they didn't even have a driveway.**
Q This cartway that you are referring to, was that a dirt cartway?
A **It was a shale, shale dirt cartway.**
Q Was it graveled in any way?
A **Well, obviously, it had been kept up by somebody, probably the Michaels, I don't know, because there weren't any trees growing in it or anything else. In fact, it had even been mowed.**
**During that period of time I also was talking to Wilson about coming in and shaleing, putting a new coating of shale on that road to bring it up to a better standard for our driveway.**
Q You were talking to Mr. Wilson about doing the work to put the shale on there?
A **Yes.**

Q And was this during the period of time that we are talking about between --
A **Well, was it during the 8 week period of time, I am not sure. It was in the fall of 1999 when all this was talking place.**
Q You said you put out feelers about selling the existing structures and 26 acres. What do you mean by that?
A **Well, I just let it be known to people that I was -- I told Simpson I would like to sell this off. I told other people that may have an interest.**
Q Who else did you tell beside Simpson that you can recall?
A **I don't remember. If I had a friend in State College that said, oh, gee, I would like to be out in that area, I would tell him that I was going to sell off 26 acres and the house and the barn.**
Q Did you have a price in mind at the time that you were putting these feelers out as to what you wanted to sell the house and the barn and the 26 acres for?
A **I had asked several realtor friends of mine what they thought something like that would go for.**
Q Do you recall who you asked?
A **Probably Pat Brewer and a fellow by the name**

**of Scott Yocum.**
Q Specifically, you asked them what?
A **What they thought a house and a barn and 26 acres would sell for.**
Q Would sell for where? Did you tell them where?
A **Yes, in Huntingdon County.**
Q Just in Huntingdon County?
A **No, I told them where the property was, Yocum had sold property over in that area before.**
Q What did these relators tell you with respect to what it would sell for?
A **They indicated, I don't remember exactly, anywhere from 125 to $175,000, if it was somebody looking with horses or something like that.**
Q Did you contract with any realtor to sell the property?
A **No.**
Q Why not?
A **Because I didn't want to.**
Q Did you do anything else to, in your terms, put out feelers to sell the property other than what we have discussed?
A **No, because before I got it I got a call from the Hewetts who had somehow heard through the**

**grapevine that this property was for sale.**
MR. SHERR: Off the record.
(Lunch recess.)
BY MR. SHERR:
Q We are back on the record. Mr. Corneal, we left off, you had indicated that you got a call from the Hewetts, who had heard through the grapevine about the property. Do you recall that testimony?
A **Yes.**
Q Where did they call you?
A **Well, when I said the grapevine, I meant the grapevine in the area down there and the grapevine specifically, they told me that Tom Wilson had told them that I was interested in selling a piece of ground. And I believe since Tom had my number at the office, I think that is where they called me, at the office.**
Q Had you prior to hearing from the Hewetts, discussed with Mr. Wilson selling the parcel containing the barn and the house?
A **Yes, in fact, he had expressed an interest in buying it himself.**
**It so happens that this property that I bought from Michaels was the old Wilson farm, which was his grandfather's farm, and he stated to me that he would love to have a place to go with his grandchildren and he**

**would be interested in personally buying the 26 acres.**
Q Did he specifically reference the 26 acres during this conversation?
A **Well, I said, I told him that I was selling off the house and the barn and approximately 25, 26 acres, something around that, so yes, that is what he anticipated it was going to be on the market.**
Q Did you have this conversation with Mr. Wilson concerning selling the house and the barn before or after the test pits were dug?
A **Well, it was during, because we had a number of discussions at that time of what was necessary to do and what the Township through its SEO required.**
**As I said before, he told me he was a supervisor. So at that time I quizzed him on what it was necessary to do and he made a joke, he says, well, in this Township we even permit privies, inferring that it was wide open.**
Q Just so I am clear about time, and the only reason I am asking this, the conversation that you had with Mr. Wilson about purchasing the property when he referenced to you that it was the old Wilson farm --
A **The old Wilson farm.**
Q -- was that before or after the test pits were dug?

A I would suspect that it was either at the same time or before. Because I brought him on and we were discussing a number of things. Remember the first time I said I talked to him, we talked about cleaning up some debris that had been thrown over and as we are going through this area of the farm he is talking about, oh, yeah, this was an old logging road. When I was a kid, there was a sawmill back here. So he was giving me a history on this thing.

I can't really pinpoint whether it was right at the same time we were doing the test, but obviously, it relates to what I was hiring him for. So we had already done the test pits, I am not sure.

It was right around that time, probably within a week of two of either prior or after the test pits, or it could have been days prior to the test pits.

Q Is it your testimony that you are aware that Mr. Wilson was a Township supervisor at or around the time that the test pits were dug?

A He had told me, yes.

Q You indicated he didn't tell you during the first conversation you had with him, it was some subsequent conversation, right?

A As I said, I can't remember exactly what the substance of each conversation was. I said at some point

it became apparent that he was a supervisor, he told me he was a supervisor. Then we had discussion, whether it was the same time as the discussion about him buying the property or not buying it, I don't recall exactly.

It was kind of like we were establishing -- I felt that I was trying to establish a rapport with some local people. So it was just a chatty, number of chatty conversations about things.

Q What is it that you recall him telling you about the Township requirements with respect to the sewage enforcement.

A As I said, he joked, and he said, we even permit privies here, which is an outdoor toilet, an outhouse. The reference was that it was unusual that they were -- I don't want to say that he didn't say they were backward, but that is, obviously, what I interpreted from it. All you had to do was do the tests and if you passed, you had no problem. I mean the log tests and the perk tests.

Q Is it your belief based on your conversations with Mr. Wilson that he was aware before the test pits were dug that you were intending to subdivide the property?

A No question about it.

Q Other than discussions about the

requirements with respect to on-lot sewage, did you have any discussions with Mr. Wilson about any other Township or county requirements for dividing the land?

A When you say discussions about dividing the land.

Q Subdividing the land?

A Or subdividing the land, the situation was that there was no subdivision requirements and code. He said, you can build whatever you want, there is no code, there is no building code, there is no subdivision. I think that was in the same conversation, he said, you can have a privy, if you wanted one, in this Township.

Q So we are clear, is it your testimony that Mr. Wilson told you at sometime before the test pits were dug and I am using that just as a reference point, that there was no subdivision requirements in the Township?

A Well, you are asking me, again, to identify a specific time. It may have occurred the day we were digging the pits or it may have occurred the day before we were digging the pits.

I know that I delivered to his office a copy of a rough map from Simpson showing proposed lots that we were going to do and whether the conversation took place at that moment, because we were, obviously, discussing subdivision, or it took place later on, I am not sure.

Q Are you sure that he told you that there were no subdivision requirements in the Township?

A Absolutely.

Let me add to that. He said there was no subdivision requirements, but we had to have the SEO's approval on these locations, which then had to be submitted to the Township. So it wasn't that you could -- you, obviously, needed the on-site septic approval from the SEO that the Township then had to sign, that then got forwarded on to DEP and that is what he had told me needed to be done; so to that extent, the Township was involved.

Q Did you discuss or did you have any discussions with anybody concerning your discussions with Mr. Wilson and what the Township required or didn't require?

A Yes, I am sure I discussed that with Max McClintic. I may have said something to my wife, I can't recall, because Max was doing the drawings for our home and art studio.

Q Did your discuss your conversations with Mr. Wilson concerning what the Township would require or wouldn't require with Mr. Simpson?

A I think Mr. Simpson already knew what the Township required and didn't require, because as I said, he was doing the sewer modules and he is the one that

recommended that I needed to get the pits done and the SEO involved.

Q My question was, did you discuss your conversation that you had with Wilson with Simpson?

A **Did I specifically discuss Wilson's conversation, I most likely did; but I can't say that I did. I don't know, that is the answer to the question, I don't remember whether I did or not. I could have and I would have to ask Mr. Simpson if. . .**

Q Other than what you have already testified to occurred with respect to either your subdividing the property and building on the property to the point where the perk tests were done, can you remember anything else happening with respect to either subdivision and/or building on the property?

A **Well, no.**

**It was my understanding from all these conversations that I had with Simpson and with Wilson that there was no problem in dividing off some pieces of ground as long as they perked or we were able to get a sewage SEO officer approval on the perk sites, that was the only requirement that we had to develop and divide up this land.**

Q Once the perk tests were done, I believe you testified that Mr. Simpson then did sewage models?

A **Yes. I don't know if it was right then that he did the sewer modules but eventually he did sewer modules within a month or two or something like that.**

Q At the time did you have any understanding as to why sewage modules were necessary?

A **Yes, that was the process upon which the SEO approved in writing the sites that were found to have passed and the Township would sign those modules and, in fact, I paid them $1400 and some cents for their SEO's work on this thing and I had paid Wilson twice, once for digging the pits and once for doing the perk tests.**

**Once that was done, then sewer modules were done for the Township to sign. Barry Parks was presented with those sewer modules, he signed them all. I took him to a meeting of the Township and asked that they be signed and the Township supervisor refused to sign them.**

Q When did you take them to the Township?

A **I believe it was the February meeting.**

Q February of what year?

A **The year 2000.**

Q Up to that point, had you had any contact either in writing or orally with anybody from the Township, any official or employee of the Township other than Mr. Parks and Mr. Wilson?

A **No, just with Wilson. I don't think I**

**talked to anybody else.**

**Wilson was my contact then and continued to be, because I was going to have him do that road that was going to be necessary -- what it really would be, would be a driveway for the house, a long one, and he was going to do the driveway for me. So my contact would have been with him.**

**In those contacts, he never said anything to me, well, we have a problem or you have a problem, nothing, everything was hunkydory as far as I knew.**

Q Did you have contact with Mr. Wilson after the perk tests were done but prior to your going to the February 2000 Township meeting?

A **That is the time period I was talking about. He and I were discussing getting the road in, because we had discussions about permitting to get the bridge across the stream. And I wanted to go ahead and get the driveway in so that when we were ready to go across the stream, that we could do it, because we had to get construction vehicles back in the back end of the property where we were going to do the construction. So I discussed that with him, from that period of time when the perk tests were done, up until February of the year 2000.**

Q When were the perk tests done, do you know?

A **In the fall of -- mid to late fall of '99.**

Q Do you recall, Mr. Wilson telling you that you should hurry and get your materials to the Township?

A **No, he never said that. He never indicated anything was wrong or anything was going to delay the project that we were pursuing.**

Q Getting back to the phone conversations with the Hewetts, it is your belief that it was Mr. Wilson who told the Hewetts that you were selling some of this property?

A **That is what I believe, as I recall, yes.**

Q What else occurred during this phone conversation?

A **That they had a daylily business and they were located in a dark area and they needed to get out into the sunshine and get some open space and they were looking for a place just like ours.**

Q Did they indicate to you during that phone conversation that they had been to the property?

A **I don't remember if they had been or not, I don't know.**

Q Did you discuss at that point during this initial phone conversation price?

A **Yes.**

Q What price did you discuss?

A **$150,000 -- actually, I discussed $160,000,**

**because that was the upper end of what my realtors had told me or had estimated the property to go for and I was looking to basically cash -- get my cash out of the investment and invest that money in a house and then I would have the rest of the land free and clear.**

Q When you say investment, as I understand your testimony, at the time that you purchased this property, you weren't purchasing it for an investment, were you?

A **Oh, absolutely. Are you kidding me? I never buy anything, unless it is an investment.**

Q So it is now your testimony that --

A **No, I haven't changed my testimony.**

Q Let me finish and you can answer it anyway you would like.

It is now your testimony that at the time that you purchased the property, one of your purposes in purchasing the property was to make money off of the property?

A **I never buy anything in real estate, unless I am going to make money on the transaction. I always look -- and my wife can attest to this and so can many people that know me -- I never make -- I never buy anything for the fun of it or for some recreational purpose. I buy it with the anticipation of getting my**

**money back somehow and then ending up with something.**

**In this case, I was willing to accept the fact that I would have no money tied up in the balance of the land that I really wanted, and that is how I always invest.**

**Property is not -- I am not an affluent person that I can afford to buy property and sit around on it. It has got to make money or return my investment to me or I have a problem with it, I always buy that way.**

Q So it was your belief then from the time that you purchased the property that you would be able to subdivide it and recoup your purchase price?

A **There was no reason to believe that I could not subdivide it and recoup my money.**

Q What I am asking you is you had a belief at the time that you could do that?

A **Yes.**

Q Recoup your money?

A **Yes.**

Q What did you base that belief on?

A **I bought a number of pieces of real estate in the past and sold them.**

**I try to anticipate where the market is going to be in the future. I anticipated that the market with I-99 going into the State College area was taking**

**away a lot of the character that drew a lot of people to the State College market.**

**Right across the mountain, 20 minutes away, was a piece of property that was ideal for -- I could just see the State College market moving that way, and, in fact, it was.**

**So I anticipated from day one that I would make money on this property, as well as have the benefit of having the property -- an art studio along the stream and either a summer house or what ended up being a permanent house.**

MS. MONTGOMERY: Can I talk to my client for one second?

MR. SHERR: No. If he wants to have a conference with you, that is one thing.

MS. MONTGOMERY: All right.

A **I want to have a conference with my attorney.**

**(Discussion held off the record.)**

**(Answer read.)**

A **A summer house is actually what I said. It ended up being a permanent house.**

**BY MR. SHERR:**

Q My question was though, how did you know or what did you base your belief that you would be able to

subdivide the property on at the time that you purchased it?

A **It is not hard to subdivide land when there is no subdivision ordinances.**

Q Were you aware there were no subdivision ordinances?

A **Somebody had told me there was virtually nothing over there. I don't remember whether it was one of my realtor friends or -- I don't know who it was.**

Q Just so we are clear on the record, it is your testimony that at the time that you purchased the property you were aware or you had a belief that there were no subdivision ordinances in Jackson Township?

A **I had a belief that that was the case. I never checked directly with the Township about that.**

Q Why didn't you check with the Township?

A **Because it wasn't a compelling situation. I didn't know how much dividing I was going to make or what exactly I was going to do. I knew that it was a good buy and I couldn't anticipate any problems.**

**Maybe it was Yocum that told me, because he had sold some pieces over there and has represented to people that it was easy to subdivide, because there were no ordinances and no building codes and he is a professional, I had no reason not to believe him.**

Q When you learned that you would have to have certification that lots were suitable for on-site sewage, were you surprised by that?

A **No, you have to have sewage disposal and most people that live in places like that don't have public sewer, so you would anticipate you have to have an on-site septic system. I certainly had heard of on-site septic before. And when I bought the property, the Michaels pointed out, here is our drain field for the on-site septic system for the house.**

Q Who pointed that out?

A **The Michaels, the people I bought the property from.**

Q Was that the first time that you become aware that there was on-site sewage at that property?

A **I guess so, but nobody in rural areas like that have public sewer. So in anticipation, if somebody asks me what kind of sewer is it, my guess would have been that it was on-site septic.**

Q But you never investigated that?

A **I didn't need to, because as I said, Michaels told me, which confirmed what was obvious.**

Q Prior to the Michaels telling you I guess is what we are trying to pinpoint now, you didn't do any investigation, whether there was on-site sewage for the

property or whether it was served by any kind of public system, you did no investigation as far as that is concerned, right?

A **There was no need to, I hadn't agreed to buy the property yet.**

Q My question is, you didn't do that, isn't that correct?

A **My answer is there was no need to do that, that is correct.**

Q During your initial conversation with the Hewetts, did you tell them that you were in the process of dividing the property?

A **I said at that time we were investigating the division of the property and we anticipated that the easiest one to divide, because we knew it already had sewer and water on it, was the house and the barn and 26 acres, a little less than 26, 25 point something.**

Q At the time that you had your initial conversation with the Hewetts, were you aware that somebody was living in the house?

A **There was no one living in the house.**

Q Was there a tenant for the property?

A **Not at that moment.**

Q At what point --

A **Excuse me, I beg your pardon. I have a**

**person that worked for me living in the house at that time, yes, I did.**

Q Who was that?

A **Scott Page.**

Q In what capacity was he living in that house?

A **He was living in there without paying rent, because he was in financial difficulties and he was a very nice young man and he worked hard for us and we wanted to give him that as a fringe benefit to help him out.**

Q What work did he do for you?

A **He worked as a front desk receptionist at our business.**

Q Is that the health club?

A **Yes, the health club.**

Q Did you have any written agreement with him with respect to his living on the property?

A **No.**

Q Did you subsequently enter into an agreement with anybody with respect to leasing any of the property?

A **Subsequent to what?**

Q To Mr. Taige living on the property?

A **We have entered into an agreement in the summer or the fall of this year.**

Q With whom?

A **Kevin, I don't remember his last name.**

Q That agreement is in writing?

A **No -- you asked me if I had a written agreement, I did not. It is an oral lease on a 60-day basis that we entered into this fall with Kevin and his fiancee, I don't remember her name either, sorry.**

Q What are the terms of the 60-day lease?

A **They pay utilities and $375 a month and maintain the property. I can give them 60 days notice for them to be out or they can give me 60 days notice that they want out.**

**They were children of a friend of mine in State College that didn't have much money and were desperate to find a place to be on their own, because she is still at Lockhaven State and going to school and teaching and he works construction with one of the local construction companies.**

Q This started in the fall of 2000?

A **Fall of 2000, yes.**

Q Have they paid $375 a month since the inception of the --

A **Yes, I think they have been there 5 or 6 months, something like that.**

Q Getting back to the Hewetts and the phone conversation that you had. During this initial

70

conversation that you had with them, did you discuss anything else concerning the sale of the property other than price?

A Well, we discussed Page living there, Mr. Page, and we discussed the Hewetts having to sell their house.

Q What did you discuss about Page living there?

A Well, I said that we cared about this young man, that we were trying to help him and the last thing we wanted to do was throw him out and so that we wanted to give him plenty of time to find something else or we were going help him find something.

That was fine with them, because they had started this daylily business and really weren't ready to go into it full-time until the spring of 2000 and so we, basically, had -- I think their contract was in October and they had until -- they weren't anticipating needing to move in there until the beginning of the summer, which worked out fine for everybody or it seemed to work out fine for everybody.

Q Did you enter into any agreement during this initial conversation?

A No, there was a subsequent written agreement.

71

Q Was there any kind of agreement between you and the Hewetts during this initial conversation that either they would purchase the property or come out and look at the property or that you would continue negotiating, anything of that nature?

A No.

At the initial discussion they came out and met me on the property. We went through the house and we went through the barn and they looked at the land and took a walk down along the stream and we discussed things.

Q What did you discuss?

A The contract or the proposed contract to purchase.

Q Did they agree that at that point they wanted to purchase the property?

A Yes -- well, at that point, they may have called me that night or they may have called me the next day; but as a result of that meeting, they elected to purchase the property.

I had offered it at 160, they asked for 150 and I agreed to it.

Q Then you entered into a written agreement of sale, correct?

A Right.

Q Who prepared the agreement of sale?

72

A I did.

Q There were a number of conditions contained within the agreement of sale, correct?

A Right.

Q The one condition, I will read it here, states: Buyers acknowledge that a present tenant, Scott Page, P-A-G-E, needs to be relocated by sellers to a property they are constructing on another portion of the farm and that they will be flexible in the settlement date to accommodate this transition.

A Yes.

Q Do you acknowledge, and I can show it to you, I don't have a copy.

A You don't have to show it to me.

Q You acknowledge that that was a condition on the agreement of sale?

A Assuming you are reading it from the agreement of sale, yes.

Q I will represent that I was reading that from the agreement of sale.

A Okay.

Q What were you constructing on the property?

A Well, we were anticipating building the house and the art studio and the garage.

Q That is where you anticipated relocating Mr.

73

Page to?

A Well, at the same time there was another possibility that -- I was talking to a neighbor called Weaver and Weaver had indicated that he may be interested in selling his property and he had a small cottage on that property. So I was anticipating that Weaver, that if I made a deal with Weaver, that Scott would move on to that property.

Q So was your contemplation at the time that you entered into the agreement of sale that that sale would not be consummated until either you entered into a separate agreement with Mr. Weaver or you completed construction of another building on this property?

A No, that is not correct.

Q Why is that not correct?

A What was anticipated was that we weren't going to move Mr. Page out into the cold without trying to help him, because he was kind of a fragile individual psychologically and we were trying to help him. The last thing we wanted to do was cause him any problems.

So we were anticipating somehow finding something, but it would not hold up this sale, we were giving ourselves plenty of time to find something, even if we had to find something in State College, it doesn't really matter. But it was just, we wanted the Hewetts to

know that we had a concern that we wanted taken care of for this young man.

Q At the time that you drew up this agreement of sale, you at least anticipated the possibility that this sale may be delayed because of Mr. Page and where to locate him, right?

A No, no.

Q Why did you include this condition in the agreement of sale?

A We included it in there because we had a discussion about it and we anticipated closing this deal sometime in the spring of the year 2000. We gave ourselves a line out there until the end of June; but everybody anticipated that it was going to happen sooner than June.

It was just a matter of we were just trying to accommodate and the Hewetts were very accommodating in that regard, they understood our concern about Mr. Page and so we put language in like that, that is all, just so there was an acknowledgment that everybody understood we needed to take care of Mr. Page, that was one of our concerns, but it certainly wouldn't have held up the sale.

Q You had in the agreement of sale that the closing date would be June 30, 2000, right?

A Yes.

Q You also put in there that both you and the Hewetts would be flexible on the closing date to make sure that Mr. Page was being accommodated?

A Right. The point is that it was not going to hold up the sale or the transfer of the property, it was just we were trying to find him something as soon as we could and the Hewetts were understanding of that and we were going to work together but it certainly wouldn't have held up the sale.

Q You also provided that you would use the second floor of the barn in anticipation of the completion of whatever you were going to build on the property?

A That's right. I had a bunch of wood, timber, that I had cut off some other property and it was being air dried, cherry, oak, maple and pine and we had moved it out to the top floor of the barn.

It wasn't easy just to move it somewhere, because it had to be inside. So I reserved the rights to do this, because I didn't know how long it was going to take us to construct things and to use up that wood.

We had an estimate of what it would take, but we were giving ourselves plenty of leeway, after discussions with the Hewetts, it probably won't be a year, but I want the right just for 2 years just in case, just trying to anticipate the worst case scenario.

Q As of the time that you entered into the agreement of sale with the Hewetts, which I will represent according to the agreement of sale states October 7, 1999, had you had any dealings with any official or employee from the Township other than Mr. Wilson and the SEO?

A I don't think so, not that I can recall.

Q Is the first time that you had any dealings with any official or employee from the Township other than Mr. Wilson and the SEO when you attended the Township meeting in February of 2000?

A I believe that is correct, yes, I think so. I am trying to think if I had called the Township secretary about any questions or information. At this moment I don't recall any conversations.

Q I am going to use as our time this February 2000 Township meeting that you attended, up to that point, up to February of 2000, had you engaged anybody else to perform any other services on the property other than Mr. Wilson; Mr. Parks; Mr. Simpson; and the designer, Mr. McClintic?

A I can't recall anybody that I would have hired to do something at that particular time.

Q What did you take to the Township meeting of February 2000?

A I took the map of the subdivision and I

believe -- I think I took the sewer modules; but their meeting is the first Monday of every month, and I may have taken the sewer modules on the first Monday of March, if I didn't take it on -- I would have to look at the date of the sewer module, the signature that Parks had done.

Q Were you present when Parks signed the sewer module --

A No, actually, they were delivered to his wife, who works in State College, she took them home to him and brought them back.

Q Brought them back to you?

A Yes, she did, she brought them -- I believe she brought them back to me. Either she brought them back or he mailed them to me; but I didn't deliver them to him personally, his wife took them to him.

Q The map showing the lots and the sewer modules, how many proposed lots were there?

A At that time there was three lots.

Q What were the three lots, if you can describe them?

A We had the 20 -- we will call it the 26 acre lot. Then there was a triangular piece of ground back in the back, that abutted the 26 acre piece but on the other side of the power line; and then there was the residue, which was what we were going to build on. The smaller

triangular pie shape, it was a pie-shaped lot, it was about 4 and a half acres, something like that.

Q What did you intend to do with that lot?

A I was going to give it to one of my kids.

Q Other than taking the map to the Township meeting and the sewer modules to the Township, did you send the sewer modules anywhere else?

A Send it somewhere else?

Q Deliver it somewhere else or bring it somewhere else?

A In what time are you talking about, when?

Q At or around the time that you brought it to a Township meeting?

A I don't think so.

David Simpson delivered the things to me done, we signed them in the owner's spot and we gave them to Parks -- I called Parks and Parks said give them to my wife, it is easier, because she worked in State College, so she brought them home and either she delivered them or he mailed them to me, one of the two, and they were all signed. Aside from that, no, I don't think they were delivered to anyone else.

Q You don't recall, as I understand, whether you brought them to the Township meeting, and we are talking about the sewer module, the Township meeting in

February of 2000 or March of 2000, right?

A Yes, you can easily determine that by the date that Parks signed it.

If he signed it before the first Monday of February, then it was taken in February; if he signed it after the first Monday of February, then it was taken to the March meeting.

Q But you recall that you were definitely at the February 2000 meeting?

A Oh, yes.

Q Is that correct?

A Oh, yes.

Q What happened at that meeting?

A I had the plan, in fact, I had 3 or 4 copies of the plan, which is what Simpson told me I needed. My wife and I had signed it and it was notarized and I asked the Township to sign it.

Q Why did you ask the Township to sign the plan?

A Because that is what I was told had to be done.

Q Who told you that?

A I think it was Simpson that said take it -- it was either Simpson or Wilson that said you have got to take the plan -- Wilson that told me to take the plan to

the Township or bring it to the supervisor's meeting for our signature.

Q What happened at the meeting?

A They said, no, we are not going to sign this plan.

Q Who said that?

A One of the supervisors.

Q Do you remember which one?

A No, I think it was whoever the chairman was, but I am not sure which one of the fellows that was.

Q Did they say why they weren't going to sign it?

A Yes, they said we have a moratorium in effect on subdivisions and we are not signing any plan.

Then they also went on to say, you are doing this wrong anyhow, it has to be submitted to the County Planning Commission first.

Q Do you remember who said that?

A Whoever it was that was talking, I think it was the supervisor.

Q You mean the chairman?

A Yes, the chairman of the supervisors.

Q Was it one person who was doing the talking?

A They all chimed in here and there. I don't remember -- in fact, it may have been -- it was probably

Mrs. Wirth that said, anyhow, you don't want to be submitting that here. Anyhow, you have to take it to the County Planning Commission first; but they were all in agreement that that is what had to be done.

Q It is your testimony, and I need to be clear about this, it is your testimony and your recollection that the person who said they are not going to sign it was the chairman of the board of supervisors?

A I said I think that is who said it initially; but as I said, they all chimed in, you know, yeah, we are not going to sign this, no, we have got a moratorium in place. I think Wilson was the one who said, yeah, we have got a moratorium in place and we are not signing it.

Q What did you say?

A I said you guys can't have a moratorium on an ordinance that you don't have, I said.

Then I think Mrs. Wirth chimed in with, yes, besides that, before we sign anything like this, you have to submit it to the County Planning Commission. She said something about, you are out of procedure or something like that.

Q So you were aware at the time that you went to the Township meeting in February of 2000 that there was no subdivision ordinance in Jackson Township?

A Right.
Q How did you become aware of that?
A Wilson had told me that way back when.
Q Did Wilson tell you way back when that they were working on an ordinance?
A No, he did not. He claimed he told me that, but that is not true at all.
Q When did he claim he told you that?
A At the meeting.
Q Do you know of any reason why Mr. Wilson claimed to have told you that?
A Why, what was in his mind?
Q Yes. Do you know or do you have a belief as to why he told you at the meeting of February 2000 that he had previously told you that they were working on a subdivision?
A You want me to speculate as to what was in his mind as to why he did that?
Q I am not asking you to speculate what was in his mind. I am asking you whether or not you had a belief or have a belief as to why he told you that?
A Well, I think Mr. Wilson wanted to interfere with the sale of this property and the subdivision of this property, because he wanted it himself and now he is trying to cover his tracks with, oh, I told you about

that, and he never told me anything like that.
Why would I hire him to do test pits and do perk tests and do all this stuff and pay the SEO if I knew there was a moratorium on or he knew there was a moratorium coming in. There is no sense to that.
So I think he was just trying to cover himself as to why he had went ahead and gotten paid for this work and then he was trying to say, well, I told you this was going to happen and he never told me that.
Q Is it your belief then that he was telling you this, that he had previously told you that they were working on a subdivision ordinance, because he was covering up because he accepted payments from you or because he wanted the property himself or some other reason?
A Both reasons that you just stated I think. In fact, after he was able to break or the Hewetts backed out of the contract, he sent his nephew to me how he wanted to buy the property now, the 26 acres, the nephew did, who was a backhoe operator and had no money, had no wife, no family. All of a sudden the backhoe nephew wants to buy the property from me.
Q Did you say anything else at the Township meeting other than you can't have a moratorium because you don't have an ordinance?

A I told them, this isn't right. I said, you can't have a moratorium on an ordinance that doesn't exist. I said, I want this plan signed and I want, you know, so we can get the sewer modules and proceed, because I have got this sale -- I told them that I had the sale of the property to the Hewetts, they already knew about that.
Q How do you know they knew?
A Because they said they knew, Wilson knew.
Q Who said they knew?
A Wilson said he knew that the Hewetts had this property or had a contract on the property.
Q Did you raise your voice at this meeting?
A Raise my voice? Not much louder than what you are listening to right now.
Q Were you angry?
A Well, I was obviously disturbed when all of a sudden they are throwing me a curve and Wilson is claiming he told me this was happening, which wasn't true. The whole thing was, needless to say, very disconcerting.
I explained to the rest of the supervisors that I had a contract for this property and that I also had contractors lined up that were committed and I was committed to them to build an art studio and a garage and a house for my wife and I.
Q What contractor did you have lined up?

A Max McClintic.
Q Up until the point of this February 2000 meeting, had you done any construction activities on the property?
A No -- none that required -- we didn't do anything. Wilson actually was supposed to start the road back to the stream but that hadn't started yet.
Q When was he supposed to start that?
A He said he was going to start it as soon as he got some of his vehicles and equipment in from other jobs and they weren't there yet and there was, you know, the typical contractor excuses and delays.
Q Did there come a point in time where Mr. Wilson told you he couldn't do the work?
A Yes.
Q When was that?
A That was shortly right thereafter. I said, are you doing this road for me or not? He said, Well, I guess under the circumstances I can't or I won't do the road. This is after we had the confrontation.
Q At the February meeting?
A At the February meeting, yes.
Q Where did this conversation take place where he told you he couldn't do the work on the road?
A I don't recall if it was at that meeting,

after the meeting, because their meetings only last 15 or 20 minutes, or I got on the phone with him a day or so -- the next day or something. I don't recall how it happened.

Q Did anything else happen at the meeting that we haven't discussed?

A They told me I needed to go to the County Planning Commission and submit my plan there and that the County Planning Commission would send it back to them for their signature.

In other words, what they inferred to me was, no, we don't have a subdivision ordinance, but we got a moratorium on them; but the Huntingdon County Planning Commission has a subdivision ordinance that you have got to clear it through first. That was the inference that they made to me.

Q So by you saying they made that inference, they didn't specifically say that to you, correct?

A They specifically said that you can't bring it here first, you have to first have the Huntingdon County Planning Commission approve your review and approve your plan.

Q Those were the words that were used?

A Those were the words that were used.

Q Who was it that used those words?

A I would say it was probably Mrs. Worth that said that. She is a secretary of that body, but she really acts as a Township manager.

Q Did anything else happen at this February 2000 Township meeting?

A No, they just shut me off. They said, we have got a moratorium, we are not going to approve your plan and you have got to take it to the County Planning Commission first anyhow, so that is it.

Q Did you thereafter discuss with anybody what happened at the February 2000 Jackson Township meeting?

A Yes, I would have talked to Max McClintic about it, I would have talked to my wife about it.

Q Anybody else?

A I may have discussed it with Fred McClintic, but I don't know if I did or not. Definitely with Max. Probably discussed it with Simpson. I would have discussed it with Hewett, in fact, I know I discussed it with Hewett.

Q Why do you know you discussed it with Hewett?

A Because Hewett then started to take an active role when they found out the Township was holding us up, because it would have affected them.

Q Did you look into whether or not you had to

submit your plan to the Huntingdon County Planning Commission?

A No, I took their word for that. It sounded quite logical and reasonable. My dealings were exclusively, if I ever dealt with anybody, it was in Centre County and I know Centre County has a Centre County Planning Commission that has control over land subdivisions. So I assumed that what they were telling me was true.

Q There was nothing to prevent you from looking into what they were telling you to see if it was true, correct?

A I asked them for a copy of the ordinances at one point, at which point they said there are none, we have no copies of those.

Q When did that --

A It wouldn't have occurred at that meeting, I think it occurred at the next meeting.

Q They said they have no copies or they had no ordinances?

A They had no copies of any ordinances, they only had the originals and couldn't provide we copies. I said, I will pay for copies, they wouldn't give them to me.

Q Who told you that they wouldn't give you

copies of the ordinances?

A Mrs. Worth.

Q Were you aware that copies of the ordinances were available at the county library?

A No.

Q You were not aware of that?

A No. I told you, I have not dealt in those areas. I hired engineers to do this stuff when needed or architects to do this stuff. If I had any involvement, there was always another attorney that specialized in that area that dealt with that, because that was not my area.

Q Up until the point of the March 2000 meeting when you are saying that you were told that you could not get a copy of the ordinance, did you consult with an attorney?

A No.

Q Why not?

A Because I didn't think it was necessary, I thought they were telling me the truth.

Q You didn't think it was necessary to consult with an attorney, even though you are testifying that they refused to give you a copy of the ordinance?

A You asked me between February and March did I consult with an attorney, that is what I interpreted in your question.

Q I apologize for that.
After you were told they would not give you a copy of the ordinance, did you consult with an attorney?
A **I talked with Jim Himes in Huntingdon.**
Q Did you talk to him for purposes of legal representation?
A **Yes. He was a close friend, so.**
Q When you spoke with him, did you anticipate that your conversation would be privileged?
A **I would think so.**
Q Were you thereafter able to review copies of the Jackson Township ordinances?
A **Did I review them or was I able to review them?**
Q Were you able to review them?
A **After the ordinance was passed.**
Q When was the ordinance passed?
A **July the 7th of the year 2000.**
MS. MONTGOMERY: Object to the form. Just be clear on what ordinance you are talking about. You are making assumptions here.
MR. SHERR: I was just referring to ordinances and--
A **I am talking about the subdivision ordinance. I never reviewed any ordinances of the**

**township.**
**BY MR. SHERR:**
Q That is true even after you consulted with this attorney in March?
A **That's right.**
Q Did you submit your plan to the County Planning Commission?
A **Yes.**
Q When did you do that?
A **Shortly within a few days of that February meeting.**
Q Did you personally submit it?
A **I did.**
Q Did you speak with anybody at the Planning Commission at the time that you submitted it?
A **I spoke to a Richard Stahl, the head of the Huntingdon County Planning Commission.**
Q What was the nature of your conversation with Mr. Stahl?
A **The nature of the conversation was, I have been told by the Jackson Township commissioners or supervisors that I needed to submit a plan to you for review and approval.**
Q What did he say?
A **He says, yes, and our fee is $75 or**

**whatever, you can bring it by and I did. I gave him a check for the $75. I think it was 75, it may have been more, less than a hundred dollars.**
Q Did Mr. Stahl indicate to you that it was, in fact, necessary for you to submit the plan to the County Planning Commission?
A **He didn't say one way or the other. He just said we reviewed -- it is customary for us to review plans, I don't remember that that was his exact language; but he never said that it was required or wasn't required.**
Q Did you ask him?
A **I assumed from what I was told that I had to do this and I assumed that Huntingdon County had a subdivision ordinance, since I never heard of a county not having a subdivision ordinance.**
Q Did you ask Mr. Stahl whether or not it was necessary for you to submit your plan to the County Planning Commission?
A **I said, I have a plan that Jackson Township has asked me or told me I needed to submit to you, what is your procedures? He told me; and he never said, you don't have to submit it to us, we don't have any ordinances. He treated it and led me down to believe that they had a requirement that it had to be reviewed by them at the Huntingdon County level.**

Q Did you ask him whether or not you had to submit it to him?
MS. MONTGOMERY: Objection to the from.
BY MR. SHERR:
Q To the County Planning Commission?
A **I already answered the question. He led me to believe that I had to submit it to them and pay the fee for their review for Jackson Township, as well as Mrs. Wirth; and the supervisors led me to believe that that is what I had to do if I wanted to get an eventual subdivision approval once the moratorium was lifted.**
Q Did you do anything else to determine whether or not you had to submit your plan to the County Planning Commission?
A **No, I followed the instructions I was given by the Township.**
Q Why do you believe, if you have a belief, that the Township told you to submit your plan to the County Planning Commission?
A **I have no idea, except my belief is that they were trying to block or stop or interfere with my development or subdivision of the land and so they were throwing up another road block.**
Q Why do you believe this was a road block?
A **Because, obviously, in hindsight, we find**

**that it was not necessary to submit this to the Planning Commission at the county level. It was totally false and unnecessary, in hindsight we find this out.**

Q How did you find it out?

A **It became obvious when I went and talked to people that were knowledgeable, such as my attorneys here, as to what is required.**

Q When is it that you found out you did not need to submit your plan to the County Planning Commission?

A **It would have been in the late spring.**

Q Of 2000?

A **Yes.**

Q What happened when you submitted your plan to the County Planning Commission, what did they do with it?

A **They came back with a letter, a copy of which has been provided to you, evaluating the plan.**

Q Contained within that letter they reference the fact that there was a moratorium in Jackson Township, correct?

A **Yes.**

Q Did they also review your plan with relation to the proposed ordinance in Jackson Township for subdivision?

A **I have no idea what they use as a basis, except that it appears that they did, because they reference the proposed plan that they had in their files.**

Q Do you recall that in that letter they stated, "the Jackson Township supervisors were in the process of adopting a Subdivision and Land Development Ordinance, the following comments are based on the draft of Jackson Township Subdivision and Land Development Ordinance."?

A **Yes.**

Q Do you recall that?

A **Yes.**

Q Then that led you to believe that, in fact, the County Planning Commission reviewed your plan under the proposed subdivision ordinance, correct?

MS. MONTGOMERY: Object to the form.

MR. SHERR: What is the basis?

MS. MONTGOMERY: I didn't understand the question.

BY MR. SHERR:

Q Do you understand the question?

A **No, I don't.**

MR. SHERR: Off the record.

(Recess.)

MR. SHERR: Back on the record.

BY MR. SHERR:

Q Mr. Corneal, when we left off we were discussing a letter that you received from the Huntingdon County Planning Commission. You did receive a copy of the letter, correct?

A **Yes.**

Q I note that also copied on the letter was Mr. Simpson, who we already discussed, and it indicates Rouzer, R-O-U-Z-E-R, do you know who that is?

A **May I see that.**

Q Sure. We can make a copy. I didn't make copies.

A **I am not sure who that is. I am thinking, but I don't want to be held to this just to help you, but it may be the staff member in the office that may have done part of the review that Mr. Stahl then signed it, I don't know, the name seems to ring a bell.**

Q It is true, is it not, that the Planning Commission recommended that your proposal be denied, correct?

A **Yes.**

Q What is your understanding as to why they recommended that it be denied?

A **Well, the main thing that they didn't like was the four and a half acre tract of land didn't have**

**road frontage and so they -- and the other main reason was the moratorium, as I understood it.**

Q Did you discuss this letter that you received from the Huntingdon County Planning Commission with anyone?

A **Yes.**

Q Who did you discuss it with?

A **Well, I would have discussed it with Mr. Simpson, because I had him redraft the plan. I probably would have discussed it with McClintic, Max. I certainly discussed it with my wife probably, maybe not, but probably.**

Q Anybody else?

A **I think that one of the things in that letter, if I can look at it a second -- there was a question at one point regarding the question of wetlands. Here it is, number 2 on page 1.**

**I have an engineering firm in State College that I hired to -- since the soil maps indicated a possible wetland area where one of the sewage disposal places were, even though the SEO was there and identified the location and, obviously, wouldn't have identified it in the middle of the wetlands, they pointed out something about the property potentially being -- the one sewage site potentially being wetland, as a result, the Township**

seized on that and said, we can't possibly approve this, there is a potential of your sewage site being on wetlands.

I said, Your SEO was there and identified this location, he knows it is not wetlands. Well, we need a certification. Just another roadblock they were throwing up, so that I had to go to the engineer and send him out there again, a second time, and pay them to identify or to certify that this was not wetlands.

Q At what point were you told that there may be wetlands?

A When the letter came in. When you have 200 --

Q Back up. When did you hire Blozsky Associates?

A I don't recall exactly when I hired them. I don't remember exactly. I can look at their bills and tell when they did work.

Q Do you recall whether it was before or after you attended the February Township meeting?

A I don't recall.

Q Who was it from the Township that told you that there may be wetlands involved?

A Well, several of the supervisors brought it up and Mrs. Worth was quick to jump all over it. Well,

there may be wetlands here, she says, and we are going to need a certification that this isn't wetlands.

I said, your SEO officer reviewed, he picked the sites, there isn't wetlands. Well, we don't know that, so you are going to have to go and send engineers out there to get a certification.

Q Where did this conversation take place?

A This took place in one of the meetings, one of the Township meetings.

Q Did it take place at the February 2000 meeting?

A No, it took place in I think at the March meeting.

Q Do you believe that, even though this letter is dated February 24, 2000, this letter being the Huntingdon County Planning Commission letter that we are discussing?

A Well, it happened in March, yes, it happened in March, yes, as I said, at the March meeting.

Q Why did you originally hire Blozsky & Associates to conduct the wetlands investigation?

A Because I wanted to know, to make sure that I wasn't doing anything wrong in locating my buildings and particularly with regard to putting our driveway in, because our driveway then comes down and goes along the

stream and I knew how sensitive everybody -- the DEP was with wetlands, so I brought the engineers in to make sure that we weren't violating any of the wetland specifications.

Q Did you bring in the engineers before or after the February 2000 Township meeting?

A Well, you asked me that before. And I would suspect, now that I had talked to Wilson about putting the road in, that it was probably before.

Again, I want to be able to correct that if I am wrong, based on their invoice to me, which will tell me when they did the work for me.

Q What prompted you to even consider or worry about wetlands?

A Wilson told me that he thought there was some wetlands down in here when I talked to him about doing the road. I said, well we certainly don't want to fill in any wetlands, so that is when I got them involved.

Q What did they tell you?

A They said, no wetlands where the road was already and where it was going to go, where the driveway was, no problem.

Q Did you tell the individuals from the Township who you were speaking to at the March 2000 meeting when the subject of wetlands came up that you had

an investigation going?

A You are talking about two different things. You are talking about a wetland investigation by a sewage site versus a wetlands investigation regarding the driveway, so whatever showed up there.

The SEO was there. He knows what wetlands are. He approved the location to dig the pit. He approved the perk tests that were done in that location and I couldn't fathom and I don't think anybody of rational thinking could fathom that he would have set that location in the middle of a wetland, but that is what the Township tried to -- another roadblock they threw up, well, we don't know, because the Planning Commission questions whether or not there were wetlands there or not. So I had to send them out again to do it, to confirm that there were no wetlands.

Q So it is your understanding that whatever was said about wetlands at the March 2000 meeting was based on the Planning Commission letter of February 24, 2000?

A I don't know what the basis of it was, but it certainly had some basis in the letter from the Planning Commission. I think it was that letter. I didn't thoroughly go through -- didn't it say something about wetlands in there?

Q Yes, I think you referenced it earlier --
A **I don't know if -- yes, right. The proposed house studio and sewage system for lot number two are within these soil types and that is what forced us to go back out again.**
Q Was it the County Planning Commission letter that required you to go hire Blazosky again or is it something that the Township --
A **The Township did. The Township said, We want a certification. Look here, the Planning Commission said there is a -- we don't know, you are into soil types of wetland type soils, so we want you to go and hire somebody and certify to us that our SEO didn't put a sewage system in a wetland area.**
Q What did you do in response to receiving the County Planning Commission letter?
A **Well, the main objection, aside from the moratorium, was the fact that this 4.5 acre lot didn't have road frontage. The 4.5 acre lot was insignificant, it didn't matter didley to me. I was doing it to set it aside for one of the kids. So I told Simpson to redraw the plan and just cut it down to two lots, the 26 acre lot with the house and the barn and the remainder and he did, he redrew the plan.**
Q I am going to read you the last paragraph of

this letter, the letter being the February 24, 2000 letter from Richard E. Stahl, Planning Director, Huntingdon County Planning Commission: "Please contact this office with any questions concerning these comments. As always, the local municipality is encouraged to carefully review the subdivision/sewage module for compliance with Township and state requirements."
In response to this letter, did you contact the Planning Commission office?
A **I discussed that letter with one of the people that reviewed, and his indication was that the main thrust of the problem in his opinion was the lot that didn't have any road frontage, because everybody was going to be concerned, it was on the other side of the stream, how are you going to get access to that lot. I said, That lot doesn't mean that much to me. We never discussed the fact that -- he never brought up that there was a wetlands problem or anything.**
**I think these guys just throw a lot of stuff in the letters and things.**
Q Do you know who that was that you discussed it with?
A **That is why I am saying, it wasn't Stahl, but it may have been that guy that was copied, Rouzer, but I am not sure of the name. If that is the guy that works**

**in that office, if that is his name, then that is who I discussed it with.**
Q How did you get to that person who you discussed it with?
A **I called the office and they said, oh, this so and so reviewed the plan, did the main review on it and you should talk to him or maybe it was that Stahl wasn't there, why don't you talk to this guy and it turned out that he did some of the review or all of the review of the plan.**
Q You made changes to your plan based on what you learned in that letter or any conversation that you had?
A **Yes, I did.**
Q Who made those changes?
A **Simpson made the changes for me.**
Q Do you know whether Simpson in making the changes reviewed a draft of the proposed Jackson Township Subdivision Ordinance?
A **I don't know that.**
Q Do you know whether he had a copy of the proposed Jackson Township Subdivision Ordinance at the time?
A **I don't know anybody that had a copy of that, with the exception of the Planning Commission,**

**because we kept asking for those things and, well, when it is all finished and all proofread, you will get a copy or you will get the original was the response that we normally got at those meetings.**
Q Did you attend the March 2000 meeting of the Jackson Township board of supervisors?
A **To the best of my knowledge, I did, yes.**
Q Was that meeting before or after you received the February 24, 2000 letter from Huntingdon County Planning Commission?
A **I would think that it was after, it was the first Monday of March.**
Q What was your purpose in going to that meeting?
A **I took my sewer modules there to be signed.**
Q What happened at the meeting?
A **I asked them to sign the sewer modules. They basically looked at me and said, What are you doing here? I said, I am here to get the sewer modules signed. Oh, we are not signing any sewer modules.**
Q Who said that?
A **Well, Wilson said it for one and so did -- they all kind of chimed in, Yoder, they all looked at each other, you agree with that? Yes, I agree, we are not signing anything for him.**

Q Did they tell you why they are not signing the sewer modules?

A **They said they are not signing the sewer module because of their moratorium.**

Q What did you say?

A **I said, Forget your moratorium, forget the subdivision, I said, I want to build a house, I have got commitments to build a house and an art studio. I said, I want to get approval to build the house. Forget that, I said, I am not asking you for a subdivision. I am telling you I own a 95 acre piece of ground and I want the sewer modules signed so that I can get permits to build the house.**

Q Why did you believe that you needed the sewer modules signed to get permits to build the house?

A **Because DEP had to review sewer modules and they would only review sewer modules that were sent to them via the Township.**

Q Why did you believe that you had to get the sewer modules signed in order to get permits to build your house?

A **Because you had to have a septic system or you had to have a sewage system approved by DEP and Wilson told me that.**

Q Didn't you testify that there was already

on-site sewage with respect to the house and the barn?

A **The farmhouse.**

Q Right.

A **This house was, you know, a quarter of a mile, a half a mile away.**

Q Did anybody tell you that you needed to have the sewer modules signed by the Township and approved by DEP in order to get a building permit to build your house?

A **Yes, Wilson told me that.**

Q When did Wilson tell you that?

A **When we were doing the system or checking out the locations and doing the perk tests.**

Q And he told you that you needed this, even if you didn't want to subdivide the property?

A **Yes, if you were going to build a property and you were going to provide a sewage disposal on the property, you had to have a DEP permit.**

**The only way you got that is you dig a hole in the ground and you found soil types that were suitable, like we did.**

**Then we did a perk test, which we found it perked and were suitable and the SEO signed them and now the Township needed to sign them and they would have been sent on to DEP for an approval and that approval would have taken from what I understood, maybe 5 or 10 days.**

**Then I could go and I could get my building permit and begin building the site.**

Q So at the March meeting, the only reason you were given why the Township would not sign the sewer modules was because of the moratorium, is that correct?

A **No.**

Q What other reason?

A **Well, yes and no.**

**Here is the twisted distortion that they took on this thing, which is very interesting. They said, We have a moratorium on subdivisions. I said, I know you do, you told me that. I don't agree with it, but let's forget the subdivision for a minute. I have a 95 acre tract of ground, I have sewer sites approved by your SEO, signed by him. I want permits to build my house, forget about the subdivision, I am not asking you to subdivide it. I am not asking you right now to subdivide this land. I am asking you to give me permits to build my house.**

**Their response was, Oh, wait a minute, if you build two houses on one tract of ground under DEP regulations, that is a subdivision. Therefore, it comes under our subdivision moratorium.**

Q You were told that at the meeting?

A **Absolutely.**

Q Who told you that?

A **Well, Ann Wirth was quite joyously saying that, Oh, but you can't do that because, you know, it constitutes a subdivision under DEP, therefore, you can't do it. So did the rest of the supervisors, they all chimed in, Oh, yeah, that's right, you can't do that, you can't do that, so you are still in the subdivision moratorium, therefore, we are not going to sign your modules.**

Q Did anything else happen at this March 2000 meeting?

A **As I said, their meetings last about 15 minutes to a half hour max, not much.**

Q What else happened?

A **That is all I know, I mean as far as it affected me.**

Q That is all I am interested in.

A **After they adjourned their meeting, I tried to talk to them about it and still, I got the same stone wall. You are still under subdivision and still under a moratorium and we are not going to give you anything.**

**I did ask one other thing, I said, When are your subdivisions going to be approved? The response was, Well, we should approve it in April.**

MS. MONTGOMERY: Excuse me.

A **But they didn't.**

110

MS. MONTGOMERY: Can we clarify the record here, because I am not sure I understand what my client just said. Were you talking about the subdivision or subdivision ordinance?

A **Their proposed subdivision ordinance that they imposed a moratorium on they told everybody was going to be probably approved in April.**

MS. MONTGOMERY: You didn't say subdivision ordinance the first time, you said --

A **No.**

**But conveniently, they didn't approve it even though it had been on the books or been in the works for months and months and months, they didn't approve it until a week after my contract ran out with Hewetts.**

**BY MR. SHERR:**

Q Did you have any discussion with anybody about what happened at the March 2000 Township meeting?

A **I would have discussed it again with Max McClintic, I certainly discussed it with my wife. I don't know if I would have talked to Simpson about it, because by that time Simpson had been instructed to redo the plan; but I probably discussed it with him. I certainly would have discussed it with Hewetts, because it affected them.**

Q Was there anybody with you at either the February or March meeting?

111

A **The March meeting the Hewetts were there. Of course, then there was half a dozen people in the audience.**

Q Anybody that you knew?

A **No, they were legal local residents.**

Q After the March meeting, did you commence any construction activity on the property?

A **No.**

Q Did you do anything to put a driveway in on the property after the March meeting?

A **I don't know -- after the March meeting, of course, we did. After the March meeting, did we start construction, yes; but not immediately after then, you have to give me a time frame where you are asking.**

Q When did you start the construction of the driveway on the property?

A **Well, as soon as the weather broke, and I suspect that was probably I am going to say April.**

Q Did you have a permit to put the driveway in?

A **Didn't need a permit.**

Q So your answer would be, no, you did not have a permit?

A **I had no permit that I didn't need, that's right.**

112

**On further clarification, as I said, that roadway was already in there, was an entry on to the Township road already, it existed. There was no new road being put in or driveway being put in. What was being done was resurfacing the existing roadway that was there.**

Q Why is it that you believe that you did not need a permit to do the driveway work?

A **Because it turns out at their -- in hindsight, in their July -- first of all, I didn't think I needed it, because it was already an existing driveway, that is the first reason.**

**Then as a side issue, in their July 7 meeting, when they passed the subdivision ordinance, for the first time they passed a driveway permit ordinance, they never had one prior to that.**

**They did force people, I found out from neighbors, they did force people to pay them fees and force them to cut trees down and do all kinds of stuff to put a driveway in but they had no ordinance for it.**

Q Who was it you believe they forced to do this?

A **One of my neighbors had told me about having to do that, I don't remember his name.**

Q Do you remember anything about him?

A **Yes, he lives off Miller Road.**

113

Q When did he tell you this?

A **He told me this in the summer of the year 2000. They forced him to cut down some beautiful old trees that were near the entry way to his driveway. They never had an ordinance allowing that, and he said he paid them a fee to put the driveway in.**

Q Did anybody else tell you that the Township required them to cut down trees or pay a fee for a driveway?

A **No.**

Q You thereafter submitted another plan to the Huntingdon County Planning Commission, right?

A **That's right.**

Q And you received a letter back from Richard Stahl at the Planning Commission?

A **Yes.**

Q This letter recommended conditional approval of the proposed subdivision plan?

A **Of the two-lot subdivision plan, that is correct.**

Q And the recommended approval pending adoption of the Subdivision and Land Development Ordinance?

A **Well, whatever it says, it says. The basis of not recommending approval I understand was their**

moratorium.
Q Did you receive a copy of the April 20 Planning Commission letter?
A Yes.
Q What did you do after receiving a copy of the letter?
A What did I do? In what regard?
Q With regard to your attempts to subdivide and build on the property?
A Well, they already had blocked me. As far as I was concerned at best I had started a process that was going to help me eventually to get a subdivision, which I should have been entitled to anyhow. So what would I do with it? There was nothing to do with it, except, you know, if I re-submitted it to the Township I would get the same response, we have a moratorium in place, we are not going to approve it.
Q Did you attend the April meeting of the Township board of supervisors?
A No.
Q Did you attend the May meeting of the Township board of supervisors?
A I don't believe so, no.
Q Did you have any contact with anybody, any official or employee from the Township during April or

May?
A I don't know if it was April or May. I went to a meeting and it was probably the March meeting and I said, Well, if you won't give me a sewer module for my house, I said, I want to build an art studio. I want to at least get started on construction of my art studio.
They said at that meeting, Nope, you can't do that, you have got to have sewer to that art studio. I said, We are not putting sewer into the art studio. Well, you have got to have it.
I said, Tom Wilson told me you have a privy permit here, so I want a privy permit, I will put a privy in with the art studio.
Q What meeting do you believe this occurred at?
A I think this was the March meeting. This was when they hit me with the, Oh, we don't care if your are forgetting about the subdivision or not, we are not going to give you this, because your house requires a sewer module approval and, therefore, it is a subdivision under the DEP regulations.
I said, okay, forget that, I said, I want to start the art studio, which didn't have any sewer, so how do I get a permit for the art studio? You can't get a permit for the art studio was the response.

Q Who said that?
A It was Ann Wirth mainly, but all of them were chiming in at the same -- you can't do that, no, you have got to have sewer in the art studio. If somebody had to go to the bathroom, where would they go? I said, Fine, Tom Wilson, you told me you have a privy permit in this Township, I said, I want a privy permit.
Q What did they say?
A They said, Well, you will have to talk to the SEO about getting a privy permit. I said, Fine, I will talk to the SEO.
So I went home that night and at 10:00 o'clock at night I call the SEO. Oh, Dave, he says, I wish you wouldn't be calling me about this. I said, Did somebody call you already from the Township? He said, Yes, they have already called me and they told me you are not allowed to have a privy permit and that I am not allowed to help you get a privy permit.
Q Did you ask him why?
A He said, you know, I can't talk to you about it, don't put me in the middle of this. I am not allowed to give you help or a privy permit; but, he says, I will talk to Wilson about it and see if we can't clear this up.
He says, I will call you in a day or so. I said, Fine; this is Barry Parks.

I don't hear anything from Barry Parks for 3 or 4 days. So I called him and I put message upon message upon his answering machine: Barry, I need a privy permit so I can start my art studio, and he refused to call me back.
Q Did he ever call you back?
A No, never called me back.
Q Did you do anything else with respect to trying to get a privy permit?
A What else could I do? I had asked the Township, they said, you had to go through the SEO officer.
The SEO officer was instructed by the Township and the supervisors not to assist me in any way to get a privy permit and he is the only one that could issue one. What else would I do?
Q So then your answer is, no, you did nothing else?
A Unless there is a supreme SEO officer, no, I did not do anything else.
Q The reason you believe that Mr. Parks was told not to help you get a privy permit is based on what Mr. Parks told you?
A The reason I believe is that they were absolutely adamant that they were going to interfere with

Case 1:00-cv-01192-SHR Document 66 Filed 06/07/2002 Page 128 of 240

my construction, subdivision, anything that I wanted to do, they were going to stop, period, that is what their intention was, that is what I believe and I think their conduct demonstrates that.

Q Do you know of any reason why they would want to stop you from building this studio?

A Well, Mr. Domlin, later on, Van Domlin, said it was because I was a trouble making yuppie from over the mountain.

Q When did he say that?

A When I went to apply for a building permit.

You see then afterwards, I went about the end of April, I decided this is crazy, I have got contractors who are depending upon me, they have given up other work to build my project, I have got to get started with something. So I found out who the building permit officer was.

Q How did you find that out?

A I think I had found that out earlier when I talked to Ann Wirth. I said, Who is your building permit officer and she told me. So I looked him up and I called him. I called him up on the phone and I said, How do I get to your place? He has a trailer out in the country. I said, I want to come out and get a building permit.

I didn't tell him my name. I said I am a

resident out there, a property owner, I want to get a building permit for a garage. He gave me directions to his place.

There is a letter confirming our conversation/meeting at the end of April, and I drove out there on a Thursday. You have a copy of the letter that I had sent to him, that will identify the specific day, I think it was the 27th.

I guess I made the mistake of introducing myself. Hi, I am David Corneal. All of a sudden this cloud comes over his face, Who are you? David Corneal. What do you want? I am here to get a building permit for a garage. I said, Can I come in? He let me in the door.

I said, I have got plans with me, I am building this garage. So I was building a house, an art studio and a garage. I figured I had the one thing that does not need sewer was the garage. It had no water, no sewer at least initially. So I said, I came to get a permit for my garage.

Oh, he says, I am not giving you a permit. I said, Well, give me an application for a permit, because your ordinance says that I have to apply under your forms.

Nope, not giving you an application either. I said, Why not? He said supervisors told me not to give

you anything, any permits, applications anything. I said, Why? He said, Because you are that trouble making yuppie from over the mountain.

I said, Well, I am not leaving until I resolve this, we have got to get this resolved. He said, Well, I will get on the phone. So he gets on the phone and he calls two or three supervisors, can't reach anybody, he finally reaches Tom Wilson.

Now, I am not listening to Tom Wilson's voice, but he says, Yes, Tom, this is Van Domlin, got Corneal here, wants a building permit for a garage. Don't give him anything. We are meeting tomorrow morning -- the supervisors are meeting tomorrow morning to discuss him.

That was a Thursday, so they would have been meeting Friday morning. He said to me, After they meet and call me, I will call you and let you know. I said, At least give me an application so I can fill it out. Nope, you are not getting any applications, you are not getting nothing.

I said to him, I said, if I were another resident of the county or the Township, and I came into get a permit for a garage, would you give it to him? Yep, sure would. I said, Why won't you give it to me? He said, I already told you, you are that trouble making yuppie and the supervisors told me not to give you

anything and I work for the supervisors, so I am not giving you anything.

Q Do you know of any other reason, other than what your testimony is that you are this trouble making yuppie from over the mountain, as to why they wanted to prevent you from building on this property?

A Well, I think that Tom Wilson wanted his piece of his old family farm, because after the contract was breached by Hewetts, Tom Wilson's nephew approached me and says, Well, I am still interested in buying that property from you.

Q Any other reason why you believe any official or employee from the Township was trying to prevent you from building on this property that you owned in Jackson Township?

A I think that is more than sufficient that they are going to -- they just wanted, I guess, show me who was boss and who was in control in their Township.

Q Did you start building on the property?

A Yes.

Q When did you start building?

A I started building in July.

Q Did you have permits to build in July?

A No, I waited 90 days.

Q You waited 90 days for what?

A Since I was wrongfully denied even the applications.
Q Why did you wait 90 days?
A Because I had consulted with Mr. Lucas of this law firm.
Q And he advised you to -- strike that.
A Nope, I am not going to tell you what he advised me.
Q I don't want to know. I apologize for that.
Did you attend any other Township meetings after the March 2000 meeting?
A As I said, I don't think I attended April, but it certainly wasn't anything after April, probably nothing after March.
Q Did you have any other conversations with any officials or employees of the Township after your conversation with Mr. Van Domlin?
A I tried to discuss this with Newton numerous times, these problems with the solicitor for the Township.
Q With anybody else other than Mr. Newton?
A With the Township, related to the Township in? No.
Q You allege in your complaint that complaints were made with the Army Corps of Engineers and DEP

regarding wetlands. What led you to believe that such complaints were made?
A Because I was there when the two of them showed up, Army Corps of Engineers and a DEP representative, they said that they had complaints that I was filling in wetlands.
Q What if anything did you say to them?
A I said, Is this a complaint from Wilson? They smiled and they said, Well, we really can't say who called us. I said, Well, Wilson is not -- has lost this job and I have given it to some other excavator and he would have had the job otherwise.
Q When did this conversation take place?
A The day that they showed up. You would have to look at their records. It would have been after I started shaleing the old driveway.
Q Do you know what month this was?
A I am guessing it was April sometime.
Q This was after Mr. Wilson told you he couldn't be involved any more with your property?
A He didn't say he couldn't be involved. He said he wasn't going to put the driveway in for me.
Q So why did you tell them Mr. Wilson lost the job?
A Why did I tell them? Because they were kind

of hinting that it was the Township or Wilson that had called them and filed a complaint. I am sure we could find that out, who did it. I was just explaining to them why, what would have motivated his complaint or the Township's actions.
Q That is what I am trying to find out. Why do you believe that that was motivating Mr. Wilson if he did make the complaint that he lost the job, when, in fact, he told you that he couldn't be involved with the job?
A That is your language. I never said he couldn't be involved with the job. He said that he couldn't build the driveway then when it was supposed to have been done. He didn't say he didn't want anything to do with it or that he didn't want the job.
I don't know if it was him for sure or not or if it was somebody from the Township that filed a complaint with these people. I wouldn't be surprised if the call didn't come from Ann Wirth.
Q Why would that not surprise you?
A Because she seemed to be the person taking the lead in many of the obstacles that they were trying to throw in my way.
Q But you have no other basis other than what your belief is and what you just testified to, right?

A You asked me what my belief is and that is my belief. We can easily find that answer out by deposing DEP or the Corps of Engineers and find out who filed the complaint.
Q What I am trying to find out, Mr. Corneal, is the basis of your belief and why you believe that it was Ann Wirth or Tom Wilson who called DEP and/or the Army Corps of Engineers with respect to an alleged wetlands violation?
A My belief is that it was a continuation of the harassment and the unreasonable restrictions they were placing on me to stop me from doing anything with my property.
Whether Wilson was angry that he actually lost the job entirely now, I don't know that. I am just making an assumption. You asked me what I thought, so I am telling you what I thought.
But it clearly was Township officials who were trying to continue to interfere with rights that I had in my property. I certainly had a right to re-shale my driveway or a driveway that already was existing.
Q You didn't have a right though, did you, to fill in wetlands?
A But I wasn't filling in wetlands and I checked that out and they knew I checked that out.

Q How did they know that?
A **Because they had the report from Blozsky.**
Q When did they get that report?
A **They knew about that report. That is how it came up in -- they got a copy of the report from the engineering company at some point. I am sure that if we look at their -- I think if we look at their correspondence, that they copied the Township.**
Q Now, this is the second report that Blozsky & Associates did that you are referring to, correct?
A **I don't know if both of them weren't sent to the Township.**
Q Let's just concentrate on the question. You are referring to a second report that Blozsky did, right?
A **I am referring -- Blozsky did two reports for me and build me twice, one related to the land, one related to the sewage site. Whether they had gotten a copy of each, I am not sure.**
Q The second report is the one that you commissioned Blozsky & Associates to do with respect to whether or not any wetlands were impacted by this proposed driveway, correct?
A **Wrong. That was the first report.**
Q The second report dealt with --
A **The SEOs locating a sewage site for our house.**

Q Do you believe that the Township got a copy of Blozsky's first report dealing with whether or not any wetlands were impacted by the driveway?
A **I think so, I don't know that for a fact.**
Q Why do you believe it?
A **Because it is standard procedure with engineers that often times -- most of the times they copy the Township engineer or Township officials when they do something that relates to a Township matter or it could relate to a Township matter. Whether they did that in Jackson Township, I don't know.**
Q Did you bring an action against the Hewetts, I know it is Hewetts and Smith, but referring to them as Hewetts, for breach of contract?
A **No.**
Q Why not?
A **As far as I was concerned, they had made a deposit of $7,000 and I was not interested -- the guy has a disease, Hewett has a disease, MS, and I just, you know, as far as I was concerned, they forfeited the $7,000 and I did not pursue it at this point. I have 2 or 3 years, whatever the statute of limitations is.**
Q You kept the $7,000?
A **So far, but we had expenses related to that of carrying this and his attorney has made demands on me to return the money, so whether I have liability for that or not is still a question.**

Q Have you made any efforts to sell the property to anybody else?
A **Yes.**
Q What efforts have you made?
A **We let people know, the realtors that I discussed previously, let them know that we had this 26 acres and that we had it on the market and we would like to sell it. If they would bring us a buyer, we would be happy to pay them a commission.**
**I had also shown the property to a friend of a neighbor's, who was in the horse business, horse business in the sense of riding horses and raising horses and things like that, he wasn't buying and selling them. Her name was Jeannie Price, and I proposed the property for her and she reviewed it and turned it down.**
Q Did you enter into any contracts with any relators?
A **No. You asked if I entered into contracts with relators. Because of my relationship with a number of relators, it is kind of awkward to give a listing to one and not to give it to others. So what I do is I will tell three or four of them that I know, well, that this is available.**
**Another woman, realtor, did show the property to a gentleman and her name was Beth Richards, she is a realtor as well. That didn't work out, he bought something else.**

Q Do you consider that property to currently be on the market?
A **Yes.**
Q Have you applied for subdivision approval under Jackson Township's Subdivision Ordinance?
A **No.**
Q Why not?
A **Because I don't think I need it.**
Q Why do you believe that you don't need it?
A **Let me consult with my attorney a second.**
**(Discussion held off the record.)**
**BY MR. SHERR:**
Q Mr. Corneal, you had an opportunity to have a conference with your attorney during our break, is there any answers that you would like to amend or change that you have given prior to now?
A **No, it wasn't anything I wanted to amend.**
**What was the last question?**
Q The last question was: Why have you not submitted a plan to Jackson Township under the Jackson

130

Township Subdivision Ordinance?

A **My answer was that I didn't have to.**

**The reason behind that is that on the morning of July the 7th, which just happened to work out that way, after consulting with attorneys, I recorded the deed from Sandy and myself to Sandy for the 26 acre tract of ground. One of the reasons in doing that was to tender a deed to Hewetts to mitigate our damages on the loss of the sale.**

Q So on or about July 7, 2000, you and your wife conveyed to your wife 27 acres of this 98 acre parcel, correct?

A **95 acres.**

MS. MONTGOMERY: I object to the form.

MR. SHEER: What is your objection?

MS. MONTGOMERY: I think you repeated his statement back incorrectly. You said conveyed and I think he said recorded.

MR. SHERR: I am not repeating what he said, I am just trying to --

MS. MONTGOMERY: Okay.

BY MR. SHERR:

Q What went into it?

A **We did a deed from the two of us to my wife , Sandy.**

131

Q That would have been?

A **The 26 acres with the house and the barn --**

Q That would have been a conveyance from you and your wife to your wife of this 26 acres, correct?

A **Exactly, right.**

Q It was your belief that you had the legal authority to do this?

A **Yes. After we discovered that the Township nor the county had a subdivision ordinance.**

Q That deed was accepted for recording?

A **It was.**

Q Has building commenced on the property?

A **Yes. I said, we started with the garage in July of 2000.**

Q Has the garage been completed?

A **Yes.**

Q Have you started building anything else on the property?

A **Built the art studio.**

Q Has that been completed?

A **Not quite completed.**

Q Is that still being built as we speak?

A **Yes.**

Q How about a house, did you start building that?

132

A **The house, yes.**

Q Has that been completed?

A **No.**

Q About how much is completed of the house?

A **I wouldn't know percentage-wise. Depending on what contractor you talk to, it could be 2 months to 3 months away from or 4 months from completion.**

Q That building is going on today?

A **Yes, it is, I hope it is.**

Q How about the driveway, has that been completed?

A **No, never had need for the driveway. Put it all in, except the bridge, and never had need for it.**

Q The bridge is not there?

A **No.**

Q Why not?

A **Because I didn't need it.**

Q Why didn't you need it?

A **Because I bought the adjoining property next to this one that had road frontage off Miller Road.**

Q When did you purchase the adjoining property?

A **In I think the first of July, the end of June of the year 2000.**

Q How much did you purchase that for?

133

A **I am not sure why that is relevant.**

Q How much did you purchase it for?

MS. MONTGOMERY: You can tell him, it is public record.

A **$365,000 I think.**

**BY MR. SHEER:**

Q Who did you purchase that from?

A **Robert Gavazzi.**

Q Is it still your intention as you sit here today to sell part of the property?

A **Yes, the house, the barn and 26 acres of ground.**

Q You allege that the moratorium on development in Jackson Township was imposed in part for the purpose of impeding your project?

A **Yes.**

Q What facts do you base that allegation upon?

A **There were no other subdivisions. I was the sole subdivision that was contemplated. There were no other pending. There was no reason to put a moratorium on one subdivision, they didn't have a rush of development. I was a single person.**

**I believe, I am not totally sure of this yet, but I believe that they had started their subdivision draft and everything else prior to issuing a moratorium**

**and they only issued a moratorium after I became serious about subdividing. I think it was exclusively for my benefit or I should say exclusively for my detriment.**

Q Any other facts on which you base those allegations?

A **I think that is enough.**

Q Who is James Whims, W-H-I-M-S?

A **Who?**

Q Do you know who James Whims, W-H-I-M-S, is?

A **Himes.**

Q Himes?

A **H-I-M-E-S.**

Q Who is that?

A **That is the attorney friend of mine that I clerked for he and his father in Huntingdon.**

Q What facts do you believe he has knowledge --

MS. MONTGOMERY: Objection.

BY MR. SHERR:

Q He was listed as somebody who has facts concerning the allegations in this complaint in your self-disclosure, so I am asking what facts he has knowledge about?

MS. MONTGOMERY: I am going to caution my client to be careful about the attorney/client privilege.

A **Mr. Himes spent a great deal of time trying to get Mr. Newton to respond to the problems that were associated with what the Township was doing and he has documented -- from what I understand -- he has documented each telephone call, each meeting with Mr. Newton and the resistance of Mr. Newton in responding.**

**BY MR. SHEER:**

Q Any other facts which you believe he has knowledge of?

A **Facts, I don't know.**

Q Who is Steven Lavitsky?

A **He is the fellow from the engineering firm that did the work.**

Q That would be Blozsky?

A **Right.**

Q Have you had any contact with the Department of Environmental Protection concerning the property or your attempts to subdivide and/or build on the property?

A **Direct contact with them?**

Q Yes.

A **I called the fellow who was in charge of that area, I think his name was Rouzer -- come to think of it, that is what Rouzer is, Rouzer is the guy from DEP, and I am referring to the bottom of the Planning Commission letter.**

Q I understand.

A **I had contacted Rouzer and was told that they needed the submission on the approved modules from Jackson Township before they would take action on it.**

Q Did you construct, along with your garage, your art studio and your house, an on-lot sewage system?

A **No.**

Q Do you intend to do that?

A **Yes.**

Q At what point do you intend to do that?

A **As soon as the spring hits and I can get approvals.**

Q Who do you believe you have to get approvals from?

A **We already submitted stuff to the Township through Terry Williams in State College and I have had a sewage system designed by an SEO that used to be in that area who now comes in and does consulting. She submitted that design of the on-site septic system, which will function properly for its use, to Barry Parks, and he has not acted on it in any way that I know of.**

Q Do you know why he hasn't acted upon it?

A **I have no idea.**

Q Do you have a belief?

A **Simply part of the process here to inhibit**

**my development of the land. There is no legitimate basis for him refusing to act on it.**

Q Do you intend to put this sewage system in regardless of whether you get approval?

A **I will not put a sewage system in without DEP's approval. If I have to put a holding tank in, then I will put a holding tank in; but I have no intention of -- DEP didn't do anything wrong to me and they have a right to pass on the availability of the sewer system that we propose and I intend to honor that obligation to go through them.**

Q Do you believe that you have any out-of-pocket expenses as a result of what you claim to be the wrongful acts of the Township?

A **No question about that.**

Q What out-of-pocket expenses do you believe that you have as a result of what you believe to be the wrongful acts of the Township?

A **I have the expenses related to the engineers.**

Q That would be Blozsky?

A **That's right, correct.**

Q Why do you believe that you had those expenses as a result of the wrongful acts of the Township?

A **Because the Township forced me to send him**

**back out there to assess the location that their SEO put the sewer site on.**

Q So you believe that the expenses that you would have with respect to the engineer would be only related to the second report and not the first report?

A **That's right.**

Q What other out-of-pocket expenses do you believe you have?

A **Well, I lost the sale of the property to the Hewetts.**

Q Why do you believe you have out-of-pocket expenses as a result of losing that sale?

A **I have big time out-of-pocket expenses, because the $150,000 I was getting from that was going to be used for construction of the property, of the buildings. As a result of not getting that $150,000, I had to go to Mellon Bank and refinance the one property on College Avenue, the 1445 West College, where I drew out a little less than $150,000 in equity.**

**I went from a 7 and a half percent interest rate to an 8 and three-eighths percent interest rate and I had to pay fees to them and I also got nailed with a no-prepayment penalty, which I didn't have in my previous contract, my financing contract with them.**

**So now the interest rates have dropped, I**

**can't refinance without paying a fee, a big fee. So I have got the difference between 8 and three-eighths percent and 7 and a half percent on the monthly payments, on the interest on that refinancing.**

**Plus, I don't know what I am going to be able to sell the property for. So if I sell the property at a lesser amount, obviously, then I have that loss. Plus I also have, you know, the loss of the use of those funds, since the Hewetts would have paid me no later than June the 30th, which they didn't.**

Q When did you refinance?

A **I waited until the last possible minute, because I was reluctant to do it; but I think I refinanced about 3 months ago, 4 months ago.**

Q Any other out-of-pocket expenses that you believe that you suffered as a result of wrongful actions of the Township?

A **Sure, I had to send Simpson back and redesign and redesign and resubmit these plans. Every time he did it, there was several thousand dollars in surveying costs and duplication and all of that.**

**I don't have the exact number that would be attributable to him above and beyond his survey that I wanted that would relate.**

**I can pull the bills out and identify what**

**was necessitated by the demands of the Township and the County Planning Commission.**

Q Anything else?

A **I have legal fees.**

Q Legal fees associated with what?

A **Associated with this lawsuit.**

Q The lawsuit we are here about today?

A **That's right.**

Q Any other legal fees?

A **I have legal fees with Terry Williams trying to work through the DEP permitting.**

Q Was that caused in some way by, that being with Terry Williams' legal fees, caused in some way by any act of the Township?

A **Yes, the Township tried to stop me from construction.**

Q So it is your testimony that the only reason that you retained Terry Williams' services was because the Township tried to stop you from --

A **No. That is one of the reasons I retained him. The other reason was to try and get the DEP permits so when we finish the construction of the properties, that we can install the sewage systems.**

Q When did you first consult with Mr. Williams?

MS. MONTGOMERY: I am going to object the time frames.

A **I don't remember when it was.**

MS. MONTGOMERY: I think the time which a person consults with their attorney --

MR. SHERR: It is not privileged, absolutely not privileged. When he first consulted with an attorney or if he consulted with an attorney is not privileged. What was consulted with is privileged.

A **I can't remember exactly when I started talking to Terry about this. I would probably say 6 to 8 months ago.**

**BY MR. SHEER:**

Q Any other out-of-pocket expenses that we haven't discussed that you feel you suffered as a result of the accident?

A **As I said, I had to sue these people because they wouldn't give me the applications or permits, so I had, you know, the private service fee of 300 and some dollars.**

Q Anything else?

A **Well, I would have to say that I had to maintain a property and pay the taxes on the property that would have been sold to Hewetts and not been my expenses that are my expenses now.**

Q Anything else?
(Discussion held off the record.)
BY MR. SHERR:
A **I have now had to hire experts that I am getting reports from in the area of the Planning and Municipal Law or Application of Municipal Law, so we are paying them. We don't know exactly what those costs are going to be.**
**If I think of any more, I will let you know.**
**(Discussion held off the record.)**
**BY MR. SHERR:**
Q You told me specifically some things that were done by Mr. Wilson and by Ms. Wirth.
I just want to ask you with respect to the other individual defendants, and I am going to start with Mr. Yoder, other than being at Township meetings that you were also at, did you have any dealings with Michael Yoder?
A **The dealings I had with him, as well as Mr. Weiler, both of them, I talked to directly at the Township meetings and I told them, you can't do this stuff. They all unanimously agreed that they are going to do it whether I liked it or not and that is too bad. That kind of response was given to me.**
Q Other than any contact which you had with

Mr. Yoder at a Township meeting, did you have any contact with him otherwise?
A **No.**
Q Same question for Ralph Weiler, did you have any contact with Mr. Weiler at any other time, other than at a Township meeting?
A **No.**
Q Can you tell me anything that Mr. Yoder specifically said at a Township meeting with respect to your attempts to subdivide and build on this property?
A **He said they had a moratorium on -- both of these guys said this -- we have a moratorium on --**
Q Both of these guys, just so we are clear, that is Mr. Yoder and Mr. Weiler?
A **Right. Said at different times at different meetings that you aren't getting what you want, because we got a moratorium on and we are not going to allow you to do this.**
**Then when I came up that I don't care about the subdivision at this moment in time, give me my sewer modules, then they all agreed that, no, that was a subdivision under DEP and, therefore, we are not going to sign your sewer modules under that.**
**So all three of them said it at one point or another or concurred, you know, they turned to each other,**

**you agree, yes, that is right, we are not doing it. So that is the contact I have had with them.**
**Also, the exception, that from what I understand from my discussion with Van Domlin, that these guys were meeting out of formal meetings to discuss me and how they were going to treat me.**
**Specifically, Van Domlin said that the Township supervisors were meeting that Friday morning to discuss me and what they are going to do about my request for applications for building permits.**
**So I can only take from that that they, in fact, did meet or have met on several occasions, at least one occasion that I am pretty sure occurred, outside of a formal meeting to discuss Township business, specifically, preventing me from building.**
MR. SHEER: I have no other questions at this time. Thank you very much.
MS. THORP: I have no questions.
MS. SIMPSON: I have a few questions.

CROSS-EXAMINATION

BY MS. SIMPSON:
Q At the February 2000 Jackson Township supervisor meeting where you presented your plan, was

Larry Newton present?
A **Excuse me, offered my plan.**
Q Offered you plan, sorry.
A **That is okay, I just wanted to clarify.**
Q Was Larry Newton present?
A **No.**
Q Was Attorney Newton present at the March 2000 supervisor's meeting?
A **No. However, as a result of the February meeting, I sent Mr. Newton a letter indicating to him the wrongfulness of their conduct and the fact that it was going to affect my contract with Hewetts or potentially could affect the contract with Hewetts and that would he, please, contact me and follow up with this to discuss correcting the problem.**
**Then I also followed up with many telephone calls to Mr. Newton, all of which went unanswered. That I can remember, he never returned a telephone call that I made to him.**
**He took one of my telephone calls that I made to him; but that was the only time I ever discussed things with him.**
Q What did you discuss in that call?
A **I was talking to him about the sewer modules at that point, that was after the March meeting.**

I said, I have got approvals of your SEO, I have got signatures on the sewer modules. There is absolutely no reason for the Township not to sign them and something has to be done.

His response was the same, I will get back to you. Never called me back, never did a thing about it. I will check into it and get back to you.

Same way when I had the situation with Van Domlin where they wouldn't even give me applications. I wrote Larry a letter the day afterwards and I sent him a copy of the letter I sent to Van Domlin.

I said in the letter to Van Domlin, hey, if you don't agree with anything I said in this letter, please, respond in writing. He never responded in writing, neither did Larry. Larry did absolutely nothing to correct a problem.

Then his partner in law was the one who wrote the letter and said on May the 1st, hey, it is obvious you are not going to get subdivision approval, so the Hewetts, my clients are cancelling the contract. Now, where would he have heard that?

Q Who is Larry Newton's partner?

A Harvey Reeder. They own a building and share office space together, whether they are truly partner/partner, I don't know, but they have the same fax

machine, the same fax number, same secretary, the same everything. Sounds like a partner.

Q How do you know they have the same secretary?

A Because I called them, I called them numerous time, always got the same woman, You want Larry or you want Harvey? I say that as an assumption, I don't know it for a fact.

Q Is it also an assumption that Mr. Reeder learned of the difficulties with the approval process from Mr. Newton?

A Yes, that is correct, I have no direct knowledge of that.

Q What duty did you believe Mr. Newton had to you?

MS. MONTGOMERY: Objection, you are asking him for a legal conclusion, it is not appropriate.

MS. SIMPSON: I will rephrase it.

BY MS. SIMPSON:

Q Do you believe Mr. Newton owed you some response to your inquires?

A He sure did.

Q Why?

A Why?

Q Yes.

A Because he was the Township solicitor, he was the guy giving them advice to put the moratorium on.

Q How do you know that?

A Because they told me at the meeting. They said, well, according to our attorney.

Q What did they say specifically?

A Like I just said, I said, you can't have a moratorium like you have. They said, Not according to our attorney.

Q So I understand this, the supervisors said that their attorney told them that the moratorium was okay or that their attorney told them to put a moratorium in place?

A I have no idea what their attorney told them.

Q What did they tell you?

A I just said what they told me, not according to my attorney.

Q In response to what?

A I said your moratorium is illegal, it is improper, you can't do it. They said, Not according to my attorney.

But then I followed later on with -- or tried to follow up with Larry to even get a copy of the resolution passing the moratorium and he wouldn't give it

to us and that is where Jim Himes had call after call, meeting after meeting, trying to get the information from him.

The same way with permits. I said, I want a building permit, application. And he stonewalled me on it, totally stonewalled me on it.

Then finally, in the end of August, he wrote me a letter and said, Oh, so sorry that we haven't sent you this, here it is.

Q What was it that you obtained at the end of August?

A An application for a building permit.

Q What did you do with those?

A I filled them out immediately and sent them with everything they required, including their fees.

Q Then what happened?

A Nothing. They sat on it for 45 days. Then Van Domlin wrote me a letter saying, you don't comply with our subdivision ordinance -- which, of course, I wasn't asking for at that point -- so, therefore, we are denying your building permits.

So then we filed under their rules to have a hearing about his denial within 30 days. They are supposed to give me a hearing within 30 days. Do you know how that hearing came out, there was none.

Q What happened?
A **Nothing. Absolutely nothing. They ignored me.**
Q You submitted a request for hearing?
A **Uh-huh, in writing.**
Q You got no response to that?
A **Right.**
Q Who was that filed with?
A **That was filed with the Township secretary. Under their ordinance, they are supposed to have a hearing.**
Q Of the damages that you have outlined, are there any that are specifically attributable to the conduct of Attorney Newton?
A **Yes, I lost a contract.**
Q By that contract you are talking about the contract for the sale of the property to Hewett and Smith?
A **Smith.**
Q Specifically, what is it that you believe that Mr. Newton did to cause you to lose that contract?
A **I think that he had involvement with the -- with his partner there, Harvey Reeder, to interfere with my contractual relationships with the Hewetts. They cancelled the contract.**
**Read Reeder's letter, he says, "It is**

**obvious you are not going to get your approvals by the June 30." He is writing that May 1st, 2 months previously. It is obvious you are not going to get approvals for your subdivision, therefore, my clients are cancelling the contract.**
Q Aside from this belief that you formed from the text of the letter that was sent to you, what evidence do you have that Mr. Newton spoke with Mr. Reeder about the approval process and its --
A **I don't have evidence with regard to that but it certainly seems rather obvious. They say if it walks like a duck and talks like a duck, it probably is a duck.**
Q Was the meeting that you attended of the Township supervisors in February of 2000 recorded in any way?
A **How they record their meetings, I don't know, I don't remember seeing a tape recording or whether the secretary was taking notes. One of the two was occurring, I don't know exactly what.**
Q Have you ever searched the record of the Township to check the minutes of the meetings that you attended?
A **The Township doesn't have an office, so, therefore, there is no records available that I know of.**

**The records that we asked for were records asked of Newton to deliver to us and it went for months and months and months and he refused to -- or just ignored delivering the records.**
Q What records did you ask him to deliver?
A **I asked him specifically for the resolution authorizing the moratorium.**
Q Did you ever ask anybody for minutes of meetings?
A **I didn't. I think Jim Himes did, but I don't know. The minutes of those meetings that I saw, if they are like the January minutes, were less than a half a page long or a third of a page.**
**As I said, they only hold meetings for 15 or 20 minutes.**
Q That was your experience?
A **That was my experience in going to two meetings and seeing the January notes of the minutes of that meeting.**
MS. SIMPSON: I have no other questions.
MR. SHERR: I have no questions.
(Discussion held off the record.)
MR. SHERR: We have had a discussion off the record concerning Mrs. Corneal, who has sat through this deposition today and who I did notice as a party to the

lawsuit.
I believe our agreement is that I will be informed through discovery the belief or the necessity to have Mrs. Corneal testify or that she has matters which she has independent knowledge about and then we will reschedule her deposition.
I don't know if I stated that artfully, but you can probably help me out.
MS. MONTGOMERY: That is not quite the agreement.
The agreement is that, although, you noticed them both for today and they both came today, this was a very long deposition and nobody wants to stay any longer.
We will reproduce her on another day, we are not going to stonewall you on that.
We will not agree, as you suggested, that she wouldn't testify, we won't agree to that. She is listed as a witness in our initial disclosures. I think you have to make an independent judgment whether or not you want to depose her.
MR. SHERR: I will do that. All I am saying is in order to avoid inconveniencing her and rather than just noticing her again and bringing her back, if there is some reason for her deposition, perhaps you can inform me of that or that she would have knowledge that a deposition

may be necessary. I guess what I am saying is if you give me some reason to do it, I will do it, otherwise, I won't do it. I understand that you don't want to commit either way.

MS. MONTGOMERY: She is listed as a potential witness, listed as a person with information. How much information might be very small. We don't know how this case is going to develop. With all due respect, it is not my job to figure out who you want to depose. I don't want to say anything that limits my ability to her as a witness and ask her anything I want when we get there.

MR. SHERR: I am not asking you to limit that. It is no skin off my nose to depose her or not depose her, I could care less; except that I don't see the need to inconvenience her if the deposition is unnecessary is the issue.

MS. MONTGOMERY: Understood.

(The deposition concluded at 4:35.)

STATE OF PENNSYLVANIA : ss.
COUNTY OF DAUPHIN :

I, Patricia C. Barrett, a Reporter Notary-Public, authorized to administer oaths within and for the Commonwealth of Pennsylvania and take depositions in the trial of causes, do hereby certify that the foregoing is the testimony of David B. Corneal.

I further certify that before the taking of said deposition, the witness was duly sworn; that the questions and answers were taken down stenographically to the best of my ability by the said reporter Patricia C. Barrett, a Reporter Notary-Public, approved and agreed to, and afterwards reduced to typewriting under the direction of the said Reporter.

I further certify that the proceedings and evidence contained fully and accurately in the notes by me on the within deposition, and that this copy is a correct transcript of the same.

In testimony whereof, I have hereunto subscribed my hand this 16th day of March 2001.

Patricia C. Barrett, Reporter

My commission expires:
May 13, 2003

DEFENDANT'S
EXHIBIT
4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL and SANDRA Y. CORNEAL,
PLAINTIFFS

VS

NO. 1:CV-00-1192

JACKSON TOWNSHIP, HUNTINGDON COUNTY, PENNSYLVANIA; W. THOMAS WILSON, individually and in his official capacity as Supervisor of Jackson Township; MICHAEL YODER, individually and in his official capacity as Supervisor of Jackson Township; RALPH WEILER, individually and in his official capacity as Supervisor of Jackson Township; BARRY PARKS, individually and in his official capacity as Sewage Enforcement Officer of Jackson Township; DAVID VAN DOMMELEN, individually and in his official capacity as Building Permit Officer; ANN L. WIRTH, individually and in her official capacity as Secretary of Jackson Township; and LARRY NEWTON, individually and in his official capacity as Solicitor to Jackson Township,
DEFENDANTS

DEPOSITION OF: ANN WIRTH
TAKEN BY: PLAINTIFFS
BEFORE: TERESA K. BEAR, REPORTER
NOTARY PUBLIC

DATE: MAY 17, 2001, 9:10 A.M.

PLACE: ECKERT SEAMANS
213 MARKET STREET
HARRISBURG, PENNSYLVANIA

APPEARANCES:
ECKERT SEAMANS
BY: BRIDGET E. MONTGOMERY, ESQUIRE
LESLIE A. MALADY, ESQUIRE
FOR - PLAINTIFFS
MAYERS, MENNIES & SHERR, LLP
BY: ANTHONY R. SHERR, ESQUIRE

FOR - ALL DEFENDANTS EXCEPT NEWTON

THOMAS, THOMAS & HAFER, LLP
BY: MICHELE J. THORP, ESQUIRE
FOR - DEFENDANT - RALPH WEILER
METTE, EVANS & WOODSIDE
BY: JENNIFER YANKANICH, ESQUIRE

FOR - DEFENDANT - LARRY NEWTON

ALSO PRESENT:

DAVID B. CORNEAL

TABLE OF CONTENTS

WITNESS

| FOR PLAINTIFFS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ann Wirth | | | | |
| By Ms. Montgomery | 4 | -- | 244 | -- |
| By Ms. Yankanich | -- | 211 | -- | 251 |

EXHIBITS

| WIRTH EXHIBIT NO. | PRODUCED AND MARKED |
|---|---|
| 1 - Notice | 49 |
| 2 - Subdivision and land development ordinance | 50 |
| 3 - Application for building permit | 62 |
| 4 - Minutes dated 7/10/00 | 64 |
| 5 - Minutes dated 2/7/00 | 81 |
| 6 - Minutes dated 1/4/00 | 90 |
| 7 - Minutes dated 4/3/00 | 102 |
| 8 - Order | 112 |
| 9 - Subdivision reviewed by HCPC | 114 |
| 10 - Letter dated 4/20/00 | 138 |
| 11 - Letter dated 2/24/00 | 139 |
| 12 - Letter dated 11/10/00 | 184 |
| 13 - Letter dated 10/10/00 | 187 |
| 14 - Packet of documents | 191 |
| 15 - Letter dated 5/5/00 | 210 |
| 16 - Letter dated 1/31/00 | 247 |
| 17 - Letter dated 7/28/00 | 249 |

ANN WIRTH, called as a witness, being sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MONTGOMERY:

Q Would you state your name for the record.

A **Ann Wirth.**

Q I think we met briefly yesterday. I'm Bridget Montgomery and as you probably know I represent the Corneals in this action. I'm going to take your deposition today. Have you ever been deposed before?

A **No.**

Q I'm going to give you just a few of the ground rules. Probably the first and most important one is for the benefit of the court reporter. If you could keep your voice up --

A **Okay.**

Q -- and give her verbal responses, yeses or noes. You can't do shakes of the head or anything because she can't hear that and she can't take that down. We also have to try and let each other finish our sentences. So if I'm asking a question, just try to wait until I'm finished and then I'll try to wait until you're finished with your answer to start talking because she can't take down two

people at once, okay.

If there's anything that you don't understand about any question that I ask you, you should feel free to ask me to repeat it. I want you to understand my question and I want you to be able to give me the best, clearest answer possible. So you shouldn't be shy about that at all if you don't understand it, okay?

A **Okay.**

Q If you are in need of a break, you know, to use the ladies room or whatever, just to stretch your legs, you're free to ask for that as well. We do want you to be comfortable. I'm not sure how long we'll be here, but I want you to be comfortable while you are here. If you need a glass of water, a cup of coffee, just get up and get it, okay?

A **Okay.**

Q Is there any reason why you couldn't give a deposition today and understand questions and give clear answers in return? For instance, are you on any sort of medication or anything like that?

A **No.**

Q Have you ever been a party to a lawsuit before?

A **No.**

Q Have you discussed the substance of your

deposition or intended deposition testimony with anyone?
A **I don't know what you mean. You mean what I -- what you want me to say or what somebody wanted me to say?**
Q Yes.
A **No.**
Q Not with anybody at all?
MR. SHERR: I'm going to object to the form of the question and exclude from that any conversations she had with her attorney.
MS. MONTGOMERY: Okay.
BY MS. MONTGOMERY:
Q Other than your counsel, have you discussed --
A **No.**
Q You have not talked about the fact that you will be deposed? You have not talked about that with the supervisors at all?
A **Oh, we've all talked about being deposed but --**
Q And what was the nature of those conversations?
A **I don't know what you're asking me.**
Q Well --
A **Just that we have to come and tell the truth and say whatever has happened, that's all.**

Q Who have you discussed it with exactly?
MR. SHERR: Again, other than your -- other than --
BY MS. MONTGOMERY:
Q Other than your attorney Mr. Sherr.
MR. SHERR: -- your attorney.
THE WITNESS: Probably my husband, who is my sounding board for a lot of things and is not involved in anything at all.
BY MS. MONTGOMERY:
Q Among the supervisors who have you talked to?
A **Probably everybody.**
Q In connection with this litigation, have you performed a search for documents?
A **Yes, I did.**
Q When did you do that?
A **Last week.**
Q When were you first asked to do that?
MR. SHERR: I'm going to object to the form of the question to the extent she was asked by her attorney because it's privileged. Don't answer with respect to anything -- conversations that we had.
MS. MONTGOMERY: That's not a privileged question.
MR. SHERR: Well, we'll let the court decide

that. I'm going to instruct her not to answer --
BY MS. MONTGOMERY:
Q When were you first asked --
MS. MONTGOMERY: Are you instructing your witness not to answer that question?
MR. SHERR: To the extent the request came from me, yes.
MS. MONTGOMERY: Well, she didn't have to tell me who it came from.
BY MS. MONTGOMERY:
Q Were you asked by anybody at any time prior to -- let me back up a second. Were you asked by anybody at any time, and I'm not asking you who, to search for documents in connection with this lawsuit last September, September of 2000?
MR. SHERR: Again, I'm going to object to the extent that any request came from me. Other than anything from your attorney, you may answer that.
THE WITNESS: No.
BY MS. MONTGOMERY:
Q You weren't asked by anybody, not one single soul?
A **No.**
Q When is the first time that anybody -- and I'm not asking you who asked you to look for documents, but when

was the first time anybody asked you to look for documents in connection with this lawsuit?
MR. SHERR: I'm going to object again based on privilege and instruct you not to answer with respect to any conversation --
MS. MONTGOMERY: I haven't asked you what your --
MR. SHERR: Please. With respect to any conversations that you had with your attorney.
MS. MONTGOMERY: Are you instructing your witness not to tell me whether anybody -- not identifying that person, but whether -- you're instructing her not to tell me whether anybody, without identifying who it was, asked her for documents? Is that your instruction?
MR. SHERR: I made my objection.
MS. MONTGOMERY: But you need to make it very clear because when I take this to the court I want to be able to tell the court exactly what you told your witness not to say.
MR. SHERR: Let me make it really clear.
MS. MONTGOMERY: Okay.
MR. SHERR: I'm instructing the witness not to answer with respect to conversations she had with her attorney.
MS. MONTGOMERY: Okay, thank you.

BY MS. MONTGOMERY:
Q Have any of the supervisors asked you to look for documents in connection with this lawsuit?
A **No.**
Q Has anybody other than your attorney asked you to look for documents in connection with this lawsuit?
A **No.**
MR. SHERR: That you can answer.
THE WITNESS: No, no.
BY MS. MONTGOMERY:
Q And so when is the first time that you actually looked for documents in connection with this lawsuit?
MR. SHERR: Objection, privileged. I'm going to instruct the witness not to answer.
MS. MONTGOMERY: What?
BY MS. MONTGOMERY:
Q When was the first time that you actually looked for documents in connection with this lawsuit?
MR. SHERR: Objection, asked and answered. You can answer the question. You can answer.
THE WITNESS: Okay. Last week.
BY MS. MONTGOMERY:
Q And what did you do in looking for documents?
A **I got a request, something that said request,**

**and I put together all the documents that I could put together on that list.**
Q Is that the first time you got that request, the written request?
A **I'm not really sure of that. I'm not really sure of that.**
Q You don't know if last week was the first time you ever looked at it?
A **I don't know that for sure, when that came to me. I really don't.**
Q Well, let's try and narrow it down a little bit. Did it come to you within the last month?
A **You're asking me during tax season so it's kind of a hard thing for me to pinpoint when I got that. I don't know.**
Q Did it come to you last year?
A **Oh, no.**
Q It didn't come to you in the year 2000?
A **No, I know that.**
Q So what did you go about doing in attempting to look for documents in response to that request?
A **I went down the list and I accumulated what was on that list that I could provide you from my office with. That's what I did.**
Q Did you withhold any documents based on --

A **No.**
Q -- privilege?
A **No.**
Q Do you know whether any documents were withheld based on privilege?
A **No.**
Q You don't know?
A **No, I don't know.**
Q Did the supervisors review the documents that you sent out?
A **No.**
Q So you handled completely the document production?
A **Right.**
Q Did you ask for any assistance from anybody in handling the document production?
A **No.**
Q Did you talk to anybody about anything or did you talk to other people? Did you say do you know where this document is or anything like that?
A **No.**
Q Well, let's talk about how documents are kept on behalf of the township. How are they kept, just generally tell me?
A **In a file cabinet.**

Q How big?
A **Four drawers, there's two.**
Q Do you have documents --
A **In a binder for the land ordinances.**
Q In a binder? And a binder or in a binder did you say?
A **In a binder.**
Q So there's binders in the file cabinets?
A **There's a binder on top of the file cabinet.**
Q Plus there's documents inside the file cabinet, correct?
A **Yes.**
Q Do you have documents that are retained only on computer?
A **Not that I'm aware of.**
Q Did you look on the computer for any documents that might be there that might be related to the document request that was sent to you?
A **I don't have any documents on the computer.**
Q Do you have a computer?
A **I shouldn't -- oh, yeah.**
Q I'm sorry?
A **I have a computer. We have two computers -- well, we have a computer.**
Q You started to say I shouldn't.

A The -- the ordinance is on the computer, but I didn't get it off the computer.
Q Do you maintain correspondence on the computer at all?
A We don't write very many letters so there's just -- there's nothing on the computer except that and the accounting.
Q What about the minutes?
A And the minutes are on there.
Q So the minutes are --
A Yeah, the minutes are on there, correct. You're right.
Q Anything else at all on the computer that you can think of?
A Yeah, there's -- PennDOT now has put out a disk that we have that we can put out our liquid fuel forms and that sort of thing and that's on the computer.
Q Do you maintain disks at all?
A No.
Q So you have a hard drive?
A Yes.
Q Everything is kept on the hard drive, nothing is copied off on separate disks?
A Only to backup.
Q So you maintain backup files?

A Oh, yeah.
Q Do you know whether you have correspondence or other documents on backup?
A I backup my computer all the time so everything is there. I back it up from front to back and it's there.
Q Well, just to be clear on your answer, because I'm not sure I heard it correctly, did you actually do a search of your computer files, whether on the computer or on backup to see whether or not there was anything available that would be responsive to the document requests that were given to you?
A No.
Q Are there documents related to township business that are kept anywhere else besides the township office where you work?
A I don't know what kind of documents you're talking about.
Q Any documents related to township business in any way.
A Yes.
Q And where is that?
A The building permits are not kept in-house.
Q Did you look -- where are they kept?
A David Van Dommelen has them.

Q Where does he keep them?
A In his home.
Q Did you ask him to give you the building permits?
A I -- I asked him for a list of the building permits and that's what I gave you.
Q But I thought you said you didn't ask anybody to help you in connection with the document production?
A No, I only asked to get the information. I didn't ask anybody to look it up for me. I just -- I must have misunderstood what you meant. I simply asked David to give me his list of all the building permits. I did the same thing with the county. So if I misunderstood what you said, I'm sorry. I did the same thing with the county.
Q That's okay. I mean, if you misunderstood, then we'll just clear it up. So my question was: Did you talk to anybody in connection with performing this collection of documents?
A Yes, I did then.
Q And who did you talk to?
A I talked to David Van Dommelen and I asked him to give me a list. I did not ask him for the permits because they're cumbersome. I did ask him for a list of all permits that were issued from -- I think you said June '99 to present and he did do that. And then I talked to Richard

Stahl and I asked him to give me a list of every one that went into the county to be reviewed from whenever and he sent me a list of everything that's ever been in there.
Q And you provided both of those lists to us?
A Yes, I did.
Q To your attorney anyway.
A And to you. They were here yesterday. I saw them.
Q When you say that the building permits are too cumbersome, why are they too cumbersome? Can you describe that for me?
A Well, I -- I have to take -- you have to understand I'm the only person that does this, okay. So I had to go -- I'd have to go get them and copy -- applications I would have had to copy. We don't have copies of the building permits, okay, just the applications, is all I would have. And I would have to go since 1999 and copy -- get David's book and copy it in my -- in the office or take it somewhere.
Q Does David keep them in a binder or something?
A I really don't know.
Q So the applications are what, one page, two page --
A I have no idea because I don't do that.
Q So when you issue a building permit -- when

the township issues a building permit, you don't keep a copy of the permit?

A No, I don't.

Q Does anybody keep a copy of the permit?

A **You'll have to ask David that. I don't actually know what he has in that -- in his files. I know he keeps a list which he provides to the supervisors and that's why I asked for that.**

Q So what you sent us was a list of permits --

A **That were issued.**

Q That were issued?

A **Right.**

Q Did you send us a list of applications for permits?

A **That's the same. I don't think there's any difference, but you'll have to ask David that.**

Q And you don't think there's any difference why?

A **I don't know. I honestly don't know. You'll have to ask David that. I don't know what he does. That's not under me.**

Q So then you talked to Richard Stahl to get what from him?

A **I asked him to give us a list of permits -- or of subdivisions that we have submitted to him, just a list,**

**to show that we were sending everything in there. And he did send me a completed list of -- they must keep track of them when they come in in that routine and that's what he sent.**

Q Anybody else?

A **No, those are the only two places I requested anything.**

Q Did you look anywhere outside the township offices --

A **No.**

Q -- for anything?

A **No.**

Q You didn't look at documents anywhere else?

A **No.**

Q You said that the building permits and applications are kept by Van Dommelen, correct?

A **Right.**

Q Are there any other documents that are maintained outside the township office relating to township business?

A **The sewage documents, Barry keeps them till he's done with -- till he has completed the project and then he sends them into the township.**

Q That's Barry Parks?

A **Barry Parks. And also DEP keeps them and then**

**sends them back. They might keep them for three or four years and then they send them back, but I didn't talk to either one of them.**

Q So you didn't ask Barry Parks what documents he has in connection with --

A **No, I did not.**

Q Is there any reason why you didn't ask Barry Parks for his documents?

A **I didn't know I was supposed to do that.**

Q Any other documents that are maintained outside the township office?

A **I can't think of any.**

Q Well, if you think of any, please feel free to tell me during the course of this deposition, or tell your counsel and he can tell me later if you don't think of it during the course of the deposition, okay?

A **Okay.**

Q Now, going back to the documents that you did produce, you said all the documents are kept in one file, in one file cabinet that's three or four drawers?

A **No, we have two file cabinets.**

Q Is that it? Is there any other, you know, sort of nooks and crannies or storage buildings on township property that --

A **Oh, yeah, we have old documents. Are you**

**talking current or ancient documents?**

Q Really I'm just trying to get a general picture of your document retention.

A **Current items are in the office. Old items are in the township building. And I honestly cannot tell you what's there and I don't go there because there's snakes in there and I don't go there. I can tell you that. I won't go there.**

Q What do you mean by current documents?

A **Well, things that -- I've been on for six years. Everything since I've been on is in my office.**

Q Is it in those two file cabinets you referred to?

A **Yes, and then in an extra storage box.**

Q And that storage box is where?

A **In my office.**

Q Did you look in that storage box in connection with this document request?

A **No, because those things were before I was on the -- on -- they weren't involving this time frame.**

Q So they are documents prior to --

A **1996.**

Q So that's the storage box and what else?

A **That's it.**

Q No attic or anything like that?

A No.
Q Let's talk a little bit about you and your background. Where do you live?
A **I live on Scare Pond Road.**
Q And where is that?
A **Petersburg, R.D. 1.**
Q Is that -- how do you spell that, Scare Pond?
A **S-c-a-r-e, P-o-n-d.**
Q And that's within Jackson Township?
A **Yes.**
Q Tell me a little bit about your educational background.
A **I have -- I graduated from high school, of course, and I have college classes in tax and accounting and business law and numerous other advanced education, but I don't have a degree.**
Q Talk to me a little bit about your advanced education, what -- go into some detail.
A **Mostly in computers, because that's what I do, and in income tax preparation, that sort of thing. I go to tax class at Penn State most every year and I do that.**
Q Do you hold any certificates or licenses or anything like that?
A **No.**
Q When did you start your post high school

education?
A **In probably 1960. I've been doing this all this time so ...**
Q Taking business classes?
A **Business classes and computer classes when we started with computers and I've been taking income tax classes since I started doing that in 1974.**
Q What is your exact title at the township?
A **I'm secretary/treasurer.**
Q Secretary/treasurer. Is there any training for performing that particular function?
A **Oh, yes.**
Q And what is that?
A **Well, we go -- every year they have classes that they get you to attend for -- it's not only secretarial duties or treasurer duties, it's everything. They -- we go to convention to do this. We go everywhere to do -- wherever they -- it's called one-step education classes through PSATS. So every year -- I even went to Shippensburg. They -- we go different places to do what we --**
Q What is PSATS?
A **Pennsylvania Association of Township Supervisors.**
Q So they send you to training and --

A **The township does.**
Q And PSATS puts on that training?
A **They're doing it now, yes. And DEP does it, Department of Transportation does it.**
Q And what does that training consist of exactly, what do they show you?
A **Well, like right now is -- they're doing a lot of computerization because this is a dinosaur thing they have for the townships. And they're doing a lot of training for the liquid fuel forms and all those things. They're training us to use their new computer systems and -- bidding. I do all the bidding and that sort of thing. So all the latest things we do.**
Q You said that what you do is computerization. What did you mean by that?
A **Well, I -- I go around and set different small businesses up with their accounting systems and that sort of thing.**
Q In connection with your work as a township --
A **Oh, no.**
Q -- supervisor secretary?
A **No, I earn a living. I don't earn a living doing township -- no, I'm not -- I shouldn't be funny about this, but that's what I do for a living.**
Q Oh, I see. So you have separate employment?

A **Oh, yeah.**
Q We'll get to that in a minute.
A **Okay.**
Q Just tell me a little bit about your duties as the township secretary.
A **Well, I take minutes at the meeting, I do do that, but I take care of all the financial end of it. I make sure that we have all the grants that we're entitled to. I fill in all the forms to get us the money. We're a poor township, we only have 900 people, and there's a lot of paperwork involved in --**
**(Interruption.)**
MS. MONTGOMERY: Excuse me one second. I'll be right with you.
(Break taken.)
MS. MONTGOMERY: Now, where were we? What was the last question.
(Question and answer read.)
THE WITNESS: There's a lot of paperwork involved in just getting the funding for what we need to do in the township. And we have -- we're audited three times a year so we're constantly under audit. I just -- I take care of all that. That's what I do.
BY MS. MONTGOMERY:
Q How much time say per week do you put into it?

A I honestly don't know. I cannot tell you how many -- because I work that in with my job and anything that needs to be done I do and I honestly cannot tell you how many hours. Some weeks it's a lot, some months it's a lot, like January, February, March is really bad, and then at audit time it's really bad but ...
Q Why are -- January, February and March for tax season?
A Because -- well, no, not for the township. The township, that's when you fill in all your forms for your funding, like your liquid fuels. And we have all -- every agency and everything we deal with we have forms we have to fill in with the supervisor's information and all that and it's -- and if you don't do that, then we don't get our liquid fuels money. So we have those -- those months we're really busy.
Q Do you do all of that work from the township office or do you do some of it at home?
A The township does not have an office. They use my office for their office. I allow them to put their stuff in my office and that's where it happens.
Q Your office where?
A On Scare Pond Road.
Q Your office at home then you mean?
A I have a separate building that is my office.

Q That you use in connection with your other employment?
A Yes.
Q So the township office is your office essentially?
A Um-hum.
Q Having said that, do you perform any of the work from inside your home?
A At my house -- my --
Q Yes.
A My office building is here and my house is over there. There's nothing together. Everything is in the building. There's nothing in my house, other than phone calls, you know, that sort of thing. I don't have anything at the house.
Q Do you keep a record of phone logs? Do you keep a phone log of like phone calls you receive --
A No.
Q -- in connection with township business?
A No, they have their own line.
Q That rings in your office?
A Um-hum.
MR. SHERR: You have to say yes or no. You can't --
THE WITNESS: I'm sorry, yes. It rings in my

office.
BY MS. MONTGOMERY:
Q So if somebody calls on township business, how do you keep a record of the fact that somebody has called on township business?
A I don't.
Q You don't, you just keep it in your head?
A I don't get enough phone calls for the township that I need to keep records or anything. It's -- if somebody calls me, I answer the phone and say Jackson Township and do what I -- you know, do what I have to do, but we don't -- we don't get a lot of phone calls.
Q Do you take messages for the supervisors in connection with --
A No, I tell them -- I give them their phone number and they call them.
Q So you don't have any kind of old phone messages or --
A No.
Q -- a book of --
A I don't do that.
Q Let me finish my question.
A I'm sorry.
Q That's all right. Thank you. So as the secretary you just sort of weave it into your other work,

your other employment as it needs to be done for the township?
A Yes.
Q You attend all the township's meetings?
A I've only missed one in the six years I've been on.
Q And when was that, the one that you missed?
A I think it was two years ago in February I was really ill and I did not go.
Q And the meetings are held in your office as well?
A No.
Q Where --
A The meetings are held -- I'm sorry. The meetings are held at the fire company building in McAlevys Fort.
Q Is there a telephone in that building?
A Yes.
Q Is there any answering of messages or, you know, answering of the telephone on behalf of the township that occurs in that building?
A No.
Q Do you know whether the supervisors have their own individual offices anywhere?
A No, they don't.

Q Do they have anybody else who answers the phone or takes messages or handles any township business in any way on behalf of them?
A **No.**
Q Typically at a township meeting -- is there a monthly meeting of the township supervisors?
A **Yes.**
Q And then there are special meetings from time to time, correct?
A **Once in a while, like when we do the ordinance or something, but not very often.**
Q Who would be present at the township meetings?
A **The supervisors and myself.**
Q Are they open to the public?
A **Oh, always. They have to be by law.**
Q Do you advertise --
A **Yes.**
Q -- all of the township meetings?
A **We have to, that's the law.**
Q Every month?
A **We are required once a year to put it in the paper in the beginning of January that our regular monthly meeting will be the first Monday of every month. And then if we change that, we have to run another ad, or if we -- excuse me. If we have a special meeting, that has to be**

**advertised.**
Q Where do you advertise?
A **In the Daily News in Huntingdon.**
Q The Huntingdon Daily News it's called?
A **Um-hum.**
Q Is there a particular amount of notice that you have to give?
A **We're supposed to give 24 hours.**
Q Twenty-four hours notice for special meetings?
A **Yes.**
Q And what else are you supposed to do in connection with those notices?
A **Just exactly what I said, we put it in once a year and I -- oh, I post it on the door. They have a Plexiglas for me on the door of the fire company and I have it -- it's posted there when our monthly meeting is. And if there's a special meeting, I go down and hang it on the door.**
Q What about the content of the notices?
A **They're just -- we just have to notify them of a meeting if there is -- and if it's -- I'm sorry.**
Q If it's a special meeting, do you have to tell them anything else?
A **Like if it's an ordinance or we're building or something, it's in the paper, we advertise it in the paper.**

**When we bid for -- if we have an emergency that we are going to bid for roadwork or something that we're doing a special meeting for, there will be an ad in the paper. Even if we are doing our bidding at a regular meeting, there still will be an ad in the paper listing what we're bidding for and when that meeting is and whatever. It's always in the Daily News.**
Q So in the notice of a special meeting do you put anything about what the meeting is going to be about?
A **Yes.**
Q You describe what exactly the supervisors are trying to accomplish?
A **We're bidding on stones or whatever.**
Q So you told me what you do in connection with your duties as secretary for Jackson Township. Is there anything else you want to add to that?
A **I don't know what it would be.**
Q How frequent is your contact with the supervisors of Jackson Township?
A **I -- I talk to Mr. Weiler on a daily basis, only because of his health and he's alone with his sister, but I don't know. It's a small community. We see one another and we run into one another. I don't know how often I talk to them.**
Q Is there something additional to add to your

duties for the township that arises out of your role as the treasurer for the township?
A **I keep track of the books. I have that computerized. I do that. I pay all the bills.**
Q Anything else?
A **I move the money around in the bank if we need to do that. I change all the signatures on the bank accounts. I --**
Q Do you write checks?
A **Oh, yes, but I don't -- yes, I do.**
Q Do you sign the checks?
A **Yes, there's two signatures required.**
Q Yours and one of the supervisors?
A **Yes.**
Q Anything else that you do as -- in connection with your role as the treasurer for the township?
A **Deposit all the money. I -- and write checks is basically what I do for --**
Q Do you participate in -- just in general in your role in the township, do you participate in substantive conversations about what the township should do or can do or --
A **I do do that.**
Q Do you do that at the monthly meetings or just on a day-to-day basis or what?

A Wherever it needs to -- wherever it comes up. If there's something -- I will get a lot of things in the mail that needs to go to the supervisors or, you know, I may have researched things for them.
Q Do you deal directly with the public yourself?
A Sometimes.
Q So they come out to your office?
A No.
Q They just call you on the telephone?
A Sometimes.
Q To ask you questions about what they need to do to do this or do that?
A Sometimes they do that.
Q Do you vote at all in connection with township business?
A No, I don't have a vote.
Q Do you have an informal vote?
A No.
Q Do the township supervisors seek your advice on how to do things for the township?
A They might ask me to research things.
Q How do you keep the minutes?
A They're in a binder.
Q So you keep --
A It's not really a binder. It's a big book and

you have to staple them in there. It has to be in this book.
Q And you also keep them on the computer?
A I print them off of there and put them -- I have to seal them and put them on -- in the book, yeah.
Q You have a word processing system?
A Yes.
Q What word processing system do you have?
A We do Microsoft Word and then we also have Excel, which is part of that, and Works. We have Works.
Q What do you use Works for?
A I use them both for -- I might have -- Word is connected to the reports that we do for PennDOT with Excel and I use -- that's mainly for the bidding. There's bidding forms where we bid for stones and blacktop, and whatever we're doing, and snow plowing and that sort of thing. That's done in Word. And Works I do my minutes in and things.
Q Do you use e-mail at all in connection with your township work?
A The township is not on the Internet.
Q Are you on the Internet?
A Oh, yes.
Q Do you use your own e-mail in connection with township business at all?

A No.
Q So you would have nothing on your -- this is -- your e-mail is on your personal computer then --
A Yes.
Q -- for your other business?
A Um-hum.
Q So there is nothing on that computer that in any way relates to township business?
A No.
Q You never use that computer to keep minutes like, for example, if the other computer is not working or something?
A No, we do not. We've only had the township computer for two -- for -- I think it's two -- maybe a year, year and a half. And before that I did, but I -- I have two new computers and I don't put the township on mine at all.
Q But before you got the township computers a year and a half ago, you did some township business on your own computer?
A Yes, I did.
Q Did you look on your own computer to see whether there was anything on there that might in any way relate to this lawsuit or the matters under consideration in this lawsuit?
A I would have trouble doing that since I don't

have that anymore. I don't have it anymore.
Q You don't have that computer anymore?
A No, and I cleared everything off of there and gave it to my grandson.
Q You gave the computer to your grandson and got a new computer?
A Yes.
Q Did you backup the information that was on your old computer?
A Oh, yeah.
Q So did you look on your backup information to see whether there was anything related to the Corneals, their property or anything that has to do with this lawsuit?
A No, I did not because the only thing that would have been on there would have been the minutes and the books.
Q Well, let's see, Mr. Corneal first started his interaction with the township back in 1999, correct, in connection with this property?
A I don't know when he started.
Q But if he did start in connection with this property in 1999, it's possible that you would have some information on your old computer, correct?
A I wouldn't have anything in '99 for Mr. Corneal.

38

Q Why is that?
A **Because I didn't have anything to do -- I didn't even know about Mr. Corneal till January 2000.**
Q Do you keep any kind of a log of township activities, you know, some sort of an organizational chart at all?
A **No, I do not.**
Q Do you keep a calendar?
A **For the township?**
Q Yes.
A **No.**
Q You don't?
A **No.**
Q Does anybody keep a calendar for the township?
A **I don't know. You'll have to -- I don't know.**
Q Have you ever held any other positions with Jackson Township besides your secretarial and treasurer positions?
A **Yes, we had a supervisor quit and I was appointed supervisor till we had a special election.**
Q And when was that?
A **Oh, I don't know whether that was '98 or -- I think it was in 1998. I'm not sure. It was just a short period of time. A man quit and then we had an election. It was just a couple months.**

39

Q It was a couple months and you were appointed to fill in as township supervisor --
A **Yes.**
Q -- for a period of time? How long have you been the secretary for the township?
A **Since 1996.**
Q How long have you been the treasurer for the township?
A **Since 1996.**
Q And how did you go about obtaining that position?
A **They put an ad in the paper and I gave them a resume.**
Q Are you related to any of the supervisors?
A **No.**
Q Are the minutes for the township meetings publicly available?
A **Oh, yes.**
Q So I could go in and look at the book of minutes?
A **Sure.**
Q Anybody could go in and look at the book of minutes, correct?
A **Yes.**
Q Who do you report to?

40

A **The three supervisors.**
Q There are three supervisors?
A **Right.**
Q And you report to them informally or formally or just at the monthly meetings or what?
A **I don't know what you're asking me.**
Q I guess I'm really asking you for a complete picture of how you report township business to the supervisors. Do you save it all for the monthly meetings, do you just call them from time to time to report to them?
A **I call them from time to time to report to them.**
Q They're your bosses, right?
A **Yes.**
Q They're the ones who hired you?
A **Yes.**
Q So you have to report to them on any township business that comes up?
A **That's right.**
Q So you just call them from time to time?
A **Yes.**
Q Do you know whether they keep any minutes or records of your telephone calls to them?
A **I don't know.**
Q So if something comes up between say the first

41

monthly -- you know, the monthly meeting in January and the monthly meeting in February and say four or five different things come up, how do you keep a list of what's come up? I mean, how do you keep all that organized?
A **When I open the mail and there's something that has to be taken care of with the supervisors, I normally copy it, if it's something they need to read or whatever, prepare for, or -- and I have a file that I have ready for the meeting. I put my copy in the folder and then I give them their copies along the way so they're prepared before the meeting. And so I don't lose it I do that because it's -- it's -- there's a lot of paperwork involved here and I do that for that reason.**
Q Do you prepare agendas for the monthly meetings?
A **Yes, I do. I have it on the computer.**
Q You have the agendas on the computer as well?
A **I have an agenda and when I -- each meeting I change it. I just go in and change it and-- it's saved under agenda and I just change it for that meeting.**
Q Do you save copies of the old agendas?
A **Probably not.**
Q Does anybody save copies of the old agendas?
A **I don't know.**
Q You don't save the agenda on the meeting from

month to month?
A No.
Q The agenda on each monthly meeting you just go in and replace --
A Yes.
Q -- and you copy over?
A **Yeah, that's what I do.**
Q So you have a form, basically a computerized form --
A **Yeah, that's what I do.**
Q Tell me about your other employment.
A **I do income tax preparation and set up computers.**
Q Are you self-employed?
A **Yes.**
Q Does your company have a name?
A **Ann's Accounting.**
Q Ann's Accounting?
A **Um-hum.**
Q And you set up computers. When you say you set up computers, what do you mean by that?
A **I load software on people's computers for accounting and word processing packets and that sort of thing, to show them how to run it, show them what to do with their payroll, keep them updated. That's what I do.**

Q So you just consult -- basically have a consulting -- computer consulting business?
A **And I do in-house payrolls and that sort of thing, quarterlies.**
Q And you prepare tax forms as well?
A **Yes.**
Q Now, you said you were briefly a supervisor for the township. Have you ever held any other position with Jackson Township?
A **No.**
Q Do you take notes at the meetings besides the minutes that you actually type up? Do you have handwritten notes that you keep somewhere?
A **No. Once I type it up, I throw it out.**
Q Discard them, okay. Do you keep a record of people in attendance at the meeting other than in the minutes?
A **I do now.**
Q A different record?
A **Yes.**
Q And what does that consist of?
A **I pass a paper around the room and have everybody sign it now, who is there.**
Q And you keep that where?
A **With the minutes.**

Q You keep it with the minutes?
A **Yes. I've been doing that maybe for -- I don't know, three, four months.**
Q You talked about opening township mail, right?
A **Yes.**
Q Is that delivered to your home or to a post office box?
A **We have a separate mailbox for the township.**
Q On your property?
A **Yes.**
Q So you keep copies of all the mail received?
A **It depends on what it is. If it's something that I'm not going to do anything with, it's just information for the supervisors from PSATS or something like that, I -- I don't necessarily keep it.**
Q But you do keep some of the mail received, copies?
A **If it's something that I have to deal with.**
Q And you keep that in those files?
A **Um-hum.**
Q The metal file cabinets that you have?
A **Yes.**
Q I think you said a moment ago that you don't really know what the building permit applications look like and you don't -- you're not sure how big they are and all

that?
A **I don't.**
Q Now, in connection with your work with the township, how many ordinances has the township passed in your -- in the history of your work with the township?
A **Three.**
Q And what were they?
A **The land development and subdivision ordinance, privy ordinance and a driveway ordinance.**
Q When did they pass the land division and subdivision ordinance?
A **July the 10th in 2000.**
Q July the 10th, 2000?
A **Um-hum.**
Q Was the meeting for that ordinance -- or for a consideration of that ordinance advertised?
A **Oh, yes.**
Q Where was it advertised?
A **The Daily News.**
Q Did the advertisement state that it would be on July the 10th?
A **Oh, yes.**
Q Did the advertisement state what was going to be considered at the meeting?
A **Oh, yes.**

46

Q Do you have a copy of the advertisement that stated when the --
A **I'm not sure I did that. I think maybe Larry Newton did that, but I'm not sure. I can't -- I don't know.**
Q Does Larry Newton sometimes do the advertisements?
A **Only for items like that.**
Q Let's talk about the advertisements for a second. I think you stated a while ago that you usually do the advertisements, right? You do them in the Daily --
A **Daily News.**
Q The Daily News in Huntingdon, correct?
A **Yes.**
Q So you would take care of the advertisements at the beginning of the year listing when the monthly meetings of the township were going to be held?
A **Right.**
Q Any other advertisements that you routinely deal with?
A **Yes, for bidding.**
Q Anything else?
A **No -- special meetings, if we called a special meeting.**
Q Sometimes do you do the advertising for special meetings held to consider ordinances?

47

A **I honestly don't know whether I did that or not. I normally do most of the advertising, but that was a special -- so I don't -- I honestly don't know if I did it or he did it.**
Q Well, what's involved when you do? Do you just call --
A **No.**
Q -- the Daily News? What do you do?
A **No, you have to type something up and fax it into them and they put it in the paper.**
Q Do you keep a record of having typed something up and faxing it into them whenever you do an advertisement?
A **Oh, yeah, I have that.**
Q Let me think about this for a second. So in some situations -- well, you said you passed three ordinances -- or the township supervisors have passed three ordinances since you've been working for the township, correct?
A **Right.**
Q Do you know whether you did the advertising for any one of those three ordinances?
A **They were all at the same time.**
Q They were all done at the same meeting?
A **Um-hum.**
Q Which you said was July 10th, 2000?

48

A **I think that's what -- it's on the back of the ordinance.**
Q So the ordinance was actually passed at the meeting?
A **Right.**
Q So the date of the ordinance -- the date of its passage is the date of the meeting, correct?
A **Yes.**
Q Did you notice when you did your search for documents whether you had any documents in there indicating -- showing advertisements for meetings sent to the newspaper, faxes for advertisements for meetings sent to the newspaper?
A **I --**
Q Do you have a special file for that?
A **I file them with the documents that we're doing. I don't have a file for advertisement. I -- because we do our bidding and that sort of thing, I -- and the auditors look at our bidding, I have to have that in the files for those items so it's got to be there.**
Q Miss Wirth, I'm going to show you a document that was faxed to us by your counsel last Friday and we're going to mark it as Wirth Exhibit 1. And I'd ask you to look at it and see whether you can identify that document for me, just familiarize yourself with it for a second.

49

(Notice produced and marked as Wirth Exhibit No. 1.)
BY MS. MONTGOMERY:
Q Do you recognize that advertisement?
A **Yes, I do.**
Q So I guess I'm a little bit confused because this is a regular monthly meeting and you had said earlier that at the beginning of the year you just do an advertisement that says this is when the monthly meetings are going to be held, but then this is a separate advertisement, correct -- I'm sorry, you just nodded your head.
A **No, I'm -- I wasn't answering you.**
Q Well, is that correct, that you said that at the beginning of the year you do an advertisement that says this is when the regular monthly meetings are going to be held, correct?
A **I did say that, and I also said that we -- if we're having any other meetings or any changes we have to do it 24-hour notice for these meetings and that's what this was.**
Q Was this a change of the regular monthly meeting?
A **Yes, because I think the regular monthly meeting then would have been on the 4th of -- that would**

**have been on the 4th of July, all right, so we changed our regular monthly meeting because we were going to enact the ordinance.**

Q So you had a monthly meeting on July 10th then?

A **Yes.**

Q So you enacted the ordinance at the regular monthly meeting?

A **We did do that.**

Q Which was held on July 10th?

A **That's right.**

Q Now that you look at this, do you recall that you're the one who put the advertisement in?

A **I did this advertisement. I didn't do the ordinance advertisement.**

Q Was there a separate ordinance advertisement?

A **Well, yeah, it's right beside it.**

Q Let me see that. Okay. So you say you didn't -- oh, Larry Newton did that one. I see that at the bottom, okay. I'm going to show you another document that is marked as -- we're going to mark it as Wirth Exhibit 2.

(Subdivision and land development ordinance Jackson Township produced and marked as Wirth Exhibit No. 2.)

BY MS. MONTGOMERY:

Q Do you know when this advertisement appeared -- going back to Exhibit 1 for a second, do you know when this advertisement appeared in the Daily News? Do you know what date?

A **I don't -- I can't tell from here, no. Off the top of my head I don't know.**

Q You don't recall?

A **No.**

Q I'm going to give you a copy of this document and ask you if you can identify it for the record.

A **This is the subdivision ordinance and land development.**

MS. MONTGOMERY: Let the record reflect that Michele Thorp just entered the room.

BY MS. MONTGOMERY:

Q Is this the subdivision --

A **Yes.**

Q -- ordinance that was passed by Jackson Township, correct?

A **Yes. This thing says the 7th.**

Q We're going to direct your attention to page 71 of the document. Was this ordinance passed before the meeting?

A **No. I probably -- I probably wrote the wrong date on there because I know it was passed the night of**

**this. That's -- and it's documented in the minutes that it was done. I probably -- I don't know why that says the 7th.**

Q Did you have a meeting -- like a separate meeting at all on July 7th?

A **Oh, no, no.**

Q Did you --

A **What day of the week is that? No, no, that was just probably me.**

Q Was this signed at the regular monthly meeting?

A **Yes, it was and -- because I took it to get copied right away and I -- I did that. I'm sure I probably wrote that there that night.**

Q Who was present at that monthly meeting?

A **All the supervisors were there.**

Q Who else?

A **Myself.**

Q Anybody else?

A **I don't remember.**

Q You don't recall whether there was a member of the public present?

A **I'm sure there were. There's usually regular people there, but I -- I don't -- I don't know for sure if they were there that night. I think they were.**

Q Did you provide us with the minutes of this

monthly meeting?

A **Yes.**

Q You provided your counsel with the minutes of the monthly meeting, correct?

A **Yes, I did.**

Q Was Larry Newton present at this monthly meeting when this ordinance was passed?

A **No.**

Q Can you remember -- this was July 2000. So can you remember --

A **I don't know why I did that. I really don't. I just wrote the 7th and it was -- but it was done at the meeting and I -- you know.**

Q Were all three supervisors present at the meeting?

A **Yes.**

Q Can you recall roughly how many people were present at the meeting?

A **We might -- there might be three or four people, that's all we ever have.**

Q Was there any other notice of the meeting published anywhere else?

A **I hung something on the door which I -- I'm obligated to do by the Sunshine Law and I put it in the paper.**

54

Q When did you hang the notice on the door?
A **When I typed this thing -- my routine is when I type this and send it into the paper, I take it down and hang it on the door, and that's what I do as my routine.**
Q Do you save copies of those notices that you hang on the door?
A **It's this. Yeah, it's just the paper that I fax over, the same thing, you know.**
Q Do you save a copy of that?
A **I probably have that.**
Q Did you provide that to your counsel in connection with this request for production of documents?
A **Probably not.**
Q Why not?
A **I don't know that I was -- I don't believe I was asked for that, was I? I don't know.**
MR. SHERR: Just answer --
THE WITNESS: It's here. It's the same thing.
BY MS. MONTGOMERY:
Q It's in the newspaper, right, but you have a separate notice that you hang on the door, right? Is it a full size notice?
A **That's just -- what's right there on a piece of paper I hang on the door.**
Q What about the more lengthy notice that Larry

55

Newton put in the paper on the ordinances that were going to be considered at the meeting? Do you know whether that more lengthy notice was put in at any other time in any other newspaper or in the same newspaper?
A **You'll have to ask Larry that. I don't know.**
Q Tell me again why did you publish this one, because it was going to be held on a different date?
A **Right, it's not the first Monday of the month.**
Q Okay, because the first Monday of the month would have been July 3rd?
A **Or July -- July 3rd. We did not -- it was Labor Day -- it was 4th of July weekend and we changed it to the 10th and we don't normally do that but we ...**
Q Would your records reflect when you sent this notice into the newspaper?
A **I might be able to see the date on the fax copy if I still have it.**
Q Would you please provide that to your counsel so that it can be provided to me?
A **I will try.**
Q Whatever you have in connection with the advertisement of this meeting in any way, shape or form. What time did the meeting take place? What time did this meeting take place?
A **Seven o'clock.**

56

Q It started as scheduled as shown here in the paper?
A **Yes, I would say it did.**
Q Do you remember how long it lasted?
A **No, I do not.**
Q Was there any discussion on the ordinances?
A **I don't remember what we discussed. I don't.**
Q Other than ordinances were there other things that the township supervisors pass, you know, sort of laws, bylaws, whatever, that the township supervisors pass?
A **Like what?**
Q Resolutions, that sort of thing.
A **Yes, we have to do resolutions.**
Q Tell me about that. What kind of resolutions do you have to do?
A **We do resolutions to belong to the Juniata Watershed. We do resolutions when we make changes at the bank, when we change the supervisors. We did a lot of resolutions when we had the flood.**
Q Did you pass any resolutions recently?
A **Yeah, the Juniata Watershed Resolution.**
Q When was that?
A **Not this month, last month.**
Q Was there any discussion on that resolution?
A **Oh, yeah. Yes.**

57

Q Was it well attended by the public, that meeting?
A **We might have had four people.**
Q And the public discussed this resolution, do you recall?
A **I don't recall that they did.**
Q But you said there was discussion on the resolution?
A **For the supervisors, I was talking about.**
Q Among the supervisors. What other resolutions have been passed say in the last year?
A **That was the first resolution, I believe, for the year.**
Q For the year 2001?
A **Yes.**
Q What about in the year 2000?
A **I honestly can't remember that we did anything other than the Juniata Watershed and -- I can't remember.**
Q So you don't recall any resolutions being passed in the year 2000, correct?
A **I'm sorry, I -- if we did, I don't know. It wouldn't be -- we don't do them -- we don't do -- it's not a routine that we do, other than bank changes and that sort of thing.**
Q Do you keep records of your resolutions?

A **Oh, yeah.**
Q Did you look at the resolutions in connection with searching for documents for this lawsuit?
A **I don't think that was part of the request.**
Q Well, did you look?
A **No.**
Q So you didn't review any of the resolutions to see whether they might be related in any way to the matters in this lawsuit?
A **No.**
Q Any other resolution like documents that are passed by the township? We've covered resolutions, we've covered ordinances, anything else?
A **No.**
Q Nothing else you can think of? Take your time.
MR. SHERR: I'm going to object to the form of the question. It's been asked and answered. She's given her answer. You can answer again.
THE WITNESS: No.
BY MS. MONTGOMERY:
Q Okay, thank you. Well, let's talk a little bit more about the ordinances that were passed. Do you recall when the issue of the subdivision and land development ordinance was first raised within the township

-- among the township supervisors, I should say?
A **Probably between '97 and '98.**
Q Who raised it?
A **I don't know.**
Q Why do you think it was first raised between '97 and '98?
A **Because it took us two years to sift through what we wanted to put in our ordinance.**
Q So if this was passed in July 2000 you think you started thinking about it two years before that?
A **I know we did.**
Q How do you know you did?
A **Because I started collecting things two years before from different areas. We used to put a feeler out to our engineer and different places, but I can't tell you the exact date.**
Q Were there other meetings of the township supervisors at which this land development and subdivision ordinance was discussed besides the one at which it was passed?
A **Oh, yes.**
Q And how do you recall that? I mean, just in keeping the minutes, is that it?
A **Yes.**
Q Was it discussed on a regular basis at the

regular monthly meetings?
A **Only if there was activity, you know, going on.**
Q What about -- you say there were two other ordinances, a driveway ordinance, correct?
A **Yes.**
Q And a privy ordinance?
A **Right.**
Q All passed on July 7th, according to the subdivision and land development ordinance --
A **Yes.**
Q -- right?
A **Yes.**
Q Did you provide us with copies of the highway and -- I mean the driveway and privy ordinances?
A **I think they're in the back of -- probably not.**
Q Whose idea was it initially to pass a subdivision and land development ordinance?
A **I don't know.**
Q You don't recall who first raised the issue?
A **No.**
Q Do you recall how it was raised?
A **No, I don't.**
Q Well, you said that it was discussed on a

number of occasions, correct?
A **Yes, I did.**
Q Do you recall the nature of those discussions?
A **No.**
Q Do you recall who talked about it?
A **No.**
Q You don't recall anything about any of the discussions?
A **No, I don't.**
Q At the meeting that was held, according to you, on July 10th, correct?
A **Yes.**
Q Was there any discussion among the public over the driveway ordinance?
A **I don't recall.**
Q Was there any discussion about the privy ordinance?
A **I don't recall.**
Q How did the driveway ordinance come up? Whose idea was that, do you recall?
A **I don't know.**
Q Do you know when it was first raised?
A **I don't -- I don't know.**
Q What about the privy ordinance, when was that first raised?

A **I don't know that either.**
Q I think you had mentioned -- so prior to the passage of the driveway ordinance, did the township collect fees for driveways for when a resident wanted to put in a driveway?
A **Not that I'm aware of.**
Q What about for the privies? Was there a fee that was paid when somebody wanted to put a privy in?
A **Not that I'm aware of. Not to the township.**
Q Are you aware of fees being paid to anybody else in connection with a privy before the ordinance was passed?
A **Only the SEO.**
Q What about the driveway, are you aware of fees being paid to anybody else?
A **No.**
Q I think that you had mentioned earlier that you didn't know what the application for building permits looked like. I'm going to show you a document that we are going to mark as Wirth Exhibit 3. That's for you.
(Application for building permit produced and marked as Wirth Exhibit No. 3.)
BY MS. MONTGOMERY:
Q I'd ask you to take a look at it for me.
A **I didn't say that I didn't know what that**

**application looked like. What I said was that I didn't know where -- what -- you asked me where he keeps these things and what that looked like and I don't know that, but I do know what this application looks like.**
Q Well, I'm not going to argue with you because the record will speak for itself, but I did ask you what did they look like, were there many pages, what's an application look like, a lot of pages, one page, two pages, and you said you didn't know. So I'm going to show you this to see if you can now talk to me about what these applications look like, okay.
MS. MONTGOMERY: Tony, do you have your copy? This is Exhibit 3.
THE WITNESS: I know what this is.
BY MS. MONTGOMERY:
Q What is it?
A **It's a -- it's the application for the building permit.**
Q For?
A **For?**
Q Is this a standard application for a building permit?
A **Yes.**
Q Is this the standard size of the application for the building permit?

A **You mean paper size?**
Q Yes, paper size.
A **Yes.**
Q Just one sheet, correct?
A **Yes.**
Q So when I asked you earlier, you know, about getting the building applications for building permits from Van Dommelen and you indicated that they were cumbersome and then I asked you, well, how big are they, can you now explain to me why we couldn't get these one sheet -- one sheet applications for building permits?
A **I -- you asked me what he -- where he keeps them or what he does with them and how big this is and I said I don't know, and I don't know. I was not referring to a piece of paper.**
Q I'm also going to show you a document that we're going to mark as Wirth Exhibit 4.
(Minutes dated 7/10/00 produced and marked as Wirth Exhibit No. 4.)
BY MS. MONTGOMERY:
Q I'd ask you to look at that. Do you recognize that document, Miss Wirth?
A **Yes.**
Q Can you describe it for the record, please?
A **It's the minutes for July 10th, 2000.**

Q For the meeting of the supervisors --
A **Yes.**
Q -- of Jackson Township?
A **Yes.**
Q Do you see where it says meeting adjourned 7:30?
A **Yes.**
Q So you indicated the meeting started as -- as advertised at 7 p.m.?
A **Right.**
Q And I had asked you earlier if you knew how long the meeting lasted, correct?
A **Yes.**
Q Now, that would indicate that the meeting lasted a half hour. Does that sound right to you?
A **Yes, it does.**
Q Now, these minutes do not indicate who was present at the meeting, correct?
A **That's exactly right.**
Q Is that because you have a separate attendance sheet that would indicate who was present at the meeting?
A **No, I probably didn't have an attendance sheet then.**
Q Earlier you testified that you now keep an attendance sheet to record who's present at the township

66

meetings, correct?
A **Yes.**
Q When did you start doing that?
A **January, February this year, something like that.**
Q Why did you start doing that?
A **Because I cannot remember everybody that's there. And when people ask me, I don't know so that's why I did that.**
Q You don't record them in the minutes, who's there?
A **No.**
Q You don't record who's at the meetings ever until this January?
MR. SHERR: Objection, asked and answered and it's argumentative. You can answer.
THE WITNESS: No.
MS. MONTGOMERY: Thank you.
BY MS. MONTGOMERY:
Q Now that you're looking at these minutes and thinking about this meeting, does that help you recall who was present at this meeting?
A **Other than the supervisors you're saying?**
Q Yes.
A **I don't have any idea.**

67

Q Does it help you recall whether there were any members of the public present at the meeting?
A **No, I can -- usually there is, but I can't tell you from looking at this if there was anybody there.**
Q Let's talk about the procedures that the board of supervisors uses in connection with enacting ordinances. Are you familiar with that?
A **I don't know what you want -- I don't know what you mean.**
Q What I mean is the process, what process does the board of supervisors use in connection with enacting an ordinance? What steps do they have to take?
A **I know it has to be advertised, okay. It has to be made available to the public. That's all I know that -- and it's got to be passed at a meeting and put down in the minutes.**
Q I mean, I think you testified earlier in connection with describing your duties as the secretary and the treasurer that you keep all the business of the township and that you basically keep track of all the things that the township has to do and you said -- and the record will speak for itself, but I think you described it to me as there are a lot of things that you have to do, say to get grants or to do this or to do that and you keep all that stuff organized for the township supervisors; isn't that correct?

68

A **That is correct.**
Q So in connection with what the board of supervisors has to do in enacting an ordinance, do you have some sort of a file or something that helps you help them make sure that they're doing what they're supposed to do in enacting an ordinance?
A **No.**
Q Why is that?
A **We've only done these three ordinances and they were taken care of by Larry Newton.**
Q So you weren't involved in it at all, discussing --
A **I don't know what -- repeat the question.**
Q You weren't involved in saying, okay, now we have to do this to make sure that we -- you know, do whatever we have to do to get the ordinance enacted, you weren't involved in that?
A **I talked to Larry Newton about it, yes, and I think I talked to the county planner about it.**
Q Do you remember the substance of those conversations?
A **I think I asked him for the routine we needed to do and Larry took care of it.**
Q You asked Larry Newton for the routine that you had to do?

69

A **Yes, and for the county -- and to the county planner.**
Q And the county planner?
A **Um-hum.**
Q When you say the county planner, are you referring to Richard Stahl?
A **Yes.**
Q What did Larry Newton tell you that you had to do in connection with the ordinance?
A **You mean other than advertising the ordinance and making it available?**
Q Right.
A **Just exactly what I told you before, that's what he told us to do.**
Q Do you recall anything else, that's all I'm asking you?
A **No.**
Q How many occasions did you talk to Larry Newton about the enacting of a subdivision and land development ordinance?
A **I have no idea.**
Q You can't remember?
A **No.**
Q Can you say you talked to him frequently or infrequently? Can you narrow it that way?

A **Probably infrequently.**
Q Over the course of how many years?
A **Over the course of how many years?**
Q Yes.
A **I don't know what you're asking.**
Q Well, I'm asking you how often you talked to Larry Newton about the enactment of a subdivision and land development ordinance and you said probably infrequently. And I'm asking you infrequently over the course of how many years?
A **Okay, probably in the beginning of -- I don't know. I don't know how many times I talked to him.**
Q Did you have occasion to talk to Larry Newton about the Corneal property?
A **Yes.**
Q Can you recall how many times you talked to Larry Newton about the Corneal property?
A **No, I can't.**
Q Did you ask Larry Newton to give you some guidance or advice about how to deal with the Corneal property?
A **No.**
Q What did you talk to him about in connection with the Corneal property?
A **I can't remember -- we talked to him about the**

**lawsuit, I know that.**
Q About this lawsuit you mean?
A **This lawsuit and the state lawsuit, the lawsuit we initiated.**
Q Do you recall talking to him about the Corneal property prior to the initiation of the lawsuit?
A **Yes, we did do that.**
Q Was Larry Newton generally aware of what was going on with the Corneal property prior to the initiation of the lawsuit?
A **I don't know. I can't answer that.**
Q Do you have reason to believe in your interaction with Larry Newton that he knew generally what was going on in connection with the Corneal property between the Corneals and the township?
A **I don't really know whether Larry did or not.**
Q Well, let's try and just, you know, back up a second and maybe we can jog your memory somehow. You indicated that you know that you spoke with Larry Newton prior to initiation of the lawsuits about the Corneal property, correct?
A **Yes, we did.**
Q On what occasions? At township meetings?
A **No, he was not at the township meetings.**
Q On what occasions then?

A **It would have to be on the telephone.**
Q On the telephone between you and him?
A **Well, it could have been between me, it could have been on the speaker phone with one of the supervisors. You know, we've talked about things.**
Q You recall both occurrences?
A **Yes.**
Q Conference calls with the supervisors and Larry and you and conversations separately between you and Larry, correct?
A **I said supervisor.**
Q Supervisor. Which supervisor?
A **I don't know. I don't know if they were all there. I'm just saying that's what I said. I don't know.**
Q Well, give me an idea of how you would come to talk to Larry about the Corneal property? Would you call him up?
A **Most of the time he called us because the information went from Jim Himes to Larry and then through Larry to us.**
Q Who is Jim Himes?
A **He was a -- I think it's Jim Himes. He was an attorney that Mr. Corneal was using in Huntingdon.**
Q So you're saying that Larry would call you and say I've spoken to Jim Himes and this is what I understand

to be going on with the Corneals?
A **No, what I'm saying is we got information from Larry, like the first document we got came to Larry from -- I guess it -- I think it was either him or Simpson. I'm not sure how it got to Larry.**
Q Who is Simpson, who are you referring to?
A **The surveyor I believe that did the original survey.**
Q When you say the first document, what do you mean the first document?
A **We had a land -- a plot plan.**
Q So that went to Larry and then came to you?
A **Yes, but I'm not sure how Larry got it.**
Q So prior to the lawsuit which was initiated last summer, summer 2000, July 2000 --
MR. CORNEAL: July.
BY MS. MONTGOMERY:
Q Can you estimate how many times you talked to Larry Newton about the Corneal property?
A **I don't recall.**
Q Was it more than twice?
A **Oh, I'm sure it was more than twice.**
Q Do you think it was more than 10 times?
A **I doubt it.**
Q Do you think it was more than five?

A I don't know.
Q But you're sure it was more than two?
A Yes. I talked to him more than twice.
Q Do you recall what you talked to him about?
A Not really. I've talked to Larry about a lot of things with the township.
Q Now, you mentioned that you remember being on a conference call with Larry and at least one of the other supervisors, one of the supervisors, correct?
A Yes.
Q Do you recall what you talked about to Larry during that meeting or what anybody talked about to Larry during that meeting?
A I think that was after the lawsuit was served.
Q Did you or the supervisors to your knowledge initiate any separate meetings with Larry -- or have any separate meetings with Larry, I should say. Have any separate meetings with Larry to discuss the Corneal property prior to the lawsuit?
A Prior?
Q Yes.
A I can't -- I can't recall that either.
Q Have you ever been at a township meeting where Mr. Corneal was present?
A Twice.

Q Twice?
A That I recall.
Q You recall twice. Do you recall when those times were?
A I think it was February and April. It's in the minutes.
Q February and April of --
A Or maybe it was February and March or January and March.
Q Of 2000?
A Yes, it was either January and March or -- yeah, maybe that's when it was.
Q Do you recall what happened at those meetings?
A Yes.
Q Can you tell me what happened at the February -- let's start with the February meeting?
A Was it February?
(Pause.)
THE WITNESS: In -- what's the date, February -- February 7th when Mr. Corneal came and asked the supervisors to sign his subdivision ordinance -- or his subdivision -- I'm sorry, to sign his subdivision plan.
BY MS. MONTGOMERY:
Q In February of 2000?
A Correct.

Q Do you recall what happened at that meeting?
A Yes, they told him that there was a moratorium and we wouldn't be signing -- approving any more subdivisions.
Q Do you recall any contact with Mr. Corneal prior to that February meeting?
A I really don't.
Q You don't recall speaking with him?
A No, I don't.
Q Do you recall him being at any other meetings?
A No.
Q So let's talk a little bit more about that meeting, okay. Mr. Corneal came in, who else was present?
A The supervisors.
Q Anybody else?
A I don't -- there was people there, but I -- I'm sure. I don't know who they were.
Q Do you recall how many people were there?
A There's usually -- there's usually four, but I can't swear who they were.
Q Is it typically the same four people?
A Yes.
Q Who are they?
A Denson Groenendaal. Rick Saunders, and I can't swear to that because he was ill for a long time, but

he normally is there. And it's usually Barb Hawbaker and Bet White, but I can't swear that any of those were there. I don't know. And maybe Mike Koch.
Q Mike Koch?
A Maybe. I don't know.
Q So those four individuals that you mentioned earlier are usually there. Is Mike Koch sometimes usually there or what?
A Sometimes he's there, sometimes he's not.
Q Anybody else there from time to time?
A Mr. Corneal.
Q Anybody else?
A I can't remember.
Q The four individuals that you named earlier and Mr. Koch, have they been attending township meetings for a long time?
A Sometimes.
Q Well, the question is a little different than that. Is their attendance -- does their frequent attendance, as I think you described it, go back several years?
A Yes.
Q Does it go back all six years you've been with the township?
A No.

Q When did it start?
A **I don't remember when they started --**
Q Do you know why these particular people always attend township meetings?
A **I would say because they're interested in what's going on in the township.**
Q Are they the only people that attend township meetings or are there others in addition to them from time to time?
A **Sometimes there will be other people.**
Q Do you ever recall -- do you know who the Hewetts are?
A **Yeah, I do. I do know who the Hewetts are.**
Q Do you recall the Hewetts being at any township meetings?
A **They might have been, I don't know. They might have been at that meeting. I'm not sure.**
Q Do you recall them being at one meeting, more than one meeting?
A **I remember that they were at -- they were definitely in the April meeting.**
Q They were definitely in the April meeting?
A **I remember that.**
Q Why do you recall that?
A **Because that was the night that Mr. Corneal**

**said he was not subdividing and they were sitting there and I remember that. And they -- I don't know what ...**
Q That meeting that they were at, that April meeting, do you recall who else was there?
A **No. It could have been the same group.**
Q At the February 7, 2000 meeting you indicated that Mr. Corneal presented his proposed subdivision plan to the township supervisors, correct?
A **Right.**
Q What happened to the subdivision plan? Did he hand it to them?
A **No.**
Q He didn't hand it to them?
A **No.**
Q What did he do with it?
A **He took it with him.**
Q He never handed it over to any of the township supervisors?
MR. SHERR: Objection. It's been asked and answered. You can answer.
MS. MONTGOMERY: I want to make sure she understands the question.
THE WITNESS: They may have looked at it. I'm not sure. I can't remember if they looked at it and -- but we did not keep it.

BY MS. MONTGOMERY:
Q Why not?
A **I don't know. I don't remember what the -- I just know what was here, okay, so -- but it never stayed with the supervisors. If they looked at it that night, I don't remember that.**
Q Did they hand it back to him?
A **Yes, it never stayed with us.**
Q Did Mr. Corneal ask them to keep it, do you know?
A **No, not that I'm aware of.**
Q What else happened at that February 7, 2000 meeting, if you recall?
A **Other than what's in the minutes?**
Q Well, anything that you recall.
A **I don't recall anything other than what's in the minutes.**
Q Did the supervisors know that Mr. Corneal was going to bring his subdivision plan into that meeting?
A **I don't know that either.**
Q Did you know?
A **I can't remember ever talking to Mr. Corneal until this point.**
Q Do you recall talking to anybody else about Mr. Corneal prior to that February 7th meeting?

A **No, I don't.**
Q Now, you had mentioned that there was -- you keep an agenda, right?
A **Yes.**
Q Was Mr. Corneal's subdivision plan on the agenda for that meeting?
A **I don't remember that, I don't.**
Q You mentioned earlier that you recall the Hewetts being at the April meeting.
A **I do.**
Q Did you have occasion to talk to the Hewetts before the meeting?
A **John Hewett called and asked if the meeting was on that day and I -- you know, if we were having our regular meeting and I said yes.**
Q So you knew they were going to be there?
A **He didn't -- well, I knew he called to ask about the meeting, that's all I knew.**
Q I'm going to give you a document that we're going to mark as Wirth Exhibit 5. Let me give a copy to the court reporter.
(Minutes dated 2/7/00 produced and marked as Wirth Exhibit No. 5.)
BY MS. MONTGOMERY:
Q I'd ask you to identify it for the record,

please.
A **It's the minutes from February 7th, 2000.**
Q Now, as you're looking at those minutes, there's a reference to Denny Grandthal, is that --
A **Groenendaal.**
Q I'm sorry?
A **That's Denny Groenendaal. I have it spelled wrong here.**
Q Denny Groenendaal?
A **Right.**
Q Presented a copy of the concerns and opinions of the taxpayer's associations on the proposed subdivision ordinances, right?
A **Yes, he did.**
Q Do you have a copy of those concerns and opinions?
A **Yes.**
Q Did you provide them in connection with your search for documents for this lawsuit?
A **You didn't ask me for those.**
Q You do have a copy of them now, you said, right?
A **Pardon?**
Q You do have a copy of them in your files, right?

A **Yeah, I believe I did see those when I went through the files.**
Q Do you recall anything about those concerns and opinions?
A **No.**
Q So there was discussion at this February 7th meeting about this proposed subdivision ordinance?
A **Obviously.**
Q You don't recall anything about it?
A **No, I don't, other than what's here.**
Q Now, at this February 7, 2000 meeting you indicated that the township supervisors told David Corneal that there was a moratorium in place, correct?
A **Yes.**
Q A moratorium on what?
A **Approving subdivisions.**
Q And when did that moratorium go into place?
A **At the January meeting.**
Q Was there some sort of a resolution or something indicating that the moratorium was being placed?
A **No, it's only in the minutes.**
Q It's only in the minutes. Was the moratorium discussed at any earlier meetings?
A **I don't recall.**
Q But you do recall that there's no resolution

or other written document concerning the moratorium, correct?
A **Yes, I do recall that.**
Q So do you recall -- I'm not sure if I asked you this question and I apologize if I already did, but I'll ask you again. Do you recall when the moratorium was first discussed at a township meeting?
A **The January meeting.**
Q That was the first time?
A **That's when it's in the minutes. I don't recall that it was discussed beforehand.**
Q You only missed one meeting, correct?
A **Yes.**
Q So if it was discussed, it would be in the minutes, correct?
A **It should be.**
Q Now, was there any discussion about the moratorium prior to the January meeting informally among the supervisors and you?
A **I don't recall.**
Q Well, I'll just ask you more generally. Do you recall discussing the moratorium at any time other than at the January meeting?
A **No.**
Q With anybody?

A **No.**
Q You didn't?
A **Well, I can't say anybody.**
Q Why is that, why can't you say anybody?
A **I don't know if I did.**
Q Because you just don't remember?
A **I just don't remember.**
Q Do you know what Mr. Corneal said at the February meeting in response to the supervisors telling him that there was a moratorium in place?
A **No. Other than what's in my minutes, I don't remember.**
Q If I tell you that Mr. Corneal told the supervisors that the moratorium was illegal, does that jog your memory at all? Do you recall him --
A **I don't remember him saying that.**
Q You don't recall him saying anything --
A **Other than what I have in my minutes, I don't recall.**
Q Now, you mentioned that at the April meeting the Hewetts were present, correct, and that they -- that John Hewett had called ahead of time and asked what was on the agenda, correct?
MR. SHERR: Objection.
BY MS. MONTGOMERY:

Q What did you say?
MR. SHERR: Objection. It's been asked and answered and you're misstating testimony now on the record, misstating the witness's testimony. You can answer it.
THE WITNESS: What are you asking me?
MR. SHERR: She's asking you what Hewett said when he called up.
THE WITNESS: He just wanted to know what was on the agenda.
BY MS. MONTGOMERY:
Q Like I said, I'm just laying a little foundation so we can go back to that meeting, okay. If ever I mischaracterize anything you say earlier, you should correct me because I don't want to do that, okay?
A **Okay.**
Q In the course of that conversation did you have any -- you know, how long was that conversation with John Hewett?
A **I don't remember.**
Q Do you know John Hewett's wife?
A **I don't know as he has a wife.**
Q Or his --
A **I don't know the situation there. I don't know. I don't want to misstate that because I don't know.**
Q Well, we call them the Hewetts.

A **I probably did and that's probably like the 7th, I did that wrong, but I don't know that.**
Q Do you know the woman who keeps company with John Hewett?
A **I've only ever seen her one time.**
Q Do you know her name, her first name?
A **Joanne Smith, I think it is. Smith is her last name.**
Q Joanne Smith, okay. Did she come to the meeting with John Hewett in April?
A **I think she was there that night.**
Q Did you have any discussions with the Hewetts prior to the meeting other than the telephone call that he placed to you?
A **No.**
Q No informal discussion, no chitchat?
A **No.**
Q What about after the meeting?
A **I think she came up to me and talked to me, either she or -- or one of them did. I think it was her.**
Q What did they talk about?
A **She introduced herself to me that night.**
Q Do you recall what they talked to you about?
A **They were asking -- they were asking how soon we were going to pass the subdivision ordinance.**

Q Did they tell you why they were interested in knowing how soon that you --
A **No.**
Q Did you understand why they wanted to know?
A **I don't know what you want me -- I don't know what you're asking me.**
Q I'm asking you if you understood why they were asking you about how soon you were going to pass the subdivision ordinance?
A **I probably did.**
Q You probably did understand?
A **Yes.**
Q What was your understanding?
A **That they were going to move into the neighborhood, you know, and they wanted to know about the subdivision ordinance and when we were going to approve it.**
Q Do you know why they wanted to know that, though?
A **No, I don't know that.**
Q Do you know where they were going to move?
A **Yes, in Mr. Corneal's farmhouse.**
Q Do you know how they were going to go about moving into Mr. Corneal's farmhouse?
A **I have no idea.**
Q Do you know whether they were going to

purchase Mr. Corneal's --
A **I do know they were going to purchase it.**
Q Do you know if they were going to purchase the farmhouse and anything else?
A **Yes, it was on the plot plan. They were going to purchase the farmhouse and some acreage.**
Q So in April 2000 you understood that that was why they were asking about the subdivision ordinance?
A **Right.**
Q Do you recall any other aspects of that conversation --
A **No.**
Q -- any more specifics?
A **No.**
Q Let me finish my question. It's for her sake.
A **I'm sorry.**
Q Did they express any concern to you about their purchase of Mr. Corneal's farmhouse?
A **Not that I recall.**
Q Did you notice whether or not they talked to any of the supervisors?
A **They might have. I don't know. I'm usually closing my books so I don't know.**
Q I'm going to show you a document that we're going to mark as Wirth Exhibit 6.

(Minutes dated 1/4/00 produced and marked as Wirth Exhibit No. 6.)

BY MS. MONTGOMERY:

Q Do you recognize this document that we've marked as Wirth Exhibit 6?

**A I do, but I don't recognize the writing that's on the bottom. I don't know where that came from.**

Q That was one of my questions for you, thank you. Now, am I correct in saying that this was the meeting in which the moratorium was approved --

**A Yes, you are.**

Q -- or passed or a resolution --

**A Yes, you are.**

Q Do you have any documents in your office about the moratorium that you didn't produce?

**A No.**

Q Do you know whether any documents exist related to the moratorium?

**A No.**

Q You don't know?

**A No.**

Q Or they don't exist? I'm just asking --

**A They don't -- this is it.**

Q They don't exist?

**A Right.**

Q So I notice here that the meeting opened at 7:10 p.m., correct?

**A No, there's another section to this. You don't have both sections.**

Q What is the other section?

**A It's the reorganizational meeting where we do all the appointing of the supervisors and state what our tax rates are going to be and all that and you don't have the other section here.**

Q So was this the meeting -- the meeting started at --

**A That started at seven and this one started at 7:10.**

Q Was the meeting started at seven open to the public?

**A Always.**

Q Always, okay. Do you have separate minutes for that meeting?

**A Yes.**

MR. SHERR: And they have been provided.

BY MS. MONTGOMERY:

Q So it looks like the regular meeting at which the moratorium was discussed lasted from 7:10 to 7:35 p.m., correct?

**A Yes.**

Q Thank you. Do you know whether they advertised -- or did you advertise this particular meeting on January 4, 2000 where the moratorium was discussed?

**A I didn't advertise it.**

Q Do you know whether anybody advertised it?

**A I'm not sure if Larry did or not. I don't know.**

Q Did you put one of those notices on the township or -- it's the firehouse door, right?

**A Yes.**

Q Did you put one of these notices on the firehouse door?

**A For what?**

Q About the fact that the moratorium was going to be discussed.

**A Probably not.**

Q Did you talk to Mr. Newton about the moratorium prior to this January meeting?

**A I probably did.**

Q You probably did?

**A Yes.**

Q Why do you think you probably did?

**A I would have wanted to know what to do.**

Q You would have wanted to know whether it was okay to do the moratorium you mean?

**A I don't know what you're asking me.**

Q Well, you said you would have wanted to know what to do. I'm just trying to get a feel for -- what do you mean? You wanted to know what to do. You wanted to know whether to advertise it or was it okay to do the moratorium or what?

**A I don't know if I would have asked him about the advertisement. I don't know if I would have done that, but I probably would have asked him about this, if it was all right to put it in the minutes.**

Q If it was okay to put the existence of the moratorium in the minutes?

**A Yes.**

Q Would you have asked him whether it was okay to impose the moratorium?

**A I'm not sure I asked him that.**

Q You don't recall?

**A No.**

Q You had mentioned earlier that you did research for the supervisors?

**A Sometimes.**

Q What kind of research?

**A I would ask questions about -- well, I call to see what stone rates are and all those kind of things.**

Q You call and find out what procedures you have

to follow? I mean --
A **Sometimes.**
Q Do you call Larry Newton to find out what procedures you would have to follow?
A **If they ask me to.**
Q Have you done that in connection with the subdivision and land development ordinance?
A **Some things, some parts of it.**
Q You've called Larry Newton and asked is this okay or is that okay?
A **I'm not sure I've talked to Larry Newton about everything. I've talked to PSATS, you know.**
Q So that's the kind of research you do for the township, just --
A **Yes.**
Q Anything? Is it just a broad range of research that you do?
A **When it's needed I do that.**
Q Do you know whether the supervisors talked to Larry Newton about the moratorium?
A **You'll have to ask them.**
Q Was Larry Newton present at the meeting?
A **No.**
Q Why do you recall that?
A **Because Larry never comes to the meeting**

**unless I request him.**
Q And you didn't request him to come to this meeting?
A **No.**
Q I'm just going to try, you know, and ask you some questions just so you can try and remember a little bit more about discussing the moratorium. Maybe it won't work, maybe it will work, but I just want to try to get as much factual information as I can so we can understand the moratorium.
Is there anybody else that you recall asking about the moratorium prior to the day it was passed?
A **Like who?**
Q I'm asking you, anybody.
A **I don't remember anybody asking me about the moratorium.**
Q Did you discuss it with the township supervisors?
A **We would have discussed it, yes.**
Q In what capacity, in what context?
A **I don't know.**
Q You mean over the telephone?
A **I don't remember if we would have talked about it over the telephone or at the meeting. I'm sure we've discussed it. I just don't remember when.**

Q Well, there's no -- if you had discussed it at prior township meetings, it would be reflected in the --
A **It would be in the minutes.**
Q Right. So if it's not in the minutes, it wasn't discussed, right?
A **Right.**
Q Now, I just want to ask you, do you recall who first brought up the idea of the moratorium?
A **I don't.**
Q You don't know whose idea it was?
A **No.**
Q Was there one particular supervisor who was -- in your memory who was a proponent of the moratorium more than any other supervisor?
A **No, I cannot remember anybody being that.**
Q Now, do you recall any specifics about discussions of the moratorium at the January meeting?
A **Other than what's in my minutes?**
Q Yes.
A **No.**
Q Do you recall who else was present at the January meeting?
A **All the supervisors.**
Q Anybody else?
A **Me. I'm not sure about Dave Van Dommelen. I**

**don't know. I don't know.**
Q Do you recall whether there was any member of the public present?
A **I don't know if Mr. Corneal was there or not. I don't know. I guess it says he was, right? No, he wasn't at the January meeting. It doesn't say that. I don't know.**
Q In your minutes it indicates that -- in the minutes of your January 4 meeting, which I guess is Exhibit 6, it states that the supervisors stated that no more subdivisions will be approved. Do you know which supervisor said that? I mean, they didn't say that in unison, right? One supervisor reported that, correct?
A **I don't -- that is just that they all agreed on it. They all agreed. So no one in particular, they just all agreed, and that's what I wrote down there.**
Q So it's just a summary of what they stated?
A **Right.**
Q At the township meetings does one supervisor sort of take the lead or, you know, act as the chair of the meetings or anything like that?
A **There is a chair.**
Q And who is that?
A **In 2000 it was Ralph Weiler.**
Q So does he sort of lead the agenda? Does he announce the items on the agenda for discussion or do you do

that?
A **He does that.**
Q What's his role as chairman exactly? What all does he do?
A **He leads the meeting.**
Q When he leads the meeting -- so he says now we're going to talk about X and now we're going to talk about Y?
A **Yeah.**
Q Do you recall him doing that that night?
A **No.**
Q In your minutes it also refers to as soon as we get the review from the planning commission. What are you talking about, the review from the planning commission? Do you recall?
A **The review from the planning commission would be one of the reviews from -- for the subdivision packet that we had put together.**
Q You had put together a packet?
A **Yes.**
Q Did the packet include anything about the moratorium?
A **I don't recall.**
Q It says that the supervisors state that no more subdivisions will be approved. Was it put to a formal

vote or anything?
A **I don't recall whether they passed a motion or -- that's what I wrote down.**
Q You don't recall whether they said all in favor say aye?
A **This is what I wrote and this is what I can testify to.**
Q Typically when they do something like this, do they do it sort of like all in favor say aye, all in favor say no and --
A **Yes, they typically do. And I did not write that down.**
Q If you didn't write it down, does that mean it didn't happen?
A **No.**
Q Now, there's another sentence in here that says that the county is now doing the boiler plate subdivision ordinance in these minutes.
A **Yes, they are.**
Q But Jackson Township had already put a lot of time into the purpose -- do you mean proposed?
A **Yes.**
Q Proposed ordinance. What do you mean by a lot of time?
A **Two years.**

Q What did you do in that two years?
A **We got subdivision ordinances from different areas and looked to see what we felt was unique to Jackson Township because we are a unique area there. And we took pieces from this subdivision and that subdivision and we put them together to meet the needs of our township.**
Q Who did that work?
A **The supervisors.**
Q Did you help?
A **Yes, I read a lot of subdivision ordinances.**
Q So did you have discussions with them over the telephone about I like this -- part of this subdivision ordinance and not that part of that other subdivision ordinance?
A **Whether I liked something or not?**
Q Whether you thought it would work for Jackson Township or not.
A **That's not my decision.**
Q You read a lot of subdivision ordinances, though?
A **Yes, I did.**
Q Do you recall what subdivision ordinances you read?
A **We had -- we had one from Porter Township, we had one from Miller Township, we had one from -- our**

**engineer gave us kind of a boiler plate one. We had one from Tell Township and there was one from Lancaster County.**
Q Who is your engineer?
A **At the time it was EADS.**
Q How do you spell that?
A **E-A-D-S, all caps.**
Q So why were you the one reading the ordinances?
A **We all were reading them.**
Q All the township supervisors and you were reading them?
A **Yes.**
Q And then you would discuss them?
A **Yes.**
Q What, would you hold special meetings to discuss them or telephone conference calls or what?
A **We had workshops to gather information on them.**
Q Were they informal workshops --
A **Yes.**
Q -- that the group of you just all got together?
A **Yes.**
Q Where did you get together?
A **Usually in my office.**

Q So do you have records of all those meetings that you held?
**A No, they're not -- they were just workshops for gathering information.**
Q Did you keep notes at those meetings or anything?
**A The only notes I would have had I would have written alongside of whatever we did and ...**
Q I'm going to show you another document that I'm going to mark as Wirth Exhibit 7, the April 3, 2000 minutes of the Jackson Township supervisor meeting.
(Minutes dated 4/3/00 produced and marked as Wirth Exhibit No. 7.)
BY MS. MONTGOMERY:
Q Now, can you review these minutes for me?
**A Sure.**
Q Can you identify them for the record?
**A Yes, April 3rd, 2000 minutes, Jackson Township Board of Supervisors.**
Q Now, take a moment and review them and see if it helps you remember what went on at the meeting that night. Now, this April 3rd meeting, is this the meeting that the Hewetts were present at, correct?
**A Yes.**
Q Who else was present?

**A Well, I can see here Art Walters was there, David Corneal and I don't -- I remember Denson Groenendaal was there that night.**
Q And why do you remember that?
**A Because he spoke to Mr. Corneal that night.**
Q He spoke to him in the course of the meeting?
**A No, I think it was after.**
Q So you overheard that conversation?
**A No, I just saw them talking and I remembered that. I don't know why.**
Q Anything else you remember about the meeting?
**A No.**
Q Now, these meetings would indicate that Mr. Corneal at the April meeting discussed his sewage module, right?
**A Yes, he did.**
Q Do you know whether this was the first time Mr. Corneal ever came to a meeting and discussed his sewage module?
**A To the best of my knowledge.**
Q To the best of your knowledge it was?
**A Um-hum.**
Q Your minutes indicate that he complained that the supervisors would not sign his sewage modules; is that right?

**A That's right.**
Q What did the supervisors respond to him in response to that complaint?
**A Just what I have here.**
Q Well, try and remember what they said to him, if you can.
**A That they couldn't approve the septic modules, the sewage module.**
Q Now, your minutes indicate that they said that even though he told them that he was not going to subdivide, okay, that they still wouldn't issue him a building permit or approve the sewage module; isn't that correct?
**A Let me see what it says here. What's in my minutes is what happened.**
Q Okay, that's fair. Your minutes indicate that they said they are not going to issue a building permit for a property that they know is going to be subdivided. How did they know it was going to be subdivided?
**A Because at a prior meeting he -- he had a plot plan in his hand, and I guess that was the February meeting.**
Q So was there a discussion between the February meeting and the April meeting about Mr. Corneal's desire to subdivide?
**A Discussion with who?**
Q With you and the supervisors.

**A Not that I'm aware of.**
Q During this period of time were you still meeting to discuss the subdivision ordinance, the proposed subdivision ordinance?
**A It was probably being typed then so I doubt -- I don't know.**
Q How many times did you and the supervisors have workshops to discuss the subdivision ordinance?
**A I have no idea.**
Q You can't remember at all?
**A No. It went on over a long period of time.**
Q Do you recall speaking yourself at the April meeting?
**A I probably did.**
Q You probably did?
**A (Witness nods head affirmatively.)**
Q Do you usually speak at the meetings?
**A Sometimes.**
Q Now, I know that you said that you don't have a vote, correct?
**A I do not have a vote.**
Q But you do speak at the meetings about township business?
**A Sometimes.**
Q And you offer your opinions about township

business?

A **Sometimes.**

Q Do you recall speaking at this meeting?

A **No.**

Q You don't recall anything? Do you recall telling Mr. -- she shook her head. It should say no.

A **I didn't think you were done yet.**

MR. SHERR: And it shouldn't say no if she didn't say no.

MS. THORP: Can we go off the record for one moment?

MS. MONTGOMERY: Yes.

(Discussion held off the record.)

BY MS. MONTGOMERY:

Q At the April meeting do you recall speaking directly to Mr. Corneal about his sewage modules or about his proposed subdivision?

A **I might have. I don't remember.**

Q Well, do you have an opinion about whether or not Mr. Corneal can build on his property even if he doesn't subdivide?

A **No.**

Q You don't have an opinion about that?

A **No.**

Q Do you have an opinion about whether or not

Mr. Corneal can build a second property -- a second house, dwelling, on his property?

A **I don't have an opinion, no.**

Q Do you have a belief about whether or not he can do it?

A **No.**

Q Did you ever express an opinion or a belief about whether or not he could do it?

A **I don't recall.**

Q Do you have an opinion about whether or not building a second dwelling on the property turns it into a subdivision?

A **I don't have an opinion, no.**

Q Do you have a belief about it?

A **No.**

Q Have you ever expressed anything about it?

A **I might have.**

Q What makes you think you might have?

A **Because of what's in the Sewage Facility Act.**

Q What's in the Sewage Facility Act?

A **That if there's more than one dwelling on a property, it constitutes an equivalent subdivision. And I may have said that, I don't know.**

Q You may have said that when?

A **I don't know. You asked me if I had a belief**

**or I had an understanding and that's what I understand.**

Q And I don't want to use the wrong word. If I say an opinion or a belief and you want to call it something else like an understanding, then you should just tell me that because I'm just trying to --

MR. SHERR: No, you should answer her questions.

BY MS. MONTGOMERY:

Q And if you don't understand my question correctly and you could answer if it was better stated, you should tell me that, okay?

MR. SHERR: If you don't understand her question, ask her to clarify.

THE WITNESS: All right.

BY MS. MONTGOMERY:

Q So I've asked you some questions about whether or not you have a belief about certain things so I'm going to back up and ask you if you have an understanding about certain things, okay?

A **I have an understanding.**

Q You have an understanding --

MR. SHERR: Let her ask the questions.

BY MS. MONTGOMERY:

Q You just said you have an understanding. What do you have an understanding about?

A **You have to ask me the question again.**

Q Okay. Do you have an understanding as to whether or not Mr. Corneal can build an additional house on his property?

A **I do.**

Q And what is your understanding?

A **From the Sewage Facility Act, if there's more than one property on an existing plot of ground, it's an equivalent subdivision.**

Q Well, then do you have an understanding as to whether or not Mr. Corneal can subdivide his property?

A **Anybody can subdivide their property.**

Q Did you ever discuss this equivalent subdivision idea with Larry Newton?

A **I don't understand what you're asking me.**

Q Did you ever discuss your understanding of what constitutes an equivalent subdivision with Larry Newton?

A **I don't recall.**

Q Did you ever discuss it with the township supervisors?

A **I probably did.**

Q And what makes you think you probably did?

A **Because the subject comes up by land owners so we probably did.**

MS. MONTGOMERY: I think we need to take a break for a minute.

(Luncheon recess taken.)

MR. SHERR: Counsel for plaintiff has asked me to repeat my statement yesterday with respect to the 30(b)(6) notice. The 30(b)(6) notice stated the subject matter as all persons who -- or a person who has knowledge or information regarding matters relating to the defense of this claim.

In that that designation did not reasonably -- with reasonable particularity state the matters on which these admonitions are requested, we were objecting to that designation and to the extent that -- to the extent of the broadness of that designation, for the time being and subject to that objection, we are designating all of these witnesses as those who have knowledge of the matter or the defense.

MS. MONTGOMERY: For the record, I did not ask Mr. Sherr to repeat his statement on the record. I asked him to tell me off the record are all the witnesses 30(b)(6) witnesses because that's what he indicated yesterday. I was asking if he was sticking with that position and I believe that what you said is yes, all the witnesses are 30(b)(6) witnesses; is that correct?

MR. SHERR: I've made my statement.

MS. MONTGOMERY: It's a simple yes or no question.

MR. SHERR: Okay.

MS. MONTGOMERY: Okay, is this witness a 30(b)(6) witness?

MR. SHERR: I've made my statement.

MS. MONTGOMERY: Is this witness a 30(b)(6) witness, Tony? It's not a game. Is this witness a 30(b)(6) witness?

MR. SHERR: I'm not playing a game. I've made my statement. If you would like to -- if you would like to make a note of a particular designation, then I will tell you particularly, but I can't do that based on the broadness of the designation. So, therefore, I'm sticking by my statement.

MS. MONTGOMERY: Are you sticking by the statement that you put on the record yesterday morning?

MR. SHERR: Sure.

MS. MONTGOMERY: Okay, fine. Thank you.

BY MS. MONTGOMERY:

Q You're still under oath. Miss Wirth, I'm going to show you a document that was previously marked yesterday as an exhibit. We're going to mark it again today as Wirth Exhibit 8 and I'm going to ask you to look at it for me, please.

(Order produced and marked as Wirth Exhibit No. 8.)

BY MS. MONTGOMERY:

Q Miss Wirth, have you seen this document before?

A **No.**

Q Miss Wirth, were you informed by anybody that the witnesses in this case were to be sequestered for purposes of their deposition testimony?

A **Yesterday I was.**

Q Yesterday you were informed by who?

A **You.**

Q Do you know what sequestration means?

A **We were not allowed to be in the room.**

Q Are you aware that you're not supposed to be in the room with the other deponents?

A **I am now, yeah.**

Q Well, I shouldn't say that. You're not supposed to be in the room with the other deponents while they're being -- while they're giving testimony, correct?

A **Yes.**

Q Have you discussed your deposition testimony with anybody since this morning?

A **No.**

Q Have you discussed anybody else's deposition

testimony with anybody since yesterday?

A **No.**

Q Do you understand that you're not supposed to discuss your deposition testimony with any of the other deponents?

A **Yes.**

Q Until all the depositions are finished?

A **Yes.**

Q Have you complied with that?

A **Yes.**

Q Have you been in a room with any of the other deponents in a situation where you could discuss your deposition testimony since this order was entered yesterday?

A **In a room, no.**

Q In any situation?

A **Yes.**

Q What was that situation?

A **It was in a car.**

Q Who did you have lunch with?

A **Tom Wilson.**

Q Did you discuss your deposition testimony with Mr. Wilson?

A **No.**

Q You had lunch with Tom Wilson today, though, right?

A **Yes.**
Q Was anybody else present?
A **No.**
Q Thank you. I'm going to show you a document that we will now mark as Wirth Exhibit 9 and ask you to look at it and identify it for me, if you can.
MS. MONTGOMERY: Tony, do you have another copy of this document?
(Discussion held off the record.)
(Subdivisions reviewed by HCPC produced and marked as Wirth Exhibit No. 9.)
BY MS. MONTGOMERY:
Q Did you have occasion to discuss with any of the supervisors or the sewage enforcement officer, Mr. Parks, bringing documents to their depositions? And I'm talking about before the order was entered yesterday.
A **Bringing documents down?**
Q To the deposition.
A **No.**
Q Did you tell anybody not to bring documents to the deposition?
A **No, I did not.**
Q Did anybody tell you not to bring documents to the deposition?
A **No.**

Q Then just to make sure that I've asked the questions as clearly as possible, did you discuss with the supervisors whether or not you ought to bring any documents to the deposition?
A **I honestly don't think we ever did.**
Q What's the box number that you receive township mail at?
A **389-A.**
Q And your home box number?
A **390.**
Q We're back with Wirth Exhibit 9. Have you had a moment to look at that?
A **Yes.**
Q Do you recognize the document?
A **Yes, I do.**
Q Did you prepare it?
A **No, I did not.**
Q Do you know whose handwriting that is?
A **I have no idea whose handwriting it is.**
Q Do you know who prepared it?
A **I know where it came from.**
Q Where did it come from?
A **Huntingdon County Planning Commission.**
Q And did it come from the commission in response to a request from you?

A **Yes, it did.**
Q So you put the request into whom, Richard Stahl?
A **Yes, I did.**
Q How did you receive this document?
A **Just the way it is.**
Q Was it by fax?
A **By fax to me.**
Q From the Huntingdon County Planning Commission?
A **Yes.**
Q When did you receive it?
A **Today is -- Monday or Tuesday, one or the other.**
Q Just this Monday or Tuesday?
A **Yes.**
Q When did you --
A **It must have been Tuesday, right. I think. I don't know.**
Q So exactly what did you ask for from Richard Stahl that resulted in his production -- did he send you this document?
A **Yes.**
Q Under a fax sheet from him?
A **Yes.**

Q So we don't know whether this is his handwriting or not, do we?
A **No.**
Q Do you assume that he's actually the one who put this together, though?
A **I'm assuming that somebody in his office keeps this -- this is out of a book, I believe, out of a --**
Q Okay. So you don't think that this document was put together just for purposes of your request but rather it was an existing document?
A **I assume that it's an existing document.**
Q From the Huntingdon County Planning Commission offices?
A **Right.**
Q Exactly what did you ask for from Mr. Stahl that led him to give you this document?
A **I asked him for a list of all subdivisions, minor and major, that we have sent to him and when we started to do it.**
Q Did you ask him when did we start to do it?
A **Yes.**
Q And what did he tell you?
A **He said as -- he's been there since 1980 and they've been doing it ever since.**
Q Been sending all subdivisions to Huntingdon

County for their review?
A **Review, right.**
Q What is your understanding with respect to Huntingdon County's review of proposed subdivisions in Jackson Township?
A **What is my understanding?**
Q Yes.
A **I don't know what you mean.**
Q How much knowledge do you have about Huntingdon County Planning Commission's review of proposed subdivisions that you send to the county, to the commission?
A **I have no idea what they do.**
Q You have no idea what they do?
A **No, I've never been in the office to see what they do.**
Q Are you the one that sends the subdivisions?
A **No.**
Q I mean subdivision plans.
A **No, I do not.**
Q Who sends them?
A **The individuals take them in there. The people that are asking for the subdivision, they take them to Richard.**
Q Who tells them to take them to Richard?
A **The township does.**

Q Who in the township tells them?
A **The supervisors or me.**
Q Are you generally aware of every subdivision plan that goes to the commission?
A **Generally.**
Q Do you believe that you're aware of every subdivision plan that's come into the township since you've been there?
A **Generally.**
Q Do you believe that you know whether or not every subdivision plan has been sent to the county since you've been there?
A **Yes.**
Q You think every one has?
A **To the best of --**
MR. SHERR: Object to the form of the question, asking this witness about other people's knowledge. You can answer.
THE WITNESS: Yes.
MS. MONTGOMERY: No, I asked her what she knows.
BY MS. MONTGOMERY:
Q I'm asking you what you know. Do you believe that every one has been sent?
A **To the best of my knowledge.**

Q Had you ever seen this document before --
A **No, I had not.**
Q -- before you received it from Mr. Stahl's office?
A **No.**
Q When did you ask the planning commission to send you this document?
A **When I was putting together the list of documents that you wanted for -- I thought it would be helpful.**
Q And when was that?
A **Last week.**
Q Now, these are all Jackson Township subdivisions, correct?
A **Yes.**
Q The ones that are listed on here. Okay, let's go through this list. Do you understand this list?
A **Yes.**
Q Do you understand the various categories on it?
A **Yes.**
Q So the 10/1/90 date in the left-hand corner, the first entry there --
A **Yes.**
Q -- does that refer to the date that the

subdivision was approved or what?
A **I don't know. I said I understand that. I understand the information that's on here, but I don't know why it says 10/1/90 there. I don't know if it's the date they received it or the date they reviewed it. That I don't know.**
Q Are these all requested subdivision plans or are some approved, some not approved and is it just all the subdivision plans that have been submitted; is that what this is?
A **Yes.**
Q To the commission?
A **Yes.**
Q Did you actually go down this list and read it at any time?
A **I've looked at it.**
Q In looking at it, do you know whether there are any subdivision plans that have been submitted to Jackson Township that aren't on this list?
A **Not to the best of my knowledge.**
Q Do you keep your own list of subdivision plans?
A **No, I do not.**
Q Well, do you keep your own file on subdivision -- proposed subdivisions --

A **Yes.**
Q -- submitted -- can I finish, please.
A **I'm sorry.**
Q Submitted to Jackson Township.
A **Yes, I do.**
Q In what form do you keep that file?
A **Just the way it comes to me.**
Q Do you keep a separate folder for each one?
A **No.**
Q Something like that?
A **No, they're all in a drawer.**
Q Just all in one big drawer?
A **Right.**
Q Are they organized by date?
A **They are.**
Q That's how they're organized. They're not organized by alphabetical order or anything?
A **No, by date.**
Q By date, okay. Typically what does a subdivision plan look like?
A **It's a plot plan similar to what we have here.**
Q Is there any sort of front page application or anything like that?
A **There's usually an application. There's a project narrative, there's septic information, there's a**

**topo area either on or attached to it.**
Q If there's an application, is there like a state form application or something that they fill out that is sort of a cover application for all of these --
A **There is now.**
Q There is now?
A **It's not a state form.**
Q What is it?
A **It's in the subdivision ordinance.**
Q It's in the Jackson --
A **It's the application for subdivision.**
Q Well, let me ask you this: In the Jackson Township subdivision ordinance there's an application?
A **Correct.**
Q Prior to the application was there some sort of a form, initial form that people filled out in submitting a proposed subdivision?
A **No.**
Q Was there any sort of a cover sheet or anything like that that would identify it or --
A **Whatever the engineer had on there that came to us is what we had.**
Q Now, I take it that the form has been in place since July 2000?
A **Yes.**

Q Have you received any subdivision -- proposed subdivisions that utilize that form?
A **Yes, and they're the ones that are on this list.**
Q Since July 2000?
A **Yes.**
Q So that would be six of them --
A **Yes.**
Q -- correct? So they all have front pages that you could produce to us just the front page, right?
A **Yes.**
Q Now, when Jackson Township approves a subdivision, is there any sort of separate form that you guys have come up with that indicates approval?
A **We sign on the form, on the plot plan.**
Q Now, I think, you know, we've heard testimony in this case -- I'll represent to you that we've heard testimony in this case that there were certain proposed subdivisions that had been submitted at the time that the township put its moratorium in place; is that correct?
A **Yes.**
Q Do you recall which --
A **Yes.**
Q -- those were? Which ones?
A **Glenn Hawbaker and Norman Davis, Harold and**

**Norman Davis.**
Q Glenn Hawbaker?
A **Yeah, Glenn O. Hawbaker and Carolyn McGraw and then Norman and Harold Davis.**
Q So what happened to those proposed subdivisions during the period of time that the moratorium was in place?
A **Nothing.**
Q What did you do with the actual documents that were submitted to you?
A **They -- they never submitted them. They came to us and asked us if they could do it and we told them we weren't submitting them and they have -- they kept their documents till July.**
Q And then they resubmitted them to you?
A **Yes, they did.**
Q And then they submitted them also to the Huntingdon County Planning Commission?
A **Yes. I don't know whether they submitted them before that to the county. I don't know when they did that.**
Q What about the ones that are after the Davis application? I can't really read that writing. Do you recognize that?
A **That's Keller.**
Q Was that subdivision first proposed after --

126

A **No.**
Q -- the ordinance was in place?
A **No, it was -- I'm sorry. Repeat your question.**
Q Was that subdivision first proposed after the ordinance was in place?
A **Yes.**
Q Do you recall, is 9/27/00 when it was first--
A **I don't recall if that's the exact date, but it's around that time.**
Q What's the next one say? David Simpson?
A **Oh, yeah, David Simpson.**
Q And the following one is Overhill, LLC?
A **Yes.**
Q And the following one is Darlene --
A **Sunderland.**
Q Sunderland. Now, have each of these proposed subdivisions been sent to the Huntingdon County Planning Commission?
A **Yes, they have.**
Q Have they each been approved?
A **Yes.**
Q All of them?
A **Yes.**
Q We have one right before this Corneal entry.

127

It says --
A **Lelia Isett.**
Q Lelia Isett?
A **Um-hum.**
Q Was that subdivision plan approved?
A **Yes.**
Q What about -- what does that say, Jordan Conrad?
A **Yes.**
Q Was that approved?
A **Yes.**
Q Going backwards now, Jos E. and Pauline Baker, was that approved?
A **That one was submitted twice.**
Q Why was it submitted twice?
A **It was just what they did. They were going to build and then they didn't and then they did.**
Q Was it approved?
A **Yes.**
Q How about this Kenwood subdivision?
A **Yes.**
Q Was that approved?
A **Yes.**
Q The Koch -- oh, is that the Koch?
A **Yeah, Koch.**

128

Q Koch subdivision, was that approved?
A **Yes.**
Q If you look down over this list of subdivisions on the first page of this document, starting with the Kenneth Miller, Kenwood Development and ending with the one on the bottom -- I can't read that.
A **Greenwood Furnace.**
Q Were all of these subdivisions approved to your knowledge?
A **Yes.**
Q Were any of them disapproved at any time to your knowledge?
A **I don't -- I don't remember.**
Q I mean, was there any initial disapproval and then a later approval?
A **There could be initial disapproval of all these.**
Q But you don't know whether any of them were or you do know?
A **I do know. There's a couple here.**
Q Which?
A **Sunderland.**
Q That's on the back page, the last one?
A **Yeah, I do know that.**
Q And why was that one initially disapproved?

129

A **It wasn't drawn to scale. And I think -- you're going to have to ask Tom that, but I think it had something to do too with there was a bridge over a stream on the property and it had something to do with that bridge and the stream. And I don't remember what it was, but I know that was one that he did what he had to do and came back.**
Q Now, on the Sunderland property, that's 85 acres, 85 plus acres divided --
A **Oh, I'm sorry. It was Simpson, is the one I was talking about with the bridge.**
Q Okay. Well, let's look. On the Simpson property it's 107 acres, right?
A **Yes.**
Q Divided into two lots?
A **Right.**
Q Do you know what's going to happen on those two lots?
A **One -- it's a hunting camp and they're separating the hunting camp and David Simpson's property where he's going to build a house.**
Q What about the Overhill, LLC?
A **That's a farm they bought in Ennisville and I don't know what they're doing there. I mean, they're building -- it was a land development. It wasn't a -- oh, I know. I do know. There's a farmhouse there and they built**

**a log house and they had two dwellings on that property. So that's why they did that.**
Q So that's why they subdivided it?
A **They did a land development.**
Q A land development. A land development plan you mean?
A **Yes.**
Q So when did they build the log house?
A **I don't know if -- I don't know if it's built yet. I don't know. That's -- they're working -- I don't know. I can't see that from the -- I don't know.**
Q So underneath lots it says one lot, second dwelling.
A **Yes, it has a farmhouse there.**
Q Let's see, and then the Sunderland property, do you know what the plans are for that place?
A **That's -- a father is dividing off the ground for one of the boys and I don't know what he's going to do with the other part.**
Q Is there a dwelling on that property?
A **Yes, there is a dwelling on that property.**
Q Is there more than one?
A **No.**
Q There's one house on it?
A **Um-hum.**

Q He's going to divide it and build on the other half?
A **He said he doesn't know what he's going to do with it. He's giving the son the house and some acreage and the rest of it he's not sure what he's going to do with it.**
Q Do you know if he has any plans to subdivide?
A **I asked him that and he does not know.**
Q Now, let's see, there's a -- W. Thomas Wilson, who is that?
A **Yes.**
Q This is on the first page, 9/3/97.
A **That's our supervisor.**
Q He's your township supervisor?
A **Yes.**
Q And he submitted a subdivision plan for 12 acres, correct?
A **Yes.**
Q To divide into three lots?
A **Yes, that's what it says.**
Q And what is on that property?
A **His shop and the next property is his son's house and I think -- and the next one -- I'm not sure if there's anything in between there or not, I don't know, and then there's a -- the other boy has a trailer. They're all along there.**

Q Now, when he subdivided, did he build anything after he subdivided?
A **(Witness shook her head negatively.)**
Q Everything was on there and they just broke it up?
MR. SHERR: You have to answer out loud.
THE WITNESS: I'm sorry.
MR. SHERR: That's okay.
THE WITNESS: No, he did not build anything on it. That was in '97. His son had a house that he had started and I'm not sure whether it was completed then or not. I don't remember that, but it is there now. There's a house and his shop and a trailer.
BY MS. MONTGOMERY:
Q Are there any other township officials or -- you know, either supervisors or former supervisors or sewage enforcement officers or anything like that on this list of individuals who have sought subdivisions in Jackson Township?
A **Not that I see.**
Q Who's Overhill, LLC?
A **It's Henwood. Jerry and Tom Henwood, I believe, from somewhere in -- near Philadelphia. It's a -- they're either going to or have built a place where they're going to raise game birds. That's all I can tell you.**

Q I see there's another Hawbaker on this -- 5/5/98.
A **Okay, that's Monty.**
Q A different Hawbaker than the other one?
A **Daughter and son-in-law.**
Q So they're related to the Glenn and Barbara Hawbaker, correct?
A **That's correct.**
Q Are those contiguous pieces of property?
A **No.**
Q Are they close to each other?
A **No.**
Q I think you testified that the subdivision ordinance had been under consideration for at least two years which takes you back to the summer of 1998, correct?
A **Somewhere in there. I cannot tell you the exact date we started it.**
Q Now, I see -- if we start say -- let's just take it -- let's take it from September 30th, 1998 and go down to 2/10/2000 -- I'm sorry, 12/13/1999, okay?
A **Okay.**
Q Were any of those proposed subdivisions rejected because there was going to be a subdivision ordinance put in place?
A **No.**

134

Q Was there any moratorium placed on subdivisions when those people came and asked you if they could subdivide?
**A No.**
Q Now, during the period of time that the moratorium was in place, did any of the subdivision plans go to the Huntingdon County Planning Commission to your knowledge?
**A The only two that I know is Mr. Corneal's.**
Q Mr. Corneal's went there?
**A And I can't say about Hawbakers and Davis. I'm not sure what they did, when they took them in there.**
**(Discussion held off the record.)**
**BY MS. MONTGOMERY:**
Q Now, when an individual takes their subdivision plan to the Huntingdon County Planning Commission, do you get some sort of notice from the commission?
**A We get a letter. When they've reviewed it, we get a letter.**
Q When they've reviewed it?
**A Right.**
Q Do you keep copies of those letters?
**A They should all be attached to the document when we approve it.**

135

Q Did you provide us with copies of those letters?
**A No, you didn't ask me for that.**
Q Let me ask you this: Did you receive any correspondence from any government agency, you personally as a -- in your -- I shouldn't say personally. You in your capacity as township secretary and treasurer receive correspondence from any government agency about the Corneal's property?
**A Are you talking about the county planning commission?**
Q Any government agency, Army Corps of Engineers, Commonwealth of Pennsylvania, DEP.
**A I did not receive anything from the Army Corps of Engineers, no.**
Q Anybody else?
**A The county planning commission and soil conservation commission, Huntingdon County Soil Conservation, whatever that is.**
Q Did you provide all of the documents that --
**A Yes, I did.**
Q -- you had in your possession from any government agency?
**A Excuse me. Yes, I did.**
Q What about -- did you have any correspondence

136

at all related to the Hewetts?
**A No.**
Q Did you get a bridge permit from a government agency regarding the Corneal property?
**A No, I did not.**
Q Let me ask you this: When you say you have an application for a proposed subdivision, right?
**A Yes.**
Q And you keep that in a file, right?
**A Right.**
Q What do you consider to be part of the application?
**A When?**
Q At any time. If you have a completed subdivision file, what all is in that file?
**A From the time the ordinance was in or from before because --**
Q From before.
**A From before there was everything -- the same as after except for the application.**
Q Except for the application form, okay. So in order for you to -- in order for the township to approve a proposed subdivision it has to go to the county first, right?
**A No, it can come to the meeting first. It can**

137

**be on the agenda and it can come to the meeting first, but you're going to have to send it to the county.**
Q That wasn't exactly my question but -- so I'll just repeat it. In order for you to actually issue final approval for the township to do it, it has to have gone to the county first, correct?
**A It has to have gone to the county but not first. There's a -- you know --**
Q Well, it has to have gone to the county prior to you issuing approval?
**A That's right.**
Q That's what I'm trying to say.
**A Okay, that's right.**
Q So part of the whole subdivision file is going to include any correspondence that you got from the county, correct?
**A Right.**
Q Do you consider what the county has to say as approval or disapproval in connection with a proposed subdivision?
**A That's not for me to do. I mean, I don't approve or not approve subdivisions.**
Q Let me put it this way: If the supervisors are going to look at a proposed subdivision plan and decide whether or not they're going to approve it, right?

A **Okay.**
Q They're going to look and see whether the county planning commission has reviewed it first?
A **Yes.**
Q What do they see in order to tell them that the county planning commission has reviewed it? What do they see in the file?
A **A letter.**
Q A letter from the county planning commission?
A **That's exactly right.**
Q That says we've received it and we're reviewing it?
A **That says we've received it and reviewed it.**
Q So it's part of the approval process, correct, for the supervisors to see what the county planning commission has to say?
A **That's right.**
Q I'm going to show you a document that we have -- we're going to mark as Wirth Exhibit 10.
(Letter dated 4/20/00 produced and marked as Wirth Exhibit No. 10.)
(Discussion held off the record.)
MS. MONTGOMERY: We'll mark the February 24th one as Wirth 11.
(Letter dated 2/24/00 produced and marked as

Wirth Exhibit No. 11.)
BY MS. MONTGOMERY:
Q Let's take Wirth Exhibit 11 first. I'm sorry to take them out of order, but that's the way it happens. Are you familiar with that document, Miss Wirth?
A **Pardon? I only have one. I have February 24.**
Q That is going to be Exhibit 11 so you have it.
A **Okay, thank you.**
Q Are you familiar with that document?
A **Which one are we talking -- the first one?**
Q February 24th.
A **Yes, I am.**
Q Is this the standard letter that you get back from the Huntingdon County Planning Commission when a proposed subdivision is submitted to the commission?
A **Yes, it is.**
Q Now, typically for each submission do you get just one letter from them or do you -- would you later get another letter from them?
A **If it has to go back and there's a resubmission, we get another letter.**
Q Now, do you get this letter immediately upon submission?
A **No, it's after review.**

Q Do you know when Mr. Corneal submitted his proposed subdivision to Huntingdon County?
A **I only know what's on here. After our first meeting it says 2/10 and then 4/11.**
Q Do you understand him to have submitted the subdivision then twice --
A **Yes.**
Q -- to the commission? Did you discuss the moratorium with the planning commission?
A **Probably.**
Q Do you recall who you discussed it with?
A **I would only discuss it with Richard Stahl.**
Q Did you ask him for any advice about whether or not you could put in a moratorium?
A **I don't know whether we talked to him about that or not. I probably asked him for procedures, but I don't know whether I did or not.**
Q Did you ever discuss the township's disapproval of Mr. Corneal's sewage modules with Larry Newton?
A **I probably told him that we weren't going to sign them.**
Q Did you ask him for any guidance in connection with whether or not you should sign them?
A **I don't know whether I asked him for guidance**

**or not.**
Q Do you remember what you talked to him about in connection with Mr. Corneal's sewage module?
A **I'd probably do -- whatever happened at the meeting I would let Larry know and that's what I would do.**
Q So you informed Larry that the township supervisors were not going to sign Mr. Corneal's sewage module?
A **Yes, I probably did -- I know I did.**
Q Now, there were a couple different occasions when the township refused to sign the sewage module, correct?
A **Are we -- what period of time are we talking here?**
Q I would say the period of time before and after the moratorium was put in place.
A **But there's also sewage modules on the board now so there's different -- there's different issues here.**
Q Right. Really I'm just asking you weren't there a couple different times when the township has been presented with Mr. Corneal's sewage modules and they have not been signed, right? Have not been signed off on by the township, correct?
A **I think we need to be specific about that.**
MR. SHERR: Then go ahead and do that.

BY MS. MONTGOMERY:
Q What is it that you need to know?
**A You need to give me a time frame.**
Q Well, it's a more general question. Did Mr. Corneal submit sewage modules for the township's approval once or more than once?
**A More than once.**
Q That's all I needed to know. How many times?
**A Twice.**
Q Did you discuss both of those submissions with Larry Newton?
**A I also want to clarify submissions because the first ones were never handed to the supervisors, okay. He had them at a meeting, but he never left his sewage modules with us. They were never submitted to us because he said then he wasn't subdividing and he wanted a privy permit.**
Q Well, I think you testified a little differently earlier, but the record will speak for itself. Go ahead.
**A And the second ones we don't have yet. I don't think we do. Barry might have them. I don't have them.**
Q Did you discuss with Larry Newton the status of Mr. Corneal's sewage modules on both -- with respect to both submissions or attempted submissions?

**A Probably.**
Q So you kept him informed about the township's position with respect to the sewage modules?
**A I probably did.**
Q What about Mr. Corneal's proposed subdivision plan? Did you keep Mr. Newton informed about that?
**A I probably did.**
Q Did he tell you what you were doing was okay or wasn't okay?
**A I don't remember.**
Q Do you recall at any time a letter going to Mr. Corneal rejecting his sewage module?
**A Sewage modules?**
Q Yes, or his proposed subdivision from the township.
**A I don't recall if Larry wrote -- I don't recall if Larry wrote him a letter or not or -- I know we didn't write him a letter. I don't think we did.**
Q Do you recall Mr. Corneal asking for a hearing --
**A No.**
Q -- in connection with his property?
**A No.**
Q Do you recall Mr. Corneal asking for a hearing in connection with his building permit?

**A No.**
Q Do you recall Mr. Corneal receiving a letter from the township -- from anybody within the township, officers, rejecting his application for anything?
**A He did get a letter from the township rejecting his building permit application.**
Q So you do recall that?
**A Yes. Now, what time frame are we talking about here because we're doing it again?**
Q Well, I'm talking about in the year 2000.
**A He did get a letter rejecting his building permit.**
Q Did you have any discussions with anybody within the township about his request for a building permit?
**A Me? I don't recall.**
Q You don't recall?
**A No, I don't.**
Q Do you recall receiving any letter from Mr. Corneal appealing his denial of a building permit?
**A I don't know if he sent it to us or Larry, but there was something.**
Q You do get the township's mail, right?
**A If it comes to me, I get it. If it goes to Larry, he'll fax it to me.**
Q What's the address that you get the township mail at?

**A 389-A.**
Q And what's your address?
**A 390.**
Q Do you sometimes get mail at the other -- at the 390 post office box for the township?
**A It's not a post office box.**
Q Well, a postal box, right?
**A On occasion.**
Q Now, I don't know if you answered this question very -- and if I already asked it, I apologize, but did you have occasion to discuss with the township supervisors the denial of Mr. Corneal's building permit?
**A I'm sure we did talk about it.**
Q Do you know whether Mr. Corneal actually submitted an application for a building permit?
**A What time frame?**
Q In the year 2000.
**A Yes, he did because he sent it to me.**
Q He sent you an application for a building permit?
**A And checks, yeah.**
Q I'm sorry?
**A Yes, he did.**
Q Did you send us a copy of that application?

146

A **Was it on the list?**
Q I'm sorry, the list of documents?
A **Yes.**
Q Well, I think it was.
A **Well, then I must have sent it. If I didn't, I didn't.**
Q Well, then I'm just a little bit confused because you had said earlier that all building application permits -- applications for building permits go out to the --
A **They do go to David Van Dommelen.**
Q So you don't keep them?
A **No.**
Q Why did this one come to you?
A **Because Mr. Corneal sent it to me, either to me or Larry.**
Q Do they sometimes come to you?
A **No.**
Q Is that the only one you've ever gotten?
A **Yes.**
Q Well, did anybody ever inform you of whether or not Mr. Corneal had requested a hearing on the denial of his building permit?
A **I do not ever remember hearing that before.**
Q Typically if there's going to be a hearing on

147

the denial of a building permit, where would that hearing be held?
A **I have no idea.**
Q You've never been present at one?
A **No.**
Q Have you ever been present at any hearing that the township supervisors have held when somebody wants to appeal something that's been going on?
A **No.**
Q Were copies of the subdivision ordinance that was passed on -- I think you said July 10th, 2000?
A **It is the 10th.**
Q It was the 10th that it was passed?
A **Yes.**
Q Were copies of that subdivision ordinance made available to the public --
A **Yes.**
Q -- prior to it being -- how? Prior to it being passed.
A **I think it's in the paper. It was in the library, in Larry's office, one in my office. It says that in the ad somewhere, either in this one or the other ad he had in. It was in the paper where they could be reviewed.**
Q Did anybody come to your office to review it?
A **No. Full text at the Daily News and at my**

148

**office, yeah.**
Q So you had copies available in your office for the public to review?
A **Yes.**
Q When were those copies made available to the public?
A **I think there's -- I think there's a regulation about when it had to happen.**
MR. SHERR: That's not what she asked you. She asked you when was it available.
THE WITNESS: I don't know.
MR. SHERR: Then that's your answer.
THE WITNESS: Yeah, I don't know.
BY MS. MONTGOMERY:
Q But they were going to be made public through you, correct?
A **Yes.**
Q So is there anybody else who would know when you made them public or put them in your office?
A **I don't know.**
Q Were the copies that you kept in your office there for say more than a week?
A **I don't know.**
Q Did you at some point keep copies of a proposed subdivision ordinance that was other than the

149

subdivision ordinance that was eventually passed? If you can hear that but --
A **Tell me that again.**
Q Okay. Did you at one point keep copies of a proposed subdivision ordinance in your office that was different than the one that was ultimately passed?
A **No.**
Q How many copies did you keep on file for the public of the proposed subdivision ordinance?
A **I think I had six.**
Q Did you make the copies?
A **No.**
Q Who made the copies?
A **I took them out to be done.**
Q Where did you take them?
A **Office Depot.**
Q Office Depot. Did you submit them or did you take them over there yourself and copy them?
A **I left them do it.**
Q You left them do it?
A **Um-hum.**
Q Did you keep an invoice for that?
A **Sure.**
Q So you have that invoice?
A **Yes.**

150

Q Did you submit the ordinance to the county planning commission?
A **Yes.**
Q When did you do that?
A **Which time?**
Q Well, why don't you tell me. Was there more than one time?
A **Yes.**
Q When's the first time you submitted a proposed ordinance to the county planning commission?
A **I can't remember exactly. Sometime in the fall.**
Q In the fall of 2000 -- in the fall of 1999 I mean?
A **Um-hum.**
MR. SHERR: You have to answer out loud.
THE WITNESS: Yes.
BY MS. MONTGOMERY:
Q Why was the subdivision ordinance submitted twice to the county planning commission?
MR. SHERR: Object to the form of the question. I don't know that she's testified that it was twice. I think she testified that it was more than once.
BY MS. MONTGOMERY:
Q Was it more than once?

151

A **Yes, it was more than once.**
Q Was it twice?
A **It might have been more than that.**
Q Can you remember if it was more than that?
A **I know it was at least -- I know three times at least. I can't tell you how many times.**
Q Well, let me ask you this: Each time that it was submitted was it a different ordinance in some way?
A **It wasn't different. They had opinions and we took them under consideration and we would make the changes.**
Q Do you have records of that correspondence going back and forth between you and the Huntingdon County Planning Commission?
A **I don't, no.**
Q Who does?
A **I would assume Richard does, but I'm not sure of that.**
Q If the ordinance --
MR. SHERR: Just for the record, Richard was Richard Stahl?
THE WITNESS: Yes, I'm sorry.
BY MS. MONTGOMERY:
Q If the ordinance was submitted to the Huntingdon County Planning Commission, how was it submitted?
A **In document form.**

152

Q By mail?
A **Hard copy.**
Q Hard copy document form?
A **I don't know if I took it in or mailed it. I doubt if I mailed it. I probably dropped it off when I went by one day.**
Q Is it close by?
A **No.**
Q How far is it?
A **Fifteen miles.**
Q So you don't think you mailed it, you think you drove it over there?
A **I probably did. I have clients there.**
Q Did you put a cover letter out with it?
A **No.**
Q Do you have some sort of a -- any application form or any transmittal form of any sort that you sent with it?
A **No.**
Q Would anybody else have dropped it off or mailed it?
A **They might have.**
Q Well, whose job was it within the township to see to it that it got to the Huntingdon County Planning Commission?

153

A **It probably was mine.**
Q Why do you say probably?
A **Well, they -- whoever -- it's not close so whoever's running goes.**
Q Now, the final proposed subdivision ordinance that was submitted to the Huntingdon County Planning Commission, was that the subdivision ordinance that eventually was passed --
A **Yes.**
Q -- by the township supervisors?
A **Yes.**
Q So it went up in one final last form, Huntingdon County Planning Commission looked at it, you got it back and then the township supervisors approved it?
A **Yes.**
Q Now, during this period of time that it was being passed back and forth with the Huntingdon County Planning Commission, was the ordinance also being presented to the public and mentioned at the township meetings?
A **I don't know how -- whether it was or not.**
Q Do you know when you submitted the final subdivision ordinance to the Huntingdon County Planning Commission?
A **After July the 10th.**
Q After July the 10th, after you passed it?

A Right.
Q Then you submitted it to them for what?
A They keep a copy for their review.
Q Well, prior to the time that you -- that the supervisors approved the final subdivision ordinance, do you know when you submitted it to the Huntingdon County Planning Commission?
A June the 3rd, Saturday morning, around 10 o'clock I got the final revisions from Richard. I went to his house to do it on a Saturday morning.
Q You mean you took it over to his house?
A No.
Q Well, my question was when did you submit it to him.
A I don't know when I submitted it to him. That's the last time that we talked about it.
Q Was June the 10th?
A June the 3rd.
Q Or June the 3rd. How do you recall that date so well?
A I have it written down because it was a Saturday and I wasn't happy about having to do it on a Saturday. I had something else to do, but Richard was going on vacation so I went.
Q Did the Huntingdon County Planning Commission

submit comments to you in writing on the proposed subdivision ordinance?
A He wrote in the column on the side and he inserted things that he felt we should consider.
Q Did you submit those to us?
A I don't have them.
Q You didn't keep any copies of them?
A No.
Q Did you just throw them away?
A Yes.
Q Do you have all the successive drafts of the proposed ordinance?
A No, I do not.
Q You just threw them away as well?
A I had no reason to keep them.
MR. SHERR: Just answer her questions.
THE WITNESS: No, I don't have them.
BY MS. MONTGOMERY:
Q Miss Wirth, do you recall whether you actually suggested a moratorium to the township supervisors?
A I did not.
Q Did you ever suggest it to anybody?
A No.
Q Did you suggest it to Larry Newton?
A No.

Q Do you recall discussions about why the moratorium was being put in place with the supervisors?
A No.
Q You don't recall any of those discussions?
A No.
Q Do you recall whether any discussions about the purpose of the moratorium took place?
A No.
Q Now, we're going to go back for just a second to this document that we marked as --
MS. THORP: It's 9.
BY MS. MONTGOMERY:
Q Wirth Exhibit 9 and I just want to make sure that I understand that there were no other subdivision -- correct me if I'm wrong. There were no other subdivision applications received by the township other than those on this list?
A To the best of my knowledge.
Q Did you ever have a public hearing on the moratorium?
A No.
Q Did you actually do a formal submission of the moratorium to the county planning commission?
A No.
Q You just told them about it?

A To the best of my knowledge.
Q Do you know how you told them about it?
A No.
Q So if there was a formal submission you would have been the one that would have been involved in preparing it, correct?
A Yes, probably.
Q Let me just ask you this, and if I asked you already I apologize, did the supervisors actually take a vote with respect to the moratorium?
A I did testify to that.
Q And what was your testimony?
A You asked me if the supervisors voted and I said -- I believe I said I don't recall whether -- normally they do, they say -- I think that's what I said.
Q But you don't recall if they did?
A They normally do and I think that's what I said.
Q Let's see, did you ever submit a copy of the driveway -- the proposed driveway ordinance to the planning commission?
A Yes, I did.
Q Did you also do the privy --
A Yes, I did.
Q When did you do that?

A **I don't recall.**
Q Did you submit it after it was approved or before, by the supervisors?
A **I don't recall.**
Q Did you discuss the driveway ordinance with Larry Newton?
A **Probably.**
Q Why do you say probably?
A **Because I think we submitted it to him for him -- I'm trying to remember if we typed it or he typed it. I don't remember.**
Q What about the privy ordinance, did you submit that to Larry Newton?
A **The same thing, I don't know if he did it or I did it.**
Q Do you recall ever reviewing any subdivision plan or drawing at all in connection with the Corneal property?
A **What time frame?**
Q In the year 2000.
A **Yes.**
Q In what context was that?
A **I think he was -- I think it was at the meeting. We talked about that earlier today.**
Q So at the meeting you recall actually looking

at a subdivision plan?
A **I'm not sure if we looked at it there. I'm not sure. I don't know.**
Q What about the year 1999?
A **In '99, no.**
Q What about this year?
A **Yes.**
Q In what context?
A **With his lawyer Terry Williams.**
Q You were present at that meeting?
A **Yes.**
Q And who else was present?
A **All the supervisors, Barry Parks, Larry Newton, Terry Williams and I think David Van Dommelen.**
Q Why were you present?
A **Why was I present?**
Q Yes.
A **Because I have to sign.**
Q Because you have to sign the --
A **I have to sign the plans.**
Q You have to be one of the two people who signs the plans?
A **Yes, I have to sign them and seal them.**
Q Did you keep minutes of that meeting?
A **No, I -- it was in the courthouse. No, I did**

**not.**
Q You mentioned that you thought you viewed a subdivision plan in 2000, right?
A **I thought what you asked me was did we look at a plot plan.**
Q Well, okay. What I said was a subdivision plan or any other drawing.
A **A drawing is what --**
Q Right, that's what I said.
A **We did look at a drawing.**
Q Now, I think you said you thought you did that at a supervisor's meeting?
A **I'm not sure.**
Q Where else would it have been?
A **I'm not -- it came to us through Larry so I don't know where we looked at it.**
Q So Larry turned over to you at some point a copy of a drawing for the proposed subdivision for the Corneal's property?
A **To the township he turned it over.**
Q He turned it over to the township and you reviewed it. Who did you review it with?
A **I didn't review it, the supervisors reviewed it.**
Q Were you present when they reviewed it?

A **Yes.**
Q And so we're going to go back around again. So in what context was that, just an informal meeting or something?
A **I don't remember. I don't remember when we got it or when we reviewed it.**
Q But you do remember that you got it from Larry Newton?
A **I said earlier today that I don't know whether it came from Larry Newton or Simpson.**
Q Did you discuss the subdivision -- the drawing with Larry Newton?
A **Probably.**
Q Did the supervisors discuss the drawing with Larry Newton?
A **Probably.**
Q Did you discuss whether or not to approve the subdivision with Larry Newton?
A **I don't know.**
Q Did the supervisors discuss whether or not to approve the subdivision with Larry Newton?
A **I don't know.**
Q Now, you testified earlier that I believe it was at the February meeting that Mr. Corneal first came in and asked the supervisors -- the February 2000 meeting he

came in and asked the supervisors to sign his subdivision plan, correct?
A **I think that's the date, yeah. Yes.**
Q And I believe you testified that they refused to do so because they said there was a moratorium in place as of January?
A **Right.**
Q Did they issue a written rejection of his subdivision plan?
A **No, I don't think so.**
Q Do you recall Mr. Corneal asking for a copy of a moratorium ordinance or resolution?
A **He might have. I don't -- I don't know. He might have.**
Q Did you discuss with Larry Newton Mr. Corneal's interest in seeing a copy of a moratorium ordinance or resolution?
A **I don't recall that.**
Q Do you recall talking with Larry Newton about whether you had to put that moratorium into a written form?
A **I don't recall that either.**
Q Do you recall whether the supervisors discussed that with him?
A **You'll have to ask them.**
Q Was there an ordinance in place at any time

prior to the subdivision ordinance that you put in place on July 10th, 2000?
A **What kind of an ordinance?**
Q Subdivision ordinance.
A **No.**
Q Was there any other ordinance in place?
A **Yes.**
Q What ordinance was that?
A **Building permit ordinance.**
Q The building permit ordinance, okay. When was that passed?
A **Long before my time. The date's in the back. I don't know.**
Q Other than the three ordinances that you testified have been passed since you've been in place as the township secretary and treasurer and other than this building ordinance, are there other ordinances in the township?
A **No.**
Q There's just those four that exist?
A **I'm not sure if this -- this -- there is an ordinance, I'm sorry. It's ag. security. We passed an ag. security ordinance. I'm sorry, I forgot that.**
Q When did you do that?
A **It might be '95 or '96. Maybe not. Maybe**

**'97. I'm not -- I don't know the date, but we do have an ag. security ordinance.**
Q But there wasn't any other ordinance that said anything about subdividing at that time prior to this subdivision ordinance?
A **Ordinances you're talking about?**
Q Yes.
A **No.**
Q What about any other document -- or I should say any other sort of rule, regulation, resolution, anything that would be a formal action of the supervisors?
A **Act 537.**
Q What's Act 537?
A **Sewage Enforcement Act.**
Q And you're saying what about that, that's the -- something that was in place of how you do subdivisions in the township?
A **It states that you have to have an equivalent subdivision if there's more than two buildings on a property, two dwellings, and we testified to that this morning.**
Q So you're saying that was what you followed as a subdivision ordinance, or something, or what are you saying?
A **Yes, we did.**

Q Was it in writing somewhere that all subdivision plans had to be submitted to the Huntingdon County Planning Commission?
A **Not to the best of my knowledge.**
Q So it was just something that the supervisors and you thought you ought to do, thought you ought to impose on the public?
A **It was done long before my time.**
Q But it's not in writing anywhere?
A **I don't know.**
Q Do you recall Mr. Corneal submitting a revised subdivision plan to the township?
A **What time frame?**
Q The year 2001.
A **Yes.**
Q Are you familiar with that document?
A **I've seen it.**
Q In what context did you see it?
A **In the courthouse.**
Q In the courthouse at a meeting?
A **At a hearing.**
Q At a hearing. What hearing was that?
A **The township has -- went before the judge asking for Mr. Corneal to comply with regulations in the township.**

Q What regulations?
**A Building permit regulations and subdivision ordinance and sewage.**
Q So you saw it there? Did you testify at that --
**A No.**
Q You just saw it in connection with that hearing?
**A Yes.**
Q Did you see it before the hearing as well?
**A No.**
Q Did you see it after the hearing?
**A It's in my office.**
Q It's in your office, okay.
**A You're talking about a plot plan?**
Q Yes.
**A It's in my office.**
Q When did you get it in your office?
**A I got it at the hearing that day. No, wait a minute. I got a copy at the hearing that day. I got a copy that day.**
Q You got a copy of it when?
**A At the hearing.**
Q And that's the first time?
**A To the best of my knowledge.**

Q Do you know whether the board ever -- the board of supervisors ever passed a resolution regarding the lawsuit that they initiated against Mr. Corneal?
**A No.**
Q You don't know or did they?
**A They didn't.**
Q They did not. Did they just decide it among themselves informally?
**A No.**
Q How was it decided?
**A With our township attorney.**
Q With Mr. Newton?
**A Yes.**
Q So Mr. Newton advised the board of supervisors that they should initiate a lawsuit against Mr. Corneal?
**A No.**
Q I'm not sure I understand your answer. Do you want to clarify what you're trying to tell me?
MR. SHERR: Don't feel that it's necessary. You've answered her question. You've answered it directly.
MS. MONTGOMERY: She hasn't answered it directly.
MR. SHERR: She absolutely has.
MS. MONTGOMERY: It's not permissible to be evasive.

MR. SHERR: She is not being evasive. Can you read back the question and the answer, please.
MS. MONTGOMERY: If we're going to read back the question and the answer, you're going to have to go a long ways back. Let's continue on.
MR. SHERR: Could you read back --
MS. MONTGOMERY: I'm going to rephrase the question. It's my deposition, knock it off.
MR. SHERR: Don't tell me to knock off anything.
MS. MONTGOMERY: Here's the question --
MR. SHERR: And don't talk to me in that tone, young lady.
MS. MONTGOMERY: This is the question and we're not reading the question back.
MR. SHERR: If you want her --
MS. MONTGOMERY: I have withdrawn the question. I've withdrawn the question.
MR. SHERR: And all I was saying is if you want her to clarify it --
MS. MONTGOMERY: Moving right along.
MR. SHERR: -- then we'll reask the question and get the answer again.
MS. MONTGOMERY: We're going to reask the question.

BY MS. MONTGOMERY:
Q Did the board of supervisors pass a resolution regarding the lawsuit that they filed against Mr. Corneal?
**A No.**
Q Did they just decide among themselves that they were going to file the lawsuit?
MR. SHERR: Objection, asked and answered.
MS. MONTGOMERY: That's good.
MR. SHERR: That's not the question. The question was -- you said did Mr. Newton advise them to file a lawsuit and she said no and then you asked her to clarify that.
MS. MONTGOMERY: I know what I said and I am going to move on.
MR. SHERR: Well, then why are you going back to all these other questions? Objection, asked and answered. You can answer.
BY MS. MONTGOMERY:
Q Did they decide among themselves to file a lawsuit?
MR. SHERR: Objection, asked and answered. You can answer it.
THE WITNESS: No.
BY MS. MONTGOMERY:
Q So did their attorney -- no, that wasn't the

question. Who else was involved in the decision to file a lawsuit?
A **I don't really know. I don't know how to answer you.**
Q Well, if they didn't decide among themselves to file a lawsuit against Mr. Corneal, how did they decide it?
MR. SHERR: Objection to the form of the question. I think you're misstating her testimony. You can answer the question if you can.
THE WITNESS: They sought counsel about it.
BY MS. MONTGOMERY:
Q Sought counsel from who?
A **Larry Newton.**
Q Then my question was did Mr. Newton advise them that they could file a lawsuit against Mr. Corneal?
A **You did it in the opposite the --**
MR. SHERR: Just answer her question.
THE WITNESS: Yes.
BY MS. MONTGOMERY:
Q He did. That's all I wanted to know. Do you recall who actually initiated the discussions about filing a lawsuit against Mr. Corneal?
A **I have no idea.**
Q Did you initiate them?

A **No.**
Q Were you involved in discussions with the supervisors about doing it?
A **I might have been. I don't know.**
Q Were you present at meetings with the supervisors when it was being discussed?
A **Probably.**
Q Why do you say probably?
A **Because I'm in a lot of things.**
Q Were you involved in discussions with the supervisors and Mr. Newton about filing a lawsuit against Mr. Corneal?
A **Probably.**
Q And why do you say probably?
A **Because I cannot remember if I was there when they did it.**
Q How do you know that they discussed it with Mr. Newton then, with Attorney Newton?
A **Because he's our lawyer.**
Q Did they tell you that they sought counsel --
A **Sure.**
Q -- from Mr. Newton?
A **Yes.**
Q Did you discuss the lawsuit directly with Mr. Newton?

A **I probably have.**
Q Are you saying probably because you don't recall?
A **I have.**
Q You have discussed it with him, okay. On what occasions?
A **I don't know.**
Q When you say you don't know, do you mean you don't know exactly when they were or what?
A **I don't know when they were.**
Q Well, if you don't know when they were, then do you just recall the setting for the discussion with Mr. Newton that you had?
A **Probably in his office.**
Q Did you go to his office by yourself?
A **For what reason?**
Q To discuss the lawsuit with Mr. Corneal.
A **No.**
Q Who did you go with?
A **I believe we were all there.**
Q On more than one occasion?
A **I don't think so.**
Q You recall then being there one time?
A **Yes.**
Q Did you discuss it over the telephone with Mr.

Newton?
A **Yes.**
Q Prior to filing the lawsuit?
A **I don't remember if it was prior or after.**
Q Did you discuss it on the telephone alone with Mr. Newton or with the other supervisors?
A **Probably both.**
Q Was anybody else there besides the supervisors when you, for example, went to the office of Larry Newton to discuss the lawsuit against Mr. Corneal?
A **No.**
Q Just the supervisors and you?
A **Yes, that I can recall.**
Q Was Barry Parks at any of the meetings that you can recall at which the lawsuit against Mr. Corneal was going to be filed?
I don't think I said that very well. Let me rephrase that. Was Barry Parks present at any of the meetings at which the lawsuit that was to be filed against Mr. Corneal was discussed?
A **I testified to that a while ago.**
Q I don't recall what you said, I apologize. What did you say?
A **Everybody that was in the lawsuit was in the courthouse.**

Q At the hearing you mean?
A **Yeah.**
Q I was talking about meetings. You're talking about the lawsuit up in the county, correct?
A **Yes.**
Q I actually was referring to meetings. When you say that everybody involved in the lawsuit was there at the courthouse, at the county courthouse in the county lawsuit, you mean everybody in this lawsuit? Is that what you mean?
A **No.**
Q You mean everybody in that lawsuit?
A **Yes.**
Q Are you a party to that lawsuit?
A **No.**
Q Is Barry Parks a party to that lawsuit?
A **Yes.**
Q His name is on the pleadings?
A **I don't know.**
Q Is Van Dommelen a party to that lawsuit?
A **I don't know.**
Q I'm just trying to clarify who it is you're talking about, that's all, because if you say everybody in that lawsuit, then we could look at those pleadings and say -- then we know who was there. If you're talking about

everybody in this lawsuit was involved in that lawsuit in the courthouse, then we know who was there.
A **I don't know.**
Q Why did you attend that hearing for the lawsuit that's up in Huntingdon County?
A **Because they take me most every place they go.**
Q Why was Mr. Parks there?
A **I don't know.**
Q Do you recall whether you sent copies of the draft township ordinance to any members of the public at any time during the time that it was under consideration?
A **What do you mean public?**
Q Well, a member of the public, resident. Did you send copies of the township ordinance to anybody, the proposed township ordinance to anybody?
MR. SHERR: Other than what's been testified to already?
THE WITNESS: No.
BY MS. MONTGOMERY:
Q Other than the county commissioners -- I mean the county planning commission.
A **No.**
Q Did anybody ever request a copy of the proposed ordinance from you?
A **Yes.**

Q And who was that?
A **Different people got it from me.**
Q Different people got it from you?
A **Bought it from me actually.**
Q Bought it from you. The proposed or the final?
A **I think it was the proposed.**
Q So you did send copies --
A **No, it was the final. The final, I'm sorry. It's the final.**
Q After it was --
A **After it was passed.**
Q But prior to the time it was passed you never sent a copy of it to anybody?
A **Not that I can recall, other than what I testified to.**
Q Did you get any requests from anybody?
A **No, except Mr. Corneal.**
Q Did you send him a copy of the proposed --
A **No.**
Q Why not?
A **I didn't have one to give him at the time.**
Q But he did ask you for one?
A **Not me.**
Q Who did he ask?

A **Larry, I believe.**
Q He asked Larry Newton for a copy of the proposed subdivision ordinance. Did Larry then pass that request on to you?
A **I believe I read it in a letter, is how I know that.**
Q Did you know about the request at the time that it was submitted?
A **No.**
Q You found out about it later?
A **Yes.**
Q But then you just said you didn't have one to give him at the time and that's why you didn't give him one.
A **No. When Larry had that request, they weren't -- the date on there -- I think it's the date that's in that letter. I don't know. It's in one of these correspondence. I saw it the other day when I was there. We didn't have an ordinance yet.**
Q Well, we were talking about the proposed subdivision ordinance and the request for that.
A **We didn't have a proposed yet either.**
Q Just so I'm clear about your testimony --
MS. MONTGOMERY: Let the record reflect that Mr. Sherr just said something to his client. I'm not sure

178

what it was.
MR. SHERR: I'll state it, you're doing all right, just listen to her questions. Are you satisfied?
THE WITNESS: That's what he said to me.
BY MS. MONTGOMERY:
Q Did the Corneals ever ask you for a copy of the ordinance at one of the township meetings?
A **Not that I recall.**
Q Do you recall telling the Corneals at any of the meetings that the board only had originals and no copies?
A **I might have done that.**
Q Is that the proposed ordinance or the final ordinance?
A **Proposed.**
Q I think, if I understand your testimony, that you said that when Mr. Corneal asked Larry Newton for a copy of the proposed ordinance you didn't have a proposed ordinance at that point?
A **We didn't have copies of a proposed ordinance.**
Q Do you recall when you gave your first proposed ordinance to the Huntingdon County Planning Commission?
A **You asked me that earlier and I don't know.**
Q Do you know if it was before or after Mr.

179

Corneal asked Mr. --
A **It had to be before.**
Q Did you talk to Larry Newton about whether or not you ought to provide Mr. Corneal with a copy of the proposed subdivision ordinance?
A **I don't recall.**
Q You don't recall. Did you ask the supervisors about whether or not you ought to provide a copy?
A **I don't recall.**
Q Do you have any understanding at all of what factors the county planning commission relies upon in reviewing a proposed subdivision ordinance?
A **No.**
Q Do you know what they compare it to?
A **No.**
Q Does the county have a subdivision ordinance?
A **No.**
Q Did you get comments from the county on all three ordinances that were passed at the July 10, 2000 meeting?
A **I don't recall if we got it on all three or not.**
Q You just testified that Huntingdon County doesn't have a subdivision ordinance, correct?
A **That's right.**

180

Q Did they ever have a subdivision ordinance to your knowledge?
A **A county subdivision ordinance?**
Q A county subdivision ordinance.
A **No.**
Q I notice that the Huntingdon County Planning Commission letters of February 24 and April 20th, which are Wirth 11 and 10 respectfully, are addressed to you.
A **Yes.**
Q Did you read these letters?
A **Yes.**
Q Look at Paragraph 2 on the April 20th letter, Paragraph 2 meaning their numbered paragraph 2. Miss Wirth, what do you understand that paragraph to mean?
A **That the county was questioning the soils at the site where he was proposing a house.**
Q Do you know what hydric soils are?
A **I know it has something to do with a wetland, that's all I know.**
Q And then continuing on with Paragraph 2 do you see where it says that the Blazosky Associates had indicated that no wetlands were present at the location of the lots in the Corneal subdivision proposal?
A **Yes.**
Q What occurred after the Blazosky Associates

181

map and study data identifying the investigation area was submitted?
A **I have no idea.**
Q What occurred in response to their opinion and their report that there were no wetlands present at the location of the lots of the proposal?
A **I don't -- I have no idea.**
Q What prompted the Huntingdon County Planning Commission to have to review whether or not there were wetlands, do you know?
A **I have no idea.**
Q Do you know whether anybody among the township supervisors questioned whether the Blazosky Associates proposal was correct?
A **I have no idea.**
Q Did you question whether the Blazosky -- are you familiar with the Blazosky Associates report?
A **I know it exists from this letter.**
Q Did you ever read it?
A **No.**
Q Did you know what the conclusions were?
A **No.**
Q Do you know whether the supervisors questioned whether Barry Parks had correctly identified wetlands? Do you know whether any supervisor questioned that?

A **You'll have to ask them.**
Q Did you have any conversations with anybody from the Huntingdon County Planning Commission about whether or not there were wetlands?
A **No.**
Q Let me ask you about Paragraph 3 of this April 20 letter. Can you just look at that, the numbered paragraph 3. What do you understand that paragraph to mean, Miss Wirth?
A **What it says.**
Q The proposal that they're speaking about in that Paragraph 3, that's the subdivision proposal, correct, that the Corneals submitted?
A **I would assume.**
Q Now, why are these letters addressed to you?
A **Because they all come to the secretary because that's where the mail comes to.**
Q Then do you pass them on to each of the township supervisors?
A **I attach them to the subdivision plot plan.**
Q You attach them to the subdivision plot plan?
A **Right, and they review it.**
Q And then the supervisors review it?
A **Right.**
Q When do they review it, at a township meeting

or informally or what?
A **It gets presented at the township meeting and then if we don't have the letter back from the county or there's something else that needs to happen they will sign them at a later date.**
Q When you say you attach them, you mean you put them in the file with it, stick them inside of the -- inside a rubber band?
A **Somewhere -- it's attached.**
Q So it becomes part of the application, correct?
A **It should.**
Q In response to this April 20, 2000 letter from the planning commission, what action did the board of supervisors take with respect to the Corneal's subdivision proposal?
A **You'll have to ask them.**
Q Was it discussed any further at an additional meeting?
A **About this proposal?**
Q About this letter.
A **This letter?**
Q What the letter recommends.
A **Not that I can recall.**
Q I'm going to show you a letter I'm going to

mark now as Wirth Exhibit 12.

(Letter dated 11/10/00 produced and marked as Wirth Exhibit No. 12.)

BY MS. MONTGOMERY:
Q Have you seen this letter before?
A **Yes, I probably have.**
Q I see that this letter is -- this Box 390 up there, that's your home address, right?
A **Yes.**
Q The letter is addressed to gentlemen, which means the township supervisors, correct?
A **Yes.**
Q So when you get a letter like this, what do you do with it?
A **Well, this one I probably gave to Larry Newton.**
Q And then you would assume that Larry Newton would pass it on to the township supervisors?
A **I might have given them copies. I don't remember.**
Q So I think you testified earlier that you didn't know anything about a hearing request in connection with his building permit?
A **I keep asking you about time frames. You must talk to me about time frames because there's two different**

**things going on here.**
Q Well, this is November 10, 2000.
A **Okay, but there's the original building -- should I go into this?**

MR. SHERR: Is it an answer to her question?

THE WITNESS: Yes. The original building -- when he applied for a building permit the first time, that was not this time. This is whenever now we're working with him to get his building permits and his sewage permits. There's two different issues here and you have to clarify not just year, you're going to have to clarify issues.

BY MS. MONTGOMERY:
Q Okay, so when I asked you do you know anything about an appeal of Mr. Corneal's application for a building -- denial of an application for a building permit, I have to tell you the exact date?
A **You're going to have to tell me which issue we're talking about because there's two different things going on.**
Q Well, now that you look at it, do you recall a hearing --
A **Yeah, I know about this.**
Q Was there a hearing ever scheduled?
A **We have talked to Terry Williams numerous times. We've had hearings with Terry and phone calls and --**

**they have.**
Q I think I asked you this before, but if you're going to have a hearing on this appeal, the denial of his building permit, where would that be held?
A **All the meetings we had with Terry Williams were in the courthouse.**
Q That wasn't my question. I'm talking about a hearing on an appeal of the denial of a building permit.
A **We never had a hearing with Mr. Corneal. We had hearings -- meetings. We had meetings with Mr. Williams in the courthouse. That's all we ever did.**
Q Let me ask you this: If Mr. Van Dommelen sends out a denial of a building permit, does he send a copy to you?
A **He would.**
Q He would?
A **Probably.**
Q And would you keep it in your files?
A **I've only ever had one.**
Q One denial of a building permit?
A **Yes.**
Q And that was Mr. Corneal's?
A **Right.**
Q No other building permit has ever been denied in Jackson Township in your time?

A **I can't say that.**
Q In your time?
A **I can't say that.**
Q But you've only ever gotten one letter?
A **I've only gotten one letter. I can't say anything else.**
Q Well, back to my question. Was a hearing ever scheduled for an appeal on the denial of the building permit in accordance with this November 10, 2000 letter?
A **I can't recall the time we met with Terry Williams. I cannot recall the hearing we had with Terry Williams, what day it was, when it was.**
Q Well, the hearing you had with Terry Williams was in the county court suit up there, right? Is that what you're talking about?
A **Yes, and that's what we -- I thought that's when this stuff took -- was taken care of.**
Q I'm going to show you a copy of a letter that we're going to mark as Wirth Exhibit 13 now.
(Letter dated 10/10/00 produced and marked as Wirth Exhibit No. 13.)
BY MS. MONTGOMERY:
Q Before we even go back and talk about that, I just want to go back to what you testified to a couple minutes ago. You had said that you couldn't respond before

to my question about whether you were aware of a hearing on Mr. Corneal's appeal of the denial of his building permit because there was another issue, there were two issues, and I need you to identify the issue, okay?
A **Okay.**
Q What was the other issue?
A **Now, I'm asking you to talk about the new submissions that he has and the old submissions that he has because they were handled in two different fashions.**
Q What do you mean they were handled in two different fashions?
A **Well, Terry Williams submits everything here, okay. This one was directly submitted to me, okay, and this was --**
Q When you say this one, what are you referring to?
A **This letter, Number 13, this came to me. Those building permits came to me.**
Q You're looking at Number 13 and you're saying the letter from David Van Dommelen dated April 10, 2000 came to you?
A **No, no, not the letter.**
Q Okay, what?
A **Mr. Corneal's application, he sent them to me, with drawings that he had drawn by hand attached, and that's**

**the answer -- this is the answer to that. And I'm assuming that's what this is about, but I don't know.**
Q So you're saying the October 10, 2000 letter from Mr. Van Dommelen is a response to Mr. Corneal's request for a building permit?
A **The first building permit.**
Q When Mr. Van Dommelen sent this letter out to Mr. and Mrs. Corneal that we've marked Wirth 13, did you get a copy of it?
A **Obviously. I gave you one.**
Q Well, you gave it to me. Did you get a copy of it when it went out?
A **I probably did. I have a file.**
Q Do you know who drafted the letter?
A **You'll have to talk to David about that.**
Q Did you draft the letter?
A **No.**
Q Does he have somebody who does his typing?
A **You'll have to talk to him.**
Q Do you do his typing ever?
A **No.**
Q I see up at the top here it has Jackson Township Board of Supervisors, R.D. 1, Box 390. That's your home box, right?
A **Yeah, that's not right.**

Q So Mr. Van Dommelen has an office where he lives, where he keeps documents, but he uses Jackson Township Board of Supervisor's address for his correspondence?

A **In this case he did.**

Q Let me ask you this: Does Mr. Van Dommelen -- is it your understanding within the township governing body that Mr. Van Dommelen passes on compliance with the Pennsylvania Sewage Facilities Act? Let me direct your attention to the October 10, 2000 letter marked Wirth 13.

A **Pennsylvania Sewage Facility Act is addressed in our building permit ordinance.**

Q So Mr. Van Dommelen passes on whether or not individuals requesting a building permit have complied with the Pennsylvania Sewage Facilities Act?

A **According to the ordinance, you have to have a sewage permit if you're going to build a property and he would say no to that if you didn't have one.**

Q So Mr. Van Dommelen would communicate with Mr. Parks about whether or not he's got a sewage permit, right?

A **No, you don't -- anybody that goes to get a permit normally has a sewage permit, if they're building a house.**

Q Let me ask you this: Do you know whether or not you need a sewage permit for a garage?

A **No.**

Q You don't think you do?

A **If you're just building a garage and nothing else.**

Q Okay.

(Discussion held off the record.)

MS. MONTGOMERY: I'm going to take a break and look at our documents and then we're going to come back and finish this up.

(Break taken at 2:42 p.m. until 3:01 p.m.)

BY MS. MONTGOMERY:

Q I want to show you a series of documents attached together that we are going to mark as Wirth Exhibit 14.

(Packet of documents produced and marked as Wirth Exhibit No. 14.)

(Discussion held off the record.)

BY MS. MONTGOMERY:

Q This is Wirth Exhibit 14. After you take a moment to look at that, Miss Wirth, at this collection of documents, would you tell me if you recognize it.

A **Yes.**

Q Do you see that there are two letters, an August 31, 2000 and a September 1, 2000 letter, correct?

A **Right.**

Q Now, you received these letters, correct?

A **Yes.**

Q Did you receive the attachments that you see here?

A **To the best of my knowledge.**

Q Were there also sewer modules attached to this when it came to you originally in the August, September 2000 time frame?

A **I don't remember.**

Q What did you do with this submission when you received it?

A **I don't remember what we did with it.**

Q Is this what you were referring to as Mr. Corneal's second request for a building permit?

A **I believe so.**

Q Did you give this to the supervisors?

A **I'm sure I did.**

Q Did you pass it onto the building inspector or the building permit officer?

A **I must have.**

Q Did you have any discussion with the supervisors or the building permit officer about this building permit application?

A **I don't recall.**

Q Do you know whether it was ever acted on?

A **I don't recall.**

Q Did you ever discuss this second set of building applications with Attorney Newton?

A **Probably.**

Q Why do you say probably?

A **Because there's a lot of things happening and I'm not sure which players are involved. I'm not sure if this is the -- I'm not sure.**

Q So if you call this the second attempt to obtain a building permit, what was the first attempt, do you recall?

A **I'm not sure. I'm not sure.**

Q Well, whether or not it was the first or second, what do you know about any other attempt by Mr. Corneal to obtain a building permit?

A **Only what I've testified.**

Q Well, what you've testified to so far, you're saying?

A **Yes.**

Q Do you know whether or not Mr. Corneal ever went out to Mr. Van Dommelen's residence to try and obtain a building permit?

A **Yes.**

Q What do you know about that?

A **I can't testify to that because I only know**

**what I heard.**
Q What did you hear?
MR. SHERR: Object to the form of the question, calls for hearsay. You can answer it.
THE WITNESS: I don't really know what happened out there. I was not there.
BY MS. MONTGOMERY:
Q I'm not asking you what you know, I'm asking you what you heard, which you're allowed to testify to in a deposition.
MR. SHERR: Same objection. Subject to the objection, you can answer.
THE WITNESS: That he didn't give him a permit.
BY MS. MONTGOMERY:
Q Why didn't he give him a permit?
MR. SHERR: Same objection. You can answer, same basis.
BY MS. MONTGOMERY:
Q You can answer it.
A **The same reason we've talked about all day.**
Q And what was that we've talked about all day?
A **He didn't have the proper documentation.**
Q Do you know whether he was even given an application when he went out to Mr. Van Dommelen's?

A **From a letter that I read, no. This letter, I think. Somewhere there's something that said he wasn't.**
Q Had you heard anything about that before that?
A **I don't know.**
Q Did you have a copy of this letter to you, the August 31 and September 1 letter in your files?
A **I gave you these.**
Q You gave me these?
A **I believe. No? Well, then I do. I know that -- I thought that was my number because I was writing on there.**
MR. SHERR: Answer her question.
THE WITNESS: Okay. I do.
BY MS. MONTGOMERY:
Q So you do have them in your files?
A **Yes.**
Q Miss Wirth, I'm going to ask you to take our document request -- which you have a copy of, correct?
A **Yes.**
Q And review it again with your counsel and see whether there are any other documents responsive to the document request and provide them to us immediately, okay.
MR. SHERR: Is that a question?
MS. MONTGOMERY: No, it's an instruction, it's a request.

MR. SHERR: Well, you can't give her instructions. You can ask her questions.
MS. MONTGOMERY: I can make a record of it if I want to.
MR. SHERR: You can make a record of anything you want, but you need to ask her questions.
MS. MONTGOMERY: That's what I did.
MR. SHERR: Are you done with the deposition?
MS. MONTGOMERY: No.
MR. SHERR: Well, then ask her a question.
BY MS. MONTGOMERY:
Q Did you bring any documents with you today to this deposition?
A **No, I ...**
Q Were you instructed by anybody whether or not to bring any documents with you to this deposition today?
A **No.**
Q You weren't instructed one way or the other?
A **No.**
Q Did you ever discuss with Mr. Parks his review of the Corneal sewage module?
A **I don't believe so.**
Q Does the board of supervisors have a particular procedure that you're aware of for review and approval of sewage modules?

A **I think I did testify that -- to that earlier.**
Q I don't recall you testifying to it but --
A **It's attached to the plot plan, the same thing as we review from the county. It's the same review.**
Q So let me ask you this: In your experience is it correct that the sewage enforcement officer, Barry Parks, first reviews the sewage module and signs off on them; is that correct?
A **I'm not sure what the procedure is.**
Q You have no idea?
A **No, I don't know.**
Q Do you know whether or not the township has ever rejected any sewage module that was approved by Barry Parks?
A **I have no idea.**
Q You have no idea. Do you know whether they rejected Mr. Corneal's sewage module?
A **Yes.**
Q Was it approved by Mr. Parks?
A **I don't know.**
Q Did you ever direct Mr. Parks or at least suggest to Mr. Parks that he go out to Mr. Corneal's property in 2001, in the year 2001, and reinspect his property to see whether there was sewage enforcement compliance?

A **Me personally?**
Q Yes.
A **No.**
Q Did you ever pass along to him a request from anybody else to do that?
A **I don't think I did that.**
Q Did the supervisors to your knowledge ever --
A **You'll have to ask them.**
Q Well, I'm asking you if in your presence or to your knowledge whether --
A **I don't recall.**
Q Let me finish my question. Whether the supervisors instructed Barry Parks to go back out to Mr. Corneal's property and reinspect his sewage sites.
A **I don't recall.**
Q Did you ever discuss it with Larry Newton whether Mr. Parks ought to go back out to Mr. Corneal's property and reinspect the test sites for sewage?
A **I don't recall.**
Q At one point when I asked you this question earlier about whether or not you asked or suggested to Barry Parks that he go back out to the Corneal property, you said not me personally.
A **No, I asked you a question, if you meant me personally.**

Q Oh, okay.
A **So I understood what you were asking me.**
Q Okay.
A **It's been a long day.**
Q Yes. So your answer is no, you personally did not?
A **No.**
Q Do you recall anybody suggesting that Barry Parks go back out to the Corneal's property to reinspect the test sites for sewage?
A **Not that I recall.**
Q Do you know how it came to occur that --
A **No.**
Q -- Mr. Parks went back out there?
A **No.**
Q You don't know, okay. Are you aware of a complaint that was filed against the Corneals concerning possible wetlands on their property?
A **I know of it.**
Q Do you know who filed -- who made that complaint?
A **I have no idea.**
Q How do you know of it?
A **Because it's in one of these documents that's here.**

Q Do you know who the complaint was made to?
A **I have no idea. I think it says Army Corps of Engineers or something.**
Q The Army Corps of Engineers. Was there any -- do you recall discussing that complaint with anybody else at all?
A **No.**
Q Do you recall anybody else discussing that complaint in your presence?
A **No.**
Q Have you seen any written correspondence about that complaint?
A **No.**
Q Is the only knowledge that you have about that complaint against the Corneals what you saw in a letter here somewhere?
A **Yes.**
Q After the initiation of the lawsuit?
A **Yes.**
Q So you didn't know about it before the initiation of the lawsuit?
A **No.**
Q When I asked you briefly earlier about whether or not you were familiar with the report from Blazosky and Associates --

A **From what?**
Q I think it's -- am I saying that right? Blazosky and Associates on wetlands on the Corneal property.
A **Okay, yeah.**
Q I asked you earlier had you ever seen that report when it came out.
A **I don't recall.**
Q Do you recall whether or not it was discussed among the supervisors?
A **No.**
Q Do you have a copy of that report in your files?
A **I don't know.**
Q Do you know how it came to occur that Mr. Corneal had to supply a third-party certification that the sites already approved by the sewage enforcement officer were not located in wetlands?
A **No.**
Q You don't know how it came -- did you ever hear it discussed?
A **No.**
Q Let me ask you a very broad, general question about it. Did you know anything about it -- do you right now know anything about it?
A **I don't know what you mean.**

202

Q The sewage enforcement officer having determined that there are no wetlands on the Corneal property, okay. Do you know anything about the board or anybody else requiring that a third party certify that the sewage enforcement officer was correct in that determination?
A **No.**
Q Do you know anything about Mr. Wilson's interest in the property now owned by the Corneals?
A **No.**
Q Do you know anything about his family's prior ownership of it?
A **No.**
Q You don't?
A **No.**
Q Do you know anything about the history of that property at all?
A **No.**
Q Are you ever involved in any way, whether it's through maintenance of records or passing correspondence, in the issuance of privy permits in the township?
A **No.**
Q That stuff never comes across your desk?
A **Nope.**
Q Did anybody ever call you and inquire about

203

it?
A **Not to the best of my knowledge.**
Q Do you know anything about the granting of privy permits in the township?
A **No, I do not.**
Q Have you ever had any conversations with Mr. Parks about the issuance of privy permits?
A **Yes.**
Q What's the nature of those conversations?
A **I told him the result -- what the supervisors said the night of our meeting, that's all I did.**
Q The night of what meeting?
A **The meeting that -- I don't know what meeting it was. After the meeting of April 3rd.**
Q What did the supervisors say at the meeting of April 3rd?
A **That Mr. Corneal could not have a privy permit.**
Q So you passed that information on to Mr. Parks?
A **Barry Parks.**
Q Did you call him?
A **Yes, I did.**
Q Did you do so at the instructions of the supervisor?

204

A **Yes.**
Q Supervisors, I should say.
A **Yes.**
Q Did one supervisor in particular ask you to make that phone call?
A **No.**
Q Did you generally understand you were supposed to make that phone call?
A **Yes.**
Q So you took it upon yourself to make the phone call without a specific instruction on that particular occasion?
A **That's right. That's exactly right.**
Q Did you discuss the refusal to provide a privy permit to Mr. Corneal with Mr. Newton?
A **I don't know if I ever did or not.**
Q In your discussion with Mr. Parks about whether or not to provide a privy permit to Mr. Corneal, how long did you talk to him?
A **I have no idea.**
Q Did you call him at his house?
A **Yes.**
Q So you don't know exactly how long you talked to him. Do you know when you talked to him?
A **After the meeting.**

205

Q The same night of the meeting?
A **Yes.**
Q Immediately after the meeting?
A **I don't know.**
Q I may have asked you this, and I apologize, but do you recall the back and forth between you and Mr. Parks about whether or not to issue a privy permit?
A **Do I what?**
Q Do you recall the substance of the conversation?
A **No. All I did -- well, I guess I do. I just repeated what happened at the meeting and that's all I did.**
Q What did Mr. Parks say?
A **I don't know as he said anything. I just told him what happened.**
Q Did you ever talk to Mr. Parks about issuing the Corneals a privy permit?
A **Not that I remember.**
Q Did you seek any advice from Larry Newton in this regard?
A **I don't -- not that I recall.**
Q Did the Corneals ever contact you directly about getting a privy permit?
A **Not that I recall.**
Q When you called Mr. Parks, did you say to him

something along these lines, and if I'm wrong correct me and tell me what you said, okay, the supervisors said do not issue a privy permit to Mr. Corneal; is that correct?
A **What I said was what was in the minutes.**
Q As you said, the minutes are a summary of what goes on at the meetings. I'm just asking you if you can be a little more specific in what you said to him.
MR. SHERR: I'm going to object to the form of the question. It's been asked and answered and at this point we're getting very argumentative, Counsel.
MS. MONTGOMERY: Really?
MR. SHERR: Yeah, really. Yeah, really. When she says it's what's in the minutes and you're asking her for more specificity and she said what's in the minutes, I think that's pretty specific.
MS. MONTGOMERY: I'm entitled.
MR. SHERR: You're entitled to what?
MS. MONTGOMERY: I'm entitled to seek information.
MR. SHERR: You are absolutely entitled to seek information. You're not entitled to harass this witness, you're not entitled to be argumentative with this witness and you're not allowed to oppress this witness. You can answer, if it's anything other than what's in the minutes as you stated.

THE WITNESS: It's what I just said.
(Discussion held off the record.)
BY MS. MONTGOMERY:
Q Are you aware of the contract that existed between Mr. Corneal and the Hewetts for the purchase of the farmhouse and some surrounding property that's located on the larger piece owned by Mr. Corneal?
A **I'm aware they had an agreement.**
Q How did you become aware of that?
A **I think -- I don't know, somewhere in this.**
Q When did you first hear about it?
A **I don't -- I don't recall.**
Q Did you ever discuss that contract with anybody else?
A **No.**
Q Did you ever discuss whether or not the Hewetts were going to go forward with their sale -- purchase of that property with anybody else?
A **I have no reason.**
Q Do you know whether anybody else is interested in purchasing the farmhouse located on Mr. Corneal's property?
A **I have no reason to have that information.**
Q I just asked you do you know.
A **No.**

Q How long have you lived in Jackson Township?
A **Eleven years.**
Q Where did you live before that?
A **Camp Hill.**
Q Did you own property up there before you moved up there 11 years ago?
A **Yes.**
Q How long did you own that property?
A **1988.**
Q Did you own any property before you owned that particular property?
A **Where?**
Q Up in Jackson Township.
A **No.**
Q Do you have family up there?
A **Yes.**
Q Who is that?
A **Nobody in Jackson Township, if that's what you're asking.**
Q That's what I'm asking, right.
A **No, I don't have any family.**
Q Were you aware that Eagle Excavation was hired to perform excavation work for test pits on the Corneal property?
A **When?**

Q At the time that they were hired to do so.
A **No.**
Q You were not aware of that?
A **No.**
Q Were you aware of Mr. Wilson doing any work up on the Corneal property whatsoever?
A **When?**
Q At the time that he performed the work.
A **No.**
Q Now, you asked me when. When did you become aware?
A **From the documents.**
Q Just from the documents in this lawsuit?
A **Right.**
Q After you initially called Mr. Parks and told him that he wasn't supposed to issue a privy permit according to the supervisors, did you ever call him back and talk to him again?
MR. SHERR: Object to the form of the question of misstating her prior testimony.
BY MS. MONTGOMERY:
Q I'll just try and rephrase it. Maybe I missed something, but after you called Mr. Parks and informed him that the supervisors said that he was not to be issued a privy permit, did you ever call -- talk to him again about

whether or not to issue the Corneals a privy permit?
A **You asked me that before and I said no.**
Q Did you ever talk --
A **Not that I recall.**
Q Did you ever talk to him again about whether or not he ought to approve the sewage modules?
A **No.**
Q Did you ever call Mr. Van Dommelen with any information about whether or not he ought to issue a building permit to the Corneals?
A **No.**
Q I'm going to show you a document we are going to mark as Wirth Exhibit 15.
(Letter dated 5/5/00 produced and marked as Wirth Exhibit No. 15.)
BY MS. MONTGOMERY:
Q Have you seen this document before, Miss Wirth?
A **Yes.**
Q In what capacity have you seen it?
A **It's in all this stuff I have.**
Q The document is dated May 5th, 2000, correct?
A **Yes.**
Q Were you given a copy of this document by Mr. Van Dommelen?

A **I don't know how I got the document.**
Q Did you have a copy of it in your files?
A **Yes.**
Q Did you provide it to us?
A **I don't know if I did or not.**
Q Did you ever discuss this letter with any of the board of the township supervisors?
A **I don't recall.**
Q Did you ever discuss it with Mr. Van Dommelen?
A **I don't -- I don't know. I don't recall.**
Q More generally did you ever discuss it with anybody at any time?
A **I don't recall.**
MS. MONTGOMERY: I don't think I have any other questions for you at this time, subject to our receipt of additional documents from your files and review of additional documents in Jackson Township and subject to what my client has to say right now about additional questions. I think we're finished for now, Miss Wirth.
THE WITNESS: Thank you.
MS. YANKANICH: I have some questions for you. I know it's been a long day and I'll try to be brief.

CROSS-EXAMINATION

BY MS. YANKANICH:
Q In case I haven't introduced myself, Miss Wirth, I'm Jennifer Yankanich and I represent Larry Newton.
A **Yes.**
Q I want to go back and retrace some of these steps so that I understand very clearly what kind of communications you had with Larry Newton and so forth. So I'd like to start with the period of 1997 to '98, which is roughly when you said you started research on the subdivision ordinance.
A **Very little probably. I don't recall.**
Q But you did start research before you actually enacted the subdivision ordinance; is that correct?
A **Oh, yes.**
Q And the three supervisors asked you to do that research.
A **Oh, yes.**
Q Did you have any contact during that research with Larry Newton?
A **Between '97 and '98?**
Q At any time during the research and before the ordinance was enacted.
A **Oh, yes.**
Q What kind of communications were they?
A **Well, he typed the final -- he typed the**

**ordinance that we came up with.**
Q Larry Newton did?
A **Yes.**
Q So --
A **Before the final -- I mean, it was a draft. He did that.**
Q When you were doing -- what kind of research were you doing on the ordinance?
A **That's what I testified, on all the other subdivision ordinances that we got and we divided and subtracted and put things together for Jackson Township.**
Q You stated that you had work groups with the three other supervisors?
A **Yes, we did.**
Q Now, how did Larry Newton come into the works? For instance, during these work groups if you had questions, did you call Larry Newton?
A **I don't recall if we called him from those work groups. I don't know that. I don't remember.**
Q Well, who made the decision on what parts to put into the subdivision ordinance?
A **The supervisors.**
Q Did you at any time contact Larry Newton and get his approval as to what was included in your draft ordinance?

A **To get his approval?**
Q Yes. When your supervisors made the decision on what specific parts to put into this draft ordinance, did they seek the approval of Larry Newton?
A **I don't know if they ever asked for his approval.**
Q Did you ever -- you testified earlier you weren't sure who asked you or who stated they wanted a subdivision ordinance. Did you ever ask Larry Newton whether or not the township could enact such an ordinance?
A **Probably.**
Q Was that before your research was started?
A **I don't remember.**
Q Do you remember that you did in fact ask him whether you could have such an ordinance?
A **I don't recall.**
Q Now, throughout your workshops when did Larry Newton get involved in typing the draft?
A **You want a time?**
Q Yes. For instance, you've told me that you did some research, you gathered some other documents from other townships who had such an ordinance, you and the three supervisors sat down and picked some parts out of each of these to put into yours. I'm asking you how Larry Newton came to even start to type this.

A **We took it into him and asked him to look at -- look at it legally, I guess.**
Q So you already had a draft?
A **Yeah -- well, no, we didn't have a draft.**
Q What did you submit to him?
A **The pieces that we had.**
Q And what did you specifically ask him about those pieces?
A **He just needed to look at them for, I guess, the legal aspect of the thing, not as far as how they -- what it did to the township, but were they legal, I guess. I don't know what he was doing. I just know that he did it.**
Q Did you have that contact with Larry Newton or did the supervisors?
A **Probably me.**
Q So were you always the go-between between Larry Newton and the supervisors?
A **No.**
Q Was there a situation with regard to this draft ordinance where the supervisors went directly to Larry Newton to ask questions?
A **You're only talking about the ordinance now?**
Q The draft ordinance before it was enacted.
A **I don't think so, but I don't -- I don't think they went without me, but I don't know that for sure.**

Q Before January 2000 when the moratorium was voted on and passed --
A **Um-hum.**
Q -- did you ever ask Larry Newton whether or not passing such a moratorium was legal?
A **I don't recall if I did or not.**
Q Do you recall if any of the supervisors asked Larry Newton that?
A **You'll have to ask them that.**
Q Do you recall ever discussing the moratorium prior to when it was passed with Larry Newton?
A **I don't recall.**
Q Before January 2000 did you have any knowledge of David Corneal's property and what he was proposing to do with it?
A **No, I did not.**
Q So did you have any discussions with Larry Newton prior to January 2000 regarding David Corneal's properties?
A **No, not to -- no.**
Q In January 2000 the moratorium was passed?
A **Right.**
Q You just stated you did not have any conversations with Larry Newton regarding that moratorium; is that correct?

A **I said I couldn't recall.**
Q You couldn't recall. Do you recall if any of the supervisors asked you to research whether or not you could -- they could pass such a moratorium?
A **I don't recall how we came about that.**
Q Typically if the supervisors wanted to do something, such as pass a moratorium or pass a resolution or pass an ordinance, would they ask you to research it?
A **It depends. Sometimes.**
Q Fifty percent of the time?
A **Maybe.**
Q Most of the time?
A **I would say about 50 percent of the time.**
Q You don't recall whether or not the supervisors asked you to research whether they could pass a moratorium?
A **I don't recall how that happened.**
Q When was the first time that you heard a moratorium was going to be passed?
A **I don't -- I don't know. I don't recall.**
Q Did you show up at the January meeting and somebody brought up the issue of a moratorium?
A **I was at the January meeting.**
Q That was the first time you heard about a moratorium?

218

A **I don't recall.**
Q And so we're clear, you had not heard of David Corneal before January 2000?
A **No.**
Q The moratorium was passed on January 4th during the meeting; is that correct?
A **Right.**
Q By a unanimous vote of the three supervisors?
A **Yes.**
Q Were you involved with that vote?
A **I don't have a vote.**
Q If you had sought the advice of Larry Newton, do the supervisors typically take your advice or do they ask Larry Newton themselves?
A **Typically take my advice?**
MR. SHERR: Make sure she can hear you.
THE WITNESS: Oh, you're still recording this?
MS. YANKANICH: Yes, we're still on the record. You're still under oath.
MR. SHERR: She got it.
MS. YANKANICH: I'm not being confrontational at all. I'm just letting her know that she's on the record.
MR. SHERR: I know you're not. She answered the question.
BY MS. YANKANICH:

219

Q Oh, you answered my question. Typically if you asked Larry Newton a question -- the supervisors asked you to ask Larry Newton a question, do they come to you and say what did he say or do they ask him themselves?
A **I'd say it's about a fifty-fifty thing.**
Q So if you went to Larry Newton and said can we pass a moratorium in January and he says, let's just say, yes, we can, you would report that back to the supervisors?
A **If he did that, I would have.**
Q And they would act upon that advice without confirming it themselves typically?
A **Sometimes, sometimes not.**
Q Did Larry Newton tell you to enact a moratorium?
A **I don't recall how that came about.**
Q You don't recall if it came about from a supervisor or from Larry Newton?
A **I don't recall how it came about.**
Q On February 7th when David Corneal submitted his subdivision plan to the three supervisors, do you recall at the meeting before they denied it, do you recall if the supervisors stopped the meeting, called their attorney, Larry Newton, and discussed the matter with him before refusing the denial?
A **I know they didn't do that.**

220

Q So they denied his subdivision plan prior to calling Larry Newton on February 7th?
A **Yes.**
Q Did they at any time after the February 7th meeting consult with Larry Newton regarding the first subdivision plan that David Corneal submitted?
A **I'm sure they did.**
Q Were you present at any of those meetings?
A **I don't recall.**
Q Did you consult with Larry Newton after February 7th regarding the first subdivision plan that David Corneal submitted?
A **I don't recall if I did or not.**
Q You said that you thought the supervisors did. Why do you think that?
A **Somebody did.**
Q How do you know that?
A **Because he's been aware of what we've been doing.**
Q Was he aware from the beginning?
A **I don't -- beginning of what?**
Q February 7th is the first time you stated that David Corneal came to your knowledge. You didn't know about David Corneal and his property before then?
A **No, I didn't.**

221

Q So February 7th he walks into the meeting where you're taking the minutes, he submits his plan and the three supervisors deny it. Did somebody get on the phone right after that and talk to Larry Newton to inform him, hey, we've got to let you know what's going on here?
A **You mean that night?**
Q Anytime after February 7th.
A **Yes, somebody did.**
Q When was that?
A **I don't know.**
Q Do you know who it was?
A **No.**
Q How do you know that Larry Newton was aware of the denial of the board on February 7th?
A **I don't know if it's in one of these documents -- I don't know. I don't know.**
Q Your testimony is that you're sure he was aware of what happened, what transpired at the February 7th meeting with David Corneal, but you don't know how?
A **I don't know how he got the information.**
Q You're sure he knew about it?
MS. MONTGOMERY: I'm going to just -- I'm now in the position that you were in. I can see that the court reporter is struggling to hear. So can you keep your voice up.

222

THE WITNESS: I'm sorry.
BY MS. YANKANICH:
Q Let me just repeat my question. You're sure that Larry Newton knows and knew right after the meeting what transpired at the February 7th, 2000 meeting?
A **I'm sure he knew. When he found -- we told him, but when he found out I don't know.**
Q Is it possible he found out about what happened at that meeting after this lawsuit was enacted, was initiated?
A **You mean after July 4th?**
Q Is it possible he found out after the county sued David Corneal for violation of building against --
A **Oh, no.**
Q He knew before then?
A **Oh, yeah.**
Q Now, on April 4th David Corneal came to the meeting to submit sewer modules. They were denied by the board; is that correct?
A **Yes.**
Q Did the three supervisors stop the meeting and seek advice from Larry Newton during the meeting?
A **No.**
Q Before that denial?
A **No.**

223

Q Did you at any time consult with Larry Newton regarding the denial of the sewer modules on April 4th?
A **At the meeting?**
Q At the meeting.
A **No.**
Q How about after the meeting?
A **Not at that time.**
Q When did you consult with Larry Newton regarding the sewer modules?
A **I don't recall when we did that.**
Q You know that you did?
A **No, I don't know if we did. I don't know how he found that out.**
Q You believe that Larry Newton knows about the board's denial of Mr. Corneal's submission of a sewer module?
A **Yes.**
Q How do you think -- why do you believe he knows about that?
A **Because of all this paperwork. We all have these big packs of paperwork now because of the lawsuit and I believe it's in there, in my minutes.**
Q So you believe he knows about it, but you don't know when he found out?
A **No.**

224

Q You never told him what happened at that meeting?
A **I don't know if I did or not.**
Q Is it customary after each meeting of the supervisors to call Larry Newton?
A **No.**
Q So the January 4th meeting, it's not customary to end the meeting and then call Larry Newton to discuss the --
A **No, it is not.**
Q That would be unusual to do that?
A **Yes, it would be.**
Q So even though it's unusual, it doesn't stand out in your mind that maybe somebody did that?
A **No.**
Q Mr. Corneal also requested a privy permit at one of these meetings. I apologize, I forget the date that he actually requested that permit. Do you recall?
A **I think it was April.**
Q Also April. It was denied as well; is that correct?
A **Yes.**
Q Did you seek the advice of Larry Newton with regard to the denial of that privy permit?
A **No, I don' think that -- did I seek it?**

225

Q Did you.
A **No.**
Q Are you aware if any of the supervisors sought Larry Newton's approval before they denied the privy permit requested by David Corneal?
A **I am not aware of that.**
Q The first time that David Corneal requested a building permit -- I'm talking the first time -- did you yourself seek the advice or guidance of Larry Newton regarding that building permit request?
A **I don't know whether -- I don't -- I don't recall.**
Q Do you remember discussing this at all with Larry Newton?
A **I'm sure I've discussed it all with him.**
Q You've discussed the entire situation with Larry Newton?
A **At some time during this we've had a discussion.**
Q During the lawsuit?
A **Yes.**
Q Do you remember prior to the lawsuit talking to Larry Newton about David Corneal?
A **I probably did.**
Q Can you give me any of the specifics of that

conversation?
A No.
Q Did you ever ask him whether what the board was doing was legal?
A **I don't think I ever asked that question.**
Q Did you ever ask him whether or not you could deny a privy permit?
A **I never asked it -- I don't think I ever asked him that question.**
Q When he came to you and said he was no longer going to subdivide and he wanted to build a garage, did you seek the advice of Larry Newton?
A **You mean during the meeting or whatever?**
Q I'm saying at any time.
A **At any time?**
Q At any time did you seek the advice of Larry Newton on behalf of yourself or the board members with respect to any requests by David Corneal with his property?
A **We've asked his advice.**
Q Give me some of the specifics of that advice.
A **It's very hard to say because we talk about a lot of things. You know, there's a lot of things going on here and you're asking for those items and I can't honestly testify to those items. We've talked about everything in -- after the lawsuit and before and I'm not sure.**

Q So you're not certain that you've ever had a conversation with Larry Newton before the lawsuit was initiated?
A **Oh, I've had conversations with Larry before the lawsuit was initiated.**
Q Conversations about David Corneal's property?
A **Yes, I'm sure I've done that.**
Q Were these conversations to just discuss David Corneal or was it to just get his advice on how the board should proceed with regard to David Corneal?
A **To get his advice.**
Q What advice specifically did the board need to proceed?
A **Before or after the lawsuit?**
Q Before.
A **I don't know. I can't give you a specific before.**
Q Well, you testified that you're certain you had conversations with Larry Newton regarding advice the board needed to proceed with regard to Mr. Corneal and what he wanted to do with his property. Am I misstating your testimony?
A **No, I did say that, but I can't give you a specific -- I can't tell you specifically what I would have talked to him about.**

Q When David Corneal came to the board meeting and said it was illegal to have a moratorium, did you ask Larry Newton about that?
A **I probably did or somebody did.**
Q Are you sure of that?
A **No, I'm not sure.**
Q Did you yourself ask him that?
A **I don't remember.**
Q There's a pretty specific chronology of events that went on in this matter before the lawsuit was initiated. There was the research for the ordinance and then you imposed the moratorium. When I say you, I mean the board. Then Mr. Corneal came on the scene and requested his first subdivision plan to be approved.
You don't recall at any point during this whether it was when he asked for his first subdivision plan or his sewer module or his privy permit or his first building permit, building application, or his second building permit, whether or not you or any board member sought the advice of Larry Newton?
A **I'm -- you asked me to be specific and I can't be specific. I don't remember.**
Q Well, when I ask you a specific question, you first tell me that you don't think you did and then I ask you another question and you tell me you're certain that you

had contact with Larry Newton. All I'm trying to find out here, and I'm trying not to be confrontational, is when did you talk to Larry Newton? When did you specifically talk to Larry Newton?
A **I don't remember.**
Q Did any of the supervisors ever come to you and say, hey, we need to find out whether or not we can do this?
A **I don't remember.**
Q Not on any of this information?
A **I remember talking to Larry, but I do not specifically -- I can't give you specifics on this. I can't.**
Q How often does the board seek the advice of Larry Newton?
A **Under normal circumstances?**
Q Under any other circumstance than the Corneal circumstance.
A **Not very often.**
Q When would be a situation where they would need to consult with Larry Newton?
A **If we were going to do an ordinance. And we had a problem with our one road, Miller Road is -- to be specific, where the contractor came in and the road failed. So we made -- we had to get after him and we filed a suit**

230

**against him to come back and redo the road, which he did.**
Q Did you ever consult with Larry Newton regarding any other person who submitted a subdivision plan?
A **Not to the best of my knowledge.**
Q So David Corneal is the only person who submitted a subdivision plan where you needed the advice and guidance of Larry Newton?
A **In the short period that I've been there, yes.**
Q But you don't recall what any of that advice was that you needed?
A **Advice?**
Q Yes.
A **You're talking about before the lawsuit?**
Q Yes, specifically I'd like to focus on before the lawsuit at this point.
A **I have no idea what we talked to him about.**
MS. YANKANICH: Give me a second here. I'll look through my notes.
(Pause.)
BY MS. YANKANICH:
Q When there was going to be an advertisement for a meeting of the board, how was it determined whether or not you would submit the notice, the advertisement, or Larry Newton would submit the advertisement?
A **You have to be specific.**

231

Q Okay, if it is a -- if it was a regular meeting of the board in January, would you advertise when the meetings were going to be held?
A **I did that.**
Q If it was going to be a special meeting of the board, how was it determined whether or not you or Larry Newton would notify the public of that meeting?
A **The only time Larry would ever advertise was for an ordinance or something. I did everything else.**
Q You stated earlier that Larry Newton is not present at the township supervisor meetings; is that correct?
A **I said unless we request him.**
Q Unless you requested him to be there; is that correct?
A **That's right.**
Q Did you ever request him to be there with regard to the David Corneal matter?
A **No.**
Q Do you know why any of the supervisors did not impose the moratorium prior to January 2000?
A **You'll have to ask them that.**
Q Do you know if it was Larry Newton who suggested that they do that in January 2000?
A **I have no idea.**

232

Q Did you talk with Larry Newton about whether or not a moratorium should be imposed in January 2000?
A **I think I've testified to that a couple times today. I don't recall.**
Q You testified earlier that you know of two specific conversations you had with Larry Newton, one was a conference call with the other supervisors present after the lawsuit was initiated and the first was a telephone call that you had with Larry Newton. Do you recall when that contact occurred?
A **July 4th.**
Q What was the substance of that conversation?
A **He called me to tell me he had been served with a lawsuit.**
Q Larry Newton called you?
A **Yes.**
Q What was the time of that conversation?
A **I have no idea. Sometime during the day.**
Q Did you make any notes of when -- of telephone calls?
A **No, this was on the 4th of July or 3rd of July or something and I was at home. I was not in my office when I got the phone call.**
Q Do you typically make any telephones notes when you receive a telephone call regarding township

233

business?
A **No, I do not.**
Q If you were sitting in your office right now, is there anything that you would reference that could get me the information to exactly what time and when this conversation occurred?
A **No.**
Q No memos from the conversation?
A **No.**
Q You also stated previously that Jim Himes would give information to Larry Newton and then Larry Newton would call and I believe you said he would call you or the supervisors; is that correct --
A **Yes.**
Q -- regarding the David Corneal matter?
A **Yes.**
Q Did he typically call you?
A **Sometimes. Sometimes he calls one of the supervisors.**
Q What would he call you and discuss?
A **Whatever is going on.**
Q What kind of information was he getting from Jim Himes?
A **I don't think he was getting information. He was -- Mr. Corneal was asking Jim Himes for -- it's in one**

234

**of these memos here, some kind of information. You know, I don't know if that was -- I don't know. It's in these papers.**
Q Was Larry Newton calling you to tell you to provide that information to Mr. Corneal?
A **I don't remember.**
Q Do you remember what information Mr. Corneal was seeking through Jim Himes?
A **At one time I think he wanted a draft copy of the ordinance.**
Q So when Larry Newton instigated the phone call to you or one of the supervisors, you don't recall what he said?
A **No.**
Q Do you recall ever being directed by Larry Newton to give a draft ordinance to Mr. Corneal?
A **No, I do not recall.**
Q Do you recall any of the telephone conversations you had with Larry Newton prior to the lawsuit?
A **No.**
Q Do you recall any other meetings that you had, conference, meetings or otherwise, with the supervisors, yourself and Larry Newton?
A **Prior to the lawsuit?**

235

Q Prior to the lawsuit.
A **No, I do not.**
Q You mentioned earlier that you have knowledge of a sewage act, I believe you said it was, where if two dwellings are on the same property it's considered an equivalent subdivision; is that correct?
A **That's right.**
Q Do you have that -- is that your own independent knowledge or did you get that advice from Larry Newton?
A **I didn't get that advice from Larry Newton.**
Q That's your own independent knowledge?
A **Yes.**
Q You said that you kept Larry Newton informed of what was happening with the Corneal property. Was it primarily you who kept him informed?
A **I can't testify as to whether the supervisors talked to Larry or not.**
Q I'm asking you whether or not you kept him informed of what was happening with the Corneal property.
A **I probably did.**
Q When you say probably, are you certain that you did?
A **Of some things I'm sure I did.**
Q Now, what specifically did you tell him about

236

the Corneal property?
A **I don't know specifics. I just -- I would -- when I get a piece of information, I forward it to everybody that needs it, that's what I do, and I can't tell you specifics. It's probably half the documents in here.**
Q Are you talking now after the litigation, once you got a document in you would talk about it with Larry Newton or are you talking about before?
A **I'm talking about now with the litigation.**
Q After the litigation. You said that you discussed the -- or I'm sorry, the supervisors discussed the driveway ordinance with Larry Newton; is that correct?
A **I believe they did.**
Q Do you recall any of the specifics of that conversation?
A **(Witness shook her head negatively.)**
Q How about did they discuss the privy ordinance with Larry Newton?
A **I'm sure it was discussed with Larry.**
Q Do you recall any of the specifics?
A **No.**
Q Do you recall whether or not they were asking him whether they could pass such ordinances?
A **I do not.**
Q Is it customary to always seek Larry Newton's

237

advice before the board acts?
A **No.**
Q Is it rare that you would seek Larry Newton's advice before the board acts?
A **I wouldn't say it's rare.**
Q How often do you seek Larry Newton's advice?
A **Only when we have a problem.**
Q Is David Corneal the only problem this township has seen in a long time?
A **No. No, I just told you about the road.**
Q So other than the road, have you ever sought Larry Newton's advice on any other resident of Jackson Township?
A **Residence?**
Q Resident of Jackson Township.
A **I can't recall.**
Q I just want to go back a little bit over your testimony that I think we weren't real clear on. At first I believe your testimony was Larry Newton did not advise the supervisors to initiate a lawsuit against Mr. Corneal. What is your testimony with regard to who advised the supervisors to initiate the lawsuit, if anyone did?
A **I don't remember saying that.**
Q With regard to the lawsuit that was initiated against Mr. Corneal by the township, did anybody advise the

238

supervisors to your knowledge to initiate that lawsuit?
A **I do not know how that happened. I can't testify to that. I don't know who did that.**
Q Were you ever present at a meeting where Larry Newton and any of the supervisors were present where Larry Newton gave that kind of advice?
A **I don't recall.**
Q You don't recall a meeting where that happened or that happening?
A **Please repeat your question for me.**
Q Okay. Were you ever present at a meeting where Larry Newton met with any of the supervisors and advised them to initiate a lawsuit against Mr. Corneal?
A **I do not recall that.**
Q Are you telling me you don't recall being at a meeting or that there wasn't -- what are you telling me you don't recall?
A **I don't recall Larry advising us to issue --**
Q Start this lawsuit?
A **Start a lawsuit.**
Q You don't recall him telling you to do that?
A **I don't know how that happened.**
Q But you're telling me you don't recall Larry Newton telling the township to do that?
A **No.**

239

Q Do you recall any of the supervisors saying they needed to seek the advice of Larry Newton before they initiated this lawsuit?
A **You'll have to ask them that.**
Q You were never present when any of the supervisors stated that?
A **I don't recall.**
Q Did you ever discuss this -- the possibility of a lawsuit against David Corneal with any of the supervisors prior to the lawsuit being initiated?
A **This lawsuit?**
Q No, the first lawsuit where the township is suing Mr. Corneal. Did you ever talk to any of the supervisors before it was initiated?
A **That's not the first lawsuit.**
Q What was the first lawsuit?
A **This is the first lawsuit.**
Q I'm sorry, let me clarify. Did you ever talk to any of the supervisors directly about Mr. Corneal before they initiated a lawsuit against him for a violation of the building permit ordinance?
A **Did I do that?**
Q Did you ever talk with the supervisors before they started the lawsuit?
A **I'm sure we talked about it.**

240

Q Did they ask you whether or not they should do that?
A **They wouldn't ask my advice.**
Q They just talk with you about it?
A **Yes.**
Q Well, if I may ask, why is it that the supervisors consult with you when they don't take your advice and they -- and you work for them?
MR. SHERR: Objection. You're asking her for somebody else's state of mind.
BY MS. YANKANICH:
Q Do you have an opinion as to why they seek your advice?
A **No.**
Q I apologize, I don't think I've asked you this question. Did you yourself ever discuss directly with Larry Newton the township's lawsuit against Mr. Corneal?
A **Did I talk to Larry about it?**
Q Yes.
A **With the supervisors, without the supervisors or what?**
Q Either one.
A **I'm sure we have.**
Q Do you recall any of the specifics of those conversations?

241

A **No, I do not.**
Q Do you recall of whether you had such a meeting?
A **You asked me if I had a conversation.**
Q Okay, I'm sorry. I apologize. Did you ever -- do you recall whether a conversation like that did happen?
A **Yes.**
Q Was it with you and Mr. Newton or with you and Mr. Newton and the supervisors?
A **I'm sure it was with all of us.**
Q And that was after the township sued Mr. Corneal?
A **I don't think that's what you asked me.**
Q That's what I asked you the first time. I'm asking you whether you had -- let me just restate the question.
A **Okay.**
Q Did you yourself discuss with Larry Newton directly, either in a meeting or a phone call, the lawsuit that the township initiated against Mr. Corneal?
A **I have talked to Larry about it.**
Q Do you recall any of the specifics of those conversations?
A **No, I do not.**

Q Do you recall whether that was a telephone call or a meeting?
A **I do not.**
Q Do you recall whether any of the supervisors were present?
A **I don't -- I don't recall.**
Q With reference to Exhibit 14, if you would -- I would actually like you to reference the specific exhibit, if I may. I just have a question as to whose notation that is. I didn't hear if Miss Montgomery asked you this. With regard to Exhibit 14, is that your handwriting that says --
A **No.**
Q -- copy sent to Newton?
A **No, it is not.**
Q Do you know whose handwriting that is?
A **I have no idea.**
Q When Mr. Van Dommelen -- let's specifically reference Exhibit 15. I'm going to show you Exhibit 15. If you would refer to Exhibit 15 during your answer, please. In this letter from David Corneal to Mr. Van Dommelen he states that Mr. Van Dommelen refused to give him a building permit application and that he did so on the advice of the supervisors.
Do you recall -- were you present at any time when the supervisors called Larry Newton? Let me rephrase

that. Do you know if the supervisors ever consulted Larry Newton with regard to whether or not they should advise Mr. Van Dommelen to not issue such an application?
A **I don't know.**
Q You don't know if they ever called Larry Newton to ask him that?
A **I don't know.**
Q Were you aware that Mr. Van Dommelen refused to give Mr. Corneal an application?
A **I think I've already testified to that.**
Q I'm sorry, what was your answer?
A **Yes.**
Q You were aware that -- you knew he refused to do so?
MR. SHERR: You don't have to repeat it again. She said yes. Let's move on, please.
MS. YANKANICH: I'm just trying to clarify for myself.
BY MS. YANKANICH:
Q You were aware that he was refused an application, is that your answer?
A **It was in the paperwork here, yes.**
Q That's when you became aware of it. Is there any other time prior to the initiation of the lawsuit that you can remember seeking the advice of Larry Newton for any

reason with regard to Mr. Corneal's property that I haven't asked you about?
A **You're going to have to tell me that one again.**
Q Do you recall any other time that you sought the advice of Larry Newton with regard to David Corneal's property that I may not have asked you about?
A **No.**
MS. YANKANICH: Thank you. I have no further questions.
MS. THORP: No questions.
MR. SHERR: Anything else?
MS. MONTGOMERY: I just have a follow-up or two. Do you have anything?
MR. SHERR: No.

REDIRECT EXAMINATION

BY MS. MONTGOMERY:
Q Just generally, you were asked a series of questions by Mr. Newton's counsel about whether or not when you spoke with Larry Newton you were seeking his advice, okay, and I want to just ask a general question.
Typically when you speak to Larry Newton are you speaking to him just as a friend or is it on township

business? Do you speak to him on township business or are you speaking to him just as a friend or are you speaking to him as the township's counsel?
A **As the township's counsel.**
Q Do you expect then that if there is anything that you are telling him that he ought to have advice on and he'll give you that advice? Is that your expectation when you talk to him?
A **I would assume.**
Q You would assume that he would give you advice if anything you tell him raises any concerns with him; is that your testimony?
A **Yes.**
Q You know, you had mentioned earlier that you lived in Camp Hill prior to what, 11 years ago?
A **Yes.**
Q And did you work here?
A **I'm retired from the state.**
Q What did you do at the state?
A **I was the cash desk for the Treasury Department for 25 years.**
Q Have you ever had any conversations with Larry -- with an attorney who shares Mr. Newton's law offices?
A **No.**
Q Do you know who Mr. Reeder is?

A **I know his name. I don't know who he is.**
Q You've never met him?
A **No.**
Q You never talked to him?
A **No.**
Q You never corresponded with him?
A **No.**
Q Now that the township has these ordinances -- well, now, let me back up a second. The township has five ordinances, I believe you said, right?
A **Four.**
Q Four?
A **I think it's four.**
MR. SHERR: You mentioned five.
BY MS. MONTGOMERY:
Q I think you mentioned five.
A **Five, okay.**
Q And you say you keep them in your office, you keep a copy of each of them in your office?
A **Yes, they're in my office.**
Q Where do you keep them?
A **The subdivision ordinance is in a binder, which I told you earlier, along with the privy and the driveway ordinance. The building permit ordinance is in an ordinance file.**

Q What's an ordinance file?
A **It's just a file that says ordinance.**
Q It's like a collapsible folder or something?
A **It's just a manila folder.**
Q A manila folder that says ordinance. And the fifth ordinance?
A **I'm so confused here. There's a subdivision ordinance, a driveway ordinance, a privy ordinance and a building permit ordinance.**
MR. CORNEAL: Agriculture.
THE WITNESS: Oh, I'm sorry. Thank you, agriculture security. That's in a separate folder because that's a whole other issue.
BY MS. MONTGOMERY:
Q Is it in a manila folder also?
A **Yes.**
Q Do you keep an ordinance book, like one book of all the ordinances?
A **No.**
Q I'm going to show you a document that we're going to mark as Wirth 16 and this is a January 31, 2000 letter from David Corneal addressed to Mr. Newton.
(Letter dated 1/31/00 produced and marked as Wirth Exhibit No. 16.)
(Discussion held off the record.)

BY MS. MONTGOMERY:
Q Did you have a chance to look at that letter?
A **Yes, I did.**
Q Have you seen the letter before?
A **I don't recall if I've seen it before or not.**
Q Do you know whether you were given a copy of the letter at the time that it was written, which I think the date of it is January 31st, 2000?
A **I just said I don't recall if I've ever seen the letter before.**
Q Do you recall ever discussing with Mr. Newton his receipt of that letter from Mr. Corneal?
A **I don't recall that.**
Q Well, look at the contents of the letter then. Now that you've had a chance to look at this letter from David Corneal to Mr. Newton, do you recall ever talking to Mr. Newton about the particular issues in this letter? And we'll start at the beginning, the approval of his subdivision.
A **I don't recall.**
Q What about -- do you know whether or not Mr. Simpson dropped off a copy of the plan at Mr. Newton's office?
A **I believe I testified earlier I don't know how that happened.**

Q And in this letter Mr. Corneal tells Mr. Newton that there is urgency of approval, in that the Hewetts have a loan commitment for settlement at the end of February. Do you recall whether or not Mr. Newton called the township offices to discuss any sort of urgency of approval of Mr. Corneal's subdivision?
A **I don't recall that.**
Q Do you know whether the supervisors got a copy of this letter?
A **You'll have to ask them.**
Q I'm going to show you one other letter then and we're going to mark it as Wirth 17.
(Letter dated 7/28/00 produced and marked as Wirth Exhibit No. 17.)
BY MS. MONTGOMERY:
Q Have you seen this letter before?
A **Yes, I have.**
Q When did you see it?
A **I don't know, but I've seen it.**
Q Do you see where it says Jackson Township Board of Supervisors down there in the cc line?
A **Right.**
Q Did the letter come to you?
A **I would assume it did. I don't know for sure.**
Q Do you have a copy of this letter in your

files?
A **Yes, I've seen this letter in my files.**
Q Did you produce it to us?
A **I don't know whether I did or not.**
Q Now that you're looking at these two letters, the letter to Mr. Newton from Mr. Corneal in January 2000 and the letter from Mr. Newton to the Corneals on July 28, 2000, do you recall whether or not you spoke with Mr. Newton in between -- in that time frame, from January to July, to seek advice about how the Corneals were dealing with their property or about how to deal with the Corneals in connection with their property? Does that help you remember?
A **What?**
Q I'm trying to get you down to a time frame about when you spoke to Mr. Newton. Mr. Newton's counsel was trying to talk to you about whether you spoke to him prior to the initiation of this lawsuit.
A **I'm sure I -- I'm sure I testified that we have talked, but I don't know when or what about.**
Q You testified that you're sure you talked to Mr. Newton about the Corneals prior to the lawsuit; is that correct?
A **I believe I said that earlier.**
Q Do these letters -- reviewing these letters

help you remember at all when you might have spoken to Mr. Corneal about the Corneal -- I'm sorry, to Mr. Newton about the Corneal's property?
A **No, it doesn't.**
MS. MONTGOMERY: I don't have any other questions.
MS. YANKANICH: I have one last question. It's just a bookkeeping matter.

RECROSS-EXAMINATION

BY MS. YANKANICH:
Q With reference to Exhibit 15 on page 2 -- or actually maybe it's Exhibit 14. Let me look. Yes, Exhibit 14. I'd asked you on the first page of Exhibit 14 whether or not the handwritten message that says copy sent to Newton was your signature and you stated that it was not; is that correct?
A **No, I didn't write that.**
Q On the second page of Exhibit 14 is copy sent to Newton your signature -- your handwriting?
A **No.**
MS. YANKANICH: Thank you. I have no further questions.
MS. MONTGOMERY: Another housekeeping matter,

and this is addressed to Mr. Newton's counsel. Do you consider Mr. Newton to be under the sequestration order that the judge entered for purposes of talking to the other defendants about the substance of the depositions?
MS. YANKANICH: Let me review the order and then I'll get you an answer. Can we go off the record briefly?
MS. MONTGOMERY: Sure.
(Discussion held off the record.)
(The deposition was concluded at 4:27 p.m.)

COUNTY OF DAUPHIN :
: SS
COMMONWEALTH OF PENNSYLVANIA :

I, Teresa K. Bear, Reporter-Notary Public, authorized to administer oaths within and for the Commonwealth of Pennsylvania and take depositions in the trial of causes, do hereby certify that the foregoing is the testimony of ANN WIRTH.

I further certify that before the taking of said deposition, the witness was duly sworn; that the questions and answers were taken down stenographically by the said Teresa K. Bear, a Reporter-Notary Public, approved and agreed to, and afterwards reduced to typewriting under the direction of the said Reporter.

I further certify that the proceedings and evidence are contained fully and accurately to the best of my ability in the notes taken by me on the within deposition, and that this copy is a correct transcript of the same.

In testimony whereof, I have hereunto subscribed my hand this 31st day of May, 2001.

____________________________
Teresa K. Bear, Reporter
Notary Public
My commission expires
on April 13, 2003

DEFENDANT EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID B. CORNEAL and SANDRA Y. CORNEAL, PLAINTIFFS | : | |
| VS | : | NO. 1:CV-00-1192 |
| JACKSON TOWNSHIP, HUNTINGDON COUNTY, PENNSYLVANIA; W. THOMAS WILSON, individually and in his official capacity as Supervisor of Jackson Township; MICHAEL YODER, individually and in his official capacity as Supervisor of Jackson Township; RALPH WEILER, individually and in his official capacity as Supervisor of Jackson Township; BARRY PARKS, individually and in his official capacity as Sewage Enforcement Officer of Jackson Township; DAVID VAN DOMMELEN, individually and in his official capacity as Building Permit Officer; ANN L. WIRTH, individually and in her official capacity as Secretary of Jackson Township; and LARRY NEWTON, individually and in his official capacity as Solicitor to Jackson Township, DEFENDANTS | : | |

DEPOSITION OF: LAWRENCE L. NEWTON
TAKEN BY: PLAINTIFFS
BEFORE: TERESA K. BEAR, REPORTER NOTARY PUBLIC

DATE: JUNE 12, 2001, 9:42 A.M.

PLACE: ECKERT SEAMANS
213 MARKET STREET
HARRISBURG, PENNSYLVANIA

APPEARANCES:
ECKERT SEAMANS
BY: BRIDGET E. MONTGOMERY, ESQUIRE
LESLIE A. MALADY, ESQUIRE
FOR - PLAINTIFFS
MAYERS, MENNIES & SHERR, LLP
BY: ANTHONY R. SHERR, ESQUIRE
FOR - ALL DEFENDANTS EXCEPT NEWTON
THOMAS, THOMAS & HAFER
BY: MICHELE J. THORP, ESQUIRE
FOR - DEFENDANT - RALPH WEILER
METTE, EVANS & WOODSIDE
BY: KATHRYN LEASE SIMPSON, ESQUIRE
FOR - DEFENDANT - LARRY NEWTON
ALSO PRESENT:
DAVID B. CORNEAL

TABLE OF CONTENTS

WITNESS
FOR PLAINTIFFS DIRECT
Lawrence L. Newton
By Ms. Montgomery 4

EXHIBITS

| NEWTON EXHIBIT NO. | PRODUCED AND MARKED |
|---|---|
| 1 - Notice | 33 |
| 2 - Minutes dated 1/4/00 | 48 |
| 3 - Letter dated 1/31/00 | 68 |
| 4 - Letter dated 8/18/00 | 77 |
| 5 - Letter dated 7/28/00 | 80 |
| 6 - Letter dated 5/5/00 | 81 |
| 7 - Letter dated 5/5/00 | 84 |
| 8 - Notice | 99 |
| 9 - Bill dated 12/28/99 | 103 |
| 10 - Letter dated 8/3/00 | 106 |
| 11 - Letter dated 8/31/00 with enclosures | 109 |
| 12 - Letter dated 9/1/00 with enclosures | 112 |
| 13 - Letter dated 10/10/00 | 113 |
| 14 - Letter dated 11/10/00 | 121 |
| 15 - Invoice dated 8/4/00 | 126 |
| 16 - Letter dated 8/29/00 | 147 |

LAWRENCE L. NEWTON, called as a witness, being sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MONTGOMERY:
Q Mr. Newton, we've just met, but for the record I'll identify myself. My name is Bridget Montgomery and I represent the Corneals in this litigation. Would you just state your name for the record.
A **Lawrence, L-a-w-r-e-n-c-e, middle initial L., Newton, N-e-w-t-o-n.**
Q Where do you live, Mr. Newton?
A **I live at 2111 Moore Street, Huntingdon, Pennsylvania.**
Q How long have you lived there?
A **Since July of 1981.**
Q Are you a native of Huntingdon?
A **No, I'm not.**
Q Where are you a native of?
A **I grew up in Latrobe, Pennsylvania.**
Q What county is that?
A **Westmoreland.**
Q Out in the western part of the state?
A **Yes.**

Q And what is your current occupation?
A **I'm an attorney.**
Q Are you in private practice?
A **Yes, I am.**
Q And what is the business address of your law practice?
A **504 Penn Street, Huntingdon, Pennsylvania.**
Q Even though you are an attorney, I was going to dispense with all of these instructions, but I think we're going to need to go through them. Have you ever been deposed before?
A **No, I haven't.**
Q Okay. You know the general instructions?
A **Yes.**
Q First of all, that you really need to let me finish my question and I'll try to let you finish your answer so that we're not talking over each other, just for the benefit of the court reporter.
I'll give you an instruction that I need to mind myself. We need to talk slow enough for the court reporter to take us down. I tend to go too fast and Michele was good about reminding me that I'm going too fast. So is there any reason why you can't give your deposition today?
A **None whatsoever.**
Q You're not on any sort of medication or

anything that would prevent you from understanding my questions and giving answers?
A No.
Q Obviously if you need to take a break for your own comfort or convenience, you can do that. There's water here if you need it, coffee, whatever you'd like.
Now, we'll go back to your employment. I think you just gave us your business address, correct?
A **That's correct.**
Q Are you in practice alone?
A **Yes.**
Q Do you occupy that space alone?
A **No.**
Q Who occupies the space with you?
A **There's another attorney, Harvey B. Reeder, and a psychologist, Lynn E. Kagarise.**
Q Do you have -- what is it, a three office space or more?
A **Well, we have -- we have more space. We have a conference room downstairs. Mr. Reeder and I share part of the second floor. We each have an office. There is a library and another conference room. Mr. Kagarise is in the second floor rear. There is an office that he has and secretarial staff.**
Q So you have your actual office space on the

second floor --
A **Yes.**
Q -- and your conference room is on the first floor?
A **Yes.**
Q You said that Mr. Reeder and you share part of the second floor?
A **Yes.**
Q You have separate offices but one secretary?
A **No, we each have our own secretary and we share a secretary.**
Q I see. So you have three secretaries altogether?
A **Yes, one of whom I employ and one of whom we share the cost of.**
Q I see. And the other whom he employs himself?
A **Yes.**
Q Do you have any other office staff?
A **No.**
Q And you have a library?
A **Yes.**
Q A law library?
A **(Witness nods head affirmatively.)**
Q Do you share that with Mr. Reeder?
A **Yes.**

Q Any other shared space?
A **No.**
Q You both are able to use the conference room or was it rooms -- room or rooms on the first floor?
A **Room. There's a kitchen area in the back of the first floor.**
Q How long has Mr. Reeder shared this space with you?
A **We purchased the building approximately five years ago. So at that location approximately five years.**
Q Did you previously share office space with him?
A **Yes.**
Q In another location?
A **Yes.**
Q Where was that?
A **331 Penn Street, Huntingdon.**
Q Also in Huntingdon?
A **Yes.**
Q And how long did you share office space with him there?
A **Well, there was another -- at that time there was another attorney that we practiced -- that I practiced with by the name of Marshal B. DeForrest.**
Q I'm sorry, I didn't hear that.

A **Marshal B. DeForrest.**
Q DeForrest?
A **Yes. Mr. Reeder was sharing space at that time as well.**
Q I take it you're each sole practitioners?
A **That's correct.**
Q And Mr. DeForrest was a sole practitioner as well?
A **Yes, he was. Now, I helped him out. We were sole practitioners, but he was -- he needed some help. He was kind of phasing out of his practice and so I did various tasks for him but we were never partners.**
Q Do you have any sort of partnership or corporate arrangement or anything like that with Mr. Reeder at this time?
A **I do not. I should say that we had a -- we have a settlement company called Standing Stone Settlement Company. We each are title agents for Old Republic. We do not have a partnership regarding the settlement company. We actually formed the settlement company because most title carriers expected some minimum volume per year so we thought if we combined and had a settlement company we could do this together, but any settlement that I have through Standing Stone is mine and any settlement he has is his.**
Q Standing Stone is what?

A **It's a fictitious name.**
Q Oh, Standing Stone is the name of your title --
A **Standing Stone Settlement Company is a fictitious name, yes.**
Q And you said your title agent's through what?
A **Old Republic Title Company.**
Q Through Old Republic Title Company?
A **(Witness nods head affirmatively.)**
Q What about the real estate itself, do you own it or rent it?
A **We own it. We have a real estate partnership, Mr. Reeder and I and Mr. Kagarise, and then we each individually pay rent to the partnership.**
Q Understood. How long have you owned that building with Mr. Reeder?
A **Since approximately five years ago.**
Q Did you own the prior office?
A **I did not. I believe Mr. DeForrest owned the building and then for a period of time I think Mr. Reeder did, but I never had an ownership interest in 331 Penn Street.**
Q Do you have one telephone number or two telephone numbers or what at this office?
A **Actually we have three lines. Technically my**

**number is 643-3820 and Mr. Reeder's number is 643-3821. You know, they both ring and our receptionist would answer either line.**
Q Is your receptionist your third shared secretary?
A **Yes.**
Q Is there a third number as well?
A **I don't believe so, no. There's just an extra line.**
Q There's just an extra line?
A **(Witness nods head affirmatively.)**
Q Is there one general number for the office or just those two numbers?
A **Those two numbers.**
Q What about your fax, do you share a fax?
A **We share a fax along with Mr. Kagarise. That number is 643-5670.**
Q I'm assuming you maintain malpractice insurance?
A **Yes.**
Q Do you maintain separate malpractice insurance?
A **Separate, yes.**
Q You each are under your own?
A **Um-hum.**

Q Do you share clients at all? I mean, do you work on cases together or --
A **We've done that occasionally. Generally not.**
Q In terms of proximity, how close are your offices, yours and Mr. Reeder's?
A **Right across the hall.**
Q And your secretaries each sit outside your desks, your individual offices?
A **No, the secretaries are all downstairs.**
Q The secretaries are on a separate floor?
A **If you go in the front door, our secretaries are to the left and our receptionist is to the right.**
Q Tell me a little bit about your education, where did you do your undergraduate work?
A **Wittenberg University in Springfield, Ohio.**
Q And what about your law degree?
A **Case Western Reserve University in Cleveland, Ohio.**
Q Do you have any other degrees?
A **I do not.**
Q A JD is enough.
A **That's enough.**
Q Causes you enough problems in your life, right. Let's see, what about other types of certificates or anything like that? Do you have anything?

A **I'm a title agent and that's all.**
Q You said that. How does one become a title agent, what do you do?
A **Apply through the title company.**
Q You apply directly to --
A **You're approved through your title company.**
Q There's no state requirement or anything like that?
A **There might be now. Not when I did it. When you are an attorney, you didn't have to take an exam and that type of thing and I'm not sure that's the case now.**
Q So you have a fictitious name for your settlement company?
A **Correct.**
Q Is it a corporation?
A **No.**
Q It's a partnership?
A **Technically, no, it's not.**
Q It's not registered in any way --
A **It's registered as a fictitious name.**
Q It's not registered as a partnership or corporate entity in any way?
A **It's not, no.**
Q Do you have some sort of insurance for that settlement company?

A We have to purchase through our professional liability carrier additional coverage for that.
Q Do you each purchase that separately or do you purchase it together or what?
A We purchase it separately through our own policies. Now, the -- we have to have a fidelity bond through Standing Stone as a requirement of -- I think Pennsylvania licensing requirements.
Q So you have a fidelity bond in the name of Standing Stone --
A Right.
Q -- which you two are the principals under Standing Stone?
A Right.
Q But each of you through your own malpractice insurance have additional insurance --
A Yes.
Q -- for your title agent work?
A For our title agent, right.
Q Is a settlement company the same as a title agency?
A Similar, yes.
Q I don't know if I asked you this, and I apologize if I did, when did you set up the title company, the settlement company?

A Approximately three years ago.
Q So is it fair to say that a significant amount of your practice involves real estate?
A I would say a fair portion of my practice involves real estate, but much of that is not the title agency.
Q What about Mr. Reeder's, do you know?
A I wouldn't know. He does -- I would say he does a fair amount of title work and real estate work.
Q So you do some real estate settlement work and title work, right?
A Yes.
Q And aside from that, what else, what other kind of work do you do?
A Civil and criminal litigation, municipal work, estates, that's about it.
Q Your municipal work, can you describe that for me?
A I'm solicitor for several townships and several boroughs.
Q And we all know that you are solicitor for Jackson Township, correct?
A Correct.
Q In Huntingdon County. What other townships and boroughs are you solicitor to?

A Let's see, townships, Dublin, Carbon.
Q Is Carbon in Centre County?
A No, it's in Huntingdon County. These would all be in Huntingdon County. Hopewell, Todd, Porter, West. I think that's it.
Q Thanks.
A For boroughs, Huntingdon, Coalmont and Shirleysburg.
Q And those are all in Huntingdon as well?
A Yes.
Q So when did you become the solicitor for Jackson Township?
A I don't know. I would say approximately 15 years ago.
Q A long time, okay. How did that come about?
A I received a telephone call from the then township secretary whose name was Leroy Koch. He asked me if I would be interested and I said yes.
Q And you serve at the pleasure of the township supervisors, correct?
A I do.
Q Is it an annual contract or an annual appointment or what?
A I think it's an annual appointment. We never have a contract.

Q Is there a list of duties or anything that came to you at any time in connection with your work for Jackson Township?
A No.
Q Well, how did you come about to have an understanding of what it is you're expected to do for them?
A Township code.
Q The township --
A Basically in Jackson Township, and as well as in the other townships, I rarely attend meetings. I only attend unless I'm requested -- if I'm requested to attend. And there will be periods of time when really not too much happens at all during the year and it's -- these are -- keep in mind these are very rural townships and they basically call as needed.
Q Understood. Are you on an hourly or on a retainer or what --
A I --
Q -- with Jackson Township?
A I generally bill -- I generally bill these townships at a discounted rate of $60 an hour.
Q So you don't have some sort of retainer or a minimum number of hours a year or something like that?
A No, there's no -- sometimes -- I don't know if I've done this the last couple years with Jackson Township,

18

**but sometimes the retainer has been $150 a year. You're smiling at me.**
Q With Jackson Township, typically how much work do you do for them a year?
A **You know, it varies. I think last year I probably billed them approximately a thousand dollars. There was more activity last year than in most years.**
Q Do you send them an invoice every month?
A **No.**
Q Just in months that you perform work?
A **Or I will not send an invoice until the job is done.**
Q I see. Do you send them any sort of periodic statement of account or anything like that?
A **No.**
Q So you say that last year there was more activity than usual?
A **Yes.**
Q Without going into anything that doesn't have to do with this lawsuit obviously, can you describe for me -- I should say can you tell me whether the additional activity is attributable to Mr. Corneal and his issues?
A **No, I would say not.**
Q No, okay.
A **Well, after the lawsuit, yes.**

19

Q Right.
A **You know, we had -- you know, we had the subdivision ordinance that we were working on and that generates some additional time.**
Q You just spoke a moment ago about the subdivision ordinance. Do you recall the first time that the subdivision ordinance was presented or the idea of a subdivision ordinance in Jackson Township was presented to you?
A **I do not recall a specific date. It was -- it was under consideration for a long period of time, at least a year, probably more than a year.**
Q Prior to its actual passage?
A **Yes.**
Q In -- what was it, July 2000?
A **July 10th, yes.**
Q Were you involved in the drafting of the ordinance yourself?
A **Not -- I guess maybe indirectly. The supervisors had obtained a copy of a subdivision ordinance from Cambria County which was kind of the prototype that was used in Jackson. And what I did at least initially was loaded that into my computer and from there the township would cut, paste and get input from the planning commission, etcetera.**

20

Q I see.
A **But I certainly didn't have any real draftsmanship with respect to the ordinance.**
Q You said it was under consideration you think for at least a year?
A **Yes.**
Q How do you know that? I mean, what is it that occurred that --
A **Well, I can -- you know, from the time that the supervisors got the Cambria County -- whatever township in Cambria County adopted the ordinance. I would say at least a year, maybe more.**
Q Do you know who brought the idea of a subdivision ordinance to the township officials?
A **I do not.**
Q Did they ever discuss with you why they thought they needed to do a subdivision ordinance?
A **Generally because Jackson borders Centre County and they wanted to be ready -- if there was going to be development in Jackson Township to be prepared for that development.**
Q Did they ask you for advice regarding whether or not it was appropriate for them to enact a subdivision ordinance or how to do it or anything like that?
A **Not directly. You know, subdivision**

21

**ordinances are -- and land development ordinances are a good idea generally. In our county right now the county planning commission is working on a prototype subdivision ordinance that perhaps will be adopted by most of the townships in the county.**
Q Let me ask you this: You said that they obtained a copy of the Cambria County subdivision ordinance?
A **It wasn't Cambria County. It was a township in Cambria County. I don't recall which township it was.**
Q That's fine. So they obtained a copy of that --
A **Yes.**
Q -- ordinance and they sent it to you you think maybe a year before the ordinance was actually passed?
A **Yes.**
Q What did you understand from them sending it to you that they were asking you to do in terms of advising them about the subdivision ordinance?
A **Well, to look at the ordinance and determine whether it would be appropriate for Jackson Township. It was a very comprehensive ordinance.**
Q Is it fair to say that when they sent you something that you took that as an indication that they were looking for your guidance or advice or comments?
A **I would say yes, yes.**

22

Q Now, you said that you didn't have much hand in drafting it. Were there a number of drafts, though, of this subdivision ordinance?
A **Yes, there were.**
Q About how many do you think?
A **Several.**
Q Who was doing the drafting to your knowledge?
A **Well, as I said to you, I loaded it into the computer and then I believe that the township got that on disk and --**
Q From your computer?
A **Right. And then through the various review processes, whether it be the county planning commission, public input, whatever, then I believe the township actually made the changes.**
Q Who at the township made them?
A **I assume it would have been Ann Wirth, the township secretary.**
Q You mentioned I think public comment or something just now. You said through the various changes.
A **Yes.**
Q What kind of public comment are you talking about?
A **Well, I -- you know, the township is required by statute to advertise and I know there was at least one**

23

**public meeting, which I didn't attend, but, you know, there were -- certainly residents of the township were interested in the ordinance.**
Q Was that public meeting the meeting at which they passed it?
A **No.**
Q What public meeting was that?
A **I know that there was a public meeting in January of 2000.**
Q Where they discussed the subdivision ordinance?
A **That was the purpose of the meeting. I wasn't there.**
Q What about the meeting in July 2000 when they passed the ordinance, were you there?
A **No.**
Q Did you know that they were going to pass the ordinance?
A **Yes, I did.**
Q Now, in the January 2000 meeting isn't it correct that they passed a moratorium -- or they attempted to pass a moratorium on subdivisions --
A **Yes.**
Q -- in Jackson Township?
A **Yes. I don't believe those meetings were the**

24

**same night, but I'm not positive.**
Q Oh, you think there was a separate meeting in January --
A **I think there might have been, right.**
Q In January when they discussed the township ordinance and when they passed the moratorium?
A **I'm really not sure if the meeting nights were the same.**
Q Under the township code requirements, they would have been required to advertise both of those meetings, correct?
A **They did.**
Q They did advertise both meetings if there --
A **Well, the -- Jackson meets the first Monday of the month and it's my understanding that there's one advertisement that's placed in the newspaper concerning when they meet for the whole year. If there is a special meeting, that would be advertised.**
Q So they advertise their monthly meeting every month; is that what you're saying?
A **No, that's not what I said.**
Q I'm sorry.
A **I believe they put one advertisement in the newspaper setting forth when they will meet throughout the year.**

25

Q I understand.
A **I don't do that, but that's my understanding of what happens.**
Q Now, if they were going to do something other than just the ordinary meeting, something like pass a subdivision ordinance at a monthly meeting, would they then be required to put an ad in --
A **Yes.**
Q Just let me finish for the record. Put an ad in stating that that's what they were going to do?
A **Yes.**
Q And is that also true for the moratorium?
A **That I don't know.**
Q Let me ask you this: Did you know prior to the time they passed the moratorium or attempted to pass it in January 2000 that they were going to do so?
A **No.**
Q Did they seek your advice about doing so at any time?
A **I received a phone call from Ann Wirth asking me if it was permissible for a municipality to have a moratorium on subdivisions. My response was I think so.**
Q Did they ask you whether it was permissible to have a moratorium when there actually wasn't a subdivision ordinance in place? Did they ask you that specific

question?

A **They did not.**

Q They did not?

A **No.**

Q But at that time did you know that there wasn't a subdivision ordinance in place?

A **Yes, obviously we were working on one.**

Q Did they follow up with you again after that initial phone call from Ann Wirth about whether or not it was appropriate to put a moratorium in place in that situation?

A **I became aware that the moratorium was in place.**

Q You became aware after it was done?

A **After it was done, right.**

Q Now, I take it -- you know, you testified earlier that when they contacted you or when they sent you something you understood that to be a request for your guidance or advice or something like that. After you said I think so, did you then go and do anything else to find out whether it was appropriate for them to put a moratorium in place in this --

A **I did not.**

Q When did she ask you this question? When did Ann Wirth ask you whether it was appropriate for the

township to put a moratorium in place?

A **I'm just guessing sometime in December.**

Q It was fairly close to the January meeting and is that why you're guessing December?

A **Yes, sometime in December would be my estimate.**

Q Now, after the moratorium was put in place, did you understand that they were looking for guidance to see whether or not the moratorium that they had put in place was appropriate?

A **I don't think I was ever consulted about that subsequent with respect to a specific question.**

Q The moratorium was never placed in writing, correct?

A **Well, I believe it was adopted at a township meeting.**

Q But there was no like official document that says we hereby adopt a moratorium or anything like that?

A **I believe there is.**

Q Do you know where that is?

A **Well, I believe it was in the January minutes, is what I'm referring to.**

Q Okay. So you're saying that the official document consists of the January minutes?

A **To my understanding, yes.**

Q Do you in fact know whether or not the township supervisors advertised specifically prior to the January meeting that they would be adopting a moratorium?

A **I do not know that.**

Q Did they ask you whether or not they were required to advertise?

A **They did not.**

Q So after they adopted the moratorium, did you have occasion to discuss with them the impact of it or the legality of it or anything like that?

A **Not really until after the lawsuit was filed.**

Q Well, I think you testified a moment ago that, you know, if they were going to do something like a subdivision ordinance, they would need a period of public comment or an advertisement or something like that. Did you have any concerns that they would need the same thing for a moratorium?

A **Well, perhaps I should have, but, you know, again, I was just asked that question and really did not follow it up further.**

Q So you had a general idea that they were going to do the moratorium but you didn't know exactly when they were going to do it?

A **Well, I really didn't know until after it was done.**

Q Do you keep time cards for your work for the township?

A **No.**

Q How do you keep track of your time?

A **Sometimes that's difficult. I try to reconstruct things. Generally I have not kept time records for the township.**

Q So at the time that you decide that it's time to bill them, you just try and remember what you did?

A **Pretty much.**

Q And you put it directly onto an invoice?

A **Yes. You lose a lot of time that way, by the way.**

Q I know, we hear about that all the time in the profession. So you don't have any records of time --

A **I don't.**

Q -- kept for -- the only records would be the actual invoice that you send?

A **Correct.**

Q You do keep records of the invoices, however?

A **Yes.**

Q Did anybody ask you in connection with this lawsuit to search your files for documents in response to a request for production of documents from the Corneals?

A **I don't believe so.**

30

Q Not at any time ever?
A **Well, be more specific with your question.**
Q Okay. I will represent to you, and anybody can object that wants to, that there was a request for production of documents served upon the supervisors, the township defendants, in September of 2000 which asked that they or any of their agents or affiliates or, you know, servants or whatever --
A **Okay, I did get a -- I did get a phone inquiry from Ann Wirth and she asked me if I had any record of the public meeting, the advertisement of the public meeting requesting comment on the subdivision ordinance.**
**Apparently-- she may have called the Daily News, which is our local paper, general circulation, and they initially couldn't find anything. I, you know, initially looked and I couldn't find anything. And what I had done at her request is prepared an advertisement to be placed in the Daily News.**
Q You did this when?
A **Well, I -- I assume it would have been in December because the -- I'm not positive, but I think the public meeting was on January 8th and I -- you know, basically I prepared the advertisement, gave it to the Daily News and Ann couldn't find it. In any event, I called her back and at the time I called her back the Daily News had**

31

**found the advertisement.**
Q The advertisement for the January 8th meeting?
A **I believe it was January 8th.**
Q Now, are you saying that was a different meeting than the regular monthly meeting?
A **Well, if you can tell me what day of the week January 8th was --**
Q I think we can do that. When did she call you and ask you whether or not you had any records of the public meeting?
A **This would have been very -- very recently.**
Q In the last two weeks?
A **I would say yes.**
Q Was it in the last week?
A **Well, I think it was shortly before the time you and Mr. Sherr were coming to her office to look at documents.**
Q I see.
A **So if that's -- that's a good time reference, it would have been before that, shortly before.**
Q Was that the first time that anybody contacted you at all about producing documents in connection with this lawsuit?
A **That I can recall.**
MS. SIMPSON: I have a January 2000 calendar

32

if you want him to look at it.
MS. MONTGOMERY: Sure. Thank you.
THE WITNESS: Well, I'm wrong on the 8th because I'm sure this wouldn't have been on a Saturday. It might have been on the 6th.
BY MS. MONTGOMERY:
Q Well, we're going to look for a second through our documents to see if we have anything that would, you know, match up with the notice that you're talking about. So you're saying that she then got that or told you that the Daily News had located --
A **The Daily News had it, right. And I think she said the Daily News had faxed it to her. So I think you would have had it with your -- with your document review.**
MS. MONTGOMERY: Excuse me a moment.
(Pause.)
BY MS. MONTGOMERY:
Q What about the July notice, did she -- well, the notice for the July 10th meeting at which the subdivision ordinance was passed --
A **Yes.**
Q -- did she contact you about that at all?
A **You mean at the time?**
Q Yes.
A **Yes.**

33

Q You mean prior to the time the subdivision ordinance was passed?
A **Well, she would have contacted me at that time to advertise that ordinance and I believe there were two other ordinances that were being considered that evening.**
Q Did you draft the notice for the newspaper for the ordinances that were to be passed --
A **Yes.**
Q -- at the July 10 meeting?
A **Yes.**
Q I'm going to show you something that we'll mark as Newton Exhibit 1.
(Notice produced and marked as Newton Exhibit No. 1.)
BY MS. MONTGOMERY:
Q First of all, I'd ask you to look at the handwriting that is on this exhibit and I'll represent to you that we got this -- well, you can see the fax legend is from Mr. Sherr's office.
A **Um-hum.**
Q So we had this faxed to us on May 11th. Do you know whose handwriting that is on the side?
A **I do not.**
Q It's not yours?
A **No.**

Q Do you know what plus item number 3, January 2000 --
A **I have no idea what it means.**
Q -- minutes refers to?
A **I do not.**
Q Do you know what day of the week or what date actually this notice was placed in the Daily record?
A **Daily News?**
Q Daily News.
A **I do not.**
Q From your memory do you have an estimate of the time period when this was placed in the Daily News?
A **Well, it would have to have been placed at least seven days prior to the meeting. Other than that I don't know.**
Q Do you know whether that occurred?
A **I assume it did.**
Q Do you have a copy of this in your files that would perhaps have a date on it?
A **I probably have a copy in my files, but I don't believe it would have a date on it.**
Q Does the --
A **The practice is -- when you take something to the Daily News, there's normally a two or three day lead time between the time you present it and when it's actually**

**put in the paper.**
Q Who actually presents it to the Daily News?
A **I would have presented this to the Daily News.**
Q Because you drafted the ordinance notice?
A **Yes, and I'm -- it's just a couple blocks away.**
Q So is that called the Huntingdon Daily News?
A **It's called the Daily News.**
Q The Daily News?
A **Yes.**
Q And it's a Huntingdon, Pennsylvania publication?
A **Yes.**
Q Do you know just from reading that newspaper whether on each page of the newspaper there's a date across the top?
A **Yes, there would be.**
Q There would be?
A **Um-hum.**
Q So if we could get a copy of the original, we would be able to see that, correct?
A **Yes. The township would also have that in its file if you have the township records because with the ordinance there's a proof of publication. In other words, a proof of publication that's signed by someone and classified**

**at the Daily News. Now, that wouldn't be part of the ordinance necessarily, but it would be part of the township record.**
Q Okay.
MS. MONTGOMERY: Excuse me for just one second.
(Pause.)
BY MS. MONTGOMERY:
Q So your testimony is that the proof of publication would be with the original ordinance?
A **Well, not necessarily the original ordinance, but it would be with the township records.**
Q Somewhere in the township records?
A **Yes.**
Q Do you know how the township records are kept?
A **I do not.**
Q You've never given any advice to them on how to keep their records?
A **I have not.**
Q Do you know whether they keep their ordinances -- or how they keep their ordinances?
A **Well, they should keep them in an ordinance book. And I'm sure over the years I've mentioned that to them, but I don't know.**
Q Now, let's talk a little bit more about the

subdivision ordinance. As changes were made to it, you'd go back and forth with Ann Wirth over the changes that were to be added?
A **I would say that the changes were basically generated by the township.**
Q And by the township you mean Ann Wirth?
A **Well, the township and its supervisors.**
Q So each time she sent you a new change or revision you would review it and comment on it or what?
A **I would say I would review it.**
Q But not necessarily comment on it?
A **Right.**
Q And why is that?
A **Well, you know, again, if I had a comment to make, I would make it. I don't recall -- I just don't recall what comments, if any, I had made after the changes started to be made. I think the township primarily was relying upon advice from Richard Stahl who was the county planning director.**
Q Did you get actual draft copies of the subdivision ordinance or was it e-mailed to you by computer or what?
A **It wasn't e-mailed. I would say draft copies.**
Q So Ann would mail them to you or something?
A **I would say yes, either mail or she would be**

**in town and drop them off.**

Q Did she ever send you anything in writing, or did anybody from the township ever send you anything in writing about the moratorium that was put in place in January 2000?

A **Not until it was requested I think initially by Mr. Corneal and then through his attorney James Himes did I get it. My recollection is that when I received that request I made a request to the township and after receiving it I delivered it to Jim Himes.**

Q Is that how you became aware that the moratorium had been put into place?

A **No, I -- I was aware that the moratorium was in place, but I had not had that -- that document, that minute entry until that time.**

Q Typically as the township holds its meetings do they send you -- routinely send you copies of their minutes?

A **No.**

Q How do you keep track of what the township has done at their meetings?

A **I don't unless they deem it advisable to let me know.**

Q So do you have copies of the township meetings in your files -- I mean minutes of the township meetings in

your files?

A **No, I do not.**

Q Do you sometimes get copies of the minutes of the township meetings?

A **No.**

Q How does the township go about letting you know what they've done? Do they call you or do they write to you or what?

A **It would probably be by telephone.**

Q From Ann Wirth or any one of the supervisors?

A **Generally from Ann. And I guess occasionally, you know, writing, too, but it's primarily I would guess telephone.**

Q Well, you mentioned Mr. Corneal a moment ago. Can you tell me how you first came to come in contact with Mr. Corneal?

A **As a result of this lawsuit?**

Q No, first at all, at any time.

A **Many years ago we had a case against each other and it was a land case. I don't recall too much about it. My client's name was Suydam. It involved I think the sale of a farm or an installment sale agreement. That, I believe, is my first contact with him.**

Q You mean Mr. Corneal represented the opposing party?

A **Yes, the other party.**

Q Mr. Corneal wasn't a party?

A **No.**

Q So you think that was like 10 years ago or something, 15?

A **At least, probably more.**

Q After that how did you first come in contact with Mr. Corneal?

A **Probably through a telephone call he made to my office.**

Q And about what time frame was that?

A **I'm just guessing January of 2000.**

Q You think that's the first time you talked to him since the lawsuit that you were mutually involved in on behalf of clients?

A **I believe so. I mean, it could have been in December, but it was around that time period.**

Q Did you have any contact with the supervisors or Ann Wirth or anybody else in the township about Mr. Corneal prior to the time he contacted your office?

A **No.**

Q What did Mr. Corneal say when he contacted -- did you actually talk to him when he contacted your office --

A **I talked to him.**

Q -- in December or January 2000?

A **He indicated, you know, he was doing a subdivision. He was anxious to get the subdivision approved. You know, I believe I said that we didn't have a subdivision ordinance. It's hard for me to -- to specifically say what happened in the first conversation. I think I talked to him on another occasion as well.**

Q When he first talked to you, do you know whether or not the moratorium had been put into place? For the record, we've done so many of these depositions I may be being --

A **I'm not sure.**

Q Hold on a second. I may be being unclear --

A **Yeah.**

Q -- but I want to say that we're talking about the moratorium on subdivisions. I don't think we said that in this depo.

A **I believe so.**

Q He contacted you before the moratorium was in --

A **No, no, I believe it was after the moratorium.**

Q What makes you think it was after the moratorium?

A **I don't know. That's a guess. I simply do not know.**

Q And so he told you that he wanted to get the subdivision approved, right, and what did you tell him?

**A I don't recall. I think that I indicated that we didn't have a subdivision ordinance. I know that he had an agreement of sale with an individual by the name of Hewett, another individual by the name of Smith and he was anxious to consummate that transaction.**

Q Did you tell him that he didn't need approval of his subdivision if there was no subdivision ordinance?

**A I do not recall.**

Q Do you think he needed approval of his subdivision if there was no subdivision ordinance?

**A Well, if the moratorium is valid, if you assume that, then of course there couldn't be any subdivision. But if the moratorium is not valid, then he would not need approval.**

Q Prior to the passage of the moratorium would he have needed approval of his subdivision?

**A No.**

Q So he could have just filed a subdivision plan at the recorder of deed's or not filed a subdivision plan, right? He could have just sold off pieces of his property, right?

**A There is subdivision for DEP planning purposes, but he would not have had to have any township**

**approval for a subdivision per se.**

Q Do you know how Mr. Corneal came to even request township approval for the subdivision plan?

**A I do not.**

Q Did the township officials contact you about Mr. Corneal contacting them about approval for his subdivision?

**A Not that I can recall. I just don't know.**

Q You just testified that if the moratorium was invalid then of course he wouldn't need township approval. Why do you say that?

**A Well, you know, you wouldn't need township approval unless there is a subdivision ordinance.**

Q You wouldn't?

**A You would not. So really the moratorium itself, you know, would only -- if the moratorium is valid, then for that period of time during which there was a moratorium there wouldn't be any subdivisions.**

Q Well, prior to the time the moratorium was put in place, did the township ask you about that particular issue, can we deny approval of a subdivision or even demand presentation of a subdivision plan if we have no ordinance?

**A If the township would have asked me, that's what I -- what I would have said.**

Q You would have said no?

**A I would have said no. Now, I don't -- there may have been something in Mr. Corneal's agreement with Mr. Hewett and Miss Smith that related to subdivision approval. So maybe that was what generated this.**

Q When you were called about the moratorium -- by Ann Wirth, correct?

**A Correct.**

Q Did Ann Wirth mention Mr. Corneal to you at that time?

**A I do not believe so.**

Q Did she mention the reason for the moratorium?

**A The only thing that was mentioned was that the township wanted to be ready in the event that there were subdivisions coming into the township.**

Q From State College you mean?

**A From the Centre County area which is kind of a growth area.**

Q Do you know whether or not there were any particular spurts of growth or anything like that in the Jackson Township area that would have led to such a concern?

**A Not that I'm aware of.**

Q Did Ann Wirth specifically mention Mr. Corneal to you when she talked to you about the moratorium?

**A Not that I can recall.**

Q And just so I'm clear about your testimony

earlier, is it that -- you said that you told her I think so about something and that was about the moratorium?

**A Yes, about the moratorium.**

Q You thought that she could put in a moratorium?

**A I thought that the township could --**

Q The township could?

**A The moratorium, yes.**

Q Even though there was no subdivision ordinance?

**A Correct.**

Q What do you think -- what is the moratorium? I mean, is it an ordinance, is it a -- I mean, what is it in terms of a legal tool or entity or document?

**A Well, what Jackson Township did was just do it by way of a motion in its regular meeting. Whether or not more needs to be done I don't know.**

Q Is there a vote required, do you know?

**A I don't know. In this case there was a vote.**

Q Was there a -- some sort of a proposal, a written proposal or a resolution or anything like that that would be required to impose a moratorium?

**A I don't know.**

Q Let me ask you this: You said that there was a vote. How do you know that there was a vote?

**A I knew that there was a vote based upon the minutes that I received from Ann Wirth.**
Q Afterward?
**A I think it said moved and seconded, as I recall.**
Q So we'll go back to Mr. Corneal for a moment. You said you think you talked to Mr. Corneal twice?
**A I think so.**
Q The first time you think was sometime in December, January, you're guessing?
**A I'm guessing. I'm just guessing.**
Q When do you think the second time was?
**A I don't know.**
Q Was it after the township refused to allow him to subdivide, do you know that?
**A I would say it probably would be, yes.**
Q And did you speak directly with him?
**A Yes.**
Q Did he call you or did you return his call or what?
**A I think he called me.**
Q And you took the call?
**A Yes.**
Q And what was the substance of that conversation?

**A I think the substance of the conversation was he requested my assistance to see what could be done to resolve the conflicts with the township.**
Q Did he mention the moratorium to you?
**A Not that I can recall.**
Q Do you think there was a need for a moratorium in the township?
MS. SIMPSON: Objection, irrelevant.
MS. MONTGOMERY: I'm sorry?
MS. SIMPSON: It's irrelevant. It's asking for a legal opinion.
MS. MONTGOMERY: Well, relevance --
THE WITNESS: That's not my -- I don't know.
MS. MONTGOMERY: Are you instructing him not to answer?
MS. SIMPSON: No.
THE WITNESS: I don't know. That's not my decision.
BY MS. MONTGOMERY:
Q You don't know whether or not there was a need for a moratorium?
**A That's not something that -- my opinion is not relevant in my opinion.**
Q What township is Huntingdon in -- or, no, what township is in -- is there a -- I'm asking a silly question

I think. Jackson Township is not within the town of Huntingdon or anything? You don't live in Jackson Township, is what I'm trying to get to.
**A No, I do not. There's Huntingdon borough that I reside in.**
Q Right, sorry. How far away from that is Jackson Township?
**A I would say approximately 16 miles.**
Q Sixteen miles?
**A Yes. Jackson Township is halfway between Huntingdon borough and Centre County.**
Q I'm going to show you a document that's been previously marked as Wirth Exhibit 6 but we'll mark it again as Newton 2. I'll ask you to look at it, please, after the court reporter has marked it.
(Minutes dated 1/4/00 produced and marked as Newton Exhibit No. 2.)
THE WITNESS: Okay.
BY MS. MONTGOMERY:
Q Are these the minutes that you're referring to?
**A Yes, and I see I was in error. I don't see a move and a second with respect to the moratorium.**
Q But these are the minutes that you're referring to that --

**A Yes.**
Q -- put you on notice that there was a moratorium?
**A Well, as I said, I think I became aware that there was a moratorium prior to receiving these minutes.**
Q Oh, okay. All right, but --
**A Yes.**
Q But these are the minutes that you're referring to that --
**A Yes.**
Q That reflect the moratorium?
**A Yep.**
Q Thank you. Now, I think you had testified earlier that there was a vote. Now, if there wasn't a vote, would the moratorium in your opinion, aside from the question -- aside from the question of whether or not you could put a moratorium in place when there was no subdivision ordinance, if there was no vote, would it be an effective moratorium?
**A I don't know.**
Q When you are asked about township procedure, you know, for example, whether or not a township can put a subdivision ordinance in place, whether or not they can put a moratorium in place, whether or not they need to vote, to what do you refer, what law?

A Well, either the township code or the Municipalities Planning Code.
Q And you just don't know as you sit here whether or not -- you know, what the answer to those questions I asked --
A And, again, these are the minutes. I don't know if the minutes accurately reflected what happened at the meeting.
Q Now, back to Mr. Corneal for a moment. Do you recall receiving correspondence from Mr. Corneal?
A Yes.
Q What did you do with that correspondence when you received it?
A I believe I forwarded it onto the township.
Q Did you call Mr. Corneal back after you received the correspondence from him?
A I don't believe so.
Q So the two times you think you talked to him were in response to telephone calls from him, correct?
A That's correct.
Q Did you ever receive other telephone calls that did not actually result in a conversation between the two of you?
A I don't know. I did receive calls from Jim Himes.

Q Did you return --
A On behalf of Mr. Corneal.
Q Did you talk to Mr. Himes?
A Yes, I did.
Q But other than those two phone calls, you never talked to Mr. Corneal again on the telephone anyway?
A I don't believe so.
Q Did you talk to him in person?
A No, I did not.
Q Let me ask you this: Did Mr. Corneal at some point deliver a copy of the subdivision plan to you?
A I think he did.
Q And what did you do with that?
A I delivered it to the township.
Q Do you know how he came to deliver a copy of that subdivision plan to you?
A I don't.
Q Did you ask him to do it?
A I don't recall.
Q Did you receive it -- this copy of a subdivision plan, did you receive it after one of the phone calls you had with Mr. Corneal?
A I would say I did.
Q Were you expecting it, let me ask you that? Were you expecting this copy that you received?

A I really can't say. I don't recall if he said in the telephone conversation he was going to drop it off, but I do know that I received it and I don't know if it came -- I certainly wasn't there when it was dropped off. I don't know if it came from Mr. Corneal personally or perhaps from David Simpson who at the time I believe was working for him. Mr. Simpson is a surveyor.
Q Did you have any occasion after receiving a copy of the subdivision ordinance -- I'm sorry, the subdivision plan from Mr. Corneal, did you have any occasion to talk with the township supervisors or Ann Wirth or any other township officials about Mr. Corneal's efforts to build on his property and to subdivide?
A I believe I attended a meeting in May.
Q May of 2000?
A May of 2000. And the primary purpose of -- the township was having -- having difficulty with New Enterprise Stone and Lime Company and I think it was the result of a road that they had done and they were having all kinds of problems with it, the bond was going to run out, and I think that was -- they asked me to come out and look at that, which I did, and I believe at that time Mr. Corneal's subdivision was also discussed.
Q Was this a public meeting?
A Well, no.

Q This was a private meeting with the township supervisors?
A It was a meeting -- it was like a workshop meeting.
Q What is a workshop meeting?
A It was a meeting to discuss, at least in my view, general administrative business. I think there was some response that had to be taken with respect to the New Enterprise situation and I know I did a letter on that. I don't recall the exact nature of it.
Q Now, a workshop meeting, when is a workshop -- you said a workshop meeting is to discuss administrative matters, I believe?
A (Witness nods head affirmatively.)
Q Are these routine meetings that the township holds?
A Not that I'm aware of. The reason that I was called, I think, was to address this New Enterprise situation that had a deadline.
Q When was this workshop meeting held?
A I think it was in May.
Q Prior to the May public meeting, 2000?
A You mean the township meeting?
Q Yes.
A I don't know.

54

Q Have you ever been to any other workshop meetings?
A **After the lawsuit -- this lawsuit was filed, I attended I believe two meetings with the township to discuss the lawsuit and the complaint.**
Q Now, where does the term workshop meetings come from? Is that your term or is it something --
A **That's my term.**
Q Is that something the township officials use as well?
A **That I'm not aware of. I don't know.**
Q Do you know -- are you familiar with meetings held by the township supervisors and the secretary and anybody else prior -- immediately prior to the public meetings?
A **I'm not.**
Q You've never discussed those and they've never discussed those meetings with you?
A **No.**
Q You've never been at a meeting with them of that nature?
A **No. Anytime I attend a meeting -- the meetings are held at the fire hall, Stone Creek Valley Fire Hall, and I've never been to a prior --**
Q To a pre-meeting?

55

A **Right.**
Q How about meetings at Ann Wirth's, the secretary's office? I think I said that badly. The secretary, Ann Wirth's office on her property, have you ever been to a meeting there?
A **Just what I've described to you. There were two times where I met with them concerning this lawsuit and I believe there was a time in May that I met with them concerning the New Enterprise issue. And I believe at that time Mr. Corneal's -- I may have delivered the subdivision at that time. I just don't recall.**
Q The subdivision plan you mean?
A **Yes.**
Q So the workshop meetings that you're referring to are held at Ann Wirth's office?
A **Yes.**
Q On her property?
A **Correct. That is also the township office.**
Q Correct.
A **That's where the township records are kept.**
Q Have you had other opportunity to go to the township office besides these workshop meetings?
A **No.**
Q Have you been there only three times?
A **Those are the times that I can recall.**

56

Q If you're going to meet in person with the supervisors or Ann Wirth or any other township official, do you generally do it in your office or do you just have telephone conferences?
A **Well, we've had -- we have had meetings in my office. I'd say primarily by telephone. And there are occasions where, you know, I either go to the regular township meeting or --**
Q Have you ever been to a township meeting when Mr. Corneal was present?
A **No, I have not.**
Q Have you ever been to a township meeting at which Mr. Corneal's issues, his building and subdivision issues were discussed?
A **I may have been and I don't -- I can say for sure that I was never at a township meeting attended by Mr. Corneal. If Mr. Corneal attended the March meeting, I definitely was not there. I know that there was a meeting that I attended in which the subdivision -- the township -- a regular township meeting in which the subdivision ordinance was discussed.**
**And the reason I seem to recall that is that I had a copy of at that time what our proposed ordinance was and someone in the audience asked if they could review it and I said sure and gave it to them, and I'm not positive**

57

**when that was.**
Q Do you recall who that person was?
A **I don't.**
Q Do you recall how many people were at that meeting?
A **I would say seven to 10 maybe.**
Q Do you recall who any of those seven to 10 people might have been?
A **I don't.**
Q You mentioned a moment ago that you had two meetings about this lawsuit after it was filed.
A **Two meetings regarding this lawsuit and other related issues, litigation issues. There may have been another meeting that would have dealt with Mr. Corneal building without a building permit.**
Q And when do you think that was?
A **Again, I don't know. It was certainly after -- I believe that we had filed -- when I say we, the township filed in October.**
Q When you say filed, you mean the lawsuit that you filed in Huntingdon County?
A **Yes. I believe that was in October.**
Q And --
A **So it would have been prior to that. We may have had a meeting on that lawsuit. I don't know.**

Q Who was present at the two meetings that you remember, aside from the one you just discussed which you're not sure about?
A **One meeting the township supervisors, myself, Ann Wirth. I think that's all. Another meeting of the township supervisors, myself and Mr. Sherr and Ann Wirth.**
Q Did Mr. Sherr represent you at that time?
A **No.**
Q Mr. Sherr has never represented you, correct?
A **No.**
Q At that first meeting where Mr. Sherr wasn't present, where was that meeting held? At Ann Wirth's office you said?
A **At the township office.**
Q Do you know when that meeting was?
A **I do not.**
Q And at that time --
A **It would have been after -- I think the lawsuit was filed -- I know we were served I think 4th of July weekend. So I'm just guessing it would have been sometime in July of 2000.**
Q And at that time did you discuss the legality of the moratorium?
A **No, we dealt with the lawsuits.**
Q What about the legality of the subdivision --

well, of refusing to allow Mr. Corneal to subdivide or to build, did you discuss that?
A **Well, we discussed it in the sense that we went over the paragraphs of the complaint, you know, paragraph by paragraph. So to that extent it was discussed, the context of the complaint.**
Q The second meeting that you recall when Mr. Sherr was present, was Mr. Van Dommelen present at that meeting?
A **He may have been. I can't say for sure, but he may have been.**
Q So you said the township supervisors, Ann Wirth, yourself, Mr. Sherr and who else?
A **If Mr. Van Dommelen was there. He could have been there.**
Q Do you recall meeting with Mr. Van Dommelen about this lawsuit at some time?
A **Only in that context, yes.**
Q You do recall him being at some meeting in which you --
A **I would say yes.**
Q So at that second meeting that Mr. Sherr was present at, did you at that time then discuss the -- generally discuss the legality of preventing Mr. Corneal from building or from subdividing?

MR. SHERR: I object to the form of the question and assert attorney/client privilege at this time.
MS. MONTGOMERY: You can object, but you can't instruct him not to answer and you don't represent him.
MR. SHERR: I can instruct on behalf of the privilege holders that their attorney not answer.
MS. MONTGOMERY: Well, he's just testified generally that he hasn't given advice about the subject of this lawsuit and that you didn't represent him in connection with this lawsuit. So I don't think those discussions are privileged.
MR. SHERR: I think they are and I don't think he said what you just stated he said and that the purpose of that meeting was to discuss the lawsuit and he was there as a representative of the township.
MS. MONTGOMERY: No, he didn't say that at all.
BY MS. MONTGOMERY:
Q Were you there --
A **Yes, I did.**
Q You were there as the township's attorney?
A **I was there as the township solicitor, yes.**
Q As the township solicitor?
A **(Witness nods head affirmatively.)**
Q In response to this lawsuit you were there as

the township solicitor?
A **Correct.**
MS. MONTGOMERY: I'm going to take a short break right now. We'll come back in 15 minutes.
(Break taken at 10:54 a.m. until 11:24 a.m.)
BY MS. MONTGOMERY:
Q Mr. Newton, you had indicated that you bill the township for legal advice given to the township at some point after you give them that legal advice, right?
A **Right.**
Q Now, you also have indicated now that you attended this meeting at which Tony Sherr was present as solicitor to the township and not as a defendant in the lawsuit?
A **(Witness nods head affirmatively.)**
Q Did you bill the township for your attendance at that meeting?
A **Not yet, but I will.**
Q When was that meeting?
A **Sometime in July, last July.**
Q So it's been 11 months?
A **Yes.**
Q Now, have you billed them since for other work?
A **No, I haven't.**

62

Q You haven't sent them a bill since last July?

A **No, I haven't.**

Q And you don't have any records of work that you've done from -- during that time period, July? Are you just going to try to reconstruct it?

A **Yes.**

Q I'm going to ask you some questions and just see what happens here. It's my position that if in fact there is any attorney/client privilege about advice that you gave concerning the issues in this lawsuit that it has been thoroughly waived. All of the deponents in this case have answered numerous questions about conversations with you and there's been no objection.

Your own counsel has asked the individual deponents about communications with you and there's been no objection from Mr. Sherr. So I'm going to ask my questions and we'll go from there.

Back to the meeting at which you were present when Mr. Sherr was present, at that time was there any inquiry made of you as to whether or not the moratorium that was put in place was effective or legal?

MR. SHERR: Object to the form of the question and on behalf of the privilege holders instruct the witness not to answer.

BY MS. MONTGOMERY:

63

Q Mr. Sherr is not your counsel, correct?

A **That's right.**

MS. MONTGOMERY: What we're going to be forced to do is halt the deposition and schedule it for another time because it's been very clear why we need to have Mr. Newton's deposition and I'm going to need to present a motion to the court that includes transcripts of testimony from all the other depositions showing that this privilege has long ago been waived.

MR. SHERR: Well, I would --

MS. MONTGOMERY: If indeed there was a privilege.

MR. SHERR: I would suggest that you follow the dictates of the federal rules in this regard and mark that and ask the rest of your questions, take the rest of your deposition and we'll have the court rule on that at a later time as the federal rules provide.

MS. MONTGOMERY: Well, as I said, I'm putting on the record right now that you are preventing me from asking questions about communications with the township supervisors that have always been known to be the subject of this deposition and we are going to have to reschedule additional time after the filing of the motion to quash, after the filing of a motion with the judge.

MS. SIMPSON: Let me interject here. This

64

objection and the claim of privilege arises from this meeting at which the township defendants, Mr. Sherr and Mr. Newton were all present and they were discussing issues of the lawsuit. I believe that questions to the township officials that have been deposed have been with respect to communications prior to this meeting and not involving this meeting and specific advice, legal advice, that was rendered or questions that were asked of Mr. Newton.

Now, I agree with Mr. Sherr, this is a particular area -- if you've got questions to ask --

MS. MONTGOMERY: Oh, we're going to go forward.

MS. SIMPSON: Okay.

MS. MONTGOMERY: I am, yes.

MS. SIMPSON: Okay. So you will ask questions other than what occurred at this meeting?

MS. MONTGOMERY: Sure, absolutely.

MS. SIMPSON: You said we were going to halt the deposition --

MS. MONTGOMERY: I'm sorry, I didn't mean to say it that way. What I really am saying is -- trying to put counsel on notice that we will have to reschedule in order to get the questions that we need to have answered answered, even if it's -- even if it requires submitting them in camera to the judge.

65

MS. SIMPSON: That assumes that your motion would be granted.

MS. MONTGOMERY: Exactly. I'm not assuming anything, but I'm saying that I'm not going to give up the issue and I'm just putting counsel on notice as a matter of courtesy that if you're going to not allow me to ask these questions now I'll have to go to the court to try to ask them later and we'll go on with whatever you allow him to answer at this time, okay.

MR. SHERR: And just so we're clear, the objection goes to this meeting that was attended -- I have not objected to any other conversations that my clients have had with Mr. Newton other than attendance at a meeting which I attended to discuss this lawsuit. And I am not preventing you from asking any questions. I'm merely asserting attorney/client privilege with respect to this meeting.

MS. MONTGOMERY: Have you read the deposition transcripts since you're asserting this privilege and saying it hasn't been waived? Have you read the deposition transcripts that have been provided?

MR. SHERR: You know, let's just go on with the deposition.

MS. MONTGOMERY: So you're asserting the privilege and you're refusing to answer that. Have you read the deposition transcripts?

66

MR. SHERR: You know, I don't have to answer your questions and I certainly don't have to answer questions about what I have done or have not done and I'm not going to do that. So why don't you just --

MS. MONTGOMERY: Just so we have a good record for the court of the basis for your objection.

MR. SHERR: I made my basis very clear on the record. I don't know how I can make it any clearer.

MS. MONTGOMERY: Okay.

BY MS. MONTGOMERY:

Q Mr. Newton, have you been made aware of a court order that requires sequestration of the defendant deponents in this matter?

A **Yes.**

Q When did you become aware of it?

A **I believe it was from my counsel. I don't recall.**

Q No, I mean when.

A **I don't know.**

Q Have you had any communication with the defendant deponents, the other defendants in this case, the supervisors, the building permit officer, the sewage enforcement officer for Jackson Township since the middle of May 2001?

A **Any communication at all?**

67

Q No -- well, any communication at all.

A **Yes.**

Q Have you had any communication with them about the contents of their depositions --

A **No.**

Q -- since the middle of May?

A **No.**

Q Have you had any communication with them prior to the middle of May about what the content of their depositions would be?

A **No. Let me say that I've had communication with Ann Wirth, not about the content of the deposition but about the health of Ralph Weiler who is one of the supervisors. That's kind of a tangential issue. Again, not with respect to the content of the deposition, but sometime in May Barry Parks, who is the SEO for the township, and I met at Mr. Corneal's property and Mr. Parks made a comment about the length of his deposition, but that was it.**

Q Thank you for that. If you had billed the township since last July, would you have included any work that had been done in the period prior? Say you billed them in November, would you have included your work --

A **Work prior, now what do you mean?**

Q Well, if you billed the -- say you billed the township in November 2000, would you have included the work done for that period of time prior to November back to the last time you billed them?

68

A **Yes.**

Q Mr. Newton, I'm going to show you an exhibit that has been previously marked but we're going to mark it again for purposes of this deposition and ask you to look at it.

(Letter dated 1/31/00 produced and marked as Newton Exhibit No. 3.)

BY MS. MONTGOMERY:

Q Mr. Newton, do you recognize this letter?

A **I do.**

Q Do you recall receiving it?

A **Yes.**

Q For the record, it's a letter -- a January 31, 2000 letter from David Corneal to you, correct?

A **Correct.**

Q Now, do you recall when you received this letter whether you had spoken to Mr. Newton -- I mean to Mr. Corneal prior to receiving this letter, as the letter itself indicates?

A **I don't have a recollection but the letter says as per our telephone conversation. So I assume that I did.**

Q Do you recall whether in your telephone conversation -- well, do you recall whether that telephone conversation that he refers to in this letter was the first or the second of the two that you remember?

69

A **I don't know. I would think it would be the first.**

Q So do you recall receiving a telephone call after receiving this letter?

A **Yes, yes.**

Q I'm just trying to put the whole thing in a good time frame for us so we can work it out. What did you do with this letter when you received it?

A **I believe I forwarded it to the township.**

Q Did you have some discussions with the township about his -- the concerns set forth in this letter?

A **Not that I can recall.**

Q I mean, did you just send it on with an FYI or something?

A **I -- I feel certain I would have sent it on. If I had any discussion, it would have been with Ann Wirth.**

Q Why would it have been with Ann Wirth?

A **Because she was my contact person with the township.**

Q She's the one who relayed information back and forth from the supervisors to you and from you to the supervisors?

A I don't know if relay information is correct, but she was the person that I generally -- when I received a contact from the township, it would generally be through Ann.
Q If the township was asking for advice, the township supervisors were asking for advice, would you convey that information to Ann?
A It depends. I mean, if she would call me, yes.
Q And so you would -- that would be your way of giving advice to the township, to talk to Ann?
A Again, it depends. It depends on the context.
Q Well, let me just ask it another way then. At times your way of giving advice to the township would be to communicate information to Ann, correct?
A That's correct.
Q You notice in this letter that there was some concern raised about the Hewetts and their commitment for a loan for settlement for purchase of a piece of the tract of land at issue in this case?
A Yes.
Q Do you know the Hewetts?
A I do not.
Q Have you met the Hewetts?
A No.

Q Have you -- and I'm using the Hewetts a little loosely.
A I think there's a Hewett and a Smith, as I recall.
Q Right, exactly, but they are a couple, correct?
A Yes.
Q So have you met either one of them?
A I don't believe so.
Q Have you spoken with them on the telephone?
A I spoke one time with Mr. Hewett.
Q In what context was that?
A Mr. Hewett called me because he was having trouble with Mr. Corneal regarding this agreement of sale.
Q When you say trouble with Mr. Corneal, what do you mean by that?
A That's my term. He was having difficulty in dealing with Mr. Corneal, whether it was regarding his agreement of sale -- he wanted representation.
Q Did you ever represent Mr. Hewett?
A No. He asked if I could represent him and I said no. I felt it could be a potential conflict because I was the township solicitor. I -- my normal practice in those circumstances would be to give him names of other attorneys, one of whom was Mr. Reeder, and he ended up

retaining Mr. Reeder.
Q When he called you and told you that he was having trouble with Mr. Corneal, did he tell you what the trouble was?
A He probably did, but I don't remember. You know, again, he wanted representation in dealing with Mr. Corneal and that's the extent that I got into it.
Q Do you know whether he already had -- let me ask you this: Did you talk to him before -- Mr. Hewett before receiving this letter?
A I don't know. I don't know when it was. I do know that I did talk to him at my office and he called on the telephone.
Q So he called you and then you had him come in, is that how it happened?
A No, he never came in. I told him I could not represent him. I had a conflict --
Q Oh, I'm sorry.
A -- and then I gave him -- I certainly gave him the name of Mr. Reeder. And, again, my normal practice would be to give him two or three other attorneys as well. I don't know if I did that or not, but I know that I gave him Mr. Reeder's name.
Q But when you just said I talked to him at my office, you meant you were at your office?

A I was at my office, yes.
Q And it was on the telephone?
A Yes, correct.
Q Just the one time?
A One time.
Q Did you ever talk to Miss Smith?
A No.
Q Were you ever at a township meeting where the Hewett and Smith --
A No. I'm sorry I jumped the gun. No.
Q That's okay. I need to finish my sentence, that's all. Maybe this will help us place the time frame a little bit, you know, in context. Do you recall whether or not you discussed this letter that you received --
A I'm certain I didn't discuss this letter.
Q Let me finish my sentence. Whether or not you discussed this letter that you received from Mr. Corneal with Mr. Hewett when he called?
A I feel certain I did not discuss the letter.
Q Did you discuss this letter with Mr. Reeder?
A No.
Q But you did send it onto the township?
A I believe so, yes.
Q Do you recall whether -- do you recall speaking to Mr. Hewett about his concerns about Mr.

Corneal's efforts to obtain permission for his subdivision?
A **No.**
Q When you say you don't recall, are you certain it never happened or you just don't recall?
A **I don't recall. What I recall from the conversation is that he wanted representation in his dealings with Mr. Corneal. That's what I recall.**
Q So Mr. Hewett eventually chose to go to Mr. Reeder, correct?
A **Correct.**
Q Now, did you have any discussions with Mr. Reeder about Mr. Corneal's efforts to obtain township cooperation in subdividing and selling this property?
A **Generally, no. At some point in time Mr. Reeder asked me if I thought that the township would have its subdivision ordinance adopted by June 30th and I responded I didn't think so and that was the extent of my conversation with Mr. Reeder.**
Q And what was the June 30th date?
A **I don't know. That was Mr. Reeder's question to me.**
Q So you remember the June 30th date. How do you recall that?
A **My recollection is that that was the time in which the agreement of sale between Mr. Corneal and Mr.**

**Hewett and Miss Smith -- that had to be consummated by that date.**
Q So you told him at that time -- now that you recall that that was what the June 30th was relevant to, you told him at that time you didn't think the subdivision ordinance would be approved, right?
A **By June 30th, yes.**
Q Right, by June 30th. What was the extent of your conversation --
A **That was it.**
Q -- with Mr. Reeder? Just for her sake, wait until I finish the question. So it was just one question?
A **Generally, yes, that's all I can recall.**
Q Did you have any other conversations with Mr. Reeder about Mr. Corneal's property?
A **Not that I can recall.**
Q What about after the subdivision ordinance was put into place?
A **Well, I know I showed Mr. Reeder the -- this complaint, this lawsuit, but other than that that's about it.**
Q Why did you show Mr. Reeder the complaint?
A **Well, we're both municipal solicitors and I wanted him to be aware of it.**
Q Mr. Reeder represents various townships and

boroughs as well?
A **He represents some townships and boroughs.**
Q Does he represent counties as well?
A **No.**
Q Just townships and boroughs?
A **Yes.**
Q Do you know which ones he represents?
A **Well, I know he represents the borough of Mount Union. I know he represents the zoning board for Huntingdon borough. I'm not sure about townships.**
Q Did you ever have occasion to discuss with Mr. Reeder the Hewett's withdraw from the sales agreement, cancellation of the sales agreement with Mr. Corneal?
A **I was aware that Mr. Reeder on behalf of Mr. Hewett filed an action, a magisterial action against the Corneals.**
Q How did you become aware of that?
A **Mr. Reeder told me.**
Q Do you know why Mr. Reeder told you that?
A **I do not.**
Q Was it just your practice to discuss business back and forth about your clients?
A **Occasionally we do.**
Q What about the moratorium, have you ever discussed the moratorium with Mr. Hewett?

A **I don't believe so.**
Q I'm sorry, I mean Mr. Reeder.
A **I don't believe so.**
Q What about the ordinance itself and the legality of it or anything like that, did you ever discuss that with --
A **No.**
Q With Mr. Reeder?
A **No.**
Q I'm going to show you another letter that we're going to mark as Newton Exhibit 4.
(Letter dated 8/18/00 produced and marked as Newton Exhibit No. 4.)
BY MS. MONTGOMERY:
Q I'd ask you to take a look at it for me, please. Do you recall receiving this letter, which for the record is an August 18, 2000 letter from Mr. Corneal to Mr. Newton?
A **I believe I did, yes.**
Q What did you do with this letter?
A **I believe I forwarded it onto the township.**
Q Did you call Mr. Corneal back about it?
A **No.**
Q Did you send Mr. Corneal the building permits that -- application forms that he's asking you for?

A I believe that was done by the township. I did not. I did not have them.
Q Did you advise the township supervisors that they really ought to send him these applications?
A I would say I probably did.
Q Did you ever receive back from Mr. Corneal a copy of the filled out application forms?
A Not that I can recall.
Q Were you consulted about the applications once they were sent?
A No.
Q Were you consulted about a building permit for Mr. Corneal in general?
A I would say -- I would say yes. There was a -- I know I wrote to Mr. Corneal at the request of the township and I think it was in July, the end of July, because he had commenced construction without a building permit. So I wrote to him then and asked him to stop construction until he received a building permit.
So the building permit issue was an issue that had been discussed I think quite frequently because I believe the township supervisors were being criticized because Mr. Corneal was acting really on his own and the township really wasn't doing anything to enforce the building permit ordinance.

Q Do you know when you wrote the July letter that you referred to -- do you know whether or not Mr. Corneal had been given building permit applications at that time?
A I don't know. I don't know.
Q Do you recall talking at all with the township supervisors or the building permit officer or anybody else about Mr. Corneal's request for building permit applications?
A No.
Q Were you ever informed about a visit that Mr. Corneal made to Mr. Van Dommelen to obtain building permit applications?
A I was.
Q When were you informed about that?
A I don't know.
Q Were you asked for advice about that?
A No.
Q They just told you about it -- what did they tell you -- who told you and what did they tell you?
A I believe it was Ann Wirth and Ann Wirth related to me that I think Mr. Corneal had been to Mr. Van Dommelen's home to get applications. And of course at that point there had not been a sewage permit so the building permit applications could not have been granted without the

sewage permit. So I did become aware of that through Mrs. Wirth.
Q Were you aware that they wouldn't even give him an application?
A I became aware of that.
Q When did you become aware of that?
A Through Miss Wirth.
Q At the same time?
A I think at the same time.
Q Was it about the time frame in which Mr. Corneal went to Mr. Van Dommelen and made that request?
A I don't know.
Q You don't recall?
A I think he clearly should have had the building permit applications.
Q I'm going to show you a letter that we'll mark as Newton Exhibit 5 and ask you to look at it for me, please.
(Letter dated 7/28/00 produced and marked as Newton Exhibit No. 5.)
BY MS. MONTGOMERY:
Q Is this the letter that you're referring to that you wrote in July?
A Yes, it is.
Q Now, at the time that you wrote this letter

you were aware that Mr. Corneal hadn't even received applications, correct?
A I don't know that. I don't know where this letter fits in in terms of time.
Q But at least at this point in time the supervisors had called you and told you that they were denying -- refusing to give Mr. Corneal building permits, correct?
A I don't know that. Again, I don't know when this was in terms of Mr. Corneal's meeting with Mr. Van Dommelen, whether it was before or after.
Q I'm going to show you a letter that we'll mark as Newton Exhibit 6 and ask you to identify that for the record if you can.
(Letter dated 5/5/00 produced and marked as Newton Exhibit No. 6.)
BY MS. MONTGOMERY:
Q Have you seen this letter in the past?
A I have.
Q How did you come to see it?
A I think that Mr. Corneal sent it to me.
Q You think he sent you a copy of it?
A Yes.
Q This letter is dated May 5, 2000, correct?
A Yes.

Q And it indicates that he had been unable to obtain an application, correct?
A **Yes.**
Q You believe that he copied you at the time that he sent it to Mr. Van Dommelen?
A **Yes.**
Q What did you do about this letter, if anything?
A **I believe that Mr. Corneal wrote me a letter around the same time, maybe the same date.**
Q Mr. Corneal wrote you a letter around the same date?
A **Yes. And my sense is I probably would have forwarded both onto the township.**
Q At that time did you provide the township with any advice about whether or not they ought to have given Mr. Corneal at least an application?
A **Well, I understood why the township didn't give him an application, because of the sewage permit issue. It was around this time -- and I believe it was after I got these letters from Mr. Corneal and there was a letter addressed to me and then a copy of a letter to Mr. Van Dommelen that I suggested to the township that we get together and meet with Mr. Corneal and see if we could work this out.**

**I recall in the last conversation I had with Mr. Corneal he had mentioned to me that he was considering litigation, a lawsuit, and I certainly didn't want that to happen and I believe in his letter to me he even mentioned that. So I contacted the township and put a request in to -- let's meet, sit down and see if we can resolve the differences.**
Q And what occurred at that time?
A **At what time?**
Q Well, you said you called the township and told them that we ought to meet and sit down and talk about this. What occurred?
A **The response back was that they didn't want to meet.**
Q They didn't want to meet with you?
A **They didn't want to have a joint meeting with Mr. Corneal and myself to try to resolve whatever differences the parties had.**
Q Who gave you that response?
A **That response was given to me by Ann Wirth.**
Q Was that in a telephone call?
A **Yes.**
Q Did she tell you why they didn't want to meet?
A **She indicated that Mr. Corneal's conduct at the township meetings was disrespectful. He apparently had**

**lost his temper and as a result the supervisors felt reluctant to meet.**
Q And what was your response to that, they don't have to meet if they don't want?
A **That's their decision, right.**
Q What about the issue of them not even giving him an application? I mean, did you indicate to them that you at least needed to resolve that?
A **Well, I don't -- I don't specifically recall. I did indicate that he needed -- he needed to have, you know, building permit applications. I mean, I'm certain that that was communicated at one point or another and it -- I wrote him again after the July letter in August, again at the request of the township.**
Q Now, I think you indicated that you had received a letter directly from Mr. Corneal around the same time that he copied you on that letter to Mr. Van Dommelen, correct?
A **Correct.**
Q I'll show you a letter that we'll mark as Newton Exhibit 7 and I'd ask you to look at that, please.
(Letter dated 5/5/00 produced and marked as Newton Exhibit No. 7.)
BY MS. MONTGOMERY:
Q Is this the letter that you're referring to

that you --
A **Yes.**
Q That you received from Mr. Corneal?
A **Correct.**
Q Now, you may have testified to this but -- and I'm sorry if you already did, but did you then forward this letter onto the supervisors?
A **I believe so, yes.**
Q If you were going to forward letters to the supervisors, you would send them to Ann Wirth; is that correct?
A **The township office, which would be the township address, the R.D. 1 box number.**
Q With respect to the contents of this letter, you note that -- Mr. Corneal makes reference to a refusal to receive a building permit to construct a garage, okay. Now, do you recall at the time did you discuss with the township their refusal to even give a permit or an application to construct a garage?
A **Well, I believe their reason for that is it was more than a garage. It was a three-bay garage and it had -- according to what I subsequently learned from Mr. Van Dommelen seeing the sketch that I think Mr. Corneal had, there was an apartment on the second floor of this garage which would have required a sewage permit.**

86

Q Mr. Van Dommelen showed you that sketch?
A **No, he did not. I just became aware of that either through -- probably through Mrs. Wirth.**
Q At what time did you -- were you told that by Mrs. Wirth?
A **I don't know.**
Q Do you know what it is that made Mrs. Wirth believe that this was a -- that there was supposed to be an apartment over this garage?
A **My understanding is that that information came from Mr. Van Dommelen, but I don't know. I can tell you that in late May I was on site and in fact there's a three-bay garage and an apartment. That's what was in fact constructed.**
Q An apartment?
A **Yes.**
Q Did you go inside?
A **Yes.**
Q What was inside that made you believe that there was an apartment?
A **A kitchen, bathroom. I think it was described by someone as a mother-in-law suite.**
Q When did you go inside?
A **It was the -- the date -- if you have a calendar, I can tell you. It was a Friday in May. I was**

87

**with Terry Williams and it was the time we met on site with Mr. Corneal's SEO, Mr. Bowes, to look at the test holes that had been done. Now, this was this year now, not in 2000. This was this May.**
Q Okay, but --
A **I would say -- I'm looking at a calendar here. I think it was May 18th, 2001.**
Q But back to May 2000, which is the point at which he couldn't even get an application for his garage, what was it that made Miss Wirth or anybody else believe that he was looking to build an apartment?
A **I think it was based upon the sketch that he showed Mr. Van Dommelen, but I don't know. I really don't know the answer to that.**
Q Did there come a time when you learned that Mr. Corneal sought to build a garage with a storage area over it?
A **No.**
Q Nobody ever told you about that request?
A **No.**
Q What about the art studio? Do you know anything about his request to build an art studio?
A **Not really, other than the fact that he was building one.**
Q Did anybody from the township ever talk to you

88

about the fact that Mr. Corneal wanted to build an art studio?
A **I would -- I'd have to say yes, but I don't have any specific recollection.**
Q If you don't have any specific recollection, what is it that makes you think yes?
A **That information was communicated to me somehow and I don't recall how. In fact, there is a garage with an apartment above it, there is an art studio, there is a home and there is another separate garage on the property as constructed now.**
Q Do you know when Mr. Corneal commenced construction on his property?
A **I don't know exactly, but certainly in the year 2000. And as of May 18th of 2001, it looked to me like construction was basically completed.**
Q Well, on May 5th, 2000 when he was asking you for applications, trying to get applications, had he started construction?
A **I don't know.**
Q How about in the summer of 2000 when he instituted this lawsuit?
A **Yes, the July 28th letter I think was written because it came to the township's attention that he had been constructing.**

89

Q Do you know what he was constructing at that time?
A **I do not know.**
Q Did the township tell you what he was trying to construct at that time?
A **I don't know.**
Q Do you know whether if Mr. Corneal wanted to build a property that didn't require sewage, build a structure that didn't require sewage --
A **Not that I'm aware of.**
Q Well, I didn't finish my question. Do you know whether if that's what he wanted to build, whether he would need approval of sewage modules?
A **I don't believe so if no sewage was contemplated.**
Q Do you know whether if what he wanted to build was just a garage or an art studio without sewage or water, whether that would be considered -- that act occurring would be considered a subdivision of his land?
A **Well, I don't think it would be a subdivision for DEP purposes unless the second structure contained sewage.**
Q Do you recall at any time discussing with the township officials, any of the defendants in this case, whether the building of a second home would render Mr.

Corneal's 95-acre tract a subdivision?
A **Well, it's my understanding -- and I think I learned actually at our May 18th meeting when we were talking to Mr. Bowes, who was the SEO there, the interpretation that Altoona DEP has given to our townships in that area is that, yes, in fact that is a subdivision for DEP purposes.**
**Mr. Bowes informed me that in terms of the Williamsport area if the first structure was maybe over 20 years old or more they don't consider that to be a subdivision.**
**So, you know, there's probably -- there is some conflict between DEP, but we -- the township was following the direction given from Altoona and that's what has been done in our county.**
Q Well, now, let me just ask you this: Is this something that came up in the context of Mr. Corneal's property or is it just something that has -- you've been the township solicitor for what, 15 years you said?
A **Approximately.**
Q The entire 15 years has this been an applied rule?
A **It's been an applied rule in Huntingdon County and I'm aware of that rule being applied to other townships.**
Q Do you know what this interpretation by DEP

comes under, what law? What are they looking at to base their interpretation on?
A **Well, it's the Pennsylvania Sewage Facilities Act and the regulations promulgated thereunder.**
Q That's what DEP has told you they're --
A **That's my understanding.**
Q What about the Municipalities Planning Code, do you know whether there was anything in there that would indicate that the construction of any additional home would render a 95-acre tract a subdivision?
A **I'm not aware of any, no.**
Q Do you know of any other instances in Jackson Township when the attempt to build a second home on a large tract of land, say 50 or 95 acres like this, has been treated as a subdivision where there is another existing structure?
A **I can tell you that -- I don't have any specific knowledge, but I know this has always been the interpretation. And Leroy Koch, who was the secretary prior to Ann Wirth, was one of the founding members of the Huntingdon County Sanitary Administrative Committee and I know that the committee adopted that interpretation.**
**So whether or not it had applied previously in Jackson Township, my inclination is to say yes, but I can't give you any specific example.**

Q Did they ever consult you about this notion of a subdivision occurring as a result of the construction of a second home?
A **That was discussed, yes.**
Q About Mr. Corneal?
A **Yes.**
Q Had they ever consulted you in the past about that?
A **I would say yes, but maybe not necessarily with this board of supervisors.**
Q When did they consult you about this subdivision notion resulting from the construction of a second home?
A **I don't have a specific date, but I know it was -- it was discussed and I believe my conversation was with Ann Wirth.**
Q Do you know whether it was prior to the time that you received these letters from --
A **I don't know.**
Q From Mr. Corneal.
A **I don't know.**
Q Do you know whether it was prior to the time this lawsuit was filed?
A **I'm sure it was prior to the time the lawsuit was filed.**

Q In imposing this interpretation on Mr. Corneal, were the township supervisors acting pursuant to your guidance and advice?
A **I would say that they were acting in conformance with the practice and procedures utilized in Huntingdon County by direction of DEP.**
Q But in discussing it with you was Miss Wirth seeking advice on behalf of the township?
A **If she was seeking advice, I agreed with that position because that's a position that has always been taken in our county.**
Q What was the nature of that conversation?
A **I don't recall.**
Q Do you recall how long the conversation was?
A **I don't.**
Q Was it a telephone conversation?
A **It was a telephone.**
Q Do you know that it happened prior to the initiation of this lawsuit?
A **The lawsuit I think was filed in July -- June or July of 2000 and I feel certain it was before. I'm not saying it wasn't also discussed after, but I think it was also discussed before.**
Q Was there a time that you became aware of Mr. Corneal's recording of an additional deed in connection with

94

his property?
A Yes.
Q How did you become aware of that?
A I think it -- first of all, all deeds that are recorded in our county are published in the paper. I may have seen it in the paper. And I did become aware that I think the recording of this deed violated the Clean and Green restrictions which would have meant rollback taxes would have been paid. I believe I may have received a request from Ann Wirth to get a copy of the deed and forward it to them.
Q Do you know when that request was made?
A I do not.
Q What makes you think that the recording of this deed would -- well, before I ask you that, you don't recall exactly how you learned about the recording of the deed?
A I may have seen it in the paper because I read deed transfers and I know that I discussed it with Ann Wirth.
Q Did you initiate that phone call or did she?
A She did.
Q Do you know how she became aware of it?
A Probably through the paper.
Q And did Miss Wirth ask you to do anything --

95

A No.
Q -- about recording of that deed?
A No.
Q Did you advise Miss Wirth to do anything?
A No.
Q Did Miss Wirth discuss with you the question of the subdivision ordinance in connection with the recording of that deed?
A I don't believe so.
Q Now, you recall that the subdivision ordinance for Jackson Township was passed at a July 10 meeting, correct?
A Yes.
Q Do you know whether this conversation was -- with Miss Wirth about this deed occurred before or after that meeting?
A I don't. Certainly it was after the deed was recorded obviously, but I don't know.
Q Do you know when the deed was recorded?
A I do not.
Q What is it about the recording of that deed that makes you think that recording that deed violated -- the Clean and Green Act, is that what you said?
A Yes.
Q What is it?

96

A I don't know the specifics, although I believe the recordation generated something from our assessment office to Mr. Corneal.
Q And what does that have to do with the Clean and Green Act?
A Well, the -- there are certain -- when you have property in Clean and Green, it's a preferential assessment. So there are restrictions that apply as to how much land you can sell over what period of time and whatever Mr. Corneal did with the recording of that deed violated those restrictions. And I believe subsequently there was a corrected deed that was recorded so as a result there wasn't any penalty that was imposed.
Q And how did you find out about the corrected deed?
A Again, I saw it in the paper, looked it up.
Q What did the corrected deed accomplish?
A You know, again, I'm not sure. I think it was probably a transfer or conveyance back so the status quo was maintained.
Q So you think that the deed was undone? In other words, the --
A Yes.
Q The transfer was undone?
A Yes, whatever -- whatever was violative of the

97

Clean and Green restriction was corrected.
Q So is it correct that if Mr. Corneal by recording that deed had violated the Clean and Green Act, the remedy would have been for him to pay certain taxes; is that correct?
A Rollback taxes, yes. That has nothing to do with the township. That's through the county.
Q And it has nothing to do with the ability to subdivide, right?
A Well, there's certainly a relationship there.
Q It has to do with preferential tax treatment?
A Exactly.
Q And you correct that by paying whatever taxes are due, correct?
A Yes. If Mr. Corneal wanted to pay the taxes, he wouldn't have to have done anything.
Q Now, if I could refer you again to the May 5, 2000 letter to you from Mr. Corneal, it makes a reference to the supervisors assuring citizens that the subdivision ordinance under contemplation would be approved by April. Do you know anything about that?
A I do not.
Q Do you know whether there was ever an April deadline for approving the subdivision ordinance?
A I do not.

Q Did the supervisors ever talk to you about the effect that failure to approve the ordinance was having on Mr. Corneal's efforts to convey a piece of his property to Mr. Hewett and Miss Smith?

A **Not directly, although I do remember Ann Wirth communicating to me that at one of the meetings that Mr. Corneal attended Mr. Hewett and Miss Smith were also present. And at the beginning of the meeting -- at the beginning of the meeting Mr. Corneal was -- and, again, this is related secondhand to me, but at the beginning of the meeting Mr. Corneal was talking about subdivision and towards the end of the meeting he was saying he wasn't going to subdivide at all, and that seemed to be, you know, certainly a conflict if he was going to sell to Hewett and Smith.**

Q You recall Miss Wirth conveying that to you?

A **Yes.**

Q Anybody else, the building permit officer or the sewage enforcement officer or anything like that?

A **No.**

MS. MONTGOMERY: I'm going to have to take this conference call which I had scheduled for lunch.

(Discussion held off the record.)

(Luncheon recess taken at 12:17 p.m. until 1:02 p.m.)

BY MS. MONTGOMERY:

Q Let me show you a document that we're going to mark as Newton Exhibit 8 and let you look at that, please.

(Notice produced and marked as Newton Exhibit No. 8.)

BY MS. MONTGOMERY:

Q Mr. Newton, I'm just going to draw your attention to the right-hand column of this series of classified ads. Do you see the public notice please take notice?

A **Yes.**

Q And there are three in a row, right --

A **Um-hum.**

Q -- that refer to Jackson Township? Have you seen this before?

A **I don't believe so.**

Q You had testified earlier that there was -- you thought there might be -- there should have been a notice in connection with the meeting for the moratorium, correct?

A **No, I testified earlier that there should have been a notice for the meeting concerning the subdivision ordinance, the public hearing and also a notice concerning the regular monthly meeting of the township.**

Q I apologize if I recalled -- is it your

testimony that if they were going to pass a moratorium on subdivisions they wouldn't have had to put a notice in the newspaper?

A **I basically told you I believe that I didn't know.**

Q You believe they do, but you don't know?

A **I -- my answer was I don't know.**

Q So you haven't seen this Exhibit 8 in the past?

A **Not in this form, no.**

Q Have you seen it in some other form?

A **If I saw it, it would have been when it was published in the Daily News, which appears to be 12/28/99.**

Q You're saying that because of the handwriting in the left-hand column, is that what you're saying, 12/28/99?

A **I'm just assuming that's when it was published, yes.**

Q If you'll notice, there are three notices about Jackson Township and the second one is the regular monthly meeting notice, correct?

A **Yes.**

Q The first one then would suggest that there was a special meeting, correct?

A **No, actually I think the first one suggests**

**that a hearing is taking place on June -- I'm sorry, on January 4th, 2000 which would be the township's normal meeting night.**

Q So do they sometimes have their public hearings on the same date --

A **Yes.**

Q -- as their normal meeting night?

A **Yes. I was -- you know, I -- before I didn't -- I couldn't recall whether or not it was the same night as the meeting night or it was a different date, but apparently this makes it clear that it is the same.**

Q In other words, that they did the moratorium and the monthly meeting --

A **No.**

Q -- on the same date?

A **No. What I'm saying is that there was a public hearing scheduled for January 4th at 7:30 to discuss and answer questions regarding the proposed subdivision ordinance. That apparently occurred on the same night as their normal meeting night.**

Q I showed you Exhibit 2 before. If you'll look at Exhibit 2, the minutes of the meeting.

A **Yes.**

Q That's dated January 4 as well, right?

A **Correct.**

Q And that's the meeting at which they passed the moratorium; is that correct?
A **That's correct.**
Q So typically I think that you had testified that if there was going to be something special going on you would draft the notice?
A **I drafted this first notice.**
Q For the public hearing?
A **Yes.**
Q It doesn't say anything about --
A **And I don't know that you characterized my response correctly. In this instance I drafted the notice at the request of the township.**
Q Okay.
A **Okay.**
Q Now, typically if you draft the notice, is it signed by you or is it signed by -- you know, as in the paper here it's signed by Ann Wirth, or could it be either way?
A **Well, it's not really signed. It can be either way. In this instance it was -- it was Ann Wirth. Typically when I advertise an ordinance, I'll put my name and address down and in each instance I would request that the statement, the invoice, along with the proof of publication be sent to the township.**

Q Now, did you draft the notice for the reorganizational meeting?
A **No.**
Q Or for the monthly meeting?
A **No.**
Q Now, typically where do the bills go for the newspaper notices that get published?
A **To the township.**
Q Even if you're the one who drafts and calls the newspaper and puts it in?
A **When I submit something to the Daily News, I direct that the statement and proof of publication be sent to the township.**
Q So I'm going to mark as Newton Exhibit 9 another document that I'll ask you to look at, please.
(Bill dated 12/28/99 produced and marked as Newton Exhibit No. 9.)
BY MS. MONTGOMERY:
Q Have you seen that before? For the record, it's a bill apparently from the Joseph Biddle Publishing Company; is that correct?
A **Yes, that's the Daily News. And, no, I haven't.**
Q Let me ask you this: Is it your understanding that you only need to publish a notice once or is it twice

prior to any public hearing where there's going to be a vote or a --
A **Well, in the -- with respect to the subdivision ordinance, it's two times and that is a requirement under the Municipalities Planning Code. This -- more or less the first notice on the public hearing was simply an informational thing. It wasn't required by anything and it was to try to get some public input, at least that was my understanding of it.**
Q You mean if there's going to be a public hearing on an issue, it doesn't have to be published separately?
A **That's not what I said.**
Q What did you say?
A **There are separate requirements for publication in the Municipalities Planning Code and my recollection is that that notice -- that notice has to go in two times.**
Q If you're going to vote on something, like an ordinance or something like that?
A **Right, it's part of, you know, the process. And my recollection is that we published the notice two times and then we published additional notice of the time we were going to adopt the ordinance.**
**This initial notice for public hearing was, I**

**believe, for the township's benefit to try to receive public input and it didn't count, so to speak, as an advertisement as regards the subdivision ordinance. It was simply to try to get input from the residents of the township.**
Q Just so I'm clear, if you -- if you were required -- and you say you don't know, but if you were required to publish notice of a moratorium the same as you're required to publish notice on the subdivision ordinance, then you'd be required to publish it twice just like you have to for the ordinance, correct?
A **I don't know.**
Q I'm going to represent to you that we've only seen one notice for the subdivision ordinance meeting that was held on July 10th, 2000 where that subdivision ordinance was passed. Is it your testimony that there were actually two notices published?
A **There was another notice published, yes.**
Q Do you know when?
A **Before the January meeting.**
Q Before the January --
A **I'm sorry, before the July meeting.**
Q Another notice that you drafted?
A **Yes.**
Q So you drafted both of them. Do you have records of them?

A I may have. I don't have them with me.
Q And there would be --
A I believe the notices that are prior to the formal notice concerning the adoption of the ordinance are -- again, my recollection is that there is a two notice requirement.
Q Right. And you believe that occurred with respect to this subdivision ordinance?
A Yes.
Q I want to show you another document we'll mark as Newton Exhibit 10.
(Letter dated 8/3/00 produced and marked as Newton Exhibit No. 10.)
BY MS. MONTGOMERY:
Q Mr. Newton, this is an August 3, 2000 letter from David Corneal to you, correct?
A Correct.
Q Do you recall receiving this letter?
A Yes, I do.
Q And what did you do with this letter?
A Forwarded it onto the township.
Q Anything else?
A Not that I can recall.
Q Do you recall having any discussions with anybody from the township about this letter?

A I don't. Of course, this was after the federal lawsuit was filed. It may have been discussed at one of our -- in one of our meetings pertaining to the federal lawsuit. I don't recall -- I don't have a specific recollection of this letter being discussed.
Q Now, this letter indicates that Mr. Corneal sent you the sewer module for his house which apparently the township had indicated there wasn't a proper sewer module and that's why he couldn't have a building permit at least in part, correct?
A Mr. Corneal never sent me a sewage module.
Q Have you ever seen Mr. Corneal's sewage module?
A I don't believe so.
Q Now, here Mr. Corneal asked you to send him applications which he'd been unable to obtain from the township, correct?
A Where are you?
Q I'm sorry, next to the last paragraph at the bottom.
A Well, I note here I enclose the sewer module for my house. I don't remember getting it. If I did get it, I forwarded it onto the township, but I don't remember it.
Q So you didn't do -- you don't recall doing any

review of the sewer module --
A No.
Q -- to see whether it looked complete or anything?
A No.
Q What about Mr. Corneal's request that you forward applications to him in care of Max McClintic?
A I believe subsequently I forwarded applications -- building permit applications, but I believe it was to Mr. Corneal directly.
Q So that was after this August 3rd letter, correct?
A Yes.
Q Let me ask you about the garage which you say now has an apartment over it in which you saw in May of 2001, correct?
A Yes.
Q Do you know when that garage was -- the building of that garage commenced?
A I don't. I can only assume that it was commenced sometime in the summer of 2000.
Q In the summer of 2000 you believe?
A (Witness nods head affirmatively.)
Q Did you have any other occasion at any time to go to that garage and look at it?

A No.
Q Has anybody ever told you that when the garage was first built it contained just a workshop with no sewage --
A No.
Q -- and such over top of it? Did you become aware of that through any means whatsoever?
A No.
Q Is this the first time you've ever heard that?
A Yes. My understanding was that sewage was contemplated for the garage itself, the second floor.
Q From the very beginning?
A That was my understanding.
Q Based on what?
A Based on what I had been told.
Q Now I'm going to show you another document that we will mark as Newton Exhibit 11 and I'd ask you to identify it if you can.
(Letter dated 8/31/00 with enclosures produced and marked as Newton Exhibit No. 11.)
BY MS. MONTGOMERY:
Q Mr. Newton, have you seen that letter to Ann Wirth dated August 31, 2000 prior to today?
A I don't believe so.
Q You've never seen it prior to today?

110

A Not that I can recall.
Q Do you recall seeing the building permit applications?
A I don't.
Q Did you get any telephone calls from Ann Wirth about these building permit applications?
A Not that I can recall.
Q How about anybody else from the township, building permit officer, any supervisor, anybody else?
A No.
Q They didn't seek your advice about this at all?
A Not that I can recall.
Q What about --
A Let me stop there. I was requested by the township to draft a response to the building permit applications and I did do that. I think Mr. Van Dommelen had written a draft and then I basically redid the draft.
Q Well, did you not have an opportunity to look at the building permit applications in drafting the response?
A I don't think so. I think my information came from Ann. I don't recall seeing the applications.
Q Well, let me ask you this: If you didn't have the building permit applications, who should have had them

111

in order for you to respond to the building permit applications that Mr. Corneal filled out?
A Well, you know, again, the application -- my recollection is that I drafted the response without the building permit applications based upon information provided to me.
Q By Ann Wirth?
A Yes.
Q Did you talk to anybody else about it?
A No.
Q Did you talk to the building permit officer?
A No.
Q Mr. Van Dommelen, I mean.
A Yes.
Q But I guess I'll ask you again: If you didn't have them, who should have had them in terms of -- I mean, shouldn't somebody at the township review the building permit applications?
A Well, I think Mr. Van Dommelen did. That was my understanding.
Q What makes you think that?
A Because he drafted the initial response to the building permit applications.
Q Did you tell him to draft that response?
A I did not, no.

112

Q Did you tell him through telling somebody else to have him draft that response or did you tell Miss Wirth to tell him to draft a response?
A Not that I recall. I think that the applications came to Mr. Van Dommelen. He drafted a response. I was requested by the township to review it and to revise it if I felt it necessary.
Q And did you do that?
A Yes, I did.
Q I'm going to show you a letter that we'll mark as Newton Exhibit 12.
(Letter dated 9/1/00 with enclosures produced and marked as Newton Exhibit No. 12.)
BY MS. MONTGOMERY:
Q Mr. Newton, have you seen this September 1, 2000 letter to Miss Wirth from Mr. Corneal prior to today?
A I don't believe so.
Q What about the attachments to the letter that shows the second floor of the garage as open storage? Have you seen that in the past?
A I don't believe so.
Q Did anybody ever discuss with you this particular letter?
A Not that I can recall.
Q Did anybody discuss with you the August 31st

113

letter that I showed you just a moment ago with the building applications?
A Well, only in the context that I drafted a response to the permit applications.
Q Did anybody discuss with you the drawings and other things that were attached to the August 31 letter?
A Not that I can recall.
Q Now, I think that you testified earlier that you drafted this response or that you revised a response that Mr. Van Dommelen started out writing. I'm going to show you a document we'll mark as Newton 13.
(Letter dated 10/10/00 produced and marked as Newton Exhibit No. 13.)
BY MS. MONTGOMERY:
Q Is this the letter that you're referring to that eventually went out from Mr. Van Dommelen --
A Yes, it is.
Q -- with your assistance?
A Yes.
Q Which part of this letter did you draft?
A I would say basically it's my letter.
Q This makes reference to, in the second paragraph, your application inadequately described the proposed construction. What was the inadequacy?
A My recollection is that that was a detail

114

**issue.**

Q What detail issue?

A **On what the -- what was to -- what was to be the proposed construction.**

Q But you never saw the application?

A **That's right. My communication was, again, through Mrs. Wirth.**

Q The same is true with respect to your third reason for denying the building permit applications?

A **That is correct.**

Q It did not include an adequate plan for the site showing the size and location of the proposed construction, right?

A **Correct.**

Q Now, what about this reference to the driveway ordinance? Not having complied with the driveway ordinance, what was that based on?

A **In July, the July township meeting, the township passed a driveway ordinance.**

Q And what was it that Mr. Corneal had done that they didn't think was correct?

A **I don't think he had done anything with respect to the ordinance, is my recollection.**

Q Well, it says you have not complied with the township's driveway ordinance.

115

A **A copy of which is enclosed.**

Q Right. In what way didn't he comply?

A **You know, again, my -- my recollection is he didn't do anything with respect to the driveway ordinance.**

Q Mr. Corneal didn't do anything?

A **Correct.**

Q On whose information are you basing that information?

A **Township information.**

Q What did you think he had to do --

A **I don't have the ordinance in front of me, but there were certain requirements that were set forth in the ordinance and I was informed that he had not complied.**

Q But you didn't have any individual -- independent information --

A **No, absolutely not.**

Q Now, the letter also makes a reference to submitting sewage facilities planning modules to the township, correct? It's higher up in the second paragraph.

A **Yes.**

Q But you didn't see these sewage facilities planning modules, correct?

A **Not to my recollection. Again, I -- if Mr. Corneal sent a module with that letter, I don't remember at least examining it.**

116

Q All right, thank you. I want you to just look at the first sentence of this October 10, 2000 letter. It says please be advised that Jackson Township has referred to me for review your applications for building permits, right?

A **Yes.**

Q But they didn't give you the applications, right?

A **Well, this is under Mr. Van Dommelen's signature. I'm really writing the letter for Mr. Van Dommelen and it referred to him, yes.**

Q But my question still stands, they didn't give you them? I mean, either -- they didn't give you these applications?

A **Not that I can recall.**

Q How did Mr. Van Dommelen deliver to you the first draft of his letter?

A **He did not. I think Mrs. Wirth faxed it to me.**

Q So he wrote it and gave it to Mrs. Wirth, do you think?

A **I believe so.**

Q Did you save a copy of it?

A **No.**

Q Do you not usually save copies of things that the township supervisors send to you?

117

A **Not something like that, no.**

Q Do you have any other copies of any drafts of this letter?

A **No, I don't.**

Q When you wrote this letter for Mr. Van Dommelen, did you have any knowledge of whether he had actually reviewed the applications?

A **I believe he had, yes.**

Q Now, let me ask you this: Have you ever been involved in an appeal of a denial of a building permit application for any of the townships that you work for?

A **I don't believe so.**

Q Never?

A **(Witness shook his head negatively.)**

Q What about --

A **Let me say in this case Mr. Wilson -- Mr. Williams appealed the denial, okay. So in this case he had requested a hearing through the township on the denial of the permits and in that regard I believe I received a telephone call from him.**

**And it was at or about the same time that the township had initiated a lawsuit against the Corneals to the Court of Common Pleas of Huntingdon County because they had commenced construction without a building permit. We had difficulty getting Mr. Corneal served with a copy of the**

118

complaint and motion for preliminary injunction. He's a Centre County resident. We forwarded it, of course, the complaint -- our sheriff's office forwarded the complaint to the Centre County sheriff and he was not able to obtain service.

And we had a preliminary hearing scheduled on our request for injunctive relief that couldn't be held because the Corneals weren't served. And it's about this time I get the call from Terry Williams. And, again, I -- it's possible that I could have called him after I became aware that he, you know, filed this appeal.

Q Do you know whether or not this request for a hearing -- or for an appeal, hearing for an appeal, was actually served, I should say, on the Jackson Township Board of Supervisors prior to the time that the Huntingdon County action was initiated against Mr. Corneal?

A I really don't know. All I can say is it was at or about the same time. And I know Terry Williams, I have high regard for him, and I said to him, look, let's sit down and see if we can resolve this. I don't think it's necessary to litigate the denial of the permit applications, let's look to the larger issue and get this -- get this solved.

So what we agreed to do on the date that was scheduled for our preliminary hearing, we agreed to meet in

119

the Huntingdon County Courthouse and in fact we did meet with Mr. Williams and that meeting included all of the township supervisors, Mr. Van Dommelen. I believe Barry Parks, the sewage enforcement officer, and myself.

And at that time we basically explained to Mr. Williams the township's position, where the township was coming from and we charted a course to resolve this. It was our hope and our goal to have it resolved by the end of the year. And rather than litigate our equity complaint, we simply tried to take whatever steps necessary to resolve this short of any litigation.

Q But back to my original question -- I'm just going to go back to the very beginning. My question -- my first question was whether or not you've ever had an appeal on a denial of a building permit application with respect to any of the townships or boroughs or other local governments that you represent.

A Well, we had one with Mr. Corneal through Attorney Williams here.

Q So it's your testimony that the meeting that you had in the courthouse in connection with the preliminary injunction hearing was the appeal of the building permit application?

A Absolutely not.

Q What's the --

120

A We met with Mr. Williams in order to try to resolve all the issues involved in this litigation.

Q So when you say you had one with Mr. Williams, you mean --

A He filed an appeal. We did not ever have an appeal hearing.

Q That was my question, did you ever have an appeal hearing --

A No.

Q -- in connection with any of the local governments that you represent on a building permit application denial?

A Not that I can recall.

Q Do you know as a township solicitor, a borough solicitor, what kind of hearing should be held in connection with the appeal of the denial of a building permit application? Do you know what the format for that hearing would be?

A Without looking it up, no.

Q Do you know who would hear the hearing? Who would the hearing be before?

A My sense is it would be before the board of supervisors.

Q Do you know whether there was ever an appeal hearing held before the board of supervisors in connection

121

with Mr. Corneal's appeal?

A The answer is no. And the reason for that is by an agreement with Mr. Williams we decided to forego the hearing and address the issues to see if we could resolve them amicably.

Q Is it your understanding that Mr. Williams was waiving the right to a hearing on the denial of the building permit application?

A I don't know if that was actually ever discussed.

Q Was there anything in writing about that?

A No.

Q You're saying that in a telephone call Mr. Williams agreed on behalf of Mr. Corneal that you wouldn't have the hearing?

A No, that's not what I said at all.

Q Well, I'm having a hard time understanding --

A Well, what I -- what I said was that -- what I proposed to Mr. Williams was instead of going through the hearing on this denial, we get to the heart of the matter and see if we can resolve the issues. He agreed to do that.

Q Well, for the record, I'll ask you to look at what we'll mark as Newton Exhibit 14.

(Letter dated 11/10/00 produced and marked as Newton Exhibit No. 14.)

BY MS. MONTGOMERY:
Q Now, this is a November 10, 2000 appeal letter from Terry Williams, correct?
A **Yes.**
Q Have you seen this in the past?
A **I believe I have.**
Q Did the township supervisors forward this to you?
A **Yes, I think so.**
Q Did you call Mr. Williams in connection with this appeal on behalf of the supervisors?
A **I believe so, yes.**
Q When did you call him?
A **Well, shortly after the township had received this letter, I believe I contacted Mr. Williams and at that time I suggested that we sit down -- when I say we, I mean the township and Mr. Williams, to look at these issues and attempt to resolve them, and in fact that's what we did. We met the same day that the motion for preliminary injunction was scheduled at the Huntingdon County Courthouse.**
Q And that preliminary injunction has not been resolved one way or the other yet, correct?
A **That's correct.**
Q So it's pending?
A **Well, I think it's probably mute at this**

**point. I believe Mr. Corneal has completed his construction. I'm happy to report that as of the township's June meeting, after hearing the presentation from Mr. Bowes, it looks like everything is going to be fine with respect to sewage modules.**
**Mr. Bowes on site indicated to us in our May 18th meeting that what had previously been proposed were not acceptable. Those sites have been destroyed and I believe that they were too close to the road that was constructed, but I think everything is basically on track to be resolved.**
Q When was this June meeting?
A **The first Monday in June.**
Q Was this a public meeting?
A **This is the township's June meeting, yes.**
Q The township's June meeting?
A **Yes.**
Q Mr. Bowes is who? Could you identify him for the record?
A **Mr. Bowes is a sewage enforcement officer that has been retained by Mr. Corneal through Terry Williams to do the design for the sewage systems that are going to go in. And I believe that he is going to design -- I think it's a newer technology called micromounds.**
Q So you're pleased to report that Mr. Bowes has found that the sewage modules are now satisfactory; is that

what you're saying?
A **Yes, that's correct.**
Q And what does the township intend to do with that information?
A **Forward them on to the Department of Environmental Protection.**
Q Well, as I understand, the preliminary injunction hearing was -- and I'm, of course, not a party to it and I'm not that familiar with it, but the preliminary injunction motion that was filed was designed to stop Mr. Corneal from building his house, correct?
A **Yes, the township had received a number of complaints from other residents concerning this construction and the fact that Mr. Corneal was building without a building permit.**
Q What other residents were those?
A **I don't know. This is what I'm being told from the township.**
Q Did you draft the complaint for the township?
A **Yes, I did.**
Q You didn't ask them who complained to them about Mr. Corneal building?
A **No, and it really wouldn't matter who complained. No one would have had to have complained if there was a violation.**

Q It might matter for this lawsuit.
A **It could.**
Q But the appeal that Mr. Williams sent to you -- or sent to the township, I'm sorry, on November 10, 2000 concerned the denial of all his applications, correct?
A **Building permit applications.**
Q Exactly.
A **Yes.**
Q The preliminary injunction was designed to get -- for Mr. Corneal's house primarily, correct?
A **No, it was every -- any and all construction. I don't believe the township knew actually what was being constructed. I think there are no trespassing signs that are posted. I think the township's knowledge came from, you know, construction vehicles going in and out and reports of others.**
Q Well, Mr. Corneal's building applications say what he was trying to construct, don't they?
A **Sure.**
Q So if Mr. Corneal didn't need sewage for his art studio and didn't need sewage for his garage, would there have been any grounds for him to have been denied a building application -- a building permit?
A **I'll stand on what was set forth in the letter under Mr. Van Dommelen's signature.**

Q Okay. What date was the preliminary injunction hearing scheduled to be held?
A **I don't know. I don't recall.**
Q Did you at the meeting that was held in the courthouse which you say was held on the date that the preliminary injunction hearing --
A **Yes.**
Q -- had been scheduled, did you discuss the appeal of the denial of the building permit application specifically?
A **We did not. We instead tried to set forth a plan where we could resolve all of these issues to get them done.**
Q Well, let me ask you this: By the date of the meeting in the courthouse had you received -- are you sure that you had received the appeal on the building permit --
A **I'm not sure. It may have been prior to that. I don't know. But there was some reason that I was in touch with Mr. Williams and -- either he called me or I called him about this appeal and the gist of our conversation was let's sit down and see if we can work it out.**
Q I'm going to show you a document that we'll mark as Newton Exhibit 15.
(Invoice dated 8/4/00 produced and marked as

Newton Exhibit No. 15.)
BY MS. MONTGOMERY:
Q Mr. Newton, do you recognize this document?
A **Yes.**
Q Is this a copy of an invoice that you sent to the supervisors for services rendered?
A **It is.**
Q So this was on August 4, 2000?
A **Right.**
Q Is it fair to assume that anything you had done up to and including August 4, 2000 would be listed on this invoice back to the time of your last invoice?
A **Not necessarily.**
Q Why is that?
A **Well, as I indicated to you, I attempt to reconstruct some of these bills and often I miss things and sometimes I bill based upon when a project is over. So I wouldn't necessarily do it on a chronological basis but on what's done.**
Q Well, let's look at Number 4 here, meeting with supervisors on July 6, 2000, re: Corneal lawsuit.
A **Yes.**
Q Now, was that the meeting that you had with the supervisors without the presence of Mr. Sherr?
A **Yes, I believe so.**

Q What about the meeting with the supervisors on July 13, 2000?
A **That may have been with Mr. Sherr.**
Q So it was one or the other?
A **I'm pretty sure -- I'm sure it wasn't the first one. I think it might have been the second one.**
Q How long was that meeting, do you recall?
A **I don't recall.**
Q Now, I see a reference to a letter to Ann Wirth dated May 8, 2000, re: David Corneal. That's Number 2.
A **Yeah, I think that would be probably the transmittal letters of his letters to me -- one letter dated May 5th and a copy of Mr. Van Dommelen's letter.**
Q So let me just ask you this: You have indicated that you bill them at $60 an hour, right?
A **Approximately, yes.**
Q So at $25 an hour it would have taken you nearly a half hour to draft this letter, correct?
A **Well, not necessarily, no. I mean --**
Q I'm just trying to really --
A **That is -- you notice here I don't have an hourly rate down here, you know. It's just what I feel was appropriate for the circumstances.**
Q I'm just trying to understand whether there

exists another letter other than some transmittal letters since this was --
A **I don't believe so.**
Q Do you save copies of all the letters that you -- correspondence that you send to the supervisors in connection with --
A **Generally, yes.**
Q I see here there's a reference to a meeting with the supervisors in May 2000 regarding David Corneal, correct?
A **New Enterprise Stone and Lime Company and David Corneal. As I indicated to you previously, I think the purpose of the meeting was to discuss this New Enterprise problem and Mr. Corneal -- the subject of Mr. Corneal came up at that meeting.**
Q Now, was this one of those workshop meetings, is that what you're thinking?
A **That's what I testified to previously.**
Q Was this meeting subsequent to the time that Mr. Van Dommelen had initially denied building permit applications to Mr. Corneal?
A **No, I don't believe so.**
Q So you think -- as far as Number 2 goes, do you think you have copies of the letters to Ann Wirth, re: David Corneal?

A **I probably do.**
Q Now, you have preparation of draft response to the Corneal's complaint, correct?
A **Yes.**
Q Did you save copies of your draft responses?
A **This would be a federal lawsuit. I believe I did, yes.**
Q And then there's reference to a letter to Ann Wirth dated August 4, 2000. Do you know whether that involved David Corneal?
A **It may have been a transmittal letter. I seem to recall there was a letter that was dated August 3rd. I'm not sure.**
Q Do you know when the last time you sent an invoice to the township prior to this August 4th --
A **Prior to August 4th, no, I don't.**
Q You have no recollection at all?
A **No.**
Q Would you have that in your records?
A **Probably, yes.**
Q Let me ask you this: I know you don't have a date for your meeting with the supervisors in May, right?
A **(Witness nods head affirmatively.)**
Q Which is Number 3 --
A **Yes.**

Q -- regarding David Corneal. But you did testify that that was I think a workshop meeting. Was that prior --
A **That's my recollection, yes.**
Q So it would have been prior to their monthly meeting, correct? Isn't that --
A **No.**
Q -- when they have their workshop meetings?
A **Not necessarily, no.**
Q Do you know whether it was before or after the May 5 letter that was sent to you by Mr. Corneal from -- regarding Mr. Van Dommelen's refusal to give him building permit applications?
A **I don't know.**
Q Was the workshop meeting held in the afternoon or in the evening?
A **I would say afternoon.**
Q Late afternoon, early evening, what?
A **Well, one of the -- I just -- I would say late afternoon -- in the afternoon. I'm not sure exactly when.**
Q And you had traveled out to the township office, right, to do that?
A **That's correct.**
Q So do you remember whether it was getting to be dusk or was it dark or anything driving out to that

meeting?
A **I don't believe so. I think it was daylight.**
Q Mr. Newton, we've already made this a copy of the record and it's so large I'm not going to do that again, but I'm going to ask you to look at the subdivision and land development ordinance and identify it for me, if you can, please.
A **It appears to be the Jackson Township subdivision ordinance.**
Q Can you look on page 71 of the ordinance.
A **Yes.**
Q Do you see where it's dated July 7, 2000?
A **Yes.**
Q Did you become aware prior to this moment that this was dated July 7, 2000?
A **No, I think that's a mistake.**
Q You think it's just the wrong date?
A **Yes.**
Q What makes you think that?
A **Because the township meeting was on July 8th.**
Q July 10, correct?
A **Well -- let me see. Whenever the first -- whenever the meeting was -- I thought it was the 8th, but maybe it was -- Monday.**
Q The first Monday of the month --

A **Yes.**
Q -- that's not a holiday?
A **Is that the 10th?**
Q I think it was, but your counsel is checking her calendar.
A **It would have been the 10th.**
Q Now, you weren't at that meeting, though, you testified, correct?
A **No, I wasn't.**
Q Do you know whether this subdivision and land development ordinance was signed at the meeting, prior to or after?
A **I wasn't there. My sense is it would have been signed at the meeting.**
Q I'm going to show you what we've marked previously in depositions. Again, I don't think I will make these additional copies for the record, but it's the Huntingdon County Planning Commission letter to Ann Wirth dated February 24, 2000.
A **Okay.**
Q Have you seen this letter in the past?
A **I believe I have.**
Q What makes you believe you have?
A **Because I believe that Ann would have maybe faxed me a copy of it or mailed it to me.**

134

Q Did you review it at the time, do you know?
A **I probably looked at it, yes.**
Q Did you have any discussions with the township about what they needed to do in order to get the subdivision proposal in order?
A **What do you mean?**
Q Well, this letter I believe indicates that there was going to be a problem or two with the proposed subdivision from Mr. Corneal, correct?
A **Yes.**
Q Did you have any discussion with the township or any of its officials or its secretary about Mr. Corneal's subdivision after you received this letter?
A **Not that I can recall.**
Q Do you think you received this letter at about the time that it was written?
A **I have no idea.**
Q What about this April 20, 2000 letter from the Huntingdon County Planning Commission which has been made part of the record in the past? Do you recall receiving a copy of that letter?
A **I would say yes.**
Q Why would you say yes?
A **Because I believe Ann forwarded it on to me.**
Q Did she forward it to you at about the time it

135

was written?
A **I would say so, but I don't recall.**
Q Did you have any discussion with the township about Mr. Corneal's proposed subdivision at that time?
A **Not that I can recall.**
Q Now, I think you had testified earlier that when they send something to you that they anticipate whatever guidance or advice you might have for them, correct?
A **That's right.**
Q Did you have any advice or guidance for them in connection with this letter?
A **Not that I can recall.**
MS. MONTGOMERY: I'm going to take a moment here to review some notes and documents. We can take a five minute break if you want.
(Break taken at 1:58 p.m. until 2:23 p.m.)
BY MS. MONTGOMERY:
Q We had talked a moment ago, Mr. Newton -- we had talked some time ago about discussions that you might have had about Mr. Corneal's sewage planning modules. I just need to know from you whether you recall talking to Ann Wirth about Mr. Corneal's sewage planning modules?
A **Yes.**
Q Do you recall when that conversation took

136

place?
A **No.**
Q Can you put it in some kind of estimated time frame?
A **Well, I -- I remember -- and, again, this was either at the -- at one of the meetings that Mr. Corneal attended. I believe Mrs. Wirth informed me that Mr. Corneal put the sewage modules on the table where the supervisors were sitting and then by the end of the meeting had taken them away. So at least at the conclusion of that meeting, even if the supervisors wanted to forward those modules on to DEP, they didn't have them to forward them. I do remember that discussion specifically.**
Q That's what Mrs. Wirth told you?
A **That's what Mrs. Wirth told me.**
Q She told you that around the time of the meeting that Mr. --
A **I can only assume so. I don't recall, but I would think that would be correct.**
Q So at that time did she discuss with you the fact that the supervisors had indicated to Mr. Corneal that he couldn't build because he would have to subdivide? In that same conversation did you have that discussion?
A **I don't recall. I do know that there was an issue concerning -- that in fact there was already an older**

137

**dwelling on the premises and if he was going to put another dwelling on that contained sewage it was a subdivision for DEP purposes.**
Q You had said that the Altoona division of DEP or --
A **That would be Joe Rouzer.**
Q Joe Rouzer?
A **Yes, uh-huh.**
Q From the Altoona regional office?
A **Yes.**
Q And that's his interpretation?
A **Yes.**
Q Has he been at the Altoona DEP regional office for many, many years?
A **Yes. I'd say in excess of 20 years.**
Q But you're aware of at least one other regional office of DEP that doesn't interpret the law that way?
A **I became aware of that on or about May 18th from Tom Bowes because we had a discussion on Mr. Corneal's property about this issue. And Mr. Rouzer was there and explained to Mr. Bowes that the way they have always interpreted that would be just the way that the townships in Jackson County have followed.**
MR. SHERR: If I may, you just said Jackson

County.
THE WITNESS: I meant -- Jackson Township I thought I said.
BY MS. MONTGOMERY:
Q How long was the conversation that you had with Mrs. Wirth in which she told you that Mr. Corneal had presented some sewage planning modules but taken them back?
A **It wasn't very long. I don't recall.**
Q Do you think it was more than 10 minutes?
A **No, less.**
Q Did she call you?
A **Yes.**
Q Was she reporting to you on the events of that meeting?
A **I would say yes.**
Q Was she asking you for advice?
A **I don't think specifically asking me for advice but informing me of what went on.**
Q So she told you that he had brought the sewage modules and taken them away, but you don't recall if she told you that Mr. Corneal was informed at that meeting that his subdivision wouldn't be approved?
A **Again, that's all I can recall from the conversation.**
Q Do you think it was in very close -- it was in

close proximity to that meeting so that would be like within a week or within a couple of days or something?
A **As to when the phone conversation occurred?**
Q Exactly.
A **I would say within a week, sure.**
Q Did you ever have any discussion with Mr. Rouzer from DEP during the year 2000 about this subdivision issue and the erection of the second dwelling on a property making it a subdivision?
A **I don't believe in the year 2000. Certainly in 2001.**
Q But not during the year 2000?
A **Not that I can recall.**
Q Did you ever discuss Mr. Corneal's property with Mr. Rouzer?
A **Yes.**
Q When was that?
A **May 18th we met on site.**
Q Of this year?
A **Yes.**
Q What about in the past?
A **I believe there was another time -- there was another time in 2001 and this was after our SEO had determined that the initial sites had been destroyed and were no longer usable and I believe I talked to Mr. Rouzer**

**about that.**
Q Now, that was in -- that was prior to your May 2001 site visit?
A **Yes.**
Q When you went to the May 2001 site visit, did you observe the various sites?
A **Yes.**
Q Were you aware that other than the two sites then that they had said had been destroyed that there were a number of other previously approved sites?
A **What I remember is Mr. Bowes agreeing with Mr. Parks that the sites that were shown previously were unacceptable. I believe he agreed with that.**
Q But do you -- you said you went on the property?
A **I did.**
Q And you observed, for example, an apartment?
A **Yes.**
Q Did you also observe a number of other septic sites?
A **We -- as I recall, there were three different pits that we walked to. I believe there were three.**
Q You walked to three of them. Was the other one satisfactory, do you know, the third --
A **Well, these were the ones -- these were new.**

**These were ones that were recently dug.**
Q What about the ones that -- are you aware that Barry Parks approved sewage modules for Mr. Corneal's property --
A **Yes.**
Q -- in the year 2000?
A **Yes.**
Q Are you aware that later two of them were -- after all the disapprovals and all of that two of them were said to be now unsatisfactory because something had been driven over them, right?
A **Yes.**
Q Were you aware that the other sites that he had approved remained satisfactory?
A **I was not aware. I'm not saying that's not the case, but that -- those sites I don't believe were looked at. I think we looked at the newer holes that were dug.**
Q Around the time that Mr. Parks approved the sewage modules presented by Mr. Corneal, did you receive any contact from the township about those sewage modules?
A **Not that I recall.**
Q Are you aware that despite the fact that Mr. Parks had approved them that the township then said no, disapprove them?

A Well, then we get into the issue they really didn't have them to approve. As I understand from Mrs. Wirth, Mr. Corneal took them with him.
Q Did she tell you in fact that he was told to take them back because they wouldn't review them?
A No, she didn't tell me that.
Q Did the supervisors seek counsel from you about filing the lawsuit against Mr. Corneal that was filed in Huntingdon County?
A Yes.
Q You actually drafted that --
A Yes.
Q -- correct? When did they first seek your counsel about that, filing a lawsuit in Huntingdon County against Mr. Corneal?
A Probably towards -- the letter that we reviewed I believe is dated July 28th of 2000. So it would have been around that time.
Q When did you actually file that lawsuit?
A I believe it was in October.
Q And what happened between July 28th and October in connection with the filing of that lawsuit?
A Be more specific.
Q Well, why did you wait until October to file that lawsuit?

A I think there was a -- I think there was another letter that we had written -- I think that was, you know, an August letter that I believe we have reviewed.
Q In this deposition?
A I think so. I believe I wrote a letter in August. Maybe we haven't reviewed it, but it was just, I guess, until October when the complaint was ready and we filed it hoping that we could resolve this without filing it.
Q You think you wrote another letter to Mr. and Mrs. Corneal in August?
A I think I wrote a letter in August.
Q After the July 28th letter?
A Yes.
Q Would you have a copy of that in your files?
A I believe I did and I believe it's in the documents that were copied.
Q From the township you mean?
A Yes.
Q Have you had an opportunity to review the documents that were --
A Yes.
Q -- copied? When did you have that opportunity?
A This morning.

Q So not all of them, a selection, I suppose, correct?
A Yes.
Q Well, we haven't had an opportunity to review all those documents. Some of them, as many of them as we've been able to make time for. Did the supervisors ever contact you about their obligation to produce documents in this lawsuit?
A No.
Q Well, I'll represent to you that we have not found so far that letter.
A I believe I -- I could be wrong on the date, but I think I saw it this morning.
Q Well, we'll see if we find it. I think that you had testified that there were a number of revisions to the land development ordinance as we went -- there were a number of revisions to the subdivision ordinance before it was actually passed.
A (Witness nods head affirmatively.)
Q Do you know whether or not each of those iterations of the proposed subdivision ordinance were made available for the public?
A I don't know. Anyone who attended a township meeting certainly would have access to that.
Q Didn't Mr. Corneal ask you for a copy of the

proposed ordinance at one time?
A He may have and -- I'd have to refer to that August letter. I know he was ultimately sent a copy.
Q The August letter that you're referring to is not in addition to -- it is in addition to this July 28th letter that you're referring to?
A Yes, that's what my recollection is.
Q But you --
A I think the supervisors asked me in August to write to him and say, look, get a building permit and then I think there was a follow-up letter in August.
Q But in any event, I think I just asked you whether or not Mr. Corneal asked you for a copy of the subdivision ordinance and you said he may have, correct?
A He may have.
Q Do you know whether or not you sent him a copy of it?
A I may have. If I did, it would be referenced in this August 28 letter.
Q You think it's an August 28th letter or do you think it's a July 28th?
A Well, I -- it's July -- the August letter, whenever the date was in August.
Q Did you ever have occasion to talk to the supervisors individually about this issue of Mr. Corneal's

146

property?

A **One-on-one?**

Q Yes.

A **No, not that I can recall.**

Q Mr. Wilson has never called you directly to talk about it?

A **If Mr. Wilson called me, it would be in the context of we've got to get something moving on the lawsuit because people in the township were upset that nothing was being done, etcetera. He may have called me. If he did, I believe it was in that context.**

Q Well, going back briefly to your August 4, 2000 invoice to the township, you would have copies of each of the documents referenced in this invoice, correct, in your files?

A **I should have.**

Q Letters to --

A **If I don't, the township certainly has them. And if I don't, they would be in the township records.**

Q And would you have a copy of the additional notice of the meeting --

A **I should have, yes.**

Q The meeting where the subdivision ordinance was ultimately passed. You'd have a copy of that additional --

147

A **My recollection is on the Municipalities Planning Code notice means publication two times in two consecutive weeks.**

Q Exactly.

A **Yeah.**

MS. MONTGOMERY: Would you mark that as Newton Exhibit 16.

(Letter dated 8/29/00 produced and marked as Newton Exhibit No. 16.)

THE WITNESS: I think that's the letter I'm referring to.

BY MS. MONTGOMERY:

Q This is the August 29, 2000 letter?

A **Yes, um-hum.**

Q And in this letter it indicates that you in fact did --

A **Yes.**

Q -- send Mr. Corneal the building permit application --

A **Yes.**

Q -- that he had been trying to get?

A **Yes.**

Q So they were sent then under cover of a letter dated August 29, 2000?

A **Yes. I think the subdivision ordinance might have been sent to him at the time of Mr. Van Dommelen's letter. I think there might be a reference to enclosing that.**

148

Q I notice this August 29, 2000 letter went out and then, as you recall, we have the September -- the August 31 and September 1 application sent right back, right?

A **I guess so, yes.**

Q Those are the documents that you reviewed in this deposition, right?

A **Yes. I don't recall the dates, but if that was the dates, yeah, fine.**

Q Well, these were Newton Exhibits 11 and 12.

A **Okay.**

Q Letters dated August 31 and September 1, 2000 with building application and materials attached. So I just want to ask you: Having sent the applications to him, did you not follow up to see whether or not the applications had been filled out and sent back?

A **No. At least as of the date that I wrote the letter I wasn't aware that they had been.**

Q You mean as of the date that you wrote the letter for Van Dommelen's signature, is that what you mean?

A **No, this is dated August 29th.**

149

Q Right.

A **And there's a letter from Mr. Corneal which is Exhibit 11 --**

Q Right.

A **-- enclosing the building permit applications --**

Q Right.

A **-- along with the check and that's dated August 31st.**

Q Right.

A **I can only assume that he probably had the building permit application already.**

Q Why would you assume that?

A **Well, if my letter is dated the 29th, you know, I can only assume by the time the mail gets from Huntingdon to State College -- well, he might have done it right away. So it's possible, yeah. I don't know.**

MS. MONTGOMERY: Well, I don't think I have any other questions for you, Mr. Newton, pending a review of the documents that we only recently received from the township in which case we might need to call you back.

THE WITNESS: How about in my county?

MS. MONTGOMERY: I'm sorry?

THE WITNESS: Love to have you come to Huntingdon County.

MS. MALADY: We've been there.

MS. MONTGOMERY: We've been there.

THE WITNESS: Thank you.

MS. MONTGOMERY: It's really quite nice. Thank you.

(The deposition was concluded at 2:46 p.m.)

COUNTY OF DAUPHIN :
: SS
COMMONWEALTH OF PENNSYLVANIA :

I, Teresa K. Bear, Reporter-Notary Public, authorized to administer oaths within and for the Commonwealth of Pennsylvania and take depositions in the trial of causes, do hereby certify that the foregoing is the testimony of LARRY L. NEWTON.

I further certify that before the taking of said deposition, the witness was duly sworn; that the questions and answers were taken down stenographically by the said Teresa K. Bear, a Reporter-Notary Public, approved and agreed to, and afterwards reduced to typewriting under the direction of the said Reporter.

I further certify that the proceedings and evidence are contained fully and accurately to the best of my ability in the notes taken by me on the within deposition, and that this copy is a correct transcript of the same.

In testimony whereof, I have hereunto subscribed my hand this 27th day of June, 2001.

Teresa K. Bear, Reporter
Notary Public
My commission expires
on April 13, 2003