

# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL AND
SANDRA Y. CORNEAL                              :          CASE NO. 1:00-CV-1192
                                               :
          vs.                                  :
                                               :
                                               :
JACKSON TOWNSHIP, Huntingdon                   :
County, Pennsylvania,                          :          JURY TRIAL DEMANDED
W. THOMAS WILSON, Individually and             :
in his Official Capacity as Supervisor of      :
Jackson Township, MICHAEL YODER,               :
Individually and in his Official Capacity as   :
Supervisor of Jackson Township,                :
RALPH WEILER, Individually and in his          :
Official Capacity as Supervisor of Jackson     :
Township, BARRY PARKS, Individually            :
and in His Official Capacity as Sewage         :
Enforcement Officer of Jackson Township,       :
DAVID VAN DOMMELEN, Individually               :
and in his Official Capacity as Building       :
Permit Officer, ANN I. WIRTH,                  :
Individually and in her Official Capacity as   :
Secretary of Jackson Township, and            :

FILED
HARRISBURG, PA
JUN 0 7 2002
MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

### DEFENDANTS' JACKSON TOWNSHIP, W. THOMAS WILSON, MICHAEL YODER, RALPH WEILER, BARRY PARKS, DAVID VAN DOMMELEN AND ANN I. WIRTH'S APPENDIX II OF EXHIBITS 6 THROUGH 26 IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## APPENDIX - II

## TABLE OF CONTENTS

Exhibit "6"  Daily News Ad

Exhibit "7"  Minutes of January 2000 meeting of Board of Supervisors of Jackson Township

Exhibit "8"  Deposition Testimony of Barry Parks

Exhibit "9"  Deposition Testimony of David Allen Simpson

Exhibit "10" Letter dated February 24, 2000 from HCPC to Ann Wirth

Exhibit "11" Minutes of Jackson Township Board of Supervisors meeting dated April 3, 2000

Exhibit "12" Minutes of Jackson Township Board of Supervisors meeting dated March 2000

Exhibit "13" Letter dated April 20, 2000 from the HCPC to Ann Wirth

Exhibit "14" Deposition Testimony of David Van Dommelen

Exhibit "15" Letter dated May 5, 2000

Exhibit "16" SALDO adopted July 10, 2000

Exhibit "17" Minutes Jackson Township Board of Supervisors meeting dated July 10, 2000

Exhibit "18" Letter dated July 28, 2000

Exhibit "19" Letter dated August 3, 2000 from Corneal to Newton

Exhibit "20" Letter dated August 18, 2000 from Corneal to Newton

Exhibit "21" Correspondence dated August 29, 2000 from Newton to Corneal

Exhibit "22" Correspondence dated August 31, 2000 from Corneal to Wirth

Exhibit "23" Letter dated September 1, 2000 from Corneal to Wirth

Exhibit "24" Letter dated October 10, 2000 from Van Dommelen to Corneals

Exhibit "25" Letter from Terry J. Williams, Esquire to Board of Supervisors

Exhibit "26" Deposition Testimony of Terry J. Williams, Esquire

**DEFENDANT'S EXHIBIT**

6

**14' Wide 3 Bedroom**
$17,990
**Sectional Home**
3 Bedroom 2 Baths
$25,900

# FAMILY HOMES

Old Rt. 220, N. Altoona
(Pinecroft Exit, New Rt 220)
942-0208
9-8 Daily 9-5 Saturday
www.Family Mobile Homes.com

Mobile home loans in parks, on land, purchase, refinance, debt consolidation, improvements. Current mobile homeowners can buy land 100% financing. American Mobile Home Finance 1-800-563-3549

## RV'S FOR SALE

'78 GMC Motor Home, 22', good clean condition. $6,000. 814-448-3488

'82 24' Prowler camper, sleeps 4. AC, micro, awning, full BA. $3,400 643-1538 or 658-2856

'89 Prowler - 26', air cond., rear bedroom, awning-hitch inc. 658-3616

'88 Chevy motorhome. 33' 454 eng. 29K, air, gen, TV, leveling jacks, many extras $17,000 firm 643-2489

'94 35' Cobra Sandpiper queen bed in rear. LR w/ couch bed, stereo, air, microwave, $8500 542-2196

'94 Ford 350 motor home. 29', 460 eng., 39K mi, loaded, avail. w/5 yr full warr. $27,000. 669-3487

Pop up camper, $400, sleeps 6. Top needs work. 643-5736

## BOATS FOR SALE

18 ft. '96 Sunbird, rack storage at 7 Points, brand new skis, jackets, tube, V-6 inboard eng. Exc. cond. 542-4341 after 5.

'88 19' Cris Craft 5.0 Mercru w/trailer $5950 Call 643-0513

'93 Jet Ski w/ trailer $2495 OBO 1-800-277-3149 or 643-1225.

'95 Houseboat w/custom made storage trailer & paid-up slip space for current yr. Can be seen at H-12 slip or call 570-658-7488. Asking $30,000 all

'98 Lund bass boat w/trailer, 55 hp Evinrude motor, 24 volt trolling motor, etc. $5,000 643-4367

## BUSINESS SERVICES

Structural repairs of barns, houses, garages. Call Woodland Bros., Inc. for straightening, jacking, cabling, foundation, and weather related repairs. Free estimates 1-800-653-2276. www.1-800-653-2276. www.1-800-Old-Barn.com

---

Spruce Creek Township
By: Gertrude Irvin
Secretary
June 22, 2000

## ORDINANCES

### NOTICE

PLEASE TAKE NOTICE that the Board of Supervisors of Jackson Township, Huntingdon County, Pennsylvania, will consider the passage of three Ordinances at a next regularly scheduled meeting to be held on Monday, July 10, 2000, at 7:00 o'clock p.m. at the Stone Valley Fire Hall. The Ordinances are summarized below:

1. Ordinance No. 2000-1 provides for subdivision standards and requirements within Township. The Ordinance addresses the following subject areas: Short Title and Purpose; Definitions; Submission and Review Procedures; Plan Requirements; Design Standards; Improvement Requirements; Supplementary Land Development Requirements; Mobile Home Park Standards; Recreational and Seasonal Land Development Standards; and Administration, Amendment and Severability.

2. Ordinance No. 2000-2 provides that it shall be unlawful for any person, firm, corporation or utility to alter, construct, or enter on the right of way of any Township Road, any facility (including, but not limited to, the erecting of poles, laying conduits, water, steam, oil or gas pipes, storm or sanitary sewers, or drainage tile), driveway or entrance without first securing a permit. The Ordinance addresses the procedures to be utilized for permit application and the standards to be followed for the work to be performed.

3. Ordinance No. 2000-3 regulates the use and maintenance of holding tanks and privies with the Township. The Ordinance sets forth the condition of privy use and the duties and responsibilities of property owners who utilize a holding tank or privy.

Copies of full texts of the aforesaid Ordinances may be examined at the County Law Library, The Daily News, and the office of Ann Wirth, Township Secretary.

Lawrence L. Newton
904 Penn Street
Huntingdon, PA 16652

Township Solicitor

## SHERIFF'S SALE

NOTICE IS HEREBY GIVEN that the following real estate of JOHN GIBBONEY and DONNA GIBBONEY will be sold at public sale on THURSDAY, the 6th day of JULY 2000, at 10:00 A.M. o'clock at HUNTINGDON COUNTY COURTHOUSE COMMISSIONER'S MEETING ROOM, Huntingdon County, Pennsylvania.

ALL THAT CERTAIN piece, parcel or plot of ground situate in the Township of Brady, County of Huntingdon, Commonwealth of Pennsylvania, more fully described as follows:

---

The regular monthly meeting of the Jackson Township Board of Supervisors for July will be held July 10, 2000 at the Stone Creek Valley Vol. Fire House in McAlevys Fort at 7:00 P.M.

Ann L. Wirth
Secretary
R. D. #1, Box 289A
Petersburg, PA 16669

The Huntingdon County Assistance Office located at 7591 Lake Raystown Shopping Center, Huntingdon, PA will hold Board Meetings on the following dates:

August 14, 2000
September 11, 2000
October 2, 2000
November 13, 2000
January 8, 2001
February 12, 2001
March 12, 2001
April 9, 2001
May 14, 2001
June 11, 2001

The meetings are open to the public and will commence at 7:30 p.m. The County Assistance Office is an Equal Opportunity Employer and provides service to eligible clients in a non-discriminatory manner. Office hours are 8:30 a.m. to 5:00 p.m., Monday through Friday.

Wood Township be oiling the following streets:

**ROBERTSDALE:**
OAK STREET-From the intersection with Birch Street (T-567) to its intersection with North Main Street (S.R. 913) HAZEL STREET-From its intersection with Cliff Street (T-573) to its intersection with East Street (T-566) LINN STREET-From its intersection with Railroad Street (T-579) to its intersection with North Main Street (S.R. 913) HARNISH STREET-From its intersection with North Main Street (S.R. 913) to its intersection with Willow Street WILLOW STREET-From its intersection with Harnish Street to Church Street (T-565) and from Church Street (T-565) northward for 160' WALNUT STREET-From its intersection with Spring Street (T-564) to its intersection with New Grenada Street (S.R. 913) SOUTH MAIN STREET (T-532)- From S.R. 3006 southerly for approximately 370 feet to S.R. 3006. SOUTH MAIN STREET(T-533)- From S.R. 3006 westerly for approximately 690 feet to S.R. 3006.

**WOOD:**
EAST BRUSH STREET-From its intersection with East Fulton Street (T-572) to the Huntingdon/Fulton County Line. TROUT ROAD (T-571)-From its intersection with S. R. 3006 northward for 200 feet. On July 10, 2000, and respectfully request any vehicles or obstacles be removed from the aforementioned streets. Rain date for oiling will be July 12, 2000.

Joyce Cooley
Secretary

The Lincoln Township Board of Supervisors will hold the July meeting on Tuesday, July 11, 2000 at 6:00 p.m. in the Entriken Community Building due to the holiday.

-Cheryl Russell,
Secretary

## Classifieds SELL!

Rt. 8

**DEFENDANT'S EXHIBIT**

7

January 4, 2000

Regular Meeting Opened at 7:10PM

Meeting called to order by Chairman Weiler at 7:00 PM

Minutes approved

Treasurer report approved as read

The Supervisor's stated that no more sub-divisions will be approved until after the proposed Sub-Division ordinance for the Township has been approved. As soon as we get the review from the Planning commission and any changes that the Supervisors feel need to be made copies will be made available to the Public and a Public meeting will be held.  It was stated that the County is now doing a " boiler plate" sub-division ordinance for those Township's who want it, but Jackson Township has already put a lot of time into the purpose ordinance and it was felt it was in the best interest of the Township to proceed with the  ordinance that the Supervisor's have decided on.

Tom Wilson the Roadmaster stated that New Enterprise would fix Miller road To our satisfaction in the spring.  He hopes to get bids on  Sawmill & Yoder for sealing this summer depending on the price and how much money we have at the time.

Meeting was adj. at 7:35PM



DEFENDANT
EXHIBIT
8

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2    DAVID B. CORNEAL and SANDRA  :
      Y. CORNEAL,                   :
 3          PLAINTIFFS              :
                                    :
 4              VS                  :   NO. 1:CV-00-1192
                                    :
 5    JACKSON TOWNSHIP, HUNTINGDON  :
      COUNTY, PENNSYLVANIA; W.      :
 6    THOMAS WILSON, individually   :
      and in his official capacity  :
 7    as Supervisor of Jackson      :
      Township; MICHAEL YODER,      :
 8    individually and in his       :
      official capacity as          :
 9    Supervisor of Jackson         :
      Township; RALPH WEILER,       :
10    individually and in his       :
      official capacity as          :
11    Supervisor of Jackson         :
      Township; BARRY PARKS,        :
12    individually and in his       :
      official capacity as Sewage   :
13    Enforcement Officer of        :
      Jackson Township; DAVID       :
14    VAN DOMMELEN, individually    :
      and in his official capacity  :
15    as Building Permit Officer;   :
      ANN L. WIRTH, individually    :
16    and in her official capacity  :
      as Secretary of Jackson       :
17    Township; and LARRY NEWTON,   :
      individually and in his       :
18    official capacity as          :
      Solicitor to Jackson          :
19    Township,                     :
            DEFENDANTS              :
20              DEPOSITION OF:   BARRY PARKS
21              TAKEN BY:        PLAINTIFFS
22              BEFORE:          TERESA K. BEAR, REPORTER
                                 NOTARY PUBLIC
23
                DATE:            MAY 16, 2001, 11:12 A.M.
24
                PLACE:           ECKERT SEAMANS
25                               213 MARKET STREET
                                 HARRISBURG, PENNSYLVANIA
```

**PARKS, BARRY**
**05/16/01**

<div align="right">

**CORNEAL  VS**
**JACKSON TOWNSHIP**

</div>

---

**2**

```
 1   APPEARANCES:
 2      ECKERT SEAMANS
        BY:  BRIDGET E. MONTGOMERY, ESQUIRE
 3           LESLIE A. MALADY, ESQUIRE
 4           FOR - PLAINTIFFS
 5      MAYERS, MENNIES & SHERR, LLP
        BY:  ANTHONY R. SHERR, ESQUIRE
 6
            FOR - ALL DEFENDANTS EXCEPT NEWTON
 7
        THOMAS, THOMAS & HAFER, LLP
 8      BY:  MICHELE J. THORP, ESQUIRE
 9           FOR - DEFENDANT - RALPH WEILER
10      METTE, EVANS & WOODSIDE
        BY:  JENNIFER YANKANICH, ESQUIRE
11
            FOR - DEFENDANT - LARRY NEWTON
12
     ALSO PRESENT:
13
        DAVID B. CORNEAL
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1            TABLE OF CONTENTS
 2            WITNESS
 3   FOR PLAINTIFFS           DIRECT CROSS REDIRECT
 4   Barry Parks
       By Ms. Montgomery         9    --   164
 5     By Ms. Yankanich          --   162   --
       By Mr. Sherr              --   163   --
 6
 7
 8            EXHIBITS

     PARKS EXHIBIT NO.        PRODUCED AND MARKED
 9
10   1 - Subdivision plan 4/7/00          88

     2 - Subdivision plan 2/4/00          104
11
     3 - Sewage facilities planning module   122
12
     4 - Activity records                125
13
     5 - Letter dated 2/8/00              150
14
     6 - Letter dated 3/24/00            156
15
     7 - Order                           168
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1         MR. SHERR:  No stipulations.  We'd like to
 2   read and sign.  I'd also like to state for the record that I
 3   have this morning given an additional document which is
 4   responsive to the request for production of documents which
 5   is entitled subdivisions reviewed by HCPC which is the
 6   Huntingdon County Planning Commission.  We are informed that
 7   these are all the subdivisions that have been reviewed by
 8   the county planning commission since 1982 and would indicate
 9   all of those plans which were -- subdivision was appropriate
10   since 1982 in Jackson Township.
11         I'd also state that we received a notice of
12   deposition of corporate designee and the designation therein
13   is for an individual or individuals who has or have
14   knowledge or information about the matters relating to the
15   defense of the claims in this lawsuit.  We would first note
16   that --
17         MS. MONTGOMERY:  Stop right there --
18         MR. SHERR:  -- the notice does not --
19         MS. MONTGOMERY:  -- before I get the court back
20   on the phone.
21         MR. SHERR:  -- describe with reasonable
22   particularity --
23         MS. MONTGOMERY:  Mr. Sherr, what are you
24   doing?  This is my deposition.  This is not a discovery
25   dispute with the court.  I have had it with you.  I will
```

**5**

```
 1   call the court and ask for sanctions now.
 2         You don't open up my deposition by making a
 3   speech on the record about stuff that has nothing to do with
 4   the deposition that I'm asking for.  Now, that's it.  Stop.
 5         MR. SHERR:  I'm sorry, but --
 6         MS. MONTGOMERY:  When those documents come
 7   into play, we will deal with it.  Stop.
 8         MR. SHERR:  I'm sorry.  There's a notice of a
 9   deposition of corporate designee for --
10         MS. MONTGOMERY:  It has nothing -- is Barry
11   Parks the corporate designee?
12         MR. SHERR:  Well, that's what I'm making a
13   statement about.  Will you just let me finish?
14         MS. MONTGOMERY:  Then tell me off the record
15   and we'll see if we need it on the record.
16         MR. SHERR:  No, this is on the record.
17         MS. MONTGOMERY:  Off the record now or I'm
18   stopping the deposition.
19         MR. SHERR:  There's a notice of deposition for
20   corporate designee --
21         MS. MONTGOMERY:  I'm calling the court right
22   now.
23         MR. SHERR:  -- for May 16, 2001 at 9:30.
24         MS. MONTGOMERY:  Do you want to do this?  Do
25   you want to do this?
```

---

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

**6**

1　　　MR. SHERR:  And I am stating on the record
2　that while your notice of deposition does not state with
3　reasonable particularity the -- it's just a very simple
4　statement for the record, if you'd just sit down.
5　　　MS. MONTGOMERY:  It is inappropriate.
6　　　MR. SHERR:  Why is it inappropriate?
7　　　MS. MONTGOMERY:  It is completely
8　inappropriate.  What are you doing?
9　　　MR. SHERR:  Any way, let me finish --
10　　　MS. MONTGOMERY:  I've never seen anybody
11　conduct himself quite this way, Mr. Sherr, and you're not
12　going to get away with it, not here, not with me, not with
13　my client.  Do you got that?
14　　　MR. SHERR:  Could I finish?
15　　　MS. MONTGOMERY:  No, you may not finish.
16　　　MR. SHERR:  You're just going to keep talking
17　over me?
18　　　MS. MONTGOMERY:  Yeah, I'm going to keep
19　talking over you until you stop.  That's right, I'm going to
20　keep talking over you.  I haven't even opened the deposition
21　yet.  We haven't even really sworn the witness yet.  You
22　interrupt and start making a speech on the record in my
23　deposition.  I haven't asked a question about that 30(b)(6)
24　notice.  I haven't asked a question about that document.
25　　　When the time comes, if you want to say

---

**8**

1　around with us anymore.  It is now what time, 11:30, while
2　we were prevented from starting on time through all sorts of
3　situations.  Now, that's enough.
4　　　MR. SHERR:  All right, look, I'm not taking
5　any more from you either.  You want to depose this witness
6　now, that's fine.  You have a notice for the simultaneous
7　time as these other people.  I'm making a simple statement
8　for the record.  Why does that get you so upset?  What is
9　the problem?
10　　　MS. MONTGOMERY:  Sit back and --
11　　　MR. SHERR:  Take your deposition.
12　　　MS. MONTGOMERY:  -- let me conduct my
13　deposition.
14　　　MR. SHERR:  Take your deposition.
15　　　MS. MONTGOMERY:  That's why it's a problem.
16　　　MR. SHERR:  Take your deposition and act
17　appropriately, would you.
18　　　MS. MONTGOMERY:  If you have an objection to
19　the 30(b)(6) notice, place it in writing like the rules
20　require you to do.
21　　　MR. SHERR:  I wasn't making an objection.  I
22　was making a designation, which I'm entitled to.
23　　　MS. MONTGOMERY:  So you're designating Barry
24　Parks as your 30(b)(6) witness?
25　　　MR. SHERR:  I've made my statement.  Now take

---

**7**

1　something and it's appropriate, you may say something.  Now,
2　I am going to conduct my deposition and you are going to
3　stop making some -- whatever you're doing here.  Is that
4　clear?  I noticed the deposition, I control the deposition.
5　This has nothing to do with this deposition, as near as I
6　can tell.  You may tell me right now on the record is Barry
7　Parks your 30(b)(6) deposition?
8　　　MR. SHERR:  Are you finished?
9　　　MS. MONTGOMERY:  You can go ahead.
10　　　MR. SHERR:  Now I'll finish.  You have a
11　notice of a corporate designee with a very broad subject
12　matter.  The mere statement I was going to make that unless
13　we can narrow down the subject matter, every deponent is the
14　corporate designee since they all have knowledge concerning
15　the subject matter or the defense of our claim.  And all I
16　was stating, appropriately so, before you got so angry and
17　started conducting yourself in a completely inappropriate
18　manner --
19　　　MS. MONTGOMERY:  No.
20　　　MR. SHERR:  -- was that all of these people for
21　now are the corporate designee since there is a broad
22　subject matter, and that's all so -- you know, come on.
23　　　MS. MONTGOMERY:  Okay.  Just so you are on
24　notice, I'm going to take this transcript and I'm going to
25　move for sanctions because I'm not going to let you play

---

**9**

1　your deposition.
2　　　MS. MONTGOMERY:  You're designating Barry
3　Parks as your 30(b)(6) witness as to what?
4　　　MR. SHERR:  Take your deposition.
5　　　MS. MONTGOMERY:  As to what?
6　　　MR. SHERR:  As to information relating to
7　matters relating to the defense of the claims in this
8　lawsuit.  Take your deposition.
9　　　MS. THORP:  I believe what you said is that
10　all the defendants in --
11　　　MR. SHERR:  I've made my statement.  Now take
12　your deposition.
13
14　　　BARRY PARKS, called as a witness, being sworn,
15　testified as follows:
16
17　　　　DIRECT EXAMINATION
18
19　BY MS. MONTGOMERY:
20　Q　　Mr. Parks, would you state your name for the
21　record, please.
22　A　　**Barry Parks.**
23　Q　　What's your address?
24　A　　**2520 Arbor Bluff Drive.**
25　Q　　Arbor Bluff Drive what?

---

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

10

1    A    Huntingdon.
2    Q    Have you ever been deposed before?
3    A    No.
4    Q    Well, I'm going to give you a few instructions
5    so you understand the nature of the deposition process,
6    which doesn't usually go like this, but I'm going to ask you
7    a series of questions. I'm looking for facts related to
8    this lawsuit. If there is anything that you don't
9    understand about any question that I ask you, you should ask
10   me to clarify it for you, okay.
11        I want to be very clear with you. I want you
12   to understand the question and you are free to ask me for
13   clarification if it's unclear to you.
14        If you need to break or anything, if you need
15   to go to the men's room or something like that, you can do
16   that. You can't break to confer with counsel, but you can
17   break to, you know -- for your own comfort.
18        Are you on any sorts of medications or
19   anything like that that would prevent you from answering
20   questions or understanding questions that are put to you?
21   A    I wouldn't think so.
22   Q    Now, you need to keep your voice up. The
23   court reporter has a difficult time taking down the
24   information if she can't hear you and also we need to wait
25   for each other to -- you know, you need to wait for me to

---

11

1    finish my question and I'll wait for you to finish your
2    answer so we're not interrupting each other because she
3    can't take down two people at once, as she just indicated,
4    okay?
5    A    (Witness nods head affirmatively.)
6    Q    The other thing is that you need to make sure
7    that you give verbal responses for the record. You need to
8    say yes or no, not -- you know, she can't take down shakes
9    of the head or nods of the head or anything, okay?
10   A    Okay.
11   Q    Can you give me just a little information
12   about your background, please. Give me your educational
13   background initially.
14   A    Huntingdon High School.
15   Q    You graduated from high school?
16   A    Yeah.
17   Q    Did you have any post high school education?
18   A    I went a year to technical school.
19   Q    What kind of technical school was that?
20   A    Auto and diesel mechanics.
21   Q    And diesel mechanics?
22   A    (Witness nods head affirmatively.)
23   Q    Have you had any other types of training at
24   all related to the work that you do, for example?
25   A    Just the -- I guess it's PSATS now is in

---

12

1    charge --
2        MS. MALADY: Pennsylvania State Association of
3    Township Supervisors.
4        THE WITNESS: They have continuing ed. for the
5    sewage officers. Every two years we renew our license and
6    we have to have a certain amount of credits to do that.
7    BY MS. MONTGOMERY:
8    Q    Well, that brings us -- as a sewage officer,
9    you're talking about?
10   A    Yes.
11   Q    Sewage enforcement officer. So in order to
12   become a sewage enforcement officer, what did you have to
13   do?
14   A    Pass an exam.
15   Q    An exam given by the state?
16   A    Yes.
17   Q    And when did you do that?
18   A    Ninety-one.
19   Q    Did you take any training before sitting for
20   the exam?
21   A    Studied the manual.
22   Q    So there's a manual that the Commonwealth --
23   A    Yeah.
24   Q    -- provides to you?
25   A    And the regulations.

---

13

1    Q    And then you said every two years you have to
2    take -- you have to do an update or some sort of --
3    A    You have to reissue your license and I'd say
4    -- in the last few years, I'd say five, six years, they
5    started a continuing ed.
6    Q    And so you've taken that, right, and you're
7    current on your continuing education requirements?
8    A    Yes.
9    Q    Do you hold any other licenses or certificates
10   other than a sewage enforcement officer license?
11   A    Treatment plant operator.
12   Q    A waste treatment plant?
13   A    Yeah.
14   Q    And that's also with the Commonwealth of
15   Pennsylvania?
16   A    Yes.
17   Q    Did you get that at the same time you got your
18   sewage enforcement officer license?
19   A    No.
20   Q    When did you get that?
21   A    I would guess '93, '94.
22   Q    So are you employed by the county or by the
23   township in that capacity as well with waste treatment
24   operation?
25   A    No, I help with the treatment plant in one

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

14

1  township.
2      Q      In one township?
3      A      (Witness nods head affirmatively.)
4      Q      Not in Jackson Township?
5      A      No.
6      Q      So you're currently employed as the sewage
7  enforcement officer for Jackson Township, correct?
8      A      Probably more under contract with -- I'm not
9  employed by them.
10     Q      You have a contract with them?
11     A      I'm hired every -- every January when they do
12  re --
13         MR. SHERR:  Reorganization.
14         THE WITNESS:  Reorganization.  They hire
15  people that's going to work with them for that year and I'm
16  hired at that time if they want to have me that year.
17  BY MS. MONTGOMERY:
18     Q      Do you do sewage enforcement work for other
19  townships as well?
20     A      Yes.
21     Q      How many other townships?
22     A      I would say 18.
23     Q      Oh.
24     A      I have 17 other ones.
25     Q      All around Huntingdon County maybe?

---

16

1  there?
2      A      The supervisors.
3      Q      How do you go about reporting to the
4  supervisors, what's the process?
5      A      Well, any work I do has to go through the
6  supervisors or -- I take care of the responsibilities for
7  the sewage officer job for the supervisors.  That's what I'm
8  hired to do.
9      Q      But I think my question was how do you go
10  about reporting to them.  Do you go to the township meetings
11  to report to them or do you file written reports on a
12  regular basis or what?
13     A      Reporting to them about what I do?
14     Q      Yes, about your work.
15     A      Well, there's some things I don't need to
16  contact them about.  There's other things that I have to
17  have their approval on before they can go through the
18  process.  It would depend on where they're starting at.
19     Q      I'm going to back up a second just so we have
20  a clear understanding of what I'm trying to ask you.  I
21  asked you who do you report to and I believe that you
22  answered -- correct me if I'm wrong, I believe that you
23  answered that you report to the township supervisors?
24     A      It depends on -- some things I report -- I
25  have to check with and I send -- more reports I send to DEP.

---

15

1      A      Fourteen in Huntingdon, four in Bedford
2  County.
3      Q      And plus you do waste treatment plant work
4  for --
5      A      I don't do very -- it's just a very small
6  thing in Hesston, a town of 50 houses.
7      Q      So your sewage enforcement officer work I take
8  it for Jackson Township is not a full-time job?
9      A      Not just for Jackson Township, no.
10     Q      But that is your only -- that is your primary
11  or only source of employment, is as a sewage enforcement
12  officer?
13     A      Yes.
14     Q      For various townships?
15     A      Yes.
16     Q      So how long have you worked for Jackson
17  Township?
18     A      Ten years.
19     Q      Since you first got your license?
20     A      Yes.
21     Q      What did you do prior to your sewage
22  enforcement work?
23     A      Excavating contractor.
24     Q      So you've been a sewage enforcement officer
25  for Jackson Township for 10 years.  To whom do you report

---

17

1      Q      I see.  When you --
2      A      What you're calling -- what I'm thinking
3  you're meaning as reports.
4      Q      Yes, I'm using report more sort of generally.
5  You know, if you are assigned some sort of job, you know, if
6  you're assigned a particular project by Jackson Township by
7  the supervisors, what is the process that you use to report
8  back to them?
9      A      I'm not usually assigned the project.
10  Somebody calls usually the secretary and she says -- just
11  says you need to contact me.
12     Q      So the public contacts you directly because
13  they want you to come out and --
14     A      After they know I'm the person they need to
15  deal with.
16     Q      And then if you want to tell the township in
17  some way what is going on with some person who contacts you,
18  how do you go about keeping the township informed of what's
19  going on?  Do you do it orally, do you do it in writing, do
20  you go to the township meetings, a combination of all three?
21     A      Again, it depends on where this is starting at
22  and what people want to do.  If it's an already existing
23  lot, I can do that on my own.  If it's something that
24  requires planning, I do the work and then the planning
25  modules are prepared and then that is presented to the

---

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

18

1 township.
2    Q    So give me an example of when there's an
3 already existing lot that you can do on your own. Can I
4 have an example of that?
5    A    If it's a parcel of ground that existed before
6 1972 and is vacant, no dwellings, I could do testing and
7 issue a permit on that, or if it's been a lot subdivided
8 from a larger tract since -- and approved since 1972, that's
9 an existing lot. I could do testing and approve the permit
10 on that.
11    Q    When you started working with Jackson Township
12 was your initial job with them as a sewage enforcement
13 officer or did you serve Jackson Township in any other
14 capacity prior to that?
15    A    I started as a sewage officer.
16    Q    Is there any sort of opportunity for promotion
17 or anything like that within or is it just once you're the
18 sewage enforcement officer that's it, right?
19    A    That's it.
20    Q    Is there just one of you for the township?
21    A    There's an alternate. In case I have a
22 conflict or I couldn't get to it and something needed done,
23 there's a backup.
24    Q    And who is the alternate?
25    A    Right now it's Theodore Koch.

19

1        THE REPORTER: Could you spell that.
2        THE WITNESS: It's on the subdivision here.
3 His dad did a subdivision in '91. K-o-c-h.
4 BY MS. MONTGOMERY:
5    Q    So if somebody from the public calls you and
6 you can't do it, then they're referred to Mr. Koch, is
7 that --
8    A    Yes.
9    Q    You mentioned a couple minutes ago that you
10 had done excavation work prior to being licensed as a sewage
11 enforcement officer.
12    A    Yes.
13    Q    Did you work for yourself?
14    A    Yes.
15    Q    Did you work at any time for anybody else as a
16 -- in the excavation business?
17    A    No.
18    Q    When you worked for yourself, did you have
19 employees?
20    A    No.
21    Q    You didn't have anybody else working with you?
22    A    (Witness shook his head negatively.)
23    Q    Do you do excavation work in connection with
24 sewage work?
25    A    Yes.

20

1    Q    Anything else?
2    A    Yes.
3    Q    And what was that?
4    A    Any type of earth moving.
5    Q    Do you have any other employment right now
6 besides your sewage enforcement officer work and your
7 occasional -- very occasional waste treatment plant operator
8 work?
9    A    No.
10    Q    Does Jackson Township have any public sewage
11 facilities? Do they have any -- I guess it would be public
12 sewer, right?
13    A    No.
14    Q    Town sewer or township sewer or anything like
15 that?
16    A    No.
17    Q    Does the township have a set of regulations or
18 anything like that that tell you exactly what you're
19 supposed to do with respect to your sewage enforcement
20 officer work?
21    A    There's statewide regulations.
22    Q    So they don't have anything in addition to
23 that?
24    A    Not as far as sewage.
25    Q    Do they have any manual or any sort of job

21

1 description or anything like that for you?
2    A    It's all state regulation.
3    Q    Are you under any sort of a written contract
4 with them?
5    A    No.
6    Q    You just go to the -- you said in January of
7 every year the township supervisor's vote as to whether or
8 not you're going to be the officer; is that correct?
9    A    Yes.
10    Q    Do you get a letter of appointment or
11 something like that, you know, a letter appointing you?
12    A    I'd probably get a notice that I didn't if I
13 didn't, but I don't recall ever getting a letter.
14    Q    Do they send you any -- does the township send
15 you any materials, any sort of written materials, whether
16 they're from the state or from any other source? Does the
17 township -- has the township ever given you any sort of, you
18 know, job description type materials or regulations or
19 anything like that?
20    A    That's all Chapter 71, 72, 73 of the sewage
21 code.
22    Q    Which you as a licensed sewage enforcement
23 officer have in your possession anyway; is that correct?
24    A    Yes.
25    Q    In your capacity as the sewage enforcement

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

22

1    officer for Jackson Township are you required or your
2    alternate -- or is your alternate required to inspect every
3    piece of property on which there's going to be construction
4    for on-lot -- for an on-lot system?
5        A    If it -- almost always, yeah.
6        Q    Are there exceptions to that?
7        A    If there's -- the only thing I can think of is
8    a replacement dwelling. If Mr. Corneal's farmhouse burnt
9    down and he wanted to rebuild within a year the same number
10   of bedroom house, he could do that without a permit.
11       Q    Okay.
12       A    Same number of bedrooms within a year and
13   there's not an ongoing investigation about a malfunctioning
14   system.
15       Q    So I suppose through his building permit
16   application it would be determined that he was looking to
17   build a house with the same -- or a dwelling with the same
18   number of bedrooms; is that correct? That's how you would
19   track this sort of information or this --
20       A    If he was replacing a dwelling, yeah.
21       Q    Let's talk a minute about -- you spoke a
22   moment ago about inspecting properties on which a building
23   is to be constructed for purposes of an on-lot system. Can
24   you just tell me, you know, what that inspection process
25   entails, what do you do? How do you go about that process?

---

23

1        A    What stage are we? Is this a brand new vacant
2    lot?
3        Q    Yes, just a brand new -- a new property that
4    has no building on it, no septic system on it of any sort.
5        A    Assuming it's an approved lot?
6        Q    An approved building lot.
7        A    It's a DEP approved lot or a prior '72 lot?
8    If the people contact me, I inform them that the first thing
9    we need to do is have a backhoe there to do soil probes,
10   assuming that this hasn't been done prior, you know.
11       Q    To do soil probes, is that what you said?
12       A    Yes.
13       Q    Okay, go ahead. And then what?
14       A    We -- I meet with the backhoe person. The
15   owner can be there if they want to and we look for suitable
16   soil to filter sewage before it gets into the water table.
17       Q    So you do that with the backhoe person? Is
18   anybody else involved in that?
19       A    That's all that needs to be there.
20       Q    Sometimes there are others involved in it?
21       A    If somebody wants to be there.
22       Q    You mean like an architect or whatever, a
23   building supervisor or something like that?
24       A    If the client -- if the property owner would
25   like to have somebody there.

---

24

1        Q    So is that -- what you're referring to right
2    now, is that what you would call test pits, you're looking
3    for test pits?
4        A    Yes.
5        Q    So you try to find an area that's suitable for
6    test pits, correct? And that's the same as soil probes; is
7    that correct?
8        A    Test pits and soil probes are the same thing,
9    yes.
10       Q    That's what I wanted to know. And then what
11   happens? Once you find suitable areas for test pits, what
12   do you do?
13       A    Well, there's a two-step procedure. The first
14   time we're looking for filter for sewage, filter depth.
15   Then we want to know how well that area takes water so we
16   dig small holes by hand and then do a perc test which means
17   how good does that area take water.
18       Q    Let's back up one second. First you look for
19   an area that's suitable to filter sewage, is that what you
20   said?
21       A    Yeah.
22       Q    So you're looking for a particular type of
23   soil, correct?
24       A    Yeah, and a depth.
25       Q    And the depth of the soil?

---

25

1        A    (Witness nods head affirmatively.)
2        Q    And you're looking for it to contain certain
3    components or -- or what are you looking for, is a better
4    way to ask that question?
5        A    Something that's suitable filter.
6        Q    What tells you that it's going to be a
7    suitable filter?
8        A    Well, it doesn't have a limiting zone, which
9    is generally the sign of a high water table, or open
10   channeled rock, which means the sewage can go through that
11   and not get treated before it gets into the water table; or
12   if it's a high water table, the water's already there some
13   times of the year.
14       Q    Okay, you answered my question. So maybe that
15   sort of answers the second part of the question. I thought
16   you had sort of divided it into two. You said you look
17   for --
18       A    There's two limiting zones.
19       Q    And you said one of them is the water table.
20       A    Open channeled rock and sign of a high water
21   table.
22       Q    So after you do that, what happens?
23       A    Is this an existing lot? I fill out soil
24   sheets for that lot. If it is a vacant, ready to build lot,
25   I send that to the person that wants to build with an

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**26**

```
 1    application.  They get a design done, fill out the
 2    application, return it to me and I can issue them a permit.
 3        Q      The application is what, you mean the sewer --
 4    the sewage permit application?
 5        A      Yes.
 6        Q      Is that what you're talking about?  You send
 7    them the application after you go out and do the perc test?
 8        A      Yes.
 9        Q      Now, you said they design it.  Do you mean
10    sewer modules, is that what you're referring to?
11        A      No, design.
12        Q      They design the --
13        A      In an existing lot you don't need a sewage
14    module.
15        Q      How are you using the term existing lot?
16        A      A lot that was prior to '72.  Like I explained
17    a while ago, prior to '72 that is vacant or one that has
18    been in a subdivision and is vacant.
19        Q      And what's the alternative to an existing lot,
20    what's the other type of lot?
21        A      A proposed lot.
22        Q      When you say lot, you're not talking about a
23    building lot, you're talking about a --
24        A      A building lot.
25        Q      You are talking about a building lot, okay.
```

**27**

```
 1        A      Whether it's one acre or a hundred acres.
 2        Q      How did you classify Mr. Corneal's property
 3    that's the subject of this litigation?
 4        A      It isn't a vacant lot.  It has a dwelling on
 5    it and at this point it is a lot.  Until it is -- has an
 6    approved sewage module, it is a lot.  So it already has a
 7    dwelling on it.  To do any more building, we need to have a
 8    sewage module approved by DEP and the township.
 9        Q      Let's go back now again to -- you talked about
10    after you do the test pits and such and if you find
11    appropriate test pits then you send them to the member of
12    the public or, you know, the person who seeks to build an
13    application, right?
14        A      If it's a vacant lot.
15        Q      If it's a vacant lot.  If it's not a vacant
16    lot, what do you do?
17        A      Then somebody has to prepare a sewage module.
18    If it's going to be subdivided, I mean actually make two
19    different deeds for it, a surveyor must do that.  If you're
20    doing a second dwelling on that lot, DEP calls that an
21    equivalent subdivision.  It still needs township approval,
22    still needs township approval and still needs DEP approval.
23    I need a DEP code number before I can send an application
24    and issue a permit.
25        Q      So I'm a little confused and you'll just have
```

**28**

```
 1    to help me.  I don't have a lot of experience with sewage
 2    enforcement matters so -- except for the ones I have applied
 3    for which my husband handles.  If you can just explain to me
 4    -- you said if it's an existing lot, then you need to get a
 5    septic design.  If it's a vacant lot, then you need a sewer
 6    module, correct, somebody has to design a sewer module; is
 7    that correct?
 8        A      If it's a vacant lot, meaning a lot before '72
 9    or a DEP approved lot, meaning a vacant piece of ground,
10    once you have a lot vacant, then I can issue a -- I'll send
11    you an application with the test results.  You take the test
12    results, give it to a person who can do a design for you.
13        Q      Septic design?
14        A      Yes.  When the design comes back with the
15    completed application, I can issue a permit.
16        Q      So you can issue --
17        A      Assuming that was a DEP approved lot or prior
18    to '72.
19        Q      And then the alternative if it's not a DEP
20    approved lot or prior to '72, which together means -- equals
21    vacant lot, correct?
22        A      Yep.
23        Q      If it's not that, then what is it?
24        A      It's a subdivision.
25        Q      And so then what happens?  So you -- backing
```

**29**

```
 1    up a second.  You can issue a permit for vacant lots,
 2    correct?
 3        A      DEP approved or prior to '72.
 4        Q      Does it go any further than that?  Does it go
 5    any further beyond you?  Does it have to go to the township
 6    for second approval or anyone else?
 7        A      No.
 8        Q      Just you?
 9        A      If it's a DEP approved lot, it's already been
10    approved.
11        Q      And so if DEP approves it, where does the
12    township come in itself?  Do they have anything to say about
13    it?
14        A      It had to approve it -- it had to do a module
15    to get it -- send it to DEP before they would approve it.
16        Q      Now I got you.  So going -- assuming you don't
17    have that, then you need to start with the module itself,
18    right?
19        A      Do the testing, then the module.
20        Q      And then what?
21        A      After the module is approved?
22        Q      Yes.
23        A      Then I can issue permits, depending on what
24    the module says.  If the module comes back and it was
25    approved for five lots, then we have five buildable approved
```

**PARKS, BARRY**
**05/16/01**

CORNEAL  VS
JACKSON TOWNSHIP

---

30

1    lots.  If it said equivalent subdivision or second dwelling.
2    subdivision and it comes back, then I can issue a sewer
3    permit -- a sewage system in for that second dwelling.
4        Q        Who designs the sewer module?
5        A        The module, if it is a subdivision, meaning
6    actually dividing it, has to be done by a surveyor.  If it's
7    a second equivalent subdivision, second house on the lot, it
8    just needs to be somebody that understands the regulations
9    well enough to do it.  It can be a consultant and it can --
10   it can still be a surveyor.
11       Q        So you said that you can issue a permit in two
12   situations when there's a sewer module involved; isn't that
13   correct?
14       A        I can issue a permit in one --
15       Q        In one situation?
16       A        In one situation.  If it's a prior to '72 lot
17   or if it's a DEP approved lot.
18       Q        But in that case you're just going with the
19   septic design. We're now talking about the sewer module.  I
20   thought you talked about after the sewage module was done
21   there was a situation in which you could issue a permit?
22       A        Then we have a DEP approved lot after --
23       Q        If the sewer modules are approved?
24       A        Yes.
25       Q        That's what I'm trying to get to.  The sewer

---

31

1    modules go to you first for review?
2        A        Generally.
3        Q        And if you approve them, how do you indicate
4    that you've approved them?
5        A        I sign them.
6        Q        You just sign off on them?
7        A        Yep.
8        Q        And that means you've approved them.  And then
9    what happens?
10       A        Then they go to either the -- sometimes
11   they'll go to the planning commission first.  Different
12   townships have the option of handling it different, but, you
13   know, on the sewage module I have to sign it.  There has to
14   be some indication that the planning commission has looked
15   at -- signed it or looked at it and then the supervisors
16   have to sign it.
17       Q        You say sometimes it goes to the planning --
18   you're talking about the planning commission first.  You're
19   talking about the Huntingdon County Planning Commission?
20       A        Well, some townships have their own planning
21   commission.
22       Q        Let's talk about Jackson Township.  How do you
23   do it in Jackson Township?
24       A        I sign them and give them back to the
25   supervisors.

---

32

1        Q        And that's how you always do it, give them
2    back to the supervisors?
3        A        Or I may just send them to -- it depends on
4    whether they want them sent to the county.
5        Q        So sometimes you send them to --
6        A        And so maybe I give them back to them and they
7    give them to the county or maybe the owner takes them to the
8    county.
9        Q        It just depends what the supervisors tell you
10   about what they want?
11       A        It kind of depends on what order things are
12   happening, I guess.
13       Q        Does Jackson Township have its own planning
14   commission?
15       A        No.
16       Q        So sometimes you just give it back to the
17   township and do they sometimes just approve it?  Does the
18   township -- do the supervisors sometimes just approve it?
19       A        Not in recent years.
20       Q        When you say recent years, can you be more
21   specific, not in how long?
22       A        Five years, something like that.
23       Q        In five years.  So what did they do instead of
24   just approving it on their own, what did they do?
25       A        Send it to the county.

---

33

1        Q        They send --
2        A        The sewage module to the county.
3        Q        For the county's approval?
4        A        Yes.
5        Q        Or disapproval?
6        A        Yes.
7        Q        Do they approve it -- do they have to approve
8    it before they send it to the county?
9        A        No.
10       Q        Do they approve it after they send it to the
11   county?  Do they have the right of approval?
12       A        They have to approve it before it can go to
13   the DEP.
14       Q        The supervisors do?
15       A        (Witness nods head affirmatively.)
16       Q        In Jackson Township now we're talking about.
17       A        Um-hum.
18       Q        You approve it, you either give it to them or
19   the customer or you, somebody takes it to the county
20   planning commission in every case?
21       A        I would say every case.
22       Q        In every case?
23       A        I'm not really involved -- after I've looked
24   at it, give it back -- I'm not really involved in it until I
25   get a letter from DEP saying it was approved.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

34

1    Q      Once you approve it, you're not really
2    involved in it after that, you say, until --
3        A      Not until the -- it goes to the other chains,
4    as it goes to DEP, when I get that letter from DEP saying
5    I'm authorized to issue permits, I'm out of it. I'm not
6    connected with it.
7        Q      Well, let me see if we could discuss this a
8    little more. You worked for the township for 10 years, you
9    say?
10      A      Yes.
11      Q      So at some point did the township approve
12   modules after you did an initial approval without sending it
13   to the Huntingdon County Planning Commission?
14      A      Yes.
15      Q      Do you know why they changed doing that?
16      A      When -- it was about the time Ann Wirth became
17   secretary.
18      Q      And did she change it?
19      A      The township has the option of -- on a minor
20   subdivision which is less than 10 -- 10 building lots, the
21   township has the option of sending it to the county. The
22   fellow that was secretary before was also one of the
23   supervisors, way back, before I was even involved, and
24   generally they didn't send them to the county. On a major
25   subdivision it's required, but Ann --

35

1        Q      What?
2        A      They just decided to start sending everything
3    to the county.
4        Q      When Ann came on board?
5        A      It seemed like it was about that time. Again,
6    I'm not in that -- in that little phase. My thing is the
7    same whether the county -- some townships do, some don't.
8        Q      But in any event, every sewer module goes
9    through you first, correct? In Jackson Township we're
10   talking about. It goes through you first?
11      A      Yeah, or the alternate.
12      Q      Or the alternate, correct. Typically, you
13   know, do you have a time line for receiving the sewer
14   module, looking it over and either approving or disapproving
15   it? How long does it typically take you to do that?
16      A      I think -- I think it's required -- it's in
17   the regulation. I try to get rid of them in a day or -- in
18   a week or two.
19      Q      And then typically -- when they go to the
20   county for approval, okay, they come back to the township
21   from the county, correct?
22      A      Yep.
23      Q      And then the township has to give approval,
24   correct?
25      A      Yes.

36

1        Q      And then the township sends it to DEP?
2        A      Yes.
3        Q      For final approval?
4        A      For their approval.
5        Q      For DEP's approval?
6        A      There is some townships that may send it to
7    DEP and in the meantime there will be another little
8    something that needed done and after it comes back they'll
9    give their final approval on it.
10      Q      What about Jackson Township?
11      A      I'm -- again, I'm a little bit out of that. I
12   just handle the sewage. There's other issues.
13      Q      Do you find out typically like when -- when do
14   you find out whether or not the county has approved a sewer
15   module that you've already preapproved?
16      A      Some things they copy me on but not always.
17      Q      When do you typically find out when the
18   township has -- whether or not the township has approved
19   something that you've preapproved?
20      A      Sometimes it might not be until I get a letter
21   from DEP.
22      Q      But it won't go to DEP unless they've approved
23   it, right?
24      A      Right.
25             Unless the township -- Jackson Township has

37

1    approved it, it won't go to DEP?
2        A      Unless any township approves it, it won't go
3    to DEP.
4        Q      It goes to DEP for approval and then comes
5    back to the township?
6        A      The township gets -- sent the letter, I get a
7    copy.
8        Q      From DEP?
9        A      The landowner would get a copy.
10      Q      And then you can go about installing whatever
11   you do and that's the next step?
12      A      Then I can issue an application.
13      Q      Or a permit -- an application?
14      A      An application for a permit.
15      Q      So then after they have all those approvals,
16   you issue an application for a permit and then what happens?
17      A      Once I have the design and the completed
18   application, I can issue a permit.
19      Q      Are you the last say on that permit once it's
20   gone through all these other processes?
21      A      In most cases.
22      Q      In what situation wouldn't you be the last say
23   on that permit?
24      A      Right now I can't think of any, what it would
25   be.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

38

1    Q       Have you ever issued a permit in this sewer
2   module scenario that's gone all the way through where it's
3   been disapproved after you've issued a permit?  Has that
4   ever happened?
5    A       The permit?
6    Q    Yes.  In Jackson Township I'm talking about.
7    A    I can't recall.
8    Q    You can't recall that it ever happened; is
9   that what you mean?
10   A    Yeah.
11   Q    You can't recall an instance of it ever
12  happening?
13   A    I was trying to think of the time -- if I saw
14  or heard something happened on that property that things
15  were disturbed and I found that out, I wouldn't be able to
16  issue a permit.
17   Q    But once --
18   A    But the designer would probably tell me that
19  too.
20   Q    But once you've issued the permit, really was
21  my question, can you think of an instance after you've
22  issued the permit in which the permit was somehow disallowed
23  or disapproved or -- let me say this, your permit issuance
24  was overruled in some way?  Can you think of an instance
25  when that occurred?

39

1    A    No.  There may have been -- see, a copy -- I
2   make three copies.  I keep a copy and give -- send it to the
3   township, because I've done this, a copy goes to the
4   property owner, a copy goes to DEP.  There could possibly
5   have been a little glitch in the design that the DEP person
6   would catch that I missed maybe that -- and I would get a
7   letter on it saying that this needs changed or something,
8   but as far as it being totally disapproved, I can't think of
9   a situation.
10   Q    For Jackson Township approximately how many
11  sewer modules are you requested to review in a given year?
12   A    I'm -- some years are busier than others.
13  Total modules are probably around a half a dozen.
14   Q    A year?
15   A    That's average probably.
16   Q    Sometimes more, sometime less?
17   A    (Witness nods head affirmatively.)
18   Q    Do you know how many you were asked to review
19  in the year 2000?
20   A    No.
21   Q    How about so far this year for Jackson
22  Township?
23   A    I can't think of one.
24   Q    How about for other townships in general, how
25  many sewer modules have you had to review this year, like

40

1   just -- I'm trying to get a feel for your experience really
2   right now.  So say in 2000 can you think of how many sewer
3   modules you reviewed altogether for all the townships you
4   perform this kind of work for?
5       MR. SHERR:  Let me object to the form of the
6   question in that it's a compound question.  You can answer
7   it.
8   BY MS. MONTGOMERY:
9    Q    Did you understand the question?  Did you
10  understand --
11   A    It varies a lot.  You know, just like the
12  economy, what's -- when things are -- the economy is booming
13  people are trying to make building lots.  A lot of things
14  happen.
15   Q    Well, I was really asking for the year
16  2000, or maybe I didn't make that clear and I apologize.
17  For the year 2000 can you estimate for me how many sewer
18  modules that you approved for all the different townships
19  that you work for?
20   A    Well, there's -- we actually get into
21  something a little different there.  If you're in an area
22  that does not have limestone soils, it is not in a high
23  quality watershed, does not have reports of nitrates in the
24  water, you can request an exemption from doing the module.
25  Half of my -- I'm not figuring -- not exactly, but I'm going

41

1   to say half my townships we can do that in.
2       You can't in Jackson Township because it's
3   high quality watershed.  So to ask how many modules -- well,
4   I'm going to say 10, but it could be 25, you know, just,
5   you know, what's happening.  One year a person would do a
6   major module and the next 10 years he can sell lots without
7   doing a module.  If three people do three modules, there
8   might be a hundred lots out there and you wouldn't have to
9   do a module until those hundred lots were sold.  So you just
10  can't say there's so many done a year.
11   Q    Well, I didn't really ask for so many a year.
12  I was really asking for the year 2000, is what I was trying
13  to -- are you saying that -- well, no, I'm really asking you
14  just a straightforward question.  If you could estimate for
15  me the number of modules that you were asked to review in
16  all the different townships that you worked for during the
17  year 2000, that's all.
18   A    Estimate?
19   Q    Yes, that will do.
20   A    But some of them was able to do the
21  exemption.  Are you saying in townships that they have to do
22  the module?
23   Q    Yes.
24   A    Again, 12, 15, I'm going to say.
25   Q    I think you said for Jackson Township you

**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

42

1  reviewed maybe six in the year 2000?
2      A      Not last year.
3      Q      No?
4      A      (Witness shook his head negatively.)
5      Q      I thought you said half a dozen for Jackson
6  Township?
7      A      I said that was an average.
8      Q      An average.  You're right, I'm sorry.  That's
9  quite right.  For the year 2000 do you recall any of the
10  sewer modules -- do you recall any sewer module that you
11  approved initially being disapproved then by the township
12  supervisors?
13          MR. SHERR:  Is this specifically for Jackson
14  Township?
15          MS. MONTGOMERY:  For Jackson Township.
16          THE WITNESS:  You better ask me that again.
17  BY MS. MONTGOMERY:
18      Q      For Jackson Township do you recall for the
19  year 2000 for any of the sewer modules that you approved
20  initially, do you recall any of them being rejected by the
21  township or disapproved, if that's the word you use, by the
22  township?
23      A      I guess Mr. Corneal's.
24      Q      Is that the only one?
25      A      There was a couple others on hold from the

---

43

1  moratorium but since then they've been approved.
2      Q      Do you recall any of the sewer modules that
3  you approved during the year 2000 being disapproved by the
4  county planning commission as opposed to being disapproved
5  by Jackson Township?
6      A      My understanding of the county planning
7  commission on minor subdivisions is advisory only.
8      Q      Okay.  So do you recall the Huntingdon County
9  Planning Commission advising against approval of any of the
10  sewer modules that you had initially approved during the
11  year 2000 for Jackson Township?
12      A      They always find something to comment bad
13  about.
14      Q      They do?
15      A      It seems like it.
16      Q      So they send their comments back to the
17  township and the township can take them or not take them,
18  correct?
19      A      That's the way I understand it.
20      Q      Can you remember back to 1999, do you recall
21  any of the sewer modules that you initially approved being
22  later disapproved by Jackson Township?
23      A      I can't think of one.
24      Q      How about 1998?
25      A      I can't think of anything.

---

44

1      Q      This may be too much to ask, but let's try for
2  the whole 10 year period you've been working with Jackson
3  Township as the sewage enforcement officer.  Do you recall
4  any sewer module that you initially approved being
5  disapproved by Jackson Township?
6      A      Not that I can recall.
7      Q      Let's talk about the testing that you did for
8  the Corneal property, the work that you did on the Corneal
9  property.  How did that come about, what was the initial
10  contact?
11      A      I think Mr. Corneal called me early July.
12      Q      Of?
13      A      Ninety-nine.
14      Q      Of 1999?
15      A      (Witness nods head affirmatively.)
16      Q      Had you heard anything about his plans for his
17  property prior to the initial contact that you just spoke
18  about in July of 1999?
19      A      Probably when I first talked to him -- I was
20  dealing with his brother in another township and may have
21  had initially thought it was the brother that I was talking
22  to and he bought it but --
23      Q      You mean Mr. Corneal's brother?
24      A      Yeah.
25      Q      You --

---

45

1      A      But after a little conversation that was
2  quickly straightened out.
3      Q      That it was David Corneal you were talking to?
4      A      Not the one I was working with in another
5  township.
6      Q      Oh, okay.  Now, had you talked to anybody else
7  about Mr. Corneal's property in Jackson Township?
8      A      I don't recall of it.
9      Q      Not that you recall?
10      A      (Witness shook his head negatively.)
11      Q      So the first time you discussed this property
12  and Mr. Corneal's plans for it was with Mr. Corneal?
13      A      That's the way I remember it, yes.
14      Q      Let me ask you this:  Before Mr. Corneal
15  bought the property, had you ever had any interaction with
16  anybody or contact with anybody about that property?
17      A      No.
18      Q      Had there ever been any other request that
19  you're aware of or any permit or application or anything
20  like that in connection with that property in Jackson
21  Township that Mr. Corneal bought?
22      A      I remember doing work across the road one day
23  and there was an older fellow there mowing the grass.
24  That's the only thing I ever even saw being done there.  I
25  don't remember seeing cars there then, but it's a -- a

---

12

---

**46**

1  little isolated from where I'm usually at.
2  Q   It's an isolated piece of property?
3  A   Not totally, but it's on an old part of the
4  road that's been replaced by a new part of the road.
5  Q   So Mr. Corneal contacted you about July 1999?
6  A   Yes.
7  Q   And what was the substance of that
8  conversation, if you recall?
9  A   Now, I talk to -- when I get home tonight, I'm
10  probably going to have 15 calls on my answering machine that
11  I'll spend an hour or two returning after I go to a meeting
12  tonight.  So if you figure I talk to a dozen people a day
13  and it's two years ago, I can't really quote conversations
14  on the phone.
15  Q   That's okay, you can --
16  A   It was generally he told me what he wanted to
17  do and I asked him how big a property, how many lots and
18  then told him the first thing we need to do is meet there
19  with a backhoe.  That's generally what I explain to people,
20  you know, you're going to be doing a sewage module, your
21  surveyor will do that, but the place we start is see what's
22  there for soil.
23  Q   So you bring -- basically you bring an
24  excavator in, right, with a backhoe; is that what you're
25  talking about?

---

**47**

1  A   Excavator meaning a contractor?
2  Q   Yes.
3  A   There's a machine called an excavator.
4  Q   Right, an individual who performs excavating
5  work you bring in.
6  A   Yeah.
7  Q   Who contacts the individual to do the
8  excavation work?
9  A   It's the property owner's responsibility to
10  line that up.
11  Q   Do you give names occasionally?  Do you tell
12  -- you know, help people find a local individual involved
13  in excavation work?
14  A   If I'm asked, I'll give a couple names.
15  Q   Do you recall whether you advised Mr. Corneal
16  who to call for excavation work?
17  A   I don't recall.
18  Q   You don't recall?
19  A   (Witness shook his head negatively.)
20  Q   Do you know -- do you remember who performed
21  the excavation work for Mr. Corneal?
22  A   Eagle Excavating.
23  Q   Eagle Excavating?
24  A   Um-hum.
25  Q   And are you familiar -- very familiar with

---

**48**

1  that company, Eagle Excavating?
2  A   Yeah.
3  Q   Do you work with them often in the course of
4  your sewage enforcement officer work?
5  A   Yeah.
6  Q   Would you say that you work with them
7  primarily --
8  A   No.
9  Q   -- in Jackson Township?
10  A   No.
11  Q   There are others who perform excavation work
12  for you -- or with you really on projects in Jackson
13  Township?
14  A   They're not -- the other people aren't from
15  Jackson Township, but there's other people that work in
16  Jackson Township.
17  Q   Thanks.  Well, tell me about Eagle Excavating.
18  What is that company?  Who works in that company?
19  A   It's Tom Wilson and his son, I think, but I'm
20  -- I'm just -- those are the contact guys.  I --
21  Q   Do you know whether anybody else works for
22  them?
23  A   They have other people, yeah.
24  Q   They have a crew?
25  A   Yeah.

---

**49**

1  Q   Do you recall whether Mr. Corneal asked you
2  who he might call to help him with the excavating work?
3  A   I don't recall that.
4  Q   So the first time you talked to Mr. Corneal
5  was by telephone, right?
6  A   The way I remember it, yeah.
7  Q   And then you agreed to meet in person at the
8  property with the excavator?
9  A   Yeah.
10  Q   And when did that happen, do you recall,
11  around the same time frame?
12  A   It's on the soil sheets there.  7/21.
13  Q   Ninety-nine you're talking about?
14  A   (Witness nods head affirmatively.)
15      MS. THORP:  Is that yes?
16      THE WITNESS:  Yes.
17  BY MS. MONTGOMERY:
18  Q   I'm sorry, you need to say yes or no.
19  A   Yes.
20  Q   So you met out at Mr. Corneal's property with
21  somebody from Eagle Excavating?
22  A   Yes.
23  Q   Do you recall who that was that showed up for
24  Eagle Excavating?
25  A   I think it was a nephew.

---

**PARKS, BARRY**
**05/16/01**

<div align="right">

**CORNEAL  VS**
**JACKSON  TOWNSHIP**

</div>

---

50

1    Q      A nephew of whom?
2    A      Tom Wilson's.
3    Q      He works for him at Eagle Excavating?
4    A      (Witness nods head affirmatively.)
5    Q      What's his name?
6    A      But it could have been the son.
7    Q      What's the nephew's name?
8    A      I don't know.  I don't take down operator's
9    names.  I -- when I see his face, I know his name, but I
10   can't think of it right off.
11   Q      You were saying that you could recall his face
12   but not his name, correct?
13   A      It's the nephew who works for him.
14   Q      Well, do you know his son's name?
15   A      They call him TC.
16   Q      You said a few moments ago that you sometimes
17   make recommendations in Jackson Township for who might help
18   with excavating work.
19   A      No, I don't make recommendations.  I may -- if
20   I'm asked, I'll give them some names.
21   Q      Do you provide more than one name, two names,
22   what?
23   A      A couple.
24   Q      You provide a couple?
25   A      (Witness nods head affirmatively.)

---

51

1    Q      What names do you typically provide?
2    A      Well, the closest ones would be Peters.
3    They're a longtime -- in the next township.  They actually
4    do a lot of the road work for Jackson Township.  They're
5    second generation.  Hoffmasters.
6    Q      Anybody else?
7    A      Those -- and along with Eagle, those three do
8    the majority of work on that -- that corner of the county.
9    Q      When you spoke to Mr. Corneal or heard from
10   Mr. Corneal about, you know, his interest in getting an
11   on-lot system, was that the first time you'd ever spoken
12   with him?
13   A      Yes.
14   Q      It was, you'd never met him before?
15   A      No.
16   Q      Had you ever heard of him before?
17   A      Again, I heard the Corneal name from working
18   with his brother in another township and I even had him
19   confused with that brother initially.  So, no, I didn't know
20   him before.
21   Q      So when you went out to Mr. Corneal's property
22   and met with him and I guess the nephew, Tom Wilson's nephew
23   from Eagle Excavating, how long did that visit last?
24   A      We were there most of the day.
25   Q      So you got out there early in the morning?

---

52

1    A      Probably eight o'clock.
2    Q      And just describe for me in your own words
3    with as much detail as you want to give what you did that
4    day.
5    A      Went around and -- Mr. Corneal had a -- gave
6    me a map showing roughly what he wanted to do with his
7    proposed parcel.  I'm not sure if he owned it then or not.
8    And we went around and tried to find suitable sites on those
9    lots he had marked out.
10   Q      So did the nephew from Eagle Excavating come
11   with you on the entire trip?
12   A      Whoever was running the backhoe was with us
13   all day, yeah.
14   Q      So you actually did some excavating that day,
15   just to test out the soil and such, is that --
16   A      Well, we probably did 20 -- 20 soil pits,
17   yeah.
18   Q      Was Mr. Corneal with you the whole time?
19   A      The majority of the day, I would say, at
20   least.
21   Q      Anybody else?
22   A      Tom Wilson may have showed up some of the day,
23   but I'm not sure, and I was introduced as -- a younger
24   brother was there for a while.
25   Q      Wilson's younger brother?

---

53

1    A      Mr. Corneal's younger brother.
2    Q      Mr. Corneal's younger brother?
3    A      He was at that time talking about getting one
4    of the lots.  And there may have been a young teenager with
5    him.
6    Q      Anybody else that you can think of?
7    A      It's two years ago.  I've talked to a thousand
8    people since then.  That's about the best I can remember.
9    Q      Thank you.  So you dug about 20 test pits that
10   day.  Now, was that the end of the excavating work that you
11   had done in connection with the test pits on Mr. Corneal's
12   property?
13   A      I think we did them all in one day, yes.
14   Q      You did them all in one day.  So what else did
15   you have to do to get to the point where you could -- let me
16   say this.  After you did the test pits, what did you do?  As
17   a sewage enforcement officer, what did you do next?
18   A      The next time I was there Eagle Excavating had
19   prepared perc sites and I did perc tests.
20   Q      So you came back.  How much later?
21   A      I think the soil sheet says August 9th.
22   Q      So within a couple weeks you went back out --
23   A      (Witness nods head affirmatively.)
24   Q      -- to look at the perc -- I'm sorry, to look
25   at the perc tests, right?

---

**54**

1 A To do the perc tests, yeah.
2 Q To do the perc tests. What did you say Eagle
3 Excavating had prepared, perc sites, is that what you called
4 them --
5 A Yes.
6 Q -- perc sites? So they came on a different
7 day and did that?
8 A In between the time of the probes and the
9 perc. A perc test is when you dig small holes in the area
10 of the big holes, presoakened with water which simulates
11 worst weather conditions. Then they leave water for me. I
12 come out and do the perc test, which is measuring how much
13 drop there is in the water. That converts on a chart to a
14 square footage that -- the slower the perc, the more we have
15 to spread it out.
16 Q So when you say the lower the perc -- is that
17 what you said?
18 A The slower.
19 Q The slower the perc. When you talk about the
20 perc, you're talking about -- are you talking about the
21 recession of the water or the --
22 A Yeah.
23 Q The slower the water goes down?
24 A Yep.
25 Q So the excavation company fills it with water?

**55**

1 A They put 12 inches of water in.
2 Q And then you wait how long after they do that?
3 A Eight to 24 hours I come out.
4 Q And do the perc test?
5 A Um-hum.
6 Q And how long does that take you?
7 A Half hour periods for approximately two hours.
8 Q So that was your second visit to the property,
9 correct?
10 A Yeah.
11 Q Did you have occasion to go a third time prior
12 to issuing whatever you were going to issue in connection
13 with that property?
14 A I can't recall being there again in '99.
15 Q So what happened after you looked at the test
16 pits and then did the perc test? Then what happened? What
17 did you do?
18 A I think as far as Mr. Corneal's property, the
19 next thing would be wait to hear from the surveyor.
20 Q And what are you waiting to hear from the
21 surveyor?
22 A That he has the modules completed.
23 Q So you have to pass on the perc test, right,
24 and the test pits, don't you?
25 A Yes.

**56**

1 Q And do you do that in writing or you just say
2 okay, this looks good or what do you do?
3 A I do it in writing.
4 Q And in what form of writing?
5 A There's a perc result sheet. I just forget
6 the number on it but --
7 Q It's a form?
8 A Yeah.
9 Q A state form?
10 A Yep.
11 Q That's the perc result sheet. What about the
12 test pits, is it all part of the same sheet?
13 A Um-hum.
14 Q So you did that for Mr. Corneal's property?
15 A Yes.
16 Q And you were satisfied with the results?
17 A We had suitable sites for each lot. Not all
18 test pits were good, not -- but we had a suitable site for
19 each lot, except there was one lot we did not have a
20 suitable site for and -- but -- it wasn't a suitable site
21 for a sand mound.
22 Q But it could have been a suitable site for
23 something else?
24 A Possibly.
25 Q What else?

**57**

1 A Spray irrigation.
2 Q So where was that lot, was that --
3 A I would say on the eastern end of the
4 property.
5 Q Was it the one Mr. Corneal intended to build
6 on?
7 A No.
8 Q So you signed off on the perc test and the
9 test pits then you wait for the surveyor to do what?
10 What did you say, come up with a --
11 A Complete the sewage module.
12 Q Complete the sewage module. How long does
13 that typically take? It depends on the size?
14 A I've had them ready the next week and I've
15 waited two years.
16 Q For Mr. Corneal's property you waited a couple
17 weeks?
18 A More than that, I think.
19 Q But eventually you got the sewer modules from
20 the surveyor?
21 A Yeah.
22 Q And then what?
23 A I reviewed them and signed them.
24 Q So you approved them, correct?
25 A Yeah.

58

1 Q Now, did you have any conversations with
2 anybody in between the time you did, starting at the
3 beginning, the soil probe, your test pits -- in between that
4 time and the time you did the perc test, did you have any
5 conversations with anybody about the property?
6 A Besides the surveyor?
7 Q Yes.
8 A And Tom Wilson calling and telling me the perc
9 was ready, the percs were ready?
10 Q Okay.
11 A After that was done, I can't recall talking to
12 anybody about the lot.
13 Q But you talked to the surveyor you said?
14 A Yeah.
15 Q Just to discuss the property and move the
16 project along, is that what you did?
17 A Um-hum.
18 Q Who is the surveyor?
19 MR. SHERR: You have to say yes or no. You
20 can't --
21 THE WITNESS: Oh, sorry. Dave Simpson.
22 BY MS. MONTGOMERY:
23 Q Then after you had the perc test done -- well,
24 let me back up a second. Tom Wilson called to tell you that
25 the perc sites were ready --

59

1 A Um-hum.
2 Q -- for you to come test?
3 A (Witness nods head affirmatively.)
4 Q Did you have any other conversation with him
5 about Mr. Corneal's property?
6 A I can't recall, but in a busy time of the year
7 I may be working on 50 other projects at different phases.
8 They may be from just conversation to approving a module.
9 Q So after Mr. Wilson called you and said the
10 perc sites are ready and you went and did the perc test, did
11 you then have occasion to talk to him again about Mr.
12 Corneal's property during the period that the sewer module
13 was being prepared?
14 A I can't recall.
15 Q You don't recall that. How about did you talk
16 to anybody else about the property?
17 A Not that I recall.
18 Q Did the surveyor contact you to talk about it
19 during that period of time or --
20 A Yeah.
21 Q He did?
22 A (Witness nods head affirmatively.)
23 Q From time to time?
24 A He called me once and we talked and I remember
25 meeting him at the courthouse and he showed me maps, but I'm

60

1 not sure if he had modules with him at that time or if he
2 just had questions about pit locations maybe.
3 Q So the surveyor more or less consulted with
4 you to make sure that he was designing the sewer modules in
5 keeping with what had been approved on the property so far;
6 is that correct?
7 A Yeah.
8 Q That's a fair way to say it?
9 A (Witness nods head affirmatively.)
10 Q So then you got the sewer modules, right?
11 A It may have had something to do with the lot
12 that the brother was going to get needed an easement. I
13 think that was part of it, how he wanted me to lay the
14 easement out. He had some questions, but that's not
15 unusual. They usually check with me a couple times so they
16 don't have to do stuff a couple times.
17 Q Have you worked with Mr. Simpson on other
18 projects?
19 A Rarely. Every couple years I'll work with him
20 on one.
21 Q So then you got the sewer modules and you
22 approved them, right?
23 A That's the way I remember it.
24 Q And then what happened? What did you do with
25 them?

61

1 A Got them back to Mr. Corneal.
2 Q Did you send them to anybody else yourself?
3 A Again, we're talking almost two years ago. At
4 that time my wife was -- the company she works for was I
5 think leasing a building owned by Mr. Corneal and somewhere
6 along the way -- either picking them up or getting them
7 there or somewhere along the way she took them to work for
8 Mr. Corneal to pick up.
9 Q I see. In State College you mean?
10 A Yes.
11 Q So after you approved them, she took them to
12 work for Mr. Corneal to pick up?
13 A I think it was at that time, yes.
14 Q Now, after that did you have any further
15 communication with anybody about those sewer modules for
16 purposes of whether or not they should be approved further?
17 A I don't recall of it.
18 Q Did Mr. Wilson talk to you about them at all?
19 A I don't think so.
20 Q Were you present at any meetings among the
21 Jackson Township supervisors or anybody else wherein those
22 sewer modules were discussed after you approved them?
23 A I can't recall of it.
24 Q Did you have an opportunity to talk to anybody
25 from the Huntingdon County Planning Commission?

**PARKS, BARRY**
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

62

1    A    I don't think I was contacted about that
2    property.
3    Q    You don't think -- so just to be clear, did
4    anybody at all contact you about the property again to ask
5    you questions about your approvals of the sewer modules?
6    A    At some time -- not about the sewer modules.
7    The person that was interested in buying part of it
8    contacted me.
9    Q    Is that Mr. Hewett?
10   A    Yeah.  Somewhere along the way wanting to know
11   time frame or something, but I don't remember that
12   conversation word for word.  I remember I talked to him.
13   Q    Do you recall what you told him generally, not
14   word for word but generally?
15   A    He couldn't do anything till we had the sewage
16   module approved.
17   Q    Did you expect the sewage modules to be
18   approved?
19   A    Yeah.
20   Q    You did, okay.  So let me just -- when did you
21   find out that the sewage modules had not been approved?
22   A    When I said yes, I didn't mean maybe right
23   away.  Sometimes there's a little -- things that have to be
24   worked out, but, you know, with the -- if everybody just
25   sticks with the project, why they get approved.

---

63

1    Q    Well, were these sewage modules approved to
2    your knowledge?
3    A    They must not have been, but, again, that's
4    out of -- I'm out of that process after that, after I've
5    approved them.
6    Q    But did you come to find out that the sewage
7    modules had not been approved?
8    A    I was hearing that, yeah.
9    Q    Who did you hear that from?
10   A    I'm not sure.  Mr. Corneal called me mid --
11   early winter 2000 and said about the moratorium and he was
12   wanting to start building and asked if I could issue him a
13   privy permit.  So I was getting the idea that, you know, it
14   was held up because of the moratorium on -- and there was a
15   couple others, too, waiting for the moratorium to be done.
16   Q    Moratorium on what?
17   A    On subdivisions in Jackson Township.
18   Q    Did anybody ever call you and ask you -- at
19   any time ask you to discuss with them, you know, any
20   problems with these sewer modules or any concerns at all?
21   A    I don't recall of it.
22   Q    So you say you remember hearing from Mr.
23   Corneal and he asked you to issue him a privy permit, right?
24   A    Yes.
25   Q    And what happened then?

---

64

1    A    Again, we go way back to when I talked about
2    lot, whether it's one acre or a hundred acres.  If it's a
3    vacant lot, prior to '72 you can use a privy, but you can't
4    have piped water or water under pressure, is the way it
5    reads in the regulations.  So Mr. Corneal had a lot, but it
6    had piped water and water under pressure on that lot.  I
7    know that doesn't maybe make sense, but it's -- it's a
8    quarter mile away, but that's regulation.
9    Q    So when you say he had a lot, you mean his
10   whole huge piece of property that included the farmhouse
11   that already existed?
12   A    (Witness nods head affirmatively.)
13   Q    Right?
14   A    Yep.
15   Q    And all the other things that he had maybe
16   tried to divide into --
17   A    Until there's a DEP approved -- approval it is
18   a lot.
19   Q    So the piped water -- well, let's go back to
20   the privy.  So he asked you for a privy permit and what
21   process did you go through after he asked you for that privy
22   permit?
23   A    I think I told him that was the problem with
24   it, that he couldn't use a privy on his property at that
25   time because it had -- technically had water -- piped water

---

65

1    and water under pressure.
2    Q    But if the property had been subdivided even
3    into two lots, you take the house with the water and then
4    the rest of the property is another lot --
5          MR. SHERR:  Object to the form of the question
6    being a hypothetical question.  You can answer it.
7    BY MS. MONTGOMERY:
8    Q    Did you understand the question?  I didn't get
9    to finish it but -- if the property was divided into two
10   lots, subdivided into just two lots --
11   A    (Witness nods head affirmatively.)
12   Q    -- one being the house with the water on it
13   and the other being the rest of the property which is -- do
14   you know how many acres that is?
15   A    It's 95 acres, isn't it?
16   Q    Something like that.  Then would there have
17   been a problem with the privy permit?
18         MR. SHERR:  Objection to the form of the
19   question, same basis.  You can answer it.
20   BY MS. MONTGOMERY:
21   Q    You can answer.
22   A    If you have a prior '72 lot with no water, you
23   can use a privy.  If you have a subdivided lot, meaning a
24   lot subdivided after '72 with DEP approval and it doesn't
25   have piped water and there's a site set aside so if you do

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

66

1   put water in you can put a system in and the township has a
2   privy ordinance, you can use a privy.
3       Q       Does the township have a privy ordinance,
4   Jackson Township?
5       A       It was part -- I understood it was part of
6   this new subdivision ordinance. I think there is now.
7       Q       Did you discuss issuing the privy permit to
8   Mr. Corneal with anybody else at all before telling him that
9   he couldn't have one?
10      A       I may have told Mr. Corneal I would see if I
11  could think of a way we could do it that meets regulations,
12  but I -- I -- with the water and -- but that's what the
13  regulations say. Now, whether it's one acre or a thousand
14  acres, if it's one parcel it's a lot.
15      Q       Are there provisions for exceptions to that
16  regulation?
17      A       Exceptions is something you don't read in the
18  DEP regulations, except that one I told you about, exception
19  to doing the planning module if you meet the criteria.
20      Q       So you don't know of any exceptions to that
21  general rule?
22      A       No.
23      Q       Well, anyway, there was another question in
24  there that I don't think I quite got an answer to. Did you
25  discuss Mr. Corneal's request for a privy permit with

---

67

1   anybody else prior to telling him that he couldn't have it?
2       A       Maybe in our conversation I may have said
3   something about I talked to the supervisors. Again, this is
4   going through -- this was going through my mind. I was
5   trying to think of a way that we could do that, but with --
6   I looked -- glanced through the regulations again and I
7   didn't see any way we could do it.
8       Q       Did the supervisors -- did you discuss with
9   the supervisors --
10      A       I don't remember talking to them about that.
11  If I could have found something in the regulations that I
12  could have given a reason for it, I would have done that.
13      Q       Do you go to township meetings, Jackson
14  Township meetings?
15      A       Sometimes, but I -- for a good period there I
16  wasn't to one.
17      Q       A good period where?
18      A       While the moratorium was going on because a
19  lot of times I go to the -- go to them with the landowner to
20  explain to the supervisors what's going on, but if the --
21  there's a moratorium on it there's no reason for me to go to
22  explain because everything is on hold.
23      Q       You said while the moratorium was going on.
24  Is the moratorium still going on in Jackson Township?
25      A       No.

---

68

1       Q       When was it lifted?
2       A       I think it was the summer of 2000.
3       Q       This is the moratorium on subdivisions, right,
4   in Jackson Township?
5       A       Yes.
6       Q       So since the moratorium has been lifted have
7   you had occasion to discuss Mr. Corneal's property with
8   anybody in, you know -- just about the sewer modules?
9       A       Yeah.
10      Q       Who?
11      A       His attorney.
12      Q       Mr. Corneal's attorney?
13      A       Yes.
14      Q       Which one are you talking about?
15      A       Names a lot of times --
16      Q       Mr. Williams?
17      A       Mr. Williams. Terry Williams, yeah.
18      Q       And what was the occasion for that discussion?
19      A       We met with him a couple times, myself and the
20  supervisors at the Huntingdon Courthouse, and then I met
21  Terry and Mr. Corneal at the property.
22      Q       Well, have you had any discussions with the
23  supervisors about Mr. Corneal's property since the
24  moratorium has been lifted?
25      A       At these -- that's what's discussed at these

---

69

1   -- when we meet with Terry.
2       Q       But I'm talking about other than meeting with
3   Terry.
4       A       I can't recall of having discussions just to
5   get together to talk about Mr. Corneal's -- we have had a
6   couple meetings to talk with our solicitor at Ann Wirth's --
7   but except for that type of meeting and -- I don't recall of
8   it.
9       Q       You've had meetings with Larry Newton, you
10  mean, township solicitor Larry Newton?
11      A       Larry's been at the meetings at the
12  courthouse, yeah.
13      Q       To talk about Mr. Corneal's property?
14      A       That's what -- that's what it was about, yeah.
15      Q       Have you had any telephone conversations with
16  anybody, with one or more of the supervisors, about Mr.
17  Corneal's property since the moratorium was lifted?
18      A       It's mostly been about a meeting or coming
19  down here.
20      Q       Who have you talked to?
21      A       Usually Ann calls me.
22      Q       She calls you what, to schedule a meeting or
23  something like that?
24      A       Tells me when the meeting is going to be.
25      Q       What is your understanding right now of the

---

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

70

```
 1   township's position on Mr. Corneal's sewer modules?
 2      A      Incomplete.
 3      Q      I'm sorry?
 4      A      They're incomplete at this time.
 5      Q      The township thinks they're incomplete?
 6      A      Yes.
 7      Q      Why is that?
 8      A      The site that was originally proposed for his
 9   home and additional buildings is not suitable to be used.
10   And I met with Mr. -- Terry and Mr. Corneal to discuss that
11   and it was 4/18.
12      Q      April 18th?
13      A      Um-hum.
14      Q      2001?
15      A      (Witness nods head affirmatively.)
16      Q      Well, was this one of the sites that you --
17   was this one of the sites that you had tested before?
18      A      Yes.
19      Q      It was one of the ones that you approved
20   before?
21      A      Yes.
22      Q      And why is it now incomplete?
23             MR. SHERR:  I'm going to object to the form of
24   the question because I think it misstates his testimony.
25   You can answer it.
```

71

```
 1             MS. MONTGOMERY:  Well --
 2             THE WITNESS:  Because in the process of doing
 3   the building that you're doing there, they've disturbed the
 4   site, is the way it's referred to.
 5   BY MS. MONTGOMERY:
 6      Q      Who made that determination, that they
 7   disturbed the site?
 8      A      I did.
 9      Q      How did he disturb the site?
10      A      Driveways.
11      Q      What did the driveway do?
12      A      Encroached on the area that the system was
13   intended to be put on.
14      Q      When did you make that determination?
15      A      I was there -- whenever I received the sewage
16   module -- the last time we were at the courthouse I asked
17   Terry if it was all right whenever I received the sewage
18   module if I could enter the property to check to see if
19   these sites that I did approve were still intact, still
20   usable.  So when I did receive the modules, I went out to
21   look and determined that they were encroached on too much.
22      Q      When you say encroached on too much, what is
23   your concern?
24      A      There's just -- there's so many driveways and
25   areas that are disturbed there's not room to put the system
```

72

```
 1   in, put a system in.
 2      Q      Is there another spot on that parcel where
 3   he's building that would be suitable to put a system in?
 4      A      There wasn't at that time.
 5      Q      Is there now?
 6      A      He's had a soil scientist out there since then
 7   and I just reviewed that letter and I guess they've come up
 8   with a couple -- a couple sites.  And the soil scientist
 9   also confirms in his letter that he agrees that that
10   original site was disturbed and is unusable.
11      Q      Who went out with you when you went to look at
12   it?  You said you wanted to go and see and make sure the
13   sites were still intact.  Who went out with you?
14      A      I was by myself.
15      Q      Is that the only time you went out to look or
16   have you been out again?
17      A      The day I met Mr. Corneal and Terry a couple
18   weeks later.
19      Q      Do you know whether anybody else has been out
20   to the property?
21      A      From the township?
22      Q      Yes.
23      A      Tom Wilson was there to meet with somebody
24   about the driveway, supposed to meet Terry, but I'm pretty
25   sure -- to the best of my knowledge he wasn't back in there.
```

73

```
 1             MS. MONTGOMERY:  I think we need to take a
 2   break for just a minute.
 3             (Break taken.)
 4   BY MS. MONTGOMERY:
 5      Q      You testified a couple moments ago that you
 6   made a subsequent visit after the moratorium was lifted to
 7   look at the Corneal's property, correct?
 8      A      When the second sewage module was presented to
 9   the township.
10      Q      What do you mean the second sewage module?
11      A      This is the second one.
12      Q      And has this been approved by you?
13      A      It's one I -- the first one I signed that was
14   for the four or five lots.  This one I can't sign because
15   the site isn't there anymore.  I'm signing that there's a
16   suitable site there for the dwellings that are being built.
17      Q      Hang on a second, please.  I want to consult
18   with my client.
19             (Mrs. Montgomery conferred with Mr. Corneal.)
20   BY MS. MONTGOMERY:
21      Q      I'm sorry, you confused me there for a
22   second.  There weren't new modules submitted, right?  It was
23   the same set of modules that you had previously approved;
24   isn't that correct?
25      A      No.  Is that it there?  This is -- it's
```

**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

74

1  requesting approval for an equivalent subdivision, no new
2  lots.
3     Q     Let's go back a second and talk about that.
4  When Mr. Corneal initially submitted these sewage modules,
5  right, he was requesting a subdivision that included a
6  number of different lots, correct?
7     A     Yes.
8     Q     Later he decided, and correct me if I'm wrong,
9  that all he was asking was to have approximately 26 acres
10  that had the existing house on separated from the rest of
11  the property; is that correct?
12     A     That's not what that's requesting there.
13     Q     Well, no, because this isn't -- this isn't a
14  subdivision plan.
15     A     Well, the one that I looked at was not -- it
16  was requesting approval to put a second dwelling on it.
17     Q     Right.
18     A     There was nothing about subdividing.
19     Q     Right, exactly.  He's not requesting
20  subdivision anymore, is what I'm saying.
21     A     When you said 26 acres, that would be a
22  subdivision.
23     Q     Initially he asked for a subdivision -- was
24  planning to ask for a subdivision that had a number of
25  different lots contained --

---

75

1     A     Fall of '99, yes.
2     Q     Right.  Subsequently, after you approved his
3  sewage modules, right, for sites on all of those different
4  lots, right --
5     A     Um-hum.
6     Q     -- he changed his mind and said I'm only going
7  to divide this parcel into two properties, correct?
8          MR. SHERR:  I'm going to object to the form of
9  the question as to whether -- asking this witness Mr.
10  Corneal's state of mind.
11  BY MS. MONTGOMERY:
12     Q     Let's just back up a second.  When you
13  reviewed the initial sewage modules, was it your
14  understanding that the plan was to divide your property up
15  into about 10 lots, right?
16     A     I would say four or five.
17     Q     So you, correct me if I'm wrong, approved
18  sewage modules in five different places, correct?
19     A     Septic sites, yes.
20     Q     Right, exactly.
21     A     Yes.
22     Q     Your understanding was that it was -- and
23  we'll use your estimate, it was going to be divided into
24  approximately five different lots at least, right?
25     A     Yeah.

---

76

1     Q     Then later, isn't it correct, that the request
2  was not to subdivide but simply to approve the sewage -- or
3  to allow him to build an additional dwelling on the entire
4  95 acres?
5     A     Yes.
6     Q     And so is it your testimony that you then felt
7  that you had to go out and see whether the original sewage
8  modules that you approved would still be suitable?
9     A     The site was tested for that area where the
10  house was being built.  I wanted to make sure that was still
11  a usable site.
12     Q     Did anybody tell you to go and look again?
13     A     The township told me they wanted to make sure
14  that was -- that site was okay.
15     Q     Who at the township told you that?
16     A     It was sort of a -- I think Ann actually said
17  the words.
18     Q     Ann said you should go and look to make sure
19  the site is okay?
20     A     Yeah.
21     Q     So was it Ann's idea that you should go and
22  look and see?
23     A     It was a general thing.  They just wanted it
24  to be right.
25     Q     So you went out and you looked -- you knew

---

77

1  where Mr. Corneal was planning to build?
2     A     The last time we were at the courthouse about
3  this building without permits, I asked Terry Williams if it
4  was all right when I received the module, before I signed
5  it, could I enter the property to check to see if that site
6  at -- where the construction was going on was still a usable
7  site and he gave me permission to do that.  So I did -- when
8  I received it, I went out and looked.
9     Q     And now tell me again why you determined that
10  it was no longer a suitable -- that there was no site out
11  there --
12     A     Well, he had had a designer submit a design to
13  me that was like -- in the proximity of 15 by 70 some feet
14  and till you take away all the limiting factors that are
15  there for driveways there's only about 40 feet.
16     Q     But that was a septic design, right?
17     A     Yes.
18     Q     Not a sewage module design, right?
19     A     No, but we have to -- there's no use in
20  approving the sewage module if we don't have -- with
21  marginal conditions if we don't have -- we don't know
22  there's a site there.  That's what I'm signing.  I'm telling
23  DEP there's a -- you know, this site is okay to put a septic
24  system on and we need your approval.
25     Q     When you initially approved the sewage

---

**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

78

1  modules, okay --
2  A    Um-hum.
3  Q    -- that you signed off on back in July or
4  August of '99, right?
5  A    **It was fall of '99.**
6  Q    Right.
7  A    **Or even early winter of 2000.**
8  Q    When you initially approved -- you're right,
9  February.  When you initially approved those sewage modules,
10  did you have a specific septic design for each one of the
11  modules that you approved for each one of the sites?
12  A    **No, there is not a design done till the person**
13  **applies for a permit.  It was a specific site for each**
14  **proposed lot, except for the one that was going to need more**
15  **testing if they did spray irrigation on and that was on the**
16  **other end of the property.**
17  Q    Right.  So you didn't have a specific septic
18  design but you approved the modules anyway, right?
19  A    **For a specific -- it was a site -- it was a**
20  **site proposed for each lot.**
21  Q    And then if you had to make some adjustments
22  to the specific septic that went into each one, you would
23  have done that later on, right?
24  A    **Yeah, but it would have been working with an**
25  **undisturbed site.**

---

79

1  Q    Maybe I didn't understand you, but I thought
2  that you said that you didn't -- well, no, you just tell me
3  in your own words.  I won't repeat it back to you.
4      When you went out the second time, okay, you
5  found that you couldn't approve any sewage module out there
6  for Mr. Corneal's building or his house because why?
7  A    **The site that the design was done for was**
8  **unusable because of soil compaction from the driveways.**
9  Q    What's the regulation on how close the septic
10  system has to be, how far it has to be from a driveway?
11  A    **Ten feet.**
12  Q    Was the original sewage module that you
13  approved -- was there an original sewage module that you
14  approved for that area that Mr. Corneal wanted to build on?
15  A    **There was a site there, yes.**
16  Q    There was a site there?
17  A    **(Witness nods head affirmatively.)**
18  Q    Was it more than 10 feet from the driveway?
19  A    **There was no driveway there.**
20  Q    When you went back and the driveway was there,
21  was that site more than 10 feet from the driveway?
22  A    **There wasn't room to put the system there and**
23  **have the system 10 feet from the driveway.**
24  Q    What system?
25  A    **The proposed system.**

---

80

1  Q    But you don't necessarily have to have the
2  system designed before you approve the sewage module, do
3  you?
4  A    **Well, you're supposed to have the sewage**
5  **module approved before you do any building.**
6  Q    Right.
7  A    **That's the problem, not the stuff I did.**
8  Q    Well, I think we're talking in circles a
9  little bit, but let's go back a second.  You approved a
10  sewage module on a site that you knew that Mr. Corneal was
11  planning to build on, correct?
12  A    **That's what he told me, yes.**
13  Q    All right, good.  Then it was disapproved by
14  the township, the township refused to approve it, correct?
15  A    **The sewage module.**
16  Q    The sewage modules that you initially
17  approved.
18  A    **It's a sewage module.**
19  Q    Well, there's five different forms here which
20  we'll have you identify in a little bit, but in any event,
21  then you went back again after the supposed moratorium was
22  in place, right, because the township --
23  A    **It was done away with.  You mean afterwards?**
24  Q    It was lifted.  Because the supervisors told
25  you to go back and look and make sure the site was still

---

81

1  okay?
2      MR. SHERR:  Objection, misstates his prior
3  testimony.  You can answer.
4  BY MS. MONTGOMERY:
5  Q    Did the supervisors tell you to go back and
6  look to make sure the site was still okay?
7  A    **They wanted to make sure it was okay.**
8  Q    So then you go back and you look at all the
9  different sites that you had approved previously, right, and
10  you know where Mr. Corneal was going to build?
11  A    **(Witness nods head affirmatively.)**
12  Q    Is your testimony now that there's no place
13  that he can put a septic system that's suitable for his
14  site.  That site is not suitable because of driveways and
15  sewage modules had been approved already?
16  A    **No, I didn't say that.**
17  Q    What did you say?
18  A    **I received -- in the meantime I received a**
19  **design for his new house.  I went and I looked at that**
20  **and it is not suitable because of driveways and**
21  **soil compaction.  There is other sites on that lot.**
22  Q    That are already approved?
23  A    **That would be suitable if you wanted to go to**
24  **the -- if you wanted to go to -- but nobody said anything**
25  **about wanting to use a site that was 500 yards away.**

---

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

82

1    Q      Now, you just said nobody talked about using a
2  site that was 500 yards away. Was there a site 500 yards
3  away that you think is suitable that was already approved by
4  you?
5    A      There is a site that -- on that lot, yes.
6    Q      Now, the site that you think is not
7  appropriate, that you now find is not suitable any more
8  because of the driveway --
9    A      Yes.
10   Q      -- is that more than 10 feet from the
11 driveway, the sewage module, where, you know, the --
12   A      The test --
13   Q      The area.
14   A      The little test pit is 10 feet away but
15 there's not room to put a system in and be 10 feet away.
16   Q      What kind of system? There's not room to put
17 what kind of -- any kind of system in?
18   A      The sand mound that was designed for that lot,
19 for that dwelling.
20   Q      And now I just need -- I know we're going
21 around in circles, but I'm really trying to understand your
22 position here. It's my understanding that you can approve
23 sewage modules without having an actual septic design in
24 front of you and you say this is suitable for some type of
25 septic system, correct?

---

83

1    A      Um-hum.
2    Q      And that's what you did the first time,
3  correct?
4    A      Yes.
5    Q      Now, the second time you're saying that there
6  was a septic design that Mr. Corneal had in mind for a sand
7  mound; is that what you're saying?
8    A      Um-hum. Yes.
9    Q      But now you're saying that this module -- or
10 that that couldn't be put in place at that site that you had
11 approved previously, but that was what he was requesting you
12 to do, right? Was he requesting you to approve a septic
13 system or was he requesting you to approve a sewage module?
14       MR. SHERR: I'm going to object to the form of
15 the question because that's a compound question.
16 BY MS. MONTGOMERY:
17   Q      Was he requesting you -- during the second
18 round, was he requesting the township to approve a sewage
19 module or a specific septic site, septic system?
20   A      The sewage module, but where I assigned the
21 sewage module I'm saying there's suitable sewage -- suitable
22 areas for that, and what I was -- the design was a little
23 ahead of its time, you know. I didn't need the design yet.
24   Q      Right.
25   A      But I took the design out and that's what was

---

84

1  proposed. There's not room to put that in. The way it
2  should be done is the sewage module approved, this area
3  staked off, if you're going to use that site, and then you
4  keep your driveways and your house and you keep everything
5  away from that, not illegally go in and do all this building
6  and driveways and disturbed sites and everything and then
7  expect this little area twice as big as this room to
8  accommodate a septic system.
9        MR. CORNEAL: We need to take a break a
10 second.
11       MS. MONTGOMERY: We can do it right here.
12       MR. CORNEAL: No, we need to take a break.
13       (Break taken.)
14 BY MS. MONTGOMERY:
15   Q      Mr. Parks, I want to show you a lot plan which
16 I think you should recognize. I'm going to move it around
17 so you can see it.
18       MR. SHERR: Are we going to have this marked?
19       MS. MONTGOMERY: Yes, when I'm ready. Right
20 now I'm just using it to talk to him.
21       MR. SHERR: Please, I'm just asking whether
22 you're going to mark it --
23       MS. MONTGOMERY: And I just answered you.
24       MR. SHERR: -- and whether we're going to
25 refer to it. You don't have to --

---

85

1        MS. MONTGOMERY: We're going to identify it.
2  We're going to do it all in good time.
3        MR. SHERR: Fine. That's all I was asking
4  you. My goodness gracious.
5  BY MS. MONTGOMERY:
6    Q      Mr. Parks, have you seen this plan before?
7        MR. SHERR: This plan being what will be
8  marked soon, we understand, so we'll refer to it on the
9  record as just this plan.
10       MS. MONTGOMERY: That's right, for now.
11       MR. SHERR: All right. And I object to the
12 form of the question. You can answer.
13       THE WITNESS: Not in this form.
14 BY MS. MONTGOMERY:
15   Q      You have not seen this plan in this form?
16       MR. SHERR: Object to the form of the
17 question.
18 BY MS. MONTGOMERY:
19   Q      Let's talk about this plan here. Have you
20 seen a plan of proposed subdivision from David and Sandra
21 Corneal for this David and Sandra Corneal property?
22   A      I've seen several of them, yes.
23   Q      What is it about the plan that I'm putting in
24 front of you right now that is different from the ones that
25 you've seen?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

86

1      MR. SHERR: I'm going to object to the form of
2  the question since the plan has not been marked nor referred
3  to in --
4      MS. MONTGOMERY: The rules don't require me to
5  mark it if I don't want to. Go ahead. Can he answer?
6      MR. SHERR: We don't have to argue objections.
7      MS. MONTGOMERY: Can he answer?
8      MR. SHERR: Of course he can. I'm just
9  stating my objection for the record.
10  BY MS. MONTGOMERY:
11     Q    Okay, let's answer.
12     A    This was two lots and this was a lot. There
13  was at least four. This was a lot -- oh, it is now too.
14     MS. MONTGOMERY: Do we have copies of this
15  exact --
16     MS. THORP: Yes, I just wanted to see what
17  he's referring to.
18  BY MS. MONTGOMERY:
19     Q    So you're saying you've never seen a proposed
20  subdivision plan --
21     A    I never saw this one, no.
22     Q    -- in this form?
23     A    No.
24     Q    April 7, 2000 is what it's marked. Well, if
25  you take a moment and look at this proposed subdivision plan

87

1  that's marked April 7, 2000, are you able to read it? Do
2  you understand what it --
3     A    Um-hum.
4     Q    -- represents?
5     A    It's -- I saw it in basic form but it had more
6  lots.
7     Q    Now, we're going to give you a pen and let you
8  mark for the record where you understand the Corneal's house
9  or proposed building to be.
10     A    Right there it has it.
11     Q    Why don't you mark it for us.
12     MR. SHERR: Again, I'm going to object to the
13  form of the question unless you tell me that you're going to
14  mark this and --
15     MS. MONTGOMERY: I just told you I was going
16  to mark it as an exhibit when I'm ready to mark it.
17     MR. SHERR: And make it as part of the --
18     MS. MONTGOMERY: I just told you that minutes
19  ago.
20  BY MS. MONTGOMERY:
21     Q    So here you go.
22     A    The proposed -- I didn't step it off and
23  measure and everything. The proposed house is fairly close
24  to where it is.
25     Q    Well, just for the record here, I'm going to

88

1  ask you to mark on this plan with this blue pen the spot on
2  the plan that you understand to be where the Corneals are
3  building.
4     MR. SHERR: If you can.
5  BY MS. MONTGOMERY:
6     Q    If you can.
7     A    Well, that's the surveyor's job. I -- just by
8  memory I can't -- I don't even know where the lines were.
9     Q    You can't read the plan?
10     MR. SHERR: No, he can't do what you asked him
11  to do.
12     THE WITNESS: I'm saying the proposed house is
13  close to where -- these two pits here -- if this is
14  accurate, these two pits have driveways and this probably
15  has -- is dug out stuff here. This pit is here, but the
16  driveway is all around it but it doesn't look like -- is
17  there a scale on this, an inch to a hundred maybe?
18     MR. SHERR: One inch to 700 feet.
19     MS. MONTGOMERY: We're going to mark this as
20  Exhibit 1, this April 2000 -- April 7, 2000 plan as Exhibit
21  1, Parks Deposition Exhibit 1. We may come back to it and
22  I'll ask you some more questions about it. We're going to
23  go to another subdivision plan and ask you to talk about
24  that one.
25     (Subdivision plan dated 4/7/00 produced and

89

1  marked as Parks Exhibit No. 1.)
2  BY MS. MONTGOMERY:
3     Q    I'm going to ask you to look at this
4  subdivision plan that's dated February 4, 2000 for the
5  Corneal property and ask you have you seen this plan before?
6     A    No.
7     Q    What plan did you see, do you recall?
8     A    It would have been when I met Dave Simpson in
9  the fall of '99.
10     Q    Well, we're going to ask you the same question
11  with respect to this February 4, 2000 subdivision plan. Can
12  you see on this plan where the Corneal's proposed building
13  for their personal home is?
14     A    I see it, yeah.
15     Q    Can you show it to me?
16     A    Right there.
17     Q    Can you circle it with this pen? Is there any
18  problem?
19     A    Yeah, I can circle it but --
20     Q    Okay, would you do that for me.
21     A    Is that all right?
22     MR. SHERR: If you feel confident, you know,
23  in your ability to show from your memory where on a scaled
24  map his proposed house would be, sure.
25     THE WITNESS: I don't know where this property

---

90

1   line is and that looks too close to the property line.
2   Right here -- if this is the scale of one inch equals 700
3   feet, those probes are 300 feet apart.  They were not 300
4   feet apart.  This is not --
5   BY MS. MONTGOMERY:
6       Q      But I'm not asking --
7       A      **It's not accurate enough for me to --**
8       Q      All I'm asking you to do is tell me where on
9   this plan --
10      A      **It's in this area.**
11      Q      -- you see -- and I will circle it.
12              MS. MONTGOMERY:  Let the record reflect that
13  Mr. Parks has pointed to the area that I circled.  Does
14  anybody disagree with that?  Anybody disagree with that?
15  All right.  Now let's look at -- which we're going to mark
16  in a minute.
17  BY MS. MONTGOMERY:
18      Q      Let's look at Parks Exhibit 1, the April 7,
19  2000 plan.  Can you point on this plan --
20      A      Same place.
21      Q      Same place.
22              MS. MONTGOMERY:  So let the record reflect
23  that Mr. Parks has --
24  BY MS. MONTGOMERY:
25      Q      Can you point to it, where you think it is?

---

91

1       A      **Well, it's in this area, yeah.**
2       Q      In this area.  This is where the Corneals
3   propose to build their property -- I mean their house, all
4   their buildings, right?
5       A      **Where the house is being built, yes.**
6       Q      Their personal houses, exactly.  Now, can you
7   also tell me -- let's work with me on this one now that you've
8   looked at it and you can see where the Corneals propose to
9   build.
10              MS. THORP:  This one being Parks Exhibit 1?
11              MS. MONTGOMERY:  Parks Exhibit 1.
12  BY MS. MONTGOMERY:
13      Q      Are there a number of sewage sites?
14      A      **There's a number of sewage probes, yes.**
15      Q      Near and around that --
16      A      **Yes.**
17      Q      -- property that I've circled, this area
18  that --
19      A      **On this map, yes.**
20      Q      Are these previously approved sites?
21      A      **This was an approved site which is -- no
22  longer exists.  The perc that I --**
23      Q      Let's stick with this one.  Let the record --
24              MR. SHERR:  Wait, let him finish his answer.
25              MS. MONTGOMERY:  No, we're going to stick with

---

92

1   this one.
2               MR. SHERR:  Well, you can't interrupt his
3   answer.
4               MS. MONTGOMERY:  No, I am going to interrupt
5   his answer because I want to be clear.
6               MR. SHERR:  Then I'll --
7   BY MS. MONTGOMERY:
8       Q      I'm going to point to this one.  You pointed
9   to this one and said this one no longer exists.
10      A      **Right.**
11              MR. SHERR:  Let me just object to the question
12  because I don't think the witness was done with his first
13  answer and he should be entitled to finish.
14  BY MS. MONTGOMERY:
15      Q      Are you finished telling me that this one no
16  longer exists, what I'm pointing to?
17      A      **Yes.**
18      Q      Then I want to talk to you about this one.
19      A      **Okay.**
20              MS. MONTGOMERY:  Now, let the record reflect
21  that you are pointing to an area that I guess I'll circle
22  with a red pen, if anybody has a red pen.
23              THE WITNESS:  If you'd just use the probe
24  numbers, that's the way I would refer to it.
25  BY MS. MONTGOMERY:

---

93

1       Q      And the probe numbers are what?
2       A      **Eight, 9 and 10.**
3       Q      So we're going to circle probe numbers 8, 9
4   and 10 and you say that this site no longer exists.
5               MR. SHERR:  Here's a black one.
6   BY MS. MONTGOMERY:
7       Q      Right?  Why does that no longer exist?
8       A      **Do you have the letter from Mr. Archmody that
9   was done last week?**
10      Q      No, I don't have it with me.
11      A      **He says on there that it's no longer suitable
12  because of compaction.**
13      Q      What would you have to do to make it suitable
14  -- no longer suitable for what?
15      A      **For sand mound.**
16      Q      Let's go back to your earlier testimony.  Did
17  you testify that first in the process of getting ultimately
18  a septic system on your property first you have modules
19  approved, correct?
20      A      **First you do the testing.**
21      Q      Right, first you do the testing and you have
22  your modules approved, you get them approved, right?
23      A      **Yes.**
24      Q      Then you send them off.  You approve them, the
25  township approves them, DEP approves them, correct?

---

94

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Then they come back -- |
| 3 | A | Yes. |
| 4 | Q | -- and then you issue an application, correct? |
| 5 | A | I send out an application, yes. |
| 6 | Q | For what? |
| 7 | A | A permit to put a -- install a septic system. |
| 8 | Q | And the septic system may or may not be |

9 suitable for the approved module and you'll figure that out
10 when you get the septic system design, correct, the
11 application with the septic system design; is that correct?
12    A    Say that again.
13    Q    Okay. Once the modules are approved --
14    A    Yeah, and I've sent out the application.
15    Q    You send out an application for a permit for a
16 septic system, right?
17    A    Yes.
18    Q    The module's approved first, septic system
19 approved much later --
20    A    Yes.
21    Q    -- correct? Permit issued much later?
22    A    Not necessarily much later, if things go
23 smoothly. We've done this where this all happened in a
24 month.
25    Q    So here you had an existing module that had

95

1 already been approved -- an existing site that had already
2 been approved by you according to a sewer module that you
3 signed, right?
4    A    There was an okay site there, yes.
5    Q    And you said that you now believe that it is
6 not suitable for a sand mound septic system?
7    A    That's correct.
8    Q    Why would that stop you from approving the
9 module anyway?
10      MR. SHERR: Objection, asked and answered.
11 BY MS. MONTGOMERY:
12    Q    From approving it?
13      MR. SHERR: I'm sorry, were you done?
14      THE WITNESS: I'm signing that there's -- the
15 proposed site is --
16      MR. SHERR: Mr. Corneal --
17      MR. CORNEAL: I was just stretching. Thank
18 you very much, Mr. Sherr, for paying attention to that.
19      MR. SHERR: I always pay attention to you.
20 BY MS. MONTGOMERY:
21    Q    Go ahead.
22    A    In the meantime I got the design for that.
23 Where that design was proposing to use, that site is no
24 longer available.
25    Q    But maybe you got a premature design. That

96

1 wouldn't necessarily stop you from approving the site or
2 some design because that's the first step, right, you
3 approve the site, you approve the sewer modules that
4 indicate that this is the site where you want to build,
5 right, where you want to put in your septic system? Not any
6 particular type of septic system but a septic system,
7 correct?
8    A    Well, it's limited to what type of system can
9 go in there.
10    Q    Right, but if one type can't go in, maybe
11 another type can and that's down the road after you approve
12 the modules, correct?
13    A    But the site still has to be there.
14    Q    Right, but the site is still there, correct,
15 but you just decided that you couldn't approve the module
16 because you couldn't put -- you didn't believe that you
17 could put a sand mound system in there; isn't that correct?
18    A    Not on that site.
19    Q    Could you put some other system in there?
20    A    There's -- possibly.
21    Q    So why not just approve the module, wait for
22 the formal application --
23    A    Well, if you're talking about the micromound
24 stuff, if you look at your paperwork you'll see that is
25 experimental and that still has to be DEP approved and --

97

1    Q    Right, but they all have to be DEP approved,
2 don't they? I mean, any septic system that goes in there
3 has to be DEP approved, correct?
4    A    It has to be done to DEP regulations, but DEP
5 doesn't actually have to approve it. It's already approved
6 in the regulations.
7    Q    So I'm going to ask you why not just approve
8 the module and wait for the formal application for a permit
9 to build a particular septic system there? Why didn't you
10 just approve the module, since it was already approved
11 before, and just wait? You didn't have a formal application
12 for that particular site, did you, for a permit?
13    A    Because we knew there was building going on in
14 that area. I was asked to make sure that the site was
15 there.
16    Q    That doesn't really answer my question. In
17 the normal course of events, you approve a module?
18    A    Normal --
19    Q    Everybody approves a module that has to do --
20    A    In the normal course of events -- sorry.
21    Q    That's all right. Go ahead.
22    A    In the normal course of events, people wait
23 until they have approval before they start building their
24 house.
25    Q    Right, but these aren't the normal course of

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

98

1   events, of course, here.  So going on we say -- what I'm
2   asking you is why wouldn't you just approve the module,
3   approve the site, sign off on the modules, just like you had
4   before, and wait for an application for a permit for a
5   septic system?  If it wasn't a suitable septic system, you
6   could deny it then.
7       A      It's just like you said, it's not a normal
8   circumstance.
9       Q      But nevertheless, normally that's exactly what
10  you would do.
11      A      Normally --
12      Q      And you didn't have a formal application, did
13  you, for -- you didn't have a formal application or a permit
14  for a specific septic system, did you, on that site?  Did
15  you?
16      A      I had a design which sort of indicates to me
17  that they were planning on doing something there.
18      Q      Well, if somebody had just given that to you,
19  would that be -- would that satisfy all the permit
20  requirements, all the application for permit requirements,
21  would it?
22      MR. SHERR:  Object to the form of the
23  question.
24      THE WITNESS:  Once I had an approved lot.
25  BY MS. MONTGOMERY:

99

1       Q      Well, we can talk in circles all you want, Mr.
2   Parks, but the question is pretty simple.  Did you have an
3   application for a permit --
4       A      No.
5       Q      No, because you didn't have a previous -- you
6   didn't have an approved signed off sewer module, right, and
7   that's the first step, right?
8       A      I didn't have a DEP approval letter that I
9   could do that.
10      Q      DEP approval letter for what?
11      A      That I could issue permits.
12      Q      Right, and that's because first you need
13  modules signed by you and the township, right?
14      A      Right.
15      Q      So first you sign the modules, send it up to
16  DEP, they send it back and then you get a permit for an
17  application for a particular septic system, right?
18      MR. SHERR:  Objection.  It's been asked and
19  answered.
20  BY MS. MONTGOMERY:
21      Q      But you denied -- correct me if I'm wrong, you
22  refused to sign off on the sewer modules the second time
23  around because you thought they were going to do a septic
24  system of a particular type, not because you had an
25  application for a permit and approved, you know, this or

100

1   that or the other thing but because you thought they might
2   want to build a particular type of septic system that you
3   decided ahead of time wasn't going to be appropriate,
4   right?  Is that right?
5       MR. SHERR:  Objection, argumentative.  You can
6   answer.
7       THE WITNESS:  Why did they send me that design
8   if they weren't planning on using it.
9   BY MS. MONTGOMERY:
10      Q      Well, your counsel says this has been asked
11  and answered so I guess we'll move on.
12      A      I can just go by what information I have.  And
13  when you get something in writing and here's maps and here's
14  letters and here's this and this, you must think, you know,
15  that's what they want to do, just like, you know, I saw
16  these with five lots and now I see them with three lots and
17  I see them there with three different lots and ...
18      Q      Working still with Exhibit 1 here, were there
19  any other sites on this plan that show previously approved
20  sites according to the sewer modules that you signed off on?
21      A      This is still proposed.  None of this -- you
22  know, these lines and stuff in here is proposed.  Right now
23  this 95 acres has other suitable sites.
24      Q      Right.  So why didn't you sign off on those
25  modules this time?

101

1       A      Nobody asked me to approve it on those.
2       Q      Well, the modules are all still in front of
3   the township, right?  The modules are all there waiting for
4   approval.  I mean, is there anything wrong with approving
5   this module?
6       MR. SHERR:  Objection to the form of the
7   question.
8       THE WITNESS:  Approving that site for that
9   lot?
10      MS. MONTGOMERY:  Yes.
11      THE WITNESS:  That could possibly be done.
12  BY MS. MONTGOMERY:
13      Q      So let's let the record reflect that we're
14  pointing to -- I pointed to on Parks Exhibit 1 an area that
15  has perc numbers 17, 18 and 20, correct?  Is that what you
16  were looking at?
17      A      Yeah.  Now, I'm not sure if 17 was okay, but
18  there was a good site there.
19      Q      So I'm going to draw with a red pen a circle
20  around where you say there is a good site, in this general
21  area?
22      A      Um-hum.
23      Q      A good site for building that was
24  previously --
25      A      I'm not sure about 17.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

102

```
 1    Q     So we'll draw 17 out of it, okay.  Any reason
 2  why Mr. Corneal can't build a septic system over here for
 3  his buildings over here?
 4           MS MONTGOMERY:  Let the record reflect I'm
 5  pointing to the 18, 20 septic --
 6           THE WITNESS:  It would be possible to do that.
 7  BY MS. MONTGOMERY:
 8    Q     Anyplace else on this map where it would be
 9  possible to put in a septic system in your opinion?
10    A     Has the line dispute been settled on this?
11    Q     What do you mean the line dispute?
12    A     That they met with Mr. Corneal and he
13  explained that the -- there was a line dispute on this lot.
14  This is -- this line is what this person claims and this
15  line is what --
16    Q     Well, does that have some influence on whether
17  or not you can approve any of these -- whether or not -- the
18  modules for the sites here?
19    A     If this belongs to -- does this belong to Mr.
20  Corneal?
21           MS. THORP:  Bridget, can you please identify
22  the area that you're referring to here.
23           MS. MONTGOMERY:  I'm sorry, we are pointing to
24  an area on Parks Exhibit 1 that's marked by perc numbers 24,
25  25, 26 and 27.
```

103

```
 1           MS. THORP:  Thank you.
 2  BY MS. MONTGOMERY:
 3    Q     So you're saying that if this line dispute --
 4  you tell me.  If this line -- if there is a line dispute and
 5  it has been resolved, is this a suitable place for a septic
 6  system?
 7    A     If that's on Mr. Corneal's property, that
 8  could possibly be a suitable site.
 9    Q     So why wasn't this site approved?  Why didn't
10  you sign the module for this site on the second round?
11    A     Again, I'm back to where they more or less
12  told me when they sent me the design they wanted to use that
13  site there.  When I met with Mr. Corneal and Terry Williams,
14  they didn't say, okay, we won't use this, we want to pipe it
15  500 yards to another site.
16    Q     So that's your reason that you wouldn't
17  approve for that?
18    A     Yeah.
19    Q     What about the area on Parks Exhibit 1 that's
20  marked by perc numbers 22 and 23?
21    A     I don't think they were any good.
22    Q     You don't think they were any good?
23    A     No.
24    Q     But is it a suitable --
25    A     I don't think it is.
```

104

```
 1    Q     Why is that?
 2    A     There's soil sheets in there.  I think there
 3  was unsuitable soil there.
 4    Q     Anything else?  Any other place here that you
 5  see on Parks Exhibit 1?
 6    A     Any of the sites, except for the backup site
 7  for the house, if they wanted to pipe it to that location
 8  and build the system, it would be possible to put a system
 9  in for where he's building his house.
10           MS. MONTGOMERY:  Let's mark the February 4,
11  2000 plan as Parks Exhibit 2.
12           (Site plan dated 2/4/00 produced and marked as
13  Parks Exhibit No. 2.)
14  BY MS. MONTGOMERY:
15    Q     I want to discuss with you a little bit more
16  this area that we've marked on Parks Exhibit 1 around perc
17  numbers 8, 9 and 10.  Why is that now not suitable for a
18  sand lot system?
19    A     It's not big enough for one.
20    Q     It's not big enough for one?
21    A     Right.  Eight and 9 probably have buildings on
22  -- or no, 8 and 10 probably have buildings on.  Nine is in
23  the middle of a little area that isn't big enough to put a
24  system on without going across disturbed area or driveway.
25    Q     What disturbed area?  So you're saying it's
```

105

```
 1  not big enough without using a disturbed area or the
 2  driveway, is that what you're saying?
 3    A     The undisturbed area isn't big enough for a
 4  sand mound.
 5    Q     In what way is the area disturbed that makes
 6  it now unsuitable for a sand lot system or not big enough
 7  for a sand lot system?
 8    A     Well, as Mr. Archmody describes it in his
 9  report, because of driveways and soil compaction.
10    Q     Now, when you talk about a driveway, what are
11  you talking about?  Are you talking about an asphalt
12  driveway?
13    A     Where they've been driving vehicles.
14    Q     Are you talking about an asphalt driveway?
15    A     No.
16    Q     You're talking about some tracks?
17    A     In one spot, yes.
18    Q     Is that the same area that you're talking
19  about compaction occurring?
20    A     Part of it, yeah.
21    Q     How do you resolve that?  How could you
22  resolve it to your knowledge?  Could you fix that site to be
23  okay?
24    A     That's something you should talk to a soil
25  scientist about.  It's an involved procedure.
```

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

---

106

1    Q    So you're not talking about this being too
2    close to like an asphalt driveway within the meaning of say
3    the regulations that say it has to be more than 10 feet from
4    a driveway? You're not talking about that, are you?
5    A    A driveway doesn't need to be blacktop.
6    Q    Well, that's true, but you're not talking
7    about an actual driveway, are you?
8    A    It appears to be driveways. When you drive in
9    the road and that's where the road goes is around to the
10   buildings and everything and there's been heavy trucks and
11   cars and there's been at least macadam shale put down, it's
12   a pretty substantial effort to make it a driveway.
13   Q    And you're saying it's within 10 feet of that?
14   A    It would be if you put the system in. You can
15   not put this system in without going over compacted areas.
16   Q    I understand your testimony to be that there's
17   an actual defined driveway now. You believe there's an
18   actual defined driveway. It's not blacktop, but it's a
19   defined driveway. Is there also another area that you
20   consider to be compacted?
21   A    Yes.
22   Q    Now, if you worked with the compacted area,
23   which is not a defined driveway -- is that correct, it's
24   just an area --
25   A    There is an area where there's been vehicles

---

107

1    running through that there's been no shale put on.
2    Q    It's compacted because somebody drove over it?
3    A    Many times.
4    Q    Have you ever been faced with that situation
5    where there's been some compacted soil on a proposed sewage
6    site?
7    A    Yeah.
8    Q    And what do you do?
9    A    Generally we refuse it.
10   Q    You generally refuse it?
11   A    Yes.
12   Q    Do you say because it's compacted soil and
13   here's what you've got to do?
14   A    Yeah, we usually try to find another site.
15   Q    Well, is there a circumstance in which you
16   didn't just try to find another site but you said, gee, you
17   drove over that and so it's not suitable so here's what
18   you've got to do make it suitable again?
19   A    That's something you should talk to the soil
20   scientist about. I'm not a soil scientist.
21   Q    But you are a sewage enforcement officer,
22   right?
23   A    Yes.
24   Q    So you have no idea as a sewage enforcement
25   officer -- and we're talking about a compacted area as

---

108

1    opposed to a defined driveway. You have no idea what you do
2    to make that okay?
3        MR. SHERR:  Object to the form of the
4    question. It's argumentative. You can answer.
5        THE WITNESS:  But this really has nothing to
6    do with the module. It would be possible to probably --
7    under a soil scientist's guidance to dig that out of there
8    and put fresh fill in, but then fresh fill has to set for
9    four years before it can be used.
10   BY MS. MONTGOMERY:
11   Q    Is it your opinion it needs to be dug out, put
12   fresh fill in and sit for four years?
13   A    If you wanted to use that again, I would want
14   to hear -- want a soil scientist to --
15   Q    To tell you what needs to be done?
16   A    To tell what needs to be done. That's why
17   they go to college for eight years and have a doctorate
18   degree.
19   Q    Mr. Parks, you've been referring to a letter
20   from a soil scientist, that you got a copy of a letter from
21   a soil scientist?
22   A    Yes.
23   Q    Did you turn that over to your counsel in the
24   course of our request for production of documents?
25   A    No.

---

109

1    Q    Any reason why not? Do you have a copy of it?
2    A    I have it in my pickup, but the supervisors
3    told me not to bring anything in.
4    Q    Not to bring anything into the deposition?
5    A    Yeah.
6    Q    What about just generally turning over
7    documents in response to a request for production of
8    documents, did anybody ask you to do that?
9    A    No.
10   Q    Nobody ever asked you to search your documents
11   in response to a request for production of documents?
12   A    Ann has the old documents.
13   Q    But you have other documents apparently, like
14   the soil scientist letter.
15   A    It just came, I think, yesterday.
16   Q    It just came yesterday, okay.
17   A    It was definitely this week.
18   Q    Do you have any other documents in your
19   possession that you thought were covered by an instruction
20   from the supervisors not to bring that relate to this
21   subdivision, these sewer modules, anything?
22   A    The thing I printed out of the regulations
23   that defines when a sewage module is needed.
24   Q    What's -- I mean, why do you have that, just
25   specifically for reference in connection with the Corneal

---

**PARKS, BARRY**
**05/16/01**

<div align="right">

**CORNEAL VS**
**JACKSON TOWNSHIP**

</div>

---

110

1  project?
2     A     Yeah.
3     Q     Where did you get that?
4     A     Out of regulations I have.
5     Q     Do you have anything else in your possession?
6  Not just in your truck, but anywhere in your possession?
7     A     Well, I have a complete set of the
8  regulations.
9     Q     Any other documents related to the Corneal's
10 project?
11    A     I have the map that Mr. Corneal gave me the
12 first day we met there and my original soil -- soil sheets.
13 This looks like the original one there maybe.
14    Q     Do you have any notes or correspondence of any
15 type from anybody other than the letter that you're
16 referring to from the soil scientist?
17    A     I can't think of anything else.
18    Q     What about the plan?  You said you had a plan
19 in your possession that you got from Mr. Corneal.  Did you
20 turn that over?
21    A     It's the original map that Mr. Corneal gave me
22 the day -- the first day we met there.
23    Q     So you still have that in your possession.
24 Well, okay, fine.  I guess you couldn't turn it over if
25 nobody ever really asked you to turn any documents over,

---

111

1  right?
2           MR. SHERR:  Object to the form of the
3  question.
4           THE WITNESS:  It was also the map, I believe,
5  that went with the first module.  It was just an extra copy
6  that ...
7  BY MS. MONTGOMERY:
8     Q     What about the documents that show the sand
9  mound system that you've been referring to, do you have
10 them?
11    A     I'd given a copy to the township.
12    Q     You gave a copy to the township.  In what
13 capacity, what context?
14    A     To show them what he has -- that I received it
15 and it's what he was proposing to put in back there.
16    Q     You have a copy of your own and you gave a
17 copy to the township, right?
18    A     The designer sent me three copies, yeah.
19    Q     Was there ever any other -- you know, any
20 design that was proposed for any other part of the -- any of
21 these other approved sites, previously approved sites on
22 Parks Exhibit 1?
23    A     There was no other designs that I received.
24    Q     At some point did you come to the conclusion
25 that a design that you had received was designed for the

---

112

1  wrong site on the map?  Did you tell somebody, oh, this was
2  -- I got this design, but it's a design for the wrong site?
3     A     No, I didn't tell them that -- oh, yeah, yeah,
4  it did have the wrong soil sheet on it.
5     Q     Tell me what design is that.  What are you
6  talking about, just tell me about it in general?
7     A     The site that I -- the design that I received
8  had the criteria on there as far as limiting zone and perc
9  rate and slope for one site, but it -- again, you're asking
10 me to -- it was -- it did have the numbers on for this right
11 here.
12    Q     Okay.  Can you point to that again?
13    A     (Indicating.)
14          MS. MONTGOMERY:  Let the record reflect that
15 on Parks Exhibit 2 Mr. Parks is pointing to the area on the
16 map that's marked by perc numbers 24, 25, 26 and 27.
17 BY MS. MONTGOMERY:
18    Q     So you received a design --
19    A     The design had this soil sheet on it -- the
20 two of them were mixed up.
21    Q     Let me ask you this:  Would that design have
22 worked there to the area that you just pointed to defined by
23 perc numbers 24, 25, 26 and 27?
24    A     I'd have to look at it again.
25    Q     Is that the sand mound design that you're

---

113

1  talking about?
2     A     Yes.
3     Q     That you've said now isn't suitable for the
4  areas marked by perc numbers 8, 9 and 10?
5     A     Um-huh.
6     Q     Mr. Parks, we had talked a little while ago
7  about a privy permit -- a request for a privy permit, I
8  should say, from Mr. Corneal, okay.  Did you receive any
9  telephone calls from any of the supervisors or Ann Wirth
10 about Mr. Corneal's request for a privy permit?
11    A     Not that I recall.
12    Q     Did you receive any instructions, whether in
13 person or by telephone or in writing, from Ann Wirth or any
14 of the supervisors about Mr. Corneal's request for a privy
15 permit?
16          MR. SHERR:  Objection to the form of the
17 question.  It's been asked and answered.  You can answer
18 it.
19          THE WITNESS:  I don't recall.
20 BY MS. MONTGOMERY:
21    Q     Do you recall talking to Ann Wirth whether in
22 person or by telephone about whether or not you should help
23 Mr. Corneal in any way in his effort to get an on-site
24 septic system?
25    A     I don't recall of talking to anything except

---

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

114

1  what was presented in the module. I'm always trying to make
2  the simplest way for everybody to get through this and on
3  with the other project, but you're asking me, you know,
4  5,000 conversations ago to remember ...
5      Q     Do you recall telling Mr. Corneal that you
6  were told not to do anything to help him get a privy permit
7  or anything else?
8      A     No.
9      Q     For the record, I'm going to ask you to
10  identify a series of documents and tell me what they are.
11      MS. MONTGOMERY: I have copies for counsel.
12  Here's your copy. You can share with your counsel.
13  BY MS. MONTGOMERY:
14      Q     I've just handed you a document, it's stapled
15  together. The first page on it has sewage facilities
16  planning module at the top. Can you look at that and tell
17  me whether or not you recognize the document?
18      A     Well, I know it's a sewage module.
19      Q     Related to what, Mr. Parks?
20      A     The Corneal subdivision.
21      MR. SHERR: Was this -- I'm sorry, was this
22  marked?
23      MS. MONTGOMERY: It's going to be marked. I
24  just told him that we're going to identify these for the
25  record.

---

115

1      MR. SHERR: It wasn't. I just didn't know
2  whether it was or not, that's all. Real simple.
3      MS. MONTGOMERY: No.
4      MR. SHERR: Keep it simple, easy.
5  BY MS. MONTGOMERY:
6      Q     Can you give me a little more detail on what
7  these are, Mr. Parks?
8      A     Well, this is the DEP form that gets submitted
9  to the township and then to DEP.
10      Q     And did you sign these?
11      A     Well, my signature is -- there's a copy of my
12  signature in here, yeah.
13      Q     So this is the sewage facilities planning
14  module submitted to you from Mr. Corneal's property,
15  correct?
16      A     Where is the original with my signature on
17  it?
18      Q     We wouldn't have it. The township would have
19  it or you would have it. We don't have it. I mean, are --
20  let's look at page 5 of this document.
21      A     Um-hum.
22      Q     Do you see where your signature is, Barry
23  Parks?
24      A     Yep.
25      Q     Is that your signature?

---

116

1      A     It's a copy of my signature, yeah.
2      Q     What's the certification number there?
3      A     2373.
4      Q     Is that your sewage enforcement officer
5  certification number?
6      A     Yes, it is.
7      MR. SHERR: I think the problem may be this is
8  all odd numbers and it appears as if they were -- it's
9  two-sided, the original is two-sided, and we don't have the
10  other side. If it's a copy you got from me, then I did copy
11  the other pages and attach them to the back of it.
12      MS. MONTGOMERY: You need to go get that
13  original group of documents. That might be the problem.
14      (Discussion held off the record.)
15  BY MS. MONTGOMERY:
16      Q     While she's out, I'm just going to ask you to
17  look at what exists here right now. We may have an
18  incomplete form of this document. Look at what is numbered
19  -- see where you have a page 5 and then the next page it
20  says project narrative? Do you see that?
21      A     Yeah.
22      Q     Do you recall this being submitted to you
23  along with the original sewage facilities planning module
24  submitted by the Corneals? Is this document familiar to you
25  as you're looking at the project narrative?

---

117

1      (Pause.)
2      THE WITNESS: Can you ask the question again?
3  BY MS. MONTGOMERY:
4      Q     Okay, Mr. Parks. There may be a couple pages
5  missing from this, but is this the sewage facilities
6  planning module that was submitted to you -- a copy of the
7  sewage facilities planning module that was submitted to you
8  by the Corneals that you signed off on?
9      A     Again, we're talking a year and a half ago. I
10  -- I don't think so.
11      Q     Why don't you think so?
12      A     It's not the way I remember the ...
13      Q     Well, let's go back to page 5, okay?
14      A     Yeah.
15      Q     See where it says Barry Parks?
16      A     Yeah.
17      Q     See where it says -- there's a box that is
18  checked that says generally suitable for on-lot disposal,
19  this module does not constitute individual permit approval,
20  right?
21      A     Yeah.
22      Q     Where your signature is and where that's
23  checked, is that generally how you sign off on a sewage
24  module?
25      A     Yes.

---

118

1    Q        So that would be an approval of the sewage
2    module right there, correct?
3    A        **That would be, yeah.**
4    Q        Let's go back to the perc tests which are on
5    this copy several -- the fifth page from the back, I
6    believe.  Site investigation and percolation test report for
7    on-lot disposal of sewage.  Is your signature down there on
8    the lower right-hand corner?
9    A        **Yes.**
10   Q        Does this indicate approval, satisfactory perc
11   test?
12   A        **Yes.  If we're talking about sites, that 4 and**
13   **5 doesn't look like -- site and garden.  That 4 and 5**
14   **doesn't look like my writing, but that is the site and the**
15   **garden, that is the alternate site for the farmhouse.**
16   Q        So this is approval of the perc test for those
17   sites, right?
18   A        **That's the alternate site for the existing**
19   **house.**
20   Q        Let's go to the next page.
21   A        **That site is 7-A.  It's the one down in back**
22   **of the pine -- little pine thicket there.**
23   Q        So is this also an approval, an approved perc
24   test --
25   A        **Yes.**

119

1    Q        -- report?  Signed by you in the lower
2    right-hand corner.  Okay, the next page.
3    A        **See right there I have marked lot 7.  This is**
4    **the one we did where Mr. Corneal explained to me how he was**
5    **going to build his house and his art studio and stuff.**
6    Q        And did you approve this --
7    A        **It was approved --**
8    Q        -- perc test?
9    A        **-- between probes 8 and 9, yes, which is the**
10   **site that I'm saying is no longer available.**
11   Q        Okay, how about the next one?
12   A        **That's the one that -- the day I was there the**
13   **younger brother was -- I assumed it was the younger brother.**
14   **He was there and he was looking at buying a smaller lot up**
15   **in the corner.**
16   Q        For the record, this is the page of this
17   sewage facilities planning module that has a handwritten
18   number 6 at the top, right, a handwritten number 6 up on the
19   top right-hand corner?
20   A        **Right.**
21   Q        Did you write that number 6 on there?  Is that
22   your handwriting?
23   A        **I don't think so.**
24   Q        Do you know what it refers to?
25   A        **No.**

120

1    Q        Is that your signature -- a copy of your
2    signature on the lower right-hand corner?
3    A        **Yeah.**
4    Q        And is this an approved perc test?
5    A        **Yes.**
6    Q        And for what perc numbers?
7    A        **Eighteen and 20.**
8    Q        Can you show on the document or refer for the
9    record to the place on the document that shows where this --
10   where the reference to the perc numbers are?
11   A        **The second place you circled in red.**
12   Q        But on this document here, how can you tell
13   that this is a perc test approved for perc numbers 18
14   and 20?
15   A        **I have it written there above the graph.**
16   Q        Where it says peaked between 18 and 20?
17   A        **Perked between 18 and 20.**
18   Q        I'm sorry, perked between 18 and 20?
19   A        **Yes.**
20   Q        Now, the next page, which is the last page of
21   this document, what is that?
22   A        **That's another approved perc site.**
23   Q        For the Corneal property?
24   A        **Yeah, it's the one that the soil sheet was**
25   **used for the design that I received.**

121

1    Q        So this is perc numbers -- between perc
2    numbers what, 24 and 26?
3    A        **Yeah.**
4    Q        Which you have handwritten and that's your
5    handwriting right above the graph in the middle of the page?
6    A        **Yes.**
7    Q        So you signed off on this perc test as well,
8    correct?
9    A        **Yes.**
10         MS. MONTGOMERY:  Tony, we just looked at the
11   original that you sent us and we do only have the odd
12   numbers.
13         MR. SHERR:  I don't think --
14         MS. MONTGOMERY:  It's not the original, it's a
15   copy.
16         MR. SHERR:  I don't think I sent this to you.
17   I was just looking for my production and I don't think I
18   sent this to you.
19         MS. MONTGOMERY:  We have it in a pile of
20   documents that we got on Friday afternoon.
21         MS. MALADY:  If you have the even numbers, if
22   you can fax them to me, we'd appreciate it.
23         MR. SHERR:  Yes, I don't -- I'm just looking
24   and I don't think I have -- all I'm saying to you is I don't
25   think I have it.

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

122

1      MS. MONTGOMERY: Well, maybe we're wrong.
2      (Discussion held off the record.)
3      MS. MONTGOMERY: Well, for now, until we get a
4  complete copy, we are going mark this as Parks Exhibit 3 and
5  we'll go from there.
6      (Sewage facilities planning module produced
7  and marked as Parks Exhibit No. 3.)
8      THE WITNESS: Can I say that I would like to
9  see a copy of the whole thing with my signature on it before
10 I say this is the way -- it hasn't been tampered with?
11     MS. MONTGOMERY: Sure.
12     THE WITNESS: Because we're all saying that
13 it's mixed up and --
14     MR. SHERR: To my understanding you haven't
15 said that. You've only identified this as your signature.
16 I don't think you've testified that this was --
17     THE WITNESS: It's been copied and that could
18 have came from -- what you're looking at right there could
19 have been pulled out of another sewage module that was okay
20 and stuck in there.
21 BY MS. MONTGOMERY:
22     Q      I mean, you already testified that you
23 approved the sewage module --
24     A      Yes.
25     Q      -- that was originally --

123

1      A      I did. I approved a sewage module. I thought
2  it was for more than -- just sitting here thinking about it,
3  I thought it was more than three lots, the original. That's
4  why I'm thinking this could ...
5      Q      There's four lots, Mr. Corneal is saying.
6      A      But, see, on the front page it says three lots
7  and the original one was -- you know, we have numbers back
8  here on these soil sheets for --
9      MR. CORNEAL: Can we go off the record for a
10 second?
11     MS. MONTGOMERY: We could. I don't mind.
12     (Discussion held off the record.)
13     THE WITNESS: They are my soil sheets and that
14 is a copy of my signature, although I have questions about
15 how this all is together here.
16 BY MS. MONTGOMERY:
17     Q      Mr. Parks, we talked about the moratorium that
18 you referred to some time ago. What was your understanding
19 of the effect of the moratorium on your process of reviewing
20 sewer modules and applications for permits?
21     A      Well, I still handle them the same way. If
22 they get to -- up to the moratorium and there's a moratorium
23 on it, it would just stop there till like Mr. Simpson --
24 well, not the Simpson -- the surveyor. There was another --
25 two brothers, the Simpsons, they were doing the same thing

124

1  **and they just waited until the moratorium was lifted, we**
2  **signed the module, sent it off when it was done and they're**
3  **putting roads in and getting ready to build legally.**
4      Q      But the moratorium was supposedly directed to
5  subdivisions, correct?
6      A      **Yes.**
7      Q      Not to sewer modules or to permits --
8      A      **Well, it's part of it.**
9      Q      But there wasn't a moratorium on you signing
10 off on sewer modules, was there?
11     A      **No.**
12     Q      Was there a moratorium on you signing off on
13 septic systems?
14     A      **Well, if there's a moratorium -- no, I could**
15 **still approve septic systems on approved lots. So if**
16 **somebody -- even during the moratorium, if somebody came**
17 **with an existing lot, we could still -- that's an existing,**
18 **it's already been subdivided, we could issue a permit on**
19 **that.**
20     Q      When did the moratorium go into place
21 according to your memory?
22     A      **That's really out of my -- you know, I'm --**
23     Q      I mean -- well, you said you were aware of it
24 so do you recall when it went into place?
25     A      **The winter of '99, 2000.**

125

1      Q      I'm going to hand you a series of documents
2  that we will mark as Parks Exhibit 4 and I'm going to hand
3  out copies to counsel, the same documents.
4      (Activity records produced and marked as Parks
5  Exhibit No. 4.)
6      MS. MONTGOMERY: Let's just look through and
7  make sure we have the same thing. They should start with --
8  folks, for the record, they should start with a document
9  that says activity record for enforcement of the
10 Pennsylvania Sewage Facilities Act. The first date in the
11 left-hand column being 1/26/00, John Younker. Does
12 everybody have that?
13     MR. SHERR: What was the first date?
14     MS. MONTGOMERY: 1/26/00.
15     MS. MALADY: It may be in reverse order.
16     MS. MONTGOMERY: Are they in reverse order?
17     MR. SHERR: That's okay.
18     MS. MONTGOMERY: If you can just reverse the
19 order, guys, then we can get started.
20 BY MS. MONTGOMERY:
21     Q      Mr. Parks.
22     A      Um-hum.
23     Q      Your first document, does it say 1/26/00?
24     A      Um-hum.
25     MR. SHERR: You have to say yes or no for the

126

1   court reporter.
2          THE WITNESS:  I'm sorry, yes.
3   BY MS. MONTGOMERY:
4    Q      Do you recognize this document?
5    A      **Yeah.**
6    Q      Did you fill it out or did you type it out
7   yourself?
8    A      **Yeah.**
9    Q      You did?
10   A      **Well, my wife types them.**
11   Q      So on the 1/26/00 column there it refers to
12  John Younker?
13   A      **Um-hum.**
14   Q      And just tell me what -- just reading across
15  what does that refer to in total?
16   A      **Activity described is an application.**
17   Q      Application for what?
18   A      **Sewage permit.  All applications are for a**
19  **sewage permit.**
20   Q      You mean so this is after already existing
21  modules were approved?
22   A      **Yep.**
23   Q      So this is an application for a sewage permit
24  for what?
25   A      **For a septic system.**

127

1    Q      And do you recall -- well, let me look at
2   this.  What's in the next column, 2/00?  Is that completely
3   unrelated?
4    A      **That's prepare and reimbursement forms for the**
5   **township.  That's something we have to do for DEP, reports**
6   **we send in at the end of the year.**
7    Q      So these are two completely unrelated
8   activities, correct?
9    A      **Yep.**
10   Q      So down in the right-hand corner it says
11  period covered February 2000.  Is this everything that you
12  did for Jackson Township --
13   A      **Yes.**
14   Q      -- for February 2000?
15   A      **Yes.**
16   Q      So this John Younker application for a --
17   A      **Um-hum.**
18   Q      -- permit for septic system -- is that what it
19  is?
20   A      **Yes.**
21   Q      Do you recall whether you approved that or
22  didn't approve it or what?
23   A      **I approved that.**
24   Q      When did you do that?
25   A      **Well, I --**

128

1    Q      Shortly thereafter?
2    A      **Yeah, existing lot.**
3    Q      It was for an existing lot?
4    A      **Yes.**
5    Q      So this was for an existing lot.  Did it have
6   any houses on it?
7    A      **No.**
8    Q      So it was for -- in connection with getting a
9   building permit, correct?
10   A      **Yeah.**
11   Q      Is it in any way subdivided?
12   A      **It was previously subdivided.**
13   Q      It was earlier subdivided?
14   A      **Yeah.**
15   Q      When?
16   A      **I don't recall exactly.  It was -- it seems**
17  **like it was -- it was one of those that took a good while**
18  **for the surveyor to get done.  I don't recall right off.  It**
19  **was one of the slower surveyors who did it.**
20   Q      Was the subdivision approved in 1999?  When
21  you say it was previously approved, was it a 1999 approval
22  to your memory?
23   A      **I don't remember.**
24   Q      Let's look at the next page.  It should say --
25  3/29/00 is the first date in the left-hand column.

129

1    A      **Yep.**
2    Q      Can you explain to me what that is?
3    A      **The Robert Treaster --**
4    Q      It looks like Treaster.
5    A      **I'm thinking that was a -- a camp.  It may**
6   **have even been on state land.  In Jackson Township there's a**
7   **lot of state leased land where they -- back in maybe the**
8   **early 1900's they sectioned off hundred-by-hundred squares**
9   **and people lease them to build a camp on and they own the**
10  **camp but they don't own the land.  Every 10 years the lease**
11  **renews.**
12          **When that lease renews, a lot of times the**
13  **park department, DC&A, send me out -- send me a letter to go**
14  **out and inspect there, which is usually a privy, but in some**
15  **cases a few of the real old ones -- they're not supposed to**
16  **have water on site so we usually update their privy.  If for**
17  **some reason -- a couple of them have water and there's no**
18  **room to put septics on so we put them in a holding tank.  I**
19  **think that's what that was.**
20   Q      So this application is for a holding tank?
21   A      **Yes.**
22   Q      What is a holding tank exactly?
23   A      **Waste carried by water to a sealed vault to be**
24  **pumped out and taken to another site.**
25   Q      So is it different than a privy?

**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

130

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Do you know -- |
| 3 | A | A privy there is no water involved. |
| 4 | Q | How did you dispose of this holding tank |
| 5 | application? |
| 6 | A | I issued a permit for it. |
| 7 | Q | And the next one is David Freeman, application |
| 8 | for tank replacement, right? |
| 9 | A | Yeah. |
| 10 | Q | What is a tank replacement? |
| 11 | A | It was one that had an undersized tank or a |
| 12 | tank that was damaged and an existing house.  Like if one |
| 13 | would go bad at Mr. Corneal's farmhouse, we would issue a |
| 14 | repair permit to -- just to put in a new tank.  You're not |
| 15 | allowed to modify the field drain any. |
| 16 | Q | So this is a holding tank replacement, is that |
| 17 | what you're saying or -- |
| 18 | A | A septic tank replacement. |
| 19 | Q | A septic tank replacement? |
| 20 | A | A holding tank there is no drain field. |
| 21 | Q | So you approved that, right? |
| 22 | A | Yes.  A repair -- both of these were basically |
| 23 | repairs and repairs we must do.  It's in regulations that |
| 24 | it's our responsibility to -- abatement of a health hazard. |
| 25 | Both of these were abatement of a health hazard and it's in |

131

| | | |
|---|---|---|
| 1 | the regulation and we must do that. |
| 2 | Q | The next page we have a document -- I guess it |
| 3 | might be easier to identify it by the reference in the lower |
| 4 | right-hand corner, period covered May 2000, right?  Do you |
| 5 | see that?  Do you have it? |
| 6 | A | Yep. |
| 7 | Q | And the first date on the left-hand corner is |
| 8 | 5/31/00, correct?  Can you tell me what that was, Debra Kerr |
| 9 | application for what? |
| 10 | A | It's not ringing a bell. |
| 11 | Q | Do you see the interim inspection and the |
| 12 | final inspection? |
| 13 | A | Um-hum. |
| 14 | Q | Does that help? |
| 15 | A | No. |
| 16 | Q | Now, let me ask you something.  I mean, you |
| 17 | would have actual written applications for these |
| 18 | activities -- |
| 19 | A | Yes. |
| 20 | Q | -- that we've been talking about? |
| 21 | A | Yes. |
| 22 | Q | Where are they kept? |
| 23 | A | When I'm done with them, I turn them over to |
| 24 | the township. |
| 25 | Q | What do they look like, the applications? |

132

| | | |
|---|---|---|
| 1 | A | Well, they're legal size paper.  The front |
| 2 | piece is white.  When I send them -- there are actually four |
| 3 | carbon copies.  There's a white one that stays at the |
| 4 | township, there's a pink one that goes to DEP, there's a |
| 5 | yellow one that goes to the applicant and there's a green |
| 6 | one that is sent into DEP after they are final inspected. |
| 7 | Q | So going back to the first two documents, the |
| 8 | application for John Younker, the application for the |
| 9 | holding tanks, they all go on the same type of application |
| 10 | form? |
| 11 | A | Yep, the form is the same. |
| 12 | Q | The form is the same? |
| 13 | A | Yep. |
| 14 | Q | And when you're finished with them, you send a |
| 15 | copy to the township, right? |
| 16 | A | When I'm totally done with it. |
| 17 | Q | And this is just one page typically, the |
| 18 | application? |
| 19 | A | The application is just one page, but there |
| 20 | may be there's a soil sheet that goes with it if it's -- |
| 21 | now, if there's a tank replacement or a holding tank or a |
| 22 | privy, there's no soil sheet, but there may be other guides |
| 23 | on how to install -- if it's a privy, how to install a privy |
| 24 | and isolation distances and -- it's written right on there |
| 25 | you can't have indoor plumbing and water on site. |

133

| | | |
|---|---|---|
| 1 | Q | So some of the applications are going to be |
| 2 | just the one page application, some of them are going to |
| 3 | have an attachment or two to them or something like that? |
| 4 | A | And if it's a sand mound or a system, it's |
| 5 | going to have a design like saying I received -- |
| 6 | Q | Like one of these, something like this or -- |
| 7 | A | No, it might have 15, 20 pages in it.  It |
| 8 | should be everything you need to know about -- |
| 9 | Q | The design? |
| 10 | A | -- installing that septic system. |
| 11 | Q | I see.  And then when you dispose of these, |
| 12 | when you say, okay, approved or granted or something like |
| 13 | that, what does that document look like? |
| 14 | A | There's just a place I sign off on. |
| 15 | Q | So it's the same application? |
| 16 | A | Yeah. |
| 17 | Q | And you just check off on that and that's a |
| 18 | freestanding form, correct, just a single form? |
| 19 | A | Yes. |
| 20 | Q | And it goes in a file in the township office? |
| 21 | A | Yes. |
| 22 | Q | Kept by whom? |
| 23 | A | Ann. |
| 24 | Q | Do you keep any copies for yourself? |
| 25 | A | Not usually. |

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

34

**PARKS, BARRY**
**05/16/01**

<div align="right">

**CORNEAL  VS**
**JACKSON TOWNSHIP**

</div>

134

1    Q      So you don't recall what Debra Kerr applied
2    for then?
3    A      No.
4    Q      Then we'll move on to the next sheet.
5    A      Although that -- I think that's one in Ken
6    Miller's subdivision.
7    Q      Ken Miller's subdivision?
8    A      Yeah.
9    Q      Tell me about Ken Miller's subdivision.
10   A      He had -- back Miller Road -- well, it's back
11   the road -- it's right across from Mr. Corneal's driveway.
12   The Millers have owned land two generations out there and
13   it's -- they used to be loggers and now Ken Miller's selling
14   -- subdividing. We've worked on this all through the
15   nineties. The last subdivision was approved '98 -- I'd say
16   '98, '99.
17   Q      So you think this was for --
18   A      This is one of the lots.
19   Q      A building lot in Ken Miller's subdivision?
20   A      They're big -- you know, it's the top of the
21   mountain.  He had probably 300 acres and he might have got
22   10 lots.  You know, it's real skimpy stuff.  They're big 20,
23   30 acre lots.
24   Q      So they're 20, 30 acre lots and so people are
25   building individual homes on them?

135

1    A      Yes.  I think Kerrs were up there.
2    Q      The next page says period covered May 2000.
3    Do you see that up in the left-hand column?
4    A      May 2000, yes.
5    Q      Then up in the left-hand column it says May 1,
6    2000, 5/1/00?
7    A      That year I probably issued four or five
8    permits in Mr. Miller's subdivision.
9    Q      So you think Drew Tomlinson --
10   A      I'm pretty sure McLaughlin is and -- I think
11   the other one is too.
12   Q      So these are permits for septic systems,
13   on-site septic systems?
14   A      Yep.
15   Q      For whatever, it might be sand mound, it might
16   be something other?
17   A      Up there they're all sand mound.
18   Q      They're all sand mound, okay.  So did you
19   approve Drew Tomlinson's and Mark McLaughlin's to your
20   memory?
21   A      Yes.
22          MR. SHERR:  Could we go off the record for a
23   second?
24          MS. MONTGOMERY:  Yes.
25          (Discussion held off the record.)

136

1    BY MS. MONTGOMERY:
2    Q      So now we're at --
3    A      If you'll look on this list here, Ken Miller's
4    subdivision was approved 9/16/97, Ken's Acres.  Now, wait,
5    that isn't it.  Kenwood was Ken Miller and Kenwood and --
6          MR. SHERR:  Just for the record, he's
7    referring to the document I gave you this morning.
8          MS. MONTGOMERY:  Right.  I was just asking
9    Leslie for my copy of that.
10         THE WITNESS:  Oh, right there it was.
11   3/24/99, 16 lots.
12   BY MS. MONTGOMERY:
13   Q      So let's move onto the next sheet which is
14   period covered June 2000.  Up in the left-hand column it
15   says 6/20/2000, June Price, is that ringing any bells with
16   you?
17   A      That -- Ken Miller's was a real happening
18   place there.
19   Q      So is this from the Miller subdivision?
20   A      I think so.
21   Q      And it's an application for an on-lot septic
22   system, right?
23   A      On an approved lot approved in -- prior
24   approved.
25   Q      The next page the period covered is June 2000?

137

1    A      I think that was a --
2    Q      It's page 2 of the period covered June 2000?
3    A      Yeah.
4    Q      I'm sorry, that was backwards.  This is page 1
5    of the period covered June 2000 and it begins 6/2/2000.  Do
6    you see that?
7    A      Yeah.
8    Q      Go ahead.
9    A      Again, there's an application for a holding
10   tank.  I think that was a little place that was just -- it
11   had water but there was no place left to put a system in.
12   So, again, abatement of a health hazard, it's our
13   responsibility to issue a holding tank as just a last --
14   last resort, when nothing else will do, short of tearing the
15   house down and making people move.
16   Q      What about William Couch, the next guy down?
17   A      Okay, that's a -- an existing farmhouse that
18   was sold and to sell it the realtors wanted dye tests.  The
19   gray water went to the creek, into the ditch, so I made them
20   put a new system in, which is what the site check, the
21   application -- that's a repair.  Again, that's our
22   responsibility to -- abatement of a health hazard.
23   Q      What's the application/alteration permit?
24   A      That one -- we later put a new system in, but
25   that one was to change the indoor plumbing so that the gray

<div align="center">

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

</div>

**PARKS, BARRY**
**05/16/01**

<div align="right">

**CORNEAL  VS**
**JACKSON TOWNSHIP**

</div>

---

138

1  water didn't go into the ditch, it went into the septic
2  system.
3      Q      The next one, Roy Augenstein?
4      A      That was for a subdivision I'd say done in
5  '98. It's over an icehouse above the Whipple's Dam Store,
6  old subdivision.
7      Q      So it was an application for what, I'm sorry?
8      A      A new house.
9      Q      For a septic system for a new house?
10     A      Yeah.
11     Q      Did you approve it?
12     A      Yes.
13     Q      Allen Crabtree/Watkins, what's that?
14     A      I -- that is not ringing a bell, but you need
15  to remember I do this in 18 townships and I look at -- I
16  issue a hundred permits a year.
17     Q      Okay, you remembered some of them. So that
18  one is not ringing a bell. Now, the next one it says for
19  period covered August 2000. Now, mine were reversed. So
20  it's page 1 of 2 and page 2 of 2 and I want to start with
21  page 1 of 2. Do you see there it says Joe Baker 8/2/2000?
22     A      Um-hum.
23     Q      Is that ringing a bell?
24     A      Yes.
25     Q      What is that?

---

139

1      A      I'm not seeing it.
2      Q      It should be page 1 of 2, period covered
3  August 2000. Look at the bottom of the one underneath it.
4      MR. SHERR: No, he doesn't have it.
5      MS. MONTGOMERY: You don't have it?
6      MR. SHERR: No.
7      THE WITNESS: No, but I know him. He'd done
8  an earlier -- Joe Baker, yeah.
9      MR. SHERR: I'll just show him my copy.
10     THE WITNESS: He had an existing house that
11  several years ago he -- oh, it was an existing trailer on
12  four or five acres. We had put a repair in several years
13  ago. There was a malfunction there. He bought it. He
14  wanted to build a house on the other half so he had
15  subdivided it. That had been going on for years.
16  BY MS. MONTGOMERY:
17     Q      Did you approve it? Did you approve his
18  application?
19     A      When I got the proper paperwork and it was
20  properly DEP approved and it was installed and everything,
21  yes. He followed the proper channels and I did approve it.
22     Q      I'm just asking if you approved Joe Baker's
23  application is all. Did you?
24     A      Yes.
25     Q      What about William Guyer?

---

140

1      A      Mr. Guyer had a couple different places that
2  he -- I don't know if he's retired and if this is kind of a
3  hobby for him or something. He built these two cabins.
4  They look like they were 20 some years old. I don't think
5  they've ever been lived in. They're three-quarter done. He
6  thought he was going to get ambitious and finish them and
7  put a septic system in. I did do testing but he's never
8  submitted an application so it's still --
9      Q      Did you approve the modules?
10     A      There's no module. This was prior to '72.
11     Q      So this just went right to a -- well, you did
12  a probe and a perc?
13     A      They're still on hold.
14     Q      So what's the application refer to, just
15  directly to an application?
16     A      I have an application I'm holding until he
17  gets me a design.
18     Q      And he has cabins up there now?
19     A      They're just little house cabins that he just
20  tinkers around with them, works on them once in a while but
21  nobody lives there.
22     Q      Do they have any septic up there at all now?
23     A      (Witness shook his head negatively.)
24     MR. SHERR: You have to answer out loud.
25     THE WITNESS: No. Nobody is living there.

---

141

1  They're not occupied.
2  BY MS. MONTGOMERY:
3      Q      So the one underneath William Guyer, that's
4  just the other cabin, right?
5      A      Yes.
6      Q      The next one down. Just for a point of
7  reference here, there's numbers under each of these people's
8  names, like R40132.
9      A      That's a DEP code number.
10     Q      It's a DEP code number. What's the R40132
11  refer to?
12     A      No, that's the application number, the DEP
13  number. That's not the module approval number, that's the
14  number -- each of these applications -- they come in a big
15  tablet. Every one of them, just like a bill sheet, has a
16  number.
17     Q      Well, some of them start with R and some of
18  them start with Q. What's the difference?
19     A      Out of two different tablets.
20     Q      That's it, okay. These two houses from
21  William Guyer are on the same lot, right?
22     A      I don't think so.
23     Q      You think they're on two different lots?
24     A      Yeah, the Guyers broke off a bunch of stuff in
25  the sixties, seventies. These are prior regulations which

---

142

1  is '72. If you read on top of the module there, it says
2  lots created after May 15th of '72 so we're -- up here.
3      Q     Oh, I see what you're saying, right.
4          MR. SHERR: The witness was referring to what
5  had previously been marked as Parks 3, I believe. I don't
6  know if it's been previously marked.
7          MS. MONTGOMERY: Parks 3, sewage facilities
8  planning module.
9          MR. SHERR: Yes.
10 BY MS. MONTGOMERY:
11     Q     The last -- well, is this the last page? No,
12 not quite. The next page is page 2 of 2 for the period
13 covered August 2000. Do you have that? It starts with
14 Stanley Wensell or something?
15     A     Yeah, Stanley Wensell. Augenstein, that's a
16 -- Stanley is the contractor. Augenstein, a hundred
17 dollars. It had to be a -- just a tank replacement.
18     Q     What about Keystone Financial, Yoder estate,
19 enforcement?
20     A     That was a real estate transfer that -- that a
21 finance company must have requested I do a dye test, or at
22 least a site check on it.
23     Q     Is it an existing lot or something?
24     A     Yeah. Well, if it's a real estate transfer
25 and I'm checking the septic, that means there's a house and

143

1  septic and everything there. They just wanted, for some
2  reason, it looked at to make sure it's not going into a
3  stream or something.
4      Q     What about period covered September 2000, page
5  1 of 1, Donald Dearment?
6      A     Dearment. That must have been -- we did nine
7  probes on it and three percs. We were looking for a -- it
8  was a repair. We had trouble finding a new site and it was
9  repairing a malfunctioning system.
10     Q     And where is this, in a development?
11     A     No, this would be an existing old house. And
12 Jerry Willey was the same thing, a house that maybe was
13 built in the fifties or sixties that now the system is a
14 malfunction so we try, if at all possible, to bring it up to
15 today's standards. Sometimes on lots in that area we have
16 to do a lot of looking around to find a suitable place.
17     Q     So you approved these applications, right?
18     A     Yes.
19     Q     The Willey and Dearment applications?
20     A     Yes.
21     Q     Now, 9/20/2000 -- I'm sorry, go to the next
22 page, period covered October 2000. Thomas -- what is that,
23 Henwood?
24     A     I don't have that one either. The next one --
25 the only one I have left is George Simpson.

144

1          MS. THORP: I have an extra one.
2          (Discussion held off the record.)
3  BY MS. MONTGOMERY:
4      Q     Are you looking at it?
5      A     Yeah.
6      Q     Thomas -- what is it, Henwood?
7      A     I think so.
8      Q     Did we already do him?
9      A     No, I don't think so. I'm not recalling that
10 -- that name. Raymond Tussey was a farmer who just got
11 remarried and they wanted to build a new house. He had a --
12 on his deed it was listed as two tracks of land. So the one
13 smaller track was like 20 acres and it was a vacant parcel.
14 He could -- that was treated as an existing lot because it
15 was existing. So we just did the testing. He didn't need
16 to do a module on it because he built it as one house on one
17 existing lot.
18     Q     So you treated it as an existing lot?
19     A     Yes.
20     Q     So what did he do with his old house?
21     A     I think one of his kids took over the farm.
22     Q     So you approved that. You just went right to
23 the septic system, right, and just approved that
24 application?
25     A     We did testing and permitted and put the

145

1  system in and everything else.
2      Q     Skipped the modules and went right to the --
3  right?
4      A     Well, we didn't have to do the modules. It
5  was a pre-'72 lot.
6      Q     What about this Mr. Esh/Camp Gunsmoke?
7      A     That's one of those state leased that I get
8  the letter on and have to go out. If it's not on a --
9  privy's not on a sealed vault, it's like the old ones used
10 to be with just a hole dug in the ground, we bring it up to
11 today's specs and put it on a sealed vault.
12     Q     This says application for a privy, right?
13     A     Yeah.
14     Q     So do you recall this project?
15     A     I think so. I think it's one of the ones
16 going over the mountain to State College.
17     Q     So you approved this application for a privy,
18 a privy permit?
19     A     Yeah.
20     Q     How about -- the last page I have is March
21 2001.
22          MS. MONTGOMERY: Is everybody else there?
23 BY MS. MONTGOMERY:
24     Q     George Simpson, what's that?
25     A     That was the other -- one of the subdivisions

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

146

1  that was caught in the moratorium. And when the moratorium
2  was over, they submitted their modules and got an approval
3  and got a permit.
4       I need to clarify something here. You
5  questioned if I approved these applications. If I -- if I'm
6  not going to approve it, I probably didn't send them an
7  application. Because if I think it's to the point where
8  it's going to work, I send an application. As long as I get
9  the design that's going to be suitable for that particular
10 repair or new house or whatever it is, I'm going to issue
11 the permit.
12      Q      Now, this George Simpson property, is that a
13 subdivision?
14      A      Yes, it was one that was tied up in the
15 moratorium and then it was -- and when the moratorium was
16 over, they submitted their plans in the process and got it
17 approved and I was able to issue them a legal DEP approved
18 permit.
19      Q      Did they have to go through the sewage module
20 phase or were they already there?
21      A      Again, they were there waiting for the
22 moratorium to be lifted, same as Mr. Corneal. They just
23 waited.
24      Q      So they had approved modules?
25      A      Yes.

---

147

1       Q      They had approved modules?
2       A      Yeah.
3       Q      Did you go back out and reinspect their
4  properties to make sure nothing was disturbed?
5       A      No, there's been no work done out there.
6       Q      So you didn't go back out and disturb -- or
7  inspect their property, that's fine. How many lots?
8       A      This Simpson's?
9       Q      Yes.
10      A      It was two brothers. They split like a
11 hundred and some acres.
12      Q      They split it into two big lots?
13      A      Yes.
14      Q      They're each going to build?
15      A      The one brother is real -- wanted to do it
16 right now, the other brother is going to eventually.
17      Q      So this is an application for a septic system?
18      A      Yes.
19      Q      What about -- and you approved it, right?
20      A      It was an approved lot.
21      Q      Hickory Hats, Timothy Lynch, what's that?
22      A      I don't recall, but sometimes I -- if these
23 are a transfer of title or something, the person I talk to
24 isn't necessarily the person that -- especially on a site
25 check. It was just somebody called and said I -- my

---

148

1  neighbor's -- I think my neighbor's septic is running over
2  on my driveway or something like that. A site check is just
3  I go out and physically walk over the land because there's
4  been a complaint.
5       Q      Let me ask you this: Do you keep copies of
6  these activity records for yourself?
7       A      Yes.
8       Q      Now, these were produced to us by the
9  township.
10      A      Um-hum.
11      Q      Or by your counsel anyway. And they start in
12 February 2000 and they skip March 2000.
13      A      Well, March of 2000 was a pretty bad winter.
14 Maybe I didn't -- sometimes -- I work on an as-needed
15 basis. If there's nothing going on there for three month,
16 I --
17             MR. SHERR: Let her ask the question. I don't
18 think she asked a question.
19             MS. MONTGOMERY: That's all right.
20 BY MS. MONTGOMERY:
21      Q      The question is -- really the question is
22 would you please search your records and provide me with --
23 or provide your counsel to provide me with activity records
24 that cover the period from June '99 to the present? We have
25 nothing before February 2000 and then after October 2000 we

---

149

1  have nothing until March 2001. So I'm just looking for the
2  rest of these documents.
3       A      Well, the March 2000 I'm pretty sure -- that
4  was in the middle of the moratorium and the middle of winter
5  and I just didn't do anything probably, but fall of '99 we
6  could do that.
7       Q      And what about after March 2001, any that you
8  have after that?
9       A      Well, we send these out at the end of the
10 month and in April of 2001 in Jackson Township we probably
11 didn't do anything there.
12      Q      What about May?
13      A      That's right now.
14      Q      This is May 2001.
15      A      I haven't done anything in Jackson Township in
16 the last month or so. So it probably ...
17      Q      There's a couple more documents I'm going to
18 try to take you through real quickly.
19             MR. SHERR: Could I just call Ann at this
20 point -- could we go off the record.
21             (Discussion held off the record.)
22 BY MS. MONTGOMERY:
23      Q      I just want to ask you one question real
24 quickly here before we go back to these documents. You had
25 testified that you wouldn't give Mr. Corneal a privy permit,

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

150

1  right, when he requested it?
2  A    Yes.
3  Q    Could you have given him a permit for a
4  holding tank?
5  A    Not for a new dwelling.
6  Q    You can't do that?
7  A    Not for a new dwelling. A holding tank for a
8  dwelling is if we have an existing dwelling -- say if the
9  farmhouse would have been on a half acre lot and we went out
10  there and tested for a -- and that system malfunctioned. We
11  went out and we couldn't find a spot to put in a new
12  approved system that meets regulations, then we have to
13  issue a holding tank. That's a Band-Aid. It's a last
14  resort. You know, we're ...
15  Q    Thank you. I'm going to show you a document
16  that we'll mark as Parks Exhibit 5 and ask you if you've
17  ever seen it. It's a February 8, 2000 letter from Blazosky
18  Associates. I have copies for counsel and for the court
19  reporter.
20       (Letter dated 2/8/00 produced and marked as
21  Parks Exhibit No. 5.)
22  BY MS. MONTGOMERY:
23  Q    Have you ever seen this document before?
24  A    It was part of the first module.
25  Q    Do you recall the substance of it?

151

1  A    It was a wetland report.
2  Q    And what does it say --
3  A    That none of the --
4  Q    -- do you recall?
5  A    The sites -- the way I remember it none of the
6  sites were wetlands.
7  Q    None of the sites that you picked -- or that
8  were actually tested?
9  A    (Witness nods head affirmatively.)
10  Q    So did this occur -- this letter come after
11  you approved the module?
12  A    I think it was part of the module.
13  Q    It was part of the module?
14  A    Yeah, I saw it before. I read through and I
15  -- my only question was -- at that time was, you know, the
16  lots they were talking about here -- see, they're talking
17  about five lots and it didn't -- that part didn't really
18  agree with the module but -- and I made a notation that I
19  was concerned about why they didn't coordinate, but, yeah, I
20  saw it before.
21  Q    And the report essentially says that there
22  aren't any wetlands?
23  A    There weren't any wetlands where it was
24  tested.
25  Q    So you saw this before you approved the

152

1  module, right?
2  A    Yeah.
3  Q    Did it influence your decision to approve the
4  module? You were satisfied that there weren't any wetlands?
5  A    In a favorable way, yeah.
6  Q    So you haven't encountered any wetlands on the
7  Corneal property in anyplace that the Corneals have sited
8  for placement of a septic system, correct?
9  A    Not the five sites that I approved, no.
10  Q    Does the township require a third party to
11  certify to you that there aren't any wetlands on a
12  particular proposed building site before you issue a sewage
13  module?
14  A    Well, you see on --
15  Q    Or before you approve a sewage module. Just
16  answer the question, does the township require you to get --
17  A    It's one of the things you check off and
18  that's what -- the page that's missing on the module is the
19  check-off list of things you look at on here and one of them
20  is wetlands and floodplain. There's 16 items. You know,
21  they have to show where the sites are and the slope and
22  existing dwellings and surface waters and it comes down to
23  agricultural land, wetlands, floodplain, you know.
24  Q    So in every application or in every request
25  for approval of sewage modules you would get a third party

153

1  to go and certify that there aren't any wetlands?
2  A    If somebody determined there was a question
3  about that.
4  Q    Well, who determines if there's a question
5  about it? In other words, can you walk the property and say
6  I don't see any wetlands and be satisfied with that?
7  A    I'm not certified to delineate wetlands.
8  Q    This is a third party certification that there
9  aren't any wetlands essentially, right?
10  A    And that's why I didn't have a problem with
11  it.
12  Q    And all I'm asking you is you say there's a
13  section on the sewage module form to check off whether there
14  are any wetlands, but you said you'd get a third party in if
15  there was a question about it. So how would you check it
16  off if there weren't any wetlands if there wasn't a third
17  party performing some sort of consulting service and
18  certifying that there aren't any?
19       MR. SHERR: I'm going to object to the form of
20  the question. You can answer.
21       THE WITNESS: Probably -- I'm not sure what
22  you're asking.
23  BY MS. MONTGOMERY:
24  Q    I'll ask you again. Do you ever check off
25  that -- a section on the module, their form, that there

**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

154

1  aren't any wetlands without having some sort of consultation
2  from an outside party?
3  A     Yeah, because there's a lot of lands that
4  there's no way there could be a wetland there.
5  Q     Who determines that, you do?
6  A     It depends. Every lot is different. And if
7  there's -- if it's a side of a mountain, you're not worried
8  about that or -- you know --
9  Q     Who asked to have a third party sign off on
10  the wetlands issue in this case?
11  A     I don't know.
12  Q     You have no idea?
13  A     It was just -- it appeared with -- it was with
14  the module when I got it.
15  Q     Back to the other question. In some
16  circumstances you can check off on the form no wetlands
17  without getting anybody involved, right?
18  A     Well, what I -- basically what I do when I get
19  the module, I'm not thinking about anything else. All I
20  look at when I approve a module is those 16 items on
21  that map. And when the surveyor fills it out, if he -- it's
22  his responsibility to mark the wetlands if they're there.
23  Q     That was my question. I was confused for a
24  minute.
25  A     He can look -- he has a book --

---

155

1  Q     So the surveyor marks no wetlands and the
2  surveyor is the one that fills out the module and -- right?
3  A     Sometimes they'll make a note in here, you
4  know --
5  Q     On the module where there's a place to check
6  off whether there's wetlands, the surveyor checks that off,
7  correct, the survey says yes or no?
8  A     You just -- if it's -- you need to notate it
9  on the map. And if it's not on there, I'm probably going to
10  assume that -- that it wasn't unless I had a suspicion that
11  -- you know, if I went down to do a pit and I walked up a
12  swamp to my ankles, I'm going to -- and it's not on there
13  I'm going to question that.
14  Q     Right. Did you question whether there were
15  wetlands on Mr. Corneal's property?
16  A     I had that form with the module saying there
17  wasn't so -- I'm not going to argue with the engineer.
18  Q     You weren't the one who raised it. You don't
19  know whether any of the supervisors questioned whether there
20  were wetlands and required a third party certification?
21  A     I thought Mr. Corneal did that for his own
22  information. It just -- it was with the module.
23  Q     We're finished with Exhibit 5. Last exhibit.
24  This is a -- it's going to be marked Parks Exhibit 6. I'll
25  give you a copy. I'm going to need to use this one.

---

156

1       (Letter dated 3/24/00 produced and marked as
2  Parks Exhibit No. 6.)
3  BY MS. MONTGOMERY:
4  Q     Did you have a minute to take a look at that?
5  A     Yeah.
6  Q     Have you seen this March 24, 2000 letter from
7  Blazosky before?
8  A     No, I haven't.
9  Q     You have not, okay. So you've never seen this
10  before. Did you know that the Army Corps of Engineers had
11  made a further inquiry into this property?
12  A     No.
13  Q     Did you know that? You had no idea?
14  A     No.
15  Q     Did you know that -- did you ever hear of a
16  complaint being filed in connection with the Corneal
17  property related to wetlands?
18  A     I wasn't aware of it, but I wouldn't
19  necessarily get notified of that unless it was, you know --
20  is there a map that goes with this? What are we trying to
21  decide here?
22  Q     I'm just trying to decide whether you know
23  anything about the letter and the Army Corps of Engineers
24  inquiring into wetlands on Mr. Corneal's property.
25  A     No, I didn't know anything about the Corps of

---

157

1  Engineers being on Mr. Corneal's property. And I knew that
2  the septic system there -- in fact, when Mr. Hewett called
3  me about that, he asked and I recommended him -- there was
4  some ruts in that septic area.
5  Q     By the farmhouse?
6  A     I said to make it last better you should -- on
7  dry -- real dry time grade some topsoil over it so surface
8  water wouldn't lay there. That system, I told him, is on
9  the edge. I didn't actually -- it isn't coming to what I
10  could call malfunctioning, but it's having problems because
11  the soil in there isn't that great and -- but if you get the
12  surface water away from it, you may -- and be careful with
13  your usage it may last longer. That's what I told him.
14  Q     So there was some wet area around that
15  farmhouse?
16  A     Well, it was just the grass grew good there
17  and there was some mower ruts.
18  Q     Understood. So you don't know anything about
19  anybody filing a complaint concerning wetlands on Mr.
20  Corneal's property?
21  A     No.
22  Q     I don't know if I asked you this question, and
23  I apologize if I already did, but did you ever discuss your
24  approval of the sewer module for the Corneal property with
25  the Huntingdon County Planning Commission?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

158

1    A    I don't think I ever talked to the planning
2 commission.
3    Q    Nobody ever called you or inquired about --
4 anything about it?
5    A    I don't recall of them, no. They rarely call
6 me about -- unless there's maybe a mix-up on the number --
7 some kind of a conflict that -- in the numbering of
8 something and then they might call me to clarify it.
9    Q    What about any of the other supervisors? And
10 if I already asked you, I apologize. I just don't
11 remember. It's been a while. Did you discuss your approval
12 of the sewer modules with any of the supervisors?
13    A    Not that I recall. Like I said, once I
14 approve the module, the next thing I'm involved with it is I
15 get a letter from DEP it's approved. Whether it takes a
16 month or a year, why I'm sort of out of the loop at that
17 point.
18    Q    What about Ann Wirth, did you discuss approval
19 of the sewer modules with Ann Wirth, or the sewer module?
20 It's one module.
21    A    Well, the first ones, you know, they had -- I
22 approved them. I never said I didn't.
23    Q    But then later --
24    A    Talking to people. Again, I'm talking to a
25 dozen people a day. Two years later I can't recall every

159

1 conversation.
2    Q    Did anybody in any capacity, whether with the
3 supervisors or Ann Wirth or the Huntingdon County Planning
4 Commission or anybody, ever discuss with you any instruction
5 not to assist the Corneals in developing their property?
6    A    Definitely not.
7    Q    Nobody has ever given you any instruction like
8 that?
9    A    I wouldn't pay any attention to it if they
10 did. I look at my job as to try to move things along and
11 get things done, not to hassle people and drag things out.
12 You'll see on the --
13    MR. SHERR: You've answered the question.
14 BY MS. MONTGOMERY:
15    Q    So if I understand what you talked about
16 earlier, there was an application -- a renewed application
17 for an on-lot septic system maybe for approval of the
18 modules that was submitted in connection with Terry
19 Williams; is that right, on the Corneal property?
20    A    They had a soil scientist out and he checked
21 for new sites.
22    Q    Was there a new application of any sort
23 submitted?
24    A    No. We have no application until we have an
25 approved module.

160

1    Q    A new module was submitted?
2    A    No, I think Tom Bowes, who is another sewage
3 officer who had the soil scientist come to the site, I think
4 he works with Terry Williams, Tom talked like he was going
5 to modify the modules to show this.
6    Q    Have you been involved in that process at all?
7    A    I had to be away the day -- they had the soil
8 scientist coming down. I didn't know it until the night
9 before, or maybe two nights before, but I couldn't be
10 there. Tom left them open. Tom and I will meet at a later
11 date and look at those sites.
12    Q    One other question for you. I think you
13 testified that Supervisor Wilson came with you when you went
14 back out to look at the Corneal property?
15    A    Yeah, but he only stayed and was meeting Terry
16 Williams about the driveway. The driveway when it was put
17 in was humped up and they were concerned the water from the
18 driveway was running out and washing the road. Tom never
19 went back in the property when I -- that I was aware of.
20    Q    You were out there with him at one point,
21 though --
22    A    We --
23    Q    -- that one day?
24    A    We stood at the end of the driveway waiting
25 for Terry Williams one day.

161

1    Q    Did you have any conversations about the
2 Corneal's efforts to get buildings on their property and
3 their efforts to get approval of their sewage module and so
4 on and so forth with Mr. Wilson?
5    A    I think we just talked about meeting Terry and
6 -- and about the things we had to do with him.
7    Q    Do you know anything about any interest that
8 Mr. Wilson has in this property?
9    A    No.
10    Q    Do you know anything about it?
11    A    No.
12    Q    How long have you lived in -- do you live in
13 Jackson Township?
14    A    No.
15    Q    Where do you live, which township?
16    A    Huntingdon. I live in the borough.
17    Q    How far is that away from the Jackson Township
18 area?
19    A    Twenty mile.
20    MS. MONTGOMERY: I don't think I have any
21 other questions. Anybody else?
22    MS. YANKANICH: I have some questions. I hope
23 everybody can hear me. My throat is a little bit scratchy
24 from the cold that I have.
25

**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

162

CROSS-EXAMINATION

BY MS. YANKANICH:

Q    After the moratorium was lifted, you said that
you met with Larry Newton to discuss the Corneal property.
What specifically did you discuss?

A    Well, there's the illegal buildings that are
being built on the property without proper permits.

Q    When did you have this meeting?

A    It's documented in the court.  Do you know
when those were?  I don't know -- they were -- we've had at
least three.

MR. SHERR:  You're referring to conferences
that occurred in Huntingdon County Court with Terry
Williams?

THE WITNESS:  Yes.

BY MS. YANKANICH:

Q    Then prior to the moratorium did you ever have
any contact with Larry Newton regarding the Corneal
property?

A    Prior to --

Q    The moratorium being lifted, I'm sorry.

A    I don't think so.  I don't think Larry -- I
don't recall of Larry getting involved with the Corneal
property until the lawsuit started.

---

163

Q    So you did not receive any advice from Larry
Newton regarding whether you should approve any sewer module
that was submitted by David Corneal?

A    I don't recall of Larry being involved until
the lawsuit started.

Q    Until the lawsuit started.

MS. YANKANICH:  I don't have any further
questions.

MS. THORP:  No questions.

CROSS-EXAMINATION

BY MR. SHERR:

Q    This meeting that Ms. Montgomery was just
asking you about that you had with Terry Williams and Tom
Wilson at the end of the driveway, when was that?

A    Early April, late March.

Q    Of 2001?

A    March or April.

Q    Of 2001?

A    Yes.

Q    And you referred to a letter you received from
a soil scientist, I think.

A    Yes.

Q    You received that in the last couple days?

---

164

A    Yeah, it was a copy of what he sent to Mr.
Corneal.

Q    And the original was sent to Mr. Corneal?

A    It has his name at the top, yeah.

Q    It had David Corneal's name at the top then?

A    Um-hum.

Q    You have to say yes or no.

A    Yes.

MR. SHERR:  Thank you.

MS. MONTGOMERY:  I do have one follow-up
question.

THE WITNESS:  I'm thinking the day Tom and I
were there waiting for Terry Williams -- I'm thinking he
didn't show up that day and I just left.  I don't think I --
I don't think I met Terry that day.

REDIRECT EXAMINATION

BY MS. MONTGOMERY:

Q    So it goes to what you asked.  I'm just going
to ask you one more question about Mr. Newton.  Do you -- in
connection with the Corneal property, have you been given
advice by Larry Newton about how to deal with this property
on which you relied?

A    Well, the only time I remember of -- was the

---

165

last meeting we had at the courthouse.  At the end of it
Terry Williams and Larry Newton were still in the courtroom
talking.  I went back in to specifically ask Terry Williams
when I got the you know, we were concerned about the site
there at the house being okay.

I went back in and specifically asked Terry,
when I get the module, is this saying that you have
permission to go in there and check this site and he said
yes.  And Terry -- and Larry was standing there at that
time.

The meetings -- we had pre -- all the
supervisors and the building officer and myself and Larry
and Terry Williams had two different meetings at the
courthouse --

Q    What about --

A    -- in a conference room.

Q    What about prior to the moratorium, did you --
in connection with the Corneal's property, did you rely on
any advice from --

A    I can't think that I --

Q    -- Larry Newton?

A    I don't usually talk to Larry unless I've got
a problem.

Q    Did you have any problems with the Corneal
property that you had to talk to him about?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

166

1   A   Through '99 I didn't think there was a
2   problem.
3   Q   Were you present at any meetings of the
4   township solicitors wherein Mr. Newton gave advice to the
5   supervisors about the Corneal property?
6   A   Just at those conference meetings that -- that
7   Terry Williams was there.
8   Q   What about like regular meetings of the board
9   of supervisors or special meetings of the supervisors, the
10  township supervisors?  Were you present at any meetings like
11  that wherein Larry --
12  A   I would say no, I've never been to a
13  supervisor's meeting where Mr. Corneal's property was
14  discussed.
15  Q   What about in general the issue of the
16  moratorium, were you present at any meetings where --
17  A   Well, again, I usually go to a township
18  meeting -- that's what I'm going to tonight.  If I've done a
19  sewage module, helped with the sewage module, we have land
20  development, I usually meet the surveyor there and we lay it
21  out on the table and explain to the supervisors what we've
22  done, what we are wanting approved.  If there's a
23  moratorium, there's none of that happening.  So I -- I
24  didn't go to any meetings during the moratorium.
25  Q   What about in connection with the proposed

167

1   subdivision ordinance, were you present at any meetings with
2   the supervisors wherein Larry Newton gave advice about a
3   proposed subdivision ordinance?
4   A   I can't recall that I was.
5   Q   Do you know of any other subdivisions that
6   have been disapproved in Jackson Township besides Mr.
7   Corneal's?
8       MR. SHERR:  Object to the form of the
9   question.
10  BY MS. MONTGOMERY:
11  Q   That have not been approved.
12  A   Well, there's been ones that weren't approved
13  the first time, but then they just go back and they make the
14  changes needed and you just keep working at it until we work
15  it through.
16  Q   Which ones can you recall that weren't
17  approved the first time?
18  A   Well, that Ken Miller, you know, this had been
19  going on since I -- 10 years before I started out there he
20  had been nibbling at this and bringing it back and doing
21  stuff and ...
22  Q   Do you recall what the supervisor's concerns
23  were with respect to the Miller subdivision?
24  A   Not right off the top of my head, no.
25  Q   You don't recall?

168

1   A   (Witness shook his head negatively.)
2   Q   I'd just to like make a part of the record the
3   order that Judge Rambo issued this morning.  Have you had a
4   chance to review it?
5   A   (Witness shook his head negatively.)
6   Q   Well, I'm going to give it to you and ask
7   you --
8   A   Is this mine?
9   Q   And ask you to review it.  Correct, that's
10  your copy.
11  A   This stuff is mine to take or am I leaving
12  this here or --
13  Q   Well, anything that's marked as an exhibit
14  isn't yours to take.  The copies you can take with you.  I'm
15  going to have Judge Rambo's order marked as Exhibit 7, Parks
16  Exhibit 7.
17      (Order produced and marked as Parks Exhibit
18  No. 7.)
19      THE WITNESS:  It just means that I don't talk
20  about it, correct?
21      MS. MONTGOMERY:  Correct.
22      THE WITNESS:  In plain language.
23  BY MS. MONTGOMERY:
24  Q   In plain language.
25  A   Okay.

169

1   Q   Do you understand that you're not supposed to
2   talk to the other deponents --
3   A   I understand.
4   Q   -- or the other defendants about the substance
5   of your deposition or their depositions?
6   A   Yes.
7       MS. MONTGOMERY:  That's it.
8       (The deposition was concluded at 3:40 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

170

1
2  COUNTY OF DAUPHIN          :
                              : SS
3  COMMONWEALTH OF PENNSYLVANIA   :
4         I, Teresa K. Bear, Reporter-Notary Public,
5  authorized to administer oaths within and for the
6  Commonwealth of Pennsylvania and take depositions in the
7  trial of causes, do hereby certify that the foregoing is the
8  testimony of BARRY PARKS.
9         I further certify that before the taking of
10  said deposition, the witness was duly sworn; that the
11  questions and answers were taken down stenographically by
12  the said Teresa K. Bear, a Reporter-Notary Public, approved
13  and agreed to, and afterwards reduced to typewriting under
14  the direction of the said Reporter.
15         I further certify that the proceedings and
16  evidence are contained fully and accurately to the best of
17  my ability in the notes taken by me on the within
18  deposition, and that this copy is a correct transcript of
19  the same.
20         In testimony whereof, I have hereunto
21  subscribed my hand this 31st day of May, 2001.
22
23         _____
           Teresa K. Bear, Reporter
24              Notary Public
           My commission expires
25              on April 13, 2003



```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
 3  DAVID B. CORNEAL AND SANDRA Y.
    CORNEAL,                         :
 4            Plaintiffs             :
 5       VS                          :   NO. 1:00-CV-1192
 6  JACKSON TOWNSHIP, Huntingdon     :
    County, Pennsylvania, W. THOMAS
 7  WILSON, Individually and in his  :
    Official Capacity as Supervisor
 8  of Jackson Township, MICHAEL     :
    YODER, Individually and in his
 9  Official Capacity as Supervisor  :   JURY TRIAL DEMANDED
    of Jackson Township, RALPH
10  WEILER, Individually and in his  :
    Official Capacity as Supervisor
11  of Jackson Township, BARRY PARKS,:
    Individually and in his Official
12  Capacity as Sewage Enforcement   :
    Officer of Jackson Township,
13  DAVID VAN DOMMELEN, Individually  :
    and in his Official Capacity as
14  Building Permit Officer, ANN I.   :
    WIRTH, Individually and in her
15  Official Capacity as Secretary   :
    of Jackson Township, and
16  LARRY NEWTON, Individually and in :
    his Official Capacity as Solicitor:
17  to Jackson Township,             :
             Defendants
18
19      DEPOSITION OF:  DAVID SIMPSON
20      TAKEN BY:       DEFENDANTS
21      BEFORE:         NICOLE L. ZIMMERMAN
                        NOTARY PUBLIC
22
23      DATE:           JULY 10, 2001, 1:10 P.M.
24      PLACE:          THE DAYS INN
                        240 SOUTH PUGH STREET
25                      STATE COLLEGE, PA  16801
```

```
 1                    I N D E X
 2  BY DEFENDANTS                         EXA
 3  DAVID SIMPSON
      By Mr. Sherr                         4
 4    By Ms. Montgomery                   25
 5
 6
 7
 8
 9
10              E X H I B I T S
11  SIMPSON'S EXHIBITS          MARKED   PRODUCED
12  No. 1 - Notice of Deposition and   4      6
             and Subpoena
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1  A P P E A R A N C E S:
 2  ECKERT SEAMANS
      BY:  BRIDGET MONTGOMERY, ESQUIRE
 3         LESLIE A. MALADY, ESQUIRE
      213 Market Street, Eighth Floor
 4    Harrisburg, PA  17101
           FOR - PLAINTIFFS
 5
    MAYERS, MENNIES & SHERR, LLP
 6    BY:  ANTHONY R. SHERR, ESQUIRE
      3031 Walton Road
 7    Building A, Suite 330
      P.O. Box 1547
 8    Blue Bell, PA  19422-0440
           FOR - JACKSON TOWNSHIP, MR. WILSON,
 9         MR. YODER, MR. WEILER, MR. PARKS,
           MR. VAN DOMMELEN & MS. WIRTH
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                    4
 1              STIPULATION
 2
 3       It is hereby stipulated by and between
 4  counsel for the respective parties that sealing,
 5  certification, and filing are waived, and that all
 6  objections except as to the form of the question are
 7  reserved to the time of trial.
 8
 9       DAVID SIMPSON, called as a witness, being
10  sworn/affirmed, testified as follows:
11       (Notice of Deposition and Subpoena premarked
12  Simpson Exhibit No. 1.)
13
14              EXAMINATION
15
16  BY MR. SHERR:
17       Q    Could you please state your full name for
18  the record?
19       A    David Allen Simpson.
20       Q    What's your address, Mr. Simpson?
21       A    Rural Route 1, Box 284-A, Huntingdon,
22  Pennsylvania, that's with a D, and the zip code is
23  16652.
24       Q    Mr. Simpson, I just met you a couple minutes
25  ago.  My name is Anthony Sherr.  I represent Jackson
```

DEFENDANT'S EXHIBIT 9

5

1 Township and some individual defendants in a lawsuit
2 filed against them by David Corneal and Sandra Corneal,
3 which is currently pending in the United States
4 District Court for the Middle District of Pennsylvania.
5        We're here today to take your deposition
6 pursuant to a subpoena.  Have you ever been deposed
7 before?
8    A    No.
9    Q    I just want to give you some ground rules.
10 I'm going to be asking you some questions, you've been
11 placed under oath and expected to answer truthfully.  I
12 ask that you give all of your answers out loud, orally
13 so that the court report can take it down.
14        She can't take down nods of the head or
15 shrugs of the shoulder and that sort of thing, so I ask
16 that you answer orally.
17        I ask that you wait until I'm done asking my
18 question before giving an answer, and likewise, I'll
19 wait until you're done answering before asking another
20 question.
21        If you don't understand my question, please
22 ask me to clarify it.  If you don't hear my question,
23 please ask me to repeat it.  If you answer the
24 question, we're going to assume that you both heard and
25 understood the question.

MLP REPORTING, INC.  (570) 748-1041

6

1        If you need to take a break for any reason
2 during this proceeding, please let us know, and we'll
3 accommodate that.  And Ms. Montgomery is here, who
4 represents David Corneal in this matter, and she may
5 have some questions for you after I've completed asking
6 you questions, okay?
7    A    Yes.
8    Q    I placed in front of you what I've had
9 marked as Simpson Exhibit 1 and I've asked you to look
10 at that and you reviewed that, correct?
11   A    Yes.
12   Q    And that's the Notice of Deposition and
13 Subpoena for you for attendance here today, right?
14   A    Yes.
15   Q    And the second page of the subpoena has a
16 request for documents?
17   A    Yes.
18   Q    Did you bring documents with you today?
19   A    Yes, I did.
20   Q    What documents did you bring with you today?
21   A    Everything that I collected and assembled
22 during the course of preparing a subdivision proposal
23 for the Corneals.
24   Q    And could we just briefly go over what those
25 documents are?

MLP REPORTING, INC.  (570) 748-1041

7

1    A    Okay, they would be --
2    Q    I mean, do you have them and we can just
3 flip through them and you could just, for the record,
4 state what they are?
5        For the record, I just want to generally
6 state what you have here.  First is a plan showing the
7 David B. and Sandra Y. Corneal property dated December
8 27, 2000.  Is there a number of copies of this?
9    A    Right, there are numerous copies and copies
10 of drawings that were used during the construction of
11 that final plan.
12   Q    Okay.  And that there's also plans dated
13 February 4, 2000; April 7, 2000, and that's the first
14 packet.  The second packet of plans --
15   A    Those would the final subdivision plans.
16   Q    The second packet of plans is dated February
17 4, 2000, and then there's also a plan of proposed
18 subdivision dated April 7, 2000, and there's one
19 December 27, 2000.  So these are the final plans, what
20 we talked about first were sketches and drafts, I
21 suppose?
22   A    That's correct.
23   Q    And what is that next packet?
24   A    This particular drawing is a copy of the
25 Huntingdon County tax map for Jackson Township showing

MLP REPORTING, INC.  (570) 748-1041

8

1 the properties in the area of the Corneals.
2    Q    And you got this from the county courthouse?
3    A    That's correct.
4    Q    What are the rest of those documents?
5    A    These are, again, various drawings that were
6 used during the construction phase or the layout design
7 for the subdivision and also some background
8 information relating to other properties.
9    Q    Okay.  And you also have, it looks like an
10 overlay, 1996 D.A. Simpson survey overlaps the 1975
11 F.D. Gay survey.  What is this document that I'm
12 looking at?
13   A    That's showing the information pertinent to
14 a boundary discrepancy that we found between the
15 Corneal property, which at the time of my initial
16 involvement in here was -- my survey was for Paul and
17 Katherine Michael, the previous owners of the property.
18   Q    And so these documents that I'm looking at
19 right now were done to deal with this border dispute?
20   A    Those particular documents were done to put
21 the information on a sheet of paper for Mr. Corneal so
22 that he could understand the background of that
23 particular boundary.
24   Q    Now, you've also provided a manila folder
25 that says Corneal, David B. and Sandra Y., Jackson

MLP REPORTING, INC.  (570) 748-1041

9

1 Township, Huntingdon County, subdivision of the former
2 Paul and Katherine Michael property. And is this your
3 file related to Mr. Corneal?
4     A    Yes, it is.
5     Q    You've also provided us with a file that
6 says Paul L. Michael, M-I-C-H-A-E-L, Jackson Township,
7 Huntingdon County and you had worked for Mr. Michael on
8 the same property prior to being engaged by
9 Mr. Corneal?
10     A    That's correct.
11     Q    And another file for Paul L. Michael. I
12 guess that would be the second part of that same file?
13     A    Yes.
14     Q    And you've finally provided three it would
15 appear to be calendars. And why did you provide these
16 calendars?
17     A    Those would have information of the various
18 times that I was working on Mr. Corneal's subdivision.
19         MR. SHERR: Off the record for a second.
20         (Discussion held off the record.)
21 BY MR. SHERR:
22     Q    Did you review anything in preparation for
23 today's deposition?
24     A    No, I didn't.
25     Q    Did you discuss today's deposition with

11

1     Q    And did you have any other technical or
2 vocational training after those two years?
3     A    The requirement for licensing as a surveyor
4 in Pennsylvania requires that you serve a six-year
5 apprenticeship under a licensed engineer or a licensed
6 surveyor before you can make application to take the
7 registration examination.
8     Q    And did you take the examination?
9     A    Yes, I did.
10     Q    When did you take the examination?
11     A    My license is dated, I think, March of 1978.
12     Q    And that's licensed as a registered surveyor
13 in the State of Pennsylvania?
14     A    Yes.
15     Q    Are you licensed in any other state?
16     A    No.
17     Q    Do you have continuing education
18 requirements?
19     A    No, as of now, there are no requirements for
20 that.
21     Q    Do you have to renew the license
22 periodically?
23     A    Yes, every two years.
24     Q    Are you familiar with Jackson Township?
25     A    In what respect?

10

1 anybody?
2     A    I told several people that I had a
3 deposition to attend, certainly I had no way of
4 discussing the content.
5     Q    Did you talk to Mr. Corneal about it?
6     A    No.
7     Q    When is the last time you saw Mr. Corneal
8 before today? You're referring to your 2001 calendar?
9     A    Yes. I think it was January 3, this year,
10 2001.
11     Q    And on what occasion did you see him?
12     A    I delivered five copies of the survey plans
13 to him.
14     Q    Were these new survey plans or were they
15 survey plans that had previously been done?
16     A    I think they would have been the copies of
17 the December 2000 survey.
18     Q    I just want to get a little of your
19 educational background. What's the highest level of
20 formal education that you completed?
21     A    I attended two years of Penn State at the
22 Penn State campus in Mont Alto, Pennsylvania, in
23 surveying technology.
24     Q    And what years were they?
25     A    That would have been until June of 1972.

12

1     Q    Well, just generally with respect to
2 development of land in Jackson Township.
3     A    As far as I knew up until just more
4 recently, there was no township subdivision or zoning
5 ordinance governing requirements of subdivision.
6     Q    Were you familiar with the board of
7 supervisors of Jackson Township?
8     A    Not really, no.
9     Q    Prior to working on what was first the
10 Michael property and then the Corneal property, had you
11 done any other work in Jackson Township?
12     A    Yes, I'm sure I did, although, I can't
13 specifically recall what particular properties.
14     Q    Do you recall when you were first contacted
15 by Mr. Corneal to do anything for his property?
16     A    I would have to check the --
17     Q    Could you, please? And you're looking now
18 at your 1999 calendar?
19     A    Yes. The one file that I have with
20 Corneal's name on it, there might be something in there
21 that would save me time.
22     I have what I think to be my first meeting
23 with Mr. Corneal as July 8, 1999.
24     Q    And there is a little piece of paper with
25 handwritten notes which indicated that to you?

13

1    A    Yes, that's correct.

2    A    I see in the 1999 calendar book, references
3 to Mr. Corneal prior to that.  I have a note in the '99
4 calendar book of having met with Mr. Corneal on the
5 site of his property Saturday, June 26, 1999.

6    Q    Do you recall what it was that Mr. Corneal
7 asked you to do?

8    A    At that time of the Saturday meeting, I have
9 noted that it was a meeting on site for review of
10 proposed subdivision requirements.

11    Q    And you met him on the site, and the site
12 being his property in Jackson Township?

13    A    That's correct.

14    Q    And you say for review of proposed
15 subdivision requirements?

16    A    Yes.

17    Q    Who asked for this meeting, Mr. Corneal?

18    A    Yes.

19    Q    And what do you mean by review of proposed
20 subdivision requirements?

21    A    As it's termed here, I met with him to see
22 what his requirements were as to lot layouts and that
23 sort of thing.

24    Q    So is it your understanding looking at that
25 note and refreshing your recollection that you knew

14

1 prior to June 26 that Mr. Corneal desired to subdivide
2 his property?

3    A    I have no note of his initial call to set up
4 that meeting.

5    Q    And that's really not what I was looking
6 for, but was it your understanding that he was
7 contacting you to help him subdivide his property?

8    A    Yes.

9    Q    Was there any other purpose that you know of
10 as to why he was retaining your services?

11    A    Not to my knowledge.

12    Q    And do you recall what he wanted to do in
13 terms of subdivision, what he told you?

14    A    I think at that time, as best I can recall,
15 that he wished to lay out approximately nine lots.

16    Q    And did he give you an indication at that
17 time what he wanted to do with those lots, if you
18 recall?

19    A    Not specifically that I recall.

20    Q    Do you do most of your surveying work within
21 Huntingdon County?

22    A    Yes, in the general area.

23    Q    So you're familiar with subdivisions
24 generally within the county?

25    A    Yes.

15

1    Q    With respect to Jackson Township in
2 particular, after Mr. Corneal made the request, did you
3 do anything to ascertain what would be required in
4 terms of township and/or county approvals?

5    A    Most times, when asked to do a subdivision
6 in any particular municipality, at some point during my
7 preparation, I would contact the Huntingdon County
8 Planning Commission to find out whether that township
9 has a subdivision ordinance and what the date of the
10 latest revision is.

11    Q    And do you recall doing that in this
12 instance?

13    A    Not specifically, but I'm sure I did.

14    Q    And do you recall what you learned when you
15 contacted the Huntingdon County Planning Commission?

16    A    It's my recollection that Jackson Township
17 at that time did not have a subdivision land
18 development ordinance.

19    Q    Was there an indication from the county
20 planning commission when you contacted them, if you
21 recall, that they were working on an ordinance?

22    A    Not at that time, I don't think.

23    Q    Did there come a time where you found out
24 that they were working on a subdivision ordinance?

25    A    Yes.

16

1    Q    Do you recall when that was?

2    A    On January 25 in the calendar book dated
3 2000, I have a note that I had called Ann Wirth of
4 Jackson Township to -- the purpose of that call at that
5 time was to find out the date of their next monthly
6 township meeting.

7        And it's my recollection at that time that
8 she told me the date of the next regular meeting, and I
9 believe she asked me the purpose of my call, at which
10 time I would have informed her that it was regarding a
11 subdivision.

12        It was at that time that she informed me
13 that they were working on -- that Jackson Township was
14 working on adopting a township subdivision ordinance.

15    Q    Did she also tell you that there was a
16 moratorium on new subdivisions within the township?

17    A    Yes, she did.

18    Q    And is that what you believe to be the first
19 time that you heard about that, on January 25?

20    A    I believe so, yes.

21    Q    Did you convey this information to
22 Mr. Corneal?

23    A    Yes.

24    Q    What did he say, if you recall?

25    A    I really don't recall.

17

1    Q     Had you contacted the township at any time
2  prior to January 25, 2000, with respect to the work
3  that you were doing for Mr. Corneal and his
4  subdivision?
5    A     Not to my knowledge.
6    Q     As of January 25, 2000, had you completed
7  the plans for the proposed subdivision?
8    A     I would say no, the earliest plan date that
9  I see here on my completed subdivision plans is
10 February 4 of 2000.
11   Q     Why were you contacting the township to find
12 out when their next meeting was?
13   A     So that I could finish the work that I was
14 progressing on prior to their township meeting.
15   Q     Why did you want to finish the work prior to
16 the township meeting?
17   A     I think Mr. Corneal expressed a desire to
18 have this information to the township for their very
19 next meeting.
20   Q     Do you know why Mr. Corneal wanted that
21 information to go to the township?
22   A     I'm sure that I had told Mr. Corneal that
23 it's been my understanding in any subdivision in any
24 municipality that because of sewage facilities
25 installation on a property anywhere that the proposal

MLP REPORTING, INC.   (570) 748-1041

18

1  would include something like that, that the township
2  supervisors must give their permission to subdivide.
3    Q     And did this subdivision plan have
4  provisions for sewage facilities?
5    A     Yes, it did.
6    Q     Now, I may have already asked this, and I
7  apologize, do you recall the discussion you had with
8  Mr. Corneal when you informed him about the moratorium
9  that you were informed about by Ann Wirth?
10   A     I really don't recall specifics of that
11 particular conversation.
12   Q     Did you attend the township meeting in
13 February?
14   A     No, I did not.
15   Q     Have you ever attended a township meeting of
16 the Jackson Township board of supervisors?
17   A     Not to my knowledge.
18   Q     Now, the plan that was drawn up in February
19 -- well, with the date of February, February 4, 2000, I
20 think you said?
21   A     Yes.
22   Q     How many lots were proposed on that plan?
23   A     At that time, there were three lots
24 proposed.
25   Q     Why did it go from the original idea of nine

MLP REPORTING, INC.   (570) 748-1041

19

1  lots down to three, if you know?
2    A     That, I really don't know.  It was simply
3  reduced -- the number of lots was reduced at
4  Mr. Corneal's request.
5    Q     Did the plan of the proposed subdivision
6  have to be submitted to the Huntingdon County Planning
7  Commission?
8    A     As I understand it, that is at the township
9  officials discretion.
10   Q     And did you ascertain whether or not in
11 Jackson Township their discretion is to have the plans
12 submitted to the planning commission?
13   A     I don't specifically recall doing that.
14   Q     Do you recall submitting the plans to the
15 Huntingdon County Planning Commission?
16   A     Not personally, no.
17   Q     Do you know whether they were?
18   A     I think that they were.  I think that one of
19 my survey files contains two separate review letters
20 issued from the planning commission.
21   Q     Do you know what happened at the February
22 township meeting with respect to the subdivision plan?
23   A     No.
24   Q     Were you asked to revise the plans at any
25 time after the February meeting?

MLP REPORTING, INC.   (570) 748-1041

20

1    A     Yes, I was.
2    Q     Who asked you to revise them?
3    A     Mr. Corneal.
4    Q     Do you know why he asked you to revise those
5  plans?
6    A     Not specifically.
7    Q     Do you know generally any reason why you
8  were asked to revise the plan?
9    A     I think because in order to revise the
10 subdivision plan to create fewer lots, it would have
11 perhaps made things easier to get through the planning
12 commission's approval.
13   Q     And did you, in fact, revise the plans?
14   A     Yes, I did.
15   Q     What's the date of your first revision?
16   A     The next consecutive plan concerning the
17 Corneal property is dated April 7 of 2000.
18   Q     And how many lots were on the April 7, 2000,
19 plan?
20   A     Only two proposed lots at that time.
21   Q     Did you have any discussion with Mr. Corneal
22 about why he went from three lots down to two lots?
23   A     Not his specific reasoning, however, I did
24 convey to Mr. Corneal that in my experience, the
25 creation on the February 4 plan of such an extended

MLP REPORTING, INC.   (570) 748-1041

21

1 right-of-way to serve Lot No. 3 generally raises
2 eyebrows at the planning commission.
3     Q     Now, did you have anything to do with the
4 preparation of sewage modules?
5     A     I prepared the Pennsylvania Department of
6 Environmental Protection sewage module, the component
7 one.
8     Q     For which plan?
9     A     For both the February 4 plan and also the
10 April 7 plan.
11     Q     And the module that you prepared for the
12 February plan, was that different than the next module
13 that was prepared for the April plan?
14     A     Yes, there would have been changes on it,
15 specifically the number of lots and other things that I
16 don't recall just at the moment.
17     Q     Were there any other revisions that you made
18 to the plan and the proposed subdivision after April?
19 In other words, were there any other plans that you
20 made?
21     A     Yes.  Yes, I have a plan showing the
22 David B. and Sandra Y. Corneal property that is dated
23 December 27, 2000.
24     Q     And how many lots are on that plan?
25     A     It's just the one survey showing the entire

MLP REPORTING, INC.   (570) 748-1041

22

1 boundary of the Corneal property with no attempted
2 divisions of the property.
3     Q     Do you know why you were asked to prepare
4 the plan with the December date on it?
5     A     Only at Mr. Corneal's request.
6     Q     You don't know why he requested that?
7     A     Not specifically, no.
8     Q     Did you have any discussions with him about
9 the preparation of the December plan?
10     A     I'm sure I did.
11     Q     That you recall, obviously.
12     A     Nothing stands out in my memory.
13     Q     And what is that December plan?  What did he
14 ask you to do?
15     A     He asked that I prepare a drawing showing
16 the entire property that he and his wife owned with the
17 positioning of the soil probes and percolation tests
18 that were done by the township's sewage enforcement
19 officer and the soil types as they are discernable from
20 the Huntingdon County soil survey, which is put out by
21 the United States Department of Agriculture.
22     Q     Did you, other than the two sewage modules
23 that we talked about, one in conjunction with the
24 February plan and one in conjunction with the April
25 plan, did you prepare any other sewage modules for

MLP REPORTING, INC.   (570) 748-1041

23

1 Mr. Corneal?
2     A     Not that I recall.
3     Q     Did you have any discussions with
4 Mr. Corneal about the approval process or what went on
5 with his proposed plans?
6     A     I'm sure I would have conveyed to
7 Mr. Corneal the general process of subdividing a piece
8 of property as best I understood it at the time.
9     Q     Very briefly, what was your understanding at
10 the time that you probably explained to Mr. Corneal?
11     A     That in any subdivision, the township
12 supervisors were required by the Pennsylvania DEP to
13 review and approve subdivision plans whether or not
14 they had an ordinance, this was strictly in compliance
15 with the Department of Environmental Protection
16 policies.
17     Q     Other than the three plans that you prepared
18 that we've talked about and the two sewage modules, did
19 you prepare anything else for Mr. Corneal?
20     A     There were — the documents we looked at
21 earlier with the information concerning the boundary
22 discrepancy and I think there were additional drawings
23 concerning the neighboring property.
24           It's my recollection that Mr. Corneal wanted
25 those because he was contemplating purchasing at least

MLP REPORTING, INC.   (570) 748-1041

24

1 a portion of the neighboring property.
2     Q     Did you have anything to do with the design
3 of any structures on the properties?
4     A     No.
5     Q     The location of any structures?
6     A     No, I would have simply shown the proposed
7 location of a structure in the position that
8 Mr. Corneal would indicate so that it could be shown on
9 the subdivision plan.
10     Q     Do you recall meeting with the SEO, the
11 sewage enforcement officer, Mr. Parks, sometime in the
12 fall of 1999 concerning Mr. Corneal's property?
13     A     I met with Barry Parks at the Huntingdon
14 County Courthouse one morning to get some insight as to
15 the positions for several of the soil probes, some of
16 the soil testing that he had done that I had not been
17 able to find on the property.
18     Q     So you couldn't find the test sites on the
19 property?
20     A     That's correct.
21     Q     And you met with Barry Parks in order to get
22 information which would enable you to find those test
23 sites?
24     A     That's my recollection, yes.
25     Q     Do you recall meeting with Barry Parks at

MLP REPORTING, INC.   (570) 748-1041

25

1 any other time concerning the Corneal property?

2     A    No, I don't.

3     Q    Other than a discussion concerning the test

4 pit sites on the property, did you have any other

5 discussion with Mr. Parks about the Corneal property?

6     A    I don't think so.

7     Q    Do you know a person by the name of George

8 Simpson?

9     A    Yes.

10     Q    Who is George Simpson?

11     A    Somebody I knew many years ago.  I don't

12 know who he is in any other capacity.  I would

13 recognize him.

14     Q    Did you have anything to do with his

15 subdivision or proposed subdivision in Jackson

16 Township?

17     A    I don't think so.

18         MR. SHERR:  I don't have any other

19 questions.  Thank you.

20         MS. MONTGOMERY:  One moment, please.

21         (Discussion held off the record.)

22

23                 EXAMINATION

24

25 BY MS. MONTGOMERY:

                MLP REPORTING, INC.   (570) 748-1041

---

26

1     Q    Mr. Simpson, I'm Bridget Montgomery, and I

2 represent the Corneals in this action, and we just met

3 a moment ago.  I just have a couple of questions for

4 you.

5         I think you testified a few moments ago that

6 you contacted Ann Wirth on January 25, 2000, to inquire

7 into when the next township meeting would be, correct?

8     A    That's correct.

9     Q    When you called her, did you tell her who

10 you were calling on behalf of or whose subdivision plan

11 you were looking to present?

12     A    I may have at some time during the

13 conversation.  It wasn't a long conversation, but I

14 don't specifically recall mentioning an individual.

15     Q    Okay.  You testified, also, about some DEP

16 requiring township supervisors to review and approve

17 certain subdivision plans?

18     A    Yes, particularly where there would be, as I

19 mentioned before, proposed sewage facilities

20 installation.

21     Q    So exactly what were they reviewing them

22 for?  Let me ask that question a little better.

23 Exactly what were the township supervisors required to

24 review such plans for?

25     A    It's my understanding the State Sewage

                MLP REPORTING, INC.   (570) 748-1041

---

27

1 Facilities Act requires the municipal officers in any

2 municipality to review subdivision proposals to make

3 certain that the sewage facilities proposed for the

4 development are adequate.

5     Q    And does the township sometimes pass that

6 task on to the county planning commission?

7     A    Yes, my understanding is that the county

8 planning commission will review and make

9 recommendations to any municipal officers as to their

10 findings in reviewing subdivision plans.

11     Q    Did Mr. Corneal, in the course of you

12 preparing the successive subdivision plans for him, did

13 he ever tell you why he kept cutting down the number of

14 proposed lots?

15     A    Not that I specifically recall.

16     Q    Did he ever tell you that his plans were

17 being — his ability to subdivide was being challenged

18 by the township at all?

19     A    I think he may have mentioned something

20 along those lines, but again, I don't specifically

21 recall the wording or the exact occasion.

22     Q    Did you have any understanding of why you

23 were preparing, you know, successive subdivision plans

24 with fewer and fewer lots?

25     A    Only based on my presumption that he felt

                MLP REPORTING, INC.   (570) 748-1041

---

28

1 the need to do so.

2     Q    Now, you testified, I think, that you had

3 some involvement with the sewage modules on

4 Mr. Corneal's property?

5     A    Yes, I would have prepared the sewage module

6 forms with all of the information that I could provide

7 on them.

8     Q    Oh, the forms?

9     A    Yes.

10     Q    I see.  For submission to whom?

11     A    They would initially go to the township and

12 the planning commission if the planning commission were

13 being asked to review this, but they would also then

14 have to be submitted to the Department of Environmental

15 Protection for their review and their approval, also.

16     Q    Did you prepare successive versions of the

17 sewage modules, as well?

18     A    Two, to my recollection.

19     Q    Okay.  Do you recall why you had to prepare

20 a second version?

21     A    Information pertinent to the second

22 subdivision proposal that is required within the form

23 would have been different than the first.

24     Q    I see.  Did anybody else work on the sewage

25 modules with you?

                MLP REPORTING, INC.   (570) 748-1041

29

1    A    No.

2         MS. MONTGOMERY:  I don't have any other

3 questions.

4         MR. SHERR:  I don't have anything further.

5 Thank you very much for your time, Mr. Simpson.

6         (The deposition concluded at 1:52 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MLP REPORTING, INC.   (570) 748-1041

---

30

1 COUNTY OF UNION         : ss
2 COMMONWEALTH OF PENNSYLVANIA:

3

4         I, NICOLE L. ZIMMERMAN, Reporter-Notary

5 Public, authorized to administer oaths within and for

6 the Commonwealth of Pennsylvania and take depositions

7 in the trial of causes, do hereby certify that the

8 foregoing is the testimony of DAVID SIMPSON.

9         I further certify that before the taking of

10 said deposition, the witness was duly sworn; that the

11 questions and answers were taken down stenographically

12 by the said NICOLE L. ZIMMERMAN a Reporter-Notary

13 Public, approved and agreed to, and afterwards reduced

14 to typewriting under the direction of the said

15 Reporter.

16         I further certify that the proceedings and

17 evidence are contained fully and accurately in the

18 notes taken by me on the within deposition, and that

19 this copy is a correct transcript of the same.

20         In testimony whereof, I have hereunto

21 subscribed my hand this 12th day of July, 2001.

22

23         _____
                 NICOLE L. ZIMMERMAN
24               Notary Public

25 My commission expires
   on May 24, 2003

MLP REPORTING, INC.   (570) 748-1041

P. 04

*Env. Plan —*

DEFENDANT'S
EXHIBIT
10

# HUNTINGDON COUNTY — PLANNING COMMISSION

(814) 643-5091

Court House - Huntingdon, Pennsylvania  16652

February 24, 2000

Mrs. Ann L. Wirth
Jackson Township Secretary
R.D 1, Box 390
Petersburg, PA 16669

RE:    David and Sandra Corneal Minor Subdivision

Dear Mrs. Wirth:

The Huntingdon County Planning Commission has reviewed the above referenced proposal to subdivide a property containing 94.67 acres into three lots. Lot 2 (the residue) contains 64.12 acres; Lot 3 contains 4.75 acres and Lot 4 contains 25.80 acres. Lot 1 was previously subdivided and is not included in this proposal. The property is located on the east side of Saw Mill Road (T-527) in Jackson Township. It is our understanding that Jackson Township has placed a moratorium on new subdivisions pending the adoption of a Subdivision and Land Development Ordinance.

The staff of the Planning Commission offers the following comments for your consideration:

1. The proposal is consistent with the draft Huntingdon County Comprehensive Plan. The land use proposed by the Plan for this area is Low Intensity Residential Use.

2. There are several physical limitations evident at the location of this proposal. Steep slopes (over 15%) can be found near the eastern boundary of the property in this proposal. No building construction should take place in steep slope areas. The soil types At, Atkins Silt Loam, and Ph, Philo and Basher Silt Loam, exist along Laurel Run, which runs through all the proposed lots. These are hydric soils and are typically found in wetland areas and near streams. The proposed house, studio, and sewage system for Lot 2 are within these soil types.

Blazosky Associates, Inc conducted a Wetlands Investigation of the project area for the developer. Further investigation should be done prior to approval to identify if wetland areas exist at the proposed construction site due to the snow cover during the

♻ recycled paper

*Wirth 11*

investigation and because maps submitted with the investigation did not identify the areas studied. No construction should take place in wetlands areas. No floodplains exist in the area of this proposal.

3. The Jackson Township Supervisors are in the process of adopting a Subdivision and Land Development Ordinance. The following comments are based on the draft Jackson Township Subdivision and Land Development Ordinance:

4. A new street is proposed on the plat to provide access to the lots in this development. Private streets (streets not offered for dedication to the Township) are prohibited unless they meet the design standards of the Ordinance (Section 502.A.6). This proposal would not be classified as a minor subdivision by the Ordinance. The definition of a Minor Subdivision in Section 204 is any subdivision containing not more than 4 lots fronting an existing street.

5. The proposal must comply with all requirements of Section 402, Preliminary Plan, and Section 403, Final Plan.

6. The following information required by Section 402 does not appear on the plat submitted:

Existing contour lines (Section 402.A.9).

Location and width of all streets, easements, right-of-ways, with a statement of any conditions governing their use (Section 402.A.14.a).

Building Setback lines along each street (Section 402.A.14.b). Building Setbacks are as follows: 40' from all right-of-way lines, 15' from property lines (Section 504.C 4,5).

Stormwater management information (Section 402.A.17.a through c).

Supplementary data as applicable (Section 402.B).

Section 403 requirements A through B.

7. The proposed street must also comply with Section 502 of the Ordinance. This section contains the required widths and specifications for a minor street. The Huntingdon County Planning Commission proposed a private driveway standard to Jackson Township in comments of the draft Ordinance on February 4, 2000. This standard, if adopted, in the Ordinance would provide a minimum standard for streets of this type.

8. A stream crossing will be necessary for the street to provide access to the lots as proposed. The developer indicated that he acquired the permit for this crossing. A copy of this permit must be submitted with other data to the Township prior to approval.

9.  A sewage easement is proposed for Lot 3 to use a portion of Lot 2 for the installation of a sewage system.  The easement should be described on the submitted plat (bearings, distances, acreage) so that a description can be included in each lot deed affected.

10.  The developer's surveyor indicated on the plat that a boundary discrepancy exists between the residual lot (Lot 2) and the adjacent property owner.  The Township's Solicitor may want to identify if any legal issues exist if the plan is approved without this boundary issue being resolved.

11.  A DEP Sewage Facilities Planning Module Component 1 was submitted as part of this proposal.  This module and accompanying data indicate soils suitable for on-lot sewage disposal.

12.  The Huntingdon County Planning Commission recommends disapproval of this proposal due to both the moratorium and the above comments.

Please contact this office with any questions concerning these comments.  As always, the local municipality is encouraged to carefully review the subdivision/sewage module for compliance with Township and State requirements.

Sincerely,

Richard E. Stahl
Planning Director

DBY
File GC,Sub,Mtg,C
Pc:     Corneal
        Simpson
        Rouzer

Case 1:00-cv-01192-SHR    Document 67    Filed 06/07/2002    Page 61 of 239

**DEFENDANT'S EXHIBIT**

_11_

April 3, 2000

Meeting called to order by Chairman Weiler

Minutes approved as read

Treasurer's report approved as read

New Business
No new business

Roadmaster – The township will continue to patch pot holes and we will be making an appointment with Mike Ford of District 9 to come down and review are roads.
And we will be in touch with New Enterprise on Miller Road

Art Walters ask the supervisors if the snow bile signs could be left up, the only concern Was that the signs may be stolen, but Art said they get stolen anyway.

David Corneal was at the meeting complaining because the Supervisors will not sign his sewage modules. He also stated that he was no longer sub-dividing and would like to build a studio and would like a permit for a privy and a building permit the Supervisors told him that they were not issuing any building permits for a property that they know is going to be subdivided, at which time Mr. Corneal said that he would sue the supervisors if we issued any building permits in the Township. He was told by the Supervisors that any Subdivisions that were approved prior to the Moratorium would be issued building & Septic permits because they do not fall under the new sub division ordinance.

Meeting ADJ.8:00pm

DEFENDANT'S
EXHIBIT

12

March 7, 2000

Bids – See Attached

Audit was presented to the Supervisors
\
Minutes approved as read

Treasurers' report approved as read

Tom Wilson the Road master stated that he had been with David Creamer from Huntingdon County Conservation for a new Dirt and Gravel Program on Silver Pines Road. We will be putting in 5 new pipes and building up the road to keep the silt out of Stone Creek.

We are going to install pipes on Ridge Road and we will be addressing the maintenance projects on other roads

The Pond on Powell Rd is being reviewed by SES because of the water running on the road

Building permits – David Van Dommelen ask if we were to issed permits for removal and demolishing of mobils homes . Frances Walters issues a $5.00 permit for the removile of mobile homes. Ann Wirth stated that she talked to the County and the said that the will not change the tax records with out the permit from the tax collector and that It is up to the Township whether we want to require a building permit.

The issue for Septic Permits for Foster and Reid was brought up and discussed – Ann Wirth stated that she had talked to Barry Parks SEO and that if the property's that burned were replaced by a building or a mobile home with like kind bedrooms then they do not need a septic permit unless there is a report of trouble with the existing system.

Meeting Adj 7:45PM



DEFENDANT'S
EXHIBIT

13



# HUNTINGDON COUNTY                    PLANNING COMMISSION

(814) 643-5091

Court House - Huntingdon, Pennsylvania 16652

April 20, 2000

Mrs. Ann L. Wirth
Jackson Township Secretary
R.D 1, Box 390
Petersburg, PA 16669

RE:    David B. and Sandra Y. Corneal Minor Subdivision

Dear Mrs. Wirth:

The Huntingdon County Planning Commission has reviewed the above referenced proposal to subdivide a property containing 94.67 acres into two lots. A proposal was submitted at the March 22, 2000 Planning Commission meeting for this property as a three lot subdivision. This proposal is a resubmission. Lot 2 (the residue) contains 68.87 acres and Lot 3 contains 25.80 acres. Lot 1 was previously subdivided and is not included in this proposal. The property in this proposal is located on the east side of Saw Mill Road (T-527) in Jackson Township. It is our understanding that Jackson Township has placed a moratorium on new subdivisions pending the adoption of a Subdivision and Land Development Ordinance.

The staff of the Planning Commission offers the following comments for your consideration:

1. The proposal is consistent with the draft Huntingdon County Comprehensive Plan. The land use proposed by the Plan for this area is Low Intensity Residential Use.

2. There are several physical limitations evident at the location of this proposal. Steep slopes (over 15%) can be found near the eastern boundary of the property in this proposal. No building construction should take place in these steep slope areas. The soil types At, Atkins Silt Loam, and Ph, Philo and Basher Silt Loam, exist along Laurel Run, which runs through the proposed lots. These are hydric soils and are typically found in wetland areas and near streams. The proposed house, studio, and sewage system for Lot 2 are within these soil types.

recycled paper

Blazosky Associates, Inc conducted a Wetlands Investigation of the project area for the developer. A detailed map and study data identifying the investigation area was submitted and indicates that no wetlands are present at the location of the lots in this proposal. The Huntingdon County Conservation District has noted that widening of the existing lane to access the new dwelling on Lot 2 may impact potential wetland areas. Road improvements should be limited to existing cartway widths.

3. The Jackson Township Supervisors are in the process of adopting a Subdivision and Land Development Ordinance. The proposal appears to be in compliance with the regulations of the draft ordinance. The building setbacks shown on the plat are in compliance with the draft ordinance. The title certificate on the plat should be completed and notarized prior to recording of the plat.

4. A stream crossing will be necessary for the driveway for Lot 2 to provide access to the proposed structures shown on the plat. The developer indicated that he acquired the permit for this crossing. A copy of this permit must be submitted with other data to the Township prior to approval.

9. The developer's surveyor indicated on the plat that a boundary discrepancy exists between the residual lot (Lot 2) and the adjacent property owner. The Municipal Solicitor may want to identify the existence of any legal issues if the plan is approved without resolution of these boundary issues.

10. A DEP Sewage Facilities Planning Module Component 1 was submitted as part of this proposal. This module and accompanying data indicate soils suitable for on-lot sewage disposal.

11. The Huntingdon County Planning Commission recommends conditional approval of this proposal pending adoption of the Subdivision and Land Development Ordinance.

Please contact this office with any questions concerning these comments. As always, the local municipality is encouraged to carefully review the subdivision/sewage module for compliance with Township and State requirements.

Sincerely,

Richard E. Stahl
Planning Director

DBY
File:GC,Sub,Mtg,C
Pc:   Corneal
      Simpson
      Rouzer

VAN DOMMELEN, DAVID                              CORNEAL VS
06/06/01                                    JACKSON TOWNSHIP

DEFENDANT'S
EXHIBIT

_14_

```
 1              IN THE UNITED STATES DISTRICT COUR
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2   DAVID B. CORNEAL and SANDRA  :
     Y. CORNEAL,
 3        PLAINTIFFS              :

 4              VS               :   NO. 1:CV-00-1192
                                 :
 5   JACKSON TOWNSHIP, HUNTINGDON :
     COUNTY, PENNSYLVANIA; W.     :
 6   THOMAS WILSON, individually  :
     and in his official capacity :
 7   as Supervisor of Jackson     :
     Township; MICHAEL YODER,     :
 8   individually and in his      :
     official capacity as         :
 9   Supervisor of Jackson        :
     Township; RALPH WEILER,      :
10   individually and in his      :
     official capacity as         :
11   Supervisor of Jackson        :
     Township; BARRY PARKS,       :
12   individually and in his      :
     official capacity as Sewage  :
13   Enforcement Officer of       :
     Jackson Township; DAVID      :
14   VAN DOMMELEN, individually   :
     and in his official capacity :
15   as Building Permit Officer;  :
     ANN L. WIRTH, individually   :
16   and in her official capacity :
     as Secretary of Jackson      :
17   Township; and LARRY NEWTON,  :
     individually and in his      :
18   official capacity as         :
     Solicitor to Jackson         :
19   Township,                    :
          DEFENDANTS
20        DEPOSITION OF:   DAVID VAN DOMMELEN
21        TAKEN BY:        PLAINTIFFS
22        BEFORE:          TERESA K. BEAR, REPORTER
                           NOTARY PUBLIC
23
          DATE:            JUNE 6, 2001, 9:44 A.M.
24
          PLACE:           ECKERT SEAMANS
25                         213 MARKET STREET
                           HARRISBURG, PENNSYLVANIA
```

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

**2**

1  APPEARANCES:
2  ECKERT SEAMANS
   BY:  BRIDGET E. MONTGOMERY, ESQUIRE
3     LESLIE A. MALADY, ESQUIRE
4     FOR - PLAINTIFFS
5  MAYERS, MENNIES & SHERR, LLP
   BY:  ANTHONY R. SHERR, ESQUIRE
6
       FOR - ALL DEFENDANTS EXCEPT NEWTON
7
   METTE, EVANS & WOODSIDE
8  BY:  JENNIFER YANKANICH, ESQUIRE
9     FOR - DEFENDANT - LARRY NEWTON
10 THOMAS, THOMAS & HAFER
   BY:  MICHELE J. THORP, ESQUIRE
11
       FOR - DEFENDANT - WEILER
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**3**

1                TABLE OF CONTENTS
2                    WITNESS
3  FOR PLAINTIFFS            DIRECT CROSS REDIRECT
4  David Van Dommelen
     By Ms. Montgomery        4   --   185
5    By Ms. Yankanich        --  183   --
6
7                    EXHIBITS
8  VAN DOMMELEN EXHIBIT NO.         PRODUCED AND MARKED
9  1 - Letter dated 5/5/00        79
10 2 - Letter dated 10/10/00       79
11 3 - Packet of documents        79
12 4 - Suggested ideas          91
13 5 - Application for building permit    100
14 6 - Application for building permit    145
15 7 - Application for building permit    148
16 8 - Application for building permit    151
17 9 - Applications for building permits  153
18 10 - Four-page document        164
19 11 - Letter dated 9/1/00        171
20
21
22
23
24
25

---

**4**

1        DAVID VAN DOMMELEN, called as a witness, being
2  sworn, testified as follows:
3
4              DIRECT EXAMINATION
5
6  BY MS. MONTGOMERY:
7      Q    Mr. Van Dommelen, we met a few moments ago but
8  for the record I'll identify myself.  I'm Bridget
9  Montgomery.
10     **A    You'll have to speak louder because I'm hard**
11 **of hearing.**
12     Q    Okay.  My name is Bridget Montgomery and I
13 represent the Corneals in this action.  I have a couple
14 questions and instructions for you about depositions in
15 general.  So I need to ask you first have you ever been
16 deposed before?
17     **A    To where?**
18     Q    Have you ever been deposed before?
19     A    No.
20     Q    Then I will just give you a little bit of
21 information about the deposition.  We're here to ask you
22 factual questions relevant to this lawsuit or likely to lead
23 to relevant information about this lawsuit.
24        One of the things that you need to do is make
25 sure that you give verbal responses.  You need to say yes or

---

**5**

1  no or, you know -- no shakes of the head, you know, no nods
2  of the head because the court reporter needs to hear you so
3  that she can take your responses down.
4        If you don't understand a question that I ask
5  you, you can ask me to repeat it or rephrase it.  I want you
6  to understand what it is I'm asking you.  If you need to
7  take a break to go to the rest room or something like that
8  or get a glass of water, you can do that as well.  You can't
9  confer with your counsel about your answers but you can take
10 a break and, you know, go and do whatever you need to do.
11        Are you on any medication today that would
12 prevent you from understanding and answering my questions?
13     **A    I'm on medication.**
14     Q    And what kind of medication is that?
15     **A    Quibron, and that's an asthmatic, and I'm on**
16 **Altace for high blood pressure, and I'm on Vilosec and I**
17 **take Proventil, which is a mist, a mister.**
18     Q    Are those all asthma related --
19     **A    All except for the --**
20     Q    -- medications?
21     **A    All except for the Altace which is for high**
22 **blood pressure.**
23     Q    One other instruction I'll give you.  For the
24 sake of the court reporter and for the sake of clarity, you
25 need to let me finish my questions and I'll let you finish

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**VAN DOMMELEN, DAVID**
06/06/01

**CORNEAL  VS**
**JACKSON TOWNSHIP**

### 6

1 your answers so that she can -- so we're not talking at the
2 same time, okay?
3    A    **Fine.**
4    Q    Back to your medications for a second.  Do any
5 of those medications affect your ability to understand
6 someone talking to you or a question or an issue?
7    A    **As far as I know, no.**
8    Q    None of them are sleep inducing medications or
9 anything like that?
10   A    **No.**
11   Q    Mr. Van Dommelen, where do you live?
12   A    **I live on Allan Seegar Road three miles**
13 **outside of McAlevys Fort in Pennsylvania.**
14   Q    Where is that in relation to, for example, the
15 Jackson Township town office on Ann Wirth's property?
16   A    **It's approximately four miles from the**
17 **township office.**
18   Q    Are you familiar with David Corneal?
19   A    **Yes.**
20   Q    And you're familiar with the property owned by
21 David Corneal --
22   A    **Yes.**
23   Q    -- in Jackson Township?
24   A    **Yes.**
25   Q    Where is your home in relation to Mr.

### 7

1 Corneal's property in Jackson Township?
2    A    **It's to the north and about three miles from**
3 **his property.**
4    Q    Is it on the same road?
5    A    **No.**
6    Q    How long have you lived at your current
7 address?
8    A    **I believe 20 years.**
9    Q    Where did you live prior to that?
10   A    **In State College, Pennsylvania.**
11   Q    Are you a native of State College?
12   A    **No.**
13   Q    Are you a native of Jackson Township?
14   A    **No.**
15   Q    Where are you from?
16   A    **I'm from Michigan.**
17   Q    Oh, you are, okay.  So you've been in Jackson
18 Township then for 20 years?
19   A    **I believe 20 years.**
20   Q    Do you own property there?
21   A    **No.**
22   Q    Do you own a home there?
23   A    **No.**
24   Q    You rent?
25   A    **No.**

### 8

1    Q    Do you live there?
2    A    **Yes.**
3    Q    Do you camp out?
4    A    **No.  Heavens, no.**
5    Q    Well, you live there for free, apparently, in
6 a residence --
7    A    **Yes.**
8    Q    -- in a house?  Let's talk a little bit about
9 your educational background.  What is the highest level of
10 education that you completed?
11   A    **A Master's degree.**
12   Q    In?
13   A    **In art.**
14   Q    And where did you complete that Master's
15 degree?
16   A    **Michigan State University.**
17   Q    So you graduated from high school out in
18 Michigan; is that correct?
19   A    **Pardon?**
20   Q    You graduated from high school out in
21 Michigan?
22   A    **Yes.**
23   Q    And where did you go to college?
24   A    **Well, I went to -- I went to interior design**
25 **school in Chicago and then I went to Michigan State for my**

### 9

1 undergraduate and for my graduate degree.
2    Q    What's the interior design school that you
3 went to?
4    A    **Harrington Institute of Interior Design.**
5    Q    Was that a two-year program or --
6    A    **It was a two-year program.**
7    Q    Did it lead to an associates degree or
8 something?
9    A    **Pardon?**
10   Q    Did it lead to an associate degree or --
11   A    **I got a diploma, interior design diploma.**
12   Q    Like a certificate of --
13   A    **Yes, right.**
14   Q    And then you went from there to Michigan State
15 University?
16   A    **No, I went to the Army.**
17   Q    Oh, okay.  When was that?
18   A    **In 1952.**
19   Q    So you went into the Army for a few years
20 and --
21   A    **For two years.**
22   Q    Two years.  And then did you start your
23 education after that?
24   A    **Then I --**
25   Q    Or continue your education after that?

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

**10**

1    A    Yes, after that I continued my education.
2    Q    So do you have a four-year degree from
3    Michigan State?
4    A    Yes.
5    Q    And then a Master's degree?
6    A    Yes.
7    Q    And is that the highest degree of education
8    you completed then, the Master's at Michigan State?
9    A    Yes.
10    Q    What did you do with that degree then once you
11    got it?  What sort of employment did you seek?
12    A    Well, I taught first in elementary schools and
13    then I was invited to go to Penn State to teach and I taught
14    at -- in the College of Home Economics for quite a few years
15    and then the College of Arts and Architecture.
16    Q    So you have an elementary teaching license as
17    well -- you had one at least --
18    A    Yes, I had one.
19    Q    -- in Michigan?
20    A    Um-hum.
21    Q    How long did you teach?
22    A    In elementary?
23    Q    Yes.
24    A    Two years, I believe.
25    Q    And then you came to State College after that?

---

**11**

1    A    Yes.
2    Q    What year was that?
3    A    That was in 1959.
4    Q    And how long did you teach at Penn State?
5    A    For over 25 years.
6    Q    So that takes you up to about 1984?
7    A    Eighty-eight.
8    Q    Oh, 1988?
9    A    Yes.  I also had an interim of two years at
10    the University of Maine.
11    Q    Did you come to State College and then go to
12    Maine and then come back?
13    A    Yes.
14    Q    Understood.  So you say -- I believe you
15    testified that you taught home economics?
16    A    Well, that's where I started teaching.  That's
17    where art and interior design was, in home economics.
18    Q    And then what?
19    A    And then I moved over to arts and
20    architecture.
21    Q    And so that takes you up to 1988.  Did you
22    retire then?
23    A    Yes, I retired then.
24    Q    Is it at that point that you moved to Jackson
25    Township?  I forget how long you said you had been there.

---

**12**

1    A    No, no, we had been in Jackson Township since
2    '82.  I have my studio there, too.
3    Q    Okay.
4    A    Because I'm a practicing artist.
5    Q    What kind of art do you do?
6    A    Fiber art.
7    Q    What is fiber art?
8    A    Weaving, surface painting on fiber, sewing
9    machine work on fiber.
10    Q    So during the time that you were teaching at
11    Penn State, you moved to Jackson Township; is that correct?
12    A    Yes.
13    Q    And in Jackson Township you have a studio on
14    this same piece of property --
15    A    Right.
16    Q    -- that you live at?
17    A    We have 40 acres of property.
18    Q    Who owns that property?
19    A    My daughter and my son.
20    Q    Did you ever own that property?
21    A    Yes.
22    Q    When did you buy it?
23    A    In '81.
24    Q    And did you sell it to your son and daughter?
25    A    Pardon?

---

**13**

1    Q    Did you sell it to your son and daughter or
2    convey it or --
3    A    No, we gave it to them.
4    Q    You gave it to them?
5    A    Um-hum.
6    Q    When did you do that?
7    A    I'm not sure if I can remember.  It must have
8    been 10 years ago.
9    Q    So it is 40 acres?
10    A    It's not quite 40 acres.
11    Q    How many houses are on it?
12    A    Just the -- our house and the studio.
13    Q    When you say our house, you mean your wife and
14    you?
15    A    Yes.
16    Q    Did you build the house?
17    A    Part of it.
18    Q    There was an existing structure there?
19    A    There was a structure and then we added on to
20    it when we moved out there because it did not have indoor
21    plumbing and ...
22    Q    Right.
23         MS. MONTGOMERY:  Just let the record reflect
24    that Michele Thorp is joining the deposition.
25    BY MS. MONTGOMERY:

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**14**

1 Q And then did you build the art studio?
2 A Yes.
3 Q When did you build that?
4 A In '82.
5 Q How big is that structure, do you know?
6 A It's 20 feet by 40 feet.
7 Q Is it one-story?
8 A Yes.
9 Q Does it have indoor plumbing?
10 A No.
11 Q Does it have electricity?
12 A Pardon?
13 Q Does it have electricity?
14 A Yes.
15 Q Are there any other structures on the
16 property?
17 A No.
18 Q Are you currently employed?
19 A In my studio, yes.
20 Q Well, let me ask you the question a little bit
21 differently. I think you said you retired from Penn
22 State --
23 A Yes.
24 Q -- in 1988?
25 A Yes.

**15**

1 Q Did you have employment elsewhere after you
2 retired from Penn State?
3 A No, except self-employment.
4 Q Are you involved somehow with Jackson
5 Township?
6 A Yes.
7 Q In what capacity?
8 A The building permit officer.
9 Q Do you consider that employment?
10 A I suppose I would have to say yes.
11 Q Is it a paid --
12 A But not for very much money.
13 Q Is it a paid position?
14 A I get a percentage of each building permit and
15 that averages to about $450 a year.
16 Q What percentage of each building permit do you
17 get?
18 A I think it's -- I can't remember. My wife
19 does all that. I think it's eight percent, I believe.
20 Q Is that the only compensation given in
21 connection with your services as the building permit
22 officer?
23 A Yes.
24 Q When did you first become the building permit
25 officer for Jackson Township?

**16**

1 A It must have been 1990.
2 Q How did you come to become the building permit
3 officer?
4 A The current -- one of the current supervisors
5 asked me if I would like to be that and I said not really
6 but they persuaded me and so I took over the job.
7 Q How did you -- well, do you know which
8 building supervisor asked you to take the job?
9 A Pardon?
10 Q Can you tell me which building --
11 A Yes, it was Gary Wilson.
12 Q He's no longer a supervisor?
13 A No.
14 Q Is he related to the current Wilson
15 supervisor?
16 A They might be far cousins.
17 Q Were you friends with Gary Wilson, is that how
18 he came to ask you?
19 A Neighbors.
20 Q So you've been the building permit officer
21 since 1990, correct?
22 A I believe that's ...
23 Q Has there been any breaks in your service
24 since --
25 A Any what?

**17**

1 Q Any breaks in your service since 1990 as the
2 building permit officer?
3 A No.
4 Q Who do you report to as the building permit
5 officer?
6 A To the supervisors.
7 Q How do you report?
8 A I go to the supervisor's meeting once a
9 month. It's a public meeting.
10 Q And is that the public meeting that's held at
11 Ann Wirth's -- in the building on Ann Wirth's property?
12 A No, no.
13 Q No?
14 A It's held in the fire hall.
15 Q In the fire hall, okay. What exactly are your
16 responsibilities as the building permit officer?
17 A To issue building permits to any resident that
18 comes to me.
19 Q Well, what do you do to determine whether you
20 should issue a building permit?
21 A They must have appropriate septic approval, if
22 it's going to be a house that has the need for a septic
23 system. And if they are going to subdivide, they must have
24 the appropriate subdivision papers.
25 Q What about if they're not going to subdivide

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

18

1  and they're not going to build a house, then would you need
2  a septic?
3      A      Well, then if they're just building a garage,
4  I'd give them a permit -- I'd issue a permit rather.
5      Q      Do you have some kind of ordinance that you
6  follow or some kind of rule book?
7      A      Yes, we do have a set of ordinances.
8      Q      What are those ordinances?
9      A      Well, that you must have a septic system and
10  that you must -- a building permit is good for one year and
11  if you're going to subdivide that you have the correct
12  subdivision.  You must also have the correct road connection
13  permit.
14      Q      Do you have a building or anything that you
15  use in connection with your work?
16      A      No.
17      Q      Do you operate out of the house that you live
18  in?
19      A      Yes.
20      Q      I asked you a moment ago what ordinances you
21  follow and you gave me an answer, but I'm asking you
22  something a little bit different.  The question I'm asking
23  you is: Do you follow a particular ordinance that's, you
24  know, like a collected set of pages that tells you what to
25  do in connection with your duties?

19

1      A      Yes, we do have a building ordinance.
2      Q      A building permit ordinance?
3      A      Permit ordinance, yeah, um-hum.
4      Q      And you follow that?
5      A      Yes.
6      Q      Do you keep a copy of it in your house?
7      A      Yes.
8      Q      Now, typically when someone comes and asks you
9  for a building permit, exactly what do you do?
10      A      I find out if they have the appropriate
11  papers.  And if they don't need septic and if they don't
12  need subdivision, then I have them sit down and fill out a
13  building permit application and I then type from that to the
14  tax assessment forms that we send into the county for tax
15  assessment and then I issue a building permit.
16      Q      And you can do that all in one day?
17      A      Yes.
18      Q      Do you typically do it all in one day?
19      A      Yes, typically I think I would say all in one
20  day.
21      Q      Do you keep the applications at your home?
22      A      I do.
23      Q      Are citizens required to come to your home to
24  get an application?
25      A      Yes.

20

1      Q      So do they have -- I mean, are you listed in
2  the telephone book or something as the building permit
3  officer?
4      A      No.
5      Q      How does the citizen find out about you?
6      A      I suppose they call our secretary or word of
7  mouth that I'm the building permit officer.
8      Q      So do they call you and ask you for an
9  appointment?
10      A      Sometimes. Sometimes they just show up.
11      Q      So do you typically go inspect the property
12  that someone is asking for a permit?
13      A      In the ordinance I can do that if I can go
14  onto the grounds and even if it says no trespassing I can go
15  on the grounds and inspect whatever is being done, and
16  sometimes I do and sometimes I don't.  It depends on what
17  the issue is.
18      Q      Under what circumstances are you permitted to
19  inspect a property?
20      A      Well, if I have a feeling that something is
21  not correct, then I might go and look and see if it fits
22  what they put on their application.
23      Q      I see.  What would give you a feeling that
24  something is not correct?
25      A      I don't know, a gut feeling.

21

1      Q      Well, let me ask you this:  How many
2  properties have you actually gone to inspect in connection
3  with applications for building permits?
4      A      I don't think I can answer that.
5      Q      Can you estimate?
6      A      Twenty-five.
7      Q      In the 10 years?
8      A      Yeah.
9      Q      Or actually it's 11 years, isn't it?
10      A      Yeah.
11      Q      That you've been the building permit officer?
12      A      Yes.
13      Q      You're not required to check each property --
14      A      No.
15      Q      -- is that correct?
16      A      No.
17      Q      Would you typically inspect a property if it
18  didn't require septic or if it didn't involve a subdivision?
19      A      Probably not.
20      Q      So how much does it cost to get the building
21  permit application and fill it out?
22      A      It depends on how much is being spent for the
23  structure.  The cheapest one is $15 and the most expensive
24  goes up to $70. So it's a graduated scale.  So a house
25  that's being built for $450,000, then the building permit

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

6

22

1 would be 70.
2    Q    How do you determine how much is going to be
3 spent on building the house or other structures?
4    A    Well, that is -- that is determined by the
5 person when they fill out their application. They give me
6 an estimate. Then the tax assessors come out and check
7 after the structure is finished.
8    Q    So after you issue a building permit, what do
9 you do with the permit itself? Do you give the permit to
10 the person and keep a copy?
11    A    I give them a large permit that they are to
12 put on the structure while they're building it and then I
13 send the tax assessment, along with the check, to Ann Wirth,
14 our secretary, and she then in turn sends it to the county
15 tax assessing office.
16    Q    Do you keep a copy of the building permit
17 yourself?
18    A    Of the application, yes.
19    Q    Of the application?
20    A    Yes, I keep that in a little black book.
21    Q    What is it, a --
22    A    It's a typical three --
23    Q    Three-ring binder?
24    A    Three-ring binder.
25    Q    In connection with this lawsuit, were you

24

1    Q    Who asked you to give them to her?
2    A    Ann Wirth.
3    Q    When did she ask you to do that?
4    A    Last week.
5    Q    Were you asked to provide documents at any
6 time prior to that?
7    A    No.
8    Q    Did you ever see a copy of a -- what we would
9 call a document request? Did you ever see a copy of a
10 document that listed different areas of documents that
11 should be produced?
12    A    No.
13    Q    Did Ann just call you up and say give me all
14 your documents?
15    A    Right.
16    Q    What did you give her?
17    A    I gave her -- she already had all the building
18 permits from 19 -- let me see. Well, let's see, about --
19 I'm trying to think when they start, but she had in her
20 township files some of the early building permits. And then
21 I usually kept in my file some of the newer ones so I could
22 go back and look at them if I needed to. And so then I
23 turned all those over to her also.
24    Q    So you had the newer building permits in your
25 file?

23

1 asked for any documents, for any building permits or other
2 documents related to township business?
3    A    Could you rephrase that.
4    Q    Okay. In connection with this lawsuit, did
5 anybody ask you to provide documents like building permits
6 or other township related documents?
7    A    I'm not quite sure what you're asking, but Mr.
8 Corneal came to the house and asked for an application.
9    Q    That's a separate issue. What I'm really
10 asking is after this lawsuit was filed did any of the other
11 defendants or anybody else come to you and say search your
12 records for building permits or other documents related to
13 township business in connection with the lawsuit, we need to
14 do this, something like that?
15    A    Well, they came and took all my building
16 permits and all my files.
17    Q    Who is they?
18    A    Well, I was asked to give them to Ann Wirth.
19    Q    Did she come and pick them up?
20    A    I took them to her office.
21    Q    So when you say they came and took them, do
22 you really mean you took them to her?
23    A    Yes, right.
24    Q    That's fine.
25    A    Yeah.

25

1    A    Yes.
2    Q    Or actually the applications, correct?
3    A    Yes, uh-huh.
4    Q    And you turned them over to her?
5    A    Yes.
6    Q    Did you turn anything else over to her?
7    A    The whole -- well, that's the whole book,
8 yeah. No, no, that would be the only thing.
9    Q    Did you have any notes or anything like that
10 that you kept in connection with applications for building
11 permits?
12    A    I have some letters which I didn't turn over,
13 some letters where I had written someone to say you have not
14 gotten a building permit for something and you need to do
15 this because you're in violation of the township ordinances.
16    Q    You have some letters like that?
17    A    Yes, um-hum.
18    Q    But you did not turn them over to her?
19    A    No.
20    Q    Why not?
21    A    Nobody asked me for them.
22    Q    Did she just ask you for your building
23 permits?
24    A    Right.
25    Q    That's all?

26

1    A    (Witness nods head affirmatively.)
2    Q    How many letters are you talking about?
3    A    Oh, I don't think more than four to 10.
4    Q    Four to 10 letters saying you're not getting a
5  building application -- or a building permit, I'm sorry?
6    A    Of someone who didn't get a permit and I had
7  to write to them and say you need to get a permit.
8    Q    Oh, I see.  Someone who was building without a
9  permit?
10   A    Right, um-hum.
11   Q    I see what you're saying.  Any other notes or
12 letters of any sort that you keep in your own files?
13   A    No, not that I can think of.
14   Q    Do you ever take handwritten notes in
15 connection with a building application?
16   A    I have -- well, most of the building
17 applications are filled out by hand.
18   Q    Right.
19   A    But then I take that information and type it
20 on the tax assessor's office form because I just think it
21 looks better, but the ones that they fill out are all by
22 hand.
23   Q    What about the tax assessor's office forms, is
24 that a one-page form?
25   A    Yes, um-hum.

27

1    Q    Do you keep copies of that?
2    A    No.
3    Q    You just send that directly to the tax
4  assessor's office?
5    A    Right, um-hum.
6    Q    Is that the county tax assessor?
7    A    Yes.
8    Q    So it's the Huntingdon County tax assessor?
9    A    Pardon?
10   Q    The Huntingdon County tax assessor?
11   A    Yes.
12   Q    So other than the letters that you sometimes
13 write to people about building permits, are you certain that
14 there are no other documents in your possession related to
15 building permits in Jackson Township or other township
16 business related to building --
17   A    No.  I've got a couple other files about
18 floodplain information and -- because that sometimes can be
19 an issue also, but otherwise there's no documents that are
20 of importance.
21   Q    Well, I'm not asking you whether they're of
22 importance, I'm just asking you if they exist.
23   A    Um-hum.
24   Q    Did you keep any notes in connection with -- I
25 may have asked you this, but I'm going to ask it to you one

28

1  more time just to make sure you understand it.  Did you ever
2  keep any notes in connection with any building permit
3  application that came your way, any handwritten notes in
4  your own writing or in your wife's writing or typed up or
5  anything --
6    A    Yes, I probably have some, um-hum.
7    Q    You do.  And is that in a separate --
8    A    Maybe telephone numbers of someone and -- just
9  that I hand jotted.
10   Q    Do you keep them in a separate file?
11   A    Yes, usually.
12   Q    Are they all together or do you keep them in a
13 file connected to a particular building application?
14   A    Yeah, I usually will put them with the
15 building permit application.
16   Q    So if you have a building permit application,
17 do you put for each person -- you said you have a book,
18 right?
19   A    Yes.
20   Q    Do you also keep it in a separate file, you
21 know, for each person labeled in some way or --
22   A    No, just in the -- just in the three-ring
23 notebook.
24   Q    So where do you keep the notes then?
25   A    Well, if they're -- I keep them until I find

29

1  they're irrelevant and then I throw them out.
2    Q    But where do you keep them?
3    A    In a file.  You know, in my file drawer.
4    Q    Just in a manila envelope or something --
5    A    Yeah, um-hum.
6    Q    -- like that?  You don't --
7    A    Or attached to the building permit
8  application.
9    Q    You just clip them to it or something?
10   A    Um-hum.
11   Q    Do you have anything like that in your
12 possession at home now, notes that you've kept in connection
13 with the building permit applications?
14   A    I'm not sure.
15   Q    You'd have to look?
16   A    I'd have to look.
17   Q    Do you recall whether you kept any notes in
18 connection with David Corneal?
19   A    Yes.
20   Q    You did?
21   A    Um-hum.
22   Q    Is the answer yes you recall or yes you did?
23   A    Pardon?
24   Q    Is the answer yes you did keep notes?
25   A    Yes.

**VAN DOMMELEN, DAVID**
**06/06/01**

<div align="right">

**CORNEAL  VS**
**JACKSON  TOWNSHIP**

</div>

---

30

1  Q    And do you have those notes at your house?
2  A    No.
3  Q    What did you do with them?
4  A    I have them in a case right here.
5  Q    Oh, you do, okay.
6        MS. MONTGOMERY: Well, Tony, I think I'm
7  entitled to have them from him. He brought them and they
8  are certainly relevant to this lawsuit.
9        MR. SHERR: Are you contending these were
10 requested in the request for production?
11       MS. MONTGOMERY: I certainly am. He's got
12 notes related to Mr. Corneal's building permit application
13 with him he said and I'd like to see them.
14       MR. SHERR: Do you want to let me see these
15 documents, please.
16 BY MS. MONTGOMERY:
17 Q    Do you have other documents with you?
18 A    Yeah, um-hum. I brought all my stuff with
19 me. I didn't know what I would need.
20 Q    Okay. What other documents do you have with
21 you?
22 A    A couple letters and things like that.
23       (Handing.)
24       MR. SHERR: Thank you.
25 BY MS. MONTGOMERY:

---

31

1  Q    Do you have a -- among those documents, Mr.
2  Van Dommelen, do you have notes related to other people's
3  building permit applications or just Mr. Corneal's?
4  A    I think just Mr. Corneal's.
5  Q    Are all of the documents that you brought with
6  you in some way related to Mr. Corneal's Jackson Township --
7  A    I think -- not all of them, no. Not all of them.
8  I think there's also -- the ordinance is in here, too.
9  Q    Anything else beside the ordinances?
10 A    I can't -- I can't remember. I just picked it
11 all up.
12 Q    Do you recall anything else, though, besides
13 the documents related to Mr. Corneal's --
14 A    Pardon?
15 Q    Do you recall anything else besides documents
16 related to Mr. Corneal's building efforts in Jackson
17 Township? Do you recall anything else being in that file
18 besides the ordinances and Mr. Corneal's building efforts in
19 Jackson Township?
20 A    I'm not understanding you.
21 Q    Let me ask you this: Did you put that file
22 together yourself?
23 A    Yes, I just put everything in one file and I
24 picked it all up so --
25 Q    Were those documents that you believed would

---

32

1  be related in some way to the issues in this lawsuit?
2  A    Some of them might be.
3  Q    What about the others, why did you bring them
4  if they're not related to it?
5  A    I don't know why.
6        MR. SHERR: Let me just state for the record
7  that a number of these documents relate to the lawsuit
8  themselves. They include the complaint and the exhibits to
9  the lawsuit, a copy of the deposition of Mr. Corneal,
10 correspondence from me, a picture of my business card, notes
11 from a meeting that I attended, what appears to be a copy of
12 the subdivision ordinance -- well, the other documents are
13 free to inspection. They appear to be a copy of the
14 subdivision ordinance --
15       THE WITNESS: Yes, the ordinance is here,
16 um-hum.
17       MR. SHERR: -- a copy of Mr. Van Dommelen's
18 2001 vita, a single page which appears to be from Act 537,
19 various correspondence to Mr. Van Dommelen, which is free to
20 inspect, and a copy of an article from a newspaper. It
21 looks like the Daily News --
22       THE WITNESS: Yeah, it's the Daily News in
23 Huntingdon.
24       MR. SHERR: -- concerning this lawsuit.
25       MS. MONTGOMERY: Okay, why are the other

---

33

1  documents not inspectable by me right now?
2        MR. SHERR: Well, you're certainly free to
3  inspect Mr. Corneal's deposition, the complaint and the
4  exhibits to the complaint. Correspondence from me to Mr.
5  Van Dommelen --
6        MS. MONTGOMERY: You're saying is protected?
7        MR. SHERR: -- as well as notes from a meeting
8  by --
9        MS. MONTGOMERY: What's on the back? There's
10 handwritten --
11       MR. SHERR: That I attended. Other notes that
12 are -- well, you're certainly free to inspect this. This is
13 something with my phone number on it, something concerning
14 -- a couple things concerning receipts regarding these
15 depositions, I assume, and -- I'll ask, what appear to be
16 notes from a conversation that I had with Mr. Van Dommelen?
17       THE WITNESS: Um-hum.
18       MR. SHERR: Is that correct?
19       THE WITNESS: Yes, um-hum.
20       MS. MONTGOMERY: So you're saying that --
21       MR. SHERR: That would also be privileged.
22       MS. MONTGOMERY: What is that, three --
23       MR. SHERR: Two.
24       MS. MONTGOMERY: Two handwritten small
25 notes --

---

34

MR. SHERR: Three-by-five notes.
THE WITNESS: Yes, this -- I don't know how that got in there. This has nothing to do with anything.
MR. SHERR: Okay, she can inspect that as well then.
MS. MONTGOMERY: So you have what, three other documents in front of you?
MR. SHERR: I have -- well, you're certainly free to inspect my business card.
MS. MONTGOMERY: Okay.
MR. SHERR: I have two documents -- well, I have three counting the three-by-five note, correct.
MS. MONTGOMERY: So you have a three-by-five note, you have a letter from you to Mr. Van Dommelen and then you have what you're saying are notes of a meeting?
MR. SHERR: Handwritten notes of a meeting that I attended with the defendants in this lawsuit when it was filed.
MS. MONTGOMERY: What's on the back of it?
MR. SHERR: Part of the same notes.
MS. MONTGOMERY: Those are notes related to the meeting?
MR. SHERR: Yes, absolutely.
MS. MONTGOMERY: Who was at that meeting? I'll ask Mr. Van Dommelen.

35

BY MS. MONTGOMERY:
Q Mr. Van Dommelen, who was at the meeting that Mr. Sherr is referring to that he says he was present at and those are notes made in connection with that meeting? Who all was at that meeting?
A **I'm assuming that all the supervisors were and I'm assuming that Ann Wirth was and I'm assuming that Larry Newton, the township lawyer was and myself.**
Q Anybody else?
A **I think that's it. That's seven people.**
Q Nobody's spouse was there or anybody else?
A **No.**
Q We're going to take a break and look at the documents that you have with you for a moment, okay?
A **Um-hum.**
Q Including your handwritten notes there.
(Break taken from 10:22 a.m. until 10:38 a.m.)
BY MS. MONTGOMERY:
Q Mr. Van Dommelen, I'm going to send Leslie to have a copy of these made by our office service people so we can use them in connection with your deposition.
A **Okay.**
Q And we'll continue with the deposition for now and she'll bring you your original file back directly.
A **Um-hum.**

36

Q But I'm going to need to use the originals to ask you certain questions because -- for a variety of reasons so -- but we'll bring your original file back in a few moments.
A **Um-hum.**
Q Mr. Van Dommelen, a few moments ago you testified that you had some handwritten notes about David Corneal's building permit application with you.
A **And I didn't see them in there. I don't -- I don't know what happened to them. They mainly were telephone numbers and -- and I didn't see them in there either.**
Q I want you to take for me a moment the document that you have said is notes in connection with -- notes that -- of a meeting that Tony Sherr attended. I'm not going to ask you anything about what they say, I'm just going to ask you to look at it for me for a second and tell me whether those notes were all taken on one day or whether any part of those notes were taken at a different time.
A **My feeling is that they were taken at different times. The reason I say that is what's on this side I think probably was written down versus the things on this side.**
Q Right, that's why I'm asking you about it. Which side do you think was taken at the meeting with Tony

37

Sherr?
A **I would assume it was this one here because I believe that meeting was at four o'clock.**
Q On what day?
A **On Thursday, the 13th.**
Q Of?
A **Of July.**
Q Of July 2000?
A **Um-hum. So that's why I'm assuming that this was all --**
Q Now, the other side, what do you think that is?
A **They were just some of my personal, you know --**
Q Thoughts about the lawsuit?
A **Yeah, um-hum.**
MS. MONTGOMERY: I'm going to represent that I'm not going to turn this document over, but I want to review the document that he says are his personal thoughts about the lawsuit.
MR. SHERR: And I believe that this is privileged because -- I believe it's privileged because I believe it states things that were stated at the meeting so you're more than happy to have the court inspect it and --
MS. MONTGOMERY: Take the document back from

**38**

1 Mr. Van Dommelen.
2 BY MS. MONTGOMERY:
3     Q     Mr. Van Dommelen, is it your position that
4 those are things stated about the meeting?
5     **A     That what?**
6         MS. MONTGOMERY:  I'm going to ask him some
7 more questions about that.
8 BY MS. MONTGOMERY:
9     Q     When did you make those notes?
10     **A     I do not know.**
11     Q     Before or after the meeting?
12     **A     These after the meeting, I'm positive.**
13     Q     Was anybody else present when you made those
14 notes?
15     **A     No.**
16     Q     I'm going to give you a sticky and ask you to
17 mark on one side --
18         MR. SHERR:  Well, let the record reflect that
19 I believe this to be a privileged document so we're not
20 going to turn it over.  You know, you can take the next step
21 if you'd like at that point, but I believe this to be a
22 privileged document.
23         MS. MONTGOMERY:  I'm going to take the next
24 step.  I'm absolutely going to take the next step.
25         MR. SHERR:  That's fine.

**39**

1         MS. MONTGOMERY:  I mean, I don't know that his
2 thoughts about a meeting with you are privileged.  I don't
3 know under what theory of law his thoughts about a meeting
4 with you are privileged.  He told me they were thoughts --
5 he didn't say they were thoughts about a meeting, he said
6 that they were thoughts about the lawsuit.  That's not
7 privileged.  And you've taken it from him and said no, I
8 think there's something in here -- thoughts about that
9 meeting and so you can't see it.
10         MR. SHERR:  I know this to be things that I
11 stated to him in notes about the meeting and it's
12 privileged.
13         MS. MONTGOMERY:  Well, we'll ask the court to
14 review it.
15         MR. SHERR:  That's fine.  I have no problem
16 with that.
17 BY MS. MONTGOMERY:
18     Q     But for now I'm just going to ask you to mark
19 the side of it that you think is the meeting that you --
20 notes of the meeting that you took while you were with Mr.
21 Sherr.
22     **A     It would be this one.  What do you want me to**
23 **write?**
24     Q     Just, you know, meeting with Mr. Sherr or
25 something like that so that we know which side you took in

**40**

1 Mr. Sherr's presence.
2     **A     (Witness so complied.)**
3     Q     Do you know somebody named Vita?
4     **A     Vita?**
5     Q     Yes.
6     **A     No.**
7     Q     Does the word vita mean anything to you,
8 v-i-t-a?
9     **A     No.**
10         MR. SHERR:  Curriculum vita?
11         THE WITNESS:  Huh?
12         MR. SHERR:  Curriculum vita.
13         THE WITNESS:  Oh, vita, I see.
14 BY MS. MONTGOMERY:
15     Q     V-i-t-a.
16     **A     I thought you were saying a name of a person,**
17 **Vita.**
18     Q     I was just asking.
19     **A     Okay, vita, curriculum vita.**
20     Q     Okay.
21     **A     Mine is in here, in this pile someplace.**
22     Q     Right, the documents that I just took and had
23 copied.
24     **A     Um-hum.**
25     Q     Do you have any other documents with you today

**41**

1 besides the ones that you just took out of your bag and
2 handed to Mr. Sherr first?
3     **A     No.**
4     Q     To your knowledge do you have any other
5 documents anywhere else that in any way relate to this
6 lawsuit?
7     **A     No.**
8     Q     That in any way relate to Mr. Corneal?
9     **A     No.**
10     Q     Did you have any documents at any other time
11 that relate to this lawsuit or to Mr. Corneal?
12     **A     No.**
13     Q     Do you work on computer?
14     **A     Yes.**
15     Q     Would you have notes on computer by any
16 chance?
17     **A     No.**
18     Q     Do you do any of your township business on
19 computer?
20     **A     Sometimes.  Sometimes I might write a letter**
21 **on the computer.**
22     Q     Did you look in your computer to see whether
23 there were any documents related to Mr. Corneal or this
24 lawsuit?
25     **A     No.**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

**42**

1 Q    Do you know right now as you sit here whether
2 there are?
3 A    Pardon?
4 Q    Do you know right now as you sit here whether
5 there are any such documents?
6 A    There are none.
7 Q    What about on floppy disk?  Do you download
8 onto floppy disk at all?
9 A    Yes.
10 Q    Do you have any documents related to this
11 lawsuit downloaded onto a floppy disc?
12 A    No.  My computer is mainly used for my
13 manuscripts for my books.
14 Q    Now, you said from time to time in your work
15 as a building permit officer that you have gone and
16 inspected property?
17 A    Um-hum.
18 Q    What does such an inspection entail?
19 A    To drive by mainly, to see what's being done.
20 Q    And when you say drive by, do you mean you
21 just drive by, you don't get out of the car?
22 A    No.
23 Q    Is that no, you don't get out of the car?
24 A    Yeah.  No, I don't get out of the car.
25 Q    You just take a slow drive by the property?

---

**43**

1 A    Correct.
2 Q    And what would you be looking for when you
3 drive by?
4 A    To see if someone has gotten a building
5 permit, to see if they're complying with our regulations.
6 Q    Well, now, in saying that, am I understanding
7 you to say that for someone who hasn't applied for a
8 building permit you've done drive-bys like that?
9 A    Yes.
10 Q    So is that because you hear from somebody that
11 somebody is building?
12 A    Yes.
13 Q    What about in connection with someone who has
14 applied for a building permit, have you done drive-bys --
15 A    Sometimes.
16 Q    How often?
17 A    Oh, I really can't say.  I think I said a
18 little earlier about 25 times.
19 Q    I was just trying to make sure that you
20 weren't talking about any drive-by that you do those 25
21 times.
22 A    No.
23 Q    So you're saying that for purposes of people
24 who have applied for the permit you think you've driven by
25 to see what is going on about 25 times?

---

**44**

1 A    Right.
2 Q    About how many building permit applications do
3 you process a year?
4 A    About -- between 35 and 40 a year.
5 Q    Is that pretty steady from --
6 A    That's pretty steady.
7 Q    Of those building permit applications, how
8 many have you denied in the 11 years that you've been the
9 building permit officer?
10 A    I'm not sure that I can answer that honestly.
11 Q    And why is that?
12 A    Because I think there are times I've said you
13 have to add more information and then they come back and
14 then I don't deny it.
15 Q    Okay.  So have you ever outright denied a
16 building permit application by sending a letter and saying
17 your building permit application is denied?
18 A    Just once.
19 Q    And when was that?
20 A    To Corneal.
21 Q    So it was in connection with Mr. Corneal?
22 A    Right.
23 Q    You have no other -- you've never written a
24 letter to anybody else and denied their building permit
25 application?

---

**45**

1 A    Not that I recall.
2 Q    So when you say you might ask them to go and
3 get additional information, what kind of additional
4 information?
5 A    Well, I might have discovered they haven't
6 gotten the proper sewage number from our sewer -- from the
7 septic officer and so I need to have that number before I
8 can -- before I can issue a permit.  That might be one
9 reason.
10 Q    So they have to go back and get you a number
11 and come back?
12 A    And I might also say you need to get a better
13 assessment, a cost of the structure that you're building.
14 Q    Okay.  Anything else?
15 A    Not that I can think of.
16 Q    So typically do they go get you the
17 information the same day and get it back to you?
18 A    They can very often, yes.
19 Q    How many times would you say you've sent
20 people back for additional information?
21 A    Oh, probably 10 times.
22 Q    Ten times in say 11 years?
23 A    Yes.
24 Q    During the year 2000 how many building permit
25 applications did you review?

---

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

46

1    A    Probably in the area of 36 or 37.

2    Q    Was Mr. Corneal -- and I take it from your

3  past answer that Mr. Corneal's was the only building permit

4  application that you denied in the year 2000?

5    A    Right.

6    Q    How did Mr. Corneal come to fill out a

7  building application, a building permit application?

8    A    How?

9    Q    Yes.  Well, let me ask that question -- strike

10  that.  What's the first contact that you had with Mr.

11  Corneal in connection with his request for a building

12  permit?

13    A    When he showed up at my house.

14    Q    Did he call you first?

15    A    I don't believe so, but I -- he might have.

16  Sometimes people do, sometimes they don't and I just do not

17  recall if he did or not.

18    Q    So he showed up at your house?

19    A    Right.

20    Q    In the daytime?

21    A    Yes.

22    Q    Do you know when that was?

23    A    No, I can't remember.  It was probably in

24  April of 2000.

25    Q    And what did he say when he got there?

---

47

1    A    He said he wanted a building permit and I said

2  what are you building and he said a garage and a house.  And

3  then he said his name and I said I cannot give you a

4  building permit.

5    Q    And why?

6    A    Because the supervisors had instructed me not

7  to give a building permit.

8    Q    When did the supervisors instruct you not to

9  give him a building permit?

10    A    Well, probably a couple of weeks before that.

11  And then while he was there, I called up Tom Wilson and Tom

12  -- and I said Mr. Corneal is here and what am I to do and

13  he said don't give him a permit.

14    Q    Did you ask him why shouldn't I give him a

15  permit?

16    A    Yes, because he was -- hadn't subdivided

17  properly and he hadn't got the correct septic tank approval.

18    Q    That's what Mr. Wilson told you?

19    A    Yes.

20    Q    Did you have any independent knowledge of

21  that?

22    A    Well, I'd heard.  Yes, I'd heard that that was

23  true.

24    Q    Where did you hear that from?

25    A    Oh, from different discussions of supervisors.

---

48

1    Q    Just with the supervisors?

2    A    Yes.

3    Q    You said that before Mr. Corneal showed up

4  that you had been instructed by the supervisors not to give

5  him a building permit.

6    A    Right.

7    Q    Now, in what -- you know, where were you when

8  you were instructed not to give him a building permit?

9    A    I can't tell you.  I can't remember.

10    Q    Did they tell you that in person or over the

11  telephone?

12    A    Over the telephone.

13    Q    They called you at your house?

14    A    Yeah, we talk on the phone, um-hum.

15    Q    So in the course of a telephone conversation

16  prior to --

17    A    Yes.

18    Q    -- Mr. Corneal's visit you're saying?

19    A    Right.

20    Q    So who exactly were you speaking to?

21    A    Pardon?

22    Q    Who exactly were you speaking to?

23    A    I know I talked to Ann Wirth about it.

24    Q    Did Miss Wirth tell you not to give him a

25  building permit?

---

49

1    A    She said the supervisors were not interested

2  in letting him have one at that time.

3    Q    And did she tell you why?

4    A    Yes, the same reason, that he was talking

5  about subdividing but he hadn't done the proper steps for

6  subdividing and he also hadn't gotten the correct permission

7  for septic systems.

8    Q    Well, let me ask you this:  If he's asking to

9  build one structure on one piece of property, does he have

10  to do some kind of subdivision thing?  I mean, what does he

11  have to do in connection with subdividing?

12    A    Well, he has to go through the planning

13  commission to subdivide and go through the supervisors.

14    Q    What if he doesn't want to subdivide, he just

15  wants to build?

16    A    Well, he couldn't on that property because

17  there was already a house on it and that would mean that he

18  would then be subdividing that property.

19    Q    Is that what Miss Wirth told you?

20    A    Yes, that's common practice, common knowledge.

21    Q    So you recall a phone call from Ann Wirth?

22    A    Yeah, I assume that -- a phone call.  I don't

23  know who called so I'll just say I talked to her on the

24  phone and I talked to Tom Wilson on the phone.

25    Q    Was that around the same time frame?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

50

1    A    Yes.
2    Q    Did either one of them express to you any
3  dislike of Mr. Corneal?
4    A    No.
5    Q    Did they express to you any conflict that they
6  were having with Mr. Corneal in any way?
7    A    Yes.
8    Q    And what did they express to you?  Who
9  expressed it to you and what did he or she express?
10    A    Well, he was very vituperative in two of the
11  township meetings.  Neither of those -- I wasn't present at
12  either of those for some reason and so they reported his
13  behavior at those and --
14    Q    What did they say about his behavior?
15    A    That it was irresponsible.  And I'm not sure
16  if that word was used, but it was very childlike and he did
17  this in front of all the -- the whole business meeting.
18    Q    What exactly did he do, did they tell you?
19    A    Well, he screamed and yelled and ...
20    Q    Did they tell you anything else about it?
21    A    What?
22    Q    Did they tell you anything else about it?
23    A    Not really.
24    Q    Who told you this, Miss Wirth or Mr. Wilson?
25    A    I think both of them.

51

1    Q    So did they tell you that because he behaved
2  in what they considered to be a childlike fashion that they
3  didn't want him to build or something?
4    A    No, that had nothing to do with it.
5    Q    What else did they tell you then?
6    A    That's essentially it.
7    Q    At the time that Miss Wirth and Mr. Wilson
8  told you that Mr. Corneal wouldn't be allowed to build
9  because he didn't have proper subdivision, was there a
10  subdivision ordinance in place in the township?
11    A    No, we had a moratorium on subdivision.
12    Q    Did you have an ordinance?
13    A    A subdivision ordinance?
14    Q    Yes.
15    A    We were working on that.
16    Q    So you just had a moratorium in place?
17    A    Right, um-hum.
18    Q    Were you involved in the discussions about
19  placing a moratorium in place in Jackson Township?
20    A    No, no.
21    Q    How did you come to find out about the
22  moratorium?
23    A    Well, it was just mentioned at township
24  meetings.
25    Q    Do you know how long it was under discussion?

52

1    A    No, I'm not sure.
2    Q    Had you ever heard about it prior to the time
3  that it was actually put in place by the township
4  supervisors?
5    A    Yes, um-hum.
6    Q    How long before that had you heard about it?
7    A    I can't remember.
8    Q    Were you present at the meeting when the
9  moratorium was put in place by the supervisors?
10    A    No.
11    Q    But you were aware of it?
12    A    Yes.
13    Q    Were you involved in any discussions or
14  conferences or anything like that concerning the moratorium
15  with the supervisors?
16    A    No.
17    Q    With anybody else?
18    A    I don't know.
19    Q    Well, do you recall who told you about the
20  moratorium?
21    A    Well, the supervisors, I assume.
22    Q    They mentioned to you that they were putting
23  it in place?
24    A    Yeah.
25    Q    That they intended to put it in place?

53

1    A    Yeah, and it was discussed at some of the
2  meetings.
3    Q    Did they tell you what their concerns were and
4  why they wanted to put a moratorium in place?
5    A    Well, they wanted to make sure that they had a
6  better understanding of the whole subdivision process.
7    Q    So they put a moratorium in place so they
8  could get a better understanding?
9    A    Yes, and they were trying to rewrite the whole
10  question of subdividing.
11    Q    Did they tell you why they needed to
12  understand it better?  Did they tell you what their concerns
13  were?
14    A    Well, I don't know that they said exactly, but
15  I'm assuming that they wanted to make sure that we had
16  better planning in the township and it wasn't
17  helter-skelter.
18    Q    So you're assuming that, but did they actually
19  tell you that?
20    A    No.
21    Q    Do you recall whether there was any public
22  expression of concern about subdivisions in the township
23  prior to the moratorium being placed --
24    A    Yes --
25    Q    Put in place?

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**54**

```
 1    A    -- there had been.
 2    Q    By whom?
 3    A    The supervisors and planners.
 4    Q    What planners?
 5    A    There were several architects and people in
 6  the township that had a concern about subdivision and the
 7  direction in which the township was or wasn't going.
 8    Q    And who were those architects and planners?
 9    A    Well, one was the name of Denson Groenendaal.
10    Q    Denson Groenendaal?
11    A    Yeah, um-hum.
12    Q    Is he a township resident?
13    A    Yes.
14    Q    Who else?
15    A    I can't think of any right now.
16    Q    You can't think of any others?
17    A    I know he was a major person.
18    Q    How do you know he was a major person?
19    A    Because he used to come to some of our
20  meetings and express that concern.
21    Q    To the supervisors?
22    A    Um-hum.
23    Q    Anybody else?
24    A    No.
25    Q    Let's go back for a second to Mr. Corneal's
```

**55**

```
 1  visit to your home in an effort to get a building permit.
 2    A    Um-hum.
 3    Q    So you told him -- as I understand your
 4  testimony, you told him he couldn't have one, correct?
 5    A    Yes, um-hum.
 6    Q    And you made a phone call to Mr. Wilson?
 7    A    Um-hum.
 8    Q    And he confirmed that you should not give
 9  him --
10    A    Right.
11    Q    -- a permit?  Did Mr. Corneal then ask you any
12  questions about why he couldn't have a permit?
13    A    Yes, and I said because you don't have the
14  proper documentation to receive one.
15    Q    For a subdivision?
16    A    For a subdivision or for septic.
17    Q    What did he say?
18    A    He started ranting and raving.
19    Q    What's your definition of ranting and raving?
20    A    Screaming and yelling at me.
21    Q    He screamed at you?
22    A    Yes.  And I began to be concerned about my
23  welfare and unfortunately my wife wasn't there.  She was not
24  in the house.  So I told him that either he leave or I'm
25  going to call authorities to take him out of my house.
```

**56**

```
 1    Q    And what did he say?
 2    A    Well, he finally left.
 3    Q    Did he ask you for an application?
 4    A    Yes.
 5    Q    Did you give him an application?
 6    A    No.
 7    Q    Why not?
 8    A    Because I didn't know what he was going to do
 9  with it.
10    Q    What did you think he was going to do with an
11  application?
12    A    Well, fill it out and pretend that he had an
13  application.
14    Q    Well, you mean pretend that he had a permit,
15  but he can't -- how could he pretend he has a permit?
16    A    Well, I don't know.
17    Q    So you didn't want to give him the
18  application?
19    A    Right.
20    Q    Why, because you just didn't want him to have
21  one?
22    A    Yes.
23    Q    Have you ever denied anybody else a building
24  permit application in the past?
25    A    No.
```

**57**

```
 1    Q    What did Mr. Corneal do when you wouldn't give
 2  him the application?
 3    A    He made a scene.
 4    Q    Is that when he started screaming and
 5  yelling --
 6    A    Right.
 7    Q    -- when you said no, I'm not going to give you
 8  an application?
 9    A    Right.
10    Q    Now, I heard you say a moment ago that you
11  attend township meetings.  Is that typically or just
12  sometimes or regularly or what?
13    A    Fairly typically.
14    Q    Do you know, for example, in 2000 how many
15  meetings you -- monthly meetings you attended?
16    A    Probably nine or 10.
17    Q    But you were not at the January meeting when
18  the moratorium --
19    A    No.
20    Q    -- was put in place?  Why not?
21    A    I cannot remember.
22    Q    What about the February 2000 meeting, do you
23  know if you were at that one?
24    A    I was not at that one either.
25    Q    What about the March 2000 meeting?
```

## 58

1  A    I can't recall.
2  Q    What about the April 2000 meeting?
3  A    I probably was at it, but I would have to look
4  at my calendar.
5  Q    Are you aware of the existence of pre-meetings
6  that --
7  A    Of what?
8  Q    I guess we would call them pre-meetings that
9  were held -- that are held by the supervisors prior to
10  township meetings?
11  A    Yes.
12  Q    Have you attended those meetings?
13  A    I've never attended one of them.
14  Q    Why is that?
15  A    Because I just didn't want to.
16  Q    Are you permitted to attend if you want?
17  A    Yes, I believe so.
18  Q    Are these meetings open to the public?
19  A    Yes.
20  Q    The pre-meetings are open to the public?
21  A    Yes, I believe so.
22  Q    Do you know where they're held?
23  A    In the secretary's — the township secretary's
24  office.
25  Q    The meetings -- the public meetings themselves

## 59

1  are held at the fire hall?
2  A    Right.
3  Q    What makes you say that the pre-meetings are
4  open to the public?
5  A    I think the Sunshine Laws of the state.
6  Q    Do people know that there are pre-meetings at
7  Ann Wirth's property?
8  A    Oh, I'm sure they do.
9  Q    And what makes you say you're sure that they
10  do?
11  A    Because they've talked about them at the
12  public meetings.
13  Q    Where is the fire hall in relation to Miss
14  Wirth's house?
15  A    About four miles away and the fire hall is
16  right in center city McAlevys Fort.
17  Q    Is there any kind of a sign at Miss Wirth's
18  that says, you know, township office --
19  A    Yes.
20  Q    -- pre-meetings held here, something like
21  that?
22  A    No, no, there is no sign that says meetings
23  held, but it does — there is a sign that says township
24  supervisors — or township secretary has an office there.
25  Q    So it's the township secretary's office?

## 60

1  A    Yes.
2  Q    Is that building open to the public, like can
3  anybody go in and walk in anytime they want?
4  A    I assume.  She has office hours.
5  Q    She does?
6  A    Yes.
7  Q    Have you ever tried to go up there just to go
8  into the township secretary's office?
9  A    Oh, yeah.
10  Q    Is it unlocked?
11  A    I don't know because if she's not there, she
12  has a sign out that she'll be back at a certain time.  I've
13  never tried the door.
14  Q    As far as the pre-meetings are concerned that
15  you think might be open to the public, are they actually
16  advertised in the newspaper or anything like that, there
17  will be a pre-meeting at Ann Wirth's office prior to the
18  public supervisor's meeting?
19  A    That I'm not sure of.  I don't get the Daily
20  News.  I don't get — receive that paper.
21  Q    To your knowledge, though, are they
22  advertised?
23  A    I think so, but I would not place my life on
24  it.
25  Q    What makes you think so?

## 61

1  A    Because I know occasionally that they have
2  said something in the paper.
3  Q    You mean occasionally the supervisors say
4  we're putting something in the paper?
5  A    And whenever the supervisors have a change of
6  the supervisor's meetings it's always in the paper.
7  Q    The regular monthly meetings?
8  A    Yes, uh-huh, and those are open and attended
9  by townspeople.
10  Q    Right.  Do you know what actions or what
11  activities take place at these pre-meetings?
12      MR. SHERR:  I'm going to object to the form of
13  the question.  I believe it's calling for hearsay now since
14  he already stated he did not go to any of those meetings.
15      MS. MONTGOMERY:  Well, hearsay is perfectly
16  permissible in a deposition, perfectly permissible.
17      MR. SHERR:  I'm not telling him not to answer.
18  I'm objecting to the form of the question because you're
19  asking for hearsay.
20      MS. MONTGOMERY:  Okay.
21  BY MS. MONTGOMERY:
22  Q    Do you know what activities take place at the
23  pre-meetings?
24  A    Well, I know they sign checks.
25  Q    The supervisors sign checks?

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

**62**

1    A    Yes, uh-huh, because I get my check from them
2    once a month.
3    Q    What else?
4    A    I have no idea.
5    Q    Do you know of any member of the public who
6    has ever attended a pre-meeting?
7    A    No, I don't.
8    Q    When Mr. Corneal visited your house and asked
9    you for a building permit application, do you recall whether
10    -- do you recall telling him that there was going to be a
11    meeting on his situation the next day?
12    A    Yes, I do recall a comment like that.
13    Q    That you made to him?
14    A    Yes, um-hum.
15    Q    How did you know there was going to be a
16    meeting on his situation?
17    A    Well, there was some talk about it, but it
18    apparently never took place.
19    Q    That wasn't a public meeting, correct?
20    A    No, I don't believe so.
21    Q    Was that going to be a meeting of the
22    supervisors and Ann Wirth?
23    A    Yes.
24    Q    Were you supposed to be there?
25    A    No.

---

**63**

1    Q    Why don't you think it ever took place?
2    A    Pardon?
3    Q    Why don't you think it ever took place?
4    A    Because I never got any response about that I
5    should change the stance on the building permit for Mr.
6    Corneal.
7    Q    So you don't really know whether or not the
8    meeting ever took place --
9    A    No.
10    Q    -- correct?  You said there had been some talk
11    of holding a meeting.  Some talk among who?
12    A    The supervisors to try and figure out what had
13    to be done.
14    Q    About Mr. Corneal?
15    A    Yes.
16    Q    So this was going to be a non-regular -- it
17    wasn't a monthly meeting or anything like that --
18    A    Not that I know of.
19    Q    -- or even a pre-meeting?
20    A    Yes.
21    Q    Was anybody else present at your house the day
22    that Mr. Corneal came?
23    A    No.
24    Q    Did you have occasion then after that visit to
25    meet with Mr. Corneal in person?

---

**64**

1    A    No.
2    Q    You never talked to him in person again --
3    A    No.
4    Q    -- about his building permit application?
5    A    No.
6    Q    What did you then do next about his building
7    permit?
8    A    I waited to hear from the supervisors.
9    Q    What did you hear next from the supervisors?
10    A    Well, that until he agreed to take care of the
11    concerns that they weren't going to allow him to have a
12    permit.
13    Q    Who agreed?
14    A    The supervisors.
15    Q    They agreed -- I'm sorry, I don't understand
16    what you said.
17    A    You asked me the next step and what I'm saying
18    is that they told him, apparently, and this is -- that until
19    he solved the problems that they wouldn't have me issue a
20    building permit.
21    Q    How do you know they told him that?
22    A    I don't know.  I'm assuming that they did.
23    Q    Okay.  Assuming based on what?
24    A    Well, based on the fact that they were trying
25    to get different things solved.

---

**65**

1    Q    Have you ever been present at a township
2    meeting that Mr. Corneal was present at?
3    A    No.
4    Q    Did you ever have the opportunity to talk to
5    Mr. Corneal again on the telephone about his building permit
6    application?
7    A    No.
8    Q    Did he ever call -- try to call you again?
9    A    No.
10    Q    Did he ever write to you?
11    A    Yes.
12    Q    What was the occasion of his writing to you?
13    A    Somewhere there's a letter in there.
14    Q    Do you recall a time when Mr. Corneal decided
15    that he just wanted to build a studio rather than a house?
16    A    Yes.
17    Q    What do you know about that?
18    A    He came and presented plans to me,
19    architectural plans, of a four garage -- four-stall garage
20    with an upstairs studio in it.
21    Q    Okay, he presented them to you.  I thought you
22    said you hadn't an occasion to meet with him again?
23    A    That was when he came that first time.
24    Q    Oh, okay.  So he was at that time asking you
25    for a garage and a house, is that what you're saying -- a

---

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

66

1  studio and a house?
2  A    Well, yes, he was going to do a house and a
3  garage and then he changed his mind and decided to have a
4  studio separate from the garage.
5  Q    So is it your testimony that the time that he
6  came to your house he was asking you for a building permit
7  both for the house and for the studio, correct?
8  A    I'm not sure about that. I can't -- the only
9  drawings he had with him were a four-stall garage and with a
10  second story for a studio.
11  Q    So he didn't need any septic for that studio,
12  right?
13  A    I would say so.
14  Q    Why is that?
15  A    Because as an artist he's got to use water and
16  that means that you've got to have, you know, a system to
17  get rid of the water and -- through a septic system.
18  Q    Do you have septic in your studio?
19  A    No, I don't.
20  Q    So you don't really know anything about why
21  Mr. -- or you don't really know anything that would
22  demonstrate that Mr. Corneal needs septic in his studio, do
23  you?
24  A    No, I'm assuming that he would need to have a
25  septic system because of the type of artwork that he's --

67

1  Q    How do you get water to your studio?
2  A    I go to the stream and get water.
3  Q    So assuming he doesn't want septic in his art
4  studio --
5  A    Pardon?
6  Q    Assuming he doesn't want water in his studio
7  like you don't need water in your studio, does he need a
8  septic system?
9  A    Well, I suppose not.
10  Q    Did Mr. Corneal ever tell you that he was
11  looking to put water in his studio?
12  A    I don't recall.
13  Q    Did you at the time that he asked you for the
14  building permit make any distinction between the art studio
15  and the house?
16  A    I knew he was going to build a house.
17  Q    But he was asking to build a house and an art
18  studio, right?
19  A    I don't recall if he was asking for both of
20  them at that time or not.
21  Q    But you did testify that he brought to you
22  some plans and the only plans that he showed you were for an
23  art studio -- or a four-bay garage with a studio above it,
24  correct?
25  A    Yes.

68

1  Q    But you denied him the application even for
2  that studio, correct?
3  A    Yes.
4  Q    Did you do so based on what the township
5  supervisors told you to do?
6  A    Right.
7  Q    So they told you don't give him a building
8  permit for anything, right?
9  A    Exactly.
10  Q    Mr. Van Dommelen, I'm just going to take a
11  second and show you a document -- while I find this
12  document, I'm going to ask you questions so we don't waste
13  time. Have you had occasion to discuss with any of the
14  township supervisors their depositions?
15  A    No.
16  Q    Have you had occasion to discuss with anybody
17  the depositions of the township supervisors?
18  A    I have not heard of anything that they've --
19  no, I haven't.
20  Q    Have you talked to the township supervisors
21  about their depositions or about this lawsuit since their
22  depositions were taken?
23  A    No.
24  Q    What about Miss Wirth, have you had occasion
25  to talk to Miss Wirth about her deposition?

69

1  A    No.
2  Q    Have you talked to her since her deposition
3  was taken?
4  A    Yes.
5  Q    When was that?
6  A    Well, I've talked to her several times about
7  different issues.
8  Q    Did you talk to her about this lawsuit?
9  A    No.
10  Q    So has anybody -- no matter who they are,
11  anybody, told you anything about the testimony that was
12  given --
13  A    No.
14  Q    -- in the depositions of the township
15  supervisors --
16  A    No.
17  Q    -- or Ms. Wirth?
18  A    Unh-unh. The only thing I know about is --
19  because I was here the day that Ann Wirth -- I know the
20  period of time it took for the deposition.
21  Q    Now, when Mr. Corneal came to your house, did
22  you indicate to him that you would call him or get back in
23  touch with him in any way?
24  A    No.
25  Q    Do you recall getting a phone call from him

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

## 70

1  after that meeting --
2  　A　　No, I don't.
3  　Q　　-- at your house?  I'm going to show you a
4  document that we're going to -- it's already been marked as
5  Wirth 15 so we don't need to mark it again and I'll ask you
6  to take a look at it.
7  　A　　Um-hum.
8  　Q　　Do you recall receiving that letter from Mr.
9  Corneal?
10  　A　　Yes, um-hum.
11  　Q　　What did you do with that letter once you
12  received it?
13  　A　　I filed it.
14  　Q　　Filed it where?
15  　A　　In my file.
16  　Q　　Did you send it on to anybody else?
17  　A　　No.
18  　Q　　Why not?
19  　A　　I don't know who I would have sent it on to.
20  　Q　　You wouldn't have sent it on to the township
21  supervisors?
22  　A　　No.
23  　Q　　Did you call him back about that letter?
24  　A　　No.
25  　Q　　Did you tell anybody about the letter?

## 72

1  　A　　Huh?
2  　Q　　I appreciate your honesty.  Why did you call
3  him a trouble-making yuppie from over the mountain?
4  　A　　Well, it was because I think it's a good
5  demographic term that is used for people of his age and for
6  people who always want to sue other people.
7  　Q　　Well, on May 5, 2000 he hadn't sued anybody,
8  right?
9  　A　　What?
10  　Q　　On May 5, 2000 he hadn't sued anybody, right?
11  　A　　I still didn't hear you.
12  　Q　　On May 5, 2000 when he wrote this letter he
13  hadn't sued anybody, right?
14  　A　　No, but I figured he would because he had
15  threatened me that he was going to sue.
16  　Q　　Did he threaten you to sue after you wouldn't
17  give him the application?
18  　A　　Yes.
19  　Q　　Did that term trouble-making yuppie from over
20  the mountain come from somebody else or did you think that
21  up yourself?
22  　A　　Oh, I just made it up myself -- or I didn't
23  make up the term yuppie.
24  　Q　　Right, of course not.  What about Mr. Corneal
25  makes you say that he's a yuppie?

## 71

1  　A　　I think I probably told Ann Wirth that I'd
2  received one.
3  　Q　　And what did you understand that letter to be
4  asking you?
5  　A　　Pardon?
6  　Q　　What did you understand that letter to be
7  asking you?
8  　A　　To call him back.
9  　Q　　Why didn't you call him back?
10  　A　　Because there's no -- nothing solved about the
11  building permit.
12  　Q　　In his letter he tells you he just wants a
13  building permit for his garage right now, correct?
14  　A　　Um-hum.
15  　Q　　Is there something that needed to be solved
16  about his garage?
17  　A　　No.
18  　Q　　Can I see that again, please -- actually hold
19  on to it, I'll get a copy, sorry.  Mr. Corneal states in
20  this letter that you called him a trouble-making yuppie from
21  over the mountain.  Is that true?
22  　A　　Yes.
23  　Q　　You did call him that?
24  　A　　Yeah.
25  　Q　　I appreciate your honesty.

## 73

1  　A　　I think he just behaves like someone who wants
2  to get their own way and his age group.
3  　Q　　So when you called Mr. Wilson the day that Mr.
4  Corneal was out at your house, you explained to him that Mr.
5  Corneal was really just right now just asking for the permit
6  for the garage, right?
7  　A　　Yes.
8  　Q　　And Mr. Wilson said what?
9  　A　　He said don't give him a permit.
10  　Q　　When you told -- you indicated earlier that
11  you told him that they were going to meet -- the supervisors
12  were going to meet the next day about Mr. Corneal's permit
13  situation, right?
14  　A　　Yes.
15  　Q　　You testified to that.  Did you tell Mr.
16  Corneal you would call him and let him know?
17  　A　　I don't recall that I did.
18  　Q　　Do you recall him giving you his telephone
19  number where you could reach him?
20  　A　　Yeah, I did have his telephone number.  I
21  thought it was here in all these papers but I can't seem to
22  find it.
23  　Q　　But he gave it to you that day, right, so you
24  could get a hold of him?
25  　A　　Well, I can't -- I can't remember if he gave

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

**74**

1  that to me -- he must have given it to me that day.
2      Q  Okay.  So now after you received this letter,
3  you just filed it away and what did you do, just wait to
4  hear from the supervisors again?
5      A  Yes.
6      Q  Did you take any independent action in
7  connection with deciding whether or not he ought to have a
8  permit?
9      A  I did one thing.  I drove down into his
10  property to see what was happening and when I came back my
11  wife said don't ever do that again.
12      Q  Why is that?
13      A  Because she doesn't trust him.
14      Q  She didn't want you to go near his property?
15      A  Right, um-hum.
16      Q  Why didn't your wife trust him?
17      A  By his behavior.
18      Q  But she wasn't there, right?
19      A  No.  Well, I told her.
20      Q  You told her that he had screamed?
21      A  I tell her everything.
22      Q  You told her he screamed at you?
23      A  Pardon?
24      Q  You told her she screamed at you?
25      A  Yes, um-hum.

**75**

1      Q  Were you at the township meeting when the
2  subdivision ordinance eventually was approved by the
3  supervisors?
4      A  I can't remember.  I have a -- I have a very
5  difficult time hearing in that hall and -- because it's all
6  metal and, you know, I just can't -- I can't hear unless I'm
7  right sitting as close as you are so I can almost read lips.
8      Q  I understand.
9      A  I miss about 75 percent of the discussion in
10  the township meetings.
11      Q  I see.  Between the time that the moratorium
12  was put in place and the subdivision ordinance was finally
13  approved --
14      A  Yes.
15      Q  -- did you issue any building permits?
16      A  Did I what?
17      Q  Issue any building permits.
18      A  After that?
19      Q  No, between the time the moratorium was put in
20  place and the time it was finally approved, did you issue
21  any building permits?
22      A  Probably, for sheds and small structures.
23      Q  So if Mr. Corneal didn't need a sewage permit,
24  right -- let me say this:  If Mr. Corneal didn't need
25  septic, he wouldn't need a sewage permit, correct?

**76**

1      A  Not if it's just a garage.
2      Q  Did there come a time then when you did
3  receive building permit applications from Mr. Corneal?
4      A  No.
5      Q  You never received a building permit
6  application from him?
7      A  No.
8      Q  I'm going to show you what's been marked
9  previously as Wirth Exhibit 13 and ask you to look at that,
10  please.  Okay?
11      A  Um-hum.
12      Q  Did you write that letter?
13      A  Did I write that?
14      Q  Yes.
15      A  I wrote part of it.
16      Q  Which part of it did you write?
17      A  Well, I wrote a general one and then Larry
18  Newton looked it over and made some slight changes.
19      Q  So you sent that letter to Larry Newton after
20  you did an initial draft of it?
21      A  Yes.
22      Q  And he sent it back with some changes?
23      A  Yes.
24      Q  Did you do that on your computer, that letter?
25      A  No, unh-unh.

**77**

1      Q  Well, let me ask you this:  When you say you
2  wrote it, did you handwrite it initially and send it back to
3  -- send it to Larry?
4      A  Well, I probably did -- the initial one I
5  probably did on the computer, but I -- I'm almost sure that
6  I didn't save it.
7      Q  Okay.  So you --
8      A  So then I sent -- the reason I say this didn't
9  come off my computer is because it's not justified and I
10  always justify all my letters because I think it looks
11  better.
12      Q  So do you think that came from Larry Newton's
13  computer?
14      A  Yes.
15      Q  In final form it came to you for your
16  signature?
17      A  Pardon?
18      Q  In final form it came to you for your
19  signature from Larry Newton?
20      A  Yes, um-hum.
21      Q  What does that letter do, purport to do?
22      A  Well, it's telling him that he hasn't met with
23  the right qualifications to get a building permit in terms
24  of no subdivision, land ordinance, sewage modules.
25      Q  Well, now, the first letter says please be

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

78

1 advised that Jackson Township has referred to me for review
2 your applications for building permits, right?
3     A     **Pardon?**
4     Q     Please be advised that Jackson Township has
5 referred to me for review your applications for building
6 permits.
7     A     **Um-hum.**
8     Q     I thought you said that you hadn't -- you
9 never got an application for a building permit?
10    A     **Well, I didn't.**
11    Q     So you never actually reviewed the
12 applications; is that right?
13    A     **No, we never -- it was never filled out.**
14    Q     Did anybody ever send to you his -- any filled
15 out application?
16    A     **No.**
17    Q     Who told you it was never filled out, that no
18 application was ever filled out?
19    A     **No what?**
20    Q     Who told you that no application was ever
21 filled out?
22    A     **Well, I never received one.**
23    Q     I'm going to show you something.  Actually
24 what I'm going to do here, just because I think -- I want to
25 keep this straight.  The first letter that we looked at,

79

1 which was the May 5th, 2000 letter from David Corneal to
2 you --
3     A     **Um-hum.**
4     Q     -- and the second letter that we looked at,
5 the October 10, 2000 letter from Mr. Corneal -- to Mr.
6 Corneal from you, we're going to mark this again actually
7 for your deposition.
8         MS. MONTGOMERY:  So we will do these Van
9 Dommelen Deposition Exhibits 1 and 2 respectfully.  And you
10 can hold onto them because I'm going to ask you a few more
11 questions about them.
12        (Letter dated 5/5/00 produced and marked as
13 Van Dommelen Exhibit No. 1.)
14        (Letter dated 10/10/00 produced and marked as
15 Van Dommelen Exhibit No. 2.)
16 BY MS. MONTGOMERY:
17    Q     Now, I'm going to show you a document that we
18 will mark as Van Dommelen Exhibit 3 at this time.
19        (Packet of documents produced and marked as
20 Van Dommelen Exhibit No. 3.)
21 BY MS. MONTGOMERY:
22    Q     Mr. Van Dommelen, the first document on your
23 Exhibit 3 there is the August 31, 2000 letter from David
24 Corneal to Ann Wirth.
25    A     **Right.**

80

1     Q     Have you ever seen this letter before?
2     A     **No.**
3     Q     Underneath it --
4     A     **I do -- I do see this building permit here and
5 I understand now where that came from.**
6     Q     You mean the building application?
7     A     **Yes, uh-huh.**
8     Q     Now, what do you understand about that?
9     A     **That was sent to Larry Newton, a blank one,
10 and Larry Newton sent it to Corneal to fill out, but I've
11 never -- see, I don't have it in my files at all.**
12    Q     And you never got a chance to actually review
13 it?
14    A     **No.**
15    Q     What about the other two applications that are
16 there?
17    A     **No, I have not seen them before.**
18    Q     You've never seen the other three either?
19    A     **No.**
20    Q     But when you wrote your letter to Mr. Corneal,
21 your October 10, 2000 letter, you made reference to
22 applications for building permits in the plural, correct?
23    A     **Yes.**
24    Q     Were those your words or was that something
25 that Larry Newton had put in?

81

1     A     **I think Larry Newton.**
2     Q     Filled that in for you?
3     A     **Um-hum, right.**
4     Q     Did your first draft -- what did your first
5 draft say, do you recall?
6     A     **No, I don't recall.**
7     Q     Did somebody tell you what to say?
8     A     **It wasn't as complicated as this, though.**
9     Q     Did somebody tell you what to say?
10    A     **Yeah, I think Larry Newton.**
11    Q     Told you what to say.  So how did you find out
12 about the applications for building permits if you never saw
13 them?
14    A     **Well, I think I sent some to Larry Newton.  He
15 asked for some.**
16    Q     For some blanks?
17    A     **Yes.**
18    Q     But then the filled out ones --
19    A     **I never saw the filled out ones.**
20    Q     How did you find out that they had been filled
21 out?
22    A     **I'm not sure that I knew.**
23    Q     But you wrote a letter that says that you
24 reviewed the applications but you didn't really know that
25 they'd been filled out?

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**VAN DOMMELEN, DAVID**
**06/06/01**

<div align="right">

**CORNEAL  VS**
**JACKSON TOWNSHIP**

</div>

82

1    A    No, I can't answer that.
2    Q    Well, let me ask you this:  I know that you --
3    I believe that you've testified essentially that you just
4    wrote a letter that somebody else had -- told you what to
5    say in the letter, correct?
6    A    Well, to some extent, yes.  I had, you know --
7    I had written a draft and I'm assuming that it -- they
8    didn't feel I was putting the proper punch in there.
9    Q    Did anybody else tell you what to say in the
10   letter besides Mr. Newton?
11   A    No, unh-unh.
12   Q    Do you recall what language Mr. Newton wanted
13   you to add to this letter?
14   A    I think a little more detail about the
15   Department of Environmental Protection, areas like that.
16   Q    Did you ever indicate to Mr. Newton that you
17   hadn't seen -- since you hadn't seen the permits --
18   A    No.
19   Q    -- it was difficult to --
20   A    No.
21   Q    -- write the letter?
22   A    No.
23   Q    Or I'm sorry, hadn't seen the applications.
24   A    No.
25   Q    You never told him that?

83

1    A    No, unh-unh.
2    Q    You just rely on him telling you what to say?
3    A    Well, I was relying on eventually that they
4    would come back for my -- you know, for my files.
5    Q    Have you ever denied a building permit
6    application without seeing it before?
7    A    No.
8    Q    Have you ever written any other letter like
9    this, like what is -- we've marked as Van Dommelen Exhibit 2
10   now --
11   A    No.
12   Q    -- the October 10 letter?  You've never
13   written any other letter like that?
14   A    I've written letters requesting someone to
15   apply for a building permit.
16   Q    Understood.  What were you thinking would come
17   back for your files?  You just said, you know, I assumed it
18   would come back for my files.
19   A    Well, once it -- if it were going to be
20   approved, then I would have to have it in my files to send
21   to the tax assessment form.
22   Q    If the supervisors had said okay --
23   A    Right.
24   Q    -- now we're going to allow you to approve it?
25   A    Right.

84

1    Q    Then you'd get an application for your files?
2    A    Yes, um-hum.
3         MS. MONTGOMERY:  Hold on a second.
4         (Pause.)
5    BY MS. MONTGOMERY:
6    Q    Now, after this October 10, 2000 letter that
7    you wrote denying these applications that you hadn't seen,
8    did there come a time once again that you had anything to do
9    with Mr. Corneal's request for a building application
10   permit?
11   A    No.
12   Q    No?
13   A    No.
14   Q    You never had any other involvement whatsoever
15   with his request for a permit?
16   A    No.
17   Q    Have you ever had any discussion with the
18   supervisors about his request for a permit?
19   A    Yeah, I would say so, but I can't give you any
20   detailed conversation.
21   Q    Have you ever attended any sort of special
22   meeting or anything --
23   A    No.
24   Q    -- like that where Mr. Corneal's --
25   A    No.

85

1    Q    -- situation was --
2    A    No.
3    Q    -- discussed?  You should let me finish my
4    sentence.
5    A    I just seen him the one time.
6    Q    I'm really talking about any meetings with
7    anybody else.
8    A    No.
9    Q    Now, do you know whether or not Mr. Corneal
10   appealed the denial of his request for building permits?
11   A    No, I don't -- I don't recall.
12   Q    Have you ever -- well, let me ask it this way:
13   I believe you testified that you never denied a building
14   permit before Mr. Corneal's, correct?
15   A    Um-hum.
16   Q    So you wouldn't have had an opportunity to be
17   involved in the appeal of a denial; is that correct?
18   A    No.
19   Q    Do you know what kind of procedures you would
20   use if you had to -- if somebody did appeal?
21   A    No.  No, the only appeals that I've dealt with
22   is on an appeal to build a structure closer to the -- to a
23   land -- a land border.
24   Q    A boundary line?
25   A    Yeah, a boundary line.  We have a 15-foot

<div align="center">

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

</div>

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

**86**

1  boundary line.
2  Q    Setback?
3  A    Yeah, setback and someone appealed to have the
4  building set back.
5  Q    And how did you -- how was that appeal
6  handled?
7  A    Well, they called me and I asked them if they
8  wanted to have an appeal and then they would have to write a
9  letter to the supervisors and they did that.
10 Q    And then what happened?
11 A    And then the supervisors approved the appeal.
12 Q    So you denied the request -- was it a request
13 for a variance, is that what it was?
14 A    Pardon?
15 Q    Was it a request for a variance of the
16 setback?
17 A    Yeah, something like a variance, um-hum.
18 Q    Did that go to the zoning officer, is that
19 what they were appealing?
20 A    We don't have a zoning officer.
21 Q    I'm just a little bit confused because you'd
22 indicated that you had -- was it a building permit that was
23 being denied or what was it?
24 A    Well, it was a -- yeah, then it would be a
25 building permit.

---

**87**

1  Q    But you had said that you never denied a
2  building permit before.
3  A    Well, they were eventually given it.
4  Q    Oh, I see. Okay. So let me just get this
5  straight. Somebody came and asked you if they could build a
6  building at a particular site on their property?
7  A    Right.
8  Q    And you said you wouldn't be able to build it
9  there, is that --
10 A    Yes, there was a question about that being
11 placed too close to the boundary line and so then I
12 suggested that they should appeal that to the board of
13 supervisors.
14 Q    What did the board of supervisors do after it
15 was appealed?
16 A    Well, they took a vote and approved it.
17 Q    Do you know when they took a vote?
18 A    At the -- at a supervisor's meeting.
19 Q    At a public meeting?
20 A    Public meeting.
21 Q    Were you there?
22 A    Yes.
23 Q    You were there. When was that?
24 A    I can't remember the date. I'd have to look
25 in my book. About a year ago.

---

**88**

1  Q    So it was in the year 2000?
2  A    A year ago or two years ago.
3  Q    You think it was in the year 2000?
4  A    Pardon?
5  Q    You think it was in the year 2000?
6  A    It might have been.
7  Q    What was the name of the man who -- or woman
8  who requested the building --
9  A    Stanborough.
10 Q    Stanborough?
11 A    Um-hum.
12 Q    Is that S-t-a-n-b-o-r-o-u-g-h?
13 A    Yes, um-hum.
14 Q    So they eventually got their building permit,
15 right?
16 A    Um-hum.
17 Q    And they were allowed to build too close to
18 the boundary line, right?
19 A    Yes.
20 Q    So you were at that meeting, correct?
21 A    Yes, I believe I was.
22 Q    Was there any discussion about --
23 A    Yeah, there was a slight discussion about it.
24 Q    Did you participate --
25 A    And the reason that they decided, they had one

---

**89**

1  shed already close and they were going to tear that one down
2  and put another one up.
3  Q    I see.
4  A    And so that's why it was approved because they
5  had already had one that was close to the boundary line.
6  Q    So you didn't give them a formal denial, you
7  just said I can't approve this, you need to go talk to
8  them --
9  A    Right.
10 Q    -- is that right?
11 A    (Witness nods head affirmatively.)
12 Q    Did you give them anything in writing actually
13 denying it?
14 A    No.
15 Q    Did they actually submit -- had they actually
16 submitted an application to you or did they just come and
17 talk to you about it informally?
18 A    It was sort of informal and then they
19 appealed.
20 Q    So is it your understanding that if someone
21 builds the denial -- I'm sorry, appeals the denial of a
22 building permit then it would be -- the appeal would be held
23 at a township supervisor's meeting?
24 A    Yes, um-hum.
25 Q    And they would rule on it there?

---

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

90

1    A    Right.
2    Q    Can you recall any other appeal of a building
3 permit situation?
4    A    Not offhand.
5    Q    What about applications for septic approval,
6 septic system approval?
7    A    I have nothing to do with that.  That all
8 comes through the septic officer and --
9    Q    Barry Parks?
10   A    Yeah, Barry Parks.  And he does all that work
11 and finally submits to the owner of the land a septic
12 approval.
13   Q    If he disapproves, though, have you ever been
14 around or in -- present in any situation where there's been
15 some discussion of the denial of septic approval?
16   A    No, unh-unh, because usually Barry Parks talks
17 to the landowner and very often to Tom Wilson.
18   Q    About any problems he's concerned with?
19   A    Yes.
20   Q    So he talks informally to Tom Wilson, is that
21 what you're saying?
22   A    I'm assuming, yeah.
23   Q    How do you know that that's what happens?
24   A    I don't know.
25   Q    Well, then let me just ask you and I'm just

91

1 curious.  Then why did you say you think that's what
2 happens?
3    A    Well, because I know that Tommy Wilson very
4 often does some of the work on septic tanks and so that
5 means that -- that he has to talk to Barry Parks.
6    Q    So if there's a problem they just work it out
7 between the two of them?
8    A    Right.
9    Q    Do you know of very many instances in which
10 that has occurred?
11   A    No, I don't.
12   Q    So nobody ever told you about an appeal of the
13 building permit decision, nobody ever mentioned it to you?
14   A    Of which one?
15   Q    Mr. Corneal's, I'm sorry.
16   A    No, no.
17   Q    I'm going to show you another document now
18 that we're going to mark as Van Dommelen Exhibit 4 and ask
19 you to take a look at it for me.  This is the suggested
20 ideas document.
21        (Suggested ideas produced and marked as Van
22 Dommelen Exhibit No. 4.)
23 BY MS. MONTGOMERY:
24   Q    Now, Mr. Van Dommelen, do you recognize this
25 cover sheet --

92

1    A    Um-hum.
2    Q    -- that says suggested ideas?  Did you prepare
3 that?
4    A    Yes, um-hum.
5    Q    What was the suggested idea in here?  Was it
6 the building permit price, is that what you're referring to?
7    A    Yes, uh-huh.  We had had a -- just a one
8 figure building price before and we felt that it should be
9 graduated and so this was voted on to -- in March '99 to
10 have a graduated cost.
11   Q    Understood.  Well, actually it says March
12 1994. Is that what you mean?
13   A    What?
14   Q    Actually it says March 1994 there.
15   A    Oh, yes.
16   Q    Is that what you mean?
17   A    Yes, I'm sorry.
18   Q    Now, was there anything else attached to this
19 document at the time?  And for the record --
20   A    No.
21   Q    -- actually I should tell other defense
22 counsel that these are documents that we got when we went up
23 to Huntingdon County last week.
24   A    No, this comes out of my -- out of my building
25 permit book.

93

1    Q    Is there any reason why it's attached to the
2 -- I will represent to you that we got it attached --
3    A    Attached to this are all the -- all the
4 applications that I file.
5    Q    Since 1989?
6    A    Since 1989, yeah.
7    Q    Is this a copy -- starting with the second
8 page where it has name, fee, date, permit of different
9 people, is this a copy of what you keep in your black
10 binder?
11   A    Yes, uh-huh.
12   Q    Is this an exact copy --
13   A    Yes.
14   Q    -- of what you would keep in your black
15 binder?
16   A    It looks like it.
17   Q    Let's turn to the next to the last page --
18 actually I'm going to direct your attention to the third to
19 the last page instead, sorry about that.
20   A    Which one?
21   Q    Third to the last page where it says -- you
22 have the name Pauline Weaver there at the bottom of the
23 page.  It's the fourth name from the bottom of the page.
24   A    Paul who?
25   Q    Pauline Weaver.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

94

1    A    Oh, yes, uh-huh.
2    Q    Do you recall that application?
3    A    No.
4    Q    Do you know who Pauline Weaver is?
5    A    Well, I'm sure I met her. I'm not sure.
6    There are several Weaver families and I'm not sure which one
7    this one is.
8    Q    Now, over on the right-hand column -- it seems
9    like some of this is missing. That's the way it came to
10    us. What would have been in the right-hand column?
11    A    On the far right-hand column?
12    Q    Yes.
13    A    Those are the plot numbers for -- the plot
14    numbers that are on the plot plans for the township.
15    Q    Do you think that you could provide a copy of
16    this document that doesn't cut off the plot numbers?
17    A    They were on -- they were on.
18    Q    Did you get your original back?
19    A    No.
20    Q    Miss Wirth still has it?
21    A    I don't know where it is.
22    Q    Maybe we still have it.
23    MS. MALADY: We can check.
24    MS. MONTGOMERY: Maybe we did it.
25    THE WITNESS: Because it's on the original

95

1    because these are all the lists of the plot numbers.
2    MS. MONTGOMERY: Okay. All right, that's
3    fine. We may have to make new copies and get them out to
4    you guys.
5    BY MS. MONTGOMERY:
6    Q    In the most right-hand column that's fully
7    showing, under purpose there, across from Pauline Weaver,
8    what does that say? Is that meant to be garage?
9    A    Oh, it must be garage. For Weaver you mean?
10    Q    Yes, for Pauline Weaver.
11    A    Yes, my typing ability.
12    Q    So that was approved, right, that building
13    permit?
14    A    Yes, uh-huh.
15    Q    But you don't recall anything about Pauline
16    Weaver and her whole situation, right?
17    A    Pardon?
18    Q    You don't recall anything about Pauline Weaver
19    and her situation?
20    A    No, I don't. I'd have to see the original --
21    Q    Do you recall Joe Merrell?
22    A    Which one is that?
23    Q    Joe Merrell which is two lines down from
24    Pauline Weaver.
25    A    Oh, Jan Cramer?

96

1    Q    No, it says Joe Merrell, two lines down from
2    Pauline --
3    A    Oh, Joe Merrell?
4    Q    Yes.
5    A    All right. No, I don't recall which one
6    he is.
7    Q    You don't recall him?
8    A    No, I can't recall him.
9    Q    How about Ruby Dunlap? That's on the next
10    page, the April 17, 2000 building permit application.
11    A    Yeah, I see it.
12    Q    Do you see that?
13    A    Yeah.
14    Q    Do you recall that application?
15    A    I'm not sure. I'm not sure.
16    Q    What about the one above it, Douglas Reid with
17    the house, the purpose is a house?
18    A    Yes, I do -- I do recall that case.
19    Q    Mr. Reid?
20    A    Uh-huh.
21    Q    You recall that?
22    A    Yeah, I recall that because that was built on
23    a floodplain and they had to get approval from the federal
24    government to rebuild a house that burnt down on the
25    floodplain.

97

1    Q    Did they get that approval?
2    A    Yes, they got -- engineers came out and
3    checked the floodplain and recommended that they build the
4    house, you know, at a certain height and so it's above the
5    100 year floodplain.
6    Q    And did the -- the supervisors wouldn't have
7    had anything to say about that then; is that correct?
8    A    No, no, it has to be done -- it has to be done
9    by an engineer that comes out and does the approval for
10    that.
11    Q    So once the federal government looks at it,
12    it just comes right back to you for approval or disapproval?
13    A    Yes, I usually get a letter and -- from the --
14    and that letter would be accompanied by the building permit
15    in my little black book.
16    Q    So the house burnt down. Do you recall the
17    size of that property? Do you recall that property
18    generally?
19    A    Pardon?
20    Q    Do you recall that property generally?
21    A    Yes, uh-huh.
22    Q    What's the size of that property?
23    A    Oh, in terms of acreage I don't know.
24    Q    Do you know whether there were any other
25    structures on the property?

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

98

```
 1    A    No, I don't know.
 2    Q    What about Robert Weaver which is --
 3    A    Okay.  Yeah, Robert Weaver is building a
 4    workshop.
 5    Q    And that application date was May 4, 2000,
 6    correct?
 7    A    Yes.  And we've had a little bit of problems
 8    because he's running out of -- he isn't getting it done and
 9    there's a year -- you know, a building permit is good for a
10    year.
11    Q    I see.
12    A    And so -- and his son is in Alaska half the
13    time and so it's not progressing.
14    Q    Who is his son?
15    A    Well, his son is Robert Weaver.
16    Q    Well, who's the father then?
17    A    Yeah, that's -- the father is --
18    Q    Is he Robert Weaver, too?
19    A    Yeah, I believe so.
20    Q    Are they both Robert Weaver?
21    A    I believe so.
22    Q    Who owns the land?
23    A    The father.
24    Q    And the father applied for the building
25    permit?
```

99

```
 1    A    Yes.
 2    Q    But the son is building the garage?
 3    A    Yes.
 4    Q    Or the workshop?
 5    A    The workshop, yes.
 6    Q    What's the workshop for?
 7    A    I think woodworking.
 8    Q    Does it have any water in it?
 9    A    Not yet.  They're not that far.
10    Q    Are they looking --
11    A    But they have a septic system there and it's
12    not a subdivided piece of property.
13    Q    You mean they have a septic system already on
14    the property?
15    A    Yes, uh-huh.  And since it's not a house and
16    -- you know, it wouldn't need one because they have a
17    system there already.
18    Q    But it wouldn't need one anyway, right, since
19    it's not a house --
20    A    No.
21    Q    -- unless it has water?
22    A    Right.
23    Q    Correct?
24    A    Pardon?
25    Q    Unless it has water?
```

100

```
 1    A    Yes, right.
 2    Q    Well, let me show you -- we're going to mark
 3    this as Van Dommelen Exhibit 5, application for building
 4    permit for Robert Weaver.
 5         (Application for building permit produced and
 6    marked as Van Dommelen Exhibit No. 5.)
 7    BY MS. MONTGOMERY:
 8    Q    Do you recall this application?
 9    A    Yes.
10    Q    So down there where you checked granted, you
11    granted this application, correct?
12    A    Yes.
13    Q    Which is noted by the fact that you marked it
14    with an X, right?
15    A    That I what?
16    Q    That you marked the document with an X where
17    it says granted, correct?
18    A    I still don't understand you.
19    Q    The fact that you approved -- this is -- on
20    this document where it says granted and you put an X --
21    A    Yes.
22    Q    -- that's how you keep a record of whether or
23    not you've approved --
24    A    Yes.
25    Q    -- a building permit application, correct?
```

101

```
 1    A    Right, X or ...
 2    Q    At the location, what is that -- 514 what,
 3    what's that road?
 4    A    That's 514, Box 514, Route 1, Petersburg,
 5    16669.
 6    Q    Oh, but I'm looking at where it says at
 7    location 514 and then there's a word after that.
 8    A    That's -- that's the box number.
 9    Q    It says a-b-u-t-e or something.  I can't read
10    that word.
11    A    Yeah.
12         MS. THORP:  Above.
13    BY MS. MONTGOMERY:
14    Q    Is that above?
15    A    Yeah, I believe it is.
16    Q    Where it says 514 above?
17    A    Yeah.
18    Q    Now, you had indicated that the Weaver
19    property has septic, right?
20    A    Yes, it has a house there.
21    Q    It has a house there?
22    A    Um-hum.
23    Q    And where is the workshop in location to the
24    house?
25    A    It's about 25 feet behind the house.
```

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**VAN DOMMELEN, DAVID**
**06/06/01**

<div align="right">

**CORNEAL VS**
**JACKSON TOWNSHIP**

</div>

---

102

1    Q    Do you recall how big that property is?
2    A    No, I -- no, I don't know.  It must be at
3    least 10 acres because in that area most pieces of property
4    are in 10 acres and that piece abuts the Corneal property.
5    Q    Now, I'm looking a little further down on this
6    sheet where it says Karl Aronson, workshop.  Do you see
7    that?
8    A    Which page is that on?
9    Q    It's the same page as Robert Weaver's was on.
10   A    Okay.  Paul?
11   Q    It says Karl Aronson.
12   A    Oh, uh-huh.
13   Q    Do you see that?
14   A    Yes.
15   Q    Do you recall that property?
16   A    Yes, um-hum.
17   Q    And what kind of workshop is that?
18   A    I'm not sure what -- that was interesting
19   because they demolished a barn and then just replaced the
20   workshop on the barn and I'm not sure what kind of workshop
21   it is.
22   Q    But you granted that building application,
23   right?
24   A    Pardon?
25   Q    You granted that building application,

---

103

1    correct?
2    A    Yes, uh-huh.
3    Q    In fact, if you start at the third page from
4    the end to -- starting with the Pauline Weaver
5    application --
6    A    Um-hum.
7    Q    -- and going all the way to the end --
8    A    Um-hum.
9    Q    -- which is Stoney Lonesome Camp requesting a
10   building application for a pavilion --
11   A    Yes.
12   Q    -- have you granted all of those applications?
13   A    Yes, uh-huh.
14   Q    Did you visit any of those properties to see
15   what was going on?
16   A    Yes, I have.
17   Q    Which ones?
18   A    I've -- I drive by Tuckaway Tree Farm every
19   day and so I could see how that barn was going on and I go
20   up to Stoney Lonesome Camp to visit friends up there.
21   Q    Did you make a specific trip out to any of
22   these properties just to make sure that the building was --
23   A    Not at these, no.
24   Q    Do you know whether any of these properties --
25   well, strike that.  This Michael Yoder on the next to the

---

104

1    last page --
2    A    Yes.
3    Q    -- is he the township supervisor?
4    A    Yes.
5    Q    I think that's all the questions I have for
6    you right now about this document.  We may go back to it
7    later.
8        MS. MONTGOMERY:  How does anybody feel about
9    lunch at this time?
10       (Discussion held off the record.)
11   BY MS. MONTGOMERY:
12   Q    Mr. Van Dommelen, I'm just going to go through
13   this collection of documents that you brought down with you
14   today.  And I'll ask you just to look at the first one.
15   It's just a City Bar and Grill receipt.
16   A    Oh, that's my -- from the last time I was here
17   and -- for lunch.
18   Q    You were here in connection with the
19   deposition?
20   A    Yes, uh-huh, and sat for six hours.
21   Q    Okay.  Who did you have lunch with that day?
22   A    And those are just -- I'll be turning those in
23   to -- for reimbursement.
24   Q    Right, I understand.  Who did you have lunch
25   with that day?

---

105

1    A    Pardon?
2    Q    Who did you have lunch with that day?
3    A    My friend from Iowa drove down with me.
4    Q    Just the two of you?
5    A    Pardon?
6    Q    Just the two of you?
7    A    Yes, um-hum.
8    Q    Did he drive down here with you?
9    A    Yes.
10   Q    He drove to Harrisburg with you?
11   A    Pardon?
12   Q    He drove to Harrisburg with you?
13   A    Yes.
14   Q    Was it just the two of you that drove down?
15   A    Yes, um-hum.
16   Q    I want you to just look at your curriculum
17   vita for a second.  How did you come to prepare this
18   curriculum vita?
19   A    Well, I keep one every year to either send to
20   galleries where I'm exhibiting and to -- you know, to
21   editors and publishers.
22   Q    Did you put it together for some reason for
23   this lawsuit?
24   A    No, I just thought maybe someone would -- you
25   know, I just threw it in here for -- no, no, no, this is on

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**VAN DOMMELEN, DAVID**
**06/06/01**

<div align="right">

**CORNEAL  VS**
**JACKSON TOWNSHIP**

</div>

---

106

1   my computer. I use this and update it every year.
2      Q      But I just wondered why you had it in your
3   file that --
4      A      Well, I just thought someone might want it.
5      Q      Okay.  Well, it's a great resume.
6      A      Pardon?
7      Q      It's a great resume.  Now, the next thing --
8   actually, let me put your original back in your file so I
9   can keep that altogether.  The next thing I'm going to show
10  you is a couple of -- it's a page that appears to just be a
11  -- it says Roman Numeral III-2.  It's a section of
12  something.  Can you just tell me what that is?
13     A      Oh, yeah, it's about -- it comes out of a
14  subdivision -- an ordinance, our ordinance book and -- so we
15  were just -- I wanted to refresh my memory about
16  subdivisions and so that's why that's in there.
17     Q      And when did you do this?
18     A      Oh, I don't know.  Probably a few months ago.
19     Q      In connection with the lawsuit?
20     A      Well, in clarifying in my -- you know, in my
21  mind about that.
22     Q      Now, the next thing is a collection of
23  documents where you have yellow stickies on, Exhibit A and B
24  to Exhibit Z.  Is that your handwriting on those yellow
25  stickies?

---

107

1      A      Yes, uh-huh, but I can't remember why I put
2   them on.
3      Q      Are they the exhibits to the complaint?
4      A      Pardon?
5      Q      Are they the exhibits to the complaint in this
6   action?
7      A      I'm not -- oh, yes, yes, I see what you're
8   saying.  This is part of the Corneal -- and they were
9   attached to his -- his thing.
10     Q      His complaint, right?
11     A      Yeah, um-hum.
12     Q      On that document there's some red
13  underlining.  This is the stuff that probably won't show up
14  on the copies.  On the document that's February 24, 2000,
15  Huntingdon County Planning Commission letter, there's some
16  red underlining there.  Is that your handwriting there?
17           MS. MONTGOMERY:  And I don't know if you guys
18  can see it but -- yes, it's in black underline.
19           THE WITNESS:  Yeah, I'm assuming that's mine.
20  BY MS. MONTGOMERY:
21     Q      So you did that?
22     A      Yes.
23     Q      Do you recall why you underlined that?
24     A      No, I'm not sure.
25     Q      Then there's sort of a parens around number 8

---

108

1   at the bottom of that page.  Did you do that mark as well?
2      A      I assume I did.  I'm not sure why.
3      Q      What about over on number 12?
4      A      Yes, I see there's -- yeah.
5      Q      Where it says -- you underlined recommends
6   disapproval of this proposal.
7      A      And I assume that I put that down there,
8   um-hum.
9      Q      Do you recall why -- I mean, why did you mark
10  this up?  Was it --
11     A      Well, I was just noticing that the Huntingdon
12  County Planning Commission disapproved of the proposal and I
13  just ...
14     Q      Later they recommended approval, right?
15     A      Yeah.
16     Q      Correct, later they recommended approval of
17  the subdivision?
18     A      Oh, yes, uh-huh.
19     Q      Did somebody tell you that they had
20  recommended approval of Mr. Corneal's subdivision?
21     A      Oh, no, no, no, I didn't -- I misunderstood
22  you.  No, I don't know about that.
23     Q      Now, the next document is a copy of the
24  complaint that was filed in this action and I'm just going
25  to ask you to look at it with me and tell you whether the

---

109

1   handwriting that appears throughout this document is your
2   handwriting.  For instance, go to --
3      A      Yes, that's -- um-hum.
4      Q      That is your handwriting?
5      A      Um-hum, right.
6      Q      Now, can you tell me, for example, where it
7   says -- at Paragraph 12 on page 4 where you wrote in acted
8   in.
9      A      Which -- page what?
10     Q      Page 4, the paragraph number is 12.
11     A      I'm not sure why I put that in.
12     Q      What about the next page at Paragraph 15 and
13  you handwrote in had not recorded deed when he started.
14  What does that mean?
15     A      Well, these -- all of these marks here are --
16  we went over with Larry and we said we can admit this and we
17  can admit that and this is true and we made just comments in
18  general.  And this was that he hadn't recorded the deed when
19  he started working on -- he hadn't recorded his deed yet
20  when he started building.
21     Q      Hadn't recorded what deed?
22     A      The deed of his property.
23     Q      When he started building which was -- well,
24  let's see, the property was acquired by the Corneals in
25  October 1998, right?

---

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

110

1   A    Yes.
2   Q    That's correct, right?
3   A    I assume it is.
4   Q    And he started building what, in 2000,
5   correct?
6   A    Right, uh-huh.
7   Q    And you're saying that he hadn't recorded the
8   deed to this property?
9   A    That's what was commented on, I think.
10  Q    Does that have any significance for you?
11  A    No, not really.
12  Q    Look at Paragraph 23 on page 6 where you have
13  handwritten in related to sewage module.
14  A    Um-hum.
15  Q    Does that have any significance to you right
16  now?
17  A    Well, that's that it -- we're talking about
18  the initial plan was related to sewage modules and that --
19  that's what this whole thing was about really here,
20  subdivision and the sewer modules hadn't been --
21  Q    Do you see the allegation --
22  A    Pardon?
23  Q    Do you see the allegation in that paragraph
24  that the Corneals -- at the end of the paragraph, the fourth
25  line from the top -- bottom says the Corneals were advised

111

1   by defendant Wilson that insofar as the township was
2   required to sign the plan, good politics suggested that the
3   initial plan should be presented to the board of supervisors
4   for review.  Are you familiar with that allegation?
5   A    No, unh-unh.
6   Q    You don't know anything about that
7   conversation?
8   A    No, unh-unh.
9   Q    Do you see at Paragraph 25 on page 7 --
10  A    Um-hum.
11  Q    -- where you have the Corneals were not
12  advised that subdivision approval was not required and then
13  you wrote in never gave -- I'm sorry, you wrote in never
14  gave to township, he was informed about the moratorium.  Why
15  did you write that in there?
16  A    I'm assuming that he said that the township
17  had never informed him about the moratorium.
18  Q    That's your assumption of why you wrote that
19  down there?
20  A    Um-hum.
21  Q    I mean, do you actually remember why you wrote
22  it down?
23       (No response.)
24       MS. THORP:  Bridget, I don't think he heard
25  your last question.

112

1   BY MS. MONTGOMERY:
2   Q    Do you actually remember --
3   A    Huh?
4   Q    Do you actually remember why you wrote that
5   down?
6   A    Pardon?
7   Q    My question was -- I'm sorry.  My question
8   was:  Do you actually remember why you wrote down --
9   A    Oh, no, I don't remember why.
10  Q    In what context were these notes taken?  Were
11  you on a telephone conference or in a group meeting or what?
12  A    No, we had a small meeting about this.
13  Q    Who all was there?
14  A    All the supervisors, Larry and Barry Parks.
15  Q    And yourself?
16  A    And myself, right.
17  Q    Anybody else?
18  A    No, I think that's it.
19  Q    Where was that meeting?
20  A    That was at Ann Wirth's, the secretary's
21  office.
22  Q    In that little office there on her property?
23  A    Right.
24  Q    When was it, do you recall?
25  A    I can't recall.  It would be after this came

113

1   out so ...
2   Q    What about 51, Paragraph 51 on page 11?
3   A    Well, it's -- the whole concern was that he
4   had no plan and no subdivision.
5   Q    But see where you've written not subdividing,
6   what does that mean?
7   A    Well, he was -- first of all, he was saying he
8   didn't have a -- he was going to subdivide and then he said
9   he wasn't going to subdivide so he was fluctuating back and
10  forth.
11  Q    Right, but didn't he say he wasn't going to
12  subdivide after you guys told him he couldn't subdivide
13  because there was a moratorium in place, right?
14  A    Well, I think so, but it was difficult to keep
15  track of when he was saying what.
16  Q    But isn't it true that he just -- he changed
17  his mind --
18  A    Yes.
19  Q    -- when he couldn't get the approvals he
20  needed, right?
21  A    Yeah, um-hum.
22  Q    Here you say -- at Paragraph 53 you have
23  underlined language indicating that --
24  A    The underline there, the art studio?
25  Q    Yes, art studio have sewer access and then you

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

114

1  have untrue out in the margin there.  What does that mean?
2  What were you saying was untrue there?
3      A      Well, there was a comment about the fact that
4  he was advised that -- for a privy permit and you can't have
5  privy permits anymore.
6      Q      But you've underlined art -- you know,
7  something indicating that he was -- the art studio had to
8  have sewer access reference.  Are you saying that it was
9  untrue that he was ever told that the art studio had to have
10  sewer access?
11      A      Well, no, I guess not.
12      Q      I mean, do you recall any discussion about
13  whether the supervisors told him the art studio had to have
14  sewer access?
15      A      No, I'm not sure.
16      Q      You don't recall that?
17      A      No, I don't recall that.
18      Q      The art studio wouldn't have to have sewer
19  access, though, right, if there wasn't water, right?
20      A      No, if there was no water.
21      Q      Now, on 54 you have marked untrue out in the
22  margin there.
23      A      Well, what is -- he was saying that we refused
24  to issue a permit and we wouldn't assist him and that wasn't
25  true.  We would assist him if he did the proper things.

115

1      Q      What did you think were the proper things that
2  he had to do to build an art studio?
3      A      (No response.)
4      Q      What did they think were the proper things
5  that he had to do to build an art studio?
6      A      Well, then he should have proper sewage.
7      Q      What about in 57 which is on page 12?
8      A      Yeah.
9      Q      Do you see where you have deny no something?
10  I can't read the other word.  What is that?
11      A      No help.
12      Q      Okay.  Deny that you've refused to provide
13  help, is that what you're saying?
14      A      Right, uh-huh.
15      Q      Look at 61 where you have refused because of
16  sub, etcetera.  What does that mean?
17      A      Subdividing.
18      Q      So Able Construction refused to do the
19  roadwork because they thought he might subdivide, is that
20  your understanding?
21      A      Well, it depends -- he didn't get any road
22  permit, plus the one road he started to put in was going to
23  go in through wetlands and that's not allowed.  So he had to
24  stop putting that road in.
25      Q      How do you know that?

116

1      A      How do I know what?
2      Q      How do you know he was starting to put a road
3  in near wetlands?
4      A      Because you can see it.
5      Q      Did somebody tell you that, though?
6      A      What?
7      Q      How did you know they were wetlands, what you
8  were seeing?
9      A      Well, it's -- you can see that it's wetlands
10  and --
11      Q      Do you have any responsibility to determine
12  what wetlands are in connection with township work?
13      A      No, that comes from the federal government and
14  they determine that.
15      Q      Let's go to page 13 and look at Paragraph 66.
16  Do you see that?
17      A      Um-hum.
18      Q      Now, where you wrote true, was that an
19  indication that you would admit it?
20      A      Well, it's a true statement that in order to
21  get a permit the township provides the permits.
22      Q      So was that -- when you wrote true, was that
23  indicated -- was that your indication that --
24      A      That that statement is true.
25      Q      That you should admit it in the answer to the

117

1  complaint, is that what you're saying?
2      A      Yes, um-hum.
3      Q      On page 70 -- I'm sorry, page 14, Paragraph 70
4  it says deny -- it says WO septic.  Do you mean without
5  septic?
6      A      Without septic.
7      Q      Now, this paragraph makes reference to the
8  garage, right?
9      A      Right.
10      Q      What is your reference to septic there, what
11  is that?
12      A      Well, the supervisors said that we were going
13  to deny it because he doesn't have septic.
14      Q      So that's all that reference is to there?
15      A      Yes.
16      Q      Now, at Paragraph 71 you have -- is that your
17  handwriting, hearsay?
18      A      Pardon?
19      Q      At Paragraph 71, is that your handwriting,
20  hearsay?
21      A      Yes, uh-huh.
22      Q      Are you familiar with the term hearsay?
23      A      Well, I've heard -- I've heard the term.
24      Q      Why did you put that in there?
25      A      Because I recall Larry made that comment.

118

1  Q    He said that would be hearsay --
2  A    Yes.
3  Q    -- so we'll deny it or something because it's
4  hearsay?
5  A    Apparently.
6  Q    Well, is that a true statement, that you
7  advised Mr. Corneal that had any other property owner
8  requested the permit it would have been issued?  Is that a
9  true statement?
10  A    It's really not true because I would -- if
11  someone had all the proper -- the proper papers, then I
12  would submit -- you know, or issue a permit.
13  Q    But let me go back a second.  In a lot of
14  these paragraphs you say true or deny or true or untrue and
15  here you have hearsay.  Was there some discussion about why
16  you would put hearsay in there instead of just true or
17  untrue?
18  A    No, unless -- unless Larry said that.
19  Q    Now, you're saying --
20  A    All these -- all these things that are written
21  in here were done in front of everybody and --
22  Q    But you said it's really not true, but I'm
23  really just asking -- it's really not true that you would
24  have issued it to any other property owner.  What I'm really
25  asking you -- this allegation says that you advised Mr.

119

1  Corneal that had it been any other property owner he would
2  have gotten it.  Is that a true or a false statement?  Did
3  you actually say that to Mr. Corneal?
4  A    No, not like that.
5  Q    What did you say to him?  Exactly what did you
6  say?
7  A    It would be -- I would issue if you had the
8  proper documentation for a sewage and subdivision.
9  Q    Okay.  Would you be looking for a subdivision
10  plan for somebody that wants to build a garage?
11  A    I'm just saying -- I'm answering what the
12  supervisors told me.
13  Q    Did you give Mr. Corneal any indication that
14  this was -- this situation where he couldn't get an
15  application even or a permit was aimed at him specifically
16  personally?
17  A    No, no.
18  Q    Did you take any other notes in that meeting?
19  A    No.
20  Q    Did you receive copies of anybody else's notes
21  taken in that meeting?
22  A    No, unh-unh.
23  Q    Now I'm going to show you --
24  A    Do you want this back or --
25  Q    No.  Is that your -- is that the original?

120

1  Yes, it is, isn't it?
2  A    Yeah, I believe it is the original.
3  Q    We'll put that back in your file.
4  A    Okay.
5  Q    I'm going to show you now what's -- we're not
6  marking it, but it's a deposition -- it's a copy of the
7  deposition transcript of David Corneal that we have from
8  your file with some yellow highlighting on it, which I don't
9  know if that will show up.  I don't think it will so it's
10  going to be tough to talk about.
11        Now, you circled also present Sandra Y.
12  Corneal on page 2.
13  A    Um-hum.
14  Q    Why did you circle that?
15  A    Well, I circled that because I couldn't
16  understand why she could be at that meeting but my wife
17  couldn't be at this one.
18  Q    Oh, she's a -- it's because she's a party.
19  A    Well, my wife is a party, too.  She might not
20  be listed but she -- as long as I'm a party, she's a party.
21  Q    Okay, I understand your position.  Now, I want
22  you to just go through the -- since nobody else can see the
23  highlighting, we're just going to try to make a record of it
24  and just the first place you see highlighting in your
25  document, just tell us what page you're on and we'll read

121

1  along with you.
2  A    That's page 3.
3  Q    On page 3?
4  A    Um-hum.
5  Q    What did you highlight on there, the first
6  part?
7  A    For high blood pressure.  I'm taking a similar
8  kind of a -- I was just noticing that you were asking about
9  medications.
10  Q    I see.  What was the next thing?
11  A    Pardon?
12  Q    What was the next thing you highlighted?
13  A    The next thing is social security number.  Had
14  you asked me what mine is I wouldn't have been able to tell
15  you.  I can never --
16  Q    Okay, that's why you highlighted that.
17  A    Yeah.
18  Q    The next thing you highlighted?  We'll come
19  back to the other markings on here, but we'll just go
20  through the highlighting to make it simple that way.  What
21  is the next thing you highlighted?
22  A    Highlighted or circled in red?
23  Q    Highlighted, just the highlighting for now.
24  What page?
25  A    Page 8 up on 28.

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

122

1   Q      And what is that?
2   A      And it says we are contemplating building.
3   Well, he was building already.  And I said we are both
4   artists and we were thinking of a summer home and an art
5   studio.  Well, I didn't know he was an artist -- well, I did
6   really but -- yeah, that --
7   Q      The next thing you highlighted is what?
8   A      Nine.  Well, I just highlighted this to --
9   Q      What did you highlight because we can't see
10  it?
11  A      Well, just the whole concept of the SEO, about
12  the sewage and just to see what some of the issues were
13  there.  There is nothing specifically, just -- you know,
14  not --
15  Q      Were you just trying to prepare yourself for
16  your own deposition --
17  A      Right, uh-huh.
18  Q      -- to understand the case?
19  A      Yes, for my own information.
20  Q      And did you do this by yourself when you did
21  all this highlighting?  Don't leave page 9 yet, okay,
22  because I have another question for you.  Did you do that by
23  yourself?
24  A      Yeah, my wife read through this also and she
25  made some grammatical checks.

123

1   Q      I see.
2   A      And misspellings.
3   Q      That was good of her.  What about on -- see
4   where it's -- the whole page is numbered 9 but then the
5   little insert page is numbered 31, I think?
6   A      Yeah, 31.
7   Q      You've got some text highlighted there, don't
8   you?
9   A      Pardon?
10  Q      You have some text highlighted there?
11  A      Yes, uh-huh.
12  Q      What is that?
13  A      Well, it's -- it shows he was interested in
14  dividing off the land into acreage.
15  Q      And what significance does that have to you?
16  A      About the concept of subdividing.
17  Q      But I don't understand, what is it -- I mean,
18  everybody knew he initially wanted to subdivide, right?
19  A      Yes.
20  Q      And then everybody knew after that he said he
21  wouldn't subdivide?
22  A      Yeah, and I just put these down for my own
23  personal looks.
24  Q      Well, was there some issue about the fact that
25  since he first said he wanted to subdivide and then he later

124

1   decided that he didn't want to subdivide, is that some big
2   issue with the supervisors and you?
3   A      Yes, it was.
4   Q      What is the issue?
5   A      The issue was that -- that he hadn't given any
6   plans to the supervisors and yet he was saying he was going
7   to subdivide.  He hadn't gone to the county.  There are
8   certain steps to subdivide that one has to take.
9   Q      But then my question was a little bit
10  different than that.  Is there some issue that you and the
11  supervisors are taking with the fact that first he said he
12  wanted to subdivide and then he said he didn't want to
13  subdivide?  After he was told he couldn't subdivide, he said
14  he didn't want to subdivide.  Is there something going on
15  there that is significant?
16  A      Yeah.  Well, he still needs to subdivide
17  because he's got another house on that property as well.
18  Q      So that's your point of the whole thing?
19  A      Yeah, that's the point of the supervisors.
20  Q      Okay.  So you think he still needs to
21  subdivide because there's that old farmhouse on the
22  property?
23  A      Yes, uh-huh.
24  Q      Now, you said that he never gave them any
25  plans.  How do you know he never gave them any plans?

125

1   A      Pardon?
2   Q      How do you --
3   A      Because they said so.
4   Q      Because they said so?
5   A      Yes, um-hum.
6   Q      Were you at the meeting, though --
7   A      No.
8   Q      -- when he tried to hand out those plans?
9   A      No.
10  Q      What's the next thing you've highlighted?
11  MS. MONTGOMERY:  Hold on, my co-counsel
12  has ...
13  BY MS. MONTGOMERY:
14  Q      Do you have some highlighting on page 10 back
15  there?
16  A      On 10, yes, uh-huh.
17  Q      What's highlighted there?
18  A      Again, this is going back to the concept of
19  decide based on finding of on-site septic suitability and
20  just to make me see the points on the whole septic question.
21  Q      That's in little insert 35, right, on the
22  insert page?
23  A      Right, yes.
24  Q      What we call these, just to make it simple for
25  the record, is these are minuscript -- what they call a

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

126

1 minuscript.  They're small --
2   **A      They're what?**
3   Q       They're small transcripts of the deposition so
4 you get four pages on one.
5   **A      Yeah.**
6   Q       So we'll refer to these inserted numbers as
7 minuscript numbers.
8   **A      Okay.**
9   Q       And that will make it easier for us.
10   **A      Oh, I see, okay.**
11   Q       It would be helpful if we'd refer to the
12 minuscript and then the lines that are along the left-hand
13 side.
14   **A      Okay.**
15   Q       Then we'll be able to -- everybody else will
16 be able to follow along because the highlighting doesn't
17 copy over and that's why we're going through this exercise.
18   **A      Right, um-hum.**
19   Q       On page 35 you have -- on minuscript 35 you
20 have highlighted what language?
21   **A      Lines 6, 7 and 8.**
22   Q       A boundary survey and then eventually
23 divide --
24   **A      Right, uh-huh.**
25   Q       -- things up into lots, whatever lots we

---

127

1 decided on based on the SEO's finding of on-site septic
2 suitability.
3   **A      Again, just to recall some of the topics and**
4 **issues that were on hand.  That's what all these -- on 36**
5 **and 37.**
6   Q       Same thing for the highlighted text?
7   **A      Thirty-six is highlighting 13, 14 and 15 and**
8 **16.**
9   Q       And 37?
10   **A      And 37 is line 4 and 5.**
11   Q       Okay.  What's the next highlighted section
12 that you come to?
13   **A      Page 15.  The whole thing on 56.**
14   Q       You highlighted all of minuscript 56?
15   **A      Yes.  And, again, that was just talking about**
16 **the subdividing of land.**
17   Q       This makes reference to a conversation that
18 Mr. Corneal says he had with Mr. Wilson, right?
19   **A      Yes, um-hum.**
20   Q       Do you know whether -- has Mr. Wilson ever
21 discussed this conversation with you, this --
22   **A      No.**
23   Q       Where he says that you can build whatever you
24 want, there's no code, there's no building code, there is no
25 subdivision?

---

128

1   **A      No.**
2   Q       Do you recall any of the conversation or --
3   **A      No.**
4   Q       -- being told about it by --
5   **A      No.  Well, of course, I know there's no**
6 **building code.**
7   Q       Right.
8   **A      We have no inspection of wiring or any kind of**
9 **building codes as such.  The only thing that we have is the**
10 **septic tank and the subdivision and -- well, there are a few**
11 **other things that -- you can build a swimming pool without**
12 **any kind of a permit and --**
13   Q       You can?
14   **A      Yes, uh-huh.  And a farmer can build a silo**
15 **for grain without any kind of a permit.  So there are some**
16 **things like that.**
17   Q       Where is this contained?  Is it in the --
18   **A      It's in the ordinances.**
19   Q       Which ordinance, do you know?
20   **A      Pardon?**
21   Q       Do you know which ordinance that's in?
22   **A      The building permit ordinance.**
23   Q       The setback line, is that --
24   **A      That's in the building permit ordinances, too.**
25   Q       The next thing that you've highlighted,

---

129

1 please?
2   **A      Well, the whole thing about an investment.**
3   Q       What page?
4   **A      Page 17, 62 and down to 63.**
5   Q       Those are the minuscript numbers, 62 and 63?
6   **A      Yeah, just --**
7   Q       Why did you highlight that?
8   **A      I just thought it was sort of funny.**
9   Q       What was funny?
10   **A      About his investment and how he's not affluent**
11 **and -- it was just a personal observation.**
12   Q       What was your personal observation about him
13 not being affluent?
14   **A      Well, he says on 63, line 6, I'm not an**
15 **affluent person.  Well ...**
16   Q       Well, doesn't he finish that I can afford to
17 buy property and sit around on it; is that correct?
18   **A      And the property was worth -- you know, he**
19 **paid 300 and some thousand dollars for it.  So it seems to**
20 **me like you have to be a little affluent.**
21   Q       To buy property worth that much?
22   **A      Yeah, and when you have property in Florida**
23 **and when you have property throughout State College and --**
24 **so I thought it was sort of a funny remark.**
25   Q       Okay, I see.  What's the next thing you have

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

130

1   highlighted?  Did you say -- you said the lines?
2       A       Sixty-five, 1, 2, 3, 4, 5 lines.  It's hard to
3   subdivide land when there is no subdivision ordinances.
4   Again, it's just something that I marked for my own
5   interest.
6       Q       What was interesting to you about that?
7       A       Well, the fact that he's talking about that
8   when -- first of all, he says there's no subdivision -- it
9   just -- it's not an intellectual, you know, conversation.
10  It's a non-issue, is what I'm saying.
11      Q       It's a non-issue that there was no subdivision
12  ordinance?
13      A       Yes.
14      Q       Why is that a non-issue?
15      A       I don't -- my wife and I always have things
16  that it's a non-conversation.
17      Q       I understand.
18      A       You understand what I'm saying?
19      Q       Well, are you saying it doesn't matter that
20  there was no subdivision ordinance; is that what you're
21  saying?
22      A       He's saying that here.  And I'm saying that,
23  too, I guess.
24      Q       No, he's saying that there was no subdivision
25  ordinance.

131

1       A       Yeah.
2       Q       Are you saying that it doesn't matter that
3   there was no subdivision ordinance?
4       A       Yeah, I think it does matter.  I think it does
5   matter, but he's getting us all confused here and I just
6   thought it was an interesting statement.
7       Q       What's the next thing you have highlighted?
8       A       I think that's all that I --
9       Q       Is there something else there?
10      A       Pardon?
11      Q       Is that another page there that you have
12  highlighted?
13      A       Yes, this is page 31 and --
14      Q       What's the first minuscript page?
15      A       118 and I've underlined 7, 8 and 9 because of
16  my misspelled name and I also underlined distrust.  He says
17  he has a trailer out in the country and I do not live in a
18  trailer.  I have nothing against trailers, I want to make
19  sure I make that clear, but he's in this statement trying to
20  make me look like trailer trash.
21      Q       That's what you think?
22      A       Pardon?
23      Q       That's what you believe?
24      A       Yes, that's exactly what I believe.
25      Q       What kind of house do you have actually?

132

1       A       Huh?
2       Q       What kind of house do you have?
3       A       Well, it's a foundation house, three bedrooms,
4   a grand room, an entrance lobby, all ceramic tile.
5       Q       Is it a ranch house?
6       A       Yeah, it's a ranch.  It's all on one floor
7   so that --
8       Q       Does it have aluminum siding?
9       A       No, it has wooden siding on part of it and
10  cinder block on other parts.
11      Q       Okay.  What's the next thing you highlighted
12  then?
13      A       Well, the other area is 120 and he is saying
14  that I said to him -- I said if I were another resident of
15  the county or the township and I came for a permit for a
16  garage you would give it to him, and that's when I called
17  him a trouble-making yuppie.
18      Q       So why did you highlight that?
19      A       Well, I think that he's misconstruing -- sure
20  I would give him a permit if he had the correct stuff and if
21  I had been told by the supervisors to give him that.
22      Q       Do the supervisors usually have some sort of
23  preapproval process with respect to people coming for
24  building permits?
25      A       No.

133

1       Q       They leave that to you, right?
2       A       Yes.
3       Q       What's the next thing you highlighted?
4       A       I think that's it.
5       Q       Now we need to just go back through quickly
6   through your --
7       A       The red --
8       Q       -- underlining.
9       A       The red marks are all by my wife.
10      Q       Oh, they're all by your wife?
11      A       Yes, um-hum.
12      Q       Well, now, some of them are red and some of
13  are black, right?
14      A       Yeah.
15      Q       Is there some handwriting of yours in there?
16      A       Yeah, and that's -- she has red here and she
17  pointed out how the word effect should have been affect.
18      Q       I see.  That one bothers me, too, and I always
19  get it wrong.
20      A       And there's other comments.  She also on
21  page 25 --
22      Q       Is that minuscript page 25?
23      A       Oh, sorry, yeah.  Yeah, page 7 and --
24      Q       Is that her circling?
25      A       And that's 25, line 6.  And, again, she's

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

134

1  doing disparaging remarks about used cars and yards. He's
2  trying to make it look like we live out in the sticks, which
3  we do, but I think he's also making particular kinds of
4  social comments.
5      Q    Well, isn't this a reference to the property
6  that he bought? Isn't that just a reference to his own
7  property, that when he bought it there were three or four
8  unused cars in the yards?
9      A    It might well be.
10     Q    Okay, keep going. What's the next thing you
11 see?
12     A    On page 11 and mini page 40 in 17 and 18,
13 again, making a remark about farmers and throwing stuff over
14 hills into gullies, and I think -- I think it says a great
15 deal about him and his social -- the way he looks at people
16 socially.
17     Q    Well, isn't this just a reference to him
18 hiring Mr. Wilson and Eagle construction to clean up his
19 property? Isn't that what that is?
20     A    Yeah, um-hum.
21     Q    He just wanted to remove some stuff thrown
22 over a hill into a gully?
23     A    Yes.
24     Q    The next thing?
25     A    The next one is a misspelling of realtors.

---

135

1      Q    Now, what about on minuscript page 55 where
2  you've underlined trying to establish a rapport with some
3  local people?
4      A    Well, I don't think he's getting much rapport
5  with the local people.
6      Q    Why is that?
7      A    Because he's coming in and trying to make his
8  own standards for the area and not listening to the local
9  people. And I think in the end he's going to antagonize the
10 local people and he will never have rapport with them.
11     Q    All right.
12     A    And on 17, mini page 63, line 7, and it's
13 where he says I'm not an affluent person.
14     Q    Right. And you think he's affluent because he
15 bought property?
16     A    Yeah.
17     Q    Is it a problem that he's affluent?
18     A    No, I don't think there's any problem but --
19     Q    Okay.
20     A    But it would be like saying --
21     Q    If he was affluent, I should say. Do you know
22 whether he mortgaged that property that he paid $350,000 to
23 build?
24     A    I have no idea what -- how he --
25     Q    You don't know?

---

136

1      A    No, I have no idea.
2      Q    Next let's go and see what else you have
3  underlined.
4      A    Next on page 22 there are several underlined
5  things about raising his voice at meetings and the
6  confrontation. And that's mini page 84, line 12. And then
7  83, line 7 and 85, line 20, the whole question of the
8  confrontational kind of ...
9      Q    Okay. Where you underlined on mini page 83 he
10 had went, that was just a grammatical problem that your wife
11 saw, is that --
12     A    Which one, which page?
13     Q    It's mini page 83, line 7. Why did you
14 underline that, just a grammatical --
15     A    He went -- yeah, right.
16     Q    On page 21 you have -- there's a sticky note,
17 it looks like.
18     A    Yeah, and I don't know what happened with that
19 -- with that page and what was there.
20     Q    Is that your handwriting no?
21     A    Pardon?
22     Q    Is that your handwriting no where it looks
23 like there was a sticky note?
24     A    No, that's not my handwriting. So I don't
25 know how that is, but we did notice it and I'm not sure --

---

137

1  so we'd have to go back to the original.
2      Q    So that's minuscript page 80 and 81, right?
3      A    Um-hum.
4      Q    And you don't know who put that sticky on
5  there --
6      A    No.
7      Q    -- and wrote no on it?
8      A    Unh-unh.
9      Q    Now, going up to page 23 for the next
10 underlines.
11     A    To which one? Oh, the other one on page 23, I
12 was just noticing that Ann Wirth's name is misspelled.
13     Q    And then just a grammatical thing on --
14     A    Yeah.
15     Q    Okay, that's fine. What's next? What page
16 are you on?
17     A    I'm on page 30, mini page 116, and I'm looking
18 to see -- it's 14, 15, 16, 17 and 18.
19     Q    On page 116 because it's highlighted?
20     A    Pardon?
21     Q    Because it's highlighted?
22     A    Yes, uh-huh.
23     Q    Did we not do that one before when we were
24 going through the highlighted --
25     A    I don't know why I highlighted that. It has

---

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

**138**

1  to deal with that whole concept of privies, a privy permit,
2  which it -- there are two ways -- there are two ways only
3  that you can get sewage taken care of in Jackson Township
4  and -- because of DER as well. And one is to have a regular
5  septic system and the other is what's called a holding tank,
6  but a holding tank isn't a privy so -- and that's why I
7  underlined that.
8     Q     Because you believe you can't get privies at
9  all --
10    A     No, you can't at all.
11    Q     -- in Jackson Township?
12    A     You're not allowed to put a privy anymore.
13    Q     All right.  Now, the next page is page 31,
14  right?
15    A     Yes, uh-huh.
16    Q     Now, you have some --
17    A     And that's that whole area when he came out to
18  visit me and so that's why I underlined that.
19    Q     And the vita that you wrote there in the left,
20  why did you write that in there?
21    A     I don't know.  It must have to do with the
22  spelling of my name, and it is Van Dommelen.  It would be
23  saying like Dick Dyke rather than Dick Van Dyke.
24    Q     Yes, I understand.  Now, look where you put --
25  on mini page number 119, which is at -- still at the larger

**139**

1  page 31 in this document.
2     A     119?
3     Q     Yes, and you have a star and you underlined
4  sewer at least initially.
5     A     Yeah, I don't think I did that, but I'm not
6  sure because I very seldom use pencil like that.
7  Occasionally I do but --
8     Q     Is that done in pencil?
9     A     Yeah.
10    Q     What about up there where there's a star next
11  to -- no, I'm sorry, what about further up that 119 where it
12  says I think it was the 27th and that's underlined?
13    A     Um-hum.
14    Q     Why did you underline that?
15    A     Um-hum.
16    Q     Why did you underline that?
17    A     I'm not sure why.
18    Q     Okay.
19    A     And on page 33, mini page 126 and 128, those
20  are typos.  And on page 34, mini page 133, that's where the
21  figure comes up, $365,000 that he paid for that piece of
22  property.
23    Q     I understand.  Okay, go ahead.
24    A     And I can't remember how many -- how much --
25  how many acres that is.  I can't remember how many acres

**140**

1  that is.  I think that's all.  Yeah, that's all.
2     Q     That is the most time consuming thing we will
3  do.  The rest of this we will be able to go through pretty
4  quickly.
5          I'm going to show you a document that's --
6  it's a July 11, 2000 letter from Larry Newton.  Can you just
7  identify that for me?  Now, there's -- on the second page of
8  that is the words draft copy written in red there.
9     A     Yeah, that's not my writing.
10    Q     That's not your handwriting?
11    A     No, uh-unh.
12    Q     Do you know whose it is?
13    A     No, uh-unh.
14    Q     Is that a draft copy of the complaint that
15  Larry Newton -- the answer to the complaint that Larry
16  Newton --
17    A     Yes, uh-huh.
18    Q     -- prepared?
19    A     Right, that's what that is.
20    Q     And you reviewed that and then made whatever
21  changes.  Is that what led to the meeting?
22    A     Yes, uh-huh.
23    Q     So after Larry Newton sent you that copy, then
24  you guys all got together?
25    A     Right, um-hum.

**141**

1     Q     And met with Mr. Sherr, I guess?
2     A     Yeah, I believe.  Didn't we?  I think so.
3     Q     And the top letter is a July 11th, 2000 letter
4  from Larry Newton to Anthony Sherr, correct?
5     A     (No response.)
6     Q     Now, I'm going to show you a letter.  It's a
7  copy of the May 5, 2000 letter from you to Mr. Corneal and
8  you have written in the margin April 27, 2000 -- or I should
9  ask you, is that your handwriting?
10    A     Yes, uh-hum.
11    Q     And what's that refer to?
12    A     That's the -- I was trying to remember when he
13  came out to the house and that's the -- that's what I put
14  down.  That was the day he came out to the house.
15    Q     Okay, thank you.  I'm going to put that back
16  in the file for you.  And then this envelope -- hang on, I
17  didn't even look in there before.  That's just the original
18  letter in the envelope.
19          So now the envelope that's in this -- in your
20  original file has a May 6, 2000 postmark, correct, and
21  that's the letter that --
22    A     Um-hum.
23    Q     The envelope that the May 5th letter --
24          MR. SHERR:  You have to answer yes or --
25  excuse me, I'm sorry.  You have to answer yes or no.  You're

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

142

1 saying other things other than yes or no.
2 BY MS. MONTGOMERY:
3    Q    Instead of saying um-hum, you have to say yes
4 or no for the court reporter.
5    A    Yes.
6    Q    So that's the letter that the May -- the
7 envelope --
8    A    Yes.
9    Q    So you received it on May 6th, right?
10   A    Yes.
11       MR. SHERR:  And that's because she can't take
12 down um-hum.
13 BY MS. MONTGOMERY:
14   Q    Now, I'll show you another letter that was in
15 your -- another copy of the May 5th letter from David to you
16 where you have an X next to Friday, April 28.  Can you tell
17 me why you have that X there?  It makes a reference to a
18 meeting.
19   A    Yes, and he apparently put the wrong date down
20 and so then I put the correct date down.
21   Q    You said he came to your house on April
22 27th --
23   A    No, no, that's --
24   Q    He's making reference to the date the
25 supervisors were going to meet.

---

143

1    A    Let me look at that again.  Let me make sure I
2 -- yes, I see what you're saying.  Yeah, that -- he came to
3 our house on April 27th and then he thought there was going
4 to be a meeting on the 28th.
5    Q    And why did you put that X down there?
6    A    I don't know why I put it down.
7    Q    Just checking dates or something?
8    A    Yeah.
9       (Discussion held off the record.)
10 BY MS. MONTGOMERY:
11   Q    I'm going to show you a document where you
12 have road ordinance, I guess, and clipped to it is a piece
13 of white notepad paper and some numbers.
14   A    Oh, that's -- this is nothing more than an
15 average of what I make a year being -- my wife figured up
16 how much I make for each year and that's about -- between
17 400 -- three to $400 a year.
18   Q    For your work as the building permit officer?
19   A    Yeah.
20   Q    And I'm just going to ask you to look -- I may
21 ask you questions about this later, but this subdivision and
22 land development ordinance that's in your file --
23   A    Yes, uh-huh.
24   Q    -- is that your personal copy of that?
25   A    Yes, uh-huh.

---

144

1    Q    When did you get that?
2    A    I don't recall and I have not really read it
3 with any depth yet.
4    Q    Did you get it after the lawsuit was
5 instituted?
6    A    Yes, uh-huh.
7    Q    What about this other ordinance in your files?
8    A    Yeah, that's the ordinance, the township
9 ordinance, and that we're going to start thinking about
10 rewriting it and redoing it.
11   Q    The building ordinance you mean?
12   A    Yeah, the building ordinance.
13   Q    Is this the current building ordinance?
14   A    Yes, uh-huh.
15   Q    It's the document that has the table of
16 contents, general provisions --
17   A    Yeah.
18   Q    -- is the first page of it, right?
19   A    Yes, it's the current one.
20   Q    So this is the current in effect building
21 ordinance?
22   A    Yes, um-hum.
23       MS. MONTGOMERY:  We'll break for lunch.  I
24 probably have -- I may have an hour for you when we come
25 back.

---

145

1       (Discussion held off the record.)
2       (Luncheon recess taken at 1:13 p.m. until
3 2:26 p.m.)
4 BY MS. MONTGOMERY:
5    Q    Mr. Van Dommelen, we're back on the record and
6 you're still under oath.  I'm going to show you a document
7 that we're going to mark as Van Dommelen Exhibit 6 and I'd
8 ask you to look at it for me.
9       (Application for building permit produced and
10 marked as Van Dommelen Exhibit No. 6.)
11 BY MS. MONTGOMERY:
12   Q    Mr. Van Dommelen, go ahead and look at that
13 document just so you familiarize yourself with it, okay?
14   A    Um-hum.
15   Q    And I'm going to ask you a question about it.
16   A    Um-hum.
17   Q    Do you recognize the document?
18   A    Pardon?
19   Q    Do you recognize the document?
20   A    Yes, um-hum.
21   Q    Can you identify it for the record.
22   A    Building permit 01-6 from Jackson Township.
23   Q    For what individual?
24   A    For Kevin Boonie.
25   Q    Now, I note that -- that's the standard

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

---

146

1    application for building permit that's used in Jackson
2    Township; is that correct?
3        A    Pardon?
4        Q    Is that the standard application for building
5    permit form --
6        A    Yeah.
7        Q    And it's been filled out by Mr. Boonie,
8    correct?
9        A    Um-hum.
10       Q    Now, there's a note in the middle of that form
11   that says attach plans or rough draft sketch of the proposed
12   structure.
13       A    What?
14       Q    Attach plans or rough draft sketch of the
15   proposed structure.
16       A    Um-hum.
17       Q    There aren't any -- there weren't any
18   documents attached to that application. Do you know whether
19   there were when they were given to you? We didn't receive
20   any, is what I'm saying. Do you know whether there were any
21   attached to it when you got it?
22       A    It was probably a small -- a floor plan which
23   I might have given back to him.  I only keep floor plans
24   that seem to have a -- you know, a certain concern, like the
25   floodplain issues and -- but a regular floor plan I don't

---

147

1    usually keep.
2        Q    Is it your testimony then that every building
3    application comes to you with some sort of an attached plan
4    or sketch or something?
5        A    No, not every.
6        Q    In what situations don't they come to you with
7    an attached plan or sketch?
8        A    Well, if it's a garage, I don't need to have
9    an attached plan for it.
10       Q    Why don't you?
11       A    Because we just haven't -- we haven't asked
12   for that.
13       Q    What about if it's a workshop that's not going
14   to have water, do you need to have an attached plan for
15   that?
16       A    No, we haven't asked for that.
17       Q    Do you only ask for an attached plan when it's
18   going to be a house?
19       A    We ask for a plan and look at it, but we don't
20   necessarily save them.
21       Q    But is the only time you want an attached plan
22   or sketch or something is when it's a house; is that
23   correct?
24       A    A house or -- yeah, I guess mainly a house,
25   um-hum.

---

148

1        Q    I want to show you another document that we'll
2    mark as Van Dommelen Exhibit 7 and ask you to look at it.
3        (Application for building permit produced and
4    marked as Van Dommelen Exhibit No. 7.)
5    BY MS. MONTGOMERY:
6        Q    Would you just take a look at that application
7    for me.
8        A    Um-hum.
9        Q    Do you recognize it?
10       A    Yes.
11       Q    And there's an attachment to that, right?
12       A    Yes, uh-huh.
13       Q    What is that attachment?
14       A    That's a sewage disposal system attachment.
15       Q    Now, it appears to me that that is an
16   application for Mr. --
17       A    It's from Mr. Henwood.
18       Q    Mr. Henwood for a vacation home, right?
19       A    Yes, uh-huh.
20       Q    A two-story vacation home?
21       A    Yes, uh-huh.
22       Q    Now, there isn't a sketch of the home or
23   anything like that or a sketch of the proposed structure, is
24   there?
25       A    No, I saw a sketch for the home.

---

149

1        (Interruption.)
2        MS. MONTGOMERY:  We'll have to stop one
3    second, I'm sorry.
4        (Discussion held off the record.)
5    BY MS. MONTGOMERY:
6        Q    The document that you've been looking at is
7    the Thomas Henwood application, correct?
8        A    Um-hum.
9        Q    So you're saying you did see a sketch for
10   that?
11       A    Yes, uh-huh, blueprints.
12       Q    That's because it was a vacation home and
13   that's why you wanted that sketch, right?
14       A    Pardon?
15       Q    It was because it was a vacation home and
16   that's why you wanted that sketch; is that right?
17       A    Yeah, it was a home and I -- and he brought it
18   along, but I don't save those.  It would take you rolls and
19   rolls and rolls.  I don't have space for saving all these
20   sketches.  So unless it's a sketch -- there's a small sketch
21   that fits in my notebook, I don't save rolled up blueprints.
22       Q    What was the name on that first -- on the
23   first document, Exhibit 6?
24       A    Boonie.
25       Q    So I understand from the Boonie application

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

150

1  that you granted that --
2      A      Right.
3      Q      -- application without seeing any sketch or
4  anything else whatsoever, right?
5      A      No, I saw -- I saw a sketch, but I --
6      Q      On the Boonie application?
7      A      Yes, uh-huh.
8      Q      I thought you said that was true of the
9  Henwood --
10     A      The Henwood.
11     Q      The Henwood application.
12     A      Right, um-hum.  And I usually also don't --
13     Q      I guess I'm confused.
14     A      I usually also don't see sketches of -- called
15  double-wides because they're pretty standard.
16     Q      So you allow double-wide trailers, you mean?
17     A      Well, double-wide homes.
18     Q      Are they double-wide -- what do they call
19  them, modular homes now or something like that?
20     A      Yes, uh-huh.
21     Q      Is that what they're called?
22     A      Yeah, right.
23     Q      Like mobile homes?
24     A      Yeah.  Well, they're not on wheels.
25     Q      I think I know what you mean.  They're like

---

151

1  trailers, right?
2      A      Your interpretation of the word mobile home
3  versus double-wide versus trailer.
4      Q      So you don't require a sketch of those
5  either --
6      A      No.
7      Q      -- because they're standardized?
8      A      No, unh-uh.
9      Q      So why did you have -- why did you keep the
10  permit for the sewage disposal system attached to the
11  Henwood application?
12     A      I do that sometimes.  I'm not consistent, I'll
13  be very frank with you.  If there is something -- I -- I
14  don't keep most of the sewage disposal things.  They just go
15  back with the person.  They show me the permit, give me the
16  number and -- and then after we approve everything they're
17  on their way.
18     Q      So let's look then at -- Van Dommelen Exhibit
19  8 we'll mark this, an application for a building permit from
20  William Foster.
21            (Application for building permit produced and
22  marked as Van Dommelen Exhibit No. 8.)
23  BY MS. MONTGOMERY:
24     Q      Now, this is dated July 2000, right, July 6,
25  2000?  And you granted this building application, right?

---

152

1      A      Um-hum.
2      Q      Did you request any documentation or anything
3  in connection with this structure?
4      A      No.
5      Q      This is a one-story shed?
6      A      Yeah, it's a one-story shed.
7      Q      And what's a shed?  Is a shed the same as a
8  garage or is it different?
9      A      No, it's an eight-by-ten foot wall with roof
10  and doors.
11     Q      Storage facility?
12     A      To store -- storage facility.
13     Q      This one is 12-by-16, right?
14     A      Huh?
15     Q      This one was 12-by-16, right?
16     A      Yeah.  Well, they range in different sizes.
17     Q      There's no plumbing in it, right?
18     A      No, unh-unh.
19     Q      So you just approve it without --
20     A      Yeah, uh-huh, right.
21     Q      Without any further documentation?
22     A      Right.
23            (Interruption.)
24            (Break taken from 2:28 p.m. until 2:46 p.m.)
25            MS. MONTGOMERY:  Where were we on the record?

---

153

1  Can you read me back the last sentence.
2            (Question and answer read.)
3  BY MS. MONTGOMERY:
4      Q      So you just approved this William Foster
5  application without any further documentation, correct?
6      A      Yes, um-hum.
7            MS. MONTGOMERY:  I think to save time what we
8  will do, so Leslie doesn't have to go back through the pile
9  of documents a whole bunch more times, we will mark the rest
10  of these building applications that we obtained from the
11  township files altogether as Van Dommelen Exhibit 9.  They
12  are Siegler, Debra Kerr and Kyle Anderson, Boring, Rush
13  Reid, Younker, Foster and Stout and that's it.  These will
14  all be Exhibit 9.
15            (Applications for building permits produced
16  and marked as Van Dommelen Exhibit No. 9.)
17  BY MS. MONTGOMERY:
18     Q      Just take a minute and look through them, Mr.
19  Van Dommelen, and I'm just going to ask you a couple
20  questions about them.
21            (Pause.)
22  BY MS. MONTGOMERY:
23     Q      Now, the first application for building permit
24  is Charles Siegler for a mobile home, correct?
25     A      Um-hum.  For a mobile home, um-hum.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

---

**154**

1    Q      And you granted that application, correct?
2    A      Um-hum.
3    Q      Now --
4           MR. SHERR:  Mr. Van Dommelen, let me just
5    remind you again that you have to say yes or no so that the
6    court reporter can take it down.
7           THE WITNESS:  Yes.
8    BY MS. MONTGOMERY:
9    Q      Now, did you go by and look and see what they
10   were doing on that property or anything, what the Sieglers
11   were doing on that property?
12   A      This one I didn't, no.
13   Q      And there was no attached documentation,
14   right?
15   A      No.
16   Q      How about the Kerr, Kyle Anderson application,
17   6/15/2000?
18   A      I have been by that site, yes.
19   Q      Why did you go by that site?
20   A      I was curious to see what was going up in that
21   area.  It was a development -- it's an area that's
22   developing and I wanted to --
23   Q      So this is a development?
24   A      Yes, it's a -- called Kenwood Acres.
25   Q      How many lots are in that development, do you

---

**155**

1    know?
2    A      I can't tell you exactly.  I really can't say.
3    Q      Now, was there documentation attached to this?
4    A      No.
5    Q      There was never any documentation attached to
6    it?
7    A      Well, I think she brought a floor plan,
8    um-hum.
9    Q      Anything else?
10   A      No.
11   Q      And this was for a home, correct?
12   A      Um-hum.  Well, the only thing is a sewage
13   permit, you know, number but ...
14   Q      And that's right on the application?
15   A      Yes, that's on the application.
16   Q      Same thing on the next one for Mark Boring?
17   A      Um-hum.
18   Q      This was May 24, 2000, correct, was the
19   application?
20   A      Um-hum.
21   Q      And it was granted the same day, right?
22   A      No, one was 6/15 and this is 5 --
23   Q      No, I mean it was granted the same day it was
24   applied for, correct?
25   A      Oh, yes, yes.

---

**156**

1    Q      Now, going back for a second to the
2    Anderson-Kerr application, I see it says the application is
3    June 15th, 2000 but the grant date is June 15, 1999.  That
4    was just you forgot to cross out the 1999 and add 2000,
5    correct?
6    A      Yeah.
7    Q      That was really granted the same day?
8    A      Yeah, I discovered that these building permits
9    had to be changed.
10   Q      And so that was actually granted the same day
11   that it was applied for, correct --
12   A      Right, um-hum.
13   Q      -- at Kerr?  The next one is a Norman Keller.
14   Right.
15   Q      April 30th, 2000, right?
16   A      Um-hum.
17   Q      And that was for a double-wide.  That's the --
18   A      Um-hum.
19   Q      -- modular home, I guess you'd call it?
20   A      Yes, uh-huh.
21   Q      Granted the same day as they applied for it,
22   right?
23   A      Um-hum.
24   Q      The next one is April 24, 2000.  Now, this was
25   an application for -- is that Jessie Rush?

---

**157**

1    A      Yes, uh-huh, Rush.  Jessie Rush, III, I think.
2    Q      So this was just an addition; is that correct?
3    A      This was just an addition to a bedroom.
4    Q      When you add a bedroom up in Jackson Township
5    is there any concern or any attention paid to the septic
6    permit or sewage permit or anything?
7    A      Only when they -- when the house is built or a
8    new house is built, then the septic tank has to -- has to
9    fit the number of bedrooms.
10   Q      What about if you add a bedroom?
11   A      There's nothing that has ever been a concern.
12   Q      So nobody asks any questions about --
13   A      No.
14   Q      -- whether this extra bedroom is going to take
15   you beyond the permissible sewage --
16   A      No.
17   Q      -- permit, right?
18   A      No, unh-unh.
19   Q      Okay, thanks.  There's another one dated May
20   4, 2000 for -- oh, I think we did this already.  Robert
21   Weaver.
22   A      Yes, um-hum.
23   Q      We already talked about that one.  And we have
24   one for Douglas Reid which is dated April 8, 2000, right?
25   A      The Douglas Reid one is --

---

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

158

1      MR. SHERR: It's not in the package you gave
2  us.
3      THE WITNESS: That's the one where they had to
4  have the site looked at by the Commonwealth of Pennsylvania
5  and a geological survey in terms of the flood creek in those
6  attachments here.
7  BY MS. MONTGOMERY:
8      Q    This is the one you talked about that was
9  destroyed by fire?
10     A    Right, um-hum.
11     Q    And they wanted to rebuild?
12     A    Right.
13     Q    Now, I notice that the application for the
14  building permit was filled out on April 8th, right?
15     A    Right.
16     Q    And it was approved also on April 8th,
17  correct?
18     A    Um-hum.
19     Q    It says one and a half where it's --
20     A    One-and-a-half story.
21     Q    One-and-a-half story home is what you're
22  referring to, correct?
23     A    Correct.
24     Q    Did anybody raise any concerns about the
25  septic in connection with the building of this house?

---

159

1      A    About what?
2      Q    The septic in connection with the building of
3  this house.
4      A    The septic was already there.
5      Q    Did anybody ask whether the septic was going
6  to be for the same number of bedrooms that the initial --
7  the house that burned down --
8      A    The house was built the same.
9      Q    It was built with the same number of bedrooms?
10     A    Um-hum.
11     Q    Did you ask that question?
12     A    Yes, um-hum. And then it was looked at, of
13  course, by the -- the engineers.
14     Q    So this is a three bedroom plus a loft,
15  correct?
16     A    Um-hum. Yes.
17     Q    And you're saying the prior house was also a
18  three bedroom, right?
19     A    Um-hum.
20         MR. SHERR: You have to --
21         THE WITNESS: Yes.
22  BY MS. MONTGOMERY:
23     Q    There's a letter from David R. Stiffler
24  attached to this. He's an engineer, I guess, for the
25  Commonwealth?

---

160

1      A    I'm going back to check that. I believe
2  that's the -- that's the -- the engineer.
3      Q    Why was there an engineering report required
4  with this --
5      A    Because it -- excuse me. Because it was a
6  floodplain.
7      Q    And that has to be a Commonwealth or an
8  engineer or --
9      A    Yes, uh-huh, and -- someone who is approved by
10  the Commonwealth.
11     Q    Was the structure built at precisely the same
12  place as the prior structure?
13     A    Essentially the same place. I think it was
14  moved up one foot to accommodate the floodplain changes.
15     Q    The next one is an application dated March 14,
16  2000 from John -- is that Younker?
17     A    Younker.
18     Q    Y-o-u-n-k-e-r. And it appears that that was
19  applied for March 14, 2000 and granted the same day,
20  correct?
21     A    Um-hum.
22     Q    This was for a home. Do you recall what was
23  attached to this?
24     A    No, I don't.
25     Q    Now, we have a March 1, 2000 application from

---

161

1  Joseph Foster?
2      A    Um-hum.
3      Q    For a mobile home --
4      A    Yes.
5      Q    -- he calls it. And I see where it says
6  sewage permit number NA. Why is there no --
7      A    Yes, they replaced a former mobile home there
8  and there was a sewage system already in place.
9      Q    And you didn't go out and -- you didn't do
10  anything further in connection with the septic or anything
11  like that?
12     A    No.
13     Q    You didn't check up on this?
14     A    Yeah, um-hum.
15     Q    And no drawings had to be attached to it,
16  right? No drawings had to be --
17     A    No drawings, no.
18     Q    And then we have February 19, 2000 application
19  from Mr. Stout?
20     A    Yes.
21     Q    And that was for a barn?
22     A    A barn.
23     Q    Now, does the barn have water in it?
24     A    No.
25     Q    No water?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

---

**162**

1    A    No, it's a storage barn.
2    Q    It's 48-feet wide by 68-feet long, right?
3    A    Right.
4    Q    So it wasn't a barn used for animals?
5    A    I think it's going to be for hay and
6    equipment.
7    Q    And so --
8    A    That's what it appears to be anyway.
9    Q    And it appears from here that that application
10    was granted the same day that it was applied for, right?
11    A    Yes.
12    Q    That permit, I should say.
13    A    Um-hum.
14    Q    No additional --
15    A    No.
16    Q    So can you distinguish then between the
17    requirements for, on the one hand, a garage or a barn or a
18    shed, a storage facility of some sort, and an art studio?
19    What's the difference?  Is there any difference under the
20    building ordinance?
21    A    Well, the art studio is going to have water in
22    it and --
23    Q    Why do you think the art studio is going to
24    have water -- an art studio is going to have water in it?
25    MR. SHERR:  Were you finished with your

---

**163**

1    answer?  I think you interrupted him.  Were you finished
2    with your answer?
3    THE WITNESS:  Well, I think an art studio in
4    general usually uses water of some kind for turpentine,
5    watercolors, unless it's a sculpture studio.
6    BY MS. MONTGOMERY:
7    Q    But you didn't know Mr. Corneal was an artist,
8    right, when he asked you for his permit for a garage with
9    studio overhead?
10    A    No.
11    Q    You didn't know he was an artist?
12    A    No.
13    Q    You didn't really know it was an art studio,
14    right?
15    A    He told me that it was going to be a garage
16    with an art studio.
17    Q    Overhead, okay.  Well, once again, I'm just
18    going to say if the art studio doesn't have water and he
19    represents to you that it doesn't have water, can you then
20    distinguish between it and a barn or a shed or a garage or
21    anything else that doesn't have water?
22    A    Well, I think so.
23    Q    Well, how do you distinguish?  What are you
24    distinguishing?
25    A    Well, by looks and by -- a shed is a shed.

---

**164**

1    Q    Well, that's not exactly my question.  My
2    question is:  Can you distinguish for purposes of building
3    application requirements between an art studio that doesn't
4    have water and a garage or a barn or a shed or any workshop
5    that doesn't have water?  Can you distinguish?
6    A    I'll say no.
7    Q    Now I'm going to show you a document -- before
8    I go to it I'm just going to clarify.  Now, you indicated
9    that your art studio on your property doesn't have water,
10    right?
11    A    Exactly.
12    Q    So you go to the stream, right?
13    A    Right.
14    Q    Mr. Corneal has a stream on his property, too,
15    right?
16    A    Okay, then he'd go to the stream and get
17    water.
18    Q    I want to show you a document that we'll mark
19    as Van Dommelen Exhibit 10.
20    (Four-page document produced and marked as Van
21    Dommelen Exhibit No. 10.)
22    BY MS. MONTGOMERY:
23    Q    Now, can you identify that document for me,
24    Mr. Van Dommelen?
25    A    Um-hum, I can.

---

**165**

1    Q    And what is it?
2    A    It's a permit analysis that I'm asked to
3    submit at the end of each year.
4    Q    And --
5    A    To determine what kind of structures were
6    built in the township.
7    Q    So it indicates that in 1995 you issued
8    building permits for seven houses?
9    A    Um-hum.  Yes.
10    Q    And then right down the list, right?
11    A    Exactly.
12    Q    For a total of 33 permits?
13    A    Right.
14    Q    In 1996 you issued permits for four houses,
15    correct?
16    A    Yes.
17    Q    And didn't deny any applications, correct?
18    A    Not for those, no.
19    Q    And then right down the list, mobile homes,
20    camps, decks, carports, outbuildings, alterations, okay.  In
21    1998 you issued permits for six houses?
22    A    Yes.
23    Q    Seven outbuildings, right?
24    A    Yes.
25    Q    You didn't deny any?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

166

```
 1    A    No.
 2    Q    In 1999 you issued permits for six houses?
 3    A    Yes.
 4    Q    And four outbuildings and didn't deny any,
 5  correct?
 6    A    No.
 7    Q    Now, I don't see for 2000.  Do you know how
 8  many permits you issued in 2000?
 9    A    No, I can't remember.  I know I turned that
10  into Ann but -- and it should have been in my book.
11    Q    Okay.  Well, maybe --
12    A    Because I'm sure I turned it in after the
13  first of the year.
14    Q    Well, was it about the same, like somewhere
15  between four and seven houses?
16    A    Yes, it would be a similar amount, yeah.  It
17  -- as you can see, it varies very little in terms of how
18  many permits and how many houses and -- it seems to be
19  fairly stable in terms of what's built.
20    Q    So if you issued permits for -- it looks like
21  between four and seven houses between 1995 and 1998 --
22    A    Yes.
23    Q    -- then say the most you issued for 2000 was
24  seven houses as well?
25    A    It would be a similar amount.
```

167

```
 1    Q    And that means you got in each of those years
 2  -- for example, in 1995 you got applications for seven
 3  houses, right?
 4    A    Probably.
 5    Q    And granted them all?
 6    A    Yes.
 7    Q    Whereas in 2000 you got applications for say
 8  eight houses and denied one, right?
 9    A    I would assume you're right, um-hum.
10    Q    And that would be Mr. Corneal's --
11    A    Yes.
12    Q    -- that you denied?  There wasn't anything
13  unusual that year about the number of houses that somebody
14  was trying to build or anybody was trying to build?
15    A    I can't remember.  I would have to look at the
16  form.
17    Q    Is there anything unusual about the number of
18  out --
19    A    No, I would think not.
20    Q    What about outbuildings?
21    A    About what?
22    Q    Outbuildings.  About the same?
23    A    No, I think it would be similar.
24    Q    And actually in 1999 you only had a request
25  for four outbuildings, right?
```

168

```
 1    A    Yes.
 2    Q    Do you recall what it was for 2000?
 3    A    No, I do not recall.
 4    Q    Would an art studio without water fall into
 5  the heading of outbuilding?
 6    A    Of an outbuilding?
 7    Q    Yes.
 8    A    I suppose it could.
 9    Q    Where else on this list could it possibly fall
10  in?
11    A    No, I think it would have to go under
12  outbuildings.
13    Q    Thank you.  Based on the number of building
14  permit applications, would you say that there wasn't any
15  particular rush or acceleration of building going on in
16  Jackson Township in that 1999-2000 time frame?
17    A    I would think there was no more acceleration
18  than other years.  I think it was fairly stable.
19    Q    I'm going to show you a document which you
20  guys have seen dated September 1, 2000.  It's a letter from
21  David Corneal to Miss Wirth and I'll ask you to look at that
22  for me.  Do you recall whether you've ever seen that letter
23  before, Mr. Van Dommelen?
24    A    I don't recall seeing it before.
25    Q    If you look at the letter, it refers back to
```

169

```
 1  those three building permit applications that Mr. Corneal
 2  sent in.
 3    A    Yes.
 4    Q    Which you say you never saw anyway, correct?
 5    A    I don't believe I did.
 6    Q    Now, look at the drawings that he has attached
 7  to this September 1, 2000 letter.
 8    A    Yes.
 9    Q    Do you see the first page of the drawings has
10  a sketch of a 40-by-20 foot garage/studio, right?
11    A    Yes.
12    Q    And the second floor is on the second -- no,
13  sorry, the second floor is on the first page and the first
14  floor is on the second page, correct?
15         MR. SHERR:  Where does it say garage/studio?
16         MS. MONTGOMERY:  In the cover letter -- well,
17  it actually says second floor with garage on the drawing.
18         MR. SHERR:  Right, but I thought you said it
19  said garage/studio.  I don't see studio written on the
20  drawings, is my point.
21         MS. MONTGOMERY:  No, but --
22         MR. SHERR:  I just wanted to clarify.
23         MS. MONTGOMERY:  Okay.
24  BY MS. MONTGOMERY:
25    Q    So have you ever seen these drawings before?
```

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

170

1  A    Not these.
2  Q    Now, if somebody were --
3  A    And I personally don't think they're very good
4  drawings.
5  Q    But you don't even require drawings for a
6  garage, right?
7  A    (No response.)
8  Q    Have you seen some other drawings because you
9  said not these drawings?
10  A    I saw an earlier drawing which was a much more
11  complex architectural scale drawing.
12  Q    Where did you see that?
13  A    When he came to my house.
14  Q    So he showed you drawings of his studio then,
15  his garage and studio?
16  A    His garage with a studio above it.
17  Q    He showed you that then?
18  A    Yes, and now it becomes a garage with an open
19  storage above it.
20  Q    But in any event, even though you don't think
21  these are good drawings, you don't even require drawings for
22  garages so these would be good enough, correct?
23  A    I did say that, yes.
24  MS. MONTGOMERY:  We're going to mark this as
25  Van Dommelen Exhibit 11.  That's the September 1, 2000

---

171

1  letter from Mr. Corneal to Ann Wirth with drawings attached.
2  (Letter dated 9/1/00 with attachments produced
3  and marked as Van Dommelen Exhibit No. 11.)
4  BY MS. MONTGOMERY:
5  Q    Well, when you saw his earlier drawings when
6  he came to your house, did you keep those?
7  A    No.
8  Q    You sent them back because he didn't have --
9  you wouldn't give him an application?
10  A    Right, and he took them back.
11  Q    Was there anything objectionable about those
12  drawings of the garage and studio?
13  A    As far as the drawings were -- they were
14  professional drawings.
15  Q    They were sufficient --
16  A    Yes, uh-huh.
17  Q    -- to tell you what it was he wanted to do
18  anyway?
19  A    Right.
20  Q    I'm going to ask you one question.  Is it your
21  understanding that you are not to discuss your deposition
22  with any of the other defendants?
23  A    Pardon?
24  Q    Is it your understanding that you are not to
25  discuss --

---

172

1  A    Oh, yes, yes.
2  Q    -- this deposition with any of the other
3  defendants?
4  A    Yes.
5  Q    Including Mr. Newton, right?
6  A    Yes.
7  MR. SHERR:  And just so we're clear, that is
8  until after the deposition of Mr. Newton and Mr. Weiler.
9  MS. MONTGOMERY:  Until the depositions are
10  completed, is what the judge said.
11  THE WITNESS:  Yes.
12  MR. SHERR:  Is that what it says?  It doesn't
13  say the deposition of defendants?
14  MS. MONTGOMERY:  Right.
15  BY MS. MONTGOMERY:
16  Q    Did you discuss with Mr. Newton your refusal
17  to provide -- other than the letter that he wrote for you
18  and had you sign to Mr. Corneal, did you ever have
19  discussions with Mr. Newton about Mr. Corneal and his
20  attempt to get approvals from the township?
21  A    No.
22  Q    You never had a telephone conversation with
23  him?
24  A    No, I believe all the discussions went between
25  him and Ann Wirth.

---

173

1  Q    What makes you think they all went between him
2  and Ann Wirth?
3  A    Because I gave -- I gave the letter to Ann
4  Wirth and then she sent it along with building permits to
5  Larry Newton.
6  Q    You mean the letter that Mr. Corneal wrote to
7  you?
8  A    No, no, that I wrote.
9  Q    Oh, the letter that you wrote?
10  A    Yes.
11  Q    You gave it to her?
12  A    Right.
13  Q    What about prior to the time -- you know, for
14  example, when he first came out to your house and asked for
15  the applications --
16  A    Right.
17  Q    -- did you have any occasion to talk to him
18  then about Mr. Corneal?
19  A    About Mr. Corneal?
20  Q    Yes.
21  A    Newton never came out to my house.
22  Q    But Mr. Corneal came out to your house,
23  correct?
24  A    Yes.
25  Q    At the time that Mr. Corneal came out to your

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

174

1  house and you first refused to give him even an
2  application --
3      A      Right.
4      Q      -- did you ever have any discussions with Mr.
5  Newton about that?
6      A      No.
7      Q      Do you know if anybody else had any
8  discussions with Mr. Newton --
9      A      No, I don't know.
10     Q      Did anybody convey to you anything that Mr.
11  Newton may have said about that?
12     A      No.
13     Q      Did anybody convey any advice from Mr. Newton
14  about that?
15     A      I don't know.
16     Q      You don't recall?
17     A      Unh-unh.
18     Q      Do you know whether Mr. Newton was ever
19  present at any of the meetings between January 2000 and July
20  2000?
21     A      Which meetings?
22     Q      The township meetings or the pre-meetings.
23     A      Yes, but I can't tell you what dates.
24     Q      What makes you think he was present?
25     A      I've seen him at some of the township meetings

---

175

1  in the fire hall and I've seen him at one meeting at Ann's
2  that we went over the -- that one document that -- that
3  Corneal had accusing us -- I can't think of what it's
4  called.
5          MR. SHERR: The complaint.
6  BY MS. MONTGOMERY:
7      Q      The complaint?
8      A      Yeah, the complaint.
9      Q      That was after the lawsuit?
10     A      Yeah, uh-huh.
11     Q      But prior to the lawsuit do you recall also
12  seeing him at township meetings?
13     A      That's the only time I ever saw him.
14     Q      The only time you ever saw him was when you
15  were at Ann's you mean?
16     A      Newton. Yeah, the only time I ever saw him
17  was at a township meeting.
18     Q      Oh, I see. And that was prior to the lawsuit?
19     A      Yes.
20     Q      Do you recall whether at any of those meetings
21  Mr. Corneal's situation was discussed when Mr. Newton was
22  there?
23     A      I don't know. In general -- in general we
24  didn't discuss at the open meetings anything about the
25  Corneal case.

---

176

1      Q      Where did you discuss it instead?
2      A      It finally came up after the article came in
3  the newspaper and some of the citizens asked about it.
4      Q      Oh, then it came up in an open meeting, you're
5  saying?
6      A      Yes, it came up in the newspaper. Someone
7  took an article about that into the Daily News and -- we
8  have no idea who it was, but to tell about the fact that he
9  -- Corneal was suing us. And so then, of course, some of
10  the -- the citizens wanted to ask about it and we said as
11  little as possible.
12     Q      Well, let me just ask you one more question
13  about the letter that Mr. Newton wrote for your signature or
14  revised for your signature.
15     A      Revised, I would say.
16     Q      Were you concerned at all that you were sort
17  of writing stuff down in a letter at somebody else's request
18  about building permit applications that you'd never seen?
19  Did that raise any concerns to you?
20     A      Maybe a little.
21     Q      Like what kind of concerns?
22     A      Well, my job was being usurped.
23     Q      Did you voice that to the supervisors at all?
24     A      I don't believe so.
25     Q      Why not?

---

177

1      A      I can't answer that.
2      Q      But was that the only situation that you can
3  think of when your job was being usurped? Is that the
4  only --
5      A      Yes, yes, um-hum, right.
6      Q      But you decided you'd go ahead and sign the
7  letter anyway and put in it what they wanted you to put in
8  it?
9      A      Yes, um-hum.
10     Q      Why did you decide to do that? Did you feel
11  that you had to?
12     A      No, I just wanted to not shake the boat, I
13  guess.
14     Q      Because you understood that was what the
15  supervisors wanted you to do?
16     A      Yes.
17     Q      Did you understand that was what Mr. Newton
18  wanted you to do as well?
19     A      Yes.
20     Q      Did anybody ever, you know, sort of tell you
21  -- did anybody ever tell you that you just needed to do
22  your job, you know, just the way they told it to you or
23  anything like that?
24     A      I'm not sure that anyone did say that in those
25  kind of words.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

178

1    Q      You didn't have any real like confrontation
2  about the fact that they were telling you what to do?
3    A      No.
4    Q      Other than all that we have talked about just
5  now, is there anything that you can think of concerning Mr.
6  Corneal and his property that you haven't told me as the
7  building permit officer for Jackson Township?
8    A      I can think of nothing.
9    Q      I'm not sure if I asked you this question, but
10  just in case, have you talked to Ann Wirth -- not about the
11  deposition.  I'm not talking about the depositions, that's
12  not it.  Have you talked to Ann Wirth about Mr. Corneal's
13  request for a building permit since the time that you wrote
14  that letter?
15    A      Well, I'm sure we talked about it because I
16  was concerned about how the whole thing was going.  I'm sure
17  I said something about what are we going to do about this
18  and that we need to bring it up to the supervisors and make
19  a decision.  So I certainly wouldn't say I never talked to
20  her, but it would be a very superficial kind of
21  conversation.
22    Q      Do you recall her talking anything to you
23  about it at all?
24    A      No, except one time, as I said earlier, that
25  she said I wasn't supposed to give a building permit to

179

1  Corneal, as did Tom Wilson.
2    Q      Because that's what Tom Wilson wanted?
3    A      Right.
4    Q      Do you know -- to your knowledge is it
5  primarily Mr. Wilson who was sort of taking the lead on this
6  thing with Mr. Corneal in his attempt to build on his
7  property?
8    A      Interesting question.  I'm not sure I would
9  want to answer that question the way it's phrased because
10  I'm not really sure.
11    Q      Well, I'm not sure it's a good answer.  It's
12  an okay answer.
13    A      Because I would assume -- no, I don't want to
14  go there.
15    Q      Well, let me ask you this:  Why is it that you
16  don't feel that you can answer that question?
17    A      Well, because I'm not sure of the answer and
18  I'm not sure how some of the supervisors and administrators
19  of the township interact with other people.
20    Q      I see.
21    A      I see them mainly on the first Monday of each
22  month at the supervisor's meeting and so I don't see their
23  interaction with other people except at that supervisor's
24  meeting.  And so it would be unfair for me to make a
25  judgment on one person that that person is doing the lead.

180

1    Q      Do you have a belief as to who was taking the
2  lead in this position that the township has taken --
3    A      No, I don't think so.  I think they were
4  taking it as a board of supervisors.
5    Q      As a group?
6    A      As a group.
7    Q      All right.  Do you know when Mr. Newton became
8  aware of what was going on between the township supervisors
9  and Mr. Corneal with respect to his attempt to build?
10    A      No, I don't -- I don't know.
11    Q      Do you know -- I'm going to ask it a little
12  more generally then.  Do you know whether he found out about
13  all this say in the spring of 2000 as opposed to later?
14    A      I would assume it was in the spring of 2000.
15    Q      Why would you assume that?
16    A      Well, just the date of -- the date of events.
17    Q      Do you know whether or not Mr. Newton knew
18  about the moratorium at the time that the moratorium went
19  into place?
20    A      Well, as a township lawyer I would say yes.
21    Q      Has it been your experience that Mr. Newton
22  generally knows what's going on in the township, in Jackson
23  Township with the board of supervisors?
24    A      Yes, I think so.
25    Q      Do you know whether any of the defendants

181

1  asked him for advice regarding the moratorium?
2    A      No.
3    Q      Did any of the township supervisors ask him
4  for --
5    A      I don't know.
6    Q      You don't know, okay.  Do you know whether or
7  not he ever told them what they could do with respect to a
8  moratorium?
9    A      No, I don't know.
10    Q      What about the subdivision ordinance, same
11  question, do you know whether Mr. Newton told the
12  supervisors or Miss Wirth or even you what they could do
13  with respect to the subdivision ordinance?
14    A      He didn't say anything to me.  I was very
15  uninvolved with the whole subdivision ordinance and so I
16  have no idea who he talked to about it.
17    Q      Now, if Mr. Corneal's property were already
18  divided such that the existing old farmhouse was on one
19  parcel and there was nothing on the other parcel, would you
20  say that if you wanted to build on that other parcel a home
21  and a garage with art studio that there would be any
22  subdivision problem?
23    A      If the subdivision is already in place, then I
24  see no problems.  There is a -- this is an example.  There
25  is a piece of property near me where it's already been

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

182

1  subdivided.  They're not building anything on it but it is
2  subdivided in preparation --
3    Q    When was it subdivided, do you know?
4    A    Oh, it has to be at least five to 10 years
5  ago.  It was a long -- a long time ago.
6    Q    So if a parcel of property were divided into
7  two parcels so you now have -- technically now you have a
8  subdivision, right, and that were done before the
9  subdivision ordinance were in place, would that be okay to
10  build on one even though there was a house on the other
11  piece?
12    A    I'm not sure.  I'm not sure.
13    Q    Let me ask it to you a different way.  If you
14  had a piece of property that was divided such that there was
15  a separate deed filed --
16    A    Right.
17    Q    -- recorded, when a piece of property had an
18  existing house on it, the other parcel had nothing on it,
19  would there be any subdivision problem with building on
20  that --
21    A    No, not if there's separate deeds.  The
22  property that I live on has two parcels, the one my house is
23  on and the one my studio is on, but that property is also
24  claimed Clean and Green so nothing can be built on it or we
25  have to pay back taxes.

183

1    Q    So you can't build any other structures on it?
2    A    No.
3    Q    Who claimed it Clean and Green?
4    A    Pardon?
5    Q    Who claimed it Clean and Green?
6    A    Well, we applied for it.
7    Q    And that excuses you from paying taxes?
8    A    Yes.
9    Q    Do you know whether or not Mr. Wilson has any
10  interest in any part of the Corneal property?
11    A    No, I don't.
12        MS. MONTGOMERY:  I don't think I have any
13  further questions right now.
14        MS. YANKANICH:  I have some questions for
15  you.
16
17        CROSS-EXAMINATION
18
19  BY MS. YANKANICH:
20    Q    If you will turn to Exhibit Number 2 for me,
21  please.
22        MR. SHERR:  Exhibit Number 2?
23        MS. YANKANICH:  Exhibit Number 2.
24        MR. SHERR:  You're going to have to speak up.
25        MS. YANKANICH:  I'll speak up, right.

184

1        (Discussion held off the record.)
2  BY MS. YANKANICH:
3    Q    You have Exhibit Number 2; is that correct?
4    A    Yes.
5        MS. MONTGOMERY:  What's the date of the
6  letter?
7  BY MS. YANKANICH:
8    Q    The date of the letter is October 10, 2000.
9  It's the letter that you previously testified you drafted --
10    A    Right.
11    Q    -- and that Larry Newton revised --
12    A    Right.
13    Q    -- is that correct?  Is that the letter you're
14  referring to there?
15    A    Yes.
16    Q    My question specifically is I'm not clear what
17  it is in this letter that you're contending Larry Newton
18  revised.  Can we go through this letter and specifically
19  point out what language was added.
20    A    I think the part that was added was the --
21  while you submitted sewage facility planning modules to the
22  township, the township cannot forward the planning modules
23  to the Department of Environmental Protection for review
24  until you meet the requirements of the township's
25  subdivision and land development.

185

1    Q    So you're referring to the second sentence in
2  the second paragraph?
3    A    Right.
4    Q    Is there anything else in the letter that --
5    A    That's, I think, the main part that was
6  added.  A few words might have been changed, but as you
7  know, nobody can look at a letter and not change words.
8    Q    But the gist of this letter is still
9  consistent with the draft that you provided to Mr. Newton;
10  is that correct?
11    A    Yes, I think except for that -- except for
12  that area.
13        MS. YANKANICH:  I have no further questions.
14        MS. THORP:  Nothing.
15        MR. SHERR:  I have no questions.
16        MS. MONTGOMERY:  I just have one follow-up.
17
18        REDIRECT EXAMINATION
19
20  BY MS. MONTGOMERY:
21    Q    I'm a little confused now about this October
22  10, 2000 letter from you --
23    A    Yeah, right.
24    Q    -- to Mr. Corneal.  I thought that you had
25  indicated that you just put in there in the first place what

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

186

1  others told you to put in there, correct?
2      A      I first wrote it, you know, myself
3  completely.
4      Q      At whose instruction?
5      A      And then I gave it to Ann Wirth and she then
6  gave it to Larry Newton and he made changes that he thought
7  should be in there.
8      Q      But my question --
9      A      I think that was correct with my previous --
10     Q      That's what I understood you to say, but when
11  you first wrote it, at whose instruction were you writing
12  it?
13     A      I guess I would have to answer the board of
14  supervisors.
15     Q      Because you hadn't seen the applications,
16  right?
17     A      Yeah.
18     Q      So they just told you to write this letter and
19  deny it?
20     A      Right.
21     Q      Did Mr. Newton tell you to write the letter?
22     A      See, that I do not remember.
23     Q      But somebody other than yourself --
24     A      Yeah.
25     Q      -- came up with the idea that you needed to

187

1  write this letter?
2      A      Right.
3              MS. MONTGOMERY:  That's it.
4              MS. YANKANICH:  Nothing further.
5              (The deposition was concluded at 3:32 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

188

1
2  COUNTY OF DAUPHIN          :
                                        : SS
3  COMMONWEALTH OF PENNSYLVANIA   :
4          I, Teresa K. Bear, Reporter-Notary Public,
5  authorized to administer oaths within and for the
6  Commonwealth of Pennsylvania and take depositions in the
7  trial of causes, do hereby certify that the foregoing is the
8  testimony of DAVID VAN DOMMELEN.
9          I further certify that before the taking of
10  said deposition, the witness was duly sworn; that the
11  questions and answers were taken down stenographically by
12  the said Teresa K. Bear, a Reporter-Notary Public, approved
13  and agreed to, and afterwards reduced to typewriting under
14  the direction of the said Reporter.
15          I further certify that the proceedings and
16  evidence are contained fully and accurately to the best of
17  my ability in the notes taken by me on the within
18  deposition, and that this copy is a correct transcript of
19  the same.
20          In testimony whereof, I have hereunto
21  subscribed my hand this 18th day of June, 2001.
22
23  _____
            Teresa K. Bear, Reporter
24          Notary Public
            My commission expires
25          on April 13, 2003

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

DEFENDANT'S
EXHIBIT

15

**DAVID B. CORNEAL**

ATTORNEY AT LAW

1445 WEST COLLEGE AVENUE

STATE COLLEGE, PENNSYLVANIA 16801

MEMBER:
PENNSYLVANIA BAR
FLORIDA BAR

(814) 238-1925
(814) 238-1929

Mr. David Van Dommelen
R.D. 1, Box 631
Petersburg, Pa. 16669

May 5, 2000

RE: Garage Building Permit

Dear Mr. Van Dommelen,

Since you have failed to call me as promised, or to return my phone call, regarding my requested Building Permit, I assume you are continuing to hold in your stated position from our last Thursday meeting in your home.

At that time I brought you a copy of my building plan for a garage approximately 20' by 40'. As stated at that meeting, since there was no sewer or water in the garage, I qualified for a building permit. In fact, you stated that if any other Jackson Township property owner requested a permit to construct a garage, you would issue them the permit. Your justification for refusing to give me even an application for a permit was that I was that "trouble making yuppie from over the mountain" and the supervisors told you not to give me any building permits. You then proceeded to call the individual supervisors for further instructions. In my presence, you got Tom Wilson on the phone who told you not to grant me the building permit after you explained to him that it was just for a garage 20' by 40'. You then told me that the supervisors were meeting the next morning (Friday April 28) to discuss my permit and that you would then call me. I then wrote down two phone numbers where you could reach me 24 hours a day or night.

Having not heard from you, I called you on Wed. May 3 and left a message on your answering machine to call me. You have obviously chosen to ignore the promise or my request. Where upon you asked me to leave, refusing to give me even an application form for a building permit.

If you disagree with any of the facts setforth herein please advise me in writing.

Sincerely,

David B. Corneal, Esq.

DEFENDANT
EXHIBIT
/C

# *SUBDIVISION*

# *and*

# *LAND DEVELOPMENT*

# *ORDINANCE*

# *JACKSON TOWNSHIP*

*2000 - 1*

# TABLE OF CONTENTS

|  | *Page(s)* |
|---|---|
| **Article I.** SHORT TITLE AND PURPOSE | |
| Section 101  Short Title | 2 |
| Section 102  Purpose | 2 |
| | |
| **Article II.** DEFINITIONS | |
| Section 201  Tense, Gender and Number | 3 |
| Section 202  General Terms | 3 |
| Section 203  Terms or Words not Defined | 3 |
| Section 204  Specific Terms | 3-9 |
| | |
| **Article III.** SUBMISSION AND REVIEW PROCEDURES | |
| Section 301  Procedure (General and Phasing Development) | 10 |
| Section 302  Submission of Sketch Plan | 11 |
| Section 303  Review of Sketch Plan | 11-12 |
| Section 304  Submission of Preliminary Plan | 12-13 |
| Section 305  Review of Preliminary Plan | 13-16 |
| Section 306  Submission of Final Plan | 16-18 |
| Section 307  Review of Final Plan | 18-19 |
| Section 308  Recording of Final Plan | 20 |
| Section 309  Performance Guarantee | 20-22 |
| Section 310  Release of Performance Guarantee | 22-24 |
| Section 311  Resubdivision Procedure | 24-25 |
| Section 312  Dedication and Maintenance Guarantee | 25 |
| | |
| **Article IV.** PLAN REQUIREMENTS | |
| Section 401  Sketch Plan | 25-26 |
| Section 402  Preliminary Plan | 26-30. |
| Section 403  Final Plan | 30-32 |
| Section 404  Minor Subdivisions and Land Developments | 33-34 |
| | |
| **Article V.** DESIGN STANDARDS | |
| Section 501  General Standards | 34 |
| Section 502  Streets | 35-40 |
| Section 503  Blocks | 41-42 |
| Section 504  Lots and Parcels | 42-43 |
| Section 505  Sanitary Sewage Disposal | 43-44 |
| Section 506  Soil Percolation Test Requirements | 44 |
| Section 507  Water Supply | 45 |
| Section 508  Storm Water Drainage | 45-47 |
| Section 509  Public Use and Service Area | 47-48 |

# TABLE OF CONTENTS

**_Page(s)_**

**Article I.** SHORT TITLE AND PURPOSE
Section 101  Short Title                                              2
Section 102  Purpose                                                 2

**Article II.** DEFINITIONS
Section 201  Tense, Gender and Number                                3
Section 202  General Terms                                           3
Section 203  Terms or Words not Defined                              3
Section 204  Specific Terms                                          3-9

**Article III.** SUBMISSION AND REVIEW PROCEDURES
Section 301  Procedure (General and Phasing Development)             10
Section 302  Submission of Sketch Plan                               11
Section 303  Review of Sketch Plan                                   11-12
Section 304  Submission of Preliminary Plan                          12-13
Section 305  Review of Preliminary Plan                              13-16
Section 306  Submission of Final Plan                                16-18
Section 307  Review of Final Plan                                    18-19
Section 308  Recording of Final Plan                                 20
Section 309  Performance Guarantee                                   20-22
Section 310  Release of Performance Guarantee                        22-24
Section 311  Resubdivision Procedure                                 24-25
Section 312  Dedication and Maintenance Guarantee                    25

**Article IV.** PLAN REQUIREMENTS
Section 401  Sketch Plan                                             25-26
Section 402  Preliminary Plan                                        26-30.
Section 403  Final Plan                                              30-32
Section 404  Minor Subdivisions and Land Developments               33-34

**Article V.** DESIGN STANDARDS
Section 501  General Standards                                       34
Section 502  Streets                                                 35-40
Section 503  Blocks                                                  41-42
Section 504  Lots and Parcels                                        42-43
Section 505  Sanitary Sewage Disposal                               43-44
Section 506  Soil Percolation Test Requirements                      44
Section 507  Water Supply                                            45
Section 508  Storm Water Drainage                                    45-47
Section 509  Public Use and Service Area                             47-48

*Table of Contents (continued)*

**Article VI. IMPROVEMENT REQUIREMENTS**
Section 601  General Requirements                                          48-49
Section 602  Required Improvements                                         49-51
Section 603  Recommended Improvements                                      51

**Article VII. SUPPLEMENTARY LAND DEVELOPMENT REQUIREMENTS**
Section 701  General Requirements and Intent                               52
Section 702  Submission Review Procedures and Plan Requirements            52
Section 703  Parking Requirements                                          52-54
Section 704  Supplementary Requirements: Commercial and Industrial         54-55

**Article VIII. MOBILE HOME PARK STANDARDS**
Section 801  Mobile Home Park Regulations                                  55-56
Section 802  Permits and Licenses                                          56
Section 803  Submission of Plans and Specification to the Township         56-57
Section 804  Fees                                                          57
Section 805  Inspection of Mobile Home Parks                               57
Section 806  Required Separation Between Mobile Homes                       57
Section 807  Required Recreational Areas                                    57
Section 808  Required Setbacks, Buffer Strips and Screening                 57-58
Section 809  Park Street Systems                                           58-59
Section 810  Required Off-Street Parking Areas                             59
Section 811  Mobile Home Stands                                            59-60
Section 812  Water Supply                                                  60
Section 813  Sewage Collection and Disposal                                60
Section 814  Electrical Distribution System                                60-61
Section 815  Refuse Handling                                               61
Section 816  Insect and Rodent Control                                     61
Section 817  Fire Protection                                               61

**Article IX. RECREATIONAL AND SEASONAL LAND DEVELOPMENT STANDARDS**
Section 901  General Requirements                                          61-62
Section 902  Submission and Review of "Sketch Plan" (Optional)             63
Section 903  Official Submission and Review of the "Preliminary Plan"      63
Section 904  Official Submission and Review of the "Final Plan"            63
Section 905  Recording of the "Final Plan"                                 63
Section 906  Performance Guarantees                                        63
Section 907  Plan Requirements                                             63
Section 908  Design Standards                                              63-65

*Table of Contents (continued)*

Section 909  Improvements                                          65-66
Section 910  Minimum Facilities                                    66

**Article X.  ADMINISTRATION, AMENDMENT, SEVERABILITY**
Section 1001  Revision and Amendment                               66-67
Section 1002  Modifications                                        67-68
Section 1003  Reconsideration, Mediation, and Appeals              68
Section 1004  Fees                                                 68-69
Section 1005  Remedies, Enforcement, and Jurisdiction              69-70
Section 1006  Keeping of Records                                   70
Section 1007  Responsibility                                       70
Section 1008  Conflicts                                            70
Section 1009  Severability                                         71
Section 1010  Effective Date                                       71

**Appendix**
Design of Local Roads and Streets                                  A-1
Streets and Intersection Design Specification                      A-2
Storm Water Runoff Calculations                                    A-3
Intersection Sight Distance                                        A-4
Sketch Plan Example                                                A-5
Preliminary Plan Example                                           A-6
Final Plan Example                                                 A-7
Typical Roadway Section                                            A-8
Subdivision or Land Development Approval Application               A-9
Consideration of a Subdivision and/or Land Development Plan Application   A-10
Review of a Minor Subdivision Plan Application                     A-11
Review of a Preliminary Subdivision Plan Application               A-12
Review of a Final Subdivision Plan Application                     A-13
Consideration of a Waiver Application                              A-14
Memorandum of Understanding of Financial Security                 A-15
Memorandum of Understand of Public Improvement                    A-16

# ARTICLE 1
## SHORT TITLE AND PURPOSE

### SECTION 101 SHORT TITLE

This Ordinance shall be known, and may be cited as, the Jackson Township Subdivision and Land Development Regulations of 2000.

### SECTION 102 PURPOSE

These regulations are adopted to protect, promote and create conditions favorable to the health, safety, morals, and general welfare of the citizens by:

A. Encouraging and promoting flexibility, economy, and ingenuity in the layout and design of subdivisions and land development including the provisions authorizing the Municipality to alter site requirements and for encouraging other practices which are in accordance with modern and evolving principles of site planning and development.

B. Assuring sites suitable for building purposes and human habitation.

C. Providing for the harmonious development of the Municipality as outlined in the Municipality's Comprehensive Plan (if applicable).

D. Assuring coordination of existing streets and highways with proposed streets, parks, or other features of the official plan or map of the Municipality.

E. Providing for adequate open spaces for traffic, recreation, light, and air and for proper distribution of population.

F. Assuring equitable and just processing of subdivision plans by providing uniform procedures and standards for the observance of both the subdivider and Municipal officials.

G. Planning and managing storm water runoff in each watershed by regulating subdivisions, land development, and mobile home parks in a manner consistent with the Pennsylvania Storm Water Management Act, No. 167.

H. Utilizing and preserving the desirable existing natural drainage system.

I. Encouraging recharge of groundwaters.

J. Maintaining the existing flows and quality of streams and watercourses in the Municipality and the Commonwealth.

K. Preserving and restoring the flood carrying capacity of streams.

L. Providing for proper maintenance of all permanent storm water management structures which are constructed in the Municipality.

*ARTICLE II*
*DEFINITIONS*

<u>*SECTION 201 TENSE, GENDER, AND NUMBER*</u>

Words in the singular include the plural and those in the plural include the singular; words in the present tense include the future tense; words used in the masculine gender include the feminine and neuter.

<u>*SECTION 202 GENERAL TERMS*</u>

The words "person", "subdivider", and "owner" include a corporation, unincorporated association and a partnership, or other legal entity, as well as an individual. The word "building" includes structures and shall be construed as if followed by the phrase "or part thereof". The word "watercourse" includes channel, creek, ditch, drain, dry run, spring, and stream. The words "should" and "may" are permissive; the words "shall" and "will" are mandatory and directive.

<u>*SECTION 203 TERMS OR WORDS NOT DEFINED*</u>

Where terms or words are not defined, they shall have their ordinarily accepted meanings or such as the context may apply.

<u>*SECTION 204 SPECIFIC TERMS*</u>

Terms or words used herein, unless otherwise expressly stated, shall have the following meanings:

<u>Accelerated Erosion</u>:  The removal of the surface of the land through the combined action of man's activities and natural processes at a rate greater than would occur because of the natural processes alone.

<u>Block</u>:  A tract of land, a lot, or group of lots, bounded by streets, public parks, railroad right-of-way, water courses, boundary lines of the Municipality, unsubdivided land, or by any combination of the above.

<u>Building</u>:  A structure having a roof supported by columns or walls, for the shelter of persons, animals, chattels, or property.   When separated by walls which are common with the walls of adjoining dwellings, each portion of such structure shall be considered a separate building.  It shall include any overhang, projection, or roof extending beyond a wall or support.  Sun parlors and covered porches whether enclosed or unenclosed, but does not include walks, steps, or terraces.

<u>Building line or Setback</u>:  The line within a property defining the required minimum distance between any enclosed structure and the adjacent right-of-way or lot line.  Such line shall be measured at right angles from the front street right-of-way line which abuts the property upon which said building is located and shall be parallel to said right-of-way line.

3

<u>Cartway (Roadway)</u>:    The portion of a street right-of-way, paved or unpaved, intended for vehicular use.

<u>Cistern</u>:  An underground reservoir or  tank for storing rainwater.

<u>Clear Sight Triangle</u>:  An area of unobstructed vision at the street intersection defined by lines of sight between points at a given distance from the intersection of street center lines.

<u>County</u>:  Huntingdon County, Commonwealth of Pennsylvania.

<u>County Planning Commission</u>:  The Huntingdon County Planning Commission.

<u>Crosswalk (Interior Walk)</u>:    A publicly or privately owned right-of-way for pedestrian use extending from a street into a block or across a block to another street.

<u>Culvert</u>:    A structure with appurtenant work which carries surface water under or through an embankment or hill.

<u>Dedication</u>:  The deliberate appropriation of land by its owner for any general and pubic use, reserving to himself no other rights than those that are compatible with the full exercise and enjoyment of the public uses to which the property has been devoted.

<u>Design Storm</u>:  The magnitude of precipitation from a storm event measured in probability of occurrence (e.g. 25 year storm) and duration (e.g. 24 hour), and used in computing storm water management control systems.

<u>Detention Basin</u>:  A basin designed to retard storm water runoff by temporarily storing the runoff and releasing it at a predetermined rate.  A detention basin can be designed to drain completely after a storm event, or it can be designed to contain a permanent pool of water.

<u>Dwelling Unit</u>:  Any structure, or part thereof, designed to be occupied as living quarters for a single housekeeping unit.

<u>Easement</u>:  A right-of-way granted, but not dedicated, for limited use of private land for a public or quasi-public purpose, and within which the grantor shall not erect any permanent structure, but shall have the right to make any other use of the land which is not inconsistent with the rights of the grantee.

<u>Engineer</u>:  A licensed professional engineer registered in the Commonwealth of Pennsylvania.

<u>Erosion</u>:  The removal of soil particles by the action of water, wind, ice or other geological agents.

<u>Infiltration Structures</u>:  A structure designed to direct runoff into the ground, e.g. french drains, seepage pits, seepage trench.

Land Development:

a. The improvement of one lot or two or more contiguous lots, tracts, or parcels of land for any purpose involving:

    1. A group of two or more residential or nonresidential buildings, whether proposed initially or cumulatively, or a single nonresidential building on a lot or lots regardless of the number of occupants or tenure;

    2. The division or allocation of land or space, whether initially or cumulatively, between or among two or more existing or prospective occupants by means of, or for the purpose of, streets, common areas, leaseholds, condominiums, building groups, or other features.

b. A subdivision of land;

c. Excepting:

    1. The conversion of an existing single family detached or single family semi-detached dwelling into not more than three residential units, unless such units are intended to be a condominium;

    2. The addition of an accessory building, including farm buildings, on a lot or lots subordinate to an existing principal building;

    3. The addition or conversion of buildings or rides within the confines of an enterprise which would be considered an amusement park. For purposes of this subclause, an amusement park is defined as a tract or area used principally as a location for permanent amusement structures or rides.

    This exclusion shall not apply to newly acquired acreage by an amusement park until initial plans for the expanded area have been approved by proper authorities.

Lot: A tract or parcel of land, regardless of size, and accessible by means of a public street which is intended for transfer of ownership, use, lease, or improvements or for development, regardless of how it is conveyed. Lot shall also mean parcel, plot, site, or any similar term.

Lot Area: The area contained within the property lines of a lot excluding space within all streets and within all permanent drainage easements, but including the areas of all other easements.

Municipality: Township of Jackson, Huntingdon County, Pennsylvania acting through its Township Supervisors.

Municipal Officers: Jackson Township Supervisors.

**Minor Subdivision:** Any subdivision containing not more than four (4) lots fronting on an existing street, and not involving the extension of sanitary water and/or sewer lines, or the creation of any public improvements, and does not adversely affect the natural resources of the Municipality, and does not adversely affect the remainder of the parcel or adjoining property, and does not adversely affect the present or future development of the Municipality.

**Mobile Home:** A transportable, single family dwelling intended for permanent occupancy, office, or place of assembly contained in one unit or in two units designed to be joined into one integral unit capable of again being separated for repeated towing, which arrives at a site complete and ready for occupancy except for minor and incidental unpacking and assembly operations, and constructed so that it may be used without a permanent foundation.

**Mobile Home Lot:** A parcel of land in a mobile home park, improved with the necessary utility connections and other appurtenances necessary for the erection thereon of a single mobile home, which is leased by the park owner to the occupants of the mobile home erected on the lot.

**Mobile Home Park:** A parcel or contiguous parcels of land under single ownership which has been planned and improved for the placement of mobile homes for non-transient use, consisting of two or more mobile home lots.

**Official Plans:** The Comprehensive Development Plan and/or Official Map and/or Topographical Survey and/or such other Plans, or portions thereof, as may have been adopted by the Municipality pursuant to statute, for the area of the Municipality in which the subdivision is located.

**Paved or Pavement:** An all-weather permanent surface composed of bituminous or concrete material applied over a base of stone or slag and used to convey motor vehicles.

**Peak Discharge:** The maximum rate of flow of water at a given point and time resulting from a storm event.

**Planning Commission or Planning Committee:** The Planning Commission or Committee representing Jackson Township.

**Plat:** The map or plan of a subdivision or land development, whether preliminary or final. The word Plat includes the word Plan.

**Public Grounds:** Includes:

1. parks, playgrounds, trails, paths, and other recreational areas and other public rests;

2. sites for schools, sewage treatment, refuse disposal and other publicly owned or operated facilities; and

3. publicly owned or operated scenic and historical sites.

**Public Hearing:** A formal meeting held pursuant to public notice by the governing body or planning agency intended to inform and obtain public comment, prior to taking action in accordance with this Ordinance.

**Public Meeting:** A forum held pursuant to notice under the act of July 3, 1986 (P.L 388, No. 84), known as the "Sunshine Act".

**Public Notice:** Notice published once each week for two successive weeks in a newspaper of general circulation in the Municipality; Such notice shall state the time and place of the hearing and the particular nature of the matter to be considered at the hearing. The first publication shall not be more than thirty (30) days and the second publication shall not be less than seven days from the date of the hearing.

**Resubdivision:** Any replatting or resubdivision of land, limited to changes in lot lines on the approved Final Plan or Recorded Plan as specified in Article III, Section 311, of these regulations. Other plattings shall be considered as constituting a new subdivision of land. See "Subdivision".

**Record Plan:** The copy of the Final Plan which contains the original endorsements of the Planning Commission, and/or Municipality, and which is intended to be recorded with the County Recorder of Deeds.

**Reverse Frontage Lot:** A lot extending between and having frontage on two (2) generally parallel streets, (excluding service streets) with vehicular access solely from one street.

**Review:** Whenever the County Planning Commission possesses such review jurisdiction, the action of the review shall not limit the appropriate authorities of the Municipality in their ultimate and final decisions.

**Right-of-Way (ROW):** The total width of any land reserved or dedicated as a street, alley, crosswalk, or for the other public or semi-public purposes.

**Roadway:** See "Cartway".

**Runoff:** That part of precipitation which flows over the land.

**Sanitary Sewage Disposal, On-Site:** Any structure designed to biochemically treat sanitary sewage within the boundaries of an individual lot.

**Sanitary Sewage Disposal, Community:** A sanitary sewage collection system in which sewage is carried from individual lots by a system of pipes to a temporary central treatment and disposal plant, generally serving a neighborhood area.

**Sanitary Sewage Disposal, Public:** A sanitary sewage collection system in which sewage is carried from individual lots by a system of pipes to a central treatment and disposal plant.

**Sediment:** Solid material, both mineral and organic, that is in suspension, is being transported, or has been moved from its site of origin by water.

<u>Septic Tank</u>: A covered watertight settling tank in which raw sewage is biochemically changed into solid, liquid, and gaseous states to facilitate further treatment and final disposal.

<u>Sight Distance</u>: The required length of roadway visible to the driver of a passenger vehicle at any given point on the roadway when the view is unobstructed by traffic. Sight distance measurements shall be made from a point four and one half (4½) feet above the centerline of the road surface to a point one half (½) foot above the centerline of road surface.

<u>Soil Percolation Test</u>: A field test conducted to determine the suitability of the soil for on-site sanitary sewage disposal facilities by measuring the absorptive capacity of the soil at a given location and depth.

<u>Solicitor</u>: The solicitor appointed by the local Municipality.

<u>Storm Water Management Plan</u>: The plan for managing storm water runoff within Huntingdon County as required by the Act of October 4, 1978, P.L. 864, (Act 167), and known as the "Storm Water Management Act".

<u>Streets</u>: A strip of land, including the entire right-of-way (not limited to the cartway), intended for use by the general public as a means of vehicular and pedestrian circulation to provide access to more than one lot. The word "street" includes street, avenue, boulevard, road, highway, freeway, thoroughfare, parkway, lane, alley, viaduct, and other terms that are used to describe the movement of vehicular or pedestrian traffic, whether public or private in nature. Streets are further defined as follows:

1. <u>Minor Street</u>: A street used primarily to provide access to abutting properties.

2. <u>Cul-de-sac Street</u>: A minor street intersecting another street at one end and terminating at the other end by a permanent vehicular turn-around.

3. <u>Half (Partial) Street</u>: A street, generally parallel and adjacent to a property line, having a lesser right-of-way width than normally required for improvement and use of the street.

4. <u>Marginal Access Street</u>: A minor street, parallel and adjacent to a major street (but separated from it by a reserve strip) which provides access to abutting properties and controls intersections with the major street.

5. <u>Collector Street</u>: A street which, in addition to providing access to abutting properties, intercepts minor streets to provide a route and gives access to community facilities and/or other collector and major streets. (Streets in industrial and commercial subdivisions shall generally be considered collector streets).

6. <u>Major Street (Minor Arterial)</u>: A street serving a large volume comparatively high speed and long distance traffic, including all facilities classified as main and secondary highways by the Pennsylvania Department of Transportation.

8

7. <u>Service Street</u>:  A minor right-of-way providing secondary vehicular access to the side or rear of two (2) or more properties.

All streets, of any nature, shall be constructed according to the design standards, as included in Article V, Section 502, and approved in writing by the Municipality and the Municipal Engineer.

<u>Structure</u>:  Any materials or combination of materials, which are constructed or erected, the sue of which requires location on or in the land or water, or attached to something located on or in land or water, whether or not affixed to the land.

<u>Subdivider</u>:  Any individual, firm, partnership, association, corporation, estate, trust, or any other group or combination acting as a unit (or agent authorized thereby) which undertakes the subdivision of land, as defined by these regulations as the owner, equitable owner (or agent authorized thereby) of the land being subdivided.

<u>Subdivision</u>:  The division of redivision of a lot, tract, or parcel of land by any means into two or more lots, tracts, parcels or other divisions of land including changes in existing lot lines for the purpose, whether immediate or future, of lease, partition by the court for distribution to heirs or devisees, transfer of ownership or building or lot development:  Provided, however, that the subdivision by lease of land for agricultural purposes into parcels of more than ten acres, not involving any new street or easement of access or any residential dwelling, shall be exempted.

<u>Substantially Completed</u>:  Where, in the judgment of the municipal engineer, at least ninety (90%) percent (based on the cost of the required improvements for which financial security was posted) of those improvements required as a condition for final approval have been completed in accordance with the approved plan, so that the project will be able to be used, occupied, or operated for its intended use.

<u>Surveyor</u>:  A licensed surveyor registered by the Commonwealth of Pennsylvania.

<u>Swale</u>:  A low-lying stretch of land which gathers or carries surface water runoff.

<u>Water Distribution System, On-Sight</u>:  A system for supplying and distributing water to a single dwelling or other building from a source located on the same lot.

<u>Water Distribution System, Community</u>:  A system for supplying and distributing water from a common source to dwellings and other buildings, but generally not confined to one neighborhood.

<u>Zoning Officer</u>:  The agent or official designated by the Municipality to administrate and enforce the Municipal Zoning Ordinance.

*ARTICLE III*
*SUBMISSION AND REVIEW PROCEDURES*

<u>SECTION 301 PROCEDURE</u>

A.  <u>General</u>

Hereinafter all plans for the subdivision or development of land within the limits of the Municipality shall be reviewed by the Huntingdon Planning Commission and other Municipal, state, or County officials as deemed necessary and shall be approved or disapproved by the Municipality in accordance with procedures specified in these regulations.    The provisions and requirements of these regulations shall apply to and control all land subdivisions which have not been recorded in the Office of the Recorder of Deeds in and for Huntingdon County, Commonwealth of Pennsylvania, prior to the effective date of these regulations provided, however, that any change in a recorded plan, except as noted in Article III, Section 311, shall constitute a resubdivision and shall make said plan subject to any and all of these regulations.    Any approval not processed as required hereafter, shall be null and void unless it was made prior to the adoption of this Ordinance.

B.  <u>Phasing Development</u>

If a developer proposes a large scale development (10 acres or more) he may desire to construct said development in steps or phases.    As the Pennsylvania Municipal Planning Code (Act 247) allows for such phased developments, the Municipality shall grant tentative approvals for the entire project, or for that portion of the project that can be completed within five (5) years of initial plan submission.    The developer shall then submit an application for final plan approval in phases, as delineated on the preliminary plan.    As so submitted, site improvements would also be constructed in phases and not all at once.    As each phase is completed, the developer shall submit an application for final approval of the next phase of development.    This process shall continue until all phases of the project (development) are complete.    If, however, no development takes place within five (5) years from date of plan approval, the developer shall comply with any change in local ordinances that have been enacted since his preliminary plan was approved.    Applicants are urged to consult the Huntingdon County Conservation District for assistance in determining the most effective storm water management measures to be utilized on the development site both during and after construction.    The applicant is also urged to submit a sketch plan with a narrative description of these measures.

10.

### SECTION 302 SUBMISSION OF SKETCH PLAN

A. <u>Plan to be Filled with Municipality</u>

Copies of the Sketch Plan for all proposed subdivisions and all required supporting data may be submitted to the Municipal Secretary by the subdivider or his representative authorized in writing to submit the plan.

B. <u>Number of Copies</u>

Four (4) legible black-line or blue-line paper prints of the Sketch Plan shall be required. Plans shall fully comply with requirements of Article IV, Section 401 of these regulations.

C. <u>Distribution of Sketch Plan</u>

The Municipal Secretary (or his/her representatives) shall immediately (within 3 working days) refer the Sketch Plans to the following:

1. One (1) copy to the County Planning Commission.

2. One (1) copy to the Municipal Planning Commission, if applicable

3. One (1) copy to the Municipal Officials.

4. One (1) copy to the Municipal Engineer

### SECTION 303 REVIEW OF SKETCH PLAN

A. A Sketch Plan may be considered as a submission for informal discussion between the subdivider and the Municipality. Submission of a Sketch Plan shall not constitute official submission of a plan to the Municipality

B. Review by the Municipal Planning Commission, if applicable:

1. Whenever a Sketch Plan has been submitted to the Municipal Secretary, the Secretary shall notify and distribute all Sketch Plan materials to the Municipal Planning Commission as required by Section 302 above. The Chairman of the Municipal Planning Commission shall then schedule a meeting to review the Sketch Plan within thirty (30) days of its receipt by the Municipal Planning Commission.

11

2. No official action shall be taken by the Municipal Planning Commission with respect to a Sketch Plan until the Planning Commissions has received the written report of the County Planning Commission, provided, however, that if the County Planning Commission shall fail to report thereon within thirty (30) days from the date the Sketch Plan was forwarded, then the Municipal Planning Commission may officially act without having received and considered such report.

3. Within ten (10) calendar days after the meeting at which the Sketch Plan is approved or disapproved by the Municipal Planning Commission, the Commission shall send written notice of the Municipal Planning Commission's action, including changes or modifications, if any, required or recommended that it deems necessary or advisable, to the following:

    a. All Municipal Officials.

    b. The County Planning Commission.

    c. The subdivider or his agent.

In addition, the Municipal Planning Commission shall forward to the Municipal Officials all copies of reports received from the County Planning Commission.

4. If no Municipal Planning Commission or Committee exists at the time of Sketch Plan submission, then the Municipal Officials shall act in lieu of this Commission, following each of the above cited subsections.

## SECTION 304 SUBMISSION OF PRELIMINARY PLAN

### A. Plan to File with the Municipality

Copies of the Preliminary Plan and all required supporting data such as that required by Department of Environmental Protection, PennDOT, and Huntingdon County Conservation District shall be officially submitted to the Municipal Secretary by the subdivider or his representative authorized in writing to submit the plan.

### B. Submission of Preliminary Plan

1. Three (3) completed copies of the Application for Review of Preliminary Subdivision Plan. (See Appendix)

2. Eight (8) legible black-line or blue-line paper prints out the Preliminary Plan which shall fully comply with the requirements of Articles IV, Section 402 of these requirements of these regulations. Ten (10) copies required if a State road abuts or traverses subdivision.

3. Four (4) completed copies of the DEP Sewage Facilities Planning Module for Land Development.

4. Three (3) copies of all other required information (DEP, Huntingdon County Conservation District, PennDOT).

## C. Filing Fee:

The Municipal Secretary (or his/her representative) shall collect a filing fee as established by the Municipality, by Resolution, for all subdivisions. Fees shall be charged in order to cover the costs of examining plans and other expenses incidental to the approval of subdivisions. The subdivider shall pay the fee at the time of application for approval of a preliminary plan.

## D. Distribution of Preliminary Plan:

The Municipal Secretary (or his/her representative) shall immediately (within 3 working days) refer the Preliminary Plan, after all required fees have been collected, to the following:

1. One (1) copy of the plan to the Municipal Planning Commission, if applicable, including one (1) copy of the application form and other required reports.

2. One (1) copy of the plan to the County Planning Commission and one (1) copy of all required supporting documents.

3. Four (4) copies of the plan to the Municipal Officials (plus Municipal File Copy) including one (1) copy of the application form and other required reports.

4. One (1) copy of the plan, and sewage facilities planning module to the Municipal Engineer.

5. One (1) copy of the plan to the Municipal Zoning Officer, if any.

## SECTION 305 REVIEW OF PRELIMINARY PLAN

## A. Review by the Municipal Engineers:

The Municipal Engineer shall review the Preliminary Plan to determine its conformance to the Municipal Subdivision Regulations. The Municipal Engineer may recommend changes, alterations or modifications, as he may deem necessary. The report of the Municipal Engineer shall be in writing and shall be submitted to the Municipal Planning Commission prior to the regularly scheduled or special meeting at which the Preliminary Plan is to be considered by the Municipal Planning Commission, if applicable. The report shall include an estimate of the

13

cost of construction of all improvements as required by this Ordinance. In the event that no Municipal Planning Commission exists, then all information requested above shall be sent to the Municipal Officials.

B. Review by the Municipal Zoning Officer (if applicable):

The Municipal Zoning Officer shall review the Preliminary Plan to determine its conformance to the Municipal Zoning Ordinance. The Zoning Officer shall check all zoning data as required to be shown under Article IV, Section 402, to determine if information shown is in accordance with latest amendments to the Zoning Ordinance. The report from the Municipal Zoning Officer as to the accuracy of the information shown shall be submitted to the Municipal Planning Commission prior to the regularly scheduled or special meeting at which the Preliminary Plan is to be considered by the Planning Commission. In the event no Municipal Planning Commission exists, then all requested information stated above shall be sent to the Municipal Officials.

C. Review by the Pennsylvania Department of Transportation:

If a proposed subdivision abuts or is traversed by a State road, the Municipal Secretary shall require two (2) additional copies of the Preliminary Plan and shall transmit these to the district office of the Pennsylvania Department of Transportation for its review and comments.

D. Review by the Municipal Planning Commission, if applicable:

1. Whenever a Preliminary Plan has been submitted to the Municipal Secretary, the Secretary shall notify and distribute all Preliminary Plan materials to the Municipal Planning Commission as required by Section 302 above. The Chairman of the Municipal Planning Commission shall then schedule a meeting to review the Preliminary Plan within thirty (30) days of its receipt by the Planning Commission.

2. No official action shall be taken by the Municipal Planning Commission with respect to a Preliminary Plan until the Commission has received the written report of the County Planning Commission and the Pennsylvania Department Transportation, provided, however, that if these reports are not received within thirty (30) days after transmittal to these agencies then the Municipal Planning Commission may officially act without having received and considered such report. In any event, the Municipal Planning Commission shall take official action no later than five (5) days after the expiration of the aforesaid thirty (30) day period.

3. During review of the Preliminary Plan, the Municipal Planning Commission shall consider the written reports of the Municipal Engineer and the Municipal Zoning Officer, if any, before making its final decision.

4.  If review by the Municipal Planning Commission is favorable, or unfavorable because the requirements of this Ordinance have not been met, or the Municipal Planning Commission deems changes or modifications of the plan submitted are advisable or necessary, such decision and the reasons therefore shall be given in written form by the Municipal Planning Commission within eight (8) days after the meeting at which the Preliminary Plan is reviewed to the following:

   a.  All Municipal Authorities.

   b.  The County Planning Commission.

   c.  The subdivider or his agent.

   In addition, the Municipal Planning Commission shall forward to the Municipal Official copies of all reports received from the County Planning Commission, Department of Transportation, Municipal Zoning Officer, and Municipal Engineer.

E.  Review by the Municipal Officials:

   1.  When a Preliminary Plan has been officially referred to the Municipal Official by the Municipal Planning Commission together with its recommendation, such Plan shall be reviewed at the next regularly scheduled meeting of the Municipal Officials, or at the discretion of the Chairman/President at a special meeting, which may be held prior thereto.

   2.  In any event, the Municipal Officials shall render their decision and communicate it to the applicant no later than ninety (90) days after such application is filed. Failure of the Municipal Officials to render a decision and communicate it to the applicant within the time and in the manner required shall be deemed an approval unless the applicant has agreed, in writing, to an extension of time.

   3.  The Municipal Officials shall review the Preliminary Plan and the written reports and recommendations thereon of the Municipal Planning Commission, if applicable, the County Planning Commission, (if same has been received), the Municipal Engineer, and by any other interested parties of the Municipality to determine the Preliminary Plan conformance to the standards contained in these regulations. Prior to these reports and recommendations, the Municipal Officials may hold a public hearing thereon after public notice to receive comments from the general public. After all desired input is received, the Municipal Officials may require or recommend such changes and modifications, as they such deem necessary or advisable in the public interest.

4. The action of the Municipal Officials, either approving or disapproving the Preliminary Plan, shall be noted with the date of such action and the signature of the Chairman/President on two (2) sets of plans. The findings and reasons upon which the action is based and citing provisions of the statute or ordinance relied upon shall be stated in the minutes and in writing. Subject to the requirements of subparagraph (2), within fifteen (15) days after the meeting at which the Preliminary Plan is reviewed, the Secretary of the Municipality shall send written notice of the findings, actions taken, and reasons thereof to the following:

    a. the County Planning Commission.

    b. the subdivider or his agent.

    c. the Municipal Planning Commission, if applicable.

One (1) copy of the Plan shall be maintained for permanent records of the Municipality, and one (1) copy shall be sent to the subdivider or his agent.

5. Approval of the Preliminary Plan shall not constitute acceptance of a subdivision for recording. Approval is only an expression of approval of a general plan to be used in preparing the Final Subdivision Plan for final approval and recording upon fulfillment of all requirements of these regulations.

6. When a Preliminary Plan has been approved or approved subject to conditions acceptable to the applicant, no subsequent change or amendment in the zoning, subdivision, or other governing ordinance or plan shall be applied to affect adversely the right of the applicant to commence and to complete any aspect of the approved development in accordance with the terms of such approval within five (5) years from such approval.

F. Municipality Sewage Enforcement Officer

The Sewage Enforcement Officer having jurisdiction in the area of the proposed subdivision shall review the Preliminary Plan to determine its conformance with applicable law and forward comments to the Municipal Planning Commission.

## SECTION 306 SUBMISSION OF FINAL PLAN

Within twelve (12) months of the Municipality approval of the Preliminary Plan, a Final Plan shall be submitted to the Municipality. However, an extension of time may be granted by the Municipality upon written request. Final Plans submitted after this expiration of time for which no time extension has been granted may be considered as a new Preliminary Plan.

16

The Final Plan shall conform in all respects to the Preliminary Plan as previously reviewed by the Municipal Planning Commission and the Municipal Officials and shall incorporate all modifications required by the Municipality in its review of the Preliminary Plan.

The Municipality may permit submission of the Final Plan in sections, or phases, each covering a reasonable portion of the entire proposed subdivision as shown on the reviewed Preliminary Plan.

A.  Plans to be Filed with the Municipality:

Copies of the Final Plan and all required supporting data shall be officially submitted to the Municipal Secretary by the subdivider or his representative authorized in writing to submit the plan.

B.  Official Submission of Final Plan Shall Comprise:

1.  Three (3) completed copies of the Application for Review of Final Subdivision Plan.

2.  Eight (8) legible black-line or blue-lined paper prints and one (1) print on linen cloth or mylar of the Final Plan which shall fully comply with Article IV, Section 403 of these regulations.

3.  Two (2) copies of all other required information including the following, if applicable:

a.  All offers of dedication and covenants governing the reservation and maintenance of undedicated open space which shall bear the certificate of approval of the Solicitor of the Municipality as to their legal sufficiency.

b.  Such private deed restrictions, including Building line or Setbacks, as may be imposed upon the property as a condition of sale together with a statement of restrictions previously imposed which may affect the title of the land being subdivided.

c.  Whenever a subdivider proposes to establish a street which is not offered for dedication to public use, Municipal Officials may require the subdivider to submit, and also to record with the Municipality on behalf of his heirs, successors and assigns and approved by the Solicitor of the Municipality and which shall establish the conditions under which the street may later be offered for dedication and shall stipulate, among other things, the following:

17

(1) The street shall conform to Municipal specifications or that the owners of the abutting lots shall include with the offer of dedication sufficient money, as estimated by the Municipal Engineer, to restore the street to conformance with the Municipal specifications.

(2) An offer to dedicate the street shall be made only for the street as a whole.

(3) The method of assessing repair cost be stipulated.

(4) Agreement by the owners of fifty-one (51%) percent of the front footage thereon shall be binding on the owners of the remaining lots.

   d. Wherever approval by the Pennsylvania Department of Environmental Protection or the Huntingdon County Soil Conservation District is required for the water supply or sanitary sewage disposal system(s) or erosion and sedimentation control for a proposed subdivision, the Municipal Planning Commission or Municipal Officials shall require that two (2) copies of such certification of approval shall be submitted with the Final Plan.

## C. Filing Fees:

The subdivider shall pay any additional fees, if required. There shall be no refund or credit of any portion of the fee should the subdivider fail to apply for final approval within the required period of time or if the Final Plan covers only a section of the subdivision for which Preliminary Approval has been obtained.

## D. Distribution of Final Plan:

The Final Plan shall be distributed in accordance with the requirements of Article III, Section 304 for Preliminary Plan. In addition, the Municipal Secretary shall retain the linen or mylar print of the Final Plan for safe-keeping in the Municipal files.

## SECTION 307 REVIEW OF FINAL PLAN

### A. Review by the Municipal Engineer:

The Final Plan shall be reviewed and a written report submitted as required under Article III, Section 305 for Preliminary Plans.

B.  <u>Review by the Municipal Zoning Officer (if applicable)</u>:

The Final Plan shall be reviewed and a written report submitted by the Municipal Zoning Officer as required under Article III, Section 305 for Preliminary Plans.

C.  <u>Review by the Municipal Planning Commission (if applicable)</u>:

The Final Plan shall be reviewed, in accordance with the procedure required under Article III, Section 305 for Preliminary Plans. In addition:

1.  If all the requirements of this Ordinance are met and the review is favorable, the Planning Commission shall authorize its Chairman, with the Secretary so attesting, to endorse the Final Plan "Reviewed and Approved by the Municipal Planning Commission", together with the date of such action.

2.  The Final Plan with the Municipal Planning Commission's endorsement shall be forwarded to the Municipal Officials.

D.  <u>Review by the Municipal Officials</u>:

The Final Plan shall be reviewed in accordance with the procedures as required under Article III, Section 305 of these regulations for Preliminary Plan. In addition:

1.  Before acting on a Final Plan, the Municipal Officials shall arrange for a public hearing. The public hearing may be held by the Municipal Officials after the Final Plan has been submitted to the Municipality and before the review required by Section 307A, B, and C. If a public hearing has been held upon a Preliminary Plan, no public hearing is required unless the Final Plan departs substantially from the Preliminary Plan.

2.  If the Municipal Officials approve the Final Plan, the Final Plan shall be signed by the Chairman/President and the Secretary, together with the date of action.

3.  A performance guarantee or a certificate of satisfactory installation, as required under Article III, Section 309, shall be required before the Final Plan is released for recording.

4.  The Final Plan with the Municipal Officials' approval and the Municipal seal shall be forwarded to the subdivider for recording.

## SECTION 308 RECORDING OF FINAL PLAN

A.  After approval by the Municipal Officials and the Municipal Planning Commission, if applicable, and with all endorsements indicated on the Final Plan, the subdivider shall record his plan.  No subdivision plan shall be legally recorded unless its bears the Municipal approval and seal.  This action shall constitute the changing of the Final Plan to the Record Plan.

B.  After the Final Plan has been approved by the appropriate Municipal authorities, the Municipal Officials shall require that the developer shall supply one (1) reproducible copy of the Final Plan, as approved, for their permanent files.

C.  The Record Plan shall be clear and legible black-line or blue-line print on linen or mylar.

D.  The subdivider shall file the Record Plan with the County Recorder of Deeds within ninety (90) days of the date of final approval by the Municipality.  If the subdivider fails to record the record Plan within such period, the action of the Municipal Officials and Municipal Planning Commission, if applicable, shall be null and void unless an extension of time is granted in writing by the Municipality after written request to do so by the subdivider.

## SECTION 309 PERFORMANCE GUARANTEE

Prior to final approval of the Final Plan, the subdivider shall guarantee the installation of all required improvements by one of the following methods:

A.  By installing the improvements required by Article VI of these Subdivision Regulations to the satisfaction of the Municipal Engineer and the Municipal Officials and Obtaining a certificate from the Municipal Engineer that all improvements have been installed in accordance with the standards and requirements contained in these regulations or required by the Municipality.

B.  In lieu of the completion of any improvements required as a condition for the final approval of a plan, the applicant or subdivider shall provide for deposit with the Municipality financial security in an amount sufficient to cover the costs of any improvements or common amenities, including, but not limited to, roads, storm water detention and/or retention basins and other related drainage facilities, recreational facilities, open space improvements, or buffer or screen plantings which may be required.  When requested by the developer, in order to facilitate financing, the Municipality shall furnish the developer with a signed copy of a resolution indicating approval of the final plan contingent upon the developer obtaining a satisfactory financial security.  The final plan or record plan shall not be signed nor recorded until the financial improvements agreement is executed.  The resolution or letter of contingent approval shall expire and be deemed to be revoked if the financial security agreement is not executed within ninety (90) days unless a written extension is granted by the Municipality; such extension shall not be unreasonably withheld and shall be placed in writing at the request of the developer.  Without limitation as to

20

other types of financial security which the Municipality may approve, which approval shall not be reasonably withheld, the following shall be deemed acceptable financial security for the purpose of this section:

1.  Federal or Commonwealth chartered lending institution irrevocable letters or credit and restrictive or escrow accounts in such lending institutions. Such financial security shall be posted with a bonding company or Federal or Commonwealth chartered lending institution chosen by the party posting the financial security, provided said bonding company or lending institution is authorized to conduct such business within the Commonwealth.

2.  Such bond, or other security shall provide for, and secure to the public, the completion of any improvements which may be required within one year of the date fixed in the subdivision plan for the completion of such improvements.

3.  The amount of financial security to be posted for the completion of the required improvements shall be equal to 110% of the cost of completion estimated as of ninety (90) days following the date scheduled for completion by the developer. Annually, the Municipality may adjust the amount of the financial security by comparing the actual cost of the improvements which have been completed and the estimated cost for the completion of the remaining improvements as of the expiration of the 90th day after either the original date scheduled for completion or a rescheduled date of completion. Subsequent to said adjustment, the Municipality may require the developer to post additional security in order to assure that the financial security equals said 110%. Any additional security shall be posted by the developer in accordance with this subsection. The amount of financial security required shall be based upon an estimate of the cost of completion of the required improvements, submitted by an applicant or developer and prepared by a professional engineer licensed as such in this Commonwealth and certified by such engineer to be a fair and reasonable estimate of such cost. The Municipality, upon the recommendation of the Municipal Engineer, may refuse to accept such estimate for good cause shown. If the applicant or developer and the Municipality are unable to agree upon an estimate, then the estimate shall be recalculated and recertified by another professional engineer licensed as such in this Commonwealth and chosen mutually by the Municipality and the applicant or developer. The estimate certified by the third engineer shall be presumed fair and reasonable and shall be the final estimate. In the event that a third engineer is chosen, fees for the services of said engineer shall be paid equally be the Municipality and applicant or developer.

4.  If the party posting the financial security requires more than one (1) year from the date of posting of the financial security to complete the required improvements, the amount of financial security may be increased by an additional 10% for each one (1) year period beyond the first anniversary date from posting of financial security or to an amount not exceeding 110% of the cost of completing the required improvements as re-established on or about the expiration of the preceding one (1) year period by using the above bidding procedure.

5. In the case where development is projected over a period of years, the Municipality may authorize submission of final plans by section or stages of development subject to such requirements or guarantees as to improvements in future sections or stage of development as it finds essential for the protection of any finally approved section of the development.

6. As the work of installing the required improvements proceeds, the party posting the financial security may request the Municipality to release or authorize the release, from time to time, such portions of the financial security necessary for payment to the contractor or contractors performing the work. Such requests shall be in writing, addressed to the Municipality, and the Municipality shall have forty-five (45) days from receipt of such request within which to allow the Municipal Engineer to certify, in writing, to the Municipality that such portion of the work upon the improvements has been completed in accordance with the approved plan. Upon such certification, the Municipality shall authorize release by the bonding company or lending institution of an amount as estimated by the Municipal Engineer fairly representing the value of the improvements completed, or if the Municipality fails to act within said forty-five (45) day period, the Municipality shall be deemed to have approved the release of funds, as requested. The Municipality may, prior to final release at the time of completion and certification by its Engineer, require retention of 10% of the estimated cost of the aforesaid improvements.

7. Where the Municipality accepts dedication of all or some of the required improvements following completion, the Municipality may require the posting of financial security to secure structural integrity of said improvements, as well as the functioning of said improvements in accordance with the design and specifications as depicted on the final plan for a term not to exceed eighteen (18) months from the date of acceptance of dedication. Said financial security shall be of the same type as otherwise required in this section with regard to installation of such improvements, and the amount of the financial security shall not exceed 15% of the actual cost of installation of said improvements.

8. If water mains or sanitary sewer lines, or both, along with apparatus or facilities related thereto, are to be installed under the jurisdiction and pursuant to the rules and regulations of a public utility or municipal authority separate and distant from the Municipality, financial security to assure proper completion and maintenance thereof shall be posted in accordance with the regulations of the controlling public utility or municipal authority and shall not be included within the financial security as otherwise required by this section.

### SECTION 310 RELEASE OF PERFORMANCE GUARANTEE

A. When the developer has completed all of the necessary and appropriate improvements, the developer shall notify the Municipality, in writing, by certified or registered mail, of the completion of the aforesaid improvements and the Municipality shall send a copy thereof to the municipal Engineer. The Municipal Officials shall, within ten (10) days after receipt of such notice, direct and authorize

the Municipal Engineer to inspect all of the aforesaid improvements. The Municipal Engineer shall, thereupon, file a report, in writing, with the Municipality, and shall promptly mail a copy of the same to the developer by certified mail. The report shall be made and mailed within thirty (30) days after receipt by the Municipal Engineer of the aforesaid authorization from the Municipal Officials; said reports shall be detailed and shall indicate approval or rejection of said improvements, either in whole or in part, and if said improvements, or any portion thereof, shall not be approved or shall be rejected by the Municipal Engineer, said report shall contain a statement of reasons for such non-approval or rejection.

B. The Municipality shall notify the developer within fifteen (15) days of receipt of the engineer's report, in writing, by certified or registered mail of their actions.

C. If the Municipality or the Municipal Engineer fail to comply with the time limitation provision contained herein, all improvements will be deemed to have been approved and the developer shall be released from all liability pursuant to his performance guarantee.

D. If any portion of the said improvements shall not be approved or shall be rejected by the Municipal Officials, the developer shall proceed to complete the same and, upon completion, the same procedure of notification, as outlined herein, shall be followed.

E. Nothing herein, however, shall be construed in limitation of the developer's right to contest or question by legal proceedings or otherwise, any determination of the Municipality or the Municipal Engineer.

F. Where herein reference is made to the Municipal Engineer, he shall be a duly registered professional engineer employed by the Municipality or engaged as a consultant thereto.

G. The Municipality may prescribe that the applicant shall reimburse the Municipality for the reasonable and necessary expense incurred for the inspection of improvements. Such reimbursement shall be based upon a schedule established by Ordinance or resolution. Such expense shall be reasonable and in accordance with the ordinary and customary fees charged by the Municipal Engineer and/or consultant for work performed for similar services in the community, but in no event shall the fees exceed the rate or cost charged by the engineer or consultant to the Municipality when fees are not reimbursed or otherwise imposed on applicants.

1. In the event that the applicant disputes the amount of any such expense in connection with the inspection of improvements, the applicant shall, within ten working days of the date of billing, notify the Municipality that such expenses are disputed as unreasonable or unnecessary, in which case the Municipality shall not delay or disapprove a subdivision or land development application or any approval or permit related to development due to the applicant's request over disputed engineer expenses.

2. If, within twenty (20) days from the date of billing, the Municipality and the applicant cannot agree on the amount of expenses which are reasonable and necessary, then the applicant and Municipality shall jointly, by mutual agreement, appoint another professional engineer licensed as such in the Commonwealth of Pennsylvania to review the same expenses and make a determination as to the amount thereof which is reasonable and necessary.

3. The professional engineer so appointed shall hear such evidence and review such documentation as the professional engineer in his or her sole opinion deems necessary and render a decision within fifty (50) days of the billing date. The applicant shall be required to pay the entire amount determined in the decision immediately.

4. In the event that the Municipality and applicant cannot agree upon the professional engineer to be appointed within twenty (20) days of the billing date, then, upon application of either party, the President Judge of the Court of Common Pleas of Huntingdon County shall appoint such engineer, who, in that case, shall be neither the municipal engineer nor any professional engineer who been retained by, or performed services for, the Municipality or the applicant within the preceding five (5) years.

5. The fee of the appointed professional engineer for determining the reasonable and necessary expenses shall be paid by the applicant if the amount of payment required in the decision is equal to or greater than the original bill. If the amount of payment required in the decision is less than the original bill by $1,000.00 or more, the Municipality shall pay the fee of the professional engineer, but otherwise the Municipality and the applicant shall each pay one-half (½) of the fee of the appointed professional engineer.

## *SECTION 311 RESUBDIVISION PROCEDURE*

Any revision or resubdivision of land which includes changes to a recorded plan shall be considered a subdivision and shall comply with all regulations of this Ordinance, except that:

A. Lot lines may be changed form those shown on a recorded plan, provided that:

1. Lot sizes comply with the requirements of both this ordinance and the municipal zoning ordinance (if applicable).

2. Easements or rights-of-way reserved for drainage or utilities shall not be eliminated unless it is demonstrated that they are no longer needed and the owners of any easements or rights-of-way give written permission for their abandonment.

3. No lot shall be created which does not abut an existing or proposed street.

4.  Street locations and block sizes shall not be changed without the written approval of abutting property owners.

*B.*  In every case wherein lot lines are changed as permitted by the above, the subdivision shall prepare a new Record Plan and shall submit the Record Plan to the Municipality for the endorsements of the Municipal Planning Commission and Municipal Zoning Officer, if applicable (the new Record Plan shall specifically identify the previous Record Plan superseded and shall also contain the record reference if the previous Record Plan has been recorded).  The subdivider shall then record the new plan in accordance with Article III, Section 308, of this Ordinance.

## *SECTION 312 DEDICATION AND MAINTENANCE GUARANTEE*

All streets, parks, or other improvements shown on the subdivision plan, recorded or otherwise, shall be deemed to be private until such time as the same has been offered for dedication to the Municipality and accepted by resolution of the Municipal Officials. Where the Municipality accepts dedication of all or some of the required improvements following completion, the Municipality may require that posting of financial security to secure structural integrity of said improvements as well as the functioning of said improvements in accordance with the design and specifications as depicted on the final plan for a term not to exceed eighteen (18) months from the date of acceptance of dedication.  Said financial security shall be of the same type as otherwise required in this Ordinance with regard to installation of such improvements, and the amount of the financial security shall not exceed fifteen (15%) percent of the actual cost of installation of said improvement.

## *ARTICLE IV*
## *PLAN REQUIREMENTS*

## *SECTION 401 SKETCH PLAN*

A.  The Sketch Plan of a proposed subdivision shall be clearly and legibly drawn to a scale of one (1) inch equals fifty (50) feet, except that:

1.  If the average size of the proposed lots in the subdivision is five (5) acres or larger, the plan may be drawn to a scale of one (1) inch equals one hundred (100) feet.

2.  If the subdivision proposes lots with an average frontage of less than fifty (50) feet, the plan may be drawn to a scale of one (1) inch equals twenty (20) feet.

3.  If the subdivision contains more than two hundred (200) acres, the plan may be drawn to a scale of one (1) inch equals two hundred (200) feet.

B.  Sketch Plan and all submitted prints thereof shall be made on sheets either:

1.  Eighteen (18) inches by twenty-four (24) inches, or

2. Twenty-four (24) inches by thirty-six (36) inches, or

3. Thirty (30) inches by forty-two (42) inches.

C. If the Sketch Plan requires more than one sheet, a key diagram showing relative location of the several sections shall be drawn on each sheet.

D. The Sketch Plan shall contain at least the following information but not necessarily showing precise dimensions:

1. Tract boundaries accurately labeled.

2. Name of the Municipality in which the subdivision is located and general location map.

3. North point, scale (written and graphic), and date.

4. Name of proposed subdivision or other identifying titles.

5. Significant topographical and physical features.

6. General street and lot layout (existing and/or proposed).

## *SECTION 402 PRELIMINARY PLAN*

A. The Preliminary Plan shall include all information as required for Sketch Plan under Article IV, Section 401, in these regulations and shall be drawn to the same scales and presented on the same sheet sizes as required for the Sketch Plan. In addition, the following information shall be shown:

1. Date, including the month, day, and year that the Preliminary Plan was completed and the month, day, and year that the Preliminary Plan was revised, for each revision.

2. Name of Proposed Development.

3. Name of recorded owner and subdivider.

4. Name, address, license number, and seal of registered engineer or surveyor responsible for the subdivision plan.

5. Names of all owners of all abutting unplatted land and the names of all abutting subdivisions, if any, with the book and page number where recorded.

6.  A key map for the purpose of locating the property being subdivided drawn at a scale not less than one (1) inch equals two thousand (2,000) feet and showing the relation of the property, differentiated by tone or pattern, to adjoining property and to all streets, roads, municipal boundaries, zoning districts, water courses, and any areas subject to flooding, and recorded subdivision plans existing within one thousand (1,000) feet of any part of the property.

7.  Total tract boundaries of the property being subdivided showing bearings and distances and a statement of total acreage of the property.

8.  Include all of the following zoning data, if applicable:

    a.  Existing Municipal zoning regulations, including district designations, requirements for lot sizes and front yards, and any zoning district boundary lines traversing the proposed subdivision.

    b.  Any changes in the existing zoning to be requested by the subdivider.

    c.  Any Municipal regulations other than zoning governing lot size and/or front yard requirements.

9.  Contours at vertical intervals of five (5) feet or, in the case of relatively level tracts, at such lesser interval as may be necessary for satisfactory study and planning of the tract.  In areas of steep slope (over 15%) a twenty (20) foot interval may be used.

10. Locations and elevations of the data to which contour elevations refer; where reasonable and practicable, datum used shall be a known and established bench mark.  It is suggested that USGS datum be used where possible.

11. All existing sewer lines, water lines, fire hydrants, electric and telephone utility lines, culverts, bridges, railroads, quarries, strip mines, water courses, flood plain areas, and other significant manmade or natural features within the proposed subdivision and fifty (50) feet beyond the boundaries of the proposed subdivision.

12. All existing buildings or other structures and the approximate location of all existing tree masses, rock outcrops, water courses within the proposed subdivision or other significant features.

13. All existing streets on the Official Plan or Plans of the Municipality (including unpaved streets), including streets of record (recorded but not constructed), easements and rights-of-way, including names, right-of-way widths, cartway (pavement) widths and approximate grades within the subdivision or within four hundred (400) feet of any part of the tract.

14. The full plan of proposed development, including:

   a. Location and width of all streets, easements, and right-of-way, with a statement of any conditions governing their use.

   b. Suggested street names and utility easement locations.

   c. Building reserve (setback) lines along each street.

   d. Lot lines with dimensions in feet and hundredths of a foot.

   e. Lot numbers and statement of number of lots and parcels

   f. A statement of the intended use of all non-residential lots and parcels.

   g. Sanitary and/or storm sewers (and other drainage facilities) with the size and material of each indicated, and any proposed connections with existing facilities.

   h. Parks, playgrounds, and other areas proposed to be dedicated or reserved for public use with any conditions governing such use.

   i. The following data shall be shown for the cartway right-of-way and, if required, the ultimate right-of-way, for existing, recorded (except those to be vacated), and proposed streets within or abutting the property to be subdivided: The length and width (in feet to the nearest hundredth of a foot) of all straight lines and radii of curved lines.; The length of all arcs (in feet, to the nearest hundredth of a foot) and the central angle (in degrees, minutes, and seconds)

15. Any trees to remain in the street ROW shall be indicated.

16. Location of all required soil percolation test holes, if required.

17. The following storm water management information shall be included:

   a. Runoff calculations for the proposed project except where the watershed storm water management plan (if any) has determined no hydrologic effect will occur downstream.

   b. A description of proposed storm water control measures and devices.

   c. Maps showing:

      (1) The location of the proposed subdivision, land development, or mobile home park within the designated watershed (consult the Huntingdon County Storm Water Management Plan for the watershed boundaries when the plan is completed).

(2) The one hundred (100) year flood plain for pre and post development conditions.

(3) Streams, swales, and drainage patterns (existing and proposed).

(4) Storm water management control measures and devices (temporary and permanent).

(5) Areas subject to special deed restrictions affecting storm water management.

(6) Contours at vertical intervals of five (5) feet or, in the case of relatively level tracts, at such lesser interval as may be necessary for satisfactory study and planning of the tract. In areas of steep slope (over 15%) a twenty (20) foot interval may be used.

(7) Show floodway boundaries if the subdivision is located in a detailed FEMA Study Area or included on FEMA Insurance Rate Map.

B. The Preliminary Plan shall be accompanied by the following supplementary data as applicable:

1. Typical street cross-section drawing(s) for all proposed streets. Cross-section drawings may be shown on either the Preliminary Plan or on separate profile sheets:

   Tentative profiles along the street centerline or along the top of curb for both sides of each proposed street shall be shown. Such profiles shall show existing and proposed grades at one of the following sets of scales:

   a. One (1) inch equals ten (10) feet horizontal, one (1) inch equals two (2) feet vertical.

   b. One (1) inch equals twenty (20) feet horizontal and one (1) inch equals four (4) feet vertical.

   c. One (1) inch equals forty (40) feet horizontal and one (1) inch equals eight (8) feet vertical.

   d. One (1) inch equals fifty (50) feet horizontal, and one (1) inch equals ten (10) feet vertical.

2. In lieu of the separate profile sheets required, the tentative finished cartway edge or top of curb grades for both sides of each street may be labeled on the Preliminary Plan.

3. Where deemed necessary by the Municipal Planning Commission, if applicable, or the Municipal Officials, a plan for the surface drainage of the tract to be subdivided shall be shown. Such plan shall include storm water runoff calculations for the entire property being subdivided and shall show the proposed method, subject to Municipal approval, of accommodating the anticipated runoff.

4. Preliminary designs of any bridges or culverts which may be required. Such designs shall meet all applicable requirements of the Department of Environmental Protection and/or the Pennsylvania Department of Transportation. Calculations for waterway opening shall be included. All designs shall be subject to approval by the Municipality.

5. Where a Preliminary Plan shows the proposed subdivision of only a part of the subdivider's total property, a sketch shall be required showing the prospective street system in the remainder of the property so that the street system in the submitted portion shall be considered in relation to future connections with the unsubmitted portion. To prevent undue hardship in the case of extremely large properties, the Municipal Planning Commission, if applicable, or Municipal Officials may, based on existing natural or manmade features, delimit the area for which a prospective street system shall be sketched.

## *SECTION 403 FINAL PLAN*

A. The Final Plan shall be prepared by and sealed by a surveyor registered in the State of Pennsylvania. The Final Plan shall be drawn to scale, and show all information required for Preliminary Plans under Article IV, Section 402 of these regulations. In addition, the Final Plan shall show the following:

1. Name of recorded owner (and subdivider) of the tract, and the source(s) of title to the land being subdivided, as shown by the County Recorder of Deeds.

2. The total tract boundary lines of the area being subdivided with accurate distances to hundredths of a foot and bearings to one-quarter (¼) of a minute. These boundaries shall be determined by accurate survey in the field, which shall be balanced and close with an error of closure not to exceed one (1) foot in ten thousand (10,000) feet; provided, however, that the boundary(s) adjoining additional unplotted land of the subdivider (for example, between separately submitted Final Plan sections) are not required to be based upon field survey, and may be calculated. The location and elevation of all boundary line (perimeter) monuments shall be indicated, along with a statement of the total area of the property being subdivided. In addition, the engineer or surveyor shall certify, to the accuracy of the survey, the drawn plan, and the placement of the monuments.

3. The name (or number) and cartway width and lines of all existing public streets and the name and location of all other roads within the property.

30

4. The following data shall be shown for the cartway right-of-way and, if required, the ultimate right-of-way, for existing, recorded (except those to be vacated), and proposed streets within or abutting the property to be subdivided: the length and width (in feet to the nearest hundredth of a foot) of all straight lines and radii of curved lines. The length of all arcs (in feet, to the nearest hundredth of a foot) and the central angle (in degrees, minutes and seconds).

5. All straight lot lines shall be dimensional (in feet, to the nearest hundredth of a foot) and all internal angles within lot lines shall be designated (in degrees, minutes, and seconds). Curved lot lines shall show length of arc (in feet, to the nearest hundredth of a foot) and the central angle (in degrees, minutes, and seconds).

6. A statement of the intended use of all nonresidential lots, with reference to restrictions of any type which exist or will exist as covenants in the deed for the lots contained in the subdivision and, if covenants are recorded, including the book and page number.

7. The proposed building reserve (setback) line for each lot, or the proposed placement of each building.

8. The location (and elevation, if established) of all existing and proposed required street monuments.

9. All easements of rights-of-way where provided for or owned by public services and any limitations on such easements or rights-of-way. Rights-of-way shall be shown and accurately identified on the plan, and easements shall either be shown or specifically described on the plan. Easements should be located in cooperation with the appropriate public utilities.

10. Locations, size and invert elevations of all sanitary and/or storm sewers and location of all manholes, inlets, and culverts (this data may be submitted as a separate plan).

11. If the subdivision proposes a new street intersection with a State Legislative Route, the intersection Occupancy Permit number(s) shall be indicated for all such intersections.

12. A Certification of Ownership, Acknowledgement of Plan, and Offer of Dedication shall be lettered on the plan, and shall be duly acknowledged and signed by the owner(s) of the property, and notarized.

13. Certification by the County Planning Commission that the subdivision has been reviewed as required by this ordinance.

14. The Plan shall contain the seal of the registered surveyor who prepared it.

15. A blank space measuring three and one half (3½) square shall be left, preferably adjacent to the Municipal Certification, in which the endorsement stamp of the county Planning Commission may be applied, if required.

16. A blank space measuring three (3) inches squared shall be left along the lower edge of the sheet, in order that the Recorder of Deeds may acknowledge receipt of the Plan when it is presented.

17. The following storm water management information shall be included:

    a. All information pertaining to storm water management from the preliminary plan along with any changes.

    b. All required permits (or letters of intent to issue such permits pending final Municipal approval) from the Department of Environmental Protection, Pennsylvania Department of Transportation, Public Utility Commission, or any other agency if appropriate.

    c. All deed restrictions, easements, and rights-of-way.

    d. The ownership and maintenance responsibilities for storm water management control devices. The identity of the responsible individual corporation, association, or other specific entity and the specific maintenance responsibility must be detailed.

    e. Where the applicant is proposing the dedication of permanent storm water management control facilities to the Municipality, such requests must include:

        1. Easements to all facilities; and

        2. A financial guarantee (acceptable to the Municipality) to insure that the control facilities are properly installed and functioning satisfactorily.

B. The Final Plan shall be accompanied by such applicable supplementary data as is required in Article IV, Section 402 in addition to profile sheets for all proposed streets within the tract. Such profiles shall show at least the following information, properly labeled:

1. Existing (natural) profiles along both cartway edges or along the centerline of each street.

2. Proposed finished grade of the centerline, and proposed finished grade at the top of both curbs, or proposed finished grade at both cartway pavement edges.

3. The length of all vertical curves.

4. Existing and proposed sanitary sewer mains and manholes, storm sewer mains, inlets, manholes, and culverts and existing or proposed water mains.

32

## SECTION 404 MINOR SUBDIVISIONS AND LAND DEVELOPMENTS

A. Definition of Minor Subdivision – in the case of any proposed subdivision, land site, or other division of land, the Plan Requirements of this Ordinance may be waived and the proposal deemed to be a Minor Subdivision, provided that the following criteria are met:

  1. The proposal does not involve the extension of any public facilities including:

       a. New Streets

       b. Paving or other improvements

       c. New or improved water lines, sewer lines, or storm drainage lines

       d. New or improved public facilities or services.

  2. The proposal does not adversely affect the natural resources of the Municipality, or have the potential to adversely affect the health or safety of the Municipality.

  3. The proposal does not adversely affect the development of the remainder of the parcel.

  4. The proposal does not adversely affect adjoining property.

  5. The proposal does not adversely affect the present or future development of the Municipality.

     If the subdivision or land development contains not more than five (5) lots, sites, or other divisions of land, and such subdivision or land development meets with all of the five (5) criteria as stated above, then the Municipal Officials shall have the authority, at their discretion, to classify such subdivision or land development as "Minor" provided that the Municipality has received documents, guarantee, or proof of improvements installation as they may require.

  6. The proposal does not constitute a subdivision, resubdivision or development of any lot, tract, parcel, site or other division of land or portion thereof which had received previous approval as a subdivision or land development within two (2) years prior to the submission of the application.  If such prior approval has taken place, all applications shall be considered a single application for purposes of classification.

B. _Plan Requirements for Minor Subdivision or Land Developments_

  1. A Minor Subdivision or land development shall be exempt from the requirements of the Ordinance calling for the submission of a separate Preliminary Plan (Sections 304 and 402).

33

2. A location map drawn on a USGS 7 ½ Minute Quadrangle Map or equivalent.

3. Sufficient data shall be included to document full compliance with all other applicable requirements and specifications of this Ordinance.

4. A registered surveyor, as required by Section 403, shall prepare the Plan.

C. *Submission and Review Procedures for Minor Subdivision or Land Developments*

1. Minor Subdivisions and land developments shall be reviewed by the agencies and officials required by Section 305 and 403.

2. Land developments shall meet all specific submission and review requirements of Article VII.

## ARTICLE V
## DESIGN STANDARDS

### SECTION 501 GENERAL STANDARDS

A. The standards and requirements contained in Articles V and VI are intended as the minimum for the promotion of the public health, safety, and general welfare, and shall be applied as such by the Municipal Planning Commission, if applicable, and Municipal Officials in reviewing all subdivision plans.

B. Whenever other Municipal Ordinances and/or regulations impose more restrictive standards and requirements than those contained herein, such other Ordinances and/or regulations shall be observed; otherwise, the standards and requirements of these regulations shall apply.

C. The subdivision shall be so designed that streets in and bordering the subdivision or land development shall be coordinated, and be of such widths and grades and in such locations as deemed necessary to accommodate prospective traffic, and facilitate fire protection.

D. Land subject to hazards to life, health, or property, such as may arise from underground fires, floods, diseases, subsidence, or other causes, shall not be subdivided for building purposes unless such hazards have been eliminated or unless the subdivision plan shall show adequate safeguards against them, which shall be approved by the appropriate regulatory agencies.

E. Subdivision plans shall conform to the "official Comprehensive Plans" of the Municipality and of the County or to such parts thereof as may have been adopted pursuant to statute.

## SECTION 502 STREETS

### A. General Standards

1. The locations and width of all streets shall conform to the "Official Plan" or to such parts thereof as may have been adopted by the Municipality.

2. The proposed street system shall extend existing or other streets on the "Official Plans" at the same width or larger but in no case at less than the required minimum width.

3. Where, in the opinion of the Municipal Planning Commission, if applicable, or Municipal Officials, it is desirable to provide for street access to adjoining property, street stubs shall be extended by dedication to the boundary of such property.

4. New minor streets shall be so designed as to discourage through traffic, but the subdivider shall give adequate continuation of major and collector streets into and from adjoining properties.

5. Where a subdivision abuts or contains an existing street of improper width or alignment, the Municipal Planning Commission, if applicable, or Municipal Officials may require the dedication of land sufficient to widen the street or correct the alignment.

6. Private streets (streets not to be offered for dedication) are prohibited unless they meet the design standards of these regulations.

### B. Partial and Half Streets:

New half or partial streets shall be prohibited except where essential for reasonable subdivision of a tract in standards of these regulations and where, in addition, satisfactory assurance for dedication of the remaining part of the street can be obtained.

### C. Street Widths:

Minimum street right-of-way and pavement widths shall be as shown on the "Official Plans" or if not shown on such plans, shall be as follows. Refer to PennDOT publication on the construction of local streets if adequate information is not indicated on the following chart. See Appendix 2.

### D. Restriction of Access:

1. Whenever a subdivision abuts or contains an existing or proposed street with an ultimate right-of-way of eighty (80) feet or more, the Municipal Planning Commission, if applicable, or Municipal Officials may require restriction of access to said street by:

35

Case 1:00-cv-01192-SHR    Document 87    Filed 06/07/2002    Page 153 of 239

A. Provision of reverse frontage lots.

B. Provision of service streets along the rear of the abutting lots, together with prohibition of private driveways intersecting the major streets.

C. Provisions of marginal access streets, provided that the reserve strips establishing such marginal access streets shall be definitely placed within the jurisdiction of the Municipality under an agreement meeting the approval of the Municipality's Solicitor.

2. Except as specified under Paragraph C above, reserve strips shall be prohibited.

E. **Street Grades.**

1. There shall be a minimum centerline grade of three quarters (¾) percent.
2. Centerline grades shall not exceed the following:

   a. Minor Street          ten (10) percent
   b. Collector Street      six (6) percent
   c. Major Street          six (6) percent
   d. Street Intersection   five (5) percent

3. Grades up to twelve (12) percent may be permitted on a through minor street where access to the street is possible over streets with grades of ten (10) percent or less.

F. **Horizontal Curves:**

1. Whenever street lines are deflected in excess of five (5) degrees, connection shall be made by horizontal curves.

2. To ensure adequate sight distance, minimum centerline radii for horizontal curves shall be as follows:

   a. Minor Streets – One hundred fifty (150) feet

   b. Collector Streets – Three hundred (300) feet

   c. Major Streets – Five hundred (500) feet

3. A tangent of at least one hundred (100) feet shall be introduced between all horizontal curves on collector and major streets.

4. To the greatest extent possible, combinations of the minimum radius and maximum grade shall be avoided.

36

G. Vertical Curves (Dip):

    At all changes of street grades where the algebraic difference exceeds one (1) percent, vertical curves shall be provided to allow an easy or smooth transition.

H. Intersections:

1. Streets shall intersect as nearly as possible at right angles, and no street shall intersect another at an angle of less than sixty (60) degrees or more than one hundred twenty (120) degrees.

2. No more than two streets shall intersect at the same point.

3. Streets intersecting another street shall either intersect directly opposite to each other or shall be separated by at least one hundred fifty (150) feet between centerlines measured along the centerline of the street being intersected.

4. Intersections shall be approached on all sides by a straight leveling area, the grade of which shall not exceed five (5) percent within fifty (50) feet of the intersection of the nearest right-of-way lines.

5. Intersections with major streets shall be located not less than one thousand (1,000) feet apart measured from centerline to centerline along the center line of the major street.

6. Street curb intersections shall be rounded by a tangential arc with a minimum radius of :

    a. thirty-five (35) feet for intersections involving only minor streets.

    b. fifty (50) feet for all intersections involving a collector street.

    c. fifty (50) feet for all intersections involving a major street.

7. Street right-of-way lines shall be parallel to (concentric with) curb arcs at intersections.

I. Sight Distance at Intersections:

1. Clear sight triangles shall be provided at all street intersections. Within such triangles, no vision-obstructing object other than utility poles shall be permitted which obscures vision above the height of thirty (30) inches and below ten (10) feet measured from the centerline grade of intersecting streets. Such triangles shall be established from a distance of:

    a. Seventy-five (75) feet from the point of intersection of the centerline, except that:

b. Clear sight triangles of one hundred fifty (150) feet shall be provided for all intersections with Major Streets (see appendix).

2. Wherever a portion of the line of such triangles occurs behind (i.e., from the street) the building reserve (setback) line, such portion shall be shown on the Final Plan of the subdivision and shall be considered a building setback (reserve) line.

J. Cul-de-Sac Streets:

1. Dead-end streets are prohibited unless designed as cul-de-sac streets or designed for future access to adjoining properties.

2. Any dead-end street for access to an adjoining property or because of authorized stage development shall be provided with a temporary all-weather turn-around within the subdivision, and the use of such turn-around shall be guaranteed to the public until such time as the street is extended.

3. Cul-de-sac streets, permanently designed as such, shall not exceed eighteen hundred (1800) feet in length and shall not furnish access to more than twenty (20) dwelling units.

4. Unless future extension is clearly impractical or undesirable, the turn-around right-of-way shall be placed adjacent to the tract boundary with sufficient additional width provided along the boundary line to permit extension of the street in full width.

5. All cul-de-sac streets, whether permanently or temporarily designed as such, shall be provided at the closed end with a fully paved turn-around. The minimum radius to the pavement edge or curb line shall be fifty (50) feet and the minimum radius of the right-of-way shall be fifty (50) feet.

6. Drainage of cul-de-sac streets shall preferably be towards the open end. If drainage is toward the closed end it shall be conducted away in an underground storm sewer.

7. The centerline grade on a cul-de-sac shall not exceed ten (10) percent, and the grade of the diameter of the turn-around shall not exceed five (5) percent.

8. All cul-de-sac street widths shall follow the same minimum street widths as prescribed for minor streets.

K. Street Names:

1. Proposed streets which are obviously in alignment with others already existing and named, shall bear the names of the existing streets.

2. In no case shall the name of the proposed street be the same as or similar to an existing street name in the Municipality and the postal district, irrespective of the use of the suffix street, road, avenue, boulevard, driveway, place, court, lane, etc.

3. All street names shall conform with the "Huntingdon County Street Naming and Addressing Ordinance and Policy" and be approved by the county addressing office.

L. Services Streets (Alleys):

1. Service streets may be permitted, provided that the subdivider produces evidence satisfactory to the Municipal Planning Commission, if applicable, or the Municipal Officials of the need for such service streets.

2. No part of any structure shall be located within twenty (20) feet of the centerline of a service street.

3. Dead-end service streets shall be avoided, but where this proves impossible, dead-end service streets shall terminate with a paved circular turn-around or equal with a minimum radius of the outer pavement edge of fifty (50) feet.

4. Service street intersections and sharp changes in alignment shall be avoided, but where necessary, corners shall be rounded to cut back sufficiently to permit safe vehicular circulation.

M. Driveways:

1. Private driveways on corner lots shall be located at least forty (40) feet from the point of intersection on the nearest street right-of-way lines.

2. In order to provide a safe and convenient means of access, grades on private driveways shall not exceed seven (7) percent. Entrances should be rounded at a minimum radius of five (5) feet, or should have a flare construction that is equivalent to the radius at the point of intersection with the cartway edge.

3. No private road or street shall be permitted off any cul-de-sac, or equal type of turn-around.

4. A private driveway may serve no more than two (2) lots before a public or private street right-of-way is required.

5. An access easement a minimum of twenty (20) feet wide shall be proved where a private driveway is shared and/or passes over the land of another. In such cases, a private right-of-way agreement shall be properly executed between the landowners granting access and all affected parties abutting and adjoining said easement. The agreement shall specify maintenance procedures and responsibilities for the easement and shall create a private right-of-way easement which shall be a covenant running with the land.

6.  The maximum allowable grade for a private driveway access shall be twelve (12) percent.  Driveway slope within any public right-of-way shall not exceed four (4) percent.  A straight leveling area twenty-five (25) feet in length with a centerline grade not exceeding eight (8) percent shall be provided at the entrance to a public street to provide a suitable stopping area, to provide an off street parking area in severe weather and to lessen erosion and subsequent sedimentation on the public cartway.  Driveways in excess of three (3) percent grade shall be paved and stormwater and erosion and sedimentation facilities installed to prevent flow into the street.

7.  All driveways onto Township streets shall have a minimum sight distance of two hundred and fifty (250) feet in each direction along the street.  Sight distance shall be measured in the same method used for street intersections and shall comply with the Pennsylvania Department of Transportation standards and shall be approved by the Department.

8.  A driveway or off-street parking area shall be set back a minimum of five (5) feet from a side property line, except where an access easement is approved per Section 512.B.

## N.  Private Streets

Private streets are permitted only if the Township Engineer certifies that the proposed street has sufficient right-of-way width, grade and designed in accordance with municipal standards.

1.  The private street shall provide access to no more than five (5) lots and shall be constructed in accordance with township standards.

2.  Any offer to dedicate the street shall be made only for the street as a whole.

3.  Agreement by the owners of fifty-one (51) percent of the front footage thereon shall be finding on the owners of the remaining lots.

4.  Dedication of any street is permitted only if it is totally accessible via a public street and meets the design standards of this ordinance with regard to structure, width, right-of-way width, etc.

5.  The building setback line for lots along private streets shall be measured from the private street right-of-way for a distance equal to that required along a public street.

## SECTION 503 BLOCKS

### A. Layout:

The length, width, and shape of blocks shall be determined with due regard to:

1. Provisions of adequate sites for buildings of the type proposed.

2. Zoning requirements, if applicable.

3. Topography.

4. Requirements for safe and convenient vehicular and pedestrian circulation, including the reduction of intersections with major streets.

### B. Length:

1. Blocks shall have a maximum length of one thousand six hundred (1,600) feet and a minimum length of five hundred (500) feet, provided however that the Municipal Planning Commission, if applicable or Municipal Officials may decrease the maximum and/or minimum lengths of blocks if in the opinion of either body, topography of the land in question and/or surface water drainage condition warrant such a decrease.

2. In the design of blocks longer than one thousand (1,000) feet, special consideration shall be given to the requirements of satisfactory fire protection.

3. Where practicable, blocks along major and collector streets shall not be less than one thousand (1,000) feet long.

### C. Crosswalks:

1. Crosswalks shall be required in blocks of over one thousand (1,000) feet or wherever necessary to facilitate pedestrian circulation and to give access to community facilities.

2. Such crosswalks shall have a right-of-way width of not less than ten (10) feet and a paved walk of not less than five (5) feet.

### D. Depth:

Residential blocks shall be of sufficient depth to accommodate two (2) tiers of lots, except where prevented by the size, topographical conditions, or other inherent conditions of property, in which case the Municipal Planning Commission, if applicable, or Municipal Officials may approve a single tier of lots.

41

E. Commercial and Industrial Blocks:

Blocks in commercial and industrial areas may vary from the element of design detailed above as required by the nature of the use.

## SECTION 504 LOTS AND PARCELS

A. General Standards:

1. Insofar as practical, side lot lines should be at right angles to straight street lines or radial to curved street lines.

2. Where feasible, lot lines should follow municipal boundaries rather than cross them in order to avoid jurisdictional problems.

3. Generally, the depth of a residential lot should be not less than one (1) nor more than two and a half (2 ½) times their width.

4. Depth and width of parcels intended for non-residential uses shall be adequate for the use proposed and sufficient to provide satisfactory space for on-site parking, loading and unloading, setbacks, landscaping, etc.

5. If, after subdividing, there exists remnants of land, they shall be either:

   a. Incorporated in existing or proposed lots, or

   b. Legally dedicated to public use, if acceptable to the Municipality.

B. Lot Frontage:

1. All lots shall have direct access to a public street, existing or proposed, or to a private street if it meets the requirements of these regulations.

2. Double or reverse frontage lots shall be avoided except where required to provide separation of residential development from major streets or to overcome specific disadvantages of topography or orientation.

3. All residential reverse frontage lots shall have, within such rear yard and immediately adjacent to the right-of-way, a planting screen easement of at least ten (10) feet in width, across which there shall be no right of access.

C. Lot Size:

Lot dimensions and areas shall not be less than specified by the Municipal Zoning Ordinance, if applicable, or if no municipal zoning exists then the following dimensions and areas shall prevail:

1. The minimum lot area for all lots with access to public water or on-lot water and public sewage collection and treatment shall be twenty-three thousand (23,000) square feet and a width at the building line of not less than one hundred fifty (150) feet.

2. The minimum lot area for all lots without access to public water and public sewage collection and treatment shall be two (2) acres, and a width at the building line of not less than two hundred (200) feet.

3. The minimum lot area for all lots with public water and without public sewage collection and treatment shall be two (2) acres, and a width at the building line of not less than two hundred (200) feet.

4. The minimum building setback from any right-of-way (ROW) shall be forty (40) feet except those along any collectors/arterial the set back shall be sixty (60) feet.

5. The minimum building setback from any property line shall be fifteen (15) feet.

## SECTION 505 SANITARY SEWAGE DISPOSAL

A. Where the public sewer is not yet accessible but is planned for extension to the subdivision (within 5 years), the subdivider shall install sewer lines, including lateral connections as may be necessary to provide adequate service to each lot when connection with the sewer system is made. The sewer lines shall be suitably capped at the limits of the subdivision, and the laterals shall be capped at the street right-of-way line. When capped sewers are provided, on-site disposal facilities shall also be provided. Design of capped sewer system shall be subject to approval by the Department of Environmental Protection.

B. Sanitary sewers shall be designed and constructed in strict accordance with Department of Environmental Protection Standards of the Commonwealth of Pennsylvania and Municipal construction standards.

C. Sanitary sewers shall not be used to carry storm water.

D. All lots which cannot be connected to a public or community sanitary sewage disposal system in operation at the time of construction of a principal building shall be provided with an on-site sanitary sewage disposal system consisting of a septic tank(s) connected with a tile disposal field or another appropriate system, which meets the design standards of the Pennsylvania Department of Environmental Protection, the Municipal Zoning Ordinance and any amendments or supplements thereto, if applicable, or any regulations adopted pursuant thereto.

E.  If on-site sanitary sewage disposal facilities are to be utilized, the Municipality may require that the subdivider submit an Economic Feasibility Report.  Such Report shall compare the cost of providing on-site facilities and the cost of connecting to a public sanitary sewer system with a temporary sewage treatment plant.  The temporary treatment plant will have to be abandoned when public trunk sewers are installed in the area.

F.  Where on-site sanitary sewage facilities are to be utilized, each lot so served shall be of a size and shape to accommodate the necessary length of tile fields at a safe distance from, and at a lower elevation than the proposed building(s) in accordance with the Department of Environmental Protection.

### SECTION 506 SOIL PERCOLATION TEST REQUIREMENTS

A.  Soil percolation tests shall be performed for all subdivisions wherein building(s) at the time of construction will not be connected to a public or community sanitary sewage disposal system.

B.  Soil percolation tests shall be made in accordance with the procedure required by the Pennsylvania Department of Environmental Protection, by a registered professional engineer or a qualified sewage enforcement officer, at the rate of one (1) test site for each acre or part thereof for the property being subdivided, or at such rates required by the Department of Environmental Protection.

C.  The engineer and/or sewage enforcement officer shall enter the result of the test and all other information on four (4) copies of the required Department of Environmental Protection form and shall submit these with the Preliminary Plans.

D.  Soil percolation tests shall be performed near the site of the proposed on-site sanitary sewage disposal facilities and spaced evenly throughout the property.

E.  The results of the soil percolation tests shall be analyzed by the Municipal Planning Commission and Municipal Officials in conjunction with the Pennsylvania Department of Environmental Protection in relation to the physical characteristics of the tract being subdivided and of the general area surrounding the tract being subdivided, and the Final Plan lot layout shall be based on this analysis.

F.  If the analysis of the soil percolation test results reveals that the soil is unsuitable for the intended use at the lot size proposed, the Municipal Planning Commission or the Municipal Officials may require that the lot size(s) be increased in accordance with the test results or that additional tests be made on each proposed lot at the location of the contemplated disposal facilities, and the data submitted for review.

## SECTION 507 WATER SUPPLY

A. Water supply shall be installed in accordance with the requirements of the water authority serving that area, if applicable. If water is to be provided by means other than private wells owned and maintained by the individual owners of lots within the subdivision or development, applicants shall present evidence to the Municipality that the subdivision or development is to be supplied by a certified public utility, a bona fide cooperative association of lot owners, or by a municipal corporation, authority or other utility. A copy of a certificate of public convenience from the Pennsylvania Public Utility Commission or application for such certificate, a cooperative agreement or a commitment or agreement to serve the area in question, whichever is appropriate, shall be acceptable evidence.

B. Where individual on-site water supply system(s) are to be utilized, each lot so served shall be of a size and shape to allow safe location of such a system and wells shall be placed uphill from sewage disposal systems and shall not be within one hundred (100) feet of any part of the absorption (tile) field of any on-site sanitary sewage disposal system, nor within fifty (50) feet from lakes, streams, ponds, quarries, etc.

C. Where individual on-site water supply system(s) are to be utilized, it is recommended that the subdivider provide at least one (1) test well for each ten (10) proposed dwelling units. Such wells should be drilled, cased, and grout sealed into bedrock at least fifty (50) feet deep, having a production capacity of at least five (5) gallons per minute or safe potable drinking water as certified by State or Municipal health officer.

## SECTION 508 STORM WATER DRAINAGE

Any landowner and any person engaged in the alteration or development of land which may affect storm water runoff characteristics shall implement such measures consistent with the provisions of the applicable watershed storm water management plan as are reasonable necessary to prevent injury to health, and of person's safety and/or damage to adjacent property. Such measures shall include such actions as are required:

1. to assure that the maximum rate of storm water runoff is no greater after development than prior to development activities; or

2. to manage the quantity, velocity and direction of resulting storm water runoff in a manner which otherwise adequately protects health and property from possible injury.

A. General Criteria

1. The storm water management plan must consider all the storm water runoff flowing over the project site.

2. All storm water runoff easements and detention controls shall be located and designed by a person qualified and/or experienced in the location and design of such structures.

3.  The method used in calculating storm water runoff shall be the method designated in the Municipal Stormwater Management Ordinance, or as computed in Section 508, Paragraph B, of this Ordinance.

4.  Storm water roof drains and pipes shall discharge water into cisterns, French drains (where soils are suitable), sheet drains or other storm water runoff dispersion and absorption control device and not into storm sewers unless recommended in the watershed storm water plan.

5.  No discharge of toxic materials into any storm water management system is permitted.

6.  Flow velocities from any storm drain may not result in a deflection of the receiving channel.

7.  Developers are encouraged to consult the following storm water management and erosion sedimentation control publications in preparing their plans.

    a.  Chapter 102.  Erosion Control, Title 25, Rules and Regulations of the Department of Environmental Protection.

    b.  Chapter 105.  Water Obstructions and Encroachments, Title 25, Rules and Regulations of the Department of Environmental Protection.

    c.  Engineering Field Manual for Conservation Practices, 1975, U.S. Department of Agriculture, Soil Conservation Service.

    d.  Guidelines for Storm Water Management, Department of Environmental Protection, Bureau of Dams and Waterway Management.

    e.  Soil Erosion and Sedimentation Control Manual, Department of Environmental Protection, Bureau of Soil and Water Conservation and Bureau of Water Quality Management.

    f.  Urban Hydrology for Small Watersheds, Technical Release No. 55, Soil Conservation Service, U.S. Department of Agriculture, January, 1975.

    g.  PennDOT Design Manual II (Publication 13), Section 10.

B.  Specific Criteria

    1.  Storm water rates shall be computed as follows:

        a.  Sites up to 5 acres shall use the rational method of calculating run-off as detailed in PA DOT Publication 13, Section 10.  Pipes, ditches, and swales shall be designed accordingly.  Storm water detention shall be designed as recommended in Appendix A of this Document.

46

   b. Sites over 5 acres shall use the rational method to design pipes, swales, and ditches. Storm water detention shall be designed using the SCS method detailed in Urban Hydrology for small watersheds, Technical Release 55. Detention shall be designed using 2, 10, and 25 year storm events.

2. Water quality for the specific watershed must comply with the appropriate Municipal Storm water Management Plan.

3. Erosion and Sedimentation – All activities shall be conducted in such a way as to minimize accelerated erosion and resulting sedimentation. Measures to control erosion and sedimentation shall at a minimum meet the standards of the Huntingdon County Conservation District and Chapter 102 (Erosion Control) of Title 25, Rules and Regulations of the Pennsylvania Department of Environmental Protection.

## *SECTION 509 PUBLIC USE AND SERVICE AREA*

### A. Public Open Spaces:

1. In reviewing subdivision plans, the Municipal Planning Commission, if applicable, and Municipal Officials shall consider whether community facilities, especially schools, in the area are adequate to serve the needs of the additional dwellings proposed by the subdivision, and shall make such report thereon as they deem necessary in the public interest.

2. Subdividers and the Municipality shall give earnest consideration to providing facilities or reserving areas for facilities normally required in residential neighborhoods, including churches, libraries, schools and other public buildings; parks, playgrounds and playfields, shopping and local business centers. Areas provided or reserved for such community facilities shall be adequate to provide for building sites, landscaping and off-street parking as appropriate to the use proposed. Prior to the preparation of plans, subdividers of large tracts should review with the Municipal Planning Commission, if applicable, or Municipal Officials the minimum standards for various community facilities applicable to the tract being subdivided.

3. In subdivisions which are intended to provide housing, the Municipal Planning Commission, if applicable, or Municipal Officials shall consider the need for suitable open areas for recreation and shall make a recommendation thereon. However, if the Municipality has a formally-adopted recreation plan, then the land area to be dedicated, or the fees to be paid in lieu thereof, shall conform to said recreation plan and shall be a condition precedent to Final Plan approval.

### B. Community Assets:

Consideration shall be shown for all natural features such as large trees, water courses, historic areas and structures, and similar community assets which, if preserved, will add attractiveness and value to the remainder of the subdivision.

47

b. Sites over 5 acres shall use the rational method to design pipes, swales, and ditches. Storm water detention shall be designed using the SCS method detailed in Urban Hydrology for small watersheds, Technical Release 55. Detention shall be designed using 2, 10, and 25 year storm events.

2. Water quality for the specific watershed must comply with the appropriate Municipal Storm water Management Plan.

3. Erosion and Sedimentation – All activities shall be conducted in such a way as to minimize accelerated erosion and resulting sedimentation. Measures to control erosion and sedimentation shall at a minimum meet the standards of the Huntingdon County Conservation District and Chapter 102 (Erosion Control) of Title 25, Rules and Regulations of the Pennsylvania Department of Environmental Protection.

### SECTION 509 PUBLIC USE AND SERVICE AREA

A. Public Open Spaces:

1. In reviewing subdivision plans, the Municipal Planning Commission, if applicable, and Municipal Officials shall consider whether community facilities, especially schools, in the area are adequate to serve the needs of the additional dwellings proposed by the subdivision, and shall make such report thereon as they deem necessary in the public interest.

2. Subdividers and the Municipality shall give earnest consideration to providing facilities or reserving areas for facilities normally required in residential neighborhoods, including churches, libraries, schools and other public buildings; parks, playgrounds and playfields, shopping and local business centers. Areas provided or reserved for such community facilities shall be adequate to provide for building sites, landscaping and off-street parking as appropriate to the use proposed. Prior to the preparation of plans, subdividers of large tracts should review with the Municipal Planning Commission, if applicable, or Municipal Officials the minimum standards for various community facilities applicable to the tract being subdivided.

3. In subdivisions which are intended to provide housing, the Municipal Planning Commission, if applicable, or Municipal Officials shall consider the need for suitable open areas for recreation and shall make a recommendation thereon. However, if the Municipality has a formally-adopted recreation plan, then the land area to be dedicated, or the fees to be paid in lieu thereof, shall conform to said recreation plan and shall be a condition precedent to Final Plan approval.

B. Community Assets:

Consideration shall be shown for all natural features such as large trees, water courses, historic areas and structures, and similar community assets which, if preserved, will add attractiveness and value to the remainder of the subdivision.

47

C. Utility Easements:

1. A temporary construction easement of thirty (30) feet and a permanent maintenance easement of fifteen (15) feet shall be provided for poles, wires, conduits, storm and sanitary seers, gas, water, and heat mains and/or other utility lines intended to service the abutting lots. No structures or trees shall be placed within such easements.

2. To the fullest extent possible, easements shall be centered on or adjacent to rear or side lot lines.

3. There shall be a minimum distance of fifty (50) feet, measured in the shortest distance, between any proposed dwelling unit and any petroleum, petroleum products, or natural gas transmission line which traverses the subdivision.

4. Subdividers are urged to avail themselves of the services provided by the various public utility companies in determining the proper locations for utility line easements.

5. Utility service for residential development is recommended to be provided through the use of underground facilities in accordance with the standards and approval of the utility company having appropriate jurisdiction.

## ARTICLE VI
## IMPROVEMENT REQUIREMENTS

### SECTION 601 GENERAL REQUIREMENTS

Physical improvements to the property being subdivided shall be provided, constructed, and installed as shown on the Record Plan, in accordance with the requirements of these regulations, or other Municipal Ordinances or Regulations.

A. As a condition to review of a Final Plan by the Municipal Planning Commission, if applicable, or Municipal Officials, the subdivider shall agree with the Municipality as to the installation of all improvements shown on the Plan and required by these or other Municipal Ordinances or Regulations.

B. All improvements installed by the subdivider shall be constructed in accordance with the design specifications of the Municipality.

Where there are no applicable Municipal Design Specifications, improvements shall be constructed in accordance with specifications furnished by the Municipal Engineer, Pennsylvania Department of Transportation, Pennsylvania Department of Environmental Protection, Pennsylvania Department of Forests and Waters, or such other State agency as applicable. If there are no applicable Municipal or State regulations, the Municipality may authorize that specifications be prepared by the Municipal Engineer or an Engineering Consultant.

C.  Supervision of the installation of the required improvements shall in all cases be the responsibility of the Municipal Engineer, water and/or sewer authority, or of the appropriate state regulatory agency.

## SECTION 602 REQUIRED IMPROVEMENTS

The following improvements shall be installed by the subdivider or a guarantee suitable to the Municipality shall be provided by the subdivider which shall ensure the provision of the improvements at the standards set forth in these regulations.

A  Street Grading:

All streets shall be graded at full right-of-way width.  See Appendix 2.

B.  Cartway Paving:

All township streets shall be paved to full cartway width (as shown on the Final Plan) in accordance with Municipal Specifications.  See Appendix 1 for paving specifications.

C.  Curbs:

Curbs are to be installed when deemed necessary by the Municipal Engineer based on the need to control storm water runoff and/or on-street parking and approved by the Municipality.

D.  Sewers:

1.  Storm Sewers:

Storm sewers and related facilities shall be installed consistent with the design principals and requirements contained in Article V of these regulations.

2.  Sanitary Sewage Disposal System(s):

a.  Sanitary sewage disposal systems shall be provided consistent with the design standards and requirements contained in Article V of these regulations.

b.  Whenever a subdivider proposes that individual on-site sanitary sewage disposal systems shall be utilized within the subdivision, the subdivder shall either install such facilities or shall require (by deed restriction or otherwise), as a condition of the sale of each lot or parcel within the subdivision, that such facilities shall be installed by the purchaser of such lot or parcel at the time that a principal building is constructed and in accordance with these regulations.

c.  In all other cases, the subdivider shall provide a complete community or public sanitary sewage disposal system. The design and installation of such public system shall be subject to the approval of the Pennsylvania Department of Environmental Protection and such system shall be further subject to satisfactory provision for the maintenance thereof.

E.  Water Supply:

1.  Water supply system(s) shall be installed consistent with design principles and requirements contained in Article V of these regulations.

2.  Where the subdivider proposes that individual on-site water supply system shall be utilized within the subdivision, the subdivder shall either install such facilities or shall require (by deed restriction or otherwise), as a condition of the sale of each lot or parcel within the subdivision, that the facilities shall be installed by the purchaser of such lot or parcel at the time that a principal building is constructed and in accordance with these regulations.

3.  Wherever economically feasible, the subdivision shall be provided with a complete public or community water distribution system.

F.  Fire Hydrants:

Wherever a public or community water supply system is provided, fire hydrants shall be installed as required by the local water supplier of all existing and proposed structures, measured by way of accessible streets.

G.  Markers:

Permanent reference markers of precast concrete or poured on-site concrete shall be installed by a professional land surveyor, as that term is defined by Act No. 367 of 1945. Precast monuments shall be at least six (6) inches square at the top and bottom and at least thirty (30) inches in depth, with a steel dowel. Poured on-site markers shall be at least nine (9) inches in diameter and at least thirty (30) inches in depth with a steel dowel. Monuments shall be set at all corners and angle points of the boundaries of the original tract to be subdivided prior to approval of the Plan. Markers shall be installed at all lot corners and shall consist of iron or steel bars at least eighteen (18) inches long, and not less than three quarter (¾) inch in diameter.

H.  Street signs:

Street name signs shall be installed at all street intersections. The design and placement of such signs shall be subject to approval by the Municipality.

I. <u>Street Lights</u>:

> In accordance with the conditions to be agreed upon by the subdivider, the Municipality, and the appropriate public utility, streetlights are required to be installed in all subdivisions. However, whether or not streetlights are initially installed, the developer shall be responsible for providing utility easements for future street lighting installation upon consultation with the public service utility company involved.

J. <u>Recreational Facilities</u>:

> As a condition precedent to final plan approval, the subdivider, upon agreement with the Municipality, shall dedicate land for the construction of recreation facilities, pay fees in lieu thereof, or reserve private land, or a combination thereof, for park or recreational purposes only if the Municipality has a formally-adopted recreation plan. The standards for determining the proportion of a development to be dedicated and/or the amount of any fee to be paid in lieu thereof shall be indicated in Section 509 of this Ordinance.

## <u>SECTION 603 RECOMMENDED IMPROVEMENTS</u>

The following improvements, intended to enhance the sales value of the subdivision as well as to benefit the Municipality are recommended.

A. <u>Shade Trees</u>:

> Every effort must be made by the subdivider to preserve existing shade trees and, in addition, deciduous hardwood trees with a minimum caliber of one and one-half (1 ½) inches should be provided in accordance with conditions to be agreed upon by the Municipality. Where provided, such trees should be planted between the sidewalk and the building reserve (setback) line at least five (5) feet from the sidewalk or between the curb and the sidewalk provided the planting strip is a minimum of six (6) feet wide. If no curb or sidewalk is provided, trees shall set back a minimum of ten (10) feet from the street ROW.

B. <u>Sidewalks</u>:

> 1. When required by the Municipality, sidewalks with a minimum width of four (4) feet shall be installed on both sides of all streets except that no sidewalks shall be required along service streets.

> 2. All sidewalks, curbs, and gutters shall be installed in accordance with these regulations and with curb, gutter, or sidewalk ordinances of the Municipality.

ARTICLE VII
*SUPPLEMENTARY LAND DEVELOPMENT REQUIREMENTS*

### SECTION 701   GENERAL REQUIREMENTS AND INTENT

In accordance with the definition in this Ordinance, as per the Pennsylvania Municipalities Planning Code (MPC), Land Development may include various types of development and subdivision of land.  In this regard, Article V delineates design standards and construction requirements which are intended to apply to all types of development, while Appendix I applies standards to the design of Mobile Home Parks.  It is recognized by the Board of Supervisors that certain types of Land Development may have needs and requirements unmet by these provisions alone.  This Article provides such supplementary standards for various forms of non-residential development such as commercial retail, professional offices, and manufacturing uses.  It is the intent of this Article to supplement and not replace any of the standards and requirements of the above referenced previous Articles.

### SECTION 702   SUBMISSION REVIEW PROCEDURES AND PLAN REQUIREMENTS

The submission review plan and design procedures contained in this ordinance shall be required for all Land Development proposals.  In addition, the following may be required for proposals for Commercial, Retail, Professional Office and manufacturing uses:

(a)    A traffic study analyzing the capacity of area streets and intersections abutting the development.  The study shall include an analysis of capacities, levels of service, and improvements required to maintain acceptable levels of service.

(b)    A landscape plan prepare by a landscape design professional.

(c)    A hydro geological study of the proposed development as directed by the Township Engineer or Township Supervisors.

(d)    A Stormwater Management Plan in accordance with the Township Stormwater Management provision herein.

### SECTION 703   PARKING REQUIREMENTS

Non-residential development shall be designed in a manner that maximized benefits and minimizes conflicts in relation to parking and traffic safety.  Specific supplementary requirements are as follows:

(a)    All non-residential proposal shall meet the following:

(1)    In cases where more than a single row of parking spaces are required due to projected parking demand and/or site conditions the following design configurations shall be followed:

52

    -    A minimum parking bay width of 45 feet shall be provided for 45-degree [diagonal] parking, with a one-lane parking lane having a minimum width of 14 feet.

    -    A minimum parking bay width of 61 feet shall be proved for 90-degree [head-in] parking with a two-way parking lane having a minimum width of 25 feet.

(2)    All parking areas shall be stabilized with compacted stone or gravel, or with a bituminous or concrete surface, and include adequate drainage control as approved by the Township.

(3)    Parking areas shall be designed so that vehicles need not back out onto a public right-of-way.

(b)    Commercial land developments within the scope of these regulations shall provide stabilized parking areas. The minimum number of 9 foot x 18 foot parking spaces to be provided will vary depending upon use and/or interior and/or gross square footage areas as summarized below:

| | | | |
|---|---|---|---|
| (1) | Department Stores | - | 1 space per 200 square feet |
| (2) | Other Retail | - | 1 space per 300 square feet |
| (3) | Banks and Related | - | 1 space per 250 square feet |
| (4) | Offices | - | 1 space per 500 square feet |
| (5) | Houses of Worship | - | 1 space for every 5 seats |
| (6) | Hotels/Motels | - | 1 space per unit |
| (7) | Supermarkets | - | 1 space per 200 square feet |
| (8) | Sit-Down Restaurants | - | 1 space per 333 square feet |
| (9) | Fast-food Restaurants | - | 1 space per 35 square feet |
| (10) | Community Buildings | - | 30% of capacity in persons |

For uses not classified above, not less than three (3) square feet of stabilized parking area, inclusive of access lands, for every one (1) square foot of interior floor area.

In addition, stabilized truck loading, unloading, and maneuvering can be accommodated within the property lines. All commercial establishments in excess of 10,000 square feet of gross floor area shall provide a loading dock/berth. The gross floor area at which point a second dock/berth is required will vary with use as summarized below:

| | | | |
|---|---|---|---|
| (1) | Wholesale | - | 40,000 square feet |
| (2) | Retail | - | 20,000 square feet |
| (3) | Offices/Services | - | 100,000 square feet |
| (4) | Restaurants | - | 25,000 square feet |
| (5) | Hotels/Schools | - | 100,000 square feet |

(c)     Industrial developments within the scope of these regulations shall provide a minimum of paved off-street parking in the ratio of one (1) parking space for every employee anticipated during the peak work shift. In addition, paved truck loading areas shall be provided such that all truck loading, unloading, and maneuvering can be accommodated within the property lines.

(d)     In addition to the requirements for commercial and industrial parking areas noted in (b) and (c) above, parking facilities provided shall also include the following:

   (1)     Illumination: All parking areas shall be illuminated by light standards with a maximum height of forth (40) feet, with sharp cut-off shields on the fixtures to allow the direction of lighting on the lot and to avoid glare above the lot and on adjacent properties.

   (2)     Interior Landscaping: All parking areas shall include interior landscaping of at least ten (10) percent of the area of the parking lot, exclusive of any buffer areas. The interior of the parking area includes that area between the frontage or buffer yard any any paved walkways or the structure, when a walkway is not necessary.

   (3)     Sidewalks: The principal access point for commercial, service and industrial establishments abutting the parking lot shall have a paved walkway with a minimum width of five (5) feet.

   (4)     Access Drives: Each parking area shall include adequately sized access drives having a minimum width of twelve (12) feet when separate exit and entrance lanes are provided, and twenty (20) feet when combined exit and entrance lanes are provided.

   (5)     Special access designation: Fire lanes and handicap parking stalls appropriately located in relation to the structure shall be designated by signage and pavement markings.

## SECTION 704   SUPPLEMENTARY REQUIREMENTS: COMMERCIAL AND INDUSTRIAL

(a)     Proposed developments with drive-in facilities shall meet the following standards:

   (1)     No more than two (2) driveways shall be provided to any one property from a public right-of-way.

   (2)     Driveways shall be no closer than thirty (30) feet from any adjacent property line.

   (3)     The maximum width of driveways shall be no wider than twenty (20) feet.

(4)     Gasoline or other fuel pumps shall be no closer than twenty-five (25) feet to any public right-of-way.

(b)     All proposed structures and buildings shall be no closer than thirty (30) feet to any right-of-way line.  Flexibility of setbacks may be permitted in village and other settings.

(c )    Proposals for industrial and commerce uses shall meet the following additional requirements:

(1)     A minimum fifty (50) foot buffer shall be provided around the development.  A larger buffer of trees shall be required adjacent to agricultural areas.  Outdoor storage areas shall be landscaped or enclosed by opaque fence.

(2)     Illumination shall be of the sharp cut-off variety avoiding glare above and onto adjacent properties.

(3)     Loading docks are required and shall be at least fourteen (14) feet wide and have a clearance of at least fourteen (14) feet, and shall not be located in the front of the building.

(4)     Manufacturing buildings may not cover more than twenty-five percent (25%) of the lot.

### ARTICLE VIII
### MOBILE HOME PARK STANDARDS

## SECTION 801 MOBILE HOME PARK REGULATIONS

Establishing minimum standards for Mobile Home Parks, establishing requirements for the design, construction, alteration, extension and maintenance of mobile home parks and related utilities and facilities.

The following terms shall have the meaning indicated when used hereinafter:

A.  Mobile Home

A transportable, non-motorized, non-recreational vehicle (RV), single family dwelling intended for permanent occupancy, contained in one (1) unit, or in two (2) or more units designed to be joined into one (1) integral unit capable of again being separated for repeated towing, which arrives at a site complete and ready for occupancy except for minor and incidental unpacking and assembly operations, and constructed so that it shall be used without a permanent foundation.

B.  Mobile Home Lot

A parcel of land in a mobile home park, improved with the necessary utility connections and other appurtenances necessary for the erections thereon of a single mobile home which is leased by the park owner to the occupants of the mobile home.

All mobile home lots shall be addressed in conformance with the "Huntingdon County Street Naming and Addressing Ordinance and Policy" and be approved by the county addressing office.

C.  Mobile Home Park

A parcel of land under a single ownership which has been placed and improved for the placement of mobile homes for non-transient use, consisting of two or more mobile home lots.

D.  Mobile Home Stand

That part of an individual lot which as been reserved for the placement of the mobile home, appurtenance structures or additions.

E.  Refuse

All putrescible and nonputrescible solids, except body wastes, including garbage, rubbish, ashes, and dead animals.

## SECTION 802  PERMITS AND LICENSES

A.  It shall be unlawful for any person to construct, alter or extend any mobile home park within the limits of the Township unless he holds a valid permit issued by the Department of Environmental Protection in the name of such person and also a licence issued by the Township hereunder.

1.  All applications when necessary for review and approvals shall be made by the owner to the Pennsylvania Department of Environmental Protection, Department of Labor and Industry, Department of Transportation or other appropriate agency as applicable.

## SECITON 803  SUBMISSION OF PLANS AND SPECIFICATION TO THE TOWNSHIP

Any person, firm or operation from or after the passage of this Ordinance who proposes to operate or maintain any premises, area, tract or piece of land for use as a mobile home park shall first submit to the Township a plan for layout and design thereof, including a legal description and map clearly setting forth the following information:

A.  Name and address of applicant.

B.  Interest of the applicant in the mobile home park.

C.  Location and legal description of the mobile home park.

56

D.    A sketch plan shall be presented to the Planning Commission for review and comment prior to the preparing and final plans to accompany and applications.

    1.    The sketch plan may be free hand superimposed on a plot plan of the property to be used for the mobile home park.   The sketch shall indicate general topography locations for mobile homes or groups thereof, accessory buildings, accesses, circulation and parking areas.

E.    Complete engineering plans and specification of the proposed park.

## SECTION 804  FEES

See resolution for fee schedules.

## SECTION 805  INSPECTION OF MOBILE HOME PARKS

The Township (Agent as appointed by the Township Supervisors) is hereby authorized to make such inspections as are necessary to determine satisfactory compliance with this Ordinance and regulations issued hereunder.

## SECTION 806  REQUIRED SEPARATION BETWEEN MOBILE HOMES

Mobile home shall be separated from each other and from buildings and structures by at least twenty (20) feet, provided that mobile homes placed end to end may have a clearance of fifteen (15) feet where opposing rear walls are staggered.

## SECTION 807  REQUIRED RECREATIONAL AREAS

Where a proposed park, playground, school, easement or other public use shown in the Comprehensive Plan, or in the opinion of the Planning Commission is necessary, the Board of Supervisors may require the reservation of such area within the mobile home park or land development in a reasonable manner.   Such areas should be in total approximately six (6) percent of the mobile home park area.

## SECTION 808  REQUIRED SETBACKS, BUFFER STRIPS AND SCREENING

A.    All mobile homes shall be at least twenty-five (25) feet from park property boundary lines.

B.    There shall be a minimum distance of twenty-five (25) feet between an individual mobile home and adjoining pavement of a park street, adjoining recreation area, adjoining park area or other common use.

C.    All mobile home parks located adjacent to industrial or commercial land use shall be provided with screening such fences or dense vegetative growth along with property line separating the park and such adjacent non-residential uses.

D.   Mobile homes and other structures in the mobile home park shall not be located within the required setbacks from public roads or rights-of-way intended to be dedicated as public roads. The following setbacks shall be required.

1.   Front Yard

Arterial Streets: 60 feet from right-of-way line

Collector Streets: 40 feet from right-of-way line

Local Streets: 40 feet away from right-of-way line

## SECTION 809  PARK STREET SYSTEMS

A.   General Requirements

All mobile home parks shall ble provided with safe and convenient year-round vehicular access from abutting pubic streets or roads to each mobile home lot. Alignment and grade shall be properly adapted to topography and shall meet with the approval of the Planning Commission. No vehicular way shall have a grade in excess of ten (10) percent.

B.   Access

Access to mobile homes shall be designed to minimize congestion and hazards at the entrance road connecting the park streets with a public street or road shall have a minimum paved cartway width of twenty-six (26) feet within wich parking shall be prohibited.   There shall be a clear sight triangle of twenty (20) feet measured along the edges of the entrance road cartway from their point of junction with the public cartway.

Roadways shall be paved and of adequate with to accommodate anticipated traffic and, in any case, shall meet the following minimum requirements:

1)   Where parking is permitted on both sides, a minimum road pavement width of thirty-six (36) feet will be required.

2)   Where parking is limited to one side, a minimum road pavement width of twenty-seven (27) feet will be required.

3)   Where parking is prohibited on either side, a minimum road pavement width of twenty (20) feet will be required.

4)   Dead-end streets will be provided a turn-around at the closed end with a minimum outside roadway radium of sixty (60) feet.

C.    Required illumination of the park street system

All parks shall be furnished with lighting units so spaced and equipped with luminaries placed at such mounting heights as will provide for the same movement of pedestrians and vehicles at night.

D.    Street Construction and Design Standards

All streets shall be proved with a smooth, hard and dense surface which will be durable and well-drained under normal use and weather conditions.

## SECTION 810   REQUIRED OFF-STREET PARKING AREAS

A.    Off-street parking areas shall be provided in all mobile home parks for the use of park occupants and guests.  Such areas shall be furnished at a rate of one and one-half (1 ½) spaces per mobile home lot.

B.    Required car parking spaces shall be so located as to provide convenient access to the mobile home but shall not exceed a distance of two hundred (200) feet from the mobile home that it is intended to  service.  Paving of parking areas shall be a smooth, dense, solid and dust-free surface capable of use thoughout the year.

## SECTION 811   MOBILE HOME STANDS

The area of the mobile home stand shall be improved to provide an adequate foundation for the placement of the mobile home thereby securing the superstructure against uplift, sliding, or rotation in accordance with the Federal Housing Administration Regulations and Township standards.

A.    The mobile home stand shall not heave, shift or settle unevenly under the weight of the mobile home due to frost action, inadequate drainage, vibration or other forces acting on the superstructure.

    1)  The foundation of the mobile home stand shall, at a minimum, consist of four concrete pads placed to support the four wheels, jacks or other supports of the mobile home.  The pads shall each measure at least four (4) feet by two (2) feet and shall extend thirty (30) inches below the finished surface grade of the mobile home stand.

B.    The mobile home stand shall be provided with anchors and tie downs such as cast-in-place "deadmen" eyelets imbedded in the concrete foundation, screw hangers, arrowhead anchors or other approved devices securing the stability of the mobile home.  Anchors and tie-downs shall be placed in at least four (4) locations around the pad area and shall be able to sustain a minimum tensile strength of 3,000 pounds.

C.   A mobile home park shall have an average gross area per mobile home lot of not less than forty-three thousand five hundred sixty (43,560) square feet.

   1)   The minimum width of a mobile home lot shall be forty (40) feet.

   2)   The minimum depth of a mobile home lot shall be one hundred (100) feet or at least forty (40) percent longer than the mobile home to be placed thereon.

D.   The clustering of mobile home lots or sites is encouraged to provide for conservation of open space and to provide for efficient development of streets and utilities.  No mobile home lot shall be less than four thousand (4,000) square feet.  In order to approve the "cluster plan", the Township shall apply the following test:

The number of mobile home lots times four thousand (4,000), plus the area of common open space in square feet, divided by the number of mobile home lots shall equal at least forth-three thousand five hundred sixty (43,560) square feet.

The open space portion of the mobile home park shall be protected from development in perpetuity by appropriate deed restrictions and may not be severed from the mobile home park for further development.

## SECTION 812   WATER SUPPLY

An adequate, safe supply of potable water shall be provided to each mobile home lot.  Where a public water supply of satisfactory quantity, quality and pressure is available connection shall be made thereto and its supply used exclusively.  Where a satisfactory public water supply is not available, a private water system may be developed and used as approve by the Pennsylvania Department of Environmental Protection.

## SECTION 813   SEWAGE COLLECTION AND DISPOSAL

An adequate and safe sewage system shall be provided in all parks for conveying and disposing of sewage from mobile homes, service buildings and other accessory facilities.  Connection shall be made to a public sewage system where available.  Where public sewage is not available, an on-site disposal system shall be designed, constructed and maintained as approved by the Pennsylvania Department of Environment Protection.

## SECTION 814   ELECTRICAL DISTRIBUTION SYSTEM

Every park shall provide an electrical wiring system consisting of wiring, fixtures, and equipment and appurtenances which shall be installed and maintained in accordance with the local electrical power utility's specifications regulating such systems.

A.   An electrical outlet supplying at least one hundred (100) amps shall be provided for each mobile home lot.  Where power lines are above the trailer park, they shall not be less than fifteen (15) feet above any trailer.

B.    The Planning Commission may require that power lines be installed underground where feasible.

## SECTION 815   REFUSE HANDLING

The storage, collection and disposal of refuse in the mobile home park shall be so conducted as to create no health hazards, rodent harborage, insect breeding areas, accident or fire hazards or air pollution and shall comply with health regulations governing mobile home parks.  Plans for refuse handling, storage and disposal shall be subject to review and approval by the Board of Supervisors, Planning Commission and Pennsylvania Department of Environmental Protection.

## SECTION 816   INSECT AND RODENT CONTROL

Grounds, building and structures shall be maintained free of insect and rodent harborage and infestation.  Extermination methods and other measures to control insects and rodents shall conform to the requirements of the Pennsylvania Department of Environmental Protection regulation governing mobile home parks.

## SECTION 817   FIRE PROTECTION

A.    The mobile home park area shall be subject to all rules and regulations of the Township, County and Commonwealth pertaining to fire protection.

B.    Mobile home park area shall be kept free of litter, rubbish and other flammable materials.

C.    Portable fire extinguishers of a type approved by the area Fire Marshall shall be kept in public service buildings and under park control.

## ARTICLE IX
### *RECREATIONAL AND SEASONAL LAND DEVELOPMENT STANDARDS*

## SECTION 901   GENERAL REQUIREMENTS

A Recreational and Seasonal Land Development includes the improvement and development of land for seasonal and/or leisure time activities.  Such developments are for temporary occupancy and are not intended now or in the future for year-round dwelling purposes, and may include travel trailers, motor homes, campers, lots intended for tents, and land intended for various other outdoor recreational activities such as hunting and fishing.  However, developments comprising cottages, cabins, second homes, other permanent and fixed dwelling structures, and any recreational and seasonal lots for sale are excluded from this Article and are viewed as residential subdivisions in relation to this Ordinance.

61

A.  Classification: Whenever any land development is proposed, before any contract is made for the sale or lease of any part thereof, and before any permit for development in such proposed land development shall be granted, the owner or his agent, shall apply for and secure approval of such proposed land development in accordance with the following procedures for development, which includes a maximum of two (2) steps for a Minor and three (3) steps for a Major Development as follows:

1.  Minor Development - includes ten (10) or fewer campsites for recreational and/or seasonal use.
    a.    Sketch Plan (optional)
    b.    Final Plan

2.  Major Development  - includes eleven (11) or more campsites for recreational and/or seasonal use
    a.    Sketch Plan (optional)
    b.    Preliminary Plan
    c.    Final Plan

B.  Pre-Application Consultation:  Prior to filing an application for approval of al land development with the Township, the owner or his authorized agent, shall meet with the Jackson Township Board of Supervisors for an official classification of his proposed land development.  The Jackson Township Board of Supervisors shall determine whether the proposal shall be classified as a Minor Development or a Major Development.  At this time, the Jackson Township Board of Supervisors shall advise the owner or his authorized agent as to which of the procedures contained herein must be followed.

C.  Official Filing Date: For the purpose of these regulations, the official filing date shall be the date of the regular meeting of the Jackson Township Board of Supervisors next following the date the application and plans are received at the Township Building providing that said regular meeting shall occur more than thirty (30) days following the submission of the application, the official filing date shall be the thirtieth (30th) day following the day the application has been submitted.  On receipt of an application for land development approval the Jackson Township Board of Supervisors shall affix to the application both the date of submittal and the official filing date.

D.  Huntingdon County Planning Commission Review:  All plans shall be submitted to and reviewed by the Huntingdon County Planning Commission in accordance with its then prevailing rules and regulations.  The Township shall forward to the applicant a copy of any report of the Huntingdon County Planning Commission.  The Township shall not approve an application until th County report is received or until the expiration of thirty (30) days from the date the application was forwarded to the County.

## SECTION 902   SUBMISSION AND REVIEW OF "SKETCH PLAN" (OPTIONAL)

The submission and review of the Optional Sketch Plan for land developments shall follow the procedures outlined in Article III, Section 303.

## SECTION 903 OFFICIAL SUBMISSION AND REVIEW OF THE "PRELIMINARY PLAN"

The submission and review of the Official Preliminary Plan shall follow the procedures outlined in Article III, Section 304.  Prior to the review and approval of the Preliminary Plan, the applicant must make application and meet all requirements of the Pennsylvania Department of Environmental Protection Regulations, Title 25, Chapter 191, regarding Organized Camps and Campgrounds, as well as any other State government regulations which may apply.

## SECTION 904   OFFICIAL SUBMISSION AND REVIEW OF THE "FINAL PLAN"

The submission and review of the Final Plan shall follow the procedures outlined in Article III, Section 305.

## SECTION 905   RECORDING OF THE "FINAL PLAN"

The recording of the Final Plan shall follow the procedures outlined in Article III, Section 306.

## SECTION 906   PERFORMANCE GUARANTEES

The submission of required performance guarantees shall follow the procedures outlines in Article III, Section 305.

## SECTION 907   PLAN REQUIRMENTS

Plan requirements for all recreation and seasonal land developments shall follow the requirements delineated in Article IV.

## SECTION 908   DESIGN STANDARDS

Recreational and seasonal land developments shall be designed pursuant to the applicable standards and requirements contained in Article V and Article VI in this Ordinance, except for the following:

A.   Section 501 – Streets
B.   Section 503 – Lots and Parcels

The following design standards apply to recreational and seasonal land developments not covered elsewhere in this Ordinance.

A.   Streets: The land development shall be designed to provide an access and internal traffic circulation system adequate to accommodate the type and volume of traffic to be generated, and shall be constructed to provide a sound, all-weather driving surface, reasonably smooth, free from mud, dust, and/or standing water.   All private streets shall be considered to be required improvements.   The following minimum standards apply to all private streets:

1.   Right-of-Way Width – 40 feet

2.   Cartway Width – 16 feet fro two-way roads, 10 feet from one-way roads.

3.   Cartway Construction – Six (6) inches of suitable, compacted and graded stone base material to provide a permanent and all-weather surface which will facilitate storm drainage management.

4.   Minimum Allowable Grade- The maximum allowable grade for private roads shall be a 10 percent (10%) slope.   However, special drainage measures and considerations will be required on grades exceeding a six (6) percent slope, including special roadway cross sections, grading, shoulder construction and stabilization, cross drainage structures, and cut-and-fill slopes, as recommended and/or accepted by the Township Engineer.

5.   Cul-de-sac minimum standards – While there are no minimum or maximum length requirements, excessively long segments are discouraged dure to emergency vehicle access considerations.   A turnaround area shall be provided at the terminus of all dead-end and/or cul-de-sac segments having an unobstructed maneuvering area equal to a fifty (50) feet turning radius.

The internal street and roadway system shall be privately owned and appropriately noted on the Final Plan, and provide safe and convenient access to all camp sites and facilities.   The alignment and gradients of all internal streets and roadway shall be properly adapted to the topography, to the types of anticipated traffic, and to the satisfactory control of surface water.   Points of connection between the private street and roadway system and the existing public street system shall be designed to avoid congestion and hazardous intersections, in accordance with Section 503.4, Intersections.

B.   Lots: Individual campsites shall comprise a minimum area of at least 2400 square feet, with no more than a total of fifteen (15) individual campsites per acre.   Each campsite shall be accessible from the private street/roadway system without the necessity to cross any other campsite.   In addition, recreation vehicle campsites shall have a minimum width of forth (40) feet, and a minimum depth of sixty (60) feet or 30 percent (30%) longer than the maximum length of the recreational vehicle anticipated to occupy the space.

C.    Parking:  Parking spaces shall be provided to accommodate the number and size of vehicles anticipated.  Parking spaces for all campsite users shall be on the campsite lot.  In addition, a minimum of one (1) parking space for every two (2) campsites shall be provided for visitors.  Parking spaces for visitors may be on a common parking area.  The parking spaces shall be of a compacted and graded stone base material to provide a permanent and all-weather surface, and support the types, lengths, and weights of vehicles anticipated to use the facility.

D.    Campsites: Individual campsites and accessory buildings shall be designed to be at least fifty (50) feet from any arterial highway, or thirty-five (35) feet from any other type of public right-of-way.  Recreational vehicle campsites for trailers, campers, and/or motor homes shall contain a stabilized vehicular parking pad of shale, gravel, stone, paving, or other suitable material, and shall be dimensioned that when any space is occupied, no portion of any camping unit shall be within ten (10) feet of any portion of any other camping unit or accessory building, and at least fifteen (15) feet from any internal private roadway.

E.    Relationship with Adjoining Properties:  The design of proposed land developments governed by this section shall take into account potential effects and impacts on adjacent properties.  A landscaped buffer strip having a minimum width of twenty (20) feet shall be provided along the perimeter of the land development, within which no campsites shall be located.

F.    Minimum Acreage: The minimum size for a Recreation Vehicle Park is five (5) acres, of which 10 percent (10%) shall be set aside and developed as common use areas for open and unenclosed recreation facilities;, which my include any required buffer areas.

## SECTION 909  IMPROVEMENTS

Where appropriate the applicant of any land development shall be required to provide the following improvements, or a suitable guarantee pursuant to Section 306, and address at least the following:

A.    Streets and access roads, including boat parking areas, driveways, curb cuts, and traffic control devices.

B.    Utilities including, where applicable, stormwater management facilities, sanitary sewer facilities, water facilities, pumping facilities, gas lines, electrical facilities, telephone, and other facilities.

C.    Any proposed amenities including recreational facilities, meeting facilities, and screening and landscaping.

D.    Any other improvements which may be required for approval.

65

E.    Procedures and mechanisms guaranteeing the perpetual private maintenance of all improvements by the owner and/or operator of the facility.

## SECTION 910 MINIMUM FACILITIES

At a minimum, land developments proposed under this Article shall include certain facilities, depending upon the type of camping areas planned.

A.    Camping areas intended to primarily serve the needs of overnight tenting campers shall include toilet facilities.

B.    Camping areas intended to primarily serve the needs of overnight camper, trailer, and motor home users shall include the availability of electric service to individual campsites, central travel trailer sanitary and water stations, and toilet facilities.

C.    Camping areas intended to serve as longer term destinations shall include back-in parking at campsites, individual electric and water connections, central travel trailer sanitation station, and central toilet and shower facilities.

The above are minimal requirements, subject to more stringent requirements imposed by the regulations of Title 25, Chapter 191 of the Pennsylvania Department of Environmental Protection.  The applicant may provide enhanced facilities such as laundry, picnic, swimming, and other facilities.  The applicant shall specify the manner in which all facilities are to be privately maintained.

## *ARTICLE X*
## *ADMINISTRATION, AMENDMENT, SEVERABILITY*

### SECTION 1001 REVISION AND AMENDMENT

A.  The Municipal Officials may, from time to time on their own motion revise, modify, or amend these regulations in order to increase their effectiveness or to expedite the approval of subdivision plans.

B.  Any revisions, modification, or amendments to these regulations shall be made in accordance with the procedures as provided in Act 247, Article V, Section 505, after a public hearing on the proposed revisions, modifications, or amendments.

In addition, in the case of amendment other that that prepared by the Municipal Planning Commission, the Municipal Officials shall submit each amendment to the Municipal Planning Commission (if applicable) and County Planning Commission for recommendations at least thirty (30) days prior to the date fixed for the public hearing on such proposed amendment.

C. Proposed Subdivision and Land Development Ordinance and amendments shall not be enacted unless notice of proposed enactment is given in the manner set forth in Act 247, Article V, Section 506. The municipal officials shall publish the proposed ordinance or amendment once in a newspaper of general circulation in the municipality not more than sixty (60) days nor less than seven (7) days prior to passage.

## SECTION 1002 MODIFICATIONS

A. The municipality may grant a modification or waiver from the requirements of one or more of the provisions within this Subdivision and Land Development Ordinance if the literal enforcement will exact undue hardship because of peculiar conditions pertaining to the land in question, provided that such modification or waiver will not be contrary to the public interest and that the purpose and intent of the Ordinance is observed.

B. All requests for a modification or waiver shall be in writing and shall accompany and be part of the application for subdivision or land development review. The request shall state in full the grounds and facts of unreasonableness or hardship on which the request is based, the provision(s) of the Ordinance involved, and the minimum modification necessary.

C. The municipality shall keep a written record of the action on all requests for modifications and/or waivers.

D. In reviewing the subdivider's requests for a modification/waiver from these Regulations, the following criteria should be used:

1. An unnecessary hardship should be established upon a finding of fact.

2. The particular hardship must stem from these regulations.

3. The situation must be unique, not one shared similarly by other properties in the neighborhood.

4. The hardship cannot be self-created by the property owner.

5. Hardship is not to be construed to mean that less profit will be made under the existing regulations than might be realized with the granting of a modification/waiver.

6. The hardship must be suffered by the parcel of land under question and not be other parcels owned by the subdivider or by the community as a whole.

7. If these regulations were in existence at the time of the purchase of the parcel of land under question, the conditions of the parcel itself or the neighborhood must have changed since the time of the purchase. The changed condition must have a unique bearing on the parcel under question.

67

E.  In granting modifications/waivers, the Municipality may impose such condition as will, in its judgement, secure substantially the original objectives of the now modified requirements.

F.  In order to encourage flexibility, economy, and ingenuity in the layout and design of subdivision and land developments, and to encourage the provisions of amenities not otherwise required by this Ordinance or other applicable regulations, the Municipality may waive, modify, reduce, or otherwise alter the standards and requirements of this Ordinance, provided, that such actions do not conflict with the purposes of this Ordinance.

## SECTION 1003 RECONSIDERATION, MEDIATION, AND APPEALS

A.  If, upon the judgement of the Municipality, the subdivider has additional relevant information to present, any subdivider aggrieved by a finding, decision, or recommendation of the Municipality may request and receive reconsideration of the original finding, decision, or recommendation by the Municipality.

B.  The Municipality may offer a mediation option as an aid in completing proceedings authorized by Article V, Section 508 of Act 247: "Approval of Plats". In exercising this option, the Municipality and mediating parties shall meet the stipulations and follow the procedures set fourth in Article IX, Section 908.1 of Act 247, as re-enacted and amended.

C.  Any subdivider aggrieved by a finding, decision, or recommendation of the Municipality may appeal such finding, decision, or recommendation to the Court of Common Pleas.

D.  All subdivision and land development appeals shall be filed not later than thirty (30) days after issuance of notice of the decision or report of the Municipality. All appeals shall be in accordance with the provisions of Article V, Act 247.

## SECTION 1004 FEES

A.  The Municipal Officials shall establish by resolution a collection procedure and Schedule of Fees to be paid by the subdivider at the time of filing a Preliminary Plan.

B.  The Schedule of Fees shall be posted in the Municipal Secretary's office or in such other place as the Municipal Officials may designate.

C.  In the event the subdivider is required to pay additional fees at the filing of the Final Plan, such fees shall be collected by the Municipal Secretary prior to distributing the Final Plan. There shall be no refund or credit of any portion of the fee should the subdivider fail to apply for final approval within the required period for time or if the Final Plan covered only a section of the subdivision for which Preliminary Approval has been obtained.

D. No Final Plan shall be approved unless all fees and charges have been paid in full to the Municipality.

## SECTION 1005 REMEDIES, ENFORCEMENT, AND JURISDICTION

A. In the event that any improvements which may be required have not been installed as provided in this Ordinance or in accord with the approved Final Plan, the Municipality is hereby granted the power to enforce any corporate bond, or other security by appropriate legal and equitable remedies to effect completion of said improvements. If proceeds of such bond, or other security are insufficient to pay the cost of installing or making repairs or corrections to all the improvements covered by said security, the Municipality may, at its option, install part of such improvements in all or part of the subdivision or land development and may institute appropriate legal or equitable action to recover the monies necessary to complete the remainder of the improvements. All of the proceeds, whether resulting from the security or from any legal or equitable action brought against the developer, or both, shall be used solely for the installation of the improvements covered by such security, and not for any other municipal purpose.

B. In addition to other remedies, the Municipality may institute and maintain appropriate actions by law or in equity to restrain, correct or abate violation, to prevent unlawful construction, to recover damages and to prevent illegal occupancy of a building, structure or premises. The description by metes and bounds in the instrument of transfer or other document used in the process of selling or transferring shall not exempt the seller or transferor from such penalties or from the remedies herein provided.

C. The Municipality may refuse to issue any permit or grant any approval necessary to further improve or develop any real property which has been developed or which has resulted from a subdivision of real property in violation of this Ordinance. This authority to deny such a permit or approval shall apply to any of the following applicants:

1. The owner of record at the time of such violation.

2. The vendee or lessee of the owner of record at the time of such violation without regard as to whether such vendee or lessee had actual or constructive knowledge of the violation.

3. The current owner of record who acquired the property subsequent to the time of violation without regard as to whether such current owner had actual or constructive knowledge of the violation.

4. The vendee or lessee of the current owner of record who acquired the property subsequent to the time of violation without regard as to whether such vendee or lessee had actual or constructive knowledge of the violation.

As an additional condition for issuance of a permit or the granting of an approval to any such owner, current owner, vendee or lessee for the development of any such real property, the Municipality may require compliance with the conditions that would have been applicable to the property at the time the applicant acquired an interest in such real property.

D. Any person, partnership, or corporation who or which has violated the provisions of this Ordinance shall, upon being found liable therefor in a civil enforcement proceeding commenced by the Municipality, pay a judgement of not more than $500.00 plus all court costs, including reasonable attorney fees incurred by the Municipality as a result thereof. No judgement shall commence or be imposed, levied, or payable until the date of the determination of a violation by the District Magistrate. If the defendant neither pays nor timely appeals the judgement, the Municipality may enforce the judgement pursuant to the applicable rules of civil procedure. Each day that a violation continues shall constitute a separate violation, unless the District Magistrate determining that there has been a violation, further determines that there was a good faith basis for the person, partnership, or corporation violating the Ordinance to have believed that there was no such violation, in which event there shall be deemed to have been only one such violation until the fifth day following the date of the determination of a violation by the District Magistrate and thereafter each day that a violation continued shall constitute a separate violation. The court of common pleas, upon cause shown, may grant an order of stay tolling the per diem judgement pending a final adjudication of the violation and judgment.

E. District Magistrates shall have initial jurisdiction in proceedings brought under enforcement remedies.

## SECTION 1006 KEEPING OF RECORDS

The Municipal Planning Commission, if applicable, and the Municipal Officials shall keep a record of their findings, decisions, and recommendations relative to all subdivision plans filed for review. Such records shall be made available to the public for review.

## SECTION 1007 RESPONSIBILITY

The subdivider shall be responsible for observing the procedures established in this Ordinance and for submitting all plans and documents as may be required.

## SECTION 1008 CONFLICTS

A. Whenever there is a difference between the minimum standards specified herein and those included in other Municipal Ordinances or regulations, the more stringent requirements shall apply.

B. All existing Ordinances or regulations or parts thereof which are contrary to the provisions of this Ordinance are hereby repealed to the extent necessary to give this Ordinance full force and effect.

## SECTION 1009 SEVERABILITY

Should any article, section, subsection, paragraph, clause, phrase, or provision of these Regulations be declared by a court or competent jurisdiction to be invalid, such judgement shall not affect the validity of the Regulations as a whole or any part or provision thereof other than the part so declared to be invalid or unconstitutional.

## SECTION 1010 EFFECTIVE DATE

This Ordinance shall become effective immediately upon adoption.

DULY ENACTED AND ORDAINED BY THE Municipality of Jackson Township, Huntingdon County, Pennsylvania this _____7_____ day of _____July_____, 20__, in lawful session duly assembled.

BY:

_Ralph Weiler_

_O. Foms Wiler_

_Michael A Jordan_

ATTEST:

_Ann L. Ward_
Secretary

71

APPENDIX 1

STREET DESIGN CRITERIA

| Road Classification | Current[1] ADT | Design Speed | Flexible Pavement[2] Minimum Depths | Paved Cartway[3] Width | Shoulder[4] Width | Right-of-Way[5] |
|---|---|---|---|---|---|---|
| Minor Street (Local Street) | 21-250 * | 30 mph | Surface – 1½" – 3½"  Base Course – 4½" – 6"  Subbase – 6" | 18' | 4' to 8' | 33' |
| Collector Street | 250-400 * | 30 mph | Surface – 3½"  Base Course – 4" – 8"  Subbase – 6" | 20' | 8' | 36' |
| Collector Street | 400 and Over | 40 mph | Surface – 3½"  Base Course – 4" – 8"  Subbase – 6" | 22' | 8' | 38' |

SOURCE:  Guidelines for the Design of Local Roads and Streets – Publication #70 (1990)
PA Department of Transportation – Tables 2, 1 and 2.1.10.

NOTES:  1 – ADT – Average Daily Traffic
2 – Bituminous Surface and Base Course varies in thickness due to materials used (Table 2.1)
3 – Two Lanes
4 – Includes both left and right shoulders
5 – Right-of-Way includes an additional 4 feet beyond both shoulders for rounding (see Typical Roadway Section). Additional right-of-way pavement widths may be required by Municipal Officials.

* 1-20 ADT Minor Street Collector or Collector cartway should have a minimum of 6 inch base of #4 or #3 limestone chocked and surfaced with chips.

A-1

MAY-11-2001 FRI 10:26 AM MAYERS,MENNIES, & SHERR    FAX NO. 16108256555    P. 144

APPENDIX 2

STREET AND INTERSECTION DESIGN SPECIFICATIONS

Minimum street right-of-way and pavement widths shall be as set forth in the following table:

| STREET TYPE | RIGHT-OF-WAY WIDTH | CARTWAY WIDTH | SHOULDER WIDTH |
|---|---|---|---|
| Arterial | 70 feet | ** | 8 feet* |
| Collector | 60 feet | 20 feet | 6 feet* |
| Local | 50 feet | 18 feet | 2 feet |

\*      In curbed sections, shoulder width may be decreased at the discretion of the Supervisors as advised by the Planning Commission.

\*\*     As deemed appropriate by the Supervisors and the Township Engineer.

A-2

# APPENDIX 3

## STORM WATER RUNOFF CALCULATIONS
### for:

All calculations require a storm of 25 years within a 24 hour duration.

Sites covering an area equal to or less than 1.00 acre shall be based on the Rational Method: Q-CIA
where
$$Q = \text{RUNOFF FROM RAINFALL (CFS)}$$
$$C = \text{RUNOFF COEFFICIENT}$$
$$I = \text{INTENSITY (INCHES/HOUR)}$$
$$A = \text{AREA (ACRES)}$$

Q after development must be less than or equal to Q prior to development. The following table shows the values of the Run Off Coefficient that are to be used in calculations:

| TYPE | SLOPE <2% | SLOPE <10% | SLOPE >10% |
|------|-----------|------------|------------|
| Bituminous Pavement | 0.90 | 0.95 | 0.95 |
| Concrete | 0.95 | 0.95 | 0.95 |
| Gravel | 0.20 | 0.25 | 0.30 |
| Roofs | 0.95 | 0.95 | 0.95 |
| Grassed Areas | 0.25 | 0.30 | 0.30 |
| Earth-No Vegetation | 0.60 | 0.65 | 0.70 |
| Wooded Areas | 0.10 | 0.15 | 0.20 |

Minimum Recommended Storm Intensity = 1.68 INCHES/HOUR
Run-off is to be calculated as one of the types listed in the preceding table.
Q should be calculated for each type and combined into a total Q.

If run-off storage is required, it should be calculated as R=C (0.4) (A). The amount of run-off to be stored should be the difference between the total run-off under existing conditions subtracted from the total run-off after development. In most cases there will be an increase in run-off after development.

where
$$R = \text{RUN-OFF STORAGE FOR EACH TYPE MATERIAL (CUBIC FEET)}$$
$$C = \text{RUN-OFF COEFFICIENT}$$
$$A = \text{AREA (SQUARE FEET)}$$

When more than one type of material is considered, the storage is considered to be the sum of each of the run-off storage types.

A-3

## WORKSHEET

EXISTING CONDITIONS

$I=1.68$

| MATERIAL TYPE | C | A |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

$Q_E = CIA$

$R = C(0.4)A$

AFTER DEVELOPMENT

$I=1.68$

| MATERIAL TYPE | C | A |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

$Q_A = CIA$

$R = C(0.4)A$

If $Q_A$ (after development) is not less than or equal to $Q_E$ (existing conditions), then on site storage will be required.

If a pipe discharge is used then:

$$A = \frac{Q(\text{existing conditions})}{c\sqrt{2gh}}$$

where
A=AREA OF PIPE DISCHARGE(SQ. FT.)
Q=EXISTING CONDITIONS
c=0.8(PVC PIPE RECOMMENDED)
g=32.2 ft/second squared
h=HEAD(FEET)

Sites covering one to five acres may use either the Rational Method or the SCS Method. If the SCS Method is used, you must follow the format as given in the U.S. Department of Agriculture Soil Conservation Field Manual.

Sites covering five acres or more must use the SCS Method.

Case 1:00-cv-01192-SHR   Document 87   Filed 06/07/2002   Page 194 of 239

## APPENDIX 4

### MINOR TO MINOR INTERSECTION



### COLLECTOR TO COLLECTOR INTERSECTION

INTERSECTION SIGHT DISTANCE

A-4

APPENDIX 5.



SKETCH PLAN

**TREEHAVEN TERRACE**

TOWNVILLE TOWNSHIP — ANY COUNTY, PENNA.

SCALE - 1" = 100'

DATE - MARCH 15, 1974

LAND DEVELOPMENT ENGINEERS

TOWNVILLE, PENNSYLVANIA

SANLE-SUBDIVIDER

JOHN A. JONES

R.D. 1

TOWNVILLE, PENNSYLVANIA

NOTES:

1. PROPERTY TO BE SERVED BY EXISTING 10"
   WATER MAIN IN WYNNWOOD ROAD.
2. PROPERTY TO BE SERVED BY INDIVIDUAL
   SEPTIC SYSTEMS.

LOCATION MAP
SCALE - 1" = 1000'

A-5

Appendix 6

Appendix 7

FINAL PLAN
OF
TREEHAVEN TERRACE
TOWNVILLE TOWNSHIP
PENNSYLVANIA
ANY COUNTY    OCTOBER 1, 1974
SCALE 1" = 100'

LAND DEVELOPMENT ENGINEERS
TOWNVILLE, PENNSYLVANIA

OWNER-SUBDIVIDER
JOHN A. JONES
R.D. 1
TOWNVILLE, PENNA.

APPROVED BY THE (GOVERNANCE BODY) OF
(MUNICIPALITY) THIS ___ DAY OF
___, 19___

APPROVED BY THE (MUNICIPALITY) PLANNING
COMMISSION THIS ___ DAY OF ___, 19___

REVIEWED BY:
___
MUNICIPAL ENGINEER    DATE

REVIEWED BY THE ANY COUNTY PLANNING
COMMISSION THIS ___ DAY OF ___, 19___

___
DIRECTOR

___
CHAIRMAN

SOURCE OF TITLE
RECORDED IN DEED
BOOK    VOLUME
PAGE

I CERTIFY THAT THIS SURVEY
AND PLAT ARE CORRECT.

___
SIGNATURE

SEAL

SEAL

JOSEPH R. SMITH
(DEED REF. 3-17-561)

5.96 ACRES TO BE DEDICATED FOR PUBLIC PARK

JOSEPH R. SMITH
(DEED REF. 3-17-561)

WYNWOOD ROAD

LANG L. LANTERNSQUARE
(DEED REF. 1-81-79)

NORTH

NOTE:
1. PERMANENT MONUMENTS ALSO MARKED WILL
2. NO BUILDING UPON CREATION OF THE GRADE
3. OFF-STREET PARKING SPACE TO BE PROVIDED ON
4. LOCAL USE.
5. ON--- ---SPECTION AND APPROVAL OF SLOPE
---  AND THE FINAL INSTALLATION ...

NEIGHBORHOOD MAP

ON THIS ___ DAY OF ___, 19___, BEFORE
ME, THE UNDERSIGNED OFFICER, PERSONALLY
APPEARED ___ WHO BEING DULY
SWORN ACCORDING TO LAW, DEPOSES AND SAYS
THAT THEY ARE THE OWNER AND/OR EQUITABLE OWNER
OF THE PROPERTY SHOWN ON THIS PLAN; THAT
THE ACKNOWLEDGES THE SAME TO BE THEIR ACT AND
PLAN SUCH ACCORDING TO LAW, AND THAT ALL
STREETS AND SPACES THEREON SHOWN AND NOT
HERETOFORE DEDICATED ARE HEREBY DEDICATED
TO THE PUBLIC USE.

___
OWNER'S SIGNATURE

___
NOTARY PUBLIC

MY COMMISSION
EXPIRES ___, 19___

A - 7

Appendix 8



TYPICAL ROADWAY SECTION

N.T.S.

A - 8

MAY-11-2001 FRI 10:28 AM MAYERS,MENNIES, & SHERR    FAX NO. 16108256555    P. 152

APPENDIX 9

**JACKSON TOWNSHIP**
R.D. 1, Box 389A
Petersburg, PA 16669
Telephone: 814-667-2992

## APPLICATION FOR SUBDIVISION OR LAND DEVELOPMENT APPROVAL

FILE NO._____
DATE_____

Name of Plan:_____

Type of Plan:_____

Owner's Name:_____

Address:_____

Applicant's Name:_____

Address:_____

Billing Address for Engineering Services:_____

_____

Location of Project:_____

Size of Project:_____ Acres:_____ Number of lots or units:_____

Drawings Prepared by:_____

Date of Drawings:_____ Latest Revision Date:_____

FEES:_____ DATE PAID:_____

I/We certify that the above information is correct and further agree to reimburse Jackson Township for the cost of Engineering Services, Materials Testing and other site inspections as required by Jackson Township throughout the course of our development.

Signature:_____ Date:_____
         Owner or Authorized Agent

A-9

APPENDIX  10

## JACKSON TOWNSHIP

## APPLICATION FOR CONSIDERATION OF A SUBDIVISON AND/OR LAND DEVELOPMENT PLAN

File No._____

Date of Receipt/Filing:_____
(For Township Use Only)

The undersigned hereby applies for approval under the Jackson Township Subdivision and Land Development Ordinance for the Plan, submitted herewith and described below:

1.    Plan Name:_____

      Plan No:_____    Plan Date:_____

2.    Project Location:_____
      _____

3.    Name of Property Owner(s):_____
      Address:_____    Phone No._____

4.    Land Use and Number of Lots and/or Units (indicate answer by number of lots or units):

      _____Single Family (Detached)          _____Commercial
      _____Multi-Family (Attached-Sale)      _____Industrial
      _____Multi-Family (Attached-Rental)    _____Institutional
      _____Mobile Home Park                  _____Other (please specify)
                                             _____

5.    Total Acreage:_____

6.    Application Classification:

      _____Pre-Application Review            _____Revised Plan
      _____Concept Plan                      _____Lot Add-On Plan
      _____Preliminary Plan                  _____Minor Plan
      _____Final Plan

7.    Name of Applicant (if other than owner):_____
      Address:_____    PhoneNo._____

A-10

8.   Firm Which Prepared Plan:_____

     Address:_____ Phone No._____

     Person Responsible for Plan:_____

9.   Is a Zoning Variance, Special Exception and/or Conditional Use Approval Necessary?

     _____ If yes, please specify:

     _____

10.  Type of Water Supply Proposed:             _____ Public

                                                _____ Semi-Private

     *Please indicate if a capped system is proposed.*   _____ Individual

11.  Type of Sanitary Sewage Disposal Proposed  _____ Public

                                                _____ Semi-Private

                                                _____ Individual

     *Please indicate if a capped system is proposed.*

12.  Lineal Feet of New Street_____

     Identify All Street(s) Not Proposed for Dedication_____

     _____

13.  Sewer Facilities Plan Revision of Supplement Number _____ and Date
     Submitted_____

     The undersigned hereby represents that, to the best of his knowledge and belief, all information
     listed above is true, correct, and complete.

     Date:_____    _____
                                     Signature of Landowner or Applicant

## APPENDIX 11
### APPLICATION FOR REVIEW OF A <u>MINOR</u> SUBDIVISION PLAN

The undersigned hereby applies for Review by the Municipality of the <u>Minor</u> land subdivision plan submitted herewith and described below:

1. Name of Subdivision:_____ Plan Date:_____

   County Deed Book No.:_____ Page No.:_____

   County Tax Map No.:_____ Parcel No.:_____

2. Name of property owner(s):_____
       (If corporation, list corporation name and address and two (2) officers of corporation)

   Address:_____

   _____ Phone No._____

3. Name of applicant:_____
       (If other than owner)

   Address:_____

   _____ Phone No._____

4. Applicant's interest (if other than owner):_____

5. Engineer or surveyor responsible for plan:_____

   Address:_____

   _____ Phone No._____

6. Total acreage:_____ Number of lots:_____ (Maximum of 5)

7. Acreage of adjoining land in same ownership (if any):_____

8. Type of development planned:

   | | |
   |---|---|
   | _____ | Single-family |
   | _____ | Two-family |
   | _____ | Row |
   | _____ | Multi-family |
   | _____ | Commercial |
   | _____ | Industrial |
   | _____ | Other (Specify) |

9. Are lots adjoining paved public or private streets? _____ Yes _____ No
       (If no, minor subdivision classification may be denied.)

A-11

10. Are lots accessible to existing water supply?    _____ Public
                                                     _____ Individual on-site

11. Are lots accessible to existing sanitary sewage disposal?    _____ Public
                                                                 _____ Individual on-site

12. Will this subdivision adversely affect the natural resources of the municipality?

     _____ No    _____ Yes

     (If yes, minor subdivision classification must be denied.)

13. Will this subdivision adversely affect adjoining property?

     _____ No    _____ Yes

     (If yes, minor subdivision classification must be denied.)

14. Will this subdivision adversely affect present or future development of the municipality (as outlined in a municipal plan)?

     _____ No    _____ Yes

     (If yes, minor subdivision classification must be denied.)

15. Is proposed development compatible with the existing zoning ordinance (if any)?

     _____ No    _____ Yes

     Current zoning district of subdivision _____

The undersigned certifies that to the best of his/her knowledge and belief, all the above statements are true, correct, and complete. The undersigned acknowledges that no extension of any public facility (street, water, sewer, etc.) will be required for the type of development being planned.

Signature of owner / applicant _____ Date _____

## APPENDIX 12
### APPLICATION FOR REVIEW OF A <u>PRELIMINARY</u> SUBDIVISION PLAN

The undersigned hereby applies for Review by this Municipality of the <u>Preliminary</u> land subdivision plan submitted herewith and described below:

1.  Name of Subdivision:_____ Plan Dated:_____

    County Deed Book No.:_____ Page No.:_____

2.  Name of property owner(s):_____
        (If corporation, list corporation name and address and two (2) officers of corporation)

    Address:_____

    _____ Phone No._____

3.  Name of applicant:_____
        (If other than owner)

    Address:_____

    _____ Phone No._____

4.  Applicant's interest (if other than owner):_____

5.  Engineer or surveyor responsible for plan:_____

    Address:_____

    _____ Phone No._____

6.  Total acreage:_____ Number of lots:_____

7.  Acreage of adjoining land in same ownership (if any):_____

8.  Type of development planned:    _____ Single-family
                                    _____ Two-family
                                    _____ Row
                                    _____ Multi-family
                                    _____ Commercial
                                    _____ Industrial
                                    _____ Other (Specify)

## APPENDIX 13
## APPLICATION FOR REVIEW OF A <u>FINAL</u> SUBDIVISION PLAN

The undersigned herby applies for Review by the Municipality of the <u>Final</u> land subdivision plan submitted herewith and described below:

1. Name of Subdivision:_____   Plan Date:_____

    County Deed Book No.:_____   Page No.:_____

    County Tax Map No.:_____   Parcel No.:_____

2. Name of property owner(s):_____
    (If corporation, list corporation name and address and two (2) officers of corporation)

    Address:_____

    _____ Phone No._____

3. Name of applicant:_____
    (If other than owner)

    Address:_____

    _____ Phone No._____

4. Applicant's interest (if other than owner):_____

5. Engineer or surveyor responsible for plan:_____

    Address:_____

    _____ Phone No._____

6. Total acreage:_____   Number of lots:_____

7. Acreage of adjoining land in same ownership (if any):_____

8. Type of development planned:   _____ Single-family
                                  _____ Two-family
                                  _____ Row
                                  _____ Multi-family
                                  _____ Commercial
                                  _____ Industrial
                                  _____ Other (Specify)

9.  Will construction of buildings be undertaken immediately? _____Yes          _____No

    By Whom?                                        _____Subdivider
                                                    _____Other developers
                                                    _____Purchasers of individual lots

10. Type of water supply proposed.                  _____Public (municipal) system
                                                    _____Semi-public (community) system
                                                    _____Individual on-site

11. Type of sanitary sewage disposal proposed.      _____Public (municipal) system
                                                        _____Live
                                                        _____Capped
                                                    _____Semi-public (community) system
                                                    _____Individual on-site

12. Are all streets proposed for dedication?        _____Yes          _____No

13. Acreage proposed for park or other public or semi-public use: _____

14. Zoning changes, if any, to be requested: _____

    _____

15. Have appropriate public utilities been consulted?    _____Yes          _____No

16. Material accompany this application:

    Number                              Item

                                        Final Plan
    a)_____               Copies of Deed Restrictions
    b)_____
    c)_____
    d)_____

The undersigned represents that to the best of his/her knowledge and belief all the above statements are true, correct, and complete.

The undersigned further represents that, except as otherwise specifically noted on the attached sheet, all proposed public improvements and facilities as shown on the Final subdivision plan are to be improved, constructed and completed, or a bond posted with the municipality in sufficient amount to cover full estimated cost of construction thereof, prior to sale, transfer or agreement of sale of any subdivided parcels as shown on the plan.

Date:_____    Signature of Owner or Applicant:_____
                                        (by):_____

APPENDIX 14
## JACKSON TOWNSHIP
## APPLICATION FOR CONSIDERATION OF A WAIVER

File No._____

Date of Receipt/Filing:_____

(For Township Use Only)

The undersigned hereby applies for approval of a waiver, submitted herewith and described below:

1. Name of Project:_____

2. Project Location:_____

    _____

3. Name of Property Owner(s):_____

    Address:_____ Phone No.:_____

4. Name of Applicant (if other than owner):_____

    Address:_____

5. Specify Sections(s) of the Jackson Township Subdivision and Land Development Ordinance for which a Waiver is requested:_____

    _____

    _____

6. The Proposed Alternative to the Requirement:_____

    _____

    _____

    _____

    _____

A-14

## APPENDIX 15

## MEMORANDUM OF UNDERSTANDING

### Financial Security

This Memorandum of Understanding is entered into by and between the following parties:

Jackson Township, hereinafter call "Township"

And

_____, hereinafter called "Developer

### RECITALS

**WHEREAS,** Developer has submitted to the Township a plan and application for a Subdivision or Land Development Plan located in _____; and, Which is known and designed as _____; and,

**WHEREAS,** Township has required and Developer has agreed that as a condition precedent to final plan approval of the Subdivision or Land Development Plan, the construction of all public improvements shall be assured by financial security, as required in Article V of the Jackson Township Subdivision and Land Development Ordinance of 1992, as amended.

**WHEREAS,** Township and Developer desire to set forth their understanding concerning the Developer's agreement and responsibility to install the public improvements, provide a financial security, and pay the costs involved in inspecting and approving Developer's Subdivision or Land Development Plan.

**NOW, THEREFORE,** intending to be legally bound hereby, Township and Developer agree as follows:

1. The Developer, at their own cost and expense, shall proceed to perform and complete all public improvements required by the Developer's Subdivision or Land Development Plan, subject to the approval of the plans and specifications by the Township.

2. To assure completion of the public improvements required as a condition for the final approval of the Developer's Subdivision and Land Development Plan, the Developer shall provide for deposit with the Township, financial security, consistent with Article V of the Jackson Township Subdivision and Land Development Ordinance, in an amount sufficient to cover the costs of all public improvements, including, but not limited to, streets, street signs, sidewalks, curbs, landscaping, storm drainage for dedication or which affect adjacent properties or streets, sanitary sewer facilities for dedication, water supply facilities for dedication, fire hydrants, lot line markers ,

<div align="center">A-15</div>

survey monuments, and other related facilities. Such security shall provide for, and secure the completion of the public improvements within one (1) year of the date fixed in the subdivision or development plan. The amount of financial security shall be equal to one hundred ten percent (110%) of the cost of the required public improvements, for which financial security is posted.

The cost of the public improvements shall be established by submission to the Township of an estimate prepared by the Developer's engineer, subject to review, comment, and approval by the Township or its designees.

3.  The Township, or its designee, and the Developer shall agree upon a notification procedure and a schedule of field inspections to be made during construction and upon completion of all public improvements.

4.  Upon completion of the public improvements, the Developer shall give notice to the Township and its designee, in writing, to inspect the public improvements. The Township or its designee shall inspect the public improvements within ten (10) days and shall approve same if they are completed in accordance with the Subdivision or Land Development Plan and acceptable engineering practices. If the Township or its designee disapproves, they shall notify the Developer promptly.

5.  Developer agrees to reimburse the Township or its designee for engineering services necessitated by the review and inspection of all required public improvements and all associated expenses at the prevailing rate of $_____ per hour, plus associated itemized expenses, where applicable. It is agreed that engineering services shall be payable by Developer within ten (10) days after date of invoice and prior to release of financial security.

IN WITNESS WHEREOF, the parties hence caused this Memorandum of Understanding to be executed, dated this _____ day of _____, 19__.

JACKSON TOWNSHIP
BOARD OF SUPERVISORS

DEVELOPER

_____
Supervisor

_____

_____
Supervisor

_____

_____
Supervisor

(NOTARY SEAL)

## APPENDIX 16
### MEMORANDUM OF UNDERSTAND
### Installation of Public Improvements
### As a Condition Precedent to Final Plan Approval

This Memorandum of Understanding is entered into by and between the following parties:
Jackson Township, hereinafter called "Township"
and
_____, hereinafter called "Owner"

### RECITALS

WHEREAS, _____ is the owner of property situated at _____

WHEREAS, the Owner has submitted to the Township a final plan and application for a project known as _____

WHEREAS, the Township has required, and the Owner has agreed, that, as a condition precedent to final plan approval, certain pubic improvements will be completed by the Owner, as provided in Article V of the Jackson Township Subdivision and Land Development Ordinance of 1992, as amended.

WHEREAS, the Township and the Owner desire to set forth their understanding concerning the Owner's agreement and responsibility to install the public improvements and pay the Township costs involved in processing, inspecting, and reviewing public improvements.

NOW, THIREEFORE, intending to be legally bound hereby, the Township and the Owner agree as follows:

1.   The Owner, at their expense, shall proceed to perform and complete only the following public improvements which shall not exceed a total estimated value of two hundred thousand dollars ($200,000). Said improvements shall conform to the final plan.
     *(Include an itemized list of improvements)*

_____

_____

_____

2.   The Owner shall construct the above public improvements in accordance with the following work schedule:
     *Include beginning and ending dates for all improvements)*

_____

_____

_____

A-16

3. The Owner shall provide the Township with a minimum of four (4) working days' notice of any intent to construct public improvements.

4. The Owner shall provide the Township with a maintenance guarantee in accordance with Section 505 of the Subdivision and Land Development Ordinance, in conjunction with this Memorandum.

5. The Owner agrees to reimburse the Township for engineering and legal services necessitated by the review of the Owner's documents and inspection of all required public improvements at the prevailing rate, plus associated itemized expenses, where applicable. It is further agreed that payment will be made within ten (10) days after date of invoice and prior to final approval of the Owner's plan.

6. The Owner assumes all responsibility for damage to other property. The Owner shall maintain public liability insurance with a value of two million dollars ($2,000,000) until all improvements are approved by the Township. Evidence of said insurance shall be provided to the Township, in conjunction with this Memorandum.

7. The Owner agrees to hold harmless the Township from liability arising from activity on the property.

8. In the event that any improvements have not been installed as provided by the plan and this agreement, or any other failure of the Owner, the Board of Supervisors are granted the authority to take all actions necessary to obtain monies from the Owner, including, but not limited to, seizure of land and/or other appropriate legal or equitable action to recover the money necessary to complete the remainder of the improvements and/or stabilize the property.

9. The terms of this agreement are binding upon the heirs and assigns of the subject property, and shall remain in effect until said improvements are installed and approved, or a suitable improvement guarantee is accepted by the Township.

IN WITNESS WHEREOF, the parties hence caused this Memorandum of Understanding to be executed, dated this _____ day of _____, 19__.

JACKSON TOWNSHIP
BOARD OF SUPERVISORS


OWNER

_____          _____
                                        Supervisor

_____          _____
                                        Supervisor

                                      _____
                                        Supervisor

**DEFENDANT'S EXHIBIT**

*17*

July 10, 2000

Meeting called to order by Chairman Weiler

Minutes approved as read

Treasurer's report approved as read

The following Ordiances were adopted by the Board of Supervisors

Sub-Division Ordiances approved   2000 - 1 Motion made by Tom Wilson Seconded by Mike Yoder

Motion made by Tom Wilson and Seconded by MIke Yoker to approve Resolutoin 2000-3
for the Sub-Division Fees.

Driveway Ordiance 2000 -2  Motion made by Tom Wilson Seconded by Mike Yoder

Holding Tank Ordiance 2000-3 Motion made by Tom Wilson Seconded by Mike Yoder

Roadmaster - Hawbaker's will be starting on Wednesday July 12, 2000 on those roads that were bid for
black top and double seal

New Enterprise will be starting July 17 to repair Miller Road and Guyer Road.

Meeting Adj 7:30 PM

# LAWRENCE L. NEWTON
*ATTORNEY AT LAW*

DEFENDANT'S
EXHIBIT

18

504 Penn Street
P. O. Box 375
Huntingdon, PA   16652

Telephone
814/643-3820
Fax
814/643-5670

July 28, 2000

Mr. David B. Corneal
Mrs. Sandra Y. Corneal
505 E. Fairmount Avenue
State College, PA   16801

Re:    Jackson Township Building Permit Ordinance

Dear Mr. and Mrs. Corneal:

I am writing at the request of the Board of Supervisors of Jackson Township, Huntingdon County, Pennsylvania.  According to the information received by the Supervisors, you have commenced construction upon your property without first obtaining a Building Permit.  This is in violation of the Township's Building Permit Ordinance.

The purpose of this letter is to request that you immediately cease and desist any and all further construction until a Building Permit is obtained.

For your information, the subject Ordinance provides that prior to the issuance of a Permit the Building Permit Officer shall review the Application to determine if other governmental permits are required, including, but not limited to, a sewage permit.

Thank you for your consideration.

Very truly yours,

LAWRENCE L. NEWTON

LLN:dlm

xc James E. Himes, Esquire
   Jackson Township Board of Supervisors

08-03-2000 01:59PM    FROM FMS

6435572

DEFENDANT'S
EXHIBIT

19

**DAVID B. CORNEAL**

505 E. FAIRMOUNT AVENUE

STATE COLLEGE, PENNSYLVANIA 16801

Mr. Lawrence L. Newton
504 Penn Street
P.O. Box 375
Huntingdon, Pa. 16652

August 3, 2000

RE: Jackson Township

Dear Mr. Newton,

Was your letter of July 28 in response to my phone call of May 1st and my letter of May 3rd? As you know, your Building Permit Ordinance requires that the application be done on the Township's form. Since I advised you on May 1st that the Permit Officer, at the direction of the supervisors, refused to even give me the Building Permit application forms, how was I to get a Building Permit???

In Fact, in March I asked the Supervisors at their meeting for a Building Permit for first my home and secondly for the art studio, both of which they denied allegedly because I didn't have a DEP sewer permit for the house and a privy permit for the studio; which I couldn't get because the Supervisors wrongfully refused to sign my sewer modules and conspired with the SEO to prevent me from applying for a privy permit.

Now you are alleging I'm building my garage without a building permit that I was entitled to but wasn't allowed to apply for? My understanding of the law under the MPC is that when a building permit is wrongfully denied, that the party automatically gets the permit after 90 days. In late April Mr. Van Dommelen in concurrence with the Supervisors commited an act of segregation against me by refusing to give me Building Permit application forms as well as a permit that he acknowledged he would grant to any other resident of Jackson Township with the exception of myself. That sounds like a permit wrongfully denied. When in March I asked for a permit to build my house, it was denied because I didn't have a DEP sewer permit due to the Supervisors refusing to sign the sewer module for the house so I could get that permit. That sounds like a permit wrongfully denied. When at that same meeting in March I

asked for a permit to build the art studio and the Supervisors said no because they said I needed some sewer access for the studio, so I asked for a privy permit. This was thwarted by calls to the SEO who, as a result of the Townships' calls, would not give me any information on how to obtain or apply for a privy permit. That sounds like a permit wrongfully denied.

When a resident tries to apply for a building permit, it is expected that the Township will act in goodfaith in supplying the forms and reviewing the applications. When they wrongfully refuse to even give you the application forms what do you suggest one does when they are faced with specific contractual obligations to others? Your refusal to help and the Township's wrongful action left me no choice, given my contractual obligations, but to mitigate damages. As you know I have been forced to file the Federal lawsuit to remedy the wrongful actions of the Township. If by your letter you are indirectly telling me that the township will now give me the applications for building permits and will sign my sewer module for my house (which has already been signed and approved by their SEO) I would ask that you immediately send me the applications. I enclose the sewer module for my house and ask that you secure the supervisors signatures so that I can submit it to DEP. Please note that I am not asking for a subdivision, only permits to proceed with my own personal buildings.

Please forward these documents to me c/o Max McClintic 472 West Whitehall Road, State College, Pa. 16801.

Sincerely,

David B. Corneal, Esq.

TOTAL P.02

#3

**DAVID B. CORNEAL**

505 E. FAIRMOUNT AVENUE

STATE COLLEGE, PENNSYLVANIA 16501



DEFENDANT'S
EXHIBIT
20

Mr. Lawrence L. Newton
504 Penn Street
P.O. Box 375
Huntingdon, Pa. 16652

August 18, 2000

RE: Jackson Township Building Permits

Dear Mr. Newton,

On August 3rd I faxed you, and then mailed you, the attached letter asking that you send me the building permit application forms that had previously been denied me by Mr. VanDommelen and the Supervisors. As of this date I have neither received those forms nor have I heard from you. Therefore, again, I request you send me the application forms to obtain a building permit for the garage, art studio and house. I would also request that you advise me of the permit fees required for the building permits.

I look forward to receiving the documents from you in the very near future.

Sincerely,

David B. Corneal, Esq

Faxed & mailed:-

DEFENDANT'S
EXHIBIT

21

# LAWRENCE L. NEWTON
*ATTORNEY AT LAW*

504 Penn Street
P. O. Box 375
Huntingdon, PA  16652

Telephone
814/643-3820
Fax
814/643-5670

August 29, 2000

David B. Corneal, Esquire
505 East Fairmont Avenue
State College, PA  16801

Re:  Jackson Township

Dear Mr. Corneal:

This is in response to your letter of August 18, 2000.  Please excuse my delay in responding.

As per your request, I am enclosing a Jackson Township building permit application.  For construction over one thousand ($1,000.00) dollars, the permit fee is twenty ($20.00) dollars.

As you are aware, you have commenced construction without a building permit.  The Board of Supervisors request that you cease any and all construction until a building permit is obtained.  If you do not confirm to me in writing that you will stop construction pending review of your building permit application, the Supervisors have instructed me to initiate legal proceedings against you.

In the event that you wish to discuss this matter, please feel free to contact me.

Thank you for your consideration.

Very truly yours,

LAWRENCE L. NEWTON

LLN/smw

Enclosure

cc.  Jackson Township Board of Supervisors

DEFENDANT'S
EXHIBIT
22

## DAVID B. CORNEAL

ATTORNEY AT LAW

1446 WEST COLLEGE AVENUE

STATE COLLEGE, PENNSYLVANIA 16801

(814) 238-1925
(814) 238-1929

MEMBER:
PENNSYLVANIA BAR
FLORIDA BAR

Jackson Township
Att: Ann Wirth
R.D. 1 Box 390
Petersburg, Pa. 16669

August 31, 2000

RE: Building Permit Application and Sewer Module

Dear Mrs. Wirth,

Enclosed are three building permit applications along with a check for each. I also enclose the sewer module for the approved on-site location for my house and art studio. If you will recall this is the module I had previously asked the supervisors to sign, and was refused, at their February meeting. Please note that this is not a subdivision. It is the approved site of your SEO officer for my house and art studio.

Please have the supervisors act upon my applications as soon as possible.

Sincerely,

David B. Corneal, Esq.

DEFENDANT'S
EXHIBIT
23

### DAVID B. CORNEAL
ATTORNEY AT LAW
1445 WEST COLLEGE AVENUE
STATE COLLEGE, PENNSYLVANIA 16801

MEMBER:
PENNSYLVANIA BAR
FLORIDA BAR

(814) 238-1925
(814) 238-1929

Jackson Township
Att: Ann Wirth
R.D. 1 Box 390
Petersburg, Pa. 16669

September 1, 2000

RE: Building Permit rough drawings

Dear Mrs. Wirth,

   Yesterday I sent you three building permit applications along with a check for each as well as the sewer module for the approved on-site location for my house and art studio. Unfortunately the rough drawings of the art studio and house were left on my desk. Therefore I am enclosing those drawings with this letter and ask you to put them with the applications for those permits.
   Please have the supervisors act upon my applications as soon as possible.

Sincerely,

David B. Corneal, Esq.



DEFENDANT'S
EXHIBIT
24

JACKSON TOWNSHIP BOARD OF SUPERVISORS
RD#1, BOX 390, PETERSBURG, PA. 16669
814-667-2992 – FAX 814-667-3892

October 10, 2000

Mr. & Mrs. David B. Corneal
505 East Fairmont Avenue
State College, Pa. 16801

Dear Mr. And Mrs. Corneal:

Please be advised that Jackson Township has referred to me for review your applications for buildings permits. As you may be aware, the Township's Building Permit Ordinance provides that the Building Permit Officer "shall issue a building permit only after it has been determined that the proposed work to be undertaken will be in conformance with the requirements of this and all other applicable codes and ordinances." Further, the Ordinance provides that prior to the issuance of any building permit, the Permit Officer "shall review the application for permit to determine if all other necessary governmental permits required by State and Federal laws have been obtained, such as those required by the Pennsylvania Sewage Facilities Act."

For the following reasons, your applications are being denied: First, you have not complied with the Pennsylvania Sewage Facilities Act. At this time, you do not have a sewage permit. A building permit cannot be issued without a sewage permit. While you submitted Sewage Facilities Planning Modules to the Township, the Township cannot forward the Planning Modules to the Department of Environmental Protection for review until you meet the requirements of the Township's Subdivision and Land Development Ordinance. A copy of the Ordinance is enclosed. Second your application inadequately described the proposed construction. Third, you did not include an adequate plan of the site showing the size and location of the proposed construction as well as any existing buildings. Fourth, you have not complied with the Township's Driveway Ordinance, a copy of which is enclosed. Fifth, as noted above you have failed to comply with the Township's Subdivision and Land Development Ordinance.

Very truly yours,

DAVID B. VAN DOMMELEN
Building Permit Officer

SEE [ILLEGIBLE]

DEFENDANT'S
EXHIBIT
25

LAW OFFICES OF

# MILLER, KISTLER, CAMPBELL, MILLER, WILLIAMS & BENSON, I

A PROFESSIONAL CORPORATION

JOHN R. MILLER, JR.
RICHARD L. CAMPBELL
JOHN R. MILLER, III
TERRY J. WILLIAMS
TRACEY G. BENSON
SCOTT C. ETTER, Ph.D.
ELIZABETH A. DUPUIS
DAVID B. CONSIGLIO
JENNIFER P. BIERLY

PLEASE REPLY TO:
STATE COLLEGE OFFICE

November 10, 2000

720 SOUTH ATHERTON STREET
STATE COLLEGE, PA. 16801-4628
(814) 234-1500
FAX (814) 234-1549
AND
124 NORTH ALLEGHENY STREET
BELLEFONTE, PA. 16823-1695
(814) 355-5474
GENERAL FAX (814) 355-5340
REAL ESTATE FAX (814) 357-0264

COUNSEL TO THE FIRM
ROBERT K. KISTLER

**VIA FACSIMILE (814) 667-3892**
**AND FIRST CLASS MAIL**

Jackson Township Board of Supervisors
RD#1, Box 390
Petersburg, PA 16669

     Re:   **David B. & Sandra Y. Corneal Property**

Gentlemen:

     On behalf of Mr. & Mrs. David B. Corneal, we hereby appeal the **building permit officer** decision of October 10, 2000 delivered on or about October 12, 2000 and request a hearing under Section 3.10 of the Jackson Township Building Permit Ordinance.

     Please enter my appearance on behalf of the Appellants and provide us with a notice of the date and time of the hearing.

                      Very truly yours,

                      MILLER, KISTLER, CAMPBELL
                      MILLER, WILLIAMS & BENSON, INC.

                      By:

                      Terry J. Williams, Esquire

TWJ/sll
cc:   Mr. & Mrs. Corneal

FILE COPY

1
2           IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
3  DAVID B. CORNEAL AND SANDRA Y.
   CORNEAL,
4              Plaintiffs
5        VS                         NO. 1:00-CV-1192
6  JACKSON TOWNSHIP, Huntingdon
   County, Pennsylvania, W. THOMAS
7  WILSON, Individually and in his
   Official Capacity as Supervisor
8  of Jackson Township, MICHAEL
   YODER, Individually and in his
9  Official Capacity as Supervisor
   of Jackson Township, RALPH       JURY TRIAL DEMANDED
10 WEILER, Individually and in his
   Official Capacity as Supervisor
11 of Jackson Township, BARRY PARKS,
   Individually and in his Official
12 Capacity as Sewage Enforcement
   Officer of Jackson Township,
13 DAVID VAN DOMMELEN, Individually
   and in his Official Capacity as
14 Building Permit Officer, ANN I.
   WIRTH, Individually and in her
15 Official Capacity as Secretary
   of Jackson Township, and
16 LARRY NEWTON, Individually and in
   his Official Capacity as Solicitor
17 to Jackson Township,
              Defendants
18
19      DEPOSITION OF:  TERRY WILLIAMS, ESQUIRE
20      TAKEN BY:       DEFENDANTS
21      BEFORE:         NICOLE L. ZIMMERMAN
                        NOTARY PUBLIC
22
23      DATE:           JULY 10, 2001, 10:08 A.M.
24      PLACE:          THE DAYS INN
                        240 SOUTH PUGH STREET
25                      STATE COLLEGE, PA  16801

           MLP REPORTING, INC.  (570) 748-1041

---

1                    I N D E X
2  BY DEFENDANTS
3  TERRY WILLIAMS, ESQ.
     By Mr. Sherr
4    By Ms. Montgomery
5
6
7
8
9
10          E X H I B I T S
11 WILLIAMS' EXHIBITS                MARKED   PRODUCED
12 No. 1 - Notice of Deposition and
           and Subpoena                 4        5
13
   No. 2 - Court Order                 12       12
14
   No. 3 - Letter (11/10/2000)         27       27
15
   No. 4 - Letter (2/5/2001)           54       54
16
17
18
19
20
21
22
23
24
25

           MLP REPORTING, INC.  (570) 748-1041

DEFENDANT'S
EXHIBIT
26

---

1           A P P E A R A N C E S :
2  ECKERT SEAMANS
   BY:  BRIDGET MONTGOMERY, ESQUIRE
3       LESLIE A. MALADY, ESQUIRE
   213 Market Street, Eighth Floor
4  Harrisburg, PA  17101
        FOR - PLAINTIFFS
5
6  MAYERS, MENNIES & SHERR, LLP
   BY:  ANTHONY R. SHERR, ESQUIRE
7  3031 Walton Road
   Building A, Suite 330
8  P.O. Box 1547
   Blue Bell, PA  19422-0440
9       FOR - JACKSON TOWNSHIP, MR. WILSON,
        MR. YODER, MR. WEILER, MR. PARKS,
10      MR. VAN DOMMELEN & MS. WIRTH
11 ALSO PRESENT:  DAVID CORNEAL
12
13
14
15
16
17
18
19
20
21
22
 3
25

           MLP REPORTING, INC.  (570) 748-1041

---

                                            4
1                 STIPULATION
2
3        It is hereby stipulated by and between
4  counsel for the respective parties that sealing,
5  certification, and filing are waived, and that all
6  objections except as to the form of the question are
7  reserved to the time of trial.
8
9        TERRY WILLIAMS, ESQ., called as a witness,
10 being sworn/affirmed, testified as follows:
11       (Notice of Deposition and Subpoena premarked
12 Williams Exhibit No. 1.)
13
14                 EXAMINATION
15
16 BY MR. SHERR:
17      Q    Could you please state your full name for
18 the record?
19      A    Terry James Williams.
20      Q    Mr. Williams, my name is Tony Sherr.  We
21 just met, we spoke before.  I represent the Defendants
22 other than Mr. Newton, in a lawsuit filed by David B.
23 Corneal and Sandra Y. Corneal, which is currently
24 pending in the United States District Court for the
25 Middle District of Pennsylvania.

           MLP REPORTING, INC.  (570) 748-1041

5

1              We're here today to take your deposition.
2 You're familiar with depositions?
3      A      Yes.
4      Q      The only thing I would just like to stress
5 is that if you don't understand my question, please ask
6 me to clarify it, and that if you don't hear it, please
7 ask me to repeat it.  If you answer the question, we're
8 going to assume that you both heard and understood the
9 question.
10             I've placed in front of you what I've had
11 marked as Williams Exhibit No. 1, which, for the
12 record, I'll state is a Notice of Deposition and a
13 Subpoena.  Are you here today pursuant to the
14 deposition notice and subpoena?
15      A      Well, to be candid, I don't know that I've
16 ever received these.  I'm responding to Judge Rambo's
17 order and I think a telephone call from your office
18 telling me when you wanted to do the deposition.  We
19 received the original subpoena that was served, these
20 were not, but...
21      Q      Okay.  The third page, the addendum to
22 subpoena, have you seen that before?
23      A      I don't believe I have.
24      Q      Have you seen Judge Rambo's order in
25 conjunction with your deposition today?

MLP REPORTING, INC.  (570) 748-1041

7

1      Q      Did you review any documents in preparation
2 for today's deposition?
3      A      Probably when I got the first subpoena, I
4 went through the file — no, wrong.  When I got Judge
5 Rambo's order, I pulled the file and removed my notes
6 and things; but did I review for today, no.
7      Q      Did you discuss, other than with
8 Mr. Corneal, today's deposition with anybody?
9      A      Other than counsel.
10      Q      When did you discuss today's deposition with
11 counsel?
12      A      I think that's privileged.
13      Q      When you discussed it with her?
14      A      Yeah, I think.
15      Q      And by counsel, you mean Bridget Montgomery?
16      A      Yes.
17      Q      Is she representing you here today?
18      A      Yes.
19             (Mr. Corneal entered the room.)
20             MR. SHERR: Let the record reflect that the
21 Plaintiff, David Corneal, just entered the room.
22 BY MR. SHERR:
23      Q      What's your business address?
24      A      720 South Atherton Street, State College.
25      Q      And you're a member of a firm there?

MLP REPORTING, INC.  (570) 748-1041

6

1      A      Oh, yes, I've seen Judge Rambo's order.
2      Q      And Judge Rambo's order referenced documents
3 that you were to produce?
4      A      Yes.
5      Q      I've been handed a number of documents by
6 Ms. Montgomery this morning.  Where were these
7 documents from, where were these documents taken from?
8      A      They're from my file.
9      Q      Other than documents in your file, did you
10 search anywhere else for documents?
11      A      No.
12      Q      Do you have any other documents relative to
13 the request of Mr. Corneal's property other than what's
14 contained in your file?
15      A      As to Judge Rambo's order, no.
16      Q      There are other documents, but you believe
17 they haven't gone to third parties, is that —
18      A      Oh, that's correct.  I mean, I would have my
19 — my file notes are not in the group that you have in
20 front of you.
21      Q      But you don't believe that there are any
22 other documents other than what's been produced that
3 concerns Mr. Corneal's property in Jackson Township
  which have been sent to third parties?
25      A      No, they would all be in that file.

MLP REPORTING, INC.  (570) 748-1041

8

1      A      Yes.
2      Q      What's the name of the firm?
3      A      Miller, Kistler, Campbell, Miller, Williams
4 & Benson.
5      Q      How long have you been practicing law?
6      A      Twenty-eight years.
7      Q      And do you have a particular specialty?
8      A      Not as that term — not as you
9 professionally understand that term like patent law or
10 anything like that, no.  It's a general practice firm.
11 I spend most of my time concentrating in municipal
12 work, commercial litigation, business-related
13 transaction law.
14      Q      What do you mean by municipal work?
15      A      Well, I serve as a solicitor for a number of
16 municipalities and I represent a number of developer
17 clients, as well as provide zoning litigation
18 assistance to other attorneys.
19      Q      When did you first become involved with
20 Mr. Corneal's property in Jackson Township?
21      A      I don't know that I can give you a specific
22 date.  Probably it would have been in November before
23 the first conference at the Huntingdon County
24 Courthouse.
25      Q      Was it your understanding that an action had

MLP REPORTING, INC.  (570) 748-1041

9

1 been filed in Huntingdon County against Mr. Corneal
2 prior to you becoming involved?

3    A    I didn't know that. Mr. Newton had
4 indicated that they had filed some sort of cease and
5 desist action. In other words, I did not have
6 pleadings, any of that sort before that meeting.

7    Q    So your first contact with anybody other
8 than Mr. Corneal with respect to his property in
9 Jackson Township was a phone call to Mr. Newton?

10    A    That's correct.

11    Q    Did you initiate that phone call?

12    A    I don't recall. I have a feeling I must
13 have, otherwise Larry would not have known of my
14 involvement, so I must have. Whether I called him or
15 he responded to a phone message from me, I don't know.

16    Q    And this phone call took place sometime
17 before the first conference in November?

18    A    Yes.

19    Q    What was the nature of that phone call?

20    A    We're going to be in front of the judge at
21 such and such a time.

22    Q    Was there any discussion about the case
23 itself?

24    A    Only from Larry's perspective about what
25 action he was trying to take, construction activities

MLP REPORTING, INC.   (570) 748-1041

---

11

1    A    That was my understanding both from -- well,
2 certainly from Mr. Newton. I had not actually seen the
3 property myself.

4    Q    Other than this discussion with Mr. Newton,
5 did you have any discussions with any third parties
6 other than -- and by third parties, I mean other than
7 Mr. and Mrs. Corneal -- prior to a hearing and/or
8 meeting at the Huntingdon County Courthouse?

9        MS. MONTGOMERY: Objection. That's been
10 asked and objected to by the deponent himself.

11        MR. SHERR: No, I asked him before the phone
12 call, now I'm asking after the phone call.

13    A    I would give the same response. I think
14 that's privileged communication.

15 BY MR. SHERR:

16    Q    Did you go to the property prior to the
17 meeting at the Huntingdon County Courthouse in
18 November?

19    A    No.

20    Q    What was your understanding of the nature of
21 the action filed against Mr. Corneal?

22    A    To be honest, I had no understanding because
23 I hadn't seen the pleadings. Mr. Newton advised me
24 that they had filed an action to obtain a cease and
25 desist order.

MLP REPORTING, INC.   (570) 748-1041

---

10

1 were ongoing without benefit of appropriate permits.

2        I think Larry mentioned that there was a
3 civil rights action that had been filed. I think I
4 told Larry that my involvement was strictly with the
5 building permitting process, that I had nothing to do
6 and would have nothing to do with the civil rights
7 action.

8    Q    Had you been out to the property, the
9 Corneal's property in Jackson Township prior to that
10 phone call?

11    A    No.

12    Q    Prior to the phone call, had you discussed
13 the Corneal property in Jackson Township with anybody
14 other than Mr. and Mrs. Corneal?

15    A    I regard that as a privileged response.
16 What I did in terms of investigation, I think is not
17 appropriate.

18    Q    Well, my question is, just so we're clear on
19 the record, did you have discussions prior to the phone
20 call with Mr. Newton concerning Mr. Corneal's property
21 with anybody other than David and Sandra Corneal?

22    A    I'm declining to answer that. I think
23 that's part of my work product.

24    Q    At the time that you had the phone call with
25 Mr. Newton, had construction commenced on the property?

MLP REPORTING, INC.   (570) 748-1041

---

12

1    Q    Did you see the pleadings prior to the
2 conference at the courthouse?

3    A    No.

4    Q    Do you know what date you met at the
5 courthouse in November?

6    A    I'm sorry, I don't. That would be in the
7 material that you have there in Judge Kurtz' orders.

8        MR. SHERR: Let's have this marked as
9 Williams No. 2, please.

10        (Court Order marked Williams Exhibit No. 2.)

11 BY MR. SHERR:

12    Q    I'm going to show you what has been marked
13 as Williams Exhibit No. 2, which is a four-page
14 document consisting of an order by Stewart Kurtz, as
15 well as a motion for preliminary injunction and ask you
16 to review that.

17    A    Okay.

18    Q    Is that the order that you were referring
19 to?

20    A    Yes. That means the meeting would have
21 occurred November 14, 2000.

22    Q    Just for a second, if you could just get
23 that back in front of you. Looking at the second page,
24 have you seen that motion for preliminary injunction
25 before today?

MLP REPORTING, INC.   (570) 748-1041

13

```
1    A    Yes.
2    Q    And it's your testimony, though, that you
3 didn't see it prior to going to the courthouse?
4    A    No.
5    Q    Who was present when you went to the
6 courthouse?
7    A    Larry Newton.
8    Q    Was it you and Larry Newton?
9    A    Yes, we met in the hallway.
10   Q    Was anybody else present?
11   A    Not in that initial conversation, no.
12   Q    Was anybody else at the courthouse for this
13 matter that you were aware of?
14   A    Not at my initial meeting with Larry,  Now,
15 they were all there apparently, but not with my
16 conference with Larry.
17   Q    And you say the conference with Larry took
18 place in a hallway?
19   A    Uh-huh, outside the main courtroom in
20 Huntingdon County.
21   Q    And who initiated this meeting?
22   A    Gosh, I don't know how to answer that.  I
23 mean, both of us were there to talk about the Corneal
24 matter.  I don't know who initiated in that sense.
25   Q    Can you tell me what the substance of the
```

MLP REPORTING, INC.  (570) 748-1041

14

```
1 conversation you had with Mr. Newton was?
2    A    Well, I'm sure other than the usual
3 civilities, I'm sure we talked about what Judge Kurtz
4 wanted to do that day.
5         I think we indicated that -- I think I
6 indicated that my purpose in being there was to find
7 out what it was the township was with trying to do to
8 try to get the building permit, sewage permit, driveway
9 permit, although I -- yes, I did know about the
10 driveway permit -- to get those matters taken care of.
11        And Larry made some comment about the
12 existence of this 1983 action, and I told him again I
13 have nothing to do with that, didn't want to have
14 anything to do with it, that I was there purely to try
15 to solve what he had filed, which I hadn't seen yet, in
16 Huntingdon County.
17        I'm sure I told him at that meeting that I
18 would try to do whatever I could to get that aspect of
19 it resolved, that I was concerned that David was in the
20 process of building without the benefit of those
21 permits and that I wanted to get that corrected.  I
22 wanted to find out what was wrong and why on heaven's
23 name the township hadn't issued building permits.
24   Q    And did you find out at that meeting?
25   A    No, not at that -- no, not at that initial
```

MLP REPORTING, INC.  (570) 748-1041

15

```
1 meeting, no, nor the subsequent conference that carried
2 over from that.  I think -- I don't remember who went
3 in to talk to the judge's clerk or his secretary,
4 probably both of us stepped in the door, I think we
5 indicated to the secretary that we wanted to confer a
6 little bit.
7         Larry ushered me into the law library, I was
8 surprised when I got in the law library that all of the
9 board of supervisors were there, the secretary,
10 Ms. Wirth, SEO Parks, the building permit officer,
11 whose name I don't recall.
12   Q    Van Donmelen?
13   A    I just don't remember his name, but the
14 building permit officer was there, I was very surprised
15 that they were all sitting in a row.
16   Q    And why did that surprise you?
17   A    Well, I hadn't anticipated that they were
18 going to have that type of full-blown meeting.  I
19 thought the purpose was to confer with Larry Newton and
20 with the judge.
21   Q    Did you confer with the judge that day?
22   A    We certainly didn't -- or I certainly didn't
23 confer with the judge in the sense of having a
24 conference with the judge about the case.
25        I have a feeling we probably talked to him
```

MLP REPORTING, INC.  (570) 748-1041

16

```
1 in the hallway, but that may have been more good
2 morning, Judge, how are you, sort of thing.  I don't
3 remember anything about the conversation with the
4 judge.
5    Q    The meeting that you had in the library,
6 what took place at that meeting?
7    A    Well, the township was telling me about what
8 they felt was wrong with what David had done.  They
9 provided an indication that construction was ongoing,
10 that there were no building permits, that there were no
11 septic permits, that there was no driveway permit and
12 that they wanted to stop him and they wanted it stopped
13 now.
14        I'm sure there was more general information
15 offered, but they had drawings, they permitted me to
16 talk to the SEO, to the building permit officer, to the
17 road master about what the situation was.
18        And actually, Mr. Newton, who obviously was
19 present, allowed me to ask questions of them, what do
20 we need to do to solve this, what's wrong with that,
21 that kind of exchange back and forth.
22   Q    You had a discussion there with the SEO?
23   A    The SEO was there, yes.
24   Q    And you had a discussion with him?
25   A    Yes, in the sense of asking him a question,
```

MLP REPORTING, INC.  (570) 748-1041

17

1 what needs to be done to get the sewer permits, an
2 explanation.
3    Q    And what do you recall him telling you
4 needed to be done?
5    A    I think his comment at that meeting, and I'm
6 sorry, Counsel, I don't have a definitive recollection,
7 but I think what he told me was that the test pits were
8 acceptable, that the modules had been filed and were in
9 appropriate form, but that the drawing which had been
10 attached to it was not because it showed a subdivision.
11    Q    And did he indicate to you what the problem
12 with the drawing showing a subdivision was?
13    A    No, I think -- no, he didn't tell me why he
14 thought that was inappropriate, no.
15    Q    Did you ask him any questions about what he
16 told you?
17    A    No.  I'm certain I asked him what else do
18 you think we -- what else do we need to do to get this
19 clarified, and from that, I don't think the SEO
20 responded; someone did, I don't recall, it may have
21 been Ms. Wirth, but I don't recall, someone responded
22 that the drawings needed to be modified to eliminate
23 references to the subdivision.
24          There was also an issue about one of the
25 test pit numbers was inaccurate in the narrative, which

MLP REPORTING, INC.  (570) 748-1041

18

1 is the detailed attachment to the plan, in other words,
2 not the plan itself, but the detail that's attached to
3 it.
4    Q    Did you make any comments concerning the
5 propriety of what they were telling you at that
6 meeting?
7    A    No.
8    Q    Did the SEO, at that meeting, ask you for
9 permission to go onto the property to see if the test
10 sites had been disturbed?
11    A    No.
12    Q    Did he ask you subsequently at another
13 meeting?
14    A    He's never asked me could he go on the
15 property to see if the sites had been disturbed.
16    Q    Did he ask you permission to go onto the
17 site?
18    A    Oh, yes.
19    Q    Was that at the November meeting?
20    A    No, that would have been months later.
21          MR. CORNEAL:  Can I have an interruption for
22 a second so I can consult with my counsel, with Terry
23 Williams?
24          MR. SHERR:  I think that's inappropriate at
25 a deposition for you to be consulting with the

MLP REPORTING, INC.  (570) 748-1041

19

1 deponent.
2          MS. MONTGOMERY:  I think this is an unusual
3 deposition and I think that he's entitled to consult
4 with his counsel.
5          MR. SHERR:  If he was being deposed, he
6 wouldn't be allowed to consult with his counsel, so the
7 fact that his counsel is being deposed, he's not
8 allowed to consult with his counsel, either.
9          MS. MONTGOMERY:  Well, actually, we haven't
10 done the depositions in this case that way, Tony.  I've
11 allowed you to consult with your clients when you've
12 asked me to.
13          MR. SHERR:  You certainly have not.  And, in
14 fact, you gave an instruction at each deposition that
15 they were not entitled to consult with their attorney
16 during the deposition.
17          MS. MONTGOMERY:  Well, Tony, we can --
18          MR. SHERR:  Unless you're charging, you
19 know, what you state there at the beginning of each
20 deposition.
21          MS. MONTGOMERY:  Hold on one second.  I'm
22 going to consult with my witness.
23          MR. SHERR:  Well, that's inappropriate, as
24 well.
25          MS. MONTGOMERY:  Well, I'm going to consult

MLP REPORTING, INC.  (570) 748-1041

20

1 with him.
2          MR. SHERR:  Well, we'll let the record
3 reflect that you're consulting with the witness,
4 inappropriately so.
5          (Discussion held off the record between
6 Ms. Montgomery and the witness.)
7          MS. MONTGOMERY:  For the record, you know,
8 since you seem to want to put this on the record, Tony,
9 we are concerned that since it is his counsel being
10 deposed and he has some concern, that he is entitled to
11 talk to his counsel on this unusual situation.
12          MR. SHERR:  Well, I don't think the
13 situation is very unusual at all, and I don't think
14 it's appropriate for you to consult with him.  You
15 know, I'm not going to physically stop him from
16 consulting with him, so, you know, do what you feel you
17 need to do.
18          MS. MONTGOMERY:  Go ahead, and I will
19 listen.
20          (Discussion held off the record.)
21 BY MR. SHERR:
22    Q    Would you like to change or modify any of
23 your responses as a result of the conference that you
24 just had with Ms. Montgomery and Mr. Corneal?
25    A    No.

MLP REPORTING, INC.  (570) 748-1041

21

1  Q    Okay.  You said that you had asked some
2  questions to the SEO about what needed to be done and
3  you believe that Ms. Wirth responded?
4    A    My recollection is that Ms. Wirth is the one
5  who pointed out the discrepancy in the soil perc
6  number.  I'm not entirely certain of that, but I think
7  she did.
8    Q    Other than the sewer modules, was there
9  anything else that the township or that the individuals
10 present at that meeting indicated to you needed to be
11 fixed or completed to have Mr. Corneal in compliance?
12   A    Yes, there was discussion with the road
13 master concerning the driveway permit, there was a
14 discussion that they really didn't have a driveway
15 permit ordinance in effect, but I agreed that if that's
16 what needed to be done to resolve that issue, we would
17 go ahead and apply for one.
18        I think the building permit officer -- I'm
19 sure I asked the same question to the building officer,
20 and I think he said, no, there's no reason why from a
21 building permit standpoint they can't be issued.
22   Q    So just in summary fashion, as a result of
23 this meeting, what did you learn that the township
24 wanted Mr. Corneal to do to come into compliance?
25   A    Well, I had a laundry list of things that

MLP REPORTING, INC.   (570) 748-1041

22

1  they wanted accomplished, principally being that he
2  obtain a septic permit, building permit and driveway
3  access permit, that the principal holdup, I guess, was
4  the modification or correction of the plan that was
5  attached to the sewer module and that was important
6  because that plan, as attached to the module, showed a
7  subdivision and the application was not for a
8  subdivision at this point, it was to obtain a building
9  permit.
10   Q    So did you indicate to the people present at
11 that time that Mr. Corneal was not attempting at this
12 time or at the time that you had the meeting to
13 subdivide the property?
14   A    No, what I indicated to them was that my
15 purpose in being there was to get the appropriate
16 permits and if that meant that the subdivision was for
17 the time being put on hold, that's what we would do,
18 but that my purpose was to get the permits.
19        Well, and obviously, to allow him to
20 continue to build, I mean, there was some discussion
21 about that, that if they were successful -- remember
22 now, they had not served anybody with this paper, with
23 what you've put in front of me, this motion, we hadn't
24 seen this, I hadn't seen it, but it had been
25 characterized to me by Mr. Newton that they wanted a

MLP REPORTING, INC.   (570) 748-1041

23

1  cease and desist order and certainly there was a great
2  deal of discussion at that meeting that if they
3  succeeded in getting a cease and desist order in
4  November, there was going to be additional damages on
5  that site.
6    Q    What do you mean by that, additional damages
7  on the site?
8    A    Well, once you've started construction,
9  stopping during winter in central Pennsylvania is
10 disastrous.
11   Q    So there would be damages from a physical
12 point of view of the site itself?
13   A    Absolutely.  I'm sure there are other
14 damages, but in terms of the structure, that's not the
15 best thing for a building.  The building officer, as I
16 recall, agreed with me about that.  He seemed like a
17 very nice man.
18   Q    Other than learning what the township wanted
19 to have, did anything else take place at this meeting?
20   A    Well, I'm sure there was a commitment on my
21 part to proceed to make whatever corrections they felt
22 they wanted and to work with them to try to bring David
23 -- to get David the permits to do what they wanted to
24 get the permits issued, and Mr. Newton agreed that they
25 would hold any further action under this filing in

MLP REPORTING, INC.   (570) 748-1041

24

1  advance.
2        And I think an agreement was reached at that
3  meeting that I would accept service of the documents so
4  that they didn't have to expend any further money
5  trying to serve the motion.  I don't recall anything
6  else.
7    Q    Did you or Mr. Newton have a discussion with
8  the judge after this meeting to let the judge know what
9  was going on?
10   A    I don't think so, we were into the noon
11 hour, I don't believe so.  Whether Mr. Newton did, I
12 don't know, of course, but I don't recall that I saw
13 the judge again.
14   Q    Were you aware at the time that you met
15 whether or not Mr. Corneal had applied for a building
16 permit?
17   A    Well, I think what I was aware of is
18 probably privileged.
19   Q    After the meeting in November, did you meet
20 with anybody other than Mr. or Mrs. Corneal for the
21 purpose of complying with what the township wanted
22 Mr. Corneal to do?
23   MS. MONTGOMERY:  Objection.  What Attorney
24 Williams' purpose was certainly a privileged, if not
25 a work product matter.

MLP REPORTING, INC.   (570) 748-1041

25

1    A    I would agree. To me, that's privileged,
2 what I did.
3 BY MR. SHERR:
4    Q    Did you meet -- I'll just say it like this
5 and noting that objection, after that November meeting,
6 did you meet with anybody other than Mr. or Mrs.
7 Corneal with respect to the property before your next
8 meeting with the township?
9    A    Once again, I think that's privileged, I
10 think that's the same question.
11    Q    Well, all I'm asking you -- just so we're
12 clear -- all I'm asking you is whether you met with
13 anybody, other than the Corneals?
14    A    Other than the Corneals before I met with
15 the township again, yeah, I think that's privileged,
16 that's my work product, that's what I do for a living.
17    Q    But this is a meeting -- well, you may be
18 asserting your work product, and I'm not asking you
19 what happened at the meeting or anything of that
20 nature, I'm asking you whether you met with somebody
21 other than Mr. or Mrs. Corneal?
22    A    But the fact that there was a meeting, I
23 think is work product. I think that gets into the
24 disclosure and I think that's clearly privileged.
25    Q    All right. Well, we'll find that out. Did

26

1 you speak with anybody other than Mr. and Mrs. Corneal
2 concerning -- and township officials concerning the
3 property prior to your next meeting with the township?
4    MS. MONTGOMERY: Objection. It's been
5 asked, objected to, answered.
6    MR. SHERR: Well, I asked for meetings and
7 now I'm asking for whether or not he spoke with
8 anybody.
9    A    Oh, then I misunderstood your prior
10 question. Let's try to short-circuit that. I feel
11 that what I did in terms of talking with people,
12 meeting with people, research or whatever, I think
13 that's all privileged material, it's a part of my job
14 in representing a client.
15 BY MR. SHERR:
16    Q    After this meeting in November, did you have
17 an opportunity to go to the property in Jackson
18 Township?
19    A    At some point, I went to the property, yes.
20    Q    When was that?
21    A    I'm sorry, sir, I don't recall. I don't
22 know when I actually went there, other than to tell you
? it was cold and there was snow on the ground.
    MR. SHERR: I would like this marked as
25 Williams No. 3, please.

27

1    (Letter marked Williams Exhibit No. 3.)
2 BY MR. SHERR:
3    Q    I'm going to show you a letter from you to
4 Jackson Township Board of Supervisors dated November
5 10, 2000, which has been marked as Williams No. 3 and
6 ask you to review that.
7    A    Yes.
8    Q    Now, you wrote this letter prior to the
9 meeting that we were just discussing, correct?
10    A    Apparently. I don't have an independent
11 recollection of that, but I must have.
12    Q    Do you have any reason to doubt the date
13 that appears on that letter?
14    A    No, I have no reason to doubt the date.
15    Q    Okay. Did you have a discussion concerning
16 Williams No. 3 with anybody from the township?
17    A    No, I don't recall any discussions about the
18 building permit appeal.
19    Q    Did you discuss that at the meeting at the
20 courthouse?
21    A    Not to my knowledge. I don't recall that.
22 There were a lot of discussions, somebody may have
23 mentioned it, but I don't remember that.
24    Q    Was it your understanding that the hearing
25 that you requested in Williams No. 3 had been subsumed

28

1 in what you discussed at the courthouse on November 19?
2    A    No, that was not my understanding.
3    Q    And it's also your testimony that you did
4 not bring up the fact that you had asked for a hearing
5 on an appeal from a denial of a building permit?
6    A    No, I don't recall talking about that. The
7 discussion centered on their request for injunctive
8 relief.
9    Q    And the discussion also centered on, at
10 least at some points, about building permits?
11    A    Absolutely. Building permits were the
12 principal focus of the meeting.
13    Q    All right. So you discussed with the
14 township at the meeting at the courthouse with the
15 township officials and employees the deficiencies they
16 found in the building permit application by
17 Mr. Corneal?
18    A    To my knowledge, there were no deficiencies
19 in the building permit application. The building
20 officer, when I asked him that question, my
21 recollection is he said no, nothing needs to be done to
22 those.
23    The problem is in the septic -- or the land
24 development plan and the driveway permit and that the
25 building -- well, I don't remember what the building

29

1 officer said about it.  I think his comment was I can't
2 issue a building permit until the septic permit is
3 resolved.
4      Q     You think he said that at the meeting in
5 November?
6      A     I'm certain it wasn't Mr. Newton.  I think
7 it was the building permit officer.
8      Q     Did you say anything in response to that
9 statement?
10     A     I don't recall a response.
11     Q     So you may have responded and you just don't
12 recall what it was?
13     A     Yeah, I just don't recall.
14     Q     Now, you indicated earlier that it was your
15 intent to comply with what the township was asking with
16 respect to the property?
17     MS. MONTGOMERY:  Objection.  That's not what
18 he testified to.
19 BY MR. SHERR:
20     Q     Do you recall testifying to that effect?
21     A     I've lost the focus of the question.  Sorry.
22     Q     Okay.
23     A     First of all, let me be clear, my intent, I
24 think is privileged.  I think what you're referring to,
25 you asked me a question about what was said, and what I

MLP REPORTING, INC.  (570) 748-1041

31

1 there was one other supervisor present was at the
2 driveway throat where it intersects the township road.
3      And there was one onsite meeting — pardon
4 me, I stand corrected — two onsite meetings where the
5 SEO was present, one with just the SEO, the other is a
6 much later meeting with representatives of DEP and the
7 SEO.  I think those are all the meetings.
8      Now, the exact sequence of those, I'm not
9 sure I can reproduce for you.  I do know the driveway
10 was first because we dealt with that issue first.
11     Q     What was the issue with the driveway that
12 was being dealt with?
13     A     Well, the township at the first meeting
14 contended that he needed a driveway permit.  I
15 politely, I wouldn't want to say argued, but politely
16 pointed out that they didn't have the driveway permit
17 ordinance enacted when the driveway throat was
18 constructed, but we would file an application for a
19 permit.
20     There was discussion at that meeting with —
21 this is the first meeting now — with the road master
22 that he was not happy about the contour of how that
23 driveway throat was constructed, so that the meeting on
24 site, site referring, again, to the intersection
25 between the driveway and the road, was to look at that

MLP REPORTING, INC.  (570) 748-1041

30

1 indicated was that I told them that I would help
2 Mr. Corneal come into compliance and do whatever they
3 wanted us to do to get the building permits, that I did
4 say.
5      Q     Okay.  Did you give an indication at any
6 time after the meeting in November at the courthouse
7 that Mr. Corneal still desired a hearing with respect
8 to the denial of his building permit?
9      A     No, I don't recall any discussion about the
10 building permit appeal hearing.
11     Q     What's the next meeting that you recall
12 having with the township or township officials
13 concerning the property?
14     A     Here I may have my sequence off.  I'm
15 certain there were phone calls with Solicitor Newton,
16 I'm certain there were one or two phone calls with
17 Ms. Wirth, I'm certain there were phone calls with the
18 road master regarding the driveway permit.
19     I suspect you have in front of you Judge
20 Kurtz' order which would tell me the date of the next
21 meeting at the courthouse.  I think the next meeting at
22 the courthouse was the only other meeting that we had.
23     Now, there was a site visitation with the
24 road master at the highway, not by said site, but let
25 me be precise, the meeting with the road master and

MLP REPORTING, INC.  (570) 748-1041

32

1 basically to say what do you want us to do.
2      Q     And what did they indicate?
3      A     Well, he indicated he wanted a
4 reconstruction of the driveway throat, obviously he
5 wanted a permit application, he wanted a reconstruction
6 of the driveway throat and that ultimately, he wanted
7 stabilization of where the driveway intersects the
8 highway so that — well, I don't know that he gave me
9 his reasons for that.
10     The reason for the reconfiguration he gave,
11 which was to facilitate water drainage so that it
12 didn't drain out onto the road surface, but went into
13 the drainage culverts — they're actually not culverts,
14 that implies some construction, they're swales on
15 either side of their township road.
16     So we talked about methods of
17 reconfiguration construction, we agreed that we would
18 pick an appointed day when the weather permitted
19 because it was very cold then to come back and redo the
20 driveway throat.
21     MR. SHERR:  Let the record reflect that
22 Ms. Montgomery is speaking to the witness.
23     (Discussion held off the record between
24 Ms. Montgomery and the witness.)
25 BY MR. SHERR:

MLP REPORTING, INC.  (570) 748-1041

33

1    Q    Would you like to change or modify any of
2 your previous responses as a result of what
3 Ms. Montgomery just told you?
4    A    No.
5    Q    So you agreed to comply with what the road
6 master was asking with respect to the intersection of
7 the driveway and the road?
8    A    Yes.
9    Q    And how about with respect to the
10 application for a driveway permit?
11    A    Well, I pointed out again to him that he
12 didn't have a driveway ordinance that was in effect at
13 the time of this construction, but if that would help
14 get the building permit issue resolved, I would have
15 David apply for a permit.
16    Q    So to the point when this meeting took place
17 on the road, no driveway permit had been applied for?
18    A    I can't answer that, Tony.  I don't know
19 when that application was filed.  It may or may not
20 have been; I don't know.
21    Q    How about the sewer modules, were they
22 amended in accordance with the discussion you had in
23 November at the courthouse at the time that you had
24 this meeting out at the roadway?
25    A    I'm sorry, sequentially, I don't know.  It

MLP REPORTING, INC.  (570) 748-1041

34

1 was an ongoing process on all those fronts and when
2 something was done in relation to another, I can't
3 answer; I don't know.
4    Q    You indicated that you had a couple
5 conversations with Mr. Newton --
6    A    Yes.
7    Q    -- by telephone?
8    A    Yes.
9    Q    And I understand we don't necessarily know
10 when the sequence of those conversations were, but what
11 was the substance of those conversations?
12    A    Well, I think -- well, that's too general of
13 a question.  It's not that I'm not trying to respond to
14 that, I don't know, the discussions were around the
15 tenor of I can't get application formats from the
16 township, will you send them to me.  Yes, I'll send
17 them to you.
18         Have we done everything on what we filed, in
19 other words, when I would send something into the
20 township, I would call him and say, is there anything
21 else you need to do here, they were along those lines.
22         Mr. Newton would tell me about his
23 frustration that these permits hadn't been issued and
24 that they were getting pressure from other citizens in
25 the township that this was going on and construction

MLP REPORTING, INC.  (570) 748-1041

35

1 was continuing.
2         And I bluntly indicated to him the fact that
3 the permits hadn't been issued was, in my view, not
4 Mr. Corneal's situation, it was because of the actions
5 of the township, but that we would continue to do
6 everything we could to correct that aspect of it.
7    Q    Did you tell him what actions of the
8 township prevented the permits from being issued?
9    A    No, I don't think we ever went into those
10 kinds of details.  We're not talking about lengthy
11 conversations.
12    Q    Did you indicate to him that the township
13 was doing something to prevent permits from being
14 issued?
15    A    Prevent, no, I can't use that word,
16 "prevent".  I'm sure I said to him on a number of
17 occasions, where in your ordinance scheme are you
18 getting this, why are you doing it -- not why are you,
19 the solicitor isn't doing it -- why is the township
20 doing it this way.
21    Q    Do you recall any specific examples of
22 asking him why are you doing this, why is the township
23 doing it this way?
24    A    Sure, why are they requiring a driveway
25 permit when they didn't have a driveway ordinance, why

MLP REPORTING, INC.  (570) 748-1041

36

1 did they go to this land development plan, why, for
2 example, when we filed the one set, did they come back
3 and ask me for drawings in a different scale, a scale
4 that, to my knowledge, nobody else uses because it's so
5 ludicrous in terms of sizing that required us to have
6 new prints drawn, those kinds of questions.
7         And quite frankly, they were rhetorical
8 questions, I don't think they were ever designed for
9 Larry to answer.
10    Q    Did Larry give you any answers to those
11 questions?
12    A    No, not to my knowledge.  Larry always
13 expressed the hope that we could get the building
14 permit worked out.
15    Q    And did you give him the indication that you
16 had that same hope?
17    A    That I would hope that we could get the
18 building permit, septic permit and driveway permit
19 worked out, yes.
20    Q    You indicated you had phone conversations
21 with Ms. Wirth?
22    A    Yes, they were very brief, they were about
23 where can I deliver these things, in other words, how
24 do I get to your secretarial office to deliver them.
25         I think I -- at one point there close to tax

MLP REPORTING, INC.  (570) 748-1041

37

1 season, there was one conversation where we hadn't
2 gotten something that we needed, I don't remember what;
3 I'm sorry, I can't recall what it was, probably an
4 application of some sort, and she said, well, she was
5 very busy, because she's a public accountant, and I
6 commiserated with her about the frustrations of early
7 April for people in that business, but we eventually
8 got that from her, but there was nothing in
9 conversations with Ms. Wirth about the substance of the
10 matter.
11    Q    How about the road master, you said you had
12 conversations with him?
13    A    Yes, they were about, once again, the
14 driveway, the necessity of the permit, the
15 configuration of the permit, and then after the work
16 was done, he called me to talk about the fact that they
17 were happy with the configuration, but that they wanted
18 it stabilized with 2RC stone.
19    Q    Was that done?
20    A    Yes, I believe it was.
21    Q    Has the driveway permit been issued?
22    A    A driveway permit was issued at some point.
23 I think that — yes, the short answer, yes.
24    Q    Any other conversations you remember having
25 with the road master, telephone conversations?

MLP REPORTING, INC.   (570) 748-1041

38

1    A    No, not to my recollection.  There may have
2 been some brief conversations about what day are we
3 going to do these things, but that's all.
4    Q    Now, you indicated that you had two meetings
5 at this site, one just with the SEO —
6    A    Yes.
7    Q    — and one with others.  Let's just talk
8 about the first meeting.
9    A    Okay.
10    Q    How did that meeting come about?
11    A    I think Mr. Parks initiated the meeting, I
12 think he indicated to me he wanted the meeting because
13 the new applications had been filed and he wanted to
14 make a site visit to see what the conditions were
15 because construction activities had taken place and he
16 wanted to — he wanted to look at it again.
17         Either in that conversation or a
18 conversation the next day, which we're in the process
19 of working out the scheduling, so there may have been a
20 second conversation, I can't remember that, but anyway,
21 he made a comment to me that he was concerned that the
22 driveways were located within ten feet of the septic
     pit, which is, if you're going to use that soil test,
,  you're going to use that as the disposal area, that's
25 contra to DEP regulations.

MLP REPORTING, INC.   (570) 748-1041

39

1    Q    Did you say anything in response to that
2 indication by Mr. Parks?
3    A    I probably said, oh, really.
4    Q    Was anything else discussed initially about
5 that?
6    A    No.  The purpose — but the purpose of the
7 meeting was to look at that and to look at the
8 condition on site.
9    Q    When you say look at that, what do you mean?
10    A    The location of the driveways in
11 relationship to the septic pit.
12    Q    And this was for the structure that was
13 being constructed on the property?
14    A    Sure.  Yes.
15    Q    And did you go with Mr. Parks to the site to
16 look at that situation?
17    A    I didn't go with him, but I met him there,
18 yes.
19    Q    Was anybody else present at that meeting?
20    A    I'm certain David was there, there were
21 workmen obviously, but I think the only people
22 participating in the meeting were Barry and I and David
23 was there.
24    Q    What happened at that meeting on the site?
25    A    Suddenly, Mr. Parks never discussed the

MLP REPORTING, INC.   (570) 748-1041

40

1 driveways, but he observed that a truck had backed over
2 one of the septic pits and he immediately said to me,
3 well, that's no longer acceptable, we can't do that, we
4 can't use that.
5    Q    What did you say in response to that?
6    A    Probably something like, oh, really.  I'm
7 sure that's not a direct quote.  Probably I see or
8 something of that sort.
9    Q    Did you give any indication to him that you
10 felt contrary?
11    A    I'm sure I probably did say to him that that
12 is a matter for a soil scientist, that while there may
13 have to be surface repair, that I felt it could still
14 be used.  I think I probably had that discussion with
15 him.  Then we looked at — well, go ahead; I'm sorry.
16    Q    What did you look at next?
17    A    We looked at the alternate sites because
18 there was more than one approved site.
19    Q    You looked at alternate —
20    A    Disposal sites.
21    Q    — approved disposal sites?
22    A    Uh-huh.
23    Q    Did you give any indication to Mr. Parks
24 that other sites would be able to be used with the
25 structure that was being constructed at that time?

MLP REPORTING, INC.   (570) 748-1041

41

1    A    I didn't do that.  I think that was general
2 knowledge.  That's why they did all the testing.  I
3 think everybody is aware there were multiple sites on
4 that property.

5    Q    Did you have the understanding that they
6 tested multiple sites because at the time there were
7 plans for a subdivision?

8    A    No, I did not have that understanding.  It's
9 prudent when you're doing this type of work to do
10 multiple sites.  I suppose -- well, I guess what my
11 impression is is privileged, but it's common practice
12 when you're doing a development like this out in the
13 woods, and by development, I mean building a house and
14 a garage and the art studio, that you would do multiple
15 sites so you had alternatives as you were in the
16 process of construction.

17    Q    Did either you or Mr. Corneal or any of the
18 workmen say that we would use an alternate site for the
19 septic for the structure?

20    A    The workmen have no involvement in this.
21 Mr. Corneal, I don't believe, other than pleasantries,
22 talked at all, he listened.  We discussed what
23 alternate sites would be useable to service the
24 structures.

25    Q    Did you ever give him any indication that an

MLP REPORTING, INC.  (570) 748-1041

42

1 alternate site would be used for the septic for the
2 structure that was being built?

3    A    No, because I felt that the one that the
4 truck backed over was still serviceable, that there
5 was no need for another one.  The point of that
6 discussion is the module, is the planning module that
7 says are there allowable and acceptable sites to permit
8 the construction of an onsite septic system, that's all
9 that's in the module.

10        The design of the system is the part of the
11 permitting process where you come in with a design for
12 the system, here's what we propose to build and the
13 permit, the septic permit is issued.  The module
14 predates the septic permit, the module is what is
15 necessary for the issuance of building permits, et
16 cetera.

17        Design of the system is a postconstruction
18 matter, in other words, you can build and not have a
19 septic permit.  So the point of the discussion with
20 Mr. Parks is there are multiple sites that are
21 available here, where's the module.

22    Q    And what was his response?

23    A    Well, Mr. Parks looked at sites on the lower
24 side and said, well, those aren't acceptable.  And I do
25 believe David did at that point in a cry of pain say,

MLP REPORTING, INC.  (570) 748-1041

43

1 but you approved those sites.

2        I asked Mr. Parks for his soil logs, those
3 are the data sheets from the testing, he did not have
4 them for those downhill sites, he had them for the one
5 that the truck backed over, he had one for a site that
6 is some extensive distance away from the construction,
7 but he did not have the one for the downhill site that
8 would have been appropriate to use as an alternate
9 system.

10    Q    Did you thereafter discuss this matter with
11 a soil scientist?

12    A    Privileged.

13    Q    Did you have any discussions with
14 Mr. Archmody, A-R-C-H-M-O-D-Y?

15    A    That name is unknown to me, so no.  Is that
16 a person?  I mean, it's a person —

17    Q    Yes, it's a person.

18    A    But I mean, who is that person?

19    Q    Well —

20    A    Names are not in my lexicon.  I don't
21 recognize the name.

22    Q    You don't recall having a meeting on the
23 site with Mr. Archmody from either DEP or —

24    A    Oh, there was a meeting with DEP officials,
25 absolutely.  That occurred later.

MLP REPORTING, INC.  (570) 748-1041

44

1    Q    Was he present at that meeting?

2    A    He may have been.  There were two DEP
3 officials.  One is the — well, I'm going to get his
4 title wrong.  He's the soil — no, he's not the soil
5 sanitarian, he's the director of the local DEP office
6 and there was an assistant.  I'm sorry, I don't
7 remember either of their names.

8    Q    Okay.

9    A    So to summarize, to my knowledge, I've never
10 talked to — I'm sorry, the name again?

11    Q    Archmody.

12    A    Archmody, I'm sorry, I don't recognize that
13 name.

14    Q    Okay.  Did you subsequently indicate to
15 Mr. Parks that the site that he indicated that could
16 not be used because it had been disturbed was a correct
17 interpretation?

18    A    Probably at the second meeting, there was
19 discussion that the SEO could raise the concern issue
20 about the site having been driven over.  I don't know
21 that we ever talked about whether it was an appropriate
22 decision or not, but yes, that he had a right to raise
23 that concern.

24        At the first meeting, that wasn't an issue.
25 The issue at the first meeting was, well, that that can

MLP REPORTING, INC.  (570) 748-1041

45

1 be repaired, which is my understanding of the soil
2 characteristics.
3    Q    Well, did you send or have prepared and at
4 some point give to the township officials a report from
5 a soil scientist?
6    A    I did not do that personally. A soil
7 scientist was consulted and a report prepared and
8 submitted, yes, to DEP, I think, yes.
9    Q    And was that report discussed at the site
10 when you met with the DEP officials?
11    A    Oh, I doubt if it was discussed. I think it
12 was clear that it had been done. I think the DEP
13 people had looked at it; but was it discussed, no.
14    Q    How did this meeting with the DEP officials
15 come about?
16    A    Well, Mr. Parks was not going to proceed
17 further without something, and I'm not sure what
18 something is. There was another change in circumstance
19 on the property not temporally related to that first
20 meeting, but before the second meeting, and as a result
21 of that, an engineer was retained for purposes of
22 assisting with solving the septic problems.
23    Q    What was the change in circumstance?
24    A    A well was drilled.
25    Q    And who indicated that that was a change in

MLP REPORTING, INC.  (570) 748-1041

46

1 circumstances that affected this issue?
2    A    I know just enough to be dangerous. The
3 location of the well would render the site that was
4 backed over by the truck unusable because the well was
5 too close to it to allow it to be used for the disposal
6 of the waste water. It makes it a nonissue, if you
7 will.
8    Q    Right. And you said an engineer was
9 retained. An engineer was retained on behalf of
10 Mr. Corneal?
11    A    That's correct.
12    Q    And somehow through this change in
13 circumstance and the engineer being retained, another
14 meeting was held at the property?
15    A    That's correct.
16    Q    Who was present at this meeting?
17    A    Oh, boy, all right, the workmen were there,
18 although not participating in the meeting, Barry Parks,
19 two representatives of the Altoona office of DEP, I was
20 there, Larry Newton was there, Tom Bowes was there,
21 B-O-W-E-S, and -- that's terrible, I don't recall
22 whether David was there or not; I assume he was, but I
23 don't remember, he may not have been, I don't remember
24 him participating in any way, so he may not have been.
25    Q    Now, do you know how it was that the

MLP REPORTING, INC.  (570) 748-1041

47

1 representatives from the Altoona DEP were present at
2 that meeting?
3    A    Well, precisely, no, but the Altoona office
4 is the reviewing agency of the module, and ultimately,
5 the reviewing agency for whatever design is put forth;
6 In other words, they would be, if you will, the people
7 to whom Barry Parks would send his data.
8    I'm certain that there were discussions
9 between Larry Newton and I by phone that DEP had to be
10 involved in this, that we needed to get this resolved,
11 who said what, I don't know, but I'm sure that the
12 township was in favor of having DEP involved.
13    We wanted that done. Obviously, we were not
14 going to get anywhere with this permit with Mr. Parks
15 and we had to go to higher authority.
16    Q    What was Mr. Parks' position at this time
17 prior to this meeting with DEP?
18    A    Oh, okay. His position at the first meeting
19 was there were not acceptable sites that would allow
20 the module to proceed.
21    Q    What happened at the second meeting where
22 the DEP officials were present?
23    A    From a septic standpoint, I think there was
24 general concurrence by all concerned that what had been
25 proposed was appropriate, that the testing had been

MLP REPORTING, INC.  (570) 748-1041

48

1 done properly, that there was no reason why the module
2 shouldn't be approved and that subject to getting the
3 actual design -- once again, remember, those are
4 separate processes -- but subject to getting detailed
5 design, that the site could be served by what had been
6 proposed.
7    Now, this involved a new pit, which didn't
8 exist at the first meeting.
9    Q    Well, that was my question, what was being
10 proposed that was acceptable?
11    A    What was being proposed was a drip
12 irrigation system.
13    Q    When was that proposed to the township?
14    A    Well, it had to be after the first meeting
15 with Parks and certainly before the second meeting with
16 DEP and Mr. Parks.
17    Q    And do you recall either of the DEP
18 representatives saying anything at this meeting?
19    A    Oh, sure.
20    Q    What do you recall them saying?
21    A    Well, both people from DEP got in the pits
22 and looked at the testing and the soil characteristics,
23 you're looking at the stratification of the soil, they
24 looked at -- commented on that, commented on the
25 characteristics of that typical soil from the mapping,

MLP REPORTING, INC.  (570) 748-1041

49

1  commented on the positioning of where these test pits
2  were and the proposed disposal sites were, and the
3  bottom line, at the end of the meeting or near the end
4  of the meeting commented they were satisfied.
5         Also, they promised, because I was anxious
6  to get the building permit, they promised that as soon
7  as they had the paperwork from the township, they would
8  review it.
9     Q    Has that been done?
10    A    As I sit here this morning, not to my
11 knowledge.  When you say done, has DEP reviewed the
12 paperwork, that's the question I'm answering?
13    Q    Yes.
14    A    No, to my knowledge, that has not been done.
15    Q    Has the paperwork been sent to DEP?
16    A    My understanding is that the paperwork went
17 to DEP recently from the township, meaning within a
18 matter of days ago.
19    Q    Do you have an understanding as to why there
20 was a delay between when you had that meeting with the
21 DEP officials and when they were sent to DEP?
22    A    There would have been further — there were,
23 not would have been, there were further modifications
24 to the module now that everyone seemed to be on line
25 with the new test pit and the drip irrigation system,

50

1  although the drip irrigation system has less to do with
2  the module than it does with the ultimate design, but
3  the location of the pit is important because that's in
4  the module and that had to be changed on the mapping.
5         I imagine there's a change in the narrative
6  statement, too, that's attached to it that makes
7  reference to drip.
8     Q    Now, this second meeting, we'll call it the
9  second meeting, with DEP officials, this took place
10 after another meeting at the courthouse, correct?
11    A    Oh, yes, the meeting with the DEP officials
12 would be in this temporal sequence to the last meeting.
13 By now, it's warm, the leaves are out.
14    Q    I want to talk about the second meeting that
15 occurred at the courthouse.  Do you recall when that
16 was?
17    A    Specifically, no.  I'm sure there's a Judge
18 Kurtz scheduling order.
19    Q    Yeah, I don't know if I separated one out.
20    A    Well, I think I got a letter from Mr. Newton
21 telling me that he had asked for, I think what he
22 described as a status conference.
23    Q    Just let the record reflect that the witness
24 is looking through his correspondence file which has
25 been produced.

51

1     A    I don't see correspondence from Mr. Newton,
2  so maybe what he did was call me that he wanted a
3  status conference.  In any event, somehow I became
4  aware that Larry had asked the Judge for a status
5  conference and that a time had been scheduled and he
6  gave me the date and time.
7     Q    Did you have a conversation with Mr. Newton
8  as to why he believed the status conference was
9  necessary?
10    A    No, I don't believe so.  I don't think Larry
11 and I were ever able to chat about that, he just simply
12 told me that's what he was doing.
13    Q    Okay.  Now, who attended this meeting at the
14 courthouse?
15    A    Well, that was done in the courtroom, Judge
16 Kurtz was present, the court reporter, tip staff,
17 Mr. Newton.  There were people from the township, I'm
18 reasonably certain Ms. Wirth was there, I don't know,
19 there were other people there from the township, but
20 exactly which ones, I don't recall.
21    Q    Were the proceedings transcribed?
22    A    You know, I don't know.  A reporter was
23 there, but whether a — I'm sure there's no
24 transcription, but whether notes of the testimony were
25 taken, I don't know.

52

1     Q    Was this in court, I mean, was court
2  actually open?
3     A    Yes, court was in session, the Judge was on
4  the bench, yes.
5     Q    And what took place at this court session?
6     A    Basically, Judge Kurtz wanted to know, well,
7  where are we, gentlemen, and Mr. Newton presented what
8  he — where we felt we are, and I responded as to where
9  I felt we were.
10    Q    And what was your response as to where you
11 felt you were?
12    A    Well, we had completed obtaining the
13 driveway permit at that point, that I felt we had
14 submitted everything that the township had asked us to
15 do, so it would seem to me that the court appearance
16 occurred before — I may be wrong, but it seems to me
17 it occurred before the meeting with Parks on site, I'm
18 not certain about that.
19         And I think the Judge's — distilling an
20 awful lot — I think the Judge said, well, do you
21 gentlemen think you're going to be able to get this
22 worked out.  I think Mr. Newton indicated that he felt
23 we had made an honorable effort to do that and that we
24 could get it worked out.  The Judge thanked us and we
25 went on our way.

53

1   Q    About how long did this proceeding last?

2   A    I don't know, 20 minutes, 15 minutes maybe.

3   Q    Did you have any other discussions with
4 Mr. Newton either before or after this proceeding at
5 the courthouse?

6   A    Oh, I'm sure I spoke to Larry before we went
7 into the courtroom, I don't have much of a recollection
8 of what went on. And I'm sure there were postmeeting
9 conversations because I remember asking them, now, is
10 there anything else that we haven't done that you need
11 to have done, and my recollection of coming away from
12 that court proceeding is that no, everything has been
13 submitted.

14   Q    Have you ever had a discussion with anybody
15 other than discussions with Mr. Corneal about a privy
16 permit?

17   A    Other than Mr. Corneal, no.

18   Q    Did you ever have discussions —

19   A    No, I don't think so.

20        MR. CORNEAL:  Can we take a break for a few
21 minutes?

22        MS. MONTGOMERY:  We can.  Sure.

23        MR. SHERR:  Sure, you can take a break.

24        MR. CORNEAL:  I want to talk to
25 Mr. Williams.

MLP REPORTING, INC.  (570) 748-1041

---

54

1        MR. SHERR:  You want to talk to Mr. Williams
2 again?

3        MR. CORNEAL:  Uh-huh.

4        MR. SHERR:  Knock yourself out.

5        (Discussion held off the record.)

6        (Letter marked Williams Exhibit No. 4.)

7        MR. SHERR:  Can you just read me the last
8 question and answer, please?

9        (The reporter read back the referred-to
10 portion of the record.)

11 BY MR. SHERR:

12   Q    I'm going to show you what has been marked
13 as Williams No. 4, which is a letter from you to Ann
14 Wirth dated February 5, 2001.  Is that, in fact, a
15 letter that you wrote to Ann Wirth on that date?

16   A    Yeah, it's written to the township, directed
17 to Ann Wirth as secretary.

18   Q    Is that the first time that you submitted
19 applications on behalf of Mr. Corneal?

20   A    That sounds right, yes.  The driveway permit
21 application I think would have been the first one, but I
22 remember, there already were applications on file for
all of this.

        The building permit applications were
25 already there, the sewage permit applications were

MLP REPORTING, INC.  (570) 748-1041

---

55

1 already there, they had them for months.

2   Q    Well, all those applications that you're now
3 referring to were all there prior to the meeting at the
4 courthouse in November, correct?

5   A    Yes, I believe so.  They had them for some
6 time before that.

7   Q    Understood.  Just so we're clear, the
8 attached — what you attached to Williams No. 4 was the
9 first time since the meeting at the courthouse in
10 November that anything was submitted to the township;
11 is that correct?

12   A    Certainly from my office, yes, I don't know
13 about completely.  I would assume that's the case
14 because they had everything and had it for some time.

15        Well, understand, they haven't issued a
16 building permit, why haven't they issued a building
17 permit, the response that I get in November is because
18 there's no septic permit, why haven't you issued a
19 septic permit, the modules are in compliance, well,
20 because it's a land development plan and it shows a
21 subdivision line.

22        They had everything, they did not have a
23 driveway permit application, but they had everything
24 else and they had it for months.

25   Q    Correct me if I'm wrong, but your testimony

MLP REPORTING, INC.  (570) 748-1041

---

56

1 is that at the meeting in November, you agreed to
2 modify the modules to comply with what the township had
3 been asking you to do, correct?

4   A    We agreed to modify the plan, not the
5 module, the plan, to take off the subdivision line that
6 was shown and to clarify because I didn't know at the
7 meeting what the story was, but to clarify the pit
8 number.

9   Q    Did you agree to modify anything else at the
10 meeting that you can recall?

11   A    Well, there was no change in the module, the
12 sites were the same, the soil tests were the same,
13 everything was there —

14   Q    Was it your understanding that there had
15 been no changes in the sewage module from those
16 originally submitted to the township?

17   A    To what, to the date of the November
18 meeting?

19   Q    Yes.

20   A    Yeah, I think they were the same.

21   Q    Okay.

22   A    It was incomprehensible to me how they had
23 not issued these permits.

24   Q    Did you tell them that?

25   A    No.

MLP REPORTING, INC.  (570) 748-1041

57

1   Q   In fact, you told them --

2   A   I'm sure I said to Larry Newton, I fail to
3 understand how you can refuse to issue permits, but at
4 the meeting, no, the meeting was courteous, the meeting
5 was to find out, all right, what do we need to do now
6 that this has gone on this long, now that you've
7 managed to get us into this position, how do we get out
8 of it.

9   Q   Did you say that, those words?

10   A   I don't know about those words, but I'm sure
11 I said -- I have a feeling I probably did say in all my
12 years, I've never seen anything like this, somehow we
13 have to find an answer to this, there is no reason -- I
14 do remember this because there was a discussion about
15 it -- there is no reason on that site, given the size
16 of the site, the location of the soil testing, why you
17 can't build there.

18       In other words, this isn't like somebody
19 wanting to build a shopping center in an R-1 zone, this
20 isn't like somebody wanting to put in a community
21 sewage system right next door to the sewage treatment
22 plant, there was no legal reason that I could define as
23 to why these permits hadn't been issued, but yet, my
24 client is building without the benefit of a permit and
25 I want to correct that.

MLP REPORTING, INC.   (570) 748-1041

---

58

1       So yes, I'm sure there was discussion, I
2 don't understand how you can do this, but you tell me
3 what you want, what do you want from this man now, and
4 when I get that, I will use my best efforts to bring
5 him into -- to get him to do that so that we can submit
6 that and get these permits done so he can go live there
7 and we can be done with this, I'm sure there were
8 discussions of that type.

9   Q   Other than the submissions which are
10 indicated in Williams No. 4, do you recall submitting
11 any other applications or materials to the township?

12   A   I probably did not directly.   After it
13 became clear that the module wasn't going to go
14 anywhere, that's after the first meeting with Parks on
15 site that he's begun to raise issues that haven't been
16 raised before, but now we're hearing about them, that's
17 when the modification was in the module, and that was
18 submitted, but it did not come from my office.

19       If seems to me there was one other thing,
20 though, that we had to deliver to Ann Wirth's home.
21 Oh, of course, after all this stuff gets in, then I get
22 a call, and I don't know whether it was from Newton --
   I'm sorry, I don't remember which of the township
   officials called me to tell me that the scale of the
25 map was wrong and pointing out the section in the

MLP REPORTING, INC.   (570) 748-1041

---

59

1 ordinance that required a different map scale.

2       And I said fine, we'll have the surveyor
3 prepare according to scale, nobody uses that scale, so
4 I did have a second delivery to Ann Wirth's home with
5 that different scaled map.

6       Oh, and there's one other thing that they
7 wanted.   They had received a topo map, but they wanted
8 the topo map combined with either the building plan
9 drawings or the survey drawings, so we did that, too,
10 and that would have been delivered.

11       Oh, and they raised an issue -- the other
12 thing that -- well, that's not something I delivered,
13 but the letter talks about the stream crossing problem.

14   Q   What was the problem with the stream
15 crossing?

16   A   Well, the township raised -- sometime early
17 on in the process, raised the issue that David was
18 going to construct a stream crossing and that they were
19 concerned about that.

20       I had never heard anything about this, so I
21 inquired and found out that there was no stream
22 crossing, that there had been discussions, but that it
23 wasn't a part of the proposal, that that's not how
24 access was being gained to the property and I confirmed
25 with Ms. Wirth that that was not an issue.

MLP REPORTING, INC.   (570) 748-1041

---

60

1   Q   Did you come to learn that stream crossing
2 was in the original proposal?

3   A   I don't know, I never saw the original
4 proposal.

5   Q   Did you learn at any point other than from
6 Mr. Corneal that the stream crossing was abandoned at
7 some point during this process because he had purchased
8 other property?

9   A   I don't know about all those nexuses.   I was
10 aware that the stream crossing was not being used to do
11 this development.   The access to this property is on
12 the top of the hill, not down the sides.

13       The issue of the stream crossing is
14 irrelevant to the issuance of these permits, which is
15 what I was pointing out to Ms. Wirth.

16       MR. SHERR:   I don't have anything further.
17 Thank you.

18       MS. MONTGOMERY:   I'm thinking.   Give me a
19 moment.   I just have one question for you.

20

21       EXAMINATION

22

23 BY MS. MONTGOMERY:

24   Q   Mr. Williams, you testified to a variety of
25 activities and things that were undertaken with respect

MLP REPORTING, INC.   (570) 748-1041

61

1 to Mr. Corneal's property since the filing of the
2 preliminary injunction.
3          My question to you is, is it your
4 understanding that those activities were required by
5 law?
6      A    All of my involvement is after the filing
7 for a temporary restraining order, although, when I got
8 to the meeting, I didn't know that that's what they had
9 requested, but that would be logical.
10          What we did through my efforts is not
11 something that is required by law.  The township had
12 every piece of information that it needed to issue
13 appropriate permits, but hadn't done so.
14          My client is in the process of constructing
15 buildings without a permit and my goal was to find out
16 what the township wanted us to do to get those permits
17 issued.
18          As I pointed out earlier, they didn't have a
19 driveway ordinance when it was built, but we agreed to
20 submit for a driveway permit, they had acceptable soil
21 modules that they hadn't transmitted that should have
22 been submitted, and the building permit could have been
23 issued legally based on that information.  They chose
24 not to do that and they chose to take the avenue of
25 enforcement action.

62

1          In a perfect world where construction hasn't
2 started, you would probably file an action in mandamus,
3 but it's too late for that when I'm involved at the
4 stage where they've already asked for a restraining
5 order to prevent construction.
6          So no, what we did was designed, as I
7 indicated at that meeting, to get the permits issued so
8 that the township would stop the enforcement action so
9 that David could finish building and David could move
10 into the home in a timely fashion.
11          And as we sit here today, I still only have
12 the septic permit, I do not have a sewer permit, I do
13 not have a building permit and my client is still at
14 risk in terms of the state action that's filed under
15 this restraining order.
16          We are doing, within reason, or maybe even
17 without a reason, but certainly we're doing everything
18 that we can on his behalf to try to get those permits
19 to be issued.
20      MS. MONTGOMERY:  I don't have any other
21 questions.  Thank you.
22      MR. SHERR:  I have a couple others.  Now
23 that you've expressed an opinion, I'm going to have to
24 ask you some other opinions.
25

63

1                EXAMINATION
2
3 BY MR. SHERR:
4      Q    First of all, I thought it was your
5 testimony that you were unaware of what had been filed
6 with the township prior to your involvement?
7      A    Other than we knew that — other than I was
8 told by Larry that they had taken some action to
9 enforce it, to stop construction, I did not see it and
10 I didn't know the form of the action.
11      Q    But I'm speaking with respect to any
12 applications filed by Mr. Corneal, I thought your
13 testimony was you were unaware what he had filed
14 originally and what the nature of all those
15 applications were?
16      A    I had not examined those applications.  What
17 they were, sure, I'm sure I was aware of what they
18 were, but no, I never looked at them.
19      Q    So you know that originally, he filed an
20 application for a subdivision?
21      A    Yes, I think — well, I don't know about the
22 word "originally", I know that there was an application
23 involving a subdivision because I saw the map that had
24 a property line in it.
25      Q    Are you aware at some point, he changed that

64

1 subdivision plan into something different?
2      A    No, I'm not aware of that.  The lot line was
3 deleted at my meeting in order to facilitate getting
4 the building permit.  Whether there is an interim plan,
5 I have no knowledge of that.
6      Q    And with respect to the sewer module, do you
7 know whether or not his original submission of sewer
8 modules was ever changed or modified up and to the
9 point that you got involved?
10      A    Boy, I do not have any knowledge that there
11 was a second application set of modules prior to my
12 involvement.
13      Q    Now, in answering Ms. Montgomery's question,
14 what do you base your answer on?
15      A    Well, her question was, were we legally
16 required to do this?  The answer to that is simple, no.
17      Q    What do you base that on?
18      A    Well, I guess I base it on 28 years of doing
19 municipal work.
20      Q    Do you base it on anything else?
21      A    Well, I suppose we could sit here and have
22 an esoteric discussion of what the municipal law
23 requires, but the baseline is, the sewage ordinance was
24 not passed until after the driveway was constructed.
25          The building officer advised me that he

65

1 thought the building applications were all in order,
2 and the sewer modules had adequate and acceptable soil
3 sites to permit the residential development, and I'm
4 using development now in the sense of construction, not
5 development in the sense of a subdivision, were on the
6 plan and had been approved, the soil testing had been
7 done.
8         Legally, I saw no reason why those permits
9 could not have been issued, but an enforcement action
10 is undertaken, which poses a great threat of financial
11 risk to my client and I have to try to help him out of
12 that, and the way you do it, I think, from, once again,
13 28 years of experience of dealing with governmental
14 bodies, with local government in particular, it isn't
15 to sit at a meeting and say you're wrong, it's to say
16 what do you want us to do, tell us what you want us to
17 do, and if it's reasonable and if it's something we can
18 do, we'll do it.
19      Q    And what they told you to do in this
20 instance was reasonable and something that you could do
21 and you went ahead and tried to do it?
22      A    I didn't know quite all the answers about
23 the sewer, but yeah, most of what — I mean, filing a
24 permit for a driveway application, is that reasonable
25 where there's no statute that requires it, I don't

MLP REPORTING, INC.  (570) 748-1041

66

1 know, is that reasonable, but it's a piece of paper.
2         Is it reasonable to go out and dig more test
3 pits, no, it's not reasonable, but is it something that
4 we can do to keep construction going, probably.
5      Q    Well, in your 28 years of experience, have
6 you been in a situation where there was a building
7 erected before provisions for sewage were established?
8      A    Yes, but never one where the applications
9 have been filed.
10      Q    And you believe that applications had been
11 filed prior to him commencing construction?
12      A    Yes.
13      Q    How do you know that?
14      A    I guess I don't have any — in the sense
15 have I looked at the township records, no, that's just
16 my impression from looking at the dates.
17      Q    And have you seen any evidence of filing of
18 any applications prior to commencing building?
19      A    Oh, yeah, when we did the modifications, I
20 saw the original application.
21      Q    You saw an application, okay, and did you
22 see — did you see any evidence that that was actually
23 filed with the township?
24      A    I did not make an examination of the
25 township records.  I believe it was filed.

MLP REPORTING, INC.  (570) 748-1041

67

1      Q    Why do you believe that?
2      A    Well, because everyone had signed onto that.
3      Q    What do you mean everyone?
4      A    Well, the SEO, the original — I think she's
5 an engineer, she may not be an engineer, but the
6 original SEO person who did some of the work on it had
7 signed.
8      Q    Any other evidence which led you to believe
9 that the application was filed?
10      A    No, it was my understanding that those
11 applications had been filed.  I have a feeling
12 Mr. Newton told me that, too, but when, I don't know
13 when that discussion was.
14      Q    Are you aware of what Mr. Corneal originally
15 filed with the township?
16      A    Originally?
17      Q    The first thing he filed with the township.
18      A    No.
19      Q    And are you aware as to whether there were
20 any modifications with what was filed originally with
21 the township?
22      A    Well, I think you need to help me here.  Are
23 you talking about the septic permit now, are you
24 talking about the building permit?
25      Q    I'm asking you what your understanding of

MLP REPORTING, INC.  (570) 748-1041

68

1 what he filed is?
2      A    Well, I think there have been field
3 modifications to the septic, which has been caused by
4 the various issues that were raised during this
5 process, but have I sat down and compared A to B, no, I
6 haven't.
7      Q    Now, with respect to the septic itself and
8 digging extra test pits, I believe your testimony is
9 that additional test pits were required to be dug
10 because the original site had been, one, disturbed,
11 and, two, a well was dug near it?
12      A    The test pit was dug because it was obvious
13 that the township was not going to accept the soil
14 testing that had previously passed and been submitted.
15         Now, once the issue was raised about backing
16 the truck over the one pit, then the location of the
17 well becomes irrelevant, it's another reason why you
18 can't use that pit.
19         At that point, you don't try to struggle
20 with the idea of do we change the soils, do we do the
21 modifications that are necessary, you go dig another
22 test pit because now maybe there's a better way to do
23 it.
24         There's expertise that you bring to bear at
25 that point, but the reason you're bringing that

MLP REPORTING, INC.  (570) 748-1041

69

1 expertise to bear is because the permits haven't been
2 issued, the module hasn't been submitted to DEP.
3        In my opinion, if it had been, it would have
4 been approved and that the permit should have been
5 issued, but that's not the circumstance I'm in at the
6 time I'm involved.
7        It's sort of like the man who goes to a car
8 lot to buy a Buick and you're on the car lot and you
9 say, hey, there's a good price on a Cadillac, so you
10 suggest to the customer, I think you ought to drive the
11 Cadillac, that's the reason for the new septic pit,
12 there's a better way to do it, but better in this case
13 means better for Mr. Corneal, it has nothing to do with
14 the permitting.
15    Q    Now, just to modify what you said again, you
16 were involved with this and we've already established
17 you were involved with this before you had knowledge of
18 this injunctive action, correct?
19        MS. MONTGOMERY:  Objection.  I don't think
20 that's what he testified to.
21        MR. SHERR:  Well, he did.  We'll get the
22 letter out where you ask for an appeal of the -- if I
23 can see the exhibits, just so we're clear.
24    A    Yes.
25 BY MR. SHERR:

                MLP REPORTING, INC.  (570) 748-1041

70

1    Q    Yes to my question that you were involved
2 prior to knowledge of the injunctive action?
3    A    My first -- this letter of Exhibit 3 is
4 produced and probably went out of my office three days
5 before the hearing, but the filing was done in October,
6 the Judge signed the order scheduling the November
7 conference on October 19.
8        I think I was aware that some type of
9 enforcement action had been undertaken by Jackson
10 Township, that's the reason for my involvement.  I
11 think I knew that when I wrote this, but I had not seen
12 this until I got to court on November 14.
13    Q    Okay.  So you were aware when you wrote
14 Williams 3 that some type of enforcement action was
15 undertaken by the township?
16    A    I believe so.  I believe so.  What it was, I
17 don't know.  I'm sure I suspected in my mind, because
18 that's how you would do it, you would ask for a
19 temporary restraining order.
20    Q    And were you also aware that on November 10,
21 2000, that construction on a building had commenced?
22    A    Oh, I'm sure I was, yes.
        Q    Is it an unusual circumstance to be
24 requesting a hearing on a denial of a building permit
25 where construction has already commenced?

                MLP REPORTING, INC.  (570) 748-1041

71

1    A    No, not at all, that would be fairly
2 typical.  You have to protect his right because under
3 the local agency law, you only have 30 days.
4    Q    You have to protect the right, but is
5 construction already commenced with protecting that
6 right?
7    A    To me, that has no relationship.  This is
8 about failure to issue a building permit, denial --
9    Q    Well, is construction of the property -- is
10 it typical to have the building permit before you
11 build?
12    A    Typical?
13    Q    Yes.
14    A    Well, sure.  In a perfect world, that's the
15 way it's supposed to work.
16    Q    Right.  And is it also true that in a
17 perfect world, that if you believe you should have been
18 issued a building permit, instead of building, you
19 would file a mandamus action, as you stated?
20    A    That would be one approach.  You would
21 probably also file an appeal from their failure to do
22 so just to protect your rights under the local agency
23 law.
24        MR. SHERR:  I have nothing further.
25        (The deposition concluded at 12:03 p.m.)

                MLP REPORTING, INC.  (570) 748-1041

72

1 COUNTY OF UNION       :
2 COMMONWEALTH OF PENNSYLVANIA: ss
3
4        I, NICOLE L. ZIMMERMAN, Reporter-Notary
5 Public, authorized to administer oaths within and for
6 the Commonwealth of Pennsylvania and take depositions
7 in the trial of causes, do hereby certify that the
8 foregoing is the testimony of TERRY WILLIAMS, ESQ.
9        I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically
12 by the said NICOLE L. ZIMMERMAN a Reporter-Notary
13 Public, approved and agreed to, and afterwards reduced
14 to typewriting under the direction of the said
15 Reporter.
16        I further certify that the proceedings and
17 evidence are contained fully and accurately in the
18 notes taken by me on the within deposition, and that
19 this copy is a correct transcript of the same.
20        In testimony whereof, I have hereunto
21 subscribed my hand this 12th day of July, 2001.
22
23
24        _____
              NICOLE L. ZIMMERMAN
              Notary Public
25 My commission expires
   on May 24, 2003

                MLP REPORTING, INC.  (570) 748-1041