**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

DAVID B. CORNEAL and :    NO. 1:CV-00-1192
SANDRA Y. CORNEAL, :
            Plaintiffs :    JURY TRIAL DEMANDED
      v. :
     :    RAMBO, J.
JACKSON TOWNSHIP, :
Huntingdon County, Pennsylvania, :
*et al.*, :
          Defendants :

**PLAINTIFFS' CONSOLIDATED STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT AND IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

    1.    David B. Corneal is an adult individual who resides at 505 East

Fairmount Avenue, State College, PA 16801.

    2.    Sandra Y. Corneal is an adult individual, and the wife of David B.

Corneal, who resides at 505 East Fairmount Avenue, State College, PA 16801.

David B. Corneal and Sandra Y. Corneal are referred to collectively herein as "the

Corneals."

    3.    Defendant Jackson Township (the "Township") is a second class

township organized and existing under the laws of the Commonwealth of

Pennsylvania with a principal place of business at R. D. 1, Box 390, Petersburg,

PA 16669, and operates through a Board of Supervisors.

1

4.     Defendant W. Thomas Wilson is an adult individual and is a member of the Board of Supervisors of the Township. [Deposition of W. Thomas Wilson, May 18, 2001, at 13:14-18 (hereinafter, "Wilson Dep."), submitted herewith as Appendix 1]

5.     Defendant Michael Yoder is the Chairman of the Board of Supervisors of the Township. [Deposition of Michael Yoder, May 18, 2001, at 6:3-6 (hereinafter "Yoder Dep."), submitted herewith as Appendix 2]

6.     Defendant Ralph Weiler is an adult individual and is a member of the Board of Supervisors of the Township. [Deposition of Ralph Weiler, June 29, 2001, at 14:14-21 (hereinafter "Weiler Dep."), submitted herewith as Appendix 3]

7.     Defendant Ann L. Wirth is an adult individual and is the Secretary of the Township. [Deposition of Ann Wirth, May 17, 2001, at 25:4-23 (hereinafter "Wirth Dep."), submitted herewith as Appendix 4]

8.     Defendant David Van Dommelen is an adult individual and is the Building Permit Officer of the Township. [Deposition of David Van Dommelen, June 6, 2001, at 15:4-8 (hereinafter "Van Dommelen Dep."), submitted herewith as Appendix 5]

9.     Defendant Barry Parks is an adult individual and is the Sewage Enforcement Officer of the Township. [Deposition of Barry Parks, May 16, 2001, at 14:6-9 (hereinafter "Parks Dep."), submitted herewith as Appendix 6]

10.    The Corneals are the owners of an approximately ninety-five (95) acre tract of land situate in Jackson Township, Huntingdon County, Pennsylvania (the "Property"). [Deposition of David B. Corneal, February 22, 2001 at 21:13-19 (hereinafter "Corneal Dep."), submitted herewith as Appendix 7]

11.    The Corneals acquired the Property in October, 1998. [Corneal Dep. at 21:18-19]

12.    The Property was part of the estate of Defendant Wilson's late grandfather. [Wilson Dep. at 55:17-19].

13.    In 1999, the Corneals desired to subdivide and sell a portion of the Property. [Corneal Dep. at 28:2-8]

14.    Believing that subdivision approval by Huntingdon County ("the County") was required, in the fall of 1999, the Corneals hired a surveyor, David Simpson, to perform a survey of the Property and to prepare a subdivision plan. [Corneal Dep. at 29:8-19]

15.    The Corneals contacted Defendant Parks, the Township's Sewage Enforcement Officer, in July 1999 to perform tests to identify those portions of the Property which were suitable for an on-lot septic system. [Parks Dep. at 44:7-15]

16.    Suitable sites for on-lot septic were located by Defendant Parks. [Parks Dep. at 56:17-21]

17.    The Corneals were required to pay over One Thousand Four Hundred ($1,400) Dollars for Defendant Parks' services and proper compensation was, in fact, paid by the Corneals for Defendant Parks' efforts.  [Corneal Dep. at 59:9-11]

18.    After Defendant Parks identified the suitable sites for on-lot septic, the Corneals contacted Defendant Wilson and engaged Defendant Wilson's private business, Eagle Excavating, to do percolation tests at the Property.  [Wilson Dep. at 46:11-16].

