# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL and : NO. 1:CV-00-1192
SANDRA Y. CORNEAL, :
                Plaintiffs : JURY TRIAL DEMANDED
     v. :
                       : RAMBO, J.
JACKSON TOWNSHIP, :
Huntingdon County, Pennsylvania, :
*et al.*, :
                Defendants :

**FILED**
HARRISBURG, PA

JUN 2 4 2002

MARY E. D'ANDREA, CLERK
Per_____
           Deputy Clerk

## APPENDIX OF EXHIBITS
## IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Date: June 24, 2002

ECKERT SEAMANS CHERIN & MELLOTT, LLC
Bridget E. Montgomery, Esquire
Adam M. Shienvold, Esquire
213 Market Street
8th Floor
Harrisburg, PA 17101
717-237-6000

# TABLE OF CONTENTS

1.    Deposition of W. Thomas Wilson, May 18, 2001

2.    Deposition of Michael Yoder, May 18, 2001

3.    Deposition of Ralph Weiler, June 29, 2001

4.    Deposition of Ann Wirth, May 17, 2001

5.    Deposition of David Van Dommelen, June 6, 2001

6.    Deposition of Barry Parks, May 16, 2001

7.    Deposition of David B. Corneal, February 22, 2001

8.    Deposition of David Simpson, July 10, 2001

9.    Contract dated October 7, 1999

10.   Minutes of the Meeting of the Board of Supervisors of Jackson Township, February 7, 2000

11.   Minutes of the Meeting of the Board of Supervisors of Jackson Township, January 4, 2000

12.   Deposition of Larry Newton, May 17, 2001

13.   Letter from Huntingdon County Planing Commission dated February 24, 2000

14.   Letter from Huntingdon County Planing Commission dated April 20, 2000

15.   Building Permit Ordinance

16.   Letter from Defendant Van Dommelen to David Corneal dated October 10, 2000

17.   Letter from David Corneal to Defendant Van Dommelen dated May 5, 2000

{L0252507.1}



18.    Ledger of Building Permit Applications and Grants

19.    Letter from Harvey B. Reeder, Esquire to David B. Corneal, dated May 1, 2000

20.    Deposition of Terry Williams, Esquire, July 10, 2001

WILSON, W. THOMAS ●                                    CORNEAL VS
05/18/01                              JACKSON TOWNSHIP, ET AL

Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2   DAVID B. CORNEAL and SANDRA   :
     Y. CORNEAL,                   :
 3        PLAINTIFFS               :
                                   :
 4            VS                   :    NO. 1:CV-00-1192
                                   :
 5   JACKSON TOWNSHIP, HUNTINGDON  :
     COUNTY, PENNSYLVANIA; W.      :
 6   THOMAS WILSON, individually   :
     and in his official capacity  :
 7   as Supervisor of Jackson      :
     Township; MICHAEL YODER,      :
 8   individually and in his       :
     official capacity as          :
 9   Supervisor of Jackson         :
     Township; RALPH WEILER,       :
10   individually and in his       :
     official capacity as          :
11   Supervisor of Jackson         :
     Township; BARRY PARKS,        :
12   individually and in his       :
     official capacity as Sewage   :
13   Enforcement Officer of        :
     Jackson Township; DAVID       :
14   VAN DOMMELEN, individually    :
     and in his official capacity  :
15   as Building Permit Officer;   :
     ANN L. WIRTH, individually    :
16   and in her official capacity  :
     as Secretary of Jackson       :
17   Township; and LARRY NEWTON,   :
     individually and in his       :
18   official capacity as          :
     Solicitor to Jackson          :
19   Township,                     :
          DEFENDANTS               :
20             DEPOSITION OF:  W. THOMAS WILSON
21             TAKEN BY:       PLAINTIFFS
22             BEFORE:         TERESA K. BEAR, REPORTER
                               NOTARY PUBLIC
23
               DATE:           MAY 18, 2001, 8:43 A.M.
24
               PLACE:          ECKERT SEAMANS
25                             213 MARKET STREET
                               HARRISBURG, PENNSYLVANIA
```

WILSON, W. THOMAS
05/18/01

● 

CORNEAL VS
JACKSON TOWNSHIP, ET AL

**2**

1   APPEARANCES:
2      ECKERT SEAMANS
       BY:  BRIDGET E. MONTGOMERY, ESQUIRE
3         LESLIE A. MALADY, ESQUIRE
4            FOR - PLAINTIFFS
5      MAYERS, MENNIES & SHERR, LLP
6      BY:  ANTHONY R. SHERR, ESQUIRE

7            FOR - ALL DEFENDANTS EXCEPT NEWTON

       METTE, EVANS & WOODSIDE
8      BY:  JENNIFER YANKANICH, ESQUIRE
9            FOR -  DEFENDANT - LARRY NEWTON
10  ALSO PRESENT:
11     DAVID B. CORNEAL
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1              TABLE OF CONTENTS
2                WITNESS
3   FOR PLAINTIFFS       DIRECT CROSS REDIRECT RECROSS
4   W. Thomas Wilson
      By Ms. Montgomery     4   --   191   --
5   By Ms. Yankanich       --   189   --   192
6
7                EXHIBITS
8   WILSON EXHIBIT NO.       PRODUCED AND MARKED
9   1 - Order              20
10  2 - Sewage facilities planning module      62
11  3 - Subdivisions reviewed by HCPC     120
12  4 - Minutes dated 4/3/00         134
13  5 - Packet of documents      143
14  6 - Subdivision plan         143
15  7 - Subdivision and land development     146
      ordinance Jackson Township
16
17
18
19
20
21
22
23
24
25

**4**

1            W. THOMAS WILSON, called as a witness, being
2   sworn, testified as follows:
3
4            DIRECT EXAMINATION
5
6   BY MS. MONTGOMERY:
7      Q     Mr. Wilson, would you state your name for the
8   record.
9      A     **W. Thomas Wilson.**
10     Q     I don't think we've met except briefly the
11  other day.
12     A     **Yeah, just upstairs, yes.**
13     Q     I'm Bridget Montgomery and I think, as you
14  know, I represent the Corneals in this case.  We're here to
15  take your deposition today and ask you a -- have you ever
16  had your deposition taken before?
17     A     **No.**
18     Q     I'll just give you a little bit of the ground
19  rules then.  I'm just going to ask you a series of questions
20  designed to get some facts.  If you don't understand any
21  question, I want you to ask me to clarify it and I'll be
22  happy to do that.
23           You should feel free to take a break whenever
24  you feel that you need to.  Not to confer with your counsel,
25  but if you need to go to the men's room or something like

**5**

1   that, or if you get really tired -- sometimes these things
2   can go on for a long time and we want you to be comfortable.
3           For the court reporter's sake, you need to
4   keep your voice up.  You need to speak clearly, keep your
5   voice up and let me finish my sentence and then I'll try to
6   let you finish your sentence because she can't take down two
7   people at once -- she can't take down two people talking at
8   once.  She also needs you to use verbal responses.
9      A     **I didn't think she could do that.**
10  **(Indicating.)**
11     Q     She can't do that.
12     A     **Right.**
13     Q     You can't do that.  So the other thing is I
14  want to make sure that there's no reason why you can't give
15  testimony today.  For example, are you on any kind of
16  medication that would prevent you from understanding the
17  questions or anything like that?
18     A     **None.**
19     Q     Where do you live?
20     A     **R.D. 1, Box 420, Petersburg, Pennsylvania.**
21     Q     Is Petersburg in Jackson Township?
22     A     **Yes.**
23     Q     How long have you lived there?
24     A     **Approximately 20 years at that location.**
25     Q     Where did you live prior to that?

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

**6**

1     A     I don't -- it's R.D. 1, Petersburg, but I
2 don't know what the box -- they've changed box numbers so I
3 don't know what it would be. Approximately three miles from
4 where I live now.
5     Q     Also in Jackson Township?
6     A     Yes.
7     Q     And how long did you live there?
8     A     Twenty-five years.
9     Q     Have you lived in Jackson Township all your
10 life?
11     A     Yes.
12     Q     And I don't want to be too nosey but how old
13 are you?
14     A     Fifty-eight.
15     Q     I'm going to ask you a question about a
16 document that's been marked before, but we'll mark it
17 again.
18        MS. MONTGOMERY: This is going to be Wilson
19 Exhibit 1. I'm going to mark that and hand it to the
20 witness.
21        (Order produced and marked as Wilson Exhibit
22 No. 1.)
23 BY MS. MONTGOMERY:
24     Q     Mr. Wilson, have you seen this court order
25 before?

---

**7**

1     A     No.
2     Q     Do you want to take a moment and look at it.
3     A     Okay.
4     Q     Do you understand the order?
5     A     Yes.
6     Q     What do you understand it to say?
7     A     I'm not supposed to talk to any of the other
8 defendants.
9     Q     About?
10     A     This proceeding.
11     Q     About your testimony or about their testimony?
12     A     Yes.
13     Q     You're also not supposed to talk to your
14 counsel and your counsel is not supposed to talk to you
15 about their testimony. Do you understand that?
16     A     Right.
17     Q     Did you become aware of this order on the day
18 it was entered, on May 16, 2001?
19     A     Yes.
20     Q     Just two days ago?
21     A     Yeah.
22     Q     Have you complied with the order to date?
23     A     Yes.
24     Q     Have you talked with any of the other
25 defendants about their testimony?

---

**8**

1     A     No.
2     Q     Did you have an opportunity to talk with any
3 of the other defendants about their testimony?
4     A     No.
5     Q     Who did you drive down here with today?
6     A     Ann Wirth and Mike Yoder.
7     Q     So Ann Wirth came back today for these
8 proceedings?
9     A     Yes, she knows Harrisburg. We -- so she got
10 us into the parking garage.
11     Q     So she drove down with you today and she's
12 going to wait all day and drive back with you today?
13     A     Yes.
14     Q     Mr. Wilson, in connection with this litigation
15 have you performed a search for documents?
16     A     No.
17     Q     Did anybody ask you to perform a search for
18 documents?
19     A     No.
20     Q     Do you keep any documents at your home --
21     A     No.
22     Q     -- related to -- I'm sorry, related to
23 township business?
24     A     No.
25     Q     Have you ever seen a request for production of

---

**9**

1 documents? Let me just show it to you. I'm not going to
2 make this part of the record, but anybody that wants to look
3 at it can look at it. Have you ever seen this document?
4        MS. MONTGOMERY: Let the record reflect --
5        THE WITNESS: I can't see quite as well as I
6 used to.
7        MS. MONTGOMERY: Sure. Let the record reflect
8 I'm showing him the request for production of documents that
9 was served upon the defendants in this case by plaintiffs.
10        THE WITNESS: I never seen this.
11 BY MS. MONTGOMERY:
12     Q     Did you know about it? Did you know that
13 there was a request for production of documents outstanding
14 in this case?
15     A     No.
16     Q     Not until this moment?
17     A     No.
18     Q     Is that a yes, not until this moment?
19     A     No, I didn't know.
20     Q     Until this very moment?
21     A     Right.
22     Q     Did Miss Wirth talk to you about the fact that
23 she needed to gather documents in this case?
24     A     No.
25     Q     Did you bring any documents with you?

---

**10**

1   A   No.
2   Q   Did you discuss with anybody whether you
3 should bring any documents with you?
4   A   No.
5   Q   Did you talk to Barry Parks about whether or
6 not he ought to bring any documents to his deposition?
7   A   No.
8   Q   Now, I'm going to represent to you that Mr.
9 Parks testified that the supervisors told him he shouldn't
10 bring any documents to his deposition.  Do you know who told
11 him that?
12   A   No.
13   Q   I'm going to talk to you a little bit about
14 your educational background.  What's your last -- the
15 highest degree of education that you completed?
16   A   High school.
17   Q   Did you finish high school?
18   A   Yes.
19   Q   You attended up there in Jackson Township?
20   A   Huntingdon.
21   Q   In Huntingdon?
22   A   Yes.
23   Q   Have you had any post high school education?
24   A   Two years at Penn State in turf management,
25 agronomy department.

**11**

1   Q   When did you do that?
2   A   Seventy-eight, '79.
3   Q   Did you receive any sort of degree from that?
4   A   No.
5   Q   Do you hold any certificates or licenses of
6 any other type -- of any type, I should say?
7   A   No.
8   Q   Have you done any other training of any sort?
9   A   No.
10   Q   What do you do for a living?
11   A   Excavating.
12   Q   Excavating?
13   A   Yeah.
14   Q   Do you have your own company?
15   A   I work for Eagle Excavation.
16   Q   Who owns Eagle Excavation?
17   A   It is a corporation and my son and I have
18 control of the stock.
19   Q   So do you own equal shares of the stock?
20   A   Yes.
21   Q   Are you the president?
22   A   Yes.
23   Q   Is your son the vice-president?
24   A   No, secretary/treasurer.
25   Q   Do you have a vice-president?

**12**

1   A   No.
2   Q   How many people work for you?
3   A   Five.
4   Q   Five people other than the two of you?
5   A   Yes.
6   Q   How long have you been performing excavating
7 work?
8   A   Twelve years.
9   Q   What did you do prior to that?
10   A   I was the golf course superintendent at the
11 Elk's Country Club in Boalsburg.
12   Q   Boalsburg?
13   A   Yes.
14   Q   Is that in Huntingdon County?
15   A   No, Centre County.
16   Q   And how long did you hold that position?
17   A   Twenty-one years.
18   Q   So that would take you back to the time that
19 you were about 25, right?
20   A   In that -- in that area.  A long time ago,
21 yes.
22   Q   What did you do prior to that?
23   A   I lived in Colorado for eight months.  Not
24 long enough to become a resident, but I took courses through
25 the extension service of Colorado State and that's where I

**13**

1 got into turf management.
2   Q   So you started your education at Colorado
3 State?
4   A   Yes.
5   Q   Did you attend any other colleges or
6 universities or --
7   A   No.
8   Q   -- secondary schooling of any type?
9   A   No.
10   Q   Just in the course of your life, really, have
11 you taken any other -- even initiated any other training of
12 any type in any field in -- you know, even just as a hobby?
13   A   No.
14   Q   Now, are you a township supervisor in Jackson
15 Township?
16   A   Yes.
17   Q   How long have you held that position?
18   A   A little over five years.
19   Q   Had you held any other position with Jackson
20 Township prior to that?
21   A   None.
22   Q   Did you run for township supervisor or were
23 you initially appointed or what?
24   A   I ran for the office.
25   Q   You ran for the office?

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

**14**

```
1    A    Yes.
2    Q    And the first time you ran for the office was
3  five years ago?
4    A    Yes.
5    Q    How long is the term of appointment?
6    A    Six years.
7    Q    Are you going to run again?
8    A    I submitted a petition. I will be on the
9  ballot in the fall.
10   Q    What are your duties as a township supervisor?
11   A    To look out for the welfare of the citizens of
12 that township.
13   Q    How many supervisors are there in the
14 township?
15   A    Three.
16   Q    Is that the full complement? Are there any
17 missing or open seats or anything?
18   A    No.
19   Q    Who's the chairman of the board of
20 supervisors?
21   A    Mike Yoder.
22   Q    Have you ever been the chairman?
23   A    No.
24   Q    How long is the term of the chairman?
25   A    That is set annually, each year.
```

---

**15**

```
1    Q    Has Mike Yoder been the chairman right along
2  since you've been on the board?
3    A    No.
4    Q    Who else was the chairman?
5    A    Ralph Weiler.
6    Q    Can you give me the names of the other two
7  township supervisors currently?
8    A    Yes, Ralph Weiler and Mike Yoder.
9    Q    And how long have they held those positions,
10 their positions?
11   A    I can't say on Ralph. All I know is it's a
12 long time. I have no -- but Mike's been on for six years.
13   Q    Were you on the -- were they both on the board
14 of supervisors when you joined the board?
15   A    No.
16   Q    Who came second, Weiler?
17   A    No.
18   Q    Who came after you?
19   A    No, Mike.
20   Q    Mike came after you. So you gave me the
21 general description of your responsibility as a township
22 supervisor. Can you now give me a detailed description of
23 the types of duties that you have to fulfill?
24   A    I was appointed at the annual meeting, which
25 is a reorganization meeting in January, to be road master.
```

---

**16**

```
1  So my primary duties are taking care of the roads and
2  bridges in the township.
3    Q    So you're the road master as well as a
4  township supervisor?
5    A    Yes.
6    Q    What is the -- is the road master an office
7  within the township or what is it?
8    A    It is a position that has been on the books as
9  long as I can remember in townships, rural townships.
10   Q    Is it a paid position?
11   A    Hourly.
12   Q    It's hourly. So whenever the township needs
13 work on the roads, you do it on behalf of the township --
14   A    Yes.
15   Q    -- and you just bill the township?
16   A    (Witness nods head affirmatively.)
17   Q    What about your job as township supervisor,
18 how does that pay?
19   A    $125 a month.
20   Q    How much time do you put into your job as
21 township supervisor?
22   A    I don't know the exact hours.
23   Q    Does it vary?
24   A    Yes.
25   Q    So you're the road master. What else do you
```

---

**17**

```
1  have to do as a township supervisor?
2    A    Attend meetings, overview on land development
3  and subdivisions, answer questions from the citizens.
4    Q    Let's take the first one. What was the first
5  one you said?
6    A    Overview of subdivision and land use.
7    Q    What do you do in your role as a township
8  supervisor in connection with subdivision and land use, is
9  that what you said?
10   A    Yes. The paperwork usually -- subdivision or
11 land use usually comes to the supervisors by an engineer or
12 a surveyor, that type of thing, and is laid out on the table
13 to -- for the township to review.
14   Q    When do you do that review, at the township
15 meetings or in your spare time or what?
16   A    We review them at the meeting.
17   Q    Just during the meeting?
18   A    Yes.
19   Q    Do you sometimes come early to the meeting to
20 review them or anything or they just get opened up at the
21 meeting?
22   A    No, they get opened at the meeting.
23   Q    What does an application for a subdivision
24 look like? What does it consist of? What is every document
25 that it consists of?
```

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

18

1   A      Well, there's only -- the application, there's
2 one sheet of what is required. And then the engineer or
3 architect or surveyor, they're familiar with our county and
4 the things that are on there that are on there, all the necessary
5 things for our subdivision are on there.
6   Q      Like what?
7   A      The landmarks, wetlands, streams, highways,
8 trails, all these things are on there.
9   Q      What else is in -- I mean, if you're at a
10 meeting and you are handed a proposed subdivision plan, what
11 all are you going to have to look at at that meeting at that
12 time?
13   A      The plan.
14   Q      Just the --
15   A      Yeah, one of those, a big sheet, yes.
16   Q      So a map basically?
17   A      And the presenter usually asks if there are
18 any questions that he can answer while he's there.
19   Q      Are there any attachments to it?
20   A      Yes.
21   Q      Like what?
22   A      There's -- they have to have the modules, the
23 location, seven and a half minute quad angle map which
24 determines the location. It's a government map.
25   Q      For the sewer modules you mean?

19

1   A      For the plan, the subdivision.
2   Q      What else? Anything else?
3   A      Usually once that's done there's a -- a
4 procedure that the surveyor or engineer brings in which is
5 the narrative and all these things contained -- concerning
6 the subdivision.
7   Q      Well, what are all these things concerning the
8 subdivision?
9   A      All the -- all the lots that are proposed and
10 the roads that are proposed. All the things pertaining to
11 that development.
12   Q      Let's talk about the sewer module for a
13 minute. What do you expect to see with the sewer module?
14   A      The sewer module will have on there the
15 proposed dwellings with the amount of gallon each per day
16 generated for the site.
17   Q      And would it have markings on it to show where
18 possible sewage sites could be?
19   A      Well, the map will show all the probes and
20 percs on the whole property that were done.
21   Q      Are these approved probes and percs, you mean?
22   A      Yes.
23   Q      So when the subdivision plan comes to you,
24 it's already -- it already has a sewer module attached to
25 it. And in order for you to approve it, it has to have an

20

1 approved sewer module, correct, an approved -- I'm sorry,
2 approved sewage sites, correct?
3   A      Yes.
4   Q      How do you tell that there's an approved
5 sewage site?
6   A      The work is done by the SEO.
7   Q      And the SEO, for the record, is?
8   A      Barry Parks. And he generates -- there has to
9 be an application and then he generates from the field work
10 what the perc rates are for each site and these are given to
11 the designer to design a system for each site.
12   Q      I'm going to show you a document that we're
13 going to mark as Wilson Exhibit 2.
14           (Sewage facilities planning module produced
15 and marked as Wilson Exhibit No. 2.)
16 BY MS. MONTGOMERY:
17   Q      I'd ask you to look at that, Mr. Wilson. Do
18 you know what this document is?
19   A      Yeah, it's a sewer planning module.
20   Q      As you look through this document, does it
21 have everything on there that you would need to see with
22 respect to the sewage sites for purposes of approving a
23 subdivision plan?
24   A      If this was setting in front of me at the
25 meeting, questions would be raised of why a new sewage

21

1 module wasn't generated because this has been reworked.
2   Q      Because what's been reworked?
3   A      It's been reworked.
4   Q      I'm not sure I understand what you mean. What
5 has been reworked?
6   A      Well, there's things on here that have been
7 changed.
8   Q      Well, what do you see that's been changed?
9   A      Well, the number of lots.
10   Q      Okay. So it went from a higher number of lots
11 to a lower number of lots, right?
12   A      Yeah, if I was looking at this, I would want
13 to see the map too, of which I assume there's one that ...
14   Q      Well, let's look at page 5. Do you see up in
15 Section H where you have the signature of Barry Parks?
16   A      Um-hum.
17   Q      Is that one of the things you'd look for to
18 see whether or not there's -- whether the lot is suitable
19 for on-site sewage, look for his signature up in that --
20   A      Yes.
21   Q      Let's look at page -- well, there's some
22 attachments so you'll have to go after page 9 to the site
23 investigation and percolation test reports. Would you look
24 at each one of these site investigation and percolation test
25 reports for the signature of the sewage enforcement officer?

WILSON, W. THOMAS ● CORNEAL VS
05/18/01 JACKSON TOWNSHIP, ET AL

22

```
1    A    No.
2    Q    You wouldn't look at that?
3    A    No.
4    Q    Why not?
5    A    If it's gone that far, it has been through his
6    process. And he's hired by the township to take care of
7    these things. And when these things come in, this sheet
8    will come with a design for him to either approve or
9    disapprove.
10   Q    A design of what?
11   A    An on-lot sewage system.
12   Q    When they come into -- when the subdivision
13   plan comes to you, it comes with the design of an on-lot
14   sewage system?
15   A    No.
16   Q    As long as you see that he signed off back
17   here, is that what you're concerned with, when we went back
18   here to page 5?
19   A    These modules -- when the plans come in and
20   the modules are there, Parks says -- I'm sorry, Barry Parks,
21   the sewage officer, is at the meeting to explain the soil
22   modules in reference to the subdivision.
23   Q    Let me ask you this: Do you understand the
24   process to be that the sewer modules -- sewage modules have
25   to be approved first and then you get an on-lot sewage
```

23

```
1    system designed? Do you understand that to be the process?
2    A    I don't remember.
3    Q    That's fine if you don't remember. That's
4    fine. The document that you're looking at right now, Wilson
5    Exhibit 2, is a sewage facilities planning module for the
6    Corneal property, correct?
7    A    That's what it states, yes.
8    Q    When you said it was reworked, are you looking
9    at Section 2 of page 1?
10   A    Yes.
11   Q    And how was it reworked there?
12   A    Creation of a different amount of lots.
13   Q    So it went from what?
14   A    I'm sorry. Apparently that's a three under
15   there to a two.
16   Q    How else was it reworked that would raise
17   questions for you?
18   A    That question right there I would pose to our
19   sewage officer.
20   Q    Would you be concerned that it went to fewer
21   lots or would you be concerned if it went to more lots?
22   A    Not concerned as long as the sewage work was
23   there.
24   Q    Now, let's talk a little bit more about your
25   work in excavation. Do you perform excavation work in
```

24

```
1    connection with the installation of septic systems?
2    A    We install -- the company Eagle installs
3    on-lot sewage systems.
4    Q    Is that primarily what Eagle Excavation does
5    or is there other types of excavating work that it does?
6    A    Other types.
7    Q    What else does it do?
8    A    Land clearing, road building, foundation
9    digging, water sewer lines and we repair septic systems.
10   Q    So let me ask you this question: If you had a
11   site that was contemplated for a septic system and it had in
12   some way been disturbed, do you know what you would do in
13   order to bring the site back to the way it had been before
14   it had been disturbed? Do you re-excavate, that's really my
15   question?
16   A    No.
17   Q    What do you do?
18   A    I don't know.
19   Q    Say that you had an approved sewage site --
20   have you ever had the situation where you've had an approved
21   sewage site and somebody drove over it, drove over the
22   site --
23   A    No.
24   Q    -- and you said, oh, the soil is compacted.
25   You never had a soil compaction problem for a sewage site
```

25

```
1    before?
2    A    No.
3    Q    Ever?
4    A    Ever.
5    Q    You never faced it?
6    A    Never.
7    Q    So do you know as an excavator and somebody
8    who excavates for the installation of septic systems what
9    you would do if a site was compacted by having been driven
10   over a few times? Do you know what you would do?
11   A    If I had a contractor construct a site there,
12   the sewage officer would be informed right away.
13   Q    But do you know what an excavation company
14   would do to fix it?
15        MR. SHERR: Objection.
16   BY MS. MONTGOMERY:
17   Q    Do you have any idea?
18        MR. SHERR: It's been asked and answered.
19        MS. MONTGOMERY: I'm asking if he knows what
20   he would do.
21        MR. SHERR: And he said he didn't already.
22   You can answer her question.
23        THE WITNESS: I don't know.
24   BY MS. MONTGOMERY:
25   Q    You wouldn't know how to fix it?
```

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

WILSON, W. THOMAS
05/18/01

●

CORNEAL VS
JACKSON TOWNSHIP, ET AL

26

1    MR. SHERR: Objection, asked and answered for
2  the fourth time. You can answer it again.
3    THE WITNESS: My experience in 12 years is
4  that it can't be fixed.
5  BY MS. MONTGOMERY:
6    Q    So you do think you know whether or not it
7  could be fixed? What is your experience in 12 years?
8    A    My experience in --
9    MR. SHERR: Objection. It's a compound
10  question. Which question would you like him to answer?
11  BY MS. MONTGOMERY:
12    Q    So you do think it can't be fixed?
13    A    That's -- yes.
14    Q    Why is that?
15    A    Whenever I go to the sewage seminars, that is
16  one of the things that's drilled into us as contractors,
17  don't touch a site, don't get near it.
18    Q    But then do they tell you -- if somebody does
19  get near it, do they tell you what to do?
20    A    Yes.
21    Q    What's that?
22    A    The sewage officer rejects it.
23    Q    That's what they taught you in the seminar?
24    A    Yes.
25    Q    Going one step further, you said in my

27

1  experience in 12 years -- I think this was your testimony.
2  It can't be fixed, is that what you said?
3    A    Yes.
4    Q    I'm just going to ask you a little bit more
5  about what you know about the whole process for approval of
6  a sewage system. Now, in your work as an excavator are you
7  expected to understand the process for sewage system
8  approval for on-lot sewage systems?
9    A    No.
10    Q    In your work as a supervisor are you expected
11  to know the process?
12    A    Yes.
13    Q    So do you understand the process and can you
14  explain it to me?
15    A    Initially the property owner calls -- they
16  usually call a contractor and we recommend that we can't do
17  anything till the sewage officer is called. And then the
18  sewage officer will set up a schedule where the backhoe can
19  meet there with the sewage officer and usually the property
20  owner and soil probes -- soil logs are dug.
21    Q    And then what?
22    A    Once the -- there's verification from the
23  sewage officer that there's suitable soil there for on-lot,
24  there's a direction made to do perc tests.
25    Q    And who does the perc tests?

28

1    A    That's up to the land owner.
2    Q    What kind of professional does the perc tests?
3    A    The perc test is done by the sewage officer.
4    Q    All right. And then what?
5    A    Once that's done, the -- that sheet is
6  generated like back here with his -- with his results.
7    Q    With the sewage officer's results?
8    A    Yes.
9    Q    So let the record reflect that you're
10  referring to the percolation test report, site investigation
11  and percolation test reports on Wilson Exhibit 2, correct?
12    A    Yes.
13    Q    So those are generated next and then what
14  happens?
15    A    The property owner takes these to a designer
16  and has a design constructed for bidding purposes to put a
17  system in there.
18    Q    So the property owner takes the approved
19  sewage facilities planning module to somebody for design,
20  correct?
21    A    That I don't know. The only -- my experience
22  is that the soil -- the application for on-lot sewage and
23  the soil work-up sheet from the sewage officer is all I've
24  ever seen from designers to use.
25    Q    The application you're -- tell me that again.

29

1  I'm sorry, I missed it.
2    A    Application for on-lot sewage.
3    Q    And?
4    A    On there it has proposed bedrooms of the house
5  and location of the house -- proposed location of the house,
6  proposed well. All these things are taken into
7  consideration by the designer.
8    Q    And then he designs a septic system suitable
9  for the property?
10    A    That site.
11    Q    For that site?
12    A    (Witness nods head affirmatively.)
13    Q    Now, if there's more than one approved site
14  investigation -- well, I should say if there's more than one
15  approved sewage site, could you expect that the septic
16  system designer could design one for any one of those
17  approved sites?
18    A    With the proper material.
19    Q    With the proper material. What do you mean by
20  material?
21    A    The application with the proposed building,
22  the size of the building, the wells, the location, all those
23  things, and the slopes.
24    Q    Well, I'll ask it to you slightly
25  differently. If there are a number of approved by Barry

8



**WILSON, W. THOMAS**
05/18/01

**CORNEAL VS**
**JACKSON TOWNSHIP, ET AL**

---

30

1  Parks, site investigation and percolation test reports, is
2  it permissible -- is it your understanding that it's
3  permissible to place a septic system at any one of those
4  approved sites?
5  A    No.
6  Q    Why is that?
7  A    Not except where the site is specific, where
8  that building is going to go.
9  Q    Right.
10  A    Yes.
11  Q    It's your understanding that it has to be a
12  specific site for where the building is going to be? I'm
13  not sure I understand you.
14  A    Where there's a proposed site, usually there's
15  a proposed home going to be there and a well and everything
16  with that.
17  Q    So could there be more than one site approved
18  by the sewage officer for the proposed building?
19  A    All the approved sites that he approves are
20  suitable for a building.
21  Q    Prior to joining the board of supervisors,
22  were you under contract to the township for any work at any
23  time?
24  A    No.
25  Q    No?

---

31

1  A    No.
2  Q    Prior to becoming the road master, did you
3  perform any roadwork for the township?
4  A    No.
5  Q    In your capacity as a township supervisor, are
6  you familiar with the requirements for enacting ordinances?
7  A    I don't understand.
8  Q    As a township supervisor, do you know what you
9  have to do to enact an ordinance for the township?
10  A    Yes.
11  Q    What do you have to do?
12  A    The ordinance is drawn up and discussed, the
13  supervisors discuss this, and it's -- and when it's pulled
14  together, typed up and ready for adoption, there's an ad put
15  in the newspaper to advertise it. And there's so many days,
16  and I -- I don't know what that -- off the top I don't know
17  what that is.
18      So many days that that has to be open for
19  public review and then there will be a -- once that's done,
20  there is another notice put in that the ordinance will be
21  adopted a certain time and date.
22  Q    How do you know how to enact an ordinance?
23  Who did you consult with to figure out how to enact an
24  ordinance?
25  A    Those things come out of the state

---

32

1  association, PSATS.
2  Q    The Pennsylvania Association of Township
3  Supervisors?
4  A    Yes.
5  Q    Do you consult with anybody else about
6  enacting ordinances?
7  A    I believe now things are -- I believe that the
8  township solicitor is asked to look at it to see if it meets
9  legal requirements.
10  Q    The township solicitor is?
11  A    Larry Newton.
12  Q    How long has he been the township solicitor?
13  A    I don't know.
14  Q    Has he been there since you've been there?
15  A    Yes.
16  Q    As a township supervisor?
17  A    Yes.
18  Q    So if you have any questions about whether or
19  not an ordinance is appropriate, you consult the solicitor?
20  A    Yes.
21  Q    Do you know whether or not you are supposed to
22  make copies of the ordinances available for the public?
23  A    Yes.
24  Q    You are supposed to?
25  A    Yes.

---

33

1  Q    Where do you keep them?
2  A    There's -- I'm going back here now. There was
3  copies made of the subdivision and land use ordinance and it
4  was advertised in the paper that they were available for --
5  I think it was five dollars. And we -- we don't have the
6  money that we went out and made lots of those things.
7  Usually people would call and we would have to go to
8  someplace that does that for us because we don't have those
9  facilities.
10  Q    Like a copy center you mean?
11  A    Yes, yes, and run them off, but there -- as
12  far as I know there is no reserve. It's a --
13  Q    Do you know how they're kept? Do you know how
14  the ordinances are kept? In what form, is really what I'm
15  asking you?
16  A    I think just in the filing cabinet in folders.
17  Q    In folders in Ann Wirth's office?
18  A    Yes.
19  Q    What about the proposed ordinances, do you
20  make them available to the public?
21  A    Proposed ordinance.
22  Q    Before the ordinance is actually enacted.
23  A    Yes, we -- that's law.
24  Q    So if somebody wants to see it, you make
25  arrangements for them to get a copy of it?

---

---

**34**

1    A    Yes.
2    Q    Do you think that that's -- they're entitled
3 to it?
4    A    Yes.
5    Q    Do you hold any hearings on the proposed
6 ordinances when you -- I know you haven't had a lot of
7 ordinances in your township, but to the extent you have, do
8 you hold public hearings on the ordinances?
9    A    **There again, it's advertised in the paper that**
10 **the ordinance is available for review.**
11    Q    And then what would you expect, if the public
12 has anything to say about it they would come to the township
13 meetings?
14    A    **Or call.**
15    Q    Or call?
16    A    **Yes.**
17    Q    And give their comments or what?
18    A    **Call to ask to see it, yes.**
19    Q    And who would they call?
20    A    **The secretary of the township.**
21    Q    Anybody else they could call?
22    A    **They could call any of the supervisors.**
23    Q    How about the township solicitor, could they
24 call him?
25    A    **I don't know.**

---

**35**

1    Q    So going back to my question about a public
2 hearing, is it your testimony that the public hearing that
3 you hold consists of publishing it in the paper and making
4 the proposed ordinances available if people want to see it?
5    A    **I haven't been involved in many. I haven't**
6 **been a supervisor that long, but the -- it was advertised in**
7 **the paper of a public meeting and the citizens were informed**
8 **of what was transpiring in the township for that -- that**
9 **meeting was a special for that.**
10    Q    A public township supervisor's meeting?
11    A    **A public meeting, yes.**
12    Q    But was the public meeting -- you mean a
13 meeting of the board of supervisors?
14    A    **No, a public meeting. Everybody's -- it's a**
15 **public meeting.**
16    Q    And who would be at that meeting?
17    A    **Any citizen.**
18    Q    So you think that it was advertised in the
19 paper -- with respect to the subdivision and land use
20 ordinance that was passed by Jackson Township, you believe
21 there was an advertisement for a public meeting?
22    A    **Yes.**
23    Q    I'm going to show you what we're going to mark
24 as Wilson Exhibit 3.
25        (Interruption.)

---

**36**

1 BY MS. MONTGOMERY:
2    Q    I'm going to show you -- well, I was going to
3 show you some documents. Unfortunately, when we handed Miss
4 Wirth this document yesterday, she wrote on it, it appears.
5 We won't make this an exhibit in this deposition so strike
6 that. We'll just show you the original that was part of
7 Miss Wirth's deposition.
8        MS. MONTGOMERY:  Let the record reflect that
9 we are showing Mr. Wilson Wirth Exhibit 1.
10 BY MS. MONTGOMERY:
11    Q    Is that the newspaper advertisement, notice of
12 a public meeting that you're referring to?
13    A    Yes.
14        MS. MONTGOMERY:  Apparently my secretary has
15 an emergency and I'm going to have to take a very short
16 break.  I will be right back.
17        (Break taken at 9:28 a.m. until 9:33 a.m.)
18 BY MS. MONTGOMERY:
19    Q    Just so I'm clear about your testimony on
20 public hearings for the proposed ordinances, if there was
21 going to be a public hearing would it be held at the
22 township supervisor's meeting house, meeting room, the
23 office there with the board of supervisors present?
24    A    No.
25    Q    Where would it be held?

---

**37**

1    A    At the fire hall.
2    Q    Oh, in the fire hall. Okay, all right. With
3 the board of supervisors present, right?
4    A    Yes.
5    Q    And would it be at a special meeting called by
6 the township supervisors precisely for that purpose?
7    A    Can you -- can you bring that back. I --
8 something jogged there.
9    Q    Okay. It would be at a meeting called by the
10 township supervisors, either a regular meeting or a special
11 meeting advertised by the township supervisors where
12 everybody would come so they could have a public meeting
13 about it; is that correct?
14    A    Yes.
15    Q    We talked a little bit about ordinances and
16 how you enact proposed ordinances in the township. What
17 about a moratorium? Have you ever done any other moratorium
18 other than the one that's at issue in this lawsuit?
19    A    No.
20    Q    So there has only been one moratorium and that
21 was a moratorium on proposed subdivisions, correct?
22    A    Yes.
23    Q    How did that come about?
24    A    **It came about from information that we were --**
25 **we had the county reviewing our ordinance and from the**

---



WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

38

1 emergency people in our area, fire company, EMS, all these
2 people had concerns that the subdivision and land use
3 ordinance was going to cover safety issues to the fullest
4 extent because of the rural area. So a decision was made by
5 the supervisors to stop subdivisions until the ordinance was
6 enacted.
7    Q    Subdivisions of any type, even dividing a
8 hundred acres into two lots?
9    A    Yes.
10    Q    You decided you couldn't do that for public
11 safety reasons?
12    A    No, it was to stop – as I stated, I believe,
13 to stop all subdivisions until the ordinance was in place.
14    Q    Whose idea was the moratorium?
15    A    The supervisors.
16    Q    Which supervisor first mentioned it?
17    A    I don't remember.
18    Q    Were you all in agreement on it, that this was
19 the thing to do?
20    A    Yes.
21    Q    Did you consult with somebody about it?
22    A    I don't believe.
23    Q    Did you consult with Larry Newton about it?
24    A    I don't remember.
25    Q    Did you tell Larry Newton you were going to

---

40

1    Q    Did you place the moratorium in any sort of
2 writing, written document?
3    A    Not that I recall.
4    Q    In other words, there's a written document
5 that reflects the ultimate subdivision plan that you all
6 drafted up and enacted, correct?
7    MR. SHERR:  Object to the form of the
8 question, subdivision plan.
9    MS. MONTGOMERY:  Subdivision ordinance.  Well,
10 just strike it and I'll start again.
11 BY MS. MONTGOMERY:
12    Q    There is a written document that comprises the
13 subdivision ordinance that the Jackson Township Board of
14 Supervisors enacted, correct?
15    A    Yes.
16    Q    Is there a similar written document that
17 comprises a moratorium on subdivision?
18    A    No.
19    Q    Now, you said you know that you informed Mr.
20 Newton at least after the moratorium was put in place and I
21 think you testified you're not sure exactly when, but now
22 that you've said that it was January 2000 when you enacted
23 -- or when you, I should say, put in place the moratorium,
24 does that help you recall when you told Larry Newton about
25 it?

---

39

1 put the moratorium in place?
2    A    Yes, and I believe that there was a public
3 notice put in the newspaper.
4    Q    You believe there was a public notice put in
5 the newspaper about the moratorium?
6    A    Yes.
7    Q    Who do you think put that public notice in the
8 newspaper?
9    A    Either the solicitor or the secretary.
10    Q    So if the solicitor put it in the newspaper,
11 he would have to have known about the moratorium, correct?
12    A    Yes.  I can't recall discussing it with him
13 till we did it.
14    Q    You can't recall discussing the moratorium
15 with him until after you did it?
16    A    Yes.
17    Q    How soon after you did it did you discuss it
18 with him?
19    A    I don't know.
20    Q    Do you remember when the moratorium was put in
21 place?
22    A    January 2000.
23    Q    Did you hold any public meetings on the
24 moratorium?
25    A    No.

---

41

1    A    No.
2    Q    Do you think you waited until the summer to
3 tell him about it?
4    A    No.  No, it wasn't that long.  I -- I don't
5 know -- I don't know days or weeks or -- that should be --
6 that should be available.
7    Q    When you told him?
8    A    No, when it was in the newspaper.
9    Q    Let me ask you this:  How does Larry Newton
10 bill the township for his time?
11    A    Hours of service.
12    Q    So he sends you monthly bills?
13    A    No.
14    Q    Does he send you quarterly bills?
15    A    No.
16    Q    What does he send you?
17    A    Whenever he has some time.  I guess in theory
18 he's a full-time solicitor but his services aren't used
19 every month or something like that.  It's just on an as –
20 as-needed basis.
21    Q    Is he on a salary or he's on an hourly?
22    A    Hourly.
23    Q    So if he performs work for you, then he writes
24 it down somehow, describes what the work is and sends it to
25 you in an invoice?

---

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

**42**

1    A    He sends it to the township secretary and it's
2    shown to us at the meeting, yes.
3    Q    So she shows you that?
4    A    Yes.
5    Q    Do you recall seeing some time on a township
6    -- on your township solicitor's bill for discussing the
7    moratorium or reviewing the moratorium or anything like
8    that?
9    A    No.
10    Q    No?
11    A    (Witness shook his head negatively.)
12    Q    You don't recall it?
13    A    I don't recall it.
14    Q    Well, you said you don't think you waited
15    until the summer, right? Do you think that you told him
16    about the moratorium within a few weeks?
17    A    I don't know.
18    Q    Well, you don't have to know the exact date.
19    I mean, that's not what we're looking for at all. We just
20    need an approximate time frame. Do you think it was still
21    winter when you told him about it?
22    A    I don't know.
23    Q    What makes you think that?
24    A    I -- I wish I could remember when the item was
25    in the newspaper. I just ...

---

**43**

1    Q    You think the item went into the newspaper
2    after the moratorium was in place?
3    A    Yes.
4    Q    I see. What makes you think the item went in
5    the newspaper after the moratorium was in place?
6    A    I don't know.
7    Q    Did you all decide, well, now we have the
8    moratorium, we better post it in the newspaper so everybody
9    knows about it?
10    A    Yes.
11    Q    So who did you discuss that with?
12    A    The solicitor.
13    Q    Did he tell you that now that you have a
14    moratorium you better put it in the paper so the public
15    knows about it?
16    A    No.
17    Q    But you discussed it with him, right? What
18    was the nature of the discussion?
19    A    He was informed that the Jackson Township
20    supervisors enacted by unanimous vote at the meeting and set
21    into motion the moratorium for subdivisions and land use in
22    Jackson Township until the ordinance was adopted.
23    Q    So whose idea was it to put it in the paper?
24    A    I don't know.
25    Q    You don't know?

---

**44**

1    A    No.
2    Q    That's okay. It's okay if you don't
3    remember. I'm just asking you. Did you discuss it with Ann
4    Wirth?
5    A    Discuss --
6    Q    Putting the notice of the moratorium in the
7    paper with Ann Wirth after the moratorium was put in place.
8    A    No.
9    Q    You didn't discuss it with her?
10    A    What would the need be, she's right at the
11    meeting taking down the information.
12    Q    I'm just trying to get to the point of who
13    decided to put the notice in the paper. At the January 2000
14    meeting when you put the moratorium in place, did you go
15    through a process of making a motion? Did somebody make a
16    motion to put a moratorium in place and was it approved and
17    all that or did you just all decide to stick it in the
18    minutes that there was a moratorium in place?
19    A    I don't remember.
20    Q    If you did that, if you made a motion, if you
21    said we now move -- somebody moves that there's a moratorium
22    to be put in place on subdivisions and somebody else seconds
23    it and somebody else says, you know, all in favor, would
24    that be in the minutes?
25    A    Yes.

---

**45**

1    Q    It should be in the minutes if you did it?
2    A    Yes.
3    Q    Let's talk about the first time that you met
4    David Corneal. Do you recall it?
5    A    Yes.
6    Q    When was that?
7    A    I don't remember the day.
8    Q    What was the occasion?
9    A    I believe he pulled into my business
10    establishment.
11    Q    For what purpose?
12    A    If I remember correctly, it was to do some
13    work for him.
14    Q    What kind of work?
15    A    Clean up a site.
16    Q    Clean up a site in what -- for what, do you
17    know?
18        MR. SHERR: Objection. Did you say clean off
19    the site?
20        THE WITNESS: Clean up the site.
21        MR. SHERR: Clean up?
22        THE WITNESS: Up. Yes, up.
23    BY MS. MONTGOMERY:
24    Q    Clean up a site for what?
25    A    It was some litter that deposited over the

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



---

46

1    years and he -- David wanted it cleaned up.
2    Q    So it was some trash on his property you mean?
3    A    Yes.
4    Q    And so did you perform that work for him?
5    A    No.
6    Q    Why is that?
7    A    I just never got to it.  It was a --
8    Q    It was a busy time?
9    A    Well, it was weather related and I didn't make
10   it.
11   Q    So then did you have occasion to meet him
12   another time after that?
13   A    Yes, and I -- I can't recall the dates, but he
14   needed a backhoe.
15   Q    For what?
16   A    Soil probes.
17   Q    For his soil probes.  So did he come again to
18   your business establishment?
19   A    I think so.
20   Q    Well, in any event, you agreed to go out and
21   do excavation work in connection with the soil probes?
22   A    Yes.
23   Q    When you agreed to do that, did Mr. Corneal
24   explain to you what he intended to do with his property?
25   A    I don't recall.

---

47

1    Q    Did he tell you that he wanted a number of
2    lots on his property?
3    A    I remember the part that he wanted various
4    probes dug, but I -- I don't recall of him saying exactly
5    how many lots he was looking for or anything like that.
6    Q    Did you understand he was looking for at least
7    another lot to build a building for himself, a dwelling for
8    himself?
9    A    Yes.
10   Q    Did you understand that he was also looking
11   for at least another lot perhaps for his -- for family
12   members?
13   A    No.
14   Q    So did you understand he wanted to subdivide
15   his property at least into two lots?
16   A    I under -- I was under -- under the
17   understanding that he was going to split it up into lots,
18   yeah.
19   Q    You were under that when you went out to do
20   that work?
21   A    Yes.
22   Q    Is your understanding that Mr. Corneal also
23   knew at that point that you were also a township supervisor?
24   A    I don't -- I don't know that.
25   Q    So you went out and you performed the

---

48

1    excavation work for Mr. Corneal?
2    A    Yes.
3    Q    What did that involve?
4    A    Driving a backhoe all over the property and
5    the sewage officer -- and I can't even remember if Mr.
6    Corneal was there -- deciding we're going to try this soil,
7    this site here and move on, that type of thing.
8    Q    Did you make reference to a plot plan at that
9    point or a plan or a survey of any type?
10   A    I don't recall.
11   Q    Do you recall whether there was a map, a
12   survey map or anything like that that accompanied you in
13   your work that day?
14   A    No.
15   Q    Did you have a written contract with him for
16   the services?
17   A    No.
18   Q    You just agreed on a price or was it on an
19   hourly or what?
20   A    Hourly rate.
21   Q    Did you actually do the work yourself?
22   A    No.
23   Q    Who did it?
24   A    I believe Mike Foster was on the backhoe.
25   Q    Mike Foster?

---

49

1    A    Yes.
2    Q    Is Mike Foster your nephew?
3    A    No.
4    Q    Do you have a nephew who works for you?
5    A    Yes.
6    Q    What's his name?
7    A    Matt Armstrong.
8    Q    Matt Armstrong.  Do you think maybe he was at
9    that project?
10   A    I'm sure that Matt was there at one time or
11   another.  I just can't recall -- I have more than one hoe
12   operator and ...
13   Q    Do you know how Mr. Corneal came to hire you
14   for this project?  Did somebody recommend him, do you know?
15   A    I don't know.
16   Q    Do you know whether you'd ever seen Mr.
17   Corneal at a township meeting prior to the time that Eagle
18   Excavation did the work?
19   A    I don't recall.
20   Q    But you said that you had met Mr. Corneal
21   prior to the time you did the excavation work in connection
22   with his request that you do other work on his property,
23   correct?
24   A    Yes.
25   Q    Do you recall how long you talked to him at

---

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

50

1  that meeting?
2  A    It was sort of a walk around chatty type and
3  that could be the -- the time that I said that I was a
4  township supervisor. I just -- it's been a while.
5  Q    Did you ever mention -- when Mr. Corneal first
6  contacted you to do the work on the property either removing
7  his debris or digging the test pits, did you mention a
8  proposed moratorium to him at that time?
9  A    I advised Mr. Corneal at one of the times we
10  were there working on the sewage that if he was going to
11  subdivide his property he should do it this year because
12  there's -- the township is working on ordinances for 2000.
13  Q    So that would indicate that you did understand
14  he was trying to subdivide his property --
15  A    Well --
16  Q    -- when you were doing that work for him,
17  correct?
18  A    These things sort of evolved in the days that
19  we were there working. I can't ...
20  Q    Did you come out to the property at some point
21  when somebody else was running the backhoe in connection
22  with digging the test pits?
23  A    I was in and out -- that's what I do. I -- I
24  have various jobs going and I'm here, there and everywhere.
25  Q    So you just go out to oversee it and that sort

51

1  of thing?
2  A    See if everything is okay.
3  Q    So you advised him that he ought to subdivide
4  his property at the point that you were doing his excavation
5  because you were going to put a subdivision ordinance in the
6  next year, right?
7  A    Yes.
8  Q    Do you recall what Mr. Corneal said back to
9  you about that?
10  A    No.
11  Q    At the time that you were out there working on
12  his property, or that Eagle Excavation was out there working
13  on his property was the township considering a moratorium at
14  that point?
15  A    No.
16  Q    After you dug the test pits, did the Corneals
17  ask you to do any other work on their property in your
18  capacity as Eagle Excavation?
19  A    Yes.
20  Q    What was that?
21  A    To shale a road.
22  Q    And what road was that?
23  A    The old logging road that went down to -- and
24  crossed the power line and actually got to where it crossed
25  the stream, Laurel Run.

52

1  Q    So did you shale that road?
2  A    No.
3  Q    Why not?
4  A    I came back to the office this one day and
5  there was a slip of paper there from David that McClintic
6  had said that it will take X amount of shale -- loads of
7  shale to do this road and I just -- I just didn't get to it.
8  Q    So you intended to do it but you just didn't
9  get to it?
10  A    Well, the length of time that had transpired
11  there, the next thing I knew somebody else was doing it.
12  Q    So Mr. --
13  A    It's not that I -- I had my shale pits right
14  there across the road from his house.
15  Q    So you intended to do it but he got somebody
16  else to do it?
17  A    I intended to do it, but I -- I was busy.
18  Q    Okay. Did you have any problem with where --
19  you know, any concerns at all about where he was putting
20  that road that he wanted you to shale -- was that road
21  already there?
22  A    It was an existing log road.
23  Q    So did you have any problem with shaling that
24  road? Did you think there was anything wrong with that?
25  A    No.

53

1  Q    Did Mr. Corneal ask you then to do any other
2  work on his property?
3  A    No.
4  Q    So you dug the test pits. Did you help at all
5  in any way with the perc tests?
6  A    Yes.
7  Q    What did you do there?
8  A    We dug the holes and supplied the water for
9  the sewage officer.
10  Q    And that was a different day than actually
11  digging the test pits, right?
12  A    Yes.
13  Q    So you did actually perform some other work
14  for him?
15  A    Yes.
16  Q    That's all right. Did you do the perc tests
17  after he asked you to shale the road or before?
18  A    Before.
19  Q    So asking you to shale the road, was that the
20  last thing he asked you to do for him on his property?
21  A    Yes.
22  Q    Did you know why Mr. Corneal was asking you to
23  help with the perc tests on the property?
24  A    No.
25  Q    You didn't know what he was looking for there?

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

**54**

1    A    Well, that was -- that was to get -- for the
2  sewage officer to set the perc rates, is all --
3    Q    So he was looking for on-lot septic system?
4    A    Yes.
5    Q    On a variety of lots, right?
6    A    Yeah.
7    Q    Did you understand that at the time?
8    A    Yes, yes.
9    Q    Did you actually perform the perc test
10  yourself?
11    A    No.
12    Q    Who did it?
13    A    My crew.
14    Q    Do you recall who from your crew went out and
15  did it?
16    A    No.
17    MS. MONTGOMERY:  Well, let me just consult for
18  one second.
19    (Break taken from 10:01 a.m. until 10:02 a.m.)
20  BY MS. MONTGOMERY:
21    Q    Did Mr. Corneal pay you for doing the work on
22  his property, pay Eagle Excavation for doing that work?
23    A    Yes.
24    Q    He paid all his bills?
25    A    Yes.

---

**55**

1    Q    Do you recall how much the work was --
2    A    No.
3    Q    How much the work cost?
4    A    No.
5    Q    Do you recall when you finished up the work on
6  the property with the perc tests?
7    A    June, July, August, late -- it was late
8  summer. It was dry. July, August, in that area.
9    Q    Was it your understanding that the sewage
10  enforcement officer had found a number of good sites for
11  on-lot sewage systems on that property?
12    A    Yes.
13    Q    Now, the property itself, the Corneal
14  property, are you familiar with that property from before
15  you knew Mr. Corneal?
16    A    Yes.
17    Q    And how are you familiar with that property?
18    A    That was my grandfather's farm so I ran around
19  there a lot as a tyke.
20    Q    Did you ever live there yourself?
21    A    No.
22    Q    Your grandfather owned the farm -- the
23  farmhouse that exists on the property now --
24    A    Yes.
25    Q    -- is that correct? Did he also own the whole

---

**56**

1  piece of land that Mr. Corneal owns there?
2    A    Yes.
3    Q    So there's approximately 95 acres, is that
4  what it is?  Is that what your grandfather owned?
5    A    No.
6    Q    What did he own?
7    A    He owned on the other side of the road, too,
8  clear across Route 26, which over the -- through the fifties
9  and stuff it was chopped up.
10    Q    He sold it off through the fifties?
11    A    Mostly to his children, yeah.
12    Q    Do you live near Mr. Corneal's property?
13    A    No.
14    Q    How far from it do you live?
15    A    Approximately three miles.
16    Q    When did your grandfather sell the farmhouse?
17    A    Unfortunately he didn't.  I believe it was an
18  estate sale.
19    Q    Oh, he passed away?
20    A    Yes.
21    Q    I'm sorry.  Did you -- I didn't mean to ask
22  you the question like that, I apologize.  Did he sell --
23  well, when the estate sale occurred, was it for the entire
24  95-acre piece?
25    A    No.

---

**57**

1    Q    What was it for?
2    A    It was -- and I don't know the acreage.
3  Across the township road from the farmhouse and barn, there
4  was acreage there that went with it.
5    Q    So there was still --
6    A    It was a bigger plot, yeah.
7    Q    And who bought the property at that point?
8    A    Taylor Wilson.
9    Q    Is that a relative of yours?
10    A    Yes.
11    Q    How is he related or she related to you?
12    A    He's deceased too.  He was a second cousin.
13    Q    I see.  So the property -- when did the estate
14  sale occur?
15    A    I believe I was a senior in high school, '59,
16  '60, along there somewhere.
17    Q    And then your second cousin bought the
18  property and how long did he own it?
19    A    Up until -- I don't know when he sold that
20  half off.  I don't know.  He split the property.
21    Q    He split the 95 acres that Mr. Corneal owns?
22    A    And kept everything on the west side of Miller
23  Road -- I mean Sawmill Road.
24    Q    Do you have any interest in purchasing the old
25  Wilson homestead there?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

WILSON, W. THOMAS  CORNEAL VS
05/18/01                    JACKSON TOWNSHIP, ET AL

---

58

1    A    I -- I think at -- in our -- no. I was
2  wandering there. I was thinking of -- we were walking
3  around and David and McClintic -- I don't remember who was
4  around, but I was sort of reminiscing about my grandkids, it
5  would be nice to have a place away from the highway that the
6  kids could go, but, geez, I couldn't afford to buy the
7  property.
8    Q    Are you aware of whether or not your nephew
9  approached Mr. Corneal about buying the property?
10   A    I am aware.
11   Q    And what happened?
12   A    He came back to me all excited and wanted me
13  to lend him money and I didn't have the money to lend him.
14   Q    He wanted to buy the old homestead?
15   A    Yeah.
16   Q    Did you and he discuss whether or not you
17  could buy it together or anything like that?
18   A    No.
19   Q    Did you ever discuss with him any way that you
20  could keep the property in the family?
21   A    No. What I might say is I advised him to go
22  to Kish Bank and see if he could get a mortgage set up,
23  that's what I advised him.
24   Q    Well, what your nephew was interested in
25  buying, was that the 26-acre piece with the farmhouse on it?

---

59

1    A    Yes.
2    Q    How did you become aware that the Corneals
3  were interested in selling that 26-acre piece off?
4    A    I don't recall.
5    Q    Did you ever try to help your nephew or
6  anybody else find the money to acquire that 26-acre piece
7  since Mr. Corneal has owned it?
8    A    No.
9    Q    Did you ever request that anybody assist your
10  nephew in purchasing it?
11   A    No.
12   Q    Now, at what point do you recall your nephew
13  coming to you all excited and talking about buying the
14  property?
15   A    I don't remember.
16   Q    Was it around the time you were doing the
17  excavating work?
18   A    I don't believe.
19   Q    You think it was later than that?
20   A    Yes.
21   Q    Do you think it was -- was it before the
22  winter, does that help?
23   A    I don't know.
24   Q    Well, correct me if I'm wrong, the excavation
25  work was done in 1999; isn't that correct?

---

60

1    A    Yes.
2    Q    Do you think it was before January 2000 when
3  you put the moratorium in place?
4    A    I -- I really don't know.
5    Q    Do you recall what your nephew was wearing?
6  Was he wearing a coat when he came to talk to you?
7    A    I -- I can remember him come flying -- I was
8  at the shop. He come flying in all excited that there was a
9  -- he had maybe a chance to get the property, but I -- I
10  can't recall when.
11   Q    Let me ask you this: We talked a moment ago
12  or so about Mr. Newton's bills. You said you review the
13  bills at the township meetings?
14   A    Did I say that?
15   Q    I believe you did.
16   A    I think I said that the -- the bills were
17  brought to the township meeting to be looked at by the
18  supervisors and -- which authorize payment, yes.
19   Q    Do you know where the bills are kept then?
20   A    I assume the township office.
21   Q    So they're kept by Ms. Wirth?
22   A    Yes.
23   Q    Does she have a file, do you know? Does she
24  keep a collapsible folder or something like that or --
25   A    What I know is the supervisors paid for two, I

---

61

1  believe they're four-drawer, filing cabinets because
2  whenever we go into all the flood issues we had no storage
3  room for records, to keep all the flood records and things
4  and -- we had no place to keep those.
5    Q    I see.
6    A    Which was -- geez, I forget. How could I
7  forget that? The flood when we lost the bridges, five years
8  ago.
9    Q    Ninety-six?
10   A    Yes.
11   Q    The big flood that came through here as
12  well --
13   A    Yes, yes.
14   Q    -- in '96, the winter, February?
15   A    Exactly. I had been a supervisor one month
16  and disaster hit, yes. What a learning experience.
17   Q    That's right. Now, at the time you were doing
18  the excavation work for Mr. Corneal, did you discuss Mr.
19  Corneal's intent to subdivide with the other township
20  supervisors?
21   A    I don't recall.
22   Q    Did you discuss it with Miss Wirth?
23   A    I don't believe.
24   Q    Even in passing, even just casually?
25   A    It's possible that it -- I said something

---

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

**62**

1  about it because as soon as people see me coming with a
2  backhoe -- it's a small community and -- what are you doing
3  over there. And it's possible that I said in passing to
4  somebody that, well, I think Mr. Corneal is going to
5  subdivide his property. I -- I think -- if that happened,
6  it happened that way, just as a casual thing. I don't -- I
7  don't really recall.
8      Q      Mr. Wilson, you subdivided some property not
9  too long ago; isn't that correct?
10     A      Yeah, I had approximately 12 acres that was
11  subdivided before I became a supervisor. My -- I have two
12  sons and for sons to get mortgages to build homes for their
13  families they have to own land so I had the property
14  subdivided.
15     Q      So you divided your 12 acres into how many
16  lots?
17     A      Three.
18     Q      Now, I think you testified that that was
19  subdivided before you became a supervisor, correct?
20     A      Yes.
21     Q      But you also said you became a supervisor in
22  1996, correct?
23     A      Yes.
24     Q      Well, I'm going to show you a document that we
25  will mark as Wilson 3 and I'll just ask you to look it over.

---

**63**

1          (Subdivisions reviewed by HCPC produced and
2  marked as Wilson Exhibit No. 3.)
3  BY MS. MONTGOMERY:
4      Q      Do you see about two-thirds of the way down
5  this document -- which is a list of subdivisions reviewed by
6  the Huntingdon County Planning Commission, correct?
7      A      Yes.
8      Q      Do you see your name, W. Thomas Wilson there?
9      A      Yes.
10     Q      And the date is September 3rd, 1997?
11     A      Yes.
12     Q      So maybe you were just mistaken about when you
13  subdivided?
14     A      A mistake?
15     Q      Well, I think you said you subdivided it
16  prior to --
17     A      To becoming a supervisor.
18     Q      Right. But this is a list of subdivisions
19  reviewed by the Huntingdon County Planning Commission which
20  has you dated -- the date is September 3rd, 1997. Is it
21  possible that you began the process of subdivision prior to
22  becoming a supervisor and finished it afterwards?
23     A      Oh, no, that was all complete before I became
24  a supervisor.
25     Q      Now, it's my understanding that the Huntingdon

---

**64**

1  County Planning Commission has to review every
2  subdivision --
3      A      Right.
4      Q      -- proposed subdivision within Jackson
5  Township before the supervisors will approve it; is that
6  correct?
7      A      Yes.
8      Q      Well, let's look back further on this
9  document. Two Corneal entries are on this document. Do you
10  see them on the second page, one is --
11     A      Yes.
12     Q      -- dated February 10, 2000 and one is dated
13  April 11, 2000, right?
14     A      Yes.
15     Q      Are those the dates of the submission of the
16  subdivision plan to the township?
17     A      I don't know.
18     Q      Is this the date they were reviewed by the
19  county, do you know?
20     A      I don't know.
21         MS. MONTGOMERY:  Just let the record reflect
22  that there was some discussion going on between Mr. Wilson
23  and his counsel.
24         MR. SHERR:  And for the record, I was showing
25  Mr. Wilson my doodles and my pad.

---

**65**

1          MS. MONTGOMERY:  For the record, he was
2  showing Mr. Wilson his yellow legal pad.
3          MR. SHERR:  I was showing him the doodles on
4  my legal pad, that's correct.
5  BY MS. MONTGOMERY:
6      Q      So when you say that the subdivision was
7  completed before you became a township supervisor, you mean
8  that you'd already recorded the deeds and all that?
9      A      I don't know when the -- my son's recorded
10  their deeds.
11     Q      But you'd already conveyed the deeds to them,
12  that's what you mean by the subdivision being completed?
13     A      Well, I know it was before I was a supervisor
14  because I had to deal with Koch, Wilson and Weiler as
15  supervisors when I submitted my subdivision plan.
16     Q      So you submitted it to them and they approved
17  it?
18     A      No. Well, they approved it, but it -- I
19  didn't -- it didn't happen right away. DEP and county,
20  every --
21     Q      So did your sons begin to build their homes
22  before you became a township supervisor?
23     A      Yes.
24     Q      They did. Were they completed before you
25  became a township supervisor?

---

WILSON, W. THOMAS
05/18/01

⬤

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

66

1   A    No.
2   Q    No?
3   A    They're still not done.
4   Q    Were they living -- I understand.
5   A    Yes.
6   Q    Were they living in them before you became a
7   township supervisor?
8   A    Yes.
9   Q    Both of them?
10  A    Yes.
11  Q    Now, you were talking earlier about the fact
12  that it's a small community and people saw you with the
13  backhoe and they'd say, you know, what are you doing up
14  there. So that's what makes you think you probably told
15  people what you were doing up on the Corneal property,
16  right?
17  A    I guess that, yes. I --
18  Q    Is it your belief that people generally knew
19  that Mr. Corneal was looking to subdivide his property up
20  there around that 1999 time frame?
21  A    I don't think so.
22  Q    You don't think so. Do you think the township
23  supervisors generally knew it?
24  A    I don't know that.
25  Q    Do you think the sewage enforcement officer

---

67

1   knew it?
2   A    Well, he did the sewage work. I'm assuming,
3   yeah. I ...
4   Q    What about Ann Wirth, do you think she knew
5   it?
6   A    I don't know.
7   Q    During that period of time that you were doing
8   the test pits up there and the perc tests, do you recall
9   anybody expressing any concern about Mr. Corneal's intent to
10  subdivide?
11  A    No.
12  Q    Do you recall anybody saying anything about --
13  anything about it, like, you know, oh, there's another
14  property owner here, he's going to break his property up
15  into some lots or anything like that?
16  A    No.
17  Q    Let's go back to when you subdivided your
18  property and you submitted a plan, right, to the township --
19  A    Yes.
20  Q    -- supervisors? Were there sewer modules
21  attached to your plan?
22  A    I don't remember.
23  Q    Do you recall whether Barry Parks came out and
24  did -- was Barry Parks the sewage enforcement officer at the
25  time?

---

68

1   A    Yes.
2   Q    Did he come out and look at the property that
3   you subdivided?
4   A    Yes.
5   Q    Did he perform the perc tests?
6   A    Probes and percs.
7   Q    So Eagle Excavating did the probes and percs
8   and all that as well?
9   A    I don't remember.
10  Q    You don't remember the process?
11  A    No. The only thing that comes to mind is Judy
12  Passmore did the designs for the septic systems.
13  Q    Did she do that after you got an approved
14  sewage module?
15  A    I don't remember.
16  Q    Did she do it after you got approved test
17  sites?
18  A    I'm sure because she had to have the work-up
19  sheets to do that.
20  Q    She had to have approved test sites in order
21  to make the design, correct?
22  A    Yes.
23  Q    Do you recall talking with Larry Newton at all
24  about Mr. Corneal's intent to subdivide the property around
25  the time that you were performing the excavation work out

---

69

1   there?
2   A    No.
3   Q    You don't think you talked to him about it?
4   A    No.
5   Q    Does your nephew work for anybody besides you?
6   A    I believe so.
7   Q    Who else does he work for?
8   A    Mr. Powell has a dairy farm on Powell Road. I
9   -- he spends a lot of time there so I assume he's a
10  part-time helper. I -- I'm speculating. I shouldn't do
11  that.
12  Q    That's okay. Do you know how much money your
13  nephew needed to come up with to buy the Corneal -- the
14  26-acre piece from the Corneals with the farmhouse on it?
15  A    He told me but I don't remember.
16  Q    Do you know if he discussed it with anybody
17  else in your family?
18  A    No.
19  Q    Do you know John Hewett?
20  A    Yes.
21  Q    How do you know John Hewett?
22  A    John Hewett had me do some work at his
23  property.
24  Q    Where is his property?
25  A    Property in Mooresville.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

70

1  Q    Mooresville, is that in Jackson Township?
2  A    No.
3  Q    It's in --
4  A    West, I believe.
5  Q    Is it in Huntingdon County?
6  A    Yes.
7  Q    Is he a native of that area?
8  A    I don't know.
9  Q    So he had you perform his work -- some work at
10 his property there.  When was that?
11 A    A couple years.
12 Q    Did you have occasion to discuss with John
13 Hewett the fact that Mr. Corneal was looking to sell off a
14 piece of his property with the farmhouse on it?
15 A    In working at his property down there digging
16 out -- he raises flowers.  And digging those things out, I
17 may have discussed with him -- because he was asking about
18 where can he find a place where he can grow flowers, open
19 fields, you know, and I may -- I may have said something
20 that there's a possibility that there's going to be some
21 property for sale in Jackson Township.  I --
22 Q    Do you think you had that conversation with
23 him?
24 A    It could have happened.  It could have
25 happened.

---

71

1  Q    When would that have been?
2  A    I don't remember.
3  Q    Was it around the time you were doing the work
4  for Mr. Corneal at his property, the excavation work?
5  A    I believe before that.
6  Q    So you knew that Mr. Corneal was looking to
7  sell off that 26-acre piece before you did the excavation
8  work?
9  A    No, I -- other than my nephew checking that, I
10 don't know how he became aware that he had that up for
11 sale.  I don't remember that, but that sort of led me onto
12 the idea, I guess, that maybe Hewett would be interested in
13 raising his flowers there in those open fields.
14 Q    So in any event, at some point John Hewett
15 became interested in Mr. Corneal's 26-acre piece and
16 farmhouse, correct?
17 A    Yeah, I -- I don't recall if I told him to
18 give David a call.  I just don't -- I don't remember.
19 Q    Do you recall when you first became aware that
20 John Hewett did in fact enter into an agreement with Mr.
21 Corneal to purchase that piece of property?
22 A    I don't -- I don't recall when.
23 Q    Do you recall whether it was before or after
24 your nephew expressed his interest in the property?
25 A    After.

---

72

1  Q    So then after your nephew expressed his
2  interest, then the Hewetts -- then you found out the Hewetts
3  had entered into an agreement to purchase it?
4  A    Well, I didn't -- I didn't know they -- that
5  they had gone into an agreement to purchase that.
6  Q    When did you find out that they had gone into
7  an agreement to purchase it?
8  A    When they started coming to supervisor's
9  meetings.
10 Q    When they started coming to supervisor's
11 meetings?
12 A    Yes.
13 Q    Do you know when that was?
14 A    No, I don't.
15 Q    Was it before or after you put the moratorium
16 in place in January?
17 A    I don't remember.
18 Q    So you testified that the Hewetts started to
19 come to township meetings and you think that that was after
20 they became interested in buying that piece of property from
21 Mr. Corneal, correct?
22 A    I believe that.
23 Q    Did you have occasion to talk with the Hewetts
24 about their interest in the property then around the time
25 they were coming to the township meetings?

---

73

1  A    No.
2  Q    Even at the township meetings you didn't talk
3  to them?
4  A    I may have talked to John and -- I forget her
5  name.  They introduced themselves with the pretense that
6  they hoped to be citizens of Jackson Township and wanted to
7  know the local officials and things like that, but I -- I
8  can't -- I can't say right now that I knew at that time that
9  he had some kind of a work-up with Mr. Corneal.  I -- I
10 don't know that.
11 Q    Well, was it your understanding when they
12 introduced themselves as people who were probably going to
13 be citizens of Jackson Township that that was going to be in
14 connection with the Corneal property?
15 A    I assumed that.
16 Q    Do you recall Mr. Hewett speaking at the
17 township meetings other than introducing himself?
18 A    No.
19 Q    Not ever?
20 A    Never.
21 Q    Did he ever speak to you outside the township
22 meeting about anything in connection with his intent to
23 purchase the Corneal property?
24 A    I don't remember that.
25 Q    What about his -- I guess girlfriend or

---

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

74

1 partner, whatever you would call her, do you recall speaking
2 with her at all?
3    A    Just shook her hand at a meeting. I -- if
4 she'd walk in here, I wouldn't even know her.
5    Q    Do you know how many meetings they came to?
6    A    No.
7    Q    Did you ever discuss the moratorium with the
8 Hewetts? We call them the Hewetts, even though it's been
9 represented to us that they are not married, but they are a
10 couple, I think everybody agrees.
11    A    No.
12    Q    You never discussed the moratorium with them?
13    A    No.
14    Q    Did you ever discuss the proposed subdivision
15 ordinance with them before it was enacted?
16    A    No.
17    Q    What about the completed subdivision ordinance
18 after it was enacted?
19    A    They were at the meetings when those things
20 were discussed, which was when the moratorium was on and the
21 subdivision was being -- through its final stages in early
22 2000.
23    Q    Do you recall when the subdivision ordinance
24 was enacted?
25    A    10th of July, 2000.

---

75

1    Q    So the moratorium was put in place January
2 4th, 2000 and what's that, seven months later the proposed
3 ordinance -- the ordinance was actually enacted?
4    A    Yes.
5    Q    And they were at meetings, are you saying,
6 between January 4th and the date that the proposed ordinance
7 was actually enacted?
8    A    Yes.
9    Q    Did they come to any meetings after that?
10    A    I don't believe.
11    Q    Did they ever make a phone call to you and
12 say, hey, what's going on with the proposed subdivision
13 ordinance?
14    A    No.
15    Q    Did they ever make -- to your knowledge did
16 they ever call any of the other township supervisors to
17 express any concern about the moratorium?
18    A    I don't know.
19    Q    Did anybody call them and tell them, hey,
20 there is going to be a moratorium in place so don't count on
21 purchasing Mr. Corneal's property?
22    A    No.
23    Q    Do you know whether Ann Wirth called them and
24 talked to them?
25    A    I don't know that.

---

76

1    MS. MALADY:  Could we take a break?
2    MS. MONTGOMERY:  Yes.
3    (Break taken at 10:35 a.m. until 10:45 a.m.)
4 BY MS. MONTGOMERY:
5    Q    Do you recall, Mr. Wilson, whether or not the
6 Hewetts complained directly to you about the effect that the
7 moratorium was having on their ability to purchase the
8 Corneal property?
9    A    No.
10    Q    Do you recall offering them a farmhouse that
11 you had that they could perhaps rent, a farmhouse that you
12 had?
13    A    That discussion was at a meeting, when Mr.
14 Corneal at the township meeting said that there was a
15 problem there and he needed -- those people needed to get in
16 there and I suggested why don't you rent them the farmhouse.
17    Q    Oh, I see. You mean why doesn't --
18    A    He rent his farmhouse.
19    Q    -- Mr. Corneal rent the farmhouse to them?
20    A    Yes.
21    Q    Until what?
22    A    Until the ordinances and stuff were in place
23 and his subdivision was approved.
24    Q    Do you recall what meeting that was?
25    A    No.

---

77

1    Q    Was that last year, was it like in -- after
2 the moratorium went in place obviously so it was after
3 January 2000?
4    A    It was sometime in that -- that span,
5 moratorium until enactment of the ordinance.
6    Q    Well, that just goes to my earlier question
7 which was whether or not you became aware of the fact that
8 Mr. Hewett was concerned about the effect the moratorium was
9 having on him. Does that help you remember that you were
10 aware that Mr. Hewett was concerned?
11    A    That discussion was at the meeting.
12    Q    It was at a township meeting?
13    A    Yes.
14    Q    Do you recall any more details about that
15 discussion?
16    A    They were concerned of losing their -- what
17 word do I want to use, their --
18    Q    Sales agreement?
19    A    Sales agreement or agreement they had with Mr.
20 Corneal because they were afraid that the ordinance wasn't
21 going to get passed in time.
22    Q    For them to go through with the purchase of
23 the farmhouse --
24    A    Yes.
25    Q    -- and 26 acres? Do you know what eventually

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

78

1  did happen with respect to that sales agreement?
2      A      The only thing I know is they bought property
3  somewhere else. I don't know what happened with --
4      Q      Do you know why they didn't purchase Mr.
5  Corneal's property?
6      A      Someone said that -- and I -- I shouldn't do
7  that. No, I don't know.
8      Q      Well, this is a discovery deposition so any
9  facts or information or memory that you have is useful.
10     A      Well, I don't -- I don't know who told me that
11 they had taken their agreement away or something from Mr.
12 Corneal and were going to buy the Rosdil property, I
13 believe.
14     Q      Is that in Jackson Township?
15     A      Yes.
16     Q      Did they tell you -- did that person tell you
17 why they were taking that property -- or they were, as you
18 said, taking the agreement away from Mr. Corneal?
19     A      No.
20     Q      Do you have any idea why they decided not to
21 go through with that sale?
22     A      The only thing I got from -- John called me
23 whenever he was buying another piece of property and wanted
24 to know if I could do some work for him there so he could
25 get his flowers planted. I --

---

79

1      Q      Did he talk with you at that time about the
2  Corneal property?
3      A      No.
4      Q      Did he talk with you about the subdivision
5  ordinance?
6      A      I don't remember.
7      Q      I'm not sure if I asked you this before, but I
8  need to ask you now. Is it your understanding that before
9  the board of supervisors can approve a subdivision ordinance
10 -- I'm sorry, a subdivision plan, that that plan has to go
11 to the Huntingdon County Planning Commission first?
12     A      Absolutely.
13     Q      Then it comes back to the board of supervisors
14 and then they can approve it finally?
15     A      It has a stint with the DEP too.
16     Q      After the board of supervisors approves it,
17 then the property owner can complete the subdivision and
18 begin building, assuming all the permits are in place,
19 correct?
20     A      Can record the subdivision in the office in
21 the courthouse in Huntingdon and proceed on.
22     Q      If the subdivision has already occurred, can
23 they go ahead and -- can the property owner go ahead and
24 apply for building permits and get moving on it?
25     A      That was the sticking point, I believe, at

---

80

1  some of the meetings because the subdivision had never been
2  approved and Mr. Corneal wanted building permits and he had
3  no sewage permits. So there was nothing issued.
4      Q      Let me just go back a second. If the property
5  had already been subdivided prior to the time that you had
6  your subdivision ordinance in place, could then Mr. Corneal
7  have gone and applied for his sewage permits and his
8  building permits?
9      A      If Mr. Corneal would have brought his
10 subdivision in before the end of '99, as I had suggested to
11 him, that it would be easier to get it before the new
12 regulations were in place, everything would have gone right
13 through, but things are -- things are a little different now
14 with an ordinance.
15     Q      But when he brought his subdivision plan in
16 there wasn't any ordinance, was there?
17     A      When he brought his subdivision plan in?
18     Q      When he brought his subdivision plan into the
19 board of supervisors there wasn't any subdivision ordinance,
20 was there?
21     A      No subdivision ordinance, right.
22     Q      Did you want to look at that document for some
23 reason?
24     A      No, just to clarify my mind.
25     Q      On the date that Mr. Corneal brought his

---

81

1  subdivision ordinance to --
2              MR. SHERR: That document being what has been
3  previously marked as Wilson Number 3.
4  BY MS. MONTGOMERY:
5      Q      Are you satisfied that you're correct in your
6  earlier statement?
7      A      There was no subdivision in Jackson Township.
8  I'm satisfied with that.
9      Q      No subdivision ordinance you mean?
10     A      No subdivision ordinance, yes.
11     Q      When Mr. Corneal brought his subdivision plan
12 to the township?
13     A      No, when he brought it to the township there
14 was a moratorium on.
15     Q      But no subdivision ordinance?
16     A      Right.
17     Q      I have a question for you about -- I want to
18 go back for just a second to the sequestration order that's
19 in place. This morning did you have an opportunity to speak
20 with anybody about these depositions?
21     A      No.
22     Q      About your deposition?
23     A      No. Well --
24     Q      You said no. Okay, fine. When you got here
25 this morning, what did you do?

---

WILSON, W. THOMAS
05/18/01

●

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

82

1      MR. SHERR: If you need to explain your prior
2   answer, feel free to do that.
3          MS. MONTGOMERY: I'm sorry, I didn't mean to
4   cut you off.
5          THE WITNESS: Well, I discussed when I left
6   the shop this morning with my son that I had -- I was
7   probably going to be gone all day at depositions. And of
8   course coming down here, as soon as I come in, I set down
9   and then Tony showed up and we asked to have a conference
10  with our attorney and we did that and then it was time to
11  come down here.
12  BY MS. MONTGOMERY:
13  Q      Who was all involved in that conference?
14  A      **Ann Wirth, Mike Yoder and myself and counsel.**
15  Q      That was this morning here in this office?
16  A      **Yes.**
17  Q      Where did you go to have that conference?
18  A      **A-3? Yeah.**
19  Q      Into a conference room?
20  A      **Yes.**
21  Q      And did you discuss your deposition at that
22  conference?
23         MR. SHERR: Objection as to anything that was
24  discussed at that meeting.
25         MS. MONTGOMERY: Well, you're under a court

---

83

1   order not to discuss the depositions with the other
2   defendants.
3          MR. SHERR: Attorney/client privilege. I'm
4   under a court order not to discuss the substance of
5   depositions and we're following the court order. So if you
6   think --
7          MS. MONTGOMERY: Well, you don't need to coach
8   the witness.
9          MR. SHERR: -- that that abrogates the
10  attorney/client privilege, then let's go talk to the judge
11  about it.
12         MS. MONTGOMERY: We shall.
13         MR. SHERR: All right, let's do it right now.
14  That will be the end of this deposition until we talk to the
15  judge. Come on.
16         MS. MONTGOMERY: Are you going to call the
17  judge?
18         MR. SHERR: Well, let's go over -- I'll call.
19         MS. MONTGOMERY: You can ask her.
20         MR. SHERR: You want -- if you want to
21  abrogate the attorney/client privilege --
22         MS. MONTGOMERY: You want to call. What's
23  your question going to be?
24         MR. SHERR: My question is going to be whether
25  or not it was proper to assert the attorney/client privilege

---

84

1   where I just did.
2          MS. MONTGOMERY: Go ahead and call her.
3          MR. SHERR: I don't need to call her. If you
4   don't need to call her, I don't need to call her.
5          MS. MONTGOMERY: You just said you wanted to
6   call her.
7          MR. SHERR: No, if you question whether or not
8   it was proper for me to assert the attorney/client privilege
9   or if you were going to ask him more questions about what
10  was discussed --
11         MS. MONTGOMERY: Could you read back the last
12  say three questions. You have to go back to when -- can you
13  do that? Would that be too much of a problem?
14         (The reporter read back as follows:
15         *QUESTION: I have a question for you about
     -- I want to go back for just a second to the sequestration
16  order that's in place. This morning did you have an
     opportunity to speak with anybody about these depositions?
17         ANSWER: No.
         QUESTION: About your deposition?
18         ANSWER: No. Well --
         QUESTION: You said no. Okay, fine. When you
19  got here this morning, what did you do?
         MR. SHERR: If you need to explain your prior
20  answer, feel free to do that.
         QUESTION: I'm sorry, I didn't mean to cut you
     off.
21         ANSWER: Well, I discussed when I left the
     shop this morning with my son that I had -- I was probably
22  going to be gone all day at depositions. And of course
     coming down here, as soon as I come in, I set down and Tony
23  showed up and we asked to have a conference with our
     attorney and we did that and it was time to come down here.
24         QUESTION: Who was all involved in that
     conference?
25         ANSWER: Ann Wirth, Mike Yoder and myself and
     counsel.

---

85

1          QUESTION: That was this morning here in this
     office?
2          ANSWER: Yes.
           QUESTION: Where did you go to have that
3   conference?
           ANSWER: A-3? Yeah.
4          QUESTION: Into a conference room?
           ANSWER: Yes.
5          QUESTION: And did you discuss your deposition
     at that conference?"
6
7          MS. MONTGOMERY: And the objection is?
8          MR. SHERR: I stated the basis for it,
9   didn't I?
10         MS. MONTGOMERY: I just wanted to hear it so
11  we're clear about it. Can you tell me what the objection
12  was?
13         MR. SHERR: Just so we're clear, since we were
14  talking over each other, the objection was based on
15  attorney/client privilege.
16  BY MS. MONTGOMERY:
17  Q      Who asked for that court conference?
18         MR. SHERR: Excuse me? Objection. Who asked
19  for what conference?
20  BY MS. MONTGOMERY:
21  Q      I'm sorry, who asked for that conference here
22  this morning in this office?
23  A      **I did.**
24  Q      You did?
25  A      **Yes.**

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

WILSON, W. THOMAS                       CORNEAL VS
05/18/01                                  JACKSON TOWNSHIP, ET AL

---

86

1  Q    All right. Do you know why Miss Wirth
2  accompanied you into that conference?
3  A    Yes.
4  Q    Why?
5      MR. SHERR: I'll caution you not to discuss
6  anything that was discussed during the conference in my
7  presence because it's privileged by the attorney/client
8  privilege.
9      THE WITNESS: No comment.
10  BY MS. MONTGOMERY:
11  Q    Did you discuss with Miss Wirth prior to your
12  attorney being here why she would come into the conference
13  with you?
14  A    Yes.
15  Q    And what was the nature of that discussion?
16  A    We're concerned about the welfare of one of
17  our supervisors that's -- and we'd like to see him
18  dismissed.
19  Q    From this case?
20  A    From deposition, that's ...
21  Q    You're talking about Mr. Weiler?
22  A    Yes. He's not well and that's why I called
23  that this morning because I'm afraid the man will die and I
24  don't want to do that.
25  Q    And what is wrong with Mr. Weiler?

---

87

1  A    He's got a bad heart and he's trying to take
2  care of his sister, too, and she's dying of cancer.
3  Q    How old is Mr. Weiler?
4  A    Seventy-two.
5  Q    Does he work?
6  A    No.
7  Q    Is he retired?
8  A    Yes.
9  Q    Does he still attend township supervisor
10  meetings?
11  A    Yes.
12  Q    When was your last township supervisor
13  meeting?
14  A    They're always the first Monday of the month.
15  I -- I don't know.
16  Q    Was there any kind of a meeting this week of
17  the township supervisors?
18  A    If it was the first Monday -- I'm sorry.
19  Q    You don't recall?
20  A    I don't recall.
21  Q    Did you have some sort of a meeting with Barry
22  Parks this week?
23  A    No.
24  Q    Was Mr. Weiler at the last township meeting?
25  A    Yes.

---

88

1  Q    Where does he live?
2  A    Up Allan Seegar Road, approximately five miles
3  from the fire hall.
4  Q    So he travels to the fire hall for the
5  township meetings?
6  A    Yes.
7  Q    In the evenings?
8  A    Yes.
9  Q    And what's the matter with Mr. Weiler's heart?
10  A    He's had two heart attacks and he's got a lot
11  of fluid and he has to wear oxygen at night because they're
12  afraid he's going to have a --
13  Q    I'm sorry, he has to wear what at night?
14  A    Oxygen.
15  Q    Oxygen?
16  A    Yeah, for -- to sustain him through the
17  night. They think he'll just die. So I'm concerned.
18  Q    Having told me that, I still need to ask you
19  the question why you decided that Miss Wirth had to
20  accompany you to that meeting?
21  A    All three of us were in that meeting.
22  Q    That still doesn't explain why Miss Wirth had
23  to accompany you into that meeting.
24  A    Miss Wirth calls him several times a day to
25  make sure he's okay and his sister is okay.

---

89

1  Q    With respect to Miss Wirth's interaction with
2  the township supervisors, does she pretty much do everything
3  with the township supervisors? Does she accompany you on
4  all of your say outings and jaunts, wherever you have to go,
5  if you have to go up and see the township solicitor and
6  stuff like that?
7  A    Yes.
8  Q    Does she come to every meeting with the
9  township solicitor that you can think of?
10  A    Yes.
11  Q    Why is that?
12  A    Because I can't remember things and I -- we --
13  I'm sorry, we depend on her to take notes and keep us
14  apprised of what I said or did or something I --
15  Q    Is she pretty much involved in every event or
16  task or undertaking that occurs among the township
17  supervisors then?
18  A    We burden her with all the letters,
19  correspondence, calls that have to be made. We -- that is
20  her duty, we assume, yes.
21  Q    Do you recall whether you discussed the
22  agreement of sale between John Hewett and the Corneals --
23  well, I should say the Hewetts and the Corneals with Larry
24  Newton?
25  A    No.

---

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

90

1  Q      You don't think you discussed that with them?
2  A      No.
3  Q      Did you ever tell them anything about the fact
4  that the Hewetts had abandoned that agreement of sale at any
5  time?
6  A      No.
7  Q      Do you know anything about a Department of
8  Environmental Protection or any other governmental complaint
9  that was filed against the Corneals in connection with their
10 property?
11 A      I know of no formal complaint.
12 Q      Do you know of an investigation that was
13 performed by any governmental entity in connection with
14 wetlands on their property?
15 A      Yes.
16 Q      What do you know about it?
17 A      When the -- Mr. Corneal took his subdivision
18 into county planning to have it reviewed to get his -- as we
19 suggested, as a jump ahead, a letter is -- comes out of
20 there from the review and on that letter it's noted -- which
21 is why the township uses the county planning to oversee the
22 county and how it goes to the comprehensive plan. It was
23 listed that there were steep slopes and hydric soils in
24 association -- those are usually associated with wetlands.
25         This is standard procedure with all our

91

1  subdivisions. Those readouts come to us and I'm sure Mr.
2  Corneal got one too because on the carbon at the bottom --
3  there's carbon copies of who all it got too.
4         And those things we have to investigate as a
5  township because of the situation we're in. We're in a high
6  quality stream area, prominent trout streams, and we work
7  closely with the soil conservation district. And every
8  chance we get, we get money from them to help with our roads
9  and stuff and we need -- we need to keep that cooperation
10 going because we need that money. So we look after our
11 environment, that's ...
12 Q      What about -- let's see, who do you typically
13 rely upon to tell you whether or not there's wetlands on a
14 property that an individual seeks to build --
15 A      The conservation district.
16 Q      What about the sewage enforcement officer?
17 A      He may say that there's some there, but that
18 isn't our final authority to clear -- to satisfy us. The
19 conservation district does that.
20 Q      So typically if you get a -- say a request for
21 a building permit or a proposed subdivision plan in which
22 the sewage enforcement officer has already done a site
23 investigation and percolation test report, okay, and on that
24 test report there's an indication that there aren't any
25 wetlands, do you then always go and ask somebody else for a

92

1  second opinion on that?
2  A      There aren't any, is that what you asked me?
3  Q      Yes.
4  A      I'm sorry.
5  Q      If the sewage enforcement officer says there's
6  no wetlands on the property, do you always go and get
7  somebody else to tell you whether that's correct or do you
8  accept his word for it?
9  A      No. No, that report will come from the
10 county.
11 Q      Well, let's look a second. I mean, as you
12 understand it, is there an entry on the form sewage
13 facilities planning module that comes from the Commonwealth
14 for checking off whether or not there are wetlands, as you
15 understand it?
16 A      I believe that you -- the sewage officer
17 checks that off.
18 Q      Right. So that's really what I'm asking you.
19 A      That's correct, he checks that off, but when
20 -- the whole subdivision plan comes from just the areas
21 that he has done his site work, he sees no wetlands, okay,
22 but whenever the overall plan is reviewed by the county,
23 where they have the big maps, if they see that there's
24 something there that was walked by or around or there's a
25 hollow or something there that the sewage officer really

93

1  didn't have any business in there, he isn't looking for
2  suitable sites, then it's handled by the conservation
3  district.
4  Q      So why don't you hold on to that exhibit which
5  is Wilson Exhibit 2, right?
6  A      Yes.
7  Q      And let's look at the place on there where
8  there's a place for the sewage enforcement officer to check
9  on whether or not there's going to be any wetlands affected
10 by the construction of a proposed -- construction of a
11 sewage system at a proposed site, okay. So we have a space
12 for that on here, right, on page 2; isn't that correct? Do
13 you see that?
14 A      Yes.
15 Q      It's Question 1.3, right?
16 A      Yes.
17 Q      Actually that wasn't the one, I'm sorry. When
18 you looked at this sewage module for the Corneal's property
19 and under those questions it says -- for example, 1.3, will
20 any work associated with this project take place within 50
21 feet of a stream, waterway or wetland and it's checked yes,
22 correct?
23 A      Yes.
24 Q      Now, it says stream, right, on the other side
25 of it?



94

1    A    Um-hum.
2    Q    Correct?  Did you express any concern to the
3  SEO about that?
4    A    I never seen this before today.
5    Q    You never saw this before today?
6    A    No.
7    Q    It wasn't submitted with Mr. Corneal's
8  initial --
9        MR. SHERR:  I'm going to object to both
10  attorneys asking questions.
11       MS. MALADY:  I'm sorry.
12       MS. MONTGOMERY:  She's talking to me.
13       MR. SHERR:  Well, she's talking out loud and I
14  think that has to be placed on the record if she's thinking
15  out loud at a deposition.
16  BY MS. MONTGOMERY:
17   Q    The sewage facilities planning module was not
18  attached to any subdivision plan that Mr. Corneal submitted
19  to the township?
20   A    I've never seen the subdivision plan.
21   Q    Did Mr. Corneal try to hand you a subdivision
22  plan at a township meeting one time?
23   A    He laid a subdivision plan on the desk on the
24  table at our meeting -- oh boy, February?  And he was
25  informed that there was no subdivisions being reviewed at

95

1  this time because of the moratorium and he suggested that --
2  someone suggested to him, one of the supervisors or -- that
3  if he -- it had to go to the -- the Huntingdon County
4  Planning to be reviewed anyhow and if he wanted to have a
5  step up while we're working on the ordinance to take it in.
6  I -- I seen it.  I couldn't even tell you what it looks
7  like.  He laid it down there and he picked it up and took
8  off with it.
9    Q    Are you saying that he took the plan back with
10  him?
11   A    Yes.
12   Q    Did he try to get you to keep the plan?
13   A    No.
14   Q    He put it in front of you and you said we
15  don't want this plan right now, take it to the Huntingdon
16  County Planning Commission?
17       MR. SHERR:  Object to the form of the
18  question.  You're trying to misstate his testimony at this
19  time.
20  BY MS. MONTGOMERY:
21   Q    You can correct me if I'm wrong, Mr. Wilson.
22  You told him we're not going to take your plan right now,
23  you should take it to the Huntingdon County Planning
24  Commission; is that correct?
25   A    No.

96

1    Q    What was correct?
2    A    It was -- it was suggested -- he wondered
3  about the procedure.  It was suggested that to save time he
4  take it to Huntingdon County to have it reviewed, but still
5  no action can be taken on it until the supervisors sign it.
6    Q    So I think what you're telling me is that it
7  may or may not have been attached to the subdivision plan
8  but you didn't look at the subdivision plan on the day that
9  he gave it to you; is that correct?
10       MR. SHERR:  Objection.  The question is
11  ambiguous and you didn't define what it is.  You can answer
12  the question.
13  BY MS. MONTGOMERY:
14   Q    Do you understand my question?
15       MR. SHERR:  You can answer the question if you
16  understand the question.
17       THE WITNESS:  There were no items attached to
18  that plan that he laid on the table and took off.  I -- I
19  think he told us at the meeting when he laid it down it's
20  for five lots.  I can't -- and that's -- that's ...
21  BY MS. MONTGOMERY:
22   Q    So is what you're calling a plan just a map?
23   A    Subdivision plan, a layout with all the
24  details, sewage, probes, percs, everything is on there,
25  wetlands, everything, streams, roads, yes.

97

1    Q    And you're saying that there were -- there was
2  nothing attached to that the day that he came to the
3  meeting?
4    A    No, it was just a -- a piece of paper.
5    Q    Just one piece of paper?
6    A    Yes.
7    Q    In any event, if the sewage enforcement
8  officer tells you that there are no wetlands on a piece of
9  property on which an individual is seeking to build and
10  place an on-lot septic system, do you accept his word for
11  it?
12   A    Not if the county sends out its referral that
13  there's wetlands on that property.
14   Q    Is that what happened with Mr. Corneal's
15  property?
16   A    Yes.
17   Q    The county came back and said there are
18  wetlands on that property?
19   A    Yes.
20   Q    Then did you call and file a complaint against
21  Mr. Corneal about an attempt to construct on property with
22  wetlands?
23   A    No.
24   Q    Did Ms. Wirth to your knowledge?
25   A    No.

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

98

1    Q    Do you know how the Army Corps of Engineers
2 came to go out and do an investigation on Mr. Corneal's
3 property?
4    A    I don't know.
5    Q    Do you know that they did an investigation on
6 Mr. Corneal's property?
7    A    Yes.
8    Q    Do you know why they did an investigation on
9 his property?
10    A    I talked to the director of the Huntingdon
11 County Conservation District after that because I got a -- I
12 personally received a call from the conservation district
13 and I asked Andy what happened, because we refer these to
14 Andy. He's in charge of the county.
15        Well, he was concerned because they'd already
16 issued -- which we didn't know. They told us at that time
17 issued a permit for a stream crossing and then we had this
18 wetland issue. So he assumed -- he didn't go out to look at
19 the -- he just issued the permit to -- I think he told me it
20 was McClintic. And after this alarm went off, he decided to
21 call in someone else to assist them with the evaluation of
22 that property.
23    Q    So is it your belief, your understanding that
24 the Army Corps of Engineers showed up there because of
25 something the county did?

---

99

1    A    No, something that the conservation district
2 asked them to do.
3    Q    You think the conservation district called the
4 Army Corps of Engineers and said you need to go do an
5 investigation?
6    A    I assume that. I didn't call them.
7    Q    Who did you talk to from the conservation
8 district about this?
9    A    Andy Patterson.
10    Q    And who is Andy Patterson?
11    A    Director.
12    Q    Director of -- what's your conservation
13 district?
14    A    Huntingdon County.
15    Q    Is that a county district or is it a federal
16 district or what?
17    A    County.
18    Q    And so you think that Andy Patterson called
19 the U.S. Army Corps of Engineers and had them come out?
20    A    I don't know.
21    Q    Do you know whether Miss Wirth called anybody
22 in connection with possible wetlands on Mr. Corneal's
23 property?
24    A    I don't know.
25    Q    Did you call anybody in connection with

---

100

1 possible wetlands on Mr. Corneal's property?
2    A    No.
3    Q    Do you have any -- can you think of any other
4 instance wherein a sewage enforcement officer in Jackson
5 Township has been unconcerned about wetlands and the county
6 has expressed some concern about wetlands?
7    A    No.
8    Q    Can you think of another instance?
9    A    No.
10    Q    Just Mr. Corneal's instance?
11    A    That's -- that's the only one I can think of.
12    Q    Do you know of any instance at all when
13 anybody called any government agency and filed a complaint
14 about Mr. Corneal?
15    A    No.
16    Q    Did you ever discuss with Larry Newton the
17 denial of the Corneal -- or the refusal of the Corneal
18 subdivision plan?
19    A    No.
20    Q    Not ever, not even to this day?
21    A    We're in litigation with Mr. Corneal, the
22 township.
23    Q    You mean up in the county?
24    A    Yes.
25    Q    So you've discussed it with him in connection

---

101

1 with that?
2    A    Mr. Newton is aware that the subdivision is
3 not approved.
4    Q    When did he become aware of that?
5    A    I don't know.
6    Q    If you're going to ask Mr. Newton for advice
7 on behalf of the township supervisors, do you call him or
8 does Miss Wirth call him?
9    A    It depends.
10    Q    Do you sometimes call him?
11    A    Yes.
12    Q    Have you ever called him for advice in
13 connection with the Corneal property?
14    A    No.
15    Q    Have you ever called him with a group of other
16 people for advice in connection with the Corneal property?
17    A    No.
18    Q    Have you ever directed anybody to call him for
19 advice in connection with the Corneal property?
20    A    No.
21    Q    Do you know whether anybody among the
22 township supervisors or Miss Wirth or the sewage enforcement
23 officer or anybody else connected with the township has
24 called Mr. Newton for advice in connection with the Corneal
25 property?

---

WILSON, W. THOMAS  CORNEAL VS
05/18/01                                    JACKSON TOWNSHIP, ET AL

102

1   A   No.
2   Q   You don't know or you think they haven't?
3   A   I don't know.
4   Q   What about in connection with the subdivision
5   ordinance, did you call him personally and ask him how you
6   ought to go about enacting a subdivision ordinance?
7   A   No.
8   Q   Do you know whether anybody else did?
9   A   I don't know.
10  Q   Do you know whether you heard from any of the
11  others in your group, your township supervisors, the
12  township secretary, Ann Wirth, the sewage enforcement
13  officer, anybody in the township governing body whether they
14  had gotten advice from Larry Newton about the subdivision
15  ordinance?
16  A   I don't know.
17  Q   What about the moratorium?
18  A   I'm sorry?
19  Q   What about the moratorium?  Do you know
20  whether any of the township supervisors or the secretary or
21  the sewage enforcement officer or any other township
22  official sought advice from Mr. Newton about the moratorium?
23  A   I don't know.
24  Q   When you were going through with enacting the
25  ordinance, did you believe that you were doing it in

103

1   accordance with the law?
2   A   Yes.
3   Q   How did you believe that?
4   A   The Township Code and the Municipal Planning
5   Act.
6   Q   Who studied that for you?
7   A   Who studied that?
8   Q   Yes.
9   A   We have it.  We read it.
10  Q   So you read it and you thought that you were
11  doing the right thing?
12  A   We did the right thing.
13  Q   Did you actually sit down and open it up at
14  some point and say, gee, I better make sure I'm doing the
15  subdivision ordinance procedures correctly?  Is that what
16  you did, or you just thought you knew them in your head or
17  what?
18  A   Oh, no.  Used the law to formulate what we
19  did, the code.
20  Q   Let me ask you this:  How long were you
21  considering enacting the subdivision ordinance as a body,
22  the township board of supervisors?
23  A   We've been working on it for pretty near two
24  years.
25  Q   So that means you've been working on it since

104

1   -- well, you mean before it was passed you had been working
2   on it for two years?
3   A   (Witness nods head affirmatively.)
4   Q   So that would be sometime in 1998, correct?
5   A   Yes.
6   Q   What all did you do in connection with working
7   on enacting the subdivision ordinance?
8   A   Attended -- attended all the sessions that
9   were available at the state convention, discussed with other
10  townships as to the procedure they followed and just kept
11  working at it and working at it and put it -- it finally got
12  to the county and they reviewed it and then they wanted some
13  changes.  So it wasn't easy.  It wasn't easy, but we have
14  it.
15  Q   Did you make successive drafts of it?
16  A   I think the -- the draft that was up that went
17  to the county -- the answer is yes, that's -- I'm sorry, I'm
18  a little slow.
19  Q   Who typed up the drafts for you?
20  A   I believe they were done in the township
21  office.
22  Q   You think Miss Wirth typed them?
23  A   If she didn't, she had somebody do it.  I -- I
24  believe that.  I didn't ask.
25  Q   Did you send the draft ordinances to Larry

105

1   Newton as they were being considered?
2   A   No.
3   Q   Do you know if anybody else sent the draft
4   ordinances to Larry Newton as they were being considered?
5   A   I don't know.
6   Q   Did you keep copies of the draft ordinances
7   available for the public to look at as it was under
8   consideration for that two year period?
9   A   At several of our meetings the drafts were
10  available for the citizens and they were reviewed and they
11  had the opportunity to come to the township office to review
12  them as we were progressing along because we have some
13  citizens in the township that are very concerned with
14  heritage and they wanted to make sure that everything was
15  covered in there because of our quaint little villages and
16  buildings that are around there.
17  Q   Now, if the draft ordinances were taken to a
18  township meeting and made available for the public, that
19  would be reflected in the minutes, correct?
20  A   It should be reflected in -- yes.
21  Q   Would you have put an advertisement or
22  anything in the paper to say at the township meeting we're
23  going to be circulating the proposed draft subdivision
24  ordinance so the public can come look at it?
25  A   No.

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

106

1  Q    So how would the public know that it was there
2  to come look at it?
3  A    **Public meeting every month.**
4  Q    Just because it's a monthly public meeting?
5  A    **Yes.**
6  Q    So if there is something special going on at a
7  public meeting, don't you usually put a notice in the paper?
8  A    **Yes.**
9  Q    But you didn't consider the circulation of a
10 proposed draft subdivision ordinance something special that
11 you needed to put the public on special notice of?
12 A    **Not at those stages.**
13 Q    Ultimately when you got your final subdivision
14 ordinance completed in the form that you thought you could
15 enact, did you then send it to Larry Newton --
16 A    **Yes.**
17 Q    -- for review?  Do you know when you did that?
18 A    **No.**
19 Q    Do you know who did it?
20 A    **Who delivered it to him?**
21 Q    Yes.
22 A    **I don't know.**
23 Q    Do you have any memory whatsoever of which
24 township supervisor first asked the board to consider a
25 moratorium on development in the township?

---

108

1  Q    Was it after it was passed?
2  A    **No.**
3  Q    Do you think it was before it was passed?
4  A    **We had to have their input to get the final**
5  **draft.**
6  Q    You did get some input from the Huntingdon
7  County Planning Commission on that final draft?
8  A    **Oh, yes.**
9  Q    How much input did you get?
10 A    **Pages I'm --**
11 Q    Do you know what happened to those pages --
12 what, was it comments or something written on the drafts
13 that you sent?
14 A    **They sent back the copy with recommendations**
15 **of changes to the ordinance, additions, deletions, that type**
16 **of thing.**
17 Q    Do you know what happened to those drafts with
18 the notes of the Huntingdon County Planning Commission?
19 A    **No.**
20 Q    Do you think they still exist somewhere?
21 A    **I don't know.**
22 Q    What about the driveway ordinance that you put
23 in place in the township, did you send that to the
24 Huntingdon County Planning Commission for its review?
25 A    **No.**

---

107

1       MR. SHERR:  Objection.  It's been asked and
2  answered.  Sorry, I thought you were done.  Objection, it's
3  been asked and answered.  You can answer it again.
4       THE WITNESS:  No.
5  BY MS. MONTGOMERY:
6  Q    Did you send your proposal or a proposal for a
7  moratorium to the Huntingdon County Planning Commission?
8  A    **I don't know.**
9  Q    Do you recall discussing it with the
10 Huntingdon County Planning Commission at all prior to the
11 time that you put it in place in January 2000?
12 A    **No.**
13 Q    Do you recall when you sent the final
14 subdivision ordinance to the Huntingdon County Planning
15 Commission for its review?
16 A    **No.**
17 Q    Do you recall that you did send it to the
18 Huntingdon County Planning Commission for review?  Do you
19 recall sending it to the Huntingdon County Planning
20 Commission for review at all?
21 A    **Yes.**
22 Q    When did you do that?
23 A    **I don't remember.**
24 Q    You just didn't remember exactly when?
25 A    **(Witness shook his head negatively.)**

---

109

1  Q    Why not?
2  A    **I don't know.**
3  Q    Prior to enacting the ordinance did the
4  township charge residents fees when they put in a driveway,
5  when the residents put in a driveway?
6  A    **No.**
7  Q    Was there any kind of a charge at all imposed
8  upon a resident in connection with their construction of a
9  driveway?
10 A    **Before the ordinance?**
11 Q    Before the ordinance.
12 A    **None.**
13 Q    Now, that wasn't -- you're saying the township
14 didn't do it.  Do you know whether anybody else did it?
15 A    **No one else did it.**
16 Q    Correct me if I'm wrong, you're saying that no
17 one at all charged any sort of a fee in connection with the
18 right to construct a driveway?
19 A    **Before the ordinance?**
20 Q    Before the ordinance.
21 A    **No fee.**
22 Q    In your capacity as Eagle Excavation Company,
23 did you ever go out and inspect driveways after they were
24 constructed?
25 A    **I don't understand.**

---

WILSON, W. THOMAS
05/18/01

●

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

110

1    Q        Did you ever go out and inspect a driveway
2    just to see whether it was constructed properly through
3    Eagle construction?
4    A        I'm --
5    Q        Did you go out and inspect a driveway for
6    proper construction in the township through Eagle
7    construction?
8    A        No.
9    Q        Did you ever get involved at all in inspecting
10   driveways in the township?
11   A        Not before I was a supervisor.
12   Q        Well, since you were a supervisor, did you
13   ever get involved in inspecting driveways?
14   A        I do them all. I'm the road master.
15   Q        You do it all?
16   A        Yes.
17   Q        So as the road master did you go out and
18   inspect driveways?
19   A        Yes.
20   Q        Did you charge a fee in connection with that
21   inspection?
22   A        No.
23   Q        Did you charge anything for doing that?
24   A        No.
25   Q        So you just went out as the road master and

---

111

1    said, well, I think your driveway is okay?
2    A        And make suggestions of what they should do to
3    it, yeah.
4    Q        Was that prior to the ordinance?
5    A        Yes.
6    Q        What authority -- I mean, I'm really just
7    trying to understand. What was the authority for your going
8    to inspect driveways as the road master?
9    A        We live in a rural area. Everybody is --
10   knows everybody and everybody wants things as smooth as
11   possible. So if someone is putting in a driveway, they come
12   to the supervisor's meeting and say, you know, I want to put
13   a driveway in here. And we as a unit -- two or three of the
14   supervisors will go out to that site and look to see if it's
15   safe or not to have a driveway there. It was -- it wasn't
16   any law or anything. It's just -- it was just common
17   courtesy. We just -- it was a service.
18   Q        Well, if you didn't think that the driveway
19   was okay, did you tell them they couldn't construct it as
20   the board of supervisors?
21   A        No, we told them how they had to construct it.
22   Q        So you told them how. And this was before the
23   ordinance, correct?
24   A        Yes.
25   Q        Did you let it be known that if a resident

---

112

1    wanted to construct a driveway that they had to come to the
2    board of supervisors for inspection of the driveway to make
3    sure it was satisfactory?
4    A        There was no rule that that was done. If the
5    property owner didn't come to the meeting, their neighbor
6    soon was on the phone calling and saying, hey, there's
7    something going on over here and it should be checked.
8    That's the --
9    Q        So what would you do, go out and check it?
10   A        Yes.
11   Q        So you'd say, okay, I got a call from a
12   neighbor, I better go out and check that driveway to make
13   sure it's being constructed properly, right?
14   A        Yes.
15   Q        And you did that prior to the enactment of the
16   driveway ordinance, correct?
17   A        Yes.
18   Q        You never charged any sort of fee or anything
19   in connection -- to anybody --
20   A        No.
21   Q        -- in connection with those inspections? Did
22   Eagle construction ever charge any sort of fee in connection
23   with those inspections?
24   A        Not unless they were asked by the property
25   owner to install a pipe or put stone or something on there.

---

113

1    Not for -- not for looking at the site.
2    Q        So if you went out and you said, okay, this
3    driveway isn't being constructed properly, would you direct
4    the resident to stop construction of the driveway?
5    A        He was advised to construct it properly or the
6    next time the grader would come by he would lose his
7    driveway if it wasn't done to a standard.
8    Q        Did you ever talk to your solicitor about
9    whether the township had the authority to oversee the way
10   people constructed their driveways without the enactment of
11   a driveway ordinance?
12   A        No.
13   Q        You never discussed it with Larry Newton?
14   A        Never.
15   Q        What about when you put your driveway
16   ordinance in place, did you send that to him for review?
17   A        I don't remember.
18   Q        So were you present at the meeting -- you were
19   present, I think you said, at the meeting of the board of
20   supervisors in January 2000 when the moratorium was put in
21   place, correct?
22   A        Yes.
23   Q        Who else was there?
24   A        I'm lost. What do you -- do you mean in the
25   audience or --

---

WILSON, W. THOMAS 
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

**114**

1  Q   All --
2  A   All three supervisors, the secretary, and I
3  don't recall who else. It would have to be -- it should be
4  in the -- on the minutes.
5  Q   Do you recall what members of the public were
6  there? Were the Hewetts there?
7  A   I don't recall.
8  Q   Was Mr. Corneal there?
9  A   No.
10  Q   Do you recall whether there was any member of
11  the public there?
12  A   Oh, yes, there was people there. I --
13  Q   Can you estimate how many?
14  A   Eight or 10.
15  Q   You think there were eight or 10 people
16  there. And how many residents are there in the township?
17  A   816.
18  Q   I think you indicated earlier that Mr. Corneal
19  had brought a subdivision plan in initially and you told him
20  he had to take it to the Huntingdon County Planning
21  Commission, there was a moratorium in place, correct?
22  A   Correct.
23  Q   Who spoke those words, you?
24      MR. SHERR: I'm going to object to the form of
25  the question in that there's never been any testimony that

---

**115**

1  those words were spoken.
2      MS. MONTGOMERY: Well, he just said yes to the
3  answer to my question.
4      MR. SHERR: And his prior testimony was
5  different from that, that -- and that may have been the gist
6  of what was said, but I don't think he's ever testified --
7      MS. MONTGOMERY: I'm not --
8      MR. SHERR: Please just let me finish so we
9  don't talk over each other so she can get us both down.
10  Thank you.
11      MS. MONTGOMERY: I'm not going to allow you to
12  coach your witness on the record.
13      MR. SHERR: And I'm not coaching my witness.
14  All I'm asking you to do is let me finish making my
15  statement so the court reporter can take it down and then
16  you can say whatever you have to say.
17      MS. MONTGOMERY: Are you finished?
18      MR. SHERR: I think I am.
19  BY MS. MONTGOMERY:
20  Q   I believe you testified earlier that when Mr.
21  Corneal came and first presented his subdivision plan to the
22  board of supervisors that he was told that there was a
23  moratorium in place and that he should take his plan to the
24  Huntingdon County Planning Commission; is that correct?
25  A   I don't believe -- I could correct it by

---

**116**

1  saying it was suggested to save him time he could take it to
2  the county.
3  Q   Who told Mr. Corneal that?
4  A   Maybe I did. I -- I don't know.
5  Q   You don't recall which supervisor actually
6  talked?
7  A   We all talk. We have a small community and we
8  all talk.
9  Q   Was Miss Wirth talking, do you recall?
10  A   I'm sure. Everybody --
11  Q   Does Miss Wirth usually talk at the township
12  meetings a lot?
13  A   When she's asked to.
14  Q   When she's asked to by whom?
15  A   The supervisors or if it's a question
16  concerning some correspondence or something, then somebody
17  from the audience might say, Ann, did you get my letter or
18  did you -- you know, that type of thing.
19  Q   Does Miss Wirth give advice to the township
20  residents or the people in attendance at the township
21  meetings regarding what's proper and what isn't proper about
22  township business?
23  A   Well, if she does, I -- I don't know what it
24  is because she's not an elected official. She's our
25  secretary.

---

**117**

1  Q   Did you need to get some water?
2  A   Please.
3  Q   Go right ahead.
4      (Pause.)
5  BY MS. MONTGOMERY:
6  Q   Do you recall Mr. Corneal asking you at the
7  meeting in which he was told that there was a moratorium in
8  place for any copy that existed -- of any written copy that
9  existed of the moratorium, do you recall that?
10  A   No.
11  Q   Do you recall Mr. Corneal asking for a copy of
12  the draft subdivision plan?
13  A   No.
14  Q   You don't recall him asking at any time for a
15  copy of the draft subdivision plan?
16  A   No.
17  Q   Did you ever learn from anybody else that he
18  asked for a copy of a draft subdivision plan -- I'm sorry, I
19  keep using plan and I apologize, a draft subdivision
20  ordinance.
21  A   No.
22  Q   So if you misunderstood my prior questions, I
23  will repeat them to you. I was asking whether you
24  understood -- whether you heard from anybody else that Mr.
25  Corneal had asked for a copy of the draft subdivision

---

WILSON, W. THOMAS 
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

118

1   ordinance at any time.
2   A   No.
3   Q   You never heard about that?
4   A   (Witness shook his head negatively.)
5   Q   Do you recall whether the Corneals ever
6   submitted a revised subdivision plan after their -- they
7   were initially told that there was a moratorium in place?
8   A   No.
9   Q   You don't recall them ever doing that?
10  A   No.
11  Q   Do you recall the March 2000 meeting of the
12  board of supervisors?
13  A   Unless there was something that happened.
14  Q   I'm sorry?
15  A   Unless there was something that happened that
16  would stick in my mind. Maybe it was a routine meeting. I
17  -- I don't know. I'd have to look at the minutes.
18  Q   I'll get you the March minutes and maybe that
19  will help you recall. Just give us a second.
20  A   While you're doing -- while you're searching
21  for that, can I go to the rest room?
22  Q   Men's room?
23  A   Yes.
24  Q   Sure.
25  (Break taken at 11:47 a.m. until 12:01 p.m.)

---

119

1   BY MS. MONTGOMERY:
2   Q   Mr. Wilson, we're back on the record. I'm
3   going to ask you, did you review any documents in
4   preparation for this deposition?
5   A   No.
6   Q   Have you reviewed any documents at all in
7   connection with the filing of this lawsuit?
8   A   No, I just keep going over the last -- that
9   thing I received on July 4th. I just keep looking at that.
10  I have it laying on my freezer.
11  Q   What did you receive on July 4th?
12  A   I was served with a lawsuit.
13  Q   With the complaint?
14  A   Yeah.
15  Q   Now, I think you testified a moment ago that
16  you don't recall whether the Corneals submitted a revised
17  subdivision plan?
18  A   Not that I know of.
19  Q   Do you recall the April 2000 meeting of the
20  board of supervisors?
21  A   No.
22  Q   Do you recall whether -- well, do you recall
23  whether there was any meeting after the January meeting in
24  which the moratorium was announced and then the February
25  meeting in which you -- Mr. Corneal was told his subdivision

---

120

1   plan couldn't be approved? Do you recall him coming to a
2   meeting and asking for a copy of the proposed subdivision
3   ordinance?
4   A   No.
5   Q   Do you recall Mr. Corneal coming to the April
6   meeting -- or to any meeting and asking that the supervisors
7   sign his sewage modules?
8   A   Yes.
9   Q   Could you tell me what you recall about that
10  meeting?
11  A   Do you have the minutes?
12  Q   Yes, I do.
13  A   I'm sorry.
14  Q   Sure.
15  MS. MONTGOMERY: We'll mark this as Wilson
16  Exhibit 4.
17  (Minutes dated 4/3/00 produced and marked as
18  Wilson Exhibit No. 4.)
19  BY MS. MONTGOMERY:
20  Q   When you're finished, Mr. Wilson, just let me
21  know.
22  A   Okay.
23  Q   Now, you asked to review the April 3rd
24  minutes. Why did you need to review them?
25  A   I can't remember the meetings.

---

121

1   Q   Now that you've reviewed the minutes do you
2   think you can remember the meeting a little better?
3   A   Yes.
4   Q   Now, tell me what you recall about the April
5   3rd, 2000 meeting.
6   A   Mr. Corneal had a handful of sewage modules
7   that he wanted the township supervisors to sign and the
8   supervisors would not sign them because we didn't have the
9   subdivision plan or anything.
10  Q   So the reason you wouldn't sign the sewage
11  modules is because you didn't have what, a map, a plan?
12  A   Yes, and we -- and we have no -- we had no
13  idea all these months what Mr. Corneal's plans were. He
14  kept changing things.
15  Q   Well, how did you know he kept changing
16  things?
17  A   I had a call from Attorney Newton that Mr.
18  Corneal had dropped off a subdivision plan at his office.
19  Well, he had to -- and I don't remember who went in and
20  picked it up, that's 16 miles away, but brought it out. But
21  these are the -- these are the kind of things we had no
22  idea, no continuity of what was happening here.
23  Q   So going back to your testimony about Mr.
24  Newton, I think you'd indicated that you didn't recall
25  discussing Mr. Corneal's subdivision plan with Mr. Newton.

---

WILSON, W. THOMAS 
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

122

1  Now do you recall discussing --
2      A     Well, I didn't discuss it with him. He called
3  and said he dropped it off here and assumed that we needed
4  it. I didn't discuss anything with Larry.
5      Q     Well, when I say discussion, I guess I'm just
6  talking about any conversation, any contact, any words
7  exchanged whatsoever about Mr. Corneal's subdivision or his
8  property. That's what I'm trying to get to.
9            So we don't need to limit ourselves to what
10  you might consider to be a discussion. I'm talking about
11  any contact, written, verbal, telephone call, meeting along
12  the street, formal, informal, anything.
13      A     That's what it was.
14      Q     And do you have any idea why Mr. Corneal took
15  the subdivision plan to Mr. Newton's office and dropped it
16  off?
17      A     No, I don't.
18      Q     Did Mr. Newton tell you why Mr. Corneal
19  dropped the subdivision plan off at his office?
20      A     No.
21      Q     Did somebody go out and pick it up, you said,
22  from Mr. Newton?
23      A     Yeah, and I don't even know who.
24      Q     And what did you do with it then?
25      A     Well, it should be at the township office.

123

1  That's the one with the orange lines on it. There's --
2  there's been various pieces of -- and designs and cut down
3  the lots and stuff. I -- I don't even know what it's at.
4  I don't even know what the -- what the last plan is.
5      Q     Do you understand why Mr. Corneal went from
6  proposing five or more lots to proposing fewer lots?
7      A     I don't know.
8      Q     You understand that he did, though, go from
9  proposing more lots to proposing fewer lots, correct?
10      A     Yes, I ...
11      Q     And do you understand as well that the sewage
12  enforcement officer had approved sewage modules for at least
13  five lots and later Mr. Corneal only wanted to take it down
14  to two of those lots; isn't that correct? Do you understand
15  that?
16      A     Yes.
17      Q     Do you understand also that the latest sewage
18  module that Mr. Corneal brought to you really only related
19  to one lot, the 95 -- the whole 95-acre piece?
20      A     Yes.
21      Q     So he was really only asking you to approve
22  the sewage module so he could build his house on his
23  property, correct?
24      A     No.
25      Q     What do you understand?

124

1      A     I don't understand that. He hired another
2  attorney and his attorney and I have been working to try to
3  get this resolved. And we went into a land development
4  plan, not a subdivision, and that's what we've been working
5  on with Terry Williams, and it still isn't -- they're
6  working on -- they're meeting on that lot today to discuss
7  the sewage problem. So I -- I'm at a loss. I'm still at a
8  loss as a supervisor as to what's happening at the Corneal
9  property.
10      Q     Well, this is May 2001. We're going back to
11  the last time that David Corneal came in and the April 2000
12  meeting with these modules that you wouldn't sign. Do you
13  understand at that point that he had said, okay, all I
14  really want to do now is build my house?
15      A     No.
16      Q     What do the minutes say?
17      A     It says he's no longer subdividing them and
18  would like to build a -- we had no idea the way things have
19  been changing that -- what was going to happen the next day.
20      Q     Did Mr. Corneal ever change the site of the
21  approved -- the approved septic sites that your sewage
22  enforcement officer had approved, did he change those sites?
23      A     I'm sorry, I --
24      Q     Did he move them? Did he say I want -- I want
25  a new -- I want a new test site approved or --

125

1      A     No.
2      Q     -- was he just using the already approved test
3  sites and saying I want to build and use one of them?
4      A     That's what I understand.
5      Q     So he had approved test sites from the sewage
6  enforcement officer and what he was doing was just changing
7  down the number of possible buildings that he might ever put
8  on that property; isn't that correct?
9      A     Possible.
10      Q     Now, it reads in the April 3, 2000 minutes
11  that the supervisors told him that they weren't going to
12  issue a building permit for a property that they know is
13  going to be subdivided, correct?
14      A     Correct.
15      Q     So despite the fact that Mr. Corneal came in and
16  said, okay, fine, I'm not going to subdivide, you said I
17  can't subdivide, I just want to build my house, you said he
18  can't even have a building permit for his house because you
19  think he might subdivide later, correct?
20      A     He needed a sewage permit to get a building
21  permit for his house.
22      Q     Right, but he couldn't get a sewage permit
23  until you signed the sewage module, correct?
24      A     Right.
25      Q     So you wouldn't sign the sewage module because



126

1  you thought he might want to subdivide later, correct?
2      A    My -- and this is my opinion at that meeting,
3  not to sign those five modules because Mr. Corneal could do
4  whatever he wanted on that property without any okay from
5  the township, any plan.
6      Q    Well, that's not accurate, is it, because he
7  still had to go get a sewage permit?
8          MR. SHERR: Objection, argumentative. You can
9  answer.
10 BY MS. MONTGOMERY:
11     Q    He still had to go get the permit for the
12 sewage, right, but he needed the sewage module first,
13 correct?
14     A    For the land -- for the land development why
15 would he need the sewage module. It's just like --
16     Q    Go ahead. I don't mean to --
17     A    The property, okay, wasn't being split, okay,
18 so he was going with a land improvement. All he had to have
19 was an approved site there for a new house and everything
20 would have been fine, but we've cluttered the landscape so
21 bad over there we don't know what Mr. Corneal is doing.
22     Q    Mr. Corneal, as you testified a moment ago,
23 told you at this April 3, 2000 meeting that he just wanted
24 to build a house on the property, correct?
25     A    Yeah, but he's -- we've had several stories

127

1  from Mr. Corneal, what he was doing, and we didn't know what
2  was happening.
3      Q    Didn't Mr. Corneal's stories change only as he
4  received refusals from the township for permission to do
5  what it was that he wanted to do?
6      A    Yes.
7      Q    Right?
8      A    Yes.
9      Q    So the last thing he came and said is I'd like
10 -- I just want to build my house. Can you please sign
11 these sewage modules and I'll get my septic system in for my
12 house, one house, right?
13     A    Well, that's what he said.
14     Q    But you wouldn't sign them because you
15 thought, well, he really wants a subdivision so I'm not
16 going to open this door for him; isn't that correct?
17     A    We were not signing five sewer modules for one
18 house.
19     Q    Well, it just gives him an option where he
20 wants to place his house, doesn't it?
21     A    He already had a house started, didn't he.
22     Q    I don't know if he had a house started on
23 April 3, 2000.
24     MR. CORNEAL: No.
25 BY MS. MONTGOMERY:

128

1      Q    Did he?
2      A    I don't know. Of course, I wasn't allowed on
3  that property.
4      Q    Let's talk about the building permit. Did you
5  have any discussions with your building permit officer about
6  whether or not Mr. Corneal ought to have a building permit?
7      A    Yeah, the day Mr. Corneal was at the building
8  officer's house, yes. Dave called me.
9      Q    He called you from his house?
10     A    Yes.
11     Q    And what did you tell Dave?
12     A    I told him don't you dare issue him a permit.
13     Q    Well, Mr. Corneal came to -- and when you say
14 Dave, you're talking about Mr. Van Dommelen, right?
15     A    Yes.
16     Q    Mr. Corneal actually came and just asked for
17 an application for a permit, correct?
18     A    That isn't what I heard on the phone.
19     Q    Well, he couldn't get a permit if he didn't
20 have an application, right?
21     A    Well, I'm -- I'm telling you what -- the
22 conversation I had on the phone. He was -- I was asked if
23 there was to be a permit issued to Mr. Corneal and I told
24 him no way, we don't have the thing signed.
25     Q    So was it your understanding that he had gone

129

1  out and asked for a building permit for a house?
2      A    No, a five-bay garage with an over-study.
3      Q    So he had gone out and asked for a building
4  permit for a garage. And does a garage require sewage?
5      A    If you have an over-study on it, there's going
6  to be water in there.
7      Q    What's an over-study?
8      A    Apartments, a living space up there.
9      Q    I thought you said you hadn't seen any, you
10 know, plans or anything for what Mr. Corneal wanted to
11 build.
12     A    No, Dave -- Dave told me that's what it was
13 when he called me.
14     Q    Dave Van Dommelen told you he wanted a
15 five-bay garage with apartments over it and you said don't
16 you dare issue him a building permit?
17     A    And he knows better than to issue a permit
18 without a sewage permit because there's potential -- there's
19 -- that building has potential for human habitat.
20     Q    So did you tell Mr. Van Dommelen not to even
21 give him the application?
22     MR. SHERR: Objection, asked and answered.
23     THE WITNESS: No.
24 BY MS. MONTGOMERY:
25     Q    No? Are you aware that Mr. Van Dommelen

WILSON, W. THOMAS
05/18/01



CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

130

1 refused to even give him an application?
2    A   No.
3    Q   You didn't know that?
4    A   No.
5    Q   So do you believe that it was appropriate for
6 you at the April 3, 2000 township meeting to tell Mr.
7 Corneal that he couldn't have a building permit for -- I'm
8 sorry, that you couldn't sign the sewage module for one
9 building because you thought he might subdivide?
10    A   **Right.**
11    Q   You think that was appropriate?
12    A   **Yes.**
13    Q   Even though he told you he wasn't going to
14 subdivide?
15    A   **Yes.**
16    Q   You didn't have an approved subdivision plan
17 at that point, right?
18    A   **We didn't have anything except his handful of**
19 **sewer modules.**
20    Q   Because you told him there was a moratorium so
21 he said, okay, I won't subdivide, right?
22    A   **I'm sorry, my --**
23    Q   I said when you had told him that there was a
24 moratorium, he said, okay, I won't subdivide right?
25    A   **Right.**

---

131

1    Q   Now, I understand that you told Mr. Van
2 Dommelen not to issue him a building permit for his garage?
3    A   **That's right.**
4    Q   Are you aware that Mr. Van Dommelen told Mr.
5 Corneal that there was going to be a meeting about his
6 property the next day?
7    A   No.
8    Q   Was there a meeting about his property the day
9 after he went out there and asked him -- Mr. Corneal went
10 out and asked Mr. Van Dommelen for a building permit?
11    A   No.
12    Q   There was no meeting?
13    A   **Not that I know of.**
14    Q   Well, do you recall what day of the week it
15 was when Mr. Van Dommelen called you about Mr. Corneal's
16 request for a building permit application?
17    A   No.
18    Q   Do you recall whether or not the supervisors
19 -- or any supervisor and Mr. Van Dommelen did in fact meet
20 the next day or soon thereafter about Mr. Corneal and his
21 property?
22    A   **I don't know.**
23    Q   Do you recall any meeting other than a formal
24 monthly township supervisor's meeting or a special meeting
25 that was called by the board of township supervisors during

---

132

1 which Mr. Corneal and his property were discussed by you and
2 the other township supervisors?
3    A   No.
4    Q   Well, I want to make sure that we're not
5 unnecessarily limiting this information.  So understand that
6 I'm asking you whether there was any informal meeting
7 whatsoever between any supervisor and anybody else, any
8 township official about Mr. Corneal's property after he went
9 out there and had that conversation with Mr. Van Dommelen
10 about his building permit?
11    A   **Not that I can recall.**
12    Q   You talked a moment ago about Larry Newton
13 calling you up and saying, well, I've got this subdivision
14 application that Mr. Corneal dropped off.  Now, was there
15 any other telephone calls from or to Larry Newton about Mr.
16 Corneal around that same time frame that you recall?
17    A   **Not that I recall.**
18    Q   Not necessarily that you took part in but that
19 Miss Wirth or you or any other township supervisor or the
20 building permit officer or the sewage enforcement officer.
21    A   **Not that I recall.**
22    Q   That's the only telephone call you can recall
23 from or to Larry Newton about Mr. Corneal?
24    A   **Yes.**
25    Q   What about any other meeting, contact,

---

133

1 conference, conversation, discussion, anything after that
2 time when Mr. Newton called about Mr. Corneal's subdivision
3 plan?
4    A   **I don't recall.**
5    Q   But I think you testified, and you correct me
6 if I'm wrong, that the call came from Larry Newton prior to
7 the point that Mr. Corneal came in and asked to have his
8 sewage modules signed at the April 3, 2000 meeting; isn't
9 that correct?
10    A   **I don't know that.**
11    Q   You had indicated that you didn't have the
12 subdivision plan in front of you when he brought the sewage
13 modules in in April 2000?
14    A   **(Witness nods head affirmatively.)**
15    Q   And you also indicated that you knew that
16 Larry Newton had them, had gotten a copy and that somebody
17 had gone out and picked them up but you didn't know what
18 happened to them, correct?
19    A   **Exactly.  I don't -- I don't know what the**
20 **dates were on this, when -- when we had the call that there**
21 **was a plan dropped off at Larry's office.  I suppose it was**
22 **the same -- at the Daily News, but I don't know what that**
23 **day was and I don't know where that got to.**
24    Q   Who talked to Larry Newton, who took that call
25 from Larry Newton?

---


---

134

1    A      That there was a plan in there?  I assume the
2  township office.
3    Q      Ann Wirth?
4    A      I'm assuming that.
5    Q      Well, you'd indicated that you didn't have the
6  plot plan in front of you, but does an individual need a
7  plot plan if they're not subdividing?
8    A      No.  If they're doing land development, they
9  do.
10   Q      I'm going to show you some documents.  We'll
11 just put them together as Wilson Exhibit 5.  These are the
12 February 24, 2000 and April 20, 2000 letters from the
13 Huntingdon County Planning Commission.
14          (Packet of documents produced and marked as
15 Wilson Exhibit No. 5.)
16 BY MS. MONTGOMERY:
17   Q      Take a moment to review them, Mr. Wilson.
18 Have you seen these documents in the past?
19   A      Yes.
20          MR. SHERR:  Have you finished reviewing them?
21          THE WITNESS:  Yes.
22 BY MS. MONTGOMERY:
23   Q      Have you seen the documents in the past?  Are
24 you ready?  I think you testified you have seen the
25 documents in the past, correct?

---

135

1    A      Yes.
2    Q      Did you see them at the time that they were
3  first generated, like around the February 2000 time frame
4  and around the April 2000 time frame?
5    A      When they came from the county, yes.
6    Q      Miss Wirth turned them over to you when they
7  came from the county?
8    A      Yes.
9    Q      I'm going to draw your attention to the April
10 20, 2000 letter from the Huntingdon County Planning
11 Commission.  Do you understand that letter to say that the
12 commission found Mr. Corneal's property suitable for on-lot
13 sewage disposal and --
14   A      Yes.
15   Q      -- for the -- yes, right?
16   A      Yes.
17   Q      I just want to make sure the court reporter
18 understood that you said yes.  Did you understand that the
19 Huntingdon County Planning Commission found the property
20 suitable for division into two lots?
21   A      Yes.
22   Q      Do you recall whether the subdivision plan for
23 the two lots was returned to the township supervisors along
24 with this letter?
25   A      I never seen it.

---

136

1    Q      So you don't know whether it was because it
2  went to Miss Wirth, right?
3    A      Well, if it -- if it came, I should have it --
4  the supervisors should have it.  I'm curious if the plan
5  came back.
6    Q      But this letter indicates that there was a
7  subdivision plan for the two lots, correct?
8    A      Well, the proposal is a resubmission, Lot 1
9  the residue and Lot 3 contains 25 acres.
10   Q      Let's read the first sentence, the Huntingdon
11 County Planning Commission.
12   A      Has reviewed the above-referenced property.
13   Q      Proposal.  Did you read that first sentence,
14 Mr. Wilson?
15   A      Has reviewed the above-referenced proposal to
16 subdivide a property containing 94.67 acres into two lots.
17   Q      Now, as you testified earlier, Mr. Corneal was
18 directed or told that he had to submit his plan to the
19 Huntingdon County Planning Commission first, correct?
20   A      For review.
21   Q      For review?
22   A      Yeah.
23   Q      So they reviewed it and sent it back to you,
24 correct?
25   A      Yes.

---

137

1    Q      And said they found it suitable, correct?
2    A      Yes.
3    Q      So at what point do you believe that Mr.
4  Corneal had not taken the proper steps to obtain permission
5  to build a house on his property?
6    A      I -- I don't think -- and this is my opinion.
7  I don't think that has anything to do with building a house
8  here.  This is approval of a subdivision, nothing about
9  building a house.
10          MR. SHERR:  You're referring to the April 20th
11 letter?
12          THE WITNESS:  Yes.
13 BY MS. MONTGOMERY:
14   Q      Right, but didn't you indicate earlier that
15 Mr. Corneal couldn't build because he didn't have -- hadn't
16 submitted all the right plans, you didn't have a plan in
17 front of you?
18          MR. SHERR:  I'm going to object to the form of
19 the question because this is completely confusing.  Are you
20 discussing now in your question what you asked him about the
21 April township meeting which occurred before the date of
22 this letter that he has in front of him?
23          MS. MONTGOMERY:  That's what I'm asking him.
24          MR. SHERR:  Okay.
25          THE WITNESS:  Okay, I still haven't seen the

---



WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

138

1 subdivision thing that is discussed here, but regenerated
2 now into a new land development certificate, okay. It's
3 being processed by Terry Williams, his other attorney, and
4 we are -- we've had two hearings in the Huntingdon County
5 Courthouse that these things were supposed to be in order to
6 the satisfaction of Jackson Township by our judge.
7     And the last time we were in there the judge
8 said that we had 30 days to get this in order or we would be
9 back in. Well, we're way past the 30 days and I don't know
10 what's going on.
11     So I'm -- my thing is that I will -- when I
12 get back, I want to call our solicitor and have him call Mr.
13 Corneal's solicitor, new solicitor, and see what's happening
14 because Williams and I have met on several occasions to try
15 to get these things resolved and we don't seem to be getting
16 any further. It's just like it stopped.
17 BY MS. MONTGOMERY:
18     Q    But the April 20, 2000 letter from the
19 Huntingdon County Planning Commission was written before
20 this lawsuit was initiated, correct?
21     A    Yeah.
22     Q    Before the Huntingdon County Commission
23 lawsuit, not the Huntingdon County lawsuit, was initiated by
24 the township, correct?
25     A    Yes.

139

1     Q    So we're just talking about this period of
2 time here where you indicated that you had not seen and
3 still have not seen a subdivision plan, right?
4     A    Right.
5     MR. SHERR:  And just to be clear, again,
6 you're saying he indicated as of that April meeting he had
7 not seen a subdivision plan.
8     MS. MONTGOMERY:  No, he indicated he still has
9 not seen the subdivision plan, that's what I'm questioning
10 him about.
11     MR. SHERR:  Well, I think it's completely
12 ambiguous and I don't really understand what you're saying
13 and --
14     MS. MONTGOMERY:  Well, then I'll just clarify
15 it.
16     MR. SHERR:  That would be great.
17     MS. MONTGOMERY:  And I don't think that your
18 witness is confused.
19     MR. SHERR:  Well, I --
20 BY MS. MONTGOMERY:
21     Q    What you testified was that you hadn't yet
22 seen an April -- I mean, you hadn't yet seen a subdivision
23 plan. Right now, today, you haven't seen one, correct?
24     A    Correct.
25     Q    I showed you an April 20, 2000 letter from the

140

1 Huntingdon County Planning Commission indicating that they
2 had reviewed and were sending back to you with approval --
3     A    Um-hum.
4     Q    -- a two lot subdivision plan, right?
5     A    Yeah.
6     Q    And so I'm asking you why you hadn't seen the
7 plan, the Huntingdon --
8     A    I still haven't seen it.
9     Q    But you don't know why you haven't seen it?
10     A    No.
11     Q    That's all I'm trying to get to.
12     MR. SHERR:  And did your question assume that
13 this letter somewhere said that they were sending the plan
14 back to the township?
15     MS. MONTGOMERY:  Actually it's based on the
16 testimony from prior witnesses and this witness that the
17 Huntingdon County Planning Commission reviews the plan and
18 sends it back.
19     MR. SHERR:  I don't remember any such
20 testimony.
21     MS. MONTGOMERY:  Well, the record will speak
22 for itself.
23     MR. SHERR:  It absolutely will.
24 BY MS. MONTGOMERY:
25     Q    Let me ask you this, Mr. Wilson:  When the

141

1 Huntingdon County Planning Commission sends a letter like
2 this back, right, saying we've reviewed a plan, do they send
3 the plan back to the township?
4     A    Not always.
5     Q    Do they --
6     A    They keep --
7     Q    -- sometimes?
8     A    They keep one on file.  It depends on how --
9 maybe I should back up.  Most of these things are submitted
10 to the county by either the owner or his representative.  So
11 we don't know how many he drops in there.  If they have an
12 extra one there, they'll send it back, but we still should
13 have one at the township and we don't -- well, it may be
14 there now.  Things are so ...
15     Q    Do you know whether or not Miss Wirth produced
16 to us a copy of this plot plan that was referenced in the
17 April 20, 2000 Huntingdon County Planning Commission letter,
18 if she produced it back to us in connection with this
19 litigation?
20     A    I don't know.  Is it possible to ask if we
21 could break?  I have to go again and maybe we could eat.
22     Q    Okay, sure.
23     (Luncheon recess taken at 12:36 p.m. until
24 1:30 p.m.)
25 BY MS. MONTGOMERY:


142

1  Q      Back on the record, Mr. Wilson.  You're still
2  under oath.
3  A      Okay.
4  Q      Do you recall whether at the February 2000
5  meeting when Mr. Corneal brought his subdivision plan in the
6  first time and you told him there was a moratorium, do you
7  recall whether he told you and the supervisors at that
8  meeting that the moratorium was illegal?
9  A      I don't recall that.
10  Q      Do you recall at any time hearing from anybody
11  that Mr. Corneal thought that the moratorium was illegal,
12  invalid?
13  A      If my memory serves me right, I -- it was at
14  the next meeting he came that he said that.
15  Q      But you recall him saying it at one meeting or
16  another?
17  A      Yes.  Yes, I heard him say that.
18  Q      What did you say?  Did you say anything back
19  to him?
20  A      It is legal.
21  Q      According to who?
22  A      According to the township regulations.
23  Q      Do you recall anybody saying to him when he
24  said it was illegal, not according to our solicitor?
25  A      No.

143

1  Q      You don't recall anybody answering him that
2  way?
3  A      No.
4  Q      Well, once he said it was illegal, did you go
5  check with your solicitor to find out whether he was --
6  A      No.
7  Q      -- correct or not?
8  A      No.
9  Q      You didn't?
10  A      No.
11  Q      Because you thought you knew yourself?
12  A      As I had testified before, there's been other
13  townships in the county that had to do -- and surrounding
14  areas that had to do the same thing and they're legal.  I
15  guess we'll find out.  The law says it is.
16  Q      I'm going to show you a document that we'll
17  mark as Wilson Exhibit 6.  We'll have the court reporter
18  mark it and then you can take a look at it.
19         (Subdivision plan produced and marked as
20  Wilson Exhibit No. 6.)
21  BY MS. MONTGOMERY:
22  Q      Take a moment and look at it, Mr. Wilson, and
23  I just want to ask you a couple questions about it.  Just
24  let me know when you're finished.
25  A      Okay.

144

1  Q      Have you seen this document before?
2  A      I seen a document that resembles this, but I
3  don't remember the black lines that are through there.
4  Q      When you say it resembles this, do you mean
5  that you saw a document where this property, the Corneal
6  property, was broken up into these lots?
7  A      Yes.
8  Q      But you don't recall which black lines?
9  A      No.  What I observe here is some of them --
10  some of them aren't -- have been whited out or something.
11  They're not continuous.
12  Q      Oh, I see.
13  A      I -- I recall seeing a document like this but
14  it had different features on it.  I mean, the lines don't
15  seem to ring a bell.
16  Q      Okay.  But just to be clear, do you recall
17  seeing a document like this mapping out the Corneal property
18  broken up into five lots?
19  A      I don't remember.
20  Q      In what context do you recall seeing a
21  document that looked like this but maybe had somewhat
22  different lines?
23  A      This -- this reminds me of the copy that I
24  seen that came from Larry Newton that was dropped off he
25  told me by Mr. Corneal, but it had bright orange lines on

145

1  it.  So it's -- the contrast of my eyes, it doesn't look --
2  overall it looks the same, but it looks different inside.
3  Q      Maybe because that was the original and these
4  are copies?
5  A      I ...
6  Q      She's going to go get the original, if she can
7  find it.  I mean, is that what's bothering you, that just
8  the lines are a different color?
9  A      Well, yeah, and there's like three and a half
10  that are -- that look like they've been whited out or
11  something.
12  Q      Right, that might just be a copy problem, but
13  we'll figure it out.  So you say you think it might have
14  been part of the materials that had gotten dropped off to
15  Larry Newton?
16  A      That's my recollection, yeah.
17  Q      When did you see those materials that were
18  dropped off to Larry Newton?
19  A      I don't recall.
20  Q      But you did see a plot plan in connection with
21  the materials that were dropped off to Larry Newton?
22  A      The only thing I seen was a plan like this
23  that had orange lines on it.  I assume somebody reworked --
24  Q      Well, as we discussed earlier, Mr. Corneal's
25  property has been reworked a number of times in terms of how

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

146

1  many lots it's going to be in, right?
2      A      Yeah.
3      Q      Well, while we're waiting for her to bring
4  back the original, let's just have you look at this -- what
5  we're going to mark as Wilson Exhibit 7.
6          (Subdivision and land development ordinance
7  Jackson Township produced and marked as Wilson Exhibit
8  No. 7.)
9          MS. MONTGOMERY: You guys already have a copy
10  of this, the subdivision plan.
11          MS. YANKANICH: Yes.
12          MS. MONTGOMERY: You can look at your client's
13  copy if you like.
14  BY MS. MONTGOMERY:
15      Q      I just want you to look at that and identify
16  it for the record, Mr. Wilson, if you will.
17      A      It looks like the -- a copy of the ordinance
18  -- subdivision and land use development ordinance of
19  Jackson Township.
20      Q      Can you turn to page 71 of the ordinance, to
21  the signatures on page 71.
22      A      Yes.
23      Q      Is that your signature there?
24      A      Yes.
25      Q      In the middle?

147

1      A      Yes.
2      Q      So this is a copy of the subdivision and land
3  development ordinance that you passed as a township
4  supervisor for Jackson Township, correct?
5      A      Correct.
6      Q      Now, let me ask you this: Do you see -- you
7  testified the ordinance was passed on July 10, at a July 10,
8  2000 meeting, correct?
9      A      Correct.
10      Q      Do you know why this is dated July 7, 2000?
11      A      No idea.
12      Q      But you're quite certain that the meeting
13  occurred on July 10th, which is I believe a Monday, right?
14      A      I believe so.
15      Q      So the subdivision ordinance was actually
16  passed after this lawsuit was initiated, correct?
17      A      I don't know.
18      Q      I think you said you recall being served with
19  the papers on July 3rd, right?
20      A      4th.
21          MR. SHERR: He said July 4th.
22  BY MS. MONTGOMERY:
23      Q      July 4th?
24      A      Yeah, it was a holiday.
25      Q      So the subdivision ordinance was passed then

148

1  after you were served with the papers, correct, for this
2  lawsuit?
3      A      Yes.
4          MS. MONTGOMERY: She doesn't have the
5  original. Well, all right then.
6          (Discussion held off the record.)
7  BY MS. MONTGOMERY:
8      Q      Well, unfortunately we don't have the original
9  in the office of this plan, but I think you've answered
10  enough questions about it for right now. We're going to
11  move on to another one, okay.
12          I'm going to take you to a plan that actually
13  -- we have plans in the record from before, right, old
14  exhibits there? I think we'll just use them instead of
15  making new ones.
16          I'm going to show you what has previously been
17  marked as Parks Exhibit 2. This is a February 4, 2000 plan
18  of proposed subdivision and I'm going to ask you to look at
19  that and tell me whether or not you've seen that in the
20  past.
21          (Pause.)
22  BY MS. MONTGOMERY:
23      Q      Do you recall seeing that document in the
24  past, Mr. Wilson?
25      A      I recall seeing a document that looked like

149

1  this, but here -- I don't recall the changes.
2      Q      You recall seeing a subdivision plan, in other
3  words, for the Corneal property but maybe the lines were
4  different at some point or what?
5      A      The only -- I don't understand the -- it looks
6  like someone tried to take these out and they added a garage
7  or something here.
8      Q      Take what out, when you say tried to take
9  these out?
10      A      The lines. See, they're -- somebody took a
11  pen or something and tried to scribble them out.
12      Q      So it looks like it was a plan that was
13  somehow redrawn, is that what you mean?
14      A      Well, it's been altered, yes.
15      Q      Well, let me show you another document that's
16  been previously marked as Parks Exhibit 1, the April 7, 2000
17  subdivision plan for the Corneal property and ask you
18  whether you recall seeing that document.
19      A      There again, it resembles something that I
20  have seen. I don't know -- it looks like all the probes and
21  percs and everything that -- well, there isn't any percs on
22  here. All the soil logs and everything are established, but
23  there should have been a later one that I seen that -- where
24  the percs were done for these sites, and those aren't on
25  there. So apparently this is an earlier one.

WILSON, W. THOMAS 
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

150

1  Q    Now, there are perc numbers on that map,
2  aren't there?
3  A    Where?
4  Q    Eight, 9, 10. Do you see that one circled
5  with the red ink?
6  A    No, those are soil logs.
7  Q    Okay. Those aren't perc numbers?
8       MR. CORNEAL: They're perc numbers.
9  BY MS. MONTGOMERY:
10  Q    What makes you think they're not perc numbers?
11  A    They're soil logs. Percs are done between the
12  soil logs to see if the site is approved.
13  Q    Well, if I represent that your sewage
14  enforcement officer told us yesterday that they were perc
15  numbers, would that change your view of it?
16  A    No.
17       MR. SHERR: Object to the form of the
18  question.
19  BY MS. MONTGOMERY:
20  Q    I'm sorry, go ahead.
21       MR. SHERR: He answered the question.
22  BY MS. MONTGOMERY:
23  Q    What did you answer?
24       MR. SHERR: He answered it no.
25  BY MS. MONTGOMERY:

---

151

1  Q    Is that what you answered, no?
2  A    No, they aren't percs.
3       (Discussion held off the record.)
4  BY MS. MONTGOMERY:
5  Q    I'm going to ask you to look at the site
6  investigation and percolation test reports that are part of
7  Wilson 2 and just refer to the graph that's in the middle of
8  this perc test here, this perc test report. There's some
9  handwriting at the top.
10       MS. MONTGOMERY: And let the record reflect
11  I'm pointing to the words that start out perked between.
12  BY MS. MONTGOMERY:
13  Q    Do you see that?
14  A    Yeah, perked between 3 and 4.
15  Q    So what do you take those numbers 3 and 4 to
16  mean?
17  A    Soil logs. Right here.
18  Q    So those are soil logs?
19  A    That's a log, yes. That perc was done right
20  along Sawmill Road.
21  Q    So you think the numbers are -- so there would
22  be separate perc numbers, are you saying, on a new map?
23  A    Perc -- I don't know that. It's whatever the
24  surveyor draws up.
25  Q    In any event, putting that aside for right

---

152

1  now, I've now shown you three maps and in response to each
2  of them you've said I've seen something that looks like
3  that.
4  A    (Witness nods head affirmatively.)
5  Q    But you think maybe the lines were a little
6  bit different or there was more or less detail, correct?
7  A    They all look -- all the ones I've seen here
8  look altered.
9  Q    Altered from the one that you saw?
10  A    Yes.
11  Q    When did you see the one that you saw?
12  A    I've -- I don't know a date.
13  Q    Have you only seen one?
14  A    I glanced at the one Mr. Corneal brought into
15  the -- what meeting was it?
16  Q    The February 2000?
17  A    February. I glanced at it and then the next
18  one I seen was the one that came from the attorney which had
19  all the orange lines and changes or --
20  Q    The one that had gotten dropped off to Larry
21  Newton --
22  A    Yes.
23  Q    -- and you didn't know how and somehow it came
24  back to you?
25  A    Yes.

---

153

1  Q    When did you see that one -- or where did you
2  see it, I should say? Where were you when you saw it?
3  A    I don't -- I don't -- I don't know about
4  these legal things. I was going to say probably, but that
5  -- that is -- that's flirty.
6  Q    That's good enough for a deposition for right
7  now. If you don't know the exact date, then you can tell me
8  as close as you can possibly tell me.
9       MR. SHERR: Right, as long as you're not
10  guessing at it you can give --
11       THE WITNESS: Yeah, I don't know. I would be
12  guessing.
13  BY MS. MONTGOMERY:
14  Q    Can you take a look at Wilson 5, the April
15  20th letter from the Huntingdon County Planning Commission.
16  Do you have it?
17  A    Yes.
18  Q    Can you look at the second page of that
19  letter. Do you see at the top where it says a detailed map
20  and study data, the second line?
21  A    This second line says investigation and
22  because maps submitted with the investigation did not --
23  Q    No, you're looking at the wrong letter. Look
24  at the April 20th letter which is the second part of that.
25  A    That's February.

---

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

154

1    Q    No, it's going to be on the same document, I
2    believe.
3    A    Okay.
4    Q    There you go. Now, look at the second page of
5    that letter, second line. Can you read that for me, please,
6    starting with the detailed map and study.
7    A    A detailed map and study data identifying the
8    investigation area was submitted and indicates no wetlands
9    are present at the location of the lots in this proposal.
10   Q    Do you recall reading that line before today?
11   A    No.
12   Q    Now, you testified earlier that you got these
13   letters when they come in, right?
14   A    Yes.
15   Q    You don't recall this letter telling you that
16   there aren't any wetlands implicated by Mr. Corneal's
17   proposed subdivision?
18        MR. SHERR:  Object to the form of the
19   question. The letter speaks for itself, but I believe it's
20   talking about what the Blazosky Associates said.
21        THE WITNESS:  I'm sure that I -- I've read it,
22   but I don't know when. That's what I'm -- I see lots of
23   these and I -- I just can't give a date.
24   BY MS. MONTGOMERY:
25   Q    Well, with this letter in hand would you have

155

1    any reason to believe that there was any problem with
2    wetlands on Mr. Corneal's property?
3    A    Yes.
4    Q    Why is that?
5    A    A detailed map and study identifying the
6    investigation area was submitted and indicates no wetlands
7    are present at the location of the lots in this proposal.
8    Well, I -- I read in that the location of the lots, his
9    proposed house development, where the house is going to set,
10   because Mr. Corneal knows as well as anybody that there are
11   wetlands on that property.
12   Q    So that's your concern?
13   A    Well, no, it's addressed -- it was addressed
14   on -- a little further down by the conservation district
15   noting that widening of the road could impact potential
16   wetland areas.
17   Q    On Lot 2, correct?
18   A    Well, the map I have here, the potential was
19   for Lot 4 and Lot 2, potential for widening of roads which
20   -- it describes there, is on Lot 4 till it goes across the
21   power right-of-way.
22   Q    But did you have any indication that there was
23   an intent to widen the road to access a new dwelling on
24   Lot 2?
25   A    No, the only --

156

1    Q    Okay, that's good.
2        MR. SHERR:  You can finish your answer.
3    BY MS. MONTGOMERY:
4    Q    Are you finished with your answer?
5    A    Well, the -- I -- the only -- I didn't know
6    how wide the road was going to be put in there. I know what
7    would be required under a subdivision ordinance, how wide it
8    would have to be, but I have no idea what Mr. Corneal was
9    going to do for a width of the road there, if it was 10
10   feet, 12 feet, 14 feet, I don't know.
11   Q    But if you're going to concern yourself with
12   that sentence that began with the Huntingdon County
13   Conservation District, then let's also read the last
14   sentence in that paragraph.
15   A    The Huntingdon County Conservation District?
16   Q    The last sentence that begins road
17   improvements.
18   A    Right, road improvements should be limited to
19   existing cartway widths.
20   Q    So do you take that to mean that's how the
21   Huntingdon County Planning Commission was telling you
22   you could deal with that concern about widening of roads?
23   A    If the road -- I believe I personally talked
24   with Andy and his thought was that the road was existing and
25   as long as the road wasn't built wider than it was it would

157

1    be permissible through there, yeah.
2    Q    Did Mr. Corneal ever come and ask you to build
3    that road wider than it was?
4    A    No.
5    Q    Thank you. Now, you had testified that when
6    you got the letter back from the Huntingdon County Planning
7    Commission that there wasn't any plan attached to it,
8    correct?
9    A    That's what I recall.
10   Q    That's what you recall, or at least the letter
11   you got didn't have a plan attached to it, right?
12   A    Right.
13   Q    The letter went to Ann Wirth, though, of
14   course, right?
15   A    All letters go to the township office and then
16   they're disseminated from there.
17   Q    Did you then say, well, you know, if I'm going
18   to consider this letter, maybe I need to look at the plan?
19   Did you ask for a plan? Did you ask anybody for a plan?
20   A    No, no actions are being taken on this.
21   Q    No action has been taken on this?
22   A    Right. We weren't taking no action on that.
23   It just laid. I -- all I did was for my information look at
24   what the county was recommending.
25   Q    Now, if the county was reviewing his

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

158

1  subdivision plan -- and I think you testified earlier that
2  that was the first step that was necessary in reviewing --
3  in getting subdivision approval in the township, right?
4      A    Yes.
5      Q    So the process was actually underway, correct,
6  because the county had finished its review and sent it back
7  to you, correct?
8      A    No, we didn't have a copy of what was going
9  on.
10     Q    So did you ask for a copy of what was going
11  on, now that you got this back from the county planning
12  commission?
13     A    There could have been an extra copy come back
14  from the county, but I -- I don't know.
15     Q    All I'm really asking you is, you know, why
16  didn't you ask for one? If your copy of the letter didn't
17  have one, why didn't you ask to see it? Why didn't you ask
18  to see a copy of the plan?
19     A    Because at the time there was no action being
20  taken on his subdivision.
21     Q    No action has ever been taken, right?
22     A    Right.
23     Q    Other than to deny it?
24     A    Well, it wasn't -- it wasn't denied.
25     Q    Okay.

---

159

1      A    It was being held up by a moratorium and then
2  things changed. Now we're into a land improvement.
3      Q    But things didn't change at the point we filed
4  this lawsuit, right? We weren't in land improvement when we
5  filed this lawsuit, were we?
6      A    No, no.
7      Q    Does that mean, I guess, that that plan is
8  still pending, the subdivision plan that was --
9      A    No, his other attorney said there will be no
10  subdivision. It was a land development and that is out.
11     Q    Okay.
12     A    No subdivision.
13     Q    And in fact at that April 2000 meeting Mr.
14  Corneal told you there was no subdivision, right?
15     A    Right.
16     Q    Now, I think you had indicated that the
17  conservation district had expressed some concern about
18  wetlands, right?
19     A    That concern came when they became aware of
20  that, which I'm assuming I initiated with Andy, because he
21  had sent us a letter that they had issued a stream crossing
22  permit and he wasn't familiar with the area.
23          And when him and I talked, he sent one of his
24  representatives out, I believe Dave Kreamer, one of his
25  associates, to check it out, but I -- I have -- to this day

---

160

1  I have never seen a permit for a stream crossing, other than
2  the letter from the county conservation district.
3      Q    So you're indicating that they had issued a
4  stream crossing permit to Mr. Corneal?
5      A    Mr. McClintic was on -- the name on it.
6      Q    So are you saying now that you initiated the
7  complaint with the conservation district?
8          MR. SHERR:  Object to the form of the
9  question. Misstating his testimony.
10         MS. MONTGOMERY:  I'm asking him what he said.
11         MR. SHERR:  Misstating -- you're stating what
12  he said and that's incorrect what he said.
13  BY MS. MONTGOMERY:
14     Q    I said are you saying now -- do you understand
15  my question? You just used the word I'm assuming I
16  initiated the complaint and I'm trying to get you to tell me
17  what you meant by that.
18         MR. SHERR:  And I'm going to have to object
19  again because it's not what he said and the record will
20  reflect what he said --
21         MS. MONTGOMERY:  What did he say?
22         MR. SHERR:  -- and he did not say that.
23         MS. MONTGOMERY:  What did he say?
24         MR. SHERR:  The record will reflect what he
25  said.

---

161

1          MS. MONTGOMERY:  Well, what did he say? You
2  know that's not what he said so you must know what he did
3  say. What did he say?
4          MR. SHERR:  I do, but I'm not going to answer
5  your questions.
6          MS. MONTGOMERY:  Well, then don't object.
7          MR. SHERR:  I'm --
8          MS. MONTGOMERY:  Don't object. Keep going,
9  Mr. --
10         MR. SHERR:  I'll absolutely object.
11  BY MS. MONTGOMERY:
12     Q    Mr. Wilson, are you confused by my question at
13  all?
14     A    Yeah. I said that maybe -- I don't recall,
15  but maybe I initiated the call to Andy Patterson at the
16  conservation district because I was shocked that they had
17  issued a stream crossing permit for a high quality trout
18  stream.
19          And he said, well, we just normally do those
20  things unless there's a problem and then we deal with it.
21  Well, then when the wetland issue came up, that struck a
22  light with him and he sent those guys out. And from what I
23  gather, when they came out they came with the Corps of
24  Engineers too. I -- I assume that.
25     Q    Have you ever done that in the past, called

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

162

1    the conservation district when you hear that they've issued
2    a permit for a stream crossing?
3         A    I call the -- yes.
4         Q    You have.  In what instance did you do that?
5         A    On occasions that I had to have a permit to
6    cross streams with my business.
7         Q    Who issues -- is it the conservation district
8    that issues the stream crossing permit?
9         A    Yes.
10        Q    So that's a little bit different than the
11   question that I asked you.  My question is:  Did you ever
12   call to inquire or express a concern to the conservation
13   district after hearing that they had issued a stream
14   crossing permit to somebody else?  Did you ever do that?
15        A    We have never had one.
16        Q    You never had one?
17        A    There's never been another stream crossing
18   permit issued in our township.
19        Q    Other than the ones that are issued to you for
20   your business?
21        A    And for McClintic.
22        Q    And for McClintic, I see.
23        A    Well, I -- let me clarify that.  I'm only one
24   contractor, okay.  I'm -- I'm trying to -- I'm trying to
25   juggle these things of my work and what we're talking about

---

163

1    here, but I was under the impression the way you talked of
2    how familiar I was with the conservation district and their
3    permits.
4         Q    Well, really I was just saying -- it sounds to
5    me like in response to the conservation district issuing
6    McClintic a stream crossing permit you called the
7    conservation district --
8         A    No, I didn't --
9         Q    -- to express a concern.
10        A    -- know he issued that until they sent a
11   letter out and then we got the feedback from the county
12   about the potential wetlands.  That's when it tied together.
13        Q    I see.  So when you got the feedback from the
14   county and you knew about the stream crossing permit because
15   the conservation district had issued you a letter on that --
16        A    Yes.
17        Q    -- then you called them up and said do you
18   know about these wetlands on the Corneal property?
19        A    Yes.
20        Q    Is that what you did?
21        A    And the answer was they'd never been on the
22   property, they didn't know.  So they came out to investigate
23   to see if they had to pull the stream crossing permit.
24        Q    From McClintic?
25        A    Right, because if he was going to infringe

---

164

1    upon wetlands -- see, they issue these on trust in there,
2    which surprised me with high quality water, but if there is
3    a problem attached with that that they find out later,
4    they'll pull them down.
5         Q    Well, who's McClintic?
6         A    I don't -- a friend of Mr. Corneal's, I
7    believe.
8         Q    So Mr. McClintic that you're talking about got
9    a stream crossing permit in connection with Mr. Corneal's
10   property, right?
11        A    Yes.
12        Q    To cross a stream on Mr. Corneal's property?
13        A    Yes.
14        Q    Now, let me ask you something.  Have you
15   performed some work on some property owned by a gentleman
16   named Weaver or a family named Weaver --
17        A    Bob?
18        Q    -- close to Mr. Corneal's property?
19        A    Yes.
20        Q    You've performed some work on his property, on
21   Weaver's property?
22        A    Yes.
23        Q    Did you get a stream crossing permit in
24   connection with that job?
25        A    That wasn't near a stream.

---

165

1         Q    You weren't near a stream.  You didn't have to
2    cross a stream?
3         A    No.
4         Q    Did you have to cross wetlands in connection
5    with that job?
6         A    No.  Well, hold it, who are you talking
7    about?  Are you talking about Bob or are you talking about
8    Adam?
9         Q    Well, if there's a different Weaver that we're
10   talking about, then we'll talk about --
11        A    I've done work for the son and the father.
12        Q    In connection with either of the Weavers and
13   their properties --
14        A    Well, clarify.  Adam Weaver, we put a three or
15   four foot culvert across a ditch and, yes, I did contact the
16   conservation district for that.
17        Q    Did you get a stream crossing permit?
18        A    I didn't need one, the stream was dry.  He
19   come out and looked at it and said to put it in.
20        Q    Did you have to go near any wetlands to do
21   that?
22        A    No.  I work --
23        Q    Go ahead.
24        A    I work closely with the conservation
25   district.  They've told me if we have to come out you're

---

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

166

1  going to pay money, call us first.
2      Q      So once you got that letter from the
3  Huntingdon County Planning Commission that indicated there
4  were some wetlands around the Corneal property, although
5  none of the lots, the proposed lots were on the wetlands,
6  correct?
7      A      (Witness nods head affirmatively.)
8      Q      And once you called the Huntingdon -- once you
9  called the conservation district and said, you know, you
10  issued a stream crossing permit on the Corneal property, did
11  you know there was wetlands, did you have any concerns after
12  that that there was any problem with Mr. Corneal's wetlands
13  or with -- I should say did you have any concerns after that
14  that there were problems with wetlands being affected on Mr.
15  Corneal's property?
16      A      Once I talked to the conservation district,
17  it's whatever their determination is satisfies the township.
18      Q      What did they decide, do you know?
19      A      I never got a letter.
20      Q      Did you get a report from the Army Corps of
21  Engineers?
22      A      No.
23      Q      You didn't get a letter from the conservation
24  district either?
25      A      There may have been a letter come in from

167

1  Andy, but I don't recall.
2      Q      Did you call them back and say, hey, what did
3  you figure out out there on the Corneal property?
4      A      No.
5      Q      Do you know whether the conservation district
6  found it necessary to pull the stream crossing permit?
7      A      No.
8      Q      To be clear, are you saying you don't know or
9  no, they didn't find it necessary?
10      A      I don't know.
11      Q      You don't know. Did you call them back to
12  find out whether they had to pull that permit or not?
13      A      I have to talk to them on Monday. I haven't
14  -- I didn't call them back.
15      Q      You have to talk to him on this Monday you
16  mean?
17      A      This coming Monday, yes.
18      Q      But how long ago did you call him about that
19  wetland concern of yours?
20      A      Well, apparently it was after this letter.
21      Q      So it was like a year ago?
22      A      Yeah.
23      Q      Did you ever talk to the sewage enforcement
24  officer about any concern over wetlands on the Corneal
25  property?

168

1      A      No.
2      Q      And I did say talk with so maybe I should say
3  did you ever communicate with him in any way or did he
4  communicate with you in any way about a concern over
5  wetlands on the Corneal's property?
6      A      No.
7      Q      Do you know whether he communicated or anybody
8  else -- do you know whether he communicated with anybody in
9  the township government or anybody in the township
10  government communicated with him about a concern over
11  wetlands?
12      A      I don't know.
13      Q      Did any of the other supervisors express any
14  concern to you about it?
15      A      No.
16      Q      How about Ann Wirth, did she express any
17  concern to you about wetlands?
18      A      No.
19      Q      So you didn't refuse to sign the sewage
20  modules because of a concern over wetlands, right?
21      A      Rephrase, please.
22      Q      You didn't refuse to sign Mr. Corneal's sewage
23  modules because of a concern over wetlands?
24      A      No.
25      Q      Let me ask you this: I hope I didn't ask you

169

1  this before, and I apologize if I did, but has the board of
2  township supervisors ever refused to sign sewage modules
3  that had been approved by the sewage enforcement officer
4  other than Mr. Corneal's?
5      A      No, not that I know of.
6      Q      Now, did you have any involvement at all with
7  anybody concerning Mr. Corneal's request for a privy permit?
8      A      I called the sewage officer. I said you do
9  your job, that's what I told him.
10      Q      Did you have some reason to believe he wasn't
11  going to do his job?
12      A      Well, I know how persuasive some individuals
13  can be so I just reminded him he was an employee of the
14  township and he should do his job.
15      Q      Did you have some experience where Mr. Parks
16  didn't do his job in the past?
17      A      No.
18      Q      So when you told him to do his job, what did
19  you mean by that?
20      A      Make sure that he did his job, the
21  regulations, DEP.
22      Q      Did you tell him not to issue a privy permit
23  to Mr. Corneal?
24      A      I don't know.
25      Q      Did you tell him not to help Mr. Corneal in



WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

170

1  any way with respect to his attempt to get a privy permit on
2  his property?
3      A     No, as I said, I told him to do his job.
4      Q     Did you tell him not to cut him any breaks?
5      A     No exceptions.  We don't give anybody else
6  exceptions, none here.
7      Q     Do you ever recall advising Mr. Parks not to
8  make any exceptions for anybody else?
9      A     No.
10     Q     Do you ever recall telling Mr. Parks maybe you
11  could make an exception for somebody?
12     A     No.
13     Q     Let me ask you this:  Did you ever find it
14  necessary in the past to call up Mr. Parks and say don't
15  make any exceptions?
16     A     No.  Ask me one more.
17     Q     What?
18     A     Ask me one more.
19     Q     Well, I can't guess what question you want me
20  to ask.  If you want to clarify your answer --
21     A     Well, I'd like to clarify my answer there.
22     Q     Okay.
23     A     Ninety-eight percent of the sewage work done
24  in Jackson Township I'm with the sewage officer so I know
25  what he does, but I wasn't privy to being involved with more

---

171

1  work at Corneals.  That's why I wanted to make sure.
2      Q     Oh, I see.  So initially you had been doing
3  the work on the Corneal property, but then Mr. Corneal got
4  somebody else to do the property --
5      A     Yes.
6      Q     To do the work?
7      A     Yes.
8      Q     Do you know why Mr. Corneal got somebody else
9  to do the work?
10     A     Well, I assume it was because I didn't get his
11  road done.
12     Q     So you felt that nobody else could really work
13  with the sewage officer appropriately on Mr. Corneal's
14  property but you?
15     A     Well, I'll tell you something, he wouldn't
16  have the trouble he has now if he had a competent
17  contractor.  The first thing you do when you go in there
18  with equipment is you rope the area off that says sewage on
19  it so nobody can get on it.  That's the first thing you do.
20  That's how he lost it.  They drove over it.
21         But experienced contractors know this because
22  they've dealt with sewage officers that have had these
23  rejections before.  You can't -- you can't work that area.
24  That's a -- that's a sacred area.
25     Q     So is it your testimony that Mr. Corneal's

---

172

1  subsequent contractor drove over a test pit or something?
2      A     Well, from what I -- was conveyed by the
3  sewage officer and Terry Williams the area has been driven
4  on and filled.  There's maintenance roads or construction
5  roads or something in that area.
6      Q     Did they tell you there's no other suitable
7  test site for Mr. Corneal to install a septic system for a
8  house?
9      A     No.
10     Q     Did they tell you there is another suitable
11  test site?
12     A     There's lots.
13     Q     There's lots.  Okay, thanks.  Did you ever
14  tell Mr. Parks that you weren't going to issue Mr. Corneal
15  -- or you weren't going to approve Mr. Corneal's sewage
16  modules?
17     A     I'm sorry?
18     Q     Did you ever tell Mr. Parks that you weren't
19  going to approve Mr. Corneal's sewage modules despite the
20  fact that he'd approved them?
21     A     I don't recall.
22     Q     Did you ever discuss with Mr. Parks that he
23  shouldn't issue a sewage permit because you weren't going to
24  approve -- the board of supervisors wasn't going to approve
25  the sewage module?

---

173

1      A     I don't recall.
2      Q     Did you ever discuss the board's refusal to
3  sign Mr. Corneal's sewage module with Mr. Parks at all?
4      A     I don't recall.
5      Q     Did you ever discuss the board's refusal to
6  sign the sewage module with anybody else?
7      A     No.
8      Q     How about with Larry Newton?
9      A     No.
10     Q     Has the board ever approved any other
11  applications for privy permits?
12     A     Yes.
13     Q     How many, do you recall?
14     A     I don't know.
15     Q     Do you think you do one or two a year, more?
16     A     I don't know.
17     Q     What's your understanding of why the sewage
18  enforcement officer wouldn't issue Mr. Corneal a privy
19  permit?
20     A     I -- I don't know.  I assume that there was
21  concern of water.
22     Q     Are you aware of whether or not the Corneals
23  sought the issuance of a privy permit just so that they
24  could build -- finish their art studio and have something up
25  there to use while they were up there?  Do you know anything

---

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

174

1  about that?
2  A    No.
3  Q    Did you ever instruct anybody not to issue a
4  privy permit no matter what Mr. Corneal asked for it for?
5  A    No.
6  Q    How long was your conversation with Mr. Parks
7  when you called him and said you do your job?
8  A    I don't know. I don't know.
9  Q    What did Mr. Parks say back to you?
10  A    Okay.
11  Q    He said okay?
12  A    Yeah.
13  Q    Do you know whether anybody else called Mr.
14  Parks in connection with the privy permit or the request for
15  a privy permit?
16  A    I don't know.
17  Q    How did the privy permit come to your
18  attention? Did Mr. Corneal come into the township
19  supervisors and ask for it initially?
20  A    I -- I believe the meeting that he was at --
21  the last meeting he was at he asked for a privy permit.
22  Q    Is that the meeting in April 2000?
23  A    I believe.
24  Q    So was it after that meeting that you called
25  Barry Parks and told him to do his job?

175

1  A    It would have to have been, yes.
2  Q    Was it that night?
3  A    I don't recall.
4  Q    Well, isn't it -- I mean, did you understand
5  that Mr. Corneal was asking you for a privy permit because
6  you wouldn't sign the sewage modules?
7  A    Yes.
8  Q    So he was just looking for something so he
9  could use his property, correct?
10  A    Yeah.
11  Q    And you said no? You told Mr. Parks to say
12  no, right?
13  A    I told Mr. Parks to do his job.
14       MR. SHERR: Object to the form.
15  BY MS. MONTGOMERY:
16  Q    Did you ever interfere or oversee Mr. Parks in
17  his work in connection with anybody else's requests for a
18  privy permit?
19       MR. SHERR: Object to the form of the
20  question. It assumes facts not in evidence. You can
21  answer.
22       THE WITNESS: I don't know how many privy
23  permits have been issued in Jackson Township. We deal with
24  them all the time because of the camps, the hunting lodges,
25  the fishing lodges that are back in the mountain. DEP

176

1  requires those. So we had to update our ordinance to get
2  some uniformity in the regulation of the township concerning
3  the maintenance of these privies and holding tanks.
4  BY MS. MONTGOMERY:
5  Q    Well, let me just clarify now. Mr. Parks is
6  the one who issues privy permits, right?
7  A    Yes.
8  Q    My question is: Did you ever find it
9  necessary to contact Mr. Parks personally about anybody
10  else's request for a privy permit?
11  A    No.
12  Q    Now, after that time that you talked to Mr.
13  Van Dommelen on the telephone when he called you because Mr.
14  Corneal had come out and asked for an application for a
15  building permit, have you talked to Mr. Van Dommelen since
16  then in any conversation, in any telephone discussion,
17  chance meeting, formal meeting, any way whatsoever about Mr.
18  Corneal's property?
19  A    No.
20  Q    Has he contacted you to ask you any questions
21  about it?
22  A    No.
23  Q    Has he contacted the township supervisors
24  generally?
25  A    Not unless there's a question with the

177

1  regulations.
2  Q    What do you mean by that?
3  A    Something that he doesn't understand with the
4  regulation to issue a permit and -- and you just said permit
5  -- no, I'm sorry, you said application.
6  Q    Yes.
7  A    When the phone call came in, it was to give
8  Mr. Corneal a building permit. Nothing was said about an
9  application.
10  Q    But Mr. Corneal didn't have an application;
11  isn't that correct?
12  A    He could have -- he should have been issued an
13  application.
14  Q    Do you know who Mr. Corneal has to go to for
15  an application?
16  A    Yeah, Dave Van Dommelen.
17  Q    Do you think it would be appropriate for Mr.
18  Van Dommelen to say no, I'm not going to give you an
19  application?
20  A    That wouldn't be appropriate, but we're doing
21  a play on words here. You're talking about a permit.
22  Q    But he can't --
23  A    He can't have --
24  Q    He can't get a permit without an application,
25  correct?



178

1    A    Right, but I never heard anything about
2  application, all I heard was permit.
3    Q    But you told him not to -- you told Mr. Van
4  Dommelen not to issue him a permit, correct?
5    A    Correct.
6    Q    Does that mean Mr. Van Dommelen should have
7  said no, you can't even have an application?
8    A    I don't know what -- what he would do in that
9  situation.
10   Q    Well, would it have been right for him to say
11 no, I'm not even going to give you an application?
12   A    No.
13   Q    Do you hire Mr. Van Dommelen?  Is it the
14 township supervisors who --
15   A    The township board of supervisors hires him.
16   Q    So you're his boss?
17   A    One of them, yes.
18   Q    So as his boss you think it wouldn't be
19 appropriate for him to refuse to just give the application,
20 correct?
21   A    I don't know.  Something seems strange.
22   Q    What seems strange?
23   A    Well, there's this -- I got a call about a
24 permit and you're talking about the application.  He should
25 -- an application should be issued to anybody and then it's

179

1  -- then it's checked out.  If it conforms with the
2  regulations, then the permit is issued.
3    Q    Is this the first time that you ever heard
4  that Mr. Van Dommelen refused to give an application to Mr.
5  Corneal?
6    A    Today?
7    Q    Yes.
8    A    Yes.
9    Q    This is the first time you ever heard it?
10   A    Application.  That was the keyword, right?
11   Q    Yes.
12   A    Yes, okay.
13   Q    Did you say you read the complaint in this
14 matter?
15   A    Huh?
16   Q    Did you say you read the complaint in this
17 matter, in this lawsuit?
18      MR. SHERR:  Do you understand what a complaint
19 -- what she's talking about?
20      THE WITNESS:  The July -- the July 4th
21 delivery?  I've read it a couple times and I -- honestly I
22 can't tell you what it says, I'm sorry.
23 BY MS. MONTGOMERY:
24   Q    It's the document that you keep sitting on
25 your freezer and keep looking at?

180

1    A    On my freezer and I keep glancing at it every
2  time I go back the hall, yeah.
3       MS. MONTGOMERY:  I'm going to take just a
4  three minute break here with my colleagues and I think we
5  may be finished with you, but we'll check it out and get
6  right back to you.
7       (Break taken at 2:27 p.m. until 2:32 p.m.)
8  BY MS. MONTGOMERY:
9    Q    Mr. Wilson, I'm just going to take you through
10 a few documents that have already been marked at prior
11 depositions.  The first has been marked Wirth 4.  It's the
12 July 10, 2000 minutes, I believe, and I'll let you look at
13 them and tell me if you recognize those minutes.
14   A    That looks correct.
15   Q    So those minutes reflect that it was on July
16 10, 2000 at the board of supervisor's meeting that you
17 passed your subdivision and land development ordinance for
18 Jackson Township, correct?
19   A    Plus the others, yes.
20   Q    Plus the other ordinances?
21   A    Yes.
22   Q    The driveway ordinance and which other one?
23   A    Holding tank and privy.
24   Q    Thank you.  Now I'm going to show you a
25 document that has been marked as Wirth Exhibit 3 in the past

181

1  and ask you to look at that.  Look at it and then tell me
2  whether you've seen that document before.
3    A    No.
4    Q    You have not seen it before?
5    A    No.
6    Q    Well, I'm going to represent to you -- well,
7  actually ask you to look at it and tell me what is it.  Now
8  that you're looking at it, do you know what it is?
9    A    Well, it says it's an application for a
10 building permit.
11   Q    By whom?
12   A    There's no signature on it.
13   Q    Is it filled out, in any event?
14   A    Yes.
15   Q    Who's it filled out by, does it look like?
16   A    I don't know.
17   Q    Let me see it, please.  When you say that it's
18 not signed, what's that on the bottom left-hand -- bottom
19 right-hand corner?
20   A    Well, that's not signed where the permit
21 officer is supposed to sign.  I don't know what that is.
22 That's -- it looks like Mrs. Corneal's signature.
23   Q    Mrs. Corneal or Mr. Corneal?
24   A    Well, I don't know.  I can make out Corneal.
25 It looks like Sandy or Sandra or something, Y.


182

1    Q    What's the date on the application?
2    A    8/31/00.
3    Q    At the time that -- around August 31, 2000 did
4    you become aware that the Corneals had submitted
5    applications for building permits on their property?
6    A    I don't remember.
7    Q    I'm going to show you another document that
8    has been marked as Wirth Exhibit 14 and ask you to look at
9    that.  There's a series of documents attached there.
10        (Pause.)
11   BY MS. MONTGOMERY:
12   Q    You've finished reviewing Wirth Exhibit 14,
13   correct?
14   A    Yes.
15   Q    Do you recall seeing those documents in the
16   past?
17   A    No.
18   Q    Now, the cover letters that are part of that
19   Wirth Exhibit 14 are addressed to the township, correct?
20   A    Yes.
21   Q    Do you normally get documents addressed to the
22   township passed on to you once Miss Wirth gets them?
23   A    Not unless there's a problem.
24   Q    Did anybody tell you that the Corneals had
25   submitted applications for building permits for their

183

1    property on the date of those letters -- around the time of
2    the date of the letters which is 8/31/2000?
3    A    I don't remember that date.
4    Q    It's accurate, isn't it, that those
5    applications for building permits are for a garage, an art
6    studio and a house, correct?
7    A    Yes.
8    Q    Do you know how those building applications --
9    or those applications for building permits were handled,
10   treated?
11   A    No, I don't.
12   Q    Do you know what the result was of the
13   applications?
14   A    I don't know that either.
15   Q    Were they granted?
16   A    I don't know if Terry has them or not.
17   Q    I show you a document --
18   A    See, I'm -- I'm trying to keep between what
19   Terry has been doing and what we're doing now and I'm -- I
20   hope I'm okay -- I'm doing okay.  I tried to explain.
21   Q    This is quite a long time before Terry was
22   doing anything so let's try and take -- stick with this time
23   frame.  I want to show you a document that has been marked
24   Wirth Exhibit 13.
25        MR. SHERR: I don't know if that

184

1    representation you made is true but --
2        MS. MONTGOMERY:  What's that?
3        MR. SHERR:  I don't think that representation
4    you made is true.  I think he was involved at least in the
5    fall of 2000, which would have been --
6        MS. MONTGOMERY:  August 31, 2000 is the fall?
7        THE WITNESS:  Yes.
8        MR. SHERR:  It's pretty much ...
9    BY MS. MONTGOMERY:
10   Q    Have you seen that document before, what's
11   been previously marked as Wirth 13?
12   A    No.
13   Q    What is that document?
14   A    Well, it looks like a letter to the Corneals
15   from Dave Van Dommelen.
16   Q    And what does it do?
17   A    Denies the application.
18   Q    Denies their building permit applications?
19   A    Their applications have been denied,
20   applications.
21   Q    Now, I note that this letter was written on
22   Jackson Township Board of Supervisor's letterhead, correct?
23   Does Mr. Van Dommelen have Jackson Township Board of
24   Supervisor's letterhead?
25   A    He should have.

185

1    Q    Does he type his own letters, do you know?
2    A    I think so.
3    Q    Do you know -- he types them himself?  He
4    actually gets on the computer or typewriter or something and
5    types it himself?
6    A    I believe so.
7    Q    Let me show you another document that's been
8    marked as Wirth 12 in the past.  Have you seen that document
9    in the past?
10   A    No, until I got to the meeting.
11   Q    What is that document?
12   A    It's an appeal.
13   Q    Request for appeal?
14   A    For a hearing for -- by the permits ordinance
15   and I believe that was one of the meetings held in the
16   Huntingdon County Courthouse to get things together or it
17   was generated from that with Terry.
18   Q    So building appeal -- this is an appeal of the
19   denial of the building permit, right?
20   A    That's what it says.
21   Q    And this is signed by Terry Williams?
22   A    Yes.
23   Q    So is it your recollection that this is about
24   the time Terry Williams got involved in this matter?
25   A    Apparently.

WILSON,  W. THOMAS
05/18/01

● CORNEAL VS
JACKSON TOWNSHIP, ET AL

186

1    Q    That's November 10, 2000, correct?
2    A    I'm -- yeah, I'm -- if my memory serves me
3    right, I think it was earlier than that.  I -- because we
4    were supposed to have all this work cleaned up, everything
5    -- he said he wanted to have everything of Corneals in
6    order by the end of December and we didn't make that.  So
7    we've had another hearing -- well, anyhow.
8    Q    Well, in any event, have you ever had an
9    appeal of a refusal of a building permit in Jackson
10   Township?
11   A    I'm not aware.
12   Q    Do you know of any building permits that have
13   been denied in Jackson Township?
14   A    I don't know.
15   Q    Now, do you understand this to be a request
16   for a hearing on an appeal of the building permit -- a
17   denial of the building permit, right?
18   A    Yes.
19   Q    Was there ever a hearing conducted on this
20   appeal?
21   A    I don't know.
22   Q    Did you contact Larry Newton about this
23   request for an appeal of the denial of Mr. Corneal's
24   application for a building permit?
25   A    I don't recall.

187

1    Q    You mentioned something about a meeting in the
2    courthouse up in Huntingdon County.  When was that meeting?
3    A    I'm trying to get the date on that.  The first
4    time I think it was Terry and Larry corresponded to set this
5    up but -- to get this thing moving.
6    Q    Well, was that after the township sued the
7    Corneals in Huntingdon County Court?
8    A    Yes.
9    Q    So any meeting that you had in the Huntingdon
10   County Court offices or the courthouse didn't have anything
11   to do with their request for an appeal of their denial of
12   the application for building permits, did it?
13   A    I don't know.  All I -- all I can remember is
14   that Attorney Williams made several requests to try to get
15   these things altogether to get the Corneal land improvement
16   gone and completed and I -- I don't -- I just don't know the
17   dates.
18   Q    Was that after say Christmas of 2000?
19   A    It was before Christmas of 2000.
20   Q    Did you bring an action against Mr. Corneal
21   after he requested an appeal of the denial of his
22   application for a building permit?
23   A    I don't know the time frame there.
24   Q    But just so we're clear, the township
25   supervisors did not actually get together and schedule a

188

1    hearing to hear Mr. Corneal's appeal of the denial of his
2    application for a building permit, correct?
3    A    As far as I know.  I was never a party to
4    that.
5    Q    Is it your understanding that it is the
6    township supervisors who would hear that appeal?
7    A    Yes.
8    Q    Do you ever recall Mr. Van Dommelen referring
9    to Mr. Corneal as a trouble-making yuppy from over the
10   mountain?
11   A    I -- the first I knew about that was in the
12   complaint or on one of the -- one of the papers.  I seen it
13   written down.  It was the first I had seen it.
14   Q    Did you ever refer to Mr. Corneal in that
15   fashion?
16   A    I hope I'm a better person than that.  Mr. --
17   even though Mr. Corneal and I don't talk much anymore, I
18   think we're still both gentlemen enough to talk to each
19   other.
20        MS. MONTGOMERY:  I don't have any other
21   questions for you right now.
22        MS. YANKANICH:  I have a couple questions for
23   you.
24
25        CROSS-EXAMINATION

189

1
2    BY MS. YANKANICH:
3    Q    In case I haven't introduced myself, I am
4    Jennifer Yankanich and I represent Larry Newton.
5         My first question is:  There were several
6    times that Mr. Corneal came before the Jackson County Board
7    of Supervisors, the first being to get his subdivision plan
8    approved by the board and then he came for a -- to get his
9    sewer modules approved and the privy permit and so forth.
10   Do you remember those times?
11   A    Yes.
12   Q    During any of those meetings did you ever
13   temporarily stop the meeting or adjourn those meetings and
14   call Larry Newton to ask his advice on how to proceed?
15   A    I don't recall doing that.
16   Q    Do you recall any of the other supervisors
17   possibly calling Mr. Newton and asking his advice?
18   A    No.
19   Q    Do you recall at any time with respect to Mr.
20   Corneal's property calling Larry Newton and asking him on
21   how to proceed with respect to Mr. Corneal?
22   A    I called -- when I say I called -- it may not
23   have been me.  The board of supervisors called Larry to get
24   proceedings started against Mr. Corneal, some action from
25   Jackson Township.  We were being pushed this way and there

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

190

1  were violations of things in Jackson Township and we wanted
2  to know what we had to do so -- to get that lawsuit going.
3      Q    So that was at the end when the lawsuit was
4  initiated?
5      A    Yes.
6      Q    Before that you don't remember any times that
7  you called Larry Newton to seek advice regarding Mr.
8  Corneal?
9      A    No, normally we don't -- unless there's a
10 potential problem at a meeting -- because we don't have any
11 money, okay.  We don't have Larry come out unless we expect
12 some problems.  We can't afford him.
13     Q    Do you recall ever asking Miss Wirth, Ann
14 Wirth, to make any calls to Larry Newton with respect to Mr.
15 Corneal?
16     A    I may have.  I don't know.  I just -- I don't
17 recall, but if I was tied up, it's possible that I did that,
18 you know, find out when I could see him or something like
19 that.
20     Q    Would that be with respect to filing a lawsuit
21 against Mr. Corneal?
22     A    Well, any problems that we have.  I'm usually
23 out -- gone all day and I'll -- I think that's -- maybe I'm
24 wrong, but I think that's what secretaries do.  You call
25 them and say would you set this up for me or, you know,

191

1  would you find out when I can talk to so and so and these
2  type of things.
3      Q    But her role there would be to set up a
4  meeting between you and Mr. Newton, not to seek Mr. Newton's
5  advice?
6      A    Right.
7      Q    Is that correct?
8      A    Right.
9      Q    Is it customary after the board meetings, the
10 regular board meetings the first Monday of each month, to
11 inform Mr. Newton of what happened during the meeting?
12     A    No.
13          MS. YANKANICH:  I don't have any further
14 questions.
15          MR. SHERR:  No questions.
16          MS. MONTGOMERY:  I just have one follow-up
17 question.
18
19          REDIRECT EXAMINATION
20
21 BY MS. MONTGOMERY:
22     Q    Just to be sure that I understand your
23 testimony in response to Mr. Newton's counsel's inquiry
24 here, are there instances in which the secretary, Miss
25 Wirth, will call Larry Newton and seek advice on behalf of

192

1  the township supervisors?
2      A    There could be.  That could be.  I can't -- I
3  can't think of an instance, but as I -- as I said, I -- I
4  think the supervisors utilize that lady to the fullest
5  extent when she's trying to run her own business and we
6  appreciate her services.  And it could be seven, eight
7  o'clock at night till -- I have some things on my mind and
8  I'll call and say, you know, did you know this or did you
9  hear anything about this, things that happen in the township
10 to keep me -- sort of keep me informed of what's going on.
11 There's 816 people, it's tough.
12     Q    Well, then the answer is it can't be that Miss
13 Wirth sometimes calls Larry Newton and seeks advice on
14 behalf of the township supervisors?
15     A    Yes, yes.
16          MS. YANKANICH:  I have a follow-up if you're
17 finished.
18
19          RECROSS-EXAMINATION
20
21 BY MS. YANKANICH:
22     Q    Does Ms. Wirth have the authority to make a
23 phone call to Mr. Newton on your behalf without asking --
24 without being directed by you or any of the other
25 supervisors?

193

1      A    No.
2      Q    To your knowledge has there ever been an
3  instance that Ms. Wirth called Mr. Newton without being told
4  by you or one of the supervisors to do so with respect to
5  Mr. Corneal?
6      A    Not that I know of.
7      Q    So would you say that you're aware of any
8  conversations that Ms. Wirth has had with Mr. Newton
9  regarding Mr. Corneal?
10     A    Any conversations between Larry's office and
11 the Jackson Township office would be available to the
12 supervisors.
13     Q    How so?
14     A    Written up or if we asked her to call in there
15 and find something out and then she would have a reply for
16 us, she would have it written down or say that, well, he
17 couldn't explain it all, you'll have to call him or go to
18 his office and those type of things.
19     Q    Do you recall seeing any of these notes that
20 she made from a telephone call with Mr. Newton?
21     A    No, she usually -- most of the time it's --
22 she'll call all supervisors and tell them what the
23 conversation was as soon as she's done.  And with me it's
24 usually -- I'm usually the last one because I'm coming home
25 late in the evenings.  So it's nothing for her at 8:30, nine

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

WILSON, W. THOMAS
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

194

1    o'clock to call and tell me this is what -- you know, the
2    information you wanted from Larry or something like that.
3    Q    The phone calls that you're referring to,
4    would these be phone calls -- and I may have already asked
5    you this. In reference to the litigation that was filed
6    against Mr. Corneal?
7    A    Township business.
8    Q    Township business in general?
9    A    Yes.
10    Q    And my final question is do you have any
11    specific recollection of a phone call that you asked Ms.
12    Wirth to make to Mr. Newton regarding David Corneal and his
13    property before litigation was commenced?
14    A    No.
15    MS. YANKANICH:  I don't have anything
16    further.
17    MS. MONTGOMERY:  Okay, thanks.
18    (The deposition was concluded at 2:54 p.m.)
19
20
21
22
23
24
25

---

195

1
2    COUNTY OF DAUPHIN            :
                                  : SS
3    COMMONWEALTH OF PENNSYLVANIA :
4         I, Teresa K. Bear, Reporter-Notary Public,
5    authorized to administer oaths within and for the
6    Commonwealth of Pennsylvania and take depositions in the
7    trial of causes, do hereby certify that the foregoing is the
8    testimony of W. THOMAS WILSON.
9         I further certify that before the taking of
10    said deposition, the witness was duly sworn; that the
11    questions and answers were taken down stenographically by
12    the said Teresa K. Bear, a Reporter-Notary Public, approved
13    and agreed to, and afterwards reduced to typewriting under
14    the direction of the said Reporter.
15         I further certify that the proceedings and
16    evidence are contained fully and accurately to the best of
17    my ability in the notes taken by me on the within
18    deposition, and that this copy is a correct transcript of
19    the same.
20         In testimony whereof, I have hereunto
21    subscribed my hand this 31st day of May, 2001.
22
23    _____
              Teresa K. Bear, Reporter
24              Notary Public
           My commission expires
25              on April 13, 2003

---

*Exhibit 2*

**YODER, MICHAEL**
**05/18/01**

**CORNEAL VS**
**JACKSON TOWNSHIP, ET AL**

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2   DAVID B. CORNEAL and SANDRA  :
     Y. CORNEAL,                  :
 3        PLAINTIFFS              :
                                  :
 4            VS                  :  NO. 1:CV-00-1192
                                  :
 5   JACKSON TOWNSHIP, HUNTINGDON :
     COUNTY, PENNSYLVANIA; W.     :
 6   THOMAS WILSON, individually  :
     and in his official capacity :
 7   as Supervisor of Jackson     :
     Township; MICHAEL YODER,     :
 8   individually and in his      :
     official capacity as         :
 9   Supervisor of Jackson        :
     Township; RALPH WEILER,      :
10   individually and in his      :
     official capacity as         :
11   Supervisor of Jackson        :
     Township; BARRY PARKS,       :
12   individually and in his      :
     official capacity as Sewage  :
13   Enforcement Officer of       :
     Jackson Township; DAVID      :
14   VAN DOMMELEN, individually   :
     and in his official capacity :
15   as Building Permit Officer;  :
     ANN L. WIRTH, individually   :
16   and in her official capacity :
     as Secretary of Jackson      :
17   Township; and LARRY NEWTON,  :
     individually and in his      :
18   official capacity as         :
     Solicitor to Jackson         :
19   Township,                    :
          DEFENDANTS              :
20            DEPOSITION OF:  MICHAEL YODER
21            TAKEN BY:       PLAINTIFFS
22            BEFORE:         TERESA K. BEAR, REPORTER
                              NOTARY PUBLIC
23
              DATE:           MAY 18, 2001, 2:57 P.M.
24
              PLACE:          ECKERT SEAMANS
25                            213 MARKET STREET
                              HARRISBURG, PENNSYLVANIA
```




**YODER, MICHAEL**
**05/18/01**

**CORNEAL VS**
**JACKSON TOWNSHIP, ET AL**

---

**2**

```
1   APPEARANCES:
2     ECKERT SEAMANS
        BY:  BRIDGET E. MONTGOMERY, ESQUIRE
3       LESLIE A. MALADY, ESQUIRE
4         FOR - PLAINTIFFS
5     MAYERS, MENNIES & SHERR, LLP
        BY:  ANTHONY R. SHERR, ESQUIRE
6
            FOR - ALL DEFENDANTS EXCEPT NEWTON
7
      METTE, EVANS & WOODSIDE
8       BY:  JENNIFER YANKANICH, ESQUIRE
9           FOR - DEFENDANT - LARRY NEWTON
10  ALSO PRESENT:
11    DAVID B. CORNEAL
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**3**

```
1            TABLE OF CONTENTS
2        WITNESS
3  FOR PLAINTIFFS        DIRECT CROSS REDIRECT RECROSS
4  Michael Yoder
     By Ms. Malady        4  --  75  --
5    By Ms. Yankanich      --  67  --  80
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**4**

```
1        MICHAEL YODER, called as a witness, being
2   sworn, testified as follows:
3
4           DIRECT EXAMINATION
5
6   BY MS. MALADY:
7   Q      Mr. Yoder, my name is Leslie Malady and I
8   represent, along with Bridget Montgomery, Mr. and Mrs.
9   Corneal in this lawsuit.  Have you ever been deposed before?
10  A      No, I haven't.
11  Q      I'm going to run through a couple guidelines
12  just to keep them in mind.
13  A      Okay.
14  Q      All your responses needs to be verbal for
15  the --
16  A      Right.
17  Q      If you don't understand a question that I ask,
18  I need you to tell me you don't understand it so I can
19  rephrase it.  If anything I say is unclear, please let me
20  know and I'll try to make it more clear.
21         I need you to let me ask my question and
22  finish before you start to answer and I'll let you answer
23  before I start to ask you another question so that she can
24  get everything down that we say.
25         Are you on any medication that would prevent
```

---

**5**

```
1   you from giving deposition testimony?
2   A      No.
3   Q      Can you state your name for the record,
4   please.
5   A      Michael — full name?
6   Q      Sure.
7   A      Michael Rolland Yoder.
8   Q      Where do you live?
9   A      Huntingdon.  I'm R.D. 2, Box 134, Huntingdon.
10  Q      Just to get started, would you explain your
11  educational background.
12  A      I just have a -- high school graduation,
13  that's it.
14  Q      Have you taken any post high school courses,
15  any seminars?
16  A      No.
17  Q      Certifications, licenses?
18  A      No.
19  Q      How long have you lived in Jackson Township?
20  A      Forty-two years.
21  Q      Your whole life?
22  A      Yes.
23  Q      Have you always lived at the same location?
24  A      The next door farm is the home farm.
25  Q      Are you presently a member of the Jackson
```

---



YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

6

1  Township Board of Supervisors?
2  A    Yes, I am.
3  Q    Are you the chairman of the board?
4  A    I am at this time, yes.
5  Q    And when were you made chairman?
6  A    Just this past January.
7  Q    And last year who was the chairman?
8  A    Ralph Weiler.
9  Q    How long have you been a supervisor for
10  Jackson Township?
11  A    This will be just over three years.
12  Q    And how long does your term last?
13  A    I have four more years.
14  Q    Let me ask you generally. I know that Jackson
15  Township doesn't have many ordinances enacted, but what do
16  you -- what is your understanding generally of the enactment
17  of an ordinance? What do you understand your
18  responsibilities as a supervisor to be?
19  A    I guess to enact an ordinance that suits our
20  community, is all I, you know, can say.
21  Q    Are there any particular steps that you're
22  aware of that need to be taken when you enact an ordinance?
23  A    I'm not that familiar with it. I know we had
24  to approve it at a meeting, you know, and that type of thing
25  and --

7

1  Q    When you approve it at a meeting, how do you
2  approve it?
3  A    We ask for a motion and have it seconded.
4  Q    And then you take a formal vote?
5  A    Yes.
6  Q    If you enact an ordinance -- let me start that
7  over again. When there is a motion made and a vote taken,
8  is that recorded in the minutes of your meeting?
9  A    Yes, it is.
10  Q    So that if you enact something, there would be
11  a record of it in the minutes of that meeting?
12  A    Yes. I would say yes.
13  Q    Let me start with your subdivision and land
14  development ordinance. I think it was enacted in July of
15  2000?
16  A    Correct.
17  Q    When did you start to put together that
18  subdivision and land development ordinance?
19  A    I believe we started working on it summer and
20  fall of 1999, I believe.
21  Q    And how did you go about compiling the
22  ordinance?
23  A    Well, we worked with county planning quite a
24  bit and they gave us a lot of information.
25  Q    What type of information?

8

1  A    What type of ordinances suit our -- you know,
2  our area and that type of thing.
3  Q    Now, did you personally go through all of
4  those piles of information given to you?
5  A    No. I would say no.
6  Q    Do you know who did?
7  A    I know county planning reviewed all the
8  ordinances that we compiled. I do know that.
9  Q    Did the supervisors as a group go through
10  those?
11  A    Yeah, we went through it. Yes, I would say we
12  went through it together, yeah.
13  Q    Did you or any of the supervisors actually
14  type up that ordinance?
15  A    No.
16  Q    Do you know who did?
17  A    I'm sorry, I don't know.
18  Q    Would Ann Wirth have done that for you?
19  A    No, I don't believe, no.
20  Q    Do you know if the subdivision -- I'll just
21  refer to it as the subdivision ordinance to shorten it up a
22  little bit.
23  A    Okay.
24  Q    Do you know if that ordinance was advertised?
25  A    Yes, I do recall it was advertised, yes.

9

1  Q    Was it advertised one time?
2  A    I believe we advertise two or three times.
3  Q    Do you know when those advertisements were
4  done?
5  A    No, I can't tell you that, no.
6  Q    Do you know what newspaper they would have
7  been advertised in?
8  A    Probably the Daily News, which is in
9  Huntingdon.
10  Q    Do you know if the draft ordinance -- how many
11  drafts would you say there were?
12  A    I don't know.
13  Q    Were those --
14  A    I don't recall, I should say.
15  Q    Were those drafts publicly available?
16  A    Yes, they were. I think they were, yes.
17  Q    Do you know where they were publicly
18  available?
19  A    I believe at the township office.
20  Q    And the township office is where?
21  A    We rent Mrs. Wirth's office as a township
22  office.
23  Q    What makes you think that they were publicly
24  available?
25  A    I believe they were announced at the meetings

 

10

1  that they were available for -- you know, for people to
2  review them. I know several people did review them.
3  Q      Were copies made available to the public?
4  A      Yes.
5  Q      Were those copies made available if someone
6  requested a copy at one of your meetings?
7  A      Yes.
8  Q      Did you have the copies physically at the
9  meetings with you?
10  A      No, I would say not.
11  Q      And that ordinance -- I'm sorry, the drafts
12  that were available, was each successive draft publicly
13  available?
14  A      No, I don't recall that. I don't recall.
15  Q      Was there a public hearing held on your
16  subdivision ordinance?
17  A      There was one I recall.
18  Q      When was that held?
19  A      I don't know. It may have been held in June
20  of 2000, I believe.
21  Q      Now, was that meeting in June, was that a
22  public hearing?
23  A      No, I can't -- I don't recall if it was a
24  public hearing.
25  Q      Do you know if the meeting in June was

11

1  specially advertised?
2  A      Yes, it was. It was advertised.
3  Q      I want to be sure that I'm clear. The meeting
4  that you're referring to -- you mean the July meeting at
5  which it was passed?
6  A      No, I'm sorry, it may have been July when we
7  adopted the ordinance. I'm not sure which month it is.
8  Q      I've got a lot of documents. I'm going to
9  show you an exhibit marked as Wirth Exhibit 4. Could you
10  tell me if you've seen that document before?
11  A      Yes, I recall seeing that.
12  Q      And is this the meeting you were referring to?
13  A      I believe it was, yes. Yes.
14  Q      Now, I think that you testified that this
15  ordinance that was finally enacted in July of 2000 was
16  undertaken sometime in the fall of 1999; is that correct?
17  A      I believe it was summer and fall we started
18  the process.
19  Q      At the January meeting in 2000 was there a
20  discussion of the imposition of a moratorium on
21  subdivisions?
22  A      Yes.
23  Q      Did one of the supervisors initiate that
24  conversation?
25  A      I don't really recall who it was, but I

12

1  imagine it was a supervisor.
2  Q      Did you initiate that conversation?
3  A      I don't -- no. I would say no.
4  Q      Did Ann Wirth initiate the conversation?
5  A      No, I can't -- I can't tell you who it was. I
6  don't know.
7  Q      Do you recall any conversations regarding the
8  moratorium occurring prior to that meeting in January 2000?
9  A      At a meeting, at a public meeting or anytime?
10  Q      Anytime, informal, formal, in any setting.
11  A      Concerning the moratorium, you're saying?
12  Q      Correct.
13  A      Yes, I would say there was discussion.
14  Q      What was the content of that discussion?
15  A      I don't recall, I really don't.
16  Q      But you recall that it was --
17  A      I believe it was talked about, yes.
18  Q      I'm sorry, that the moratorium was talked
19  about?
20  A      Yes.
21  Q      Who was present during that conversation?
22  A      I really don't recall everybody, no.
23  Q      Do you recall any of them?
24  A      I would say the supervisors were there at
25  least, but I think there may have been more. I don't know.

13

1  Q      Do you recall if Ann Wirth was present at that
2  conversation?
3  A      I would say yes.
4  Q      Is it your recollection that all three of the
5  supervisors were present?
6  A      Yes.
7  Q      Do you remember when that conversation would
8  have occurred? And I'm not looking for a specific date.
9  A      Probably in the fall of '99.
10  Q      Do you remember what the impetus for the
11  discussion was? What prompted the discussion of a
12  moratorium?
13  A      I can't tell you what prompted it, no. I
14  don't know.
15  Q      Prior to this January meeting in 2000 at which
16  the moratorium was discussed, did you call your solicitor
17  Larry Newton to discuss the moratorium?
18  A      No.
19  Q      Do you know if any of the supervisors called
20  him?
21  A      No, I don't know.
22  Q      Do you know if Ann Wirth called him?
23  A      I don't know. I don't know.
24  Q      Prior to your enactment of your subdivision
25  ordinance in July 2000, did you call Larry Newton to discuss

 

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

14

1   the subdivision ordinance?
2      A      No.
3      Q      Do you know if any of the supervisors did?
4      A      I don't know.
5      Q      Do you know if Ann Wirth did?
6      A      I don't know.
7      Q      Prior to the enactment of your subdivision
8   ordinance can you tell me generally what the process for the
9   submission of a subdivision application entailed, and I'm
10  just looking for a very general process?
11     A      Right. I'll be honest with you, I was kind of
12  new at it so I really couldn't -- I don't know. I was kind
13  of new on the job.
14     Q      Are you aware that the township requires
15  subdivision applicants to provide an application to the
16  Huntingdon County Planning Commission prior to your review
17  as a supervisor?
18     A      Was I aware of that?
19     Q      Yes.
20     A      No, I was not.
21     Q      When a subdivision application comes before
22  you, what does it -- what does it entail, what is it
23  comprised of, what do you review?
24     A      The map, that basically is what we review as
25  far as the sewage and that type of thing, I believe.

15

1      Q      When you receive that application is there --
2   or are there letters from the Huntingdon County Planning
3   Commission along with that ap or plan?
4      A      I believe sometimes we receive a map but then
5   we tell them to send it onto the county.
6      Q      So it is your understanding that they need to
7   submit that plan to the county --
8      A      That's correct.
9      Q      -- before you will approve it as a supervisor?
10     A      That's correct, yes.
11     Q      When you receive comments from the Huntingdon
12  County Planning Commission on a subdivision application, do
13  you -- let me go back. Prior to your approval or
14  disapproval do you review the comments or the
15  recommendations of the planning commission?
16     A      Yes.
17     Q      To your knowledge has the board of supervisors
18  ever denied a subdivision application that the Huntingdon
19  County Planning Commission has recommended approval of?
20     A      I really don't recall.
21     Q      To the best of your recollection has the board
22  always approved a plan that the planning commission has
23  recommended approval of?
24     A      I really don't know.
25     Q      Before I get into any specifics, I have a

16

1   document that I'd like to show you. It's marked Parks
2   Exhibit 7.
3             (Pause.)
4   BY MS. MALADY:
5      Q      Have you had an opportunity to review that
6   document?
7      A      Prior to now?
8      Q      No, just now.
9      A      Yeah.
10     Q      Have you seen that document before today?
11     A      No.
12     Q      Is this the first time you've seen that
13  document?
14     A      Yes, it is.
15     Q      Were you aware that that document was issued
16  by the court in this matter?
17     A      Yes, I was aware, yes.
18     Q      So you're aware that the court has issued a
19  sequestration order?
20     A      Yes.
21     Q      What does that -- what is your understanding
22  of that order?
23     A      That the defendants are not allowed to be in
24  this room at this time, the other defendants.
25     Q      Do you understand that that order also means

17

1   that you're not to talk to the other defendants regarding
2   this deposition testimony?
3      A      Correct.
4      Q      Have you discussed your deposition today with
5   any of the other defendants?
6      A      No, I haven't. This morning we had a meeting
7   -- I'm sorry, we did have a meeting this morning, I'm
8   sorry, with Mr. Sherr concerning the -- I guess the health
9   of the one supervisor, is what it come down to.
10     Q      Was anything else discussed at that meeting
11  regarding your deposition?
12            MR. SHERR: Objection. I'm going to instruct
13  you not to answer anything that -- where I was present and
14  any conversations that took place while I was present
15  because that's attorney/client privilege.
16  BY MS. MALADY:
17     Q      Let me ask you this: During that conversation
18  were any of the other defendants present?
19     A      Yes.
20     Q      And who was present?
21     A      Tom and Ann.
22     Q      I'm sorry, Tom Wilson and Ann Wirth?
23     A      Ann Wirth, yes.
24     Q      Let me ask you this: How did you get to
25  Harrisburg today?




YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

18

1    A    Drive.
2    Q    Did you drive with anyone else?
3    A    Tom and Ann.
4    Q    Did you have lunch today?
5    A    Yeah, I guess you could say that, yeah.
6    Q    Who did you have lunch with today?
7    A    Tom and Ann.
8    Q    I'm going to show you what is marked as Wirth
9    Exhibit 6. Take a minute to review that. What is that
10   document?
11   A    It's minutes of a meeting, I believe.
12   Q    Have you seen that document before?
13   A    I don't recall, but I -- yes. I would say
14   yes.
15   Q    And for the record those are the minutes of
16   the January 4, 2000 meeting of the board of supervisors?
17   A    Correct.
18   Q    Is there an indication that at the January
19   4th, 2000 meeting of the board the moratorium was discussed?
20   A    Yes, there is discussion.
21   Q    Is there any indication who initiated the
22   discussion?
23   A    No.
24   Q    Is there any indication that a vote was taken
25   on the moratorium?

19

1    A    No.
2    Q    Thank you. Do you recall who was present at
3    the January 4th, 2000 meeting of the board?
4    A    All the supervisors and the secretary, I
5    imagine.
6    Q    Any members of the public that you recall?
7    A    I can't recall names specifically, no.
8    Q    Do you have any idea approximately how many
9    people were there from the public?
10   A    No, I couldn't -- I don't know.
11   Q    Do you know the Hewetts?
12   A    Not personally, no.
13   Q    Are you familiar with them?
14   A    No. I've met them, but I'm not familiar.
15   Q    Are you aware of the agreement that they had
16   entered into with Mr. Corneal?
17   A    No.
18   Q    You were not aware that they had entered into
19   an agreement to purchase a portion of Mr. Corneal's
20   property?
21   A    Yeah, I believe I did know that, that they
22   were in that type of agreement.
23   Q    Do you recall how you became aware of that?
24   A    No, I don't recall that.
25   Q    Was the Hewetts' agreement the subject of any

20

1    conversations with the board members?
2    A    I don't recall.
3    Q    Did the Hewetts attend any of the board of
4    supervisors's meetings?
5    A    Yes.
6    Q    Did they speak at any of those meetings?
7    A    I really don't recall.
8    Q    Was Mr. Corneal present at the same meetings?
9    A    The same meetings?
10   Q    Yes.
11   A    I don't know.
12   Q    Was Mr. Corneal present at the meetings which
13   the Hewetts were present?
14   A    I don't recall that either.
15   Q    Do you recall Mr. Corneal being present at any
16   of your board meetings?
17   A    Yes, I recall.
18   Q    Do you recall which meetings he was present
19   at?
20   A    I believe it was the February meeting. I
21   recall that one.
22   Q    And that would be February 2000?
23   A    Yes.
24   Q    What do you recall about that meeting?
25   A    I believe he presented something to us about

21

1    subdivision at that time.
2    Q    He presented a subdivision plan to the board
3    of supervisors?
4    A    We didn't see no plan but he had something
5    with him.
6    Q    Did he attempt to give the board the plan?
7    A    I don't really recall, no.
8    Q    Do you recall what the response from the board
9    was?
10   A    That there is a moratorium, I believe.
11   Q    Was anything else said with regard to his
12   plan?
13   A    No, I don't believe, no.
14   Q    Do you recall that he was prompted to take
15   that plan to the county planning commission?
16   A    I believe, yes.
17   Q    Did you tell him to take it to the county?
18   A    I don't know who did. I didn't.
19   Q    Did the board of supervisors review the
20   subdivision plan that Mr. Corneal brought to the February
21   2000 meeting?
22   A    No.
23   Q    Did the board have any conversations regarding
24   Mr. Corneal's subdivision plan following that February
25   meeting?




**YODER, MICHAEL**
**05/18/01**

**CORNEAL VS**
**JACKSON TOWNSHIP, ET AL**

22

1    A    I don't recall.
2    Q    Did Ann Wirth have any conversations with the
3    board of supervisors regarding Mr. Corneal's subdivision
4    plan?
5    A    I don't recall.
6    Q    I'm going to show you an exhibit marked as
7    Wirth Exhibit 11. This is a letter dated February 24th from
8    the Huntingdon County Planning Commission. Have you seen
9    that document before?
10    A    I really don't recall.
11    Q    You don't recall seeing it?
12    A    No.
13    Q    Do you recall Mr. Corneal submitting a revised
14    subdivision plan to the board of supervisors?
15    A    I really don't recall.
16    Q    Let me ask you this: At the February meeting
17    when Mr. Corneal submitted his -- or attempted to submit his
18    first subdivision plan, did you tell him that there was a
19    moratorium in effect?
20    A    Personally, no.
21    Q    Do you know who did?
22    A    I don't -- I don't recall that.
23    Q    In response to the board informing Mr. Corneal
24    that there was a moratorium in effect, do you recall if he
25    had any response?

23

1    A    No, I don't recall that either.
2    Q    Do you recall Mr. Corneal informing the board
3    at any time that the moratorium that the board enacted was
4    illegal?
5    A    I don't recall that.
6    Q    Do you recall having a conversation with
7    anyone wherein the moratorium was referred to as unlawful or
8    illegal?
9    A    No.
10    Q    I'm sorry, I probably asked you this already.
11    Had you discussed the moratorium with your solicitor prior
12    to that January 4th, 2000 meeting?
13    A    Personally, no.
14    Q    Did any one of the board of supervisors?
15    A    I don't know.
16    Q    Did Ann Wirth?
17    A    I don't know.
18    Q    I'm going to show you what was marked as Wirth
19    Exhibit 7.
20    MS. MALADY: For the record, this document is
21    the -- are the minutes of the April 3rd, 2000 meeting.
22    BY MS. MALADY:
23    Q    Have you seen this document before?
24    A    I don't recall, but I would say yes, I have.
25    Q    Do you recall Mr. Corneal being present at the

24

1    April 3rd, 2000 meeting?
2    A    Yes, I believe, yes.
3    Q    And what do you recall about Mr. Corneal's
4    presence at that meeting?
5    A    That he is applying for a privy permit there.
6    Q    Do you recall that he discussed sewage modules
7    that he wanted the board to approve?
8    A    I don't recall that.
9    Q    Do you recall Mr. Corneal having sewage
10    modules that he wanted the board to approve?
11    A    I don't recall.
12    Q    Do you recall seeing sewage modules signed by
13    Barry Parks for the property owned by Mr. Corneal?
14    A    No.
15    Q    I'm going to show you what was marked as Parks
16    Exhibit 3, if you would take a minute and review that. Is
17    that document familiar to you?
18    A    No, it isn't.
19    Q    Can you tell me what that document is?
20    A    It's the sewage module, I guess.
21    Q    Do you know who it was submitted by? Is there
22    an indication on the document who it was submitted by?
23    A    Mr. Corneal.
24    Q    Is this the first time you've ever seen that
25    document?

25

1    A    I really don't recall.
2    Q    Back to the April 3rd meeting of the board of
3    supervisors, do you recall why Mr. Corneal requested a
4    privy? And please tell me if I'm misstating your
5    testimony. It's my understanding that you testified that
6    your recollection of this meeting was that Mr. Corneal had
7    requested a privy permit; is that correct?
8    A    Yes, that's what it says.
9    Q    Do you have any independent recollection of
10    that?
11    A    I don't -- I don't really recall, no.
12    Q    Do you recall Mr. Corneal's presence -- I'm
13    sorry, let me rephrase that. Do you recall Mr. Corneal
14    stating to the board that he was no longer going to
15    subdivide his property?
16    A    At this meeting?
17    Q    Yes.
18    A    I really don't recall that.
19    Q    Do you remember Mr. Corneal -- let me start
20    over. You recall the February 2000 meeting at which Mr.
21    Corneal attempted to submit a subdivision application; is
22    that correct?
23    A    Yes, I recall that.
24    Q    What other recollection do you have with
25    regard to Mr. Corneal's attempt to subdivide his property?




YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

26

1    A    (Witness shook his head negatively.)
2    Q    Did you ever see him again?
3    A    Just at the two meetings.
4    Q    But you don't remember why he was at the
5    second meeting?
6    A    The privy permit is all I know, what I read
7    there.
8    Q    But you don't recall why he wanted one?
9    A    Not exactly, no.
10   Q    Inexactly do you remember why?
11   A    I believe he said something about his art
12   studio. That's the only thing I can recall.
13   Q    What about his art studio?
14   A    He needed a privy permit for -- to serve him,
15   I guess.
16   Q    Any indication as to why he would need a privy
17   permit to service an art studio?
18   A    No.
19   Q    Were you curious at all why he didn't put in
20   an on-lot system rather than request a privy permit?
21   A    I didn't ask him.
22   Q    Not curious?
23   A    I didn't ask him, no.
24   Q    What was the board's reaction to his request
25   for a privy permit?

27

1    A    I believe it was denied.
2    Q    Did you tell him no yourself?
3    A    Yes, I think I said no.
4    Q    Why did you tell him no?
5    A    Specifically I can't tell you right now, no.
6    Q    Generally?
7    A    I believe he had -- already had on-lot modules
8    there. I think he already had modules.
9    Q    How did you know that he had modules?
10   A    I don't recall that.
11   Q    I think you testified that you have never seen
12   Mr. Corneal's application for sewage modules prior to today;
13   is that correct?
14   A    I don't recall.
15   Q    Let me ask you this: So you denied Mr.
16   Corneal's privy permit at the April 3rd, 2000 meeting
17   because you knew that he had sewer modules; is that correct?
18   A    Yes, I believe that's what he said.
19   Q    Now, when you say sewer modules, you mean he
20   had a pending sewer module -- a pending application for
21   approval of sewer modules?
22   A    I don't recall what he had.
23   Q    What was your understanding then of the sewer
24   modules that he had?
25   A    I had no understanding what he had really.

28

1    Q    But you said you knew that he had sewer
2    modules.
3    A    Yeah, but I didn't know what he had as far as
4    where he was at with it.
5    Q    How were you aware of the sewer modules?
6    A    I don't recall how I found that out.
7    Q    Did you discuss it with someone?
8    A    I really don't recall who it might have been.
9    Q    Was it Van Dommelen?
10   A    I don't know.
11   Q    Was it another member of the board?
12   A    I don't know who it was. It may have been a
13   board member.
14   Q    Was it Ralph Weiler?
15   A    I really don't know which one it was.
16   Q    But it was one of -- either Mr. Weiler or Mr.
17   Wilson?
18   A    I believe, yes.
19   Q    Do you recall the substance of the
20   conversation regarding the sewage modules, Mr. Corneal's
21   sewage modules?
22   A    No, I don't recall that.
23   Q    Are you familiar with Mr. Wilson's company
24   Eagle Excavating?
25   A    Yes.

29

1    Q    How are you familiar with that company or what
2    is -- let me ask you this: Does Eagle Excavating do a lot
3    of excavation work in the township?
4    A    Yes. I would say yes.
5    Q    Does Eagle Excavating do a lot of the test pit
6    digging for on-lot systems in the township?
7    A    I can't say how much. I don't know.
8    Q    Were you aware that Eagle Excavating performed
9    the test pit digging on Mr. Corneal's property?
10   A    No.
11   Q    Mr. Wilson never discussed that with you?
12   A    If he did, I don't recall.
13   Q    Were you aware that Mr. Wilson as the
14   president of Eagle Excavating performed perc testing with
15   your sewage enforcement officer on Mr. Corneal's property?
16   A    No, I don't know anything about that.
17   Q    Did you ever have any conversation -- I'm
18   sorry, you testified that you lived in Jackson Township?
19   A    Correct.
20   Q    Does Mr. Wilson live nearby?
21   A    No.
22   Q    How far from you is he?
23   A    Probably six mile maybe, something like that.
24   Q    Does Mr. Corneal live near you?
25   A    Probably the same distance.




YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

30

1   Q    About six miles?
2   A    Yeah, I would say.
3   Q    Did Mr. Wilson and Mr. Corneal live near each
4   other, if you know?
5   A    I don't know.  I don't know.
6   Q    I just wondered since they were both six miles
7   away.
8   A    I don't know where Mr. Corneal lives so ...
9   Q    Then you're not quite sure he's six miles from
10  you?
11  A    No, I don't know at all.
12  Q    So I just want to be clear, you have
13  testified, I believe, that you have no knowledge of Mr.
14  Corneal's submission of an application for approval of a
15  sewage module?
16  A    I don't recall the sewage module application.
17  Q    Do you recall another application?
18  A    No.
19  Q    Did the board of supervisors ever consider Mr.
20  Corneal's sewer module application to the best of your
21  knowledge?
22  A    I don't recall.
23  Q    Has Jackson Township ever granted a privy
24  permit to anyone else, to any applicant?  Let me reask
25  that.  Has anyone in Jackson Township ever applied to the

31

1   board for a privy permit?
2   A    Not that I recall in my time that I've been
3   there.
4   Q    You're not aware of a single --
5   A    No.
6   Q    -- application for a privy permit?
7   A    (Witness shook his head negatively.)
8   Q    Are you aware of any applications for a
9   holding tank?
10  A    I'm not aware of any, no.
11  Q    And that's during your tenure as a board of
12  supervisor's member?
13  A    Yes.
14  Q    Have you ever had any conversation with your
15  sewage enforcement officer regarding Mr. Corneal's property?
16  A    No.
17  Q    Have you ever attended a meeting at which your
18  sewage enforcement officer was present?  Let me ask you this
19  way:  Has your sewage enforcement officer ever attended a
20  board meeting, a board of supervisor's meeting?
21  A    Several, yes.  I don't know how many.
22  Q    Were any of those meetings meetings at which
23  Mr. Corneal's property was discussed?
24  A    I really don't recall that.
25  Q    Were you aware that your sewage enforcement

32

1   officer approved Mr. Corneal's sewer module application?
2   A    No.
3   Q    Is this the first time you've heard about
4   that?
5   A    I guess I'm just not that interested, I guess,
6   really, when it comes down to it.
7   Q    Did you receive a copy of the complaint filed
8   in this matter --
9   A    Yes.
10  Q    -- by Mr. Corneal?
11  A    Yes.
12  Q    Did you read that complaint?
13  A    I read over it, yes.  I don't understand
14  everything.
15  Q    Were you aware that Mr. Corneal applied for
16  building permits for his property?
17  A    Yes, I believe I heard that, yes.
18  Q    And how did you hear that?
19  A    I believe it was at a meeting we discussed it
20  maybe.  I don't know.
21  Q    We includes who?
22  A    Probably all the supervisors.
23  Q    Would Ann Wirth have been present?
24  A    Yes.  I would say yes.
25  Q    Would Mr. Van Dommelen have been present?

33

1   A    I don't know.  He's not at every meeting so I
2   don't know.
3   Q    Was your solicitor present?
4   A    I don't know that.
5   Q    Do you recall when that meeting occurred?
6   A    No, I don't recall.
7   Q    Was it summer?
8   A    I really couldn't recall when it was.
9   Q    Did you have shorts on?
10  A    I don't wear shorts.
11  Q    Okay.  Did you have a coat on?
12  A    I don't recall.
13  Q    What was the substance of the conversation
14  regarding the building permit?
15  A    I really don't recall what the substance was.
16  Q    Who began the conversation?
17  A    I don't know that either.
18  Q    What was discussed generally?
19  A    That he asked for an application for a
20  building permit, that's all I recall.
21  Q    And what was the result of his request for an
22  application?
23  A    As I recall, it was denied.
24  Q    The application was denied?
25  A    I think the building permit was denied.  I'm

 

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

34

1 **not sure which -- how it was.**
2 Q    What year was that, the denial that you
3 discussed? Can you remember what year that happened?
4 **A    I believe it would have been 2000.**
5 Q    Do you recall that that meeting occurred
6 sometime close to the April 3rd, 2000 meeting?
7 **A    No, I don't recall when it was.**
8 Q    Did that meeting occur prior to your being
9 served with the lawsuit filed by Mr. Corneal?
10 **A    No, I don't know when it was.**
11 Q    Let me ask you this: You're aware that
12 there's a lawsuit that has been filed in the county court
13 against Mr. Corneal by the township supervisors, correct?
14 **A    Yes.**
15 Q    What generated that lawsuit to the best of
16 your recollection?
17 **A    I guess no building permits, I believe.**
18 Q    And no building permits, by that you mean
19 what?
20 **A    He has none, Mr. Corneal.**
21 Q    Who brought up that the board of supervisors
22 should file a lawsuit against Mr. Corneal? Who suggested
23 that the board should file a lawsuit against Mr. Corneal?
24 **A    I'm not sure who it was.**
25 Q    Was there a particular meeting at which the

35

1 discussions took place?
2 **A    I don't know if there was a particular**
3 **meeting, no.**
4 Q    Were there a series of meetings at which it
5 was discussed?
6 **A    I would say no.**
7 Q    There was just one meeting?
8 **A    There may have been, yes.**
9 Q    But there may have been more than one meeting?
10 **A    There may have been more than one.**
11 Q    Were all of the supervisors present?
12 **A    I would say yes.**
13 Q    Would Ann Wirth have been present?
14 **A    I would say yes.**
15 Q    Was your solicitor Larry Newton present?
16 **A    He may have been or it may have been a phone**
17 **conference. I don't know.**
18 Q    Did you call him?
19 **A    No.**
20 Q    Do you recall if Ann Wirth called him?
21 **A    She may have. It was in her office.**
22 Q    So this meeting took place in Ann's office?
23 **A    I would say yes.**
24 Q    Do you recall when that meeting took place?
25 **A    No.**

36

1 Q    Did Ann Wirth have shorts on?
2 **A    I don't have no idea.**
3 Q    Was Mr. Newton conferenced in?
4 **A    I don't recall which it was. I really don't.**
5 Q    Was he on a speaker phone or did Ann Wirth
6 have a handset in her hand?
7 **A    She has a speaker phone, if it was that.**
8 Q    Was there a meeting of the board of
9 supervisors at which a resolution authorizing Solicitor
10 Newton to file the lawsuit was discussed? Let me rephrase
11 that question. Did the board ever enact a resolution
12 authorizing the filing of the lawsuit against Mr. Corneal?
13 **A    At a public meeting?**
14 Q    Yes.
15 **A    No, I would say not.**
16 Q    At an informal meeting?
17 **A    I would say no.**
18 Q    At any private get-together?
19 **A    I don't really recall.**
20 Q    Did you suggest that the board file the
21 lawsuit?
22 **A    No.**
23 Q    Did Mr. Wilson suggest that the board file the
24 lawsuit?
25 **A    I don't recall who it was.**

37

1 Q    Would Mr. Weiler have suggested that the board
2 file a lawsuit?
3 **A    I don't know. I don't recall.**
4 Q    Was there more than one meeting in Ann Wirth's
5 office regarding the lawsuit? Was there more than one
6 meeting of the board in Ann Wirth's office regarding filing
7 a lawsuit against Mr. Corneal?
8 **A    I don't recall if there was or not.**
9 Q    Would you have been present?
10 **A    Yes, I probably would have been, yes.**
11 Q    Do you have any knowledge of Mr. Corneal's
12 attempts to get a building permit application from Mr. Van
13 Dommelen?
14 **A    Do I have knowledge of it happening?**
15 Q    Yes.
16 **A    Yes, I have knowledge of it happening.**
17 Q    Tell me what you know about that.
18 **A    All I know is it was denied.**
19 Q    Were you aware that Mr. Corneal went to Mr.
20 Van Dommelen to tell him?
21 **A    Yes. Not at the time but --**
22 Q    Subsequent?
23 **A    Yes.**
24 Q    How did you find out subsequently?
25 **A    I believe it was at a meeting.**

 

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

38

1    Q    And who told you about it?
2    A    I'm not sure if it was Mr. Van Dommelen or
3    Tom.  I'm not sure.
4    Q    Tom?
5    A    Wilson, sorry.
6    Q    Do you have any recollection as to when it was
7    Mr. Corneal tried to get the application?
8    A    No, I don't recall him.
9    Q    Do you remember at what meeting Mr. Wilson or
10   Mr. Van Dommelen discussed Mr. Corneal's attempts to get a
11   building permit application?
12   A    No, I don't recall.
13   Q    Does Mr. Van Dommelen normally attend board
14   meetings?
15   A    Public meetings or --
16   Q    The board of supervisor's meetings.
17   A    Occasionally he does.
18   Q    How often would you say in a year, how many
19   meetings would he be at or be present at?
20   A    Maybe four.
21   Q    Are you sure that he was present at the
22   meeting at which you were informed of Mr. Corneal's attempts
23   to get a building permit application?
24   A    I really don't recall that.
25   Q    Was it discussed at a board meeting, a regular

39

1    monthly board meeting?
2    A    I don't recall -- you mean at --
3    Q    Your regular monthly supervisor's meeting.
4    A    I don't recall if we talked about it or not.
5    Q    Do you recall that the conversation happened
6    privately?
7    A    I would say it happened at a workshop, yes.
8    Q    What kind of a workshop?
9    A    It's just an informal workshop prior to the
10   monthly meeting.
11   Q    Do you have those every month?
12   A    Yes.
13   Q    What do you do at those workshop meetings?
14   A    Just set up our agenda for the meeting.
15   Q    And who sets up the agenda?
16   A    We all do in a way.  People call in.
17   Q    People call in?
18   A    For requests to be -- to be heard at the
19   meetings.
20   Q    What date were you elected, I guess, as
21   chairman of the board of supervisors?
22   A    The first Monday of January.
23   Q    Would that have been January 4th -- no, I'm
24   sorry, that would have been --
25   A    I'm not sure of the day, no.  It would be this

40

1    year, the first Monday -- no, it may have been this --
2    Q    January 2001?
3    A    I think it was the day after.  We have it the
4    day after the beginning of the year, I think.
5    Q    So there's a reorganization meeting --
6    A    That's correct.
7    Q    -- of the board that occurs first?
8    A    That's correct.
9    Q    And that's followed by a regular meeting?
10   A    That's correct.
11   Q    As the chairman of the board of supervisors,
12   do you set up the agenda?
13   A    No.
14   Q    Who does?
15   A    I believe our secretary.
16   Q    Ann Wirth?
17   A    Yeah, yeah.
18   Q    Where do you hold your workshop meetings?
19   A    At Ann's office where the township rents it, I
20   guess.
21   Q    Is her office close to where the meetings of
22   the board of supervisors are held?
23   A    Probably three to four miles.
24   Q    Do you meet at Ann's office before every
25   single meeting?

41

1    A    Yes.
2    Q    How long do those meetings, those workshop
3    meetings normally last?
4    A    Usually an hour to an hour and a half.
5    Q    And your meetings normally last how long?
6    A    An hour.
7    Q    I'm sorry, the meeting of the board itself.
8    A    The monthly meeting --
9    Q    Yes.
10   A    -- community meeting?  I would say an hour on
11   average.
12   Q    And I'm sorry, you may have told me this
13   already, but that meeting in Ann's office occurs prior to
14   every board meeting, every monthly board meeting?
15   A    Yes, they call it a workshop.
16   Q    Let me change subjects.  Mr. Yoder, did you
17   bring any documents with you today to this deposition?
18   A    No.
19   Q    Were you instructed to bring any documents
20   with you today?
21   A    No.
22   Q    Were you instructed not to bring any documents
23   with you today?
24   A    I really don't recall if I was.  I couldn't
25   tell you.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

 

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

42

1    Q      So you recall -- you know that you --
2    A      I don't believe -- I believe I was instructed
3    not to bring documents, yes.
4    Q      Who would have instructed you not to bring
5    documents with you? Did Ann Wirth ask you not to bring
6    documents with you today? Remember you're under oath, Mr.
7    Yoder.
8    A      I think Mr. Sherr told me that.
9    Q      Prior to your attendance at today's deposition
10   did you perform a search of any records that you might have
11   regarding Mr. Corneal's property or involvement of the
12   township in this lawsuit?
13   A      Did I put a search in?
14   Q      Did you perform a search of any --
15   A      No.
16   Q      -- records? Do you keep any records of the
17   township at all?
18   A      Very few.
19   Q      What kind of records do you keep?
20   A      Just the monthly minutes and that type of
21   thing.
22   Q      Do you hold on to any subdivision
23   applications?
24   A      No.
25   Q      Sewer planning modules?

43

1    A      No.
2    Q      Building permit applications?
3    A      No.
4    Q      Any other documents at all that are township
5    related?
6    A      No, I don't believe, no.
7    Q      Were you instructed to perform a search of
8    those documents that you do have to see if anything was
9    relevant to this lawsuit?
10   A      No.
11   Q      Do you know if any of the members of the board
12   of supervisors take notes at those workshop meetings that
13   you have in Miss Wirth's office?
14   A      Do I know if anyone does?
15   Q      Yes.
16   A      I don't know that.
17   Q      Would Miss Wirth keep notes of those meetings,
18   something like the minutes that she keeps for your monthly
19   meetings?
20   A      No, I don't believe she does.
21   Q      Would Mr. Wilson or Mr. Weiler take notes down
22   for those workshop meetings?
23   A      I don't know.
24   Q      Have you ever noticed anyone taking notes at
25   any of those meetings?

44

1    A      I believe maybe Tom has occasionally, yes.
2    Q      Would you know if Mr. Wilson would give the
3    notes to Miss Wirth to hold on to?
4    A      No, I wouldn't know that.
5    Q      You wouldn't know then if he would keep them
6    in a file himself?
7    A      No, I wouldn't know that.
8          MS. MONTGOMERY:  Off the record for a second,
9    please.
10         (Discussion held off the record.)
11   BY MS. MALADY:
12   Q      You're still under oath. Are you aware of Mr.
13   Wilson's family interest in Mr. Corneal's property?
14   A      No, I'm not aware of that.
15   Q      You're not aware that his grandfather used to
16   own that same property?
17   A      He told me recently.
18   Q      So you know that there's an interest -- or not
19   that there's an interest --
20   A      Not an interest, no. I just know that his
21   grandparents owned it, I guess, that's all I know.
22   Q      Did Mr. Wilson ever express to you an interest
23   in acquiring that property?
24   A      No.
25   Q      Did he ever talk to you about Mr. Corneal's

45

1    property?
2    A      No.
3    Q      Let me ask you this: When he informed you
4    that his grandfather used to own that property, how did that
5    come up and what was the conversation?
6    A      I don't really recall how it was brought up.
7    Q      But this was recent?
8    A      Yes, I would say it's fairly recent, yes.
9    Q      Did it come up as a result of conversations
10   regarding the lawsuit?
11   A      It may have, yes.
12   Q      Do you recall where you were?
13   A      No, I don't recall that.
14   Q      Do you recall how long ago it was?
15   A      No.
16   Q      Let me get back to the workshop meetings at
17   Miss Wirth's office. Do you recall if the discussions
18   regarding Mr. Corneal's request for a building permit
19   application occurred at the workshop meeting?
20   A      Yes, I would say they occurred at a workshop
21   meeting.
22   Q      Do you know what month that meeting would have
23   taken place?
24   A      I have no idea.
25   Q      Do you recall approximately how long the

 

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

46

1 conversation lasted?
2    A    I would say not long. I don't know.
3    Q    Was Mr. Van Dommelen present in Ann's office?
4    A    I don't know if he was or not.
5    Q    Was Mr. Wilson present in Ann's office?
6    A    I would say yes.
7    Q    Did Mr. Wilson bring up the conversation?
8    A    I don't really recall who it was.
9    Q    Tell me about the conversation.
10    A    I recall Mr. Corneal talking to Mr. Van
11 Dommelen about it and then he refused apparently.
12    Q    Did Mr. Wilson mention that Mr. Van Dommelen
13 called him at home?
14    A    Mr. Wilson?
15    Q    Yes.
16    A    I'm sorry, could you repeat that again?
17    Q    Sure. Did Mr. Wilson tell you that when Mr.
18 Corneal went to Mr. Van Dommelen's home Mr. Van Dommelen
19 called Mr. Wilson while Mr. Corneal was there?
20    A    Yes, they stated that, yes.
21    Q    Did he tell you why he called -- why Mr. Van
22 Dommelen called Mr. Wilson?
23    A    I guess he's the only one he could get a hold
24 of, I guess, at that time.
25    Q    Do you have any knowledge as to why Mr. Van

47

1 Dommelen had a reason to call any of the supervisors while
2 Mr. Corneal was there?
3    A    I don't really recall if there was a reason.
4    Q    Did you ever ask Mr. Van Dommelen why he was
5 trying to get a hold of you or any of the other supervisors?
6    A    I haven't talked to him about it.
7    Q    When was the last time you talked to Mr. Van
8 Dommelen?
9    A    I probably said hi to him at a monthly
10 meeting, that's about all, recently.
11    Q    Would that have been this month's meeting?
12    A    Yes. I think he was there.
13    Q    Now, when you have these workshop meetings --
14 as I understand, your monthly meeting occurs the first
15 Monday of every month; is that correct?
16    A    That's correct.
17    Q    When do you hold your workshop meetings?
18    MR. SHERR: Objection. It's been asked and
19 answered.
20    MS. MALADY: It's my understanding that he
21 testified that the meetings occur prior and I'm just asking
22 if it's the same day or --
23    MR. SHERR: He said --
24    MS. MALADY: -- a different day.
25    MR. SHERR: All right, okay. You can answer

48

1 that.
2    THE WITNESS: The week prior. It's different
3 days. There's no set day.
4 BY MS. MALADY:
5    Q    There's no specific Thursday night you get
6 together or --
7    A    No.
8    Q    -- Friday night?
9    A    No, whenever it suits schedules.
10    Q    Who schedules that workshop meeting for you?
11    A    Our secretary asks each person when it suits
12 and that's how it's --
13    Q    Does she call you at home and ask you what
14 your schedule is like?
15    A    Yes. I would say yes.
16    Q    Would you assume then that she calls Mr.
17 Weiler and Mr. Wilson as well?
18    A    Yes.
19    Q    I'm not sure if I asked you, Mr. Yoder, and if
20 I did I apologize, do you have a -- I understand that you're
21 a township supervisor, but do you have a job outside your
22 work as a supervisor?
23    A    Yes.
24    Q    What do you do?
25    A    Dairy farmer.

49

1    Q    Do you have your own farm?
2    A    Yes.
3    Q    Now, you had testified I think that your
4 family farm is on the property next to yours?
5    A    That's correct.
6    Q    Is that where you're mom and dad live
7 presently or used to live?
8    A    Used to.
9    Q    Did they have a dairy farm as well?
10    A    Correct.
11    MS. MALADY: I'm going to -- if you don't
12 mind, I'm going to take a minute and just kind of run
13 through -- I don't think I have a lot of questions left for
14 you.
15    THE WITNESS: Okay.
16    (Pause.)
17 BY MS. MALADY:
18    Q    I know that we've talked about the building
19 permit application that Mr. Corneal sought. Were you aware
20 that Mr. Corneal subsequently received an application for a
21 building permit?
22    A    Yes, I was aware of that.
23    Q    How were you made aware of that?
24    A    I'm not sure if it was at a public meeting or
25 a workshop. I don't recall.

 

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

50

1    Q    Who did you discuss it with?
2    A    I imagine the other board members.
3    Q    Do you recall if Mr. Van Dommelen was present
4    at the meeting?
5    A    I would say he probably was, yes.
6    Q    Were you aware or are you aware of any action
7    that was taken on that application?
8    A    I don't really recall the action.
9    Q    I'm going to show you two documents. The
10   first is marked Wirth Exhibit 13. It's a letter dated
11   October 10th from Mr. Van Dommelen, if you could take a
12   minute to review that. Have you ever seen that letter
13   before?
14   A    Yes, I have.
15   Q    When did you see that letter -- when did you
16   first see this letter?
17   A    I don't know when I first seen it, no.
18   Q    Do you believe that it was reasonably soon
19   after it was written?
20   A    Yes, I would say soon after.
21   Q    Let me ask you this: I notice that the letter
22   is on township supervisor stationery.
23   A    Um-hum.
24   Q    Is it your understanding that Mr. Van Dommelen
25   sends out letters on supervisor's stationery?

51

1    A    I couldn't tell you. I don't know.
2    Q    Is it your understanding that Mr. Van Dommelen
3    drafts his own letters?
4    A    I couldn't tell you. I don't know.
5    Q    Do you know if Miss Wirth normally types up
6    letters for Mr. Van Dommelen?
7    A    I don't know if she does or not.
8    Q    Is it your understanding that Mr. Van Dommelen
9    drafted this letter by himself?
10   A    I couldn't tell you, but I would say yes.
11   Q    Did Mr. Van Dommelen discuss the content of
12   this letter with the board prior to sending this letter out?
13   A    Yes, I believe he did.
14   Q    And when did he discuss that with the board?
15   A    I couldn't give you a date. I don't know.
16   Q    Would it have been at the meeting -- the first
17   meeting -- I'm sorry, at the board meeting in October of
18   2000?
19   A    Apparently, yeah. Yes, I would say.
20   Q    Would that have occurred -- I'm sorry, you may
21   have said this. Was it at the workshop meeting?
22   A    I believe it was the workshop meeting, yes.
23   Q    And who was present at that meeting?
24   A    Probably Van Dommelen, Tom Wilson, Ann Wirth,
25   Ralph Weiler and I.

52

1    Q    And what did Mr. Van Dommelen tell you about
2    the substance of this letter?
3    A    I guess just what it says, that's all. We
4    just read it.
5    Q    Did anyone else discuss with Mr. Van Dommelen
6    his denial of Mr. Corneal's building permit application?
7    A    I really don't recall.
8    Q    Do you recall if Mr. Wilson had any comments
9    with regard to Mr. Van Dommelen's proposed denial of the
10   building --
11   A    I don't recall what was -- if he had any
12   problems.
13   Q    I'm going to show you what is marked as Wirth
14   Exhibit 12. It's a letter dated November 10th from Terry
15   Williams. Have you ever seen that letter?
16   A    I don't recall seeing that, no.
17   Q    I note that the letter is addressed to R.D. 1,
18   Box 390. I understand that's Miss Wirth's home address; is
19   that correct?
20   A    Apparently, yes.
21   Q    Does Miss Wirth often receive township
22   business letters at her home or at her office address?
23   A    At the office, yes, as township secretary.
24   Q    As a matter of course, does Miss Wirth
25   normally make copies of documents she receives at home for

53

1    the supervisors?
2    A    No.
3    Q    Does she bring documents received to the
4    meetings of the board of supervisors?
5    A    No, I don't think she does, no.
6    Q    So is it your testimony that when Miss Wirth
7    receives documents such as this letter she doesn't provide
8    them to the board of supervisors?
9    A    No copy. We see the letter, but we receive no
10   copy.
11   Q    So she brings the actual letter to the board
12   of supervisors?
13   A    That's correct. No copies.
14   Q    But you don't recall ever having seen this
15   letter?
16   A    No. I receive so many letters I don't -- I
17   don't recall.
18   Q    What do you understand this letter to do --
19   what do you understand this letter to be?
20   A    They're appealing Mr. Corneal's -- I mean Mr.
21   Van Dommelen's decision.
22   Q    Does that request trigger any action of the
23   board of supervisors to the best of your knowledge?
24   A    I don't really recall.
25   Q    Are you aware of any Jackson Township

 

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

54

1  ordinance or ordinances that impose any requirements upon
2  the board of supervisors upon receipt of a document
3  appealing the decision of the building permit officer?
4      A      Any ordinance?  Not really, no.
5      Q      Are you aware that your building permit
6  ordinance requires that the board of supervisors hold a
7  hearing within 30 days after the receipt of an appeal from a
8  decision of your building permit officer?
9      A      I'm not aware of that, no.
10     Q      If I represent to you that your building
11  permit ordinance contains a requirement that the board of
12  supervisors hold a hearing on an appeal from a denial of a
13  building permit, do you have any knowledge of such a hearing
14  being held for Mr. Corneal?
15     A      No, I do not.
16     Q      Were you present at any hearing on the
17  building permit denial for Mr. Corneal?
18     A      No.
19     Q      As the chairman of the board of supervisors
20  would you have been in charge of organizing this hearing --
21  a hearing from a denial of a building permit?
22     A      I really don't know.
23     Q      Would Ann Wirth have been in charge of
24  scheduling a hearing?
25     A      With our input, yes, I would say she'd be in

55

1  charge of it.
2      Q      Did you ever receive any notes, letters,
3  correspondence, communication, telephone call, anything at
4  all regarding a hearing being held on Mr. Corneal's building
5  permit application denial?
6      A      I really don't recall.  I don't know.
7      Q      Do you recall attending a hearing on Mr.
8  Corneal's building permit denial?
9      A      No.
10     Q      Is it safe to assume it didn't happen, would
11  you say?
12     A      I don't know.  I don't really recall, sorry.
13            MS. MALADY:  We can go off the record.
14            (Discussion held off the record.)
15  BY MS. MALADY:
16     Q      I do have a couple of questions.  I'll try to
17  get through them as quickly as I can.  Has Mr. Wilson ever
18  expressed to you a concern regarding wetlands on Mr.
19  Corneal's property?
20     A      I really don't recall if he did.
21     Q      You've never had a conversation with Mr.
22  Wilson regarding --
23     A      Not personally.
24     Q      -- the presence of wetlands?
25     A      (Witness shook his head negatively.)

56

1      Q      Do you know of any conversations that have
2  taken place regarding wetlands on Mr. Corneal's property?
3      A      I may have heard discussion about it, but I
4  don't specifically know.
5      Q      Generally what were the discussions regarding
6  it?
7      A      I guess concern about it.  That's all I can
8  say.
9      Q      Do you recall why there was a concern?
10     A      Not specifically, no.
11     Q      Generally?
12     A      No, I don't.
13     Q      Do you know who was concerned with -- about
14  the wetlands?
15     A      No, I can't say.  I don't know.
16     Q      Was Mr. Wilson concerned about the presence of
17  wetlands on Mr. Corneal's property?
18     A      I believe he mentioned it, yes.
19     Q      Do you recall the setting in which he
20  mentioned it?  Let me be more specific.  Would it have been
21  at a workshop meeting?
22     A      If there was discussion, yes, it would be at a
23  workshop meeting.
24     Q      Was that concern expressed at one workshop
25  meeting or was it expressed at more than one workshop

57

1  meeting?
2      A      I don't know.  I don't know how many.
3      Q      Was it discussed at quite a few workshop
4  meetings, would you say?
5      A      I would say not, no.  No, not quite a few.
6      Q      More than one?
7      A      Maybe one or two.
8      Q      What was his concern specifically?
9      A      I really don't know the specifics of it.
10     Q      Did Mr. Wilson ever express a concern that
11  your sewage enforcement officer Barry Parks had
12  inadvertently located on-lot sites in the wetlands on Mr.
13  Corneal's property?
14     A      I don't know anything about it.
15     Q      Did Mr. Wilson ever express concern about
16  construction vehicles located on Mr. Corneal's property?
17     A      No, not to me.
18     Q      Did Mr. Wilson ever express concern about the
19  cartway located on Mr. Corneal's property?  Let me back up.
20  Are you familiar with the physical layout of Mr. Corneal's
21  property?
22     A      No, I'm not, not at all.
23     Q      Have you ever been to Mr. Corneal's property?
24     A      I've been on Sawmill Road, but that's all.
25     Q      Are you aware that there is a cartway on Mr.



YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

58

1  Corneal's property?
2      A      I'm not familiar with the cartway, no.
3      Q      When Mr. Corneal first came before the board
4  of supervisors with a subdivision plan, did you have any
5  knowledge of how many lots he wanted to break his property
6  into?
7      A      Did I have any knowledge?
8      Q      Yes.
9      A      No.
10      Q      Did you subsequently become aware of how many
11  lots he wanted to break his property into?
12      A      Yeah. I would say yes, I do.
13      Q      And how many was that?
14      A      I believe four or five. I can't give you an
15  exact number.
16      Q      Did you become aware at some time later that
17  he had changed the number of lots that he wanted to
18  subdivide his property into?
19      A      Did I become aware of it?
20      Q      Yes.
21      A      I really couldn't tell you. I don't really
22  recall.
23      Q      Did you find out later that he wanted to
24  change the plan that he had originally proposed?
25      A      I don't really recall that, no.

59

1      Q      Was there a point at which you became aware
2  that Mr. Corneal no longer wanted to subdivide his property
3  at all?
4      A      There was a point I became aware of that, yes.
5      Q      Do you recall when that was?
6      A      I believe I became aware of that in the
7  courthouse.
8      Q      And you were in the courthouse for what
9  reason?
10      A      A hearing of some kind.
11      Q      Do you recall what the hearing was regarding?
12      A      I believe it was regarding building permits, I
13  believe at that time, yes.
14      Q      Were you present at the April 3rd, 2000
15  meeting that Mr. Corneal was present at?
16      A      Yes, um-hum.
17      Q      Do you recall at that meeting that Mr. Corneal
18  told the board that he no longer wanted to subdivide the
19  property?
20      A      I recall that, yes. I believe, yes.
21      Q      So you were aware at least as of April 3rd
22  that he no longer wanted to subdivide his property?
23      A      I believe I became aware.
24      Q      Did you ever discuss with the other
25  supervisors or Ann Wirth the fact that Mr. Corneal no longer

60

1  wanted to subdivide his property?
2      A      I believe we discussed it, yes.
3      Q      Can you tell me about those discussions?
4      A      Not -- no, I can't tell you specifically, no,
5  but I know we did discuss it.
6      Q      Do you recall where you discussed it?
7      A      Probably at a workshop.
8      Q      Would that workshop have been the workshop in
9  May of 2000?
10      A      I have no idea.
11      Q      Did you discuss it at more than one workshop?
12      A      I don't know.
13      Q      Have you ever gone to Mr. Corneal's building
14  site on his property?
15      A      No.
16      Q      I know you said you've been on Sawmill --
17      A      Sawmill Road, yes.
18      Q      Do you know if any of the other supervisors
19  have ever gone to Mr. Corneal's building site?
20      A      No, I don't know.
21      Q      Do you know if any of the supervisors have
22  ever gone out to inspect Mr. Corneal's property?
23      A      I really don't know.
24      Q      Do you know -- well, let me ask you this: Did
25  you direct Barry Parks, your sewage enforcement officer, to

61

1  go back to Mr. Corneal's property?
2      A      Did I direct him?
3      Q      Yes.
4      A      No, I didn't direct him.
5      Q      Do you know if any other member of the board
6  of the supervisors asked Mr. Parks to go back out to Mr.
7  Corneal's property and reinspect the sites that Mr. Parks
8  had already approved in the sewage module?
9      A      I really don't recall who did.
10      Q      But you recall that it was done?
11      A      I believe it was done, yes.
12      Q      Now, did Ann Wirth ask Mr. Parks to do a
13  reinvestigation or does that require a supervisor?
14      A      I believe it requires a supervisor.
15      Q      Did Mr. Weiler ask Barry Parks to go out?
16      A      I'm not sure who it was.
17      Q      But it was either Mr. Weiler or Mr. Wilson; is
18  that correct?
19      A      I believe.
20      Q      Do you recall Mr. Parks ever coming back and
21  reporting to the board of supervisors the results of his
22  investigation?
23      A      Yes, I believe he did.
24      Q      And what did he say?
25      A      The site was not a good site anymore is all I




YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

62

1   recall.
2    Q    What site was he referring to to the best of
3   your knowledge?  What did you believe he was referring to?
4    A    There was a site between two roads, I
5   believe.  I'd have to see the map, but there was a site
6   between two roads.
7    Q    Are you aware that Mr. Parks had approved five
8   sites on Mr. Corneal's property?
9    A    Yes, I believe he did.
10   Q    Is it your understanding that based on Mr.
11  Parks' approval of those five sites that Mr. Corneal could
12  use any of the other four for any building that he would
13  construct on his property?
14   A    I'm sorry, would you repeat that?
15   Q    Let me rephrase that, I apologize.  You
16  testified that you understand that Mr. Parks approved
17  five --
18   A    Okay, yes.
19   Q    -- sites?  Now, you testified that following
20  his investigation -- and correct me if I'm wrong, please.  I
21  don't want to misstate your testimony.  Following Mr. Parks'
22  investigation, his report to the board was that one of those
23  sites was no longer suitable; is that correct?
24   A    Yes, I recall that.
25   Q    Did he provide any information regarding the

---

63

1   other four sites?
2    A    I really don't recall if he did.
3    Q    You don't remember that he said any of the
4   other four were now unsuitable?
5    A    No, I don't recall if he said that.
6    Q    Was he asked about the other four sites?
7    A    I don't recall.  Not by me.
8    Q    Do you recall if either of the other --
9    A    No.
10   Q    -- supervisors asked?
11   A    No.
12   Q    Did Mr. Parks submit any comments to the board
13  in writing regarding his investigation?
14   A    I don't recall.  I don't believe I read
15  anything, no.
16   Q    Let me ask you this:  To the best of your
17  knowledge has the board ever requested that a third party
18  certify that sites approved by Mr. Parks are correctly
19  approved by Mr. Parks?
20        That question sounded terrible even to me, I
21  apologize.  Let me reask.  To the best of your knowledge
22  when Mr. Parks approves a sewer module application has the
23  board ever then required that a third party go back out and
24  check what Mr. Parks has done?
25   A    Before my time I don't recall of any, no.

---

64

1    Q    During your tenure as a supervisor have they
2   ever done that?
3    A    I don't recall any, no.
4    Q    If I told you that a third party was required
5   to certify Mr. Parks' approval of Mr. Corneal's sites, would
6   you be surprised by that?
7    A    I don't recall if it was done or not to the
8   best of my knowledge right now.
9    Q    Would it be unusual for that to happen?
10   A    I don't know.
11   Q    Well, does it happen often?
12   A    No, not that I recall.
13   Q    So it would be unusual?
14   A    Probably, yes.
15   Q    Are you aware of any other subdivision
16  application that has been submitted to Jackson Township
17  being denied by the board of supervisors?
18        MR. SHERR:  Object to the form of the
19  question.
20        MS. MALADY:  Is that awkward?
21        MR. SHERR:  No, it was a fine question, but I
22  don't -- I don't think there is any testimony that this plan
23  was denied.  You said any other plan denied.  You're just
24  assuming facts not in evidence.
25        MS. MALADY:  I'll reask the question.

---

65

1   BY MS. MALADY:
2    Q    Are you aware of any subdivision application
3   that has been denied by the board of supervisors of Jackson
4   Township?
5    A    No.
6    Q    Are you aware that Mr. Corneal's subdivision
7   plan has not been approved by the board of supervisors?
8    A    Yes.
9    Q    Was it your understanding that Mr. Corneal
10  withdrew his revised subdivision plan?
11   A    I'm sorry, what was --
12   Q    I think I need to ask that better.  Are you
13  aware that Mr. Corneal revised the subdivision plan that he
14  had submitted in February of 2000 to the county planning
15  commission?  Are you aware that he revised that plan?
16   A    Yes, I am.
17   Q    Have you ever seen a copy of that revised
18  plan?
19   A    Yes, I did once.
20   Q    When did you see it?
21   A    I believe it was with the meeting with Terry
22  Williams, I believe.
23   Q    Do you know if that plan was submitted to the
24  county planning commission?
25   A    I don't know.

---

 

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

66

1    Q    I don't think that I've shown you this
2   document. It's a document marked Wilson Exhibit 5. It's a
3   letter from the Huntingdon County Planning Commission dated
4   April 20th. Have you ever seen that letter before?
5    A    I don't recall, but I would say I have seen
6   it, yes.
7    Q    Do you understand what the content of the
8   letter is?
9    A    Not completely.
10   Q    Do you understand that this is a letter
11  recommending approval of Mr. Corneal's revised subdivision
12  plan?
13   A    Yes.
14   Q    To the best of your knowledge has Mr. Corneal
15  withdrawn from the Jackson Township Board of Supervisor's
16  consideration this revised plan?
17   A    He's withdrawn it?
18   Q    To the best of your knowledge has he?
19   A    Yes, I believe he has, yes.
20   Q    Have you ever seen anything in writing
21  withdrawing that plan from your consideration?
22   A    No, I don't -- I don't recall.
23   Q    Do you recall Mr. Corneal ever requesting that
24  you not consider his revised subdivision plan?
25   A    No.

67

1    Q    Did you ever take any action on Mr. Corneal's
2   revised subdivision plan, you meaning the board of
3   supervisors?
4    A    I don't recall right now.
5    Q    You don't recall taking any action?
6    A    No.
7
8            CROSS-EXAMINATION
9
10  BY MS. YANKANICH:
11   Q    Mr. Yoder, I'm Jennifer Yankanich. I'm
12  counsel for Larry Newton. I just wanted to introduce myself
13  to you, if I haven't already. I have a couple questions for
14  you regarding your interaction with Larry Newton with regard
15  to the David Corneal property.
16       Let's start back when you first decided to
17  start researching the subdivision ordinance. I believe that
18  came before you actually issued the moratorium?
19   A    Correct.
20   Q    You said possibly in the summer of '99 -- or
21  excuse me, summer of '98 you may have started researching
22  the possible ordinance; is that correct?
23   A    I believe it was '99. I'm not sure.
24   Q    Well, summer of '99 -- okay.
25   A    Well, whenever.

68

1    Q    The date doesn't really matter, but you did
2   start researching it before the moratorium?
3    A    We did research it, yes, correct.
4    Q    During your research of the proposed
5   subdivision ordinance, did you ever have reason to seek the
6   advice of Larry Newton with regard to the proposed
7   ordinance?
8    A    I believe we did, yes.
9    Q    Do you know in what capacity you asked for his
10  advice?
11   A    I don't recall right now. I don't recall
12  exactly. He may have -- I believe he said if it was -- it
13  was something we could do. It's something we could do,
14  we're allowed to do.
15   Q    So you asked him whether or not you were
16  allowed to pass such an ordinance; is that correct?
17   A    I believe we did, yes.
18   Q    Did you ever ask Larry Newton whether or not
19  it was legal for you to impose a moratorium upon building in
20  Jackson Township?
21   A    I don't recall if we did or not.
22   Q    Do you recall if you personally ever asked
23  Larry Newton that question?
24   A    I never did, no.
25   Q    Do you recall if any of the supervisors ever

69

1   asked Larry Newton whether or not it was legal to impose a
2   moratorium on building?
3    A    I don't recall if any others did or not.
4    Q    Do you recall if any of them maybe asked Ann
5   Wirth to call Larry Newton and ask him that question?
6    A    No, I don't recall that.
7    Q    On February 7th I believe you testified you
8   remember David Corneal coming to the Jackson Township Board
9   of Supervisor meeting; is that correct?
10   A    In February?
11   Q    On February 7th, 2000.
12   A    Okay.
13   Q    Is that what -- you remember him coming there?
14   A    I believe, yes.
15   Q    Do you recall that he came with a subdivision
16  plan for your approval, the board's approval?
17   A    Yes.
18   Q    Do you recall if you stopped the meeting to
19  call Larry Newton to seek his advice before the board turned
20  down Mr. Corneal's request?
21   A    No, I don't -- we did not.
22   Q    Do you recall anyone asking Ann Wirth to call
23  Larry Newton --
24   A    No.
25   Q    -- for his advice?

 

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

70

1        (Discussion held off the record.)
2   BY MS. YANKANICH:
3        Q    At a subsequent meeting Mr. Corneal came back
4   to the board of supervisors and asked that sewage modules be
5   approved; is that correct?
6        A    You mean a subsequent meeting?
7        Q    On a subsequent meeting, yes.
8        A    After the February meeting?
9        Q    Yes.
10       A    I recall the privy permit.
11       Q    Do you recall at the meeting where he
12  requested a privy permit whether or not you stopped the
13  meeting and called Larry Newton to seek his advice on how to
14  proceed?
15       A    We did not.
16       Q    Do you recall if anyone asked Ann Wirth to
17  call Larry Newton and ask his advice?
18       A    No.
19       Q    Do you recall at any time whether you -- in
20  connection with David Corneal's property and how the board
21  of supervisors should proceed, do you recall at any time you
22  personally calling Larry Newton and asking his advice on
23  what to do?
24       A    Personally, no.
25       Q    Do you recall any of the other supervisors

---

71

1   calling Larry Newton and asking him how to proceed with
2   regard to David Corneal's property?
3        A    I don't recall, no.
4        Q    Do you recall if anyone asked Ann Wirth to
5   call Larry Newton and ask him how to proceed with regard to
6   David Corneal's --
7        A    I would say at a workshop, yes.
8        Q    At a workshop?
9        A    Yes.
10       Q    Was that before the ordinance was -- is that
11  during the research of the ordinance?
12       A    I couldn't tell you when, no. I don't -- I
13  would say yes, that's correct.
14       Q    So to my question -- you believe one of the
15  supervisors asked Ann Wirth to call Larry Newton --
16       A    I would say yes.
17       Q    Let me finish my question before you answer
18  the question.
19       A    I'm sorry.
20       Q    I'm just doing it for the benefit of the court
21  reporter. Is it your testimony that one of the supervisors
22  asked Ann Wirth to call Larry Newton, the solicitor, and ask
23  him on how the board should proceed with regard to David
24  Corneal?
25       A    Yes.

---

72

1        Q    Can you recall what the board asked her to ask
2   Mr. Newton?
3        A    No, I don't recall exactly, no. I don't
4   recall.
5        Q    Do you recall if that instruction that was
6   given to Ann Wirth to make that telephone call to Mr. Newton
7   was before the litigation commenced in this lawsuit?
8        A    I don't recall. I believe it would be before,
9   yes.
10       Q    Do you have any recollection of what Ann --
11  what the result of that telephone call was between Ann Wirth
12  and Larry Newton?
13       A    It would have been a conference call so I
14  don't recall exactly.
15       Q    It would have been a conference call between
16  whom?
17       A    The supervisors over the phone.
18       Q    With Larry Newton?
19       A    With Larry Newton.
20       Q    Was this the conference call that you
21  testified to earlier regarding when you should file a
22  lawsuit against Mr. Corneal?
23       A    No, I would say, no.
24       Q    It was before that?
25       A    I would say before that.

---

73

1        Q    Did Mr. Newton give the board of supervisors
2   advice during that telephone call?
3        A    I don't recall the advice, no, if there was
4   advice.
5        Q    Can you tell me anything about that telephone
6   call?
7        A    No.
8        Q    You don't know what prompted the telephone
9   call?
10       A    He's our solicitor. I guess we wanted his
11  input.
12       Q    And you're sure that it was about David
13  Corneal's property?
14       A    I would say it was about the moratorium.
15       Q    It was about the moratorium?
16       A    Yes.
17       Q    When did you first hear of David Corneal?
18       A    At the first meeting he was in attendance.
19       Q    So that would be February 7th, 2000?
20       A    Correct.
21       Q    That was the first time that you heard about
22  David Corneal?
23       A    Yes.
24       Q    Now, you just stated that the telephone call
25  you had with Larry Newton was regarding the moratorium?

---




**YODER, MICHAEL**
**05/18/01**

**CORNEAL VS**
**JACKSON TOWNSHIP, ET AL**

---

74

1    A    That would have been before that, I believe.
2    Q    So that was before you ever heard about David
3    Corneal?
4    A    Correct.
5    Q    So does it refresh your recollection that
6    perhaps you were asking him whether or not you could have
7    such a moratorium?
8    A    I believe that's correct, yes. I would say
9    that would be correct.
10   Q    Then did that have anything to do with David
11   Corneal's property then at that time?
12   A    No.
13   Q    Is it customary after the board meetings on
14   the first Monday of each month to inform Larry Newton about
15   the actions that were taken by the supervisors at those
16   meetings?
17   A    No, that's not customary.
18   Q    Do you recall if at any time after David
19   Corneal attended a supervisor's board meeting -- excuse me,
20   Jackson Township Board of Supervisor's meeting whether or
21   not you called Larry Newton to tell him what happened during
22   the meeting?
23   A    I don't know. I do not recall.
24        MS. YANKANICH: I don't have any further
25   questions.

---

75

1        MS. MALADY: Just a couple questions.
2
3        REDIRECT EXAMINATION
4
5    BY MS. MALADY:
6    Q    I think that you have been asked whether Ann
7    Wirth contacted Larry Newton directly on behalf of the board
8    of supervisors; is that correct?
9        MS. MALADY: Is that -- did I restate your
10   question?
11       MS. YANKANICH: Not exactly. I'd rather we
12   read back if you're going to ask him about a specific
13   question.
14       MS. MALADY: No, that's okay.
15   BY MS. MALADY:
16   Q    In the ordinary course does Ann Wirth call
17   Larry Newton on behalf of the board of supervisors without
18   your instruction?
19   A    No, she does not.
20   Q    Does Ann Wirth need to get your permission to
21   call your solicitor?
22   A    I really couldn't tell you. I don't know if
23   she needs our permission completely or not.
24   Q    Is it your belief that she should get the
25   permission of the board of supervisors prior to calling your

---

76

1    solicitor?
2    A    Yes, I would say that, yes.
3    Q    Are you aware that your solicitor may take the
4    position that actions taken by the board of supervisors were
5    taken without consultation with him?
6    A    Am I aware of that?
7    Q    Yes.
8    A    I'm really not aware of that, no.
9    Q    Are you aware that your solicitor may take the
10   position that actions taken by the board were not lawful?
11   A    No.
12   Q    Are you aware that your solicitor may take the
13   position that the board of supervisors did not rely upon his
14   advice in taking any actions which are the basis of this
15   lawsuit?
16   A    Could you start at the beginning of that, I'm
17   sorry.
18   Q    Sure. Are you aware that your solicitor may
19   take the position that the board of supervisors did not rely
20   upon any advice that he provided in taking any of the
21   actions which form the subject of this lawsuit?
22   A    No, I'm not aware of that.
23   Q    Very briefly. Do you know of any other
24   subdivision application submissions to the township during
25   the period of the moratorium? Do you know if any other

---

77

1    subdivision applications were provided to the board of
2    supervisors?
3    A    No, I'm not aware of any, no.
4    Q    Are you aware -- I'm sorry, I don't mean to
5    ask every question starting the same way. Does the board
6    keep an ordinance book to the best of your knowledge?
7    A    An ordinance book?
8    Q    Yes.
9    A    Yes.
10   Q    Do you know where that's kept?
11   A    I believe a copy -- the main copy is at the
12   township office.
13   Q    Following the passage of an ordinance by the
14   board of supervisors, what happens to the physical ordinance
15   that's been enacted? Is it filed, is it --
16   A    I would say it's filed at the office, yes.
17   Q    So you believe it would be placed in a file in
18   Ann Wirth's office?
19   A    Yes, correct.
20   Q    Do you have any knowledge or what do you
21   believe that an ordinance book is?
22   A    It's something you follow to -- for building
23   and that type of thing in the township.
24   Q    So to the best of your knowledge the
25   ordinances that you pass are kept in files in Ann's office?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**




YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

78

1   A   Yes.
2   Q   In Miss Wirth's office?
3   A   Yes.
4   Q   Let me ask you:  To the best of your knowledge
5   are they filed according to subject matter or are they filed
6   separately or are they -- how are they kept, do you have any
7   idea?
8   A   I have no idea.
9   Q   Did you ever talk to your solicitor -- you
10  personally or the board or Ann Wirth, did you ever talk to
11  your solicitor about the likelihood that Mr. Corneal's
12  subdivision would not be approved?
13  A   I really don't recall.
14  Q   You weren't present at any conversation at
15  which that topic was discussed?
16  A   I may have been.  I don't recall.
17  Q   You don't recall the conversation or you don't
18  recall being present at --
19  A   I don't recall the conversation.
20  Q   Do you have any knowledge of Mr. Wilson's
21  telephone conversation with Barry Parks regarding Mr.
22  Corneal's request for sewer module approval --
23  A   No.
24  Q   -- generally?
25  A   No.

79

1   Q   Do you have any knowledge of Mr. Wilson
2   directing Mr. Parks to do his job?  Are you aware that Mr.
3   Wilson told Mr. Parks to do his job with regard to Mr.
4   Corneal's sewage module application?
5   A   No, I'm not aware.
6   Q   Are you aware that he was informed -- that Mr.
7   Wilson informed Mr. Parks to do his job with regard to a
8   privy permit request by Mr. Corneal?
9   A   No, I'm not aware of that.
10  Q   Were you present at a meeting regarding Mr.
11  Corneal's property involving Mr. Van Dommelen's failure to
12  provide a permit -- a building permit application to Mr.
13  Corneal?
14  A   Was I at a meeting?
15  Q   Yes.
16  A   Where it was discussed you mean?
17  Q   Yes.
18  A   Yes, I was there.
19  Q   And can you tell me about that meeting?
20  A   No, I can't tell you specifics, no.
21  Q   You don't recall what was discussed at that
22  meeting?
23  A   No.  The letter may have been discussed.
24  Q   The letter being Mr. Van Dommelen's denial --
25  A   I believe, yes.

80

1   Q   -- of Mr. Corneal's permit.  Were you aware
2   before this deposition that Mr. Van Dommelen refused to give
3   Mr. Corneal a building permit application?
4   A   Yes, I believe it was discussed.
5   Q   Did you ever have a discussion with Mr. Van
6   Dommelen regarding the appropriateness of his failure to
7   provide a building permit application to Mr. Corneal?
8   A   I believe we discussed that he should provide
9   him with a permit.
10  Q   Can you tell me about that conversation?
11  A   That's basically what was said, that we
12  should, I guess.  That's all I can recall.
13  Q   Would that have -- would that conversation
14  have occurred at the same meeting at which --
15  A   I would say yes.
16  Q   -- his denial --
17      MS. MALADY:  I don't have any other questions,
18  but there are a couple things I wanted to get on the record
19  before we stop the deposition.
20      MS. YANKANICH:  I have another question.
21
22      RECROSS-EXAMINATION
23
24  BY MS. YANKANICH:
25  Q   With regard to township business, do you

81

1   regularly seek the advice of Larry Newton with regard to any
2   potential business?
3   A   Not all township business, no.
4   Q   If the supervisors wanted the advice of Larry
5   Newton, how would they typically get in contact with him?
6   Would they -- I guess what I'm asking is would you contact
7   him directly or would you go through Ann Wirth?
8   A   We would go through Ann Wirth at the office.
9   Q   And if Larry Newton does work on behalf of the
10  supervisors does he bill for that time?
11  A   I don't know.
12  Q   You're not aware of how Larry Newton gets paid
13  by the township --
14  A   No, I'm really not.
15  Q   -- for his services?  Do you recall ever
16  approving any work that he's done on behalf of the
17  supervisors?
18  A   No.
19  Q   Do you recall seeing any bills that he
20  submitted to the board for approval?
21  A   I sign the check, I believe, and that's it.
22  Q   But you don't know what that was for?
23  A   No, not specifically, no.
24      MS. YANKANICH:  That's all the questions I
25  have.  Thank you.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

82

1    MS. MALADY: As you may be aware, Mr. Yoder,
2  we will be traveling -- I'm sorry, we being counsel for Mr.
3  and Mrs. Corneal, and I'm not sure if the other counsel will
4  be present. We'll be in Huntingdon County to depose Mr.
5  Weiler at some point in the near future. Evidently we're
6  coming up next week to inspect documents and we would
7  request that you have documents ready for our review made
8  available through your counsel --
9    MR. SHERR: Hold it. You do this through me.
10 I don't know that --
11   MS. MONTGOMERY: We're going to place it on
12 the record.
13   MR. SHERR: You can place whatever you want on
14 the record, but you'll make the arrangements through me
15 because --
16   MS. MONTGOMERY: Well, we'll place it on the
17 record.
18   MS. MALADY: Subject to Mr. Sherr's objection,
19 we would like to get the following documents. If you would
20 arrange for Miss Wirth to give those documents to Mr. Sherr
21 for our inspection --
22   MR. SHERR: Well, you know, he can't even talk
23 to Miss Wirth about it, you know, pursuant to the order. So
24 why don't we do this through me.
25   MS. MONTGOMERY: That's absolutely not true.

83

1    MR. SHERR: It is. If it's not a deposition,
2  then he's leaving. So you can -- why don't you just do it
3  through me. Why don't you -- tell me what documents you
4  want and we'll have them.
5    MS. MONTGOMERY: I'm doing it through you
6  right now. You're here so you should listen.
7    MR. SHERR: We don't have to do it on the
8  record.
9    MS. MONTGOMERY: We are doing it on the
10 record.
11   MR. SHERR: You can do it on the record.
12 Let's go. I'm done. The deposition is over.
13   MS. MONTGOMERY: You're going to leave the
14 deposition while we place on the record the documents that
15 we would like you to have ready for us to inspect next week.
16   MR. SHERR: I'd appreciate you doing that in
17 correspondence.
18   MS. MONTGOMERY: You are leaving the
19 deposition despite the fact that we are going to place on
20 the record --
21   MR. SHERR: You said the deposition is over.
22   MS. MONTGOMERY: -- what you would like --
23 okay, would you please continue -- he's left the deposition
24 before it's over.
25   We would like to inspect in Huntingdon County

84

1  the invoices that Larry Newton has sent to the township for
2  work -- legal work done in connection with Jackson Township
3  over the last two years. We would like minutes from the
4  workshops of the meetings of the supervisors, the workshop
5  meetings of the supervisors. We would like any bills that
6  Ann Wirth has for copies made of the ordinances at any
7  time.
8    We also would like bills related to any
9  advertisements of the ordinances and any newspaper files
10 that she has related to advertisements of the ordinances,
11 any advertisements. We would like the list of attendees to
12 the township meetings that she started to keep in January of
13 2001.
14   We would like to look at the originals of the
15 subdivision files and any and all other documents that are
16 in any way related to the subdivision ordinance, the
17 moratorium, the highway ordinance -- I'm sorry, the driveway
18 ordinance and anything at all to do with the Corneal
19 property.
20   Now the deposition is concluded despite the
21 fact that Mr. Sherr has taken his client and left the room.
22   (The deposition was concluded at 4:56 p.m.)
23
24
25

85

1
2  COUNTY OF DAUPHIN          :
                             : SS
3  COMMONWEALTH OF PENNSYLVANIA    :
4    I, Teresa K. Bear, Reporter-Notary Public,
5  authorized to administer oaths within and for the
6  Commonwealth of Pennsylvania and take depositions in the
7  trial of causes, do hereby certify that the foregoing is the
8  testimony of MICHAEL YODER.
9    I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically by
12 the said Teresa K. Bear, a Reporter-Notary Public, approved
13 and agreed to, and afterwards reduced to typewriting under
14 the direction of the said Reporter.
15   I further certify that the proceedings and
16 evidence are contained fully and accurately to the best of
17 my ability in the notes taken by me on the within
18 deposition, and that this copy is a correct transcript of
19 the same.
20   In testimony whereof, I have hereunto
21 subscribed my hand this 4th day of June, 2001.
22
23
         _____
         Teresa K. Bear, Reporter
24         Notary Public
         My commission expires
25         on April 13, 2003

Exhibit 3

IN THE UNITED STATES COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

DAVID B. CORNEAL, and*

SANDRA Y. CORNEAL,     * Case No.

    Plaintiffs      * 1 CV-00-1192

    vs.             *

JACKSON TOWNSHIP,      *     COPY

et al,                 *

    Defendant        *

      * * * * * * * *

DEPOSITION OF

RALPH WEILER

JUNE 29, 2001

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

2

1                    D E P O S I T I O N

2                         O F

3     RALPH WEILER, taken on behalf of the

4     Plaintiff herein, pursuant to the

5     Rules of Civil Procedure, taken

6     before me, the undersigned, Jane E.

7     Messner, a Court Reporter and Notary

8     Public in and for the Commonwealth of

9     Pennsylvania, The Stoneycreek

10    Volunteer Fire Department, Route 26,

11    McAlevey's Fort, Petersburg,

12    Pennsylvania, on Friday, June 29,

13    2001, beginning at 10:25 a.m.

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1           A P P E A R A N C E S
 2   LESLIE MALADY, ESQUIRE
 3   BRIDGET E. MONTGOMERY, ESQUIRE
 4   Eckert, Seamans, Cherin
 5   & Mellott, LLC
 6   213 Market Street
 7   Eighth Floor
 8   P.O. Box 1248
 9   Harrisburg, PA  17101
10      COUNSEL FOR PLAINTIFF
11   MICHELE J. THORP, ESQUIRE
12   Thomas, Thomas & Hafer, LLP
13   305 North Front Street
14   P.O. Box 999
15   Harrisburg, PA  17106
16      COUNSEL FOR DEFENDANT
17   ANTHONY R. SHERR, ESQUIRE
18   Mayers, Mennies & Sherr, LLP
19   3031 Walton Road, Building A
20   Suite 330
21   P.O. Box 1547
22   Blue Bell, PA  19422-0440
23      COUNSEL FOR DEFENDANTS
24
25
```

4

1                    I N D E X

2

3    WITNESS:   RALPH WEILER

4    EXAMINATION

5        by Attorney Montgomery        7 - 46

6    CERTIFICATE                          47

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                           EXHIBIT PAGE

2

3                                                    PAGE

4       NUMBER      DESCRIPTION            IDENTIFIED

5          1        Sequestration Order        8 *

6          2        Moratorium                27 *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                   * NOT ATTACHED

23

24

25

6

OBJECTION PAGE

ATTORNEY                                    PAGE

NONE MADE

7

1              P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3    RALPH WEILER, HAVING FIRST BEEN DULY

4    SWORN, TESTIFIED AS FOLLOWS:

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6    DIRECT EXAMINATION

7    BY ATTORNEY MALADY:

8    Q.      Mr. Weiler, would you state

9    your name for the record, please?

10   A.      Ralph Weiler.

11   Q.      My name is Leslie Malady.  I'm

12   an attorney with Eckert Seamans. We

13   represent Mr. and Mrs. Corneal.  I'm

14   going to take your deposition.  Have

15   you ever been deposed, Mr. Weiler?

16   A.      I don't believe.

17   Q.      Have you ever been a party to

18   a lawsuit before?

19   A.      No.

20   Q.      Let me run through, very

21   quickly, just the format of this

22   deposition.  I'm going to ask you a

23   series of questions.  I need you to

24   answer me verbally.  I can't have you

25   nod your head or shake your head no.

8

1  For the court reporter, it needs to
2  be verbal.  Are you on any
3  medications today that would prevent
4  you giving a deposition?
5  A.     No.
6  Q.     Mr. Weiler, do you drive?
7  A.     Yes.
8  Q.     Did you drive here this
9  morning?
10  A.     Yes.
11  Q.     Did you drive here by
12  yourself?
13  A.     Yes.
14  Q.     I'm going to show you a
15  document which we'll mark Weiler
16  Exhibit One.  Have you seen that
17  document before?
18            (Deposition Exhibit
19            Number One marked for
20            identification.)
21  A.     I can't say that I have.
22  Q.     Were you aware that the court
23  had entered a sequestration order in
24  this case?
25  A.     What's a sequestration?

9

1    Q.    The court entered this order

2    which says that the Defendants, you

3    and the other supervisors, Anne

4    Worth, Barry Parks, Mr. Vandommel and

5    Mr. Newton are not to talk about your

6    deposition testimony with one another

7    until all of the depositions have

8    been taken.  Were you aware of that?

9    A.    Yes.  I'd heard that they

10   weren't supposed to speak of it.

11   Q.    And where did you hear that?

12   A.    Well, I don't know.  I think

13   when they came back I asked them how

14   it went, and they said we can't talk

15   about it.

16   Q.    And when was that?

17   A.    Two weeks, three weeks.  I

18   don't know whenever they were away.

19   Q.    And they is who?

20   A.    I would say Anne, mainly.  Tom

21   might have mentioned it too.

22   Q.    And Tom is?

23   A.    Wilson.

24   Q.    And I'm sorry, Anne?

25   A.    Worth.

10

1    Q.    Anyone else?

2    A.    No, I don't think.  When we

3    went to talk about it they just

4    hushed up.  That was all.

5    Q.    So you haven't talked to any

6    of the supervisors, any of the other

7    Defendants about any of their

8    deposition testimony?

9    A.    No.

10   Q.    Have you had an opportunity to

11   talk to any of them following their

12   depositions?

13   A.    Oh, yes.  We have done work

14   and stuff.

15   Q.    What kind of work have you

16   done?

17   A.    We have been together out at

18   Anne's for administrative work.  And

19   I was up there checking the truck.  I

20   guess nobody was up there with me at

21   this township building the one day.

22   No, that would be all.

23   Q.    Have you had any other

24   opportunity to talk to any of the

25   other Defendants?

11

1    A.        No.

2    Q.        Have you been alone with any

3    of the other Defendants?

4    A.        No.

5    Q.        While you were waiting this

6    morning for the deposition, did you

7    have the opportunity to speak to any

8    of the other Defendants?

9    A.        Well, first Anne was here, but

10   she never mentioned nothing about it.

11   Q.        And why was Anne here?

12   A.        She was here to see that this

13   thing was set up?

14   Q.        What was set up?

15   A.        The tables and stuff.  See,

16   sometimes these are all out away in a

17   corner, chairs are put up.

18   Q.        How long did she wait with you

19   this morning?

20   A.        I suppose a half hour maybe.

21   Q.        Was she setting up tables the

22   whole time you were waiting?

23   A.        She had come in and checked on

24   it, and this is about the way she

25   found it.

12

1    Q.      And then what did she do?

2    A.      Well, she would just wait out

3    there.

4    Q.      Where?

5    A.      Outside.

6    Q.      Anywhere in particular

7    outside?

8    A.      Outside the door.  Didn't you

9    see her there this morning?

10   Q.      Yes.  And where were you

11   waiting this morning?

12   A.      Well, I stood there a while

13   and then we sat down in the car.

14   Q.      Whose car?

15   A.      Anne's.

16   Q.      Did you read anything while

17   you were waiting this morning?

18   A.      No.

19   Q.      You didn't have any documents

20   that you were going through?

21   A.      No.

22   Q.      Where do you live, Mr. Weiler?

23   A.      A mile east of here.

24   Q.      And what is your address?

25   A.      R.D. 1 Box 651, Petersburg, PA

13

1    16669.

2    Q.    Is Petersburg --- is that in

3    Jackson Township?

4    A.    No.

5    Q.    I'm sorry.  You're a Jackson

6    Township supervisor?

7    A.    Yes.

8    Q.    How is it that you're a

9    Jackson Township supervisor if you

10   don't live in Jackson Township?

11   A.    I live in Jackson Township

12   You asked me if Petersburg was in

13   Jackson Township, and it's not.

14   Q.    So how is that your mailing

15   address is Petersburg?

16   A.    This is Petersburg.  You go on

17   the other side of that bridge there

18   and it's Huntingdon.

19   Q.    The Huntingdon proper or

20   Huntingdon County?

21   A.    Huntingdon, R.D. 1.

22   Q.    So you physically live in

23   Jackson Township?

24   A.    Right.

25   Q.    Can you tell me your

14

1   educational history?  What's the

2   highest grade you've completed?

3   A.      Twelfth.

4   Q.      Did you go to any college?

5   A.      I had a couple short courses.

6   Q.      What kind of courses did you

7   take?

8   A.      Mainly farming.

9   Q.      Did you receive an Associate's

10  Degree or just ---.

11  A.      No.  It wasn't that long.  It

12  was only --- each one of them was

13  probably three months.

14  Q.      How long have you lived in

15  Jackson Township?

16  A.      Seventy-one (71) years.

17  Q.      All of your life?

18  A.      Uh-huh (yes).

19  Q.      Do you do any other work other

20  than working as a supervisor?

21  A.      Not now, no.

22  Q.      What did you used to do?

23  A.      Farm.

24  Q.      Do you own your own farm?

25  A.      Yes.

15

1   Q.      Did you parents have a farm?

2   A.      Yes, they did.

3   Q.      And they lived in Jackson

4   Township?

5   A.      Oh, no.

6   Q.      I'm sorry, how long have you

7   been a supervisor for Jackson

8   Township?

9   A.      Probably close to 20 years,

10  something around there.

11  Q.      Have you ever been the

12  Chairman of the Board?

13  A.      Yeah, I've been Chairman.

14  Q.      Do you know how many times?

15  A.      I think it was only one time.

16  Q.      Are you presently the

17  chairman?

18  A.      No.

19  Q.      When were you the chairman?

20  A.      Back four or five years ago

21  probably.

22  Q.      Mr. Weiler, are you aware of

23  the procedures that your Board uses

24  when it enacts an ordinance?

25  A.      Yes, pretty much.

16

1   Q.      Can you describe those

2   procedures for me?

3   A.      Well, I'd have to see papers

4   and stuff, then I'll know.

5   Q.      Like what kind of papers?

6   A.      When they enact a what?

7   Q.      An ordinance.

8   A.      Well, we have a meeting here

9   at our --- at the fire hall, a

10  meeting, yeah, and we just do it at

11  that.

12  Q.      Do you know if that meeting is

13  preceded by any advertisements?

14  A.      Yes.

15  Q.      Do you know if the

16  advertisements specify that you're

17  going to consider an ordinance?

18  A.      Yeah.

19  Q.      They do?

20  A.      Uh-huh (yes).  Yeah, I think

21  they do.

22  Q.      Do you vote on ordinances at

23  the meetings?

24  A.      Yeah.  Uh-huh (yes).

25  Q.      Do the minutes from your

17

1  minutes reflect the vote that you've

2  taken?

3  A.     Yes.

4  Q.     Is that how a record of the

5  vote is kept?

6  A.     Yeah.

7  Q.     When you have a proposed

8  ordinance that the Board is

9  considering, do you make it publicly

10  available?

11  A.     Oh, yeah.

12  Q.     Where is it publicly

13  available?

14  A.     Well, of course the

15  secretary's got it, and I think

16  ordinances are posted I think on the

17  building here, I believe.  But I

18  won't say for sure about the

19  building, but I think they are.

20  Q.     Do you if know copies are

21  available at the meetings when

22  they're voted on?

23  A.     Yeah.  There could be copies

24  there, yeah.

25  Q.     Are there normally copies

18

1    available?

2    A.      I think generally.  It's in

3    the paper.

4    Q.      Have you ever enacted an

5    ordinance that wasn't in the paper?

6    A.      No, I don't think.

7    Q.      Have you ever enacted any

8    resolutions?  Let me ask you this,

9    has the Board of Supervisors ever

10   enacted a resolution?

11   A.      I don't know.

12   Q.      Would you say to the best of

13   your knowledge that they haven't?

14   A.      I don't know about that.

15   Q.      Do you know if a resolution

16   would be advertised in the paper?

17   A.      I would think so.

18   Q.      This sounds like a similar

19   question, but I'm going to ask you

20   just a little differently.  Are you

21   aware of any resolutions being passed

22   by the Board of Supervisors that

23   weren't in the paper?

24   A.      No.  I feel sure if any of

25   them were passed, they'd been

19

1  advertised.

2  Q.      Do you know if the Board would

3  vote on a resolution?

4  A.      Yeah.

5  Q.      Would that vote occur at a

6  meeting?

7  A.      Yeah.

8  Q.      Would that be the regular

9  meeting held here?

10 A.      Yeah.  This is the only place

11 we have meetings.

12 Q.      Have you ever attended

13 workshop meetings?

14 A.      Yes.

15 Q.      And where are the workshop

16 meetings held?

17 A.      Well, the County does

18 workshops.  Huntingdon County outside

19 does stuff like that.

20 Q.      Does the township have any

21 workshop meetings?

22 A.      In what way are you meaning?

23 Q.      Do you meet at the township

24 building on Anne Worth's property

25 once a month?

20

1    A.      Generally we do, yes.

2    Q.      And what do you call those

3    meetings?

4    A.      They're just administrative

5    meetings.

6    Q.      Do you advertise the

7    administrative meetings?

8    A.      No, I don't think they're

9    advertised.

10   Q.      Are they open to the public?

11   A.      Well, they'd be open if they

12   wanted to come, yeah.

13   Q.      How would the public know

14   about the administrative meeting?

15   A.      Well, I don't know.  They all

16   know that we do this.  It's just a

17   short meeting.  It's setting up our

18   agenda for the next meeting and

19   making out checks.

20   Q.      When are those administrative

21   meetings generally held?

22   A.      Monday, Tuesday evening --- or

23   afternoon it is, I guess.

24   Q.      Is that the Monday or Tuesday

25   just prior to ---

21

1    A.        Prior, yeah.

2    Q.        --- the regular meeting?

3    A.        Yeah.

4    Q.        How long have the

5    administrative meetings been going

6    on?

7    A.        Quite some time, I guess.

8    Q.        As long as you've been the

9    supervisor?

10   A.        I won't say that long, no.

11   I'd hate to say how long they've been

12   going on.

13   Q.        Have they been going on as

14   long as Anne Worth has been a

15   secretary?

16   A.        Yeah.  I think it was before

17   that maybe.

18   Q.        Do you recall where they would

19   have been held?

20   A.        No, I can't tell you that.

21                   ATTORNEY THORP:

22                   Excuse me.  Let me go

23          see if I can tell them ---.

24   BRIEF INTERRUPTION

25                   ATTORNEY MALADY:

22

1           Okay.  Thank you.

2  BY ATTORNEY MALADY:

3  Q.      Mr. Weiler, I think that you

4  had testified a little earlier that

5  when you were waiting for the

6  deposition with Anne Worth, you were

7  not reading anything while sitting in

8  her car; is that correct?

9  A.      Yes.

10  Q.      I can represent to you that

11  when we pulled in there was a stack

12  of white papers on your lap that you

13  appeared to be reading.  Can you tell

14  me what they were?

15  A.      There were no white papers on

16  my lap.

17  Q.      There was no paper --- you

18  were reading nothing?

19  A.      Uh-uh (no).  No, there was no

20  papers.

21  Q.      Mr. Weiler, has anyone

22  requested that you perform a document

23  search in relation to the lawsuit

24  filed by Mr. Corneal?

25  A.      No.

23

1    Q.      Have you been provided with a

2    copy of a document that's entitled a

3    request for production of documents?

4    A.      No.

5    Q.      Were you aware that there was

6    an outstanding request for documents?

7    A.      No.

8    Q.      So you haven't looked in any

9    of your files for any documents

10   related to Mr. Corneal's property?

11   A.      I have not looked in any

12   files.

13   Q.      Do you have any files that are

14   related to Mr. Corneal's property?

15   A.      Do I have?

16   Q.      Yes.

17   A.      No.

18   Q.      Do you have any documents of

19   any kind related to Mr. Corneal's

20   property?

21   A.      No.

22   Q.      Did the Board of Supervisors

23   --- let me ask you, has the Board of

24   Supervisors ever discussed Mr.

25   Corneal's property?

24

1    A.        Well, I've heard it discussed,

2    yes, at the meetings here.

3    Q.        Just at the regular meetings?

4    A.        Yeah.

5    Q.        What were those discussions?

6    A.        What were they?

7    Q.        Yes.  Can you tell me the

8    basis for them?  Well, let me ask you

9    this.  Were you present at the

10   February 2000 Board of Supervisors

11   regular meeting?

12   A.        What was that one?

13   Q.        That was the meeting at which

14   Mr. Corneal submitted his subdivision

15   plan.

16   A.        Yes.  I was there.

17   Q.        Can you tell me what happened

18   at the meeting?

19   A.        I don't know.  He just came up

20   here and slammed them down on the

21   table and then he took off.  He was

22   very disturbed.

23   Q.        Why was he disturbed?

24   A.        I don't know what it was over.

25   It was over this building out there.

25

1    But everybody has to have a building

2    permit to build in Jackson Township

3    and Corneal's going to have to have

4    one too.   That's what it amounts to.

5    Q.      When he attended the February

6    meeting, was he looking for a

7    building permit?

8    A.      I forget what he was looking

9    for.   No, I don't believe.

10   Q.      So he wasn't looking for a

11   building permit at the February 2000

12   meeting?

13   A.      No.

14   Q.      Do you recall that he had

15   submitted a subdivision plan to the

16   Board at the February meeting?

17   A.      I remember once that he did.

18   I didn't know if it was just then,

19   but I remember once that he did.

20   Q.      What was the result of his

21   submitting the subdivision plan to

22   the Board?

23   A.      It wasn't really a subdivision

24   plan.

25   Q.      What was it?

26

1    A.      It was maybe his idea.  It

2    isn't what all the rest of the people

3    put in.  I could say --- everybody

4    else has to have a permit to do

5    things here, and he will too.

6    Q.      Did Jackson Township have a

7    subdivision ordinance in February

8    2000?

9    A.      I think we were working on

10   one.  I think that's what it was.

11   Q.      But one had not been enacted?

12   A.      I can't tell you for sure when

13   we did enact that.

14   Q.      Mr. Weiler, I apologize.  My

15   co-counsel just pointed out to me

16   that I needed to let you know, if you

17   need to take a break at any time,

18   just let me know.

19   A.      Okay.

20   Q.      If you need to get some water,

21   get some air, anything like that,

22   make sure that you're feeling all

23   right.

24   A.      Okay.

25   Q.      Let me ask you a little bit

27

1   about the moratorium.  When did the

2   Board first consider imposing a

3   moratorium?

4   A.      I can't tell you that.  I

5   don't know for sure what date it was.

6   Q.      Do you remember what month it

7   was?

8   A.      No, I don't remember.  I

9   imagine it was December, January we

10  talked about it probably, but I won't

11  say for certain on that.

12  Q.      Would that be December 1999,

13  January 2000?

14  A.      I don't know for sure.

15  Q.      I'm going to show you a

16  document we'll mark Weiler Exhibit

17  Two.  Do you want to take a look at

18  that, please?

19                  (Deposition Exhibit

20                  Number Two marked for

21                  identification.)

22  A.      Is this explaining the

23  moratorium, or not.  Is this what

24  you're doing here?

25  Q.      I believe that it is.  Does

28

1   that refresh your recollection as to

2   when the moratorium was imposed?

3   A.      Well, it says here January the

4   4th, 2000.

5   Q.      Did the Board discuss imposing

6   a moratorium sometime before this

7   meeting?

8   A.      Probably it was discussed in

9   January --- or in December.

10  Q.      Do you remember those

11  discussions?

12  A.      No.  I can't tell you now.

13  Q.      Do you know who brought up the

14  moratorium?

15  A.      Not for sure.

16  Q.      Did you bring it up?

17  A.      No, no.

18  Q.      Did Mr. Yoder bring it up?

19  A.      No.  I presume it might have

20  been Paul.

21  Q.      And why is that?

22  A.      Well, I don't know.  He's just

23  --- you know, said that.  I don't

24  know for sure who did bring it up.

25  Q.      Did you vote on the

29

1    moratorium?

2    A.        Yes.

3    Q.        Do you see any record of that

4    vote?

5    A.        You mean on here?

6    Q.        Yes, sir.

7    A.        I don't see it here.  But see,

8    we've been working on this before

9    that even, must have been.

10   Q.        Do you recall discussing it at

11   any of your administrative meetings?

12   A.        No.  Well, there would be no

13   decisions.  We can't make decisions

14   there.

15   Q.        Did you discuss it?

16   A.        Well, this one I don't

17   remember.  I can't say for sure.

18   Q.        Do you recall why the issue of

19   a moratorium was brought up?

20   A.        Well, we did this to get ready

21   for this thing.

22   Q.        To get ready for what thing?

23   A.        Ready for this subdivision.

24   There were places these grounds were

25   on subdivision now to, you know, have

30

1   an orderly building fashion.

2   Q.      How many subdivisions would

3   you say Jackson Township has seen

4   requests for in the year 2001?  Let

5   me rephrase that.  That was terrible.

6   How many subdivision requests did

7   Jackson Township receive in the year

8   2001, to the best of your knowledge?

9   A.      Well, we had two that was held

10  up due to this moratorium.  We had

11  two besides Mr. Corneal that I can

12  think of right now.

13  Q.      That was the year 2000; wasn't

14  it?

15  A.      Whatever year we put this into

16  effect, there was work on it, at the

17  moratorium.  There was two of them

18  out there hanging on that.

19  Q.      But generally, to the best of

20  your knowledge, how many subdivision

21  applications does the Board of

22  Supervisors receive in a given year?

23  A.      I don't know.

24  Q.      Would you say five?

25  A.      That may cover it.  Yes, that

31

1  may cover it.

2  Q.      I think that you testified

3  that the moratorium came up because

4  you were considering the subdivision

5  ordinance; is that correct?

6  A.      Yeah.

7  Q.      When did you begin to consider

8  that subdivision ordinance?

9  A.      I don't know.  I don't know.

10  Q.      Would you say it was a year

11  before the moratorium?

12  A.      Could have been.  I just can't

13  tell you off hand.

14  Q.      Could it have been more than a

15  year before the moratorium?

16  A.      I don't know.

17  Q.      Do you recall how long the

18  moratorium was in effect?

19  A.      Not now.  I don't remember.

20  Q.      Do you recall when you --- do

21  you recall when the subdivision

22  ordinance went into effect?

23  A.      I can't recall what day it

24  was, you know, month and year.

25  Q.      Do you know if there was an

32

1  advertisement regarding the

2  moratorium?

3  A.      Yes.  I think there was a

4  piece in the paper.  Anything we do,

5  it's always in the paper.

6  Q.      And why is that?

7  A.      State law, I guess.

8  Q.      So if it's not advertised in

9  the paper, it's not lawful?

10 A.      I don't know what to say about

11 that.  Most of your stuff, like bids

12 for warrants down and so on, that has

13 to be advertised.  So I supposed that

14 this is the same.

15 Q.      Now, you testified that you

16 were present at the February 2000

17 meeting when Mr. Corneal submitted

18 what he thought was a subdivision

19 plan?

20 A.      Yes.

21 Q.      I think that you testified

22 that it wasn't a subdivision plan in

23 your opinion; is that correct?

24 A.      From the Board's opinion, it

25 wasn't.

33

Q.      And why ---?

A.      He didn't --- you know, he just threw it down and I gathered he was mad, and out he went.

Q.      Why was he upset, do you know?

A.      I have no idea.

Q.      Now, when you say it wasn't a subdivision plan, in your opinion, what was that opinion based on?

A.      Of what other ones are like, how they're drawn up and so on.

Q.      What do you compare a subdivision ordinance --- or, I'm sorry, a subdivision plan to?

A.      Well, you see them going through here.  You know what they're like.

Q.      But are there some standards that the Board compares a subdivision application to?

A.      Well, yeah.  There's certain things they have to have in it, yes.

Q.      What things would that be?

A.      Have to have a topo map of the area.  I can't tell you what all they

34

1   do to have that.

2   Q.      Where are these requirements

3   found?

4   A.      In the subdivision ordinance,

5   in our ordinance.

6   Q.      But at the time that Mr.

7   Corneal submitted that subdivision,

8   you didn't have a subdivision

9   ordinance?

10  A.      That's what we had the

11  moratorium on.

12  Q.      But at the time he submitted

13  that subdivision plan, where were the

14  standards for a subdivision to be

15  considered by the Board?

16  A.      Well, that was the one I think

17  he was making up; wasn't it?

18  Q.      But it hadn't been enacted?

19  A.      No.  I didn't say it had been.

20  Q.      So would you say it's fair

21  that at the time that Mr. Corneal

22  submitted his subdivision plan, there

23  were no enacted standards by which

24  the Board could review his

25  subdivision application?

35

1    A.    I don't know if we had that

2    enacted then.  I don't know.

3    Q.    I'm going to ask you a couple

4    of questions about the Hewitts.  Are

5    you familiar with the Hewitts?

6    A.    No.

7    Q.    Were you aware that Mr.

8    Corneal had an agreement of sale with

9    the Hewitts?

10   A.    I think I heard that or

11   something, yes.

12   Q.    Do you know where you heard

13   that?

14   A.    I can't tell you where it was.

15   Q.    Did Mr. Wilson tell you?

16   A.    No, I don't think.

17   Q.    Did Anne Worth tell you about

18   it?

19   A.    I don't know if she even knows

20   them.  I don't know.  I can't

21   remember how that did come about.

22   Q.    Was it discussed at a regular

23   meeting of the Board?

24   A.    They were here one night.

25   Q.    And what happened when they

36

1    were here?

2    A.        That was probably that

3    February meeting that you were

4    talking about.  That's right, they

5    were here.  They even kind of

6    apologized for Corneal's actions.

7    Q.        What did they say?

8    A.        I don't remember.

9    Q.        Did they get up and speak to

10   the Board?

11   A.        I think they spoke to somebody

12   afterwards.  After the meeting,

13   though, I think they came out and

14   talked.

15   Q.        Did they talk to you?

16   A.        No, I don't think they did.

17   Q.        Did they talk to Anne?

18   A.        No.  They may have talked to

19   Yoder.  I just forget who it was.

20   They talked, I know that.  I heard

21   that.

22   Q.        Did the Board ever discuss

23   what the Hewitts had talked to one of

24   the supervisors about?

25   A.        I don't know what it was, no,

37

1  as far as I know.

2  Q.    Did you, or any member of the

3  Board, ever discuss the Hewitts at

4  one of your administrative meetings?

5  A.    No.

6  Q.    Were you aware that the

7  Hewitt's wanted to buy a part of Mr.

8  Corneal's property?

9  A.    No.  I believe maybe that

10  there was something said about that.

11  Q.    Do you know who said something

12  about it?

13  A.    On some of these papers that

14  Corneal handed in, it showed where

15  the Hewitts were on there.  That's

16  where I think I seen that.

17  Q.    Were those papers part of the

18  subdivision plan?

19  A.    I don't know about that.

20  Q.    Do you recall that Mr. Corneal

21  submitted something after the

22  subdivision plan?

23  A.    He wasn't going to subdivide

24  one time, and then the next time he

25  was.  Okay.

38

1    Q.      Are you familiar with Mr.

2    Corneal's property here in Jackson

3    Township?

4    A.      No.  Just driving along the

5    road is all I know.

6    Q.      Have you ever been there?

7    A.      No.  Never on it, never set a

8    foot on it.

9    Q.      Were you aware that it used to

10   belong to Mr. Wilson's grandfather?

11   A.      No.  That must have been long

12   ago.

13   Q.      Approximately how far from Mr.

14   Corneal's property do you live?

15   A.      Well, do you know where it's

16   at?

17   Q.      I do not.

18   A.      You have to go out 26 about a

19   mile, turn off the road.  And the

20   first --- I live a mile up this

21   narrow road over here.  Driving about

22   four miles.  No, about two and a half

23   miles.

24   Q.      Were you aware that Barry

25   Parks had approved sewage modules for

39

1   Mr. Corneal's property?

2   A.      Yes.  I had heard that.

3   Q.      Are you aware of any actions

4   that the Board took after Barry Parks

5   approved those sewage modules?

6   A.      Well, I did hear that Corneal

7   destroyed them after they were

8   approved there.

9   Q.      He destroyed what?

10  A.      Where they're supposed to put

11  their septic systems and so on.

12  Q.      How did he destroy them?

13  A.      By running trucks and tractors

14  over them.

15  Q.      And where did you hear that

16  from?

17  A.      That was probably heard at the

18  meeting, too.

19  Q.      Would that have been at a

20  regular meeting?

21  A.      Yeah.

22  Q.      Did you discuss it at any

23  administrative meetings?

24  A.      No.

25  Q.      Did you ever review Mr.

40

1   Corneal's approved sewage modules?

2   A.      I have looked at them.  I have

3   looked at them.

4   Q.      Did the Board ever approve

5   those Sewage modules?

6   A.      I'm sure they looked at them.

7   Q.      Did they approve them?

8   A.      Not while that --- not when he

9   destroyed that --- the sewage module.

10   Maybe I'm talking about is two

11  different things, that's right.  I

12  won't say.

13  Q.      And why is that?

14  A.      What?

15  Q.      Why won't you say?

16  A.      Well, you're talking sewage

17  module and I'm talking about where he

18  done his test probes for his septic

19  system, that's all.

20  Q.      Let me ask you this.  He did

21  his test probes and Barry Parks

22  signed his sewer module application.

23  A.      Okay.

24  Q.      Was that module submitted to

25  the Board; do you know?

41

1   A.      I don't know if that's the one

2   or not.  I don't know if it was.

3   Q.      Do you know if the Board ever

4   approved any sewage module

5   application from Mr. Corneal?

6   A.      I don't know.  I don't know of

7   it.

8   Q.      Do you have any knowledge of

9   Mr. Corneal's visiting Mr.

10  Vandomalen's (phonetic) home?

11  A.      No.

12  Q.      Did you know Mr. Corneal went

13  to Mr. Vandomalan's home and told him

14  to get a building permit application?

15  A.      No.

16  Q.      You have no knowledge of that?

17  A.      I don't think, no.

18  Q.      The Board never discussed Mr.

19  Corneal's seeking a building permit

20  application?

21  A.      There was something said about

22  him, yes, about him wanting a

23  building permit.

24  Q.      What was said?

25  A.      I forget what happened there.

42

1    Q.      Do you recall who was present

2    at the discussion?

3    A.      It was probably our Board

4    here.

5    Q.      Would Anne Worth have been

6    there?

7    A.      Sure.  She's at all our board

8    meetings.

9    Q.      Would it have been a board

10   meeting?

11   A.      Yeah.  That's where we make

12   all the decisions.

13   Q.      But I'm not asking you if you

14   made any decisions, I'm just asking

15   if you discussed it?

16   A.      I don't think we did.

17   Q.      Did Mr. Vandomalan ever come

18   see the Board to discuss it?

19   A.      He was at all the meetings.  I

20   imagine he did discuss that, yeah.

21   Q.      Does Mr. Vandomalan ever go to

22   any of the administrative meetings?

23   A.      No.

24   Q.      He's never attended ---.

25   A.      I don't think, uh-uh (no).

43

1    Q.      So do you have any

2    recollection of the discussion

3    regarding Mr. Corneal's seeking a

4    building permit?

5    A.      No.

6    Q.      Were you aware that Mr.

7    Corneal tried to get a privy permit

8    from the Board?

9    A.      Uh-uh (no).

10   Q.      You didn't know anything about

11   that?

12   A.      No.  Privy permit?

13   Q.      Yes, sir.

14   A.      Don't recall that one either.

15   Q.      Mr. Weiler, have you ever

16   talked to Larry Newton about Mr.

17   Corneal?

18   A.      I may have.  I don't know.

19   See, he's our attorney.  I may have.

20   Q.      Did you call him on the phone?

21   A.      If I talked to him, that's

22   probably what it was.

23   Q.      Did you talk to him by

24   yourself or were you in a group?

25   A.      Well, you're talking about

44

1    Corneal, so there had to have been

2    somebody else, some of the other ones

3    there to have done that.  He's also

4    my attorney.

5    Q.        Did you ever discuss with Mr.

6    Newton the moratorium that the Board

7    was considering?

8    A.        Well, he's been to our

9    meetings and we touched on that, I

10   think at a meeting.

11   Q.        Did you discuss it with him

12   yourself?

13   A.        No.  It was just a meeting.

14   Q.        Mr. Weiler, did you know that

15   Mr. Corneal submitted a building

16   permit application to the township?

17   A.        I didn't know he put in an

18   application, I don't think.

19   Q.        Did you know he filled out an

20   application?

21   A.        I can't say as I did.

22   Q.        Did you ever see his

23   application?

24   A.        I can't say that I did.  I

25   don't know.  I don't believe I did.

45

1  Q.      Did you personally review his

2  subdivision application?

3  A.      We have it here on the table

4  and we looked over it.  We go over

5  it. All of us go over everything.

6  Q.      Do you recall why Mr. Corneal

7  left the meeting or when Mr. Corneal

8  left the meeting after your reviewing

9  his subdivision plan?

10  A.      No.

11  Q.      Do you recall what he was told

12  to do with the subdivision plan?

13  A.      No.

14  Q.      Do you normally refer

15  subdivision plan applicants to the

16  county?

17  A.      Yes.

18  Q.      And why is that?

19  A.      Well, they go over them first,

20  the County planners, and then they

21  send them back to us with

22  recommendations on it.

23  Q.      Do you have some ordinance or

24  document that requires the county to

25  look at the subdivision applications

46

1  first?

2  A.      I don't know.  I don't know.

3              ATTORNEY MALADY:

4              Just give me a minute.

5  Michele, do you have any

6  questions?

7              ATTORNEY THORP:

8              No.

9              ATTORNEY MALADY:

10             Tony?

11             ATTORNEY THORP:

12             No.

13             ATTORNEY MALADY:

14             That's it.  You're

15  done.

16          *  *  *  *  *  *  *

17    DEPOSITION CONCLUDED AT 11:15 A.M.

18          *  *  *  *  *  *  *

19

20

21

22

23

24

25

COMMONWEALTH OF PENNSYLVANIA)

COUNTY OF BLAIR                    )

                    C E R T I F I C A T E

    I, Jane E. Messner, a Notary Public in and for

the Commonwealth of Pennsylvania, do hereby certify:

    That the witness was first duly sworn to testify

to the truth, the whole truth, and nothing but the

truth; that the foregoing deposition was taken at the

time and place stated herein; and that the said

deposition was taken stenographically by me and

reduced to typewriting, and constitutes a true and

correct record of the testimony given by the witness.

    I further certify that the reading and signing

of said depositions were (not) waived by counsel for

the respective parties and by the witness.

    I further certify that I am not a relative,

employee or attorney of any of the parties, nor a

relative or employee of counsel, and that I am in no

way interested directly or indirectly in this action.

    IN WITNESS WHEREOF, I have hereunto set my hand

and stamp this 19 day of July 2001 .

_Jane E. Messner_

NOTARIAL SEAL
JANE E. MESSNER, Notary Public
Hollidaysburg Boro, Blair County, PA
My Commission Expires Dec. 27, 2001

· PITTSBURGH, PA

· CLEARFIELD, PA        · ERIE, PA

· STATE COLLEGE, PA    · OIL CITY, PA

· HOLLIDAYSBURG, PA    · HARRISBURG, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA  15901

· INDIANA, PA

· GREENSBURG, PA

· PHILADELPHIA, PA

· SOMERSET, PA

· WILKES-BARRE, PA

· CHARLESTON, WV

Exhibit 4

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2   DAVID B. CORNEAL and SANDRA   :
     Y. CORNEAL,                   :
 3        PLAINTIFFS               :
                                   :
 4              VS                 :  NO. 1:CV-00-1192
                                   :
 5   JACKSON TOWNSHIP, HUNTINGDON  :
     COUNTY, PENNSYLVANIA; W.      :
 6   THOMAS WILSON, individually   :
     and in his official capacity  :
 7   as Supervisor of Jackson      :
     Township; MICHAEL YODER,      :
 8   individually and in his       :
     official capacity as          :
 9   Supervisor of Jackson         :
     Township; RALPH WEILER,       :
10   individually and in his       :
     official capacity as          :
11   Supervisor of Jackson         :
     Township; BARRY PARKS,        :
12   individually and in his       :
     official capacity as Sewage   :
13   Enforcement Officer of        :
     Jackson Township; DAVID       :
14   VAN DOMMELEN, individually    :
     and in his official capacity  :
15   as Building Permit Officer;   :
     ANN L. WIRTH, individually    :
16   and in her official capacity  :
     as Secretary of Jackson       :
17   Township; and LARRY NEWTON,   :
     individually and in his       :
18   official capacity as          :
     Solicitor to Jackson          :
19   Township,                     :
          DEFENDANTS               :
20              DEPOSITION OF:  ANN WIRTH
21          TAKEN BY:       PLAINTIFFS
22          BEFORE:         TERESA K. BEAR, REPORTER
                            NOTARY PUBLIC
23
            DATE:           MAY 17, 2001, 9:10 A.M.
24
            PLACE:          ECKERT SEAMANS
25                          213 MARKET STREET
                            HARRISBURG, PENNSYLVANIA
```



**WIRTH, ANN**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

**2**

1  APPEARANCES:
2     ECKERT SEAMANS
      BY:  BRIDGET E. MONTGOMERY, ESQUIRE
3        LESLIE A. MALADY, ESQUIRE
4        FOR - PLAINTIFFS
5     MAYERS, MENNIES & SHERR, LLP
      BY:  ANTHONY R. SHERR, ESQUIRE
6
       FOR - ALL DEFENDANTS EXCEPT NEWTON
7
      THOMAS, THOMAS & HAFER, LLP
8     BY:  MICHELE J. THORP, ESQUIRE
9        FOR - DEFENDANT - RALPH WEILER
10    METTE, EVANS & WOODSIDE
      BY:  JENNIFER YANKANICH, ESQUIRE
11
       FOR - DEFENDANT - LARRY NEWTON
12
   ALSO PRESENT:
13
      DAVID B. CORNEAL
14
15
16
17
18
19
20
21
22
23
24
25

---

**3**

1              TABLE OF CONTENTS
2         WITNESS
3  FOR PLAINTIFFS        DIRECT CROSS REDIRECT RECROSS
4  Ann Wirth
5     By Ms. Montgomery    4  --  244  --
      By Ms. Yankanich   --  211  --  251
6         EXHIBITS
7  WIRTH EXHIBIT NO.        PRODUCED AND MARKED
8  1 - Notice          49
9  2 - Subdivision and land      50
   development ordinance
10
11 3 - Application for building permit    62
12 4 - Minutes dated 7/10/00      64
13 5 - Minutes dated 2/7/00      81
14 6 - Minutes dated 1/4/00      90
15 7 - Minutes dated 4/3/00      102
16 8 - Order        112
17 9 - Subdivision reviewed by HCPC    114
18 10 - Letter dated 4/20/00      138
19 11 - Letter dated 2/24/00      139
20 12 - Letter dated 11/10/00      184
21 13 - Letter dated 10/10/00      187
22 14 - Packet of documents      191
23 15 - Letter dated 5/5/00      210
24 16 - Letter dated 1/31/00      247
25 17 - Letter dated 7/28/00      249

---

**4**

1          ANN WIRTH, called as a witness, being sworn,
2  testified as follows:
3
4          DIRECT EXAMINATION
5
6  BY MS. MONTGOMERY:
7     Q     Would you state your name for the record.
8     A     **Ann Wirth.**
9     Q     I think we met briefly yesterday.  I'm Bridget
10 Montgomery and as you probably know I represent the Corneals
11 in this action.  I'm going to take your deposition today.
12 Have you ever been deposed before?
13    A     No.
14    Q     I'm going to give you just a few of the ground
15 rules.  Probably the first and most important one is for the
16 benefit of the court reporter.  If you could keep your voice
17 up --
18    A     Okay.
19    Q     -- and give her verbal responses, yeses or
20 noes.  You can't do shakes of the head or anything because
21 she can't hear that and she can't take that down.  We also
22 have to try and let each other finish our sentences.  So if
23 I'm asking a question, just try to wait until I'm finished
24 and then I'll try to wait until you're finished with your
25 answer to start talking because she can't take down two

---

**5**

1  people at once, okay.
2          If there's anything that you don't understand
3  about any question that I ask you, you should feel free to
4  ask me to repeat it.  I want you to understand my question
5  and I want you to be able to give me the best, clearest
6  answer possible.  So you shouldn't be shy about that at all
7  if you don't understand it, okay?
8     A     Okay.
9     Q     If you are in need of a break, you know, to
10 use the ladies room or whatever, just to stretch your legs,
11 you're free to ask for that as well.  We do want you to be
12 comfortable.  I'm not sure how long we'll be here, but I
13 want you to be comfortable while you are here.  If you need
14 a glass of water, a cup of coffee, just get up and get it,
15 okay?
16    A     Okay.
17    Q     Is there any reason why you couldn't give a
18 deposition today and understand questions and give clear
19 answers in return?  For instance, are you on any sort of
20 medication or anything like that?
21    A     No.
22    Q     Have you ever been a party to a lawsuit
23 before?
24    A     No.
25    Q     Have you discussed the substance of your

---

WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

6

1    deposition or intended deposition testimony with anyone?
2       A    I don't know what you mean. You mean what I
3    -- what you want me to say or what somebody wanted me to
4    say?
5       Q    Yes.
6       A    No.
7       Q    Not with anybody at all?
8          MR. SHERR: I'm going to object to the form of
9    the question and exclude from that any conversations she had
10   with her attorney.
11         MS. MONTGOMERY: Okay.
12   BY MS. MONTGOMERY:
13      Q    Other than your counsel, have you discussed --
14      A    No.
15      Q    You have not talked about the fact that you
16   will be deposed? You have not talked about that with the
17   supervisors at all?
18      A    Oh, we've all talked about being deposed
19   but --
20      Q    And what was the nature of those
21   conversations?
22      A    I don't know what you're asking me.
23      Q    Well --
24      A    Just that we have to come and tell the truth
25   and say whatever has happened, that's all.

7

1       Q    Who have you discussed it with exactly?
2          MR. SHERR: Again, other than your -- other
3    than --
4    BY MS. MONTGOMERY:
5       Q    Other than your attorney Mr. Sherr.
6          MR. SHERR: -- your attorney.
7          THE WITNESS: Probably my husband, who is my
8    sounding board for a lot of things and is not involved in
9    anything at all.
10   BY MS. MONTGOMERY:
11      Q    Among the supervisors who have you talked to?
12      A    Probably everybody.
13      Q    In connection with this litigation, have you
14   performed a search for documents?
15      A    Yes, I did.
16      Q    When did you do that?
17      A    Last week.
18      Q    When were you first asked to do that?
19         MR. SHERR: I'm going to object to the form of
20   the question to the extent she was asked by her attorney
21   because it's privileged. Don't answer with respect to
22   anything -- conversations that we had.
23         MS. MONTGOMERY: That's not a privileged
24   question.
25         MR. SHERR: Well, we'll let the court decide

8

1    that. I'm going to instruct her not to answer --
2    BY MS. MONTGOMERY:
3       Q    When were you first asked --
4          MS. MONTGOMERY: Are you instructing your
5    witness not to answer that question?
6          MR. SHERR: To the extent the request came
7    from me, yes.
8          MS. MONTGOMERY: Well, she didn't have to tell
9    me who it came from.
10   BY MS. MONTGOMERY:
11      Q    Were you asked by anybody at any time prior to
12   -- let me back up a second. Were you asked by anybody at
13   any time, and I'm not asking you who, to search for
14   documents in connection with this lawsuit last September,
15   September of 2000?
16         MR. SHERR: Again, I'm going to object to the
17   extent that any request came from me. Other than anything
18   from your attorney, you may answer that.
19         THE WITNESS: No.
20   BY MS. MONTGOMERY:
21      Q    You weren't asked by anybody, not one single
22   soul?
23      A    No.
24      Q    When is the first time that anybody -- and I'm
25   not asking you who asked you to look for documents, but when

9

1    was the first time anybody asked you to look for documents
2    in connection with this lawsuit?
3          MR. SHERR: I'm going to object again based on
4    privilege and instruct you not to answer with respect to any
5    conversation --
6          MS. MONTGOMERY: I haven't asked you what
7    your --
8          MR. SHERR: Please. With respect to any
9    conversations that you had with your attorney.
10         MS. MONTGOMERY: Are you instructing your
11   witness not to tell me whether anybody -- not identifying
12   that person, but whether -- you're instructing her not to
13   tell me whether anybody, without identifying who it was,
14   asked her for documents? Is that your instruction?
15         MR. SHERR: I made my objection.
16         MS. MONTGOMERY: But you need to make it very
17   clear because when I take this to the court I want to be
18   able to tell the court exactly what you told your witness
19   not to say.
20         MR. SHERR: Let me make it really clear.
21         MS. MONTGOMERY: Okay.
22         MR. SHERR: I'm instructing the witness not to
23   answer with respect to conversations she had with her
24   attorney.
25         MS. MONTGOMERY: Okay, thank you.

3

---

**10**

BY MS. MONTGOMERY:

1   Q    Have any of the supervisors asked you to look
2   for documents in connection with this lawsuit?
3   A    No.
4   Q    Has anybody other than your attorney asked you
5   to look for documents in connection with this lawsuit?
6   A    No.
7        MR. SHERR: That you can answer.
8        THE WITNESS: No, no.
9   BY MS. MONTGOMERY:
10  Q    And so when is the first time that you
11  actually looked for documents in connection with this
12  lawsuit?
13       MR. SHERR: Objection, privileged. I'm going
14  to instruct the witness not to answer.
15       MS. MONTGOMERY: What?
16  BY MS. MONTGOMERY:
17  Q    When was the first time that you actually
18  looked for documents in connection with this lawsuit?
19       MR. SHERR: Objection, asked and answered.
20  You can answer the question. You can answer.
21       THE WITNESS: Okay. Last week.
22  BY MS. MONTGOMERY:
23  Q    And what did you do in looking for documents?
24  A    I got a request, something that said request,
25

---

**11**

1   and I put together all the documents that I could put
2   together on that list.
3   Q    Is that the first time you got that request,
4   the written request?
5   A    I'm not really sure of that. I'm not really
6   sure of that.
7   Q    You don't know if last week was the first time
8   you ever looked at it?
9   A    I don't know that for sure, when that came to
10  me. I really don't.
11  Q    Well, let's try and narrow it down a little
12  bit. Did it come to you within the last month?
13  A    You're asking me during tax season so it's
14  kind of a hard thing for me to pinpoint when I got that. I
15  don't know.
16  Q    Did it come to you last year?
17  A    Oh, no.
18  Q    It didn't come to you in the year 2000?
19  A    No, I know that.
20  Q    So what did you go about doing in attempting
21  to look for documents in response to that request?
22  A    I went down the list and I accumulated what
23  was on that list that I could provide you from my office
24  with. That's what I did.
25  Q    Did you withhold any documents based on --

---

**12**

1   A    No.
2   Q    -- privilege?
3   A    No.
4   Q    Do you know whether any documents were
5   withheld based on privilege?
6   A    No.
7   Q    You don't know?
8   A    No, I don't know.
9   Q    Did the supervisors review the documents that
10  you sent out?
11  A    No.
12  Q    So you handled completely the document
13  production?
14  A    Right.
15  Q    Did you ask for any assistance from anybody in
16  handling the document production?
17  A    No.
18  Q    Did you talk to anybody about anything or did
19  you talk to other people? Did you say do you know where
20  this document is or anything like that?
21  A    No.
22  Q    Well, let's talk about how documents are kept
23  on behalf of the township. How are they kept, just
24  generally tell me?
25  A    In a file cabinet.

---

**13**

1   Q    How big?
2   A    Four drawers, there's two.
3   Q    Do you have documents --
4   A    In a binder for the land ordinances.
5   Q    In a binder? And a binder or in a binder did
6   you say?
7   A    In a binder.
8   Q    So there's binders in the file cabinets?
9   A    There's a binder on top of the file cabinet.
10  Q    Plus there's documents inside the file
11  cabinet, correct?
12  A    Yes.
13  Q    Do you have documents that are retained only
14  on computer?
15  A    Not that I'm aware of.
16  Q    Did you look on the computer for any documents
17  that might be there that might be related to the document
18  request that was sent to you?
19  A    I don't have any documents on the computer.
20  Q    Do you have a computer?
21  A    I shouldn't -- oh, yeah.
22  Q    I'm sorry?
23  A    I have a computer. We have two computers --
24  well, we have a computer.
25  Q    You started to say I shouldn't.

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

14

1    A        The -- the ordinance is on the computer, but I
2    didn't get it off the computer.
3    Q        Do you maintain correspondence on the computer
4    at all?
5    A        We don't write very many letters so there's
6    just -- there's nothing on the computer except that and the
7    accounting.
8    Q        What about the minutes?
9    A        And the minutes are on there.
10   Q        So the minutes are --
11   A        Yeah, the minutes are on there, correct.
12   You're right.
13   Q        Anything else at all on the computer that you
14   can think of?
15   A        Yeah, there's -- PennDOT now has put out a
16   disk that we have that we can put out our liquid fuel forms
17   and that sort of thing and that's on the computer.
18   Q        Do you maintain disks at all?
19   A        No.
20   Q        So you have a hard drive?
21   A        Yes.
22   Q        Everything is kept on the hard drive, nothing
23   is copied off on separate disks?
24   A        Only to backup.
25   Q        So you maintain backup files?

---

15

1    A        Oh, yeah.
2    Q        Do you know whether you have correspondence or
3    other documents on backup?
4    A        I backup my computer all the time so
5    everything is there. I back it up from front to back and
6    it's there.
7    Q        Well, just to be clear on your answer, because
8    I'm not sure I heard it correctly, did you actually do a
9    search of your computer files, whether on the computer or on
10   backup to see whether or not there was anything available
11   that would be responsive to the document requests that were
12   given to you?
13   A        No.
14   Q        Are there documents related to township
15   business that are kept anywhere else besides the township
16   office where you work?
17   A        I don't know what kind of documents you're
18   talking about.
19   Q        Any documents related to township business in
20   any way.
21   A        Yes.
22   Q        And where is that?
23   A        The building permits are not kept in-house.
24   Q        Did you look -- where are they kept?
25   A        David Van Dommelen has them.

---

16

1    Q        Where does he keep them?
2    A        In his home.
3    Q        Did you ask him to give you the building
4    permits?
5    A        I -- I asked him for a list of the building
6    permits and that's what I gave you.
7    Q        But I thought you said you didn't ask anybody
8    to help you in connection with the document production?
9    A        No, I only asked to get the information. I
10   didn't ask anybody to look it up for me. I just -- I must
11   have misunderstood what you meant. I simply asked David to
12   give me his list of all the building permits. I did the
13   same thing with the county. So if I misunderstood what you
14   said, I'm sorry. I did the same thing with the county.
15   Q        That's okay. I mean, if you misunderstood,
16   then we'll just clear it up. So my question was: Did you
17   talk to anybody in connection with performing this
18   collection of documents?
19   A        Yes, I did then.
20   Q        And who did you talk to?
21   A        I talked to David Van Dommelen and I asked him
22   to give me a list. I did not ask him for the permits
23   because they're cumbersome. I did ask him for a list of all
24   permits that were issued from -- I think you said June '99
25   to present and he did do that. And then I talked to Richard

---

17

1    Stahl and I asked him to give me a list of every one that
2    went into the county to be reviewed from whenever and he
3    sent me a list of everything that's ever been in there.
4    Q        And you provided both of those lists to us?
5    A        Yes, I did.
6    Q        To your attorney anyway.
7    A        And to you. They were here yesterday. I saw
8    them.
9    Q        When you say that the building permits are too
10   cumbersome, why are they too cumbersome? Can you describe
11   that for me?
12   A        Well, I -- I have to take -- you have to
13   understand I'm the only person that does this, okay. So I
14   had to go -- I'd have to go get them and copy --
15   applications I would have had to copy. We don't have copies
16   of the building permits, okay, just the applications, is all
17   I would have. And I would have to go since 1999 and copy --
18   get David's book and copy it in my -- in the office or take
19   it somewhere.
20   Q        Does David keep them in a binder or something?
21   A        I really don't know.
22   Q        So the applications are what, one page, two
23   page --
24   A        I have no idea because I don't do that.
25   Q        So when you issue a building permit -- when

---

WIRTH, ANN
05/16/01

CORNEAL  VS
JACKSON TOWNSHIP

---

**18**

1  the township issues a building permit, you don't keep a copy
2  of the permit?
3      A    No, I don't.
4      Q    Does anybody keep a copy of the permit?
5      A    You'll have to ask David that.  I don't
6  actually know what he has in that -- in his files.  I know
7  he keeps a list which he provides to the supervisors and
8  that's why I asked for that.
9      Q    So what you sent us was a list of permits --
10     A    That were issued.
11     Q    That were issued?
12     A    Right.
13     Q    Did you send us a list of applications for
14  permits?
15     A    That's the same.  I don't think there's any
16  difference, but you'll have to ask David that.
17     Q    And you don't think there's any difference
18  why?
19     A    I don't know.  I honestly don't know.  You'll
20  have to ask David that.  I don't know what he does.  That's
21  not under me.
22     Q    So then you talked to Richard Stahl to get
23  what from him?
24     A    I asked him to give us a list of permits -- or
25  of subdivisions that we have submitted to him, just a list,

---

**19**

1  to show that we were sending everything in there.  And he
2  did send me a completed list of -- they must keep track of
3  them when they come in in that routine and that's what he
4  sent.
5      Q    Anybody else?
6      A    No, those are the only two places I requested
7  anything.
8      Q    Did you look anywhere outside the township
9  offices --
10     A    No.
11     Q    -- for anything?
12     A    No.
13     Q    You didn't look at documents anywhere else?
14     A    No.
15     Q    You said that the building permits and
16  applications are kept by Van Dommelen, correct?
17     A    Right.
18     Q    Are there any other documents that are
19  maintained outside the township office relating to township
20  business?
21     A    The sewage documents, Barry keeps them till
22  he's done with -- till he has completed the project and then
23  he sends them into the township.
24     Q    That's Barry Parks?
25     A    Barry Parks.  And also DEP keeps them and then

---

**20**

1  sends them back.  They might keep them for three or four
2  years and then they send them back, but I didn't talk to
3  either one of them.
4      Q    So you didn't ask Barry Parks what documents
5  he has in connection with --
6      A    No, I did not.
7      Q    Is there any reason why you didn't ask Barry
8  Parks for his documents?
9      A    I didn't know I was supposed to do that.
10     Q    Any other documents that are maintained
11  outside the township office?
12     A    I can't think of any.
13     Q    Well, if you think of any, please feel free to
14  tell me during the course of this deposition, or tell your
15  counsel and he can tell me later if you don't think of it
16  during the course of the deposition, okay?
17     A    Okay.
18     Q    Now, going back to the documents that you did
19  produce, you said all the documents are kept in one file, in
20  one file cabinet that's three or four drawers?
21     A    No, we have two file cabinets.
22     Q    Is that it?  Is there any other, you know,
23  sort of nooks and crannies or storage buildings on township
24  property that --
25     A    Oh, yeah, we have old documents.  Are you

---

**21**

1  talking current or ancient documents?
2      Q    Really I'm just trying to get a general
3  picture of your document retention.
4      A    Current items are in the office.  Old items
5  are in the township building.  And I honestly cannot tell
6  you what's there and I don't go there because there's snakes
7  in there and I don't go there.  I can tell you that.  I
8  won't go there.
9      Q    What do you mean by current documents?
10     A    Well, things that -- I've been on for six
11  years.  Everything since I've been on is in my office.
12     Q    Is it in those two file cabinets you referred
13  to?
14     A    Yes, and then in an extra storage box.
15     Q    And that storage box is where?
16     A    In my office.
17     Q    Did you look in that storage box in connection
18  with this document request?
19     A    No, because those things were before I was on
20  the -- on -- they weren't involving this time frame.
21     Q    So they are documents prior to --
22     Q    1996.
23     Q    So that's the storage box and what else?
24     A    That's it.
25     Q    No attic or anything like that?

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

22

1    A    No.
2    Q    Let's talk a little bit about you and your
3    background. Where do you live?
4    A    I live on Scare Pond Road.
5    Q    And where is that?
6    A    Petersburg, R.D. 1.
7    Q    Is that -- how do you spell that, Scare Pond?
8    A    S-c-a-r-e, P-o-n-d.
9    Q    And that's within Jackson Township?
10   A    Yes.
11   Q    Tell me a little bit about your educational
12   background.
13   A    I have -- I graduated from high school, of
14   course, and I have college classes in tax and accounting and
15   business law and numerous other advanced education, but I
16   don't have a degree.
17   Q    Talk to me a little bit about your advanced
18   education, what -- go into some detail.
19   A    Mostly in computers, because that's what I do,
20   and in income tax preparation, that sort of thing. I go to
21   tax class at Penn State most every year and I do that.
22   Q    Do you hold any certificates or licenses or
23   anything like that?
24   A    No.
25   Q    When did you start your post high school

23

1    education?
2    A    In probably 1960. I've been doing this all
3    this time so ...
4    Q    Taking business classes?
5    A    Business classes and computer classes when we
6    started with computers and I've been taking income tax
7    classes since I started doing that in 1974.
8    Q    What is your exact title at the township?
9    A    I'm secretary/treasurer.
10   Q    Secretary/treasurer. Is there any training
11   for performing that particular function?
12   A    Oh, yes.
13   Q    And what is that?
14   A    Well, we go -- every year they have classes
15   that they get you to attend for -- it's not only secretarial
16   duties or treasurer duties, it's everything. They -- we go
17   to convention to do this. We go everywhere to do --
18   wherever they -- it's called one-step education classes
19   through PSATS. So every year -- I even went to
20   Shippensburg. They -- we go different places to do what
21   we --
22   Q    What is PSATS?
23   A    Pennsylvania Association of Township
24   Supervisors.
25   Q    So they send you to training and --

24

1    A    The township does.
2    Q    And PSATS puts on that training?
3    A    They're doing it now, yes. And DEP does it,
4    Department of Transportation does it.
5    Q    And what does that training consist of
6    exactly, what do they show you?
7    A    Well, like right now is -- they're doing a lot
8    of computerization because this is a dinosaur thing they
9    have for the townships. And they're doing a lot of training
10   for the liquid fuel forms and all those things. They're
11   training us to use their new computer systems and --
12   bidding. I do all the bidding and that sort of thing. So
13   all the latest things we do.
14   Q    You said that what you do is computerization.
15   What did you mean by that?
16   A    Well, I -- I go around and set different small
17   businesses up with their accounting systems and that sort of
18   thing.
19   Q    In connection with your work as a township --
20   A    Oh, no.
21   Q    -- supervisor secretary?
22   A    No, I earn a living. I don't earn a living
23   doing township -- no, I'm not -- I shouldn't be funny about
24   this, but that's what I do for a living.
25   Q    Oh, I see. So you have separate employment?

25

1    A    Oh, yeah.
2    Q    We'll get to that in a minute.
3    A    Okay.
4    Q    Just tell me a little bit about your duties as
5    the township secretary.
6    A    Well, I take minutes at the meeting, I do
7    do that, but I take care of all the financial end of it. I
8    make sure that we have all the grants that we're entitled
9    to. I fill in all the forms to get us the money. We're a
10   poor township, we only have 900 people, and there's a lot of
11   paperwork involved in --
12         (Interruption.)
13         MS. MONTGOMERY: Excuse me one second. I'll
14   be right with you.
15         (Break taken.)
16         MS. MONTGOMERY: Now, where were we? What was
17   the last question.
18         (Question and answer read.)
19         THE WITNESS: There's a lot of paperwork
20   involved in just getting the funding for what we need to do
21   in the township. And we have -- we're audited three times a
22   year so we're constantly under audit. I just -- I take care
23   of all that. That's what I do.
24   BY MS. MONTGOMERY:
25   Q    How much time say per week do you put into it?



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

26

1    A    I honestly don't know. I cannot tell you how
2 many -- because I work that in with my job and anything that
3 needs to be done I do and I honestly cannot tell you how
4 many hours. Some weeks it's a lot, some months it's a lot,
5 like January, February, March is really bad, and then at
6 audit time it's really bad but ...
7    Q    Why are -- January, February and March for tax
8 season?
9    A    Because -- well, no, not for the township.
10 The township, that's when you fill in all your forms for
11 your funding, like your liquid fuels. And we have all --
12 every agency and everything we deal with we have forms we
13 have to fill in with the supervisor's information and all
14 that and it's -- and if you don't do that, then we don't get
15 our liquid fuels money. So we have those -- those months
16 we're really busy.
17    Q    Do you do all of that work from the township
18 office or do you do some of it at home?
19    A    The township does not have an office. They
20 use my office for their office. I allow them to put their
21 stuff in my office and that's where it happens.
22    Q    Your office where?
23    A    On Scare Pond Road.
24    Q    Your office at home then you mean?
25    A    I have a separate building that is my office.

---

27

1    Q    That you use in connection with your other
2 employment?
3    A    Yes.
4    Q    So the township office is your office
5 essentially?
6    A    Um-hum.
7    Q    Having said that, do you perform any of the
8 work from inside your home?
9    A    At my house -- my --
10   Q    Yes.
11   A    My office building is here and my house is
12 over there. There's nothing together. Everything is in the
13 building. There's nothing in my house, other than phone
14 calls, you know, that sort of thing. I don't have anything
15 at the house.
16   Q    Do you keep a record of phone logs? Do you
17 keep a phone log of like phone calls you receive --
18   A    No.
19   Q    -- in connection with township business?
20   A    No, they have their own line.
21   Q    That rings in your office?
22   A    Um-hum.
23        MR. SHERR: You have to say yes or no. You
24 can't --
25        THE WITNESS: I'm sorry, yes. It rings in my

---

28

1 office.
2 BY MS. MONTGOMERY:
3    Q    So if somebody calls on township business, how
4 do you keep a record of the fact that somebody has called on
5 township business?
6    A    I don't.
7    Q    You don't, you just keep it in your head?
8    A    I don't get enough phone calls for the
9 township that I need to keep records or anything. It's --
10 if somebody calls me, I answer the phone and say Jackson
11 Township and do what I -- you know, do what I have to do,
12 but we don't -- we don't get a lot of phone calls.
13   Q    Do you take messages for the supervisors in
14 connection with --
15   A    No, I tell them -- I give them their phone
16 number and they call them.
17   Q    So you don't have any kind of old phone
18 messages or --
19   A    No.
20   Q    -- a book of --
21   A    I don't do that.
22   Q    Let me finish my question.
23   A    I'm sorry.
24   Q    That's all right. Thank you. So as the
25 secretary you just sort of weave it into your other work,

---

29

1 your other employment as it needs to be done for the
2 township?
3    A    Yes.
4    Q    You attend all the township's meetings?
5    A    I've only missed one in the six years I've
6 been on.
7    Q    And when was that, the one that you missed?
8    A    I think it was two years ago in February I was
9 really ill and I did not go.
10   Q    And the meetings are held in your office as
11 well?
12   A    No.
13   Q    Where --
14   A    The meetings are held -- I'm sorry. The
15 meetings are held at the fire company building in McAlevys
16 Fort.
17   Q    Is there a telephone in that building?
18   A    Yes.
19   Q    Is there any answering of messages or, you
20 know, answering of the telephone on behalf of the township
21 that occurs in that building?
22   A    No.
23   Q    Do you know whether the supervisors have their
24 own individual offices anywhere?
25   A    No, they don't.

---

WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

30

1  Q      Do they have anybody else who answers the
2  phone or takes messages or handles any township business in
3  any way on behalf of them?
4  A      No.
5  Q      Typically at a township meeting -- is there a
6  monthly meeting of the township supervisors?
7  A      Yes.
8  Q      And then there are special meetings from time
9  to time, correct?
10  A      Once in a while, like when we do the ordinance
11  or something, but not very often.
12  Q      Who would be present at the township meetings?
13  A      The supervisors and myself.
14  Q      Are they open to the public?
15  A      Oh, always. They have to be by law.
16  Q      Do you advertise --
17  A      Yes.
18  Q      -- all of the township meetings?
19  A      We have to, that's the law.
20  Q      Every month?
21  A      We are required once a year to put it in the
22  paper in the beginning of January that our regular monthly
23  meeting will be the first Monday of every month. And then
24  if we change that, we have to run another ad, or if we --
25  excuse me. If we have a special meeting, that has to be

31

1  advertised.
2  Q      Where do you advertise?
3  A      In the Daily News in Huntingdon.
4  Q      The Huntingdon Daily News it's called?
5  A      Um-hum.
6  Q      Is there a particular amount of notice that
7  you have to give?
8  A      We're supposed to give 24 hours.
9  Q      Twenty-four hours notice for special meetings?
10  A      Yes.
11  Q      And what else are you supposed to do in
12  connection with those notices?
13  A      Just exactly what I said, we put it in once a
14  year and I -- oh, I post it on the door. They have a
15  Plexiglas for me on the door of the fire company and I have
16  it -- it's posted there when our monthly meeting is. And if
17  there's a special meeting, I go down and hang it on the
18  door.
19  Q      What about the content of the notices?
20  A      They're just -- we just have to notify them of
21  a meeting if there is -- and if it's -- I'm sorry.
22  Q      If it's a special meeting, do you have to tell
23  them anything else?
24  A      Like if it's an ordinance or we're building or
25  something, it's in the paper, we advertise it in the paper.

32

1  When we bid for -- if we have an emergency that we are going
2  to bid for roadwork or something that we're doing a special
3  meeting for, there will be an ad in the paper. Even if we
4  are doing our bidding at a regular meeting, there still will
5  be an ad in the paper listing what we're bidding for and
6  when that meeting is and whatever. It's always in the Daily
7  News.
8  Q      So in the notice of a special meeting do you
9  put anything about what the meeting is going to be about?
10  A      Yes.
11  Q      You describe what exactly the supervisors are
12  trying to accomplish?
13  A      We're bidding on stones or whatever.
14  Q      So you told me what you do in connection with
15  your duties as secretary for Jackson Township. Is there
16  anything else you want to add to that?
17  A      I don't know what it would be.
18  Q      How frequent is your contact with the
19  supervisors of Jackson Township?
20  A      I -- I talk to Mr. Weiler on a daily basis,
21  only because of his health and he's alone with his sister,
22  but I don't know. It's a small community. We see one
23  another and we run into one another. I don't know how often
24  I talk to them.
25  Q      Is there something additional to add to your

33

1  duties for the township that arises out of your role as the
2  treasurer for the township?
3  A      I keep track of the books. I have that
4  computerized. I do that. I pay all the bills.
5  Q      Anything else?
6  A      I move the money around in the bank if we need
7  to do that. I change all the signatures on the bank
8  accounts. I --
9  Q      Do you write checks?
10  A      Oh, yes, but I don't -- yes, I do.
11  Q      Do you sign the checks?
12  A      Yes, there's two signatures required.
13  Q      Yours and one of the supervisors?
14  A      Yes.
15  Q      Anything else that you do as -- in connection
16  with your role as the treasurer for the township?
17  A      Deposit all the money. I -- and write checks
18  is basically what I do for --
19  Q      Do you participate in -- just in general in
20  your role in the township, do you participate in substantive
21  conversations about what the township should do or can do
22  or --
23  A      I do do that.
24  Q      Do you do that at the monthly meetings or just
25  on a day-to-day basis or what?

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

9



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

34

1    A    Wherever it needs to -- wherever it comes up.
2    If there's something -- I will get a lot of things in the
3    mail that needs to go to the supervisors or, you know, I may
4    have researched things for them.
5    Q    Do you deal directly with the public yourself?
6    A    Sometimes.
7    Q    So they come out to your office?
8    A    No.
9    Q    They just call you on the telephone?
10   A    Sometimes.
11   Q    To ask you questions about what they need to
12   do to do this or do that?
13   A    Sometimes they do that.
14   Q    Do you vote at all in connection with township
15   business?
16   A    No, I don't have a vote.
17   Q    Do you have an informal vote?
18   A    No.
19   Q    Do the township supervisors seek your advice
20   on how to do things for the township?
21   A    They might ask me to research things.
22   Q    How do you keep the minutes?
23   A    They're in a binder.
24   Q    So you keep --
25   A    It's not really a binder.  It's a big book and

35

1    you have to staple them in there.  It has to be in this
2    book.
3    Q    And you also keep them on the computer?
4    A    I print them off of there and put them -- I
5    have to seal them and put them on -- in the book, yeah.
6    Q    You have a word processing system?
7    A    Yes.
8    Q    What word processing system do you have?
9    A    We do Microsoft Word and then we also have
10   Excel, which is part of that, and Works.  We have Works.
11   Q    What do you use Works for?
12   A    I use them both for -- I might have -- Word is
13   connected to the reports that we do for PennDOT with Excel
14   and I use -- that's mainly for the bidding.  There's bidding
15   forms where we bid for stones and blacktop, and whatever
16   we're doing, and snow plowing and that sort of thing.
17   That's done in Word.  And Works I do my minutes in and
18   things.
19   Q    Do you use e-mail at all in connection with
20   your township work?
21   A    The township is not on the Internet.
22   Q    Are you on the Internet?
23   A    Oh, yes.
24   Q    Do you use your own e-mail in connection with
25   township business at all?

36

1    A    No.
2    Q    So you would have nothing on your -- this is
3    -- your e-mail is on your personal computer then --
4    A    Yes.
5    Q    -- for your other business?
6    A    Um-hum.
7    Q    So there is nothing on that computer that in
8    any way relates to township business?
9    A    No.
10   Q    You never use that computer to keep minutes
11   like, for example, if the other computer is not working or
12   something?
13   A    No, we do not.  We've only had the township
14   computer for two -- for -- I think it's two -- maybe a year,
15   year and a half.  And before that I did, but I -- I have two
16   new computers and I don't put the township on mine at all.
17   Q    But before you got the township computers a
18   year and a half ago, you did some township business on your
19   own computer?
20   A    Yes, I did.
21   Q    Did you look on your own computer to see
22   whether there was anything on there that might in any way
23   relate to this lawsuit or the matters under consideration in
24   this lawsuit?
25   A    I would have trouble doing that since I don't

37

1    have that anymore.  I don't have it anymore.
2    Q    You don't have that computer anymore?
3    A    No, and I cleared everything off of there and
4    gave it to my grandson.
5    Q    You gave the computer to your grandson and got
6    a new computer?
7    A    Yes.
8    Q    Did you backup the information that was on
9    your old computer?
10   A    Oh, yeah.
11   Q    So did you look on your backup information to
12   see whether there was anything related to the Corneals,
13   their property or anything that has to do with this lawsuit?
14   A    No, I did not because the only thing that
15   would have been on there would have been the minutes and the
16   books.
17   Q    Well, let's see, Mr. Corneal first started his
18   interaction with the township back in 1999, correct, in
19   connection with this property?
20   A    I don't know when he started.
21   Q    But if he did start in connection with this
22   property in 1999, it's possible that you would have some
23   information on your old computer, correct?
24   A    I wouldn't have anything in '99 for Mr.
25   Corneal.

**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

38

1   Q      Why is that?
2   A      Because I didn't have anything to do -- I
3   didn't even know about Mr. Corneal till January 2000.
4   Q      Do you keep any kind of a log of township
5   activities, you know, some sort of an organizational chart
6   at all?
7   A      No, I do not.
8   Q      Do you keep a calendar?
9   A      For the township?
10  Q      Yes.
11  A      No.
12  Q      You don't?
13  A      No.
14  Q      Does anybody keep a calendar for the township?
15  A      I don't know. You'll have to -- I don't know.
16  Q      Have you ever held any other positions with
17  Jackson Township besides your secretarial and treasurer
18  positions?
19  A      Yes, we had a supervisor quit and I was
20  appointed supervisor till we had a special election.
21  Q      And when was that?
22  A      Oh, I don't know whether that was '98 or -- I
23  think it was in 1998. I'm not sure. It was just a short
24  period of time. A man quit and then we had an election. It
25  was just a couple months.

39

1   Q      It was a couple months and you were appointed
2   to fill in as township supervisor --
3   A      Yes.
4   Q      -- for a period of time? How long have you
5   been the secretary for the township?
6   A      Since 1996.
7   Q      How long have you been the treasurer for the
8   township?
9   A      Since 1996.
10  Q      And how did you go about obtaining that
11  position?
12  A      They put an ad in the paper and I gave them a
13  resume.
14  Q      Are you related to any of the supervisors?
15  A      No.
16  Q      Are the minutes for the township meetings
17  publicly available?
18  A      Oh, yes.
19  Q      So I could go in and look at the book of
20  minutes?
21  A      Sure.
22  Q      Anybody could go in and look at the book of
23  minutes, correct?
24  A      Yes.
25  Q      Who do you report to?

40

1   A      The three supervisors.
2   Q      There are three supervisors?
3   A      Right.
4   Q      And you report to them informally or formally
5   or just at the monthly meetings or what?
6   A      I don't know what you're asking me.
7   Q      I guess I'm really asking you for a complete
8   picture of how you report township business to the
9   supervisors. Do you save it all for the monthly meetings,
10  do you just call them from time to time to report to them?
11  A      I call them from time to time to report to
12  them.
13  Q      They're your bosses, right?
14  A      Yes.
15  Q      They're the ones who hired you?
16  A      Yes.
17  Q      So you have to report to them on any township
18  business that comes up?
19  A      That's right.
20  Q      So you just call them from time to time?
21  A      Yes.
22  Q      Do you know whether they keep any minutes or
23  records of your telephone calls to them?
24  A      I don't know.
25  Q      So if something comes up between say the first

41

1   monthly -- you know, the monthly meeting in January and the
2   monthly meeting in February and say four or five different
3   things come up, how do you keep a list of what's come up? I
4   mean, how do you keep all that organized?
5   A      When I open the mail and there's something
6   that has to be taken care of with the supervisors, I
7   normally copy it, if it's something they need to read or
8   whatever, prepare for, or -- and I have a file that I have
9   ready for the meeting. I put my copy in the folder and then
10  I give their copies along the way so they're prepared
11  before the meeting. And so I don't lose it I do that
12  because it's -- it's -- there's a lot of paperwork involved
13  here and I do that for that reason.
14  Q      Do you prepare agendas for the monthly
15  meetings?
16  A      Yes, I do. I have it on the computer.
17  Q      You have the agendas on the computer as well?
18  A      I have an agenda and when I -- each meeting I
19  change it. I just go in and change it and-- it's saved
20  under agenda and I just change it for that meeting.
21  Q      Do you save copies of the old agendas?
22  A      Probably not.
23  Q      Does anybody save copies of the old agendas?
24  A      I don't know.
25  Q      You don't save the agenda on the meeting from

WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

**42**

1  month to month?
2  A    No.
3  Q    The agenda on each monthly meeting you just go
4  in and replace --
5  A    Yes.
6  Q    -- and you copy over?
7  A    Yeah, that's what I do.
8  Q    So you have a form, basically a computerized
9  form --
10  A    Yeah, that's what I do.
11  Q    Tell me about your other employment.
12  A    I do income tax preparation and set up
13  computers.
14  Q    Are you self-employed?
15  A    Yes.
16  Q    Does your company have a name?
17  A    Ann's Accounting.
18  Q    Ann's Accounting?
19  A    Um-hum.
20  Q    And you set up computers.  When you say you
21  set up computers, what do you mean by that?
22  A    I load software on people's computers for
23  accounting and word processing packets and that sort of
24  thing, to show them how to run it, show them what to do with
25  their payroll, keep them updated.  That's what I do.

---

**43**

1  Q    So you just consult -- basically have a
2  consulting -- computer consulting business?
3  A    And I do in-house payrolls and that sort of
4  thing, quarterlies.
5  Q    And you prepare tax forms as well?
6  A    Yes.
7  Q    Now, you said you were briefly a supervisor
8  for the township.  Have you ever held any other position
9  with Jackson Township?
10  A    No.
11  Q    Do you take notes at the meetings besides the
12  minutes that you actually type up?  Do you have handwritten
13  notes that you keep somewhere?
14  A    No.  Once I type it up, I throw it out.
15  Q    Discard them, okay.  Do you keep a record of
16  people in attendance at the meeting other than in the
17  minutes?
18  A    I do now.
19  Q    A different record?
20  A    Yes.
21  Q    And what does that consist of?
22  A    I pass a paper around the room and have
23  everybody sign it now, who is there.
24  Q    And you keep that where?
25  A    With the minutes.

---

**44**

1  Q    You keep it with the minutes?
2  A    Yes.  I've been doing that maybe for -- I
3  don't know, three, four months.
4  Q    You talked about opening township mail, right?
5  A    Yes.
6  Q    Is that delivered to your home or to a post
7  office box?
8  A    We have a separate mailbox for the township.
9  Q    On your property?
10  A    Yes.
11  Q    So you keep copies of all the mail received?
12  A    It depends on what it is.  If it's something
13  that I'm not going to do anything with, it's just
14  information for the supervisors from PSATS or something like
15  that, I -- I don't necessarily keep it.
16  Q    But you do keep some of the mail received,
17  copies?
18  A    If it's something that I have to deal with.
19  Q    And you keep that in those files?
20  A    Um-hum.
21  Q    The metal file cabinets that you have?
22  A    Yes.
23  Q    I think you said a moment ago that you don't
24  really know what the building permit applications look like
25  and you don't -- you're not sure how big they are and all

---

**45**

1  that?
2  A    I don't.
3  Q    Now, in connection with your work with the
4  township, how many ordinances has the township passed in
5  your -- in the history of your work with the township?
6  A    Three.
7  Q    And what were they?
8  A    The land development and subdivision
9  ordinance, privy ordinance and a driveway ordinance.
10  Q    When did they pass the land division and
11  subdivision ordinance?
12  A    July the 10th in 2000.
13  Q    July the 10th, 2000?
14  A    Um-hum.
15  Q    Was the meeting for that ordinance -- or for a
16  consideration of that ordinance advertised?
17  A    Oh, yes.
18  Q    Where was it advertised?
19  A    The Daily News.
20  Q    Did the advertisement state that it would be
21  on July the 10th?
22  A    Oh, yes.
23  Q    Did the advertisement state what was going to
24  be considered at the meeting?
25  A    Oh, yes.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

46

1  Q      Do you have a copy of the advertisement that
2  stated when the --
3  A      I'm not sure I did that. I think maybe Larry
4  Newton did that, but I'm not sure. I can't -- I don't know.
5  Q      Does Larry Newton sometimes do the
6  advertisements?
7  A      Only for items like that.
8  Q      Let's talk about the advertisements for a
9  second. I think you stated a while ago that you usually do
10 the advertisements, right? You do them in the Daily --
11 A      Daily News.
12 Q      The Daily News in Huntingdon, correct?
13 A      Yes.
14 Q      So you would take care of the advertisements
15 at the beginning of the year listing when the monthly
16 meetings of the township were going to be held?
17 A      Right.
18 Q      Any other advertisements that you routinely
19 deal with?
20 A      Yes, for bidding.
21 Q      Anything else?
22 A      No -- special meetings, if we called a special
23 meeting.
24 Q      Sometimes do you do the advertising for
25 special meetings held to consider ordinances?

47

1  A      I honestly don't know whether I did that or
2  not. I normally do most of the advertising, but that was a
3  special -- so I don't -- I honestly don't know if I did it
4  or he did it.
5  Q      Well, what's involved when you do? Do you
6  just call --
7  A      No.
8  Q      -- the Daily News? What do you do?
9  A      No, you have to type something up and fax it
10 into them and they put it in the paper.
11 Q      Do you keep a record of having typed something
12 up and faxing it into them whenever you do an advertisement?
13 A      Oh, yeah, I have that.
14 Q      Let me think about this for a second. So in
15 some situations -- well, you said you passed three
16 ordinances -- or the township supervisors have passed three
17 ordinances since you've been working for the township,
18 correct?
19 A      Right.
20 Q      Do you know whether you did the advertising
21 for any one of those three ordinances?
22 A      They were all at the same time.
23 Q      They were all done at the same meeting?
24 A      Um-hum.
25 Q      Which you said was July 10th, 2000?

48

1  A      I think that's what -- it's on the back of the
2  ordinance.
3  Q      So the ordinance was actually passed at the
4  meeting?
5  A      Right.
6  Q      So the date of the ordinance -- the date of
7  its passage is the date of the meeting, correct?
8  A      Yes.
9  Q      Did you notice when you did your search for
10 documents whether you had any documents in there indicating
11 -- showing advertisements for meetings sent to the
12 newspaper, faxes for advertisements for meetings sent to the
13 newspaper?
14 A      I --
15 Q      Do you have a special file for that?
16 A      I file them with the documents that we're
17 doing. I don't have a file for advertisement. I -- because
18 we do our bidding and that sort of thing, I -- and the
19 auditors look at our bidding, I have to have that in the
20 files for those items so it's got to be there.
21 Q      Miss Wirth, I'm going to show you a document
22 that was faxed to us by your counsel last Friday and we're
23 going to mark it as Wirth Exhibit 1. And I'd ask you to
24 look at it and see whether you can identify that document
25 for me, just familiarize yourself with it for a second.

49

1          (Notice produced and marked as Wirth Exhibit
2  No. 1.)
3  BY MS. MONTGOMERY:
4  Q      Do you recognize that advertisement?
5  A      Yes, I do.
6  Q      So I guess I'm a little bit confused because
7  this is a regular monthly meeting and you had said earlier
8  that at the beginning of the year you just do an
9  advertisement that says this is when the monthly meetings
10 are going to be held, but then this is a separate
11 advertisement, correct -- I'm sorry, you just nodded your
12 head.
13 A      No, I'm -- I wasn't answering you.
14 Q      Well, is that correct, that you said that at
15 the beginning of the year you do an advertisement that says
16 this is when the regular monthly meetings are going to be
17 held, correct?
18 A      I did say that, and I also said that we -- if
19 we're having any other meetings or any changes we have to do
20 it 24-hour notice for these meetings and that's what this
21 was.
22 Q      Was this a change of the regular monthly
23 meeting?
24 A      Yes, because I think the regular monthly
25 meeting then would have been on the 4th of -- that would



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

50

1  have been on the 4th of July, all right, so we changed our
2  regular monthly meeting because we were going to enact the
3  ordinance.
4      Q     So you had a monthly meeting on July 10th
5  then?
6      A     Yes.
7      Q     So you enacted the ordinance at the regular
8  monthly meeting?
9      A     We did do that.
10     Q     Which was held on July 10th?
11     A     That's right.
12     Q     Now that you look at this, do you recall that
13 you're the one who put the advertisement in?
14     A     I did this advertisement. I didn't do the
15 ordinance advertisement.
16     Q     Was there a separate ordinance advertisement?
17     A     Well, yeah, it's right beside it.
18     Q     Let me see that. Okay. So you say you didn't
19 -- oh, Larry Newton did that one. I see that at the
20 bottom, okay. I'm going to show you another document that
21 is marked as -- we're going to mark it as Wirth Exhibit 2.
22          (Subdivision and land development ordinance
23 Jackson Township produced and marked as Wirth Exhibit
24 No. 2.)
25 BY MS. MONTGOMERY:

---

51

1      Q     Do you know when this advertisement appeared
2  -- going back to Exhibit 1 for a second, do you know when
3  this advertisement appeared in the Daily News? Do you know
4  what date?
5      A     I don't -- I can't tell from here, no. Off
6  the top of my head I don't know.
7      Q     You don't recall?
8      A     No.
9      Q     I'm going to give you a copy of this document
10 and ask you if you can identify it for the record.
11     A     This is the subdivision ordinance and land
12 development.
13          MS. MONTGOMERY: Let the record reflect that
14 Michele Thorp just entered the room.
15 BY MS. MONTGOMERY:
16     Q     Is this the subdivision --
17     A     Yes.
18     Q     -- ordinance that was passed by Jackson
19 Township, correct?
20     A     Yes. This thing says the 7th.
21     Q     We're going to direct your attention to
22 page 71 of the document. Was this ordinance passed before
23 the meeting?
24     A     No. I probably -- I probably wrote the wrong
25 date on there because I know it was passed the night of

---

52

1  this. That's -- and it's documented in the minutes that it
2  was done. I probably -- I don't know why that says the 7th.
3      Q     Did you have a meeting -- like a separate
4  meeting at all on July 7th?
5      A     Oh, no, no.
6      Q     Did you --
7      A     What day of the week is that? No, no, that
8  was just probably me.
9      Q     Was this signed at the regular monthly
10 meeting?
11     A     Yes, it was and -- because I took it to get
12 copied right away and I -- I did that. I'm sure I probably
13 wrote that there that night.
14     Q     Who was present at that monthly meeting?
15     A     All the supervisors were there.
16     Q     Who else?
17     A     Myself.
18     Q     Anybody else?
19     A     I don't remember.
20     Q     You don't recall whether there was a member of
21 the public present?
22     A     I'm sure there were. There's usually regular
23 people there, but I -- I don't -- I don't know for sure if
24 they were there that night. I think they were.
25     Q     Did you provide us with the minutes of this

---

53

1  monthly meeting?
2      A     Yes.
3      Q     You provided your counsel with the minutes of
4  the monthly meeting, correct?
5      A     Yes, I did.
6      Q     Was Larry Newton present at this monthly
7  meeting when this ordinance was passed?
8      A     No.
9      Q     Can you remember -- this was July 2000. So
10 can you remember --
11     A     I don't know why I did that. I really don't.
12 I just wrote the 7th and it was -- but it was done at the
13 meeting and I -- you know.
14     Q     Were all three supervisors present at the
15 meeting?
16     A     Yes.
17     Q     Can you recall roughly how many people were
18 present at the meeting?
19     A     We might -- there might be three or four
20 people, that's all we ever have.
21     Q     Was there any other notice of the meeting
22 published anywhere else?
23     A     I hung something on the door which I -- I'm
24 obligated to do by the Sunshine Law and I put it in the
25 paper.

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

54

1　Q　When did you hang the notice on the door?
2　A　When I typed this thing -- my routine is when
3　I type this and send it into the paper, I take it down and
4　hang it on the door, and that's what I do as my routine.
5　Q　Do you save copies of those notices that you
6　hang on the door?
7　A　It's this. Yeah, it's just the paper that I
8　fax over, the same thing, you know.
9　Q　Do you save a copy of that?
10　A　I probably have that.
11　Q　Did you provide that to your counsel in
12　connection with this request for production of documents?
13　A　Probably not.
14　Q　Why not?
15　A　I don't know that I was -- I don't believe I
16　was asked for that, was I?  I don't know.
17　MR. SHERR:  Just answer --
18　THE WITNESS:  It's here.  It's the same thing.
19　BY MS. MONTGOMERY:
20　Q　It's in the newspaper, right, but you have a
21　separate notice that you hang on the door, right?  Is it a
22　full size notice?
23　A　That's just -- what's right there on a piece
24　of paper I hang on the door.
25　Q　What about the more lengthy notice that Larry

---

55

1　Newton put in the paper on the ordinances that were going to
2　be considered at the meeting?  Do you know whether that more
3　lengthy notice was put in at any other time in any other
4　newspaper or in the same newspaper?
5　A　You'll have to ask Larry that.  I don't know.
6　Q　Tell me again why did you publish this one,
7　because it was going to be held on a different date?
8　A　Right, it's not the first Monday of the month.
9　Q　Okay, because the first Monday of the month
10　would have been July 3rd?
11　A　Or July -- July 3rd.  We did not -- it was
12　Labor Day -- it was 4th of July weekend and we changed it to
13　the 10th and we don't normally do that but we ...
14　Q　Would your records reflect when you sent this
15　notice into the newspaper?
16　A　I might be able to see the date on the fax
17　copy if I still have it.
18　Q　Would you please provide that to your counsel
19　so that it can be provided to me?
20　A　I will try.
21　Q　Whatever you have in connection with the
22　advertisement of this meeting in any way, shape or form.
23　What time did the meeting take place?  What time did this
24　meeting take place?
25　A　Seven o'clock.

---

56

1　Q　It started as scheduled as shown here in the
2　paper?
3　A　Yes, I would say it did.
4　Q　Do you remember how long it lasted?
5　A　No, I do not.
6　Q　Was there any discussion on the ordinances?
7　A　I don't remember what we discussed.  I don't.
8　Q　Other than ordinances were there other things
9　that the township supervisors pass, you know, sort of laws,
10　bylaws, whatever, that the township supervisors pass?
11　A　Like what?
12　Q　Resolutions, that sort of thing.
13　A　Yes, we have to do resolutions.
14　Q　Tell me about that.  What kind of resolutions
15　do you have to do?
16　A　We do resolutions to belong to the Juniata
17　Watershed.  We do resolutions when we make changes at the
18　bank, when we change the supervisors.  We did a lot of
19　resolutions when we had the flood.
20　Q　Did you pass any resolutions recently?
21　A　Yeah, the Juniata Watershed Resolution.
22　Q　When was that?
23　A　Not this month, last month.
24　Q　Was there any discussion on that resolution?
25　A　Oh, yeah.  Yes.

---

57

1　Q　Was it well attended by the public, that
2　meeting?
3　A　We might have had four people.
4　Q　And the public discussed this resolution, do
5　you recall?
6　A　I don't recall that they did.
7　Q　But you said there was discussion on the
8　resolution?
9　A　For the supervisors, I was talking about.
10　Q　Among the supervisors.  What other resolutions
11　have been passed say in the last year?
12　A　That was the first resolution, I believe, for
13　the year.
14　Q　For the year 2001?
15　A　Yes.
16　Q　What about in the year 2000?
17　A　I honestly can't remember that we did anything
18　other than the Juniata Watershed and -- I can't remember.
19　Q　So you don't recall any resolutions being
20　passed in the year 2000, correct?
21　A　I'm sorry, I -- if we did, I don't know.  It
22　wouldn't be -- we don't do them -- we don't do -- it's not a
23　routine that we do, other than bank changes and that sort of
24　thing.
25　Q　Do you keep records of your resolutions?

---



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

58

1    A    Oh, yeah.
2    Q    Did you look at the resolutions in connection
3  with searching for documents for this lawsuit?
4    A    I don't think that was part of the request.
5    Q    Well, did you look?
6    A    No.
7    Q    So you didn't review any of the resolutions to
8  see whether they might be related in any way to the matters
9  in this lawsuit?
10    A    No.
11    Q    Any other resolution like documents that are
12  passed by the township?  We've covered resolutions, we've
13  covered ordinances, anything else?
14    A    No.
15    Q    Nothing else you can think of?  Take your
16  time.
17          MR. SHERR:  I'm going to object to the form of
18  the question.  It's been asked and answered.  She's given
19  her answer.  You can answer again.
20          THE WITNESS:  No.
21  BY MS. MONTGOMERY:
22    Q    Okay, thank you.  Well, let's talk a little
23  bit more about the ordinances that were passed.  Do you
24  recall when the issue of the subdivision and land
25  development ordinance was first raised within the township

59

1  -- among the township supervisors, I should say?
2    A    Probably between '97 and '98.
3    Q    Who raised it?
4    A    I don't know.
5    Q    Why do you think it was first raised between
6  '97 and '98?
7    A    Because it took us two years to sift through
8  what we wanted to put in our ordinance.
9    Q    So if this was passed in July 2000 you think
10  you started thinking about it two years before that?
11    A    I know we did.
12    Q    How do you know you did?
13    A    Because I started collecting things two years
14  before from different areas.  We used to put a feeler out to
15  our engineer and different places, but I can't tell you the
16  exact date.
17    Q    Were there other meetings of the township
18  supervisors at which this land development and subdivision
19  ordinance was discussed besides the one at which it was
20  passed?
21    A    Oh, yes.
22    Q    And how do you recall that?  I mean, just in
23  keeping the minutes, is that it?
24    A    Yes.
25    Q    Was it discussed on a regular basis at the

60

1  regular monthly meetings?
2    A    Only if there was activity, you know, going
3  on.
4    Q    What about -- you say there were two other
5  ordinances, a driveway ordinance, correct?
6    A    Yes.
7    Q    And a privy ordinance?
8    A    Right.
9    Q    All passed on July 7th, according to the
10  subdivision and land development ordinance --
11    A    Yes.
12    Q    -- right?
13    A    Yes.
14    Q    Did you provide us with copies of the highway
15  and -- I mean the driveway and privy ordinances?
16    A    I think they're in the back of -- probably
17  not.
18    Q    Whose idea was it initially to pass a
19  subdivision and land development ordinance?
20    A    I don't know.
21    Q    You don't recall who first raised the issue?
22    A    No.
23    Q    Do you recall how it was raised?
24    A    No, I don't.
25    Q    Well, you said that it was discussed on a

61

1  number of occasions, correct?
2    A    Yes, I did.
3    Q    Do you recall the nature of those discussions?
4    A    No.
5    Q    Do you recall who talked about it?
6    A    No.
7    Q    You don't recall anything about any of the
8  discussions?
9    A    No, I don't.
10    Q    At the meeting that was held, according to
11  you, on July 10th, correct?
12    A    Yes.
13    Q    Was there any discussion among the public over
14  the driveway ordinance?
15    A    I don't recall.
16    Q    Was there any discussion about the privy
17  ordinance?
18    A    I don't recall.
19    Q    How did the driveway ordinance come up?  Whose
20  idea was that, do you recall?
21    A    I don't know.
22    Q    Do you know when it was first raised?
23    A    I don't -- I don't know.
24    Q    What about the privy ordinance, when was that
25  first raised?



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

62

1    A    I don't know that either.
2    Q    I think you had mentioned -- so prior to the
3 passage of the driveway ordinance, did the township collect
4 fees for driveways for when a resident wanted to put in a
5 driveway?
6    A    Not that I'm aware of.
7    Q    What about for the privies? Was there a fee
8 that was paid when somebody wanted to put a privy in?
9    A    Not that I'm aware of. Not to the township.
10    Q    Are you aware of fees being paid to anybody
11 else in connection with a privy before the ordinance was
12 passed?
13    A    Only the SEO.
14    Q    What about the driveway, are you aware of fees
15 being paid to anybody else?
16    A    No.
17    Q    I think that you had mentioned earlier that
18 you didn't know what the application for building permits
19 looked like. I'm going to show you a document that we are
20 going to mark as Wirth Exhibit 3. That's for you.
21        (Application for building permit produced and
22 marked as Wirth Exhibit No. 3.)
23 BY MS. MONTGOMERY:
24    Q    I'd ask you to take a look at it for me.
25    A    I didn't say that I didn't know what that

---

63

1 application looked like. What I said was that I didn't know
2 where -- what -- you asked me where he keeps these things
3 and what that looked like and I don't know that, but I do
4 know what this application looks like.
5    Q    Well, I'm not going to argue with you because
6 the record will speak for itself, but I did ask you what did
7 they look like, were there many pages, what's an application
8 look like, a lot of pages, one page, two pages, and you said
9 you didn't know. So I'm going to show you this to see if
10 you can now talk to me about what these applications look
11 like, okay.
12        MS. MONTGOMERY: Tony, do you have your copy?
13 This is Exhibit 3.
14        THE WITNESS: I know what this is.
15 BY MS. MONTGOMERY:
16    Q    What is it?
17    A    It's a -- it's the application for the
18 building permit.
19    Q    For?
20    A    For?
21    Q    Is this a standard application for a building
22 permit?
23    A    Yes.
24    Q    Is this the standard size of the application
25 for the building permit?

---

64

1    A    You mean paper size?
2    Q    Yes, paper size.
3    A    Yes.
4    Q    Just one sheet, correct?
5    A    Yes.
6    Q    So when I asked you earlier, you know, about
7 getting the building applications for building permits from
8 Van Dommelen and you indicated that they were cumbersome and
9 then I asked you, well, how big are they, can you now
10 explain to me why we couldn't get these one sheet -- one
11 sheet applications for building permits?
12    A    I -- you asked me what he -- where he keeps
13 them or what he does with them and how big this is and I
14 said I don't know, and I don't know. I was not referring to
15 a piece of paper.
16    Q    I'm also going to show you a document that
17 we're going to mark as Wirth Exhibit 4.
18        (Minutes dated 7/10/00 produced and marked as
19 Wirth Exhibit No. 4.)
20 BY MS. MONTGOMERY:
21    Q    I'd ask you to look at that. Do you recognize
22 that document, Miss Wirth?
23    A    Yes.
24    Q    Can you describe it for the record, please?
25    A    It's the minutes for July 10th, 2000.

---

65

1    Q    For the meeting of the supervisors --
2    A    Yes.
3    Q    -- of Jackson Township?
4    A    Yes.
5    Q    Do you see where it says meeting adjourned
6 7:30?
7    A    Yes.
8    Q    So you indicated the meeting started as -- as
9 advertised at 7 p.m.?
10    A    Right.
11    Q    And I had asked you earlier if you knew how
12 long the meeting lasted, correct?
13    A    Yes.
14    Q    Now, that would indicate that the meeting
15 lasted a half hour. Does that sound right to you?
16    A    Yes, it does.
17    Q    Now, these minutes do not indicate who was
18 present at the meeting, correct?
19    A    That's exactly right.
20    Q    Is that because you have a separate attendance
21 sheet that would indicate who was present at the meeting?
22    A    No, I probably didn't have an attendance sheet
23 then.
24    Q    Earlier you testified that you now keep an
25 attendance sheet to record who's present at the township

---



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

66

1  meetings, correct?
2     A     Yes.
3     Q     When did you start doing that?
4     A     January, February this year, something like
5  that.
6     Q     Why did you start doing that?
7     A     Because I cannot remember everybody that's
8  there.  And when people ask me, I don't know so that's why I
9  did that.
10    Q     You don't record them in the minutes, who's
11 there?
12    A     No.
13    Q     You don't record who's at the meetings ever
14 until this January?
15          MR. SHERR:  Objection, asked and answered and
16 it's argumentative.  You can answer.
17          THE WITNESS:  No.
18          MS. MONTGOMERY:  Thank you.
19 BY MS. MONTGOMERY:
20    Q     Now that you're looking at these minutes and
21 thinking about this meeting, does that help you recall who
22 was present at this meeting?
23    A     Other than the supervisors you're saying?
24    Q     Yes.
25    A     I don't have any idea.

---

67

1     Q     Does it help you recall whether there were any
2  members of the public present at the meeting?
3     A     No, I can -- usually there is, but I can't
4  tell you from looking at this if there was anybody there.
5     Q     Let's talk about the procedures that the board
6  of supervisors uses in connection with enacting ordinances.
7  Are you familiar with that?
8     A     I don't know what you want -- I don't know
9  what you mean.
10    Q     What I mean is the process, what process does
11 the board of supervisors use in connection with enacting an
12 ordinance?  What steps do they have to take?
13    A     I know it has to be advertised.  It has
14 to be made available to the public.  That's all I know that
15 -- and it's got to be passed at a meeting and put down in
16 the minutes.
17    Q     I mean, I think you testified earlier in
18 connection with describing your duties as the secretary and
19 the treasurer that you keep all the business of the township
20 and that you basically keep track of all the things that the
21 township has to do and you said -- and the record will speak
22 for itself, but I think you described it to me as there are
23 a lot of things that you have to do, say to get grants or to
24 do this or to do that and you keep all that stuff organized
25 for the township supervisors; isn't that correct?

---

68

1     A     That is correct.
2     Q     So in connection with what the board of
3  supervisors has to do in enacting an ordinance, do you have
4  some sort of a file or something that helps you help them
5  make sure that they're doing what they're supposed to do in
6  enacting an ordinance?
7     A     No.
8     Q     Why is that?
9     A     We've only done these three ordinances and
10 they were taken care of by Larry Newton.
11    Q     So you weren't involved in it at all,
12 discussing --
13    A     I don't know what -- repeat the question.
14    Q     You weren't involved in saying, okay, now we
15 have to do this to make sure that we -- you know, do
16 whatever we have to do to get the ordinance enacted, you
17 weren't involved in that?
18    A     I talked to Larry Newton about it, yes, and I
19 think I talked to the county planner about it.
20    Q     Do you remember the substance of those
21 conversations?
22    A     I think I asked him for the routine we needed
23 to do and Larry took care of it.
24    Q     You asked Larry Newton for the routine that
25 you had to do?

---

69

1     A     Yes, and for the county -- and to the county
2  planner.
3     Q     And the county planner?
4     A     Um-hum.
5     Q     When you say the county planner, are you
6  referring to Richard Stahl?
7     A     Yes.
8     Q     What did Larry Newton tell you that you had to
9  do in connection with the ordinance?
10    A     You mean other than advertising the ordinance
11 and making it available?
12    Q     Right.
13    A     Just exactly what I told you before, that's
14 what he told us to do.
15    Q     Do you recall anything else, that's all I'm
16 asking you?
17    A     No.
18    Q     How many occasions did you talk to Larry
19 Newton about the enacting of a subdivision and land
20 development ordinance?
21    A     I have no idea.
22    Q     You can't remember?
23    A     No.
24    Q     Can you say you talked to him frequently or
25 infrequently?  Can you narrow it that way?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

70

1　A　Probably infrequently.
2　Q　Over the course of how many years?
3　A　Over the course of how many years?
4　Q　Yes.
5　A　I don't know what you're asking.
6　Q　Well, I'm asking you how often you talked to
7　Larry Newton about the enactment of a subdivision and land
8　development ordinance and you said probably infrequently.
9　And I'm asking you infrequently over the course of how many
10　years?
11　A　Okay, probably in the beginning of -- I don't
12　know.  I don't know how many times I talked to him.
13　Q　Did you have occasion to talk to Larry Newton
14　about the Corneal property?
15　A　Yes.
16　Q　Can you recall how many times you talked to
17　Larry Newton about the Corneal property?
18　A　No, I can't.
19　Q　Did you ask Larry Newton to give you some
20　guidance or advice about how to deal with the Corneal
21　property?
22　A　No.
23　Q　What did you talk to him about in connection
24　with the Corneal property?
25　A　I can't remember -- we talked to him about the

---

71

1　lawsuit, I know that.
2　Q　About this lawsuit you mean?
3　A　This lawsuit and the state lawsuit, the
4　lawsuit we initiated.
5　Q　Do you recall talking to him about the Corneal
6　property prior to the initiation of the lawsuit?
7　A　Yes, we did do that.
8　Q　Was Larry Newton generally aware of what was
9　going on with the Corneal property prior to the initiation
10　of the lawsuit?
11　A　I don't know.  I can't answer that.
12　Q　Do you have reason to believe in your
13　interaction with Larry Newton that he knew generally what
14　was going on in connection with the Corneal property between
15　the Corneals and the township?
16　A　I don't really know whether Larry did or not.
17　Q　Well, let's try and just, you know, back up a
18　second and maybe we can jog your memory somehow.  You
19　indicated that you know that you spoke with Larry Newton
20　prior to initiation of the lawsuits about the Corneal
21　property, correct?
22　A　Yes, we did.
23　Q　On what occasions?  At township meetings?
24　A　No, he was not at the township meetings.
25　Q　On what occasions then?

---

72

1　A　It would have to be on the telephone.
2　Q　On the telephone between you and him?
3　A　Well, it could have been between me, it could
4　have been on the speaker phone with one of the supervisors.
5　You know, we've talked about things.
6　Q　You recall both occurrences?
7　A　Yes.
8　Q　Conference calls with the supervisors and
9　Larry and you and conversations separately between you and
10　Larry, correct?
11　A　I said supervisor.
12　Q　Supervisor.  Which supervisor?
13　A　I don't know.  I don't know if they were all
14　there.  I'm just saying that's what I said.  I don't know.
15　Q　Well, give me an idea of how you would come to
16　talk to Larry about the Corneal property?  Would you call
17　him up?
18　A　Most of the time he called us because the
19　information went from Jim Himes to Larry and then through
20　Larry to us.
21　Q　Who is Jim Himes?
22　A　He was a -- I think it's Jim Himes.  He was an
23　attorney that Mr. Corneal was using in Huntingdon.
24　Q　So you're saying that Larry would call you and
25　say I've spoken to Jim Himes and this is what I understand

---

73

1　to be going on with the Corneals?
2　A　No, what I'm saying is we got information from
3　Larry, like the first document we got came to Larry from --
4　I guess it -- I think it was either him or Simpson.  I'm not
5　sure how it got to Larry.
6　Q　Who is Simpson, who are you referring to?
7　A　The surveyor I believe that did the original
8　survey.
9　Q　When you say the first document, what do you
10　mean the first document?
11　A　We had a land -- a plot plan.
12　Q　So that went to Larry and then came to you?
13　A　Yes, but I'm not sure how Larry got it.
14　Q　So prior to the lawsuit which was initiated
15　last summer, summer 2000, July 2000 --
16　　　　MR. CORNEAL:  July.
17　BY MS. MONTGOMERY:
18　Q　Can you estimate how many times you talked to
19　Larry Newton about the Corneal property?
20　A　I don't recall.
21　Q　Was it more than twice?
22　A　Oh, I'm sure it was more than twice.
23　Q　Do you think it was more than 10 times?
24　A　I doubt it.
25　Q　Do you think it was more than five?

---

**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

74

1  A    I don't know.
2  Q    But you're sure it was more than two?
3  A    Yes. I talked to him more than twice.
4  Q    Do you recall what you talked to him about?
5  A    Not really. I've talked to Larry about a lot
6  of things with the township.
7  Q    Now, you mentioned that you remember being on
8  a conference call with Larry and at least one of the other
9  supervisors, one of the supervisors, correct?
10  A    Yes.
11  Q    Do you recall what you talked about to Larry
12  during that meeting or what anybody talked about to Larry
13  during that meeting?
14  A    I think that was after the lawsuit was served.
15  Q    Did you or the supervisors to your knowledge
16  initiate any separate meetings with Larry -- or have any
17  separate meetings with Larry, I should say. Have any
18  separate meetings with Larry to discuss the Corneal property
19  prior to the lawsuit?
20  A    Prior?
21  Q    Yes.
22  A    I can't -- I can't recall that either.
23  Q    Have you ever been at a township meeting where
24  Mr. Corneal was present?
25  A    Twice.

---

75

1  Q    Twice?
2  A    That I recall.
3  Q    You recall twice. Do you recall when those
4  times were?
5  A    I think it was February and April. It's in
6  the minutes.
7  Q    February and April of --
8  A    Or maybe it was February and March or January
9  and March.
10  Q    Of 2000?
11  A    Yes, it was either January and March or --
12  yeah, maybe that's when it was.
13  Q    Do you recall what happened at those meetings?
14  A    Yes.
15  Q    Can you tell me what happened at the February
16  -- let's start with the February meeting?
17  A    Was it February?
18  (Pause.)
19  THE WITNESS: In -- what's the date, February
20  -- February 7th when Mr. Corneal came and asked the
21  supervisors to sign his subdivision ordinance -- or his
22  subdivision -- I'm sorry, to sign his subdivision plan.
23  BY MS. MONTGOMERY:
24  Q    In February of 2000?
25  A    Correct.

---

76

1  Q    Do you recall what happened at that meeting?
2  A    Yes, they told him that there was a moratorium
3  and we wouldn't be signing -- approving any more
4  subdivisions.
5  Q    Do you recall any contact with Mr. Corneal
6  prior to that February meeting?
7  A    I really don't.
8  Q    You don't recall speaking with him?
9  A    No, I don't.
10  Q    Do you recall him being at any other meetings?
11  A    No.
12  Q    So let's talk a little bit more about that
13  meeting, okay. Mr. Corneal came in, who else was present?
14  A    The supervisors.
15  Q    Anybody else?
16  A    I don't -- there was people there, but I --
17  I'm sure. I don't know who they were.
18  Q    Do you recall how many people were there?
19  A    There's usually -- there's usually four, but I
20  can't swear who they were.
21  Q    Is it typically the same four people?
22  A    Yes.
23  Q    Who are they?
24  A    Denson Groenendaal. Rick Saunders, and I
25  can't swear to that because he was ill for a long time, but

---

77

1  he normally is there. And it's usually Barb Hawbaker and
2  Bet White, but I can't swear that any of those were there.
3  I don't know. And maybe Mike Koch.
4  Q    Mike Koch?
5  A    Maybe. I don't know.
6  Q    So those four individuals that you mentioned
7  earlier are usually there. Is Mike Koch sometimes usually
8  there or what?
9  A    Sometimes he's there, sometimes he's not.
10  Q    Anybody else there from time to time?
11  A    Mr. Corneal.
12  Q    Anybody else?
13  A    I can't remember.
14  Q    The four individuals that you named earlier
15  and Mr. Koch, have they been attending township meetings for
16  a long time?
17  A    Sometimes.
18  Q    Well, the question is a little different than
19  that. Is their attendance -- does their frequent
20  attendance, as I think you described it, go back several
21  years?
22  A    Yes.
23  Q    Does it go back all six years you've been with
24  the township?
25  A    No.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



**WIRTH, ANN**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

78

1    Q    When did it start?

2    A    I don't remember when they started --

3    Q    Do you know why these particular people always

4    attend township meetings?

5    A    I would say because they're interested in

6    what's going on in the township.

7    Q    Are they the only people that attend township

8    meetings or are there others in addition to them from time

9    to time?

10    A    Sometimes there will be other people.

11    Q    Do you ever recall -- do you know who the

12    Hewetts are?

13    A    Yeah, I do.  I do know who the Hewetts are.

14    Q    Do you recall the Hewetts being at any

15    township meetings?

16    A    They might have been, I don't know.  They

17    might have been at that meeting.  I'm not sure.

18    Q    Do you recall them being at one meeting, more

19    than one meeting?

20    A    I remember that they were at -- they were

21    definitely in the April meeting.

22    Q    They were definitely in the April meeting?

23    A    I remember that.

24    Q    Why do you recall that?

25    A    Because that was the night that Mr. Corneal

---

79

1    said he was not subdividing and they were sitting there and

2    I remember that.  And they -- I don't know what ...

3    Q    That meeting that they were at, that April

4    meeting, do you recall who else was there?

5    A    No.  It could have been the same group.

6    Q    At the February 7, 2000 meeting you indicated

7    that Mr. Corneal presented his proposed subdivision plan to

8    the township supervisors, correct?

9    A    Right.

10    Q    What happened to the subdivision plan?  Did he

11    hand it to them?

12    A    No.

13    Q    He didn't hand it to them?

14    A    No.

15    Q    What did he do with it?

16    A    He took it with him.

17    Q    He never handed it over to any of the township

18    supervisors?

19        MR. SHERR:  Objection.  It's been asked and

20    answered.  You can answer.

21        MS. MONTGOMERY:  I want to make sure she

22    understands the question.

23        THE WITNESS:  They may have looked at it.  I'm

24    not sure.  I can't remember if they looked at it and -- but

25    we did not keep it.

---

80

1    BY MS. MONTGOMERY:

2    Q    Why not?

3    A    I don't know.  I don't remember what the -- I

4    just know what was here, okay, so -- but it never stayed

5    with the supervisors.  If they looked at it that night, I

6    don't remember that.

7    Q    Did they hand it back to him?

8    A    Yes, it never stayed with us.

9    Q    Did Mr. Corneal ask them to keep it, do you

10    know?

11    A    No, not that I'm aware of.

12    Q    What else happened at that February 7, 2000

13    meeting, if you recall?

14    A    Other than what's in the minutes?

15    Q    Well, anything that you recall.

16    A    I don't recall anything other than what's in

17    the minutes.

18    Q    Did the supervisors know that Mr. Corneal was

19    going to bring his subdivision plan into that meeting?

20    A    I don't know that either.

21    Q    Did you know?

22    A    I can't remember ever talking to Mr. Corneal

23    until this point.

24    Q    Do you recall talking to anybody else about

25    Mr. Corneal prior to that February 7th meeting?

---

81

1    A    No, I don't.

2    Q    Now, you had mentioned that there was -- you

3    keep an agenda, right?

4    A    Yes.

5    Q    Was Mr. Corneal's subdivision plan on the

6    agenda for that meeting?

7    A    I don't remember that, I don't.

8    Q    You mentioned earlier that you recall the

9    Hewetts being at the April meeting.

10    A    I do.

11    Q    Did you have occasion to talk to the Hewetts

12    before the meeting?

13    A    John Hewett called and asked if the meeting

14    was on that day and I -- you know, if we were having our

15    regular meeting and I said yes.

16    Q    So you knew they were going to be there?

17    A    He didn't -- well, I knew he called to ask

18    about the meeting, that's all I knew.

19    Q    I'm going to give you a document that we're

20    going to mark as Wirth Exhibit 5.  Let me give a copy to the

21    court reporter.

22        (Minutes dated 2/7/00 produced and marked as

23    Wirth Exhibit No. 5.)

24    BY MS. MONTGOMERY:

25    Q    I'd ask you to identify it for the record,

---



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

82

1    please.
2        A        It's the minutes from February 7th, 2000.
3        Q        Now, as you're looking at those minutes,
4    there's a reference to Denny Grandthal, is that --
5        A        Groenendaal.
6        Q        I'm sorry?
7        A        That's Denny Groenendaal.  I have it spelled
8    wrong here.
9        Q        Denny Groenendaal?
10       A        Right.
11       Q        Presented a copy of the concerns and opinions
12   of the taxpayer's associations on the proposed subdivision
13   ordinances, right?
14       A        Yes, he did.
15       Q        Do you have a copy of those concerns and
16   opinions?
17       A        Yes.
18       Q        Did you provide them in connection with your
19   search for documents for this lawsuit?
20       A        You didn't ask me for those.
21       Q        You do have a copy of them now, you said,
22   right?
23       A        Pardon?
24       Q        You do have a copy of them in your files,
25   right?

83

1        A        Yeah, I believe I did see those when I went
2    through the files.
3        Q        Do you recall anything about those concerns
4    and opinions?
5        A        No.
6        Q        So there was discussion at this February 7th
7    meeting about this proposed subdivision ordinance?
8        A        Obviously.
9        Q        You don't recall anything about it?
10       A        No, I don't, other than what's here.
11       Q        Now, at this February 7, 2000 meeting you
12   indicated that the township supervisors told David Corneal
13   that there was a moratorium in place, correct?
14       A        Yes.
15       Q        A moratorium on what?
16       A        Approving subdivisions.
17       Q        And when did that moratorium go into place?
18       A        At the January meeting.
19       Q        Was there some sort of a resolution or
20   something indicating that the moratorium was being placed?
21       A        No, it's only in the minutes.
22       Q        It's only in the minutes.  Was the moratorium
23   discussed at any earlier meetings?
24       A        I don't recall.
25       Q        But you do recall that there's no resolution

84

1    or other written document concerning the moratorium,
2    correct?
3        A        Yes, I do recall that.
4        Q        So do you recall -- I'm not sure if I asked
5    you this question and I apologize if I already did, but I'll
6    ask you again.  Do you recall when the moratorium was first
7    discussed at a township meeting?
8        A        The January meeting.
9        Q        That was the first time?
10       A        That's when it's in the minutes.  I don't
11   recall that it was discussed beforehand.
12       Q        You only missed one meeting, correct?
13       A        Yes.
14       Q        So if it was discussed, it would be in the
15   minutes, correct?
16       A        It should be.
17       Q        Now, was there any discussion about the
18   moratorium prior to the January meeting informally among the
19   supervisors and you?
20       A        I don't recall.
21       Q        Well, I'll just ask you more generally.  Do
22   you recall discussing the moratorium at any time other than
23   at the January meeting?
24       A        No.
25       Q        With anybody?

85

1        A        No.
2        Q        You didn't?
3        A        Well, I can't say anybody.
4        Q        Why is that, why can't you say anybody?
5        A        I don't know if I did.
6        Q        Because you just don't remember?
7        A        I just don't remember.
8        Q        Do you know what Mr. Corneal said at the
9    February meeting in response to the supervisors telling him
10   that there was a moratorium in place?
11       A        No.  Other than what's in my minutes, I don't
12   remember.
13       Q        If I tell you that Mr. Corneal told the
14   supervisors that the moratorium was illegal, does that jog
15   your memory at all?  Do you recall him --
16       A        I don't remember him saying that.
17       Q        You don't recall him saying anything --
18       A        Other than what I have in my minutes, I don't
19   recall.
20       Q        Now, you mentioned that at the April meeting
21   the Hewetts were present, correct, and that they -- that
22   John Hewett had called ahead of time and asked what was on
23   the agenda, correct?
24            MR. SHERR:  Objection.
25   BY MS. MONTGOMERY:



86

1    Q    What did you say?
2         MR. SHERR: Objection. It's been asked and
3    answered and you're misstating testimony now on the record,
4    misstating the witness's testimony. You can answer it.
5         THE WITNESS: What are you asking me?
6         MR. SHERR: She's asking you what Hewett said
7    when he called up.
8         THE WITNESS: He just wanted to know what was
9    on the agenda.
10   BY MS. MONTGOMERY:
11   Q    Like I said, I'm just laying a little
12   foundation so we can go back to that meeting, okay. If ever
13   I mischaracterize anything you say earlier, you should
14   correct me because I don't want to do that, okay?
15   A    Okay.
16   Q    In the course of that conversation did you
17   have any -- you know, how long was that conversation with
18   John Hewett?
19   A    I don't remember.
20   Q    Do you know John Hewett's wife?
21   A    I don't know as he has a wife.
22   Q    Or his --
23   A    I don't know the situation there. I don't
24   know. I don't want to misstate that because I don't know.
25   Q    Well, we call them the Hewetts.

87

1    A    I probably did and that's probably like the
2    7th, I did that wrong, but I don't know that.
3    Q    Do you know the woman who keeps company with
4    John Hewett?
5    A    I've only ever seen her one time.
6    Q    Do you know her name, her first name?
7    A    Joanne Smith, I think it is. Smith is her
8    last name.
9    Q    Joanne Smith, okay. Did she come to the
10   meeting with John Hewett in April?
11   A    I think she was there that night.
12   Q    Did you have any discussions with the Hewetts
13   prior to the meeting other than the telephone call that he
14   placed to you?
15   A    No.
16   Q    No informal discussion, no chitchat?
17   A    No.
18   Q    What about after the meeting?
19   A    I think she came up to me and talked to me,
20   either she or -- or one of them did. I think it was her.
21   Q    What did they talk about?
22   A    She introduced herself to me that night.
23   Q    Do you recall what they talked to you about?
24   A    They were asking -- they were asking how soon
25   we were going to pass the subdivision ordinance.

88

1    Q    Did they tell you why they were interested in
2    knowing how soon that you --
3    A    No.
4    Q    Did you understand why they wanted to know?
5    A    I don't know what you want me -- I don't know
6    what you're asking me.
7    Q    I'm asking you if you understood why they were
8    asking you about how soon you were going to pass the
9    subdivision ordinance?
10   A    I probably did.
11   Q    You probably did understand?
12   A    Yes.
13   Q    What was your understanding?
14   A    That they were going to move into the
15   neighborhood, you know, and they wanted to know about the
16   subdivision ordinance and when we were going to approve it.
17   Q    Do you know why they wanted to know that,
18   though?
19   A    No, I don't know that.
20   Q    Do you know where they were going to move?
21   A    Yes, in Mr. Corneal's farmhouse.
22   Q    Do you know how they were going to go about
23   moving into Mr. Corneal's farmhouse?
24   A    I have no idea.
25   Q    Do you know whether they were going to

89

1    purchase Mr. Corneal's --
2    A    I do know they were going to purchase it.
3    Q    Do you know if they were going to purchase the
4    farmhouse and anything else?
5    A    Yes, it was on the plot plan. They were going
6    to purchase the farmhouse and some acreage.
7    Q    So in April 2000 you understood that that was
8    why they were asking about the subdivision ordinance?
9    A    Right.
10   Q    Do you recall any other aspects of that
11   conversation --
12   A    No.
13   Q    -- any more specifics?
14   A    No.
15   Q    Let me finish my question. It's for her sake.
16   A    I'm sorry.
17   Q    Did they express any concern to you about
18   their purchase of Mr. Corneal's farmhouse?
19   A    Not that I recall.
20   Q    Did you notice whether or not they talked to
21   any of the supervisors?
22   A    They might have. I don't know. I'm usually
23   closing my books so I don't know.
24   Q    I'm going to show you a document that we're
25   going to mark as Wirth Exhibit 6.



90

1          (Minutes dated 1/4/00 produced and marked as
2   Wirth Exhibit No. 6.)
3   BY MS. MONTGOMERY:
4       Q       Do you recognize this document that we've
5   marked as Wirth Exhibit 6?
6       A       I do, but I don't recognize the writing that's
7   on the bottom. I don't know where that came from.
8       Q       That was one of my questions for you, thank
9   you. Now, am I correct in saying that this was the meeting
10  in which the moratorium was approved --
11      A       Yes, you are.
12      Q       -- or passed or a resolution --
13      A       Yes, you are.
14      Q       Do you have any documents in your office about
15  the moratorium that you didn't produce?
16      A       No.
17      Q       Do you know whether any documents exist
18  related to the moratorium?
19      A       No.
20      Q       You don't know?
21      A       No.
22      Q       Or they don't exist? I'm just asking --
23      A       They don't -- this is it.
24      Q       They don't exist?
25      A       Right.

91

1       Q       So I notice here that the meeting opened at
2   7:10 p.m., correct?
3       A       No, there's another section to this. You
4   don't have both sections.
5       Q       What is the other section?
6       A       It's the reorganizational meeting where we do
7   all the appointing of the supervisors and state what our tax
8   rates are going to be and all that and you don't have the
9   other section here.
10      Q       So was this the meeting -- the meeting started
11  at --
12      A       That started at seven and this one started at
13  7:10.
14      Q       Was the meeting started at seven open to the
15  public?
16      A       Always.
17      Q       Always, okay. Do you have separate minutes
18  for that meeting?
19      A       Yes.
20          MR. SHERR: And they have been provided.
21  BY MS. MONTGOMERY:
22      Q       So it looks like the regular meeting at which
23  the moratorium was discussed lasted from 7:10 to 7:35 p.m.,
24  correct?
25      A       Yes.

92

1       Q       Thank you. Do you know whether they
2   advertised -- or did you advertise this particular meeting
3   on January 4, 2000 where the moratorium was discussed?
4       A       I didn't advertise it.
5       Q       Do you know whether anybody advertised it?
6       A       I'm not sure if Larry did or not. I don't
7   know.
8       Q       Did you put one of those notices on the
9   township or -- it's the firehouse door, right?
10      A       Yes.
11      Q       Did you put one of these notices on the
12  firehouse door?
13      A       For what?
14      Q       About the fact that the moratorium was going
15  to be discussed.
16      A       Probably not.
17      Q       Did you talk to Mr. Newton about the
18  moratorium prior to this January meeting?
19      A       I probably did.
20      Q       You probably did?
21      A       Yes.
22      Q       Why do you think you probably did?
23      A       I would have wanted to know what to do.
24      Q       You would have wanted to know whether it was
25  okay to do the moratorium you mean?

93

1       A       I don't know what you're asking me.
2       Q       Well, you said you would have wanted to know
3   what to do. I'm just trying to get a feel for -- what do
4   you mean? You wanted to know what to do. You wanted to
5   know whether to advertise it or was it okay to do the
6   moratorium or what?
7       A       I don't know if I would have asked him about
8   the advertisement. I don't know if I would have done that,
9   but I probably would have asked him about this, if it was
10  all right to put it in the minutes.
11      Q       If it was okay to put the existence of the
12  moratorium in the minutes?
13      A       Yes.
14      Q       Would you have asked him whether it was okay
15  to impose the moratorium?
16      A       I'm not sure I asked him that.
17      Q       You don't recall?
18      A       No.
19      Q       You had mentioned earlier that you did
20  research for the supervisors?
21      A       Sometimes.
22      Q       What kind of research?
23      A       I would ask questions about -- well, I call to
24  see what stone rates are and all those kind of things.
25      Q       You call and find out what procedures you have

WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

94

1  to follow?  I mean --
2  A    Sometimes.
3  Q    Do you call Larry Newton to find out what
4  procedures you would have to follow?
5  A    If they ask me to.
6  Q    Have you done that in connection with the
7  subdivision and land development ordinance?
8  A    Some things, some parts of it.
9  Q    You've called Larry Newton and asked is this
10  okay or is that okay?
11  A    I'm not sure I've talked to Larry Newton about
12  everything.  I've talked to PSATS, you know.
13  Q    So that's the kind of research you do for the
14  township, just --
15  A    Yes.
16  Q    Anything?  Is it just a broad range of
17  research that you do?
18  A    When it's needed I do that.
19  Q    Do you know whether the supervisors talked to
20  Larry Newton about the moratorium?
21  A    You'll have to ask them.
22  Q    Was Larry Newton present at the meeting?
23  A    No.
24  Q    Why do you recall that?
25  A    Because Larry never comes to the meeting

95

1  unless I request him.
2  Q    And you didn't request him to come to this
3  meeting?
4  A    No.
5  Q    I'm just going to try, you know, and ask you
6  some questions just so you can try and remember a little bit
7  more about discussing the moratorium.  Maybe it won't work,
8  maybe it will work, but I just want to try to get as much
9  factual information as I can so we can understand the
10  moratorium.
11      Is there anybody else that you recall asking
12  about the moratorium prior to the day it was passed?
13  A    Like who?
14  Q    I'm asking you, anybody.
15  A    I don't remember anybody asking me about the
16  moratorium.
17  Q    Did you discuss it with the township
18  supervisors?
19  A    We would have discussed it, yes.
20  Q    In what capacity, in what context?
21  A    I don't know.
22  Q    You mean over the telephone?
23  A    I don't remember if we would have talked about
24  it over the telephone or at the meeting.  I'm sure we've
25  discussed it.  I just don't remember when.

96

1  Q    Well, there's no -- if you had discussed it at
2  prior township meetings, it would be reflected in the --
3  A    It would be in the minutes.
4  Q    Right.  So if it's not in the minutes, it
5  wasn't discussed, right?
6  A    Right.
7  Q    Now, I just want to ask you, do you recall who
8  first brought up the idea of the moratorium?
9  A    I don't.
10  Q    You don't know whose idea it was?
11  A    No.
12  Q    Was there one particular supervisor who was --
13  in your memory who was a proponent of the moratorium more
14  than any other supervisor?
15  A    No, I cannot remember anybody being that.
16  Q    Now, do you recall any specifics about
17  discussions of the moratorium at the January meeting?
18  A    Other than what's in my minutes?
19  Q    Yes.
20  A    No.
21  Q    Do you recall who else was present at the
22  January meeting?
23  A    All the supervisors.
24  Q    Anybody else?
25  A    Me.  I'm not sure about Dave Van Dommelen.  I

97

1  don't know.  I don't know.
2  Q    Do you recall whether there was any member of
3  the public present?
4  A    I don't know if Mr. Corneal was there or not.
5  I don't know.  I guess it says he was, right?  No, he wasn't
6  at the January meeting.  It doesn't say that.  I don't know.
7  Q    In your minutes it indicates that -- in the
8  minutes of your January 4 meeting, which I guess is
9  Exhibit 6, it states that the supervisors stated that no
10  more subdivisions will be approved.  Do you know which
11  supervisor said that?  I mean, they didn't say that in
12  unison, right?  One supervisor reported that, correct?
13  A    I don't -- that is just that they all agreed
14  on it.  They all agreed.  So no one in particular, they just
15  all agreed, and that's what I wrote down there.
16  Q    So it's just a summary of what they stated?
17  A    Right.
18  Q    At the township meetings does one supervisor
19  sort of take the lead or, you know, act as the chair of the
20  meetings or anything like that?
21  A    There is a chair.
22  Q    And who is that?
23  A    In 2000 it was Ralph Weiler.
24  Q    So he sort of lead the agenda?  Does he
25  announce the items on the agenda for discussion or do you do

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

98

1  that?
2  A   He does that.
3  Q   What's his role as chairman exactly?  What all
4  does he do?
5  A   He leads the meeting.
6  Q   When he leads the meeting -- so he says now
7  we're going to talk about X and now we're going to talk
8  about Y?
9  A   Yeah.
10  Q   Do you recall him doing that that night?
11  A   No.
12  Q   In your minutes it also refers to as soon as
13  we get the review from the planning commission.  What are
14  you talking about, the review from the planning commission?
15  Do you recall?
16  A   The review from the planning commission would
17  be one of the reviews from -- for the subdivision packet
18  that we had put together.
19  Q   You had put together a packet?
20  A   Yes.
21  Q   Did the packet include anything about the
22  moratorium?
23  A   I don't recall.
24  Q   It says that the supervisors state that no
25  more subdivisions will be approved.  Was it put to a formal

99

1  vote or anything?
2  A   I don't recall whether they passed a motion or
3  -- that's what I wrote down.
4  Q   You don't recall whether they said all in
5  favor say aye?
6  A   This is what I wrote and this is what I can
7  testify to.
8  Q   Typically when they do something like this, do
9  they do it sort of like all in favor say aye, all in favor
10  say no and --
11  A   Yes, they typically do.  And I did not write
12  that down.
13  Q   If you didn't write it down, does that mean it
14  didn't happen?
15  A   No.
16  Q   Now, there's another sentence in here that
17  says that the county is now doing the boiler plate
18  subdivision ordinance in these minutes.
19  A   Yes, they are.
20  Q   But Jackson Township had already put a lot of
21  time into the purpose -- do you mean proposed?
22  A   Yes.
23  Q   Proposed ordinance.  What do you mean by a lot
24  of time?
25  A   Two years.

100

1  Q   What did you do in that two years?
2  A   We got subdivision ordinances from different
3  areas and looked to see what we felt was unique to Jackson
4  Township because we are a unique area there.  And we took
5  pieces from this subdivision and that subdivision and we put
6  them together to meet the needs of our township.
7  Q   Who did that work?
8  A   The supervisors.
9  Q   Did you help?
10  A   Yes, I read a lot of subdivision ordinances.
11  Q   So did you have discussions with them over the
12  telephone about I like this -- part of this subdivision
13  ordinance and not that part of that other subdivision
14  ordinance?
15  A   Whether I liked something or not?
16  Q   Whether you thought it would work for Jackson
17  Township or not.
18  A   That's not my decision.
19  Q   You read a lot of subdivision ordinances,
20  though?
21  A   Yes, I did.
22  Q   Do you recall what subdivision ordinances you
23  read?
24  A   We had -- we had one from Porter Township, we
25  had one from Miller Township, we had one from -- our

101

1  engineer gave us kind of a boiler plate one.  We had one
2  from Tell Township and there was one from Lancaster County.
3  Q   Who is your engineer?
4  A   At the time it was EADS.
5  Q   How do you spell that?
6  A   E-A-D-S, all caps.
7  Q   So why were you the one reading the
8  ordinances?
9  A   We all were reading them.
10  Q   All the township supervisors and you were
11  reading them?
12  A   Yes.
13  Q   And then you would discuss them?
14  A   Yes.
15  Q   What, would you hold special meetings to
16  discuss them or telephone conference calls or what?
17  A   We had workshops to gather information on
18  them.
19  Q   Were they informal workshops --
20  A   Yes.
21  Q   -- that the group of you just all got
22  together?
23  A   Yes.
24  Q   Where did you get together?
25  A   Usually in my office.



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

102

1    Q    So do you have records of all those meetings
2    that you held?
3    A    No, they're not -- they were just workshops
4    for gathering information.
5    Q    Did you keep notes at those meetings or
6    anything?
7    A    The only notes I would have had I would have
8    written alongside of whatever we did and ...
9    Q    I'm going to show you another document that
10   I'm going to mark as Wirth Exhibit 7, the April 3, 2000
11   minutes of the Jackson Township supervisor meeting.
12        (Minutes dated 4/3/00 produced and marked as
13   Wirth Exhibit No. 7.)
14   BY MS. MONTGOMERY:
15   Q    Now, can you review these minutes for me?
16   A    Sure.
17   Q    Can you identify them for the record?
18   A    Yes, April 3rd, 2000 minutes, Jackson Township
19   Board of Supervisors.
20   Q    Now, take a moment and review them and see if
21   it helps you remember what went on at the meeting that
22   night. Now, this April 3rd meeting, is this the meeting
23   that the Hewetts were present at, correct?
24   A    Yes.
25   Q    Who else was present?

---

103

1    A    Well, I can see here Art Walters was there,
2    David Corneal and I don't -- I remember Denson Groenendaal
3    was there that night.
4    Q    And why do you remember that?
5    A    Because he spoke to Mr. Corneal that night.
6    Q    He spoke to him in the course of the meeting?
7    A    No, I think it was after.
8    Q    So you overheard that conversation?
9    A    No, I just saw them talking and I remembered
10   that. I don't know why.
11   Q    Anything else you remember about the meeting?
12   A    No.
13   Q    Now, these meetings would indicate that Mr.
14   Corneal at the April meeting discussed his sewage module,
15   right?
16   A    Yes, he did.
17   Q    Do you know whether this was the first time
18   Mr. Corneal ever came to a meeting and discussed his sewage
19   module?
20   A    To the best of my knowledge.
21   Q    To the best of your knowledge it was?
22   A    Um-hum.
23   Q    Your minutes indicate that he complained that
24   the supervisors would not sign his sewage modules; is that
25   right?

---

104

1    A    That's right.
2    Q    What did the supervisors respond to him in
3    response to that complaint?
4    A    Just what I have here.
5    Q    Well, try and remember what they said to him,
6    if you can.
7    A    That they couldn't approve the septic modules,
8    the sewage module.
9    Q    Now, your minutes indicate that they said that
10   even though he told them that he was not going to subdivide,
11   okay, that they still wouldn't issue him a building permit
12   or approve the sewage module; isn't that correct?
13   A    Let me see what it says here. What's in my
14   minutes is what happened.
15   Q    Okay, that's fair. Your minutes indicate that
16   they said they are not going to issue a building permit for
17   a property that they know is going to be subdivided. How
18   did they know it was going to be subdivided?
19   A    He had a prior meeting he -- he had a plot
20   plan in his hand, and I guess that was the February meeting.
21   Q    So was there a discussion between the February
22   meeting and the April meeting about Mr. Corneal's desire to
23   subdivide?
24   A    Discussion with who?
25   Q    With you and the supervisors.

---

105

1    A    Not that I'm aware of.
2    Q    During this period of time were you still
3    meeting to discuss the subdivision ordinance, the proposed
4    subdivision ordinance?
5    A    It was probably being typed then so I doubt --
6    I don't know.
7    Q    How many times did you and the supervisors
8    have workshops to discuss the subdivision ordinance?
9    A    I have no idea.
10   Q    You can't remember at all?
11   A    No. It went on over a long period of time.
12   Q    Do you recall speaking yourself at the April
13   meeting?
14   A    I probably did.
15   Q    You probably did?
16   A    (Witness nods head affirmatively.)
17   Q    Do you usually speak at the meetings?
18   A    Sometimes.
19   Q    Now, I know that you said that you don't have
20   a vote, correct?
21   A    I do not have a vote.
22   Q    But you do speak at the meetings about
23   township business?
24   A    Sometimes.
25   Q    And you offer your opinions about township

---



WIRTH, ANN
05/16/01

CORNEAL  VS
JACKSON TOWNSHIP

---

106

1  business?
2  A    Sometimes.
3  Q    Do you recall speaking at this meeting?
4  A    No.
5  Q    You don't recall anything?  Do you recall
6  telling Mr. -- she shook her head.  It should say no.
7  A    I didn't think you were done yet.
8        MR. SHERR:  And it shouldn't say no if she
9  didn't say no.
10       MS. THORP:  Can we go off the record for one
11  moment?
12       MS. MONTGOMERY:  Yes.
13       (Discussion held off the record.)
14  BY MS. MONTGOMERY:
15  Q    At the April meeting do you recall speaking
16  directly to Mr. Corneal about his sewage modules or about
17  his proposed subdivision?
18  A    I might have.  I don't remember.
19  Q    Well, do you have an opinion about whether or
20  not Mr. Corneal can build on his property even if he doesn't
21  subdivide?
22  A    No.
23  Q    You don't have an opinion about that?
24  A    No.
25  Q    Do you have an opinion about whether or not

---

107

1  Mr. Corneal can build a second property -- a second house,
2  dwelling, on his property?
3  A    I don't have an opinion, no.
4  Q    Do you have a belief about whether or not he
5  can do it?
6  A    No.
7  Q    Did you ever express an opinion or a belief
8  about whether or not he could do it?
9  A    I don't recall.
10  Q    Do you have an opinion about whether or not
11  building a second dwelling on the property turns it into a
12  subdivision?
13  A    I don't have an opinion, no.
14  Q    Do you have a belief about it?
15  A    No.
16  Q    Have you ever expressed anything about it?
17  A    I might have.
18  Q    What makes you think you might have?
19  A    Because of what's in the Sewage Facility Act.
20  Q    What's in the Sewage Facility Act?
21  A    That if there's more than one dwelling on a
22  property, it constitutes an equivalent subdivision.  And I
23  may have said that, I don't know.
24  Q    You may have said that when?
25  A    I don't know.  You asked me if I had a belief

---

108

1  or I had an understanding and that's what I understand.
2  Q    And I don't want to use the wrong word.  If I
3  say an opinion or a belief and you want to call it something
4  else like an understanding, then you should just tell me
5  that because I'm just trying to --
6        MR. SHERR:  No, you should answer her
7  questions.
8  BY MS. MONTGOMERY:
9  Q    And if you don't understand my question
10  correctly and you could answer if it was better stated, you
11  should tell me that, okay?
12       MR. SHERR:  If you don't understand her
13  question, ask her to clarify.
14       THE WITNESS:  All right.
15  BY MS. MONTGOMERY:
16  Q    So I've asked you some questions about whether
17  or not you have a belief about certain things so I'm going
18  to back up and ask you if you have an understanding about
19  certain things, okay?
20  A    I have an understanding.
21  Q    You have an understanding --
22       MR. SHERR:  Let her ask the questions.
23  BY MS. MONTGOMERY:
24  Q    You just said you have an understanding.  What
25  do you have an understanding about?

---

109

1  A    You have to ask me the question again.
2  Q    Okay.  Do you have an understanding as to
3  whether or not Mr. Corneal can build an additional house on
4  his property?
5  A    I do.
6  Q    And what is your understanding?
7  A    From the Sewage Facility Act, if there's more
8  than one property on an existing plot of ground, it's an
9  equivalent subdivision.
10  Q    Well, then do you have an understanding as to
11  whether or not Mr. Corneal can subdivide his property?
12  A    Anybody can subdivide their property.
13  Q    Did you ever discuss this equivalent
14  subdivision idea with Larry Newton?
15  A    I don't understand what you're asking me.
16  Q    Did you ever discuss your understanding of
17  what constitutes an equivalent subdivision with Larry
18  Newton?
19  A    I don't recall.
20  Q    Did you ever discuss it with the township
21  supervisors?
22  A    I probably did.
23  Q    And what makes you think you probably did?
24  A    Because the subject comes up by land owners so
25  we probably did.

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

110

1    MS. MONTGOMERY: I think we need to take a
2 break for a minute.
3    (Luncheon recess taken.)
4    MR. SHERR: Counsel for plaintiff has asked me
5 to repeat my statement yesterday with respect to the
6 30(b)(6) notice. The 30(b)(6) notice stated the subject
7 matter as all persons who -- or a person who has knowledge
8 or information regarding matters relating to the defense of
9 this claim.
10    In that that designation did not reasonably --
11 with reasonable particularity state the matters on which
12 these admonitions are requested, we were objecting to that
13 designation and to the extent that -- to the extent of the
14 broadness of that designation, for the time being and
15 subject to that objection, we are designating all of these
16 witnesses as those who have knowledge of the matter or the
17 defense.
18    MS. MONTGOMERY: For the record, I did not ask
19 Mr. Sherr to repeat his statement on the record. I asked
20 him to tell me off the record are all the witnesses 30(b)(6)
21 witnesses because that's what he indicated yesterday. I was
22 asking if he was sticking with that position and I believe
23 that what you said is yes, all the witnesses are 30(b)(6)
24 witnesses; is that correct?
25    MR. SHERR: I've made my statement.

---

111

1    MS. MONTGOMERY: It's a simple yes or no
2 question.
3    MR. SHERR: Okay.
4    MS. MONTGOMERY: Okay, is this witness a
5 30(b)(6) witness?
6    MR. SHERR: I've made my statement.
7    MS. MONTGOMERY: Is this witness a 30(b)(6)
8 witness, Tony? It's not a game. Is this witness a 30(b)(6)
9 witness?
10    MR. SHERR: I'm not playing a game. I've made
11 my statement. If you would like to -- if you would like to
12 make a note of a particular designation, then I will tell
13 you particularly, but I can't do that based on the broadness
14 of the designation. So, therefore, I'm sticking by my
15 statement.
16    MS. MONTGOMERY: Are you sticking by the
17 statement that you put on the record yesterday morning?
18    MR. SHERR: Sure.
19    MS. MONTGOMERY: Okay, fine. Thank you.
20 BY MS. MONTGOMERY:
21    Q    You're still under oath. Miss Wirth, I'm
22 going to show you a document that was previously marked
23 yesterday as an exhibit. We're going to mark it again today
24 as Wirth Exhibit 8 and I'm going to ask you to look at it
25 for me, please.

---

112

1    (Order produced and marked as Wirth Exhibit
2 No. 8.)
3 BY MS. MONTGOMERY:
4    Q    Miss Wirth, have you seen this document
5 before?
6    A    No.
7    Q    Miss Wirth, were you informed by anybody that
8 the witnesses in this case were to be sequestered for
9 purposes of their deposition testimony?
10    A    Yesterday I was.
11    Q    Yesterday you were informed by who?
12    A    You.
13    Q    Do you know what sequestration means?
14    A    We were not allowed to be in the room.
15    Q    Are you aware that you're not supposed to be
16 in the room with the other deponents?
17    A    I am now, yeah.
18    Q    Well, I shouldn't say that. You're not
19 supposed to be in the room with the other deponents while
20 they're being -- while they're giving testimony, correct?
21    A    Yes.
22    Q    Have you discussed your deposition testimony
23 with anybody since this morning?
24    A    No.
25    Q    Have you discussed anybody else's deposition

---

113

1 testimony with anybody since yesterday?
2    A    No.
3    Q    Do you understand that you're not supposed to
4 discuss your deposition testimony with any of the other
5 deponents?
6    A    Yes.
7    Q    Until all the depositions are finished?
8    A    Yes.
9    Q    Have you complied with that?
10    A    Yes.
11    Q    Have you been in a room with any of the other
12 deponents in a situation where you could discuss your
13 deposition testimony since this order was entered yesterday?
14    A    In a room, no.
15    Q    In any situation?
16    A    Yes.
17    Q    What was that situation?
18    A    It was in a car.
19    Q    Who did you have lunch with?
20    A    Tom Wilson.
21    Q    Did you discuss your deposition testimony with
22 Mr. Wilson?
23    A    No.
24    Q    You had lunch with Tom Wilson today, though,
25 right?

---



WIRTH, ANN
05/16/01

CORNEAL  VS
JACKSON TOWNSHIP

---

114

1    A    Yes.
2    Q    Was anybody else present?
3    A    No.
4    Q    Thank you. I'm going to show you a document
5    that we will now mark as Wirth Exhibit 9 and ask you to look
6    at it and identify it for me, if you can.
7         MS. MONTGOMERY: Tony, do you have another
8    copy of this document?
9         (Discussion held off the record.)
10        (Subdivisions reviewed by HCPC produced and
11   marked as Wirth Exhibit No. 9.)
12   BY MS. MONTGOMERY:
13   Q    Did you have occasion to discuss with any of
14   the supervisors or the sewage enforcement officer, Mr.
15   Parks, bringing documents to their depositions? And I'm
16   talking about before the order was entered yesterday.
17   A    Bringing documents down?
18   Q    To the deposition.
19   A    No.
20   Q    Did you tell anybody not to bring documents to
21   the deposition?
22   A    No, I did not.
23   Q    Did anybody tell you not to bring documents to
24   the deposition?
25   A    No.

---

115

1    Q    Then just to make sure that I've asked the
2    questions as clearly as possible, did you discuss with the
3    supervisors whether or not you ought to bring any documents
4    to the deposition?
5    A    I honestly don't think we ever did.
6    Q    What's the box number that you receive
7    township mail at?
8    A    389-A.
9    Q    And your home box number?
10   A    390.
11   Q    We're back with Wirth Exhibit 9. Have you had
12   a moment to look at that?
13   A    Yes.
14   Q    Do you recognize the document?
15   A    Yes, I do.
16   Q    Did you prepare it?
17   A    No, I did not.
18   Q    Do you know whose handwriting that is?
19   A    I have no idea whose handwriting it is.
20   Q    Do you know who prepared it?
21   A    I know where it came from.
22   Q    Where did it come from?
23   A    Huntingdon County Planning Commission.
24   Q    And did it come from the commission in
25   response to a request from you?

---

116

1    A    Yes, it did.
2    Q    So you put the request into whom, Richard
3    Stahl?
4    A    Yes, I did.
5    Q    How did you receive this document?
6    A    Just the way it is.
7    Q    Was it by fax?
8    A    By fax to me.
9    Q    From the Huntingdon County Planning
10   Commission?
11   A    Yes.
12   Q    When did you receive it?
13   A    Today is -- Monday or Tuesday, one or the
14   other.
15   Q    Just this Monday or Tuesday?
16   A    Yes.
17   Q    When did you --
18   A    It must have been Tuesday, right. I think. I
19   don't know.
20   Q    So exactly what did you ask for from Richard
21   Stahl that resulted in his production -- did he send you
22   this document?
23   A    Yes.
24   Q    Under a fax sheet from him?
25   A    Yes.

---

117

1    Q    So we don't know whether this is his
2    handwriting or not, do we?
3    A    No.
4    Q    Do you assume that he's actually the one who
5    put this together, though?
6    A    I'm assuming that somebody in his office keeps
7    this -- this is out of a book, I believe, out of a --
8    Q    Okay. So you don't think that this document
9    was put together just for purposes of your request but
10   rather it was an existing document?
11   A    I assume that it's an existing document.
12   Q    From the Huntingdon County Planning Commission
13   offices?
14   A    Right.
15   Q    Exactly what did you ask for from Mr. Stahl
16   that led him to give you this document?
17   A    I asked him for a list of all subdivisions,
18   minor and major, that we have sent to him and when we
19   started to do it.
20   Q    Did you ask him when did we start to do it?
21   A    Yes.
22   Q    And what did he tell you?
23   A    He said as -- he's been there since 1980 and
24   they've been doing it ever since.
25   Q    Been sending all subdivisions to Huntingdon

---




118

1  County for their review?
2  A    Review, right.
3  Q    What is your understanding with respect to
4  Huntingdon County's review of proposed subdivisions in
5  Jackson Township?
6  A    What is my understanding?
7  Q    Yes.
8  A    I don't know what you mean.
9  Q    How much knowledge do you have about
10 Huntingdon County Planning Commission's review of proposed
11 subdivisions that you send to the county, to the commission?
12 A    I have no idea what they do.
13 Q    You have no idea what they do?
14 A    No, I've never been in the office to see what
15 they do.
16 Q    Are you the one that sends the subdivisions?
17 A    No.
18 Q    I mean subdivision plans.
19 A    No, I do not.
20 Q    Who sends them?
21 A    The individuals take them in there.  The
22 people that are asking for the subdivision, they take them
23 to Richard.
24 Q    Who tells them to take them to Richard?
25 A    The township does.

119

1  Q    Who in the township tells them?
2  A    The supervisors or me.
3  Q    Are you generally aware of every subdivision
4  plan that goes to the commission?
5  A    Generally.
6  Q    Do you believe that you're aware of every
7  subdivision plan that's come into the township since you've
8  been there?
9  A    Generally.
10 Q    Do you believe that you know whether or not
11 every subdivision plan has been sent to the county since
12 you've been there?
13 A    Yes.
14 Q    You think every one has?
15 A    To the best of --
16      MR. SHERR:  Object to the form of the
17 question, asking this witness about other people's
18 knowledge.  You can answer.
19      THE WITNESS:  Yes.
20      MS. MONTGOMERY:  No, I asked her what she
21 knows.
22 BY MS. MONTGOMERY:
23 Q    I'm asking you what you know.  Do you believe
24 that every one has been sent?
25 A    To the best of my knowledge.

120

1  Q    Had you ever seen this document before --
2  A    No, I had not.
3  Q    -- before you received it from Mr. Stahl's
4  office?
5  A    No.
6  Q    When did you ask the planning commission to
7  send you this document?
8  A    When I was putting together the list of
9  documents that you wanted for -- I thought it would be
10 helpful.
11 Q    And when was that?
12 A    Last week.
13 Q    Now, these are all Jackson Township
14 subdivisions, correct?
15 A    Yes.
16 Q    The ones that are listed on here.  Okay, let's
17 go through this list.  Do you understand this list?
18 A    Yes.
19 Q    Do you understand the various categories on
20 it?
21 A    Yes.
22 Q    So the 10/1/90 date in the left-hand corner,
23 the first entry there --
24 A    Yes.
25 Q    -- does that refer to the date that the

121

1  subdivision was approved or what?
2  A    I don't know.  I said I understand that.  I
3  understand the information that's on here, but I don't know
4  why it says 10/1/90 there.  I don't know if it's the date
5  they received it or the date they reviewed it.  That I don't
6  know.
7  Q    Are these all requested subdivision plans or
8  are some approved, some not approved and is it just all the
9  subdivision plans that have been submitted; is that what
10 this is?
11 A    Yes.
12 Q    To the commission?
13 A    Yes.
14 Q    Did you actually go down this list and read it
15 at any time?
16 A    I've looked at it.
17 Q    In looking at it, do you know whether there
18 are any subdivision plans that have been submitted to
19 Jackson Township that aren't on this list?
20 A    Not to the best of my knowledge.
21 Q    Do you keep your own list of subdivision
22 plans?
23 A    No, I do not.
24 Q    Well, do you keep your own file on subdivision
25 -- proposed subdivisions --

**122**

1  A    Yes.
2  Q    -- submitted -- can I finish, please.
3  A    I'm sorry.
4  Q    Submitted to Jackson Township.
5  A    Yes, I do.
6  Q    In what form do you keep that file?
7  A    Just the way it comes to me.
8  Q    Do you keep a separate folder for each one?
9  A    No.
10 Q    Something like that?
11 A    No, they're all in a drawer.
12 Q    Just all in one big drawer?
13 A    Right.
14 Q    Are they organized by date?
15 A    They are.
16 Q    That's how they're organized.  They're not
17 organized by alphabetical order or anything?
18 A    No, by date.
19 Q    By date, okay.  Typically what does a
20 subdivision plan look like?
21 A    It's a plot plan similar to what we have here.
22 Q    Is there any sort of front page application or
23 anything like that?
24 A    There's usually an application.  There's a
25 project narrative, there's septic information, there's a

**123**

1  topo area either on or attached to it.
2  Q    If there's an application, is there like a
3  state form application or something that they fill out that
4  is sort of a cover application for all of these --
5  A    There is now.
6  Q    There is now?
7  A    It's not a state form.
8  Q    What is it?
9  A    It's in the subdivision ordinance.
10 Q    It's in the Jackson --
11 A    It's the application for subdivision.
12 Q    Well, let me ask you this:  In the Jackson
13 Township subdivision ordinance there's an application?
14 A    Correct.
15 Q    Prior to the application was there some sort
16 of a form, initial form that people filled out in submitting
17 a proposed subdivision?
18 A    No.
19 Q    Was there any sort of a cover sheet or
20 anything like that that would identify it or --
21 A    Whatever the engineer had on there that came
22 to us is what we had.
23 Q    Now, I take it that the form has been in place
24 since July 2000?
25 A    Yes.

**124**

1  Q    Have you received any subdivision -- proposed
2  subdivisions that utilize that form?
3  A    Yes, and they're the ones that are on this
4  list.
5  Q    Since July 2000?
6  A    Yes.
7  Q    So that would be six of them --
8  A    Yes.
9  Q    -- correct?  So they all have front pages that
10 you could produce to us just the front page, right?
11 A    Yes.
12 Q    Now, when Jackson Township approves a
13 subdivision, is there any sort of separate form that you
14 guys have come up with that indicates approval?
15 A    We sign on the form, on the plot plan.
16 Q    Now, I think, you know, we've heard testimony
17 in this case -- I'll represent to you that we've heard
18 testimony in this case that there were certain proposed
19 subdivisions that had been submitted at the time that the
20 township put its moratorium in place; is that correct?
21 A    Yes.
22 Q    Do you recall which --
23 A    Yes.
24 Q    -- those were?  Which ones?
25 A    Glenn Hawbaker and Norman Davis, Harold and

**125**

1  Norman Davis.
2  Q    Glenn Hawbaker?
3  A    Yeah, Glenn O. Hawbaker and Carolyn McGraw and
4  then Norman and Harold Davis.
5  Q    So what happened to those proposed
6  subdivisions during the period of time that the moratorium
7  was in place?
8  A    Nothing.
9  Q    What did you do with the actual documents that
10 were submitted to you?
11 A    They -- they never submitted them.  They came
12 to us and asked us if they could do it and we told them we
13 weren't submitting them and they have -- they kept their
14 documents till July.
15 Q    And then they resubmitted them to you?
16 A    Yes, they did.
17 Q    And then they submitted them also to the
18 Huntingdon County Planning Commission?
19 A    Yes.  I don't know whether they submitted them
20 before that to the county.  I don't know when they did that.
21 Q    What about the ones that are after the Davis
22 application?  I can't really read that writing.  Do you
23 recognize that?
24 A    That's Keller.
25 Q    Was that subdivision first proposed after --



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

126

```
 1    A    No.
 2    Q    -- the ordinance was in place?
 3    A    No, it was -- I'm sorry.  Repeat your
 4  question.
 5    Q         Was that subdivision first proposed after the
 6  ordinance was in place?
 7    A    Yes.
 8    Q    Do you recall, is 9/27/00 when it was first--
 9    A    I don't recall if that's the exact date, but
10  it's around that time.
11    Q    What's the next one say?  David Simpson?
12    A    Oh, yeah, David Simpson.
13    Q    And the following one is Overhill, LLC?
14    A    Yes.
15    Q    And the following one is Darlene --
16    A    Sunderland.
17    Q    Sunderland.  Now, have each of these proposed
18  subdivisions been sent to the Huntingdon County Planning
19  Commission?
20    A    Yes, they have.
21    Q    Have they each been approved?
22    A    Yes.
23    Q    All of them?
24    A    Yeah, that.
25    Q    We have one right before this Corneal entry.
```

127

```
 1  It says --
 2    A    Lelia Isett.
 3    Q    Lelia Isett?
 4    A    Um-hum.
 5    Q    Was that subdivision plan approved?
 6    A    Yes.
 7    Q    What about -- what does that say, Jordan
 8  Conrad?
 9    A    Yes.
10    Q    Was that approved?
11    A    Yes.
12    Q    Going backwards now, Jos E. and Pauline Baker,
13  was that approved?
14    A    That one was submitted twice.
15    Q    Why was it submitted twice?
16    A    It was just what they did.  They were going to
17  build and then they didn't and then they did.
18    Q    Was it approved?
19    A    Yes.
20    Q    How about this Kenwood subdivision?
21    A    Yes.
22    Q    Was that approved?
23    A    Yes.
24    Q    The Koch -- oh, is that the Koch?
25    A    Yeah, Koch.
```

128

```
 1    Q    Koch subdivision, was that approved?
 2    A    Yes.
 3    Q    If you look down over this list of
 4  subdivisions on the first page of this document, starting
 5  with the Kenneth Miller, Kenwood Development and ending with
 6  the one on the bottom -- I can't read that.
 7    A    Greenwood Furnace.
 8    Q    Were all of these subdivisions approved to
 9  your knowledge?
10    A    Yes.
11    Q    Were any of them disapproved at any time to
12  your knowledge?
13    A    I don't -- I don't remember.
14    Q    I mean, was there any initial disapproval and
15  then a later approval?
16    A    There could be initial disapproval of all
17  these.
18    Q    But you don't know whether any of them were or
19  you do know?
20    A    I do know.  There's a couple here.
21    Q    Which?
22    A    Sunderland.
23    Q    That's on the back page, the last one?
24    A    Yeah, I do know that.
25    Q    And why was that one initially disapproved?
```

129

```
 1    A    It wasn't drawn to scale.  And I think --
 2  you're going to have to ask Tom that, but I think it had
 3  something to do too with there was a bridge over a stream on
 4  the property and it had something to do with that bridge and
 5  the stream.  And I don't remember what it was, but I know
 6  that was one that he did what he had to do and came back.
 7    Q    Now, on the Sunderland property, that's 85
 8  acres, 85 plus acres divided --
 9    A    Oh, I'm sorry.  It was Simpson, is the one I
10  was talking about with the bridge.
11    Q    Okay.  Well, let's look.  On the Simpson
12  property it's 107 acres, right?
13    A    Yes.
14    Q    Divided into two lots?
15    A    Right.
16    Q    Do you know what's going to happen on those
17  two lots?
18    A    One -- it's a hunting camp and they're
19  separating the hunting camp and David Simpson's property
20  where he's going to build a house.
21    Q    What about the Overhill, LLC?
22    A    That's a farm they bought in Ennisville and I
23  don't know what they're doing there.  I mean, they're
24  building -- it was a land development.  It wasn't a -- oh, I
25  know.  I do know.  There's a farmhouse there and they built
```



**WIRTH, ANN**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

130

1  a log house and they had two dwellings on that property. So
2  that's why they did that.
3     Q     So that's why they subdivided it?
4     A     They did a land development.
5     Q     A land development. A land development plan
6  you mean?
7     A     Yes.
8     Q     So when did they build the log house?
9     A     I don't know if -- I don't know if it's built
10  yet. I don't know. That's -- they're working -- I don't
11  know. I can't see that from the -- I don't know.
12     Q     So underneath lots it says one lot, second
13  dwelling.
14     A     Yes, it has a farmhouse there.
15     Q     Let's see, and then the Sunderland property,
16  do you know what the plans are for that place?
17     A     That's -- a father is dividing off the ground
18  for one of the boys and I don't know what he's going to do
19  with the other part.
20     Q     Is there a dwelling on that property?
21     A     Yes, there is a dwelling on that property.
22     Q     Is there more than one?
23     A     No.
24     Q     There's one house on it?
25     A     Um-hum.

---

131

1     Q     He's going to divide it and build on the other
2  half?
3     A     He said he doesn't know what he's going to do
4  with it. He's giving the son the house and some acreage and
5  the rest of it he's not sure what he's going to do with it.
6     Q     Do you know if he has any plans to subdivide?
7     A     I asked him that and he does not know.
8     Q     Now, let's see, there's a -- W. Thomas Wilson,
9  who is that?
10     A     Yes.
11     Q     This is on the first page, 9/3/97.
12     A     That's our supervisor.
13     Q     He's your township supervisor?
14     A     Yes.
15     Q     And he submitted a subdivision plan for 12
16  acres, correct?
17     A     Yes.
18     Q     To divide into three lots?
19     A     Yes, that's what it says.
20     Q     And what is on that property?
21     A     His shop and the next property is his son's
22  house and I think -- and the next one -- I'm not sure if
23  there's anything in between there or not, I don't know, and
24  then there's a -- the other boy has a trailer. They're all
25  along there.

---

132

1     Q     Now, when he subdivided, did he build anything
2  after he subdivided?
3     A     (Witness shook her head negatively.)
4     Q     Everything was on there and they just broke it
5  up?
6            MR. SHERR: You have to answer out loud.
7            THE WITNESS: I'm sorry.
8            MR. SHERR: That's okay.
9            THE WITNESS: No, he did not build anything on
10  it. That was in '97. His son had a house that he had
11  started and I'm not sure whether it was completed then or
12  not. I don't remember that, but it is there now. There's a
13  house and his shop and a trailer.
14  BY MS. MONTGOMERY:
15     Q     Are there any other township officials or --
16  you know, either supervisors or former supervisors or sewage
17  enforcement officers or anything like that on this list of
18  individuals who have sought subdivisions in Jackson
19  Township?
20     A     Not that I see.
21     Q     Who's Overhill, LLC?
22     A     It's Henwood. Jerry and Tom Henwood, I
23  believe, from somewhere in -- near Philadelphia. It's --
24  they're either going to or have built a place where they're
25  going to raise game birds. That's all I can tell you.

---

133

1     Q     I see there's another Hawbaker on this --
2  5/5/98.
3     A     Okay, that's Monty.
4     Q     A different Hawbaker than the other one?
5     A     Daughter and son-in-law.
6     Q     So they're related to the Glenn and Barbara
7  Hawbaker, correct?
8     A     That's correct.
9     Q     Are those contiguous pieces of property?
10     A     No.
11     Q     Are they close to each other?
12     A     No.
13     Q     I think you testified that the subdivision
14  ordinance had been under consideration for at least two
15  years which takes you back to the summer of 1998, correct?
16     A     Somewhere in there. I cannot tell you the
17  exact date we started it.
18     Q     Now, I see -- if we start say -- let's just
19  take it -- let's take it from September 30th, 1998 and go
20  down to 2/10/2000 -- I'm sorry, 12/13/1999, okay?
21     A     Okay.
22     Q     Were any of those proposed subdivisions
23  rejected because there was going to be a subdivision
24  ordinance put in place?
25     A     No.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

134

1  Q    Was there any moratorium placed on
2  subdivisions when those people came and asked you if they
3  could subdivide?
4  A    No.
5  Q    Now, during the period of time that the
6  moratorium was in place, did any of the subdivision plans go
7  to the Huntingdon County Planning Commission to your
8  knowledge?
9  A    The only two that I know is Mr. Corneal's.
10  Q    Mr. Corneal's went there?
11  A    And I can't say about Hawbakers and Davis.
12  I'm not sure what they did, when they took them in there.
13  (Discussion held off the record.)
14  BY MS. MONTGOMERY:
15  Q    Now, when an individual takes their
16  subdivision plan to the Huntingdon County Planning
17  Commission, do you get some sort of notice from the
18  commission?
19  A    We get a letter. When they've reviewed it, we
20  get a letter.
21  Q    When they've reviewed it?
22  A    Right.
23  Q    Do you keep copies of those letters?
24  A    They should all be attached to the document
25  when we approve it.

---

135

1  Q    Did you provide us with copies of those
2  letters?
3  A    No, you didn't ask me for that.
4  Q    Let me ask you this: Did you receive any
5  correspondence from any government agency, you personally as
6  a -- in your -- I shouldn't say personally. You in your
7  capacity as township secretary and treasurer receive
8  correspondence from any government agency about the
9  Corneal's property?
10  A    Are you talking about the county planning
11  commission?
12  Q    Any government agency, Army Corps of
13  Engineers, Commonwealth of Pennsylvania, DEP.
14  A    I did not receive anything from the Army Corps
15  of Engineers, no.
16  Q    Anybody else?
17  A    The county planning commission and soil
18  conservation commission, Huntingdon County Soil
19  Conservation, whatever that is.
20  Q    Did you provide all of the documents that --
21  A    Yes, I did.
22  Q    -- you had in your possession from any
23  government agency?
24  A    Excuse me. Yes, I did.
25  Q    What about -- did you have any correspondence

---

136

1  at all related to the Hewetts?
2  A    No.
3  Q    Did you get a bridge permit from a government
4  agency regarding the Corneal property?
5  A    No, I did not.
6  Q    Let me ask you this: When you say you have an
7  application for a proposed subdivision, right?
8  A    Yes.
9  Q    And you keep that in a file, right?
10  A    Right.
11  Q    What do you consider to be part of the
12  application?
13  A    When?
14  Q    At any time. If you have a completed
15  subdivision file, what all is in that file?
16  A    From the time the ordinance was in or from
17  before because --
18  Q    From before.
19  A    From before there was everything -- the same
20  as after except for the application.
21  Q    Except for the application form, okay. So in
22  order for you to -- in order for the township to approve a
23  proposed subdivision it has to go to the county first,
24  right?
25  A    No, it can come to the meeting first. It can

---

137

1  be on the agenda and it can come to the meeting first, but
2  you're going to have to send it to the county.
3  Q    That wasn't exactly my question but -- so I'll
4  just repeat it. In order for you to actually issue final
5  approval for the township to do it, it has to have gone to
6  the county first, correct?
7  A    It has to have gone to the county but not
8  first. There's a -- you know --
9  Q    Well, it has to have gone to the county prior
10  to you issuing approval?
11  A    That's right.
12  Q    That's what I'm trying to say.
13  A    Okay, that's right.
14  Q    So part of the whole subdivision file is going
15  to include any correspondence that you got from the county,
16  correct?
17  A    Right.
18  Q    Do you consider what the county has to say as
19  approval or disapproval in connection with a proposed
20  subdivision?
21  A    That's not for me to do. I mean, I don't
22  approve or not approve subdivisions.
23  Q    Let me put it this way: If the supervisors
24  are going to look at a proposed subdivision plan and decide
25  whether or not they're going to approve it, right?

---



WIRTH, ANN
05/16/01

CORNEAL  VS
JACKSON TOWNSHIP

---

**138**

1  A    Okay.
2  Q    They're going to look and see whether the
3  county planning commission has reviewed it first?
4  A    Yes.
5  Q    What do they see in order to tell them that
6  the county planning commission has reviewed it?  What do
7  they see in the file?
8  A    A letter.
9  Q    A letter from the county planning commission?
10  A    That's exactly right.
11  Q    That says we've received it and we're
12  reviewing it?
13  A    That says we've received it and reviewed it.
14  Q    So it's part of the approval process, correct,
15  for the supervisors to see what the county planning
16  commission has to say?
17  A    That's right.
18  Q    I'm going to show you a document that we have
19  -- we're going to mark as Wirth Exhibit 10.
20       (Letter dated 4/20/00 produced and marked as
21  Wirth Exhibit No. 10.)
22       (Discussion held off the record.)
23       MS. MONTGOMERY:  We'll mark the February 24th
24  one as Wirth 11.
25       (Letter dated 2/24/00 produced and marked as

---

**139**

1  Wirth Exhibit No. 11.)
2  BY MS. MONTGOMERY:
3  Q    Let's take Wirth Exhibit 11 first.  I'm sorry
4  to take them out of order, but that's the way it happens.
5  Are you familiar with that document, Miss Wirth?
6  A    Pardon?  I only have one.  I have February 24.
7  Q    That is going to be Exhibit 11 so you have
8  it.
9  A    Okay, thank you.
10  Q    Are you familiar with that document?
11  A    Which one are we talking -- the first one?
12  Q    February 24th.
13  A    Yes, I am.
14  Q    Is this the standard letter that you get back
15  from the Huntingdon County Planning Commission when a
16  proposed subdivision is submitted to the commission?
17  A    Yes, it is.
18  Q    Now, typically for each submission do you get
19  just one letter from them or do you -- would you later get
20  another letter from them?
21  A    If it has to go back and there's a
22  resubmission, we get another letter.
23  Q    Now, do you get this letter immediately upon
24  submission?
25  A    No, it's after review.

---

**140**

1  Q    Do you know when Mr. Corneal submitted his
2  proposed subdivision to Huntingdon County?
3  A    I only know what's on here.  After our first
4  meeting it says 2/10 and then 4/11.
5  Q    Do you understand him to have submitted the
6  subdivision then twice --
7  A    Yes.
8  Q    -- to the commission?  Did you discuss the
9  moratorium with the planning commission?
10  A    Probably.
11  Q    Do you recall who you discussed it with?
12  A    I would only discuss it with Richard Stahl.
13  Q    Did you ask him for any advice about whether
14  or not you could put in a moratorium?
15  A    I don't know whether we talked to him about
16  that or not.  I probably asked him for procedures, but I
17  don't know whether I did or not.
18  Q    Did you ever discuss the township's
19  disapproval of Mr. Corneal's sewage modules with Larry
20  Newton?
21  A    I probably told him that we weren't going to
22  sign them.
23  Q    Did you ask him for any guidance in connection
24  with whether or not you should sign them?
25  A    I don't know whether I asked him for guidance

---

**141**

1  or not.
2  Q    Do you remember what you talked to him about
3  in connection with Mr. Corneal's sewage module?
4  A    I'd probably do -- whatever happened at the
5  meeting I would let Larry know and that's what I would do.
6  Q    So you informed Larry that the township
7  supervisors were not going to sign Mr. Corneal's sewage
8  module?
9  A    Yes, I probably did -- I know I did.
10  Q    Now, there were a couple different occasions
11  when the township refused to sign the sewage module,
12  correct?
13  A    Are we -- what period of time are we talking
14  here?
15  Q    I would say the period of time before and
16  after the moratorium was put in place.
17  A    But there's also sewage modules on the board
18  now so there's different -- there's different issues here.
19  Q    Right.  Really I'm just asking you weren't
20  there a couple different times when the township has been
21  presented with Mr. Corneal's sewage modules and they have
22  not been signed, right?  Have not been signed off on by the
23  township, correct?
24  A    I think we need to be specific about that.
25       MR. SHERR:  Then go ahead and do that.

---



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

142

1   BY MS. MONTGOMERY:
2   Q      What is it that you need to know?
3   A      **You need to give me a time frame.**
4   Q      Well, it's a more general question. Did Mr.
5   Corneal submit sewage modules for the township's approval
6   once or more than once?
7   A      **More than once.**
8   Q      That's all I needed to know. How many times?
9   A      **Twice.**
10  Q      Did you discuss both of those submissions with
11  Larry Newton?
12  A      **I also want to clarify submissions because the**
13  **first ones were never handed to the supervisors, okay. He**
14  **had them at a meeting, but he never left his sewage modules**
15  **with us. They were never submitted to us because he said**
16  **then he wasn't subdividing and he wanted a privy permit.**
17  Q      Well, I think you testified a little
18  differently earlier, but the record will speak for itself.
19  Go ahead.
20  A      **And the second ones we don't have yet. I**
21  **don't think we do. Barry might have them. I don't have**
22  **them.**
23  Q      Did you discuss with Larry Newton the status
24  of Mr. Corneal's sewage modules on both -- with respect to
25  both submissions or attempted submissions?

---

143

1   A      **Probably.**
2   Q      So you kept him informed about the township's
3   position with respect to the sewage modules?
4   A      **I probably did.**
5   Q      What about Mr. Corneal's proposed subdivision
6   plan? Did you keep Mr. Newton informed about that?
7   A      **I probably did.**
8   Q      Did he tell you what you were doing was okay
9   or wasn't okay?
10  A      **I don't remember.**
11  Q      Do you recall at any time a letter going to
12  Mr. Corneal rejecting his sewage module?
13  A      **Sewage modules?**
14  Q      Yes, or his proposed subdivision from the
15  township.
16  A      **I don't recall if Larry wrote -- I don't**
17  **recall if Larry wrote him a letter or not or -- I know we**
18  **didn't write him a letter. I don't think we did.**
19  Q      Do you recall Mr. Corneal asking for a
20  hearing --
21  A      **No.**
22  Q      -- in connection with his property?
23  A      **No.**
24  Q      Do you recall Mr. Corneal asking for a hearing
25  in connection with his building permit?

---

144

1   A      **No.**
2   Q      Do you recall Mr. Corneal receiving a letter
3   from the township -- from anybody within the township,
4   officers, rejecting his application for anything?
5   A      **He did get a letter from the township**
6   **rejecting his building permit application.**
7   Q      So you do recall that?
8   A      **Yes. Now, what time frame are we talking**
9   **about here because we're doing it again?**
10  Q      Well, I'm talking about in the year 2000.
11  A      **He did get a letter rejecting his building**
12  **permit.**
13  Q      Did you have any discussions with anybody
14  within the township about his request for a building permit?
15  A      **Me? I don't recall.**
16  Q      You don't recall?
17  A      **No, I don't.**
18  Q      Do you recall receiving any letter from Mr.
19  Corneal appealing his denial of a building permit?
20  A      **I don't know if he sent it to us or Larry, but**
21  **there was something.**
22  Q      You do get the township's mail, right?
23  A      **If it comes to me, I get it. If it goes to**
24  **Larry, he'll fax it to me.**
25  Q      What's the address that you get the township

---

145

1   mail at?
2   A      **389-A.**
3   Q      And what's your address?
4   A      **390.**
5   Q      Do you sometimes get mail at the other -- at
6   the 390 post office box for the township?
7   A      **It's not a post office box.**
8   Q      Well, a postal box, right?
9   A      **On occasion.**
10  Q      Now, I don't know if you answered this
11  question very -- and if I already asked it, I apologize, but
12  did you have occasion to discuss with the township
13  supervisors the denial of Mr. Corneal's building permit?
14  A      **I'm sure we did talk about it.**
15  Q      Do you know whether Mr. Corneal actually
16  submitted an application for a building permit?
17  A      **What time frame?**
18  Q      In the year 2000.
19  A      **Yes, he did because he sent it to me.**
20  Q      He sent you an application for a building
21  permit?
22  A      **And checks, yeah.**
23  Q      I'm sorry?
24  A      **Yes, he did.**
25  Q      Did you send us a copy of that application?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

146

1   A    Was it on the list?
2   Q    I'm sorry, the list of documents?
3   A    Yes.
4   Q    Well, I think it was.
5   A    Well, then I must have sent it.  If I didn't,
6   I didn't.
7   Q    Well, then I'm just a little bit confused
8   because you had said earlier that all building application
9   permits -- applications for building permits go out to
10  the --
11  A    They do go to David Van Dommelen.
12  Q    So you don't keep them?
13  A    No.
14  Q    Why did this one come to you?
15  A    Because Mr. Corneal sent it to me, either to
16  me or Larry.
17  Q    Do they sometimes come to you?
18  A    No.
19  Q    Is that the only one you've ever gotten?
20  A    Yes.
21  Q    Well, did anybody ever inform you of whether
22  or not Mr. Corneal had requested a hearing on the denial of
23  his building permit?
24  A    I do not ever remember hearing that before.
25  Q    Typically if there's going to be a hearing on

147

1   the denial of a building permit, where would that hearing be
2   held?
3   A    I have no idea.
4   Q    You've never been present at one?
5   A    No.
6   Q    Have you ever been present at any hearing that
7   the township supervisors have held when somebody wants to
8   appeal something that's been going on?
9   A    No.
10  Q    Were copies of the subdivision ordinance that
11  was passed on -- I think you said July 10th, 2000?
12  A    It is the 10th.
13  Q    It was the 10th that it was passed?
14  A    Yes.
15  Q    Were copies of that subdivision ordinance made
16  available to the public --
17  A    Yes.
18  Q    -- prior to it being -- how?  Prior to it
19  being passed.
20  A    I think it's in the paper.  It was in the
21  library, in Larry's office, one in my office.  It says that
22  in the ad somewhere, either in this one or the other ad he
23  had in.  It was in the paper where they could be reviewed.
24  Q    Did anybody come to your office to review it?
25  A    No.  Full text at the Daily News and at my

148

1   office, yeah.
2   Q    So you had copies available in your office for
3   the public to review?
4   A    Yes.
5   Q    When were those copies made available to the
6   public?
7   A    I think there's -- I think there's a
8   regulation about when it had to happen.
9        MR. SHERR:  That's not what she asked you.
10  She asked you when was it available.
11       THE WITNESS:  I don't know.
12       MR. SHERR:  Then that's your answer.
13       THE WITNESS:  Yeah, I don't know.
14  BY MS. MONTGOMERY:
15  Q    But they were going to be made public through
16  you, correct?
17  A    Yes.
18  Q    So is there anybody else who would know when
19  you made them public or put them in your office?
20  A    I don't know.
21  Q    Were the copies that you kept in your office
22  there for say more than a week?
23  A    I don't know.
24  Q    Did you at some point keep copies of a
25  proposed subdivision ordinance that was other than the

149

1   subdivision ordinance that was eventually passed?  If you
2   can hear that but --
3   A    Tell me that again.
4   Q    Okay.  Did you at one point keep copies of a
5   proposed subdivision ordinance in your office that was
6   different than the one that was ultimately passed?
7   A    No.
8   Q    How many copies did you keep on file for the
9   public of the proposed subdivision ordinance?
10  A    I think I had six.
11  Q    Did you make the copies?
12  A    No.
13  Q    Who made the copies?
14  A    I took them out to be done.
15  Q    Where did you take them?
16  A    Office Depot.
17  Q    Office Depot.  Did you submit them or did you
18  take them over there yourself and copy them?
19  A    I left them do it.
20  Q    You left them do it?
21  A    Um-hum.
22  Q    Did you keep an invoice for that?
23  A    Sure.
24  Q    So you have that invoice?
25  A    Yes.



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

150

1    Q      Did you submit the ordinance to the county
2    planning commission?
3    A      Yes.
4    Q      When did you do that?
5    A      Which time?
6    Q      Well, why don't you tell me.  Was there more
7    than one time?
8    A      Yes.
9    Q      When's the first time you submitted a proposed
10   ordinance to the county planning commission?
11   A      I can't remember exactly.  Sometime in the
12   fall.
13   Q      In the fall of 2000 -- in the fall of 1999 I
14   mean?
15   A      Um-hum.
16          MR. SHERR:  You have to answer out loud.
17          THE WITNESS:  Yes.
18   BY MS. MONTGOMERY:
19   Q      Why was the subdivision ordinance submitted
20   twice to the county planning commission?
21          MR. SHERR:  Object to the form of the
22   question.  I don't know that she's testified that it was
23   twice.  I think she testified that it was more than once.
24   BY MS. MONTGOMERY:
25   Q      Was it more than once?

---

151

1    A      Yes, it was more than once.
2    Q      Was it twice?
3    A      It might have been more than that.
4    Q      Can you remember if it was more than that?
5    A      I know it was at least -- I know three times
6    at least.  I can't tell you how many times.
7    Q      Well, let me ask you this:  Each time that it
8    was submitted was it a different ordinance in some way?
9    A      It wasn't different.  They had opinions and we
10   took them under consideration and we would make the changes.
11   Q      Do you have records of that correspondence
12   going back and forth between you and the Huntingdon County
13   Planning Commission?
14   A      I don't, no.
15   Q      Who does?
16   A      I would assume Richard does, but I'm not sure
17   of that.
18   Q      If the ordinance --
19          MR. SHERR:  Just for the record, Richard was
20   Richard Stahl?
21          THE WITNESS:  Yes, I'm sorry.
22   BY MS. MONTGOMERY:
23   Q      If the ordinance was submitted to the
24   Huntingdon County Planning Commission, how was it submitted?
25   A      In document form.

---

152

1    Q      By mail?
2    A      Hard copy.
3    Q      Hard copy document form?
4    A      I don't know if I took it in or mailed it.  I
5    doubt if I mailed it.  I probably dropped it off when I went
6    by one day.
7    Q      Is it close by?
8    A      No.
9    Q      How far is it?
10   A      Fifteen miles.
11   Q      So you don't think you mailed it, you think
12   you drove it over there?
13   A      I probably did.  I have clients there.
14   Q      Did you put a cover letter out with it?
15   A      No.
16   Q      Do you have some sort of a -- any application
17   form or any transmittal form of any sort that you sent with
18   it?
19   A      No.
20   Q      Would anybody else have dropped it off or
21   mailed it?
22   A      They might have.
23   Q      Well, whose job was it within the township to
24   see to it that it got to the Huntingdon County Planning
25   Commission?

---

153

1    A      It probably was mine.
2    Q      Why do you say probably?
3    A      Well, they -- whoever -- it's not close so
4    whoever's running goes.
5    Q      Now, the final proposed subdivision ordinance
6    that was submitted to the Huntingdon County Planning
7    Commission, was that the subdivision ordinance that
8    eventually was passed --
9    A      Yes.
10   Q      -- by the township supervisors?
11   A      Yes.
12   Q      So it went up in one final last form,
13   Huntingdon County Planning Commission looked at it, you got
14   it back and then the township supervisors approved it?
15   A      Yes.
16   Q      Now, during this period of time that it was
17   being passed back and forth with the Huntingdon County
18   Planning Commission, was the ordinance also being presented
19   to the public and mentioned at the township meetings?
20   A      I don't know how -- whether it was or not.
21   Q      Do you know when you submitted the final
22   subdivision ordinance to the Huntingdon County Planning
23   Commission?
24   A      After July the 10th.
25   Q      After July the 10th, after you passed it?

---



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

154

1  A    Right.
2  Q    Then you submitted it to them for what?
3  A    They keep a copy for their review.
4  Q    Well, prior to the time that you -- that the
5  supervisors approved the final subdivision ordinance, do you
6  know when you submitted it to the Huntingdon County Planning
7  Commission?
8  A    June the 3rd, Saturday morning, around 10
9  o'clock I got the final revisions from Richard. I went to
10 his house to do it on a Saturday morning.
11 Q    You mean you took it over to his house?
12 A    No.
13 Q    Well, my question was when did you submit it
14 to him.
15 A    I don't know when I submitted it to him.
16 That's the last time that we talked about it.
17 Q    Was June the 10th?
18 A    June the 3rd.
19 Q    Or June the 3rd. How do you recall that date
20 so well?
21 A    I have it written down because it was a
22 Saturday and I wasn't happy about having to do it on a
23 Saturday. I had something else to do, but Richard was going
24 on vacation so I went.
25 Q    Did the Huntingdon County Planning Commission

---

155

1  submit comments to you in writing on the proposed
2  subdivision ordinance?
3  A    He wrote in the column on the side and he
4  inserted things that he felt we should consider.
5  Q    Did you submit those to us?
6  A    I don't have them.
7  Q    You didn't keep any copies of them?
8  A    No.
9  Q    Did you just throw them away?
10 A    Yes.
11 Q    Do you have all the successive drafts of the
12 proposed ordinance?
13 A    No, I do not.
14 Q    You just threw them away as well?
15 A    I had no reason to keep them.
16      MR. SHERR: Just answer her questions.
17      THE WITNESS: No, I don't have them.
18 BY MS. MONTGOMERY:
19 Q    Miss Wirth, do you recall whether you actually
20 suggested a moratorium to the township supervisors?
21 A    I did not.
22 Q    Did you ever suggest it to anybody?
23 A    No.
24 Q    Did you suggest it to Larry Newton?
25 A    No.

---

156

1  Q    Do you recall discussions about why the
2  moratorium was being put in place with the supervisors?
3  A    No.
4  Q    You don't recall any of those discussions?
5  A    No.
6  Q    Do you recall whether any discussions about
7  the purpose of the moratorium took place?
8  A    No.
9  Q    Now, we're going to go back for just a second
10 to this document that we marked as --
11      MS. THORP: It's 9.
12 BY MS. MONTGOMERY:
13 Q    Wirth Exhibit 9 and I just want to make sure
14 that I understand that there were no other subdivision --
15 correct me if I'm wrong. There were no other subdivision
16 applications received by the township other than those on
17 this list?
18 A    To the best of my knowledge.
19 Q    Did you ever have a public hearing on the
20 moratorium?
21 A    No.
22 Q    Did you actually do a formal submission of the
23 moratorium to the county planning commission?
24 A    No.
25 Q    You just told them about it?

---

157

1  A    To the best of my knowledge.
2  Q    Do you know how you told them about it?
3  A    No.
4  Q    So if there was a formal submission you would
5  have been the one that would have been involved in preparing
6  it, correct?
7  A    Yes, probably.
8  Q    Let me just ask you this, and if I asked you
9  already I apologize, did the supervisors actually take a
10 vote with respect to the moratorium?
11 A    I did testify to that.
12 Q    And what was your testimony?
13 A    You asked me if the supervisors voted and I
14 said -- I believe I said I don't recall whether -- normally
15 they do, they say -- I think that's what I said.
16 Q    But you don't recall if they did?
17 A    They normally do and I think that's what I
18 said.
19 Q    Let's see, did you ever submit a copy of the
20 driveway -- the proposed driveway ordinance to the planning
21 commission?
22 A    Yes, I did.
23 Q    Did you also do the privy --
24 A    Yes, I did.
25 Q    When did you do that?

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

158

1  A    I don't recall.
2  Q    Did you submit it after it was approved or
3  before, by the supervisors?
4  A    I don't recall.
5  Q    Did you discuss the driveway ordinance with
6  Larry Newton?
7  A    Probably.
8  Q    Why do you say probably?
9  A    Because I think we submitted it to him for him
10  -- I'm trying to remember if we typed it or he typed it. I
11  don't remember.
12  Q    What about the privy ordinance, did you submit
13  that to Larry Newton?
14  A    The same thing, I don't know if he did it or I
15  did it.
16  Q    Do you recall ever reviewing any subdivision
17  plan or drawing at all in connection with the Corneal
18  property?
19  A    What time frame?
20  Q    In the year 2000.
21  A    Yes.
22  Q    In what context was that?
23  A    I think he was -- I think it was at the
24  meeting. We talked about that earlier today.
25  Q    So at the meeting you recall actually looking

159

1  at a subdivision plan?
2  A    I'm not sure if we looked at it there. I'm
3  not sure. I don't know.
4  Q    What about the year 1999?
5  A    In '99, no.
6  Q    What about this year?
7  A    Yes.
8  Q    In what context?
9  A    With his lawyer Terry Williams.
10  Q    You were present at that meeting?
11  A    Yes.
12  Q    And who else was present?
13  A    All the supervisors, Barry Parks, Larry
14  Newton, Terry Williams and I think David Van Dommelen.
15  Q    Why were you present?
16  A    Why was I present?
17  Q    Yes.
18  A    Because I have to sign.
19  Q    Because you have to sign the --
20  A    I have to sign the plans.
21  Q    You have to be one of the two people who signs
22  the plans?
23  A    Yes, I have to sign them and seal them.
24  Q    Did you keep minutes of that meeting?
25  A    No, I -- it was in the courthouse. No, I did

160

1  not.
2  Q    You mentioned that you thought you viewed a
3  subdivision plan in 2000, right?
4  A    I thought what you asked me was did we look at
5  a plot plan.
6  Q    Well, okay. What I said was a subdivision
7  plan or any other drawing.
8  A    A drawing is what --
9  Q    Right, that's what I said.
10  A    We did look at a drawing.
11  Q    Now, I think you said you thought you did that
12  at a supervisor's meeting?
13  A    I'm not sure.
14  Q    Where else would it have been?
15  A    I'm not -- it came to us through Larry so I
16  don't know where we looked at it.
17  Q    So Larry turned over to you at some point a
18  copy of a drawing for the proposed subdivision for the
19  Corneal's property?
20  A    To the township he turned it over.
21  Q    He turned it over to the township and you
22  reviewed it. Who did you review it with?
23  A    I didn't review it, the supervisors reviewed
24  it.
25  Q    Were you present when they reviewed it?

161

1  A    Yes.
2  Q    And so we're going to go back around again.
3  So in what context was that, just an informal meeting or
4  something?
5  A    I don't remember. I don't remember when we
6  got it or when we reviewed it.
7  Q    But you do remember that you got it from Larry
8  Newton?
9  A    I said earlier today that I don't know whether
10  it came from Larry Newton or Simpson.
11  Q    Did you discuss the subdivision -- the drawing
12  with Larry Newton?
13  A    Probably.
14  Q    Did the supervisors discuss the drawing with
15  Larry Newton?
16  A    Probably.
17  Q    Did you discuss whether or not to approve the
18  subdivision with Larry Newton?
19  A    I don't know.
20  Q    Did the supervisors discuss whether or not to
21  approve the subdivision with Larry Newton?
22  A    I don't know.
23  Q    Now, you testified earlier that I believe it
24  was at the February meeting that Mr. Corneal first came in
25  and asked the supervisors -- the February 2000 meeting he



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

162

1  came in and asked the supervisors to sign his subdivision
2  plan, correct?
3  **A      I think that's the date, yeah.  Yes.**
4  Q      And I believe you testified that they refused
5  to do so because they said there was a moratorium in place
6  as of January?
7  **A      Right.**
8  Q      Did they issue a written rejection of his
9  subdivision plan?
10  **A      No, I don't think so.**
11  Q      Do you recall Mr. Corneal asking for a copy of
12  a moratorium ordinance or resolution?
13  **A      He might have.  I don't -- I don't know.  He**
14  **might have.**
15  Q      Did you discuss with Larry Newton Mr.
16  Corneal's interest in seeing a copy of a moratorium
17  ordinance or resolution?
18  **A      I don't recall that.**
19  Q      Do you recall talking with Larry Newton about
20  whether you had to put that moratorium into a written form?
21  **A      I don't recall that either.**
22  Q      Do you recall whether the supervisors
23  discussed that with him?
24  **A      You'll have to ask them.**
25  Q      Was there an ordinance in place at any time

---

163

1  prior to the subdivision ordinance that you put in place on
2  July 10th, 2000?
3  **A      What kind of an ordinance?**
4  Q      Subdivision ordinance.
5  **A      No.**
6  Q      Was there any other ordinance in place?
7  **A      Yes.**
8  Q      What ordinance was that?
9  **A      Building permit ordinance.**
10  Q      The building permit ordinance, okay.  When was
11  that passed?
12  **A      Long before my time.  The date's in the back.**
13  **I don't know.**
14  Q      Other than the three ordinances that you
15  testified have been passed since you've been in place as the
16  township secretary and treasurer and other than this
17  building ordinance, are there other ordinances in the
18  township?
19  **A      No.**
20  Q      There's just those four that exist?
21  **A      I'm not sure if this -- this -- there is an**
22  **ordinance, I'm sorry.  It's ag. security.  We passed an ag.**
23  **security ordinance.  I'm sorry, I forgot that.**
24  Q      When did you do that?
25  **A      It might be '95 or '96.  Maybe not.  Maybe**

---

164

1  '97.  I'm not -- I don't know the date, but we do have an
2  ag. security ordinance.
3  Q      But there wasn't any other ordinance that said
4  anything about subdividing at that time prior to this
5  subdivision ordinance?
6  **A      Ordinances you're talking about?**
7  Q      Yes.
8  **A      No.**
9  Q      What about any other document -- or I should
10  say any other sort of rule, regulation, resolution, anything
11  that would be a formal action of the supervisors?
12  **A      Act 537.**
13  Q      What's Act 537?
14  **A      Sewage Enforcement Act.**
15  Q      And you're saying what about that, that's the
16  -- something that was in place of how you do subdivisions
17  in the township?
18  **A      It states that you have to have an equivalent**
19  **subdivision if there's more than two buildings on a**
20  **property, two dwellings, and we testified to that this**
21  **morning.**
22  Q      So you're saying that was what you followed as
23  a subdivision ordinance, or something, or what are you
24  saying?
25  **A      Yes, we did.**

---

165

1  Q      Was it in writing somewhere that all
2  subdivision plans had to be submitted to the Huntingdon
3  County Planning Commission?
4  **A      Not to the best of my knowledge.**
5  Q      So it was just something that the supervisors
6  and you thought you ought to do, thought you ought to impose
7  on the public?
8  **A      It was done long before my time.**
9  Q      But it's not in writing anywhere?
10  **A      I don't know.**
11  Q      Do you recall Mr. Corneal submitting a revised
12  subdivision plan to the township?
13  **A      What time frame?**
14  Q      The year 2001.
15  **A      Yes.**
16  Q      Are you familiar with that document?
17  **A      I've seen it.**
18  Q      In what context did you see it?
19  **A      In the courthouse.**
20  Q      In the courthouse at a meeting?
21  **A      At a hearing.**
22  Q      At a hearing.  What hearing was that?
23  **A      The township has -- went before the judge**
24  **asking for Mr. Corneal to comply with regulations in the**
25  **township.**

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

166

1  Q    What regulations?
2  A    **Building permit regulations and subdivision**
3  **ordinance and sewage.**
4  Q    So you saw it there?  Did you testify at
5  that --
6  A    **No.**
7  Q    You just saw it in connection with that
8  hearing?
9  A    **Yes.**
10 Q    Did you see it before the hearing as well?
11 A    **No.**
12 Q    Did you see it after the hearing?
13 A    **It's in my office.**
14 Q    It's in your office, okay.
15 A    **You're talking about a plot plan?**
16 Q    Yes.
17 A    **It's in my office.**
18 Q    When did you get it in your office?
19 A    **I got it at the hearing that day.  No, wait a**
20 **minute.  I got a copy at the hearing that day.  I got a copy**
21 **that day.**
22 Q    You got a copy of it when?
23 A    **At the hearing.**
24 Q    And that's the first time?
25 A    **To the best of my knowledge.**

---

167

1  Q    Do you know whether the board ever -- the
2  board of supervisors ever passed a resolution regarding the
3  lawsuit that they initiated against Mr. Corneal?
4  A    **No.**
5  Q    You don't know or did they?
6  A    **They didn't.**
7  Q    They did not.  Did they just decide it among
8  themselves informally?
9  A    **No.**
10 Q    How was it decided?
11 A    **With our township attorney.**
12 Q    With Mr. Newton?
13 A    **Yes.**
14 Q    So Mr. Newton advised the board of supervisors
15 that they should initiate a lawsuit against Mr. Corneal?
16 A    **No.**
17 Q    I'm not sure I understand your answer.  Do you
18 want to clarify what you're trying to tell me?
19      MR. SHERR:  Don't feel that it's necessary.
20 You've answered her question.  You've answered it directly.
21      MS. MONTGOMERY:  She hasn't answered it
22 directly.
23      MR. SHERR:  She absolutely has.
24      MS. MONTGOMERY:  It's not permissible to be
25 evasive.

---

168

1      MR. SHERR:  She is not being evasive.  Can you
2  read back the question and the answer, please.
3      MS. MONTGOMERY:  If we're going to read back
4  the question and the answer, you're going to have to go a
5  long ways back.  Let's continue on.
6      MR. SHERR:  Could you read back --
7      MS. MONTGOMERY:  I'm going to rephrase the
8  question.  It's my deposition, knock it off.
9      MR. SHERR:  Don't tell me to knock off
10 anything.
11      MS. MONTGOMERY:  Here's the question --
12      MR. SHERR:  And don't talk to me in that tone,
13 young lady.
14      MS. MONTGOMERY:  This is the question and
15 we're not reading the question back.
16      MR. SHERR:  If you want her --
17      MS. MONTGOMERY:  I have withdrawn the
18 question.  I've withdrawn the question.
19      MR. SHERR:  And all I was saying is if you
20 want her to clarify it --
21      MS. MONTGOMERY:  Moving right along.
22      MR. SHERR:  -- then we'll reask the question
23 and get the answer again.
24      MS. MONTGOMERY:  We're going to reask the
25 question.

---

169

1  BY MS. MONTGOMERY:
2  Q    Did the board of supervisors pass a resolution
3  regarding the lawsuit that they filed against Mr. Corneal?
4  A    **No.**
5  Q    Did they just decide among themselves that
6  they were going to file the lawsuit?
7      MR. SHERR:  Objection, asked and answered.
8      MS. MONTGOMERY:  That's good.
9      MR. SHERR:  That's not the question.  The
10 question was -- you said did Mr. Newton advise them to file
11 a lawsuit and she said no and then you asked her to clarify
12 that.
13      MS. MONTGOMERY:  I know what I said and I am
14 going to move on.
15      MR. SHERR:  Well, then why are you going back
16 to all these other questions?  Objection, asked and
17 answered.  You can answer.
18 BY MS. MONTGOMERY:
19 Q    Did they decide among themselves to file a
20 lawsuit?
21      MR. SHERR:  Objection, asked and answered.
22 You can answer it.
23      THE WITNESS:  No.
24 BY MS. MONTGOMERY:
25 Q    So did their attorney -- no, that wasn't the

---



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

170

1 question. Who else was involved in the decision to file a
2 lawsuit?
3    A    I don't really know. I don't know how to
4 answer you.
5    Q    Well, if they didn't decide among themselves
6 to file a lawsuit against Mr. Corneal, how did they decide
7 it?
8    MR. SHERR: Objection to the form of the
9 question. I think you're misstating her testimony. You can
10 answer the question if you can.
11    THE WITNESS: They sought counsel about it.
12 BY MS. MONTGOMERY:
13    Q    Sought counsel from who?
14    A    Larry Newton.
15    Q    Then my question was did Mr. Newton advise
16 them that they could file a lawsuit against Mr. Corneal?
17    A    You did it in the opposite the --
18    MR. SHERR: Just answer her question.
19    THE WITNESS: Yes.
20 BY MS. MONTGOMERY:
21    Q    He did. That's all I wanted to know. Do you
22 recall who actually initiated the discussions about filing a
23 lawsuit against Mr. Corneal?
24    A    I have no idea.
25    Q    Did you initiate them?

171

1    A    No.
2    Q    Were you involved in discussions with the
3 supervisors about doing it?
4    A    I might have been. I don't know.
5    Q    Were you present at meetings with the
6 supervisors when it was being discussed?
7    A    Probably.
8    Q    Why do you say probably?
9    A    Because I'm in a lot of things.
10    Q    Were you involved in discussions with the
11 supervisors and Mr. Newton about filing a lawsuit against
12 Mr. Corneal?
13    A    Probably.
14    Q    And why do you say probably?
15    A    Because I cannot remember if I was there when
16 they did it.
17    Q    How do you know that they discussed it with
18 Mr. Newton then, with Attorney Newton?
19    A    Because he's our lawyer.
20    Q    Did they tell you that they sought counsel --
21    A    Sure.
22    Q    -- from Mr. Newton?
23    A    Yes.
24    Q    Did you discuss the lawsuit directly with Mr.
25 Newton?

172

1    A    I probably have.
2    Q    Are you saying probably because you don't
3 recall?
4    A    I have.
5    Q    You have discussed it with him, okay. On what
6 occasions?
7    A    I don't know.
8    Q    When you say you don't know, do you mean you
9 don't know exactly when they were or what?
10    A    I don't know when they were.
11    Q    Well, if you don't know when they were, then
12 do you just recall the setting for the discussion with Mr.
13 Newton that you had?
14    A    Probably in his office.
15    Q    Did you go to his office by yourself?
16    A    For what reason?
17    Q    To discuss the lawsuit with Mr. Corneal.
18    A    No.
19    Q    Who did you go with?
20    A    I believe we were all there.
21    Q    On more than one occasion?
22    A    I don't think so.
23    Q    You recall then being there one time?
24    A    Yes.
25    Q    Did you discuss it over the telephone with Mr.

173

1 Newton?
2    A    Yes.
3    Q    Prior to filing the lawsuit?
4    A    I don't remember if it was prior or after.
5    Q    Did you discuss it on the telephone alone with
6 Mr. Newton or with the other supervisors?
7    A    Probably both.
8    Q    Was anybody else there besides the supervisors
9 when you, for example, went to the office of Larry Newton to
10 discuss the lawsuit against Mr. Corneal?
11    A    No.
12    Q    Just the supervisors and you?
13    A    Yes, that I can recall.
14    Q    Was Barry Parks at any of the meetings that
15 you can recall at which the lawsuit against Mr. Corneal was
16 going to be filed?
17    I don't think I said that very well. Let me
18 rephrase that. Was Barry Parks present at any of the
19 meetings at which the lawsuit that was to be filed against
20 Mr. Corneal was discussed?
21    A    I testified to that a while ago.
22    Q    I don't recall what you said, I apologize.
23 What did you say?
24    A    Everybody that was in the lawsuit was in the
25 courthouse.



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

174

1  Q      At the hearing you mean?
2  A      Yeah.
3  Q      I was talking about meetings. You're talking
4  about the lawsuit up in the county, correct?
5  A      Yes.
6  Q      I actually was referring to meetings. When
7  you say that everybody involved in the lawsuit was there at
8  the courthouse, at the county courthouse in the county
9  lawsuit, you mean everybody in this lawsuit? Is that what
10  you mean?
11  A      No.
12  Q      You mean everybody in that lawsuit?
13  A      Yes.
14  Q      Are you a party to that lawsuit?
15  A      No.
16  Q      Is Barry Parks a party to that lawsuit?
17  A      Yes.
18  Q      His name is on the pleadings?
19  A      I don't know.
20  Q      Is Van Dommelen a party to that lawsuit?
21  A      I don't know.
22  Q      I'm just trying to clarify who it is you're
23  talking about, that's all, because if you say everybody in
24  that lawsuit, then we could look at those pleadings and say
25  -- then we know who was there. If you're talking about

---

175

1  everybody in this lawsuit was involved in that lawsuit in
2  the courthouse, then we know who was there.
3  A      I don't know.
4  Q      Why did you attend that hearing for the
5  lawsuit that's up in Huntingdon County?
6  A      Because they take me most every place they go.
7  Q      Why was Mr. Parks there?
8  A      I don't know.
9  Q      Do you recall whether you sent copies of the
10  draft township ordinance to any members of the public at any
11  time during the time that it was under consideration?
12  A      What do you mean public?
13  Q      Well, a member of the public, resident. Did
14  you send copies of the township ordinance to anybody, the
15  proposed township ordinance to anybody?
16        MR. SHERR: Other than what's been testified
17  to already?
18        THE WITNESS: No.
19  BY MS. MONTGOMERY:
20  Q      Other than the county commissioners -- I mean
21  the county planning commission.
22  A      No.
23  Q      Did anybody ever request a copy of the
24  proposed ordinance from you?
25  A      Yes.

---

176

1  Q      And who was that?
2  A      Different people got it from me.
3  Q      Different people got it from you?
4  A      Bought it from me actually.
5  Q      Bought it from you. The proposed or the
6  final?
7  A      I think it was the proposed.
8  Q      So you did send copies --
9  A      No, it was the final. The final, I'm sorry.
10  It's the final.
11  Q      After it was --
12  A      After it was passed.
13  Q      But prior to the time it was passed you never
14  sent a copy of it to anybody?
15  A      Not that I can recall, other than what I
16  testified to.
17  Q      Did you get any requests from anybody?
18  A      No, except Mr. Corneal.
19  Q      Did you send him a copy of the proposed --
20  A      No.
21  Q      Why not?
22  A      I didn't have one to give him at the time.
23  Q      But he did ask you for one?
24  A      Not me.
25  Q      Who did he ask?

---

177

1  A      Larry, I believe.
2  Q      He asked Larry Newton for a copy of the
3  proposed subdivision ordinance. Did Larry then pass that
4  request on to you?
5  A      I believe I read it in a letter, is how I know
6  that.
7  Q      Did you know about the request at the time
8  that it was submitted?
9  A      No.
10  Q      You found out about it later?
11  A      Yes.
12  Q      But then you just said you didn't have one to
13  give him at the time and that's why you didn't give him
14  one.
15  A      No. When Larry had that request, they weren't
16  -- the date on there -- I think it's the date that's in
17  that letter. I don't know. It's in one of these
18  correspondence. I saw it the other day when I was there.
19  We didn't have an ordinance yet.
20  Q      Well, we were talking about the proposed
21  subdivision ordinance and the request for that.
22  A      We didn't have a proposed yet either.
23  Q      Just so I'm clear about your testimony --
24        MS. MONTGOMERY: Let the record reflect that
25  Mr. Sherr just said something to his client. I'm not sure

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

178

1  what it was.
2          MR. SHERR:  I'll state it, you're doing all
3  right, just listen to her questions.  Are you satisfied?
4          THE WITNESS:  That's what he said to me.
5  BY MS. MONTGOMERY:
6      Q      Did the Corneals ever ask you for a copy of
7  the ordinance at one of the township meetings?
8      A      **Not that I recall.**
9      Q      Do you recall telling the Corneals at any of
10  the meetings that the board only had originals and no
11  copies?
12      A      **I might have done that.**
13      Q      Is that the proposed ordinance or the final
14  ordinance?
15      A      **Proposed.**
16      Q      I think, if I understand your testimony, that
17  you said that when Mr. Corneal asked Larry Newton for a copy
18  of the proposed ordinance you didn't have a proposed
19  ordinance at that point?
20      A      **We didn't have copies of a proposed ordinance.**
21      Q      Do you recall when you gave your first
22  proposed ordinance to the Huntingdon County Planning
23  Commission?
24      A      **You asked me that earlier and I don't know.**
25      Q      Do you know if it was before or after Mr.

---

179

1  Corneal asked Mr. --
2      A      **It had to be before.**
3      Q      Did you talk to Larry Newton about whether or
4  not you ought to provide Mr. Corneal with a copy of the
5  proposed subdivision ordinance?
6      A      **I don't recall.**
7      Q      You don't recall.  Did you ask the supervisors
8  about whether or not you ought to provide a copy?
9      A      **I don't recall.**
10      Q      Do you have any understanding at all of what
11  factors the county planning commission relies upon in
12  reviewing a proposed subdivision ordinance?
13      A      **No.**
14      Q      Do you know what they compare it to?
15      A      **No.**
16      Q      Does the county have a subdivision ordinance?
17      A      **No.**
18      Q      Did you get comments from the county on all
19  three ordinances that were passed at the July 10, 2000
20  meeting?
21      A      **I don't recall if we got it on all three or**
22  **not.**
23      Q      You just testified that Huntingdon County
24  doesn't have a subdivision ordinance, correct?
25      A      **That's right.**

---

180

1      Q      Did they ever have a subdivision ordinance to
2  your knowledge?
3      A      **A county subdivision ordinance?**
4      Q      A county subdivision ordinance.
5      A      **No.**
6      Q      I notice that the Huntingdon County Planning
7  Commission letters of February 24 and April 20th, which are
8  Wirth 11 and 10 respectfully, are addressed to you.
9      A      **Yes.**
10      Q      Did you read these letters?
11      A      **Yes.**
12      Q      Look at Paragraph 2 on the April 20th letter,
13  Paragraph 2 meaning their numbered paragraph 2.  Miss Wirth,
14  what do you understand that paragraph to mean?
15      A      **That the county was questioning the soils at**
16  **the site where he was proposing a house.**
17      Q      Do you know what hydric soils are?
18      A      **I know it has something to do with a wetland,**
19  **that's all I know.**
20      Q      And then continuing on with Paragraph 2 do you
21  see where it says that the Blazosky Associates had indicated
22  that no wetlands were present at the location of the lots in
23  the Corneal subdivision proposal?
24      A      **Yes.**
25      Q      What occurred after the Blazosky Associates

---

181

1  map and study data identifying the investigation area was
2  submitted?
3      A      **I have no idea.**
4      Q      What occurred in response to their opinion and
5  their report that there were no wetlands present at the
6  location of the lots of the proposal?
7      A      **I don't -- I have no idea.**
8      Q      What prompted the Huntingdon County Planning
9  Commission to have to review whether or not there were
10  wetlands, do you know?
11      A      **I have no idea.**
12      Q      Do you know whether anybody among the township
13  supervisors questioned whether the Blazosky Associates
14  proposal was correct?
15      A      **I have no idea.**
16      Q      Did you question whether the Blazosky -- are
17  you familiar with the Blazosky Associates report?
18      A      **I know it exists from this letter.**
19      Q      Did you ever read it?
20      A      **No.**
21      Q      Did you know what the conclusions were?
22      A      **No.**
23      Q      Do you know whether the supervisors questioned
24  whether Barry Parks had correctly identified wetlands?  Do
25  you know whether any supervisor questioned that?

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

182

1   A    You'll have to ask them.
2   Q    Did you have any conversations with anybody
3   from the Huntingdon County Planning Commission about whether
4   or not there were wetlands?
5   A    No.
6   Q    Let me ask you about Paragraph 3 of this April
7   20 letter. Can you just look at that, the numbered
8   paragraph 3. What do you understand that paragraph to mean,
9   Miss Wirth?
10  A    What it says.
11  Q    The proposal that they're speaking about in
12  that Paragraph 3, that's the subdivision proposal, correct,
13  that the Corneals submitted?
14  A    I would assume.
15  Q    Now, why are these letters addressed to you?
16  A    Because they all come to the secretary because
17  that's where the mail comes to.
18  Q    Then do you pass them on to each of the
19  township supervisors?
20  A    I attach them to the subdivision plot plan.
21  Q    You attach them to the subdivision plot plan?
22  A    Right, and they review it.
23  Q    And then the supervisors review it?
24  A    Right.
25  Q    When do they review it, at a township meeting

---

183

1   or informally or what?
2   A    It gets presented at the township meeting and
3   then if we don't have the letter back from the county or
4   there's something else that needs to happen they will sign
5   them at a later date.
6   Q    When you say you attach them, you mean you put
7   them in the file with it, stick them inside of the -- inside
8   a rubber band?
9   A    Somewhere -- it's attached.
10  Q    So it becomes part of the application,
11  correct?
12  A    It should.
13  Q    In response to this April 20, 2000 letter from
14  the planning commission, what action did the board of
15  supervisors take with respect to the Corneal's subdivision
16  proposal?
17  A    You'll have to ask them.
18  Q    Was it discussed any further at an additional
19  meeting?
20  A    About this proposal?
21  Q    About this letter.
22  A    This letter?
23  Q    What the letter recommends.
24  A    Not that I can recall.
25  Q    I'm going to show you a letter I'm going to

---

184

1   mark now as Wirth Exhibit 12.
2       (Letter dated 11/10/00 produced and marked as
3   Wirth Exhibit No. 12.)
4   BY MS. MONTGOMERY:
5   Q    Have you seen this letter before?
6   A    Yes, I probably have.
7   Q    I see that this letter is -- this Box 390 up
8   there, that's your home address, right?
9   A    Yes.
10  Q    The letter is addressed to gentlemen, which
11  means the township supervisors, correct?
12  A    Yes.
13  Q    So when you get a letter like this, what do
14  you do with it?
15  A    Well, this one I probably gave to Larry
16  Newton.
17  Q    And then you would assume that Larry Newton
18  would pass it on to the township supervisors?
19  A    I might have given them copies. I don't
20  remember.
21  Q    So I think you testified earlier that you
22  didn't know anything about a hearing request in connection
23  with his building permit?
24  A    I keep asking you about time frames. You must
25  talk to me about time frames because there's two different

---

185

1   things going on here.
2   Q    Well, this is November 10, 2000.
3   A    Okay, but there's the original building --
4   should I go into this?
5       MR. SHERR: Is it an answer to her question?
6       THE WITNESS: Yes. The original building --
7   when he applied for a building permit the first time, that
8   was not this time. This is whenever now we're working with
9   him to get his building permits and his sewage permits.
10  There's two different issues here and you have to clarify
11  not just year, you're going to have to clarify issues.
12  BY MS. MONTGOMERY:
13  Q    Okay, so when I asked you do you know anything
14  about an appeal of Mr. Corneal's application for a building
15  -- denial of an application for a building permit, I have
16  to tell you the exact date?
17  A    You're going to have to tell me which issue
18  we're talking about because there's two different things
19  going on.
20  Q    Well, now that you look at it, do you recall
21  a hearing --
22  A    Yeah, I know about this.
23  Q    Was there a hearing ever scheduled?
24  A    We have talked to Terry Williams numerous
25  times. We've had hearings with Terry and phone calls and --

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

186

1   they have.
2      Q      I think I asked you this before, but if you're
3   going to have a hearing on this appeal, the denial of his
4   building permit, where would that be held?
5      A      All the meetings we had with Terry Williams
6   were in the courthouse.
7      Q      That wasn't my question. I'm talking about a
8   hearing on an appeal of the denial of a building permit.
9      A      We never had a hearing with Mr. Corneal. We
10  had hearings -- meetings. We had meetings with Mr. Williams
11  in the courthouse. That's all we ever did.
12     Q      Let me ask you this: If Mr. Van Dommelen
13  sends out a denial of a building permit, does he send a copy
14  to you?
15     A      He would.
16     Q      He would?
17     A      Probably.
18     Q      And would you keep it in your files?
19     A      I've only ever had one.
20     Q      One denial of a building permit?
21     A      Yes.
22     Q      And that was Mr. Corneal's?
23     A      Right.
24     Q      No other building permit has ever been denied
25  in Jackson Township in your time?

187

1      A      I can't say that.
2      Q      In your time?
3      A      I can't say that.
4      Q      But you've only ever gotten one letter?
5      A      I've only gotten one letter. I can't say
6   anything else.
7      Q      Well, back to my question. Was a hearing ever
8   scheduled for an appeal on the denial of the building permit
9   in accordance with this November 10, 2000 letter?
10     A      I can't recall the time we met with Terry
11  Williams. I cannot recall the hearing we had with Terry
12  Williams, what day it was, when it was.
13     Q      Well, the hearing you had with Terry Williams
14  was in the county court suit up there, right? Is that what
15  you're talking about?
16     A      Yes, and that's what we -- I thought that's
17  when this stuff took -- was taken care of.
18     Q      I'm going to show you a copy of a letter that
19  we're going to mark as Wirth Exhibit 13 now.
20          (Letter dated 10/10/00 produced and marked as
21  Wirth Exhibit No. 13.)
22  BY MS. MONTGOMERY:
23     Q      Before we even go back and talk about that, I
24  just want to go back to what you testified to a couple
25  minutes ago. You had said that you couldn't respond before

188

1   to my question about whether you were aware of a hearing on
2   Mr. Corneal's appeal of the denial of his building permit
3   because there was another issue, there were two issues, and
4   I need you to identify the issue, okay?
5      A      Okay.
6      Q      What was the other issue?
7      A      Now, I'm asking you to talk about the new
8   submissions that he has and the old submissions that he has
9   because they were handled in two different fashions.
10     Q      What do you mean they were handled in two
11  different fashions?
12     A      Well, Terry Williams submits everything here,
13  okay. This one was directly submitted to me, okay, and this
14  was --
15     Q      When you say this one, what are you referring
16  to?
17     A      This letter, Number 13, this came to me.
18  Those building permits came to me.
19     Q      You're looking at Number 13 and you're saying
20  the letter from David Van Dommelen dated April 10, 2000 came
21  to you?
22     A      No, no, not the letter.
23     Q      Okay, what?
24     A      Mr. Corneal's application, he sent them to me,
25  with drawings that he had drawn by hand attached, and that's

189

1   the answer -- this is the answer to that. And I'm assuming
2   that's what this is about, but I don't know.
3      Q      So you're saying the October 10, 2000 letter
4   from Mr. Van Dommelen is a response to Mr. Corneal's request
5   for a building permit?
6      A      The first building permit.
7      Q      When Mr. Van Dommelen sent this letter out to
8   Mr. and Mrs. Corneal that we've marked Wirth 13, did you get
9   a copy of it?
10     A      Obviously. I gave you one.
11     Q      Well, you gave it to me. Did you get a copy
12  of it when it went out?
13     A      I probably did. I have a file.
14     Q      Do you know who drafted the letter?
15     A      You'll have to talk to David about that.
16     Q      Did you draft the letter?
17     A      No.
18     Q      Does he have somebody who does his typing?
19     A      You'll have to talk to him.
20     Q      Do you do his typing ever?
21     A      No.
22     Q      I see up at the top here it has Jackson
23  Township Board of Supervisors, R.D. 1, Box 390. That's your
24  home box, right?
25     A      Yeah, that's not right.



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

190

1   Q      So Mr. Van Dommelen has an office where he
2   lives, where he keeps documents, but he uses Jackson
3   Township Board of Supervisor's address for his
4   correspondence?
5        **A      In this case he did.**
6   Q      Let me ask you this: Does Mr. Van Dommelen --
7   is it your understanding within the township governing body
8   that Mr. Van Dommelen passes on compliance with the
9   Pennsylvania Sewage Facilities Act? Let me direct your
10  attention to the October 10, 2000 letter marked Wirth 13.
11       **A      Pennsylvania Sewage Facility Act is addressed**
12  **in our building permit ordinance.**
13  Q      So Mr. Van Dommelen passes on whether or not
14  individuals requesting a building permit have complied with
15  the Pennsylvania Sewage Facilities Act?
16       **A      According to the ordinance, you have to have a**
17  **sewage permit if you're going to build a property and he**
18  **would say no to that if you didn't have one.**
19  Q      So Mr. Van Dommelen would communicate with Mr.
20  Parks about whether or not he's got a sewage permit, right?
21       **A      No, you don't -- anybody that goes to get a**
22  **permit normally has a sewage permit, if they're building a**
23  **house.**
24  Q      Let me ask you this: Do you know whether or
25  not you need a sewage permit for a garage?

191

1        A      No.
2   Q      You don't think you do?
3        **A      If you're just building a garage and nothing**
4   **else.**
5   Q      Okay.
6        (Discussion held off the record.)
7        MS. MONTGOMERY: I'm going to take a break and
8   look at our documents and then we're going to come back and
9   finish this up.
10       (Break taken at 2:42 p.m. until 3:01 p.m.)
11  BY MS. MONTGOMERY:
12  Q      I want to show you a series of documents
13  attached together that we are going to mark as Wirth
14  Exhibit 14.
15       (Packet of documents produced and marked as
16  Wirth Exhibit No. 14.)
17       (Discussion held off the record.)
18  BY MS. MONTGOMERY:
19  Q      This is Wirth Exhibit 14. After you take a
20  moment to look at that, Miss Wirth, at this collection of
21  documents, would you tell me if you recognize it.
22       **A      Yes.**
23  Q      Do you see that there are two letters, an
24  August 31, 2000 and a September 1, 2000 letter, correct?
25       **A      Right.**

192

1   Q      Now, you received these letters, correct?
2        **A      Yes.**
3   Q      Did you receive the attachments that you see
4   here?
5        **A      To the best of my knowledge.**
6   Q      Were there also sewer modules attached to this
7   when it came to you originally in the August, September 2000
8   time frame?
9        **A      I don't remember.**
10  Q      What did you do with this submission when you
11  received it?
12       **A      I don't remember what we did with it.**
13  Q      Is this what you were referring to as Mr.
14  Corneal's second request for a building permit?
15       **A      I believe so.**
16  Q      Did you give this to the supervisors?
17       **A      I'm sure I did.**
18  Q      Did you pass it onto the building inspector or
19  the building permit officer?
20       **A      I must have.**
21  Q      Did you have any discussion with the
22  supervisors or the building permit officer about this
23  building permit application?
24       **A      I don't recall.**
25  Q      Do you know whether it was ever acted on?

193

1        **A      I don't recall.**
2   Q      Did you ever discuss this second set of
3   building applications with Attorney Newton?
4        **A      Probably.**
5   Q      Why do you say probably?
6        **A      Because there's a lot of things happening and**
7   **I'm not sure which players are involved. I'm not sure if**
8   **this is the -- I'm not sure.**
9   Q      So if you call this the second attempt to
10  obtain a building permit, what was the first attempt, do you
11  recall?
12       **A      I'm not sure. I'm not sure.**
13  Q      Well, whether or not it was the first or
14  second, what do you know about any other attempt by Mr.
15  Corneal to obtain a building permit?
16       **A      Only what I've testified.**
17  Q      Well, what you've testified to so far, you're
18  saying?
19       **A      Yes.**
20  Q      Do you know whether or not Mr. Corneal ever
21  went out to Mr. Van Dommelen's residence to try and obtain a
22  building permit?
23       **A      Yes.**
24  Q      What do you know about that?
25       **A      I can't testify to that because I only know**

WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

194

1  what I heard.
2  Q      What did you hear?
3          MR. SHERR: Object to the form of the
4  question, calls for hearsay. You can answer it.
5          THE WITNESS: I don't really know what
6  happened out there. I was not there.
7  BY MS. MONTGOMERY:
8  Q      I'm not asking you what you know, I'm asking
9  you what you heard, which you're allowed to testify to in a
10  deposition.
11          MR. SHERR: Same objection. Subject to the
12  objection, you can answer.
13          THE WITNESS: That he didn't give him a
14  permit.
15  BY MS. MONTGOMERY:
16  Q      Why didn't he give him a permit?
17          MR. SHERR: Same objection. You can answer,
18  same basis.
19  BY MS. MONTGOMERY:
20  Q      You can answer it.
21  A      The same reason we've talked about all day.
22  Q      And what was that we've talked about all day?
23  A      He didn't have the proper documentation.
24  Q      Do you know whether he was even given an
25  application when he went out to Mr. Van Dommelen's?

195

1  A      From a letter that I read, no. This letter, I
2  think. Somewhere there's something that said he wasn't.
3  Q      Had you heard anything about that before that?
4  A      I don't know.
5  Q      Did you have a copy of this letter to you, the
6  August 31 and September 1 letter in your files?
7  A      I gave you these.
8  Q      You gave me these?
9  A      I believe. No? Well, then I do. I know that
10  -- I thought that was my number because I was writing on
11  there.
12          MR. SHERR: Answer her question.
13          THE WITNESS: Okay. I do.
14  BY MS. MONTGOMERY:
15  Q      So you do have them in your files?
16  A      Yes.
17  Q      Miss Wirth, I'm going to ask you to take our
18  document request -- which you have a copy of, correct?
19  A      Yes.
20  Q      And review it again with your counsel and see
21  whether there are any other documents responsive to the
22  document request and provide them to us immediately, okay.
23          MR. SHERR: Is that a question?
24          MS. MONTGOMERY: No, it's an instruction, it's
25  a request.

196

1          MR. SHERR: Well, you can't give her
2  instructions. You can ask her questions.
3          MS. MONTGOMERY: I can make a record of it if
4  I want to.
5          MR. SHERR: You can make a record of anything
6  you want, but you need to ask her questions.
7          MS. MONTGOMERY: That's what I did.
8          MR. SHERR: Are you done with the deposition?
9          MS. MONTGOMERY: No.
10          MR. SHERR: Well, then ask her a question.
11  BY MS. MONTGOMERY:
12  Q      Did you bring any documents with you today to
13  this deposition?
14  A      No, I ...
15  Q      Were you instructed by anybody whether or not
16  to bring any documents with you to this deposition today?
17  A      No.
18  Q      You weren't instructed one way or the other?
19  A      No.
20  Q      Did you ever discuss with Mr. Parks his review
21  of the Corneal sewage module?
22  A      I don't believe so.
23  Q      Does the board of supervisors have a
24  particular procedure that you're aware of for review and
25  approval of sewage modules?

197

1  A      I think I did testify that -- to that earlier.
2  Q      I don't recall you testifying to it but --
3  A      It's attached to the plot plan, the same thing
4  as we review from the county. It's the same review.
5  Q      So let me ask you this: In your experience is
6  it correct that the sewage enforcement officer, Barry Parks,
7  first reviews the sewage module and signs off on them; is
8  that correct?
9  A      I'm not sure what the procedure is.
10  Q      You have no idea?
11  A      No, I don't know.
12  Q      Do you know whether or not the township has
13  ever rejected any sewage module that was approved by Barry
14  Parks?
15  A      I have no idea.
16  Q      You have no idea. Do you know whether they
17  rejected Mr. Corneal's sewage module?
18  A      Yes.
19  Q      Was it approved by Mr. Parks?
20  A      I don't know.
21  Q      Did you ever direct Mr. Parks or at least
22  suggest to Mr. Parks that he go out to Mr. Corneal's
23  property in 2001, in the year 2001, and reinspect his
24  property to see whether there was sewage enforcement
25  compliance?

WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

**198**

1  A    Me personally?
2  Q    Yes.
3  A    No.
4  Q    Did you ever pass along to him a request from
5  anybody else to do that?
6  A    I don't think I did that.
7  Q    Did the supervisors to your knowledge ever --
8  A    You'll have to ask them.
9  Q    Well, I'm asking you if in your presence or to
10 your knowledge whether --
11 A    I don't recall.
12 Q    Let me finish my question.  Whether the
13 supervisors instructed Barry Parks to go back out to Mr.
14 Corneal's property and reinspect his sewage sites.
15 A    I don't recall.
16 Q    Did you ever discuss it with Larry Newton
17 whether Mr. Parks ought to go back out to Mr. Corneal's
18 property and reinspect the test sites for sewage?
19 A    I don't recall.
20 Q    At one point when I asked you this question
21 earlier about whether or not you asked or suggested to Barry
22 Parks that he go back out to the Corneal property, you said
23 not me personally.
24 A    No, I asked you a question, if you meant me
25 personally.

---

**199**

1  Q    Oh, okay.
2  A    So I understood what you were asking me.
3  Q    Okay.
4  A    It's been a long day.
5  Q    Yes.  So your answer is no, you personally did
6  not?
7  A    No.
8  Q    Do you recall anybody suggesting that Barry
9  Parks go back out to the Corneal's property to reinspect the
10 test sites for sewage?
11 A    Not that I recall.
12 Q    Do you know how it came to occur that --
13 A    No.
14 Q    -- Mr. Parks went back out there?
15 A    No.
16 Q    You don't know, okay.  Are you aware of a
17 complaint that was filed against the Corneals concerning
18 possible wetlands on their property?
19 A    I know of it.
20 Q    Do you know who filed -- who made that
21 complaint?
22 A    I have no idea.
23 Q    How do you know of it?
24 A    Because it's in one of these documents that's
25 here.

---

**200**

1  Q    Do you know who the complaint was made to?
2  A    I have no idea.  I think it says Army Corps of
3  Engineers or something.
4  Q    The Army Corps of Engineers.  Was there any --
5  do you recall discussing that complaint with anybody else at
6  all?
7  A    No.
8  Q    Do you recall anybody else discussing that
9  complaint in your presence?
10 A    No.
11 Q    Have you seen any written correspondence    ✗
12 about that complaint?
13 A    No.
14 Q    Is the only knowledge that you have about that
15 complaint against the Corneals what you saw in a letter here
16 somewhere?
17 A    Yes.
18 Q    After the initiation of the lawsuit?
19 A    Yes.
20 Q    So you didn't know about it before the
21 initiation of the lawsuit?
22 A    No.
23 Q    When I asked you briefly earlier about whether
24 or not you were familiar with the report from Blazosky and
25 Associates --

---

**201**

1  A    From what?
2  Q    I think it's -- am I saying that right?
3  Blazosky and Associates on wetlands on the Corneal property.
4  A    Okay, yeah.
5  Q    I asked you earlier had you ever seen that
6  report when it came out.
7  A    I don't recall.
8  Q    Do you recall whether or not it was discussed
9  among the supervisors?
10 A    No.
11 Q    Do you have a copy of that report in your
12 files?
13 A    I don't know.
14 Q    Do you know how it came to occur that Mr.
15 Corneal had to supply a third-party certification that the
16 sites already approved by the sewage enforcement officer
17 were not located in wetlands?
18 A    No.
19 Q    You don't know how it came -- did you ever
20 hear it discussed?
21 A    No.
22 Q    Let me ask you a very broad, general question
23 about it.  Did you know anything about it -- do you right
24 now know anything about it?
25 A    I don't know what you mean.

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

202

1    Q    The sewage enforcement officer having
2    determined that there are no wetlands on the Corneal
3    property, okay. Do you know anything about the board or
4    anybody else requiring that a third party certify that the
5    sewage enforcement officer was correct in that
6    determination?
7    A    No.
8    Q    Do you know anything about Mr. Wilson's
9    interest in the property now owned by the Corneals?
10   A    No.
11   Q    Do you know anything about his family's prior
12   ownership of it?
13   A    No.
14   Q    You don't?
15   A    No.
16   Q    Do you know anything about the history of that
17   property at all?
18   A    No.
19   Q    Are you ever involved in any way, whether it's
20   through maintenance of records or passing correspondence, in
21   the issuance of privy permits in the township?
22   A    No.
23   Q    That stuff never comes across your desk?
24   A    Nope.
25   Q    Did anybody ever call you and inquire about

---

203

1    it?
2    A    Not to the best of my knowledge.
3    Q    Do you know anything about the granting of
4    privy permits in the township?
5    A    No, I do not.
6    Q    Have you ever had any conversations with Mr.
7    Parks about the issuance of privy permits?
8    A    Yes.
9    Q    What's the nature of those conversations?
10   A    I told him the result -- what the supervisors
11   said the night of our meeting, that's all I did.
12   Q    The night of what meeting?
13   A    The meeting that -- I don't know what meeting
14   it was. After the meeting of April 3rd.
15   Q    What did the supervisors say at the meeting of
16   April 3rd?
17   A    That Mr. Corneal could not have a privy
18   permit.
19   Q    So you passed that information on to Mr.
20   Parks?
21   A    Barry Parks.
22   Q    Did you call him?
23   A    Yes, I did.
24   Q    Did you do so at the instructions of the
25   supervisor?

---

204

1    A    Yes.
2    Q    Supervisors, I should say.
3    A    Yes.
4    Q    Did one supervisor in particular ask you to
5    make that phone call?
6    A    No.
7    Q    Did you generally understand you were supposed
8    to make that phone call?
9    A    Yes.
10   Q    So you took it upon yourself to make the phone
11   call without a specific instruction on that particular
12   occasion?
13   A    That's right. That's exactly right.
14   Q    Did you discuss the refusal to provide a privy
15   permit to Mr. Corneal with Mr. Newton?
16   A    I don't know if I ever did or not.
17   Q    In your discussion with Mr. Parks about
18   whether or not to provide a privy permit to Mr. Corneal, how
19   long did you talk to him?
20   A    I have no idea.
21   Q    Did you call him at his house?
22   A    Yes.
23   Q    So you don't know exactly how long you talked
24   to him. Do you know when you talked to him?
25   A    After the meeting.

---

205

1    Q    The same night of the meeting?
2    A    Yes.
3    Q    Immediately after the meeting?
4    A    I don't know.
5    Q    I may have asked you this, and I apologize,
6    but do you recall the back and forth between you and Mr.
7    Parks about whether or not to issue a privy permit?
8    A    Do I what?
9    Q    Do you recall the substance of the
10   conversation?
11   A    No. All I did -- well, I guess I do. I just
12   repeated what happened at the meeting and that's all I did.
13   Q    What did Mr. Parks say?
14   A    I don't know as he said anything. I just told
15   him what happened.
16   Q    Did you ever talk to Mr. Parks about issuing
17   the Corneals a privy permit?
18   A    Not that I remember.
19   Q    Did you seek any advice from Larry Newton in
20   this regard?
21   A    I don't -- not that I recall.
22   Q    Did the Corneals ever contact you directly
23   about getting a privy permit?
24   A    Not that I recall.
25   Q    When you called Mr. Parks, did you say to him

---



**WIRTH, ANN**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

206

1  something along these lines, and if I'm wrong correct me and
2  tell me what you said, okay, the supervisors said do not
3  issue a privy permit to Mr. Corneal; is that correct?
4      A    **What I said was what was in the minutes.**
5      Q    As you said, the minutes are a summary of what
6  goes on at the meetings.  I'm just asking you if you can be
7  a little more specific in what you said to him.
8      MR. SHERR:  I'm going to object to the form of
9  the question.  It's been asked and answered and at this
10  point we're getting very argumentative, Counsel.
11      MS. MONTGOMERY:  Really?
12      MR. SHERR:  Yeah, really.  Yeah, really.  When
13  she says it's what's in the minutes and you're asking her
14  for more specificity and she said what's in the minutes, I
15  think that's pretty specific.
16      MS. MONTGOMERY:  I'm entitled.
17      MR. SHERR:  You're entitled to what?
18      MS. MONTGOMERY:  I'm entitled to seek
19  information.
20      MR. SHERR:  You are absolutely entitled to
21  seek information.  You're not entitled to harass this
22  witness, you're not entitled to be argumentative with this
23  witness and you're not allowed to oppress this witness.  You
24  can answer, if it's anything other than what's in the
25  minutes as you stated.

---

207

1      THE WITNESS:  It's what I just said.
2      (Discussion held off the record.)
3  BY MS. MONTGOMERY:
4      Q    Are you aware of the contract that existed
5  between Mr. Corneal and the Hewetts for the purchase of the
6  farmhouse and some surrounding property that's located on
7  the larger piece owned by Mr. Corneal?
8      A    **I'm aware they had an agreement.**
9      Q    How did you become aware of that?
10      A    **I think -- I don't know, somewhere in this.**
11      Q    When did you first hear about it?
12      A    **I don't -- I don't recall.**
13      Q    Did you ever discuss that contract with
14  anybody else?
15      A    **No.**
16      Q    Did you ever discuss whether or not the
17  Hewetts were going to go forward with their sale -- purchase
18  of that property with anybody else?
19      A    **I have no reason.**
20      Q    Do you know whether anybody else is interested
21  in purchasing the farmhouse located on Mr. Corneal's
22  property?
23      A    **I have no reason to have that information.**
24      Q    I just asked you do you know.
25      A    **No.**

---

208

1      Q    How long have you lived in Jackson Township?
2      A    **Eleven years.**
3      Q    Where did you live before that?
4      A    **Camp Hill.**
5      Q    Did you own property up there before you moved
6  up there 11 years ago?
7      A    **Yes.**
8      Q    How long did you own that property?
9      A    **1988.**
10      Q    Did you own any property before you owned that
11  particular property?
12      A    **Where?**
13      Q    Up in Jackson Township.
14      A    **No.**
15      Q    Do you have family up there?
16      A    **Yes.**
17      Q    Who is that?
18      A    **Nobody in Jackson Township, if that's what**
19  **you're asking.**
20      Q    That's what I'm asking, right.
21      A    **No, I don't have any family.**
22      Q    Were you aware that Eagle Excavation was hired
23  to perform excavation work for test pits on the Corneal
24  property?
25      A    **When?**

---

209

1      Q    At the time that they were hired to do so.
2      A    **No.**
3      Q    You were not aware of that?
4      A    **No.**
5      Q    Were you aware of Mr. Wilson doing any work up
6  on the Corneal property whatsoever?
7      A    **When?**
8      Q    At the time that he performed the work.
9      A    **No.**
10      Q    Now, you asked me when.  When did you become
11  aware?
12      A    **From the documents.**
13      Q    Just from the documents in this lawsuit?
14      A    **Right.**
15      Q    After you initially called Mr. Parks and told
16  him that he wasn't supposed to issue a privy permit
17  according to the supervisors, did you ever call him back and
18  talk to him again?
19      MR. SHERR:  Object to the form of the question
20  of misstating her prior testimony.
21  BY MS. MONTGOMERY:
22      Q    I'll just try and rephrase it.  Maybe I missed
23  something, but after you called Mr. Parks and informed him
24  that the supervisors said that he was not to be issued a
25  privy permit, did you ever call -- talk to him again about

---



210

1    whether or not to issue the Corneals a privy permit?
2        A        You asked me that before and I said no.
3        Q        Did you ever talk --
4        A        Not that I recall.
5        Q        Did you ever talk to him again about whether
6    or not he ought to approve the sewage modules?
7        A        No.
8        Q        Did you ever call Mr. Van Dommelen with any
9    information about whether or not he ought to issue a
10   building permit to the Corneals?
11       A        No.
12       Q        I'm going to show you a document we are going
13   to mark as Wirth Exhibit 15.
14               (Letter dated 5/5/00 produced and marked as
15   Wirth Exhibit No. 15.)
16   BY MS. MONTGOMERY:
17       Q        Have you seen this document before, Miss
18   Wirth?
19       A        Yes.
20       Q        In what capacity have you seen it?
21       A        It's in all this stuff I have.
22       Q        The document is dated May 5th, 2000, correct?
23       A        Yes.
24       Q        Were you given a copy of this document by Mr.
25   Van Dommelen?

211

1        A        I don't know how I got the document.
2        Q        Did you have a copy of it in your files?
3        A        Yes.
4        Q        Did you provide it to us?
5        A        I don't know if I did or not.
6        Q        Did you ever discuss this letter with any of
7    the board of the township supervisors?
8        A        I don't recall.
9        Q        Did you ever discuss it with Mr. Van Dommelen?
10       A        I don't -- I don't know.  I don't recall.
11       Q        More generally did you ever discuss it with
12   anybody at any time?
13       A        I don't recall.
14               MS. MONTGOMERY:  I don't think I have any
15   other questions for you at this time, subject to our receipt
16   of additional documents from your files and review of
17   additional documents in Jackson Township and subject to what
18   my client has to say right now about additional questions.
19   I think we're finished for now, Miss Wirth.
20               THE WITNESS:  Thank you.
21               MS. YANKANICH:  I have some questions for you.
22   I know it's been a long day and I'll try to be brief.
23
24               CROSS-EXAMINATION
25

212

1    BY MS. YANKANICH:
2        Q        In case I haven't introduced myself, Miss
3    Wirth, I'm Jennifer Yankanich and I represent Larry Newton.
4        A        Yes.
5        Q        I want to go back and retrace some of these
6    steps so that I understand very clearly what kind of
7    communications you had with Larry Newton and so forth.  So
8    I'd like to start with the period of 1997 to '98, which is
9    roughly when you said you started research on the
10   subdivision ordinance.
11       A        Very little probably.  I don't recall.
12       Q        But you did start research before you actually
13   enacted the subdivision ordinance; is that correct?
14       A        Oh, yes.
15       Q        And the three supervisors asked you to do that
16   research.
17       A        Oh, yes.
18       Q        Did you have any contact during that research
19   with Larry Newton?
20       A        Between '97 and '98?
21       Q        At any time during the research and before the
22   ordinance was enacted.
23       A        Oh, yes.
24       Q        What kind of communications were they?
25       A        Well, he typed the final -- he typed the

213

1    ordinance that we came up with.
2        Q        Larry Newton did?
3        A        Yes.
4        Q        So --
5        A        Before the final -- I mean, it was a draft.
6    He did that.
7        Q        When you were doing -- what kind of research
8    were you doing on the ordinance?
9        A        That's what I testified, on all the other
10   subdivision ordinances that we got and we divided and
11   subtracted and put things together for Jackson Township.
12       Q        You stated that you had work groups with the
13   three other supervisors?
14       A        Yes, we did.
15       Q        Now, how did Larry Newton come into the
16   works?  For instance, during these work groups if you had
17   questions, did you call Larry Newton?
18       A        I don't recall if we called him from those
19   work groups.  I don't know that.  I don't remember.
20       Q        Well, who made the decision on what parts to
21   put into the subdivision ordinance?
22       A        The supervisors.
23       Q        Did you at any time contact Larry Newton and
24   get his approval as to what was included in your draft
25   ordinance?



**WIRTH, ANN**
**05/16/01**

CORNEAL VS
JACKSON TOWNSHIP

214

1   A     To get his approval?
2   Q     Yes. When your supervisors made the decision
3   on what specific parts to put into this draft ordinance, did
4   they seek the approval of Larry Newton?
5   A     I don't know if they ever asked for his
6   approval.
7   Q     Did you ever -- you testified earlier you
8   weren't sure who asked you or who stated they wanted a
9   subdivision ordinance. Did you ever ask Larry Newton
10  whether or not the township could enact such an ordinance?
11  A     Probably.
12  Q     Was that before your research was started?
13  A     I don't remember.
14  Q     Do you remember that you did in fact ask him
15  whether you could have such an ordinance?
16  A     I don't recall.
17  Q     Now, throughout your workshops when did Larry
18  Newton get involved in typing the draft?
19  A     You want a time?
20  Q     Yes. For instance, you've told me that you
21  did some research, you gathered some other documents from
22  other townships who had such an ordinance, you and the three
23  supervisors sat down and picked some parts out of each of
24  these to put into yours. I'm asking you how Larry Newton
25  came to even start to type this.

216

1   Q     Before January 2000 when the moratorium was
2   voted on and passed --
3   A     Um-hum.
4   Q     -- did you ever ask Larry Newton whether or
5   not passing such a moratorium was legal?
6   A     I don't recall if I did or not.
7   Q     Do you recall if any of the supervisors asked
8   Larry Newton that?
9   A     You'll have to ask them that.
10  Q     Do you recall ever discussing the moratorium
11  prior to when it was passed with Larry Newton?
12  A     I don't recall.
13  Q     Before January 2000 did you have any knowledge
14  of David Corneal's property and what he was proposing to do
15  with it?
16  A     No, I did not.
17  Q     So did you have any discussions with Larry
18  Newton prior to January 2000 regarding David Corneal's
19  properties?
20  A     No, not to -- no.
21  Q     In January 2000 the moratorium was passed?
22  A     Right.
23  Q     You just stated you did not have any
24  conversations with Larry Newton regarding that moratorium;
25  is that correct?

215

1   A     We took it into him and asked him to look at
2   -- look at it legally, I guess.
3   Q     So you already had a draft?
4   A     Yeah -- well, no, we didn't have a draft.
5   Q     What did you submit to him?
6   A     The pieces that we had.
7   Q     And what did you specifically ask him about
8   those pieces?
9   A     He just needed to look at them for, I guess,
10  the legal aspect of the thing, not as far as how they --
11  what it did to the township, but were they legal, I guess.
12  I don't know what he was doing. I just know that he did it.
13  Q     Did you have that contact with Larry Newton or
14  did the supervisors?
15  A     Probably me.
16  Q     So were you always the go-between between
17  Larry Newton and the supervisors?
18  A     No.
19  Q     Was there a situation with regard to this
20  draft ordinance where the supervisors went directly to Larry
21  Newton to ask questions?
22  A     You're only talking about the ordinance now?
23  Q     The draft ordinance before it was enacted.
24  A     I don't think so, but I don't -- I don't think
25  they went without me, but I don't know that for sure.

217

1   A     I said I couldn't recall.
2   Q     You couldn't recall. Do you recall if any of
3   the supervisors asked you to research whether or not you
4   could -- they could pass such a moratorium?
5   A     I don't recall how we came about that.
6   Q     Typically if the supervisors wanted to do
7   something, such as pass a moratorium or pass a resolution or
8   pass an ordinance, would they ask you to research it?
9   A     It depends. Sometimes.
10  Q     Fifty percent of the time?
11  A     Maybe.
12  Q     Most of the time?
13  A     I would say about 50 percent of the time.
14  Q     You don't recall whether or not the
15  supervisors asked you to research whether they could pass a
16  moratorium?
17  A     I don't recall how that happened.
18  Q     When was the first time that you heard a
19  moratorium was going to be passed?
20  A     I don't -- I don't know. I don't recall.
21  Q     Did you show up at the January meeting and
22  somebody brought up the issue of a moratorium?
23  A     I was at the January meeting.
24  Q     That was the first time you heard about a
25  moratorium?



**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

218

1    A    I don't recall.
2    Q    And so we're clear, you had not heard of David
3    Corneal before January 2000?
4    A    No.
5    Q    The moratorium was passed on January 4th
6    during the meeting; is that correct?
7    A    Right.
8    Q    By a unanimous vote of the three supervisors?
9    A    Yes.
10    Q    Were you involved with that vote?
11    A    I don't have a vote.
12    Q    If you had sought the advice of Larry Newton,
13    do the supervisors typically take your advice or do they ask
14    Larry Newton themselves?
15    A    Typically take my advice?
16    MR. SHERR:  Make sure she can hear you.
17    THE WITNESS:  Oh, you're still recording this?
18    MS. YANKANICH:  Yes, we're still on the
19    record.  You're still under oath.
20    MR. SHERR:  She got it.
21    MS. YANKANICH:  I'm not being confrontational
22    at all.  I'm just letting her know that she's on the record.
23    MR. SHERR:  I know you're not.  She answered
24    the question.
25    BY MS. YANKANICH:

219

1    Q    Oh, you answered my question.  Typically if
2    you asked Larry Newton a question -- the supervisors asked
3    you to ask Larry Newton a question, do they come to you and
4    say what did he say or do they ask him themselves?
5    A    I'd say it's about a fifty-fifty thing.
6    Q    So if you went to Larry Newton and said can we
7    pass a moratorium in January and he says, let's just say,
8    yes, we can, you would report that back to the supervisors?
9    A    If he did that, I would have.
10    Q    And they would act upon that advice without
11    confirming it themselves typically?
12    A    Sometimes, sometimes not.
13    Q    Did Larry Newton tell you to enact a
14    moratorium?
15    A    I don't recall how that came about.
16    Q    You don't recall if it came about from a
17    supervisor or from Larry Newton?
18    A    I don't recall how it came about.
19    Q    On February 7th when David Corneal submitted
20    his subdivision plan to the three supervisors, do you recall
21    at the meeting before they denied it, do you recall if the
22    supervisors stopped the meeting, called their attorney,
23    Larry Newton, and discussed the matter with him before
24    refusing the denial?
25    A    I know they didn't do that.

220

1    Q    So they denied his subdivision plan prior to
2    calling Larry Newton on February 7th?
3    A    Yes.
4    Q    Did they at any time after the February 7th
5    meeting consult with Larry Newton regarding the first
6    subdivision plan that David Corneal submitted?
7    A    I'm sure they did.
8    Q    Were you present at any of those meetings?
9    A    I don't recall.
10    Q    Did you consult with Larry Newton after
11    February 7th regarding the first subdivision plan that David
12    Corneal submitted?
13    A    I don't recall if I did or not.
14    Q    You said that you thought the supervisors
15    did.  Why do you think that?
16    A    Somebody did.
17    Q    How do you know that?
18    A    Because he's been aware of what we've been
19    doing.
20    Q    Was he aware from the beginning?
21    A    I don't -- beginning of what?
22    Q    February 7th is the first time you stated that
23    David Corneal came to your knowledge.  You didn't know about
24    David Corneal and his property before then?
25    A    No, I didn't.

221

1    Q    So February 7th he walks into the meeting
2    where you're taking the minutes, he submits his plan and the
3    three supervisors deny it.  Did somebody get on the phone
4    right after that and talk to Larry Newton to inform him,
5    hey, we've got to let you know what's going on here?
6    A    You mean that night?
7    Q    Anytime after February 7th.
8    A    Yes, somebody did.
9    Q    When was that?
10    A    I don't know.
11    Q    Do you know who it was?
12    A    No.
13    Q    How do you know that Larry Newton was aware of
14    the denial of the board on February 7th?
15    A    I don't know if it's in one of these documents
16    -- I don't know.  I don't know.
17    Q    Your testimony is that you're sure he was
18    aware of what happened, what transpired at the February 7th
19    meeting with David Corneal, but you don't know how?
20    A    I don't know how he got the information.
21    Q    You're sure he knew about it?
22    MS. MONTGOMERY:  I'm going to just -- I'm now
23    in the position that you were in.  I can see that the court
24    reporter is struggling to hear.  So can you keep your voice
25    up.



222

1      THE WITNESS: I'm sorry.
2  BY MS. YANKANICH:
3      Q      Let me just repeat my question. You're sure
4  that Larry Newton knows and knew right after the meeting
5  what transpired at the February 7th, 2000 meeting?
6      A      I'm sure he knew. When he found -- we told
7  him, but when he found out I don't know.
8      Q      Is it possible he found out about what
9  happened at that meeting after this lawsuit was enacted, was
10 initiated?
11     A      You mean after July 4th?
12     Q      Is it possible he found out after the county
13 sued David Corneal for violation of building against --
14     A      Oh, no.
15     Q      He knew before then?
16     A      Oh, yeah.
17     Q      Now, on April 4th David Corneal came to the
18 meeting to submit sewer modules. They were denied by the
19 board; is that correct?
20     A      Yes.
21     Q      Did the three supervisors stop the meeting and
22 seek advice from Larry Newton during the meeting?
23     A      No.
24     Q      Before that denial?
25     A      No.

223

1      Q      Did you at any time consult with Larry Newton
2  regarding the denial of the sewer modules on April 4th?
3      A      At the meeting?
4      Q      At the meeting.
5      A      No.
6      Q      How about after the meeting?
7      A      Not at that time.
8      Q      When did you consult with Larry Newton
9  regarding the sewer modules?
10     A      I don't recall when we did that.
11     Q      You know that you did?
12     A      No, I don't know if we did. I don't know how
13 he found that out.
14     Q      You believe that Larry Newton knows about the
15 board's denial of Mr. Corneal's submission of a sewer
16 module?
17     A      Yes.
18     Q      How do you think -- why do you believe he
19 knows about that?
20     A      Because of all this paperwork. We all have
21 these big packs of paperwork now because of the lawsuit and
22 I believe it's in there, in my minutes.
23     Q      So you believe he knows about it, but you
24 don't know when he found out?
25     A      No.

224

1      Q      You never told him what happened at that
2  meeting?
3      A      I don't know if I did or not.
4      Q      Is it customary after each meeting of the
5  supervisors to call Larry Newton?
6      A      No.
7      Q      So the January 4th meeting, it's not customary
8  to end the meeting and then call Larry Newton to discuss
9  the --
10     A      No, it is not.
11     Q      That would be unusual to do that?
12     A      Yes, it would be.
13     Q      So even though it's unusual, it doesn't stand
14 out in your mind that maybe somebody did that?
15     A      No.
16     Q      Mr. Corneal also requested a privy permit at
17 one of these meetings. I apologize, I forget the date that
18 he actually requested that permit. Do you recall?
19     A      I think it was April.
20     Q      Also April. It was denied as well; is that
21 correct?
22     A      Yes.
23     Q      Did you seek the advice of Larry Newton with
24 regard to the denial of that privy permit?
25     A      No, I don' think that -- did I seek it?

225

1      Q      Did you.
2      A      No.
3      Q      Are you aware if any of the supervisors sought
4  Larry Newton's approval before they denied the privy permit
5  requested by David Corneal?
6      A      I am not aware of that.
7      Q      The first time that David Corneal requested a
8  building permit -- I'm talking the first time -- did you
9  yourself seek the advice or guidance of Larry Newton
10 regarding that building permit request?
11     A      I don't know whether -- I don't -- I don't
12 recall.
13     Q      Do you remember discussing this at all with
14 Larry Newton?
15     A      I'm sure I've discussed it all with him.
16     Q      You've discussed the entire situation with
17 Larry Newton?
18     A      At some time during this we've had a
19 discussion.
20     Q      During the lawsuit?
21     A      Yes.
22     Q      Do you remember prior to the lawsuit talking
23 to Larry Newton about David Corneal?
24     A      I probably did.
25     Q      Can you give me any of the specifics of that



226

1    conversation?
2    A    No.
3    Q    Did you ever ask him whether what the board
4    was doing was legal?
5    A    I don't think I ever asked that question.
6    Q    Did you ever ask him whether or not you could
7    deny a privy permit?
8    A    I never asked it -- I don't think I ever asked
9    him that question.
10    Q    When he came to you and said he was no longer
11    going to subdivide and he wanted to build a garage, did you
12    seek the advice of Larry Newton?
13    A    You mean during the meeting or whatever?
14    Q    I'm saying at any time.
15    A    At any time?
16    Q    At any time did you seek the advice of Larry
17    Newton on behalf of yourself or the board members with
18    respect to any requests by David Corneal with his property?
19    A    We've asked his advice.
20    Q    Give me some of the specifics of that advice.
21    A    It's very hard to say because we talk about a
22    lot of things.  You know, there's a lot of things going on
23    here and you're asking for those items and I can't honestly
24    testify to those items.  We've talked about everything in --
25    after the lawsuit and before and I'm not sure.

227

1    Q    So you're not certain that you've ever had a
2    conversation with Larry Newton before the lawsuit was
3    initiated?
4    A    Oh, I've had conversations with Larry before
5    the lawsuit was initiated.
6    Q    Conversations about David Corneal's property?
7    A    Yes, I'm sure I've done that.
8    Q    Were these conversations to just discuss David
9    Corneal or was it to just get his advice on how the board
10    should proceed with regard to David Corneal?
11    A    To get his advice.
12    Q    What advice specifically did the board need to
13    proceed?
14    A    Before or after the lawsuit?
15    Q    Before.
16    A    I don't know.  I can't give you a specific
17    before.
18    Q    Well, you testified that you're certain you
19    had conversations with Larry Newton regarding advice the
20    board needed to proceed with regard to Mr. Corneal and what
21    he wanted to do with his property.  Am I misstating your
22    testimony?
23    A    No, I did say that, but I can't give you a
24    specific -- I can't tell you specifically what I would have
25    talked to him about.

228

1    Q    When David Corneal came to the board meeting
2    and said it was illegal to have a moratorium, did you ask
3    Larry Newton about that?
4    A    I probably did or somebody did.
5    Q    Are you sure of that?
6    A    No, I'm not sure.
7    Q    Did you yourself ask him that?
8    A    I don't remember.
9    Q    There's a pretty specific chronology of events
10    that went on in this matter before the lawsuit was
11    initiated.  There was the research for the ordinance and
12    then you imposed the moratorium.  When I say you, I mean the
13    board.  Then Mr. Corneal came on the scene and requested his
14    first subdivision plan to be approved.
15    You don't recall at any point during this
16    whether it was when he asked for his first subdivision plan
17    or his sewer module or his privy permit or his first
18    building permit, building application, or his second
19    building permit, whether or not you or any board member
20    sought the advice of Larry Newton?
21    A    I'm -- you asked me to be specific and I can't
22    be specific.  I don't remember.
23    Q    Well, when I ask you a specific question, you
24    first tell me that you don't think you did and then I ask
25    you another question and you tell me you're certain that you

229

1    had contact with Larry Newton.  All I'm trying to find out
2    here, and I'm trying not to be confrontational, is when did
3    you talk to Larry Newton?  When did you specifically talk to
4    Larry Newton?
5    A    I don't remember.
6    Q    Did any of the supervisors ever come to you
7    and say, hey, we need to find out whether or not we can do
8    this?
9    A    I don't remember.
10    Q    Not on any of this information?
11    A    I remember talking to Larry, but I do not
12    specifically -- I can't give you specifics on this.  I
13    can't.
14    Q    How often does the board seek the advice of
15    Larry Newton?
16    A    Under normal circumstances?
17    Q    Under any other circumstance than the Corneal
18    circumstance.
19    A    Not very often.
20    Q    When would be a situation where they would
21    need to consult with Larry Newton?
22    A    If we were going to do an ordinance.  And we
23    had a problem with our one road, Miller Road is -- to be
24    specific, where the contractor came in and the road failed.
25    So we made -- we had to get after him and we filed a suit



230

1   against him to come back and redo the road, which he did.
2   Q    Did you ever consult with Larry Newton
3   regarding any other person who submitted a subdivision plan?
4   A    Not to the best of my knowledge.
5   Q    So David Corneal is the only person who
6   submitted a subdivision plan where you needed the advice and
7   guidance of Larry Newton?
8   A    In the short period that I've been there, yes.
9   Q    But you don't recall what any of that advice
10  was that you needed?
11  A    Advice?
12  Q    Yes.
13  A    You're talking about before the lawsuit?
14  Q    Yes, specifically I'd like to focus on before
15  the lawsuit at this point.
16  A    I have no idea what we talked to him about.
17       MS. YANKANICH:  Give me a second here.  I'll
18  look through my notes.
19       (Pause.)
20  BY MS. YANKANICH:
21  Q    When there was going to be an advertisement
22  for a meeting of the board, how was it determined whether or
23  not you would submit the notice, the advertisement, or Larry
24  Newton would submit the advertisement?
25  A    You have to be specific.

231

1   Q    Okay, if it is a -- if it was a regular
2   meeting of the board in January, would you advertise when
3   the meetings were going to be held?
4   A    I did that.
5   Q    If it was going to be a special meeting of the
6   board, how was it determined whether or not you or Larry
7   Newton would notify the public of that meeting?
8   A    The only time Larry would ever advertise was
9   for an ordinance or something.  I did everything else.
10  Q    You stated earlier that Larry Newton was not
11  present at the township supervisor meetings; is that
12  correct?
13  A    I said unless we request him.
14  Q    Unless you requested him to be there; is that
15  correct?
16  A    That's right.
17  Q    Did you ever request him to be there with
18  regard to the David Corneal matter?
19  A    No.
20  Q    Do you know why any of the supervisors did not
21  impose the moratorium prior to January 2000?
22  A    You'll have to ask them that.
23  Q    Do you know if it was Larry Newton who
24  suggested that they do that in January 2000?
25  A    I have no idea.

232

1   Q    Did you talk with Larry Newton about whether
2   or not a moratorium should be imposed in January 2000?
3   A    I think I've testified to that a couple times
4   today.  I don't recall.
5   Q    You testified earlier that you know of two
6   specific conversations you had with Larry Newton, one was a
7   conference call with the other supervisors present after the
8   lawsuit was initiated and the first was a telephone call
9   that you had with Larry Newton.  Do you recall when that
10  contact occurred?
11  A    July 4th.
12  Q    What was the substance of that conversation?
13  A    He called me to tell me he had been served
14  with a lawsuit.
15  Q    Larry Newton called you?
16  A    Yes.
17  Q    What was the time of that conversation?
18  A    I have no idea.  Sometime during the day.
19  Q    Did you make any notes of when -- of telephone
20  calls?
21  A    No, this was on the 4th of July or 3rd of July
22  or something and I was at home.  I was not in my office when
23  I got the phone call.
24  Q    Do you typically make any telephones notes
25  when you receive a telephone call regarding township

233

1   business?
2   A    No, I do not.
3   Q    If you were sitting in your office right now,
4   is there anything that you would reference that could get me
5   the information to exactly what time and when this
6   conversation occurred?
7   A    No.
8   Q    No memos from the conversation?
9   A    No.
10  Q    You also stated previously that Jim Himes
11  would give information to Larry Newton and then Larry Newton
12  would call and I believe you said he would call you or the
13  supervisors; is that correct --
14  A    Yes.
15  Q    -- regarding the David Corneal matter?
16  A    Yes.
17  Q    Did he typically call you?
18  A    Sometimes.  Sometimes he calls one of the
19  supervisors.
20  Q    What would he call you and discuss?
21  A    Whatever is going on.
22  Q    What kind of information was he getting from
23  Jim Himes?
24  A    I don't think he was getting information.  He
25  was -- Mr. Corneal was asking Jim Himes for -- it's in one



WIRTH, ANN
05/16/01

CORNEAL  VS
JACKSON TOWNSHIP

234

1  of these memos here, some kind of information.  You know, I
2  don't know if that was -- I don't know.  It's in these
3  papers.
4      Q      Was Larry Newton calling you to tell you to
5  provide that information to Mr. Corneal?
6      A      I don't remember.
7      Q      Do you remember what information Mr. Corneal
8  was seeking through Jim Himes?
9      A      At one time I think he wanted a draft copy of
10  the ordinance.
11      Q      So when Larry Newton instigated the phone call
12  to you or one of the supervisors, you don't recall what he
13  said?
14      A      No.
15      Q      Do you recall ever being directed by Larry
16  Newton to give a draft ordinance to Mr. Corneal?
17      A      No, I do not recall.
18      Q      Do you recall any of the telephone
19  conversations you had with Larry Newton prior to the
20  lawsuit?
21      A      No.
22      Q      Do you recall any other meetings that you had,
23  conference, meetings or otherwise, with the supervisors,
24  yourself and Larry Newton?
25      A      Prior to the lawsuit?

235

1      Q      Prior to the lawsuit.
2      A      No, I do not.
3      Q      You mentioned earlier that you have knowledge
4  of a sewage act, I believe you said it was, where if two
5  dwellings are on the same property it's considered an
6  equivalent subdivision; is that correct?
7      A      That's right.
8      Q      Do you have that -- is that your own
9  independent knowledge or did you get that advice from Larry
10  Newton?
11      A      I didn't get that advice from Larry Newton.
12      Q      That's your own independent knowledge?
13      A      Yes.
14      Q      You said that you kept Larry Newton informed
15  of what was happening with the Corneal property.  Was it
16  primarily you who kept him informed?
17      A      I can't testify as to whether the supervisors
18  talked to Larry or not.
19      Q      I'm asking you whether or not you kept him
20  informed of what was happening with the Corneal property.
21      A      I probably did.
22      Q      When you say probably, are you certain that
23  you did?
24      A      Of some things I'm sure I did.
25      Q      Now, what specifically did you tell him about

236

1  the Corneal property?
2      A      I don't know specifics.  I just -- I would --
3  when I get a piece of information, I forward it to everybody
4  that needs it, that's what I do, and I can't tell you
5  specifics.  It's probably half the documents in here.
6      Q      Are you talking now after the litigation, once
7  you got a document in you would talk about it with Larry
8  Newton or are you talking about before?
9      A      I'm talking about now with the litigation.
10      Q      After the litigation.  You said that you
11  discussed the -- or I'm sorry, the supervisors discussed the
12  driveway ordinance with Larry Newton; is that correct?
13      A      I believe they did.
14      Q      Do you recall any of the specifics of that
15  conversation?
16      A      (Witness shook her head negatively.)
17      Q      How about did they discuss the privy ordinance
18  with Larry Newton?
19      A      I'm sure it was discussed with Larry.
20      Q      Do you recall any of the specifics?
21      A      No.
22      Q      Do you recall whether or not they were asking
23  him whether they could pass such ordinances?
24      A      I do not.
25      Q      Is it customary to always seek Larry Newton's

237

1  advice before the board acts?
2      A      No.
3      Q      Is it rare that you would seek Larry Newton's
4  advice before the board acts?
5      A      I wouldn't say it's rare.
6      Q      How often do you seek Larry Newton's advice?
7      A      Only when we have a problem.
8      Q      Is David Corneal the only problem this
9  township has seen in a long time?
10      A      No.  No, I just told you about the road.
11      Q      So other than the road, have you ever sought
12  Larry Newton's advice on any other resident of Jackson
13  Township?
14      A      Residence?
15      Q      Resident of Jackson Township.
16      A      I can't recall.
17      Q      I just want to go back a little bit over your
18  testimony that I think we weren't real clear on.  At first I
19  believe your testimony was Larry Newton did not advise the
20  supervisors to initiate a lawsuit against Mr. Corneal.  What
21  is your testimony with regard to who advised the supervisors
22  to initiate the lawsuit, if anyone did?
23      A      I don't remember saying that.
24      Q      With regard to the lawsuit that was initiated
25  against Mr. Corneal by the township, did anybody advise the

**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

238

1  supervisors to your knowledge to initiate that lawsuit?
2      A    **I do not know how that happened. I can't**
3  **testify to that. I don't know who did that.**
4      Q    Were you ever present at a meeting where Larry
5  Newton and any of the supervisors were present where Larry
6  Newton gave that kind of advice?
7      A    **I don't recall.**
8      Q    You don't recall a meeting where that happened
9  or that happening?
10      A    **Please repeat your question for me.**
11      Q    Okay. Were you ever present at a meeting
12  where Larry Newton met with any of the supervisors and
13  advised them to initiate a lawsuit against Mr. Corneal?
14      A    **I do not recall that.**
15      Q    Are you telling me you don't recall being at a
16  meeting or that there wasn't -- what are you telling me you
17  don't recall?
18      A    **I don't recall Larry advising us to issue --**
19      Q    Start this lawsuit?
20      A    **Start a lawsuit.**
21      Q    You don't recall him telling you to do that?
22      A    **I don't know how that happened.**
23      Q    But you're telling me you don't recall Larry
24  Newton telling the township to do that?
25      A    **No.**

---

239

1      Q    Do you recall any of the supervisors saying
2  they needed to seek the advice of Larry Newton before they
3  initiated this lawsuit?
4      A    **You'll have to ask them that.**
5      Q    You were never present when any of the
6  supervisors stated that?
7      A    **I don't recall.**
8      Q    Did you ever discuss this -- the possibility
9  of a lawsuit against David Corneal with any of the
10  supervisors prior to the lawsuit being initiated?
11      A    **This lawsuit?**
12      Q    No, the first lawsuit where the township is
13  suing Mr. Corneal. Did you ever talk to any of the
14  supervisors before it was initiated?
15      A    **That's not the first lawsuit.**
16      Q    What was the first lawsuit?
17      A    **This is the first lawsuit.**
18      Q    I'm sorry, let me clarify. Did you ever talk
19  to any of the supervisors directly about Mr. Corneal before
20  they initiated a lawsuit against him for a violation of the
21  building permit ordinance?
22      A    **Did I do that?**
23      Q    Did you ever talk with the supervisors before
24  they started the lawsuit?
25      A    **I'm sure we talked about it.**

---

240

1      Q    Did they ask you whether or not they should do
2  that?
3      A    **They wouldn't ask my advice.**
4      Q    They just talk with you about it?
5      A    **Yes.**
6      Q    Well, if I may ask, why is it that the
7  supervisors consult with you when they don't take your
8  advice and they -- and you work for them?
9      MR. SHERR: Objection. You're asking her for
10  somebody else's state of mind.
11  BY MS. YANKANICH:
12      Q    Do you have an opinion as to why they seek
13  your advice?
14      A    **No.**
15      Q    I apologize, I don't think I've asked you this
16  question. Did you yourself ever discuss directly with Larry
17  Newton the township's lawsuit against Mr. Corneal?
18      A    **Did I talk to Larry about it?**
19      Q    Yes.
20      A    **With the supervisors, without the supervisors**
21  **or what?**
22      Q    Either one.
23      A    **I'm sure we have.**
24      Q    Do you recall any of the specifics of those
25  conversations?

---

241

1      A    **No, I do not.**
2      Q    Do you recall of whether you had such a
3  meeting?
4      A    **You asked me if I had a conversation.**
5      Q    Okay, I'm sorry. I apologize. Did you ever
6  -- do you recall whether a conversation like that did
7  happen?
8      A    **Yes.**
9      Q    Was it with you and Mr. Newton or with you and
10  Mr. Newton and the supervisors?
11      A    **I'm sure it was with all of us.**
12      Q    And that was after the township sued Mr.
13  Corneal?
14      A    **I don't think that's what you asked me.**
15      Q    That's what I asked you the first time. I'm
16  asking you whether you had -- let me just restate the
17  question.
18      A    **Okay.**
19      Q    Did you yourself discuss with Larry Newton
20  directly, either in a meeting or a phone call, the lawsuit
21  that the township initiated against Mr. Corneal?
22      A    **I have talked to Larry about it.**
23      Q    Do you recall any of the specifics of those
24  conversations?
25      A    **No, I do not.**

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

242

1    Q    Do you recall whether that was a telephone
2 call or a meeting?
3    A    I do not.
4    Q    Do you recall whether any of the supervisors
5 were present?
6    A    I don't -- I don't recall.
7    Q    With reference to Exhibit 14, if you would --
8 I would actually like you to reference the specific exhibit,
9 if I may. I just have a question as to whose notation that
10 is. I didn't hear if Miss Montgomery asked you this. With
11 regard to Exhibit 14, is that your handwriting that says --
12    A    No.
13    Q    -- copy sent to Newton?
14    A    No, it is not.
15    Q    Do you know whose handwriting that is?
16    A    I have no idea.
17    Q    When Mr. Van Dommelen -- let's specifically
18 reference Exhibit 15. I'm going to show you Exhibit 15. If
19 you would refer to Exhibit 15 during your answer, please.
20 In this letter from David Corneal to Mr. Van Dommelen he
21 states that Mr. Van Dommelen refused to give him a building
22 permit application and that he did so on the advice of the
23 supervisors.
24        Do you recall -- were you present at any time
25 when the supervisors called Larry Newton? Let me rephrase

243

1 that. Do you know if the supervisors ever consulted Larry
2 Newton with regard to whether or not they should advise Mr.
3 Van Dommelen to not issue such an application?
4    A    I don't know.
5    Q    You don't know if they ever called Larry
6 Newton to ask him that?
7    A    I don't know.
8    Q    Were you aware that Mr. Van Dommelen refused
9 to give Mr. Corneal an application?
10    A    I think I've already testified to that.
11    Q    I'm sorry, what was your answer?
12    A    Yes.
13    Q    You were aware that -- you knew he refused to
14 do so?
15        MR. SHERR: You don't have to repeat it
16 again. She said yes. Let's move on, please.
17        MS. YANKANICH: I'm just trying to clarify for
18 myself.
19 BY MS. YANKANICH:
20    Q    You were aware that he was refused an
21 application, is that your answer?
22    A    It was in the paperwork here, yes.
23    Q    That's when you became aware of it. Is there
24 any other time prior to the initiation of the lawsuit that
25 you can remember seeking the advice of Larry Newton for any

244

1 reason with regard to Mr. Corneal's property that I haven't
2 asked you about?
3    A    You're going to have to tell me that one
4 again.
5    Q    Do you recall any other time that you sought
6 the advice of Larry Newton with regard to David Corneal's
7 property that I may not have asked you about?
8    A    No.
9        MS. YANKANICH: Thank you. I have no further
10 questions.
11        MS. THORP: No questions.
12        MR. SHERR: Anything else?
13        MS. MONTGOMERY: I just have a follow-up or
14 two. Do you have anything?
15        MR. SHERR: No.
16
17        REDIRECT EXAMINATION
18
19 BY MS. MONTGOMERY:
20    Q    Just generally, you were asked a series of
21 questions by Mr. Newton's counsel about whether or not when
22 you spoke with Larry Newton you were seeking his advice,
23 okay, and I want to just ask a general question.
24        Typically when you speak to Larry Newton are
25 you speaking to him just as a friend or is it on township

245

1 business? Do you speak to him on township business or are
2 you speaking to him just as a friend or are you speaking to
3 him as the township's counsel?
4    A    As the township's counsel.
5    Q    Do you expect then that if there is anything
6 that you are telling him that he ought to have advice on and
7 he'll give you that advice? Is that your expectation when
8 you talk to him?
9    A    I would assume.
10    Q    You would assume that he would give you advice
11 if anything you tell him raises any concerns with him; is
12 that your testimony?
13    A    Yes.
14    Q    You know, you had mentioned earlier that you
15 lived in Camp Hill prior to what, 11 years ago?
16    A    Yes.
17    Q    And did you work here?
18    A    I'm retired from the state.
19    Q    What did you do at the state?
20    A    I was the cash desk for the Treasury
21 Department for 25 years.
22    Q    Have you ever had any conversations with Larry
23 -- with an attorney who shares Mr. Newton's law offices?
24    A    No.
25    Q    Do you know who Mr. Reeder is?



WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

246

1    A    I know his name.  I don't know who he is.
2    Q    You've never met him?
3    A    No.
4    Q    You never talked to him?
5    A    No.
6    Q    You never corresponded with him?
7    A    No.
8    Q    Now that the township has these ordinances --
9    well, now, let me back up a second.  The township has five
10   ordinances, I believe you said, right?
11   A    Four.
12   Q    Four?
13   A    I think it's four.
14        MR. SHERR:  You mentioned five.
15   BY MS. MONTGOMERY:
16   Q    I think you mentioned five.
17   A    Five, okay.
18   Q    And you say you keep them in your office, you
19   keep a copy of each of them in your office?
20   A    Yes, they're in my office.
21   Q    Where do you keep them?
22   A    The subdivision ordinance is in a binder,
23   which I told you earlier, along with the privy and the
24   driveway ordinance.  The building permit ordinance is in an
25   ordinance file.

247

1    Q    What's an ordinance file?
2    A    It's just a file that says ordinance.
3    Q    It's like a collapsible folder or something?
4    A    It's just a manila folder.
5    Q    A manila folder that says ordinance.  And the
6    fifth ordinance?
7    A    I'm so confused here.  There's a subdivision
8    ordinance, a driveway ordinance, a privy ordinance and a
9    building permit ordinance.
10        MR. CORNEAL:  Agriculture.
11        THE WITNESS:  Oh, I'm sorry.  Thank you,
12   agriculture security.  That's in a separate folder because
13   that's a whole other issue.
14   BY MS. MONTGOMERY:
15   Q    Is it in a manila folder also?
16   A    Yes.
17   Q    Do you keep an ordinance book, like one book
18   of all the ordinances?
19   A    No.
20   Q    I'm going to show you a document that we're
21   going to mark as Wirth 16 and this is a January 31, 2000
22   letter from David Corneal addressed to Mr. Newton.
23        (Letter dated 1/31/00 produced and marked as
24   Wirth Exhibit No. 16.)
25        (Discussion held off the record.)

248

1    BY MS. MONTGOMERY:
2    Q    Did you have a chance to look at that letter?
3    A    Yes, I did.
4    Q    Have you seen the letter before?
5    A    I don't recall if I've seen it before or not.
6    Q    Do you know whether you were given a copy of
7    the letter at the time that it was written, which I think
8    the date of it is January 31st, 2000?
9    A    I just said I don't recall if I've ever seen
10   the letter before.
11   Q    Do you recall ever discussing with Mr. Newton
12   his receipt of that letter from Mr. Corneal?
13   A    I don't recall that.
14   Q    Well, look at the contents of the letter
15   then.  Now that you've had a chance to look at this letter
16   from David Corneal to Mr. Newton, do you recall ever talking
17   to Mr. Newton about the particular issues in this letter?
18   And we'll start at the beginning, the approval of his
19   subdivision.
20   A    I don't recall.
21   Q    What about -- do you know whether or not Mr.
22   Simpson dropped off a copy of the plan at Mr. Newton's
23   office?
24   A    I believe I testified earlier I don't know how
25   that happened.

249

1    Q    And in this letter Mr. Corneal tells Mr.
2    Newton that there is urgency of approval, in that the
3    Hewetts have a loan commitment for settlement at the end of
4    February.  Do you recall whether or not Mr. Newton called
5    the township offices to discuss any sort of urgency of
6    approval of Mr. Corneal's subdivision?
7    A    I don't recall that.
8    Q    Do you know whether the supervisors got a copy
9    of this letter?
10   A    You'll have to ask them.
11   Q    I'm going to show you one other letter then
12   and we're going to mark it as Wirth 17.
13        (Letter dated 7/28/00 produced and marked as
14   Wirth Exhibit No. 17.)
15   BY MS. MONTGOMERY:
16   Q    Have you seen this letter before?
17   A    Yes, I have.
18   Q    When did you see it?
19   A    I don't know, but I've seen it.
20   Q    Do you see where it says Jackson Township
21   Board of Supervisors down there in the cc line?
22   A    Right.
23   Q    Did the letter come to you?
24   A    I would assume it did.  I don't know for sure.
25   Q    Do you have a copy of this letter in your




**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**



250

1  files?
2  A    Yes, I've seen this letter in my files.
3  Q    Did you produce it to us?
4  A    I don't know whether I did or not.
5  Q    Now that you're looking at these two letters,
6  the letter to Mr. Newton from Mr. Corneal in January 2000
7  and the letter from Mr. Newton to the Corneals on July 28,
8  2000, do you recall whether or not you spoke with Mr. Newton
9  in between -- in that time frame, from January to July, to
10 seek advice about how the Corneals were dealing with their
11 property or about how to deal with the Corneals in
12 connection with their property? Does that help you
13 remember?
14 A    What?
15 Q    I'm trying to get you down to a time frame
16 about when you spoke to Mr. Newton. Mr. Newton's counsel
17 was trying to talk to you about whether you spoke to him
18 prior to the initiation of this lawsuit.
19 A    I'm sure I -- I'm sure I testified that we
20 have talked, but I don't know when or what about.
21 Q    You testified that you're sure you talked to
22 Mr. Newton about the Corneals prior to the lawsuit; is that
23 correct?
24 A    I believe I said that earlier.
25 Q    Do these letters -- reviewing these letters

251

1  help you remember at all when you might have spoken to Mr.
2  Corneal about the Corneal -- I'm sorry, to Mr. Newton about
3  the Corneal's property?
4  A    No, it doesn't.
5        MS. MONTGOMERY: I don't have any other
6  questions.
7        MS. YANKANICH: I have one last question.
8  It's just a bookkeeping matter.
9
10             RECROSS-EXAMINATION
11
12 BY MS. YANKANICH:
13 Q    With reference to Exhibit 15 on page 2 -- or
14 actually maybe it's Exhibit 14. Let me look. Yes, Exhibit
15 14. I'd asked you on the first page of Exhibit 14 whether
16 or not the handwritten message that says copy sent to Newton
17 was your signature and you stated that it was not; is that
18 correct?
19 A    No, I didn't write that.
20 Q    On the second page of Exhibit 14 is copy sent
21 to Newton your signature -- your handwriting?
22 A    No.
23       MS. YANKANICH: Thank you. I have no further
24 questions.
25       MS. MONTGOMERY: Another housekeeping matter,

252

1  and this is addressed to Mr. Newton's counsel. Do you
2  consider Mr. Newton to be under the sequestration order that
3  the judge entered for purposes of talking to the other
4  defendants about the substance of the depositions?
5        MS. YANKANICH: Let me review the order and
6  then I'll get you an answer. Can we go off the record
7  briefly?
8        MS. MONTGOMERY: Sure.
9        (Discussion held off the record.)
10       (The deposition was concluded at 4:27 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

253

1
2  COUNTY OF DAUPHIN          :
                             : SS
3  COMMONWEALTH OF PENNSYLVANIA  :
4        I, Teresa K. Bear, Reporter-Notary Public,
5  authorized to administer oaths within and for the
6  Commonwealth of Pennsylvania and take depositions in the
7  trial of causes, do hereby certify that the foregoing is the
8  testimony of ANN WIRTH.
9        I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically by
12 the said Teresa K. Bear, a Reporter-Notary Public, approved
13 and agreed to, and afterwards reduced to typewriting under
14 the direction of the said Reporter.
15       I further certify that the proceedings and
16 evidence are contained fully and accurately to the best of
17 my ability in the notes taken by me on the within
18 deposition, and that this copy is a correct transcript of
19 the same.
20       In testimony whereof, I have hereunto
21 subscribed my hand this 31st day of May, 2001.
22
23
          Teresa K. Bear, Reporter
24        Notary Public
          My commission expires
25        on April 13, 2003

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



Exhibit 5

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2      DAVID B. CORNEAL and SANDRA   :
        Y. CORNEAL,
 3           PLAINTIFFS              :

 4              VS                    :   NO. 1:CV-00-1192
                                      :
 5      JACKSON TOWNSHIP, HUNTINGDON  :
        COUNTY, PENNSYLVANIA; W.      :
 6      THOMAS WILSON, individually   :
        and in his official capacity  :
 7      as Supervisor of Jackson      :
        Township; MICHAEL YODER,      :
 8      individually and in his       :
        official capacity as          :
 9      Supervisor of Jackson         :
        Township; RALPH WEILER,       :
10      individually and in his       :
        official capacity as          :
11      Supervisor of Jackson         :
        Township; BARRY PARKS,        :
12      individually and in his       :
        official capacity as Sewage   :
13      Enforcement Officer of        :
        Jackson Township; DAVID       :
14      VAN DOMMELEN, individually    :
        and in his official capacity  :
15      as Building Permit Officer;   :
        ANN L. WIRTH, individually    :
16      and in her official capacity  :
        as Secretary of Jackson       :
17      Township; and LARRY NEWTON,   :
        individually and in his       :
18      official capacity as          :
        Solicitor to Jackson          :
19      Township,                     :
             DEFENDANTS               :
20                    DEPOSITION OF:  DAVID VAN DOMMELEN
21                    TAKEN BY:       PLAINTIFFS
22                    BEFORE:         TERESA K. BEAR, REPORTER
                                      NOTARY PUBLIC
23
                      DATE:           JUNE 6, 2001, 9:44 A.M.
24
                      PLACE:          ECKERT SEAMANS
25                                    213 MARKET STREET
                                      HARRISBURG, PENNSYLVANIA
```

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

**2**

```
 1   APPEARANCES:
 2     ECKERT SEAMANS
       BY: BRIDGET E. MONTGOMERY, ESQUIRE
 3         LESLIE A. MALADY, ESQUIRE
 4         FOR - PLAINTIFFS
 5     MAYERS, MENNIES & SHERR, LLP
       BY: ANTHONY R. SHERR, ESQUIRE
 6
       FOR - ALL DEFENDANTS EXCEPT NEWTON
 7
     METTE, EVANS & WOODSIDE
 8     BY: JENNIFER YANKANICH, ESQUIRE
 9         FOR - DEFENDANT - LARRY NEWTON
10     THOMAS, THOMAS & HAFER
       BY: MICHELE J. THORP, ESQUIRE
11
           FOR - DEFENDANT - WEILER
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1              TABLE OF CONTENTS
 2        WITNESS
 3   FOR PLAINTIFFS          DIRECT CROSS REDIRECT
 4   David Van Dommelen
       By Ms. Montgomery      4   --   185
 5     By Ms. Yankanich       --  183   --
 6
 7              EXHIBITS
 8   VAN DOMMELEN EXHIBIT NO.        PRODUCED AND MARKED
 9   1 - Letter dated 5/5/00           79
10   2 - Letter dated 10/10/00         79
11   3 - Packet of documents           79
12   4 - Suggested ideas               91
13   5 - Application for building permit    100
14   6 - Application for building permit    145
15   7 - Application for building permit    148
16   8 - Application for building permit    151
17   9 - Applications for building permits  153
18   10 - Four-page document           164
19   11 - Letter dated 9/1/00          171
20
21
22
23
24
25
```

**4**

```
 1        DAVID VAN DOMMELEN, called as a witness, being
 2   sworn, testified as follows:
 3
 4           DIRECT EXAMINATION
 5
 6   BY MS. MONTGOMERY:
 7   Q     Mr. Van Dommelen, we met a few moments ago but
 8   for the record I'll identify myself.  I'm Bridget
 9   Montgomery.
10   A     You'll have to speak louder because I'm hard
11   of hearing.
12   Q     Okay.  My name is Bridget Montgomery and I
13   represent the Corneals in this action.  I have a couple
14   questions and instructions for you about depositions in
15   general.  So I need to ask you first have you ever been
16   deposed before?
17   A     To where?
18   Q     Have you ever been deposed before?
19   A     No.
20   Q     Then I will just give you a little bit of
21   information about the deposition.  We're here to ask you
22   factual questions relevant to this lawsuit or likely to lead
23   to relevant information about this lawsuit.
24         One of the things that you need to do is make
25   sure that you give verbal responses.  You need to say yes or
```

**5**

```
 1   no or, you know -- no shakes of the head, you know, no nods
 2   of the head because the court reporter needs to hear you so
 3   that she can take your responses down.
 4         If you don't understand a question that I ask
 5   you, you can ask me to repeat it or rephrase it.  I want you
 6   to understand what it is I'm asking you.  If you need to
 7   take a break to go to the rest room or something like that
 8   or get a glass of water, you can do that as well.  You can't
 9   confer with your counsel about your answers but you can take
10   a break and, you know, go and do whatever you need to do.
11         Are you on any medication today that would
12   prevent you from understanding and answering my questions?
13   A     I'm on medication.
14   Q     And what kind of medication is that?
15   A     Quibron, and that's an asthmatic, and I'm on
16   Altace for high blood pressure, and I'm on Vilosec and I
17   take Proventil, which is a mist, a mister.
18   Q     Are those all asthma related --
19   A     All except for the --
20   Q     -- medications?
21   A     All except for the Altace which is for high
22   blood pressure.
23   Q     One other instruction I'll give you.  For the
24   sake of the court reporter and for the sake of clarity, you
25   need to let me finish my questions and I'll let you finish
```



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

**6**

1  your answers so that she can -- so we're not talking at the
2  same time, okay?
3      A    Fine.
4      Q    Back to your medications for a second. Do any
5  of those medications affect your ability to understand
6  someone talking to you or a question or an issue?
7      A    As far as I know, no.
8      Q    None of them are sleep inducing medications or
9  anything like that?
10     A    No.
11     Q    Mr. Van Dommelen, where do you live?
12     A    I live on Allan Seegar Road three miles
13  outside of McAlevys Fort in Pennsylvania.
14     Q    Where is that in relation to, for example, the
15  Jackson Township town office on Ann Wirth's property?
16     A    It's approximately four miles from the
17  township office.
18     Q    Are you familiar with David Corneal?
19     A    Yes.
20     Q    And you're familiar with the property owned by
21  David Corneal --
22     A    Yes.
23     Q    -- in Jackson Township?
24     A    Yes.
25     Q    Where is your home in relation to Mr.

**7**

1  Corneal's property in Jackson Township?
2      A    It's to the north and about three miles from
3  his property.
4      Q    Is it on the same road?
5      A    No.
6      Q    How long have you lived at your current
7  address?
8      A    I believe 20 years.
9      Q    Where did you live prior to that?
10     A    In State College, Pennsylvania.
11     Q    Are you a native of State College?
12     A    No.
13     Q    Are you a native of Jackson Township?
14     A    No.
15     Q    Where are you from?
16     A    I'm from Michigan.
17     Q    Oh, you are, okay. So you've been in Jackson
18  Township then for 20 years?
19     A    I believe 20 years.
20     Q    Do you own property there?
21     A    No.
22     Q    Do you own a home there?
23     A    No.
24     Q    You rent?
25     A    No.

**8**

1      Q    Do you live there?
2      A    Yes.
3      Q    Do you camp out?
4      A    No. Heavens, no.
5      Q    Well, you live there for free, apparently, in
6  a residence --
7      A    Yes.
8      Q    -- in a house? Let's talk a little bit about
9  your educational background. What is the highest level of
10  education that you completed?
11     A    A Master's degree.
12     Q    In?
13     A    In art.
14     Q    And where did you complete that Master's
15  degree?
16     A    Michigan State University.
17     Q    So you graduated from high school out in
18  Michigan; is that correct?
19     A    Pardon?
20     Q    You graduated from high school out in
21  Michigan?
22     A    Yes.
23     Q    And where did you go to college?
24     A    Well, I went to -- I went to interior design
25  school in Chicago and then I went to Michigan State for my

**9**

1  undergraduate and for my graduate degree.
2      Q    What's the interior design school that you
3  went to?
4      A    Harrington Institute of Interior Design.
5      Q    Was that a two-year program or --
6      A    It was a two-year program.
7      Q    Did it lead to an associates degree or
8  something?
9      A    Pardon?
10     Q    Did it lead to an associate degree or --
11     A    I got a diploma, interior design diploma.
12     Q    Like a certificate of --
13     A    Yes, right.
14     Q    And then you went from there Michigan State
15  University?
16     A    No, I went to the Army.
17     Q    Oh, okay. When was that?
18     A    In 1952.
19     Q    So you went into the Army for a few years
20  and --
21     A    For two years.
22     Q    Two years. And then did you start your
23  education after that?
24     A    Then I --
25     Q    Or continue your education after that?



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

10

```
 1    A      Yes, after that I continued my education.
 2    Q      So do you have a four-year degree from
 3  Michigan State?
 4    A      Yes.
 5    Q      And then a Master's degree?
 6    A      Yes.
 7    Q      And is that the highest degree of education
 8  you completed then, the Master's at Michigan State?
 9    A      Yes.
10    Q      What did you do with that degree then once you
11  got it?  What sort of employment did you seek?
12    A      Well, I taught first in elementary schools and
13  then I was invited to go to Penn State to teach and I taught
14  at – in the College of Home Economics for quite a few years
15  and then the College of Arts and Architecture.
16    Q      So you have an elementary teaching license as
17  well – you had one at least --
18    A      Yes, I had one.
19    Q      -- in Michigan?
20    A      Um-hum.
21    Q      How long did you teach?
22    A      In elementary?
23    Q      Yes.
24    A      Two years, I believe.
25    Q      And then you came to State College after that?
```

11

```
 1    A      Yes.
 2    Q      What year was that?
 3    A      That was in 1959.
 4    Q      And how long did you teach at Penn State?
 5    A      For over 25 years.
 6    Q      So that takes you up to about 1984?
 7    A      Eighty-eight.
 8    Q      Oh, 1988?
 9    A      Yes.  I also had an interim of two years at
10  the University of Maine.
11    Q      Did you come to State College and then go to
12  Maine and then come back?
13    A      Yes.
14    Q      Understood.  So you say -- I believe you
15  testified that you taught home economics?
16    A      Well, that's where I started teaching.  That's
17  where art and interior design was, in home economics.
18    Q      And then what?
19    A      And then I moved over to arts and
20  architecture.
21    Q      And so that takes you up to 1988.  Did you
22  retire then?
23    A      Yes, I retired then.
24    Q      Is it at that point that you moved to Jackson
25  Township?  I forget how long you said you had been there.
```

12

```
 1    A      No, no, we had been in Jackson Township since
 2  '82.  I have my studio there, too.
 3    Q      Okay.
 4    A      Because I'm a practicing artist.
 5    Q      What kind of art do you do?
 6    A      Fiber art.
 7    Q      What is fiber art?
 8    A      Weaving, surface painting on fiber, sewing
 9  machine work on fiber.
10    Q      So during the time that you were teaching at
11  Penn State, you moved to Jackson Township; is that correct?
12    A      Yes.
13    Q      And in Jackson Township you have a studio on
14  this same piece of property --
15    A      Right.
16    Q      -- that you live at?
17    A      We have 40 acres of property.
18    Q      Who owns that property?
19    A      My daughter and my son.
20    Q      Did you ever own that property?
21    A      Yes.
22    Q      When did you buy it?
23    A      In '81.
24    Q      And did you sell it to your son and daughter?
25    A      Pardon?
```

13

```
 1    Q      Did you sell it to your son and daughter or
 2  convey it or --
 3    A      No, we gave it to them.
 4    Q      You gave it to them?
 5    A      Um-hum.
 6    Q      When did you do that?
 7    A      I'm not sure if I can remember.  It must have
 8  been 10 years ago.
 9    Q      So it is 40 acres?
10    A      It's not quite 40 acres.
11    Q      How many houses are on it?
12    A      Just the -- our house and the studio.
13    Q      When you say our house, you mean your wife and
14  you?
15    A      Yes.
16    Q      Did you build the house?
17    A      Part of it.
18    Q      There was an existing structure there?
19    A      There was a structure and then we added on to
20  it when we moved out there because it did not have indoor
21  plumbing and ...
22    Q      Right.
23         MS. MONTGOMERY: Just let the record reflect
24  that Michele Thorp is joining the deposition.
25  BY MS. MONTGOMERY:
```

4



VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

---

14

| | | |
|---|---|---|
| 1 | Q | And then did you build the art studio? |
| 2 | A | Yes. |
| 3 | Q | When did you build that? |
| 4 | A | In '82. |
| 5 | Q | How big is that structure, do you know? |
| 6 | A | It's 20 feet by 40 feet. |
| 7 | Q | Is it one-story? |
| 8 | A | Yes. |
| 9 | Q | Does it have indoor plumbing? |
| 10 | A | No. |
| 11 | Q | Does it have electricity? |
| 12 | A | Pardon? |
| 13 | Q | Does it have electricity? |
| 14 | A | Yes. |
| 15 | Q | Are there any other structures on the |
| 16 | | property? |
| 17 | A | No. |
| 18 | Q | Are you currently employed? |
| 19 | A | In my studio, yes. |
| 20 | Q | Well, let me ask you the question a little bit |
| 21 | | differently.  I think you said you retired from Penn |
| 22 | | State -- |
| 23 | A | Yes. |
| 24 | Q | -- in 1988? |
| 25 | A | Yes. |

---

15

| | | |
|---|---|---|
| 1 | Q | Did you have employment elsewhere after you |
| 2 | | retired from Penn State? |
| 3 | A | No, except self-employment. |
| 4 | Q | Are you involved somehow with Jackson |
| 5 | | Township? |
| 6 | A | Yes. |
| 7 | Q | In what capacity? |
| 8 | A | The building permit officer. |
| 9 | Q | Do you consider that employment? |
| 10 | A | I suppose I would have to say yes. |
| 11 | Q | Is it a paid -- |
| 12 | A | But not for very much money. |
| 13 | Q | Is it a paid position? |
| 14 | A | I get a percentage of each building permit and |
| 15 | | that averages to about $450 a year. |
| 16 | Q | What percentage of each building permit do you |
| 17 | | get? |
| 18 | A | I think it's -- I can't remember.  My wife |
| 19 | | does all that.  I think it's eight percent, I believe. |
| 20 | Q | Is that the only compensation given in |
| 21 | | connection with your services as the building permit |
| 22 | | officer? |
| 23 | A | Yes. |
| 24 | Q | When did you first become the building permit |
| 25 | | officer for Jackson Township? |

---

16

| | | |
|---|---|---|
| 1 | A | It must have been 1990. |
| 2 | Q | How did you come to become the building permit |
| 3 | | officer? |
| 4 | A | The current -- one of the current supervisors |
| 5 | | asked me if I would like to be that and I said not really |
| 6 | | but they persuaded me and so I took over the job. |
| 7 | Q | How did you -- well, do you know which |
| 8 | | building supervisor asked you to take the job? |
| 9 | A | Pardon? |
| 10 | Q | Can you tell me which building -- |
| 11 | A | Yes, it was Gary Wilson. |
| 12 | Q | He's no longer a supervisor? |
| 13 | A | No. |
| 14 | Q | Is he related to the current Wilson |
| 15 | | supervisor? |
| 16 | A | They might be far cousins. |
| 17 | Q | Were you friends with Gary Wilson, is that how |
| 18 | | he came to ask you? |
| 19 | A | Neighbors. |
| 20 | Q | So you've been the building permit officer |
| 21 | | since 1990, correct? |
| 22 | A | I believe that's ... |
| 23 | Q | Has there been any breaks in your service |
| 24 | | since -- |
| 25 | A | Any what? |

---

17

| | | |
|---|---|---|
| 1 | Q | Any breaks in your service since 1990 as the |
| 2 | | building permit officer? |
| 3 | A | No. |
| 4 | Q | Who do you report to as the building permit |
| 5 | | officer? |
| 6 | A | To the supervisors. |
| 7 | Q | How do you report? |
| 8 | A | I go to the supervisor's meeting once a |
| 9 | | month.  It's a public meeting. |
| 10 | Q | And is that the public meeting that's held at |
| 11 | | Ann Wirth's -- in the building on Ann Wirth's property? |
| 12 | A | No, no. |
| 13 | Q | No? |
| 14 | A | It's held in the fire hall. |
| 15 | Q | In the fire hall, okay.  What exactly are your |
| 16 | | responsibilities as the building permit officer? |
| 17 | A | To issue building permits to any resident that |
| 18 | | comes to me. |
| 19 | Q | Well, what do you do to determine whether you |
| 20 | | should issue a building permit? |
| 21 | A | They must have appropriate septic approval, if |
| 22 | | it's going to be a house that has the need for a septic |
| 23 | | system.  And if they are going to subdivide, they must have |
| 24 | | the appropriate subdivision papers. |
| 25 | Q | What about if they're not going to subdivide |

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

18

```
 1   and they're not going to build a house, then would you need
 2   a septic?
 3      A     Well, then if they're just building a garage,
 4   I'd give them a permit -- I'd issue a permit rather.
 5      Q     Do you have some kind of ordinance that you
 6   follow or some kind of rule book?
 7      A     Yes, we do have a set of ordinances.
 8      Q     What are those ordinances?
 9      A     Well, that you must have a septic system and
10   that you must -- a building permit is good for one year and
11   if you're going to subdivide that you have the correct
12   subdivision.  You must also have the correct road connection
13   permit.
14      Q     Do you have a building or anything that you
15   use in connection with your work?
16      A     No.
17      Q     Do you operate out of the house that you live
18   in?
19      A     Yes.
20      Q     I asked you a moment ago what ordinances you
21   follow and you gave me an answer, but I'm asking you
22   something a little bit different.  The question I'm asking
23   you is:  Do you follow a particular ordinance that's, you
24   know, like a collected set of pages that tells you what to
25   do in connection with your duties?
```

19

```
 1      A     Yes, we do have a building ordinance.
 2      Q     A building permit ordinance?
 3      A     Permit ordinance, yeah, um-hum.
 4      Q     And you follow that?
 5      A     Yes.
 6      Q     Do you keep a copy of it in your house?
 7      A     Yes.
 8      Q     Now, typically when someone comes and asks you
 9   for a building permit, exactly what do you do?
10      A     I find out if they have the appropriate
11   papers.  And if they don't need septic and if they don't
12   need subdivision, then I have them sit down and fill out a
13   building permit application and I then form that to the
14   tax assessment forms that we send into the county for tax
15   assessment and then I issue a building permit.
16      Q     And you can do that all in one day?
17      A     Yes.
18      Q     Do you typically do it all in one day?
19      A     Yes, typically I think I would say all in one
20   day.
21      Q     Do you keep the applications at your home?
22      A     I do.
23      Q     Are citizens required to come to your home to
24   get an application?
25      A     Yes.
```

20

```
 1      Q     So do they have -- I mean, are you listed in
 2   the telephone book or something as the building permit
 3   officer?
 4      A     No.
 5      Q     How does the citizen find out about you?
 6      A     I suppose they call our secretary or word of
 7   mouth that I'm the building permit officer.
 8      Q     So do they call you and ask you for an
 9   appointment?
10      A     Sometimes.  Sometimes they just show up.
11      Q     So do you typically go inspect the property
12   that someone is asking for a permit?
13      A     In the ordinance I can do that if I can go
14   onto the grounds and even if it says no trespassing I can go
15   on the grounds and inspect whatever is being done, and
16   sometimes I do and sometimes I don't.  It depends on what
17   the issue is.
18      Q     Under what circumstances are you permitted to
19   inspect a property?
20      A     Well, if I have a feeling that something is
21   not correct, then I might go and look and see if it fits
22   what they put on their application.
23      Q     I see.  What would give you a feeling that
24   something is not correct?
25      A     I don't know, a gut feeling.
```

21

```
 1      Q     Well, let me ask you this:  How many
 2   properties have you actually gone to inspect in connection
 3   with applications for building permits?
 4      A     I don't think I can answer that.
 5      Q     Can you estimate?
 6      A     Twenty-five.
 7      Q     In the 10 years?
 8      A     Yeah.
 9      Q     Or actually it's 11 years, isn't it?
10      A     Yeah.
11      Q     That you've been the building permit officer?
12      A     Yes.
13      Q     You're not required to check each property --
14      A     No.
15      Q     -- is that correct?
16      A     No.
17      Q     Would you typically inspect a property if it
18   didn't require septic or if it didn't involve a subdivision?
19      A     Probably not.
20      Q     So how much does it cost to get the building
21   permit application and fill it out?
22      A     It depends on how much is being spent for the
23   structure.  The cheapest one is $15 and the most expensive
24   goes up to $70.  So it's a graduated scale.  So a house
25   that's being built for $450,000, then the building permit
```

6



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

22

1  would be 70.
2  Q    How do you determine how much is going to be
3  spent on building the house or other structures?
4  A    Well, that is -- that is determined by the
5  person when they fill out their application. They give me
6  an estimate. Then the tax assessors come out and check
7  after the structure is finished.
8  Q    So after you issue a building permit, what do
9  you do with the permit itself? Do you give the permit to
10  the person and keep a copy?
11  A    I give them a large permit that they are to
12  put on the structure while they're building it and then I
13  send the tax assessment, along with the check, to Ann Wirth,
14  our secretary, and she then in turn sends it to the county
15  tax assessing office.
16  Q    Do you keep a copy of the building permit
17  yourself?
18  A    Of the application, yes.
19  Q    Of the application?
20  A    Yes, I keep that in a little black book.
21  Q    What is it, a --
22  A    It's a typical three --
23  Q    Three-ring binder?
24  A    Three-ring binder.
25  Q    In connection with this lawsuit, were you

---

24

1  Q    Who asked you to give them to her?
2  A    Ann Wirth.
3  Q    When did she ask you to do that?
4  A    Last week.
5  Q    Were you asked to provide documents at any
6  time prior to that?
7  A    No.
8  Q    Did you ever see a copy of a -- what we would
9  call a document request? Did you ever see a copy of a
10  document that listed different areas of documents that
11  should be produced?
12  A    No.
13  Q    Did Ann just call you up and say give me all
14  your documents?
15  A    Right.
16  Q    What did you give her?
17  A    I gave her -- she already had all the building
18  permits from 19 -- let me see. Well, let's see, about --
19  I'm trying to think when they start, but she had in her
20  township files some of the early building permits. And then
21  I usually kept in my file some of the newer ones so I could
22  go back and look at them if I needed to. And so then I
23  turned all those over to her also.
24  Q    So you had the newer building permits in your
25  file?

---

23

1  asked for any documents, for any building permits or other
2  documents related to township business?
3  A    Could you rephrase that.
4  Q    Okay. In connection with this lawsuit, did
5  anybody ask you to provide documents like building permits
6  or other township related documents?
7  A    I'm not quite sure what you're asking, but Mr.
8  Corneal came to the house and asked for an application.
9  Q    That's a separate issue. What I'm really
10  asking is after this lawsuit was filed did any of the other
11  defendants or anybody else come to you and say search your
12  records for building permits or other documents related to
13  township business in connection with the lawsuit, we need to
14  do this, something like that?
15  A    Well, they came and took all my building
16  permits and all my files.
17  Q    Who is they?
18  A    Well, I was asked to give them to Ann Wirth.
19  Q    Did she come and pick them up?
20  A    I took them to her office.
21  Q    So when you say they came and took them, do
22  you really mean you took them to her?
23  A    Yes, right.
24  Q    That's fine.
25  A    Yeah.

---

25

1  A    Yes.
2  Q    Or actually the applications, correct?
3  A    Yes, uh-huh.
4  Q    And you turned them over to her?
5  A    Yes.
6  Q    Did you turn anything else over to her?
7  A    The whole -- well, that's the whole book,
8  yeah. No, no, that would be the only thing.
9  Q    Did you have any notes or anything like that
10  that you kept in connection with applications for building
11  permits?
12  A    I have some letters which I didn't turn over,
13  some letters where I had written someone to say you have not
14  gotten a building permit for something and you need to do
15  this because you're in violation of the township ordinances.
16  Q    You have some letters like that?
17  A    Yes, um-hum.
18  Q    But you did not turn them over to her?
19  A    No.
20  Q    Why not?
21  A    Nobody asked me for them.
22  Q    Did she just ask you for your building
23  permits?
24  A    Right.
25  Q    That's all?

---



**VAN DOMMELEN, DAVID**
**06/06/01**

CORNEAL VS
JACKSON TOWNSHIP

---

26

1   A     (Witness nods head affirmatively.)
2   Q     How many letters are you talking about?
3   A     Oh, I don't think more than four to 10.
4   Q     Four to 10 letters saying you're not getting a
5   building application -- or a building permit, I'm sorry?
6   A     Of someone who didn't get a permit and I had
7   to write to them and say you need to get a permit.
8   Q     Oh, I see.  Someone who was building without a
9   permit?
10   A     Right, um-hum.
11   Q     I see what you're saying.  Any other notes or
12   letters of any sort that you keep in your own files?
13   A     No, not that I can think of.
14   Q     Do you ever take handwritten notes in
15   connection with a building application?
16   A     I have -- well, most of the building
17   applications are filled out by hand.
18   Q     Right.
19   A     But then I take that information and type it
20   on the tax assessor's office form because I just think it
21   looks better, but the ones that they fill out are all by
22   hand.
23   Q     What about the tax assessor's office forms, is
24   that a one-page form?
25   A     Yes, um-hum.

---

27

1   Q     Do you keep copies of that?
2   A     No.
3   Q     You just send that directly to the tax
4   assessor's office?
5   A     Right, um-hum.
6   Q     Is that the county tax assessor?
7   A     Yes.
8   Q     So it's the Huntingdon County tax assessor?
9   A     Pardon?
10   Q     The Huntingdon County tax assessor?
11   A     Yes.
12   Q     So other than the letters that you sometimes
13   write to people about building permits, are you certain that
14   there are no other documents in your possession related to
15   building permits in Jackson Township or other township
16   business related to building --
17   A     No.  I've got a couple other files about
18   floodplain information and -- because that sometimes can be
19   an issue also, but otherwise there's no documents that are
20   of importance.
21   Q     Well, I'm not asking you whether they're of
22   importance, I'm just asking you if they exist.
23   A     Um-hum.
24   Q     Did you keep any notes in connection with -- I
25   may have asked you this, but I'm going to ask it to you one

---

28

1   more time just to make sure you understand it.  Did you ever
2   keep any notes in connection with any building permit
3   application that came your way, any handwritten notes in
4   your own writing or in your wife's writing or typed up or
5   anything --
6   A     Yes, I probably have some, um-hum.
7   Q     You do.  And is that in a separate --
8   A     Maybe telephone numbers of someone and -- just
9   that I hand jotted.
10   Q     Do you keep them in a separate file?
11   A     Yes, usually.
12   Q     Are they all together or do you keep them in a
13   file connected to a particular building application?
14   A     Yeah, I usually will put them with the
15   building permit application.
16   Q     So if you have a building permit application,
17   do you put for each person -- you said you have a book,
18   right?
19   A     Yes.
20   Q     Do you also keep it in a separate file, you
21   know, for each person labeled in some way or --
22   A     No, just in the -- just in the three-ring
23   notebook.
24   Q     So where do you keep the notes then?
25   A     Well, if they're -- I keep them until I find

---

29

1   they're irrelevant and then I throw them out.
2   Q     But where do you keep them?
3   A     In a file.  You know, in my file drawer.
4   Q     Just in a manila envelope or something --
5   A     Yeah, um-hum.
6   Q     -- like that?  You don't --
7   A     Or attached to the building permit
8   application.
9   Q     You just clip them to it or something?
10   A     Um-hum.
11   Q     Do you have anything like that in your
12   possession at home now, notes that you've kept in connection
13   with the building permit applications?
14   A     I'm not sure.
15   Q     You'd have to look?
16   A     I'd have to look.
17   Q     Do you recall whether you kept any notes in
18   connection with David Corneal?
19   A     Yes.
20   Q     You did?
21   A     Um-hum.
22   Q     Is the answer yes you recall or yes you did?
23   A     Pardon?
24   Q     Is the answer yes you did keep notes?
25   A     Yes.

---



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

30

1    Q    And do you have those notes at your house?
2    A    No.
3    Q    What did you do with them?
4    A    I have them in a case right here.
5    Q    Oh, you do, okay.
6    MS. MONTGOMERY: Well, Tony, I think I'm
7    entitled to have them from him. He brought them and they
8    are certainly relevant to this lawsuit.
9    MR. SHERR: Are you contending these were
10   requested in the request for production?
11   MS. MONTGOMERY: I certainly am. He's got
12   notes related to Mr. Corneal's building permit application
13   with him he said and I'd like to see them.
14   MR. SHERR: Do you want to let me see these
15   documents, please.
16   BY MS. MONTGOMERY:
17   Q    Do you have other documents with you?
18   A    Yeah, um-hum. I brought all my stuff with
19   me. I didn't know what I would need.
20   Q    Okay. What other documents do you have with
21   you?
22   A    A couple letters and things like that.
23   (Handing.)
24   MR. SHERR: Thank you.
25   BY MS. MONTGOMERY:

---

31

1    Q    Do you have a -- among those documents, Mr.
2    Van Dommelen, do you have notes related to other people's
3    building permit applications or just Mr. Corneal's?
4    A    I think just Mr. Corneal's.
5    Q    Are all of the documents that you brought with
6    you in some way related to Mr. Corneal's Jackson Township --
7    A    I think -- not all of them, not all of them.
8    I think there's also -- the ordinance is in here, too.
9    Q    Anything else beside the ordinances?
10   A    I can't -- I can't remember. I just picked it
11   all up.
12   Q    Do you recall anything else, though, besides
13   the documents related to Mr. Corneal's --
14   A    Pardon?
15   Q    Do you recall anything else besides documents
16   related to Mr. Corneal's building efforts in Jackson
17   Township? Do you recall anything else being in that file
18   besides the ordinances and Mr. Corneal's building efforts in
19   Jackson Township?
20   A    I'm not understanding you.
21   Q    Let me ask you this: Did you put that file
22   together yourself?
23   A    Yes, I just put everything in one file and I
24   picked it all up --
25   Q    Were those documents that you believed would

---

32

1    be related in some way to the issues in this lawsuit?
2    A    Some of them might be.
3    Q    What about the others, why did you bring them
4    if they're not related to it?
5    A    I don't know why.
6    MR. SHERR: Let me just state for the record
7    that a number of these documents relate to the lawsuit
8    themselves. They include the complaint and the exhibits to
9    the lawsuit, a copy of the deposition of Mr. Corneal,
10   correspondence from me, a picture of my business card, notes
11   from a meeting that I attended, what appears to be a copy of
12   the subdivision ordinance -- well, the other documents are
13   free to inspection. They appear to be a copy of the
14   subdivision ordinance --
15   THE WITNESS: Yes, the ordinance is here,
16   um-hum.
17   MR. SHERR: -- a copy of Mr. Van Dommelen's
18   2001 vita, a single page which appears to be from Act 537,
19   various correspondence from Mr. Van Dommelen, which is free to
20   inspect, and a copy of an article from a newspaper. It
21   looks like the Daily News --
22   THE WITNESS: Yeah, it's the Daily News in
23   Huntingdon.
24   MR. SHERR: -- concerning this lawsuit.
25   MS. MONTGOMERY: Okay, why are the other

---

33

1    documents not inspectable by me right now?
2    MR. SHERR: Well, you're certainly free to
3    inspect Mr. Corneal's deposition, the complaint and the
4    exhibits to the complaint. Correspondence from me to Mr.
5    Van Dommelen --
6    MS. MONTGOMERY: You're saying is protected?
7    MR. SHERR: -- as well as notes from a meeting
8    by --
9    MS. MONTGOMERY: What's on the back? There's
10   handwritten --
11   MR. SHERR: That I attended. Other notes that
12   are -- well, you're certainly free to inspect this. This is
13   something with my phone number on it, something concerning
14   -- a couple things concerning receipts regarding these
15   depositions, I assume, and -- I'll ask, what appear to be
16   notes from a conversation that I had with Mr. Van Dommelen?
17   THE WITNESS: Um-hum.
18   MR. SHERR: Is that correct?
19   THE WITNESS: Yes, um-hum.
20   MS. MONTGOMERY: So you're saying that --
21   MR. SHERR: That would also be privileged.
22   MS. MONTGOMERY: What is that, three --
23   MR. SHERR: Two.
24   MS. MONTGOMERY: Two handwritten small
25   notes --

---



34

MR. SHERR: Three-by-five notes.
THE WITNESS: Yes, this -- I don't know how that got in there. This has nothing to do with anything.
MR. SHERR: Okay, she can inspect that as well then.
MS. MONTGOMERY: So you have what, three other documents in front of you?
MR. SHERR: I have -- well, you're certainly free to inspect my business card.
MS. MONTGOMERY: Okay.
MR. SHERR: I have two documents -- well, I have three counting the three-by-five note, correct.
MS. MONTGOMERY: So you have a three-by-five note, you have a letter from you to Mr. Van Dommelen and then you have what you're saying are notes of a meeting?
MR. SHERR: Handwritten notes of a meeting that I attended with the defendants in this lawsuit when it was filed.
MS. MONTGOMERY: What's on the back of it?
MR. SHERR: Part of the same notes.
MS. MONTGOMERY: Those are notes related to the meeting?
MR. SHERR: Yes, absolutely.
MS. MONTGOMERY: Who was at that meeting? I'll ask Mr. Van Dommelen.

35

BY MS. MONTGOMERY:
Q Mr. Van Dommelen, who was at the meeting that Mr. Sherr is referring to that he says he was present at and those are notes made in connection with that meeting? Who all was at that meeting?
A **I'm assuming that all the supervisors were and I'm assuming that Ann Wirth was and I'm assuming that Larry Newton, the township lawyer was and myself.**
Q Anybody else?
A **I think that's it. That's seven people.**
Q Nobody's spouse was there or anybody else?
A **No.**
Q We're going to take a break and look at the documents that you have with you for a moment, okay?
A **Um-hum.**
Q Including your handwritten notes there.
(Break taken from 10:22 a.m. until 10:38 a.m.)
BY MS. MONTGOMERY:
Q Mr. Van Dommelen, I'm going to send Leslie to have a copy of these made by our office service people so we can use them in connection with your deposition.
A **Okay.**
Q And we'll continue with the deposition for now and she'll bring you your original file back directly.
A **Um-hum.**

36

Q But I'm going to need to use the originals to ask you certain questions because -- for a variety of reasons so -- but we'll bring your original file back in a few moments.
A **Um-hum.**
Q Mr. Van Dommelen, a few moments ago you testified that you had some handwritten notes about David Corneal's building permit application with you.
A **And I didn't see them in there. I don't -- I don't know what happened to them. They mainly were telephone numbers and -- and I didn't see them in there either.**
Q I want you to take for me a moment the document that you have said is notes in connection with -- notes that -- of a meeting that Tony Sherr attended. I'm not going to ask you anything about what they say, I'm just going to ask you to look at it for me for a second and tell me whether those notes were all taken on one day or whether any part of those notes were taken at a different time.
A **My feeling is that they were taken at different times. The reason I say that is what's on this side I think probably was written down versus the things on this side.**
Q Right, that's why I'm asking you about it. Which side do you think was taken at the meeting with Tony

37

Sherr?
A **I would assume it was this one here because I believe that meeting was at four o'clock.**
Q On what day?
A **On Thursday, the 13th.**
Q Of?
A **Of July.**
Q Of July 2000?
A **Um-hum. So that's why I'm assuming that this was all --**
Q Now, the other side, what do you think that is?
A **They were just some of my personal, you know --**
Q Thoughts about the lawsuit?
A **Yeah, um-hum.**
MS. MONTGOMERY: I'm going to represent that I'm not going to turn this document over, but I want to review the document that he says are his personal thoughts about the lawsuit.
MR. SHERR: And I believe that this is privileged because -- I believe it's privileged because I believe it states things that were stated at the meeting so you're more than happy to have the court inspect it and --
MS. MONTGOMERY: Take the document back from



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

**38**

1 Mr. Van Dommelen.
2 BY MS. MONTGOMERY:
3 Q    Mr. Van Dommelen, is it your position that
4 those are things stated about the meeting?
5 A    That what?
6     MS. MONTGOMERY:  I'm going to ask him some
7 more questions about that.
8 BY MS. MONTGOMERY:
9 Q    When did you make those notes?
10 A    I do not know.
11 Q    Before or after the meeting?
12 A    These after the meeting, I'm positive.
13 Q    Was anybody else present when you made those
14 notes?
15 A    No.
16 Q    I'm going to give you a sticky and ask you to
17 mark on one side --
18     MR. SHERR:  Well, let the record reflect that
19 I believe this to be a privileged document so we're not
20 going to turn it over.  You know, you can take the next step
21 if you'd like at that point, but I believe this to be a
22 privileged document.
23     MS. MONTGOMERY:  I'm going to take the next
24 step. I'm absolutely going to take the next step.
25     MR. SHERR:  That's fine.

**39**

1     MS. MONTGOMERY:  I mean, I don't know that his
2 thoughts about a meeting with you are privileged.  I don't
3 know under what theory of law his thoughts about a meeting
4 with you are privileged.  He told me they were thoughts --
5 he didn't say they were thoughts about a meeting, he said
6 that they were thoughts about the lawsuit.  That's not
7 privileged.  And you've taken it from him and said no, I
8 think there's something in here -- thoughts about that
9 meeting and so you can't see it.
10     MR. SHERR:  I know this to be things that I
11 stated to him in notes about the meeting and it's
12 privileged.
13     MS. MONTGOMERY:  Well, we'll ask the court to
14 review it.
15     MR. SHERR:  That's fine.  I have no problem
16 with that.
17 BY MS. MONTGOMERY:
18 Q    But for now I'm just going to ask you to mark
19 the side of it that you think is the meeting that you --
20 notes of the meeting that you took while you were with Mr.
21 Sherr.
22 A    It would be this one.  What do you want me to
23 write?
24 Q    Just, you know, meeting with Mr. Sherr or
25 something like that so that we know which side you took in

**40**

1 Mr. Sherr's presence.
2 A    (Witness so complied.)
3 Q    Do you know somebody named Vita?
4 A    Vita?
5 Q    Yes.
6 A    No.
7 Q    Does the word vita mean anything to you,
8 v-i-t-a?
9 A    No.
10     MR. SHERR:  Curriculum vita?
11     THE WITNESS:  Huh?
12     MR. SHERR:  Curriculum vita.
13     THE WITNESS:  Oh, vita, I see.
14 BY MS. MONTGOMERY:
15 Q    V-i-t-a.
16 A    I thought you were saying a name of a person,
17 Vita.
18 Q    I was just asking.
19 A    Okay, vita, curriculum vita.
20 Q    Okay.
21 A    Mine is in here, in this pile someplace.
22 Q    Right, the documents that I just took and had
23 copied.
24 A    Um-hum.
25 Q    Do you have any other documents with you today

**41**

1 besides the ones that you just took out of your bag and
2 handed to Mr. Sherr first?
3 A    No.
4 Q    To your knowledge do you have any other
5 documents anywhere else that in any way relate to this
6 lawsuit?
7 A    No.
8 Q    That in any way relate to Mr. Corneal?
9 A    No.
10 Q    Did you have any documents at any other time
11 that relate to this lawsuit or to Mr. Corneal?
12 A    No.
13 Q    Do you work on computer?
14 A    Yes.
15 Q    Would you have notes on computer by any
16 chance?
17 A    No.
18 Q    Do you do any of your township business on
19 computer?
20 A    Sometimes.  Sometimes I might write a letter
21 on the computer.
22 Q    Did you look in your computer to see whether
23 there were any documents related to Mr. Corneal or this
24 lawsuit?
25 A    No.

 

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

42

1    Q    Do you know right now as you sit here whether
2    there are?
3    A    Pardon?
4    Q    Do you know right now as you sit here whether
5    there are any such documents?
6    A    There are none.
7    Q    What about on floppy disk? Do you download
8    onto floppy disk at all?
9    A    Yes.
10   Q    Do you have any documents related to this
11   lawsuit downloaded onto a floppy disc?
12   A    No. My computer is mainly used for my
13   manuscripts for my books.
14   Q    Now, you said from time to time in your work
15   as a building permit officer that you have gone and
16   inspected property?
17   A    Um-hum.
18   Q    What does such an inspection entail?
19   A    To drive by mainly, to see what's being done.
20   Q    And when you say drive by, do you mean you
21   just drive by, you don't get out of the car?
22   A    No.
23   Q    Is that no, you don't get out of the car?
24   A    Yeah. No, I don't get out of the car.
25   Q    You just take a slow drive by the property?

---

43

1    A    Correct.
2    Q    And what would you be looking for when you
3    drive by?
4    A    To see if someone has gotten a building
5    permit, to see if they're complying with our regulations.
6    Q    Well, now, in saying that, am I understanding
7    you to say that for someone who hasn't applied for a
8    building permit you've done drive-bys like that?
9    A    Yes.
10   Q    So is that because you hear from somebody that
11   somebody is building?
12   A    Yes.
13   Q    What about in connection with someone who has
14   applied for a building permit, have you done drive-bys --
15   A    Sometimes.
16   Q    How often?
17   A    Oh, I really can't say. I think I said a
18   little earlier about 25 times.
19   Q    I was just trying to make sure that you
20   weren't talking about any drive-by that you do those 25
21   times.
22   A    No.
23   Q    So you're saying that for purposes of people
24   who have applied for the permit you think you've driven by
25   to see what is going on about 25 times?

---

44

1    A    Right.
2    Q    About how many building permit applications do
3    you process a year?
4    A    About -- between 35 and 40 a year.
5    Q    Is that pretty steady from --
6    A    That's pretty steady.
7    Q    Of those building permit applications, how
8    many have you denied in the 11 years that you've been the
9    building permit officer?
10   A    I'm not sure that I can answer that honestly.
11   Q    And why is that?
12   A    Because I think there are times I've said you
13   have to add more information and then they come back and
14   then I don't deny it.
15   Q    Okay. So have you ever outright denied a
16   building permit application by sending a letter and saying
17   your building permit application is denied?
18   A    Just once.
19   Q    And when was that?
20   A    To Corneal.
21   Q    So it was in connection with Mr. Corneal?
22   A    Right.
23   Q    You have no other -- you've never written a
24   letter to anybody else and denied their building permit
25   application?

---

45

1    A    Not that I recall.
2    Q    So when you say you might ask them to go and
3    get additional information, what kind of additional
4    information?
5    A    Well, I might have discovered they haven't
6    gotten the proper sewage number from our sewer -- from the
7    septic officer and so I need to have that number before I
8    can -- before I can issue a permit. That might be one
9    reason.
10   Q    So they have to go back and get you a number
11   and come back?
12   A    And I might also say you need to get a better
13   assessment, a cost of the structure that you're building.
14   Q    Okay. Anything else?
15   A    Not that I can think of.
16   Q    So typically do they go get you the
17   information the same day and get it back to you?
18   A    They can very often, yes.
19   Q    How many times would you say you've sent
20   people back for additional information?
21   A    Oh, probably 10 times.
22   Q    Ten times in say 11 years?
23   A    Yes.
24   Q    During the year 2000 how many building permit
25   applications did you review?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

46

1    A    Probably in the area of 36 or 37.

2    Q    Was Mr. Corneal -- and I take it from your

3    past answer that Mr. Corneal's was the only building permit

4    application that you denied in the year 2000?

5    A    Right.

6    Q    How did Mr. Corneal come to fill out a

7    building application, a building permit application?

8    A    How?

9    Q    Yes.  Well, let me ask that question -- strike

10    that.  What's the first contact that you had with Mr.

11    Corneal in connection with his request for a building

12    permit?

13    A    When he showed up at my house.

14    Q    Did he call you first?

15    A    I don't believe so, but I -- he might have.

16    Sometimes people do, sometimes they don't and I just do not

17    recall if he did or not.

18    Q    So he showed up at your house?

19    A    Right.

20    Q    In the daytime?

21    A    Yes.

22    Q    Do you know when that was?

23    A    No, I can't remember.  It was probably in

24    April of 2000.

25    Q    And what did he say when he got there?

---

47

1    A    He said he wanted a building permit and I said

2    what are you building and he said a garage and a house.  And

3    then he said his name and I said I cannot give you a

4    building permit.

5    Q    And why?

6    A    Because the supervisors had instructed me not

7    to give a building permit.

8    Q    When did the supervisors instruct you not to

9    give him a building permit?

10    A    Well, probably a couple of weeks before that.

11    And then while he was there, I called up Tom Wilson and Tom

12    -- and I said Mr. Corneal is here and what am I to do and

13    he said don't give him a permit.

14    Q    Did you ask him why shouldn't I give him a

15    permit?

16    A    Yes, because he was -- hadn't subdivided

17    properly and he hadn't got the correct septic tank approval.

18    Q    That's what Mr. Wilson told you?

19    A    Yes.

20    Q    Did you have any independent knowledge of

21    that?

22    A    Well, I'd heard.  Yes, I'd heard that that was

23    true.

24    Q    Where did you hear that from?

25    A    Oh, from different discussions of supervisors.

---

48

1    Q    Just with the supervisors?

2    A    Yes.

3    Q    You said that before Mr. Corneal showed up

4    that you had been instructed by the supervisors not to give

5    him a building permit.

6    A    Right.

7    Q    Now, in what -- you know, where were you when

8    you were instructed not to give him a building permit?

9    A    I can't tell you.  I can't remember.

10    Q    Did they tell you that in person or over the

11    telephone?

12    A    Over the telephone.

13    Q    They called you at your house?

14    A    Yeah, we talk on the phone, um-hum.

15    Q    So in the course of a telephone conversation

16    prior to --

17    A    Yes.

18    Q    -- Mr. Corneal's visit you're saying?

19    A    Right.

20    Q    So who exactly were you speaking to?

21    A    Pardon?

22    Q    Who exactly were you speaking to?

23    A    I know I talked to Ann Wirth about it.

24    Q    Did Miss Wirth tell you not to give him a

25    building permit?

---

49

1    A    She said the supervisors were not interested

2    in letting him have one at that time.

3    Q    And did she tell you why?

4    A    Yes, the same reason, that he was talking

5    about subdividing but he hadn't done the proper steps for

6    subdividing and he also hadn't gotten the correct permission

7    for septic systems.

8    Q    Well, let me ask you this:  If he's asking to

9    build one structure on one piece of property, does he have

10    to do some kind of subdivision thing?  I mean, what does he

11    have to do in connection with subdividing?

12    A    Well, he has to go through the planning

13    commission to subdivide and go through the supervisors.

14    Q    What if he doesn't want to subdivide, he just

15    wants to build?

16    A    Well, he couldn't on that property because

17    there was already a house on it and that would mean that he

18    would then be subdividing that property.

19    Q    Is that what Miss Wirth told you?

20    A    Yes, that's common practice, common knowledge.

21    Q    So you recall a phone call from Ann Wirth?

22    A    Yeah, I assume that -- a phone call.  I don't

23    know who called so I'll just say I talked to her on the

24    phone and I talked to Tom Wilson on the phone.

25    Q    Was that around the same time frame?

---




VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

---

50

1  A    Yes.
2  Q    Did either one of them express to you any
3  dislike of Mr. Corneal?
4  A    No.
5  Q    Did they express to you any conflict that they
6  were having with Mr. Corneal in any way?
7  A    Yes.
8  Q    And what did they express to you?  Who
9  expressed it to you and what did he or she express?
10  A    Well, he was very vituperative in two of the
11  township meetings.  Neither of those -- I wasn't present at
12  either of those for some reason and so they reported his
13  behavior at those and --
14  Q    What did they say about his behavior?
15  A    That it was irresponsible.  And I'm not sure
16  if that word was used, but it was very childlike and he did
17  this in front of all the -- the whole business meeting.
18  Q    What exactly did he do, did they tell you?
19  A    Well, he screamed and yelled and ...
20  Q    Did they tell you anything else about it?
21  Q    What?
22  Q    Did they tell you anything else about it?
23  A    Not really.
24  Q    Who told you this, Miss Wirth or Mr. Wilson?
25  A    I think both of them.

---

51

1  Q    So did they tell you that because he behaved
2  in what they considered to be a childlike fashion that they
3  didn't want him to build or something?
4  A    No, that had nothing to do with it.
5  Q    What else did they tell you then?
6  A    That's essentially it.
7  Q    At the time that Miss Wirth and Mr. Wilson
8  told you that Mr. Corneal wouldn't be allowed to build
9  because he didn't have proper subdivision, was there a
10  subdivision ordinance in place in the township?
11  A    No, we had a moratorium on subdivision.
12  Q    Did you have an ordinance?
13  A    A subdivision ordinance?
14  Q    Yes.
15  A    We were working on that.
16  Q    So you just had a moratorium in place?
17  A    Right, um-hum.
18  Q    Were you involved in the discussions about
19  placing a moratorium in place in Jackson Township?
20  A    No, no.
21  Q    How did you come to find out about the
22  moratorium?
23  A    Well, it was just mentioned at township
24  meetings.
25  Q    Do you know how long it was under discussion?

---

52

1  A    No, I'm not sure.
2  Q    Had you ever heard about it prior to the time
3  that it was actually put in place by the township
4  supervisors?
5  A    Yes, um-hum.
6  Q    How long before that had you heard about it?
7  A    I can't remember.
8  Q    Were you present at the meeting when the
9  moratorium was put in place by the supervisors?
10  A    No.
11  Q    But you were aware of it?
12  A    Yes.
13  Q    Were you involved in any discussions or
14  conferences or anything like that concerning the moratorium
15  with the supervisors?
16  A    No.
17  Q    With anybody else?
18  A    I don't know.
19  Q    Well, do you recall who told you about the
20  moratorium?
21  A    Well, the supervisors, I assume.
22  Q    They mentioned to you that they were putting
23  it in place?
24  A    Yeah.
25  Q    That they intended to put it in place?

---

53

1  A    Yeah, and it was discussed at some of the
2  meetings.
3  Q    Did they tell you what their concerns were and
4  why they wanted to put a moratorium in place?
5  A    Well, they wanted to make sure that they had a
6  better understanding of the whole subdivision process.
7  Q    So they put a moratorium in place so they
8  could get a better understanding?
9  A    Yes, and they were trying to rewrite the whole
10  question of subdividing.
11  Q    Did they tell you why they needed to
12  understand it better?  Did they tell you what their concerns
13  were?
14  A    Well, I don't know that they said exactly, but
15  I'm assuming that they wanted to make sure that we had
16  better planning in the township and it wasn't
17  helter-skelter.
18  Q    So you're assuming that, but did they actually
19  tell you that?
20  A    No.
21  Q    Do you recall whether there was any public
22  expression of concern about subdivisions in the township
23  prior to the moratorium being placed --
24  A    Yes --
25  Q    Put in place?

---

 

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

54

| | | |
|---|---|---|
| 1 | A | -- there had been. |
| 2 | Q | By whom? |
| 3 | A | The supervisors and planners. |
| 4 | Q | What planners? |
| 5 | A | There were several architects and people in |
| 6 | | the township that had a concern about subdivision and the |
| 7 | | direction in which the township was or wasn't going. |
| 8 | Q | And who were those architects and planners? |
| 9 | A | Well, one was the name of Denson Groenendaal. |
| 10 | Q | Denson Groenendaal? |
| 11 | A | Yeah, um-hum. |
| 12 | Q | Is he a township resident? |
| 13 | A | Yes. |
| 14 | Q | Who else? |
| 15 | A | I can't think of any right now. |
| 16 | Q | You can't think of any others? |
| 17 | A | I know he was a major person. |
| 18 | Q | How do you know he was a major person? |
| 19 | A | Because he used to come to some of our |
| 20 | | meetings and express that concern. |
| 21 | Q | To the supervisors? |
| 22 | A | Um-hum. |
| 23 | Q | Anybody else? |
| 24 | A | No. |
| 25 | Q | Let's go back for a second to Mr. Corneal's |

55

| | | |
|---|---|---|
| 1 | | visit to your home in an effort to get a building permit. |
| 2 | A | Um-hum. |
| 3 | Q | So you told him -- as I understand your |
| 4 | | testimony, you told him he couldn't have one, correct? |
| 5 | A | Yes, um-hum. |
| 6 | Q | And you made a phone call to Mr. Wilson? |
| 7 | A | Um-hum. |
| 8 | Q | And he confirmed that you should not give |
| 9 | | him -- |
| 10 | A | Right. |
| 11 | Q | -- a permit?  Did Mr. Corneal then ask you any |
| 12 | | questions about why he couldn't have a permit? |
| 13 | A | Yes, and I said because you don't have the |
| 14 | | proper documentation to receive one. |
| 15 | Q | For a subdivision? |
| 16 | A | For a subdivision or for septic. |
| 17 | Q | What did he say? |
| 18 | A | He started ranting and raving. |
| 19 | Q | What's your definition of ranting and raving? |
| 20 | A | Screaming and yelling at me. |
| 21 | Q | He screamed at you? |
| 22 | A | Yes.  And I began to be concerned about my |
| 23 | | welfare and unfortunately my wife wasn't there.  She was not |
| 24 | | in the house.  So I told him that either he leave or I'm |
| 25 | | going to call authorities to take him out of my house. |

56

| | | |
|---|---|---|
| 1 | Q | And what did he say? |
| 2 | A | Well, he finally left. |
| 3 | Q | Did he ask you for an application? |
| 4 | A | Yes. |
| 5 | Q | Did you give him an application? |
| 6 | A | No. |
| 7 | Q | Why not? |
| 8 | A | Because I didn't know what he was going to do |
| 9 | | with it. |
| 10 | Q | What did you think he was going to do with an |
| 11 | | application? |
| 12 | A | Well, fill it out and pretend that he had an |
| 13 | | application. |
| 14 | Q | Well, you mean pretend that he had a permit, |
| 15 | | but he can't -- how could he pretend he has a permit? |
| 16 | A | Well, I don't know. |
| 17 | Q | So you didn't want to give him the |
| 18 | | application? |
| 19 | A | Right. |
| 20 | Q | Why, because you just didn't want him to have |
| 21 | | one? |
| 22 | A | Yes. |
| 23 | Q | Have you ever denied anybody else a building |
| 24 | | permit application in the past? |
| 25 | A | No. |

57

| | | |
|---|---|---|
| 1 | Q | What did Mr. Corneal do when you wouldn't give |
| 2 | | him the application? |
| 3 | A | He made a scene. |
| 4 | Q | Is that when he started screaming and |
| 5 | | yelling -- |
| 6 | A | Right. |
| 7 | Q | -- when you said no, I'm not going to give you |
| 8 | | an application? |
| 9 | A | Right. |
| 10 | Q | Now, I heard you say a moment ago that you |
| 11 | | attend township meetings.  Is that typically or just |
| 12 | | sometimes or regularly or what? |
| 13 | A | Fairly typically. |
| 14 | Q | Do you know, for example, in 2000 how many |
| 15 | | meetings you -- monthly meetings you attended? |
| 16 | A | Probably nine or 10. |
| 17 | Q | But you were not at the January meeting when |
| 18 | | the moratorium -- |
| 19 | A | No. |
| 20 | Q | -- was put in place?  Why not? |
| 21 | A | I cannot remember. |
| 22 | Q | What about the February 2000 meeting, do you |
| 23 | | know if you were at that one? |
| 24 | A | I was not at that one either. |
| 25 | Q | What about the March 2000 meeting? |




**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

58

1    A    I can't recall.
2    Q    What about the April 2000 meeting?
3    A    I probably was at it, but I would have to look
4    at my calendar.
5    Q    Are you aware of the existence of pre-meetings
6    that --
7    A    Of what?
8    Q    I guess we would call them pre-meetings that
9    were held -- that are held by the supervisors prior to
10   township meetings?
11   A    Yes.
12   Q    Have you attended those meetings?
13   A    I've never attended one of them.
14   Q    Why is that?
15   A    Because I just didn't want to.
16   Q    Are you permitted to attend if you want?
17   A    Yes, I believe so.
18   Q    Are these meetings open to the public?
19   A    Yes.
20   Q    The pre-meetings are open to the public?
21   A    Yes, I believe so.
22   Q    Do you know where they're held?
23   A    In the secretary's -- the township secretary's
24   office.
25   Q    The meetings -- the public meetings themselves

59

1    are held at the fire hall?
2    A    Right.
3    Q    What makes you say that the pre-meetings are
4    open to the public?
5    A    I think the Sunshine Laws of the state.
6    Q    Do people know that there are pre-meetings at
7    Ann Wirth's property?
8    A    Oh, I'm sure they do.
9    Q    And what makes you say you're sure that they
10   do?
11   A    Because they've talked about them at the
12   public meetings.
13   Q    Where is the fire hall in relation to Miss
14   Wirth's house?
15   A    About four miles away and the fire hall is
16   right in center city McAlevys Fort.
17   Q    Is there any kind of a sign at Miss Wirth's
18   that says, you know, township office --
19   A    Yes.
20   Q    -- pre-meetings held here, something like
21   that?
22   A    No, no, there is no sign that says meetings
23   held, but it does -- there is a sign that says township
24   supervisors -- or township secretary has an office there.
25   Q    So it's the township secretary's office?

60

1    A    Yes.
2    Q    Is that building open to the public, like can
3    anybody go in and walk in anytime they want?
4    A    I assume. She has office hours.
5    Q    She does?
6    A    Yes.
7    Q    Have you ever tried to go up there just to go
8    into the township secretary's office?
9    A    Oh, yeah.
10   Q    Is it unlocked?
11   A    I don't know because if she's not there, she
12   has a sign out that she'll be back at a certain time. I've
13   never tried the door.
14   Q    As far as the pre-meetings are concerned that
15   you think might be open to the public, are they actually
16   advertised in the newspaper or anything like that, there
17   will be a pre-meeting at Ann Wirth's office prior to the
18   public supervisor's meeting?
19   A    That I'm not sure of. I don't get the Daily
20   News. I don't get -- receive that paper.
21   Q    To your knowledge, though, are they
22   advertised?
23   A    I think so, but I would not place my life on
24   it.
25   Q    What makes you think so?

61

1    A    Because I know occasionally that they have
2    said something is in the paper.
3    Q    You mean occasionally the supervisors say
4    we're putting something in the paper?
5    A    And whenever the supervisors have a change of
6    the supervisor's meetings it's always in the paper.
7    Q    The regular monthly meetings?
8    A    Yes, uh-huh, and those are open and attended
9    by townspeople.
10   Q    Right. Do you know what actions or what
11   activities take place at these pre-meetings?
12       MR. SHERR: I'm going to object to the form of
13   the question. I believe it's calling for hearsay since
14   he already stated he did not go to any of those meetings.
15       MS. MONTGOMERY: Well, hearsay is perfectly
16   permissible in a deposition, perfectly permissible.
17       MR. SHERR: I'm not telling him not to answer.
18   I'm objecting to the form of the question because you're
19   asking for hearsay.
20       MS. MONTGOMERY: Okay.
21   BY MS. MONTGOMERY:
22   Q    Do you know what activities take place at the
23   pre-meetings?
24   A    Well, I know they sign checks.
25   Q    The supervisors sign checks?



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

62

1   A       Yes, uh-huh, because I get my check from them
2   once a month.
3   Q       What else?
4   A       I have no idea.
5   Q       Do you know of any member of the public who
6   has ever attended a pre-meeting?
7   A       No, I don't.
8   Q       When Mr. Corneal visited your house and asked
9   you for a building permit application, do you recall whether
10  -- do you recall telling him that there was going to be a
11  meeting on his situation the next day?
12  A       Yes, I do recall a comment like that.
13  Q       That you made to him?
14  A       Yes, um-hum.
15  Q       How did you know there was going to be a
16  meeting on his situation?
17  A       Well, there was some talk about it, but it
18  apparently never took place.
19  Q       That wasn't a public meeting, correct?
20  A       No, I don't believe so.
21  Q       Was that going to be a meeting of the
22  supervisors and Ann Wirth?
23  A       Yes.
24  Q       Were you supposed to be there?
25  A       No.

---

64

1   A       No.
2   Q       You never talked to him in person again --
3   A       No.
4   Q       -- about his building permit application?
5   A       No.
6   Q       What did you then do next about his building
7   permit?
8   A       I waited to hear from the supervisors.
9   Q       What did you hear next from the supervisors?
10  A       Well, that until he agreed to take care of the
11  concerns that they weren't going to allow him to have a
12  permit.
13  Q       Who agreed?
14  A       The supervisors.
15  Q       They agreed -- I'm sorry, I don't understand
16  what you said.
17  A       You asked me the next step and what I'm saying
18  is that they told him, apparently, and this is -- that until
19  he solved the problems that they wouldn't have me issue a
20  building permit.
21  Q       How do you know they told him that?
22  A       I don't know.  I'm assuming that they did.
23  Q       Okay.  Assuming based on what?
24  A       Well, based on the fact that they were trying
25  to get different things solved.

---

63

1   Q       Why don't you think it ever took place?
2   A       Pardon?
3   Q       Why don't you think it ever took place?
4   A       Because I never got any response about that I
5   should change the stance on the building permit for Mr.
6   Corneal.
7   Q       So you don't really know whether or not the
8   meeting ever took place --
9   A       No.
10  Q       -- correct?  You said there had been some talk
11  of holding a meeting.  Some talk among who?
12  A       The supervisors to try and figure out what had
13  to be done.
14  Q       About Mr. Corneal?
15  A       Yes.
16  Q       So this was going to be a non-regular -- it
17  wasn't a monthly meeting or anything like that --
18  A       Not that I know of.
19  Q       -- or even a pre-meeting?
20  A       Yes.
21  Q       Was anybody else present at your house the day
22  that Mr. Corneal came?
23  A       No.
24  Q       Did you have occasion then after that visit to
25  meet with Mr. Corneal in person?

---

65

1   Q       Have you ever been present at a township
2   meeting that Mr. Corneal was present at?
3   A       No.
4   Q       Did you ever have the opportunity to talk to
5   Mr. Corneal again on the telephone about his building permit
6   application?
7   A       No.
8   Q       Did he ever call -- try to call you again?
9   A       No.
10  Q       Did he ever write to you?
11  A       Yes.
12  Q       What was the occasion of his writing to you?
13  A       Somewhere there's a letter in there.
14  Q       Do you recall a time when Mr. Corneal decided
15  that he just wanted to build a studio rather than a house?
16  A       Yes.
17  Q       What do you know about that?
18  A       He came and presented plans to me,
19  architectural plans, of a four-stall garage -- four-stall garage
20  with an upstairs studio in it.
21  Q       Okay, he presented them to you.  I thought you
22  said you hadn't an occasion to meet with him again?
23  A       That was when he came that first time.
24  Q       Oh, okay.  So he was at that time asking you
25  for a garage and a house, is that what you're saying -- a

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

---

66

1  studio and a house?
2      A      Well, yes, he was going to do a house and a
3  garage and then he changed his mind and decided to have a
4  studio separate from the garage.
5      Q      So is it your testimony that the time that he
6  came to your house he was asking you for a building permit
7  both for the house and for the studio, correct?
8      A      I'm not sure about that.  I can't -- the only
9  drawings he had with him were a four-stall garage and with a
10  second story for a studio.
11      Q      So he didn't need any septic for that studio,
12  right?
13      A      I would say so.
14      Q      Why is that?
15      A      Because as an artist he's got to use water and
16  that means that you've got to have, you know, a system to
17  get rid of the water and -- through a septic system.
18      Q      Do you have septic in your studio?
19      A      No, I don't.
20      Q      So you don't really know anything about why
21  Mr. -- or you don't really know anything that would
22  demonstrate that Mr. Corneal needs septic in his studio, do
23  you?
24      A      No, I'm assuming that he would need to have a
25  septic system because of the type of artwork that he's --

---

67

1      Q      How do you get water to your studio?
2      A      I go to the stream and get water.
3      Q      So assuming he doesn't want septic in his art
4  studio --
5      A      Pardon?
6      Q      Assuming he doesn't want water in his studio
7  like you don't need water in your studio, does he need a
8  septic system?
9      A      Well, I suppose not.
10      Q      Did Mr. Corneal ever tell you that he was
11  looking to put water in his studio?
12      A      I don't recall.
13      Q      Did you at the time that he asked you for the
14  building permit make any distinction between the art studio
15  and the house?
16      A      I knew he was going to build a house.
17      Q      But he was asking to build a house and an art
18  studio, right?
19      A      I don't recall if he was asking for both of
20  them at that time or not.
21      Q      But you did testify that he brought to you
22  some plans and the only plans that he showed you were for an
23  art studio -- or a four-bay garage with a studio above it,
24  correct?
25      A      Yes.

---

68

1      Q      But you denied him the application even for
2  that studio, correct?
3      A      Yes.
4      Q      Did you do so based on what the township
5  supervisors told you to do?
6      A      Right.
7      Q      So they told you don't give him a building
8  permit for anything, right?
9      A      Exactly.
10      Q      Mr. Van Dommelen, I'm just going to take a
11  second and show you a document -- while I find this
12  document, I'm going to ask you questions so we don't waste
13  time.  Have you had occasion to discuss with any of the
14  township supervisors their depositions?
15      A      No.
16      Q      Have you had occasion to discuss with anybody
17  the depositions of the township supervisors?
18      A      I have not heard of anything that they've --
19  no, I haven't.
20      Q      Have you talked to the township supervisors
21  about their depositions or about this lawsuit since their
22  depositions were taken?
23      A      No.
24      Q      What about Miss Wirth, have you had occasion
25  to talk to Miss Wirth about her deposition?

---

69

1      A      No.
2      Q      Have you talked to her since her deposition
3  was taken?
4      A      Yes.
5      Q      When was that?
6      A      Well, I've talked to her several times about
7  different issues.
8      Q      Did you talk to her about this lawsuit?
9      A      No.
10      Q      So has anybody -- no matter who they are,
11  anybody, told you anything about the testimony that was
12  given --
13      A      No.
14      Q      -- in the depositions of the township
15  supervisors --
16      A      No.
17      Q      -- or Ms. Wirth?
18      A      Unh-unh.  The only thing I know about is --
19  because I was here the day that Ann Wirth -- I know the
20  period of time it took for the deposition.
21      Q      Now, when Mr. Corneal came to your house, did
22  you indicate to him that you would call him or get back in
23  touch with him in any way?
24      A      No.
25      Q      Do you recall getting a phone call from him

---



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

70

1 after that meeting --
2 A    No, I don't.
3 Q    -- at your house? I'm going to show you a
4 document that we're going to -- it's already been marked as
5 Wirth 15 so we don't need to mark it again and I'll ask you
6 to take a look at it.
7 A    Um-hum.
8 Q    Do you recall receiving that letter from Mr.
9 Corneal?
10 A    Yes, um-hum.
11 Q    What did you do with that letter once you
12 received it?
13 A    I filed it.
14 Q    Filed it where?
15 A    In my file.
16 Q    Did you send it on to anybody else?
17 A    No.
18 Q    Why not?
19 A    I don't know who I would have sent it on to.
20 Q    You wouldn't have sent it on to the township
21 supervisors?
22 A    No.
23 Q    Did you call him back about that letter?
24 A    No.
25 Q    Did you tell anybody about the letter?

---

71

1 A    I think I probably told Ann Wirth that I'd
2 received one.
3 Q    And what did you understand that letter to be
4 asking you?
5 A    Pardon?
6 Q    What did you understand that letter to be
7 asking you?
8 A    To call him back.
9 Q    Why didn't you call him back?
10 A    Because there's no -- nothing solved about the
11 building permit.
12 Q    In his letter he tells you he just wants a
13 building permit for his garage right now, correct?
14 A    Um-hum.
15 Q    Is there something that needed to be solved
16 about his garage?
17 A    No.
18 Q    Can I see that again, please -- actually hold
19 on to it, I'll get a copy, sorry. Mr. Corneal states in
20 this letter that you called him a trouble-making yuppie from
21 over the mountain. Is that true?
22 A    Yes.
23 Q    You did call him that?
24 A    Yeah.
25 Q    I appreciate your honesty.

---

72

1 A    Huh?
2 Q    I appreciate your honesty. Why did you call
3 him a trouble-making yuppie from over the mountain?
4 A    Well, it was because I think it's a good
5 demographic term that is used for people of his age and for
6 people who always want to sue other people.
7 Q    Well, on May 5, 2000 he hadn't sued anybody,
8 right?
9 A    What?
10 Q    On May 5, 2000 he hadn't sued anybody, right?
11 A    I still didn't hear you.
12 Q    On May 5, 2000 when he wrote this letter he
13 hadn't sued anybody, right?
14 A    No, but I figured he would because he had
15 threatened me that he was going to sue.
16 Q    Did he threaten you to sue after you wouldn't
17 give him the application?
18 A    Yes.
19 Q    Did that term trouble-making yuppie from over
20 the mountain come from somebody else or did you think that
21 up yourself?
22 A    Oh, I just made it up myself -- or I didn't
23 make up the term yuppie.
24 Q    Right, of course not. What about Mr. Corneal
25 makes you say that he's a yuppie?

---

73

1 A    I think he just behaves like someone who wants
2 to get their own way and his age group.
3 Q    So when you called Mr. Wilson the day that Mr.
4 Corneal was out at your house, you explained to him that Mr.
5 Corneal was really just right now just asking for the permit
6 for the garage, right?
7 A    Yes.
8 Q    And Mr. Wilson said what?
9 A    He said don't give him a permit.
10 Q    When you told -- you indicated earlier that
11 you told him that they were going to meet -- the supervisors
12 were going to meet the next day about Mr. Corneal's permit
13 situation, right?
14 A    Yes.
15 Q    You testified to that. Did you tell Mr.
16 Corneal you would call him and let him know?
17 A    I don't recall that I did.
18 Q    Do you recall him giving you his telephone
19 number where you could reach him?
20 A    Yeah, I did have his telephone number. I
21 thought it was here in all these papers but I can't seem to
22 find it.
23 Q    But he gave it to you that day, right, so you
24 could get a hold of him?
25 A    Well, I can't -- I can't remember if he gave

---



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

74

1   that to me -- he must have given it to me that day.
2   Q      Okay. So now after you received this letter,
3   you just filed it away and what did you do, just wait to
4   hear from the supervisors again?
5   A      Yes.
6   Q      Did you take any independent action in
7   connection with deciding whether or not he ought to have a
8   permit?
9   A      I did one thing. I drove down into his
10  property to see what was happening and when I came back my
11  wife said don't ever do that again.
12  Q      Why is that?
13  A      Because she doesn't trust him.
14  Q      She didn't want you to go near his property?
15  A      Right, um-hum.
16  Q      Why didn't your wife trust him?
17  A      By his behavior.
18  Q      But she wasn't there, right?
19  A      No. Well, I told her.
20  Q      You told her that he had screamed?
21  A      I tell her everything.
22  Q      You told her he screamed at you?
23  A      Pardon?
24  Q      You told her he screamed at you?
25  A      Yes, um-hum.

---

75

1   Q      Were you at the township meeting when the
2   subdivision ordinance eventually was approved by the
3   supervisors?
4   A      I can't remember. I have a -- I have a very
5   difficult time hearing in that hall and -- because it's all
6   metal and, you know, I just can't -- I can't hear unless I'm
7   right sitting as close as you are so I can almost read lips.
8   Q      I understand.
9   A      I miss about 75 percent of the discussion in
10  the township meetings.
11  Q      I see. Between the time that the moratorium
12  was put in place and the subdivision ordinance was finally
13  approved --
14  A      Yes.
15  Q      -- did you issue any building permits?
16  A      Did I what?
17  Q      Issue any building permits.
18  A      After that?
19  Q      No, between the time the moratorium was put in
20  place and the time it was finally approved, did you issue
21  any building permits?
22  A      Probably, for sheds and small structures.
23  Q      So if Mr. Corneal didn't need a sewage permit,
24  right -- let me say this: If Mr. Corneal didn't need
25  septic, he wouldn't need a sewage permit, correct?

---

76

1   A      Not if it's just a garage.
2   Q      Did there come a time then when you did
3   receive building permit applications from Mr. Corneal?
4   A      No.
5   Q      You never received a building permit
6   application from him?
7   A      No.
8   Q      I'm going to show you what's been marked
9   previously as Wirth Exhibit 13 and ask you to look at that,
10  please. Okay?
11  A      Um-hum.
12  Q      Did you write that letter?
13  A      Did I write that?
14  Q      Yes.
15  A      I wrote part of it.
16  Q      Which part of it did you write?
17  A      Well, I wrote a general one and then Larry
18  Newton looked it over and made some slight changes.
19  Q      So you sent that letter to Larry Newton after
20  you did an initial draft of it?
21  A      Yes.
22  Q      And he sent it back with some changes?
23  A      Yes.
24  Q      Did you do that on your computer, that letter?
25  A      No, unh-unh.

---

77

1   Q      Well, let me ask you this: When you say you
2   wrote it, did you handwrite it initially and send it back to
3   -- send it to Larry?
4   A      Well, I probably did -- the initial one I
5   probably did on the computer, but I -- I'm almost sure that
6   I didn't save it.
7   Q      Okay. So you --
8   A      So then I sent -- the reason I say this didn't
9   come off my computer is because it's not justified and I
10  always justify all my letters because I think it looks
11  better.
12  Q      So do you think that came from Larry Newton's
13  computer?
14  A      Yes.
15  Q      In final form it came to you for your
16  signature?
17  A      Pardon?
18  Q      In final form it came to you for your
19  signature from Larry Newton?
20  A      Yes, um-hum.
21  Q      What does that letter do, purport to do?
22  A      Well, it's telling him that he hasn't met with
23  the right qualifications to get a building permit in terms
24  of no subdivision, land ordinance, sewage modules.
25  Q      Well, now, the first letter says please be

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

78

1   advised that Jackson Township has referred to me for review
2   your applications for building permits, right?
3       A       Pardon?
4       Q       Please be advised that Jackson Township has
5   referred to me for review your applications for building
6   permits.
7       A       Um-hum.
8       Q       I thought you said that you hadn't -- you
9   never got an application for a building permit?
10      A       Well, I didn't.
11      Q       So you never actually reviewed the
12  applications; is that right?
13      A       No, we never -- it was never filled out.
14      Q       Did anybody ever send to you his -- any filled
15  out application?
16      A       No.
17      Q       Who told you it was never filled out, that no
18  application was ever filled out?
19      A       No what?
20      Q       Who told you that no application was ever
21  filled out?
22      A       Well, I never received one.
23      Q       I'm going to show you something. Actually
24  what I'm going to do here, just because I think -- I want to
25  keep this straight. The first letter that we looked at,

---

79

1   which was the May 5th, 2000 letter from David Corneal to
2   you --
3       A       Um-hum.
4       Q       -- and the second letter that we looked at,
5   the October 10, 2000 letter from Mr. Corneal -- to Mr.
6   Corneal from you, we're going to mark this again actually
7   for your deposition.
8           MS. MONTGOMERY: So we will do these Van
9   Dommelen Deposition Exhibits 1 and 2 respectfully. And you
10  can hold onto them because I'm going to ask you a few more
11  questions about them.
12          (Letter dated 5/5/00 produced and marked as
13  Van Dommelen Exhibit No. 1.)
14          (Letter dated 10/10/00 produced and marked as
15  Van Dommelen Exhibit No. 2.)
16  BY MS. MONTGOMERY:
17      Q       Now, I'm going to show you a document that we
18  will mark as Van Dommelen Exhibit 3 at this time.
19          (Packet of documents produced and marked as
20  Van Dommelen Exhibit No. 3.)
21  BY MS. MONTGOMERY:
22      Q       Mr. Van Dommelen, the first document on your
23  Exhibit 3 there is the August 31, 2000 letter from David
24  Corneal to Ann Wirth.
25      A       Right.

---

80

1       Q       Have you ever seen this letter before?
2       A       No.
3       Q       Underneath it --
4       A       I do -- I do see this building permit here and
5   I understand now where that came from.
6       Q       You mean the building application?
7       A       Yes, uh-huh.
8       Q       Now, what do you understand about that?
9       A       That was sent to Larry Newton, a blank one,
10  and Larry Newton sent it to Corneal to fill out, but I've
11  never -- see, I don't have it in my files at all.
12      Q       And you never got a chance to actually review
13  it?
14      A       No.
15      Q       What about the other two applications that are
16  there?
17      A       No, I have not seen them before.
18      Q       You've never seen the other three either?
19      A       No.
20      Q       But when you wrote your letter to Mr. Corneal,
21  your October 10, 2000 letter, you made reference to
22  applications for building permits in the plural, correct?
23      A       Yes.
24      Q       Were those your words or was that something
25  that Larry Newton had put in?

---

81

1       A       I think Larry Newton.
2       Q       Filled that in for you?
3       A       Um-hum, right.
4       Q       Did your first draft -- what did your first
5   draft say, do you recall?
6       A       No, I don't recall.
7       Q       Did somebody tell you what to say?
8       A       It wasn't as complicated as this, though.
9       Q       Did somebody tell you what to say?
10      A       Yeah, I think Larry Newton.
11      Q       Told you what to say. So how did you find out
12  about the applications for building permits if you never saw
13  them?
14      A       Well, I think I sent some to Larry Newton. He
15  asked for some.
16      Q       For some blanks?
17      A       Yes.
18      Q       But then the filled out ones --
19      A       I never saw the filled out ones.
20      Q       How did you find out that they had been filled
21  out?
22      A       I'm not sure that I knew.
23      Q       But you wrote a letter that says that you
24  reviewed the applications but you didn't really know that
25  they'd been filled out?

---

 

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

82

1  A    No, I can't answer that.
2  Q    Well, let me ask you this: I know that you --
3  I believe that you've testified essentially that you just
4  wrote a letter that somebody else had -- told you what to
5  say in the letter, correct?
6  A    Well, to some extent, yes. I had, you know --
7  I had written a draft and I'm assuming that it -- they
8  didn't feel I was putting the proper punch in there.
9  Q    Did anybody else tell you what to say in the
10 letter besides Mr. Newton?
11 A    No, unh-unh.
12 Q    Do you recall what language Mr. Newton wanted
13 you to add to this letter?
14 A    I think a little more detail about the
15 Department of Environmental Protection, areas like that.
16 Q    Did you ever indicate to Mr. Newton that you
17 hadn't seen -- since you hadn't seen the permits --
18 A    No.
19 Q    -- it was difficult to --
20 A    No.
21 Q    -- write the letter?
22 A    No.
23 Q    Or I'm sorry, hadn't seen the applications.
24 A    No.
25 Q    You never told him that?

---

83

1  A    No, unh-unh.
2  Q    You just rely on him telling you what to say?
3  A    Well, I was relying on eventually that they
4  would come back for my -- you know, for my files.
5  Q    Have you ever denied a building permit
6  application without seeing it before?
7  A    No.
8  Q    Have you ever written any other letter like
9  this, like what is -- we've marked as Van Dommelen Exhibit 2
10 now --
11 A    No.
12 Q    -- the October 10 letter? You've never
13 written any other letter like that?
14 A    I've written letters requesting someone to
15 apply for a building permit.
16 Q    Understood. What were you thinking would come
17 back for your files? You just said, you know, I assumed it
18 would come back for my files.
19 A    Well, once it -- if it were going to be
20 approved, then I would have to have it in my files to send
21 to the tax assessment form.
22 Q    If the supervisors had said okay --
23 A    Right.
24 Q    -- now we're going to allow you to approve it?
25 A    Right.

---

84

1  Q    Then you'd get an application for your files?
2  A    Yes, um-hum.
3  MS. MONTGOMERY:  Hold on a second.
4  (Pause.)
5  BY MS. MONTGOMERY:
6  Q    Now, after this October 10, 2000 letter that
7  you wrote denying these applications that you hadn't seen,
8  did there come a time once again that you had anything to do
9  with Mr. Corneal's request for a building application
10 permit?
11 A    No.
12 Q    No?
13 A    No.
14 Q    You never had any other involvement whatsoever
15 with his request for a permit?
16 A    No.
17 Q    Have you ever had any discussion with the
18 supervisors about his request for a permit?
19 A    Yeah, I would say so, but I can't give you any
20 detailed conversation.
21 Q    Have you ever attended any sort of special
22 meeting or anything --
23 A    No.
24 Q    -- like that where Mr. Corneal's --
25 A    No.

---

85

1  Q    -- situation was --
2  A    No.
3  Q    -- discussed? You should let me finish my
4  sentence.
5  A    I just seen him the one time.
6  Q    I'm really talking about any meetings with
7  anybody else.
8  A    No.
9  Q    Now, do you know whether or not Mr. Corneal
10 appealed the denial of his request for building permits?
11 A    No, I don't -- I don't recall.
12 Q    Have you ever -- well, let me ask it this way:
13 I believe you testified that you never denied a building
14 permit before Mr. Corneal's, correct?
15 A    Um-hum.
16 Q    So you wouldn't have had an opportunity to be
17 involved in the appeal of a denial; is that correct?
18 A    No.
19 Q    Do you know what kind of procedures you would
20 use if you had to -- if somebody did appeal?
21 A    No, the only appeals that I've dealt with
22 is on an appeal to build a structure closer to the -- to a
23 land -- a land border.
24 Q    A boundary line?
25 A    Yeah, a boundary line. We have a 15-foot

---



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

86

1    boundary line.
2    Q    Setback?
3    A    Yeah, setback and someone appealed to have the
4    building set back.
5    Q    And how did you -- how was that appeal
6    handled?
7    A    Well, they called me and I asked them if they
8    wanted to have an appeal and then they would have to write a
9    letter to the supervisors and they did that.
10   Q    And then what happened?
11   A    And the supervisors approved the appeal.
12   Q    So you denied the request -- was it a request
13   for a variance, is that what it was?
14   A    Pardon?
15   Q    Was it a request for a variance of the
16   setback?
17   A    Yeah, something like a variance, um-hum.
18   Q    Did that go to the zoning officer, is that
19   what they were appealing?
20   A    We don't have a zoning officer.
21   Q    I'm just a little bit confused because you'd
22   indicated that you had -- was it a building permit that was
23   being denied or what was it?
24   A    Well, it was a -- yeah, then it would be a
25   building permit.

---

87

1    Q    But you had said that you never denied a
2    building permit before.
3    A    Well, they were eventually given it.
4    Q    Oh, I see.  Okay.  So let me just get this
5    straight.  Somebody came and asked you if they could build a
6    building at a particular site on their property?
7    A    Right.
8    Q    And you said you wouldn't be able to build it
9    there, is that --
10   A    Yes, there was a question about that being
11   placed too close to the boundary line and so then I
12   suggested that they should appeal that to the board of
13   supervisors.
14   Q    What did the board of supervisors do after it
15   was appealed?
16   A    Well, they took a vote and approved it.
17   Q    Do you know when they took a vote?
18   A    At the -- at a supervisor's meeting.
19   Q    At a public meeting.
20   A    Public meeting.
21   Q    Were you there?
22   A    Yes.
23   Q    You were there.  When was that?
24   A    I can't remember the date.  I'd have to look
25   in my book.  About a year ago.

---

88

1    Q    So it was in the year 2000?
2    A    A year ago or two years ago.
3    Q    You think it was in the year 2000?
4    A    Pardon?
5    Q    You think it was in the year 2000?
6    A    It might have been.
7    Q    What was the name of the man who -- or woman
8    who requested the building --
9    A    Stanborough.
10   Q    Stanborough?
11   A    Um-hum.
12   Q    Is that S-t-a-n-b-o-r-o-u-g-h?
13   A    Yes, um-hum.
14   Q    So they eventually got their building permit,
15   right?
16   A    Um-hum.
17   Q    And they were allowed to build too close to
18   the boundary line, right?
19   A    Yes.
20   Q    So you were at that meeting, correct?
21   A    Yes, I believe I was.
22   Q    Was there any discussion about --
23   A    Yeah, there was a slight discussion about it.
24   Q    Did you participate --
25   A    And the reason that they decided, they had one

---

89

1    shed already close and they were going to tear that one down
2    and put another one up.
3    Q    I see.
4    A    And so that's why it was approved because they
5    had already had one that was close to the boundary line.
6    Q    So you didn't give them a formal denial, you
7    just said I can't approve this, you need to go talk to
8    them --
9    A    Right.
10   Q    -- is that right?
11   A    (Witness nods head affirmatively.)
12   Q    Did you give them anything in writing actually
13   denying it?
14   A    No.
15   Q    Did they actually submit -- had they actually
16   submitted an application to you or did they just come and
17   talk to you about it informally?
18   A    It was sort of informal and then they
19   appealed.
20   Q    So is it your understanding that if someone
21   builds the denial -- I'm sorry, appeals the denial of a
22   building permit then it would be -- the appeal would be held
23   at a township supervisor's meeting?
24   A    Yes, um-hum.
25   Q    And they would rule on it there?

---

 

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

90

1  A    Right.
2  Q    Can you recall any other appeal of a building
3  permit situation?
4  A    Not offhand.
5  Q    What about applications for septic approval,
6  septic system approval?
7  A    I have nothing to do with that. That all
8  comes through the septic officer and --
9  Q    Barry Parks?
10  A    Yeah, Barry Parks. And he does all that work
11  and finally submits to the owner of the land a septic
12  approval.
13  Q    If he disapproves, though, have you ever been
14  around or in -- present in any situation where there's been
15  some discussion of the denial of septic approval?
16  A    No, unh-unh, because usually Barry Parks talks
17  to the landowner and very often to Tom Wilson.
18  Q    About any problems he's concerned with?
19  A    Yes.
20  Q    So he talks informally to Tom Wilson, is that
21  what you're saying?
22  A    I'm assuming, yeah.
23  Q    How do you know that that's what happens?
24  A    I don't know.
25  Q    Well, then let me just ask you and I'm just

91

1  curious. Then why did you say you think that's what
2  happens?
3  A    Well, because I know that Tommy Wilson very
4  often does some of the work on septic tanks and so that
5  means that -- that he has to talk to Barry Parks.
6  Q    So if there's a problem they just work it out
7  between the two of them?
8  A    Right.
9  Q    Do you know of very many instances in which
10  that has occurred?
11  A    No, I don't.
12  Q    So nobody ever told you about an appeal of the
13  building permit decision, nobody ever mentioned it to you?
14  A    Of which one?
15  Q    Mr. Corneal's, I'm sorry.
16  A    No, no.
17  Q    I'm going to show you another document now
18  that we're going to mark as Van Dommelen Exhibit 4 and ask
19  you to take a look at it for me. This is the suggested
20  ideas document.
21      (Suggested ideas produced and marked as Van
22  Dommelen Exhibit No. 4.)
23  BY MS. MONTGOMERY:
24  Q    Now, Mr. Van Dommelen, do you recognize this
25  cover sheet --

92

1  A    Um-hum.
2  Q    -- that says suggested ideas? Did you prepare
3  that?
4  A    Yes, um-hum.
5  Q    What was the suggested idea in here? Was it
6  the building permit price, is that what you're referring to?
7  A    Yes, uh-huh. We had had a -- just a one
8  figure building price before and we felt that it should be
9  graduated and so this was voted on to -- in March '99 to
10  have a graduated cost.
11  Q    Understood. Well, actually it says March
12  1994. Is that what you mean?
13  A    What?
14  Q    Actually it says March 1994 there.
15  A    Oh, yes.
16  Q    Is that what you mean?
17  A    Yes, I'm sorry.
18  Q    Now, was there anything else attached to this
19  document at the time? And for the record --
20  A    No.
21  Q    -- actually I should tell other defense
22  counsel that these are documents that we got when we went up
23  to Huntingdon County last week.
24  A    No, this comes out of my -- out of my building
25  permit book.

93

1  Q    Is there any reason why it's attached to the
2  -- I will represent to you that we got it attached --
3  A    Attached to this are all the -- all the
4  applications that I file.
5  Q    Since 1989?
6  A    Since 1989, yeah.
7  Q    Is this a copy -- starting with the second
8  page where it has name, fee, date, permit of different
9  people, is this a copy of what you keep in your black
10  binder?
11  A    Yes, uh-huh.
12  Q    Is this an exact copy --
13  A    Yes.
14  Q    -- of what you would keep in your black
15  binder?
16  A    It looks like it.
17  Q    Let's turn to the next to the last page --
18  actually I'm going to direct your attention to the third to
19  the last page instead, sorry about that.
20  A    Which one?
21  Q    Third to the last page where it says -- you
22  have the name Pauline Weaver there at the bottom of the
23  page. It's the fourth name from the bottom of the page.
24  A    Paul who?
25  Q    Pauline Weaver.



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

94

1   A    Oh, yes, uh-huh.
2   Q    Do you recall that application?
3   A    No.
4   Q    Do you know who Pauline Weaver is?
5   A    Well, I'm sure I met her. I'm not sure.
6   There are several Weaver families and I'm not sure which one
7   this one is.
8   Q    Now, over on the right-hand column -- it seems
9   like some of this is missing. That's the way it came to
10  us. What would have been in the right-hand column?
11  A    On the far right-hand column?
12  Q    Yes.
13  A    Those are the plot numbers for -- the plot
14  numbers that are on the plot plans for the township.
15  Q    Do you think that you could provide a copy of
16  this document that doesn't cut off the plot numbers?
17  A    They were on -- they were on.
18  Q    Did you get your original back?
19  A    No.
20  Q    Miss Wirth still has it?
21  A    I don't know where it is.
22  Q    Maybe we still have it.
23       MS. MALADY: We can check.
24       MS. MONTGOMERY: Maybe we did it.
25       THE WITNESS: Because it's on the original

95

1   because these are all the lists of the plot numbers.
2        MS. MONTGOMERY: Okay. All right, that's
3   fine. We may have to make new copies and get them out to
4   you guys.
5   BY MS. MONTGOMERY:
6   Q    In the most right-hand column that's fully
7   showing, under purpose there, across from Pauline Weaver,
8   what does that say? Is that meant to be garage?
9   A    Oh, it must be garage. For Weaver you mean?
10  Q    Yes, for Pauline Weaver.
11  A    Yes, my typing ability.
12  Q    So that was approved, right, that building
13  permit?
14  A    Yes, uh-huh.
15  Q    But you don't recall anything about Pauline
16  Weaver and her whole situation, right?
17  A    Pardon?
18  Q    You don't recall anything about Pauline Weaver
19  and her situation?
20  A    No, I don't. I'd have to see the original --
21  Q    Do you recall Joe Merrell?
22  A    Which one is that?
23  Q    Joe Merrell which is two lines down from
24  Pauline Weaver.
25  A    Oh, Jan Cramer?

96

1   Q    No, it says Joe Merrell, two lines down from
2   Pauline --
3   A    Oh, Joe Merrell?
4   Q    Yes.
5   A    All right. No, I don't recall which one
6   he is.
7   Q    You don't recall him?
8   A    No, I can't recall him.
9   Q    How about Ruby Dunlap? That's on the next
10  page, the April 17, 2000 building permit application.
11  A    Yeah, I see it.
12  Q    Do you see that?
13  A    Yeah.
14  Q    Do you recall that application?
15  A    I'm not sure. I'm not sure.
16  Q    What about the one above it, Douglas Reid with
17  the house, the purpose is a house?
18  A    Yes, I do -- I do recall that case.
19  Q    Mr. Reid?
20  A    Uh-huh.
21  Q    You recall that?
22  A    Yeah, I recall that because that was built on
23  a floodplain and they had to get approval from the federal
24  government to rebuild a house that burnt down on the
25  floodplain.

97

1   Q    Did they get that approval?
2   A    Yes, they got -- engineers came out and
3   checked the floodplain and recommended that they build the
4   house, you know, at a certain height and so it's above the
5   100 year floodplain.
6   Q    And did the -- the supervisors wouldn't have
7   had anything to say about that then; is that correct?
8   A    No, no, it has to be done -- it has to be done
9   by an engineer that comes out and does the approval for
10  that.
11  Q    So once the federal government looks at it,
12  it just comes right back to you for approval or disapproval?
13  A    Yes, I usually get a letter and -- from the --
14  and that letter would be accompanied by the building permit
15  in my little black book.
16  Q    So the house burnt down. Do you recall the
17  size of that property? Do you recall that property
18  generally?
19  A    Pardon?
20  Q    Do you recall that property generally?
21  A    Yes, uh-huh.
22  Q    What's the size of that property?
23  A    Oh, in terms of acreage I don't know.
24  Q    Do you know whether there were any other
25  structures on the property?



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

98

1   A   No, I don't know.
2   Q   What about Robert Weaver which is --
3   A   Okay. Yeah, Robert Weaver is building a
4   workshop.
5   Q   And that application date was May 4, 2000,
6   correct?
7   A   Yes. And we've had a little bit of problems
8   because he's running out of -- he isn't getting it done and
9   there's a year -- you know, a building permit is good for a
10  year.
11  Q   I see.
12  A   And so -- and his son is in Alaska half the
13  time and so it's not progressing.
14  Q   Who is his son?
15  A   Well, his son is Robert Weaver.
16  Q   Well, who's the father then?
17  A   Yeah, that's -- the father is --
18  Q   Is he Robert Weaver, too?
19  A   Yeah, I believe so.
20  Q   Are they both Robert Weaver?
21  A   I believe so.
22  Q   Who owns the land?
23  A   The father.
24  Q   And the father applied for the building
25  permit?

---

99

1   A   Yes.
2   Q   But the son is building the garage?
3   A   Yes.
4   Q   Or the workshop?
5   A   The workshop, yes.
6   Q   What's the workshop for?
7   A   I think woodworking.
8   Q   Does it have any water in it?
9   A   Not yet. They're not that far.
10  Q   Are they looking --
11  A   But they have a septic system there and it's
12  not a subdivided piece of property.
13  Q   You mean they have a septic system already on
14  the property?
15  A   Yes, uh-huh. And since it's not a house and
16  -- you know, it wouldn't need one because they have a
17  system there already.
18  Q   But it wouldn't need one anyway, right, since
19  it's not a house --
20  A   No.
21  Q   -- unless it has water?
22  A   Right.
23  Q   Correct?
24  A   Pardon?
25  Q   Unless it has water?

---

100

1   A   Yes, right.
2   Q   Well, let me show you -- we're going to mark
3   this as Van Dommelen Exhibit 5, application for building
4   permit for Robert Weaver.
5       (Application for building permit produced and
6   marked as Van Dommelen Exhibit No. 5.)
7   BY MS. MONTGOMERY:
8   Q   Do you recall this application?
9   A   Yes.
10  Q   So down there where you checked granted, you
11  granted this application, correct?
12  A   Yes.
13  Q   Which is noted by the fact that you marked it
14  with an X, right?
15  A   That I what?
16  Q   That you marked the document with an X where
17  it says granted, correct?
18  A   I still didn't understand you.
19  Q   The fact that you approved -- this is -- on
20  this document where it says granted and you put an X --
21  A   Yes.
22  Q   -- that's how you keep a record of whether or
23  not you've approved --
24  A   Yes.
25  Q   -- a building permit application, correct?

---

101

1   A   Right, X or ...
2   Q   At the location, what is that -- 514 what,
3   what's that road?
4   A   That's 514, Box 514, Route 1, Petersburg,
5   16669.
6   Q   Oh, but I'm looking at where it says at
7   location 514 and then there's a word after that.
8   A   That's -- that's the box number.
9   Q   It says a-b-u-t-e or something. I can't read
10  that word.
11  A   Yeah.
12      MS. THORP: Above.
13  BY MS. MONTGOMERY:
14  Q   Is that above?
15  A   Yeah, I believe it is.
16  Q   Where it says 514 above?
17  A   Yeah.
18  Q   Now, you had indicated that the Weaver
19  property has septic, right?
20  A   Yes, it has a house there.
21  Q   It has a house there?
22  A   Um-hum.
23  Q   And where is the workshop in location to the
24  house?
25  A   It's about 25 feet behind the house.

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

102

1    Q    Do you recall how big that property is?
2    A    No, I -- no, I don't know. It must be at
3    least 10 acres because in that area most pieces of property
4    are in 10 acres and that piece abuts the Corneal property.
5    Q    Now, I'm looking a little further down on this
6    sheet where it says Karl Aronson, workshop. Do you see
7    that?
8    A    Which page is that on?
9    Q    It's the same page as Robert Weaver's was on.
10   A    Okay. Paul?
11   Q    It says Karl Aronson.
12   A    Oh, uh-huh.
13   Q    Do you see that?
14   A    Yes.
15   Q    Do you recall that property?
16   A    Yes, um-hum.
17   Q    And what kind of workshop is that?
18   A    I'm not sure what -- that was interesting
19   because they demolished a barn and then just replaced the
20   workshop on the barn and I'm not sure what kind of workshop
21   it is.
22   Q    But you granted that building application,
23   right?
24   A    Pardon?
25   Q    You granted that building application,

103

1    correct?
2    A    Yes, uh-huh.
3    Q    In fact, if you start at the third page from
4    the end to -- starting with the Pauline Weaver
5    application --
6    A    Um-hum.
7    Q    -- and going all the way to the end --
8    A    Um-hum.
9    Q    -- which is Stoney Lonesome Camp requesting a
10   building application for a pavilion --
11   A    Yes.
12   Q    -- have you granted all of those applications?
13   A    Yes, uh-huh.
14   Q    Did you visit any of those properties to see
15   what was going on?
16   A    Yes, I have.
17   Q    Which ones?
18   A    I've -- I drive by Tuckaway Tree Farm every
19   day and so I could see how that barn was gone on and I go
20   up to Stoney Lonesome Camp to visit friends up there.
21   Q    Did you make a specific trip out to any of
22   these properties just to make sure that the building was --
23   A    Not at these, no.
24   Q    Do you know whether any of these properties --
25   well, strike that. This Michael Yoder on the next to the

104

1    last page --
2    A    Yes.
3    Q    -- is he the township supervisor?
4    A    Yes.
5    Q    I think that's all the questions I have for
6    you right now about this document. We may go back to it
7    later.
8         MS. MONTGOMERY: How does anybody feel about
9    lunch at this time?
10        (Discussion held off the record.)
11   BY MS. MONTGOMERY:
12   Q    Mr. Van Dommelen, I'm just going to go through
13   this collection of documents that you brought down with you
14   today. And I'll ask you just to look at the first one.
15   It's just a City Bar and Grill receipt.
16   A    Oh, that's my -- from the last time I was here
17   and -- for lunch.
18   Q    You were here in connection with the
19   deposition?
20   A    Yes, uh-huh, and sat for six hours.
21   Q    Okay. Who did you have lunch with that day?
22   A    And those are just -- I'll be turning those in
23   to -- for reimbursement.
24   Q    Right, I understand. Who did you have lunch
25   with that day?

105

1    A    Pardon?
2    Q    Who did you have lunch with that day?
3    A    My friend from Iowa drove down with me.
4    Q    Just the two of you?
5    A    Pardon?
6    Q    Just the two of you?
7    A    Yes, um-hum.
8    Q    Did he drive down here with you?
9    A    Yes.
10   Q    He drove to Harrisburg with you?
11   A    Pardon?
12   Q    He drove to Harrisburg with you?
13   A    Yes.
14   Q    Was it just the two of you that drove down?
15   A    Yes, um-hum.
16   Q    I want you to just look at your curriculum
17   vita for a second. How did you come to prepare this
18   curriculum vita?
19   A    Well, I keep one every year to either send to
20   galleries where I'm exhibiting and to -- you know, to
21   editors and publishers.
22   Q    Did you put it together for some reason for
23   this lawsuit?
24   A    No, I just thought maybe someone would -- you
25   know, I just threw it in here for -- no, no, no, this is on



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

106

1    my computer. I use this and update it every year.
2    Q      But I just wondered why you had it in your
3    file that --
4    A      Well, I just thought someone might want it.
5    Q      Okay. Well, it's a great resume.
6    A      Pardon?
7    Q      It's a great resume. Now, the next thing --
8    actually, let me put your original back in your file so I
9    can keep that altogether. The next thing I'm going to show
10   you is a couple of -- it's a page that appears to just be a
11   -- it says Roman Numeral III-2. It's a section of
12   something. Can you just tell me what that is?
13   A      Oh, yeah, it's about -- it comes out of a
14   subdivision -- an ordinance, our ordinance book and -- so we
15   were just -- I wanted to refresh my memory about
16   subdivisions and so that's why that's in there.
17   Q      And when did you do this?
18   A      Oh, I don't know. Probably a few months ago.
19   Q      In connection with the lawsuit?
20   A      Well, in clarifying in my -- you know, in my
21   mind about that.
22   Q      Now, the next thing is a collection of
23   documents where you have yellow stickies on, Exhibit A and B
24   to Exhibit Z. Is that your handwriting on those yellow
25   stickies?

---

107

1    A      Yes, uh-huh, but I can't remember why I put
2    them on.
3    Q      Are they the exhibits to the complaint?
4    A      Pardon?
5    Q      Are they the exhibits to the complaint in this
6    action?
7    A      I'm not -- oh, yes, yes, I see what you're
8    saying. This is part of the Corneal -- and they were
9    attached to his -- his thing.
10   Q      His complaint, right?
11   A      Yeah, um-hum.
12   Q      On that document there's some red
13   underlining. This is the stuff that probably won't show up
14   on the copies. On the document that's February 24, 2000,
15   Huntingdon County Planning Commission letter, there's some
16   red underlining there. Is that your handwriting there?
17          MS. MONTGOMERY: And I don't know if you guys
18   can see it but -- yes, it's in black underline.
19          THE WITNESS: Yeah, I'm assuming that's mine.
20   BY MS. MONTGOMERY:
21   Q      So you did that?
22   A      Yes.
23   Q      Do you recall why you underlined that?
24   A      No, I'm not sure.
25   Q      Then there's sort of a parens around number 8

---

108

1    at the bottom of that page. Did you do that mark as well?
2    A      I assume I did. I'm not sure why.
3    Q      What about over on number 12?
4    A      Yes, I see there's -- yeah.
5    Q      Where it says -- you underlined recommends
6    disapproval of this proposal?
7    A      And I assume that I put that down there,
8    um-hum.
9    Q      Do you recall why -- I mean, why did you mark
10   this up? Was it --
11   A      Well, I was just noticing that the Huntingdon
12   County Planning Commission disapproved of the proposal and I
13   just ...
14   Q      Later they recommended approval, right?
15   A      Yeah.
16   Q      Correct, later they recommended approval of
17   the subdivision?
18   A      Oh, yes, uh-huh.
19   Q      Did somebody tell you that they had
20   recommended approval of Mr. Corneal's subdivision?
21   A      Oh, no, no, no, I didn't -- I misunderstood
22   you. No, I don't know about that.
23   Q      Now, the next document is a copy of the
24   complaint that was filed in this action and I'm just going
25   to ask you to look at it with me and tell me whether the

---

109

1    handwriting that appears throughout this document is your
2    handwriting. For instance, go to --
3    A      Yes, that's -- um-hum.
4    Q      That is your handwriting?
5    A      Um-hum, right.
6    Q      Now, can you tell me, for example, where it
7    says -- at Paragraph 12 on page 4 where you wrote in acted
8    in.
9    A      Which -- page what?
10   Q      Page 4, the paragraph number is 12.
11   A      I'm not sure why I put that in.
12   Q      What about the next page at Paragraph 15 and
13   you handwrote in had not recorded deed when he started.
14   What does that mean?
15   A      Well, these -- all of these marks here are --
16   we went over with Larry and we said we can admit this and we
17   can admit that and this is true and we made just comments in
18   general. And this was that he hadn't recorded the deed when
19   he started working on -- he hadn't recorded his deed yet
20   when he started building.
21   Q      Hadn't recorded what deed?
22   A      The deed of his property.
23   Q      When he started building which was -- well,
24   let's see, the property was acquired by the Corneals in
25   October 1998, right?

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

---

110

1    A    Yes.
2    Q    That's correct, right?
3    A    I assume it is.
4    Q    And he started building what, in 2000,
5    correct?
6    A    Right, uh-huh.
7    Q    And you're saying that he hadn't recorded the
8    deed to this property?
9    A    That's what was commented on, I think.
10    Q    Does that have any significance for you?
11    A    No, not really.
12    Q    Look at Paragraph 23 on page 6 where you have
13    handwritten in related to sewage module.
14    A    Um-hum.
15    Q    Does that have any significance to you right
16    now?
17    A    Well, that's that it -- we're talking about
18    the initial plan was related to sewage modules and that --
19    that's what this whole thing was about really here,
20    subdivision and the sewer modules hadn't been --
21    Q    Do you see the allegation --
22    A    Pardon?
23    Q    Do you see the allegation in that paragraph
24    that the Corneals -- at the end of the paragraph, the fourth
25    line from the top -- bottom says the Corneals were advised

---

111

1    by defendant Wilson that insofar as the township was
2    required to sign the plan, good politics suggested that the
3    initial plan should be presented to the board of supervisors
4    for review.  Are you familiar with that allegation?
5    A    No, unh-unh.
6    Q    You don't know anything about that
7    conversation?
8    A    No, unh-unh.
9    Q    Do you see at Paragraph 25 on page 7 --
10    A    Um-hum.
11    Q    -- where you have the Corneals were not
12    advised that subdivision approval was not required and then
13    you wrote in never gave -- I'm sorry, you wrote in never
14    gave to township, he was informed about the moratorium.  Why
15    did you write that in there?
16    A    I'm assuming that he said that the township
17    had never informed him about the moratorium.
18    Q    That's your assumption of why you wrote that
19    down there?
20    A    Um-hum.
21    Q    I mean, do you actually remember why you wrote
22    it down?
23         (No response.)
24         MS. THORP:  Bridget, I don't think he heard
25    your last question.

---

112

1    BY MS. MONTGOMERY:
2    Q    Do you actually remember --
3    A    Huh?
4    Q    Do you actually remember why you wrote that
5    down?
6    A    Pardon?
7    Q    My question was -- I'm sorry.  My question
8    was:  Do you actually remember why you wrote down --
9    A    Oh, no, I don't remember why.
10    Q    In what context were these notes taken?  Were
11    you on a telephone conference or in a group meeting or what?
12    A    No, we had a small meeting about this.
13    Q    Who all was there?
14    A    All the supervisors, Larry and Barry Parks.
15    Q    And yourself?
16    A    And myself, right.
17    Q    Anybody else?
18    A    No, I think that's it.
19    Q    Where was that meeting?
20    A    That was at Ann Wirth's, the secretary's
21    office.
22    Q    In that little office there on her property?
23    A    Right.
24    Q    When was it, do you recall?
25    A    I can't recall.  It would be after this came

---

113

1    out so ...
2    Q    What about 51, Paragraph 51 on page 11?
3    A    Well, it's -- the whole concern was that he
4    had no plan and no subdivision.
5    Q    But see where you've written not subdividing,
6    what does that mean?
7    A    Well, he was -- first of all, he was saying he
8    didn't have a -- he was going to subdivide and then he said
9    he wasn't going to subdivide so he was fluctuating back and
10    forth.
11    Q    Right, but didn't he say he wasn't going to
12    subdivide after you guys told him he couldn't subdivide
13    because there was a moratorium in place, right?
14    A    Well, I think so, but it was difficult to keep
15    track of when he was saying what.
16    Q    But isn't it true that he just -- he changed
17    his mind --
18    A    Yes.
19    Q    -- when he couldn't get the approvals he
20    needed, right?
21    A    Yeah, um-hum.
22    Q    Here you say -- at Paragraph 53 you have
23    underlined language indicating that --
24    A    The underline there, the art studio?
25    Q    Yes, art studio have sewer access and then you

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

**114**

1  have untrue out in the margin there.  What does that mean?
2  What were you saying was untrue there?
3  **A    Well, there was a comment about the fact that**
4  **he was advised that -- for a privy permit and you can't have**
5  **privy permits anymore.**
6  Q    But you've underlined art -- you know,
7  something indicating that he was -- the art studio had to
8  have sewer access reference.  Are you saying that it was
9  untrue that he was ever told that the art studio had to have
10  sewer access?
11  **A    Well, no, I guess not.**
12  Q    I mean, do you recall any discussion about
13  whether the supervisors told him the art studio had to have
14  sewer access?
15  **A    No, I'm not sure.**
16  Q    You don't recall that?
17  **A    No, I don't recall that.**
18  Q    The art studio wouldn't have to have sewer
19  access, though, right, if there wasn't water, right?
20  **A    No, if there was no water.**
21  Q    Now, on 54 you have marked untrue out in the
22  margin here.
23  **A    Well, what is -- he was saying that we refused**
24  **to issue a permit and we wouldn't assist him and that wasn't**
25  **true.  We would assist him if he did the proper things.**

---

**115**

1  Q    What did you think were the proper things that
2  he had to do to build an art studio?
3  **A    (No response.)**
4  Q    What did they think were the proper things
5  that he had to do to build an art studio?
6  **A    Well, then he should have proper sewage.**
7  Q    What about in 57 which is on page 12?
8  **A    Yeah.**
9  Q    Do you see where you have deny no something?
10  I can't read the other word.  What is that?
11  **A    No help.**
12  Q    Okay.  Deny that you've refused to provide
13  help, is that what you're saying?
14  **A    Right, uh-huh.**
15  Q    Look at 61 where you have refused because of
16  sub, etcetera.  What does that mean?
17  **A    Subdividing.**
18  Q    So Able Construction refused to do the
19  roadwork because they thought he might subdivide, is that
20  your understanding?
21  **A    Well, it depends -- he didn't get any road**
22  **permit, plus the one road he started to put in was going to**
23  **go in through wetlands and that's not allowed.  So he had to**
24  **stop putting that road in.**
25  Q    How do you know that?

---

**116**

1  **A    How do I know what?**
2  Q    How do you know he was starting to put a road
3  in near wetlands?
4  **A    Because you can see it.**
5  Q    Did somebody tell you that, though?
6  **A    What?**
7  Q    How did you know they were wetlands, what you
8  were seeing?
9  **A    Well, it's -- you can see that it's wetlands**
10  **and --**
11  Q    Do you have any responsibility to determine
12  what wetlands are in connection with township work?
13  **A    No, that comes from the federal government and**
14  **they determine that.**
15  Q    Let's go to page 13 and look at Paragraph 66.
16  Do you see that?
17  **A    Um-hum.**
18  Q    Now, where you wrote true, was that an
19  indication that you would admit it?
20  **A    Well, it's a true statement that in order to**
21  **get a permit the township provides the permits.**
22  Q    So was that -- when you wrote true, was that
23  indicated -- was that your indication that --
24  **A    That that statement is true.**
25  Q    That you should admit it in the answer to the

---

**117**

1  complaint, is that what you're saying?
2  **A    Yes, um-hum.**
3  Q    On page 70 -- I'm sorry, page 14, Paragraph 70
4  it says deny -- it says WO septic.  Do you mean without
5  septic?
6  **A    Without septic.**
7  Q    Now, this paragraph makes reference to the
8  garage, right?
9  **A    Right.**
10  Q    What is your reference to septic there, what
11  is that?
12  **A    Well, the supervisors said that we were going**
13  **to deny it because he doesn't have septic.**
14  Q    So that's all that reference is to there?
15  **A    Yes.**
16  Q    Now, at Paragraph 71 you have -- is that your
17  handwriting, hearsay?
18  **A    Pardon?**
19  Q    At Paragraph 71, is that your handwriting,
20  hearsay?
21  **A    Yes, uh-huh.**
22  Q    Are you familiar with the term hearsay?
23  **A    Well, I've heard -- I've heard the term.**
24  Q    Why did you put that in there?
25  **A    Because I recall Larry made that comment.**

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

---

118

1    Q    He said that would be hearsay --
2    A    Yes.
3    Q    -- so we'll deny it or something because it's
4    hearsay?
5    A    Apparently.
6    Q    Well, is that a true statement, that you
7    advised Mr. Corneal that had any other property owner
8    requested the permit it would have been issued?  Is that a
9    true statement?
10   A    It's really not true because I would -- if
11   someone had all the proper -- the proper papers, then I
12   would submit -- you know, or issue a permit.
13   Q    But let me go back a second.  In a lot of
14   these paragraphs you say true or deny or true or untrue and
15   here you have hearsay.  Was there some discussion about why
16   you would put hearsay in there instead of just true or
17   untrue?
18   A    No, unless -- unless Larry said that.
19   Q    Now, you're saying --
20   A    All these -- all these things that are written
21   in here were done in front of everybody and --
22   Q    But you said it's really not true, but I'm
23   really just asking -- it's really not true that you would
24   have issued it to any other property owner.  What I'm really
25   asking you -- this allegation says that you advised Mr.

---

119

1    Corneal that had it been any other property owner he would
2    have gotten it.  Is that a true or a false statement?  Did
3    you actually say that to Mr. Corneal?
4    A    No, not like that.
5    Q    What did you say to him?  Exactly what did you
6    say?
7    A    It would be -- I would issue if you had the
8    proper documentation for a sewage and subdivision.
9    Q    Okay.  Would you be looking for a subdivision
10   plan for somebody that wants to build a garage?
11   A    I'm just saying -- I'm answering what the
12   supervisors told me.
13   Q    Did you give Mr. Corneal any indication that
14   this was -- this situation where he couldn't get an
15   application even or a permit was aimed at him specifically
16   personally?
17   A    No, no.
18   Q    Did you take any other notes in that meeting?
19   A    No.
20   Q    Did you receive copies of anybody else's notes
21   taken in that meeting?
22   A    No, unh-unh.
23   Q    Now I'm going to show you --
24   A    Do you want this back or --
25   Q    No.  Is that your -- is that the original?

---

120

1    Yes, it is, isn't it?
2    A    Yeah, I believe it is the original.
3    Q    We'll put that back in your file.
4    A    Okay.
5    Q    I'm going to show you now what's -- we're not
6    marking it, but it's a deposition -- it's a copy of the
7    deposition transcript of David Corneal that we have from
8    your file with some yellow highlighting on it, which I don't
9    know if that will show up.  I don't think it will so it's
10   going to be tough to talk about.
11       Now, you circled also present Sandra Y.
12   Corneal on page 2.
13   A    Um-hum.
14   Q    Why did you circle that?
15   A    Well, I circled that because I couldn't
16   understand why she could be at that meeting but my wife
17   couldn't be at this one.
18   Q    Oh, she's a -- it's because she's a party.
19   A    Well, my wife is a party, too.  She might not
20   be listed but she -- as long as I'm a party, she's a party.
21   Q    Okay, I understand your position.  Now, I want
22   you to just go through the -- since nobody else can see the
23   highlighting, we're just going to try to make a record of it
24   and just the first place you see highlighting in your
25   document, just tell us what page you're on and we'll read

---

121

1    along with you.
2    A    That's page 3.
3    Q    On page 3?
4    A    Um-hum.
5    Q    What did you highlight on there, the first
6    part?
7    A    For high blood pressure.  I'm taking a similar
8    kind of a -- I was just noticing that you were asking about
9    medications.
10   Q    I see.  What was the next thing?
11   A    Pardon?
12   Q    What was the next thing you highlighted?
13   A    The next thing is social security number.  Had
14   you asked me what mine is I wouldn't have been able to tell
15   you.  I can never --
16   Q    Okay, that's why you highlighted that.
17   A    Yeah.
18   Q    The next thing you highlighted?  We'll come
19   back to the other markings on here, but we'll just go
20   through the highlighting to make it simple that way.  What
21   is the next thing you highlighted?
22   A    Highlighted or circled in red?
23   Q    Highlighted, just the highlighting for now.
24   What page?
25   A    Page 8 up on 28.

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

122

1   Q     And what is that?
2   A     And it says we are contemplating building.
3   Well, he was building already. And I said we are both
4   artists and we were thinking of a summer home and an art
5   studio. Well, I don't know he was an artist -- well, I did
6   really but -- yeah, that --
7   Q     The next thing you highlighted is what?
8   A     Nine. Well, I just highlighted this to --
9   Q     What did you highlight because we can't see
10  it?
11  A     Well, just the whole concept of the SEO, about
12  the sewage and just to see what some of the issues were
13  there. There is nothing specifically, just -- you know,
14  not --
15  Q     Were you just trying to prepare yourself for
16  your own deposition --
17  A     Right, uh-huh.
18  Q     -- to understand the case?
19  A     Yes, for my own information.
20  Q     And did you do this by yourself when you did
21  all this highlighting? Don't leave page 9 yet, okay,
22  because I have another question for you. Did you do that by
23  yourself?
24  A     Yeah, my wife read through this also and she
25  made some grammatical checks.

---

123

1   Q     I see.
2   A     And misspellings.
3   Q     That was good of her. What about on -- see
4   where it's -- the whole page is numbered 9 but then the
5   little insert page is numbered 31, I think?
6   A     Yeah, 31.
7   Q     You've got some text highlighted there, don't
8   you?
9   A     Pardon?
10  Q     You have some text highlighted there?
11  A     Yes, uh-huh.
12  Q     What is that?
13  A     Well, it's -- it shows he was interested in
14  dividing off the land into acreage.
15  Q     And what significance does that have to you?
16  A     About the concept of subdividing.
17  Q     But I don't understand, what is it -- I mean,
18  everybody knew he initially wanted to subdivide, right?
19  A     Yes.
20  Q     And then everybody knew after that he said he
21  wouldn't subdivide?
22  A     Yeah, and I just put these down for my own
23  personal looks.
24  Q     Well, was there some issue about the fact that
25  since he first said he wanted to subdivide and then he later

---

124

1   decided that he didn't want to subdivide, is that some big
2   issue with the supervisors and you?
3   A     Yes, it was.
4   Q     What is the issue?
5   A     The issue was that -- that he hadn't given any
6   plans to the supervisors and yet he was saying he was going
7   to subdivide. He hadn't gone to the county. There are
8   certain steps to subdivide that one has to take.
9   Q     But then my question was a little bit
10  different than that. Is there some issue that you and the
11  supervisors are taking with the fact that first he said he
12  wanted to subdivide and then he said he didn't want to
13  subdivide? After he was told he couldn't subdivide, he said
14  he didn't want to subdivide. Is there something going on
15  there that is significant?
16  A     Yeah. Well, he still needs to subdivide
17  because he's got another house on that property as well.
18  Q     So that's your point of the whole thing?
19  A     Yeah, that's the point of the supervisors.
20  Q     Okay. So you think he still needs to
21  subdivide because there's that old farmhouse on the
22  property?
23  A     Yes, uh-huh.
24  Q     Now, you said that he never gave them any
25  plans. How do you know he never gave them any plans?

---

125

1   A     Pardon?
2   Q     How do you --
3   A     Because they said so.
4   Q     Because they said so?
5   A     Yes, um-hum.
6   Q     Were you at the meeting, though --
7   A     No.
8   Q     -- when he tried to hand out those plans?
9   A     No.
10  Q     What's the next thing you've highlighted?
11        MS. MONTGOMERY: Hold on, my co-counsel
12  has ...
13  BY MS. MONTGOMERY:
14  Q     Do you have some highlighting on page 10 back
15  there?
16  A     On 10, yes, uh-huh.
17  Q     What's highlighted there?
18  A     Again, this is going back to the concept of
19  decide based on finding of on-site septic suitability and
20  just to make me see the points on the whole septic question.
21  Q     That's in little insert 35, right, on the
22  insert page?
23  A     Right, yes.
24  Q     What we call these, just to make it simple for
25  the record, is these are manuscript -- what they call a

---



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

126

1  minuscript.  They're small --
2  A   They're what?
3  Q   They're small transcripts of the deposition so
4  you get four pages on one.
5  A   Yeah.
6  Q   So we'll refer to these inserted numbers as
7  minuscript numbers.
8  A   Okay.
9  Q   And that will make it easier for us.
10  A   Oh, I see, okay.
11  Q   It would be helpful if we'd refer to the
12  minuscript and then the lines that are along the left-hand
13  side.
14  A   Okay.
15  Q   Then we'll be able to -- everybody else will
16  be able to follow along because the highlighting doesn't
17  copy over and that's why we're going through this exercise.
18  A   Right, um-hum.
19  Q   On page 35 you have -- on minuscript 35 you
20  have highlighted what language?
21  A   Lines 6, 7 and 8.
22  Q   A boundary survey and then eventually
23  divide --
24  A   Right, uh-huh.
25  Q   -- things up into lots, whatever lots we

---

127

1  decided on based on the SEO's finding of on-site septic
2  suitability.
3  A   Again, just to recall some of the topics and
4  issues that were on hand.  That's what all these -- on 36
5  and 37.
6  Q   Same thing for the highlighted text?
7  A   Thirty-six is highlighting 13, 14 and 15 and
8  16.
9  Q   And 37?
10  A   And 37 is line 4 and 5.
11  Q   Okay.  What's the next highlighted section
12  that you come to?
13  A   Page 15.  The whole thing on 56.
14  Q   You highlighted all of minuscript 56?
15  A   Yes.  And, again, that was just talking about
16  the subdividing of land.
17  Q   This makes reference to a conversation that
18  Mr. Corneal says he had with Mr. Wilson, right?
19  A   Yes, um-hum.
20  Q   Do you know whether -- has Mr. Wilson ever
21  discussed this conversation with you, this --
22  A   No.
23  Q   Where he says that you can build whatever you
24  want, there's no code, there's no building code, there is no
25  subdivision?

---

128

1  A   No.
2  Q   Do you recall any of the conversation or --
3  A   No.
4  Q   -- being told about it by --
5  A   No.  Well, of course, I know there's no
6  building code.
7  Q   Right.
8  A   We have no inspection of wiring or any kind of
9  building codes as such.  The only thing that we have is the
10  septic tank and the subdivision and -- well, there are a few
11  other things that -- you can build a swimming pool without
12  any kind of a permit and --
13  Q   You can?
14  A   Yes, uh-huh.  And a farmer can build a silo
15  for grain without any kind of a permit.  So there are some
16  things like that.
17  Q   Where is this contained?  Is it in the --
18  A   It's in the ordinances.
19  Q   Which ordinance, do you know?
20  A   Pardon?
21  Q   Do you know which ordinance that's in?
22  A   The building permit ordinance.
23  Q   The setback line, is that --
24  A   That's in the building permit ordinances, too.
25  Q   The next thing that you've highlighted,

---

129

1  please?
2  A   Well, the whole thing about an investment.
3  Q   What page?
4  A   Page 17, 62 and down to 63.
5  Q   Those are the minuscript numbers, 62 and 63?
6  A   Yeah, just --
7  Q   Why did you highlight that?
8  A   I just thought it was sort of funny.
9  Q   What was funny?
10  A   About his investment and how he's not affluent
11  and -- it was just a personal observation.
12  Q   What was your personal observation about him
13  not being affluent?
14  A   Well, he says on 63, line 6, I'm not an
15  affluent person.  Well ...
16  Q   Well, doesn't he finish that I can afford to
17  buy property and sit around on it; is that correct?
18  A   And the property was worth -- you know, he
19  paid 300 and some thousand dollars for it.  So it seems to
20  me like you have to be a little affluent.
21  Q   To buy property worth that much?
22  A   Yeah, and when you have property in Florida
23  and when you have property throughout State College and --
24  so I thought it was sort of a funny remark.
25  Q   Okay, I see.  What's the next thing you have

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

130

1  highlighted? Did you say -- you said the lines?
2      A      Sixty-five, 1, 2, 3, 4, 5 lines. It's hard to
3  subdivide land when there is no subdivision ordinances.
4  Again, it's just something that I marked for my own
5  interest.
6      Q      What was interesting to you about that?
7      A      Well, the fact that he's talking about that
8  when -- first of all, he says there's no subdivision -- it
9  just -- it's not an intellectual, you know, conversation.
10  It's a non-issue, is what I'm saying.
11      Q      It's a non-issue that there was no subdivision
12  ordinance?
13      A      Yes.
14      Q      Why is that a non-issue?
15      A      I don't -- my wife and I always have things
16  that it's a non-conversation.
17      Q      I understand.
18      A      You understand what I'm saying?
19      Q      Well, are you saying it doesn't matter that
20  there was no subdivision ordinance; is that what you're
21  saying?
22      A      He's saying that here. And I'm saying that,
23  too, I guess.
24      Q      No, he's saying that there was no subdivision
25  ordinance.

---

131

1      A      Yeah.
2      Q      Are you saying that it doesn't matter that
3  there was no subdivision ordinance?
4      A      Yeah, I think it does matter. I think it does
5  matter, but he's getting us all confused here and I just
6  thought it was an interesting statement.
7      Q      What's the next thing you have highlighted?
8      A      I think that's all that I --
9      Q      Is there something else there?
10      A      Pardon?
11      Q      Is that another page there that you have
12  highlighted?
13      A      Yes, this is page 31 and --
14      Q      What's the first minuscript page?
15      A      118 and I've underlined 7, 8 and 9 because of
16  my misspelled name and I also underlined distruth. He says
17  he has a trailer out in the country and I do not live in a
18  trailer. I have nothing against trailers, I want to make
19  sure I make that clear, but he's in this statement trying to
20  make me look like trailer trash.
21      Q      That's what you think?
22      A      Pardon?
23      Q      That's what you believe?
24      A      Yes, that's exactly what I believe.
25      Q      What kind of house do you have actually?

---

132

1      A      Huh?
2      Q      What kind of house do you have?
3      A      Well, it's a foundation house, three bedrooms,
4  a grand room, an entrance lobby, all ceramic tile.
5      Q      Is it a ranch house?
6      A      Yeah, it's a ranch. It's all on one floor
7  so that --
8      Q      Does it have aluminum siding?
9      A      No, it has wooden siding on part of it and
10  cinder block on other parts.
11      Q      Okay. What's the next thing you highlighted
12  then?
13      A      Well, the other area is 120 and he is saying
14  that I said to him -- I said if I were another resident of
15  the county or the township and I came for a permit for a
16  garage you would give it to him, and that's when I called
17  him a trouble-making yuppie.
18      Q      So why did you highlight that?
19      A      Well, I think that he's misconstruing -- sure
20  I would give him a permit if he had the correct stuff and if
21  I had been told by the supervisors to give him that.
22      Q      Do the supervisors usually have some sort of
23  preapproval process with respect to people coming for
24  building permits?
25      A      No.

---

133

1      Q      They leave that to you, right?
2      A      Yes.
3      Q      What's the next thing you highlighted?
4      A      I think that's it.
5      Q      Now we need to just go back through quickly
6  through your --
7      A      The red --
8      Q      -- underlining.
9      A      The red marks are all by my wife.
10      Q      Oh, they're all by your wife?
11      A      Yes, um-hum.
12      Q      Well, now, some of them are red and some of
13  are black, right?
14      A      Yeah.
15      Q      Is there some handwriting of yours in there?
16      A      Yeah, and that's -- she has red here and she
17  pointed out how the word effect should have been affect.
18      Q      I see. That one bothers me, too, and I always
19  get it wrong.
20      A      And there's other comments. She also on
21  page 25 --
22      Q      Is that minuscript page 25?
23      A      Oh, sorry, yeah. Yeah, page 7 and --
24      Q      Is that her circling?
25      A      And that's 25, line 6. And, again, she's

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

134

1  doing disparaging remarks about used cars and yards. He's
2  trying to make it look like we live out in the sticks, which
3  we do, but I think he's also making particular kinds of
4  social comments.
5       Q     Well, isn't this a reference to the property
6  that he bought? Isn't that just a reference to his own
7  property, that when he bought it there were three or four
8  unused cars in the yards?
9       A     It might well be.
10      Q     Okay, keep going. What's the next thing you
11 see?
12      A     On page 11 and mini page 40 in 17 and 18,
13 again, making a remark about farmers and throwing stuff over
14 hills into gullies, and I think -- I think it says a great
15 deal about him and his social -- the way he looks at people
16 socially.
17      Q     Well, isn't this just a reference to him
18 hiring Mr. Wilson and Eagle construction to clean up his
19 property? Isn't that what that is?
20      A     Yeah, um-hum.
21      Q     He just wanted to remove some stuff thrown
22 over a hill into a gully?
23      A     Yes.
24      Q     The next thing?
25      A     The next one is a misspelling of realtors.

135

1       Q     Now, what about on minuscript page 55 where
2  you've underlined trying to establish a rapport with some
3  local people?
4       A     Well, I don't think he's getting much rapport
5  with the local people.
6       Q     Why is that?
7       A     Because he's coming in and trying to make his
8  own standards for the area and not listening to the local
9  people. And I think in the end he's going to antagonize the
10 local people and he will never have rapport with them.
11      Q     All right.
12      A     And on 17, mini page 63, line 7, and it's
13 where he says I'm not an affluent person.
14      Q     Right. And you think he's affluent because he
15 bought property?
16      A     Yeah.
17      Q     Is it a problem that he's affluent?
18      A     No, I don't think there's any problem but --
19      Q     Okay.
20      A     But it would be like saying --
21      Q     If he was affluent, I should say. Do you know
22 whether he mortgaged that property that he paid $350,000 to
23 build?
24      A     I have no idea what -- how he --
25      Q     You don't know?

136

1       A     No, I have no idea.
2       Q     Next let's go and see what else you have
3  underlined.
4       A     Next on page 22 there are several underlined
5  things about raising his voice at meetings and the
6  confrontation. And that's mini page 84, line 12. And then
7  83, line 7 and 85, line 20, the whole question of the
8  confrontational kind of --
9       Q     Okay. Where you underlined on mini page 83 he
10 had went, that was just a grammatical problem that your wife
11 saw, is that --
12      A     Which one, which page?
13      Q     It's mini page 83, line 7. Why did you
14 underline that, just a grammatical --
15      A     He went -- yeah, right.
16      Q     On page 21 you have -- there's a sticky note,
17 it looks like.
18      A     Yeah, and I don't know what happened with that
19 -- with that page and what was there.
20      Q     Is that your handwriting no?
21      A     Pardon?
22      Q     Is that your handwriting no where it looks
23 like there was a sticky note?
24      A     No, that's not my handwriting. So I don't
25 know how that is, but we did notice it and I'm not sure --

137

1  so we'd have to go back to the original.
2       Q     So that's minuscript page 80 and 81, right?
3       A     Um-hum.
4       Q     And you don't know who put that sticky on
5  there --
6       A     No.
7       Q     -- and wrote no on it?
8       A     Unh-unh.
9       Q     Now, going up to page 23 for the next
10 underlines.
11      A     To which one? Oh, the other one on page 23, I
12 was just noticing that Ann Wirth's name is misspelled.
13      Q     And then just a grammatical thing on --
14      A     Yeah.
15      Q     Okay, that's fine. What's next? What page
16 are you on?
17      A     I'm on page 30, mini page 116, and I'm looking
18 to see -- it's 14, 15, 16, 17 and 18.
19      Q     On page 116 because it's highlighted?
20      A     Pardon?
21      Q     Because it's highlighted?
22      A     Yes, uh-huh.
23      Q     Did we not do that one before when we were
24 going through the highlighted --
25      A     I don't know why I highlighted that. It has



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

138

1  to deal with that whole concept of privies, a privy permit,
2  which it -- there are two ways -- there are two ways only
3  that you can get sewage taken care of in Jackson Township
4  and -- because of DER as well. And one is to have a regular
5  septic system and the other is what's called a holding tank,
6  but a holding tank isn't a privy so -- and that's why I
7  underlined that.
8      Q     Because you believe you can't get privies at
9  all --
10     A     No, you can't at all.
11     Q     -- in Jackson Township?
12     A     You're not allowed to put a privy anymore.
13     Q     All right. Now, the next page is page 31,
14  right?
15     A     Yes, uh-huh.
16     Q     Now, you have some --
17     A     And that's that whole area when he came out to
18  visit me and so that's why I underlined that.
19     Q     And the vita that you wrote there in the left,
20  why did you write that in there?
21     A     I don't know. It must have to do with the
22  spelling of my name, and it is Van Dommelen. It would be
23  saying like Dick Dyke rather than Dick Van Dyke.
24     Q     Yes, I understand. Now, look where you put --
25  on mini page number 119, which is at -- still at the larger

139

1  page 31 in this document.
2      A     119?
3      Q     Yes, and you have a star and you underlined
4  sewer at least initially.
5      A     Yeah, I don't think I did that, but I'm not
6  sure because I very seldom use pencil like that.
7  Occasionally I do but --
8      Q     Is that done in pencil?
9      A     Yeah.
10     Q     What about up there where there's a star next
11  to -- no, I'm sorry, what about further up that 119 where it
12  says I think it was the 27th and that's underlined?
13     A     Um-hum.
14     Q     Why did you underline that?
15     A     Um-hum.
16     Q     Why did you underline that?
17     A     I'm not sure why.
18     Q     Okay.
19     A     And on page 33, mini page 126 and 128, those
20  are typos. And on page 34, mini page 133, that's where the
21  figure comes up, $365,000 that he paid for that piece of
22  property.
23     Q     I understand. Okay, go ahead.
24     A     And I can't remember how many -- how much --
25  how many acres that is. I can't remember how many acres

140

1  that is. I think that's all. Yeah, that's all.
2      Q     That is the most time consuming thing we will
3  do. The rest of this we will be able to go through pretty
4  quickly.
5            I'm going to show you a document that's --
6  it's a July 11, 2000 letter from Larry Newton. Can you just
7  identify that for me? Now, there's -- on the second page of
8  that is the words draft copy written in red there.
9      A     Yeah, that's not my writing.
10     Q     That's not your handwriting?
11     A     No, unh-unh.
12     Q     Do you know whose it is?
13     A     No, unh-unh.
14     Q     Is that a draft copy of the complaint that
15  Larry Newton -- the answer to the complaint that Larry
16  Newton --
17     A     Yes, uh-huh.
18     Q     -- prepared?
19     A     Right, that's what that is.
20     Q     And you reviewed that and then made whatever
21  changes. Is that what led to the meeting?
22     A     Yes, uh-huh.
23     Q     So after Larry Newton sent you that copy, then
24  you guys all got together?
25     A     Right, um-hum.

141

1      Q     And met with Mr. Sherr, I guess?
2      A     Yeah, I believe. Didn't we? I think so.
3      Q     And the top letter is a July 11th, 2000 letter
4  from Larry Newton to Anthony Sherr, correct?
5      A     (No response.)
6      Q     Now, I'm going to show you a letter. It's a
7  copy of the May 5, 2000 letter from you to Mr. Corneal and
8  you have written in the margin April 27, 2000 -- or I should
9  ask you, is that your handwriting?
10     A     Yes, uh-huh.
11     Q     And what's that refer to?
12     A     That's the -- I was trying to remember when he
13  came out to the house and that's the -- that's what I put
14  down. That was the day he came out to the house.
15     Q     Okay, thank you. I'm going to put that back
16  in the file for you. And then this envelope -- hang on, I
17  didn't even look in there before. That's just the original
18  letter in the envelope.
19           So now the envelope that's in this -- in your
20  original file has a May 6, 2000 postmark, correct, and
21  that's the letter that --
22     A     Um-hum.
23     Q     The envelope that the May 5th letter --
24           MR. SHERR: You have to answer yes or --
25  excuse me, I'm sorry. You have to answer yes or no. You're

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

142

1    saying other things other than yes or no.
2    BY MS. MONTGOMERY:
3        Q        Instead of saying um-hum, you have to say yes
4    or no for the court reporter.
5        A        Yes.
6        Q        So that's the letter that the May -- the
7    envelope --
8        A        Yes.
9        Q        So you received it on May 6th, right?
10        A        Yes.
11            MR. SHERR:  And that's because she can't take
12    down um-hum.
13    BY MS. MONTGOMERY:
14        Q        Now, I'll show you another letter that was in
15    your -- another copy of the May 5th letter from David to you
16    where you have an X next to Friday, April 28.  Can you tell
17    me why you have that X there?  It makes a reference to a
18    meeting.
19        A        Yes, and he apparently put the wrong date down
20    and so then I put the correct date down.
21        Q        You said he came to your house on April
22    27th --
23        A        No, no, that's --
24        Q        He's making reference to the date the
25    supervisors were going to meet.

143

1        A        Let me look at that again.  Let me make sure I
2    -- yes, I see what you're saying.  Yeah, that -- he came to
3    our house on April 27th and then he thought there was going
4    to be a meeting on the 28th.
5        Q        And why did you put that X down there?
6        A        I don't know why I put it down.
7        Q        Just checking dates or something?
8        A        Yeah.
9            (Discussion held off the record.)
10    BY MS. MONTGOMERY:
11        Q        I'm going to show you a document where you
12    have road ordinance, I guess, and clipped to it is a piece
13    of white notepad paper and some numbers.
14        A        Oh, that's -- this is nothing more than an
15    average of what I make a year being -- my wife figured up
16    how much I make for each year and that's about -- between
17    400 -- three to $400 a year.
18        Q        For your work as the building permit officer?
19        A        Yeah.
20        Q        And I'm just going to ask you to look -- I may
21    ask you questions about this later, but this subdivision and
22    land development ordinance that's in your file --
23        A        Yes, uh-huh.
24        Q        -- is that your personal copy of that?
25        A        Yes, uh-huh.

144

1        Q        When did you get that?
2        A        I don't recall and I have not really read it
3    with any depth yet.
4        Q        Did you get it after the lawsuit was
5    instituted?
6        A        Yes, uh-huh.
7        Q        What about this other ordinance in your files?
8        A        Yeah, that's the ordinance, the township
9    ordinance, and that we're going to start thinking about
10    rewriting it and redoing it.
11        Q        The building ordinance you mean?
12        A        Yeah, the building ordinance.
13        Q        Is this the current building ordinance?
14        A        Yes, uh-huh.
15        Q        It's the document that has the table of
16    contents, general provisions --
17        A        Yeah.
18        Q        -- is the first page of it, right?
19        A        Yes, it's the current one.
20        Q        So this is the current in effect building
21    ordinance?
22        A        Yes, um-hum.
23            MS. MONTGOMERY:  We'll break for lunch.  I
24    probably have -- I may have an hour for you when we come
25    back.

145

1            (Discussion held off the record.)
2        (Luncheon recess taken at 1:13 p.m. until
3    2:26 p.m.)
4    BY MS. MONTGOMERY:
5        Q        Mr. Van Dommelen, we're back on the record and
6    you're still under oath.  I'm going to show you a document
7    that we're going to mark as Van Dommelen Exhibit 6 and I'd
8    ask you to look at it for me.
9            (Application for building permit produced and
10    marked as Van Dommelen Exhibit No. 6.)
11    BY MS. MONTGOMERY:
12        Q        Mr. Van Dommelen, go ahead and look at that
13    document just so you familiarize yourself with it, okay?
14        A        Um-hum.
15        Q        And I'm going to ask you a question about it.
16        A        Um-hum.
17        Q        Do you recognize the document?
18        A        Pardon?
19        Q        Do you recognize the document?
20        A        Yes, um-hum.
21        Q        Can you identify it for the record.
22        A        Building permit 01-6 from Jackson Township.
23        Q        For what individual?
24        A        For Kevin Boonie.
25        Q        Now, I note that -- that's the standard



VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

---

146

1  application for building permit that's used in Jackson
2  Township; is that correct?
3      A      Pardon?
4      Q      Is that the standard application for building
5  permit form --
6      A      Yeah.
7      Q      And it's been filled out by Mr. Boonie,
8  correct?
9      A      Um-hum.
10     Q      Now, there's a note in the middle of that form
11  that says attach plans or rough draft sketch of the proposed
12  structure.
13     A      What?
14     Q      Attach plans or rough draft sketch of the
15  proposed structure.
16     A      Um-hum.
17     Q      There aren't any -- there weren't any
18  documents attached to that application. Do you know whether
19  there were when they were given to you? We didn't receive
20  any, is what I'm saying. Do you know whether there were any
21  attached to it when you got it?
22     A      It was probably a small -- a floor plan which
23  I might have given back to him.  I only keep floor plans
24  that seem to have a -- you know, a certain concern, like the
25  floodplain issues and -- but a regular floor plan I don't

---

147

1  usually keep.
2      Q      Is it your testimony then that every building
3  application comes to you with some sort of an attached plan
4  or sketch or something?
5      A      No, not every.
6      Q      In what situations don't they come to you with
7  an attached plan or sketch?
8      A      Well, if it's a garage, I don't need to have
9  an attached plan for it.
10     Q      Why don't you?
11     A      Because we just haven't -- we haven't asked
12  for that.
13     Q      What about if it's a workshop that's not going
14  to have water, do you need to have an attached plan for
15  that?
16     A      No, we haven't asked for that.
17     Q      Do you only ask for an attached plan when it's
18  going to be a house?
19     A      We ask for a plan and look at it, but we don't
20  necessarily save them.
21     Q      But is the only time you want an attached plan
22  or sketch or something is when it's a house; is that
23  correct?
24     A      A house or -- yeah, I guess mainly a house,
25  um-hum.

---

148

1      Q      I want to show you another document that we'll
2  mark as Van Dommelen Exhibit 7 and ask you to look at it.
3             (Application for building permit produced and
4  marked as Van Dommelen Exhibit No. 7.)
5  BY MS. MONTGOMERY:
6      Q      Would you just take a look at that application
7  for me.
8      A      Um-hum.
9      Q      Do you recognize it?
10     A      Yes.
11     Q      And there's an attachment to that, right?
12     A      Yes, uh-huh.
13     Q      What is that attachment?
14     A      That's a sewage disposal system attachment.
15     Q      Now, it appears to me that that is an
16  application for Mr. --
17     A      It's from Mr. Henwood.
18     Q      Mr. Henwood for a vacation home, right?
19     A      Yes, uh-huh.
20     Q      A two-story vacation home?
21     A      Yes, uh-huh.
22     Q      Now, there isn't a sketch of the home or
23  anything like that or a sketch of the proposed structure, is
24  there?
25     A      No, I saw a sketch for the home.

---

149

1             (Interruption.)
2             MS. MONTGOMERY: We'll have to stop one
3  second, I'm sorry.
4             (Discussion held off the record.)
5  BY MS. MONTGOMERY:
6      Q      The document that you've been looking at is
7  the Thomas Henwood application, correct?
8      A      Um-hum.
9      Q      So you're saying you did see a sketch for
10  that?
11     A      Yes, uh-huh, blueprints.
12     Q      That's because it was a vacation home and
13  that's why you wanted that sketch, right?
14     A      Pardon?
15     Q      It was because it was a vacation home and
16  that's why you wanted that sketch; is that right?
17     A      Yeah, it was a home and I -- and he brought it
18  along, but I don't save those. It would take you rolls and
19  rolls and rolls. I don't have space for saving all these
20  sketches. So unless it's a sketch -- there's a small sketch
21  that fits in my notebook, I don't save rolled up blueprints.
22     Q      What was the name on that first -- on the
23  first document, Exhibit 6?
24     A      Boonie.
25     Q      So I understand from the Boonie application

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

150

1  that you granted that --
2  A     Right.
3  Q     -- application without seeing any sketch or
4  anything else whatsoever, right?
5  A     No, I saw -- I saw a sketch, but I --
6  Q     On the Boonie application?
7  A     Yes, uh-huh.
8  Q     I thought you said that was true of the
9  Henwood --
10  A     The Henwood.
11  Q     The Henwood application.
12  A     Right, um-hum.  And I usually also don't --
13  Q     I guess I'm confused.
14  A     I usually also don't see sketches of — called
15  double-wides because they're pretty standard.
16  Q     So you allow double-wide trailers, you mean?
17  A     Well, double-wide homes.
18  Q     Are they double-wide -- what do they call
19  them, modular homes now or something like that?
20  A     Yes, uh-huh.
21  Q     Is that what they're called?
22  A     Yeah, right.
23  Q     Like mobile homes?
24  A     Yeah.  Well, they're not on wheels.
25  Q     I think I know what you mean.  They're like

151

1  trailers, right?
2  A     Your interpretation of the word mobile home
3  versus double-wide versus trailer.
4  Q     So you don't require a sketch of those
5  either --
6  A     No.
7  Q     -- because they're standardized?
8  A     No, unh-unh.
9  Q     So why did you have -- why did you keep the
10  permit for the sewage disposal system attached to the
11  Henwood application?
12  A     I do that sometimes.  I'm not consistent, I'll
13  be very frank with you.  If there is something — I — I
14  don't keep most of the sewage disposal things.  They just go
15  back with the person.  They show me the permit, give me the
16  number and -- and then after we approve everything they're
17  on their way.
18  Q     So let's look then at -- Van Dommelen Exhibit
19  8 we'll mark this, an application for a building permit from
20  William Foster.
21  (Application for building permit produced and
22  marked as Van Dommelen Exhibit No. 8.)
23  BY MS. MONTGOMERY:
24  Q     Now, this is dated July 2000, right, July 6,
25  2000?  And you granted this building application, right?

152

1  A     Um-hum.
2  Q     Did you request any documentation or anything
3  in connection with this structure?
4  A     No.
5  Q     This is a one-story shed?
6  A     Yeah, it's a one-story shed.
7  Q     And what's a shed?  Is a shed the same as a
8  garage or is it different?
9  A     No, it's an eight-by-ten foot wall with roof
10  and doors.
11  Q     Storage facility?
12  A     To store -- storage facility.
13  Q     This one is 12-by-16, right?
14  A     Huh?
15  Q     This one was 12-by-16, right?
16  A     Well, they range in different sizes.
17  There's no plumbing in it, right?
18  A     No, unh-unh.
19  Q     So you just approve it without --
20  A     Yeah, uh-huh, right.
21  Q     Without any further documentation?
22  A     Right.
23  (Interruption.)
24  (Break taken from 2:28 p.m. until 2:46 p.m.)
25  MS. MONTGOMERY:  Where were we on the record?

153

1  Can you read me back the last sentence.
2  (Question and answer read.)
3  BY MS. MONTGOMERY:
4  Q     So you just approved this William Foster
5  application without any further documentation, correct?
6  A     Yes, um-hum.
7  MS. MONTGOMERY:  I think to save time what we
8  will do, so Leslie doesn't have to go back through the pile
9  of documents a whole bunch more times, we will mark the rest
10  of these building applications that we obtained from the
11  township files altogether as Van Dommelen Exhibit 9.  They
12  are Siegler, Debra Kerr and Kyle Anderson, Boring, Rush
13  Reid, Younker, Foster and Stout and that's it.  These will
14  all be Exhibit 9.
15  (Applications for building permits produced
16  and marked as Van Dommelen Exhibit No. 9.)
17  BY MS. MONTGOMERY:
18  Q     Just take a minute and look through them, Mr.
19  Van Dommelen, and I'm just going to ask you a couple
20  questions about them.
21  (Pause.)
22  BY MS. MONTGOMERY:
23  Q     Now, the first application for building permit
24  is Charles Siegler for a mobile home, correct?
25  A     Um-hum.  For a mobile home, um-hum.



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

154

1  Q      And you granted that application, correct?
2  A      Um-hum.
3  Q      Now --
4         MR. SHERR:  Mr. Van Dommelen, let me just
5  remind you again that you have to say yes or no so that the
6  court reporter can take it down.
7         THE WITNESS:  Yes.
8  BY MS. MONTGOMERY:
9  Q      Now, did you go by and look and see what they
10 were doing on that property or anything, what the Sieglers
11 were doing on that property?
12 A      This one I didn't, no.
13 Q      And there was no attached documentation,
14 right?
15 A      No.
16 Q      How about the Kerr, Kyle Anderson application,
17 6/15/2000?
18 A      I have been by that site, yes.
19 Q      Why did you go by that site?
20 A      I was curious to see what was going up in that
21 area.  It was a development -- it's an area that's
22 developing and I wanted to --
23 Q      So this is a development?
24 A      Yes, it's a -- called Kenwood Acres.
25 Q      How many lots are in that development, do you

---

155

1  know?
2  A      I can't tell you exactly.  I really can't say.
3  Q      Now, was there documentation attached to this?
4  A      No.
5  Q      There was never any documentation attached to
6  it?
7  A      Well, I think she brought a floor plan,
8  um-hum.
9  Q      Anything else?
10 A      No.
11 Q      And this was for a home, correct?
12 A      Um-hum.  Well, the only thing is a sewage
13 permit, you know, number but ...
14 Q      And that's right on the application?
15 A      Yes, that's on the application.
16 Q      Same thing on the next one for Mark Boring?
17 A      Um-hum.
18 Q      This was May 24, 2000, correct, was the
19 application?
20 A      Um-hum.
21 Q      And it was granted the same day, right?
22 A      No, one was 6/15 and this is 5 --
23 Q      No, I mean it was granted the same day it was
24 applied for, correct?
25 A      Oh, yes, yes.

---

156

1  Q      Now, going back for a second to the
2  Anderson-Kerr application, I see it says the application is
3  June 15th, 2000 but the grant date is June 15, 1999.  That
4  was just you forgot to cross out the 1999 and add 2000,
5  correct?
6  A      Yeah.
7  Q      That was really granted the same day?
8  A      Yeah, I discovered that these building permits
9  had to be changed.
10 Q      And so that was actually granted the same day
11 that it was applied for, correct --
12 A      Right, um-hum.
13 Q      -- at Kerr?  The next one is a Norman Keller.
14 A      Right.
15 Q      April 30th, 2000, right?
16 A      Um-hum.
17 Q      And that was for a double-wide.  That's the --
18 A      Um-hum.
19 Q      -- modular home, I guess you'd call it?
20 A      Yes, uh-huh.
21 Q      Granted the same day as they applied for it,
22 right?
23 A      Um-hum.
24 Q      The next one is April 24, 2000.  Now, this was
25 an application for -- is that Jessie Rush?

---

157

1  A      Yes, uh-huh, Rush.  Jessie Rush, III, I think.
2  Q      So this was just an addition; is that correct?
3  A      This was just an addition to a bedroom.
4  Q      When you add a bedroom up in Jackson Township
5  is there any concern or any attention paid to the septic
6  permit or sewage permit or anything?
7  A      Only when they -- when the house is built or a
8  new house is built, then the septic tank has to -- has to
9  fit the number of bedrooms.
10 Q      What about if you add a bedroom?
11 A      There's nothing that has ever been a concern.
12 Q      So nobody asks any questions about --
13 A      No.
14 Q      -- whether this extra bedroom is going to take
15 you beyond the permissible sewage --
16 A      No.
17 Q      -- permit, right?
18 A      No, unh-unh.
19 Q      Okay, thanks.  There's another one dated May
20 4, 2000 for -- oh, I think we did this already.  Robert
21 Weaver.
22 A      Yes, um-hum.
23 Q      We already talked about that one.  And we have
24 one for Douglas Reid which is dated April 8, 2000, right?
25 A      The Douglas Reid one is --

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

158

1       MR. SHERR: It's not in the package you gave
2  us.
3       THE WITNESS: That's the one where they had to
4  have the site looked at by the Commonwealth of Pennsylvania
5  and a geological survey in terms of the flood creek in those
6  attachments here.
7  BY MS. MONTGOMERY:
8       Q       This is the one you talked about that was
9  destroyed by fire?
10      A       Right, um-hum.
11      Q       And they wanted to rebuild?
12      A       Right.
13      Q       Now, I notice that the application for the
14  building permit was filled out on April 8th, right?
15      A       Right.
16      Q       And it was approved also on April 8th,
17  correct?
18      A       Um-hum.
19      Q       It says one and a half where it's --
20      A       One-and-a-half story.
21      Q       One-and-a-half story home is what you're
22  referring to, correct?
23      A       Correct.
24      Q       Did anybody raise any concerns about the
25  septic in connection with the building of this house?

---

159

1       A       About what?
2       Q       The septic in connection with the building of
3  this house.
4       A       The septic was already there.
5       Q       Did anybody ask whether the septic was going
6  to be for the same number of bedrooms that the initial --
7  the house that burned down --
8       A       The house was built the same.
9       Q       It was built with the same number of bedrooms?
10      A       Um-hum.
11      Q       Did you ask that question?
12      A       Yes, um-hum. And then it was looked at, of
13  course, by the -- the engineers.
14      Q       So this is a three bedroom plus a loft,
15  correct?
16      A       Um-hum. Yes.
17      Q       And you're saying the prior house was also a
18  three bedroom, right?
19      A       Um-hum.
20      MR. SHERR: You have to --
21      THE WITNESS: Yes.
22  BY MS. MONTGOMERY:
23      Q       There's a letter from David R. Stiffler
24  attached to this. He's an engineer, I guess, for the
25  Commonwealth?

---

160

1       A       I'm going back to check that. I believe
2  that's the -- that's the -- engineer.
3       Q       Why was there an engineering report required
4  with this --
5       A       Because it -- excuse me. Because it was a
6  floodplain.
7       Q       And that has to be a Commonwealth or an
8  engineer or --
9       A       Yes, uh-huh, and -- someone who is approved by
10  the Commonwealth.
11      Q       Was the structure built at precisely the same
12  place as the prior structure?
13      A       Essentially the same place. I think it was
14  moved up one foot to accommodate the floodplain changes.
15      Q       The next one is an application dated March 14,
16  2000 from John -- is that Younker?
17      A       Younker.
18      Q       Y-o-u-n-k-e-r. And it appears that that was
19  applied for March 14, 2000 and granted the same day,
20  correct?
21      A       Um-hum.
22      Q       This was for a home. Do you recall what was
23  attached to this?
24      A       No, I don't.
25      Q       Now, we have a March 1, 2000 application from

---

161

1  Joseph Foster?
2       A       Um-hum.
3       Q       For a mobile home --
4       A       Yes.
5       Q       -- he calls it. And I see where it says
6  sewage permit number NA. Why is there no --
7       A       Yes, they replaced a former mobile home there
8  and there was a sewage system already in place.
9       Q       And you didn't go out and -- you didn't do
10  anything further in connection with the septic or anything
11  like that?
12      A       No.
13      Q       You didn't check up on this?
14      A       Yeah, um-hum.
15      Q       And no drawings had to be attached to it,
16  right? No drawings had to be --
17      A       No drawings, no.
18      Q       And then we have February 19, 2000 application
19  from Mr. Stout?
20      A       Yes.
21      Q       And that was for a barn?
22      A       A barn.
23      Q       Now, does the barn have water in it?
24      A       No.
25      Q       No water?

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

162

1  A    No, it's a storage barn.
2  Q    It's 48-feet wide by 68-feet long, right?
3  A    Right.
4  Q    So it wasn't a barn used for animals?
5  A    I think it's going to be for hay and
6  equipment.
7  Q    And so --
8  A    That's what it appears to be anyway.
9  Q    And it appears from here that application
10  was granted the same day that it was applied for, right?
11  A    Yes.
12  Q    That permit, I should say.
13  A    Um-hum.
14  Q    No additional --
15  A    No.
16  Q    So can you distinguish then between the
17  requirements for, on the one hand, a garage or a barn or a
18  shed, a storage facility of some sort, and an art studio?
19  What's the difference?  Is there any difference under the
20  building ordinance?
21  A    Well, the art studio is going to have water in
22  it and --
23  Q    Why do you think the art studio is going to
24  have water -- an art studio is going to have water in it?
25        MR. SHERR: Were you finished with your

163

1  answer?  I think you interrupted him.  Were you finished
2  with your answer?
3        THE WITNESS: Well, I think an art studio in
4  general usually uses water of some kind for turpentine,
5  watercolors, unless it's a sculpture studio.
6  BY MS. MONTGOMERY:
7  Q    But you didn't know Mr. Corneal was an artist,
8  right, when he asked you for his permit for a garage with
9  studio overhead?
10  A    No.
11  Q    You didn't know he was an artist?
12  A    No.
13  Q    You didn't really know it was an art studio,
14  right?
15  A    He told me that it was going to be a garage
16  with an art studio.
17  Q    Overhead, okay.  Well, once again, I'm just
18  going to say if the art studio doesn't have water and he
19  represents to you that it doesn't have water, can you then
20  distinguish between it and a barn or a shed or a garage or
21  anything else that doesn't have water?
22  A    Well, I think so.
23  Q    Well, how do you distinguish?  What are you
24  distinguishing?
25  A    Well, by looks and by -- a shed is a shed.

164

1  Q    Well, that's not exactly my question.  My
2  question is:  Can you distinguish for purposes of building
3  application requirements between an art studio that doesn't
4  have water and a garage or a barn or a shed or any workshop
5  that doesn't have water?  Can you distinguish?
6  A    I'll say no.
7  Q    Now I'm going to show you a document -- before
8  I go to it I'm just going to clarify.  Now, you indicated
9  that your art studio on your property doesn't have water,
10  right?
11  A    Exactly.
12  Q    So you go to the stream, right?
13  A    Right.
14  Q    Mr. Corneal has a stream on his property, too,
15  right?
16  A    Okay, then he'd go to the stream and get
17  water.
18  Q    I want to show you a document that we'll mark
19  as Van Dommelen Exhibit 10.
20        (Four-page document produced and marked as Van
21  Dommelen Exhibit No. 10.)
22  BY MS. MONTGOMERY:
23  Q    Now, can you identify that document for me,
24  Mr. Van Dommelen?
25  A    Um-hum, I can.

165

1  Q    And what is it?
2  A    It's a permit analysis that I'm asked to
3  submit at the end of each year.
4  Q    And --
5  A    To determine what kind of structures were
6  built in the township.
7  Q    So it indicates that in 1995 you issued
8  building permits for seven houses?
9  A    Um-hum. Yes.
10  Q    And then right down the list, right?
11  A    Exactly.
12  Q    For a total of 33 permits?
13  A    Right.
14  Q    In 1996 you issued permits for four houses,
15  correct?
16  A    Yes.
17  Q    And didn't deny any applications, correct?
18  A    Not for those, no.
19  Q    And then right down the list, mobile homes,
20  camps, decks, carports, outbuildings, alterations, okay.  In
21  1998 you issued permits for six houses?
22  A    Yes.
23  Q    Seven outbuildings, right?
24  A    Yes.
25  Q    You didn't deny any?



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

166

1   A   No.
2   Q   In 1999 you issued permits for six houses?
3   A   Yes.
4   Q   And four outbuildings and didn't deny any,
5   correct?
6   A   No.
7   Q   Now, I don't see for 2000. Do you know how
8   many permits you issued in 2000?
9   A   No, I can't remember. I know I turned that
10  into Ann but -- and it should have been in my book.
11  Q   Okay. Well, maybe --
12  A   Because I'm sure I turned it in after the
13  first of the year.
14  Q   Well, was it about the same, like somewhere
15  between four and seven houses?
16  A   Yes, it would be a similar amount, yeah. It
17  -- as you can see, it varies very little in terms of how
18  many permits and how many houses and -- it seems to be
19  fairly stable in terms of what's built.
20  Q   So if you issued permits for -- it looks like
21  between four and seven houses between 1995 and 1998 --
22  A   Yes.
23  Q   -- then say the most you issued for 2000 was
24  seven houses as well?
25  A   It would be a similar amount.

---

167

1   Q   And that means you got in each of those years
2   -- for example, in 1995 you got applications for seven
3   houses, right?
4   A   Probably.
5   Q   And granted them all?
6   A   Yes.
7   Q   Whereas in 2000 you got applications for say
8   eight houses and denied one, right?
9   A   I would assume you're right, um-hum.
10  Q   And that would be Mr. Corneal's --
11  A   Yes.
12  Q   -- that you denied? There wasn't anything
13  unusual that year about the number of houses that somebody
14  was trying to build or anybody was trying to build?
15  A   I can't remember. I would have to look at the
16  form.
17  Q   Is there anything unusual about the number of
18  out --
19  A   No, I would think not.
20  Q   What about outbuildings?
21  A   About what?
22  Q   Outbuildings. About the same?
23  A   No, I think it would be similar.
24  Q   And actually in 1999 you only had a request
25  for four outbuildings, right?

---

168

1   A   Yes.
2   Q   Do you recall what it was for 2000?
3   A   No, I do not recall.
4   Q   Would an art studio without water fall into
5   the heading of outbuilding?
6   A   Of an outbuilding?
7   Q   Yes.
8   A   I suppose it could.
9   Q   Where else on this list could it possibly fall
10  in?
11  A   No, I think it would have to go under
12  outbuildings.
13  Q   Thank you. Based on the number of building
14  permit applications, would you say that there wasn't any
15  particular rush or acceleration of building going on in
16  Jackson Township in that 1999-2000 time frame?
17  A   I would think there was no more acceleration
18  than other years. I think it was fairly stable.
19  Q   I'm going to show you a document which you
20  guys have seen dated September 1, 2000. It's a letter from
21  David Corneal to Miss Wirth and I'll ask you to look at that
22  for me. Do you recall whether you've ever seen that letter
23  before, Mr. Van Dommelen?
24  A   I don't recall seeing it before.
25  Q   If you look at the letter, it refers back to

---

169

1   those three building permit applications that Mr. Corneal
2   sent in.
3   A   Yes.
4   Q   Which you say you never saw anyway, correct?
5   A   I don't believe I did.
6   Q   Now, look at the drawings that he has attached
7   to this September 1, 2000 letter.
8   A   Yes.
9   Q   Do you see the first page of the drawings has
10  a sketch of a 40-by-20 foot garage/studio, right?
11  A   Yes.
12  Q   And the second floor is on the second -- no,
13  sorry, the second floor is on the first page and the first
14  floor is on the second page, correct?
15      MR. SHERR: Where does it say garage/studio?
16      MS. MONTGOMERY: In the cover letter -- well,
17  it actually says second floor with garage on the drawing.
18      MR. SHERR: Right, but I thought you said it
19  said garage/studio. I don't see studio written on the
20  drawings, is my point.
21      MS. MONTGOMERY: No, but --
22      MR. SHERR: I just wanted to clarify.
23      MS. MONTGOMERY: Okay.
24  BY MS. MONTGOMERY:
25  Q   So have you ever seen these drawings before?

---



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

170

1    A    Not these.
2    Q    Now, if somebody were --
3    A    **And I personally don't think they're very good**
4    **drawings.**
5    Q    But you don't even require drawings for a
6    garage, right?
7    A    **(No response.)**
8    Q    Have you seen some other drawings because you
9    said not these drawings?
10   A    **I saw an earlier drawing which was a much more**
11   **complex architectural scale drawing.**
12   Q    Where did you see that?
13   A    **When he came to my house.**
14   Q    So he showed you drawings of his studio then,
15   his garage and studio?
16   A    **His garage with a studio above it.**
17   Q    He showed you that then?
18   A    **Yes, and now it becomes a garage with an open**
19   **storage above it.**
20   Q    But in any event, even though you don't think
21   these are good drawings, you don't even require drawings for
22   garages so these would be good enough, correct?
23   A    I did say that, yes.
24        MS. MONTGOMERY: We're going to mark this as
25   Van Dommelen Exhibit 11. That's the September 1, 2000

171

1    letter from Mr. Corneal to Ann Wirth with drawings attached.
2         (Letter dated 9/1/00 with attachments produced
3    and marked as Van Dommelen Exhibit No. 11.)
4    BY MS. MONTGOMERY:
5    Q    Well, when you saw his earlier drawings when
6    he came to your house, did you keep those?
7    A    **No.**
8    Q    You sent them back because he didn't have --
9    you wouldn't give him an application?
10   A    **Right, and he took them back.**
11   Q    Was there anything objectionable about those
12   drawings of the garage and studio?
13   A    **As far as the drawings were -- they were**
14   **professional drawings.**
15   Q    They were sufficient --
16   A    **Yes, uh-huh.**
17   Q    -- to tell you what it was he wanted to do
18   anyway?
19   A    **Right.**
20   Q    I'm going to ask you one question. Is it your
21   understanding that you are not to discuss your deposition
22   with any of the other defendants?
23   A    **Pardon?**
24   Q    Is it your understanding that you are not to
25   discuss --

172

1    A    **Oh, yes, yes.**
2    Q    -- this deposition with any of the other
3    defendants?
4    A    **Yes.**
5    Q    Including Mr. Newton, right?
6    A    **Yes.**
7         MR. SHERR: And just so we're clear, that is
8    until after the deposition of Mr. Newton and Mr. Weiler.
9         MS. MONTGOMERY: Until the depositions are
10   completed, is what the judge said.
11        THE WITNESS: Yes.
12        MR. SHERR: Is that what it says? It doesn't
13   say the deposition of defendants?
14        MS. MONTGOMERY: Right.
15   BY MS. MONTGOMERY:
16   Q    Did you discuss with Mr. Newton your refusal
17   to provide -- other than the letter that he wrote for you
18   and had you sign to Mr. Corneal, did you ever have
19   discussions with Mr. Newton about Mr. Corneal and his
20   attempt to get approvals from the township?
21   A    No.
22   Q    You never had a telephone conversation with
23   him?
24   A    **No, I believe all the discussions went between**
25   **him and Ann Wirth.**

173

1    Q    What makes you think they all went between him
2    and Ann Wirth?
3    A    **Because I gave -- I gave the letter to Ann**
4    **Wirth and then she sent it along with building permits to**
5    **Larry Newton.**
6    Q    You mean the letter that Mr. Corneal wrote to
7    you?
8    A    **No, no, that I wrote.**
9    Q    Oh, the letter that you wrote?
10   A    **Yes.**
11   Q    You gave it to her?
12   A    **Right.**
13   Q    What about prior to the time -- you know, for
14   example, when he first came out to your house and asked for
15   the applications --
16   A    **Right.**
17   Q    -- did you have any occasion to talk to him
18   then about Mr. Corneal?
19   A    **About Mr. Corneal?**
20   Q    Yes.
21   A    **Newton never came out to my house.**
22   Q    But Mr. Corneal came out to your house,
23   correct?
24   A    **Yes.**
25   Q    At the time that Mr. Corneal came out to your



VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

174

1  house and you first refused to give him even an
2  application --
3      A      Right.
4      Q      -- did you ever have any discussions with Mr.
5  Newton about that?
6      A      No.
7      Q      Do you know if anybody else had any
8  discussions with Mr. Newton --
9      A      No, I don't know.
10     Q      Did anybody convey to you anything that Mr.
11 Newton may have said about that?
12     A      No.
13     Q      Did anybody convey any advice from Mr. Newton
14 about that?
15     A      I don't know.
16     Q      You don't recall?
17     A      Unh-unh.
18     Q      Do you know whether Mr. Newton was ever
19 present at any of the meetings between January 2000 and July
20 2000?
21     A      Which meetings?
22     Q      The township meetings or the pre-meetings.
23     A      Yes, but I can't tell you what dates.
24     Q      What makes you think he was present?
25     A      I've seen him at some of the township meetings

---

175

1  in the fire hall and I've seen him at one meeting at Ann's
2  that we went over the -- that one document that -- that
3  Corneal had accusing us -- I can't think of what it's
4  called.
5          MR. SHERR:  The complaint.
6  BY MS. MONTGOMERY:
7      Q      The complaint?
8      A      Yeah, the complaint.
9      Q      That was after the lawsuit.
10     A      Yeah, uh-huh.
11     Q      But prior to the lawsuit do you recall also
12 seeing him at township meetings?
13     A      That's the only time I ever saw him.
14     Q      The only time you ever saw him was when you
15 were at Ann's you mean?
16     A      Newton.  Yeah, the only time I ever saw him
17 was at a township meeting.
18     Q      Oh, I see.  And that was prior to the lawsuit?
19     A      Yes.
20     Q      Do you recall whether at any of those meetings
21 Mr. Corneal's situation was discussed when Mr. Newton was
22 there?
23     A      I don't know.  In general -- in general we
24 didn't discuss at the open meetings anything about the
25 Corneal case.

---

176

1      Q      Where did you discuss it instead?
2      A      It finally came up after the article came in
3  the newspaper and some of the citizens asked about it.
4      Q      Oh, then it came up in an open meeting, you're
5  saying?
6      A      Yes, it came up in the newspaper.  Someone
7  took an article about that into the Daily News and -- we
8  have no idea who it was, but to tell about the fact that he
9  -- Corneal was suing us.  And so then, of course, some of
10 the -- the citizens wanted to ask about it and we said as
11 little as possible.
12     Q      Well, let me just ask you one more question
13 about the letter that Mr. Newton wrote for your signature or
14 revised for your signature.
15     A      Revised, I would say.
16     Q      Were you concerned at all that you were sort
17 of writing stuff down in a letter at somebody else's request
18 about building permit applications that you'd never seen?
19 Did that raise any concerns to you?
20     A      Maybe a little.
21     Q      Like what kind of concerns?
22     A      Well, my job was being usurped.
23     Q      Did you voice that to the supervisors at all?
24     A      I don't believe so.
25     Q      Why not?

---

177

1      A      I can't answer that.
2      Q      But was that the only situation that you can
3  think of when your job was being usurped?  Is that the
4  only --
5      A      Yes, yes, um-hum, right.
6      Q      But you decided you'd go ahead and sign the
7  letter anyway and put in it what they wanted you to put in
8  it?
9      A      Yes, um-hum.
10     Q      Why did you decide to do that?  Did you feel
11 that you had to?
12     A      No, I just wanted to not shake the boat, I
13 guess.
14     Q      Because you understood that was what the
15 supervisors wanted you to do?
16     A      Yes.
17     Q      Did you understand that was what Mr. Newton
18 wanted you to do as well?
19     A      Yes.
20     Q      Did anybody ever, you know, sort of tell you
21 -- did anybody ever tell you that you just needed to do
22 your job, you know, just the way they told it to you or
23 anything like that?
24     A      I'm not sure that anyone did say that in those
25 kind of words.

---



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

178

1  Q    You didn't have any real like confrontation
2  about the fact that they were telling you what to do?
3  A    No.
4  Q    Other than all that we have talked about just
5  now, is there anything that you can think of concerning Mr.
6  Corneal and his property that you haven't told me as the
7  building permit officer for Jackson Township?
8  A    I can think of nothing.
9  Q    I'm not sure if I asked you this question, but
10  just in case, have you talked to Ann Wirth -- not about the
11  deposition. I'm not talking about the depositions, that's
12  not it. Have you talked to Ann Wirth about Mr. Corneal's
13  request for a building permit since the time that you wrote
14  that letter?
15  A    Well, I'm sure we talked about it because I
16  was concerned about how the whole thing was going. I'm sure
17  I said something about what are we going to do about this
18  and that we need to bring it up to the supervisors and make
19  a decision. So I certainly wouldn't say I never talked to
20  her, but it would be a very superficial kind of
21  conversation.
22  Q    Do you recall her talking anything to you
23  about it at all?
24  A    No, except one time, as I said earlier, that
25  she said I wasn't supposed to give a building permit to

180

1  Q    Do you have a belief as to who was taking the
2  lead in this position that the township has taken --
3  A    No, I don't think so. I think they were
4  taking it as a board of supervisors.
5  Q    As a group?
6  A    As a group.
7  Q    All right. Do you know when Mr. Newton became
8  aware of what was going on between the township supervisors
9  and Mr. Corneal with respect to his attempt to build?
10  A    No, I don't -- I don't know.
11  Q    Do you know -- I'm going to ask it a little
12  more generally then. Do you know whether he found out about
13  all this in the spring of 2000 as opposed to later?
14  A    I would assume it was in the spring of 2000.
15  Q    Why would you assume that?
16  A    Well, just the date of -- the date of events.
17  Q    Do you know whether or not Mr. Newton knew
18  about the moratorium at the time that the moratorium went
19  into place?
20  A    Well, as a township lawyer I would say yes.
21  Q    Has it been your experience that Mr. Newton
22  generally knows what's going on in the township, in Jackson
23  Township with the board of supervisors?
24  A    Yes, I think so.
25  Q    Do you know whether any of the defendants

179

1  Corneal, as did Tom Wilson.
2  Q    Because that's what Tom Wilson wanted?
3  A    Right.
4  Q    Do you know -- to your knowledge is it
5  primarily Mr. Wilson who was sort of taking the lead on this
6  thing with Mr. Corneal in his attempt to build on his
7  property?
8  A    Interesting question. I'm not sure I would
9  want to answer that question the way it's phrased because
10  I'm not really sure.
11  Q    Well, I'm not sure it's a good answer. It's
12  an okay answer.
13  A    Because I would assume -- no, I don't want to
14  go there.
15  Q    Well, let me ask you this: Why is it that you
16  don't feel that you can answer that question?
17  A    Well, because I'm not sure of the answer and
18  I'm not sure how some of the supervisors and administrators
19  of the township interact with other people.
20  Q    I see.
21  A    I see them mainly on the first Monday of each
22  month at the supervisor's meeting and so I don't see their
23  interaction with other people except at that supervisor's
24  meeting. And so it would be unfair for me to make a
25  judgment on one person that that person is doing the lead.

181

1  asked him for advice regarding the moratorium?
2  A    No.
3  Q    Did any of the township supervisors ask him
4  for --
5  A    I don't know.
6  Q    You don't know, okay. Do you know whether or
7  not he ever told them what they could do with respect to a
8  moratorium?
9  A    No, I don't know.
10  Q    What about the subdivision ordinance, same
11  question, do you know whether Mr. Newton told the
12  supervisors or Miss Wirth or even you what they could do
13  with respect to the subdivision ordinance?
14  A    He didn't say anything to me. I was very
15  uninvolved with the whole subdivision ordinance and so I
16  have no idea who he talked to about it.
17  Q    Now, if Mr. Corneal's property were already
18  divided such that the existing old farmhouse was on one
19  parcel and there was nothing on the other parcel, would you
20  say that if you wanted to build on that other parcel a home
21  and a garage with art studio that there would be any
22  subdivision problem?
23  A    If the subdivision is already in place, then I
24  see no problems. There is a -- this is an example. There
25  is a piece of property near me where it's already been



VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

182

1  subdivided.  They're not building anything on it but it is
2  subdivided in preparation --
3     Q     When was it subdivided, do you know?
4     A     Oh, it has to be at least five to 10 years
5  ago.  It was a long -- a long time ago.
6     Q     So if a parcel of property were divided into
7  two parcels so you now have -- technically now you have a
8  subdivision, right, and that were done before the
9  subdivision ordinance were in place, would that be okay to
10  build on one even though there was a house on the other
11  piece?
12     A     I'm not sure.  I'm not sure.
13     Q     Let me ask it to you a different way.  If you
14  had a piece of property that was divided such that there was
15  a separate deed filed --
16     A     Right.
17     Q     -- recorded, when a piece of property had an
18  existing house on it, the other parcel had nothing on it,
19  would there be any subdivision problem with building on
20  that --
21     A     No, not if there's separate deeds.  The
22  property that I live on has two parcels, the one my house is
23  on and the one my studio is on, but that property is also
24  claimed Clean and Green so nothing can be built on it or we
25  have to pay back taxes.

183

1     Q     So you can't build any other structures on it?
2     A     No.
3     Q     Who claimed it Clean and Green?
4     A     Pardon?
5     Q     Who claimed it Clean and Green?
6     A     Well, we applied for it.
7     Q     And that excuses you from paying taxes?
8     A     Yes.
9     Q     Do you know whether or not Mr. Wilson has any
10  interest in any part of the Corneal property?
11     A     No, I don't.
12        MS. MONTGOMERY:  I don't think I have any
13  further questions right now.
14        MS. YANKANICH:  I have some questions for
15  you.
16
17            CROSS-EXAMINATION
18
19  BY MS. YANKANICH:
20     Q     If you will turn to Exhibit Number 2 for me,
21  please.
22        MR. SHERR:  Exhibit Number 2?
23        MS. YANKANICH:  Exhibit Number 2.
24        MR. SHERR:  You're going to have to speak up.
25        MS. YANKANICH:  I'll speak up, right.

184

1            (Discussion held off the record.)
2  BY MS. YANKANICH:
3     Q     You have Exhibit Number 2; is that correct?
4     A     Yes.
5        MS. MONTGOMERY:  What's the date of the
6  letter?
7  BY MS. YANKANICH:
8     Q     The date of the letter is October 10, 2000.
9  It's the letter that you previously testified you drafted --
10     A     Right.
11     Q     -- and that Larry Newton revised --
12     A     Right.
13     Q     -- is that correct?  Is that the letter you're
14  referring to there?
15     A     Yes.
16     Q     My question specifically is I'm not clear what
17  it is in this letter that you're contending Larry Newton
18  revised.  Can we go through this letter and specifically
19  point out what language was added.
20     A     I think the part that was added was the --
21  while you submitted sewage facility planning modules to the
22  township, the township cannot forward the planning modules
23  to the Department of Environmental Protection for review
24  until you meet the requirements of the township's
25  subdivision and land development.

185

1     Q     So you're referring to the second sentence in
2  the second paragraph?
3     A     Right.
4     Q     Is there anything else in the letter that --
5     A     That's, I think, the main part that was
6  added.  A few words might have been changed, but as you
7  know, nobody can look at a letter and not change words.
8     Q     But the gist of this letter is still
9  consistent with the draft that you provided to Mr. Newton;
10  is that correct?
11     A     Yes, I think except for that -- except for
12  that area.
13        MS. YANKANICH:  I have no further questions.
14        MS. THORP:  Nothing.
15        MR. SHERR:  I have no questions.
16        MS. MONTGOMERY:  I just have one follow-up.
17
18            REDIRECT EXAMINATION
19
20  BY MS. MONTGOMERY:
21     Q     I'm a little confused now about this October
22  10, 2000 letter from you --
23     A     Yeah, right.
24     Q     -- to Mr. Corneal.  I thought that you had
25  indicated that you just put in there in the first place what



**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

186

1   others told you to put in there, correct?
2      A      I first wrote it, you know, myself
3   completely.
4      Q      At whose instruction?
5      A      And then I gave it to Ann Wirth and she then
6   gave it to Larry Newton and he made changes that he thought
7   should be in there.
8      Q      But my question --
9      A      I think that was correct with my previous --
10     Q      That's what I understood you to say, but when
11  you first wrote it, at whose instruction were you writing
12  it?
13     A      I guess I would have to answer the board of
14  supervisors.
15     Q      Because you hadn't seen the applications,
16  right?
17     A      Yeah.
18     Q      So they just told you to write this letter and
19  deny it?
20     A      Right.
21     Q      Did Mr. Newton tell you to write the letter?
22     A      See, that I do not remember.
23     Q      But somebody other than yourself --
24     A      Yeah.
25     Q      -- came up with the idea that you needed to

187

1   write this letter?
2      A      Right.
3             MS. MONTGOMERY:  That's it.
4             MS. YANKANICH:  Nothing further.
5             (The deposition was concluded at 3:32 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

188

1
2   COUNTY OF DAUPHIN              :
3                                 : SS
4   COMMONWEALTH OF PENNSYLVANIA   :
5          I, Teresa K. Bear, Reporter-Notary Public,
6   authorized to administer oaths within and for the
7   Commonwealth of Pennsylvania and take depositions in the
8   trial of causes, do hereby certify that the foregoing is the
9   testimony of DAVID VAN DOMMELEN.
10         I further certify that before the taking of
11  said deposition, the witness was duly sworn; that the
12  questions and answers were taken down stenographically by
13  the said Teresa K. Bear, a Reporter-Notary Public, approved
14  and agreed to, and afterwards reduced to typewriting under
15  the direction of the said Reporter.
16         I further certify that the proceedings and
17  evidence are contained fully and accurately to the best of
18  my ability in the notes taken by me on the within
19  deposition, and that this copy is a correct transcript of
20  the same.
21         In testimony whereof, I have hereunto
22  subscribed my hand this 18th day of June, 2001.
23
24         _____
25         Teresa K. Bear, Reporter
           Notary Public
           My commission expires
           on April 13, 2003

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

48

**PARKS, BARRY**
**05/16/01**



*Exhibit 6*
**CORNEAL VS**
**JACKSON TOWNSHIP**

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2    DAVID B. CORNEAL and SANDRA       :
      Y. CORNEAL,                       :
 3         PLAINTIFFS                   :
                                        :
 4              VS                      :  NO. 1:CV-00-1192
                                        :
 5    JACKSON TOWNSHIP, HUNTINGDON      :
      COUNTY, PENNSYLVANIA; W.          :
 6    THOMAS WILSON, individually       :
      and in his official capacity      :
 7    as Supervisor of Jackson          :
      Township; MICHAEL YODER,          :
 8    individually and in his           :
      official capacity as              :
 9    Supervisor of Jackson             :
      Township; RALPH WEILER,           :
10    individually and in his           :
      official capacity as              :
11    Supervisor of Jackson             :
      Township; BARRY PARKS,            :
12    individually and in his           :
      official capacity as Sewage       :
13    Enforcement Officer of            :
      Jackson Township; DAVID           :
14    VAN DOMMELEN, individually        :
      and in his official capacity      :
15    as Building Permit Officer;       :
      ANN L. WIRTH, individually        :
16    and in her official capacity      :
      as Secretary of Jackson           :
17    Township; and LARRY NEWTON,       :
      individually and in his           :
18    official capacity as              :
      Solicitor to Jackson              :
19    Township,                         :
           DEFENDANTS                   :
20              DEPOSITION OF:  BARRY PARKS
21              TAKEN BY:       PLAINTIFFS
22              BEFORE:         TERESA K. BEAR, REPORTER
                                NOTARY PUBLIC
23
                DATE:           MAY 16, 2001, 11:12 A.M.
24
                PLACE:          ECKERT SEAMANS
25                              213 MARKET STREET
                                HARRISBURG, PENNSYLVANIA
```



PARKS, BARRY
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

2

1   APPEARANCES:
2       ECKERT SEAMANS
        BY: BRIDGET E. MONTGOMERY, ESQUIRE
3           LESLIE A. MALADY, ESQUIRE
4           FOR - PLAINTIFFS
5       MAYERS, MENNIES & SHERR, LLP
        BY: ANTHONY R. SHERR, ESQUIRE
6
            FOR - ALL DEFENDANTS EXCEPT NEWTON
7
        THOMAS, THOMAS & HAFER, LLP
8       BY: MICHELE J. THORP, ESQUIRE
9           FOR - DEFENDANT - RALPH WEILER
10      METTE, EVANS & WOODSIDE
        BY: JENNIFER YANKANICH, ESQUIRE
11
            FOR - DEFENDANT - LARRY NEWTON
12
        ALSO PRESENT:
13
        DAVID B. CORNEAL
14
15
16
17
18
19
20
21
22
23
24
25

3

1               TABLE OF CONTENTS
2               WITNESS
3   FOR PLAINTIFFS          DIRECT CROSS REDIRECT
    Barry Parks
4   By Ms. Montgomery       9    --  164
5   By Ms. Yankanich        --  162  --
    By Mr. Sherr            --  163  --
6
7
8               EXHIBITS

    PARKS EXHIBIT NO.          PRODUCED AND MARKED
9
    1 - Subdivision plan 4/7/00        88
10
    2 - Subdivision plan 2/4/00        104
11
    3 - Sewage facilities planning module    122
12
    4 - Activity records               125
13
    5 - Letter dated 2/8/00            150
14
    6 - Letter dated 3/24/00           156
15
    7 - Order                          168
16
17
18
19
20
21
22
23
24
25

4

1          MR. SHERR:  No stipulations.  We'd like to
2   read and sign.  I'd also like to state for the record that I
3   have this morning given an additional document which is
4   responsive to the request for production of documents which
5   is entitled subdivisions reviewed by HCPC which is the
6   Huntingdon County Planning Commission.  We are informed that
7   these are all the subdivisions that have been reviewed by
8   the county planning commission since 1982 and would indicate
9   all of those plans which were -- subdivision was appropriate
10  since 1982 in Jackson Township.
11         I'd also state that we received a notice of
12  deposition of corporate designee and the designation therein
13  is for an individual or individuals who has or have
14  knowledge or information about the matters relating to the
15  defense of the claims in this lawsuit.  We would first note
16  that --
17         MS. MONTGOMERY:  Stop right there --
18         MR. SHERR: -- the notice does not --
19         MS. MONTGOMERY: -- before I get the court back
20  on the phone.
21         MR. SHERR: -- describe with reasonable
22  particularity.
23         MS. MONTGOMERY:  Mr. Sherr, what are you
24  doing?  This is my deposition.  This is not a discovery
25  dispute with the court.  I have had it with you.  I will

5

1   call the court and ask for sanctions now.
2          You don't open up my deposition by making a
3   speech on the record about stuff that has nothing to do with
4   the deposition that I'm asking for.  Now, that's it.  Stop.
5          MR. SHERR:  I'm sorry, but --
6          MS. MONTGOMERY:  When those documents come
7   into play, we will deal with it.  Stop.
8          MR. SHERR:  I'm sorry.  There's a notice of a
9   deposition of corporate designee for --
10         MS. MONTGOMERY:  It has nothing -- is Barry
11  Parks the corporate designee?
12         MR. SHERR:  Well, that's what I'm making a
13  statement about.  Will you just let me finish?
14         MS. MONTGOMERY:  Then tell me off the record
15  and we'll see if we need it on the record.
16         MR. SHERR:  No, this is on the record.
17         MS. MONTGOMERY:  Off the record now or I'm
18  stopping the deposition.
19         MR. SHERR:  There's a notice of deposition for
20  corporate designee --
21         MS. MONTGOMERY:  I'm calling the court right
22  now.
23         MR. SHERR: -- for May 16, 2001 at 9:30.
24         MS. MONTGOMERY:  Do you want to do this?  Do
25  you want to do this?



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

6

1     MR. SHERR: And I am stating on the record
2 that while your notice of deposition does not state with
3 reasonable particularity the -- it's just a very simple
4 statement for the record, if you'd just sit down.
5     MS. MONTGOMERY: It is inappropriate.
6     MR. SHERR: Why is it inappropriate?
7     MS. MONTGOMERY: It is completely
8 inappropriate. What are you doing?
9     MR. SHERR: Any way, let me finish --
10     MS. MONTGOMERY: I've never seen anybody
11 conduct himself quite this way, Mr. Sherr, and you're not
12 going to get away with it, not here, not with me, not with
13 my client. Do you got that?
14     MR. SHERR: Could I finish?
15     MS. MONTGOMERY: No, you may not finish.
16     MR. SHERR: You're just going to keep talking
17 over me?
18     MS. MONTGOMERY: Yeah, I'm going to keep
19 talking over you until you stop. That's right, I'm going to
20 keep talking over you. I haven't even opened the deposition
21 yet. We haven't even really sworn the witness yet. You
22 interrupt and start making a speech on the record in my
23 deposition. I haven't asked a question about that 30(b)(6)
24 notice. I haven't asked a question about that document.
25     When the time comes, if you want to say

7

1 something and it's appropriate, you may say something. Now,
2 I am going to conduct my deposition and you are going to
3 stop making some -- whatever you're doing here. Is that
4 clear? I noticed the deposition, I control the deposition.
5 This has nothing to do with this deposition, as near as I
6 can tell. You may tell me right now on the record is Barry
7 Parks your 30(b)(6) deposition?
8     MR. SHERR: Are you finished?
9     MS. MONTGOMERY: You can go ahead.
10     MR. SHERR: Now I'll finish. You have a
11 notice of a corporate designee with a very broad subject
12 matter. The mere statement I was going to make that unless
13 we can narrow down the subject matter, every deponent is the
14 corporate designee since they all have knowledge concerning
15 the subject matter or the defense of our claim. And all I
16 was stating, appropriately so, before you got so angry and
17 started conducting yourself in a completely inappropriate
18 manner --
19     MS. MONTGOMERY: No.
20     MR. SHERR: -- was that all of these people for
21 now are the corporate designee since there is a broad
22 subject matter, and that's all so -- you know, come on.
23     MS. MONTGOMERY: Okay. Just so you are on
24 notice, I'm going to take this transcript and I'm going to
25 move for sanctions because I'm not going to let you play

8

1 around with us anymore. It is now what time, 11:30, while
2 we were prevented from starting on time through all sorts of
3 situations. Now, that's enough.
4     MR. SHERR: All right, look, I'm not taking
5 any more from you either. You want to depose this witness
6 now, that's fine. You have a notice for the simultaneous
7 time as these other people. I'm making a simple statement
8 for the record. Why does that get you so upset? What is
9 the problem?
10     MS. MONTGOMERY: Sit back and --
11     MR. SHERR: Take your deposition.
12     MS. MONTGOMERY: -- let me conduct my
13 deposition.
14     MR. SHERR: Take your deposition.
15     MS. MONTGOMERY: That's why it's a problem.
16     MR. SHERR: Take your deposition and act
17 appropriately, would you.
18     MS. MONTGOMERY: If you have an objection to
19 the 30(b)(6) notice, place it in writing like the rules
20 require you to do.
21     MR. SHERR: I wasn't making an objection. I
22 was making a designation, which I'm entitled to.
23     MS. MONTGOMERY: So you're designating Barry
24 Parks as your 30(b)(6) witness?
25     MR. SHERR: I've made my statement. Now take

9

1 your deposition.
2     MS. MONTGOMERY: You're designating Barry
3 Parks as your 30(b)(6) witness as to what?
4     MR. SHERR: Take your deposition.
5     MS. MONTGOMERY: As to what?
6     MR. SHERR: As to information relating to
7 matters relating to the defense of the claims in this
8 lawsuit. Take your deposition.
9     MS. THORP: I believe what you said is that
10 all the defendants in --
11     MR. SHERR: I've made my statement. Now take
12 your deposition.
13
14     BARRY PARKS, called as a witness, being sworn,
15 testified as follows:
16
17     DIRECT EXAMINATION
18
19 BY MS. MONTGOMERY:
20     Q     Mr. Parks, would you state your name for the
21 record, please.
22     A     **Barry Parks.**
23     Q     What's your address?
24     A     **2520 Arbor Bluff Drive.**
25     Q     Arbor Bluff Drive what?



**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

10

1    A    Huntingdon.
2    Q    Have you ever been deposed before?
3    A    No.
4    Q    Well, I'm going to give you a few instructions
5    so you understand the nature of the deposition process,
6    which doesn't usually go like this, but I'm going to ask you
7    a series of questions.  I'm looking for facts related to
8    this lawsuit.  If there is anything that you don't
9    understand about any question that I ask you, you should ask
10    me to clarify it for you, okay.
11         I want to be very clear with you.  I want you
12    to understand the question and you are free to ask me for
13    clarification if it's unclear to you.
14         If you need to break or anything, if you need
15    to go to the men's room or something like that, you can do
16    that.  You can't break to confer with counsel, but you can
17    break to, you know -- for your own comfort.
18         Are you on any sorts of medications or
19    anything like that that would prevent you from answering
20    questions or understanding questions that are put to you?
21    A    I wouldn't think so.
22    Q    Now, you need to keep your voice up.  The
23    court reporter has a difficult time taking down the
24    information if she can't hear you and also we need to wait
25    for each other to -- you know, you need to wait for me to

---

11

1    finish my question and I'll wait for you to finish your
2    answer so we're not interrupting each other because she
3    can't take down two people at once, as she just indicated,
4    okay?
5    A    (Witness nods head affirmatively.)
6    Q    The other thing is that you need to make sure
7    that you give verbal responses for the record.  You need to
8    say yes or no, not -- you know, she can't take down shakes
9    of the head or nods of the head or anything, okay?
10    A    Okay.
11    Q    Can you give me just a little information
12    about your background, please.  Give me your educational
13    background initially.
14    A    Huntingdon High School.
15    Q    You graduated from high school?
16    A    Yeah.
17    Q    Did you have any post high school education?
18    A    I went a year to technical school.
19    Q    What kind of technical school was that?
20    A    Auto and diesel mechanics.
21    Q    And diesel mechanics?
22    A    (Witness nods head affirmatively.)
23    Q    Have you had any other types of training at
24    all related to the work that you do, for example?
25    A    Just the — I guess it's PSATS now is in

---

12

1    charge —
2         MS. MALADY:  Pennsylvania State Association of
3    Township Supervisors.
4         THE WITNESS:  They have continuing ed. for the
5    sewage officers.  Every two years we renew our license and
6    we have to have a certain amount of credits to do that.
7    BY MS. MONTGOMERY:
8    Q    Well, that brings us -- as a sewage officer,
9    you're talking about?
10    A    Yes.
11    Q    Sewage enforcement officer.  So in order to
12    become a sewage enforcement officer, what did you have to
13    do?
14    A    Pass an exam.
15    Q    An exam given by the state?
16    A    Yes.
17    Q    And when did you do that?
18    A    Ninety-one.
19    Q    Did you take any training before sitting for
20    the exam?
21    A    Studied the manual.
22    Q    So there's a manual that the Commonwealth --
23    A    Yeah.
24    Q    -- provides to you?
25    A    And the regulations.

---

13

1    Q    And then you said every two years you have to
2    take -- you have to do an update or some sort of --
3    A    You have to reissue your license and I'd say
4    -- in the last few years, I'd say five, six years, they
5    started a continuing ed.
6    Q    And so you've taken that, right, and you're
7    current on your continuing education requirements?
8    A    Yes.
9    Q    Do you hold any other licenses or certificates
10    other than a sewage enforcement officer license?
11    A    Treatment plant operator.
12    Q    A waste treatment plant?
13    A    Yeah.
14    Q    And that's also with the Commonwealth of
15    Pennsylvania?
16    A    Yes.
17    Q    Did you get that at the same time you got your
18    sewage enforcement officer license?
19    A    No.
20    Q    When did you get that?
21    A    I would guess '93, '94.
22    Q    So are you employed by the county or by the
23    township in that capacity as well with waste treatment
24    operation?
25    A    No, I help with the treatment plant in one

---

4



**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

14

1  township.
2    Q    In one township?
3    A    (Witness nods head affirmatively.)
4    Q    Not in Jackson Township?
5    A    No.
6    Q    So you're currently employed as the sewage
7  enforcement officer for Jackson Township, correct?
8    A    Probably more under contract with -- I'm not
9  employed by them.
10    Q    You have a contract with them?
11    A    I'm hired every -- every January when they do
12  re --
13        MR. SHERR:  Reorganization.
14        THE WITNESS:  Reorganization.  They hire
15  people that's going to work with them for that year and I'm
16  hired at that time if they want to have me that year.
17  BY MS. MONTGOMERY:
18    Q    Do you do sewage enforcement work for other
19  townships as well?
20    A    Yes.
21    Q    How many other townships?
22    A    I would say 18.
23    Q    Oh.
24    A    I have 17 other ones.
25    Q    All around Huntingdon County maybe?

15

1    A    Fourteen in Huntingdon, four in Bedford
2  County.
3    Q    And plus you do waste treatment plant work
4  for --
5    A    I don't do very -- it's just a very small
6  thing in Hesston, a town of 50 houses.
7    Q    So your sewage enforcement officer work I take
8  it for Jackson Township is not a full-time job?
9    A    Not just for Jackson Township, no.
10    Q    But that is your only -- that is your primary
11  or only source of employment, is as a sewage enforcement
12  officer?
13    A    Yes.
14    Q    For various townships?
15    A    Yes.
16    Q    So how long have you worked for Jackson
17  Township?
18    A    Ten years.
19    Q    Since you first got your license?
20    A    Yes.
21    Q    What did you do prior to your sewage
22  enforcement work?
23    A    Excavating contractor.
24    Q    So you've been a sewage enforcement officer
25  for Jackson Township for 10 years.  To whom do you report

16

1  there?
2    A    The supervisors.
3    Q    How do you go about reporting to the
4  supervisors, what's the process?
5    A    Well, any work I do has to go through the
6  supervisors or -- I take care of the responsibilities for
7  the sewage officer job for the supervisors.  That's what I'm
8  hired to do.
9    Q    But I think my question was how do you go
10  about reporting to them.  Do you go to the township meetings
11  to report to them or do you file written reports on a
12  regular basis or what?
13    A    Reporting to them about what I do?
14    Q    Yes, about your work.
15    A    Well, there's some things I don't need to
16  contact them about.  There's other things that I have to
17  have their approval on before they can go through the
18  process.  It would depend on where they're starting at.
19    Q    I'm going to back up a second just so we have
20  a clear understanding of what I'm trying to ask you.  I
21  asked you who do you report to and I believe that you
22  answered -- correct me if I'm wrong, I believe that you
23  answered that you report to the township supervisors?
24    A    It depends on -- some things I report -- I
25  have to check with and I send -- more reports I send to DEP.

17

1    Q    I see.  When you --
2    A    What you're calling -- what I'm thinking
3  you're meaning as reports.
4    Q    Yes, I'm using report more sort of generally.
5  You know, if you are assigned some sort of job, you know, if
6  you're assigned a particular project by Jackson Township by
7  the supervisors, what is the process that you use to report
8  back to them?
9    A    I'm not usually assigned the project.
10  Somebody calls usually the secretary and she says -- just
11  says you need to contact me.
12    Q    So the public contacts you directly because
13  they want you to come out and --
14    A    After they know I'm the person they need to
15  deal with.
16    Q    And then if you want to tell the township in
17  some way what is going on with some person who contacts you,
18  how do you go about keeping the township informed of what's
19  going on?  Do you do it orally, do you do it in writing, do
20  you go to the township meetings, a combination of all three?
21    A    Again, it depends on where this is starting at
22  and what people want to do.  If it's an already existing
23  lot, I can do that on my own.  If it's something that
24  requires planning, I do the work and then the planning
25  modules are prepared and then that is presented to the



18

1  township.
2     Q     So give me an example of when there's an
3  already existing lot that you can do on your own.  Can I
4  have an example of that?
5     A     If it's a parcel of ground that existed before
6  1972 and is vacant, no dwellings, I could do testing and
7  issue a permit on that, or if it's been a lot subdivided
8  from a larger tract since -- and approved since 1972, that's
9  an existing lot.  I could do testing and approve the permit
10  on that.
11    Q     When you started working with Jackson Township
12  was your initial job with them as a sewage enforcement
13  officer or did you serve Jackson Township in any other
14  capacity prior to that?
15    A     I started as a sewage officer.
16    Q     Is there any sort of opportunity for promotion
17  or anything like that within or is it just once you're the
18  sewage enforcement officer that's it, right?
19    A     That's it.
20    Q     Is there just one of you for the township?
21    A     There's an alternate.  In case I have a
22  conflict or I couldn't get to it and something needed done,
23  there's a backup.
24    Q     And who is the alternate?
25    A     Right now it's Theodore Koch.

19

1          THE REPORTER:  Could you spell that.
2          THE WITNESS:  It's on the subdivision here.
3  His dad did a subdivision in '91.  K-o-c-h.
4  BY MS. MONTGOMERY:
5     Q     So if somebody from the public calls you and
6  you can't do it, then they're referred to Mr. Koch, is
7  that --
8     A     Yes.
9     Q     You mentioned a couple minutes ago that you
10  had done excavation work prior to being licensed as a sewage
11  enforcement officer.
12    A     Yes.
13    Q     Did you work for yourself?
14    A     Yes.
15    Q     Did you work at any time for anybody else as a
16  -- in the excavation business?
17    A     No.
18    Q     When you worked for yourself, did you have
19  employees?
20    A     No.
21    Q     You didn't have anybody else working with you?
22    A     (Witness shook his head negatively.)
23    Q     Do you do excavation work in connection with
24  sewage work?
25    A     Yes.

20

1     Q     Anything else?
2     A     Yes.
3     Q     And what was that?
4     A     Any type of earth moving.
5     Q     Do you have any other employment right now
6  besides your sewage enforcement officer work and your
7  occasional -- very occasional waste treatment plant operator
8  work?
9     A     No.
10    Q     Does Jackson Township have any public sewage
11  facilities?  Do they have any -- I guess it would be public
12  sewer, right?
13    A     No.
14    Q     Town sewer or township sewer or anything like
15  that?
16    A     No.
17    Q     Does the township have a set of regulations or
18  anything like that that tell you exactly what you're
19  supposed to do with respect to your sewage enforcement
20  officer work?
21    A     There's statewide regulations.
22    Q     So they don't have anything in addition to
23  that?
24    A     Not as far as sewage.
25    Q     Do they have any manual or any sort of job

21

1  description or anything like that for you?
2     A     It's all state regulation.
3     Q     Are you under any sort of a written contract
4  with them?
5     A     No.
6     Q     You just go to the -- you said in January of
7  every year the township supervisor's vote as to whether or
8  not you're going to be the officer; is that correct?
9     A     Yes.
10    Q     Do you get a letter of appointment or
11  something like that, you know, a letter appointing you?
12    A     I'd probably get a notice that I didn't if I
13  didn't, but I don't recall ever getting a letter.
14    Q     Do they send you any -- does the township send
15  you any materials, any sort of written materials, whether
16  they're from the state or from any other source?  Does the
17  township -- has the township ever given you any sort of, you
18  know, job description type materials or regulations or
19  anything like that?
20    A     That's all Chapter 71, 72, 73 of the sewage
21  code.
22    Q     Which you as a licensed sewage enforcement
23  officer have in your possession anyway; is that correct?
24    A     Yes.
25    Q     In your capacity as the sewage enforcement



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

22

1  officer for Jackson Township are you required or your
2  alternate -- or is your alternate required to inspect every
3  piece of property on which there's going to be construction
4  for on-lot -- for an on-lot system?
5      A      If it -- almost always, yeah.
6      Q      Are there exceptions to that?
7      A      If there's -- the only thing I can think of is
8  a replacement dwelling. If Mr. Corneal's farmhouse burnt
9  down and he wanted to rebuild within a year the same number
10  of bedroom house, he could do that without a permit.
11      Q      Okay.
12      A      Same number of bedrooms within a year and
13  there's not an ongoing investigation about a malfunctioning
14  system.
15      Q      So I suppose through his building permit
16  application it would be determined that he was looking to
17  build a house with the same -- or a dwelling with the same
18  number of bedrooms; is that correct? That's how you would
19  track this sort of information or this --
20      A      If he was replacing a dwelling, yeah.
21      Q      Let's talk a minute about -- you spoke a
22  moment ago about inspecting properties on which a building
23  is to be constructed for purposes of an on-lot system. Can
24  you just tell me, you know, what that inspection process
25  entails, what do you do? How do you go about that process?

---

23

1      A      What stage are we? Is this a brand new vacant
2  lot?
3      Q      Yes, just a brand new -- a new property that
4  has no building on it, no septic system on it of any sort.
5      A      Assuming it's an approved lot?
6      Q      An approved building lot.
7      A      It's a DEP approved lot or a prior '72 lot?
8  If the people contact me, I inform them that the first thing
9  we need to do is have a backhoe there to do soil probes,
10  assuming that this hasn't been done prior, you know.
11      Q      To do soil probes, is that what you said?
12      A      Yes.
13      Q      Okay, go ahead. And then what?
14      A      We -- I meet with the backhoe person. The
15  owner can be there if they want to and we look for suitable
16  soil to filter sewage before it gets into the water table.
17      Q      So you do that with the backhoe person? Is
18  anybody else involved in that?
19      A      That's all that needs to be there.
20      Q      Sometimes there are others involved in it?
21      A      If somebody wants to be there.
22      Q      You mean like an architect or whatever, a
23  building supervisor or something like that?
24      A      If the client -- if the property owner would
25  like to have somebody there.

---

24

1      Q      So is that -- what you're referring to right
2  now, is that what you would call test pits, you're looking
3  for test pits?
4      A      Yes.
5      Q      So you try to find an area that's suitable for
6  test pits, correct? And that's the same as soil probes; is
7  that correct?
8      A      Test pits and soil probes are the same thing,
9  yes.
10      Q      That's what I wanted to know. And then what
11  happens? Once you find suitable areas for test pits, what
12  do you do?
13      A      Well, there's a two-step procedure. The first
14  time we're looking for filter for sewage, filter depth.
15  Then we want to know how well that area takes water so we
16  dig small holes by hand and do a perc test which means
17  how good does that area take water.
18      Q      Let's back up one second. First you look for
19  an area that's suitable to filter sewage, is that what you
20  said?
21      A      Yeah.
22      Q      So you're looking for a particular type of
23  soil, correct?
24      A      Yeah, and a depth.
25      Q      And the depth of the soil?

---

25

1      A      (Witness nods head affirmatively.)
2      Q      And you're looking for it to contain certain
3  components or -- or what are you looking for, is a better
4  way to ask that question?
5      A      Something that's suitable filter.
6      Q      What tells you that it's going to be a
7  suitable filter?
8      A      Well, it doesn't have a limiting zone, which
9  is generally the sign of a high water table, or open
10  channeled rock, which means the sewage can go through that
11  and not get treated before it gets into the water table; or
12  if it's a high water table, the water's already there some
13  times of the year.
14      Q      Okay, you answered my question. So maybe that
15  sort of answers the second part of the question. I thought
16  you had sort of divided it into two. You said you look
17  for --
18      A      There's two limiting zones.
19      Q      And you said one of them is the water table.
20      A      Open channeled rock and sign of a high water
21  table.
22      Q      So after you do that, what happens?
23      A      Is this an existing lot? I fill out soil
24  sheets for that lot. If it is a vacant, ready to build lot,
25  I send that to the person that wants to build with an

---



PARKS, BARRY
05/16/01

CORNEAL  VS
JACKSON TOWNSHIP

---

26

1  application. They get a design done, fill out the
2  application, return it to me and I can issue them a permit.
3  Q  The application is what, you mean the sewer --
4  the sewage permit application?
5  A  Yes.
6  Q  Is that what you're talking about?  You send
7  them the application after you go out and do the perc test?
8  A  Yes.
9  Q  Now, you said they design it.  Do you mean
10  sewer modules, is that what you're referring to?
11  A  No, design.
12  Q  They design the --
13  A  In an existing lot you don't need a sewage
14  module.
15  Q  How are you using the term existing lot?
16  A  A lot that was prior to '72.  Like I explained
17  a while ago, prior to '72 that is vacant or one that has
18  been in a subdivision and is vacant.
19  Q  And what's the alternative to an existing lot,
20  what's the other type of lot?
21  A  A proposed lot.
22  Q  When you say lot, you're not talking about a
23  building lot, you're talking about a --
24  A  A building lot.
25  Q  You are talking about a building lot, okay.

---

27

1  A  Whether it's one acre or a hundred acres.
2  Q  How did you classify Mr. Corneal's property
3  that's the subject of this litigation?
4  A  It isn't a vacant lot.  It has a dwelling on
5  it and at this point it is a lot.  Until it is -- has an
6  approved sewage module, it is a lot.  So it already has a
7  dwelling on it.  To do any more building, we need to have a
8  sewage module approved by DEP and the township.
9  Q  Let's go back now again to -- you talked about
10  after you do the test pits and such and if you find
11  appropriate test pits then you send them to the member of
12  the public or, you know, the person who seeks to build an
13  application, right?
14  A  If it's a vacant lot.
15  Q  If it's a vacant lot.  If it's not a vacant
16  lot, what do you do?
17  A  Then somebody has to prepare a sewage module.
18  If it's going to be subdivided, I mean actually make two
19  different deeds for it, a surveyor must do that.  If you're
20  doing a second dwelling on that lot, DEP calls that an
21  equivalent subdivision.  It still needs a sewage module,
22  still needs township approval and still needs DEP approval.
23  I need a DEP code number before I can send an application
24  and issue a permit.
25  Q  So I'm a little confused and you'll just have

---

28

1  to help me.  I don't have a lot of experience with sewage
2  enforcement matters so -- except for the ones I have applied
3  for which my husband handles.  If you just explain to me
4  -- you said if it's an existing lot, then you need to get a
5  septic design.  If it's a vacant lot, then you need a sewer
6  module, correct, somebody has to design a sewer module; is
7  that correct?
8  A  If it's a vacant lot, meaning a lot before '72
9  or a DEP approved lot, meaning a vacant piece of ground,
10  once you have a lot vacant, then I can issue a -- I'll send
11  you an application with the test results.  You take the test
12  results, give it to a person who can do a design for you.
13  Q  Septic design?
14  A  Yes.  When the design comes back with the
15  completed application, I can issue a permit.
16  Q  So you can issue a --
17  A  Assuming that was a DEP approved lot or prior
18  to '72.
19  Q  And then the alternative if it's not a DEP
20  approved lot or prior to '72, which together means -- equals
21  vacant lot, correct?
22  A  Yep.
23  Q  If it's not that, then what is it?
24  A  It's a subdivision.
25  Q  And so then what happens?  So you -- backing

---

29

1  up a second.  You can issue a permit for vacant lots,
2  correct?
3  A  DEP approved or prior to '72.
4  Q  Does it go any further than that?  Does it go
5  any further beyond you?  Does it have to go to the township
6  for second approval or anyone else?
7  A  No.
8  Q  Just you?
9  A  If it's a DEP approved lot, it's already been
10  approved.
11  Q  And so if DEP approves it, where does the
12  township come in itself?  Do they have anything to say about
13  it?
14  A  It had to approve it -- it had to do a module
15  to get it -- send it to DEP before they would approve it.
16  Q  Now I got you.  So going -- assuming you don't
17  have that, then you need to start with the module itself,
18  right?
19  A  Do the testing, then the module.
20  Q  And then what?
21  A  After the module is approved?
22  Q  Yes.
23  A  Then I can issue permits, depending on what
24  the module says.  If the module comes back and it was
25  approved for five lots, then we have five buildable approved

---



**PARKS, BARRY**
05/16/01

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

30

1   lots. If it said equivalent subdivision or second dwelling
2   subdivision and it comes back, then I can issue a sewer
3   permit -- a sewage system in for that second dwelling.
4       Q        Who designs the sewer module?
5       A        The module, if it is a subdivision, meaning
6   actually dividing it, has to be done by a surveyor. If it's
7   a second equivalent subdivision, second house on the lot, it
8   just needs to be somebody that understands the regulations
9   well enough to do it. It can be a consultant and it can --
10  it can still be a surveyor.
11      Q        So you said that you can issue a permit in two
12  situations when there's a sewer module involved; isn't that
13  correct?
14      A        I can issue a permit in one --
15      Q        In one situation?
16      A        In one situation. If it's a prior to '72 lot
17  or if it's a DEP approved lot.
18      Q        But in that case you're just going with the
19  septic design. We're now talking about the sewer module. I
20  thought you talked about after the sewage module was done
21  there was a situation in which you could issue a permit?
22      A        Then we have a DEP approved lot after --
23      Q        If the sewer modules are approved?
24      A        Yes.
25      Q        That's what I'm trying to get to. The sewer

---

31

1   modules go to you first for review?
2       A        Generally.
3       Q        And if you approve them, how do you indicate
4   that you've approved them?
5       A        I sign them.
6       Q        You just sign off on them?
7       A        Yep.
8       Q        And that means you've approved them. And then
9   what happens?
10      A        Then they go to either the -- sometimes
11  they'll go to the planning commission first. Different
12  townships have the option of handling it different, but, you
13  know, on the sewage module I have to sign it. There has to
14  be some indication that the planning commission has looked
15  at -- signed it or looked at it and then the supervisors
16  have to sign it.
17      Q        You say sometimes it goes to the planning --
18  you're talking about the planning commission first. You're
19  talking about the Huntingdon County Planning Commission?
20      A        Well, some townships have their own planning
21  commission.
22      Q        Let's talk about Jackson Township. How do you
23  do it in Jackson Township?
24      A        I sign them and give them back to the
25  supervisors.

---

32

1       Q        And that's how you always do it, give them
2   back to the supervisors?
3       A        Or I may just send them to -- it depends on
4   whether they want them sent to the county.
5       Q        So sometimes you send them to --
6       A        And so maybe I give them back to them and they
7   give them to the county or maybe the owner takes them to the
8   county.
9       Q        It just depends what the supervisors tell you
10  about what they want?
11      A        It kind of depends on what order things are
12  happening, I guess.
13      Q        Does Jackson Township have its own planning
14  commission?
15      A        No.
16      Q        So sometimes you just give it back to the
17  township and do they sometimes just approve it? Does the
18  township -- do the supervisors sometimes just approve it?
19      A        Not in recent years.
20      Q        When you say recent years, can you be more
21  specific, not in how long?
22      A        Five years, something like that.
23      Q        In five years. So what did they do instead of
24  just approving it on their own, what did they do?
25      A        Send it to the county.

---

33

1       Q        They send --
2       A        The sewage module to the county.
3       Q        For the county's approval?
4       A        Yes.
5       Q        Or disapproval?
6       A        Yes.
7       Q        Do they approve it -- do they have to approve
8   it before they send it to the county?
9       A        No.
10      Q        Do they approve it after they send it to the
11  county? Do they have the right of approval?
12      A        They have to approve it before it can go to
13  the DEP.
14      Q        The supervisors do?
15      A        (Witness nods head affirmatively.)
16      Q        In Jackson Township now we're talking about.
17      A        Um-hum.
18      Q        You approve it, you either give it to them or
19  the customer or you, somebody takes it to the county
20  planning commission in every case?
21      A        I would say every case.
22      Q        In every case?
23      A        I'm not really involved -- after I've looked
24  at it, give it back -- I'm not really involved in it until I
25  get a letter from DEP saying it was approved.

---



PARKS, BARRY
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

34

1    Q    Once you approve it, you're not really
2    involved in it after that, you say, until --
3    A    Not until the -- it goes to the other chains,
4    as it goes to DEP, when I get that letter from DEP saying
5    I'm authorized to issue permits, I'm out of it. I'm not
6    connected with it.
7    Q    Well, let me see if we could discuss this a
8    little more. You worked for the township for 10 years, you
9    say?
10   A    Yes.
11   Q    So at some point did the township approve
12   modules after you did an initial approval without sending it
13   to the Huntingdon County Planning Commission?
14   A    Yes.
15   Q    Do you know why they changed doing that?
16   A    When -- it was about the time Ann Wirth became
17   secretary.
18   Q    And did she change it?
19   A    The township has the option of -- on a minor
20   subdivision which is less than 10 -- 10 building lots, the
21   township has the option of sending it to the county. The
22   fellow that was secretary before was also one of the
23   supervisors, way back, before I was even involved, and
24   generally they didn't send them to the county. On a major
25   subdivision it's required, but Ann --

35

1    Q    What?
2    A    They just decided to start sending everything
3    to the county.
4    Q    When Ann came on board?
5    A    It seemed like it was about that time. Again,
6    I'm not in that -- in that little phase. My thing is the
7    same whether the county -- some townships do, some don't.
8    Q    But in any event, every sewer module goes
9    through you first, correct? In Jackson Township we're
10   talking about. It goes through you first?
11   A    Yeah, or the alternate.
12   Q    Or the alternate, correct. Typically, you
13   know, do you have a time line for receiving the sewer
14   module, looking it over and either approving or disapproving
15   it? How long does it typically take you to do that?
16   A    I think -- I think it's required -- it's in
17   the regulation. I try to get rid of them in a day or -- in
18   a week or two.
19   Q    And then typically -- when they go to the
20   county for approval, okay, they come back to the township
21   from the county, correct?
22   A    Yep.
23   Q    And then the township has to give approval,
24   correct?
25   A    Yes.

36

1    Q    And then the township sends it to DEP?
2    A    Yes.
3    Q    For final approval?
4    A    For their approval.
5    Q    For DEP's approval?
6    A    There is some townships that may send it to
7    DEP and in the meantime there will be another little
8    something that needed done and after it comes back they'll
9    give their final approval on it.
10   Q    What about Jackson Township?
11   A    I'm -- again, I'm a little bit out of that. I
12   just handle the sewage. There's other issues.
13   Q    Do you find out typically like when -- when do
14   you find out whether or not the county has approved a sewer
15   module that you've already preapproved?
16   A    Some things they copy me on but not always.
17   Q    When do you typically find out when the
18   township has -- whether or not the township has approved
19   something that you've preapproved?
20   A    Sometimes it might not be until I get a letter
21   from DEP.
22   Q    But it won't go to DEP unless they've approved
23   it, right?
24   A    Right.
25   Q    Unless the township -- Jackson Township has

37

1    approved it, it won't go to DEP?
2    A    Unless any township approves it, it won't go
3    to DEP.
4    Q    It goes to DEP for approval and then comes
5    back to the township?
6    A    The township gets -- sent the letter, I get a
7    copy.
8    Q    From DEP?
9    A    The landowner would get a copy.
10   Q    And then you can go about installing whatever
11   you do and that's the next step?
12   A    Then I can issue an application.
13   Q    Or a permit -- an application?
14   A    An application for a permit.
15   Q    So then after they have all those approvals,
16   you issue an application for a permit and then what happens?
17   A    Once I have the design and the completed
18   application, I can issue a permit.
19   Q    Are you the last say on that permit once it's
20   gone through all these other processes?
21   A    In most cases.
22   Q    In what situation wouldn't you be the last say
23   on that permit?
24   A    Right now I can't think of any, what it would
25   be.



**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

38

1    Q      Have you ever issued a permit in this sewer
2   module scenario that's gone all the way through where it's
3   been disapproved after you've issued a permit?  Has that
4   ever happened?
5    A      The permit?
6    Q      Yes.  In Jackson Township I'm talking about.
7    A      I can't recall.
8    Q      You can't recall that it ever happened; is
9   that what you mean?
10   A      Yeah.
11   Q      You can't recall an instance of it ever
12  happening?
13   A      I was trying to think of the time -- if I saw
14  or heard something happened on that property that things
15  were disturbed and I found that out, I wouldn't be able to
16  issue a permit.
17   Q      But once --
18   A      But the designer would probably tell me that
19  too.
20   Q      But once you've issued the permit, really was
21  my question, can you think of an instance after you've
22  issued the permit in which the permit was somehow disallowed
23  or disapproved or -- let me say this, your permit issuance
24  was overruled in some way?  Can you think of an instance
25  when that occurred?

39

1    A      No.  There may have been -- see, a copy -- I
2   make three copies.  I keep a copy and give -- send it to the
3   township, because I've done this, a copy goes to the
4   property owner, a copy goes to DEP.  There could possibly
5   have been a little glitch in the design that the DEP person
6   would catch that I missed maybe that -- and I would get a
7   letter on it saying that this needs changed or something,
8   but as far as it being totally disapproved, I can't think of
9   a situation.
10   Q      For Jackson Township approximately how many
11  sewer modules are you requested to review in a given year?
12   A      I'm -- some years are busier than others.
13  Total modules are probably around a half a dozen.
14   Q      A year?
15   A      That's average probably.
16   Q      Sometimes more, sometime less?
17   A      (Witness nods head affirmatively.)
18   Q      Do you know how many you were asked to review
19  in the year 2000?
20   A      No.
21   Q      How about so far this year for Jackson
22  Township?
23   A      I can't think of one.
24   Q      How about for other townships in general, how
25  many sewer modules have you had to review this year, like

40

1   just -- I'm trying to get a feel for your experience really
2   right now.  So say in 2000 can you think of how many sewer
3   modules you reviewed altogether for all the townships you
4   perform this kind of work for?
5           MR. SHERR:  Let me object to the form of the
6   question in that it's a compound question.  You can answer
7   it.
8   BY MS. MONTGOMERY:
9    Q      Did you understand the question?  Did you
10  understand --
11   A      It varies a lot.  You know, just like the
12  economy, what's -- when things are -- the economy is booming
13  people are trying to make building lots.  A lot of things
14  happen.
15   Q      Well, I was really asking you for the year
16  2000, or maybe I didn't make that clear and I apologize.
17  For the year 2000 can you estimate for me how many sewer
18  modules that you approved for all the different townships
19  that you work for?
20   A      Well, there's -- we actually get into
21  something a little different there.  If you're in an area
22  that does not have limestone soils, it is not in a high
23  quality watershed, does not have reports of nitrates in the
24  water, you can request an exemption from doing the module.
25  Half of my -- I'm not figuring -- not exactly, but I'm going

41

1   to say half my townships we can do that in.
2           You can't in Jackson Township because it's
3   high quality watershed.  So to ask how many modules -- well,
4   I'm going to say 10, but it could be 25, you know, just,
5   you know, what's happening.  One year a person would do a
6   major module and the next 10 years he can sell lots without
7   doing a module.  If three people do three modules, there
8   might be a hundred lots out there and you wouldn't have to
9   do a module until those hundred lots were sold.  So you just
10  can't say there's so many done a year.
11   Q      Well, I didn't really ask for so many a year.
12  I was really asking for the year 2000, is what I was trying
13  to -- are you saying that -- well, no, I'm really asking you
14  just a straightforward question.  If you could estimate for
15  me the number of modules that you were asked to review in
16  all the different townships that you worked for during the
17  year 2000, that's all.
18   A      Estimate?
19   Q      Yes, that will do.
20   A      But some of them was able to do the
21  exemption.  Are you saying in townships that they have to do
22  the module?
23   Q      Yes.
24   A      Again, 12, 15, I'm going to say.
25   Q      I think you said for Jackson Township you



**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

42

1  reviewed maybe six in the year 2000?
2  A    Not last year.
3  Q    No?
4  A    (Witness shook his head negatively.)
5  Q    I thought you said half a dozen for Jackson
6  Township?
7  A    I said that was an average.
8  Q    An average.  You're right, I'm sorry.  That's
9  quite right.  For the year 2000 do you recall any of the
10  sewer modules -- do you recall any sewer module that you
11  approved initially being disapproved then by the township
12  supervisors?
13        MR. SHERR:  Is this specifically for Jackson
14  Township?
15        MS. MONTGOMERY:  For Jackson Township.
16        THE WITNESS:  You better ask me that again.
17  BY MS. MONTGOMERY:
18  Q    For Jackson Township do you recall for the
19  year 2000 for any of the sewer modules that you approved
20  initially, do you recall any of them being rejected by the
21  township or disapproved, if that's the word you use, by the
22  township?
23  A    I guess Mr. Corneal's.
24  Q    Is that the only one?
25  A    There was a couple others on hold from the

---

43

1  moratorium but since then they've been approved.
2  Q    Do you recall any of the sewer modules that
3  you approved during the year 2000 being disapproved by the
4  county planning commission as opposed to being disapproved
5  by Jackson Township?
6  A    My understanding of the county planning
7  commission on minor subdivisions is advisory only.
8  Q    Okay.  So do you recall the Huntingdon County
9  Planning Commission advising against approval of any of the
10  sewer modules that you had initially approved during the
11  year 2000 for Jackson Township?
12  A    They always find something to comment bad
13  about.
14  Q    They do?
15  A    It seems like it.
16  Q    So they send their comments back to the
17  township and the township can take them or not take them,
18  correct?
19  A    That's the way I understand it.
20  Q    Can you remember back to 1999, do you recall
21  any of the sewer modules that you initially approved being
22  later disapproved by Jackson Township?
23  A    I can't think of one.
24  Q    How about 1998?
25  A    I can't think of anything.

---

44

1  Q    This may be too much to ask, but let's try for
2  the whole 10 year period you've been working with Jackson
3  Township as the sewage enforcement officer.  Do you recall
4  any sewer module that you initially approved being
5  disapproved by Jackson Township?
6  A    Not that I can recall.
7  Q    Let's talk about the testing that you did for
8  the Corneal property, the work that you did on the Corneal
9  property.  How did that come about, what was the initial
10  contact?
11  A    I think Mr. Corneal called me early July.
12  Q    Of?
13  A    Ninety-nine.
14  Q    Of 1999?
15  A    (Witness nods head affirmatively.)
16  Q    Had you heard anything about his plans for his
17  property prior to the initial contact that you just spoke
18  about in July of 1999?
19  A    Probably when I first talked to him -- I was
20  dealing with his brother in another township and may have
21  had initially thought it was the brother that I was talking
22  to and he bought it but --
23  Q    You mean Mr. Corneal's brother?
24  A    Yeah.
25  Q    You --

---

45

1  A    But after a little conversation that was
2  quickly straightened out.
3  Q    That it was David Corneal you were talking to?
4  A    Not the one I was working with in another
5  township.
6  Q    Oh, okay.  Now, had you talked to anybody else
7  about Mr. Corneal's property in Jackson Township?
8  A    I don't recall of it.
9  Q    Not that you recall?
10  A    (Witness shook his head negatively.)
11  Q    So the first time you discussed this property
12  and Mr. Corneal's plans for it was with Mr. Corneal?
13  A    That's the way I remember it, yes.
14  Q    Let me ask you this:  Before Mr. Corneal
15  bought the property, had you ever had any interaction with
16  anybody or contact with anybody about that property?
17  A    No.
18  Q    Had there ever been any other request that
19  you're aware of for any permit or application or anything
20  like that in connection with that property in Jackson
21  Township that Mr. Corneal bought?
22  A    I remember doing work across the road one day
23  and there was an older fellow there mowing the grass.
24  That's the only thing I ever even saw being done there.  I
25  don't remember seeing cars there then, but it's a -- a

---



**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

46

1  little isolated from where I'm usually at.

2  Q    It's an isolated piece of property?

3  A    Not totally, but it's on an old part of the

4  road that's been replaced by a new part of the road.

5  Q    So Mr. Corneal contacted you about July 1999?

6  A    Yes.

7  Q    And what was the substance of that

8  conversation, if you recall?

9  A    Now, I talk to -- when I get home tonight, I'm

10  probably going to have 15 calls on my answering machine that

11  I'll spend an hour or two returning after I go to a meeting

12  tonight.  So if you figure I talk to a dozen people a day

13  and it's two years ago, I can't really quote conversations

14  on the phone.

15  Q    That's okay, you can --

16  A    It was generally he told me what he wanted to

17  do and I asked him how big a property, how many lots and

18  then told him the first thing we need to do is meet there

19  with a backhoe.  That's generally what I explain to people,

20  you know, you're going to be doing a sewage module, your

21  surveyor will do that, but the place we start is see what's

22  there for soil.

23  Q    So you bring -- basically you bring an

24  excavator in, right, with a backhoe; is that what you're

25  talking about?

---

47

1  A    Excavator meaning a contractor?

2  A    Yes.

3  A    There's a machine called an excavator.

4  Q    Right, an individual who performs excavating

5  work you bring in.

6  A    Yeah.

7  Q    Who contacts the individual to do the

8  excavation work?

9  A    It's the property owner's responsibility to

10  line that up.

11  Q    Do you give names occasionally?  Do you tell

12  -- you know, help people find a local individual involved

13  in excavation work?

14  A    If I'm asked, I'll give a couple names.

15  Q    Do you recall whether you advised Mr. Corneal

16  who to call for excavation work?

17  A    I don't recall.

18  Q    You don't recall?

19  A    (Witness shook his head negatively.)

20  Q    Do you know -- do you remember who performed

21  the excavation work for Mr. Corneal?

22  A    Eagle Excavating.

23  Q    Eagle Excavating?

24  A    Um-hum.

25  Q    And are you familiar -- very familiar with

---

48

1  that company, Eagle Excavating?

2  A    Yeah.

3  Q    Do you work with them often in the course of

4  your sewage enforcement officer work?

5  A    Yeah.

6  Q    Would you say that you work with them

7  primarily --

8  A    No.

9  Q    -- in Jackson Township?

10  A    No.

11  Q    There are others who perform excavation work

12  for you -- or with you really on projects in Jackson

13  Township?

14  A    They're not -- the other people aren't from

15  Jackson Township, but there's other people that work in

16  Jackson Township.

17  Q    Thanks.  Well, tell me about Eagle Excavating.

18  What is that company?  Who works in that company?

19  A    It's Tom Wilson and his son, I think, but I'm

20  -- I'm just -- those are the contact guys.  I --

21  Q    Do you know whether anybody else works for

22  them?

23  A    They have other people, yeah.

24  Q    They have a crew?

25  A    Yeah.

---

49

1  Q    Do you recall whether Mr. Corneal asked you

2  who he might call to help him with the excavating work?

3  A    I don't recall that.

4  Q    So the first time you talked to Mr. Corneal

5  was by telephone, right?

6  A    The way I remember it, yeah.

7  Q    And then you agreed to meet in person at the

8  property with the excavator?

9  A    Yeah.

10  Q    And when did that happen, do you recall,

11  around the same time frame?

12  A    It's on the soil sheets there.  7/21.

13  Q    Ninety-nine you're talking about?

14  A    (Witness nods head affirmatively.)

15      MS. THORP:  Is that yes?

16      THE WITNESS:  Yes.

17  BY MS. MONTGOMERY:

18  Q    I'm sorry, you need to say yes or no.

19  A    Yes.

20  Q    So you met out at Mr. Corneal's property with

21  somebody from Eagle Excavating?

22  A    Yes.

23  Q    Do you recall who that was that showed up for

24  Eagle Excavating?

25  A    I think it was a nephew.

---



PARKS, BARRY
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

50

1   Q   A nephew of whom?
2   A   Tom Wilson's.
3   Q   He works for him at Eagle Excavating?
4   A   (Witness nods head affirmatively.)
5   Q   What's his name?
6   A   But it could have been the son.
7   Q   What's the nephew's name?
8   A   I don't know. I don't take down operator's
9   names. I -- when I see his face, I know his name, but I
10  can't think of it right off.
11  Q   You were saying that you could recall his face
12  but not his name, correct?
13  A   It's the nephew who works for him.
14  Q   Well, do you know his son's name?
15  A   They call him TC.
16  Q   You said a few moments ago that you sometimes
17  make recommendations in Jackson Township for who might help
18  with excavating work.
19  A   No, I don't make recommendations. I may -- if
20  I'm asked, I'll give them some names.
21  Q   Do you provide more than one name, two names,
22  what?
23  A   A couple.
24  Q   You provide a couple?
25  A   (Witness nods head affirmatively.)

---

51

1   Q   What names do you typically provide?
2   A   Well, the closest ones would be Peters.
3   They're a longtime -- in the next township. They actually
4   do a lot of the road work for Jackson Township. They're
5   second generation. Hoffmasters.
6   Q   Anybody else?
7   A   Those -- and along with Eagle, those three do
8   the majority of work on that -- that corner of the county.
9   Q   When you spoke to Mr. Corneal or heard from
10  Mr. Corneal about, you know, his interest in getting an
11  on-lot system, was that the first time you'd ever spoken
12  with him?
13  A   Yes.
14  Q   It was, you'd never met him before?
15  A   No.
16  Q   Had you ever heard of him before?
17  A   Again, I heard the Corneal name from working
18  with his brother in another township and I even had him
19  confused with that brother initially. So, no, I didn't know
20  him before.
21  Q   So when you went out to Mr. Corneal's property
22  and met with him and I guess the nephew, Tom Wilson's nephew
23  from Eagle Excavating, how long did that visit last?
24  A   We were there most of the day.
25  Q   So you got out there early in the morning?

---

52

1   A   Probably eight o'clock.
2   Q   And just describe for me in your own words
3   with as much detail as you want to give what you did that
4   day.
5   A   Went around and -- Mr. Corneal had a -- gave
6   me a map showing roughly what he wanted to do with his
7   proposed parcel. I'm not sure if he owned it then or not.
8   And we went around and tried to find suitable sites on those
9   lots he had marked out.
10  Q   So did the nephew from Eagle Excavating come
11  with you on the entire trip?
12  A   Whoever was running the backhoe was with us
13  all day, yeah.
14  Q   So you actually did some excavating that day,
15  just to test out the soil and such, is that --
16  A   Well, we probably did 20 -- 20 soil pits,
17  yeah.
18  Q   Was Mr. Corneal with you the whole time?
19  A   The majority of the day, I would say, at
20  least.
21  Q   Anybody else?
22  A   Tom Wilson may have showed up some of the day,
23  but I'm not sure, and I was introduced as -- a younger
24  brother was there for a while.
25  Q   Wilson's younger brother?

---

53

1   A   Mr. Corneal's younger brother.
2   Q   Mr. Corneal's younger brother?
3   A   He was at that time talking about getting one
4   of the lots. And there may have been a young teenager with
5   him.
6   Q   Anybody else that you can think of?
7   A   It's two years ago. I've talked to a thousand
8   people since then. That's about the best I can remember.
9   Q   Thank you. So you dug about 20 test pits that
10  day. Now, was that the end of the excavating work that you
11  had done in connection with the test pits on Mr. Corneal's
12  property?
13  A   I think we did them all in one day, yes.
14  Q   You did them all in one day. So what else did
15  you have to do to get to the point where you could -- let me
16  say this. After you did the test pits, what did you do? As
17  a sewage enforcement officer, what did you do next?
18  A   The next time I was there Eagle Excavating had
19  prepared perc sites and I did perc tests.
20  Q   So you came back. How much later?
21  A   I think the soil sheet says August 9th.
22  Q   So within a couple weeks you went back out --
23  A   (Witness nods head affirmatively.)
24  Q   -- to look at the perc -- I'm sorry, to look
25  at the perc tests, right?

---



PARKS, BARRY
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

54

1    A    To do the perc tests, yeah.
2    Q    To do the perc tests. What did you say Eagle
3  Excavating had prepared, perc sites, is that what you called
4  them --
5    A    Yes.
6    Q    -- perc sites? So they came on a different
7  day and did that?
8    A    In between the time of the probes and the
9  perc. A perc test is when you dig small holes in the area
10  of the big holes, presoakened with water which simulates
11  worst weather conditions. Then they leave water for me. I
12  come out and do the perc test, which is measuring how much
13  drop there is in the water. That converts on a chart to a
14  square footage that -- the slower the perc, the more we have
15  to spread it out.
16    Q    So when you say the lower the perc -- is that
17  what you said?
18    A    The slower.
19    Q    The slower the perc. When you talk about the
20  perc, you're talking about -- are you talking about the
21  recession of the water or the --
22    A    Yeah.
23    Q    The slower the water goes down?
24    A    Yep.
25    Q    So the excavation company fills it with water?

---

55

1    A    They put 12 inches of water in.
2    Q    And then you wait how long after they do that?
3    A    Eight to 24 hours I come out.
4    Q    And do the perc test?
5    A    Um-hum.
6    Q    And how long does that take you?
7    A    Half hour periods for approximately two hours.
8    Q    So that was your second visit to the property,
9  correct?
10    A    Yeah.
11    Q    Did you have occasion to go a third time prior
12  to issuing whatever you were going to issue in connection
13  with that property?
14    A    I can't recall being there again in '99.
15    Q    So what happened after you looked at the test
16  pits and then did the perc test? Then what happened? What
17  did you do?
18    A    I think as far as Mr. Corneal's property, the
19  next thing would be wait to hear from the surveyor.
20    Q    And what are you waiting to hear from the
21  surveyor?
22    A    That he has the modules completed.
23    Q    So you have to pass on the perc test, right,
24  and the test pits, don't you?
25    A    Yes.

---

56

1    Q    And do you do that in writing or you just say
2  okay, this looks good or what do you do?
3    A    I do it in writing.
4    Q    And in what form of writing?
5    A    There's a perc result sheet. I just forget
6  the number on it but --
7    Q    It's a form?
8    A    Yeah.
9    Q    A state form?
10    A    Yep.
11    Q    That's the perc result sheet. What about the
12  test pits, is it all part of the same sheet?
13    A    Um-hum.
14    Q    So you did that for Mr. Corneal's property?
15    A    Yes.
16    Q    And you were satisfied with the results?
17    A    We had suitable sites for each lot. Not all
18  test pits were good, not -- but we had a suitable site for
19  each lot, except there was one lot we did not have a
20  suitable site for and -- but -- it wasn't a suitable site
21  for a sand mound.
22    Q    But it could have been a suitable site for
23  something else?
24    A    Possibly.
25    Q    What else?

---

57

1    A    Spray irrigation.
2    Q    So where was that lot, was that --
3    A    I would say on the eastern end of the
4  property.
5    Q    Was it the one Mr. Corneal intended to build
6  on?
7    A    No.
8    Q    So you signed off on the perc test and the
9  test pits and then you wait for the surveyor to do what?
10  What did you say, come up with a --
11    A    Complete the sewage module.
12    Q    Complete the sewage module. How long does
13  that typically take? It depends on the size?
14    A    I've had them ready the next week and I've
15  waited two years.
16    Q    For Mr. Corneal's property you waited a couple
17  weeks?
18    A    More than that, I think.
19    Q    But eventually you got the sewer modules from
20  the surveyor?
21    A    Yeah.
22    Q    And then what?
23    A    I reviewed them and signed them.
24    Q    So you approved them, correct?
25    A    Yeah.

---



58

Q Now, did you have any conversations with anybody in between the time you did, starting at the beginning, the soil probe, your test pits -- in between that time and the time you did the perc test, did you have any conversations with anybody about the property?
A **Besides the surveyor?**
Q Yes.
A **And Tom Wilson calling and telling me the perc was ready, the percs were ready?**
Q Okay.
A **After that was done, I can't recall talking to anybody about the lot.**
Q But you talked to the surveyor you said?
A **Yeah.**
Q Just to discuss the property and move the project along, is that what you did?
A **Um-hum.**
Q Who is the surveyor?
MR. SHERR: You have to say yes or no. You can't --
THE WITNESS: Oh, sorry. Dave Simpson.
BY MS. MONTGOMERY:
Q Then after you had the perc test done -- well, let me back up a second. Tom Wilson called to tell you that the perc sites were ready --

59

A **Um-hum.**
Q -- for you to come test?
A **(Witness nods head affirmatively.)**
Q Did you have any other conversation with him about Mr. Corneal's property?
A **I can't recall, but in a busy time of the year I may be working on 50 other projects at different phases. They may be from just conversation to approving a module.**
Q So after Mr. Wilson called you and said the perc sites are ready and you went and did the perc test, did you then have occasion to talk to him again about Mr. Corneal's property during the period that the sewer module was being prepared?
A **I can't recall.**
Q You don't recall that. How about did you talk to anybody else about the property?
A **Not that I recall.**
Q Did the surveyor contact you to talk about it during that period of time or --
A **Yeah.**
Q He did?
A **(Witness nods head affirmatively.)**
Q From time to time?
A **He called me once and we talked and I remember meeting him at the courthouse and he showed me maps, but I'm**

60

**not sure if he had modules with him at that time or if he just had questions about pit locations maybe.**
Q So the surveyor more or less consulted with you to make sure that he was designing the sewer modules in keeping with what had been approved on the property so far; is that correct?
A **Yeah.**
Q That's a fair way to say it?
A **(Witness nods head affirmatively.)**
Q So then you got the sewer modules, right?
A **It may have had something to do with the lot that the brother was going to get needed an easement. I think that was part of it, how he wanted me to lay the easement out. He had some questions, but that's not unusual. They usually check with me a couple times so they don't have to do stuff a couple times.**
Q Have you worked with Mr. Simpson on other projects?
A **Rarely. Every couple years I'll work with him on one.**
Q So then you got the sewer modules and you approved them, right?
A **That's the way I remember it.**
Q And then what happened? What did you do with them?

61

A **Got them back to Mr. Corneal.**
Q Did you send them to anybody else yourself?
A **Again, we're talking almost two years ago. At that time my wife was -- the company she works for was I think leasing a building owned by Mr. Corneal and somewhere along the way -- either picking them up or getting them there or somewhere along the way she took them to work for Mr. Corneal to pick up.**
Q I see. In State College you mean?
A **Yes.**
Q So after you approved them, she took them to work for Mr. Corneal to pick up?
A **I think it was at that time, yes.**
Q Now, after that did you have any further communication with anybody about those sewer modules for purposes of whether or not they should be approved further?
A **I don't recall of it.**
Q Did Mr. Wilson talk to you about them at all?
A **I don't think so.**
Q Were you present at any meetings among the Jackson Township supervisors or anybody else wherein those sewer modules were discussed after you approved them?
A **I can't recall of it.**
Q Did you have an opportunity to talk to anybody from the Huntingdon County Planning Commission?



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

62

```
 1    A     I don't think I was contacted about that
 2  property.
 3    Q     You don't think -- so just to be clear, did
 4  anybody at all contact you about the property again to ask
 5  you questions about your approvals of the sewer modules?
 6    A     At some time -- not about the sewer modules.
 7  The person that was interested in buying part of it
 8  contacted me.
 9    Q     Is that Mr. Hewett?
10    A     Yeah.  Somewhere along the way wanting to know
11  time frame or something, but I don't remember that
12  conversation word for word.  I remember I talked to him.
13    Q     Do you recall what you told him generally, not
14  word for word but generally?
15    A     He couldn't do anything till we had the sewage
16  module approved.
17    Q     Did you expect the sewage modules to be
18  approved?
19    A     Yeah.
20    Q     You did, okay.  So let me just -- when did you
21  find out that the sewage modules had not been approved?
22    A     When I said yes, I didn't mean maybe right
23  away.  Sometimes there's a little -- things that have to be
24  worked out, but, you know, with the -- if everybody just
25  sticks with the project, why they get approved.
```

---

63

```
 1    Q     Well, were these sewage modules approved to
 2  your knowledge?
 3    A     They must not have been, but, again, that's
 4  out of -- I'm out of that process after that, after I've
 5  approved them.
 6    Q     But did you come to find out that the sewage
 7  modules had not been approved?
 8    A     I was hearing that, yeah.
 9    Q     Who did you hear that from?
10    A     I'm not sure.  Mr. Corneal called me mid --
11  early winter 2000 and said about the moratorium and he was
12  wanting to start building and asked if I could issue him a
13  privy permit.  So I was getting the idea that, you know, it
14  was held up because of the moratorium on -- and there was a
15  couple others, too, waiting for the moratorium to be done.
16    Q     Moratorium on what?
17    A     On subdivisions in Jackson Township.
18    Q     Did anybody ever call you and ask you -- at
19  any time ask you to discuss with them, you know, any
20  problems with these sewer modules or any concerns at all?
21    A     I don't recall of it.
22    Q     So you say you remember hearing from Mr.
23  Corneal and he asked you to issue him a privy permit, right?
24    A     Yes.
25    Q     And what happened then?
```

---

64

```
 1    A     Again, we go way back to when I talked about
 2  lot, whether it's one acre or a hundred acres.  If it's a
 3  vacant lot, prior to '72 you can use a privy, but you can't
 4  have piped water or water under pressure, is the way it
 5  reads in the regulations.  So Mr. Corneal had a lot, but it
 6  had piped water and water under pressure on that lot.  I
 7  know that doesn't maybe make sense, but it's -- it's a
 8  quarter mile away, but that's regulation.
 9    Q     So when you say he had a lot, you mean his
10  whole huge piece of property that included the farmhouse
11  that already existed?
12    A     (Witness nods head affirmatively.)
13    Q     Right?
14    A     Yep.
15    Q     And all the other things that he had maybe
16  tried to divide into --
17    A     Until there's a DEP approved -- approval it is
18  a lot.
19    Q     So the piped water -- well, let's go back to
20  the privy.  So he asked you for a privy permit and what
21  process did you go through after he asked you for that privy
22  permit?
23    A     I think I told him that was the problem with
24  it, that he couldn't use a privy on his property at that
25  time because it had -- technically had water -- piped water
```

---

65

```
 1  and water under pressure.
 2    Q     But if the property had been subdivided even
 3  into two lots, you take the house with the water and then
 4  the rest of the property is another lot --
 5          MR. SHERR:  Object to the form of the question
 6  being a hypothetical question.  You can answer it.
 7  BY MS. MONTGOMERY:
 8    Q     Did you understand the question?  I didn't get
 9  to finish it but -- if the property was divided into two
10  lots, subdivided into just two lots --
11    A     (Witness nods head affirmatively.)
12    Q     -- one being the house with the water on it
13  and the other being the rest of the property which is -- do
14  you know how many acres that is?
15    A     It's 95 acres, isn't it?
16    Q     Something like that.  Then would there have
17  been a problem with the privy permit?
18          MR. SHERR:  Objection to the form of the
19  question, same basis.  You can answer it.
20  BY MS. MONTGOMERY:
21    Q     You can answer.
22    A     If you have a prior '72 lot with no water, you
23  can use a privy.  If you have a subdivided lot, meaning a
24  lot subdivided after '72 with DEP approval and it doesn't
25  have piped water and there's a site set aside so if you do
```

---



PARKS, BARRY
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

66

1  put water in you can put a system in and the township has a
2  privy ordinance, you can use a privy.
3  Q    Does the township have a privy ordinance,
4  Jackson Township?
5  A    It was part -- I understood it was part of
6  this new subdivision ordinance. I think there is now.
7  Q    Did you discuss issuing the privy permit to
8  Mr. Corneal with anybody else at all before telling him that
9  he couldn't have one?
10  A    I may have told Mr. Corneal I would see if I
11  could think of a way that we could do it that meets regulations,
12  but I -- I -- with the water and -- but that's what the
13  regulations say. Now, whether it's one acre or a thousand
14  acres, if it's one parcel it's a lot.
15  Q    Are there provisions for exceptions to that
16  regulation?
17  A    Exceptions is something you don't read in the
18  DEP regulations, except that one I told you about, exception
19  to doing the planning module if you meet the criteria.
20  Q    So you don't know of any exceptions to that
21  general rule?
22  A    No.
23  Q    Well, anyway, there was another question in
24  there that I don't think I quite got an answer to. Did you
25  discuss Mr. Corneal's request for a privy permit with

67

1  anybody else prior to telling him that he couldn't have it?
2  A    Maybe in our conversation I may have said
3  something about I talked to the supervisors. Again, this is
4  going through -- this was going through my mind. I was
5  trying to think of a way that we could do that, but with --
6  I looked -- glanced through the regulations again and I
7  didn't see any way we could do it.
8  Q    Did the supervisors -- did you discuss with
9  the supervisors --
10  A    I don't remember talking to them about that.
11  If I could have found something in the regulations that I
12  could have given a reason for it, I would have done that.
13  Q    Do you go to township meetings, Jackson
14  Township meetings?
15  A    Sometimes, but I -- for a good period there I
16  wasn't to one.
17  Q    A good period where?
18  A    While the moratorium was going on because a
19  lot of times I go to the -- go to them with the landowner to
20  explain to the supervisors what's going on, but if the --
21  there's a moratorium on it there's no reason for me to go to
22  explain because everything is on hold.
23  Q    You said while the moratorium was going on.
24  Is the moratorium still going on in Jackson Township?
25  A    No.

68

1  Q    When was it lifted?
2  A    I think it was the summer of 2000.
3  Q    This is the moratorium on subdivisions, right,
4  in Jackson Township?
5  A    Yes.
6  Q    So since the moratorium has been lifted have
7  you had occasion to discuss Mr. Corneal's property with
8  anybody in, you know -- just about the sewer modules?
9  A    Yeah.
10  Q    Who?
11  A    His attorney.
12  Q    Mr. Corneal's attorney?
13  A    Yes.
14  Q    Which one are you talking about?
15  A    Names a lot of times --
16  Q    Mr. Williams?
17  A    Mr. Williams. Terry Williams, yeah.
18  Q    And what was the occasion for that discussion?
19  A    We met with him a couple times, myself and the
20  supervisors at the Huntingdon Courthouse, and then I met
21  Terry and Mr. Corneal at the property.
22  Q    Well, have you had any discussions with the
23  supervisors about Mr. Corneal's property since the
24  moratorium has been lifted?
25  A    At these -- that's what's discussed at these

69

1  -- when we meet with Terry.
2  Q    But I'm talking about other than meeting with
3  Terry.
4  A    I can't recall of having discussions just to
5  get together to talk about Mr. Corneal's -- we have had a
6  couple meetings to talk with our solicitor at Ann Wirth's --
7  but except for that type of meeting and -- I don't recall of
8  it.
9  Q    You've had meetings with Larry Newton, you
10  mean, township solicitor Larry Newton?
11  A    Larry's been at the meetings at the
12  courthouse, yeah.
13  Q    To talk about Mr. Corneal's property?
14  A    That's what -- that's what it was about, yeah.
15  Q    Have you had any telephone conversations with
16  anybody, with one or more of the supervisors, about Mr.
17  Corneal's property since the moratorium was lifted?
18  A    It's mostly been about a meeting or coming
19  down here.
20  Q    Who have you talked to?
21  A    Usually Ann calls me.
22  Q    She calls you what, to schedule a meeting or
23  something like that?
24  A    Tells me when the meeting is going to be.
25  Q    What is your understanding right now of the



PARKS, BARRY
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

70

1　township's position on Mr. Corneal's sewer modules?
2　　A　Incomplete.
3　　Q　I'm sorry?
4　　A　They're incomplete at this time.
5　　Q　The township thinks they're incomplete?
6　　A　Yes.
7　　Q　Why is that?
8　　A　The site that was originally proposed for his
9　home and additional buildings is not suitable to be used.
10　And I met with Mr. -- Terry and Mr. Corneal to discuss that
11　and it was 4/18.
12　　Q　April 18th?
13　　A　Um-hum.
14　　Q　2001?
15　　A　(Witness nods head affirmatively.)
16　　Q　Well, was this one of the sites that you --
17　was this one of the sites that you had tested before?
18　　A　Yes.
19　　Q　It was one of the ones that you approved
20　before?
21　　A　Yes.
22　　Q　And why is it now incomplete?
23　　　MR. SHERR: I'm going to object to the form of
24　the question because I think it misstates his testimony.
25　You can answer it.

71

1　　　MS. MONTGOMERY: Well --
2　　　THE WITNESS: Because in the process of doing
3　the building that you're doing there, they've disturbed the
4　site, is the way it's referred to.
5　BY MS. MONTGOMERY:
6　　Q　Who made that determination, that they
7　disturbed the site?
8　　A　I did.
9　　Q　How did he disturb the site?
10　　A　Driveways.
11　　Q　What did the driveway do?
12　　A　Encroached on the area that the system was
13　intended to be put on.
14　　Q　When did you make that determination?
15　　A　I was there -- whenever I received the sewage
16　module -- the last time we were at the courthouse I asked
17　Terry if it was all right whenever I received the sewage
18　module if I could enter the property to check to see if
19　these sites that I did approve were still intact, still
20　usable. So when I did receive the modules, I went out to
21　look and determined that they were encroached on too much.
22　　Q　When you say encroached on too much, what is
23　your concern?
24　　A　There's just -- there's so many driveways and
25　areas that are disturbed there's not room to put the system

72

1　in, put a system in.
2　　Q　Is there another spot on that parcel where
3　he's building that would be suitable to put a system in?
4　　A　There wasn't at that time.
5　　Q　Is there now?
6　　A　He's had a soil scientist out there since then
7　and I just reviewed that letter and I guess they've come up
8　with a couple -- a couple sites. And the soil scientist
9　also confirms in his letter that he agrees that that
10　original site was disturbed and is unusable.
11　　Q　Who went out with you when you went to look at
12　it? You said you wanted to go and see and make sure the
13　sites were still intact. Who went out with you?
14　　A　I was by myself.
15　　Q　Is that the only time you went out to look or
16　have you been out again?
17　　A　The day I met Mr. Corneal and Terry a couple
18　weeks later.
19　　Q　Do you know whether anybody else has been out
20　to the property?
21　　A　From the township?
22　　Q　Yes.
23　　A　Tom Wilson was there to meet with somebody
24　about the driveway, supposed to meet Terry, but I'm pretty
25　sure -- to the best of my knowledge he wasn't back in there.

73

1　　　MS. MONTGOMERY: I think we need to take a
2　break for just a minute.
3　　　(Break taken.)
4　BY MS. MONTGOMERY:
5　　Q　You testified a couple moments ago that you
6　made a subsequent visit after the moratorium was lifted to
7　look at the Corneal's property, correct?
8　　A　When the second sewage module was presented to
9　the township.
10　　Q　What do you mean the second sewage module?
11　　A　This is the second one.
12　　Q　And has this been approved by you?
13　　A　It's one I -- the first one I signed that was
14　for the four or five lots. This one I can't sign because
15　the site isn't there anymore. I'm signing that there's a
16　suitable site there for the dwellings that are being built.
17　　Q　Hang on a second, please. I want to consult
18　with my client.
19　　　(Mrs. Montgomery conferred with Mr. Corneal.)
20　BY MS. MONTGOMERY:
21　　Q　I'm sorry, you confused me there for a
22　second. There weren't new modules submitted, right? It was
23　the same set of modules that you had previously approved;
24　isn't that correct?
25　　A　No. Is that it there? This is -- it's



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

74

1  requesting approval for an equivalent subdivision, no new
2  lots.
3    Q    Let's go back a second and talk about that.
4  When Mr. Corneal initially submitted these sewage modules,
5  right, he was requesting a subdivision that included a
6  number of different lots, correct?
7    A    Yes.
8    Q    Later he decided, and correct me if I'm wrong,
9  that all he was asking was to have approximately 26 acres
10  that had the existing house on separated from the rest of
11  the property; is that correct?
12    A    That's not what that's requesting there.
13    Q    Well, no, because this isn't -- this isn't a
14  subdivision plan.
15    A    Well, the one that I looked at was not -- it
16  was requesting approval to put a second dwelling on it.
17    Q    Right.
18    A    There was nothing about subdividing.
19    Q    Right, exactly.  He's not requesting
20  subdivision anymore, is what I'm saying.
21    A    When you said 26 acres, that would be a
22  subdivision.
23    Q    Initially he asked for a subdivision -- was
24  planning to ask for a subdivision that had a number of
25  different lots contained --

---

75

1    A    Fall of '99, yes.
2    Q    Right.  Subsequently, after you approved his
3  sewage modules, right, for sites on all of those different
4  lots, right --
5    A    Um-hum.
6    Q    -- he changed his mind and said I'm only going
7  to divide this parcel into two properties, correct?
8    MR. SHERR:  I'm going to object to the form of
9  the question as to whether -- asking this witness Mr.
10  Corneal's state of mind.
11  BY MS. MONTGOMERY:
12    Q    Let's just back up a second.  When you
13  reviewed the initial sewage modules, was it your
14  understanding that the plan was to divide the property up
15  into about 10 lots, right?
16    A    I would say four or five.
17    Q    So you, correct me if I'm wrong, approved
18  sewage modules in five different places, correct?
19    A    Septic sites, yes.
20    Q    Right, exactly.
21    A    Yes.
22    Q    Your understanding was that it was -- and
23  we'll use your estimate, it was going to be divided into
24  approximately five different lots at least, right?
25    A    Yeah.

---

76

1    Q    Then later, isn't it correct, that the request
2  was not to subdivide but simply to approve the sewage -- or
3  to allow him to build an additional dwelling on the entire
4  95 acres?
5    A    Yes.
6    Q    And so is it your testimony that you then felt
7  that you had to go out and see whether the original sewage
8  modules that you approved would still be suitable?
9    A    The site was tested for that area where the
10  house was being built.  I wanted to make sure that was still
11  a usable site.
12    Q    Did anybody tell you to go and look again?
13    A    The township told me they wanted to make sure
14  that was -- that site was okay.
15    Q    Who at the township told you that?
16    A    It was sort of a -- I think Ann actually said
17  the words.
18    Q    Ann said you should go and look to make sure
19  the site is okay?
20    A    Yeah.
21    Q    So was it Ann's idea that you should go and
22  look and see?
23    A    It was a general thing.  They just wanted it
24  to be right.
25    Q    So you went out and you looked -- you knew

---

77

1  where Mr. Corneal was planning to build?
2    A    The last time we were at the courthouse about
3  this building without permits, I asked Terry Williams if it
4  was all right when I received the module, before I signed
5  it, could I enter the property to check to see if that site
6  at -- where the construction was going on was still a usable
7  site and he gave me permission to do that.  So I did -- when
8  I received it, I went out and looked.
9    Q    And now tell me again why you determined that
10  it was no longer a suitable -- that there was no site out
11  there --
12    A    Well, he had had a designer submit a design to
13  me that was like -- in the proximity of 15 by 70 some feet
14  and till you take away all the limiting factors that are
15  there for driveways there's only about 40 feet.
16    Q    But that was a septic design, right?
17    A    Yes.
18    Q    Not a sewage module design, right?
19    A    No, but we have to -- there's no use in
20  approving the sewage module if we don't have -- with
21  marginal conditions if we don't have -- we don't know
22  there's a site there.  That's what I'm signing.  I'm telling
23  DEP there's a -- you know, this site is okay to put a septic
24  system on and we need your approval.
25    Q    When you initially approved the sewage

---



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

78

1 modules, okay --
2    A    Um-hum.
3    Q    -- that you signed off on back in July or
4 August of '99, right?
5    A    It was fall of '99.
6    Q    Right.
7    A    Or even early winter of 2000.
8    Q    When you initially approved -- you're right,
9 February. When you initially approved those sewage modules,
10 did you have a specific septic design for each one of the
11 modules that you approved for each one of the sites?
12    A    No, there is not a design done till the person
13 applies for a permit. It was a specific site for each
14 proposed lot, except for the one that was going to need more
15 testing if they did spray irrigation on and that was on the
16 other end of the property.
17    Q    Right. So you didn't have a specific septic
18 design but you approved the modules anyway, right?
19    A    For a specific -- it was a site -- it was a
20 site proposed for each lot.
21    Q    And then if you had to make some adjustments
22 to the specific septic that went into each one, you would
23 have done that later on, right?
24    A    Yeah, but it would have been working with an
25 undisturbed site.

79

1    Q    Maybe I didn't understand you, but I thought
2 that you said that you didn't -- well, no, you just tell me
3 in your own words. I won't repeat it back to you.
4       When you went out the second time, okay, you
5 found that you couldn't approve any sewage module out there
6 for Mr. Corneal's building or his house because why?
7    A    The site that the design was done for was
8 unusable because of soil compaction from the driveways.
9    Q    What's the regulation on how close the septic
10 system has to be, how far it has to be from a driveway?
11    A    Ten feet.
12    Q    Was the original sewage module that you
13 approved -- was there an original sewage module that you
14 approved for that area that Mr. Corneal wanted to build on?
15    A    There was a site there, yes.
16    Q    There was a site there?
17    A    (Witness nods head affirmatively.)
18    Q    Was it more than 10 feet from the driveway?
19    A    There was no driveway there.
20    Q    When you went back and the driveway was there,
21 was that site more than 10 feet from the driveway?
22    A    There wasn't room to put the system there and
23 have the system 10 feet from the driveway.
24    Q    What system?
25    A    The proposed system.

80

1    Q    But you don't necessarily have to have the
2 system designed before you approve the sewage module, do
3 you?
4    A    Well, you're supposed to have the sewage
5 module approved before you do any building.
6    Q    Right.
7    A    That's the problem, not the stuff I did.
8    Q    Well, I think we're talking in circles a
9 little bit, but let's go back a second. You approved a
10 sewage module on a site that you knew that Mr. Corneal was
11 planning to build on, correct?
12    A    That's what he told me, yes.
13    Q    All right, good. Then it was disapproved by
14 the township, the township refused to approve it, correct?
15    A    The sewage module.
16    Q    The sewage modules that you initially
17 approved.
18    A    It's a sewage module.
19    Q    Well, there's five different forms here which
20 we'll have you identify in a little bit, but in any event,
21 then you went back again after the supposed moratorium was
22 in place, right, because the township --
23    A    It was done away with. You mean afterwards?
24    Q    It was lifted. Because the supervisors told
25 you to go back and look and make sure the site was still

81

1 okay?
2       MR. SHERR: Objection, misstates his prior
3 testimony. You can answer.
4 BY MS. MONTGOMERY:
5    Q    Did the supervisors tell you to go back and
6 look to make sure the site was still okay?
7    A    They wanted to make sure it was okay.
8    Q    So then you go back and you look at all the
9 different sites that you had approved previously, right, and
10 you know where Mr. Corneal was going to build?
11    A    (Witness nods head affirmatively.)
12    Q    Is your testimony now that there's no place
13 that he can put a septic system that's suitable for his
14 building on any of those previously approved sites where the
15 sewage modules had been approved already?
16    A    No, I didn't say that.
17    Q    What did you say?
18    A    I received -- in the meantime I received a
19 design for his new house. I went and I looked at that
20 site. That site is not suitable because of driveways and
21 soil compaction. There is other sites on that lot.
22    Q    That are already approved?
23    A    That would be suitable if you wanted to go to
24 the -- if you wanted to go to -- but nobody said anything
25 about wanting to use a site that was 500 yards away.



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

82

1  Q      Now, you just said nobody talked about using a
2  site that was 500 yards away. Was there a site 500 yards
3  away that you think is suitable that was already approved by
4  you?
5  A      There is a site that -- on that lot, yes.
6  Q      Now, the site that you think is not
7  appropriate, that you now find is not suitable any more
8  because of the driveway --
9  A      Yes.
10  Q      -- is that more than 10 feet from the
11  driveway, the sewage module, where, you know, the --
12  A      The test --
13  Q      The area.
14  A      The little test pit is 10 feet away but
15  there's not room to put a system in and be 10 feet away.
16  Q      What kind of system? There's not room to put
17  what kind of -- any kind of system in?
18  A      The sand mound that was designed for that lot,
19  for that dwelling.
20  Q      And now I just need -- I know we're going
21  around in circles, but I'm really trying to understand your
22  position here. It's my understanding that you can approve
23  sewage modules without having an actual septic design in
24  front of you and you say this is suitable for some type of
25  septic system, correct?

---

83

1  A      Um-hum.
2  Q      And that's what you did the first time,
3  correct?
4  A      Yes.
5  Q      Now, the second time you're saying that there
6  was a septic design that Mr. Corneal had in mind for a sand
7  mound; is that what you're saying?
8  A      Um-hum. Yes.
9  Q      But now you're saying that this module -- or
10  that that couldn't be put in place at that site that you had
11  approved previously, but that was what he was requesting you
12  to do, right? Was he requesting you to approve a septic
13  system or was he requesting you to approve a sewage module?
14  MR. SHERR: I'm going to object to the form of
15  the question because that's a compound question.
16  BY MS. MONTGOMERY:
17  Q      Was he requesting you -- during the second
18  round, was he requesting the township to approve a sewage
19  module or a specific septic site, septic system?
20  A      The sewage module, but where I assigned the
21  sewage module I'm saying there's suitable sewage -- suitable
22  areas for that, and what I was -- the design was a little
23  ahead of its time, you know. I didn't need the design yet.
24  Q      Right.
25  A      But I took the design out and that's what was

---

84

1  proposed. There's not room to put that in. The way it
2  should be done is the sewage module approved, this area
3  staked off, if you're going to use that site, and then you
4  keep your driveways and your house and you keep everything
5  away from that, not illegally go in and do all this building
6  and driveways and disturbed sites and everything and then
7  expect this little area twice as big as this room to
8  accommodate a septic system.
9  MR. CORNEAL: We need to take a break a
10  second.
11  MS. MONTGOMERY: We can do it right here.
12  MR. CORNEAL: No, we need to take a break.
13  (Break taken.)
14  BY MS. MONTGOMERY:
15  Q      Mr. Parks, I want to show you a lot plan which
16  I think you should recognize. I'm going to move it around
17  so you can see it.
18  MR. SHERR: Are we going to have this marked?
19  MS. MONTGOMERY: Yes, when I'm ready. Right
20  now I'm just using it to talk to him.
21  MR. SHERR: Please, I'm just asking whether
22  you're going to mark it --
23  MS. MONTGOMERY: And I just answered you.
24  MR. SHERR: -- and whether we're going to
25  refer to it. You don't have to --

---

85

1  MS. MONTGOMERY: We're going to identify it.
2  We're going to do it all in good time.
3  MR. SHERR: Fine. That's all I was asking
4  you. My goodness gracious.
5  BY MS. MONTGOMERY:
6  Q      Mr. Parks, have you seen this plan before?
7  MR. SHERR: This plan being what will be
8  marked soon, we understand, so we'll refer to it on the
9  record as just this plan.
10  MS. MONTGOMERY: That's right, for now.
11  MR. SHERR: All right. And I object to the
12  form of the question. You can answer.
13  THE WITNESS: Not in this form.
14  BY MS. MONTGOMERY:
15  Q      You have not seen this plan in this form?
16  MR. SHERR: Object to the form of the
17  question.
18  BY MS. MONTGOMERY:
19  Q      Let's talk about this plan here. Have you
20  seen a plan of proposed subdivision from David and Sandra
21  Corneal for this David and Sandra Corneal property?
22  A      I've seen several of them, yes.
23  Q      What is it about the plan that I'm putting in
24  front of you right now that is different from the ones that
25  you've seen?

---



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

86

1      MR. SHERR: I'm going to object to the form of
2   the question since the plan has not been marked nor referred
3   to in --
4      MS. MONTGOMERY: The rules don't require me to
5   mark it if I don't want to. Go ahead. Can he answer?
6      MR. SHERR: We don't have to argue objections.
7      MS. MONTGOMERY: Can he answer?
8      MR. SHERR: Of course he can. I'm just
9   stating my objection for the record.
10  BY MS. MONTGOMERY:
11     Q    Okay, let's answer.
12     A    This was two lots and this was a lot. There
13  was at least four. This was a lot -- oh, it is now too.
14     MS. MONTGOMERY: Do we have copies of this
15  exact --
16     MS. THORP: Yes, I just wanted to see what
17  he's referring to.
18  BY MS. MONTGOMERY:
19     Q    So you're saying you've never seen a proposed
20  subdivision plan --
21     A    I never saw this one, no.
22     Q    -- in this form?
23     A    No.
24     Q    April 7, 2000 is what it's marked. Well, if
25  you take a moment and look at this proposed subdivision plan

---

87

1   that's marked April 7, 2000, are you able to read it? Do
2   you understand what it --
3      A    Um-hum.
4      Q    -- represents?
5      A    It's -- I saw it in basic form but it had more
6   lots.
7      Q    Now, we're going to give you a pen and let you
8   mark for the record where you understand the Corneal's house
9   or proposed building to be.
10     A    Right there it has it.
11     Q    Why don't you mark it for us.
12     MR. SHERR: Again, I'm going to object to the
13  form of the question unless you tell me that you're going to
14  mark this and --
15     MS. MONTGOMERY: I just told you I was going
16  to mark it as an exhibit when I'm ready to mark it.
17     MR. SHERR: And make it as part of the --
18     MS. MONTGOMERY: I just told you that minutes
19  ago.
20  BY MS. MONTGOMERY:
21     Q    So here you go.
22     A    The proposed -- I didn't step it off and
23  measure and everything. The proposed house is fairly close
24  to where it is.
25     Q    Well, just for the record here, I'm going to

---

88

1   ask you to mark on this plan with this blue pen the spot on
2   the plan that you understand to be where the Corneals are
3   building.
4      MR. SHERR: If you can.
5   BY MS. MONTGOMERY:
6      Q    If you can.
7      A    Well, that's the surveyor's job. I -- just by
8   memory I can't -- I don't even know where the lines were.
9      Q    You can't read the plan?
10     MR. SHERR: No, he can't do what you asked him
11  to do.
12     THE WITNESS: I'm saying the proposed house is
13  close to where -- these two pits here -- if this is
14  accurate, these two pits have driveways and this probably
15  has -- is dug out stuff here. This pit is here, but the
16  driveway is all around it but it doesn't look like -- is
17  there a scale on this, an inch to a hundred maybe?
18     MR. SHERR: One inch to 700 feet.
19     MS. MONTGOMERY: We're going to mark this as
20  Exhibit 1, this April 2000 -- April 7, 2000 plan as Exhibit
21  1, Parks Deposition Exhibit 1. We may come back to it and
22  I'll ask you some more questions about it. We're going to
23  go to another subdivision plan and ask you to talk about
24  that one.
25     (Subdivision plan dated 4/7/00 produced and

---

89

1   marked as Parks Exhibit No. 1.)
2   BY MS. MONTGOMERY:
3      Q    I'm going to ask you to look at this
4   subdivision plan that's dated February 4, 2000 for the
5   Corneal property and ask you have you seen this plan before?
6      A    No.
7      Q    What plan did you see, do you recall?
8      A    It would have been when I met Dave Simpson in
9   the fall of '99.
10     Q    Well, we're going to ask you the same question
11  with respect to this February 4, 2000 subdivision plan. Can
12  you see on this plan where the Corneal's proposed building
13  for their personal home is?
14     A    I see it, yeah.
15     Q    Can you show it to me?
16     A    Right there.
17     Q    Can you circle it with this pen? Is there any
18  problem?
19     A    Yeah, I can circle it but --
20     Q    Okay, would you do that for me.
21     A    Is that all right?
22     MR. SHERR: If you feel confident, you know,
23  in your ability to show from your memory where on a scaled
24  map his proposed house would be, sure.
25     THE WITNESS: I don't know where this property

---



PARKS, BARRY
05/16/01

CORNEAL  VS
JACKSON TOWNSHIP

---

90

1  line is and that looks too close to the property line.
2  Right here -- if this is the scale of one inch equals 700
3  feet, those probes are 300 feet apart. They were not 300
4  feet apart. This is not --
5  BY MS. MONTGOMERY:
6  Q    But I'm not asking --
7  A    It's not accurate enough for me to --
8  Q    All I'm asking you to do is tell me where on
9  this plan --
10  A    It's in this area.
11  Q    -- you see -- and I will circle it.
12      MS. MONTGOMERY: Let the record reflect that
13  Mr. Parks has pointed to the area that I circled. Does
14  anybody disagree with that? Anybody disagree with that?
15  All right. Now let's look at -- which we're going to mark
16  in a minute.
17  BY MS. MONTGOMERY:
18  Q    Let's look at Parks Exhibit 1, the April 7,
19  2000 plan. Can you point on this plan --
20  A    Same place.
21  Q    Same place.
22      MS. MONTGOMERY: So let the record reflect
23  that Mr. Parks has --
24  BY MS. MONTGOMERY:
25  Q    Can you point to it, where you think it is?

---

91

1  A    Well, it's in this area, yeah.
2  Q    In this area. This is where the Corneals
3  propose to build their property -- I mean their house, all
4  their buildings, right?
5  A    Where the house is being built, yes.
6  Q    Their personal houses, exactly. Now, can you
7  also tell me -- let's work with this one now that you've
8  looked at it and you can see where the Corneals propose to
9  build.
10      MR. THORP: This one being Parks Exhibit 1?
11      MS. MONTGOMERY: Parks Exhibit 1.
12  BY MS. MONTGOMERY:
13  Q    Are there a number of sewage sites?
14  A    There's a number of sewage probes, yes.
15  Q    Near and around that --
16  A    Yes.
17  Q    -- property that I've circled, this area
18  that --
19  A    On this map, yes.
20  Q    Are these previously approved sites?
21  A    This was an approved site which is -- no
22  longer exists. The perc that I --
23  Q    Let's stick with this one. Let the record --
24      MR. SHERR: Wait, let him finish his answer.
25      MS. MONTGOMERY: No, we're going to stick with

---

92

1  this one.
2      MR. SHERR: Well, you can't interrupt his
3  answer.
4      MS. MONTGOMERY: No, I am going to interrupt
5  his answer because I want to be clear.
6      MR. SHERR: Then I'll --
7  BY MS. MONTGOMERY:
8  Q    I'm going to point to this one. You pointed
9  to this one and said this one no longer exists.
10  A    Right.
11      MR. SHERR: Let me just object to the question
12  because I don't think the witness was done with his first
13  answer and he should be entitled to finish.
14  BY MS. MONTGOMERY:
15  Q    Are you finished telling me that this one no
16  longer exists, what I'm pointing to?
17  A    Yes.
18  Q    Then I want to talk to you about this one.
19  A    Okay.
20      MS. MONTGOMERY: Now, let the record reflect
21  that you are pointing to an area that I guess I'll circle
22  with a red pen, if anybody has a red pen.
23      THE WITNESS: If you'd just use the probe
24  numbers, that's the way I would refer to it.
25  BY MS. MONTGOMERY:

---

93

1  Q    And the probe numbers are what?
2  A    Eight, 9 and 10.
3  Q    So we're going to circle probe numbers 8, 9
4  and 10 and you say that this site no longer exists?
5      MR. SHERR: Here's a black one.
6  BY MS. MONTGOMERY:
7  Q    Right? Why does that no longer exist?
8  A    Do you have the letter from Mr. Archmody that
9  was done last week?
10  Q    No, I don't have it with me.
11  A    He says on there that it's no longer suitable
12  because of compaction.
13  Q    What would you have to do to make it suitable
14  -- no longer suitable for what?
15  A    For sand mound.
16  Q    Let's go back to your earlier testimony. Did
17  you testify that first in the process of getting ultimately
18  a septic system on your property first you have modules
19  approved, correct?
20  A    First you do the testing.
21  Q    Right, first you do the testing and you have
22  your modules approved, you get them approved, right?
23  A    Yes.
24  Q    Then you send them off. You approve them, the
25  township approves them, DEP approves them, correct?

---



---

94

1    A    Yes.
2    Q    Then they come back --
3    A    Yes.
4    Q    -- and then you issue an application, correct?
5    A    I send out an application, yes.
6    Q    For what?
7    A    A permit to put a -- install a septic system.
8    Q    And the septic system may or may not be
9    suitable for the approved module and you'll figure that out
10   when you get the septic system design, correct, the
11   application with the septic system design; is that correct?
12   A    Say that again.
13   Q    Okay. Once the modules are approved --
14   A    Yeah, and I've sent out the application.
15   Q    You send out an application for a permit for a
16   septic system, right?
17   A    Yes.
18   Q    The module's approved first, septic system
19   approved much later --
20   A    Yes.
21   Q    -- correct?  Permit issued much later?
22   A    Not necessarily much later, if things go
23   smoothly.  We've done this where this all happened in a
24   month.
25   Q    So here you had an existing module that had

---

95

1    already been approved -- an existing site that had already
2    been approved by you according to a sewer module that you
3    signed, right?
4    A    There was an okay site there, yes.
5    Q    And you said that you now believe that it is
6    not suitable for a sand mound septic system?
7    A    That's correct.
8    Q    Why would that stop you from approving the
9    module anyway?
10   MR. SHERR:  Objection, asked and answered.
11   BY MS. MONTGOMERY:
12   Q    From approving it?
13   MR. SHERR:  I'm sorry, were you done?
14   THE WITNESS:  I'm signing that there's -- the
15   proposed site is --
16   MR. SHERR:  Mr. Corneal --
17   MR. CORNEAL:  I was just stretching.  Thank
18   you very much, Mr. Sherr, for paying attention to that.
19   MR. SHERR:  I always pay attention to you.
20   BY MS. MONTGOMERY:
21   Q    Go ahead.
22   A    In the meantime I got the design for that.
23   Where that design was proposing to use, that site is no
24   longer available.
25   Q    But maybe you got a premature design.  That

---

96

1    wouldn't necessarily stop you from approving the site or
2    some design because that's the first step, right, you
3    approve the site, you approve the sewer modules that
4    indicate that this is the site where you want to build,
5    right, where you want to put in your septic system?  Not any
6    particular type of septic system but a septic system,
7    correct?
8    A    Well, it's limited to what type of system can
9    go in there.
10   Q    Right, but if one type can't go in, maybe
11   another type can and that's down the road after you approve
12   the modules, correct?
13   A    But the site still has to be there.
14   Q    Right, but the site is still there, correct,
15   but you just decided that you couldn't approve the module
16   because you couldn't put -- you didn't believe that you
17   could put a sand mound system in there; isn't that correct?
18   A    Not on that site.
19   Q    Could you put some other system in there?
20   A    There's -- possibly.
21   Q    So why not just approve the module, wait for
22   the formal application --
23   A    Well, if you're talking about the micromound
24   stuff, if you look at your paperwork you'll see that is
25   experimental and that still has to be DEP approved and --

---

97

1    Q    Right, but they all have to be DEP approved,
2    don't they?  I mean, any septic system that goes in there
3    has to be DEP approved, correct?
4    A    It has to be done to DEP regulations, but DEP
5    doesn't actually have to approve it.  It's already approved
6    in the regulations.
7    Q    So I'm going to ask you why not just approve
8    the module and wait for the formal application for a permit
9    to build a particular septic system there?  Why didn't you
10   just approve the module, since it was already approved
11   before, and just wait?  You didn't have a formal application
12   for that particular site, did you, for a permit?
13   A    Because we knew there was building going on in
14   that area.  I was asked to make sure that the site was
15   there.
16   Q    That doesn't really answer my question.  In
17   the normal course of events, you approve a module?
18   A    Normal --
19   Q    Everybody approves a module that has to do --
20   A    In the normal course of events -- sorry.
21   Q    That's all right.  Go ahead.
22   A    In the normal course of events, people wait
23   until they have approval before they start building their
24   house.
25   Q    Right, but these aren't the normal course of

---


98

1  events, of course, here.  So going on we say -- what I'm
2  asking you is why wouldn't you just approve the module,
3  approve the site, sign off on the modules, just like you had
4  before, and wait for an application for a permit for a
5  septic system?  If it wasn't a suitable septic system, you
6  could deny it then.
7      A      It's just like you said, it's not a normal
8  circumstance.
9      Q      But nevertheless, normally that's exactly what
10  you would do.
11     A      Normally --
12     Q      And you didn't have a formal application, did
13  you, for -- you didn't have a formal application or a permit
14  for a specific septic system, did you, on that site?  Did
15  you?
16     A      I had a design which sort of indicates to me
17  that they were planning on doing something there.
18     Q      Well, if somebody had just given that to you,
19  would that be -- would that satisfy all the permit
20  requirements, all the application for permit requirements,
21  would it?
22             MR. SHERR:  Object to the form of the
23  question.
24             THE WITNESS:  Once I had an approved lot.
25  BY MS. MONTGOMERY:

99

1      Q      Well, we can talk in circles all you want, Mr.
2  Parks, but the question is pretty simple.  Did you have an
3  application for a permit --
4      A      No.
5      Q      No, because you didn't have a previous -- you
6  didn't have an approved signed off sewer module, right, and
7  that's the first step, right?
8      A      I didn't have a DEP approval letter that I
9  could do that.
10     Q      DEP approval letter for what?
11     A      That I could issue permits.
12     Q      Right, and that's because first you need
13  modules signed by you and the township, right?
14     A      Right.
15     Q      So first you sign the modules, send it up to
16  DEP, they send it back and then you get a permit for an
17  application for a particular septic system, right?
18             MR. SHERR:  Objection.  It's been asked and
19  answered.
20  BY MS. MONTGOMERY:
21     Q      But you denied -- correct me if I'm wrong, you
22  refused to sign off on the sewer modules the second time
23  around because you thought they were going to do a septic
24  system of a particular type, not because you had an
25  application for a permit and approved, you know, this or

100

1  that or the other thing but because you thought they might
2  want to build a particular type of septic system that you
3  decided ahead of time wasn't going to be appropriate,
4  right?  Is that right?
5             MR. SHERR:  Objection, argumentative.  You can
6  answer.
7             THE WITNESS:  Why did they send me that design
8  if they weren't planning on using it.
9  BY MS. MONTGOMERY:
10     Q      Well, your counsel says this has been asked
11  and answered so I guess we'll move on.
12     A      I can just go by what information I have.  And
13  when you get something in writing and here's maps and here's
14  letters and here's this and this, you must think, you know,
15  that's what they want to do, just like, you know, I saw
16  these with five lots and now I see them with three lots and
17  I see them there with three different lots and ...
18     Q      Working still with Exhibit 1 here, were there
19  any other sites on this plan that show previously approved
20  sites according to the sewer modules that you signed off on?
21     A      This is still proposed.  None of this -- you
22  know, these lines and stuff in here is proposed.  Right now
23  this 95 acres has other suitable sites.
24     Q      Right.  So why didn't you sign off on those
25  modules this time?

101

1      A      Nobody asked me to approve it on those.
2      Q      Well, the modules are all still in front of
3  the township, right?  The modules are all there waiting for
4  approval.  I mean, is there anything wrong with approving
5  this module?
6             MR. SHERR:  Objection to the form of the
7  question.
8             THE WITNESS:  Approving that site for that
9  lot?
10             MS. MONTGOMERY:  Yes.
11             THE WITNESS:  That could possibly be done.
12  BY MS. MONTGOMERY:
13     Q      So let's let the record reflect that we're
14  pointing to -- I pointed to on Parks Exhibit 1 an area that
15  has perc numbers 17, 18 and 20, correct?  Is that what you
16  were looking at?
17     A      Yeah.  Now, I'm not sure if 17 was okay, but
18  there was a good site there.
19     Q      So I'm going to draw with a red pen a circle
20  around where you say there is a good site, in this general
21  area?
22     A      Um-hum.
23     Q      A good site for building that was
24  previously --
25     A      I'm not sure about 17.



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

102

1  Q    So we'll draw 17 out of it, okay.  Any reason
2  why Mr. Corneal can't build a septic system over here for
3  his buildings over here?
4       MS MONTGOMERY:  Let the record reflect I'm
5  pointing to the 18, 20 septic --
6       THE WITNESS:  It would be possible to do that.
7  BY MS. MONTGOMERY:
8  Q    Anyplace else on this map where it would be
9  possible to put a septic system in your opinion?
10  A    Has the line dispute been settled on this?
11  Q    What do you mean the line dispute?
12  A    That they met with Mr. Corneal and he
13  explained that the -- there was a line dispute on this lot.
14  This is -- this line is what this person claims and this
15  line is what --
16  Q    Well, does that have some influence on whether
17  or not you can approve any of these -- whether or not -- the
18  modules for the sites here?
19  A    If this belongs to -- does this belong to Mr.
20  Corneal?
21       MS. THORP:  Bridget, can you please identify
22  the area that you're referring to here.
23       MS. MONTGOMERY:  I'm sorry, we are pointing to
24  an area on Parks Exhibit 1 that's marked by perc numbers 24,
25  25, 26 and 27.

103

1       MS. THORP:  Thank you.
2  BY MS. MONTGOMERY:
3  Q    So you're saying that if this line dispute --
4  you tell me.  If this line -- if there is a line dispute and
5  it has been resolved, is this a suitable place for a septic
6  system?
7  A    If that's on Mr. Corneal's property, that
8  could possibly be a suitable site.
9  Q    So why wasn't this site approved?  Why didn't
10  you sign the module for this site on the second round?
11  A    Again, I'm back to where they more or less
12  told me when they sent me the design they wanted to use that
13  site there.  When I met with Mr. Corneal and Terry Williams,
14  they didn't say, okay, we won't use this, we want to pipe it
15  500 yards to another site.
16  Q    So that's your reason that you wouldn't
17  approve for that?
18  A    Yeah.
19  Q    What about the area on Parks Exhibit 1 that's
20  marked by perc numbers 22 and 23?
21  A    I don't think they were any good.
22  Q    You don't think they were any good?
23  A    No.
24  Q    But is it a suitable --
25  A    I don't think it is.

104

1  Q    Why is that?
2  A    There's soil sheets in there.  I think there
3  was unsuitable soil there.
4  Q    Anything else?  Any other place here that you
5  see on Parks Exhibit 1?
6  A    Any of the sites, except for the backup site
7  for the house, if they wanted to pipe it to that location
8  and build the system, it would be possible to put a system
9  in for where he's building his house.
10       MS. MONTGOMERY:  Let's mark the February 4,
11  2000 plan as Parks Exhibit 2.
12       (Site plan dated 2/4/00 produced and marked as
13  Parks Exhibit No. 2.)
14  BY MS. MONTGOMERY:
15  Q    I want to discuss with you a little bit more
16  this area that we've marked on Parks Exhibit 1 around perc
17  numbers 8, 9 and 10.  Why is that now not suitable for a
18  sand lot system?
19  A    It's not big enough for one.
20  Q    It's not big enough for one?
21  A    Right.  Eight and 9 probably have buildings on
22  -- or no, 8 and 10 probably have buildings on.  Nine is in
23  the middle of a little area that isn't big enough to put a
24  system on without going across disturbed area or driveway.
25  Q    What disturbed area?  So you're saying it's

105

1  not big enough without using a disturbed area or the
2  driveway, is that what you're saying?
3  A    The undisturbed area isn't big enough for a
4  sand mound.
5  Q    In what way is the area disturbed that makes
6  it now unsuitable for a sand lot system or not big enough
7  for a sand lot system?
8  A    Well, as Mr. Archmody describes it in his
9  report, because of driveways and soil compaction.
10  Q    Now, when you talk about a driveway, what are
11  you talking about?  Are you talking about an asphalt
12  driveway?
13  A    Where they've been driving vehicles.
14  Q    Are you talking about an asphalt driveway?
15  A    No.
16  Q    You're talking about some tracks?
17  A    In one spot, yes.
18  Q    Is that the same area that you're talking
19  about compaction occurring?
20  A    Part of it, yeah.
21  Q    How do you resolve that?  How could you
22  resolve it to your knowledge?  Could you fix that site to be
23  okay?
24  A    That's something you should talk to a soil
25  scientist about.  It's an involved procedure.



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

106

1    Q    So you're not talking about this being too
2  close to like an asphalt driveway within the meaning of say
3  the regulations that say it has to be more than 10 feet from
4  a driveway? You're not talking about that, are you?
5    A    A driveway doesn't need to be blacktop.
6    Q    Well, that's true, but you're not talking
7  about an actual driveway, are you?
8    A    It appears to be driveways. When you drive in
9  the road and that's where the road goes is around to the
10  buildings and everything and there's been heavy trucks and
11  cars and there's been at least macadam shale put down, it's
12  a pretty substantial effort to make it a driveway.
13    Q    And you're saying it's within 10 feet of that?
14    A    It would be if you put the system in. You can
15  not put this system in without going over compacted areas.
16    Q    I understand your testimony to be that there's
17  an actual defined driveway now. You believe there's an
18  actual defined driveway. It's not blacktop, but it's a
19  defined driveway. Is there also another area that you
20  consider to be compacted?
21    A    Yes.
22    Q    Now, if you worked with the compacted area,
23  which is not a defined driveway -- is that correct, it's
24  just an area --
25    A    There is an area where there's been vehicles

---

107

1  running through that there's been no shale put on.
2    Q    It's compacted because somebody drove over it?
3    A    Many times.
4    Q    Have you ever been faced with that situation
5  where there's been some compacted soil on a proposed sewage
6  site?
7    A    Yeah.
8    Q    And what do you do?
9    A    Generally we refuse it.
10    Q    You generally refuse it?
11    A    Yes.
12    Q    Do you say because it's compacted soil and
13  here's what you've got to do?
14    A    Yeah, we usually try to find another site.
15    Q    Well, is there a circumstance in which you
16  didn't just try to find another site but you said, gee, you
17  drove over that and so it's not suitable so here's what
18  you've got to do to make it suitable again?
19    A    That's something you should talk to the soil
20  scientist about. I'm not a soil scientist.
21    Q    But you are a sewage enforcement officer,
22  right?
23    A    Yes.
24    Q    So you have no idea as a sewage enforcement
25  officer -- and we're talking about a compacted area as

---

108

1  opposed to a defined driveway. You have no idea what you do
2  to make that okay?
3    MR. SHERR: Object to the form of the
4  question. It's argumentative. You can answer.
5    THE WITNESS: But this really has nothing to
6  do with the module. It would be possible to probably --
7  under a soil scientist's guidance to dig that out of there
8  and put fresh fill in, but then fresh fill has to set for
9  four years before it can be used.
10  BY MS. MONTGOMERY:
11    Q    Is it your opinion it needs to be dug out, put
12  fresh fill in and sit for four years?
13    A    If you wanted to use that again, I would want
14  to hear -- want a soil scientist to --
15    Q    To tell you what needs to be done?
16    A    To tell what needs to be done. That's why
17  they go to college for eight years and have a doctorate
18  degree.
19    Q    Mr. Parks, you've been referring to a letter
20  from a soil scientist, that you got a copy of a letter from
21  a soil scientist?
22    A    Yes.
23    Q    Did you turn that over to your counsel in the
24  course of our request for production of documents?
25    A    No.

---

109

1    Q    Any reason why not? Do you have a copy of it?
2    A    I have it in my pickup, but the supervisors
3  told me not to bring anything in.
4    Q    Not to bring anything into the deposition?
5    A    Yeah.
6    Q    What about just generally turning over
7  documents in response to a request for production of
8  documents, did anybody ask you to do that?
9    A    No.
10    Q    Nobody ever asked you to search your documents
11  in response to a request for production of documents?
12    A    Ann has the old documents.
13    Q    But you have other documents apparently, like
14  the soil scientist letter.
15    A    It just came, I think, yesterday.
16    Q    It just came yesterday, okay.
17    A    It was definitely this week.
18    Q    Do you have any other documents in your
19  possession that you thought were covered by an instruction
20  from the supervisors not to bring that relate to this
21  subdivision, these sewer modules, anything?
22    A    The thing I printed out of the regulations
23  that defines when a sewage module is needed.
24    Q    What's -- I mean, why do you have that, just
25  specifically for reference in connection with the Corneal

---



**110**

1 project?
2 A    Yeah.
3 Q    Where did you get that?
4 A    Out of regulations I have.
5 Q    Do you have anything else in your possession?
6 Not just in your truck, but anywhere in your possession?
7 A    Well, I have a complete set of the
8 regulations.
9 Q    Any other documents related to the Corneal's
10 project?
11 A    I have the map that Mr. Corneal gave me the
12 first day we met there and my original soil -- soil sheets.
13 This looks like the original one there maybe.
14 Q    Do you have any notes or correspondence of any
15 type from anybody other than the letter that you're
16 referring to from the soil scientist?
17 A    I can't think of anything else.
18 Q    What about the plan?  You said you had a plan
19 in your possession that you got from Mr. Corneal.  Did you
20 turn that over?
21 A    It's the original map that Mr. Corneal gave me
22 the day -- the first day we met there.
23 Q    So you still have that in your possession.
24 Well, okay, fine.  I guess you couldn't turn it over if
25 nobody ever really asked you to turn any documents over,

**111**

1 right?
2     MR. SHERR:  Object to the form of the
3 question.
4     THE WITNESS:  It was also the map, I believe,
5 that went with the first module.  It was just an extra copy
6 that ...
7 BY MS. MONTGOMERY:
8 Q    What about the documents that show the sand
9 mound system that you've been referring to, do you have
10 them?
11 A    I'd given a copy to the township.
12 Q    You gave a copy to the township.  In what
13 capacity, what context?
14 A    To show them what he has -- that I received it
15 and it's what he was proposing to put in back there.
16 Q    You have a copy of your own and you gave a
17 copy to the township, right?
18 A    The designer sent me three copies, yeah.
19 Q    Was there ever any other -- you know, any
20 design that was proposed for any other part of the -- any of
21 these other approved sites, previously approved sites on
22 Parks Exhibit 1?
23 A    There was no other designs that I received.
24 Q    At some point did you come to the conclusion
25 that a design that you had received was designed for the

**112**

1 wrong site on the map?  Did you tell somebody, oh, this was
2 -- I got this design, but it's a design for the wrong site?
3 A    No, I didn't tell them that -- oh, yeah, yeah,
4 it did have the wrong soil sheet on it.
5 Q    Tell me what design is that.  What are you
6 talking about, just tell me about it in general?
7 A    The site that I -- the design that I received
8 had the criteria on there as far as limiting zone and perc
9 rate and slope for one site, but it -- again, you're asking
10 me to -- it was -- it did have the numbers on for this right
11 here.
12 Q    Okay.  Can you point to that again?
13 A    (Indicating.)
14     MS. MONTGOMERY:  Let the record reflect that
15 on Parks Exhibit 2 Mr. Parks is pointing to the area on the
16 map that's marked by perc numbers 24, 25, 26 and 27.
17 BY MS. MONTGOMERY:
18 Q    So you received a design --
19 A    The design had this soil sheet on it -- the
20 two of them were mixed up.
21 Q    Let me ask you this:  Would that design have
22 worked there to the area that you just pointed to defined by
23 perc numbers 24, 25, 26 and 27?
24 A    I'd have to look at it again.
25 Q    Is that the sand mound design that you're

**113**

1 talking about?
2 A    Yes.
3 Q    That you've said now isn't suitable for the
4 areas marked by perc numbers 8, 9 and 10?
5 A    Um-hum.
6 Q    Mr. Parks, we had talked a little while ago
7 about a privy permit -- a request for a privy permit, I
8 should say, from Mr. Corneal, okay.  Did you receive any
9 telephone calls from any of the supervisors or Ann Wirth
10 about Mr. Corneal's request for a privy permit?
11 A    Not that I recall.
12 Q    Did you receive any instructions, whether in
13 person or by telephone or in writing, from Ann Wirth or any
14 of the supervisors about Mr. Corneal's request for a privy
15 permit?
16     MR. SHERR:  Objection to the form of the
17 question.  It's been asked and answered.  You can answer
18 it.
19     THE WITNESS:  I don't recall.
20 BY MS. MONTGOMERY:
21 Q    Do you recall talking to Ann Wirth whether in
22 person or by telephone about whether or not you should help
23 Mr. Corneal in any way in his effort to get an on-site
24 septic system?
25 A    I don't recall of talking to anything except



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

114

1 what was presented in the module. I'm always trying to make
2 the simplest way for everybody to get through this and on
3 with the other project, but you're asking me, you know,
4 5,000 conversations ago to remember ...
5 Q    Do you recall telling Mr. Corneal that you
6 were told not to do anything to help him get a privy permit
7 or anything else?
8 A    No.
9 Q    For the record, I'm going to ask you to
10 identify a series of documents and tell me what they are.
11      MS. MONTGOMERY:  I have copies for counsel.
12 Here's your copy.  You can share with your counsel.
13 BY MS. MONTGOMERY:
14 Q    I've just handed you a document, it's stapled
15 together.  The first page on it has sewage facilities
16 planning module at the top.  Can you look at that and tell
17 me whether or not you recognize the document?
18 A    Well, I know it's a sewage module.
19 Q    Related to what, Mr. Parks?
20 A    The Corneal subdivision.
21      MR. SHERR:  Was this -- I'm sorry, was this
22 marked?
23      MS. MONTGOMERY:  It's going to be marked.  I
24 just told him that we're going to identify these for the
25 record.

---

115

1      MR. SHERR:  It wasn't.  I just didn't know
2 whether it was or not, that's all.  Real simple.
3      MS. MONTGOMERY:  No.
4      MR. SHERR:  Keep it simple, easy.
5 BY MS. MONTGOMERY:
6 Q    Can you give me a little more detail on what
7 these are, Mr. Parks?
8 A    Well, this is the DEP form that gets submitted
9 to the township and then to DEP.
10 Q    And did you sign these?
11 A    Well, my signature is -- there's a copy of my
12 signature in here, yeah.
13 Q    So this is the sewage facilities planning
14 module submitted to you from Mr. Corneal's property,
15 correct?
16 A    Where is the original with my signature on
17 it?
18 Q    We wouldn't have it.  The township would have
19 it or you would have it.  We don't have it.  I mean, are --
20 let's look at page 5 of this document.
21 A    Um-hum.
22 Q    Do you see where your signature is, Barry
23 Parks?
24 A    Yep.
25 Q    Is that your signature?

---

116

1 A    It's a copy of my signature, yeah.
2 Q    What's the certification number there?
3 A    2373.
4 Q    Is that your sewage enforcement officer
5 certification number?
6 A    Yes, it is.
7      MR. SHERR:  I think the problem may be this is
8 all odd numbers and it appears as if they were -- it's
9 two-sided, the original is two-sided, and we don't have the
10 other side.  If it's a copy you got from me, then I did copy
11 the other pages and attach them to the back of it.
12      MS. MONTGOMERY:  You need to go get that
13 original group of documents.  That might be the problem.
14      (Discussion held off the record.)
15 BY MS. MONTGOMERY:
16 Q    While she's out, I'm just going to ask you to
17 look at what exists here right now.  We may have an
18 incomplete form of this document.  Look at what is numbered
19 -- see where you have a page 5 and then the next page it
20 says project narrative?  Do you see that?
21 A    Yeah.
22 Q    Do you recall this being submitted to you
23 along with the original sewage facilities planning module
24 submitted by the Corneals?  Is this document familiar to you
25 as you're looking at the project narrative?

---

117

1      (Pause.)
2      THE WITNESS:  Can you ask the question again?
3 BY MS. MONTGOMERY:
4 Q    Okay, Mr. Parks.  There may be a couple pages
5 missing from this, but is this the sewage facilities
6 planning module that was submitted to you -- a copy of the
7 sewage facilities planning module that was submitted to you
8 by the Corneals that you signed off on?
9 A    Again, we're talking a year and a half ago.  I
10 -- I don't think so.
11 Q    Why don't you think so?
12 A    It's not the way I remember the ...
13 Q    Well, let's go back to page 5, okay?
14 A    Yeah.
15 Q    See where it says Barry Parks?
16 A    Yeah.
17 Q    See where it says -- there's a box that is
18 checked that says generally suitable for on-lot disposal,
19 this module does not constitute individual permit approval,
20 right?
21 A    Yeah.
22 Q    Where your signature is and where that's
23 checked, is that generally how you sign off on a sewage
24 module?
25 A    Yes.

---



**PARKS, BARRY**
05/16/01

**CORNEAL  VS
JACKSON TOWNSHIP**

---

118

1  Q    So that would be an approval of the sewage
2  module right there, correct?
3  A    **That would be, yeah.**
4  Q    Let's go back to the perc tests which are on
5  this copy several -- the fifth page from the back, I
6  believe. Site investigation and percolation test report for
7  on-lot disposal of sewage. Is your signature down there on
8  the lower right-hand corner?
9  A    **Yes.**
10  Q    Does this indicate approval, satisfactory perc
11  test?
12  A    **Yes. If we're talking about sites, that 4 and
13  5 doesn't look like — site and garden. That 4 and 5
14  doesn't look like my writing, but that is the site and the
15  garden, that is the alternate site for the farmhouse.**
16  Q    So this is approval of the perc test for those
17  sites, right?
18  A    **That's the alternate site for the existing
19  house.**
20  Q    Let's go to the next page.
21  A    **That site is 7-A. It's the one down in back
22  of the pine -- little pine thicket there.**
23  Q    So is this also an approval, an approved perc
24  test --
25  A    **Yes.**

---

119

1  Q    -- report? Signed by you in the lower
2  right-hand corner. Okay, the next page.
3  A    **See right there I have marked lot 7. This is
4  the one we did where Mr. Corneal explained to me how he was
5  going to build his house and his art studio and stuff.**
6  Q    And did you approve this --
7  A    **It was approved --**
8  Q    -- perc test?
9  A    **— between probes 8 and 9, yes, which is the
10  site that I'm saying is no longer available.**
11  Q    Okay, how about the next one?
12  A    **That's the one that – the day I was there the
13  younger brother was — I assumed it was the younger brother.
14  He was there and he was looking at buying a smaller lot up
15  in the corner.**
16  Q    For the record, this is the page of this
17  sewage facilities planning module that has a handwritten
18  number 6 at the top, right, a handwritten number 6 up on the
19  top right-hand corner?
20  A    **Right.**
21  Q    Did you write that number 6 on there? Is that
22  your handwriting?
23  A    **I don't think so.**
24  Q    Do you know what it refers to?
25  A    **No.**

---

120

1  Q    Is that your signature -- a copy of your
2  signature on the lower right-hand corner?
3  A    **Yeah.**
4  Q    And is this an approved perc test?
5  A    **Yes.**
6  Q    And for what perc numbers?
7  A    **Eighteen and 20.**
8  Q    Can you show on the document or refer for the
9  record to the place on the document that shows where this --
10  where the reference to the perc numbers are?
11  A    **The second place you circled in red.**
12  Q    But on this document here, how can you tell
13  that this is a perc test approved for perc numbers 18
14  and 20?
15  A    **I have it written there above the graph.**
16  Q    Where it says peaked between 18 and 20?
17  A    **Perked between 18 and 20.**
18  Q    I'm sorry, perked between 18 and 20?
19  A    **Yes.**
20  Q    Now, the next page, which is the last page of
21  this document, what is that?
22  A    **That's another approved perc site.**
23  Q    For the Corneal property?
24  A    **Yeah, it's the one that the soil sheet was
25  used for the design that I received.**

---

121

1  Q    So this is perc numbers -- between perc
2  numbers what, 24 and 26?
3  A    **Yeah.**
4  Q    Which you have handwritten and that's your
5  handwriting right above the graph in the middle of the page?
6  A    **Yes.**
7  Q    So you signed off on this perc test as well,
8  correct?
9  A    **Yes.**
10  MS. MONTGOMERY: Tony, we just looked at the
11  original that you sent us and we do only have the odd
12  numbers.
13  MR. SHERR: I don't think --
14  MS. MONTGOMERY: It's not the original, it's a
15  copy.
16  MR. SHERR: I don't think I sent this to you.
17  I was just looking for my production and I don't think I
18  sent this to you.
19  MS. MONTGOMERY: We have it in a pile of
20  documents that we got on Friday afternoon.
21  MS. MALADY: If you have the even numbers, if
22  you can fax them to me, we'd appreciate it.
23  MR. SHERR: Yes, I don't -- I'm just looking
24  and I don't think I have -- all I'm saying to you is I don't
25  think I have it.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



122

MS. MONTGOMERY: Well, maybe we're wrong.
(Discussion held off the record.)
MS. MONTGOMERY: Well, for now, until we get a complete copy, we are going mark this as Parks Exhibit 3 and we'll go from there.
(Sewage facilities planning module produced and marked as Parks Exhibit No. 3.)
THE WITNESS: Can I say that I would like to see a copy of the whole thing with my signature on it before I say this is the way -- it hasn't been tampered with?
MS. MONTGOMERY: Sure.
THE WITNESS: Because we're all saying that it's mixed up and --
MR. SHERR: To my understanding you haven't said that. You've only identified this as your signature. I don't think you've testified that this was --
THE WITNESS: It's been copied and that could have came from -- what you're looking at right there could have been pulled out of another sewage module that was okay and stuck in there.
BY MS. MONTGOMERY:
Q I mean, you already testified that you approved the sewage module --
A **Yes.**
Q -- that was originally --

123

A **I did. I approved a sewage module. I thought it was for more than -- just sitting here thinking about it, I thought it was more than three lots, the original. That's why I'm thinking this could ...**
Q There's four lots, Mr. Corneal is saying.
A **But, see, on the front page it says three lots and the original one was -- you know, we have numbers back here on these soil sheets for --**
MR. CORNEAL: Can we go off the record for a second?
MS. MONTGOMERY: We could. I don't mind.
(Discussion held off the record.)
THE WITNESS: They are my soil sheets and that is a copy of my signature, although I have questions about how this all is together here.
BY MS. MONTGOMERY:
Q Mr. Parks, we talked about the moratorium that you referred to some time ago. What was your understanding of the effect of the moratorium on your process of reviewing sewer modules and applications for permits?
A **Well, I still handle them the same way. If they get to -- up to the moratorium and there's a moratorium on it, it would just stop there till like Mr. Simpson -- well, not the Simpson -- the surveyor. There was another -- two brothers, the Simpsons, they were doing the same thing**

124

**and they just waited until the moratorium was lifted, we signed the module, sent it off when it was done and they're putting roads in and getting ready to build legally.**
Q But the moratorium was supposedly directed to subdivisions, correct?
A **Yes.**
Q Not to sewer modules or to permits --
A **Well, it's part of it.**
Q But there wasn't a moratorium on you signing off on sewer modules, was there?
A **No.**
Q Was there a moratorium on you signing off on septic systems?
A **Well, if there's a moratorium -- no, I could still approve septic systems on approved lots. So if somebody -- even during the moratorium, if somebody came with an existing lot, we could still -- that's an existing, that's already been subdivided, we could issue a permit on that.**
Q When did the moratorium go into place according to your memory?
A **That's really out of my -- you know, I'm --**
Q I mean -- well, you said you were aware of it so do you recall when it went into place?
A **The winter of '99, 2000.**

125

Q I'm going to hand you a series of documents that we will mark as Parks Exhibit 4 and I'm going to hand out copies to counsel, the same documents.
(Activity records produced and marked as Parks Exhibit No. 4.)
MS. MONTGOMERY: Let's just look through and make sure we have the same thing. They should start with -- folks, for the record, they should start with a document that says activity record for enforcement of the Pennsylvania Sewage Facilities Act. The first date in the left-hand column being 1/26/00, John Younker. Does everybody have that?
MR. SHERR: What was the first date?
MS. MONTGOMERY: 1/26/00.
MS. MALADY: It may be in reverse order.
MS. MONTGOMERY: Are they in reverse order?
MR. SHERR: That's okay.
MS. MONTGOMERY: If you can just reverse the order, guys, then we can get started.
BY MS. MONTGOMERY:
Q Mr. Parks.
A **Um-hum.**
Q Your first document, does it say 1/26/00?
A **Um-hum.**
MR. SHERR: You have to say yes or no for the

126

1  court reporter.
2      THE WITNESS:  I'm sorry, yes.
3  BY MS. MONTGOMERY:
4    Q    Do you recognize this document?
5    A    **Yeah.**
6    Q    Did you fill it out or did you type it out
7  yourself?
8    A    **Yeah.**
9    Q    You did?
10   A    **Well, my wife types them.**
11   Q    So on the 1/26/00 column there it refers to
12 John Younker?
13   A    **Um-hum.**
14   Q    And just tell me what -- just reading across
15 what does that refer to in total?
16   A    **Activity described is an application.**
17   Q    Application for what?
18   A    **Sewage permit.  All applications are for a**
19 **sewage permit.**
20   Q    You mean so this is after already existing
21 modules were approved?
22   A    **Yep.**
23   Q    So this is an application for a sewage permit
24 for what?
25   A    **For a septic system.**

127

1    Q    And do you recall -- well, let me look at
2  this.  What's in the next column, 2/00?  Is that completely
3  unrelated?
4    A    **That's prepare and reimbursement forms for the**
5  **township.  That's something we have to do for DEP, reports**
6  **we send in at the end of the year.**
7    Q    So these are two completely unrelated
8  activities, correct?
9    A    **Yep.**
10   Q    So down in the right-hand corner it says
11 period covered February 2000.  Is this everything that you
12 did for Jackson Township --
13   A    **Yes.**
14   Q    -- for February 2000?
15   A    **Yes.**
16   Q    So this John Younker application for a --
17   A    **Um-hum.**
18   Q    -- permit for septic system -- is that what it
19 is?
20   A    **Yes.**
21   Q    Do you recall whether you approved that or
22 didn't approve it or what?
23   A    **I approved that.**
24   Q    When did you do that?
25   A    **Well, I --**

128

1    Q    Shortly thereafter?
2    A    **Yeah, existing lot.**
3    Q    It was for an existing lot?
4    A    **Yes.**
5    Q    So this was for an existing lot.  Did it have
6  any houses on it?
7    A    **No.**
8    Q    So it was for -- in connection with getting a
9  building permit, correct?
10   A    **Yeah.**
11   Q    Is it in any way subdivided?
12   A    **It was previously subdivided.**
13   Q    It was earlier subdivided?
14   A    **Yeah.**
15   Q    When?
16   A    **I don't recall exactly.  It was -- it seems**
17 **like it was -- it was one of those that took a good while**
18 **for the surveyor to get done.  I don't recall right off.  It**
19 **was one of the slower surveyors who did it.**
20   Q    Was the subdivision approved in 1999?  When
21 you say it was previously approved, was it a 1999 approval
22 to your memory?
23   A    **I don't remember.**
24   Q    Let's look at the next page.  It should say --
25 3/29/00 is the first date in the left-hand column.

129

1    A    **Yep.**
2    Q    Can you explain to me what that is?
3    A    **The Robert Treaster --**
4    Q    It looks like Treaster.
5    A    **I'm thinking that was a -- a camp.  It may**
6  **have even been on state land.  In Jackson Township there's a**
7  **lot of state leased land where they -- back in maybe the**
8  **early 1900's they sectioned off hundred-by-hundred squares**
9  **and people lease them to build a camp on and they own the**
10 **camp but they don't own the land.  Every 10 years the lease**
11 **renews.**
12     **When that lease renews, a lot of times the**
13 **park department, DC&A, send me out -- send me a letter to go**
14 **out and inspect there, which is usually a privy, but in some**
15 **cases a few of the real old ones -- they're not supposed to**
16 **have water on site so we usually update their privy.  If for**
17 **some reason -- a couple of them have water and there's no**
18 **room to put septics on so we put them in a holding tank.  I**
19 **think that's what that was.**
20   Q    So this application is for a holding tank?
21   A    **Yes.**
22   Q    What is a holding tank exactly?
23   A    **Waste carried by water to a sealed vault to be**
24 **pumped out and taken to another site.**
25   Q    So is it different than a privy?



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

130

1   A    Yes.
2   Q    Do you know --
3   A    A privy there is no water involved.
4   Q    How did you dispose of this holding tank
5   application?
6   A    I issued a permit for it.
7   Q    And the next one is David Freeman, application
8   for tank replacement, right?
9   A    Yeah.
10  Q    What is a tank replacement?
11  A    It was one that had an undersized tank or a
12  tank that was damaged and an existing house. Like if one
13  would go bad at Mr. Corneal's farmhouse, we would issue a
14  repair permit to -- just to put in a new tank. You're not
15  allowed to modify the field drain any.
16  Q    So this is a holding tank replacement, is that
17  what you're saying or --
18  A    A septic tank replacement.
19  Q    A septic tank replacement?
20  A    A holding tank there is no drain field.
21  Q    So you approved that, right?
22  A    Yes. A repair -- both of these were basically
23  repairs and repairs we must do. It's in regulations that
24  it's our responsibility to -- abatement of a health hazard.
25  Both of these were abatement of a health hazard and it's in

---

131

1   the regulation and we must do that.
2   Q    The next page we have a document -- I guess it
3   might be easier to identify it by the reference in the lower
4   right-hand corner, period covered May 2000, right? Do you
5   see that? Do you have it?
6   A    Yep.
7   Q    And the first date on the left-hand corner is
8   5/31/00, correct? Can you tell me what that was, Debra Kerr
9   application for what?
10  A    It's not ringing a bell.
11  Q    Do you see the interim inspection and the
12  final inspection?
13  A    Um-hum.
14  Q    Does that help?
15  A    No.
16  Q    Now, let me ask you something. I mean, you
17  would have actual written applications for these
18  activities --
19  A    Yes.
20  Q    -- that we've been talking about?
21  A    Yes.
22  Q    Where are they kept?
23  A    When I'm done with them, I turn them over to
24  the township.
25  Q    What do they look like, the applications?

---

132

1   A    Well, they're legal size paper. The front
2   piece is white. When I send them -- there are actually four
3   carbon copies. There's a white one that stays at the
4   township, there's a pink one that goes to DEP, there's a
5   yellow one that goes to the applicant and there's a green
6   one that is sent into DEP after they are final inspected.
7   Q    So going back to the first two documents, the
8   application for John Younker, the application for the
9   holding tanks, they all go on the same type of application
10  form?
11  A    Yep, the form is the same.
12  Q    The form is the same?
13  A    Yep.
14  Q    And when you're finished with them, you send a
15  copy to the township, right?
16  A    When I'm totally done with it.
17  Q    And this is just one page typically, the
18  application?
19  A    The application is just one page, but there
20  may be there's a soil sheet that goes with it if it's --
21  now, if there's a tank replacement or a holding tank or a
22  privy, there's no soil sheet, but there may be other guides
23  on how to install -- if it's a privy, how to install a privy
24  and isolation distances and -- it's written right on there
25  you can't have indoor plumbing and water on site.

---

133

1   Q    So some of the applications are going to be
2   just the one page application, some of them are going to
3   have an attachment or two to them or something like that?
4   A    And if it's a sand mound or a system, it's
5   going to have a design like saying I received --
6   Q    Like one of these, something like this or --
7   A    No, it might have 15, 20 pages in it. It
8   should be everything you need to know about --
9   Q    The design?
10  A    -- installing that septic system.
11  Q    I see. And then when you dispose of these,
12  when you say, okay, approved or granted or something like
13  that, what does that document look like?
14  A    There's just a place I sign off on.
15  Q    So it's the same application?
16  A    Yeah.
17  Q    And you just check off on that and that's a
18  freestanding form, correct, just a single form?
19  A    Yes.
20  Q    And it goes in a file in the township office?
21  A    Yes.
22  Q    Kept by whom?
23  A    Ann.
24  Q    Do you keep any copies for yourself?
25  A    Not usually.

---



---

134

1    Q    So you don't recall what Debra Kerr applied
2  for then?
3    A    No.
4    Q    Then we'll move on to the next sheet.
5    A    Although that -- I think that's one in Ken
6  Miller's subdivision.
7    Q    Ken Miller's subdivision?
8    A    Yeah.
9    Q    Tell me about Ken Miller's subdivision.
10    A    He had -- back Miller Road -- well, it's back
11  the road -- it's right across from Mr. Corneal's driveway.
12  The Millers have owned land two generations out there and
13  it's -- they used to be loggers and now Ken Miller's selling
14  -- subdividing. We've worked on this all through the
15  nineties. The last subdivision was approved '98 -- I'd say
16  '98, '99.
17    Q    So you think this was for --
18    A    This is one of the lots.
19    Q    A building lot in Ken Miller's subdivision?
20    A    They're big -- you know, it's the top of the
21  mountain. He had probably 300 acres and he might have got
22  10 lots. You know, it's real skimpy stuff. They're big 20,
23  30 acre lots.
24    Q    So they're 20, 30 acre lots and so people are
25  building individual homes on them?

---

135

1    A    Yes. I think Kerrs were up there.
2    Q    The next page says period covered May 2000.
3  Do you see that up in the left-hand column?
4    A    May 2000, yes.
5    Q    Then up in the left-hand column it says May 1,
6  2000, 5/1/00?
7    A    That year I probably issued four or five
8  permits in Mr. Miller's subdivision.
9    Q    So you think Drew Tomlinson --
10    A    I'm pretty sure McLaughlin is and -- I think
11  the other one is too.
12    Q    So these are permits for septic systems,
13  on-site septic systems?
14    A    Yep.
15    Q    For whatever, it might be sand mound, it might
16  be something other?
17    A    Up there they're all sand mound.
18    Q    They're all sand mound, okay. So did you
19  approve Drew Tomlinson's and Mark McLaughlin's to your
20  memory?
21    A    Yes.
22        MR. SHERR: Could we go off the record for a
23  second?
24        MS. MONTGOMERY: Yes.
25        (Discussion held off the record.)

---

136

1  BY MS. MONTGOMERY:
2    Q    So now we're at --
3    A    If you'll look on this list here, Ken Miller's
4  subdivision was approved 9/16/97, Ken's Acres. Now, wait,
5  that isn't it. Kenwood was Ken Miller and Kenwood and --
6        MR. SHERR: Just for the record, he's
7  referring to the document I gave you this morning.
8        MS. MONTGOMERY: Right. I was just asking
9  Leslie for my copy of that.
10        THE WITNESS: Oh, right there it was.
11  3/24/99, 16 lots.
12  BY MS. MONTGOMERY:
13    Q    So let's move onto the next sheet which is
14  period covered June 2000. Up in the left-hand column it
15  says 6/20/2000, June Price, is that ringing any bells with
16  you?
17    A    That -- Ken Miller's was a real happening
18  place there.
19    Q    So is this from the Miller subdivision?
20    A    I think so.
21    Q    And it's an application for an on-lot septic
22  system, right?
23    A    On an approved lot approved in -- prior
24  approved.
25    Q    The next page the period covered is June 2000?

---

137

1    A    I think that was a --
2    Q    It's page 2 of the period covered June 2000?
3    A    Yeah.
4    Q    I'm sorry, that was backwards. This is page 1
5  of the period covered June 2000 and it begins 6/2/2000. Do
6  you see that?
7    A    Yeah.
8    Q    Go ahead.
9    A    Again, there's an application for a holding
10  tank. I think that was a little place that was just -- it
11  had water but there was no place left to put a system in.
12  So, again, abatement of a health hazard, it's our
13  responsibility to issue a holding tank as just a last --
14  last resort, when nothing else will do, short of tearing the
15  house down and making people move.
16    Q    What about William Couch, the next guy down?
17    A    Okay, that's a -- an existing farmhouse that
18  was sold and to sell it the realtors wanted dye tests. The
19  gray water went to the creek, into the ditch, so I made them
20  put a new system in, which is what the site check, the
21  application -- that's a repair. Again, that's our
22  responsibility to -- abatement of a health hazard.
23    Q    What's the application/alteration permit?
24    A    That one -- we later put a new system in, but
25  that one was to change the indoor plumbing so that the gray

---



**PARKS, BARRY**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

138

1  water didn't go into the ditch, it went into the septic
2  system.
3  Q      The next one, Roy Augenstein?
4  A      That was for a subdivision I'd say done in
5  '98. It's over an icehouse above the Whipple's Dam Store,
6  old subdivision.
7  Q      So it was an application for what, I'm sorry?
8  A      A new house.
9  Q      For a septic system for a new house?
10  A      Yeah.
11  Q      Did you approve it?
12  A      Yes.
13  Q      Allen Crabtree/Watkins, what's that?
14  A      I -- that is not ringing a bell, but you need
15  to remember I do this in 18 townships and I look at -- I
16  issue a hundred permits a year.
17  Q      Okay, you remembered some of them. So that
18  one is not ringing a bell. Now, the next one it says for
19  period covered August 2000. Now, mine were reversed. So
20  it's page 1 of 2 and page 2 of 2 and I want to start with
21  page 1 of 2. Do you see there it says Joe Baker 8/2/2000?
22  A      Um-hum.
23  Q      Is that ringing a bell?
24  A      Yes.
25  Q      What is that?

---

139

1  A      I'm not seeing it.
2  Q      It should be page 1 of 2, period covered
3  August 2000. Look at the bottom of the one underneath it.
4          MR. SHERR: No, he doesn't have it.
5          MS. MONTGOMERY: You don't have it?
6          MR. SHERR: No.
7          THE WITNESS: No, but I know him. He'd done
8  an earlier -- Joe Baker, yeah.
9          MR. SHERR: I'll just show him my copy.
10          THE WITNESS: He had an existing house that
11  several years ago he -- oh, it was an existing trailer on
12  four or five acres. We had put a repair in several years
13  ago. There was a malfunction there. He bought it. He
14  wanted to build a house on the other half so he had
15  subdivided it. That had been going on for years.
16  BY MS. MONTGOMERY:
17  Q      Did you approve it? Did you approve his
18  application?
19  A      When I got the proper paperwork and it was
20  properly DEP approved and it was installed and everything,
21  yes. He followed the proper channels and I did approve it.
22  Q      I'm just asking if you approved Joe Baker's
23  application is all. Did you?
24  A      Yes.
25  Q      What about William Guyer?

---

140

1  A      Mr. Guyer had a couple different places that
2  he -- I don't know if he's retired and if this is kind of a
3  hobby for him or something. He built these two cabins.
4  They look like they were 20 some years old. I don't think
5  they've ever been lived in. They're three-quarter done. He
6  thought he was going to get ambitious and finish them and
7  put a septic system in. I did do testing but he's never
8  submitted an application so it's still --
9  Q      Did you approve the modules?
10  A      There's no module. This was prior to '72.
11  Q      So this just went right to a -- well, you did
12  a probe and a perc?
13  A      They're still on hold.
14  Q      So what's the application refer to, just
15  directly to an application?
16  A      I have an application I'm holding until he
17  gets me a design.
18  Q      And he has cabins up there now?
19  A      They're just little house cabins that he just
20  tinkers around with them, works on them once in a while but
21  nobody lives there.
22  Q      Do they have any septic up there at all now?
23  A      (Witness shook his head negatively.)
24          MR. SHERR: You have to answer out loud.
25          THE WITNESS: No. Nobody is living there.

---

141

1  They're not occupied.
2  BY MS. MONTGOMERY:
3  Q      So the one underneath William Guyer, that's
4  just the other cabin, right?
5  A      Yes.
6  Q      The next one down. Just for a point of
7  reference here, there's numbers under each of these people's
8  names, like R40132.
9  A      That's a DEP code number.
10  Q      It's a DEP code number. What's the R40132
11  refer to?
12  A      No, that's the application number, the DEP
13  number. That's not the module approval number, that's the
14  number -- each of these applications -- they come in a big
15  tablet. Every one of them, just like a bill sheet, has a
16  number.
17  Q      Well, some of them start with R and some of
18  them start with Q. What's the difference?
19  A      Out of two different tablets.
20  Q      That's it, okay. These two houses from
21  William Guyer are on the same lot, right?
22  A      I don't think so.
23  Q      You think they're on two different lots?
24  A      Yeah, the Guyers broke off a bunch of stuff in
25  the sixties, seventies. These are prior regulations which

---



142

1  is '72. If you read on top of the module there, it says
2  lots created after May 15th of '72 so we're -- up here.
3      Q      Oh, I see what you're saying, right.
4      MR. SHERR: The witness was referring to what
5  had previously been marked as Parks 3, I believe. I don't
6  know if it's been previously marked.
7      MS. MONTGOMERY: Parks 3, sewage facilities
8  planning module.
9      MR. SHERR: Yes.
10 BY MS. MONTGOMERY:
11     Q      The last -- well, is this the last page? No,
12 not quite. The next page is page 2 of 2 for the period
13 covered August 2000. Do you have that? It starts with
14 Stanley Wensell or something?
15     A      Yeah, Stanley Wensell. Augenstein, that's a
16 -- Stanley is the contractor. Augenstein, a hundred
17 dollars. It had to be a -- just a tank replacement.
18     Q      What about Keystone Financial, Yoder estate,
19 enforcement?
20     A      That was a real estate transfer that -- that a
21 finance company must have requested I do a dye test, or at
22 least a site check on it.
23     Q      Is it an existing lot or something?
24     A      Yeah. Well, if it's a real estate transfer
25 and I'm checking the septic, that means there's a house and

143

1  septic and everything there. They just wanted, for some
2  reason, it looked at to make sure it's not going into a
3  stream or something.
4      Q      What about period covered September 2000, page
5  1 of 1, Donald Dearment?
6      A      Dearment. That must have been -- we did nine
7  probes on it and three percs. We were looking for a -- it
8  was a repair. We had trouble finding a new site and it was
9  repairing a malfunctioning system.
10     Q      And where is this, in a development?
11     A      No, this would be an existing old house. And
12 Jerry Willey was the same thing, a house that maybe was
13 built in the fifties or sixties that now the system is a
14 malfunction so we try, if at all possible, to bring it up to
15 today's standards. Sometimes on lots in that area we have
16 to do a lot of looking around to find a suitable place.
17     Q      So you approved these applications, right?
18     A      Yes.
19     Q      The Willey and Dearment applications?
20     A      Yes.
21     Q      Now, 9/20/2000 -- I'm sorry, go to the next
22 page, period covered October 2000. Thomas -- what is that,
23 Henwood?
24     A      I don't have that one either. The next one --
25 the only one I have left is George Simpson.

144

1      MS. THORP: I have an extra one.
2      (Discussion held off the record.)
3  BY MS. MONTGOMERY:
4      Q      Are you looking at it?
5      A      Yeah.
6      Q      Thomas -- what is it, Henwood?
7      A      I think so.
8      Q      Did we already do him?
9      A      No, I don't think so. I'm not recalling that
10 -- that name. Raymond Tussey was a farmer who just got
11 remarried and they wanted to build a new house. He had a --
12 on his deed it was listed as two tracks of land. So the one
13 smaller track was like 20 acres and it was a vacant parcel.
14 He could -- that was treated as an existing lot because it
15 was existing. So we just did the testing. He didn't need
16 to do a module on it because he built it as one house on one
17 existing lot.
18     Q      So you treated it as an existing lot?
19     A      Yes.
20     Q      So what did he do with his old house?
21     A      I think one of his kids took over the farm.
22     Q      So you approved that. You just went right to
23 the septic system, right, and just approved that
24 application?
25     A      We did testing and permitted and put the

145

1  system in and everything else.
2      Q      Skipped the modules and went right to the --
3  right?
4      A      Well, we didn't have to do the modules. It
5  was a pre-'72 lot.
6      Q      What about this Mr. Esh/Camp Gunsmoke?
7      A      That's one of those state leased that I get
8  the letter on and have to go out. If it's not on a --
9  privy's not on a sealed vault, it's like the old ones used
10 to be with just a hole dug in the ground, we bring it up to
11 today's specs and put it on a sealed vault.
12     Q      This says application for a privy, right?
13     A      Yeah.
14     Q      So do you recall this project?
15     A      I think so. I think it's one of the ones
16 going over the mountain to State College.
17     Q      So you approved this application for a privy,
18 a privy permit?
19     A      Yeah.
20     Q      How about -- the last page I have is March
21 2001.
22     MS. MONTGOMERY: Is everybody else there?
23 BY MS. MONTGOMERY:
24     Q      George Simpson, what's that?
25     A      That was the other -- one of the subdivisions



**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

146

1 that was caught in the moratorium. And when the moratorium
2 was over, they submitted their modules and got an approval
3 and got a permit.
4        I need to clarify something here. You
5 questioned if I approved these applications. If I -- if I'm
6 not going to approve it, I probably didn't send them an
7 application. Because if I think it's to the point where
8 it's going to work, I send an application. As long as I get
9 the design that's going to be suitable for that particular
10 repair or new house or whatever it is, I'm going to issue
11 the permit.
12    Q    Now, this George Simpson property, is that a
13 subdivision?
14    A    Yes, it was one that was tied up in the
15 moratorium and then it was -- and when the moratorium was
16 over, they submitted their plans in the process and got it
17 approved and I was able to issue them a legal DEP approved
18 permit.
19    Q    Did they have to go through the sewage module
20 phase or were they already there?
21    A    Again, they were there waiting for the
22 moratorium to be lifted, same as Mr. Corneal. They just
23 waited.
24    Q    So they had approved modules?
25    A    Yes.

147

1    Q    They had approved modules?
2    A    Yeah.
3    Q    Did you go back out and reinspect their
4 properties to make sure nothing was disturbed?
5    A    No, there's been no work done out there.
6    Q    So you didn't go back out and disturb -- or
7 inspect their property, that's fine. How many lots?
8    A    This Simpson's?
9    Q    Yes.
10    A    It was two brothers. They split like a
11 hundred and some acres.
12    Q    They split it into two big lots?
13    A    Yes.
14    Q    They're each going to build?
15    A    The one brother is real -- wanted to do it
16 right now, the other brother is going to eventually.
17    Q    So this is an application for a septic system?
18    A    Yes.
19    Q    What about -- and you approved it, right?
20    A    It was an approved lot.
21    Q    Hickory Hats, Timothy Lynch, what's that?
22    A    I don't recall, but sometimes I -- if these
23 are a transfer of title or something, the person I talk to
24 isn't necessarily the person that -- especially on a site
25 check. It was just somebody called and said I -- my

148

1 neighbor's -- I think my neighbor's septic is running over
2 on my driveway or something like that. A site check is just
3 I go out and physically walk over the land because there's
4 been a complaint.
5    Q    Let me ask you this: Do you keep copies of
6 these activity records for yourself?
7    A    Yes.
8    Q    Now, these were produced to us by the
9 township.
10    A    Um-hum.
11    Q    Or by your counsel anyway. And they start in
12 February 2000 and they skip March 2000.
13    A    Well, March of 2000 was a pretty bad winter.
14 Maybe I didn't -- sometimes -- I work on an as-needed
15 basis. If there's nothing going on there for three month,
16 I --
17        MR. SHERR: Let her ask the question. I don't
18 think she asked a question.
19        MS. MONTGOMERY: That's all right.
20 BY MS. MONTGOMERY:
21    Q    The question is -- really the question is
22 would you please search your records and provide me with --
23 or provide your counsel to provide me with activity records
24 that cover the period from June '99 to the present? We have
25 nothing before February 2000 and then after October 2000 we

149

1 have nothing until March 2001. So I'm just looking for the
2 rest of these documents.
3    A    Well, the March 2000 I'm pretty sure -- that
4 was in the middle of the moratorium and the middle of winter
5 and I just didn't do anything probably, but fall of '99 we
6 could do that.
7    Q    And what about after March 2001, any that you
8 have after that?
9    A    Well, we send these out at the end of the
10 month and in April of 2001 in Jackson Township we probably
11 didn't do anything there.
12    Q    What about May?
13    A    That's right now.
14    Q    This is May 2001.
15    A    I haven't done anything in Jackson Township in
16 the last month or so. So it probably ...
17    Q    There's a couple more documents I'm going to
18 try to take you through real quickly.
19        MR. SHERR: Could I just call Ann at this
20 point -- could we go off the record.
21        (Discussion held off the record.)
22 BY MS. MONTGOMERY:
23    Q    I just want to ask you one question real
24 quickly here before we go back to these documents. You had
25 testified that you wouldn't give Mr. Corneal a privy permit,



**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

150

1  right, when he requested it?
2  A    Yes.
3  Q    Could you have given him a permit for a
4  holding tank?
5  A    Not for a new dwelling.
6  Q    You can't do that?
7  A    Not for a new dwelling. A holding tank for a
8  dwelling is if we have an existing dwelling -- say if the
9  farmhouse would have been on a half acre lot and we went out
10 there and tested for a -- and that system malfunctioned. We
11 went out and we couldn't find a spot to put in a new
12 approved system that meets regulations, then we have to
13 issue a holding tank. That's how a Band-Aid. It's a last
14 resort. You know, we're ...
15 Q    Thank you. I'm going to show you a document
16 that we'll mark as Parks Exhibit 5 and ask you if you've
17 ever seen it. It's a February 8, 2000 letter from Blazosky
18 Associates. I have copies for counsel and for the court
19 reporter.
20       (Letter dated 2/8/00 produced and marked as
21 Parks Exhibit No. 5.)
22 BY MS. MONTGOMERY:
23 Q    Have you ever seen this document before?
24 A    It was part of the first module.
25 Q    Do you recall the substance of it?

---

151

1  A    It was a wetland report.
2  Q    And what does it say --
3  A    That none of the --
4  Q    -- do you recall?
5  A    The sites -- the way I remember it none of the
6  sites were wetlands.
7  Q    None of the sites that you picked -- or that
8  were actually tested?
9  A    (Witness nods head affirmatively.)
10 Q    So did this occur -- this letter come after
11 you approved the module?
12 A    I think it was part of the module.
13 Q    It was part of the module?
14 A    Yeah, I saw it before. I read through and I
15 -- my only question was -- at that time was, you know, the
16 lots they were talking about here -- see, they're talking
17 about five lots and it didn't -- that part didn't really
18 agree with the module but -- and I made a notation that I
19 was concerned about why they didn't coordinate, but, yeah, I
20 saw it before.
21 Q    And the report essentially says that there
22 aren't any wetlands?
23 A    There weren't any wetlands where it was
24 tested.
25 Q    So you saw this before you approved the

---

152

1  module, right?
2  A    Yeah.
3  Q    Did it influence your decision to approve the
4  module? You were satisfied that there weren't any wetlands?
5  A    In a favorable way, yeah.
6  Q    So you haven't encountered any wetlands on the
7  Corneal property in anyplace that the Corneals have sited
8  for placement of a septic system, correct?
9  A    Not the five sites that I approved, no.
10 Q    Does the township require a third party to
11 certify to you that there aren't any wetlands on a
12 particular proposed building site before you issue a sewage
13 module?
14 A    Well, you see on --
15 Q    Or before you approve a sewage module. Just
16 answer the question, does the township require you to get --
17 A    It's one of the things you check off and
18 that's what -- the page that's missing on the module is the
19 check-off list of things you look at on here and one of them
20 is wetlands and floodplain. There's 16 items. You know,
21 they have to show where the sites are and the slope and
22 existing dwellings and surface waters and it comes down to
23 agricultural land, wetlands, floodplain, you know.
24 Q    So in every application or in every request
25 for approval of sewage modules you would get a third party

---

153

1  to go and certify that there aren't any wetlands?
2  A    If somebody determined there was a question
3  about that.
4  Q    Well, who determines if there's a question
5  about it? In other words, can you walk the property and say
6  I don't see any wetlands and be satisfied with that?
7  A    I'm not certified to delineate wetlands.
8  Q    This is a third party certification that there
9  aren't any wetlands essentially, right?
10 A    And that's why I didn't have a problem with
11 it.
12 Q    And all I'm asking you is you say there's a
13 section on the sewage module form to check off whether there
14 are any wetlands, but you said you'd get a third party in if
15 there was a question about it. So how would you check it
16 off if there weren't any wetlands if there wasn't a third
17 party performing some sort of consulting service and
18 certifying that there aren't any?
19       MR. SHERR: I'm going to object to the form of
20 the question. You can answer.
21       THE WITNESS: Probably -- I'm not sure what
22 you're asking.
23 BY MS. MONTGOMERY:
24 Q    I'll ask you again. Do you ever check off
25 that -- a section on the module, their form, that there

---



**PARKS, BARRY**
05/16/01

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

154

1  aren't any wetlands without having some sort of consultation
2  from an outside party?
3    A    Yeah, because there's a lot of lands that
4  there's no way there could be a wetland there.
5    Q    Who determines that, you do?
6    A    It depends. Every lot is different. And if
7  there's -- if it's a side of a mountain, you're not worried
8  about that or -- you know --
9    Q    Who asked to have a third party sign off on
10  the wetlands issue in this case?
11    A    I don't know.
12    Q    You have no idea?
13    A    It was just -- it appeared with -- it was with
14  the module when I got it.
15    Q    Back to the other question. In some
16  circumstances you can check off on the form no wetlands
17  without getting anybody involved, right?
18    A    Well, what I -- basically what I do when I get
19  the module, I'm not thinking about anything else. All I
20  look at when I approve a module are those 16 items on
21  that map. And when the surveyor fills it out, if he -- it's
22  his responsibility to mark the wetlands if they're there.
23    Q    That was my question. I was confused for a
24  minute.
25    A    He can look -- he has a book --

---

155

1    Q    So the surveyor marks no wetlands and the
2  surveyor is the one that fills out the module and -- right?
3    A    Sometimes they'll make a note in here, you
4  know --
5    Q    On the module where there's a place to check
6  off whether there's wetlands, the surveyor checks that off,
7  correct, the survey says yes or no?
8    A    You just -- if it's -- you need to notate it
9  on the map. And if it's not on there, I'm probably going to
10  assume that -- that it wasn't unless I had a suspicion that
11  -- you know, if I went down to do a pit and I walked up a
12  swamp to my ankles, I'm going to -- and it's not on there
13  I'm going to question that.
14    Q    Right. Did you question whether there were
15  wetlands on Mr. Corneal's property?
16    A    I had that form with the module saying there
17  wasn't so -- I'm not going to argue with the engineer.
18    Q    You weren't the one who raised it. You don't
19  know whether any of the supervisors questioned whether there
20  were wetlands and required a third party certification?
21    A    I thought Mr. Corneal did that for his own
22  information. It just -- it was with the module.
23    Q    We're finished with Exhibit 5. Last exhibit.
24  This is a -- it's going to be marked Parks Exhibit 6. I'll
25  give you a copy. I'm going to need to use this one.

---

156

1        (Letter dated 3/24/00 produced and marked as
2  Parks Exhibit No. 6.)
3  BY MS. MONTGOMERY:
4    Q    Did you have a minute to take a look at that?
5    A    Yeah.
6    Q    Have you seen this March 24, 2000 letter from
7  Blazosky before?
8    A    No, I haven't.
9    Q    You have not, okay. So you've never seen this
10  before. Did you know that the Army Corps of Engineers had
11  made a further inquiry into this property?
12    A    No.
13    Q    Did you know that? You had no idea?
14    A    No.
15    Q    Did you know that -- did you ever hear of a
16  complaint being filed in connection with the Corneal
17  property related to wetlands?
18    A    I wasn't aware of it, but I wouldn't
19  necessarily get notified of that unless it was, you know --
20  is there a map that goes with this? What are we trying to
21  decide here?
22    Q    I'm just trying to decide whether you know
23  anything about the letter and the Army Corps of Engineers
24  inquiring into wetlands on Mr. Corneal's property.
25    A    No, I didn't know anything about the Corps of

---

157

1  Engineers being on Mr. Corneal's property. And I knew that
2  the septic system there -- in fact, when Mr. Hewett called
3  me about that, he asked and I recommended him -- there was
4  some ruts in that septic area.
5    Q    By the farmhouse?
6    A    I said to make it last better you should -- on
7  dry -- real dry time grade some topsoil over it so surface
8  water wouldn't lay there. That system, I told him, is on
9  the edge. I didn't actually -- it isn't coming to what I
10  could call malfunctioning, but it's having problems because
11  the soil in there isn't that great and -- but if you get the
12  surface water away from it, you may -- and be careful with
13  your usage it may last longer. That's what I told him.
14    Q    So there was some wet area around that
15  farmhouse?
16    A    Well, it was just the grass grew good there
17  and there was some mower ruts.
18    Q    Understood. So you don't know anything about
19  anybody filing a complaint concerning wetlands on Mr.
20  Corneal's property?
21    A    No.
22    Q    I don't know if I asked you this question, and
23  I apologize if I already did, but did you ever discuss your
24  approval of the sewer module for the Corneal property with
25  the Huntingdon County Planning Commission?

---



---

158

1   A       I don't think I ever talked to the planning
2   commission.
3   Q       Nobody ever called you or inquired about --
4   anything about it?
5   A       I don't recall of them, no. They rarely call
6   me about -- unless there's maybe a mix-up on the number --
7   some kind of a conflict that -- in the numbering of
8   something and then they might call me to clarify it.
9   Q       What about any of the other supervisors? And
10  if I already asked you, I apologize. I just don't
11  remember. It's been a while. Did you discuss your approval
12  of the sewer modules with any of the supervisors?
13  A       Not that I recall. Like I said, once I
14  approve the module, the next thing I'm involved with it is I
15  get a letter from DEP it's approved. Whether it takes a
16  month or a year, why I'm sort of out of the loop at that
17  point.
18  Q       What about Ann Wirth, did you discuss approval
19  of the sewer modules with Ann Wirth, or the sewer module?
20  It's one module.
21  A       Well, the first ones, you know, they had -- I
22  approved them. I never said I didn't.
23  Q       But then later --
24  A       Talking to people. Again, I'm talking to a
25  dozen people a day. Two years later I can't recall every

---

159

1   conversation.
2   Q       Did anybody in any capacity, whether with the
3   supervisors or Ann Wirth or the Huntingdon County Planning
4   Commission or anybody, ever discuss with you any instruction
5   not to assist the Corneals in developing their property?
6   A       Definitely not.
7   Q       Nobody has ever given you any instruction like
8   that?
9   A       I wouldn't pay any attention to it if they
10  did. I look at my job as to try to move things along and
11  get things done, not to hassle people and drag things out.
12  You'll see on the --
13          MR. SHERR: You've answered the question.
14  BY MS. MONTGOMERY:
15  Q       So if I understand what you talked about
16  earlier, there was an application -- a renewed application
17  for an on-lot septic system maybe for approval of the
18  modules that was submitted in connection with Terry
19  Williams; is that right, on the Corneal property?
20  A       They had a soil scientist out and he checked
21  for new sites.
22  Q       Was there a new application of any sort
23  submitted?
24  A       No. We have no application until we have an
25  approved module.

---

160

1   Q       A new module was submitted?
2   A       No, I think Tom Bowes, who is another sewage
3   officer who had the soil scientist come to the site, I think
4   he works with Terry Williams, Tom talked like he was going
5   to modify the modules to show this.
6   Q       Have you been involved in that process at all?
7   A       I had to be away the day -- they had the soil
8   scientist coming down. I didn't know it until the night
9   before, or maybe two nights before, but I couldn't be
10  there. Tom left them open. Tom and I will meet at a later
11  date and look at those sites.
12  Q       One other question for you. I think you
13  testified that Supervisor Wilson came with you when you went
14  back out to look at the Corneal property?
15  A       Yeah, but he only issued and was meeting Terry
16  Williams about the driveway. The driveway when it was put
17  in was humped up and they were concerned the water from the
18  driveway was running out and washing the road. Tom never
19  went back in the property when I -- that I was aware of.
20  Q       You were out there with him at one point,
21  though --
22  A       We --
23  Q       -- that one day?
24  A       We stood at the end of the driveway waiting
25  for Terry Williams one day.

---

161

1   Q       Did you have any conversations about the
2   Corneal's efforts to get buildings on their property and
3   their efforts to get approval of their sewage module and so
4   on and so forth with Mr. Wilson?
5   A       I think we just talked about meeting Terry and
6   -- and about the things we had to do with him.
7   Q       Do you know anything about any interest that
8   Mr. Wilson has in this property?
9   A       No.
10  Q       Do you know anything about it?
11  A       No.
12  Q       How long have you lived in -- do you live in
13  Jackson Township?
14  A       No.
15  Q       Where do you live, which township?
16  A       Huntingdon. I live in the borough.
17  Q       How far is that away from the Jackson Township
18  area?
19  A       Twenty mile.
20          MS. MONTGOMERY: I don't think I have any
21  other questions. Anybody else?
22          MS. YANKANICH: I have some questions. I hope
23  everybody can hear me. My throat is a little bit scratchy
24  from the cold that I have.
25

---



**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

162

1       CROSS-EXAMINATION
2
3   BY MS. YANKANICH:
4       Q       After the moratorium was lifted, you said that
5   you met with Larry Newton to discuss the Corneal property.
6   What specifically did you discuss?
7       A       Well, there's the illegal buildings that are
8   being built on the property without proper permits.
9       Q       When did you have this meeting?
10      A       It's documented in the court.  Do you know
11  when those were?  I don't know -- they were -- we've had at
12  least three.
13      MR. SHERR:  You're referring to conferences
14  that occurred in Huntingdon County Court with Terry
15  Williams?
16      THE WITNESS:  Yes.
17  BY MS. YANKANICH:
18      Q       Then prior to the moratorium did you ever have
19  any contact with Larry Newton regarding the Corneal
20  property?
21      A       Prior to --
22      Q       The moratorium being lifted, I'm sorry.
23      A       I don't think so.  I don't think Larry -- I
24  don't recall of Larry getting involved with the Corneal
25  property until the lawsuit started.

---

163

1       Q       So you did not receive any advice from Larry
2   Newton regarding whether you should approve any sewer module
3   that was submitted by David Corneal?
4       A       I don't recall of Larry being involved until
5   the lawsuit started.
6       Q       Until the lawsuit started.
7       MS. YANKANICH:  I don't have any further
8   questions.
9       MS. THORP:  No questions.
10
11      CROSS-EXAMINATION
12
13  BY MR. SHERR:
14      Q       This meeting that Ms. Montgomery was just
15  asking you about that you had with Terry Williams and Tom
16  Wilson at the end of the driveway, when was that?
17      A       Early April, late March.
18      Q       Of 2001?
19      A       March or April.
20      Q       Of 2001?
21      A       Yes.
22      Q       And you referred to a letter you received from
23  a soil scientist, I think.
24      A       Yes.
25      Q       You received that in the last couple days?

---

164

1       A       Yeah, it was a copy of what he sent to Mr.
2   Corneal.
3       Q       And the original was sent to Mr. Corneal?
4       A       It has his name at the top, yeah.
5       Q       It had David Corneal's name at the top then?
6       A       Um-hum.
7       Q       You have to say yes or no.
8       A       Yes.
9       MR. SHERR:  Thank you.
10      MS. MONTGOMERY:  I do have one follow-up
11  question.
12      THE WITNESS:  I'm thinking the day Tom and I
13  were there waiting for Terry Williams -- I'm thinking he
14  didn't show up that day and I just left. I don't think I --
15  I don't think I met Terry that day.
16
17      REDIRECT EXAMINATION
18
19  BY MS. MONTGOMERY:
20      Q       So it goes to what you asked. I'm just going
21  to ask you one more question about Mr. Newton. Do you -- in
22  connection with the Corneal property, have you been given
23  advice by Larry Newton about how to deal with this property
24  on which you relied?
25      A       Well, the only time I remember of -- was the

---

165

1   last meeting we had at the courthouse. At the end of it
2   Terry Williams and Larry Newton were still in the courtroom
3   talking. I went back in to specifically ask Terry Williams
4   when I got the -- you know, we were concerned about the site
5   there at the house being okay.
6       I went back in and specifically asked Terry,
7   when I get the module, is this saying that you have
8   permission to go in there and check this site and he said
9   yes. And Terry -- and Larry was standing there at that
10  time.
11      The meetings -- we had pre -- all the
12  supervisors and the building officer and myself and Larry
13  and Terry Williams had two different meetings at the
14  courthouse --
15      Q       What about --
16      A       -- in a conference room.
17      Q       What about prior to the moratorium, did you --
18  in connection with the Corneal's property, did you rely on
19  any advice from --
20      A       I can't think that I --
21      Q       -- Larry Newton?
22      A       I don't usually talk to Larry unless I've got
23  a problem.
24      Q       Did you have any problems with the Corneal
25  property that you had to talk to him about?

---



**PARKS, BARRY**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

166

1    A    Through '99 I didn't think there was a
2    problem.
3    Q    Were you present at any meetings of the
4    township solicitors wherein Mr. Newton gave advice to the
5    supervisors about the Corneal property?
6    A    Just at those conference meetings that -- that
7    Terry Williams was there.
8    Q    What about like regular meetings of the board
9    of supervisors or special meetings of the supervisors, the
10   township supervisors?  Were you present at any meetings like
11   that wherein Larry --
12   A    I would say no, I've never been to a
13   supervisor's meeting where Mr. Corneal's property was
14   discussed.
15   Q    What about in general the issue of the
16   moratorium, were you present at any meetings where --
17   A    Well, again, I usually go to a township
18   meeting -- that's what I'm going to tonight.  If I've done a
19   sewage module, helped with the sewage module, we have land
20   development, I usually meet the surveyor there and we lay it
21   out on the table and explain to the supervisors what we've
22   done, what we are wanting approved.  If there's a
23   moratorium, there's none of that happening.  So I -- I
24   didn't go to any meetings during the moratorium.
25   Q    What about in connection with the proposed

---

167

1    subdivision ordinance, were you present at any meetings with
2    the supervisors wherein Larry Newton gave advice about a
3    proposed subdivision ordinance?
4    A    I can't recall that I was.
5    Q    Do you know of any other subdivisions that
6    have been disapproved in Jackson Township besides Mr.
7    Corneal's?
8         MR. SHERR:  Object to the form of the
9    question.
10   BY MS. MONTGOMERY:
11   Q    That have not been approved.
12   A    Well, there's been ones that weren't approved
13   the first time, but then they just go back and they make the
14   changes needed and you just keep working at it until we work
15   it through.
16   Q    Which ones can you recall that weren't
17   approved the first time?          .
18   A    Well, that Ken Miller, you know, this had been
19   going on since I -- 10 years before I started out there he
20   had been nibbling at this and bringing it back and doing
21   stuff and ...
22   Q    Do you recall what the supervisor's concerns
23   were with respect to the Miller subdivision?
24   A    Not right off the top of my head, no.
25   Q    You don't recall?

---

168

1    A    (Witness shook his head negatively.)
2    Q    I'd just to like make a part of the record the
3    order that Judge Rambo issued this morning.  Have you had a
4    chance to review it?
5    A    (Witness shook his head negatively.)
6    Q    Well, I'm going to give it to you and ask
7    you --
8    A    Is this mine?
9    Q    And ask you to review it.  Correct, that's
10   your copy.
11   A    This stuff is mine to take or am I leaving
12   this here or --
13   Q    Well, anything that's marked as an exhibit
14   isn't yours to take.  The copies you can take with you.  I'm
15   going to have Judge Rambo's order marked as Exhibit 7, Parks
16   Exhibit 7.
17        (Order produced and marked as Parks Exhibit
18   No. 7.)
19        THE WITNESS:  It just means that I don't talk
20   about it, correct?
21        MS. MONTGOMERY:  Correct.
22        THE WITNESS:  In plain language.
23   BY MS. MONTGOMERY:
24   Q    In plain language.
25   A    Okay.

---

169

1    Q    Do you understand that you're not supposed to
2    talk to the other deponents --
3    A    I understand.
4    Q    -- or the other defendants about the substance
5    of your deposition or their depositions?
6    A    Yes.
7        MS. MONTGOMERY:  That's it.
8        (The deposition was concluded at 3:40 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**PARKS, BARRY**
**05/16/01**



**CORNEAL VS**
**JACKSON TOWNSHIP**

170

```
 1
 2   COUNTY OF DAUPHIN          :
                               : SS
 3   COMMONWEALTH OF PENNSYLVANIA   :
 4         I, Teresa K. Bear, Reporter-Notary Public,
 5   authorized to administer oaths within and for the
 6   Commonwealth of Pennsylvania and take depositions in the
 7   trial of causes, do hereby certify that the foregoing is the
 8   testimony of BARRY PARKS.
 9         I further certify that before the taking of
10   said deposition, the witness was duly sworn; that the
11   questions and answers were taken down stenographically by
12   the said Teresa K. Bear, a Reporter-Notary Public, approved
13   and agreed to, and afterwards reduced to typewriting under
14   the direction of the said Reporter.
15         I further certify that the proceedings and
16   evidence are contained fully and accurately in the best of
17   my ability in the notes taken by me on the within
18   deposition, and that this copy is a correct transcript of
19   the same.
20         In testimony whereof, I have hereunto
21   subscribed my hand this 31st day of May, 2001.
22
23         _____
              Teresa K. Bear, Reporter
24              Notary Public
              My commission expires
25              on April 13, 2003
```

Exhibit 7

CORNEAL, DAVID
02/22/01

CORNEAL VS
JACKSON TOWNSHIP

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
     DAVID B. CORNEAL AND SANDRA      :
 3   Y. CORNEAL,
                     PLAINTIFFS       :
 4
                 VS                   :    NO.  1:CV-00-1192
 5
     JACKSON TOWNSHIP, HUNTINGDON     :
 6   COUNTY, PENNSYLVANIA, W. THOMAS  :
     WILSON, INDIVIDUALLY AND IN      :
 7   HIS OFFICIAL CAPACITY AS
     SUPERVISOR OF JACKSON TOWNSHIP,  :
 8   MICHAEL YODER, INDIVIDUALLY AND  :
     IN HIS OFFICIAL CAPACITY AS
 9   SUPERVISOR OF JACKSON TOWNSHIP,  :
     RALPH WEILER, INDIVIDUALLY AND   :
10   IN HIS OFFICIAL CAPACITY AS      :
     SUPERVISOR OF JACKSON TOWNSHIP,  :
11   BARRY PARKS, INDIVIDUALLY AND    :
     IN HIS OFFICIAL CAPACITY AS      :
12   SEWAGE ENFORCEMENT OFFICER OF    :
     JACKSON TOWNSHIP, DAVID VAN      :
13   DOMMELEN, INDIVIDUALLY AND IN    :
     HIS OFFICIAL CAPACITY AS BUILDING:
14   PERMIT OFFICER, ANN L. WIRTH,    :
     INDIVIDUALLY AND IN HER OFFICIAL :
15   CAPACITY AS SECRETARY OF JACKSON :
     TOWNSHIP, AND LARRY NEWTON,      :
16   INDIVIDUALLY AND IN HIS OFFICIAL :
     CAPACITY AS SOLICITOR TO JACKSON :
17   TOWNSHIP,                        :
                     DEFENDANTS       :
18
19
                 DEPOSITION OF:  DAVID B. CORNEAL
20
                 TAKEN BY:       DEFENDANTS
21
                 BEFORE:         PATRICIA C. BARRETT,
22                               REPORTER - NOTARY PUBLIC
23   DATE:                       FEBRUARY 22, 2001, 10:45 A.M.
24   PLACE:                      ECKERT SEAMANS
                                 213 MARKET STREET, 8TH FLOOR
25                               HARRISBURG, PENNSYLVANIA
```



**CORNEAL, DAVID**
**02/22/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

4

1    APPEARANCES:
2
3    ECKERT SEAMANS
     BY: BRIDGET E. MONTGOMERY, ESQUIRE
         CHARLES M. SUHR, ESQUIRE
4
5        FOR - PLAINTIFF
6    MAYERS, MENNIES & SHERR LLP
     BY: ANTHONY R. SHERR, ESQUIRE
7        FOR - ALL DEFENDANTS EXCEPT NEWTON
8    METTE, EVANS & WOODSIDE
     BY: KATHRYN LEASE SIMPSON, ESQUIRE
9
10       FOR - DEFENDANT LARRY NEWTON
11   THOMAS, THOMAS & HAFER, LLP
     BY: MICHELE J. THORP, ESQUIRE
12       FOR - DEFENDANT RALPH WEILER
13   ALSO PRESENT:
14       SANDRA Y. CORNEAL
15
16
17
18
19
20
21
22
23
24
25

1            STIPULATION
2         It is hereby stipulated by and between
3    counsel for the respective parties that sealing,
4    certification and filing are waived; and that all
5    objections except as to the form of the question are
6    reserved to the time of the trial.
7
8         DAVID B. CORNEAL, called as a witness, being
9    sworn, testified as follows:
10
11           DIRECT EXAMINATION
12
13   BY MR. SHERR:
14   Q      Mr. Corneal, good morning.
15   **A      Good morning.**
16   Q      As you know, we are here today to take your
17   deposition in a matter which is currently pending in the
18   U.S. District Court for the Middle District of
19   Pennsylvania, in which you and your wife have brought an
20   action against Jackson Township, its supervisors and other
21   individuals.
22        Have you ever had your deposition taken
23   before?
24   **A      I don't think so.  I can't remember.**
25   Q      I just want to go over a couple ground

3

1            TABLE OF CONTENTS
2
3            WITNESS
4    FOR DEFENDANT          DIRECT      CROSS
5    David B. Corneal
6      By Mr. Sherr          4
       By Ms. Simpson              144
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1    rules.  I know that you are familiar with depositions, but
2    just to go over a couple ground rules so we are sure of
3    things.
4         You have been placed under oath, you are
5    expected to answer truthfully.  I ask that you wait until
6    I am finished asking my question before giving your
7    response.  Likewise, I will try to wait until your
8    response is completed before I ask you another question.
9         If you don't understand my question, please,
10   ask me to clarify it.  If you don't hear my question,
11   please, ask me to repeat it.  If you answer the question,
12   we are going to assume that you both heard and understood
13   the question.
14        You are represented here today by counsel,
15   if you need to take to have a conference with your
16   attorney, please, indicate that and we will accommodate
17   it. If you need to take a break for any other reason,
18   please, let us know that.
19        We are here today to take your deposition to
20   find out your recollection in the events surrounding your
21   complaint and the allegations within your complaint.
22        If you don't know something, please, let us
23   know that, otherwise, give the response to the best of
24   your knowledge.  I ask that you give all your responses
25   out loud orally, so that the court reporter can take it



**6**

1  down. She can't take down nods of the head and that sort
2  of thing.
3      Did you review anything in preparation for
4  today's deposition?
5    A  **I looked at some of the documents, yes.**
6    Q  What documents did you look at?
7    A  **The complaint and some letters.**
8    Q  Do you know specially what letters you
9  looked at?
10   A  **No, it was about a week ago.**
11   Q  Anything else other than the complaint and
12 some letters?
13   A  **That I reviewed?**
14   Q  That you specifically reviewed in
15 preparation for today's deposition?
16   A  **No.**
17   Q  Other than any discussions which you had
18 with your attorneys, did you discuss today's deposition
19 with anyone?
20   A  **My wife.**
21   Q  Other than your wife, anybody else?
22   A  **No.**
23   Q  Are you currently taking any medications?
24   A  **20 milligrams of Zestril for high blood**
25 **pressure.**

**7**

1    Q  Would that effect in any way your ability to
2  give testimony here today?
3    A  **I am not aware of it.**
4    Q  Is there any other reason that you are aware
5  of that you are somehow impeded from giving us the best
6  recollection that you can concerning the events
7  surrounding your complaint?
8    A  **Not that I am aware of.**
9    Q  Where do you currently reside?
10   A  **5205 East Fairmount, F-A-I-R-M-O-U-N-T,**
11 **Avenue, State College, Pennsylvania.**
12   Q  How long have you resided there?
13   A  **Since 1983.**
14   Q  Who do you reside there with?
15   A  **My wife.**
16   Q  Anybody else?
17   A  **Our children, until they grew up and moved**
18 **out.**
19   Q  How many children do you have?
20   A  **Three.**
21   Q  They are all out of the house?
22   A  **Yes, they are all adults.**
23   Q  What is your social security number?
24   A  **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.**
25   Q  Your wife's full name?

**8**

1    A  **Sandy Cornell.**
2    Q  She is in the room with us today?
3    A  **Yes.**
4    Q  How long have you been married?
5    A  **We were married in 1968.**
6    Q  What is the highest level of formal
7  education that you completed?
8    A  **I completed a law degree.**
9    Q  When was that?
10   A  **In 1973.**
11   Q  Where was that from?
12   A  **Stetson University College of Law.**
13   Q  Have you had any formal education since the
14 completion of your law degree in 1973?
15   A  **Not any more than continuing education**
16 **courses for the law.**
17   Q  Do you currently practice law?
18   A  **No.**
19   Q  When did you stop practicing?
20   A  **Say 4 or 5 years ago.**
21   Q  Are you currently employed?
22   A  **Yes.**
23   Q  How are you employed?
24   A  **I teach Business Law and Entrepreneurship at**
25 **Penn State University.**

**9**

1    Q  How long have you been teaching at Penn
2  State?
3    A  **Since I think 1982, approximately, I am not**
4  **sure of the exact date.**
5    Q  Have you been teaching both Business Law and
6  Entrepreneurship since 1982?
7    A  **Initially Business Law and then**
8  **Entrepreneurship that started a few years later.**
9    Q  What is your position at the university?
10   A  **Assistant professor.**
11   Q  Do you consider this a full-time position?
12   A  **They consider it a full-time position, they,**
13 **meaning Penn State.**
14   Q  Very briefly, Business Law is a broad
15 subject, obviously, what specifically do you teach about?
16   A  **I teach an undergraduate course, with an**
17 **introductory course to what law is all about.**
18   Q  Do you have a textbook for that course?
19   A  **No.**
20   Q  How about Entrepreneurship, what does that
21 entail?
22   A  **It entails starting your own business.**
23   Q  What do you teach specifically?
24   A  **Starting your own business and picking a**
25 **business organization, financing the business.**



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

10

1  Q    Is there a textbook for that course?
2  A    No.
3  Q    Are there written materials that are used in
4  either of these courses?
5  A    Written materials?  No, not really, I have
6  some handouts in one or two of the courses, but.
7  Q    Are the students asked to read anything?
8  A    No.
9  Q    How many courses do you currently teach?
10 A    Three.
11 Q    What are the titles of those courses?
12 A    Business Law 243, Business Administration
13 250 and Business Administration 497-A.
14 Q    When you practiced law, were you a member of
15 the firm?
16 A    I was a member of several firms during the
17 period I practiced law.
18 Q    Most recently, what firm were you a member
19 of?
20 A    I was a sole practitioner.
21 Q    Prior to that, were you a member of the
22 firm?
23 A    We had our own firm, three or four guys.
24 Q    What was the name of that firm?
25 A    Well, the last name would have Kalman,

11

1  Corneal, Mason, I think Mason, that was the last name.
2  Q    What type of law did you practice at the
3  time that you were practicing law?
4  A    It was general, business mainly.
5  Q    Did you consider yourself to have a
6  specialty?
7  A    Not really.  In a small town you really
8  can't.  I would say the specialty was, if you had to say a
9  specialty, it was contract law, business-related
10 contracts.
11 Q    Did you ever practice in the area of land
12 use?
13 A    The only time I ever did that was a case of
14 a friend of mine that you were involved in and that was
15 Wesley Young.
16 Q    It was the Young versus Harris Township
17 case?
18 A    Right.
19 Q    So would I be correct then in stating you
20 did not get involved with land use matters while you
21 practiced law, other than to the extent you got involved
22 with them in that Young case?
23 A    I wouldn't say that.  I had business clients
24 that had questions about land use; and generally at that
25 time that we would have done anything, Ron Lucas was a

12

1  partner and that was his specialty so he would handle --
2  it would be referred to him.
3  Q    So you, yourself, wouldn't handle matters
4  dealing with land use, you would refer them to a partner
5  or to another attorney, is that correct?
6  A    Right.
7       If it was a simple question that you heard
8  an answer to before or knew the answer to before, you
9  would answer it; but if it was more complicated, it would
10 be referred to somebody else that did that.
11 Q    How about other areas of municipal law, did
12 you consider yourself to be practicing in other areas of
13 municipal law other than land use?
14 A    As I said, I didn't really practice in land
15 use.  I would say not, no.
16 Q    Are you familiar with the Pennsylvania
17 Municipal Planning Code?
18 A    I know of it.
19 Q    When you say you know of it --
20 A    I know it exists.
21 Q    Other than knowing it exists, do you know
22 any of the details contained within it or the cases
23 decided thereunder, are you familiar with them?
24 A    Well, the only thing that I -- no, the
25 answer would be basically not, except, I recently had

13

1  discussions about the Naylor case, which affects things or
2  could affect things.  Other than that, no, I have never
3  read the Municipal Planning Code.
4  Q    In the discussion that you recently had
5  concerning the Naylor case --
6       MS. MONTGOMERY:  Objection.
7       MR. SHERR:  That is what I was going to get
8  to.  Give me a chance.
9  BY MR. SHERR:
10 Q    Did you have those discussions with anyone
11 other than your attorneys?
12 A    No.
13 Q    Other than your residence and the property
14 which forms the basis of the lawsuit that we are here
15 about today, do you own other properties?
16 A    Yes.
17 Q    How many other properties do you own?
18 A    You would have to ask me -- it would be
19 easier to tell you where they are.
20 Q    Do it that way then.  Can you tell me what
21 other properties you own other than your residence and the
22 property that forms the basis of this lawsuit?
23 A    I own a property at 1445 West College
24 Avenue, I own a property at -- my wife and I, when I say
25 I, my wife and I, I own a property at 1510 Martin Street.



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

---

14

1        I own a property in -- outside Hershey,
2   Pennsylvania, which is in Lower -- I forget the name of
3   the Township. It is just a tract of land, but near
4   Hershey; and we own a property in Key West, Florida at 816
5   Eaton Street; I jointly own a property with my youngest
6   son at 822 Eaton Street, Key West. I think that is it.
7        Q        Just taking these properties one at a time.
8        MS. MONTGOMERY: I am going to object. I
9   have given you some leeway, considered that this is a
10  discovery deposition, but what does that have to do with
11  this case? This is his personal information, I don't
12  think you are entitled to ask him about all this stuff.
13       MR. SHERR: One of the reasons I am going to
14  get into the other properties, I am not going to get into
15  them in great length, is to find out whether or not he has
16  been involved in developing other properties.
17       MS. MONTGOMERY: Ask him that question,
18  then.
19       MR. SHERR: I will.
20       MS. MONTGOMERY: Maybe it is an appropriate
21  question, maybe not, but it is beyond the scope of this
22  lawsuit for you to be asking him about his other business
23  affairs and that sort of thing, you have got to tie it in
24  and tie it in pretty quickly, or, you know.
25  BY MR. SHERR:

---

16

1   Street, is there anything --
2        A        It is an existing commercial building.
3        Q        The question was: Is there anything on that
4   property and your answer was that you purchased it with a
5   building on that property?
6        A        Right.
7        Q        Did you ever go through any kind of approval
8   process with respect to a local authority on that
9   property?
10       A        What do you mean, a local authority?
11       Q        A municipality.
12       A        Well, we put an addition on that property
13  and so we hired an engineering firm to do that; but it was
14  just a matter of expanding a building that was already
15  existing.
16       Q        You indicated that you owned a property
17  outside of Hershey and I believe in giving your answer you
18  said it was a tract of land.
19       A        206 acres.
20       Q        That is undeveloped?
21       A        Right.
22       Q        Have you made attempts to develop that land?
23       A        No. I have made attempts to sell the land.
24       Q        Is there a reason you haven't sold the land?
25       A        I just put it on the market a month ago.

---

15

1        Q        The property at 1445 West College Avenue, is
2   that property developed?
3        A        Commercial building.
4        Q        When you purchased it, did you purchase it
5   with a commercial building on it?
6        A        No.
7        Q        The commercial building that is on it, did
8   you have to receive approval from any local authorities to
9   build that building on the property?
10       A        I hired an architect.
11       Q        I don't know if that was responsive to my
12  question.
13       My question was, did you have to get any
14  approval from any local authorities?
15       A        Obviously, whenever you build a building,
16  you have to have approvals, the approvals were obtained by
17  the architect.
18       Q        Judging by that answer, you had nothing to
19  do with obtaining the approvals other than hiring an
20  architect?
21       A        No, of course, I discussed it with the
22  architect. It was in 1979, I don't remember exactly what
23  transpired between us or my involvement in that, I don't
24  remember.
25       Q        How about the property at 1510 Martin

---

17

1        Q        When did you purchase it?
2        A        A long time ago. It was probably somewhere
3   in the late '70s.
4        Q        With respect to these three properties, you
5   indicated that you own them with your wife, is that
6   correct?
7        A        Yes.
8        Q        Do you have ownership interests in any other
9   properties, excluding the ones in Florida, with any other
10  entity?
11       A        No, not that I can remember right now. I am
12  trying to think. I don't believe so, aside from the
13  properties we are talking about here. You said excluding
14  Florida, you also exclude the properties in Jackson
15  Township?
16       Q        Yes.
17       A        No.
18       Q        Do you have any ownership interest in any
19  corporation or other business entity which owns property?
20       MS. MONTGOMERY: Objection, just way beyond
21  the scope of this lawsuit. This isn't hunting season on
22  his personal life and business life, this is a
23  lawsuit about Jackson Township property.
24       MR. SHERR: Are you instructing him not to
25  answer?

---

CORNEAL, DAVID 
02/22/01

CORNEAL VS
JACKSON TOWNSHIP

18

1      MS. MONTGOMERY: I am objecting to it and I
2  am asking you not to do this in this deposition, not to
3  make it contentious, asking him questions that don't have
4  anything to do with the lawsuit. If you can explain what
5  it has to do with the lawsuit, I will be reasonable about
6  it, I am very willing to do that.
7      MR. SHERR: Depending upon whether he owns
8  any other property and had made attempts to develop any
9  other property --
10      MS. MONTGOMERY: He said, no. He gave you
11  the answer to those questions.
12      MR. SHERR: He hasn't given me the answer to
13  this yet, so I don't know.
14      MS. MONTGOMERY: Like I said earlier, this
15  may be marginally somehow likely to lead to developing
16  discoverable evidence that he may have developed other
17  property. Ask him that question and stay out of his
18  private business affairs, otherwise, that don't have
19  anything to do with the development of Jackson Township
20  BY MR. SHERR:
21  Q      If you could answer my question.
22  A      The question was?
23  Q      Do you have an ownership in any corporation
24  or other entity which owns property?
25  A      Other than Florida you said, is that right?

19

1  Q      Yes, I am only interested -- to limit this,
2  I am only interested in properties in Pennsylvania and
3  your attempts to develop or be involved with developments
4  in Pennsylvania.
5  A      No.
6      Let me rephrase it. No, not that I can
7  recall. As you asked the question, I can't think of
8  anything at this moment that I have an interest in.
9      We have several corporations that operate
10  the properties that are identified, they don't own the
11  properties.
12  Q      Other than the property which forms the
13  basis of this lawsuit and excluding properties outside of
14  this Commonwealth and other than what you have already
15  talked about, have you been involved in the development of
16  any other properties?
17  A      We had a property in Boalsburg that we had
18  the engineer subdivide and we sold that off.
19  Q      Again, excluding the property that forms the
20  basis of this lawsuit, have you ever personally applied
21  with any local municipality for building permits?
22  A      Well, you have to apply. Obviously, the
23  owner of the property has to sign the application, so the
24  applications were normally prepared by the engineer or
25  architect and, obviously, the owner signed them, which

20

1  would have been myself and my wife.
2  Q      What I am searching for here is involvement
3  by you other than just signing it, where you actually went
4  to the Township or other municipality and had involvement
5  with the local officials, are there any instances like
6  that?
7  A      I have been in townships before, I mean the
8  borough, where we were -- in our home we were building a
9  fence around an area and we needed to get approval for
10  that.
11      I probably accompanied an architect or
12  engineer on these two properties that I identified
13  previously to a Township meeting or two; but like I said,
14  that was a long time ago.
15  Q      Have you ever been the party to a lawsuit
16  other than this one?
17  A      I want to say, yes, and I am trying to think
18  of what it was. You said other than this one. For
19  example, I just got served by Old Guard Insurance, who is
20  representing one of the supervisors who is asking for a
21  declaratory judgment as to whether they have coverage or
22  not.
23      You mean in Pennsylvania, parties to a
24  lawsuit?
25  Q      We could limit it to Pennsylvania -- no,

21

1  let's just expand that to any lawsuit.
2  A      Well, we have had a family fight in Florida
3  over some properties and that ended up in litigation.
4  Q      That litigation was in Florida?
5  A      Yes. That family fight then got extended
6  here in Pennsylvania, just slightly.
7  Q      Was there a lawsuit in Pennsylvania?
8  A      There was a lawsuit regarding my mother's
9  will.
10  Q      Any other lawsuits to which you were a party
11  other than what you have mentioned?
12  A      Not that I can remember.
13  Q      Turning to the property which forms the
14  basis of this lawsuit which is located in Jackson
15  Township. This property was purchased jointly, you and
16  your wife?
17  A      Yes.
18  Q      When did you purchase the property?
19  A      I believe it was around October of '98.
20  Q      How much did you purchase it for?
21  A      $160,000. Total price was actually
22  $170,000, but 10 was attributable to personal property.
23  Q      Who did you purchase it from?
24  A      Paul and Catherine Michael.
25  Q      How did you first hear about the property?

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

---

22

1  A    They were friends of mine and indicated they
2  were going to sell what they referred to as their farm.
3  Q    What was your purpose for purchasing the
4  property?
5  A    I was thinking that it would be a nice
6  place, my wife and I were both artists at that point and
7  still are, and it would be a nice place maybe to do
8  painting and put perhaps a summer house on it or something
9  like that.
10  Q    At the time that you were considering
11  purchasing the property, did you have any other purposes
12  for the property in mind other than to do some painting
13  and to put a summer home on it?
14  A    Other purposes at that moment?
15  Q    At the time that you were considering
16  purchasing the property.
17  A    Obviously, I was looking at a 95 acre tract
18  of ground and I didn't think I needed all of that.
19  Q    I am not sure that that is really responsive
20  though.
21     Were you thinking about doing anything else
22  with the property when you were considering purchasing it,
23  other than using it as a nice place to paint and as a
24  summer home?
25  A    Well, as I said, we didn't need 95 acres,

---

23

1  and it was naturally divided by a power line; and so
2  without having investigated it, certainly the thought ran
3  through my mind that perhaps I would sell off a piece of
4  it or two or even divide it up for lots for my children. I
5  didn't have any real plan, there was a lot of things that
6  were possible.
7  Q    Do you recall what the asking price for the
8  property was?
9  A    I paid them what their asking price was.
10  Q    So there was no negotiations over the price?
11  A    No negotiations.  I thought it was a fair
12  price.
13  Q    How did you make that determination that it
14  was a fair price?
15  A    They gave me an appraisal that they had
16  done.
17  Q    Do you still have that appraisal?
18  A    I will say probably, somewhere in the file.
19  Q    Do you know what Paul and Catherine Michael
20  used this property for?
21  A    They had their children living there at
22  different times and they used it as a weekend retreat for
23  themselves.
24     (Recess.)
25  BY MR. SHERR:

---

24

1  Q    Other than reviewing the appraisal, which
2  was provided to you by the Michaels, did you do any other
3  investigation prior to purchasing the property?
4  A    Aside from walking on the property, that is
5  all I did.
6  Q    Were there any structures on the property
7  when you were considering purchasing it?
8  A    A house and a barn.
9  Q    Did the property consist of one solitary lot
10  to your knowledge at the time that you were considering
11  purchasing it?
12  A    One tract of ground.
13  Q    Were you aware as to whether there were any
14  attempts to subdivide the property prior to you purchasing
15  it?
16  A    Well, I was aware that -- no, there was no
17  attempts to subdivide it.  I was aware that a single lot
18  had been subdivided off by a previous owner, but I don't
19  know who that owner was.
20  Q    The single lot which had been subdivided off
21  of the property, was that still part of the property that
22  you were going to purchase or had that been sold already?
23  A    That was developed into a homesite years
24  ago.
25  Q    Were you aware that a lot had been

---

25

1  subdivided off of this tract of ground prior to your
2  purchase?
3  A    Yes, sure.
4  Q    How did you become aware?
5  A    It was obvious, there was somebody living
6  there with their three or four unused cars in the yard.
7  Q    How did you know that that was part of the
8  same tract of land?
9  A    Because it was obvious that it was cornered
10  out; and somebody told me, I don't remember whether the
11  Michaels told me or somebody, it was rather are obvious.
12  Q    Other than walking the property and
13  reviewing the appraisal, did you do anything else, any
14  other investigation into the property prior to purchasing
15  it?
16  A    No.
17  Q    Was there a real estate broker and/or agent
18  involved with the sale to you of this property?
19  A    No.
20  Q    Were you represented in the sale of this
21  property?
22  A    Was I represented?
23  Q    Yes.
24  A    No.
25  Q    Were the Michaels represented?

---



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

26

1    A    No.
2    Q    Did you sign an agreement of sale?
3    A    Yes.
4    Q    Do you still have a copy of that agreement
5    of sale?
6    A    I don't remember if I have it or not,
7    probably somewhere.
8    Q    Did the agreement of sale have any
9    conditions in it?
10    A    What kind of conditions?
11    Q    Any conditions?
12    A    No conditions.
13    Q    Did the agreement of sale provide for
14    anything other than you would be purchasing the property
15    and the Michaels would be selling the property?
16    A    Not really, no. There was a tractor
17    involved. That is why I said part — it was a John Deer
18    tractor involved. Prorated taxes and the typical things
19    that we do with properties.
20    Q    You indicated that you purchased this
21    property in October of '98, is that when you closed on the
22    property?
23    A    Yes.
24    Q    Had you ever purchased property in Jackson
25    Township prior to October of '98?

27

1    A    No.
2    Q    Had you ever had any dealings with Jackson
3    Township officials and/or employees prior to October of
4    '98?
5    A    I don't believe so, I can't remember ever
6    having.
7    Q    Prior to purchasing the property in October
8    of '98, did you personally know W. Thomas Wilson?
9    A    No.
10    Q    Prior to purchasing the property, had you
11    had any prior dealings with Huntingdon County?
12    A    Well, I don't know what you mean prior
13    dealings.
14        Before I went to law school, I went over and
15    I clerked for James Himes and his father, who was the
16    judge, Swirls Himes, but that was back in 1969, '68. Of
17    course, I am sure over the years every once in a great
18    while I was in Huntingdon County on some minor law thing
19    but I don't think very often. Most of the time if I had
20    something over there, I referred to Jim Himes.
21    Q    After you purchased the property in October
22    of '98, did you take any actions with respect to the
23    property?
24    A    What do you mean actions?
25    Q    Well, let's break that down, that was not a

28

1    very good question.
2        When did you first decide to subdivide the
3    property?
4    A    As I said, I contemplated that the
5    possibility was there at the beginning, because we didn't
6    really want the house and the barn. So probably in the
7    spring of the year, 1999, we started seriously thinking
8    about that. I am just guessing, a ballpark.
9    Q    So am I accurate in stating that prior to
10    purchasing the property or at or around the time that you
11    purchased the property, you intended to build something on
12    the property?
13    A    Yes.
14    Q    Was that before you purchased the property?
15    A    That we contemplated building?
16    Q    Yes.
17    A    Yes.
18    Q    What did you contemplate building?
19    A    As I said, we are both artists, and we were
20    thinking of a summer home and an art studio.
21        This was a vague thought at that time, it
22    wasn't a plan.
23    Q    When did it become more than a vague thought
24    and moved into a plan?
25    A    In the spring of '99 we started thinking

29

1    seriously about recovering some of our investment and
2    using that money to build something.
3    Q    The thoughts about recovering some of your
4    investment and building something with that money is the
5    contemplation that you would subdivide and sell part of
6    the property off?
7    A    Yes.
8    Q    What is the first action that you took with
9    respect to selling part of the property?
10    A    Well, we decided that it needed a survey,
11    current survey.
12    Q    Prior to getting a current survey, did you
13    personally do any research with respect to what you needed
14    to do to sell part of the property off?
15    A    No, that is part of the discussion I had
16    with the surveyor.
17    Q    So who was the surveyor that you had a
18    discussion with?
19    A    David Simpson.
20    Q    How was it that you got Mr. Simpson?
21    A    Because Michaels had used him before.
22    Q    So then you had a discussion with
23    Mr. Michaels about --
24    A    No, some of the documents —
25    Q    Let me finish the question.



**CORNEAL, DAVID**
**02/22/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

30

1  A    Sorry.
2  Q    Did you have a discussion with Mr. Michaels
3  about subdividing the property?
4  A    No.
5  Q    How was it then that you got to Mr. Simpson
6  through Mr. Michael?
7  A    Mr. Michael had used Mr. Simpson before and
8  recommended him.
9  Q    Do you know why he recommended Mr. Simpson
10 to you, he, being Mr. Michael?
11 A    Obviously, he was pleased with Mr. Simpson's
12 work.
13 Q    Do you know why he felt the need or even
14 wanted to recommend the surveyor to you?
15 A    I don't know if I asked him or -- I don't
16 know. I know that he had -- when I bought the property,
17 he had given me documentation of things that related to
18 the property about planting trees and things that he had
19 -- and his tractor manual and all this other stuff. Part
20 of that was some work, survey work that Simpson had done.
21 I don't know if that is what stimulated Simpson or it was
22 a discussion with Michael.
23 Q    Where is Mr. Simpson located?
24 A    He lives in Huntingdon, outside of
25 Huntingdon.

---

31

1  Q    Do you recall when you first contacted
2  Mr. Simpson?
3  A    As I said, sometime in the spring of '99 I
4  believe.
5  Q    When you first contacted him, did you
6  indicate to Mr. Simpson why you were contacting him?
7  A    Yes, I said I wanted him to survey the land
8  and I wanted to divide off the farm, the acreage. At that
9  time I was contemplating some lots for my children.
10 Q    What did he tell you?
11 A    He said, sure, he would be happy to do it.
12 Q    Did you have a conversation with Mr. Simpson
13 at or around that time with respect to what would have to
14 be done to subdivide the property?
15 A    Well, what he said was, if you are going to
16 subdivide it, you are going to need to find sewage
17 locations, on-site sewage.
18 Q    Other than telling you that you needed to
19 find on-site sewage locations, did he tell you anything
20 else that you would need to do with respect to subdividing
21 the property?
22 A    No.
23 Q    Do you have an understanding as to why he
24 told you, you needed to find on-site sewage locations?
25 A    Well, my understanding was that if you had a

---

32

1  lot, you had to be able to provide on-site sewage for that
2  lot. So if I was going to divide something off, I needed
3  on-site sewage.
4  Q    Did you have an understanding at that time
5  what required you to have on-site sewage on a lot?
6  A    What do you mean?
7  Q    What rule or regulation or statute?
8  A    He said that the SEO, which is the sewage
9  enforcement officer, needed to do test pits at different
10 locations where we were contemplating lots.
11 Q    Did you inquire as to why you had to have
12 areas where you could have on-site sewage on a particular
13 lot?
14 A    Well, you can't build a house on a lot that
15 doesn't have on-site sewage.
16 Q    You had that knowledge that you couldn't
17 build a house on a lot without on-site sewage?
18 A    You had to have sewage disposal, either
19 public or on-site, and there was no public available, so
20 we had to have sites that were approved for on-site
21 sewage.
22 Q    Again, did you have any understanding as to
23 where those requirements were contained, which required you
24 to have those on-site sewage on any particular lot?
25 A    He said, DEP, Department of Environmental

---

33

1  Protection, he told me had those regulations.
2  Q    Did you have familiarity with those
3  regulations prior to this conversation with Mr. Simpson?
4  A    No, I never had on-site septic on any
5  property I ever owned.
6  Q    Did you make any inquiries at that time as
7  to the requirements of on-site sewage?
8  A    He said that the SEO officer would be the
9  one that would meet me on the site or meet us on the site
10 and dig test pits and would decide whether the soil was
11 appropriate for on-site systems.
12 Q    Prior to this time, this conversation with
13 Mr. Simpson, had you ever been involved in any way with
14 on-site sewage systems?
15 A    No.
16 Q    Did Mr. Simpson tell you who the sewage
17 enforcement officer was?
18 A    Probably. I think he did.
19 Q    Do you recall that he did?
20 A    I would say that he probably told me who it
21 was. I don't remember, but I would suspect that that is
22 where the information came from.
23 Q    Who did he tell you the sewage enforcement
24 officer was?
25 A    Barry Parks.

---



CORNEAL, DAVID
02/22/01

CORNEAL VS
JACKSON TOWNSHIP

34

1  Q  Other than finding sewage locations, did
2  Mr. Simpson tell you, you would have to do anything else
3  in order to divide the property and sell part of it?
4  A  He said that we would submit those things,
5  the sewage things to the Township.
6  Q  Did he tell you why you would have to submit
7  them to the Township?
8  A  No, but that was the procedure.
9  Q  He told you that was the procedure?
10  A  That was the procedure that he used he said.
11  Q  Did he indicate that he had other dealings
12  with the Jackson Township officials with respect to
13  dividing lots?
14  A  Never talked to him about that.
15  Q  Did you understand that you would have to be
16  involved with the process or was it your understanding
17  that Mr. Simpson would take care of this for you?
18  A  No. He had indicated that he would do the
19  drawings, but he didn't want to go to the meetings or do
20  anything to walk things through, that I would have to do
21  it.
22  Q  Did he tell you about any other requirements
23  for dividing property in Jackson Township, other than
24  finding sewage locations?
25  A  No. I say no, not that I recall, I can't

35

1  recall that he had said anything about that.
2  Q  What was your understanding as to what
3  Mr. Simpson would do for you?
4  A  A survey.
5  Q  Anything else?
6  A  A boundary survey and then eventually divide
7  things up into lots, whatever lots we decided on based on
8  the SEO's finding of on-site septic suitability.
9  Q  Other than doing a boundary survey and
10  drawing up lots once you divided what lots you wanted, did
11  you have expectations that Mr. Simpson was going to do
12  anything else with respect to this property?
13  A  I didn't have expectations, because I didn't
14  know exactly what was required with on-site septic, but he
15  did prepare the sewer modules, he called them sewer
16  modules, for the SEO's findings that would fit with the
17  map that he would prepare.
18  Q  At what point did you learn that he was
19  going to prepare sewage modules?
20  A  I think when he prepared them.
21  Q  Did you ask him to prepare sewage modules?
22  A  I didn't know about sewage modules.
23  Q  So then you didn't ask him to prepare them?
24  A  No, I didn't; but he did it as I guess a
25  standard operating procedure as what he did as part of his

36

1  function.
2  Q  Did you make any inquiry to Mr. Simpson as
3  to why you needed sewage modules?
4  A  The answer was obvious, because the SEO had
5  checked the sites and you needed DEP approval and my
6  understanding was from Simpson, the sewer modules would be
7  signed by the Township and then submitted to DEP for final
8  approval.
9  Q  Who contacted the SEO?
10  A  Probably, I did. He had given me the guy's
11  name, probably I did. He could have contracted him first,
12  I don't know.
13  Q  Do you recall contacting Mr. Parks?
14  A  I know that I called Mr. Parks on several
15  occasions. I can't remember if the initial contact was by
16  myself or Mr. Simpson. I would suspect it was probably by
17  me.
18  Q  How did you get in touch with him? How did
19  you learn how to get in touch with him?
20  A  I don't remember. I would be guessing as to
21  how it happened, I don't remember how it happened.
22  Q  I don't want you to guess.
23  Do you remember the first contact that you
24  had with Mr. Parks?
25  A  No. It was a telephone conversation, but I

37

1  don't remember it exactly.
2  Q  Do you recall telling Mr. Parks what you
3  intended to do with the property?
4  A  I said we were going to do some subdividing
5  and needed to find suitable spaces for on-site septic.
6  Q  The reason that you told him you needed to
7  find suitable spaces for on-site septic was because Mr.
8  Simpson told you, you needed that?
9  A  Yes.
10  Q  Did you contact anybody else other than
11  Mr. Parks and Mr. Simpson with respect to these initials
12  efforts to subdivide the property?
13  A  Yes.
14  Q  Who else did you contact?
15  A  I contacted Eagle Construction and
16  Mr. Wilson.
17  Q  How was it that you came to contact Eagle
18  Construction and Mr. Wilson?
19  A  Well, it is a very small area over there and
20  he had a construction site less than a half mile from the
21  site. And I don't know if Simpson recommended him or
22  Parks recommended him; but I knew I needed a backhoe, so
23  he was the guy with a backhoe nearby.
24  Q  Would you have any records and/or document
25  which would reflect who referred you to Mr. Wilson and



---

**38**

1    Eagle Construction?
2    A.    No.
3    Q.    Who initially contacted Eagle Construction
4    and/or Mr. Wilson?
5    A.    I would suspect I did.
6    Q.    Do you recall when it was that you contacted
7    Mr. Wilson?
8    A.    It would have been probably the late spring,
9    early summer of '99.
10    Q.    Was this a phone conversation, your first
11    contact?
12    A.    I don't know.
13    Q.    Can you tell me the gist of this first
14    contact that you had with Mr. Wilson?
15    A.    I said we wanted to do some work on the
16    property and whether he would be available to provide that
17    work.
18    Q.    What did he indicate?
19    A.    Sure.
20    Q.    When did you become aware that Mr. Wilson
21    was a supervisor in Jackson Township?
22    A.    I don't think it was until a month or two
23    later.
24    Q.    How did you become aware?
25    A.    I think he told me.

---

**39**

1    Q.    Do you recall in the context of what
2    conversation you were having at the time that he told you?
3    A.    We were on-site, and I don't know, it came
4    up that he was a supervisor at Jackson Township.
5    Q.    Do you recall Mr. Wilson telling you that
6    there was going to be a moratorium on development in
7    Jackson Township?
8    A.    Absolutely not.
9    Q.    So it is your testimony that Mr. Wilson
10    never told you that there was going to be a moratorium on
11    development in Jackson Township?
12    A.    Absolutely not.
13    Q.    What is your testimony then?
14    A.    My testimony is that. I said he absolutely
15    did not tell me that.
16    Q.    Just so we are clear, I believe you may have
17    misheard me or something. My question to you was: Is it
18    your testimony that Mr. Wilson did not tell you about a
19    moratorium on development in Jackson Township?
20    A.    That is absolutely correct. He did not tell
21    me about a moratorium or any proposed moratoriums in
22    Jackson Township.
23    Q.    Did Mr. Wilson tell you that Jackson
24    Township was working on a subdivision ordinance?
25    A.    No.

---

**40**

1    Q.    Did you enter into a written agreement with
2    Mr. Simpson?
3    A.    I don't believe so.
4    Q.    Did you enter into a written agreement with
5    Mr. Wilson?
6    A.    No.
7    Q.    Did you enter into a written agreement with
8    Eagle Construction?
9    A.    No, not that I can recall. I don't
10    remember, I think it was — when outside contractors give
11    you prices and you say, okay, go ahead, that was, I think
12    — I don't remember anything in writing about it, about a
13    contract.
14    Q.    What was it that you hired Mr. Wilson and
15    Eagle Construction to do?
16    A.    Well, initially there was some debris that I
17    wanted him to remove from the property where some farmers
18    had thrown stuff over a hill into a gully. That never
19    came about, he never completed that task.
20    Q.    Why not?
21    A.    I don't know, but he didn't get to it and we
22    kind of ignored that after awhile.
23            Then I hired him really to send a backhoe in
24    to dig the test pits with the SEO and myself present.
25    Q.    Did he operate the backhoe?

---

**41**

1    A.    No.
2    Q.    Who was operating the backhoe?
3    A.    I believe that it was his nephew; but I
4    don't know the man's name, I don't recall his name.
5    Q.    When was this done?
6    A.    It was done probably the summer, sometime
7    in the summer of '99, I don't recall exactly when.
8    Q.    Was anybody else present, other than
9    Mr. Parks, who is the SEO, yourself, and the backhoe
10    operator at the time you were digging these test pits?
11    A.    Not that I know of, not that I recall.
12    Q.    Who made the determination where the test
13    pits would be dug?
14    A.    It was kind of a combination of Simpson and
15    I, because what we were contemplating subdividing, the
16    lots, kind of dictated where you try to find on-site
17    septic.
18    Q.    At the time that you were digging test pits,
19    how many lots did you contemplate you would be dividing
20    the property into?
21    A.    I think that it was five or six, because we
22    had the farmhouse and barn and three lots, one for each of
23    our children, the residue for ourselves and another lot
24    along the road. That was all tentative.
25    Q.    What was the result to your knowledge of

---

CORNEAL, DAVID 
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

42

1  these test pits?
2      A     Well, we did, I don't know, I forget how
3  many we dug; but we ended up with five or six approved
4  sites.
5      Q     Were there any records indicating how many
6  test pits were dug and how many sites were approved?
7      A     Well, there is a record of all the sites
8  that were approved and the Township has that and so do you
9  on the sewer modules.
10     Q     Is there any record of sites which were not
11 approved?
12     A     Not that I know of. You dug a hole, and if
13 it didn't look good, then you covered it up and moved on.
14 There is no point of making a record of one that didn't
15 pass.
16     Q     Were you present the entire time that the
17 test pits were being dug?
18     A     I think I was present for all of them,
19 except one. I think I was called away on the property for
20 something when one was dug and came back when they were
21 still there after the fact.
22     Q     Who were you called away by?
23     A     I don't know, I don't remember.
24     Q     What were you called away to do?
25     A     I don't know, I don't remember. I just

43

1  remember I went away and then I came back and they had
2  already dug the test pit, so I wasn't present when they
3  dug that.
4      Q     Prior to this time, had you ever witnessed
5  test pits being dug or anything to do with test pits?
6      A     No.
7      Q     Did you learn at the time you were on the
8  property and the test pits were being dug that these sites
9  were being approved or did you learn sometime thereafter?
10     A     They are not approved when you dig a site
11 pit.
12     Q     What happens?
13     A     Well, they told me that once you found
14 suitable soil, then they had to come back and do a perk
15 test in those locations.
16     Q     Who told you that?
17     A     I may have been Wilson.
18     Q     Was this during the original conversation
19 you had with Mr. Wilson or at some subsequent
20 conversation?
21     A     No, it was probably a subsequent
22 conversation afterward, I don't recall exactly when that
23 took place.
24     Q     How many conversations do you recall having
25 with Mr. Wilson prior to being out on the property and

44

1  digging these test pits?
2      A     I don't know, I don't recall how many.  I
3  would be guessing if I gave you a number.
4      Q     Was it more than five?
5      A     No.
6      Q     Who performed the perk tests?
7      A     Wilson's crew did.
8      Q     Were you present during the performance of
9  the perk tests?
10     A     No.
11     Q     Do you know when they were performed?
12     A     No, I am not positive of when that was — I
13 would say within, here again, I am guessing, estimating, 6
14 weeks of when we dug the — 6 to 8 weeks from when we dug
15 the test pits.
16     Q     Between the time that the test pits were dug
17 and the perk tests were performed, which you are
18 indicating about a 6 week period, did you do anything
19 else, you personally do anything else with respect to
20 subdividing the property?
21     A     Well, we couldn't subdivide the property
22 until we knew whether a site had perked, so there was
23 nothing to do.
24     Q     So your answer to my question was you did
25 nothing in the 6 weeks between when you dug the test pits

45

1  and when the perk tests were done?
2      A     I may have been — again, it is speculation
3  — talking to a builder friend of mine for design of an
4  art studio and a house; but at some point in there, that
5  would be the fall of '99, this started to evolve.
6      Q     Who would this builder friend have been?
7      A     McClintic.
8      Q     That is the name of an individual or a
9  company?
10     A     It is an individual, Max McClintic.
11     Q     Where is Mr. McClintic located?
12     A     He is in State College, Pennsylvania.
13     Q     Was it your intent at the time that you had
14 conversations with him to have him build the structure
15 that you contemplated on the property?
16     A     It was my intention that he would help
17 design it and help build it.  His brother, Fred McClintic,
18 actually had the construction crew.
19     Q     Did you enter into a written contract with
20 Max McClintic with respect to the design of the building?
21     A     No, Max and I have always operated on a
22 handshake.
23     Q     How about with his brother with respect to
24 building it, did you enter into a contract?
25     A     We entered in a contract where he agreed —

CORNEAL, DAVID 
02/22/01

CORNEAL VS
JACKSON TOWNSHIP

---

46

1    Q    Did you enter into a written contract?
2    A    No.
3    Q    What contract did you enter into with the
4    builder?
5    A    The time and material, construction and that
6    we set aside or he set aside the -- as soon as the weather
7    broke in the year 2000, that he would begin construction
8    on a garage, an art studio and a house.
9    Q    Anything else that you recall doing toward
10   developing the property or building on the property during
11   this 6 week period between when the test pits were done
12   and the perk tests?
13   A    Well, we had put the -- we had put feelers
14   out for the house and -- see, the house and barn already
15   had a sewage system existing, so we didn't need to worry
16   about whether we perked or probed there.  So we put
17   feelers out to find a buyer for about a little less than
18   26 acres and the house and the barn.
19   Q    How did you determine what acreage you would
20   sell with the house and barn?
21   A    Because of Simpson's survey; and as I said,
22   there is a main power line going down through the property
23   and it acted as a natural divider.
24   Q    Did Simpson do a survey?
25   A    Yes.

---

47

1    Q    When did he do the survey?
2    A    That spring and summer.
3    Q    The spring and summer of '99?
4    A    Yes.
5    Q    Do you still have that survey?
6    A    A copy of that survey was provided to you.
7    Q    Did you take any other action, I am just
8    going to limit it to the 6 week period --
9    A    You are calling it 6 weeks, I said, 6 to 8
10   weeks, I don't remember.
11   Q    Whatever that period was, that is why I am
12   relating it to the test pits being dug and the perk tests
13   being performed, whatever time period that was,
14   understanding that we don't have the exact time period;
15   but did you take any other action toward developing
16   building on the property and/or subdividing the property?
17   A    Well, we started to look at the
18   possibility -- we had to get a road back to where we
19   wanted to build and it was already a base road back there
20   but it crossed the stream.
21   Q    How did it cross the stream?
22   A    It didn't, it came to the stream and it
23   would have had to cross the stream to get to the property
24   where we were going to build or the land that we were
25   going to build on, so Max McCliutic was exploring getting

---

48

1    a permit.  I am not sure from whom, Forest and Waters or
2    somebody, for a stream crossing, for a bridge.
3    Q    He was exploring the permit at your behest?
4    A    Yes.
5    Q    Did you tell him specifically to get a
6    permit or did you just tell him that you wanted this road
7    and do what is necessary, how did that work?
8    A    Well, I never got a permit to cross the
9    stream, so he was exploring what it took.  He is the kind
10   of guy that just takes charge and before I knew it, he had
11   applied for a permit and gotten it.
12   Q    Who did he apply with --
13   A    As I said, I don't remember if it was Forest
14   and Waters or -- I forget the people that issue -- the
15   Township has a copy of the permit that was a copy of the
16   permit that was issued by whatever department was required
17   for a bridge to be put across the stream.
18   Q    When you said there was already a base road,
19   what do you mean by that, what is --
20   A    There was already an obvious cartway that
21   went all the way back into the woods, through the woods,
22   to the stream.
23   Q    Was this cartway being used in any fashion
24   to service either the barn or existing house?
25   A    No.

---

49

1    Q    Was there any roadway being used or any on
2    the property?
3    A    The house and the barn were already right
4    along the paved road.
5    Q    They had access to the paved road how?
6    A    Right there it was -- the house was within
7    20 feet of the paved road and the barn was 20 feet from
8    the -- all there was in front of the house and the paved
9    road was a parking space, they didn't even have a
10   driveway.
11   Q    This cartway that you are referring to, was
12   that a dirt cartway?
13   A    It was a shale, shale dirt cartway.
14   Q    Was it graveled in any way?
15   A    Well, obviously, it had been kept up by
16   somebody, probably the Michaels, I don't know, because
17   there weren't any trees growing in it or anything else.
18   In fact, it had even been mowed.
19         During that period of time I also was
20   talking to Wilson about coming in and shaleing, putting a
21   new coating of shale on that road to bring it up to a
22   better standard for our driveway.
23   Q    You were talking to Mr. Wilson about doing
24   the work to put the shale on there?
25   A    Yes.



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

---

50

1    Q      And was this during the period of time that
2  we are talking about between --
3    A      Well, was it during the 8 week period of
4  time, I am not sure. It was in the fall of 1999 when all
5  this was talking place.
6    Q      You said you put out feelers about selling
7  the existing structures and 26 acres. What do you mean by
8  that?
9    A      Well, I just let it be known to people that
10 I was — I told Simpson I would like to sell this off. I
11 told other people that may have an interest.
12   Q      Who else did you tell beside Simpson that
13 you can recall?
14   A      I don't remember.  If I had a friend in
15 State College that said, oh, gee, I would like to be out
16 in that area, I would tell him that I was going to sell
17 off 26 acres and the house and the barn.
18   Q      Did you have a price in mind at the time
19 that you were putting these feelers out as to what you
20 wanted to sell the house and the barn and the 26 acres
21 for?
22   A      I had asked several realtor friends of mine
23 what they thought something like that would go for.
24   Q      Do you recall who you asked?
25   A      Probably Pat Brewer and a fellow by the name

---

51

1  of Scott Yocum.
2    Q      Specifically, you asked them what?
3    A      What they thought a house and a barn and 26
4  acres would sell for.
5    Q      Would sell for where? Did you tell them
6  where?
7    A      Yes, in Huntingdon County.
8    Q      Just in Huntingdon County?
9    A      No, I told them where the property was,
10 Yocum had sold property over in that area before.
11   Q      What did these relators tell you with
12 respect to what it would sell for?
13   A      They indicated, I don't remember exactly,
14 anywhere from 125 to $175,000, if it was somebody looking
15 with horses or something like that.
16   Q      Did you contract with any realtor to sell
17 the property?
18   A      No.
19   Q      Why not?
20   A      Because I didn't want to.
21   Q      Did you do anything else to, in your terms,
22 put out feelers to sell the property other than what we
23 have discussed?
24   A      No, because before I got it I got a call
25 from the Hewetts who had somehow heard through the

---

52

1  grapevine that this property was for sale.
2            MR. SHERR:  Off the record.
3            (Lunch recess.)
4  BY MR. SHERR:
5    Q      We are back on the record.  Mr. Corneal, we
6  left off, you had indicated that you got a call from the
7  Hewetts, who had heard through the grapevine about the
8  property. Do you recall that testimony?
9    A      Yes.
10   Q      Where did they call you?
11   A      Well, when I said the grapevine, I meant the
12 grapevine in the area down there and the grapevine
13 specifically, they told me that Tom Wilson had told them
14 that I was interested in selling a piece of ground.  And I
15 believe since Tom had my number at the office, I think
16 that is where they called me, at the office.
17   Q      Had you prior to hearing from the Hewetts,
18 discussed with Mr. Wilson selling the parcel containing
19 the barn and the house?
20   A      Yes, in fact, he had expressed an interest
21 in buying it himself.
22            It so happens that this property that I
23 bought from Michaels was the old Wilson farm, which was
24 his grandfather's farm, and he stated to me that he would
25 love to have a place to go with his grandchildren and he

---

53

1  would be interested in personally buying the 26 acres.
2    Q      Did he specifically reference the 26 acres
3  during this conversation?
4    A      Well, I said, I told him that I was selling
5  off the house and the barn and approximately 25, 26 acres,
6  something around that, so yes, that is what he anticipated
7  it was going to be on the market.
8    Q      Did you have this conversation with
9  Mr. Wilson concerning selling the house and the barn
10 before or after the test pits were dug?
11   A      Well, it was during, because we had a number
12 of discussions at that time of what was necessary to do
13 and what the Township through its SEO required.
14            As I said before, he told me he was a
15 supervisor. So at that time I quizzed him on what it was
16 necessary to do and he made a joke, he says, well, in this
17 Township we even permit privies, inferring that it was
18 wide open.
19   Q      Just so I am clear about time, and the only
20 reason I am asking this, the conversation that you had
21 with Mr. Wilson about purchasing the property when he
22 referenced to you that it was the old Wilson farm --
23   A      The old Wilson farm.
24   Q      -- was that before or after the test pits
25 were dug?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



54

1    A    I would suspect that it was either at the
2  same time or before.  Because I brought him on and we were
3  discussing a number of things.  Remember the first time I
4  said I talked to him, we talked about cleaning up some
5  debris that had been thrown over and as we are going
6  through this area of the farm he is talking about, oh,
7  yeah, this was an old logging road.  When I was a kid,
8  there was a sawmill back here.  So he was giving me a
9  history on this thing.
10    I can't really pinpoint whether it was right
11  at the same time we were doing the test, but obviously, it
12  relates to what I was hiring him for.  So we had already
13  done the test pits, I am not sure.
14    It was right around that time, probably
15  within a week of two of either prior or after the test
16  pits, or it could have been days prior to the test pits.
17    Q    Is it your testimony that you are aware that
18  Mr. Wilson was a Township supervisor at or around the time
19  that the test pits were dug?
20    A    He had told me, yes.
21    Q    You indicated he didn't tell you during the
22  first conversation you had with him, it was some
23  subsequent conversation, right?
24    A    As I said, I can't remember exactly what the
25  substance of each conversation was.  I said at some point

55

1  it became apparent that he was a supervisor, he told me he
2  was a supervisor.  Then we had discussion, whether it was
3  the same time as the discussion about him buying the
4  property or not buying it, I don't recall exactly.
5    It was kind of like we were establishing --
6  I felt that I was trying to establish a rapport with some
7  local people.  So it was just a chatty, number of chatty
8  conversations about things.
9    Q    What is it that you recall him telling you
10  about the Township requirements with respect to the sewage
11  enforcement.
12    A    As I said, he joked, and he said, we even
13  permit privies here, which is an outdoor toilet, an
14  outhouse.  The reference was that it was unusual that they
15  were -- I don't want to say that he didn't say they were
16  backward, but that is, obviously, what I interpreted from
17  it.  All you had to do was do the tests and if you passed,
18  you had no problem.  I mean the log tests and the perk
19  tests.
20    Q    Is it your belief based on your
21  conversations with Mr. Wilson that he was aware before the
22  test pits were dug that you were intending to subdivide
23  the property?
24    A    No question about it.
25    Q    Other than discussions about the

56

1  requirements with respect to on-lot sewage, did you have
2  any discussions with Mr. Wilson about any other Township
3  or county requirements for dividing the land?
4    A    When you say discussions about dividing the
5  land.
6    Q    Subdividing the land?
7    A    Or subdividing the land, the situation was
8  that there was no subdivision requirements and code.  He
9  said, you can build whatever you want, there is no code,
10  there is no building code, there is no subdivision.  I
11  think that was in the conversation, he said, you can
12  have a privy, if you wanted one, in this Township.
13    Q    So we are clear, is it your testimony that
14  Mr. Wilson told you at sometime before the test pits were
15  dug and I am using that just as a reference point, that
16  there was no subdivision requirements in the Township?
17    A    Well, you are asking me, again, to identify
18  a specific time.  It may have occurred the day we were
19  digging the pits or it may have occurred the day before we
20  were digging the pits.
21    I know that I delivered to his office a copy
22  of a rough map from Simpson showing proposed lots that we
23  were going to do and whether the conversation took place
24  at that moment, because we were, obviously, discussing
25  subdivision, or it took place later on, I am not sure.

57

1    Q    Are you sure that he told you that there
2  were no subdivision requirements in the Township?
3    A    Absolutely.
4    Let me add to that.  He said there was no
5  subdivision requirements, but we had to have the SEO's
6  approval on these locations, which then had to be
7  submitted to the Township. So it wasn't that you could --
8  you, obviously, needed the on-site septic approval from
9  the SEO that the Township then had to sign, that then got
10  forwarded on to DEP and that is what he had told me needed
11  to be done; so to that extent, the Township was involved.
12    Q    Did you discuss or did you have any
13  discussions with anybody concerning your discussions with
14  Mr. Wilson and what the Township required or didn't
15  require?
16    A    Yes, I am sure I discussed that with Max
17  McClintic.  I may have said something to my wife, I can't
18  recall, because Max was doing the drawings for our home
19  and art studio.
20    Q    Did you discuss your conversations with
21  Mr. Wilson concerning what the Township would require or
22  wouldn't require with Mr. Simpson?
23    A    I think Mr. Simpson already knew what the
24  Township required and didn't require, because as I said,
25  he was doing the sewer modules and he is the one that



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

**58**

1 recommended that I needed to get the pits done and the SEO
2 involved.
3    Q    My question was, did you discuss your
4 conversation that you had with Wilson with Simpson?
5    A    Did I specifically discuss Wilson's
6 conversation, I most likely did; but I can't say that I
7 did. I don't know, that is the answer to the question, I
8 don't remember whether I did or not. I could have and I
9 would have to ask Mr. Simpson if. . .
10    Q    Other than what you have already testified
11 to occurred with respect to either your subdividing the
12 property and building on the property to the point where
13 the perk tests were done, can you remember anything else
14 happening with respect to either subdivision and/or
15 building on the property?
16    A    Well, no.
17       It was my understanding from all these
18 conversations that I had with Simpson and with Wilson that
19 there was no problem in dividing off some pieces of ground
20 as long as they perked or we were able to get a sewage SEO
21 officer approval on the perk sites, that was the only
22 requirement that we had to develop and divide up this
23 land.
24    Q    Once the perk tests were done, I believe you
25 testified that Mr. Simpson then did sewage models?

**59**

1    A    Yes. I don't know if it was right then that
2 he did the sewer modules but eventually he did sewer
3 modules within a month or two or something like that.
4    Q    At the time did you have any understanding
5 as to why sewage modules were necessary?
6    A    Yes, that was the process upon which the SEO
7 approved in writing the sites that were found to have
8 passed and the Township would sign those modules and, in
9 fact, I paid them $1400 and some cents for their SEO's
10 work on this thing and I had paid Wilson twice, once for
11 digging the pits and once for doing the perk tests.
12       Once that was done, then sewer modules were
13 done for the Township to sign. Barry Parks was presented
14 with those sewer modules, he signed them all. I took him
15 to a meeting of the Township and asked that they be signed
16 and the Township supervisor refused to sign them.
17    Q    When did you take them to the Township?
18    A    I believe it was the February meeting.
19    Q    February of what year?
20    A    The year 2000.
21    Q    Up to that point, had you had any contact
22 either in writing or orally with anybody from the
23 Township, any official or employee of the Township other
24 than Mr. Parks and Mr. Wilson?
25    A    No, just with Wilson. I don't think I

**60**

1 talked to anybody else.
2       Wilson was my contact then and continued to
3 be, because I was going to have him do that road that was
4 going to be necessary -- what it really would be, would be
5 a driveway for the house, a long one, and he was going to
6 do the driveway for me. So my contact would have been
7 with him.
8       In those contacts, he never said anything to
9 me, well, we have a problem or you have a problem,
10 nothing, everything was hunkydory as far as I knew.
11    Q    Did you have contact with Mr. Wilson after
12 the perk tests were done but prior to your going to the
13 February 2000 Township meeting?
14    A    That is the time period I was talking
15 about. He and I were discussing getting the road in,
16 because we had discussions about permitting to get the
17 bridge across the stream. And I wanted to go ahead and
18 get the driveway in so that when we were ready to go
19 across the stream, that we could do it, because we had to
20 get construction vehicles back in the back end of the
21 property where we were going to do the construction. So I
22 discussed that with him, from that period of time when the
23 perk tests were done, up until February of the year 2000.
24    Q    When were the perk tests done, do you know?
25    A    In the fall of -- mid to late fall of '99.

**61**

1    Q    Do you recall, Mr. Wilson telling you that
2 you should hurry and get your materials to the Township?
3    A    No, he never said that. He never indicated
4 anything was wrong or anything was going to delay the
5 project that we were pursuing.
6    Q    Getting back to the phone conversations with
7 the Hewetts, it is your belief that it was Mr. Wilson who
8 told the Hewetts that you were selling some of this
9 property?
10    A    That is what I believe, as I recall, yes.
11    Q    What else occurred during this phone
12 conversation?
13    A    That they had a daylily business and they
14 were located in a dark area and they needed to get out
15 into the sunshine and get some open space and they were
16 looking for a place just like ours.
17    Q    Did they indicate to you during that phone
18 conversation that they had been to the property?
19    A    I don't remember if they had been or not, I
20 don't know.
21    Q    Did you discuss at that point during this
22 initial phone conversation price?
23    A    Yes.
24    Q    What price did you discuss?
25    A    $150,000 -- actually, I discussed $160,000,



CORNEAL, DAVID
02/22/01

CORNEAL VS
JACKSON TOWNSHIP

62

1 because that was the upper end of what my realtors had
2 told me or had estimated the property to go for and I was
3 looking to basically cash -- get my cash out of the
4 investment and invest that money in a house and then I
5 would have the rest of the land free and clear.
6    Q    When you say investment, as I understand
7 your testimony, at the time that you purchased this
8 property, you weren't purchasing it for an investment,
9 were you?
10   A    Oh, absolutely. Are you kidding me? I
11 never buy anything, unless it is an investment.
12   Q    So it is now your testimony that --
13   A    No, I haven't changed my testimony.
14   Q    Let me finish and you can answer it anyway
15 you would like.
16        It is now your testimony that at the time
17 that you purchased the property, one of your purposes in
18 purchasing the property was to make money off of the
19 property?
20   A    I never buy anything in real estate, unless
21 I am going to make money on the transaction. I always
22 look -- and my wife can attest to this and so can many
23 people that know me -- I never make -- I never buy
24 anything for the fun of it or for some recreational
25 purpose. I buy it with the anticipation of getting my

63

1 money back somehow and then ending up with something.
2        In this case, I was willing to accept the
3 fact that I would have no money tied up in the balance of
4 the land that I really wanted, and that is how I always
5 invest.
6        Property is not -- I am not an affluent
7 person that I can afford to buy property and sit around on
8 it. It has got to make money or return my investment to
9 me or I have a problem with it, I always buy that way.
10   Q    So it was your belief then from the time
11 that you purchased the property that you would be able to
12 subdivide it and recoup your purchase price?
13   A    There was no reason to believe that I could
14 not subdivide it and recoup my money.
15   Q    What I am asking you is you had a belief at
16 the time that you could do that?
17   A    Yes.
18   Q    Recoup your money?
19   A    Yes.
20   Q    What did you base that belief on?
21   A    I bought a number of pieces of real estate
22 in the past and sold them.
23        I try to anticipate where the market is
24 going to be in the future. I anticipated that the market
25 with I-99 going into the State College area was taking

64

1 away a lot of the character that drew a lot of people to
2 the State College market.
3        Right across the mountain, 20 minutes away,
4 was a piece of property that was ideal for -- I could just
5 see the State College market moving that way, and, in
6 fact, it was.
7        So I anticipated from day one that I would
8 make money on this property, as well as have the benefit
9 of having the property -- an art studio along the stream
10 and either a summer house or what ended up being a
11 permanent house.
12        MS. MONTGOMERY: Can I talk to my client for
13 one second?
14        MR. SHERR: No. If he wants to have a
15 conference with you, that is one thing.
16        MS. MONTGOMERY: All right.
17   A    I want to have a conference with my
18 attorney.
19        (Discussion held off the record.)
20        (Answer read.)
21   A    A summer house is actually what I said. It
22 ended up being a permanent house.
23 BY MR. SHERR:
24   Q    My question was though, how did you know or
25 what did you base your belief that you would be able to

65

1 subdivide the property on at the time that you purchased
2 it?
3    A    It is not hard to subdivide land when there
4 is no subdivision ordinances.
5    Q    Were you aware there were no subdivision
6 ordinances?
7    A    Somebody had told me there was virtually
8 nothing over there. I don't remember whether it was one
9 of my realtor friends or -- I don't know who it was.
10   Q    Just so we are clear on the record, it is
11 your testimony that at the time that you purchased the
12 property you were aware or you had a belief that there
13 were no subdivision ordinances in Jackson Township?
14   A    I had a belief that that was the case. I
15 never checked with the Township about that.
16   Q    Why didn't you check with the Township?
17   A    Because it wasn't a compelling situation. I
18 didn't know how much dividing I was going to make or what
19 exactly I was going to do. I knew that it was a good buy
20 and I couldn't anticipate any problems.
21        Maybe it was Yocum that told me, because he
22 had sold some pieces over there and has represented to
23 people that it was easy to subdivide, because there were
24 no ordinances and no building codes and he is a
25 professional, I had no reason not to believe him.



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

66

1    Q    When you learned that you would have to have
2  certification that lots were suitable for on-site sewage,
3  were you surprised by that?
4    A    No, you have to have sewage disposal and
5  most people that live in places like that don't have
6  public sewer, so you would anticipate you have to have an
7  on-site septic system. I certainly had heard of on-site
8  septic before. And when I bought the property, the
9  Michaels pointed out, here is our drain field for the
10  on-site septic system for the house.
11    Q    Who pointed that out?
12    A    The Michaels, the people I bought the
13  property from.
14    Q    Was that the first time that you become
15  aware that there was on-site sewage at that property?
16    A    I guess so, but nobody in rural areas like
17  that have public sewer. So in anticipation, if somebody
18  asks me what kind of sewer is it, my guess would have been
19  that it was on-site septic.
20    Q    But you never investigated that?
21    A    I didn't need to, because as I said,
22  Michaels told me, which confirmed what was obvious.
23    Q    Prior to the Michaels telling you I guess is
24  what we are trying to pinpoint now, you didn't do any
25  investigation, whether there was on-site sewage for the

67

1  property or whether it was served by any kind of public
2  system, you did no investigation as far as that is
3  concerned, right?
4    A    There was no need to, I hadn't agreed to buy
5  the property yet.
6    Q    My question is, you didn't do that, isn't
7  that correct?
8    A    My answer is there was no need to do that,
9  that is correct.
10    Q    During your initial conversation with the
11  Hewetts, did you tell them that you were in the process of
12  dividing the property?
13    A    I said at that time we were investigating
14  the division of the property and we anticipated that the
15  easiest one to divide, because we knew it already had
16  sewer and water on it, was the house and the barn and 26
17  acres, a little less than 26, 25 point something.
18    Q    At the time that you had your initial
19  conversation with the Hewetts, were you aware that
20  somebody was living in the house?
21    A    There was no one living in the house.
22    Q    Was there a tenant for the property?
23    A    Not at that moment.
24    Q    At what point --
25    A    Excuse me, I beg your pardon. I have a

68

1  person that worked for me living in the house at that
2  time, yes, I did.
3    Q    Who was that?
4    A    Scott Page.
5    Q    In what capacity was he living in that
6  house?
7    A    He was living in there without paying rent,
8  because he was in financial difficulties and he was a very
9  nice young man and he worked hard for us and we wanted to
10  give him that as a fringe benefit to help him out.
11    Q    What work did he do for you?
12    A    He worked as a front desk receptionist at
13  our business.
14    Q    Is that the health club?
15    A    Yes, the health club.
16    Q    Did you have any written agreement with him
17  with respect to his living on the property?
18    A    No.
19    Q    Did you subsequently enter into an agreement
20  with anybody with respect to leasing any of the property?
21    A    Subsequent to what?
22    Q    To Mr. Taige living on the property?
23    A    We have entered into an agreement in the
24  summer or the fall of this year.
25    Q    With whom?

69

1    A    Kevin, I don't remember his last name.
2    Q    That agreement is in writing?
3    A    No -- you asked me if I had a written
4  agreement, I did not. It is an oral lease on a 60-day
5  basis that we entered into this fall with Kevin and his
6  fiancee, I don't remember her name either, sorry.
7    Q    What are the terms of the 60-day lease?
8    A    They pay utilities and $375 a month and
9  maintain the property. I can give them 60 days notice for
10  them to be out or they can give me 60 days notice that
11  they want out.
12    They were children of a friend of mine in
13  State College that didn't have much money and were
14  desperate to find a place to be on their own, because she
15  is still at Lockhaven State and going to school and
16  teaching and he works construction with one of the local
17  construction companies.
18    Q    This started in the fall of 2000?
19    A    Fall of 2000, yes.
20    Q    Have they paid $375 a month since the
21  inception of the --
22    A    Yes, I think they have been there 5 or 6
23  months, something like that.
24    Q    Getting back to the Hewetts and the phone
25  conversation that you had. During this initial



70

1    conversation that you had with them, did you discuss
2    anything else concerning the sale of the property other
3    than price?
4        A        Well, we discussed Page living there, Mr.
5    Page, and we discussed the Hewetts having to sell their
6    house.
7        Q        What did you discuss about Page living
8    there?
9        A        Well, I said that we cared about this young
10   man, that we were trying to help him and the last thing we
11   do was throw him out and so that we wanted to
12   give him plenty of time to find something else or we were
13   going help him find something.
14               That was fine with them, because they had
15   started this daylily business and really weren't ready to
16   go into it full-time until the spring of 2000 and so we,
17   basically, had — I think their contract was in October
18   and they had until — they weren't anticipating needing to
19   move in there until the beginning of the summer, which
20   worked out fine for everybody or it seemed to work out
21   fine for everybody.
22       Q        Did you enter into any agreement during this
23   initial conversation?
24       A        No, there was a subsequent written
25   agreement.

71

1        Q        Was there any kind of agreement between you
2    and the Hewetts during this initial conversation that
3    either they would purchase the property or come out and
4    look at the property or that you would continue
5    negotiating, anything of that nature?
6        A        No.
7                At the initial discussion they came out and
8    met me on the property. We went through the house and we
9    went through the barn and they looked at the land and took
10   a walk down along the stream and we discussed things.
11       Q        What did you discuss?
12       A        The contract or the proposed contract to
13   purchase.
14       Q        Did they agree that at that point they
15   wanted to purchase the property?
16       A        Yes — well, at that point, they may have
17   called me that night or they may have called me the next
18   day; but as a result of that meeting, they elected to
19   purchase the property.
20               I had offered it at 160, they asked for 150
21   and I agreed to it.
22       Q        Then you entered into a written agreement of
23   sale, correct?
24       A        Right.
25       Q        Who prepared the agreement of sale?

72

1        A        I did.
2        Q        There were a number of conditions contained
3    within the agreement of sale, correct?
4        A        Right.
5        Q        The one condition, I will read it here,
6    states: Buyers acknowledge that a present tenant, Scott
7    Page, P-A-G-E, needs to be relocated by sellers to a
8    property they are constructing on another portion of the
9    farm and that they will be flexible in the settlement date
10   to accommodate this transition.
11       A        Yes.
12       Q        Do you acknowledge, and I can show it to
13   you, I don't have a copy.
14       A        You don't have to show it to me.
15       Q        You acknowledge that that was a condition on
16   the agreement of sale?
17       A        Assuming you are reading it from the
18   agreement of sale, yes.
19       Q        I will represent that I was reading that
20   from the agreement of sale.
21       A        Okay.
22       Q        What were you constructing on the property?
23       A        Well, we were anticipating building the
24   house and the art studio and the garage.
25       Q        That is where you anticipated relocating Mr.

73

1    Page to?
2        A        Well, at the same time there was another
3    possibility that — I was talking to a neighbor called
4    Weaver and Weaver had indicated that he may be interested
5    in selling his property and he had a small cottage on that
6    property. So I was anticipating that Weaver, that if I
7    made a deal with Weaver, that Scott would move on to that
8    property.
9        Q        So was your contemplation at the time that
10   you entered into the agreement of sale that that sale
11   would not be consummated until either you entered into a
12   separate agreement with Mr. Weaver or you completed
13   construction of another building on this property?
14       A        No, that is not correct.
15       Q        Why is that not correct?
16       A        What was anticipated was that we weren't
17   going to move Mr. Page out into the cold without trying to
18   help him, because he was kind of a fragile individual
19   psychologically and we were trying to help him. The last
20   thing we wanted to do was cause him any problems.
21               So we were anticipating somehow finding
22   something, but it would not hold up this sale, we were
23   giving ourselves plenty of time to find something, even if
24   we had to find something in State College, it doesn't
25   really matter. But it was just, we wanted the Hewetts to



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

74

1  know that we had a concern that we wanted taken care of
2  for this young man.
3      Q      At the time that you drew up this agreement
4  of sale, you at least anticipated the possibility that
5  this sale may be delayed because of Mr. Page and where to
6  locate him, right?
7      A      No, no.
8      Q      Why did you include this condition in the
9  agreement of sale?
10     A      We included it in there because we had a
11 discussion about it and we anticipated closing this deal
12 sometime in the spring of the year 2000.  We gave
13 ourselves a line out there until the end of June; but
14 everybody anticipated that it was going to happen sooner
15 than June.
16         It was just a matter of we were just trying
17 to accommodate and the Hewetts were very accommodating in
18 that regard, they understood our concern about Mr. Page
19 and so we put language in like that, that is all, just so
20 there was an acknowledgment that everybody understood we
21 needed to take care of Mr. Page, that was one of our
22 concerns, but it certainly wouldn't have held up the sale.
23     Q      You had in the agreement of sale that the
24 closing date would be June 30, 2000, right?
25     A      Yes.

75

1      Q      You also put in there that both you and the
2  Hewetts would be flexible on the closing date to make sure
3  that Mr. Page was being accommodated?
4      A      Right.  The point is that it was not going
5  to hold up the sale or the transfer of the property, it
6  was just we were trying to find him something as soon as
7  we could and the Hewetts were understanding of that and we
8  were going to work together but it certainly wouldn't have
9  held up the sale.
10     Q      You also provided that you would use the
11 second floor of the barn in anticipation of the completion
12 of whatever you were going to build on the property?
13     A      That's right.  I had a bunch of wood,
14 timber, that I had cut off some other property and it was
15 being air dried, cherry, oak, maple and pine and we had
16 moved it out to the top floor of the barn.
17         It wasn't easy just to move it somewhere,
18 because it had to be inside.  So I reserved the rights to
19 do this, because I didn't know how long it was going to
20 take us to construct things and to use up that wood.
21         We had an estimate of what it would take,
22 but we were giving ourselves plenty of leeway, after
23 discussions with the Hewetts, it probably won't be a year,
24 but I want the right just for 2 years just in case, just
25 trying to anticipate the worst case scenario.

76

1      Q      As of the time that you entered into the
2  agreement of sale with the Hewetts, which I will represent
3  according to the agreement of sale states October 7, 1999,
4  had you had any dealings with any official or employee
5  from the Township other than Mr. Wilson and the SEO?
6      A      I don't think so, not that I can recall.
7      Q      Is the first time that you had any dealings
8  with any official or employee from the Township other than
9  Mr. Wilson and the SEO when you attended the Township
10 meeting in February of 2000?
11     A      I believe that is correct, yes, I think so.
12 I am trying to think if I had called the Township
13 secretary about any questions or information.  At this
14 moment I don't recall any conversations.
15     Q      I am going to use as our time this February
16 2000 Township meeting that you attended, up to that point,
17 up to February of 2000, had you engaged anybody else to
18 perform any other services on the property other than
19 Mr. Wilson; Mr. Parks; Mr. Simpson; and the designer, Mr.
20 McClintic?
21     A      I can't recall anybody that I would have
22 hired to do something at that particular time.
23     Q      What did you take to the Township meeting of
24 February 2000?
25     A      I took the map of the subdivision and I

77

1  believe -- I think I took the sewer modules; but their
2  meeting is the first Monday of every month, and I may have
3  taken the sewer modules on the first Monday of March, if I
4  didn't take it on -- I would have to look at the date of
5  the sewer module, the signature that Parks had done.
6      Q      Were you present when Parks signed the sewer
7  module --
8      A      No, actually, they were delivered to his
9  wife, who works in State College, she took them home to
10 him and brought them back.
11     Q      Brought them back to you?
12     A      Yes, she did, she brought them -- I believe
13 she brought them back to me.  Either she brought them back
14 or he mailed them to me; but I didn't deliver them to him
15 personally, his wife took them to him.
16     Q      The map showing the lots and the sewer
17 modules, how many proposed lots were there?
18     A      At that time there was three lots.
19     Q      What were the three lots, if you can
20 describe them?
21     A      We had the 20 -- we will call it the 26 acre
22 lot.  Then there was a triangular piece of ground back in
23 the back, that abutted the 26 acre piece but on the other
24 side of the power line; and then there was the residue,
25 which was what we were going to build on.  The smaller



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

78

1  triangular pie shape, it was a pie-shaped lot, it was
2  about 4 and a half acres, something like that.
3      Q    What did you intend to do with that lot?
4      A    I was going to give it to one of my kids.
5      Q    Other than taking the map to the Township
6  meeting and the sewer modules to the Township, did you
7  send the sewer modules anywhere else?
8      A    Send it somewhere else?
9      Q    Deliver it somewhere else or bring it
10  somewhere else?
11      A    In what time are you talking about, when?
12      Q    At or around the time that you brought it to
13  a Township meeting?
14      A    I don't think so.
15          David Simpson delivered the things to me
16  done, we signed them in the owner's spot and we gave them
17  to Parks -- I called Parks and Parks said give them to my
18  wife, it is easier, because she worked in State College,
19  so she brought them home and either she delivered them or
20  he mailed them to me, one of the two, and they were all
21  signed.  Aside from that, no, I don't think they were
22  delivered to anyone else.
23      Q    You don't recall, as I understand, whether
24  you brought them to the Township meeting, and we are
25  talking about the sewer module, the Township meeting in

80

1  the Township or bring it to the supervisor's meeting for
2  our signature.
3      Q    What happened at the meeting?
4      A    They said, no, we are not going to sign this
5  plan.
6      Q    Who said that?
7      A    One of the supervisors.
8      Q    Do you remember which one?
9      A    No, I think it was whoever the chairman was,
10  but I am not sure which one of the fellows that was.
11      Q    Did they say why they weren't going to sign
12  it?
13      A    Yes, they said we have a moratorium in
14  effect on subdivisions and we are not signing any plan.
15          Then they also went on to say, you are doing
16  this wrong anyhow, it has to be submitted to the County
17  Planning Commission first.
18      Q    Do you remember who said that?
19      A    Whoever it was that was talking, I think it
20  was the supervisor.
21      Q    You mean the chairman?
22      A    Yes, the chairman of the supervisors.
23      Q    Was it one person who was doing the talking?
24      A    They all chimed in here and there.  I don't
25  remember -- in fact, it may have been -- it was probably

79

1  February of 2000 or March of 2000, right?
2      A    Yes, you can easily determine that by the
3  date that Parks signed it.
4          If he signed it before the first Monday of
5  February, then it was taken in February; if he signed it
6  after the first Monday of February, then it was taken to
7  the March meeting.
8      Q    But you recall that you were definitely at
9  the February 2000 meeting?
10      A    Oh, yes.
11      Q    Is that correct?
12      A    Oh, yes.
13      Q    What happened at that meeting?
14      A    I had the plan, in fact, I had 3 or 4 copies
15  of the plan, which is what Simpson told me I needed. My
16  wife and I had signed it and it was notarized and I asked
17  the Township to sign it.
18      Q    Why did you ask the Township to sign the
19  plan?
20      A    Because that is what I was told had to be
21  done.
22      Q    Who told you that?
23      A    I think it was Simpson that said take it --
24  it was either Simpson or Wilson that said you have got to
25  take the plan -- Wilson that told me to take the plan to

81

1  Mrs. Wirth that said, anyhow, you don't want to be
2  submitting that here.  Anyhow, you have to take it to the
3  County Planning Commission first; but they were all in
4  agreement that that is what had to be done.
5      Q    It is your testimony, and I need to be clear
6  about this, it is your testimony and your recollection
7  that the person who said they are not going to sign it was
8  the chairman of the board of supervisors?
9      A    I said I think that is who said it
10  initially; but as I said, they all chimed in, you know,
11  yeah, we are not going to sign this, no, we have got a
12  moratorium in place. I think Wilson was the one who said,
13  yeah, we have got a moratorium in place and we are not
14  signing it.
15      Q    What did you say?
16      A    I said you guys can't have a moratorium on
17  an ordinance that you don't have, I said.
18          Then I think Mrs. Wirth chimed in with, yes,
19  besides that, before we sign anything like this, you have
20  to submit it to the County Planning Commission.  She said
21  something about, you are out of procedure or something
22  like that.
23      Q    So you were aware at the time that you went
24  to the Township meeting in February of 2000 that there was
25  no subdivision ordinance in Jackson Township?



CORNEAL, DAVID
02/22/01

CORNEAL VS
JACKSON TOWNSHIP

82

1    A    Right.
2    Q    How did you become aware of that?
3    A    Wilson had told me that way back when.
4    Q    Did Wilson tell you way back when that they
5    were working on an ordinance?
6    A    No, he did not. He claimed he told me that,
7    but that is not true at all.
8    Q    When did he claim he told you that?
9    A    At the meeting.
10   Q    Do you know of any reason why Mr. Wilson
11   claimed to have told you that?
12   A    Why, what was in his mind?
13   Q    Yes. Do you know or do you have a belief as
14   to why he told you at the meeting of February 2000 that he
15   had previously told you that they were working on a
16   subdivision?
17   A    You want me to speculate as to what was in
18   his mind as to why he did that?
19   Q    I am not asking you to speculate what was in
20   his mind. I am asking you whether or not you had a belief
21   or have a belief as to why he told you that?
22   A    Well, I think Mr. Wilson wanted to interfere
23   with the sale of this property and the subdivision of this
24   property, because he wanted it himself and now he is
25   trying to cover his tracks with, oh, I told you about

83

1    that, and he never told me anything like that.
2         Why would I hire him to do test pits and do
3    perk tests and do all this stuff and pay the SEO if I knew
4    there was a moratorium on or he knew there was a
5    moratorium coming in. There is no sense to that.
6         So I think he was just trying to cover
7    himself as to why he had went ahead and gotten paid for
8    this work and then he was trying to say, well, I told you
9    this was going to happen and he never told me that.
10   Q    Is it your belief then that he was telling
11   you this, that he had previously told you that they were
12   working on a subdivision ordinance, because he was
13   covering up because he accepted payments from you or
14   because he wanted the property himself or some other
15   reason?
16   A    Both reasons that you just stated I think.
17   In fact, after he was able to break or the Hewetts backed
18   out of the contract, he sent his nephew to me how he
19   wanted to buy the property now, the 26 acres, the nephew
20   did, who was a backhoe operator and had no money, had no
21   wife, no family. All of a sudden the backhoe nephew wants
22   to buy the property from me.
23   Q    Did you say anything else at the Township
24   meeting other than you can't have a moratorium because you
25   don't have an ordinance?

84

1    A    I told them, this isn't right. I said, you
2    can't have a moratorium on an ordinance that doesn't
3    exist. I said, I want this plan signed and I want, you
4    know, so we can get the sewer modules and proceed, because
5    I have got this sale — I told them that I had the sale of
6    the property to the Hewetts, they already knew about that.
7    Q    How do you know they knew?
8    A    Because they said they knew, Wilson knew.
9    Q    Who said they knew?
10   A    Wilson said he knew that the Hewetts had
11   this property or had a contract on the property.
12   Q    Did you raise your voice at this meeting?
13   A    Raise my voice? Not much louder than what
14   you are listening to right now.
15   Q    Were you angry?
16   A    Well, I was obviously disturbed when all of
17   a sudden they are throwing me a curve and Wilson is
18   claiming he told me this was happening, which wasn't true.
19   The whole thing was, needless to say, very disconcerting.
20        I explained to the rest of the supervisors
21   that I had a contract for this property and that I also
22   had contractors lined up that were committed and I was
23   committed to them to build an art studio and a garage and
24   a house for my wife and I.
25   Q    What contractor did you have lined up?

85

1    A    Max McClintic.
2    Q    Up until the point of this February 2000
3    meeting, had you done any construction activities on the
4    property?
5    A    No — none that required — we didn't do
6    anything. Wilson actually was supposed to start the road
7    back to the stream but that hadn't started yet.
8    Q    When was he supposed to start that?
9    A    He said he was going to start it as soon as
10   he got some of his vehicles and equipment in from other
11   jobs and they weren't there yet and there was, you know,
12   the typical contractor excuses and delays.
13   Q    Did there come a point in time where
14   Mr. Wilson told you he couldn't do the work?
15   A    Yes.
16   Q    When was that?
17   A    That was shortly right thereafter. I said,
18   are you doing this road for me or not? He said, Well, I
19   guess under the circumstances I can't or I won't do the
20   road. This is after we had the confrontation.
21   Q    At the February meeting?
22   A    At the February meeting, yes.
23   Q    Where did this conversation take place where
24   he told you he couldn't do the work on the road?
25   A    I don't recall if it was at that meeting,



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

---

86

1  after the meeting, because their meetings only last 15 or
2  20 minutes, or I got on the phone with him a day or so --
3  the next day or something.  I don't recall how it
4  happened.
5  Q  Did anything else happen at the meeting that
6  we haven't discussed?
7  A  They told me I needed to go to the County
8  Planning Commission and submit my plan there and that the
9  County Planning Commission would send it back to them for
10  their signature.
11  In other words, what they inferred to me
12  was, no, we don't have a subdivision ordinance, but we got
13  a moratorium on them; but the Huntingdon County Planning
14  Commission has a subdivision ordinance that you have got
15  to clear it through first.  That was the inference that
16  they made to me.
17  Q  So by you saying they made that inference,
18  they didn't specifically say that to you, correct?
19  A  They specifically said that you can't bring
20  it here first, you have to first have the Huntingdon
21  County Planning Commission approve your review and approve
22  your plan.
23  Q  Those were the words that were used?
24  A  Those were the words that were used.
25  Q  Who was it that used those words?

---

87

1  A  I would say it was probably Mrs. Worth that
2  said that. She is a secretary of that body, but she really
3  acts as a Township manager.
4  Q  Did anything else happen at this February
5  2000 Township meeting?
6  A  No, they just shut me off. They said, we
7  have got a moratorium, we are not going to approve your
8  plan and you have got to take it to the County Planning
9  Commission first anyhow, so that is it.
10  Q  Did you thereafter discuss with anybody what
11  happened at the February 2000 Jackson Township meeting?
12  A  Yes, I would have talked to Max McClintic
13  about it, I would have talked to my wife about it.
14  Q  Anybody else?
15  A  I may have discussed it with Fred McClintic,
16  but I don't know if I did or not.  Definitely with Max.
17  Probably discussed it with Simpson.  I would have
18  discussed it with Hewett, in fact, I know I discussed it
19  with Hewett.
20  Q  Why do you know you discussed it with
21  Hewett?
22  A  Because Hewett then started to take an
23  active role when they found out the Township was holding
24  us up, because it would have affected them.
25  Q  Did you look into whether or not you had to

---

88

1  submit your plan to the Huntingdon County Planning
2  Commission?
3  A  No, I took their word for that. It sounded
4  quite logical and reasonable.  My dealings were
5  exclusively, if I ever dealt with anybody, it was in
6  Centre County and I know Centre County has a Centre County
7  Planning Commission that has control over land
8  subdivisions. So I assumed that what they were telling me
9  was true.
10  Q  There was nothing to prevent you from
11  looking into what they were telling you to see if it was
12  true, correct?
13  A  I asked them for a copy of the ordinances at
14  one point, at which point they said there are none, we
15  have no copies of those.
16  Q  When did that --
17  A  It wouldn't have occurred at that meeting, I
18  think it occurred at the next meeting.
19  Q  They said they have no copies or they had no
20  ordinances?
21  A  They had no copies of any ordinances, they
22  only had the originals and couldn't provide we copies.  I
23  said, I will pay for copies, they wouldn't give them to
24  me.
25  Who told you that they wouldn't give you

---

89

1  copies of the ordinances?
2  A  Mrs. Worth.
3  Q  Were you aware that copies of the ordinances
4  were available at the county library?
5  A  No.
6  Q  You were not aware of that?
7  A  I told you, I have not dealt in those
8  areas.  I hired engineers to do this stuff when needed or
9  architects to do this stuff. If I had any involvement,
10  there was always another attorney that specialized in that
11  area that dealt with that, because that was not my area.
12  Q  Up until the point of the March 2000 meeting
13  when you are saying that you were told that you could not
14  get a copy of the ordinance, did you consult with an
15  attorney?
16  A  No.
17  Q  Why not?
18  A  Because I didn't think it was necessary, I
19  thought they were telling me the truth.
20  Q  You didn't think it was necessary to consult
21  with an attorney, even though you are testifying that they
22  refused to give you a copy of the ordinance?
23  A  You asked me between February and March did
24  I consult with an attorney, that is what I interpreted in
25  your question.

---


90

1     Q       I apologize for that.
2             After you were told they would not give you
3   a copy of the ordinance, did you consult with an attorney?
4     A       I talked with Jim Himes in Huntingdon.
5     Q       Did you talk to him for purposes of legal
6   representation?
7     A       Yes.  He was a close friend, so.
8     Q       When you spoke with him, did you anticipate
9   that your conversation would be privileged?
10    A       I would think so.
11    Q       Were you thereafter able to review copies of
12  the Jackson Township ordinances?
13    A       Did I review them or was I able to review
14  them?
15    Q       Were you able to review them?
16    A       After the ordinance was passed.
17    Q       When was the ordinance passed?
18    A       July the 7th of the year 2000.
19            MS. MONTGOMERY: Object to the form.  Just
20  be clear on what ordinance you are talking about.  You are
21  making assumptions here.
22            MR. SHERR: I was just referring to
23  ordinances and--
24    A       I am talking about the subdivision
25  ordinance.  I never reviewed any ordinances of the

91

1   township.
2   BY MR. SHERR:
3     Q       That is true even after you consulted with
4   this attorney in March?
5     A       That's right.
6     Q       Did you submit your plan to the County
7   Planning Commission?
8     A       Yes.
9     Q       When did you do that?
10    A       Shortly within a few days of that February
11  meeting.
12    Q       Did you personally submit it?
13    A       I did.
14    Q       Did you speak with anybody at the Planning
15  Commission at the time that you submitted it?
16    A       I spoke to a Richard Stahl, the head of the
17  Huntingdon County Planning Commission.
18    Q       What was the nature of your conversation
19  with Mr. Stahl?
20    A       The nature of the conversation was, I have
21  been told by the Jackson Township commissioners or
22  supervisors that I needed to submit a plan to you for
23  review and approval.
24    Q       What did he say?
25    A       He says, yes, and our fee is $75 or

92

1   whatever, you can bring it by and I did.  I gave him a
2   check for the $75.  I think it was 75, it may have been
3   more, less than a hundred dollars.
4     Q       Did Mr. Stahl indicate to you that it was,
5   in fact, necessary for you to submit the plan to the
6   County Planning Commission?
7     A       He didn't say one way or the other.  He just
8   said we reviewed -- it is customary for us to review
9   plans, I don't remember that that was his exact language;
10  but he never said that it was required or wasn't required.
11    Q       Did you ask him?
12    A       I assumed from what I was told that I had to
13  do this and I assumed that Huntingdon County had a
14  subdivision ordinance, since I never heard of a county not
15  having a subdivision ordinance.
16    Q       Did you ask Mr. Stahl whether or not it was
17  necessary for you to submit your plan to the County
18  Planning Commission?
19    A       I said, I have a plan that Jackson Township
20  has asked me or told me I needed to submit to you, what is
21  your procedures?  He told me; and he never said, you don't
22  have to submit it to us, we don't have any ordinances.  He
23  treated it and led me down to believe that they had a
24  requirement that it had to be reviewed by them at the
25  Huntingdon County level.

93

1     Q       Did you ask him whether or not you had to
2   submit it to him?
3             MS. MONTGOMERY:  Objection to the from.
4   BY MR. SHERR:
5     Q       To the County Planning Commission?
6     A       I already answered the question. He led me
7   to believe that I had to submit it to them and pay the fee
8   for their review for Jackson Township, as well as Mrs.
9   Wirth; and the supervisors led me to believe that that is
10  what I had to do if I wanted to get an eventual
11  subdivision approval once the moratorium was lifted.
12    Q       Did you do anything else to determine
13  whether or not you had to submit your plan to the County
14  Planning Commission?
15    A       No, I followed the instructions I was given
16  by the Township.
17    Q       Why do you believe, if you have a belief,
18  that the Township told you to submit your plan to the
19  County Planning Commission?
20    A       I have no idea, except my belief is that
21  they were trying to block or stop or interfere with my
22  development or subdivision of the land and so they were
23  throwing up another road block.
24    Q       Why do you believe this was a road block?
25    A       Because, obviously, in hindsight, we find



CORNEAL, DAVID
02/22/01

CORNEAL VS
JACKSON TOWNSHIP

---

94

1  that it was not necessary to submit this to the Planning
2  Commission at the county level. It was totally false and
3  unnecessary, in hindsight we find this out.
4     Q     How did you find it out?
5     A     It became obvious when I went and talked to
6  people that were knowledgeable, such as my attorneys here,
7  as to what is required.
8     Q     When is it that you found out you did not
9  need to submit your plan to the County Planning
10 Commission?
11    A     It would have been in the late spring.
12    Q     Of 2000?
13    A     Yes.
14    Q     What happened when you submitted your plan
15 to the County Planning Commission, what did they do with
16 it?
17    A     They came back with a letter, a copy of
18 which has been provided to you, evaluating the plan.
19    Q     Contained within that letter they reference
20 the fact that there was a moratorium in Jackson Township,
21 correct?
22    A     Yes.
23    Q     Did they also review your plan with relation
24 to the proposed ordinance in Jackson Township for
25 subdivision?

---

95

1     A     I have no idea what they use as a basis,
2  except that it appears that they did, because they
3  reference the proposed plan that they had in their files.
4     Q     Do you recall that in that letter they
5  stated, "the Jackson Township supervisors were in the
6  process of adopting a Subdivision and Land Development
7  Ordinance, the following comments are based on the draft
8  of Jackson Township Subdivision and Land Development
9  Ordinance."?
10    A     Yes.
11    Q     Do you recall that?
12    A     Yes.
13    Q     Then that led you to believe that, in fact,
14 the County Planning Commission reviewed your plan under
15 the proposed subdivision ordinance, correct?
16    MS. MONTGOMERY: Object to the form.
17    MR. SHERR: What is the basis?
18    MS. MONTGOMERY: I didn't understand the
19 question.
20 BY MR. SHERR:
21    Q     Do you understand the question?
22    A     No, I don't.
23    MR. SHERR: Off the record.
24    (Recess.)
25    MR. SHERR: Back on the record.

---

96

1  BY MR. SHERR:
2     Q     Mr. Corneal, when we left off we were
3  discussing a letter that you received from the Huntingdon
4  County Planning Commission. You did receive a copy of the
5  letter, correct?
6     A     Yes.
7     Q     I note that also copied on the letter was
8  Mr. Simpson, who we already discussed, and it indicates
9  Rouzer, R-O-U-Z-E-R, do you know who that is?
10    A     May I see that.
11    Q     Sure. We can make a copy. I didn't make
12 copies.
13    A     I am not sure who that is. I am thinking,
14 but I don't want to be held to this just to help you, but
15 it may be the staff member in the office that may have
16 done part of the review that Mr. Stahl then signed it, I
17 don't know, the name seems to ring a bell.
18    Q     It is true, is it not, that the Planning
19 Commission recommended that your proposal be denied,
20 correct?
21    A     Yes.
22    Q     What is your understanding as to why they
23 recommended that it be denied?
24    A     Well, the main thing that they didn't like
25 was the four and a half acre tract of land didn't have

---

97

1  road frontage and so they — and the other main reason was
2  the moratorium, as I understood it.
3     Q     Did you discuss this letter that you
4  received from the Huntingdon County Planning Commission
5  with anyone?
6     A     Yes.
7     Q     Who did you discuss it with?
8     A     Well, I would have discussed it with Mr.
9  Simpson, because I had him redraft the plan. I probably
10 would have discussed it with McClintic, Max. I certainly
11 discussed it with my wife probably, maybe not, but
12 probably.
13    Q     Anybody else?
14    A     I think that one of the things in that
15 letter, if I can look at it a second — there was a
16 question at one point regarding the question of wetlands.
17 Here it is, number 2 on page 1.
18       I have an engineering firm in State College
19 that I hired to — since the soil maps indicated a
20 possible wetland area where one of the sewage disposal
21 places were, even though the SEO was there and identified
22 the location and, obviously, wouldn't have identified it
23 in the middle of the wetlands, they pointed out something
24 about the property potentially being — the one sewage
25 site potentially being wetland, as a result, the Township

---


98

1 seized on that and said, we can't possibly approve this,
2 there is a potential of your sewage site being on
3 wetlands.
4     I said, Your SEO was there and identified
5 this location, he knows it is not wetlands. Well, we need
6 a certification. Just another roadblock they were
7 throwing up, so that I had to go to the engineer and send
8 him out there again, a second time, and pay them to
9 identify or to certify that this was not wetlands.
10    Q    At what point were you told that there may
11 be wetlands?
12    A    When the letter came in. When you have
13 200 --
14    Q    Back up. When did you hire Blozsky
15 Associates?
16    A    I don't recall exactly when I hired them. I
17 don't remember exactly. I can look at their bills and
18 tell when they did work.
19    Q    Do you recall whether it was before or after
20 you attended the February Township meeting?
21    A    I don't recall.
22    Q    Who was it from the Township that told you
23 that there may be wetlands involved?
24    A    Well, several of the supervisors brought it
25 up and Mrs. Worth was quick to jump all over it. Well,

99

1 there may be wetlands here, she says, and we are going to
2 need a certification that this isn't wetlands.
3     I said, your SEO officer reviewed, he picked
4 the sites, there isn't wetlands. Well, we don't know
5 that, so you are going to have to go and send engineers
6 out there to get a certification.
7    Q    Where did this conversation take place?
8    A    This took place in one of the meetings, one
9 of the Township meetings.
10    Q    Did it take place at the February 2000
11 meeting?
12    A    No, it took place in I think at the March
13 meeting.
14    Q    Do you believe that, even though this letter
15 is dated February 24, 2000, this letter being the
16 Huntingdon County Planning Commission letter that we are
17 discussing?
18    A    Well, it happened in March, yes, it happened
19 in March, yes, as I said, at the March meeting.
20    Q    Why did you originally hire Blozsky &
21 Associates to conduct the wetlands investigation?
22    A    Because I wanted to know, to make sure that
23 I wasn't doing anything wrong in locating my buildings and
24 particularly with regard to putting our driveway in,
25 because our driveway then comes down and goes along the

100

1 stream and I knew how sensitive everybody -- the DEP was
2 with wetlands, so I brought the engineers in to make sure
3 that we weren't violating any of the wetland
4 specifications.
5    Q    Did you bring in the engineers before or
6 after the February 2000 Township meeting?
7    A    Well, you asked me that before. And I would
8 suspect, now that I had talked to Wilson about putting the
9 road in, that it was probably before.
10    Again, I want to be able to correct that if
11 I am wrong, based on their invoice to me, which will tell
12 me when they did the work for me.
13    Q    What prompted you to even consider or worry
14 about wetlands?
15    A    Wilson told me that he thought there was
16 some wetlands down in here when I talked to him about
17 doing the road. I said, well we certainly don't want to
18 fill in any wetlands, so that is when I got them involved.
19    Q    What did they tell you?
20    A    They said, no wetlands where the road was
21 already and where it was going to go, where the driveway
22 was, no problem.
23    Q    Did you tell the individuals from the
24 Township who you were speaking to at the March 2000
25 meeting when the subject of wetlands came up that you had

101

1 an investigation going?
2    A    You are talking about two different things.
3 You are talking about a wetland investigation by a sewage
4 site versus a wetlands investigation regarding the
5 driveway, so whatever showed up there.
6    The SEO was there. He knows what wetlands
7 are. He approved the location to dig the pit. He approved
8 the perk tests that were done in that location and I
9 couldn't fathom and I don't think anybody of rational
10 thinking could fathom that he would have set that location
11 in the middle of a wetland, but that is what the Township
12 tried to -- another roadblock they threw up, well, we
13 don't know, because the Planning Commission questions
14 whether or not there were wetlands there or not. So I had
15 to send them out again to do it, to confirm that there
16 were no wetlands.
17    Q    So it is your understanding that whatever
18 was said about wetlands at the March 2000 meeting was
19 based on the Planning Commission letter of February 24,
20 2000?
21    A    I don't know what the basis of it was, but
22 it certainly had some basis in the letter from the
23 Planning Commission. I think it was that letter. I didn't
24 thoroughly go through -- didn't it say something about
25 wetlands in there?



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

---

102

1    Q    Yes, I think you referenced it earlier --
2    A    I don't know if -- yes, right. The proposed
3  house studio and sewage system for lot number two are
4  within these soil types and that is what forced us to go
5  back out again.
6    Q    Was it the County Planning Commission letter
7  that required you to go hire Blazosky again or is it
8  something that the Township --
9    A    The Township did. The Township said, We
10  want a certification. Look here, the Planning Commission
11  said there is a -- we don't know, you are into soil types
12  of wetland type soils, so we want you to go and hire
13  somebody and certify to us that our SEO didn't put a
14  sewage system in a wetland area.
15    Q    What did you do in response to receiving the
16  County Planning Commission letter?
17    A    Well, the main objection, aside from the
18  moratorium, was the fact that this 4.5 acre lot didn't
19  have road frontage. The 4.5 acre lot was insignificant,
20  it didn't matter didley to me. I was doing it to set it
21  aside for one of the kids. So I told Simpson to redraw
22  the plan and just cut it down to two lots, the 26 acre lot
23  with the house and the barn and the remainder and he did,
24  he redrew the plan.
25    Q    I am going to read you the last paragraph of

---

103

1  this letter, the letter being the February 24, 2000 letter
2  from Richard E. Stahl, Planning Director, Huntingdon
3  County Planning Commission: "Please contact this office
4  with any questions concerning these comments. As always,
5  the local municipality is encouraged to carefully review
6  the subdivision/sewage module for compliance with Township
7  and state requirements."
8        In response to this letter, did you contact
9  the Planning Commission office?
10    A    I discussed that letter with one of the
11  people that reviewed, and his indication was that the main
12  thrust of the problem in his opinion was the lot that
13  didn't have any road frontage, because everybody was going
14  to be concerned, it was on the other side of the stream,
15  how are you going to get access to that lot. I said, That
16  lot doesn't mean that much to me. We never discussed the
17  fact that -- he never brought up that there was a wetlands
18  problem or anything.
19        I think these guys just throw a lot of stuff
20  in the letters and things.
21    Q    Do you know who that was that you discussed
22  it with?
23    A    That is why I am saying, it wasn't Stahl,
24  but it may have been that guy that was copied, Rouzer, but
25  I am not sure of the name. If that is the guy that works

---

104

1  in that office, if that is his name, then that is who I
2  discussed it with.
3    Q    How did you get to that person who you
4  discussed it with?
5    A    I called the office and they said, oh, this
6  so and so reviewed the plan, did the main review on it and
7  you should talk to him or maybe it was that Stahl wasn't
8  there, why don't you talk to this guy and it turned out
9  that he did some of the review or all of the review of the
10  plan.
11    Q    You made changes to your plan based on what
12  you learned in that letter or any conversation that you
13  had?
14    A    Yes, I did.
15    Q    Who made those changes?
16    A    Simpson made the changes for me.
17    Q    Do you know whether Simpson in making the
18  changes reviewed a draft of the proposed Jackson Township
19  Subdivision Ordinance?
20    A    I don't know that.
21    Q    Do you know whether he had a copy of the
22  proposed Jackson Township Subdivision Ordinance at the
23  time?
24    A    I don't know anybody that had a copy of
25  that, with the exception of the Planning Commission,

---

105

1  because we kept asking for those things and, well, when it
2  is all finished and all proofread, you will get a copy or
3  you will get the original was the response that we
4  normally got at those meetings.
5    Q    Did you attend the March 2000 meeting of the
6  Jackson Township board of supervisors?
7    A    To the best of my knowledge, I did, yes.
8    Q    Was that meeting before or after you
9  received the February 24, 2000 letter from Huntingdon
10  County Planning Commission?
11    A    I would think that it was after, it was the
12  first Monday of March.
13    Q    What was your purpose in going to that
14  meeting?
15    A    I took my sewer modules there to be signed.
16    Q    What happened at the meeting?
17    A    I asked them to sign the sewer modules. They
18  basically looked at me and said, What are you doing here?
19  I said, I am here to get the sewer modules signed. Oh, we
20  are not signing any sewer modules.
21    Q    Who said that?
22    A    Well, Wilson said it for one and so did --
23  they all kind of chimed in, Yoder, they all looked at each
24  other, you agree with that? Yes, I agree, we are not
25  signing anything for him.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

106

1    Q    Did they tell you why they are not signing
2  the sewer modules?
3    A    They said they are not signing the sewer
4  module because of their moratorium.
5    Q    What did you say?
6    A    I said, Forget your moratorium, forget the
7  subdivision, I said, I want to build a house, I have got
8  commitments to build a house and an art studio. I said, I
9  want to get approval to build the house. Forget that, I
10  said, I am not asking you for a subdivision. I am telling
11  you I own a 95 acre piece of ground and I want the sewer
12  modules signed so that I can get permits to build the
13  house.
14    Q    Why did you believe that you needed the
15  sewer modules signed to get permits to build the house?
16    A    Because DEP had to review sewer modules and
17  they would only review sewer modules that were sent to
18  them via the Township.
19    Q    Why did you believe that you had to get the
20  sewer modules signed in order to get permits to build your
21  house?
22    A    Because you had to have a septic system or
23  you had to have a sewage system approved by DEP and Wilson
24  told me that.
25    Q    Didn't you testify that there was already

107

1  on-site sewage with respect to the house and the barn?
2    A    The farmhouse.
3    Q    Right.
4    A    This house was, you know, a quarter of a
5  mile, a half a mile away.
6    Q    Did anybody tell you that you needed to have
7  the sewer modules signed by the Township and approved by
8  DEP in order to get a building permit to build your house?
9    A    Yes, Wilson told me that.
10    Q    When did Wilson tell you that?
11    A    When we were doing the system or checking
12  out the locations and doing the perk tests.
13    Q    And he told you that you needed this, even
14  if you didn't want to subdivide the property?
15    A    Yes, if you were going to build a property
16  and you were going to provide a sewage disposal on the
17  property, you had to have a DEP permit.
18        The only way you got that is you dig a hole
19  in the ground and you found soil types that were suitable,
20  like we did.
21        Then we did a perk test, which we found it
22  perked and were suitable and the SEO signed them and now
23  the Township needed to sign them and they would have been
24  sent on to DEP for an approval and that approval would
25  have taken from what I understood, maybe 5 or 10 days.

108

1  Then I could go and I could get my building permit and
2  begin building the site.
3    Q    So at the March meeting, the only reason you
4  were given why the Township would not sign the sewer
5  modules was because of the moratorium, is that correct?
6    A    No.
7    Q    What other reason?
8    A    Well, yes and no.
9        Here is the twisted distortion that they
10  took on this thing, which is very interesting. They said,
11  We have a moratorium on subdivisions. I said, I know you
12  do, you told me that. I don't agree with it, but let's
13  forget the subdivision for a minute. I have a 95 acre
14  tract of ground, I have sewer sites approved by your SEO,
15  signed by him. I want permits to build my house, forget
16  about the subdivision, I am not asking you to subdivide
17  it. I am not asking you right now to subdivide this land.
18  I am asking you to give me permits to build my house.
19        Their response was, Oh, wait a minute, if
20  you build two houses on one tract of ground under DEP
21  regulations, that is a subdivision. Therefore, it comes
22  under our subdivision moratorium.
23    Q    You were told that at the meeting?
24    A    Absolutely.
25    Q    Who told you that?

109

1    A    Well, Ann Wirth was quite joyously saying
2  that, Oh, but you can't do that because, you know, it
3  constitutes a subdivision under DEP, therefore, you can't
4  do it. So did the rest of the supervisors, they all
5  chimed in, Oh, yeah, that's right, you can't do that, you
6  can't do that, so you are still in the subdivision
7  moratorium, therefore, we are not going to sign your
8  modules.
9    Q    Did anything else happen at this March 2000
10  meeting?
11    A    As I said, their meetings last about 15
12  minutes to a half hour max, not much.
13    Q    What else happened?
14    A    That is all I know, I mean as far as it
15  affected me.
16    Q    That is all I am interested in.
17    A    After they adjourned their meeting, I tried
18  to talk to them about it and still, I got the same stone
19  wall. You are still under subdivision and still under a
20  moratorium and we are not going to give you anything.
21        I did ask one other thing, I said, When are
22  your subdivisions going to be approved? The response was,
23  Well, we should approve it in April.
24        MS. MONTGOMERY:  Excuse me.
25    A    But they didn't.


110

1   MS. MONTGOMERY: Can we clarify the record
2   here, because I am not sure I understand what my client
3   just said. Were you talking about the subdivision or
4   subdivision ordinance?
5   A   Their proposed subdivision ordinance that
6   they imposed a moratorium on they told everybody was going
7   to be probably approved in April.
8   MS. MONTGOMERY: You didn't say subdivision
9   ordinance the first time, you said --
10  A   No.
11  But conveniently, they didn't approve it
12  even though it had been on the books or been in the works
13  for months and months and months, they didn't approve it
14  until a week after my contract ran out with Hewetts.
15  BY MR. SHERR:
16  Q   Did you have any discussion with anybody
17  about what happened at the March 2000 Township meeting?
18  A   I would have discussed it again with Max
19  McClintic, I certainly discussed it with my wife. I don't
20  know if I would have talked to Simpson about it, because
21  by that time Simpson had been instructed to redo the plan;
22  but I probably discussed it with him. I certainly would
23  have discussed it with Hewetts, because it affected them.
24  Q   Was there anybody with you at either the
25  February or March meeting?

111

1   A   The March meeting the Hewetts were there.
2   Of course, then there was half a dozen people in the
3   audience.
4   Q   Anybody that you knew?
5   A   No, they were legal local residents.
6   Q   After the March meeting, did you commence
7   any construction activity on the property?
8   A   No.
9   Q   Did you do anything to put a driveway in on
10  the property after the March meeting?
11  A   I don't know -- after the March meeting, of
12  course, we did. After the March meeting, did we start
13  construction, yes; but not immediately after then, you
14  have to give me a time frame where you are asking.
15  Q   When did you start the construction of the
16  driveway on the property?
17  A   Well, as soon as the weather broke, and I
18  suspect that was probably I am going to say April.
19  Q   Did you have a permit to put the driveway
20  in?
21  A   Didn't need a permit.
22  Q   So your answer would be, no, you did not
23  have a permit?
24  A   I had no permit that I didn't need, that's
25  right.

112

1   On further clarification, as I said, that
2   roadway was already in there, was an entry on to the
3   Township road already, it existed. There was no new road
4   being put in or driveway being put in. What was being
5   done was resurfacing the existing roadway that was there.
6   Q   Why is it that you believe that you did not
7   need a permit to do the driveway work?
8   A   Because it turns out at their -- in
9   hindsight, their July -- first of all, I didn't think I
10  needed it, because it was already an existing driveway,
11  that is the first reason.
12  Then as a side issue, in their July 7
13  meeting, when they passed the subdivision ordinance, for
14  the first time they passed a driveway permit ordinance,
15  they never had one prior to that.
16  They did force people, I found out from
17  neighbors, they did force people to pay them fees and
18  force them to cut trees down and do all kinds of stuff to
19  put a driveway in but they had no ordinance for it.
20  Q   Who was it you believe they forced to do
21  this?
22  A   One of my neighbors had told me about having
23  to do that, I don't remember his name.
24  Q   Do you remember anything about him?
25  A   Yes, he lives off Miller Road.

113

1   Q   When did he tell you this?
2   A   He told me this in the summer of the year
3   2000. They forced him to cut down some beautiful old
4   trees that were near the entry way to his driveway. They
5   never had an ordinance allowing that, and he said he paid
6   them a fee to put the driveway in.
7   Q   Did anybody else tell you that the Township
8   required them to cut down trees or pay a fee for a
9   driveway?
10  A   No.
11  Q   You thereafter submitted another plan to the
12  Huntingdon County Planning Commission, right?
13  A   That's right.
14  Q   And you received a letter back from Richard
15  Stahl at the Planning Commission?
16  A   Yes.
17  Q   This letter recommended conditional approval
18  of the proposed subdivision plan?
19  A   Of the two-lot subdivision plan, that is
20  correct.
21  Q   And the recommended approval pending
22  adoption of the Subdivision and Land Development
23  Ordinance?
24  A   Well, whatever it says, it says. The basis
25  of not recommending approval I understand was their



114

1  moratorium.
2      Q      Did you receive a copy of the April 20
3  Planning Commission letter?
4      A      Yes.
5      Q      What did you do after receiving a copy of
6  the letter?
7      A      What did I do?  In what regard?
8      Q      With regard to your attempts to subdivide
9  and build on the property?
10     A      Well, they already had blocked me.  As far
11 as I was concerned at best I had started a process that
12 was going to help me eventually to get a subdivision,
13 which I should have been entitled to anyhow. So what would
14 I do with it?  There was nothing to do with it, except,
15 you know, if I re-submitted it to the Township I would get
16 the same response, we have a moratorium in place, we are
17 not going to approve it.
18     Q      Did you attend the April meeting of the
19 Township board of supervisors?
20     A      No.
21     Q      Did you attend the May meeting of the
22 Township board of supervisors?
23     A      I don't believe so, no.
24     Q      Did you have any contact with anybody, any
25 official or employee from the Township during April or

115

1  May?
2      A      I don't know if it was April or May. I went
3  to a meeting and it was probably the March meeting and I
4  said, Well, if you won't give me a sewer module for my
5  house, I said, I want to build an art studio. I want to
6  at least get started on construction of my art studio.
7          They said at that meeting, Nope, you can't
8  do that, you have got to have sewer to that art studio. I
9  said, We are not putting sewer into the art studio. Well,
10 you have got to have it.
11         I said, Tom Wilson told me you have a privy
12 permit here, so I want a privy permit, I will put a privy
13 in with the art studio.
14     Q      What meeting do you believe this occurred
15 at?
16     A      I think this was the March meeting. This was
17 when they hit me with the, Oh, we don't care if your are
18 forgetting about the subdivision or not, we are not going
19 to give you this, because your house requires a sewer
20 module approval and, therefore, it is a subdivision under
21 the DEP regulations.
22         I said, okay, forget that, I said, I want to
23 start the art studio, which didn't have any sewer, so how
24 do I get a permit for the art studio?  You can't get a
25 permit for the art studio was the response.

116

1      Q      Who said that?
2      A      It was Ann Wirth mainly, but all of them
3  were chiming in at the same -- you can't do that, no, you
4  have got to have sewer in the art studio.  If somebody had
5  to go to the bathroom, where would they go? I said, Fine,
6  Tom Wilson, you told me you have a privy permit in this
7  Township, I said, I want a privy permit.
8      Q      What did they say?
9      A      They said, Well, you will have to talk to
10 the SEO about getting a privy permit. I said, Fine, I will
11 talk to the SEO.
12         So I went home that night and at 10:00
13 o'clock at night I call the SEO. Oh, Dave, he says, I
14 wish you wouldn't be calling me about this. I said, Did
15 somebody call you already from the Township?  He said,
16 Yes, they have already called me and they told me you are
17 not allowed to have a privy permit and that I am not
18 allowed to give you a privy permit.
19     Q      Did you ask him why?
20     A      He said, you know, I can't talk to you about
21 it, don't put me in the middle of this.  I am not allowed
22 to give you help or a privy permit; but, he says, I will
23 talk to Wilson about it and see if we can't clear this up.
24         He says, I will call you in a day or so.  I
25 said, Fine; this is Barry Parks.

117

1          I don't hear anything from Barry Parks for 3
2  or 4 days. So I called him and I put message upon message
3  upon his answering machine:  Barry, I need a privy permit
4  so I can start my art studio, and he refused to call me
5  back.
6      Q      Did he ever call you back?
7      A      No, never called me back.
8      Q      Did you do anything else with respect to
9  trying to get a privy permit?
10     A      What else could I do?  I had asked the
11 Township, they said, you had to go through the SEO
12 officer.
13         The SEO officer was instructed by the
14 Township and the supervisors not to assist me in any way
15 to get a privy permit and he is the only one that could
16 issue one.  What else would I do?
17     Q      So then your answer is, no, you did nothing
18 else?
19     A      Unless there is a supreme SEO officer, no, I
20 did not do anything else.
21     Q      The reason you believe that Mr. Parks was
22 told not to help you get a privy permit is based on what
23 Mr. Parks told you?
24     A      The reason I believe is that they were
25 absolutely adamant that they were going to interfere with


118

1  my construction, subdivision, anything that I wanted to
2  do, they were going to stop, period, that is what their
3  intention was, that is what I believe and I think their
4  conduct demonstrates that.
5      Q    Do you know of any reason why they would
6  want to stop you from building this studio?
7      A    Well, Mr. Domlin, later on, Van Domlin, said
8  it was because I was a trouble making yuppie from over the
9  mountain.
10     Q    When did he say that?
11     A    When I went to apply for a building permit.
12         You see then afterwards, I went about the
13  end of April, I decided this is crazy, I have got
14  contractors who are depending upon me, they have given up
15  other work to build my project, I have got to get started
16  with something. So I found out who the building permit
17  officer was.
18     Q    How did you find that out?
19     A    I think I had found that out earlier when I
20  talked to Ann Wirth. I said, Who is your building permit
21  officer and she told me. So I looked him up and I called
22  him. I called him up on the phone and I said, How do I
23  get to your place? He has a trailer out in the country.
24  I said, I want to come out and get a building permit.
25         I didn't tell him my name. I said I am a

119

1  resident out there, a property owner, I want to get a
2  building permit for a garage. He gave me directions to
3  his place.
4          There is a letter confirming our
5  conversation/meeting at the end of April, and I drove out
6  there on a Thursday. You have a copy of the letter that I
7  had sent to him, that will identify the specific day, I
8  think it was the 27th.
9          I guess I made the mistake of introducing
10 myself. Hi, I am David Corneal. All of a sudden this
11 cloud comes over his face, Who are you? David Corneal.
12 What do you want? I am here to get a building permit for
13 a garage. I said, Can I come in? He let me in the door.
14         I said, I have got plans with me, I am
15 building this garage. So I was building a house, an art
16 studio and a garage. I figured I had the one thing that
17 does not need sewer was the garage. It had no water, no
18 sewer at least initially. So I said, I came to get a
19 permit for my garage.
20         Oh, he says, I am not giving you a permit.
21 I said, Well, give me an application for a permit, because
22 your ordinance says that I have to apply under your
23 forms.
24         Nope, not giving you an application either.
25 I said, Why not? He said supervisors told me not to give

120

1  you anything, any permits, applications anything. I said,
2  Why? He said, Because you are that trouble making yuppie
3  from over the mountain.
4          I said, Well, I am not leaving until I
5  resolve this, we have got to get this resolved. He said,
6  Well, I will get on the phone. So he gets on the phone
7  and he calls two or three supervisors, can't reach
8  anybody, he finally reaches Tom Wilson.
9          Now, I am not listening to Tom Wilson's
10 voice, but he says, Yes, Tom, this is Van Domlin, got
11 Corneal here, wants a building permit for a garage. Don't
12 give him anything. We are meeting tomorrow morning — the
13 supervisors are meeting tomorrow morning to discuss him.
14         That was a Thursday, so they would have been
15 meeting Friday morning. He said to me, After they meet
16 and call me, I will call you and let you know. I said, At
17 least give me an application so I can fill it out. Nope,
18 you are not getting any applications, you are not getting
19 nothing.
20         I said to him, I said, if I were another
21 resident of the county or the Township, and I came into
22 get a permit for a garage, would you give it to him? Yep,
23 sure would. I said, Why won't you give it to me? He
24 said, I already told you, you are that trouble making
25 yuppie and the supervisors told me not to give you

121

1  anything and I work for the supervisors, so I am not
2  giving you anything.
3      Q    Do you know of any other reason, other than
4  what your testimony is that you are this trouble making
5  yuppie from over the mountain, as to why they wanted to
6  prevent you from building on this property?
7      A    Well, I think that Tom Wilson wanted his
8  piece of his old family farm, because after the contract
9  was breached by Hewetts, Tom Wilson's nephew approached me
10 and says, Well, I am still interested in buying that
11 property from you.
12     Q    Any other reason why you believe any
13 official or employee from the Township was trying to
14 prevent you from building on this property that you owned
15 in Jackson Township?
16     A    I think that is more than sufficient that
17 they are going to — they just wanted, I guess, show me
18 who was boss and who was in control in their Township.
19     Q    Did you start building on the property?
20     A    Yes.
21     Q    When did you start building?
22     A    I started building in July.
23     Q    Did you have permits to build in July?
24     A    No, I waited 90 days.
25     Q    You waited 90 days for what?



CORNEAL, DAVID
02/22/01

CORNEAL VS
JACKSON TOWNSHIP

---

122

1    A    Since I was wrongfully denied even the
2   applications.
3    Q    Why did you wait 90 days?
4    A    Because I had consulted with Mr. Lucas of
5   this law firm.
6    Q    And he advised you to -- strike that.
7    A    Nope, I am not going to tell you what he
8   advised me.
9    Q    I don't want to know. I apologize for that.
10       Did you attend any other Township meetings
11   after the March 2000 meeting?
12    A    As I said, I don't think I attended April,
13   but it certainly wasn't anything after April, probably
14   nothing after March.
15    Q    Did you have any other conversations with
16   any officials or employees of the Township after your
17   conversation with Mr. Van Domlin?
18    A    I tried to discuss this with Newton numerous
19   times, these problems with the solicitor for the
20   Township.
21    Q    With anybody else other than Mr. Newton?
22    A    With the Township, related to the Township
23   in? No.
24    Q    You allege in your complaint that complaints
25   were made with the Army Corps of Engineers and DEP

---

123

1   regarding wetlands. What led you to believe that such
2   complaints were made?
3    A    Because I was there when the two of them
4   showed up, Army Corps of Engineers and a DEP
5   representative, they said that they had complaints that I
6   was filling in wetlands.
7    Q    What if anything did you say to them?
8    A    I said, Is this a complaint from Wilson?
9   They smiled and they said, Well, we really can't say who
10   called us. I said, Well, Wilson is not -- has lost this
11   job and I have given it to some other excavator and he
12   would have had the job otherwise.
13    Q    When did this conversation take place?
14    A    The day that they showed up. You would have
15   to look at their records. It would have been after I
16   started shaleing the old driveway.
17    Q    Do you know what month this was?
18    A    I am guessing it was April sometime.
19    Q    This was after Mr. Wilson told you he
20   couldn't be involved any more with your property?
21    A    He didn't say he couldn't be involved. He
22   said he wasn't going to put the driveway in for me.
23    Q    So why did you tell them Mr. Wilson lost the
24   job?
25    A    Why did I tell them? Because they were kind

---

124

1   of hinting that it was the Township or Wilson that had
2   called them and filed a complaint. I am sure we could find
3   that out, who did it. I was just explaining to them why,
4   what would have motivated his complaint or the Township's
5   actions.
6    Q    That is what I am trying to find out. Why
7   do you believe that that was motivating Mr. Wilson if he
8   did make the complaint that he lost the job, when, in
9   fact, he told you that he couldn't be involved with the
10   job?
11    A    That is your language. I never said he
12   couldn't be involved with the job. He said that he
13   couldn't build the driveway then when it was supposed to
14   have been done. He didn't say he didn't want anything to
15   do with it or that he didn't want the job.
16       I don't know if it was him for sure or not
17   or if it was somebody from the Township that filed a
18   complaint with these people. I wouldn't be surprised if
19   the call didn't come from Ann Wirth.
20    Q    Why would that not surprise you?
21    A    Because she seemed to be the person taking
22   the lead in many of the obstacles that they were trying to
23   throw in my way.
24    Q    But you have no other basis other than what
25   your belief is and what you just testified to, right?

---

125

1    A    You asked me what my belief is and that is
2   my belief. We can easily find that answer out by deposing
3   DEP or the Corps of Engineers and find out who filed a
4   complaint.
5    Q    What I am trying to find out, Mr. Corneal,
6   is the basis of your belief and why you believe that it
7   was Ann Wirth or Tom Wilson who called DEP and/or the Army
8   Corps of Engineers with respect to an alleged wetlands
9   violation?
10    A    My belief is that it was a continuation of
11   the harassment and the unreasonable restrictions they were
12   placing on me to stop me from doing anything with my
13   property.
14       Whether Wilson was angry that he actually
15   lost the job entirely now, I don't know that. I am just
16   making an assumption. You asked me what I thought, so I
17   am telling you what I thought.
18       But it clearly was Township officials who
19   were trying to continue to interfere with rights that I
20   had in my property. I certainly had a right to re-shale
21   my driveway or a driveway that already was existing.
22    Q    You didn't have a right though, did you, to
23   fill in wetlands?
24    A    But I wasn't filling in wetlands and I
25   checked that out and they knew I checked that out.

---


126

1  Q    How did they know that?
2  A    Because they had the report from Blozsky.
3  Q    When did they get that report?
4  A    They knew about that report. That is how it
5  came up in -- they got a copy of the report from the
6  engineering company at some point. I am sure that if we
7  look at their -- I think if we look at their
8  correspondence, that they copied the Township.
9  Q    Now, this is the second report that Blozsky
10 & Associates did that you are referring to, correct?
11 A    I don't know if both of them weren't sent to
12 the Township.
13 Q    Let's just concentrate on the question. You
14 are referring to a second report that Blozsky did, right?
15 A    I am referring -- Blozsky did two reports
16 for me and build me twice, one related to the land, one
17 related to the sewage site. Whether they had gotten a copy
18 of each, I am not sure.
19 Q    The second report is the one that you
20 commissioned Blozsky & Associates to do with respect to
21 whether or not any wetlands were impacted by this proposed
22 driveway, correct?
23 A    Wrong. That was the first report.
24 Q    The second report dealt with --
25 A    The SEOs locating a sewage site for our

127

1  house.
2  Q    Do you believe that the Township got a copy
3  of Blozsky's first report dealing with whether or not any
4  wetlands were impacted by the driveway?
5  A    I think so, I don't know that for a fact.
6  Q    Why do you believe it?
7  A    Because it is standard procedure with
8  engineers that often times -- most of the times they copy
9  the Township engineer or Township officials when they do
10 something that relates to a Township matter or it could
11 relate to a Township matter. Whether they did that in
12 Jackson Township, I don't know.
13 Q    Did you bring an action against the Hewetts,
14 I know it is Hewetts and Smith, but referring to them as
15 Hewetts, for breach of contract?
16 A    No.
17 Q    Why not?
18 A    As far as I was concerned, they had made a
19 deposit of $7,000 and I was not interested -- the guy has
20 a disease, Hewett has a disease, MS, and I just, you know,
21 as far as I was concerned, they forfeited the $7,000 and I
22 did not pursue it at this point. I have 2 or 3 years,
23 whatever the statute of limitations is.
24 Q    You kept the $7,000?
25 A    So far, but we had expenses related to that

128

1  of carrying this and his attorney has made demands on me
2  to return the money, so whether I have liability for that
3  or not is still a question.
4  Q    Have you made any efforts to sell the
5  property to anybody else?
6  A    Yes.
7  Q    What efforts have you made?
8  A    We let people know, the realtors that I
9  discussed previously, let them know that we had this 26
10 acres and that we had it on the market and we would like
11 to sell it. If they would bring us a buyer, we would be
12 happy to pay them a commission.
13      I had also shown the property to a friend of
14 a neighbor's, who was in the horse business, horse
15 business in the sense of riding horses and raising horses
16 and things like that, he wasn't buying and selling them.
17 Her name was Jeannie Price, and I proposed the property
18 for her and she reviewed it and turned it down.
19 Q    Did you enter into any contracts with any
20 relators?
21 A    No. You asked if I entered into contracts
22 with relators. Because of my relationship with a number
23 of relators, it is kind of awkward to give a listing to
24 one and not to give it to others. So what I do is I will
25 tell three or four of them that I know, well, that this is

129

1  available.
2      Another woman, realtor, did show the
3  property to a gentleman and her name was Beth Richards,
4  she is a realtor as well. That didn't work out, he bought
5  something else.
6  Q    Do you consider that property to currently
7  be on the market?
8  A    Yes.
9  Q    Have you applied for subdivision approval
10 under Jackson Township's Subdivision Ordinance?
11 A    No.
12 Q    Why not?
13 A    Because I don't think I need it.
14 Q    Why do you believe that you don't need it?
15 A    Let me consult with my attorney a second.
16      (Discussion held off the record.)
17 BY MR. SHERR:
18 Q    Mr. Corneal, you had an opportunity to have
19 a conference with your attorney during our break, is there
20 any answers that you would like to amend or change that
21 you have given prior to now?
22 A    No, it wasn't anything I wanted to amend.
23      What was the last question?
24 Q    The last question was: Why have you not
25 submitted a plan to Jackson Township under the Jackson

CORNEAL, DAVID
02/22/01



CORNEAL VS
JACKSON TOWNSHIP

---

130

1    Township Subdivision Ordinance?
2    A    My answer was that I didn't have to.
3        The reason behind that is that on the
4    morning of July the 7th, which just happened to work out
5    that way, after consulting with attorneys, I recorded the
6    deed from Sandy and myself to Sandy for the 26 acre tract
7    of ground. One of the reasons in doing that was to tender
8    a deed to Hewetts to mitigate our damages on the loss of
9    the sale.
10    Q    So on or about July 7, 2000, you and your
11    wife conveyed to your wife 27 acres of this 98 acre
12    parcel, correct?
13    A    95 acres.
14        MS. MONTGOMERY: I object to the form.
15        MR. SHEER: What is your objection?
16        MS. MONTGOMERY: I think you repeated his
17    statement back incorrectly. You said conveyed and I think
18    he said recorded.
19        MR. SHERR: I am not repeating what he said,
20    I am just trying to --
21        MS. MONTGOMERY: Okay.
22    BY MR. SHERR:
23    Q    What went into it?
24    A    We did a deed from the two of us to my
25    wife , Sandy.

---

131

1    Q    That would have been?
2    A    The 26 acres with the house and the barn --
3    Q    That would have been a conveyance from you
4    and your wife to your wife of this 26 acres, correct?
5    A    Exactly, right.
6    Q    It was your belief that you had the legal
7    authority to do this?
8    A    Yes. After we discovered that the Township
9    nor the county had a subdivision ordinance.
10    Q    That deed was accepted for recording?
11    A    It was.
12    Q    Has building commenced on the property?
13    A    Yes. I said, we started with the garage in
14    July of 2000.
15    Q    Has the garage been completed?
16    A    Yes.
17    Q    Have you started building anything else on
18    the property?
19    A    Built the art studio.
20    Q    Has that been completed?
21    A    Not quite completed.
22    Q    Is that still being built as we speak?
23    A    Yes.
24    Q    How about a house, did you start building
25    that?

---

132

1    A    The house, yes.
2    Q    Has that been completed?
3    A    No.
4    Q    About how much is completed of the house?
5    A    I wouldn't know percentage-wise. Depending
6    on what contractor you talk to, it could be 2 months to 3
7    months away from or 4 months from completion.
8    Q    That building is going on today?
9    A    Yes, it is, I hope it is.
10    Q    How about the driveway, has that been
11    completed?
12    A    No, never need need for the driveway. Put it
13    all in, except the bridge, and never had need for it.
14    Q    The bridge is not there?
15    A    No.
16    Q    Why not?
17    A    Because I didn't need it.
18    Q    Why didn't you need it?
19    A    Because I bought the adjoining property next
20    to this one that had road frontage off Miller Road.
21    Q    When did you purchase the adjoining
22    property?
23    A    In I think the first of July, the end of
24    June of the year 2000.
25    Q    How much did you purchase that for?

---

133

1    A    I am not sure why that is relevant.
2    Q    How much did you purchase it for?
3        MS. MONTGOMERY: You can tell him, it is
4    public record.
5    A    $365,000 I think.
6    BY MR. SHEER:
7    Q    Who did you purchase that from?
8    A    Robert Gavazzi.
9    Q    Is it still your intention as you sit here
10    today to sell part of the property?
11    A    Yes, the house, the barn and 26 acres of
12    ground.
13    Q    You allege that the moratorium on
14    development in Jackson Township was imposed in part for
15    the purpose of impeding your project?
16    A    Yes.
17    Q    What facts do you base that allegation upon?
18    A    There were no other subdivisions. I was the
19    sole subdivision that was contemplated. There were no
20    other pending. There was no reason to put a moratorium on
21    one subdivision, they didn't have a rush of development.
22    I was a single person.
23        I believe, I am not totally sure of this
24    yet, but I believe that they had started their subdivision
25    draft and everything else prior to issuing a moratorium

---



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

134

1  and they only issued a moratorium after I became serious
2  about subdividing.  I think it was exclusively for my
3  benefit or I should say exclusively for my detriment.
4      Q      Any other facts on which you base those
5  allegations?
6      A      I think that is enough.
7      Q      Who is James Whims, W-H-I-M-S?
8      A      Who?
9      Q      Do you know who James Whims, W-H-I-M-S, is?
10     A      Himes.
11     Q      Himes?
12     A      H-I-M-E-S.
13     Q      Who is that?
14     A      That is the attorney friend of mine that I
15  clerked for he and his father in Huntingdon.
16     Q      What facts do you believe he has knowledge
17  --
18             MS. MONTGOMERY:  Objection.
19  BY MR. SHERR:
20     Q      He was listed as somebody who has facts
21  concerning the allegations in this complaint in your
22  self-disclosure, so I am asking what facts he has
23  knowledge about?
24             MS. MONTGOMERY:  I am going to caution my
25  client to be careful about the attorney/client privilege.

135

1      A      Mr. Himes spent a great deal of time trying
2  to get Mr. Newton to respond to the problems that were
3  associated with what the Township was doing and he has
4  documented -- from what I understand -- he has documented
5  each telephone call, each meeting with Mr. Newton and the
6  resistance of Mr. Newton in responding.
7  BY MR. SHEER:
8      Q      Any other facts which you believe he has
9  knowledge of?
10     A      Facts, I don't know.
11     Q      Who is Steven Lavitsky?
12     A      He is the fellow from the engineering firm
13  that did the work.
14     Q      That would be Blozsky?
15     A      Right.
16     Q      Have you had any contact with the Department
17  of Environmental Protection concerning the property or
18  your attempts to subdivide and/or build on the property?
19     A      Direct contact with them?
20     Q      Yes.
21     A      I called the fellow who was in charge of
22  that area, I think his name was Rouzer -- come to think of
23  it, that is what Rouzer is, Rouzer is the guy from DEP,
24  and I am referring to the bottom of the Planning
25  Commission letter.

136

1      Q      I understand.
2      A      I had contacted Rouzer and was told that
3  they needed the submission on the approved modules from
4  Jackson Township before they would take action on it.
5      Q      Did you construct, along with your garage,
6  your art studio and your house, an on-lot sewage system?
7      A      No.
8      Q      Do you intend to do that?
9      A      Yes.
10     Q      At what point do you intend to do that?
11     A      As soon as the spring hits and I can get
12  approvals.
13     Q      Who do you believe you have to get approvals
14  from?
15     A      We already submitted stuff to the Township
16  through Terry Williams in State College and I have had a
17  sewage system designed by an SEO that used to be in that
18  area who now comes in and does consulting.  She submitted
19  that design of the on-site septic system, which will
20  function properly for its use, to Barry Parks, and he has
21  not acted on it in any way that I know of.
22     Q      Do you know why he hasn't acted upon it?
23     A      I have no idea.
24     Q      Do you have a belief?
25     A      Simply part of the process here to inhibit

137

1  my development of the land.  There is no legitimate basis
2  for him refusing to act on it.
3      Q      Do you intend to put this sewage system in
4  regardless of whether you get approval?
5      A      I will not put a sewage system in without
6  DEP's approval.  If I have to put a holding tank in, then
7  I will put a holding tank in; but I have no intention of
8  -- DEP didn't do anything wrong to me and they have a
9  right to pass on the availability of the sewer system that
10  we propose and I intend to honor that obligation to go
11  through them.
12     Q      Do you believe that you have any
13  out-of-pocket expenses as a result of what you claim to be
14  the wrongful acts of the Township?
15     A      No question about that.
16     Q      What out-of-pocket expenses do you believe
17  that you have as a result of what you believe to be the
18  wrongful acts of the Township?
19     A      I have the expenses related to the
20  engineers.
21     Q      That would be Blozsky?
22     A      That's right, correct.
23     Q      Why do you believe that you had those
24  expenses as a result of the wrongful acts of the Township?
25     A      Because the Township forced me to send him


138

1  back out there to assess the location that their SEO put
2  the sewer site on.
3  Q    So you believe that the expenses that you
4  would have with respect to the engineer would be only
5  related to the second report and not the first report?
6  A    That's right.
7  Q    What other out-of-pocket expenses do you
8  believe you have?
9  A    Well, I lost the sale of the property to the
10 Hewetts.
11 Q    Why do you believe you have out-of-pocket
12 expenses as a result of losing that sale?
13 A    I have big time out-of-pocket expenses,
14 because the $150,000 I was getting from that was going to
15 be used for construction of the property, of the
16 buildings. As a result of not getting that $150,000, I
17 had to go to Mellon Bank and refinance the one property on
18 College Avenue, the 1445 West College, where I drew out a
19 little less than $150,000 in equity.
20       I went from a 7 and a half percent interest
21 rate to an 8 and three-eighths percent interest rate and I
22 had to pay fees to them and I also got nailed with a
23 no-prepayment penalty, which I didn't have in my previous
24 contract, my financing contract with them.
25       So now the interest rates have dropped, I

139

1  can't refinance without paying a fee, a big fee. So I
2  have got the difference between 8 and three-eighths
3  percent and 7 and a half percent on the monthly payments,
4  on the interest on that refinancing.
5        Plus, I don't know what I am going to be
6  able to sell the property for. So if I sell the property
7  at a lesser amount, obviously, then I have that loss.
8  Plus I also have, you know, the loss of the use of those
9  funds, since the Hewetts would have paid me no later than
10 June the 30th, which they didn't.
11 Q    When did you refinance?
12 A    I waited until the last possible minute,
13 because I was reluctant to do it; but I think I refinanced
14 about 3 months ago, 4 months ago.
15 Q    Any other out-of-pocket expenses that you
16 believe that you suffered as a result of wrongful actions
17 of the Township?
18 A    Sure, I had to send Simpson back and
19 redesign and redesign and resubmit these plans. Every
20 time he did it, there was several thousand dollars in
21 surveying costs and duplication and all of that.
22       I don't have the exact number that would be
23 attributable to him above and beyond his survey that I
24 wanted that would relate.
25       I can pull the bills out and identify what

140

1  was necessitated by the demands of the Township and the
2  County Planning Commission.
3  Q    Anything else?
4  A    I have legal fees.
5  Q    Legal fees associated with what?
6  A    Associated with this lawsuit.
7  Q    The lawsuit we are here about today?
8  A    That's right.
9  Q    Any other legal fees?
10 A    I have legal fees with Terry Williams trying
11 to work through the DEP permitting.
12 Q    Was that caused in some way by, that being
13 with Terry Williams' legal fees, caused in some way by any
14 act of the Township?
15 A    Yes, the Township tried to stop me from
16 construction.
17 Q    So it is your testimony that the only reason
18 that you retained Terry Williams' services was because the
19 Township tried to stop you from --
20 A    No. That is one of the reasons I retained
21 him. The other reason was to try and get the DEP permits
22 so when we finish the construction of the properties, that
23 we can install the sewage systems.
24 Q    When did you first consult with Mr.
25 Williams?

141

1        MS. MONTGOMERY: I am going to object the
2  time frames.
3  A    I don't remember when it was.
4        MS. MONTGOMERY: I think the time which a
5  person consults with their attorney --
6        MR. SHERR: It is not privileged, absolutely
7  not privileged. When he first consulted with an attorney
8  or if he consulted with an attorney is not privileged.
9  What was consulted with is privileged.
10 A    I can't remember exactly when I started
11 talking to Terry about this. I would probably say 6 to 8
12 months ago.
13 BY MR. SHEER:
14 Q    Any other out-of-pocket expenses that we
15 haven't discussed that you feel you suffered as a result
16 of the accident?
17 A    As I said, I had to sue these people because
18 they wouldn't give me the applications or permits, so I
19 had, you know, the private service fee of 300 and some
20 dollars.
21 Q    Anything else?
22 A    Well, I would have to say that I had to
23 maintain a property and pay the taxes on the property that
24 would have been sold to Hewetts and not been my expenses
25 that are my expenses now.

CORNEAL, DAVID
02/22/01


CORNEAL VS
JACKSON TOWNSHIP

142

1    Q    Anything else?
2         (Discussion held off the record.)
3    BY MR. SHERR:
4    A    I have now had to hire experts that I am
5    getting reports from in the area of the Planning and
6    Municipal Law or Application of Municipal Law, so we are
7    paying them. We don't know exactly what those costs are
8    going to be.
9         If I think of any more, I will let you know.
10         (Discussion held off the record.)
11   BY MR. SHERR:
12   Q    You told me specifically some things that
13   were done by Mr. Wilson and by Ms. Wirth.
14         I just want to ask you with respect to the
15   other individual defendants, and I am going to start with
16   Mr. Yoder, other than being at Township meetings that you
17   were also at, did you have any dealings with Michael
18   Yoder?
19   A    The dealings I had with him, as well as Mr.
20   Weiler, both of them, I talked to directly at the Township
21   meetings and I told them, you can't do this stuff. They
22   all unanimously agreed that they are going to do it
23   whether I liked it or not and that is too bad. That kind
24   of response was given to me.
25   Q    Other than any contact which you had with

143

1    Mr. Yoder at a Township meeting, did you have any contact
2    with him otherwise?
3    A    No.
4    Q    Same question for Ralph Weiler, did you have
5    any contact with Mr. Weiler at any other time, other than
6    at a Township meeting?
7    A    No.
8    Q    Can you tell me anything that Mr. Yoder
9    specifically said at a Township meeting with respect to
10   your attempts to subdivide and build on this property?
11   A    He said they had a moratorium on -- both of
12   these guys said this -- we have a moratorium on --
13   Q    Both of these guys, just so we are clear,
14   that is Mr. Yoder and Mr. Weiler?
15   A    Right. Said at different times at different
16   meetings that you aren't getting what you want, because we
17   got a moratorium on and we are not going to allow you to
18   do this.
19         Then when I came up that I don't care about
20   the subdivision at this moment in time, give me my sewer
21   modules, then they all agreed that, no, that was a
22   subdivision under DEP and, therefore, we are not going to
23   sign your sewer modules under that.
24         So all three of them said it at one point or
25   another or concurred, you know, they turned to each other,

144

1    you agree, yes, that is right, we are not doing it. So
2    that is the contact I have had with them.
3         Also, the exception, that from what I
4    understand from my discussion with Van Domlin, that these
5    guys were meeting out of formal meetings to discuss me and
6    how they were going to treat me.
7         Specifically, Van Domlin said that the
8    Township supervisors were meeting that Friday morning to
9    discuss me and what they are going to do about my request
10   for applications for building permits.
11        So I can only take from that that they, in
12   fact, did meet or have met on several occasions, at least
13   one occasion that I am pretty sure occurred, outside of a
14   formal meeting to discuss Township business, specifically,
15   preventing me from building.
16        MR. SHEER: I have no other questions at
17   this time. Thank you very much.
18        MS. THORP: I have no questions.
19        MS. SIMPSON: I have a few questions.
20
21        CROSS-EXAMINATION
22
23   BY MS. SIMPSON:
24   Q    At the February 2000 Jackson Township
25   supervisor meeting where you presented your plan, was

145

1    Larry Newton present?
2    A    Excuse me, offered my plan.
3    Q    Offered you plan, sorry.
4    A    That is okay, I just wanted to clarify.
5    Q    Was Larry Newton present?
6    A    No.
7    Q    Was Attorney Newton present at the March
8    2000 supervisor's meeting?
9    A    No. However, as a result of the February
10   meeting, I sent Mr. Newton a letter indicating to him the
11   wrongfulness of their conduct and the fact that it was
12   going to affect my contract with Hewetts or potentially
13   could affect the contract with Hewetts and that would he,
14   please, contact me and follow up with this to discuss
15   correcting the problem.
16        Then I also followed up with many telephone
17   calls to Mr. Newton, all of which went unanswered. That I
18   can remember, he never returned a telephone call that I
19   made to him.
20        He took one of my telephone calls that I
21   made to him; but that was the only time I ever discussed
22   things with him.
23   Q    What did you discuss in that call?
24   A    I was talking to him about the sewer modules
25   at that point, that was after the March meeting.



CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

---

146

1       I said, I have got approvals of your SEO, I
2   have got signatures on the sewer modules. There is
3   absolutely no reason for the Township not to sign them and
4   something has to be done.
5       His response was the same, I will get back
6   to you. Never called me back, never did a thing about
7   it. I will check into it and get back to you.
8       Same way when I had the situation with Van
9   Domlin where they wouldn't even give me applications. I
10  wrote Larry a letter the day afterwards and I sent him a
11  copy of the letter I sent to Van Domlin.
12      I said in the letter to Van Domlin, hey, if
13  you don't agree with anything I said in this letter,
14  please, respond in writing. He never responded in
15  writing, neither did Larry. Larry did absolutely nothing
16  to correct a problem.
17      Then his partner in law was the one who
18  wrote the letter and said on May the 1st, hey, it is
19  obvious you are not going to get subdivision approval, so
20  the Hewetts, my clients are cancelling the contract. Now,
21  where would he have heard that?
22  Q   Who is Larry Newton's partner?
23  A   Harvey Reeder. They own a building and
24  share office space together, whether they are truly
25  partner/partner, I don't know, but they have the same fax

---

147

1   machine, the same fax number, same secretary, the same
2   everything. Sounds like a partner.
3   Q   How do you know they have the same
4   secretary?
5   A   Because I called them, I called them
6   numerous time, always got the same woman, You want Larry
7   or you want Harvey? I say that as an assumption, I don't
8   know it for a fact.
9   Q   Is it also an assumption that Mr. Reeder
10  learned of the difficulties with the approval process from
11  Mr. Newton?
12  A   Yes, that is correct, I have no direct
13  knowledge of that.
14  Q   What duty did you believe Mr. Newton had to
15  you?
16      MS. MONTGOMERY: Objection, you are asking
17  him for a legal conclusion, it is not appropriate.
18      MS. SIMPSON: I will rephrase it.
19  BY MS. SIMPSON:
20  Q   Do you believe Mr. Newton owed you some
21  response to your inquires?
22  A   He sure did.
23  Q   Why?
24  A   Why?
25  Q   Yes.

---

148

1   A   Because he was the Township solicitor, he
2   was the guy giving them advice to put the moratorium on.
3   Q   How do you know that?
4   A   Because they told me at the meeting. They
5   said, well, according to our attorney.
6   Q   What did they say specifically?
7   A   Like I just said, I said, you can't have a
8   moratorium like you have. They said, Not according to our
9   attorney.
10  Q   So I understand this, the supervisors said
11  that their attorney told them that the moratorium was okay
12  or that their attorney told them to put a moratorium in
13  place?
14  A   I have no idea what their attorney told
15  them.
16  Q   What did they tell you?
17  A   I just said what they told me, not according
18  to my attorney.
19  Q   In response to what?
20  A   I said your moratorium is illegal, it is
21  improper, you can't do it. They said, Not according to my
22  attorney.
23      But then I followed later on with -- or
24  tried to follow up with Larry to even get a copy of the
25  resolution passing the moratorium and he wouldn't give it

---

149

1   to us and that is where Jim Himes had call after call,
2   meeting after meeting, trying to get the information from
3   him.
4       The same way with permits. I said, I want a
5   building permit, application. And he stonewalled me on
6   it, totally stonewalled me on it.
7       Then finally, in the end of August, he wrote
8   me a letter and said, Oh, so sorry that we haven't sent
9   you this, here it is.
10  Q   What was it that you obtained at the end of
11  August?
12  A   An application for a building permit.
13  Q   What did you do with those?
14  A   I filled them out immediately and sent them
15  with everything they required, including their fees.
16  Q   Then what happened?
17  A   Nothing. They sat on it for 45 days. Then
18  Van Domlin wrote me a letter saying, you don't comply with
19  our subdivision ordinance -- which, of course, I wasn't
20  asking for at that point -- so, therefore, we are denying
21  your building permits.
22      So then we filed under their rules to have a
23  hearing about his denial within 30 days. They are
24  supposed to give me a hearing within 30 days. Do you know
25  how that hearing came out, there was none.

---



150

1  Q    What happened?
2  A    Nothing. Absolutely nothing. They ignored
3  me.
4  Q    You submitted a request for hearing?
5  A    Uh-huh, in writing.
6  Q    You got no response to that?
7  A    Right.
8  Q    Who was that filed with?
9  A    That was filed with the Township secretary.
10 Under their ordinance, they are supposed to have a
11 hearing.
12 Q    Of the damages that you have outlined, are
13 there any that are specifically attributable to the
14 conduct of Attorney Newton?
15 A    Yes, I lost a contract.
16 Q    By that contract you are talking about the
17 contract for the sale of the property to Hewett and Smith?
18 A    Smith.
19 Q    Specifically, what is it that you believe
20 that Mr. Newton did to cause you to lose that contract?
21 A    I think that he had involvement with the —
22 with his partner there, Harvey Reeder, to interfere with
23 my contractual relationships with the Hewetts. They
24 cancelled the contract.
25 Read Reeder's letter, he says, "It is

151

1  obvious you are not going to get your approvals by the
2  June 30." He is writing that May 1st, 2 months
3  previously. It is obvious you are not going to get
4  approvals for your subdivision, therefore, my clients are
5  cancelling the contract.
6  Q    Aside from this belief that you formed from
7  the text of the letter that was sent to you, what evidence
8  do you have that Mr. Newton spoke with Mr. Reeder about
9  the approval process and its --
10 A    I don't have evidence with regard to that
11 but it certainly seems rather obvious. They say if it
12 walks like a duck and talks like a duck, it probably is a
13 duck.
14 Q    Was the meeting that you attended of the
15 Township supervisors in February of 2000 recorded in any
16 way?
17 A    How they record their meetings, I don't
18 know, I don't remember seeing a tape recording or whether
19 the secretary was taking notes. One of the two was
20 occurring, I don't know exactly what.
21 Q    Have you ever searched the record of the
22 Township to check the minutes of the meetings that you
23 attended?
24 A    The Township doesn't have an office, so,
25 therefore, there is no records available that I know of.

152

1        The records that we asked for were records
2  asked of Newton to deliver to us and it went for months
3  and months and months and he refused to -- or just ignored
4  delivering the records.
5  Q    What records did you ask him to deliver?
6  A    I asked him specifically for the resolution
7  authorizing the moratorium.
8  Q    Did you ever ask anybody for minutes of
9  meetings?
10 A    I didn't. I think Jim Himes did, but I
11 don't know. The minutes of those meetings that I saw, if
12 they are like the January minutes, were less than a half a
13 page long or a third of a page.
14        As I said, they only hold meetings for 15 or
15 20 minutes.
16 Q    That was your experience?
17 A    That was my experience in going to two
18 meetings and seeing the January notes of the minutes of
19 that meeting.
20        MS. SIMPSON: I have no other questions.
21        MR. SHERR: I have no questions.
22        (Discussion held off the record.)
23        MR. SHERR: We have had a discussion off the
24 record concerning Mrs. Corneal, who has sat through this
25 deposition today and who I did notice as a party to the

153

1  lawsuit.
2        I believe our agreement is that I will be
3  informed through discovery the belief or the necessity to
4  have Mrs. Corneal testify or that she has matters which
5  she has independent knowledge about and then we will
6  reschedule her deposition.
7        I don't know if I stated this artfully, but
8  you can probably help me out.
9        MS. MONTGOMERY: That is not quite the
10 agreement.
11        The agreement is that, although, you noticed
12 them both for today and they both came today, this was a
13 very long deposition and nobody wants to stay any longer.
14        We will reproduce her on another day, we are
15 not going to stonewall you on that.
16        We will not agree, as you suggested, that
17 she wouldn't testify, we won't agree to that. She is
18 listed as a witness in our initial disclosures. I think
19 you have to make an independent judgment whether or not
20 you want to depose her.
21        MR. SHERR: I will do that. All I am saying
22 is in order to avoid inconveniencing her and rather than
23 just noticing her again and bringing her back, if there is
24 some reason for her deposition, perhaps you can inform me
25 of that or that she would have knowledge that a deposition



**CORNEAL, DAVID**
**02/22/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

154

1 may be necessary. I guess what I am saying is if you give
2 me some reason to do it, I will do it, otherwise, I won't
3 do it. I understand that you don't want to commit either
4 way.
5      MS. MONTGOMERY:  She is listed as a
6 potential witness, listed as a person with information.
7 How much information might be very small. We don't know
8 how this case is going to develop. With all due respect,
9 it is not my job to figure out who you want to depose. I
10 don't want to say anything that limits my ability to her
11 as a witness and ask her anything I want when we get
12 there.
13      MR. SHERR:  I am not asking you to limit
14 that. It is no skin off my nose to depose her or not
15 depose her, I could care less; except that I don't see the
16 need to inconvenience her if the deposition is unnecessary
17 is the issue.
18      MS. MONTGOMERY:  Understood.
19      (The deposition concluded at 4:35.)
20
21
22
23
24
25

155

1 STATE OF PENNSYLVANIA  :  ss.
2 COUNTY OF DAUPHIN     :
3
4      I, Patricia C. Barrett, a Reporter
5 Notary-Public, authorized to administer oaths within and
6 for the Commonwealth of Pennsylvania and take depositions
7 in the trial of causes, do hereby certify that the
8 foregoing is the testimony of David B. Corneal.
9      I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically to
12 the best of my ability by the said reporter Patricia C.
13 Barrett, a Reporter Notary-Public, approved and agreed to,
14 and afterwards reduced to typewriting under the direction
15 of the said Reporter.
16      I further certify that the proceedings and
17 evidence contained fully and accurately in the notes by me
18 on the within deposition, and that this copy is a correct
19 transcript of the same.
20      In testimony whereof, I have hereunto
21 subscribed my hand this 16th day of March 2001.
22
23           Patricia C. Barrett, Reporter
24 My commission expires:
25 May 13, 2003

Exhibit 8

1
IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3 DAVID B. CORNEAL AND SANDRA Y.
CORNEAL,
4              Plaintiffs

5        VS                    : NO. 1:00-CV-1192

6 JACKSON TOWNSHIP, Huntingdon
County, Pennsylvania, W. THOMAS
7 WILSON, Individually and in his
Official Capacity as Supervisor
8 of Jackson Township, MICHAEL
YODER, Individually and in his
9 Official Capacity as Supervisor
of Jackson Township, RALPH      : JURY TRIAL DEMANDED
10 WEILER, Individually and in his
Official Capacity as Supervisor
11 of Jackson Township, BARRY PARKS,  :
Individually and in his Official
12 Capacity as Sewage Enforcement
Officer of Jackson Township,
13 DAVID VAN DOMELEN, Individually
and in his Official Capacity as
14 Building Permit Officer, ANN I.
WIRTH, Individually and in her
15 Official Capacity as Secretary
of Jackson Township, and
16 LARRY NEWTON, Individually and in
his Official Capacity as Solicitor:
17 to Jackson Township,
Defendants
18

19        DEPOSITION OF:  DAVID SIMPSON

20        TAKEN BY:       DEFENDANTS

21        BEFORE:         NICOLE L. ZIMMERMAN
NOTARY PUBLIC
22

23        DATE:           JULY 10, 2001, 1:10 P.M.

24        PLACE:          THE DAYS INN
240 SOUTH PUGH STREET
25                        STATE COLLEGE, PA  16801

MLP REPORTING, INC.   (570) 748-1041

---

3

1              I N D E X

2 BY DEFENDANTS                      EXAMINATION

3 DAVID SIMPSON
   By Mr. Sherr                          4
4  By Ms. Montgomery                      25

5

6

7

8

9

10            E X H I B I T S

11 SIMPSON'S EXHIBITS           MARKED    PRODUCED

12 No. 1 - Notice of Deposition and
           and Subpoena            4         6
13

14

15

16

17                 -

18

19

20

21

22

23

24

25

MLP REPORTING, INC.   (570) 748-1041

---

1              A P P E A R A N C E S :

2 ECKERT SEAMANS
  BY:  BRIDGET MONTGOMERY, ESQUIRE
3       LESLIE A. MALADY, ESQUIRE
  213 Market Street, Eighth Floor
4 Harrisburg, PA  17101
       FOR - PLAINTIFFS
5

6 MAYERS, MENNIES & SHERR, LLP
  BY:  ANTHONY R. SHERR, ESQUIRE
7 3031 Walton Road
  Building A, Suite 330
8 P.O. Box 1547
  Blue Bell, PA  19422-0440
9        FOR - JACKSON TOWNSHIP, MR. WILSON,
         MR. YODER, MR. WEILER, MR. PARKS,
         MR. VAN DOMELEN & MS. WIRTH
10

11

12

13

14

15

16

17

18

19

20

21

'2

23

24

25

MLP REPORTING, INC.   (570) 748-1041

---

4

1              STIPULATION

2

3        It is hereby stipulated by and between

4 counsel for the respective parties that sealing,

5 certification, and filing are waived, and that all

6 objections except as to the form of the question are

7 reserved to the time of trial.

8

9        DAVID SIMPSON, called as a witness, being

10 sworn/affirmed, testified as follows:

11        (Notice of Deposition and Subpoena premarked

12 Simpson Exhibit No. 1.)

13

14              EXAMINATION

15

16 BY MR. SHERR:

17    Q    Could you please state your full name for

18 the record?

19    A    David Allen Simpson.

20    Q    What's your address, Mr. Simpson?

21    A    Rural Route 1, Box 284-A, Huntingdon,

22 Pennsylvania, that's with a D, and the zip code is

23 16652.

24    Q    Mr. Simpson, I just met you a couple minutes

25 ago.  My name is Anthony Sherr.  I represent Jackson

MLP REPORTING, INC.   (570) 748-1041

5

1 Township and some individual defendants in a lawsuit
2 filed against them by David Corneal and Sandra Corneal,
3 which is currently pending in the United States
4 District Court for the Middle District of Pennsylvania.
5          We're here today to take your deposition
6 pursuant to a subpoena.  Have you ever been deposed
7 before?
8     A     No.
9     Q     I just want to give you some ground rules.
10 I'm going to be asking you some questions, you've been
11 placed under oath and expected to answer truthfully.  I
12 ask that you give all of your answers out loud, orally
13 so that the court report can take it down.
14          She can't take down nods of the head or
15 shrugs of the shoulder and that sort of thing, so I ask
16 that you answer orally.
17          I ask that you wait until I'm done asking my
18 question before giving an answer, and likewise, I'll
19 wait until you're done answering before asking another
20 question.
21          If you don't understand my question, please
22 ask me to clarify it.  If you don't hear my question,
23 please ask me to repeat it.  If you answer the
24 question, we're going to assume that you both heard and
25 understood the question.

MLP REPORTING, INC.  (570) 748-1041

---

6

1          If you need to take a break for any reason
2 during this proceeding, please let us know, and we'll
3 accommodate that.  And Ms. Montgomery is here, who
4 represents David Corneal in this matter, and she may
5 have some questions for you after I've completed asking
6 you questions, okay?
7     A     Yes.
8     Q     I placed in front of you what I've had
9 marked as Simpson Exhibit 1 and I've asked you to look
10 at that and you reviewed that, correct?
11    A     Yes.
12    Q     And that's the Notice of Deposition and
13 Subpoena for you for attendance here today, right?
14    A     Yes.
15    Q     And the second page of the subpoena has a
16 request for documents?
17    A     Yes.
18    Q     Did you bring documents with you today?
19    A     Yes, I did.
20    Q     What documents did you bring with you today?
21    A     Everything that I collected and assembled
22 during the course of preparing a subdivision proposal
23 for the Corneals.
24    Q     And could we just briefly go over what those
25 documents are?

MLP REPORTING, INC.  (570) 748-1041

---

7

1     A     Okay, they would be —
2     Q     I mean, do you have them and we can just
3 flip through them and you could just, for the record,
4 state what they are?
5          For the record, I just want to generally
6 state what you have here.  First is a plan showing the
7 David B. and Sandra Y. Corneal property dated December
8 27, 2000.  Is there a number of copies of this?
9     A     Right, there are numerous copies and copies
10 of drawings that were used during the construction of
11 that final plan.
12    Q     Okay.  And that there's also plans dated
13 February 4, 2000; April 7, 2000, and that's the first
14 packet.  The second packet of plans —
15    A     Those would be the final subdivision plans.
16    Q     The second packet of plans is dated February
17 4, 2000, and then there's also a plan of proposed
18 subdivision dated April 7, 2000, and there's one
19 December 27, 2000.  So these are the final plans, what
20 we talked about first were sketches and drafts, I
21 suppose?
22    A     That's correct.
23    Q     And what is that next packet?
24    A     This particular drawing is a copy of the
25 Huntington County tax map for Jackson Township showing

MLP REPORTING, INC.  (570) 748-1041

---

8

1 the properties in the area of the Corneals.
2     Q     And you got this from the county courthouse?
3     A     That's correct.
4     Q     What are the rest of those documents?
5     A     These are, again, various drawings that were
6 used during the construction phase or the layout design
7 for the subdivision and also some background
8 information relating to other properties.
9     Q     Okay.  And you also have, it looks like an
10 overlay, 1996 D.A. Simpson survey overlaps the 1975
11 F.D. Gay survey.  What is this document that I'm
12 looking at?
13    A     That's showing the information pertinent to
14 a boundary discrepancy that we found between the
15 Corneal property, which at the time of my initial
16 involvement in here was — my survey was for Paul and
17 Katherine Michael, the previous owners of the property.
18    Q     And so these documents that I'm looking at
19 right now were done to deal with this border dispute?
20    A     Those particular documents were done to put
21 the information on a sheet of paper for Mr. Corneal so
22 that he could understand the background of that
23 particular boundary.
24    Q     Now, you've also provided a manila folder
25 that says Corneal, David B. and Sandra Y., Jackson

MLP REPORTING, INC.  (570) 748-1041

9

1 Township, Huntingdon County, subdivision of the former
2 Paul and Katherine Michael property.  And is this your
3 file related to Mr. Corneal?
4     A     Yes, it is.
5     Q     You've also provided us with a file that
6 says Paul L. Michael, M-I-C-H-A-E-L, Jackson Township,
7 Huntingdon County and you had worked for Mr. Michael on
8 the same property prior to being engaged by
9 Mr. Corneal?
10    A     That's correct.
11    Q     And another file for Paul L. Michael.  I
12 guess that would be the second part of that same file?
13    A     Yes.
14    Q     And you've finally provided three it would
15 appear to be calendars.  And why did you provide these
16 calendars?
17    A     Those would have information of the various
18 times that I was working on Mr. Corneal's subdivision.
19          MR. SHERR:  Off the record for a second.
20          (Discussion held off the record.)
21 BY MR. SHERR:
22    Q     Did you review anything in preparation for
23 today's deposition?
24    A     No, I didn't.
25    Q     Did you discuss today's deposition with

MLP REPORTING, INC.  (570) 748-1041

10

1 anybody?
2     A     I told several people that I had a
3 deposition to attend, certainly I had no way of
4 discussing the content.
5     Q     Did you talk to Mr. Corneal about it?
6     A     No.
7     Q     When is the last time you saw Mr. Corneal
8 before today?  You're referring to your 2001 calendar?
9     A     Yes.  I think it was January 3, this year,
10 2001.
11    Q     And on what occasion did you see him?
12    A     I delivered five copies of the survey plans
13 to him.
14    Q     Were these new survey plans or were they
15 survey plans that had previously been done?
16    A     I think they would have been the copies of
17 the December 2000 survey.
18    Q     I just want to get a little of your
19 educational background.  What's the highest level of
20 formal education that you completed?
21    A     I attended two years of Penn State at the
22 Penn State campus in Mont Alto, Pennsylvania, in
23 surveying technology.
24    Q     And what years were they?
25    A     That would have been until June of 1972.

MLP REPORTING, INC.  (570) 748-1041

11

1     Q     And did you have any other technical or
2 vocational training after those two years?
3     A     The requirement for licensing as a surveyor
4 in Pennsylvania requires that you serve a six-year
5 apprenticeship under a licensed engineer or a licensed
6 surveyor before you can make application to take the
7 registration examination.
8     Q     And did you take the examination?
9     A     Yes, I did.
10    Q     When did you take the examination?
11    A     My license is dated, I think, March of 1978.
12    Q     And that's licensed as a registered surveyor
13 in the State of Pennsylvania?
14    A     Yes.
15    Q     Are you licensed in any other state?
16    A     No.
17    Q     Do you have continuing education
18 requirements?
19    A     No, as of now, there are no requirements for
20 that.
21    Q     Do you have to renew the license
22 periodically?
23    A     Yes, every two years.
24    Q     Are you familiar with Jackson Township?
25    A     In what respect?

MLP REPORTING, INC.  (570) 748-1041

12

1     Q     Well, just generally with respect to
2 development of land in Jackson Township.
3     A     As far as I knew up until just more
4 recently, there was no township subdivision or zoning
5 ordinance governing requirements of subdivision.
6     Q     Were you familiar with the board of
7 supervisors of Jackson Township?
8     A     Not really, no.
9     Q     Prior to working on what was first the
10 Michael property and then the Corneal property, had you
11 done any other work in Jackson Township?
12    A     Yes, I'm sure I did, although, I can't
13 specifically recall what particular properties.
14    Q     Do you recall when you were first contacted
15 by Mr. Corneal to do anything for his property?
16    A     I would have to check the —
17    Q     Could you, please?  And you're looking now
18 at your 1999 calendar?
19    A     Yes.  The one file that I have with
20 Corneal's name on it, there might be something in there
21 that would save me time.
22          I have what I think to be my first meeting
23 with Mr. Corneal as July 8, 1999.
24    Q     And there is a little piece of paper with
25 handwritten notes which indicated that to you?

MLP REPORTING, INC.  (570) 748-1041

13

1    A    Yes, that's correct.

2    A    I see in the 1999 calendar book, references
3 to Mr. Corneal prior to that.  I have a note in the '99
4 calendar book of having met with Mr. Corneal on the
5 site of his property Saturday, June 26, 1999.

6    Q    Do you recall what it was that Mr. Corneal
7 asked you to do?

8    A    At that time of the Saturday meeting, I have
9 noted that it was a meeting on site for review of
10 proposed subdivision requirements.

11    Q    And you met him on the site, and the site
12 being his property in Jackson Township?

13    A    That's correct.

14    Q    And you say for review of proposed
15 subdivision requirements?

16    A    Yes.

17    Q    Who asked for this meeting, Mr. Corneal?

18    A    Yes.

19    Q    And what do you mean by review of proposed
20 subdivision requirements?

21    A    As it's termed here, I met with him to see
22 what his requirements were as to lot layouts and that
23 sort of thing.

24    Q    So is it your understanding looking at that
25 note and refreshing your recollection that you knew

14

1 prior to June 26 that Mr. Corneal desired to subdivide
2 his property?

3    A    I have no note of his initial call to set up
4 that meeting.

5    Q    And that's really not what I was looking
6 for, but was it your understanding that he was
7 contacting you to help him subdivide his property?

8    A    Yes.

9    Q    Was there any other purpose that you know of
10 as to why he was retaining your services?

11    A    Not to my knowledge.

12    Q    And do you recall what he wanted to do in
13 terms of subdivision, what he told you?

14    A    I think at that time, as best I can recall,
15 that he wished to lay out approximately nine lots.

16    Q    And did he give you an indication at that
17 time what he wanted to do with those lots, if you
18 recall?

19    A    Not specifically that I recall.

20    Q    Do you do most of your surveying work within
21 Huntingdon County?

22    A    Yes, in the general area.

23    Q    So you're familiar with subdivisions
24 generally within the county?

25    A    Yes.

15

1    Q    With respect to Jackson Township in
2 particular, after Mr. Corneal made the request, did you
3 do anything to ascertain what would be required in
4 terms of township and/or county approvals?

5    A    Most times, when asked to do a subdivision
6 in any particular municipality, at some point during my
7 preparation, I would contact the Huntington County
8 Planning Commission to find out whether that township
9 has a subdivision ordinance and what the date of the
10 latest revision is.

11    Q    And do you recall doing that in this
12 instance?

13    A    Not specifically, but I'm sure I did.

14    Q    And do you recall what you learned when you
15 contacted the Huntington County Planning Commission?

16    A    It's my recollection that Jackson Township
17 at that time did not have a subdivision land
18 development ordinance.

19    Q    Was there an indication from the county
20 planning commission when you contacted them, if you
21 recall, that they were working on an ordinance?

22    A    Not at that time, I don't think.

23    Q    Did there come a time where you found out
24 that they were working on a subdivision ordinance?

25    A    Yes.

16

1    Q    Do you recall when that was?

2    A    On January 25 in the calendar book dated
3 2000, I have a note that I had called Ann Wirth of
4 Jackson Township to -- the purpose of that call at that
5 time was to find out the date of their next monthly
6 township meeting.

7        And it's my recollection at that time that
8 she told me the date of the next regular meeting, and I
9 believe she asked me the purpose of my call, at which
10 time I would have informed her that it was regarding a
11 subdivision.

12        It was at that time that she informed me
13 that they were working on -- that Jackson Township was
14 working on adopting a township subdivision ordinance.

15    Q    Did she also tell you that there was a
16 moratorium on new subdivisions within the township?

17    A    Yes, she did.

18    Q    And is that what you believe to be the first
19 time that you heard about that, on January 25?

20    A    I believe so, yes.

21    Q    Did you convey this information to
22 Mr. Corneal?

23    A    Yes.

24    Q    What did he say, if you recall?

25    A    I really don't recall.

17

1    Q      Had you contacted the township at any time
2 prior to January 25, 2000, with respect to the work
3 that you were doing for Mr. Corneal and his
4 subdivision?
5    A      Not to my knowledge.
6    Q      As of January 25, 2000, had you completed
7 the plans for the proposed subdivision?
8    A      I would say no, the earliest plan date that
9 I see here on my completed subdivision plans is
10 February 4 of 2000.
11   Q      Why were you contacting the township to find
12 out when their next meeting was?
13   A      So that I could finish the work that I was
14 progressing on prior to their township meeting.
15   Q      Why did you want to finish the work prior to
16 the township meeting?
17   A      I think Mr. Corneal expressed a desire to
18 have this information to the township for their very
19 next meeting.
20   Q      Do you know why Mr. Corneal wanted that
21 information to go to the township?
22   A      I'm sure that I had told Mr. Corneal that
23 it's been my understanding in any subdivision in any
24 municipality that because of sewage facilities
25 installation on a property anywhere that the proposal

MLP REPORTING, INC.   (570) 748-1041

18

1 would include something like that, that the township
2 supervisors must give their permission to subdivide.
3    Q      And did this subdivision plan have
4 provisions for sewage facilities?
5    A      Yes, it did.
6    Q      Now, I may have already asked this, and I
7 apologize, do you recall the discussion you had with
8 Mr. Corneal when you informed him about the moratorium
9 that you were informed about by Ann Wirth?
10   A      I really don't recall specifics of that
11 particular conversation.
12   Q      Did you attend the township meeting in
13 February?
14   A      No, I did not.
15   Q      Have you ever attended a township meeting of
16 the Jackson Township board of supervisors?
17   A      Not to my knowledge.
18   Q      Now, the plan that was drawn up in February
19 -- well, with the date of February, February 4, 2000, I
20 think you said?
21   A      Yes.
22   Q      How many lots were proposed on that plan?
23   A      At that time, there were three lots
24 proposed.
25   Q      Why did it go from the original idea of nine

MLP REPORTING, INC.   (570) 748-1041

19

1 lots down to three, if you know?
2    A      That, I really don't know.  It was simply
3 reduced -- the number of lots was reduced at
4 Mr. Corneal's request.
5    Q      Did the plan of the proposed subdivision
6 have to be submitted to the Huntingdon County Planning
7 Commission?
8    A      As I understand it, that is at the township
9 officials discretion.
10   Q      And did you ascertain whether or not in
11 Jackson Township whether its discretion is to have the plans
12 submitted to the planning commission?
13   A      I don't specifically recall doing that.
14   Q      Do you recall submitting the plans to the
15 Huntingdon County Planning Commission?
16   A      Not personally, no.
17   Q      Do you know whether they were?
18   A      I think that they were.  I think that one of
19 my survey files contains two separate review letters
20 issued from the planning commission.
21   Q      Do you know what happened at the February
22 township meeting with respect to the subdivision plan?
23   A      No.
24   Q      Were you asked to revise the plans at any
25 time after the February meeting?

MLP REPORTING, INC.   (570) 748-1041

20

1    A      Yes, I was.
2    Q      Who asked you to revise them?
3    A      Mr. Corneal.
4    Q      Do you know why he asked you to revise those
5 plans?
6    A      Not specifically.
7    Q      Do you know generally any reason why you
8 were asked to revise the plan?
9    A      I think because in order to revise the
10 subdivision plan to create fewer lots, it would have
11 perhaps made things easier to get through the planning
12 commission's approval.
13   Q      And did you, in fact, revise the plans?
14   A      Yes, I did.
15   Q      What's the date of your first revision?
16   A      The next consecutive plan concerning the
17 Corneal property is dated April 7 of 2000.
18   Q      And how many lots were on the April 7, 2000,
19 plan?
20   A      Only two proposed lots at that time.
21   Q      Did you have any discussion with Mr. Corneal
22 about why he went from three lots down to two lots?
23   A      Not his specific reasoning, however, I did
24 convey to Mr. Corneal that in my experience, the
25 creation on the February 4 plan of such an extended

MLP REPORTING, INC.   (570) 748-1041

●

21

1 right-of-way to serve Lot No. 3 generally raises
2 eyebrows at the planning commission.
3     Q     Now, did you have anything to do with the
4 preparation of sewage modules?
5     A     I prepared the Pennsylvania Department of
6 Environmental Protection sewage module, the component
7 one.
8     Q     For which plan?
9     A     For both the February 4 plan and also the
10 April 7 plan.
11     Q     And the module that you prepared for the
12 February plan, was that different than the next module
13 that was prepared for the April plan?
14     A     Yes, there would have been changes on it,
15 specifically the number of lots and other things that I
16 don't recall just at the moment.
17     Q     Were there any other revisions that you made
18 to the plan and the proposed subdivision after April?
19 In other words, were there any other plans that you
20 made?
21     A     Yes.  Yes, I have a plan showing the
22 David B. and Sandra Y. Corneal property that is dated
23 December 27, 2000.
24     Q     And how many lots are on that plan?
25     A     It's just the one survey showing the entire

MLP REPORTING, INC.  (570) 748-1041

●

23

1 Mr. Corneal?
2     A     Not that I recall.
3     Q     Did you have any discussions with
4 Mr. Corneal about the approval process or what went on
5 with his proposed plans?
6     A     I'm sure I would have conveyed to
7 Mr. Corneal the general process of subdividing a piece
8 of property as best I understood it at the time.
9     Q     Very briefly, what was your understanding at
10 the time that you probably explained to Mr. Corneal?
11     A     That in any subdivision, the township
12 supervisors were required by the Pennsylvania DEP to
13 review and approve subdivision plans whether or not
14 they had an ordinance, this was strictly in compliance
15 with the Department of Environmental Protection
16 policies.
17     Q     Other than the three plans that you prepared
18 that we've talked about and the two sewage modules, did
19 you prepare anything else for Mr. Corneal?
20     A     There were — the documents we looked at
21 earlier with the information concerning the boundary
22 discrepancy and I think there were additional drawings
23 concerning the neighboring property.
24          It's my recollection that Mr. Corneal wanted
25 those because he was contemplating purchasing at least

MLP REPORTING, INC.  (570) 748-1041

22

1 boundary of the Corneal property with no attempted
2 divisions of the property.
3     Q     Do you know why you were asked to prepare
4 the plan with the December date on it?
5     A     Only at Mr. Corneal's request.
6     Q     You don't know why he requested that?
7     A     Not specifically, no.
8     Q     Did you have any discussions with him about
9 the preparation of the December plan?
10     A     I'm sure I did.
11     Q     That you recall, obviously.
12     A     Nothing stands out in my memory.
13     Q     And what is that December plan?  What did he
14 ask you to do?
15     A     He asked that I prepare a drawing showing
16 the entire property that he and his wife owned with the
17 positioning of the soil probes and percolation tests
18 that were done by the township's sewage enforcement
19 officer and the soil types as they are discernable from
20 the Huntingdon County soil survey, which is put out by
21 the United States Department of Agriculture.
22     Q     Did you, other than the two sewage modules
23 that we talked about, one in conjunction with the
24 February plan and one in conjunction with the April
25 plan, did you prepare any other sewage modules for

MLP REPORTING, INC.  (570) 748-1041

24

1 a portion of the neighboring property.
2     Q     Did you have anything to do with the design
3 of any structures on the properties?
4     A     No.
5     Q     The location of any structures?
6     A     No, I would have simply shown the proposed
7 location of a structure in the position that
8 Mr. Corneal would indicate so that it could be shown on
9 the subdivision plan.
10     Q     Do you recall meeting with the SEO, the
11 sewage enforcement officer, Mr. Parks, sometime in the
12 fall of 1999 concerning Mr. Corneal's property?
13     A     I met with Barry Parks at the Huntingdon
14 County Courthouse one morning to get some insight as to
15 the positions for several of the soil probes, some of
16 the soil testing that he had done that I had not been
17 able to find on the property.
18     Q     So you couldn't find the test sites on the
19 property?
20     A     That's correct.
21     Q     And you met with Barry Parks in order to get
22 information which would enable you to find those test
23 sites?
24     A     That's my recollection, yes.
25     Q     Do you recall meeting with Barry Parks at

MLP REPORTING, INC.  (570) 748-1041

25

1 any other time concerning the Corneal property?
2    A    No, I don't.
3    Q    Other than a discussion concerning the test
4 pit sites on the property, did you have any other
5 discussion with Mr. Parks about the Corneal property?
6    A    I don't think so.
7    Q    Do you know a person by the name of George
8 Simpson?
9    A    Yes.
10    Q    Who is George Simpson?
11    A    Somebody I knew many years ago.  I don't
12 know who he is in any other capacity.  I would
13 recognize him.
14    Q    Did you have anything to do with his
15 subdivision or proposed subdivision in Jackson
16 Township?
17    A    I don't think so.
18        MR. SHERR:  I don't have any other
19 questions.  Thank you.
20        MS. MONTGOMERY:  One moment, please.
21        (Discussion held off the record.)
22
23              EXAMINATION
24
25 BY MS. MONTGOMERY:

MLP REPORTING, INC.  (570) 748-1041

26

1    Q    Mr. Simpson, I'm Bridget Montgomery, and I
2 represent the Corneals in this action, and we just met
3 a moment ago.  I just have a couple of questions for
4 you.
5        I think you testified a few moments ago that
6 you contacted Ann Wirth on January 25, 2000, to inquire
7 into when the next township meeting would be, correct?
8    A    That's correct.
9    Q    When you called her, did you tell her who
10 you were calling on behalf of or whose subdivision plan
11 you were looking to present?
12    A    I may have at some time during the
13 conversation.  It wasn't a long conversation, but I
14 don't specifically recall mentioning an individual.
15    Q    Okay.  You testified, also, about some DEP
16 requiring township supervisors to review and approve
17 certain subdivision plans?
18    A    Yes, particularly where there would be, as I
19 mentioned before, proposed sewage facilities
20 installation.
21    Q    So exactly what were they reviewing them
22 for?  Let me ask that question a little better.
23 Exactly what were the township supervisors required to
24 review such plans for?
25    A    It's my understanding the State Sewage

MLP REPORTING, INC.  (570) 748-1041

27

1 Facilities Act requires the municipal officers in any
2 municipality to review subdivision proposals to make
3 certain that the sewage facilities proposed for the
4 development are adequate.
5    Q    And does the township sometimes pass that
6 task on to the county planning commission?
7    A    Yes, my understanding is that the county
8 planning commission will review and make
9 recommendations to any municipal officers as to their
10 findings in reviewing subdivision plans.
11    Q    Did Mr. Corneal, in the course of you
12 preparing the successive subdivision plans for him, did
13 he ever tell you why he kept cutting down the number of
14 proposed lots?
15    A    Not that I specifically recall.
16    Q    Did he ever tell you that his plans were
17 being -- his ability to subdivide was being challenged
18 by the township at all?
19    A    I think he may have mentioned something
20 along those lines, but again, I don't specifically
21 recall the wording or the exact occasion.
22    Q    Did you have any understanding of why you
23 were preparing, you know, successive subdivision plans
24 with fewer and fewer lots?
25    A    Only based on my presumption that he felt

MLP REPORTING, INC.  (570) 748-1041

28

1 the need to do so.
2    Q    Now, you testified, I think, that you had
3 some involvement with the sewage modules on
4 Mr. Corneal's property?
5    A    Yes, I would have prepared the sewage module
6 forms with all of the information that I could provide
7 on them.
8    Q    Oh, the forms?
9    A    Yes.
10    Q    I see.  For submission to whom?
11    A    They would initially go to the township and
12 the planning commission if the planning commission were
13 being asked to review this, but they would also then
14 have to be submitted to the Department of Environmental
15 Protection for their review and their approval, also.
16    Q    Did you prepare successive versions of the
17 sewage modules, as well?
18    A    Two, to my recollection.
19    Q    Okay.  Do you recall why you had to prepare
20 a second version?
21    A    Information pertinent to the second
22 subdivision proposal that is required within the form
23 would have been different than the first.
24    Q    I see.  Did anybody else work on the sewage
25 modules with you?

MLP REPORTING, INC.  (570) 748-1041

29

```
1     A     No.
2           MS. MONTGOMERY:  I don't have any other
3 questions.
4           MR. SHERR:  I don't have anything further.
5 Thank you very much for your time, Mr. Simpson.
6           (The deposition concluded at 1:52 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MLP REPORTING, INC.   (570) 748-1041

---

30

```
1 COUNTY OF UNION          :
                           : ss
2 COMMONWEALTH OF PENNSYLVANIA:
3
4           I, NICOLE L. ZIMMERMAN, Reporter-Notary
5 Public, authorized to administer oaths within and for
6 the Commonwealth of Pennsylvania and take depositions
7 in the trial of causes, do hereby certify that the
8 foregoing is the testimony of DAVID SIMPSON.
9           I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically
12 by the said NICOLE L. ZIMMERMAN a Reporter-Notary
13 Public, approved and agreed to, and afterwards reduced
14 to typewriting under the direction of the said
15 Reporter.
16          I further certify that the proceedings and
17 evidence are contained fully and accurately in the
18 notes taken by me on the within deposition, and that
19 this copy is a correct transcript of the same.
20          In testimony whereof, I have hereunto
21 subscribed my hand this 12th day of July, 2001.
22
23
24                    _____
                       NICOLE L. ZIMMERMAN
                       Notary Public
25 My commission expires
   on May 24, 2003
```

MLP REPORTING, INC.   (570) 748-1041

06-29-2002 03:58AM   FROM FMS              TO       17172376019    P.02

8-1.  Agreement for Sale of Land—Judgment
The Plankenhorn Co., Williamsport 2, Pa.

# Article of Agreement,

Exhibit 9

**Made** the        7th           day of        October                    in the year
one thousand nine hundred    ninty nine (1999).

**Between**   DAVID B. CORNEAL and SANDRA Y. CORNEAL , parties
                                        of the first part.

**and**    JOHN B. HEWETT, JR. and JoANN  F. SMITH, parties
                                        of the second part,

**Witnesseth**, that the said part   ie s of the first part, for the consideration hereinafter mentioned
and contained, agree    to sell and convey unto the said part   ie s of the second part,   their
heirs or assigns, all     Farm House, Barn and 25.8 acres, more or less,
    located in Jackson Township, Huntingdon County, more fully
    described in a proposed subdivision survey prepared by David A.
    Simpson for David B. and Sandra Y. Corneal. Being a portion of a
    larger fram tract owned by the parties of the first part.
    Said subdivision to be finalized and recorded prior to settle-
    ment by the parties herein.


    THIS CONTRACT IS SUBJECT TO THE ADDITIONAL TERMS SETFORTH
    IN AN ADDENDUM ATTACHED HERETO.


**In Consideration Whereof**, the said parties of the second part        agree   to purchase
said premises and to pay said part    of the first part therefor, the sum of one hundred and
    fifty thousand ($150,000.00) and xx/00 ------------------- Dollars,
in the manner following, to-wit:

  1.  Four thousand and xx/00 ($4,000.00) dollars downpayment.
  2.  Monthly payments of five hundred and xx/00($500.00) dollars
      beginning on November 7, 1999 and continuing each month
      thereafter until final settlement on or about JUne 30th,2000.
      Said monthly payments to be applied to principle against the
      purchase price.
  3.  The balance in full at the time of settlement.
  4.  Buyers to pay 1% transfer tax and a proration of the real estate
      taxes.
  5.  No personal property is included in this sale.


and upon the payment of the said sum, the said parties   of the first part will, at  their
    own proper cost and charge, make, execute and deliver to the said part   ie s of the second
part a good and sufficient Deed for the proper conveying and assuring of the said premises in fee
simple, free from all incumbrance, and dower and right of dower, such conveyance to contain the
usual covenants of       Special

                                        warranty

06-29-2000 05:58AM    FROM FMS                    TO              17172376019    P.03

ADDENDUM/ENDORSEMENT        AGREEMENT OF SALE

Form 102-6L

RE: PROPERTY ___ 25.8 acres with house and barn _____
SELLERS  DAVID B. CORNEAL and SANDRA Y. CORNEAL
BUYERS   JOHN B. HEWETT, JR. and JoANN F. SMITH
DATE OF AGREEMENT ___ 10-7-1999 _ SETTLEMENT DATE ___ 6-30 x6-2000 SALE PRICE $50,000

1. Buyers acknowledge that a present tenant, Scott Page, needs to be relocated by Sellers to a property they are constructing on another portion of the farm and that they will be flexable in the settlement date to accommodate this transition.

2. Sellers grant to the Buyers, upon the signing of this agreement the right to begin preparation of flower beds for Spring planting. Sellers have the right to approve or disapprove the numbers and locations of the flower beds.

3. Sellers shall retain the right to occupy the upper level of the barn for a period of two years or until their home is finished on the remainder of the farm, which ever comes first.

4. The deed will contain restrictive covenants that the land may not be further subdivided, that there may not be mobile homes of any nature put on the property permanently or temporarily. That any home constructed on the property shall contain a minimum of 2,000 sq. feet of living space.

1300 tor

All other terms and conditions of the said agreement shall remain unchanged and in full force and effect.

| | |
|---|---|
| WITNESS _____ | BUYER _____(S) |
| WITNESS _____ | BUYER _____(S) |
| | DATE _____ 19__ |
| WITNESS _____ | SELLER _____(S) |
| WITNESS _____ | SELLER _____(S) |
| AGENT _____ | DATE _____ 19__ |

COPIES: WHITE: SELLER,  YELLOW: AGENT,  PINK: BUYER,  BLUE: MORTGAGEE ,  GOLD: _____ ; GREEN: BUYER'S AT TIME OF SIGNING

PENNSYLVANIA ASSOCIATION OF REALTORS®        SPEED FORMS                                    4/89

And it is further agreed, by and between the said parties that possession of said premises shall be delivered to the part ies of the second part, their heirs or assigns, on the 30th day of June 19 2000, until which time the part ies of the first part shall be entitled to receive the rents, issues and profits thereof.

And it is further understood and agreed, that in case default shall be made in the payment of any installment of principal or interest hereby agreed to be paid, for a period of ten (10) days after the same shall have become due and payable by the terms hereof, then and in that case the whole of the principal sum and interest shall, at the option of the said part ies of the first part, become forthwith due and payable, without defalcation or stay of execution; said part ies of the second part do hereby empower any attorney of any Court of Record of Pennsylvania or elsewhere, to appear and confess judgment against them for the above sum, or so much thereof as remains unpaid, together with the interest, with costs of suit, release of errors, attorney's commission of 10% per cent., waiving inquisition and exemption.

**In Witness Whereof,** the parties to this agreement, have hereunto set their hands and seals, the day and year first above written.

SEALED AND DELIVERED
IN THE PRESENCE OF

DAVID B. CORNEAL (SEAL)

SANDRA H. CORNEAL (SEAL)

JOHN B. BOWER, JR. (SEAL)

JOANN F. SMITH

**State of** , **County of** , ss.

On this day of 19 , before me, the subscriber, personally came the above named who in due form of law acknowledged the foregoing Indenture to be act and deed, and desired that the same might be recorded as such.

Witness my hand and seal the day and year aforesaid.

(SEAL)

My Commission Expires

**Agreement.**

WITH

Dated

For

Entered for record in the Recorder's Office of County, the day of 19

Recorder.

Tax $

Fees $

WILLIAM H. SIMMET

To Recorder of Deeds:

**Certificate of Residence**

I, hereby certify that the correct address and place of residence of the grantee herein as follows:

Attorney or Agent for Grantee

**Recorded** in the Office for Recording of Deeds, &c., in and for said County, in Deed Book No. Vol., Page

**Witness** my Hand and Official Seal this day of , 19

Recorder of Deeds

TOTAL P.04

Exhibit 10

February 7, 2000
Meeting called to order by Chairman Weiler
Minutes approved as read

Treasurer's report approved as read

The Board appointed two new auditors - Lucille Yutzy and Sondra Armstrong

The Fireman presented a list - Fireman trained in Hazardous Materials Operations
and Incident Commanders - Fireman driving under Red Lights and Sirens and Blue Lights.
And a List of Fireman and their Drivers License's.

Denny Grandthal presented a copy of the concerns and opinions of the Taxpayers Associations
On the proposed Subdivision Ordinances.

Fire Chief Chris Wilson ask if the proposed sub-division ordinance had addressed the width of the
roads with the Fireman trucks in mind and he was assured that all the proposed streets will
be wide enough to get the fire trucks in and out and turn them around.

Roadmaster had a few complaints about snow removal but he felt that we have worked out the problems
and things are going well.

David Corneal ask if the Supervisors would approve a sub-division on Sawmill road, all three supervisors
told him that we are not approving any sub-division at this time and that it had been announced at the
January meeting. He ask if he could submit his sub-division to the County and when we are ready would
be a head of the game and he was told that he could do so but that the Township had the final approval of
all sub-divisions.

Meeting adj 7:50PM

*Ann Lunth*



EXHIBIT

Wirth 5

TKB   5-17-01

Exhibit 11

January 4, 2000

Regular Meeting Opened at 7:10PM

Meeting called to order by Chairman Weiler at 7:00 PM

Minutes approved

Treasurer report approved as read

The Supervisor's stated that no more sub-divisions will be approved until after the proposed Sub-Division ordinance for the Township has been approved. As soon as we get the review from the Planning commission and any changes that the Supervisors feel need to be made copies will be made available to the Public and a Public meeting will be held.  It was stated that the County is now doing a " boiler plate" sub-division ordinance for those Township's who want it, but Jackson Township has already put a lot of time into the purpose ordinance and it was felt it was in the best interest of the Township to proceed with the  ordinance that the Supervisor's have decided on.

Tom Wilson the Roadmaster stated that New Enterprise would fix Miller road
To our satisfaction in the spring.  He hopes to get bids on  Sawmill & Yoder for sealing this summer depending on the price and how much money we have at the time.

Meeting was adj. at 7:35PM

( June 26ᵗʰ - Will public meeting re: Subdivision and adoption
   Time ?

EXHIBIT
Wirth 6
TKB    5-17-01


*Exhibit 12*

**NEWTON, LAWRENCE**
**06/12/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2    DAVID B. CORNEAL and SANDRA  :
      Y. CORNEAL,                  :
 3         PLAINTIFFS              :
                                   :
 4              VS                 :   NO. 1:CV-00-1192
                                   :
 5    JACKSON TOWNSHIP, HUNTINGDON :
      COUNTY, PENNSYLVANIA; W.     :
 6    THOMAS WILSON, individually  :
      and in his official capacity :
 7    as Supervisor of Jackson     :
      Township; MICHAEL YODER,     :
 8    individually and in his      :
      official capacity as         :
 9    Supervisor of Jackson        :
      Township; RALPH WEILER,      :
10    individually and in his      :
      official capacity as         :
11    Supervisor of Jackson        :
      Township; BARRY PARKS,       :
12    individually and in his      :
      official capacity as Sewage  :
13    Enforcement Officer of       :
      Jackson Township; DAVID      :
14    VAN DOMMELEN, individually   :
      and in his official capacity :
15    as Building Permit Officer;  :
      ANN L. WIRTH, individually   :
16    and in her official capacity :
      as Secretary of Jackson      :
17    Township; and LARRY NEWTON,  :
      individually and in his      :
18    official capacity as         :
      Solicitor to Jackson         :
19    Township,                    :
           DEFENDANTS             :
20         DEPOSITION OF:  LAWRENCE L. NEWTON
21         TAKEN BY:       PLAINTIFFS
22         BEFORE:         TERESA K. BEAR, REPORTER
                           NOTARY PUBLIC
23
           DATE:           JUNE 12, 2001, 9:42 A.M.
24
           PLACE:          ECKERT SEAMANS
25                         213 MARKET STREET
                           HARRISBURG, PENNSYLVANIA
```


2

1  APPEARANCES:
2     ECKERT SEAMANS
      BY: BRIDGET E. MONTGOMERY, ESQUIRE
3     LESLIE A. MALADY, ESQUIRE
4        FOR - PLAINTIFFS
5     MAYERS, MENNIES & SHERR, LLP
      BY: ANTHONY R. SHERR, ESQUIRE
6
         FOR - ALL DEFENDANTS EXCEPT NEWTON
7
      THOMAS, THOMAS & HAFER
8     BY: MICHELE J. THORP, ESQUIRE
9        FOR - DEFENDANT - RALPH WEILER
10    METTE, EVANS & WOODSIDE
      BY: KATHRYN LEASE SIMPSON, ESQUIRE
11
         FOR - DEFENDANT - LARRY NEWTON
12
      ALSO PRESENT:
13
      DAVID B. CORNEAL
14
15
16
17
18
19
20
21
22
23
24
25

3

1              TABLE OF CONTENTS
2                 WITNESS
3  FOR PLAINTIFFS                    DIRECT
4  Lawrence L. Newton
      By Ms. Montgomery                4
5
6                 EXHIBITS
7  NEWTON EXHIBIT NO.        PRODUCED AND MARKED
8   1 - Notice                    33
9   2 - Minutes dated 1/4/00          48
10  3 - Letter dated 1/31/00          68
11  4 - Letter dated 8/18/00          77
12  5 - Letter dated 7/28/00          80
13  6 - Letter dated 5/5/00           81
14  7 - Letter dated 5/5/00           84
15  8 - Notice                        99
16  9 - Bill dated 12/28/99          103
17  10 - Letter dated 8/3/00         106
18  11 - Letter dated 8/31/00 with enclosures   109
19  12 - Letter dated 9/1/00 with enclosures    112
20  13 - Letter dated 10/20/00       113
21  14 - Letter dated 11/10/00       121
22  15 - Invoice dated 8/4/00        126
23  16 - Letter dated 8/29/00        147
24
25

4

1          LAWRENCE L. NEWTON, called as a witness, being
2   sworn, testified as follows:
3
4              DIRECT EXAMINATION
5
6   BY MS. MONTGOMERY:
7       Q    Mr. Newton, we've just met, but for the record
8   I'll identify myself. My name is Bridget Montgomery and I
9   represent the Corneals in this litigation. Would you just
10  state your name for the record.
11      A    Lawrence, L-a-w-r-e-n-c-e, middle initial L.,
12  Newton, N-e-w-t-o-n.
13      Q    Where do you live, Mr. Newton?
14      A    I live at 2111 Moore Street, Huntingdon,
15  Pennsylvania.
16      Q    How long have you lived there?
17      A    Since July of 1981.
18      Q    Are you a native of Huntingdon?
19      A    No, I'm not.
20      Q    Where are you a native of?
21      A    I grew up in Latrobe, Pennsylvania.
22      Q    What county is that?
23      A    Westmoreland.
24      Q    Out in the western part of the state?
25      A    Yes.

5

1       Q    And what is your current occupation?
2       A    I'm an attorney.
3       Q    Are you in private practice?
4       A    Yes, I am.
5       Q    And what is the business address of your law
6   practice?
7       A    504 Penn Street, Huntingdon, Pennsylvania.
8       Q    Even though you are an attorney, I was going
9   to dispense with all of these instructions, but I think
10  we're going to need to go through them. Have you ever been
11  deposed before?
12      A    No, I haven't.
13      Q    Okay. You know the general instructions?
14      A    Yes.
15      Q    First of all, that you really need to let me
16  finish my question and I'll try to let you finish your
17  answer so that we're not talking over each other, just for
18  the benefit of the court reporter.
19           I'll give you an instruction that I need to
20  mind myself. We need to talk slow enough for the court
21  reporter to take us down. I tend to go too fast and Michele
22  was good about reminding me that I'm going too fast. So is
23  there any reason why you can't give your deposition today?
24      A    None whatsoever.
25      Q    You're not on any sort of medication or

NEWTON, LAWRENCE
06/12/01



CORNEAL  VS
JACKSON TOWNSHIP

6

1 anything that would prevent you from understanding my
2 questions and giving answers?
3   A   No.
4   Q   Obviously if you need to take a break for your
5 own comfort or convenience, you can do that. There's water
6 here if you need it, coffee, whatever you'd like.
7       Now, we'll go back to your employment. I
8 think you just gave us your business address, correct?
9   A   That's correct.
10  Q   Are you in practice alone?
11  A   Yes.
12  Q   Do you occupy that space alone?
13  A   No.
14  Q   Who occupies the space with you?
15  A   There's another attorney, Harvey B. Reeder,
16 and a psychologist, Lynn E. Kagarise.
17  Q   Do you have -- what is it, a three office
18 space or more?
19  A   Well, we have -- we have more space. We have
20 a conference room downstairs. Mr. Reeder and I share part
21 of the second floor. We each have an office. There is a
22 library and another conference room. Mr. Kagarise is in the
23 second floor rear. There is an office that he has and
24 secretarial staff.
25  Q   So you have your actual office space on the

7

1 second floor --
2   A   Yes.
3   Q   -- and your conference room is on the first
4 floor?
5   A   Yes.
6   Q   You said that Mr. Reeder and you share part of
7 the second floor?
8   A   Yes.
9   Q   You have separate offices but one secretary?
10  A   No, we each have our own secretary and we
11 share a secretary.
12  Q   I see. So you have three secretaries
13 altogether?
14  A   Yes, one of whom I employ and one of whom we
15 share the cost of.
16  Q   I see. And the other whom he employs himself?
17  A   Yes.
18  Q   Do you have any other office staff?
19  A   No.
20  Q   And you have a library?
21  A   Yes.
22  Q   A law library?
23  A   (Witness nods head affirmatively.)
24  Q   Do you share that with Mr. Reeder?
25  A   Yes.

8

1   Q   Any other shared space?
2   A   No.
3   Q   You both are able to use the conference room
4 or was it rooms -- room or rooms on the first floor?
5   A   Room. There's a kitchen area in the back of
6 the first floor.
7   Q   How long has Mr. Reeder shared this space with
8 you?
9   A   We purchased the building approximately five
10 years ago. So at that location approximately five years.
11  Q   Did you previously share office space with
12 him?
13  A   Yes.
14  Q   In another location?
15  A   Yes.
16  Q   Where was that?
17  A   331 Penn Street, Huntingdon.
18  Q   Also in Huntingdon?
19  A   Yes.
20  Q   And how long did you share office space with
21 him there?
22  A   Well, there was another -- at that time there
23 was another attorney that we practiced -- that I practiced
24 with by the Marshal B. DeForrest.
25  Q   I'm sorry, I didn't hear that.

9

1   A   Marshal B. DeForrest.
2   Q   DeForrest?
3   A   Yes. Mr. Reeder was sharing space at that
4 time as well.
5   Q   I take it you're each sole practitioners?
6   A   That's correct.
7   Q   And Mr. DeForrest was a sole practitioner as
8 well?
9   A   Yes, he was. Now, I helped him out. We were
10 sole practitioners, but he was -- he needed some help. He
11 was kind of phasing out of his practice and so I did various
12 tasks for him but we were never partners.
13  Q   Do you have any sort of partnership or
14 corporate arrangement or anything like that with Mr. Reeder
15 at this time?
16  A   I do not. I should say that we had a -- we
17 have a settlement company called Standing Stone Settlement
18 Company. We each are title agents for Old Republic. We do
19 not have a partnership regarding the settlement company. We
20 actually formed the settlement company because most title
21 carriers expected some minimum volume per year so we thought
22 if we combined and had a settlement company we could do this
23 together, but any settlement that I have through Standing
24 Stone is mine and any settlement he has is his.
25  Q   Standing Stone is what?

3



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

10

1   A     It's a fictitious name.
2   Q     Oh, Standing Stone is the name of your
3   title --
4   A     Standing Stone Settlement Company is a
5   fictitious name, yes.
6   Q     And you said your title agent's through what?
7   A     Old Republic Title Company.
8   Q     Through Old Republic Title Company?
9   A     (Witness nods head affirmatively.)
10  Q     What about the real estate itself, do you own
11  it or rent it?
12  A     We own it. We have a real estate partnership,
13  Mr. Reeder and I and Mr. Kagarise, and then we each
14  individually pay rent to the partnership.
15  Q     Understood. How long have you owned that
16  building with Mr. Reeder?
17  A     Since approximately five years ago.
18  Q     Did you own the prior office?
19  A     I did not. I believe Mr. DeForrest owned the
20  building and then for a period of time I think Mr. Reeder
21  did, but I never had an ownership interest in 331 Penn
22  Street.
23  Q     Do you have one telephone number or two
24  telephone numbers or what at this office?
25  A     Actually we have three lines. Technically my

11

1   number is 643-3820 and Mr. Reeder's number is 643-3821. You
2   know, they both ring and our receptionist would answer
3   either line.
4   Q     Is your receptionist your third shared
5   secretary?
6   A     Yes.
7   Q     Is there a third number as well?
8   A     I don't believe so, no. There's just an extra
9   line.
10  Q     There's just an extra line?
11  A     (Witness nods head affirmatively.)
12  Q     Is there one general number for the office or
13  just those two numbers?
14  A     Those two numbers.
15  Q     What about your fax, do you share a fax?
16  A     We share a fax along with Mr. Kagarise. That
17  number is 643-5670.
18  Q     I'm assuming you maintain malpractice
19  insurance?
20  A     Yes.
21  Q     Do you maintain separate malpractice
22  insurance?
23  A     Separate, yes.
24  Q     You each are under your own?
25  A     Um-hum.

12

1   Q     Do you share clients at all? I mean, do you
2   work on cases together or --
3   A     We've done that occasionally. Generally not.
4   Q     In terms of proximity, how close are your
5   offices, yours and Mr. Reeder's?
6   A     Right across the hall.
7   Q     And your secretaries each sit outside your
8   desks, your individual offices?
9   A     No, the secretaries are all downstairs.
10  Q     The secretaries are on a separate floor?
11  A     If you go in the front door, our secretaries
12  are to the left and our receptionist is to the right.
13  Q     Tell me a little bit about your education,
14  where did you do your undergraduate work?
15  A     Wittenberg University in Springfield, Ohio.
16  Q     And what about your law degree?
17  A     Case Western Reserve University in Cleveland,
18  Ohio.
19  Q     Do you have any other degrees?
20  A     I do not.
21  Q     A JD is enough.
22  A     That's enough.
23  Q     Causes you enough problems in your life,
24  right. Let's see, what about other types of certificates or
25  anything like that? Do you have anything?

13

1   A     I'm a title agent and that's all.
2   Q     You said that. How does one become a title
3   agent, what do you do?
4   A     Apply through the title company.
5   Q     You apply directly to --
6   A     You're approved through your title company.
7   Q     There's no state requirement or anything like
8   that?
9   A     There might be now. Not when I did it. When
10  you are an attorney, you didn't have to take an exam and
11  that type of thing and I'm not sure that's the case now.
12  Q     So you have a fictitious name for your
13  settlement company?
14  A     Correct.
15  Q     Is it a corporation?
16  A     No.
17  Q     It's a partnership?
18  A     Technically, no, it's not.
19  Q     It's not registered in any way --
20  A     It's registered as a fictitious name.
21  Q     It's not registered as a partnership or
22  corporate entity in any way?
23  A     It's not, no.
24  Q     Do you have some sort of insurance for that
25  settlement company?



NEWTON, LAWRENCE
06/12/01

CORNEAL  VS
JACKSON TOWNSHIP

---

14

1   A       We have to purchase through our professional
2   liability carrier additional coverage for that.
3   Q       Do you each purchase that separately or do you
4   purchase it together or what?
5   A       We purchase it separately through our own
6   policies. Now, the -- we have to have a fidelity bond
7   through Standing Stone as a requirement of -- I think
8   Pennsylvania licensing requirements.
9   Q       So you have a fidelity bond in the name of
10  Standing Stone --
11  A       Right.
12  Q       -- which you two are the principals under
13  Standing Stone?
14  A       Right.
15  Q       But each of you through your own malpractice
16  insurance have additional insurance --
17  A       Yes.
18  Q       -- for your title agent work?
19  A       For our title agent, right.
20  Q       Is a settlement company the same as a title
21  agency?
22  A       Similar, yes.
23  Q       I don't know if I asked you this, and I
24  apologize if I did, when did you set up the title company,
25  the settlement company?

---

15

1   A       Approximately three years ago.
2   Q       So is it fair to say that a significant amount
3   of your practice involves real estate?
4   A       I would say a fair portion of my practice
5   involves real estate, but much of that is not the title
6   agency.
7   Q       What about Mr. Reeder's, do you know?
8   A       I wouldn't know. He does -- I would say he
9   does a fair amount of title work and real estate work.
10  Q       So you do some real estate settlement work and
11  title work, right?
12  A       Yes.
13  Q       And aside from that, what else, what other
14  kind of work do you do?
15  A       Civil and criminal litigation, municipal work,
16  estates, that's about it.
17  Q       Your municipal work, can you describe that for
18  me?
19  A       I'm solicitor for several townships and
20  several boroughs.
21  Q       And we all know that you are solicitor for
22  Jackson Township, correct?
23  A       Correct.
24  Q       In Huntingdon County. What other townships
25  and boroughs are you solicitor to?

---

16

1   A       Let's see, townships, Dublin, Carbon.
2   Q       Is Carbon in Centre County?
3   A       No, it's in Huntingdon County. These would
4   all be in Huntingdon County. Hopewell, Todd, Porter, West.
5   I think that's it.
6   Q       Thanks.
7   A       For boroughs, Huntingdon, Coalmont and
8   Shirleysburg.
9   Q       And those are all in Huntingdon as well?
10  A       Yes.
11  Q       So when did you become the solicitor for
12  Jackson Township?
13  A       I don't know. I would say approximately 15
14  years ago.
15  Q       A long time, okay. How did that come about?
16  A       I received a telephone call from the then
17  township secretary whose name was Leroy Koch. He asked me
18  if I would be interested and I said yes.
19  Q       And you serve at the pleasure of the township
20  supervisors, correct?
21  A       I do.
22  Q       Is it an annual contract or an annual
23  appointment or what?
24  A       I think it's an annual appointment. We never
25  have a contract.

---

17

1   Q       Is there a list of duties or anything that
2   came to you at any time in connection with your work for
3   Jackson Township?
4   A       No.
5   Q       Well, how did you come about to have an
6   understanding of what it is you're expected to do for them?
7   A       Township code.
8   Q       The township --
9   A       Basically in Jackson Township, and as well as
10  in the other townships, I rarely attend meetings. I only
11  attend unless I'm requested -- if I'm requested to attend.
12  And there will be periods of time when really not too much
13  happens at all during the year and it's -- these are -- keep
14  in mind these are very rural townships and they basically
15  call as needed.
16  Q       Understood. Are you on an hourly or on a
17  retainer or what --
18  A       I --
19  Q       -- with Jackson Township?
20  A       I generally bill -- I generally bill these
21  townships at a discounted rate of $60 an hour.
22  Q       So you don't have some sort of retainer or a
23  minimum number of hours a year or something like that?
24  A       No, there's no -- sometimes -- I don't know if
25  I've done this the last couple years with Jackson Township,

---

NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP



**18**

1 but sometimes the retainer has been $150 a year. You're
2 smiling at me.
3 Q    With Jackson Township, typically how much work
4 do you do for them a year?
5 A    You know, it varies. I think last year I
6 probably billed them approximately a thousand dollars.
7 There was more activity last year than in most years.
8 Q    Do you send them an invoice every month?
9 A    No.
10 Q    Just in months that you perform work?
11 A    Or I will not send an invoice until the job is
12 done.
13 Q    I see. Do you send them any sort of periodic
14 statement of account or anything like that?
15 A    No.
16 Q    So you say that last year there was more
17 activity than usual?
18 A    Yes.
19 Q    Without going into anything that doesn't have
20 to do with this lawsuit obviously, can you describe for me
21 -- I should say can you tell me whether the additional
22 activity is attributable to Mr. Corneal and his issues?
23 A    No, I would say not.
24 Q    No, okay.
25 A    Well, after the lawsuit, yes.

**20**

1 Q    I see.
2 A    But I certainly didn't have any real
3 draftsmanship with respect to the ordinance.
4 Q    You said it was under consideration you think
5 for at least a year?
6 A    Yes.
7 Q    How do you know that? I mean, what is it that
8 occurred that --
9 A    Well, I can -- you know, from the time that
10 the supervisors got the Cambria County -- whatever township
11 in Cambria County adopted the ordinance. I would say at
12 least a year, maybe more.
13 Q    Do you know who brought the idea of a
14 subdivision ordinance to the township officials?
15 A    I do not.
16 Q    Did they ever discuss with you why they
17 thought they needed to do a subdivision ordinance?
18 A    Generally because Jackson borders Centre
19 County and they wanted to be ready -- if there was going to
20 be development in Jackson Township to be prepared for that
21 development.
22 Q    Did they ask you for advice regarding whether
23 or not it was appropriate for them to enact a subdivision
24 ordinance or how to do it or anything like that?
25 A    Not directly. You know, subdivision

**19**

1 Q    Right.
2 A    You know, we had -- you know, we had the
3 subdivision ordinance that we were working on and that
4 generates some additional time.
5 Q    You just spoke a moment ago about the
6 subdivision ordinance. Do you recall the first time that
7 the subdivision ordinance was presented or the idea of a
8 subdivision ordinance in Jackson Township was presented to
9 you?
10 A    I do not recall a specific date. It was -- it
11 was under consideration for a long period of time, at least
12 a year, probably more than a year.
13 Q    Prior to its actual passage?
14 A    Yes.
15 Q    In -- what was it, July 2000?
16 A    July 10th, yes.
17 Q    Were you involved in the drafting of the
18 ordinance yourself?
19 A    Not -- I guess maybe indirectly. The
20 supervisors had obtained a copy of a subdivision ordinance
21 from Cambria County which was kind of the prototype that was
22 used in Jackson. And what I did at least initially was
23 loaded that into my computer and from there the township
24 would cut, paste and get input from the planning commission,
25 etcetera.

**21**

1 ordinances are -- and land development ordinances are a good
2 idea generally. In our county right now the county planning
3 commission is working on a prototype subdivision ordinance
4 that perhaps will be adopted by most of the townships in the
5 county.
6 Q    Let me ask you this: You said that they
7 obtained a copy of the Cambria County subdivision ordinance?
8 A    It wasn't Cambria County. It was a township
9 in Cambria County. I don't recall which township it was.
10 Q    That's fine. So they obtained a copy of
11 that --
12 A    Yes.
13 Q    -- ordinance and they sent it to you you think
14 maybe a year before the ordinance was actually passed?
15 A    Yes.
16 Q    What did you understand from them sending it
17 to you that they were asking you to do in terms of advising
18 them about the subdivision ordinance?
19 A    Well, to look at the ordinance and determine
20 whether it would be appropriate for Jackson Township. It
21 was a very comprehensive ordinance.
22 Q    Is it fair to say that when they sent you
23 something that you took that as an indication that they were
24 looking for your guidance or advice or comments?
25 A    I would say yes, yes.



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

22

1    Q      Now, you said that you didn't have much hand
2  in drafting it. Were there a number of drafts, though, of
3  this subdivision ordinance?
4    A      Yes, there were.
5    Q      About how many do you think?
6    A      Several.
7    Q      Who was doing the drafting to your knowledge?
8    A      Well, as I said to you, I loaded it into the
9  computer and then I believe that the township got that on
10  disk and --
11    Q      From your computer?
12    A      Right. And then through the various review
13  processes, whether it be the county planning commission,
14  public input, whatever, then I believe the township actually
15  made the changes.
16    Q      Who at the township made them?
17    A      I assume it would have been Ann Wirth, the
18  township secretary.
19    Q      You mentioned I think public comment or
20  something just now. You said through the various changes.
21    A      Yes.
22    Q      What kind of public comment are you talking
23  about?
24    A      Well, I -- you know, the township is required
25  by statute to advertise and I know there was at least one

23

1  public meeting, which I didn't attend, but, you know, there
2  were -- certainly residents of the township were interested
3  in the ordinance.
4    Q      Was that public meeting the meeting at which
5  they passed it?
6    A      No.
7    Q      What public meeting was that?
8    A      I know that there was a public meeting in
9  January of 2000.
10    Q      Where they discussed the subdivision
11  ordinance?
12    A      That was the purpose of the meeting. I wasn't
13  there.
14    Q      What about the meeting in July 2000 when they
15  passed the ordinance, were you there?
16    A      No.
17    Q      Did you know that they were going to pass the
18  ordinance?
19    A      Yes, I did.
20    Q      Now, in the January 2000 meeting isn't it
21  correct that they passed a moratorium -- or they attempted
22  to pass a moratorium on subdivisions --
23    A      Yes.
24    Q      -- in Jackson Township?
25    A      Yes. I don't believe those meetings were the

24

1  same night, but I'm not positive.
2    Q      Oh, you think there was a separate meeting in
3  January --
4    A      I think there might have been, right.
5    Q      In January when they discussed the township
6  ordinance and when they passed the moratorium?
7    A      I'm really not sure if the meeting nights were
8  the same.
9    Q      Under the township code requirements, they
10  would have been required to advertise both of those
11  meetings, correct?
12    A      They did.
13    Q      They did advertise both meetings if there --
14    A      Well, the -- Jackson meets the first Monday of
15  the month and it's my understanding that there's one
16  advertisement that's placed in the newspaper concerning when
17  they meet for the whole year. If there is a special
18  meeting, that would be advertised.
19    Q      So they advertise their monthly meeting every
20  month; is that what you're saying?
21    A      No, that's not what I said.
22    Q      I'm sorry.
23    A      I believe they put one advertisement in the
24  newspaper setting forth when they will meet throughout the
25  year.

25

1    Q      I understand.
2    A      I don't do that, but that's my understanding
3  of what happens.
4    Q      Now, if they were going to do something other
5  than just the ordinary meeting, something like pass a
6  subdivision ordinance at a monthly meeting, would they then
7  be required to put an ad in --
8    A      Yes.
9    Q      Just let me finish for the record. Put an ad
10  in stating that that's what they were going to do?
11    A      Yes.
12    Q      And is that also true for the moratorium?
13    A      That I don't know.
14    Q      Let me ask you this: Did you know prior to
15  the time they passed the moratorium or attempted to pass it
16  in January 2000 that they were going to do so?
17    A      No.
18    Q      Did they seek your advice about doing so at
19  any time?
20    A      I received a phone call from Ann Wirth asking
21  me if it was permissible for a municipality to have a
22  moratorium on subdivisions. My response was I think so.
23    Q      Did they ask you whether it was permissible to
24  have a moratorium when there actually wasn't a subdivision
25  ordinance in place? Did they ask you that specific



26

1  question?
2  A   They did not.
3  Q   They did not?
4  A   No.
5  Q   But at that time did you know that there
6  wasn't a subdivision ordinance in place?
7  A   Yes, obviously we were working on one.
8  Q   Did they follow up with you again after that
9  initial phone call from Ann Wirth about whether or not it
10  was appropriate to put a moratorium in place in that
11  situation?
12  A   I became aware that the moratorium was in
13  place.
14  Q   You became aware after it was done?
15  A   After it was done, right.
16  Q   Now, I take it -- you know, you testified
17  earlier that when they contacted you or when they sent you
18  something you understood that to be a request for your
19  guidance or advice or something like that. After you said I
20  think so, did you then go and do anything else to find out
21  whether it was appropriate for them to put a moratorium in
22  place in this --
23  A   I did not.
24  Q   When did she ask you this question? When did
25  Ann Wirth ask you whether it was appropriate for the

27

1  township to put a moratorium in place?
2  A   I'm just guessing sometime in December.
3  Q   It was fairly close to the January meeting and
4  is that why you're guessing December?
5  A   Yes, sometime in December would be my
6  estimate.
7  Q   Now, after the moratorium was put in place,
8  did you understand that they were looking for guidance to
9  see whether or not the moratorium that they had put in place
10  was appropriate?
11  A   I don't think I was ever consulted about that
12  subsequent with respect to a specific question.
13  Q   The moratorium was never placed in writing,
14  correct?
15  A   Well, I believe it was adopted at a township
16  meeting.
17  Q   But there was no like official document that
18  says we hereby adopt a moratorium or anything like that?
19  A   I believe there is.
20  Q   Do you know where that is?
21  A   Well, I believe it was in the January minutes,
22  is what I'm referring to.
23  Q   Okay. So you're saying that the official
24  document consists of the January minutes?
25  A   To my understanding, yes.

28

1  Q   Do you in fact know whether or not the
2  township supervisors advertised specifically prior to the
3  January meeting that they would be adopting a moratorium?
4  A   I do not know that.
5  Q   Did they ask you whether or not they were
6  required to advertise?
7  A   They did not.
8  Q   So after they adopted the moratorium, did you
9  have occasion to discuss with them the impact of it or the
10  legality of it or anything like that?
11  A   Not really until after the lawsuit was filed.
12  Q   Well, I think you testified a moment ago that,
13  you know, if they were going to do something like a
14  subdivision ordinance, they would need a period of public
15  comment or an advertisement or something like that. Did you
16  have any concerns that they would need the same thing for a
17  moratorium?
18  A   Well, perhaps I should have, but, you know,
19  again, I was just asked that question and really did not
20  follow it up further.
21  Q   So you had a general idea that they were going
22  to do the moratorium but you didn't know exactly when they
23  were going to do it?
24  A   Well, I really didn't know until after it was
25  done.

29

1  Q   Do you keep time cards for your work for the
2  township?
3  A   No.
4  Q   How do you keep track of your time?
5  A   Sometimes that's difficult. I try to
6  reconstruct things. Generally I have not kept time records
7  for the township.
8  Q   So at the time that you decide that it's time
9  to bill them, you just try and remember what you did?
10  A   Pretty much.
11  Q   And you put it directly onto an invoice?
12  A   Yes. You lose a lot of time that way, by the
13  way.
14  Q   I know, we hear about that all the time in the
15  profession. So you don't have any records of time --
16  A   I don't.
17  Q   -- kept for -- the only records would be the
18  actual invoice that you send?
19  A   Correct.
20  Q   You do keep records of the invoices, however?
21  A   Yes.
22  Q   Did anybody ask you in connection with this
23  lawsuit to search your files for documents in response to a
24  request for production of documents from the Corneals?
25  A   I don't believe so.



30

1  Q    Not at any time ever?
2  A    Well, be more specific with your question.
3  Q    Okay. I will represent to you, and anybody
4  can object that wants to, that there was a request for
5  production of documents served upon the supervisors, the
6  township defendants, in September of 2000 which asked that
7  they or any of their agents or affiliates or, you know,
8  servants or whatever --
9  A    Okay, I did get a -- I did get a phone inquiry
10  from Ann Wirth and she asked me if I had any record of the
11  public meeting, the advertisement of the public meeting
12  requesting comment on the subdivision ordinance.
13      Apparently-- she may have called the Daily
14  News, which is our local paper, general circulation, and
15  they initially couldn't find anything. I, you know,
16  initially looked and I couldn't find anything. And what I
17  had done at her request is prepared an advertisement to be
18  placed in the Daily News.
19  Q    You did this when?
20  A    Well, I -- I assume it would have been in
21  December because the -- I'm not positive, but I think the
22  public meeting was on January 8th and I -- you know,
23  basically I prepared the advertisement, gave it to the Daily
24  News and Ann couldn't find it. In any event, I called her
25  back and at the time I called her back the Daily News had

31

1  found the advertisement.
2  Q    The advertisement for the January 8th meeting?
3  A    I believe it was January 8th.
4  Q    Now, are you saying that was a different
5  meeting than the regular monthly meeting?
6  A    Well, if you can tell me what day of the week
7  January 8th was --
8  Q    I think we can do that. When did she call you
9  and ask you whether or not you had any records of the public
10  meeting?
11  A    This would have been very -- very recently.
12  Q    In the last two weeks?
13  A    I would say yes.
14  Q    Was it in the last week?
15  A    Well, I think it was shortly before the time
16  you and Mr. Sherr were coming to her office to look at
17  documents.
18  Q    I see.
19  A    So if that's -- that's a good time reference,
20  it would have been before that, shortly before.
21  Q    Was that the first time that anybody contacted
22  you at all about producing documents in connection with this
23  lawsuit?
24  A    That I can recall.
25      MS. SIMPSON: I have a January 2000 calendar

32

1  if you want him to look at it.
2      MS. MONTGOMERY: Sure. Thank you.
3      THE WITNESS: Well, I'm wrong on the 8th
4  because I'm sure this wouldn't have been on a Saturday. It
5  might have been on the 6th.
6  BY MS. MONTGOMERY:
7  Q    Well, we're going to look for a second through
8  our documents to see if we have anything that would, you
9  know, match up with the notice that you're talking about.
10  So you're saying that she then got that or told you that the
11  Daily News had located --
12  A    The Daily News had it, right. And I think she
13  said the Daily News had faxed it to her. So I think you
14  would have had it with your -- with your document review.
15      MS. MONTGOMERY: Excuse me a moment.
16      (Pause.)
17  BY MS. MONTGOMERY:
18  Q    What about the July notice, did she -- well,
19  the notice for the July 10th meeting at which the
20  subdivision ordinance was passed --
21  A    Yes.
22  Q    -- did she contact you about that at all?
23  A    You mean at the time?
24  Q    Yes.
25  A    Yes.

33

1  Q    You mean prior to the time the subdivision
2  ordinance was passed?
3  A    Well, she would have contacted me at that time
4  to advertise that ordinance and I believe there were two
5  other ordinances that were being considered that evening.
6  Q    Did you draft the notice for the newspaper for
7  the ordinances that were to be passed --
8  A    Yes.
9  Q    -- at the July 10 meeting?
10  A    Yes.
11  Q    I'm going to show you something that we'll
12  mark as Newton Exhibit 1.
13      (Notice produced and marked as Newton Exhibit
14  No. 1.)
15  BY MS. MONTGOMERY:
16  Q    First of all, I'd ask you to look at the
17  handwriting that is on this exhibit and I'll represent to
18  you that we got this -- well, you can see the fax legend is
19  from Mr. Sherr's office.
20  A    Um-hum.
21  Q    So we had this faxed to us on May 11th. Do
22  you know whose handwriting that is on the side?
23  A    I do not.
24  Q    It's not yours?
25  A    No.



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

34

1    Q      Do you know what plus item number 3, January
2  2000 --
3    A      I have no idea what it means.
4    Q      -- minutes refers to?
5    A      I do not.
6    Q      Do you know what day of the week or what date
7  actually this notice was placed in the Daily record?
8    A      Daily News?
9    Q      Daily News.
10   A      I do not.
11   Q      From your memory do you have an estimate of
12  the time period when this was placed in the Daily News?
13   A      Well, it would have to have been placed at
14  least seven days prior to the meeting. Other than that I
15  don't know.
16   Q      Do you know whether that occurred?
17   A      I assume it did.
18   Q      Do you have a copy of this in your files that
19  would perhaps have a date on it?
20   A      I probably have a copy in my files, but I
21  don't believe it would have a date on it.
22   Q      Does the --
23   A      The practice is -- when you take something to
24  the Daily News, there's normally a two or three day lead
25  time between the time you present it and when it's actually

35

1  put in the paper.
2    Q      Who actually presents it to the Daily News?
3    A      I would have presented this to the Daily News.
4    Q      Because you drafted the ordinance notice?
5    A      Yes, and I'm -- it's just a couple blocks
6  away.
7    Q      So is that called the Huntingdon Daily News?
8    A      It's called the Daily News.
9    Q      The Daily News?
10   A      Yes.
11   Q      And it's a Huntingdon, Pennsylvania
12  publication?
13   A      Yes.
14   Q      Do you know just from reading that newspaper
15  whether on each page of the newspaper there's a date across
16  the top?
17   A      Yes, there would be.
18   Q      There would be?
19   A      Um-hum.
20   Q      So if we could get a copy of the original, we
21  would be able to see that, correct?
22   A      Yes. The township would also have that in its
23  file if you have the township records because with the
24  ordinance there's a proof of publication. In other words, a
25  proof of publication that's signed by someone and classified

36

1  at the Daily News. Now, that wouldn't be part of the
2  ordinance necessarily, but it would be part of the township
3  record.
4    Q      Okay.
5           MS. MONTGOMERY: Excuse me for just one
6  second.
7           (Pause.)
8  BY MS. MONTGOMERY:
9    Q      So your testimony is that the proof of
10  publication would be with the original ordinance?
11   A      Well, not necessarily the original ordinance,
12  but it would be with the township records.
13   Q      Somewhere in the township records?
14   A      Yes.
15   Q      Do you know how the township records are kept?
16   A      I do not.
17   Q      You've never given any advice to them on how
18  to keep their records?
19   A      I have not.
20   Q      Do you know whether they keep their ordinances
21  -- or how they keep their ordinances?
22   A      Well, they should keep them in an ordinance
23  book. And I'm sure over the years I've mentioned that to
24  them, but I don't know.
25   Q      Now, let's talk a little bit more about the

37

1  subdivision ordinance. As changes were made to it, you'd go
2  back and forth with Ann Wirth over the changes that were to
3  be added?
4    A      I would say that the changes were basically
5  generated by the township.
6    Q      And by the township you mean Ann Wirth?
7    A      Well, the township and its supervisors.
8    Q      So each time she sent you a new change or
9  revision you would review it and comment on it or what?
10   A      I would say I would review it.
11   Q      But not necessarily comment on it?
12   A      Right.
13   Q      And why is that?
14   A      Well, you know, again, if I had a comment to
15  make, I would make it. I don't recall -- I just don't
16  recall what comments, if any, I had made after the changes
17  started to be made. I think the township primarily was
18  relying upon advice from Richard Stahl who was the county
19  planning director.
20   Q      Did you get actual draft copies of the
21  subdivision ordinance or was it e-mailed to you by computer
22  or what?
23   A      It wasn't e-mailed. I would say draft copies.
24   Q      So Ann would mail them to you or something?
25   A      I would say yes, either mail or she would be



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

---

**38**

1   in town and drop them off.
2       Q       Did she ever send you anything in writing, or
3   did anybody from the township ever send you anything in
4   writing about the moratorium that was put in place in
5   January 2000?
6       A       Not until it was requested I think initially
7   by Mr. Corneal and then through his attorney James Himes did
8   I get it. My recollection is that when I received that
9   request I made a request to the township and after receiving
10  it I delivered it to Jim Himes.
11      Q       Is that how you became aware that the
12  moratorium had been put into place?
13      A       No, I -- I was aware that the moratorium was
14  in place, but I had not had that -- that document, that
15  minute entry until that time.
16      Q       Typically as the township holds its meetings
17  do they send you -- routinely send you copies of their
18  minutes?
19      A       No.
20      Q       How do you keep track of what the township has
21  done at their meetings?
22      A       I don't unless they deem it advisable to let
23  me know.
24      Q       So do you have copies of the township meetings
25  in your files -- I mean minutes of the township meetings in

---

**39**

1   your files?
2       A       No, I do not.
3       Q       Do you sometimes get copies of the minutes of
4   the township meetings?
5       A       No.
6       Q       How does the township go about letting you
7   know what they've done? Do they call you or do they write
8   to you or what?
9       A       It would probably be by telephone.
10      Q       From Ann Wirth or any one of the supervisors?
11      A       Generally from Ann. And I guess occasionally,
12  you know, writing, too, but it's primarily I would guess
13  telephone.
14      Q       Well, you mentioned Mr. Corneal a moment ago.
15  Can you tell me how you first came to come in contact with
16  Mr. Corneal?
17      A       As a result of this lawsuit?
18      A       No, first at all, at any time.
19      A       Many years ago we had a case against each
20  other and it was a land case. I don't recall too much about
21  it. My client's name was Suydam. It involved I think the
22  sale of a farm or an installment sale agreement. That, I
23  believe, is my first contact with him.
24      Q       You mean Mr. Corneal represented the opposing
25  party?

---

**40**

1       A       Yes, the other party.
2       Q       Mr. Corneal wasn't a party?
3       A       No.
4       Q       So you think that was like 10 years ago or
5   something, 15?
6       A       At least, probably more.
7       Q       After that how did you first come in contact
8   with Mr. Corneal?
9       A       Probably through a telephone call he made to
10  my office.
11      Q       And about what time frame was that?
12      A       I'm just guessing January of 2000.
13      Q       You think that's the first time you talked to
14  him since the lawsuit that you were mutually involved in on
15  behalf of clients?
16      A       I believe so. I mean, it could have been in
17  December, but it was around that time period.
18      Q       Did you have any contact with the supervisors
19  or Ann Wirth or anybody else in the township about Mr.
20  Corneal prior to the time he contacted your office?
21      A       No.
22      Q       What did Mr. Corneal say when he contacted --
23  did you actually talk to him when he contacted your
24  office --
25      A       I talked to him.

---

**41**

1       Q       -- in December or January 2000?
2       A       He indicated, you know, he was doing a
3   subdivision. He was anxious to get the subdivision
4   approved. You know, I believe I said that we didn't have a
5   subdivision ordinance. It's hard for me to -- to
6   specifically say what happened in the first conversation. I
7   think I talked to him on another occasion as well.
8       Q       When he first talked to you, do you know
9   whether or not the moratorium had been put into place? For
10  the record, we've done so many of these depositions I may be
11  being --
12      A       I'm not sure.
13      Q       Hold on a second. I may be being unclear --
14      A       Yeah.
15      Q       -- but I want to say that we're talking about
16  the moratorium on subdivisions. I don't think we said that
17  in this depo.
18      A       I believe so.
19      Q       He contacted you before the moratorium was
20  in --
21      A       No, no, I believe it was after the moratorium.
22      Q       What makes you think it was after the
23  moratorium?
24      A       I don't know. That's a guess. I simply do
25  not know.

---

NEWTON, LAWRENCE 
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

---

42

1    Q     And so he told you that he wanted to get the
2 subdivision approved, right, and what did you tell him?
3    A     I don't recall. I think that I indicated that
4 we didn't have a subdivision ordinance. I know that he had
5 an agreement of sale with an individual by the name of
6 Hewett, another individual by the name of Smith and he was
7 anxious to consummate that transaction.
8    Q     Did you tell him that he didn't need approval
9 of his subdivision if there was no subdivision ordinance?
10    A     I do not recall.
11    Q     Do you think he needed approval of his
12 subdivision if there was no subdivision ordinance?
13    A     Well, if the moratorium is valid, if you
14 assume that, then of course there couldn't be any
15 subdivision. But if the moratorium is not valid, then he
16 would not need approval.
17    Q     Prior to the passage of the moratorium would
18 he have needed approval of his subdivision?
19    A     No.
20    Q     So he could have just filed a subdivision plan
21 at the recorder of deed's or not filed a subdivision plan,
22 right? He could have just sold off pieces of his property,
23 right?
24    A     There is subdivision for DEP planning
25 purposes, but he would not have had to have any township

---

43

1 approval for a subdivision per se.
2    Q     Do you know how Mr. Corneal came to even
3 request township approval for the subdivision plan?
4    A     I do not.
5    Q     Did the township officials contact you about
6 Mr. Corneal contacting them about approval for his
7 subdivision?
8    A     Not that I can recall. I just don't know.
9    Q     You just testified that if the moratorium was
10 invalid then of course he wouldn't need township approval.
11 Why do you say that?
12    A     Well, you know, you wouldn't need township
13 approval unless there is a subdivision ordinance.
14    Q     You wouldn't?
15    A     You would not. So really the moratorium
16 itself, you know, would only -- if the moratorium is valid,
17 then for that period of time during which there was a
18 moratorium there wouldn't be any subdivisions.
19    Q     Well, prior to the time the moratorium was put
20 in place, did the township ask you about that particular
21 issue, can we deny approval of a subdivision or even demand
22 presentation of a subdivision plan if we have no ordinance?
23    A     If the township would have asked me, that's
24 what I -- what I would have said.
25    Q     You would have said no?

---

44

1    A     I would have said no. Now, I don't -- there
2 may have been something in Mr. Corneal's agreement with Mr.
3 Hewett and Miss Smith that related to subdivision approval.
4 So maybe that was what generated this.
5    Q     When you were called about the moratorium --
6 by Ann Wirth, correct?
7    A     Correct.
8    Q     Did Ann Wirth mention Mr. Corneal to you at
9 that time?
10    A     I do not believe so.
11    Q     Did she mention the reason for the moratorium?
12    A     The only thing that was mentioned was that the
13 township wanted to be ready in the event that there were
14 subdivisions coming into the township.
15    Q     From State College you mean?
16    A     From the Centre County area which is kind of a
17 growth area.
18    Q     Do you know whether or not there were any
19 particular spurts of growth or anything like that in the
20 Jackson Township area that would have led to such a concern?
21    A     Not that I'm aware of.
22    Q     Did Ann Wirth specifically mention Mr. Corneal
23 to you when she talked to you about the moratorium?
24    A     Not that I can recall.
25    Q     And just so I'm clear about your testimony

---

45

1 earlier, is it that -- you said that you told her I think so
2 about something and that was about the moratorium?
3    A     Yes, about the moratorium.
4    Q     You thought that she could put in a
5 moratorium?
6    A     I thought that the township could --
7    Q     The township could?
8    A     The moratorium, yes.
9    Q     Even though there was no subdivision
10 ordinance?
11    A     Correct.
12    Q     What do you think -- what is the moratorium?
13 I mean, is it an ordinance, is it a -- I mean, what is it in
14 terms of a legal tool or entity or document?
15    A     Well, what Jackson Township did was just do it
16 by way of a motion in its regular meeting. Whether or not
17 more needs to be done I don't know.
18    Q     Is there a vote required, do you know?
19    A     I don't know. In this case there was a vote.
20    Q     Was there a -- some sort of a proposal, a
21 written proposal or a resolution or anything like that that
22 would be required to impose a moratorium?
23    A     I don't know.
24    Q     Let me ask you this: You said that there was
25 a vote. How do you know that there was a vote?

---



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

---

46

1    A    I knew that there was a vote based upon the
2 minutes that I received from Ann Wirth.
3    Q    Afterward?
4    A    I think it said moved and seconded, as I
5 recall.
6    Q    So we'll go back to Mr. Corneal for a moment.
7 You said you think you talked to Mr. Corneal twice?
8    A    I think so.
9    Q    The first time you think was sometime in
10 December, January, you're guessing?
11    A    I'm guessing. I'm just guessing.
12    Q    When do you think the second time was?
13    A    I don't know.
14    Q    Was it after the township refused to allow him
15 to subdivide, do you know that?
16    A    I would say it probably would be, yes.
17    Q    And did you speak directly with him?
18    A    Yes.
19    Q    Did he call you or did you return his call or
20 what?
21    A    I think he called me.
22    Q    And you took the call?
23    A    Yes.
24    Q    And what was the substance of that
25 conversation?

---

47

1    A    I think the substance of the conversation was
2 he requested my assistance to see what could be done to
3 resolve the conflicts with the township.
4    Q    Did he mention the moratorium to you?
5    A    Not that I can recall.
6    Q    Do you think there was a need for a moratorium
7 in the township?
8         MS. SIMPSON: Objection, irrelevant.
9         MS. MONTGOMERY: I'm sorry?
10         MS. SIMPSON: It's irrelevant. It's asking
11 for a legal opinion.
12         MS. MONTGOMERY: Well, relevance --
13         THE WITNESS: That's not my -- I don't know.
14         MS. MONTGOMERY: Are you instructing him not
15 to answer?
16         MS. SIMPSON: No.
17         THE WITNESS: I don't know. That's not my
18 decision.
19 BY MS. MONTGOMERY:
20    Q    You don't know whether or not there was a need
21 for a moratorium?
22    A    That's not something that -- my opinion is not
23 relevant in my opinion.
24    Q    What township is Huntingdon in -- or, no, what
25 township is in -- is there a -- I'm asking a silly question

---

48

1 I think. Jackson Township is not within the town of
2 Huntingdon or anything? You don't live in Jackson Township,
3 is what I'm trying to get to.
4    A    No, I do not. There's Huntingdon borough that
5 I reside in.
6    Q    Right, sorry. How far away from that is
7 Jackson Township?
8    A    I would say approximately 16 miles.
9    Q    Sixteen miles?
10    A    Yes. Jackson Township is halfway between
11 Huntingdon borough and Centre County.
12    Q    I'm going to show you a document that's been
13 previously marked as Wirth Exhibit 6 but we'll mark it again
14 as Newton 2. I'll ask you to look at it, please, after the
15 court reporter has marked it.
16         (Minutes dated 1/4/00 produced and marked as
17 Newton Exhibit No. 2.)
18         THE WITNESS: Okay.
19 BY MS. MONTGOMERY:
20    Q    Are these the minutes that you're referring
21 to?
22    A    Yes, and I see I was in error. I don't see a
23 move and a second with respect to the moratorium.
24    Q    But these are the minutes that you're
25 referring to that --

---

49

1    A    Yes.
2    Q    -- put you on notice that there was a
3 moratorium?
4    A    Well, as I said, I think I became aware that
5 there was a moratorium prior to receiving these minutes.
6    Q    Oh, okay. All right, but --
7    A    Yes.
8    Q    But these are the minutes that you're
9 referring to that --
10    A    Yes.
11    Q    That reflect the moratorium?
12    A    Yep.
13    Q    Thank you. Now, I think you had testified
14 earlier that there was a vote. Now, if there wasn't a vote,
15 would the moratorium in your opinion, aside from the
16 question -- aside from the question of whether or not you
17 could put a moratorium in place when there was no
18 subdivision ordinance, if there was no vote, would it be an
19 effective moratorium?
20    A    I don't know.
21    Q    When you are asked about township procedure,
22 you know, for example, whether or not a township can put a
23 subdivision ordinance in place, whether or not they can put
24 a moratorium in place, whether or not they need to vote, to
25 what do you refer, what law?

---

NEWTON, LAWRENCE
06/12/01



CORNEAL VS
JACKSON TOWNSHIP

50

1    A       Well, either the township code or the
2  Municipalities Planning Code.
3    Q       And you just don't know as you sit here
4  whether or not -- you know, what the answer to those
5  questions I asked --
6    A       And, again, these are the minutes.  I don't
7  know if the minutes accurately reflected what happened at
8  the meeting.
9    Q       Now, back to Mr. Corneal for a moment.  Do you
10  recall receiving correspondence from Mr. Corneal?
11    A       Yes.
12    Q       What did you do with that correspondence when
13  you received it?
14    A       I believe I forwarded it onto the township.
15    Q       Did you call Mr. Corneal back after you
16  received the correspondence from him?
17    A       I don't believe so.
18    Q       So the two times you think you talked to him
19  were in response to telephone calls from him, correct?
20    A       That's correct.
21    Q       Did you ever receive other telephone calls
22  that did not actually result in a conversation between the
23  two of you?
24    A       I don't know.  I did receive calls from Jim
25  Himes.

51

1    Q       Did you return --
2    A       On behalf of Mr. Corneal.
3    Q       Did you talk to Mr. Himes?
4    A       Yes, I did.
5    Q       But other than those two phone calls, you
6  never talked to Mr. Corneal again on the telephone anyway?
7    A       I don't believe so.
8    Q       Did you talk to him in person?
9    A       No, I did not.
10    Q       Let me ask you this:  Did Mr. Corneal at some
11  point deliver a copy of the subdivision plan to you?
12    A       I think he did.
13    Q       And what did you do with that?
14    A       I delivered it to the township.
15    Q       Do you know how he came to deliver a copy of
16  that subdivision plan to you?
17    A       I don't.
18    Q       Did you ask him to do it?
19    A       I don't recall.
20    Q       Did you receive it -- this copy of a
21  subdivision plan, did you receive it after one of the phone
22  calls you had with Mr. Corneal?
23    A       I would say I did.
24    Q       Were you expecting it, let me ask you that?
25  Were you expecting this copy that you received?

52

1    A       I really can't say.  I don't recall if he said
2  in the telephone conversation he was going to drop it off,
3  but I do know that I received it and I don't know if it came
4  -- I certainly wasn't there when it was dropped off.  I
5  don't know if it came from Mr. Corneal personally or perhaps
6  from David Simpson who at the time I believe was working for
7  him.  Mr. Simpson is a surveyor.
8    Q       Did you have any occasion after receiving a
9  copy of the subdivision ordinance -- I'm sorry, the
10  subdivision plan from Mr. Corneal, did you have any occasion
11  to talk with the township supervisors or Ann Wirth or any
12  other township officials about Mr. Corneal's efforts to
13  build on his property and to subdivide?
14    A       I believe I attended a meeting in May.
15    Q       May of 2000?
16    A       May of 2000.  And the primary purpose of --
17  the township was having -- having difficulty with New
18  Enterprise Stone and Lime Company and I think it was the
19  result of a road that they had done and they were having all
20  kinds of problems with it, the bond was going to run out,
21  and I think that was -- they asked me to come out and look
22  at that, which I did, and I believe at that time Mr.
23  Corneal's subdivision was also discussed.
24    Q       Was this a public meeting?
25    A       Well, no.

53

1    Q       This was a private meeting with the township
2  supervisors?
3    A       It was a meeting -- it was like a workshop
4  meeting.
5    Q       What is a workshop meeting?
6    A       It was a meeting to discuss, at least in my
7  view, general administrative business.  I think there was
8  some response that had to be taken with respect to the New
9  Enterprise situation and I know I did a letter on that.  I
10  don't recall the exact nature of it.
11    Q       Now, a workshop meeting, when is a workshop --
12  you said a workshop meeting is to discuss administrative
13  matters, I believe?
14    A       (Witness nods head affirmatively.)
15    Q       Are these routine meetings that the township
16  holds?
17    A       Not that I'm aware of.  The reason that I was
18  called, I think, was to address this New Enterprise
19  situation that had a deadline.
20    Q       When was this workshop meeting held?
21    A       I think it was in May.
22    Q       Prior to the May public meeting, 2000?
23    A       You mean the township meeting?
24    Q       Yes.
25    A       I don't know.



54

1    Q    Have you ever been to any other workshop
2  meetings?
3    A    After the lawsuit -- this lawsuit was filed, I
4  attended I believe two meetings with the township to discuss
5  the lawsuit and the complaint.
6    Q    Now, where does the term workshop meetings
7  come from? Is that your term or is it something --
8    A    That's my term.
9    Q    Is that something the township officials use
10  as well?
11    A    That I'm not aware of. I don't know.
12    Q    Do you know -- are you familiar with meetings
13  held by the township supervisors and the secretary and
14  anybody else prior -- immediately prior to the public
15  meetings?
16    A    I'm not.
17    Q    You've never discussed those and they've never
18  discussed those meetings with you?
19    A    No.
20    Q    You've never been at a meeting with them of
21  that nature?
22    A    No. Anytime I attend a meeting -- the
23  meetings are held at the fire hall, Stone Creek Valley Fire
24  Hall, and I've never been to a prior --
25    Q    To a pre-meeting?

55

1    A    Right.
2    Q    How about meetings at Ann Wirth's, the
3  secretary's office? I think I said that badly. The
4  secretary, Ann Wirth's office on her property, have you ever
5  been to a meeting there?
6    A    Just what I've described to you. There were
7  two times where I met with them concerning this lawsuit and
8  I believe there was a time in May that I met with them
9  concerning the New Enterprise issue. And I believe at that
10  time Mr. Corneal's -- I may have delivered the subdivision
11  at that time. I just don't recall.
12    Q    The subdivision plan you mean?
13    A    Yes.
14    Q    So the workshop meetings that you're referring
15  to are held at Ann Wirth's office?
16    A    Yes.
17    Q    On her property?
18    A    Correct. That is also the township office.
19    Q    Correct.
20    A    That's where the township records are kept.
21    Q    Have you had other opportunity to go to the
22  township office besides these workshop meetings?
23    A    No.
24    Q    Have you been there only three times?
25    A    Those are the times that I can recall.

56

1    Q    If you're going to meet in person with the
2  supervisors or Ann Wirth or any other township official, do
3  you generally do it in your office or do you just have
4  telephone conferences?
5    A    Well, we've had -- we have had meetings in my
6  office. I'd say primarily by telephone. And there are
7  occasions where, you know, I either go to the regular
8  township meeting or --
9    Q    Have you ever been to a township meeting when
10  Mr. Corneal was present?
11    A    No, I have not.
12    Q    Have you ever been to a township meeting at
13  which Mr. Corneal's issues, his building and subdivision
14  issues were discussed?
15    A    I may have been and I don't -- I can say for
16  sure that I was never at a township meeting attended by Mr.
17  Corneal. If Mr. Corneal attended the March meeting, I
18  definitely was not there. I know that there was a meeting
19  that I attended in which the subdivision -- the township --
20  a regular township meeting in which the subdivision
21  ordinance was discussed.
22        And the reason I seem to recall that is that I
23  had a copy of at that time what our proposed ordinance was
24  and someone in the audience asked if they could review it
25  and I said sure and gave it to them, and I'm not positive

57

1  when that was.
2    Q    Do you recall who that person was?
3    A    I don't.
4    Q    Do you recall how many people were at that
5  meeting?
6    A    I would say seven to 10 maybe.
7    Q    Do you recall who any of those seven to 10
8  people might have been?
9    A    I don't.
10    Q    You mentioned a moment ago that you had two
11  meetings about this lawsuit after it was filed.
12    A    Two meetings regarding this lawsuit and other
13  related issues, litigation issues. There may have been
14  another meeting that would have dealt with Mr. Corneal
15  building without a building permit.
16    Q    And when do you think that was?
17    A    Again, I don't know. It was certainly after
18  -- I believe that we had filed -- when I say we, the
19  township filed in October.
20    Q    When you say filed, you mean the lawsuit that
21  you filed in Huntingdon County?
22    A    Yes. I believe that was in October.
23    Q    And --
24    A    So it would have been prior to that. We may
25  have had a meeting on that lawsuit. I don't know.



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

---

58

1   Q      Who was present at the two meetings that you
2   remember, aside from the one you just discussed which you're
3   not sure about?
4   A      One meeting the township supervisors, myself,
5   Ann Wirth. I think that's all. Another meeting of the
6   township supervisors, myself and Mr. Sherr and Ann Wirth.
7   Q      Did Mr. Sherr represent you at that time?
8   A      No.
9   Q      Mr. Sherr has never represented you, correct?
10  A      No.
11  Q      At that first meeting where Mr. Sherr wasn't
12  present, where was that meeting held? At Ann Wirth's office
13  you said?
14  A      At the township office.
15  Q      Do you know when that meeting was?
16  A      I do not.
17  Q      And at that time --
18  A      It would have been after -- I think the
19  lawsuit was filed -- I know we were served I think 4th of
20  July weekend. So I'm just guessing it would have been
21  sometime in July of 2000.
22  Q      And at that time did you discuss the legality
23  of the moratorium?
24  A      No, we dealt with the lawsuits.
25  Q      What about the legality of the subdivision --

---

59

1   well, of refusing to allow Mr. Corneal to subdivide or to
2   build, did you discuss that?
3   A      Well, we discussed it in the sense that we
4   went over the paragraphs of the complaint, you know,
5   paragraph by paragraph. So to that extent it was discussed,
6   the context of the complaint.
7   Q      The second meeting that you recall when Mr.
8   Sherr was present, was Van Dommelen present at that
9   meeting?
10  A      He may have been. I can't say for sure, but
11  he may have been.
12  Q      So you said the township supervisors, Ann
13  Wirth, yourself, Mr. Sherr and who else?
14  A      If Mr. Van Dommelen was there. He could have
15  been there.
16  Q      Do you recall meeting with Mr. Van Dommelen
17  about this lawsuit at some time?
18  A      Only in that context, yes.
19  Q      You do recall him being at some meeting in
20  which you --
21  A      I would say yes.
22  Q      So at that second meeting that Mr. Sherr was
23  present at, did you at that time then discuss the --
24  generally discuss the legality of preventing Mr. Corneal
25  from building or from subdividing?

---

60

1        MR. SHERR: I object to the form of the
2   question and assert attorney/client privilege at this time.
3        MS. MONTGOMERY: You can object, but you can't
4   instruct him not to answer and you don't represent him.
5        MR. SHERR: I can instruct on behalf of the
6   privilege holders that their attorney not answer.
7        MS. MONTGOMERY: Well, he's just testified
8   generally that he hasn't given advice about the subject of
9   this lawsuit and that you didn't represent him in connection
10  with this lawsuit. So I don't think those discussions are
11  privileged.
12        MR. SHERR: I think they are and I don't think
13  he said what you just stated he said and that the purpose of
14  that meeting was to discuss the lawsuit and he was there as
15  a representative of the township.
16        MS. MONTGOMERY: No, he didn't say that at
17  all.
18  BY MS. MONTGOMERY:
19  Q      Were you there --
20  A      Yes, I did.
21  Q      You were there as the township's attorney?
22  A      I was there as the township solicitor, yes.
23  Q      As the township solicitor?
24  A      (Witness nods head affirmatively.)
25  Q      In response to this lawsuit you were there as

---

61

1   the township solicitor?
2   A      Correct.
3        MS. MONTGOMERY: I'm going to take a short
4   break right now. We'll come back in 15 minutes.
5        (Break taken at 10:54 a.m. until 11:24 a.m.)
6   BY MS. MONTGOMERY:
7   Q      Mr. Newton, you had indicated that you bill
8   the township for legal advice given to the township at some
9   point after you give them that legal advice, right?
10  A      Right.
11  Q      Now, you also have indicated now that you
12  attended this meeting at which Tony Sherr was present as
13  solicitor to the township and not as a defendant in the
14  lawsuit?
15  A      (Witness nods head affirmatively.)
16  Q      Did you bill the township for your attendance
17  at that meeting?
18  A      Not yet, but I will.
19  Q      When was that meeting?
20  A      Sometime in July, last July.
21  Q      So it's been 11 months?
22  A      Yes.
23  Q      Now, have you billed them since for other
24  work?
25  A      No, I haven't.

---



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

62

1　Q　You haven't sent them a bill since last July?
2　A　No, I haven't.
3　Q　And you don't have any records of work that
4　you've done from -- during that time period, July?  Are you
5　just going to try to reconstruct it?
6　A　Yes.
7　Q　I'm going to ask you some questions and just
8　see what happens here.  It's my position that if in fact
9　there is any attorney/client privilege about advice that you
10　gave concerning the issues in this lawsuit that it has been
11　thoroughly waived.  All of the deponents in this case have
12　answered numerous questions about conversations with you and
13　there's been no objection.
14　　　Your own counsel has asked the individual
15　deponents about communications with you and there's been no
16　objection from Mr. Sherr.  So I'm going to ask my questions
17　and we'll go from there.
18　　　Back to the meeting at which you were present
19　when Mr. Sherr was present, at that time was there any
20　inquiry made of you as to whether or not the moratorium that
21　was put in place was effective or legal?
22　　　MR. SHERR:  Object to the form of the question
23　and on behalf of the privilege holders instruct the witness
24　not to answer.
25　BY MS. MONTGOMERY:

63

1　Q　Mr. Sherr is not your counsel, correct?
2　A　That's right.
3　　　MS. MONTGOMERY:  What we're going to be forced
4　to do is halt the deposition and schedule it for another
5　time because it's been very clear why we need to have Mr.
6　Newton's deposition and I'm going to need to present a
7　motion to the court that includes transcripts of testimony
8　from all the other depositions showing that this privilege
9　has long ago been waived.
10　　　MR. SHERR:  Well, I would --
11　　　MS. MONTGOMERY:  If indeed there was a
12　privilege.
13　　　MR. SHERR:  I would suggest that you follow
14　the dictates of the federal rules in this regard and mark
15　that and ask the rest of your questions, take the rest of
16　your deposition and we'll have the court rule on that at a
17　later time as the federal rules provide.
18　　　MS. MONTGOMERY:  Well, as I said, I'm putting
19　on the record right now that you are preventing me from
20　asking questions about communications with the township
21　supervisors that have always been known to be the subject of
22　this deposition and we are going to have to reschedule
23　additional time after the filing of the motion to quash,
24　after the filing of a motion with the judge.
25　　　MS. SIMPSON:  Let me interject here.  This

64

1　objection and the claim of privilege arises from this
2　meeting at which the township defendants, Mr. Sherr and Mr.
3　Newton were all present and they were discussing issues of
4　the lawsuit.  I believe that questions to the township
5　officials that have been deposed have been with respect to
6　communications prior to this meeting and not involving this
7　meeting and specific advice, legal advice, that was rendered
8　or questions that were asked of Mr. Newton.
9　　　Now, I agree with Mr. Sherr, this is a
10　particular issue -- if you've got questions to ask --
11　　　MS. MONTGOMERY:  Oh, we're going to go
12　forward.
13　　　MS. SIMPSON:  Okay.
14　　　MS. MONTGOMERY:  I am, yes.
15　　　MS. SIMPSON:  Okay.  So you will ask questions
16　other than what occurred at this meeting?
17　　　MS. MONTGOMERY:  Sure, absolutely.
18　　　MS. SIMPSON:  You said we were going to halt
19　the deposition --
20　　　MS. MONTGOMERY:  I'm sorry, I didn't mean to
21　say it that way.  What I really am saying is -- trying to
22　put counsel on notice that we will have to reschedule in
23　order to get the questions that we need to have answered
24　answered, even if it's -- even if it requires submitting
25　them in camera to the judge.

65

1　　　MS. SIMPSON:  That assumes that your motion
2　would be granted.
3　　　MS. MONTGOMERY:  Exactly.  I'm not assuming
4　anything, but I'm saying that I'm not going to give up the
5　issue and I'm just putting counsel on notice as a matter of
6　courtesy that if you're going to not allow me to ask these
7　questions now I'll have to go to the court to try to ask
8　them later and we'll go on with whatever you allow him to
9　answer at this time, okay.
10　　　MR. SHERR:  And just so we're clear, the
11　objection goes to this meeting that was attended -- I have
12　not objected to any other conversations that my clients have
13　had with Mr. Newton other than attendance at a meeting which
14　I attended to discuss this lawsuit.  And I am not preventing
15　you from asking any questions.  I'm merely asserting
16　attorney/client privilege with respect to this meeting.
17　　　MS. MONTGOMERY:  Have you read the deposition
18　transcripts since you're asserting this privilege and saying
19　it hasn't been waived?  Have you read the deposition
20　transcripts that have been provided?
21　　　MR. SHERR:  You know, let's just go on with
22　the deposition.
23　　　MS. MONTGOMERY:  So you're asserting the
24　privilege and you're refusing to answer that.  Have you read
25　the deposition transcripts?



66

1      MR. SHERR:  You know, I don't have to answer
2  your questions and I certainly don't have to answer
3  questions about what I have done or have not done and I'm
4  not going to do that.  So why don't you just --
5      MS. MONTGOMERY:  Just so we have a good record
6  for the court of the basis for your objection.
7      MR. SHERR:  I made my basis very clear on the
8  record.  I don't know how I can make it any clearer.
9      MS. MONTGOMERY:  Okay.
10  BY MS. MONTGOMERY:
11     Q     Mr. Newton, have you been made aware of a
12  court order that requires sequestration of the defendant
13  deponents in this matter?
14     A     Yes.
15     Q     When did you become aware of it?
16     A     I believe it was from my counsel.  I don't
17  recall.
18     Q     No, I mean when.
19     A     I don't know.
20     Q     Have you had any communication with the
21  defendant deponents, the other defendants in this case, the
22  supervisors, the building permit officer, the sewage
23  enforcement officer for Jackson Township since the middle of
24  May 2001?
25     A     Any communication at all?

67

1      Q     No -- well, any communication at all.
2      A     Yes.
3      Q     Have you had any communication with them about
4  the contents of their depositions --
5      A     No.
6      Q     -- since the middle of May?
7      A     No.
8      Q     Have you had any communication with them prior
9  to the middle of May about what the content of their
10  depositions would be?
11     A     No.  Let me say that I've had communication
12  with Ann Wirth, not about the content of the deposition but
13  about the health of Ralph Weiler who is one of the
14  supervisors.  That's kind of a tangential issue.  Again, not
15  with respect to the content of the deposition, but sometime
16  in May Barry Parks, who is the SEO for the township, and I
17  met at Mr. Corneal's property and Mr. Parks made a comment
18  about the length of his deposition, but that was it.
19     Q     Thank you for that.  If you had billed the
20  township since last July, would you have included any work
21  that had been done in the period prior?  Say you billed them
22  in November, would you have included your work --
23     A     Work prior, now what do you mean?
24     Q     Well, if you billed the -- say you billed the
25  township in November 2000, would you have included the work

68

1  done for that period of time prior to November back to the
2  last time you billed them?
3      A     Yes.
4      Q     Mr. Newton, I'm going to show you an exhibit
5  that has been previously marked but we're going to mark it
6  again for purposes of this deposition and ask you to look at
7  it.
8      (Letter dated 1/31/00 produced and marked as
9  Newton Exhibit No. 3.)
10  BY MS. MONTGOMERY:
11     Q     Mr. Newton, do you recognize this letter?
12     A     I do.
13     Q     Do you recall receiving it?
14     A     Yes.
15     Q     For the record, it's a letter -- a January 31,
16  2000 letter from David Corneal to you, correct?
17     A     Correct.
18     Q     Now, do you recall when you received this
19  letter whether you had spoken to Mr. Newton -- I mean to Mr.
20  Corneal prior to receiving this letter, as the letter itself
21  indicates?
22     A     I don't have a recollection but the letter
23  says as per our telephone conversation.  So I assume that I
24  did.
25     Q     Do you recall whether in your telephone

69

1  conversation -- well, do you recall whether that telephone
2  conversation that he refers to in this letter was the first
3  or the second of the two that you remember?
4      A     I don't know.  I would think it would be the
5  first.
6      Q     So do you recall receiving a telephone call
7  after receiving this letter?
8      A     Yes, yes.
9      Q     I'm just trying to put the whole thing in a
10  good time frame for us so we can work it out.  What did you
11  do with this letter when you received it?
12     A     I believe I forwarded it to the township.
13     Q     Did you have some discussions with the
14  township about his -- the concerns set forth in this letter?
15     A     Not that I can recall.
16     Q     I mean, did you just send it on with an FYI or
17  something?
18     A     I -- I feel certain I would have sent it on.
19  If I had any discussion, it would have been with Ann Wirth.
20     Q     Why would I have been with Ann Wirth?
21     A     Because she was my contact person with the
22  township.
23     She's the one who relayed information back and
24  forth from the supervisors to you and from you to the
25  supervisors?



70

1    A    I don't know if relay information is correct,
2  but she was the person that I generally -- when I received a
3  contact from the township, it would generally be through
4  Ann.
5    Q    If the township was asking for advice, would you
6  township supervisors were asking for advice, would you
7  convey that information to Ann?
8    A    It depends. I mean, if she would call me,
9  yes.
10    Q    And so you would -- that would be your way of
11  giving advice to the township, to talk to Ann?
12    A    Again, it depends. It depends on the context.
13    Q    Well, let me just ask it another way then. At
14  times your way of giving advice to the township would be to
15  communicate information to Ann, correct?
16    A    That's correct.
17    Q    You notice in this letter that there was some
18  concern raised about the Hewetts and their commitment for a
19  loan for settlement for purchase of a piece of the tract of
20  land at issue in this case?
21    A    Yes.
22    Q    Do you know the Hewetts?
23    A    I do not.
24    Q    Have you met the Hewetts?
25    A    No.

71

1    Q    Have you -- and I'm using the Hewetts a little
2  loosely.
3    A    I think there's a Hewett and a Smith, as I
4  recall.
5    Q    Right, exactly, but they are a couple,
6  correct?
7    A    Yes.
8    Q    So have you met either one of them?
9    A    I don't believe so.
10    Q    Have you spoken with them on the telephone?
11    A    I spoke one time with Mr. Hewett.
12    Q    In what context was that?
13    A    Mr. Hewett called me because he was having
14  trouble with Mr. Corneal regarding this agreement of sale.
15    Q    When you say trouble with Mr. Corneal, what do
16  you mean by that?
17    A    That's my term. He was having difficulty in
18  dealing with Mr. Corneal, whether it was regarding his
19  agreement of sale -- he wanted representation.
20    Q    Did you ever represent Mr. Hewett?
21    A    No. He asked if I could represent him and I
22  said no. I felt it could be a potential conflict because I
23  was the township solicitor. I -- my normal practice in
24  those circumstances would be to give him names of other
25  attorneys, one of whom was Mr. Reeder, and he ended up

72

1  retaining Mr. Reeder.
2    Q    When he called you and told you that he was
3  having trouble with Mr. Corneal, did he tell you what the
4  trouble was?
5    A    He probably did, but I don't remember. You
6  know, again, he wanted representation in dealing with Mr.
7  Corneal and that's the extent that I got into it.
8    Q    Do you know whether he already had -- let me
9  ask you this: Did you talk to him before -- Mr. Hewett
10  before receiving this letter?
11    A    I don't know. I don't know when it was. I do
12  know that I did talk to him at my office and he called on
13  the telephone.
14    Q    So he called you and then you had him come in,
15  is that how it happened?
16    A    No, he never came in. I told him I could not
17  represent him. I had a conflict --
18    Q    Okay.
19    A    -- and then I gave him -- I certainly gave him
20  the name of Mr. Reeder. And, again, my normal practice
21  would be to give him two or three other attorneys as well.
22  I don't know if I did that or not, but I know that I gave
23  him Mr. Reeder's name.
24    Q    But when you just said I talked to him at my
25  office, you meant you were at your office?

73

1    A    I was at my office, yes.
2    Q    And it was on the telephone?
3    A    Yes, correct.
4    Q    Just the one time?
5    A    One time.
6    Q    Did you ever talk to Miss Smith?
7    A    No.
8    Q    Were you ever at a township meeting where the
9  Hewett and Smith --
10    A    No. I'm sorry I jumped the gun. No.
11    Q    That's okay. I need to finish my sentence,
12  that's all. Maybe this will help us place the time frame a
13  little bit, you know, in context. Do you recall whether or
14  not you discussed this letter that you received --
15    A    I'm certain I didn't discuss this letter.
16    Q    Let me finish my sentence. Whether or not you
17  discussed this letter that you received from Mr. Corneal
18  with Mr. Hewett when he called?
19    A    I feel certain I did not discuss the letter.
20    Q    Did you discuss this letter with Mr. Reeder?
21    A    No.
22    Q    But you did send it onto the township?
23    A    I believe so, yes.
24    Q    Do you recall whether -- do you recall
25  speaking to Mr. Hewett about his concerns about Mr.



74

1  Corneal's efforts to obtain permission for his subdivision?
2     A     No.
3     Q     When you say you don't recall, are you certain
4  it never happened or you just don't recall?
5     A     I don't recall.  What I recall from the
6  conversation is that he wanted representation in his
7  dealings with Mr. Corneal.  That's what I recall.
8     Q     So Mr. Hewett eventually chose to go to Mr.
9  Reeder, correct?
10    A     Correct.
11    Q     Now, did you have any discussions with Mr.
12  Reeder about Mr. Corneal's efforts to obtain township
13  cooperation in subdividing and selling this property?
14    A     Generally, no.  At some point in time Mr.
15  Reeder asked me if I thought that the township would have
16  its subdivision ordinance adopted by June 30th and I
17  responded I didn't think so and that was the extent of my
18  conversation with Mr. Reeder.
19    Q     And what was the June 30th date?
20    A     I don't know.  That was Mr. Reeder's question
21  to me.
22    Q     So you remember the June 30th date.  How do
23  you recall that?
24    A     My recollection is that that was the time in
25  which the agreement of sale between Mr. Corneal and Mr.

75

1  Hewett and Miss Smith -- that had to be consummated by that
2  date.
3     Q     So you told him at that time -- now that you
4  recall that was what the June 30th was relevant to, you
5  told him at that time you didn't think the subdivision
6  ordinance would be approved, right?
7     A     By June 30th, yes.
8     Q     Right, by June 30th.  What was the extent of
9  your conversation --
10    A     That was it.
11    Q     -- with Mr. Reeder?  Just for her sake, wait
12  until I finish the question.  So it was just one question?
13    A     Generally, yes, that's all I can recall.
14    Q     Did you have any other conversations with Mr.
15  Reeder about Mr. Corneal's property?
16    A     Not that I can recall.
17    Q     What about after the subdivision ordinance was
18  put into place?
19    A     Well, I know I showed Mr. Reeder the -- this
20  complaint, this lawsuit, but other than that that's about
21  it.
22    Q     Why did you show Mr. Reeder the complaint?
23    A     Well, we're both municipal solicitors and I
24  wanted him to be aware of it.
25    Q     Mr. Reeder represents various townships and

76

1  boroughs as well?
2     A     He represents some townships and boroughs.
3     Q     Does he represent counties as well?
4     A     No.
5     Q     Just townships and boroughs?
6     A     Yes.
7     Q     Do you know which ones he represents?
8     A     Well, I know he represents the borough of
9  Mount Union.  I know he represents the zoning board for
10  Huntingdon borough.  I'm not sure about townships.
11    Q     Did you ever have occasion to discuss with Mr.
12  Reeder the Hewett's withdraw from the sales agreement,
13  cancellation of the sales agreement with Mr. Corneal?
14    A     I was aware that Mr. Reeder on behalf of Mr.
15  Hewett filed an action, a magisterial action against the
16  Corneals.
17    Q     How did you become aware of that?
18    A     Mr. Reeder told me.
19    Q     Do you know why Mr. Reeder told you that?
20    A     I do not.
21    Q     Was it just your practice to discuss business
22  back and forth about your clients?
23    A     Occasionally we do.
24    Q     What about the moratorium, have you ever
25  discussed the moratorium with Mr. Hewett?

77

1     A     I don't believe so.
2     Q     I'm sorry, I mean Mr. Reeder.
3     A     I don't believe so.
4     Q     What about the ordinance itself and the
5  legality of it or anything like that, did you ever discuss
6  that with --
7     A     No.
8     Q     With Mr. Reeder?
9     A     No.
10    Q     I'm going to show you another letter that
11  we're going to mark as Newton Exhibit 4.
12          (Letter dated 8/18/00 produced and marked as
13  Newton Exhibit No. 4.)
14  BY MS. MONTGOMERY:
15    Q     I'd ask you to take a look at it for me,
16  please.  Do you recall receiving this letter, which for the
17  record is an August 18, 2000 letter from Mr. Corneal to Mr.
18  Newton?
19    A     I believe I did, yes.
20    Q     What did you do with this letter?
21    A     I believe I forwarded it onto the township.
22    Q     Did you call Mr. Corneal back about it?
23    A     No.
24    Q     Did you send Mr. Corneal the building permits
25  that -- application forms that he's asking you for?

NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP



---

78

1    A    I believe that was done by the township. I
2 did not. I did not have them.
3    Q    Did you advise the township supervisors that
4 they really ought to send him these applications?
5    A    I would say I probably did.
6    Q    Did you ever receive back from Mr. Corneal a
7 copy of the filled out application forms?
8    A    Not that I can recall.
9    Q    Were you consulted about the applications once
10 they were sent?
11    A    No.
12    Q    Were you consulted about a building permit for
13 Mr. Corneal in general?
14    A    I would say -- I would say yes. There was a
15 -- I know I wrote to Mr. Corneal at the request of the
16 township and I think it was in July, the end of July,
17 because he had commenced construction without a building
18 permit. So I wrote to him then and asked him to stop
19 construction until he received a building permit.
20    So the building permit issue was an issue that
21 had been discussed I think quite frequently because I
22 believe the township supervisors were being criticized
23 because Mr. Corneal was acting really on his own and the
24 township really wasn't doing anything to enforce the
25 building permit ordinance.

---

79

1    Q    Do you know when you wrote the July letter
2 that you referred to -- do you know whether or not Mr.
3 Corneal had been given building permit applications at that
4 time?
5    A    I don't know. I don't know.
6    Q    Do you recall talking at all with the township
7 supervisors or the building permit officer or anybody else
8 about Mr. Corneal's request for building permit
9 applications?
10    A    No.
11    Q    Were you ever informed about a visit that Mr.
12 Corneal made to Mr. Van Dommelen to obtain building permit
13 applications?
14    A    I was.
15    Q    When were you informed about that?
16    A    I don't know.
17    Q    Were you asked for advice about that?
18    A    No.
19    Q    They just told you about it -- what did they
20 tell you -- who told you and what did they tell you?
21    A    I believe it was Ann Wirth and Ann Wirth
22 related to me that I think Mr. Corneal had been to Mr. Van
23 Dommelen's home to get applications. And of course at that
24 point there had not been a sewage permit so the building
25 permit applications could not have been granted without the

---

80

1 sewage permit. So I did become aware of that through Mrs.
2 Wirth.
3    Q    Were you aware that they wouldn't even give
4 him an application?
5    A    I became aware of that.
6    Q    When did you become aware of that?
7    A    Through Miss Wirth.
8    Q    At the same time?
9    A    I think at the same time.
10    Q    Was it about the time frame in which Mr.
11 Corneal went to Mr. Van Dommelen and made that request?
12    A    I don't know.
13    Q    You don't recall?
14    A    I think he clearly should have had the
15 building permit applications.
16    Q    I'm going to show you a letter that we'll mark
17 as Newton Exhibit 5 and ask you to look at it for me,
18 please.
19    (Letter dated 7/28/00 produced and marked as
20 Newton Exhibit No. 5.)
21 BY MS. MONTGOMERY:
22    Q    Is this the letter that you're referring to
23 that you wrote in July?
24    A    Yes, it is.
25    Q    Now, at the time that you wrote this letter

---

81

1 you were aware that Mr. Corneal hadn't even received
2 applications, correct?
3    A    I don't know that. I don't know where this
4 letter fits in in terms of time.
5    Q    But at least at this point in time the
6 supervisors had called you and told you that they were
7 denying -- refusing to give Mr. Corneal building permits,
8 correct?
9    A    I don't know that. Again, I don't know when
10 this was in terms of Mr. Corneal's meeting with Mr. Van
11 Dommelen, whether it was before or after.
12    Q    I'm going to show you a letter that we'll mark
13 as Newton Exhibit 6 and ask you to identify that for the
14 record if you can.
15    (Letter dated 5/5/00 produced and marked as
16 Newton Exhibit No. 6.)
17 BY MS. MONTGOMERY:
18    Q    Have you seen this letter in the past?
19    A    I have.
20    Q    How did you come to see it?
21    A    I think that Mr. Corneal sent it to me.
22    Q    You think he sent you a copy of it?
23    A    Yes.
24    Q    This letter is dated May 5, 2000, correct?
25    A    Yes.

---



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

82

1    Q    And it indicates that he had been unable to
2  obtain an application, correct?
3    A    Yes.
4    Q    You believe that he copied you at the time
5  that he sent it to Mr. Van Dommelen?
6    A    Yes.
7    Q    What did you do about this letter, if
8  anything?
9    A    I believe that Mr. Corneal wrote me a letter
10  around the same time, maybe the same date.
11    Q    Mr. Corneal wrote you a letter around the same
12  date?
13    A    Yes. And my sense is I probably would have
14  forwarded both onto the township.
15    Q    At that time did you provide the township with
16  any advice about whether or not they ought to have given Mr.
17  Corneal at least an application?
18    A    Well, I understood why the township didn't
19  give him an application, because of the sewage permit
20  issue. It was around this time — and I believe it was
21  after I got these letters from Mr. Corneal and there was a
22  letter addressed to me and then a copy of a letter to Mr.
23  Van Dommelen that I suggested to the township that we get
24  together and meet with Mr. Corneal and see if we could work
25  this out.

83

1            I recall in the last conversation I had with
2  Mr. Corneal he had mentioned to me that he was considering
3  litigation, a lawsuit, and I certainly didn't want that to
4  happen and I believe in his letter to me he even mentioned
5  that. So I contacted the township and put a request in to
6  — let's meet, sit down and see if we can resolve the
7  differences.
8    Q    And what occurred at that time?
9    A    At what time?
10    Q    Well, you said you called the township and
11  told them that we ought to meet and sit down and talk about
12  this. What occurred?
13    A    The response back was that they didn't want to
14  meet.
15    Q    They didn't want to meet with you?
16    A    They didn't want to have a joint meeting with
17  Mr. Corneal and myself to try to resolve whatever
18  differences the parties had.
19    Q    Who gave you that response?
20    A    That response was given to me by Ann Wirth.
21    Q    Was that in a telephone call?
22    A    Yes.
23    Q    Did she tell you why they didn't want to meet?
24    A    She indicated that Mr. Corneal's conduct at
25  the township meetings was disrespectful. He apparently had

84

1  lost his temper and as a result the supervisors felt
2  reluctant to meet.
3    Q    And what was your response to that, they don't
4  have to meet if they don't want?
5    A    That's their decision, right.
6    Q    What about the issue of them not even giving
7  him an application? I mean, did you indicate to them that
8  you at least needed to resolve that?
9    A    Well, I don't — I don't specifically recall.
10  I did indicate that he needed — he needed to have, you
11  know, building permit applications. I mean, I'm certain
12  that that was communicated at one point or another and it —
13  I wrote him again in after the July letter in August, again at
14  the request of the township.
15    Q    Now, I think you indicated that you had
16  received a letter directly from Mr. Corneal around the same
17  time that he copied you on that letter to Mr. Van Dommelen,
18  correct?
19    A    Correct.
20    Q    I'll show you a letter that we'll mark as
21  Newton Exhibit 7 and I'd ask you to look at that, please.
22            (Letter dated 5/5/00 produced and marked as
23  Newton Exhibit No. 7.)
24  BY MS. MONTGOMERY:
25    Q    Is this the letter that you're referring to

85

1  that you —
2    A    Yes.
3    Q    That you received from Mr. Corneal?
4    A    Correct.
5    Q    Now, you may have testified to this but — and
6  I'm sorry if you already did, but did you then forward this
7  letter onto the supervisors?
8    A    I believe so, yes.
9    Q    If you were going to forward letters to the
10  supervisors, you would send them to Ann Wirth; is that
11  correct?
12    A    The township office, which would be the
13  township address, the R.D. 1 box number.
14    Q    With respect to the contents of this letter,
15  you note that — Mr. Corneal makes reference to a refusal to
16  receive a building permit to construct a garage, okay. Now,
17  do you recall at the time did you discuss with the township
18  their refusal to even give a permit or an application to
19  construct a garage?
20    A    Well, I believe their reason for that is it
21  was more than a garage. It was a three-bay garage and it
22  had — according to what I subsequently learned from Mr. Van
23  Dommelen seeing the sketch that I think Mr. Corneal had,
24  there was an apartment on the second floor of this garage
25  which would have required a sewage permit.



86

1    Q    Mr. Van Dommelen showed you that sketch?
2    A    No, he did not.  I just became aware of the
3    either through -- probably through Mrs. Wirth.
4    Q    At what time did you -- were you told that by
5    Mrs. Wirth?
6    A    I don't know.
7    Q    Do you know what it is that made Mrs. Wirth
8    believe that this was a -- that there was supposed to be an
9    apartment over this garage?
10    A    My understanding is that that information came
11    from Mr. Van Dommelen, but I don't know.  I can tell you
12    that in late May I was on site and in fact there's a
13    three-bay garage and an apartment.  That's what was in fact
14    constructed.
15    Q    An apartment?
16    A    Yes.
17    Q    Did you go inside?
18    A    Yes.
19    Q    What was inside that made you believe that
20    there was an apartment?
21    A    A kitchen, bathroom.  I think it was described
22    by someone as a mother-in-law suite.
23    Q    When did you go inside?
24    A    It was the -- date -- if you have a
25    calendar, I can tell you.  It was a Friday in May.  I was

87

1    with Terry Williams and it was the time we met on site with
2    Mr. Corneal's SEO, Mr. Bowes, to look at the test holes that
3    had been done.  Now, this was this year now, not in 2000.
4    This was this May.
5    Q    Okay, but --
6    A    I would say -- I'm looking at a calendar
7    here.  I think it was May 18th, 2001.
8    Q    But back to May 2000, which is the point at
9    which he couldn't even get an application for his garage,
10    what was it that made Miss Wirth or anybody else believe
11    that he was looking to build an apartment?
12    A    I think it was based upon the sketch that he
13    showed Mr. Van Dommelen, but I don't know.  I really don't
14    know the answer to that.
15    Q    Did there come a time when you learned that
16    Mr. Corneal sought to build a garage with a storage area
17    over it?
18    A    No.
19    Q    Nobody ever told you about that request?
20    A    No.
21    Q    What about the art studio?  Do you know
22    anything about his request to build an art studio?
23    A    Not really, other than the fact that he was
24    building one.
25    Q    Did anybody from the township ever talk to you

88

1    about the fact that Mr. Corneal wanted to build an art
2    studio?
3    A    I would -- I'd have to say yes, but I don't
4    have any specific recollection.
5    Q    If you don't have any specific recollection,
6    what is it that makes you think yes?
7    A    That information was communicated to me
8    somehow and I don't recall how.  In fact, there is a garage
9    with an apartment above it, there is an art studio, there is
10    a home and there is another separate garage on the property
11    as constructed now.
12    Q    Do you know when Mr. Corneal commenced
13    construction on his property?
14    A    I don't know exactly, but certainly in the
15    year 2000.  And as of May 18th of 2001, it looked to me like
16    construction was basically completed.
17    Q    Well, on May 5th, 2000 when he was asking you
18    for applications, trying to get applications, had he started
19    construction?
20    A    I don't know.
21    Q    How about in the summer of 2000 when he
22    instituted this lawsuit?
23    A    Yes, the July 28th letter I think was written
24    because it came to the township's attention that he had been
25    constructing.

89

1    Q    Do you know what he was constructing at that
2    time?
3    A    I do not know.
4    Q    Did the township tell you what he was trying
5    to construct at that time?
6    A    I don't know.
7    Q    Do you know whether if Mr. Corneal wanted to
8    build a property that didn't require sewage, build a
9    structure that didn't require sewage --
10    A    Not that I'm aware of.
11    Q    Well, I didn't finish my question.  Do you
12    know whether if that's what he wanted to build, whether he
13    would need approval of sewage modules?
14    A    I don't believe so if no sewage was
15    contemplated.
16    Q    Do you know whether if what he wanted to build
17    was just a garage or an art studio without sewage or water,
18    whether that would be considered -- that act occurring would
19    be considered a subdivision of his land?
20    A    Well, I don't think it would be a subdivision
21    for DEP purposes unless the second structure contained
22    sewage.
23    Q    Do you recall at any time discussing with the
24    township officials, any of the defendants in this case,
25    whether the building of a second home would render Mr.



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

90

1    Corneal's 95-acre tract a subdivision?
2    A    Well, it's my understanding — and I think I
3    learned actually at our May 18th meeting when we were
4    talking to Mr. Bowes, who was the SEO there, the
5    interpretation that Altoona DEP has given to our townships
6    in that area is that, yes, in fact that is a subdivision for
7    DEP purposes.
8        Mr. Bowes informed me that in terms of the
9    Williamsport area if the first structure was maybe over 20
10    years old or more they don't consider that to be a
11    subdivision.
12        So, you know, there's probably — there is
13    some conflict between DEP, but we — the township was
14    following the direction given from Altoona and that's what
15    has been done in our county.
16    Q    Well, now, let me just ask you this: Is this
17    something that came up in the context of Mr. Corneal's
18    property or is it just something that has — you've been the
19    township solicitor for what, 15 years you said?
20    A    Approximately.
21    Q    The entire 15 years has this been an applied
22    rule?
23    A    It's been an applied rule in Huntingdon County
24    and I'm aware of that rule being applied to other townships.
25    Q    Do you know what this interpretation by DEP

91

1    comes under, what law?  What are they looking at to base
2    their interpretation on?
3    A    Well, it's the Pennsylvania Sewage Facilities
4    Act and the regulations promulgated thereunder.
5    Q    That's what DEP has told you they're —
6    A    That's my understanding.
7    Q    What about the Municipalities Planning Code,
8    do you know whether there was anything in there that would
9    indicate that the construction of any additional home would
10    render a 95-acre tract a subdivision?
11    A    I'm not aware of any, no.
12    Q    Do you know of any other instances in Jackson
13    Township when the attempt to build a second home on a large
14    tract of land, say 50 or 95 acres like this, has been
15    treated as a subdivision where there is another existing
16    structure?
17    A    I can tell you that — I don't have any
18    specific knowledge, but I know this has always been the
19    interpretation. And Leroy Koch, who was the secretary prior
20    to Ann Wirth, was one of the founding members of the
21    Huntingdon County Sanitary Administrative Committee and I
22    know that the committee adopted that interpretation.
23        So whether or not it had applied previously in
24    Jackson Township, my inclination is to say yes, but I can't
25    give you any specific example.

92

1    Q    Did they ever consult you about this notion of
2    a subdivision occurring as a result of the construction of a
3    second home?
4    A    That was discussed, yes.
5    Q    About Mr. Corneal?
6    A    Yes.
7    Q    Had they ever consulted you in the past about
8    that?
9    A    I would say yes, but maybe not necessarily
10    with this board of supervisors.
11    Q    When did they consult you about this
12    subdivision notion resulting from the construction of a
13    second home?
14    A    I don't have a specific date, but I know it
15    was — it was discussed and I believe my conversation was
16    with Ann Wirth.
17    Q    Do you know whether it was prior to the time
18    that you received these letters from —
19    A    I don't know.
20    Q    From Mr. Corneal.
21    A    I don't know.
22    Q    Do you know whether it was prior to the time
23    this lawsuit was filed?
24    A    I'm sure it was prior to the time the lawsuit
25    was filed.

93

1    Q    In imposing this interpretation on Mr.
2    Corneal, were the township supervisors acting pursuant to
3    your guidance and advice?
4    A    I would say that they were acting in
5    conformance with the practice and procedures utilized in
6    Huntingdon County by direction of DEP.
7    Q    But in discussing it with you was Miss Wirth
8    seeking advice on behalf of the township?
9    A    If she was seeking advice, I agreed with that
10    position because that's a position that has always been
11    taken in our county.
12    Q    What was the nature of that conversation?
13    A    I don't recall.
14    Q    Do you recall how long the conversation was?
15    A    I don't.
16    Q    Was it a telephone conversation?
17    A    It was a telephone.
18    Q    Do you know that it happened prior to the
19    initiation of this lawsuit?
20    A    The lawsuit I think was filed in July — June
21    or July of 2000 and I feel certain it was before.  I'm not
22    saying it wasn't also discussed after, but I think it was
23    also discussed before.
24    Q    Was there a time that you became aware of Mr.
25    Corneal's recording of an additional deed in connection with



94

1    his property?
2    A    Yes.
3    Q    How did you become aware of that?
4    A    I think it -- first of all, all deeds that are
5    recorded in our county are published in the paper. I may
6    have seen it in the paper. And I did become aware that I
7    think the recording of this deed violated the Clean and
8    Green restrictions which would have meant rollback taxes
9    would have been paid. I believe I may have received a
10   request from Ann Wirth to get a copy of the deed and forward
11   it to them.
12   Q    Do you know when that request was made?
13   A    I do not.
14   Q    What makes you think that the recording of
15   this deed would -- well, before I ask you that, you don't
16   recall exactly how you learned about the recording of the
17   deed?
18   A    I may have seen it in the paper because I read
19   deed transfers and I know that I discussed it with Ann
20   Wirth.
21   Q    Did you initiate that phone call or did she?
22   A    She did.
23   Q    Do you know how she became aware of it?
24   A    Probably through the paper.
25   Q    And did Miss Wirth ask you to do anything --

95

1    A    No.
2    Q    -- about recording of that deed?
3    A    No.
4    Q    Did you advise Miss Wirth to do anything?
5    A    No.
6    Q    Did Miss Wirth discuss with you the question
7    of the subdivision ordinance in connection with the
8    recording of that deed?
9    A    I don't believe so.
10   Q    Now, you recall that the subdivision ordinance
11   for Jackson Township was passed at a July 10 meeting,
12   correct?
13   A    Yes.
14   Q    Do you know whether this conversation was --
15   with Miss Wirth about this deed occurred before or after
16   that meeting?
17   A    I don't. Certainly it was after the deed was
18   recorded obviously, but I don't know.
19   Q    Do you know when the deed was recorded?
20   A    I do not.
21   Q    What is it about the recording of that deed
22   that makes you think that recording that deed violated --
23   the Clean and Green Act, is that what you said?
24   A    Yes.
25   Q    What is it?

96

1    A    I don't know the specifics, although I believe
2    the recordation generated something from our assessment
3    office to Mr. Corneal.
4    Q    And what does that have to do with the Clean
5    and Green Act?
6    A    Well, the -- there are certain -- when you
7    have property in Clean and Green, it's a preferential
8    assessment. So there are restrictions that apply as to how
9    much land you can sell over what period of time and whatever
10   Mr. Corneal did with the recording of that deed violated
11   those restrictions. And I believe subsequently there was a
12   corrected deed that was recorded so as a result there wasn't
13   any penalty that was imposed.
14   Q    And how did you find out about the corrected
15   deed?
16   A    Again, I saw it in the paper, looked it up.
17   Q    What did the corrected deed accomplish?
18   A    You know, again, I'm not sure. I think it was
19   probably a transfer or conveyance back so the status quo was
20   maintained.
21   Q    So you think that the deed was undone? In
22   other words, the --
23   A    Yes.
24   Q    The transfer was undone?
25   A    Yes, whatever -- whatever was violative of the

97

1    Clean and Green restriction was corrected.
2    Q    So is it correct that if Mr. Corneal by
3    recording that deed had violated the Clean and Green Act,
4    the remedy would have been for him to pay certain taxes; is
5    that correct?
6    A    Rollback taxes, yes. That has nothing to do
7    with the township. That's through the county.
8    Q    And it has nothing to do with the ability to
9    subdivide, right?
10   A    Well, there's certainly a relationship there.
11   Q    It has to do with preferential tax treatment?
12   A    Exactly.
13   Q    And you correct that by paying whatever taxes
14   are due, correct?
15   A    Yes. If Mr. Corneal wanted to pay the taxes,
16   he wouldn't have to have done anything.
17   Q    Now, if I could refer you again to the May 5,
18   2000 letter to you from Mr. Corneal, it makes a reference to
19   the supervisors assuring citizens that the subdivision
20   ordinance under contemplation would be approved by April.
21   Do you know anything about that?
22   A    I do not.
23   Q    Do you know whether there was ever an April
24   deadline for approving the subdivision ordinance?
25   A    I do not.



98

1    Q    Did the supervisors ever talk to you about the
2    effect that failure to approve the ordinance was having on
3    Mr. Corneal's efforts to convey a piece of his property to
4    Mr. Hewett and Miss Smith?
5    A    Not directly, although I do remember Ann Wirth
6    communicating to me that at one of the meetings that Mr.
7    Corneal attended Mr. Hewett and Miss Smith were also
8    present. And at the beginning of the meeting -- at the
9    beginning of the meeting Mr. Corneal was -- and, again, this
10   is related secondhand to me, but at the beginning of the
11   meeting Mr. Corneal was talking about subdivision and
12   towards the end of the meeting he was saying he wasn't going
13   to subdivide at all, and that seemed to be, you know,
14   certainly a conflict if he was going to sell to Hewett and
15   Smith.
16   Q    You recall Miss Wirth conveying that to you?
17   A    Yes.
18   Q    Anybody else, the building permit officer or
19   the sewage enforcement officer or anything like that?
20   A    No.
21        MS. MONTGOMERY: I'm going to have to take
22   this conference call which I had scheduled for lunch.
23        (Discussion held off the record.)
24        (Luncheon recess taken at 12:17 p.m. until
25   1:02 p.m.)

99

1    BY MS. MONTGOMERY:
2    Q    Let me show you a document that we're going to
3    mark as Newton Exhibit 8 and let you look at that, please.
4        (Notice produced and marked as Newton Exhibit
5    No. 8.)
6    BY MS. MONTGOMERY:
7    Q    Mr. Newton, I'm just going to draw your
8    attention to the right-hand column of this series of
9    classified ads. Do you see the public notice please take
10   notice?
11   A    Yes.
12   Q    And there are three in a row, right --
13   A    Um-hum.
14   Q    -- that refer to Jackson Township? Have you
15   seen this before?
16   A    I don't believe so.
17   Q    You had testified earlier that there was --
18   you thought there might be -- there should have been a
19   notice in connection with the meeting for the moratorium,
20   correct?
21   A    No, I testified earlier that there should have
22   been a notice for the meeting concerning the subdivision
23   ordinance, the public hearing and also a notice concerning
24   the regular monthly meeting of the township.
25   Q    I apologize if I recalled -- is it your

100

1    testimony that if they were going to pass a moratorium on
2    subdivisions they wouldn't have had to put a notice in the
3    newspaper?
4    A    I basically told you I believe that I didn't
5    know.
6    Q    You believe they do, but you don't know?
7    A    I -- my answer was I don't know.
8    Q    So you haven't seen this Exhibit 8 in the
9    past?
10   A    Not in this form, no.
11   Q    Have you seen it in some other form?
12   A    If I saw it, it would have been when it was
13   published in the Daily News, which appears to be 12/28/99.
14   Q    You're saying that because of the handwriting
15   in the left-hand column, is that what you're saying,
16   12/28/99?
17   A    I'm just assuming that's when it was
18   published, yes.
19   Q    If you'll notice, there are three notices
20   about Jackson Township and the second one is the regular
21   monthly meeting notice, correct?
22   A    Yes.
23   Q    The first one then would suggest that there
24   was a special meeting, correct?
25   A    No, actually I think the first one suggests

101

1    that a hearing is taking place on June -- I'm sorry, on
2    January 4th, 2000 which would be the township's normal
3    meeting night.
4    Q    So do they sometimes have their public
5    hearings on the same date?
6    A    Yes.
7    Q    -- as their normal meeting night?
8    A    Yes. I was -- you know, I -- before I didn't
9    -- I couldn't recall whether or not it was the same night
10   as the meeting night or it was a different date, but
11   apparently this makes it clear that it is the same.
12   Q    In other words, that they did the moratorium
13   and the monthly meeting --
14   A    No.
15   Q    -- on the same date?
16   A    No. What I'm saying is that there was a
17   public hearing scheduled for January 4th at 7:30 to discuss
18   and answer questions regarding the proposed subdivision
19   ordinance. That apparently occurred on the same night as
20   their normal meeting night.
21   Q    I showed you Exhibit 2 before. If you'll look
22   at Exhibit 2, the minutes of the meeting.
23   A    Yes.
24   Q    That's dated January 4 as well, right?
25   A    Correct.



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

102

1    Q    And that's the meeting at which they passed
2    the moratorium; is that correct?
3    A    That's correct.
4    Q    So typically I think that you had testified
5    that if there was going to be something special going on you
6    would draft the notice?
7    A    I drafted this first notice.
8    Q    For the public hearing?
9    A    Yes.
10   Q    It doesn't say anything about --
11   A    And I don't know that you characterized my
12   response correctly.  In this instance I drafted the notice
13   at the request of the township.
14   Q    Okay.
15   A    Okay.
16   Q    Now, typically if you draft the notice, is it
17   signed by you or is it signed by -- you know, as in the
18   paper here it's signed by Ann Wirth, or could it be either
19   way?
20   A    Well, it's not really signed.  It can be
21   either way.  In this instance it was -- it was Ann Wirth.
22   Typically when I advertise an ordinance, I'll put my name
23   and address down and in each instance I would request that
24   the statement, the invoice, along with the proof of
25   publication be sent to the township.

103

1    Q    Now, did you draft the notice for the
2    reorganizational meeting?
3    A    No.
4    Q    Or for the monthly meeting?
5    A    No.
6    Q    Now, typically where do the bills go for the
7    newspaper notices that get published?
8    A    To the township.
9    Q    Even if you're the one who drafts and calls
10   the newspaper and puts it in?
11   A    When I submit something to the Daily News, I
12   direct that the statement and proof of publication be sent
13   to the township.
14   Q    So I'm going to mark as Newton Exhibit 9
15   another document that I'll ask you to look at, please.
16        (Bill dated 12/28/99 produced and marked as
17   Newton Exhibit No. 9.)
18   BY MS. MONTGOMERY:
19   Q    Have you seen that before?  For the record,
20   it's a bill apparently from the Joseph Biddle Publishing
21   Company; is that correct?
22   A    Yes, that's the Daily News.  And, no, I
23   haven't.
24   Q    Let me ask you this:  Is it your understanding
25   that you only need to publish a notice once or is it twice

104

1    prior to any public hearing where there's going to be a vote
2    or a --
3    A    Well, in the -- with respect to the
4    subdivision ordinance, it's two times and that is a
5    requirement under the Municipalities Planning Code.  This --
6    more or less the first notice on the public hearing was
7    simply an informational thing.  It wasn't required by
8    anything and it was to try to get some public input, at
9    least that was my understanding of it.
10   Q    You mean if there's going to be a public
11   hearing on an issue, it doesn't have to be published
12   separately?
13   A    That's not what I said.
14   Q    What did you say?
15   A    There are separate requirements for
16   publication in the Municipalities Planning Code and my
17   recollection is that that notice -- that notice has to go in
18   two times.
19   Q    If you're going to vote on something, like an
20   ordinance or something like that?
21   A    Right, it's part of, you know, the process.
22   And my recollection is that we published the notice two
23   times and then we published additional notice of the time we
24   were going to adopt the ordinance.
25        This initial notice for public hearing was, I

105

1    believe, for the township's benefit to try to receive public
2    input and it didn't count, so to speak, as an advertisement
3    as regards the subdivision ordinance.  It was simply to try
4    to get input from the residents of the township.
5    Q    Just so I'm clear, if you -- if you were
6    required -- and you say you don't know, but if you were
7    required to publish notice of a moratorium the same as
8    you're required to publish notice on the subdivision
9    ordinance, then you'd be required to publish it twice just
10   like you have to for the ordinance, correct?
11   A    I don't know.
12   Q    I'm going to represent to you that we've only
13   seen one notice for the subdivision ordinance meeting that
14   was held on July 10th, 2000 where that subdivision ordinance
15   was passed.  Is it your testimony that there were actually
16   two notices published?
17   A    There was another notice published, yes.
18   Q    Do you know when?
19   A    Before the January meeting.
20   Q    Before the January --
21   A    I'm sorry, before the July meeting.
22   Q    Another notice that you drafted?
23   A    Yes.
24   Q    So you drafted both of them.  Do you have
25   records of them?



NEWTON, LAWRENCE
06/12/01

CORNEAL  VS
JACKSON TOWNSHIP

106

1    A    I may have.  I don't have them with me.
2    Q    And there would be --
3    A    I believe the notices that are prior to the
4    formal notice concerning the adoption of the ordinance are
5    -- again, my recollection is that there is a two notice
6    requirement.
7    Q    Right.  And you believe that occurred with
8    respect to this subdivision ordinance?
9    A    Yes.
10    Q    I want to show you another document we'll mark
11    as Newton Exhibit 10.
12        (Letter dated 8/3/00 produced and marked as
13    Newton Exhibit No. 10.)
14    BY MS. MONTGOMERY:
15    Q    Mr. Newton, this is an August 3, 2000 letter
16    from David Corneal to you, correct?
17    A    Correct.
18    Q    Do you recall receiving this letter?
19    A    Yes, I do.
20    Q    And what did you do with this letter?
21    A    Forwarded it onto the township.
22    Q    Anything else?
23    A    Not that I can recall.
24    Q    Do you recall having any discussions with
25    anybody from the township about this letter?

107

1    A    I don't.  Of course, this was after the
2    federal lawsuit was filed.  It may have been discussed at
3    one of our -- in one of our meetings pertaining to the
4    federal lawsuit.  I don't recall -- I don't have a specific
5    recollection of this letter being discussed.
6    Q    Now, this letter indicates that Mr. Corneal
7    sent you the sewer module for his house which apparently the
8    township had indicated there wasn't a proper sewer module
9    and that's why he couldn't have a building permit at least
10    in part, correct?
11    A    Mr. Corneal never sent me a sewage module.
12    Q    Have you ever seen Mr. Corneal's sewage
13    module?
14    A    I don't believe so.
15    Q    Now, here Mr. Corneal asked you to send him
16    applications which he'd been unable to obtain from the
17    township, correct?
18    A    Where are you?
19    Q    I'm sorry, next to the last paragraph at the
20    bottom.
21    A    Well, I note here I enclose the sewer module
22    for my house.  I don't remember getting it.  If I did get
23    it, I forwarded it onto the township, but I don't remember
24    it.
25    Q    So you didn't do -- you don't recall doing any

108

1    review of the sewer module --
2    A    No.
3    Q    -- to see whether it looked complete or
4    anything?
5    A    No.
6    Q    What about Mr. Corneal's request that you
7    forward applications to him in care of Max McClintic?
8    A    I believe subsequently I forwarded
9    applications -- building permit applications, but I believe
10    it was to Mr. Corneal directly.
11    Q    So that was after this August 3rd letter,
12    correct?
13    A    Yes.
14    Q    Let me ask you about the garage which you say
15    now has an apartment over it in which you saw in May of
16    2001, correct?
17    A    Yes.
18    Q    Do you know when that garage was -- the
19    building of that garage commenced?
20    A    I don't.  I can only assume that it was
21    commenced sometime in the summer of 2000.
22    Q    In the summer of 2000 you believe?
23    A    (Witness nods head affirmatively.)
24    Q    Did you have any other occasion at any time to
25    go to that garage and look at it?

109

1    A    No.
2    Q    Has anybody ever told you that when the garage
3    was first built it contained just a workshop with no
4    sewage --
5    A    No.
6    Q    -- and such over top of it?  Did you become
7    aware of that through any means whatsoever?
8    A    No.
9    Q    Is this the first time you've ever heard that?
10    A    Yes.  My understanding was that sewage was
11    contemplated for the garage itself, the second floor.
12    Q    From the very beginning?
13    A    That was my understanding.
14    Q    Based on what?
15    A    Based on what I had been told.
16    Q    Now I'm going to show you another document
17    that we will mark as Newton Exhibit 11 and I'd ask you to
18    identify it if you can.
19        (Letter dated 8/31/00 with enclosures produced
20    and marked as Newton Exhibit No. 11.)
21    BY MS. MONTGOMERY:
22    Q    Mr. Newton, have you seen that letter to Ann
23    Wirth dated August 31, 2000 prior to today?
24    A    I don't believe so.
25    Q    You've never seen it prior to today?



110

1    A    Not that I can recall.
2    Q    Do you recall seeing the building permit
3    applications?
4    A    I don't.
5    Q    Did you get any telephone calls from Ann Wirth
6    about these building permit applications?
7    A    Not that I can recall.
8    Q    How about anybody else from the township,
9    building permit officer, any supervisor, anybody else?
10    A    No.
11    Q    They didn't seek your advice about this at
12    all?
13    A    Not that I can recall.
14    Q    What about --
15    A    Let me stop there. I was requested by the
16    township to draft a response to the building permit
17    applications and I did do that. I think Mr. Van Dommelen
18    had written a draft and then I basically redid the draft.
19    Q    Well, did you not have an opportunity to look
20    at the building permit applications in drafting the
21    response?
22    A    I don't think so. I think my information came
23    from Ann. I don't recall seeing the applications.
24    Q    Well, let me ask you this: If you didn't have
25    the building permit applications, who should have had them

111

1    in order for you to respond to the building permit
2    applications that Mr. Corneal filled out?
3    A    Well, you know, again, the application -- my
4    recollection is that I drafted the response without the
5    building permit applications based upon information provided
6    to me.
7    Q    By Ann Wirth?
8    A    Yes.
9    Q    Did you talk to anybody else about it?
10    A    No.
11    Q    Did you talk to the building permit officer?
12    A    No.
13    Q    Mr. Van Dommelen, I mean.
14    A    Yes.
15    Q    But I guess I'll ask you again: If you didn't
16    have them, who should have had them in terms of -- I mean,
17    shouldn't somebody at the township review the building
18    permit applications?
19    A    Well, I think Mr. Van Dommelen did. That was
20    my understanding.
21    Q    What makes you think that?
22    A    Because he drafted the initial response to the
23    building permit applications.
24    Q    Did you tell him to draft that response?
25    A    I did not, no.

112

1    Q    Did you tell him through telling somebody else
2    to have him draft that response or did you tell Miss Wirth
3    to tell him to draft a response?
4    A    Not that I recall. I think that the
5    applications came to Mr. Van Dommelen. He drafted a
6    response. I was requested by the township to review it and
7    to revise it if I felt it necessary.
8    Q    And did you do that?
9    A    Yes, I did.
10    Q    I'm going to show you a letter that we'll mark
11    as Newton Exhibit 12.
12        (Letter dated 9/1/00 with enclosures produced
13    and marked as Newton Exhibit No. 12.)
14    BY MS. MONTGOMERY:
15    Q    Mr. Newton, have you seen this September 1,
16    2000 letter to Miss Wirth from Mr. Corneal prior to today?
17    A    I don't believe so.
18    Q    What about the attachments to the letter that
19    shows the second floor of the garage as open storage? Have
20    you seen that in the past?
21    A    I don't believe so.
22    Q    Did anybody ever discuss with you this
23    particular letter?
24    A    Not that I can recall.
25    Q    Did anybody discuss with you the August 31st

113

1    letter that I showed you just a moment ago with the building
2    applications?
3    A    Well, only in the context that I drafted a
4    response to the permit applications.
5    Q    Did anybody discuss with you the drawings and
6    other things that were attached to the August 31 letter?
7    A    Not that I can recall.
8    Q    Now, I think that you testified earlier that
9    you drafted this response or that you revised a response
10    that Mr. Van Dommelen started out writing. I'm going to
11    show you a document we'll mark as Newton 13.
12        (Letter dated 10/10/00 produced and marked as
13    Newton Exhibit No. 13.)
14    BY MS. MONTGOMERY:
15    Q    Is this the letter that you're referring to
16    that eventually went out from Mr. Van Dommelen --
17    A    Yes, it is.
18    Q    -- with your assistance?
19    A    Yes.
20    Q    Which part of this letter did you draft?
21    A    I would say basically it's my letter.
22    Q    This makes reference to, in the second
23    paragraph, your application inadequately described the
24    proposed construction. What was the inadequacy?
25    A    My recollection is that that was a detail



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

---

114

1  issue.
2  Q      What detail issue?
3  A      On what the -- what was to -- what was to be
4  the proposed construction.
5  Q      But you never saw the application?
6  A      That's right. My communication was, again,
7  through Mrs. Wirth.
8  Q      The same is true with respect to your third
9  reason for denying the building permit applications?
10  A      That is correct.
11  Q      It did not include an adequate plan for the
12  site showing the size and location of the proposed
13  construction, right?
14  A      Correct.
15  Q      Now, what about this reference to the driveway
16  ordinance? Not having complied with the driveway ordinance,
17  what was that based on?
18  A      In July, the July township meeting, the
19  township passed a driveway ordinance.
20  Q      And what was it that Mr. Corneal had done that
21  they didn't think was correct?
22  A      I don't think he had done anything with
23  respect to the ordinance, is my recollection.
24  Q      Well, it says you have not complied with the
25  township's driveway ordinance.

---

115

1  A      A copy of which is enclosed.
2  Q      Right. In what way didn't he comply?
3  A      You know, again, my -- my recollection is he
4  didn't do anything with respect to the driveway ordinance.
5  Q      Mr. Corneal didn't do anything?
6  A      Correct.
7  Q      On whose information are you basing that
8  information?
9  A      Township information.
10  Q      What did you think he had to do --
11  A      I don't have the ordinance in front of me, but
12  there were certain requirements that were set forth in the
13  ordinance and I was informed that he had not complied.
14  Q      But you didn't have any individual --
15  independent information --
16  A      No, absolutely not.
17  Q      Now, the letter also makes a reference to
18  submitting sewage facilities planning modules to the
19  township, correct? It's higher up in the second paragraph.
20  A      Yes.
21  Q      But you didn't see these sewage facilities
22  planning modules, correct?
23  A      Not to my recollection. Again, I -- if Mr.
24  Corneal sent a module with that letter, I don't remember at
25  least examining it.

---

116

1  Q      All right, thank you. I want you to just look
2  at the first sentence of this October 10, 2000 letter. It
3  says please be advised that Jackson Township has referred to
4  me for review your applications for building permits, right?
5  A      Yes.
6  Q      But they didn't give you the applications,
7  right?
8  A      Well, this is under Mr. Van Dommelen's
9  signature. I'm really writing the letter for Mr. Van
10  Dommelen and it referred to him, yes.
11  Q      But my question still stands, they didn't give
12  you them? I mean, either -- they didn't give you these
13  applications?
14  A      Not that I can recall.
15  Q      How did Mr. Van Dommelen deliver to you the
16  first draft of his letter?
17  A      He did not. I think Mrs. Wirth faxed it to
18  me.
19  Q      So he wrote it and gave it to Mrs. Wirth, do
20  you think?
21  A      I believe so.
22  Q      Did you save a copy of it?
23  A      No.
24  Q      Do you not usually save copies of things that
25  the township supervisors send to you?

---

117

1  A      Not something like that, no.
2  Q      Do you have any other copies of any drafts of
3  this letter?
4  A      No, I don't.
5  Q      When you wrote this letter for Mr. Van
6  Dommelen, did you have any knowledge of whether he had
7  actually reviewed the applications?
8  A      I believe he had, yes.
9  Q      Now, let me ask you this: Have you ever been
10  involved in an appeal of a denial of a building permit
11  application for any of the townships that you work for?
12  A      I don't believe so.
13  Q      Never?
14  A      (Witness shook his head negatively.)
15  Q      What about --
16  A      Let me say in this case Mr. Wilson -- Mr.
17  Williams appealed the denial, okay. So in this case he had
18  requested a hearing through the township on the denial of
19  the permits and in that regard I believe I received a
20  telephone call from him.
21  And it was at or about the same time that the
22  township had initiated a lawsuit against the Corneals to the
23  Court of Common Pleas of Huntingdon County because they had
24  commenced construction without a building permit. We had
25  difficulty getting Mr. Corneal served with a copy of the

---



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

118

1 complaint and motion for preliminary injunction. He's a
2 Centre County resident. We forwarded it, of course, the
3 complaint -- our sheriff's office forwarded the complaint to
4 the Centre County sheriff and he was not able to obtain
5 service.
6        And we had a preliminary hearing scheduled on
7 our request for injunctive relief that couldn't be held
8 because the Corneals weren't served. And it's about this
9 time I get the call from Terry Williams. And, again, I --
10 it's possible that I could have called him after I became
11 aware that he, you know, filed this appeal.
12    Q    Do you know whether or not this request for a
13 hearing -- or for an appeal, hearing for an appeal, was
14 actually served, I should say, on the Jackson Township Board
15 of Supervisors prior to the time that the Huntingdon County
16 action was initiated against Mr. Corneal?
17    A    I really don't know. All I can say is it was
18 at or about the same time. And I know Terry Williams, I
19 have high regard for him, and I said to him, look, let's sit
20 down and see if we can resolve this. I don't think it's
21 necessary to litigate the denial of the permit applications,
22 let's look to the larger issue and get this -- get this
23 solved.
24        So what we agreed to do on the date that was
25 scheduled for our preliminary hearing, we agreed to meet in

119

1 the Huntingdon County Courthouse and in fact we did meet
2 with Mr. Williams and that meeting included all of the
3 township supervisors, Mr. Van Dommelen. I believe Barry
4 Parks, the sewage enforcement officer, and myself.
5        And at that time we basically explained to Mr.
6 Williams the township's position, where the township was
7 coming from and we charted a course to resolve this. It was
8 our hope and our goal to have it resolved by the end of the
9 year. And rather than litigate our equity complaint, we
10 simply tried to take whatever steps necessary to resolve
11 this short of any litigation.
12    Q    But back to my original question -- I'm just
13 going to go back to the very beginning. My question -- my
14 first question was whether or not you've ever had an appeal
15 on a denial of a building permit application with respect to
16 any of the townships or boroughs or other local governments
17 that you represent.
18    A    Well, we had one with Mr. Corneal through
19 Attorney Williams here.
20    Q    So it's your testimony that the meeting that
21 you had in the courthouse in connection with the preliminary
22 injunction hearing was the appeal of the building permit
23 application?
24    A    Absolutely not.
25    Q    What's the --

120

1    A    We met with Mr. Williams in order to try to
2 resolve all the issues involved in this litigation.
3    Q    So when you say you had one with Mr. Williams,
4 you mean --
5    A    He filed an appeal. We did not ever have an
6 appeal hearing.
7    Q    That was my question, did you ever have an
8 appeal hearing --
9    A    No.
10    Q    -- in connection with any of the local
11 governments that you represent on a building permit
12 application denial?
13    A    Not that I can recall.
14    Q    Do you know as a township solicitor, a borough
15 solicitor, what kind of hearing should be held in connection
16 with the appeal of the denial of a building permit
17 application? Do you know what the format for that hearing
18 would be?
19    A    Without looking it up, no.
20    Q    Do you know who would hear the hearing? Who
21 would hear it before?
22    A    My sense is it would be before the board of
23 supervisors.
24    Q    Do you know whether there was ever an appeal
25 hearing held before the board of supervisors in connection

121

1 with Mr. Corneal's appeal?
2    A    The answer is no. And the reason for that is
3 by an agreement with Mr. Williams we decided to forego the
4 hearing and address the issues to see if we could resolve
5 them amicably.
6    Q    Is it your understanding that Mr. Williams was
7 waiving the right to a hearing on the denial of the building
8 permit application?
9    A    I don't know if that was actually ever
10 discussed.
11    Q    Was there anything in writing about that?
12    A    No.
13    Q    You're saying that in a telephone call Mr.
14 Williams agreed on behalf of Mr. Corneal that you wouldn't
15 have the hearing?
16    A    No, that's not what I said at all.
17    Q    Well, I'm having a hard time understanding --
18    A    Well, what I -- what I said was that -- what I
19 proposed to Mr. Williams was instead of going through the
20 hearing on this denial, we get to the heart of the matter
21 and see if we can resolve the issues. He agreed to do that.
22    Q    Well, for the record, I'll ask you to look at
23 what we'll mark as Newton Exhibit 14.
24        (Letter dated 11/10/00 produced and marked as
25 Newton Exhibit No. 14.)



122

1  BY MS. MONTGOMERY:
2    Q    Now, this is a November 10, 2000 appeal letter
3  from Terry Williams, correct?
4    A    Yes.
5    Q    Have you seen this in the past?
6    A    I believe I have.
7    Q    Did the township supervisors forward this to
8  you?
9    A    Yes, I think so.
10   Q    Did you call Mr. Williams in connection with
11  this appeal on behalf of the supervisors?
12   A    I believe so, yes.
13   Q    When did you call him?
14   A    Well, shortly after the township had received
15  this letter, I believe I contacted Mr. Williams and at
16  time I suggested that we sit down -- when I say we, I mean
17  the township and Mr. Williams, to look at these issues and
18  attempt to resolve them, and in fact that's what we did. We
19  met the same day that the motion for preliminary injunction
20  was scheduled at the Huntingdon County Courthouse.
21   Q    And that preliminary injunction has not been
22  resolved one way or the other yet, correct?
23   A    That's correct.
24   Q    So it's pending?
25   A    Well, I think it's probably mute at this

123

1  point. I believe Mr. Corneal has completed his
2  construction. I'm happy to report that as of the township's
3  June meeting, after hearing the presentation from Mr. Bowes,
4  it looks like everything is going to be fine with respect to
5  sewage modules.
6        Mr. Bowes on site indicated to us in our May
7  18th meeting that what had previously been proposed were not
8  acceptable. Those sites have been destroyed and I believe
9  that they were too close to the road that was constructed,
10  but I think everything is basically on track to be resolved.
11   Q    When was this June meeting?
12   A    The first Monday in June.
13   Q    Was this a public meeting?
14   A    This is the township's June meeting, yes.
15   Q    The township's June meeting?
16   A    Yes.
17   Q    Mr. Bowes is who? Could you identify him for
18  the record?
19   A    Mr. Bowes is a sewage enforcement officer that
20  has been retained by Mr. Corneal through Terry Williams to
21  do the design for the sewage systems that are going to go
22  in. And I believe that he is going to design -- I think
23  it's a newer technology called micromounds.
24   Q    So you're pleased to report that Mr. Bowes has
25  found that the sewage modules are now satisfactory; is that

124

1  what you're saying?
2    A    Yes, that's correct.
3    Q    And what does the township intend to do with
4  that information?
5    A    Forward them on to the Department of
6  Environmental Protection.
7    Q    Well, as I understand, the preliminary
8  injunction hearing was -- and I'm, of course, not a party to
9  it and I'm not that familiar with it, but the preliminary
10  injunction motion that was filed was designed to stop Mr.
11  Corneal from building his house, correct?
12   A    Yes, the township had received a number of
13  complaints from other residents concerning this construction
14  and the fact that Mr. Corneal was building without a
15  building permit.
16   Q    What other residents were those?
17   A    I don't know. This is what I'm being told
18  from the township.
19   Q    Did you draft the complaint for the township?
20   A    Yes, I did.
21   Q    You didn't ask them who complained to them
22  about Mr. Corneal building?
23   A    No, and it really wouldn't matter who
24  complained. No one would have had to have complained if
25  there was a violation.

125

1    Q    It might matter for this lawsuit.
2    A    It could.
3    Q    But the appeal that Mr. Williams sent to you
4  -- or sent to the township, I'm sorry, on November 10, 2000
5  concerned the denial of all his applications, correct?
6    A    Building permit applications.
7    Q    Exactly.
8    A    Yes.
9    Q    The preliminary injunction was designed to get
10  -- for Mr. Corneal's house primarily, correct?
11   A    No, it was every -- any and all construction.
12  I don't believe the township knew actually what was being
13  constructed. I think there are no trespassing signs that
14  are posted. I think the township's knowledge came from, you
15  know, construction vehicles going in and out and reports of
16  others.
17   Q    Well, Mr. Corneal's building applications say
18  what he was trying to construct, don't they?
19   A    Sure.
20   Q    So if Mr. Corneal didn't need sewage for his
21  art studio and didn't need sewage for his garage, would
22  there have been any grounds for him to have been denied a
23  building application -- a building permit?
24   A    I'll stand on what was set forth in the letter
25  under Mr. Van Dommelen's signature.



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

---

126

1    Q      Okay. What date was the preliminary
2  injunction hearing scheduled to be held?
3    A      I don't know. I don't recall.
4    Q      Did you at the meeting that was held in the
5  courthouse which you say was held on the date that the
6  preliminary injunction hearing --
7    A      Yes.
8    Q      -- had been scheduled, did you discuss the
9  appeal of the denial of the building permit application
10  specifically?
11    A      We did not. We instead tried to set forth a
12  plan where we could resolve all of these issues to get them
13  done.
14    Q      Well, let me ask you this: By the date of the
15  meeting in the courthouse had you received -- are you sure
16  that you had received the appeal on the building permit --
17    A      I'm not sure. It may have been prior to
18  that. I don't know. But there was some reason that I was
19  in touch with Mr. Williams and -- either he called me or I
20  called him about this appeal and the gist of our
21  conversation was let's sit down and see if we can work it
22  out.
23    Q      I'm going to show you a document that we'll
24  mark as Newton Exhibit 15.
25          (Invoice dated 8/4/00 produced and marked as

---

127

1  Newton Exhibit No. 15.)
2  BY MS. MONTGOMERY:
3    Q      Mr. Newton, do you recognize this document?
4    A      Yes.
5    Q      Is this a copy of an invoice that you sent to
6  the supervisors for services rendered?
7    A      It is.
8    Q      So this was on August 4, 2000?
9    A      Right.
10    Q      Is it fair to assume that anything you had
11  done up to and including August 4, 2000 would be listed on
12  this invoice back to the time of your last invoice?
13    A      Not necessarily.
14    Q      Why is that?
15    A      Well, as I indicated to you, I attempt to
16  reconstruct some of these bills and often I miss things and
17  sometimes I bill based upon when a project is over. So I
18  wouldn't necessarily do it on a chronological basis but on
19  what's done.
20    Q      Well, let's look at Number 4 here, meeting
21  with supervisors on July 6, 2000, re: Corneal lawsuit.
22    A      Yes.
23    Q      Now, was that the meeting that you had with
24  the supervisors without the presence of Mr. Sherr?
25    A      Yes, I believe so.

---

128

1    Q      What about the meeting with the supervisors on
2  July 13, 2000?
3    A      That may have been with Mr. Sherr.
4    Q      So it was one or the other?
5    A      I'm pretty sure -- I'm sure it wasn't the
6  first one. I think it might have been the second one.
7    Q      How long was that meeting, do you recall?
8    A      I don't recall.
9    Q      Now, I see a reference to a letter to Ann
10  Wirth dated May 8, 2000, re: David Corneal. That's
11  Number 2.
12    A      Yeah, I think that would be probably the
13  transmittal letters of his letters to me -- one letter dated
14  May 5th and a copy of Mr. Van Dommelen's letter.
15    Q      So let me just ask you this: You have
16  indicated that you bill them at $60 an hour, right?
17    A      Approximately, yes.
18    Q      So at $25 an hour it would have taken you
19  nearly a half hour to draft this letter, correct?
20    A      Well, not necessarily, no. I mean --
21    Q      I'm just trying to really --
22    A      That is -- you notice here I don't have an
23  hourly rate down here, you know. It's just what I feel was
24  appropriate for the circumstances.
25    Q      I'm just trying to understand whether there

---

129

1  exists another letter other than some transmittal letters
2  since this was --
3    A      I don't believe so.
4    Q      Do you save copies of all the letters that you
5  -- correspondence that you send to the supervisors in
6  connection with --
7    A      Generally, yes.
8    Q      I see here there's a reference to a meeting
9  with the supervisors in May 2000 regarding David Corneal,
10  correct?
11    A      New Enterprise Stone and Lime Company and
12  David Corneal. As I indicated to you previously, I think
13  the purpose of the meeting was to discuss this New
14  Enterprise problem and Mr. Corneal -- the subject of Mr.
15  Corneal came up at that meeting.
16    Q      Now, was this one of those workshop meetings,
17  is that what you're thinking?
18    A      That's what I testified to previously.
19    Q      Was this meeting subsequent to the time that
20  Mr. Van Dommelen had initially denied building permit
21  applications to Mr. Corneal?
22    A      No, I don't believe so.
23    Q      So you think -- as far as Number 2 goes, do
24  you think you have copies of the letters to Ann Wirth, re:
25  David Corneal?

---



NEWTON, LAWRENCE
06/12/01

CORNEAL  VS
JACKSON TOWNSHIP

---

130

1   A   I probably do.
2   Q   Now, you have preparation of draft response to
3  the Corneal's complaint, correct?
4   A   Yes.
5   Q   Did you save copies of your draft responses?
6   A   This would be a federal lawsuit. I believe I
7  did, yes.
8   Q   And then there's reference to a letter to Ann
9  Wirth dated August 4, 2000. Do you know whether that
10  involved David Corneal?
11   A   It may have been a transmittal letter. I seem
12  to recall there was a letter that was dated August 3rd. I'm
13  not sure.
14   Q   Do you know when the last time you sent an
15  invoice to the township prior to this August 4th --
16   A   Prior to August 4th, no, I don't.
17   Q   You have no recollection at all?
18   A   No.
19   Q   Would you have that in your records?
20   A   Probably, yes.
21   Q   Let me ask you this: I know you don't have a
22  date for your meeting with the supervisors in May, right?
23   A   (Witness nods head affirmatively.)
24   Q   Which is Number 3 --
25   A   Yes.

---

131

1   Q   -- regarding David Corneal. But you did
2  testify that that was I think a workshop meeting. Was that
3  prior --
4   A   That's my recollection, yes.
5   Q   So it would have been prior to their monthly
6  meeting, correct? Isn't that --
7   A   No.
8   Q   -- when they have their workshop meetings?
9   A   Not necessarily, no.
10   Q   Do you know whether it was before or after the
11  May 5 letter that was sent to you by Mr. Corneal from --
12  regarding Mr. Van Dommelen's refusal to give him building
13  permit applications?
14   A   I don't know.
15   Q   Was the workshop meeting held in the afternoon
16  or in the evening?
17   A   I would say afternoon.
18   Q   Late afternoon, early evening, what?
19   A   Well, one of the -- I just -- I would say late
20  afternoon -- in the afternoon. I'm not sure exactly when.
21   Q   And you had traveled out to the township
22  office, right, to do that?
23   A   That's correct.
24   Q   So do you remember whether it was getting to
25  be dusk or was it dark or anything driving out to that

---

132

1  meeting?
2   A   I don't believe so. I think it was daylight.
3   Q   Mr. Newton, we've already made this a copy of
4  the record and it's so large I'm not going to do that again,
5  but I'm going to ask you to look at the subdivision and land
6  development ordinance and identify it for me, if you can,
7  please.
8   A   It appears to be the Jackson Township
9  subdivision ordinance.
10   Q   Can you look on page 71 of the ordinance.
11   A   Yes.
12   Q   Do you see where it's dated July 7, 2000?
13   A   Yes.
14   Q   Did you become aware prior to this moment that
15  this was dated July 7, 2000?
16   A   No, I think that's a mistake.
17   Q   You think it's just the wrong date?
18   A   Yes.
19   Q   What makes you think that?
20   A   Because the township meeting was on July 8th.
21   Q   July 10, correct?
22   A   Well -- let me see. Whenever the first --
23  whenever the meeting was -- I thought it was the 8th, but
24  maybe it was -- Monday.
25   Q   The first Monday of the month --

---

133

1   A   Yes.
2   Q   -- that's not a holiday?
3   Q   Is that the 10th?
4   Q   I think it was, but your counsel is checking
5  her calendar.
6   A   It would have been the 10th.
7   Q   Now, you weren't at that meeting, though, you
8  testified, correct?
9   A   No, I wasn't.
10   Q   Do you know whether this subdivision and land
11  development ordinance was signed at the meeting, prior to or
12  after?
13   A   I wasn't there. My sense is it would have
14  been signed at the meeting.
15   Q   I'm going to show you what we've marked
16  previously in depositions. Again, I don't think I will make
17  these additional copies for the record, but it's the
18  Huntingdon County Planning Commission letter to Ann Wirth
19  dated February 24, 2000.
20   A   Okay.
21   Q   Have you seen this letter in the past?
22   A   I believe I have.
23   Q   What makes you believe you have?
24   A   Because I believe that Ann would have maybe
25  faxed me a copy of it or mailed it to me.

---



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

---

134

1  Q    Did you review it at the time, do you know?
2  A    I probably looked at it, yes.
3  Q    Did you have any discussions with the township
4  about what they needed to do in order to get the subdivision
5  proposal in order?
6  A    What do you mean?
7  Q    Well, this letter I believe indicates that
8  there was going to be a problem or two with the proposed
9  subdivision from Mr. Corneal, correct?
10 A    Yes.
11 Q    Did you have any discussion with the township
12 or any of its officials or its secretary about Mr. Corneal's
13 subdivision after you received this letter?
14 A    Not that I can recall.
15 Q    Do you think you received this letter at about
16 the time that it was written?
17 A    I have no idea.
18 Q    What about this April 20, 2000 letter from the
19 Huntingdon County Planning Commission which has been made
20 part of the record in the past?  Do you recall receiving a
21 copy of that letter?
22 A    I would say yes.
23 Q    Why would you say yes?
24 A    Because I believe Ann forwarded it on to me.
25 Q    Did she forward it to you at about the time it

---

135

1  was written?
2  A    I would say so, but I don't recall.
3  Q    Did you have any discussion with the township
4  about Mr. Corneal's proposed subdivision at that time?
5  A    Not that I can recall.
6  Q    Now, I think you had testified earlier that
7  when they send something to you that they anticipate
8  whatever guidance or advice you might have for them,
9  correct?
10 A    That's right.
11 Q    Did you have any advice or guidance for them
12 in connection with this letter?
13 A    Not that I can recall.
14     MS. MONTGOMERY:  I'm going to take a moment
15 here to review some notes and documents.  We can take a five
16 minute break if you want.
17     (Break taken at 1:58 p.m. until 2:23 p.m.)
18 BY MS. MONTGOMERY:
19 Q    We had talked a moment ago, Mr. Newton -- we
20 had talked some time ago about discussions that you might
21 have had about Mr. Corneal's sewage planning modules.  I
22 just need to know from you whether you recall talking to Ann
23 Wirth about Mr. Corneal's sewage planning modules?
24 A    Yes.
25 Q    Do you recall when that conversation took

---

136

1  place?
2  A    No.
3  Q    Can you put it in some kind of estimated time
4  frame?
5  A    Well, I -- I remember -- and, again, this was
6  either at the -- at one of the meetings that Mr. Corneal
7  attended.  I believe Mrs. Wirth informed me that Mr. Corneal
8  put the sewage modules on the table where the supervisors
9  were sitting and then by the end of the meeting had taken
10 them away.  So at least at the conclusion of that meeting,
11 even if the supervisors wanted to forward those modules on
12 to DEP, they didn't have them to forward them.  I do
13 remember that discussion specifically.
14 Q    That's what Mrs. Wirth told you?
15 A    That's what Mrs. Wirth told me.
16 Q    She told you that around the time of the
17 meeting that Mr. --
18 A    I can only assume so.  I don't recall, but I
19 would think that would be correct.
20 Q    So at that time did she discuss with you the
21 fact that the supervisors had indicated to Mr. Corneal that
22 he couldn't build because he would have to subdivide?  In
23 that same conversation did you have that discussion?
24 A    I don't recall.  I do know that there was an
25 issue concerning -- that in fact there was already an older

---

137

1  dwelling on the premises and if he was going to put another
2  dwelling on that contained sewage it was a subdivision for
3  DEP purposes.
4  Q    You had said that the Altoona division of DEP
5  or --
6  A    That would be Joe Rouzer.
7  Q    Joe Rouzer?
8  A    Yes, uh-huh.
9  Q    From the Altoona regional office?
10 A    Yes.
11 Q    And that's his interpretation?
12 A    Yes.
13 Q    Has he been at the Altoona DEP regional office
14 for many, many years?
15 A    Yes.  I'd say in excess of 20 years.
16 Q    But you're aware of at least one other
17 regional office of DEP that doesn't interpret the law that
18 way?
19 A    I became aware of that on or about May 18th
20 from Tom Bowes because we had a discussion on Mr. Corneal's
21 property about this issue.  And Mr. Rouzer was there and
22 explained to Mr. Bowes the way they have always
23 interpreted that would be just the way that the townships in
24 Jackson County have followed.
25     MR. SHERR:  If I may, you just said Jackson

---



NEWTON, LAWRENCE
06/12/01

CORNEAL  VS
JACKSON TOWNSHIP

138

1  County.
2        THE WITNESS:  I meant -- Jackson Township I
3  thought I said.
4  BY MS. MONTGOMERY:
5     Q     How long was the conversation that you had
6  with Mrs. Wirth in which she told you that Mr. Corneal had
7  presented some sewage planning modules but taken them back?
8     A     It wasn't very long.  I don't recall.
9     Q     Do you think it was more than 10 minutes?
10    A     No, less.
11    Q     Did she call you?
12    A     Yes.
13    Q     Was she reporting to you on the events of that
14  meeting?
15    A     I would say yes.
16    Q     Was she asking you for advice?
17    A     I don't think specifically asking me for
18  advice but informing me of what went on.
19    Q     So she told you that he had brought the sewage
20  modules and taken them away, but you don't recall if she
21  told you that Mr. Corneal was informed at that meeting that
22  his subdivision wouldn't be approved?
23    A     Again, that's all I can recall from the
24  conversation.
25    Q     Do you think it was in very close -- it was in

139

1  close proximity to that meeting so that would be like within
2  a week or within a couple of days or something?
3     A     As to when the phone conversation occurred?
4     Q     Exactly.
5     A     I would say within a week, sure.
6     Q     Did you ever have any discussion with Mr.
7  Rouzer from DEP during the year 2000 about this subdivision
8  issue and the erection of the second dwelling on a property
9  making it a subdivision?
10    A     I don't believe in the year 2000.  Certainly
11  in 2001.
12    Q     But not during the year 2000?
13    A     Not that I can recall.
14    Q     Did you ever discuss Mr. Corneal's property
15  with Mr. Rouzer?
16    A     Yes.
17    Q     When was that?
18    A     May 18th we met on site.
19    Q     Of this year?
20    A     Yes.
21    Q     What about in the past?
22    A     I believe there was another time -- there was
23  another time in 2001 and this was after our SEO had
24  determined that the initial sites had been destroyed and
25  were no longer usable and I believe I talked to Mr. Rouzer

140

1  about that.
2     Q     Now, that was in -- that was prior to your May
3  2001 site visit?
4     A     Yes.
5     Q     When you went to the May 2001 site visit, did
6  you observe the various sites?
7     A     Yes.
8     Q     Were you aware that other than the two sites
9  then that they had said had been destroyed that there were a
10  number of other previously approved sites?
11    A     What I remember is Mr. Bowes agreeing with Mr.
12  Parks that the sites that were shown previously were
13  unacceptable.  I believe he agreed with that.
14    Q     But do you -- you said you went on the
15  property?
16    A     I did.
17    Q     And you observed, for example, an apartment?
18    A     Yes.
19    Q     Did you also observe a number of other septic
20  sites?
21    A     We -- as I recall, there were three different
22  pits that we walked to.  I believe there were three.
23    Q     You walked to three of them.  Was the other
24  one satisfactory, do you know, the third --
25    A     Well, these were the ones -- these were new.

141

1  These were ones that were recently dug.
2     Q     What about the ones that -- are you aware that
3  Barry Parks approved sewage modules for Mr. Corneal's
4  property --
5     A     Yes.
6     Q     -- in the year 2000?
7     A     Yes.
8     Q     Are you aware that later two of them were --
9  after all the disapprovals and all of that two of them were
10  said to be now unsatisfactory because something had been
11  driven over them, right?
12    A     Yes.
13    Q     Were you aware that the other sites that he
14  had approved remained satisfactory?
15    A     I was not aware.  I'm not saying that's not
16  the case, but that -- those sites I don't believe were
17  looked at.  I think we looked at the newer holes that were
18  dug.
19    Q     Around the time that Mr. Parks approved the
20  sewage modules presented by Mr. Corneal, did you receive any
21  contact from the township about those sewage modules?
22    A     Not that I recall.
23    Q     Are you aware that despite the fact that Mr.
24  Parks had approved them that the township then said no,
25  disapprove them?

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577



142

1    A       Well, then we get into the issue they really
2   didn't have them to approve.  As I understand from Mrs.
3   Wirth, Mr. Corneal took them with him.
4    Q       Did she tell you in fact that he was told to
5   take them back because they wouldn't review them?
6    A       No, she didn't tell me that.
7    Q       Did the supervisors seek counsel from you
8   about filing the lawsuit against Mr. Corneal that was filed
9   in Huntingdon County?
10   A       Yes.
11   Q       You actually drafted that --
12   A       Yes.
13   Q       -- correct?  When did they first seek your
14  counsel about that, filing a lawsuit in Huntingdon County
15  against Mr. Corneal?
16   A       Probably towards -- the letter that we
17  reviewed I believe is dated July 28th of 2000.  So it would
18  have been around that time.
19   Q       When did you actually file that lawsuit?
20   A       I believe it was in October.
21   Q       And what happened between July 28th and
22  October in connection with the filing of that lawsuit?
23   A       Be more specific.
24   Q       Well, why did you wait until October to file
25  that lawsuit?

143

1    A       I think there was a -- I think there was
2   another letter that we had written -- I think that was, you
3   know, an August letter that I believe we have reviewed.
4    Q       In this deposition?
5    A       I think so.  I believe I wrote a letter in
6   August.  Maybe we haven't reviewed it, but it was just, I
7   guess, until October when the complaint was ready and we
8   filed it hoping that we could resolve this without filing
9   it.
10   Q       You think you wrote another letter to Mr. and
11  Mrs. Corneal in August?
12   A       I think I wrote a letter in August.
13   Q       After the July 28th letter?
14   A       Yes.
15   Q       Would you have a copy of that in your files?
16   A       I believe I did and I believe it's in the
17  documents that were copied.
18   Q       From the township you mean?
19   A       Yes.
20   Q       Have you had an opportunity to review the
21  documents that were --
22   A       Yes.
23   Q       -- copied?  When did you have that
24  opportunity?
25   A       This morning.

144

1    Q       So not all of them, a selection, I suppose,
2   correct?
3    A       Yes.
4    Q       Well, we haven't had an opportunity to review
5   all those documents.  Some of them, as many of them as we've
6   been able to make time for.  Did the supervisors ever
7   contact you about their obligation to produce documents in
8   this lawsuit?
9    A       No.
10   Q       Well, I'll represent to you that we have not
11  found so far that letter.
12   A       I believe I -- I could be wrong on the date,
13  but I think I saw it this morning.
14   Q       Well, we'll see if we find it.  I think that
15  you had testified that there were a number of revisions to
16  the land development ordinance as we went -- there were a
17  number of revisions to the subdivision ordinance before it
18  was actually passed.
19   A       (Witness nods head affirmatively.)
20   Q       Do you know whether or not each of those
21  iterations of the proposed subdivision ordinance were made
22  available for the public?
23   A       I don't know.  Anyone who attended a township
24  meeting certainly would have access to that.
25   Q       Didn't Mr. Corneal ask you for a copy of the

145

1   proposed ordinance at one time?
2    A       He may have and -- I'd have to refer to that
3   August letter.  I know he was ultimately sent a copy.
4    Q       The August letter that you're referring to is
5   not in addition to -- it is in addition to this July 28th
6   letter that you're referring to?
7    A       Yes, that's what my recollection is.
8    Q       But you --
9    A       I think the supervisors asked me in August to
10  write to him and say, look, get a building permit and then I
11  think there was a follow-up letter in August.
12   Q       But in any event, I think I just asked you
13  whether or not Mr. Corneal asked you for a copy of the
14  subdivision ordinance and you said he may have, correct?
15   A       He may have.
16   Q       Do you know whether or not you sent him a copy
17  of it?
18   A       I may have.  If I did, it would be referenced
19  in this August 28 letter.
20   Q       You think it's an August 28th letter or do you
21  think it's a July 28th?
22   A       Well, I -- it's July -- the August letter,
23  whenever the date was in August.
24   Q       Did you ever have occasion to talk to the
25  supervisors individually about this issue of Mr. Corneal's



NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

146

1    property?
2    A    One-on-one?
3    Q    Yes.
4    A    No, not that I can recall.
5    Q    Mr. Wilson has never called you directly to
6    talk about it?
7    A    If Mr. Wilson called me, it would be in the
8    context of we've got to get something moving on the lawsuit
9    because people in the township were upset that nothing was
10   being done, etcetera.  He may have called me.  If he did, I
11   believe it was in that context.
12   Q    Well, going back briefly to your August 4,
13   2000 invoice to the township, you would have copies of each
14   of the documents referenced in this invoice, correct, in
15   your files?
16   A    I should have.
17   Q    Letters to --
18   A    If I don't, the township certainly has them.
19   And if I don't, they would be in the township records.
20   Q    And would you have a copy of the additional
21   notice of the meeting --
22   A    I should have, yes.
23   Q    The meeting where the subdivision ordinance
24   was ultimately passed.  You'd have a copy of that
25   additional --

147

1    A    My recollection is on the Municipalities
2    Planning Code notice means publication two times in two
3    consecutive weeks.
4    Q    Exactly.
5    A    Yeah.
6         MS. MONTGOMERY:  Would you mark that as Newton
7    Exhibit 16.
8         (Letter dated 8/29/00 produced and marked as
9    Newton Exhibit No. 16.)
10        THE WITNESS:  I think that's the letter I'm
11   referring to.
12   BY MS. MONTGOMERY:
13   Q    This is the August 29, 2000 letter?
14   A    Yes, um-hum.
15   Q    And in this letter it indicates that you in
16   fact did --
17   A    Yes.
18   Q    -- send Mr. Corneal the building permit
19   application --
20   A    Yes.
21   Q    -- that he had been trying to get?
22   A    Yes.
23   Q    So they were sent then under cover of a letter
24   dated August 29, 2000?
25   A    Yes.  I think the subdivision ordinance might

148

1    have been sent to him at the time of Mr. Van Dommelen's
2    letter.  I think there might be a reference to enclosing
3    that.
4    Q    I notice this August 29, 2000 letter went out
5    and then, as you recall, we have the September -- the
6    August 31 and September 1 application sent right back,
7    right?
8    A    I guess so, yes.
9    Q    Those are the documents that you reviewed in
10   this deposition, right?
11   A    Yes.  I don't recall the dates, but if that
12   was the dates, yeah, fine.
13   Q    Well, these were Newton Exhibits 11 and 12.
14   A    Okay.
15   Q    Letters dated August 31 and September 1, 2000
16   with building application and materials attached.  So I just
17   want to ask you:  Having sent the applications to him, did
18   you not follow up to see whether or not the applications had
19   been filled out and sent back?
20   A    No.  At least as of the date that I wrote the
21   letter I wasn't aware that they had been.
22   Q    You mean as of the date that you wrote the
23   letter for Van Dommelen's signature, is that what you
24   mean?
25   A    No, this is dated August 29th.

149

1    Q    Right.
2    A    And there's a letter from Mr. Corneal which is
3    Exhibit 11 --
4    Q    Right.
5    A    -- enclosing the building permit
6    applications --
7    Q    Right.
8    A    -- along with the check and that's dated
9    August 31st.
10   Q    Right.
11   A    I can only assume that he probably had the
12   building permit application already.
13   Q    Why would you assume that?
14   A    Well, if my letter is dated the 29th, you
15   know, I can only assume by the time the mail gets from
16   Huntingdon to State College -- well, he might have done it
17   right away.  So it's possible, yeah.  I don't know.
18        MS. MONTGOMERY:  Well, I don't think I have
19   any other questions for you, Mr. Newton, pending a review of
20   the documents that we only recently received from the
21   township in which case we might need to call you back.
22        THE WITNESS:  How about in my county?
23        MS. MONTGOMERY:  I'm sorry?
24        THE WITNESS:  Love to have you come to
25   Huntingdon County.

NEWTON, LAWRENCE
06/12/01

CORNEAL  VS
JACKSON TOWNSHIP



150

1          MS. MALADY:  We've been there.
2          MS. MONTGOMERY:  We've been there.
3          THE WITNESS:  Thank you.
4          MS. MONTGOMERY:  It's really quite nice.
5     Thank you.
6          (The deposition was concluded at 2:46 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

151

1
2     COUNTY OF DAUPHIN          :
                                      : SS
3     COMMONWEALTH OF PENNSYLVANIA    :
4          I, Teresa K. Bear, Reporter-Notary Public,
5     authorized to administer oaths within and for the
6     Commonwealth of Pennsylvania and take depositions in the
7     trial of causes, do hereby certify that the foregoing is the
8     testimony of LARRY L. NEWTON.
9          I further certify that before the taking of
10    said deposition, the witness was duly sworn; that the
11    questions and answers were taken down stenographically by
12    the said Teresa K. Bear, a Reporter-Notary Public, approved
13    and agreed to, and afterwards reduced to typewriting under
14    the direction of the said Reporter.
15         I further certify that the proceedings and
16    evidence are contained fully and accurately to the best of
17    my ability in the notes taken by me on the within
18    deposition, and that this copy is a correct transcript of
19    the same.
20         In testimony whereof, I have hereunto
21    subscribed my hand this 27th day of June, 2001.
22
23    _____
           Teresa K. Bear, Reporter
24            Notary Public
           My commission expires
25            on April 13, 2003



*Env.*
*Plan -*    **Exhibit 13**

# HUNTINGDON COUNTY    PLANNING COMMISSION

(814) 643-5091

Court House - Huntingdon, Pennsylvania  16652

February 24, 2000

Mrs. Ann L. Wirth
Jackson Township Secretary
R D 1, Box 390
Petersburg, PA 16669

   RE: David and Sandra Corneal Minor Subdivision

Dear Mrs. Wirth:

The Huntingdon County Planning Commission has reviewed the above referenced proposal to subdivide a property containing 94.67 acres into three lots. Lot 2 (the residue) contains 64.12 acres; Lot 3 contains 4.75 acres and Lot 4 contains 25.80 acres. Lot 1 was previously subdivided and is not included in this proposal. The property is located on the east side of Saw Mill Road (T-527) in Jackson Township. It is our understanding that Jackson Township has placed a moratorium on new subdivisions pending the adoption of a Subdivision and Land Development Ordinance.

The staff of the Planning Commission offers the following comments for your consideration:

1. The proposal is consistent with the draft Huntingdon County Comprehensive Plan. The land use proposed by the Plan for this area is Low Intensity Residential Use.

2. There are several physical limitations evident at the location of this proposal. Steep slopes (over 15%) can be found near the eastern boundary of the property in this proposal. No building construction should take place in steep slope areas. The soil types At, Atkins Silt Loam, and Ph, Philo and Basher Silt Loam, exist along Laurel Run, which runs through all the proposed lots. These are hydric soils and are typically found in wetland areas and near streams. The proposed house, studio, and sewage system for Lot 2 are within these soil types.

Blazosky Associates, Inc conducted a Wetlands Investigation of the project area for the developer. Further investigation should be done prior to approval to identify if wetland areas exist at the proposed construction site due to the snow cover during the



recycled paper

**EXHIBIT**
Wirth 11

investigation and because maps submitted with the investigation did not identify the areas studied. No construction should take place in wetlands areas. No floodplains exist in the area of this proposal.

3. The Jackson Township Supervisors are in the process of adopting a Subdivision and Land Development Ordinance. The following comments are based on the draft Jackson Township Subdivision and Land Development Ordinance:

4. A new street is proposed on the plat to provide access to the lots in this development. Private streets (streets not offered for dedication to the Township) are prohibited unless they meet the design standards of the Ordinance (Section 502.A.6). This proposal would not be classified as a minor subdivision by the Ordinance. The definition of a Minor Subdivision in Section 204 is any subdivision containing not more than 4 lots fronting an existing street.

5. The proposal must comply with all requirements of Section 402, Preliminary Plan, and Section 403, Final Plan.

6. The following information required by Section 402 does not appear on the plat submitted:

Existing contour lines (Section 402.A.9).

Location and width of all streets, easements, right-of-ways, with a statement of any conditions governing their use (Section 402.A.14.a).

Building Setback lines along each street (Section 402.A.14.b). Building Setbacks are as follows: 40' from all right-of-way lines, 15' from property lines (Section 504.C 4,5).

Stormwater management information (Section 402.A.17.a through c).

Supplementary data as applicable (Section 402.B).

Section 403 requirements A through B.

7. The proposed street must also comply with Section 502 of the Ordinance. This section contains the required widths and specifications for a minor street. The Huntingdon County Planning Commission proposed a private driveway standard to Jackson Township in comments of the draft Ordinance on February 4, 2000. This standard, if adopted, in the Ordinance would provide a minimum standard for streets of this type.

8. A stream crossing will be necessary for the street to provide access to the lots as proposed. The developer indicated that he acquired the permit for this crossing. A copy of this permit must be submitted with other data to the Township prior to approval.

9. A sewage easement is proposed for Lot 3 to use a portion of Lot 2 for the installation of a sewage system. The easement should be described on the submitted plat (bearings, distances, acreage) so that a description can be included in each lot deed affected.

10. The developer's surveyor indicated on the plat that a boundary discrepancy exists between the residual lot (Lot 2) and the adjacent property owner. The Township's Solicitor may want to identify if any legal issues exist if the plan is approved without this boundary issue being resolved.

11. A DEP Sewage Facilities Planning Module Component 1 was submitted as part of this proposal. This module and accompanying data indicate soils suitable for on-lot sewage disposal.

12. The Huntingdon County Planning Commission recommends disapproval of this proposal due to both the moratorium and the above comments.

Please contact this office with any questions concerning these comments. As always, the local municipality is encouraged to carefully review the subdivision/sewage module for compliance with Township and State requirements

Sincerely,

Richard E. Stahl
Planning Director

DBY
File GC,Sub,Mtg,C
Pc.   Corneal
      Simpson
      Rouzer

P.02

Exhibit 14



# HUNTINGDON COUNTY

(814) 643-5091

# PLANNING COMMISSION

Court House - Huntingdon, Pennsylvania  16652

April 20, 2000

Mrs. Ann L. Wirth
Jackson Township Secretary
R.D 1, Box 390
Petersburg, PA 16669

RE:   David B. and Sandra Y. Corneal Minor Subdivision

Dear Mrs. Wirth:

The Huntingdon County Planning Commission has reviewed the above referenced
proposal to subdivide a property containing 94.67 acres into two lots.  A proposal was
submitted at the March 22, 2000 Planning Commission meeting for this property as a
three lot subdivision.  This proposal is a resubmission.  Lot 2 (the residue) contains 68.87
acres and Lot 3 contains 25.80 acres.  Lot 1 was previously subdivided and is not
included in this proposal.  The property in this proposal is located on the east side of Saw
Mill Road (T-527) in Jackson Township.  It is our understanding that Jackson Township
has placed a moratorium on new subdivisions pending the adoption of a Subdivision and
Land Development Ordinance.

The staff of the Planning Commission offers the following comments for your
consideration:

1.  The proposal is consistent with the draft Huntingdon County Comprehensive Plan.
The land use proposed by the Plan for this area is Low Intensity Residential Use.

2.  There are several physical limitations evident at the location of this proposal.  Steep
slopes (over 15%) can be found near the eastern boundary of the property in this
proposal.  No building construction should take place in these steep slope areas.  The soil
types At, Atkins Silt Loam, and Ph, Philo and Basher Silt Loam, exist along Laurel Run,
which runs through the proposed lots.  These are hydric soils and are typically found in
wetland areas and near streams.  The proposed house, studio, and sewage system for Lot
2 are within these soil types.



recycled paper

**EXHIBIT**

Wirth 10

Blazosky Associates, Inc conducted a Wetlands Investigation of the project area for the developer  A detailed map and study data identifying the investigation area was submitted and indicates that no wetlands are present at the location of the lots in this proposal.  The Huntingdon County Conservation District has noted that widening of the existing lane to access the new dwelling on Lot 2 may impact potential wetland areas. Road improvements should be limited to existing cartway widths.

3. The Jackson Township Supervisors are in the process of adopting a Subdivision and Land Development Ordinance.  The proposal appears to be in compliance with the regulations of the draft ordinance.  The building setbacks shown on the plat are in compliance with the draft ordinance.  The title certificate on the plat should be completed and notarized prior to recording of the plat.

4. A stream crossing will be necessary for the driveway for Lot 2 to provide access to the proposed structures shown on the plat.  The developer indicated that he acquired the permit for this crossing.  A copy of this permit must be submitted with other data to the Township prior to approval.

9. The developer's surveyor indicated on the plat that a boundary discrepancy exists between the residual lot (Lot 2) and the adjacent property owner.  The Municipal Solicitor may want to identify the existence of any legal issues if the plan is approved without resolution of these boundary issues.

10. A DEP Sewage Facilities Planning Module Component 1 was submitted as part of this proposal  This module and accompanying data indicate soils suitable for on-lot sewage disposal.

11. The Huntingdon County Planning Commission recommends conditional approval of this proposal pending adoption of the Subdivision and Land Development Ordinance.

Please contact this office with any questions concerning these comments.  As always, the local municipality is encouraged to carefully review the subdivision/sewage module for compliance with Township and State requirements.

Sincerely,

Richard E. Stahl
Planning Director

DBY
File:GC,Sub,Mtg,C
Pc:    Corneal
        Simpson
        Rouzer

*Exhibit 15*

## TABLE OF CONTENTS

Article II    General Provisions                      3

    Section 1.00    Intent                      3
              1.01    Applicability               3
              1.02    Abrogation & Greater
                     Restrictions                4
              1.03    Severability                4
              1.04    Warning and Disclaimer
                     of Liability

Article II  Definitions                               4
    Section 2.00    General
              2.01    Specific Definitions        5

Article III Administration                            8
    Section 3.00    Building Permits
                     Required                    8
              3.01    Issuance of Building
                     Permits                     8
              3.02    Application Procedures
                     & Requirements              9
              3.03    Review of Application
                     by Others                   12
              3.04    Changes                     12
              3.05    Placards                    12
              3.06    Start of Construction       12
              3.07    Inspection & Revocation     13
              3.08    Fees                        14
              3.09    Enforcement                 14
             3.10    Appeals                     15

Article IV    General Provisions                      16
    Section 4.00    Design Standards            16

Article V    Floodplain Provisions                    16
    Section 5.00    Construction or
                     Development                 16
              5.01    Identification              16

Article VI    Variances                               18
    Section 6.00    General                     18
              6.01    Variance Procedures
                     & Requirements              18

Article VII Technical Provisions                      20
    Section 7.00    General                     20
              7.01    Special Floodway &
                     Stream Setback
                     Requirements                20
              7.02    Elevation and Flood-
                     proofing Requirements       21

2

7.03  Design and Construction
      Standards                    22
7.04  Development Which May
      Endanger Human Life          25
7.05  Special Requirements for
      Manufactured Homes           26

Article VIII General                   27
      Section 8.00  General            27
             8.01  Application Requirements
                   for Special Permits  27
             8.02  Application Review
                   Procedures           30
             8.03  Special Technical
                   Requirements         31

Article IX   Existing Structures in
             Identified Floodplain Areas  32
      Section 9.00  General              32

AN ORDINANCE REQUIRING ALL PERSONS, PARTNERSHIPS,
BUSINESSES AND CORPORATIONS TO OBTAIN A BUILDING
PERMIT FOR THE CONSTRUCTION, RECONSTRUCTION, EN-
LARGEMENT, ALTERATION, OR RELOCATION OF ANY BUILD-
ING OR STRUCTURE:  PROVIDING FOR THE ISSUANCE OF
SUCH BUILDING PERMITS; AND PROVIDING FOR PENALTIES
FOR ANY PERSONS WHO FAIL OR REFUSE TO COMPLY WITH
THE REQUIREMENTS OR PROVISIONS OF THE ORDINANCE.

BE IT ENACTED AND ORDAINED BY the Jackson Township
Supervisors, Huntingdon County, Pennsylvania, and it is
hereby enacted and ordained by the authority of the same as
follows:

ARTICLE I  GENERAL PROVISIONS

Section 1.00  Intent

The intent of this Ordinance is to:

A.    Promote the general health, welfare, and safety of
the community.

B.    Encourage the utilization of appropriate
construction practices in order to prevent or
minimize flood damage in the future.

C.    Minimize danger to public health by protecting
water supply and natural drainage.

D.    Reduce financial burdens imposed on the community,
its governmental units, and its residents, by
preventing excessive development in areas subject
to flooding.

E.    Comply with federal and state floodplain
management requirements.

Section 1.01.  Applicability

A.    It shall be unlawful for any person, partnership,
business, or corporation to undertake, or cause to
be undertaken, any construction or development
anywhere within the Township unless a Building
Permit has been obtained from the Building Permit
Officer.

B.    A building permit shall not be required for minor
repairs to existing buildings or structures.

4

## Section 1.02   Abrogation and Greater Restrictions

This Ordinance supersedes any other conflicting provisions which may be in effect in identified floodplain areas.  However, any other Ordinance provisions shall remain in full force and effect to the extent that those provisions are more restrictive.  If there is any conflict between any of the provisions of this Ordinance, the more restrictive shall apply.

## Section 1.03   Severability

If any section, subsection, paragraph, sentence, clause, or phrase of this Ordinance should be declared invalid for any reason whatsoever, such decision shall not affect the remaining portions of this Ordinance which shall remain in full force and effect, and for this purpose, the provisions of this Ordinance are hereby declared to be severable.

## Section 1.04   Warning and Disclaimer of Liability

The degree of flood protection sought by the provisions of this Ordinance is considered reasonable for regulatory purposes and is based on acceptable engineering methods of study.  Larger floods may occur. Flood heights may be increased by man-made or natural causes, such as ice jams and bridge openings restricted by debris.  This Ordinance does not imply that areas outside any identified floodplain area, or that land uses permitted within such areas will be free from flooding or flood damages.

This Ordinance shall not create liability on the Part of the Township or any officer or employee thereof for any flood damages that result from reliance on this Ordinance or any administrative decision lawfully made thereunder.

## ARTICLE II   DEFINITIONS

## Section 2.00   General

Unless specifically defined below, words and phrases used in this Ordinance shall be interpreted so as to give this Ordinance its most reasonable application.

5

Section 2.01 Specific Definitions

    A.    Accessory use or structure - a use of structure on the same lot with, and of a nature customarily incidental and subordinate to, the principal use or structure.

    B.    Building - a combination of materials to form a permanent structure having walls and a roof. Included shall be all manufactured homes and trailers to be used for human habitation.

    C.    Completely dry space - a space which will remain totally dry during flooding; the structure is designed and constructed to prevent the passage of water and water vapor.

    D.    Construction - the construction, reconstruction, renovation, repair, extension, expansion, alteration, or relocation of a building or structure, including the placement of manufactured homes.

    E.    Development - any man-made change to improved or unimproved real estate, including but not limited to buildings or other structures, the placement of manufactured homes, streets, and other paving, utilities, filling, grading, excavation, mining, dredging, or drilling operations and the subdivision of land.

    F.    Essentially dry space - a space which will remain dry during flooding, except for the passage of some water vapor or minor seepage; the structure is substantially impermeable to the passage of water.

    G.    Flood - a temporary inundation of normally dry land areas.

    H.    Floodplain - a relatively flat or low land area which is subject to partial or complete inundation from an adjoining or nearby stream, river, or watercourse; and/or any area subject to the unusual and rapid accumulation of surface waters from any source.

    I.    Floodproofing - means any combination of structural and non-structural additions, changes, or adjustments to structures which reduce or eliminate flood damage to real estate or improved real property, water and sanitary facilities, structures, and their contents.

J    FW   (Floodway Area) - the areas identified as "Floodway" in the Flood Insurance Study prepared by FEMA.  The term shall also include floodway areas which have been identified in other available studies or sources of information for those floodplain areas where no floodway has been identified in the Flood Insurance Study prepared by FEMA.

K.   FF   (Flood-Fringe Area) - the areas identified as "Floodway Fringe" in the Flood Insurance Study prepared by FEMA.

L.   Identified Floodplain Area - the floodplain area specifically identified in this Ordinance as being inundated by the one hundred (100) year flood. Included would be areas identified as Floodway (FW), Flood-Fringe (FF), and General Flood Plain (FA).

M.   Land Development - (i) the improvement of one lot, or two or more contiguous lots, tracts, or parcels of land for any purpose involving: (a) a group of two or more buildings, or (b) the division or allocation of land or space between or among two or more existing or prospective occupants by means of, or for the purpose of streets, common areas, leaseholds, condominiums, building groups, or other features; (ii) a subdivision of land.

N.   Lowest Floor - means the lowest floor of the lowest enclosed area (including basement).  An unfinished or flood resistant enclosure, usable soley for parking of vehicles, building access or storage in an area other than a basement area is not considered a building's lowest floor; Provided, that such enclosure is not built so as to render the structure in violation of the applicable non-evevation design requirements of 44 CFR - 60.3

O.   Minor repair - the replacement of existing work with equivalent materials for the purpose of its routine maintenance and upkeep, but not including the cutting away of any wall, partition or portion thereof, the removal or cutting of any structural beam or bearing support, or the removal or change of any required means of egress, or rearrangement of parts of a structure affecting the exitway requirements; nor shall minor repairs include addition to, alteration of, replacement or relocation of any standpipe, water supply, sewer, drainage, drain leader, gas, soil, waste, vent or similar piping, electric wiring or mechanical or

other work affecting public health or general safety.

P.  Manufactured home - a structure, transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities.  The term includes park trailers, travel trailers, recreational, and other similar vehicles placed on a site for more than 180 consecutive days.

Q.  Manufactured home park - a parcel (or contiguous parcels) of land which has been planned and improved for the placement of two or more manufactured homes.

R.  Obstruction - any wall, dam, wharf, embankment, levee, dike, pile abutment, projection, excavation, channel, rectification, culvert, building, fence, stockpile, refuse, fill, structure, or matter in, along, across, or projecting into any channel, watercourse, or flood-prone area, (i) which may impede, retard, or change the direction of the flow of water either in itself or by catching or collecting debris carried by such water, or (ii) which is placed where the flow of the water might carry the same downstream to the damage of life and property.

S.  One hundred year flood - a flood that, on the average, is likely to occur once every one hundred (100) years (i.e. that has a one (1) percent chance of occurring each year, although the flood may occur in any year).

T.  Person - an individual, partnership, public or private association or corporation, firm, trust, estate, municipality, governmental unit, public utility, or any other legal entity whatsoever which is recognized by law as the subject of rights and duties.

U.  Regulatory flood elevation - the one hundred (100) year flood elevation plus a freeboard safety factor of one and one-half (1 1/2) feet.

V.  Special permit - a special approval which is required for hospitals, nursing homes, jails, and new manufactured home parks and subdivisions, and substantial improvements to such existing parks, when such development is located in all, or a designated portion of a floodplain.

W.    Structure - anything constructed or erected on the
      ground, or attached to the ground including, but
      not limited to buildings, sheds, manufactured
      homes, and other similar items.

X.    Subdivision - the division or redivision of a lot,
      tract, or parcel of land by any means into two or
      more lots, tracts, parcels, or other division of
      land, including changes in existing lot lines for
      the purpose, whether immediate or future, of
      lease, transfer of ownership, or building, or lot
      development, provided however, that the division
      of land for agricultural purposes into parcels of
      more than ten (10) acres, not involving any new
      street or easement of access, shall be exempted.

Y.    Substantial Improvement - any repair,
      reconstruction, or improvement of a structure, the
      cost of which equals or exceeds 50 percent of the
      market value of the structure either, (a) before
      the improvement or repair is started, or (b) if
      the stricture has been damaged, and is being
      restored, before the damage occurred.

ARTICLE III   ADMINISTRATION

Section 3.00  Building Permits Required

      Building permits shall be required before any
      construction or development is undertaken within any
      area of the Township.

Section 3.01  Issuance of Building Permits

A.    The Building Permit Officer shall issue a building
      permit only after it has been determined that the
      proposed work to be undertaken will be in
      conformance with the requirements of this and all
      other applicable codes and ordinances.

B.    Prior to the issuance of any building permit, the
      Building Permit Officer shall review the
      application for permit to determine if all other
      necessary governmental permits required by State
      and Federal laws have been obtained, such as those
      required by the Pennsylvania Sewage Facilities Act
      (Act 1966-537, as amended); the Dam Safety and
      Encroachments Act (Act 1978-325, as amended); the
      US Clean Water Act, Section 404, 33, USC 1334; and
      the Pennsylvania Clean Streams Act (Act 1937-394,
      as amended).  Highway Occupancy Permit (Act 1986-
      43)  No permit shall be issued until this
      determination has been made.

C.    No encroachment, alteration, or improvement of any
      kind shall be made to any watercourse until all
      adjacent municipalities which may be affected by
      such action have been notified by the municipality
      and until all required permits or approvals have
      been first obtained from the Department of
      Environmental Resources, Bureau of Dams and
      Waterway Management.

      In addition, the Federal Emergency Management
      Agency and Pennsylvania Department of Community
      Affairs, Bureau of Community Planning, shall be
      notified by the municipality prior to any
      alteration or relocation of any watercourse.

Section 3.02  Application Procedures and Requirements

A.    Application for such a building permit shall be
      made, in writing, to the Building Permit Officer
      on forms supplied by the Township.  Such
      applications shall contain the following:

      1.  Name and address of applicant.

      2.  Name and address of owner of land on which
          proposed construction is to occur.

      3.  Name and address of contractor.

      4.  Site location.

      5.  Listing of other permits required.

      6.  Brief description of proposed work and
          estimated cost.

      7.  A plan of the site showing the size
          and location of the proposed construction as
          well as any existing buildings or structures.

B.    If any proposed construction or development is
      located entirely or partially within any
      identified floodplain area, applicants for
      Building Permits shall provide all the necessary
      information in sufficient detail and clarity to
      enable the Building Permit Officer to determine
      that:

      (a)  all such proposals are consistent with the
           need to minimize flood damage and conform

with the requirements of this and all other
applicable codes and ordinances;

(b)  all utilities and facilities, such as sewer,
gas, electrical, and water systems are
located and constructed to minimize or
eliminate flood damage; and

(c)  adequate drainage is provided so as to reduce
exposure to flood hazards.

Applicants shall file the following minimum
information, plus any other pertinent information
as may be required by the Building Permit Officer
to make the above determination:

1.  A completed Building Permit Application Form.

2.  A plan of the entire site, clearly and
legibly drawn at a scale of one (1) inch
being equal to one hundred (100) feet or
less, showing the following:

a.  north arrow, scale, and date;

b.  topographic contour lines, if available;

c.  all property and lot lines including
dimensions, and the size of the site
expressed in acres or square feet;

d.  the location of all existing and
proposed buildings, structures, and
other improvements, including the
location of any existing or proposed
subdivision and land development;

e.  the location of all existing streets,
drives, and other accessways; and

f.  the location of any existing bodies of
water or watercourses, identified
floodplain areas, and, if available,
information pertaining to the floodway,
and the flow of water, including
direction and velocities.

3.  Plans of all proposed buildings, structures, and
other improvements, drawn at suitable scale
showing the following:

a.  the proposed lowest floor elevation of any proposed building based upon National Geodetic Vertical Datum of 1929;

b.  the elevation of the one hundred (100) year flood;

c.  if available, information concerning flood depths, pressures, velocities, impact and uplift forces, and other factors associated with a one hundred (100) year flood; and

d.  detailed information concerning any proposed floodproofing measures.

4.  The following data and documentation:

a.  documentation, certified by a registered professional engineer or architect, to show that the cumulative effect of any proposed development within an AE Area/District, when combined with all other existing and anticipated development, will not increase the elevation of the one hundred (100) year flood more than one foot at any point.

b.  a document, certified by a registered professional engineer or architect, which states that the proposed construction or development has been adequately designed to withstand the one hundred (100) year flood elevations, pressures, velocities, impact, and uplift forces associated with the one hundred (100) year flood.

Such a statement shall include a description of the type and extent of flood-proofing measures which have been incorporated into the design of the structure and/or the development.

c.  detailed information needed to determine compliance with Section 7.03 F., Storage, and Section 7.04, Development Which May Endanger Human Life, including:

(i)  the amount, location, and purpose of any materials or substances referred to in Sections 7.03 F and 7.04 which are intended to be used, produced, stored, or otherwise maintained on site.

(ii) a description of the safeguards incorporated into the design of the

proposed structure to prevent leaks or
spills of the dangerous materials or
substances listed in Section 7.04 during
a one hundred (100) year flood.

    d.    the appropriate component of the Department
of Environmental Resources "Planning Module
for Land Development."

    e.    where any excavation or grading is proposed,
a plan meeting the requirements of the
Department of Environmental Resources, to
implement and maintain erosion and
sedimentation control.

Section 3.03   Review of Application by Others

A copy of all plans and applications for any proposed
construction or development in any identified
floodplain area to be considered for approval may be
submitted by the Building Permit Officer to any other
appropriate agencies and/or individuals (e.g. planning
commission, municipal engineer, etc.) for review and
comment.

Section 3.04   Changes

After the issuance of a building permit by the Building
Permit Officer, no changes of any kind shall be made to
the application, permit, or any of the plans,
specifications, or other documents submitted with the
application without the written consent or approval of
the Building Permit Officer. Requests for any such
change shall be in writing, and shall be submitted by
the applicant to the Building Permit Officer for
consideration.

Section 3.05   Placards

In addition to the building permit, the Building Permit
Officer shall issue a placard which shall be displayed
on the premises during the time construction is in
progress. This placard shall show the number of the
building permit, the date of its issuance, and be
signed by the Building Permit Officer.

Section 3.06   Start of Construction

Work on the proposed construction shall begin within
six (6) months and shall be completed within twelve
(12) months after the date of issuance of the building
permit or the permit shall expire unless a time
extension is granted, in writing, by the Building
Permit Officer. Construction shall be considered to

*Time period* [handwritten margin note]

have started with the first placement of permanent construction on the site, such as the pouring of slabs or footings or any work beyond the stage of excavation. For a structure without a basement or poured footings, the start of construction includes the first permanent framing or assembly of the structure or any part thereof on its pilings or foundation, or the affixing of any prefabricated structure or mobile home to its permanent site. Permanent construction does not include land preparation, land clearing, grading, filling; excavation for basement, footings, piers, or foundations; erection of temporary forms; the installation of piling under proposed subsurface footings; or the installation of sewer, gas, and water pipes, or electric or other service lines from the street.

The extension shall be granted only if a written request is submitted by the applicant, which sets forth sufficient and reasonable cause for the Building Permit Officer to approve such a request.

Section 3.07  Inspection and Revocation

A.  During the construction period, the Building Permit Officer or other authorized official may inspect the premises to determine that the work is progressing in compliance with the information provided on the permit application and with all applicable municipal laws and ordinances. He shall make as many inspections during and upon completion of the work as are necessary.

B.  In the discharge of his duties, the Building Permit Officer shall have the authority to enter any building, structure, premises or development in the identified floodplain area, upon presentation of proper credentials, at any reasonable hour to enforce the provisions of this ordinance.

C.  In the event the Building Permit Officer discovers that the work does not comply with the permit applications or any applicable laws and ordinances, or that there has been a false statement or misrepresentation by any applicant, the Building Permit Officer shall revoke the building permit and report such facts to the Supervisors for whatever action they consider necessary.

D.  A record of all such inspections and violations of this Ordinance shall be maintained.

14

Section 3.08 Fees

Applications for a building permit shall be accompanied by a fee, payable to the municipality, based upon the estimated cost of the proposed construction, as determined by the Building Permit Officer, at the following rates:

| Building Cost | Fee |
|---|---|
| $0 - $999 Dollars | $10.00 |
| $1,000 + | $20.00 |
| Non-Buildings (eg. fences, above ground pools, filling, grading, excavating, paving, utilities, mining, dredging etc.) | $ 0.00 |

*Fee Schedule*

*Petty ... Sliding Scale*

Section 3.09 Enforcement

A. Notices

Whenever the Building Official or other authorized municipal representative determines that there are reasonable grounds to believe that there has been a violation of any provision of this Ordinance, or of any regulations adopted pursuant thereto, such authority shall give notice of such alleged violation as hereinafter provided. Such notice shall (a) be in writing; (b) include a statement of the reasons for its issuance; (c) allow a reasonable time for the performance of any act it requires; (d) be served upon the property owner or his agent as the case may require; provided, however, that such notice or order shall be deemed to have been properly served upon such owner or agent when a copy thereof has been served with such notice by any other method authorized or required by the laws of this state; (e) contain an outline of remedial action which, if taken, will affect compliance with the provisions of this Ordinance, or any part thereof, and with the regulations adopted pursuant thereto.

B. Penalties

Any person who fails to comply with any or all of the requirements or provisions of this Ordinance or who fails or refuses to comply with any notice, order, or direction of the Building Permit Officer

or any other authorized employee of the
municipality, shall be guilty of an offense and,
upon conviction, shall pay a fine to the Township
of not less than Twenty-five Dollars ($25) nor
more than Three Hundred Dollars ($300), plus costs
of prosecution. In default of such payment, such
person shall be imprisoned in county prison for a
period not to exceed ten (10) days. Each day
during which any violation of this Ordinance
continues shall constitute a separate offense. In
addition to the above penalties all other actions
are hereby reserved including an action in equity
for the proper enforcement of this Ordinance. The
imposition of a fine or penalty for any violation
of, or noncompliance with, this Ordinance shall
not excuse the violation or noncompliance or
permit it to continue; and all such persons shall
be required to correct or remedy such violations
and noncompliances within a reasonable time. Any
structure or building construction, reconstructed,
enlarged, altered, or relocated, in noncompliance
with this Ordinance may be declared by the
Supervisors to be a public nuisance and abatable
as such.

Section 3.10   Appeals

A.    Any person aggrieved by an action or decision of
the Building Permit Officer involving
administration of the provisions of the Ordinance
may appeal to the Township Supervisors. Such
appeal must be filed, in writing, within thirty
(30) days after the decision or action by the
Building Permit Officer.

B.    Upon receipt of such appeal, the Township
Supervisors shall set a time and place, within not
less than ten (10) nor more than thirty (30) days,
for the purpose of considering the appeal. Notice
of the time and place of the hearing of the appeal
shall be given to all the parties.

C.    Any person aggrieved by any decision of the
Supervisors may seek relief therefrom by appeal to
court, as provided by the laws of the
Commonwealth, including the Pennsylvania Flood
Plain Management Act.

ARTICLE IV GENERAL PROVISIONS

Section 4.00   Design Standards

The plans and specifications submitted as provided
in Section 3.02 above shall conform to the

667 - 389, 16

following requirements, and any building constructed within the Township, or any addition to any existing building therein, must conform to the following requirements:

A.  No building shall be located closer than forty (40) feet from the street right-of-way or sixty-five (65) feet from the street centerline.

B.  No building shall be located closer than fifteen (15) feet from any property line, and no residence shall be constructed within thirty (30) feet of an existing residential structure.

C.  No building or structure shall be constructed closer than fifty (50) feet from the top-of-bank of any watercourse.

ARTICLE V  FLOODPLAIN PROVISIONS

Section 5.00  Construction or Development

A.  Any new construction, development, uses or activities allowed within any identified floodplain area, shall be undertaken in strict compliance with the provisions contained in this Ordinance and any other applicable codes, ordinances and regulations.

B.  Repairs, improvements, or modifications to an existing structure which amount to less than fifty (50) percent of the market value are permitted provided such work does not result in the expansion or enlargement of the structure.

Section 5.01  Identification

A.  For the purposes of this Ordinance, the areas considered to be floodplain within the Township shall be those areas identified as being subject to flooding by a one hundred (100) year flood in the Flood Insurance Study prepared for the Township by the Federal Emergency Management Agency or the most recent revision thereof, or the areas shown as such on the most recent (FIRM) Flood Insurance Rate Map.

B.  A map showing all areas considered to be subject to the one hundred (100) year flood is available for inspection at the Township office.  For the purposes of this Ordinance,

the following nomenclature is used in referring to the various kinds of floodplain areas:

AE    The AE Area/District shall be those areas identified as an AE Zone on the FIRM included in the FIS prepared by FEMA and for which one hundred (100) year flood elevations have been provided in the FIS.

FA    (General Floodplain Area) - the areas identified as "Approximate 100 year Floodplain" in the Flood Insurance Study prepared by FEMA.

C.    The FA (General Floodplain Area) shall be that floodplain for which no detailed flood elevations or floodway information is provided.  Such areas are shown as Zone A on the maps accompanying the Flood Insurance Study prepared by FEMA.  For these areas, elevation and floodway information from other Federal, State, or other acceptable sources, shall be used when available.  When such other acceptable information is not available, the applicant for the proposed use, development, or activity shall determine the one hundred (100) year flood elevation in accordance with hydrologic and hydraulic engineering techniques.

D.    The identified floodplain area may be revised or modified by the Township Supervisors where studies or information provided by a qualified agency or person documents the need for such revision or modification.  However, prior to any such change, approval must be obtained from the Federal Emergency Management Agency.

E.    Should a dispute concerning any identified floodplain boundary arise, any party aggrieved by such determination may appeal to the Supervisors.  The  burden of proof shall be on the appellant.

F.    The Municipality reserves the right to require the applicant to delineate a floodway area and provide sufficient documentation to demonstrate that his proposed activity, together with all other existing and

anticipated development, uses, and
activities, will not increase the water
surface elevation of the one hundred (100)
year flood more than one (1) foot at any
point. The engineering principle of equal
reduction of conveyance, shall be used to
make the determination of increases in flood
heights.

G. Hydrologic and hydraulic analyses shall be
undertaken only by professional engineers or
others of demonstrated qualifications, who
shall certify that the technical methods used
correctly reflect currently accepted
technical concepts. Studies, analyses,
computations, etc., shall be submitted in
sufficient detail to allow a thorough
technical review by the Township.

ARTICLE VI   VARIANCES

Section 6.00   General

If compliance with any of the requirements of this ordinance
would result in an exceptional hardship to a prospective
builder, developer or landowner, the Township Supervisors
may, upon request, grant relief from the strict application
of the requirements.

Section 6.01   Variance Procedures and Requirements

Requests for variance shall be considered by the
Township Supervisors in accordance with the following:

A. No variance shall be granted for any construction,
development, use, or activity within any floodway
area that would cause any increase in the one
hundred (100) year flood elevation.

B. Except for a possible modification of the one and
one-half (1 1/2) foot freeboard requirements, no
variance shall be granted for any of the other
requirements pertaining specifically to
development regulated by Special Permits (Article
VIII) or to Development Which May Endanger Human
Life (Section 7.04).

C. If granted, a variance shall involve only the
least modification necessary to provide relief.

D. In granting any variance, the Township shall
attach whatever reasonable conditions and
safeguards it considers necessary in order to

protect public health, safety, and welfare, and to achieve the objectives of this Ordinance.

E.   Whenever a variance is granted, the Township shall notify the applicant in writing that:

   a.   the granting of the variance may result in increased premium rates for flood insurance.

   b.   such variances may increase the risks to life and property.

F.   In reviewing any request for a variance, the Township shall consider, but be limited to, the following:

   a.   that there is good and sufficient cause.

   b.   that failure to grant the variance would result in exceptional hardship to the applicant.

   c.   that the granting of the variance will (i) neither result in an unacceptable or prohibited increase in flood heights, additional threats to public safety, or extraordinary public expenses; (ii) nor create nuisances, cause fraud on, or victimize the public, or conflict with any other applicable State statute or regulations, or local ordinances or regulations.

G.   A complete record of all variance requests and related actions shall be maintained by the Township.  In addition, a report of all variances granted during the year shall be included in the annual report to the Federal Emergency Management Agency.

Not withstanding any of the above, however, all structures shall be designed and constructed so as to have the capability of resisting the one hundred (100) year flood.

ARTICLE VII  TECHNICAL PROVISIONS

Section 7.00  General

A.   No encroachment, alteration, or improvement of any kind shall be made to any watercourse until all adjacent municipalities which may be affected by such action have been notified by the

municipality, and until all required permits or approvals have been first obtained from the Department of Environmental Resources, the Bureau of Dams and Waterway Management.

In addition, the Federal Emergency Management Agency and Pennsylvania Department of Community Affairs, Bureau of Community Planning, shall be notified prior to any alteration or relocation of any watercourse.

B.    Any new construction, development, uses, or activities allowed within any identified floodplain area, shall be undertaken in strict compliance with the provisions contained in this Ordinance and any other applicable codes, ordinances, and regulations.

C.    Within any AE Area/District, no new construction or development shall be allowed unless it is demonstrated that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the elevation of the one (100) year flood more than one (1) foot at any point.

Section 7.01    Special Floodway and Stream Setback Requirements

A.    Within any floodway area, the following provisions apply:

1.    Any new construction, development, use, activity, or encroachment that would cause any increase in flood heights shall be prohibited.

2.    No new construction or development shall be allowed, unless a permit is obtained from the Department of Environmental Resources, Bureau of Dams and Waterway Management.

B.    Within any FA (General Floodplain Area) or AE Area, the following provisions apply:

1.    No new construction or development shall be located within the area measured fifty (50) feet landward from the top-of-bank of any watercourse, unless a permit is obtained from the Department of Environmental Resources, Bureau of Dams and Waterway Management.

2.   Any new construction, development, use, activity, or encroachment which would cause any increase in flood heights shall be prohibited within a floodway area delineated by an applicant.

Section 7.02   Elevation and Floodproofing Requirements

A.   Residential Structures

Within any Identified Flood Plain Area, the lowest floor (including the basement) of any new or substantially improved residential structure shall be at least one and one-half (1 1/2) feet above the one hundred (100) year flood elevation.

B.   Non-Residential Structures

1.   Within any Identified Flood Plain Area, the lowest floor (including the basement) of any new or substantially improved non-residential structure shall be at least one and one-half (1 1/2) feet above the one hundred (100) year flood elevation, or be designed and constructed so that the space enclosed by such structure shall remain either completely or essentially dry during any flood up to that height.

2.   Any non-residential structure, or part thereof, having a lowest floor (including basement) which is not elevated to at least one and one half (1 1/2) feet above the one hundred year flood elevation, shall be floodproofed in a completely or essentially dry manner in acordance with the W-1 or W-2 space classification standards contained in the publication entitled "Flood-Proofing Regulations" published by the U.S. Army Corps of Engineers (June 1972), or with some other equivalent standard.  All plans and specifications for such floodproofing shall be accompanied by a statement certified by a registered professional engineer or architect which states that the proposed design and methods of construction are in conformance with the above referenced standards.

C.   Enclosed Areas Below the Lowest Floor

Enclosed areas below the lowest floor (including the basement) are prohibited.

Section 7.03   Design and Construction Standards

The following standards shall apply for all construction and development proposed within any identified floodplain area:

A.    Fill

If fill is used, it shall:

1.    extend laterally at least fifteen (15) feet beyond the building line from all points.

2.    consist of soil or small rock materials only. Sanitary Landfills shall not be permitted.

3.    be compacted to provide the necessary permeability and resistance to erosion, scouring, or settling.

4.    be no steeper than one (1) vertical to two (2) horizontal, unless substantiated data, justifying steeper slopes are submitted to, and approved by the Building Permit Officer.

5.    be used to the extent to which it does not adversely affect adjacent properties.

B.    Drainage

Storm drainage facilities shall be designed to convey the flow of storm water runoff in a safe and efficient manner. The system shall insure proper drainage along streets, and provide positive drainage away from buildings. The system shall also be designed to prevent the discharge of excess runoff onto adjacent properties.

C.    Water and Sanitary Sewer Facilities and Systems

1.    All new or replacement water and sanitary sewer facilities and systems shall be located, designed, and constructed to minimize or eliminate flood damages and the infiltration of flood waters.

2.    Sanitary sewer facilities and systems shall be designed to prevent the discharge of untreated sewage into flood waters.

3.    No part of any on-site sewage system shall be located within any identified flooplain area except in strict compliance with all State and local regulations for such systems. If any such system is permitted, it shall be

located so as to avoid impairment to it, or
contamination from it, during a flood.

D.    Other Utilities

All other utilities, such as, gas lines,
electrical and telephone systems shall be located,
elevated (where possible) and constructed to
minimize the chance of impairment during a flood.

E.    Streets

The finished elevation of all new streets shall be
no more than one (1) foot below the Regulatory
Flood Elevation.

F.    Storage

All materials that are buoyant, flammable,
explosive or, in times of flooding, could be
injurious to human, animal, or plant life, and not
listed in Section 7.04, Development Which May
Endanger Human Life, shall be stored at or above
the Regulatory Flood Elevation and/or floodproofed
to the maximum extent possible.

G.    Placement of Buildings and Structures

All buildings and structures shall be designed,
located, and constructed so as to offer the
minimum obstruction to the flow of water and shall
be designed to have a minimum effect upon the flow
and height of flood water.

H.    Anchoring

1.    All buildings and structures shall be firmly
anchored in accordance with accepted
engineering practices to prevent flotation,
collapse, or lateral movement.

2.    All air ducts, large pipes, storage tanks,
and other similar objects or components
located below the Regulatory Flood Elevation
shall be securely anchored or affixed to
prevent flotation.

I.    Floors, Walls, and Ceilings

1.    Wood flooring used at or below the Regulatory
Flood Elevation shall be installed to
accommodate a lateral expansion of the
flooring, perpendicular to the flooring grain

24

without causing structural damage to the
building.

2.    Plywood used at or below the Regulatory Flood
Elevation shall be designed and constructed
of materials that are water-resistant and
will withstand inundation.

3.    Walls and ceilings at or below the Regulatory
Flood Elevation shall be designed and
constructed of materials that are water-
resistant and will withstand inundation.

4.    Windows, doors, and other components at or
below the Regulatory Flood Elevation shall be
made of metal or other water-resistant
material.

J.    Paints and Adhesives

1.    Paints or other finishes used at or below the
Regulatory Flood Elevation shall be of a
"marine" or water-resistant quality.

2.    Adhesives used at or below the Regulatory
Flood Elevation shall be of a "marine" or
water-resistant quality.

3.    All wooden components (doors, trim, cabinets,
etc.) used at or below the Regulatory Flood
Elevation shall be finished with a "marine"
or water-resistant paint or other finishing
material.

K.    Electrical Components

1.    Electrical distribution panels shall be at
least three (3) feet above the one hundred
(100) year flood elevation.

2.    Separate electrical circuits shall serve
lower levels and shall be dropped from above.

L.   Equipment

Water heaters, furnaces, air conditioning, and
ventilating units, and other electrical,
mechanical, or utility equipment or apparatus
shall not be located below the Regulatory Flood
Elevation.

M.   Fuel Supply Systems

All gas and oil supply systems shall be designed
to prevent the infiltration of flood waters into
the system and discharges from the system into
flood waters.  Additional provisions shall be made
for the drainage of these systems in the event
that flood water infiltration occurs.

Section 7.04   Development Which May Endanger Human Life

A.   In accordance with the Pennsylvania Flood Plain
Management Act, and the regulations adopted by the
Department of Community Affairs as required by the
Act, any new or substantially improved structure
which:

- will be used for the production or storage of
any of the following dangerous materials or
substances; or,

- will be used for any activity requiring the
maintenance of a supply of more than 550 gallons,
or other comparable volume, of any of the
following dangerous materials or substances on the
premises; or,

- will involve the production, storage, or use of
any amount of radioactive substances;

shall be subject to the provisions of this
section, in addition to all other applicable
provisions.  The following list of materials and
substances are considered dangerous to human life:

a.   Acetone
b.   Ammonia
c.   Benzene
d.   Calcium carbide
e.   Carbon disulfide
f.   Celluloid
g.   Chlorine
h.   Hydrochloric acid
i.   Hydrocyanic acid
j.   Magnesium
k.   Nitric acid and oxides of nitrogen

        l.    Petroleum products (gasoline, fuel
                oil, etc.)
        m.   Phosphorus
        n.   Potassium
        o.   Sodium
        p.   Sulphur and sulphur products
        q.   Pesticides (including insecticides,
                fungicides, and rodenticides)
        r.   Radioactive substances, insofar as
                such substances are not otherwise
                regulated.

B.   Within any FW (Floodway Area), any structure of
     the kind described in Subsection A, above, shall
     be prohibited.

C.   Within any FA (General Floodplain Area), any
     structure of the kind described in Subsection A,
     above, shall be prohibited within the area
     measured fifty (50) feet landward from the top-of-
     bank of any watercourse.

D.   Where permitted within any FF (Flood-Fringe Area)
     or FA (General Floodplain Area) or AE Area, any
     structure of the kind described in Subsection A,
     above shall be:

      1.   elevated or designed and constructed to
          remain completely dry up to at least one and
          one-half (1 1/2) feet above the one hundred
          (100) year flood and

      2.   designed to prevent pollution from the
          structure or activity during the course of a
          one hundred (100) year flood.

     Any such structure, or part thereof, that will be
     built below the Regulatory Flood Elevation shall
     be designed and constructed in accordance with the
     standards for completely dry flood-proofing
     contained in the publication "Flood-Proofing
     Regulations" (U.S. Army Corps of Engineers, June
     1972), or with some other equivalent watertight
     standard.

Section 7.05  Special Requirements for Manufactured Homes

   A.   With any floodway area, manufactured homes shall
      be prohibited.

   B.   Within any FA (General Floodplain Area) or AE
      Area, manufactured homes shall be prohibited

within the area measured fifty (50) feet landward from top-of-bank of any watercourse.

C.   Where permitted within any floodplain area, all manufactured homes, and any additions thereto, shall be:

1.   placed on a permanent foundation.

2.   elevated so that the lowest floor of the manufactured home is one and one half (1 1/2) feet or more above the elevation of the one hundred (100) year flood.

3.   anchored to resist flotation, collapse, or lateral movement.

ARTICLE VIII

Section 8.00   General

In accordance with the administration regulations promulgated by the Department of Community Affairs to implement the Pennsylvania Flood Plain Management Act, the following activities shall be prohibited within any identified floodplain area unless a Special Permit has been issued by the Township.

A.   The commencement of any of the following activities; or the construction, enlargement, or expansion of any structure used, or intended to be used, for any of the following activities:

1.   hospitals

2.   nursing homes

3.   jails or prisons

B.   The commencement of, or any construction of, a new manufactured home park or manufactured home subdivision, or substantial improvement to an existing manufactured home park or manufactured home subdivision.

Section 8.01   Application Requirements for Special Permits

Applicants for Special Permits shall provide five copies of the following items:

A.   A written request including a completed Building Permit Application Form.

B.   A small scale map showing the vicinity in which the proposed site is located.

C.   A plan of the entire site, clearly and legibly drawn at a scale of one (1) inch being equal to one hundred (100) feet or less, showing the following:

1.   north arrow, scale, and date;

2.   topography based upon the National Geodetic Vertical Datum of 1929, showing existing and proposed contours at intervals of two (2) feet;

3.   all property and lot lines including dimensions, and the size of the site expressed in acres or square feet;

4.   the location of all existing streets, drives, other accessways, and parking areas, with information concerning widths, pavement types and construction, and elevations;

5.   the location of any existing bodies of water or watercourses, buildings, structures, and other public or private facilities, including railroad tracks and facilities and any other natural and man-made features affecting, or affected by, the proposed activity or development;

6.   the location of the floodplain boundary line, information and spot elevations concerning the one hundred (100) year flood elevations, and information concerning the flow of water including direction and velocities;

7.   the location of all proposed buildings, structures, utilities, and any other improvements; and

8.   any other information which the municipality considers necessary for adequate review of the application.

D.   Plans of all proposed buildings, structures, and other improvements, clearly and legibly drawn at suitable scale showing the following:

1.   sufficiently detailed architectural or engineering drawings including floor plans, sections, and exterior building elevations, as appropriate;

29

2.  for any proposed building, the elevation of the lowest floor (including basement) and, as required, the elevation of any other floor;

3.  complete information concerning flood depths, pressures, velocities, impact and uplift forces, and other factors associated with the one hundred (100) year flood;

4.  detailed information concerning any proposed flood-proofing measures;

5.  cross-section drawings for all proposed streets, drives, other accessways, and parking areas, showing all rights-of-way and pavement widths;

6.  profile drawings for all proposed streets, drives, and vehicular accessways including existing and proposed grades; and

7.  plans and profiles of all proposed sanitary and storm sewer systems, water supply systems, and any other utilities and facilities.

E.  The following data and documentation:

1.  certification from the applicant that the site upon which the activity or development is proposed is an existing separate and single parcel, owned by the applicant or the client he represents;

2.  certification from a registered professional engineer, architect, or landscape architect that the proposed construction has been adequately designed to protect against damage from the one hundred (100) year flood;

3.  a statement, certified by a registered professional engineer, architect, landscape architect, or other qualified person which contains a complete and accurate description of the nature and extent of pollution that might possibly occur from the development during the course of a one hundred (100) year flood, including a statement concerning the effects such pollution may have on human life;

4.  a statement certified by a registered professional engineer, architect, or

landscape architect, which contains a complete and accurate description of the effects the proposed development will have on one hundred (100) year flood elevations and flows;

5.    a statement, certified by a registered professional engineer, architect, or landscape architect, which contains a complete and accurate description of the kinds and amounts of any loose buoyant materials or debris that may possibly exist or be located on the site below the one hundred (100) year flood elevation and the effects such materials and debris may have on one hundred (100) year flood elevations and flows;

6.    the appropriate component of the Department of Environmental Resources' "Planning Module for Land Development;"

7.    where any excavation or grading is proposed, a plan meeting the requirements of the Department of Environmental Resources to implement and maintain erosion and sedimentation control;

8.    any other applicable permits such as, but not limited to, a permit for any activity regulated by the Department of Environmental Resources under Section 302 of Act 1978-166; and

9.    an evacuation plan which fully explains the manner in which the site will be safely evacuated before or during the course of a one hundred (100) year flood.

Section 8.02   Application Review Procedures

Upon receipt of an application for a Special Permit by the Township, the following procedures shall apply in addition to those of Article III:

A.    Within three (3) working days following receipt of the application, a complete copy of the application and all accompanying documentation shall be forwarded to the County Planning Commission by registered or certified mail for its review and recommendations.  Copies of the application shall also be forwarded to the Township, Planning Commission, and Township

Engineer (to be retained by the applicant) for review and comment.

B.    If an application is received that is incomplete, the Township shall notify the applicant in writing, stating in what respect the application is deficient.

C.    If the Township decides to disapprove an application, it shall notify the applicant, in writing, of the reasons for the disapproval.

D.    If the Township approves an application, it shall file written notification, together with the application and all pertinent information, with the Department of Community Affairs, by registered or certified mail, within five (5) working days after the date of approval.

E.    Before issuing the Special Permit, the Township shall allow the Department of Community Affairs thirty (30) days, after receipt of the notification by the Department, to review the application and decision made by the Township.

F.    If the Township does not receive any communication from the Department of Community Affairs during the thirty (30) day review period, it may issue a Special Permit to the applicant.

G.    If the Department of Community Affairs should decide to disapprove an application, it shall notify the Township and the applicant, in writing, of the reasons for the disapproval, and Township shall not issue the Special Permit.

Section 8.03   Special Technical Requirements.

A.    In addition to the requirements of Article VII of this Ordinance, the following minimum requirements shall also apply to any proposed development requiring a Special Permit.  If there is any conflict between any of the following requirements and those in Article VII of this Ordinance or in any other code, ordinance, or regulation, the more restrictive provision shall apply.

B.    No application for a Special Permit shall be approved unless it can be determined that the structure or activity will be located, constructed, and maintained in a manner which will:

1.  Fully protect the health and safety of the general public and any occupants of the structure.  At a minimum, all new structures shall be designed, located, and constructed so that:

    a.  the structure will survive inundation by waters of the one hundred (100) year flood without any lateral movement or damage to either the structure itself, or to any of its equipment or contents below the one hundred (100) year flood elevation.

    b.  the lowest floor elevation will be at least one and one half (1 1/2) feet above the one hundred (100) year flood elevation.

    c.  the occupants of the structure can remain inside for an indefinite period of time and be safely evacuated at any time during the one hundred (100) year flood.

2.  Prevent any significant possibility of pollution, increased flood levels or flows, or debris endangering life and property.

All hydrologic and hydraulic analyses shall be undertaken only by professional engineers or others of demonstrated qualifications, who shall certify that the technical methods used correctly reflect currently accepted technical concepts.  Studies, analyses, computations, etc. shall be submitted in sufficient detail to allow a thorough technical review by the Township and the Department of Community Affairs.

ARTICLE IX   EXISTING STRUCTURES IN IDENTIFIED FLOODPLAIN AREAS

Section 9.00   General

Structures existing in any identified floodplain area prior to the enactment of this Ordinance may continue subject to the following provision:

A.  No expansion or enlargement of an existing structure shall be allowed within any identified floodway that would cause any increase in flood heights.

B.  Any modification, alteration, reconstruction, or improvement of any kind to an existing structure,

to an extent or amount of fifty (50) percent or more of its market value shall constitute a substantial improvement and shall be undertaken only in full compliance with the provisions of this Ordinance.

C.  Any modification, alteration, reconstruction, improvement of any kind to an existing structure, to an extent or amount of less than fifty (50) percent of its market value, shall be elevated and/or floodproofed to the greatest extent possible.

34

Adopted at a _Regular_ meeting of the Board of
Supervisors of Jackson Township, Huntingdon County,
Pennsylvania on the _3rd_ day of _July_, 19_87_

_Ralph Weiler_
Chairman

_Gary L. Ohlson_

_Leroy J. Kirk Secy_
Attest

Township Seal

   Exhibit 16

JACKSON TOWNSHIP BOARD OF SUPERVISORS
RD#1, BOX 390, PETERSBURG, PA. 16669
814-667-2992 – FAX 814-667-3892

October 10, 2000

Mr. & Mrs. David B. Corneal
505 East Fairmont Avenue
State College, Pa. 16801

Dear Mr. And Mrs. Corneal:

Please be advised that Jackson Township has referred to me for review your applications for buildings permits.  As you may be aware, the Township's Building  Permit Ordinance provides that the Building Permit Officer "shall issue a building permit only after it has been determined that the proposed work to be undertaken will be in conformance with the requirements of this and all other applicable codes and ordinances."  Further, the Ordinance provides that prior to the issuance of any building permit, the Permit Officer shall review the application for permit to determine if all other necessary governmental permits required by State and Federal laws have been obtained, such as those required by the Pennsylvania Sewage Facilities Act."

For the following reasons, your applications are being denied:  First, you  have not complied with the Pennsylvania Sewage Facilities Act.  At this time, you do not have a sewage permit.  A building permit cannot be issued without a sewage permit.  While you submitted Sewage Facilities Planning Modules to the Township, the Township cannot forward the Planning Modules to the Department of Environmental Protection for review until you meet the requirements of the Township's Subdivision and Land Development Ordinance.  A copy of the Ordinance is enclosed.  Second your application inadequately described the proposed construction.  Third, you did not include an adequate plan of the site showing the size and location of the proposed construction as well as any existing buildings.  Fourth, you have not complied with the Township's Driveway Ordinance, a copy of which is enclosed.  Fifth, as noted above you have failed to comply with the Township's Subdivision and Land Development Ordinance.

Very truly yours,

DAVID B. VAN DOMMELEN
Building Permit Officer



EXHIBIT
Van Dommelen
TKB   2   6-6-01

EXHIBIT
Wirth 13
TKB   5-17-01



Exhibit 17

### DAVID B. CORNEAL

ATTORNEY AT LAW

1445 WEST COLLEGE AVENUE

STATE COLLEGE, PENNSYLVANIA 16801

MEMBER:
NNSYLVANIA BAR
..ORIDA BAR

(814) 238-1925
(814) 238-1929

Mr. David Van Dommelen
R.D. 1, Box 631
Petersburg, Pa. 16669

May 5, 2000

RE: Garage Building Permit

Dear Mr. Van Dommelen,

Since you have failed to call me as promised, or to return my phone call, regarding my requested Building Permit, I assume you are continuing to hold in your stated position from our last Thursday meeting in your home.

At that time I brought you a copy of my building plan for a garage approximately 20' by 40'. As stated at that meeting, since there was no sewer or water in the garage, I qualified for a building permit. In fact, you stated that if any other Jackson Township property owner requested a permit to construct a garage, you would issue them the permit. Your justification for refusing to give me even an application for a permit was that I was that "trouble making yuppie from over the mountain" and the supervisors told you not to give me any building permits. You then proceeded to call the individual supervisors for further instructions. In my presence, you got Tom Wilson on the phone who told you not to grant me the building permit after you explained to him that it was just for a garage 20' by 40'. You then told me that the supervisors were meeting the next morning (Friday April 28) to discuss my permit and that you would then call me. I then wrote down two phone numbers where you could reach me 24 hours a day or night.

Having not heard from you, I called you on Wed. May 3 and left a message on your answering machine to call me. You have obviously chosen to ignore the promise or my request. Where upon you asked me to leave, refusing to give me even an application form for a building permit.

If you disagree with any of the facts setforth herein please advise me in writing.

Sincerely,

David B. Corneal, Esq.

EXHIBIT

Van Dommelen

TKB   1   6-6-0

EXHIBIT

Wirth 15

TKB   5-17-01

Exhibit 18

SUGGESTED IDEAS

BUILDING PERMIT FEES AND B.P. OFFICER % FEE

|  |  |  |  | PERMIT | B.P.O. % |
|---|---|---|---|---|---|
| 0 | – | $ | 999 | $15.00 | $  6.00 |
| $ 1,000 | – | $ | 15,999 | $20.00 | $  8.00 |
| $ 16,000 | – | $ | 24,999 | $30.00 | $ 12.00 |
| $ 25,000 | – | $ | 35,999 | $40.00 | $ 16.00 |
| $ 36,000 | – | $ | 49,000 | $50.00 | $ 20.00 |
| $ 50,000 | – | $ | 99,999 | $60.00 | $ 24.00 |
| $ 100,000 | – | $ | 499,999 | $70.00 | $ 28.00 |

A $10.00 fee will be charged for any additional follow-up
trips after the initial contact.

SUBMITTED BY      David B Van Dommelen
                  Jackson Township
                  Building Permit Officer      March 7, 1994

EXHIBIT
Van Dommelen
TKB 4 6801

| NAME | FEE | DATE | PERMIT NO | VALUE | PURPOSE |
|---|---|---|---|---|---|
| Roland G. Yoder | $20.00 | 12/6/89 | 25-89n | $10,000 | living qtrs. |
| Leslie L. Lutz Jr. | $20.00 | 12/16/89 | 26-89n | $4,000. | Mobile home |
| Charles Wirth | $20.00 | 3/3/90 | 01-90 | $45,000 | House |
| James Stewart | $20.00 | 3/6/90 | 02-90 | $1400. | storagf shed |
| Raymond Tussey | $20.00 | 3/12.90 | 03-90 | $5,000.00 | machinestor |
| Marie H. Porter | $20.00 | 3/12/90 | 04-90 | $3,000.00 | garage |
| Donald H. Gibboney | $10.00 | 3/22/90 | 05-90 | $500.00 | storage |
| Albert Hershey | $10.00 | 3/31/90 | 06-90 | $400.00 | faimly room |
| Stoney Lonesome R&G club | $20.00 | 3/31/90 | 07-90 | $16,000 | camp |
| Thomas Eckley | $20.00 | 4/7/90 | 08-90 | $5400.00 | garage remodel |
| Robert Nichol | $20.00 | 4/9/90 | 09-90 | $40,000 | house mobile |
| Laurence Moyer | $20.00 | 4/27/90 | 10-90 | $7500.00 | home porch |
| Walter C. Hagans | $20.00 | 5/7/90 | 11-90 | 2000.00 | roof |
| David P. Melson | $20.00 | 5/16/90 | 12-90 | 11,200.00 | Garage |
| Wilbur Foster | $10.00 | 5/23/90 | 13-90 | $200.00 | Porch |
| D & D Hamberger | $20.00 | 5/25/90 | 14-90 | $35,000 | Addition to Summer Home |
| D. Van Dommelen | $20.00 | 6/2/90 | 15-90 | $4000.00 | Extension |
| Richard Rudy | $20.00 | 6/12/90 | 16-90 | #3500.00 | Garage |
| Andrew Couch | $10.00 | 7/7/90 | 17-90 | $400.00 | Porch |
| Richard Chura | $20.00 | 7/8/90 | 18-90 | $50,000 | House/Camp |
| Walter Garner | $10.00 | 7/10/90 | 19-90 | $100.00 | Roof Repair |
| Kevin Monihen | $20.00 | 7/17/90 | 20-90 | $50,000 | Build House |
| J & N Albright | $20.00 | 7/17/90 | 21-90n | $1,700 | Horse Barn |
| E. Scott Walker | $10.00 | 7/20/90 | 22-90 | $500. | Storage She |
| Kenneth Miller | $20.00 | 7/28/90 | 23-90 | $2239.78 | Utility Buil Gazebo |
| Hazel M. Briggs | $10.00 | 8/4/90 | 24-90 | 400.00 | House Sider |

| NAME | FEE | DATE | PERMIT NO. | VALUE | TYPE |
|------|-----|------|-----------|-------|------|
| Richard A. Boonie | $20.00 | 8/9/90 | 25-90 | $55,000 | Home |
| James Simparosa | $20.00 | 8/23/90 | 26-90 | 2,000 | Trailer Exte |
| David B. Van Dommelen | $20.00 | 8/28/90 | 27-90 | $5,000 | Studio Extend |
| Eugene Bigelow | $10.00 | 9/12/90 | 28-90 | $300.00 | Porch & cella door |
| Donald Biddle | $20.00 | 9/23/90 | 29-90 | $5867 | Garage |
| Mary Dukeman | $20.00 | | 30-90 | | Garage |
| Caroline A. McGraw | $20.00 | 10/10/90 | 31-90 | $72,000 | House |
| Clifford D. Towson | $20.00 | 10/14/90 | 32-90 | $120,000 | House |
| Jeffery Shoemaker | $20.00 | 10/22/90 | 33-90 | $80,000 | House |
| Robert Nichols | $20.00 | 10/22/90 | 34-90 | $2500. | Mobile Home |
| James Morris | $20.00 | 10/26/90 | 35-90 | @2,600. | Garage |
| Ken Miller | $20.00 | 10/30/90 | 36-90 | $500,000 | 4 buildings at Mill |
| Fred K. Tucker | $20.00 | 10/3/90 | 37-90 | $150,000. | House & Ga |
| Scott Pletcher | $20.00 | 11/29/90 | 38-90 | $4000.00 | Garage |
| Sumner Smith | $20.00 | 16/1/91 | 1-91 | $5500.00 | IceCream Sta |
| Norman Keller | $20.00 | 1/23/91 | 2-91 | $5000.00 | Family Room |
| Fred V Schilling | $20.00 | 2/3/91 | 3.91 | 1500 00 | Barn |
| Robert Reese | $10.00 | 3/19/91 | 4-91 | $600.00 | Siding |
| Bruce Smith | $20.00 | 3/26/91 | 5-91 | $8,000. | Pole Barn |
| Robert Guyer Sr. | $10.00 | 4/2/91 | 6-91 | $1,000 | Extend House |
| Chester Benson | $20.00 | 4/4/91 | 7-91 | $3,000. | Car Port |
| Larry H. Ross | $20.00 | 4/12/91 | 8-91 | $2,000 | Siding, etc. |
| Lawrence Moyer | $10.00 | 4/15/91 | 9-91 | $1,000 | Deck & shkirt |
| Walnut Acres Camp | $10.00 | 6/6/91 | 10-91 | $400. | Pavilion |
| Robert Herr - Camp | $10.00 | 11/5/91 | 11-91 | $1,000 | Roof etc. |
| Robert Nichols | $20.00 | 5/16/91 | 12-91 | $12,000 | Barn |
| James Leisey | $10.00 | 5/23/91 | 13-91 | $1,000 | Barn |
| Ricky Watt | $20.00 | 5/23/91 | 14-91 | $2,500 | CarPort |
| Willard Yoder | $20.00 | 5/28/91 | 15-91 | $80,000 | House |

| NAME | FEE | DATE | PERMIT No. | VALUE | PURPOSE |
|------|-----|------|-----------|-------|---------|
| Walter Hagans | $20.00 | 5/28/91 | 16-91 | $1,500 | Carport |
| James   Leisey | $10.00 | 5/30/91 | 17-91 | $600.00 | Pront Roof |
| Roland Yoder | $20.00 | 6/13/91 | 18-91 | $5,000 | Extend Shed |
| G. Merle Hawn | $10.00 | 6/20/91 | 19-91 | $500. | Picni Pavilio |
| Eagle Excavation | $20,00 | 6/24/91 | 20-91 | $2,000 | Pole Building |
| Sterret Watt | $10.00 | 6/25/91 | 21-91 | #300.00 | Porch |
| Caroline A. McGraw | $20.00 | 7/3/91 | 22-91 | $10,000 | Garge |
| James D. Henry | $10.00 | 7/11/91 | 23-91 | $1,000 | Storage/Garag |
| Jay Yoder | $10.00 | 7/27/91 | 24-91 | $500.00 | Utility Shed |
| Herbert Clinger | $10.00 | 8/3/91 | 25-91 | $900.00 | Pole Shed |
| Mary Dukeman 𝔅ox 582 | $20.00 | 8/3/91 | 26-91 | $2450.00 | Carport/sidi |
| Karl Raudensky | $20.00 | 8/10/91 | 27-91 | $30,000 | Cabin/camp |
| William Dickson | $20.00 | 8/22/91 | 28/91 | $6000.00 | Porch & Siding |
| T. Couch | $10.00 | 9/9/91 | 29/91 | $500.00 | Pavillion |
| Ron Wilson | $20.00 | 9/9/91 | 30-91 | $6000.00 | Extend Bedr |
| Wayne Mambeck | $10.00 | 9/6/91 | 32-91 | $800.00 | Porch |
| J. Edward Rudy | $10.00 | 10/5/91 | 31-91 | $989.00 | Shed |
| James Stewart | $20.00 | 10/5/91 | 33-91 | $10,000 | Living room |
| James E. Smith | $20.00 | 10/20/91 | 34-91 | $26,000 | Living Area |
| Gettys Ridge Club | $20.00 | 10/22/91 | 35-91 | $1,000 | Room |
| K. Monihen | $20.00 | 10/28/91 | 36-91 | $65,000 | Addition |
| Todd Bailey | $10.00 | 10/31/91 | 37091 | $500.00 | Mobile Home |
| Robert Nicholl | $10.00 | 11/1/91 | 38-91 | $650.00 | Pole Barn |
| Norman Davis | $20.00 | 11/5/91 | 39-91 | $45,000 | House |
| Leroy Koch | $10.00 | 11/15/91 | 40-91 | $700.00 | Extend Pole barn |
| Phyllis Rogers | $20.00 | 12/7/91 | 41-91 | $7000.00 | Erect Trailr |
| Scott Wilson | $20.00 | 12/11/91 | 42-91 | $7800.00 | Erect trailr |
| Geraldine Hagans | $20.00 | 12/13/91 | 43-91 | $4500 | Siding |

4 Nov

| NAME | FEE | DATE | PERMIT | VALUE | PURPOSE |
|------|-----|------|--------|-------|---------|
| Arthur Walters | $20.00 | 1/21/92 | 1-92 | $3,500.00 | Stoarge Shed |
| M. Dirk Boring | $20.00 | 2/27/92 | 2-92 | $38,900.00 | House |
| Dale Lightner | $20.00 | 2/28/92 | 3-92 | $1700.00 | Porch addition |
| Douglas Weaver | $20.00 | 2/29/92 | 4-92 | $40,000 | House & Garage |
| Eugene L. Barr | $20.00 | 3/14/92 | 5-92 | $2,500.00 | Porch & Siding |
| Willard Yoder | $20.00 | 4/9/92 | 6/92 | $1,700. | Mobile Home |
| David Kirk | $20.00 | 4/11/92 | 7-92 | $20,000.00 | House |
| Arthur & Frances Walters | $20. | 4/13 92 | 8-92 | $3,000. | Porch |
| Lee Dean | $20.00 | 4/13/92 | 9-92 | $24,000.00 | House |
| Kish Gun Club | $20.00 | 4/15/92 | 9A-92 | $29,400.00 | Camp |
| Thomas Sechler | $20.00 | 5/26/92 | 10-92 | $30,000. | House Addition |
| Gary Stainer | $20.00 | 6/4/92 | 11-92 | $16,000. | Garage & Barn |
| Janet McGrew | $10.00 | 6/26/92 | 12-92 | $900.00 | Porch |
| John Clickner | $20.00 | 6/27/92 | 13-92 | $50,000.00 | Family Room |
| Sam Bricker | $20.00 | 7/3/92 | 14-92 | $80,000. | House |
| Chester Wilson | $10.00 | 7/7/92 | 15-92 | $350.00 | Deck |
| Leo & Sharron Sable | $10.00 | 7/29/92 | 16-92 | $900.00 | Porch/Deck |
| Harold E. Goshert | $10.00 | 8/1/92 | 17Q92 | $400.00 | Siding |
| Noel Reese | ~~$20.00~~ ~~$1,500~~ | 8/7/92 | 18-92 | 3,500 | Shed |
| Albert Hershey | $10.00 | 8/20/92 | 19-92 | $400.00 | Deck |
| Joseph Tine | $20.00 | 8/20/92 | 20-92 | $50,000 | House |
| Brain Bliss | $10.00 | 8/21/92 | 21-92 | $500.00 | Shed/wood sto |
| Homer Wagner | $20.00 | 8/23/92 | 22-92 | $2,000.00 | Trailer |
| Dennis Smith | $20.00 | 8/24/92 | 23-92 | $34,000.00 | Addition/house |
| Harvey Knepp | $20.00 | 8/26/92 | 24-92 | $1,500.00 | Porch |
| Harold E. Keller Sr | $20.00 | 9/16/92 | 25-92 | $22,000. | Double Wide |
| Harold E. Keller Jr | $20.00 | 9/16/92 | 26-92 | $2,400.00 | Garage |
| Gary/Laura Staines | $20.00 | 9/21/92 | 27-92 | $50,000.00 | House |
| Harry Riling | $10.00 | 10/1/92 | 28-92 | $400.00 | Deck |

| NAME | FEE | DATE | PERMIT | VALUE | PURPOSE/TAX MA |
|------|-----|------|--------|-------|-----------------|
| Hugh Berg | $20.00 | 10/1/92 | 29-92 | $2,500. | Garage      22 |
| Barry Bargo | $10.00 | 10/15/92 | 30-92 | $500.00 | Siding on Car |
| Charles Devinney | $20.00 | 10/16/92 | 31-92 | $20,000.00 | Bedroom Wing |
| James O'Bryan | $20.00 | 10/21.92 | 32-92 | $6,162.00 | Hay Storage |
| James Henry | $20.00 | 12/3/92 | 33-92 | $2,500.00 | Storage & Gar |
| Dwight A. Glick | $20.00 | 12/3/92 | 34-92 | $1,500.00 | Stoage/Camp |
| Richard Pletcher | $20.00 | 12/3/92 | 35-92 | $5,000.00 | Garage |
| Richard Pletcher | $20.00 | 1/4/93 | 1-93 | $5,000.00 | Garage/Deck |
| Larry Smith | $20.00 | 1/14/93 | 2-93 | $13,446. | Garage |
| Samuel Keller | $20.00 | 1/19/93 | 3-93 | $1,500. | Mobile Home |
| Don Gibboney | $10.00 | 2/4/93 | 4-93 | $1,000. | Extend Store |
| Thomas Wilson | $20.00 | 2/5/93 | 5-93 | $15,000. | Mobile Home |
| Tom & Jo  Merrell | $20.00 | 2/9/93 | 6-93 | $60,000. | Extend House |
| Whipple Dam Store | $10.00 | 3/2/93 | 7-93 | $850. | Extend Store |
| Betty Younker | $10.00 | 4/5/93 | 8-93 | $1,000 | Soffit etc |
| Wilber  Foster | No Fee | 4/5/93 | 9-93 | None | Demolish Mobile Home |
| P. Gavazzi | $20.00 | 5/7/93 | 10- 93 | $2000.00 | Tool Shed |
| Stoney Lonesome | $20.00 | 5/8/93 | 12-93 | $1200.00 | Deck |
| Lee Knode Jr | $20.00 | 5/11/93 | 13-93 | $1,200.00 | Deck & Sidin |
| Rodger Keller | $20.00 | 5/21/93 | 15-93 | $6000.00 | Garage & Roo |
| Roland   Yoder | $20.00 | May/18/93 | 14-93 | $6000. | Milkhouse |
| Donald Beever | $20.00 | 5/21/93 | 14-93 | $15,000 | Camp |
| Gary/Chris Wilson | $20.00 | 5/25/93 | 17-93 | $1,500.00 | Barn |
| William Stanbrough | $10.00 | 6/14/93 | 18-93 | $935.00 | Porch/Deck/s |
| Larry Smith | $20.00 | 6/16/93 | 19-93 | $52,401. | Extend House |
| Seth Richards | $20.00 | 6/16/93 | 20-93 | $1,200. | Stoareg Shed |
| Jean Dickson | $20.00 | 5/8/93 | 11-93 | $10,000. | Add Room |
| Patricia Rosdil | $20.00 | 6/21/93 | 21-93 | $68,000. | Erect House |

| NAME | FEE | DATE | PERMIT | VALUE | PURPOSE/TAX |
|------|-----|------|--------|-------|-------------|
| Keller, Elwood | $20.00 | 8/5/93 | 22- | $2000.00 | Roof, Deck and Garage |
| Gibboney, Steve | $20.00 | 8/7/93 | 23-93 | $15,000.00 | Garage |
| Elliott, James | $20.00 | 8/17/93 | 24-93 | $20,000.00 | Build Camp |
| Bliss, Brian | $10.00 | 8/21/93 | 25-93 | $650.00 | Add Bedroom |
| Pouch, Dennis | $10.00 | 8/22/93 | 26-93 | $100.00 | Shed |
| R. Hockenberry | $20.00 | 8/24/93 | 27-93 | $140,000. | House |
| D. Maddox | $20.00 | 9/8/93 | 28-93 | $4300.00 | Deck |
| Roland Yoder | $20.00 | 13/9/93 | 29-93 | $4,000.00 | Heifer Pen |
| Samuel Keller | $10.00 | 9/24/93 | 30-90 | $1,000.00 | Mobile Home |
| Twin Pine Lodge  deck | $20.00 | 11/22/93 | 31-93 | $10,000. | Alter |
| Richard Rudy  deck | $20.00 | 11/20/93 | 32-93 | $2,000. | Picnic Shelter |
| Thomas Wilson  cash | $20.00 | 11/20/93 | 33-93 | $1,500. | Extend Shed |
| Judith Fleck  check | $20.00 | 12/6/93 | 34-93 | $1,058 | Porches |
| James W. Croyle  cash | $20.00 | 12/14/93 | 35-93 | $20,000. | Extend House |

*Finished 1993*

| William Foster  check | $10.00 | 4/6/94 | 1-94 | $300.00 | Shed Addition |
| Stone Creek Fire Hall  N | | 4/14/94 | 2-94 | $2,500 | Extension |
| Jr. Eschenbach  cash | $10.00 | 4/22/94 | 3-94 | $200.00 | Porch/Shed |

14/94

| NAME | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|------|-----|-----|------|--------|-------|---------|
| Drew Tomlinson | Chec | $20.00 | 12/30/93 | 1- | $20,000.00 | Addition |
| Ennisville Church | Chec | $20.00 | 2/19/94 | 2-94D | Demolition | -------- |
| Georg Sunderland | Chec | $20.00 | 2/19/94 | 3-94 | $5,000.00 | Addition |
| 7 march 1994 | | | | | | |
| William Foster | CA | $10.00 | 4/6/94 | 1-94B | $300.00 | Shed |
| Stone Creek Fire | NA | ----- | 4/14/94 | 2-94B | $2500.00 | Addition |
| J. Eschenbach | CA | $10.00 | 4/22/94 | 3-94B | $500.00 | Porch |
| Richard Boonie | Chec | $20.00 | 5/14/94 | 4-94 | $9,800 | Porch/siding |
| Kish Bank | Chec | $70.00 | 5/17/94 | 5-94 | $109,000. | Bank |
| Stephen Black | Chec | $60.00 | 5/24/94 | 6-94 | $69,000.00 | House |
| Lonnie Dawes | Chec | $70.00 | 5, 24/94 | 7-94 | $131,000. | House |
| Douglas Maddox | Chec | $40.00 | 5/24/94 | 8-94 | $25,000. | Addition |
| R. Schaeffer | Chec | $60.00 | 6/2/94 | 9-94 | $75,000. | House |
| Walnut Acre | Chec | $15.00 | 6/3/94 | 10-94 | $800.00 | Shed |
| Larry Narehood | Chec | $30.00 | 6/8/94 | 11-94 | $18,000. | Garage |
| Daniel B. Wilson | Chec | $20.00 | 6/20/94 | 12-94 | $10,000. | Mobile Home |
| Mary Randolph | Cash | $15.00 | 6/28/94 | 13-94 | $300. | Siding |
| Ted Couch | Cash | $15.00 | 7/11/94 | 14-94 | $300.00 | Shed |
| Sam Keller Jr | Cash | $50.00 | 7/14/94 | 15-94 | $37,000.00 | Double wide |
| S. Stoltzfus | Chec | $15.00 | 7/27/94 | 16-94 | $5,500.00 | Porch |
| D.S. Feahley | Chec | $40.00 | 7/31/94 | 17-94 | $32,000.00 | Doublewide |
| George Vahoviak | Chec | $70.00 | 8/10/94 | 18094 | $110,000.00 | House |
| Daryl Stickler | Chec | $20.00 | 8/11/94 | 19-94 | $7000.00 | House |
| Leroy Koch | Cash | $20.00 | 8/13/94 | 20.94 | $9000.00 | House |
| Sondra Armstrong | Chec | $20.00 | 8/19/94 | 21-94 | $4600.00 | Proch/siding |
| Keith Hollinshead | Chec | $30.00 | 8/19/94 | 22-94 | $30.00 | House |
| Scott Wilson | Chec | $15.00 | 8/21/94 | 23-94 | $500.00 | Shed |
| Glenn Hawbaker | Chec | $40. | 8/27/94 | 24-94 | $25,000.00 | Kitchen |
| Daniel Tanner | Cash | $20.00 | 9/4/94 | 25-94 | $1600.00 | Shed/deck |
| Tom Wilson | Cash | $60.00 | 9/15/94 | 26-94 | $50,000.00 | House |
| Hawn (White) | Cash | $20.00 | 9/16/94 | 27-94 | $1,500.00 | Trailer |
| Corvin, Anita | Chec | $20.00 | 9/21/94 | 28-94 | $1,000.00 | Camp |
| David Freeman | Chec | $20.00 | 9/21/94 | 29-94 | $7,000.00 | Bedroom |
| Annette Givler | Chec | $60.00 | 9/25/94 | 30-94 | $75,000.00 | Bedroom,etc |
| Newall Crownover | Chec | $20.00 | 10/13/94 | 31-94 | $4,000.00 | Car Port |
| Paul Powell | Cash | $20.00 | 10/18/94 | 32-94 | $1,700.00 | Shed |
| Bruce Telega | Chec | $20.00 | 10/18/94 | 33-94 | $1,500.00 | Deck |
| John Couch | Chec | $50.00 | 10/19/94 | 34-94 | $45,000.00 | Double Wide |
| William White | Chec | $20.00 | 11/7/94 | 35-94 | $9,050.00 | Garage |

26.00

48.50

33.50

177-

| NAME | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| Harvey Knepp | CA | $60.00 | 1/9/95 | 1-95 | $65,000.00 | Double wide |
| Van Sommelen | CH | $15.00 | 1/30/95 | 2-95 | $500.00 | Deck |
| C. McKinney | CA | $20.00 | 1/30/95 | 3-95 | $18,900 | Mobilehome |
| Glenn Bailey | CK | $20.00 | 2/11/95 | 4-95 | $3,000.00 | Mobile Home |
| Dayton Hostetter | CK | $30.00 | 2/28/95 | 5-95 | $16,500.00 | Mobile Home |
| Donna-Rae Ralston | CK | $60.00 | 3/11/95 | 6-95 | $62,000.00 | House |
| Louis Weiler | CK | $30.00 | 3/21/95 | 7-95 | $18,000.00 | Extend roof |
| Ralph Schlegelmilch | CK | $20.00 | 3/21/95 | 8-95 | $8,000.00 | Restor |
| T. Stanbrouch | CK | $15.00 | 3/22/95 | 9-95 | $900.00 | Carport |
| Gary Morland | CK | $60.00 | 3/30/95 | 10-95 | $70,000.00 | House |
| Lewis E. McCarty | CA | $40.00 | 4/4/95 | 11-95 | $35,963.00 | Doublewide |
| J. Edward Rudy | CA | $20.00 | 4/17/95 | 12-95 | $1,650.00 | Storage she |
| Dale Buchanan | CK | $40.00 | 4/18/95 | 13-95 | $40,000.00 | Cabin |
| James Condon | CH | $20.00 | 4/19/95 | 14-95 | $4,000.00 | Greenhouse |
| Christina Muyer | CA | $20.00 | 6/6/95 | 15-95 | $10,000.00 | Mobile Home |
| Richard Horner | CA | $20.00 | 6/9/95 | 16-95 | $2,500.00 | Shed |
| David Corwin | CK | $70.00 | 6/22/95 | 17-95 | $170,000.00 | House |
| Carl Bickett | CK | $20.00 | 6/24/95 | 18-95 | $1290.00 | Reparis-etc |
| Frank Dean | CK | $15.00 | 7/11/95 | 19-95 | $600.00 | Deck |
| **Jay Yoder** | CK | $20.00 | 8/5/95 | 20-95 | $5,000.00 | Shop |
| **Eliz. Wojdylak** | CK | $20.00 | 8/5/95 | 21-95 | $8,000.00 | Mobilehome |
| **L. Lucabaugh** | CK | $30.00 | 8/5/95 | 22-95 | $21,000.00 | Extend/etc |
| **Marjorie Rudy** | CA | $15.00 | 8/18/95 | 23-95 | $200.00 | Deck |
| **Kevin Monihen** | CH | $15.00 | 9/1/95 | 24-95 | $1,000.00 | Shed |
| **Seth Richards** | CH | $20.00 | 9/1/95 | 25-95 | $15,000.00 | Barn |
| **Winchester Club** | | | | | | |
| **S. Wensel** | CK | $70.00 | 9/11/95 | 26-95 | $106,000.00 | Rebuild |
| **Lee Knode &** | | | | | | |
| **Wm. Summers** | CK | $20.00 | 9/30/95 | 27-95 | $10,000.00 | Camp |
| **Dirk Boring** | CH | $60.00 | 10/24/95 | 28-95 | $60,000.00 | House |
| **Gregory McKinney** | CHAA | $20.00 | 10/29/95 | 29-95 | $2,900.00 | MobileHome |
| **John Randolph** | CA | $20.00 | 11/7/95 | 30-95 | $1,900.00 | ColdFrame |
| **Tim Grove** | CK | $15.00 | 11/14/95 | 31-95 | $900.00 | Repairs |
| **Rodney Scaeffre** | CK | $20.00 | 16/6/95 | 32-95 | $1,000.00 | Barn |
| **Michael Koch** | CA | $15.00 | 12/20/95 | 33-95 | $500.00 | Shed |

| NAME | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE | |
|------|-----|-----|------|--------|-------|---------|---|
| E. Wojdylak | CK | $20.00 | 1/12/96 | 1-96 | $1,500.00 | Shed | |
| Kenneth Miller | CK | $60.00 | 2/16/96 | 2-96 | $50,000.00 | Camp | |
| George Vahoviak | CK | $20.00 | 2/24/96 | 3-96 | $4,000.00 | Barn | |
| Oscar Ryen | CA. | $20.00 | 4/25/96 | 4-95 | $9,500.00 | Cottage | |
| Tom Sanker | | | | | | | |
| Tom & Jerry Camp | CA | $20.00 | 5/4/95 | 5-95 | $1,200.00 | Bedroom | |
| Eliz. Wojdylak | CK | $20.00 | May 9,96 | 6-96 | $8,875.00 | Pole Shed | |
| Steve Fleck | CK | $20.00 | May 9,96 | 7-96 | $1,500.00 | Bedroom | |
| Peter Hadley | CK | $70.00 | 23 May 96 | 8-96 | $150,000 | House | |
| Pat Wilson | CK | $15.00 | 3 June 96 | 9-96 | $600.00 | Storage Shed | |
| Tim Peachy | X | None | 4 June 96 | 10-96 | NA | Demolish Bldg | |
| Dixon, Brett | CK | $20.00 | 6/6/96 | 11-96 | $15,000.00 | Bedroom | |
| Keller, Rodger | CK | $60.00 | 6/24/96 | 12-96 | $80,000.00 | House | |
| Saunders, Richard | CK | $20.00 | 6/26/96 | 13-96 | $7,000.00 | Garage | |
| Miller, Jay | CK | $20.00 | 6/27/96 | 14-96 | $1,200.00 | Shed | |
| Dean Laub | CA. | $20.00 | 6/28/96 | 15-96 | $2,500.00 | Room | |
| Glenn Peachy | CK | $20.00 | 7/1/96 | 16-96 | $15,000.00 | Cabin | |
| Ricky Watt | CK | $20.00 | 7/17/96 | 17-96 | $15,000.00 | Room & Deck | |
| Wm & Betty White | CK | $70.00 | 7/233/96 | 18-96 | $200,000.00 | House | |
| Wilber Foster | CA | $15.00 | 8-3-96 | 19-96 | $400.00 | Shed | |
| Mary Grove | CK | $15.00 | 8-4-96 | 20-96 | $500.00 | Shed | |
| James Boring | CK | $15.00 | 8-11-96 | 21-96 | $700.00 | Porch | |
| Steve Bugbee | CK | $70.00 | 8-23-96 | 23-96 | $280,000.00 | House | |
| Ward Studebaker | CK | $15.00 | 8-22-96 | 22-96 | $1,000.00 | Deck & Carport | |
| William Brumbaugh | CK | $20.00 | 9-9-96 | 24-96 | $2,250 | Garage | |
| Bertha Riling | CK | $15.00 | 9/11/96 | 24-96 | $500.00 | Extend Barn | |
| Allan Diehl | CK | $15.00 | 11/15/96 | 26-96 | $1342.99 | Storage | |
| Russell Koch | CK | $30.00 | 10/14/96 | 27-96 | $20,000.00 | Trailer | |
| Michael Carowich | CA | $20.00 | 12/5/96 | 28-96 | $5,000.00 | Garage | |

| NAME | CA. | FEE | DATE | PERMI | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| Drew Tomlinson | CK | $20.00 | 1/7/97 | 1-97 | $15,000.00 | Kitchen |
| Anna Stanbrough | CK | $20.00 | 3/1/97 | 2-97 | $1,500 | Shed |
| Richard Fletcher | CK | $20.00 | 3/4/97 | 3-97 | $1,000.00 | Porch |
| Craig Brossman | CK | $20.00 | 3/15/97 | 4-97 | $10,000.00 | Restore |
| Ivan Kauffman | CK | $20.00 | 3/20/97 | 5-97 | $7,000.00 | Camp |
| Robert Guyer | CK | $200.00 | 3/25/97 | 6-97 | $2,000.00 | Garage |
| S. Wojdylak | CK | $20.00 | 4/2/97 | 7-79 | $8,000.00 | Porch |
| Suzanne Morlang | CK | $20.00 | 4/9/97 | 8-97 | $12,000.00 | Horse Barn |
| Daryl Stickler | CK | $20.00 | 5/1/97 | 9-97 | $7,000.00 | HOUSE/renew |
| William Stout | CK | $70.00 | 5/2/97 | 10-97 | $310,000.00 | House |
| Warren Long | CA | $20.00 | 5/3/97 | 11-97 | $15,000.00 | Addition |
| James Smolko | CK | $15.00 | 5/3/97 | 12-97 | $800.00 | Shed |
| Don Gibboney | CK | $20.00 | 5/8/97 | 13-97 | $6,300.00 | Porch |
| Mary Grove | CK | $20.00 | 5/12/97 | 14-97 | $8,900.00 | Laundry |
| Tom Wilson | CA | $60.00 | 5/29/97 | 15-97 | $50,000.00 | House/renew |
| David Koch | CK | $20.00 | 5/31/97 | 16-97 | $15,000.00 | Mobilehome |
| Pat Wilson | CK | $15.00 | 6/17/97 | 17-97 | $750.00 | Pavilion |
| George Vahoviak | CK | $20.00 | 6/28/97 | 18-97 | $2,000.00 | Equip Shed |
| Larry Narehooh | CA | $20.00 | 7/22/97 | 19-97 | $5,000.00 | Garge |
| Steve Stoltzus | CK | $60.00 | Aug 8 -97 | 20-97 | 53,000.00 | Shop/Green |
| Kevin Boonie | CK | $20.00 | Aug 9/97 | 21-97 | $10,000.00 | Mobile Home |
| Randolph/Rush | CK | $20.00 | 8/15/97 | 22-97 | $7,500.00 | Barn |
| George Sunderland | CK | $20.00 | 8/28/97 | 23-25 | $3,000.00 | Roof On Deck |
| Dennis McClure | CK | $20.00 | 9/15/97 | 24-97 | $5,000.00 | Bedrroom |
| Chester Wilson | CK | $20.00 | 9/21/97 | 25-97 | $6,000.00 | Mobile Home |
| Scott Wilson | CK | $40.00 | 9/22/97 | 26-97 | $35,000.00 | House |
| Bruce Kirkpatriach | CA | $20.00 | 10/11/97 | 27-97 | $2500.00 | Bedroom/shed |
| Hank Berg (A-1) | CK | $20.00 | 10/14/97 | 28-97 | $2,000.00 | Shed |
| Barry Barco | CA | $15.00 | 10/15/97 | 29-97 | $950.00 | Shed |
| Brian Bliss | CK | $15.00 | 10/16/97 | 30-97 | $200.00 | Pole Shed |
| Duane Coy | CK | $20.00 | 10/19/97 | 31-97 | $1,5000.00 | Shed |
| ENVDPONMENTAL CONST. | | CANCELLED | | 32-97 | CANCELLED | |
| Frank Dean | CK | $15.00 | 10/23/97 | 33-97 | $800.00 | Pole Shed |
| Daniel Wilson | CK | $15.00 | 11/11/97 | 34-97 | $400.00 | Shed |
| Barbara Wilson | CK | $20.00 | 11/11/97 | 35-97 | $15,200.00 | Mobile Home |
| Andrew Jone | CA | $15.00 | 12/16/97 | 36-97 | $90.00 | Shed |

| NAME 1998 | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| Michael Stanbrough | CK | $20.00 | 1/6/98 | 1-98 | $1,500.00 | Pole Shed |
| Jeff Bierly | CK | $70.00 | 1/28/98 | 2-98 | $114,000.00 | House |
| George Sunderland | CK | $20.00 | 2/4/98 | 3-98 | $2,000.00 | Deck/steps |
| Bill Stanbrough | CK | $15.00 | 2/28/98 | 4-98 | $500.00 | Shed |
| Eagle Excavation | CK | $20.00 | 3/4/98 | 5-98 | $2,000.00 | Mobile Home |
| Forrest Mills | CA | $20.00 | 3/11/98 | 6-98 | $2,000.00 | Carport |
| Donald P Walters | CK | $15.00 | 3/20/98 | 7-98 | $600.00 | Porch&roof |
| Richard Horner | CK | $30.00 | 3/21/98 | 8-98 | $20,000.00 | Garage |
| Harvey Wagner | CA | $20.00 | 4/13/98 | 9-98 | $5,000.00 | Basement |
| Getty Ridge Rod | CK | $20.00 | 4/23/98 | 10-98 | $4,000.00 | Porch |
| Robert Enyeart | CA | $20.00 | 5/11/98 | 11-98 | $10,000.00 | Pole Barn |
| Daniel Kearns | CK | $20.00 | 5/15/98 | 12-98 | $5,000.00 | Camp |
| Monty Claar | CK | $70.00 | 6/25/98 | 13-98 | $125,000.00 | House |
| Russel Person | CK | $70.00 | 6/25/98 | 14-98 | $135,000.00 | House |
| Jack Price | CK | $15.00 | 7/4/98 | 15-98 | DEMOLISH | Mobilehome |
| Jeffrey Shoemaker | CK | $20.00 | 7/11/98 | 16-98 | Room addon | $4,000.00 |
| Cindy Lauer | CK | $70.00 | 7/11/98 | 17-98 | $101,000.00 | Home |
| Judy Keller | CA | $15.00 | 7/28/98 | 18-98 | $800.00 | Porch |
| Robert Lynch | CK | $20.00 | 7/29/98 | 19-98 | $10,000.00 | Patio/siding |
| Kevin Boonie | CK | $20.00 | 8/20/98 | 20-98 | $1,000.00 | Shed |
| Glenn Hawbaker | CK | $20.00 | 8/21/98 | 21-98 | $10,000.00 | Garage |
| Jim Stewart | CK | $20.00 | 8/27/98 | 22-98 | $33,500.00 | Pole Barn |
| Ken Koch | CK | $60.00 | 8/31/98 | 22-19 | $50,000.00 | Doublewide |
| Richard Zeallor | CK | $30.00 | 9/3/98 | 23-14 | $20,000.00 | Addition |
| Larry Smith | CK | $15.00 | 9/4/98 | 24-98 | Demolish | Trailer |
| Pauline Baker | CA | $20.00 | 9/11/98 | 25-98 | $3,000.00 | Garage |
| Gary O'Bryan | CK | $20.00 | 9/14/98 | 26-98 | $10,000.00 | Equip. Shed |
| Leroy Koch | CA | $15.00 | 9/24/98 | 27-98 | $400.00 | Garage-Ext. |
| Angela Hawn | CK | $30.00 | 9/28/98 | 28-98 | $23,800.00 | Extend house |
| Henry Berg | CK | $20.00 | 10/13/98 | 29-98 | $10,000.00 | Extend House |
| L.E. Rudy | CA | $20.00 | 10/30/98 | 30-98 | $12,000.00 | Garage |
| David Keller | CK | $20.00 | 11/2/98 | 31-98 | $3,500.00 | Porch-closein |
| Jesse Stickler | CA | $15.00 | 11/3/98 | 32-98 | $500.00 | Mobile Home |
| Wesley Boonie | CA | $20.00 | 11/4/98 | 33-98 | $1,595.00 | Carport |
| Scott Pletcher | CK | $20.00 | 11/8/98 | 34-98 | $5,000.00 | Garage |
| John Albright | CK | $30.00 | 11/20/98 | 35-98 | $17,300.00 | Addition |
| Dwight Glick | CK | $15.00 | 11/24/98 | 36-98 | $900.00 | Outhouse |

| NAME 1999 | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| Pauline Weaver | CK | $20.00 | 2/15/99 | 2-99 | $3,500.00 | Porch |
| Huntingdon School | CK | $70.00 | 2/15/99 | 1-99 | $1,090,069. | Addition |
| Tom Loser/Grove | CK | $70.00 | 2/24/99 | 3-99 | $100,000.00 | Addition |
| Donald Lichtner | CK | $60.00 | 3/22/99 | 4-99 | $80,000.00 | House |
| Bill Stanbrough | CK | $15.00 | 3/23/99 | 5-99 | $300.00 | Porch |
| Richard Saunders | CK | $30.00 | 30/Mar/99 | 6-99 | $18,000.00 | Room |
| Daryl Sttickler | CK | $15.00 | 3/31/99 | 7-99 | $300.00 | MobileHome |
| Jr. Exchenbach | CA | $15.00 | 4/16/99 | 8-99 | $400.00 | Shed |
| Michael Lorenz | CK | $30.00 | 4/20/99 | 9-99 | $19,000.00 | Addition |
| David/Ruth Koch | CK | $50.00 | 5/1/99 | 10-99 | $40,000.00 | Doublewide |
| Sue Hess | CA | $20.00 | 5/13/99 | 11-99 | $1,000.00 | Garage |
| Samuel Keller | CA | $20.00 | 5/15/99 | 12-99 | $3,500.00 | Shed |
| Charles Yoat | CK | $20.00 | 5/22/99 | 13-99 | $2,000.00 | Room |
| Kenneth Kauffman | CA | $15.00 | 5/25/99 | 14-99 | $300.00 | Extend camp |
| Douglas Horst | CK | $40.00 | 6/17/99 | 15-99 | $35,000.00 | Extend House |
| Robert King | CK | $40.00 | 6/21/99 | 16-99 | $2,000.00 | Roof |
| Matt King | CK | " | 6/21/99 | 17-99 | $10,000.00 | Garage |
| Harry Lehman | CK | $50.00 | 6/25/99 | 18-99 | $40,000.00 | Addition |
| James Peters | CK | $20.00 | 7/14/99 | 19-99 | $7,300.00 | Camp |
| Dan Wilson | CK | $15.00 | 7/17/99 | 20-99 | $500.00 | Shed |
| James Huckabaa | CA | $20.00 | 7/31/99 | 21-99 | $10,000 | Addition |
| Robert E Cuyer | CA | $15.00 | 8/4/99 | 22-99 | $25000 | Canopy |
| Melissa Foster | CK | $15.00 | 8/7/99 | 23-99 | $500.00 | Porch |
| A-1 Auto | CK | $20.00 | 8/25/99 | 24-99 | $2,000.00 | Garageport |
| Donna Counch | NA | NA | 8/31/99 | 25-99 | NA | Demolition |
| Earle Hawn | CK | $20.00 | 9/1/99 | 26-99 | $9,000.00 | Rood/deck |
| Koch Kenneth | CK | $15.00 | 1/9/99 | 27-99 | $1,000.00 | Addition |
| Brain Bliss | CK | $60.00 | 9/2/99 | 28-99 | $50,000.00 | House |
| Barbara Wilson | CK | $15.00 | 9/29/99 | 29-99 | $500.00 | Porch |
| Jan Cramer | CK | $20.00 | 10/2/99 | 30-99 | &8,000.00 | Shed |
| Timothy Hanna | CK | $70.00 | 10/8/99 | 31-99 | $175.000.00 | House |
| Richard Boonie | CK | $15.00 | 10/25/99 | 32-99 | $400.00 | Porch Roof |
| Stephen Stoltzfus | CA | $30.00 | 10/30/99 | 33-99 | $20,000.00 | Office |
| Pauline Weaver | CK | $20.00 | 11/10/99 | 34-99 | $6,000.00 | Garge |
| David Houtz | CK | $20.00 | 11/22/99 | 35-99 | $1,528.70 | Carport |
| Joe Merrell | CK | $30.00 | 11/22/99 | 36-99 | $19,500.00 | Garage |
| Gloria Sendzik | CK | $60.00 | 12/1/99 | 37-99 | &58,000.00 | Doublewide |

| NAME | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| William Luver | CA | $20.00 | 2-17-00 | 00-1 | $1,00.00 | Mobile Home |
| William Stout | CK | $40.00 | 2-19-00 | 00-2 | $29,000.00 | Barn |
| Joseph Foster | CK | $20.00 | 3-1-00 | 00-3 | $7,000.00 | Mobile Home |
| John P. Yonker | CK | $50.00 | 3-14-00 | 004 | $50,000.00 | Signlewide |
| Patrick Simmet | CK | $20.00 | 3/31/00 | 00-5 | $2,000.00 | Porch |
| Douglas Reid | CK | $60.00 | 4/8/00 | 00-6 | $65,000.00 | House |
| Ruby Dunlap | CA | $40.00 | 4/17/00 | 00-7 | $35,000.00 | Garage |
| Jesse Bush | CK | $30.00 | 4/24/00 | 00-8 | $20,000.00 | Poof |
| Norman Keller | CK | $60.00 | 4/30/00 | 00-9 | $67,800.00 | Doublewide |
| Robert Weaver | CK | $50.00 | 5/4/00 | 00-10 | $40,0000.00 | Workshop |
| Mark Boring | CK | $60.00 | 5/24/00 | 00-11 | $80,000.00 | House |
| Jack Price | CK | $20.00 | 5/27/00 | 00-12 | $1,599.00 | Shed |
| William Brumbaugh | CA | $20.00 | 6/1/00 | 00-13 | $2,500.00 | Mobile Home |
| Dale Lichtner | CA | $15.00 | 6/2/00 | 00-14 | $200.00 | Shed |
| Ferry Miller | CA | $20.00 | 6/13/00 | 00-15 | $1,500.00 | Shed |
| Debra Kerr | CK | $70.00 | 6/15/00 | 00-16 | $190,000.00 | House |
| Charles Siegler | CK | $40.00 | 6/19/00 | 00-17 | $30,000.00 | Mobile Home |
| James Morris | CK | $20.00 | 6/24/00 | 00-18 | $4,500.00 | Bedroom |
| J. Robert Jounker | CK | $15.00 | 7/1/00 | 00-19 | $900.00 | Deck |
| William Foster | CK | $15.00 | 7/6/00 | 00-20 | $750.00 | Shed |
| Jesse Stickler | CK | $20.00 | 7/10/00 | 00-21 | $9000.00 | Mobilehome |
| Roy Augenstein | CK | $70.00 | 7/21/00 | 00-22 | $235,000.00 | House |
| Jeanne Price | CK | $70.00 | 7/22/00 | 00-23 | $135,000.00 | House |
| John Hewett | CK | $20.00 | 7/27/00 | 00-24 | $12,000.00 | Shed |
| Melissa Foster | CA | $20.00 | 8/30/00 | 00-25 | $1,500.00 | Room |
| Theodore  Kock | CK | $20.00 | 8/31/00 | 00-26 | $2,000.00 | Barn |
| Joe Baker | CA | $20.00 | 9/18/00 | 00-27 | $ 3,000.00 | Mobile Home |
| Karl Aronson | CK | $20.00 | 9/20/00 | 0028 | $10,000.00 | Workshop |
| Karl Aronson | NA | NA | 9/20/00 | 0029 | NA   Demolish Barn | |
| Donald DeArment | CK | $20.00 | 9/25/00 | 00-30 | $15,000.00 | Camp |
| William Koch | CA | $20.00 | 10/3/00 | 00-31 | $6,600.00 | Siding |
| Don Gibboney | CA | $15.00 | 10/3/00 | 00-32 | $700.00 | Deck |
| Paul Powell | CK | $15.00 | 10/25/00 | 00-33 | $900.00 | Porch |
| Mark McLaughlin | CK | $70.00 | 10/27/00 | 00-34 | $186,000.00 | House |
| A-1 Auto | CK | $20.00 | 11/17/00 | 00-35 | $1,000.00 | Mobile Home |
| Michael Yoder | CK | $20.00 | 12/4/00 | 00-36 | $2,000.00 | Storage Unit |

$1,248,549.00

| NAME | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|------|-----|-----|------|--------|-------|---------|
| Raymond Tussey | CK | $60.00 | 1/6/01 | 00-1 | $65,000.00 | House |
| Tuckaway Tree Farm | CK | $50.00 | 1/11/01 | 01-02 | $46,000,00 | Barn |
| Thomas Henwood | CK | $70.00 | 1/11/01 | 01-3 | $400,000.00 | House |
| Donald Powell | CA | $15.00 | 2/14/01 | 01-4 | NA    Demolition of Camp | |
| Allan Diehl | CK | $60.00 | 2/27/01 | 01-5 | $65,000.00 | Addition |
| Kevin Boonie | CK | $60.00 | 3/31/01 | 01-6 | $52,000.00 | House |
| Joel Menuez | CK | $40.00 | 4/10/01 | 01-7 | $500.00 | Deck |
| | | (Since | this was | deliquent a fine was | added) | |
| Dennis Rief | CK | $20.00 | 5/17/01 | 01-8 | $2,500.00 | Sheds |
| Stephen Stoltzfus | CK | $15.00 | 5/1/01 | 01-9 | $5,000.00 | Garage |
| Brian Bliss | CK | $20.00 | 5/5/01 | 01-10 | $1,000.00 | Porch/Pavill |
| Stoney Lonesome Camp | CA | $20.00 | 5/9/01 | 01-11 | $1,100.00 | Pavillion |



*Law Office*
## HARVEY B. REEDER

Exhibit 19

504 Penn Street
Huntingdon, PA 16652

*Phone: 814/643-3821*

May 1, 2000

David B. Corneal, Esquire
1445 West College Avenue
State College, PA  16801

Re:    John B. Hewett, Jr. and JoAnn F. Smith

Dear Mr. Corneal:

I am in receipt of your fax dated April 28, 2000.  Please be advised that I represent John B. Hewett, Jr. and JoAnn F. Smith.

It is my understanding that there are some difficulties with the Township in obtaining subdivision approval.  It is quite obvious to me that final settlement will not be able to take place on or before June 30, 2000.

My clients are not interested in any addendum to this Agreement and desire that the Agreement be terminated.

Accordingly, we would request that you return to us the down payment of $4,000.00, together with the monthly payments totaling $3,000.00 which have been made since November 7, 1999.  We are returning the original map which you left with Mr. Hewett.

Should you have any questions, please feel free to contact me.

Sincerely yours,

Harvey B. Reeder

HBR:klb

Enclosure

cc:    Mr. John B. Hewett, Jr.

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3  DAVID B. CORNEAL AND SANDRA Y.
   CORNEAL,
4          Plaintiffs

5        VS                      : NO. 1:00-CV-1192

6  JACKSON TOWNSHIP, Huntingdon
   County, Pennsylvania, W. THOMAS
7  WILSON, Individually and in his
   Official Capacity as Supervisor
8  of Jackson Township, MICHAEL
   YODER, Individually and in his
9  Official Capacity as Supervisor   : JURY TRIAL DEMANDED
   of Jackson Township, RALPH
10 WEILER, Individually and in his
   Official Capacity as Supervisor
11 of Jackson Township, BARRY PARKS, :
   Individually and in his Official
12 Capacity as Sewage Enforcement
   Officer of Jackson Township,
13 DAVID VAN DOMMELEN, Individually
   and in his Official Capacity as'
14 Building Permit Officer, ANN I.
   WIRTH, Individually and in her
15 Official Capacity as Secretary
   of Jackson Township, and
16 LARRY NEWTON, Individually and in
   his Official Capacity as Solicitor:
17 to Jackson Township,
             Defendants
18

19        DEPOSITION OF:  TERRY WILLIAMS, ESQUIRE

20        TAKEN BY:       DEFENDANTS

21        BEFORE:         NICOLE L. ZIMMERMAN
                          NOTARY PUBLIC
22
          DATE:           JULY 10, 2001, 10:08 A.M.
23
          PLACE:          THE DAYS INN
24                        240 SOUTH PUGH STREET
                          STATE COLLEGE, PA 16801
25

           MLP REPORTING, INC.  (570) 748-1041

---

3

1              I N D E X

2  BY DEFENDANTS                      EXAMINATION

3  TERRY WILLIAMS, ESQ.
      By Mr. Sherr                    4, 63
4     By Ms. Montgomery                  60

5

6

7

8

9

10             E X H I B I T S

11 WILLIAMS' EXHIBITS              MARKED  PRODUCED

12 No. 1 - Notice of Deposition and    4       5
           and Subpoena
13
   No. 2 - Court Order               12       12
14
   No. 3 - Letter (11/10/2000)       27       27
15
   No. 4 - Letter (2/5/2001)         54       54
16

17

18

19

20

21

22

23

24

25

           MLP REPORTING, INC.  (570) 748-1041

---

1           A P P E A R A N C E S:

2  ECKERT SEAMANS
   BY:  BRIDGET MONTGOMERY, ESQUIRE
3       LESLIE A. MALADY, ESQUIRE
   213 Market Street, Eighth Floor
4  Harrisburg, PA 17101
       FOR - PLAINTIFFS
5
   MAYERS, MENNIES & SHERR, LLP
6  BY:  ANTHONY R. SHERR, ESQUIRE
   3031 Walton Road
7  Building A, Suite 330
   P.O. Box 1547
8  Blue Bell, PA 19422-0440
       FOR - JACKSON TOWNSHIP, MR. WILSON,
9      MR. YODER, MR. WEILER, MR. PARKS,
       MR. VAN DOMMELEN & MS. WIRTH
10
   ALSO PRESENT:  DAVID CORNEAL
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

           MLP REPORTING, INC.  (570) 748-1041

---

4

1              STIPULATION

2

3         It is hereby stipulated by and between

4  counsel for the respective parties that sealing,

5  certification, and filing are waived, and that all

6  objections except as to the form of the question are

7  reserved to the time of trial.

8

9         TERRY WILLIAMS, ESQ., called as a witness,

10 being sworn/affirmed, testified as follows:

11        (Notice of Deposition and Subpoena premarked

12 Williams Exhibit No. 1.)

13

14              EXAMINATION

15

16 BY MR. SHERR:

17    Q     Could you please state your full name for

18 the record?

19    A     Terry James Williams.

20    Q     Mr. Williams, my name is Tony Sherr.  We

21 just met, we spoke before.  I represent the Defendants,

22 other than Mr. Newton, in a lawsuit filed by David B.

23 Corneal and Sandra Y. Corneal, which is currently

24 pending in the United States District Court for the

25 Middle District of Pennsylvania.

           MLP REPORTING, INC.  (570) 748-1041

5

1        We're here today to take your deposition.
2 You're familiar with depositions?
3     A    Yes.
4     Q    The only thing I would just like to stress
5 is that if you don't understand my question, please ask
6 me to clarify it, and that if you don't hear it, please
7 ask me to repeat it.  If you answer the question, we're
8 going to assume that you both heard and understood the
9 question.
10       I've placed in front of you what I've had
11 marked as Williams Exhibit No. 1, which, for the
12 record, I'll state is a Notice of Deposition and a
13 Subpoena.  Are you here today pursuant to the
14 deposition notice and subpoena?
15    A    Well, to be candid, I don't know that I've
16 ever received these.  I'm responding to Judge Rambo's
17 order and I think a telephone call from your office
18 telling me when you wanted to do the deposition.  We
19 received the original subpoena that was served, these
20 were not, but...
21    Q    Okay.  The third page, the addendum to
22 subpoena, have you seen that before?
23    A    I don't believe I have.
24    Q    Have you seen Judge Rambo's order in
25 conjunction with your deposition today?

                MLP REPORTING, INC.  (570) 748-1041

6

1     A    Oh, yes, I've seen Judge Rambo's order.
2     Q    And Judge Rambo's order referenced documents
3 that you were to produce?
4     A    Yes.
5     Q    I've been handed a number of documents by
6 Ms. Montgomery this morning.  Where were these
7 documents from, where were these documents taken from?
8     A    They're from my file.
9     Q    Other than documents in your file, did you
10 search anywhere else for documents?
11    A    No.
12    Q    Do you have any other documents relative to
13 the request of Mr. Corneal's property other than what's
14 contained in your file?
15    A    As to Judge Rambo's order, no.
16    Q    There are other documents, but you believe
17 they haven't gone to third parties, is that —
18    A    Oh, that's correct.  I mean, I would have my
19 — my file notes are not in the group that you have in
20 front of you.
21    Q    But you don't believe that there are any
22 other documents other than what's been produced that
23 concerns Mr. Corneal's property in Jackson Township
24 which have been sent to third parties?
25    A    No, they would all be in that file.

                MLP REPORTING, INC.  (570) 748-1041

7

1     Q    Did you review any documents in preparation
2 for today's deposition?
3     A    Probably when I got the first subpoena, I
4 went through the file — no, wrong.  When I got Judge
5 Rambo's order, I pulled the file and removed my notes
6 and things; but did I review for today, no.
7     Q    Did you discuss, other than with
8 Mr. Corneal, today's deposition with anybody?
9     A    Other than counsel.
10    Q    When did you discuss today's deposition with
11 counsel?
12    A    I think that's privileged.
13    Q    When you discussed it with her?
14    A    Yeah, I think.
15    Q    And by counsel, you mean Bridget Montgomery?
16    A    Yes.
17    Q    Is she representing you here today?
18    A    Yes.
19       (Mr. Corneal entered the room.)
20       MR. SHERR:  Let the record reflect that the
21 Plaintiff, David Corneal, just entered the room.
22 BY MR. SHERR:
23    Q    What's your business address?
24    A    720 South Atherton Street, State College.
25    Q    And you're a member of a firm there?

                MLP REPORTING, INC.  (570) 748-1041

8

1     A    Yes.
2     Q    What's the name of the firm?
3     A    Miller, Kistler, Campbell, Miller, Williams
4 & Benson.
5     Q    How long have you been practicing law?
6     A    Twenty-eight years.
7     Q    And do you have a particular specialty?
8     A    Not as that term — not as you
9 professionally understand that term like patent law or
10 anything like that, no.  It's a general practice firm.
11 I spend most of my time concentrating in municipal
12 work, commercial litigation, business-related
13 transaction law.
14    Q    What do you mean by municipal work?
15    A    Well, I serve as a solicitor for a number of
16 municipalities and I represent a number of developer
17 clients, as well as provide zoning litigation
18 assistance to other attorneys.
19    Q    When did you first become involved with
20 Mr. Corneal's property in Jackson Township?
21    A    I don't know that I can give you a specific
22 date.  Probably it would have been in November before
23 the first conference at the Huntingdon County
24 Courthouse.
25    Q    Was it your understanding that an action had

                MLP REPORTING, INC.  (570) 748-1041

9

1 been filed in Huntingdon County against Mr. Corneal
2 prior to you becoming involved?
3      A      I didn't know that.  Mr. Newton had
4 indicated that they had filed some sort of cease and
5 desist action.  In other words, I did not have
6 pleadings, any of that sort before that meeting.
7      Q      So your first contact with anybody other
8 than Mr. Corneal with respect to his property in
9 Jackson Township was a phone call to Mr. Newton?
10     A      That's correct.
11     Q      Did you initiate that phone call?
12     A      I don't recall.  I have a feeling I must
13 have, otherwise Larry would not have known of my
14 involvement, so I must have.  Whether I called him or
15 he responded to a phone message from me, I don't know.
16     Q      And this phone call took place sometime
17 before the first conference in November?
18     A      Yes.
19     Q      What was the nature of that phone call?
20     A      We're going to be in front of the judge at
21 such and such a time.
22     Q      Was there any discussion about the case
23 itself?
24     A      Only from Larry's perspective about what
25 action he was trying to take, construction activities

                    MLP REPORTING, INC.  (570) 748-1041

10

1 were ongoing without benefit of appropriate permits.
2             I think Larry mentioned that there was a
3 civil rights action that had been filed.  I think I
4 told Larry that my involvement was strictly with the
5 building permitting process, that I had nothing to do
6 and would have nothing to do with the civil rights
7 action.
8      Q      Had you been out to the property, the
9 Corneal's property in Jackson Township prior to that
10 phone call?
11     A      No.
12     Q      Prior to the phone call, had you discussed
13 the Corneal property in Jackson Township with anybody
14 other than Mr. and Mrs. Corneal?
15     A      I regard that as a privileged response.
16 What I did in terms of investigation, I think is not
17 appropriate.
18     Q      Well, my question is, just so we're clear on
19 the record, did you have discussions prior to the phone
20 call with Mr. Newton concerning Mr. Corneal's property
21 with anybody other than David and Sandra Corneal?
22     A      I'm declining to answer that.  I think
23 that's part of my work product.
24     Q      At the time that you had the phone call with
25 Mr. Newton, had construction commenced on the property?

                    MLP REPORTING, INC.  (570) 748-1041

11

1      A      That was my understanding both from — well,
2 certainly from Mr. Newton.  I had not actually seen the
3 property myself.
4      Q      Other than this discussion with Mr. Newton,
5 did you have any discussions with any third parties
6 other than — and by third parties, I mean other than
7 Mr. and Mrs. Corneal — prior to a hearing and/or
8 meeting at the Huntingdon County Courthouse?
9             MS. MONTGOMERY:  Objection.  That's been
10 asked and objected to by the deponent himself.
11            MR. SHERR:  No, I asked him before the phone
12 call, now I'm asking after the phone call.
13     A      I would give the same response.  I think
14 that's privileged communication.
15 BY MR. SHERR:
16     Q      Did you go to the property prior to the
17 meeting at the Huntingdon County Courthouse in
18 November?
19     A      No.
20     Q      What was your understanding of the nature of
21 the action filed against Mr. Corneal?
22     A      To be honest, I had no understanding because
23 I hadn't seen the pleadings.  Mr. Newton advised me
24 that they had filed an action to obtain a cease and
25 desist order.

                    MLP REPORTING, INC.  (570) 748-1041

12

1      Q      Did you see the pleadings prior to the
2 conference at the courthouse?
3      A      No.
4      Q      Do you know what date you met at the
5 courthouse in November?
6      A      I'm sorry, I don't.  That would be in the
7 material that you have there in Judge Kurtz' orders.
8             MR. SHERR:  Let's have this marked as
9 Williams No. 2, please.
10            (Court Order marked Williams Exhibit No. 2.)
11 BY MR. SHERR:
12     Q      I'm going to show you what has been marked
13 as Williams Exhibit No. 2, which is a four-page
14 document consisting of an order by Stewart Kurtz, as
15 well as a motion for preliminary injunction and ask you
16 to review that.
17     A      Okay.
18     Q      Is that the order that you were referring
19 to?
20     A      Yes.  That means the meeting would have
21 occurred November 14, 2000.
22     Q      Just for a second, if you could just get
23 that back in front of you.  Looking at the second page,
24 have you seen that motion for preliminary injunction
25 before today?

                    MLP REPORTING, INC.  (570) 748-1041

13

1    A    Yes.

2    Q    And it's your testimony, though, that you

3 didn't see it prior to going to the courthouse?

4    A    No.

5    Q    Who was present when you went to the

6 courthouse?

7    A    Larry Newton.

8    Q    Was it you and Larry Newton?

9    A    Yes, we met in the hallway.

10    Q    Was anybody else present?

11    A    Not in that initial conversation, no.

12    Q    Was anybody else at the courthouse for this

13 matter that you were aware of?

14    A    Not at my initial meeting with Larry,  Now,

15 they were all there apparently, but not with my

16 conference with Larry.

17    Q    And you say the conference with Larry took

18 place in a hallway?

19    A    Uh-huh, outside the main courtroom in

20 Huntingdon County.

21    Q    And who initiated this meeting?

22    A    Gosh, I don't know how to answer that.  I

23 mean, both of us were there to talk about the Corneal

24 matter.  I don't know who initiated it in that sense.

25    Q    Can you tell me what the substance of the

MLP REPORTING, INC.  (570) 748-1041

---

14

1 conversation you had with Mr. Newton was?

2    A    Well, I'm sure other than the usual

3 civilities, I'm sure we talked about what Judge Kurtz

4 wanted to do that day.

5         I think we indicated that -- I think I

6 indicated that my purpose in being there was to find

7 out what it was the township was with trying to do to

8 try to get the building permit, sewage permit, driveway

9 permit, although I -- yes, I did know about the

10 driveway permit -- to get those matters taken care of.

11        And Larry made some comment about the

12 existence of this 1983 action, and I told him again I

13 have nothing to do with that, didn't want to have

14 anything to do with it, that I was there purely to try

15 to solve what he had filed, which I hadn't seen yet, in

16 Huntingdon County.

17        I'm sure I told him at that meeting that I

18 would try to do whatever I could to get that aspect of

19 it resolved, that I was concerned that David was in the

20 process of building without the benefit of those

21 permits and that I wanted to get that corrected.  I

22 wanted to find out what was wrong and why on heaven's

23 name the township hadn't issued building permits.

24    Q    And did you find out at that meeting?

25    A    No, not at that -- no, not at that initial

MLP REPORTING, INC.  (570) 748-1041

---

15

1 meeting, no, nor the subsequent conference that carried

2 over from that.  I think -- I don't remember who went

3 in to talk to the judge's clerk or his secretary,

4 probably both of us stepped in the door, I think we

5 indicated to the secretary that we wanted to confer a

6 little bit.

7         Larry ushered me into the law library, I was

8 surprised when I got in the law library that all of the

9 board of supervisors were there, the secretary,

10 Ms. Wurth, SEO Parks, the building permit officer,

11 whose name I don't recall.

12    Q    Van Dommelen?

13    A    I just don't remember his name, but the

14 building permit officer was there, I was very surprised

15 that they were all sitting in a row.

16    Q    And why did that surprise you?

17    A    Well, I hadn't anticipated that they were

18 going to have that type of full-blown meeting.  I

19 thought the purpose was to confer with Larry Newton and

20 with the judge.

21    Q    Did you confer with the judge that day?

22    A    We certainly didn't -- or I certainly didn't

23 confer with the judge in the sense of having a

24 conference with the judge about the case.

25         I have a feeling we probably talked to him

MLP REPORTING, INC.  (570) 748-1041

---

16

1 in the hallway, but that may have been more good

2 morning, Judge, how are you, sort of thing.  I don't

3 remember anything about the conversation with the

4 judge.

5    Q    The meeting that you had in the library,

6 what took place at that meeting?

7    A    Well, the township was telling me about what

8 they felt was wrong with what David had done.  They

9 provided an indication that construction was ongoing,

10 that there were no building permits, that there were no

11 septic permits, that there was no driveway permit and

12 that they wanted to stop him and they wanted it stopped

13 now.

14         I'm sure there was more general information

15 offered, but they had drawings, they permitted me to

16 talk to the SEO, to the building permit officer, to the

17 road master about what the situation was.

18         And actually, Mr. Newton, who obviously was

19 present, allowed me to ask questions of them, what do

20 we need to do to solve this, what's wrong with that,

21 that kind of exchange back and forth.

22    Q    You had a discussion there with the SEO?

23    A    The SEO was there, yes.

24    Q    And you had a discussion with him?

25    A    Yes, in the sense of asking him a question,

MLP REPORTING, INC.  (570) 748-1041

17

1 what needs to be done to get the sewer permits, an
2 explanation.
3     Q    And what do you recall him telling you
4 needed to be done?
5     A    I think his comment at that meeting, and I'm
6 sorry, Counsel, I don't have a definitive recollection,
7 but I think what he told me was that the test pits were
8 acceptable, that the modules had been filed and were in
9 appropriate form, but that the drawing which had been
10 attached to it was not because it showed a subdivision.
11     Q    And did he indicate to you what the problem
12 with the drawing showing a subdivision was?
13     A    No, I think -- no, he didn't tell me why he
14 thought that was inappropriate, no.
15     Q    Did you ask him any questions about what he
16 told you?
17     A    No.  I'm certain I asked him what else do
18 you think we -- what else do we need to do to get this
19 clarified, and from that, I don't think the SEO
20 responded; someone did, I don't recall, it may have
21 been Ms. Wirth, but I don't recall, someone responded
22 that the drawings needed to be modified to eliminate
23 references to the subdivision.
24          There was also an issue about one of the
25 test pit numbers was inaccurate in the narrative, which

18

1 is the detailed attachment to the plan, in other words,
2 not the plan itself, but the detail that's attached to
3 it.
4     Q    Did you make any comments concerning the
5 propriety of what they were telling you at that
6 meeting?
7     A    No.
8     Q    Did the SEO, at that meeting, ask you for
9 permission to go onto the property to see if the test
10 sites had been disturbed?
11     A    No.
12     Q    Did he ask you subsequently at another
13 meeting?
14     A    He's never asked me could he go on the
15 property to see if the sites had been disturbed.
16     Q    Did he ask you permission to go onto the
17 site?
18     A    Oh, yes.
19     Q    Was that at the November meeting?
20     A    No, that would have been months later.
21     MR. CORNEAL:  Can I have an interruption for
22 a second so I can consult with my counsel, with Terry
23 Williams?
24     MR. SHERR:  I think that's inappropriate at
25 a deposition for you to be consulting with the

19

1 deponent.
2          MS. MONTGOMERY:  I think this is an unusual
3 deposition and I think that he's entitled to consult
4 with his counsel.
5          MR. SHERR:  If he was being deposed, he
6 wouldn't be allowed to consult with his counsel, so the
7 fact that his counsel is being deposed, he's not
8 allowed to consult with his counsel, either.
9          MS. MONTGOMERY:  Well, actually, we haven't
10 done the depositions in this case that way, Tony.  I've
11 allowed you to consult with your clients when you've
12 asked me to.
13          MR. SHERR:  You certainly have not.  And, in
14 fact, you gave an instruction at each deposition that
15 they were not entitled to consult with their attorney
16 during the deposition.
17          MS. MONTGOMERY:  Well, Tony, we can --
18          MR. SHERR:  Unless you're changing, you
19 know, what you state there at the beginning of each
20 deposition.
21          MS. MONTGOMERY:  Hold on one second.  I'm
22 going to consult with my witness.
23          MR. SHERR:  Well, that's inappropriate, as
24 well.
25          MS. MONTGOMERY:  Well, I'm going to consult

20

1 with him.
2          MR. SHERR:  Well, we'll let the record
3 reflect that you're consulting with the witness,
4 inappropriately so.
5          (Discussion held off the record between
6 Ms. Montgomery and the witness.)
7          MS. MONTGOMERY:  For the record, you know,
8 since you seem to want to put this on the record, Tony,
9 we are concerned that since it is his counsel being
10 deposed and he has some concern, that he is entitled to
11 talk to his counsel on this unusual situation.
12          MR. SHERR:  Well, I don't think the
13 situation is very unusual at all, and I don't think
14 it's appropriate for you to consult with him.  You
15 know, I'm not going to physically stop him from
16 consulting with him, so, you know, do what you feel you
17 need to do.
18          MS. MONTGOMERY:  Go ahead, and I will
19 listen.
20          (Discussion held off the record.)
21 BY MR. SHERR:
22     Q    Would you like to change or modify any of
23 your responses as a result of the conference that you
24 just had with Ms. Montgomery and Mr. Corneal?
25     A    No.

21

1    Q    Okay.  You said that you had asked some
2  questions to the SEO about what needed to be done and
3  you believe that Ms. Wirth responded?
4    A    My recollection is that Ms. Wirth is the one
5  who pointed out the discrepancy in the soil perc
6  number.  I'm not entirely certain of that, but I think
7  she did.
8    Q    Other than the sewer modules, was there
9  anything else that the township or that the individuals
10  present at that meeting indicated to you needed to be
11  fixed or completed to have Mr. Corneal in compliance?
12    A    Yes, there was discussion with the road
13  master concerning the driveway permit, there was
14  discussion that they really didn't have a driveway
15  permit ordinance in effect, but I agreed that if that's
16  what needed to be done to resolve that issue, we would
17  go ahead and apply for one.
18        I think the building permit officer -- I'm
19  sure I asked the same question to the building officer,
20  and I think he said, no, there's no reason why from a
21  building permit standpoint they can't be issued.
22    Q    So just in summary fashion, as a result of
23  this meeting, what did you learn that the township
24  wanted Mr. Corneal to do to come into compliance?
25    A    Well, I had a laundry list of things that

MLP REPORTING, INC.  (570) 748-1041

22

1  they wanted accomplished, principally being that he
2  obtain a septic permit, building permit and driveway
3  access permit, that the principal holdup, I guess, was
4  the modification or correction of the plan that was
5  attached to the sewer module and that was important
6  because that plan, as attached to the module, showed a
7  subdivision and the application was not for a
8  subdivision at this point, it was to obtain a building
9  permit.
10    Q    So did you indicate to the people present at
11  that time that Mr. Corneal was not attempting at this
12  time or at the time that you had the meeting to
13  subdivide the property?
14    A    No, what I indicated to them was that my
15  purpose in being there was to get the appropriate
16  permits and if that meant that the subdivision was for
17  the time being put on hold, that's what we would do,
18  but that my purpose was to get the permits.
19        Well, and obviously, to allow him to
20  continue to build, I mean, there was some discussion
21  about that, that if they were successful -- remember
22  now, they had not served anybody with this paper, with
23  what you've put in front of me, this motion, we hadn't
24  seen this, I hadn't seen it, but it had been
25  characterized to me by Mr. Newton that they wanted a

MLP REPORTING, INC.  (570) 748-1041

23

1  cease and desist order and certainly there was a great
2  deal of discussion at that meeting that if they
3  succeeded in getting a cease and desist order in
4  November, there was going to be additional damages on
5  that site.
6    Q    What do you mean by that, additional damages
7  on the site?
8    A    Well, once you've started construction,
9  stopping during winter in central Pennsylvania is
10  disastrous.
11    Q    So there would be damages from a physical
12  point of view of the site itself?
13    A    Absolutely.  I'm sure there are other
14  damages, but in terms of the structure, that's not the
15  best thing for a building.  The building officer, as I
16  recall, agreed with me about that.  He seemed like a
17  very nice man.
18    Q    Other than learning what the township wanted
19  to have, did anything else take place at this meeting?
20    A    Well, I'm sure there was a commitment on my
21  part to proceed to make whatever corrections they felt
22  they wanted and to work with them to try to bring David
23  -- to get David the permits to do what they wanted to
24  get the permits issued, and Mr. Newton agreed that they
25  would hold any further action under this filing in

MLP REPORTING, INC.  (570) 748-1041

24

1  advance.
2        And I think an agreement was reached at that
3  meeting that I would accept service of the documents so
4  that they didn't have to expend any further money
5  trying to serve the motion.  I don't recall anything
6  else.
7    Q    Did you or Mr. Newton have a discussion with
8  the judge after this meeting to let the judge know what
9  was going on?
10    A    I don't think so, we were into the noon
11  hour, I don't believe so.  Whether Mr. Newton did, I
12  don't know, of course, but I don't recall that I saw
13  the judge again.
14    Q    Were you aware at the time that you met
15  whether or not Mr. Corneal had applied for a building
16  permit?
17    A    Well, I think what I was aware of is
18  probably privileged.
19    Q    After the meeting in November, did you meet
20  with anybody other than Mr. or Mrs. Corneal for the
21  purpose of complying with what the township wanted
22  Mr. Corneal to do?
23        MS. MONTGOMERY:  Objection.  What Attorney
24  Williams' purpose was is certainly a privileged, if not
25  a work product matter.

MLP REPORTING, INC.  (570) 748-1041

25

1    A    I would agree.  To me, that's privileged,
2 what I did.
3 BY MR. SHERR:
4    Q    Did you meet -- I'll just say it like this
5 and noting that objection, after that November meeting,
6 did you meet with anybody other than Mr. or Mrs.
7 Corneal with respect to the property before your next
8 meeting with the township?
9    A    Once again, I think that's privileged, I
10 think that's the same question.
11    Q    Well, all I'm asking you -- just so we're
12 clear -- all I'm asking you is whether you met with
13 anybody, other than the Corneals?
14    A    Other than the Corneals before I met with
15 the township again, yeah, I think that's privileged,
16 that's my work product, that's what I do for a living.
17    Q    But this is a meeting -- well, you may be
18 asserting your work product, and I'm not asking you
19 what happened at the meeting or anything of that
20 nature, I'm asking you whether you met with somebody
21 other than Mr. or Mrs. Corneal?
22    A    But the fact that there was a meeting, I
23 think is work product.  I think that gets into the
24 disclosure and I think that's clearly privileged.
25    Q    All right.  Well, we'll find that out.  Did

MLP REPORTING, INC.  (570) 748-1041

26

1 you speak with anybody other than Mr. and Mrs. Corneal
2 concerning -- and township officials concerning the
3 property prior to your next meeting with the township?
4    MS. MONTGOMERY:  Objection.  It's been
5 asked, objected to, answered.
6    MR. SHERR:  Well, I asked for meetings and
7 now I'm asking for whether or not he spoke with
8 anybody.
9    A    Oh, then I misunderstood your prior
10 question.  Let's try to short-circuit that.  I feel
11 that what I did in terms of talking with people,
12 meeting with people, research or whatever, I think
13 that's all privileged material, it's a part of my job
14 in representing a client.
15 BY MR. SHERR:
16    Q    After this meeting in November, did you have
17 an opportunity to go to the property in Jackson
18 Township?
19    A    At some point, I went to the property, yes.
20    Q    When was that?
21    A    I'm sorry, sir, I don't recall.  I don't
22 know when I actually went there, other than to tell you
23 it was cold and there was snow on the ground.
24    MR. SHERR:  I would like this marked as
25 Williams No. 3, please.

MLP REPORTING, INC.  (570) 748-1041

27

1    (Letter marked Williams Exhibit No. 3.)
2 BY MR. SHERR:
3    Q    I'm going to show you a letter from you to
4 Jackson Township Board of Supervisors dated November
5 10, 2000, which has been marked as Williams No. 3 and
6 ask you to review that.
7    A    Yes.
8    Q    Now, you wrote this letter prior to the
9 meeting that we were just discussing, correct?
10    A    Apparently.  I don't have an independent
11 recollection of that, but I must have.
12    Q    Do you have any reason to doubt the date
13 that appears on that letter?
14    A    No, I have no reason to doubt the date.
15    Q    Okay.  Did you have a discussion concerning
16 Williams No. 3 with anybody from the township?
17    A    No, I don't recall any discussions about the
18 building permit appeal.
19    Q    Did you discuss that at the meeting at the
20 courthouse?
21    A    Not to my knowledge.  I don't recall that.
22 There appears a lot of discussions, somebody may have
23 mentioned it, but I don't remember that.
24    Q    Was it your understanding that the hearing
25 that you requested in Williams No. 3 had been subsumed

MLP REPORTING, INC.  (570) 748-1041

28

1 in what you discussed at the courthouse on November 19?
2    A    No, that was not my understanding.
3    Q    And it's also your testimony that you did
4 not bring up the fact that you had asked for a hearing
5 on an appeal from a denial of a building permit?
6    A    No, I don't recall talking about that.  The
7 discussion centered on their request for injunctive
8 relief.
9    Q    And the discussion also centered on, at
10 least at some points, about building permits?
11    A    Absolutely.  Building permits were the
12 principal focus of the meeting.
13    Q    All right.  So you discussed with the
14 township at the meeting at the courthouse with the
15 township officials and employees the deficiencies they
16 found in the building permit application by
17 Mr. Corneal?
18    A    To my knowledge, there were no deficiencies
19 in the building permit application.  The building
20 officer, when I asked him that question, my
21 recollection is he said no, nothing needs to be done to
22 those.
23    The problem is in the septic -- or the land
24 development plan and the driveway permit and that the
25 building -- well, I don't remember what the building

MLP REPORTING, INC.  (570) 748-1041

29

1 officer said about it.  I think his comment was I can't
2 issue a building permit until the septic permit is
3 resolved.
4      Q     You think he said that at the meeting in
5 November?
6      A     I'm certain it wasn't Mr. Newton.  I think
7 it was the building permit officer.
8      Q     Did you say anything in response to that
9 statement?
10      A     I don't recall a response.
11      Q     So you may have responded and you just don't
12 recall what it was?
13      A     Yeah, I just don't recall.
14      Q     Now, you indicated earlier that it was your
15 intent to comply with what the township was asking with
16 respect to the property?
17           MS. MONTGOMERY:  Objection.  That's not what
18 he testified to.
19 BY MR. SHERR:
20      Q     Do you recall testifying to that effect?
21      A     I've lost the focus of the question.  Sorry.
22      Q     Okay.
23      A     First of all, let me be clear, my intent, I
24 think is privileged.  I think what you're referring to,
25 you asked me a question about what was said, and what I

31

1 there was one other supervisor present was at the
2 driveway throat where it intersects the township road.
3           And there was one onsite meeting -- pardon
4 me, I stand corrected -- two onsite meetings where the
5 SEO was present, one with just the SEO, the other is a
6 much later meeting with representatives of DEP and the
7 SEO.  I think those are all the meetings.
8           Now, the exact sequence of those, I'm not
9 sure I can reproduce for you.  I do know the driveway
10 was first because we dealt with that issue first.
11      Q     What was the issue with the driveway that
12 was being dealt with?
13      A     Well, the township at the first meeting
14 contended that he needed a driveway permit.  I
15 politely, I wouldn't want to say argued, but politely
16 pointed out that they didn't have the driveway permit
17 ordinance enacted when the driveway throat was
18 constructed, but we would file an application for a
19 permit.
20           There was discussion at that meeting with --
21 this is the first meeting now -- with the road master
22 that he was not happy about the contour of how that
23 driveway throat was constructed, so that the meeting on
24 site, site referring, again, to the intersection
25 between the driveway and the road, was to look at that

30

1 indicated was that I told them that I would help
2 Mr. Corneal come into compliance and do whatever they
3 wanted us to do to get the building permits, that I did
4 say.
5      Q     Okay.  Did you give an indication at any
6 time after the meeting in November at the courthouse
7 that Mr. Corneal still desired a hearing with respect
8 to the denial of his building permit?
9      A     No, I don't recall any discussion about the
10 building permit appeal hearing.
11      Q     What's the next meeting that you recall
12 having with the township or township officials
13 concerning the property?
14      A     Here I may have my sequence off.  I'm
15 certain there were phone calls with Solicitor Newton,
16 I'm certain there were one or two phone calls with
17 Ms. Wirth, I'm certain there were phone calls with the
18 road master regarding the driveway permit.
19           I suspect you have in front of you Judge
20 Kurtz' order which would tell me the date of the next
21 meeting at the courthouse.  I think the next meeting at
22 the courthouse was the only other meeting that we had.
23           Now, there was a site visitation with the
24 road master at the highway, not by said site, but let
25 me be precise, the meeting with the road master and

32

1 basically to say what do you want us to do.
2      Q     And what did they indicate?
3      A     Well, he indicated he wanted a
4 reconstruction of the driveway throat, obviously he
5 wanted a permit application, he wanted a reconstruction
6 of the driveway throat and that ultimately, he wanted
7 stabilization of where the driveway intersects the
8 highway so that -- well, I don't know that he gave me
9 his reasons for that.
10           The reason for the reconfiguration he gave,
11 which was to facilitate water drainage so that it
12 didn't drain out onto the road surface, but went into
13 the drainage culverts -- they're actually not culverts,
14 that implies some construction, they're swales on
15 either side of their township road.
16           So we talked about methods of
17 reconfiguration construction, we agreed that we would
18 pick an appointed day when the weather permitted
19 because it was very cold then to come back and redo the
20 driveway throat.
21           MR. SHERR:  Let the record reflect that
22 Ms. Montgomery is speaking to the witness.
23           (Discussion held off the record between
24 Ms. Montgomery and the witness.)
25 BY MR. SHERR:

33

1    Q    Would you like to change or modify any of
2 your previous responses as a result of what
3 Ms. Montgomery just told you?
4    A    No.
5    Q    So you agreed to comply with what the road
6 master was asking with respect to the intersection of
7 the driveway and the road?
8    A    Yes.
9    Q    And how about with respect to the
10 application for a driveway permit?
11   A    Well, I pointed out again to him that he
12 didn't have a driveway ordinance that was in effect at
13 the time of this construction, but if that would help
14 get the building permit issue resolved, I would have
15 David apply for a permit.
16   Q    So to the point when this meeting took place
17 on the road, no driveway permit had been applied for?
18   A    I can't answer that, Tony.  I don't know
19 when that application was filed.  It may or may not
20 have been; I don't know.
21   Q    How about the sewer modules, were they
22 amended in accordance with the discussion you had in
23 November at the courthouse at the time that you had
24 this meeting out at the roadway?
25   A    I'm sorry, sequentially, I don't know.  It

35

1 was continuing.
2         And I bluntly indicated to him the fact that
3 the permits hadn't been issued was, in my view, not
4 Mr. Corneal's situation, it was because of the actions
5 of the township, but that we would continue to do
6 everything we could to correct that aspect of it.
7    Q    Did you tell him what actions of the
8 township prevented the permits from being issued?
9    A    No, I don't think we ever went into those
10 kinds of details.  We're not talking about lengthy
11 conversations.
12   Q    Did you indicate to him that the township
13 was doing something to prevent permits from being
14 issued?
15   A    Prevent, no, I can't use that word,
16 "prevent".  I'm sure I said to him on a number of
17 occasions, where in your ordinance scheme are you
18 getting this, why are you doing it -- not why are you,
19 the solicitor isn't doing it -- why is the township
20 doing it this way.
21   Q    Do you recall any specific examples of
22 asking him why are you doing this, why is the township
23 doing it this way?
24   A    Sure, why are they requiring a driveway
25 permit when they didn't have a driveway ordinance, why

34

1 was an ongoing process on all those fronts and when
2 something was done in relation to another, I can't
3 answer; I don't know.
4    Q    You indicated that you had a couple
5 conversations with Mr. Newton --
6    A    Yes.
7    Q    -- by telephone?
8    A    Yes.
9    Q    And I understand we don't necessarily know
10 when the sequence of those conversations were, but what
11 was the substance of those conversations?
12   A    Well, I think -- well, that's too general of
13 a question.  It's not that I'm not trying to respond to
14 that, I don't know, the discussions were around the
15 tenor of I can't get application formats from the
16 township, will you send them to me.  Yes, I'll send
17 them to you.
18        Have we done everything on what we filed, in
19 other words, when I would send something into the
20 township, I would call him and say, is there anything
21 else you need to do here, they were along those lines.
22   Mr. Newton would tell me about his
23 frustration that these permits hadn't been issued and
24 that they were getting pressure from other citizens in
25 the township that this was going on and construction

36

1 did they go to this land development plan, why, for
2 example, when we filed the one set, did they come back
3 and ask me for drawings in a different scale, a scale
4 that, to my knowledge, nobody else uses because it's so
5 ludicrous in terms of sizing that required us to have
6 new prints drawn, those kinds of questions.
7         And quite frankly, they were rhetorical
8 questions, I don't think they were ever designed for
9 Larry to answer.
10   Q    Did Larry give you any answers to those
11 questions?
12   A    No, not to my knowledge.  Larry always
13 expressed the hope that we could get the building
14 permit worked out.
15   Q    And did you give him the indication that you
16 had that same hope?
17   A    That I would hope that we could get the
18 building permit, septic permit and driveway permit
19 worked out, yes.
20   Q    You indicated you had phone conversations
21 with Ms. Wirth?
22   A    Yes, they were very brief, they were about
23 where can I deliver these things, in other words, how
24 do I get to your secretarial office to deliver them.
25        I think I -- at one point there close to tax

37

1 season, there was one conversation where we hadn't
2 gotten something that we needed, I don't remember what;
3 I'm sorry, I can't recall what it was, probably an
4 application of some sort, and she said, well, she was
5 very busy, because she's a public accountant, and I
6 commiserated with her about the frustrations of early
7 April for people in that business, but we eventually
8 got that from her, but there was nothing in
9 conversations with Ms. Wirth about the substance of the
10 matter.
11     Q     How about the road master, you said you had
12 conversations with him?
13     A     Yes, they were about, once again, the
14 driveway, the necessity of the permit, the
15 configuration of the permit, and then after the work
16 was done, he called me to talk about the fact that they
17 were happy with the configuration, but that they wanted
18 it stabilized with 2RC stone.
19     Q     Was that done?
20     A     Yes, I believe it was.
21     Q     Has the driveway permit been issued?
22     A     A driveway permit was issued at some point.
23 I think that -- yes, the short answer, yes.
24     Q     Any other conversations you remember having
25 with the road master, telephone conversations?

38

1     A     No, not to my recollection.  There may have
2 been some brief conversations about what day are we
3 going to do these things, but that's all.
4     Q     Now, you indicated that you had two meetings
5 at this site, one just with the SEO --
6     A     Yes.
7     Q     -- and one with others.  Let's just talk
8 about the first meeting.
9     A     Okay.
10     Q     How did that meeting come about?
11     A     I think Mr. Parks initiated the meeting, I
12 think he indicated to me he wanted the meeting because
13 the new applications had been filed and he wanted to
14 make a site visit to see what the conditions were
15 because construction activities had taken place and he
16 wanted to -- he wanted to look at it again.
17           Either in that conversation or a
18 conversation the next day, which we're in the process
19 of working out the scheduling, so there may have been a
20 second conversation, I can't remember that, but anyway,
21 he made a comment to me that he was concerned that the
22 driveways were located within ten feet of the septic
23 pit, which is, if you're going to use that soil test,
24 you're going to use that as the disposal area, that's
25 contra to DEP regulations.

39

1     Q     Did you say anything in response to that
2 indication by Mr. Parks?
3     A     I probably said, oh, really.
4     Q     Was anything else discussed initially about
5 that?
6     A     No.  The purpose -- but the purpose of the
7 meeting was to look at that and to look at the
8 condition on site.
9     Q     When you say look at that, what do you mean?
10     A     The location of the driveways in
11 relationship to the septic pit.
12     Q     And this was for the structure that was
13 being constructed on the property?
14     A     Sure.  Yes.
15     Q     And did you go with Mr. Parks to the site to
16 look at that situation?
17     A     I didn't go with him, but I met him there,
18 yes.
19     Q     Was anybody else present at that meeting?
20     A     I'm certain David was there, there were
21 workmen obviously, but I think the only people
22 participating in the meeting were Barry and I and David
23 was there.
24     Q     What happened at that meeting on the site?
25     A     Suddenly, Mr. Parks never discussed the

40

1 driveways, but he observed that a truck had backed over
2 one of the septic pits and he immediately said to me,
3 well, that's no longer acceptable, we can't do that, we
4 can't use that.
5     Q     What did you say in response to that?
6     A     Probably something like, oh, really.  I'm
7 sure that's not a direct quote.  Probably I see or
8 something of that sort.
9     Q     Did you give any indication to him that you
10 felt contrary?
11     A     I'm sure I probably did say to him that that
12 is a matter for a soil scientist, that while there may
13 have to be surface repair, that I felt it could still
14 be used.  I think I probably had that discussion with
15 him.  Then we looked at -- well, go ahead; I'm sorry.
16     Q     What did you look at next?
17     A     We looked at the alternate sites because
18 there was more than one approved site.
19     Q     You looked at alternate --
20     A     Disposal sites.
21     Q     -- approved disposal sites?
22     A     Uh-huh.
23     Q     Did you give any indication to Mr. Parks
24 that other sites would be able to be used with the
25 structure that was being constructed at that time?

41

1    A    I didn't do that. I think that was general
2  knowledge. That's why they did all the testing. I
3  think everybody is aware there were multiple sites on
4  that property.
5    Q    Did you have the understanding that they
6  tested multiple sites because at the time there were
7  plans for a subdivision?
8    A    No, I did not have that understanding. It's
9  prudent when you're doing this type of work to do
10 multiple sites. I suppose -- well, I guess what my
11 impression is is privileged, but it's common practice
12 when you're doing a development like this out in the
13 woods, and by development, I mean building a house and
14 a garage and the art studio, that you would do multiple
15 sites so you had alternatives as you were in the
16 process of construction.
17    Q    Did either you or Mr. Corneal or any of the
18 workmen say that we would use an alternate site for the
19 septic for the structure?
20    A    The workmen have no involvement in this.
21 Mr. Corneal, I don't believe, other than pleasantries,
22 talked at all, he listened. We discussed what
23 alternate sites would be useable to service the
24 structures.
25    Q    Did you ever give him any indication that an

MLP REPORTING, INC.  (570) 748-1041

---

42

1  alternate site would be used for the septic for the
2  structure that was being built?
3    A    No, because I felt that the one that the
4  truck had backed over was still serviceable, that there
5  was no need for another one. The point of that
6  discussion is the module, is the planning module that
7  says are there allowable and acceptable sites to permit
8  the construction of an onsite septic system, that's all
9  that's in the module.
10            The design of the system is the part of the
11 permitting process where you come in with a design for
12 the system, here's what we propose to build and the
13 permit, the septic permit is issued. The module
14 predates the septic permit, the module is what is
15 necessary for the issuance of building permits, et
16 cetera.
17            Design of the system is a postconstruction
18 matter, in other words, you can build and not have a
19 septic permit. So the point of the discussion with
20 Mr. Parks is there are multiple sites that are
21 available here, where's the module.
22    Q    And what was his response?
23    A    Well, Mr. Parks looked at sites on the lower
24 side and said, well, those aren't acceptable. And I do
25 believe David did at that point in a cry of pain say,

MLP REPORTING, INC.  (570) 748-1041

---

43

1  but you approved those sites.
2            I asked Mr. Parks for his soil logs, those
3  are the data sheets from the testing, he did not have
4  them for those downhill sites, he had them for the one
5  that the truck backed over, he had one for a site that
6  is some extensive distance away from the construction,
7  but he did not have the one for the downhill site that
8  would have been appropriate to use as an alternate
9  system.
10    Q    Did you thereafter discuss this matter with
11 a soil scientist?
12    A    Privileged.
13    Q    Did you have any discussions with
14 Mr. Archmody, A-R-C-H-M-O-D-Y?
15    A    That name is unknown to me, so no. Is that
16 a person? I mean, it's a person --
17    Q    Yes, it's a person.
18    A    But I mean, who is that person?
19    Q    Well --
20    A    Names are not in my lexicon. I don't
21 recognize the name.
22    Q    You don't recall having a meeting on the
23 site with Mr. Archmody from either DEP or --
24    A    Oh, there was a meeting with DEP officials,
25 absolutely. That occurred later.

MLP REPORTING, INC.  (570) 748-1041

---

44

1    Q    Was he present at that meeting?
2    A    He may have been. There were two DEP
3  officials. One is the -- well, I'm going to get his
4  title wrong. He's the soil -- no, he's not the soil
5  sanitarian, he's the director of the local DEP office
6  and there was an assistant. I'm sorry, I don't
7  remember either of their names.
8    Q    Okay.
9    A    So to summarize, to my knowledge, I've never
10 talked to -- I'm sorry, the name again?
11    Q    Archmody.
12    A    Archmody, I'm sorry, I don't recognize that
13 name.
14    Q    Okay. Did you subsequently indicate to
15 Mr. Parks that the site that he indicated that could
16 not be used because it had been disturbed was a correct
17 interpretation?
18    A    Probably at the second meeting, there was
19 discussion that the SEO could raise the concern issue
20 about the site having been driven over. I don't know
21 that we ever talked about whether it was an appropriate
22 decision or not, but yes, that he had a right to raise
23 that concern.
24            At the first meeting, that wasn't an issue.
25 The issue at the first meeting was, well, that that can

MLP REPORTING, INC.  (570) 748-1041

45

1 be repaired, which is my understanding of the soil
2 characteristics.
3    Q    Well, did you send or have prepared and at
4 some point give to the township officials a report from
5 a soil scientist?
6    A    I did not do that personally.  A soil
7 scientist was consulted and a report prepared and
8 submitted, yes, to DEP, I think, yes.
9    Q    And was that report discussed at the site
10 when you met with the DEP officials?
11    A    Oh, I doubt if it was discussed.  I think it
12 was clear that it had been done.  I think the DEP
13 people had looked at it; but was it discussed, no.
14    Q    How did this meeting with the DEP officials
15 come about?
16    A    Well, Mr. Parks was not going to proceed
17 further without something, and I'm not sure what
18 something is.  There was another change in circumstance
19 on the property not temporally related to that first
20 meeting, but before the second meeting, and as a result
21 of that, an engineer was retained for purposes of
22 assisting with solving the septic problems.
23    Q    What was the change in circumstance?
24    A    A well was drilled.
25    Q    And who indicated that that was a change in

MLP REPORTING, INC.  (570) 748-1041

47

1 representatives from the Altoona DEP were present at
2 that meeting?
3    A    Well, precisely, no, but the Altoona office
4 is the reviewing agency of the module, and ultimately,
5 the reviewing agency for whatever design is put forth;
6 In other words, they would be, if you will, the people
7 to whom Barry Parks would send his data.
8        I'm certain that there were discussions
9 between Larry Newton and I by phone that DEP had to be
10 involved in this, that we needed to get this resolved,
11 who said what, I don't know, but I'm sure that the
12 township was in favor of having DEP involved.
13        We wanted that done.  Obviously, we were not
14 going to get anywhere with this permit with Mr. Parks
15 and we had to go to higher authority.
16    Q    What was Mr. Parks' position at this time
17 prior to this meeting with DEP?
18    A    Oh, okay.  His position at the first meeting
19 was there were not acceptable sites that would allow
20 the module to proceed.
21    Q    What happened at the second meeting where
22 the DEP officials were present?
23    A    From a septic standpoint, I think there was
24 general concurrence by all concerned that what had been
25 proposed was appropriate, that the testing had been

MLP REPORTING, INC.  (570) 748-1041

46

1 circumstances that affected this issue?
2    A    I know just enough to be dangerous.  The
3 location of the well would render the site that was
4 backed over by the truck unusable because the well was
5 too close to it to allow it to be used for the disposal
6 of the waste water.  It makes it a nonissue, if you
7 will.
8    Q    Right.  And you said an engineer was
9 retained.  An engineer was retained on behalf of
10 Mr. Corneal?
11    A    That's correct.
12    Q    And somehow through this change in
13 circumstance and the engineer being retained, another
14 meeting was held at the property?
15    A    That's correct.
16    Q    Who was present at this meeting?
17    A    Oh, boy, all right, the workmen were there,
18 although not participating in the meeting, Barry Parks,
19 two representatives of the Altoona office of DEP, I was
20 there, Larry Newton was there, Tom Bowes was there,
21 B-O-W-E-S, and -- that's terrible, I don't recall
22 whether David was there or not; I assume he was, but I
23 don't remember, he may not have been, I don't remember
24 him participating in any way, so he may not have been.
25    Q    Now, do you know how it was that the

MLP REPORTING, INC.  (570) 748-1041

48

1 done properly, that there was no reason why the module
2 shouldn't be approved and that subject to getting the
3 actual design -- once again, remember, those are
4 separate processes -- but subject to getting detailed
5 design, that the site could be served by what had been
6 proposed.
7        Now, this involved a new pit, which didn't
8 exist at the first meeting.
9    Q    Well, that was my question, what was being
10 proposed that was acceptable?
11    A    What was being proposed was a drip
12 irrigation system.
13    Q    When was that proposed to the township?
14    A    Well, it had to be after the first meeting
15 with Parks and certainly before the second meeting with
16 DEP and Mr. Parks.
17    Q    And do you recall either of the DEP
18 representatives saying anything at this meeting?
19    A    Oh, sure.
20    Q    What do you recall them saying?
21    A    Well, both people from DEP got in the pits
22 and looked at the testing and the soil characteristics,
23 you're looking at the stratification of the soil, they
24 looked at -- commented on that, commented on the
25 characteristics of that typical soil from the mapping,

MLP REPORTING, INC.  (570) 748-1041

49

1 commented on the positioning of where these test pits
2 were and the proposed disposal sites were, and the
3 bottom line, at the end of the meeting or near the end
4 of the meeting commented they were satisfied.
5          Also, they promised, because I was anxious
6 to get the building permit, they promised that as soon
7 as they had the paperwork from the township, they would
8 review it.
9     Q     Has that been done?
10    A     As I sit here this morning, not to my
11 knowledge.  When you say done, has DEP reviewed the
12 paperwork, that's the question I'm answering?
13    Q     Yes.
14    A     No, to my knowledge, that has not been done.
15    Q     Has the paperwork been sent to DEP?
16    A     My understanding is that the paperwork went
17 to DEP recently from the township, meaning within a
18 matter of days ago.
19    Q     Do you have an understanding as to why there
20 was a delay between when you had that meeting with the
21 DEP officials and when they were sent to DEP?
22    A     There would have been further -- there were,
23 not would have been, there were further modifications
24 to the module now that everyone seemed to be on line
25 with the new test pit and the drip irrigation system,

                MLP REPORTING, INC.  (570) 748-1041

50

1 although the drip irrigation system has less to do with
2 the module than it does with the ultimate design, but
3 the location of the pit is important because that's in
4 the module and that had to be changed on the mapping.
5          I imagine there's a change in the narrative
6 statement, too, that's attached to it that makes
7 reference to drip.
8     Q     Now, this second meeting, we'll call it the
9 second meeting, with DEP officials, this took place
10 after another meeting at the courthouse, correct?
11    A     Oh, yes, the meeting with the DEP officials
12 would be in this temporal sequence to the last meeting.
13 By now, it's warm, the leaves are out.
14    Q     I want to talk about the second meeting that
15 occurred at the courthouse.  Do you recall when that
16 was?
17    A     Specifically, no.  I'm sure there's a Judge
18 Kurtz scheduling order.
19    Q     Yeah, I don't know if I separated one out.
20    A     Well, I think I got a letter from Mr. Newton
21 telling me that he had asked for, I think what he
22 described as a status conference.
23    Q     Just let the record reflect that the witness
24 is looking through his correspondence file which has
25 been produced.

                MLP REPORTING, INC.  (570) 748-1041

51

1     A     I don't see correspondence from Mr. Newton,
2 so maybe what he did was call me that he wanted a
3 status conference.  In any event, somehow I became
4 aware that Larry had asked the Judge for a status
5 conference and that a time had been scheduled and he
6 gave me the date and time.
7     Q     Did you have a conversation with Mr. Newton
8 as to why he believed the status conference was
9 necessary?
10    A     No, I don't believe so.  I don't think Larry
11 and I were ever able to chat about that, he just simply
12 told me that's what he was doing.
13    Q     Okay.  Now, who attended this meeting at the
14 courthouse?
15    A     Well, that was done in the courtroom, Judge
16 Kurtz was present, the court reporter, tip staff,
17 Mr. Newton.  There were people from the township, I'm
18 reasonably certain Ms. Wirth was there, I don't know,
19 there were other people there from the township, but
20 exactly which ones, I don't recall.
21    Q     Were the proceedings transcribed?
22    A     You know, I don't know.  A reporter was
23 there, but whether a -- I'm sure there's no
24 transcription, but whether notes of the testimony were
25 taken, I don't know.

                MLP REPORTING, INC.  (570) 748-1041

52

1     Q     Was this in court, I mean, was court
2 actually open?
3     A     Yes, court was in session, the Judge was on
4 the bench, yes.
5     Q     And what took place at this court session?
6     A     Basically, Judge Kurtz wanted to know, well,
7 where are we, gentlemen, and Mr. Newton presented what
8 he -- where we felt we are, and I responded as to where
9 I felt we were.
10    Q     And what was your response as to where you
11 felt you were?
12    A     Well, we had completed obtaining the
13 driveway permit at that point, that I felt we had
14 submitted everything that the township had asked us to
15 do, so it would seem to me that the court appearance
16 occurred before -- I may be wrong, but it seems to me
17 it occurred before the meeting with Parks on site, I'm
18 not certain about that.
19          And I think the Judge's -- distilling an
20 awful lot -- I think the Judge said, well, do you
21 gentlemen think you're going to be able to get this
22 worked out.  I think Mr. Newton indicated that he felt
23 we had made an honorable effort to do that and that we
24 could get it worked out.  The Judge thanked us and we
25 went on our way.

                MLP REPORTING, INC.  (570) 748-1041

53

1    Q    About how long did this proceeding last?
2    A    I don't know, 20 minutes, 15 minutes maybe.
3    Q    Did you have any other discussions with
4 Mr. Newton either before or after this proceeding at
5 the courthouse?
6    A    Oh, I'm sure I spoke to Larry before we went
7 into the courtroom, I don't have much of a recollection
8 of what went on.  And I'm sure there were postmeeting
9 conversations because I remember asking them, now, is
10 there anything else that we haven't done that you need
11 to have done, and my recollection of coming away from
12 that court proceeding is that no, everything has been
13 submitted.
14    Q    Have you ever had a discussion with anybody
15 other than discussions with Mr. Corneal about a privy
16 permit?
17    A    Other than Mr. Corneal, no.
18    Q    Did you ever have discussions --
19    A    No, I don't think so.
20    MR. CORNEAL:  Can we take a break for a few
21 minutes?
22    MS. MONTGOMERY:  We can.  Sure.
23    MR. SHERR:  Sure, you can take a break.
24    MR. CORNEAL:  I want to talk to
25 Mr. Williams.

MLP REPORTING, INC.  (570) 748-1041

54

1    MR. SHERR:  You want to talk to Mr. Williams
2 again?
3    MR. CORNEAL:  Uh-huh.
4    MR. SHERR:  Knock yourself out.
5    (Discussion held off the record.)
6    (Letter marked Williams Exhibit No. 4.)
7    MR. SHERR:  Can you just read me the last
8 question and answer, please?
9    (The reporter read back the referred-to
10 portion of the record.)
11 BY MR. SHERR:
12    Q    I'm going to show you what has been marked
13 as Williams No. 4, which is a letter from you to Ann
14 Wirth dated February 5, 2001.  Is that, in fact, a
15 letter that you wrote to Ann Wirth on that date?
16    A    Yeah, it's written to the township, directed
17 to Ann Wirth as secretary.
18    Q    Is that the first time that you submitted
19 applications on behalf of Mr. Corneal?
20    A    That sounds right, yes.  The driveway permit
21 application I think would have been the first one, but
22 remember, there already were applications on file for
23 all of this.
24    The building permit applications were
25 already there, the sewage permit applications were

MLP REPORTING, INC.  (570) 748-1041

55

1 already there, they had them for months.
2    Q    Well, all those applications that you're now
3 referring to were all there prior to the meeting at the
4 courthouse in November, correct?
5    A    Yes, I believe so.  They had them for some
6 time before that.
7    Q    Understood.  Just so we're clear, the
8 attached -- what you attached to Williams No. 4 was the
9 first time since the meeting at the courthouse in
10 November that anything was submitted to the township;
11 is that correct?
12    A    Certainly from my office, yes, I don't know
13 about completely.  I would assume that's the case
14 because they had everything and had it for some time.
15    Well, understand, they haven't issued a
16 building permit, why haven't they issued a building
17 permit, the response that I get in November is because
18 there's no septic permit, why haven't you issued a
19 septic permit, the modules are in compliance, well,
20 because it's a land development plan and it shows a
21 subdivision line.
22    They had everything, they did not have a
23 driveway permit application, but they had everything
24 else and they had it for months.
25    Q    Correct me if I'm wrong, but your testimony

MLP REPORTING, INC.  (570) 748-1041

56

1 is that at the meeting in November, you agreed to
2 modify the modules to comply with what the township had
3 been asking you to do, correct?
4    A    We agreed to modify the plan, not the
5 module, the plan, to take off the subdivision line that
6 was shown and to clarify because I didn't know at the
7 meeting what the story was, but to clarify the pit
8 number.
9    Q    Did you agree to modify anything else at the
10 meeting that you can recall?
11    A    Well, there was no change in the module, the
12 sites were the same, the soil tests were the same,
13 everything was there --
14    Q    Was it your understanding that there had
15 been no changes in the sewage module from those
16 originally submitted to the township?
17    A    To what, to the date of the November
18 meeting?
19    Q    Yes.
20    A    Yeah, I think they were the same.
21    Q    Okay.
22    A    It was incomprehensible to me how they had
23 not issued these permits.
24    Q    Did you tell them that?
25    A    No.

MLP REPORTING, INC.  (570) 748-1041

57

```
1     Q    In fact, you told them --
2     A    I'm sure I said to Larry Newton, I fail to
3 understand how you can refuse to issue permits, but at
4 the meeting, no, the meeting was courteous, the meeting
5 was to find out, all right, what do we need to do now
6 that this has gone on this long, now that you've
7 managed to get us into this position, how do we get out
8 of it.
9     Q    Did you say that, those words?
10    A    I don't know about those words, but I'm sure
11 I said -- I have a feeling I probably did say in all my
12 years, I've never seen anything like this, somehow we
13 have to find an answer to this, there is no reason -- I
14 do remember this because there was a discussion about
15 it -- there is no reason on that site, given the size
16 of the site, the location of the soil testing, why you
17 can't build this.
18         In other words, this isn't like somebody
19 wanting to build a shopping center in an R-1 zone, this
20 isn't like somebody wanting to put in a community
21 sewage system right next door to the sewage treatment
22 plant, there was no legal reason that I could define as
23 to why these permits hadn't been issued, but yet, my
24 client is building without the benefit of a permit and
25 I want to correct that.
```

                MLP REPORTING, INC.  (570) 748-1041

58

```
1         So yes, I'm sure there was discussion, I
2 don't understand how you can do this, but you tell me
3 what you want, what do you want from this man now, and
4 when I get that, I will use my best efforts to bring
5 him into -- to get him to do that so that we can submit
6 that and get these permits done so he can go live there
7 and we can be done with this, I'm sure there were
8 discussions of that type.
9     Q    Other than the submissions which are
10 indicated in Williams No. 4, do you recall submitting
11 any other applications or materials to the township?
12    A    I probably did not directly.  After it
13 became clear that the module wasn't going to go
14 anywhere, that's after the first meeting with Parks on
15 site that he's begun to raise issues that haven't been
16 raised before, but now we're hearing about them, that's
17 when the modification was in the module, and that was
18 submitted, but it did not come from my office.
19         If seems to me there was one other thing,
20 though, that we had to deliver to Ann Wirth's home.
21 Oh, of course, after all this stuff gets in, then I get
22 a call, and I don't know whether it was from Newton --
23 I'm sorry, I don't remember which of the township
24 officials called me to tell me that the scale of the
25 map was wrong and pointing out the section in the
```

                MLP REPORTING, INC.  (570) 748-1041

59

```
1 ordinance that required a different map scale.
2         And I said fine, we'll have the surveyor
3 prepare according to scale, nobody uses that scale, so
4 I did have a second delivery to Ann Wirth's home with
5 that different scaled map.
6         Oh, and there's one other thing that they
7 wanted.  They had received a topo map, but they wanted
8 the topo map combined with either the building plan
9 drawings or the survey drawings, so we did that, too,
10 and that would have been delivered.
11        Oh, and they raised an issue — the other
12 thing that — well, that's not something I delivered,
13 but the letter talks about the stream crossing problem.
14    Q    What was the problem with the stream
15 crossing?
16    A    Well, the township raised — sometime early
17 on in the process, raised the issue that David was
18 going to construct a stream crossing and that they were
19 concerned about that.
20        I had never heard anything about this, so I
21 inquired and found out that there was no stream
22 crossing, that there had been discussions, but that it
23 wasn't a part of the proposal, that that's not how
24 access was being gained to the property and I confirmed
25 with Ms. Wirth that that was not an issue.
```

                MLP REPORTING, INC.  (570) 748-1041

60

```
1     Q    Did you come to learn that stream crossing
2 was in the original proposal?
3     A    I don't know, I never saw the original
4 proposal.
5     Q    Did you learn at any point other than from
6 Mr. Corneal that the stream crossing was abandoned at
7 some point during this process because he had purchased
8 other property?
9     A    I don't know about all those nexuses.  I was
10 aware that the stream crossing was not being used to do
11 this development.  The access to this property is on
12 the top of the hill, not down the sides.
13        The issue of the stream crossing is
14 irrelevant to the issuance of these permits, which is
15 what I was pointing out to Ms. Wirth.
16        MR. SHERR:  I don't have anything further.
17 Thank you.
18        MS. MONTGOMERY:  I'm thinking.  Give me a
19 moment.  I just have one question for you.
20
21              EXAMINATION
22
23 BY MS. MONTGOMERY:
24    Q    Mr. Williams, you testified to a variety of
25 activities and things that were undertaken with respect
```

                MLP REPORTING, INC.  (570) 748-1041

61

1 to Mr. Corneal's property since the filing of the
2 preliminary injunction.
3         My question to you is, is it your
4 understanding that those activities were required by
5 law?
6     A    All of my involvement is after the filing
7 for a temporary restraining order, although, when I got
8 to the meeting, I didn't know that that's what they had
9 requested, but that would be logical.
10        What we did through my efforts is not
11 something that is required by law.  The township had
12 every piece of information that it needed to issue
13 appropriate permits, but hadn't done so.
14        My client is in the process of constructing
15 buildings without a permit and my goal was to find out
16 what the township wanted us to do to get those permits
17 issued.
18        As I pointed out earlier, they didn't have a
19 driveway ordinance when it was built, but we agreed to
20 submit for a driveway permit, they had acceptable soil
21 modules that they hadn't transmitted that should have
22 been submitted, and the building permit could have been
23 issued legally based on that information.  They chose
24 not to do that and they chose to take the avenue of
25 enforcement action.

MLP REPORTING, INC.  (570) 748-1041

62

1         In a perfect world where construction hasn't
2 started, you would probably file an action in mandamus,
3 but it's too late for that when I'm involved at the
4 stage where they've already asked for a restraining
5 order to prevent construction.
6         So no, what we did was designed, as I
7 indicated at that meeting, to get the permits issued so
8 that the township would stop the enforcement action so
9 that David could finish building and David could move
10 into the home in a timely fashion.
11        And as we sit here today, I still only have
12 the septic permit, I do not have a sewer permit, I do
13 not have a building permit and my client is still at
14 risk in terms of the state action that's filed under
15 this restraining order.
16        We are doing, within reason, or maybe even
17 without a reason, but certainly we're doing everything
18 that we can on his behalf to try to get those permits
19 to be issued.
20    MS. MONTGOMERY:  I don't have any other
21 questions.  Thank you.
22    MR. SHERR:  I have a couple others.  Now
23 that you've expressed an opinion, I'm going to have to
24 ask you some other opinions.
25

MLP REPORTING, INC.  (570) 748-1041

63

1         EXAMINATION
2
3 BY MR. SHERR:
4     Q    First of all, I thought it was your
5 testimony that you were unaware of what had been filed
6 with the township prior to your involvement?
7     A    Other than we knew that — other than I was
8 told by Larry that they had taken some action to
9 enforce it, to stop construction, I did not see it and
10 I didn't know the form of the action.
11    Q    But I'm speaking with respect to any
12 applications filed by Mr. Corneal, I thought your
13 testimony was you were unaware what he had filed
14 originally and what the nature of all those
15 applications were?
16    A    I had not examined those applications.  What
17 they were, sure, I'm sure I was aware of what they
18 were, but no, I never looked at them.
19    Q    So you know that originally, he filed an
20 application for a subdivision?
21    A    Yes, I think — well, I don't know about the
22 word "originally", I know that there was an application
23 involving a subdivision because I saw the map that had
24 a property line in it.
25    Q    Are you aware at some point, he changed that

MLP REPORTING, INC.  (570) 748-1041

64

1 subdivision plan into something different?
2     A    No, I'm not aware of that.  The lot line was
3 deleted at my meeting in order to facilitate getting
4 the building permit.  Whether there is an interim plan,
5 I have no knowledge of that.
6     Q    And with respect to the sewer module, do you
7 know whether or not his original submission of sewer
8 modules was ever changed or modified up and to the
9 point that you got involved?
10    A    Boy, I do not have any knowledge that there
11 was a second application set of modules prior to my
12 involvement.
13    Q    Now, in answering Ms. Montgomery's question,
14 what do you base your answer on?
15    A    Well, her question was, were we legally
16 required to do this?  The answer to that is simple, no.
17    Q    What do you base that on?
18    A    Well, I guess I base it on 28 years of doing
19 municipal work.
20    Q    Do you base it on anything else?
21    A    Well, I suppose we could sit here and have
22 an esoteric discussion of what the municipal law
23 requires, but the baseline is, the sewage ordinance was
24 not passed until after the driveway was constructed.
25        The building officer advised me that he

MLP REPORTING, INC.  (570) 748-1041

65

1 thought the building applications were all in order,
2 and the sewer modules had adequate and acceptable soil
3 sites to permit the residential development, and I'm
4 using development now in the sense of construction, not
5 development in the sense of a subdivision, were on the
6 plan and had been approved, the soil testing had been
7 done.
8         Legally, I saw no reason why those permits
9 could not have been issued, but an enforcement action
10 is undertaken, which poses a great threat of financial
11 risk to my client and I have to try to help him out of
12 that, and the way you do it, I think, from, once again,
13 28 years of experience of dealing with governmental
14 bodies, with local government in particular, it isn't
15 to sit at a meeting and say you're wrong, it's to say
16 what do you want us to do, tell us what you want us to
17 do, and if it's reasonable and if it's something we can
18 do, we'll do it.
19    Q    And what they told you to do in this
20 instance was reasonable and something that you could do
21 and you went ahead and tried to do it?
22    A    I didn't know quite all the answers about
23 the sewer, but yeah, most of what -- I mean, filing a
24 permit for a driveway application, is that reasonable
25 where there's no statute that requires it, I don't

                MLP REPORTING, INC.   (570) 748-1041

66

1 know, is that reasonable, but it's a piece of paper.
2         Is it reasonable to go out and dig more test
3 pits, no, it's not reasonable, but is it something that
4 we can do to keep construction going, probably.
5    Q    Well, in your 28 years of experience, have
6 you been in a situation where there was a building
7 erected before provisions for sewage were established?
8    A    Yes, but never one where the applications
9 have been filed.
10    Q    And you believe that applications had been
11 filed prior to him commencing construction?
12    A    Yes.
13    Q    How do you know that?
14    A    I guess I don't have any -- in the sense
15 have I looked at the township records, no, that's just
16 my impression from looking at the dates.
17    Q    And have you seen any evidence of filing of
18 any applications prior to commencing building?
19    A    Oh, yeah, when we did the modifications, I
20 saw the original application.
21    Q    You saw an application, okay, and did you
22 see -- did you see any evidence that that was actually
23 filed with the township?
24    A    I did not make an examination of the
25 township records.  I believe it was filed.

                MLP REPORTING, INC.   (570) 748-1041

67

1    Q    Why do you believe that?
2    A    Well, because everyone had signed onto that.
3    Q    What do you mean everyone?
4    A    Well, the SEO, the original -- I think she's
5 an engineer, she may not be an engineer, but the
6 original SEO person who did some of the work on it had
7 signed.
8    Q    Any other evidence which led you to believe
9 that the application was filed?
10    A    No, it was my understanding that those
11 applications had been filed.  I have a feeling
12 Mr. Newton told me that, too, but when, I don't know
13 when that discussion was.
14    Q    Are you aware of what Mr. Corneal originally
15 filed with the township?
16    A    Originally?
17    Q    The first thing he filed with the township.
18    A    No.
19    Q    And are you aware as to whether there were
20 any modifications with what was filed originally with
21 the township?
22    A    Well, I think you need to help me here.  Are
23 you talking about the septic permit now, are you
24 talking about the building permit?
25    Q    I'm asking you what your understanding of

                MLP REPORTING, INC.   (570) 748-1041

68

1 what he filed is?
2    A    Well, I think there have been field
3 modifications to the septic, which has been caused by
4 the various issues that were raised during this
5 process, but have I sat down and compared A to B, no, I
6 haven't.
7    Q    Now, with respect to the septic itself and
8 digging extra test pits, I believe your testimony is
9 that additional test pits were required to be dug
10 because the original site had been, one, disturbed,
11 and, two, a well was dug near it?
12    A    The test pit was dug because it was obvious
13 that the township was not going to accept the soil
14 testing that had previously passed and been submitted.
15         Now, once the issue was raised about backing
16 the truck over the one pit, then the location of the
17 well becomes irrelevant, it's another reason why you
18 can't use that pit.
19         At that point, you don't try to struggle
20 with the idea of do we change the soils, do we do the
21 modifications that are necessary, you go dig another
22 test pit because now maybe there's a better way to do
23 it.
24         There's expertise that you bring to bear at
25 that point, but the reason you're bringing that

                MLP REPORTING, INC.   (570) 748-1041

69

1 expertise to bear is because the permits haven't been
2 issued, the module hasn't been submitted to DEP.
3          In my opinion, if it had been, it would have
4 been approved and that the permit should have been
5 issued, but that's not the circumstance I'm in at the
6 time I'm involved.
7          It's sort of like the man who goes to a car
8 lot to buy a Buick and you're on the car lot and you
9 say, hey, there's a good price on a Cadillac, so you
10 suggest to the customer, I think you ought to drive the
11 Cadillac, that's the reason for the new septic pit,
12 there's a better way to do it, but better in this case
13 means better for Mr. Corneal, it has nothing to do with
14 the permitting.
15     Q    Now, just to modify what you said again, you
16 were involved with this and we've already established
17 you were involved with this before you had knowledge of
18 this injunctive action, correct?
19          MS. MONTGOMERY:  Objection.  I don't think
20 that's what he testified to.
21          MR. SHERR:  Well, he did.  We'll get the
22 letter out where you ask for an appeal of the -- if I
23 can see the exhibits, just so we're clear.
24     A    Yes.
25 BY MR. SHERR:

                    MLP REPORTING, INC.  (570) 748-1041

70

1     Q    Yes to my question that you were involved
2 prior to knowledge of the injunctive action?
3     A    My first -- this letter of Exhibit 3 is
4 produced and probably went out of my office three days
5 before the hearing, but the filing was done in October,
6 the Judge signed the order scheduling the November
7 conference on October 19.
8          I think I was aware that some type of
9 enforcement action had been undertaken by Jackson
10 Township, that's the reason for my involvement.  I
11 think I knew that when I wrote this, but I had not seen
12 this until I got to court on November 14.
13     Q    Okay.  So you were aware when you wrote
14 Williams 3 that some type of enforcement action was
15 undertaken by the township?
16     A    I believe so.  I believe so.  What it was, I
17 don't know.  I'm sure I suspected in my mind, because
18 that's how you would do it, you would ask for a
19 temporary restraining order.
20     Q    And were you also aware that on November 10,
21 2000, that construction on a building had commenced?
22     A    Oh, I'm sure I was, yes.
23     Q    Is it an unusual circumstance to be
24 requesting a hearing on a denial of a building permit
25 where construction has already commenced?

                    MLP REPORTING, INC.  (570) 748-1041

71

1     A    No, not at all, that would be fairly
2 typical.  You have to protect his right because under
3 the local agency law, you only have 30 days.
4     Q    You have to protect the right, but is
5 construction already commenced with protecting that
6 right?
7     A    To me, that has no relationship.  This is
8 about failure to issue a building permit, denial —
9     Q    Well, is construction of the property — is
10 it typical to have the building permit before you
11 build?
12     A    Typical?
13     Q    Yes.
14     A    Well, sure.  In a perfect world, that's the
15 way it's supposed to work.
16     Q    Right.  And is it also true that in a
17 perfect world, that if you believe you should have been
18 issued a building permit, instead of building, you
19 would file a mandamus action, as you stated?
20     A    That would be one approach.  You would
21 probably also file an appeal from their failure to do
22 so just to protect your rights under the local agency
23 law.
24          MR. SHERR:  I have nothing further.
25          (The deposition concluded at 12:03 p.m.)

                    MLP REPORTING, INC.  (570) 748-1041

72

1 COUNTY OF UNION           : ss
2 COMMONWEALTH OF PENNSYLVANIA:
3
4          I, NICOLE L. ZIMMERMAN, Reporter-Notary
5 Public, authorized to administer oaths within and for
6 the Commonwealth of Pennsylvania and take depositions
7 in the trial of causes, do hereby certify that the
8 foregoing is the testimony of TERRY WILLIAMS, ESQ.
9          I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically
12 by the said NICOLE L. ZIMMERMAN a Reporter-Notary
13 Public, approved and agreed to, and afterwards reduced
14 to typewriting under the direction of the said
15 Reporter.
16          I further certify that the proceedings and
17 evidence are contained fully and accurately in the
18 notes taken by me on the within deposition, and that
19 this copy is a correct transcript of the same.
20          In testimony whereof, I have hereunto
21 subscribed my hand this 12th day of July, 2001.
22
23
24          _____
                NICOLE L. ZIMMERMAN
                Notary Public
25 My commission expires
   on May 24, 2003

                    MLP REPORTING, INC.  (570) 748-1041

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL and SANDRA Y.  :    NO. 1:CV-00-1192
CORNEAL,                             :
                 Plaintiffs  :    JURY TRIAL DEMANDED
       v.                    :
                            :    RAMBO, J.
JACKSON TOWNSHIP, Huntingdon  :
County, Pennsylvania, *et al.*,        :
                Defendants  :
                            :

## CERTIFICATION

I, Adam M. Shienvold, Esquire, am counsel for the Plaintiffs, David B.

Corneal and Sandra Y. Corneal, and I hereby certify that the documents submitted

in support of Plaintiffs' Motion for Summary Judgment are true and correct copies

of documents that were produced and prepared in the course of discovery in the

above-captioned proceeding.  I understand that all statements contained herein are

made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn

falsification to authorities.

ECKERT SEAMANS CHERIN &
MELLOTT, LLC


Adam M. Shienvold, Esquire
Pa. I.D. No. 81941

## CERTIFICATE OF SERVICE

I, Adam M. Shienvold, Esquire, hereby certify that I am this day serving a copy of the foregoing document via First Class U.S. Mail, which service satisfies the requirements of the Federal Rules of Civil Procedure and Middle District Local Rules of Court, addressed as follows:

> Anthony R. Sherr, Esquire
> Mayers, Mennies & Sherr, LLP
> 3031 Walton Road, Building A
> Suite 330, P.A. Box 1547
> Blue Bell, PA  19422-0440

Adam M. Shienvold, Esquire

Date:  June 24, 2002          Attorney for Plaintiffs,
                              David B. and Sandra Y. Corneal