# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL AND : 
SANDRA Y. CORNEAL :    CASE NO. 1:00-CV-1192
  :
    vs. :
  :
JACKSON TOWNSHIP, Huntingdon :
County, Pennsylvania, :
W. THOMAS WILSON, Individually and :    **JURY TRIAL DEMANDED**
in his Official Capacity as Supervisor of :
Jackson Township, MICHAEL YODER, :
Individually and in his Official Capacity as :
Supervisor of Jackson Township, :
RALPH WEILER, Individually and in his :
Official Capacity as Supervisor of Jackson :
Township, BARRY PARKS, Individually :
and in His Official Capacity as Sewage :
Enforcement Officer of Jackson Township, :
DAVID VAN DOMMELEN, Individually :
and in his Official Capacity as Building :
Permit Officer, ANN I. WIRTH, :
Individually and in her Official Capacity as :
Secretary of Jackson Township, and :
  :

*FILED*
*HARRISBURG, PA*
*JUL 1 2 2002*
*FOR _____ CLERK*

## DEFENDANTS' JACKSON TOWNSHIP, W. THOMAS WILSON, MICHAEL YODER, RALPH WEILER, BARRY PARKS, DAVID VAN DOMMELEN AND ANN I. WIRTH'S CONCISE STATEMENT OF MATERIAL FACTS IN RESPONSE TO THE CONSOLIDATED STATEMENT OF UNDISPUTED MATERIAL FACTS FILED BY PLAINTIFFS

### PRELIMINARY STATEMENT

Plaintiffs have responded to Defendants' Summary Judgment Motion by filing

a Response and Summary Judgment Motion on their own behalf. However,

Plaintiffs have violated local rule 56.1 with respect to responding to Summary

Judgment Motions.  The Rules require Plaintiff to include a "separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried."  Plaintiffs have not filed such a statement and, therefore, the material facts set forth in Defendants' statement are to be deemed admitted.  As Plaintiffs' response included its own Motion for Summary Judgment, Defendants herein respond to Plaintiffs' Consolidated Statement of Undisputed Material Facts and note that this statement in no way corresponds with the statement made by Defendants in support of its Motion for Summary Judgment.  As a separate statement included with this filing, Defendants will set forth those material facts deemed admitted as a result of Plaintiffs' violation of local rule.

1.    Admitted.

2.    Admitted.

3.    Admitted.  (See Defendants' Statement of Undisputed Material Facts Nos. 4, 5).

4.    Admitted.  (See Defendants' Statement of Undisputed Material Facts Nos. 5, 7, 8).

5.    Admitted.  (See Defendants' Statement of Undisputed Material Facts Nos. 5, 6, 10).

6.    Admitted.

7.    Admitted.  (See Defendants' Statement of Undisputed Material Facts No. 11).

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Denied.  Plaintiff in his deposition stated that he believed the purchase was around October of 1998.  (David Corneal dep., p. 21).  Despite requests, Mr. Corneal has not produced an agreement of sale and/or a deed for the property.

12.    Denied as stated.  The property that the Corneals purchased was part of property owned by Mr. Wilson's grandfather, which was sold at an estate sale back in 1959 or 1960.  It was purchased from the estate by a second cousin of Mr. Wilson's.  (Wilson dep., pp. 55-58).

13.    Denied.  To the contrary, Corneal testified that "... probably in the spring of the year 1999, we started seriously thinking about that [subdividing] I am just guessing, a ballpark."

14.    Denied.  To the contrary, Mr. Corneal has testified that he did no research with respect to what was needed to do to sell off part of his property and that, therefore, he hired a surveyor, David Simpson.  (Corneal deposition, p. 29, ll. 8-16).  Mr. Simpson, the surveyor testified that he first met with Mr. Corneal about the property on July 8, 1999.  (See Exhibit "9", p. 12).  Mr. Simpson further testified that he met with Mr. Corneal on June 26, 1999 for review of proposed subdivision requirements.  Mr. Simpson went on to testify that after his discussion with Mr. Corneal, he is sure that he contacted the Huntingdon County Planning Commission to ascertain whether the Township had a subdivision ordinance.  (Id. at p. 15).  Mr. Simpson testified that he told Mr. Corneal that it was his understanding in any subdivision in any municipality that because sewage facilities installation on a property anywhere that the proposal would include something like that that the Township Supervisors must give their permission to subdivide.  Finally, Simpson testified that it was his understanding that in Huntingdon County, Township officials had discretion whether to require submission of a subdivision plan to the Huntingdon County Planning Commission.  (Id.)

