# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL AND : 
SANDRA Y. CORNEAL :         CASE NO. 1:00-CV-1192
 :
vs. :
 :
JACKSON TOWNSHIP, Huntingdon :
County, Pennsylvania, :
W. THOMAS WILSON, Individually and :      JURY TRIAL DEMANDED
in his Official Capacity as Supervisor of :
Jackson Township, MICHAEL YODER, :
Individually and in his Official Capacity as :
Supervisor of Jackson Township, :
RALPH WEILER, Individually and in his :
Official Capacity as Supervisor of Jackson :
Township, BARRY PARKS, Individually :
and in His Official Capacity as Sewage :          FILED
Enforcement Officer of Jackson Township, :      HARRISBURG, PA
DAVID VAN DOMMELEN, Individually :
and in his Official Capacity as Building :          FEB 2 1 2003
Permit Officer, ANN I. WIRTH, :
Individually and in her Official Capacity as :   MARY E. D'ANDREA, CLERK
Secretary of Jackson Township, and :           Per _____

## DEFENDANTS' JACKSON TOWNSHIP, W. THOMAS WILSON,
## MICHAEL YODER, RALPH WEILER, BARRY PARKS,
## DAVID VAN DOMMELEN AND ANN I. WIRTH'S MOTION IN LIMINE

**NOW COMES** Defendants, Jackson Township, W. Thomas Wilson, Michael

Yoder, Ralph Weiler, Barry Parks, David Van Dommelen and Ann I. Wirth by and

through their authorized counsel of record, Mayers, Mennies & Sherr, LLP, and

move this Honorable Court to preclude the admissibility of specific testimony and

reports of Plaintiffs' experts, George W. Fasic and Allen G. Heist and in support

thereof aver the following:

1.    Plaintiffs filed a three count Complaint on June 30, 2000 alleging that Defendants violated 42 U.S.C. §1983 by purportedly depriving Plaintiffs of their substantive and procedural due process rights.

2.    Count II of the Complaint alleged a claim for state law civil conspiracy purportedly to prevent Plaintiffs from developing their property; Count III alleges a state law claim for intentional interference with contractual relations.

3.    On August 3, 2000, Defendants filed a Motion to Dismiss.

4.    On March 29, 2001, this Court granted in part Defendants' Motion to Dismiss.

5.    Specifically, this Court dismissed Count I's allegation of §1983 liability for violation of state constitutional rights and Count III's allegation for intentional interference with a contractual relationship as to the Township.

6.    On October 18, 2001, this Honorable Court granted Plaintiffs' Motion for Leave to Amend their Complaint with regard to a third pendent state law claim for alleged violations of the Pennsylvania Constitution.  After the conclusion of discovery, both parties moved for summary judgment.

7.    Defendants moved for summary judgment on all claims, including Plaintiffs' claim for alleged violation of their procedural due process rights.

8.    This Honorable Court granted Defendants' Motion on this claim.

9.    Specifically, the Corneals' claim in this regard is based on the Board's alleged refusal to issue them permits and the Board's alleged adoption of the moratorium.

10.    In this regard, this Honorable Court determined that no procedural due process claims lie where there is an adequate judicial mechanism for challenging the decision of the Board.  (See Court's Memorandum dated December 23, 2002, p. 11).

11.    This remains the rule even if the Board's decisions were not in accordance with Pennsylvania law as argued by Plaintiffs.

12.    Essentially, there was an appeal process available to Plaintiffs for both the Board's alleged refusals to issue requested permits and the purported inappropriate adoption of the moratorium.  (See Court's Memorandum dated December 23, 2002, pp. 11-12).

13.    The Court further granted Defendants' Motion with regard to the intentional interference with a contractual relations claim and the state law civil conspiracy claim as alleged against the Township.

14.    The Court denied Defendants' Motion with regard to Plaintiffs'

3

substantive due process claim and similarly denied Plaintiffs' Motion for Summary Judgment.

15.    Plaintiffs have filed a Motion for Reconsideration on their claim for intentional interference with contractual relations; Defendants have filed a Cross-Motion for Reconsideration on Plaintiffs' substantive due process claim based on a recent change in the controlling law.

16.    These Motions are pending.

17.    Plaintiffs' produced two expert reports.  The first report was prepared by George W. Fasic.

18.    Mr. Fasic's, "... review addresses municipal planning and land use regulations, and the processes for appropriate administration and planning, and the regulation of the use and development of private property by a municipality in Pennsylvania."  It also includes, "... the application of standard planning and land use regulation procedures to the record of events..."[1]

19.    The second report was prepared by Allen G. Heist and the "scope" of his project is, "... with respect to reasonable and accepted township management, administration and municipal land use planning practices and procedures..."[2]

---

[1] A true and correct copy of the expert report of George W. Fasic is attached hereto as Exhibit "1.
[2] A true and correct copy of the expert report of Allen G. Heist is attached hereto as Exhibit "2".

20.    Based on this Court's dismissal of Plaintiffs' procedural due process claim, Defendants respectfully file this Motion in Limine and seek to preclude both Plaintiffs' experts' reports, as set forth below as well as the admissibility of specific testimony.

21.    Federal Rule of Evidence 401 defines relevant evidence as, "… evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." F.R.E. 401.

22.    Pursuant to F.R.E. 402, relevant evidence is generally admissible and irrelevant evidence is not admissible. F.R.E. 402.

23.    Federal Rule of Evidence 702 defines testimony by experts and provides, in relevant part as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

24.    The Third Circuit has construed Rule 702 as having "three distinct

substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." See Elcock v. K-Mart Corp., 233 F.3d 734, 741 (3d Cir. 2000).

25.    "Rule 702's fit requirement derives from the textual provision that 'scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.'" United States v. Mathis, 264 F.3d 321, 334 (3d Cir. 2001).

26.    Essentially, Rule 702 dictates that all expert testimony must be relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 1174 (1994).

27.    A District Court's "gatekeeping obligation" requires an inquiry into both relevance and reliability and applies to all expert testimony, not just "scientific" testimony. Id.

28.    The party offering the testimony must demonstrate that the expert's conclusions are reliable by a preponderance of the evidence. In re Paoli Railroad Yard, PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994), cert denied 513 U.S. 1190 (1995).

6

29.    Mr. Fasic's expert report and/or testimony are no longer relevant since his conclusions speak generally to Plaintiffs' procedural due process claim.

30.    Similarly, Mr. Heist's expert report and/or testimony are relevant or does not "fit" to the extent it addresses the propriety of the moratorium.  (See Exhibit "2", ¶2, the alleged refusal to issue permits, Exhibit "2", ¶5), and the alleged failure to accept or to deny the sewage modules.  (See Exhibit "2", ¶6).

31.    Based on the experts' reports and deposition testimony, those portions of each which deal with appropriate procedures, refusal to issue permits, and the adoption or propriety of the moratorium is no longer relevant, since this Court granted Defendants' Motion for Summary Judgment with regard to Plaintiffs' procedural due process claim.

**WHEREFORE**, based on the foregoing, Defendants' respectfully request that this Honorable Court grant their Motion in Limine and preclude Plaintiffs' experts' reports and testimony as set forth above.

MAYERS, MENNIES & SHERR, LLP

BY: _____
ANTHONY R. SHERR, ESQUIRE
Attorney for Defendants

3031 Walton Road, Building A
Suite 330, P.O. Box 1547
Blue Bell, PA 19422-0440
(610) 825-0300
Fax (610) 825-6555

8

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL AND         :
SANDRA Y. CORNEAL          :      CASE NO. 1:00-CV-1192
                                    :
         vs.                     :
                                    :
JACKSON TOWNSHIP, Huntingdon    :
County, Pennsylvania,            :      JURY TRIAL DEMANDED
W. THOMAS WILSON, Individually and :
in his Official Capacity as Supervisor of :
Jackson Township, MICHAEL YODER, :
Individually and in his Official Capacity as :
Supervisor of Jackson Township,        :
RALPH WEILER, Individually and in his :
Official Capacity as Supervisor of Jackson :
Township, BARRY PARKS, Individually :
and in His Official Capacity as Sewage :
Enforcement Officer of Jackson Township, :
DAVID VAN DOMMELEN, Individually :
and in his Official Capacity as Building :
Permit Officer, ANN I. WIRTH,       :
Individually and in her Official Capacity as :
Secretary of Jackson Township, and     :

### DEFENDANTS' JACKSON TOWNSHIP, W. THOMAS WILSON, MICHAEL YODER, RALPH WEILER, BARRY PARKS, DAVID VAN DOMMELEN AND ANN I. WIRTH'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION IN LIMINE

## I.     <u>INTRODUCTION</u>

In this matter, Plaintiffs allege a claim for procedural due process violations

based essentially on the Board's alleged refusal to issue them certain permits and its

adoption of a moratorium on subdivision development.  Plaintiffs retained two

experts in this matter and each have prepared reports, which speak to the procedural

due process aspects of this case, including accepted procedures for the issuance of permits and the propriety of the moratorium. However, since Plaintiffs' claims for alleged procedural due process violations have been dismissed on summary judgment, the expert reports are no longer relevant. Accordingly, Defendants' Motion in Limine in this regard must be granted.

II.   **STATEMENT OF FACTS**

Plaintiffs filed a three count Complaint on June 30, 2000 alleging that Defendants violated 42 U.S.C. §1983, by allegedly depriving Plaintiffs of their substantive and procedural due process rights. Count II of the Complaint alleges a claim for state law civil conspiracy purportedly to prevent Plaintiffs from developing their property; Count III alleges a state law claim for intentional interference with contractual relations.

Defendants filed a Motion to Dismiss. On March 29, 2001, this Court granted, in part, Defendants' Motion to Dismiss. Specifically, this Court dismissed Count I's allegation of §1983 liability for alleged violations of state constitutional rights, and Count III's allegation for intentional interference with contractual relations as to the Township.

2

Plaintiffs were granted leave to amend their Complaint with regard to a third pendent state law claim for alleged violation of the Pennsylvania Constitution.

After the conclusion of discovery, both parties moved for summary judgment. Defendants moved for summary judgment on all claims, including Plaintiffs' claim for alleged violation of their procedure due process rights. This Honorable Court granted Defendants' Motion on this claim. Specifically, the Corneals' claim in this regard is based on the Board's alleged refusal to issue them various permits and the Board's alleged improper adoption of a moratorium on subdivision development. In this regard, this Honorable Court determined that the procedural due process claim fails as a matter of law since there is an adequate judicial mechanism for challenging the various decisions of the Board. (See Court's Memorandum dated December 23, 2002, p. 11). Even if the Board's decisions were not in accordance with Pennsylvania law, as argued by Plaintiffs, does not form the basis of a procedural due process violation. Essentially, there was an appeal process available to Plaintiffs for both the Board's alleged refusal to issue the requested permits and the purported inappropriate adoption of the moratorium. (See Court Memorandum, December 23, 2002, pp. 11-12).

3

The Court further granted Defendants' Motion with regard to the intentional interference with contractual relations claim and the state law civil conspiracy claim as alleged against the Township. The Court denied Defendants' Motion for Summary Judgment with regard to Plaintiffs' substantive due process claims and similarly denied Plaintiffs' Motion for Summary Judgment. Plaintiffs have filed a Motion for Reconsideration based on their intentional interference with contractual relationship claim. Defendants have filed a Cross-Motion for Reconsideration on Plaintiffs' substantive due process claim based on a recent change in the controlling law. These Motions are pending.

