ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL and      :
SANDRA Y. CORNEAL,      :
     :    No. 1: CV-00-1192
         Plaintiffs      :
     :
     :    **FILED**
   v.      :    JURY TRIAL DEMANDED HARRISBURG, PA
     :
     :    APR 1 8 2003
JACKSON TOWNSHIP, et al.,      :
     :    RAMBO, J.
         Defendants      :    MARY E. D'ANDREA, CLERK
     Per _____
     Deputy Clerk

### PLAINTIFFS' ANSWER TO DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule of Civil Procedure 56.1, Plaintiffs, David B. Corneal and Sandra Y. Corneal , through their attorneys, Eckert Seamans Cherin & Mellott, LLC, submit this Answer to Defendants' Statement of Material Facts in Support of Motion for Summary Judgment.

### INTRODUCTION

Despite submitting an extensive statement of facts with their first motion for summary judgment, defendants have submitted a second "Statement of Material Facts" in support of their motion for summary judgment on Plaintiffs' Substantive Due Process and State Law Claims. Notably, Defendants have not submitted a "Statement of <u>Undisputed</u> Material Facts," as required by local rule 56.1. To the

contrary, Defendants have submitted more of a "Wish List of Facts" that are unsupported by the record, or taken so far out of context as to be misleading.

Perhaps not surprisingly, then, Defendants' second statement of material facts differs substantially from their initial statement of material facts and, in some instances, contradicts certain facts that already have been judicially determined by this Court's Order and Opinion dated December 23, 2003, contradicts the Defendants' own deposition testimony, and contradicts admissions and/or stipulations that Defendants already have made in the course of this litigation. Moreover, Defendants rely upon eleventh-hour affidavits from Defendant Wirth and Defendant Wilson, as well as a document that never was produced in discovery or introduced at any deposition (Defendants' Appendix 14). Finally, Defendants' second statement of material facts contains vast amounts of irrelevant facts and conclusions of law, both of which are completely inappropriate for inclusion in a Local Rule 56.1 Concise Statement of Undisputed Material Facts. Subject to the foregoing, Plaintiffs provide the following answer to Defendants' Statement of Material Facts, as well as additional Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment.

1.    Admitted that Jackson Township is a second class township located in Huntingdon County, Pennsylvania, and that Jackson Township had approximately 816 residents.

2.     Denied.  Plaintiffs have no way of ascertaining the truth of this statement.  By way of further answer, the purported basis for this allegation is an undated, unsworn affidavit of Defendant Ann I. Wirth, Secretary of Jackson Township, that was submitted for the very first time with Defendants' Second Motion for Summary Judgment.  Moreover, the facts alleged in this paragraph are completely immaterial to the pending motion for summary judgment.

3.     Denied.  Plaintiffs have no way of ascertaining the truth of this statement.  By way of further answer, the purported basis for this allegation is an undated, unsworn affidavit of Defendant Ann I. Wirth, Secretary of Jackson Township, that was submitted for the very first time with Defendants' Second Motion for Summary Judgment.  Moreover, Defendant Wilson testified in his deposition that attorney Newton "in theory" is a "full-time solicitor but his services aren't used every month or something like that.  It's just on an as – as-needed basis." (Deposition of W. Thomas Wilson, May 18, 2001, at 41, submitted as Appendix 1).  Finally, the facts alleged in this paragraph are completely immaterial to the pending motion for summary judgment.

4.     Denied.  The purported basis for this allegation is an undated, unsworn affidavit of Defendant W. Thomas Wilson, Supervisor of Jackson Township, that was submitted for the very first time with Defendants' Second Motion for Summary Judgment.  By way of further answer, the allegation in

3

paragraph 4 is contrary to the testimony provided by Defendant Wilson at his

deposition.  Mr. Wilson testified that:

> At several of our meetings the drafts [of the proposed
> Subdivision Ordinance] were available for the citizens
> and they were reviewed and they had the opportunity to
> come to the township office to review them as we were
> progressing along because we have some citizens in the
> township that are very concerned with heritage and they
> wanted to make sure that everything was covered in there
> because of our quaint little villages and buildings that are
> around there.

(Wilson Dep. at 105).  Additionally, Defendant Van Dommelen testified that there

was no particular rush or acceleration of building in Jackson Township in the

1999-2000 time frame.  (Deposition of David Van Dommelen, June 6, 2001, at

168, submitted as Appendix 5).  Finally, the facts alleged in paragraph 4 are

completely immaterial to the pending motion for summary judgment.

5.      Denied.  The record citations provided by defendants do not support

the allegations of paragraph 5.  To the contrary, the cited testimony indicates only

that Defendant Wilson testified that the Township had been planning the

Subdivision Ordinance for nearly two years, and that Solicitor Newton testified

that he believed that the Township relied in part on Richard Stahl in drafting the

Subdivision Ordinance.  By way of further answer, the allegations of paragraph 5

are completely immaterial to the pending motion for summary judgment.

4

6.     Admitted that in approximately October 1998 the Corneals purchased a tract of land in Jackson Township, Huntingdon County, Pennsylvania, consisting of approximately 95 acres ("the Property"), that there was a farmhouse and barn located on the Property, and that a stream ran across the Property. (Deposition of David B. Corneal, February 22, 2001, at 21, 24 and 47-48, submitted as Appendix 7; Summ. J. Op., December 23, 2002, at 2). By way of further answer, the Property was part of the estate of Defendant Wilson's late grandfather. (Wilson Dep. at 55; Summ. J. Op. at 2).

7.     Admitted that David Corneal hired David Simpson to perform a survey of the Property and to prepare sewage modules so that the Corneals could subdivide the Property. (Corneal Dep. at 31-33; Summ. J. Op. at 2).

8.     Denied. David Corneal did not rely on Mr. Simpson with regard to the requirements to develop property in Jackson Township. To the contrary, Mr. Corneal testified that Defendant Wilson, whom Mr. Corneal had learned was a Township Supervisor, told Mr. Corneal "you can build whatever you want, there is no code, there is no building code, there is no subdivision." (Corneal Dep. at 56). Mr. Corneal testified:

> Q: Are you sure that [Defendant Wilson] told you that there were no subdivision requirements in the Township?
>
> A: Absolutely. Let me add to that. He said there was no subdivision requirements, but we had to have the SEO's approval on these locations, which then had to be

> submitted to the Township.  So it wasn't that you could –
> you, obviously, needed the on-site septic approval from
> the SEO that the Township then had to sign, that then got
> forwarded on to DEP and that is what he had told me
> needed to be done; so to that extent, the Township was
> involved.

(Corneal Dep. at 57).

With regard to Mr. Simpson, Mr. Corneal testified that, "I think Mr.

Simpson already knew what the Township required and didn't require, because, as

I said, he was doing the sewer modules and he is the one that recommended that I

needed to get the pits done and the SEO involved."  (Corneal Dep. at 57-58).

9.       Denied.  The testimony cited by Defendants does not support the

allegation of paragraph 9 that the Corneals contacted Defendant Parks pursuant to

Mr. Simpson's Advice.  To the contrary, Mr. Corneal testified that:

> [Mr. Simpson] said that the SEO officer would be the one
> that would meet me on the site or meet us on the site and
> dig test pits and would decide whether the soil was
> appropriate for on-site systems. ... I would say that he
> probably told me who [the sewage enforcement officer]
> was.  I don't remember, but I would suspect that that is
> where the information came from.

(Corneal Dep. at 33).  Mr. Corneal further testified that:

> It was my understanding from all these conversations that
> I had with Simpson *and with Wilson* that there was no
> problem in dividing off some pieces of ground as long as
> they perked or we were able to get a sewage SEO officer
> approval on the perk sites, that was the only requirement
> that we had to develop and divide up this land.

6

(Corneal Dep. at 58) (emphasis added).

By way of further answer, it is admitted that Mr. Corneal contacted Defendant Parks, the Jackson Township Sewage Enforcement Officer ("SEO") in approximately July 1999 to perform tests to identify those areas of the Property that were suitable for an on-lot septic system.  (Deposition of Barry Parks, May 16, 2001, at 44, submitted as Appendix 6).

10.   Admitted that Mr. Corneal engaged Defendant Wilson's private excavating business, Eagle Excavation, to dig percolation test pits and to do additional work on the Property.  (Wilson Dep. at 46).  Denied that Eagle Excavation is owned "in part" by Defendant Wilson.  No basis exists in the record to support that allegation.

11.   Denied that Defendant Wilson ever advised Mr. Corneal to subdivide the Property during 1999.  To the contrary, Mr. Corneal testified clearly and repeatedly that Defendant Wilson "did not tell me about a moratorium or any proposed moratoriums in Jackson Township," and that Defendant Wilson did not "tell [Mr. Corneal] that Jackson Township was working on a subdivision ordinance." (Corneal Dep. at 39).  Indeed, Mr. Corneal testified that Defendant Wilson "never indicated anything was wrong or anything was going to delay the project that we were pursuing."  (Corneal Dep. at 61).

12.     Admitted that Defendant Parks approved and signed the percolation tests that were conducted on the Property to locate appropriate sites for on-site septic.

13.     Admitted that Defendant Parks reviewed, approved and signed the proposed sewage modules that Mr. Simpson had prepared on behalf of the Corneals.

