Case 1:00-cv-01192-SHR   Document 119   Filed 04/18/2003   Page 1 of 100

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID B. CORNEAL and | : | NO. 1:CV-00-1192 |
| SANDRA Y. CORNEAL, | : | |
| Plaintiffs | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | RAMBO, J. |
| JACKSON TOWNSHIP, | : | |
| Huntingdon County, Pennsylvania, | : | |
| *et al.*, | : | |
| Defendants | : | |

**FILED**
**HARRISBURG, PA**

APR 1 8 2003

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

### APPENDIX OF EXHIBITS
### IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Date: April 18, 2003

ECKERT SEAMANS CHERIN & MELLOTT, LLC
Bridget E. Montgomery, Esquire
Adam M. Shienvold, Esquire
213 Market Street
8th Floor
Harrisburg, PA  17101
717-237-6000

{L0252507.1}

# TABLE OF CONTENTS

<u>Volume No. 1</u>

1.  Deposition of W. Thomas Wilson, May 18, 2001

2.  Deposition of Michael Yoder, May 18, 2001

3.  Deposition of Ralph Weiler, June 29, 2001

4.  Deposition of Ann Wirth, May 17, 2001

5.  Deposition of David Van Dommelen, June 6, 2001

<u>Volume No. 2</u>

6.  Deposition of Barry Parks, May 16, 2001

7.  Deposition of David B. Corneal, February 22, 2001

8.  Deposition of David Simpson, July 10, 2001

9.  Contract dated October 7, 1999

10. Minutes of the Meeting of the Board of Supervisors of Jackson Township, February 7, 2000

11. Minutes of the Meeting of the Board of Supervisors of Jackson Township, January 4, 2000

12. Deposition of Larry Newton, May 17, 2001

13. Letter from Huntingdon County Planning Commission dated February 24, 2000

14. Letter from Huntingdon County Planning Commission dated April 20, 2000

15. Jackson Township Building Permit Ordinance, dated July 3, 1989

16. Letter from Defendant Van Dommelen to David Corneal dated October 10, 2000

17. Letter from David Corneal to Defendant Van Dommelen dated May 5, 2000

18. Ledger of Building Permit Applications and Grants

19. Letter from Harvey B. Reeder, Esquire to David B. Corneal, dated May 1, 2000

20. Deposition of Terry Williams, Esquire, July 10, 2001

Volume No. 3

21. Revised Subdivision Plan, Dated April 7, 2000

22. Minutes of the Meeting of the Board of Supervisors of Jackson Township, April 3, 2000

23. Jackson Township Ordinance 2000-1 ("Subdivision and Land Development Ordinance"), dated July 7, 2000

24. Minutes of the Meeting of the Board of Supervisors of Jackson Township, July 10, 2000

25. Jackson Township Ordinance 2000-2 ("Driveway Ordinance"), dated July 10, 2000

26. Jackson Township Ordinance 2000-3 ("Holding Tank Ordinance"), dated July 10, 2000

27. Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated May 5, 2000

28. Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated August 3, 2000

29. Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated August 18, 2000

30. Letter from Jackson Township Solicitor Larry Newton to David B. Corneal, dated August 29, 2000

31.    Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated January 31, 2000

32.    Letter from David B. Corneal to Defendant Wirth, dated August 31, 2000 (and attachments)

33.    Order dated October 19, 2000, Huntingdon County Court of Common Pleas Judge Stewart L. Kurtz, Docket number 2000-1290

34.    Letter from A. Sherr to B. Montgomery, dated March 18, 2003 and Draft Statement of Undisputed Facts As Agreed to by Counsel, dated June 24, 2002 (collectively "Stipulations")

36.    Expert Report of George W. Fasic, dated July 2001

37.    General Resume, Resume Addendum and List of Recent Publications for George W. Fasic

38.    Expert Report of Allen G. Heist, dated July  2001

39.    Resume and Publications List for Allen G. Heist

# CERTIFICATE OF SERVICE

I, Adam Shienvold, Esquire, hereby certify that I am this day serving a copy

of the foregoing document via First Class U.S. Mail, which service satisfies the

requirements of the Federal Rules of Civil Procedure and Middle District Local

Rules of Court, addressed as follows:

<u>By Facsimile and First Class U. S. Mail</u>

Anthony R. Sherr, Esquire
Mayers, Mennies & Sherr, LLP
3031 Walton Road, Building A
Suite 330, P.O. Box 1547
Blue Bell, PA  19422-0440

_____

Adam M. Shienvold, Esquire

Attorney for Plaintiffs,
David B. and Sandra Y. Corneal

Date:

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2    DAVID B. CORNEAL and SANDRA    :
      Y. CORNEAL,                    :
 3         PLAINTIFFS                :
                                     :
 4              VS                   :  NO. 1:CV-00-1192
                                     :
 5    JACKSON TOWNSHIP, HUNTINGDON   :
      COUNTY, PENNSYLVANIA; W.       :
 6    THOMAS WILSON, individually    :
      and in his official capacity   :
 7    as Supervisor of Jackson       :
      Township; MICHAEL YODER,       :
 8    individually and in his        :
      official capacity as           :
 9    Supervisor of Jackson          :
      Township; RALPH WEILER,        :
10    individually and in his        :
      official capacity as           :
11    Supervisor of Jackson          :
      Township; BARRY PARKS,         :
12    individually and in his        :
      official capacity as Sewage    :
13    Enforcement Officer of         :
      Jackson Township; DAVID        :
14    VAN DOMMELEN, individually     :
      and in his official capacity   :
15    as Building Permit Officer;    :
      ANN L. WIRTH, individually     :
16    and in her official capacity   :
      as Secretary of Jackson        :
17    Township; and LARRY NEWTON,    :
      individually and in his        :
18    official capacity as           :
      Solicitor to Jackson           :
19    Township,                      :
               DEFENDANTS            :
20             DEPOSITION OF:  W. THOMAS WILSON
21             TAKEN BY:       PLAINTIFFS
22             BEFORE:         TERESA K. BEAR, REPORTER
                               NOTARY PUBLIC
23
               DATE:           MAY 18, 2001, 8:43 A.M.
24
               PLACE:          ECKERT SEAMANS
25                             213 MARKET STREET
                               HARRISBURG, PENNSYLVANIA
```

Case 1:00-cv-01192-SHR   Document 119   Filed 04/18/2003   Page 7 of 100

**2**

1  APPEARANCES:
2  ECKERT SEAMANS
   BY: BRIDGET E. MONTGOMERY, ESQUIRE
3  LESLIE A. MALADY, ESQUIRE
4  FOR - PLAINTIFFS
5  MAYERS, MENNIES & SHERR, LLP
   BY: ANTHONY R. SHERR, ESQUIRE
6
   FOR - ALL DEFENDANTS EXCEPT NEWTON
7
   METTE, EVANS & WOODSIDE
8  BY: JENNIFER YANKANICH, ESQUIRE
9  FOR - DEFENDANT - LARRY NEWTON
10 ALSO PRESENT:
11 DAVID B. CORNEAL
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1            TABLE OF CONTENTS
2                  WITNESS
3  FOR PLAINTIFFS        DIRECT CROSS REDIRECT RECROSS
4  W. Thomas Wilson
     By Ms. Montgomery       4   --   191   --
5    By Ms. Yankanich        --   189   --   192
6
7                  EXHIBITS
8  WILSON EXHIBIT NO.         PRODUCED AND MARKED
9  1 - Order                20
10 2 - Sewage facilities planning module      62
11 3 - Subdivisions reviewed by HCPC       120
12 4 - Minutes dated 4/3/00           134
13 5 - Packet of documents         143
14 6 - Subdivision plan           143
15 7 - Subdivision and land development      146
     ordinance Jackson Township
16
17
18
19
20
21
22
23
24
25

**4**

1         W. THOMAS WILSON, called as a witness, being
2  sworn, testified as follows:
3
4            DIRECT EXAMINATION
5
6  BY MS. MONTGOMERY:
7  Q     Mr. Wilson, would you state your name for the
8  record.
9  A     **W. Thomas Wilson.**
10 Q     I don't think we've met except briefly the
11 other day.
12 A     **Yeah, just upstairs, yes.**
13 Q     I'm Bridget Montgomery and I think, as you
14 know, I represent the Corneals in this case. We're here to
15 take your deposition today and ask you a -- have you ever
16 had your deposition taken before?
17 A     **No.**
18 Q     I'll just give you a little bit of the ground
19 rules then. I'm just going to ask you a series of questions
20 designed to get some facts. If you don't understand any
21 question, I want you to ask me to clarify it and I'll be
22 happy to do that.
23        You should feel free to take a break whenever
24 you feel that you need to. Not to confer with your counsel,
25 but if you need to go to the men's room or something like

**5**

1  that, or if you get really tired -- sometimes these things
2  can go on for a long time and we want you to be comfortable.
3        For the court reporter's sake, you need to
4  keep your voice up. You need to speak clearly, keep your
5  voice up and let me finish my sentence and then I'll try to
6  let you finish your sentence because she can't take down two
7  people at once -- she can't take down two people talking at
8  once. She also needs you to use verbal responses.
9  A     **I didn't think she could do that.**
10 **(Indicating.)**
11 Q     She can't do that.
12 A     **Right.**
13 Q     You can't do that. So the other thing is I
14 want to make sure that there's no reason why you can't give
15 testimony today. For example, are you on any kind of
16 medication that would prevent you from understanding the
17 questions or anything like that?
18 A     **None.**
19 Q     Where do you live?
20 A     **R.D. 1, Box 420, Petersburg, Pennsylvania.**
21 Q     Is Petersburg in Jackson Township?
22 A     **Yes.**
23 Q     How long have you lived there?
24 A     **Approximately 20 years at that location.**
25 Q     Where did you live prior to that?

6

```
1    A    I don't -- it's R.D. 1, Petersburg, but I
2    don't know what the box -- they've changed box numbers so I
3    don't know what it would be.  Approximately three miles from
4    where I live now.
5    Q    Also in Jackson Township?
6    A    Yes.
7    Q    And how long did you live there?
8    A    Twenty-five years.
9    Q    Have you lived in Jackson Township all your
10   life?
11   A    Yes.
12   Q    And I don't want to be too nosey but how old
13   are you?
14   A    Fifty-eight.
15   Q    I'm going to ask you a question about a
16   document that's been marked before, but we'll mark it
17   again.
18        MS. MONTGOMERY:  This is going to be Wilson
19   Exhibit 1.  I'm going to mark that and hand it to the
20   witness.
21        (Order produced and marked as Wilson Exhibit
22   No. 1.)
23   BY MS. MONTGOMERY:
24   Q    Mr. Wilson, have you seen this court order
25   before?
```

7

```
1    A    No.
2    Q    Do you want to take a moment and look at it.
3    A    Okay.
4    Q    Do you understand the order?
5    A    Yes.
6    Q    What do you understand it to say?
7    A    I'm not supposed to talk to any of the other
8    defendants.
9    Q    About?
10   A    This proceeding.
11   Q    About your testimony or about their testimony?
12   A    Yes.
13   Q    You're also not supposed to talk to your
14   counsel and your counsel is not supposed to talk to you
15   about their testimony.  Do you understand that?
16   A    Right.
17   Q    Did you become aware of this order on the day
18   it was entered, on May 16, 2001?
19   A    Yes.
20   Q    Just two days ago?
21   A    Yeah.
22   Q    Have you complied with the order to date?
23   A    Yes.
24   Q    Have you talked with any of the other
25   defendants about their testimony?
```

8

```
1    A    No.
2    Q    Did you have an opportunity to talk with any
3    of the other defendants about their testimony?
4    A    No.
5    Q    Who did you drive down here with today?
6    A    Ann Wirth and Mike Yoder.
7    Q    So Ann Wirth came back today for these
8    proceedings?
9    A    Yes, she knows Harrisburg.  We -- so she got
10   us into the parking garage.
11   Q    So she drove down with you today and she's
12   going to wait all day and drive back with you today?
13   A    Yes.
14   Q    Mr. Wilson, in connection with this litigation
15   have you performed a search for documents?
16   A    No.
17   Q    Did anybody ask you to perform a search for
18   documents?
19   A    No.
20   Q    Do you keep any documents at your home --
21   A    No.
22   Q    -- related to -- I'm sorry, related to
23   township business?
24   A    No.
25   Q    Have you ever seen a request for production of
```

9

