1  A.      Well, I've heard it discussed,

2  yes, at the meetings here.

3  Q.      Just at the regular meetings?

4  A.      Yeah.

5  Q.      What were those discussions?

6  A.      What were they?

7  Q.      Yes.  Can you tell me the

8  basis for them?  Well, let me ask you

9  this.  Were you present at the

10  February 2000 Board of Supervisors

11  regular meeting?

12  A.      What was that one?

13  Q.      That was the meeting at which

14  Mr. Corneal submitted his subdivision

15  plan.

16  A.      Yes.  I was there.

17  Q.      Can you tell me what happened

18  at the meeting?

19  A.      I don't know.  He just came up

20  here and slammed them down on the

21  table and then he took off.  He was

22  very disturbed.

23  Q.      Why was he disturbed?

24  A.      I don't know what it was over.

25  It was over this building out there.

1    But everybody has to have a building

2    permit to build in Jackson Township

3    and Corneal's going to have to have

4    one too.  That's what it amounts to.

5    Q.      When he attended the February

6    meeting, was he looking for a

7    building permit?

8    A.      I forget what he was looking

9    for.  No, I don't believe.

10   Q.      So he wasn't looking for a

11   building permit at the February 2000

12   meeting?

13   A.      No.

14   Q.      Do you recall that he had

15   submitted a subdivision plan to the

16   Board at the February meeting?

17   A.      I remember once that he did.

18   I didn't know if it was just then,

19   but I remember once that he did.

20   Q.      What was the result of his

21   submitting the subdivision plan to

22   the Board?

23   A.      It wasn't really a subdivision

24   plan.

25   Q.      What was it?

1   A.      It was maybe his idea. It

2   isn't what all the rest of the people

3   put in. I could say --- everybody

4   else has to have a permit to do

5   things here, and he will too.

6   Q.      Did Jackson Township have a

7   subdivision ordinance in February

8   2000?

9   A.      I think we were working on

10   one. I think that's what it was.

11   Q.      But one had not been enacted?

12   A.      I can't tell you for sure when

13   we did enact that.

14   Q.      Mr. Weiler, I apologize. My

15   co-counsel just pointed out to me

16   that I needed to let you know, if you

17   need to take a break at any time,

18   just let me know.

19   A.      Okay.

20   Q.      If you need to get some water,

21   get some air, anything like that,

22   make sure that you're feeling all

23   right.

24   A.      Okay.

25   Q.      Let me ask you a little bit

1  about the moratorium. When did the

2  Board first consider imposing a

3  moratorium?

4  A.      I can't tell you that. I

5  don't know for sure what date it was.

6  Q.      Do you remember what month it

7  was?

8  A.      No, I don't remember. I

9  imagine it was December, January we

10  talked about it probably, but I won't

11  say for certain on that.

12  Q.      Would that be December 1999,

13  January 2000?

14  A.      I don't know for sure.

15  Q.      I'm going to show you a

16  document we'll mark Weiler Exhibit

17  Two. Do you want to take a look at

18  that, please?

19                    (Deposition Exhibit

20                    Number Two marked for

21                    identification.)

22  A.      Is this explaining the

23  moratorium, or not. Is this what

24  you're doing here?

25  Q.      I believe that it is. Does

1   that refresh your recollection as to

2   when the moratorium was imposed?

3   A.      Well, it says here January the

4   4th, 2000.

5   Q.      Did the Board discuss imposing

6   a moratorium sometime before this

7   meeting?

8   A.      Probably it was discussed in

9   January --- or in December.

10   Q.      Do you remember those

11   discussions?

12   A.      No.  I can't tell you now.

13   Q.      Do you know who brought up the

14   moratorium?

15   A.      Not for sure.

16   Q.      Did you bring it up?

17   A.      No, no.

18   Q.      Did Mr. Yoder bring it up?

19   A.      No.  I presume it might have

20   been Paul.

21   Q.      And why is that?

22   A.      Well, I don't know.  He's just

23   --- you know, said that.  I don't

24   know for sure who did bring it up.

25   Q.      Did you vote on the

1  moratorium?

2  A.     Yes.

3  Q.     Do you see any record of that

4  vote?

5  A.     You mean on here?

6  Q.     Yes, sir.

7  A.     I don't see it here.  But see,

8  we've been working on this before

9  that even, must have been.

10  Q.     Do you recall discussing it at

11  any of your administrative meetings?

12  A.     No.  Well, there would be no

13  decisions.  We can't make decisions

14  there.

15  Q.     Did you discuss it?

16  A.     Well, this one I don't

17  remember.  I can't say for sure.

18  Q.     Do you recall why the issue of

19  a moratorium was brought up?

20  A.     Well, we did this to get ready

21  for this thing.

22  Q.     To get ready for what thing?

23  A.     Ready for this subdivision.

24  There were places these grounds were

25  on subdivision now to, you know, have

30

1   an orderly building fashion.

2   Q.      How many subdivisions would

3   you say Jackson Township has seen

4   requests for in the year 2001?  Let

5   me rephrase that.  That was terrible.

6   How many subdivision requests did

7   Jackson Township receive in the year

8   2001, to the best of your knowledge?

9   A.      Well, we had two that was held

10   up due to this moratorium.  We had

11   two besides Mr. Corneal that I can

12   think of right now.

13   Q.      That was the year 2000; wasn't

14   it?

15   A.      Whatever year we put this into

16   effect, there was work on it, at the

17   moratorium.  There was two of them

18   out there hanging on that.

19   Q.      But generally, to the best of

20   your knowledge, how many subdivision

21   applications does the Board of

22   Supervisors receive in a given year?

23   A.      I don't know.

24   Q.      Would you say five?

25   A.      That may cover it.  Yes, that

1   may cover it.

2   Q.      I think that you testified

3   that the moratorium came up because

4   you were considering the subdivision

5   ordinance; is that correct?

6   A.      Yeah.

7   Q.      When did you begin to consider

8   that subdivision ordinance?

9   A.      I don't know.  I don't know.

10   Q.      Would you say it was a year

11   before the moratorium?

12   A.      Could have been.  I just can't

13   tell you off hand.

14   Q.      Could it have been more than a

15   year before the moratorium?

16   A.      I don't know.

17   Q.      Do you recall how long the

18   moratorium was in effect?

19   A.      Not now.  I don't remember.

20   Q.      Do you recall when you --- do

21   you recall when the subdivision

22   ordinance went into effect?

23   A.      I can't recall what day it

24   was, you know, month and year.

25   Q.      Do you know if there was an

1    advertisement regarding the

2    moratorium?

3    A.      Yes.  I think there was a

4    piece in the paper.  Anything we do,

5    it's always in the paper.

6    Q.      And why is that?

7    A.      State law, I guess.

8    Q.      So if it's not advertised in

9    the paper, it's not lawful?

10   A.      I don't know what to say about

11   that.  Most of your stuff, like bids

12   for warrants down and so on, that has

13   to be advertised.  So I supposed that

14   this is the same.

15   Q.      Now, you testified that you

16   were present at the February 2000

17   meeting when Mr. Corneal submitted

18   what he thought was a subdivision

19   plan?

20   A.      Yes.

21   Q.      I think that you testified

22   that it wasn't a subdivision plan in

23   your opinion; is that correct?

24   A.      From the Board's opinion, it

25   wasn't.

1    Q.    And why ---?

2    A.    He didn't --- you know, he

3    just threw it down and I gathered he

4    was mad, and out he went.

5    Q.    Why was he upset, do you know?

6    A.    I have no idea.

7    Q.    Now, when you say it wasn't a

8    subdivision plan, in your opinion,

9    what was that opinion based on?

10   A.    Of what other ones are like,

11   how they're drawn up and so on.

12   Q.    What do you compare a

13   subdivision ordinance --- or, I'm

14   sorry, a subdivision plan to?

15   A.    Well, you see them going

16   through here.  You know what they're

17   like.

18   Q.    But are there some standards

19   that the Board compares a subdivision

20   application to?

21   A.    Well, yeah.  There's certain

22   things they have to have in it, yes.

23   Q.    What things would that be?

24   A.    Have to have a topo map of the

25   area.  I can't tell you what all they

1    do to have that.

2    Q.      Where are these requirements

3    found?

4    A.      In the subdivision ordinance,

5    in our ordinance.

6    Q.      But at the time that Mr.

7    Corneal submitted that subdivision,

8    you didn't have a subdivision

9    ordinance?

10   A.      That's what we had the

11   moratorium on.

12   Q.      But at the time he submitted

13   that subdivision plan, where were the

14   standards for a subdivision to be

15   considered by the Board?

16   A.      Well, that was the one I think

17   he was making up; wasn't it?

18   Q.      But it hadn't been enacted?

19   A.      No.  I didn't say it had been.

20   Q.      So would you say it's fair

21   that at the time that Mr. Corneal

22   submitted his subdivision plan, there

23   were no enacted standards by which

24   the Board could review his

25   subdivision application?

1   A.      I don't know if we had that

2   enacted then.  I don't know.

3   Q.      I'm going to ask you a couple

4   of questions about the Hewitts.  Are

5   you familiar with the Hewitts?

6   A.      No.

7   Q.      Were you aware that Mr.

8   Corneal had an agreement of sale with

9   the Hewitts?

10  A.      I think I heard that or

11  something, yes.

12  Q.      Do you know where you heard

13  that?

14  A.      I can't tell you where it was.

15  Q.      Did Mr. Wilson tell you?

16  A.      No, I don't think.

17  Q.      Did Anne Worth tell you about

18  it?

19  A.      I don't know if she even knows

20  them.  I don't know.  I can't

21  remember how that did come about.

22  Q.      Was it discussed at a regular

23  meeting of the Board?

24  A.      They were here one night.

25  Q.      And what happened when they

1    were here?

2    A.        That was probably that

3    February meeting that you were

4    talking about.   That's right, they

5    were here.   They even kind of

6    apologized for Corneal's actions.

7    Q.        What did they say?

8    A.        I don't remember.

9    Q.        Did they get up and speak to

10   the Board?

11   A.        I think they spoke to somebody

12   afterwards.   After the meeting,

13   though, I think they came out and

14   talked.

15   Q.        Did they talk to you?

16   A.        No, I don't think they did.

17   Q.        Did they talk to Anne?

18   A.        No.   They may have talked to

19   Yoder.   I just forget who it was.

20   They talked, I know that.   I heard

21   that.

22   Q.        Did the Board ever discuss

23   what the Hewitts had talked to one of

24   the supervisors about?

25   A.        I don't know what it was, no,

1   as far as I know.

2   Q.      Did you, or any member of the

3   Board, ever discuss the Hewitts at

4   one of your administrative meetings?

5   A.      No.

6   Q.      Were you aware that the

7   Hewitt's wanted to buy a part of Mr.

8   Corneal's property?

9   A.      No.  I believe maybe that

10  there was something said about that.

11  Q.      Do you know who said something

12  about it?

13  A.      On some of these papers that

14  Corneal handed in, it showed where

15  the Hewitts were on there.  That's

16  where I think I seen that.

17  Q.      Were those papers part of the

18  subdivision plan?

19  A.      I don't know about that.

20  Q.      Do you recall that Mr. Corneal

21  submitted something after the

22  subdivision plan?

23  A.      He wasn't going to subdivide

24  one time, and then the next time he

25  was.  Okay.

Case 1:00-cv-01192-SHR   Document 119-2   Filed 04/18/2003   Page 15 of 100

1    Q.      Are you familiar with Mr.

2    Corneal's property here in Jackson

3    Township?

4    A.      No. Just driving along the

5    road is all I know.

6    Q.      Have you ever been there?

7    A.      No. Never on it, never set a

8    foot on it.

9    Q.      Were you aware that it used to

10   belong to Mr. Wilson's grandfather?

11   A.      No. That must have been long

12   ago.

13   Q.      Approximately how far from Mr.

14   Corneal's property do you live?

15   A.      Well, do you know where it's

16   at?

17   Q.      I do not.

18   A.      You have to go out 26 about a

19   mile, turn off the road. And the

20   first --- I live a mile up this

21   narrow road over here. Driving about

22   four miles. No, about two and a half

23   miles.

24   Q.      Were you aware that Barry

25   Parks had approved sewage modules for

1    Mr. Corneal's property?

2    A.      Yes.  I had heard that.

3    Q.      Are you aware of any actions

4    that the Board took after Barry Parks

5    approved those sewage modules?

6    A.      Well, I did hear that Corneal

7    destroyed them after they were

8    approved there.

9    Q.      He destroyed what?

10   A.      Where they're supposed to put

11   their septic systems and so on.

12   Q.      How did he destroy them?

13   A.      By running trucks and tractors

14   over them.

15   Q.      And where did you hear that

16   from?

17   A.      That was probably heard at the

18   meeting, too.

19   Q.      Would that have been at a

20   regular meeting?

21   A.      Yeah.

22   Q.      Did you discuss it at any

23   administrative meetings?

24   A.      No.

25   Q.      Did you ever review Mr.

40

1  Corneal's approved sewage modules?

2  A.      I have looked at them.   I have

3  looked at them.

4  Q.      Did the Board ever approve

5  those Sewage modules?

6  A.      I'm sure they looked at them.

7  Q.      Did they approve them?

8  A.      Not while that --- not when he

9  destroyed that --- the sewage module.

10   Maybe I'm talking about is two

11  different things, that's right.   I

12  won't say.

13  Q.      And why is that?

14  A.      What?

15  Q.      Why won't you say?

16  A.      Well, you're talking sewage

17  module and I'm talking about where he

18  done his test probes for his septic

19  system, that's all.

20  Q.      Let me ask you this.   He did

21  his test probes and Barry Parks

22  signed his sewer module application.

23  A.      Okay.

24  Q.      Was that module submitted to

25  the Board; do you know?

1   A.      I don't know if that's the one

2   or not.  I don't know if it was.

3   Q.      Do you know if the Board ever

4   approved any sewage module

5   application from Mr. Corneal?

6   A.      I don't know.  I don't know of

7   it.

8   Q.      Do you have any knowledge of

9   Mr. Corneal's visiting Mr.

10  Vandomalen's (phonetic) home?

11  A.      No.

12  Q.      Did you know Mr. Corneal went

13  to Mr. Vandomalan's home and told him

14  to get a building permit application?

15  A.      No.

16  Q.      You have no knowledge of that?

17  A.      I don't think, no.

18  Q.      The Board never discussed Mr.

19  Corneal's seeking a building permit

20  application?

21  A.      There was something said about

22  him, yes, about him wanting a

23  building permit.

24  Q.      What was said?

25  A.      I forget what happened there.

1    Q.    Do you recall who was present

2  at the discussion?

3    A.    It was probably our Board

4  here.

5    Q.    Would Anne Worth have been

6  there?

7    A.    Sure.  She's at all our board

8  meetings.

9    Q.    Would it have been a board

10  meeting?

11    A.    Yeah.  That's where we make

12  all the decisions.

13    Q.    But I'm not asking you if you

14  made any decisions, I'm just asking

15  if you discussed it?

16    A.    I don't think we did.

17    Q.    Did Mr. Vandomalan ever come

18  see the Board to discuss it?

19    A.    He was at all the meetings.  I

20  imagine he did discuss that, yeah.

21    Q.    Does Mr. Vandomalan ever go to

22  any of the administrative meetings?

23    A.    No.

24    Q.    He's never attended ---.

25    A.    I don't think, uh-uh (no).

43

```
1    Q.      So do you have any
2    recollection of the discussion
3    regarding Mr. Corneal's seeking a
4    building permit?
5    A.      No.
6    Q.      Were you aware that Mr.
7    Corneal tried to get a privy permit
8    from the Board?
9    A.      Uh-uh (no).
10   Q.      You didn't know anything about
11   that?
12   A.      No.  Privy permit?
13   Q.      Yes, sir.
14   A.      Don't recall that one either.
15   Q.      Mr. Weiler, have you ever
16   talked to Larry Newton about Mr.
17   Corneal?
18   A.      I may have.  I don't know.
19   See, he's our attorney.  I may have.
20   Q.      Did you call him on the phone?
21   A.      If I talked to him, that's
22   probably what it was.
23   Q.      Did you talk to him by
24   yourself or were you in a group?
25   A.      Well, you're talking about
```

Corneal, so there had to have been
somebody else, some of the other ones
there to have done that. He's also
my attorney.

Q.     Did you ever discuss with Mr.
Newton the moratorium that the Board
was considering?

A.     Well, he's been to our
meetings and we touched on that, I
think at a meeting.

Q.     Did you discuss it with him
yourself?

A.     No.  It was just a meeting.

Q.     Mr. Weiler, did you know that
Mr. Corneal submitted a building
permit application to the township?

A.     I didn't know he put in an
application, I don't think.

Q.     Did you know he filled out an
application?

A.     I can't say as I did.

Q.     Did you ever see his
application?

A.     I can't say that I did.  I
don't know.  I don't believe I did.

1    Q.        Did you personally review his

2    subdivision application?

3    A.        We have it here on the table

4    and we looked over it.  We go over

5    it. All of us go over everything.

6    Q.        Do you recall why Mr. Corneal

7    left the meeting or when Mr. Corneal

8    left the meeting after your reviewing

9    his subdivision plan?

10    A.        No.

11    Q.        Do you recall what he was told

12    to do with the subdivision plan?

13    A.        No.

14    Q.        Do you normally refer

15    subdivision plan applicants to the

16    county?

17    A.        Yes.

18    Q.        And why is that?

19    A.        Well, they go over them first,

20    the County planners, and then they

21    send them back to us with

22    recommendations on it.

23    Q.        Do you have some ordinance or

24    document that requires the county to

25    look at the subdivision applications

46

1    first?

2    A.      I don't know.  I don't know.

3                   ATTORNEY MALADY:

4                   Just give me a minute.

5            Michele, do you have any

6            questions?

7                   ATTORNEY THORP:

8                   No.

9                   ATTORNEY MALADY:

10                  Tony?

11                  ATTORNEY THORP:

12                  No.

13                  ATTORNEY MALADY:

14                  That's it.  You're

15           done.

16                * * * * * * * *

17       DEPOSITION CONCLUDED AT 11:15 A.M.

18                * * * * * * * *

19

20

21

22

23

24

25

COMMONWEALTH OF PENNSYLVANIA)

COUNTY OF BLAIR                 )

C E R T I F I C A T E

I, Jane E. Messner, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness was first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was taken stenographically by me and reduced to typewriting, and constitutes a true and correct record of the testimony given by the witness.

I further certify that the reading and signing of said depositions were (not) waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative, employee or attorney of any of the parties, nor a relative or employee of counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and stamp this 19 day of July 2001 .

_Jane E. Messner_

NOTARIAL SEAL
JANE E. MESSNER, Notary Public
Hollidaysburg Boro, Blair County, PA
My Commission Expires Dec. 27, 2001

· PITTSBURGH, PA
· CLEARFIELD, PA
· STATE COLLEGE, PA
· HOLLIDAYSBURG, PA

· ERIE, PA
· OIL CITY, PA
· HARRISBURG, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA 15901
(814) 536-8908

· INDIANA, PA
· GREENSBURG, PA

· PHILADELPHIA, PA
· SOMERSET, PA
· WILKES-BARRE, PA
· CHARLESTON, WV

4

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2    DAVID B. CORNEAL and SANDRA    :
      Y. CORNEAL,                    :
 3         PLAINTIFFS                :
                                     :
 4              VS                   :    NO. 1:CV-00-1192
                                     :
 5    JACKSON TOWNSHIP, HUNTINGDON   :
      COUNTY, PENNSYLVANIA; W.       :
 6    THOMAS WILSON, individually    :
      and in his official capacity   :
 7    as Supervisor of Jackson       :
      Township; MICHAEL YODER,       :
 8    individually and in his        :
      official capacity as           :
 9    Supervisor of Jackson          :
      Township; RALPH WEILER,        :
10    individually and in his        :
      official capacity as           :
11    Supervisor of Jackson          :
      Township; BARRY PARKS,         :
12    individually and in his        :
      official capacity as Sewage    :
13    Enforcement Officer of         :
      Jackson Township; DAVID        :
14    VAN DOMMELEN, individually     :
      and in his official capacity   :
15    as Building Permit Officer;    :
      ANN L. WIRTH, individually     :
16    and in her official capacity   :
      as Secretary of Jackson        :
17    Township; and LARRY NEWTON,    :
      individually and in his        :
18    official capacity as           :
      Solicitor to Jackson           :
19    Township,                      :
                DEFENDANTS           :
20              DEPOSITION OF:  ANN WIRTH

