VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

**46**

1    A      Probably in the area of 36 or 37.
2    Q      Was Mr. Corneal -- and I take it from your
3    past answer that Mr. Corneal's was the only building permit
4    application that you denied in the year 2000?
5    A      Right.
6    Q      How did Mr. Corneal come to fill out a
7    building application, a building permit application?
8    A      How?
9    Q      Yes. Well, let me ask that question -- strike
10   that. What's the first contact that you had with Mr.
11   Corneal in connection with his request for a building
12   permit?
13   A      When he showed up at my house.
14   Q      Did he call you first?
15   A      I don't believe so, but I -- he might have.
16   Sometimes people do, sometimes they don't and I just do not
17   recall if he did or not.
18   Q      So he showed up at your house?
19   A      Right.
20   Q      In the daytime?
21   A      Yes.
22   Q      Do you know when that was?
23   A      No, I can't remember. It was probably in
24   April of 2000.
25   Q      And what did he say when he got there?

**47**

1    A      He said he wanted a building permit and I said
2    what are you building and he said a garage and a house. And
3    then he said his name and I said I cannot give you a
4    building permit.
5    Q      And why?
6    A      Because the supervisors had instructed me not
7    to give a building permit.
8    Q      When did the supervisors instruct you not to
9    give him a building permit?
10   A      Well, probably a couple of weeks before that.
11   And then while he was there, I called up Tom Wilson and Tom
12   -- and I said Mr. Corneal is here and what am I to do and
13   he said don't give him a permit.
14   Q      Did you ask him why shouldn't I give him a
15   permit?
16   A      Yes, because he was -- hadn't subdivided
17   properly and he hadn't got the correct septic tank approval.
18   Q      That's what Mr. Wilson told you?
19   A      Yes.
20   Q      Did you have any independent knowledge of
21   that?
22   A      Well, I'd heard. Yes, I'd heard that that was
23   true.
24   Q      Where did you hear that from?
25   A      Oh, from different discussions of supervisors.

**48**

1    Q      Just with the supervisors?
2    A      Yes.
3    Q      You said that before Mr. Corneal showed up
4    that you had been instructed by the supervisors not to give
5    him a building permit.
6    A      Right.
7    Q      Now, in what -- you know, where were you when
8    you were instructed not to give him a building permit?
9    A      I can't tell you. I can't remember.
10   Q      Did they tell you that in person or over the
11   telephone?
12   A      Over the telephone.
13   Q      They called you at your house?
14   A      Yeah, we talk on the phone, um-hum.
15   Q      So in the course of a telephone conversation
16   prior to --
17   A      Yes.
18   Q      -- Mr. Corneal's visit you're saying?
19   A      Right.
20   Q      So who exactly were you speaking to?
21   A      Pardon?
22   Q      Who exactly were you speaking to?
23   A      I know I talked to Ann Wirth about it.
24   Q      Did Miss Wirth tell you not to give him a
25   building permit?

**49**

1    A      She said the supervisors were not interested
2    in letting him have one at that time.
3    Q      And did she tell you why?
4    A      Yes, the same reason, that he was talking
5    about subdividing but he hadn't done the proper steps for
6    subdividing and he also hadn't gotten the correct permission
7    for septic systems.
8    Q      Well, let me ask you this: If he's asking to
9    build one structure on one piece of property, does he have
10   to do some kind of subdivision thing? I mean, what does he
11   have to do in connection with subdividing?
12   A      Well, he has to go through the planning
13   commission to subdivide and go through the supervisors.
14   Q      What if he doesn't want to subdivide, he just
15   wants to build?
16   A      Well, he couldn't on that property because
17   there was already a house on it and that would mean that he
18   would then be subdividing that property.
19   Q      Is that what Miss Wirth told you?
20   A      Yes, that's common practice, common knowledge.
21   Q      So you recall a phone call from Ann Wirth?
22   A      Yeah, I assume that -- a phone call. I don't
23   know who called so I'll just say I talked to her on the
24   phone and I talked to Tom Wilson on the phone.
25   Q      Was that around the same time frame?

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

50

1    A    Yes.
2    Q    Did either one of them express to you any
3    dislike of Mr. Corneal?
4    A    No.
5    Q    Did they express to you any conflict that they
6    were having with Mr. Corneal in any way?
7    A    Yes.
8    Q    And what did they express to you?  Who
9    expressed it to you and what did he or she express?
10   A    Well, he was very vituperative in two of the
11   township meetings.  Neither of those -- I wasn't present at
12   either of those for some reason and so they reported his
13   behavior at those and --
14   Q    What did they say about his behavior?
15   A    That it was irresponsible.  And I'm not sure
16   if that word was used, but it was very childlike and he did
17   this in front of all the -- the whole business meeting.
18   Q    What exactly did he do, did they tell you?
19   A    Well, he screamed and yelled and ...
20   Q    Did they tell you anything else about it?
21   A    What?
22   Q    Did they tell you anything else about it?
23   A    Not really.
24   Q    Who told you this, Miss Wirth or Mr. Wilson?
25   A    I think both of them.

51

1    Q    So did they tell you that because he behaved
2    in what they considered to be a childlike fashion that they
3    didn't want him to build or something?
4    A    No, that had nothing to do with it.
5    Q    What else did they tell you then?
6    A    That's essentially it.
7    Q    At the time that Miss Wirth and Mr. Wilson
8    told you that Mr. Corneal wouldn't be allowed to build
9    because he didn't have proper subdivision, was there a
10   subdivision ordinance in place in the township?
11   A    No, we had a moratorium on subdivision.
12   Q    Did you have an ordinance?
13   A    A subdivision ordinance?
14   Q    Yes.
15   A    We were working on that.
16   Q    So you just had a moratorium in place?
17   A    Right, um-hum.
18   Q    Were you involved in the discussions about
19   placing a moratorium in place in Jackson Township?
20   A    No, no.
21   Q    How did you come to find out about the
22   moratorium?
23   A    Well, it was just mentioned at township
24   meetings.
25   Q    Do you know how long it was under discussion?

52

1    A    No, I'm not sure.
2    Q    Had you ever heard about it prior to the time
3    that it was actually put in place by the township
4    supervisors?
5    A    Yes, um-hum.
6    Q    How long before that had you heard about it?
7    A    I can't remember.
8    Q    Were you present at the meeting when the
9    moratorium was put in place by the supervisors?
10   A    No.
11   Q    But you were aware of it?
12   A    Yes.
13   Q    Were you involved in any discussions or
14   conferences or anything like that concerning the moratorium
15   with the supervisors?
16   A    No.
17   Q    With anybody else?
18   A    I don't know.
19   Q    Well, do you recall who told you about the
20   moratorium?
21   A    Well, the supervisors, I assume.
22   Q    They mentioned to you that they were putting
23   it in place?
24   A    Yeah.
25   Q    That they intended to put it in place?

53

1    A    Yeah, and it was discussed at some of the
2    meetings.
3    Q    Did they tell you what their concerns were and
4    why they wanted to put a moratorium in place?
5    A    Well, they wanted to make sure that they had a
6    better understanding of the whole subdivision process.
7    Q    So they put a moratorium in place so they
8    could get a better understanding?
9    A    Yes, and they were trying to rewrite the whole
10   question of subdividing.
11   Q    Did they tell you why they needed to
12   understand it better?  Did they tell you what their concerns
13   were?
14   A    Well, I don't know that they said exactly, but
15   I'm assuming that they wanted to make sure that we had
16   better planning in the township and it wasn't
17   helter-skelter.
18   Q    So you're assuming that, but did they actually
19   tell you that?
20   A    No.
21   Q    Do you recall whether there was any public
22   expression of concern about subdivisions in the township
23   prior to the moratorium being placed --
24   A    Yes --
25   Q    Put in place?

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

54

1    A    — there had been.
2    Q    By whom?
3    A    The supervisors and planners.
4    Q    What planners?
5    A    There were several architects and people in
6    the township that had a concern about subdivision and the
7    direction in which the township was or wasn't going.
8    Q    And who were those architects and planners?
9    A    Well, one was the name of Denson Groenendaal.
10   Q    Denson Groenendaal?
11   A    Yeah, um-hum.
12   Q    Is he a township resident?
13   A    Yes.
14   Q    Who else?
15   A    I can't think of any right now.
16   Q    You can't think of any others?
17   A    I know he was a major person.
18   Q    How do you know he was a major person?
19   A    Because he used to come to some of our
20   meetings and express that concern.
21   Q    To the supervisors?
22   A    Um-hum.
23   Q    Anybody else?
24   A    No.
25   Q    Let's go back for a second to Mr. Corneal's

---

55

1    visit to your home in an effort to get a building permit.
2    A    Um-hum.
3    Q    So you told him -- as I understand your
4    testimony, you told him he couldn't have one, correct?
5    A    Yes, um-hum.
6    Q    And you made a phone call to Mr. Wilson?
7    A    Um-hum.
8    Q    And he confirmed that you should not give
9    him --
10   A    Right.
11   Q    -- a permit?  Did Mr. Corneal then ask you any
12   questions about why he couldn't have a permit?
13   A    Yes, and I said because you don't have the
14   proper documentation to receive one.
15   Q    For a subdivision?
16   A    For a subdivision or for septic.
17   Q    What did he say?
18   A    He started ranting and raving.
19   Q    What's your definition of ranting and raving?
20   A    Screaming and yelling at me.
21   Q    He screamed at you?
22   A    Yes.  And I began to be concerned about my
23   welfare and unfortunately my wife wasn't there.  She was not
24   in the house.  So I told him that either he leave or I'm
25   going to call authorities to take him out of my house.

---

56

1    Q    And what did he say?
2    A    Well, he finally left.
3    Q    Did he ask you for an application?
4    A    Yes.
5    Q    Did you give him an application?
6    A    No.
7    Q    Why not?
8    A    Because I didn't know what he was going to do
9    with it.
10   Q    What did you think he was going to do with an
11   application?
12   A    Well, fill it out and pretend that he had an
13   application.
14   Q    Well, you mean pretend that he had a permit,
15   but he can't -- how could he pretend he has a permit?
16   A    Well, I don't know.
17   Q    So you didn't want to give him the
18   application?
19   A    Right.
20   Q    Why, because you just didn't want him to have
21   one?
22   A    Yes.
23   Q    Have you ever denied anybody else a building
24   permit application in the past?
25   A    No.

---

57

1    Q    What did Mr. Corneal do when you wouldn't give
2    him the application?
3    A    He made a scene.
4    Q    Is that when he started screaming and
5    yelling --
6    A    Right.
7    Q    -- when you said no, I'm not going to give you
8    an application?
9    A    Right.
10   Q    Now, I heard you say a moment ago that you
11   attend township meetings.  Is that typically or just
12   sometimes or regularly or what?
13   A    Fairly typically.
14   Q    Do you know, for example, in 2000 how many
15   meetings you -- monthly meetings you attended?
16   A    Probably nine or 10.
17   Q    But you were not at the January meeting when
18   the moratorium --
19   A    No.
20   Q    -- was put in place?  Why not?
21   A    I cannot remember.
22   Q    What about the February 2000 meeting, do you
23   know if you were at that one?
24   A    I was not at that one either.
25   Q    What about the March 2000 meeting?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

58

1 A I can't recall.
2 Q What about the April 2000 meeting?
3 A I probably was at it, but I would have to look
4 at my calendar.
5 Q Are you aware of the existence of pre-meetings
6 that --
7 A Of what?
8 Q I guess we would call them pre-meetings that
9 were held -- that are held by the supervisors prior to
10 township meetings?
11 A Yes.
12 Q Have you attended those meetings?
13 A I've never attended one of them.
14 Q Why is that?
15 A Because I just didn't want to.
16 Q Are you permitted to attend if you want?
17 A Yes, I believe so.
18 Q Are these meetings open to the public?
19 A Yes.
20 Q The pre-meetings are open to the public?
21 A Yes, I believe so.
22 Q Do you know where they're held?
23 A In the secretary's -- the township secretary's
24 office.
25 Q The meetings -- the public meetings themselves

59

1 are held at the fire hall?
2 A Right.
3 Q What makes you say that the pre-meetings are
4 open to the public?
5 A I think the Sunshine Laws of the state.
6 Q Do people know that there are pre-meetings at
7 Ann Wirth's property?
8 A Oh, I'm sure they do.
9 Q And what makes you say you're sure that they
10 do?
11 A Because they've talked about them at the
12 public meetings.
13 Q Where is the fire hall in relation to Miss
14 Wirth's house?
15 A About four miles away and the fire hall is
16 right in center city McAlevys Fort.
17 Q Is there any kind of a sign at Miss Wirth's
18 that says, you know, township office --
19 A Yes.
20 Q -- pre-meetings held here, something like
21 that?
22 A No, no, there is no sign that says meetings
23 held, but it does -- there is a sign that says township
24 supervisors -- or township secretary has an office there.
25 Q So it's the township secretary's office?

60

1 A Yes.
2 Q Is that building open to the public, like can
3 anybody go in and walk in anytime they want?
4 A I assume. She has office hours.
5 Q She does?
6 A Yes.
7 Q Have you ever tried to go up there just to go
8 into the township secretary's office?
9 A Oh, yeah.
10 Q Is it unlocked?
11 A I don't know because if she's not there, she
12 has a sign out that she'll be back at a certain time. I've
13 never tried the door.
14 Q As far as the pre-meetings are concerned that
15 you think might be open to the public, are they actually
16 advertised in the newspaper or anything like that, there
17 will be a pre-meeting at Ann Wirth's office prior to the
18 public supervisor's meeting?
19 A That I'm not sure of. I don't get the Daily
20 News. I don't get -- receive that paper.
21 Q To your knowledge, though, are they
22 advertised?
23 A I think so, but I would not place my life on
24 it.
25 Q What makes you think so?

61

1 A Because I know occasionally that they have
2 said something is in the paper.
3 Q You mean occasionally the supervisors say
4 we're putting something in the paper?
5 A And whenever the supervisors have a change of
6 the supervisor's meetings it's always in the paper.
7 Q The regular monthly meetings?
8 A Yes, uh-huh, and those are open and attended
9 by townspeople.
10 Q Right. Do you know what actions or what
11 activities take place at these pre-meetings?
12 MR. SHERR: I'm going to object to the form of
13 the question. I believe it's calling for hearsay now since
14 he already stated he did not go to any of those meetings.
15 MS. MONTGOMERY: Well, hearsay is perfectly
16 permissible in a deposition, perfectly permissible.
17 MR. SHERR: I'm not telling him not to answer.
18 I'm objecting to the form of the question because you're
19 asking for hearsay.
20 MS. MONTGOMERY: Okay.
21 BY MS. MONTGOMERY:
22 Q Do you know what activities take place at the
23 pre-meetings?
24 A Well, I know they sign checks.
25 Q The supervisors sign checks?

## 62

1     A     Yes, uh-huh, because I get my check from them
2 once a month.
3     Q     What else?
4     A     I have no idea.
5     Q     Do you know of any member of the public who
6 has ever attended a pre-meeting?
7     A     No, I don't.
8     Q     When Mr. Corneal visited your house and asked
9 you for a building permit application, do you recall whether
10 -- do you recall telling him that there was going to be a
11 meeting on his situation the next day?
12     A     Yes, I do recall a comment like that.
13     Q     That you made to him?
14     A     Yes, um-hum.
15     Q     How did you know there was going to be a
16 meeting on his situation?
17     A     Well, there was some talk about it, but it
18 apparently never took place.
19     Q     That wasn't a public meeting, correct?
20     A     No, I don't believe so.
21     Q     Was that going to be a meeting of the
22 supervisors and Ann Wirth?
23     A     Yes.
24     Q     Were you supposed to be there?
25     A     No.

## 63

1     Q     Why don't you think it ever took place?
2     A     Pardon?
3     Q     Why don't you think it ever took place?
4     A     Because I never got any response about that I
5 should change the stance on the building permit for Mr.
6 Corneal.
7     Q     So you don't really know whether or not the
8 meeting ever took place --
9     A     No.
10     Q     -- correct? You said there had been some talk
11 of holding a meeting. Some talk among who?
12     A     The supervisors to try and figure out what had
13 to be done.
14     Q     About Mr. Corneal?
15     A     Yes.
16     Q     So this was going to be a non-regular -- it
17 wasn't a monthly meeting or anything like that --
18     A     Not that I know of.
19     Q     -- or even a pre-meeting?
20     A     Yes.
21     Q     Was anybody else present at your house the day
22 that Mr. Corneal came?
23     A     No.
24     Q     Did you have occasion then after that visit to
25 meet with Mr. Corneal in person?

## 64

1     A     No.
2     Q     You never talked to him in person again --
3     A     No.
4     Q     -- about his building permit application?
5     A     No.
6     Q     What did you then do next about his building
7 permit?
8     A     I waited to hear from the supervisors.
9     Q     What did you hear next from the supervisors?
10     A     Well, that until he agreed to take care of the
11 concerns that they weren't going to allow him to have a
12 permit.
13     Q     Who agreed?
14     A     The supervisors.
15     Q     They agreed -- I'm sorry, I don't understand
16 what you said.
17     A     You asked me the next step and what I'm saying
18 is that they told him, apparently, and this is -- that until
19 he solved the problems that they wouldn't have me issue a
20 building permit.
21     Q     How do you know they told him that?
22     A     I don't know. I'm assuming that they did.
23     Q     Okay. Assuming based on what?
24     A     Well, based on the fact that they were trying
25 to get different things solved.