19.    At the time that Corneal hired Defendant Wilson and Eagle Construction Company, Corneal did not know that Wilson was a Township supervisor.  [Corneal Dep. at 38:20-23]

20.    After Wilson's private business dug the test pits, approximately six to eight weeks later, Defendant Wilson and Eagle Construction performed percolation tests in the test pits.  [Wilson Dep. at 55:5-8; Corneal Dep. at 44:6-15]

21.    During the time period between digging the test pits and conducting the percolation tests, Corneal hired an architect and builder for his house, art studio and garage that he intended to build on the property.  [Corneal Dep. at 45:2-26:8]

22.    The Corneals compensated Defendant Wilson's private business for its excavation services in connection with the percolation tests on the Property. [Wilson Dep. at 54:21-25]

23.    At the time that Wilson's private business performed the percolation tests at the property, Wilson knew that the Corneals intended to subdivide the Property. [Wilson Dep. at 47:14-18].

24.    Approximately the time that Wilson was on the property to dig the test pits, Wilson told Corneal that there was no building code and no subdivision ordinance in Jackson Township. [Corneal Dep. at 56:1-12, 17-20]

25.    Wilson told Corneal that there were no subdivision requirements, but that he had to get the sewage enforcement officer's approval of the locations for the on-site septic before the Township signed the sewage modules that would be forwarded to the Department of Environmental Protection. [Corneal Dep. at 57:4-11]

26.    At the time that Wilson's private business performed the percolation tests at the property, the Township was not considering a moratorium on property subdivision. [Wilson Dep. at 51:13-15]

27.    After the test pits were dug and the percolation tests were completed, Simpson prepared the sewage modules, and Corneal presented them to Defendant Parks, who signed all of them. [Corneal Dep. at 59:12-14]

28.    In or around January 2000, Simpson drafted a subdivision plan for the Corneals that divided the property into three lots ("Initial Plan"). [Deposition of

David Simpson at 18:18-24 (hereinafter "Simpson Dep."), submitted herewith as Appendix 8]

29.    Corneal had discussed selling the 26-acre parcel containing the barn and the house to Defendant Wilson because it was his grandfather's farm. [Corneal Dep. at 52:17-24]

30.    In August-September, 1999, the Corneals commenced the marketing of one of the lots, a twenty-six (26) acre tract of land, upon which a house and barn were situate. [Corneal Dep. at 46:13-18]

31.    Defendant Wilson's nephew desired to purchase the portion of the Property that contained the farmhouse originally owned by Defendant Wilson's grandfather. [Wilson Dep. at 58:8-59:1]

32.    Defendant Wilson claims that he learned that John Hewett, Jr. was interested in purchasing a portion of the Property in 1999. [Wilson Dep. at 70:12-21; 73:4-15]

33.    Hewett called Corneal and expressed an interest in purchasing the farmhouse. [Corneal Dep. at 51:24-52:1]

34.    Hewett told Corneal that he had heard about the farmhouse from Defendant Wilson. [Corneal Dep. at 52:11-16]

35.    On October 7, 1999, the Corneals entered into a contract with John Hewett, Jr., and Joann Smith, pursuant to which Hewett and Smith agreed to

purchase said twenty-five (25) acre lot for One Hundred Fifty Thousand ($150,000) Dollars (the "Contract"), pursuant to which Hewett and Smith placed a down payment of Four Thousand ($4,000) Dollars and agreed to pay Five Hundred ($500) Dollars per month against the purchase price until settlement on the purchase that was scheduled for June 30, 2000. [Contract Dated Oct. 7, 1999, submitted herewith as Appendix 9]

36.     The Corneals presented the Initial Plan to the Defendant Township at the monthly meeting of the Township Board of Supervisors on or about February 7, 2000. [Wirth Dep. at 75:15-25]

37.     At the time that Corneal presented the Initial Plan to the Township at the February 2000 Township meeting, the plan showed three lots: the 26-acre lot containing the farmhouse and the barn, a 4½-acre plot in the back of the property, and the residue on which the Corneals intended to build a house, art studio and garage. [Corneal Dep. at 77:16-78:2]

38.     Corneal took three or four signed and notarized copies of the subdivision plan to the Township meeting in February 2000 to have it signed. [Corneal Dep. at 79:14-17]

39.     Corneal took the subdivision plan to the Township to have it signed because Defendant Wilson told Corneal that he had to take the plan to the

Township or bring it to the supervisors' meeting for signature. [Corneal Dep. at 79:18-80:2]

40.    At the time the Corneals submitted the Initial Plan to the Township, the Township did not have a subdivision ordinance. [Wilson Dep. at 80:18-21]

41.    Prior to the February 2000 meeting, Wilson had told Corneal that there was no subdivision ordinance in place, but never told Corneal that the Township was working on a subdivision ordinance or that a moratorium was going to be implemented. [Corneal Dep. at 81:23-82:7]