15.    Denied.  To the contrary, it was Mr. Parks' recollection that Mr. Corneal contacted him and generally told him that he wanted to subdivide the

4

property.  Mr. Parks then told Mr. Corneal that he would need to meet Mr. Parks on the property with a backhoe in that he would need to do a sewage module, which a surveyor would do.  Parks told him that the place to start is to see what is there for soil.  (Parks dep., p. 46).

16.    Denied.  To the contrary, Mr. Parks testified that while there was a suitable site for each lot, one lot did not have a suitable site for a sand mound.

17.    Denied.  To the contrary, $1,400.00 and some cents were paid to the Township.

18.    Denied as stated.  To the contrary, Eagle Excavating was present on the property when Mr. Parks identified that suitable sites for on lot septic.  Eagle Excavating had been contacted by Mr. Corneal prior to such work to do other work on his property.  (Wilson dep., pp. 47 – 54).

19.    Denied.  After reasonable investigation, Answering Defendants are without sufficient information upon which to form a belief as to the truth of this assertion.  Mr. Corneal in his testimony indicated that he had contacted Eagle Excavating to remove debris from his property.  Mr. Corneal also testified that he did not "think it was until a month or two later after his first contact that he became aware that Mr. Wilson was a Supervisor in Jackson Township."  (Corneal dep., pp.

38-40).  It is unclear from the testimony of Mr. Corneal when in the process he hired Eagle Excavating and how that related to his knowledge of Mr. Wilson's position as a Township Supervisor.

20.    Denied as stated.    Answering Defendants are without sufficient information as to form a belief as to the truth of this assertion.  In that Mr. Corneal when asked when the perk tests were performed stated that he was not positive of when that was.  He stated that he was only "guessing" as to the six to eight weeks from when the test pits were dug.  (Corneal dep., p. 44, l. 11).  Mr. Wilson in his testimony can pinpoint the date to no more than "late summer".  (Wilson dep., p. 55).

21.    Denied.  To the contrary, when asked whether he had done anything with respect to subdividing the property between the time that the test pit was dug and the perk tests were performed, Mr. Corneal answered: "well, we couldn't subdivide the property until we knew whether a site had perk so there was nothing to do."  (Corneal dep., p. 44, l. 16).  Mr. Corneal went on to testify that he was only speculating when he said he may have spoken to a builder friend of his for a design of an art studio and house "at some point in there".  (Id. at p. 45, l. 2).

22.    Denied as stated.  It is admitted that Mr. Corneal paid all his bills with

6

respect to the work done by Eagle Excavating on his property.

23.     Denied as stated.  It is admitted that Mr. Wilson had an understanding that Mr. Corneal was going to split up the property into lots.  He had no knowledge regarding the number of lots or the intended use of the lots.  (Wilson dep., p. 47).

24.     Denied as stated. Mr. Corneal was told be Wilson that if he was going to subdivide he should do it this year [1999] because the township was working on ordinances for 2000.  (Wilson dep., p. 50 l. 9).

25.     Admitted that Corneal testified as stated as to what Wilson told him.  It is denied that Wilson made such statements.  Mr. Corneal, however, relied upon his Surveyor with respect to what needed to be done to subdivide the property.  Also, the procedure with respect to sewage approval.

26.     Admitted.

27.     Denied as stated, in that there was only one sewer module, the remainder of this paragraph is admitted.  By way of further response, it was Mr. Parks' recollection that it took more than a couple of weeks to complete the sewage module.  (Parks dep., p. 57, l. 18).

28.     Denied as stated.  It is admitted that Simpson completed a subdivision plan calling for the property to be divided into three lots on February 4, 2000, after

Mr. Simpson was aware that the township had enacted a moratorium on subdivisions in the township. (Simpson Dep., pp. 16-18).