Previously, Plaintiffs produced two expert reports, the first report was prepared by George W. Fasic, and a copy of his report is attached to Defendants' Motion in Limine as Exhibit "1". Mr. Fasic's, "… review addresses municipal planning and land use regulations, and the processes for appropriate administration and planning," and further includes, "… the application of standard planning and land use regulation procedures to the record of events…" The second report was prepare by Allen G. Heist and a copy of his report is attached to Defendants' Motion in Limine as Exhibit "2". The scope of Mr. Heist's project is with respect to, "… reasonable and accepted

township management, administration and municipal land use planning practices and procedures…"

Based on this Court's dismissal of the procedural due process claim, Defendants respectfully file this Motion in Limine seeking to exclude Mr. Fasic's report and testimony and those portions of Mr. Heist's report and testimony as detailed below.

III.    **ARGUMENT**

  A.    **LEGAL STANDARD**

Federal Rule of Evidence 401 defines relevant evidence as, "… evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." F.R.E. 401. Pursuant to F.R.E. 402, relevant evidence is generally admissible and irrelevant evidence is not admissible. F.R.E. 402.

Federal Rule of Evidence 702 defines testimony by experts and provides, in relevant part as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable principles and

5

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Third Circuit has construed Rule 702 as having "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." See Elcock v. K-Mart Corp., 233 F.3d 734, 741 (3d Cir. 2000). "Rule 702's fit requirement derives from the textual provision that 'scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.'" United States v. Mathis, 264 F.3d 321, 334 (3d Cir. 2001). Essentially, Rule 702 dictates that all expert testimony must be relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 1174 (1994).

A District Court's "gatekeeping obligation" requires an inquiry into both relevance and reliability and applies to all expert testimony, not just "scientific" testimony. Id. The party offering the testimony must demonstrate that the expert's conclusions are reliable by a preponderance of the evidence. In re Paoli Railroad Yard, PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994), cert denied 513 U.S. 1190 (1995).

Finally, "... the expert's opinion must be drawn from the facts of the case, not from the expert's own speculation." Kent v. Howell Electric Motors, 1999

WL517106,*4 (E.D. Pa.).  The admissibility of evidence is committed to the sound discretion of the trial court.  In re  Paoli Railroad Yard, PCB Litig., 35 F.3d 717 (3d Cir. 1994).

### B.    DEFENDANTS' MOTION IN LIMINE MUST BE GRANTED

As outlined in Defendants' Motion in Limine, Mr. Fasic's expert report and/or testimony is no longer relevant.  Since his conclusions speak largely to Plaintiff's procedural due process claim.  The introduction to his report, which is attached to Defendants' Motion as Exhibit "1", Mr. Fasic states that his review addresses processes for appropriate administration and planning as well as the application of standard planning and land use regulation procedures.  (See Exhibit "1", p. 1).  In Section V of Mr. Fasic's report, he addresses the "Jackson Township Administration of Land Use Ordinances as related to the D. Corneal property."  Mr. Fasic addresses the Township's position of the moratorium and states, in relevant part, as follows:

> The Minutes of the Board of Supervisors do not give evidence of proper advertisement of a moratorium, do not give evidence of the moratorium ordinance, do not show a public hearing was held on the moratorium and do not show the motion in vote of the governing body prior to the reported existence of the moratorium.

(See Exhibit "1", p. 3).  Based on these alleged failures, Mr. Fasic opines that the

7

moratorium was invalid. Mr. Fasic also recounts the alleged failures of the Board of Supervisors with regard to issuance of the requested permits. In the conclusion portion of his report, Mr. Fasic surmises that the Township's failure to either approve or deny the Corneals' permits demonstrates that they failed to follow required procedures in the administration of land use ordinances. Mr. Fasic also disputes the adoption of the moratorium.

Essentially, then, a review of Mr. Fasic's expert report demonstrates that he focused upon and primarily addressed the alleged procedural anomalies with regard to the permit process and/or the adoption of the moratorium in this case. Although his report states that the Township, "... exhibited malicious and discriminatory intent toward this property owner," his deposition testimony in this regard demonstrates that it is related to the application process. Mr. Fasic testified in this regard as follows:

> Q.: What do you believe was done maliciously by the Township?
>
> A.: The denial of what I call applications or the material to provide a due process for the applicant to prepare information to give to the municipality. I believe that was malicious. I believe that they were under an obligation under the building code to make it available. To deny that, I think that's a malicious action.[1]

---

[1] A true and correct copy of the deposition testimony of George W. Fasic is attached hereto as Exhibit "3", p. 50.

Mr. Fasic explained his conclusion that the Township has caused Mr. Corneal "irreparable damage", and also stated that, "... they [the Township] denied him the full use of his property," and further stated that, "... the invocation of police power without due process of an adopting ordinance." (See Exhibit "3", p. 50). Mr. Fasic's report and testimony must be excluded in that they relate to the purported procedural anomalies with regard to the permit process and/or the adoption of the ordinance in this case. This Court determined in its Memorandum/Order granting Defendants' Motion for Summary Judgment on this claim, "Pennsylvania provides a judicial mechanism to challenge these decision." (See Court Memorandum dated December 23, 2002, p. 11). Briefly, the Corneals could have appealed the Board's decision with regard to enactment of the moratorium and/or the refusal to issue certain permits. On this basis, these claims are no longer an issue and, as such, the expert reports as they relate thereto are no longer relevant.

Similarly, with regard to Mr. Heist's report, paragraphs II, V and VI of his conclusions are no longer relevant since they deal directly with the enactment of the moratorium, and procedures pendent to the request for permits in this case. Specifically, in paragraph II of Mr. Heist's "conclusions", he opines that the Township did not follow accepted practice in imposing the moratorium. Again, as

this Court stated in its Memorandum dated December 23, 2002, this decision could have been appealed by filing an action in the Court of Common Pleas for Huntingdon County, Pennsylvania is no longer at issue. Paragraph V of Mr. Heist's conclusion states in relevant part as follows:

> Because the Township Sewage Enforcement Officer approved the Corneals' sewage facility planning module and the building permit applications appeared to have complied with all applicable rules and regulations of the Township Building Permit Office, it was not accepted practice for the Township to have refused to issue the permits ... the ordinance does not authorize the Board of Supervisors ... to approve or deny a building permit application.

Mr. Heist also concludes that the failure of the Township Board of Supervisors to act with regard to either accept or deny the Plaintiffs' sewage facilities planning module constitutes a "deemed approval." These conclusions address the actual procedural process with regard to the applications for acceptance or denial of the requested permits. Since Plaintiffs' procedural due process claim, that is the propriety of the procedural access of the permit process, are no longer an issue, Mr. Heist's report and/or testimony in this regard is irrelevant.

10

## IV.    <u>CONCLUSION</u>

Based on the foregoing, Defendants respectfully request that this Honorable Court grant its Motion in Limine excluding the report and testimony of George W. Fasic in its entirety, and excluding the report and testimony of Allen G. Heist as set forth above.

Respectfully submitted,

**MAYERS, MENNIES & SHERR, LLP**

BY: _____

ANTHONY R. SHERR, ESQUIRE
Attorney for Defendants

3031 Walton Road, Building A
Suite 330, P.O. Box 1547
Blue Bell, PA 19422-0440
(610) 825-0300
Fax (610) 825-6555

# **CERTIFICATE OF SERVICE**

I, Cheryl Zeigler, hereby certify that on the 29th day of February 2003, a true and correct copy of Defendants, Jackson Township, W. Thomas Wilson, Michael Yoder, Ralph Weiler, Barry Parks, David Van Dommelen and Ann I. Wirth's Motion in Limine and Memorandum of Law, was served by first class regular mail, postage prepaid upon the following:

Bridget E. Montgomery, Esquire
Adam M. Shienvold, Esquire
Eckert, Seamans Cherin & Mellott
213 Market Street, 8th Floor
Harrisburg, PA 17101

BY: _____
Cheryl Zeigler
Legal Assistant to Anthony R. Sherr

# EXHIBIT "1"



George W. Fasic
802 Strasburg Road
West Chester, Pennsylvania 19382

610-431-2437

# EXPERT   REPORT

## on the  matter of
## CORNEAL  V. JACKSON TOWNSHIP
### Huntingdon County, Pennsylvania

prepared for
David  Corneal

prepared by
George W. Fasic, AICP
Community Planner

July 2001

## I. INTRODUCTION:

This report is prepared at the request of David B. Corneal and is a result of my review of the matters related to the Corneal property located in Jackson Township, Huntingdon County, Pennsylvania. My review addresses municipal planning and land use regulations, and the processes for appropriate administration and planning, and the regulation of the use and development of private property by a municipality in Pennsylvania. My review includes the application of standard planning and land use regulation procedures to the record of events related to Mr. Corneal's efforts to develop his 95 acre parcel held under a single deed, in Jackson Township, Huntingdon County.

## II. BACKGROUND:

Mr. Corneal in his attempt to utilize and develop his property sought from the Township of Jackson and its agents the appropriate application forms and guidance on the application processes. He sought to:
    a. subdivide his property by conveyance of a tract of land to a second party,
    b. obtain a building permit to erect an art studio,
    c. obtain permit for an on lot sewage system,
    d. obtain an approved permit for a " privy " system,
    e. obtain a building permit to erect a garage.

## III. MUNICIPAL AUTHORITY

The Commonwealth of Pennsylvania has enacted enabling legislation for municipal planning and land use regulation. The Pennsylvania Municipalities Planning Code ( MPC) permits a Township to plan and to guide development through the use of certain land use regulations. It gives the governing body the choice whether to plan and regulate development. If the municipality chooses to plan and regulate, it is obligated to follow the procedures set forth by the MPC, including provisions for the content, adoption, administration, appeal processes and amendment for the various land use regulations/ordinances allowed. In addition, Jackson Township is governed by the provisions of the Municipal Code for Townships of the Second Class.

Each land use ordinance has a specific and separate function in the regulation of the use and development of land. Land use ordinances or growth management ordinances come under the category of "police power" authority given to municipalities to regulate the use and development desired of private land.

In addition, there is other legislation in Pennsylvania that sets forth municipal requirements in the matters related to development of land . The provisions of Act 537, Pennsylvania Sewage Facilities Act, require municipalities to have a Sewage Facilities Plan. Act 537 requires a municipality to regulate on-lot sewage systems, and to employ a certified Sewage Enforcement Officer(SEO). The SEO is responsible to oversee and inspect all aspects of proposed on-lot sewage treatment facilities, to review and act on all applications for on-lot systems and, where appropriate compliance is demonstrated, to issue permits. The SEO has sole authority for the permitting of a single lot on-site sewage system. which does not require additional approval by the governing body. In the

1

instance of a single lot on-site sewage system, the application does not require a sewage module as an amendment to the municipal sewage facilities plan, nor require approval by the Pennsylvania Department of Environmental Protection.(DEP).