14.     Denied as stated.  At the monthly meeting of the Township Board of Supervisors on January 4, 2000, the Township purported to orally impose a moratorium on new subdivisions within Jackson Township (the "Moratorium"). The Minutes from the meeting reflect that "The Supervisor's [sic] stated that no more sub-divisions will be approved until after the proposed Sub-Division ordinance for the Township has been approved."  (Minutes of the Meeting of the Board of Supervisors of Jackson Township, Jan. 4, 2000, submitted as Appendix 11).  The Township purported to enact the Moratorium by unanimous vote of the three Supervisors.  (Deposition of Ann Wirth, May 17, 2001, at 218, submitted as Appendix 4; Summ. J. Op. at 3).  The Supervisors attempted to enact the Moratorium without any resolution or other formal action – it only appears in the minutes.  (Wirth Dep. at 83; Summ. J. Op. at 3 and n.3).[1]  No documents, other

---

[1] Defendants, in the first summary judgment proceedings, attempted to deny that the moratorium was enacted without formal action, but offered no support for their denial.  (Defs.' Resp. to Pls.' Cons. Stmt. Mat. Facts, July 12, 2002, at ¶ 45,).  The Court, therefore, determined that the dispute was not genuine, particularly in light of Defendant Wirth's testimony and Defendants' admission that no document other than the Minutes exist relating to the

than the minutes, exist relating to the Moratorium. (Wirth Dep. at 83; Summ. J.
Op. at 3 and n.3). The Township did not hold a public hearing on the Moratorium
(Wirth Dep. at 156), did not publish the proposed Moratorium in advance of the
meeting, and did not record the Moratorium in the ordinance book. (Summ. J. Op.
at 20).

15.    Admitted that Mr. Simpson completed the Initial Subdivision Plan for
the Property on or about February 4, 2000.

16.    Admitted that Mr. Corneal presented his Initial Subdivision Plan to
the Township on February 7, 2000, at the regular monthly meeting of the
Township Board of Supervisors.

17.    Denied as stated. When Mr. Corneal presented his Initial Subdivision
Plan to the Township on February 7, 2000, at the regular monthly meeting of the
Township Board of Supervisors, the Supervisors refused to accept the Plan, and
told Mr. Corneal that no subdivisions were being reviewed because of the
Moratorium. (Wilson Dep. at 94, Wirth Dep. at 83, Minutes of the Meeting of the
Board of Supervisors of Jackson Township, Feb. 7, 2000, submitted as Appendix
10).

---

Moratorium. Nevertheless, Defendants have continued to deny or refuse to stipulate to this fact, including refusing a
stipulation proposed in the course of preparing the Pre-Trial Memorandum pursuant to Local Rule of Civil
Procedure 16.3(b). (Letter dated March 18, 2003, to Bridget E. Montgomery from Anthony R. Sherr, refusing to
stipulate to Plaintiffs' proposed stipulation number 45; and Draft Statement of Undisputed Facts As Agreed To By
Counsel) (The Letter and Draft Statement are referred to hereafter as "Stipulation" and are submitted herewith as
Appendix 34).

18.    Denied as stated.    When the Supervisors refused to accept or review the Corneals' Initial Subdivision Plan on February 7, 2000, either one of the Supervisors or Defendant Wirth told Mr. Corneal that he had to submit his Initial Subdivision Plan to the Huntingdon County Planning Commission ("HCPC") for approval before the Township would approve the Plan, and that he should do that while the Moratorium purportedly was in place. (Corneal Dep. at 86-87). Similarly, Defendant Wilson testified that:

> He laid a subdivision plan on the desk on the table at our meeting – oh boy, February?  And he was informed that there was no subdivisions being reviewed at this time because of the moratorium and he suggested that – *someone suggested to him, one of the supervisors or – that if he – it had to go to the – Huntingdon County Planning to be reviewed anyhow* and if he wanted to have a step up while we're working on the ordinance to take it in.

(Wilson Dep. at 94-95) (emphasis added).  In reliance on the statements of the Defendants at the February Meeting, Mr. Corneal submitted the Initial Subdivision Plan to HCPC for review.  (Corneal Dep. at 87-88, 91-93).

19.    Denied as stated.  The testimony referenced by Defendants does not support the alleged fact.  Defendant Wirth testified that, to the best of her knowledge, every subdivision plan in Jackson Township has been sent to the HCPC for review since Defendant Wirth has been Secretary of the Township. (Wirth Dep. at 118-119).  At the time that the Corneals prepared the Initial

Subdivision Plan, Huntingdon County did not have a subdivision ordinance; rather, the County merely had a "Land Development Guide" that was not an ordinance under the Municipalities Planning Code. (Summ. J. Op. at 3 n.2).

20.    Denied.  The document submitted as Defendants' Appendix 12 does not relate in any way to the Corneals' Initial Subdivision Plan.  Moreover, the letter dated February 24, 2000, to Defendant Wirth from the HCPC is a written document that speaks for itself, and the incomplete interpretation or characterization thereof by Defendants is denied.  It is admitted that the Letter dated February 24, 2000, states that "Huntingdon County Planning Commission recommends disapproval of this proposal due to both the moratorium and the above comments [relating to the Initial Subdivision Plan's conformity with the draft Jackson Township Subdivision and Land Development Ordinance]."

21.    It is admitted only that the Corneals submitted a Revised Subdivision Plan to the HCPC.  The remaining allegations of paragraph 21 are denied.  The Revised Subdivision Plan proposed to subdivide the Property into two lots. (Corneal Dep. at 102-104, 113; Revised Subdivision Plan, dated April 7, 2000; submitted as Appendix 21; Letter from Huntingdon County Planning Commission to Defendant Wirth, dated April 20, 2000, submitted as Appendix 14).

22.    Admitted that, on April 3, 2000, at the monthly meeting of the Township Board of Supervisors, Mr. Corneal requested the Supervisors to sign

11

sewage modules because he needed the approval of the sewage modules so that he could obtain building permits to begin construction of his house. (Corneal Dep. at 106).

23.   Denied.  The Supervisors refused to sign the Corneals' sewage modules at the April 3, 2000, meeting because of the Moratorium. (Corneal Dep. at 106).  In response to the Supervisors' refusal to sign the sewage modules because of the Moratorium, Mr. Corneal informed the Supervisors that he would not subdivide, that he only wanted to build his house. (Wilson Dep. at 125-27; Corneal Dep. at 106-08). The Supervisors then stated that because there already was a house on the Property, if he were to build a second house on the Property, that would constitute a subdivision, and therefore be subject to the Moratorium. (Corneal Dep. at 108-09; Wirth Dep. at 107-08). The Minutes state,

> He also stated that he was no longer sub-dividing and would like to build a studio and would like a permit for a privy and a building permit the Supervisors told him that the were not issuing any building permits for a property they know is going to be subdivided.

(Minutes of the Meeting of the Board of Supervisors of Jackson Township, April 3, 2000, submitted as Appendix 22).  Moreover, Defendant Wilson testified:

> Q:  So you wouldn't sign the sewage module because you thought he might want to subdivide later, correct?
>
> A:  My – and this is my opinion at that meeting, not to sign those five modules because Mr. Corneal could do

12

> whatever he wanted on that property without any okay
> from the township, any plan.
>
> …
>
> Q: So the last thing he came and said is I'd like – I just
> want to build my house. Can you please sign these
> sewage modules and I'll get my septic system in for my
> house, one house, right?
>
> A: Well, that's what he said.
>
> Q: But you wouldn't sign them because you thought,
> well, he really wants a subdivision so I'm not going to
> open this door for him; isn't that correct?
>
> A: We were not signing five sewer modules for one
> house.

(Wilson Dep. at 125-27).

    24.    Admitted that, after the Supervisors refused to sign the Corneals'

sewage modules at the April 3, 2000, meeting, Mr. Corneal requested the

Township to issue him a privy permit so that he could begin construction of the

proposed art studio and garage on the Property. (Corneal Dep. at 115; Minutes

April 3, 2000; Summ. J. Op. at 5). By way of further answer, the Defendants

advised Mr. Corneal that he would have to contact Defendant Parks, the SEO,

about getting a privy permit, and Mr. Corneal did, in fact, telephone Defendant

Parks on April 3, 2000, after the meeting concluded. (Corneal Dep. at 116; Summ.

J. Op. at 5).

25.    Denied.  Defendant Parks did not advise Mr. Corneal that DEP regulations precluded the use of a privy on the Property.  To the contrary, when Mr. Corneal telephoned Defendant Parks, Defendant Parks told Mr. Corneal that the Township already had telephoned him and instructed him that Mr. Corneal was not allowed to have a privy permit, and that Defendant Parks was not allowed to help Mr. Corneal obtain a privy permit.  (Corneal Dep. at 116; Summ. J. Op. at 5). Indeed, Defendant Wirth testified that she telephoned Defendant Parks at his home after the April 3, 2000, meeting at the instruction of the Defendant Supervisors to instruct Defendant Parks that Mr. Corneal could not have a privy permit.  (Wirth Dep. at 203-04; Summ. J. Op. at 5).

26.    Denied.  Mr. Simpson testified that he prepared the Revised Subdivision Plan at some point after the February meeting of the Jackson Township Board of Supervisors, and that the next consecutive plan concerning the Property is dated April 7, 2000.  (Deposition of David Simpson, July 10, 2001 at 20, submitted as Appendix 8; Revised Subdivision Plan).  By way of further answer, Appendix 14 to Defendants' Statement of Material Facts never has been identified or authenticated by any witness, and never was produced to Plaintiffs in discovery.  In any event, the document submitted by Defendants as Appendix 14 provides absolutely no support for the proffered fact.