```
1    documents?  Let me just show it to you.  I'm not going to
2    make this part of the record, but anybody that wants to look
3    at it can look at it.  Have you ever seen this document?
4         MS. MONTGOMERY:  Let the record reflect --
5         THE WITNESS:  I can't see quite as well as I
6    used to.
7         MS. MONTGOMERY:  Sure.  Let the record reflect
8    I'm showing him the request for production of documents that
9    was served upon the defendants in this case by plaintiffs.
10        THE WITNESS:  I never seen this.
11   BY MS. MONTGOMERY:
12   Q    Did you know about it?  Did you know that
13   there was a request for production of documents outstanding
14   in this case?
15   A    No.
16   Q    Not until this moment?
17   A    No.
18   Q    Is that a yes, not until this moment?
19   A    No, I didn't know.
20   Q    Until this very moment?
21   A    Right.
22   Q    Did Miss Wirth talk to you about the fact that
23   she needed to gather documents in this case?
24   A    No.
25   Q    Did you bring any documents with you?
```

**10**

1  A    No.
2  Q    Did you discuss with anybody whether you
3  should bring any documents with you?
4  A    No.
5  Q    Did you talk to Barry Parks about whether or
6  not he ought to bring any documents to his deposition?
7  A    No.
8  Q    Now, I'm going to represent to you that Mr.
9  Parks testified that the supervisors told him he shouldn't
10 bring any documents to his deposition. Do you know who told
11 him that?
12 A    No.
13 Q    I'm going to talk to you a little bit about
14 your educational background. What's your last -- the
15 highest degree of education that you completed?
16 A    **High school.**
17 Q    Did you finish high school?
18 A    **Yes.**
19 Q    You attended up there in Jackson Township?
20 A    **Huntingdon.**
21 Q    In Huntingdon?
22 A    **Yes.**
23 Q    Have you had any post high school education?
24 A    **Two years at Penn State in turf management,**
25 **agronomy department.**

**11**

1  Q    When did you do that?
2  A    **Seventy-eight, '79.**
3  Q    Did you receive any sort of degree from that?
4  A    **No.**
5  Q    Do you hold any certificates or licenses of
6  any type -- of any type, I should say?
7  A    **No.**
8  Q    Have you done any other training of any sort?
9  A    **No.**
10 Q    What do you do for a living?
11 A    **Excavating.**
12 Q    Excavating?
13 A    **Yeah.**
14 Q    Do you have your own company?
15 A    **I work for Eagle Excavation.**
16 Q    Who owns Eagle Excavation?
17 A    **It is a corporation and my son and I have**
18 **control of the stock.**
19 Q    So do you own equal shares of the stock?
20 A    **Yes.**
21 Q    Are you the president?
22 A    **Yes.**
23 Q    Is your son the vice-president?
24 A    **No, secretary/treasurer.**
25 Q    Do you have a vice-president?

**12**

1  A    No.
2  Q    How many people work for you?
3  A    **Five.**
4  Q    Five people other than the two of you?
5  A    **Yes.**
6  Q    How long have you been performing excavating
7  work?
8  A    **Twelve years.**
9  Q    What did you do prior to that?
10 A    **I was the golf course superintendent at the**
11 **Elk's Country Club in Boalsburg.**
12 Q    Boalsburg?
13 A    **Yes.**
14 Q    Is that in Huntingdon County?
15 A    **No, Centre County.**
16 Q    And how long did you hold that position?
17 A    **Twenty-one years.**
18 Q    So that would take you back to the time that
19 you were about 25, right?
20 A    **In that -- in that area. A long time ago,**
21 **yes.**
22 Q    What did you do prior to that?
23 A    **I lived in Colorado for eight months. Not**
24 **long enough to become a resident, but I took courses through**
25 **the extension service of Colorado State and that's where I**

**13**

1  **got into turf management.**
2  Q    So you started your education at Colorado
3  State?
4  A    **Yes.**
5  Q    Did you attend any other colleges or
6  universities or --
7  A    **No.**
8  Q    -- secondary schooling of any type?
9  A    **No.**
10 Q    Just in the course of your life, really, have
11 you taken any other -- even initiated any other training of
12 any type in any field -- you know, even just as a hobby?
13 A    **No.**
14 Q    Now, are you a township supervisor in Jackson
15 Township?
16 A    **Yes.**
17 Q    How long have you held that position?
18 A    **A little over five years.**
19 Q    Had you held any other position with Jackson
20 Township prior to that?
21 A    **None.**
22 Q    Did you run for township supervisor or were
23 you initially appointed or what?
24 A    **I ran for the office.**
25 Q    You ran for the office?

Case 1:00-cv-01192-SHR   Document 119   Filed 04/18/2003   Page 10 of 100

14

1    A    Yes.
2    Q    And the first time you ran for the office was
3  five years ago?
4    A    Yes.
5    Q    How long is the term of appointment?
6    A    Six years.
7    Q    Are you going to run again?
8    A    I submitted a petition.  I will be on the
9  ballot in the fall.
10   Q    What are your duties as a township supervisor?
11   A    To look out for the welfare of the citizens of
12 that township.
13   Q    How many supervisors are there in the
14 township?
15   A    Three.
16   Q    Is that the full complement?  Are there any
17 missing or open seats or anything?
18   A    No.
19   Q    Who's the chairman of the board of
20 supervisors?
21   A    Mike Yoder.
22   Q    Have you ever been the chairman?
23   A    No.
24   Q    How long is the term of the chairman?
25   A    That is set annually, each year.

15

1    Q    Has Mike Yoder been the chairman right along
2  since you've been on the board?
3    A    No.
4    Q    Who else was the chairman?
5    A    Ralph Weiler.
6    Q    Can you give me the names of the other two
7  township supervisors currently?
8    A    Yes, Ralph Weiler and Mike Yoder.
9    Q    And how long have they held those positions,
10 their positions?
11   A    I can't say on Ralph.  All I know is it's a
12 long time.  I have no -- but Mike's been on for six years.
13   Q    Were you on the -- were they both on the board
14 of supervisors when you joined the board?
15   A    No.
16   Q    Who came second, Weiler?
17   A    No.
18   Q    Who came after you?
19   A    No, Mike.
20   Q    Mike came after you.  So you gave me the
21 general description of your responsibility as a township
22 supervisor.  Can you now give me a detailed description of
23 the types of duties that you have to fulfill?
24   A    I was appointed at the annual meeting, which
25 is a reorganization meeting in January, to be road master.

16

1  So my primary duties are taking care of the roads and
2  bridges in the township.
3    Q    So you're the road master as well as a
4  township supervisor?
5    A    Yes.
6    Q    What is the -- is the road master an office
7  within the township or what is it?
8    A    It is a position that has been on the books as
9  long as I can remember in townships, rural townships.
10   Q    Is it a paid position?
11   A    Hourly.
12   Q    It's hourly.  So whenever the township needs
13 work on the roads, you do it on behalf of the township --
14   A    Yes.
15   Q    -- and you just bill the township?
16   A    (Witness nods head affirmatively.)
17   Q    What about your job as township supervisor,
18 how does that pay?
19   A    $125 a month.
20   Q    How much time do you put into your job as
21 township supervisor?
22   A    I don't know the exact hours.
23   Q    Does it vary?
24   A    Yes.
25   Q    So you're the road master.  What else do you

17

1  have to do as a township supervisor?
2    A    Attend meetings, overview on land development
3  and subdivisions, answer questions from the citizens.
4    Q    Let's take the first one.  What was the first
5  one you said?
6    A    Overview of subdivision and land use.
7    Q    What do you do in your role as a township
8  supervisor in connection with subdivision and land use, is
9  that what you said?
10   A    Yes.  The paperwork usually -- subdivision or
11 land use usually comes to the supervisors by an engineer or
12 a surveyor, that type of thing, and is laid out on the table
13 to -- for the township to review.
14   Q    When do you do that review, at the township
15 meetings or in your spare time or what?
16   A    We review them at the meeting.
17   Q    Just during the meeting?
18   A    Yes.
19   Q    Do you sometimes come early to the meeting to
20 review them or anything or they just get opened up at the
21 meeting?
22   A    No, they get opened at the meeting.
23   Q    What does an application for a subdivision
24 look like?  What does it consist of?  What is every document
25 that it consists of?

**18**

1    A    Well, there's only -- the application, there's
2  one sheet of what is required. And then the engineer or
3  architect or surveyor, they're familiar with our county and
4  the things that are on there that come in, all the necessary
5  things for our subdivision are on there.
6    Q    Like what?
7    A    The landmarks, wetlands, streams, highways,
8  trails, all these things are on there.
9    Q    What else is in -- I mean, if you're at a
10  meeting and you are handed a proposed subdivision plan, what
11  all are you going to have to look at at that meeting at that
12  time?
13    A    The plan.
14    Q    Just the --
15    A    Yeah, one of those, a big sheet, yes.
16    Q    So a map basically?
17    A    And the presenter usually asks if there are
18  any questions that he can answer while he's there.
19    Q    Are there any attachments to it?
20    A    Yes.
21    Q    Like what?
22    A    There's -- they have to have the modules, the
23  location, seven and a half minute quad angle map which
24  determines the location. It's a government map.
25    Q    For the sewer modules you mean?

**19**

1    A    For the plan, the subdivision.
2    Q    What else? Anything else?
3    A    Usually once that's done there's a -- a
4  procedure that the surveyor or engineer brings in which is
5  the narrative and all these things contained -- concerning
6  the subdivision.
7    Q    Well, what are all these things concerning the
8  subdivision?
9    A    All the -- all the lots that are proposed and
10  the roads that are proposed. All the things pertaining to
11  that development.
12    Q    Let's talk about the sewer module for a
13  minute. What do you expect to see with the sewer module?
14    A    The sewer module will have on there the
15  proposed dwellings with the amount of gallon each per day
16  generated for the site.
17    Q    And would it have markings on it to show where
18  possible sewage sites could be?
19    A    Well, the map will show all the probes and
20  percs on the whole property that were done.
21    Q    Are these approved probes and percs, you mean?
22    A    Yes.
23    Q    So when the subdivision plan comes to you,
24  it's already -- it already has a sewer module attached to
25  it. And in order for you to approve it, it has to have an

**20**

1  approved sewer module, correct, an approved -- I'm sorry,
2  approved sewage sites, correct?
3    A    Yes.
4    Q    How do you tell that there's an approved
5  sewage site?
6    A    The work is done by the SEO.
7    Q    And the SEO, for the record, is?
8    A    Barry Parks. And he generates -- there has to
9  be an application and then he generates from the field work
10  what the perc rates are for each site and these are given to
11  the designer to design a system for each site.
12    Q    I'm going to show you a document that we're
13  going to mark as Wilson Exhibit 2.
14        (Sewage facilities planning module produced
15  and marked as Wilson Exhibit No. 2.)
16  BY MS. MONTGOMERY:
17    Q    I'd ask you to look at that, Mr. Wilson. Do
18  you know what this document is?
19    A    Yeah, it's a sewer planning module.
20    Q    As you look through this document, does it
21  have everything on there that you would need to see with
22  respect to the sewage sites for purposes of approving a
23  subdivision plan?
24    A    If this was setting in front of me at the
25  meeting, questions would be raised of why a new sewage

**21**

1  module wasn't generated because this has been reworked.
2    Q    Because what's been reworked?
3    A    It's been reworked.
4    Q    I'm not sure I understand what you mean. What
5  has been reworked?
6    A    Well, there's things on here that have been
7  changed.
8    Q    Well, what do you see that's been changed?
9    A    Well, the number of lots.
10    Q    Okay. So it went from a higher number of lots
11  to a lower number of lots, right?
12    A    Yeah, if I was looking at this, I would want
13  to see the map too, of which I assume there's one that ...
14    Q    Well, let's look at page 5. Do you see up in
15  Section H where you have the signature of Barry Parks?
16    A    Um-hum.
17    Q    Is that one of the things you'd look for to
18  see whether or not there's -- whether the lot is suitable
19  for on-site sewage, look for his signature up in that --
20    A    Yes.
21    Q    Let's look at page -- well, there's some
22  attachments so you'll have to go after page 9 to the site
23  investigation and percolation test reports. Would you look
24  at each one of these site investigation and percolation test
25  reports for the signature of the sewage enforcement officer?

---

**22**

1  A  No.
2  Q  You wouldn't look at that?
3  A  No.
4  Q  Why not?
5  A  If it's gone that far, it has been through his
6  process. And he's hired by the township to take care of
7  these things. And when these things come in, this sheet
8  will come with a design for him to either approve or
9  disapprove.
10  Q  A design of what?
11  A  An on-lot sewage system.
12  Q  When they come into -- when the subdivision
13  plan comes to you, it comes with the design of an on-lot
14  sewage system?
15  A  No.
16  Q  As long as you see that he signed off back
17  here, is that what you're concerned with, when we went back
18  here to page 5?
19  A  These modules -- when the plans come in and
20  the modules are there, Parks says -- I'm sorry, Barry Parks,
21  the sewage officer, is at the meeting to explain the soil
22  modules in reference to the subdivision.
23  Q  Let me ask you this: Do you understand the
24  process to be that the sewer modules -- sewage modules have
25  to be approved first and then you get an on-lot sewage

---

**23**

1  system designed? Do you understand that to be the process?
2  A  I don't remember.
3  Q  That's fine if you don't remember. That's
4  fine. The document that you're looking at right now, Wilson
5  Exhibit 2, is a sewage facilities planning module for the
6  Corneal property, correct?
7  A  That's what it states, yes.
8  Q  When you said it was reworked, are you looking
9  at Section 2 of page 1?
10  A  Yes.
11  Q  And how was it reworked there?
12  A  Creation of a different amount of lots.
13  Q  So it went from what?
14  A  I'm sorry. Apparently that's a three under
15  there to a two.
16  Q  How else was it reworked that would raise
17  questions for you?
18  A  That question right there I would pose to our
19  sewage officer.
20  Q  Would you be concerned that it went to fewer
21  lots or would you be concerned if it went to more lots?
22  A  Not concerned as long as the sewage work was
23  there.
24  Q  Now, let's talk a little bit more about your
25  work in excavation. Do you perform excavation work in

---

**24**

1  connection with the installation of septic systems?
2  A  We install -- the company Eagle installs
3  on-lot sewage systems.
4  Q  Is that primarily what Eagle Excavation does
5  or is there other types of excavating work that it does?
6  A  Other types.
7  Q  What else does it do?
8  A  Land clearing, road building, foundation
9  digging, water sewer lines and we repair septic systems.
10  Q  So let me ask you this question: If you had a
11  site that was contemplated for a septic system and it had in
12  some way been disturbed, do you know what you would do in
13  order to bring the site back to the way it had been before
14  it had been disturbed? Do you re-excavate, that's really my
15  question?
16  A  No.
17  Q  What do you do?
18  A  I don't know.
19  Q  Say that you had an approved sewage site --
20  have you ever had the situation where you've had an approved
21  sewage site and somebody drove over it, drove over the
22  site --
23  A  No.
24  Q  -- and you said, oh, the soil is compacted.
25  You never had a soil compaction problem for a sewage site

---

**25**

1  before?
2  A  No.
3  Q  Ever?
4  A  Ever.
5  Q  You never faced it?
6  A  Never.
7  Q  So do you know as an excavator and somebody
8  who excavates for the installation of septic systems what
9  you would do if a site was compacted by having been driven
10  over a few times? Do you know what you would do?
11  A  If I had a contractor construct a site there,
12  the sewage officer would be informed right away.
13  Q  But do you know what an excavation company
14  would do to fix it?
15  MR. SHERR: Objection.
16  BY MS. MONTGOMERY:
17  Q  Do you have any idea?
18  MR. SHERR: It's been asked and answered.
19  MS. MONTGOMERY: I'm asking if he knows what
20  he would do.
21  MR. SHERR: And he said he didn't already.
22  You can answer her question.
23  THE WITNESS: I don't know.
24  BY MS. MONTGOMERY:
25  Q  You wouldn't know how to fix it?

---

Case 1:00-cv-01192-SHR    Document 119    Filed 04/18/2003    Page 13 of 100

26

1      MR. SHERR: Objection, asked and answered for
2   the fourth time. You can answer it again.
3      THE WITNESS: My experience in 12 years is
4   that it can't be fixed.
5   BY MS. MONTGOMERY:
6      Q      So you do think you know whether or not it
7   could be fixed? What is your experience in 12 years?
8      A      My experience in --
9      MR. SHERR: Objection. It's a compound
10  question. Which question would you like him to answer?
11  BY MS. MONTGOMERY:
12     Q      So you do think it can't be fixed?
13     A      That's -- yes.
14     Q      Why is that?
15     A      Whenever I go to the sewage seminars, that is
16  one of the things that's drilled into us as contractors,
17  don't touch a site, don't near it.
18     Q      But then do they tell you -- if somebody does
19  get near it, do they tell you what to do?
20     A      Yes.
21     Q      What's that?
22     A      The sewage officer rejects it.
23     Q      That's what they taught you in the seminar?
24     A      Yes.
25     Q      Going one step further, you said in my

27

1   experience in 12 years -- I think this was your testimony.
2   It can't be fixed, is that what you said?
3      A      Yes.
4      Q      I'm just going to ask you a little bit more
5   about what you know about the whole process for approval of
6   a sewage system. Now, in your work as an excavator are you
7   expected to understand the process for sewage system
8   approval for on-lot sewage systems?
9      A      No.
10     Q      In your work as a supervisor are you expected
11  to know the process?
12     A      Yes.
13     Q      So do you understand the process and can you
14  explain it to me?
15     A      Initially the property owner calls -- they
16  usually call a contractor and we recommend that we can't do
17  anything till the sewage officer is called. And then the
18  sewage officer will set up a schedule where the backhoe can
19  meet there with the sewage officer and usually the property
20  owner and soil probes -- soil logs are dug.
21     Q      And then what?
22     A      Once the -- there's verification from the
23  sewage officer that there's suitable soil there for on-lot,
24  there's a direction made to do perc tests.
25     Q      And who does the perc tests?

28

1      A      That's up to the land owner.
2      Q      What kind of professional does the perc tests?
3      A      The perc test is done by the sewage officer.
4      Q      All right. And then what?
5      A      Once that's done, the -- that sheet is
6   generated like back here with his -- with his results.
7      Q      With the sewage officer's results?
8      A      Yes.
9      Q      So let the record reflect that you're
10  referring to the percolation test report, site investigation
11  and percolation test reports on Wilson Exhibit 2, correct?
12     A      Yes.
13     Q      So those are generated next and then what
14  happens?
15     A      The property owner takes these to a designer
16  and has a design constructed for bidding purposes to put a
17  system in there.
18     Q      So the property owner takes the approved
19  sewage facilities planning module to somebody for design,
20  correct?
21     A      That I don't know. The only -- my experience
22  is that the soil -- the application for on-lot sewage and
23  the soil work-up sheet from the sewage officer is all I've
24  ever seen from designers to use.
25     Q      The application you're -- tell me that again.

29

1   I'm sorry, I missed it.
2      A      Application for on-lot sewage.
3      Q      And?
4      A      On there it has proposed bedrooms of the house
5   and location of the house -- proposed location of the house,
6   proposed well. All these things are taken into
7   consideration by the designer.
8      Q      And then he designs a septic system suitable
9   for the property?
10     A      That site.
11     Q      For that site?
12     A      (Witness nods head affirmatively.)
13     Q      Now, if there's more than one approved site
14  investigation -- well, I should say if there's more than one
15  approved sewage site, could you expect that the septic
16  system designer could design one for any one of those
17  approved sites?
18     A      With the proper material.
19     Q      With the proper material. What do you mean by
20  material?
21     A      The application with the proposed building,
22  the size of the building, the wells, the location, all those
23  things, and the slopes.
24     Q      Well, I'll ask it to you slightly
25  differently. If there are a number of approved by Barry

30

1 Parks, site investigation and percolation test reports, is
2 it permissible -- is it your understanding that it's
3 permissible to place a septic system at any one of those
4 approved sites?
5 A  No.
6 Q  Why is that?
7 A  Not except where the site is specific, where
8 that building is going to go.
9 Q  Right.
10 A  Yes.
11 Q  It's your understanding that it has to be a
12 specific site for where the building is going to be?  I'm
13 not sure I understand you.
14 A  Where there's a proposed site, usually there's
15 a proposed home going to be there and a well and everything
16 with that.
17 Q  So could there be more than one site approved
18 by the sewage officer for the proposed building?
19 A  All the approved sites that he approves are
20 suitable for a building.
21 Q  Prior to joining the board of supervisors,
22 were you under contract to the township for any work at any
23 time?
24 A  No.
25 Q  No?

31

1 A  No.
2 Q  Prior to becoming the road master, did you
3 perform any roadwork for the township?
4 A  No.
5 Q  In your capacity as a township supervisor, are
6 you familiar with the requirements for enacting ordinances?
7 A  I don't understand.
8 Q  As a township supervisor, do you know what you
9 have to do to enact an ordinance for the township?
10 A  Yes.
11 Q  What do you have to do?
12 A  The ordinance is drawn up and discussed, the
13 supervisors discuss this, and it's -- and when it's pulled
14 together, typed up and ready for adoption, there's an ad put
15 in the newspaper to advertise it. And there's so many days,
16 and I -- I don't know what that -- off the top I don't know
17 what that is.
18 So many days that that has to be open for
19 public review and then there will be a -- once that's done,
20 there is another notice put in that the ordinance will be
21 adopted a certain time and date.
22 Q  How do you know how to enact an ordinance?
23 Who did you consult with to figure out how to enact an
24 ordinance?
25 A  Those things come out of the state

32

1 association, PSATS.
2 Q  The Pennsylvania Association of Township
3 Supervisors?
4 A  Yes.
5 Q  Do you consult with anybody else about
6 enacting ordinances?
7 A  I believe now things are -- I believe that the
8 township solicitor is asked to look at it to see if it meets
9 legal requirements.
10 Q  The township solicitor is?
11 A  Larry Newton.
12 Q  How long has he been the township solicitor?
13 A  I don't know.
14 Q  Has he been there since you've been there?
15 A  Yes.
16 Q  As a township supervisor?
17 A  Yes.
18 Q  So if you have any questions about whether or
19 not an ordinance is appropriate, you consult the solicitor?
20 A  Yes.
21 Q  Do you know whether or not you are supposed to
22 make copies of the ordinances available for the public?
23 A  Yes.
24 Q  You are supposed to?
25 A  Yes.

33

1 Q  Where do you keep them?
2 A  There's -- I'm going back here now.  There was
3 copies made of the subdivision and land use ordinance and it
4 was advertised in the paper that they were available for --
5 I think it was five dollars.  And we -- we don't have the
6 money that we went out and made lots of those things.
7 Usually people would call and we would have to go to
8 someplace that does that for us because we don't have those
9 facilities.
10 Q  Like a copy center you mean?
11 A  Yes, yes, and run them off, but there -- as
12 far as I know there is no reserve.  It's a --
13 Q  Do you know how they're kept?  Do you know how
14 the ordinances are kept?  In what form, is really what I'm
15 asking you?
16 A  I think just in the filing cabinet in folders.
17 Q  In folders in Ann Wirth's office?
18 A  Yes.
19 Q  What about the proposed ordinances, do you
20 make them available to the public?
21 A  Proposed ordinance.
22 Q  Before the ordinance is actually enacted.
23 A  Yes, we -- that's law.
24 Q  So if somebody wants to see it, you make
25 arrangements for them to get a copy of it?

34

1  A    Yes.
2  Q    Do you think that that's -- they're entitled
3  to it?
4  A    Yes.
5  Q    Do you hold any hearings on the proposed
6  ordinances when you -- I know you haven't had a lot of
7  ordinances in your township, but to the extent you have, do
8  you hold public hearings on the ordinances?
9  A    There again, it's advertised in the paper that
10 the ordinance is available for review.
11 Q    And then what would you expect, if the public
12 has anything to say about it they would come to the township
13 meetings?
14 A    Or call.
15 Q    Or call?
16 A    Yes.
17 Q    And give their comments or what?
18 A    Call to ask to see it, yes.
19 Q    And who would they call?
20 A    The secretary of the township.
21 Q    Anybody else they could call?
22 A    They could call any of the supervisors.
23 Q    How about the township solicitor, could they
24 call him?
25 A    I don't know.

35

1  Q    So going back to my question about a public
2  hearing, is it your testimony that the public hearing that
3  you hold consists of publishing it in the paper and making
4  the proposed ordinances available if people want to see it?
5  A    I haven't been involved in many. I haven't
6  been a supervisor that long, but the -- it was advertised in
7  the paper of a public meeting and the citizens were informed
8  of what was transpiring in the township for that -- that
9  meeting was a special for that.
10 Q    A public township supervisor's meeting?
11 A    A public meeting, yes.
12 Q    But was the public meeting -- you mean a
13 meeting of the board of supervisors?
14 A    No, a public meeting. Everybody's -- it's a
15 public meeting.
16 Q    And who would be at that meeting?
17 A    Any citizen.
18 Q    So you think that it was advertised in the
19 paper -- with respect to the subdivision and land use
20 ordinance that was passed by Jackson Township, you believe
21 there was an advertisement for a public meeting?
22 A    Yes.
23 Q    I'm going to show you what we're going to mark
24 as Wilson Exhibit 3.
25       (Interruption.)

36

1  BY MS. MONTGOMERY:
2  Q    I'm going to show you -- well, I was going to
3  show you some documents. Unfortunately, when we handed Miss
4  Wirth this document yesterday, she wrote on it, it appears.
5  We won't make this an exhibit in this deposition so strike
6  that. We'll just show you the original that was part of
7  Miss Wirth's deposition.
8        MS. MONTGOMERY: Let the record reflect that
9  we are showing Mr. Wilson Wirth Exhibit 1.
10 BY MS. MONTGOMERY:
11 Q    Is that the newspaper advertisement, notice of
12 a public meeting that you're referring to?
13 A    Yes.
14       MS. MONTGOMERY: Apparently my secretary has
15 an emergency and I'm going to have to take a very short
16 break. I will be right back.
17       (Break taken at 9:28 a.m. until 9:33 a.m.)
18 BY MS. MONTGOMERY:
19 Q    Just so I'm clear about your testimony on
20 public hearings for the proposed ordinances, if there was
21 going to be a public hearing would it be held at the
22 township supervisor's meeting house, meeting room, the
23 office there with the board of supervisors present?
24 A    No.
25 Q    Where would it be held?

37

1  A    At the fire hall.
2  Q    Oh, in the fire hall. Okay, all right. With
3  the board of supervisors present, right?
4  A    Yes.
5  Q    And would it be at a special meeting called by
6  the township supervisors precisely for that purpose?
7  A    Can you -- can you bring that back. I --
8  something jogged there.
9  Q    Okay. It would be at a meeting called by the
10 township supervisors, either a regular meeting or a special
11 meeting advertised by the township supervisors where
12 everybody would come so they could have a public meeting
13 about it; is that correct?
14 A    Yes.
15 Q    We talked a little bit about ordinances and
16 how you enact proposed ordinances in the township. What
17 about a moratorium? Have you ever done any other moratorium
18 other than the one that's at issue in this lawsuit?
19 A    No.
20 Q    So there has only been one moratorium and that
21 was a moratorium on proposed subdivisions, correct?
22 A    Yes.
23 Q    How did that come about?
24 A    It came about from information that we were --
25 we had the county reviewing our ordinance and from the

---

**38**

1 emergency people in our area, fire company, EMS, all these
2 people had concerns that the subdivision and land use
3 ordinance was going to cover safety issues to the fullest
4 extent because of the rural area. So a decision was made by
5 the supervisors to stop subdivisions until the ordinance was
6 enacted.

7     Q    Subdivisions of any type, even dividing a
8 hundred acres into two lots?

9     A    Yes.

10     Q    You decided you couldn't do that for public
11 safety reasons?

12     A    No, it was to stop -- as I stated, I believe,
13 to stop all subdivisions until the ordinance was in place.

14     Q    Whose idea was the moratorium?

15     A    The supervisors.

16     Q    Which supervisor first mentioned it?

17     A    I don't remember.

18     Q    Were you all in agreement on it, that this was
19 the thing to do?

20     A    Yes.

21     Q    Did you consult with somebody about it?

22     A    I don't believe.

23     Q    Did you consult with Larry Newton about it?

24     A    I don't remember.

25     Q    Did you tell Larry Newton you were going to

---

**39**

1 put the moratorium in place?

2     A    Yes, and I believe that there was a public
3 notice put in the newspaper.

4     Q    You believe there was a public notice put in
5 the newspaper about the moratorium?

6     A    Yes.

7     Q    Who do you think put that public notice in the
8 newspaper?

9     A    Either the solicitor or the secretary.

10     Q    So if the solicitor put it in the newspaper,
11 he would have to have known about the moratorium, correct?

12     A    Yes. I can't recall discussing it with him
13 till we did it.

14     Q    You can't recall discussing the moratorium
15 with him until after you did it?

16     A    Yes.

17     Q    How soon after you did it did you discuss it
18 with him?

19     A    I don't know.

20     Q    Do you remember when the moratorium was put in
21 place?

22     A    January 2000.

23     Q    Did you hold any public meetings on the
24 moratorium?

25     A    No.

---

**40**

1     Q    Did you place the moratorium in any sort of
2 writing, written document?

3     A    Not that I recall.

4     Q    In other words, there's a written document
5 that reflects the ultimate subdivision plan that you all
6 drafted up and enacted, correct?

7     MR. SHERR: Object to the form of the
8 question, subdivision plan.

9     MS. MONTGOMERY: Subdivision ordinance. Well,
10 just strike it and I'll start again.

11 BY MS. MONTGOMERY:

12     Q    There is a written document that comprises the
13 subdivision ordinance that the Jackson Township Board of
14 Supervisors enacted, correct?

15     A    Yes.

16     Q    Is there a similar written document that
17 comprises a moratorium on subdivision?

18     A    No.

19     Q    Now, you said you know that you informed Mr.
20 Newton at least after the moratorium was put in place and I
21 think you testified you're not sure exactly when, but now
22 that you've said that it was January 2000 when you enacted
23 -- or when you, I should say, put in place the moratorium,
24 does that help you recall when you told Larry Newton about
25 it?

---

**41**

1     A    No.

2     Q    Do you think you waited until the summer to
3 tell him about it?

4     A    No. No, it wasn't that long. I -- I don't
5 know -- I don't know days or weeks or -- that should be --
6 that should be available.

7     Q    When you told him?

8     A    No, when it was in the newspaper.

9     Q    Let me ask you this: How does Larry Newton
10 bill the township for his time?

11     A    Hours of service.

12     Q    So he sends you monthly bills?

13     A    No.

14     Q    Does he send you quarterly bills?

15     A    No.

16     Q    What does he send you?

17     A    Whenever he has some time. I guess in theory
18 he's a full-time solicitor but his services aren't used
19 every month or something like that. It's just on an as --
20 as-needed basis.

21     Q    Is he on a salary or he's on an hourly?

22     A    Hourly.

23     Q    So if he performs work for you, then he writes
24 it down somehow, describes what the work is and sends it to
25 you in an invoice?

---

Case 1:00-cv-01192-SHR   Document 119   Filed 04/18/2003   Page 17 of 100

42

1  A     He sends it to the township secretary and it's
2  shown to us at the meeting, yes.
3  Q     So she shows you that?
4  A     Yes.
5  Q     Do you recall seeing some time on a township
6  -- on your township solicitor's bill for discussing the
7  moratorium or reviewing the moratorium or anything like
8  that?
9  A     No.
10 Q     No?
11 A     (Witness shook his head negatively.)
12 Q     You don't recall it?
13 A     I don't recall it.
14 Q     Well, you said you don't think you waited
15 until the summer, right?  Do you think that you told him
16 about the moratorium within a few weeks?
17 A     I don't know.
18 Q     Well, you don't have to know the exact date.
19 I mean, that's not what we're looking for at all.  We just
20 need an approximate time frame.  Do you think it was still
21 winter when you told him about it?
22 A     Yes.
23 Q     What makes you think that?
24 A     I -- I wish I could remember when the item was
25 in the newspaper.  I just ...

43

1  Q     You think the item went into the newspaper
2  after the moratorium was in place?
3  A     Yes.
4  Q     I see.  What makes you think the item went in
5  the newspaper after the moratorium was in place?
6  A     I don't know.
7  Q     Did you all decide, well, now we have the
8  moratorium, we better post it in the newspaper so everybody
9  knows about it?
10 A     Yes.
11 Q     So who did you discuss that with?
12 A     The solicitor.
13 Q     Did he tell you that now that you have a
14 moratorium you better put it in the paper so the public
15 knows about it?
16 A     No.
17 Q     But you discussed it with him, right?  What
18 was the nature of that discussion?
19 A     He was informed that the Jackson Township
20 supervisors enacted by unanimous vote at the meeting and set
21 into motion the moratorium for subdivisions and land use in
22 Jackson Township until the ordinance was adopted.
23 Q     So whose idea was it to put it in the paper?
24 A     I don't know.
25 Q     You don't know?

44

1  A     No.
2  Q     That's okay.  It's okay if you don't
3  remember.  I'm just asking you.  Did you discuss it with Ann
4  Wirth?
5  A     Discuss --
6  Q     Putting the notice of the moratorium in the
7  paper with Ann Wirth after the moratorium was put in place.
8  A     No.
9  Q     You didn't discuss it with her?
10 A     What would the need be, she's right at the
11 meeting taking down the information.
12 Q     I'm just trying to get to the point of who
13 decided to put the notice in the paper.  At the January 2000
14 meeting when you put the moratorium in place, did you go
15 through a process of making a motion?  Did somebody make a
16 motion to put a moratorium in place and was it approved and
17 all that or did you just all decide to stick it in the
18 minutes that there was a moratorium in place?
19 A     I don't remember.
20 Q     If you did that, if you made a motion, if you
21 said we now move -- somebody moves that there's a moratorium
22 to be put in place on subdivisions and somebody else seconds
23 it and somebody else says, you know, all in favor, would
24 that be in the minutes?
25 A     Yes.

45

1  Q     It should be in the minutes if you did it?
2  A     Yes.
3  Q     Let's talk about the first time that you met
4  David Corneal.  Do you recall it?
5  A     Yes.
6  Q     When was that?
7  A     I don't remember the day.
8  Q     What was the occasion?
9  A     I believe he pulled into my business
10 establishment.
11 Q     For what purpose?
12 A     If I remember correctly, it was to do some
13 work for him.
14 Q     What kind of work?
15 A     Clean up a site.
16 Q     Clean up a site in what -- for what, do you
17 know?
18 MR. SHERR:  Objection.  Did you say clean off
19 the site?
20 THE WITNESS:  Clean up the site.
21 MR. SHERR:  Clean up?
22 THE WITNESS:  Up.  Yes, up.
23 BY MS. MONTGOMERY:
24 Q     Clean up a site for what?
25 A     It was some litter that deposited over the

46

1  years and he -- David wanted it cleaned up.
2    Q    So it was some trash on his property you mean?
3    A    Yes.
4    Q    And so did you perform that work for him?
5    A    No.
6    Q    Why is that?
7    A    I just never got to it. It was a --
8    Q    It was a busy time?
9    A    Well, it was weather related and I didn't make
10  it.
11    Q    So then did you have occasion to meet him
12  another time after that?
13    A    Yes, and I -- I can't recall the dates, but he
14  needed a backhoe.
15    Q    For what?
16    A    Soil probes.
17    Q    For his soil probes. So did he come again to
18  your business establishment?
19    A    I think so.
20    Q    Well, in any event, you agreed to go out and
21  do excavation work in connection with the soil probes?
22    A    Yes.
23    Q    When you agreed to do that, did Mr. Corneal
24  explain to you what he intended to do with his property?
25    A    I don't recall.

47

1    Q    Did he tell you that he wanted a number of
2  lots on his property?
3    A    I remember the part that he wanted various
4  probes dug, but I -- I don't recall of him saying exactly
5  how many lots he was looking for or anything like that.
6    Q    Did you understand he was looking for at least
7  another lot to build a building for himself, a dwelling for
8  himself?
9    A    Yes.
10    Q    Did you understand that he was also looking
11  for at least another lot perhaps for his -- for family
12  members?
13    A    No.
14    Q    So did you understand he wanted to subdivide
15  his property at least into two lots?
16    A    I under -- I was under -- under the
17  understanding that he was going to split it up into lots,
18  yeah.
19    Q    You were under that when you went out to do
20  that work?
21    A    Yes.
22    Q    Is it your understanding that Mr. Corneal also
23  knew at that point that you were also a township supervisor?
24    A    I don't -- I don't know that.
25    Q    So you went out and you performed the

48

1  excavation work for Mr. Corneal?
2    A    Yes.
3    Q    What did that involve?
4    A    Driving a backhoe all over the property and
5  the sewage officer -- and I can't even remember if Mr.
6  Corneal was there -- deciding we're going to try this soil,
7  this site here and move on, that type of thing.
8    Q    Did you make reference to a plot plan at that
9  point or a plan or a survey of any type?
10    A    I don't recall.
11    Q    Do you recall whether there was a map, a
12  survey map or anything like that that accompanied you in
13  your work that day?
14    A    No.
15    Q    Did you have a written contract with him for
16  the services?
17    A    No.
18    Q    You just agreed on a price or was it on an
19  hourly or what?
20    A    Hourly rate.
21    Q    Did you actually do the work yourself?
22    A    No.
23    Q    Who did it?
24    A    I believe Mike Foster was on the backhoe.
25    Q    Mike Foster?

49

1    A    Yes.
2    Q    Is Mike Foster your nephew?
3    A    No.
4    Q    Do you have a nephew who works for you?
5    A    Yes.
6    Q    What's his name?
7    A    Matt Armstrong.
8    Q    Matt Armstrong. Do you think maybe he was at
9  that project?
10    A    I'm sure that Matt was there at one time or
11  another. I just can't recall -- I have more than one hoe
12  operator and ...
13    Q    Do you know how Mr. Corneal came to hire you
14  for this project? Did somebody recommend him, do you know?
15    A    I don't know.
16    Q    Do you know whether you'd ever seen Mr.
17  Corneal at a township meeting prior to the time that Eagle
18  Excavation did the work?
19    A    I don't recall.
20    Q    But you said that you had met Mr. Corneal
21  prior to the time you did the excavation work in connection
22  with his request that you do other work on his property,
23  correct?
24    A    Yes.
25    Q    Do you recall how long you talked to him at

50

1   that meeting?
2       A      It was sort of a walk around chatty type and
3   that could be the -- the time that I said that I was a
4   township supervisor. I just -- it's been a while.
5       Q      Did you ever mention -- when Mr. Corneal first
6   contacted you to do the work on the property either removing
7   his debris or digging the test pits, did you mention a
8   proposed moratorium to him at that time?
9       A      I advised Mr. Corneal at one of the times we
10  were there working on the sewage that if he was going to
11  subdivide his property he should do it this year because
12  there's -- the township is working on ordinances for 2000.
13      Q      So that would indicate that you did understand
14  he was trying to subdivide his property --
15      A      Well --
16      Q      -- when you were doing that work for him,
17  correct?
18      A      These things sort of evolved in the days that
19  we were there working. I can't ...
20      Q      Did you come out to the property at some point
21  when somebody else was running the backhoe in connection
22  with digging the test pits?
23      A      I was in and out -- that's what I do. I -- I
24  have various jobs going and I'm here, there and everywhere.
25      Q      So you just go out to oversee it and that sort

51

1   of thing?
2       A      See if everything is okay.
3       Q      So you advised him that he ought to subdivide
4   his property at the point that you were doing his excavation
5   because you were going to put a subdivision ordinance in the
6   next year, right?
7       A      Yes.
8       Q      Do you recall what Mr. Corneal said back to
9   you about that?
10      A      No.
11      Q      At the time that you were out there working on
12  his property, or that Eagle Excavation was out there working
13  on his property was the township considering a moratorium at
14  that point?
15      A      No.
16      Q      After you dug the test pits, did the Corneals
17  ask you to do any other work on their property in your
18  capacity as Eagle Excavation?
19      A      Yes.
20      Q      What was that?
21      A      To shale a road.
22      Q      And what road was that?
23      A      The old logging road that went down to -- and
24  crossed the power line and actually got to where it crossed
25  the stream, Laurel Run.

52

1       Q      So did you shale that road?
2       A      No.
3       Q      Why not?
4       A      I came back to the office this one day and
5   there was a slip of paper there from David that McClintic
6   had said that it will take X amount of shale -- loads of
7   shale to do this road and I just -- I just didn't get to it.
8       Q      So you intended to do it but you just didn't
9   get to it?
10      A      Well, the length of time that had transpired
11  there, the next thing I knew somebody else was doing it.
12      Q      So Mr. --
13      A      It's not that I -- I had my shale pits right
14  there across the road from his house.
15      Q      So you intended to do it but he got somebody
16  else to do it?
17      A      I intended to do it, but I -- I was busy.
18      Q      Okay. Did you have any problem with where --
19  you know, any concerns at all about where he was putting
20  that road that he wanted you to shale -- was that road
21  already there?
22      A      It was an existing log road.
23      Q      So did you have any problem with shaling that
24  road? Did you think there was anything wrong with that?
25      A      No.

53

1       Q      Did Mr. Corneal ask you then to do any other
2   work on his property?
3       A      No.
4       Q      So you dug the test pits. Did you help at all
5   in any way with the perc tests?
6       A      Yes.
7       Q      What did you do there?
8       A      We dug the holes and supplied the water for
9   the sewage officer.
10      Q      And that was a different day than actually
11  digging the test pits, right?
12      A      Yes.
13      Q      So you did actually perform some other work
14  for him?
15      A      Yes.
16      Q      That's all right. Did you do the perc tests
17  after he asked you to shale the road or before?
18      A      Before.
19      Q      So asking you to shale the road, was that the
20  last thing he asked you to do for him on his property?
21      A      Yes.
22      Q      Did you know why Mr. Corneal was asking you to
23  help with the perc tests on the property?
24      A      No.
25      Q      You didn't know what he was looking for there?

Case 1:00-cv-01192-SHR   Document 119   Filed 04/18/2003   Page 20 of 100

**54**

1  A  Well, that was -- that was to get -- for the
2  sewage officer to set the perc rates, is all --
3  Q  So he was looking for on-lot septic system?
4  A  Yes.
5  Q  On a variety of lots, right?
6  A  Yeah.
7  Q  Did you understand that at the time?
8  A  Yes, yes.
9  Q  Did you actually perform the perc test
10  yourself?
11  A  No.
12  Q  Who did it?
13  A  My crew.
14  Q  Do you recall who from your crew went out and
15  did it?
16  A  No.
17     MS. MONTGOMERY:  Well, let me just consult for
18  one second.
19     (Break taken from 10:01 a.m. until 10:02 a.m.)
20  BY MS. MONTGOMERY:
21  Q  Did Mr. Corneal pay you for doing the work on
22  his property, pay Eagle Excavation for doing that work?
23  A  Yes.
24  Q  He paid all his bills?
25  A  Yes.

**55**

1  Q  Do you recall how much the work was --
2  A  No.
3  Q  How much the work cost?
4  A  No.
5  Q  Do you recall when you finished up the work on
6  the property with the perc tests?
7  A  June, July, August, late -- it was late
8  summer. It was dry. July, August, in that area.
9  Q  Was it your understanding that the sewage
10  enforcement officer had found a number of good sites for
11  on-lot sewage systems on that property?
12  A  Yes.
13  Q  Now, the property itself, the Corneal
14  property, are you familiar with that property from before
15  you knew Mr. Corneal?
16  A  Yes.
17  Q  And how are you familiar with that property?
18  A  That was my grandfather's farm so I ran around
19  there a lot as a tyke.
20  Q  Did you ever live there yourself?
21  A  No.
22  Q  Your grandfather owned the farm -- the
23  farmhouse that exists on the property now --
24  A  Yes.
25  Q  -- is that correct? Did he also own the whole

**56**

1  piece of land that Mr. Corneal owns there?
2  A  Yes.
3  Q  So there's approximately 95 acres, is that
4  what it is? Is that what your grandfather owned?
5  A  No.
6  Q  What did he own?
7  A  He owned on the other side of the road, too,
8  clear across Route 26, which over the -- through the fifties
9  and stuff it was chopped up.
10  Q  He sold it off through the fifties?
11  A  Mostly to his children, yeah.
12  Q  Do you live near Mr. Corneal's property?
13  A  No.
14  Q  How far from it do you live?
15  A  Approximately three miles.
16  Q  When did your grandfather sell the farmhouse?
17  A  Unfortunately he didn't. I believe it was an
18  estate sale.
19  Q  Oh, he passed away?
20  A  Yes.
21  Q  I'm sorry. Did you -- I didn't mean to ask
22  you the question like that, I apologize. Did he sell --
23  well, when the estate sale occurred, was it for the entire
24  95-acre piece?
25  A  No.

**57**

1  Q  What was it for?
2  A  It was -- and I don't know the acreage.
3  Across the township road from the farmhouse and barn, there
4  was acreage there that went with it.
5  Q  So there was still --
6  A  It was a bigger plot, yeah.
7  Q  And who bought the property at that point?
8  A  Taylor Wilson.
9  Q  Is that a relative of yours?
10  A  Yes.
11  Q  How is he related or she related to you?
12  A  He's deceased too. He was a second cousin.
13  Q  I see. So the property -- when did the estate
14  sale occur?
15  A  I believe I was a senior in high school, '59,
16  '60, along there somewhere.
17  Q  And then your second cousin bought the
18  property and how long did he own it?
19  A  Up until -- I don't know when he sold that
20  half off. I don't know. He split the property.
21  Q  He split the 95 acres that Mr. Corneal owns?
22  A  And kept everything on the west side of Miller
23  Road -- I mean Sawmill Road.
24  Q  Do you have any interest in purchasing the old
25  Wilson homestead there?

58

1  A    I -- I think at -- in our -- no. I was
2  wandering there. I was thinking of -- we were walking
3  around and David and McClintic -- I don't remember who was
4  around, but I was sort of reminiscing about my grandkids, it
5  would be nice to have a place away from the highway that the
6  kids could go, but, geez, I couldn't afford to buy the
7  property.
8  Q    Are you aware of whether or not your nephew
9  approached Mr. Corneal about buying the property?
10 A    I am aware.
11 Q    And what happened?
12 A    He came back to me all excited and wanted me
13 to lend him money and I didn't have the money to lend him.
14 Q    He wanted to buy the old homestead?
15 A    Yeah.
16 Q    Did you and he discuss whether or not you
17 could buy it together or anything like that?
18 A    No.
19 Q    Did you ever discuss with him any way that you
20 could keep the property in the family?
21 A    No. What I might say is I advised him to go
22 to Kish Bank and see if he could get a mortgage set up,
23 that's what I advised him.
24 Q    Well, what your nephew was interested in
25 buying, was that the 26-acre piece with the farmhouse on it?

59

1  A    Yes.
2  Q    How did you become aware that the Corneals
3  were interested in selling that 26-acre piece off?
4  A    I don't recall.
5  Q    Did you ever try to help your nephew or
6  anybody else find the money to acquire that 26-acre piece
7  since Mr. Corneal has owned it?
8  A    No.
9  Q    Did you ever request that anybody assist your
10 nephew in purchasing it?
11 A    No.
12 Q    Now, at what point do you recall your nephew
13 coming to you all excited and talking about buying the
14 property?
15 A    I don't remember.
16 Q    Was it around the time you were doing the
17 excavating work?
18 A    I don't believe.
19 Q    You think it was later than that?
20 A    Yes.
21 Q    Do you think it was -- was it before the
22 winter, does that help?
23 A    I don't know.
24 Q    Well, correct me if I'm wrong, the excavation
25 work was done in 1999; isn't that correct?

60

1  A    Yes.
2  Q    Do you think it was before January 2000 when
3  you put the moratorium in place?
4  A    I -- I really don't know.
5  Q    Do you recall what your nephew was wearing?
6  Was he wearing a coat when he came to talk to you?
7  A    I -- I can remember him come flying -- I was
8  at the shop. He come flying in all excited that there was a
9  -- he had maybe a chance to get the property, but I -- I
10 can't recall when.
11 Q    Let me ask you this: We talked a moment ago
12 or so about Mr. Newton's bills. You said you review the
13 bills at the township meetings?
14 A    Did I say that?
15 Q    I believe you did.
16 A    I think I said that the -- the bills were
17 brought to the township meeting to be looked at by the
18 supervisors and -- which authorize payment, yes.
19 Q    Do you know where the bills are kept then?
20 A    I assume the township office.
21 Q    So they're kept by Ms. Wirth?
22 A    Yes.
23 Q    Does she have a file, do you know? Does she
24 keep a collapsible folder or something like that or --
25 A    What I know is the supervisors paid for two, I

61

1  believe they're four-drawer, filing cabinets because
2  whenever we go into all the flood issues we had no storage
3  room for records, to keep all the flood records and things
4  and -- we had no place to keep those.
5  Q    I see.
6  A    Which was -- geez, I forget. How could I
7  forget that? The flood when we lost the bridges, five years
8  ago.
9  Q    Ninety-six?
10 A    Yes.
11 Q    The big flood that came through here as
12 well --
13 A    Yes, yes.
14 Q    -- in '96, the winter, February?
15 A    Exactly. I had been a supervisor one month
16 and disaster hit, yes. What a learning experience.
17 Q    That's right. Now, at the time you were doing
18 the excavation work for Mr. Corneal, did you discuss Mr.
19 Corneal's intent to subdivide with the other township
20 supervisors?
21 A    I don't recall.
22 Q    Did you discuss it with Miss Wirth?
23 A    I don't believe.
24 Q    Even in passing, even just casually?
25 A    It's possible that it -- I said something

Case 1:00-cv-01192-SHR   Document 119   Filed 04/18/2003   Page 22 of 100

**62**

1 about it because as soon as people see me coming with a
2 backhoe -- it's a small community and -- what are you doing
3 over there. And it's possible that I said in passing to
4 somebody that, well, I think Mr. Corneal is going to
5 subdivide his property. I -- I think -- if that happened,
6 it happened that way, just as a casual thing. I don't -- I
7 don't really recall.
8    Q    Mr. Wilson, you subdivided some property not
9 too long ago; isn't that correct?
10   A    Yeah, I had approximately 12 acres that was
11 subdivided before I became a supervisor. My -- I have two
12 sons and for sons to get mortgages to build homes for their
13 families they have to own land so I had the property
14 subdivided.
15   Q    So you divided your 12 acres into how many
16 lots?
17   A    Three.
18   Q    Now, I think you testified that that was
19 subdivided before you became a supervisor, correct?
20   A    Yes.
21   Q    But you also said you became a supervisor in
22 1996, correct?
23   A    Yes.
24   Q    Well, I'm going to show you a document that we
25 will mark as Wilson 3 and I'll just ask you to look it over.

**63**

1         (Subdivisions reviewed by HCPC produced and
2 marked as Wilson Exhibit No. 3.)
3 BY MS. MONTGOMERY:
4    Q    Do you see about two-thirds of the way down
5 this document -- which is a list of subdivisions reviewed by
6 the Huntingdon County Planning Commission, correct?
7    A    Yes.
8    Q    Do you see your name, W. Thomas Wilson there?
9    A    Yes.
10   Q    And the date is September 3rd, 1997?
11   A    Yes.
12   Q    So maybe you were just mistaken about when you
13 subdivided?
14   A    A mistake?
15   Q    Well, I think you said you subdivided it
16 prior to --
17   A    To becoming a supervisor.
18   Q    Right. But this is a list of subdivisions
19 reviewed by the Huntingdon County Planning Commission which
20 has you dated -- the date is September 3rd, 1997. Is it
21 possible that you began the process of subdivision prior to
22 becoming a supervisor and finished it afterwards?
23   A    Oh, no, that was all complete before I became
24 a supervisor.
25   Q    Now, it's my understanding that the Huntingdon

**64**

1 County Planning Commission has to review every
2 subdivision --
3    A    Right.
4    Q    -- proposed subdivision within Jackson
5 Township before the supervisors will approve it; is that
6 correct?
7    A    Yes.
8    Q    Well, let's look back further on this
9 document. Two Corneal entries are on this document. Do you
10 see them on the second page, one is --
11   A    Yes.
12   Q    -- dated February 10, 2000 and one is dated
13 April 11, 2000, right?
14   A    Yes.
15   Q    Are those the dates of the submission of the
16 subdivision plan to the township?
17   A    I don't know.
18   Q    Is this the date they were reviewed by the
19 county, do you know?
20   A    I don't know.
21        MS. MONTGOMERY: Just let the record reflect
22 that there was some discussion going on between Mr. Wilson
23 and his counsel.
24        MR. SHERR: And for the record, I was showing
25 Mr. Wilson my doodles and my pad.

**65**

1        MS. MONTGOMERY: For the record, he was
2 showing Mr. Wilson his yellow legal pad.
3        MR. SHERR: I was showing him the doodles on
4 my legal pad, that's correct.
5 BY MS. MONTGOMERY:
6    Q    So when you say that the subdivision was
7 completed before you became a township supervisor, you mean
8 that you'd already recorded the deeds and all that?
9    A    I don't know when the -- my son's recorded
10 their deeds.
11   Q    But you'd already conveyed the deeds to them,
12 that's what you mean by the subdivision being completed?
13   A    Well, I know it was before I was a supervisor
14 because I had to deal with Koch, Wilson and Weiler as
15 supervisors when I submitted my subdivision plan.
16   Q    So you submitted it to them and they approved
17 it?
18   A    No. Well, they approved it, but it -- I
19 didn't -- it didn't happen right away. DEP and county,
20 every --
21   Q    So did your sons begin to build their homes
22 before you became a township supervisor?
23   A    Yes.
24   Q    They did. Were they completed before you
25 became a township supervisor?

66

1    A    No.
2    Q    No?
3    A    They're still not done.
4    Q    Were they living -- I understand.
5    A    Yes.
6    Q    Were they living in them before you became a
7 township supervisor?
8    A    Yes.
9    Q    Both of them?
10    A    Yes.
11    Q    Now, you were talking earlier about the fact
12 that it's a small community and people saw you with the
13 backhoe and they'd say, you know, what are you doing up
14 there. So that's what makes you think you probably told
15 people what you were doing up on the Corneal property,
16 right?
17    A    I guess that, yes. I —
18    Q    Is it your belief that people generally knew
19 that Mr. Corneal was looking to subdivide his property up
20 there around that 1999 time frame?
21    A    I don't think so.
22    Q    You don't think so. Do you think the township
23 supervisors generally knew it?
24    A    I don't know that.
25    Q    Do you think the sewage enforcement officer

67

1 knew it?
2    A    Well, he did the sewage work. I'm assuming,
3 yeah. I ...
4    Q    What about Ann Wirth, do you think she knew
5 it?
6    A    I don't know.
7    Q    During that period of time that you were doing
8 the test pits up there and the perc tests, do you recall
9 anybody expressing any concern about Mr. Corneal's intent to
10 subdivide?
11    A    No.
12    Q    Do you recall anybody saying anything about --
13 anything about it, like, you know, oh, there's another
14 property owner here, he's going to break his property up
15 into some lots or anything like that?
16    A    No.
17    Q    Let's go back to when you subdivided your
18 property and you submitted a plan, right, to the township --
19    A    Yes.
20    Q    -- supervisors? Were there sewer modules
21 attached to your plan?
22    A    I don't remember.
23    Q    Do you recall whether Barry Parks came out and
24 did -- was Barry Parks the sewage enforcement officer at the
25 time?

68

1    A    Yes.
2    Q    Did he come out and look at the property that
3 you subdivided?
4    A    Yes.
5    Q    Did he perform the perc tests?
6    A    Probes and percs.
7    Q    So Eagle Excavating did the probes and percs
8 and all that as well?
9    A    I don't remember.
10    Q    You don't remember the process?
11    A    No. The only thing that comes to mind is Judy
12 Passmore did the designs for the septic systems.
13    Q    Did she do that after you got an approved
14 sewage module?
15    A    I don't remember.
16    Q    Did she do it after you got approved test
17 sites?
18    A    I'm sure because she had to have the work-up
19 sheets to do that.
20    Q    She had to have approved test sites in order
21 to make the design, correct?
22    A    Yes.
23    Q    Do you recall talking with Larry Newton at all
24 about Mr. Corneal's intent to subdivide the property around
25 the time that you were performing the excavation work out

69

1 there?
2    A    No.
3    Q    You don't think you talked to him about it?
4    A    No.
5    Q    Does your nephew work for anybody besides you?
6    A    I believe so.
7    Q    Who else does he work for?
8    A    Mr. Powell has a dairy farm on Powell Road. I
9 — he spends a lot of time there so I assume he's a
10 part-time helper. I — I'm speculating. I shouldn't do
11 that.
12    Q    That's okay. Do you know how much money your
13 nephew needed to come up with to buy the Corneal -- the
14 26-acre piece from the Corneals with the farmhouse on it?
15    A    He told me but I don't remember.
16    Q    Do you know if he discussed it with anybody
17 else in your family?
18    A    No.
19    Q    Do you know John Hewett?
20    A    Yes.
21    Q    How do you know John Hewett?
22    A    John Hewett had me do some work at his
23 property.
24    Q    Where is his property?
25    A    Property in Mooresville.

70

1 Q Mooresville, is that in Jackson Township?
2 A No.
3 Q It's in --
4 A West, I believe.
5 Q Is it in Huntingdon County?
6 A Yes.
7 Q Is he a native of that area?
8 A I don't know.
9 Q So he had you perform his work -- some work at
10 his property there. When was that?
11 A A couple years.
12 Q Did you have occasion to discuss with John
13 Hewett the fact that Mr. Corneal was looking to sell off a
14 piece of his property with the farmhouse on it?
15 A In working at his property down there digging
16 out -- he raises flowers. And digging those things out, I
17 may have discussed with him -- because he was asking about
18 where can he find a place where he can grow flowers, open
19 fields, you know, and I may -- I may have said something
20 that there's a possibility that there's going to be some
21 property for sale in Jackson Township. I --
22 Q Do you think you had that conversation with
23 him?
24 A It could have happened. It could have
25 happened.

71

1 Q When would that have been?
2 A I don't remember.
3 Q Was it around the time you were doing the work
4 for Mr. Corneal at his property, the excavation work?
5 A I believe before that.
6 Q So you knew that Mr. Corneal was looking to
7 sell off that 26-acre piece before you did the excavation
8 work?
9 A No, I -- other than my nephew checking that, I
10 don't know how he became aware that he had that up for
11 sale. I don't remember that, but that sort of led me onto
12 the idea, I guess, that maybe Hewett would be interested in
13 raising his flowers there in those open fields.
14 Q So in any event, at some point John Hewett
15 became interested in Mr. Corneal's 26-acre piece and
16 farmhouse, correct?
17 A Yeah, I -- I don't recall if I told him to
18 give David a call. I just don't -- I don't remember.
19 Q Do you recall when you first became aware that
20 John Hewett did in fact enter into an agreement with Mr.
21 Corneal to purchase that piece of property?
22 A I don't -- I don't recall when.
23 Q Do you recall whether it was before or after
24 your nephew expressed his interest in the property?
25 A After.

72

1 Q So then after your nephew expressed his
2 interest, then the Hewetts -- then you found out the Hewetts
3 had entered into an agreement to purchase it?
4 A Well, I didn't -- I didn't know they -- that
5 they had gone into an agreement to purchase that.
6 Q When did you find out that they had gone into
7 an agreement to purchase it?
8 A When they started coming to supervisor's
9 meetings.
10 Q When they started coming to supervisor's
11 meetings?
12 A Yes.
13 Q Do you know when that was?
14 A No, I don't.
15 Q Was it before or after you put the moratorium
16 in place in January?
17 A I don't remember.
18 Q So you testified that the Hewetts started to
19 come to township meetings and you think that that was after
20 they became interested in buying that piece of property from
21 Mr. Corneal, correct?
22 A I believe that.
23 Q Did you have occasion to talk with the Hewetts
24 about their interest in the property then around the time
25 they were coming to the township meetings?

73

1 A No.
2 Q Even at the township meetings you didn't talk
3 to them?
4 A I may have talked to John and -- I forget her
5 name. They introduced themselves with the pretense that
6 they hoped to be citizens of Jackson Township and wanted to
7 know the local officials and things like that, but I -- I
8 can't -- I can't say right now that I knew at that time that
9 he had some kind of a work-up with Mr. Corneal. I -- I
10 don't know that.
11 Q Well, was it your understanding when they
12 introduced themselves as people who were probably going to
13 be citizens of Jackson Township that that was going to be in
14 connection with the Corneal property?
15 A I assumed that.
16 Q Do you recall Mr. Hewett speaking at the
17 township meetings other than introducing himself?
18 A No.
19 Q Not ever?
20 A Never.
21 Q Did he ever speak to you outside the township
22 meeting about anything in connection with his intent to
23 purchase the Corneal property?
24 A I don't remember that.
25 Q What about his -- I guess girlfriend or

74

1   partner, whatever you would call her, do you recall speaking
2   with her at all?
3   A   **Just shook her hand at a meeting. I -- if**
4   **she'd walk in here, I wouldn't even know her.**
5   Q   Do you know how many meetings they came to?
6   A   **No.**
7   Q   Did you ever discuss the moratorium with the
8   Hewetts? We call them the Hewetts, even though it's been
9   represented to us that they are not married, but they are a
10   couple, I think everybody agrees.
11   A   **No.**
12   Q   You never discussed the moratorium with them?
13   A   **No.**
14   Q   Did you ever discuss the proposed subdivision
15   ordinance with them before it was enacted?
16   A   **No.**
17   Q   What about the completed subdivision ordinance
18   after it was enacted?
19   A   **They were at the meetings when those things**
20   **were discussed, which was when the moratorium was on and the**
21   **subdivision was being -- through its final stages in early**
22   **2000.**
23   Q   Do you recall when the subdivision ordinance
24   was enacted?
25   A   **10th of July, 2000.**

76

1   MS. MALADY: Could we take a break?
2   MS. MONTGOMERY: Yes.
3   (Break taken at 10:35 a.m. until 10:45 a.m.)
4   BY MS. MONTGOMERY:
5   Q   Do you recall, Mr. Wilson, whether or not the
6   Hewetts complained directly to you about the effect that the
7   moratorium was having on their ability to purchase the
8   Corneal property?
9   A   **No.**
10   Q   Do you recall offering them a farmhouse that
11   you had that they could perhaps rent, a farmhouse that you
12   had?
13   A   **That discussion was at a meeting, when Mr.**
14   **Corneal at the township meeting said that there was a**
15   **problem there and he needed -- those people needed to get in**
16   **there and I suggested why don't you rent them the farmhouse.**
17   Q   Oh, I see. You mean why doesn't --
18   A   **He rent his farmhouse.**
19   Q   -- Mr. Corneal rent the farmhouse to them?
20   A   **Yes.**
21   Q   Until what?
22   A   **Until the ordinances and stuff were in place**
23   **and his subdivision was approved.**
24   Q   Do you recall what meeting that was?
25   A   **No.**

75

1   Q   So the moratorium was put in place January
2   4th, 2000 and what's that, seven months later the proposed
3   ordinance -- the ordinance was actually enacted?
4   A   **Yes.**
5   Q   And they were at meetings, are you saying,
6   between January 4th and the date that the proposed ordinance
7   was actually enacted?
8   A   **Yes.**
9   Q   Did they come to any meetings after that?
10   A   **I don't believe.**
11   Q   Did they ever make a phone call to you and
12   say, hey, what's going on with the proposed subdivision
13   ordinance?
14   A   **No.**
15   Q   Did they ever make -- to your knowledge did
16   they ever call any of the other township supervisors to
17   express any concern about the moratorium?
18   A   **I don't know.**
19   Q   Did anybody call them and tell them, hey,
20   there is going to be a moratorium in place so don't count on
21   purchasing Mr. Corneal's property?
22   A   **No.**
23   Q   Do you know whether Ann Wirth called them and
24   talked to them?
25   A   **I don't know that.**

77

1   Q   Was that last year, was it like in -- after
2   the moratorium went in place obviously so it was after
3   January 2000?
4   A   **It was sometime in that -- that span,**
5   **moratorium until enactment of the ordinance.**
6   Q   Well, that just goes to my earlier question
7   which was whether or not you became aware of the fact that
8   Mr. Hewett was concerned about the effect the moratorium was
9   having on him. Does that help you remember that you were
10   aware that Mr. Hewett was concerned?
11   A   **That discussion was at the meeting.**
12   Q   It was at a township meeting?
13   A   **Yes.**
14   Q   Do you recall any more details about that
15   discussion?
16   A   **They were concerned of losing their -- what**
17   **word do I want to use, their --**
18   Q   Sales agreement?
19   A   **Sales agreement or agreement they had with Mr.**
20   **Corneal because they were afraid that the ordinance wasn't**
21   **going to get passed in time.**
22   Q   For them to go through with the purchase of
23   the farmhouse --
24   A   **Yes.**
25   Q   -- and 26 acres? Do you know what eventually

**78**

1  did happen with respect to that sales agreement?
2    A    The only thing I know is they bought property
3  somewhere else. I don't know what happened with --
4    Q    Do you know why they didn't purchase Mr.
5  Corneal's property?
6    A    Someone said that -- and I -- I shouldn't do
7  that. No, I don't know.
8    Q    Well, this is a discovery deposition so any
9  facts or information or memory that you have is useful.
10    A    Well, I don't -- I don't know who told me that
11  they had taken their agreement away or something from Mr.
12  Corneal and were going to buy the Rosdil property, I
13  believe.
14    Q    Is that in Jackson Township?
15    A    Yes.
16    Q    Did they tell you -- did that person tell you
17  why they were taking that property -- or they were, as you
18  said, taking the agreement away from Mr. Corneal?
19    A    No.
20    Q    Do you have any idea why they decided not to
21  go through with that sale?
22    A    The only thing I got from -- John called me
23  whenever he was buying another piece of property and wanted
24  to know if I could do some work for him there so he could
25  get his flowers planted. I --

**79**

1    Q    Did he talk with you at that time about the
2  Corneal property?
3    A    No.
4    Q    Did he talk with you about the subdivision
5  ordinance?
6    A    I don't remember.
7    Q    I'm not sure if I asked you this before, but I
8  need to ask you now. Is it your understanding that before
9  the board of supervisors can approve a subdivision ordinance
10  -- I'm sorry, a subdivision plan, that that plan has to go
11  to the Huntingdon County Planning Commission first?
12    A    Absolutely.
13    Q    Then it comes back to the board of supervisors
14  and then they can approve it finally?
15    A    It has a stint with the DEP too.
16    Q    After the board of supervisors approves it,
17  then the property owner can complete the subdivision and