21              TAKEN BY:       PLAINTIFFS

22              BEFORE:         TERESA K. BEAR, REPORTER
                                NOTARY PUBLIC
23
                DATE:           MAY 17, 2001, 9:10 A.M.
24
                PLACE:          ECKERT SEAMANS
25                              213 MARKET STREET
                                HARRISBURG, PENNSYLVANIA
```

**WIRTH, ANN**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

**2**

1  APPEARANCES:
2   ECKERT SEAMANS
    BY: BRIDGET E. MONTGOMERY, ESQUIRE
3      LESLIE A. MALADY, ESQUIRE
4        FOR - PLAINTIFFS
5   MAYERS, MENNIES & SHERR, LLP
    BY: ANTHONY R. SHERR, ESQUIRE
6
        FOR - ALL DEFENDANTS EXCEPT NEWTON
7
   THOMAS, THOMAS & HAFER, LLP
8   BY: MICHELE J. THORP, ESQUIRE
9        FOR - DEFENDANT - RALPH WEILER
10  METTE, EVANS & WOODSIDE
    BY: JENNIFER YANKANICH, ESQUIRE
11
        FOR - DEFENDANT - LARRY NEWTON
12
   ALSO PRESENT:
13
   DAVID B. CORNEAL
14
15
16
17
18
19
20
21
22
23
24
25

---

**3**

1          TABLE OF CONTENTS
2              WITNESS
3  FOR PLAINTIFFS      DIRECT CROSS REDIRECT RECROSS
4  Ann Wirth
5   By Ms. Montgomery      4  --  244  --
    By Ms. Yankanich       211  --  251
6          EXHIBITS
7  WIRTH EXHIBIT NO.      PRODUCED AND MARKED
8  1 - Notice              49
9  2 - Subdivision and land      50
   development ordinance
10
   3 - Application for building permit      62
11
   4 - Minutes dated 7/10/00      64
12
   5 - Minutes dated 2/7/00      81
13
   6 - Minutes dated 1/4/00      90
14
   7 - Minutes dated 4/3/00      102
15
   8 - Order      112
16
   9 - Subdivision reviewed by HCPC      114
17
   10 - Letter dated 4/20/00      138
18
   11 - Letter dated 2/24/00      139
19
   12 - Letter dated 11/10/00      184
20
   13 - Letter dated 10/10/00      187
21
   14 - Packet of documents      191
22
   15 - Letter dated 5/5/00      210
23
   16 - Letter dated 1/31/00      247
24
   17 - Letter dated 7/28/00      249
25

---

**4**

1          ANN WIRTH, called as a witness, being sworn,
2   testified as follows:
3
4          DIRECT EXAMINATION
5
6   BY MS. MONTGOMERY:
7      Q      Would you state your name for the record.
8      A      **Ann Wirth.**
9      Q      I think we met briefly yesterday. I'm Bridget
10  Montgomery and as you probably know I represent the Corneals
11  in this action. I'm going to take your deposition today.
12  Have you ever been deposed before?
13     A      **No.**
14     Q      I'm going to give you just a few of the ground
15  rules. Probably the first and most important one is for the
16  benefit of the court reporter. If you could keep your voice
17  up --
18     A      **Okay.**
19     Q      -- and give her verbal responses, yeses or
20  noes. You can't do shakes of the head or anything because
21  she can't hear that and she can't take that down. We also
22  have to try and let each other finish our sentences. So if
23  I'm asking a question, just try to wait until I'm finished
24  and then I'll try to wait until you're finished with your
25  answer to start talking because she can't take down two

---

**5**

1   people at once, okay.
2          If there's anything that you don't understand
3   about any question that I ask you, you should feel free to
4   ask me to repeat it. I want you to understand my question
5   and I want you to be able to give me the best, clearest
6   answer possible. So you shouldn't be shy about that at all
7   if you don't understand it, okay?
8      A      **Okay.**
9      Q      If you are in need of a break, you know, to
10  use the ladies room or whatever, just to stretch your legs,
11  you're free to ask for that as well. We do want you to be
12  comfortable. I'm not sure how long we'll be here, but I
13  want you to be comfortable while you are here. If you need
14  a glass of water, a cup of coffee, just get up and get it,
15  okay?
16     A      **Okay.**
17     Q      Is there any reason why you couldn't give a
18  deposition today and understand questions and give clear
19  answers in return? For instance, are you on any sort of
20  medication or anything like that?
21     A      **No.**
22     Q      Have you ever been a party to a lawsuit
23  before?
24     A      **No.**
25     Q      Have you discussed the substance of your

---

6

1  deposition or intended deposition testimony with anyone?
2      A      I don't know what you mean. You mean what I
3  -- what you want me to say or what somebody wanted me to
4  say?
5      Q      Yes.
6      A      No.
7      Q      Not with anybody at all?
8              MR. SHERR: I'm going to object to the form of
9  the question and exclude from that any conversations she had
10  with her attorney.
11             MS. MONTGOMERY: Okay.
12  BY MS. MONTGOMERY:
13     Q      Other than your counsel, have you discussed --
14     A      No.
15     Q      You have not talked about the fact that you
16  will be deposed? You have not talked about that with the
17  supervisors at all?
18     A      Oh, we've all talked about being deposed
19  but --
20     Q      And what was the nature of those
21  conversations?
22     A      I don't know what you're asking me.
23     Q      Well --
24     A      Just that we have to come and tell the truth
25  and say whatever has happened, that's all.

8

1  that. I'm going to instruct her not to answer --
2  BY MS. MONTGOMERY:
3      Q      When were you first asked --
4              MS. MONTGOMERY: Are you instructing your
5  witness not to answer that question?
6              MR. SHERR: To the extent the request came
7  from me, yes.
8              MS. MONTGOMERY: Well, she didn't have to tell
9  me who it came from.
10  BY MS. MONTGOMERY:
11     Q      Were you asked by anybody at any time prior to
12  -- let me back up a second. Were you asked by anybody at
13  any time, and I'm not asking you who, to search for
14  documents in connection with this lawsuit last September,
15  September of 2000?
16             MR. SHERR: Again, I'm going to object to the
17  extent that any request came from me. Other than anything
18  from your attorney, you may answer that.
19             THE WITNESS: No.
20  BY MS. MONTGOMERY:
21     Q      You weren't asked by anybody, not one single
22  soul?
23     A      No.
24     Q      When is the first time that anybody -- and I'm
25  not asking you who asked you to look for documents, but when

7

1      Q      Who have you discussed it with exactly?
2              MR. SHERR: Again, other than your -- other
3  than --
4  BY MS. MONTGOMERY:
5      Q      Other than your attorney Mr. Sherr.
6              MR. SHERR: -- your attorney.
7              THE WITNESS: Probably my husband, who is my
8  sounding board for a lot of things and is not involved in
9  anything at all.
10  BY MS. MONTGOMERY:
11     Q      Among the supervisors who have you talked to?
12     A      Probably everybody.
13     Q      In connection with this litigation, have you
14  performed a search for documents?
15     A      Yes, I did.
16     Q      When did you do that?
17     A      Last week.
18     Q      When were you first asked to do that?
19             MR. SHERR: I'm going to object to the form of
20  the question to the extent she was asked by her attorney
21  because it's privileged. Don't answer with respect to
22  anything -- conversations that we had.
23             MS. MONTGOMERY: That's not a privileged
24  question.
25             MR. SHERR: Well, we'll let the court decide

9

1  was the first time anybody asked you to look for documents
2  in connection with this lawsuit?
3              MR. SHERR: I'm going to object again based on
4  privilege and instruct you not to answer with respect to any
5  conversation --
6              MS. MONTGOMERY: I haven't asked you what
7  your --
8              MR. SHERR: Please. With respect to any
9  conversations that you had with your attorney.
10             MS. MONTGOMERY: Are you instructing your
11  witness not to tell me whether anybody -- not identifying
12  that person, but whether -- you're instructing her not to
13  tell me whether anybody, without identifying who it was,
14  asked her for documents? Is that your instruction?
15             MR. SHERR: I made my objection.
16             MS. MONTGOMERY: But you need to make it very
17  clear because when I take this to the court I want to be
18  able to tell the court exactly what you told your witness
19  not to say.
20             MR. SHERR: Let me make it really clear.
21             MS. MONTGOMERY: Okay.
22             MR. SHERR: I'm instructing the witness not to
23  answer with respect to conversations she had with her
24  attorney.
25             MS. MONTGOMERY: Okay, thank you.

**10**

1  BY MS. MONTGOMERY:
2      Q      Have any of the supervisors asked you to look
3  for documents in connection with this lawsuit?
4      A      No.
5      Q      Has anybody other than your attorney asked you
6  to look for documents in connection with this lawsuit?
7      A      No.
8          MR. SHERR:  That you can answer.
9          THE WITNESS:  No, no.
10  BY MS. MONTGOMERY:
11      Q      And so when is the first time that you
12  actually looked for documents in connection with this
13  lawsuit?
14          MR. SHERR:  Objection, privileged.  I'm going
15  to instruct the witness not to answer.
16          MS. MONTGOMERY:  What?
17  BY MS. MONTGOMERY:
18      Q      When was the first time that you actually
19  looked for documents in connection with this lawsuit?
20          MR. SHERR:  Objection, asked and answered.
21  You can answer the question.  You can answer.
22          THE WITNESS:  Okay.  Last week.
23  BY MS. MONTGOMERY:
24      Q      And what did you do in looking for documents?
25      A      I got a request, something that said request,

**11**

1  and I put together all the documents that I could put
2  together on that list.
3      Q      Is that the first time you got that request,
4  the written request?
5      A      I'm not really sure of that.  I'm not really
6  sure of that.
7      Q      You don't know if last week was the first time
8  you ever looked at it?
9      A      I don't know that for sure, when that came to
10  me.  I really don't.
11      Q      Well, let's try and narrow it down a little
12  bit.  Did it come to you within the last month?
13      A      You're asking me during tax season so it's
14  kind of a hard thing for me to pinpoint when I got that.  I
15  don't know.
16      Q      Did it come to you last year?
17      A      Oh, no.
18      Q      It didn't come to you in the year 2000?
19      A      No, I know that.
20      Q      So what did you go about doing in attempting
21  to look for documents in response to that request?
22      A      I went down the list and I accumulated what
23  was on that list that I could provide you from my office
24  with.  That's what I did.
25      Q      Did you withhold any documents based on --

**12**

1      A      No.
2      Q      -- privilege?
3      A      No.
4      Q      Do you know whether any documents were
5  withheld based on privilege?
6      A      No.
7      Q      You don't know?
8      A      No, I don't know.
9      Q      Did the supervisors review the documents that
10  you sent out?
11      A      No.
12      Q      So you handled completely the document
13  production?
14      A      Right.
15      Q      Did you ask for any assistance from anybody in
16  handling the document production?
17      A      No.
18      Q      Did you talk to anybody about anything or did
19  you talk to other people?  Did you say do you know where
20  this document is or anything like that?
21      A      No.
22      Q      Well, let's talk about how documents are kept
23  on behalf of the township.  How are they kept, just
24  generally tell me?
25      A      In a file cabinet.

**13**

1      Q      How big?
2      A      Four drawers, there's two.
3      Q      Do you have documents --
4      A      In a binder for the land ordinances.
5      Q      In a binder?  And a binder or in a binder did
6  you say?
7      A      In a binder.
8      Q      So there's binders in the file cabinets?
9      A      There's a binder on top of the file cabinet.
10      Q      Plus there's documents inside the file
11  cabinet, correct?
12      A      Yes.
13      Q      Do you have documents that are retained only
14  on computer?
15      A      Not that I'm aware of.
16      Q      Did you look on the computer for any documents
17  that might be there that might be related to the document
18  request that was sent to you?
19      A      I don't have any documents on the computer.
20      Q      Do you have a computer?
21      A      I shouldn't -- oh, yeah.
22      Q      I'm sorry?
23      A      I have a computer.  We have two computers --
24  well, we have a computer.
25      Q      You started to say I shouldn't.

14

1    A    The -- the ordinance is on the computer, but I
2 didn't get it off the computer.
3    Q    Do you maintain correspondence on the computer
4 at all?
5    A    We don't write very many letters so there's
6 just -- there's nothing on the computer except that and the
7 accounting.
8    Q    What about the minutes?
9    A    And the minutes are on there.
10    Q    So the minutes are --
11    A    Yeah, the minutes are on there, correct.
12 You're right.
13    Q    Anything else at all on the computer that you
14 can think of?
15    A    Yeah, there's -- PennDOT now has put out a
16 disk that we have that we can put out our liquid fuel forms
17 and that sort of thing and that's on the computer.
18    Q    Do you maintain disks at all?
19    A    No.
20    Q    So you have a hard drive?
21    A    Yes.
22    Q    Everything is kept on the hard drive, nothing
23 is copied off on separate disks?
24    A    Only to backup.
25    Q    So you maintain backup files?

15

1    A    Oh, yeah.
2    Q    Do you know whether you have correspondence or
3 other documents on backup?
4    A    I backup my computer all the time so
5 everything is there. I back it up from front to back and
6 it's there.
7    Q    Well, just to be clear on your answer, because
8 I'm not sure I heard it correctly, did you actually do a
9 search of your computer files, whether on the computer or on
10 backup to see whether or not there was anything available
11 that would be responsive to the document requests that were
12 given to you?
13    A    No.
14    Q    Are there documents related to township
15 business that are kept anywhere else besides the township
16 office where you work?
17    A    I don't know what kind of documents you're
18 talking about.
19    Q    Any documents related to township business in
20 any way.
21    A    Yes.
22    Q    And where is that?
23    A    The building permits are not kept in-house.
24    Q    Did you look -- where are they kept?
25    A    David Van Dommelen has them.

16

1    Q    Where does he keep them?
2    A    In his home.
3    Q    Did you ask him to give you the building
4 permits?
5    A    I -- I asked him for a list of the building
6 permits and that's what I gave you.
7    Q    But I thought you said you didn't ask anybody
8 to help you in connection with the document production?
9    A    No, I only asked to get the information. I
10 didn't ask anybody to look it up for me. I just -- I must
11 have misunderstood what you meant. I simply asked David to
12 give me his list of all the building permits. I did the
13 same thing with the county. So if I misunderstood what you
14 said, I'm sorry. I did the same thing with the county.
15    Q    That's okay. I mean, if you misunderstood,
16 then we'll just clear it up. So my question was: Did you
17 talk to anybody in connection with performing this
18 collection of documents?
19    A    Yes, I did them.
20    Q    And who did you talk to?
21    A    I talked to David Van Dommelen and I asked him
22 to give me a list. I did not ask him for the permits
23 because they're cumbersome. I did ask him for a list of all
24 permits that were issued from -- I think you said June '99
25 to present and he did do that. And then I talked to Richard

17

1 Stahl and I asked him to give me a list of every one that
2 went into the county to be reviewed from whenever and he
3 sent me a list of everything that's ever been in there.
4    Q    And you provided both of those lists to us?
5    A    Yes, I did.
6    Q    To your attorney anyway.
7    A    And to you. They were here yesterday. I saw
8 them.
9    Q    When you say that the building permits are too
10 cumbersome, why are they too cumbersome? Can you describe
11 that for me?
12    A    Well, I -- I have to take -- you have to
13 understand I'm the only person that does this, okay. So I
14 had to go -- I'd have to go get them and copy --
15 applications I would have had to copy. We don't have copies
16 of the building permits, okay, just the applications, is all
17 I would have. And I would have to go since 1999 and copy --
18 get David's book and copy it in my -- in the office or take
19 it somewhere.
20    Q    Does David keep them in a binder or something?
21    A    I really don't know.
22    Q    So the applications are what, one page, two
23 page --
24    A    I have no idea because I don't do that.
25    Q    So when you issue a building permit -- when

18

1  the township issues a building permit, you don't keep a copy
2  of the permit?
3      A    No, I don't.
4      Q    Does anybody keep a copy of the permit?
5      A    You'll have to ask David that. I don't
6  actually know what he has in that -- in his files. I know
7  he keeps a list which he provides to the supervisors and
8  that's why I asked for that.
9      Q    So what you sent us was a list of permits --
10     A    That were issued.
11     Q    That were issued?
12     A    Right.
13     Q    Did you send us a list of applications for
14 permits?
15     A    That's the same. I don't think there's any
16 difference, but you'll have to ask David that.
17     Q    And you don't think there's any difference
18 why?
19     A    I don't know. I honestly don't know. You'll
20 have to ask David that. I don't know what he does. That's
21 not under me.
22     Q    So then you talked to Richard Stahl to get
23 what from him?
24     A    I asked him to give us a list of permits -- or
25 of subdivisions that we have submitted to him, just a list,

19

1  to show that we were sending everything in there. And he
2  did send me a completed list of -- they must keep track of
3  them when they come in in that routine and that's what he
4  sent.
5      Q    Anybody else?
6      A    No, those are the only two places I requested
7  anything.
8      Q    Did you look anywhere outside the township
9  offices --
10     A    No.
11     Q    -- for anything?
12     A    No.
13     Q    You didn't look at documents anywhere else?
14     A    No.
15     Q    You said that the building permits and
16 applications are kept by Van Dommelen, correct?
17     A    Right.
18     Q    Are there any other documents that are
19 maintained outside the township office relating to township
20 business?
21     A    The sewage documents, Barry keeps them till
22 he's done with -- till he has completed the project and then
23 he sends them into the township.
24     Q    That's Barry Parks?
25     A    Barry Parks. And also DEP keeps them then

20

1  sends them back. They might keep them for three or four
2  years and then they send them back, but I didn't talk to
3  either one of them.
4      Q    So you didn't ask Barry Parks what documents
5  he has in connection with --
6      A    No, I did not.
7      Q    Is there any reason why you didn't ask Barry
8  Parks for his documents?
9      A    I didn't know I was supposed to do that.
10     Q    Any other documents that are maintained
11 outside the township office?
12     A    I can't think of any.
13     Q    Well, if you think of any, please feel free to
14 tell me during the course of this deposition, or tell your
15 counsel and he can tell me later if you don't think of it
16 during the course of the deposition, okay?
17     A    Okay.
18     Q    Now, going back to the documents that you did
19 produce, you said all the documents are kept in one file, in
20 one file cabinet that's three or four drawers?
21     A    No, we have two file cabinets.
22     Q    Is that it? Is there any other, you know,
23 sort of nooks and crannies or storage buildings on township
24 property that --
25     A    Oh, yeah, we have old documents. Are you

21

1  talking current or ancient documents?
2      Q    Really I'm just trying to get a general
3  picture of your document retention.
4      A    Current items are in the office. Old items
5  are in the township building. And I honestly cannot tell
6  you what's there and I don't go there because there's snakes
7  in there and I don't go there. I can tell you that. I
8  won't go there.
9      Q    What do you mean by current documents?
10     A    Well, things that -- I've been on for six
11 years. Everything since I've been on is in my office.
12     Q    Is it in those two file cabinets you referred
13 to?
14     A    Yes, and then in an extra storage box.
15     Q    And that storage box is where?
16     A    In my office.
17     Q    Did you look in that storage box in connection
18 with this document request?
19     A    No, because those things were before I was on
20 the -- on -- they weren't involving this time frame.
21     Q    So they are documents prior to --
22     A    1996.
23     Q    So that's the storage box and what else?
24     A    That's it.
25     Q    No attic or anything like that?

## 22

1  A    No.
2  Q    Let's talk a little bit about you and your
3  background. Where do you live?
4  A    I live on Scare Pond Road.
5  Q    And where is that?
6  A    Petersburg, R.D. 1.
7  Q    Is that -- how do you spell that, Scare Pond?
8  A    S-c-a-r-e, P-o-n-d.
9  Q    And that's within Jackson Township?
10 A    Yes.
11 Q    Tell me a little bit about your educational
12 background.
13 A    I have -- I graduated from high school, of
14 course, and I have college classes in tax and accounting and
15 business law and numerous other advanced education, but I
16 don't have a degree.
17 Q    Talk to me a little bit about your advanced
18 education, what -- go into some detail.
19 A    Mostly in computers, because that's what I do,
20 and in income tax preparation, that sort of thing. I go to
21 tax class at Penn State most every year and I do that.
22 Q    Do you hold any certificates or licenses or
23 anything like that?
24 A    No.
25 Q    When did you start your post high school

## 23

1  education?
2  A    In probably 1960. I've been doing this all
3  this time so ...
4  Q    Taking business classes?
5  A    Business classes and computer classes when we
6  started with computers and I've been taking income tax
7  classes since I started doing that in 1974.
8  Q    What is your exact title at the township?
9  A    I'm secretary/treasurer.
10 Q    Secretary/treasurer. Is there any training
11 for performing that particular function?
12 A    Oh, yes.
13 Q    And what is that?
14 A    Well, we go -- every year they have classes
15 that they get you to attend for -- it's not only secretarial
16 duties or treasurer duties, it's everything. They -- we go
17 to convention to do this. We go everywhere to do --
18 wherever they -- it's called one-step education classes
19 through PSATS. So every year -- I even went to
20 Shippensburg. They -- we go different places to do what
21 we --
22 Q    What is PSATS?
23 A    Pennsylvania Association of Township
24 Supervisors.
25 Q    So they send you to training and --

## 24

1  A    The township does.
2  Q    And PSATS puts on that training?
3  A    They're doing it now, yes. And DEP does it,
4  Department of Transportation does it.
5  Q    And what does that training consist of
6  exactly, what do they show you?
7  A    Well, like right now is -- they're doing a lot
8  of computerization because this is a dinosaur thing they
9  have for the townships. And they're doing a lot of training
10 for the liquid fuel forms and all those things. They're
11 training us to use their new computer systems and I do
12 bidding. I do all the bidding and that sort of thing. So
13 all the latest things we do.
14 Q    You said that what you do is computerization.
15 What did you mean by that?
16 A    Well, I -- I go around and set different small
17 businesses up with their accounting systems and that sort of
18 thing.
19 Q    In connection with your work as a township --
20 A    Oh, no.
21 Q    -- supervisor secretary?
22 A    No, I earn a living. I don't earn a living
23 doing township -- no, I'm not -- I shouldn't be funny about
24 this, but that's what I do for a living.
25 Q    Oh, I see. So you have separate employment?

## 25

1  A    Oh, yeah.
2  Q    We'll get to that in a minute.
3  A    Okay.
4  Q    Just tell me a little bit about your duties as
5  the township secretary.
6  A    Well, I take minutes at the meeting, I do
7  that, but I take care of all the financial end of it. I
8  make sure that we have all the grants that we're entitled
9  to. I fill in all the forms to get us the money. We're a
10 poor township, we only have 900 people, and there's a lot of
11 paperwork involved in --
12     (Interruption.)
13     MS. MONTGOMERY: Excuse me one second. I'll
14 be right with you.
15     (Break taken.)
16     MS. MONTGOMERY: Now, where were we? What was
17 the last question.
18     (Question and answer read.)
19     THE WITNESS: There's a lot of paperwork
20 involved in just getting the funding for what we need to do
21 in the township. And we have -- we're audited three times a
22 year so we're constantly under audit. I just -- I take care
23 of all that. That's what I do.
24 BY MS. MONTGOMERY:
25 Q    How much time say per week do you put into it?

26

1    A    I honestly don't know. I cannot tell you how
2  many -- because I work that in with my job and anything that
3  needs to be done I do and I honestly cannot tell you how
4  many hours. Some weeks it's a lot, some months it's a lot,
5  like January, February, March is really bad, and then at
6  audit time it's really bad but ...
7    Q    Why are -- January, February and March for tax
8  season?
9    A    Because -- well, no, not for the township.
10  The township, that's when you fill in all your forms for
11  your funding, like your liquid fuels. And we have all --
12  every agency and everything we deal with we have forms we
13  have to fill in with the supervisor's information and all
14  that and it's -- and if you don't do that, then we don't get
15  our liquid fuels money. So we have those -- those months
16  we're really busy.
17    Q    Do you do all of that work from the township
18  office or do you do some of it at home?
19    A    The township does not have an office. They
20  use my office for their office. I allow them to put their
21  stuff in my office and that's where it happens.
22    Q    Your office where?
23    A    On Scare Pond Road.
24    Q    Your office at home then you mean?
25    A    I have a separate building that is my office.

27

1    Q    That you use in connection with your other
2  employment?
3    A    Yes.
4    Q    So the township office is your office
5  essentially?
6    A    Um-hum.
7    Q    Having said that, do you perform any of the
8  work from inside your home?
9    A    At my house -- my --
10    Q    Yes.
11    A    My office building is here and my house is
12  over there. There's nothing together. Everything is in the
13  building. There's nothing in my house, other than phone
14  calls, you know, that sort of thing. I don't have anything
15  at the house.
16    Q    Do you keep a record of phone logs? Do you
17  keep a phone log of like phone calls you receive --
18    A    No.
19    Q    -- in connection with township business?
20    A    No, they have their own line.
21    Q    That rings in your office?
22    A    Um-hum.
23    MR. SHERR: You have to say yes or no. You
24  can't --
25    THE WITNESS: I'm sorry, yes. It rings in my

28

1  office.
2  BY MS. MONTGOMERY:
3    Q    So if somebody calls on township business, how
4  do you keep a record of the fact that somebody has called on
5  township business?
6    A    I don't.
7    Q    You don't, you just keep it in your head?
8    A    I don't get enough phone calls for the
9  township that I need to keep records or anything. It's --
10  if somebody calls me, I answer the phone and say Jackson
11  Township and do what I -- you know, do what I have to do,
12  but we don't -- we don't get a lot of phone calls.
13    Q    Do you take messages for the supervisors in
14  connection with --
15    A    No, I tell them -- I give them their phone
16  number and they call them.
17    Q    So you don't have any kind of old phone
18  messages or --
19    A    No.
20    Q    -- a book of --
21    A    I don't do that.
22    Q    Let me finish my question.
23    A    I'm sorry.
24    Q    That's all right. Thank you. So as the
25  secretary you just sort of weave it into your other work,

29

1  your other employment as it needs to be done for the
2  township?
3    A    Yes.
4    Q    You attend all the township's meetings?
5    A    I've only missed one in the six years I've
6  been on.
7    Q    And when was that, the one that you missed?
8    A    I think it was two years ago in February I was
9  really ill and I did not go.
10    Q    And the meetings are held in your office as
11  well?
12    A    No.
13    Q    Where --
14    A    The meetings are held -- I'm sorry. The
15  meetings are held at the fire company building in McAlevys
16  Fort.
17    Q    Is there a telephone in that building?
18    A    Yes.
19    Q    Is there any answering of messages or, you
20  know, answering of the telephone on behalf of the township
21  that occurs in that building?
22    A    No.
23    Q    Do you know whether the supervisors have their
24  own individual offices anywhere?
25    A    No, they don't.

WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

30

1  Q      Do they have anybody else who answers the
2  phone or takes messages or handles any township business in
3  any way on behalf of them?
4  A      No.
5  Q      Typically at a township meeting -- is there a
6  monthly meeting of the township supervisors?
7  A      Yes.
8  Q      And then there are special meetings from time
9  to time, correct?
10  A      Once in a while, like when we do the ordinance
11  or something, but not very often.
12  Q      Who would be present at the township meetings?
13  A      The supervisors and myself.
14  Q      Are they open to the public?
15  A      Oh, always. They have to be by law.
16  Q      Do you advertise --
17  A      Yes.
18  Q      -- all of the township meetings?
19  A      We have to, that's the law.
20  Q      Every month?
21  A      We are required once a year to put it in the
22  paper in the beginning of January that our regular monthly
23  meeting will be the first Monday of every month. And then
24  if we change that, we have to run another ad, or if we --
25  excuse me. If we have a special meeting, that has to be

31

1  advertised.
2  Q      Where do you advertise?
3  A      In the Daily News in Huntingdon.
4  Q      The Huntingdon Daily News it's called?
5  A      Um-hum.
6  Q      Is there a particular amount of notice that
7  you have to give?
8  A      We're supposed to give 24 hours.
9  Q      Twenty-four hours notice for special meetings?
10  A      Yes.
11  Q      And what else are you supposed to do in
12  connection with those notices?
13  A      Just exactly what I said, we put it in once a
14  year and I -- oh, I post it on the door. They have a
15  Plexiglas for me on the door of the fire company and I have
16  it -- it's posted there when our monthly meeting is. And if
17  there's a special meeting, I go down and hang it on the
18  door.
19  Q      What about the content of the notices?
20  A      They're just -- we just have to notify them of
21  a meeting if there is -- and if it's -- I'm sorry.
22  Q      If it's a special meeting, do you have to tell
23  them anything else?
24  A      Like if it's an ordinance or we're building or
25  something, it's in the paper, we advertise it in the paper.

32

1  When we bid for -- if we have an emergency that we are going
2  to bid for roadwork or something that we're doing a special
3  meeting for, there will be an ad in the paper. Even if we
4  are doing our bidding at a regular meeting, there still will
5  be an ad in the paper listing what we're bidding for and
6  when that meeting is and whatever. It's always in the Daily
7  News.
8  Q      So in the notice of a special meeting do you
9  put anything about what the meeting is going to be about?
10  A      Yes.
11  Q      You describe what exactly the supervisors are
12  trying to accomplish?
13  A      We're bidding on stones or whatever.
14  Q      So you told me what you do in connection with
15  your duties as secretary for Jackson Township. Is there
16  anything else you want to add to that?
17  A      I don't know what it would be.
18  Q      How frequent is your contact with the
19  supervisors of Jackson Township?
20  A      I -- I talk to Mr. Weiler on a daily basis,
21  only because of his health and he's alone with his sister,
22  but I don't know. It's a small community. We see one
23  another and we run into one another. I don't know how often
24  I talk to them.
25  Q      Is there something additional to add to your

33

1  duties for the township that arises out of your role as the
2  treasurer for the township?
3  A      I keep track of the books. I have that
4  computerized. I do that. I pay all the bills.
5  Q      Anything else?
6  A      I move the money around in the bank if we need
7  to do that. I change all the signatures on the bank
8  accounts. I --
9  Q      Do you write checks?
10  A      Oh, yes, but I don't -- yes, I do.
11  Q      Do you sign the checks?
12  A      Yes, there's two signatures required.
13  Q      Yours and one of the supervisors?
14  A      Yes.
15  Q      Anything else that you do as -- in connection
16  with your role as the treasurer for the township?
17  A      Deposit all the money. I -- and write checks
18  is basically what I do for --
19  Q      Do you participate in -- just in general in
20  your role in the township, do you participate in substantive
21  conversations about what the township should do or can do
22  or --
23  A      I do do that.
24  Q      Do you do that at the monthly meetings or just
25  on a day-to-day basis or what?

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**34**

1  A    Wherever it needs to -- wherever it comes up.
2  If there's something -- I will get a lot of things in the
3  mail that needs to go to the supervisors or, you know, I may
4  have researched things for them.
5  Q    Do you deal directly with the public yourself?
6  A    Sometimes.
7  Q    So they come out to your office?
8  A    No.
9  Q    They just call you on the telephone?
10  A    Sometimes.
11  Q    To ask you questions about what they need to
12  do to do this or do that?
13  A    Sometimes they do that.
14  Q    Do you vote at all in connection with township
15  business?
16  A    No, I don't have a vote.
17  Q    Do you have an informal vote?
18  A    No.
19  Q    Do the township supervisors seek your advice
20  on how to do things for the township?
21  A    They might ask me to research things.
22  Q    How do you keep the minutes?
23  A    They're in a binder.
24  Q    So you keep --
25  A    It's not really a binder. It's a big book and

**35**

1  you have to staple them in there. It has to be in this
2  book.
3  Q    And you also keep them on the computer?
4  A    I print them off of there and put them -- I
5  have to seal them and put them on -- in the book, yeah.
6  Q    You have a word processing system?
7  A    Yes.
8  Q    What word processing system do you have?
9  A    We do Microsoft Word and then we also have
10  Excel, which is part of that, and Works. We have Works.
11  Q    What do you use Works for?
12  A    I use them both for -- I might have -- Word is
13  connected to the reports that we do for PennDOT with Excel
14  and I use -- that's mainly for the bidding. There's bidding
15  forms where we bid for stones and blacktop, and whatever
16  we're doing, and snow plowing and that sort of thing.
17  That's done in Word. And Works I do my minutes in and
18  things.
19  Q    Do you use e-mail at all in connection with
20  your township work?
21  A    The township is not on the Internet.
22  Q    Are you on the Internet?
23  A    Oh, yes.
24  Q    Do you use your own e-mail in connection with
25  township business at all?

**36**

1  A    No.
2  Q    So you would have nothing on your -- this is
3  -- your e-mail is on your personal computer then --
4  A    Yes.
5  Q    -- for your other business?
6  A    Um-hum.
7  Q    So there is nothing on that computer that in
8  any way relates to township business?
9  A    No.
10  Q    You never use that computer to keep minutes
11  like, for example, if the other computer is not working or
12  something?
13  A    No, we do not. We've only had the township
14  computer for two -- for -- I think it's two -- maybe a year,
15  year and a half. And before that I did, but I -- I have two
16  new computers and I don't put the township on mine at all.
17  Q    But before you got the township computers a
18  year and a half ago, you did some township business on your
19  own computer?
20  A    Yes, I did.
21  Q    Did you look on your own computer to see
22  whether there was anything on there that might in any way
23  relate to this lawsuit or the matters under consideration in
24  this lawsuit?
25  A    I would have trouble doing that since I don't

**. 37**

1  have that anymore. I don't have it anymore.
2  Q    You don't have that computer anymore?
3  A    No, and I cleared everything off of there and
4  gave it to my grandson.
5  Q    You gave the computer to your grandson and got
6  a new computer?
7  A    Yes.
8  Q    Did you backup the information that was on
9  your old computer?
10  A    Oh, yeah.
11  Q    So did you look on your backup information to
12  see whether there was anything related to the Corneals,
13  their property or anything that has to do with this lawsuit?
14  A    No, I did not because the only thing that
15  would have been on there would have been the minutes and the
16  books.
17  Q    Well, let's see, Mr. Corneal first started his
18  interaction with the township back in 1999, correct, in
19  connection with this property?
20  A    I don't know when he started.
21  Q    But if he did start in connection with this
22  property in 1999, it's possible that you would have some
23  information on your old computer, correct?
24  A    I wouldn't have anything in '99 for Mr.
25  Corneal.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

38

1  Q    Why is that?
2  A    Because I didn't have anything to do -- I
3  didn't even know about Mr. Corneal till January 2000.
4  Q    Do you keep any kind of a log of township
5  activities, you know, some sort of an organizational chart
6  at all?
7  A    No, I do not.
8  Q    Do you keep a calendar?
9  A    For the township?
10  Q    Yes.
11  A    No.
12  Q    You don't?
13  A    No.
14  Q    Does anybody keep a calendar for the township?
15  A    I don't know. You'll have to -- I don't know.
16  Q    Have you ever held any other positions with
17  Jackson Township besides your secretarial and treasurer
18  positions?
19  A    Yes, we had a supervisor quit and I was
20  appointed supervisor till we had a special election.
21  Q    And when was that?
22  A    Oh, I don't know whether that was '98 or -- I
23  think it was in 1998. I'm not sure. It was just a short
24  period of time. A man quit and then we had an election. It
25  was just a couple months.

39

1  Q    It was a couple months and you were appointed
2  to fill in as township supervisor --
3  A    Yes.
4  Q    -- for a period of time? How long have you
5  been the secretary for the township?
6  A    Since 1996.
7  Q    How long have you been the treasurer for the
8  township?
9  A    Since 1996.
10  Q    And how did you go about obtaining that
11  position?
12  A    They put an ad in the paper and I gave them a
13  resume.
14  Q    Are you related to any of the supervisors?
15  A    No.
16  Q    Are the minutes for the township meetings
17  publicly available?
18  A    Oh, yes.
19  Q    So I could go in and look at the book of
20  minutes?
21  A    Sure.
22  Q    Anybody could go in and look at the book of
23  minutes, correct?
24  A    Yes.
25  Q    Who do you report to?

40

1  A    The three supervisors.
2  Q    There are three supervisors?
3  A    Right.
4  Q    And you report to them informally or formally
5  or just at the monthly meetings or what?
6  A    I don't know what you're asking me.
7  Q    I guess I'm really asking you for a complete
8  picture of how you report township business to the
9  supervisors. Do you save it all for the monthly meetings,
10  do you just call them from time to time to report to them?
11  A    I call them from time to time to report to
12  them.
13  Q    They're your bosses, right?
14  A    Yes.
15  Q    They're the ones who hired you?
16  A    Yes.
17  Q    So you have to report to them on any township
18  business that comes up?
19  A    That's right.
20  Q    So you just call them from time to time?
21  A    Yes.
22  Q    Do you know whether they keep any minutes or
23  records of your telephone calls to them?
24  A    I don't know.
25  Q    So if something comes up between say the first

41

1  monthly -- you know, the monthly meeting in January and the
2  monthly meeting in February and say four or five different
3  things come up, how do you keep a list of what's come up? I
4  mean, how do you keep all that organized?
5  A    When I open the mail and there's something
6  that has to be taken care of with the supervisors, I
7  normally copy it, if it's something they need to read or
8  whatever, prepare for, or -- and I have a file that I have
9  ready for the meeting. I put my copy in the folder and then
10  I give them their copies along the way so they're prepared
11  before the meeting. And so I don't lose it I do that
12  because it's -- it's -- there's a lot of paperwork involved
13  here and I do that for that reason.
14  Q    Do you prepare agendas for the monthly
15  meetings?
16  A    Yes, I do. I have it on the computer.
17  Q    You have the agendas on the computer as well?
18  A    I have an agenda and when I -- each meeting I
19  change it. I just go in and change it and-- it's saved
20  under agenda and I just change it for that meeting.
21  Q    Do you save copies of the old agendas?
22  A    Probably not.
23  Q    Does anybody save copies of the old agendas?
24  A    I don't know.
25  Q    You don't save the agenda on the meeting from

42

1   month to month?
2   A   No.
3   Q   The agenda on each monthly meeting you just go
4   in and replace --
5   A   Yes.
6   Q   -- and you copy over?
7   A   Yeah, that's what I do.
8   Q   So you have a form, basically a computerized
9   form --
10  A   Yeah, that's what I do.
11  Q   Tell me about your other employment.
12  A   I do income tax preparation and set up
13  computers.
14  Q   Are you self-employed?
15  A   Yes.
16  Q   Does your company have a name?
17  A   Ann's Accounting.
18  Q   Ann's Accounting?
19  A   Um-hum.
20  Q   And you set up computers. When you say you
21  set up computers, what do you mean by that?
22  A   I load software on people's computers for
23  accounting and word processing packets and that sort of
24  thing, to show them how to run it, show them what to do with
25  their payroll, keep them updated. That's what I do.

43

1   Q   So you just consult -- basically have a
2   consulting -- computer consulting business?
3   A   And I do in-house payrolls and that sort of
4   thing, quarterlies.
5   Q   And you prepare tax forms as well?
6   A   Yes.
7   Q   Now, you said you were briefly a supervisor
8   for the township. Have you ever held any other position
9   with Jackson Township?
10  A   No.
11  Q   Do you take notes at the meetings besides the
12  minutes that you actually type up? Do you have handwritten
13  notes that you keep somewhere?
14  A   No. Once I type it up, I throw it out.
15  Q   Discard them, okay. Do you keep a record of
16  people in attendance at the meeting other than in the
17  minutes?
18  A   I do now.
19  Q   A different record?
20  A   Yes.
21  Q   And what does that consist of?
22  A   I pass a paper around the room and have
23  everybody sign it now, who is there.
24  Q   And you keep that where?
25  A   With the minutes.

44

1   Q   You keep it with the minutes?
2   A   Yes. I've been doing that maybe for -- I
3   don't know, three, four months.
4   Q   You talked about opening township mail, right?
5   A   Yes.
6   Q   Is that delivered to your home or to a post
7   office box?
8   A   We have a separate mailbox for the township.
9   Q   On your property?
10  A   Yes.
11  Q   So you keep copies of all the mail received?
12  A   It depends on what it is. If it's something
13  that I'm not going to do anything with, it's just
14  information for the supervisors from PSATS or something like
15  that, I -- I don't necessarily keep it.
16  Q   But you do keep some of the mail received,
17  copies?
18  A   If it's something that I have to deal with.
19  Q   And you keep that in those files?
20  A   Um-hum.
21  Q   The metal file cabinets that you have?
22  A   Yes.
23  Q   I think you said a moment ago that you don't
24  really know what the building permit applications look like
25  and you don't -- you're not sure how big they are and all

45

1   that?
2   A   I don't.
3   Q   Now, in connection with your work with the
4   township, how many ordinances has the township passed in
5   your -- in the history of your work with the township?
6   A   Three.
7   Q   And what were they?
8   A   The land development and subdivision
9   ordinance, privy ordinance and a driveway ordinance.
10  Q   When did they pass the land division and
11  subdivision ordinance?
12  A   July the 10th in 2000.
13  Q   July the 10th, 2000?
14  A   Um-hum.
15  Q   Was the meeting for that ordinance -- or for a
16  consideration of that ordinance advertised?
17  A   Oh, yes.
18  Q   Where was it advertised?
19  A   The Daily News.
20  Q   Did the advertisement state that it would be
21  on July the 10th?
22  A   Oh, yes.
23  Q   Did the advertisement state what was going to
24  be considered at the meeting?
25  A   Oh, yes.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

46

1 Q Do you have a copy of the advertisement that
2 stated when the --
3 A I'm not sure I did that. I think maybe Larry
4 Newton did that, but I'm not sure. I can't -- I don't know.
5 Q Does Larry Newton sometimes do the
6 advertisements?
7 A Only for items like that.
8 Q Let's talk about the advertisements for a
9 second. I think you stated a while ago that you usually do
10 the advertisements, right? You do them in the Daily --
11 A Daily News.
12 Q The Daily News in Huntingdon, correct?
13 A Yes.
14 Q So you would take care of the advertisements
15 at the beginning of the year listing when the monthly
16 meetings of the township were going to be held?
17 A Right.
18 Q Any other advertisements that you routinely
19 deal with?
20 A Yes, for bidding.
21 Q Anything else?
22 A No -- special meetings, if we called a special
23 meeting.
24 Q Sometimes do you do the advertising for
25 special meetings held to consider ordinances?

47

1 A I honestly don't know whether I did that or
2 not. I normally do most of the advertising, but that was a
3 special -- so I don't -- I honestly don't know if I did it
4 or he did it.
5 Q Well, what's involved when you do? Do you
6 just call --
7 A No.
8 Q -- the Daily News? What do you do?
9 A No, you have to type something up and fax it
10 into them and they put it in the paper.
11 Q Do you keep a record of having typed something
12 up and faxing it into them whenever you do an advertisement?
13 A Oh, yeah, I have that.
14 Q Let me think about this for a second. So in
15 some situations -- well, you said you passed three
16 ordinances -- or the township supervisors have passed three
17 ordinances since you've been working for the township,
18 correct?
19 A Right.
20 Q Do you know whether you did the advertising
21 for any one of those three ordinances?
22 A They were all at the same time.
23 Q They were all done at the same meeting?
24 A Um-hum.
25 Q Which you said was July 10th, 2000?

48

1 A I think that's what -- it's on the back of the
2 ordinance.
3 Q So the ordinance was actually passed at the
4 meeting?
5 A Right.
6 Q So the date of the ordinance -- the date of
7 its passage is the date of the meeting, correct?
8 A Yes.
9 Q Did you notice when you did your search for
10 documents whether you had any documents in there indicating
11 -- showing advertisements for meetings sent to the
12 newspaper, faxes for advertisements for meetings sent to the
13 newspaper?
14 A I --
15 Q Do you have a special file for that?
16 A I file them with the documents that we're
17 doing. I don't have a file for advertisement. I -- because
18 we do our bidding and that sort of thing, I -- and the
19 auditors look at our bidding, I have to have that in the
20 files for those items so it's got to be there.
21 Q Miss Wirth, I'm going to show you a document
22 that was faxed to us by your counsel last Friday and we're
23 going to mark it as Wirth Exhibit 1. And I'd ask you to
24 look at it and see whether you can identify that document
25 for me, just familiarize yourself with it for a second.

49

1 (Notice produced and marked as Wirth Exhibit
2 No. 1.)
3 BY MS. MONTGOMERY:
4 Q Do you recognize that advertisement?
5 A Yes, I do.
6 Q So I guess I'm a little bit confused because
7 this is a regular monthly meeting and you had said earlier
8 that at the beginning of the year you just do an
9 advertisement that says this is when the monthly meetings
10 are going to be held, but then this is a separate
11 advertisement, correct -- I'm sorry, you just nodded your
12 head.
13 A No, I'm -- I wasn't answering you.
14 Q Well, is that correct, that you said that at
15 the beginning of the year you do an advertisement that says
16 this is when the regular monthly meetings are going to be
17 held, correct?
18 A I did say that, and I also said that we -- if
19 we're having any other meetings or any changes we have to do
20 it 24-hour notice for these meetings and that's what this
21 was.
22 Q Was this a change of the regular monthly
23 meeting?
24 A Yes, because I think the regular monthly
25 meeting then would have been on the 4th of -- that would

---

50

1   have been on the 4th of July, all right, so we changed our
2   regular monthly meeting because we were going to enact the
3   ordinance.
4        Q      So you had a monthly meeting on July 10th
5   then?
6        A      Yes.
7        Q      So you enacted the ordinance at the regular
8   monthly meeting?
9        A      We did do that.
10       Q      Which was held on July 10th?
11       A      That's right.
12       Q      Now that you look at this, do you recall that
13   you're the one who put the advertisement in?
14       A      I did this advertisement.  I didn't do the
15   ordinance advertisement.
16       Q      Was there a separate ordinance advertisement?
17       A      Well, yeah, it's right beside it.
18       Q      Let me see that.  Okay.  So you say you didn't
19   — oh, Larry Newton did that one.  I see that at the
20   bottom, okay.  I'm going to show you another document that
21   is marked as — we're going to mark it as Wirth Exhibit 2.
22          (Subdivision and land development ordinance
23   Jackson Township produced and marked as Wirth Exhibit
24   No. 2.)
25   BY MS. MONTGOMERY:

---

51

1        Q      Do you know when this advertisement appeared
2   — going back to Exhibit 1 for a second, do you know when
3   this advertisement appeared in the Daily News?  Do you know
4   what date?
5        A      I don't — I can't tell from here, no.  Off
6   the top of my head I don't know.
7        Q      You don't recall?
8        A      No.
9        Q      I'm going to give you a copy of this document
10   and ask you if you can identify it for the record.
11       A      This is the subdivision ordinance and land
12   development.
13          MS. MONTGOMERY:  Let the record reflect that
14   Michele Thorp just entered the room.
15   BY MS. MONTGOMERY:
16       Q      Is this the subdivision —
17       A      Yes.
18       Q      — ordinance that was passed by Jackson
19   Township, correct?
20       A      Yes.  This thing says the 7th.
21       Q      We're going to direct your attention to
22   page 71 of the document.  Was this ordinance passed before
23   the meeting?
24       A      No.  I probably — I probably wrote the wrong
25   date on there because I know it was passed the night of

---

52

1   this.  That's — and it's documented in the minutes that it
2   was done.  I probably — I don't know why that says the 7th.
3        Q      Did you have a meeting — like a separate
4   meeting at all on July 7th?
5        A      Oh, no, no.
6        Q      Did you —
7        A      What day of the week is that?  No, no, that
8   was just probably me.
9        Q      Was this signed at the regular monthly
10   meeting?
11       A      Yes, it was and — because I took it to get
12   copied right away and I — I did that.  I'm sure I probably
13   wrote that there that night.
14       Q      Who was present at that monthly meeting?
15       A      All the supervisors were there.
16       Q      Who else?
17       A      Myself.
18       Q      Anybody else?
19       A      I don't remember.
20       Q      You don't recall whether there was a member of
21   the public present?
22       A      I'm sure there were.  There's usually regular
23   people there, but I — I don't — I don't know for sure if
24   they were there that night.  I think they were.
25       Q      Did you provide us with the minutes of this

---

53

1   monthly meeting?
2        A      Yes.
3        Q      You provided your counsel with the minutes of
4   the monthly meeting, correct?
5        A      Yes, I did.
6        Q      Was Larry Newton present at this monthly
7   meeting when this ordinance was passed?
8        A      No.
9        Q      Can you remember — this was July 2000.  So
10   can you remember —
11       A      I don't know why I did that.  I really don't.
12   I just wrote the 7th and it was — but it was done at the
13   meeting and I — you know.
14       Q      Were all three supervisors present at the
15   meeting?
16       A      Yes.
17       Q      Can you recall roughly how many people were
18   present at the meeting?
19       A      We might — there might be three or four
20   people, that's all we ever have.
21       Q      Was there any other notice of the meeting
22   published anywhere else?
23       A      I hung something on the door which I — I'm
24   obligated to do by the Sunshine Law and I put it in the
25   paper.

---

54

1    Q      When did you hang the notice on the door?
2    A      When I typed this thing -- my routine is when
3  I type this and send it into the paper, I take it down and
4  hang it on the door, and that's what I do as my routine.
5    Q      Do you save copies of those notices that you
6  hang on the door?
7    A      It's this. Yeah, it's just the paper that I
8  fax over, the same thing, you know.
9    Q      Do you save a copy of that?
10    A      I probably have that.
11    Q      Did you provide that to your counsel in
12  connection with this request for production of documents?
13    A      Probably not.
14    Q      Why not?
15    A      I don't know that I was -- I don't believe I
16  was asked for that, was I?  I don't know.
17          MR. SHERR:  Just answer --
18          THE WITNESS:  It's here. It's the same thing.
19  BY MS. MONTGOMERY:
20    Q      It's in the newspaper, right, but you have a
21  separate notice that you hang on the door, right?  Is it a
22  full size notice?
23    A      That's just -- what's right there on a piece
24  of paper I hang on the door.
25    Q      What about the more lengthy notice that Larry

55

1  Newton put in the paper on the ordinances that were going to
2  be considered at the meeting?  Do you know whether that more
3  lengthy notice was put in at any other time in any other
4  newspaper or in the same newspaper?
5    A      You'll have to ask Larry that.  I don't know.
6    Q      Tell me again why did you publish this one,
7  because it was going to be held on a different date?
8    A      Right, it's not the first Monday of the month.
9    Q      Okay, because the first Monday of the month
10  would have been July 3rd?
11    A      Or July -- July 3rd. We did not -- it was
12  Labor Day -- it was 4th of July weekend and we changed it to
13  the 10th and we don't normally do that but we ...
14    Q      Would your records reflect when you sent this
15  notice into the newspaper?
16    A      I might be able to see the date on the fax
17  copy if I still have it.
18    Q      Would you please provide that to your counsel
19  so that it can be provided to me?
20    A      I will try.
21    Q      Whatever you have in connection with the
22  advertisement of this meeting in any way, shape or form.
23  What time did the meeting take place?  What time did this
24  meeting take place?
25    A      Seven o'clock.

56

1    Q      It started as scheduled as shown here in the
2  paper?
3    A      Yes, I would say it did.
4    Q      Do you remember how long it lasted?
5    A      No, I do not.
6    Q      Was there any discussion on the ordinances?
7    A      I don't remember what we discussed.  I don't.
8    Q      Other than ordinances were there other things
9  that the township supervisors pass, you know, sort of laws,
10  bylaws, whatever, that the township supervisors pass?
11    A      Like what?
12    Q      Resolutions, that sort of thing.
13    A      Yes, we have to do resolutions.
14    Q      Tell me about that.  What kind of resolutions
15  do you have to do?
16    A      We do resolutions to belong to the Juniata
17  Watershed.  We do resolutions when we make changes at the
18  bank, when we change the supervisors.  We did a lot of
19  resolutions when we had the flood.
20    Q      Did you pass any resolutions recently?
21    A      Yeah, the Juniata Watershed Resolution.
22    Q      When was that?
23    A      Not this month, last month.
24    Q      Was there any discussion on that resolution?
25    A      Oh, yeah.  Yes.

57

1    Q      Was it well attended by the public, that
2  meeting?
3    A      We might have had four people.
4    Q      And the public discussed this resolution, do
5  you recall?
6    A      I don't recall that they did.
7    Q      But you said there was discussion on the
8  resolution?
9    A      For the supervisors, I was talking about.
10    Q      Among the supervisors.  What other resolutions
11  have been passed say in the last year?
12    A      That was the first resolution, I believe, for
13  the year.
14    Q      For the year 2001?
15    A      Yes.
16    Q      What about in the year 2000?
17    A      I honestly can't remember that we did anything
18  other than the Juniata Watershed and -- I can't remember.
19    Q      So you don't recall any resolutions being
20  passed in the year 2000, correct?
21    A      I'm sorry, I -- if we did, I don't know.  It
22  wouldn't be -- we don't do them -- we don't do -- it's not a
23  routine that we do, other than bank changes and that sort of
24  thing.
25    Q      Do you keep records of your resolutions?

58

1   A    Oh, yeah.
2   Q    Did you look at the resolutions in connection
3 with searching for documents for this lawsuit?
4   A    **I don't think that was part of the request.**
5   Q    Well, did you look?
6   A    **No.**
7   Q    So you didn't review any of the resolutions to
8 see whether they might be related in any way to the matters
9 in this lawsuit?
10   A    **No.**
11   Q    Any other resolution like documents that are
12 passed by the township?  We've covered resolutions, we've
13 covered ordinances, anything else?
14   A    **No.**
15   Q    Nothing else you can think of?  Take your
16 time.
17          MR. SHERR:  I'm going to object to the form of
18 the question.  It's been asked and answered.  She's given
19 her answer.  You can answer again.
20          THE WITNESS:  No.
21 BY MS. MONTGOMERY:
22   Q    Okay, thank you.  Well, let's talk a little
23 bit more about the ordinances that were passed.  Do you
24 recall when the issue of the subdivision and land
25 development ordinance was first raised within the township

59

1 -- among the township supervisors, I should say?
2   A    **Probably between '97 and '98.**
3   Q    Who raised it?
4   A    **I don't know.**
5   Q    Why do you think it was first raised between
6 '97 and '98?
7   A    **Because it took us two years to sift through**
8 **what we wanted to put in our ordinance.**
9   Q    So if this was passed in July 2000 you think
10 you started thinking about it two years before that?
11   A    **I know we did.**
12   Q    How do you know you did?
13   A    **Because I started collecting things two years**
14 **before from different areas.  We used to put a feeler out to**
15 **our engineer and different places, but I can't tell you the**
16 **exact date.**
17   Q    Were there other meetings of the township
18 supervisors at which this land development and subdivision
19 ordinance was discussed besides the one at which it was
20 passed?
21   A    **Oh, yes.**
22   Q    And how do you recall that?  I mean, just in
23 keeping the minutes, is that it?
24   A    **Yes.**
25   Q    Was it discussed on a regular basis at the

60

1 regular monthly meetings?
2   A    **Only if there was activity, you know, going**
3 **on.**
4   Q    What about -- you say there were two other
5 ordinances, a driveway ordinance, correct?
6   A    **Yes.**
7   Q    And a privy ordinance?
8   A    **Right.**
9   Q    All passed on July 7th, according to the
10 subdivision and land development ordinance --
11   A    **Yes.**
12   Q    -- right?
13   A    **Yes.**
14   Q    Did you provide us with copies of the highway
15 and -- I mean the driveway and privy ordinances?
16   A    **I think they're in the back of -- probably**
17 **not.**
18   Q    Whose idea was it initially to pass a
19 subdivision and land development ordinance?
20   A    **I don't know.**
21   Q    You don't recall who first raised the issue?
22   A    **No.**
23   Q    Do you recall how it was raised?
24   A    **No, I don't.**
25   Q    Well, you said that it was discussed on a

61

1 number of occasions, correct?
2   A    **Yes, I did.**
3   Q    Do you recall the nature of those discussions?
4   A    **No.**
5   Q    Do you recall who talked about it?
6   A    **No.**
7   Q    You don't recall anything about any of the
8 discussions?
9   A    **No, I don't.**
10   Q    At the meeting that was held, according to
11 you, on July 10th, correct?
12   A    **Yes.**
13   Q    Was there any discussion among the public over
14 the driveway ordinance?
15   A    **I don't recall.**
16   Q    Was there any discussion about the privy
17 ordinance?
18   A    **I don't recall.**
19   Q    How did the driveway ordinance come up?  Whose
20 idea was that, do you recall?
21   A    **I don't know.**
22   Q    Do you know when it was first raised?
23   A    **I don't -- I don't know.**
24   Q    What about the privy ordinance, when was that
25 first raised?

62

1    A    I don't know that either.

2    Q    I think you had mentioned -- so prior to the

3 passage of the driveway ordinance, did the township collect

4 fees for driveways for when a resident wanted to put in a

5 driveway?

6    A    Not that I'm aware of.

7    Q    What about for the privies? Was there a fee

8 that was paid when somebody wanted to put a privy in?

9    A    Not that I'm aware of. Not to the township.

10    Q    Are you aware of fees being paid to anybody

11 else in connection with a privy before the ordinance was

12 passed?

13    A    Only the SEO.

14    Q    What about the driveway, are you aware of fees

15 being paid to anybody else?

16    A    No.

17    Q    I think that you had mentioned earlier that

18 you didn't know what the application for building permits

19 looked like. I'm going to show you a document that we are

20 going to mark as Wirth Exhibit 3. That's for you.

21        (Application for building permit produced and

22 marked as Wirth Exhibit No. 3.)

23 BY MS. MONTGOMERY:

24    Q    I'd ask you to take a look at it for me.

25    A    I didn't say that I didn't know what that

63

1 application looked like. What I said was that I didn't know

2 where -- what -- you asked me where he keeps these things

3 and what that looked like and I don't know that, but I do

4 know what this application looks like.

5    Q    Well, I'm not going to argue with you because

6 the record will speak for itself, but I did ask you what did

7 they look like, were there many pages, what's an application

8 look like, a lot of pages, one page, two pages, and you said

9 you didn't know. So I'm going to show you this to see if

10 you can now talk to me about what these applications look

11 like, okay.

12        MS. MONTGOMERY: Tony, do you have your copy?

13 This is Exhibit 3.

14        THE WITNESS: I know what this is.

15 BY MS. MONTGOMERY:

16    Q    What is it?

17    A    It's a -- it's the application for the

18 building permit.

19    Q    For?

20    A    For?

21    Q    Is this a standard application for a building

22 permit?

23    A    Yes.

24    Q    Is this the standard size of the application

25 for the building permit?

64

1    A    You mean paper size?

2    Q    Yes, paper size.

3    A    Yes.

4    Q    Just one sheet, correct?

5    A    Yes.

6    Q    So when I asked you earlier, you know, about

7 getting the building applications for building permits from

8 Van Dommelen and you indicated that they were cumbersome and

9 then I asked you, well, how big are they, can you now

10 explain to me why we couldn't get these one sheet -- one

11 sheet applications for building permits?

12    A    I -- you asked me what he -- where he keeps

13 them or what he does with them and how big this is and I

14 said I don't know, and I don't know. I was not referring to

15 a piece of paper.

16    Q    I'm also going to show you a document that

17 we're going to mark as Wirth Exhibit 4.

18        (Minutes dated 7/10/00 produced and marked as

19 Wirth Exhibit No. 4.)

20 BY MS. MONTGOMERY:

21    Q    I'd ask you to look at that. Do you recognize

22 that document, Miss Wirth?

23    A    Yes.

24    Q    Can you describe it for the record, please?

25    A    It's the minutes for July 10th, 2000.

65

1    Q    For the meeting of the supervisors --

2    A    Yes.

3    Q    -- of Jackson Township?

4    A    Yes.

5    Q    Do you see where it says meeting adjourned

6 7:30?

7    A    Yes.

8    Q    So you indicated the meeting started as -- as

9 advertised at 7 p.m.?

10    A    Right.

11    Q    And I had asked you earlier if you knew how

12 long the meeting lasted, correct?

13    A    Yes.

14    Q    Now, that would indicate that the meeting

15 lasted a half hour. Does that sound right to you?

16    A    Yes, it does.

17    Q    Now, these minutes do not indicate who was

18 present at the meeting, correct?

19    A    That's exactly right.

20    Q    Is that because you have a separate attendance

21 sheet that would indicate who was present at the meeting?

22    A    No, I probably didn't have an attendance sheet

23 then.

24    Q    Earlier you testified that you now keep an

25 attendance sheet to record who's present at the township

66

1    meetings, correct?
2        A    Yes.
3        Q    When did you start doing that?
4        A    January, February this year, something like
5    that.
6        Q    Why did you start doing that?
7        A    Because I cannot remember everybody that's
8    there.  And when people ask me, I don't know so that's why I
9    did that.
10       Q    You don't record them in the minutes, who's
11   there?
12       A    No.
13       Q    You don't record who's at the meetings ever
14   until this January?
15              MR. SHERR:  Objection, asked and answered and
16   it's argumentative.  You can answer.
17              THE WITNESS:  No.
18              MS. MONTGOMERY:  Thank you.
19   BY MS. MONTGOMERY:
20       Q    Now that you're looking at these minutes and
21   thinking about this meeting, does that help you recall who
22   was present at this meeting?
23       A    Other than the supervisors you're saying?
24       Q    Yes.
25       A    I don't have any idea.

67

1        Q    Does it help you recall whether there were any
2    members of the public present at the meeting?
3        A    No, I can -- usually there is, but I can't
4    tell you from looking at this if there was anybody there.
5        Q    Let's talk about the procedures that the board
6    of supervisors uses in connection with enacting ordinances.
7    Are you familiar with that?
8        A    I don't know what you want -- I don't know
9    what you mean.
10       Q    What I mean is the process, what process does
11   the board of supervisors use in connection with enacting an
12   ordinance?  What steps do they have to take?
13       A    I know it has to be advertised, okay.  It has
14   to be made available to the public.  That's all I know that
15   -- and it's got to be passed at a meeting and put down in
16   the minutes.
17       Q    I mean, I think you testified earlier in
18   connection with describing your duties as the secretary and
19   the treasurer that you keep all the business of the township
20   and that you basically keep track of all the things that the
21   township has to do and you said -- and the record will speak
22   for itself, but I think you described it to me as there are
23   a lot of things that you have to do, say to get grants or to
24   do this or to do that and you keep all that stuff organized
25   for the township supervisors; isn't that correct?

68

1        A    That is correct.
2        Q    So in connection with what the board of
3    supervisors has to do in enacting an ordinance, do you have
4    some sort of a file or something that helps you help them
5    make sure that they're doing what they're supposed to do in
6    enacting an ordinance?
7        A    No.
8        Q    Why is that?
9        A    We've only done these three ordinances and
10   they were taken care of by Larry Newton.
11       Q    So you weren't involved in it at all,
12   discussing --
13       A    I don't know what -- repeat the question.
14       Q    You weren't involved in saying, okay, now we
15   have to do this to make sure that we -- you know, do
16   whatever we have to do to get the ordinance enacted, you
17   weren't involved in that?
18       A    I talked to Larry Newton about it, yes, and I
19   think I talked to the county planner about it.
20       Q    Do you remember the substance of those
21   conversations?
22       A    I think I asked him for the routine we needed
23   to do and Larry took care of it.
24       Q    You asked Larry Newton for the routine that
25   you had to do?

69

1        A    Yes, and for the county -- and to the county
2    planner.
3        Q    And the county planner?
4        A    Um-hum.
5        Q    When you say the county planner, are you
6    referring to Richard Stahl?
7        A    Yes.
8        Q    What did Larry Newton tell you that you had to
9    do in connection with the ordinance?
10       A    You mean other than advertising the ordinance
11   and making it available?
12       Q    Right.
13       A    Just exactly what I told you before, that's
14   what he told us to do.
15       Q    Do you recall anything else, that's all I'm
16   asking you?
17       A    No.
18       Q    How many occasions did you talk to Larry
19   Newton about the enacting of a subdivision and land
20   development ordinance?
21       A    I have no idea.
22       Q    You can't remember?
23       A    No.
24       Q    Can you say you talked to him frequently or
25   infrequently?  Can you narrow it that way?

70

1　A　Probably infrequently.
2　Q　Over the course of how many years?
3　A　Over the course of how many years?
4　Q　Yes.
5　A　I don't know what you're asking.
6　Q　Well, I'm asking you how often you talked to
7　Larry Newton about the enactment of a subdivision and land
8　development ordinance and you said probably infrequently.
9　And I'm asking you infrequently over the course of how many
10　years?
11　A　Okay, probably in the beginning of -- I don't
12　know. I don't know how many times I talked to him.
13　Q　Did you have occasion to talk to Larry Newton
14　about the Corneal property?
15　A　Yes.
16　Q　Can you recall how many times you talked to
17　Larry Newton about the Corneal property?
18　A　No, I can't.
19　Q　Did you ask Larry Newton to give you some
20　guidance or advice about how to deal with the Corneal
21　property?
22　A　No.
23　Q　What did you talk to him about in connection
24　with the Corneal property?
25　A　I can't remember -- we talked to him about the

71

1　lawsuit, I know that.
2　Q　About this lawsuit you mean?
3　A　This lawsuit and the state lawsuit, the
4　lawsuit we initiated.
5　Q　Do you recall talking to him about the Corneal
6　property prior to the initiation of the lawsuit?
7　A　Yes, we did do that.
8　Q　Was Larry Newton generally aware of what was
9　going on with the Corneal property prior to the initiation
10　of the lawsuit?
11　A　I don't know. I can't answer that.
12　Q　Do you have reason to believe in your
13　interaction with Larry Newton that he knew generally what
14　was going on in connection with the Corneal property between
15　the Corneals and the township?
16　A　I don't really know whether Larry did or not.
17　Q　Well, let's try and just, you know, back up a
18　second and maybe we can jog your memory somehow. You
19　indicated that you know that you spoke with Larry Newton
20　prior to initiation of the lawsuits about the Corneal
21　property, correct?
22　A　Yes, we did.
23　Q　On what occasions? At township meetings?
24　A　No, he was not at the township meetings.
25　Q　On what occasions then?

72

1　A　It would have to be on the telephone.
2　Q　On the telephone between you and him?
3　A　Well, it could have been between me, it could
4　have been on the speaker phone with one of the supervisors.
5　You know, we've talked about things.
6　Q　You recall both occurrences?
7　A　Yes.
8　Q　Conference calls with the supervisors and
9　Larry and you and conversations separately between you and
10　Larry, correct?
11　A　I said supervisor.
12　Q　Supervisor. Which supervisor?
13　A　I don't know. I don't know if they were all
14　there. I'm just saying that's what I said. I don't know.
15　Q　Well, give me an idea of how you would come to
16　talk to Larry about the Corneal property? Would you call
17　him up?