## 65

1     Q     Have you ever been present at a township
2 meeting that Mr. Corneal was present at?
3     A     No.
4     Q     Did you ever have the opportunity to talk to
5 Mr. Corneal again on the telephone about his building permit
6 application?
7     A     No.
8     Q     Did he ever call -- try to call you again?
9     A     No.
10     Q     Did he ever write to you?
11     A     Yes.
12     Q     What was the occasion of his writing to you?
13     A     Somewhere there's a letter in there.
14     Q     Do you recall a time when Mr. Corneal decided
15 that he just wanted to build a studio rather than a house?
16     A     Yes.
17     Q     What do you know about that?
18     A     He came and presented plans to me,
19 architectural plans, of a four garage -- four-stall garage
20 with an upstairs studio in it.
21     Q     Okay, he presented them to you. I thought you
22 said you hadn't an occasion to meet with him again?
23     A     That was when he came that first time.
24     Q     Oh, okay. So he was at that time asking you
25 for a garage and a house, is that what you're saying -- a

Case 1:00-cv-01182-SHR   Document 119-3   Filed 04/18/2003   Page 6 of 36

66

1　studio and a house?

2　　A　Well, yes, he was going to do a house and a

3　garage and then he changed his mind and decided to have a

4　studio separate from the garage.

5　　Q　So is it your testimony that the time that he

6　came to your house he was asking you for a building permit

7　both for the house and for the studio, correct?

8　　A　I'm not sure about that. I can't -- the only

9　drawings he had with him were a four-stall garage and with a

10　second story for a studio.

11　　Q　So he didn't need any septic for that studio,

12　right?

13　　A　I would say so.

14　　Q　Why is that?

15　　A　Because as an artist he's got to use water and

16　that means that you've got to have, you know, a system to

17　get rid of the water and -- through a septic system.

18　　Q　Do you have septic in your studio?

19　　A　No, I don't.

20　　Q　So you don't really know anything about why

21　Mr. -- or you don't really know anything that would

22　demonstrate that Mr. Corneal needs septic in his studio, do

23　you?

24　　A　No, I'm assuming that he would need to have a

25　septic system because of the type of artwork that he's --

67

1　　Q　How do you get water to your studio?

2　　A　I go to the stream and get water.

3　　Q　So assuming he doesn't want septic in his art

4　studio --

5　　A　Pardon?

6　　Q　Assuming he doesn't want water in his studio

7　like you don't need water in your studio, does he need a

8　septic system?

9　　A　Well, I suppose not.

10　　Q　Did Mr. Corneal ever tell you that he was

11　looking to put water in his studio?

12　　A　I don't recall.

13　　Q　Did you at the time that he asked you for the

14　building permit make any distinction between the art studio

15　and the house?

16　　A　I knew he was going to build a house.

17　　Q　But he was asking to build a house and an art

18　studio, right?

19　　A　I don't recall if he was asking for both of

20　them at that time or not.

21　　Q　But you did testify that he brought to you

22　some plans and the only plans that he showed you were for an

23　art studio -- or a four-bay garage with a studio above it,

24　correct?

25　　A　Yes.

68

1　　Q　But you denied him the application even for

2　that studio, correct?

3　　A　Yes.

4　　Q　Did you do so based on what the township

5　supervisors told you to do?

6　　A　Right.

7　　Q　So they told you don't give him a building

8　permit for anything, right?

9　　A　Exactly.

10　　Q　Mr. Van Dommelen, I'm just going to take a

11　second and show you a document -- while I find this

12　document, I'm going to ask you questions so we don't waste

13　time. Have you had occasion to discuss with any of the

14　township supervisors their depositions?

15　　A　No.

16　　Q　Have you had occasion to discuss with anybody

17　the depositions of the township supervisors?

18　　A　I have not heard of anything that they've --

19　no, I haven't.

20　　Q　Have you talked to the township supervisors

21　about their depositions or about this lawsuit since their

22　depositions were taken?

23　　A　No.

24　　Q　What about Miss Wirth, have you had occasion

25　to talk to Miss Wirth about her deposition?

69

1　　A　No.

2　　Q　Have you talked to her since her deposition

3　was taken?

4　　A　Yes.

5　　Q　When was that?

6　　A　Well, I've talked to her several times about

7　different issues.

8　　Q　Did you talk to her about this lawsuit?

9　　A　No.

10　　Q　So has anybody -- no matter who they are,

11　anybody, told you anything about the testimony that was

12　given --

13　　A　No.

14　　Q　-- in the depositions of the township

15　supervisors --

16　　A　No.

17　　Q　-- or Ms. Wirth?

18　　A　Unh-unh. The only thing I know about is --

19　because I was here the day that Ann Wirth -- I know the

20　period of time it took for the deposition.

21　　Q　Now, when Mr. Corneal came to your house, did

22　you indicate to him that you would call him or get back in

23　touch with him in any way?

24　　A　No.

25　　Q　Do you recall getting a phone call from him

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

70

1  after that meeting --
2  **A  No, I don't.**
3  Q  -- at your house?  I'm going to show you a
4  document that we're going to -- it's already been marked as
5  Wirth 15 so we don't need to mark it again and I'll ask you
6  to take a look at it.
7  **A  Um-hum.**
8  Q  Do you recall receiving that letter from Mr.
9  Corneal?
10  **A  Yes, um-hum.**
11  Q  What did you do with that letter once you
12  received it?
13  **A  I filed it.**
14  Q  Filed it where?
15  **A  In my file.**
16  Q  Did you send it on to anybody else?
17  **A  No.**
18  Q  Why not?
19  **A  I don't know who I would have sent it on to.**
20  Q  You wouldn't have sent it on to the township
21  supervisors?
22  **A  No.**
23  Q  Did you call him back about that letter?
24  **A  No.**
25  Q  Did you tell anybody about the letter?

---

71

1  **A  I think I probably told Ann Wirth that I'd**
2  **received one.**
3  Q  And what did you understand that letter to be
4  asking you?
5  **A  Pardon?**
6  Q  What did you understand that letter to be
7  asking you?
8  **A  To call him back.**
9  Q  Why didn't you call him back?
10  **A  Because there's no -- nothing solved about the**
11  **building permit.**
12  Q  In his letter he tells you he just wants a
13  building permit for his garage right now, correct?
14  **A  Um-hum.**
15  Q  Is there something that needed to be solved
16  about his garage?
17  **A  No.**
18  Q  Can I see that again, please -- actually hold
19  on to it, I'll get a copy, sorry.  Mr. Corneal states in
20  this letter that you called him a trouble-making yuppie from
21  over the mountain.  Is that true?
22  **A  Yes.**
23  Q  You did call him that?
24  **A  Yeah.**
25  Q  I appreciate your honesty.

---

72

1  **A  Huh?**
2  Q  I appreciate your honesty.  Why did you call
3  him a trouble-making yuppie from over the mountain?
4  **A  Well, it was because I think it's a good**
5  **demographic term that is used for people of his age and for**
6  **people who always want to sue other people.**
7  Q  Well, on May 5, 2000 he hadn't sued anybody,
8  right?
9  **A  What?**
10  Q  On May 5, 2000 he hadn't sued anybody, right?
11  **A  I still don't hear you.**
12  Q  On May 5, 2000 when he wrote this letter he
13  hadn't sued anybody, right?
14  **A  No, but I figured he would because he had**
15  **threatened me that he was going to sue.**
16  Q  Did he threaten you to sue after you wouldn't
17  give him the application?
18  **A  Yes.**
19  Q  Did that term trouble-making yuppie from over
20  the mountain come from somebody else or did you think that
21  up yourself?
22  **A  Oh, I just made it up myself -- or I didn't**
23  **make up the term yuppie.**
24  Q  Right, of course not.  What about Mr. Corneal
25  makes you say that he's a yuppie?

---

73

1  **A  I think he just behaves like someone who wants**
2  **to get their own way and his age group.**
3  Q  So when you called Mr. Wilson the day that Mr.
4  Corneal was out at your house, you explained to him that Mr.
5  Corneal was really just right now just asking for the permit
6  for the garage, right?
7  **A  Yes.**
8  Q  And Mr. Wilson said what?
9  **A  He said don't give him a permit.**
10  Q  When you told -- you indicated earlier that
11  you told him that they were going to meet -- the supervisors
12  were going to meet the next day about Mr. Corneal's permit
13  situation, right?
14  **A  Yes.**
15  Q  You testified to that.  Did you tell Mr.
16  Corneal you would call him and let him know?
17  **A  I don't recall that I did.**
18  Q  Do you recall him giving you his telephone
19  number where you could reach him?
20  **A  Yeah, I did have his telephone number.  I**
21  **thought it was here in all these papers but I can't seem to**
22  **find it.**
23  Q  But he gave it to you that day, right, so you
24  could get a hold of him?
25  **A  Well, I can't -- I can't remember if he gave**

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**VAN DOMMELEN, DAVID**
**06/06/01**

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

74

1  that to me -- he must have given it to me that day.
2      Q      Okay.  So now after you received this letter,
3  you just filed it away and what did you do, just wait to
4  hear from the supervisors again?
5      A      Yes.
6      Q      Did you take any independent action in
7  connection with deciding whether or not he ought to have a
8  permit?
9      A      I did one thing.  I drove down into his
10  property to see what was happening and when I came back my
11  wife said don't ever do that again.
12      Q      Why is that?
13      A      Because she doesn't trust him.
14      Q      She didn't want you to go near his property?
15      A      Right, um-hum.
16      Q      Why didn't your wife trust him?
17      A      By his behavior.
18      Q      But she wasn't there, right?
19      Q      No.  Well, I told her.
20      Q      You told her that he had screamed?
21      A      I tell her everything.
22      Q      You told her he screamed at you?
23      A      Pardon?
24      Q      You told her he screamed at you?
25      A      Yes, um-hum.

---

75

1      Q      Were you at the township meeting when the
2  subdivision ordinance eventually was approved by the
3  supervisors?
4      A      I can't remember.  I have a -- I have a very
5  difficult time hearing in that hall and -- because it's all
6  metal and, you know, I just can't -- I can't hear unless I'm
7  right sitting as close as you are so I can almost read lips.
8      Q      I understand.
9      A      I miss about 75 percent of the discussion in
10  the township meetings.
11      Q      I see.  Between the time that the moratorium
12  was put in place and the subdivision ordinance was finally
13  approved --
14      A      Yes.
15      Q      -- did you issue any building permits?
16      A      Did I what?
17      Q      Issue any building permits.
18      A      After that?
19      Q      No, between the time the moratorium was put in
20  place and the time it was finally approved, did you issue
21  any building permits?
22      A      Probably, for sheds and small structures.
23      Q      So if Mr. Corneal didn't need a sewage permit,
24  right -- let me say this:  If Mr. Corneal didn't need
25  septic, he wouldn't need a sewage permit, correct?

---

76

1      A      Not if it's just a garage.
2      Q      Did there come a time then when you did
3  receive building permit applications from Mr. Corneal?
4      A      No.
5      Q      You never received a building permit
6  application from him?
7      A      No.
8      Q      I'm going to show you what's been marked
9  previously as Wirth Exhibit 13 and ask you to look at that,
10  please.  Okay?
11      A      Um-hum.
12      Q      Did you write that letter?
13      A      Did I write that?
14      Q      Yes.
15      A      I wrote part of it.
16      Q      Which part of it did you write?
17      A      Well, I wrote a general one and then Larry
18  Newton looked it over and made some slight changes.
19      Q      So you sent that letter to Larry Newton after
20  you did an initial draft of it?
21      A      Yes.
22      Q      And he sent it back with some changes?
23      A      Yes.
24      Q      Did you do that on your computer, that letter?
25      A      No, unh-unh.

---

77

1      Q      Well, let me ask you this:  When you say you
2  wrote it, did you handwrite it initially and send it back to
3  -- send it to Larry?
4      A      Well, I probably did -- the initial one I
5  probably did on the computer, but I -- I'm almost sure that
6  I didn't save it.
7      Q      Okay.  So you --
8      A      So then I sent -- the reason I say this didn't
9  come off my computer is because it's not justified and I
10  always justify all my letters because I think it looks
11  better.
12      Q      So do you think that came from Larry Newton's
13  computer?
14      A      Yes.
15      Q      In final form it came to you for your
16  signature?
17      A      Pardon?
18      Q      In final form it came to you for your
19  signature from Larry Newton?
20      A      Yes, um-hum.
21      Q      What does that letter do, purport to do?
22      A      Well, it's telling him that he hasn't met with
23  the right qualifications to get a building permit in terms
24  of no subdivision, land ordinance, sewage modules.
25      Q      Well, now, the first letter says please be

---

78

1 advised that Jackson Township has referred to me for review
2 your applications for building permits, right?
3     A    **Pardon?**
4     Q    Please be advised that Jackson Township has
5 referred to me for review your applications for building
6 permits.
7     A    **Um-hum.**
8     Q    I thought you said that you hadn't -- you
9 never got an application for a building permit?
10     A    **Well, I didn't.**
11     Q    So you never actually reviewed the
12 applications; is that right?
13     A    **No, we never -- it was never filled out.**
14     Q    Did anybody ever send to you his -- any filled
15 out application?
16     A    **No.**
17     Q    Who told you it was never filled out, that no
18 application was ever filled out?
19     A    **No what?**
20     Q    Who told you that no application was ever
21 filled out?
22     A    **Well, I never received one.**
23     Q    I'm going to show you something. Actually
24 what I'm going to do here, just because I think -- I want to
25 keep this straight. The first letter that we looked at,

79

1 which was the May 5th, 2000 letter from David Corneal to
2 you --
3     A    **Um-hum.**
4     Q    -- and the second letter that we looked at,
5 the October 10, 2000 letter from Mr. Corneal -- to Mr.
6 Corneal from you, we're going to mark this again actually
7 for your deposition.
8     MS. MONTGOMERY: So we will do these Van
9 Dommelen Deposition Exhibits 1 and 2 respectfully. And you
10 can hold onto them because I'm going to ask you a few more
11 questions about them.
12     (Letter dated 5/5/00 produced and marked as
13 Van Dommelen Exhibit No. 1.)
14     (Letter dated 10/10/00 produced and marked as
15 Van Dommelen Exhibit No. 2.)
16 BY MS. MONTGOMERY:
17     Q    Now, I'm going to show you a document that we
18 will mark as Van Dommelen Exhibit 3 at this time.
19     (Packet of documents produced and marked as
20 Van Dommelen Exhibit No. 3.)
21 BY MS. MONTGOMERY:
22     Q    Mr. Van Dommelen, the first document on your
23 Exhibit 3 there is the August 31, 2000 letter from David
24 Corneal to Ann Wirth.
25     A    **Right.**

80

1     Q    Have you ever seen this letter before?
2     A    **No.**
3     Q    Underneath it --
4     A    **I do -- I do see this building permit here and**
5 **I understand now where that came from.**
6     Q    You mean the building application?
7     A    **Yes, uh-huh.**
8     Q    Now, what do you understand about that?
9     A    **That was sent to Larry Newton, a blank one,**
10 **and Larry Newton sent it to Corneal to fill out, but I've**
11 **never -- see, I don't have it in my files at all.**
12     Q    And you never got a chance to actually review
13 it?
14     A    **No.**
15     Q    What about the other two applications that are
16 there?
17     A    **No, I have not seen them before.**
18     Q    You've never seen the other three either?
19     A    **No.**
20     Q    But when you wrote your letter to Mr. Corneal,
21 your October 10, 2000 letter, you made reference to
22 applications for building permits in the plural, correct?
23     A    **Yes.**
24     Q    Were those your words or was that something
25 that Larry Newton had put in?

81

1     A    **I think Larry Newton.**
2     Q    Filled that in for you?
3     A    **Um-hum, right.**
4     Q    Did your first draft -- what did your first
5 draft say, do you recall?
6     A    **No, I don't recall.**
7     Q    Did somebody tell you what to say?
8     A    **It wasn't as complicated as this, though.**
9     Q    Did somebody tell you what to say?
10     A    **Yeah, I think Larry Newton.**
11     Q    Told you what to say. So how did you find out
12 about the applications for building permits if you never saw
13 them?
14     A    **Well, I think I sent some to Larry Newton. He**
15 **asked for some.**
16     Q    For some blanks?
17     A    **Yes.**
18     Q    But then the filled out ones --
19     A    **I never saw the filled out ones.**
20     Q    How did you find out that they had been filled
21 out?
22     A    **I'm not sure that I knew.**
23     Q    But you wrote a letter that says that you
24 reviewed the applications but you didn't really know that
25 they'd been filled out?