42.    When the Corneals attempted to submit the Initial Plan to the Township on February 7, 2000, they were informed that no subdivisions were being reviewed because of a moratorium on new subdivisions in the Township [the "Moratorium"). [Wilson Dep. at 94:23-95:1; Wirth Dep. at 83:11-16; Minutes of the Meeting of the Board of Supervisors of Jackson Township, February 7, 2000, submitted herewith as Appendix 10]

43.    The Moratorium was enacted at the January, 2000 meeting of the Township Board of Supervisors. [Wirth Dep. at 83:17-18; Minutes of the Meeting of the Board of Supervisors of Jackson Township, Jan. 4, 2000, submitted herewith as Appendix 11]

44.    The Moratorium was passed on January 4th during the meeting by unanimous vote of the three supervisors. [Wirth Dep. at 218:5-9; Minutes Jan. 4, 2000]

45.    The Moratorium was not passed by resolution or any other formal action, it only appears in the minutes. [Wirth Dep. at 83:19-21]

46.    Township minutes reflect that Defendants Wilson, Yoder and Weiler merely made a statement indicating that "no more sub-divisions will be approved until after the proposed Sub-Division ordinance for the Township has been approved." [Minutes Jan. 4, 2000]

47.    Defendant Wirth does not recall the Moratorium being discussed at any previous meeting of the Township Board of Supervisors. [Wirth Dep. at 83:22-24]

48.    Defendant Wirth does not recall any discussions about why the supervisors were implementing the Moratorium. [Wirth Dep. at 156:1-3]

49.    Defendant Wirth does not recall the Moratorium being discussed at any time prior to the January, 2000 meeting of the Township Board of Supervisors. [Wirth Dep. at 84:9-11]

50.    Wirth does not recall whether any discussions about the purpose of the Moratorium ever took place. [Wirth Dep. at 156:6-8]

51.    With the exception of the minutes of the Township Board of Supervisors meeting dated January 4, 2000, no documents exist relating to the Moratorium.  [Wirth Dep. at 90:14-25]

52.    Wirth "probably [did] [not] advertise" that the moratorium was going to be discussed on the January 4, 2000 meeting of the Township Board of Supervisors.  [Wirth Dep. at 92:1-16]

53.    Defendant Wirth cannot recall which Supervisor first discussed the Moratorium at the January, 2000 meeting of the Township Board of Supervisors. [Wirth Dep. at 97:7-15]

54.    Defendant Wirth recalls only that all of the Supervisors agreed on imposition of the Moratorium.  [Wirth Dep. at 97:14-15]

55.    Defendant Wirth discussed the Moratorium with Richard Stahl of the Huntingdon County Planning Commission ("HCPC").  [Wirth Dep. at 140:8-12]

56.    Wirth does not recall whether she asked Richard Stahl for any advice about whether or not the Moratorium was legal.  [Wirth Dep. at 140:13-17]

57.    The Jackson Township Board of Supervisors never held a public hearing on the Moratorium.  [Wirth Dep. at 156:19-21]

58.    The Jackson Township Board of Supervisors never formally submitted the Moratorium to the HCPC.  [Wirth Dep. at 156:22-24]

59.    There was no subdivision ordinance in place at any time prior to July 10, 2000, in Jackson Township. [Wirth Dep. at 162:25-163:5]

60.    Defendant Yoder is not familiar with the procedure to be followed by the Township to enact an ordinance. [Yoder Dep. at 6:21-25]

61.    Defendant Yoder recalls that there were conversations prior to the January 2000 meeting of the Township Board of Supervisors discussing the imposition of the Moratorium. [Yoder Dep. at 12:7-13]

62.    Defendant Yoder recalls all three supervisors being present at the conversations regarding the Moratorium that occurred prior to the January 2000 meeting of the Township Board of Supervisors. [Yoder Dep. at 12:21-13:6]

63.    Defendant Yoder believes that the conversation among the supervisors regarding the imposition of the Moratorium occurred in the fall of 1999. [Yoder Dep. at 13:7-9]

64.    At no time prior to the January, 2000 meeting of the Township Board of Supervisors did Defendant Yoder discuss the imposition of the Moratorium with Township Solicitor Larry Newton. [Yoder Dep. at 13:15-18]

65.    Defendant Yoder never personally asked Township Solicitor Larry Newton whether it was legal to impose a Moratorium upon building in Jackson Township. [Yoder Dep. at 68:18-24]

66.    Wilson, in his capacity as Supervisor of the Township, never consulted with the Township Solicitor to determine whether the Moratorium was legal.  [Wilson Dep. at 143:4-10]

67.    In fact, none of the supervisors ever consulted with Township Solicitor Newton regarding the legality of the Moratorium.  [Deposition of Larry Newton, May 17, 2001, at 25:14 – 26:23 (hereinafter "Newton Dep."), submitted herewith as Appendix 12]