29.   Denied. Mr. Wilson could not afford the property. (Wilson dep., p. 58, l. 1).

30.   Denied as stated. Mr. Corneal merely indicated that "we had put out feelers out for the house…" ( Wilson dep., p. 46, l. 13).

31.   Admitted.

32.   Denied. Mr. Wilson stated that he didn't recall when he learned that Hewitt was interested in purchasing the property. (Wilson Dep., p. l. 22).

33.   Admitted.

34.   Admitted.

35.   Admitted that the contract was entered into. As the contract is in writing, plaintiffs' characterization of the contract is denied.

36.   Admitted

37.   Admitted that Corneal attempted to present a plan to the township at the February meeting. The plan contained three proposed lots. As to the particulars of the lots, the plan is in writing and therefore the best evidence of lot dimensions.

38.   Admitted.

39.    Denied.  To the contrary Corneal was in formed by his agent, Mr. Simpson that the plan had to go to the township for approval.  It is believed that Simpson also told Corneal that the township had enacted a moratorium prior to the meeting.  (Simpson dep., pp. 16, 17).

40.    Admitted.

41.    Denied.  Wilson informed Corneal that the township was working on Ordinances, and that he should present his plan prior to 2000.  (Wilson dep., p. 50, l. 9).

42.    Admitted that Mr. Corneal was told that the plan would not be accepted until the moratorium was lifted.  By way of further response Mr. Corneal knew about the moratorium prior to attending the meeting.

43.    Admitted.

44.    Admitted.

45.    Denied.

46.    Denied as stated, as the minutes are in writing, Plaintiff's characterization of the Minutes is denied.

47.    Admitted that Ms. Wirth did not remember discussing a moratorium prior to the January meeting of 2000 except with Mr. Newton.  (Wirth dep., p. 92)

9

48.    Admitted that Ms. Wirth did not remember discussing the moratorium prior to the January meeting except with Mr. Newton. (Wirth dep., 92)

49.    Admitted that Ms. Wirth did not remember discussing the moratorium prior to the January meeting except with Mr. Newton. (Wirth dep., p. 92)

50.    Admitted that Ms. Wirth did not remember discussing the moratorium prior to the January meeting except with Mr. Newton. (Wirth dep., p. 92)

51.    Admitted.

52.    Denied. The meeting was advertised, Ms. Wirth could not recall if the moratorium was discussed in the advertising. (Wirth dep., p. 92)

53.    Admitted.

54.    Admitted that all of the supervisors approved the moratorium.

55.    Denied, Ms. Wirth stated that she probably asked Mr. Stahl "procedures". (Wirth dep., p. 140, l. 15)

56.    Denied. Ms. Wirth was not asked whether Stahl believed the moratorium was legal.

57.    Admitted.

58.    Denied, Ms. Wirth testified that she probably discussed the moratorium with Mr. Stahl of the planning commission. By way of further response Answering

defendants do not know what is meant by "formal" in this context.

59.    Upon information and belief, admitted.

60.    Denied.  (Yoder dep., p.p. 6,7)

61.    Admitted.

62.    Admitted.

63.    Admitted.

64.    Denied.  The cited reference just indicates that Mr. Yoder did not call Mr. Newton prior to the January 2000 meeting of the Board.

65.    Admitted.

66.    Denied.  To the contrary the cited reference only indicates that Mr. Wilson did not check with Mr. Newton after the March meeting of 2000 to see if the moratorium was legal.

67.    Denied.   By way of further response, Ms. Wirth checked with Mr. Newton on the subject of the moratorium. (Newton dep., p. 25, 1.20)

68.    Admitted that the February meeting of the Board was not stopped to call Mr. Newton.

69.    Denied.  The cited reference only indicates that Mr. Wilson did not call Mr. Newton about the subdivision plan of Mr. Corneal.

11

70.    Denied.  The sewage modules were taken to the township meeting of March.

71.    Admitted.  By way of further response, his agent Mr. Simpson had conversations with other township officials and employees.

72.    Denied.  (Wilson dep., p. 50, l. 9).

73.    Denied.  Ms. Wirth believed that it was the custom and practice, and probably legal requirement to submit subdivision plans to the County Planning Commission.

74.    Denied as stated.  Mr. Corneal was told that the plan had to be submitted the County planning commission, and that he should probably do that while the moratorium was in place.