The Municipal Code for Townships of the Second Class authorizes the enactment of a Building Code( section 1517), which is intended to regulate the construction and the materials used for structures and buildings, as well as sanitation, water supply, drainage, inspection and other aspects of buildings and houses used for any use or occupancy. A building code is enacted based on the municipal use of the "police power" the same as other land use ordinances.

The Moratorium is generally used to delay or hold off development through the restriction or withholding of building permits, or the withholding of consideration of applications requesting zoning ordinance changes/amendments. A moratorium is a land use related ordinance. An appropriate moratorium is based on:

     a). being adopted in "good faith": indicating which ordinance is addressed, and providing for public notice and public hearing, and action by the governing body at a public meeting; and

     b). being adopted with a stated duration or time limit to the abatement.

The moratorium in Pennsylvania is not specifically permitted by the Municipalities Planning Code(MPC). The Township Code for Townships of the Second Class permits enactment of ordinances, but does not specifically identify the moratorium. The dominant use of the moratorium in Pennsylvania is made by DEP in cases associated to a threat to public health or safety; such as inadequate sewage treatment capacity, or for areas experiencing failure of on-lot sewage systems.

## IV. PREPARATION AND ADOPTION OF LAND USE ORDIANCES:

The Pennsylvania Municipalities Planning Code sets forth the procedural responsibilities and requirements for adoption and administration of land use ordinances. The authority to prepare and adopt land use ordinances rests with the governing body( board of supervisors in the case of a Township of the Second Class). Following the preparation of the land use ordinance authorized by the governing body, adoption requires a prescribed procedure of public notice and public hearings and action by the governing body Public notice is defined by the MPC as a notice published once each week for two successive weeks in a newspaper of general circulation in the municipality. The notice must state the time and place of hearing, and nature of matter to be considered. The MPC requires the governing body to hold at least one public hearing on the adoption of zoning and subdivision ordinances.

Building Codes Ordinances require the same process of public notice and public hearing before action to adopt is taken by the governing body of the municipality.

Act 537, Pennsylvania Sewage Facilities Act, sets forth the requirements for municipal sewage facilities plans, and the standards and procedures governing the operation of the SEO for a municipality. Where a municipality has an adopted Act 537 Plan, approval and permitting for a single parcel / tract on lot sewage system is the responsibility of the SEO. Requiring additional approval by the governing body for a single lot on-lot sewage system already approved by the municipal SEO is not

appropriate. The Board of Supervisors are not certified by DEP to issue permits. Their additional approval represents duplication of the SEO function.

## V. JACKSON TOWNSHIP ADMINISTRATION OF LAND USE ORDINANCES  AS RELATED TO THE  D. CORNEAL  PROPERTY .

Jackson Township did not have an adopted zoning ordinance at the time that Mr. Corneal submitted a subdivision for the development of his land. The matter of zoning and  the appropriate uses of land does not apply in this instance.

Mr. Corneal was advised in the years 1999 and 2000 by the Board of Supervisors that a land subdivision application was required in Jackson Township, and that the subdivision plan further required  Huntingdon County Planning Commission approval. There was no  adopted land subdivision ordinance for Huntingdon County.  Jackson Township  subdivision and land development ordinance did not exist at the time the land owner Mr. Corneal  sought to subdivide his property in February 2000.

In the absence of an adopted subdivision and  land development ordinance in Jackson Township and in Huntingdon County,  a property owner can  not be required, nor should be made to file a subdivision plan.  In my opinion, the Township erred in requiring the submission of  a subdivision plan, and  erred in requiring Mr. Corneal  to send the subdivision plan to the Huntingdon County Planning Commission for approval. The Board of Supervisors were responsible to inform Mr. Corneal of the fact that  a Township subdivision ordinance did not exist. When Mr. Corneal applied for a building permit for an art studio, the Township had the obligation to inform Mr. Corneal that a building permit and sewage permit where required, and to advise him how to proceed to make applications for these permits.

The minutes of January 4,  2000 meeting  of the Board of Supervisors of Jackson Township indicate that the Board of Supervisors decided to impose a moratorium. At the February   meeting the Board would not accept, review or approve any subdivision plan for Mr. Corneal's property.  The minutes of the Board of Supervisors do not give evidence of proper advertisement of a moratorium,  do not give evidence of the moratorium ordinance, do not show a public hearing was held on the moratorium and  do not show the motion and vote of the governing body prior to the  reported existence of the moratorium. In my opinion, failure by the Board of Supervisors to  adhere to the requirements for  public notice and process for ordinance adoption renders the moratorium invalid. To attempt to impose a moratorium on subdivisions when  there was no subdivision and land development ordinance in place, is in my opinion a serious breach of public trust by  the Board of Supervisors of Jackson Township. The Board of Supervisors gave the public false and misleading information. This is a failure by the Township Supervisors to uphold their oath for  public office. Providing correct information is  an obligation inherent  in  the authority of a municipality to use land use ordinances.

Appropriate administration by the Township of its building code obligates the Township to advise Mr. Corneal of the need for sewage permit before requiring him to obtain a building permit, or at a minimum to advise him to file the two applications

together. Submission to the Board of Supervisors of an application for an on-lot sewage permit already approved by the Township SEO, should result in a permit being issued. Following the failure by the Board of Supervisors to issue a sewage permit for an on-lot system, Mr. Corneal attempted to apply for a "privy" permit, which was also denied, as a result of the failure by the Township to make available the appropriate application forms. Regulation of "Privy" obligates the Township to provide to the requesting property owner / public any forms and information needed to make application. The withholding of application forms is improper and suggests discrimination. An appropriate procedure is to accept the application and then act on it, and where merited deny the permit. As administered in the case of Mr. Corneal, the failure to provide the require application forms denied him use of his property.

A building permit for a garage does not require a sewage permit since the garage is not for habitation and not likely to generate the need for sewage treatment and disposal. The record shows the building code officer would not provide the appropriate forms for making application for a building permit to construct a garage. In my opinion, failure to provide necessary forms required to make application is inconsistent with the intent of land use ordinances and use of police power by a municipality. It denies a property owner the right to utilize his property, and compromises his ability to comply with applicable building code provisions. This approach is inappropriate, unacceptable, and discriminatory.

## VI. CONCLUSIONS:

Based on my review of documents related to this matter, and my experience as a professional community planner in the compilation and administration of municipal planning and land use ordinances and other growth management ordinances in Pennsylvania, it is my opinion that the Jackson Township Board of Supervisors and its agents failed to comply with normal and reasonable administration of land use planning ordinances, and failed in their duty to inform Mr. Corneal of the requirements related to his proposal to subdivide and develop his property in Jackson Township, and the Township, exhibited malicious and discriminatory intent toward this property owner / applicant. .

At the time of Mr. Corneal's initial inquiry expressing intent to convey a portion of his property, the Board of Supervisors and it agents had the duty to inform him that the Township did not have a subdivision and land development ordinance. As elected officials, they are required to give correct and appropriate information to enable citizens to proceed with intended utilization of land. The Board of Supervisors statements and direction to Mr. Corneal that he was to obtain both Township and Huntingdon County approval of his subdivision was a gross violation of their public duty.

In the matter of the alleged moratorium, the alleged moratorium (referenced in the Board of Supervisors minutes of January 4, 2000) they fail to meet the correct procedural requirements for public notice, public hearing, and proper motion and voting action by the individual members of the Board of Supervisors, as is required for similar land use regulations.

4

The Board of Supervisors erred in refusing to approve Mr. Corneal's sewage module without providing their basis for not signing the sewage permit already approved by the Township's SEO. The adoption of a Privy Ordinance by the Township carries the burden for the Township and its agents to make available to the public( Mr. Corneal) all forms necessary and information to make application and to comply with the requirements for a ' privy" permit. The appropriate procedure for denial is to accept the application and then taking action to deny, citing the basis for denial.

A building permit for a garage does not require a sewage permit. It does require the Township of Jackson to provide and make available all forms and information necessary so the property owner / applicant can file an application, and comply with the provisions of the building code. The denial of such forms and information is a breach of duty by an elected official wherein a land use ordinance has been adopted to regulate private property. The accepted process would be to give the application forms, accept the completed form and then act on the application. Action to deny would require some indication of the basis for denial.

Jackson Township failed to followed acceptable and required procedures in the adoption, and the administration of land use ordinances. It is my opinion, their actions are unique, unwarranted, malicious and discriminatory and unlike those I have experienced in dealing with many municipalities throughout Pennsylvania. In the absence of an applicable ordinance, the property owner / applicant should be advised by the municipality how to proceed. Where the property owner / applicant has complied with the provisions of applicable land use ordinances, the Municipality is required to act favorably and issue appropriate permits. Where a municipality enacts a land use ordinance, there is the responsibility by the governing body and its agents to make available all forms necessary for the property owner / applicant to make application and to be able to file the application for consideration and action by the appropriate municipal body.

The normal and prescribed procedures were not used or followed by the elected officials of Jackson Township and their agents( secretary/manager, building code officer and SEO.) Their actions are contrary to normally accepted and lawful practice by municipal officials in Pennsylvania. I believe their actions and failure to act have caused irreparable damage, loss of full use of his property, unnecessary costs to Mr. Corneal and these were totally inappropriate.

Submitted by
George W. Fasic, AICP

_George W Fasic_
7/4

5

# EXHIBIT "2"

10/05/2001 15:59 FAX 717 237 6019        Eckert Seamans                    005

EXPERT REPORT OF ALLEN G. HEIST

CORNEAL V. JACKSON TOWNSHIP

July 2001

## SCOPE OF PROJECT

Allen G. Heist HAS been retained by Eckert, Seamans, Cherin & Mellott LLC to provide expert testimony with respect to reasonable and accepted township management, administration and municipal land use planning practices and procedures in the case of Corneal v. Jackson Township, Huntingdon County, Pennsylvania. The plaintiffs have filed a civil rights action against Jackson Township, the Township Board of Supervisors, the Township Secretary, the Township Building Permit Officer, the Township Sewage Enforcement Officer, and the Township Solicitor.

I have been involved in municipal planning, development, and for 24 years, during which I have provided expert testimony in approximately 75 zoning Hearing Board and curative amendment applications. I reviewed documents, facts and pleadings in this case to prepare this expert report.

## SUMMARY OF FACTS

1. The Corneals are the owners of a 95-acre tract of land located in Jackson Township, Huntingdon County, Pennsylvania. The Corneals desired to subdivide their property and to sell one subdivided parcel, consisting of 25.8 acres, to a third party (Hewitt and Smith). The Corneals had a subdivision plan drawn up and in October 1999 the Corneals and Hewitt and Smith entered into an agreement of sale for this portion.   Although neither the Township nor the County had an adopted subdivision or land development ordinance in effect at the time, the Corneals were informed by Township officials that Township approval was needed for their subdivision and land development plan.

2. On February 7, 2000, the Corneals submitted their subdivision plan to the Township for its review and approval.  At that meeting, they were informed by the Township that the Board of Supervisors had invoked a moratorium at their January 4, 2000 meeting prohibiting the approval of any further subdivisions until the proposed Township subdivision ordinance was approved.

3. Subsequent to submitting their initial plan to the Township, the Corneals presented their subdivision plan to the Huntingdon County Planning Commission. Although the County had no official subdivision or land development ordinance, the Corneals believed that County approval of their plan was required, based upon information provided by the Township at the February 7, 2000 meeting.  Upon review of the Corneals' subdivision plan, the County issued a recommendation to the Township on February 24, 2000 that the plan be denied based, in part, on the Township's subdivision moratorium and proposed subdivision and land development ordinance.