14

27.     Denied.  The Revised Subdivision Plan included two proposed lots; one lot consisting of 25.80 acres on which a house and barn were located, and the residue, consisting of 68.87 acres, on which the Corneals proposed to construct a house, art studio and garage.  (Revised Subdivision Plan; HCPC Letter April 20, 2000; Summ. J. Op. at 4).  By way of further answer, Appendix 14 to Defendants' Statement of Material Facts never has been identified or authenticated by any witness, and never was produced to Plaintiffs in discovery.  In any event, the document submitted by Defendants as Appendix 14 provides absolutely no support for the proffered fact.

28.     Admitted that the Corneals submitted the Revised Subdivision Plan to the HCPC.

29.     Admitted in part and denied in part.  Admitted that the HCPC issued a letter dated April 20, 2000, to Defendant Wirth, which states, in part, "The Huntingdon County Planning Commission recommends conditional approval of this proposal pending adoption of the Subdivision and Land Development Ordinance."  By way of further answer, the allegation of paragraph 29 relates only to a written document that speaks for itself, and the incomplete interpretation and characterization thereof by Defendants is denied.  (HCPC Letter April 20, 2000).

30.     Admitted that the Corneals never presented the Revised Subdivision Plan to the Township.  By way of further answer, Mr. Corneal testified that the

reason they never submitted the Revised Subdivision Plan to the Township was because,

> they already had blocked me. As far as I was concerned at best I had started a process that was going to help me eventually get a subdivision, which I should have been entitled to anyhow. So what would I do with it? There was nothing to do with it, except, you know, if I re-submitted it to the Township I would get the same response, we have a moratorium in place, we are not going to approve it.

(Corneal Dep. at 114). Moreover, the Corneals ultimately subdivided the Property on or about July 7, 2000, three days before the Township enacted its Subdivision and Land Development Ordinance. (Corneal Dep. at 129-31). Consequently, no requirement ever existed that the Corneals submit the Revised Subdivision Plan to the Township.

31.    Admitted that, on or about April 27, 2000, Mr. Corneal drove to Defendant Van Dommelen's home to request a building permit to begin construction of the garage on the Property. (Corneal Dep. at 119).

32.    Denied. When Mr. Corneal requested a building permit from Defendant Van Dommelen, Mr. Corneal deliberately asked for a permit only for the garage because the garage did not require any sewer system. (Corneal Dep. at 119).

33.    Admitted that when Mr. Corneal requested a building permit from Defendant Van Dommelen to begin construction of his garage, Mr. Corneal had

with him drawings depicting the proposed garage. (Corneal Dep. at 119). It is denied that Mr. Corneal ever proposed to construct a studio in the second story of the proposed garage.

34.    Denied.  Defendants offer no citation to any testimony or document to support the allegation of paragraph 34.  By way of further answer, Defendant Van Dommelen testified that, when Mr. Corneal requested a building permit on April 27, 2000, Defendant Van Dommelen told Mr. Corneal that he could not issue a building permit because, a couple weeks earlier, the Township Board of Supervisors had instructed him not to give Mr. Corneal a building permit.  (Van Dommelen Dep. at 47).  Defendant Van Dommelen testified that Defendant Wirth had instructed him that the Township Board of Supervisors was not interested in letting the Corneals have a building permit.  (Van Dommelen Dep. at 48-49; Summ. J. Op. at 6).  Moreover, while Mr. Corneal was at Defendant Van Dommelen's house on April 27, 2000, Defendant Van Dommelen telephoned Defendant Wilson, who told Van Dommelen "don't you dare issue him a permit." (Van Dommelen Dep. at 47; Wilson Dep. at 128; Summ. J. Op. at 6).  After Defendant Van Dommelen telephoned Defendant Wilson, Defendant Van Dommelen refused to give Mr. Corneal even an application for a building permit, because Mr. Corneal was that "trouble making yuppie from over the mountain,"

17

and because Defendant Van Dommelen "just didn't want him to have one." (Van
Dommelen Dep. at 56, 71; Summ. J. Op. at 6; Stipulation ¶ 135).

35. Denied. Defendants have not cited to any testimony or document to
support this allegation. By way of further answer, in the spring of 2000, the
Corneals began resurfacing the existing roadway on the Property so that the
Corneals could use the roadway as a driveway. (Corneal Dep. at 111-12). The
Corneals began construction of the garage, art studio and house on the Property in
July 2000, after waiting 90 days from the date that Defendant Van Dommelen
refused to give Mr. Corneal the building permit applications. (Corneal Dep. at
121-22).

36. Admitted that on June 30, 2000, Plaintiffs filed the instant civil rights
action against the Defendants. By way of further answer, as a result of the filing
and litigation of the civil rights litigation, and over the course of more than two
years, the Defendants have issued all required permits necessary to begin
development of the Property.

37. Admitted. By way of further answer, although the Township passed
the Subdivision and Land Development Ordinance on July 10, 2000, the Township
back-dated the Ordinance to July 7, 2000. (Jackson Township Ordinance 2000-1
("Subdivision and Land Development Ordinance"), July 7, 2000, submitted as
Appendix 23; Minutes of the Meeting of the Board of Supervisors of Jackson

18

Township, July 10, 2000, submitted as Appendix 24). The Township did not,

however, back-date the Driveway Ordinance or the Holding Tank Ordinance.

(Jackson Township Ordinance 2000-2 ("Driveway Ordinance"), July 10, 2000,

submitted as Appendix 25; Jackson Township Ordinance 2000-3 ("Holding Tank

Ordinance" ), July 10, 2000, submitted as Appendix 26).

    38.    Denied. Defendants have cited to no record or documentary evidence

to support this allegation. By way of further answer, the Moratorium cannot

"expire" inasmuch as it never was properly enacted (Summ. J. Op. at 20), nor

could it ever have been enacted properly inasmuch as Jackson Township never had

a subdivision and land development ordinance prior to July 10, 2000. (Wirth Dep.

at 162). Moreover, the Corneals properly subdivided the Property *prior* to the

enactment of the Subdivision and Land Development Ordinance, consequently

there never was any requirement to seek or obtain subdivision approval. (Corneal

Dep. at 129-131).

    39.    Admitted only that the Corneals received a letter dated July 28, 2000,

from Solicitor Newton. The letter is a written document that speaks for itself, and

any characterization thereof by Defendants is denied.

    40.    Denied as stated. It is admitted that Mr. Corneal requested building

permit applications and fee information from Solicitor Newton in August 2000.

Plaintiffs expressly deny the implication that Mr. Corneal did not request building

permit applications or fee information prior to August 2000.  To the contrary, on or about April 27, 2000, Mr. Corneal requested from Defendant Van Dommelen, the building permit officer of Jackson Township, the appropriate applications to obtain building permits prior to commencing construction on the Property.  (See Plaintiffs' Answers to ¶ 31-35, supra).

Moreover, after Defendant Van Dommelen refused to provide even the application forms for a building permit, Mr. Corneal attempted to contact Solicitor Newton by telephone on May 1, 2000, to obtain building permit applications, and then submitted a letter dated May 5, 2000, requesting building permit applications.  (Deposition of Larry Newton, May 17, 2001, at 82; submitted as Appendix 12; Letter from David B. Corneal to Jackson Township Solicitor Larry Newton dated May 5, 2000, submitted as Appendix 27).  Solicitor Newton, however, never called Mr. Corneal or sent application forms to him.  (Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated August 3, 2000, submitted as Appendix 28).

Nearly three months later, Solicitor Newton delivered the letter dated July 28, 2000, to the Corneals.  (See Plaintiffs' Answer to ¶ 40, supra ).  After receiving the July 28, 2000, letter, Mr. Corneal again wrote to Solicitor Newton by letter dated August 3, 2000, in which he stated

> As you know I have been forced to file the Federal
> lawsuit to remedy the wrongful actions of the Township.

> If by your letter you are indirectly telling me that the
> township will now give me the applications for building
> permits and will sign my sewer module for my house
> (which already has been signed and approved by their
> SEO) I would ask that you immediately send me the
> applications.

(Letter dated August 3, 2000). Solicitor Newton did not respond to Mr. Corneal's

letter dated August 3, 2000, causing Mr. Corneal to deliver a second letter, dated

August 18, 2000, requesting again that Solicitor Newton send him the application

forms and the permit fees. (Letter from David B. Corneal to Jackson Township

Solicitor Larry Newton, dated August 18, 2000, submitted as Appendix 29;

Newton Dep. at 106). Finally, by letter dated August 29, 2000, Solicitor Newton

responded to Mr. Corneal, and forwarded a building permit application and fee

schedule to Mr. Corneal. (Letter from Jackson Township Solicitor Larry Newton

to David B. Corneal, dated August 29, 2000, submitted as Appendix 30).

41.     Admitted that Solicitor Newton forwarded a Jackson Township

building permit application and permit fee information to Mr. Corneal. By way of

further answer, Plaintiffs incorporate their answer to paragraph 40 as though the

same were more fully set forth herein.

42.     Denied as stated. The letter dated August 29, 2000, is a written

document that speaks for itself, and any characterization thereof by Defendants is

denied. It is admitted that the letter states: "The Board of Supervisors request that

you cease any and all construction until a building permit is obtained."