18  begin building, assuming all the permits are in place,
19  correct?
20    A    Can record the subdivision in the office in
21  the courthouse in Huntingdon and proceed on.
22    Q    If the subdivision has already occurred, can
23  they go ahead and -- can the property owner go ahead and
24  apply for building permits and get moving on it?
25    A    That was the sticking point, I believe, at

**80**

1  some of the meetings because the subdivision had never been
2  approved and Mr. Corneal wanted building permits and he had
3  no sewage permits. So there was nothing issued.
4    Q    Let me just go back a second. If the property
5  had already been subdivided prior to the time that you had
6  your subdivision ordinance in place, could then Mr. Corneal
7  have gone and applied for his sewage permits and his
8  building permits?
9    A    If Mr. Corneal would have brought his
10  subdivision in before the end of '99, as I had suggested to
11  him, that it would be easier to get it before the new
12  regulations were in place, everything would have gone right
13  through, but things are -- things are a little different now
14  with an ordinance.
15    Q    But when he brought his subdivision plan in
16  there wasn't any ordinance, was there?
17    A    When he brought his subdivision plan in?
18    Q    When he brought his subdivision plan into the
19  board of supervisors there wasn't any subdivision ordinance,
20  was there?
21    A    No subdivision ordinance, right.
22    Q    Did you want to look at that document for some
23  reason?
24    A    No, just to clarify my mind.
25    Q    On the date that Mr. Corneal brought his

**81**

1  subdivision ordinance to -:
2        MR. SHERR: That document being what has been
3  previously marked as Wilson Number 3.
4  BY MS. MONTGOMERY:
5    Q    Are you satisfied that you're correct in your
6  earlier statement?
7    A    There was no subdivision in Jackson Township.
8  I'm satisfied with that.
9    Q    No subdivision ordinance you mean?
10    A    No subdivision ordinance, yes.
11    Q    When Mr. Corneal brought his subdivision plan
12  to the township?
13    A    No, when he brought it to the township there
14  was a moratorium on.
15    Q    But no subdivision ordinance?
16    A    Right.
17    Q    I have a question for you about -- I want to
18  go back for just a second to the sequestration order that's
19  in place. This morning did you have an opportunity to speak
20  with anybody about these depositions?
21    A    No.
22    Q    About your deposition?
23    A    No. Well --
24    Q    You said no. Okay, fine. When you got here
25  this morning, what did you do?

82

1    MR. SHERR: If you need to explain your prior
2  answer, feel free to do that.
3    MS. MONTGOMERY: I'm sorry, I didn't mean to
4  cut you off.
5    THE WITNESS: Well, I discussed when I left
6  the shop this morning with my son that I had -- I was
7  probably going to be gone all day at depositions. And of
8  course coming down here, as soon as I come in, I set down
9  and then Tony showed up and we asked to have a conference
10  with our attorney and we did that and then it was time to
11  come down here.
12  BY MS. MONTGOMERY:
13  Q    Who was all involved in that conference?
14  A    **Ann Wirth, Mike Yoder and myself and counsel.**
15  Q    That was this morning here in this office?
16  A    **Yes.**
17  Q    Where did you go to have that conference?
18  A    **A-3? Yeah.**
19  Q    Into a conference room?
20  A    **Yes.**
21  Q    And did you discuss your deposition at that
22  conference?
23    MR. SHERR: Objection as to anything that was
24  discussed at that meeting.
25    MS. MONTGOMERY: Well, you're under a court

83

1  order not to discuss the depositions with the other
2  defendants.
3    MR. SHERR: Attorney/client privilege. I'm
4  under a court order not to discuss the substance of
5  depositions and we're following the court order. So if you
6  think --
7    MS. MONTGOMERY: Well, you don't need to coach
8  the witness.
9    MR. SHERR: -- that that abrogates the
10  attorney/client privilege, then let's go talk to the judge
11  about it.
12    MS. MONTGOMERY: We shall.
13    MR. SHERR: All right, let's do it right now.
14  That will be the end of this deposition until we talk to the
15  judge. Come on.
16    MS. MONTGOMERY: Are you going to call the
17  judge?
18    MR. SHERR: Well, let's go over -- I'll call.
19    MS. MONTGOMERY: You can ask her.
20    MR. SHERR: You want -- if you want to
21  abrogate the attorney/client privilege --
22    MS. MONTGOMERY: You want to call. What's
23  your question going to be?
24    MR. SHERR: My question is going to be whether
25  or not it was proper to assert the attorney/client privilege

84

1  where I just did.
2    MS. MONTGOMERY: Go ahead and call her.
3    MR. SHERR: I don't need to call her. If you
4  don't need to call her, I don't need to call her.
5    MS. MONTGOMERY: You just said you wanted to
6  call her.
7    MR. SHERR: No, if you question whether or not
8  it was proper for me to assert the attorney/client privilege
9  or if you were going to ask him more questions about what
10  was discussed --
11    MS. MONTGOMERY: Could you read back the last
12  say three questions. You have to go back to when -- can you
13  do that? Would that be too much of a problem?
14    (The reporter read back as follows:
      "QUESTION: I have a question for you about
15  -- I want to go back for just a second to the sequestration
      order that's in place. This morning did you have an
16  opportunity to speak with anybody about these depositions?
      ANSWER: No.
      QUESTION: About your deposition?
      ANSWER: No. Well --
18    QUESTION: You said no. Okay, fine. When you
      got here this morning, what did you do?
19    MR. SHERR: If you need to explain your prior
      answer, feel free to do that.
20    QUESTION: I'm sorry, I didn't mean to cut you
      off.
21    ANSWER: Well, I discussed when I left the
      shop this morning with my son that I had -- I was probably
22  going to be gone all day at depositions. And of course
      coming down here, as soon as I come in, I set down and Tony
23  showed up and we asked to have a conference with our
      attorney and we did that and it was time to come down here.
24    QUESTION: Who was all involved in that
      conference?
25    ANSWER: Ann Wirth, Mike Yoder and myself and
      counsel.

85

1    QUESTION: That was this morning here in this
      office?
2    ANSWER: Yes.
      QUESTION: Where did you go to have that
3  conference?
      ANSWER: A-3? Yeah.
4    QUESTION: Into a conference room?
      ANSWER: Yes.
5    QUESTION: And did you discuss your deposition
      at that conference?"
6
7    MS. MONTGOMERY: And the objection is?
8    MR. SHERR: I stated the basis for it,
9  didn't I?
10    MS. MONTGOMERY: I just wanted to hear it so
11  we're clear about it. Can you tell me what the objection
12  was?
13    MR. SHERR: Just so we're clear, since we were
14  talking over each other, the objection was based on
15  attorney/client privilege.
16  BY MS. MONTGOMERY:
17  Q    Who asked for that court conference?
18    MR. SHERR: Excuse me? Objection. Who asked
19  for what conference?
20  BY MS. MONTGOMERY:
21  Q    I'm sorry, who asked for that conference here
22  this morning in this office?
23  A    **I did.**
24  Q    You did?
25  A    **Yes.**

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

86

1   Q    All right. Do you know why Miss Wirth
2 accompanied you into that conference?
3   A    **Yes.**
4   Q    Why?
5       MR. SHERR: I'll caution you not to discuss
6 anything that was discussed during the conference in my
7 presence because it's privileged by the attorney/client
8 privilege.
9       THE WITNESS: No comment.
10 BY MS. MONTGOMERY:
11   Q    Did you discuss with Miss Wirth prior to your
12 attorney being here why she would come into the conference
13 with you?
14   A    **Yes.**
15   Q    And what was the nature of that discussion?
16   A    **We're concerned about the welfare of one of**
17 **our supervisors that's -- and we'd like to see him**
18 **dismissed.**
19   Q    From this case?
20   A    **From deposition, that's ...**
21   Q    You're talking about Mr. Weiler?
22   A    **Yes. He's not well and that's why I called**
23 **that this morning because I'm afraid the man will die and I**
24 **don't want to do that.**
25   Q    And what is wrong with Mr. Weiler?

87

1   A    **He's got a bad heart and he's trying to take**
2 **care of his sister, too, and she's dying of cancer.**
3   Q    How old is Mr. Weiler?
4   A    **Seventy-two.**
5   Q    Does he work?
6   A    **No.**
7   Q    Is he retired?
8   A    **Yes.**
9   Q    Does he still attend township supervisor
10 meetings?
11   A    **Yes.**
12   Q    When was your last township supervisor
13 meeting?
14   A    **They're always the first Monday of the month.**
15 **I -- I don't know.**
16   Q    Was there any kind of a meeting this week of
17 the township supervisors?
18   A    **If it was the first Monday -- I'm sorry.**
19   Q    You don't recall?
20   A    **I don't recall.**
21   Q    Did you have some sort of a meeting with Barry
22 Parks this week?
23   A    **No.**
24   Q    Was Mr. Weiler at the last township meeting?
25   A    **Yes.**

88

1   Q    Where does he live?
2   A    **Up Allan Seegar Road, approximately five miles**
3 **from the fire hall.**
4   Q    So he travels to the fire hall for the
5 township meetings?
6   A    **Yes.**
7   Q    In the evenings?
8   A    **Yes.**
9   Q    And what's the matter with Mr. Weiler's heart?
10   A    **He's had two heart attacks and he's got a lot**
11 **of fluid and he has to wear oxygen at night because they're**
12 **afraid he's going to have a --**
13   Q    I'm sorry, he has to wear what at night?
14   A    **Oxygen.**
15   Q    Oxygen?
16   A    **Yeah, for -- to sustain him through the**
17 **night. They think he'll just die. So I'm concerned.**
18   Q    Having told me that, I still need to ask you
19 the question why you decided that Miss Wirth had to
20 accompany you to that meeting?
21   A    **All three of us were in that meeting.**
22   Q    That still doesn't explain why Miss Wirth had
23 to accompany you into the meeting.
24   A    **Miss Wirth calls him several times a day to**
25 **make sure he's okay and his sister is okay.**

89

1   Q    With respect to Miss Wirth's interaction with
2 the township supervisors, does she pretty much do everything
3 with the township supervisors? Does she accompany you on
4 all of your say outings and jaunts, wherever you have to go,
5 if you have to go up and see the township solicitor and
6 stuff like that?
7   A    **Yes.**
8   Q    Does she come to every meeting with the
9 township solicitor that you can think of?
10   A    **Yes.**
11   Q    Why is that?
12   A    **Because I can't remember things and I -- we --**
13 **I'm sorry, we depend on her to take notes and keep us**
14 **apprised of what I said or did or something I --**
15   Q    Is she pretty much involved in every event or
16 task or undertaking that occurs among the township
17 supervisors then?
18   A    **We burden her with all the letters,**
19 **correspondence, calls that have to be made. We -- that is**
20 **her duty, we assume, yes.**
21   Q    Do you recall whether you discussed the
22 agreement of sale between John Hewett and the Corneals --
23 well, I should say the Hewetts and the Corneals with Larry
24 Newton?
25   A    **No.**

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

90

1  Q    You don't think you discussed that with them?
2  A    No.
3  Q    Did you ever tell them anything about the fact
4  that the Hewetts had abandoned that agreement of sale at any
5  time?
6  A    No.
7  Q    Do you know anything about a Department of
8  Environmental Protection or any other governmental complaint
9  that was filed against the Corneals in connection with their
10  property?
11  **A    I know of no formal complaint.**
12  Q    Do you know of an investigation that was
13  performed by any governmental entity in connection with
14  wetlands on their property?
15  **A    Yes.**
16  Q    What do you know about it?
17  **A    When the -- Mr. Corneal took his subdivision**
18  **into county planning to have it reviewed to get his -- as we**
19  **suggested, as a jump ahead, a letter is -- comes out of**
20  **there from the review and on that letter it's noted -- which**
21  **is why the township uses the county planning to oversee the**
22  **county and how it goes to the comprehensive plan. It was**
23  **listed that there were steep slopes and hydric soils in**
24  **association -- those are usually associated with wetlands.**
25  **This is standard procedure with all our**

91

1  subdivisions. Those readouts come to us and I'm sure Mr.
2  Corneal got one too because on the carbon at the bottom --
3  there's carbon copies of who all it got too.
4       And those things we have to investigate as a
5  township because of the situation we're in. We're in a high
6  quality stream area, prominent trout streams, and we work
7  closely with the soil conservation district. And every
8  chance we get, we get money from them to help with our roads
9  and stuff and we need -- we need to keep that cooperation
10  going because we need that money. So we look after our
11  environment, that's ...
12  Q    What about -- let's see, who do you typically
13  rely upon to tell you whether or not there's wetlands on a
14  property that an individual seeks to build --
15  A    The conservation district.
16  Q    What about the sewage enforcement officer?
17  A    He may say that there's some there, but that
18  isn't our final authority to clear -- to satisfy us. The
19  conservation district does that.
20  Q    So typically if you get a -- say a request for
21  a building permit or a proposed subdivision plan in which
22  the sewage enforcement officer has already done a site
23  investigation and percolation test report, okay, and on that
24  test report there's an indication that there aren't any
25  wetlands, do you then always go and ask somebody else for a

92

1  second opinion on that?
2  **A    There aren't any, is that what you asked me?**
3  Q    Yes.
4  **A    I'm sorry.**
5  Q    If the sewage enforcement officer says there's
6  no wetlands on the property, do you always go and get
7  somebody else to tell you whether that's correct or do you
8  accept his word for it?
9  **A    No. No, that report will come from the**
10  **county.**
11  Q    Well, let's look a second. I mean, as you
12  understand it, is there an entry on the form sewage
13  facilities planning module that comes from the Commonwealth
14  for checking off whether or not there are wetlands, as you
15  understand it?
16  **A    I believe that you -- the sewage officer**
17  **checks that off.**
18  Q    Right. So that's really what I'm asking you.
19  **A    That's correct, he checks that off, but when**
20  **-- the whole subdivision plan comes from just the areas**
21  **that he has done his site work, he sees no wetlands, okay,**
22  **but whenever the overall plan is reviewed by the county,**
23  **where they have the big maps, if they see that there's**
24  **something there that was walked by or around or there's a**
25  **hollow or something there that the sewage officer really**

93

1  didn't have any business in there, he isn't looking for
2  suitable sites, then it's handled by the conservation
3  district.
4  Q    So why don't you hold on to that exhibit which
5  is Wilson Exhibit 2, right?
6  A    Yes.
7  Q    And let's look at the place on there where
8  there's a place for the sewage enforcement officer to check
9  on whether or not there's going to be any wetlands affected
10  by the construction of a proposed -- construction of a
11  sewage system at a proposed site, okay. So we have a space
12  for that on here, right, on page 2; isn't that correct? Do
13  you see that?
14  A    Yes.
15  Q    It's Question 1.3, right?
16  A    Yes.
17  Q    Actually that wasn't the one, I'm sorry. When
18  you looked at this sewage module for the Corneal's property
19  and under those questions it says -- for example, 1.3, will
20  any work associated with this project take place within 50
21  feet of a stream, waterway or wetland and it's checked yes,
22  correct?
23  A    Yes.
24  Q    Now, it says stream, right, on the other side
25  of it?

94

1 A Um-hum.
2 Q Correct? Did you express any concern to the
3 SEO about that?
4 A I never seen this before today.
5 Q You never saw this before today?
6 A No.
7 Q It wasn't submitted with Mr. Corneal's
8 initial --
9 MR. SHERR: I'm going to object to both
10 attorneys asking questions.
11 MS. MALADY: I'm sorry.
12 MS. MONTGOMERY: She's talking to me.
13 MR. SHERR: Well, she's talking out loud and I
14 think that has to be placed on the record if she's thinking
15 out loud at a deposition.
16 BY MS. MONTGOMERY:
17 Q The sewage facilities planning module was not
18 attached to any subdivision plan that Mr. Corneal submitted
19 to the township?
20 A I've never seen the subdivision plan.
21 Q Did Mr. Corneal try to hand you a subdivision
22 plan at a township meeting one time?
23 A He laid a subdivision plan on the desk on the
24 table at our meeting -- oh boy, February? And he was
25 informed that there was no subdivisions being reviewed at

95

1 this time because of the moratorium and he suggested that --
2 someone suggested to him, one of the supervisors or -- that
3 if he -- it had to go to the -- the Huntingdon County
4 Planning to be reviewed anyhow and if he wanted to have a
5 step up while we're working on the ordinance to take it in.
6 I -- I seen it. I couldn't even tell you what it looks
7 like. He laid it down there and he picked it up and took
8 off with it.
9 Q Are you saying that he took the plan back with
10 him?
11 A Yes.
12 Q Did he try to get you to keep the plan?
13 A No.
14 Q He put it in front of you and you said we
15 don't want this plan right now, take it to the Huntingdon
16 County Planning Commission?
17 MR. SHERR: Object to the form of the
18 question. You're trying to misstate his testimony at this
19 time.
20 BY MS. MONTGOMERY:
21 Q You can correct me if I'm wrong, Mr. Wilson.
22 You told him we're not going to take your plan right now,
23 you should take it to the Huntingdon County Planning
24 Commission; is that correct?
25 A No.

96

1 Q What was correct?
2 A It was -- it was suggested -- he wondered
3 about the procedure. It was suggested that to save time he
4 take it to Huntingdon County to have it reviewed, but still
5 no action can be taken on it until the supervisors sign it.
6 Q So I think what you're telling me is that it
7 may or may not have been attached to the subdivision plan
8 but you didn't look at the subdivision plan on the day that
9 he gave it to you; is that correct?
10 MR. SHERR: Objection. The question is
11 ambiguous and you didn't define what it is. You can answer
12 the question.
13 BY MS. MONTGOMERY:
14 Q Do you understand my question?
15 MR. SHERR: You can answer the question if you
16 understand the question.
17 THE WITNESS: There were no items attached to
18 that plan that he laid on the table and took off. I -- I
19 think he told us at the meeting when he laid it down it's
20 for five lots. I can't -- and that's -- that's ...
21 BY MS. MONTGOMERY:
22 Q So is what you're calling a plan just a map?
23 A Subdivision plan, a layout with all the
24 details, sewage, probes, percs, everything is on there,
25 wetlands, everything, streams, roads, yes.

97

1 Q And you're saying that there were -- there was
2 nothing attached to that the day that he came to the
3 meeting?
4 A No, it was just a -- a piece of paper.
5 Q Just one piece of paper?
6 A Yes.
7 Q In any event, if the sewage enforcement
8 officer tells you that there are no wetlands on a piece of
9 property on which an individual is seeking to build and
10 place an on-lot septic system, do you accept his word for
11 it?
12 A Not if the county sends out its referral that
13 there's wetlands on that property.
14 Q Is that what happened with Mr. Corneal's
15 property?
16 A Yes.
17 Q The county came back and said there are
18 wetlands on that property?
19 A Yes.
20 Q Then did you call and file a complaint against
21 Mr. Corneal about an attempt to construct on property with
22 wetlands?
23 A No.
24 Q Did Ms. Wirth to your knowledge?
25 A No.

## 98

1  Q      Do you know how the Army Corps of Engineers
2  came to go out and do an investigation on Mr. Corneal's
3  property?
4  A      I don't know.
5  Q      Do you know that they did an investigation on
6  Mr. Corneal's property?
7  A      Yes.
8  Q      Do you know why they did an investigation on
9  his property?
10  A      I talked to the director of the Huntingdon
11  County Conservation District after that because I got a -- I
12  personally received a call from the conservation district
13  and I asked Andy what happened, because we refer these to
14  Andy. He's in charge of the county.
15       Well, he was concerned because they'd already
16  issued -- which we didn't know. They told us at that time
17  issued a permit for a stream crossing and then we had this
18  wetland issue. So he assumed -- he didn't go out to look at
19  the -- he just issued the permit to -- I think he told me it
20  was McClintic. And after this alarm went off, he decided to
21  call in someone else to assist them with the evaluation of
22  that property.
23  Q      So is it your belief, your understanding that
24  the Army Corps of Engineers showed up there because of
25  something the county did?

## 99

1  A      No, something that the conservation district
2  asked them to do.
3  Q      You think the conservation district called the
4  Army Corps of Engineers and said you need to go do an
5  investigation?
6  A      I assume that. I didn't call them.
7  Q      Who did you talk to from the conservation
8  district about this?
9  A      Andy Patterson.
10  Q      And who is Andy Patterson?
11  A      Director.
12  Q      Director of -- what's your conservation
13  district?
14  A      Huntingdon County.
15  Q      Is that a county district or is it a federal
16  district or what?
17  A      County.
18  Q      And so you think that Andy Patterson called
19  the U.S. Army Corps of Engineers and had them come out?
20  A      I don't know.
21  Q      Do you know whether Miss Wirth called anybody
22  in connection with possible wetlands on Mr. Corneal's
23  property?
24  A      I don't know.
25  Q      Did you call anybody in connection with

## 100

1  possible wetlands on Mr. Corneal's property?
2  A      No.
3  Q      Do you have any -- can you think of any other
4  instance wherein a sewage enforcement officer in Jackson
5  Township has been unconcerned about wetlands and the county
6  has expressed some concern about wetlands?
7  A      No.
8  Q      Can you think of another instance?
9  A      No.
10  Q      Just Mr. Corneal's instance?
11  A      That's -- that's the only one I can think of.
12  Q      Do you know of any instance at all when
13  anybody called any government agency and filed a complaint
14  about Mr. Corneal?
15  A      No.
16  Q      Did you ever discuss with Larry Newton the
17  denial of the Corneal -- or the refusal of the Corneal
18  subdivision plan?
19  A      No.
20  Q      Not ever, not even to this day?
21  A      We're in litigation with Mr. Corneal, the
22  township.
23  Q      You mean up in the county?
24  A      Yes.
25  Q      So you've discussed it with him in connection

## 101

1  with that?
2  A      Mr. Newton is aware that the subdivision is
3  not approved.
4  Q      When did he become aware of that?
5  A      I don't know.
6  Q      If you're going to ask Mr. Newton for advice
7  on behalf of the township supervisors, do you call him or
8  does Miss Wirth call him?
9  A      It depends.
10  Q      Do you sometimes call him?
11  A      Yes.
12  Q      Have you ever called him for advice in
13  connection with the Corneal property?
14  A      No.
15  Q      Have you ever called him with a group of other
16  people for advice in connection with the Corneal property?
17  A      No.
18  Q      Have you ever directed anybody to call him for
19  advice in connection with the Corneal property?
20  A      No.
21  Q      Do you know whether anybody among the
22  township supervisors or Miss Wirth or the sewage enforcement
23  officer or anybody else connected with the township has
24  called Mr. Newton for advice in connection with the Corneal
25  property?

102

1   A    No.
2   Q    You don't know or you think they haven't?
3   A    I don't know.
4   Q    What about in connection with the subdivision
5   ordinance, did you call him personally and ask him how you
6   ought to go about enacting a subdivision ordinance?
7   A    No.
8   Q    Do you know whether anybody else did?
9   A    I don't know.
10  Q    Do you know whether you heard from any of the
11  others in your group, your township supervisors, the
12  township secretary, Ann Wirth, the sewage enforcement
13  officer, anybody in the township governing body whether they
14  had gotten advice from Larry Newton about the subdivision
15  ordinance?
16  A    I don't know.
17  Q    What about the moratorium?
18  A    I'm sorry?
19  Q    What about the moratorium?  Do you know
20  whether any of the township supervisors or the secretary or
21  the sewage enforcement officer or any other township
22  official sought advice from Mr. Newton about the moratorium?
23  A    I don't know.
24  Q    When you were going through with enacting the
25  ordinance, did you believe that you were doing it in

103

1   accordance with the law?
2   A    Yes.
3   Q    How did you believe that?
4   A    The Township Code and the Municipal Planning
5   Act.
6   Q    Who studied that for you?
7   A    Who studied that?
8   Q    Yes.
9   A    We have it.  We read it.
10  Q    So you read it and you thought that you were
11  doing the right thing?
12  A    We did the right thing.
13  Q    Did you actually sit down and open it up at
14  some point and say, gee, I better make sure I'm doing the
15  subdivision ordinance procedures correctly?  Is that what
16  you did, or you just thought you knew them in your head or
17  what?
18  A    Oh, no.  Used the law to formulate what we
19  did, the code.
20  Q    Let me ask you this:  How long were you
21  considering enacting the subdivision ordinance as a body,
22  the township board of supervisors?
23  A    We've been working on it for pretty near two
24  years.
25  Q    So that means you've been working on it since

104

1   -- well, you mean before it was passed you had been working
2   on it for two years?
3   A    (Witness nods head affirmatively.)
4   Q    So that would be sometime in 1998, correct?
5   A    Yes.
6   Q    What all did you do in connection with working
7   on enacting the subdivision ordinance?
8   A    Attended -- attended all the sessions that
9   were available at the state convention, discussed with other
10  townships as to the procedure they followed and just kept
11  working at it and working at it and put it -- it finally got
12  to the county and they reviewed it and then they wanted some
13  changes.  So it wasn't easy.  It wasn't easy, but we have
14  it.
15  Q    Did you make successive drafts of it?
16  A    I think the -- the draft that was up that went
17  to the county -- the answer is yes, that's -- I'm sorry, I'm
18  a little slow.
19  Q    Who typed up the drafts for you?
20  A    I believe they were done in the township
21  office.
22  Q    You think Miss Wirth typed them?
23  A    If she didn't, she had somebody do it.  I -- I
24  believe that.  I didn't ask.
25  Q    Did you send the draft ordinances to Larry

105

1   Newton as they were being considered?
2   A    No.
3   Q    Do you know if anybody else sent the draft
4   ordinances to Larry Newton as they were being considered?
5   A    I don't know.
6   Q    Did you keep copies of the draft ordinances
7   available for the public to look at as it was under
8   consideration for that two year period?
9   A    At several of our meetings the drafts were
10  available for the citizens and they were reviewed and they
11  had the opportunity to come to the township office to review
12  them as we were progressing along because we have some
13  citizens in the township that are very concerned with
14  heritage and they wanted to make sure that everything was
15  covered in there because of our quaint little villages and
16  buildings that are around there.
17  Q    Now, if the draft ordinances were taken to a
18  township meeting and made available for the public, that
19  would be reflected in the minutes, correct?
20  A    It should be reflected in -- yes.
21  Q    Would you have put an advertisement or
22  anything in the paper to say at the township meeting we're
23  going to be circulating the proposed draft subdivision
24  ordinance so the public can come look at it?
25  A    No.

**106**

1    Q    So how would the public know that it was there
2    to come look at it?
3    A    **Public meeting every month.**
4    Q    Just because it's a monthly public meeting?
5    A    Yes.
6    Q    So if there is something special going on at a
7    public meeting, don't you usually put a notice in the paper?
8    A    **Yes.**
9    Q    But you didn't consider the circulation of a
10   proposed draft subdivision ordinance something special that
11   you needed to put the public on special notice of?
12   A    **Not at those stages.**
13   Q    Ultimately when you got your final subdivision
14   ordinance completed in the form that you thought you could
15   enact, did you then send it to Larry Newton --
16   A    Yes.
17   Q    -- for review?  Do you know when you did that?
18   A    No.
19   Q    Do you know who did it?
20   A    **Who delivered it to him?**
21   Q    Yes.
22   A    **I don't know.**
23   Q    Do you have any memory whatsoever of which
24   township supervisor first asked the board to consider a
25   moratorium on development in the township?

**107**

1         MR. SHERR:  Objection.  It's been asked and
2    answered.  Sorry.  I thought you were done.  Objection, it's
3    been asked and answered.  You can answer it again.
4         THE WITNESS:  No.
5    BY MS. MONTGOMERY:
6    Q    Did you send your proposal or a proposal for a
7    moratorium to the Huntingdon County Planning Commission?
8    A    **I don't know.**
9    Q    Do you recall discussing it with the
10   Huntingdon County Planning Commission at all prior to the
11   time that you put it in place in January 2000?
12   A    No.
13   Q    Do you recall when you sent the final
14   subdivision ordinance to the Huntingdon County Planning
15   Commission for its review?
16   A    **No.**
17   Q    Do you recall that you did send it to the
18   Huntingdon County Planning Commission for review?  Do you
19   recall sending it to the Huntingdon County Planning
20   Commission for review at all?
21   A    Yes.
22   Q    When did you do that?
23   A    **I don't remember.**
24   Q    You just didn't remember exactly when?
25   A    **(Witness shook his head negatively.)**

**108**

1    Q    Was it after it was passed?
2    A    **No.**
3    Q    Do you think it was before it was passed?
4    A    **We had to have their input to get the final**
5    **draft.**
6    Q    You did get some input from the Huntingdon
7    County Planning Commission on that final draft?
8    A    Oh, yes.
9    Q    How much input did you get?
10   A    **Pages I'm --**
11   Q    Do you know what happened to those pages --
12   what, was it comments or something written on the drafts
13   that you sent?
14   A    **They sent back the copy with recommendations**
15   **of changes to the ordinance, additions, deletions, that type**
16   **of thing.**
17   Q    Do you know what happened to those drafts with
18   the notes of the Huntingdon County Planning Commission?
19   A    No.
20   Q    Do you think they still exist somewhere?
21   A    **I don't know.**
22   Q    What about the driveway ordinance that you put
23   in place in the township, did you send that to the
24   Huntingdon County Planning Commission for its review?
25   A    **No.**

**109**

1    Q    Why not?
2    A    **I don't know.**
3    Q    Prior to enacting the ordinance did the
4    township charge residents fees when they put in a driveway,
5    when the residents put in a driveway?
6    A    No.
7    Q    Was there any kind of a charge at all imposed
8    upon a resident in connection with their construction of a
9    driveway?
10   A    **Before the ordinance?**
11   Q    Before the ordinance.
12   A    **None.**
13   Q    Now, that wasn't -- you're saying the township
14   didn't do it.  Do you know whether anybody else did it?
15   A    **No one else did it.**
16   Q    Correct me if I'm wrong, you're saying that no
17   one at all charged any sort of a fee in connection with the
18   right to construct a driveway?
19   A    **Before the ordinance?**
20   Q    Before the ordinance.
21   A    **No fee.**
22   Q    In your capacity as Eagle Excavation Company,
23   did you ever go out and inspect driveways after they were
24   constructed?
25   A    **I don't understand.**

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

110

1    Q    Did you ever go out and inspect a driveway
2 just to see whether it was constructed properly through
3 Eagle construction?
4    A    I'm --
5    Q    Did you go out and inspect a driveway for
6 proper construction in the township through Eagle
7 construction?
8    A    No.
9    Q    Did you ever get involved at all in inspecting
10 driveways in the township?
11    A    Not before I was a supervisor.
12    Q    Well, since you were a supervisor, did you
13 ever get involved in inspecting driveways?
14    A    I do them all. I'm the road master.
15    Q    You do it all?
16    A    Yes.
17    Q    So as the road master did you go out and
18 inspect driveways?
19    A    Yes.
20    Q    Did you charge a fee in connection with that
21 inspection?
22    A    No.
23    Q    Did you charge anything for doing that?
24    A    No.
25    Q    So you just went out as the road master and

111

1 said, well, I think your driveway is okay?
2    A    And make suggestions of what they should do to
3 it, yeah.
4    Q    Was that prior to the ordinance?
5    A    Yes.
6    Q    What authority -- I mean, I'm really just
7 trying to understand. What was the authority for your going
8 to inspect driveways as the road master?
9    A    We live in a rural area. Everybody is --
10 knows everybody and everybody wants things as smooth as
11 possible. So if someone is putting in a driveway, they come
12 to the supervisor's meeting and say, you know, I want to put
13 a driveway in here. And we as a unit -- two or three of the
14 supervisors will go out to that site and look to see if it's
15 safe or not to have a driveway there. It was -- it wasn't
16 any law or anything. It's just -- it was just common
17 courtesy. We just -- it was a service.
18    Q    Well, if you didn't think that the driveway
19 was okay, did you tell them they couldn't construct it as
20 the board of supervisors?
21    A    No, we told them how they had to construct it.
22    Q    So you told them how. And this was before the
23 ordinance, correct?
24    A    Yes.
25    Q    Did you let it be known that if a resident

112

1 wanted to construct a driveway that they had to come to the
2 board of supervisors for inspection of the driveway to make
3 sure it was satisfactory?
4    A    There was no rule that that was done. If the
5 property owner didn't come to the meeting, their neighbor
6 soon was on the phone calling and saying, hey, there's
7 something going on over here and it should be checked.
8 That's the --
9    Q    So what would you do, go out and check it?
10    A    Yes.
11    Q    So you'd say, okay, I got a call from a
12 neighbor, I better go out and check that driveway to make
13 sure it's being constructed properly, right?
14    A    Yes.
15    Q    And you did that prior to the enactment of the
16 driveway ordinance, correct?
17    A    Yes.
18    Q    You never charged any sort of fee or anything
19 in connection -- to anybody --
20    A    No.
21    Q    -- in connection with those inspections? Did
22 Eagle construction ever charge any sort of fee in connection
23 with those inspections?
24    A    Not unless they were asked by the property
25 owner to install a pipe or put stone or something on there.

113

1 Not for -- not for looking at the site.
2    Q    So if you went out and you said, okay, this
3 driveway isn't being constructed properly, would you direct
4 the resident to stop construction of the driveway?
5    A    He was advised to construct it properly or the
6 next time the grader would come by he would lose his
7 driveway if it wasn't done to a standard.
8    Q    Did you ever talk to your solicitor about
9 whether the township had the authority to oversee the way
10 people constructed their driveways without the enactment of
11 a driveway ordinance?
12    A    No.
13    Q    You never discussed it with Larry Newton?
14    A    Never.
15    Q    What about when you put your driveway
16 ordinance in place, did you send that to him for review?
17    A    I don't remember.
18    Q    So were you present at the meeting -- you were
19 present, I think you said, at the meeting of the board of
20 supervisors in January 2000 when the moratorium was put in
21 place, correct?
22    A    Yes.
23    Q    Who else was there?
24    A    I'm lost. What do you -- do you mean in the
25 audience or --

114

1  Q      All --
2  A      All three supervisors, the secretary, and I
3  don't recall who else. It would have to be -- it should be
4  in the -- on the minutes.
5  Q      Do you recall what members of the public were
6  there? Were the Hewetts there?
7  A      I don't recall.
8  Q      Was Mr. Corneal there?
9  A      No.
10  Q      Do you recall whether there was any member of
11  the public there?
12  A      Oh, yes, there was people there. I --
13  Q      Can you estimate how many?
14  A      Eight or 10.
15  Q      You think there were eight or 10 people
16  there. And how many residents are there in the township?
17  A      816.
18  Q      I think you indicated earlier that Mr. Corneal
19  had brought a subdivision plan in initially and you told him
20  he had to take it to the Huntingdon County Planning
21  Commission, there was a moratorium in place, correct?
22  A      Correct.
23  Q      Who spoke those words, you?
24         MR. SHERR: I'm going to object to the form of
25  the question in that there's never been any testimony that

115

1  those words were spoken.
2         MS. MONTGOMERY: Well, he just said yes to the
3  answer to my question.
4         MR. SHERR: And his prior testimony was
5  different from that, that -- and that may have been the gist
6  of what was said, but I don't think he's ever testified --
7         MS. MONTGOMERY: I'm not --
8         MR. SHERR: Please just let me finish so we
9  don't talk over each other so she can get us both down.
10  Thank you.
11         MS. MONTGOMERY: I'm not going to allow you to
12  coach your witness on the record.
13         MR. SHERR: And I'm not coaching my witness.
14  All I'm asking you to do is let me finish making my
15  statement so the court reporter can take it down and then
16  you can say whatever you have to say.
17         MS. MONTGOMERY: Are you finished?
18         MR. SHERR: I think I am.
19  BY MS. MONTGOMERY:
20  Q      I believe you testified earlier that when Mr.
21  Corneal came and first presented his subdivision plan to the
22  board of supervisors that he was told that there was a
23  moratorium in place and that he should take his plan to the
24  Huntingdon County Planning Commission; is that correct?
25  A      I don't believe -- I could correct it by

116

1  saying it was suggested to save him time he could take it to
2  the county.
3  Q      Who told Mr. Corneal that?
4  A      Maybe I did. I -- I don't know.
5  Q      You don't recall which supervisor actually
6  talked?
7  A      We all talk. We have a small community and we
8  all talk.
9  Q      Was Miss Wirth talking, do you recall?
10  A      I'm sure. Everybody --
11  Q      Does Miss Wirth usually talk at the township
12  meetings a lot?
13  A      When she's asked to.
14  Q      When she's asked to by whom?
15  A      The supervisors or if it's a question
16  concerning some correspondence or something, then somebody
17  from the audience might say, Ann, did you get my letter or
18  did you -- you know, that type of thing.
19  Q      Does Miss Wirth give advice to the township
20  residents or the people in attendance at the township
21  meetings regarding what's proper and what isn't proper about
22  township business?
23  A      Well, if she does, I -- I don't know what it
24  is because she's not an elected official. She's our
25  secretary.

117

1  Q      Did you need to get some water?
2  A      Please.
3  Q      Go right ahead.
4         (Pause.)
5  BY MS. MONTGOMERY:
6  Q      Do you recall Mr. Corneal asking you at the
7  meeting in which he was told that there was a moratorium in
8  place for any copy that existed -- of any written copy that
9  existed of the moratorium, do you recall that?
10  A      No.
11  Q      Do you recall Mr. Corneal asking for a copy of
12  the draft subdivision plan?
13  A      No.
14  Q      You don't recall him asking at any time for a
15  copy of the draft subdivision plan?
16  A      No.
17  Q      Did you ever learn from anybody else that he
18  asked for a copy of a draft subdivision plan -- I'm sorry, I
19  keep using plan and I apologize, a draft subdivision
20  ordinance.
21  A      No.
22  Q      So if you misunderstood my prior questions, I
23  will repeat them to you. I was asking whether you
24  understood -- whether you heard from anybody else that Mr.
25  Corneal had asked for a copy of the draft subdivision

118

1  ordinance at any time.
2      A      No.
3      Q      You never heard about that?
4      A      (Witness shook his head negatively.)
5      Q      Do you recall whether the Corneals ever
6  submitted a revised subdivision plan after their -- they
7  were initially told that there was a moratorium in place?
8      A      No.
9      Q      You don't recall them ever doing that?
10     A      No.
11     Q      Do you recall the March 2000 meeting of the
12  board of supervisors?
13     A      Unless there was something that happened.
14     Q      I'm sorry?
15     A      Unless there was something that happened that
16  would stick in my mind.  Maybe it was a routine meeting.  I
17  -- I don't know.  I'd have to look at the minutes.
18     Q      I'll get you the March minutes and maybe that
19  will help you recall.  Just give us a second.
20     A      While you're doing -- while you're searching
21  for that, can I go to the rest room?
22     Q      Men's room?
23     A      Yes.
24     Q      Sure.
25         (Break taken at 11:47 a.m. until 12:01 p.m.)

119

1  BY MS. MONTGOMERY:
2      Q      Mr. Wilson, we're back on the record.  I'm
3  going to ask you, did you review any documents in
4  preparation for this deposition?
5      A      No.
6      Q      Have you reviewed any documents at all in
7  connection with the filing of this lawsuit?
8      A      No, I just keep going over the last -- that
9  thing I received on July 4th.  I just keep looking at that.
10  I have it laying on my freezer.
11     Q      What did you receive on July 4th?
12     A      I was served with a lawsuit.
13     Q      With the complaint?
14     A      Yeah.
15     Q      Now, I think you testified a moment ago that
16  you don't recall whether the Corneals submitted a revised
17  subdivision plan?
18     A      Not that I know of.
19     Q      Do you recall the April 2000 meeting of the
20  board of supervisors?
21     A      No.
22     Q      Do you recall whether -- well, do you recall
23  whether there was any meeting after the January meeting in
24  which the moratorium was announced and then the February
25  meeting in which you -- Mr. Corneal was told his subdivision

120

1  plan couldn't be approved?  Do you recall him coming to a
2  meeting and asking for a copy of the proposed subdivision
3  ordinance?
4      A      No.
5      Q      Do you recall Mr. Corneal coming to the April
6  meeting -- or to any meeting and asking that the supervisors
7  sign his sewage modules?
8      A      Yes.
9      Q      Could you tell me what you recall about that
10  meeting?
11     A      Do you have the minutes?
12     Q      Yes, I do.
13     A      I'm sorry.
14     Q      Sure.
15         MS. MONTGOMERY:  We'll mark this as Wilson
16  Exhibit 4.
17         (Minutes dated 4/3/00 produced and marked as
18  Wilson Exhibit No. 4.)
19  BY MS. MONTGOMERY:
20     Q      When you're finished, Mr. Wilson, just let me
21  know.
22     A      Okay.
23     Q      Now, you asked to review the April 3rd
24  minutes.  Why did you need to review them?
25     A      I can't remember the meetings.

121

1      Q      Now that you've reviewed the minutes do you
2  think you can remember the meeting a little better?
3      A      Yes.
4      Q      Now, tell me what you recall about the April
5  3rd, 2000 meeting.
6      A      Mr. Corneal had a handful of sewage modules
7  that he wanted the township supervisors to sign and the
8  supervisors would not sign them because we didn't have the
9  subdivision plan or anything.
10     Q      So the reason you wouldn't sign the sewage
11  modules is because you didn't have what, a map, a plan?
12     A      Yes, and we -- and we have no -- we had no
13  idea all these months what Mr. Corneal's plans were.  He
14  kept changing things.
15     Q      Well, how did you know he kept changing
16  things?
17     A      I had a call from Attorney Newton that Mr.
18  Corneal had dropped off a subdivision plan at his office.
19  Well, he had to -- and I don't remember who went in and
20  picked it up, that's 16 miles away, but brought it out.  But
21  these are the -- these are the kind of things we had no
22  idea, no continuity of what was happening here.
23     Q      So going back to your testimony about Mr.
24  Newton, I think you'd indicated that you didn't recall
25  discussing Mr. Corneal's subdivision plan with Mr. Newton.

122

1 Now do you recall discussing --
2    A   Well, I didn't discuss it with him. He called
3 and said he dropped it off here and assumed that we needed
4 it. I didn't discuss anything with Larry.
5    Q   Well, when I say discussion, I guess I'm just
6 talking about any conversation, any contact, any words
7 exchanged whatsoever about Mr. Corneal's subdivision or his
8 property. That's what I'm trying to get to.
9      So we don't need to limit ourselves to what
10 you might consider to be a discussion. I'm talking about
11 any contact, written, verbal, telephone call, meeting along
12 the street, formal, informal, anything.
13    A   That's what it was.
14    Q   And do you have any idea why Mr. Corneal took
15 the subdivision plan to Mr. Newton's office and dropped it
16 off?
17    A   No, I don't.
18    Q   Did Mr. Newton tell you why Mr. Corneal
19 dropped the subdivision plan off at his office?
20    A   No.
21    Q   Did somebody go out and pick it up, you said,
22 from Mr. Newton?
23    A   Yeah, and I don't even know who.
24    Q   And what did you do with it then?
25    A   Well, it should be at the township office.

123

1 That's the one with the orange lines on it. There's --
2 there's been various pieces of -- and designs and cut down
3 the lots and stuff. I -- I don't even know where it's at.
4 I don't even know what the -- what the last plan is.
5    Q   Do you understand why Mr. Corneal went from
6 proposing five or more lots to proposing fewer lots?
7    A   I don't know.
8    Q   You understand that he did, though, go from
9 proposing more lots to proposing fewer lots, correct?
10    A   Yes, I ...
11    Q   And do you understand as well that the sewage
12 enforcement officer had approved sewage modules for at least
13 five lots and later Mr. Corneal only wanted to take it down
14 to two of those lots; isn't that correct? Do you understand
15 that?
16    A   Yes.
17    Q   Do you understand also that the latest sewage
18 module that Mr. Corneal brought to you really only related
19 to one lot, the 95 -- the whole 95-acre piece?
20    A   Yes.
21    Q   So he was really only asking you to approve
22 the sewage module so he could build his house on his
23 property, correct?
24    A   No.
25    Q   What do you understand?

124

1    A   I don't understand that. He hired another
2 attorney and his attorney and I have been working to try to
3 get this resolved. And we went into a land development
4 plan, not a subdivision, and that's what we've been working
5 on with Terry Williams, and it still isn't -- they're
6 working on -- they're meeting on that lot today to discuss
7 the sewage problem. So I -- I'm at a loss. I'm still at a
8 loss as a supervisor as to what's happening at the Corneal
9 property.
10    Q   Well, this is May 2001. We're going back to
11 the last time that David Corneal came in and the April 2000
12 meeting with these modules that you wouldn't sign. Do you
13 understand at that point that he had said, okay, all I
14 really want to do now is build my house?
15    A   No.
16    Q   What do the minutes say?
17    A   It says he's no longer subdividing them and
18 would like to build a -- we had no idea the way things have
19 been changing that -- what was going to happen the next day.
20    Q   Did Mr. Corneal ever change the site of the
21 approved -- the approved septic sites that your sewage
22 enforcement officer had approved, did he change those sites?
23    A   I'm sorry, I --
24    Q   Did he move them? Did he say I want -- I want
25 a new -- I want a new test site approved or --

125

1    A   No.
2    Q   -- was he just using the already approved test
3 sites and saying I want to build and use one of them?
4    A   That's what I understand.
5    Q   So he had approved test sites from the sewage
6 enforcement officer and what he was doing was just changing
7 down the number of possible buildings that he might ever put
8 on that property; isn't that correct?
9    A   Possible.
10    Q   Now, it reads in the April 3, 2000 minutes
11 that the supervisors told him that they weren't going to
12 issue a building permit for a property that they know is
13 going to be subdivided, correct?
14    A   Correct.
15    Q   So despite the fact that Mr. Corneal came in and
16 said, okay, fine, I'm not going to subdivide, you said I
17 can't subdivide, I just want to build my house, you said he
18 can't even have a building permit for his house because you
19 think he might subdivide later, correct?
20    A   He needed a sewage permit to get a building
21 permit for his house.
22    Q   Right, but he couldn't get a sewage permit
23 until you signed the sewage module, correct?
24    A   Right.
25    Q   So you wouldn't sign the sewage module because

126

1 you thought he might want to subdivide later, correct?
2 A    My -- and this is my opinion at that meeting,
3 not to sign those five modules because Mr. Corneal could do
4 whatever he wanted on that property without any okay from
5 the township, any plan.
6 Q    Well, that's not accurate, is it, because he
7 still had to go get a sewage permit?
8     MR. SHERR: Objection, argumentative. You can
9 answer.
10 BY MS. MONTGOMERY:
11 Q    He still had to go get the permit for the
12 sewage, right, but he needed the sewage module first,
13 correct?
14 A    For the land -- for the land development why
15 would he need the sewage module. It's just like --
16 Q    Go ahead. I don't mean to --
17 A    The property, okay, wasn't being split, okay,
18 so he was going with a land improvement. All he had to have
19 was an approved site there for a new house and everything
20 would have been fine, but we've cluttered the landscape so
21 bad over there we don't know what Mr. Corneal is doing.
22 Q    Mr. Corneal, as you testified a moment ago,
23 told you at this April 3, 2000 meeting that he just wanted
24 to build a house on the property, correct?
25 A    Yeah, but he's -- we've had several stories

127

1 from Mr. Corneal, what he was doing, and we didn't know what
2 was happening.
3 Q    Didn't Mr. Corneal's stories change only as he
4 received refusals from the township for permission to do
5 what it was that he wanted to do?
6 A    Yes.
7 Q    Right?
8 A    Yes.
9 Q    So the last thing he came and said is I'd like
10 -- I just want to build my house. Can you please sign
11 these sewage modules and I'll get my septic system in for my
12 house, one house, right?
13 A    Well, that's what he said.
14 Q    But you wouldn't sign them because you
15 thought, well, he really wants a subdivision so I'm not
16 going to open this door for him; isn't that correct?
17 A    We were not signing five sewer modules for one
18 house.
19 Q    Well, it just gives him an option where he
20 wants to place his house, doesn't it?
21 A    He already had a house started, didn't he.
22 Q    I don't know if he had a house started on
23 April 3, 2000.
24     MR. CORNEAL: No.
25 BY MS. MONTGOMERY:

128

1 Q    Did he?
2 A    I don't know. Of course, I wasn't allowed on
3 that property.
4 Q    Let's talk about the building permit. Did you
5 have any discussions with your building permit officer about
6 whether or not Mr. Corneal ought to have a building permit?
7 A    Yeah, the day Mr. Corneal was at the building
8 officer's house, yes. Dave called me.
9 Q    He called you from his house?
10 A    Yes.
11 Q    And what did you tell Dave?
12 A    I told him don't you dare issue him a permit.
13 Q    Well, Mr. Corneal came to -- and when you say
14 Dave, you're talking about Mr. Van Dommelen, right?
15 A    Yes.
16 Q    Mr. Corneal actually came and just asked for
17 an application for a permit, correct?
18 A    That isn't what I heard on the phone.
19 Q    Well, he couldn't get a permit if he didn't
20 have an application, right?
21 A    Well, I'm -- I'm telling you what -- the
22 conversation I had on the phone. He was -- I was asked if
23 there was to be a permit issued to Mr. Corneal and I told
24 him no way, we don't have the thing signed.
25 Q    So was it your understanding that he had gone

129

1 out and asked for a building permit for a house?
2 A    No, a five-bay garage with an over-study.
3 Q    So he had gone out and asked for a building
4 permit for a garage. And does a garage require sewage?
5 A    If you have an over-study on it, there's going
6 to be water in there.
7 Q    What's an over-study?
8 A    Apartments, a living space up there.
9 Q    I thought you said you hadn't seen any, you
10 know, plans or anything for what Mr. Corneal wanted to
11 build.
12 A    No, Dave -- Dave told me that's what it was
13 when he called me.
14 Q    Dave Van Dommelen told you he wanted a
15 five-bay garage with apartments over it and you said don't
16 you dare issue him a building permit?
17 A    And he knows better than to issue a permit
18 without a sewage permit because there's potential -- there's
19 -- that building has potential for human habitat.
20 Q    So did you tell Mr. Van Dommelen not to even
21 give him the application?
22     MR. SHERR: Objection, asked and answered.
23     THE WITNESS: No.
24 BY MS. MONTGOMERY:
25 Q    No? Are you aware that Mr. Van Dommelen

130

1　refused to even give him an application?
2　　A　　No.
3　　Q　　You didn't know that?
4　　A　　No.
5　　Q　　So do you believe that it was appropriate for
6　you at the April 3, 2000 township meeting to tell Mr.
7　Corneal that he couldn't have a building permit or -- I'm
8　sorry, that you couldn't sign the sewage module for one
9　building because you thought he might subdivide?
10　　A　　Right.
11　　Q　　You think that was appropriate?
12　　A　　Yes.
13　　Q　　Even though he told you he wasn't going to
14　subdivide?
15　　A　　Yes.
16　　Q　　You didn't have an approved subdivision plan
17　at that point, right?
18　　A　　We didn't have anything except his handful of
19　sewer modules.
20　　Q　　Because you told him there was a moratorium so
21　he said, okay, I won't subdivide, right?
22　　A　　I'm sorry, my --
23　　Q　　I said when you had told him that there was a
24　moratorium, he said, okay, I won't subdivide right?
25　　A　　Right.

131

1　　Q　　Now, I understand that you told Mr. Van
2　Dommelen not to issue him a building permit for his garage?
3　　A　　That's right.
4　　Q　　Are you aware that Mr. Van Dommelen told Mr.
5　Corneal that there was going to be a meeting about his
6　property the next day?
7　　A　　No.
8　　Q　　Was there a meeting about his property the day
9　after he went out there and asked him -- Mr. Corneal went
10　out and asked Mr. Van Dommelen for a building permit?
11　　A　　No.
12　　Q　　There was no meeting?
13　　A　　Not that I know of.
14　　Q　　Well, do you recall what day of the week it
15　was when Mr. Van Dommelen called you about Mr. Corneal's
16　request for a building permit application?
17　　A　　No.
18　　Q　　Do you recall whether or not the supervisors
19　-- or any supervisor and Mr. Van Dommelen did in fact meet
20　the next day or soon thereafter about Mr. Corneal and his
21　property?
22　　A　　I don't know.
23　　Q　　Do you recall any meeting other than a formal
24　monthly township supervisor's meeting or a special meeting
25　that was called by the board of township supervisors during

132

1　which Mr. Corneal and his property were discussed by you and
2　the other township supervisors?
3　　A　　No.
4　　Q　　Well, I want to make sure that we're not
5　unnecessarily limiting this information. So understand that
6　I'm asking you whether there was any informal meeting
7　whatsoever between any supervisor and anybody else, any
8　township official about Mr. Corneal's property after he went
9　out there and had that conversation with Mr. Van Dommelen
10　about his building permit?
11　　A　　Not that I can recall.
12　　Q　　You talked a moment ago about Larry Newton
13　calling you up and saying, well, I've got this subdivision
14　application that Mr. Corneal dropped off. Now, was there
15　any other telephone calls from or to Larry Newton about Mr.
16　Corneal around that same time frame that you recall?
17　　A　　Not that I recall.
18　　Q　　Not necessarily that you took part in but that
19　Miss Wirth or you or any other township supervisor or the
20　building permit officer or the sewage enforcement officer.
21　　A　　Not that I recall.
22　　Q　　That's the only telephone call you can recall
23　from or to Larry Newton about Mr. Corneal?
24　　A　　Yes.
25　　Q　　What about any other meeting, contact,

133

1　conference, conversation, discussion, anything after that
2　time when Mr. Newton called about Mr. Corneal's subdivision
3　plan?
4　　A　　I don't recall.
5　　Q　　But I think you testified, and you correct me
6　if I'm wrong, that the call came from Larry Newton prior to
7　the point that Mr. Corneal came in and asked to have his
8　sewage modules signed at the April 3, 2000 meeting; isn't
9　that correct?
10　　A　　I don't know that.
11　　Q　　You had indicated that you didn't have the
12　subdivision plan in front of you when he brought the sewage
13　modules in in April 2000?
14　　A　　(Witness nods head affirmatively.)
15　　Q　　And you also indicated that you knew that
16　Larry Newton had them, had gotten a copy and that somebody
17　had gone out and picked them up but you didn't know what
18　happened to them, correct?
19　　A　　Exactly. I don't -- I don't know what the
20　dates were on this, when -- when we had the call that there
21　was a plan dropped off at Larry's office. I suppose it was
22　the same -- at the Daily News, but I don't know what that
23　day was and I don't know where that got to.
24　　Q　　Who talked to Larry Newton, who took that call
25　from Larry Newton?

134

1    A    That there was a plan in there? I assume the
2 township office.
3    Q    Ann Wirth?
4    A    I'm assuming that.
5    Q    Well, you'd indicated that you didn't have the
6 plot plan in front of you, but does an individual need a
7 plot plan if they're not subdividing?
8    A    No. If they're doing land development, they
9 do.
10    Q    I'm going to show you some documents. We'll
11 just put them together as Wilson Exhibit 5. These are the
12 February 24, 2000 and April 20, 2000 letters from the
13 Huntingdon County Planning Commission.
14        (Packet of documents produced and marked as
15 Wilson Exhibit No. 5.)
16 BY MS. MONTGOMERY:
17    Q    Take a moment to review them, Mr. Wilson.
18 Have you seen these documents in the past?
19    A    Yes.
20        MR. SHERR: Have you finished reviewing them?
21        THE WITNESS: Yes.
22 BY MS. MONTGOMERY:
23    Q    Have you seen the documents in the past? Are
24 you ready? I think you testified you have seen the
25 documents in the past, correct?

135

1    A    Yes.
2    Q    Did you see them at the time that they were
3 first generated, like around the February 2000 time frame
4 and around the April 2000 time frame?
5    A    When they came from the county, yes.
6    Q    Miss Wirth turned them over to you when they
7 came from the county?
8    A    Yes.
9    Q    I'm going to draw your attention to the April
10 20, 2000 letter from the Huntingdon County Planning
11 Commission. Do you understand that letter to say that the
12 commission found Mr. Corneal's property suitable for on-lot
13 sewage disposal and --
14    A    Yes.
15    Q    -- for the -- yes, right?
16    A    Yes.
17    Q    I just want to make sure the court reporter
18 understood that you said yes. Did you understand that the
19 Huntingdon County Planning Commission found the property
20 suitable for division into two lots?
21    A    Yes.
22    Q    Do you recall whether the subdivision plan for
23 the two lots was returned to the township supervisors along
24 with this letter?
25    A    I never seen it.

136

1    Q    So you don't know whether it was because it
2 went to Miss Wirth, right?
3    A    Well, if it -- if it came, I should have it --
4 the supervisors should have it. I'm curious if the plan
5 came back.
6    Q    But this letter indicates that there was a
7 subdivision plan for the two lots, correct?
8    A    Well, the proposal is a resubmission, Lot 1
9 the residue and Lot 3 contains 25 acres.
10    Q    Let's read the first sentence, the Huntingdon
11 County Planning Commission.
12    A    Has reviewed the above-referenced property.
13    Q    Proposal. Did you read that first sentence,
14 Mr. Wilson?
15    A    Has reviewed the above-referenced proposal to
16 subdivide a property containing 94.67 acres into two lots.
17    Q    Now, as you testified earlier, Mr. Corneal was
18 directed or told that he had to submit his plan to the
19 Huntingdon County Planning Commission first, correct?
20    A    For review.
21    Q    For review?
22    A    Yeah.
23    Q    So they reviewed it and sent it back to you,
24 correct?
25    A    Yes.

137

1    Q    And said they found it suitable, correct?
2    A    Yes.
3    Q    So at what point do you believe that Mr.
4 Corneal had not taken the proper steps to obtain permission
5 to build a house on his property?
6    A    I -- I don't think -- and this is my opinion.
7 I don't think that has anything to do with building a house
8 here. This is approval of a subdivision, nothing about
9 building a house.
10        MR. SHERR: You're referring to the April 20th
11 letter?
12        THE WITNESS: Yes.
13 BY MS. MONTGOMERY:
14    Q    Right, but didn't you indicate earlier that
15 Mr. Corneal couldn't build because he didn't have -- hadn't
16 submitted all the right plans, you didn't have a plan in
17 front of you?
18        MR. SHERR: I'm going to object to the form of
19 the question because this is completely confusing. Are you
20 discussing now in your question what you asked him about the
21 April township meeting which occurred before the date of
22 this letter that he has in front of him?
23        MS. MONTGOMERY: That's what I'm asking him.
24        MR. SHERR: Okay.
25        THE WITNESS: Okay, I still haven't seen the

138

1 subdivision thing that is discussed here, but regenerated
2 now into a new land development certificate, okay. It's
3 being processed by Terry Williams, his other attorney, and
4 we are -- we've had two hearings in the Huntingdon County
5 Courthouse that these things were supposed to be in order to
6 the satisfaction of Jackson Township by our judge.
7 And the last time we were in there the judge
8 said that we had 30 days to get this in order or we would be
9 back in. Well, we're way past the 30 days and I don't know
10 what's going on.
11 So I'm -- my thing is that I will -- when I
12 get back, I want to call our solicitor and have him call Mr.
13 Corneal's solicitor, new solicitor, and see what's happening
14 because Williams and I have met on several occasions to try
15 to get these things resolved and we don't seem to be getting
16 any further. It's just like it stopped.
17 BY MS. MONTGOMERY:
18 Q But the April 20, 2000 letter from the
19 Huntingdon County Planning Commission was written before
20 this lawsuit was initiated, correct?
21 A Yeah.
22 Q Before the Huntingdon County Commission
23 lawsuit, not the Huntingdon County lawsuit, was initiated by
24 the township, correct?
25 A Yes.

139

1 Q So we're just talking about this period of
2 time here where you indicated that you had not seen and
3 still have not seen a subdivision plan, right?
4 A Right.
5 MR. SHERR: And just to be clear, again,
6 you're saying he indicated as of that April meeting he had
7 not seen a subdivision plan.
8 MS. MONTGOMERY: No, he indicated he still has
9 not seen the subdivision plan, that's what I'm questioning
10 him about.
11 MR. SHERR: Well, I think it's completely
12 ambiguous and I don't really understand what you're saying
13 and --
14 MS. MONTGOMERY: Well, then I'll just clarify
15 it.
16 MR. SHERR: That would be great.
17 MS. MONTGOMERY: And I don't think that your
18 witness is confused.
19 MR. SHERR: Well, I --
20 BY MS. MONTGOMERY:
21 Q What you testified was that you hadn't yet
22 seen an April -- I mean, you hadn't yet seen a subdivision
23 plan. Right now, today, you haven't seen one, correct?
24 A Correct.
25 Q I showed you an April 20, 2000 letter from the

140

1 Huntingdon County Planning Commission indicating that they
2 had reviewed and were sending back to you with approval --
3 A Um-hum.
4 Q -- a two lot subdivision plan, right?
5 A Yeah.
6 Q And so I'm asking you why you hadn't seen the
7 plan, the Huntingdon --
8 A I still haven't seen it.
9 Q But you don't know why you haven't seen it?
10 A No.
11 Q That's all I'm trying to get to.
12 MR. SHERR: And did your question assume that
13 this letter somewhere said that they were sending the plan
14 back to the township?
15 MS. MONTGOMERY: Actually it's based on the
16 testimony from prior witnesses and this witness that the
17 Huntingdon County Planning Commission reviews the plan and
18 sends it back.
19 MR. SHERR: I don't remember any such
20 testimony.
21 MS. MONTGOMERY: Well, the record will speak
22 for itself.
23 MR. SHERR: It absolutely will.
24 BY MS. MONTGOMERY:
25 Q Let me ask you this, Mr. Wilson: When the

141

1 Huntingdon County Planning Commission sends a letter like
2 this back, right, saying we've reviewed a plan, do they send
3 the plan back to the township?
4 A Not always.
5 Q Do they --
6 A They keep --
7 Q -- sometimes?
8 A They keep one on file. It depends on how --
9 maybe I should back up. Most of these things are submitted
10 to the county by either the owner or his representative. So
11 we don't know how many he drops in there. If they have an
12 extra one there, they'll send it back, but we still should
13 have one at the township and we don't -- well, it may be
14 there now. Things are so ...
15 Q Do you know whether or not Miss Wirth produced
16 to us a copy of this plot plan that was referenced in the
17 April 20, 2000 Huntingdon County Planning Commission letter,
18 if she produced it back to us in connection with this
19 litigation?
20 A I don't know. Is it possible to ask if we
21 could break? I have to go again and maybe we could eat.
22 Q Okay, sure.
23 (Luncheon recess taken at 12:36 p.m. until
24 1:30 p.m.)
25 BY MS. MONTGOMERY:

Case 1:00-cv-01192-SHR   Document 119   Filed 04/18/2003   Page 42 of 100

142

1    Q        Back on the record, Mr. Wilson. You're still
2    under oath.
3    A        Okay.
4    Q        Do you recall whether at the February 2000
5    meeting when Mr. Corneal brought his subdivision plan in the
6    first time and you told him there was a moratorium, do you
7    recall whether he told you and the supervisors at that
8    meeting that the moratorium was illegal?
9    A        I don't recall that.
10   Q        Do you recall at any time hearing from anybody
11   that Mr. Corneal thought that the moratorium was illegal,
12   invalid?
13   A        If my memory serves me right, I -- it was at
14   the next meeting he came that he said that.
15   Q        But you recall him saying it at one meeting or
16   another?
17   A        Yes. Yes, I heard him say that.
18   Q        What did you say? Did you say anything back
19   to him?
20   A        It is legal.
21   Q        According to who?
22   A        According to the township regulations.
23   Q        Do you recall anybody saying to him when he
24   said it was illegal, not according to our solicitor?
25   A        No.

143

1    Q        You don't recall anybody answering him that
2    way?
3    A        No.
4    Q        Well, once he said it was illegal, did you go
5    check with your solicitor to find out whether he was --
6    A        No.
7    Q        -- correct or not?
8    A        No.
9    Q        You didn't?
10   A        No.
11   Q        Because you thought you knew yourself?
12   A        As I had testified before, there's been other
13   townships in the county that had to do -- and surrounding
14   areas that had to do the same thing and they're legal. I
15   guess we'll find out. The law says it is.
16   Q        I'm going to show you a document that we'll
17   mark as Wilson Exhibit 6. We'll have the court reporter
18   mark it and then you can take a look at it.
19            (Subdivision plan produced and marked as
20   Wilson Exhibit No. 6.)
21   BY MS. MONTGOMERY:
22   Q        Take a moment and look at it, Mr. Wilson, and
23   I just want to ask you a couple questions about it. Just
24   let me know when you're finished.
25   A        Okay.

144

1    Q        Have you seen this document before?
2    A        I seen a document that resembles this, but I
3    don't remember the black lines that are through there.
4    Q        When you say it resembles this, do you mean
5    that you saw a document where this property, the Corneal
6    property, was broken up into these lots?
7    A        Yes.
8    Q        But you don't recall which black lines?
9    A        No. What I observe here is some of them --
10   some of them aren't -- have been whited out or something.
11   They're not continuous.
12   Q        Oh, I see.
13   A        I -- I recall seeing a document like this but
14   it had different features on it. I mean, the lines don't
15   seem to ring a bell.
16   Q        Okay. But just to be clear, do you recall
17   seeing a document like this mapping out the Corneal property
18   broken up into five lots?
19   A        I don't remember.
20   Q        In what context do you recall seeing a
21   document that looked like this but maybe had somewhat
22   different lines?
23   A        This -- this reminds me of the copy that I
24   seen that came from Larry Newton that was dropped off he
25   told me by Mr. Corneal, but it had bright orange lines on

145

1    it. So it's -- the contrast of my eyes, it doesn't look --
2    overall it looks the same, but it looks different inside.
3    Q        Maybe because that was the original and these
4    are copies?
5    A        I ...
6    Q        She's going to go get the original, if she can
7    find it. I mean, is that what's bothering you, that just
8    the lines are a different color?
9    A        Well, yeah, and there's like three and a half
10   that are -- that look like they've been whited out or
11   something.
12   Q        Right, that might just be a copy problem, but
13   we'll figure it out. So you say you think it might have
14   been part of the materials that had gotten dropped off to
15   Larry Newton?
16   A        That's my recollection, yeah.
17   Q        When did you see those materials that were
18   dropped off to Larry Newton?
19   A        I don't recall.
20   Q        But you did see a plot plan in connection with
21   the materials that were dropped off to Larry Newton?
22   A        The only thing I seen was a plan like this
23   that had orange lines on it. I assume somebody reworked --
24   Q        Well, as we discussed earlier, Mr. Corneal's
25   property has been reworked a number of times in terms of how

Case 1:00-cv-01192-SHR   Document 119   Filed 04/18/2003   Page 43 of 100

146