18　A　Most of the time he called us because the
19　information went from Jim Himes to Larry and then through
20　Larry to us.
21　Q　Who is Jim Himes?
22　A　He was a -- I think it's Jim Himes. He was an
23　attorney that Mr. Corneal was using in Huntingdon.
24　Q　So you're saying that Larry would call you and
25　say I've spoken to Jim Himes and this is what I understand

73

1　to be going on with the Corneals?
2　A　No, what I'm saying is we got information from
3　Larry, like the first document we got came to Larry from --
4　I guess it -- I think it was either him or Simpson. I'm not
5　sure how it got to Larry.
6　Q　Who is Simpson, who are you referring to?
7　A　The surveyor I believe that did the original
8　survey.
9　Q　When you say the first document, what do you
10　mean the first document?
11　A　We had a land -- a plot plan.
12　Q　So that went to Larry and then came to you?
13　A　Yes, but I'm not sure how Larry got it.
14　Q　So prior to the lawsuit which was initiated
15　last summer, summer 2000, July 2000 --
16　　　　MR. CORNEAL: July.
17　BY MS. MONTGOMERY:
18　Q　Can you estimate how many times you talked to
19　Larry Newton about the Corneal property?
20　A　I don't recall.
21　Q　Was it more than twice?
22　A　Oh, I'm sure it was more than twice.
23　Q　Do you think it was more than 10 times?
24　A　I doubt it.
25　Q　Do you think it was more than five?

**WIRTH, ANN**
**05/16/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

74

1  A   I don't know.
2  Q   But you're sure it was more than two?
3  A   Yes. I talked to him more than twice.
4  Q   Do you recall what you talked to him about?
5  A   Not really. I've talked to Larry about a lot
6  of things with the township.
7  Q   Now, you mentioned that you remember being on
8  a conference call with Larry and at least one of the other
9  supervisors, one of the supervisors, correct?
10  A   Yes.
11  Q   Do you recall what you talked about to Larry
12  during that meeting or what anybody talked about to Larry
13  during that meeting?
14  A   I think that was after the lawsuit was served.
15  Q   Did you or the supervisors to your knowledge
16  initiate any separate meetings with Larry -- or have any
17  separate meetings with Larry, I should say. Have any
18  separate meetings with Larry to discuss the Corneal property
19  prior to the lawsuit?
20  A   Prior?
21  Q   Yes.
22  A   I can't -- I can't recall that either.
23  Q   Have you ever been at a township meeting where
24  Mr. Corneal was present?
25  A   Twice.

---

75

1  Q   Twice?
2  A   That I recall.
3  Q   You recall twice. Do you recall when those
4  times were?
5  A   I think it was February and April. It's in
6  the minutes.
7  Q   February and April of --
8  A   Or maybe it was February and March or January
9  and March.
10  Q   Of 2000?
11  A   Yes, it was either January and March or --
12  yeah, maybe that's when it was.
13  Q   Do you recall what happened at those meetings?
14  A   Yes.
15  Q   Can you tell me what happened at the February
16  -- let's start with the February meeting?
17  A   Was it February?
18      (Pause.)
19      THE WITNESS: In -- what's the date, February
20  -- February 7th when Mr. Corneal came and asked the
21  supervisors to sign his subdivision ordinance -- or his
22  subdivision -- I'm sorry, to sign his subdivision plan.
23  BY MS. MONTGOMERY:
24  Q   In February of 2000?
25  A   Correct.

---

76

1  Q   Do you recall what happened at that meeting?
2  A   Yes, they told him that there was a moratorium
3  and we wouldn't be signing -- approving any more
4  subdivisions.
5  Q   Do you recall any contact with Mr. Corneal
6  prior to that February meeting?
7  A   I really don't.
8  Q   You don't recall speaking with him?
9  A   No, I don't.
10  Q   Do you recall him being at any other meetings?
11  A   No.
12  Q   So let's talk a little bit more about that
13  meeting, okay. Mr. Corneal came in, who else was present?
14  A   The supervisors.
15  Q   Anybody else?
16  A   I don't -- there was people there, but I --
17  I'm sure. I don't know who they were.
18  Q   Do you recall how many people were there?
19  A   There's usually -- there's usually four, but I
20  can't swear who they were.
21  Q   Is it typically the same four people?
22  A   Yes.
23  Q   Who are they?
24  A   Denson Groenendaal. Rick Saunders, and I
25  can't swear to that because he was ill for a long time, but

---

77

1  he normally is there. And it's usually Barb Hawbaker and
2  Bet White, but I can't swear that any of those were there.
3  I don't know. And maybe Mike Koch.
4  Q   Mike Koch?
5  A   Maybe. I don't know.
6  Q   So those four individuals that you mentioned
7  earlier are usually there. Is Mike Koch sometimes usually
8  there or what?
9  A   Sometimes he's there, sometimes he's not.
10  Q   Anybody else there from time to time?
11  A   Mr. Corneal.
12  Q   Anybody else?
13  A   I can't remember.
14  Q   The four individuals that you named earlier
15  and Mr. Koch, have they been attending township meetings for
16  a long time?
17  A   Sometimes.
18  Q   Well, the question is a little different than
19  that. Is their attendance -- does their frequent
20  attendance, as I think you described it, go back several
21  years?
22  A   Yes.
23  Q   Does it go back all six years you've been with
24  the township?
25  A   No.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

78

1  Q    When did it start?
2  A    I don't remember when they started --
3  Q    Do you know why these particular people always
4  attend township meetings?
5  A    I would say because they're interested in
6  what's going on in the township.
7  Q    Are they the only people that attend township
8  meetings or are there others in addition to them from time
9  to time?
10  A    Sometimes there will be other people.
11  Q    Do you ever recall -- do you know who the
12  Hewetts are?
13  A    Yeah, I do.  I do know who the Hewetts are.
14  Q    Do you recall the Hewetts being at any
15  township meetings?
16  A    They might have been, I don't know.  They
17  might have been at that meeting.  I'm not sure.
18  Q    Do you recall them being at one meeting, more
19  than one meeting?
20  A    I remember that they were at -- they were
21  definitely in the April meeting.
22  Q    They were definitely in the April meeting?
23  A    I remember that.
24  Q    Why do you recall that?
25  A    Because that was the night that Mr. Corneal

79

1  said he was not subdividing and they were sitting there and
2  I remember that.  And they -- I don't know what ...
3  Q    That meeting that they were at, that April
4  meeting, do you recall who else was there?
5  A    No.  It could have been the same group.
6  Q    At the February 7, 2000 meeting you indicated
7  that Mr. Corneal presented his proposed subdivision plan to
8  the township supervisors, correct?
9  A    Right.
10  Q    What happened to the subdivision plan?  Did he
11  hand it to them?
12  A    No.
13  Q    He didn't hand it to them?
14  A    No.
15  Q    What did he do with it?
16  A    He took it with him.
17  Q    He never handed it over to any of the township
18  supervisors?
19        MR. SHERR:  Objection.  It's been asked and
20  answered.  You can answer.
21        MS. MONTGOMERY:  I want to make sure she
22  understands the question.
23        THE WITNESS:  They may have looked at it.  I'm
24  not sure.  I can't remember if they looked at it and -- but
25  we did not keep it.

80

1  BY MS. MONTGOMERY:
2  Q    Why not?
3  A    I don't know.  I don't remember what the -- I
4  just know what was here, okay, so -- but it never stayed
5  with the supervisors.  If they looked at it that night, I
6  don't remember that.
7  Q    Did they hand it back to him?
8  A    Yes, it never stayed with us.
9  Q    Did Mr. Corneal ask them to keep it, do you
10  know?
11  A    No, not that I'm aware of.
12  Q    What else happened at that February 7, 2000
13  meeting, if you recall?
14  A    Other than what's in the minutes?
15  Q    Well, anything that you recall.
16  A    I don't recall anything other than what's in
17  the minutes.
18  Q    Did the supervisors know that Mr. Corneal was
19  going to bring his subdivision plan into that meeting?
20  A    I don't know that either.
21  Q    Did you know?
22  A    I can't remember ever talking to Mr. Corneal
23  until this point.
24  Q    Do you recall talking to anybody else about
25  Mr. Corneal prior to that February 7th meeting?

81

1  A    No, I don't.
2  Q    Now, you had mentioned that there was -- you
3  keep an agenda, right?
4  A    Yes.
5  Q    Was Mr. Corneal's subdivision plan on the
6  agenda for that meeting?
7  A    I don't remember that, I don't.
8  Q    You mentioned earlier that you recall the
9  Hewetts being at the April meeting.
10  A    I do.
11  Q    Did you have occasion to talk to the Hewetts
12  before the meeting?
13  A    John Hewett called and asked if the meeting
14  was on that day and I -- you know, if we were having our
15  regular meeting and I said yes.
16  Q    So you knew they were going to be there?
17  A    He didn't -- well, I knew he called to ask
18  about the meeting, that's all I knew.
19  Q    I'm going to give you a document that we're
20  going to mark as Wirth Exhibit 5.  Let me give a copy to the
21  court reporter.
22        (Minutes dated 2/7/00 produced and marked as
23  Wirth Exhibit No. 5.)
24  BY MS. MONTGOMERY:
25  Q    I'd ask you to identify it for the record,

82

1  please.
2  A      It's the minutes from February 7th, 2000.
3  Q      Now, as you're looking at those minutes,
4  there's a reference to Denny Grandthal, is that --
5  A      Groenendaal.
6  Q      I'm sorry?
7  A      That's Denny Groenendaal.  I have it spelled
8  wrong here.
9  Q      Denny Groenendaal?
10  A      Right.
11  Q      Presented a copy of the concerns and opinions
12  of the taxpayer's associations on the proposed subdivision
13  ordinances, right?
14  A      Yes, he did.
15  Q      Do you have a copy of those concerns and
16  opinions?
17  A      Yes.
18  Q      Did you provide them in connection with your
19  search for documents for this lawsuit?
20  A      You didn't ask me for those.
21  Q      Well, I'll just ask you more generally.  Do
22  right?
23  A      Pardon?
24  Q      You do have a copy of them in your files,
25  right?

83

1  A      Yeah, I believe I did see those when I went
2  through the files.
3  Q      Do you recall anything about those concerns
4  and opinions?
5  A      No.
6  Q      So there was discussion at this February 7th
7  meeting about this proposed subdivision ordinance?
8  A      Obviously.
9  Q      You don't recall anything about it?
10  A      No, I don't, other than what's here.
11  Q      Now, at this February 7, 2000 meeting you
12  indicated that the township supervisors told David Corneal
13  that there was a moratorium in place, correct?
14  A      Yes.
15  Q      A moratorium on what?
16  A      Approving subdivisions.
17  Q      And when did that moratorium go into place?
18  A      At the January meeting.
19  Q      Was there some sort of a resolution or
20  something indicating that the moratorium was being placed?
21  A      No, it's only in the minutes.
22  Q      It's only in the minutes.  Was the moratorium
23  discussed at any earlier meetings?
24  A      I don't recall.
25  Q      But you do recall that there's no resolution

84

1  or other written document concerning the moratorium,
2  correct?
3  A      Yes, I do recall that.
4  Q      So do you recall -- I'm not sure if I asked
5  you this question and I apologize if I already did, but I'll
6  ask you again.  Do you recall when the moratorium was first
7  discussed at a township meeting?
8  A      The January meeting.
9  Q      That was the first time?
10  A      That's when it's in the minutes.  I don't
11  recall that it was discussed beforehand.
12  Q      You only missed one meeting, correct?
13  A      Yes.
14  Q      So if it was discussed, it would be in the
15  minutes, correct?
16  A      It should be.
17  Q      Now, was there any discussion about the
18  moratorium prior to the January meeting informally among the
19  supervisors and you?
20  A      I don't recall.
21  Q      Well, I'll just ask you more generally.  Do
22  you recall discussing the moratorium at any time other than
23  at the January meeting?
24  A      No.
25  Q      With anybody?

85

1  A      No.
2  Q      You didn't?
3  A      Well, I can't say anybody.
4  Q      Why is that, why can't you say anybody?
5  A      I don't know if I did.
6  Q      Because you just don't remember?
7  A      I just don't remember.
8  Q      Do you know what Mr. Corneal said at the
9  February meeting in response to the supervisors telling him
10  that there was a moratorium in place?
11  A      No.  Other than what's in my minutes, I don't
12  remember.
13  Q      If I tell you that Mr. Corneal told the
14  supervisors that the moratorium was illegal, does that jog
15  your memory at all?  Do you recall him --
16  A      I don't remember him saying that.
17  Q      You don't recall him saying anything --
18  A      Other than what I have in my minutes, I don't
19  recall.
20  Q      Now, you mentioned that at the April meeting
21  the Hewetts were present, correct, and that they -- that
22  John Hewett had called ahead of time and asked what was on
23  the agenda, correct?
24         MR. SHERR:  Objection.
25  BY MS. MONTGOMERY:

86

1    Q      What did you say?
2          MR. SHERR:  Objection.  It's been asked and
3    answered and you're misstating testimony now on the record,
4    misstating the witness's testimony.  You can answer it.
5          THE WITNESS:  What are you asking me?
6          MR. SHERR:  She's asking you what Hewett said
7    when he called up.
8          THE WITNESS:  He just wanted to know what was
9    on the agenda.
10   BY MS. MONTGOMERY:
11   Q      Like I said, I'm just laying a little
12   foundation so we can go back to that meeting, okay.  If ever
13   I mischaracterize anything you say earlier, you should
14   correct me because I don't want to do that, okay?
15   A      Okay.
16   Q      In the course of that conversation did you
17   have any -- you know, how long was that conversation with
18   John Hewett?
19   A      I don't remember.
20   Q      Do you know John Hewett's wife?
21   A      I don't know as he has a wife.
22   Q      Or his --
23   A      I don't know the situation there.  I don't
24   know.  I don't want to misstate that because I don't know.
25   Q      Well, we call them the Hewetts.

87

1    A      I probably did and that's probably like the
2    7th, I did that wrong, but I don't know that.
3    Q      Do you know the woman who keeps company with
4    John Hewett?
5    A      I've only ever seen her one time.
6    Q      Do you know her name, her first name?
7    A      Joanne Smith, I think it is.  Smith is her
8    last name.
9    Q      Joanne Smith, okay.  Did she come to the
10   meeting with John Hewett in April?
11   A      I think she was there that night.
12   Q      Did you have any discussions with the Hewetts
13   prior to the meeting other than the telephone call that he
14   placed to you?
15   A      No.
16   Q      No informal discussion, no chitchat?
17   A      No.
18   Q      What about after the meeting?
19   A      I think she came up to me and talked to me,
20   either she or -- or one of them did.  I think it was her.
21   Q      What did they talk about?
22   A      She introduced herself to me that night.
23   Q      Do you recall what they talked to you about?
24   A      They were asking -- they were asking how soon
25   we were going to pass the subdivision ordinance.

88

1    Q      Did they tell you why they were interested in
2    knowing how soon that you --
3    A      No.
4    Q      Did you understand why they wanted to know?
5    A      I don't know what you want me -- I don't know
6    what you're asking me.
7    Q      I'm asking you if you understood why they were
8    asking you about how soon you were going to pass the
9    subdivision ordinance?
10   A      I probably did.
11   Q      You probably did understand?
12   A      Yes.
13   Q      What was your understanding?
14   A      That they were going to move into the
15   neighborhood, you know, and they wanted to know about the
16   subdivision ordinance and when we were going to approve it.
17   Q      Do you know why they wanted to know that,
18   though?
19   A      No, I don't know that.
20   Q      Do you know where they were going to move?
21   A      Yes, in Mr. Corneal's farmhouse.
22   Q      Do you know how they were going to go about
23   moving into Mr. Corneal's farmhouse?
24   A      I have no idea.
25   Q      Do you know whether they were going to

89

1    purchase Mr. Corneal's --
2    A      I do know they were going to purchase it.
3    Q      Do you know if they were going to purchase the
4    farmhouse and anything else?
5    A      Yes, it was on the plot plan.  They were going
6    to purchase the farmhouse and some acreage.
7    Q      So in April 2000 you understood that that was
8    why they were asking about the subdivision ordinance?
9    A      Right.
10   Q      Do you recall any other aspects of that
11   conversation --
12   A      No.
13   Q      -- any more specifics?
14   A      No.
15   Q      Let me finish my question.  It's for her sake.
16   A      I'm sorry.
17   Q      Did they express any concern to you about
18   their purchase of Mr. Corneal's farmhouse?
19   A      Not that I recall.
20   Q      Did you notice whether or not they talked to
21   any of the supervisors?
22   A      They might have.  I don't know.  I'm usually
23   closing my books so I don't know.
24   Q      I'm going to show you a document that we're
25   going to mark as Wirth Exhibit 6.

Case 1:00-cv-01192-SHR   Document 119-2   Filed 04/18/2003   Page 48 of 100

90

1          (Minutes dated 1/4/00 produced and marked as
2     Wirth Exhibit No. 6.)
3     BY MS. MONTGOMERY:
4          Q     Do you recognize this document that we've
5     marked as Wirth Exhibit 6?
6          A     I do, but I don't recognize the writing that's
7     on the bottom.  I don't know where that came from.
8          Q     That was one of my questions for you, thank
9     you.  Now, am I correct in saying that this was the meeting
10    in which the moratorium was approved --
11         A     Yes, you are.
12         Q     -- or passed or a resolution --
13         A     Yes, you are.
14         Q     Do you have any documents in your office about
15    the moratorium that you didn't produce?
16         A     No.
17         Q     Do you know whether any documents exist
18    related to the moratorium?
19         A     No.
20         Q     You don't know?
21         A     No.
22         Q     Or they don't exist?  I'm just asking --
23         A     They don't -- this is it.
24         Q     They don't exist?
25         A     Right.

91

1          Q     So I notice here that the meeting opened at
2     7:10 p.m., correct?
3          A     No, there's another section to this.  You
4     don't have both sections.
5          Q     What is the other section?
6          A     It's the reorganizational meeting where we do
7     all the appointing of the supervisors and state what our tax
8     rates are going to be and all that and you don't have the
9     other section here.
10         Q     So was this the meeting -- the meeting started
11    at --
12         A     That started at seven and this one started at
13    7:10.
14         Q     Was the meeting started at seven open to the
15    public?
16         A     Always.
17         Q     Always, okay.  Do you have separate minutes
18    for that meeting?
19         A     Yes.
20         MR. SHERR:  And they have been provided.
21    BY MS. MONTGOMERY:
22         Q     So it looks like the regular meeting at which
23    the moratorium was discussed lasted from 7:10 to 7:35 p.m.,
24    correct?
25         A     Yes.

92

1          Q     Thank you.  Do you know whether they
2     advertised -- or did you advertise this particular meeting
3     on January 4, 2000 where the moratorium was discussed?
4          A     I didn't advertise it.
5          Q     Do you know whether anybody advertised it?
6          A     I'm not sure if Larry did or not.  I don't
7     know.
8          Q     Did you put one of those notices on the
9     township or -- it's the firehouse door, right?
10         A     Yes.
11         Q     Did you put one of these notices on the
12    firehouse door?
13         A     For what?
14         Q     About the fact that the moratorium was going
15    to be discussed.
16         A     Probably not.
17         Q     Did you talk to Mr. Newton about the
18    moratorium prior to this January meeting?
19         A     I probably did.
20         Q     You probably did?
21         A     Yes.
22         Q     Why do you think you probably did?
23         A     I would have wanted to know what to do.
24         Q     You would have wanted to know whether it was
25    okay to do the moratorium you mean?

93

1          A     I don't know what you're asking me.
2          Q     Well, you said you would have wanted to know
3     what to do.  I'm just trying to get a feel for -- what do
4     you mean?  You wanted to know what to do.  You wanted to
5     know whether to advertise it or was it okay to do the
6     moratorium or what?
7          A     I don't know if I would have asked him about
8     the advertisement.  I don't know if I would have done that,
9     but I probably would have asked him about this, if it was
10    all right to put it in the minutes.
11         Q     If it was okay to put the existence of the
12    moratorium in the minutes?
13         A     Yes.
14         Q     Would you have asked him whether it was okay
15    to impose the moratorium?
16         A     I'm not sure I asked him that.
17         Q     You don't recall?
18         A     No.
19         Q     You had mentioned earlier that you did
20    research for the supervisors?
21         A     Sometimes.
22         Q     What kind of research?
23         A     I would ask questions about -- well, I call to
24    see what stone rates are and all those kind of things.
25         Q     You call and find out what procedures you have

**94**

1  to follow? I mean --
2  A    Sometimes.
3  Q    Do you call Larry Newton to find out what
4  procedures you would have to follow?
5  A    If they ask me to.
6  Q    Have you done that in connection with the
7  subdivision and land development ordinance?
8  A    Some things, some parts of it.
9  Q    You've called Larry Newton and asked is this
10 okay or is that okay?
11 A    I'm not sure I've talked to Larry Newton about
12 everything.  I've talked to PSATS, you know.
13 Q    So that's the kind of research you do for the
14 township, just --
15 A    Yes.
16 Q    Anything?  Is it just a broad range of
17 research that you do?
18 A    When it's needed I do that.
19 Q    Do you know whether the supervisors talked to
20 Larry Newton about the moratorium?
21 A    You'll have to ask them.
22 Q    Was Larry Newton present at the meeting?
23 A    No.
24 Q    Why do you recall that?
25 A    Because Larry never comes to the meeting

**95**

1  unless I request him.
2  Q    And you didn't request him to come to this
3  meeting?
4  A    No.
5  Q    I'm just going to try, you know, and ask you
6  some questions just so you can try and remember a little bit
7  more about discussing the moratorium.  Maybe it won't work,
8  maybe it will work, but I just want to try to get as much
9  factual information as I can so we can understand the
10 moratorium.
11       Is there anybody else that you recall asking
12 about the moratorium prior to the day it was passed?
13 A    Like who?
14 Q    I'm asking you, anybody.
15 A    I don't remember anybody asking me about the
16 moratorium.
17 Q    Did you discuss it with the township
18 supervisors?
19 A    We would have discussed it, yes.
20 Q    In what capacity, in what context?
21 A    I don't know.
22 Q    You mean over the telephone?
23 A    I don't remember if we would have talked about
24 it over the telephone or at the meeting.  I'm sure we've
25 discussed it.  I just don't remember when.

**96**

1  Q    Well, there's no -- if you had discussed it at
2  prior township meetings, it would be reflected in the --
3  A    It would be in the minutes.
4  Q    Right.  So if it's not in the minutes, it
5  wasn't discussed, right?
6  A    Right.
7  Q    Now, I just want to ask you, do you recall who
8  first brought up the idea of the moratorium?
9  A    I don't.
10 Q    You don't know whose idea it was?
11 A    No.
12 Q    Was there one particular supervisor who was --
13 in your memory who was a proponent of the moratorium more
14 than any other supervisor?
15 A    No, I cannot remember anybody being that.
16 Q    Now, do you recall any specifics about
17 discussions of the moratorium at the January meeting?
18 A    Other than what's in my minutes?
19 Q    Yes.
20 A    No.
21 Q    Do you recall who else was present at the
22 January meeting?
23 A    All the supervisors.
24 Q    Anybody else?
25 A    Me.  I'm not sure about Dave Van Dommelen.  I

**97**

1  don't know.  I don't know.
2  Q    Do you recall whether there was any member of
3  the public present?
4  A    I don't know if Mr. Corneal was there or not.
5  I don't know.  I guess it says he was, right?  No, he wasn't
6  at the January meeting.  It doesn't say that.  I don't know.
7  Q    In your minutes it indicates that -- in the
8  minutes of your January 4 meeting, which I guess is
9  Exhibit 6, it states that the supervisors stated that no
10 more subdivisions will be approved.  Do you know which
11 supervisor said that?  I mean, they didn't say that in
12 unison, right?  One supervisor reported that, correct?
13 A    I don't -- that is just that they all agreed
14 on it.  They all agreed.  So no one in particular, they just
15 all agreed, and that's what I wrote down there.
16 Q    So it's just a summary of what they stated?
17 A    Right.
18 Q    At the township meetings does one supervisor
19 sort of take the lead or, you know, act as the chair of the
20 meetings or anything like that?
21 A    There is a chair.
22 Q    And who is that?
23 A    In 2000 it was Ralph Weiler.
24 Q    So does he sort of lead the agenda?  Does he
25 announce the items on the agenda for discussion or do you do

98

1 that?
2 A He does that.
3 Q What's his role as chairman exactly? What all
4 does he do?
5 A He leads the meeting.
6 Q When he leads the meeting -- so he says now
7 we're going to talk about X and now we're going to talk
8 about Y?
9 A Yeah.
10 Q Do you recall him doing that that night?
11 A No.
12 Q In your minutes it also refers to as soon as
13 we get the review from the planning commission. What are
14 you talking about, the review from the planning commission?
15 Do you recall?
16 A The review from the planning commission would
17 be one of the reviews from -- for the subdivision packet
18 that we had put together.
19 Q You had put together a packet?
20 A Yes.
21 Q Did the packet include anything about the
22 moratorium?
23 A I don't recall.
24 Q It says that the supervisors state that no
25 more subdivisions will be approved. Was it put to a formal

99

1 vote or anything?
2 A I don't recall whether they passed a motion or
3 -- that's what I wrote down.
4 Q You don't recall whether they said all in
5 favor say aye?
6 A This is what I wrote and this is what I can
7 testify to.
8 Q Typically when they do something like this, do
9 they do it sort of like all in favor say aye, all in favor
10 say no and --
11 A Yes, they typically do. And I did not write
12 that down.
13 Q If you didn't write it down, does that mean it
14 didn't happen?
15 A No.
16 Q Now, there's another sentence in here that
17 says that the county is now doing the boiler plate
18 subdivision ordinance in these minutes.
19 A Yes, they are.
20 Q But Jackson Township had already put a lot of
21 time into the purpose -- do you mean proposed?
22 A Yes.
23 Q Proposed ordinance. What do you mean by a lot
24 of time?
25 A Two years.

100

1 Q What did you do in that two years?
2 A We got subdivision ordinances from different
3 areas and looked to see what we felt was unique to Jackson
4 Township because we are a unique area there. And we took
5 pieces from this subdivision and that subdivision and we put
6 them together to meet the needs of our township.
7 Q Who did that work?
8 A The supervisors.
9 Q Did you help?
10 A Yes, I read a lot of subdivision ordinances.
11 Q So did you have discussions with them over the
12 telephone about I like this -- part of this subdivision
13 ordinance and not that part of that other subdivision
14 ordinance?
15 A Whether I liked something or not?
16 Q Whether you thought it would work for Jackson
17 Township or not.
18 A That's not my decision.
19 Q You read a lot of subdivision ordinances,
20 though?
21 A Yes, I did.
22 Q Do you recall what subdivision ordinances you
23 read?
24 A We had -- we had one from Porter Township, we
25 had one from Miller Township, we had one from -- our

101

1 engineer gave us kind of a boiler plate one. We had one
2 from Tell Township and there was one from Lancaster County.
3 Q Who is your engineer?
4 A At the time it was EADS.
5 Q How do you spell that?
6 A E-A-D-S, all caps.
7 Q So why were you the one reading the
8 ordinances?
9 A We all were reading them.
10 Q All the township supervisors and you were
11 reading them?
12 A Yes.
13 Q And then you would discuss them?
14 A Yes.
15 Q What, would you hold special meetings to
16 discuss them or telephone conference calls or what?
17 A We had workshops to gather information on
18 them.
19 Q Were they informal workshops --
20 A Yes.
21 Q -- that the group of you just all got
22 together?
23 A Yes.
24 Q Where did you get together?
25 A Usually in my office.

**102**

1    Q      So do you have records of all those meetings
2  that you held?
3    A      No, they're not -- they were just workshops
4  for gathering information.
5    Q      Did you keep notes at those meetings or
6  anything?
7    A      The only notes I would have had I would have
8  written alongside of whatever we did and ...
9    Q      I'm going to show you another document that
10  I'm going to mark as Wirth Exhibit 7, the April 3, 2000
11  minutes of the Jackson Township supervisor meeting.
12         (Minutes dated 4/3/00 produced and marked as
13  Wirth Exhibit No. 7.)
14  BY MS. MONTGOMERY:
15    Q      Now, can you review these minutes for me?
16    A      Sure.
17    Q      Can you identify them for the record?
18    A      Yes, April 3rd, 2000 minutes, Jackson Township
19  Board of Supervisors.
20    Q      Now, take a moment and review them and see if
21  it helps you remember what went on at the meeting that
22  night. Now, this April 3rd meeting, is this the meeting
23  that the Hewetts were present at, correct?
24    A      Yes.
25    Q      Who else was present?

**103**

1    A      Well, I can see here Art Walters was there,
2  David Corneal and I don't -- I remember Denson Groenendaal
3  was there that night.
4    Q      And why do you remember that?
5    A      Because he spoke to Mr. Corneal that night.
6    Q      He spoke to him in the course of the meeting?
7    A      No, I think it was after.
8    Q      So you overheard that conversation?
9    A      No, I just saw them talking and I remembered
10  that. I don't know why.
11    Q      Anything else you remember about the meeting?
12    A      No.
13    Q      Now, these meetings would indicate that Mr.
14  Corneal at the April meeting discussed his sewage module,
15  right?
16    A      Yes, he did.
17    Q      Do you know whether this was the first time
18  Mr. Corneal ever came to a meeting and discussed his sewage
19  module?
20    A      To the best of my knowledge.
21    Q      To the best of your knowledge it was?
22    A      Um-hum.
23    Q      Your minutes indicate that he complained that
24  the supervisors would not sign his sewage modules; is that
25  right?

**104**

1    A      That's right.
2    Q      What did the supervisors respond to him in
3  response to that complaint?
4    A      Just what I have here.
5    Q      Well, try and remember what they said to him,
6  if you can.
7    A      That they couldn't approve the septic modules,
8  the sewage module.
9    Q      Now, your minutes indicate that they said that
10  even though he told them that he was not going to subdivide,
11  okay, that they still wouldn't issue him a building permit
12  or approve the sewage module; isn't that correct?
13    A      Let me see what it says here. What's in my
14  minutes is what happened.
15    Q      Okay, that's fair. Your minutes indicate that
16  they said they are not going to issue a building permit for
17  a property that they know is going to be subdivided. How
18  did they know it was going to be subdivided?
19    A      Because at a prior meeting he -- he had a plot
20  plan in his hand, and I guess that was the February meeting.
21    Q      So was there a discussion between the February
22  meeting and the April meeting about Mr. Corneal's desire to
23  subdivide?
24    A      Discussion with who?
25    Q      With you and the supervisors.

**105**

1    A      Not that I'm aware of.
2    Q      During this period of time were you still
3  meeting to discuss the subdivision ordinance, the proposed
4  subdivision ordinance?
5    A      It was probably being typed then so I doubt --
6  I don't know.
7    Q      How many times did you and the supervisors
8  have workshops to discuss the subdivision ordinance?
9    A      I have no idea.
10    Q      You can't remember at all?
11    A      No. It went on over a long period of time.
12    Q      Do you recall speaking yourself at the April
13  meeting?
14    A      I probably did.
15    Q      You probably did?
16    A      (Witness nods head affirmatively.)
17    Q      Do you usually speak at the meetings?
18    A      Sometimes.
19    Q      Now, I know that you said that you don't have
20  a vote, correct?
21    A      I do not have a vote.
22    Q      But you do speak at the meetings about
23  township business?
24    A      Sometimes.
25    Q      And you offer your opinions about township

106

1   business?
2   A   Sometimes.
3   Q   Do you recall speaking at this meeting?
4   A   No.
5   Q   You don't recall anything? Do you recall
6   telling Mr. -- she shook her head. It should say no.
7   A   I didn't think you were done yet.
8       MR. SHERR: And it shouldn't say no if she
9   didn't say no.
10      MS. THORP: Can we go off the record for one
11  moment?
12      MS. MONTGOMERY: Yes.
13      (Discussion held off the record.)
14  BY MS. MONTGOMERY:
15  Q   At the April meeting do you recall speaking
16  directly to Mr. Corneal about his sewage modules or about
17  his proposed subdivision?
18  A   I might have. I don't remember.
19  Q   Well, do you have an opinion about whether or
20  not Mr. Corneal can build on his property even if he doesn't
21  subdivide?
22  A   No.
23  Q   You don't have an opinion about that?
24  A   No.
25  Q   Do you have an opinion about whether or not

107

1   Mr. Corneal can build a second property -- a second house,
2   dwelling, on his property?
3   A   I don't have an opinion, no.
4   Q   Do you have a belief about whether or not he
5   can do it?
6   A   No.
7   Q   Did you ever express an opinion or a belief
8   about whether or not he could do it?
9   A   I don't recall.
10  Q   Do you have an opinion about whether or not
11  building a second dwelling on the property turns it into a
12  subdivision?
13  A   I don't have an opinion, no.
14  Q   Do you have a belief about it?
15  A   No.
16  Q   Have you ever expressed anything about it?
17  A   I might have.
18  Q   What makes you think you might have?
19  A   Because of what's in the Sewage Facility Act.
20  Q   What's in the Sewage Facility Act?
21  A   That if there's more than one dwelling on a
22  property, it constitutes an equivalent subdivision. And I
23  may have said that, I don't know.
24  Q   You may have said that when?
25  A   I don't know. You asked me if I had a belief

108

1   or I had an understanding and that's what I understand.
2   Q   And I don't want to use the wrong word. If I
3   say an opinion or a belief and you want to call it something
4   else like an understanding, then you should just tell me
5   that because I'm just trying to --
6       MR. SHERR: No, you should answer her
7   questions.
8   BY MS. MONTGOMERY:
9   Q   And if you don't understand my question
10  correctly and you could answer if it was better stated, you
11  should tell me that, okay?
12      MR. SHERR: If you don't understand her
13  question, ask her to clarify.
14      THE WITNESS: All right.
15  BY MS. MONTGOMERY:
16  Q   So I've asked you some questions about whether
17  or not you have a belief about certain things so I'm going
18  to back up and ask you if you have an understanding about
19  certain things, okay?
20  A   I have an understanding.
21  Q   You have an understanding --
22      MR. SHERR: Let her ask the questions.
23  BY MS. MONTGOMERY:
24  Q   You just said you have an understanding. What
25  do you have an understanding about?

109

1   A   You have to ask me the question again.
2   Q   Okay. Do you have an understanding as to
3   whether or not Mr. Corneal can build an additional house on
4   his property?
5   A   I do.
6   Q   And what is your understanding?
7   A   From the Sewage Facility Act, if there's more
8   than one property on an existing plot of ground, it's an
9   equivalent subdivision.
10  Q   Well, then do you have an understanding as to
11  whether or not Mr. Corneal can subdivide his property?
12  A   Anybody can subdivide their property.
13  Q   Did you ever discuss this equivalent
14  subdivision idea with Larry Newton?
15  A   I don't understand what you're asking me.
16  Q   Did you ever discuss your understanding of
17  what constitutes an equivalent subdivision with Larry
18  Newton?
19  A   I don't recall.
20  Q   Did you ever discuss it with the township
21  supervisors?
22  A   I probably did.
23  Q   And what makes you think you probably did?
24  A   Because the subject comes up by land owners so
25  we probably did.

110

1     MS. MONTGOMERY: I think we need to take a
2  break for a minute.
3     (Luncheon recess taken.)
4     MR. SHERR: Counsel for plaintiff has asked me
5  to repeat my statement yesterday with respect to the
6  30(b)(6) notice. The 30(b)(6) notice stated the subject
7  matter as all persons who -- or a person who has knowledge
8  or information regarding matters relating to the defense of
9  this claim.
10     In that that designation did not reasonably --
11  with reasonable particularity state the matters on which
12  these admonitions are requested, we were objecting to that
13  designation and to the extent that -- to the extent of the
14  broadness of that designation, for the time being and
15  subject to that objection, we are designating all of these
16  witnesses as those who have knowledge of the matter or the
17  defense.
18     MS. MONTGOMERY: For the record, I did not ask
19  Mr. Sherr to repeat his statement on the record. I asked
20  him to tell me off the record are all the witnesses 30(b)(6)
21  witnesses because that's what he indicated yesterday. I was
22  asking if he was sticking with that position and I believe
23  that what you said is yes, all the witnesses are 30(b)(6)
24  witnesses; is that correct?
25     MR. SHERR: I've made my statement.

111

1     MS. MONTGOMERY: It's a simple yes or no
2  question.
3     MR. SHERR: Okay.
4     MS. MONTGOMERY: Okay, is this witness a
5  30(b)(6) witness?
6     MR. SHERR: I've made my statement.
7     MS. MONTGOMERY: Is this witness a 30(b)(6)
8  witness, Tony? It's not a game. Is this witness a 30(b)(6)
9  witness?
10     MR. SHERR: I'm not playing a game. I've made
11  my statement. If you would like to -- if you would like to
12  make a note of a particular designation, then I will tell
13  you particularly, but I can't do that based on the broadness
14  of the designation. So, therefore, I'm sticking by my
15  statement.
16     MS. MONTGOMERY: Are you sticking by the
17  statement that you put on the record yesterday morning?
18     MR. SHERR: Sure.
19     MS. MONTGOMERY: Okay, fine. Thank you.
20  BY MS. MONTGOMERY:
21     Q     You're still under oath. Miss Wirth, I'm
22  going to show you a document that was previously marked
23  yesterday and we're going to mark it again today
24  as Wirth Exhibit 8 and I'm going to ask you to look at it
25  for me, please.

112

1     (Order produced and marked as Wirth Exhibit
2  No. 8.)
3  BY MS. MONTGOMERY:
4     Q     Miss Wirth, have you seen this document
5  before?
6     A     No.
7     Q     Miss Wirth, were you informed by anybody that
8  the witnesses in this case were to be sequestered for
9  purposes of their deposition testimony?
10     A     Yesterday I was.
11     Q     Yesterday you were informed by who?
12     A     You.
13     Q     Do you know what sequestration means?
14     A     We were not allowed to be in the room.
15     Q     Are you aware that you're not supposed to be
16  in the room with the other deponents?
17     A     I am now, yeah.
18     Q     Well, I shouldn't say that. You're not
19  supposed to be in the room with the other deponents while
20  they're being -- while they're giving testimony, correct?
21     A     Yes.
22     Q     Have you discussed your deposition testimony
23  with anybody since this morning?
24     A     No.
25     Q     Have you discussed anybody else's deposition

113.

1  testimony with anybody since yesterday?
2     A     No.
3     Q     Do you understand that you're not supposed to
4  discuss your deposition testimony with any of the other
5  deponents?
6     A     Yes.
7     Q     Until all the depositions are finished?
8     A     Yes.
9     Q     Have you complied with that?
10     A     Yes.
11     Q     Have you been in a room with any of the other
12  deponents in a situation where you could discuss your
13  deposition testimony since this order was entered yesterday?
14     A     In a room, no.
15     Q     In any situation?
16     A     Yes.
17     Q     What was that situation?
18     A     It was in a car.
19     Q     Who did you have lunch with?
20     A     Tom Wilson.
21     Q     Did you discuss your deposition testimony with
22  Mr. Wilson?
23     A     No.
24     Q     You had lunch with Tom Wilson today, though,
25  right?

**114**

1   A    Yes.
2   Q    Was anybody else present?
3   A    No.
4   Q    Thank you. I'm going to show you a document
5   that we will now mark as Wirth Exhibit 9 and ask you to look
6   at it and identify it for me, if you can.
7        MS. MONTGOMERY: Tony, do you have another
8   copy of this document?
9        (Discussion held off the record.)
10       (Subdivisions reviewed by HCPC produced and
11  marked as Wirth Exhibit No. 9.)
12  BY MS. MONTGOMERY:
13   Q    Did you have occasion to discuss with any of
14  the supervisors or the sewage enforcement officer, Mr.
15  Parks, bringing documents to their depositions? And I'm
16  talking about before the order was entered yesterday.
17   A    **Bringing documents down?**
18   Q    To the deposition.
19   A    No.
20   Q    Did you tell anybody not to bring documents to
21  the deposition?
22   A    **No, I did not.**
23   Q    Did anybody tell you not to bring documents to
24  the deposition?
25   A    **No.**

**115**

1    Q    Then just to make sure that I've asked the
2   questions as clearly as possible, did you discuss with the
3   supervisors whether or not you ought to bring any documents
4   to the deposition?
5    A    **I honestly don't think we ever did.**
6    Q    What's the box number that you receive
7   township mail at?
8    A    **389-A.**
9    Q    And your home box number?
10   A    **390.**
11   Q    We're back with Wirth Exhibit 9. Have you had
12  a moment to look at that?
13   A    **Yes.**
14   Q    Do you recognize the document?
15   A    **Yes, I do.**
16   Q    Did you prepare it?
17   A    **No, I did not.**
18   Q    Do you know whose handwriting that is?
19   A    **I have no idea whose handwriting it is.**
20   Q    Do you know who prepared it?
21   A    **I know where it came from.**
22   Q    Where did it come from?
23   A    **Huntingdon County Planning Commission.**
24   Q    And did it come from the commission in
25  response to a request from you?

**116**

1    A    **Yes, it did.**
2    Q    So you put the request into whom, Richard
3   Stahl?
4    A    **Yes, I did.**
5    Q    How did you receive this document?
6    A    **Just the way it is.**
7    Q    Was it by fax?
8    A    **By fax to me.**
9    Q    From the Huntingdon County Planning
10  Commission?
11   A    **Yes.**
12   Q    When did you receive it?
13   A    **Today is -- Monday or Tuesday, one or the**
14  **other.**
15   Q    Just this Monday or Tuesday?
16   A    **Yes.**
17   Q    When did you --
18   A    **It must have been Tuesday, right. I think. I**
19  **don't know.**
20   Q    So exactly what did you ask for from Richard
21  Stahl that resulted in his production -- did he send you
22  this document?
23   A    **Yes.**
24   Q    Under a fax sheet from him?
25   A    **Yes.**

**117**

1    Q    So we don't know whether this is his
2   handwriting or not, do we?
3    A    **No.**
4    Q    Do you assume that he's actually the one who
5   put this together, though?
6    A    **I'm assuming that somebody in his office keeps**
7   **this -- this is out of a book, I believe, out of a --**
8    Q    Okay. So you don't think that this document
9   was put together just for purposes of your request but
10  rather it was an existing document?
11   A    **I assume that it's an existing document.**
12   Q    From the Huntingdon County Planning Commission
13  offices?
14   A    **Right.**
15   Q    Exactly what did you ask for from Mr. Stahl
16  that led him to give you this document?
17   A    **I asked him for a list of all subdivisions,**
18  **minor and major, that we have sent to him and when we**
19  **started to do it.**
20   Q    Did you ask him when did we start to do it?
21   A    **Yes.**
22   Q    And what did he tell you?
23   A    **He said as -- he's been there since 1980 and**
24  **they've been doing it ever since.**
25   Q    Been sending all subdivisions to Huntingdon

118

1  County for their review?
2  A    Review, right.
3  Q    What is your understanding with respect to
4  Huntingdon County's review of proposed subdivisions in
5  Jackson Township?
6  A    What is my understanding?
7  Q    Yes.
8  A    I don't know what you mean.
9  Q    How much knowledge do you have about
10 Huntingdon County Planning Commission's review of proposed
11 subdivisions that you send to the county, to the commission?
12 A    I have no idea what they do.
13 Q    You have no idea what they do?
14 A    No, I've never been in the office to see what
15 they do.
16 Q    Are you the one that sends the subdivisions?
17 A    No.
18 Q    I mean subdivision plans.
19 A    No, I do not.
20 Q    Who sends them?
21 A    The individuals take them in there. The
22 people that are asking for the subdivision, they take them
23 to Richard.
24 Q    Who tells them to take them to Richard?
25 A    The township does.

120

1  Q    Had you ever seen this document before --
2  A    No, I had not.
3  Q    -- before you received it from Mr. Stahl's
4  office?
5  A    No.
6  Q    When did you ask the planning commission to
7  send you this document?
8  A    When I was putting together the list of
9  documents that you wanted for -- I thought it would be
10 helpful.
11 Q    And when was that?
12 A    Last week.
13 Q    Now, these are all Jackson Township
14 subdivisions, correct?
15 A    Yes.
16 Q    The ones that are listed on here. Okay, let's
17 go through this list. Do you understand this list?
18 A    Yes.
19 Q    Do you understand the various categories on
20 it?
21 A    Yes.
22 Q    So the 10/1/90 date in the left-hand corner,
23 the first entry there --
24 A    Yes.
25 Q    -- does that refer to the date that the

119

1  Q    Who in the township tells them?
2  A    The supervisors or me.
3  Q    Are you generally aware of every subdivision
4  plan that goes to the commission?
5  A    Generally.
6  Q    Do you believe that you're aware of every
7  subdivision plan that's come into the township since you've
8  been there?
9  A    Generally.
10 Q    Do you believe that you know whether or not
11 every subdivision plan has been sent to the county since
12 you've been there?
13 A    Yes.
14 Q    You think every one has?
15 A    To the best of --
16        MR. SHERR: Object to the form of the
17 question, asking this witness about other people's
18 knowledge. You can answer.
19        THE WITNESS: Yes.
20        MS. MONTGOMERY: No, I asked her what she
21 knows.
22 BY MS. MONTGOMERY:
23 Q    I'm asking you what you know. Do you believe
24 that every one has been sent?
25 A    To the best of my knowledge.

121

1  subdivision was approved or what?
2  A    I don't know. I said I understand that. I
3  understand the information that's on here, but I don't know
4  why it says 10/1/90 there. I don't know if it's the date
5  they received it or the date they reviewed it. That I don't
6  know.
7  Q    Are these all requested subdivision plans or
8  are some approved, some not approved and is it just all the
9  subdivision plans that have been submitted; is that what
10 this is?
11 A    Yes.
12 Q    To the commission?
13 A    Yes.
14 Q    Did you actually go down this list and read it
15 at any time?
16 A    I've looked at it.
17 Q    In looking at it, do you know whether there
18 are any subdivision plans that have been submitted to
19 Jackson Township that aren't on this list?
20 A    Not to the best of my knowledge.
21 Q    Do you keep your own list of subdivision
22 plans?
23 A    No, I do not.
24 Q    Well, do you keep your own file on subdivision
25 -- proposed subdivisions --

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

122

1   A   Yes.
2   Q   -- submitted -- can I finish, please.
3   A   I'm sorry.
4   Q   Submitted to Jackson Township.
5   A   Yes, I do.
6   Q   In what form do you keep that file?
7   A   Just the way it comes to me.
8   Q   Do you keep a separate folder for each one?
9   A   No.
10  Q   Something like that?
11  A   No, they're all in a drawer.
12  Q   Just all in one big drawer?
13  A   Right.
14  Q   Are they organized by date?
15  A   They are.
16  Q   That's how they're organized. They're not
17  organized by alphabetical order or anything?
18  A   No, by date.
19  Q   By date, okay. Typically what does a
20  subdivision plan look like?
21  A   It's a plot plan similar to what we have here.
22  Q   Is there any sort of front page application or
23  anything like that?
24  A   There's usually an application. There's a
25  project narrative, there's septic information, there's a

123

1   topo area either on or attached to it.
2   Q   If there's an application, is there like a
3   state form application or something that they fill out that
4   is sort of a cover application for all of these --
5   A   There is now.
6   Q   There is now?
7   A   It's not a state form.
8   Q   What is it?
9   A   It's in the subdivision ordinance.
10  Q   It's in the Jackson --
11  A   It's the application for subdivision.
12  Q   Well, let me ask you this: In the Jackson
13  Township subdivision ordinance there's an application?
14  A   Correct.
15  Q   Prior to the application was there some sort
16  of a form, initial form that people filled out in submitting
17  a proposed subdivision?
18  A   No.
19  Q   Was there any sort of a cover sheet or
20  anything like that that would identify it or --
21  A   Whatever the engineer had on there that came
22  to us is what we had.
23  Q   Now, I take it that the form has been in place
24  since July 2000?
25  A   Yes.

124

1   Q   Have you received any subdivision -- proposed
2   subdivisions that utilize that form?
3   A   Yes, and they're the ones that are on this
4   list.
5   Q   Since July 2000?
6   A   Yes.
7   Q   So that would be six of them --
8   A   Yes.
9   Q   -- correct? So they all have front pages that
10  you could produce to us just the front page, right?
11  A   Yes.
12  Q   Now, when Jackson Township approves a
13  subdivision, is there any sort of separate form that you
14  guys have come up with that indicates approval?
15  A   We sign on the form, on the plot plan.
16  Q   Now, I think, you know, we've heard testimony
17  in this case -- I'll represent to you that we've heard
18  testimony in this case that there were certain proposed
19  subdivisions that had been submitted at the time that the
20  township put its moratorium in place; is that correct?
21  A   Yes.
22  Q   Do you recall which --
23  A   Yes.
24  Q   -- those were? Which ones?
25  A   Glenn Hawbaker and Norman Davis, Harold and

125

1   Norman Davis.
2   Q   Glenn Hawbaker?
3   A   Yeah, Glenn O. Hawbaker and Carolyn McGraw and
4   then Norman and Harold Davis.
5   Q   So what happened to those proposed
6   subdivisions during the period of time that the moratorium
7   was in place?
8   A   Nothing.
9   Q   What did you do with the actual documents that
10  were submitted to you?
11  A   They -- they never submitted them. They came
12  to us and asked us if they could do it and we told them we
13  weren't submitting them and they have -- they kept their
14  documents till July.
15  Q   And then they resubmitted them to you?
16  A   Yes, they did.
17  Q   And then they submitted them also to the
18  Huntingdon County Planning Commission?
19  A   Yes. I don't know whether they submitted them
20  before that to the county. I don't know when they did that.
21  Q   What about the ones that are after the Davis
22  application? I can't really read that writing. Do you
23  recognize that?
24  A   That's Keller.
25  Q   Was that subdivision first proposed after --

**WIRTH, ANN**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

126

1    A    No.
2    Q    -- the ordinance was in place?
3    A    No, it was -- I'm sorry.  Repeat your
4    question.
5    Q    Was that subdivision first proposed after the
6    ordinance was in place?
7    A    Yes.
8    Q    Do you recall, is 9/27/00 when it was first--
9    A    I don't recall if that's the exact date, but
10   it's around that time.
11   Q    What's the next one say?  David Simpson?
12   A    Oh, yeah, David Simpson.
13   Q    And the following one is Overhill, LLC?
14   A    Yes.
15   Q    And the following one is Darlene --
16   A    Sunderland.
17   Q    Sunderland.  Now, have each of these proposed
18   subdivisions been sent to the Huntingdon County Planning
19   Commission?
20   A    Yes, they have.
21   Q    Have they each been approved?
22   A    Yes.
23   Q    All of them?
24   A    Yes.
25   Q    We have one right before this Corneal entry.

127

1    It says --
2    A    Lelia Isett.
3    Q    Lelia Isett?
4    A    Um-hum.
5    Q    Was that subdivision plan approved?
6    A    Yes.
7    Q    What about -- what does that say, Jordan
8    Conrad?
9    A    Yes.
10   Q    Was that approved?
11   A    Yes.
12   Q    Going backwards now, Jos E. and Pauline Baker,
13   was that approved?
14   A    That one was submitted twice.
15   Q    Why was it submitted twice?
16   A    It was just what they did.  They were going to
17   build and then they didn't and then they did.
18   Q    Was it approved?
19   A    Yes.
20   Q    How about this Kenwood subdivision?
21   A    Yes.
22   Q    Was that approved?
23   A    Yes.
24   Q    The Koch -- oh, is that the Koch?
25   A    Yeah, Koch.

128

1    Q    Koch subdivision, was that approved?
2    A    Yes.
3    Q    If you look down over this list of
4    subdivisions on the first page of this document, starting
5    with the Kenneth Miller, Kenwood Development and ending with
6    the one on the bottom -- I can't read that.
7    A    Greenwood Furnace.
8    Q    Were all of these subdivisions approved to
9    your knowledge?
10   A    Yes.
11   Q    Were any of them disapproved at any time to
12   your knowledge?
13   A    I don't -- I don't remember.
14   Q    I mean, was there any initial disapproval and
15   then a later approval?
16   A    There could be initial disapproval of all
17   these.
18   Q    But you don't know whether any of them were or
19   you do know?
20   A    I do know.  There's a couple here.
21   Q    Which?
22   A    Sunderland.
23   Q    That's on the back page, the last one?
24   A    Yeah, I do know that.
25   Q    And why was that one initially disapproved?

129

1    A    It wasn't drawn to scale.  And I think --
2    you're going to have to ask Tom that, but I think it had
3    something to do too with there was a bridge over a stream on
4    the property and it had something to do with that bridge and
5    the stream.  And I don't remember what it was, but I know
6    that was one that he did what he had to do and came back.
7    Q    Now, on the Sunderland property, that's 85
8    acres, 85 plus acres divided --
9    A    Oh, I'm sorry.  It was Simpson, is the one I
10   was talking about with the bridge.
11   Q    Okay.  Well, let's look.  On the Simpson
12   property it's 107 acres, right?
13   A    Yes.
14   Q    Divided into two lots?
15   A    Right.
16   Q    Do you know what's going to happen on those
17   two lots?
18   A    One -- it's a hunting camp and they're
19   separating the hunting camp and David Simpson's property
20   where he's going to build a house.
21   Q    What about the Overhill, LLC?
22   A    That's a farm they bought in Ennisville and I
23   don't know what they're doing there.  I mean, they're
24   building -- it was a land development.  It wasn't a -- oh, I
25   know.  I do know.  There's a farmhouse there and they built

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

---

130

1 a log house and they had two dwellings on that property. So
2 that's why they did that.
3    Q    So that's why they subdivided it?
4    A    They did a land development.
5    Q    A land development. A land development plan
6 you mean?
7    A    Yes.
8    Q    So when did they build the log house?
9    A    I don't know if -- I don't know if it's built
10 yet. I don't know. That's -- they're working -- I don't
11 know. I can't see that from the -- I don't know.
12    Q    So underneath lots it says one lot, second
13 dwelling.
14    A    Yes, it has a farmhouse there.
15    Q    Let's see, and then the Sunderland property,
16 do you know what the plans are for that place?
17    A    That's -- a father is dividing off the ground
18 for one of the boys and I don't know what he's going to do
19 with the other part.
20    Q    Is there a dwelling on that property?
21    A    Yes, there is a dwelling on that property.
22    Q    Is there more than one?
23    A    No.
24    Q    There's one house on it?
25    A    Um-hum.

---

131

1    Q    He's going to divide it and build on the other
2 half?
3    A    He said he doesn't know what he's going to do
4 with it. He's giving the son the house and some acreage and
5 the rest of it he's not sure what he's going to do with it.
6    Q    Do you know if he has any plans to subdivide?
7    A    I asked him that and he does not know.
8    Q    Now, let's see, there's a -- W. Thomas Wilson,
9 who is that?
10    A    Yes.
11    Q    This is on the first page, 9/3/97.
12    A    That's our supervisor.
13    Q    He's your township supervisor?
14    A    Yes.
15    Q    And he submitted a subdivision plan for 12
16 acres, correct?
17    A    Yes.
18    Q    To divide into three lots?
19    A    Yes, that's what it says.
20    Q    And what is on that property?
21    A    His shop and the next property is his son's
22 house and I think -- and the next one -- I'm not sure if
23 there's anything in between there or not, I don't know, and
24 then there's a -- the other boy has a trailer. They're all
25 along there.

---

132

1    Q    Now, when he subdivided, did he build anything
2 after he subdivided?
3    A    (Witness shook her head negatively.)
4    Q    Everything was on there and they just broke it
5 up?
6        MR. SHERR: You have to answer out loud.
7        THE WITNESS: I'm sorry.
8        MR. SHERR: That's okay.
9        THE WITNESS: No, he did not build anything on
10 it. That was in '97. His son had a house that he had
11 started and I'm not sure whether it was completed then or
12 not. I don't remember that, but it is there now. There's a
13 house and his shop and a trailer.
14 BY MS. MONTGOMERY:
15    Q    Are there any other township officials or --
16 you know, either supervisors or former supervisors or sewage
17 enforcement officers or anything like that on this list of
18 individuals who have sought subdivisions in Jackson
19 Township?
20    A    Not that I see.
21    Q    Who's Overhill, LLC?
22    A    It's Henwood. Jerry and Tom Henwood, I
23 believe, from somewhere in -- near Philadelphia. It's a --
24 they're either going to or have built a place where they're
25 going to raise game birds. That's all I can tell you.

---

133

1    Q    I see there's another Hawbaker on this --
2 5/5/98.
3    A    Okay, that's Monty.
4    Q    A different Hawbaker than the other one?
5    A    Daughter and son-in-law.
6    Q    So they're related to the Glenn and Barbara
7 Hawbaker, correct?
8    A    That's correct.
9    Q    Are those contiguous pieces of property?
10    A    No.
11    Q    Are they close to each other?
12    A    No.
13    Q    I think you testified that the subdivision
14 ordinance had been under consideration for at least two
15 years which takes you back to the summer of 1998, correct
16    A    Somewhere in there. I cannot tell you the
17 exact date we started it.
18    Q    Now, I see -- if we start say -- let's just
19 take it -- let's take it from September 30th, 1998 and go
20 down to 2/10/2000 -- I'm sorry, 12/13/1999, okay?
21    A    Okay.
22    Q    Were any of those proposed subdivisions
23 rejected because there was going to be a subdivision
24 ordinance put in place?
25    A    No.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

134

1    Q    Was there any moratorium placed on
2  subdivisions when those people came and asked you if they
3  could subdivide?
4    A    No.
5    Q    Now, during the period of time that the
6  moratorium was in place, did any of the subdivision plans go
7  to the Huntingdon County Planning Commission to your
8  knowledge?
9    A    The only two that I know is Mr. Corneal's.
10    Q    Mr. Corneal's went there?
11    A    And I can't say about Hawbakers and Davis.
12  I'm not sure what they did, when they took them in there.
13        (Discussion held off the record.)
14  BY MS. MONTGOMERY:
15    Q    Now, when an individual takes their
16  subdivision plan to the Huntingdon County Planning
17  Commission, do you get some sort of notice from the
18  commission?
19    A    We get a letter. When they've reviewed it, we
20  get a letter.
21    Q    When they've reviewed it?
22    A    Right.
23    Q    Do you keep copies of those letters?
24    A    They should all be attached to the document
25  when we approve it.

135

1    Q    Did you provide us with copies of those
2  letters?
3    A    No, you didn't ask me for that.
4    Q    Let me ask you this: Did you receive any
5  correspondence from any government agency, you personally as
6  a -- in your -- I shouldn't say personally. You in your
7  capacity as township secretary and treasurer receive
8  correspondence from any government agency about the
9  Corneal's property?
10    A    Are you talking about the county planning
11  commission?
12    Q    Any government agency, Army Corps of
13  Engineers, Commonwealth of Pennsylvania, DEP.
14    A    I did not receive anything from the Army Corps
15  of Engineers, no.
16    Q    Anybody else?
17    A    The county planning commission and soil
18  conservation commission, Huntingdon County Soil
19  Conservation, whatever that is.
20    Q    Did you provide all of the documents that --
21    A    Yes, I did.
22    Q    -- you had in your possession from any
23  government agency?
24    A    Excuse me. Yes, I did.
25    Q    What about -- did you have any correspondence

136

1  at all related to the Hewetts?
2    A    No.
3    Q    Did you get a bridge permit from a government
4  agency regarding the Corneal property?
5    A    No, I did not.
6    Q    Let me ask you this: When you say you have an
7  application for a proposed subdivision, right?
8    A    Yes.
9    Q    And you keep that in a file, right?
10    A    Right.
11    Q    What do you consider to be part of the
12  application?
13    A    When?
14    Q    At any time. If you have a completed
15  subdivision file, what all is in that file?
16    A    From the time the ordinance was in or from
17  before because --
18    Q    From before.
19    A    From before there was everything -- the same
20  as after except for the application.
21    Q    Except for the application form, okay. So in
22  order for you to -- in order for the township to approve a
23  proposed subdivision it has to go to the county first,
24  right?
25    A    No, it can come to the meeting first. It can

137

1  be on the agenda and it can come to the meeting first, but
2  you're going to have to send it to the county.
3    Q    That wasn't exactly my question but -- so I'll
4  just repeat it. In order for you to actually issue final
5  approval for the township to do it, it has to have gone to
6  the county first, correct?
7    A    It has to have gone to the county but not
8  first. There's a -- you know --
9    Q    Well, it has to have gone to the county prior
10  to you issuing approval?
11    A    That's right.
12    Q    That's what I'm trying to say.
13    A    Okay, that's right.
14    Q    So part of the whole subdivision file is going
15  to include any correspondence that you got from the county,
16  correct?
17    A    Right.
18    Q    Do you consider what the county has to say as
19  approval or disapproval in connection with a proposed
20  subdivision?
21    A    That's not for me to do. I mean, I don't
22  approve or not approve subdivisions.
23    Q    Let me put it this way: If the supervisors
24  are going to look at a proposed subdivision plan and decide
25  whether or not they're going to approve it, right?

138

1    A    Okay.
2    Q    They're going to look and see whether the
3  county planning commission has reviewed it first?
4    A    Yes.
5    Q    What do they see in order to tell them that
6  the county planning commission has reviewed it?  What do
7  they see in the file?
8    A    A letter.
9    Q    A letter from the county planning commission?
10   A    That's exactly right.
11   Q    That says we've received it and we're
12  reviewing it?
13   A    That says we've received it and reviewed it.
14   Q    So it's part of the approval process, correct,
15  for the supervisors to see what the county planning
16  commission has to say?
17   A    That's right.
18   Q    I'm going to show you a document that we have
19  -- we're going to mark as Wirth Exhibit 10.
20       (Letter dated 4/20/00 produced and marked as
21  Wirth Exhibit No. 10.)
22       (Discussion held off the record.)
23       MS. MONTGOMERY:  We'll mark the February 24th
24  one as Wirth 11.
25       (Letter dated 2/24/00 produced and marked as

140

1    Q    Do you know when Mr. Corneal submitted his
2  proposed subdivision to Huntingdon County?
3    A    I only know what's on here.  After our first
4  meeting it says 2/10 and then 4/11.
5    Q    Do you understand him to have submitted the
6  subdivision then twice --
7    A    Yes.
8    Q    -- to the commission?  Did you discuss the
9  moratorium with the planning commission?
10   A    Probably.
11   Q    Do you recall who you discussed it with?
12   A    I would only discuss it with Richard Stahl.
13   Q    Did you ask him for any advice about whether
14  or not you could put in a moratorium?
15   A    I don't know whether we talked to him about
16  that or not.  I probably asked him for procedures, but I
17  don't know whether I did or not.
18   Q    Did you ever discuss the township's
19  disapproval of Mr. Corneal's sewage modules with Larry
20  Newton?
21   A    I probably told him that we weren't going to
22  sign them.
23   Q    Did you ask him for any guidance in connection
24  with whether or not you should sign them?
25   A    I don't know whether I asked him for guidance

139

1  Wirth Exhibit No. 11.)
2  BY MS. MONTGOMERY:
3    Q    Let's take Wirth Exhibit 11 first.  I'm sorry
4  to take them out of order, but that's the way it happens.
5  Are you familiar with that document, Miss Wirth?
6    A    Pardon?  I only have one.  I have February 24.
7    Q    That is going to be Exhibit 11 so you have
8  it.
9    A    Okay, thank you.
10   Q    Are you familiar with that document?
11   A    Which one are we talking -- the first one?
12   Q    February 24th.
13   A    Yes, I am.
14   Q    Is this the standard letter that you get back
15  from the Huntingdon County Planning Commission when a
16  proposed subdivision is submitted to the commission?
17   A    Yes, it is.
18   Q    Now, typically for each submission do you get
19  just one letter from them or do you -- would you later get
20  another letter from them?
21   A    If it has to go back and there's a
22  resubmission, we get another letter.
23   Q    Now, do you get this letter immediately upon
24  submission?
25   A    No, it's after review.

141

1  or not.
2    Q    Do you remember what you talked to him about
3  in connection with Mr. Corneal's sewage module?
4    A    I'd probably do -- whatever happened at the
5  meeting I would let Larry know and that's what I would do.
6    Q    So you informed Larry that the township
7  supervisors were not going to sign Mr. Corneal's sewage
8  module?
9    A    Yes, I probably did -- I know I did.
10   Q    Now, there were a couple different occasions
11  when the township refused to sign the sewage module,
12  correct?
13   A    Are we -- what period of time are we talking
14  here?
15   Q    I would say the period of time before and
16  after the moratorium was put in place.
17   A    But there's also sewage modules on the board
18  now so there's different -- there's different issues here.
19   Q    Right.  Really I'm just asking you weren't
20  there a couple different times when the township has been
21  presented with Mr. Corneal's sewage modules and they have
22  not been signed, right?  Have not been signed off on by the
23  township, correct?
24   A    I think we need to be specific about that.
25       MR. SHERR:  Then go ahead and do that.

142

1  BY MS. MONTGOMERY:
2      Q      What is it that you need to know?
3      A      You need to give me a time frame.
4      Q      Well, it's a more general question.  Did Mr.
5  Corneal submit sewage modules for the township's approval
6  once or more than once?
7      A      More than once.
8      Q      That's all I needed to know.  How many times?
9      A      Twice.
10     Q      Did you discuss both of those submissions with
11  Larry Newton?
12     A      I also want to clarify submissions because the
13  first ones were never handed to the supervisors, okay.  He
14  had them at a meeting, but he never left his sewage modules
15  with us.  They were never submitted to us because he said
16  then he wasn't subdividing and he wanted a privy permit.
17     Q      Well, I think you testified a little
18  differently earlier, but the record will speak for itself.
19  Go ahead.
20     A      And the second ones we don't have yet.  I
21  don't think we do.  Barry might have them.  I don't have
22  them.
23     Q      Did you discuss with Larry Newton the status
24  of Mr. Corneal's sewage modules on both -- with respect to
25  both submissions or attempted submissions?

143

1      A      Probably.
2      Q      So you kept him informed about the township's
3  position with respect to the sewage modules?
4      A      I probably did.
5      Q      What about Mr. Corneal's proposed subdivision
6  plan?  Did you keep Mr. Newton informed about that?
7      A      I probably did.
8      Q      Did he tell you what you were doing was okay
9  or wasn't okay?
10     A      I don't remember.
11     Q      Do you recall at any time a letter going to
12  Mr. Corneal rejecting his sewage module?
13     A      Sewage modules?
14     Q      Yes, or his proposed subdivision from the
15  township.
16     A      I don't recall if Larry wrote -- I don't
17  recall if Larry wrote him a letter or not or -- I know we
18  didn't write him a letter.  I don't think we did.
19     Q      Do you recall Mr. Corneal asking for a
20  hearing --
21     A      No.
22     Q      -- in connection with his property?
23     A      No.
24     Q      Do you recall Mr. Corneal asking for a hearing
25  in connection with his building permit?

144

1      A      No.
2      Q      Do you recall Mr. Corneal receiving a letter
3  from the township -- from anybody within the township,
4  officers, rejecting his application for anything?
5      A      He did get a letter from the township
6  rejecting his building permit application.
7      Q      So you do recall that?
8      A      Yes.  Now, what time frame are we talking
9  about here because we're doing it again?
10     Q      Well, I'm talking about in the year 2000.
11     A      He did get a letter rejecting his building
12  permit.
13     Q      Did you have any discussions with anybody
14  within the township about his request for a building permit?
15     A      Me?  I don't recall.
16     Q      You don't recall?
17     A      No, I don't.
18     Q      Do you recall receiving any letter from Mr.
19  Corneal appealing his denial of a building permit?
20     A      I don't know if he sent it to us or Larry, but
21  there was something.
22     Q      You do get the township's mail, right?
23     A      If it comes to me, I get it.  If it goes to
24  Larry, he'll fax it to me.
25     Q      What's the address that you get the township

145

1  mail at?
2      A      389-A.
3      Q      And what's your address?
4      A      390.
5      Q      Do you sometimes get mail at the other -- at
6  the 390 post office box for the township?
7      A      It's not a post office box.
8      Q      Well, a postal box, right?
9      A      On occasion.
10     Q      Now, I don't know if you answered this
11  question very -- and if I already asked it, I apologize, but
12  did you have occasion to discuss with the township
13  supervisors the denial of Mr. Corneal's building permit?
14     A      I'm sure we did talk about it.
15     Q      Do you know whether Mr. Corneal actually
16  submitted an application for a building permit?
17     A      What time frame?
18     Q      In the year 2000.
19     A      Yes, he did because he sent it to me.
20     Q      He sent you an application for a building
21  permit?
22     A      And checks, yeah.
23     Q      I'm sorry?
24     A      Yes, he did.
25     Q      Did you send us a copy of that application?

146