82

1    A    No, I can't answer that.
2    Q    Well, let me ask you this:  I know that you --
3   I believe that you've testified essentially that you just
4   wrote a letter that somebody else had -- told you what to
5   say in the letter, correct?
6    A    Well, to some extent, yes.  I had, you know --
7   I had written a draft and I'm assuming that it -- they
8   didn't feel I was putting the proper punch in there.
9    Q    Did anybody else tell you what to say in the
10  letter besides Mr. Newton?
11   A    No, unh-unh.
12   Q    Do you recall what language Mr. Newton wanted
13  you to add to this letter?
14   A    I think a little more detail about the
15  Department of Environmental Protection, areas like that.
16   Q    Did you ever indicate to Mr. Newton that you
17  hadn't seen -- since you hadn't seen the permits --
18   A    No.
19   Q    -- it was difficult to --
20   A    No.
21   Q    -- write the letter?
22   A    No.
23   Q    Or I'm sorry, hadn't seen the applications.
24   A    No.
25   Q    You never told him that?

83

1    A    No, unh-unh.
2    Q    You just rely on him telling you what to say?
3    A    Well, I was relying on eventually that they
4   would come back for my -- you know, for my files.
5    Q    Have you ever denied a building permit
6   application without seeing it before?
7    A    No.
8    Q    Have you ever written any other letter like
9   this, like what is -- we've marked as Van Dommelen Exhibit 2
10  now --
11   A    No.
12   Q    -- the October 10 letter?  You've never
13  written any other letter like that?
14   A    I've written letters requesting someone to
15  apply for a building permit.
16   Q    Understood.  What were you thinking would come
17  back for your files?  You just said, you know, I assumed it
18  would come back for my files.
19   A    Well, once it -- if it were going to be
20  approved, then I would have to have it in my files to send
21  to the tax assessment form.
22   Q    If the supervisors had said okay --
23   A    Right.
24   Q    -- now we're going to allow you to approve it?
25   A    Right.

84

1    Q    Then you'd get an application for your files?
2    A    Yes, um-hum.
3        MS. MONTGOMERY:  Hold on a second.
4        (Pause.)
5   BY MS. MONTGOMERY:
6    Q    Now, after this October 10, 2000 letter that
7   you wrote denying these applications that you hadn't seen,
8   did there come a time once again that you had anything to do
9   with Mr. Corneal's request for a building application
10  permit?
11   A    No.
12   Q    No?
13   A    No.
14   Q    You never had any other involvement whatsoever
15  with his request for a permit?
16   A    No.
17   Q    Have you ever had any discussion with the
18  supervisors about his request for a permit?
19   A    Yeah, I would say so, but I can't give you any
20  detailed conversation.
21   Q    Have you ever attended any sort of special
22  meeting or anything --
23   A    No.
24   Q    -- like that where Mr. Corneal's --
25   A    No.

85

1    Q    -- situation was --
2    A    No.
3    Q    -- discussed?  You should let me finish my
4   sentence.
5    A    I just seen him the one time.
6    Q    I'm really talking about any meetings with
7   anybody else.
8    A    No.
9    Q    Now, do you know whether or not Mr. Corneal
10  appealed the denial of his request for building permits?
11   A    No, I don't -- I don't recall.
12   Q    Have you ever -- well, let me ask it this way:
13  I believe you testified that you never denied a building
14  permit before Mr. Corneal's, correct?
15   A    Um-hum.
16   Q    So you wouldn't have had an opportunity to be
17  involved in the appeal of a denial; is that correct?
18   A    No.
19   Q    Do you know what kind of procedures you would
20  use if you had to -- if somebody did appeal?
21   A    No.  No, the only appeals that I've dealt with
22  is on an appeal to build a structure closer to the -- to a
23  land -- a land border.
24   Q    A boundary line?
25   A    Yeah, a boundary line.  We have a 15-foot

VAN DOMMELEN, DAVID
06/06/01

CORNEAL  VS
JACKSON TOWNSHIP

**86**

1  boundary line.
2  Q  Setback?
3  A  Yeah, setback and someone appealed to have the
4  building set back.
5  Q  And how did you -- how was that appeal
6  handled?
7  A  Well, they called me and I asked them if they
8  wanted to have an appeal and then they would have to write a
9  letter to the supervisors and they did that.
10  Q  And then what happened?
11  A  And then the supervisors approved the appeal.
12  Q  So you denied the request -- was it a request
13  for a variance, is that what it was?
14  A  Pardon?
15  Q  Was it a request for a variance of the
16  setback?
17  A  Yeah, something like a variance, um-hum.
18  Q  Did that go to the zoning officer, is that
19  what they were appealing?
20  A  We don't have a zoning officer.
21  Q  I'm just a little bit confused because you'd
22  indicated that you had -- was it a building permit that was
23  being denied or what was it?
24  A  Well, it was a -- yeah, then it would be a
25  building permit.

**87**

1  Q  But you had said that you never denied a
2  building permit before.
3  A  Well, they were eventually given it.
4  Q  Oh, I see.  Okay.  So let me just get this
5  straight.  Somebody came and asked you if they could build a
6  building at a particular site on their property?
7  A  Right.
8  Q  And you said you wouldn't be able to build it
9  there, is that --
10  A  Yes, there was a question about that being
11  placed too close to the boundary line and so then I
12  suggested that they should appeal that to the board of
13  supervisors.
14  Q  What did the board of supervisors do after it
15  was appealed?
16  A  Well, they took a vote and approved it.
17  Q  Do you know when they took a vote?
18  A  At the -- at a supervisor's meeting.
19  Q  At a public meeting?
20  A  Public meeting.
21  Q  Were you there?
22  A  Yes.
23  Q  You were there.  When was that?
24  A  I can't remember the date.  I'd have to look
25  in my book.  About a year ago.

**88**

1  Q  So it was in the year 2000?
2  A  A year ago or two years ago.
3  Q  You think it was in the year 2000?
4  A  Pardon?
5  Q  You think it was in the year 2000?
6  A  It might have been.
7  Q  What was the name of the man who -- or woman
8  who requested the building --
9  A  Stanborough.
10  Q  Stanborough?
11  A  Um-hum.
12  Q  Is that S-t-a-n-b-o-r-o-u-g-h?
13  A  Yes, um-hum.
14  Q  So they eventually got their building permit,
15  right?
16  A  Um-hum.
17  Q  And they were allowed to build too close to
18  the boundary line, right?
19  A  Yes.
20  Q  So you were at that meeting, correct?
21  A  Yes, I believe I was.
22  Q  Was there any discussion about --
23  A  Yeah, there was a slight discussion about it.
24  Q  Did you participate --
25  A  And the reason that they decided, they had one

**89**

1  shed already close and they were going to tear that one down
2  and put another one up.
3  Q  I see.
4  A  And so that's why it was approved because they
5  had already had one that was close to the boundary line.
6  Q  So you didn't give them a formal denial, you
7  just said I can't approve this, you need to go talk to
8  them --
9  A  Right.
10  Q  -- is that right?
11  A  (Witness nods head affirmatively.)
12  Q  Did you give them anything in writing actually
13  denying it?
14  A  No.
15  Q  Did they actually submit -- had they actually
16  submitted an application to you or did they just come and
17  talk to you about it informally?
18  A  It was sort of informal and then they
19  appealed.
20  Q  So is it your understanding that if someone
21  builds the denial -- I'm sorry, appeals the denial of a
22  building permit then it would be -- the appeal would be held
23  at a township supervisor's meeting?
24  A  Yes, um-hum.
25  Q  And they would rule on it there?

94

1　A　Oh, yes, uh-huh.

2　Q　Do you recall that application?

3　A　No.

4　Q　Do you know who Pauline Weaver is?

5　A　Well, I'm sure I met her. I'm not sure.

6　There are several Weaver families and I'm not sure which one

7　this one is.

8　Q　Now, over on the right-hand column -- it seems

9　like some of this is missing. That's the way it came to

10　us. What would have been in the right-hand column?

11　A　On the far right-hand column?

12　Q　Yes.

13　A　Those are the plot numbers for -- the plot

14　numbers that are on the plot plans for the township.

15　Q　Do you think that you could provide a copy of

16　this document that doesn't cut off the plot numbers?

17　A　They were on -- they were on.

18　Q　Did you get your original back?

19　A　No.

20　Q　Miss Wirth still has it?

21　A　I don't know where it is.

22　Q　Maybe we still have it.

23　　MS. MALADY: We can check.

24　　MS. MONTGOMERY: Maybe we did it.

25　　THE WITNESS: Because it's on the original

95

1　because these are all the lists of the plot numbers.

2　　MS. MONTGOMERY: Okay. All right, that's

3　fine. We may have to make new copies and get them out to

4　you guys.

5　BY MS. MONTGOMERY:

6　Q　In the most right-hand column that's fully

7　showing, under purpose there, across from Pauline Weaver,

8　what does that say? Is that meant to be garage?

9　A　Oh, it must be garage. For Weaver you mean?

10　Q　Yes, for Pauline Weaver.

11　A　Yes, my typing ability.

12　Q　So that was approved, right, that building

13　permit?

14　A　Yes, uh-huh.

15　Q　But you don't recall anything about Pauline

16　Weaver and her whole situation, right?

17　A　Pardon?

18　Q　You don't recall anything about Pauline Weaver

19　and her situation?

20　A　No, I don't. I'd have to see the original --

21　Q　Do you recall Joe Merrell?

22　A　Which one is that?

23　Q　Joe Merrell which is two lines down from

24　Pauline Weaver.

25　A　Oh, Jan Cramer?

96

1　Q　No, it says Joe Merrell, two lines down from

2　Pauline --

3　A　Oh, Joe Merrell?

4　Q　Yes.

5　A　All right. No, I don't recall which one

6　he is.

7　Q　You don't recall him?

8　A　No, I can't recall him.

9　Q　How about Ruby Dunlap? That's on the next

10　page, the April 17, 2000 building permit application.

11　A　Yeah, I see it.

12　Q　Do you see that?

13　A　Yeah.

14　Q　Do you recall that application?

15　A　I'm not sure. I'm not sure.

16　Q　What about the one above it, Douglas Reid with

17　the house, the purpose is a house?

18　A　Yes, I do -- I do recall that case.

19　Q　Mr. Reid?

20　A　Uh-huh.

21　Q　You recall that?

22　A　Yeah, I recall that because that was built on

23　a floodplain and they had to get approval from the federal

24　government to rebuild a house that burnt down on the

25　floodplain.

97

1　Q　Did they get that approval?

2　A　Yes, they got -- engineers came out and

3　checked the floodplain and recommended that they build the

4　house, you know, at a certain height and so it's above the

5　100 year floodplain.

6　Q　And did the -- the supervisors wouldn't have

7　had anything to say about that then; is that correct?

8　A　No, no, it has to be done -- it has to be done

9　by an engineer that comes out and does the approval for

10　that.

11　Q　So once the federal government looks at it,

12　it just comes right back to you for approval or disapproval?

13　A　Yes, I usually get a letter and -- from the --

14　and that letter would be accompanied by the building permit

15　in my little black book.

16　Q　So the house burnt down. Do you recall the

17　size of that property? Do you recall that property

18　generally?

19　A　Pardon?

20　Q　Do you recall that property generally?

21　A　Yes, uh-huh.

22　Q　What's the size of that property?

23　A　Oh, in terms of acreage I don't know.

24　Q　Do you know whether there were any other

25　structures on the property?

90

```
 1    A    Right.
 2    Q    Can you recall any other appeal of a building
 3  permit situation?
 4    A    Not offhand.
 5    Q    What about applications for septic approval,
 6  septic system approval?
 7    A    I have nothing to do with that.  That all
 8  comes through the septic officer and --
 9    Q    Barry Parks?
10    A    Yeah, Barry Parks.  And he does all that work
11  and finally submits to the owner of the land a septic
12  approval.
13    Q    If he disapproves, though, have you ever been
14  around or in -- present in any situation where there's been
15  some discussion of the denial of septic approval?
16    A    No, unh-unh, because usually Barry Parks talks
17  to the landowner and very often to Tom Wilson.
18    Q    About any problems he's concerned with?
19    A    Yes.
20    Q    So he talks informally to Tom Wilson, is that
21  what you're saying?
22    A    I'm assuming, yeah.
23    Q    How do you know that that's what happens?
24    A    I don't know.
25    Q    Well, then let me just ask you and I'm just
```

91

```
 1  curious.  Then why did you say you think that's what
 2  happens?
 3    A    Well, because I know that Tommy Wilson very
 4  often does some of the work on septic tanks and so that
 5  means that -- that he has to talk to Barry Parks.
 6    Q    So if there's a problem they just work it out
 7  between the two of them?
 8    A    Right.
 9    Q    Do you know of very many instances in which
10  that has occurred?
11    A    No, I don't.
12    Q    So nobody ever told you about an appeal of the
13  building permit decision, nobody ever mentioned it to you?
14    A    Of which one?
15    Q    Mr. Corneal's, I'm sorry.
16    A    No, no.
17    Q    I'm going to show you another document now
18  that we're going to mark as Van Dommelen Exhibit 4 and ask
19  you to take a look at it for me.  This is the suggested
20  ideas document.
21         (Suggested ideas produced and marked as Van
22  Dommelen Exhibit No. 4.)
23  BY MS. MONTGOMERY:
24    Q    Now, Mr. Van Dommelen, do you recognize this
25  cover sheet --
```

92

```
 1    A    Um-hum.
 2    Q    -- that says suggested ideas?  Did you prepare
 3  that?
 4    A    Yes, um-hum.
 5    Q    What was the suggested idea in here?  Was it
 6  the building permit price, is that what you're referring to?
 7    A    Yes, uh-huh.  We had had a -- just a one
 8  figure building price before and we felt that it should be
 9  graduated and so this was voted on to -- in March '99 to
10  have a graduated cost.
11    Q    Understood.  Well, actually it says March
12  1994. Is that what you mean?
13    A    What?
14    Q    Actually it says March 1994 there.
15    A    Oh, yes.
16    Q    Is that what you mean?
17    A    Yes, I'm sorry.
18    Q    Now, was there anything else attached to this
19  document at the time?  And for the record --
20    A    No.
21    Q    -- actually I should tell other defense
22  counsel that these are documents that we got when we went up
23  to Huntingdon County last week.
24    A    No, this comes out of my -- out of my building
25  permit book.
```

93

```
 1    Q    Is there any reason why it's attached to the
 2  -- I will represent to you that we got it attached --
 3    A    Attached to this are all the -- all the
 4  applications that I file.
 5    Q    Since 1989?
 6    A    Since 1989, yeah.
 7    Q    Is this a copy -- starting with the second
 8  page where it has name, fee, date, permit of different
 9  people, is this a copy of what you keep in your black
10  binder?
11    A    Yes, uh-huh.
12    Q    Is this an exact copy --
13    A    Yes.
14    Q    -- of what you would keep in your black
15  binder?
16    A    It looks like it.
17    Q    Let's turn to the next to the last page --
18  actually I'm going to direct your attention to the third to
19  the last page instead, sorry about that.
20    A    Which one?
21    Q    Third to the last page where it says -- you
22  have the name Pauline Weaver there at the bottom of the
23  page.  It's the fourth name from the bottom of the page.
24    A    Paul who?
25    Q    Pauline Weaver.
```

98

1    A    No, I don't know.
2    Q    What about Robert Weaver which is --
3    A    Okay. Yeah, Robert Weaver is building a
4    workshop.
5    Q    And that application date was May 4, 2000,
6    correct?
7    A    Yes. And we've had a little bit of problems
8    because he's running out of -- he isn't getting it done and
9    there's a year -- you know, a building permit is good for a
10   year.
11   Q    I see.
12   A    And so -- and his son is in Alaska half the
13   time and so it's not progressing.
14   Q    Who is his son?
15   A    Well, his son is Robert Weaver.
16   Q    Well, who's the father then?
17   A    Yeah, that's -- the father is --
18   Q    Is he Robert Weaver, too?
19   A    Yeah, I believe so.
20   Q    Are they both Robert Weaver?
21   A    I believe so.
22   Q    Who owns the land?
23   A    The father.
24   Q    And the father applied for the building
25   permit?

99

1    A    Yes.
2    Q    But the son is building the garage?
3    A    Yes.
4    Q    Or the workshop?
5    A    The workshop, yes.
6    Q    What's the workshop for?
7    A    I think woodworking.
8    Q    Does it have any water in it?
9    A    Not yet. They're not that far.
10   Q    Are they looking --
11   A    But they have a septic system there and it's
12   not a subdivided piece of property.
13   Q    You mean they have a septic system already on
14   the property?
15   A    Yes, uh-huh. And since it's not a house and
16   -- you know, it wouldn't need one because they have a
17   system there already.
18   Q    But it wouldn't need one anyway, right, since
19   it's not a house --
20   A    No.
21   Q    -- unless it has water?
22   A    Right.
23   Q    Correct?
24   A    Pardon?
25   Q    Unless it has water?

100

1    A    Yes, right.
2    Q    Well, let me show you -- we're going to mark
3    this as Van Dommelen Exhibit 5, application for building
4    permit for Robert Weaver.
5         (Application for building permit produced and
6    marked as Van Dommelen Exhibit No. 5.)
7    BY MS. MONTGOMERY:
8    Q    Do you recall this application?
9    A    Yes.
10   Q    So down there where you checked granted, you
11   granted this application, correct?
12   A    Yes.
13   Q    Which is noted by the fact that you marked it
14   with an X, right?
15   A    That I what?
16   Q    That you marked the document with an X where
17   it says granted, correct?
18   A    I still didn't understand you.
19   Q    The fact that you approved -- this is -- on
20   this document where it says granted and you put an X --
21   A    Yes.
22   Q    -- that's how you keep a record of whether or
23   not you've approved --
24   A    Yes.
25   Q    -- a building permit application, correct?