68.    The Township Board of Supervisors did not seek the advice of Township Solicitor Larry Newton on February 7, 2000 prior to refusing to review the Corneals' subdivision plan.  [Yoder Dep. at 69:18-21]

69.    Defendant Wilson, in his capacity as Supervisor to the Township, never consulted with the Township Solicitor for advice in connection with the Corneals' attempts to subdivide the Property.  [Wilson Dep. 101:12-20]

70.    Corneal took the sewage modules for the Property that defendant Parks already had approved to the Township meeting in February 2000, where he asked the Township to sign the sewage modules, but the supervisors refused to sign them.  [Corneal Dep. at 59:14-20]

71.    Prior to the February 2000 Township meeting, Corneal had no contact with any official or employee of the Township other than Defendants Parks and Wilson.  [Corneal Dep. at 59:21-25]

12

72.    Defendant Wilson never told Corneal that he should hurry and get his materials to the Township throughout any of their conversations in the fall or winter of 1999.  [Corneal Dep. at 60:11-61:5]

73.    Defendant Wirth is not aware of any rule or regulation or requirement that requires subdivision plans to be submitted to the HCPC.  [Wirth Dep. at 165:1-10]

74.    At the February 2000 meeting, Defendant Wirth told Corneal that he had to take his subdivision plan to the HCPC to approve the plan before he could present it to the Township.  [Corneal Dep. at 86:19-87:2]

75.    Defendant Yoder was not aware that the Township required subdivision applicants to provide an application to the HCPC prior to review by the Township Board of Supervisors.  [Yoder Dep. at 14:14-20]

76.    Prior to enactment of the subdivision ordinance in July, 2000, Defendant Yoder was unaware of the process for submission of a subdivision application.  [Yoder Dep. at 14:7-13]

77.    The Township Board of Supervisors never consulted with the Township Solicitor during the February 2000 meeting at which the Corneals sought review of the Initial Plan.  [Wilson Dep. at 189:5-18]

78.    During the period between digging the test pits and conducting the percolation tests, Corneal also had talked to Defendant Wilson about improving the

driveway that already was on the property and crossed the stream on the property. [Corneal Dep. at 47:17-25; 48:18-22; 49:11-50:5]

79.    Shortly after the February 2000 meeting, Defendant Wilson, through Eagle Construction, told Corneal that he would not do the work to repair the road on the property.  [Corneal Dep. at 85:17-20]

80.    Shortly after the February 2000 meeting, Corneal submitted the subdivision plan to the HCPC.  [Corneal Dep. at 91:6-13]

81.    The County of Huntingdon has never enacted a subdivision and land development ordinance pursuant to the provisions of the MPC.  Rather, the County has merely caused to be prepared a "Land Development Guide" which purports to govern land development within the County.

82.    The County provided comments on the Initial Plan and, by way of letter dated February 24, 2000, recommended that the Township deny approval of the Initial Plan.  [Letter from Huntingdon County Planing Commission dated Feb. 24, 2000, submitted herewith as Appendix 13]

83.    The HCPC recommended that the Initial Plan be "denied" even though neither the County nor the Defendant Township has a duly enacted ordinance upon which a denial could be lawfully based.  [Id.]

14

84.    Attempting to cooperate with the County and the Defendants, the Corneals revised the Initial Plan to address the purported "concerns" expressed by the County Planning Commission. [Simpson Dep. at 19:24-20:14]

85.    The revised plan depicted the division of the Property into two lots, consisting of a 25.80-acre parcel of land which was to be conveyed to Hewett and Smith pursuant to the Contract and a residual 68.87-acre parcel of land (approximately) upon which the Corneals intended to construct a house, an art studio and a garage (the "Revised Plan"). [Simpson Dep. at 20:18-20]

86.    The Revised Plan was submitted to the HCPC for review. [Corneal Dep. at 113:11-13]

87.    By way of letter dated April 20, 2000, the HCPC "recommended" "conditional approval of this proposal pending adoption of the subdivision and land development ordinance" by the Township. [Letter dated Apr. 20, 2000 from Huntingdon County Planning Commission, Appendix 14]

88.    Defendant Yoder cannot recall the Township Board of Supervisors ever denying a subdivision application that the HCPC has recommended approval of. [Yoder Dep. at 15:17-20]

89.    At the March 2000 meeting, Corneal requested copies of the Township ordinances, but the Township, through Defendant Wirth, refused to

provide copies even when Mr. Corneal offered to pay for the copies to be made. [Corneal Dep. at 88:13-89:2]