75.    Denied as stated.  As there is no time reference with respect to when Mr. Yoder did not know of the requirement to submit plans to the County Planning Commission, it cannot be admitted.

76.    Denied.  Mr. Yoder could not, at his deposition relate the process for subdivision approval, he did not testify that he did not know what the process was.

77.    Admitted that Mr. Newton was not present at the referenced meeting.

78.    Admitted.

79.    Admitted.

80.    Admitted.

81.    Denied as stated.  As plaintiff's statement of facts number 81 are conclusions of law rather than factual statements they are denied.

82.    Admitted that the referenced letter contains the planning commission's comments on the plan.  As the letter is in writing, plaintiff's characterization of the writing is denied.

83.    Admitted that the County Planning Commission recommended denial of the plan, the remaining assertions of this paragraph constitute legal conclusions, which are denied.

84.    Denied as stated.  It is specifically denied that Mr. Corneal attempted to cooperate with anyone during the proceedings, and to the contrary was belligerent, bombastic and mostly uncooperative.  Mr. Simpson, contrary to the assertions made, indicated that he did no know why Mr. Corneal asked him to reduce the number of lots.  (See Simpson Dep. At p. 20, 1.6).

85.    Denied as stated.  The cited testimony only indicates that Mr. Simpson revised the original plan, and a revised plan dated April 7th was prepared showing only two lots.  The motivation for the changes and what was to be done with the two

proposed lots was not a subject of testimony of Simpson.

86.    Admitted.

87.    Admitted.

88.    Admitted that Mr. Yoder indicated that he did not recall the Board denying a subdivision proposal, which had been approved by the County Planning Commission.  However, it bears noting that Mr. Yoder had only been a township supervisor for three years at the time of his deposition.  (Yoder dep., p. 6, 1.11).

89.    Denied.

90.    Denied in that a response can't be formulated since "prior to approval" is not sufficiently defined.

91.    Denied in that Ms. Wirth testified that at the time Corneal requested a copy, no copies were available because it had been completely written.  (Wirth dep., pp. 175-177).

92.    Denied.  As there was an existing structure on the property, Mr. Corneal's desire to build another house constituted a subdivision and had to be approved.  (Simpson dep., p. 23)

93.    Denied.  As there was an existing structure on the property, Mr.

Corneal's desire to build another house constituted a subdivision and had to be approved. (Simpson dep., p. 23). As a result of the moratorium no subdivisions could be submitted at the time.

94.    Denied as stated. Mr. Parks clearly testified that like Mr. Corneal's proposed plan, other sewer modules were not approved by the Board of Supervisors during the moratorium. (Parks dep., pp. 42, 43).

95.    Denied as stated. Mr. Wilson testified that he did not know of any other sewer modules, which had been approved by the Sewage Enforcement Officer that the Board of Supervisors refused to sign. (See Wilson dep. p. 169).

96.    Denied. Supervisor Wilson testified that the Supervisors would not sign them [the sewer modules] because they did not have a "subdivision plan" or anything and further testified that the Supervisors, "... were not signing five sewer modules for one house." (Wilson dep., Exhibit "2", pp. 121, 127).

97.    Denied as stated. The Minutes of the Jackson Township Board of Supervisors, dated April 3, 2000 indicates that Mr. Corneal, "... also stated that he was no longer sub-dividing and would like to build a studio and would like a permit for a privy and a building permit." (See Exhibit "11").

98.    Denied as stated. Mr. Corneal's own deposition testimony states that

he was advised that, "... if you build two houses on one tract of ground under DEP regulations that is a subdivision.    Therefore, it comes under our subdivision moratorium." (See Corneal dep., p. 108).  By way of further response, while the deposition testimony upon which Plaintiffs' Paragraph No. 98 relies indicates that the Supervisors advised Mr. Corneal the allegations contained in Paragraph 98 at a Township meeting, neither the March nor April Minutes indicate that this was discussed.  (See Exhibits "11" and "12").

99.    Denied as stated.  The April 3, 2000 Minutes of the Jackson Township Board of Supervisors meeting indicates that Mr. Corneal, "... would like to build a studio and would like a permit for a privy and a building permit."  (See Exhibit "11").