4. The Corneals submitted a sewage planning module for the creation of residential lots on 95 acres to the Township.  Although the Township sewage enforcement officer approved the module on February 19, 2000, the Board of Supervisors refused to approve and sign the module.

5. Based upon the County Planning Commission comments of February 24, 2000, the Corneals prepared and submitted a revised subdivision plan to the County Planning Commission.  In a letter dated April 20, 2000, the County recommended conditional approval of the revised plan pending adoption of the Township subdivision and land development ordinance. Subsequent to County's review, the Township refused to review the revised plan.

6. The Corneals later applied for a building permit, apart from any subdivision plan, for an art studio. The Township Building Code Officer refused to provide a building permit application, much less issue the building permit, because the Board of Supervisors directed him not to issue a building permit to the plaintiffs.   Upon the Corneals' request for a building permit application to construct a garage, the Township Building Permit Officer refused.

## SUMMARY OF GOVERNING LAW

1. It is common knowledge if a municipality has no subdivision and land development ordinance, there is no authority to regulate the preparation, submission, content, review or approval of a plan of subdivision. Section 501 of the Pennsylvania Municipalities Planning Code (MPC) allows municipalities to regulate subdivisions and land development only if they enact a subdivision and land development ordinance. Section 504 of the MPC describes the process for enacting a subdivision and land development ordinance. In summary, the proposed ordinance must be submitted to the local and county planning commission for review and comment, and the Board of Supervisors must hold a "public hearing" pursuant to "public notice". Section 503 of the MPC describes the contents of a subdivision and land development ordinance.

2. Section 502 of the MPC details the relationship between local and county subdivision and land development ordinances. If the county enacts a subdivision and land development ordinance, the regulations apply to any and all local municipalities in the county which have no such regulations. If a municipality elects to adopt its own regulations, it may do so by adopting the county regulations by reference or by adopting its own regulations. If the municipality has enacted its own regulations, such adoption repeals the county regulations but the municipality is still required to forward proposed plans to the county for review and comment.

3. The only authority for enacting moratoriums is contained in Section 609.2 of the MPC. This provision only allows a moratorium for <u>curative amendment</u> applications until such time that the municipality adopts a revised or amended <u>zoning ordinance.</u> To invoke a curative amendment moratorium, a municipality must declare by formal action (e.g. – motion, resolution, etc.) that its zoning ordinances or portions thereof are substantively invalid and propose to prepare a curative amendment to overcome such invalidity. Within thirty (30) days of such a declaration and proposal, the Board of supervisors are required by resolution to make specific findings setting forth the declared invalidity and begin to prepare and consider a curative amendment. Within 180 days of the declaration and proposal, the municipality must enact a curative amendment to validate or reaffirm the validity of its zoning ordinance. There is no authority vested in municipal authorities to authorize a general subdivision moratorium even when the municipal authority has subdivision and land development ordinances.

4. Building permits are authorized in the MPC (including, but not necessarily limited to, Sections 603.(b)(2) and 614) and the Statewide Building Code, Act 45 of 1999. Jackson Township adopted a building permit ordinance on July 3, 1989.

5. Section 3.02 of the Jackson Township Building Permit Ordinance requires that building permit applications be submitted, in writing, to the Building Permit Officer on forms supplied by the Township. Various information, data, and documentation is required to accompany the permit application. Section 3.01A. of the Township Building Permit Ordinance states that "the Building Permit Officer <u>shall</u> (emphasis added) issue a building permit only after it has been determined that the proposed work to be undertaken will be in

10/05/2001 16:01 FAX 717 237 6019          Eckert Seamans                                    ⧄009

conformance with the requirements of this and all other applicable codes and ordinances". Sections 3.01B and C. list specific state and federal permits (including sewer permits) which the Building Permit Officer is required to verify prior to issuance of a Township building permit. The Jackson Township Building Permit Ordinance includes no reference to the time period required by the Building Permit Officer to issue or deny a permit application, however, the Statewide Building Code, Act 45 of 1999, requires that building permits for one-family and two-family dwelling units and utility and miscellaneous use structures be granted or denied within 15 business days of the filing date (all other building permits are given 30 business days).

6. Sewer permits are authorized through Act 537 and Title 25 of the Pennsylvania Code, Chapters 71 through 73. With no county health department to implement these regulations, Jackson Township is required to retain its own sewage enforcement officer. Failure of the Township to act within sixty (60) days of receipt of a sewage facilities planning module application constitutes a "deemed approval" per Section 71.53, Chapter 73, Title 25 of the Pennsylvania Code.

## CONCLUSIONS

1. Since neither Jackson Township nor Huntingdon County had enacted a subdivision and land development ordinance at the time of the Corneals' first submission of the subdivision plan, it was not accepted practice or lawful to require a subdivision plan except as a courtesy to the Township and county planning commission or as required for tax/title transfer purposes. The Township and its employees lacked authority to deny subdivision approval and no reasonable Township officials would have thought it lawful to do so. Without a township or county subdivision and land development ordinance, the submission of a subdivision plan and subsequent review by the Township is optional, no official action by the Township was required or possible, it was not accepted practice to deny the Corneals' permission to subdivide based upon a future plan to pass an ordinance and no reasonable municipal official could have though it was lawful to do so.

2. Jackson Township had no authority to enact a moratorium prohibiting the approval of subdivisions pending approval of the proposed subdivision ordinance. The MPC authorizes moratoriums only for curative amendments and only if the municipality declares by formal action that its zoning ordinance is substantially invalid and by resolution what specific findings are being used to declare such invalidity. Moreover, there is no indication that the moratorium was even "enacted" as there was, evidently, no advertisement or vote thereof. Furthermore, there was no moratorium "ordinance" or "resolution". The Township did not follow accepted practice in imposing the moratorium on the Corneals and no reasonable municipal official could have thought it was lawful to do so.

3. The Corneals were required only to apply for building permits and sewage permits, since the only adopted regulations in place at the time were the Township Building Permit Ordinance and the Act 537 and Chapter 72 sewage facilities planning regulations. To require them to do more is not accepted practice and no reasonable municipal official could have thought it was lawful to do so.

4. Building permit applications are a matter of public record and therefore the Township Building Permits Officer's refusal to supply an application to the Corneals is not accepted practice and no reasonable municipal official could have thought it was lawful to do so.

5. Because the Township Sewage Enforcement Officer approved the Corneals' sewage facilities planning module and the building permit applications appear to have complied with all applicable rules and regulations of the Township Building Permit Ordinance, it was not accepted practice for the Township to have refused to issue the permits and no reasonable municipal official could have thought it was lawful to do so. The Ordinance does not authorize the Board of Supervisors or any other Township official to approve or deny a building permit application.

6. The Township Board of Supervisors did not act within accepted or legal practice when it failed to accept or not accept the plaintiffs' sewage facilities planning module within 60 days of receipt of an application. Failure to act within 60 days constitutes a "deemed approval" per Section 71.53, Chapter 73, Title 25 of the Pennsylvania Code, and no reasonable municipal official could have thought it otherwise.

7. In my experience as township manager, the Township Solicitor advises the Board of Supervisors in all aspect of the Township duties, including the proper procedure for enacting a

subdivision and land development ordinance and a development moratorium, and the legal authority and application of such regulations. Assuming the Township Solicitor was aware of and participated in the Board of Supervisors' discussion of the various plaintiffs' applications, he should have advised the Board of the lack of legal authority to regulate subdivisions and to deny building and sewer permits.

Submitted by: _____        Date: 7|10|01
                    Allen G. Heist

# EXHIBIT "3"

## Page 1

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


DAVID B. CORNEAL and     : NO. 1:00-CV-1192
SANDRA Y. CORNEAL

        Vs.              :

JACKSON TOWNSHIP, Huntingdon
County, Pennsylvania.
W. THOMAS WILSON, Individually
and in his Official Capacity
as Supervisor of
Jackson Township, et al   :


                - - -

            Blue Bell, Pennsylvania
            Friday, October 19, 2001
                - - -



        DEPOSITION OF GEORGE W. FASIC,
held in the offices of Mayers, Mennies and
Sherr, 3031 Walton Road, Building A,
Suite 330, on the above date, commencing at
10:10 a.m., before Barbara Donatelli, An
Approved Court Reporter of the United States
District Court and Notary Public of the
Commonwealth of Pennsylvania.




        Barbara Donatelli
        - Court Reporter-
     Suite 1905, 1616 Walnut Street
     Philadelphia, Pennsylvania, 19103
              215-546-7020
```

## Page 2

```
APPEARANCES:


ECKERT, SEAMANS, CHERIN AND MELLOTT
BY:  RON S. CHIMA, ESQUIRE
213 Market Street, Eighth Floor
Harrisburg, Pennsylvania, 17101.
            Attorneys for Plaintiffs



MAYERS, MENNIES AND SHERR
BY:  ANTHONY R. SHERR, ESQUIRE
3031 Walton Road
Building A Suite 330,
Blue Bell, Pennsylvania, 19422-0440.
            Attorney for Defendants
```

## Page 3

```
                    E X H I B I T S



EXHIBIT NO.                      PAGE NO.