21

43.    Admitted that, on August 31, 2000, Mr. Corneal sent a letter to Defendant Wirth, in her capacity as Secretary of Jackson Township, enclosing three completed building permit applications as well as a check for the appropriate fee for each application.  Mr. Corneal also submitted the sewage modules for the approved on-site septic locations that previously had been approved by Defendant Parks.  Mr. Corneal also submitted a United States Geological Survey map depicting the location of the Property and the proposed construction. (Defendants' Appendix 21, Wirth Dep. at 145:15-22; Stipulation ¶ 151).

44.    Admitted that on September 1, 2000, Mr. Corneal forwarded to the attention of Defendant Wirth in her capacity as Secretary of Jackson Township rough drawings of the art studio and house for which the Corneals had submitted building permit applications on August 31, 2000.  By way of further answer, the Jackson Township Building Permit Ordinance does not require submission of drawings or plans of the proposed construction.  (Jackson Township Building Permit Ordinance, § 3.02A, submitted as Appendix 15).

45.    Denied.  The letter dated October 10, 2000, to the Corneals from Defendant Van Dommelen, upon which Defendants rely for the allegation of paragraph 45 is a sham.  The letter from Defendant Van Dommelen states, "Jackson Township has referred to me for review your applications for building permits."  (Letter from Defendant Van Dommelen to David Corneal dated October

10, 2000, submitted as Appendix 16). The testimony elicited in depositions of the Defendants and witnesses, however, makes clear that Defendant Van Dommelen never reviewed the applications and that the Township never forwarded the applications to Defendant Van Dommelen. Defendant Van Dommelen himself testified that he never reviewed any building permit application submitted by Mr. Corneal. (Van Dommelen Dep. at 76, 78, 80). Moreover, Defendant Van Dommelen testified that he wrote the letter at the instruction of the Township Board of Supervisors, (Van Dommelen Dep. at 186, Stipulation ¶ 153), and that Solicitor Newton actually told Defendant Van Dommelen what to say in the letter. (Van Dommelen Dep. at 81).

Defendant Van Dommelen further testified that he was "maybe a little" concerned that he sent the letter without ever having seen the building permit applications because his "job was being usurped" by the Supervisors. (Van Dommelen Dep. at 176). Defendant Van Dommelen, however, did not object to the Supervisors "usurp[ing]" his job because he "wanted not to shake the boat," and he understood that it was what the Supervisors and Solicitor Newton wanted him to do. (Van Dommelen Dep. at 177; Stipulation ¶ 158).

Solicitor Newton also testified regarding the October 10, 2000, letter. Solicitor Newton testified that "I was requested by the township to draft a response to the building permit applications and I did do that. I think Mr. Van Dommelen

23

had written a draft and then I basically redid the draft." (Newton Dep. at 110).

When asked which parts of the October 10, 2000, letter he drafted, Solicitor

Newton responded, "I would say basically it's my letter." (Newton Dep. at 113).

The record also is clear that Solicitor Newton never saw or reviewed the building

permit applications. Solicitor Newton testified that he "[doesn't] think" he ever

saw the building permit applications that Mr. Corneal submitted; to the contrary,

he testified,

> I think my information came from Ann [Wirth]. I don't
> recall seeing the applications. … My recollection is that I
> drafted the response based on information provided to me
> [by Ann Wirth].

(Newton Dep. at 110-11).

46. Admitted that on or about October 19, 2000, three and one-half

months after the Corneals filed the instant civil rights action, the Township filed a

Complaint in the Court of Common Pleas of Huntingdon County, captioned

Jackson Township, Huntingdon County, Pennsylvania v. David B. Corneal and

Sandra Y. Corneal, and docketed at Civil Division – Equity No. 2000-1290. By

way of further answer, the Complaint is a written document that speaks for itself,

and any characterization thereof by Defendants is denied.

47. Admitted.

48. Denied. The citations provided by Defendants do not support the

allegation of paragraph 48. By way of further answer, after the Township filed the

24

Huntingdon County Action, the Honorable Judge Kurtz entered an Order setting a

hearing on the Township's motion for preliminary injunction for November 14,

2000. (Deposition of Terry Williams, Esquire, July 10, 2001 at 12, submitted as

Appendix 20; Order dated October 19, 2000, Huntingdon County Court of

Common Pleas, Docket number 2000-1290, submitted as Appendix 33). On

November 14, 2000, when Attorney Williams appeared at the Huntingdon County

Courthouse on behalf of the Corneals, he encountered Solicitor Newton. (Williams

Dep. at 13-14). Attorney Williams testified that, after conversing briefly with

Solicitor Newton,

> Larry [Newton] ushered me into the law library, I was
> surprised when I got in the law library that all of the
> board of supervisors were there, the secretary, Ms. Wirth,
> SEO Parks, the building permit officer, whose name I
> don't recall. ... I hadn't anticipated that they were going
> to have that type of full-blown meeting. I thought the
> purpose was to confer with Larry Newton and with the
> judge.

(Williams Dep. at 15).

49.     Denied. This misleading allegation is not supported by any testimony

or documentary evidence of record. The document cited by Defendants does not

support the allegation contained in paragraph 49. Contrary to the allegation and

implication in paragraph 49, the Corneals already were in compliance with all

applicable ordinances, and had been in compliance at all times material hereto.

Indeed, Attorney Williams testified that, as of November 2000, "They had

everything, they did not have a driveway permit application, but they had everything else and they had it for months." (Williams Dep. at 55). Attorney Williams noted that no driveway permit application was required because the Township did not have a Driveway Ordinance at the time the driveway throat was constructed. (Williams Dep. at 31). Attorney Williams also testified that

> What we did through my efforts is not something that is required by law. The township had every piece of information that it needed to issue the appropriate permits, but hadn't done so.

(Williams Dep. at 61).

50. Denied. The document cited by Defendants does not support the allegation contained in paragraph 50. Contrary to the allegation in paragraph 50, Attorney Williams testified that,

> The township at the first meeting contended that he needed a driveway permit. I politely, I wouldn't say argued, but politely pointed out that they didn't have the driveway permit ordinance enacted when the driveway throat was constructed, but we would file an application for a permit.

(Williams Dep. at 31). Attorney Williams further testified that, at a subsequent meeting between Attorney Williams and the road master (Defendant Wilson),

> He [Defendant Wilson] indicated he wanted a reconstruction of the driveway throat, obviously he wanted an application, he wanted a reconstruction of the driveway throat and that ultimately, he wanted stabilization of where the driveway intersects the highway. … So we talked about methods of

26

> reconfiguration construction, we agreed that we would
> pick an appointed day when the weather permitted
> because it was very cold then to come back and redo the
> driveway throat.

(Williams Dep. at 32).  With regard to the application for a driveway permit,

Attorney Williams,

> pointed out again to him [Defendant Wilson] that he
> didn't have a driveway ordinance that was in effect at the
> time of this construction, but if that would help get the
> building permit issue resolved, I would have David apply
> for a permit.

(Williams Dep. at 33).

    51.    Admitted that, on February 5, 2001, Attorney Williams submitted a

Driveway Application and a Land Development Plan Application, along with

application fees, to Defendant Wirth in her capacity as Secretary of the Township.

By way of further answer, Plaintiffs incorporate by reference their answer to

paragraph 50, supra.  It is expressly denied that the Corneals were under any

obligation to submit any applications for, or obtain a Driveway Permit or Land

Development Permit.  Attorney Williams testified that:

> What we did through my efforts is not something that is
> required by law.  The township had every piece of
> information that it needed to issue appropriate permits,
> but hadn't done so. ... As I pointed out earlier, they
> didn't have a driveway ordinance when it was built, but
> we agreed to submit for a driveway permit, they had
> acceptable soil modules that they hadn't transmitted that
> should have been submitted, and the building permit
> could have been issued legally based on that information.

> They chose not to do that and they chose to take the
> avenue of enforcement action.

(Williams Dep. at 61).

52.     Admitted that Plaintiffs submitted an original mylar site plan and

building footprint to the Township on or about March 23, 2001.  Plaintiffs deny

any suggestion or implication that they were under any legal obligation to submit

any such site plans or drawings.  By way of further answer, Plaintiffs incorporate

by reference their answer to paragraph 51, supra.

53.     Admitted that Attorney Williams submitted two sewage planning

modules relating to the Corneals' Property on or about April 2, 2001.  Plaintiffs

deny any suggestion or implication that they were under any legal obligation to

submit any such sewage planning modules.  By way of further answer, Plaintiffs

incorporate by reference their answer to paragraph 51, supra.

54.     Admitted that Attorney Williams submitted building permit

applications on behalf of the Corneals on or about April 2, 2001.  Plaintiffs deny

any suggestion or implication that they were under any legal obligation to submit

any such applications.  By way of further answer, Plaintiffs incorporate by

reference their answer to paragraph 51, supra.

55.     Admitted.

56.     Admitted that the Township has issued all necessary permits for

completion of the Corneals' efforts to build their home, art studio and garage on

the Property. By way of further answer, Plaintiffs incorporate by reference their answer to paragraph 51, supra. Moreover, it is believed and therefore averred that the Township agreed to issue all necessary permits as a direct consequence of the filing of the instant civil rights litigation.

## ADDITIONAL UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

57.     The Corneals desired to subdivide the Property, and to sell a portion of the Property. (Corneal Dep. at 28).

58.     In August or September 1999, the Corneals began to seek a buyer for the portion of the Property that consisted of approximately 26 acres, and which included the farmhouse and barn (the "26 Acre Parcel"). (Corneal Dep. at 46).