```
 1   many lots it's going to be in, right?
 2       A    Yeah.
 3       Q    Well, while we're waiting for her to bring
 4   back the original, let's just have you look at this -- what
 5   we're going to mark as Wilson Exhibit 7.
 6           (Subdivision and land development ordinance
 7   Jackson Township produced and marked as Wilson Exhibit
 8   No. 7.)
 9           MS. MONTGOMERY:  You guys already have a copy
10   of this, the subdivision plan.
11           MS. YANKANICH:  Yes.
12           MS. MONTGOMERY:  You can look at your client's
13   copy if you like.
14   BY MS. MONTGOMERY:
15       Q    I just want you to look at that and identify
16   it for the record, Mr. Wilson, if you will.
17       A    It looks like the -- a copy of the ordinance
18   -- subdivision and land use development ordinance of
19   Jackson Township.
20       Q    Can you turn to page 71 of the ordinance, to
21   the signatures on page 71.
22       A    Yes.
23       Q    Is that your signature there?
24       A    Yes.
25       Q    In the middle?
```

147

```
 1       A    Yes.
 2       Q    So this is a copy of the subdivision and land
 3   development ordinance that you passed as a township
 4   supervisor for Jackson Township, correct?
 5       A    Correct.
 6       Q    Now, let me ask you this:  Do you see -- you
 7   testified the ordinance was passed on July 10, at a July 10,
 8   2000 meeting, correct?
 9       A    Correct.
10       Q    Do you know why this is dated July 7, 2000?
11       A    No idea.
12       Q    But you're quite certain that the meeting
13   occurred on July 10th, which is I believe a Monday, right?
14       A    I believe so.
15       Q    So the subdivision ordinance was actually
16   passed after this lawsuit was initiated, correct?
17       A    I don't know.
18       Q    I think you said you recall being served with
19   the papers on July 3rd, right?
20       A    4th.
21           MR. SHERR:  He said July 4th.
22   BY MS. MONTGOMERY:
23       Q    July 4th?
24       A    Yeah, it was a holiday.
25       Q    So the subdivision ordinance was passed then
```

148