```
 1    A    Was it on the list?
 2    Q    I'm sorry, the list of documents?
 3    A    Yes.
 4    Q    Well, I think it was.
 5    A    Well, then I must have sent it.  If I didn't,
 6  I didn't.
 7    Q    Well, then I'm just a little bit confused
 8  because you had said earlier that all building application
 9  permits -- applications for building permits go out to
10  the --
11    A    They do go to David Van Dommelen.
12    Q    So you don't keep them?
13    A    No.
14    Q    Why did this one come to you?
15    A    Because Mr. Corneal sent it to me, either to
16  me or Larry.
17    Q    Do they sometimes come to you?
18    A    No.
19    Q    Is that the only one you've ever gotten?
20    A    Yes.
21    Q    Well, did anybody ever inform you of whether
22  or not Mr. Corneal had requested a hearing on the denial of
23  his building permit?
24    A    I do not ever remember hearing that before.
25    Q    Typically if there's going to be a hearing on
```

147

```
 1  the denial of a building permit, where would that hearing be
 2  held?
 3    A    I have no idea.
 4    Q    You've never been present at one?
 5    A    No.
 6    Q    Have you ever been present at any hearing that
 7  the township supervisors have held when somebody wants to
 8  appeal something that's been going on?
 9    A    No.
10    Q    Were copies of the subdivision ordinance that
11  was passed on -- I think you said July 10th, 2000?
12    A    It is the 10th.
13    Q    It was the 10th that it was passed?
14    A    Yes.
15    Q    Were copies of that subdivision ordinance made
16  available to the public --
17    A    Yes.
18    Q    -- prior to it being -- how?  Prior to it
19  being passed.
20    A    I think it's in the paper.  It was in the
21  library, in Larry's office, one in my office.  It says that
22  in the ad somewhere, either in this one or the other ad he
23  had in.  It was in the paper where they could be reviewed.
24    Q    Did anybody come to your office to review it?
25    A    No.  Full text at the Daily News and at my
```

148

```
 1  office, yeah.
 2    Q    So you had copies available in your office for
 3  the public to review?
 4    A    Yes.
 5    Q    When were those copies made available to the
 6  public?
 7    A    I think there's -- I think there's a
 8  regulation about when it had to happen.
 9         MR. SHERR:  That's not what she asked you.
10  She asked you when was it available.
11         THE WITNESS:  I don't know.
12         MR. SHERR:  Then that's your answer.
13         THE WITNESS:  Yeah, I don't know.
14  BY MS. MONTGOMERY:
15    Q    But they were going to be made public through
16  you, correct?
17    A    Yes.
18    Q    So is there anybody else who would know when
19  you made them public or put them in your office?
20    A    I don't know.
21    Q    Were the copies that you kept in your office
22  there for say more than a week?
23    A    I don't know.
24    Q    Did you at some point keep copies of a
25  proposed subdivision ordinance that was other than the
```

149