101

1    A    Right, X or ...
2    Q    At the location, what is that -- 514 what,
3    what's that road?
4    A    That's 514, Box 514, Route 1, Petersburg,
5    16669.
6    Q    Oh, but I'm looking at where it says at
7    location 514 and then there's a word after that.
8    A    That's -- that's the box number.
9    Q    It says a-b-u-t-e or something. I can't read
10   that word.
11   A    Yeah.
12   MS. THORP: Above.
13   BY MS. MONTGOMERY:
14   Q    Is that above?
15   A    Yeah, I believe it is.
16   Q    Where it says 514 above?
17   A    Yeah.
18   Q    Now, you had indicated that the Weaver
19   property has septic, right?
20   A    Yes, it has a house there.
21   Q    It has a house there?
22   A    Um-hum.
23   Q    And where is the workshop in location to the
24   house?
25   A    It's about 25 feet behind the house.

**VAN DOMMELEN, DAVID**
06/06/01

102

1  Q  Do you recall how big that property is?
2  A  No, I -- no, I don't know. It must be at
3  least 10 acres because in that area most pieces of property
4  are in 10 acres and that piece abuts the Corneal property.
5  Q  Now, I'm looking a little further down on this
6  sheet where it says Karl Aronson, workshop. Do you see
7  that?
8  A  Which page is that on?
9  Q  It's the same page as Robert Weaver's was on.
10  A  Okay. Paul?
11  Q  It says Karl Aronson.
12  A  Oh, uh-huh.
13  Q  Do you see that?
14  A  Yes.
15  Q  Do you recall that property?
16  A  Yes, um-hum.
17  Q  And what kind of workshop is that?
18  A  I'm not sure what -- that was interesting
19  because they demolished a barn and then just replaced the
20  workshop on the barn and I'm not sure what kind of workshop
21  it is.
22  Q  But you granted that building application,
23  right?
24  A  Pardon?
25  Q  You granted that building application,

103

1  correct?
2  A  Yes, uh-huh.
3  Q  In fact, if you start at the third page from
4  the end to -- starting with the Pauline Weaver
5  application --
6  A  Um-hum.
7  Q  -- and going all the way to the end --
8  A  Um-hum.
9  Q  -- which is Stoney Lonesome Camp requesting a
10  building application for a pavilion --
11  A  Yes.
12  Q  -- have you granted all of those applications?
13  A  Yes, uh-huh.
14  Q  Did you visit any of those properties to see
15  what was going on?
16  A  Yes, I have.
17  Q  Which ones?
18  A  I've -- I drive by Tuckaway Tree Farm every
19  day and so I could see how that barn was going on and I go
20  up to Stoney Lonesome Camp to visit friends up there.
21  Q  Did you make a specific trip out to any of
22  these properties just to make sure that the building was --
23  A  Not at these, no.
24  Q  Do you know whether any of these properties --
25  well, strike that. This Michael Yoder on the next to the

104

1  last page --
2  A  Yes.
3  Q  -- is he the township supervisor?
4  A  Yes.
5  Q  I think that's all the questions I have for
6  you right now about this document. We may go back to it
7  later.
8  MS. MONTGOMERY: How does anybody feel about
9  lunch at this time?
10  (Discussion held off the record.)
11  BY MS. MONTGOMERY:
12  Q  Mr. Van Dommelen, I'm just going to go through
13  this collection of documents that you brought down with you
14  today. And I'll ask you just to look at the first one.
15  It's just a City Bar and Grill receipt.
16  A  Oh, that's my -- from the last time I was here
17  and -- for lunch.
18  Q  You were here in connection with the
19  deposition?
20  A  Yes, uh-huh, and sat for six hours.
21  Q  Okay. Who did you have lunch with that day?
22  A  And those are just -- I'll be turning those in
23  to -- for reimbursement.
24  Q  Right, I understand. Who did you have lunch
25  with that day?

105

1  A  Pardon?
2  Q  Who did you have lunch with that day?
3  A  My friend from Iowa drove down with me.
4  Q  Just the two of you?
5  A  Pardon?
6  Q  Just the two of you?
7  A  Yes, um-hum.
8  Q  Did he drive down here with you?
9  A  Yes.
10  Q  He drove to Harrisburg with you?
11  A  Pardon?
12  Q  He drove to Harrisburg with you?
13  A  Yes.
14  Q  Was it just the two of you that drove down?
15  A  Yes, um-hum.
16  Q  I want you to just look at your curriculum
17  vita for a second. How did you come to prepare this
18  curriculum vita?
19  A  Well, I keep one every year to either send to
20  galleries where I'm exhibiting and to -- you know, to
21  editors and publishers.
22  Q  Did you put it together for some reason for
23  this lawsuit?
24  A  No, I just thought maybe someone would -- you
25  know, I just threw it in here for -- no, no, no, this is on

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

106

1 my computer. I use this and update it every year.
2 Q    But I just wondered why you had it in your
3 file that --
4 A    Well, I just thought someone might want it.
5 Q    Okay. Well, it's a great resume.
6 A    Pardon?
7 Q    It's a great resume. Now, the next thing --
8 actually, let me put your original back in your file so I
9 can keep that altogether. The next thing I'm going to show
10 you is a couple of -- it's a page that appears to just be a
11 -- it says Roman Numeral III-2. It's a section of
12 something. Can you just tell me what that is?
13 A    Oh, yeah, it's about -- it comes out of a
14 subdivision -- an ordinance, our ordinance book and -- so we
15 were just -- I wanted to refresh my memory about
16 subdivisions and so that's why that's in there.
17 Q    And when did you do this?
18 A    Oh, I don't know. Probably a few months ago.
19 Q    In connection with the lawsuit?
20 A    Well, in clarifying in my -- you know, in my
21 mind about that.
22 Q    Now, the next thing is a collection of
23 documents where you have yellow stickies on, Exhibit A and B
24 to Exhibit Z. Is that your handwriting on those yellow
25 stickies?

107

1 A    Yes, uh-huh, but I can't remember why I put
2 them on.
3 Q    Are they the exhibits to the complaint?
4 A    Pardon?
5 Q    Are they the exhibits to the complaint in this
6 action?
7 A    I'm not -- oh, yes, yes, I see what you're
8 saying. This is part of the Corneal -- and they were
9 attached to his -- his thing.
10 Q    His complaint, right?
11 A    Yeah, um-hum.
12 Q    On that document there's some red
13 underlining. This is the stuff that probably won't show up
14 on the copies. On the document that's February 24, 2000,
15 Huntingdon County Planning Commission letter, there's some
16 red underlining there. Is that your handwriting there?
17     MS. MONTGOMERY: And I don't know if you guys
18 can see it but -- yes, it's in black underline.
19     THE WITNESS: Yeah, I'm assuming that's mine.
20 BY MS. MONTGOMERY:
21 Q    So you did that?
22 A    Yes.
23 Q    Do you recall why you underlined that?
24 A    No, I'm not sure.
25 Q    Then there's sort of a parens around number 8

108

1 at the bottom of that page. Did you do that mark as well?
2 A    I assume I did. I'm not sure why.
3 Q    What about over on number 12?
4 A    Yes, I see there's -- yeah.
5 Q    Where it says -- you underlined recommends
6 disapproval of this proposal.
7 A    And I assume that I put that down there,
8 um-hum.
9 Q    Do you recall why -- I mean, why did you mark
10 this up? Was it --
11 A    Well, I was just noticing that the Huntingdon
12 County Planning Commission disapproved of the proposal and I
13 just ...
14 Q    Later they recommended approval, right?
15 A    Yeah.
16 Q    Correct, later they recommended approval of
17 the subdivision?
18 A    Oh, yes, uh-huh.
19 Q    Did somebody tell you that they had
20 recommended approval of Mr. Corneal's subdivision?
21 A    Oh, no, no, no, I didn't -- I misunderstood
22 you. No, I don't know about that.
23 Q    Now, the next document is a copy of the
24 complaint that was filed in this action and I'm just going
25 to ask you to look at it with me and tell me whether the

109

1 handwriting that appears throughout this document is your
2 handwriting. For instance, go to --
3 A    Yes, that's -- um-hum.
4 Q    That is your handwriting?
5 A    Um-hum, right.
6 Q    Now, can you tell me, for example, where it
7 says -- at Paragraph 12 on page 4 where you wrote in acted
8 in.
9 A    Which -- page what?
10 Q    Page 4, the paragraph number is 12.
11 A    I'm not sure why I put that in.
12 Q    What about the next page at Paragraph 15 and
13 you handwrote in had not recorded deed when he started.
14 What does that mean?
15 A    Well, these -- all of these marks here are --
16 we went over with Larry and we said we can admit this and we
17 can admit that and this is true and we made just comments in
18 general. And this was that he hadn't recorded the deed when
19 he started working on -- he hadn't recorded his deed yet
20 when he started building.
21 Q    Hadn't recorded what deed?
22 A    The deed of his property.
23 Q    When he started building which was -- well,
24 let's see, the property was acquired by the Corneals in
25 October 1998, right?

110

1    A    Yes.
2    Q    That's correct, right?
3    A    I assume it is.
4    Q    And he started building what, in 2000,
5    correct?
6    A    Right, uh-huh.
7    Q    And you're saying that he hadn't recorded the
8    deed to this property?
9    A    That's what was commented on, I think.
10    Q    Does that have any significance for you?
11    A    No, not really.
12    Q    Look at Paragraph 23 on page 6 where you have
13    handwritten in related to sewage module.
14    A    Um-hum.
15    Q    Does that have any significance to you right
16    now?
17    A    Well, that's that it — we're talking about
18    the initial plan was related to sewage modules and that —
19    that's what this whole thing was about really here,
20    subdivision and the sewer modules hadn't been —
21    Q    Do you see the allegation —
22    A    Pardon?
23    Q    Do you see the allegation in that paragraph
24    that the Corneals — at the end of the paragraph, the fourth
25    line from the top — bottom says the Corneals were advised

111

1    by defendant Wilson that insofar as the township was
2    required to sign the plan, good politics suggested that the
3    initial plan should be presented to the board of supervisors
4    for review. Are you familiar with that allegation?
5    A    No, unh-unh.
6    Q    You don't know anything about that
7    conversation?
8    A    No, unh-unh.
9    Q    Do you see at Paragraph 25 on page 7 —
10    A    Um-hum.
11    Q    — where you have the Corneals were not
12    advised that subdivision approval was not required and then
13    you wrote in never gave — I'm sorry, you wrote in never
14    gave to township, he was informed about the moratorium. Why
15    did you write that in there?
16    A    I'm assuming that he said that the township
17    had never informed him about the moratorium.
18    Q    That's your assumption of why you wrote that
19    down there?
20    A    Um-hum.
21    Q    I mean, do you actually remember why you wrote
22    it down?
23    (No response.)
24    MS. THORP: Bridget, I don't think he heard
25    your last question.

112

1    BY MS. MONTGOMERY:
2    Q    Do you actually remember —
3    A    Huh?
4    Q    Do you actually remember why you wrote that
5    down?
6    A    Pardon?
7    Q    My question was -- I'm sorry. My question
8    was: Do you actually remember why you wrote down —
9    A    Oh, no, I don't remember why.
10    Q    In what context were these notes taken?  Were
11    you on a telephone conference or in a group meeting or what?
12    A    No, we had a small meeting about this.
13    Q    Who all was there?
14    A    All the supervisors, Larry and Barry Parks.
15    Q    And yourself?
16    A    And myself, right.
17    Q    Anybody else?
18    A    No, I think that's it.
19    Q    Where was that meeting?
20    A    That was at Ann Wirth's, the secretary's
21    office.
22    Q    In that little office there on her property?
23    A    Right.
24    Q    When was it, do you recall?
25    A    I can't recall.  It would be after this came

113

1    out so ...
2    Q    What about 51, Paragraph 51 on page 11?
3    A    Well, it's -- the whole concern was that he
4    had no plan and no subdivision.
5    Q    But see where you've written not subdividing,
6    what does that mean?
7    A    Well, he was — first of all, he was saying he
8    didn't have a — he was going to subdivide and then he said
9    he wasn't going to subdivide so he was fluctuating back and
10    forth.
11    Q    Right, but didn't he say he wasn't going to
12    subdivide after you guys told him he couldn't subdivide
13    because there was a moratorium in place, right?
14    A    Well, I think so, but it was difficult to keep
15    track of when he was saying what.
16    Q    But isn't it true that he just -- he changed
17    his mind --
18    A    Yes.
19    Q    -- when he couldn't get the approvals he
20    needed, right?
21    A    Yeah, um-hum.
22    Q    Here you say -- at Paragraph 53 you have
23    underlined language indicating that --
24    A    The underline there, the art studio?
25    Q    Yes, art studio have sewer access and then you

114

1 have untrue out in the margin there. What does that mean?
2 What were you saying was untrue there?
3    A    Well, there was a comment about the fact that
4 he was advised that -- for a privy permit and you can't have
5 privy permits anymore.
6    Q    But you've underlined art -- you know,
7 something indicating that he was -- the art studio had to
8 have sewer access reference. Are you saying that it was
9 untrue that he was ever told that the art studio had to have
10 sewer access?
11    A    Well, no, I guess not.
12    Q    I mean, do you recall any discussion about
13 whether the supervisors told him the art studio had to have
14 sewer access?
15    A    No, I'm not sure.
16    Q    You don't recall that?
17    A    No, I don't recall that.
18    Q    The art studio wouldn't have to have sewer
19 access, though, right, if there wasn't water, right?
20    A    No, if there was no water.
21    Q    Now, on 54 you have marked untrue out in the
22 margin there.
23    A    Well, what is -- he was saying that we refused
24 to issue a permit and we wouldn't assist him and that wasn't
25 true. We would assist him if he did the proper things.

115

1    Q    What did you think were the proper things that
2 he had to do to build an art studio?
3    A    (No response.)
4    Q    What did they think were the proper things
5 that he had to do to build an art studio?
6    A    Well, then he should have proper sewage.
7    Q    What about in 57 which is on page 12?
8    A    Yeah.
9    Q    Do you see where you have deny no something?
10 I can't read the other word. What is that?
11    A    No help.
12    Q    Okay. Deny that you've refused to provide
13 help, is that what you're saying?
14    A    Right, uh-huh.
15    Q    Look at 61 where you have refused because of
16 sub, etcetera. What does that mean?
17    A    Subdividing.
18    Q    So Able Construction refused to do the
19 roadwork because they thought he might subdivide, is that
20 your understanding?
21    A    Well, it depends -- he didn't get any road
22 permit, plus the one road he started to put in was going to
23 go in through wetlands and that's not allowed. So he had to
24 stop putting that road in.
25    Q    How do you know that?

116

1    A    How do I know what?
2    Q    How do you know he was starting to put a road
3 in near wetlands?
4    A    Because you can see it.
5    Q    Did somebody tell you that, though?
6    A    What?
7    Q    How did you know they were wetlands, what you
8 were seeing?
9    A    Well, it's -- you can see that it's wetlands
10 and --
11    Q    Do you have any responsibility to determine
12 what wetlands are in connection with township work?
13    A    No, that comes from the federal government and
14 they determine that.
15    Q    Let's go to page 13 and look at Paragraph 66.
16 Do you see that?
17    A    Um-hum.
18    Q    Now, where you wrote true, was that an
19 indication that you would admit it?
20    A    Well, it's a true statement that in order to
21 get a permit the township provides the permits.
22    Q    So was that -- when you wrote true, was that
23 indicated -- was that your indication that --
24    A    That that statement is true.
25    Q    That you should admit it in the answer to the

117

1 complaint, is that what you're saying?
2    A    Yes, um-hum.
3    Q    On page 70 -- I'm sorry, page 14, Paragraph 70
4 it says deny -- it says WO septic. Do you mean without
5 septic?
6    A    Without septic.
7    Q    Now, this paragraph makes reference to the
8 garage, right?
9    A    Right.
10    Q    What is your reference to septic there, what
11 is that?
12    A    Well, the supervisors said that we were going
13 to deny it because he doesn't have septic.
14    Q    So that's all that reference is to there?
15    A    Yes.
16    Q    Now, at Paragraph 71 you have -- is that your
17 handwriting, hearsay?
18    A    Pardon?
19    Q    At Paragraph 71, is that your handwriting,
20 hearsay?
21    A    Yes, uh-huh.
22    Q    Are you familiar with the term hearsay?
23    A    Well, I've heard -- I've heard the term.
24    Q    Why did you put that in there?
25    A    Because I recall Larry made that comment.