90.    Mr. Corneal also requested a copy of the proposed Jackson Township subdivision ordinance prior to approval by the Township Board of Supervisors. [Wirth Dep. at 176:17-18]

91.    Despite Mr. Corneal's request for a copy of the proposed subdivision ordinance, Township secretary Wirth did not send him a copy of the proposed ordinance.  [Wirth Dep. at 176:19-20]

92.    As a result of the Township's refusal to review the Initial Plan, the Corneals' requested the Township to approve sewer modules for construction of a house, art studio and garage on the property without any subdivision.  [Corneal Dep. at 115:16-21

93.    On April 3, 2000, even after David Corneal informed the Township that he was not going to subdivide the Property, the Township acting through its Board of Supervisors refused to sign the Corneals' sewer modules for the Property. [Wilson Dep. at 120-127:18]

94.    Defendant Parks cannot recall the Township ever refusing to approve any other sewer modules that had been initially approved by Defendant Parks. [Parks Dep. at 42:18-23; 43:20-44:6]

16

95.    Prior to April 3, 2000, the Board of Supervisors of the Township never has refused to sign sewage modules that had been approved by the Sewage Enforcement Officer.  [Wilson Dep. at 169:1-5].

96.    The supervisors said they would not sign the sewer modules because of the Moratorium.  [Corneal Dep. at 106:3-4]

97.    Corneal then requested the Township to sign the sewer modules so that he could begin construction on his house and art studio without asking for the subdivision.  [Corneal Dep. at 106:6-8]

98.    In response to Corneal's request for the sewage modules to construct the house and art studio, Defendant Wirth told Corneal that constructing a second house on the same tract of ground constitutes a subdivision and, therefore, is covered by the Moratorium.  [Corneal Dep. at 108:19-109:8]

99.    After the supervisors refused to sign the sewer modules for the house, Corneal requested permission to begin construction of the art studio.  [Corneal Dep. at 115:4-6]

100.   The supervisors refused permission to begin the art studio, as well, because they said they required sewer facilities in the art studio, but were not signing any sewer modules.  [Corneal Dep. at 115:7-10]

101.   After the supervisors refused to allow him to begin construction of the art studio because he did not have a sewage permit, Corneal requested a privy

permit so that he could install a privy for the art studio.  [Corneal Dep. at 115:11-13]

102.   The supervisors responded that he would have to contact the Sewage Enforcement Officer in order to inquire about obtaining a privy permit for the art studio.  [Corneal Dep. at 116:9-11]

103.   Corneal called the Sewage Enforcement Officer, Defendant Parks, after the Supervisors' Meeting to request a privy permit.  [Corneal Dep. at 116:12-13]

104.   After the April 3, 2000, meeting at the Township Board of Supervisors, Defendant Wirth, at the instruction of the Board of Supervisors, telephoned Jackson Township sewage enforcement officer Barry Parks and told him that Mr. Corneal "could not have a privy permit."  [Wirth Dep. at 203:6-204:3]

105.   Parks told Corneal that the Township supervisors already called him and told him that Corneal was not allowed to have a privy permit and that Parks was not allowed to help Corneal get a privy permit.  [Corneal Dep. at 116:13-18]

106.   The Board of Supervisors did not seek the advice of Township Solicitor Larry Newton prior to denying the Corneals' request for a privy permit.  [Yoder Dep. at 70:11-15]

107.   In its review of the Initial Plan, the HCPC potential wetlands on the Property.  [Corneal Dep. at 97:14-17; HCPC Feb. 24 Letter]

108.    Shortly after the HCPC identified the potential wetlands, the Township required additional engineering studies to prove that Corneal was not infringing upon wetlands, despite the fact that Defendant Parks already had evaluated, tested and approved the sites.  [Corneal Dep. at 98:1-9]

109.    After the Corneals requested approval of the sewer modules for construction of the house, art studio and garage, Defendant Wirth telephoned Defendant Parks, the Sewage Enforcement Officer, and told him to go back to the Property and re-evaluate the septic sites that Defendant Parks already had approved.  [Parks Dep. at 76:6-20]

110.    Defendant Yoder recalls that either Defendant Weiler or Defendant Wilson, in their capacity as Supervisor of the Township, directed Defendant Parks, the Sewage Enforcement Officer, to go back to the Property to reinspect the sites that Defendant Parks already had approved in the sewage modules.  [Yoder Dep. at 60:24-61:19]

111.    Defendant Yoder recalls that, after Defendant Parks' reinspection of the site, that one of the five approved sites on the Property no longer was usable. [Yoder Dep. at 61:20-62:9]