100.    Denied as stated.  The Supervisors did not require sewer facilities in the art studio, but rather, as Mr. Van Dommelen testified, Mr. Corneal indicated that he intended to build a four-bay garage with an art studio on top of it, which Mr. Van Dommelen believed required septic use.  (See Exhibit "14", pp. 66-67; Exhibit "5", p. 85).  By way of further response, Mr. Corneal ultimately constructed a three bay garage with an apartment on top of it, which included a kitchen and a bathroom. (See Exhibit "5", p. 86).

101. Denied as stated. At the April 3, 2000 meeting, Mr. Corneal stated that he would like a permit for a privy. (See Exhibit "11"). By way of further response, again, the Township believed that Mr. Corneal's proposed construction would require sewage facilities, which under DEP regulations would necessitate a "subdivision" of the property precluded by the moratorium.

102. Admitted.

103. Admitted.

104. Denied as stated. To the contrary, Ms. Wirth testified that no one Supervisor in particular asked her to make a phone call to Mr. Parks. Rather, she generally understood that she was supposed to make the phone call; Ms. Wirth advised Mr. Parks as to what was said by the Supervisors in the Minutes. (With dep., Exhibit "4", pp. 203-206).

105. Denied. To the contrary, Mr. Parks testified that Mr. Corneal could not use a privy on his property at the time because the Corneals had pipe water on the property and, also, water under pressure, which under DEP regulations precluded use of a privy. (Parks dep., Exhibit "8", pp. 64-66). However, Mr. Parks told Mr. Corneal that Parks would try to think of a way in which Corneal could use a privy under the regulations. (Parks dep., Exhibit "8", pp. 66-67).

106.  Denied as stated.  Supervisor Yoder testified that at the meeting where Mr. Corneal "requested a privy permit" they did not stop to call Larry Newton to seek his advice on how to proceed.

107.  Denied as stated.  Initially, Plaintiffs' proposed Statement of Fact contained in Paragraph 107 is incomplete.  That being said, the HCPC letter dated February 24, 2001 provides that, "... further investigation should be done prior to approval to identify as wetland areas exist at the proposed construction site due to the snow cover during the investigation and because maps submitted with the investigation did not identify the area studied.  No construction should take place in wetlands areas..."  (See Exhibit "11").

108.  Denied as stated.  To the contrary, the HCPC required that further investigation should be done prior to approval to identify if wetland areas exist.

109.  Denied as stated.  Mr. Parks testified that the Township told him that they wanted to make sure that the site was okay and that it was a general thing. They just wanted it to be right.  By way of further response, Mr. Parks also testified that he asked Terry Williams if it was alright when Mr. Parks received the module, before he signed it, that he could enter the property to check to see if that site, where the construction was going on, was still a usable site.  Mr. Williams gave him

18

that permission.  (Parks dep., Exhibit "8", pp. 76-77).

110.  Denied as stated.  Mr. Yoder repeatedly said he did not really recall who requested Mr. Parks to go back out to Mr. Corneal's property and re-inspect the sites that Mr. Parks had already approved in the sewage module.  He believed it was either Mr. Weiler or Mr. Wilson.

111.  Admitted.

112.  Denied as stated.  Mr. Yoder testified that he did not recall whether Mr. Parks provided any information regarding the other four sites, not that Mr. Parks did not provide any information regarding the other four sites.  (Yoder dep., pp. 62-63, ¶113).

113.  Admitted.

114.  Denied as stated.  Defendant, Yoder testified that he did not recall whether any of the other Supervisors asked about the other four sites, he did not recall any of the other Supervisors asking about the other four sites.  (Yoder dep., p. 63).

115.  Admitted.

116.  Denied as stated.  Defendant, Yoder testified that he did not recall if it was done or not to the best of his knowledge at that time and when asked whether

he thought it would be unusual for a third party to "double check" sewer modules that had already been approved by Defendant, Parks, he stated that he did not know. Eventually, Defendant, Yoder testified that it probably would be unusual.  (Yoder dep., p. 64).

117.  Denied as stated.  Mr. Wilson testified only that he did not recall either temporarily stopping Township meetings or adjourning those meetings in order to call Larry Newton to ask his advice on how to proceed.  (Wilson dep., Exhibit "2", p. 189).