Fasic-1      Expert Report        4

Fasic-2      List of Publications

             and Expert Testimony  11
```

## Page 4

1 　　　(It is stipulated by and between
2 counsel for the respective parties that
3 signing, sealing, certification and
4 filing are waived; and that all
5 objections except as to form, are reserved
6 to the time of trial.)
7 　　　　　- - -.
8 　　　GEORGE W. FASIC, having been
9 first duly sworn, was examined and testified
10 as follows:
11 　　　(Exhibit Fasic-1 is marked for
12 identification.)
13 EXAMINATION
14 BY SHERR:
15 Q. Mr. Fasic, would you please state your
16 full name and spell your last name?
17 A. George W. Fasic, F-A-S-I-C.
18 Q. My name is Tony Sherr. I represent the
19 remaining defendants in this lawsuit currently
20 pending in the United States District Court
21 for the Middle District of Pennsylvania, David
22 Corneal and Sandra Corneal versus Jackson
23 Township and others.
24 　　　Your name and your report have

CORNEAL VS. JACKSON TWP., ET AL    CondenseIt™    GEORGE W. FASIC 10-19-0

Page 5

1  been submitted as an expert in this matter on
2  behalf of the plaintiffs. We're here today to
3  take your deposition. Have you ever had your
4  deposition taken before?
5  A. Once or twice.
6  Q. So you know the basic ground rules, but
7  I'll just go over some of the rules so that
8  this goes smoothly. I'm going to ask you a
9  series of questions concerning your report and
10  questions about your qualifications. I
11  anticipate that this will be a relatively
12  short deposition.
13      I ask that you make all of your
14  answers verbally so that the court reporter
15  can take them down. She can't take down nods
16  of your head and that sort of thing. I ask
17  that you wait until I finish asking the
18  question before you begin giving the answer.
19  Likewise, I'll wait until you're done
20  answering before asking another question
21  because it's difficult for the court reporter
22  to take down two people talking at once.
23      If you don't understand any
24  question, please ask me to clarify it. If you

Page 6

1  don't hear any question, please ask me to
2  repeat it. If you answer the question I'm
3  going to assume that you both heard and
4  understood the question. Is that okay?
5  A. Says that again?
6  Q. If you answer the question, we're going
7  to assume that you both heard and understood
8  the question, okay?
9  A. Yes.
10  Q. If you need a break for any reason, let
11  me know and that will be fine. I'm trying to
12  get your best recollection. I ask that you
13  not guess at any answers. If you don't know
14  an answer, please tell me that you don't know
15  and that will be fine as well.
16      Did you review anything in
17  preparation paying for today's deposition?
18  A. Yes, I did.
19  Q. What did you review?
20  A. The Complaint filed by Mr. Corneal. I
21  reviewed documents of Huntingdon County's
22  claim. I reviewed the Building Code of
23  Jackson Township. I reviewed some material
24  from the DEP, DER.

Page 7

1      I did some review of the
2  Pennsylvania Municipalities Planning Code. Mr.
3  Sherr, could we refer to that as MPC to make
4  it easier for the court reporter?
5  Q. Absolutely. We'll preserve her fingers.
6  Did you review anything else?
7  A. Not that I recall right now.
8  Q. Did you discuss today's deposition with
9  anyone?
10  A. Yes, I did.
11  Q. Who did you discuss it with?
12  A. I discussed it with Mr. Lucas, Bridget
13  Montgomery and this gentleman sitting here.
14  Q. Anybody else?
15  A. Not that I recall.
16  Q. Have you ever had any discussions with
17  Mr. David Corneal?
18  A. One telephone conversation which was in
19  reference to an invoice.
20  Q. When was that discussion?
21  A. Must have been in August.
22  Q. By your response that your discussion was
23  in reference to an invoice, am I correct in
24  assuming that you did not discuss the

Page 8

1  substantive matters that we're here about
2  today?
3  A. That's correct.
4  Q. I want to show you what I've had marked
5  as Fasic-1 and ask you to review that
6  document. It's a fifteen-page document. Have
7  you reviewed that?
8  A. Yes, sir.
9  Q. Other than the first two pages and the
10  last page of Fasic-1, would you agree with me
11  that the exhibit constitutes your expert
12  report as well as your general resume?
13  A. Yes.
14  Q. Have you provided any other documents
15  that you generated to the Corneal's attorneys?
16  A. I believe there are two exhibits that I
17  was requested to provide. One was publications
18  and I believe the other one was expert
19  testimony.
20  Q. Have you done that?
21  A. I believe I did.
22      MR. SHERR: I will state on the
23  record that the disclosure says that that will
24  be provided.

CORNEAL VS. JACKSON TWP., ET AL   Condenselt™   GEORGE W. FASIC 10-19-0

Page 9

1    MR. CHIMA: The list of the
2    publications and the times that he testified
3    before?
4    MR. SHERR: Yes, other than
5    what's in here.
6    MR. CHIMA: All right. I'll take
7    a break for a second and see if I have it
8    here.
9    MR. SHERR: I'm just requesting
10   that, generally.
11   MR. CHIMA: I'll see that you are
12   supplied with that.
13   MR. SHERR: I note on the
14   disclosure sheet that Number 3 states that
15   what we will be provided is a general resume
16   and a complete list of Mr. Fasic's
17   publications over the last ten years.
18   It also says at Number 4 that a
19   complete listing of cases in which Mr. Fasic
20   has testified as an expert over the past four
21   years will be provided. Again, I state on the
22   record that those have not been provided.
23   MR. CHIMA: I will provide them
24   to you.

Page 10

1    MR. SHERR: Thank you.
2    Q. What were you asked to do in this matter?
3    A. To look into the situation of Mr.
4    Corneal's efforts to develop his property from
5    a community planner's perspective.
6    Q. I have just a couple of questions
7    concerning your qualifications. First, have
8    you ever been accepted as an expert in any
9    Federal Court proceeding?
10   A. No, sir, I have not.
11   Q. How about in State Court proceedings?
12   A. Yes.
13   Q. What was the nature of those proceedings,
14   generally?
15   A. In the most recent one I testified on
16   behalf of a citizens group in Sugarloaf
17   Township which is Central Pennsylvania.
18   Q. Do you know what county that is?
19   A. Luzerne County. The applicant was Larock
20   Township, Sugarloaf Township. The issue was a
21   request for use variance. The decision of the
22   hearing board was to deny the request. The
23   applicant and the citizens group of the
24   township appealed. It went to Commonwealth

Page 11

1    Court, and the Judge sent it back to the trial
2    court for further testimony. I was asked to
3    testify at that time.
4    MR. CHIMA: One moment. I have
5    it here. Would you like to make a copy?
6    MR. SHERR: Sure. I'll take a
7    moment to look at it. Off the record.
8    (Discussion is held off the
9    record.)
10   MR. SHERR: Back on the record.
11   Let the record reflect that I've been handed a
12   two-page document, the first page of which
13   says recent publications and the second page
14   says recent activity as expert witness. I'll
15   review the second sheet since it's germane to
16   what we're talking about. I'll mark that as
17   Fasic-2.
18   (Exhibit Fasic-2 is marked for
19   identification.)
20   Q. On the second sheet, the seven matters
21   listed as recent activity as an expert
22   witness, are those the seven most recent?
23   A. Yes.
24   Q. And have you ever testified in a matter

Page 12

1    involving allegations of civil rights
2    violations?
3    A. No.
4    Q. Getting back to your general resume,
5    first, on the resume addendum, are you still
6    involved at West Chester University as an
7    assistant professor?
8    A. Yes, I am.
9    Q. It notes here that you teach one course a
10   semester?
11   A. On a part-time basis.
12   Q. Are you still teaching one course each
13   semester?
14   A. Yes.
15   Q. How many semesters do they have in a
16   year?
17   A. Two regular, fall and spring, but the
18   courses offered in the summer would be a
19   three-week pre-session, six-week main session
20   and three-week post-session.
21   Q. Other than the six courses listed on this
22   resume addendum, are there any additional
23   courses which you teach?
24   A. At West Chester?

CORNEAL VS. JACKSON TWP., ET AL    CondenseIt™    GEORGE W. FASIC 10-19-0

Page 13

1 Q. Yes.
2 A. No, other than as a guest for someone
3 else's course.
4 Q. Have you taught all six of these courses?
5 A. Yes.
6 Q. Have you ever taught any of those courses
7 twice, in other words, succeeding years?
8 A. Well, there's a sequence.
9 Q. What is the sequence?
10 A. That depends upon the department chair.
11 They try to have the in-depth courses first
12 and then they schedule the courses that I
13 teach, depending on the other faculty and
14 teachers, such as environmental planning or
15 G.I.S. course. So the introductory course
16 will come up more frequently than the other
17 courses.
18 Q. Other than your teaching activities at
19 West Chester and any consulting that you may
20 do, are you currently employed in any other
21 fashion?
22 A. Yes. I do some instructional work for
23 the Pennsylvania Municipal Planning Education
24 Institute, which is a consortium of the

Page 14

1 Pennsylvania Planning Association, Penn State
2 Extension Service.
3 Q. What do you teach for them?
4 A. I teach four basic courses. The courses
5 are designed for municipal officials, elected
6 officials, community planning officials,
7 municipal zoning to board members, code
8 officers and the general public.
9       I believe that the courses --
10 I'll use the word qualify -- for continuing
11 education. I don't know the letters for the
12 legal community, but there are legal people
13 who take those courses for continuing credits.
14 Q. CLE.
15 A. Whatever, I don't know, but I know they
16 are there to satisfy the requirement.
17 Q. Where are of those courses taught?
18 A. Throughout Pennsylvania. We have two
19 types of courses. We have fixed-site, usually
20 six of those in each of the fall, winter and
21 spring sessions, and then there are those same
22 courses taught by sponsored sites. It might be
23 a county planning commission who might sponsor
24 that course.

Page 15

1       The instructors have been
2 certified by the institute. I have been
3 certified for all four of those courses.
4 Q. What's the process to get certified?
5 A. There's an application that's required,
6 experience, et cetera. There's a training
7 program of two periods of time, usually a
8 month apart, two three-day sessions.
9       There's a critique, not an
10 examination in terms of what you would call an
11 examination that gets graded, but an
12 examination or critique of performance that
13 the instructors have to make before the review
14 committee.
15 Q. In looking at the list of courses, have
16 you ever taught any courses dealing with
17 Act 537.
18 A. Not a full course that deals with 537.
19 But 537 is part of the planning process, so it
20 comes in in the basic course. It also comes in
21 in the law course, the Certified courses.
22 Because 537 planning is considered to be part
23 of planning law, it's related but not solely
24 on 537.

Page 16

1 Q. With respect to your training, you note
2 in your general resume that you have had
3 courses in municipal management, zoning, land
4 development techniques, transportation
5 planning, G.I.S., and public administration,
6 land use law. What is G.I.S.?
7 A. Geographic Information Systems.
8 Q. What courses have you had where you
9 reference land use law?
10 A. What page?
11 Q. Page 1 of your general resume.
12 A. Sometimes the Bar Association will
13 sponsor a seminar or course and I attended
14 those.
15 Q. Is that the Bar Association of
16 Pennsylvania?
17 A. Yes, sir. The Township Association
18 Pennsylvania or Associations of Pennsylvania
19 Townships. It's called PSATS. They have short
20 courses, refresher courses and I have attended
21 those. G.I.S., I attended those at West
22 Chester.
23 Q. As I read this, other than the course
24 work you did at Penn State for your B.S. and

**Page 17**

1 Columbia University for your M.S., the only
2 course work that you've had is what you just
3 told us about?
4 A. That's not academic. They're called a
5 refresher continuing education type of thing.
6 Q. How many, generally, of those courses
7 would you say you've attended since 1962?
8 A. I don't have any idea.
9 Q. Have you currently attended those in the
10 last five years?