59.     Defendant Wilson's nephew desired to purchase the portion of the Property that included the farmhouse and barn originally owned by Defendant Wilson's grandfather. (Wilson Dep. at 58-59).

60.     Defendant Wilson knew that John Hewett and JoAnn Smith were interested in purchasing the 26 Acre Parcel. (Wilson dep. at 70, 73).

61.     Mr. Hewett telephoned Mr. Corneal and expressed an interest in purchasing the 26 Acre Parcel. (Corneal Dep. at 51-52).

62.     On October 7, 1999, the Corneals entered into a contract to sell the 26 Acre Parcel to Mr. Hewett and Ms. Smith (hereinafter referred to as the

"Hewetts"), for $150,000, pursuant to which the Hewetts placed a down payment of $4,000 and agreed to pay $500 per month against the purchase price until settlement, which was scheduled for June 30, 2000. (Contract dated Oct. 7, 1999, submitted as Appendix 9; Summ. J. Op. at 3).

63. The Defendants attempted to enact the Moratorium at the January 2000 meeting of the Township Board of Supervisors.

64. Defendant Wirth does not recall the Moratorium being discussed at any previous meeting of the Township Board of Supervisors. (Wirth Dep. at 83)

65. Defendant Wirth does not recall any discussions about why the supervisors were implementing the Moratorium. (Wirth Dep. at 156:1-3).

66. At her deposition, Defendant Wirth did not recall the Moratorium being discussed at any time prior to the January 2000 meeting of the Township Board of Supervisors. (Wirth Dep. at 84:9-11; Stipulation ¶ 49).

67. At her deposition, Defendant Wirth did not recall whether any discussions about the purpose of the Moratorium ever took place. (Wirth Dep. at 156:6-8; Stipulation ¶ 50).

68. Defendant Van Dommelen testified that there was no more acceleration in building projects in the Township in 1999-2000 than in other years, and the number of applications was fairly stable. (Van Dommelen Dep. at 168:13-18; Stipulation ¶ 149).

69.    With the exception of the minutes of the Township Board of Supervisors meeting dated January 4, 2000, no documents exist relating to the Moratorium.  (Wirth Dep. at 90:14-25; Stipulation ¶ 51).

70.    Defendant Wirth "probably [did] [not] advertise" that the moratorium was going to be discussed on the January 4, 2000 meeting of the Township Board of Supervisors.  (Wirth Dep. at 92:1-16; Stipulation ¶ 52).[2]

71.    At her deposition, Defendant Wirth could not recall which Supervisor first discussed the Moratorium at the January 2000 meeting of the Township Board of Supervisors.  (Wirth Dep. at 97:7-15; Stipulation ¶ 53).

72.    Defendant Wirth recalls that all of the Supervisors agreed on imposition of the Moratorium.  (Wirth Dep. at 97:14-15; Stipulation ¶ 54).

73.    The Jackson Township Board of Supervisors never held a public hearing on the Moratorium.  (Wirth Dep. at 156:19-21; Stipulation ¶ 57).

74.    The Jackson Township Board of Supervisors never formally submitted the Moratorium to the HCPC.  (Wirth Dep. at 156:22-24).

75.    There was no subdivision ordinance in place at any time prior to July 10, 2000, in Jackson Township.  (Wirth Dep. at 162:25-163:5; Stipulation ¶ 59).

---

[2] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

76.     Defendant Yoder is not familiar with the procedure to be followed by the Township to enact an ordinance.  (Deposition of Michael Yoder, May 18, 2001 at 6:21-25, submitted as Appendix 2).

77.     Defendant Yoder recalls that there were conversations prior to the January 2000 meeting of the Township Board of Supervisors discussing the imposition of the Moratorium.  (Yoder Dep. at 12:7-13; Stipulation ¶ 61).

78.     Defendant Yoder recalls all three supervisors being present at the conversations regarding the Moratorium that occurred prior to the January 2000 meeting of the Township Board of Supervisors.  (Yoder Dep. at 12:21-13:6; Stipulation ¶ 62).

79.     Defendant Yoder believes that the conversation among the supervisors regarding the imposition of the Moratorium occurred in the fall of 1999.  (Yoder Dep. at 13:7-9; Stipulation ¶ 63).

80.     At no time prior to the January, 2000 meeting of the Township Board of Supervisors did Defendant Yoder discuss the imposition of the Moratorium with Township Solicitor Larry Newton.  (Yoder Dep. at 13:15-18).

81.     Defendant Yoder never personally asked Township Solicitor Larry Newton whether it was legal to impose a Moratorium upon building in Jackson Township.  (Yoder Dep. at 68:18-24; Stipulation ¶ 65).

82.    Defendant Wilson, in his capacity as Supervisor of the Township,
never consulted with the Township Solicitor to determine whether the Moratorium
was legal.  (Wilson Dep. at 143:4-10).

83.    In fact, none of the supervisors ever consulted with Township
Solicitor Newton regarding the legality of the Moratorium.  (Newton Dep. at
25:14-26:23).

84.    The Township Board of Supervisors did not seek the advice of
Township Solicitor Larry Newton on February 7, 2000, prior to refusing to review
the Corneals' subdivision plan.  (Yoder Dep. at 69:18-21; Wilson Dep. at 189:5-
18; Stipulation ¶ 77).

85.    Defendant Wilson, in his capacity as Supervisor to the Township,
never consulted with the Township Solicitor for advice in connection with the
Corneals' attempts to subdivide the Property.  (Wilson Dep. at 101:12-20).

86.    Mr. Corneal took the sewage modules for the Property that Defendant
Parks already had approved to the Township meeting in April 2000, where he
asked the Township to sign the sewage modules, but the supervisors refused to
sign them.  (Corneal Dep. at 59:14-20; Minutes April 3, 2000).

87.    In January 2000, Mr. Corneal telephoned Solicitor Newton and wrote
to Solicitor Newton to request that the Township approve the Initial Subdivision
Plan at the February 2000 meeting, and explained the "urgency of approval"

relating to the agreement to sell the 26 Acre Parcel to the Hewetts. (Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated January 31, 2000, submitted as Appendix 31).

88.    Defendant Wilson never told Mr. Corneal that he should hurry and get his materials to the Township throughout any of their conversations in the fall or winter of 1999. (Corneal Dep. at 60:11-61:5).

89.    Defendant Wirth is not aware of any rule or regulation or requirement that requires subdivision plans to be submitted to the HCPC. (Wirth Dep. at 165:1-10).

90.    At the February 2000 meeting, Mr. Corneal was told that he had to submit his subdivision plan to the HCPC, and that he should do that while the Moratorium was in place. (Corneal Dep. at 86:19-87:2; Stipulation ¶ 74).

91.    Defendant Yoder was not aware that the Township required subdivision applicants to provide an application to the HCPC prior to review by the Township Board of Supervisors. (Yoder Dep. at 14:14-20; Stipulation ¶ 75).[3]

92.    Prior to enactment of the subdivision ordinance in July, 2000, Defendant Yoder was unaware of the process for submission of a subdivision application. (Yoder Dep. at 14:7-13).

---

[3] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

93.     During the period between digging the test pits and conducting the percolation tests, Mr. Corneal also had talked to Defendant Wilson about improving the driveway that already was on the property and crossed the stream on the property.  (Corneal Dep. at 47:17-25, 48:18-22, 49:11-50:5; Stipulation ¶ 78).

94.     Shortly after the February 2000 meeting, Defendant Wilson, through Eagle Construction, told Mr. Corneal that he would not do the work to repair the road on the property.  (Corneal Dep. at 85:17-20; Stipulation ¶ 79).

95.     Shortly after the February 2000 meeting, Mr. Corneal submitted the subdivision plan to the HCPC.  (Corneal Dep. at 91:6-13; Stipulation ¶ 80).

96.     The County provided comments on the Initial Plan and, by way of letter dated February 24, 2000, recommended that the Township deny approval of the Initial Plan.  (Letter from Huntingdon County Planning Commission dated February 24, 2000, submitted as Appendix 13; Stipulation ¶ 82).

97.     The HCPC recommended that the Initial Plan be "denied" even though neither the County nor the Defendant Township has a duly enacted ordinance upon which a denial could be lawfully based.  (HCPC Letter February 24, 2000).

98.     The Corneals revised the Initial Plan to address the purported "concerns" expressed by the Huntingdon County Planning Commission.  (Simpson Dep. at 19:24-20:14; Stipulation ¶ 84).

99. The revised plan depicted the division of the Property into two lots, consisting of a 25.80-acre parcel of land which was to be conveyed to Hewett and Smith pursuant to the Contract and a residual 68.87-acre parcel of land (approximately) upon which the Corneals intended to construct a house, an art studio and a garage (the "Revised Plan"). (Simpson Dep. at 20:18-20; Stipulation ¶ 85).

100. The Revised Plan was submitted to the HCPC for review. (Corneal Dep. at 113:11-13; Stipulation ¶ 86).

101. By way of letter dated April 20, 2000, the HCPC "recommended" "conditional approval of this proposal pending adoption of the subdivision and land development ordinance" by the Township. (HCPC Letter April 20, 2000 ; Stipulation ¶ 87).

102. Defendant Yoder cannot recall the Township Board of Supervisors ever denying a subdivision application for which the HCPC has recommended approval. (Yoder Dep. at 15:17-20; Stipulation ¶ 88).