```
 1   after you were served with the papers, correct, for this
 2   lawsuit?
 3       A    Yes.
 4           MS. MONTGOMERY:  She doesn't have the
 5   original.  Well, all right then.
 6           (Discussion held off the record.)
 7   BY MS. MONTGOMERY:
 8       Q    Well, unfortunately we don't have the original
 9   in the office of this plan, but I think you've answered
10   enough questions about it for right now.  We're going to
11   move on to another one, okay.
12           I'm going to take you to a plan that actually
13   -- we have plans in the record from before, right, old
14   exhibits there?  I think we'll just use them instead of
15   making new ones.
16           I'm going to show you what has previously been
17   marked as Parks Exhibit 2.  This is a February 4, 2000 plan
18   of proposed subdivision and I'm going to ask you to look at
19   that and tell me whether or not you've seen that in the
20   past.
21           (Pause.)
22   BY MS. MONTGOMERY:
23       Q    Do you recall seeing that document in the
24   past, Mr. Wilson?
25       A    I recall seeing a document that looked like
```

149

```
 1   this, but here -- I don't recall the changes.
 2       Q    You recall seeing a subdivision plan, in other
 3   words, for the Corneal property but maybe the lines were
 4   different at some point or what?
 5       A    The only -- I don't understand the -- it looks
 6   like someone tried to take these out and they added a garage
 7   or something here.
 8       Q    Take what out, when you say tried to take
 9   these out?
10       A    The lines.  See, they're -- somebody took a
11   pen or something and tried to scribble them out.
12       Q    So it looks like it was a plan that was
13   somehow redrawn, is that what you mean?
14       A    Well, it's been altered, yes.
15       Q    Well, let me show you another document that's
16   been previously marked as Parks Exhibit 1, the April 7, 2000
17   subdivision plan for the Corneal property and ask you
18   whether you recall seeing that document.
19       A    There again, it resembles something that I
20   have seen.  I don't know -- it looks like all the probes and
21   percs and everything that -- well, there isn't any percs on
22   here.  All the soil logs and everything are established, but
23   there should have been a later one that I seen that -- where
24   the percs were done for these sites, and those aren't on
25   there.  So apparently this is an earlier one.
```

150

1  Q   Now, there are perc numbers on that map,
2  aren't there?
3  A   Where?
4  Q   Eight, 9, 10. Do you see that one circled
5  with the red ink?
6  A   No, those are soil logs.
7  Q   Okay. Those aren't perc numbers?
8      MR. CORNEAL: They're perc numbers.
9  BY MS. MONTGOMERY:
10  Q   What makes you think they're not perc numbers?
11  A   They're soil logs. Percs are done between the
12  soil logs if the site is approved.
13  Q   Well, if I represent that your sewage
14  enforcement officer told us yesterday that they were perc
15  numbers, would that change your view of it?
16  A   No.
17      MR. SHERR: Object to the form of the
18  question.
19  BY MS. MONTGOMERY:
20  Q   I'm sorry, go ahead.
21      MR. SHERR: He answered the question.
22  BY MS. MONTGOMERY:
23  Q   What did you answer?
24      MR. SHERR: He answered it no.
25  BY MS. MONTGOMERY:

151

1  Q   Is that what you answered, no?
2  A   No, they aren't percs.
3      (Discussion held off the record.)
4  BY MS. MONTGOMERY:
5  Q   I'm going to ask you to look at the site
6  investigation and percolation test reports that are part of
7  Wilson 2 and just refer to the graph that's in the middle of
8  this perc test here, this perc test report. There's some
9  handwriting at the top.
10      MS. MONTGOMERY: And let the record reflect
11  I'm pointing to the words that start out perked between.
12  BY MS. MONTGOMERY:
13  Q   Do you see that?
14  A   Yeah, perked between 3 and 4.
15  Q   So what do you take those numbers 3 and 4 to
16  mean?
17  A   Soil logs. Right here.
18  Q   So those are soil logs?
19  A   That's a log, yes. That perc was done right
20  along Sawmill Road.
21  Q   So you think the numbers are -- so there would
22  be separate perc numbers, are you saying, on a new map?
23  A   Perc -- I don't know that. It's whatever the
24  surveyor draws up.
25  Q   In any event, putting that aside for right

152

1  now, I've now shown you three maps and in response to each
2  of them you've said I've seen something that looks like
3  that.
4  A   (Witness nods head affirmatively.)
5  Q   But you think maybe the lines were a little
6  bit different or there was more or less detail, correct?
7  A   They all look -- all the ones I've seen here
8  look altered.
9  Q   Altered from the one that you saw?
10  A   Yes.
11  Q   When did you see the one that you saw?
12  A   I've -- I don't know a date.
13  Q   Have you only seen one?
14  A   I glanced at the one Mr. Corneal brought into
15  the -- what meeting was it?
16  Q   The February 2000?
17  A   February. I glanced at it and then the next
18  one I seen was the one that came from the attorney which had
19  all the orange lines and changes or --
20  Q   The one that had gotten dropped off to Larry
21  Newton --
22  A   Yes.
23  Q   -- and you didn't know how and somehow it came
24  back to you?
25  A   Yes.

153

1  Q   When did you see that one -- or where did you
2  see it, I should say? Where were you when you saw it?
3  A   I don't know. I don't -- I don't know about
4  these legal things. I was going to say probably, but that
5  -- that is -- that's flirty.
6  Q   That's good enough for a deposition for right
7  now. If you don't know the exact date, then you can tell me
8  as close as you can possibly tell me.
9      MR. SHERR: Right, as long as you're not
10  guessing at it you can give --
11      THE WITNESS: Yeah, I don't know. I would be
12  guessing.
13  BY MS. MONTGOMERY:
14  Q   Can you take a look at Wilson 5, the April
15  20th letter from the Huntingdon County Planning Commission.
16  Do you have it?
17  A   Yes.
18  Q   Can you look at the second page of that
19  letter. Do you see at the top where it says a detailed map
20  and study data, the second line?
21  A   The second line of mine says investigation and
22  because maps submitted with the investigation did not --
23  Q   No, you're looking at the wrong letter. Look
24  at the April 20th letter which is the second part of that.
25  A   That's February.

## 154

1 Q    No, it's going to be on the same document, I
2 believe.
3 A    Okay.
4 Q    There you go. Now, look at the second page of
5 that letter, second line. Can you read that for me, please,
6 starting with the detailed map and study.
7 A    A detailed map and study data identifying the
8 investigation area was submitted and indicates no wetlands
9 are present at the location of the lots in this proposal.
10 Q    Do you recall reading that line before today?
11 A    No.
12 Q    Now, you testified earlier that you got these
13 letters when they come in, right?
14 A    Yes.
15 Q    You don't recall this letter telling you that
16 there aren't any wetlands implicated by Mr. Corneal's
17 proposed subdivision?
18     MR. SHERR: Object to the form of the
19 question. The letter speaks for itself, but I believe it's
20 talking about what the Blazosky Associates said.
21     THE WITNESS: I'm sure that I -- I've read it,
22 but I don't know when. That's what I'm -- I see lots of
23 these and I -- I just can't give a date.
24 BY MS. MONTGOMERY:
25 Q    Well, with this letter in hand would you have

## 155

1 any reason to believe that there was any problem with
2 wetlands on Mr. Corneal's property?
3 A    Yes.
4 Q    Why is that?
5 A    A detailed map and study identifying the
6 investigation area was submitted and indicates no wetlands
7 are present at the location of the lots in this proposal.
8 Well, I -- I read in that the location of the lots, his
9 proposed house development, where the house is going to set,
10 because Mr. Corneal knows as well as anybody that there are
11 wetlands on that property.
12 Q    So that's your concern?
13 A    Well, no, it's addressed -- it was addressed
14 on -- a little further down by the conservation district
15 noting that widening of the road could impact potential
16 wetland areas.
17 Q    On Lot 2, correct?
18 A    Well, the map I have here, the potential is
19 for Lot 4 and Lot 2, potential for widening of roads which
20 -- it describes there, is on Lot 4 till it goes across the
21 power right-of-way.
22 Q    But did you have any indication that there was
23 an intent to widen the road to access a new dwelling on
24 Lot 2?
25 A    No, the only --

## 156

1 Q    Okay, that's good.
2     MR. SHERR: You can finish your answer.
3 BY MS. MONTGOMERY:
4 Q    Are you finished with your answer?
5 A    Well, the -- I -- the only -- I didn't know
6 how wide the road was going to be put in there. I know what
7 would be required under a subdivision ordinance, how wide it
8 would have to be, but I have no idea what Mr. Corneal was
9 going to do for a width of the road there, if it was 10
10 feet, 12 feet, 14 feet, I don't know.
11 Q    But if you're going to concern yourself with
12 that sentence that began with the Huntingdon County
13 Conservation District, then let's also read the last
14 sentence in that paragraph.
15 A    The Huntingdon County Conservation District?
16 Q    The last sentence that begins road
17 improvements.
18 A    Right, road improvements should be limited to
19 existing cartway widths.
20 Q    So do you take that to mean that's how the
21 Huntingdon County Planning Commission was telling you
22 you could deal with that concern about widening of roads?
23 A    If the road -- I believe I personally talked
24 with Andy and his thought was that the road was existing and
25 as long as the road wasn't built wider than it was it would

## 157

1 be permissible through there, yeah.
2 Q    Did Mr. Corneal ever come and ask you to build
3 that road wider than it was?
4 A    No.
5 Q    Thank you. Now, you had testified that when
6 you got the letter back from the Huntingdon County Planning
7 Commission that there wasn't any plan attached to it,
8 correct?
9 A    That's what I recall.
10 Q    That's what you recall, or at least the letter
11 you got didn't have a plan attached to it, right?
12 A    Right.
13 Q    The letter went to Ann Wirth, though, of
14 course, right?
15 A    All letters go to the township office and then
16 they're disseminated from there.
17 Q    Did you then say, well, you know, if I'm going
18 to consider this letter, maybe I need to look at the plan?
19 Did you ask for a plan? Did you ask anybody for a plan?
20 A    No, no actions are being taken on this.
21 Q    No action has been taken on this?
22 A    Right. We weren't taking no action on that.
23 It just laid. I -- all I did was for my information look at
24 what the county was recommending.
25 Q    Now, if the county was reviewing his

158

1 subdivision plan -- and I think you testified earlier that
2 that was the first step that was necessary in reviewing --
3 in getting subdivision approval in the township, right?
4    A    Yes.
5    Q    So the process was actually underway, correct,
6 because the county had finished its review and sent it back
7 to you, correct?
8    A    No, we didn't have a copy of what was going
9 on.
10    Q    So did you ask for a copy of what was going
11 on, now that you got this back from the county planning
12 commission?
13    A    There could have been an extra copy come back
14 from the county, but I -- I don't know.
15    Q    All I'm really asking you is, you know, why
16 didn't you ask for one? If your copy of the letter didn't
17 have one, why didn't you ask to see it? Why didn't you ask
18 to see a copy of the plan?
19    A    Because at the time there was no action being
20 taken on his subdivision.
21    Q    No action has ever been taken, right?
22    A    Right.
23    Q    Other than to deny it?
24    A    Well, it wasn't -- it wasn't denied.
25    Q    Okay.

159

1    A    It was being held up by a moratorium and then
2 things changed. Now we're into a land improvement.
3    Q    But things didn't change at the point we filed
4 this lawsuit, right? We weren't in land improvement when we
5 filed this lawsuit, were we?
6    A    No, no.
7    Q    Does that mean, I guess, that that plan is
8 still pending, the subdivision plan that was --
9    A    No, his other attorney said there will be no
10 subdivision. It was a land development and that is out.
11    Q    Okay.
12    A    No subdivision.
13    Q    And in fact at that April 2000 meeting Mr.
14 Corneal told you there was no subdivision, right?
15    A    Right.
16    Q    Now, I think you had indicated that the
17 conservation district had expressed some concern about
18 wetlands, right?
19    A    That concern came when they became aware of
20 that, which I'm assuming I initiated with Andy, because he
21 had sent us a letter that they had issued a stream crossing
22 permit and he wasn't familiar with the area.
23        And when him and I talked, he sent one of his
24 representatives out, I believe Dave Kreamer, one of his
25 associates, to check it out, but I -- I have -- to this day

160

1 I have never seen a permit for a stream crossing, other than
2 the letter from the county conservation district.
3    Q    So you're indicating that they had issued a
4 stream crossing permit to Mr. Corneal?
5    A    Mr. McClintic was on -- the name on it.
6    Q    So are you saying now that you initiated the
7 complaint with the conservation district?
8        MR. SHERR:    Object to the form of the
9 question. Misstating his testimony.
10        MS. MONTGOMERY:    I'm asking him what he said.
11        MR. SHERR:    Misstating -- you're stating what
12 he said and that's incorrect what he said.
13 BY MS. MONTGOMERY:
14    Q    I said are you saying now -- do you understand
15 my question? You just used the word I'm assuming I
16 initiated the complaint and I'm trying to get you to tell me
17 what you meant by that.
18        MR. SHERR:    And I'm going to have to object
19 again because it's not what he said and the record will
20 reflect what he said --
21        MS. MONTGOMERY:    What did he say?
22        MR. SHERR:    -- and he did not say that.
23        MS. MONTGOMERY:    What did he say?
24        MR. SHERR:    The record will reflect what he
25 said.

161

1        MS. MONTGOMERY:    Well, what did he say? You
2 know that's not what he said so you must know what he did
3 say. What did he say?
4        MR. SHERR:    I do, but I'm not going to answer
5 your questions.
6        MS. MONTGOMERY:    Well, then don't object.
7        MR. SHERR:    I'm --
8        MS. MONTGOMERY:    Don't object. Keep going,
9 Mr. --
10        MR. SHERR:    I'll absolutely object.
11 BY MS. MONTGOMERY:
12    Q    Mr. Wilson, are you confused by my question at
13 all?
14    A    Yeah. I said that maybe -- I don't recall,
15 but maybe I initiated the call to Andy Patterson at the
16 conservation district because I was shocked that they had
17 issued a stream crossing permit for a high quality trout
18 stream.
19        And he said, well, we just normally do those
20 things unless there's a problem and then we deal with it.
21 Well, then when the wetland issue came up, that struck a
22 light with him and he sent those guys out. And from what I
23 gather, when they came out they came with the Corps of
24 Engineers too. I -- I assume that.
25    Q    Have you ever done that in the past, called

Case 1:00-cv-01192-SHR   Document 119   Filed 04/18/2003   Page 47 of 100

162

1    the conservation district when you hear that they've issued
2    a permit for a stream crossing?
3        A    I call the -- yes.
4        Q    You have.  In what instance did you do that?
5        A    On occasions that I had to have a permit to
6    cross streams with my business.
7        Q    Who issues -- is it the conservation district
8    that issues the stream crossing permit?
9        A    Yes.
10       Q    So that's a little bit different than the
11   question that I asked you.  My question is:  Did you ever
12   call to inquire or express a concern to the conservation
13   district after hearing that they had issued a stream
14   crossing permit to somebody else?  Did you ever do that?
15       A    We have never had one.
16       Q    You never had one?
17       A    There's never been another stream crossing
18   permit issued in our township.
19       Q    Other than the ones that are issued to you for
20   your business?
21       A    And for McClintic.
22       Q    And for McClintic, I see.
23       A    Well, I -- let me clarify that.  I'm only one
24   contractor, okay.  I'm -- I'm trying to -- I'm trying to
25   juggle these things of my work and what we're talking about

163

1    here, but I was under the impression the way you talked of
2    how familiar I was with the conservation district and their
3    permits.
4        Q    Well, really I was just saying -- it sounds to
5    me like in response to the conservation district issuing
6    McClintic a stream crossing permit you called the
7    conservation district --
8        A    No, I didn't --
9        Q    -- to express a concern.
10       A    -- know he issued that until they sent a
11   letter out and then we got the feedback from the county
12   about the potential wetlands.  That's when it tied together.
13       Q    I see.  So when you got the feedback from the
14   county and you knew about the stream crossing permit because
15   the conservation district had issued you a letter on that --
16       A    Yes.
17       Q    -- then you called them up and said do you
18   know about these wetlands on the Corneal property?
19       A    Yes.
20       Q    Is that what you did?
21       A    And the answer was they'd never been on the
22   property, they didn't know.  So they came out to investigate
23   to see if they had to pull the stream crossing permit.
24       Q    From McClintic?
25       A    Right, because if he was going to infringe

164

1    upon wetlands -- see, they issue these on trust in there,
2    which surprised me with high quality water, but if there is
3    a problem attached with that that they find out later,
4    they'll pull the permit.
5        Q    Well, who's McClintic?
6        A    I don't -- a friend of Mr. Corneal's, I
7    believe.
8        Q    So Mr. McClintic that you're talking about got
9    a stream crossing permit in connection with Mr. Corneal's
10   property, right?
11       A    Yes.
12       Q    To cross a stream on Mr. Corneal's property?
13       A    Yes.
14       Q    Now, let me ask you something.  Have you
15   performed some work on some property owned by a gentleman
16   named Weaver or a family named Weaver --
17       A    Bob?
18       Q    -- close to Mr. Corneal's property?
19       A    Yes.
20       Q    You've performed some work on his property, on
21   Weaver's property?
22       A    Yes.
23       Q    Did you get a stream crossing permit in
24   connection with that job?
25       A    That wasn't near a stream.

165

1        Q    You weren't near a stream.  You didn't have to
2    cross a stream?
3        A    No.
4        Q    Did you have to cross wetlands in connection
5    with that job?
6        A    No.  Well, hold it, who are you talking
7    about?  Are you talking about Bob or are you talking about
8    Adam?
9        Q    Well, if there's a different Weaver that we're
10   talking about, then we'll talk about --
11       A    I've done work for the son and the father.
12       Q    In connection with either of the Weavers and
13   their properties --
14       A    Well, clarify.  Adam Weaver, we put a three or
15   four foot culvert across a ditch and, yes, I did contact the
16   conservation district for that.
17       Q    Did you get a stream crossing permit?
18       A    I didn't need one, the stream was dry.  He
19   come out and looked at it and said to put it in.
20       Q    Did you have to go near any wetlands to do
21   that?
22       A    No.  I work --
23       Q    Go ahead.
24       A    I work closely with the conservation
25   district.  They've told me if we have to come out you're

166

1 going to pay money, call us first.
2 Q   So once you got that letter from the
3 Huntingdon County Planning Commission that indicated there
4 were some wetlands around the Corneal property, although
5 none of the lots, the proposed lots were on the wetlands,
6 correct?
7 A   (Witness nods head affirmatively.)
8 Q   And once you called the Huntingdon -- once you
9 called the conservation district and said, you know, you
10 issued a stream crossing permit on the Corneal property, did
11 you know there was wetlands, did you have any concerns after
12 that that there was a problem with Mr. Corneal's wetlands
13 or with -- I should say did you have any concerns after that
14 that there were problems with wetlands being affected on Mr.
15 Corneal's property?
16 A   Once I talked to the conservation district,
17 it's whatever their determination is satisfies the township.
18 Q   What did they decide, do you know?
19 A   I never got a letter.
20 Q   Did you get a report from the Army Corps of
21 Engineers?
22 A   No.
23 Q   You didn't get a letter from the conservation
24 district either?
25 A   There may have been a letter come in from

167

1 Andy, but I don't recall.
2 Q   Did you call them back and say, hey, what did
3 you figure out out there on the Corneal property?
4 A   No.
5 Q   Do you know whether the conservation district
6 found it necessary to pull the stream crossing permit?
7 A   No.
8 Q   To be clear, are you saying you don't know or
9 no, they didn't find it necessary?
10 A   I don't know.
11 Q   You don't know. Did you call them back to
12 find out whether they had to pull that permit or not?
13 A   I have to talk to them on Monday. I haven't
14 -- I didn't call them back.
15 Q   You have to talk to him on this Monday you
16 mean?
17 A   This coming Monday, yes.
18 Q   But how long ago did you call him about that
19 wetland concern of yours?
20 A   Well, apparently it was after this letter.
21 Q   So it was like a year ago?
22 A   Yeah.
23 Q   Did you ever talk to the sewage enforcement
24 officer about any concern over wetlands on the Corneal
25 property?

168

1 A   No.
2 Q   And I did say talk with so maybe I should say
3 did you ever communicate with him in any way or did he
4 communicate with you in any way about a concern over
5 wetlands on the Corneal's property?
6 A   No.
7 Q   Do you know whether he communicated or anybody
8 else -- do you know whether he communicated with anybody in
9 the township government or anybody in the township
10 government communicated with him about a concern over
11 wetlands?
12 A   I don't know.
13 Q   Did any of the other supervisors express any
14 concern to you about it?
15 A   No.
16 Q   How about Ann Wirth, did she express any
17 concern to you about wetlands?
18 A   No.
19 Q   So you didn't refuse to sign the sewage
20 modules because of a concern over wetlands, right?
21 A   Rephrase, please.
22 Q   You didn't refuse to sign Mr. Corneal's sewage
23 modules because of a concern over wetlands?
24 A   No.
25 Q   Let me ask you this: I hope I didn't ask you

169

1 this before, and I apologize if I did, but has the board of
2 township supervisors ever refused to sign sewage modules
3 that had been approved by the sewage enforcement officer
4 other than Mr. Corneal's?
5 A   No, not that I know of.
6 Q   Now, did you have any involvement at all with
7 anybody concerning Mr. Corneal's request for a privy permit?
8 A   I called the sewage officer. I said you do
9 your job, that's what I told him.
10 Q   Did you have some reason to believe he wasn't
11 going to do his job?
12 A   Well, I know how persuasive some individuals
13 can be so I just reminded him he was an employee of the
14 township and he should do his job.
15 Q   Did you have some experience where Mr. Parks
16 didn't do his job in the past?
17 A   No.
18 Q   So when you told him to do his job, what did
19 you mean by that?
20 A   Make sure that he did his job, the
21 regulations, DEP.
22 Q   Did you tell him not to issue a privy permit
23 to Mr. Corneal?
24 A   I don't know.
25 Q   Did you tell him not to help Mr. Corneal in

---

**170**

1　any way with respect to his attempt to get a privy permit on
2　his property?
3　　A　No, as I said, I told him to do his job.
4　　Q　Did you tell him not to cut him any breaks?
5　　A　No exceptions. We don't give anybody else
6　exceptions, none here.
7　　Q　Do you ever recall advising Mr. Parks not to
8　make any exceptions for anybody else?
9　　A　No.
10　　Q　Do you ever recall telling Mr. Parks maybe you
11　could make an exception for somebody?
12　　A　No.
13　　Q　Let me ask you this: Did you ever find it
14　necessary in the past to call up Mr. Parks and say don't
15　make any exceptions?
16　　A　No. Ask me one more.
17　　Q　What?
18　　A　Ask me one more.
19　　Q　Well, I can't guess what question you want me
20　to ask. If you want to clarify your answer --
21　　A　Well, I'd like to clarify my answer there.
22　　Q　Okay.
23　　A　Ninety-eight percent of the sewage work done
24　in Jackson Township I'm with the sewage officer so I know
25　what he does, but I wasn't privy to being involved with more

---

**172**

1　subsequent contractor drove over a test pit or something?
2　　A　Well, from what I -- was conveyed by the
3　sewage officer and Terry Williams the area has been driven
4　on and filled. There's maintenance roads or construction
5　roads or something in that area.
6　　Q　Did they tell you there's no other suitable
7　test site for Mr. Corneal to install a septic system for a
8　house?
9　　A　No.
10　　Q　Did they tell you there is another suitable
11　test site?
12　　A　There's lots.
13　　Q　There's lots. Okay, thanks. Did you ever
14　tell Mr. Parks that you weren't going to issue Mr. Corneal
15　-- or you weren't going to approve Mr. Corneal's sewage
16　modules?
17　　A　I'm sorry?
18　　Q　Did you ever tell Mr. Parks that you weren't
19　going to approve Mr. Corneal's sewage modules despite the
20　fact that he'd approved them?
21　　A　I don't recall.
22　　Q　Did you ever discuss with Mr. Parks that he
23　shouldn't issue a sewage permit because you weren't going to
24　approve -- the board of supervisors wasn't going to approve
25　the sewage module?

---

**171**

1　work at Corneals. That's why I wanted to make sure.
2　　Q　Oh, I see. So initially you had been doing
3　the work on the Corneal property, but then Mr. Corneal got
4　somebody else to do the property --
5　　A　Yes.
6　　Q　To do the work?
7　　A　Yes.
8　　Q　Do you know why Mr. Corneal got somebody else
9　to do the work?
10　　A　Well, I assume it was because I didn't get his
11　road done.
12　　Q　So you felt that nobody else could really work
13　with the sewage officer appropriately on Mr. Corneal's
14　property but you?
15　　A　Well, I'll tell you something, he wouldn't
16　have the trouble he has now if he had a competent
17　contractor. The first thing you do when you go in there
18　with equipment is you rope the area off that says sewage on
19　it so nobody can get on it. That's the first thing you do.
20　That's how he lost it. They drove over it.
21　　　　But experienced contractors know this because
22　they've dealt with sewage officers that have had these
23　rejections before. You can't -- you can't work that area.
24　That's a -- that's a sacred area.
25　　Q　So is it your testimony that Mr. Corneal's

---

**173**

1　　A　I don't recall.
2　　Q　Did you ever discuss the board's refusal to
3　sign Mr. Corneal's sewage module with Mr. Parks at all?
4　　A　I don't recall.
5　　Q　Did you ever discuss the board's refusal to
6　sign the sewage module with anybody else?
7　　A　No.
8　　Q　How about with Larry Newton?
9　　A　No.
10　　Q　Has the board ever approved any other
11　applications for privy permits?
12　　A　Yes.
13　　Q　How many, do you recall?
14　　A　I don't know.
15　　Q　Do you think you do one or two a year, more?
16　　A　I don't know.
17　　Q　What's your understanding of why the sewage
18　enforcement officer wouldn't issue Mr. Corneal a privy
19　permit?
20　　A　I -- I don't know. I assume that there was
21　concern of water.
22　　Q　Are you aware of whether or not the Corneals
23　sought the issuance of a privy permit just so that they
24　could build -- finish their art studio and have something up
25　there to use while they were up there? Do you know anything

---

174

1  about that?
2  A     No.
3  Q     Did you ever instruct anybody not to issue a
4  privy permit no matter what Mr. Corneal asked for it for?
5  A     No.
6  Q     How long was your conversation with Mr. Parks
7  when you called him and said you do your job?
8  A     I don't know.  I don't know.
9  Q     What did Mr. Parks say back to you?
10  A     Okay.
11  Q     He said okay?
12  A     Yeah.
13  Q     Do you know whether anybody else called Mr.
14  Parks in connection with the privy permit or the request for
15  a privy permit?
16  A     I don't know.
17  Q     How did the privy permit come to your
18  attention?  Did Mr. Corneal come into the township
19  supervisors and ask for it initially?
20  A     I -- I believe the meeting that he was at --
21  the last meeting he was at he asked for a privy permit.
22  Q     Is that the meeting in April 2000?
23  A     I believe.
24  Q     So was it after that meeting that you called
25  Barry Parks and told him to do his job?

175

1  A     It would have to have been, yes.
2  Q     Was it that night?
3  A     I don't recall.
4  Q     Well, isn't it -- I mean, did you understand
5  that Mr. Corneal was asking you for a privy permit because
6  you wouldn't sign the sewage modules?
7  A     Yes.
8  Q     So he was just looking for something so he
9  could use his property, correct?
10  A     Yeah.
11  Q     And you said no?  You told Mr. Parks to say
12  no, right?
13  A     I told Mr. Parks to do his job.
14       MR. SHERR:  Object to the form.
15  BY MS. MONTGOMERY:
16  Q     Did you ever interfere or oversee Mr. Parks in
17  his work in connection with anybody else's requests for a
18  privy permit?
19       MR. SHERR:  Object to the form of the
20  question.  It assumes facts not in evidence.  You can
21  answer.
22       THE WITNESS:  I don't know how many privy
23  permits have been issued in Jackson Township.  We deal with
24  them all the time because of the camps, the hunting lodges,
25  the fishing lodges that are back in the mountain.  DEP

176

1  requires those.  So we had to update our ordinance to get
2  some uniformity in the regulation of the township concerning
3  the maintenance of these privies and holding tanks.
4  BY MS. MONTGOMERY:
5  Q     Well, let me just clarify now.  Mr. Parks is
6  the one who issues privy permits, right?
7  A     Yes.
8  Q     My question is:  Did you ever find it
9  necessary to contact Mr. Parks personally about anybody
10  else's request for a privy permit?
11  A     No.
12  Q     Now, after that time that you talked to Mr.
13  Van Dommelen on the telephone when he called you because Mr.
14  Corneal had come out and asked for an application for a
15  building permit, have you talked to Mr. Van Dommelen since
16  then in any conversation, in any telephone discussion,
17  chance meeting, formal meeting, any way whatsoever about Mr.
18  Corneal's property?
19  A     No.
20  Q     Has he contacted you to ask you any questions
21  about it?
22  A     No.
23  Q     Has he contacted the township supervisors
24  generally?
25  A     Not unless there's a question with the

177

1  regulations.
2  Q     What do you mean by that?
3  A     Something that he doesn't understand with the
4  regulation to issue a permit and -- and you just said permit
5  -- no, I'm sorry, you said application.
6  Q     Yes.
7  A     When the phone call came in, it was to give
8  Mr. Corneal a building permit.  Nothing was said about an
9  application.
10  Q     But Mr. Corneal didn't have an application;
11  isn't that correct?
12  A     He could have -- he should have been issued an
13  application.
14  Q     Do you know who Mr. Corneal has to go to for
15  an application?
16  A     Yeah, Dave Van Dommelen.
17  Q     Do you think it would be appropriate for Mr.
18  Van Dommelen to say no, I'm not going to give you an
19  application?
20  A     That wouldn't be appropriate, but we're doing
21  a play on words here.  You're talking about a permit.
22  Q     But he can't --
23  A     He can't have --
24  Q     He can't get a permit without an application,
25  correct?

178

1    A    Right, but I never heard anything about
2 application, all I heard was permit.
3    Q    But you told him not to -- you told Mr. Van
4 Dommelen not to issue him a permit, correct?
5    A    Correct.
6    Q    Does that mean Mr. Van Dommelen should have
7 said no, you can't even have an application?
8    A    I don't know what -- what he would do in that
9 situation.
10    Q    Well, would it have been right for him to say
11 no, I'm not even going to give you an application?
12    A    No.
13    Q    Do you hire Mr. Van Dommelen?  Is it the
14 township supervisors who --
15    A    The township board of supervisors hires him.
16    Q    So you're his boss?
17    A    One of them, yes.
18    Q    So as his boss you think it wouldn't be
19 appropriate for him to refuse to just give the application,
20 correct?
21    A    I don't know.  Something seems strange.
22    Q    What seems strange?
23    A    Well, there's this -- I got a call about a
24 permit and you're talking about the application.  He should
25 -- an application should be issued to anybody and then it's

179

1 -- then it's checked out.  If it conforms with the
2 regulations, then the permit is issued.
3    Q    Is this the first time that you ever heard
4 that Mr. Van Dommelen refused to give an application to Mr.
5 Corneal?
6    A    Today?
7    Q    Yes.
8    A    Yes.
9    Q    This is the first time you ever heard it?
10    A    Application.  That was the keyword, right?
11    Q    Yes.
12    A    Yes, okay.
13    Q    Did you say you read the complaint in this
14 matter?
15    A    Huh?
16    Q    Did you say you read the complaint in this
17 matter, in this lawsuit?
18           MR. SHERR:  Do you understand what a complaint
19 -- what she's talking about?
20           THE WITNESS:  The July -- the July 4th
21 delivery?  I've read it a couple times and I -- honestly I
22 can't tell you what it says, I'm sorry.
23 BY MS. MONTGOMERY:
24    Q    It's the document that you keep sitting on
25 your freezer and keep looking at?

180

1    A    On my freezer and I keep glancing at it every
2 time I go back the hall, yeah.
3           MS. MONTGOMERY:  I'm going to take just a
4 three minute break here with my colleagues and I think we
5 may be finished with you, but we'll check it out and get
6 right back to you.
7           (Break taken at 2:27 p.m. until 2:32 p.m.)
8 BY MS. MONTGOMERY:
9    Q    Mr. Wilson, I'm just going to take you through
10 a few documents that have already been marked at prior
11 depositions.  The first has been marked Wirth 4.  It's the
12 July 10, 2000 minutes, I believe, and I'll let you look at
13 them and tell me if you recognize those minutes.
14    A    That looks correct.
15    Q    So those minutes reflect that it was on July
16 10, 2000 at the board of supervisor's meeting that you
17 passed your subdivision and land development ordinance for
18 Jackson Township, correct?
19    A    Plus the others, yes.
20    Q    Plus the other ordinances?
21    A    Yes.
22    Q    The driveway ordinance and which other one?
23    A    Holding tank and privy.
24    Q    Thank you.  Now I'm going to show you a
25 document that has been marked as Wirth Exhibit 3 in the past

181

1 and ask you to look at that.  Look at it and then tell me
2 whether you've seen that document before.
3    A    No.
4    Q    You have not seen it before?
5    A    No.
6    Q    Well, I'm going to represent to you -- well,
7 actually ask you to look at it and tell me what it is.  Now
8 that you're looking at it, do you know what it is?
9    A    Well, it says it's an application for a
10 building permit.
11    Q    By whom?
12    A    There's no signature on it.
13    Q    Is it filled out, in any event?
14    A    Yes.
15    Q    Who's it filled out by, does it look like?
16    A    I don't know.
17    Q    Let me see it, please.  When you say that it's
18 not signed, what's that on the bottom left-hand -- bottom
19 right-hand corner?
20    A    Well, that's not signed where the permit
21 officer is supposed to sign.  I don't know what that is.
22 That's -- it looks like Mrs. Corneal's signature.
23    Q    Mrs. Corneal or Mr. Corneal?
24    A    Well, I don't know.  I can make out Corneal.
25 It looks like Sandy or Sandra or something, Y.

**182**

1  Q   What's the date on the application?
2  A   8/31/00.
3  Q   At the time that -- around August 31, 2000 did
4  you become aware that the Corneals had submitted
5  applications for building permits on their property?
6  A   I don't remember.
7  Q   I'm going to show you another document that
8  has been marked as Wirth Exhibit 14 and ask you to look at
9  that. There's a series of documents attached there.
10        (Pause.)
11 BY MS. MONTGOMERY:
12 Q   You've finished reviewing Wirth Exhibit 14,
13 correct?
14 A   Yes.
15 Q   Do you recall seeing those documents in the
16 past?
17 A   No.
18 Q   Now, the cover letters that are part of that
19 Wirth Exhibit 14 are addressed to the township, correct?
20 A   Yes.
21 Q   Do you normally get documents addressed to the
22 township passed on to you once Miss Wirth gets them?
23 A   Not unless there's a problem.
24 Q   Did anybody tell you that the Corneals had
25 submitted applications for building permits for their

**183**

1  property on the date of those letters -- around the time of
2  the date of the letters which is 8/31/2000?
3  A   I don't remember that date.
4  Q   It's accurate, isn't it, that those
5  applications for building permits are for a garage, an art
6  studio and a house, correct?
7  A   Yes.
8  Q   Do you know how those building applications --
9  or those applications for building permits were handled,
10 treated?
11 A   No, I don't.
12 Q   Do you know what the result was of the
13 applications?
14 A   I don't know that either.
15 Q   Were they granted?
16 A   I don't know if Terry has them or not.
17 Q   I show you a document --
18 A   See, I'm -- I'm trying to keep between what
19 Terry has been doing and what we're doing now and I'm -- I
20 hope I'm okay -- I'm doing okay. I tried to explain.
21 Q   This is quite a long time before Terry was
22 doing anything so let's try and take -- stick with this time
23 frame. I want to show you a document that has been marked
24 Wirth Exhibit 13.
25        MR. SHERR: I don't know if that

**184**

1  representation you made is true but --
2        MS. MONTGOMERY: What's that?
3        MR. SHERR: I don't think that representation
4  you made is true. I think he was involved at least in the
5  fall of 2000, which would have been --
6        MS. MONTGOMERY: August 31, 2000 is the fall?
7        THE WITNESS: Yes.
8        MR. SHERR: It's pretty much ...
9  BY MS. MONTGOMERY:
10 Q   Have you seen that document before, what's
11 been previously marked as Wirth 13?
12 A   No.
13 Q   What is that document?
14 A   Well, it looks like a letter to the Corneals
15 from Dave Van Dommelen.
16 Q   And what does it do?
17 A   Denies the application.
18 Q   Denies their building permit applications?
19 A   Their applications have been denied,
20 applications.
21 Q   Now, I note that this letter was written on
22 Jackson Township Board of Supervisor's letterhead, correct?
23 Does Mr. Van Dommelen have Jackson Township Board of
24 Supervisor's letterhead?
25 A   He should have.

**185**

1  Q   Does he type his own letters, do you know?
2  A   I think so.
3  Q   Do you know -- he types them himself? He
4  actually gets on the computer or typewriter or something and
5  types it himself?
6  A   I believe so.
7  Q   Let me show you another document that's been
8  marked as Wirth 12 in the past. Have you seen that document
9  in the past?
10 A   No, until I got to the meeting.
11 Q   What is that document?
12 A   It's an appeal.
13 Q   Request for appeal?
14 A   For a hearing for -- by the permits ordinance
15 and I believe that was one of the meetings held in the
16 Huntingdon County Courthouse to get things together or it
17 was generated from that with Terry.
18 Q   So building appeal -- this is an appeal of the
19 denial of the building permit, right?
20 A   That's what it says.
21 Q   And this is signed by Terry Williams?
22 A   Yes.
23 Q   So is it your recollection that this is about
24 the time Terry Williams got involved in this matter?
25 A   Apparently.

186

1   Q       That's November 10, 2000, correct?
2   A       I'm -- yeah, I'm -- if my memory serves me
3   right, I think it was earlier than that. I -- because we
4   were supposed to have all this work cleaned up, everything
5   -- he said he wanted to have everything of Corneals in
6   order by the end of December and we didn't make that. So
7   we've had another hearing -- well, anyhow.
8   Q       Well, in any event, have you ever had an
9   appeal of a refusal of a building permit in Jackson
10  Township?
11  A       I'm not aware.
12  Q       Do you know of any building permits that have
13  been denied in Jackson Township?
14  A       I don't know.
15  Q       Now, do you understand this to be a request
16  for a hearing on an appeal of the building permit -- a
17  denial of the building permit, right?
18  A       Yes.
19  Q       Was there ever a hearing conducted on this
20  appeal?
21  A       I don't know.
22  Q       Did you contact Larry Newton about this
23  request for an appeal of the denial of Mr. Corneal's
24  application for a building permit?
25  A       I don't recall.

187

1   Q       You mentioned something about a meeting in the
2   courthouse up in Huntingdon County. When was that meeting?
3   A       I'm trying to get the date on that. The first
4   time I think it was Terry and Larry corresponded to set this
5   up but -- to get this thing moving.
6   Q       Well, was that after the township sued the
7   Corneals in Huntingdon County Court?
8   A       Yes.
9   Q       So any meeting that you had in the Huntingdon
10  County Court offices or the courthouse didn't have anything
11  to do with their request for an appeal of their denial of
12  the application for building permits, did it?
13  A       I don't know. All I -- all I can remember is
14  that Attorney Williams made several requests to try to get
15  these things altogether to get the Corneal land improvement
16  gone and completed and I -- I don't -- I just don't know the
17  dates.
18  Q       Was that after say Christmas of 2000?
19  A       It was before Christmas of 2000.
20  Q       Did you bring an action against Mr. Corneal
21  after he requested an appeal of the denial of his
22  application for a building permit?
23  A       I don't know the time frame there.
24  Q       But just so we're clear, the township
25  supervisors did not actually get together and schedule a

188

1   hearing to hear Mr. Corneal's appeal of the denial of his
2   application for a building permit, correct?
3   A       As far as I know. I was never a party to
4   that.
5   Q       Is it your understanding that it is the
6   township supervisors who would hear that appeal?
7   A       Yes.
8   Q       Do you ever recall Mr. Van Dommelen referring
9   to Mr. Corneal as a trouble-making yuppy from over the
10  mountain?
11  A       I -- the first I knew about that was in the
12  complaint or on one of the -- one of the papers. I seen it
13  written down. It was the first I had seen that.
14  Q       Did you ever refer to Mr. Corneal in that
15  fashion?
16  A       I hope I'm a better person than that. Mr. --
17  even though Mr. Corneal and I don't talk much anymore, I
18  think we're still both gentlemen enough to talk to each
19  other.
20          MS. MONTGOMERY: I don't have any other
21  questions for you right now.
22          MS. YANKANICH: I have a couple questions for
23  you.
24
25          CROSS-EXAMINATION

189

1
2   BY MS. YANKANICH:
3   Q       In case I haven't introduced myself, I am
4   Jennifer Yankanich and I represent Larry Newton.
5           My first question is: There were several
6   times that Mr. Corneal came before the Jackson County Board
7   of Supervisors, the first being to get his subdivision plan
8   approved by the board and then he came for a -- to get his
9   sewer modules approved and the privy permit and so forth.
10  Do you remember those times?
11  A       Yes.
12  Q       During any of those meetings did you ever
13  temporarily stop the meeting or adjourn those meetings and
14  call Larry Newton to ask his advice on how to proceed?
15  A       I don't recall doing that.
16  Q       Do you recall any of the other supervisors
17  possibly calling Mr. Newton and asking his advice?
18  A       No.
19  Q       Do you recall at any time with respect to Mr.
20  Corneal's property calling Larry Newton and asking him on
21  how to proceed with respect to Mr. Corneal?
22  A       I called -- when I say I called -- it may not
23  have been me. The board of supervisors called Larry to get
24  proceedings started against Mr. Corneal, some action from
25  Jackson Township. We were being pushed this way and there

## 190

1  were violations of things in Jackson Township and we wanted
2  to know what we had to do so -- to get that lawsuit going.
3      Q      So that was at the end when the lawsuit was
4  initiated?
5      A      Yes.
6      Q      Before that you don't remember any times that
7  you called Larry Newton to seek advice regarding Mr.
8  Corneal?
9      A      No, normally we don't -- unless there's a
10  potential problem at a meeting -- because we don't have any
11  money, okay. We don't have Larry come out unless we expect
12  some problems. We can't afford him.
13     Q      Do you recall ever asking Miss Wirth, Ann
14  Wirth, to make any calls to Larry Newton with respect to Mr.
15  Corneal?
16     A      I may have. I don't know. I just -- I don't
17  recall, but if I was tied up, it's possible that I did that,
18  you know, find out when I could see him or something like
19  that.
20     Q      Would that be with respect to filing a lawsuit
21  against Mr. Corneal?
22     A      Well, any problems that we have. I'm usually
23  out -- gone all day and I'll -- I think that's -- maybe I'm
24  wrong, but I think that's what secretaries do. You call
25  them and say would you set this up for me or, you know,

## 191

1  would you find out when I can talk to so and so and these
2  type of things.
3      Q      But her role there would be to set up a
4  meeting between you and Mr. Newton, not to seek Mr. Newton's
5  advice?
6      A      Right.
7      Q      Is that correct?
8      A      Right.
9      Q      Is it customary after the board meetings, the
10  regular board meetings the first Monday of each month, to
11  inform Mr. Newton of what happened during the meeting?
12     A      No.
13         MS. YANKANICH: I don't have any further
14  questions.
15         MR. SHERR: No questions.
16         MS. MONTGOMERY: I just have one follow-up
17  question.
18
19         REDIRECT EXAMINATION
20
21  BY MS. MONTGOMERY:
22     Q      Just to be sure that I understand your
23  testimony in response to Mr. Newton's counsel's inquiry
24  here, are there instances in which the secretary, Miss
25  Wirth, will call Larry Newton and seek advice on behalf of

## 192

1  the township supervisors?
2      A      There could be. That could be. I can't -- I
3  can't think of an instance, but as I -- as I said, I -- I
4  think the supervisors utilize that lady to the fullest
5  extent when she's trying to run her own business and we
6  appreciate her services. And it could be seven, eight
7  o'clock at night till -- I have some things on my mind and
8  I'll call and say, you know, did you know this or did you
9  hear anything about this, things that happen in the township
10  to keep me -- sort of keep me informed of what's going on.
11  There's 816 people, it's tough.
12     Q      Well, then the answer is it could be that Miss
13  Wirth sometimes calls Larry Newton and seeks advice on
14  behalf of the township supervisors?
15     A      Yes, yes.
16         MS. YANKANICH: I have a follow-up if you're
17  finished.
18
19         RECROSS-EXAMINATION
20
21  BY MS. YANKANICH:
22     Q      Does Ms. Wirth have the authority to make a
23  phone call to Mr. Newton on your behalf without asking --
24  without being directed by you or any of the other
25  supervisors?

## 193

1      A      No.
2      Q      To your knowledge has there ever been an
3  instance that Ms. Wirth called Mr. Newton without being told
4  by you or one of the supervisors to do so with respect to
5  Mr. Corneal?
6      A      Not that I know of.
7      Q      So would you say that you're aware of any
8  conversations that Ms. Wirth has had with Mr. Newton
9  regarding Mr. Corneal?
10     A      Any conversations between Larry's office and
11  the Jackson Township office would be available to the
12  supervisors.
13     Q      How so?
14     A      Written up or if we asked her to call in there
15  and find something out and then she would have a reply for
16  us, she would have it written down or say that, well, she
17  couldn't explain it all, you'll have to call him or go to
18  his office and those type of things.
19     Q      Do you recall seeing any of these notes that
20  she made from a telephone call with Mr. Newton?
21     A      No, she usually -- most of the time it's --
22  she'll call all supervisors and tell them what the
23  conversation was as soon as she's done. And with me it's
24  usually -- I'm usually the last one because I'm coming home
25  late in the evenings. So it's nothing for her at 8:30, nine

194

1 o'clock to call and tell me this is what -- you know, the
2 information you wanted from Larry or something like that.
3     Q    The phone calls that you're referring to,
4 would these be phone calls -- and I may have already asked
5 you this. In reference to the litigation that was filed
6 against Mr. Corneal?
7     A    Township business.
8     Q    Township business in general?
9     A    Yes.
10     Q    And my final question is do you have any
11 specific recollection of a phone call that you asked Ms.
12 Wirth to make to Mr. Newton regarding David Corneal and his
13 property before litigation was commenced?
14     A    No.
15     MS. YANKANICH:  I don't have anything
16 further.
17     MS. MONTGOMERY:  Okay, thanks.
18     (The deposition was concluded at 2:54 p.m.)
19
20
21
22
23
24
25

195

1
2 COUNTY OF DAUPHIN    :
    : SS
3 COMMONWEALTH OF PENNSYLVANIA  :
4     I, Teresa K. Bear, Reporter-Notary Public,
5 authorized to administer oaths within and for the
6 Commonwealth of Pennsylvania and take depositions in the
7 trial of causes, do hereby certify that the foregoing is the
8 testimony of W. THOMAS WILSON.
9     I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically by
12 the said Teresa K. Bear, a Reporter-Notary Public, approved
13 and agreed to, and afterwards reduced to typewriting under
14 the direction of the said Reporter.
15     I further certify that the proceedings and
16 evidence are contained fully and accurately to the best of
17 my ability in the notes taken by me on the within
18 deposition, and that this copy is a correct transcript of
19 the same.
20     In testimony whereof, I have hereunto
21 subscribed my hand this 31st day of May, 2001.
22
23     _____
    Teresa K. Bear, Reporter
24     Notary Public
    My commission expires
25     on April 13, 2003

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2    DAVID B. CORNEAL and SANDRA  :
      Y. CORNEAL,                  :
 3         PLAINTIFFS              :
                                   :
 4            VS                   :  NO. 1:CV-00-1192
                                   :
 5    JACKSON TOWNSHIP, HUNTINGDON :
      COUNTY, PENNSYLVANIA; W.     :
 6    THOMAS WILSON, individually  :
      and in his official capacity :
 7    as Supervisor of Jackson     :
      Township; MICHAEL YODER,     :
 8    individually and in his      :
      official capacity as         :
 9    Supervisor of Jackson        :
      Township; RALPH WEILER,      :
10    individually and in his      :
      official capacity as         :
11    Supervisor of Jackson        :
      Township; BARRY PARKS,       :
12    individually and in his      :
      official capacity as Sewage  :
13    Enforcement Officer of       :
      Jackson Township; DAVID      :
14    VAN DOMMELEN, individually   :
      and in his official capacity :
15    as Building Permit Officer;  :
      ANN L. WIRTH, individually   :
16    and in her official capacity :
      as Secretary of Jackson      :
17    Township; and LARRY NEWTON,  :
      individually and in his      :
18    official capacity as         :
      Solicitor to Jackson         :
19    Township,                    :
           DEFENDANTS              :
20            DEPOSITION OF:  MICHAEL YODER
21            TAKEN BY:       PLAINTIFFS
22            BEFORE:         TERESA K. BEAR, REPORTER
                              NOTARY PUBLIC
23
              DATE:           MAY 18, 2001, 2:57 P.M.
24
              PLACE:          ECKERT SEAMANS
25                            213 MARKET STREET
                              HARRISBURG, PENNSYLVANIA
```