```
 1  subdivision ordinance that was eventually passed?  If you
 2  can hear that but --
 3    A    Tell me that again.
 4    Q    Okay.  Did you at one point keep copies of a
 5  proposed subdivision ordinance in your office that was
 6  different than the one that was ultimately passed?
 7    A    No.
 8    Q    How many copies did you keep on file for the
 9  public of the proposed subdivision ordinance?
10    A    I think I had six.
11    Q    Did you make the copies?
12    A    No.
13    Q    Who made the copies?
14    A    I took them out to be done.
15    Q    Where did you take them?
16    A    Office Depot.
17    Q    Office Depot.  Did you submit them or did you
18  take them over there yourself and copy them?
19    A    I left them do it.
20    Q    You left them do it?
21    A    Um-hum.
22    Q    Did you keep an invoice for that?
23    A    Sure.
24    Q    So you have that invoice?
25    A    Yes.
```

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

38

150

1    Q      Did you submit the ordinance to the county
2  planning commission?
3    A      Yes.
4    Q      When did you do that?
5    A      Which time?
6    Q      Well, why don't you tell me. Was there more
7  than one time?
8    A      Yes.
9    Q      When's the first time you submitted a proposed
10  ordinance to the county planning commission?
11    A      I can't remember exactly. Sometime in the
12  fall.
13    Q      In the fall of 2000 -- in the fall of 1999 I
14  mean?
15    A      Um-hum.
16          MR. SHERR: You have to answer out loud.
17          THE WITNESS: Yes.
18  BY MS. MONTGOMERY:
19    Q      Why was the subdivision ordinance submitted
20  twice to the county planning commission?
21          MR. SHERR: Object to the form of the
22  question. I don't know that she's testified that it was
23  twice. I think she testified that it was more than once.
24  BY MS. MONTGOMERY:
25    Q      Was it more than once?

151

1    A      Yes, it was more than once.
2    Q      Was it twice?
3    A      It might have been more than that.
4    Q      Can you remember if it was more than that?
5    A      I know it was at least -- I know three times
6  at least. I can't tell you how many times.
7    Q      Well, let me ask you this: Each time that it
8  was submitted was it a different ordinance in some way?
9    A      It wasn't different. They had opinions and we
10  took them under consideration and we would make the changes.
11    Q      Do you have records of that correspondence
12  going back and forth between you and the Huntingdon County
13  Planning Commission?
14    A      I don't, no.
15    Q      Who does?
16    A      I would assume Richard does, but I'm not sure
17  of that.
18    Q      If the ordinance --
19          MR. SHERR: Just for the record, Richard was
20  Richard Stahl?
21          THE WITNESS: Yes, I'm sorry.
22  BY MS. MONTGOMERY:
23    Q      If the ordinance was submitted to the
24  Huntingdon County Planning Commission, how was it submitted?
25    A      In document form.

152

1    Q      By mail?
2    A      Hard copy.
3    Q      Hard copy document form?
4    A      I don't know if I took it in or mailed it. I
5  doubt if I mailed it. I probably dropped it off when I went
6  by one day.
7    Q      Is it close by?
8    A      No.
9    Q      How far is it?
10    A      Fifteen miles.
11    Q      So you don't think you mailed it, you think
12  you drove it over there?
13    A      I probably did. I have clients there.
14    Q      Did you put a cover letter out with it?
15    A      No.
16    Q      Do you have some sort of a -- any application
17  form or any transmittal form of any sort that you sent with
18  it?
19    A      No.
20    Q      Would anybody else have dropped it off or
21  mailed it?
22    A      They might have.
23    Q      Well, whose job was it within the township to
24  see to it that it got to the Huntingdon County Planning
25  Commission?

153

1    A      It probably was mine.
2    Q      Why do you say probably?
3    A      Well, they -- whoever -- it's not close so
4  whoever's running goes.
5    Q      Now, the final proposed subdivision ordinance
6  that was submitted to the Huntingdon County Planning
7  Commission, was that the subdivision ordinance that
8  eventually was passed --
9    A      Yes.
10    Q      -- by the township supervisors?
11    A      Yes.
12    Q      So it went up in one final last form,
13  Huntingdon County Planning Commission looked at it, you got
14  it back and then the township supervisors approved it?
15    A      Yes.
16    Q      Now, during this period of time that it was
17  being passed back and forth with the Huntingdon County
18  Planning Commission, was the ordinance also being presented
19  to the public and mentioned at the township meetings?
20    A      I don't know how -- whether it was or not.
21    Q      Do you know when you submitted the final
22  subdivision ordinance to the Huntingdon County Planning
23  Commission?
24    A      After July the 10th.
25    Q      After July the 10th, after you passed it?

154

1    A    Right.
2    Q    Then you submitted it to them for what?
3    A    They keep a copy for their review.
4    Q    Well, prior to the time that you -- that the
5    supervisors approved the final subdivision ordinance, do you
6    know when you submitted it to the Huntingdon County Planning
7    Commission?
8    A    June the 3rd, Saturday morning, around 10
9    o'clock I got the final revisions from Richard. I went to
10   his house to do it on a Saturday morning.
11   Q    You mean you took it over to his house?
12   A    No.
13   Q    Well, my question was when did you submit it
14   to him.
15   A    I don't know when I submitted it to him.
16   That's the last time that we talked about it.
17   Q    Was June the 10th?
18   A    June the 3rd.
19   Q    Or June the 3rd. How do you recall that date
20   so well?
21   A    I have it written down because it was a
22   Saturday and I wasn't happy about having to do it on a
23   Saturday. I had something else to do, but Richard was going
24   on vacation so I went.
25   Q    Did the Huntingdon County Planning Commission

155

1    submit comments to you in writing on the proposed
2    subdivision ordinance?
3    A    He wrote in the column on the side and he
4    inserted things that he felt we should consider.
5    Q    Did you submit those to us?
6    A    I don't have them.
7    Q    You didn't keep any copies of them?
8    A    No.
9    Q    Did you just throw them away?
10   A    Yes.
11   Q    Do you have all the successive drafts of the
12   proposed ordinance?
13   A    No, I do not.
14   Q    You just threw them away as well?
15   A    I had no reason to keep them.
16       MR. SHERR: Just answer her questions.
17       THE WITNESS: No, I don't have them.
18   BY MS. MONTGOMERY:
19   Q    Miss Wirth, do you recall whether you actually
20   suggested a moratorium to the township supervisors?
21   A    I did not.
22   Q    Did you ever suggest it to anybody?
23   A    No.
24   Q    Did you suggest it to Larry Newton?
25   A    No.

156

1    Q    Do you recall discussions about why the
2    moratorium was being put in place with the supervisors?
3    A    No.
4    Q    You don't recall any of those discussions?
5    A    No.
6    Q    Do you recall whether any discussions about
7    the purpose of the moratorium took place?
8    A    No.
9    Q    Now, we're going to go back for just a second
10   to this document that we marked as --
11       MS. THORP: It's 9.
12   BY MS. MONTGOMERY:
13   Q    Wirth Exhibit 9 and I just want to make sure
14   that I understand that there were no other subdivision --
15   correct me if I'm wrong. There were no other subdivision
16   applications received by the township other than those on
17   this list?
18   A    To the best of my knowledge.
19   Q    Did you ever have a public hearing on the
20   moratorium?
21   A    No.
22   Q    Did you actually do a formal submission of the
23   moratorium to the county planning commission?
24   A    No.
25   Q    You just told them about it?

157

1    A    To the best of my knowledge.
2    Q    Do you know how you told them about it?
3    A    No.
4    Q    So if there was a formal submission you would
5    have been the one that would have been involved in preparing
6    it, correct?
7    A    Yes, probably.
8    Q    Let me just ask you this, and if I asked you
9    already I apologize, did the supervisors actually take a
10   vote with respect to the moratorium?
11   A    I did testify to that.
12   Q    And what was your testimony?
13   A    You asked me if the supervisors voted and I
14   said -- I believe I said I don't recall whether -- normally
15   they do, they say -- I think that's what I said.
16   Q    But you don't recall if they did?
17   A    They normally do and I think that's what I
18   said.
19   Q    Let's see, did you ever submit a copy of the
20   driveway -- the proposed driveway ordinance to the planning
21   commission?
22   A    Yes, I did.
23   Q    Did you also do the privy --
24   A    Yes, I did.
25   Q    When did you do that?

WIRTH, ANN
05/16/01

CORNEAL VS
JACKSON TOWNSHIP

---

158

1  A    I don't recall.
2  Q    Did you submit it after it was approved or
3  before, by the supervisors?
4  A    I don't recall.
5  Q    Did you discuss the driveway ordinance with
6  Larry Newton?
7  A    Probably.
8  Q    Why do you say probably?
9  A    Because I think we submitted it to him for him
10  -- I'm trying to remember if we typed it or he typed it. I
11  don't remember.
12  Q    What about the privy ordinance, did you submit
13  that to Larry Newton?
14  A    The same thing, I don't know if he did it or I
15  did it.
16  Q    Do you recall ever reviewing any subdivision
17  plan or drawing at all in connection with the Corneal
18  property?
19  A    What time frame?
20  Q    In the year 2000.
21  A    Yes.
22  Q    In what context was that?
23  A    I think he was -- I think it was at the
24  meeting. We talked about that earlier today.
25  Q    So at the meeting you recall actually looking

---

159

1  at a subdivision plan?
2  A    I'm not sure if we looked at it there. I'm
3  not sure. I don't know.
4  Q    What about the year 1999?
5  A    In '99, no.
6  Q    What about this year?
7  A    Yes.
8  Q    In what context?
9  A    With his lawyer Terry Williams.
10  Q    You were present at that meeting?
11  A    Yes.
12  Q    And who else was present?
13  A    All the supervisors, Barry Parks, Larry
14  Newton, Terry Williams and I think David Van Dommelen.
15  Q    Why were you present?
16  A    Why was I present?
17  Q    Yes.
18  A    Because I have to sign.
19  Q    Because you have to sign the --
20  A    I have to sign the plans.
21  Q    You have to be one of the two people who signs
22  the plans?
23  A    Yes, I have to sign them and seal them.
24  Q    Did you keep minutes of that meeting?
25  A    No, I -- it was in the courthouse. No, I did

---

160

1  not.
2  Q    You mentioned that you thought you viewed a
3  subdivision plan in 2000, right?
4  A    I thought what you asked me was did we look at
5  a plot plan.
6  Q    Well, okay. What I said was a subdivision
7  plan or any other drawing.
8  A    A drawing is what --
9  Q    Right, that's what I said.
10  A    We did look at a drawing.
11  Q    Now, I think you said you thought you did that
12  at a supervisor's meeting?
13  A    I'm not sure.
14  Q    Where else would it have been?
15  A    I'm not -- it came to us through Larry so I
16  don't know where we looked at it.
17  Q    So Larry turned over to you at some point a
18  copy of a drawing for the proposed subdivision for the
19  Corneal's property?
20  A    To the township he turned it over.
21  Q    He turned it over to the township and you
22  reviewed it. Who did you review it with?
23  A    I didn't review it, the supervisors reviewed
24  it.
25  Q    Were you present when they reviewed it?

---

161

1  A    Yes.
2  Q    And so we're going to go back around again.
3  So in what context was that, just an informal meeting or
4  something?
5  A    I don't remember. I don't remember when we
6  got it or when we reviewed it.
7  Q    But you do remember that you got it from Larry
8  Newton?
9  A    I said earlier today that I don't know whether
10  it came from Larry Newton or Simpson.
11  Q    Did you discuss the subdivision -- the drawing
12  with Larry Newton?
13  A    Probably.
14  Q    Did the supervisors discuss the drawing with
15  Larry Newton?
16  A    Probably.
17  Q    Did you discuss whether or not to approve the
18  subdivision with Larry Newton?
19  A    I don't know.
20  Q    Did the supervisors discuss whether or not to
21  approve the subdivision with Larry Newton?
22  A    I don't know.
23  Q    Now, you testified earlier that I believe it
24  was at the February meeting that Mr. Corneal first came in
25  and asked the supervisors -- the February 2000 meeting he

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

162

1 came in and asked the supervisors to sign his subdivision
2 plan, correct?
3    A   **I think that's the date, yeah. Yes.**
4    Q   And I believe you testified that they refused
5 to do so because they said there was a moratorium in place
6 as of January?
7    A   **Right.**
8    Q   Did they issue a written rejection of his
9 subdivision plan?
10    A   **No, I don't think so.**
11    Q   Do you recall Mr. Corneal asking for a copy of
12 a moratorium ordinance or resolution?
13    A   **He might have. I don't -- I don't know. He**
14 **might have.**
15    Q   Did you discuss with Larry Newton Mr.
16 Corneal's interest in seeing a copy of a moratorium
17 ordinance or resolution?
18    A   **I don't recall that.**
19    Q   Do you recall talking with Larry Newton about
20 whether you had to put that moratorium into a written form?
21    A   **I don't recall that either.**
22    Q   Do you recall whether the supervisors
23 discussed that with him?
24    A   **You'll have to ask them.**
25    Q   Was there an ordinance in place at any time

163

1 prior to the subdivision ordinance that you put in place on
2 July 10th, 2000?
3    A   **What kind of an ordinance?**
4    Q   Subdivision ordinance.
5    A   **No.**
6    Q   Was there any other ordinance in place?
7    A   **Yes.**
8    Q   What ordinance was that?
9    A   **Building permit ordinance.**
10    Q   The building permit ordinance, okay. When was
11 that passed?
12    A   **Long before my time. The date's in the back.**
13 **I don't know.**
14    Q   Other than the three ordinances that you
15 testified have been passed since you've been in place as the
16 township secretary and treasurer and other than this
17 building ordinance, are there other ordinances in the
18 township?
19    A   **No.**
20    Q   There's just those four that exist?
21    A   **I'm not sure if this -- this -- there is an**
22 **ordinance, I'm sorry. It's ag. security. We passed an ag.**
23 **security ordinance. I'm sorry, I forgot that.**
24    Q   When did you do that?
25    A   **It might be '95 or '96. Maybe not. Maybe**

164

1 '97. I'm not -- I don't know the date, but we do have an
2 ag. security ordinance.
3    Q   But there wasn't any other ordinance that said
4 anything about subdividing at that time prior to this
5 subdivision ordinance?
6    A   **Ordinances you're talking about?**
7    Q   Yes.
8    A   **No.**
9    Q   What about any other document -- or I should
10 say any other sort of rule, regulation, resolution, anything
11 that would be a formal action of the supervisors?
12    A   **Act 537.**
13    Q   What's Act 537?
14    A   **Sewage Enforcement Act.**
15    Q   And you're saying what about that, that's the
16 -- something that was in place of how you do subdivisions
17 in the township?
18    A   **It states that you have to have an equivalent**
19 **subdivision if there's more than two buildings on a**
20 **property, two dwellings, and we testified to that this**
21 **morning.**
22    Q   So you're saying that was what you followed as
23 a subdivision ordinance, or something, or what are you
24 saying?
25    A   **Yes, we did.**

165

1    Q   Was it in writing somewhere that all
2 subdivision plans had to be submitted to the Huntingdon
3 County Planning Commission?
4    A   **Not to the best of my knowledge.**
5    Q   So it was just something that the supervisors
6 and you thought you ought to do, thought you ought to impose
7 on the public?
8    A   **It was done long before my time.**
9    Q   But it's not in writing anywhere?
10    A   **I don't know.**
11    Q   Do you recall Mr. Corneal submitting a revised
12 subdivision plan to the township?
13    A   **What time frame?**
14    Q   The year 2001.
15    A   **Yes.**
16    Q   Are you familiar with that document?
17    A   **I've seen it.**
18    Q   In what context did you see it?
19    A   **In the courthouse.**
20    Q   In the courthouse at a meeting?
21    A   **At a hearing.**
22    Q   At a hearing. What hearing was that?
23    A   **The township has -- went before the judge**
24 **asking for Mr. Corneal to comply with regulations in the**
25 **township.**

**WIRTH, ANN**
**05/16/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

166

1    Q      What regulations?

2    A      **Building permit regulations and subdivision**

3    **ordinance and sewage.**

4    Q      So you saw it there?  Did you testify at

5    that --

6    A      No.

7    Q      You just saw it in connection with that

8    hearing?

9    A      **Yes.**

10    Q      Did you see it before the hearing as well?

11    A      No.

12    Q      Did you see it after the hearing?

13    A      **It's in my office.**

14    Q      It's in your office, okay.

15    A      **You're talking about a plot plan?**

16    Q      Yes.

17    A      **It's in my office.**

18    Q      When did you get it in your office?

19    A      **I got it at the hearing that day.  No, wait a**

20    **minute.  I got a copy at the hearing that day.  I got a copy**

21    **that day.**

22    Q      You got a copy of it when?

23    A      **At the hearing.**

24    Q      And that's the first time?

25    A      **To the best of my knowledge.**

---

167

1    Q      Do you know whether the board ever -- the

2    board of supervisors ever passed a resolution regarding the

3    lawsuit that they initiated against Mr. Corneal?

4    A      No.

5    Q      You don't know or did they?

6    A      **They didn't.**

7    Q      They did not.  Did they just decide it among

8    themselves informally?

9    A      **No.**

10    Q      How was it decided?

11    A      **With our township attorney.**

12    Q      With Mr. Newton?

13    A      **Yes.**

14    Q      So Mr. Newton advised the board of supervisors

15    that they should initiate a lawsuit against Mr. Corneal?

16    A      No.

17    Q      I'm not sure I understand your answer.  Do you

18    want to clarify what you're trying to tell me?

19           MR. SHERR:  Don't feel that it's necessary.

20    You've answered her question.  You've answered it directly.

21           MS. MONTGOMERY:  She hasn't answered it

22    directly.

23           MR. SHERR:  She absolutely has.

24           MS. MONTGOMERY:  It's not permissible to be

25    evasive.

---

168

1           MR. SHERR:  She is not being evasive.  Can you

2    read back the question and the answer, please.

3           MS. MONTGOMERY:  If we're going to read back

4    the question and the answer, you're going to have to go a

5    long ways back.  Let's continue on.

6           MR. SHERR:  Could you read back --

7           MS. MONTGOMERY:  I'm going to rephrase the

8    question.  It's my deposition, knock it off.

9           MR. SHERR:  Don't tell me to knock off

10    anything.

11           MS. MONTGOMERY:  Here's the question --

12           MR. SHERR:  And don't talk to me in that tone,

13    young lady.

14           MS. MONTGOMERY:  This is the question and

15    we're not reading the question back.

16           MR. SHERR:  If you want her --

17           MS. MONTGOMERY:  I have withdrawn the

18    question.  I've withdrawn the question.

19           MR. SHERR:  And all I was saying is if you

20    want her to clarify it --

21           MS. MONTGOMERY:  Moving right along.

22           MR. SHERR:  -- then we'll reask the question

23    and get the answer again.

24           MS. MONTGOMERY:  We're going to reask the

25    question.

---

169

1    BY MS. MONTGOMERY:

2    Q      Did the board of supervisors pass a resolution

3    regarding the lawsuit that they filed against Mr. Corneal?

4    A      No.

5    Q      Did they just decide among themselves that

6    they were going to file the lawsuit?

7           MR. SHERR:  Objection, asked and answered.

8           MS. MONTGOMERY:  That's good.

9           MR. SHERR:  That's not the question.  The

10    question was -- you said did Mr. Newton advise them to file

11    a lawsuit and she said no and then you asked her to clarify

12    that.

13           MS. MONTGOMERY:  I know what I said and I am

14    going to move on.

15           MR. SHERR:  Well, then why are you going back

16    to all these other questions?  Objection, asked and

17    answered.  You can answer.

18    BY MS. MONTGOMERY:

19    Q      Did they decide among themselves to file a

20    lawsuit?

21           MR. SHERR:  Objection, asked and answered.

22    You can answer it.

23           THE WITNESS:  No.

24    BY MS. MONTGOMERY:

25    Q      So did their attorney -- no, that wasn't the

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

170

1  question. Who else was involved in the decision to file a
2  lawsuit?
3  　　A　　I don't really know. I don't know how to
4  answer you.
5  　　Q　　Well, if they didn't decide among themselves
6  to file a lawsuit against Mr. Corneal, how did they decide
7  it?
8  　　　　MR. SHERR: Objection to the form of the
9  question. I think you're misstating her testimony. You can
10 answer the question if you can.
11 　　　　THE WITNESS: They sought counsel about it.
12 BY MS. MONTGOMERY:
13 　　Q　　Sought counsel from who?
14 　　A　　Larry Newton.
15 　　Q　　Then my question was did Mr. Newton advise
16 them that they could file a lawsuit against Mr. Corneal?
17 　　A　　You did it in the opposite the --
18 　　　　MR. SHERR: Just answer her question.
19 　　　　THE WITNESS: Yes.
20 BY MS. MONTGOMERY:
21 　　Q　　He did. That's all I wanted to know. Do you
22 recall who actually initiated the discussions about filing a
23 lawsuit against Mr. Corneal?
24 　　A　　I have no idea.
25 　　Q　　Did you initiate them?

171

1  　　A　　No.
2  　　Q　　Were you involved in discussions with the
3  supervisors about doing it?
4  　　A　　I might have been. I don't know.
5  　　Q　　Were you present at meetings with the
6  supervisors when it was being discussed?
7  　　A　　Probably.
8  　　Q　　Why do you say probably?
9  　　A　　Because I'm in a lot of things.
10 　　Q　　Were you involved in discussions with the
11 supervisors and Mr. Newton about filing a lawsuit against
12 Mr. Corneal?
13 　　A　　Probably.
14 　　Q　　And why do you say probably?
15 　　A　　Because I cannot remember if I was there when
16 they did it.
17 　　Q　　How do you know that they discussed it with
18 Mr. Newton then, with Attorney Newton?
19 　　A　　Because he's our lawyer.
20 　　Q　　Did they tell you that they sought counsel --
21 　　A　　Sure.
22 　　Q　　-- from Mr. Newton?
23 　　A　　Yes.
24 　　Q　　Did you discuss the lawsuit directly with Mr.
25 Newton?

172

1  　　A　　I probably have.
2  　　Q　　Are you saying probably because you don't
3  recall?
4  　　A　　I have.
5  　　Q　　You have discussed it with him, okay. On what
6  occasions?
7  　　A　　I don't know.
8  　　Q　　When you say you don't know, do you mean you
9  don't know exactly when they were or what?
10 　　A　　I don't know when they were.
11 　　Q　　Well, if you don't know when they were, then
12 do you just recall the setting for the discussion with Mr.
13 Newton that you had?
14 　　A　　Probably in his office.
15 　　Q　　Did you go to his office by yourself?
16 　　A　　For what reason?
17 　　Q　　To discuss the lawsuit with Mr. Corneal.
18 　　A　　No.
19 　　Q　　Who did you go with?
20 　　A　　I believe we were all there.
21 　　Q　　On more than one occasion?
22 　　A　　I don't think so.
23 　　Q　　You recall then being there one time?
24 　　A　　Yes.
25 　　Q　　Did you discuss it over the telephone with Mr.

173

1  Newton?
2  　　A　　Yes.
3  　　Q　　Prior to filing the lawsuit?
4  　　A　　I don't remember if it was prior or after.
5  　　Q　　Did you discuss it on the telephone alone with
6  Mr. Newton or with the other supervisors?
7  　　A　　Probably both.
8  　　Q　　Was anybody else there besides the supervisors
9  when you, for example, went to the office of Larry Newton to
10 discuss the lawsuit against Mr. Corneal?
11 　　A　　No.
12 　　Q　　Just the supervisors and you?
13 　　A　　Yes, that I can recall.
14 　　Q　　Was Barry Parks at any of the meetings that
15 you can recall at which the lawsuit against Mr. Corneal was
16 going to be filed?
17 　　　　I don't think I said that very well. Let me
18 rephrase that. Was Barry Parks present at any of the
19 meetings at which the lawsuit that was to be filed against
20 Mr. Corneal was discussed?
21 　　A　　I testified to that a while ago.
22 　　Q　　I don't recall what you said, I apologize.
23 What did you say?
24 　　A　　Everybody that was in the lawsuit was in the
25 courthouse.

174

1   Q   At the hearing you mean?
2   A   Yeah.
3   Q   I was talking about meetings. You're talking
4   about the lawsuit up in the county, correct?
5   A   Yes.
6   Q   I actually was referring to meetings. When
7   you say that everybody involved in the lawsuit was there at
8   the courthouse, at the county courthouse in that
9   lawsuit, you mean everybody in this lawsuit? Is that what
10  you mean?
11  A   No.
12  Q   You mean everybody in that lawsuit?
13  A   Yes.
14  Q   Are you a party to that lawsuit?
15  A   No.
16  Q   Is Barry Parks a party to that lawsuit?
17  A   Yes.
18  Q   His name is on the pleadings?
19  A   I don't know.
20  Q   Is Van Dommelen a party to that lawsuit?
21  A   I don't know.
22  Q   I'm just trying to clarify who it is you're
23  talking about, that's all, because if you say everybody in
24  that lawsuit, then we could look at those pleadings and say
25  -- then we know who was there. If you're talking about

175

1   everybody in this lawsuit was involved in that lawsuit in
2   the courthouse, then we know who was there.
3   A   I don't know.
4   Q   Why did you attend that hearing for the
5   lawsuit that's up in Huntingdon County?
6   A   Because they take me most every place they go.
7   Q   Why was Mr. Parks there?
8   A   I don't know.
9   Q   Do you recall whether you sent copies of the
10  draft township ordinance to any members of the public at any
11  time during the time that it was under consideration?
12  A   What do you mean public?
13  Q   Well, a member of the public, resident. Did
14  you send copies of the township ordinance to anybody, the
15  proposed township ordinance to anybody?
16      MR. SHERR: Other than what's been testified
17  to already?
18      THE WITNESS: No.
19  BY MS. MONTGOMERY:
20  Q   Other than the county commissioners -- I mean
21  the county planning commission.
22  A   No.
23  Q   Did anybody ever request a copy of the
24  proposed ordinance from you?
25  A   Yes.

176

1   Q   And who was that?
2   A   Different people got it from me.
3   Q   Different people got it from you?
4   A   Bought it from me actually.
5   Q   Bought it from you. The proposed or the
6   final?
7   A   I think it was the proposed.
8   Q   So you did send copies --
9   A   No, it was the final. The final, I'm sorry.
10  It's the final.
11  Q   After it was --
12  A   After it was passed.
13  Q   But prior to the time it was passed you never
14  sent a copy of it to anybody?
15  A   Not that I can recall, other than what I
16  testified to.
17  Q   Did you get any requests from anybody?
18  A   No, except Mr. Corneal.
19  Q   Did you send him a copy of the proposed --
20  A   No.
21  Q   Why not?
22  A   I didn't have one to give him at the time.
23  Q   But he did ask you for one?
24  A   Not me.
25  Q   Who did he ask?

177

1   A   Larry, I believe.
2   Q   He asked Larry Newton for a copy of the
3   proposed subdivision ordinance. Did Larry then pass that
4   request on to you?
5   A   I believe I read it in a letter, is how I know
6   that.
7   Q   Did you know about the request at the time
8   that it was submitted?
9   A   No.
10  Q   You found out about it later?
11  A   Yes.
12  Q   But then you just said you didn't have one to
13  give him at the time and that's why you didn't give him
14  one.
15  A   No. When Larry had that request, they weren't
16  -- the date on there -- I think it's the date that's in
17  that letter. I don't know. It's in one of these
18  correspondence. I saw it the other day when I was there.
19  We didn't have an ordinance yet.
20  Q   Well, we were talking about the proposed
21  subdivision ordinance and the request for that.
22  A   We didn't have a proposed yet either.
23  Q   Just so I'm clear about your testimony --
24      MS. MONTGOMERY: Let the record reflect that
25  Mr. Sherr just said something to his client. I'm not sure

178

1    what it was.
2         MR. SHERR: I'll state it, you're doing all
3    right, just listen to her questions. Are you satisfied?
4         THE WITNESS: That's what he said to me.
5    BY MS. MONTGOMERY:
6    Q    Did the Corneals ever ask you for a copy of
7    the ordinance at one of the township meetings?
8    A    Not that I recall.
9    Q    Do you recall telling the Corneals at any of
10   the meetings that the board only had originals and no
11   copies?
12   A    I might have done that.
13   Q    Is that the proposed ordinance or the final
14   ordinance?
15   A    Proposed.
16   Q    I think, if I understand your testimony, that
17   you said that when Mr. Corneal asked Larry Newton for a copy
18   of the proposed ordinance you didn't have a proposed
19   ordinance at that point?
20   A    We didn't have copies of a proposed ordinance.
21   Q    Do you recall when you gave your first
22   proposed ordinance to the Huntingdon County Planning
23   Commission?
24   A    You asked me that earlier and I don't know.
25   Q    Do you know if it was before or after Mr.

179

1    Corneal asked Mr. --
2    A    It had to be before.
3    Q    Did you talk to Larry Newton about whether or
4    not you ought to provide Mr. Corneal with a copy of the
5    proposed subdivision ordinance?
6    A    I don't recall.
7    Q    You don't recall. Did you ask the supervisors
8    about whether or not you ought to provide a copy?
9    A    I don't recall.
10   Q    Do you have any understanding at all of what
11   factors the county planning commission relies upon in
12   reviewing a proposed subdivision ordinance?
13   A    No.
14   Q    Do you know what they compare it to?
15   A    No.
16   Q    Does the county have a subdivision ordinance?
17   A    No.
18   Q    Did you get comments from the county on all
19   three ordinances that were passed at the July 10, 2000
20   meeting?
21   A    I don't recall if we got it on all three or
22   not.
23   Q    You just testified that Huntingdon County
24   doesn't have a subdivision ordinance, correct?
25   A    That's right.

180

1    Q    Did they ever have a subdivision ordinance to
2    your knowledge?
3    A    A county subdivision ordinance?
4    Q    A county subdivision ordinance.
5    A    No.
6    Q    I notice that the Huntingdon County Planning
7    Commission letters of February 24 and April 20th, which are
8    Wirth 11 and 10 respectfully, are addressed to you.
9    A    Yes.
10   Q    Did you read these letters?
11   A    Yes.
12   Q    Look at Paragraph 2 on the April 20th letter,
13   Paragraph 2 meaning their numbered paragraph 2. Miss Wirth,
14   what do you understand that paragraph to mean?
15   A    That the county was questioning the soils at
16   the site where he was proposing a house.
17   Q    Do you know what hydric soils are?
18   A    I know it has something to do with a wetland,
19   that's all I know.
20   Q    And then continuing on with Paragraph 2 do you
21   see where it says that the Blazosky Associates had indicated
22   that no wetlands were present at the location of the lots in
23   the Corneal subdivision proposal?
24   A    Yes.
25   Q    What occurred after the Blazosky Associates

181

1    map and study data identifying the investigation area was
2    submitted?
3    A    I have no idea.
4    Q    What occurred in response to their opinion and
5    their report that there were no wetlands present at the
6    location of the lots of the proposal?
7    A    I don't -- I have no idea.
8    Q    What prompted the Huntingdon County Planning
9    Commission to have to review whether or not there were
10   wetlands, do you know?
11   A    I have no idea.
12   Q    Do you know whether anybody among the township
13   supervisors questioned whether the Blazosky Associates
14   proposal was correct?
15   A    I have no idea.
16   Q    Did you question whether the Blazosky -- are
17   you familiar with the Blazosky Associates report?
18   A    I know it exists from this letter.
19   Q    Did you ever read it?
20   A    No.
21   Q    Did you know what the conclusions were?
22   A    No.
23   Q    Do you know whether the supervisors questioned
24   whether Barry Parks had correctly identified wetlands? Do
25   you know whether any supervisor questioned that?

182

1   A     You'll have to ask them.
2   Q     Did you have any conversations with anybody
3 from the Huntingdon County Planning Commission about whether
4 or not there were wetlands?
5   A     No.
6   Q     Let me ask you about Paragraph 3 of this April
7 20 letter. Can you just look at that, the numbered
8 paragraph 3. What do you understand that paragraph to mean,
9 Miss Wirth?
10   A     What it says.
11   Q     The proposal that they're speaking about in
12 that Paragraph 3, that's the subdivision proposal, correct,
13 that the Corneals submitted?
14   A     I would assume.
15   Q     Now, why are these letters addressed to you?
16   A     Because they all come to the secretary because
17 that's where the mail comes to.
18   Q     Then do you pass them on to each of the
19 township supervisors?
20   A     I attach them to the subdivision plot plan.
21   Q     You attach them to the subdivision plot plan?
22   A     Right, and they review it.
23   Q     And then the supervisors review it?
24   A     Right.
25   Q     When do they review it, at a township meeting

183

1 or informally or what?
2   A     It gets presented at the township meeting and
3 then if we don't have the letter back from the county or
4 there's something else that needs to happen they will sign
5 them at a later date.
6   Q     When you say you attach them, you mean you put
7 them in the file with it, stick them inside of the -- inside
8 a rubber band?
9   A     Somewhere -- it's attached.
10   Q     So it becomes part of the application,
11 correct?
12   A     It should.
13   Q     In response to this April 20, 2000 letter from
14 the planning commission, what action did the board of
15 supervisors take with respect to the Corneal's subdivision
16 proposal?
17   A     You'll have to ask them.
18   Q     Was it discussed any further at an additional
19 meeting?
20   A     About this proposal?
21   Q     About this letter.
22   A     This letter?
23   Q     What the letter recommends.
24   A     Not that I can recall.
25   Q     I'm going to show you a letter I'm going to

184

1 mark now as Wirth Exhibit 12.
2       (Letter dated 11/10/00 produced and marked as
3 Wirth Exhibit No. 12.)
4 BY MS. MONTGOMERY:
5   Q     Have you seen this letter before?
6   A     Yes, I probably have.
7   Q     I see that this letter is -- this Box 390 up
8 there, that's your home address, right?
9   A     Yes.
10   Q     The letter is addressed to gentlemen, which
11 means the township supervisors, correct?
12   A     Yes.
13   Q     So when you get a letter like this, what do
14 you do with it?
15   A     Well, this one I probably gave to Larry
16 Newton.
17   Q     And then you would assume that Larry Newton
18 would pass it on to the township supervisors?
19   A     I might have given them copies. I don't
20 remember.
21   Q     So I think you testified earlier that you
22 didn't know anything about a hearing request in connection
23 with his building permit?
24   A     I keep asking you about time frames. You must
25 talk to me about time frames because there's two different

185

1 things going on here.
2   Q     Well, this is November 10, 2000.
3   A     Okay, but there's the original building --
4 should I go into this?
5       MR. SHERR: Is it an answer to her question?
6       THE WITNESS: Yes. The original building --
7 when he applied for a building permit the first time, that
8 was not this time. This is whenever now we're working with
9 him to get his building permits and his sewage permits.
10 There's two different issues here and you have to clarify
11 not just year, you're going to have to clarify issues.
12 BY MS. MONTGOMERY:
13   Q     Okay, so when I asked you do you know anything
14 about an appeal of Mr. Corneal's application for a building
15 -- denial of an application for a building permit, I have
16 to tell you the exact date?
17   A     You're going to have to tell me which issue
18 we're talking about because there's two different things
19 going on.
20   Q     Well, now that you look at it, do you recall
21 a hearing --
22   A     Yeah, I know about this.
23   Q     Was there a hearing ever scheduled?
24   A     We have talked to Terry Williams numerous
25 times. We've had hearings with Terry and phone calls and --

186

1     they have.
2     Q     I think I asked you this before, but if you're
3     going to have a hearing on this appeal, the denial of his
4     building permit, where would that be held?
5     A     All the meetings we had with Terry Williams
6     were in the courthouse.
7     Q     That wasn't my question. I'm talking about a
8     hearing on an appeal of the denial of a building permit.
9     A     We never had a hearing with Mr. Corneal. We
10     had hearings -- meetings. We had meetings with Mr. Williams
11     in the courthouse. That's all we ever did.
12     Q     Let me ask you this: If Mr. Van Dommelen
13     sends out a denial of a building permit, does he send a copy
14     to you?
15     A     He would.
16     Q     He would?
17     A     Probably.
18     Q     And would you keep it in your files?
19     A     I've only ever had one.
20     Q     One denial of a building permit?
21     A     Yes.
22     Q     And that was Mr. Corneal's?
23     A     Right.
24     Q     No other building permit has ever been denied
25     in Jackson Township in your time?

187

1     A     I can't say that.
2     Q     In your time?
3     A     I can't say that.
4     Q     But you've only ever gotten one letter?
5     A     I've only gotten one letter. I can't say
6     anything else.
7     Q     Well, back to my question. Was a hearing ever
8     scheduled for an appeal on the denial of the building permit
9     in accordance with this November 10, 2000 letter?
10     A     I can't recall the time we met with Terry
11     Williams. I cannot recall the hearing we had with Terry
12     Williams, what day it was, when it was.
13     Q     Well, the hearing you had with Terry Williams
14     was in the county court suit up there, right? Is that what
15     you're talking about?
16     A     Yes, and that's what we — I thought that's
17     when this stuff took -- was taken care of.
18     Q     I'm going to show you a copy of a letter that
19     we're going to mark as Wirth Exhibit 13 now.
20     (Letter dated 10/10/00 produced and marked as
21     Wirth Exhibit No. 13.)
22     BY MS. MONTGOMERY:
23     Q     Before we even go back and talk about that, I
24     just want to go back to what you testified to a couple
25     minutes ago. You had said that you couldn't respond before

188

1     to my question about whether you were aware of a hearing on
2     Mr. Corneal's appeal of the denial of his building permit
3     because there was another issue, there were two issues, and
4     I need you to identify the issue, okay?
5     A     Okay.
6     Q     What was the other issue?
7     A     Now, I'm asking you to talk about the new
8     submissions that he has and the old submissions that he has
9     because they were handled in two different fashions.
10     Q     What do you mean they were handled in two
11     different fashions?
12     A     Well, Terry Williams submits everything here,
13     okay. This one was directly submitted to me, okay, and this
14     was --
15     Q     When you say this one, what are you referring
16     to?
17     A     This letter, Number 13, this came to me.
18     Those building permits came to me.
19     Q     You're looking at Number 13 and you're saying
20     the letter from David Van Dommelen dated April 10, 2000 came
21     to you?
22     A     No, no, not the letter.
23     Q     Okay, what?
24     A     Mr. Corneal's application, he sent them to me,
25     with drawings that he had drawn by hand attached, and that's

189

1     the answer -- this is the answer to that. And I'm assuming
2     that's what this is about, but I don't know.
3     Q     So you're saying the October 10, 2000 letter
4     from Mr. Van Dommelen is a response to Mr. Corneal's request
5     for a building permit?
6     A     The first building permit.
7     Q     When Mr. Van Dommelen sent this letter out to
8     Mr. and Mrs. Corneal that we've marked Wirth 13, did you get
9     a copy of it?
10     A     Obviously. I gave you one.
11     Q     Well, you gave it to me. Did you get a copy
12     of it when it went out?
13     A     I probably did. I have a file.
14     Q     Do you know who drafted the letter?
15     A     You'll have to talk to David about that.
16     Q     Did you draft the letter?
17     A     No.
18     Q     Does he have somebody who does his typing?
19     A     You'll have to talk to him.
20     Q     Do you do his typing ever?
21     A     No.
22     Q     I see up at the top here it has Jackson
23     Township Board of Supervisors, R.D. 1, Box 390. That's your
24     home box, right?
25     A     Yeah, that's not right.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

194

1 what I heard.
2 Q     What did you hear?
3        MR. SHERR: Object to the form of the
4 question, calls for hearsay. You can answer it.
5        THE WITNESS: I don't really know what
6 happened out there. I was not there.
7 BY MS. MONTGOMERY:
8 Q     I'm not asking you what you know, I'm asking
9 you what you heard, which you're allowed to testify to in a
10 deposition.
11        MR. SHERR: Same objection. Subject to the
12 objection, you can answer.
13        THE WITNESS: That he didn't give him a
14 permit.
15 BY MS. MONTGOMERY:
16 Q     Why didn't he give him a permit?
17        MR. SHERR: Same objection. You can answer,
18 same basis.
19 BY MS. MONTGOMERY:
20 Q     You can answer it.
21 A     The same reason we've talked about all day.
22 Q     And what was that we've talked about all day?
23 A     He didn't have the proper documentation.
24 Q     Do you know whether he was even given an
25 application when he went out to Mr. Van Dommelen's?

196

1        MR. SHERR: Well, you can't give her
2 instructions. You can ask her questions.
3        MS. MONTGOMERY: I can make a record of it if
4 I want to.
5        MR. SHERR: You can make a record of anything
6 you want, but you need to ask her questions.
7        MS. MONTGOMERY: That's what I did.
8        MR. SHERR: Are you done with the deposition?
9        MS. MONTGOMERY: No.
10        MR. SHERR: Well, then ask her a question.
11 BY MS. MONTGOMERY:
12 Q     Did you bring any documents with you today to
13 this deposition?
14 A     No, I ...
15 Q     Were you instructed by anybody whether or not
16 to bring any documents with you to this deposition today?
17 A     No.
18 Q     You weren't instructed one way or the other?
19 A     No.
20 Q     Did you ever discuss with Mr. Parks his review
21 of the Corneal sewage module?
22 A     I don't believe so.
23 Q     Does the board of supervisors have a
24 particular procedure that you're aware of for review and
25 approval of sewage modules?

195

1 A     From a letter that I read, no. This letter, I
2 think. Somewhere there's something that said he wasn't.
3 Q     Had you heard anything about that before that?
4 A     I don't know.
5 Q     Did you have a copy of this letter to you, the
6 August 31 and September 1 letter in your files?
7 A     I gave you these.
8 Q     You gave me these?
9 A     I believe. No? Well, then I do. I know that
10 -- I thought that was my number because I was writing on
11 there.
12        MR. SHERR: Answer her question.
13        THE WITNESS: Okay. I do.
14 BY MS. MONTGOMERY:
15 Q     So you do have them in your files?
16 A     Yes.
17 Q     Miss Wirth, I'm going to ask you to take our
18 document request -- which you have a copy of, correct?
19 A     Yes.
20 Q     And review it again with your counsel and see
21 whether there are any other documents responsive to the
22 document request and provide them to us immediately, okay.
23        MR. SHERR: Is that a question?
24        MS. MONTGOMERY: No, it's an instruction, it's
25 a request.

197

1 A     I think I did testify that -- to that earlier.
2 Q     I don't recall you testifying to it but --
3 A     It's attached to the plot plan, the same thing
4 as we review from the county. It's the same review.
5 Q     So let me ask you this: In your experience is
6 it correct that the sewage enforcement officer, Barry Parks,
7 first reviews the sewage module and signs off on them; is
8 that correct?
9 A     I'm not sure what the procedure is.
10 Q     You have no idea?
11 A     No, I don't know.
12 Q     Do you know whether or not the township has
13 ever rejected any sewage module that was approved by Barry
14 Parks?
15 A     I have no idea.
16 Q     You have no idea. Do you know whether they
17 rejected Mr. Corneal's sewage module?
18 A     Yes.
19 Q     Was it approved by Mr. Parks?
20 A     I don't know.
21 Q     Did you ever direct Mr. Parks or at least
22 suggest to Mr. Parks that he go out to Mr. Corneal's
23 property in 2001, in the year 2001, and reinspect his
24 property to see whether there was sewage enforcement
25 compliance?

190

1    Q    So Mr. Van Dommelen has an office where he
2  lives, where he keeps documents, but he uses Jackson
3  Township Board of Supervisor's address for his
4  correspondence?
5    A    **In this case he did.**
6    Q    Let me ask you this: Does Mr. Van Dommelen --
7  is it your understanding within the township governing body
8  that Mr. Van Dommelen passes on compliance with the
9  Pennsylvania Sewage Facilities Act? Let me direct your
10  attention to the October 10, 2000 letter marked Wirth 13.
11    A    **Pennsylvania Sewage Facility Act is addressed**
12  **in our building permit ordinance.**
13    Q    So Mr. Van Dommelen passes on whether or not
14  individuals requesting a building permit have complied with
15  the Pennsylvania Sewage Facilities Act?
16    A    **According to the ordinance, you have to have a**
17  **sewage permit if you're going to build a property and he**
18  **would say no to that if you didn't have one.**
19    Q    So Mr. Van Dommelen would communicate with Mr.
20  Parks about whether or not he's got a sewage permit, right?
21    A    **No, you don't -- anybody that goes to get a**
22  **permit normally has a sewage permit, if they're building a**
23  **house.**
24    Q    Let me ask you this: Do you know whether or
25  not you need a sewage permit for a garage?

191

1    A    **No.**
2    Q    You don't think you do?
3    A    **If you're just building a garage and nothing**
4  **else.**
5    Q    Okay.
6        (Discussion held off the record.)
7        MS. MONTGOMERY: I'm going to take a break and
8  look at our documents and then we're going to come back and
9  finish this up.
10        (Break taken at 2:42 p.m. until 3:01 p.m.)
11  BY MS. MONTGOMERY:
12    Q    I want to show you a series of documents
13  attached together that we are going to mark as Wirth
14  Exhibit 14.
15        (Packet of documents produced and marked as
16  Wirth Exhibit No. 14.)
17        (Discussion held off the record.)
18  BY MS. MONTGOMERY:
19    Q    This is Wirth Exhibit 14. After you take a
20  moment to look at that, Miss Wirth, at this collection of
21  documents, would you tell me if you recognize it.
22    A    **Yes.**
23    Q    Do you see that there are two letters, an
24  August 31, 2000 and a September 1, 2000 letter, correct?
25    A    **Right.**

192

1    Q    Now, you received these letters, correct?
2    A    **Yes.**
3    Q    Did you receive the attachments that you see
4  here?
5    A    **To the best of my knowledge.**
6    Q    Were there also sewer modules attached to this
7  when it came to you originally in the August, September 2000
8  time frame?
9    A    **I don't remember.**
10    Q    What did you do with this submission when you
11  received it?
12    A    **I don't remember what we did with it.**
13    Q    Is this what you were referring to as Mr.
14  Corneal's second request for a building permit?
15    A    **I believe so.**
16    Q    Did you give this to the supervisors?
17    A    **I'm sure I did.**
18    Q    Did you pass it onto the building inspector or
19  the building permit officer?
20    A    **I must have.**
21    Q    Did you have any discussion with the
22  supervisors or the building permit officer about this
23  building permit application?
24    A    **I don't recall.**
25    Q    Do you know whether it was ever acted on?

193

1    A    **I don't recall.**
2    Q    Did you ever discuss this second set of
3  building applications with Attorney Newton?
4    A    **Probably.**
5    Q    Why do you say probably?
6    A    **Because there's a lot of things happening and**
7  **I'm not sure which players are involved. I'm not sure if**
8  **this is the -- I'm not sure.**
9    Q    So if you call this the second attempt to
10  obtain a building permit, what was the first attempt, do you
11  recall?
12    A    **I'm not sure. I'm not sure.**
13    Q    Well, whether or not it was the first or
14  second, what do you know about any other attempt by Mr.
15  Corneal to obtain a building permit?
16    A    **Only what I've testified.**
17    Q    Well, what you've testified to so far, you're
18  saying?
19    A    **Yes.**
20    Q    Do you know whether or not Mr. Corneal ever
21  went out to Mr. Van Dommelen's residence to try and obtain a
22  building permit?
23    A    **Yes.**
24    Q    What do you know about that?
25    A    **I can't testify to that because I only know**

198

1   A   Me personally?
2   Q   Yes.
3   A   No.
4   Q   Did you ever pass along to him a request from
5   anybody else to do that?
6   A   I don't think I did that.
7   Q   Did the supervisors to your knowledge ever --
8   A   You'll have to ask them.
9   Q   Well, I'm asking you if in your presence or to
10  your knowledge whether --
11  A   I don't recall.
12  Q   Let me finish my question.  Whether the
13  supervisors instructed Barry Parks to go back out to Mr.
14  Corneal's property and reinspect his sewage sites.
15  A   I don't recall.
16  Q   Did you ever discuss it with Larry Newton
17  whether Mr. Parks ought to go back out to Mr. Corneal's
18  property and reinspect the test sites for sewage?
19  A   I don't recall.
20  Q   At one point when I asked you this question
21  earlier about whether or not you asked or suggested to Barry
22  Parks that he go back out to the Corneal property, you said
23  not me personally.
24  A   No, I asked you a question, if you meant me
25  personally.

199

1   Q   Oh, okay.
2   A   So I understood what you were asking me.
3   Q   Okay.
4   A   It's been a long day.
5   Q   Yes.  So your answer is no, you personally did
6   not?
7   A   No.
8   Q   Do you recall anybody suggesting that Barry
9   Parks go back out to the Corneal's property to reinspect the
10  test sites for sewage?
11  A   Not that I recall.
12  Q   Do you know how it came to occur that --
13  A   No.
14  Q   -- Mr. Parks went back out there?
15  A   No.
16  Q   You don't know, okay.  Are you aware of a
17  complaint that was filed against the Corneals concerning
18  possible wetlands on their property?
19  A   I know of it.
20  Q   Do you know who filed -- who made that
21  complaint?
22  A   I have no idea.
23  Q   How do you know of it?
24  A   Because it's in one of these documents that's
25  here.

200

1   Q   Do you know who the complaint was made to?
2   A   I have no idea.  I think it says Army Corps of
3   Engineers or something.
4   Q   The Army Corps of Engineers.  Was there any --
5   do you recall discussing that complaint with anybody else at
6   all?
7   A   No.
8   Q   Do you recall anybody else discussing that
9   complaint in your presence?
10  A   No.
11  Q   Have you seen any written correspondence   ✗
12  about that complaint?
13  A   No.
14  Q   Is the only knowledge that you have about that
15  complaint against the Corneals what you saw in a letter here
16  somewhere?
17  A   Yes.
18  Q   After the initiation of the lawsuit?
19  A   Yes.
20  Q   So you didn't know about it before the
21  initiation of the lawsuit?
22  A   No.
23  Q   When I asked you briefly earlier about whether
24  or not you were familiar with the report from Blazosky and
25  Associates --

201

1   A   From what?
2   Q   I think it's -- am I saying that right?
3   Blazosky and Associates on wetlands on the Corneal property.
4   A   Okay, yeah.
5   Q   I asked you earlier had you ever seen that
6   report when it came out.
7   A   I don't recall.
8   Q   Do you recall whether or not it was discussed
9   among the supervisors?
10  A   No.
11  Q   Do you have a copy of that report in your
12  files?
13  A   I don't know.
14  Q   Do you know how it came to occur that Mr.
15  Corneal had to supply a third-party certification that the
16  sites already approved by the sewage enforcement officer
17  were not located in wetlands?
18  A   No.
19  Q   You don't know how it came -- did you ever
20  hear it discussed?
21  A   No.
22  Q   Let me ask you a very broad, general question
23  about it.  Did you know anything about it -- do you right
24  now know anything about it?
25  A   I don't know what you mean.

202

1    Q    The sewage enforcement officer having
2  determined that there are no wetlands on the Corneal
3  property, okay. Do you know anything about the board or
4  anybody else requiring that a third party certify that the
5  sewage enforcement officer was correct in that
6  determination?
7    A    No.
8    Q    Do you know anything about Mr. Wilson's
9  interest in the property now owned by the Corneals?
10   A    No.
11   Q    Do you know anything about his family's prior
12 ownership of it?
13   A    No.
14   Q    You don't?
15   A    No.
16   Q    Do you know anything about the history of that
17 property at all?
18   A    No.
19   Q    Are you ever involved in any way, whether it's
20 through maintenance of records or passing correspondence, in
21 the issuance of privy permits in the township?
22   A    No.
23   Q    That stuff never comes across your desk?
24   A    Nope.