## 118

1   Q   He said that would be hearsay --
2   A   **Yes.**
3   Q   -- so we'll deny it or something because it's
4 hearsay?
5   A   **Apparently.**
6   Q   Well, is that a true statement, that you
7 advised Mr. Corneal that had any other property owner
8 requested the permit it would have been issued? Is that a
9 true statement?
10   A   **It's really not true because I would -- if**
11 **someone had all the proper -- the proper papers, then I**
12 **would submit -- you know, or issue a permit.**
13   Q   But let me go back a second. In a lot of
14 these paragraphs you say true or deny or true or untrue and
15 here you have hearsay. Was there some discussion about why
16 you would put hearsay in there instead of just true or
17 untrue?
18   A   **No, unless -- unless Larry said that.**
19   Q   Now, you're saying --
20   A   **All these -- all these things that are written**
21 **in here were done in front of everybody and --**
22   Q   But you said it's really not true, but I'm
23 really just asking -- it's really not true that you would
24 have issued it to any other property owner. What I'm really
25 asking you -- this allegation says that you advised Mr.

## 119

1 Corneal that had it been any other property owner he would
2 have gotten it. Is that a true or a false statement? Did
3 you actually say that to Mr. Corneal?
4   A   **No, not like that.**
5   Q   What did you say to him? Exactly what did you
6 say?
7   A   **It would be -- I would issue if you had the**
8 **proper documentation for a sewage and subdivision.**
9   Q   Okay. Would you be looking for a subdivision
10 plan for somebody that wants to build a garage?
11   A   **I'm just saying -- I'm answering what the**
12 **supervisors told me.**
13   Q   Did you give Mr. Corneal any indication that
14 this was -- this situation where he couldn't get an
15 application even or a permit was aimed at him specifically
16 personally?
17   A   **No, no.**
18   Q   Did you take any other notes in that meeting?
19   A   **No.**
20   Q   Did you receive copies of anybody else's notes
21 taken in that meeting?
22   A   **No, unh-unh.**
23   Q   Now I'm going to show you --
24   A   **Do you want this back or --**
25   Q   No. Is that your -- is that the original?

## 120

1 Yes, it is, isn't it?
2   A   **Yeah, I believe it is the original.**
3   Q   We'll put that back in your file.
4   A   **Okay.**
5   Q   I'm going to show you now what's -- we're not
6 marking it, but it's a deposition -- it's a copy of the
7 deposition transcript of David Corneal that we have from
8 your file with some yellow highlighting on it, which I don't
9 know if that will show up. I don't think it will so it's
10 going to be tough to talk about.
11      Now, you circled also present Sandra Y.
12 Corneal on page 2.
13   A   **Um-hum.**
14   Q   Why did you circle that?
15   A   **Well, I circled that because I couldn't**
16 **understand why she could be at that meeting but my wife**
17 **couldn't be at this one.**
18   Q   Oh, she's a -- it's because she's a party.
19   A   **Well, my wife is a party, too. She might not**
20 **be listed but she -- as long as I'm a party, she's a party.**
21   Q   Okay, I understand your position. Now, I want
22 you to just go through the -- since nobody else can see the
23 highlighting, we're just going to try to make a record of it
24 and just the first place you see highlighting in your
25 document, just tell us what page you're on and we'll read

## 121

1 along with you.
2   A   **That's page 3.**
3   Q   On page 3?
4   A   **Um-hum.**
5   Q   What did you highlight on there, the first
6 part?
7   A   **For high blood pressure. I'm taking a similar**
8 **kind of a -- I was just noticing that you were asking about**
9 **medications.**
10   Q   I see. What was the next thing?
11   A   **Pardon?**
12   Q   What was the next thing you highlighted?
13   A   **The next thing is social security number. Had**
14 **you asked me what mine is I wouldn't have been able to tell**
15 **you. I can never --**
16   Q   Okay, that's why you highlighted that.
17   A   **Yeah.**
18   Q   The next thing you highlighted? We'll come
19 back to the other markings on here, but we'll just go
20 through the highlighting to make it simple that way. What
21 is the next thing you highlighted?
22   A   **Highlighted or circled in red?**
23   Q   Highlighted, just the highlighting for now.
24 What page?
25   A   **Page 8 up on 28.**

**122**

1    Q    And what is that?
2    A    And it says we are contemplating building.
3    Well, he was building already.  And I said we are both
4    artists and we were thinking of a summer home and an art
5    studio.  Well, I didn't know he was an artist -- well, I did
6    really but -- yeah, that --
7    Q    The next thing you highlighted is what?
8    A    Nine.  Well, I just highlighted this to --
9    Q    What did you highlight because we can't see
10   it?
11   A    Well, just the whole concept of the SEO, about
12   the sewage and just to see what some of the issues were
13   there.  There is nothing specifically, just -- you know,
14   not --
15   Q    Were you just trying to prepare yourself for
16   your own deposition --
17   A    Right, uh-huh.
18   Q    -- to understand the case?
19   A    Yes, for my own information.
20   Q    And did you do this by yourself when you did
21   all this highlighting?  Don't leave page 9 yet, okay,
22   because I have another question for you.  Did you do that by
23   yourself?
24   A    Yeah, my wife read through this also and she
25   made some grammatical checks.

**123**

1    Q    I see.
2    A    And misspellings.
3    Q    That was good of her.  What about on -- see
4    where it's -- the whole page is numbered 9 but then the
5    little insert page is numbered 31, I think?
6    A    Yeah, 31.
7    Q    You've got some text highlighted there, don't
8    you?
9    A    Pardon?
10   Q    You have some text highlighted there?
11   A    Yes, uh-huh.
12   Q    What is that?
13   A    Well, it's -- it shows he was interested in
14   dividing off the land into acreage.
15   Q    And what significance does that have to you?
16   A    About the concept of subdividing.
17   Q    But I don't understand, what is it -- I mean,
18   everybody knew he initially wanted to subdivide, right?
19   A    Yes.
20   Q    And then everybody knew after that he said he
21   wouldn't subdivide?
22   A    Yeah, and I just put these down for my own
23   personal looks.
24   Q    Well, was there some issue about the fact that
25   since he first said he wanted to subdivide and then he later

**124**

1    decided that he didn't want to subdivide, is that some big
2    issue with the supervisors and you?
3    A    Yes, it was.
4    Q    What is the issue?
5    A    The issue was that -- that he hadn't given any
6    plans to the supervisors and yet he was saying he was going
7    to subdivide.  He hadn't gone to the county.  There are
8    certain steps to subdivide that one has to take.
9    Q    But then my question was a little bit
10   different than that.  Is there some issue that you and the
11   supervisors are taking with the fact that first he said he
12   wanted to subdivide and then he said he didn't want to
13   subdivide?  After he was told he couldn't subdivide, he said
14   he didn't want to subdivide.  Is there something going on
15   there that is significant?
16   A    Yeah.  Well, he still needs to subdivide
17   because he's got another house on that property as well.
18   Q    So that's your point of the whole thing?
19   A    Yeah, that's the point of the supervisors.
20   Q    Okay.  So you think he still needs to
21   subdivide because there's that old farmhouse on the
22   property?
23   A    Yes, uh-huh.
24   Q    Now, you said that he never gave them any
25   plans.  How do you know he never gave them any plans?

**125**

1    A    Pardon?
2    Q    How do you --
3    A    Because they said so.
4    Q    Because they said so?
5    A    Yes, um-hum.
6    Q    Were you at the meeting, though --
7    A    No.
8    Q    -- when he tried to hand out those plans?
9    A    No.
10   Q    What's the next thing you've highlighted?
11   MS. MONTGOMERY:  Hold on, my co-counsel
12   has ...
13   BY MS. MONTGOMERY:
14   Q    Do you have some highlighting on page 10 back
15   there?
16   A    On 10, yes, uh-huh.
17   Q    What's highlighted there?
18   A    Again, this is going back to the concept of
19   decide based on finding of on-site septic suitability and
20   just to make me see the points on the whole septic question.
21   Q    That's in little insert 35, right, on the
22   insert page?
23   A    Right, yes.
24   Q    What we call these, just to make it simple for
25   the record, is these are minuscript -- what they call a

### 126

1 minuscript. They're small --
2    A   They're what?
3    Q   They're small transcripts of the deposition so
4 you get four pages on one.
5    A   Yeah.
6    Q   So we'll refer to these inserted numbers as
7 minuscript numbers.
8    A   Okay.
9    Q   And that will make it easier for us.
10    A   Oh, I see, okay.
11    Q   It would be helpful if we'd refer to the
12 minuscript and then the lines that are along the left-hand
13 side.
14    A   Okay.
15    Q   Then we'll be able to -- everybody else will
16 be able to follow along because the highlighting doesn't
17 copy over and that's why we're going through this exercise.
18    A   Right, um-hum.
19    Q   On page 35 you have -- on minuscript 35 you
20 have highlighted what language?
21    A   Lines 6, 7 and 8.
22    Q   A boundary survey and then eventually
23 divide --
24    A   Right, uh-huh.
25    Q   -- things up into lots, whatever lots we

### 127

1 decided on based on the SEO's finding of on-site septic
2 suitability.
3    A   Again, just to recall some of the topics and
4 issues that were on hand. That's what all these -- on 36
5 and 37.
6    Q   Same thing for the highlighted text?
7    A   Thirty-six is highlighting 13, 14 and 15 and
8 16.
9    Q   And 37?
10    A   And 37 is line 4 and 5.
11    Q   Okay. What's the next highlighted section
12 that you come to?
13    A   Page 15. The whole thing on 56.
14    Q   You highlighted all of minuscript 56?
15    A   Yes. And, again, that was just talking about
16 the subdividing of land.
17    Q   This makes reference to a conversation that
18 Mr. Corneal says he had with Mr. Wilson, right?
19    A   Yes, um-hum.
20    Q   Do you know whether -- has Mr. Wilson ever
21 discussed this conversation with you, this --
22    A   No.
23    Q   Where he says that you can build whatever you
24 want, there's no code, there's no building code, there is no
25 subdivision?

### 128

1    A   No.
2    Q   Do you recall any of the conversation or --
3    A   No.
4    Q   -- being told about it by --
5    A   No. Well, of course, I know there's no
6 building code.
7    Q   Right.
8    A   We have no inspection of wiring or any kind of
9 building codes as such. The only thing that we have is the
10 septic tank and the subdivision and -- well, there are a few
11 other things that -- you can build a swimming pool without
12 any kind of a permit and --
13    Q   You can?
14    A   Yes, uh-huh. And a farmer can build a silo
15 for grain without any kind of a permit. So there are some
16 things like that.
17    Q   Where is this contained? Is it in the --
18    A   It's in the ordinances.
19    Q   Which ordinance, do you know?
20    A   Pardon?
21    Q   Do you know which ordinance that's in?
22    A   The building permit ordinance.
23    Q   The setback line, is that --
24    A   That's in the building permit ordinances, too.
25    Q   The next thing that you've highlighted,

### 129

1 please?
2    A   Well, the whole thing about an investment.
3    Q   What page?
4    A   Page 17, 62 and down to 63.
5    Q   Those are the minuscript numbers, 62 and 63?
6    A   Yeah, just --
7    Q   Why did you highlight that?
8    A   I just thought it was sort of funny.
9    Q   What was funny?
10    A   About his investment and how he's not affluent
11 and -- it was just a personal observation.
12    Q   What was your personal observation about him
13 not being affluent?
14    A   Well, he says on 63, line 6, I'm not an
15 affluent person. Well ...
16    Q   Well, doesn't he finish that I can afford to
17 buy property and sit around on it; is that correct?
18    A   And the property was worth -- you know, he
19 paid 300 and some thousand dollars for it. So it seems to
20 me like you have to be a little affluent.
21    Q   To buy property worth that much?
22    A   Yeah, and when you have property in Florida
23 and when you buy property throughout State College and --
24 so I thought it was sort of a funny remark.
25    Q   Okay, I see. What's the next thing you have

130

1  highlighted? Did you say -- you said the lines?
2  A  Sixty-five, 1, 2, 3, 4, 5 lines. It's hard to
3  subdivide land when there is no subdivision ordinances.
4  Again, it's just something that I marked for my own
5  interest.
6  Q  What was interesting to you about that?
7  A  Well, the fact that he's talking about that
8  when -- first of all, he says there's no subdivision -- it
9  just -- it's not an intellectual, you know, conversation.
10  It's a non-issue, is what I'm saying.
11  Q  It's a non-issue that there was no subdivision
12  ordinance?
13  A  Yes.
14  Q  Why is that a non-issue?
15  A  I don't -- my wife and I always have things
16  that it's a non-conversation.
17  Q  I understand.
18  A  You understand what I'm saying?
19  Q  Well, are you saying it doesn't matter that
20  there was no subdivision ordinance; is that what you're
21  saying?
22  A  He's saying that here. And I'm saying that,
23  too, I guess.
24  Q  No, he's saying that there was no subdivision
25  ordinance.

131

1  A  Yeah.
2  Q  Are you saying that it doesn't matter that
3  there was no subdivision ordinance?
4  A  Yeah, I think it does matter. I think it does
5  matter, but he's getting us all confused here and I just
6  thought it was an interesting statement.
7  Q  What's the next thing you have highlighted?
8  A  I think that's all that I --
9  Q  Is there something else there?
10  A  Pardon?
11  Q  Is that another page there that you have
12  highlighted?
13  A  Yes, this is page 31 and --
14  Q  What's the first minuscript page?
15  A  118 and I've underlined 7, 8 and 9 because of
16  my misspelled name and I also underlined distrust. He says
17  he has a trailer out in the country and I do not live in a
18  trailer. I have nothing against trailers, I want to make
19  sure I make that clear, but he's in this statement trying to
20  make me look like trailer trash.
21  Q  That's what you think?
22  A  Pardon?
23  Q  That's what you believe?
24  A  Yes, that's exactly what I believe.
25  Q  What kind of house do you have actually?

132

1  A  Huh?
2  Q  What kind of house do you have?
3  A  Well, it's a foundation house, three bedrooms,
4  a grand room, an entrance lobby, all ceramic tile.
5  Q  Is it a ranch house?
6  A  Yeah, it's a ranch. It's all on one floor
7  so that --
8  Q  Does it have aluminum siding?
9  A  No, it has wooden siding on part of it and
10  cinder block on other parts.
11  Q  Okay. What's the next thing you highlighted
12  then?
13  A  Well, the other area is 120 and he is saying
14  that I said to him -- I said if I were another resident of
15  the county or the township and I came for a permit for a
16  garage you would give it to him, and that's when I called
17  him a trouble-making yuppie.
18  Q  So why did you highlight that?
19  A  Well, I think that he's misconstruing -- sure
20  I would give him a permit if he had the correct stuff and if
21  I had been told by the supervisors to give him that.
22  Q  Do the supervisors usually have some sort of
23  preapproval process with respect to people coming for
24  building permits?
25  A  No.

133

1  Q  They leave that to you, right?
2  A  Yes.
3  Q  What's the next thing you highlighted?
4  A  I think that's it.
5  Q  Now we need to just go back through quickly
6  through your --
7  A  The red --
8  Q  -- underlining.
9  A  The red marks are all by my wife.
10  Q  Oh, they're all by your wife?
11  A  Yes, um-hum.
12  Q  Well, now, some of them are red and some of
13  are black, right?
14  A  Yeah.
15  Q  Is there some handwriting of yours in there?
16  A  Yeah, and that's -- she has red here and she
17  pointed out how the word effect should have been affect.
18  Q  I see. That one bothers me, too, and I always
19  get it wrong.
20  A  And there's other comments. She also on
21  page 25 --
22  Q  Is that minuscript page 25?
23  A  Oh, sorry, yeah. Yeah, page 7 and --
24  Q  Is that her circling?
25  A  And that's 25, line 6. And, again, she's

---

**134**

1  doing disparaging remarks about used cars and yards. He's
2  trying to make it look like we live out in the sticks, which
3  we do, but I think he's also making particular kinds of
4  social comments.
5     Q    Well, isn't this a reference to the property
6  that he bought? Isn't that just a reference to his own
7  property, that when he bought it there were three or four
8  unused cars in the yards?
9     A    It might well be.
10    Q    Okay, keep going. What's the next thing you
11 see?
12    A    On page 11 and mini page 40 in 17 and 18,
13 again, making a remark about farmers and throwing stuff over
14 hills into gullies, and I think -- I think it says a great
15 deal about him and his social -- the way he looks at people
16 socially.
17    Q    Well, isn't this just a reference to him
18 hiring Mr. Wilson and Eagle construction to clean up his
19 property? Isn't that what it is?
20    A    Yeah, um-hum.
21    Q    He just wanted to remove some stuff thrown
22 over a hill into a gully?
23    A    Yes.
24    Q    The next thing?
25    A    The next one is a misspelling of realtors.

---

**135**

1     Q    Now, what about on minuscript page 55 where
2  you've underlined trying to establish a rapport with some
3  local people?
4     A    Well, I don't think he's getting much rapport
5  with the local people.
6     Q    Why is that?
7     A    Because he's coming in and trying to make his
8  own standards for the area and not listening to the local
9  people. And I think in the end he's going to antagonize the
10 local people and he will never have rapport with them.
11    Q    All right.
12    A    And on 17, mini page 63, line 7, and it's
13 where he says I'm not an affluent person.
14    Q    Right. And you think he's affluent because he
15 bought property?
16    A    Yeah.
17    Q    Is it a problem that he's affluent?
18    A    No, I don't think there's any problem but --
19    Q    Okay.
20    A    But it would be like saying --
21    Q    If he was affluent, I should say. Do you know
22 whether he mortgaged that property that he paid $350,000 to
23 build?
24    A    I have no idea what -- how he --
25    Q    You don't know?