112.    Defendant Yoder does not recall Defendant Parks providing any information regarding the other four sites.  [Yoder Dep. at 62:24-63:2]

113.   Defendant Yoder does not recall asking Defendant Parks about the other four sites.  [Yoder Dep. at 63:6-7]

114.   Defendant Yoder does not recall any of the other Supervisors asking about the other four sites.  [Yoder Dep. at 63:8-11]

115.   Defendant Yoder cannot recall the Township Board of Supervisors ever asking a third party to go double-check sewer modules that had already been approved by Defendant Parks.  [Yoder Dep. at 63:16-64:3]

116.   Defendant Yoder testified that it would be unusual for the Board to request a third party to double-check sewer modules that had been approved by Defendant Parks.  [Yoder Dep. at 64:4-14]

117.   The Township Board of Supervisors never consulted with the Township Solicitor during the April 2000 meeting at which the Corneals sought approval of their Sewer Modules.  [Wilson Dep. at 189:5-18]

118.   The Township Board of Supervisors never consulted with the Township Solicitor during the April 2000 meeting at which the Corneals sought review of their application for a privy permit.  [Wilson Dep. at 189:5-18]

119.   Defendant Wirth told Township solicitor Larry Newton that the supervisors were not going to sign the Corneals' sewage module.  [Wirth Dep. at 140:18-141:9]

20

120.   Wirth kept Township solicitor Newton informed about the Township's position with regard to the Corneal's sewage modules.  [Wirth Dep. at 143:2-4]

121.   Wirth kept Township solicitor Larry Newton informed about the Corneals' proposed subdivision plan.  [Wirth Dep. at 143:5-7]

122.   Defendant Wilson called Andy Patterson, Director of the Huntingdon County Conservation District, and initiated a private complaint against Corneal for potential wetlands violations.  [Wilson Dep. at 160:6-7, 161:15-163:23]

123.   Defendant Yoder testified that Defendant Wilson raised the issue of the presence of wetlands on the Property at one or two of the private meetings of the Township Supervisors.  [Yoder Dep. at 56:16-57:7]

124.   In April 2000, Pursuant to the Township Building Ordinance, David Corneal went to Van Dommelen's home to request a building permit application for the issuance of a building permit for the garage.  [Van Dommelen Dep. at 46:9-24]

125.   Section 3.02A of the Building Permit Ordinance requires an individual who desires that a building permit be issued to him or her complete an application for the permit on forms supplied by the Township.  [Building Permit Ordinance, submitted herewith as Appendix 15]

126.    When David Corneal identified himself to Van Dommelen, Van Dommelen told David Corneal that he could not issue a building permit because the Township Board of Supervisors had instructed him not to give a building permit.  [Van Dommelen Dep. at 47:2-7].

127.    A couple weeks before David Corneal sought a building permit from Van Dommelen, the Township Board of Supervisors had instructed Van Dommelen not to issue a building permit to the Corneals.  [Van Dommelen Dep. at 47:8-10]

128.    Defendant Wirth told Van Dommelen that the Township Board of Supervisors was not interested in letting the Corneals have a building permit.  [Van Dommelen Dep. at 48:23-49:2]

129.    While David Corneal was at Van Dommelen's house seeking a building permit, Van Dommelen telephoned Defendant Wilson, who told Van Dommelen not to give a permit to David Corneal.  [Van Dommelen Dep. at 47:11-13].

130.    Defendant Wilson told Defendant Van Dommelen, the Building Permit Officer, "don't you dare issue him [David Corneal] a permit."  [Wilson Dep. at 128:4-12]

131.    The Township Board of Supervisors does not have any sort of preapproval process with respect to building permits.  [Van Dommelen Dep. at 132:22-25]

132.    Van Dommelen has the responsibility to make the determination of whether to issue a building permit.  [Van Dommelen Dep. at 13:1-2]

133.    After Van Dommelen telephoned Defendant Wilson, Van Dommelen then refused to provide David Corneal with even an application for a building permit.  [Van Dommelen Dep. at 56]

134.    Van Dommelen's stated reason for refusing to provide an application for a building permit was that he "just didn't want him to have one."  [Van Dommelen Dep. at 56:17-22]

135.    Van Dommelen also called David Corneal "a trouble-making yuppie from over the mountain."  [Van Dommelen Dep. at 71:18-22]

136.    Van Dommelen never has refused to provide any other person with an application for a building permit.  [Van Dommelen Dep. at 56:23-25]

137.    Van Dommelen never has denied a buiding permit application except for the one from the Corneals.  [Van Dommelen Dep. at 44:9-20]

138.    In October 2000, Defendant Van Dommelen, the Building Permit Officer, denied the Corneals' request for building permits to construct an art studio, garage and house.  [Van Dommelen Dep. at 76:8-18; Wilson Dep. 184:10-