118.  Denied as stated.  Mr. Wilson testified only that he did not recall either temporarily stopping Township meetings or adjourning those meetings in order to call Larry Newton to ask his advice on how to proceed.  (Wilson dep., Exhibit "2", p. 189).

119.  Admitted.

120.  Denied as stated.  Ms. Wirth testified that she probably kept Mr. Newton informed about the Township's position with respect to the sewage module. (Wirth dep., Exhibit "4", p. 143).

121.  Denied as stated.  Ms. Wirth testified that she probably kept Mr. Newton informed about the Corneals proposed subdivision plan.  (Wirth dep.,

Exhibit "4", p. 143).

122.   Denied.  To the contrary, Defendant, Wilson testified that he may have initiated the call to Andy Patterson at the Conservation District and that when the wetland issue came up, Mr. Patterson sent the Conservation people out presumably along with the corps. of engineers.  (Wilson dep., Exhibit "2", p. 161).

123.   Denied as stated.  Defendant, Yoder testified that Mr. Wilson might have discussed the presence of wetlands at one or two workshop meetings.  (Yoder dep., pp. 56-57).

124.   Denied as stated.  Mr. Corneal advised Mr. Van Dommelen that he wanted a building permit and when Mr. Van Dommelen asked Mr. Corneal what he was building, Mr. Corneal responded a garage and a house.  (Van Dommelen dep., Exhibit "14", pp. 46-47).

125.   Denied as stated.  Section 3.02A provides in relevant part, as follows, "... application for such a building permit shall be made, in writing, to the Building Permit Officer on forms supplied by the Township."

126.   Admitted.

127.   Admitted.

128.   Denied as stated.  Mr. Van Dommelen testified that Ms. Wirth said the

Supervisors were not interested in letting him have one [a building permit] at that time.  (Van Dommelen dep., Exhibit "14", pp. 48-49).

129.  Admitted.

130.  Admitted.

131.  Denied as stated.  Mr. Van Dommelen testified that usually there is not a pre-approval process with respect to people coming for building permits.  (Van Dommelen dep., Exhibit "14", pp. 132-133).

132.  Denied as stated.  Mr. Van Dommelen testified that the Supervisors usually leave the pre-approval process to Mr. Van Dommelen.  (Van Dommelen dep., Exhibit "14", pp. 132-133).

133.  Denied as stated.  Mr. Van Dommelen testified that he did not give Mr. Corneal an application.  (Van Dommelen dep., Exhibit "14", p. 56).

134.  Admitted.

135.  Admitted.

136.  Denied as stated.  Mr. Van Dommelen testified that he never denied anybody else a building permit application in the past.  (Van Dommelen dep., Exhibit "14", p. 56).

137.  Denied as stated.  Mr. Van Dommelen testified that he has never

written a letter to anybody else and denied their building permit application that he can recall, but that he may have asked them to go and get additional information, which they have done.  (Van Dommelen dep., Exhibit "14", pp. 44-45).

138.   Denied as stated.  On October 10, 2000, Mr. David D. Van Dommelen sent a letter to Mr. and Mrs. Corneal, which states as follows, "... Please be advised that Jackson Township has referred to me for review your applications for building permits ... for the following reasons, your applications are being denied."  (See Exhibit "24").

139.   Denied as stated.  Mr. Wilson was asked, "... do you know of any building permits that have been denied in Jackson Township?, and he responded "I don't know."  (Wilson dep., Exhibit "2", p. 186).

140.   Denied as stated.  Mr. Van Dommelen testified that he recalled telling Mr. Corneal that, "... there was going to be a meeting on his situation the next day." (Van Dommelen dep., Exhibit "14", p. 62).

141.   Denied.  The allegations contained in Paragraph 141 characterize a written document and those characterizations are, therefore, denied.  (See Plaintiffs' Appendix, Exhibit "17").

142.   Denied as stated.  Mr. Van Dommelen testified that in order to

determine whether he should issue a building permit, an applicant must have appropriate septic approval if it is going to be a house that has the need for septic system and if the applicant is going to subdivide, they must have the appropriate subdivision papers. However, if an applicant were just building a garage, then Mr. Van Dommelen would issue a permit. (Van Dommelen dep., Exhibit "14", pp. 17-18).