11 A. I haven't attended any since I retired,
12 which was in 1995.
13 Q. Since 1995 have you done anything to stay
14 current with respect to developments in your
15 area of are expertise?
16 A. Yes.
17 Q. What have you done?
18 A. I attend professional planning
19 conferences. I attend other professional
20 conferences, like architects, engineers,
21 township official conferences, seminars
22 sponsored by the Department of Community
23 Economic Development, which is a state agency.
24 I read what are call trade journals.

**Page 18**

1 Q. What are those trade journals?
2 A. American Planning Association puts out
3 one called Zoning. I don't know the exact
4 title. It's a technical publication, research
5 type of thing. It gives a different
6 perspective.
7       Sometimes I read reviews on
8 court cases, or what have you, just to have an
9 overview of what's going on. There may be a
10 specific type of a case that I'm working on.
11 There are fliers coming in.
12       And I read publications of
13 county agencies, newsletters. I attend what I
14 would call discussion sessions with my peers.
15 I can't think of anything else.
16 Q. Do you receive any periodicals in your
17 area of expertise?
18 A. Yes. I receive the Pennsylvania Planning
19 Institute materials, some newsletters. I
20 receive a number of texts that I get through
21 the university as desk copies, publishers are
22 suggesting textbooks to review. Sometimes I've
23 been asked to review and comment on them. I'm
24 drawing a blank.

**Page 19**

1 Q. That fine. If you remember anything, you
2 can come back to it. With respect to the
3 texts, is there any one textbook which you
4 consider to be particularly authoritative in
5 your field that you refer to?
6 A. No.
7 Q. Are there any texts?
8 A. Sorry. I misunderstood your question. Is
9 there a particular one?
10 Q. Yes.
11 A. I use a series of them.
12 Q. Can you give me names, titles?
13 A. There are several. I'll try to give you
14 the titles. There's "Urban Planning" by, I
15 think, Galli, usually the current edition. I
16 use Levy, which is "The Practices of Land Use
17 Planning."
18       I use Jeurgenmyer, it's a horn
19 book. "Urban Planning Law And Language" I
20 think is the title. I use Rutherford Platt,
21 he has several books. I can't think of the
22 titles. I'm drawing a blank. I guess I could
23 stop. I'm drawing a blank.
24 Q. Of the ones that you listed for us, do

**Page 20**

1 you own any of those?
2 A. All of them.
3 Q. Have you ever been directly involved with
4 a municipality's adoption of and use of a land
5 use ordinance?
6 A. Yes, sir.
7 Q. What was the most recent?
8 A. Probably 1995.
9 Q. Where would that have been?
10 A. I was executive director of the Chester
11 County Planning Commission.
12 Q. What land use ordinance was involved?
13 A. I can't tell you the municipality because
14 there were so many. We reviewed probably ten
15 to twenty a year.
16 Q. When you say we reviewed, meaning?
17 A. The County Planning Commission. On
18 referral from municipalities we reviewed
19 zoning ordinances and amendments. In my role
20 as executive director I had hands-on since I
21 would have to sign those reviews. I've had, I
22 can't say heavy, but a fair amount of
23 involvement in the review.
24 Q. What would be your involvement in the

CORNEAL VS. JACKSON TWP., ET AL    CondenseIt™                    GEORGE W. FASIC 10-19-01

Page 21

1 review?
2 A. I would read the ordinance, go through
3 the ordinance. I would look at the report of
4 the section chief planner that had done the
5 basic review and we would have discussions
6 about it.
7      I would review the draft of the
8 letter prepared in response to the
9 municipality's request that was done by the
10 section chief. I might edit it or embellish
11 it. I'd sign it and have it processed by the
12 planning commission. Since I was the
13 executive secretary, I would sign it.
14 Q. Currently, is it required that if a
15 municipality, a township, is planning to pass
16 a zoning and land use ordinance, that it be
17 reviewed by the county planning commission?
18 A. I think the wording is that the
19 municipality must send it to the county
20 planning commission for review and comment.
21 Q. That wording is contained within the MPC?
22 A. I believe so.
23 Q. With respect to the matter that you're
24 here testifying about today, the Corneal

Page 22

1 matter in Jackson Township and hundred go down
2 county, can you tell me what you reviewed
3 prior to writing your report?
4 A. I reviewed the Complaint, some
5 publications by Huntingdon County Planning
6 Commission. I believe it was a total
7 comprehensive plan. I think this is part of
8 Section One or Book One. I can't remember the
9 exact township building code.
10     I believe it was that, but it
11 didn't have a cover, but it was signed by the
12 supervisor and dated. I reviewed some -- what
13 do you call it -- area-wide map just to get an
14 idea of where the property was. I believe
15 that's about all of it.
16 Q. Did you review any of the deposition
17 transcripts?
18 A. Not at that time.
19 Q. Have you since?
20 A. Yes.
21 Q. What deposition transcripts have you
22 since reviewed?
23 A. The building code officer, Mr. --
24 Q. Van Dommelen?

Page 23

1 A. Yes.
2 Q. Which one?
3 A. Both of them, and a portion of Supervisor
4 Wilson's. That's it.
5 Q. As I understand your testimony, you
6 reviewed those transcripts after writing your
7 report?
8 A. Yes.
9 Q. Did you review anything else relative to
10 this matter after you wrote your report.
11 A. Just the depositions.
12 Q. Why was it that you reviewed the
13 depositions after writing your report?
14 A. That's when they were given to me.
15 Q. Was there anything contained within those
16 deposition transcripts that either changed or
17 amended in your mind what you had written in
18 the report?
19 A. Basically, no.
20 Q. You said you read a portion of Supervisor
21 Wilson's deposition. Did you only read a
22 portion of that because that was what was
23 provided to you?
24 A. No.

Page 24

1 Q. Why did you only read a portion?
2 A. Time limitations.
3 Q. When were these deposition transcripts
4 provided?
5 A. Within the last several weeks.
6 Q. Do you anticipate reviewing any other
7 material in the matter?
8 A. Yes.
9 Q. What else do you anticipate reviewing?
10 A. The rest of the depositions.
11 Q. Have they been provided to you?
12 A. Not at this time.
13 Q. Do you feel that reviewing the deposition
14 transcripts were necessary for you to render
15 your opinion in this matter?
16 A. No.
17 Q. Why not?
18 A. Because I believe the information that
19 was given to me by the solicitor or attorney
20 for Mr. Corneal and the Complaint, as I
21 understood the situation, gave me enough to
22 work on to draw a conclusion.
23 Q. Would it be accurate to state that the
24 facts enumerated within your report were

Page 25

1 supplied to you by Mr. Corneal's attorneys?
2 A. And the Complaint.
3 Q. And the Complaint?
4 A. Yes.
5 Q. You referred to nothing else in
6 enumerating the facts in your report other
7 than discussions with Mr. Corneal's attorneys
8 and the Complaint?
9 A. And the material that I reviewed from the
10 county and the building code review, plus my
11 own research.
12 Q. Well, you didn't do any research with
13 respect to the facts in this matter, did you?
14 A. I did some research on moratoriums and I
15 did some research on Act 537.
16 Q. I guess what I'm talking about is what
17 happened as opposed to that?
18 A. No, I did not.
19       MR. CHIMA: By what happened, do
20 you mean the situation?
21 Q. With the Corneals' attempts to develop
22 their property?
23 A. Yes.
24 Q. Getting back to your functions in

Page 26

1 reviewing proposed zoning and land use
2 ordinances that we talked about before, have
3 any of those townships and communities imposed
4 moratoriums on pending applications during the
5 adoption of a land use ordinance?
6 A. No.
7 Q. Are you aware of any municipality having
8 a moratorium on new applications for zoning
9 and/or land use approval during the process of
10 adopting an ordinance?
11 A. For zoning, yes. I don't know what you
12 mean by land use. Are you talking about
13 subdivision?
14 Q. Subdivsion, yes, talking about zoning and
15 subdivision ordinances, right.
16 A. What I'm familiar with is the
17 municipalities that have used moratoriums
18 where there is a ordinance in process, a
19 zoning ordinance in process.
20 Q. Are you familiar with the pending
21 ordinance doctrine?
22 A. Yes.
23 Q. What's your general familiarity with
24 that?

Page 27

1 A. That a pending ordinance situation is a
2 procedure where the municipality has
3 advertised, and when advertised it gives some
4 status to it in terms of what I call due
5 process.
6       That gives that ordinance some
7 status in consideration of land development,
8 mutual property, applications by property
9 owners with the intent to develop and whether
10 that ordinance applies.
11 Q. Whether or not they have complied with
12 that ordinance?
13 A. Whether that ordinance has effect.
14 Q. Does your general familiarity with that
15 doctrine indicate that an applicant would have
16 to comply with that pending ordinance?
17 A. Depends.
18 Q. Upon what?
19 A. Who makes the decision.
20 Q. So the municipality could require
21 adherence to a pending ordinance under that
22 doctrine for new applications while the
23 ordinance is pending?
24 A. I believe that is correct.

Page 28

1 Q. Did you consider the pending ordinance
2 doctrine in rendering your opinion in this
3 matter?
4 A. Yes.
5 Q. Beginning on Page 1 of your report under
6 the section marked Municipal Authority, the
7 last complete sentence on the page that begins
8 with, "The SEO has the sole authority," do you
9 see that?
10 A. Yes.
11 Q. What is your authority for that statement
12 that the SEO has sole authority for permitting
13 a single lot on-site sewage system which does
14 not require additional approval by the
15 governing body?
16 A. It's my understanding that under Act 537
17 that a single dwelling on a single parcel
18 allows the enforcement officer to issue a
19 permit if it meets the requirements of the
20 regulations, et cetera. He can issue that
21 permit and he doesn't have to have total
22 authority to make an action.
23 Q. What if there's a second dwelling on a
24 single parcel?

Page 29

1  A. Then I believe that that becomes, and I
2  use the word development, and depending upon
3  the participants and the amount of sewage to
4  be generated by the two equivalent dwellings,
5  then a module has to be prepared and filed
6  with the municipality.
7       And I believe then that the
8  municipality signs, but that's not an action.
9  That's an administrative function. It doesn't
10 take a vote, though it's sent forward to the
11 DEP.
12 Q. For the DEP's approval?
13 A. I believe so. I believe that's correct.
14 Q. That sewage module in a situation where
15 there is more than one dwelling on a single
16 parcel, once approved, do you believe it
17 becomes an amendment to the municipality's Act
18 537 plan?
19 A. That's correct. I think that's the
20 intent. I don't know whether two houses on a
21 single lot constitutes an amendment to 537.
22 I'm not clear on that.
23 Q. Are you clear on whether or not a second
24 dwelling on a single parcel would require the

Page 30

1  module that you've been talking about?
2  A. Yes, I believe so, if it generated more
3  than two equivalent dwellings in terms of
4  sewage. I don't have the details. I'm not an
5  SEO.
6  Q. On Page 2, the last sentence -- it's not
7  a complete sentence it goes onto the next
8  pages. It starts with, "Requiring additional,"
9  do you see that?
10 A. Yes.
11 Q. You state in your report, "Requiring
12 additional approval by the governing body for
13 a single lot on-lot sewage system already
14 approved by the municipal SEO is not
15 appropriate."
16      What's your authority for that
17 statement.
18 A. The authority is that, again, my
19 understanding of 537 that the SEO is a trained
20 sanitarian. He has been delegated the
21 authority to issue permits for dwellings on a
22 single lot.
23      Any further requirement of the
24 property owner would be a duplication.

Page 31

1  Municipal officials trained in that are not
2  certified by the state. In my opinion, it is
3  not appropriate.
4  Q. That statement that you made about
5  duplication of effort and whether or not
6  there's other approvals required, assumes that
7  the on-lot sewage system in question would be
8  the only one for the parcel?
9  A. Yes, a single parcel.
10 Q. Single parcel, single system?
11 A. Yes.
12 Q. Go to Page 3 of your report. You say,
13 "Jackson Township did not have an adopted