103. At the March 2000 meeting, Mr. Corneal requested copies of the Township ordinances, but the Township, through Defendant Wirth, refused to provide copies even when Mr. Corneal offered to pay for the copies to be made. (Corneal Dep. at 88:13-89:2).

104.   Mr. Corneal also requested a copy of the proposed Jackson Township subdivision ordinance prior to approval by the Township Board of Supervisors. (Wirth Dep. at 176:17-18; Stipulation ¶ 90).

105.   Despite Mr. Corneal's request for a copy of the proposed subdivision ordinance, Township Secretary Defendant Wirth did not send him a copy of the proposed ordinance.  (Wirth Dep. at 176:19-20).

106.   As a result of the Township's refusal to review the Initial Plan, the Corneals' requested the Township to approve sewer modules for construction of a house, art studio and garage on the property without any subdivision.  (Corneal Dep. at 115:16-21).

107.   On April 3, 2000, even after David Corneal informed the Township that he was not going to subdivide the Property, the Township acting through its Board of Supervisors refused to sign the Corneals' sewer modules for the Property, even though Defendant Parks already had approved and signed the sewer modules. (Wilson Dep. at 120-127:18; Stipulation ¶ 93).[4]

108.   Defendant Parks cannot recall the Township ever refusing to approve any other sewer modules that had been initially approved by Defendant Parks. (Parks Dep. at 42:18-23; 43:20-44:6).

---

[4] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

109.    Prior to April 3, 2000, Defendant Wilson could not recall the Board of Supervisors of the Township ever refusing to sign sewage modules that had been approved by the Sewage Enforcement Officer.  (Wilson Dep. at 169:1-5; Stipulation ¶ 95).

110.    The supervisors said they would not sign the sewer modules because of the Moratorium.  (Corneal Dep. at 106:3-4).

111.    Mr. Corneal then requested the Township to sign the sewer modules so that he could begin construction on his house and art studio without asking for the subdivision.  (Corneal Dep. at 106:6-8; Stipulation ¶ 97).[5]

112.    In response to Mr. Corneal's request for the sewage modules to construct the house and art studio, Defendant Wirth told Mr. Corneal that constructing a second house on the same tract of ground constitutes a subdivision and, therefore, is covered by the Moratorium.  (Corneal Dep. at 108:19-109:8; Stipulation ¶ 98).[6]

---

[5] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

[6] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

113.   After the supervisors refused to sign the sewer modules for the house,

Mr. Corneal requested permission to begin construction of the art studio.  (Corneal

Dep. at 115:4-6; Stipulation ¶ 99).[7]

114.   The Supervisors refused permission to begin the art studio, as well.

(Corneal Dep. at 115; Stipulation ¶ 100).

115.   The Supervisors refused permission to begin the art studio because

they said they required sewer facilities in the art studio, but were not signing any

sewer modules.  (Corneal Dep. at 115:7-10).

116.   After the supervisors refused to allow him to begin construction of the

art studio because he did not have a sewage permit, Mr. Corneal requested a privy

permit so that he could install a privy for the art studio.  (Corneal Dep. at 115:11-

13; Stipulation ¶ 101).[8]

117.   The Supervisors responded that he would have to contact the Sewage

Enforcement Officer in order to inquire about obtaining a privy permit for the art

studio.  (Corneal Dep. at 116:9-11; Stipulation 102).

---

[7] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to
Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary
Judgment and in Support of Plaintiffs' Motion for Summary Judgment.
[8] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to
Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary
Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

118. Mr. Corneal called the Sewage Enforcement Officer, Defendant

Parks, after the Supervisors' Meeting on April 3, 2000, to request a privy permit.

(Corneal Dep. at 116:12-13; Stipulation ¶ 103).

119. That same night, after the April 3, 2000, meeting at the Township

Board of Supervisors, Defendant Wirth, at the instruction of the Board of

Supervisors, telephoned Jackson Township sewage enforcement officer Barry

Parks and told him that Mr. Corneal "could not have a privy permit." (Wirth Dep.

at 203:6-204:3; Summ. J. Op. at 5).[9]

120. That same night, April 3, 2000, Defendant Parks told Mr. Corneal that

the Township supervisors already called him and told him that Mr. Corneal was

not allowed to have a privy permit and that Defendant Parks was not allowed to

help Mr. Corneal get a privy permit. (Corneal Dep. at 116:13-18).[10]

121. The Board of Supervisors did not seek the advice of Township

Solicitor Larry Newton prior to denying the Corneals' request for a privy permit.

(Yoder Dep. at 70:11-15; Stipulation ¶ 106).[11]

122. In its review of the Initial Plan, the HCPC noted potential wetlands on

the 95 acre Property. (Corneal Dep. at 97:14-17; HCPC Letter February 24, 2000).

---

[9] Defendants refused to stipulate to this fact, despite that the Court found "Defendant Wirth then called Defendant Parks and instructed him not to issue any permits to the Corneals." (Summ. J. Op. at 5).

[10] The Court found that "Defendant Parks told them that Defendant Wilson had barred him from issuing the Permit." (Summ. J. Op. at 5).

[11] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

123. Shortly after the HCPC identified the potential wetlands, the Township required additional engineering studies to prove that Mr. Corneal was not infringing upon wetlands in the approved sewer areas; Defendant Parks already had evaluated, tested and approved the sites. (Corneal Dep. at 98:1-9; Stipulation ¶ 108).

124. In the fall of 2000, after the Corneals requested approval of the sewer modules for construction of the house, art studio and garage, Defendant Wirth telephoned Defendant Parks, the Sewage Enforcement Officer, and told him to go back to the Property and re-evaluate the septic sites that Defendant Parks already had approved. (Parks Dep. at 76:6-20; Stipulation ¶ 109).[12]

125. Defendant Yoder recalls that either Defendant Weiler or Defendant Wilson, in their capacity as Supervisor of the Township, directed Defendant Parks, the Sewage Enforcement Officer, to go back to the Property to reinspect the sites that Defendant Parks already had approved in the sewage modules. (Yoder Dep. at 60:24-61:19).

126. Defendant Yoder recalls that, after Defendant Parks' reinspection of the site, one of the five approved sites on the Property no longer was usable. (Yoder Dep. at 61:20-62:9; Stipulation ¶ 111).

---

[12] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

127. Defendant Yoder does not recall whether Defendant Parks provided any information regarding the other four sites. (Yoder Dep. at 62:24-63:2; Stipulation ¶ 112).

128. Defendant Yoder does not recall asking Defendant Parks about the other four sites. (Yoder Dep. at 63:6-7; Stipulation ¶ 113).

129. Defendant Yoder does not recall any of the other Supervisors asking about the other four sites. (Yoder Dep. at 63:8-11).

130. Defendant Yoder cannot recall the Township Board of Supervisors ever asking a third party to go double-check sewer modules that had already been approved by Defendant Parks. (Yoder Dep. at 63:16-64:3; Stipulation ¶ 115).

131. Defendant Yoder testified that it would be unusual for the Board to request a third party to double-check sewer modules that had been approved by Defendant Parks. (Yoder Dep. at 64:4-14; Stipulation ¶ 116).

132. The Township Board of Supervisors never consulted with the Township Solicitor during the April 2000 meeting at which the Corneals sought approval of their Sewer Modules. (Wilson Dep. at 189:5-18; Stipulation ¶ 117).[13]

133. The Township Board of Supervisors never consulted with the Township Solicitor during the April 2000 meeting at which the Corneals sought

---

[13] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

review of their application for a privy permit.  (Wilson Dep. at 189:5-18;

Stipulation ¶ 118).[14]

134.   Defendant Wirth told Township Solicitor Larry Newton that the

supervisors were not going to sign the Corneals' sewage module.  (Wirth Dep. at

140:18-141:9; Stipulation ¶ 119).

135.   Defendant Wirth "probably" kept Solicitor Newton informed about

the Township's position with regard to the Corneal's sewage modules.  (Wirth

Dep. at 143:2-4; Stipulation ¶ 120).

136.   Defendant Wirth "probably" kept Solicitor Newton informed about

the Corneals' proposed subdivision plan.  (Wirth Dep. at 143:5-7; Stipulation ¶

121).

137.   Defendant Wilson called Andy Patterson, Director of the Huntingdon

County Conservation District.  (Wilson Dep. at 160-161; Stipulation ¶ 122).

138.   Defendant Wilson called Mr. Patterson for the purpose of initiating a

private complaint against the Corneals for potential wetlands violations in the area

of the driveway that the Corneals were improving on the Property.  (Wilson Dep.

at 160:6-7, 161:15-163:23).

---

[14] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to
Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary
Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

139.    Defendant Yoder testified that Defendant Wilson raised the issue of the presence of wetlands on the Property at one or two of the private meetings of the Township Supervisors.  (Yoder Dep. at 56:16-57:7).

140.    In April 2000, Pursuant to the Township Building Ordinance, Mr. Corneal went to Defendant Van Dommelen's home to request a building permit application for the issuance of a building permit for the garage.  (Van Dommelen Dep. at 46:9-24; Summ. J. Op. at 6).

141.    Section 3.02A of the Building Permit Ordinance states that "application for such a building permit shall be made, in writing, to the Building Permit Officer on forms supplied by the Township."  (Building Permit Ordinance (emphasis added); Stipulation ¶ 125).

142.    When David Corneal identified himself to Defendant Van Dommelen, Defendant Van Dommelen told Mr. Corneal that he could not issue a building permit because the Township Board of Supervisors had instructed him not to give a building permit to Mr. Corneal.  (Van Dommelen Dep. at 47:2-7; Stipulation ¶ 126).