**Page 2**

1  APPEARANCES:
2  ECKERT SEAMANS
   BY:  BRIDGET E. MONTGOMERY, ESQUIRE
3      LESLIE A. MALADY, ESQUIRE
4      FOR - PLAINTIFFS
5  MAYERS, MENNIES & SHERR, LLP
   BY: ANTHONY R. SHERR, ESQUIRE
6
       FOR - ALL DEFENDANTS EXCEPT NEWTON
7
   METTE, EVANS & WOODSIDE
8  BY: JENNIFER YANKANICH, ESQUIRE
9      FOR - DEFENDANT - LARRY NEWTON
10 ALSO PRESENT:
11 DAVID B. CORNEAL
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1              TABLE OF CONTENTS
2      WITNESS
3  FOR PLAINTIFFS          DIRECT CROSS REDIRECT RECROSS
4  Michael Yoder
   By Ms. Malady        4  --  75  --
5  By Ms. Yankanich        --  67  --  80
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1          MICHAEL YODER, called as a witness, being
2  sworn, testified as follows:
3
4          DIRECT EXAMINATION
5
6  BY MS. MALADY:
7      Q      Mr. Yoder, my name is Leslie Malady and I
8  represent, along with Bridget Montgomery, Mr. and Mrs.
9  Corneal in this lawsuit.  Have you ever been deposed before?
10     A      No, I haven't.
11     Q      I'm going to run through a couple guidelines
12 just to keep them in mind.
13     A      Okay.
14     Q      All your responses needs to be verbal for
15 the --
16     A      Right.
17     Q      If you don't understand a question that I ask,
18 I need you to tell me you don't understand it so I can
19 rephrase it.  If anything I say is unclear, please let me
20 know and I'll try to make it more clear.
21         I need you to let me ask my question and
22 finish before you start to answer and I'll let you answer
23 before I start to ask you another question so that she can
24 get everything down that we say.
25         Are you on any medication that would prevent

**Page 5**

1  you from giving deposition testimony?
2      A      No.
3      Q      Can you state your name for the record,
4  please.
5      A      Michael -- full name?
6      Q      Sure.
7      A      Michael Rolland Yoder.
8      Q      Where do you live?
9      A      Huntingdon.  I'm R.D. 2, Box 134, Huntingdon.
10     Q      Just to get started, would you explain your
11 educational background.
12     A      I just have a -- high school graduation,
13 that's it.
14     Q      Have you taken any post high school courses,
15 any seminars?
16     A      No.
17     Q      Certifications, licenses?
18     A      No.
19     Q      How long have you lived in Jackson Township?
20     A      Forty-two years.
21     Q      Your whole life?
22     A      Yes.
23     Q      Have you always lived at the same location?
24     A      The next door farm is the home farm.
25     Q      Are you presently a member of the Jackson

6

1  Township Board of Supervisors?
2      A      Yes, I am.
3      Q      Are you the chairman of the board?
4      A      I am at this time, yes.
5      Q      And when were you made chairman?
6      A      Just this past January.
7      Q      And last year who was the chairman?
8      A      Ralph Weiler.
9      Q      How long have you been a supervisor for
10  Jackson Township?
11      A      This will be just over three years.
12      Q      And how long does your term last?
13      A      I have four more years.
14      Q      Let me ask you generally. I know that Jackson
15  Township doesn't have many ordinances enacted, but what do
16  you -- what is your understanding generally of the enactment
17  of an ordinance? What do you understand your
18  responsibilities as a supervisor to be?
19      A      I guess to enact an ordinance that suits our
20  community, is all I, you know, can say.
21      Q      Are there any particular steps that you're
22  aware of that need to be taken when you enact an ordinance?
23      A      I'm not that familiar with it. I know we had
24  to approve it at a meeting, you know, and that type of thing
25  and --

7

1      Q      When you approve it at a meeting, how do you
2  approve it?
3      A      We ask for a motion and have it seconded.
4      Q      And then you take a formal vote?
5      A      Yes.
6      Q      If you enact an ordinance -- let me start that
7  over again. When there is a motion made and a vote taken,
8  is that recorded in the minutes of your meeting?
9      A      Yes, it is.
10      Q      So that if you enact something, there would be
11  a record of it in the minutes of that meeting?
12      A      Yes. I would say yes.
13      Q      Let me start with your subdivision and land
14  development ordinance. I think it was enacted in July of
15  2000?
16      A      Correct.
17      Q      When did you start to put together that
18  subdivision and land development ordinance?
19      A      I believe we started working on it summer and
20  fall of 1999, I believe.
21      Q      And how did you go about compiling the
22  ordinance?
23      A      Well, we worked with county planning quite a
24  bit and they gave us a lot of information.
25      Q      What type of information?

8

1      A      What type of ordinances suit our -- you know,
2  our area and that type of thing.
3      Q      Now, did you personally go through all of
4  those piles of information given to you?
5      A      No. I would say no.
6      Q      Do you know who did?
7      A      I know county planning reviewed all the
8  ordinances that we compiled. I do know that.
9      Q      Did the supervisors as a group go through
10  those?
11      A      Yeah, we went through it. Yes, I would say we
12  went through it together, yeah.
13      Q      Did you or any of the supervisors actually
14  type up that ordinance?
15      A      No.
16      Q      Do you know who did?
17      A      I'm sorry, I don't know.
18      Q      Would Ann Wirth have done that for you?
19      A      No, I don't believe, no.
20      Q      Do you know if the subdivision -- I'll just
21  refer to it as the subdivision ordinance to shorten it up a
22  little bit.
23      A      Okay.
24      Q      Do you know if that ordinance was advertised?
25      A      Yes, I do recall it was advertised, yes.

9

1      Q      Was it advertised one time?
2      A      I believe we advertise two or three times.
3      Q      Do you know when those advertisements were
4  done?
5      A      No, I can't tell you that, no.
6      Q      Do you know what newspaper they would have
7  been advertised in?
8      A      Probably the Daily News, which is in
9  Huntingdon.
10      Q      Do you know if the draft ordinance -- how many
11  drafts would you say there were?
12      A      I don't know.
13      Q      Were those --
14      A      I don't recall, I should say.
15      Q      Were those drafts publicly available?
16      A      Yes, they were. I think they were, yes.
17      Q      Do you know where they were publicly
18  available?
19      A      I believe at the township office.
20      Q      And the township office is where?
21      A      We rent Mrs. Wirth's office as a township
22  office.
23      Q      What makes you think that they were publicly
24  available?
25      A      I believe they were announced at the meetings

10

1   that they were available for -- you know, for people to
2   review them. I know several people did review them.
3      Q      Were copies made available to the public?
4      A      Yes.
5      Q      Were those copies made available if someone
6   requested a copy at one of your meetings?
7      A      Yes.
8      Q      Did you have the copies physically at the
9   meetings with you?
10     A      No, I would say not.
11     Q      And that ordinance -- I'm sorry, the drafts
12  that were available, was each successive draft publicly
13  available?
14     A      No, I don't recall that. I don't recall.
15     Q      Was there a public hearing held on your
16  subdivision ordinance?
17     A      There was one I recall.
18     Q      When was that held?
19     A      I don't know. It may have been held in June
20  of 2000, I believe.
21     Q      Now, was that meeting in June, was that a
22  public hearing?
23     A      No, I can't -- I don't recall if it was a
24  public hearing.
25     Q      Do you know if the meeting in June was

11

1   specially advertised?
2      A      Yes, it was. It was advertised.
3      Q      I want to be sure that I'm clear. The meeting
4   that you're referring to -- you mean the July meeting at
5   which it was passed?
6      A      No, I'm sorry, it may have been July when we
7   adopted the ordinance. I'm not sure which month it is.
8      Q      I've got a lot of documents. I'm going to
9   show you an exhibit marked as Wirth Exhibit 4. Could you
10  tell me if you've seen that document before?
11     A      Yes, I recall seeing that.
12     Q      And is this the meeting you were referring to?
13     A      I believe it was, yes. Yes.
14     Q      Now, I think that you testified that this
15  ordinance that was finally enacted in July of 2000 was
16  undertaken sometime in the fall of 1999; is that correct?
17     A      I believe it was summer and fall we started
18  the process.
19     Q      At the January meeting in 2000 was there a
20  discussion of the imposition of a moratorium on
21  subdivisions?
22     A      Yes.
23     Q      Did one of the supervisors initiate that
24  conversation?
25     A      I don't really recall who it was, but I

12

1   imagine it was a supervisor.
2      Q      Did you initiate that conversation?
3      A      I don't -- no. I would say no.
4      Q      Did Ann Wirth initiate the conversation?
5      A      No, I can't -- I can't tell you who it was. I
6   don't know. I don't know.
7      Q      Do you recall any conversations regarding the
8   moratorium occurring prior to that meeting in January 2000?
9      A      At a meeting, at a public meeting or anytime?
10     Q      Anytime, informal, formal, in any setting.
11     A      Concerning the moratorium, you're saying?
12     Q      Correct.
13     A      Yes, I would say there was discussion.
14     Q      What was the content of that discussion?
15     A      I don't recall, I really don't.
16     Q      But you recall that it was --
17     A      I believe it was talked about, yes.
18     Q      I'm sorry, that the moratorium was talked
19  about?
20     A      Yes.
21     Q      Who was present during that conversation?
22     A      I really don't recall everybody, no.
23     Q      Do you recall any of them?
24     A      I would say the supervisors were there at
25  least, but I think there may have been more. I don't know.

13

1      Q      Do you recall if Ann Wirth was present at that
2   conversation?
3      A      I would say yes.
4      Q      Is it your recollection that all three of the
5   supervisors were present?
6      A      Yes.
7      Q      Do you remember when that conversation would
8   have occurred? And I'm not looking for a specific date.
9      A      Probably in the fall of '99.
10     Q      Do you remember what the impetus for the
11  discussion was? What prompted the discussion of a
12  moratorium?
13     A      I can't really tell you what prompted it, no.
14  I don't know.
15     Q      Prior to this January meeting in 2000 at which
16  the moratorium was discussed, did you call your solicitor
17  Larry Newton to discuss the moratorium?
18     A      No.
19     Q      Do you know if any of the supervisors called
20  him?
21     A      No, I don't know.
22     Q      Do you know if Ann Wirth called him?
23     A      I don't know. I don't know.
24     Q      Prior to your enactment of your subdivision
25  ordinance in July 2000, did you call Larry Newton to discuss

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

14

1   the subdivision ordinance?
2   **A   No.**
3   Q   Do you know if any of the supervisors did?
4   **A   I don't know.**
5   Q   Do you know if Ann Wirth did?
6   **A   I don't know.**
7   Q   Prior to the enactment of your subdivision
8   ordinance can you tell me generally what the process for the
9   submission of a subdivision application entailed, and I'm
10   just looking for a very general process?
11   **A   Right. I'll be honest with you, I was kind of**
12   **new at it so I really couldn't -- I don't know. I was kind**
13   **of new on the job.**
14   Q   Are you aware that the township requires
15   subdivision applicants to provide an application to the
16   Huntingdon County Planning Commission prior to your review
17   as a supervisor?
18   **A   Was I aware of that?**
19   Q   Yes.
20   **A   No, I was not.**
21   Q   When a subdivision application comes before
22   you, what does it -- what does it entail, what is it
23   comprised of, what do you review?
24   **A   The map, that basically is what we review as**
25   **far as the sewage and that type of thing, I believe.**

15

1   Q   When you receive that application is there --
2   or are there letters from the Huntingdon County Planning
3   Commission along with that ap or plan?
4   **A   I believe sometimes we receive a map but then**
5   **we tell them to send it onto the county.**
6   Q   So it is your understanding that they need to
7   submit that plan to the county --
8   **A   That's correct.**
9   Q   -- before you will approve it as a supervisor?
10   **A   That's correct, yes.**
11   Q   When you receive comments from the Huntingdon
12   County Planning Commission on a subdivision application, do
13   you -- let me go back. Prior to your approval or
14   disapproval do you review the comments or the
15   recommendations of the planning commission?
16   **A   Yes.**
17   Q   To your knowledge has the board of supervisors
18   ever denied a subdivision application that the Huntingdon
19   County Planning Commission has recommended approval of?
20   **A   I really don't recall.**
21   Q   To the best of your recollection has the board
22   always approved a plan that the planning commission has
23   recommended approval of?
24   **A   I really don't know.**
25   Q   Before I get into any specifics, I have a

16

1   document that I'd like to show you. It's marked Parks
2   Exhibit 7.
3   (Pause.)
4   BY MS. MALADY:
5   Q   Have you had an opportunity to review that
6   document?
7   **A   Prior to now?**
8   Q   No, just now.
9   **A   Yeah.**
10   Q   Have you seen that document before today?
11   **A   No.**
12   Q   Is this the first time you've seen that
13   document?
14   **A   Yes, it is.**
15   Q   Were you aware that that document was issued
16   by the court in this matter?
17   **A   Yes, I was aware, yes.**
18   Q   So you're aware that the court has issued a
19   sequestration order?
20   **A   Yes.**
21   Q   What does that -- what is your understanding
22   of that order?
23   **A   That the defendants are not allowed to be in**
24   **this room at this time, the other defendants.**
25   Q   Do you understand that that order also means

17

1   that you're not to talk to the other defendants regarding
2   this deposition testimony?
3   **A   Correct.**
4   Q   Have you discussed your deposition today with
5   any of the other defendants?
6   **A   No, I haven't. This morning we had a meeting**
7   **-- I'm sorry, we did have a meeting this morning, I'm**
8   **sorry, with Mr. Sherr concerning the -- I guess the health**
9   **of the one supervisor, is what it come down to.**
10   Q   Was anything else discussed at that meeting
11   regarding your deposition?
12   MR. SHERR: Objection. I'm going to instruct
13   you not to answer anything that -- where I was present and
14   any conversations that took place while I was present
15   because that's attorney/client privilege.
16   BY MS. MALADY:
17   Q   Let me ask you this: During that conversation
18   were any of the other defendants present?
19   **A   Yes.**
20   Q   And who was present?
21   **A   Tom and Ann.**
22   Q   I'm sorry, Tom Wilson and Ann Wirth?
23   **A   Ann Wirth, yes.**
24   Q   Let me ask you this: How did you get to
25   Harrisburg today?

**18**

1  A    Drive.
2  Q    Did you drive with anyone else?
3  A    Tom and Ann.
4  Q    Did you have lunch today?
5  A    Yeah, I guess you could say that, yeah.
6  Q    Who did you have lunch with today?
7  A    Tom and Ann.
8  Q    I'm going to show you what is marked as Wirth
9  Exhibit 6. Take a minute to review that. What is that
10  document?
11  A    It's minutes of a meeting, I believe.
12  Q    Have you seen that document before?
13  A    I don't recall, but I -- yes. I would say
14  yes.
15  Q    And for the record those are the minutes of
16  the January 4, 2000 meeting of the board of supervisors?
17  A    Correct.
18  Q    Is there an indication that at the January
19  4th, 2000 meeting of the board the moratorium was discussed?
20  A    Yes, there is discussion.
21  Q    Is there any indication who initiated the
22  discussion?
23  A    No.
24  Q    Is there any indication that a vote was taken
25  on the moratorium?

**20**

1  conversations with the board members?
2  A    I don't recall.
3  Q    Did the Hewetts attend any of the board of
4  supervisor's meetings?
5  A    Yes.
6  Q    Did they speak at any of those meetings?
7  A    I really don't recall.
8  Q    Was Mr. Corneal present at the same meetings?
9  A    The same meetings?
10  Q    Yes.
11  A    I don't know.
12  Q    Was Mr. Corneal present at the meetings which
13  the Hewetts were present?
14  A    I don't recall that either.
15  Q    Do you recall Mr. Corneal being present at any
16  of your board meetings?
17  A    Yes, I recall.
18  Q    Do you recall which meetings he was present
19  at?
20  A    I believe it was the February meeting. I
21  recall that one.
22  Q    And that would be February 2000?
23  A    Yes.
24  Q    What do you recall about that meeting?
25  A    I believe he presented something to us about

**19**

1  A    No.
2  Q    Thank you. Do you recall who was present at
3  the January 4th, 2000 meeting of the board?
4  A    All the supervisors and the secretary, I
5  imagine.
6  Q    Any members of the public that you recall?
7  A    I can't recall names specifically, no.
8  Q    Do you have any idea approximately how many
9  people were there from the public?
10  A    No, I couldn't -- I don't know.
11  Q    Do you know the Hewetts?
12  A    Not personally, no.
13  Q    Are you familiar with them?
14  A    No. I've met them, but I'm not familiar.
15  Q    Are you aware of the agreement that they had
16  entered into with Mr. Corneal?
17  A    No.
18  Q    You were not aware that they had entered into
19  an agreement to purchase a portion of Mr. Corneal's
20  property?
21  A    Yeah, I believe I did know that, that they
22  were in that type of agreement.
23  Q    Do you recall how you became aware of that?
24  A    No, I don't recall that.
25  Q    Was the Hewetts' agreement the subject of any

**21**

1  subdivision at that time.
2  Q    He presented a subdivision plan to the board
3  of supervisors?
4  A    We didn't see no plan but he had something
5  with him.
6  Q    Did he attempt to give the board the plan?
7  A    I don't really recall, no.
8  Q    Do you recall what the response from the board
9  was?
10  A    That there is a moratorium, I believe.
11  Q    Was anything else said with regard to his
12  plan?
13  A    No, I don't believe, no.
14  Q    Do you recall that he was prompted to take
15  that plan to the county planning commission?
16  A    I believe, yes.
17  Q    Did you tell him to take it to the county?
18  A    I don't know who did. I didn't.
19  Q    Did the board of supervisors review the
20  subdivision plan that Mr. Corneal brought to the February
21  2000 meeting?
22  A    No.
23  Q    Did the board have any conversations regarding
24  Mr. Corneal's subdivision plan following that February
25  meeting?

22

1   A    I don't recall.
2   Q    Did Ann Wirth have any conversations with the
3   board of supervisors regarding Mr. Corneal's subdivision
4   plan?
5   A    I don't recall.
6   Q    I'm going to show you an exhibit marked as
7   Wirth Exhibit 11. This is a letter dated February 24th from
8   the Huntingdon County Planning Commission. Have you seen
9   that document before?
10  A    I really don't recall.
11  Q    You don't recall seeing it?
12  A    No.
13  Q    Do you recall Mr. Corneal submitting a revised
14  subdivision plan to the board of supervisors?
15  A    I really don't recall.
16  Q    Let me ask you this: At the February meeting
17  when Mr. Corneal submitted his -- or attempted to submit his
18  first subdivision plan, did you tell him that there was a
19  moratorium in effect?
20  A    Personally, no.
21  Q    Do you know who did?
22  A    I don't -- I don't recall that.
23  Q    In response to the board informing Mr. Corneal
24  that there was a moratorium in effect, do you recall if he
25  had any response?

23

1   A    No, I don't recall that either.
2   Q    Do you recall Mr. Corneal informing the board
3   at any time that the moratorium that the board enacted was
4   illegal?
5   A    No, I don't recall that.
6   Q    Do you recall having a conversation with
7   anyone wherein the moratorium was referred to as unlawful or
8   illegal?
9   A    No.
10  Q    I'm sorry, I probably asked you this already.
11  Had you discussed the moratorium with your solicitor prior
12  to that January 4th, 2000 meeting?
13  A    Personally, no.
14  Q    Did any one of the board of supervisors?
15  A    I don't know.
16  Q    Did Ann Wirth?
17  A    I don't know.
18  Q    I'm going to show you what was marked as Wirth
19  Exhibit 7.
20       MS. MALADY: For the record, this document is
21  the -- are the minutes of the April 3rd, 2000 meeting.
22  BY MS. MALADY:
23  Q    Have you seen this document before?
24  A    I don't recall, but I would say yes, I have.
25  Q    Do you recall Mr. Corneal being present at the

24

1   April 3rd, 2000 meeting?
2   A    Yes, I believe, yes.
3   Q    And what do you recall about Mr. Corneal's
4   presence at that meeting?
5   A    That he is applying for a privy permit there.
6   Q    Do you recall that he discussed sewage modules
7   that he wanted the board to approve?
8   A    I don't recall that.
9   Q    Do you recall Mr. Corneal having sewage
10  modules that he wanted the board to approve?
11  A    I don't recall.
12  Q    Do you recall seeing sewage modules signed by
13  Barry Parks for the property owned by Mr. Corneal?
14  A    No.
15  Q    I'm going to show you what was marked as Parks
16  Exhibit 3, if you would take a minute and review that. Is
17  that document familiar to you?
18  A    No, it isn't.
19  Q    Can you tell me what that document is?
20  A    It's the sewage module, I guess.
21  Q    Do you know who it was submitted by? Is there
22  an indication on the document who it was submitted by?
23  A    Mr. Corneal.
24  Q    Is this the first time you've ever seen that
25  document?

25

1   A    I really don't recall.
2   Q    Back to the April 3rd meeting of the board of
3   supervisors, do you recall why Mr. Corneal requested a
4   privy? And please tell me if I'm misstating your
5   testimony. It's my understanding that you testified that
6   your recollection of this meeting was that Mr. Corneal had
7   requested a privy permit; is that correct?
8   A    Yes, that's what it says.
9   Q    Do you have any independent recollection of
10  that?
11  A    I don't -- I don't really recall, no.
12  Q    Do you recall Mr. Corneal's presence -- I'm
13  sorry, let me rephrase that. Do you recall Mr. Corneal
14  stating to the board that he was no longer going to
15  subdivide his property?
16  A    At this meeting?
17  Q    Yes.
18  A    I really don't recall that.
19  Q    Do you remember Mr. Corneal -- let me start
20  over. You recall the February 2000 meeting at which Mr.
21  Corneal attempted to submit a subdivision application; is
22  that correct?
23  A    Yes, I recall that.
24  Q    What other recollection do you have with
25  regard to Mr. Corneal's attempt to subdivide his property?

26

1    A    (Witness shook his head negatively.)
2    Q    Did you ever see him again?
3    A    Just at the two meetings.
4    Q    But you don't remember why he was at the
5    second meeting?
6    A    The privy permit is all I know, what I read
7    there.
8    Q    But you don't recall why he wanted one?
9    A    Not exactly, no.
10   Q    Inexactly do you remember why?
11   A    I believe he said something about his art
12   studio. That's the only thing I can recall.
13   Q    What about his art studio?
14   A    He needed a privy permit for -- to serve him,
15   I guess.
16   Q    Any indication as to why he would need a privy
17   permit to service an art studio?
18   A    No.
19   Q    Were you curious at all why he didn't put in
20   an on-lot system rather than request a privy permit?
21   A    I didn't ask him.
22   Q    Not curious?
23   A    I didn't ask him, no.
24   Q    What was the board's reaction to his request
25   for a privy permit?

27

1    A    I believe it was denied.
2    Q    Did you tell him no yourself?
3    A    Yes, I think I said no.
4    Q    Why did you tell him no?
5    A    Specifically I can't tell you right now, no.
6    Q    Generally?
7    A    I believe he had -- already had on-lot modules
8    there. I think he already had modules.
9    Q    How did you know that he had modules?
10   A    I don't recall that.
11   Q    I think you testified that you have never seen
12   Mr. Corneal's application for sewage modules prior to today;
13   is that correct?
14   A    I don't recall.
15   Q    Let me ask you this: So you denied Mr.
16   Corneal's privy permit at the April 3rd, 2000 meeting
17   because you knew that he had sewer modules; is that correct?
18   A    Yes, I believe that's what he said.
19   Q    Now, when you say sewer modules, you mean he
20   had a pending sewer module -- a pending application for
21   approval of sewer modules?
22   A    I don't recall what he had.
23   Q    What was your understanding then of the sewer
24   modules that he had?
25   A    I had no understanding what he had really.