25   Q    Did anybody ever call you and inquire about

203

1  it?
2    A    Not to the best of my knowledge.
3    Q    Do you know anything about the granting of
4  privy permits in the township?
5    A    No, I do not.
6    Q    Have you ever had any conversations with Mr.
7  Parks about the issuance of privy permits?
8    A    Yes.
9    Q    What's the nature of those conversations?
10   A    I told him the result -- what the supervisors
11 said the night of our meeting, that's all I did.
12   Q    The night of what meeting?
13   A    The meeting that -- I don't know what meeting
14 it was. After the meeting of April 3rd.
15   Q    What did the supervisors say at the meeting of
16 April 3rd?
17   A    That Mr. Corneal could not have a privy
18 permit.
19   Q    So you passed that information on to Mr.
20 Parks?
21   A    Barry Parks.
22   Q    Did you call him?
23   A    Yes, I did.
24   Q    Did you do so at the instructions of the
25 supervisor?

204

1    A    Yes.
2    Q    Supervisors, I should say.
3    A    Yes.
4    Q    Did one supervisor in particular ask you to
5  make that phone call?
6    A    No.
7    Q    Did you generally understand you were supposed
8  to make that phone call?
9    A    Yes.
10   Q    So you took it upon yourself to make the phone
11 call without a specific instruction on that particular
12 occasion?
13   A    That's right. That's exactly right.
14   Q    Did you discuss the refusal to provide a privy
15 permit to Mr. Corneal with Mr. Newton?
16   A    I don't know if I ever did or not.
17   Q    In your discussion with Mr. Parks about
18 whether or not to provide a privy permit to Mr. Corneal, how
19 long did you talk to him?
20   A    I have no idea.
21   Q    Did you call him at his house?
22   A    Yes.
23   Q    So you don't know exactly how long you talked
24 to him. Do you know when you talked to him?
25   A    After the meeting.

205

1    Q    The same night of the meeting?
2    A    Yes.
3    Q    Immediately after the meeting?
4    A    I don't know.
5    Q    I may have asked you this, and I apologize,
6  but do you recall the back and forth between you and Mr.
7  Parks about whether or not to issue a privy permit?
8    A    Do I what?
9    Q    Do you recall the substance of the
10 conversation?
11   A    No. All I did -- well, I guess I do. I just
12 repeated what happened at the meeting and that's all I did.
13   Q    What did Mr. Parks say?
14   A    I don't know as he said anything. I just told
15 him what happened.
16   Q    Did you ever talk to Mr. Parks about issuing
17 the Corneals a privy permit?
18   A    Not that I remember.
19   Q    Did you seek any advice from Larry Newton in
20 this regard?
21   A    I don't -- not that I recall.
22   Q    Did the Corneals ever contact you directly
23 about getting a privy permit?
24   A    Not that I recall.
25   Q    When you called Mr. Parks, did you say to him

## 206

1  something along these lines, and if I'm wrong correct me and
2  tell me what you said, okay, the supervisors said do not
3  issue a privy permit to Mr. Corneal; is that correct?
4      A    **What I said was what was in the minutes.**
5      Q    As you said, the minutes are a summary of what
6  goes on at the meetings. I'm just asking you if you can be
7  a little more specific in what you said to him.
8      MR. SHERR: I'm going to object to the form of
9  the question. It's been asked and answered and at this
10 point we're getting very argumentative, Counsel.
11     MS. MONTGOMERY: Really?
12     MR. SHERR: Yeah, really. Yeah, really. When
13 she says it's what's in the minutes and you're asking her
14 for more specificity and she said what's in the minutes, I
15 think that's pretty specific.
16     MS. MONTGOMERY: I'm entitled.
17     MR. SHERR: You're entitled to what?
18     MS. MONTGOMERY: I'm entitled to seek
19 information.
20     MR. SHERR: You are absolutely entitled to
21 seek information. You're not entitled to harass this
22 witness, you're not entitled to be argumentative with this
23 witness and you're not allowed to oppress this witness. You
24 can answer, if it's anything other than what's in the
25 minutes as you stated.

## 207

1      THE WITNESS: It's what I just said.
2      (Discussion held off the record.)
3  BY MS. MONTGOMERY:
4      Q    Are you aware of the contract that existed
5  between Mr. Corneal and the Hewetts for the purchase of the
6  farmhouse and some surrounding property that's located on
7  the larger piece owned by Mr. Corneal?
8      A    **I'm aware they had an agreement.**
9      Q    How did you become aware of that?
10     A    **I think -- I don't know, somewhere in this.**
11     Q    When did you first hear about it?
12     A    **I don't -- I don't recall.**
13     Q    Did you ever discuss that contract with
14 anybody else?
15     A    **No.**
16     Q    Did you ever discuss whether or not the
17 Hewetts were going to go forward with their sale -- purchase
18 of that property with anybody else?
19     A    **I have no reason.**
20     Q    Do you know whether anybody else is interested
21 in purchasing the farmhouse located on Mr. Corneal's
22 property?
23     A    **I have no reason to have that information.**
24     Q    I just asked you do you know.
25     A    **No.**

## 208

1      Q    How long have you lived in Jackson Township?
2      A    **Eleven years.**
3      Q    Where did you live before that?
4      A    **Camp Hill.**
5      Q    Did you own property up there before you moved
6  up there 11 years ago?
7      A    **Yes.**
8      Q    How long did you own that property?
9      A    **1988.**
10     Q    Did you own any property before you owned that
11 particular property?
12     A    **Where?**
13     Q    Up in Jackson Township.
14     A    **No.**
15     Q    Do you have family up there?
16     A    **Yes.**
17     Q    Who is that?
18     A    **Nobody in Jackson Township, if that's what**
19 **you're asking.**
20     Q    That's what I'm asking, right.
21     A    **No, I don't have any family.**
22     Q    Were you aware that Eagle Excavation was hired
23 to perform excavation work for test pits on the Corneal
24 property?
25     A    **When?**

## 209

1      Q    At the time that they were hired to do so.
2      A    **No.**
3      Q    You were not aware of that?
4      A    **No.**
5      Q    Were you aware of Mr. Wilson doing any work up
6  on the Corneal property whatsoever?
7      A    **When?**
8      Q    At the time that he performed the work.
9      A    **No.**
10     Q    Now, you asked me when. When did you become
11 aware?
12     A    **From the documents.**
13     Q    Just from the documents in this lawsuit?
14     A    **Right.**
15     Q    After you initially called Mr. Parks and told
16 him that he wasn't supposed to issue a privy permit
17 according to the supervisors, did you ever call him back and
18 talk to him again?
19     MR. SHERR: Object to the form of the question
20 of misstating her prior testimony.
21 BY MS. MONTGOMERY:
22     Q    I'll just try and rephrase it. Maybe I missed
23 something, but after you called Mr. Parks and informed him
24 that the supervisors said that he was not to be issued a
25 privy permit, did you ever call -- talk to him again about

210

1  whether or not to issue the Corneals a privy permit?
2  A    You asked me that before and I said no.
3  Q    Did you ever talk --
4  A    Not that I recall.
5  Q    Did you ever talk to him again about whether
6  or not he ought to approve the sewage modules?
7  A    No.
8  Q    Did you ever call Mr. Van Dommelen with any
9  information about whether or not he ought to issue a
10  building permit to the Corneals?
11  A    No.
12  Q    I'm going to show you a document we are going
13  to mark as Wirth Exhibit 15.
14        (Letter dated 5/5/00 produced and marked as
15  Wirth Exhibit No. 15.)
16  BY MS. MONTGOMERY:
17  Q    Have you seen this document before, Miss
18  Wirth?
19  A    Yes.
20  Q    In what capacity have you seen it?
21  A    It's in all this stuff I have.
22  Q    The document is dated May 5th, 2000, correct?
23  A    Yes.
24  Q    Were you given a copy of this document by Mr.
25  Van Dommelen?

211

1  A    I don't know how I got the document.
2  Q    Did you have a copy of it in your files?
3  A    Yes.
4  Q    Did you provide it to us?
5  A    I don't know if I did or not.
6  Q    Did you ever discuss this letter with any of
7  the board of the township supervisors?
8  A    I don't recall.
9  Q    Did you ever discuss it with Mr. Van Dommelen?
10  A    I don't -- I don't know. I don't recall.
11  Q    More generally did you ever discuss it with
12  anybody at any time?
13  A    I don't recall.
14        MS. MONTGOMERY: I don't think I have any
15  other questions for you at this time, subject to our receipt
16  of additional documents from your files and review of
17  additional documents in Jackson Township and subject to what
18  my client has to say right now about additional questions.
19  I think we're finished for now, Miss Wirth.
20        THE WITNESS: Thank you.
21        MS. YANKANICH: I have some questions for you.
22  I know it's been a long day and I'll try to be brief.
23
24                    CROSS-EXAMINATION
25

212

1  BY MS. YANKANICH:
2  Q    In case I haven't introduced myself, Miss
3  Wirth, I'm Jennifer Yankanich and I represent Larry Newton.
4  A    Yes.
5  Q    I want to go back and retrace some of these
6  steps so that I understand very clearly what kind of
7  communications you had with Larry Newton and so forth. So
8  I'd like to start with the period of 1997 to '98, which is
9  roughly when you said you started research on the
10  subdivision ordinance.
11  A    Very little probably. I don't recall.
12  Q    But you did start research before you actually
13  enacted the subdivision ordinance; is that correct?
14  A    Oh, yes.
15  Q    And the three supervisors asked you to do that
16  research.
17  A    Oh, yes.
18  Q    Did you have any contact during that research
19  with Larry Newton?
20  A    Between '97 and '98?
21  Q    At any time during the research and before the
22  ordinance was enacted.
23  A    Oh, yes.
24  Q    What kind of communications were they?
25  A    Well, he typed the final -- he typed the

213

1  ordinance that we came up with.
2  Q    Larry Newton did?
3  A    Yes.
4  Q    So --
5  A    Before the final -- I mean, it was a draft.
6  He did that.
7  Q    When you were doing -- what kind of research
8  were you doing on the ordinance?
9  A    That's what I testified, on all the other
10  subdivision ordinances that we got and we divided and
11  subtracted and put things together for Jackson Township.
12  Q    You stated that you had work groups with the
13  three other supervisors?
14  A    Yes, we did.
15  Q    Now, how did Larry Newton come into the
16  works? For instance, during these work groups if you had
17  questions, did you call Larry Newton?
18  A    I don't recall if we called him from those
19  work groups. I don't know that. I don't remember.
20  Q    Well, who made the decision on what parts to
21  put into the subdivision ordinance?
22  A    The supervisors.
23  Q    Did you at any time contact Larry Newton and
24  get his approval as to what was included in your draft
25  ordinance?

214

1 A To get his approval?
2 Q Yes. When your supervisors made the decision
3 on what specific parts to put into this draft ordinance, did
4 they seek the approval of Larry Newton?
5 A I don't know if they ever asked for his
6 approval.
7 Q Did you ever -- you testified earlier you
8 weren't sure who asked you or who stated they wanted a
9 subdivision ordinance. Did you ever ask Larry Newton
10 whether or not the township could enact such an ordinance?
11 A Probably.
12 Q Was that before your research was started?
13 A I don't remember.
14 Q Do you remember that you did in fact ask him
15 whether you could have such an ordinance?
16 A I don't recall.
17 Q Now, throughout your workshops when did Larry
18 Newton get involved in typing the draft?
19 A You want a time?
20 Q Yes. For instance, you've told me that you
21 did some research, you gathered some other documents from
22 other townships who had such an ordinance, you and the three
23 supervisors sat down and picked some parts out of each of
24 these to put into yours. I'm asking you how Larry Newton
25 came to even start to type this.

215

1 A We took it into him and asked him to look at
2 -- look at it legally, I guess.
3 Q So you already had a draft?
4 A Yeah -- well, no, we didn't have a draft.
5 Q What did you submit to him?
6 A The pieces that we had.
7 Q And what did you specifically ask him about
8 those pieces?
9 A He just needed to look at them for, I guess,
10 the legal aspect of the thing, not as far as how they --
11 what it did to the township, but were they legal, I guess.
12 I don't know what he was doing. I just know that he did it.
13 Q Did you have that contact with Larry Newton or
14 did the supervisors?
15 A Probably me.
16 Q So were you always the go-between between
17 Larry Newton and the supervisors?
18 A No.
19 Q Was there a situation with regard to this
20 draft ordinance where the supervisors went directly to Larry
21 Newton to ask questions?
22 A You're only talking about the ordinance now?
23 Q The draft ordinance before it was enacted.
24 A I don't think so, but I don't -- I don't think
25 they went without me, but I don't know that for sure.

216

1 Q Before January 2000 when the moratorium was
2 voted on and passed --
3 A Um-hum.
4 Q -- did you ever ask Larry Newton whether or
5 not passing such a moratorium was legal?
6 A I don't recall if I did or not.
7 Q Do you recall if any of the supervisors asked
8 Larry Newton that?
9 A You'll have to ask them that.
10 Q Do you recall ever discussing the moratorium
11 prior to when it was passed with Larry Newton?
12 A I don't recall.
13 Q Before January 2000 did you have any knowledge
14 of David Corneal's property and what he was proposing to do
15 with it?
16 A No, I did not.
17 Q So did you have any discussions with Larry
18 Newton prior to January 2000 regarding David Corneal's
19 properties?
20 A No, not to -- no.
21 Q In January 2000 the moratorium was passed?
22 A Right.
23 Q You just stated you did not have any
24 conversations with Larry Newton regarding that moratorium;
25 is that correct?

217

1 A I said I couldn't recall.
2 Q You couldn't recall. Do you recall if any of
3 the supervisors asked you to research whether or not you
4 could -- they could pass such a moratorium?
5 A I don't recall how we came about that.
6 Q Typically if the supervisors wanted to do
7 something, such as pass a moratorium or pass a resolution or
8 pass an ordinance, would they ask you to research it?
9 A It depends. Sometimes.
10 Q Fifty percent of the time?
11 A Maybe.
12 Q Most of the time?
13 A I would say about 50 percent of the time.
14 Q You don't recall whether or not the
15 supervisors asked you to research whether they could pass a
16 moratorium?
17 A I don't recall how that happened.
18 Q When was the first time that you heard a
19 moratorium was going to be passed?
20 A I don't -- I don't know. I don't recall.
21 Q Did you show up at the January meeting and
22 somebody brought up the issue of a moratorium?
23 A I was at the January meeting.
24 Q That was the first time you heard about a
25 moratorium?

218

1    A    I don't recall.
2    Q    And so we're clear, you had not heard of David
3    Corneal before January 2000?
4    A    No.
5    Q    The moratorium was passed on January 4th
6    during the meeting; is that correct?
7    A    Right.
8    Q    By a unanimous vote of the three supervisors?
9    A    Yes.
10    Q    Were you involved with that vote?
11    A    I don't have a vote.
12    Q    If you had sought the advice of Larry Newton,
13    do the supervisors typically take your advice or do they ask
14    Larry Newton themselves?
15    A    Typically take my advice?
16         MR. SHERR:  Make sure she can hear you.
17         THE WITNESS:  Oh, you're still recording this?
18         MS. YANKANICH:  Yes, we're still on the
19    record.  You're still under oath.
20         MR. SHERR:  She got it.
21         MS. YANKANICH:  I'm not being confrontational
22    at all.  I'm just letting her know that she's on the record.
23         MR. SHERR:  I know you're not.  She answered
24    the question.
25    BY MS. YANKANICH:

219

1    Q    Oh, you answered my question.  Typically if
2    you asked Larry Newton a question -- the supervisors asked
3    you to ask Larry Newton a question, do they come to you and
4    say what did he say or do they ask him themselves?
5    A    I'd say it's about a fifty-fifty thing.
6    Q    So if you went to Larry Newton and said can we
7    pass a moratorium in January and he says, let's just say,
8    yes, we can, you would report that back to the supervisors?
9    A    If he did that, I would have.
10    Q    And they would act upon that advice without
11    confirming it themselves typically?
12    A    Sometimes, sometimes not.
13    Q    Did Larry Newton tell you to enact a
14    moratorium?
15    A    I don't recall how that came about.
16    Q    You don't recall if it came about from a
17    supervisor or from Larry Newton?
18    A    I don't recall how it came about.
19    Q    On February 7th when David Corneal submitted
20    his subdivision plan to the three supervisors, do you recall
21    at the meeting before they denied it, do you recall if the
22    supervisors stopped the meeting, called their attorney,
23    Larry Newton, and discussed the matter with him before
24    refusing the denial?
25    A    I know they didn't do that.

220

1    Q    So they denied his subdivision plan prior to
2    calling Larry Newton on February 7th?
3    A    Yes.
4    Q    Did they at any time after the February 7th
5    meeting consult with Larry Newton regarding the first
6    subdivision plan that David Corneal submitted?
7    A    I'm sure they did.
8    Q    Were you present at any of those meetings?
9    A    I don't recall.
10    Q    Did you consult with Larry Newton after
11    February 7th regarding the first subdivision plan that David
12    Corneal submitted?
13    A    I don't recall if I did or not.
14    Q    You said that you thought the supervisors
15    did.  Why do you think that?
16    A    Somebody did.
17    Q    How do you know that?
18    A    Because he's been aware of what we've been
19    doing.
20    Q    Was he aware from the beginning?
21    A    I don't -- beginning of what?
22    Q    February 7th is the first time you stated that
23    David Corneal came to your knowledge.  You didn't know about
24    David Corneal and his property before then?
25    A    No, I didn't.

221

1    Q    So February 7th he walks into the meeting
2    where you're taking the minutes, he submits his plan and the
3    three supervisors deny it.  Did somebody get on the phone
4    right after that and talk to Larry Newton to inform him,
5    hey, we've got to let you know what's going on here?
6    A    You mean that night?
7    Q    Anytime after February 7th.
8    A    Yes, somebody did.
9    Q    When was that?
10    A    I don't know.
11    Q    Do you know who it was?
12    A    No.
13    Q    How do you know that Larry Newton was aware of
14    the denial of the board on February 7th?
15    A    I don't know if it's in one of these documents
16    -- I don't know.  I don't know.
17    Q    Your testimony is that you're sure he was
18    aware of what happened, what transpired at the February 7th
19    meeting with David Corneal, but you don't know how?
20    A    I don't know how he got the information.
21    Q    You're sure he knew about it?
22         MS. MONTGOMERY:  I'm going to just -- I'm now
23    in the position that you were in.  I can see that the court
24    reporter is struggling to hear.  So can you keep your voice
25    up.

**222**

1    THE WITNESS: I'm sorry.
2  BY MS. YANKANICH:
3    Q    Let me just repeat my question.  You're sure
4  that Larry Newton knows and knew right after the meeting
5  what transpired at the February 7th, 2000 meeting?
6    A    I'm sure he knew.  When he found -- we told
7  him, but when he found out I don't know.
8    Q    Is it possible he found out about what
9  happened at that meeting after this lawsuit was enacted, was
10  initiated?
11    A    You mean after July 4th?
12    Q    Is it possible he found out after the county
13  sued David Corneal for violation of building against --
14    A    Oh, no.
15    Q    He knew before then?
16    A    Oh, yeah.
17    Q    Now, on April 4th David Corneal came to the
18  meeting to submit sewer modules.  They were denied by the
19  board; is that correct?
20    A    Yes.
21    Q    Did the three supervisors stop the meeting and
22  seek advice from Larry Newton during the meeting?
23    A    No.
24    Q    Before that denial?
25    A    No.

**223**

1    Q    Did you at any time consult with Larry Newton
2  regarding the denial of the sewer modules on April 4th?
3    A    At the meeting?
4    Q    At the meeting.
5    A    No.
6    Q    How about after the meeting?
7    A    Not at that time.
8    Q    When did you consult with Larry Newton
9  regarding the sewer modules?
10    A    I don't recall when we did that.
11    Q    You know that you did?
12    A    No, I don't know if we did.  I don't know how
13  he found that out.
14    Q    You believe that Larry Newton knows about the
15  board's denial of Mr. Corneal's submission of a sewer
16  module?
17    A    Yes.
18    Q    How do you think -- why do you believe he
19  knows about that?
20    A    Because of all this paperwork.  We all have
21  these big packs of paperwork now because of the lawsuit and
22  I believe it's in there, in my minutes.
23    Q    So you believe he knows about it, but you
24  don't know when he found out?
25    A    No.

**224**

1    Q    You never told him what happened at that
2  meeting?
3    A    I don't know if I did or not.
4    Q    Is it customary after each meeting of the
5  supervisors to call Larry Newton?
6    A    No.
7    Q    So the January 4th meeting, it's not customary
8  to end the meeting and then call Larry Newton to discuss
9  the --
10    A    No, it is not.
11    Q    That would be unusual to do that?
12    A    Yes, it would be.
13    Q    So even though it's unusual, it doesn't stand
14  out in your mind that maybe somebody did that?
15    A    No.
16    Q    Mr. Corneal also requested a privy permit at
17  one of these meetings.  I apologize, I forget the date that
18  he actually requested that permit.  Do you recall?
19    A    I think it was April.
20    Q    Also April.  It was denied as well; is that
21  correct?
22    A    Yes.
23    Q    Did you seek the advice of Larry Newton with
24  regard to the denial of that privy permit?
25    A    No, I don' think that -- did I seek it?

**225**

1    Q    Did you.
2    A    No.
3    Q    Are you aware if any of the supervisors sought
4  Larry Newton's approval before they denied the privy permit
5  requested by David Corneal?
6    A    I am not aware of that.
7    Q    The first time that David Corneal requested a
8  building permit -- I'm talking the first time -- did you
9  yourself seek the advice or guidance of Larry Newton
10  regarding that building permit request?
11    A    I don't know whether -- I don't -- I don't
12  recall.
13    Q    Do you remember discussing this at all with
14  Larry Newton?
15    A    I'm sure I've discussed it all with him.
16    Q    You've discussed the entire situation with
17  Larry Newton?
18    A    At some time during this we've had a
19  discussion.
20    Q    During the lawsuit?
21    A    Yes.
22    Q    Do you remember prior to the lawsuit talking
23  to Larry Newton about David Corneal?
24    A    I probably did.
25    Q    Can you give me any of the specifics of that

226

1 conversation?
2 A No.
3 Q Did you ever ask him whether what the board
4 was doing was legal?
5 A I don't think I ever asked that question.
6 Q Did you ever ask him whether or not you could
7 deny a privy permit?
8 A I never asked it -- I don't think I ever asked
9 him that question.
10 Q When he came to you and said he was no longer
11 going to subdivide and he wanted to build a garage, did you
12 seek the advice of Larry Newton?
13 A You mean during the meeting or whatever?
14 Q I'm saying at any time.
15 A At any time?
16 Q At any time did you seek the advice of Larry
17 Newton on behalf of yourself or the board members with
18 respect to any requests by David Corneal with his property?
19 A We've asked his advice.
20 Q Give me some of the specifics of that advice.
21 A It's very hard to say because we talk about a
22 lot of things. You know, there's a lot of things going on
23 here and you're asking for those items and I can't honestly
24 testify to those items. We've talked about everything in --
25 after the lawsuit and before and I'm not sure.

228

1 Q When David Corneal came to the board meeting
2 and said it was illegal to have a moratorium, did you ask
3 Larry Newton about that?
4 A I probably did or somebody did.
5 Q Are you sure of that?
6 A No, I'm not sure.
7 Q Did you yourself ask him that?
8 A I don't remember.
9 Q There's a pretty specific chronology of events
10 that went on in this matter before the lawsuit was
11 initiated. There was the research for the ordinance and
12 then you imposed the moratorium. When I say you, I mean the
13 board. Then Mr. Corneal came on the scene and requested his
14 first subdivision plan to be approved.
15 You don't recall at any point during this
16 whether it was when he asked for his first subdivision plan
17 or his sewer module or his privy permit or his first
18 building permit, building application, or his second
19 building permit, whether or not you or any board member
20 sought the advice of Larry Newton?
21 A I'm -- you asked me to be specific and I can't
22 be specific. I don't remember.
23 Q Well, when I ask you a specific question, you
24 first tell me that you don't think you did and then I ask
25 you another question and you tell me you're certain that you

227

1 Q So you're not certain that you've ever had a
2 conversation with Larry Newton before the lawsuit was
3 initiated?
4 A Oh, I've had conversations with Larry before
5 the lawsuit was initiated.
6 Q Conversations about David Corneal's property?
7 A Yes, I'm sure I've done that.
8 Q Were these conversations to just discuss David
9 Corneal or was it to just get his advice on how the board
10 should proceed with regard to David Corneal?
11 A To get his advice.
12 Q What advice specifically did the board need to
13 proceed?
14 A Before or after the lawsuit?
15 Q Before.
16 A I don't know. I can't give you a specific
17 before.
18 Q Well, you testified that you're certain you
19 had conversations with Larry Newton regarding advice the
20 board needed to proceed with regard to Mr. Corneal and what
21 he wanted to do with his property. Am I misstating your
22 testimony?
23 A No, I did say that, but I can't give you a
24 specific -- I can't tell you specifically what I would have
25 talked to him about.

229

1 had contact with Larry Newton. All I'm trying to find out
2 here, and I'm trying not to be confrontational, is when did
3 you talk to Larry Newton? When did you specifically talk to
4 Larry Newton?
5 A I don't remember.
6 Q Did any of the supervisors ever come to you
7 and say, hey, we need to find out whether or not we can do
8 this?
9 A I don't remember.
10 Q Not on any of this information?
11 A I remember talking to Larry, but I do not
12 specifically -- I can't give you specifics on this. I
13 can't.
14 Q How often does the board seek the advice of
15 Larry Newton?
16 A Under normal circumstances?
17 Q Under any other circumstance than the Corneal
18 circumstance.
19 A Not very often.
20 Q When would be a situation where they would
21 need to consult with Larry Newton?
22 A If we were going to do an ordinance. And we
23 had a problem with our one road, Miller Road is -- to be
24 specific, where the contractor came in and the road failed.
25 So we made -- we had to get after him and we filed a suit

230

1    against him to come back and redo the road, which he did.
2    Q    Did you ever consult with Larry Newton
3    regarding any other person who submitted a subdivision plan?
4    A    Not to the best of my knowledge.
5    Q    So David Corneal is the only person who
6    submitted a subdivision plan where you needed the advice and
7    guidance of Larry Newton?
8    A    In the short period that I've been there, yes.
9    Q    But you don't recall what any of that advice
10   was that you needed?
11   A    Advice?
12   Q    Yes.
13   A    You're talking about before the lawsuit?
14   Q    Yes, specifically I'd like to focus on before
15   the lawsuit at this point.
16   A    I have no idea what we talked to him about.
17        MS. YANKANICH:  Give me a second here.  I'll
18   look through my notes.
19        (Pause.)
20   BY MS. YANKANICH:
21   Q    When there was going to be an advertisement
22   for a meeting of the board, how was it determined whether or
23   not you would submit the notice, the advertisement, or Larry
24   Newton would submit the advertisement?
25   A    You have to be specific.

231

1    Q    Okay, if it is a -- if it was a regular
2    meeting of the board in January, would you advertise when
3    the meetings were going to be held?
4    A    I did that.
5    Q    If it was going to be a special meeting of the
6    board, how was it determined whether or not you or Larry
7    Newton would notify the public of that meeting?
8    A    The only time Larry would ever advertise was
9    for an ordinance or something.  I did everything else.
10   Q    You stated earlier that Larry Newton is not
11   present at the township supervisor meetings; is that
12   correct?
13   A    I said unless we request him.
14   Q    Unless you requested him to be there; is that
15   correct?
16   A    That's right.
17   Q    Did you ever request him to be there with
18   regard to the David Corneal matter?
19   A    No.
20   Q    Do you know why any of the supervisors did not
21   impose the moratorium prior to January 2000?
22   A    You'll have to ask them that.
23   Q    Do you know if it was Larry Newton who
24   suggested that they do that in January 2000?
25   A    I have no idea.

232

1    Q    Did you talk with Larry Newton about whether
2    or not a moratorium should be imposed in January 2000?
3    A    I think I've testified to that a couple times
4    today.  I don't recall.
5    Q    You testified earlier that you know of two
6    specific conversations you had with Larry Newton, one was a
7    conference call with the other supervisors present after the
8    lawsuit was initiated and the first was a telephone call
9    that you had with Larry Newton.  Do you recall when that
10   contact occurred?
11   A    July 4th.
12   Q    What was the substance of that conversation?
13   A    He called me to tell me he had been served
14   with a lawsuit.
15   Q    Larry Newton called you?
16   A    Yes.
17   Q    What was the time of that conversation?
18   A    I have no idea.  Sometime during the day.
19   Q    Did you make any notes of when -- of telephone
20   calls?
21   A    No, this was on the 4th of July or 3rd of July
22   or something and I was at home.  I was not in my office when
23   I got the phone call.
24   Q    Do you typically make any telephones notes
25   when you receive a telephone call regarding township

233

1    business?
2    A    No, I do not.
3    Q    If you were sitting in your office right now,
4    is there anything that you would reference that could get me
5    the information to exactly what time and when this
6    conversation occurred?
7    A    No.
8    Q    No memos from the conversation?
9    A    No.
10   Q    You also stated previously that Jim Himes
11   would give information to Larry Newton and then Larry Newton
12   would call and I believe you said he would call you or the
13   supervisors; is that correct --
14   A    Yes.
15   Q    -- regarding the David Corneal matter?
16   A    Yes.
17   Q    Did he typically call you?
18   A    Sometimes.  Sometimes he calls one of the
19   supervisors.
20   Q    What would he call you and discuss?
21   A    Whatever is going on.
22   Q    What kind of information was he getting from
23   Jim Himes?
24   A    I don't think he was getting information.  He
25   was -- Mr. Corneal was asking Jim Himes for -- it's in one

234

1 of these memos here, some kind of information. You know, I
2 don't know if that was -- I don't know. It's in these
3 papers.
4    Q    Was Larry Newton calling you to tell you to
5 provide that information to Mr. Corneal?
6    A   I don't remember.
7    Q   Do you remember what information Mr. Corneal
8 was seeking through Jim Himes?
9    A   At one time I think he wanted a draft copy of
10 the ordinance.
11    Q   So when Larry Newton instigated the phone call
12 to you or one of the supervisors, you don't recall what he
13 said?
14    A   No.
15    Q   Do you recall ever being directed by Larry
16 Newton to give a draft ordinance to Mr. Corneal?
17    A   No, I do not recall.
18    Q   Do you recall any of the telephone
19 conversations you had with Larry Newton prior to the
20 lawsuit?
21    A   No.
22    Q   Do you recall any other meetings that you had,
23 conference, meetings or otherwise, with the supervisors,
24 yourself and Larry Newton?
25    A   Prior to the lawsuit?

235

1    Q   Prior to the lawsuit.
2    A   No, I do not.
3    Q   You mentioned earlier that you have knowledge
4 of a sewage act, I believe you said it was, where if two
5 dwellings are on the same property it's considered an
6 equivalent subdivision; is that correct?
7    A   That's right.
8    Q   Do you have that -- is that your own
9 independent knowledge or did you get that advice from Larry
10 Newton?
11    A   I didn't get that advice from Larry Newton.
12    Q   That's your own independent knowledge?
13    A   Yes.
14    Q   You said that you kept Larry Newton informed
15 of what was happening with the Corneal property. Was it
16 primarily you who kept him informed?
17    A   I can't testify as to whether the supervisors
18 talked to Larry or not.
19    Q   I'm asking you whether or not you kept him
20 informed of what was happening with the Corneal property.
21    A   I probably did.
22    Q   When you say probably, are you certain that
23 you did?
24    A   Of some things I'm sure I did.
25    Q   Now, what specifically did you tell him about

236

1 the Corneal property?
2    A   I don't know specifics. I just -- I would --
3 when I get a piece of information, I forward it to everybody
4 that needs it, that's what I do, and I can't tell you
5 specifics. It's probably half the documents in here.
6    Q   Are you talking now after the litigation, once
7 you got a document in you would talk about it with Larry
8 Newton or are you talking about before?
9    A   I'm talking about now with the litigation.
10    Q   After the litigation. You said that you
11 discussed the -- or I'm sorry, the supervisors discussed the
12 driveway ordinance with Larry Newton; is that correct?
13    A   I believe they did.
14    Q   Do you recall any of the specifics of that
15 conversation?
16    A   (Witness shook her head negatively.)
17    Q   How about did they discuss the privy ordinance
18 with Larry Newton?
19    A   I'm sure it was discussed with Larry.
20    Q   Do you recall any of the specifics?
21    A   No.
22    Q   Do you recall whether or not they were asking
23 him whether they could pass such ordinances?
24    A   I do not.
25    Q   Is it customary to always seek Larry Newton's

237

1 advice before the board acts?
2    A   No.
3    Q   Is it rare that you would seek Larry Newton's
4 advice before the board acts?
5    A   I wouldn't say it's rare.
6    Q   How often do you seek Larry Newton's advice?
7    A   Only when we have a problem.
8    Q   Is David Corneal the only problem this
9 township has seen in a long time?
10    A   No. No, I just told you about the road.
11    Q   So other than the road, have you ever sought
12 Larry Newton's advice on any other resident of Jackson
13 Township?
14    A   Residence?
15    Q   Resident of Jackson Township.
16    A   I can't recall.
17    Q   I just want to go back a little bit over your
18 testimony that I think we weren't real clear on. At first I
19 believe your testimony was Larry Newton did not advise the
20 supervisors to initiate a lawsuit against Mr. Corneal. What
21 is your testimony with regard to who advised the supervisors
22 to initiate the lawsuit, if anyone did?
23    A   I don't remember saying that.
24    Q   With regard to the lawsuit that was initiated
25 against Mr. Corneal by the township, did anybody advise the

238

1 supervisors to your knowledge to initiate that lawsuit?
2     **A**     **I do not know how that happened.  I can't**
3 **testify to that.  I don't know who did that.**
4     **Q**     Were you ever present at a meeting where Larry
5 Newton and any of the supervisors were present where Larry
6 Newton gave that kind of advice?
7     **A**     **I don't recall.**
8     **Q**     You don't recall a meeting where that happened
9 or that happening?
10     **A**     **Please repeat your question for me.**
11     **Q**     Okay.  Were you ever present at a meeting
12 where Larry Newton met with any of the supervisors and
13 advised them to initiate a lawsuit against Mr. Corneal?
14     **A**     **I do not recall that.**
15     **Q**     Are you telling me you don't recall being at a
16 meeting or that there wasn't -- what are you telling me you
17 don't recall?
18     **A**     **I don't recall Larry advising us to issue --**
19     **Q**     Start this lawsuit?
20     **A**     **Start a lawsuit.**
21     **Q**     You don't recall him telling you to do that?
22     **A**     **I don't know how that happened.**
23     **Q**     But you're telling me you don't recall Larry
24 Newton telling the township to do that?
25     **A**     **No.**

239

1     **Q**     Do you recall any of the supervisors saying
2 they needed to seek the advice of Larry Newton before they
3 initiated this lawsuit?
4     **A**     **You'll have to ask them that.**
5     **Q**     You were never present when any of the
6 supervisors stated that?
7     **A**     **I don't recall.**
8     **Q**     Did you ever discuss this -- the possibility
9 of a lawsuit against David Corneal with any of the
10 supervisors prior to the lawsuit being initiated?
11     **A**     **This lawsuit?**
12     **Q**     No, the first lawsuit where the township is
13 suing Mr. Corneal.  Did you ever talk to any of the
14 supervisors before it was initiated?
15     **A**     **That's not the first lawsuit.**
16     **Q**     What was the first lawsuit?
17     **A**     **This is the first lawsuit.**
18     **Q**     I'm sorry, let me clarify.  Did you ever talk
19 to any of the supervisors directly about Mr. Corneal before
20 they initiated a lawsuit against him for a violation of the
21 building permit ordinance?
22     **A**     **Did I do that?**
23     **Q**     Did you ever talk with the supervisors before
24 they started the lawsuit?
25     **A**     **I'm sure we talked about it.**

240

1     **Q**     Did they ask you whether or not they should do
2 that?
3     **A**     **They wouldn't ask my advice.**
4     **Q**     They just talk with you about it?
5     **A**     **Yes.**
6     **Q**     Well, if I may ask, why is it that the
7 supervisors consult with you when they don't take your
8 advice and they -- and you work for them?
9     MR. SHERR:  Objection.  You're asking her for
10 somebody else's state of mind.
11 BY MS. YANKANICH:
12     **Q**     Do you have an opinion as to why they seek
13 your advice?
14     **A**     **No.**
15     **Q**     I apologize, I don't think I've asked you this
16 question.  Did you yourself ever discuss directly with Larry
17 Newton the township's lawsuit against Mr. Corneal?
18     **A**     **Did I talk to Larry about it?**
19     **Q**     Yes.
20     **A**     **With the supervisors, without the supervisors**
21 **or what?**
22     **Q**     Either one.
23     **A**     **I'm sure we have.**
24     **Q**     Do you recall any of the specifics of those
25 conversations?

241

1     **A**     **No, I do not.**
2     **Q**     Do you recall of whether you had such a
3 meeting?
4     **A**     **You asked me if I had a conversation.**
5     **Q**     Okay, I'm sorry.  I apologize.  Did you ever
6 -- do you recall whether a conversation like that did
7 happen?
8     **A**     **Yes.**
9     **Q**     Was it with you and Mr. Newton or with you and
10 Mr. Newton and the supervisors?
11     **A**     **I'm sure it was with all of us.**
12     **Q**     And that was after the township sued Mr.
13 Corneal?
14     **A**     **I don't think that's what you asked me.**
15     **Q**     That's what I asked you the first time.  I'm
16 asking you whether you had -- let me just restate the
17 question.
18     **A**     **Okay.**
19     **Q**     Did you yourself discuss with Larry Newton
20 directly, either in a meeting or a phone call, the lawsuit
21 that the township initiated against Mr. Corneal?
22     **A**     **I have talked to Larry about it.**
23     **Q**     Do you recall any of the specifics of those
24 conversations?
25     **A**     **No, I do not.**

## 242

1   Q    Do you recall whether that was a telephone
2  call or a meeting?
3   A   I do not.
4   Q    Do you recall whether any of the supervisors
5  were present?
6   A   I don't -- I don't recall.
7   Q    With reference to Exhibit 14, if you would --
8  I would actually like you to reference the specific exhibit,
9  if I may. I just have a question as to whose notation that
10  is. I didn't hear if Miss Montgomery asked you this. With
11  regard to Exhibit 14, is that your handwriting that says --
12   A   No.
13   Q    -- copy sent to Newton?
14   A   No, it is not.
15   Q    Do you know whose handwriting that is?
16   A   I have no idea.
17   Q    When Mr. Van Dommelen -- let's specifically
18  reference Exhibit 15. I'm going to show you Exhibit 15. If
19  you would refer to Exhibit 15 during your answer, please.
20  In this letter from David Corneal to Mr. Van Dommelen he
21  states that Mr. Van Dommelen refused to give him a building
22  permit application and that he did so on the advice of the
23  supervisors.
24      Do you recall -- were you present at any time
25  when the supervisors called Larry Newton? Let me rephrase

## 243

1  that. Do you know if the supervisors ever consulted Larry
2  Newton with regard to whether or not they should advise Mr.
3  Van Dommelen to not issue such an application?
4   A   I don't know.
5   Q    You don't know if they ever called Larry
6  Newton to ask him that?
7   A   I don't know.
8   Q    Were you aware that Mr. Van Dommelen refused
9  to give Mr. Corneal an application?
10   A   I think I've already testified to that.
11   Q    I'm sorry, what was your answer?
12   A   Yes.
13   Q    You were aware that -- you knew he refused to
14  do so?
15      MR. SHERR: You don't have to repeat it
16  again. She said yes. Let's move on, please.
17      MS. YANKANICH: I'm just trying to clarify for
18  myself.
19  BY MS. YANKANICH:
20   Q    You were aware that he was refused an
21  application, is that your answer?
22   A   It was in the paperwork here, yes.
23   Q    That's when you became aware of it. Is there
24  any other time prior to the initiation of the lawsuit that
25  you can remember seeking the advice of Larry Newton for any

## 244

1  reason with regard to Mr. Corneal's property that I haven't
2  asked you about?
3   A   You're going to have to tell me that one
4  again.
5   Q    Do you recall any other time that you sought
6  the advice of Larry Newton with regard to David Corneal's
7  property that I may not have asked you about?
8   A   No.
9      MS. YANKANICH: Thank you. I have no further
10  questions.
11      MS. THORP: No questions.
12      MR. SHERR: Anything else?
13      MS. MONTGOMERY: I just have a follow-up or
14  two. Do you have anything?
15      MR. SHERR: No.
16
17      REDIRECT EXAMINATION
18
19  BY MS. MONTGOMERY:
20   Q    Just generally, you were asked a series of
21  questions by Mr. Newton's counsel about whether or not when
22  you spoke with Larry Newton you were seeking his advice,
23  okay, and I want to just ask a general question.
24      Typically when you speak to Larry Newton are
25  you speaking to him just as a friend or is it on township

## 245

1  business? Do you speak to him on township business or are
2  you speaking to him just as a friend or are you speaking to
3  him as the township's counsel?
4   A   As the township's counsel.
5   Q    Do you expect then that if there is anything
6  that you are telling him that he ought to have advice on and
7  he'll give you that advice? Is that your expectation when
8  you talk to him?
9   A   I would assume.
10   Q    You would assume that he would give you advice
11  if anything you tell him raises any concerns with him; is
12  that your testimony?
13   A   Yes.
14   Q    You know, you had mentioned earlier that you
15  lived in Camp Hill prior to what, 11 years ago?
16   A   Yes.
17   Q    And did you work here?
18   A   I'm retired from the state.
19   Q    What did you do at the state?
20   A   I was the cash desk for the Treasury
21  Department for 25 years.
22   Q    Have you ever had any conversations with Larry
23  -- with an attorney who shares Mr. Newton's law offices?
24   A   No.
25   Q    Do you know who Mr. Reeder is?

246

1  A    I know his name.  I don't know who he is.
2  Q    You've never met him?
3  A    No.
4  Q    You never talked to him?
5  A    No.
6  Q    You never corresponded with him?
7  A    No.
8  Q    Now that the township has these ordinances --
9  well, now, let me back up a second.  The township has five
10 ordinances, I believe you said, right?
11 A    Four.
12 Q    Four?
13 A    I think it's four.
14      MR. SHERR:  You mentioned five.
15 BY MS. MONTGOMERY:
16 Q    I think you mentioned five.
17 A    Five, okay.
18 Q    And you say you keep them in your office, you
19 keep a copy of each of them in your office?
20 A    Yes, they're in my office.
21 Q    Where do you keep them?
22 A    The subdivision ordinance is in a binder,
23 which I told you earlier, along with the privy and the
24 driveway ordinance.  The building permit ordinance is in an
25 ordinance file.

247

1  Q    What's an ordinance file?
2  A    It's just a file that says ordinance.
3  Q    It's like a collapsible folder or something?
4  A    It's just a manila folder.
5  Q    A manila folder that says ordinance.  And the
6  fifth ordinance?
7  A    I'm so confused here.  There's a subdivision
8  ordinance, a driveway ordinance, a privy ordinance and a
9  building permit ordinance.
10      MR. CORNEAL:  Agriculture.
11      THE WITNESS:  Oh, I'm sorry.  Thank you,
12 agriculture security.  That's in a separate folder because
13 that's a whole other issue.
14 BY MS. MONTGOMERY:
15 Q    Is it in a manila folder also?
16 A    Yes.
17 Q    Do you keep an ordinance book, like one book
18 of all the ordinances?
19 A    No.
20 Q    I'm going to show you a document that we're
21 going to mark as Wirth 16 and this is a January 31, 2000
22 letter from David Corneal addressed to Mr. Newton.
23      (Letter dated 1/31/00 produced and marked as
24 Wirth Exhibit No. 16.)
25      (Discussion held off the record.)

248

1  BY MS. MONTGOMERY:
2  Q    Did you have a chance to look at that letter?
3  A    Yes, I did.
4  Q    Have you seen the letter before?
5  A    I don't recall if I've seen it before or not.
6  Q    Do you know whether you were given a copy of
7  the letter at the time that it was written, which I think
8  the date of it is January 31st, 2000?
9  A    I just said I don't recall if I've ever seen
10 the letter before.
11 Q    Do you recall ever discussing with Mr. Newton
12 his receipt of that letter from Mr. Corneal?
13 A    I don't recall that.
14 Q    Well, look at the contents of the letter
15 then.  Now that you've had a chance to look at this letter
16 from David Corneal to Mr. Newton, do you recall ever talking
17 to Mr. Newton about the particular issues in this letter?
18 And we'll start at the beginning, the approval of his
19 subdivision.
20 A    I don't recall.
21 Q    What about -- do you know whether or not Mr.
22 Simpson dropped off a copy of the plan at Mr. Newton's
23 office?
24 A    I believe I testified earlier I don't know how
25 that happened.

249

1  Q    And in this letter Mr. Corneal tells Mr.
2  Newton that there is urgency of approval, in that the
3  Hewetts have a loan commitment for settlement at the end of
4  February.  Do you recall whether or not Mr. Newton called
5  the township offices to discuss any sort of urgency of
6  approval of Mr. Corneal's subdivision?
7  A    I don't recall that.
8  Q    Do you know whether the supervisors got a copy
9  of this letter?
10 A    You'll have to ask them.
11 Q    I'm going to show you one other letter then
12 and we're going to mark it as Wirth 17.
13      (Letter dated 7/28/00 produced and marked as
14 Wirth Exhibit No. 17.)
15 BY MS. MONTGOMERY:
16 Q    Have you seen this letter before?
17 A    Yes, I have.
18 Q    When did you see it?
19 A    I don't know, but I've seen it.
20 Q    Do you see where it says Jackson Township
21 Board of Supervisors down there in the cc line?
22 A    Right.
23 Q    Did the letter come to you?
24 A    I would assume it did.  I don't know for sure.
25 Q    Do you have a copy of this letter in your



---

**250**

1   files?

2   A    Yes, I've seen this letter in my files.

3   Q    Did you produce it to us?

4   A    I don't know whether I did or not.

5   Q    Now that you're looking at these two letters,

6   the letter to Mr. Newton from Mr. Corneal in January 2000

7   and the letter from Mr. Newton to the Corneals on July 28,

8   2000, do you recall whether or not you spoke with Mr. Newton

9   in between -- in that time frame, from January to July, to

10  seek advice about how the Corneals were dealing with their

11  property or about how to deal with the Corneals in

12  connection with their property?  Does that help you

13  remember?

14  A    What?

15  Q    I'm trying to get you down to a time frame

16  about when you spoke to Mr. Newton.  Mr. Newton's counsel

17  was trying to talk to you about whether you spoke to him

18  prior to the initiation of this lawsuit.

19  A    I'm sure I -- I'm sure I testified that we

20  have talked, but I don't know when or what about.

21  Q    You testified that you're sure you talked to

22  Mr. Newton about the Corneals prior to the lawsuit; is that

23  correct?

24  A    I believe I said that earlier.

25  Q    Do these letters -- reviewing these letters

---

**251**

1   help you remember at all when you might have spoken to Mr.

2   Corneal about the Corneal -- I'm sorry, to Mr. Newton about

3   the Corneal's property?

4   A    No, it doesn't.

5   MS. MONTGOMERY:  I don't have any other

6   questions.

7   MS. YANKANICH:  I have one last question.

8   It's just a bookkeeping matter.

9

10  RECROSS-EXAMINATION

11

12  BY MS. YANKANICH:

13  Q    With reference to Exhibit 15 on page 2 -- or

14  actually maybe it's Exhibit 14.  Let me look.  Yes, Exhibit

15  14.  I'd asked you on the first page of Exhibit 14 whether

16  or not the handwritten message that says copy sent to Newton

17  was your signature and you stated that it was not; is that

18  correct?

19  A    No, I didn't write that.

20  Q    On the second page of Exhibit 14 is copy sent

21  to Newton your signature -- your handwriting?

22  A    No.

23  MS. YANKANICH:  Thank you.  I have no further

24  questions.

25  MS. MONTGOMERY:  Another housekeeping matter,

---

**252**

1   and this is addressed to Mr. Newton's counsel.  Do you

2   consider Mr. Newton to be under the sequestration order that

3   the judge entered for purposes of talking to the other

4   defendants about the substance of the depositions?

5   MS. YANKANICH:  Let me review the order and

6   then I'll get you an answer.  Can we go off the record

7   briefly?

8   MS. MONTGOMERY:  Sure.

9   (Discussion held off the record.)

10  (The deposition was concluded at 4:27 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**253**

1

2   COUNTY OF DAUPHIN          :

3                             : SS

4   COMMONWEALTH OF PENNSYLVANIA   :

5   I, Teresa K. Bear, Reporter-Notary Public,

6   authorized to administer oaths within and for the

7   Commonwealth of Pennsylvania and take depositions in the

8   trial of causes, do hereby certify that the foregoing is the

9   testimony of ANN WIRTH.

10  I further certify that before the taking of

11  said deposition, the witness was duly sworn; that the

12  questions and answers were taken down stenographically by

13  the said Teresa K. Bear, a Reporter-Notary Public, approved

14  and agreed to, and afterwards reduced to typewriting under

15  the direction of the said Reporter.

16  I further certify that the proceedings and

17  evidence are contained fully and accurately to the best of

18  my ability in the notes taken by me on the within

19  deposition, and that this copy is a correct transcript of

20  the same.

21  In testimony whereof, I have hereunto

22  subscribed my hand this 31st day of May, 2001.

23

                    _____

24                  Teresa K. Bear, Reporter
                    Notary Public
25                  My commission expires
                    on April 13, 2003

---

5

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2   DAVID B. CORNEAL and SANDRA   :
     Y. CORNEAL,                   :
 3        PLAINTIFFS               :
                                   :
 4             VS                  :  NO. 1:CV-00-1192
                                   :
 5   JACKSON TOWNSHIP, HUNTINGDON  :
     COUNTY, PENNSYLVANIA; W.      :
 6   THOMAS WILSON, individually   :
     and in his official capacity  :
 7   as Supervisor of Jackson      :
     Township; MICHAEL YODER,      :
 8   individually and in his       :
     official capacity as          :
 9   Supervisor of Jackson         :
     Township; RALPH WEILER,       :
10   individually and in his       :
     official capacity as          :
11   Supervisor of Jackson         :
     Township; BARRY PARKS,        :
12   individually and in his       :
     official capacity as Sewage   :
13   Enforcement Officer of        :
     Jackson Township; DAVID       :
14   VAN DOMMELEN, individually    :
     and in his official capacity  :
15   as Building Permit Officer;   :
     ANN L. WIRTH, individually    :
16   and in her official capacity  :
     as Secretary of Jackson       :
17   Township; and LARRY NEWTON,   :
     individually and in his       :
18   official capacity as          :
     Solicitor to Jackson          :
19   Township,                     :
              DEFENDANTS           :
20        DEPOSITION OF:  DAVID VAN DOMMELEN
21        TAKEN BY:       PLAINTIFFS
22        BEFORE:         TERESA K. BEAR, REPORTER
                          NOTARY PUBLIC
23
          DATE:           JUNE 6, 2001, 9:44 A.M.
24
          PLACE:          ECKERT SEAMANS
25                        213 MARKET STREET
                          HARRISBURG, PENNSYLVANIA
```