---

**136**

1     A    No, I have no idea.
2     Q    Next let's go and see what else you have
3  underlined.
4     A    Next on page 22 there are several underlined
5  things about raising his voice at meetings and the
6  confrontation. And that's mini page 84, line 12. And then
7  83, line 7 and 85, line 20, the whole question of the
8  confrontational kind of ...
9     Q    Okay. Where you underlined on mini page 83 he
10 had went, that was just a grammatical problem that your wife
11 saw, is that --
12    A    Which one, which page?
13    Q    It's mini page 83, line 7. Why did you
14 underline that, just a grammatical --
15    A    He went -- yeah, right.
16    Q    On page 21 you have -- there's a sticky note,
17 it looks like.
18    A    Yeah, and I don't know what happened with that
19 -- with that page and what was there.
20    Q    Is that your handwriting no?
21    A    Pardon?
22    Q    Is that your handwriting no where it looks
23 like there was a sticky note?
24    A    No, that's not my handwriting. So I don't
25 know how that is, but we did notice it and I'm not sure --

---

**137**

1  so we'd have to go back to the original.
2     Q    So that's minuscript page 80 and 81, right?
3     A    Um-hum.
4     Q    And you don't know who put that sticky on
5  there --
6     A    No.
7     Q    -- and wrote no on it?
8     A    Unh-unh.
9     Q    Now, going up to page 23 for the next
10 underlines.
11    A    To which one? Oh, the other one on page 23, I
12 was just noticing that Ann Wirth's name is misspelled.
13    Q    And then just a grammatical thing on --
14    A    Yeah.
15    Q    Okay, that's fine. What's next? What page
16 are you on?
17    A    I'm on page 30, mini page 116, and I'm looking
18 to see -- it's 14, 15, 16, 17 and 18.
19    Q    On page 116 because it's highlighted?
20    A    Pardon?
21    Q    Because it's highlighted?
22    A    Yes, uh-huh.
23    Q    Did we not do that one before when we were
24 going through the highlighted --
25    A    I don't know why I highlighted that. It has

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

138

1  to deal with that whole concept of privies, a privy permit,
2  which it -- there are two ways -- there are two ways only
3  that you can get sewage taken care of in Jackson Township
4  and -- because of DER as well. And one is to have a regular
5  septic system and the other is what's called a holding tank,
6  but a holding tank isn't a privy so -- and that's why I
7  underlined that.
8      Q      Because you believe you can't get privies at
9  all --
10     A      No, you can't at all.
11     Q      -- in Jackson Township?
12     A      You're not allowed to put a privy anymore.
13     Q      All right. Now, the next page is page 31,
14 right?
15     A      Yes, uh-huh.
16     Q      Now, you have some --
17     A      And that's that whole area when he came out to
18 visit me and so that's why I underlined that.
19     Q      And the vita that you wrote there in the left,
20 why did you write that in there?
21     A      I don't know. It must have to do with the
22 spelling of my name, and it is Van Dommelen. It would be
23 saying like Dick Dyke rather than Dick Van Dyke.
24     Q      Yes, I understand. Now, look where you put --
25 on mini page number 119, which is at -- still at the larger

139

1  page 31 in this document.
2      A      119?
3      Q      Yes, and you have a star and you underlined
4  sewer at least initially.
5      A      Yeah, I don't think I did that, but I'm not
6  sure because I very seldom use pencil like that.
7  Occasionally I do but --
8      Q      Is that done in pencil?
9      A      Yeah.
10     Q      What about up there where there's a star next
11 to -- no, I'm sorry, what about further up that 119 where it
12 says I think it was the 27th and that's underlined?
13     A      Um-hum.
14     Q      Why did you underline that?
15     A      Um-hum.
16     Q      Why did you underline that?
17     A      I'm not sure why.
18     Q      Okay.
19     A      And on page 33, mini page 126 and 128, those
20 are typos. And on page 34, mini page 133, that's where the
21 figure comes up, $365,000 that he paid for that piece of
22 property.
23     Q      I understand. Okay, go ahead.
24     A      And I can't remember how many -- how much --
25 how many acres that is. I can't remember how many acres

140

1  that is. I think that's all. Yeah, that's all.
2      Q      That is the most time consuming thing we will
3  do. The rest of this we will be able to go through pretty
4  quickly.
5          I'm going to show you a document that's --
6  it's a July 11, 2000 letter from Larry Newton. Can you just
7  identify that for me? Now, there's -- on the second page of
8  that is the words draft copy written in red there.
9      A      Yeah, that's not my writing.
10     Q      That's not your handwriting?
11     A      No, unh-unh.
12     Q      Do you know whose it is?
13     A      No, unh-unh.
14     Q      Is that a draft copy of the complaint that
15 Larry Newton -- the answer to the complaint that Larry
16 Newton --
17     A      Yes, uh-huh.
18     Q      -- prepared?
19     A      Right, that's what that is.
20     Q      And you reviewed that and then made whatever
21 changes. Is that what led to the meeting?
22     A      Yes, uh-huh.
23     Q      So after Larry Newton sent you that copy, then
24 you guys all got together?
25     A      Right, um-hum.

141

1      Q      And met with Mr. Sherr, I guess?
2      A      Yeah, I believe. Didn't we? I think so.
3      Q      And the top letter is a July 11th, 2000 letter
4  from Larry Newton to Anthony Sherr, correct?
5      A      (No response.)
6      Q      Now, I'm going to show you a letter. It's a
7  copy of the May 5, 2000 letter from you to Mr. Corneal and
8  you have written in the margin April 27, 2000 -- or I should
9  ask you, is that your handwriting?
10     A      Yes, uh-huh.
11     Q      And what's that refer to?
12     A      That's the -- I was trying to remember when he
13 came out to the house and that's the -- that's what I put
14 down. That was the day he came out to the house.
15     Q      Okay, thank you. I'm going to put that back
16 in the file for you. And then this envelope -- hang on, I
17 didn't even look in there before. That's just the original
18 letter in the envelope.
19         So now the envelope that's in this -- in your
20 original file has a May 6, 2000 postmark, correct, and
21 that's the letter that --
22     A      Um-hum.
23     Q      The envelope that the May 5th letter --
24         MR. SHERR: You have to answer yes or --
25 excuse me, I'm sorry. You have to answer yes or no. You're

142

1 saying other things other than yes or no.
2 BY MS. MONTGOMERY:
3     Q    Instead of saying um-hum, you have to say yes
4 or no for the court reporter.
5     A    Yes.
6     Q    So that's the letter that the May -- the
7 envelope --
8     A    Yes.
9     Q    So you received it on May 6th, right?
10     A    Yes.
11         MR. SHERR: And that's because she can't take
12 down um-hum.
13 BY MS. MONTGOMERY:
14     Q    Now, I'll show you another letter that was in
15 your -- another copy of the May 5th letter from David to you
16 where you have an X next to Friday, April 28. Can you tell
17 me why you have that X there? It makes a reference to a
18 meeting.
19     A    Yes, and he apparently put the wrong date down
20 and so then I put the correct date down.
21     Q    You said he came to your house on April
22 27th --
23     A    No, no, that's --
24     Q    He's making reference to the date the
25 supervisors were going to meet.

143

1     A    Let me look at that again. Let me make sure I
2 -- yes, I see what you're saying. Yeah, that -- he came to
3 our house on April 27th and then he thought there was going
4 to be a meeting on the 28th.
5     Q    And why did you put that X down there?
6     A    I don't know why I put it down.
7     Q    Just checking dates or something?
8     A    Yeah.
9         (Discussion held off the record.)
10 BY MS. MONTGOMERY:
11     Q    I'm going to show you a document where you
12 have road ordinance, I guess, and clipped to it is a piece
13 of white notepad paper and some numbers.
14     A    Oh, that's -- this is nothing more than an
15 average of what I make a year being -- my wife figured up
16 how much I make for each year and that's about -- between
17 400 -- three to $400 a year.
18     Q    For your work as the building permit officer?
19     A    Yeah.
20     Q    And I'm just going to ask you to look -- I may
21 ask you questions about this later, but this subdivision and
22 land development ordinance that's in your file --
23     A    Yes, uh-huh.
24     Q    -- is that your personal copy of that?
25     A    Yes, uh-huh.

144

1     Q    When did you get that?
2     A    I don't recall and I have not really read it
3 with any depth yet.
4     Q    Did you get it after the lawsuit was
5 instituted?
6     A    Yes, uh-huh.
7     Q    What about this other ordinance in your files?
8     A    Yeah, that's the ordinance, the township
9 ordinance, and that we're going to start thinking about
10 rewriting it and redoing it.
11     Q    The building ordinance you mean?
12     A    Yeah, the building ordinance.
13     Q    Is this the current building ordinance?
14     A    Yes, uh-huh.
15     Q    It's the document that has the table of
16 contents, general provisions --
17     A    Yeah.
18     Q    -- is the first page of it, right?
19     A    Yes, it's the current one.
20     Q    So this is the current in effect building
21 ordinance?
22     A    Yes, um-hum.
23         MS. MONTGOMERY: We'll break for lunch. I
24 probably have -- I may have an hour for you when we come
25 back.

145

1         (Discussion held off the record.)
2         (Luncheon recess taken at 1:13 p.m. until
3 2:26 p.m.)
4 BY MS. MONTGOMERY:
5     Q    Mr. Van Dommelen, we're back on the record and
6 you're still under oath. I'm going to show you a document
7 that we're going to mark as Van Dommelen Exhibit 6 and I'd
8 ask you to look at it for me.
9         (Application for building permit produced and
10 marked as Van Dommelen Exhibit No. 6.)
11 BY MS. MONTGOMERY:
12     Q    Mr. Van Dommelen, go ahead and look at that
13 document just so you familiarize yourself with it, okay?
14     A    Um-hum.
15     Q    And I'm going to ask you a question about it.
16     A    Um-hum.
17     Q    Do you recognize the document?
18     A    Pardon?
19     Q    Do you recognize the document?
20     A    Yes, um-hum.
21     Q    Can you identify it for the record.
22     A    Building permit 01-6 from Jackson Township.
23     Q    For what individual?
24     A    For Kevin Boonie.
25     Q    Now, I note that -- that's the standard

146

1 application for building permit that's used in Jackson
2 Township; is that correct?
3    A    Pardon?
4    Q    Is that the standard application for building
5 permit form --
6    A    Yeah.
7    Q    And it's been filled out by Mr. Boonie,
8 correct?
9    A    Um-hum.
10   Q    Now, there's a note in the middle of that form
11 that says attach plans or rough draft sketch of the proposed
12 structure.
13   A    What?
14   Q    Attach plans or rough draft sketch of the
15 proposed structure.
16   A    Um-hum.
17   Q    There aren't any -- there weren't any
18 documents attached to that application. Do you know whether
19 there were when they were given to you? We didn't receive
20 any, is what I'm saying. Do you know whether there were any
21 attached to it when you got it?
22   A    It was probably a small -- a floor plan which
23 I might have given back to him. I only keep floor plans
24 that seem to have a -- you know, a certain concern, like the
25 floodplain issues and -- but a regular floor plan I don't

147

1 usually keep.
2    Q    Is it your testimony then that every building
3 application comes to you with some sort of an attached plan
4 or sketch or something?
5    A    No, not every.
6    Q    In what situations don't they come to you with
7 an attached plan or sketch?
8    A    Well, if it's a garage, I don't need to have
9 an attached plan for it.
10   Q    Why don't you?
11   A    Because we just haven't -- we haven't asked
12 for that.
13   Q    What about if it's a workshop that's not going
14 to have water, do you need to have an attached plan for
15 that?
16   A    No, we haven't asked for that.
17   Q    Do you only ask for an attached plan when it's
18 going to be a house?
19   A    We ask for a plan and look at it, but we don't
20 necessarily save them.
21   Q    But is the only time you want an attached plan
22 or sketch or something is when it's a house; is that
23 correct?
24   A    A house or -- yeah, I guess mainly a house,
25 um-hum.

148

1    Q    I want to show you another document that we'll
2 mark as Van Dommelen Exhibit 7 and ask you to look at it.
3         (Application for building permit produced and
4 marked as Van Dommelen Exhibit No. 7.)
5 BY MS. MONTGOMERY:
6    Q    Would you just take a look at that application
7 for me.
8    A    Um-hum.
9    Q    Do you recognize it?
10   A    Yes.
11   Q    And there's an attachment to that, right?
12   A    Yes, uh-huh.
13   Q    What is that attachment?
14   A    That's a sewage disposal system attachment.
15   Q    Now, it appears to me that that is an
16 application for Mr. --
17   A    It's from Mr. Henwood.
18   Q    Mr. Henwood for a vacation home, right?
19   A    Yes, uh-huh.
20   Q    A two-story vacation home?
21   A    Yes, uh-huh.
22   Q    Now, there isn't a sketch of the home or
23 anything like that or a sketch of the proposed structure, is
24 there?
25   A    No, I saw a sketch for the home.

149

1         (Interruption.)
2         MS. MONTGOMERY: We'll have to stop one
3 second, I'm sorry.
4         (Discussion held off the record.)
5 BY MS. MONTGOMERY:
6    Q    The document that you've been looking at is
7 the Thomas Henwood application, correct?
8    A    Um-hum.
9    Q    So you're saying you did see a sketch for
10 that?
11   A    Yes, uh-huh, blueprints.
12   Q    That's because it was a vacation home and
13 that's why you wanted that sketch, right?
14   A    Pardon?
15   Q    It was because it was a vacation home and
16 that's why you wanted that sketch; is that right?
17   A    Yeah, it was a home and I -- and he brought it
18 along, but I don't save those. It would take you rolls and
19 rolls and rolls. I don't have space for saving all these
20 sketches. So unless it's a sketch -- there's a small sketch
21 that fits in my notebook, I don't save rolled up blueprints.
22   Q    What was the name on that first -- on the
23 first document, Exhibit 6?
24   A    Boonie.
25   Q    So I understand from the Boonie application

150

1    that you granted that --
2    A    Right.
3    Q    -- application without seeing any sketch or
4    anything else whatsoever, right?
5    A    No, I saw -- I saw a sketch, but I --
6    Q    On the Boonie application?
7    A    Yes, uh-huh.
8    Q    I thought you said that was true of the
9    Henwood --
10   A    The Henwood.
11   Q    The Henwood application.
12   A    Right, um-hum.  And I usually also don't --
13   Q    I guess I'm confused.
14   A    I usually also don't see sketches of -- called
15   double-wides because they're pretty standard.
16   Q    So you allow double-wide trailers, you mean?
17   A    Well, double-wide homes.
18   Q    Are they double-wide -- what do they call
19   them, modular homes now or something like that?
20   A    Yes, uh-huh.
21   Q    Is that what they're called?
22   A    Yeah, right.
23   Q    Like mobile homes?
24   A    Yeah.  Well, they're not on wheels.
25   Q    I think I know what you mean.  They're like

151

1    trailers, right?
2    A    Your interpretation of the word mobile home
3    versus double-wide versus trailer.
4    Q    So you don't require a sketch of those
5    either --
6    A    No.
7    Q    -- because they're standardized?
8    A    No, unh-unh.
9    Q    So why did you have -- why did you keep the
10   permit for the sewage disposal system attached to the
11   Henwood application?
12   A    I do that sometimes.  I'm not consistent, I'll
13   be very frank with you.  If there is something -- I -- I
14   don't keep most of the sewage disposal things.  They just go
15   back with the person.  They show me the permit, give me the
16   number and -- and then after we approve everything they're
17   on their way.
18   Q    So let's look then at -- Van Dommelen Exhibit
19   8 we'll mark this, an application for a building permit from
20   William Foster.
21        (Application for building permit produced and
22   marked as Van Dommelen Exhibit No. 8.)
23   BY MS. MONTGOMERY:
24   Q    Now, this is dated July 2000, right, July 6,
25   2000?  And you granted this building application, right?

152

1    A    Um-hum.
2    Q    Did you request any documentation or anything
3    in connection with this structure?
4    A    No.
5    Q    This is a one-story shed?
6    A    Yeah, it's a one-story shed.
7    Q    And what's a shed?  Is a shed the same as a
8    garage or is it different?
9    A    No, it's an eight-by-ten foot wall with roof
10   and doors.
11   Q    Storage facility?
12   A    To store -- storage facility.
13   Q    This one is 12-by-16, right?
14   A    Huh?
15   Q    This one was 12-by-16, right?
16   A    Yeah.  Well, they range in different sizes.
17   Q    There's no plumbing in it, right?
18   A    No, unh-unh.
19   Q    So you just approve it without --
20   A    Yeah, uh-huh, right.
21   Q    Without any further documentation?
22   A    Right.
23        (Interruption.)
24        (Break taken from 2:28 p.m. until 2:46 p.m.)
25        MS. MONTGOMERY:  Where were we on the record?