17; Letter from Defendant Van Dommelen to David Corneal dated October 10,

2000, submitted herewith as Appendix 16]

139.   Wilson does not know of any other building permit that ever has been

denied by the Township.  [Wilson Dep. at 186:8-11]

140.   Van Dommelen told David Corneal that the Township Board of

Supervisors intended to hold a meeting about his situation the day after he sought a

building permit application from Van Dommelen.  [Van Dommelen Dep. at 62:8-

14]

141.   After Van Dommelen refused to give David Corneal even an

application for a building permit, David Corneal sent a letter to Van Dommelen

requesting a building permit only to build a garage.  [Van Dommelen Dep. at 70:3-

71:14; Letter from David Corneal to Defendant Van Dommelen dated May 5,

2000, submitted herewith as Appendix 17]

142.   Van Dommelen ordinarily would issue a permit for a garage without

any subdivision plan or septic approval.  [Van Dommelen Dep. at 17:19-18:4]

143.   Van Dommelen refused even to telephone David Corneal about the

letter.  [Van Dommelen Dep. at 70:23-24].

144.   After Van Dommelen received the letter from David Corneal, Van

Dommelen drove to the Property to see what was happening.  [Van Dommelen

Dep. at 74:6-10]

145.   Van Dommelen granted every other building permit application that was submitted to him in 2000.  [Van Dommelen Dep. at 103:3-13; Ledger of Building Permit Applications and Grants, submitted herewith as Appendix 18]

146.   Van Dommelen did not go out to the site of any other building permit issued in 2000 to inspect the progress of the building.  [Van Dommelen Dep. at 103:21-23]

147.   Van Dommelen stated that there is no distinction between a shed, garage, barn, workshop and art studio without water for purposes of applying for a building permit.  [Van Dommelen Dep. at 164:2-6]

148.   Van Dommelen testified that he does not require submission of architectural plans for outbuildings such as a garage prior to granting a building permit.  [Van Dommelen Dep. at 147:2-9]

149.   Van Dommelen testified that there was no acceleration in building projects, either for houses or outbuildings, in the Township from 1995 through 2000.  [Van Dommelen Dep. at 168:13-18]

150.   Van Dommelen claims that the Corneals never submitted a completed building permit application for the proposed garage.  [Van Dommelen Dep. at 78:8-22]

151.    Defendant Wirth recalls David Corneal submitting applications for building permits along with checks directly to defendant Wirth.  [Wirth Dep. at 145:15-22]

152.    On October 10, 2000, Van Dommelen, with the assistance of Township Solicitor Larry Newton, wrote a letter to the Corneals purportedly denying the Corneals' building permit applications for failure to comply with, *inter alia*, the Pennsylvania Sewage Facilities Act and the Township's Subdivision and Land Development Ordinance.  [Van Dommelen Dep. at 76:8-23; 77:12-20; Van Dommelen Exh. 2]

153.    Van Dommelen wrote the October 10, 2000, letter to the Corneals at the instruction of the Township Board of Supervisors.  [Van Dommelen Dep. at 186:10-20]

154.    Prior to October 10, 2000, Van Dommelen never had denied any building permit without actually seeing the application.  [Van Dommelen Dep. at 83:5-7]

155.    Van Dommelen was concerned about sending the October 10, 2000, letter because he had never seen the building permit applications.  [Van Dommelen Dep. at 176:16-20]

26

156.   Van Dommelen felt that the Township Board of Supervisors was "usurp[ing]" his job as Building Permit Officer by directing him to send the October 10, 2000, letter to the Corneals.  [Van Dommelen Dep. at 176:21-22]

157.   Van Dommelen testified that the October 10, 2000, letter was the only time that the Township Board of Supervisors every had "usurped" his job as Building Permit Officer.  [Van Dommelen Dep. at 177:2-5]

158.   Van Dommelen did not object to the Township Board of Supervisors' action in "usurp[ing]" his job as Building Permit Officer because he did not want to "shake the boat" because he understood that the Supervisors and Township Solicitor Larry Newton wanted Van Dommelen to send the letter.  [Van Dommelen Dep. at 177:6-19]

159.   Defendant Van Dommelen discussed the contents of the October 10, 2000 letter with the Township Board of Supervisors and Secretary Ann Wirth prior to sending the letter to Mr. Corneal.  [Yoder Dep. at 51:11-13]

160.   The discussion regarding the October 10, 2000 letter from Defendant Van Dommelen to Mr. Corneal occurred at a private meeting between Defendants Van Dommelen, Wilson, Wirth, Weiler and Yoder.  [Yoder Dep. at 51:20-25]