143. Denied as stated. Mr. Van Dommelen testified that he did not call Mr. Corneal back because nothing was solved with regard to his building permit. (Van Dommelen dep., Exhibit "14", p. 71).

144. Admitted.

145. Denied as stated. Mr. Van Dommelen testified that he granted those applications, which were reflected in Exhibit "18" of Plaintiffs' Appendix.

146. Denied. Mr. Van Dommelen testified that he did visit some of those properties to see what was going on although he did not make a specific trip out to any of them. (Van Dommelen dep., Exhibit "14", p. 103).

147. Denied as stated. Mr. Van Dommelen testified that he could not distinguish for purposes of building application requirements between an art studio, that does not have water and a garage or a barn or a shed or any workshop that does

not have water.  (Van Dommelen dep., Exhibit "14", p. 164).

148.  Denied as stated.  Mr. Van Dommelen testified that he does not need an attached plan for a garage or a workshop that is not going to have water.  (Van Dommelen dep., Exhibit "14", p. 147).

149.  Denied as stated.  Mr. Van Dommelen testified when asked whether, "... based on the number of building permit applications, would you say that there wasn't any particular rush or acceleration of building going on in Jackson Township in the 1999 through 2000 timeframe?," he would think there was no more acceleration than other years.  He testified he thought it was fairly stable.  (Van Dommelen dep., Exhibit "14", p. 168).

150.  Denied as stated.  Mr. Van Dommelen testified that he never received an application for a building permit; specifically when asked who told you that no application was ever filled out, he responded I never received one.  (Van Dommelen dep., Exhibit "14", p. 78).

151.  Denied as stated.  Ms. Wirth testified that Mr. Corneal sent an application for a building permit with checks sometime in the year 2000.  (Wirth dep., Exhibit "4", p. 145).

152.  Admitted in part, denied in part.  It is admitted that Mr. Van

Dommelen sent a letter to the Corneals dated October 10, 2000.  It is further admitted that Mr. Van Dommelen testified that Solicitor, Larry Newton reviewed it and "made some slight changes" to it.  By way of further response, to the extent the allegations contained in Paragraph 152 characterize a legal writing, those characterizations are denied.  (See Exhibit "24"; Van Dommelen dep., Exhibit "14", p. 76).

153.  Admitted.

154.  Denied as stated.  Mr. Van Dommelen testified that he had never denied a building permit application without seeing it before.  (Van Dommelen dep., Exhibit "14", p. 83).

155.  Denied as stated.  Mr. Van Dommelen testified that he was "maybe a little" concerned that his job was being "usurped" in sending the letter; Mr. Newton testified that he believed that Mr. Van Dommelen had actually reviewed the application.  (Van Dommelen dep., Exhibit "14", p. 176; Newton dep., Exhibit "5", p. 117).

156.  Denied as stated.  Mr. Van Dommelen testified that he was a little concerned that his job was being usurped at the time that he sent the letter to the Corneals.  (Van Dommelen dep., Exhibit "14", p. 176).

157. Admitted.

158. Admitted.

159. Admitted.

160. Denied as stated.  Mr. Van Dommelen testified that he believed that he discussed the contents of the October 10, 2000 letter with the Board at a workshop meeting where Van Dommelen, Thomas Wilson, Ann Wirth and Ralph Weiler were probably present.  (Van Dommelen dep., Exhibit "14", p. 51).

161. Denied as stated.  Defendant, Yoder testified that he did not recall seeing a letter dated November 10 from Terry Williams.   (Identified as Wirth Exhibit "12"). (Yoder dep., p. 52).  By way of further response, Yoder testified that he received so many letters that he did not recall ever having seen that letter.

162. Denied as stated.  Ms. Wirth testified that she did not ever remember hearing whether or not Mr. Corneal had requested a hearing on the denial of his building permit.  (With dep., Exhibit "4", p. 146).

163. Admitted.

164. Admitted.

165. Denied as stated.  Mr. Yoder testified that he did not recall attending a hearing on Mr. Corneal's building permit denial and he does not know or recall

whether it happened.  (Yoder dep., p. 55).