14 zoning ordinance at the time that Mr. Corneal
15 submitted a subdivision for the development of
16 his land."
17      Are you aware of whether or not
18 Jackson Township had a proposed land
19 development -- proposed zoning ordinance at
20 the time that Mr. Corneal submitted his
21 subdivision for development of his land?
22 A. My understanding is the township did not
23 have zoning in effect, nor was it pending, nor
24 was it in the process.

Page 32

1  Q. If you were to find out that they, in
2  fact, had a pending ordinance, would that
3  change any of your opinions in this matter?
4  A. What kind of ordinance?
5  Q. Zoning, pending zoning ordinance?
6  A. It might have.
7  Q. You would have to look at that ordinance
8  to know whether or not it would change your
9  opinion?
10 A. And the timing and whether it was
11 properly advertised and so on, what the status
12 of that document was.
13 Q. As you sit here today, you don't know any
14 of those matters. Is that correct?
15 A. My understanding is there was no zoning
16 at the time.
17 Q. Are you aware of when Mr. Corneal first
18 advised the township of his plan for the
19 property that he had purchased in Jackson
20 Township?
21 A. I'm not sure I understand your question.
22 Q. I'll re-ask it. Do you know when it was
23 that Mr. Corneal first informed the township
24 that he had plans to develop his property in

Page 33

1  Jackson Township?
2  A. You mean at an official township
3  meeting?
4  Q. Anywhere.
5  A. I don't know the initial time, no.
6  Sometime in the year 2000.
7  Q. Do you know who he informed initially?
8  A. No -- the property supervisor.
9  Q. So is it accurate to say that the only
10  knowledge you have with respect to when Mr.
11  Corneal gave any information to the township
12  about his plans to develop his property was
13  when he submitted his application?
14  A. I believe there was some dialogue with
15  the supervisor, but I don't know if that was
16  in an official capacity. In terms of official
17  submission, I believe that came after the
18  first of the year.
19  Q. In reaching your conclusions in this
20  matter as set forth in Fasic-1, which is in
21  front of you, did you have any knowledge as to
22  the practice and customs in Huntingdon County
23  concerning zoning and subdivisions?
24  A. I had some general knowledge, not

Page 34

1  specific. I know a little bit about
2  Huntingdon County.
3  Q. Where did you get this knowledge about
4  Huntingdon County?
5  A. Probably from working through the
6  Pennsylvania Planning Association, working
7  with The Center for Rural Pennsylvania. I
8  recently finished a survey of all the
9  municipalities in Pennsylvania about the
10  effectiveness of their planning.
11  Q. Is that a published document?
12  A. Yes.
13  Q. What's the name of that document?
14  A. " Measuring The Effectiveness of Community
15  Planning And Land Use Regulations In
16  Pennsylvania."
17  Q. Is that number one on your list of recent
18  publications?
19  A. Yes. I work in Central Pennsylvania, and
20  through that work I get some feel for how
21  things operate in what I call Huntingdon
22  County, that general area. I know that they
23  are somewhat less formal than Southeast
24  Pennsylvania. I know that that county has a

Page 35

1  limited use. When I say that county, I mean
2  the geography has a limited use on land use
3  regulations.
4          It's basically in the area of
5  Huntingdon County. Maybe down toward
6  Huntingdon, the city, they may use it more,
7  But this a mountain area. I know a little bit
8  about how it operates.
9  Q. Are you aware that it was the practice of
10  Huntingdon County to review all applications
11  for subdivisions for all municipalities which
12  did not have their own zoning ordinances?
13  A. All zoning applications?
14  Q. I said all subdivision applications. Let
15  me ask that again. Are you aware that it was
16  the practice in Huntingdon County to review
17  all applications for subdivisions in
18  municipalities which did not have their own
19  subdivision ordinance?
20  A. I knew generally they did, but I didn't
21  agree with it.
22  Q. Do you know how long this practice had
23  been going on?
24  A. No.

Page 36

1  Q. Any knowledge with respect to how long it
2  had been going on?
3  A. No. I don't how long it has been going
4  on.
5  Q. Why don't you agree with it?
6  A. One, neither municipality had subdivision
7  regulations, neither the township or the
8  county, so I don't see where the authority
9  comes for the municipality or the county to
10  require the property owner to submit a plan
11  for review under subdivision regulations.
12  Q. Assuming that that was the generally
13  accepted practice within Huntingdon County,
14  was there anything wrong with the official in
15  Jackson Township advising Mr. Corneal that he
16  had to have his subdivision application
17  reviewed by the county?
18  A. I believe that if a municipality has
19  subdivision regulations, then they are
20  obligated to send subdivisions to the county.
21  To require Mr. Corneal to go there I think is
22  inappropriate. They don't have the
23  regulations in place. Secondly, they're
24  supposed to send it, not him. The code is very

Page 37

1 clear on that.
2 Q. My question is do you find fault with the
3 township for following the generally accepted
4 procedures in that area at that time?
5 A. When the procedure is not in accordance
6 with the planning code, yes.
7 Q. In doing a review of the facts in this
8 matter, did you find anything which indicated
9 that the township was requiring Mr. Corneal to
10 have his subdivision application reviewed by
11 the county for any other reason other than
12 that it was the accepted practice in the area
13 at that time?
14 A. Reword that. I don't understand your
15 question.
16 Q. In your review of this matter did you
17 find anything which indicated to you that the
18 township in advising Mr. Corneal that he had
19 to have his application for subdivision
20 reviewed by the county planning commission was
21 done pursuant to anything other than what the
22 local practice and custom was at the time in
23 Huntingdon County?
24 A. I think they needed to advise Mr. Corneal

Page 38

1 that that was the practice, but I think they
2 had an obligation to tell him that they did
3 not have the authority to require filing a
4 subdivision plan with the county.
5 Q. My question was a little different and
6 perhaps inartfully asked. Did you see
7 anything which indicated to you that in
8 telling Mr. Corneal he had to submit his plan
9 to the county planning commission that they
10 were doing anything other than following what
11 had been the practice and custom at that time?
12 A. That may have been the custom, but it was
13 not correct.
14 Q. My question is did you see anything to
15 indicate to you that there was some other
16 reason that they were requiring Mr. Corneal to
17 do this other than it was what they had always
18 done?
19 A. I don't know the reason they required
20 that.
21 Q. So you didn't see anything one way or the
22 other?
23 A. No.
24 Q. In the third paragraph of Page 3 it

Page 39

1 starts with "In the absence of an adopted
2 subdivision," do you see?
3 A. Yes.
4 Q. You indicate that the property owner
5 cannot be required nor should be made to file
6 a subdivision plan under those circumstances,
7 correct?
8 A. That's my understanding.
9 Q. What about Act 537? Is there anything
10 within 537 that would require submission of a
11 subdivision plan?
12 A. Yes. That's the definition.
13 Q. What's the definition?
14 A. That's the DEP's definition and MPC.
15 Q. So that Act 537 could require the
16 submission of a subdivision plan, right?
17 A. For multiple lots.
18 Q. Is it your understanding that Mr. Corneal
19 was proposing multiple lots?
20 A. I believe initially.
21 Q. The last sentence of that paragraph
22 states, "When Mr. Corneal applied for a
23 building permit for an art studio, the
24 township had the obligation to inform Mr.

Page 40

1 Corneal that a building permit and sewage
2 permit were required, and to advise him how to
3 proceed to make applications for these
4 permits."
5       Are you aware of whether or not
6 the township so advised Mr. Corneal?
7 A. My understanding was that they didn't.
8 Q. Where did you get that understanding?
9 A. From the Complaint.
10 Q. Did you see anything in the depositions
11 you reviewed that may change that?
12 A. No. I think it fortified that.
13 Q. Do you know of any authority which would
14 require the board of supervisors to inform Mr.
15 Corneal of the fact that they did not have a
16 zoning or land development ordinance?
17 A. You're mixing them up again, zoning and
18 land.
19 Q. Sorry, land development and subdivision
20 ordinance. I apologize. I'm not trying to
21 trick you. I understand the need to be
22 precise.
23 A. Ask the question again.
24 Q. Absolutely. What authority do you have

CORNEAL VS. JACKSON TWP., ET AL    CondenseIt™    GEORGE W. FASIC 10-19-0

Page 41

1   for the assertion that the board of
2   supervisors were responsible to inform Mr.
3   Corneal of the fact that they did not have a
4   subdivision or zoning ordinance.
5   A. First of all, they didn't have a zoning
6   ordinance. Secondly, they didn't have a
7   subdivision ordinance. Two separate
8   ordinances. I believe that it's a common
9   practice that when a property owner comes to
10  the community seeking to develop his property,
11  that the municipality advise him of what it
12  has and doesn't have so he can proceed through
13  their system.
14         When Mr. Corneal approached the
15  municipality about subdividing his property, I
16  believe that the municipality had an
17  obligation under its authority as a municipal
18  government to advise him what the process was,
19  and that they didn't have a subdivision
20  regulation and that he would need a building
21  permit and need a sewage module. There is an
22  implied responsibility of elected officials to
23  help. I think it comes under health, safety
24  and welfare.

Page 42

1   Q. Would your opinions change if you were
2   informed that Mr. Corneal was informed that
3   the township did not have a zoning ordinance
4   or subdivision ordinance in place but they
5   were working on one?
6   A. No.
7   Q. Well, would you agree with me that that
8   would discharge the obligations as you're
9   stating them?
10  A. No.
11  Q. Why not?
12  A. Because they were requiring a plan. They
13  didn't need to require one. They were working
14  on the ordinance, but that was two years down
15  the road. They didn't have one in place.
16  Q. Would it change your opinion if you knew
17  that they had given Mr. Corneal information as
18  to when they expected to adopt zoning and
19  subdivision ordinances?
20  A. Rephrase that. You're mixing them up
21  again.
22  Q. Would it change your opinion if you were
23  aware that Mr. Corneal had been informed by
24  township officials when they had expected to

Page 43

1   adopt a zoning ordinance and subdivision
2   ordinance?
3   A. No.
4   Q. Why not?
5   A. Because he was there at a point in time.
6   Those were things in the future. They didn't
7   apply to his situation.
8   Q. You talked about proper advertisement of
9   the proposed zoning ordinance and proposed
10  subdivision ordinance in your report. You
11  refer to the township's minutes. Have you
12  looked at the township's minutes?
13  A. One set.
14  Q. What township minutes did you look at?
15  A. January 4th. I believe it's an exhibit
16  in the Complaint.
17  Q. Did you ever review any documents dealing
18  with the actual advertisement of the zoning
19  ordinance and subdivision ordinance that was
20  proposed in Jackson Township?
21  A. No.
22  Q. Do you have an opinion whether or not the
23  proposed ordinances were advertised properly?
24  A. No.

Page 44

1   Q. No, you don't have an opinion?
2   A. That's correct.
3   Q. You state that you believe to attempt to
4   impose a moratorium where no ordinance is in
5   place is a breach of public trust, would you
6   explain that?
7   A. I believe when you elect somebody that
8   they are there to manage the municipality.
9   They have some obligations of public trust in
10  that they are protecting property, protecting
11  the property owner, protecting the value of
12  the property, and to adopt or to put into
13  place land use regulations.
14         Using police power without the
15  proper procedure for adopting that, I think
16  that's in direct conflict with public trust
17  and not going by the procedures that are
18  prescribed by the laws that that municipality