143.    A couple weeks before Mr. Corneal sought a building permit from Defendant Van Dommelen, the Township Board of Supervisors had instructed Defendant Van Dommelen not to issue a building permit to the Corneals.  (Van Dommelen Dep. at 47:8-10; Stipulation ¶ 127; Summ. J. Op. at 6).

44

144. Defendant Wirth told Defendant Van Dommelen that the Township Board of Supervisors was not interested in letting the Corneals have a building permit at that time. (Van Dommelen Dep. at 48:23-49:2; Stipulation ¶ 128).[15]

145. While Mr. Corneal was at Defendant Van Dommelen's house seeking a building permit, Defendant Van Dommelen telephoned Defendant Wilson, who told Defendant Van Dommelen not to give a permit to Mr. Corneal. (Van Dommelen Dep. at 47:11-13; Stipulation ¶ 129; Summ. J. Op. at 6).

146. Defendant Wilson told Defendant Van Dommelen, the Building Permit Officer, "don't you dare issue him [David Corneal] a permit." (Wilson Dep. at 128:4-12; Stipulation ¶ 130; Summ. J. Op. at 6).

147. The Township Board of Supervisors does not have any sort of preapproval process with respect to building permits. (Van Dommelen Dep. at 132:22-25)

148. Defendant Van Dommelen has the responsibility to make the determination of whether to issue a building permit. (Van Dommelen Dep. at 13:1-2; Stipulation ¶ 132).[16]

---

[15] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

[16] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

149.   After Defendant Van Dommelen telephoned Defendant Wilson, Defendant Van Dommelen then refused to provide David Corneal with even an application for a building permit.  (Van Dommelen Dep. at 56; Stipulation ¶ 133; Summ. J. Op. at 6).

150.   Defendant Van Dommelen's stated reason for refusing to provide an application for a building permit was that he "just didn't want him to have one." (Van Dommelen Dep. at 56:17-22; Stipulation ¶ 134).

151.   Defendant Van Dommelen also called David Corneal "a trouble-making yuppie from over the mountain."  (Van Dommelen Dep. at 71:18-22; Stipulation ¶ 135; Summ. J. Op. at 6).

152.   Defendant Van Dommelen never has refused to provide any other person with an application for a building permit.  (Van Dommelen Dep. at 56:23-25; Stipulation ¶ 136).[17]

153.   Defendant Van Dommelen never has denied a building permit application except for the one from the Corneals.  (Van Dommelen Dep. at 44:9-20).

154.   Indeed, Defendant Van Dommelen told Mr. Corneal that he would have issued a building permit to any other Jackson Township resident who

_____

[17] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

requested one to build a garage. (Letter from David Corneal to Defendant Van Dommelen dated May 5, 2000, submitted as Appendix 17).

155. Defendant Van Dommelen told Mr. Corneal that the Township Board of Supervisors intended to hold a meeting about his situation the day after he sought a building permit application from Defendant Van Dommelen in April 2000. (Van Dommelen Dep. at 62:8-14; Stipulation ¶ 140).[18]

156. After Defendant Van Dommelen refused to give Mr. Corneal even an application for a building permit, Mr. Corneal sent a letter to Defendant Van Dommelen requesting a building permit only to build a garage. (Van Dommelen Dep. at 70:3-71:14; Letter from David Corneal to Defendant Van Dommelen dated May 5, 2000; Stipulation ¶ 141).

157. Defendant Van Dommelen ordinarily would issue a permit for a garage without any subdivision plan or septic approval. (Van Dommelen Dep. at 17:19-18:4).

158. Defendant Van Dommelen refused even to telephone David Corneal about the May 5, 2000, letter. (Van Dommelen Dep. at 70:23-24).

159. After Defendant Van Dommelen received the letter from David Corneal, Defendant Van Dommelen drove to the Property to see what was happening. (Van Dommelen Dep. at 74:6-10; Stipulation ¶ 144).

---

[18] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

160.  Defendant Van Dommelen did not make a specific visit to the site of any other building permit issued in 2000 to inspect the progress of the building. (Van Dommelen Dep. at 103:21-23; Stipulation ¶ 146).

161.  Defendant Van Dommelen stated that there is no distinction between a shed, garage, barn, workshop and art studio without water for purposes of applying for a building permit.  (Van Dommelen Dep. at 164:2-6; Stipulation ¶ 147).

162.  Defendant Van Dommelen testified that he does not require submission of architectural plans for outbuildings such as a garage prior to granting a building permit.  (Van Dommelen Dep. at 147:2-9).

163.  Defendant Van Dommelen granted every other building permit application submitted to him in 2000.  (Van Dommelen Dep. at 103:3-13; Ledger of Building Permit Applications and Grants, submitted as Appendix 18; Stipulation ¶ 145; Summ. J. Op. at 6).

164.  In August 2000, Mr. Corneal attempted again to apply for building permits by submitting building permit applications, along with supporting documentation and checks for the appropriate fees, directly to Defendant Wirth in her capacity as Secretary of Jackson Township.  (Letter from David B. Corneal to Defendant Wirth, dated August 31, 2000 (and attachments), submitted as Appendix 32).

165. Defendant Wirth recalls Mr. Corneal submitting applications for building permits along with checks directly to Defendant Wirth. (Wirth Dep. at 145:15-22; Stipulation ¶ 151).

166. Defendant Van Dommelen claims that he never received an application for a building permit from the Corneals. (Van Dommelen Dep. at 78:8-22; Stipulation ¶ 150).

167. In October 2000, Defendant Van Dommelen, the Building Permit Officer, denied the Corneals' applications for building permits to construct an art studio, garage and house. (Van Dommelen Dep. at 76:8-18; Wilson Dep. 184:10-17; Letter October 10, 2000; Stipulation ¶ 138).[19]

168. On October 10, 2000, Defendant Van Dommelen, with the assistance of Solicitor Newton, wrote a letter to the Corneals denying the Corneals' building permit applications for failure to comply with, *inter alia*, the Pennsylvania Sewage Facilities Act and the Township's Subdivision and Land Development Ordinance. (Van Dommelen Dep. at 76:8-23; 77:12-20; Letter October 10, 2000; Stipulation ¶ 152).

169. Defendant Van Dommelen wrote the October 10, 2000, letter to the Corneals at the instruction of the Township Board of Supervisors. (Van Dommelen Dep. at 186:10-20; Stipulation ¶ 153).

---

[19] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

170.   Defendant Wilson does not know of any other building permit that ever has been denied by the Township. (Wilson Dep. at 186:8-11; Stipulation ¶ 139).[20]

171.   Prior to denying the Corneals' building permit applications, Defendant Van Dommelen never had denied any building permit without actually seeing the application. (Van Dommelen Dep. at 83:5-7; Stipulation ¶ 154).

172.   Defendant Van Dommelen was concerned about sending the October 10, 2000, letter because he had never seen the building permit applications. (Van Dommelen Dep. at 176:16-20).

173.   Indeed, Defendant Van Dommelen felt that the Township Board of Supervisors "usurped" his job as Building Permit Officer by directing him to send the October 10, 2000, letter to the Corneals. (Van Dommelen Dep. at 176:21-22).

174.   Defendant Van Dommelen testified at his deposition that the October 10, 2000, letter was the only time that the Township Board of Supervisors ever had "usurped" his job as Building Permit Officer. (Van Dommelen Dep. at 177:2-5; Stipulation ¶ 157).

175.   Defendant Van Dommelen did not object to the Township Board of Supervisors' action in "usurp(ing)" his job as Building Permit Officer because he did not want to "shake the boat" because he understood that the Supervisors and

---

[20] Although Defendants stipulated to this fact, they previously denied the very same fact in their response to Plaintiffs' Consolidated Statement of Undisputed Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

Solicitor Newton wanted Defendant Van Dommelen to send the letter. (Van Dommelen Dep. at 177:6-19; Stipulation ¶ 158).

176. Defendant Van Dommelen discussed the contents of the October 10, 2000, letter with the Township Board of Supervisors and Defendant Wirth prior to sending the letter to Mr. Corneal. (Yoder Dep. at 51:11-13; Stipulation ¶ 159).

177. The discussion regarding the October 10, 2000, letter from Defendant Van Dommelen to Mr. Corneal occurred at a "workshop" meeting between Defendants Van Dommelen, Wilson, Wirth, Weiler and Yoder. (Yoder Dep. at 51:20-25; Stipulation ¶ 160).

178. Defendant Yoder testified that he cannot recall ever having seen the letter dated November 10, 2000, from Terry Williams regarding an appeal of the denial of the Corneals' building permits. (Yoder Dep. at 52:13-16; Stipulation ¶ 161).

179. At her deposition, Defendant Wirth testified that she did not recall ever hearing that Mr. Corneal had requested a hearing on the denial of his building permit. (Wirth Dep. at 146:21-24; Stipulation ¶ 162).

180. At his deposition, Defendant Yoder testified that he is not aware of any Jackson Township ordinance that imposes any requirements upon the Board of Supervisors upon receipt of a document appealing the decision of the Building Permit Officer. (Yoder Dep. at 53:25-54:4; Stipulation ¶ 163).

181.    At his deposition, Defendant Yoder testified that he is not aware that the Building Permit Ordinance requires the Board of Supervisors to hold a hearing within thirty (30) days after the receipt of an appeal of a decision of the Building Permit Officer.  (Yoder Dep. at 54:5-9; Stipulation ¶ 164).