28

1    Q    But you said you knew that he had sewer
2    modules.
3    A    Yeah, but I didn't know what he had as far as
4    where he was at with it.
5    Q    How were you aware of the sewer modules?
6    A    I don't recall how I found that out.
7    Q    Did you discuss it with someone?
8    A    I really don't recall who it might have been.
9    Q    Was it Van Dommelen?
10   A    I don't know.
11   Q    Was it another member of the board?
12   A    I don't know who it was. It may have been a
13   board member.
14   Q    Was it Ralph Weiler?
15   A    I really don't know which one it was.
16   Q    But it was one of -- either Mr. Weiler or Mr.
17   Wilson?
18   A    I believe, yes.
19   Q    Do you recall the substance of the
20   conversation regarding the sewage modules, Mr. Corneal's
21   sewage modules?
22   A    No, I don't recall that.
23   Q    Are you familiar with Mr. Wilson's company
24   Eagle Excavating?
25   A    Yes.

29

1    Q    How are you familiar with that company or what
2    is -- let me ask you this: Does Eagle Excavating do a lot
3    of excavation work in the township?
4    A    Yes. I would say yes.
5    Q    Does Eagle Excavating do a lot of the test pit
6    digging for on-lot systems in the township?
7    A    I can't say how much. I don't know.
8    Q    Were you aware that Eagle Excavating performed
9    the test pit digging on Mr. Corneal's property?
10   A    No.
11   Q    Mr. Wilson never discussed that with you?
12   A    If he did, I don't recall.
13   Q    Were you aware that Mr. Wilson as the
14   president of Eagle Excavating performed perc testing with
15   your sewage enforcement officer on Mr. Corneal's property?
16   A    No, I don't know anything about that.
17   Q    Did you ever have any conversation -- I'm
18   sorry, you testified that you lived in Jackson Township?
19   A    Correct.
20   Q    Does Mr. Wilson live nearby?
21   A    No.
22   Q    How far from you is he?
23   A    Probably six mile maybe, something like that.
24   Q    Does Mr. Corneal live near you?
25   A    Probably the same distance.

---

**30**

1  Q   About six miles?
2  A   Yeah, I would say.
3  Q   Did Mr. Wilson and Mr. Corneal live near each
4  other, if you know?
5  A   I don't know.  I don't know.
6  Q   I just wondered since they were both six miles
7  away.
8  A   I don't know where Mr. Corneal lives so ...
9  Q   Then you're not quite sure he's six miles from
10 you?
11 A   No, I don't know at all.
12 Q   So I just want to be clear, you have
13 testified, I believe, that you have no knowledge of Mr.
14 Corneal's submission of an application for approval of a
15 sewage module?
16 A   I don't recall the sewage module application.
17 Q   Do you recall another application?
18 A   No.
19 Q   Did the board of supervisors ever consider Mr.
20 Corneal's sewer module application to the best of your
21 knowledge?
22 A   I don't recall.
23 Q   Has Jackson Township ever granted a privy
24 permit to anyone else, to any applicant?  Let me reask
25 that.  Has anyone in Jackson Township ever applied to the

---

**31**

1  board for a privy permit?
2  A   Not that I recall in my time that I've been
3  there.
4  Q   You're not aware of a single --
5  A   No.
6  Q   -- application for a privy permit?
7  A   (Witness shook his head negatively.)
8  Q   Are you aware of any applications for a
9  holding tank?
10 A   I'm not aware of any, no.
11 Q   And that's during your tenure as a board of
12 supervisor's member?
13 A   Yes.
14 Q   Have you ever had any conversation with your
15 sewage enforcement officer regarding Mr. Corneal's property?
16 A   No.
17 Q   Have you ever attended a meeting at which your
18 sewage enforcement officer was present?  Let me ask you this
19 way:  Has your sewage enforcement officer ever attended a
20 board meeting, a meeting of supervisor's meeting?
21 A   Several, yes.  I don't know how many.
22 Q   Were any of those meetings meetings at which
23 Mr. Corneal's property was discussed?
24 A   I really don't recall that.
25 Q   Were you aware that your sewage enforcement

---

**32**

1  officer approved Mr. Corneal's sewer module application?
2  A   No.
3  Q   Is this the first time you've heard about
4  that?
5  A   I guess I'm just not that interested, I guess,
6  really, when it comes down to it.
7  Q   Did you receive a copy of the complaint filed
8  in this matter --
9  A   Yes.
10 Q   -- by Mr. Corneal?
11 A   Yes.
12 Q   Did you read that complaint?
13 A   I read over it, yes.  I don't understand
14 everything.
15 Q   Were you aware that Mr. Corneal applied for
16 building permits for his property?
17 A   Yes, I believe I heard that, yes.
18 Q   And how did you hear that?
19 A   I believe it was at a meeting we discussed it
20 maybe.  I don't know.
21 Q   We includes who?
22 A   Probably all the supervisors.
23 Q   Would Ann Wirth have been present?
24 A   Yes.  I would say yes.
25 Q   Would Mr. Van Dommelen have been present?

---

**33**

1  A   I don't know.  He's not at every meeting so I
2  don't know.
3  Q   Was your solicitor present?
4  A   I don't know that.
5  Q   Do you recall when that meeting occurred?
6  A   No, I don't recall.
7  Q   Was it summer?
8  A   I really couldn't recall when it was.
9  Q   Did you have shorts on?
10 A   I don't wear shorts.
11 Q   Okay.  Did you have a coat on?
12 A   I don't recall.
13 Q   What was the substance of the conversation
14 regarding the building permit?
15 A   I really don't recall what the substance was.
16 Q   Who began the conversation?
17 A   I don't know that either.
18 Q   What was discussed generally?
19 A   That he asked for an application for a
20 building permit, that's all I recall.
21 Q   And what was the result of his request for an
22 application?
23 A   As I recall, it was denied.
24 Q   The application was denied?
25 A   I think the building permit was denied.  I'm

---

**34**

1  not sure which — how it was.
2  Q  What year was that, the denial that you
3  discussed? Can you remember what year that happened?
4  A  I believe it would have been 2000.
5  Q  Do you recall that that meeting occurred
6  sometime close to the April 3rd, 2000 meeting?
7  A  No, I don't recall when it was.
8  Q  Did that meeting occur prior to your being
9  served with the lawsuit filed by Mr. Corneal?
10  A  No, I don't know when it was.
11  Q  Let me ask you this: You're aware that
12  there's a lawsuit that has been filed in the county court
13  against Mr. Corneal by the township supervisors, correct?
14  A  Yes.
15  Q  What generated that lawsuit to the best of
16  your recollection?
17  A  I guess no building permits, I believe.
18  Q  And no building permits, by that you mean
19  what?
20  A  He has none, Mr. Corneal.
21  Q  Who brought up that the board of supervisors
22  should file a lawsuit against Mr. Corneal? Who suggested
23  that the board should file a lawsuit against Mr. Corneal?
24  A  I'm not sure who it was.
25  Q  Was there a particular meeting at which the

**35**

1  discussions took place?
2  A  I don't know if there was a particular
3  meeting, no.
4  Q  Were there a series of meetings at which it
5  was discussed?
6  A  I would say no.
7  Q  There was just one meeting?
8  A  There may have been, yes.
9  Q  But there may have been more than one meeting?
10  A  There may have been more than one.
11  Q  Were all of the supervisors present?
12  A  I would say yes.
13  Q  Would Ann Wirth have been present?
14  A  I would say yes.
15  Q  Was your solicitor Larry Newton present?
16  A  He may have been or it may have been a phone
17  conference. I don't know.
18  Q  Did you call him?
19  A  No.
20  Q  Do you recall if Ann Wirth called him?
21  A  She may have. It was in her office.
22  Q  So this meeting took place in Ann's office?
23  A  I would say yes.
24  Q  Do you recall when that meeting took place?
25  A  No.

**36**

1  Q  Did Ann Wirth have shorts on?
2  A  I don't have no idea.
3  Q  Was Mr. Newton conferenced in?
4  A  I don't recall which it was. I really don't.
5  Q  Was he on a speaker phone or did Ann Wirth
6  have a handset in her hand?
7  A  She has a speaker phone, if it was that.
8  Q  Was there a meeting of the board of
9  supervisors at which a resolution authorizing Solicitor
10  Newton to file the lawsuit was discussed? Let me rephrase
11  that question. Did the board ever enact a resolution
12  authorizing the filing of the lawsuit against Mr. Corneal?
13  A  At a public meeting?
14  Q  Yes.
15  A  No, I would say not.
16  Q  At an informal meeting?
17  A  I would say no.
18  Q  At any private get-together?
19  A  I don't really recall.
20  Q  Did you suggest that the board file the
21  lawsuit?
22  A  No.
23  Q  Did Mr. Wilson suggest that the board file the
24  lawsuit?
25  A  I don't recall who it was.

**37**

1  Q  Would Mr. Weiler have suggested that the board
2  file a lawsuit?
3  A  I don't know. I don't recall.
4  Q  Was there more than one meeting in Ann Wirth's
5  office regarding the lawsuit? Was there more than one
6  meeting of the board in Ann Wirth's office regarding filing
7  a lawsuit against Mr. Corneal?
8  A  I don't recall if there was or not.
9  Q  Would you have been present?
10  A  Yes, I probably would have been, yes.
11  Q  Do you have any knowledge of Mr. Corneal's
12  attempts to get a building permit application from Mr. Van
13  Dommelen?
14  A  Do I have knowledge of it happening?
15  Q  Yes.
16  A  Yes, I have knowledge of it happening.
17  Q  Tell me what you know about that.
18  A  All I know is it was denied.
19  Q  Were you aware that Mr. Corneal went to Mr.
20  Van Dommelen to tell him?
21  A  Yes. Not at the time but —
22  Q  Subsequent?
23  A  Yes.
24  Q  How did you find out subsequently?
25  A  I believe it was at a meeting.

38

1    Q    And who told you about it?
2    A    I'm not sure if it was Mr. Van Dommelen or
3  Tom. I'm not sure.
4    Q    Tom?
5    A    Wilson, sorry.
6    Q    Do you have any recollection as to when it was
7  Mr. Corneal tried to get the application?
8    A    No, I don't recall that.
9    Q    Do you remember at what meeting Mr. Wilson or
10  Mr. Van Dommelen discussed Mr. Corneal's attempts to get a
11  building permit application?
12    A    No, I don't recall.
13    Q    Does Mr. Van Dommelen normally attend board
14  meetings?
15    A    Public meetings or --
16    Q    The board of supervisor's meetings.
17    A    Occasionally he does.
18    Q    How often would you say in a year, how many
19  meetings would he be at or be present at?
20    A    Maybe four.
21    Q    Are you sure that he was present at the
22  meeting at which you were informed of Mr. Corneal's attempts
23  to get a building permit application?
24    A    I really don't recall that.
25    Q    Was it discussed at a board meeting, a regular

39

1  monthly board meeting?
2    A    I don't recall -- you mean at --
3    Q    Your regular monthly supervisor's meeting.
4    A    I don't recall if we talked about it or not.
5    Q    Do you recall that the conversation happened
6  privately?
7    A    I would say it happened at a workshop, yes.
8    Q    What kind of a workshop?
9    A    It's just an informal workshop prior to the
10  monthly meeting.
11    Q    Do you have those every month?
12    A    Yes.
13    Q    What do you do at those workshop meetings?
14    A    Just set up our agenda for the meeting.
15    Q    And who sets up the agenda?
16    A    We all do in a way. People call in.
17    Q    People call in?
18    A    For requests to be -- to be heard at the
19  meetings.
20    Q    What date were you elected, I guess, as
21  chairman of the board of supervisors?
22    A    The first Monday of January.
23    Q    Would that have been January 4th -- no, I'm
24  sorry, that would have been --
25    A    I'm not sure of the day, no. It would be this

40

1  year, the first Monday -- no, it may have been this --
2    Q    January 2001?
3    A    I think it was the day after. We have it the
4  day after the beginning of the year, I think.
5    Q    So there's a reorganization meeting --
6    A    That's correct.
7    Q    -- of the board that occurs first?
8    A    That's correct.
9    Q    And that's followed by a regular meeting?
10    A    That's correct.
11    Q    As the chairman of the board of supervisors,
12  do you set up the agenda?
13    A    No.
14    Q    Who does?
15    A    I believe our secretary.
16    Q    Ann Wirth?
17    A    Yeah, yeah.
18    Q    Where do you hold your workshop meetings?
19    A    At Ann's office where the township rents it, I
20  guess.
21    Q    Is her office close to where the meetings of
22  the board of supervisors are held?
23    A    Probably three to four miles.
24    Q    Do you meet at Ann's office before every
25  single meeting?

41

1    A    Yes.
2    Q    How long do those meetings, those workshop
3  meetings normally last?
4    A    Usually an hour to an hour and a half.
5    Q    And your meetings normally last how long?
6    A    An hour.
7    Q    I'm sorry, the meeting of the board itself.
8    A    The monthly meeting --
9    Q    Yes.
10    A    -- community meeting? I would say an hour on
11  average.
12    Q    And I'm sorry, you may have told me this
13  already, but that meeting in Ann's office occurs prior to
14  every board meeting, every monthly board meeting?
15    A    Yes, they call it a workshop.
16    Q    Let me change subjects. Mr. Yoder, did you
17  bring any documents with you today to this deposition?
18    A    No.
19    Q    Were you instructed to bring any documents
20  with you today?
21    A    No.
22    Q    Were you instructed not to bring any documents
23  with you today?
24    A    I really don't recall if I was. I couldn't
25  tell you.

**42**

```
 1    Q       So you recall -- you know that you --
 2    A       I don't believe -- I believe I was instructed
 3    not to bring documents, yes.
 4    Q       Who would have instructed you not to bring
 5    documents with you? Did Ann Wirth ask you not to bring
 6    documents with you today? Remember you're under oath, Mr.
 7    Yoder.
 8    A       I think Mr. Sherr told me that.
 9    Q       Prior to your attendance at today's deposition
10    did you perform a search of any records that you might have
11    regarding Mr. Corneal's property or involvement of the
12    township in this lawsuit?
13    A       Did I put a search in?
14    Q       Did you perform a search of any --
15    A       No.
16    Q       -- records? Do you keep any records of the
17    township at all?
18    A       Very few.
19    Q       What kind of records do you keep?
20    A       Just the monthly minutes and that type of
21    thing.
22    Q       Do you hold on to any subdivision
23    applications?
24    A       No.
25    Q       Sewer planning modules?
```

**43**

```
 1    A       No.
 2    Q       Building permit applications?
 3    A       No.
 4    Q       Any other documents at all that are township
 5    related?
 6    A       No, I don't believe, no.
 7    Q       Were you instructed to perform a search of
 8    those documents that you do have to see if anything was
 9    relevant to this lawsuit?
10    A       No.
11    Q       Do you know if any of the members of the board
12    of supervisors take notes at those workshop meetings that
13    you have in Miss Wirth's office?
14    A       Do I know if anyone does?
15    Q       Yes.
16    A       I don't know that.
17    Q       Would Miss Wirth keep notes of those meetings,
18    something like the minutes that she keeps for your monthly
19    meetings?
20    A       No, I don't believe she does.
21    Q       Would Mr. Wilson or Mr. Weiler take notes down
22    for those workshop meetings?
23    A       I don't know.
24    Q       Have you ever noticed anyone taking notes at
25    any of those meetings?
```

**44**

```
 1    A       I believe maybe Tom has occasionally, yes.
 2    Q       Would you know if Mr. Wilson would give the
 3    notes to Miss Wirth to hold on to?
 4    A       No, I wouldn't know that.
 5    Q       You wouldn't know then if he would keep them
 6    in a file himself?
 7    A       No, I wouldn't know that.
 8            MS. MONTGOMERY: Off the record for a second,
 9    please.
10            (Discussion held off the record.)
11    BY MS. MALADY:
12    Q       You're still under oath. Are you aware of Mr.
13    Wilson's family interest in Mr. Corneal's property?
14    A       No, I'm not aware of that.
15    Q       You're not aware that his grandfather used to
16    own that same property?
17    A       He told me recently.
18    Q       So you know that there's an interest -- or not
19    that there's an interest --
20    A       Not an interest, no. I just know that his
21    grandparents used to, I guess, that's all I know.
22    Q       Did Mr. Wilson ever express to you an interest
23    in acquiring that property?
24    A       No.
25    Q       Did he ever talk to you about Mr. Corneal's
```

**45**

```
 1    property?
 2    A       No.
 3    Q       Let me ask you this: When he informed you
 4    that his grandfather used to own that property, how did that
 5    come up and what was the conversation?
 6    A       I don't really recall how it was brought up.
 7    Q       But this was recent?
 8    A       Yes, I would say it's fairly recent, yes.
 9    Q       Did it come up as a result of conversations
10    regarding the lawsuit?
11    A       It may have, yes.
12    Q       Do you recall where you were?
13    A       No, I don't recall that.
14    Q       Do you recall how long ago it was?
15    A       No.
16    Q       Let me get back to the workshop meetings at
17    Miss Wirth's office. Do you recall if the discussions
18    regarding Mr. Corneal's request for a building permit
19    application occurred at the workshop meeting?
20    A       Yes, I would say they occurred at a workshop
21    meeting.
22    Q       Do you know what month that meeting would have
23    taken place?
24    A       I have no idea.
25    Q       Do you recall approximately how long the
```

46

1  conversation lasted?
2      A     I would say not long. I don't know.
3      Q     Was Mr. Van Dommelen present in Ann's office?
4      A     I don't know if he was or not.
5      Q     Was Mr. Wilson present in Ann's office?
6      A     I would say yes.
7      Q     Did Mr. Wilson bring up the conversation?
8      A     I don't really recall who it was.
9      Q     Tell me about the conversation.
10     A     I recall Mr. Corneal talking to Mr. Van
11 Dommelen about it and then he refused apparently.
12     Q     Did Mr. Wilson mention that Mr. Van Dommelen
13 called him at home?
14     A     Mr. Wilson?
15     Q     Yes.
16     A     I'm sorry, could you repeat that again?
17     Q     Sure. Did Mr. Wilson tell you that when Mr.
18 Corneal went to Mr. Van Dommelen's home Mr. Van Dommelen
19 called Mr. Wilson while Mr. Corneal was there?
20     A     Yes, they stated that, yes.
21     Q     Did he tell you why he called -- why Mr. Van
22 Dommelen called Mr. Wilson?
23     A     I guess he's the only one he could get a hold
24 of, I guess, at that time.
25     Q     Do you have any knowledge as to why Mr. Van

47

1  Dommelen had a reason to call any of the supervisors while
2  Mr. Corneal was there?
3      A     I don't really recall if there was a reason.
4      Q     Did you ever ask Mr. Van Dommelen why he was
5  trying to get a hold of you or any of the other supervisors?
6      A     I haven't talked to him about it.
7      Q     When was the last time you talked to Mr. Van
8  Dommelen?
9      A     I probably said hi to him at a monthly
10 meeting, that's about all, recently.
11     Q     Would that have been this month's meeting?
12     A     Yes. I think he was there.
13     Q     Now, when you have these workshop meetings --
14 as I understand, your monthly meeting occurs the first
15 Monday of every month; is that correct?
16     A     That's correct.
17     Q     When do you hold your workshop meetings?
18           MR. SHERR: Objection. It's been asked and
19 answered.
20           MS. MALADY: It's my understanding that he
21 testified that the meetings occur prior and I'm just asking
22 if it's the same day or --
23           MR. SHERR: He said --
24           MS. MALADY: -- a different day.
25           MR. SHERR: All right, okay. You can answer

48

1  that.
2            THE WITNESS: The week prior. It's different
3  days. There's no set day.
4  BY MS. MALADY:
5      Q     There's no specific Thursday night you get
6  together or --
7      A     No.
8      Q     -- Friday night?
9      A     No, whenever it suits schedules.
10     Q     Who schedules that workshop meeting for you?
11     A     Our secretary asks each person when it suits
12 and that's how it's --
13     Q     Does she call you at home and ask you what
14 your schedule is like?
15     A     Yes. I would say yes.
16     Q     Would you assume then that she calls Mr.
17 Weiler and Mr. Wilson as well?
18     A     Yes.
19     Q     I'm not sure if I asked you, Mr. Yoder, and if
20 I did I apologize, do you have a -- I understand that you're
21 a township supervisor, but do you have a job outside your
22 work as a supervisor?
23     A     Yes.
24     Q     What do you do?
25     A     Dairy farmer.

49

1      Q     Do you have your own farm?
2      A     Yes.
3      Q     Now, you had testified I think that your
4  family farm is on the property next to yours?
5      A     That's correct.
6      Q     Is that where you're mom and dad live
7  presently or used to live?
8      A     Used to.
9      Q     Did they have a dairy farm as well?
10     A     Correct.
11           MS. MALADY: I'm going to -- if you don't
12 mind, I'm going to take a minute and just kind of run
13 through -- I don't think I have a lot of questions left for
14 you.
15           THE WITNESS: Okay.
16           (Pause.)
17 BY MS. MALADY:
18     Q     I know that we've talked about the building
19 permit application that Mr. Corneal sought. Were you aware
20 that Mr. Corneal subsequently received an application for a
21 building permit?
22     A     Yes, I was aware of that.
23     Q     How were you made aware of that?
24     A     I'm not sure if it was at a public meeting or
25 a workshop. I don't recall.

50

1  Q    Who did you discuss it with?
2  A    I imagine the other board members.
3  Q    Do you recall if Mr. Van Dommelen was present
4  at the meeting?
5  A    I would say he probably was, yes.
6  Q    Were you aware or are you aware of any action
7  that was taken on that application?
8  A    I don't really recall the action.
9  Q    I'm going to show you two documents. The
10 first is marked Wirth Exhibit 13. It's a letter dated
11 October 10th from Mr. Van Dommelen, if you could take a
12 minute to review that. Have you ever seen that letter
13 before?
14 A    Yes, I have.
15 Q    When did you see that letter -- when did you
16 first see this letter?
17 A    I don't know when I first seen it, no.
18 Q    Do you believe that it was reasonably soon
19 after it was written?
20 A    Yes, I would say soon after.
21 Q    Let me ask you this: I notice that the letter
22 is on township supervisor stationery.
23 A    Um-hum.
24 Q    Is it your understanding that Mr. Van Dommelen
25 sends out letters on supervisor's stationery?

51

1  A    I couldn't tell you. I don't know.
2  Q    Is it your understanding that Mr. Van Dommelen
3  drafts his own letters?
4  A    I couldn't tell you. I don't know.
5  Q    Do you know if Miss Wirth normally types up
6  letters for Mr. Van Dommelen?
7  A    I don't know if she does or not.
8  Q    Is it your understanding that Mr. Van Dommelen
9  drafted this letter by himself?
10 A    I couldn't tell you, but I would say yes.
11 Q    Did Mr. Van Dommelen discuss the content of
12 this letter with the board prior to sending this letter out?
13 A    Yes, I believe he did.
14 Q    And when did he discuss that with the board?
15 A    I couldn't give you a date. I don't know.
16 Q    Would it have been at the meeting -- the first
17 meeting -- I'm sorry, at the board meeting in October of
18 2000?
19 A    Apparently, yeah. Yes, I would say.
20 Q    Would that have occurred -- I'm sorry, you may
21 have said this. Was it at the workshop meeting?
22 A    I believe it was the workshop meeting, yes.
23 Q    And who was present at that meeting?
24 A    Probably Van Dommelen, Tom Wilson, Ann Wirth,
25 Ralph Weiler and I.

52

1  Q    And what did Mr. Van Dommelen tell you about
2  the substance of this letter?
3  A    I guess just what it says, that's all. We
4  just read it.
5  Q    Did anyone else discuss with Mr. Van Dommelen
6  his denial of Mr. Corneal's building permit application?
7  A    I really don't recall.
8  Q    Do you recall if Mr. Wilson had any comments
9  with regard to Mr. Van Dommelen's proposed denial of the
10 building --
11 A    I don't recall what was -- if he had any
12 problems.
13 Q    I'm going to show you what is marked as Wirth
14 Exhibit 12. It's a letter dated November 10th from Terry
15 Williams. Have you ever seen that letter?
16 A    I don't recall seeing that, no.
17 Q    I note that the letter is addressed to R.D. 1,
18 Box 390. I understand that's Miss Wirth's home address; is
19 that correct?
20 A    Apparently, yes.
21 Q    Does Miss Wirth often receive township
22 business letters at her home or at her office address?
23 A    At the office, yes, as township secretary.
24 Q    As a matter of course, does Miss Wirth
25 normally make copies of documents she receives at home for

53

1  the supervisors?
2  A    No.
3  Q    Does she bring documents received to the
4  meetings of the board of supervisors?
5  A    No, I don't think she does, no.
6  Q    So is it your testimony that when Miss Wirth
7  receives documents such as this letter she doesn't provide
8  them to the board of supervisors?
9  A    No copy. We see the letter, but we receive no
10 copy.
11 Q    So she brings the actual letter to the board
12 of supervisors?
13 A    That's correct. No copies.
14 Q    But you don't recall ever having seen this
15 letter?
16 A    No. I receive so many letters I don't -- I
17 don't recall.
18 Q    What do you understand this letter to do --
19 what do you understand this letter to be?
20 A    They're appealing Mr. Corneal's -- I mean Mr.
21 Van Dommelen's decision.
22 Q    Does that request trigger any action of the
23 board of supervisors to the best of your knowledge?
24 A    I don't really recall.
25 Q    Are you aware of any Jackson Township

**54**

1  ordinance or ordinances that impose any requirements upon
2  the board of supervisors upon receipt of a document
3  appealing the decision of the building permit officer?
4  **A     Any ordinance?  Not really, no.**
5  Q     Are you aware that your building permit
6  ordinance requires that the board of supervisors hold a
7  hearing within 30 days after the receipt of an appeal from a
8  decision of your building permit officer?
9  **A     I'm not aware of that, no.**
10  Q     If I represent to you that your building
11  permit ordinance contains a requirement that the board of
12  supervisors hold a hearing on an appeal from a denial of a
13  building permit, do you have any knowledge of such a hearing
14  being held for Mr. Corneal?
15  **A     No, I do not.**
16  Q     Were you present at any hearing on the
17  building permit denial for Mr. Corneal?
18  **A     No.**
19  Q     As the chairman of the board of supervisors
20  would you have been in charge of organizing this hearing --
21  a hearing from a denial of a building permit?
22  **A     I really don't know.**
23  Q     Would Ann Wirth have been in charge of
24  scheduling a hearing?
25  **A     With our input, yes, I would say she'd be in**

**55**

1  **charge of it.**
2  Q     Did you ever receive any notes, letters,
3  correspondence, communication, telephone call, anything at
4  all regarding a hearing being held on Mr. Corneal's building
5  permit application denial?
6  **A     I really don't recall.  I don't know.**
7  Q     Do you recall attending a hearing on Mr.
8  Corneal's building permit denial?
9  **A     No.**
10  Q     Is it safe to assume it didn't happen, would
11  you say?
12  **A     I don't know.  I don't really recall, sorry.**
13  MS. MALADY:  We can go off the record.
14  (Discussion held off the record.)
15  BY MS. MALADY:
16  Q     I do have a couple of questions.  I'll try to
17  get through them as quickly as I can.  Has Mr. Wilson ever
18  expressed to you a concern regarding wetlands on Mr.
19  Corneal's property?
20  **A     I really don't recall if he did.**
21  Q     You've never had a conversation with Mr.
22  Wilson regarding --
23  **A     Not personally.**
24  Q     -- the presence of wetlands?
25  **A     (Witness shook his head negatively.)**

**56**

1  Q     Do you know of any conversations that have
2  taken place regarding wetlands on Mr. Corneal's property?
3  **A     I may have heard discussion about it, but I**
4  **don't specifically know.**
5  Q     Generally what were the discussions regarding
6  it?
7  **A     I guess concern about it.  That's all I can**
8  **say.**
9  Q     Do you recall why there was a concern?
10  **A     Not specifically, no.**
11  Q     Generally?
12  **A     No, I don't.**
13  Q     Do you know who was concerned with -- about
14  the wetlands?
15  **A     No, I can't say.  I don't know.**
16  Q     Was Mr. Wilson concerned about the presence of
17  wetlands on Mr. Corneal's property?
18  **A     I believe he mentioned it, yes.**
19  Q     Do you recall the setting in which he
20  mentioned it?  Let me be more specific.  Would it have been
21  at a workshop meeting?
22  **A  ·   If there was discussion, yes, it would be at a**
23  **workshop meeting.**
24  Q     Was that concern expressed at one workshop
25  meeting or was it expressed at more than one workshop

**57**

1  meeting?
2  **A     I don't know.  I don't know how many.**
3  Q     Was it discussed at quite a few workshop
4  meetings, would you say?
5  **A     I would say not, no.  No, not quite a few.**
6  Q     More than one?
7  **A     Maybe one or two.**
8  Q     What was his concern specifically?
9  **A     I really don't know the specifics of it.**
10  Q     Did Mr. Wilson ever express a concern that
11  your sewage enforcement officer Barry Parks had
12  inadvertently located on-lot sites in the wetlands on Mr.
13  Corneal's property?
14  **A     I don't know anything about it.**
15  Q     Did Mr. Wilson ever express concern about
16  construction vehicles located on Mr. Corneal's property?
17  **A     No, not to me.**
18  Q     Did Mr. Wilson ever express concern about the
19  cartway located on Mr. Corneal's property?  Let me back up.
20  Are you familiar with the physical layout of Mr. Corneal's
21  property?
22  **A     No, I'm not, not at all.**
23  Q     Have you ever been to Mr. Corneal's property?
24  **A     I've been on Sawmill Road, but that's all.**
25  Q     Are you aware that there is a cartway on Mr.

58

1  Corneal's property?
2      A    I'm not familiar with the cartway, no.
3      Q    When Mr. Corneal first came before the board
4  of supervisors with a subdivision plan, did you have any
5  knowledge of how many lots he wanted to break his property
6  into?
7      A    Did I have any knowledge?
8      Q    Yes.
9      A    No.
10     Q    Did you subsequently become aware of how many
11  lots he wanted to break his property into?
12     A    Yeah.  I would say yes, I do.
13     Q    And how many was that?
14     A    I believe four or five.  I can't give you an
15  exact number.
16     Q    Did you become aware at some time later that
17  he had changed the number of lots that he wanted to
18  subdivide his property into?
19     A    Did I become aware of it?
20     Q    Yes.
21     A    I really couldn't tell you.  I don't really
22  recall.
23     Q    Did you find out later that he wanted to
24  change the plan that he had originally proposed?
25     A    I don't really recall that, no.

59

1      Q    Was there a point at which you became aware
2  that Mr. Corneal no longer wanted to subdivide his property
3  at all?
4      A    There was a point I became aware of that, yes.
5      Q    Do you recall when that was?
6      A    I believe I became aware of that in the
7  courthouse.
8      Q    And you were in the courthouse for what
9  reason?
10     A    A hearing of some kind.
11     Q    Do you recall what the hearing was regarding?
12     A    I believe it was regarding building permits, I
13  believe at that time, yes.
14     Q    Were you present at the April 3rd, 2000
15  meeting that Mr. Corneal was present at?
16     A    Yes, um-hum.
17     Q    Do you recall at that meeting that Mr. Corneal
18  told the board that he no longer wanted to subdivide the
19  property?
20     A    I recall that, yes.  I believe, yes.
21     Q    So you were aware at least as of April 3rd
22  that he no longer wanted to subdivide his property?
23     A    I believe I became aware.
24     Q    Did you ever discuss with the other
25  supervisors or Ann Wirth the fact that Mr. Corneal no longer

60

1  wanted to subdivide his property?
2      A    I believe we discussed it, yes.
3      Q    Can you tell me about those discussions?
4      A    Not -- no, I can't tell you specifically, no,
5  but I know we did discuss it.
6      Q    Do you recall where you discussed it?
7      A    Probably at a workshop.
8      Q    Would that workshop have been the workshop in
9  May of 2000?
10     A    I have no idea.
11     Q    Did you discuss it at more than one workshop?
12     A    I don't know.
13     Q    Have you ever gone to Mr. Corneal's building
14  site on his property?
15     A    No.
16     Q    I know you said you've been on Sawmill --
17     A    Sawmill Road, yes.
18     Q    Do you know if any of the other supervisors
19  have ever gone to Mr. Corneal's building site?
20     A    No, I don't know.
21     Q    Do you know if any of the supervisors have
22  ever gone out to inspect Mr. Corneal's property?
23     A    I really don't know.
24     Q    Do you know -- well, let me ask you this:  Did
25  you direct Barry Parks, your sewage enforcement officer, to

61

1  go back to Mr. Corneal's property?
2      A    Did I direct him?
3      Q    Yes.
4      A    No, I didn't direct him.
5      Q    Do you know if any other member of the board
6  of the supervisors asked Mr. Parks to go back out to Mr.
7  Corneal's property and reinspect the sites that Mr. Parks
8  had already approved in the sewage module?
9      A    I really don't recall who did.
10     Q    But you recall that it was done?
11     A    I believe it was done, yes.
12     Q    Now, did Ann Wirth ask Mr. Parks to do a
13  reinvestigation or does that require a supervisor?
14     A    I believe it requires a supervisor.
15     Q    Did Mr. Weiler ask Barry Parks to go out?
16     A    I'm not sure who it was.
17     Q    But it was either Mr. Weiler or Mr. Wilson; is
18  that correct?
19     A    I believe.
20     Q    Do you recall Mr. Parks ever coming back and
21  reporting to the board of supervisors the results of his
22  investigation?
23     A    Yes, I believe he did.
24     Q    And what did he say?
25     A    The site was not a good site anymore is all I

YODER, MICHAEL
05/18/01

CORNEAL VS
JACKSON TOWNSHIP, ET AL

---

**62**

1  recall.
2    Q      What site was he referring to to the best of
3  your knowledge? What did you believe he was referring to?
4    A      There was a site between two roads, I
5  believe. I'd have to see the map, but there was a site
6  between two roads.
7    Q      Are you aware that Mr. Parks had approved five
8  sites on Mr. Corneal's property?
9    A      Yes, I believe he did.
10   Q      Is it your understanding that based on Mr.
11 Parks' approval of those five sites that Mr. Corneal could
12 use any of the other four for any building that he would
13 construct on his property?
14   A      I'm sorry, would you repeat that?
15   Q      Let me rephrase that, I apologize. You
16 testified that you understand that Mr. Parks approved
17 five --
18   A      Okay, yes.
19   Q      -- sites? Now, you testified that following
20 his investigation -- and correct me if I'm wrong, please. I
21 don't want to misstate your testimony. Following Mr. Parks'
22 investigation, his report to the board was that one of those
23 sites was no longer suitable; is that correct?
24   A      Yes, I recall that.
25   Q      Did he provide any information regarding the

---

**64**

1    Q      During your tenure as a supervisor have they
2  ever done that?
3    A      I don't recall any, no.
4    Q      If I told you that a third party was required
5  to certify Mr. Parks' approval of Mr. Corneal's sites, would
6  you be surprised by that?
7    A      I don't recall if it was done or not to the
8  best of my knowledge right now.
9    Q      Would it be unusual for that to happen?
10   A      I don't know.
11   Q      Well, does it happen often?
12   A      No, not that I recall.
13   Q      So it would be unusual?
14   A      Probably, yes.
15   Q      Are you aware of any other subdivision
16 application that has been submitted to Jackson Township
17 being denied by the board of supervisors?
18         MR. SHERR:  Object to the form of the
19 question.
20         MS. MALADY:  Is that awkward?
21         MR. SHERR:  No, it was a fine question, but I
22 don't -- I don't think there is any testimony that this plan
23 was denied. You said any other plan denied. You're just
24 assuming facts not in evidence.
25         MS. MALADY:  I'll reask the question.

---

**63**

1  other four sites?
2    A      I really don't recall if he did.
3    Q      You don't remember that he said any of the
4  other four were now unsuitable?
5    A      No, I don't recall if he said that.
6    Q      Was he asked about the other four sites?
7    A      I don't recall. Not by me.
8    Q      Do you recall if either of the other --
9    A      No.
10   Q      -- supervisors asked?
11   A      No.
12   Q      Did Mr. Parks submit any comments to the board
13 in writing regarding his investigation?
14   A      I don't recall. I don't believe I read
15 anything, no.
16   Q      Let me ask you this: To the best of your
17 knowledge has the board ever requested that a third party
18 certify that sites approved by Mr. Parks are correctly
19 approved by Mr. Parks?
20         That question sounded terrible even to me, I
21 apologize. Let me reask. To the best of your knowledge
22 when Mr. Parks approves a sewer module application has the
23 board ever then required that a third party go back out and
24 check what Mr. Parks has done?
25   A      Before my time I don't recall of any, no.