2

```
 1   APPEARANCES:
 2      ECKERT SEAMANS
        BY:  BRIDGET E. MONTGOMERY, ESQUIRE
 3         LESLIE A. MALADY, ESQUIRE
 4         FOR - PLAINTIFFS
 5      MAYERS, MENNIES & SHERR, LLP
        BY: ANTHONY R. SHERR, ESQUIRE
 6
           FOR - ALL DEFENDANTS EXCEPT NEWTON
 7
        METTE, EVANS & WOODSIDE
 8      BY: JENNIFER YANKANICH, ESQUIRE
 9         FOR - DEFENDANT - LARRY NEWTON
10      THOMAS, THOMAS & HAFER
        BY: MICHELE J. THORP, ESQUIRE
11
           FOR - DEFENDANT - WEILER
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1              TABLE OF CONTENTS
 2              WITNESS
 3   FOR PLAINTIFFS          DIRECT CROSS REDIRECT
 4   David Van Dommelen
        By Ms. Montgomery        4   --   185
 5      By Ms. Yankanich        --  183   --
 6
 7              EXHIBITS
 8   VAN DOMMELEN EXHIBIT NO.        PRODUCED AND MARKED
 9   1 - Letter dated 5/5/00         79
10   2 - Letter dated 10/10/00       79
11   3 - Packet of documents         79
12   4 - Suggested ideas             91
13   5 - Application for building permit    100
14   6 - Application for building permit    145
15   7 - Application for building permit    148
16   8 - Application for building permit    151
17   9 - Applications for building permits  153
18   10 - Four-page document         164
19   11 - Letter dated 9/1/00        171
20
21
22
23
24
25
```

TABLE OF CONTENTS
WITNESS
FOR PLAINTIFFS          DIRECT CROSS REDIRECT
David Van Dommelen
   By Ms. Montgomery        4   --   185
   By Ms. Yankanich        --  183   --

EXHIBITS
VAN DOMMELEN EXHIBIT NO.        PRODUCED AND MARKED
1 - Letter dated 5/5/00         79
2 - Letter dated 10/10/00       79
3 - Packet of documents         79
4 - Suggested ideas             91
5 - Application for building permit    100
6 - Application for building permit    145
7 - Application for building permit    148
8 - Application for building permit    151
9 - Applications for building permits  153
10 - Four-page document         164
11 - Letter dated 9/1/00        171

4

```
 1          DAVID VAN DOMMELEN, called as a witness, being
 2   sworn, testified as follows:
 3
 4          DIRECT EXAMINATION
 5
 6   BY MS. MONTGOMERY:
 7      Q    Mr. Van Dommelen, we met a few moments ago but
 8   for the record I'll identify myself. I'm Bridget
 9   Montgomery.
10      A    You'll have to speak louder because I'm hard
11   of hearing.
12      Q    Okay.  My name is Bridget Montgomery and I
13   represent the Corneals in this action. I have a couple
14   questions and instructions for you about depositions in
15   general. So I need to ask you first have you ever been
16   deposed before?
17      A    To where?
18      Q    Have you ever been deposed before?
19      A    No.
20      Q    Then I will just give you a little bit of
21   information about the deposition.  We're here to ask you
22   factual questions relevant to this lawsuit or likely to lead
23   to relevant information about this lawsuit.
24          One of the things that you need to do is make
25   sure that you give verbal responses.  You need to say yes or
```

5

```
 1   no or, you know -- no shakes of the head, you know, no nods
 2   of the head because the court reporter needs to hear you so
 3   that she can take your responses down.
 4          If you don't understand a question that I ask
 5   you, you can ask me to repeat it or rephrase it.  I want you
 6   to understand what it is I'm asking you.  If you need to
 7   take a break to go to the rest room or something like that
 8   or get a glass of water, you can do that as well.  You can't
 9   confer with your counsel about your answers but you can take
10   a break and, you know, go and do whatever you need to do.
11          Are you on any medication today that would
12   prevent you from understanding and answering my questions?
13      A    I'm on medication.
14      Q    And what kind of medication is that?
15      A    Quibron, and that's an asthmatic.  I'm on
16   Altace for high blood pressure, and I'm on Vilosec and I
17   take Proventil, which is a mist, a mister.
18      Q    Are those all asthma related --
19      A    All except for the --
20      Q    -- medications?
21      A    All except for the Altace which is for high
22   blood pressure.
23      Q    One other instruction I'll give you.  For the
24   sake of the court reporter and for the sake of clarity, you
25   need to let me finish my questions and I'll let you finish
```

6

1   your answers so that she can -- so we're not talking at the
2   same time, okay?
3        A     Fine.
4        Q     Back to your medications for a second. Do any
5   of those medications affect your ability to understand
6   someone talking to you or a question or an issue?
7        A     As far as I know, no.
8        Q     None of them are sleep inducing medications or
9   anything like that?
10       A     No.
11       Q     Mr. Van Dommelen, where do you live?
12       A     I live on Allan Seegar Road three miles
13   outside of McAlevys Fort in Pennsylvania.
14       Q     Where is that in relation to, for example, the
15   Jackson Township town office on Ann Wirth's property?
16       A     It's approximately four miles from the
17   township office.
18       Q     Are you familiar with David Corneal?
19       A     Yes.
20       Q     And you're familiar with the property owned by
21   David Corneal --
22       A     Yes.
23       Q     -- in Jackson Township?
24       A     Yes.
25       Q     Where is your home in relation to Mr.