153

1    Can you read me back the last sentence.
2        (Question and answer read.)
3    BY MS. MONTGOMERY:
4    Q    So you just approved this William Foster
5    application without any further documentation, correct?
6    A    Yes, um-hum.
7        MS. MONTGOMERY:  I think to save time what we
8    will do, so Leslie doesn't have to go back through the pile
9    of documents a whole bunch more times, we will mark the rest
10   of these building applications that we obtained from the
11   township files altogether as Van Dommelen Exhibit 9.  They
12   are Siegler, Debra Kerr and Kyle Anderson, Boring, Rush
13   Reid, Younker, Foster and Stout and that's it.  These will
14   all be Exhibit 9.
15        (Applications for building permits produced
16   and marked as Van Dommelen Exhibit No. 9.)
17   BY MS. MONTGOMERY:
18   Q    Just take a minute and look through them, Mr.
19   Van Dommelen, and I'm just going to ask you a couple
20   questions about them.
21        (Pause.)
22   BY MS. MONTGOMERY:
23   Q    Now, the first application for building permit
24   is Charles Siegler for a mobile home, correct?
25   A    Um-hum.  For a mobile home, um-hum.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

VAN DOMMELEN, DAVID
06/06/01

CORNEAL VS
JACKSON TOWNSHIP

---

154

1  Q    And you granted that application, correct?
2  A    Um-hum.
3  Q    Now --
4       MR. SHERR: Mr. Van Dommelen, let me just
5  remind you again that you have to say yes or no so that the
6  court reporter can take it down.
7       THE WITNESS: Yes.
8  BY MS. MONTGOMERY:
9  Q    Now, did you go by and look and see what they
10 were doing on that property or anything, what the Sieglers
11 were doing on that property?
12 A    This one I didn't, no.
13 Q    And there was no attached documentation,
14 right?
15 A    No.
16 Q    How about the Kerr, Kyle Anderson application,
17 6/15/2000?
18 A    I have been by that site, yes.
19 Q    Why did you go by that site?
20 A    I was curious to see what was going up in that
21 area. It was a development — it's an area that's
22 developing and I wanted to —
23 Q    So this is a development?
24 A    Yes, it's a — called Kenwood Acres.
25 Q    How many lots are in that development, do you

---

155

1  know?
2  A    I can't tell you exactly. I really can't say.
3  Q    Now, was there documentation attached to this?
4  A    No.
5  Q    There was never any documentation attached to
6  it?
7  A    Well, I think she brought a floor plan,
8  um-hum.
9  Q    Anything else?
10 A    No.
11 Q    And this was for a home, correct?
12 A    Um-hum. Well, the only thing is a sewage
13 permit, you know, number but ...
14 Q    And that's right on the application?
15 A    Yes, that's on the application.
16 Q    Same thing on the next one for Mark Boring?
17 A    Um-hum.
18 Q    This was May 24, 2000, correct, was the
19 application?
20 A    Um-hum.
21 Q    And it was granted the same day, right?
22 A    No, one was 6/15 and this is 5 —
23 Q    No, I mean it was granted the same day it was
24 applied for, correct?
25 A    Oh, yes, yes.

---

156

1  Q    Now, going back for a second to the
2  Anderson-Kerr application, I see it says the application is
3  June 15th, 2000 but the grant date is June 15, 1999. That
4  was just you forgot to cross out the 1999 and add 2000,
5  correct?
6  A    Yeah.
7  Q    That was really granted the same day?
8  A    Yeah, I discovered that these building permits
9  had to be changed.
10 Q    And so that was actually granted the same day
11 that it was applied for, correct --
12 A    Right, um-hum.
13 Q    -- at Kerr? The next one is a Norman Keller.
14 A    Right.
15 Q    April 30th, 2000, right?
16 A    Um-hum.
17 Q    And that was for a double-wide. That's the --
18 A    Um-hum.
19 Q    -- modular home, I guess you'd call it?
20 A    Yes, uh-huh.
21 Q    Granted the same day as they applied for it,
22 right?
23 A    Um-hum.
24 Q    The next one is April 24, 2000. Now, this was
25 an application for -- is that Jessie Rush?

---

157

1  A    Yes, uh-huh, Rush. Jessie Rush, III, I think.
2  Q    So this was just an addition; is that correct?
3  A    This was just an addition to a bedroom.
4  Q    When you add a bedroom up in Jackson Township
5  is there any concern or any attention paid to the septic
6  permit or sewage permit or anything?
7  A    Only when they -- when the house is built or a
8  new house is built, then the septic tank has to -- has to
9  fit the number of bedrooms.
10 Q    What about if you add a bedroom?
11 A    There's nothing that has ever been a concern.
12 Q    So nobody asks any questions about --
13 A    No.
14 Q    -- whether this extra bedroom is going to take
15 you beyond the permissible sewage --
16 A    No.
17 Q    -- permit, right?
18 A    No, unh-unh.
19 Q    Okay, thanks. There's another one dated May
20 4, 2000 for -- oh, I think we did this already. Robert
21 Weaver.
22 A    Yes, um-hum.
23 Q    We already talked about that one. And we have
24 one for Douglas Reid which is dated April 8, 2000, right?
25 A    The Douglas Reid one is --

---

---

158

1    MR. SHERR: It's not in the package you gave
2 us.
3    THE WITNESS: That's the one where they had to
4 have the site looked at by the Commonwealth of Pennsylvania
5 and a geological survey in terms of the flood creek in those
6 attachments here.
7 BY MS. MONTGOMERY:
8    Q    This is the one you talked about that was
9 destroyed by fire?
10   A    Right, um-hum.
11   Q    And they wanted to rebuild?
12   A    Right.
13   Q    Now, I notice that the application for the
14 building permit was filled out on April 8th, right?
15   A    Right.
16   Q    And it was approved also on April 8th,
17 correct?
18   A    Um-hum.
19   Q    It says one and a half where it's --
20   A    One-and-a-half story.
21   Q    One-and-a-half story home is what you're
22 referring to, correct?
23   A    Correct.
24   Q    Did anybody raise any concerns about the
25 septic in connection with the building of this house?

---

159

1    A    About what?
2    Q    The septic in connection with the building of
3 this house.
4    A    The septic was already there.
5    Q    Did anybody ask whether the septic was going
6 to be for the same number of bedrooms that the initial --
7 the house that burned down --
8    A    The house was built the same.
9    Q    It was built with the same number of bedrooms?
10   A    Um-hum.
11   Q    Did you ask that question?
12   A    Yes, um-hum. And then it was looked at, of
13 course, by the -- the engineers.
14   Q    So this is a three bedroom plus a loft,
15 correct?
16   A    Um-hum. Yes.
17   Q    And you're saying the prior house was also a
18 three bedroom, right?
19   A    Um-hum.
20   MR. SHERR: You have to --
21   THE WITNESS: Yes.
22 BY MS. MONTGOMERY:
23   Q    There's a letter from David R. Stiffler
24 attached to this. He's an engineer, I guess, for the
25 Commonwealth?

---

160

1    A    I'm going back to check that. I believe
2 that's the -- that's the -- the engineer.
3    Q    Why was there an engineering report required
4 with this --
5    A    Because it -- excuse me. Because it was a
6 floodplain.
7    Q    And that has to be a Commonwealth or an
8 engineer or --
9    A    Yes, uh-huh, and -- someone who is approved by
10 the Commonwealth.
11   Q    Was the structure built at precisely the same
12 place as the prior structure?
13   A    Essentially the same place. I think it was
14 moved up one foot to accommodate the floodplain changes.
15   Q    The next one is an application dated March 14,
16 2000 from John -- is that Younker?
17   A    Younker.
18   Q    Y-o-u-n-k-e-r. And it appears that that was
19 applied for March 14, 2000 and granted the same day,
20 correct?
21   A    Um-hum.
22   Q    This was for a home. Do you recall what was
23 attached to this?
24   A    No, I don't.
25   Q    Now, we have a March 1, 2000 application from

---

161

1 Joseph Foster?
2    A    Um-hum.
3    Q    For a mobile home --
4    A    Yes.
5    Q    -- he calls it. And I see where it says
6 sewage permit number NA. Why is there no --
7    A    Yes, they replaced a former mobile home there
8 and there was a sewage system already in place.
9    Q    And you didn't go out and -- you didn't do
10 anything further in connection with the septic or anything
11 like that?
12   A    No.
13   Q    You didn't check up on this?
14   A    Yeah, um-hum.
15   Q    And no drawings had to be attached to it,
16 right? No drawings had to be --
17   A    No drawings, no.
18   Q    And then we have February 19, 2000 application
19 from Mr. Stout?
20   A    Yes.
21   Q    And that was for a barn?
22   A    A barn.
23   Q    Now, does the barn have water in it?
24   A    No.
25   Q    No water?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

162

1    A    No, it's a storage barn.
2    Q    It's 48-feet wide by 68-feet long, right?
3    A    Right.
4    Q    So it wasn't a barn used for animals?
5    A    I think it's going to be for hay and
6    equipment.
7    Q    And so --
8    A    That's what it appears to be anyway.
9    Q    And it appears from here that that application
10    was granted the same day that it was applied for, right?
11    A    Yes.
12    Q    That permit, I should say.
13    A    Um-hum.
14    Q    No additional --
15    A    No.
16    Q    So can you distinguish then between the
17    requirements for, on the one hand, a garage or a barn or a
18    shed, a storage facility of some sort, and an art studio?
19    What's the difference?  Is there any difference under the
20    building ordinance?
21    A    Well, the art studio is going to have water in
22    it and --
23    Q    Why do you think the art studio is going to
24    have water -- an art studio is going to have water in it?
25         MR. SHERR:  Were you finished with your

163

1    answer?  I think you interrupted him.  Were you finished
2    with your answer?
3         THE WITNESS:  Well, I think an art studio in
4    general usually uses water of some kind for turpentine,
5    watercolors, unless it's a sculpture studio.
6    BY MS. MONTGOMERY:
7    Q    But you didn't know Mr. Corneal was an artist,
8    right, when he asked you for his permit for a garage with
9    studio overhead?
10    A    No.
11    Q    You didn't know he was an artist?
12    A    No.
13    Q    You didn't really know it was an art studio,
14    right?
15    A    He told me that it was going to be a garage
16    with an art studio.
17    Q    Overhead, okay.  Well, once again, I'm just
18    going to say if the art studio doesn't have water and he
19    represents to you that it doesn't have water, can you then
20    distinguish between it and a barn or a shed or a garage or
21    anything else that doesn't have water?
22    A    Well, I think so.
23    Q    Well, how do you distinguish?  What are you
24    distinguishing?
25    A    Well, by looks and by -- a shed is a shed.

164

1    Q    Well, that's not exactly my question.  My
2    question is:  Can you distinguish for purposes of building
3    application requirements between an art studio that doesn't
4    have water and a garage or a barn or a shed or any workshop
5    that doesn't have water?  Can you distinguish?
6    A    I'll say no.
7    Q    Now I'm going to show you a document -- before
8    I go to it I'm just going to clarify.  Now, you indicated
9    that your art studio on your property doesn't have water,
10    right?
11    A    Exactly.
12    Q    So you go to the stream, right?
13    A    Right.
14    Q    Mr. Corneal has a stream on his property, too,
15    right?
16    A    Okay, then he'd go to the stream and get
17    water.
18    Q    I want to show you a document that we'll mark
19    as Van Dommelen Exhibit 10.
20         (Four-page document produced and marked as Van
21    Dommelen Exhibit No. 10.)
22    BY MS. MONTGOMERY:
23    Q    Now, can you identify that document for me,
24    Mr. Van Dommelen?
25    A    Um-hum, I can.

165

1    Q    And what is it?
2    A    It's a permit analysis that I'm asked to
3    submit at the end of each year.
4    Q    And --
5    A    To determine what kind of structures were
6    built in the township.
7    Q    So it indicates that in 1995 you issued
8    building permits for seven houses?
9    A    Um-hum.  Yes.
10    Q    And then right down the list, right?
11    A    Exactly.
12    Q    For a total of 33 permits?
13    A    Right.
14    Q    In 1996 you issued permits for four houses,
15    correct?
16    A    Yes.
17    Q    And didn't deny any applications, correct?
18    A    Not for those, no.
19    Q    And then right down the list, mobile homes,
20    camps, decks, carports, outbuildings, alterations, okay.  In
21    1998 you issued permits for six houses?
22    A    Yes.
23    Q    Seven outbuildings, right?
24    A    Yes.
25    Q    You didn't deny any?

166

1   A   No.
2   Q   In 1999 you issued permits for six houses?
3   A   Yes.
4   Q   And four outbuildings and didn't deny any,
5   correct?
6   A   No.
7   Q   Now, I don't see for 2000. Do you know how
8   many permits you issued in 2000?
9   A   No, I can't remember. I know I turned that
10  into Ann but -- and it should have been in my book.
11  Q   Okay. Well, maybe --
12  A   Because I'm sure I turned it in after the
13  first of the year.
14  Q   Well, was it about the same, like somewhere
15  between four and seven houses?
16  A   Yes, it would be a similar amount, yeah. It
17  -- as you can see, it varies very little in terms of how
18  many permits and how many houses and -- it seems to be
19  fairly stable in terms of what's built.
20  Q   So if you issued permits for -- it looks like
21  between four and seven houses between 1995 and 1998 --
22  A   Yes.
23  Q   -- then say the most you issued for 2000 was
24  seven houses as well?
25  A   It would be a similar amount.

167

1   Q   And that means you got in each of those years
2   -- for example, in 1995 you got applications for seven
3   houses, right?
4   A   Probably.
5   Q   And granted them all?
6   A   Yes.
7   Q   Whereas in 2000 you got applications for say
8   eight houses and denied one, right?
9   A   I would assume you're right, um-hum.
10  Q   And that would be Mr. Corneal's --
11  A   Yes.
12  Q   -- that you denied? There wasn't anything
13  unusual that year about the number of houses that somebody
14  was trying to build or anybody was trying to build?
15  A   I can't remember. I would have to look at the
16  form.
17  Q   Is there anything unusual about the number of
18  out --
19  A   No, I would think not.
20  Q   What about outbuildings?
21  A   About what?
22  Q   Outbuildings. About the same?
23  A   No, I think it would be similar.
24  Q   And actually in 1999 you only had a request
25  for four outbuildings, right?

168

1   A   Yes.
2   Q   Do you recall what it was for 2000?
3   A   No, I do not recall.
4   Q   Would an art studio without water fall into
5   the heading of outbuilding?
6   A   Of an outbuilding?
7   Q   Yes.
8   A   I suppose it could.
9   Q   Where else on this list could it possibly fall
10  in?
11  A   No, I think it would have to go under
12  outbuildings.
13  Q   Thank you. Based on the number of building
14  permit applications, would you say that there wasn't any
15  particular rush or acceleration of building going on in
16  Jackson Township in that 1999-2000 time frame?
17  A   I would think there was no more acceleration
18  than other years. I think it was fairly stable.
19  Q   I'm going to show you a document which you
20  guys have seen dated September 1, 2000. It's a letter from
21  David Corneal to Miss Wirth and I'll ask you to look at that
22  for me. Do you recall whether you've ever seen that letter
23  before, Mr. Van Dommelen?
24  A   I don't recall seeing it before.
25  Q   If you look at the letter, it refers back to

169

1   those three building permit applications that Mr. Corneal
2   sent in.
3   A   Yes.
4   Q   Which you say you never saw anyway, correct?
5   A   I don't believe I did.
6   Q   Now, look at the drawings that he has attached
7   to this September 1, 2000 letter.
8   A   Yes.
9   Q   Do you see the first page of the drawings has
10  a sketch of a 40-by-20 foot garage/studio, right?
11  A   Yes.
12  Q   And the second floor is on the second -- no,
13  sorry, the second floor is on the first page and the first
14  floor is on the second page, correct?
15      MR. SHERR: Where does it say garage/studio?
16      MS. MONTGOMERY: In the cover letter -- well,
17  it actually says second floor with garage on the drawing.
18      MR. SHERR: Right, but I thought you said it
19  said garage/studio. I don't see studio written on the
20  drawings, is my point.
21      MS. MONTGOMERY: No, but --
22      MR. SHERR: I just wanted to clarify.
23      MS. MONTGOMERY: Okay.
24  BY MS. MONTGOMERY:
25  Q   So have you ever seen these drawings before?

170

1   A    Not these.

2   Q    Now, if somebody were --

3   A    And I personally don't think they're very good

4 drawings.

5   Q    But you don't even require drawings for a

6 garage, right?

7   A    (No response.)

8   Q    Have you seen some other drawings because you

9 said not these drawings?

10   A    I saw an earlier drawing which was a much more

11 complex architectural scale drawing.

12   Q    Where did you see that?

13   A    When he came to my house.

14   Q    So he showed you drawings of his studio then,

15 his garage and studio?

16   A    His garage with a studio above it.

17   Q    He showed you that then?

18   A    Yes, and now it becomes a garage with an open

19 storage above it.

20   Q    But in any event, even though you don't think

21 these are good drawings, you don't even require drawings for

22 garages so these would be good enough, correct?