161.   Defendant Yoder testified that he cannot recall ever having seen the letter dated November 10, 2000, from Terry Williams regarding an appeal of the denial of the Corneals' building permits.  [Yoder Dep. at 52:13-16]

162.   Wirth doesn't recall ever hearing that Mr. Corneal had requested a hearing on the denial of his building permit.  [Wirth Dep. at 146:21-24]

163.   Defendant Yoder is not aware of any Jackson Township ordinance that imposes any requirements upon the Board of Supervisors upon receipt of a document appealing the decision of the Building Permit Officer.  [Yoder Dep. at 53:25-54:4]

164.   Defendant Yoder is not aware that the building permit ordinance of Jackson Township requires the Board of Supervisors to hold a hearing within thirty (30) days after the receipt of an appeal of a decision of the Building Permit Officer. [Yoder Dep. at 54:5-9]

165.   Defendant Yoder has no knowledge of any hearing being held by the Board of Supervisors regarding the appeal of the Corneals from the decision of the Building Permit Officer as requested in the letter dated November 10, 2000. [Yoder Dep. at 54:10-18]

166.   At no time did Yoder ever seek the advice of Township Solicitor Larry Newton in connection with the activities of the Board of Supervisors with regard to the Corneals' attempts to subdivide or develop the Property.  [Yoder Dep. at 70:19-24]

167.   Defendant Yoder does not recall any of the other Supervisors ever seeking the advice of Township Supervisor Larry Newton with regard to the

Board's activities regarding the Corneals' attempts to subdivide and/or develop the Property. [Yoder Dep. at 70:25-71:3]

168.   Township Solicitor Newton shares office space and support staff, as well as certain professional and business ventures with attorney Harvey B. Reeder, Esq. [Newton Dep. at 6:7 –12:6]

169.   On or about May 1, 2000, Corneal received correspondence from Attorney Reeder, counsel for Hewett and Smith, requesting that the Agreement of Sale be terminated as a result of "difficulties with the Township in obtaining subdivision approval." [Letter from Harvey B. Reeder, Esq. To David B. Corneal, May 1, 2000, submitted herewith as Appendix 19]

170.   Prior to and after attorney Reeder sent the May 1, 2000 letter, Township Solicitor Newton discussed the Corneals' land development efforts with attorney Reeder. [Newton Dep. at 74:11 – 76:20]

171.   After Hewett and Smith backed out of the contract to purchase the 26-acre parcel, including the farmhouse and barn, Wilson's nephew approached Corneal and attempted to purchase the 26-acre parcel. [Corneal Dep. at 83:17-22]

172.   In or around July 2000, the Corneals began construction of the garage, art studio and house on the property. [Corneal Dep. at 131:12-132:2]

173. In or around October 2000, the Township filed a law suit in the Court of Common Pleas of Huntingdon County to enjoin the construction on the property because the Township had not issued the appropriate permits.

174. The Corneals' attorney, Terry Williams, Esq., represented the Corneals in the enforcement action by Jackson Township. [Deposition of Terry Williams, Esq., July 10, 2001, at *passim* (hereinafter "Williams Dep."), submitted herewith as Appendix 20]

175. In an effort to resolve the law suit filed against the Corneals, Attorney Williams undertook various activities with the Township to resolve whatever concerns they had with the construction. [Id.]

176. Attorney Williams opined that none of the activities that he undertook on behalf of Mr. Corneal with regard to obtaining permits and permissions from the Township were required by law. [Williams Dep. at 61:10-13; 64:15-16]

177. Attorney Williams opined that "the sewage ordinance was not passed until after the driveway was constructed. The building officer advised me that he thought the building applications were all in order, and the sewer modules had adequate and acceptable soil sites to permit the residential development … were on the plan and had been approved, the soil testing had been done. Legally, I saw no reason why those permits could not have been issued, but an enforcement action is undertaken, which poses a great threat of financial risk to my client and I have to

# CERTIFICATE OF SERVICE

I, Adam M. Shienvold, Esquire, hereby certify that I am this day serving a copy of the foregoing document via First Class U.S. Mail, which service satisfies the requirements of the Federal Rules of Civil Procedure and Middle District Local Rules of Court, addressed as follows:

> Anthony R. Sherr, Esquire
> Mayers, Mennies & Sherr, LLP
> 3031 Walton Road, Building A
> Suite 330, P.A. Box 1547
> Blue Bell, PA 19422-0440

Adam M. Shienvold, Esquire

Date: June 24, 2002

Attorney for Plaintiffs,
David B. and Sandra Y. Corneal

{L0249049.1}