166.  Denied as stated.  Mr. Yoder testified that he did not recall personally calling Larry Newton and asking his advice with regard to the Corneal property. (Yoder dep., p. 70).

167.  Denied as stated.  Mr. Yoder testified that he did not recall whether any of the other Supervisors called Larry Newton and asked him how to proceed with regard to David Corneal's property.  By way of further response, he did recall that someone asked Ann Wirth to call Larry Newton and ask him how to proceed with regard to the Corneal property.  (Yoder dep., pp. 70-71).

168.  Denied as stated.  Township Solicitor, Newton has his own office, as does attorney Reeder on the second floor of the same building, each has their own secretary and they share the expense of a third common secretary.  By way of further response, attorneys, Newton and Reeder have a settlement company called Standing Stone Settlement Company and they are each title agents for Old Republic. Mr. Newton does not have a partnership with Mr. Reeder regarding the settlement company.  Mr. Reeder and Mr. Kagarise had a real estate partnership.  They each maintain separate malpractice insurance.  Generally, they do not work on cases together.  (Newton dep., Exhibit "5", pp. 6-12).

169.  Denied.  Paragraph 169 characterizes a legal writing and, as such, Plaintiffs' characterizations of the same are specifically denied.

170.  Denied as stated.  Mr. Newton testified that at some point in time, Mr. Reeder asked Mr. Newton if Mr. Newton thought that the Township would have its subdivision ordinance adopted by June 30 and Mr. Newton responded he didn't think so and that was the extent of his conversation with Mr. Reeder.  Mr. Newton does not recall any other conversations regarding the Corneal property that he had with Mr. Reeder.  After the subdivision ordinance was enacted, Mr. Newton showed Mr. Reeder Plaintiffs' Complaint.  (Newton dep., Exhibit "5", pp. 74-75).

171.  Denied.  Mr. Wilson testified that the Hewitts became interested in the Corneal property and/or entered into an agreement with Mr. Corneal for purchase of that property after his nephew express interest in the property.  (Wilson dep., Exhibit "2", pp. 71-72).

172.  Denied as stated.  Mr. Corneal testified that he started with the garage in July of 2000.  By way of further response, Defendants' Exhibit "18" contained in their Appendix indicates that the Township had information that Mr. Corneal had commenced construction upon his property without first obtaining a building permit.  (Corneal dep., Exhibit "3", p. 131).

173.   Denied as stated.  In October 2000, the Township filed a lawsuit in Huntingdon County against Mr. Corneal.  (Newton dep., Exhibit "5", p. 142).

174.   Admitted.

175.   Admitted.

176.   Denied as stated.  While Attorney Williams testified that, "… what we did through my efforts is not something that is required by law", he also testified that he was concerned that Mr. Corneal was in the process of building without the benefit of various permits and Mr. Williams wanted to get that corrected.  (Williams dep., Exhibit "26", pp. 14, 61).

177.   Admitted in part, denied in part.  It is admitted that Attorney Williams provided this testimony at his deposition.  The substance of his testimony, however, is denied as a conclusion of law.

**MAYERS, MENNIES & SHERR, LLP**

BY: _____

ANTHONY R. SHERR, ESQUIRE
Attorney for Defendants

3031 Walton Road, Building A
Suite 330, P.O. Box 1547
Blue Bell, PA 19422-0440
(610) 825-0300
Fax (610) 825-6555

30

## CERTIFICATE OF SERVICE

I, Cheryl Zeigler, hereby certify that on the 12th day of July, 2002, a true and correct copy of Defendants, Jackson Township, W. Thomas Wilson, Michael Yoder, Ralph Weiler, Barry Parks, David Van Dommelen and Ann I. Wirth's Concise Statement of Material Facts in Response to the Consolidated Statement of Undisputed Material Facts Filed by Plaintiffs was served by first class regular mail, postage prepaid upon the following:

Bridget E. Montgomery, Esquire
Adam Sheinvold, Esquire
Eckert, Seamans Cherin & Mellott
213 Market Street, 8th Floor
Harrisburg, PA 17101

BY: _____
Cheryl Zeigler
Legal Assistant to Anthony R. Sherr