19  is operating under.
20  Q. You're talking about the public trust,
21  you're talking about their duty to protect
22  land values, the health, safety and welfare of
23  the citizens?
24  A. Yes.

CORNEAL VS. JACKSON TWP., ET AL    CondenseIt™                GEORGE W. FASIC 10-19-0

Page 45

1  Q. In other words, you're saying the
2  supervisors violated public trust?
3  A. By misusing or misinterpreting their
4  requirements, yes.
5  Q. Do you know why Jackson Township put the
6  moratorium in place?  Do you know the stated
7  reasons why?
8  A. I have an impression that they had some
9  concern that there was development taking
10 place in the township that needed to be
11 regulated, so they thought they could do that
12 through looking at the DEP regulations to do
13 that.
14 Q. Where did you get that impression?
15 A. I think I got that by reading the
16 depositions of the two code officers, and
17 maybe part of Mr. Wilson's.
18 Q. Would it be accurate to state that based
19 on your understanding of why they were doing
20 this moratorium, it was to protect or to
21 adhere to their obligations as you stated
22 them?
23 A. I don't know.
24         MR. CHIMA: Objection.  I don't

Page 46

1  think he said that.
2  Q. I'll re-ask that.  I can do that better.
3  Do you find fault with the township's
4  motivation in enacting the ordinance?
5  A. I don't know what their motivation was.
6  Q. Either way, you don't find fault?
7  A. I don't know what their motivation was.
8  Q. Moving on to Page 4 of your report, in
9  that first full paragraph you state, "A
10 building permit for a garage does not require
11 a sewage permit since the garage is not likely
12 to generate the need for sewage treatment and
13 disposal."
14        Do you believe that a
15 municipality has an obligation to ascertain
16 whether or not a proposed structure will
17 generate the need for sewage treatment and
18 disposal?
19 A. Yes.
20 Q. What if the township suspects that a
21 proposed dwelling will generate the need for
22 sewage disposal, would it be proper for them
23 then to require a sewage permit?
24 A. For a dwelling?

Page 47

1  Q. For a dwelling.
2  A. You're using the word dwelling instead of
3  garage?
4  Q. For a garage, if they suspect it will
5  generate the need for sewage treatment?
6  A. Repeat the question?
7  Q. Sure.  Do you believe it's proper for a
8  township to require a sewage permit for a
9  garage if they suspect that that garage will
10 generate the need for sewage treatment?
11 A. I think they need to require an
12 application.
13 Q. Application for what?
14 A. For the building permit, and the code
15 officer would then be reasonable in asking for
16 clarification of those kinds of things.
17 Q. You agree with me that it's the code
18 officer's obligation to find out whether or
19 not a proposed dwelling --
20 A. Structure.
21 Q. -- a proposed structure will generate the
22 need for sewage treatment?
23 A. Yes.
24 Q. At the beginning of your conclusions in

Page 48

1  your report, last full sentence, first
2  paragraph, you state, "That the township
3  exhibited malicious and discriminatory
4  intent."
5         What do you believe was done
6  maliciously by the township?
7  A. The denial of what I call applications or
8  the material to provide a due process for the
9  applicant to prepare information to give to
10 the municipality.  I believe that was
11 malicious.  I believe that they are under an
12 obligation under the building code to make it
13 available.  To deny that, I think that's a
14 malicious action.
15 Q. Anything else that you believe was
16 malicious and maliciously done by the township
17 in this case?
18 A. I believe the sequence of events seems to
19 have some type of overtones by requiring
20 additional things rather than giving the
21 applicant a complete list of what was
22 required.  I think that the overtones imply
23 that there was a unique approach to this
24 person.

**CORNEAL VS. JACKSON TWP., ET AL    CondenseIt™    GEORGE W. FASIC 10-19-01**

Page 49

1 Q. Do you have any knowledge as to how
2 others similarly situated were dealt with by
3 the township?
4 A. Just from reading the depositions of the
5 two code officers, this seemed to be a fairly
6 unique situation. It didn't seem to be
7 standard.
8 Q. By reading those depositions, was there
9 any indication given as to why those officers
10 believed this to be a unique situation?
11 A. Well, in one place I think the code
12 officer said that normally he would give the
13 permit. And at another place he says I am
14 told that I am not to give an application. At
15 places he testified he was told don't give him
16 anything. That sounds malicious.
17 Q. I guess my question is do you have any
18 knowledge as to how the township dealt with
19 others in similar situations?
20 A. Only from those depositions. It seemed to
21 me by the flavor of their comments that this
22 wasn't the way they usually did things. As a
23 matter of fact, one guy said this is the first
24 time I ever turned down a permit, I think.

Page 50

1 Q. Going to the very last sentence of your
2 report on Page 5, "I believe their actions and
3 failure to act have caused irreparable
4 damage."
5     What irreparable damage do you
6 think has been caused by the township's
7 actions?
8 A. I think there were lost opportunities of
9 this property owner to use his property
10 properly. There was a delay of time. They
11 denied him the full use of his property. The
12 invocation of police power without due process
13 of an adopting ordinance.
14     Use of police power where they
15 go beyond what I call their authority to
16 impinge on the property rights. They don't
17 have a comprehensive plan, yet they're using
18 police power. That's an impingement of
19 property rights. I think that's damage.
20 Q. You think that's irreparable damage?
21 A. Yes, absolutely.
22 Q. That's because he wasn't allowed to use
23 the property as he wanted to?
24 A. In a timely fashion.

Page 51

1 Q. For a certain period of time?
2 A. In a timely fashion.
3 Q. Do you know what the situation is with
4 the property currently?
5 A. No.
6 Q. Do you have any knowledge whatsoever?
7 A. General knowledge that some things moved
8 forward.
9 Q. Do you know whether or not Mr. Corneal
10 has built any structure?
11 A. I understand there is construction.
12 Q. Do you have any knowledge with respect to
13 whether or not there is any delay in the
14 construction of any structures on his
15 property?
16 A. Delay?
17 Q. Yes.
18 A. I believe there was a delay. He came in
19 early 2000. Job construction didn't take
20 place until 2001.
21 Q. Do you know when he had originally
22 planned to begin construction?
23 A. No, sir.
24 Q. You don't know whether he planned to

Page 52

1 begin it in 2000 or 2001 or later?
2 A. Obviously, he was trying to do something
3 with it in 2000 or he would not have come to
4 the township, so there was an intent to do
5 something.
6 Q. The loss of full use of his property,
7 that's the next clause you have in that
8 sentence. Do you believe this loss to be
9 permanent?
10 A. Not in total.
11 Q. Would you agree with me that what you're
12 talking about here is temporary loss of the
13 full use of his property?
14 A. Some of the loss is permanent. It's
15 gone.
16 Q. What loss do you believe is permanent and
17 gone?
18 A. Probably the development of multiple
19 lots.
20 Q. Why do you believe that to be gone?
21 A. Because he revised his plan several
22 times.
23 Q. Is there anything that township did that
24 required him to revise his plans?

Page 53

1  A. I think what the township did was they
2  didn't require, but they caused him to revise
3  his plans because he was trying make use of
4  it. Their actions and inactions caused him to
5  re-evaluate what he wanted to do so he could
6  make some use of the property.
7  Q. Do you know of anything which would
8  prevent Mr. Corneal from developing his
9  property today as he originally proposed?
10  A. Offhand, no.
11  Q. You refer in the next clause to
12  unnecessary costs. What unnecessary costs are
13  you referring to?
14  A. I believe he had to revise willingly --
15  I'm not sure if that's the word or not -- he
16  revised his drawings getting engineering
17  costs. It was delayed. His costs for loss of
18  opportunity. Certainly, legal costs, people
19  working for him at two levels. In my opinion,
20  this should have been resolved in the year
21  2000.
22  Q. Are you aware of whether or not Mr.
23  Corneal had the proper approvals to commence
24  construction of the structures which he is

Page 54

1  placing on this property?
2  A. Approvals from whom?
3  Q. Approvals from anybody -- well, are you
4  aware whether or not Mr. Corneal had proper
5  approval from the state, DEP at the time he
6  commenced construction of the structures on
7  his property?
8  A. Approval for what?
9  Q. His sewage module?
10  A. No.
11  Q. Do you know whether or not Mr. Corneal
12  had proper approval from the township when he
13  commenced construction of the structures on
14  his property?
15  A. Approval for what?
16  Q. Building.
17  A. Approval of a building permit?
18  Q. Yes.
19  A. I don't know.
20  Q. Do you know when Mr. Corneal commenced
21  construction of any structures on his
22  property?
23  A. No.
24  Q. Do you know whether Mr. Corneal has

Page 55

1  current plans to subdivide his property in
2  Jackson Township?
3  A. Current plans?
4  Q. Yes.
5  A. He had plans to subdivide when he
6  initially started.
7  Q. I'm asking as of right now do you know
8  whether or he has plans to subdivide the
9  property?
10  A. No, I don't.
11       MR. SHERR: I don't have anything
12  further. Thank you very much.
13       The two-page document that we've
14  been referring to during this deposition is
15  marked at Fasic-2 and will be attached to the
16  transcript.
17       MR. CHIMA: And I have satisfied
18  my agreement to provide you with those two
19  documents.
20       · (The Deposition is concluded at
21  11:30 a.m..)
22
23
24

Page 56

1            CERTIFICATE
2
3  State of Pennsylvania    )
4  County of Philadelphia   )
5
6       I, Barbara Donatelli, Federally
7  Approved Court Reporter, before whom the
8  deposition of said witness was taken, do
9  hereby certify that the witness, whose
10  testimony appears in the foregoing deposition,
11  was duly sworn, and that the transcribed
12  deposition of said witness is a true record of
13  the testimony given by the witness; that the
14  proceedings herein are recorded fully and
15  accurately; that I am neither attorney nor
16  counsel for, nor related to any of the parties
17  to the action in which this deposition was
18  taken; and, further, that I am not a relative
19  of any attorney or counsel employed by the
20  parties hereto, or financially interested in
21  this action.
22
23  _____
24       Barbara Donatelli

2 tick u/o

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL AND
SANDRA Y. CORNEAL                                :          CASE NO. 1:00-CV-1192

                                                 :
                    vs.                          :          J. Rambo
                                                 :
JACKSON TOWNSHIP, Huntingdon                     :
County, Pennsylvania,                            :          JURY TRIAL DEMANDED
W. THOMAS WILSON, Individually and               :
in his Official Capacity as Supervisor of        :
Jackson Township, MICHAEL YODER,                 :
Individually and in his Official Capacity as     :
Supervisor of Jackson Township,                  :
RALPH WEILER, Individually and in his            :                    FILED
Official Capacity as Supervisor of Jackson       :              HARRISBURG, PA
Township, BARRY PARKS, Individually              :
and in His Official Capacity as Sewage           :            FEB 2 1 2003
Enforcement Officer of Jackson Township,         :
DAVID VAN DOMMELEN, Individually                 :          MARY E. D'ANDREA, CLERK
and in his Official Capacity as Building         :          Per
Permit Officer, ANN I. WIRTH,                    :
Individually and in her Official Capacity as     :
Secretary of Jackson Township, and               :

## CERTIFICATE OF CONCURRENCE/NON-CONCURRENCE

The undersigned hereby certifies that on February 20, 2003, Lori Miller,

Esquire contacted the offices of Adam Sheinvold, Esquire, counsel for

Plaintiffs, in order to seek his concurrence in this Motion, but has not received a response.

MAYERS, MENNIES & SHERR, LLP

BY: _____
ANTHONY R. SHERR, ESQUIRE
Attorney for Defendants

3031 Walton Road, Building A
Suite 330, P.O. Box 1547
Blue Bell, PA 19422-0440
(610) 825-0300
Fax (610) 825-6555