182.    Defendant Yoder does not recall attending any hearing being held by the Board of Supervisors regarding the appeal of the Corneals from the decision of the Building Permit Officer as requested in the letter dated November 10, 2000. (Yoder Dep. at 54:10-18; Stipulation ¶ 165).

183.    Defendant Yoder does not recall ever seeking the advice of Solicitor Newton in connection with the activities of the Board of Supervisors with regard to the Corneals' attempts to subdivide or develop the Property.  (Yoder Dep. at 70:19-24; Stipulation ¶ 166).

184.    Defendant Yoder does not recall any of the other Supervisors ever seeking the advice of Solicitor Newton with regard to the Board's activities regarding the Corneals' attempts to subdivide and/or develop the Property.  (Yoder Dep. at 70:25-71:3)

185.    Solicitor Newton shares office support staff, a law library, conference room and kitchen, and shares certain professional and business ventures with attorney Harvey B. Reeder, Esq.  (Newton Dep. at 6:7 –12:6)

186.   After Defendant Van Dommelen refused to provide even the application forms for a building permit to Mr. Corneal on April 27, 2000, Mr. Corneal attempted to contact Solicitor Newton by telephone on May 1, 2000, to obtain building permit applications.  (Newton Dep. at 82; Letter from David Corneal to Jackson Township Solicitor Larry Newton dated May 5, 2000).

187.   The very same day that Mr. Corneal telephoned Solicitor Newton, Attorney Reeder, counsel for the Hewetts, delivered correspondence to the Corneals requesting that the Agreement of Sale for the 26 Acre Parcel be terminated as a result of "difficulties with the Township in obtaining subdivision approval."  (Letter from Harvey B. Reeder, Esquire To David B. Corneal, dated May 1, 2000, submitted as Appendix 19; Stipulation ¶ 169).

188.   After the Hewetts backed out of the contract to purchase the 26 Acre Parcel, including the farmhouse and barn, Defendant Wilson's nephew approached Mr. Corneal and expressed an interest in purchasing the 26 Acre Parcel.  (Corneal Dep. at 83:17-22).[21]

189.   In or around July 2000, the Corneals began construction of the garage, art studio and house on the property.  (Corneal Dep. at 131:12-132:2; Stipulation at ¶ 172).

---

[21] Although Defendants previously have denied this fact, they offered no evidence to dispute Mr. Corneal's testimony that shortly after the Hewetts terminated their contract to purchase the 26 Acre Parcel, Defendant Wilson's nephew approached Mr. Corneal in an attempt to purchase the 26 Acre Parcel.

190. In or around October 2000, the Township filed a law suit in the Court of Common Pleas of Huntingdon County to enjoin the construction on the property because the Township had not issued the appropriate permits. (Stipulation ¶ 173).

191. The Corneals' attorney, Terry Williams, Esq., represented the Corneals in the enforcement action by Jackson Township. (Williams Dep. at *passim*; Stipulation ¶ 174).

192. In an effort to resolve the law suit filed against the Corneals, Attorney Williams undertook various activities with the Township to resolve whatever concerns they had with the construction. (Williams Dep. at *passim*; Stipulation ¶ 175).

193. Attorney Williams opined that none of the activities that he undertook on behalf of Mr. Corneal with regard to obtaining permits and permissions from the Township were required by law. (Williams Dep. at 61:10-13; 64:15-16)

194. Attorney Williams opined that

> the [driveway] ordinance was not passed until after the driveway was constructed. The building officer advised me that he thought the building applications were all in order, and the sewer modules had adequate and acceptable soil sites to permit the residential development … were on the plan and had been approved, the soil testing had been done. Legally, I saw no reason why those permits could not have been issued, but an enforcement action is undertaken, which poses a great threat of financial risk to my client and I have to try to help him out of that, and the way you do it I think, from, once again, 28 years of experience of dealing with

> governmental bodies, with local government in
> particular, it isn't to sit at a meeting and say you are
> wrong, it's to say what do you want us to do, tell us what
> you want us to do, and if it's reasonable and if it's
> something we can do, we'll do it.

(Williams Dep. at 64:23-65:18).

195.    Plaintiffs' expert witness, George W. Fasic, is an expert in municipal

planning and land use.  Mr. Fasic teaches graduate and undergraduate classes in

land use and community planning at West Chester University, is a certified

instructor for the Pennsylvania Municipal Planning Education Institute, and is a

private consultant in community planning.  Mr. Fasic has been employed in the

field of community planning and land use continuously since 1947. (Expert Report

of George W. Fasic, dated July 2001, submitted as Appendix 36; General Resume,

Resume Addendum and List of Recent Publications for George W. Fasic,

submitted as Appendix 37).

196.    After reviewing various materials relating to this litigation, Mr. Fasic

opined that "to attempt to impose a moratorium on subdivisions when there was no

subdivision and land use ordinance in place, is in my opinion a serious breach of

public trust by the Board of Supervisors of Jackson Township."  (Fasic Expert

Report at 3).

197.    Mr. Fasic further opined that, "The withholding of application forms

is improper and suggests discrimination. … In my opinion, failure to provide

necessary forms required to make application is inconsistent with the intent of land

use ordinances and use of police power by a municipality.  It denies a property

owner the right to utilize his property, and compromises his ability to comply with

applicable building code provisions.  This approach is inappropriate, unacceptable,

and discriminatory."  (Fasic Expert Report at 4).

   198. Finally, Mr. Fasic concluded:

> [I]t is my opinion that the Jackson Township Board of
> Supervisors and its agents failed to comply with normal
> and reasonable administration of land use planning
> ordinances, and failed in their duty to inform Mr. Corneal
> of the requirements related to his proposal to subdivide
> and develop his property in Jackson Township, and the
> Township, exhibited malicious and discriminatory intent
> toward this property owner/applicant.
>
> …
>
> The Board of Supervisors statements and direction to Mr.
> Corneal that he was to obtain both Township and
> Huntingdon County approval of his subdivision was a
> gross violation of their public duty.
>
> …
>
> Jackson Township failed to follow[] acceptable and
> required procedures in the adoption, and the
> administration of land use ordinances.  It is my opinion,
> their actions are unique, unwarranted, malicious and
> discriminatory and unlike those I have experienced in
> dealing with many municipalities throughout
> Pennsylvania.

(Fasic Expert Report at 4-5).

199.   Plaintiffs' expert witness, Allen G. Heist, is an expert in municipal planning and land use.  Mr. Heist has been employed in the field of land use and municipal planning for 25 years, including serving as Township Manager for West Vincent Township, Chester County, Pennsylvania for more than ten years, and providing private consulting services for regional planning.  Mr. Heist has testified as an expert witness in more than 75 land use and planning proceedings, and has authored more than 50 publications relating to land use regulation.  (Expert Report of Allen G. Heist, dated July 2001, submitted as Appendix 38; Resume and Publications List for Allen G. Heist, submitted as Appendix 39).

200.   Mr. Heist opined that "The Township and its employees lacked authority to deny subdivision approval and no reasonable Township officials would have thought it lawful to do so. ... it was not accepted practice to deny the Corneals' permission to subdivide based on a future plan to pass an ordinance and no reasonable municipal official could have thought it was lawful to do so."  (Heist Expert Report at 5, Conclusion 1).

201.   Mr. Heist further opined that "the Township did not follow accepted practice in imposing the moratorium on the Corneals and no reasonable municipal official could have thought it was lawful to do so."  (Heist Expert Report at 5, Conclusion 2).

202.   Mr. Heist further opined that "the Building Permit Officer's refusal to supply an application to the Corneals is not accepted practice and no reasonable municipal official could have thought it was lawful to do so."  (Heist Expert Report at 5, Conclusion 4).

203.   Mr. Heist further opined that, "the Corneals were required only to apply for building permits and sewage permits. … To require them to do more is not accepted practice and no reasonable municipal official could have thought it was lawful to do so."  (Heist Expert Report at 5, Conclusion 3).

204.   Finally, Mr. Heist opined that

> Because the Township Sewage Enforcement Officer approved the Corneals' sewage facilities planning module and the building permit applications appear to have complied with all applicable rules and regulations of the Township Building Permit Ordinance, it was not accepted practice for the Township to have refused to issue the permits and no reasonable municipal official could have thought it was lawful to do so.

(Heist Expert Report at 5, Conclusion 5).

Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Bridget E. Montgomery, Esquire
Supreme Ct. I.D. #56105
Adam M. Shienvold, Esquire
Supreme Ct. I.D. #81941
One South Market Square Building
213 Market Street
Harrisburg, PA 17101
(717) 237-6000

Date:  April 18, 2003          Attorneys for Plaintiffs,
                               David B. and Sandra Y. Corneal

L0263808

## CERTIFICATE OF SERVICE

I, Adam Shienvold, Esquire, hereby certify that I am this day serving a copy of the foregoing document via First Class U.S. Mail, which service satisfies the requirements of the Federal Rules of Civil Procedure and Middle District Local Rules of Court, addressed as follows:

By Facsimile and First Class U. S. Mail

Anthony R. Sherr, Esquire
Mayers, Mennies & Sherr, LLP
3031 Walton Road, Building A
Suite 330, P.O. Box 1547
Blue Bell, PA  19422-0440

Adam M. Shienvold, Esquire

Date: 4/18/03

Attorney for Plaintiffs,
David B. and Sandra Y. Corneal