---

**65**

1  BY MS. MALADY:
2    Q      Are you aware of any subdivision application
3  that has been denied by the board of supervisors of Jackson
4  Township?
5    A      No.
6    Q      Are you aware that Mr. Corneal's subdivision
7  plan has not been approved by the board of supervisors?
8    A      Yes.
9    Q      Was it your understanding that Mr. Corneal
10 withdrew his revised subdivision plan?
11   A      I'm sorry, what was --
12   Q      I think I need to ask that better. Are you
13 aware that Mr. Corneal revised the subdivision plan that he
14 had submitted in February of 2000 to the county planning
15 commission? Are you aware that he revised that plan?
16   A      Yes, I am.
17   Q      Have you ever seen a copy of that revised
18 plan?
19   A      Yes, I did once.
20   Q      When did you see it?
21   A      I believe it was with the meeting with Terry
22 Williams, I believe.
23   Q      Do you know if that plan was submitted to the
24 county planning commission?
25   A      I don't know.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

66

1    Q    I don't think that I've shown you this
2  document. It's a document marked Wilson Exhibit 5. It's a
3  letter from the Huntingdon County Planning Commission dated
4  April 20th. Have you ever seen that letter before?
5    A    **I don't recall, but I would say I have seen**
6  **it, yes.**
7    Q    Do you understand what the content of the
8  letter is?
9    A    **Not completely.**
10   Q    Do you understand that this is a letter
11 recommending approval of Mr. Corneal's revised subdivision
12 plan?
13   A    **Yes.**
14   Q    To the best of your knowledge has Mr. Corneal
15 withdrawn from the Jackson Township Board of Supervisor's
16 consideration this revised plan?
17   A    **He's withdrawn it?**
18   Q    To the best of your knowledge has he?
19   A    **Yes, I believe he has, yes.**
20   Q    Have you ever seen anything in writing
21 withdrawing that plan from your consideration?
22   A    **No, I don't -- I don't recall.**
23   Q    Do you recall Mr. Corneal ever requesting that
24 you not consider his revised subdivision plan?
25   A    **No.**

67

1    Q    Did you ever take any action on Mr. Corneal's
2  revised subdivision plan, you meaning the board of
3  supervisors?
4    A    **I don't recall right now.**
5    Q    You don't recall taking any action?
6    A    **No.**
7
8           CROSS-EXAMINATION
9
10 BY MS. YANKANICH:
11   Q    Mr. Yoder, I'm Jennifer Yankanich. I'm
12 counsel for Larry Newton. I just wanted to introduce myself
13 to you, if I haven't already. I have a couple questions for
14 you regarding your interaction with Larry Newton with regard
15 to the David Corneal property.
16          Let's start back when you first decided to
17 start researching the subdivision ordinance. I believe that
18 came before you actually issued the moratorium?
19   A    **Correct.**
20   Q    You said possibly in the summer of '99 -- or
21 excuse me, summer of '98 you may have started researching
22 the possible ordinance; is that correct?
23   A    **I believe it was '99. I'm not sure.**
24   Q    Well, summer of '99 -- okay.
25   A    **Well, whenever.**

68

1    Q    The date doesn't really matter, but you did
2  start researching it before the moratorium?
3    A    **We did research it, yes, correct.**
4    Q    During your research of the proposed
5  subdivision ordinance, did you ever have reason to seek the
6  advice of Larry Newton with regard to the proposed
7  ordinance?
8    A    **I believe we did, yes.**
9    Q    Do you know in what capacity you asked for his
10 advice?
11   A    **I don't recall right now. I don't recall**
12 **exactly. He may have -- I believe he said if it was -- it**
13 **was something we could do. It's something we could do,**
14 **we're allowed to do.**
15   Q    So you asked him whether or not you were
16 allowed to pass such an ordinance; is that correct?
17   A    **I believe we did, yes.**
18   Q    Did you ever ask Larry Newton whether or not
19 it was legal for you to impose a moratorium upon building in
20 Jackson Township?
21   A    **I don't recall if we did or not.**
22   Q    Do you recall if you personally ever asked
23 Larry Newton that question?
24   A    **I never did, no.**
25   Q    Do you recall if any of the supervisors ever

69

1  asked Larry Newton whether or not it was legal to impose a
2  moratorium on building?
3    A    **I don't recall if any others did or not.**
4    Q    Do you recall if any of them maybe asked Ann
5  Wirth to call Larry Newton and ask him that question?
6    A    **No, I don't recall that.**
7    Q    On February 7th I believe you testified you
8  remember David Corneal coming to the Jackson Township Board
9  of Supervisor meeting; is that correct?
10   A    **In February?**
11   Q    On February 7th, 2000.
12   A    **Okay.**
13   Q    Is that what -- you remember him coming there?
14   A    **I believe, yes.**
15   Q    Do you recall that he came with a subdivision
16 plan for your approval, the board's approval?
17   A    **Yes.**
18   Q    Do you recall if you stopped the meeting to
19 call Larry Newton to seek his advice before the board turned
20 down Mr. Corneal's request?
21   A    **No, I don't -- we did not.**
22   Q    Do you recall anyone asking Ann Wirth to call
23 Larry Newton --
24   A    **No.**
25   Q    -- for his advice?

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

70

1        (Discussion held off the record.)
2  BY MS. YANKANICH:
3        Q      At a subsequent meeting Mr. Corneal came back
4  to the board of supervisors and asked that sewage modules be
5  approved; is that correct?
6        A      You mean a subsequent meeting?
7        Q      On a subsequent meeting, yes.
8        A      After the February meeting?
9        Q      Yes.
10       A      I recall the privy permit.
11       Q      Do you recall at the meeting where he
12  requested a privy permit whether or not you stopped the
13  meeting and called Larry Newton to seek his advice on how to
14  proceed?
15       A      We did not.
16       Q      Do you recall if anyone asked Ann Wirth to
17  call Larry Newton and ask his advice?
18       A      No.
19       Q      Do you recall at any time whether you -- in
20  connection with David Corneal's property and how the board
21  of supervisors should proceed, do you recall at any time you
22  personally calling Larry Newton and asking his advice on
23  what to do?
24       A      Personally, no.
25       Q      Do you recall any of the other supervisors

71

1  calling Larry Newton and asking him how to proceed with
2  regard to David Corneal's property?
3        A      I don't recall, no.
4        Q      Do you recall if anyone asked Ann Wirth to
5  call Larry Newton and ask him how to proceed with regard to
6  David Corneal's --
7        A      I would say at a workshop, yes.
8        Q      At a workshop?
9        A      Yes.
10       Q      Was that before the ordinance was -- is that
11  during the research of the ordinance?
12       A      I couldn't tell you when, no. I don't -- I
13  would say yes, that's correct.
14       Q      So to my question -- you believe one of the
15  supervisors asked Ann Wirth to call Larry Newton --
16       A      I would say yes.
17       Q      Let me finish my question before you answer
18  the question.
19       A      I'm sorry.
20       Q      I'm just doing it for the benefit of the court
21  reporter. Is it your testimony that one of the supervisors
22  asked Ann Wirth to call Larry Newton, the solicitor, and ask
23  him on how the board should proceed with regard to David
24  Corneal?
25       A      Yes.

72

1        Q      Can you recall what the board asked her to ask
2  Mr. Newton?
3        A      No, I don't recall exactly, no. I don't
4  recall.
5        Q      Do you recall if that instruction that was
6  given to Ann Wirth to make that telephone call to Mr. Newton
7  was before the litigation commenced in this lawsuit?
8        A      I don't recall. I believe it would be before,
9  yes.
10       Q      Do you have any recollection of what Ann --
11  what the result of that telephone call was between Ann Wirth
12  and Larry Newton?
13       A      It would have been a conference call so I
14  don't recall exactly.
15       Q      It would have been a conference call between
16  whom?
17       A      The supervisors over the phone.
18       Q      With Larry Newton?
19       A      With Larry Newton.
20       Q      Was this the conference call that you
21  testified to earlier regarding when you should file a
22  lawsuit against Mr. Corneal?
23       A      No, I would say, no.
24       Q      It was before that?
25       A      I would say before that.

73

1        Q      Did Mr. Newton give the board of supervisors
2  advice during that telephone call?
3        A      I don't recall the advice, no, if there was
4  advice.
5        Q      Can you tell me anything about that telephone
6  call?
7        A      No.
8        Q      You don't know what prompted the telephone
9  call?
10       A      He's our solicitor. I guess we wanted his
11  input.
12       Q      And you're sure that it was about David
13  Corneal's property?
14       A      I would say it was about the moratorium.
15       Q      It was about the moratorium?
16       A      Yes.
17       Q      When did you first hear of David Corneal?
18       A      At the first meeting he was in attendance.
19       Q      So that would be February 7th, 2000?
20       A      Correct.
21       Q      That was the first time that you heard about
22  David Corneal?
23       A      Yes.
24       Q      Now, you just stated that the telephone call
25  you had with Larry Newton was regarding the moratorium?

**74**

1    A    That would have been before that, I believe.
2    Q    So that was before you ever heard about David
3    Corneal?
4    A    Correct.
5    Q    So does it refresh your recollection that
6    perhaps you were asking him whether or not you could have
7    such a moratorium?
8    A    I believe that's correct, yes. I would say
9    that would be correct.
10   Q    Then did that have anything to do with David
11   Corneal's property then at that time?
12   A    No.
13   Q    Is it customary after the board meetings on
14   the first Monday of each month to inform Larry Newton about
15   the actions that were taken by the supervisors at those
16   meetings?
17   A    No, that's not customary.
18   Q    Do you recall if at any time after David
19   Corneal attended a supervisor's board meeting -- excuse me,
20   Jackson Township Board of Supervisor's meeting whether or
21   not you called Larry Newton to tell him what happened during
22   the meeting?
23   A    I don't know. I do not recall.
24        MS. YANKANICH: I don't have any further
25   questions.

**75**

1        MS. MALADY: Just a couple questions.
2
3        REDIRECT EXAMINATION
4
5    BY MS. MALADY:
6    Q    I think that you have been asked whether Ann
7    Wirth contacted Larry Newton directly on behalf of the board
8    of supervisors; is that correct?
9        MS. MALADY: Is that -- did I restate your
10   question?
11       MS. YANKANICH: Not exactly. I'd rather we
12   read back if you're going to ask him about a specific
13   question.
14       MS. MALADY: No, that's okay.
15   BY MS. MALADY:
16   Q    In the ordinary course does Ann Wirth call
17   Larry Newton on behalf of the board of supervisors without
18   your instruction?
19   A    No, she does not.
20   Q    Does Ann Wirth need to get your permission to
21   call your solicitor?
22   A    I really couldn't tell you. I don't know if
23   she needs our permission completely or not.
24   Q    Is it your belief that she should get the
25   permission of the board of supervisors prior to calling your

**76**

1    solicitor?
2    A    Yes, I would say that, yes.
3    Q    Are you aware that your solicitor may take the
4    position that actions taken by the board of supervisors were
5    taken without consultation with him?
6    A    Am I aware of that?
7    Q    Yes.
8    A    I'm really not aware of that, no.
9    Q    Are you aware that your solicitor may take the
10   position that actions taken by the board were not lawful?
11   A    No.
12   Q    Are you aware that your solicitor may take the
13   position that the board of supervisors did not rely upon his
14   advice in taking any actions which are the basis of this
15   lawsuit?
16   A    Could you start at the beginning of that, I'm
17   sorry.
18   Q    Sure. Are you aware that your solicitor may
19   take the position that the board of supervisors did not rely
20   upon any advice that he provided in taking any of the
21   actions which form the subject of this lawsuit?
22   A    No, I'm not aware of that.
23   Q    Very briefly. Do you know of any other
24   subdivision application submissions to the township during
25   the period of the moratorium? Do you know if any other

**77**

1    subdivision applications were provided to the board of
2    supervisors?
3    A    No, I'm not aware of any, no.
4    Q    Are you aware -- I'm sorry, I don't mean to
5    ask every question starting the same way. Does the township
6    keep an ordinance book to the best of your knowledge?
7    A    An ordinance book?
8    Q    Yes.
9    A    Yes.
10   Q    Do you know where that's kept?
11   A    I believe a copy -- the main copy is at the
12   township office.
13   Q    Following the passage of an ordinance by the
14   board of supervisors, what happens to the physical ordinance
15   that's been enacted? Is it filed, is it --
16   A    I would say it's filed at the office, yes.
17   Q    So you believe it would be placed in a file in
18   Ann Wirth's office?
19   A    Yes, correct.
20   Q    Do you have any knowledge or what do you
21   believe that an ordinance book is?
22   A    It's something you follow to -- for building
23   and that type of thing in the township.
24   Q    So to the best of your knowledge the
25   ordinances that you pass are kept in files in Ann's office?

**78**

1   A   Yes.

2   Q   In Miss Wirth's office?

3   A   Yes.

4   Q   Let me ask you: To the best of your knowledge

5  are they filed according to subject matter or are they filed

6  separately or are they -- how are they kept, do you have any

7  idea?

8   A   I have no idea.

9   Q   Did you ever talk to your solicitor -- you

10  personally or the board or Ann Wirth, did you ever talk to

11  your solicitor about the likelihood that Mr. Corneal's

12  subdivision would not be approved?

13   A   I really don't recall.

14   Q   You weren't present at any conversation at

15  which that topic was discussed?

16   A   I may have been. I don't recall.

17   Q   You don't recall the conversation or you don't

18  recall being present at --

19   A   I don't recall the conversation.

20   Q   Do you have any knowledge of Mr. Wilson's

21  telephone conversation with Barry Parks regarding Mr.

22  Corneal's request for sewer module approval --

23   A   No.

24   Q   -- generally?

25   A   No.

**79**

1   Q   Do you have any knowledge of Mr. Wilson

2  directing Mr. Parks to do his job? Are you aware that Mr.

3  Wilson told Mr. Parks to do his job with regard to Mr.

4  Corneal's sewage module application?

5   A   No, I'm not aware.

6   Q   Are you aware that he was informed -- that Mr.

7  Wilson informed Mr. Parks to do his job with regard to a

8  privy permit request by Mr. Corneal?

9   A   No, I'm not aware of that.

10   Q   Were you present at a meeting regarding Mr.

11  Corneal's property involving Mr. Van Dommelen's failure to

12  provide a permit -- a building permit application to Mr.

13  Corneal?

14   A   Was I at a meeting?

15   Q   Yes.

16   A   Where it was discussed you mean?

17   Q   Yes.

18   A   Yes, I was there.

19   Q   And can you tell me about that meeting?

20   A   No, I can't tell you specifics, no.

21   Q   You don't recall what was discussed at that

22  meeting?

23   A   No. The letter may have been discussed.

24   Q   The letter being Mr. Van Dommelen's denial --

25   A   I believe, yes.

**80**

1   Q   -- of Mr. Corneal's permit. Were you aware

2  before this deposition that Mr. Van Dommelen refused to give

3  Mr. Corneal a building permit application?

4   A   Yes, I believe it was discussed.

5   Q   Did you ever have a discussion with Mr. Van

6  Dommelen regarding the appropriateness of his failure to

7  provide a building permit application to Mr. Corneal?

8   A   I believe we discussed that he should provide

9  him with a permit.

10   Q   Can you tell me about that conversation?

11   A   That's basically what was said, that we

12  should, I guess. That's all I can recall.

13   Q   Would that have -- would that conversation

14  have occurred at the same meeting at which --

15   A   I would say yes.

16   Q   -- his denial --

17   MS. MALADY: I don't have any other questions,

18  but there are a couple things I wanted to get on the record

19  before we stop the deposition.

20   MS. YANKANICH: I have another question.

21

22        RECROSS-EXAMINATION

23

24  BY MS. YANKANICH:

25   Q   With regard to township business, do you

**81**

1  regularly seek the advice of Larry Newton with regard to any

2  potential business?

3   A   Not all township business, no.

4   Q   If the supervisors wanted the advice of Larry

5  Newton, how would they typically get in contact with him?

6  Would they -- I guess what I'm asking is would you contact

7  him directly or would you go through Ann Wirth?

8   A   We would go through Ann Wirth at the office.

9   Q   And if Larry Newton does work on behalf of the

10  supervisors does he bill for that time?

11   A   I don't know.

12   Q   You're not aware of how Larry Newton gets paid

13  by the township --

14   A   No, I'm really not.

15   Q   -- for his services? Do you recall ever

16  approving any work that he's done on behalf of the

17  supervisors?

18   A   No.

19   Q   Do you recall seeing any bills that he

20  submitted to the board for approval?

21   A   I sign the check, I believe, and that's it.

22   Q   But you don't know what that was for?

23   A   No, not specifically, no.

24   MS. YANKANICH: That's all the questions I

25  have. Thank you.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

---

82

1    MS. MALADY: As you may be aware, Mr. Yoder,
2  we will be traveling -- I'm sorry, we being counsel for Mr.
3  and Mrs. Corneal, and I'm not sure if the other counsel will
4  be present. We'll be in Huntingdon County to depose Mr.
5  Weiler at some point in the near future. Evidently we're
6  coming up next week to inspect documents and we would
7  request that you have documents ready for our review made
8  available through your counsel --
9    MR. SHERR: Hold it. You do this through me.
10  I don't know that --
11    MS. MONTGOMERY: We're going to place it on
12  the record.
13    MR. SHERR: You can place whatever you want on
14  the record, but you'll make the arrangements through me
15  because --
16    MS. MONTGOMERY: Well, we'll place it on the
17  record.
18    MS. MALADY: Subject to Mr. Sherr's objection,
19  we would like to get the following documents. If you would
20  arrange for Miss Wirth to give those documents to Mr. Sherr
21  for our inspection --
22    MR. SHERR: Well, you know, he can't even talk
23  to Miss Wirth about it, you know, pursuant to the order. So
24  why don't we do this through me.
25    MS. MONTGOMERY: That's absolutely not true.

---

83

1    MR. SHERR: It is. If it's not a deposition,
2  then he's leaving. So you can -- why don't you just do it
3  through me. Why don't you -- tell me what documents you
4  want and we'll have them.
5    MS. MONTGOMERY: I'm doing it through you
6  right now. You're here so you should listen.
7    MR. SHERR: We don't have to do it on the
8  record.
9    MS. MONTGOMERY: We are doing it on the
10  record.
11    MR. SHERR: You can do it on the record.
12  Let's go. I'm done. The deposition is over.
13    MS. MONTGOMERY: You're going to leave the
14  deposition while we place on the record the documents that
15  we would like you to have ready for us to inspect next week.
16    MR. SHERR: I'd appreciate you doing that in
17  correspondence.
18    MS. MONTGOMERY: You are leaving the
19  deposition despite the fact that we are going to place on
20  the record --
21    MR. SHERR: You said the deposition is over.
22    MS. MONTGOMERY: -- what you would like --
23  okay, would you please continue -- he's left the deposition
24  before it's over.
25    We would like to inspect in Huntingdon County

---

84

1  the invoices that Larry Newton has sent to the township for
2  work -- legal work done in connection with Jackson Township
3  over the last two years. We would like minutes from the
4  workshops of the meetings of the supervisors, the workshop
5  meetings of the supervisors. We would like any bills that
6  Ann Wirth has for copies made of the ordinances at any
7  time.
8    We also would like bills related to any
9  advertisements of the ordinances and any newspaper files
10  that she has related to advertisements of the ordinances,
11  any advertisements. We would like the list of attendees to
12  the township meetings that she started to keep in January of
13  2001.
14    We would like to look at the originals of the
15  subdivision files and any and all other documents that are
16  in any way related to the subdivision ordinance, the
17  moratorium, the highway ordinance -- I'm sorry, the driveway
18  ordinance and anything at all to do with the Corneal
19  property.
20    Now the deposition is concluded despite the
21  fact that Mr. Sherr has taken his client and left the room.
22    (The deposition was concluded at 4:56 p.m.)
23
24
25

---

85

1
2  COUNTY OF DAUPHIN                    :
                                       : SS
3  COMMONWEALTH OF PENNSYLVANIA    :
4    I, Teresa K. Bear, Reporter-Notary Public,
5  authorized to administer oaths within and for the
6  Commonwealth of Pennsylvania and take depositions in the
7  trial of causes, do hereby certify that the foregoing is the
8  testimony of MICHAEL YODER.
9    I further certify that before the taking of
10  said deposition, the witness was duly sworn; that the
11  questions and answers were taken down stenographically by
12  the said Teresa K. Bear, a Reporter-Notary Public, approved
13  and agreed to, and afterwards reduced to typewriting under
14  the direction of the said Reporter.
15    I further certify that the proceedings and
16  evidence are contained fully and accurately to the best of
17  my ability in the notes taken by me on the within
18  deposition, and that this copy is a correct transcript of
19  the same.
20    In testimony whereof, I have hereunto
21  subscribed my hand this 4th day of June, 2001.
22
23
                    _____
                    Teresa K. Bear, Reporter
24                      Notary Public
                    My commission expires
25                      on April 13, 2003

3

IN THE UNITED STATES COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

DAVID B. CORNEAL, and*

SANDRA Y. CORNEAL,      * Case No.

    Plaintiffs      * 1 CV-00-1192

    vs.      *

JACKSON TOWNSHIP,      *

et al,      *

    Defendant      *

* * * * * * * *

DEPOSITION OF

RALPH WEILER

JUNE 29, 2001

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

1　　　　　　　　D E P O S I T I O N

2　　　　　　　　　　O F

3　RALPH  WEILER,  taken  on  behalf  of  the

4　Plaintiff  herein,  pursuant  to  the

5　Rules  of  Civil  Procedure,  taken

6　before  me,  the  undersigned,  Jane  E.

7　Messner,  a  Court  Reporter  and  Notary

8　Public  in  and  for  the  Commonwealth  of

9　Pennsylvania,  The  Stoneycreek

10　Volunteer  Fire  Department,  Route  26,

11　McAlevey's  Fort,  Petersburg,

12　Pennsylvania,  on  Friday,  June  29,

13　2001,  beginning  at  10:25  a.m.

14

15

16

17

18

19

20

21

22

23

24

25

3

                    A P P E A R A N C E S

1

2   LESLIE MALADY, ESQUIRE

3   BRIDGET E. MONTGOMERY, ESQUIRE

4   Eckert, Seamans, Cherin

5   & Mellott, LLC

6   213 Market Street

7   Eighth Floor

8   P.O. Box 1248

9   Harrisburg, PA  17101

10      COUNSEL FOR PLAINTIFF

11  MICHELE J. THORP, ESQUIRE

12  Thomas, Thomas & Hafer, LLP

13  305 North Front Street

14  P.O. Box 999

15  Harrisburg, PA  17106

16      COUNSEL FOR DEFENDANT

17  ANTHONY R. SHERR, ESQUIRE

18  Mayers, Mennies & Sherr, LLP

19  3031 Walton Road, Building A

20  Suite 330

21  P.O. Box 1547

22  Blue Bell, PA  19422-0440

23      COUNSEL FOR DEFENDANTS

24

25

4

I N D E X


WITNESS:  RALPH WEILER

EXAMINATION

   by Attorney Montgomery        7 - 46

CERTIFICATE                           47

1  <u>E X H I B I T   P A G E</u>

2

3                                      <u>P A G E</u>

4  <u>N U M B E R</u>   <u>D E S C R I P T I O N</u>        <u>I D E N T I F I E D</u>

5     1      Sequestration Order      8 *

6     2      Moratorium              2 7 *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22            *  N O T   A T T A C H E D

23

24

25

6

1                    OBJECTION PAGE

2

3   ATTORNEY                              PAGE

4

5                     NONE MADE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2     - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3     RALPH WEILER, HAVING FIRST BEEN DULY

4     SWORN, TESTIFIED AS FOLLOWS:

5     - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6     DIRECT EXAMINATION

7     BY ATTORNEY MALADY:

8     Q.      Mr. Weiler, would you state

9     your name for the record, please?

10    A.      Ralph Weiler.

11    Q.      My name is Leslie Malady.  I'm

12    an attorney with Eckert Seamans.  We

13    represent Mr. and Mrs. Corneal.  I'm

14    going to take your deposition.  Have

15    you ever been deposed, Mr. Weiler?

16    A.      I don't believe.

17    Q.      Have you ever been a party to

18    a lawsuit before?

19    A.      No.

20    Q.      Let me run through, very

21    quickly, just the format of this

22    deposition.  I'm going to ask you a

23    series of questions.  I need you to

24    answer me verbally.  I can't have you

25    nod your head or shake your head no.

1  For the court reporter, it needs to

2  be verbal.  Are you on any

3  medications today that would prevent

4  you giving a deposition?

5  A.      No.

6  Q.      Mr. Weiler, do you drive?

7  A.      Yes.

8  Q.      Did you drive here this

9  morning?

10  A.      Yes.

11  Q.      Did you drive here by

12  yourself?

13  A.      Yes.

14  Q.      I'm going to show you a

15  document which we'll mark Weiler

16  Exhibit One.  Have you seen that

17  document before?

18                  (Deposition Exhibit

19                  Number One marked for

20                  identification.)

21  A.      I can't say that I have.

22  Q.      Were you aware that the court

23  had entered a sequestration order in

24  this case?

25  A.      What's a sequestration?

1  Q.    The court entered this order

2  which says that the Defendants, you

3  and the other supervisors, Anne

4  Worth, Barry Parks, Mr. Vandommel and

5  Mr. Newton are not to talk about your

6  deposition testimony with one another

7  until all of the depositions have

8  been taken.  Were you aware of that?

9  A.    Yes.  I'd heard that they

10  weren't supposed to speak of it.

11  Q.    And where did you hear that?

12  A.    Well, I don't know.  I think

13  when they came back I asked them how

14  it went, and they said we can't talk

15  about it.

16  Q.    And when was that?

17  A.    Two weeks, three weeks.  I

18  don't know whenever they were away.

19  Q.    And they is who?

20  A.    I would say Anne, mainly.  Tom

21  might have mentioned it too.

22  Q.    And Tom is?

23  A.    Wilson.

24  Q.    And I'm sorry, Anne?

25  A.    Worth.

1    Q.      Anyone else?

2    A.      No, I don't think. When we

3    went to talk about it they just

4    hushed up. That was all.

5    Q.      So you haven't talked to any

6    of the supervisors, any of the other

7    Defendants about any of their

8    deposition testimony?

9    A.      No.

10    Q.      Have you had an opportunity to

11    talk to any of them following their

12    depositions?

13    A.      Oh, yes. We have done work

14    and stuff.

15    Q.      What kind of work have you

16    done?

17    A.      We have been together out at

18    Anne's for administrative work. And

19    I was up there checking the truck. I

20    guess nobody was up there with me at

21    this township building the one day.

22    No, that would be all.

23    Q.      Have you had any other

24    opportunity to talk to any of the

25    other Defendants?

1   A.      No.

2   Q.      Have you been alone with any

3   of the other Defendants?

4   A.      No.

5   Q.      While you were waiting this

6   morning for the deposition, did you

7   have the opportunity to speak to any

8   of the other Defendants?

9   A.      Well, first Anne was here, but

10   she never mentioned nothing about it.

11   Q.      And why was Anne here?

12   A.      She was here to see that this

13   thing was set up?

14   Q.      What was set up?

15   A.      The tables and stuff.  See,

16   sometimes these are all out away in a

17   corner, chairs are put up.

18   Q.      How long did she wait with you

19   this morning?

20   A.      I suppose a half hour maybe.

21   Q.      Was she setting up tables the

22   whole time you were waiting?

23   A.      She had come in and checked on

24   it, and this is about the way she

25   found it.

1  Q.      And then what did she do?

2  A.      Well, she would just wait out

3  there.

4  Q.      Where?

5  A.      Outside.

6  Q.      Anywhere in particular

7  outside?

8  A.      Outside the door.  Didn't you

9  see her there this morning?

10  Q.      Yes.  And where were you

11  waiting this morning?

12  A.      Well, I stood there a while

13  and then we sat down in the car.

14  Q.      Whose car?

15  A.      Anne's.

16  Q.      Did you read anything while

17  you were waiting this morning?

18  A.      No.

19  Q.      You didn't have any documents

20  that you were going through?

21  A.      No.

22  Q.      Where do you live, Mr. Weiler?

23  A.      A mile east of here.

24  Q.      And what is your address?

25  A.      R.D. 1 Box 651, Petersburg, PA

1    16669.

2    Q.       Is Petersburg --- is that in

3    Jackson Township?

4    A.       No.

5    Q.       I'm sorry.  You're a Jackson

6    Township supervisor?

7    A.       Yes.

8    Q.       How is it that you're a

9    Jackson Township supervisor if you

10   don't live in Jackson Township?

11   A.       I live in Jackson Township

12   You asked me if Petersburg was in

13   Jackson Township, and it's not.

14   Q.       So how is that your mailing

15   address is Petersburg?

16   A.       This is Petersburg.  You go on

17   the other side of that bridge there

18   and it's Huntingdon.

19   Q.       The Huntingdon proper or

20   Huntingdon County?

21   A.       Huntingdon, R.D. 1.

22   Q.       So you physically live in

23   Jackson Township?

24   A.       Right.

25   Q.       Can you tell me your

14

1    educational history?   What's the

2    highest grade you've completed?

3    A.        Twelfth.

4    Q.        Did you go to any college?

5    A.        I had a couple short courses.

6    Q.        What kind of courses did you

7    take?

8    A.        Mainly farming.

9    Q.        Did you receive an Associate's

10   Degree or just ---.

11   A.        No.   It wasn't that long.   It

12   was only --- each one of them was

13   probably three months.

14   Q.        How long have you lived in

15   Jackson Township?

16   A.        Seventy-one (71) years.

17   Q.        All of your life?

18   A.        Uh-huh (yes).

19   Q.        Do you do any other work other

20   than working as a supervisor?

21   A.        Not now, no.

22   Q.        What did you used to do?

23   A.        Farm.

24   Q.        Do you own your own farm?

25   A.        Yes.

1    Q.      Did you parents have a farm?

2    A.      Yes, they did.

3    Q.      And they lived in Jackson

4    Township?

5    A.      Oh, no.

6    Q.      I'm sorry, how long have you

7    been a supervisor for Jackson

8    Township?

9    A.      Probably close to 20 years,

10   something around there.

11   Q.      Have you ever been the

12   Chairman of the Board?

13   A.      Yeah, I've been Chairman.

14   Q.      Do you know how many times?

15   A.      I think it was only one time.

16   Q.      Are you presently the

17   chairman?

18   A.      No.

19   Q.      When were you the chairman?

20   A.      Back four or five years ago

21   probably.

22   Q.      Mr. Weiler, are you aware of

23   the procedures that your Board uses

24   when it enacts an ordinance?

25   A.      Yes, pretty much.

1   Q.      Can you describe those

2   procedures for me?

3   A.      Well, I'd have to see papers

4   and stuff, then I'll know.

5   Q.      Like what kind of papers?

6   A.      When they enact a what?

7   Q.      An ordinance.

8   A.      Well, we have a meeting here

9   at our --- at the fire hall, a

10  meeting, yeah, and we just do it at

11  that.

12  Q.      Do you know if that meeting is

13  preceded by any advertisements?

14  A.      Yes.

15  Q.      Do you know if the

16  advertisements specify that you're

17  going to consider an ordinance?

18  A.      Yeah.

19  Q.      They do?

20  A.      Uh-huh (yes).   Yeah, I think

21  they do.

22  Q.      Do you vote on ordinances at

23  the meetings?

24  A.      Yeah.   Uh-huh (yes).

25  Q.      Do the minutes from your

1    minutes reflect the vote that you've

2    taken?

3    A.      Yes.

4    Q.      Is that how a record of the

5    vote is kept?

6    A.      Yeah.

7    Q.      When you have a proposed

8    ordinance that the Board is

9    considering, do you make it publicly

10   available?

11   A.      Oh, yeah.

12   Q.      Where is it publicly

13   available?

14   A.      Well, of course the

15   secretary's got it, and I think

16   ordinances are posted I think on the

17   building here, I believe.  But I

18   won't say for sure about the

19   building, but I think they are.

20   Q.      Do you if know copies are

21   available at the meetings when

22   they're voted on?

23   A.      Yeah.  There could be copies

24   there, yeah.

25   Q.      Are there normally copies

1  available?

2  A.       I think generally.  It's in

3  the paper.

4  Q.       Have you ever enacted an

5  ordinance that wasn't in the paper?

6  A.       No, I don't think.

7  Q.       Have you ever enacted any

8  resolutions?  Let me ask you this,

9  has the Board of Supervisors ever

10  enacted a resolution?

11  A.       I don't know.

12  Q.       Would you say to the best of

13  your knowledge that they haven't?

14  A.       I don't know about that.

15  Q.       Do you know if a resolution

16  would be advertised in the paper?

17  A.       I would think so.

18  Q.       This sounds like a similar

19  question, but I'm going to ask you

20  just a little differently.  Are you

21  aware of any resolutions being passed

22  by the Board of Supervisors that

23  weren't in the paper?

24  A.       No.  I feel sure if any of

25  them were passed, they'd been

1    advertised.

2    Q.      Do you know if the Board would

3    vote on a resolution?

4    A.      Yeah.

5    Q.      Would that vote occur at a

6    meeting?

7    A.      Yeah.

8    Q.      Would that be the regular

9    meeting held here?

10   A.      Yeah.  This is the only place

11   we have meetings.

12   Q.      Have you ever attended

13   workshop meetings?

14   A.      Yes.

15   Q.      And where are the workshop

16   meetings held?

17   A.      Well, the County does

18   workshops.  Huntingdon County outside

19   does stuff like that.

20   Q.      Does the township have any

21   workshop meetings?

22   A.      In what way are you meaning?

23   Q.      Do you meet at the township

24   building on Anne Worth's property

25   once a month?

20

```
 1   A.       Generally we do, yes.

 2   Q.       And what do you call those

 3   meetings?

 4   A.       They're just administrative

 5   meetings.

 6   Q.       Do you advertise the

 7   administrative meetings?

 8   A.       No, I don't think they're

 9   advertised.

10   Q.       Are they open to the public?

11   A.       Well, they'd be open if they

12   wanted to come, yeah.

13   Q.       How would the public know

14   about the administrative meeting?

15   A.       Well, I don't know.  They all

16   know that we do this.  It's just a

17   short meeting.  It's setting up our

18   agenda for the next meeting and

19   making out checks.

20   Q.       When are those administrative

21   meetings generally held?

22   A.       Monday, Tuesday evening --- or

23   afternoon it is, I guess.

24   Q.       Is that the Monday or Tuesday

25   just prior to ---
```

```
1   A.        Prior, yeah.

2   Q.        --- the regular meeting?

3   A.        Yeah.

4   Q.        How long have the

5   administrative meetings been going

6   on?

7   A.        Quite some time, I guess.

8   Q.        As long as you've been the

9   supervisor?

10  A.        I won't say that long, no.

11  I'd hate to say how long they've been

12  going on.

13  Q.        Have they been going on as

14  long as Anne Worth has been a

15  secretary?

16  A.        Yeah.  I think it was before

17  that maybe.

18  Q.        Do you recall where they would

19  have been held?

20  A.        No, I can't tell you that.

21                  ATTORNEY THORP:

22                  Excuse me.  Let me go

23          see if I can tell them ---.

24  BRIEF INTERRUPTION

25                  ATTORNEY MALADY:
```

1              Okay.   Thank you.

2   BY ATTORNEY MALADY:

3   Q.       Mr. Weiler, I think that you

4   had testified a little earlier that

5   when you were waiting for the

6   deposition with Anne Worth, you were

7   not reading anything while sitting in

8   her car; is that correct?

9   A.       Yes.

10  Q.       I can represent to you that

11  when we pulled in there was a stack

12  of white papers on your lap that you

13  appeared to be reading.  Can you tell

14  me what they were?

15  A.       There were no white papers on

16  my lap.

17  Q.       There was no paper --- you

18  were reading nothing?

19  A.       Uh-uh (no).  No, there was no

20  papers.

21  Q.       Mr. Weiler, has anyone

22  requested that you perform a document

23  search in relation to the lawsuit

24  filed by Mr. Corneal?

25  A.       No.

1   Q.     Have you been provided with a

2   copy of a document that's entitled a

3   request for production of documents?

4   A.     No.

5   Q.     Were you aware that there was

6   an outstanding request for documents?

7   A.     No.

8   Q.     So you haven't looked in any

9   of your files for any documents

10   related to Mr. Corneal's property?

11   A.     I have not looked in any

12   files.

13   Q.     Do you have any files that are

14   related to Mr. Corneal's property?

15   A.     Do I have?

16   Q.     Yes.

17   A.     No.

18   Q.     Do you have any documents of

19   any kind related to Mr. Corneal's

20   property?

21   A.     No.

22   Q.     Did the Board of Supervisors

23   --- let me ask you, has the Board of

24   Supervisors ever discussed Mr.

25   Corneal's property?