7

1   Corneal's property in Jackson Township?
2        A     It's to the north and about three miles from
3   his property.
4        Q     Is it on the same road?
5        A     No.
6        Q     How long have you lived at your current
7   address?
8        A     I believe 20 years.
9        Q     Where did you live prior to that?
10       A     In State College, Pennsylvania.
11       Q     Are you a native of State College?
12       A     No.
13       Q     Are you a native of Jackson Township?
14       A     No.
15       Q     Where are you from?
16       A     I'm from Michigan.
17       Q     Oh, you are, okay. So you've been in Jackson
18   Township then for 20 years?
19       A     I believe 20 years.
20       Q     Do you own property there?
21       A     No.
22       Q     Do you own a home there?
23       A     No.
24       Q     You rent?
25       A     No.

8

1        Q     Do you live there?
2        A     Yes.
3        Q     Do you camp out?
4        A     No. Heavens, no.
5        Q     Well, you live there for free, apparently, in
6   a residence --
7        A     Yes.
8        Q     -- in a house? Let's talk a little bit about
9   your educational background. What is the highest level of
10   education that you completed?
11       A     A Master's degree.
12       Q     In?
13       A     In art.
14       Q     And where did you complete that Master's
15   degree?
16       A     Michigan State University.
17       Q     So you graduated from high school out in
18   Michigan; is that correct?
19       A     Pardon?
20       Q     You graduated from high school out in
21   Michigan?
22       A     Yes.
23       Q     And where did you go to college?
24       A     Well, I went to -- I went to interior design
25   school in Chicago and then I went to Michigan State for my

9

1   undergraduate and for my graduate degree.
2        Q     What's the interior design school that you
3   went to?
4        A     Harrington Institute of Interior Design.
5        Q     Was that a two-year program or --
6        A     It was a two-year program.
7        Q     Did it lead to an associates degree or
8   something?
9        A     Pardon?
10       Q     Did it lead to an associate degree or --
11       A     I got a diploma, interior design diploma.
12       Q     Like a certificate of --
13       A     Yes, right.
14       Q     And then you went from there to Michigan State
15   University?
16       A     No, I went to the Army.
17       Q     Oh, okay. When was that?
18       A     In 1952.
19       Q     So you went into the Army for a few years
20   and --
21       A     For two years.
22       Q     Two years. And then did you start your
23   education after that?
24       A     Then I --
25       Q     Or continue your education after that?

10

1    A    Yes, after that I continued my education.
2    Q    So do you have a four-year degree from
3  Michigan State?
4    A    Yes.
5    Q    And then a Master's degree?
6    A    Yes.
7    Q    And is that the highest degree of education
8  you completed then, the Master's at Michigan State?
9    A    Yes.
10   Q    What did you do with that degree then once you
11  got it?  What sort of employment did you seek?
12   A    Well, I taught first in elementary schools and
13  then I was invited to go to Penn State to teach and I taught
14  at -- in the College of Home Economics for quite a few years
15  and then the College of Arts and Architecture.
16   Q    So you have an elementary teaching license as
17  well -- you had one at least --
18   A    Yes, I had one.
19   Q    -- in Michigan?
20   A    Um-hum.
21   Q    How long did you teach?
22   A    In elementary?
23   Q    Yes.
24   A    Two years, I believe.
25   Q    And then you came to State College after that?

11

1    A    Yes.
2    Q    What year was that?
3    A    That was in 1959.
4    Q    And how long did you teach at Penn State?
5    A    For over 25 years.
6    Q    So that takes you up to about 1984?
7    A    Eighty-eight.
8    Q    Oh, 1988?
9    A    Yes.  I also had an interim of two years at
10  the University of Maine.
11   Q    Did you come to State College and then go to
12  Maine and then come back?
13   A    Yes.
14   Q    Understood.  So you say -- I believe you
15  testified that you taught home economics?
16   A    Well, that's where I started teaching.  That's
17  where art and interior design was, in home economics.
18   Q    And then what?
19   A    And then I moved over to arts and
20  architecture.
21   Q    And so that takes you up to 1988.  Did you
22  retire then?
23   A    Yes, I retired then.
24   Q    Is it at that point that you moved to Jackson
25  Township?  I forget how long you said you had been there.

12

1    A    No, no, we had been in Jackson Township since
2  '82.  I have my studio there, too.
3    Q    Okay.
4    A    Because I'm a practicing artist.
5    Q    What kind of art do you do?
6    A    Fiber art.
7    Q    What is fiber art?
8    A    Weaving, surface painting on fiber, sewing
9  machine work on fiber.
10   Q    So during the time that you were teaching at
11  Penn State, you moved to Jackson Township; is that correct?
12   A    Yes.
13   Q    And in Jackson Township you have a studio on
14  this same piece of property --
15   A    Right.
16   Q    -- that you live at?
17   A    We have 40 acres of property.
18   Q    Who owns that property?
19   A    My daughter and my son.
20   Q    Did you ever own that property?
21   A    Yes.
22   Q    When did you buy it?
23   A    In '81.
24   Q    And did you sell it to your son and daughter?
25   A    Pardon?

13

1    Q    Did you sell it to your son and daughter or
2  convey it or --
3    A    No, we gave it to them.
4    Q    You gave it to them?
5    A    Um-hum.
6    Q    When did you do that?
7    A    I'm not sure if I can remember.  It must have
8  been 10 years ago.
9    Q    So it is 40 acres?
10   A    It's not quite 40 acres.
11   Q    How many houses are on it?
12   A    Just the -- our house and the studio.
13   Q    When you say our house, you mean your wife and
14  you?
15   A    Yes.
16   Q    Did you build the house?
17   A    Part of it.
18   Q    There was an existing structure there?
19   A    There was a structure and then we added on to
20  it when we moved out there because it did not have indoor
21  plumbing and ...
22   Q    Right.
23        MS. MONTGOMERY:  Just let the record reflect
24  that Michele Thorp is joining the deposition.
25  BY MS. MONTGOMERY:

14

| | | |
|---|---|---|
| 1 | Q | And then did you build the art studio? |
| 2 | A | Yes. |
| 3 | Q | When did you build that? |
| 4 | A | In '82. |
| 5 | Q | How big is that structure, do you know? |
| 6 | A | It's 20 feet by 40 feet. |
| 7 | Q | Is it one-story? |
| 8 | A | Yes. |
| 9 | Q | Does it have indoor plumbing? |
| 10 | A | No. |
| 11 | Q | Does it have electricity? |
| 12 | A | Pardon? |
| 13 | Q | Does it have electricity? |
| 14 | A | Yes. |
| 15 | Q | Are there any other structures on the |
| 16 | | property? |
| 17 | A | No. |
| 18 | Q | Are you currently employed? |
| 19 | A | In my studio, yes. |
| 20 | Q | Well, let me ask you the question a little bit |
| 21 | | differently. I think you said you retired from Penn |
| 22 | | State -- |
| 23 | A | Yes. |
| 24 | Q | -- in 1988? |
| 25 | A | Yes. |

15

| | | |
|---|---|---|
| 1 | Q | Did you have employment elsewhere after you |
| 2 | | retired from Penn State? |
| 3 | A | No, except self-employment. |
| 4 | Q | Are you involved somehow with Jackson |
| 5 | | Township? |
| 6 | A | Yes. |
| 7 | Q | In what capacity? |
| 8 | A | The building permit officer. |
| 9 | Q | Do you consider that employment? |
| 10 | A | I suppose I would have to say yes. |
| 11 | Q | Is it a paid -- |
| 12 | A | But not for very much money. |
| 13 | Q | Is it a paid position? |
| 14 | A | I get a percentage of each building permit and |
| 15 | | that averages to about $450 a year. |
| 16 | Q | What percentage of each building permit do you |
| 17 | | get? |
| 18 | A | I think it's -- I can't remember. My wife |
| 19 | | does all that. I think it's eight percent, I believe. |
| 20 | Q | Is that the only compensation given in |
| 21 | | connection with your services as the building permit |
| 22 | | officer? |
| 23 | A | Yes. |
| 24 | Q | When did you first become the building permit |
| 25 | | officer for Jackson Township? |

16

| | | |
|---|---|---|
| 1 | A | It must have been 1990. |
| 2 | Q | How did you come to become the building permit |
| 3 | | officer? |
| 4 | A | The current -- one of the current supervisors |
| 5 | | asked me if I would like to be that and I said not really |
| 6 | | but they persuaded me and so I took over the job. |
| 7 | Q | How did you -- well, do you know which |
| 8 | | building supervisor asked you to take the job? |
| 9 | A | Pardon? |
| 10 | Q | Can you tell me which building -- |
| 11 | A | Yes, it was Gary Wilson. |
| 12 | Q | He's no longer a supervisor? |
| 13 | A | No. |
| 14 | Q | Is he related to the current Wilson |
| 15 | | supervisor? |
| 16 | A | They might be far cousins. |
| 17 | Q | Were you friends with Gary Wilson, is that how |
| 18 | | he came to ask you? |
| 19 | A | Neighbors. |
| 20 | Q | So you've been the building permit officer |
| 21 | | since 1990, correct? |
| 22 | A | I believe that's ... |
| 23 | Q | Has there been any breaks in your service |
| 24 | | since -- |
| 25 | A | Any what? |

17

| | | |
|---|---|---|
| 1 | Q | Any breaks in your service since 1990 as the |
| 2 | | building permit officer? |
| 3 | A | No. |
| 4 | Q | Who do you report to as the building permit |
| 5 | | officer? |
| 6 | A | To the supervisors. |
| 7 | Q | How do you report? |
| 8 | A | I go to the supervisor's meeting once a |
| 9 | | month. It's a public meeting. |
| 10 | Q | And is that the public meeting that's held at |
| 11 | | Ann Wirth's -- in the building on Ann Wirth's property? |
| 12 | A | No, no. |
| 13 | Q | No? |
| 14 | A | It's held in the fire hall. |
| 15 | Q | In the fire hall, okay. What exactly are your |
| 16 | | responsibilities as the building permit officer? |
| 17 | A | To issue building permits to any resident that |
| 18 | | comes to me. |
| 19 | Q | Well, what do you do to determine whether you |
| 20 | | should issue a building permit? |
| 21 | A | They must have appropriate septic approval, if |
| 22 | | it's going to be a house that has the need for a septic |
| 23 | | system. And if they are going to subdivide, they must have |
| 24 | | the appropriate subdivision papers. |
| 25 | Q | What about if they're not going to subdivide |

**18**

1 and they're not going to build a house, then would you need
2 a septic?
3 A    Well, then if they're just building a garage,
4 I'd give them a permit -- I'd issue a permit rather.
5 Q    Do you have some kind of ordinance that you
6 follow or some kind of rule book?
7 A    Yes, we do have a set of ordinances.
8 Q    What are those ordinances?
9 A    Well, that you must have a septic system and
10 that you must -- a building permit is good for one year and
11 if you're going to subdivide that you have the correct
12 subdivision. You must also have the correct road connection
13 permit.
14 Q    Do you have a building or anything that you
15 use in connection with your work?
16 A    No.
17 Q    Do you operate out of the house that you live
18 in?
19 A    Yes.
20 Q    I asked you a moment ago what ordinances you
21 follow and you gave me an answer, but I'm asking you
22 something a little bit different. The question I'm asking
23 you is: Do you follow a particular ordinance that's, you
24 know, like a collected set of pages that tells you what to
25 do in connection with your duties?

**19**

1 A    Yes, we do have a building ordinance.
2 Q    A building permit ordinance?
3 A    Permit ordinance, yeah, um-hum.
4 Q    And you follow that?
5 A    Yes.
6 Q    Do you keep a copy of it in your house?
7 A    Yes.
8 Q    Now, typically when someone comes and asks you
9 for a building permit, exactly what do you do?
10 A    I find out if they have the appropriate
11 papers. And if they don't need septic and if they don't
12 need subdivision, then I have them sit down and fill out a
13 building permit application and I then type from that to the
14 tax assessment forms that we send into the county for tax
15 assessment and then I issue a building permit.
16 Q    And you can do that all in one day?
17 A    Yes.
18 Q    Do you typically do it all in one day?
19 A    Yes, typically I think I would say all in one
20 day.
21 Q    Do you keep the applications at your home?
22 A    I do.
23 Q    Are citizens required to come to your home to
24 get an application?
25 A    Yes.

**20**

1 Q    So do they have -- I mean, are you listed in
2 the telephone book or something as the building permit
3 officer?
4 A    No.
5 Q    How does the citizen find out about you?
6 A    I suppose they call our secretary or word of
7 mouth that I'm the building permit officer.
8 Q    So do they call you and ask you for an
9 appointment?
10 A    Sometimes. Sometimes they just show up.
11 Q    So do you typically go inspect the property
12 that someone is asking for a permit?
13 A    In the ordinance I can do that if I can go
14 onto the grounds and even if it says no trespassing I can go
15 on the grounds and inspect whatever is being done, and
16 sometimes I do and sometimes I don't. It depends on what
17 the issue is.
18 Q    Under what circumstances are you permitted to
19 inspect a property?
20 A    Well, if I have a feeling that something is
21 not correct, then I might go and look and see if it fits
22 what they put on their application.
23 Q    I see. What would give you a feeling that
24 something is not correct?
25 A    I don't know, a gut feeling.

**21**

1 Q    Well, let me ask you this: How many
2 properties have you actually gone to inspect in connection
3 with applications for building permits?
4 A    I don't think I can answer that.
5 Q    Can you estimate?
6 A    Twenty-five.
7 Q    In the 10 years?
8 A    Yeah.
9 Q    Or actually it's 11 years, isn't it?
10 A    Yeah.
11 Q    That you've been the building permit officer?
12 A    Yes.
13 Q    You're not required to check each property --
14 A    No.
15 Q    -- is that correct?
16 A    No.
17 Q    Would you typically inspect a property if it
18 didn't require septic or if it didn't involve a subdivision?
19 A    Probably not.
20 Q    So how much does it cost to get the building
21 permit application and fill it out?
22 A    It depends on how much is being spent for the
23 structure. The cheapest one is $15 and the most expensive
24 goes up to $70. So it's a graduated scale. So a house
25 that's being built for $450,000, then the building permit

22

1 would be 70.
2 Q How do you determine how much is going to be
3 spent on building the house or other structures?
4 A Well, that is -- that is determined by the
5 person when they fill out their application. They give me
6 an estimate. Then the tax assessors come out and check
7 after the structure is finished.
8 Q So after you issue a building permit, what do
9 you do with the permit itself? Do you give the permit to
10 the person and keep a copy?
11 A I give them a large permit that they are to
12 put on the structure while they're building it and then I
13 send the tax assessment, along with the check, to Ann Wirth,
14 our secretary, and she then in turn sends it to the county
15 tax assessing office.
16 Q Do you keep a copy of the building permit
17 yourself?
18 A Of the application, yes.
19 Q Of the application?
20 A Yes, I keep that in a little black book.
21 Q What is it, a --
22 A It's a typical three --
23 Q Three-ring binder?
24 A Three-ring binder.
25 Q In connection with this lawsuit, were you

23

1 asked for any documents, for any building permits or other
2 documents related to township business?
3 A Could you rephrase that.
4 Q Okay. In connection with this lawsuit, did
5 anybody ask you to provide documents like building permits
6 or other township related documents?
7 A I'm not quite sure what you're asking, but Mr.
8 Corneal came to the house and asked for an application.
9 Q That's a separate issue. What I'm really
10 asking is after this lawsuit was filed did any of the other
11 defendants or anybody else come to you and say search your
12 records for building permits or other documents related to
13 township business in connection with the lawsuit, we need to
14 do this, something like that?
15 A Well, they came and took all my building
16 permits and all my files.
17 Q Who is they?
18 A Well, I was asked to give them to Ann Wirth.
19 Q Did she come and pick them up?
20 A I took them to her office.
21 Q So when you say they came and took them, do
22 you really mean you took them to her?
23 A Yes, right.
24 Q That's fine.
25 A Yeah.

24

1 Q Who asked you to give them to her?
2 A Ann Wirth.
3 Q When did she ask you to do that?
4 A Last week.
5 Q Were you asked to provide documents at any
6 time prior to that?
7 A No.
8 Q Did you ever see a copy of a -- what we would
9 call a document request? Did you ever see a copy of a
10 document that listed different areas of documents that
11 should be produced?
12 A No.
13 Q Did Ann just call you up and say give me all
14 your documents?
15 A Right.
16 Q What did you give her?
17 A I gave her -- she already had all the building
18 permits from 19 -- let me see. Well, let's see, about --
19 I'm trying to think when they start, but she had in her
20 township files some of the early building permits. And then
21 I usually kept in my file some of the newer ones so I could
22 go back and look at them if I needed to. And so then I
23 turned all those over to her also.
24 Q So you had the newer building permits in your
25 file?

25

1 A Yes.
2 Q Or actually the applications, correct?
3 A Yes, uh-huh.
4 Q And you turned them over to her?
5 A Yes.
6 Q Did you turn anything else over to her?
7 A The whole -- well, that's the whole book,
8 yeah. No, no, that would be the only thing.
9 Q Did you have any notes or anything like that
10 that you kept in connection with applications for building
11 permits?
12 A I have some letters which I didn't turn over,
13 some letters where I had written someone to say you have not
14 gotten a building permit for something and you need to do
15 this because you're in violation of the township ordinances.
16 Q You have some letters like that?
17 A Yes, um-hum.
18 Q But you did not turn them over to her?
19 A No.
20 Q Why not?
21 A Nobody asked me for them.
22 Q Did she just ask you for your building
23 permits?
24 A Right.
25 Q That's all?

26

1    A      (Witness nods head affirmatively.)
2    Q      How many letters are you talking about?
3    A      Oh, I don't think more than four to 10.
4    Q      Four to 10 letters saying you're not getting a
5    building application -- or a building permit, I'm sorry?
6    A      Of someone who didn't get a permit and I had
7    to write to them and say you need to get a permit.
8    Q      Oh, I see. Someone who was building without a
9    permit?
10   A      Right, um-hum.
11   Q      I see what you're saying. Any other notes or
12   letters of any sort that you keep in your own files?
13   A      No, not that I can think of.
14   Q      Do you ever take handwritten notes in
15   connection with a building application?
16   A      I have -- well, most of the building
17   applications are filled out by hand.
18   Q      Right.
19   A      But then I take that information and type it
20   on the tax assessor's office form because I just think it
21   looks better, but the ones that they fill out are all by
22   hand.
23   Q      What about the tax assessor's office forms, is
24   that a one-page form?
25   A      Yes, um-hum.

27

1    Q      Do you keep copies of that?
2    A      No.
3    Q      You just send that directly to the tax
4    assessor's office?
5    A      Right, um-hum.
6    Q      Is that the county tax assessor?
7    A      Yes.
8    Q      So it's the Huntingdon County tax assessor?
9    A      Pardon?
10   Q      The Huntingdon County tax assessor?
11   A      Yes.
12   Q      So other than the letters that you sometimes
13   write to people about building permits, are you certain that
14   there are no other documents in your possession related to
15   building permits in Jackson Township or other township
16   business related to building --
17   A      No. I've got a couple other files about
18   floodplain information and -- because that sometimes can be
19   an issue also, but otherwise there's no documents that are
20   of importance.
21   Q      Well, I'm not asking you whether they're of
22   importance, I'm just asking you if they exist.
23   A      Um-hum.
24   Q      Did you keep any notes in connection with -- I
25   may have asked you this, but I'm going to ask it to you one

28

1    more time just to make sure you understand it. Did you ever
2    keep any notes in connection with any building permit
3    application that came your way, any handwritten notes in
4    your own writing or in your wife's writing or typed up or
5    anything --
6    A      Yes, I probably have some, um-hum.
7    Q      You do. And is that in a separate --
8    A      Maybe telephone numbers of someone and -- just
9    that I hand jotted.
10   Q      Do you keep them in a separate file?
11   A      Yes, usually.
12   Q      Are they all together or do you keep them in a
13   file connected to a particular building application?
14   A      Yeah, I usually will put them with the
15   building permit application.
16   Q      So if you have a building permit application,
17   do you put for each person -- you said you have a book,
18   right?
19   A      Yes.
20   Q      Do you also keep it in a separate file, you
21   know, for each person labeled in some way or --
22   A      No, just in the -- just in the three-ring
23   notebook.
24   Q      So where do you keep the notes then?
25   A      Well, if they're -- I keep them until I find

29

1    they're irrelevant and then I throw them out.
2    Q      But where do you keep them?
3    A      In a file. You know, in my file drawer.
4    Q      Just in a manila envelope or something --
5    A      Yeah, um-hum.
6    Q      -- like that? You don't --
7    A      Or attached to the building permit
8    application.
9    Q      You just clip them to it or something?
10   A      Um-hum.
11   Q      Do you have anything like that in your
12   possession at home now, notes that you've kept in connection
13   with the building permit applications?
14   A      I'm not sure.
15   Q      You'd have to look?
16   A      I'd have to look.
17   Q      Do you recall whether you kept any notes in
18   connection with David Corneal?
19   A      Yes.
20   Q      You did?
21   A      Um-hum.
22   Q      Is the answer yes you recall or yes you did?
23   A      Pardon?
24   Q      Is the answer yes you did keep notes?
25   A      Yes.

30

1  Q   And do you have those notes at your house?
2  A   No.
3  Q   What did you do with them?
4  A   I have them in a case right here.
5  Q   Oh, you do, okay.
6      MS. MONTGOMERY: Well, Tony, I think I'm
7  entitled to have them from him. He brought them and they
8  are certainly relevant to this lawsuit.
9      MR. SHERR: Are you contending these were
10 requested in the request for production?
11     MS. MONTGOMERY: I certainly am. He's got
12 notes related to Mr. Corneal's building permit application
13 with him he said and I'd like to see them.
14     MR. SHERR: Do you want to let me see these
15 documents, please.
16 BY MS. MONTGOMERY:
17 Q   Do you have other documents with you?
18 A   Yeah, um-hum. I brought all my stuff with
19 me. I didn't know what I would need.
20 Q   Okay. What other documents do you have with
21 you?
22 A   A couple letters and things like that.
23     (Handing.)
24     MR. SHERR: Thank you.
25 BY MS. MONTGOMERY:

31

1  Q   Do you have a -- among those documents, Mr.
2  Van Dommelen, do you have notes related to other people's
3  building permit applications or just Mr. Corneal's?
4  A   I think just Mr. Corneal's.
5  Q   Are all of the documents that you brought with
6  you in some way related to Mr. Corneal's Jackson Township --
7  A   I think -- not all of them, not all of them.
8  I think there's also -- the ordinance is in here, too.
9  Q   Anything else beside the ordinances?
10 A   I can't -- I can't remember. I just picked it
11 all up.
12 Q   Do you recall anything else, though, besides
13 the documents related to Mr. Corneal's --
14 A   Pardon?
15 Q   Do you recall anything else besides documents
16 related to Mr. Corneal's building efforts in Jackson
17 Township? Do you recall anything else being in that file
18 besides the ordinances and Mr. Corneal's building efforts in
19 Jackson Township?
20 A   I'm not understanding you.
21 Q   Let me ask you this: Did you put that file
22 together yourself?
23 A   Yes, I just put everything in one file and I
24 picked it all up so --
25 Q   Were those documents that you believed would

32

1  be related in some way to the issues in this lawsuit?
2  A   Some of them might be.
3  Q   What about the others, why did you bring them
4  if they're not related to it?
5  A   I don't know why.
6      MR. SHERR: Let me just state for the record
7  that a number of these documents relate to the lawsuit
8  themselves. They include the complaint and the exhibits to
9  the lawsuit, a copy of the deposition of Mr. Corneal,
10 correspondence from me, a picture of my business card, notes
11 from a meeting that I attended, what appears to be a copy of
12 the subdivision ordinance -- well, the other documents are
13 free to inspection. They appear to be a copy of the
14 subdivision ordinance --
15     THE WITNESS: Yes, the ordinance is here,
16 um-hum.
17     MR. SHERR: -- a copy of Mr. Van Dommelen's
18 2001 vita, a single page which appears to be from Act 537,
19 various correspondence to Mr. Van Dommelen, which is free to
20 inspect, and a copy of an article from a newspaper. It
21 looks like the Daily News --
22     THE WITNESS: Yeah, it's the Daily News in
23 Huntingdon.
24     MR. SHERR: -- concerning this lawsuit.
25     MS. MONTGOMERY: Okay, why are the other

33

1  documents not inspectable by me right now?
2      MR. SHERR: Well, you're certainly free to
3  inspect Mr. Corneal's deposition, the complaint and the
4  exhibits to the complaint. Correspondence from me to Mr.
5  Van Dommelen --
6      MS. MONTGOMERY: You're saying is protected?
7      MR. SHERR: -- as well as notes from a meeting
8  by --
9      MS. MONTGOMERY: What's on the back? There's
10 handwritten --
11     MR. SHERR: That I attended. Other notes that
12 are -- well, you're certainly free to inspect this. This is
13 something with my phone number on it, something concerning
14 -- a couple things concerning receipts regarding these
15 depositions, I assume, and -- I'll ask, what appear to be
16 notes from a conversation that I had with Mr. Van Dommelen?
17     THE WITNESS: Um-hum.
18     MR. SHERR: Is that correct?
19     THE WITNESS: Yes, um-hum.
20     MS. MONTGOMERY: So you're saying that --
21     MR. SHERR: That would also be privileged.
22     MS. MONTGOMERY: What is that, three --
23     MR. SHERR: Two.
24     MS. MONTGOMERY: Two handwritten small
25 notes --

MR. SHERR: Three-by-five notes.

THE WITNESS: Yes, this -- I don't know how that got in there. This has nothing to do with anything.

MR. SHERR: Okay, she can inspect that as well then.

MS. MONTGOMERY: So you have what, three other documents in front of you?

MR. SHERR: I have -- well, you're certainly free to inspect my business card.

MS. MONTGOMERY: Okay.

MR. SHERR: I have two documents -- well, I have three counting the three-by-five note, correct.

MS. MONTGOMERY: So you have a three-by-five note, you have a letter from you to Mr. Van Dommelen and then you have what you're saying are notes of a meeting?

MR. SHERR: Handwritten notes of a meeting that I attended with the defendants in this lawsuit when it was filed.

MS. MONTGOMERY: What's on the back of it?

MR. SHERR: Part of the same notes.

MS. MONTGOMERY: Those are notes related to the meeting?

MR. SHERR: Yes, absolutely.

MS. MONTGOMERY: Who was at that meeting? I'll ask Mr. Van Dommelen.

BY MS. MONTGOMERY:

Q Mr. Van Dommelen, who was at the meeting that Mr. Sherr is referring to that he says he was present at and those are notes made in connection with that meeting? Who all was at that meeting?

A **I'm assuming that all the supervisors were and I'm assuming that Ann Wirth was and I'm assuming that Larry Newton, the township lawyer was and myself.**

Q Anybody else?

A **I think that's it. That's seven people.**

Q Nobody's spouse was there or anybody else?

A **No.**

Q We're going to take a break and look at the documents that you have with you for a moment, okay?

A **Um-hum.**

Q Including your handwritten notes there.

(Break taken from 10:22 a.m. until 10:38 a.m.)

BY MS. MONTGOMERY:

Q Mr. Van Dommelen, I'm going to send Leslie to have a copy of these made by our office service people so we can use them in connection with your deposition.

A **Okay.**

Q And we'll continue with the deposition for now and she'll bring you your original file back directly.

A **Um-hum.**

Q But I'm going to need to use the originals to ask you certain questions because -- for a variety of reasons so -- but we'll bring your original file back in a few moments.

A **Um-hum.**

Q Mr. Van Dommelen, a few moments ago you testified that you had some handwritten notes about David Corneal's building permit application with you.

A **And I didn't see them in there. I don't -- I don't know what happened to them. They mainly were telephone numbers and -- and I didn't see them in there either.**

Q I want you to take for me a moment the document that you have said is notes in connection with -- notes that -- of a meeting that Tony Sherr attended. I'm not going to ask you anything about what they say, I'm just going to ask you to look at it for me for a second and tell me whether those notes were all taken on one day or whether any part of those notes were taken at a different time.

A **My feeling is that they were taken at different times. The reason I say that is what's on this side I think probably was written down versus the things on this side.**

Q Right, that's why I'm asking you about it. Which side do you think was taken at the meeting with Tony

Sherr?

A **I would assume it was this one here because I believe that meeting was at four o'clock.**

Q On what day?

A **On Thursday, the 13th.**

Q Of?

A **Of July.**

Q Of July 2000?

A **Um-hum. So that's why I'm assuming that this was all --**

Q Now, the other side, what do you think that is?

A **They were just some of my personal, you know --**

Q Thoughts about the lawsuit?

A **Yeah, um-hum.**

MS. MONTGOMERY: I'm going to represent that I'm not going to turn this document over, but I want to review the document that he says are his personal thoughts about the lawsuit.

MR. SHERR: And I believe that this is privileged because -- I believe it's privileged because I believe it states things that were stated at the meeting so you're more than happy to have the court inspect it and --

MS. MONTGOMERY: Take the document back from

# VAN DOMMELEN, DAVID
## 06/06/01

<div align="right">

# CORNEAL VS
## JACKSON TOWNSHIP

</div>

**38**

1   Mr. Van Dommelen.
2   BY MS. MONTGOMERY:
3   Q   Mr. Van Dommelen, is it your position that
4   those are things stated about the meeting?
5   A   **That what?**
6   MS. MONTGOMERY: I'm going to ask him some
7   more questions about that.
8   BY MS. MONTGOMERY:
9   Q   When did you make those notes?
10   A   **I do not know.**
11   Q   Before or after the meeting?
12   A   **These after the meeting, I'm positive.**
13   Q   Was anybody else present when you made those
14   notes?
15   A   **No.**
16   Q   I'm going to give you a sticky and ask you to
17   mark on one side --
18   MR. SHERR: Well, let the record reflect that
19   I believe this to be a privileged document so we're not
20   going to turn it over. You know, you can take the next step
21   if you'd like at that point, but I believe this to be a
22   privileged document.
23   MS. MONTGOMERY: I'm going to take the next
24   step. I'm absolutely going to take the next step.
25   MR. SHERR: That's fine.

**39**

1   MS. MONTGOMERY: I mean, I don't know that his
2   thoughts about a meeting with you are privileged. I don't
3   know under what theory of law his thoughts about a meeting
4   with you are privileged. He told me they were thoughts --
5   he didn't say they were thoughts about a meeting, he said
6   that they were thoughts about the lawsuit. That's not
7   privileged. And you've taken it from him and said no, I
8   think there's something in here -- thoughts about that
9   meeting and so you can't see it.
10   MR. SHERR: I know this to be things that I
11   stated to him in notes about the meeting and it's
12   privileged.
13   MS. MONTGOMERY: Well, we'll ask the court to
14   review it.
15   MR. SHERR: That's fine. I have no problem
16   with that.
17   BY MS. MONTGOMERY:
18   Q   But for now I'm just going to ask you to mark
19   the side of it that you think is the meeting that you --
20   notes of the meeting that you took while you were with Mr.
21   Sherr.
22   A   **It would be this one. What do you want me to**
23   **write?**
24   Q   Just, you know, meeting with Mr. Sherr or
25   something like that so that we know which side you took in

**40**

1   Mr. Sherr's presence.
2   A   **(Witness so complied.)**
3   Q   Do you know somebody named Vita?
4   A   **Vita?**
5   Q   Yes.
6   A   **No.**
7   Q   Does the word vita mean anything to you,
8   v-i-t-a?
9   A   **No.**
10   MR. SHERR: Curriculum vita?
11   THE WITNESS: Huh?
12   MR. SHERR: Curriculum vita.
13   THE WITNESS: Oh, vita, I see.
14   BY MS. MONTGOMERY:
15   Q   V-i-t-a.
16   A   **I thought you were saying a name of a person,**
17   **Vita.**
18   Q   I was just asking.
19   A   **Okay, vita, curriculum vita.**
20   Q   Okay.
21   A   **Mine is in here, in this pile someplace.**
22   Q   Right, the documents that I just took and had
23   copied.
24   A   **Um-hum.**
25   Q   Do you have any other documents with you today

**41**

1   besides the ones that you just took out of your bag and
2   handed to Mr. Sherr first?
3   A   **No.**
4   Q   To your knowledge do you have any other
5   documents anywhere else that in any way relate to this
6   lawsuit?
7   A   **No.**
8   Q   That in any way relate to Mr. Corneal?
9   A   **No.**
10   Q   Did you have any documents at any other time
11   that relate to this lawsuit or to Mr. Corneal?
12   A   **No.**
13   Q   Do you work on computer?
14   A   **Yes.**
15   Q   Would you have notes on computer by any
16   chance?
17   A   **No.**
18   Q   Do you do any of your township business on
19   computer?
20   A   **Sometimes. Sometimes I might write a letter**
21   **on the computer.**
22   Q   Did you look in your computer to see whether
23   there were any documents related to Mr. Corneal or this
24   lawsuit?
25   A   **No.**

<div align="center">

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

</div>

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

42

1 Q    Do you know right now as you sit here whether
2 there are?
3 A    Pardon?
4 Q    Do you know right now as you sit here whether
5 there are any such documents?
6 A    There are none.
7 Q    What about on floppy disk?  Do you download
8 onto floppy disk at all?
9 A    Yes.
10 Q    Do you have any documents related to this
11 lawsuit downloaded onto a floppy disc?
12 A    No.  My computer is mainly used for my
13 manuscripts for my books.
14 Q    Now, you said from time to time in your work
15 as a building permit officer that you have gone and
16 inspected property?
17 A    Um-hum.
18 Q    What does such an inspection entail?
19 A    To drive by mainly, to see what's being done.
20 Q    And when you say drive by, do you mean you
21 just drive by, you don't get out of the car?
22 A    No.
23 Q    Is that no, you don't get out of the car?
24 A    Yeah.  No, I don't get out of the car.
25 Q    You just take a slow drive by the property?

---

43

1 A    Correct.
2 Q    And what would you be looking for when you
3 drive by?
4 A    To see if someone has gotten a building
5 permit, to see if they're complying with our regulations.
6 Q    Well, now, in saying that, am I understanding
7 you to say that for someone who hasn't applied for a
8 building permit you've done drive-bys like that?
9 A    Yes.
10 Q    So is that because you hear from somebody that
11 somebody is building?
12 A    Yes.
13 Q    What about in connection with someone who has
14 applied for a building permit, have you done drive-bys --
15 A    Sometimes.
16 Q    How often?
17 A    Oh, I really can't say.  I think I said a
18 little earlier about 25 times.
19 Q    I was just trying to make sure that you
20 weren't talking about any drive-by that you do those 25
21 times.
22 A    No.
23 Q    So you're saying that for purposes of people
24 who have applied for the permit you think you've driven by
25 to see what is going on about 25 times?

---

44

1 A    Right.
2 Q    About how many building permit applications do
3 you process a year?
4 A    About -- between 35 and 40 a year.
5 Q    Is that pretty steady from --
6 A    That's pretty steady.
7 Q    Of those building permit applications, how
8 many have you denied in the 11 years that you've been the
9 building permit officer?
10 A    I'm not sure that I can answer that honestly.
11 Q    And why is that?
12 A    Because I think there are times I've said you
13 have to add more information and then they come back and
14 then I don't deny it.
15 Q    Okay.  So have you ever outright denied a
16 building permit application by sending a letter and saying
17 your building permit application is denied?
18 A    Just once.
19 Q    And when was that?
20 A    To Corneal.
21 Q    So it was in connection with Mr. Corneal?
22 A    Right.
23 Q    You have no other -- you've never written a
24 letter to anybody else and denied their building permit
25 application?

---

45

1 A    Not that I recall.
2 Q    So when you say you might ask them to go and
3 get additional information, what kind of additional
4 information?
5 A    Well, I might have discovered they haven't
6 gotten the proper sewage number from our sewer -- from the
7 septic officer and so I need to have that number before I
8 can -- before I can issue a permit.  That might be one
9 reason.
10 Q    So they have to go back and get you a number
11 and come back?
12 A    And I might also say you need to get a better
13 assessment, a cost of the structure that you're building.
14 Q    Okay.  Anything else?
15 A    Not that I can think of.
16 Q    So typically do they go get you the
17 information the same day and get it back to you?
18 A    They can very often, yes.
19 Q    How many times would you say you've sent
20 people back for additional information?
21 A    Oh, probably 10 times.
22 Q    Ten times in say 11 years?
23 A    Yes.
24 Q    During the year 2000 how many building permit
25 applications did you review?

---