23   A    I did say that, yes.

24      MS. MONTGOMERY:  We're going to mark this as

25 Van Dommelen Exhibit 11.  That's the September 1, 2000

171

1 letter from Mr. Corneal to Ann Wirth with drawings attached.

2      (Letter dated 9/1/00 with attachments produced

3 and marked as Van Dommelen Exhibit No. 11.)

4 BY MS. MONTGOMERY:

5   Q    Well, when you saw his earlier drawings when

6 he came to your house, did you keep those?

7   A    No.

8   Q    You sent them back because he didn't have --

9 you wouldn't give him an application?

10   A    Right, and he took them back.

11   Q    Was there anything objectionable about those

12 drawings of the garage and studio?

13   A    As far as the drawings were -- they were

14 professional drawings.

15   Q    They were sufficient --

16   A    Yes, uh-huh.

17   Q    -- to tell you what it was he wanted to do

18 anyway?

19   A    Right.

20   Q    I'm going to ask you one question.  Is it your

21 understanding that you are not to discuss your deposition

22 with any of the other defendants?

23   A    Pardon?

24   Q    Is it your understanding that you are not to

25 discuss --

172

1   A    Oh, yes, yes.

2   Q    -- this deposition with any of the other

3 defendants?

4   A    Yes.

5   Q    Including Mr. Newton, right?

6   A    Yes.

7      MR. SHERR:  And just so we're clear, that is

8 until after the deposition of Mr. Newton and Mr. Weiler.

9      MS. MONTGOMERY:  Until the depositions are

10 completed, is what the judge said.

11      THE WITNESS:  Yes.

12      MR. SHERR:  Is that what it says?  It doesn't

13 say the deposition of defendants?

14      MS. MONTGOMERY:  Right.

15 BY MS. MONTGOMERY:

16   Q    Did you discuss with Mr. Newton your refusal

17 to provide -- other than the letter that he wrote for you

18 and had you sign to Mr. Corneal, did you ever have

19 discussions with Mr. Newton about Mr. Corneal and his

20 attempt to get approvals from the township?

21   A    No.

22   Q    You never had a telephone conversation with

23 him?

24   A    No, I believe all the discussions went between

25 him and Ann Wirth.

173

1   Q    What makes you think they all went between him

2 and Ann Wirth?

3   A    Because I gave -- I gave the letter to Ann

4 Wirth and then she sent it along with building permits to

5 Larry Newton.

6   Q    You mean the letter that Mr. Corneal wrote to

7 you?

8   A    No, no, that I wrote.

9   Q    Oh, the letter that you wrote?

10   A    Yes.

11   Q    You gave it to her?

12   A    Right.

13   Q    What about prior to the time -- you know, for

14 example, when he first came out to your house and asked for

15 the applications --

16   A    Right.

17   Q    -- did you have any occasion to talk to him

18 then about Mr. Corneal?

19   A    About Mr. Corneal?

20   Q    Yes.

21   A    Newton never came out to my house.

22   Q    But Mr. Corneal came out to your house,

23 correct?

24   A    Yes.

25   Q    At the time that Mr. Corneal came out to your

---

174

1　house and you first refused to give him even an
2　application --
3　　A　　Right.
4　　Q　　-- did you ever have any discussions with Mr.
5　Newton about that?
6　　A　　No.
7　　Q　　Do you know if anybody else had any
8　discussions with Mr. Newton --
9　　A　　No, I don't know.
10　　Q　　Did anybody convey to you anything that Mr.
11　Newton may have said about that?
12　　A　　No.
13　　Q　　Did anybody convey any advice from Mr. Newton
14　about that?
15　　A　　I don't know.
16　　Q　　You don't recall?
17　　A　　Unh-unh.
18　　Q　　Do you know whether Mr. Newton was ever
19　present at any of the meetings between January 2000 and July
20　2000?
21　　A　　Which meetings?
22　　Q　　The township meetings or the pre-meetings.
23　　A　　Yes, but I can't tell you what dates.
24　　Q　　What makes you think he was present?
25　　A　　I've seen him at some of the township meetings

---

175

1　in the fire hall and I've seen him at one meeting at Ann's
2　that we went over the -- that one document that -- that
3　Corneal had accusing us -- I can't think of what it's
4　called.
5　　　MR. SHERR:　The complaint.
6　BY MS. MONTGOMERY:
7　　Q　　The complaint?
8　　A　　Yeah, the complaint.
9　　Q　　That was after the lawsuit?
10　　A　　Yeah, uh-huh.
11　　Q　　But prior to the lawsuit do you recall also
12　seeing him at township meetings?
13　　A　　That's the only time I ever saw him.
14　　Q　　The only time you ever saw him was when you
15　were at Ann's you mean?
16　　A　　Newton. Yeah, the only time I ever saw him
17　was at a township meeting.
18　　Q　　Oh, I see. And that was prior to the lawsuit?
19　　A　　Yes.
20　　Q　　Do you recall whether at any of those meetings
21　Mr. Corneal's situation was discussed when Mr. Newton was
22　there?
23　　A　　I don't know. In general -- in general we
24　didn't discuss at the open meetings anything about the
25　Corneal case.

---

176

1　　Q　　Where did you discuss it instead?
2　　A　　It finally came up after the article came in
3　the newspaper and some of the citizens asked about it.
4　　Q　　Oh, then it came up in an open meeting, you're
5　saying?
6　　A　　Yes, it came up in the newspaper. Someone
7　took an article about that into the Daily News and -- we
8　have no idea who it was, but to tell about the fact that he
9　-- Corneal was suing us. And so then, of course, some of
10　the -- the citizens wanted to ask about it and we said as
11　little as possible.
12　　Q　　Well, let me just ask you one more question
13　about the letter that Mr. Newton wrote for your signature or
14　revised for your signature.
15　　A　　Revised, I would say.
16　　Q　　Were you concerned at all that you were sort
17　of writing stuff down in a letter at somebody else's request
18　about building permit applications that you'd never seen?
19　Did that raise any concerns to you?
20　　A　　Maybe a little.
21　　Q　　Like what kind of concerns?
22　　A　　Well, my job was being usurped.
23　　Q　　Did you voice that to the supervisors at all?
24　　A　　I don't believe so.
25　　Q　　Why not?

---

177

1　　A　　I can't answer that.
2　　Q　　But was that the only situation that you can
3　think of when your job was being usurped? Is that the
4　only --
5　　A　　Yes, yes, um-hum, right.
6　　Q　　But you decided you'd go ahead and sign the
7　letter anyway and put in it what they wanted you to put in
8　it?
9　　A　　Yes, um-hum.
10　　Q　　Why did you decide to do that? Did you feel
11　that you had to?
12　　A　　No, I just wanted to not shake the boat, I
13　guess.
14　　Q　　Because you understood that was what the
15　supervisors wanted you to do?
16　　A　　Yes.
17　　Q　　Did you understand that was what Mr. Newton
18　wanted you to do as well?
19　　A　　Yes.
20　　Q　　Did anybody ever, you know, sort of tell you
21　-- did anybody ever tell you that you just needed to do
22　your job, you know, just the way they told it to you or
23　anything like that?
24　　A　　I'm not sure that anyone did say that in those
25　kind of words.

178

1    Q      You didn't have any real like confrontation
2  about the fact that they were telling you what to do?
3    A      No.
4    Q      Other than all that we have talked about just
5  now, is there anything that you can think of concerning Mr.
6  Corneal and his property that you haven't told me as the
7  building permit officer for Jackson Township?
8    A      I can think of nothing.
9    Q      I'm not sure if I asked you this question, but
10 just in case, have you talked to Ann Wirth -- not about the
11 deposition. I'm not talking about the depositions, that's
12 not it. Have you talked to Ann Wirth about Mr. Corneal's
13 request for a building permit since the time that you wrote
14 that letter?
15   A      Well, I'm sure we talked about it because I
16 was concerned about how the whole thing was going. I'm sure
17 I said something about what are we going to do about this
18 and that we need to bring it up to the supervisors and make
19 a decision. So I certainly wouldn't say I never talked to
20 her, but it would be a very superficial kind of
21 conversation.
22   Q      Do you recall her talking anything to you
23 about it at all?
24   A      No, except one time, as I said earlier, that
25 she said I wasn't supposed to give a building permit to

179

1  Corneal, as did Tom Wilson.
2    Q      Because that's what Tom Wilson wanted?
3    A      Right.
4    Q      Do you know -- to your knowledge is it
5  primarily Mr. Wilson who was sort of taking the lead on this
6  thing with Mr. Corneal in his attempt to build on his
7  property?
8    A      Interesting question. I'm not sure I would
9  want to answer that question the way it's phrased because
10 I'm not really sure.
11   Q      Well, I'm not sure it's a good answer. It's
12 an okay answer.
13   A      Because I would assume -- no, I don't want to
14 go there.
15   Q      Well, let me ask you this: Why is it that you
16 don't feel that you can answer that question?
17   A      Well, because I'm not sure of the answer and
18 I'm not sure how some of the supervisors and administrators
19 of the township interact with other people.
20   Q      I see.
21   A      I see them mainly on the first Monday of each
22 month at the supervisor's meeting and so I don't see their
23 interaction with other people except at that supervisor's
24 meeting. And so it would be unfair for me to make a
25 judgment on one person that person is doing the lead.

180

1    Q      Do you have a belief as to who was taking the
2  lead in this position that the township has taken --
3    A      No, I don't think so. I think they were
4  taking it as a board of supervisors.
5    Q      As a group?
6    A      As a group.
7    Q      All right. Do you know when Mr. Newton became
8  aware of what was going on between the township supervisors
9  and Mr. Corneal with respect to his attempt to build?
10   A      No, I don't -- I don't know.
11   Q      Do you know -- I'm going to ask it a little
12 more generally then. Do you know whether he found out about
13 all this say in the spring of 2000 as opposed to later?
14   A      I would assume it was in the spring of 2000.
15   Q      Why would you assume that?
16   A      Well, just the date of -- the date of events.
17   Q      Do you know whether or not Mr. Newton knew
18 about the moratorium at the time that the moratorium went
19 into place?
20   A      Well, as a township lawyer I would say yes.
21   Q      Has it been your experience that Mr. Newton
22 generally knows what's going on in the township, in Jackson
23 Township with the board of supervisors?
24   A      Yes, I think so.
25   Q      Do you know whether any of the defendants

181

1  asked him for advice regarding the moratorium?
2    A      No.
3    Q      Did any of the township supervisors ask him
4  for --
5    A      I don't know.
6    Q      You don't know, okay. Do you know whether or
7  not he ever told them what they could do with respect to a
8  moratorium?
9    A      No, I don't know.
10   Q      What about the subdivision ordinance, same
11 question, do you know whether Mr. Newton told the
12 supervisors or Miss Wirth or even you what they could do
13 with respect to the subdivision ordinance?
14   A      He didn't say anything to me. I was very
15 uninvolved with the whole subdivision ordinance and so I
16 have no idea who he talked to about it.
17   Q      Now, if Mr. Corneal's property were already
18 divided such that the existing old farmhouse was on one
19 parcel and there was nothing on the other parcel, would you
20 say that if you wanted to build on that other parcel a home
21 and a garage with art studio that there would be any
22 subdivision problem?
23   A      If the subdivision is already in place, then I
24 see no problems. There is a -- this is an example. There
25 is a piece of property near me where it's already been

**182**

1  subdivided. They're not building anything on it but it is
2  subdivided in preparation --
3  Q  When was it subdivided, do you know?
4  A  Oh, it has to be at least five to 10 years
5  ago. It was a long -- a long time ago.
6  Q  So if a parcel of property were divided into
7  two parcels so you now have -- technically now you have a
8  subdivision, right, and that were done before the
9  subdivision ordinance were in place, would that be okay to
10  build on one even though there was a house on the other
11  piece?
12  A  I'm not sure. I'm not sure.
13  Q  Let me ask it to you a different way. If you
14  had a piece of property that was divided such that there was
15  a separate deed filed --
16  A  Right.
17  Q  -- recorded, when a piece of property had an
18  existing house on it, the other parcel had nothing on it,
19  would there be any subdivision problem with building on
20  that --
21  A  No, not if there's separate deeds. The
22  property that I live on has two parcels, the one my house is
23  on and the one my studio is on, but that property is also
24  claimed Clean and Green so nothing can be built on it or we
25  have to pay back taxes.

**183**

1  Q  So you can't build any other structures on it?
2  A  No.
3  Q  Who claimed it Clean and Green?
4  A  Pardon?
5  Q  Who claimed it Clean and Green?
6  A  Well, we applied for it.
7  Q  And that excuses you from paying taxes?
8  A  Yes.
9  Q  Do you know whether or not Mr. Wilson has any
10  interest in any part of the Corneal property?
11  A  No, I don't.
12  MS. MONTGOMERY: I don't think I have any
13  further questions right now.
14  MS. YANKANICH: I have some questions for
15  you.
16
17  CROSS-EXAMINATION
18
19  BY MS. YANKANICH:
20  Q  If you will turn to Exhibit Number 2 for me,
21  please.
22  MR. SHERR: Exhibit Number 2?
23  MS. YANKANICH: Exhibit Number 2.
24  MR. SHERR: You're going to have to speak up.
25  MS. YANKANICH: I'll speak up, right.

**184**

1  (Discussion held off the record.)
2  BY MS. YANKANICH:
3  Q  You have Exhibit Number 2; is that correct?
4  A  Yes.
5  MS. MONTGOMERY: What's the date of the
6  letter?
7  BY MS. YANKANICH:
8  Q  The date of the letter is October 10, 2000.
9  It's the letter that you previously testified you drafted --
10  A  Right.
11  Q  -- and that Larry Newton revised --
12  A  Right.
13  Q  -- is that correct? Is that the letter you're
14  referring to there?
15  A  Yes.
16  Q  My question specifically is I'm not clear what
17  it is in this letter that you're contending Larry Newton
18  revised. Can we go through this letter and specifically
19  point out what language was added.
20  A  I think the part that was added was the --
21  while you submitted sewage facility planning modules to the
22  township, the township cannot forward the planning modules
23  to the Department of Environmental Protection for review
24  until you meet the requirements of the township's
25  subdivision and land development.

**185**

1  Q  So you're referring to the second sentence in
2  the second paragraph?
3  A  Right.
4  Q  Is there anything else in the letter that --
5  A  That's, I think, the main part that was
6  added. A few words might have been changed, but as you
7  know, nobody can look at a letter and not change words.
8  Q  But the gist of this letter is still
9  consistent with the draft that you provided to Mr. Newton;
10  is that correct?
11  A  Yes, I think except for that -- except for
12  that area.
13  MS. YANKANICH: I have no further questions.
14  MS. THORP: Nothing.
15  MR. SHERR: I have no questions.
16  MS. MONTGOMERY: I just have one follow-up.
17
18  REDIRECT EXAMINATION
19
20  BY MS. MONTGOMERY:
21  Q  I'm a little confused now about this October
22  10, 2000 letter from you --
23  A  Yeah, right.
24  Q  -- to Mr. Corneal. I thought that you had
25  indicated that you just put in there in the first place what

186

1   others told you to put in there, correct?

2   A     I first wrote it, you know, myself

3   completely.

4   Q     At whose instruction?

5   A     And then I gave it to Ann Wirth and she then

6   gave it to Larry Newton and he made changes that he thought

7   should be in there.

8   Q     But my question --

9   A     I think that was correct with my previous --

10   Q     That's what I understood you to say, but when

11   you first wrote it, at whose instruction were you writing

12   it?

13   A     I guess I would have to answer the board of

14   supervisors.

15   Q     Because you hadn't seen the applications,

16   right?

17   A     Yeah.

18   Q     So they just told you to write this letter and

19   deny it?

20   A     Right.

21   Q     Did Mr. Newton tell you to write the letter?

22   A     See, that I do not remember.

23   Q     But somebody other than yourself --

24   A     Yeah.

25   Q     -- came up with the idea that you needed to

187

1   write this letter?

2   A     Right.

3       MS. MONTGOMERY:  That's it.

4       MS. YANKANICH:  Nothing further.

5       (The deposition was concluded at 3:32 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

188

1

2   COUNTY OF DAUPHIN       :

3               : SS

    COMMONWEALTH OF PENNSYLVANIA   :

4       I, Teresa K. Bear, Reporter-Notary Public,

5   authorized to administer oaths within and for the

6   Commonwealth of Pennsylvania and take depositions in the

7   trial of causes, do hereby certify that the foregoing is the

8   testimony of DAVID VAN DOMMELEN.

9       I further certify that before the taking of

10   said deposition, the witness was duly sworn; that the

11   questions and answers were taken down stenographically by

12   the said Teresa K. Bear, a Reporter-Notary Public, approved

13   and agreed to, and afterwards reduced to typewriting under

14   the direction of the said Reporter.

15       I further certify that the proceedings and

16   evidence are contained fully and accurately to the best of

17   my ability in the notes taken by me on the within

18   deposition, and that this copy is a correct transcript of

19   the same.

20       In testimony whereof, I have hereunto

21   subscribed my hand this 18th day of June, 2001.

22

23          _____

         Teresa K. Bear, Reporter

24          Notary Public

         My commission expires

25          on April 13, 2003