# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID B. CORNEAL and : NO. 1:CV-00-1192
SANDRA Y. CORNEAL, :
               Plaintiffs : JURY TRIAL DEMANDED
       v. :
                 : RAMBO, J.
JACKSON TOWNSHIP, :
Huntingdon County, Pennsylvania, :
*et al.*, :
              Defendants :

**FILED**
**HARRISBURG, PA**

APR 1 8 2003

MARY E. D'ANDREA, CLERK
Per _____
           Deputy Clerk

## APPENDIX OF EXHIBITS
## IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Date: April 18, 2003

ECKERT SEAMANS CHERIN & MELLOTT, LLC
Bridget E. Montgomery, Esquire
Adam M. Shienvold, Esquire
213 Market Street
8th Floor
Harrisburg, PA 17101
717-237-6000

{L0252507.1}

# TABLE OF CONTENTS

<u>Volume No. 1</u>

1.      Deposition of W. Thomas Wilson, May 18, 2001

2.      Deposition of Michael Yoder, May 18, 2001

3.      Deposition of Ralph Weiler, June 29, 2001

4.      Deposition of Ann Wirth, May 17, 2001

5.      Deposition of David Van Dommelen, June 6, 2001

<u>Volume No. 2</u>

6.      Deposition of Barry Parks, May 16, 2001

7.      Deposition of David B. Corneal, February 22, 2001

8.      Deposition of David Simpson, July 10, 2001

9.      Contract dated October 7, 1999

10.     Minutes of the Meeting of the Board of Supervisors of Jackson Township, February 7, 2000

11.     Minutes of the Meeting of the Board of Supervisors of Jackson Township, January 4, 2000

12.     Deposition of Larry Newton, May 17, 2001

13.     Letter from Huntingdon County Planning Commission dated February 24, 2000

14.     Letter from Huntingdon County Planning Commission dated April 20, 2000

15.     Jackson Township Building Permit Ordinance, dated July 3, 1989

16.     Letter from Defendant Van Dommelen to David Corneal dated October 10, 2000

{L0252507.1}

17.    Letter from David Corneal to Defendant Van Dommelen dated May 5, 2000

18.    Ledger of Building Permit Applications and Grants

19.    Letter from Harvey B. Reeder, Esquire to David B. Corneal, dated May 1, 2000

20.    Deposition of Terry Williams, Esquire, July 10, 2001

Volume No. 3

21.    Revised Subdivision Plan, Dated April 7, 2000

22.    Minutes of the Meeting of the Board of Supervisors of Jackson Township, April 3, 2000

23.    Jackson Township Ordinance 2000-1 ("Subdivision and Land Development Ordinance"), dated July 7, 2000

24.    Minutes of the Meeting of the Board of Supervisors of Jackson Township, July 10, 2000

25.    Jackson Township Ordinance 2000-2 ("Driveway Ordinance"), dated July 10, 2000

26.    Jackson Township Ordinance 2000-3 ("Holding Tank Ordinance"), dated July 10, 2000

27.    Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated May 5, 2000

28.    Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated August 3, 2000

29.    Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated August 18, 2000

30.    Letter from Jackson Township Solicitor Larry Newton to David B. Corneal, dated August 29, 2000

{L0252507.1}

31.   Letter from David B. Corneal to Jackson Township Solicitor Larry Newton, dated January 31, 2000

32.   Letter from David B. Corneal to Defendant Wirth, dated August 31, 2000 (and attachments)

33.   Order dated October 19, 2000, Huntingdon County Court of Common Pleas Judge Stewart L. Kurtz,  Docket number 2000-1290

34.   Letter from A. Sherr to B. Montgomery, dated March 18, 2003 and Draft Statement of Undisputed Facts As Agreed to by Counsel, dated June 24, 2002 (collectively "Stipulations")

36.   Expert Report of George W. Fasic, dated July 2001

37.   General Resume, Resume Addendum and List of Recent Publications for George W. Fasic

38.   Expert Report of Allen G. Heist, dated July  2001

39.   Resume and Publications List for Allen G. Heist

{L0252507.1}

## <u>CERTIFICATE OF SERVICE</u>

I, Adam Shienvold, Esquire, hereby certify that I am this day serving a copy

of the foregoing document via First Class U.S. Mail, which service satisfies the

requirements of the Federal Rules of Civil Procedure and Middle District Local

Rules of Court, addressed as follows:

<u>By Facsimile and First Class U. S. Mail</u>

Anthony R. Sherr, Esquire
Mayers, Mennies & Sherr, LLP
3031 Walton Road, Building A
Suite 330, P.O. Box 1547
Blue Bell, PA  19422-0440

---

Adam M. Shienvold, Esquire

Attorney for Plaintiffs,
David B. and Sandra Y. Corneal

Date:

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2    DAVID B. CORNEAL and SANDRA    :
      Y. CORNEAL,                    :
 3         PLAINTIFFS               :
                                     :
 4           VS                      :  NO. 1:CV-00-1192
                                     :
 5    JACKSON TOWNSHIP, HUNTINGDON   :
      COUNTY, PENNSYLVANIA; W.       :
 6    THOMAS WILSON, individually    :
      and in his official capacity   :
 7    as Supervisor of Jackson       :
      Township; MICHAEL YODER,       :
 8    individually and in his        :
      official capacity as           :
 9    Supervisor of Jackson          :
      Township; RALPH WEILER,        :
10    individually and in his        :
      official capacity as           :
11    Supervisor of Jackson          :
      Township; BARRY PARKS,         :
12    individually and in his        :
      official capacity as Sewage    :
13    Enforcement Officer of         :
      Jackson Township; DAVID        :
14    VAN DOMMELEN, individually     :
      and in his official capacity   :
15    as Building Permit Officer;    :
      ANN L. WIRTH, individually     :
16    and in her official capacity   :
      as Secretary of Jackson        :
17    Township; and LARRY NEWTON,    :
      individually and in his        :
18    official capacity as           :
      Solicitor to Jackson           :
19    Township,                      :
           DEFENDANTS               :
20         DEPOSITION OF:  BARRY PARKS
21         TAKEN BY:       PLAINTIFFS
22         BEFORE:         TERESA K. BEAR, REPORTER
                           NOTARY PUBLIC
23
           DATE:           MAY 16, 2001, 11:12 A.M.
24
           PLACE:          ECKERT SEAMANS
25                         213 MARKET STREET
                           HARRISBURG, PENNSYLVANIA
```

Case 1:00-cv-01192-SHR   Document 120   Filed 04/18/2003   Page 7 of 100

**2**

1 APPEARANCES:
2   ECKERT SEAMANS
    BY: BRIDGET E. MONTGOMERY, ESQUIRE
3     LESLIE A. MALADY, ESQUIRE
4      FOR - PLAINTIFFS
5   MAYERS, MENNIES & SHERR, LLP
    BY: ANTHONY R. SHERR, ESQUIRE
6
     FOR - ALL DEFENDANTS EXCEPT NEWTON
7
  THOMAS, THOMAS & HAFER, LLP
8   BY: MICHELE J. THORP, ESQUIRE
9     FOR - DEFENDANT - RALPH WEILER
10   METTE, EVANS & WOODSIDE
    BY: JENNIFER YANKANICH, ESQUIRE
11
    FOR - DEFENDANT - LARRY NEWTON
12
  ALSO PRESENT:
13
  DAVID B. CORNEAL
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1       TABLE OF CONTENTS
2     WITNESS
3 FOR PLAINTIFFS      DIRECT CROSS REDIRECT
4 Barry Parks
  By Ms. Montgomery     9   --   164
5   By Ms. Yankanich     --   162   --
  By Mr. Sherr     --   163   --
6
7
      EXHIBITS
8
PARKS EXHIBIT NO.     PRODUCED AND MARKED
9
1 - Subdivision plan 4/7/00     88
10
2 - Subdivision plan 2/4/00     104
11
3 - Sewage facilities planning module     122
12
4 - Activity records     125
13
5 - Letter dated 2/8/00     150
14
6 - Letter dated 3/24/00     156
15
7 - Order     168
16
17
18
19
20
21
22
23
24
25

**4**

1     MR. SHERR: No stipulations. We'd like to
2 read and sign. I'd also like to state for the record that I
3 have this morning given an additional document which is
4 responsive to the request for production of documents which
5 is entitled subdivisions reviewed by HCPC which is the
6 Huntingdon County Planning Commission. We are informed that
7 these are all the subdivisions that have been reviewed by
8 the county planning commission since 1982 and would indicate
9 all of those plans which were -- subdivision was appropriate
10 since 1982 in Jackson Township.
11     I'd also state that we received a notice of
12 deposition of corporate designee and the designation therein
13 is for an individual or individuals who has or have
14 knowledge or information about the matters relating to the
15 defense of the claims in this lawsuit. We would first note
16 that --
17     MS. MONTGOMERY: Stop right there --
18     MR. SHERR: -- the notice does not --
19     MS. MONTGOMERY: -- before I get the court back
20 on the phone.
21     MR. SHERR: -- describe with reasonable
22 particularity --
23     MS. MONTGOMERY: Mr. Sherr, what are you
24 doing? This is my deposition. This is not a discovery
25 dispute with the court. I have had it with you. I will

**5**

1 call the court and ask for sanctions now.
2     You don't open up my deposition by making a
3 speech on the record about stuff that has nothing to do with
4 the deposition that I'm asking for. Now, that's it. Stop.
5     MR. SHERR: I'm sorry, but --
6     MS. MONTGOMERY: When those documents come
7 into play, we will deal with it. Stop.
8     MR. SHERR: I'm sorry. There's a notice of a
9 deposition of corporate designee for --
10     MS. MONTGOMERY: It has nothing -- is Barry
11 Parks the corporate designee?
12     MR. SHERR: Well, that's what I'm making a
13 statement about. Will you just let me finish?
14     MS. MONTGOMERY: Then tell me off the record
15 and we'll see if we need it on the record.
16     MR. SHERR: No, this is on the record.
17     MS. MONTGOMERY: Off the record now or I'm
18 stopping the deposition.
19     MR. SHERR: There's a notice of deposition for
20 corporate designee --
21     MS. MONTGOMERY: I'm calling the court right
22 now.
23     MR. SHERR: -- for May 16, 2001 at 9:30.
24     MS. MONTGOMERY: Do you want to do this? Do
25 you want to do this?

**6**

1  MR. SHERR: And I am stating on the record
2  that while your notice of deposition does not state with
3  reasonable particularity the -- it's just a very simple
4  statement for the record, if you'd just sit down.
5  MS. MONTGOMERY: It is inappropriate.
6  MR. SHERR: Why is it inappropriate?
7  MS. MONTGOMERY: It is completely
8  inappropriate. What are you doing?
9  MR. SHERR: Any way, let me finish --
10  MS. MONTGOMERY: I've never seen anybody
11  conduct himself quite this way, Mr. Sherr, and you're not
12  going to get away with it, not here, not with me, not with
13  my client. Do you got that?
14  MR. SHERR: Could I finish?
15  MS. MONTGOMERY: No, you may not finish.
16  MR. SHERR: You're just going to keep talking
17  over me?
18  MS. MONTGOMERY: Yeah, I'm going to keep
19  talking over you until you stop. That's right, I'm going to
20  keep talking over you. I haven't even opened the deposition
21  yet. We haven't even really sworn the witness yet. You
22  interrupt and start making a speech on the record in my
23  deposition. I haven't asked a question about that 30(b)(6)
24  notice. I haven't asked a question about that document.
25  When the time comes, if you want to say

**7**

1  something and it's appropriate, you may say something. Now,
2  I am going to conduct my deposition and you are going to
3  stop making some -- whatever you're doing here. Is that
4  clear? I noticed the deposition, I control the deposition.
5  This has nothing to do with this deposition, as near as I
6  can tell. You may tell me right now on the record is Barry
7  Parks your 30(b)(6) deposition?
8  MR. SHERR: Are you finished?
9  MS. MONTGOMERY: You can go ahead.
10  MR. SHERR: Now I'll finish. You have a
11  notice of a corporate designee with a very broad subject
12  matter. The mere statement I was going to make that unless
13  we can narrow down the subject matter, every deponent is the
14  corporate designee since they all have knowledge concerning
15  the subject matter or the defense of our claim. And all I
16  was stating, appropriately so, before you got so angry and
17  started conducting yourself in a completely inappropriate
18  manner --
19  MS. MONTGOMERY: No.
20  MR. SHERR: -- was that all of these people for
21  now are the corporate designee since there is a broad
22  subject matter, and that's all so -- you know, come on.
23  MS. MONTGOMERY: Okay. Just so you are on
24  notice, I'm going to take this transcript and I'm going to
25  move for sanctions because I'm not going to let you play

**8**

1  around with us anymore. It is now what time, 11:30, while
2  we were prevented from starting on time through all sorts of
3  situations. Now, that's enough.
4  MR. SHERR: All right, look, I'm not taking
5  any more from you either. You want to depose this witness
6  now, that's fine. You have a notice for the simultaneous
7  time as these other people. I'm making a simple statement
8  for the record. Why does that get you so upset? What is
9  the problem?
10  MS. MONTGOMERY: Sit back and --
11  MR. SHERR: Take your deposition.
12  MS. MONTGOMERY: -- let me conduct my
13  deposition.
14  MR. SHERR: Take your deposition. ·
15  MS. MONTGOMERY: That's why it's a problem.
16  MR. SHERR: Take your deposition and act
17  appropriately, would you.
18  MS. MONTGOMERY: If you have an objection to
19  the 30(b)(6) notice, place it in writing like the rules
20  require you to do.
21  MR. SHERR: I wasn't making an objection. I
22  was making a designation, which I'm entitled to.
23  MS. MONTGOMERY: So you're designating Barry
24  Parks as your 30(b)(6) witness?
25  MR. SHERR: I've made my statement. Now take

**9**

1  your deposition.
2  MS. MONTGOMERY: You're designating Barry
3  Parks as your 30(b)(6) witness as to what?
4  MR. SHERR: Take your deposition.
5  MS. MONTGOMERY: As to what?
6  MR. SHERR: As to information relating to
7  matters relating to the defense of the claims in this
8  lawsuit. Take your deposition.
9  MS. THORP: I believe what you said is that
10  all the defendants in --
11  MR. SHERR: I've made my statement. Now take
12  your deposition.
13
14  BARRY PARKS, called as a witness, being sworn,
15  testified as follows:
16
17  DIRECT EXAMINATION
18
19  BY MS. MONTGOMERY:
20  Q  Mr. Parks, would you state your name for the
21  record, please.
22  A  **Barry Parks.**
23  Q  What's your address?
24  A  **2520 Arbor Bluff Drive.**
25  Q  Arbor Bluff Drive what?

**10**

1    A    Huntingdon.

2    Q    Have you ever been deposed before?

3    A    No.

4    Q    Well, I'm going to give you a few instructions

5    so you understand the nature of the deposition process,

6    which doesn't usually go like this, but I'm going to ask you

7    a series of questions. I'm looking for facts related to

8    this lawsuit. If there is anything that you don't

9    understand about any question that I ask you, you should ask

10   me to clarify it for you, okay.

11          I want to be very clear with you. I want you

12   to understand the question and you are free to ask me for

13   clarification if it's unclear to you.

14          If you need to break or anything, if you need

15   to go to the men's room or something like that, you can do

16   that. You can't break to confer with counsel, but you can

17   break to, you know -- for your own comfort.

18          Are you on any sorts of medications or

19   anything like that that would prevent you from answering

20   questions or understanding questions that are put to you?

21   A    I wouldn't think so.

22   Q    Now, you need to keep your voice up. The

23   court reporter has a difficult time taking down the

24   information if she can't hear you and also we need to wait

25   for each other to -- you know, you need to wait for me to

**11**

1    finish my question and I'll wait for you to finish your

2    answer so we're not interrupting each other because she

3    can't take down two people at once, as she just indicated,

4    okay?

5    A    (Witness nods head affirmatively.)

6    Q    The other thing is that you need to make sure

7    that you give verbal responses for the record. You need to

8    say yes or no, not -- you know, she can't take down shakes

9    of the head or nods of the head or anything, okay?

10   A    Okay.

11   Q    Can you give me just a little information

12   about your background, please. Give me your educational

13   background initially.

14   A    Huntingdon High School.

15   Q    You graduated from high school?

16   A    Yeah.

17   Q    Did you have any post high school education?

18   A    I went a year to technical school.

19   Q    What kind of technical school was that?

20   A    Auto and diesel mechanics.

21   Q    And diesel mechanics?

22   A    (Witness nods head affirmatively.)

23   Q    Have you had any other types of training at

24   all related to the work that you do, for example?

25   A    Just the -- I guess it's PSATS now is in

**12**

1    charge --

2          MS. MALADY:  Pennsylvania State Association of

3    Township Supervisors.

4          THE WITNESS:  They have continuing ed. for the

5    sewage officers. Every two years we renew our license and

6    we have to have a certain amount of credits to do that.

7    BY MS. MONTGOMERY:

8    Q    Well, that brings us -- as a sewage officer,

9    you're talking about?

10   A    Yes.

11   Q    Sewage enforcement officer. So in order to

12   become a sewage enforcement officer, what did you have to

13   do?

14   A    Pass an exam.

15   Q    An exam given by the state?

16   A    Yes.

17   Q    And when did you do that?

18   A    Ninety-one.

19   Q    Did you take any training before sitting for

20   the exam?

21   A    Studied the manual.

22   Q    So there's a manual that the Commonwealth --

23   A    Yeah.

24   Q    -- provides to you?

25   A    And the regulations.

**13**

1    Q    And then you said every two years you have to

2    take -- you have to do an update or some sort of --

3    A    You have to reissue your license and I'd say

4    -- in the last few years, I'd say five, six years, they

5    started a continuing ed.

6    Q    And so you've taken that, right, and you're

7    current on your continuing education requirements?

8    A    Yes.

9    Q    Do you hold any other licenses or certificates

10   other than a sewage enforcement officer license?

11   A    Treatment plant operator.

12   Q    A waste treatment plant?

13   A    Yeah.

14   Q    And that's also with the Commonwealth of

15   Pennsylvania?

16   A    Yes.

17   Q    Did you get that at the same time you got your

18   sewage enforcement officer license?

19   A    No.

20   Q    When did you get that?

21   A    I would guess '93, '94.

22   Q    So are you employed by the county or by the

23   township in that capacity as well with waste treatment

24   operation?

25   A    No, I help with the treatment plant in one

**14**

1 township.
2 Q    In one township?
3 A    (Witness nods head affirmatively.)
4 Q    Not in Jackson Township?
5 A    No.
6 Q    So you're currently employed as the sewage
7 enforcement officer for Jackson Township, correct?
8 A    Probably more under contract with — I'm not
9 employed by them.
10 Q    You have a contract with them?
11 A    I'm hired every — every January when they do
12 re —
13      MR. SHERR:  Reorganization.
14      THE WITNESS:  Reorganization.  They hire
15 people that's going to work with them for that year and I'm
16 hired at that time if they want to have me that year.
17 BY MS. MONTGOMERY:
18 Q    Do you do sewage enforcement work for other
19 townships as well?
20 A    Yes.
21 Q    How many other townships?
22 A    I would say 18.
23 Q    Oh.
24 A    I have 17 other ones.
25 Q    All around Huntingdon County maybe?

**15**

1 A    Fourteen in Huntingdon, four in Bedford
2 County.
3 Q    And plus you do waste treatment plant work
4 for --
5 A    I don't do very -- it's just a very small
6 thing in Hesston, a town of 50 houses.
7 Q    So your sewage enforcement officer work I take
8 it for Jackson Township is not a full-time job?
9 A    Not just for Jackson Township, no.
10 Q    But that is your only -- that is your primary
11 or only source of employment, is as a sewage enforcement
12 officer?
13 A    Yes.
14 Q    For various townships?
15 A    Yes.
16 Q    So how long have you worked for Jackson
17 Township?
18 A    Ten years.
19 Q    Since you first got your license?
20 A    Yes.
21 Q    What did you do prior to your sewage
22 enforcement work?
23 A    Excavating contractor.
24 Q    So you've been a sewage enforcement officer
25 for Jackson Township for 10 years.  To whom do you report

**16**

1 there?
2 A    The supervisors.
3 Q    How do you go about reporting to the
4 supervisors, what's the process?
5 A    Well, any work I do has to go through the
6 supervisors or — I take care of the responsibilities for
7 the sewage officer job for the supervisors.  That's what I'm
8 hired to do.
9 Q    But I think my question was how do you go
10 about reporting to them.  Do you go to the township meetings
11 to report to them or do you file written reports on a
12 regular basis or what?
13 A    Reporting to them about what I do?
14 Q    Yes, about your work.
15 A    Well, there's some things I don't need to
16 contact them about.  There's other things that I have to
17 have their approval on before they can go through the
18 process.  It would depend on where they're starting at.
19 Q    I'm going to back up a second just so we have
20 a clear understanding of what I'm trying to ask you.  I
21 asked you who do you report to and I believe that you
22 answered -- correct me if I'm wrong, I believe that you
23 answered that you report to the township supervisors?
24 A    It depends on — some things I report — I
25 have to check with and I send -- more reports I send to DEP.

**17**

1 Q    I see.  When you --
2 A    What you're calling -- what I'm thinking
3 you're meaning as reports.
4 Q    Yes, I'm using report more sort of generally.
5 You know, if you are assigned some sort of job, you know, if
6 you're assigned a particular project by Jackson Township by
7 the supervisors, what is the process that you use to report
8 back to them?
9 A    I'm not usually assigned the project.
10 Somebody calls usually the secretary and she says -- just
11 says you need to contact me.
12 Q    So the public contacts you directly because
13 they want you to come out and --
14 A    After they know I'm the person they need to
15 deal with.
16 Q    And then if you want to tell the township in
17 some way what is going on with some person who contacts you,
18 how do you go about keeping the township informed of what's
19 going on?  Do you do it orally, do you do it in writing, do
20 you go to the township meetings, a combination of all three?
21 A    Again, it depends on where this is starting at
22 and what people want to do.  If it's an already existing
23 lot, I can do that on my own.  If it's something that
24 requires planning, I do the work and then the planning
25 modules are prepared and then that is presented to the

Case 1:00-cv-01192-SHR    Document 120    Filed 04/18/2003    Page 11 of 100

18

1 township.
2 Q So give me an example of when there's an
3 already existing lot that you can do on your own. Can I
4 have an example of that?
5 A If it's a parcel of ground that existed before
6 1972 and is vacant, no dwellings, I could do testing and
7 issue a permit on that, or if it's been a lot subdivided
8 from a larger tract since -- and approved since 1972, that's
9 an existing lot. I could do testing and approve the permit
10 on that.
11 Q When you started working with Jackson Township
12 was your initial job with them as a sewage enforcement
13 officer or did you serve Jackson Township in any other
14 capacity prior to that?
15 A I started as a sewage officer.
16 Q Is there any sort of opportunity for promotion
17 or anything like that within or is it just once you're the
18 sewage enforcement officer that's it, right?
19 A That's it.
20 Q Is there just one of you for the township?
21 A There's an alternate. In case I have a
22 conflict or I couldn't get to it and something needed done,
23 there's a backup.
24 Q And who is the alternate?
25 A Right now it's Theodore Koch.

19

1 THE REPORTER: Could you spell that.
2 THE WITNESS: It's on the subdivision here.
3 His dad did a subdivision in '91. K-o-c-h.
4 BY MS. MONTGOMERY:
5 Q So if somebody from the public calls you and
6 you can't do it, then they're referred to Mr. Koch, is
7 that --
8 A Yes.
9 Q You mentioned a couple minutes ago that you
10 had done excavation work prior to being licensed as a sewage
11 enforcement officer.
12 A Yes.
13 Q Did you work for yourself?
14 A Yes.
15 Q Did you work at any time for anybody else as a
16 -- in the excavation business?
17 A No.
18 Q When you worked for yourself, did you have
19 employees?
20 A No.
21 Q You didn't have anybody else working with you?
22 A (Witness shook his head negatively.)
23 Q Do you do excavation work in connection with
24 sewage work?
25 A Yes.

20

1 Q Anything else?
2 A Yes.
3 Q And what was that?
4 A Any type of earth moving.
5 Q Do you have any other employment right now
6 besides your sewage enforcement officer work and your
7 occasional -- very occasional waste treatment plant operator
8 work?
9 A No.
10 Q Does Jackson Township have any public sewage
11 facilities? Do they have any -- I guess it would be public
12 sewer, right?
13 A No.
14 Q Town sewer or township sewer or anything like
15 that?
16 A No.
17 Q Does the township have a set of regulations or
18 anything like that that tell you exactly what you're
19 supposed to do with respect to your sewage enforcement
20 officer work?
21 A There's statewide regulations.
22 Q So they don't have anything in addition to
23 that?
24 A Not as far as sewage.
25 Q Do they have any manual or any sort of job

21

1 description or anything like that for you?
2 A It's all state regulation.
3 Q Are you under any sort of a written contract
4 with them?
5 A No.
6 Q You just go to the -- you said in January of
7 every year the township supervisor's vote as to whether or
8 not you're going to be the officer; is that correct?
9 A Yes.
10 Q Do you get a letter of appointment or
11 something like that, you know, a letter appointing you?
12 A I'd probably get a notice that I didn't if I
13 didn't, but I don't recall ever getting a letter.
14 Q Do they send you any -- does the township send
15 you any materials, any sort of written materials, whether
16 they're from the state or from any other source? Does the
17 township -- has the township ever given you any sort of, you
18 know, job description type materials or regulations or
19 anything like that?
20 A That's all Chapter 71, 72, 73 of the sewage
21 code.
22 Q Which you as a licensed sewage enforcement
23 officer have in your possession anyway; is that correct?
24 A Yes.
25 Q In your capacity as the sewage enforcement

22

1  officer for Jackson Township are you required or your
2  alternate -- or is your alternate required to inspect every
3  piece of property on which there's going to be construction
4  for on-lot -- for an on-lot system?
5  A    If it -- almost always, yeah.
6  Q    Are there exceptions to that?
7  A    If there's -- the only thing I can think of is
8  a replacement dwelling. If Mr. Corneal's farmhouse burnt
9  down and he wanted to rebuild within a year the same number
10  of bedroom house, he could do that without a permit.
11  Q    Okay.
12  A    Same number of bedrooms within a year and
13  there's not an ongoing investigation about a malfunctioning
14  system.
15  Q    So I suppose through his building permit
16  application it would be determined that he was looking to
17  build a house with the same -- or a dwelling with the same
18  number of bedrooms; is that correct? That's how you would
19  track this sort of information or this --
20  A    If he was replacing a dwelling, yeah.
21  Q    Let's talk a minute about -- you spoke a
22  moment ago about inspecting properties on which a building
23  is to be constructed for purposes of an on-lot system. Can
24  you just tell me, you know, what that inspection process
25  entails, what do you do? How do you go about that process?

23

1  A    What stage are we? Is this a brand new vacant
2  lot?
3  Q    Yes. just a brand new -- a new property that
4  has no building on it, no septic system on it of any sort.
5  A    Assuming it's an approved lot?
6  Q    An approved building lot.
7  A    It's a DEP approved lot or a prior '72 lot?
8  If the people contact me, I inform them that the first thing
9  we need to do is have a backhoe there to do soil probes,
10  assuming that this hasn't been done prior, you know.
11  Q    To do soil probes, is that what you said?
12  A    Yes.
13  Q    Okay, go ahead. And then what?
14  A    We -- I meet with the backhoe person. The
15  owner can be there if they want to and we look for suitable
16  soil to filter sewage before it gets into the water table.
17  Q    So you do that with the backhoe person? Is
18  anybody else involved in that?
19  A    That's all that needs to be there.
20  Q    Sometimes there are others involved in it?
21  A    If somebody wants to be there.
22  Q    You mean like an architect or whatever, a
23  building supervisor or something like that?
24  A    If the client -- if the property owner would
25  like to have somebody there.

24

1  Q    So is that -- what you're referring to right
2  now, is that what you would call test pits, you're looking
3  for test pits?
4  A    Yes.
5  Q    So you try to find an area that's suitable for
6  test pits, correct? And that's the same as soil probes; is
7  that correct?
8  A    Test pits and soil probes are the same thing,
9  yes.
10  Q    That's what I wanted to know. And then what
11  happens? Once you find suitable areas for test pits, what
12  do you do?
13  A    Well, there's a two-step procedure. The first
14  time we're looking for filter for sewage, filter depth.
15  Then we want to know how well that area takes water so we
16  dig small holes by hand and then do a perc test which means
17  how.good does that area take water.
18  Q    Let's back up one second. First you look for
19  an area that's suitable to filter sewage, is that what you
20  said?
21  A    Yeah.
22  Q    So you're looking for a particular type of
23  soil, correct?
24  A    Yeah, and a depth.
25  Q    And the depth of the soil?

25

1  A    (Witness nods head affirmatively.)
2  Q    And you're looking for it to contain certain
3  components or -- or what are you looking for, is a better
4  way to ask that question?
5  A    Something that's suitable filter.
6  Q    What tells you that it's going to be a
7  suitable filter?
8  A    Well, it doesn't have a limiting zone, which
9  is generally the sign of a high water table, or open
10  channeled rock, which means the sewage can go through that
11  and not get treated before it gets into the water table; or
12  if it's a high water table, the water's already there some
13  times of the year.
14  Q    Okay, you answered my question. So maybe that
15  sort of answers the second part of the question. I thought
16  you had sort of divided it into two. You said you look
17  for --
18  A    There's two limiting zones.
19  Q    And you said one of them is the water table.
20  A    Open channeled rock and sign of a high water
21  table.
22  Q    So after you do that, what happens?
23  A    Is this an existing lot? I fill out soil
24  sheets for that lot. If it is a vacant, ready to build lot,
25  I send that to the person that wants to build with an

26

1  application.  They get a design done, fill out the
2  application, return it to me and I can issue them a permit.
3       Q       The application is what, you mean the sewer --
4  the sewage permit application?
5       A       Yes.
6       Q       Is that what you're talking about?  You send
7  them the application after you go out and do the perc test?
8       A       Yes.
9       Q       Now, you said they design it.  Do you mean
10  sewer modules, is that what you're referring to?
11       A       No, design.
12       Q       They design the --
13       A       In an existing lot you don't need a sewage
14  module.
15       Q       How are you using the term existing lot?
16       A       A lot that was prior to '72.  Like I explained
17  a while ago, prior to '72 that is vacant or one that has
18  been in a subdivision and is vacant.
19       Q       And what's the alternative to an existing lot,
20  what's the other type of lot?
21       A       A proposed lot.
22       Q       When you say lot, you're not talking about a
23  building lot, you're talking about a --
24       A       A building lot.
25       Q       You are talking about a building lot, okay.

27

1       A       Whether it's one acre or a hundred acres.
2       Q       How did you classify Mr. Corneal's property
3  that's the subject of this litigation?
4       A       It isn't a vacant lot.  It has a dwelling on
5  it and at this point it is a lot.  Until it is -- has an
6  approved sewage module, it is a lot.  So it already has a
7  dwelling on it.  To do any more building, we need to have a
8  sewage module approved by DEP and the township.
9       Q       Let's go back now again to -- you talked about
10  after you do the test pits and such and if you find
11  appropriate test pits then you send them to the member of
12  the public or, you know, the person who seeks to build an
13  application, right?
14       A       If it's a vacant lot.
15       Q       If it's a vacant lot.  If it's not a vacant
16  lot, what do you do?
17       A       Then somebody has to prepare a sewage module.
18  If it's going to be subdivided, I mean actually make two
19  different deeds for it, a surveyor must do that.  If you're
20  doing a second dwelling on that lot, DEP calls that an
21  equivalent subdivision.  It still needs a sewage module,
22  still needs township approval and still needs DEP approval.
23  I need a DEP code number before I can send an application
24  and issue a permit.
25       Q       So I'm a little confused and you'll just have

28

1  to help me.  I don't have a lot of experience with sewage
2  enforcement matters so -- except for the ones I have applied
3  for which my husband handles.  If you can just explain to me
4  -- you said if it's an existing lot, then you need to get a
5  septic design.  If it's a vacant lot, then you need a sewer
6  module, correct, somebody has to design a sewer module; is
7  that correct?
8       A       If it's a vacant lot, meaning a lot before '72
9  or a DEP approved lot, meaning a vacant piece of ground,
10  once you have a lot vacant, then I can issue a -- I'll send
11  you an application with the test results.  You take the test
12  results, give it to a person who can do a design for you.
13       Q       Septic design?
14       A       Yes.  When the design comes back with the
15  completed application, I can issue a permit.
16       Q       So you can issue --
17       A       Assuming that was a DEP approved lot or prior
18  to '72.
19       Q       And then the alternative if it's not a DEP
20  approved lot or prior to '72, which together means -- equals
21  vacant lot, correct?
22       A       Yep.
23       Q       If it's not that, then what is it?
24       A       It's a subdivision.
25       Q       And so then what happens?  So you -- backing

29

1  up a second.  You can issue a permit for vacant lots,
2  correct?
3       A       DEP approved or prior to '72.
4       Q       Does it go any further than that?  Does it go
5  any further beyond you?  Does it have to go to the township
6  for second approval or anyone else?
7       A       No.
8       Q       Just you?
9       A       If it's a DEP approved lot, it's already been
10  approved.
11       Q       And so if DEP approves it, where does the
12  township come in itself?  Do they have anything to say about
13  it?
14       A       It had to approve it -- it had to do a module
15  to get it -- send it to DEP before they would approve it.
16       Q       Now I got you.  So going -- assuming you don't
17  have that, then you need to start with the module itself,
18  right?
19       A       Do the testing, then the module.
20       Q       And then what?
21       A       After the module is approved?
22       Q       Yes.
23       A       Then I can issue permits, depending on what
24  the module says.  If the module comes back and it was
25  approved for five lots, then we have five buildable approved

## 30

1　lots. If it said equivalent subdivision or second dwelling
2　subdivision and it comes back, then I can issue a sewer
3　permit -- a sewage system in for that second dwelling.
4　　　　Q　　Who designs the sewer module?
5　　　　A　　The module, if it is a subdivision, meaning
6　actually dividing it, has to be done by a surveyor. If it's
7　a second equivalent subdivision, second house on the lot, it
8　just needs to be somebody that understands the regulations
9　well enough to do it. It can be a consultant and it can --
10　it can still be a surveyor.
11　　　　Q　　So you said that you can issue a permit in two
12　situations when there's a sewer module involved; isn't that
13　correct?
14　　　　A　　I can issue a permit in one --
15　　　　Q　　In one situation?
16　　　　A　　In one situation. If it's prior to '72 lot
17　or if it's a DEP approved lot.
18　　　　Q　　But in that case you're just going with the
19　septic design. We're now talking about the sewer module. I
20　thought you talked about after the sewage module was done
21　there was a situation in which you could issue a permit?
22　　　　A　　Then we have a DEP approved lot after --
23　　　　Q　　If the sewer modules are approved?
24　　　　A　　Yes.
25　　　　Q　　That's what I'm trying to get to. The sewer

## 31

1　modules go to you first for review?
2　　　　A　　Generally.
3　　　　Q　　And if you approve them, how do you indicate
4　that you've approved them?
5　　　　A　　I sign them.
6　　　　Q　　You just sign off on them?
7　　　　A　　Yep.
8　　　　Q　　And that means you've approved them. And then
9　what happens?
10　　　　A　　Then they go to either the -- sometimes
11　they'll go to the planning commission first. Different
12　townships have the option of handling it different, but, you
13　know, on the sewage module I have to sign it. There has to
14　be some indication that the planning commission has looked
15　at -- signed it or looked at it and then the supervisors
16　have to sign it.
17　　　　Q　　You say sometimes it goes to the planning --
18　you're talking about the planning commission first. You're
19　talking about the Huntingdon County Planning Commission?
20　　　　A　　Well, some townships have their own planning
21　commission.
22　　　　Q　　Let's talk about Jackson Township. How do you
23　do it in Jackson Township?
24　　　　A　　I sign them and give them back to the
25　supervisors.

## 32

1　　　　Q　　And that's how you always do it, give them
2　back to the supervisors?
3　　　　A　　Or I may just send them to -- it depends on
4　whether they want them sent to the county.
5　　　　Q　　So sometimes you send them to --
6　　　　A　　And so maybe I give them back to them and they
7　give them to the county or maybe the owner takes them to the
8　county.
9　　　　Q　　It just depends what the supervisors tell you
10　about what they want?
11　　　　A　　It kind of depends on what order things are
12　happening, I guess.
13　　　　Q　　Does Jackson Township have its own planning
14　commission?
15　　　　A　　No.
16　　　　Q　　So sometimes you just give it back to the
17　township and do they sometimes just approve it? Does the
18　township -- do the supervisors sometimes just approve it?
19　　　　A　　Not in recent years.
20　　　　Q　　When you say recent years, can you be more
21　specific, not in how long?
22　　　　A　　Five years, something like that.
23　　　　Q　　In five years. So what did they do instead of
24　just approving it on their own, what did they do?
25　　　　A　　Send it to the county.

## 33

1　　　　Q　　They send --
2　　　　A　　The sewage module to the county.
3　　　　Q　　For the county's approval?
4　　　　A　　Yes.
5　　　　Q　　Or disapproval?
6　　　　A　　Yes.
7　　　　Q　　Do they approve it -- do they have to approve
8　it before they send it to the county?
9　　　　A　　No.
10　　　　Q　　Do they approve it after they send it to the
11　county? Do they have the right of approval?
12　　　　A　　They have to approve it before it can go to
13　the DEP.
14　　　　Q　　The supervisors do?
15　　　　A　　(Witness nods head affirmatively.)
16　　　　Q　　In Jackson Township now we're talking about.
17　　　　A　　Um-hum.
18　　　　Q　　You approve it, you either give it to them or
19　the customer or you, somebody takes it to the county
20　planning commission in every case?
21　　　　A　　I would say every case.
22　　　　Q　　In every case?
23　　　　A　　I'm not really involved -- after I've looked
24　at it, give it back -- I'm not really involved in it until I
25　get a letter from DEP saying it was approved.

34

1    Q    Once you approve it, you're not really
2 involved in it after that, you say, until --
3    A    Not until the -- it goes to the other chains,
4 as it goes to DEP, when I get that letter from DEP saying
5 I'm authorized to issue permits, I'm out of it. I'm not
6 connected with it.
7    Q    Well, let me see if we could discuss this a
8 little more. You worked for the township for 10 years, you
9 say?
10   A    Yes.
11   Q    So at some point did the township approve
12 modules after you did an initial approval without sending it
13 to the Huntingdon County Planning Commission?
14   A    Yes.
15   Q    Do you know why they changed doing that?
16   A    When -- it was about the time Ann Wirth became
17 secretary.
18   Q    And did she change it?
19   A    The township has the option of -- on a minor
20 subdivision which is less than 10 -- 10 building lots, the
21 township has the option of sending it to the county. The
22 fellow that was secretary before was also one of the
23 supervisors, way back, before I was even involved, and
24 generally they didn't send them to the county. On a major
25 subdivision it's required, but Ann --

35

1    Q    What?
2    A    They just decided to start sending everything
3 to the county.
4    Q    When Ann came on board?
5    A    It seemed like it was about that time. Again,
6 I'm not in that -- in that little phase. My thing is the
7 same whether the county -- some townships do, some don't.
8    Q    But in any event, every sewer module goes
9 through you first, correct? In Jackson Township we're
10 talking about. It goes through you first?
11   A    Yeah, or the alternate.
12   Q    Or the alternate, correct. Typically, you
13 know, do you have a time line for receiving the sewer
14 module, looking it over and either approving or disapproving
15 it? How long does it typically take you to do that?
16   A    I think -- I think it's required -- it's in
17 the regulation. I try to get rid of them in a day or -- in
18 a week or two.
19   Q    And then typically -- when they go to the
20 county for approval, okay, they come back to the township
21 from the county, correct?
22   A    Yep.
23   Q    And then the township has to give approval,
24 correct?
25   A    Yes.

36

1    Q    And then the township sends it to DEP?
2    A    Yes.
3    Q    For final approval?
4    A    For their approval.
5    Q    For DEP's approval?
6    A    There is some townships that may send it to
7 DEP and in the meantime there will be another little
8 something that needed done and after it comes back they'll
9 give their final approval on it.
10   Q    What about Jackson Township?
11   A    I'm -- again, I'm a little bit out of that. I
12 just handle the sewage. There's other issues.
13   Q    Do you find out typically like when -- when do
14 you find out whether or not the county has approved a sewer
15 module that you've already preapproved?
16   A    Some things they copy me on but not always.
17   Q    When do you typically find out when the
18 township has -- whether or not the township has approved
19 something that you've preapproved?
20   A    Sometimes it might not be until I get a letter
21 from DEP.
22   Q    But it won't go to DEP unless they've approved
23 it, right?
24   A    Right.
25   Q    Unless the township -- Jackson Township has

37

1 approved it, it won't go to DEP?
2    A    Unless any township approves it, it won't go
3 to DEP.
4    Q    It goes to DEP for approval and then comes
5 back to the township?
6    A    The township gets -- sent the letter, I get a
7 copy.
8    Q    From DEP?
9    A    The landowner would get a copy.
10   Q    And then you can go about installing whatever
11 you do and that's the next step?
12   A    Then I can issue an application.
13   Q    Or a permit -- an application?
14   A    An application for a permit.
15   Q    So then after they have all those approvals,
16 you issue an application for a permit and then what happens?
17   A    Once I have the design and the completed
18 application, I can issue a permit.
19   Q    Are you the last say on that permit once it's
20 gone through all these other processes?
21   A    In most cases.
22   Q    In what situation wouldn't you be the last say
23 on that permit?
24   A    Right now I can't think of any, what it would
25 be.

**38**

1   Q    Have you ever issued a permit in this sewer
2  module scenario that's gone all the way through where it's
3  been disapproved after you've issued a permit? Has that
4  ever happened?
5   A    **The permit?**
6   Q    Yes. In Jackson Township I'm talking about.
7   A    **I can't recall.**
8   Q    You can't recall that it ever happened; is
9  that what you mean?
10   A    **Yeah.**
11   Q    You can't recall an instance of it ever
12  happening?
13   A    **I was trying to think of the time -- if I saw**
14  **or heard something happened on that property that things**
15  **were disturbed and I found that out, I wouldn't be able to**
16  **issue a permit.**
17   Q    But once --
18   A    **But the designer would probably tell me that**
19  **too.**
20   Q    But once you've issued the permit, really was
21  my question, can you think of an instance after you've
22  issued the permit in which the permit was somehow disallowed
23  or disapproved or -- let me say this, your permit issuance
24  was overruled in some way? Can you think of an instance
25  when that occurred?

**39**

1   A    **No. There may have been -- see, a copy -- I**
2  **make three copies. I keep a copy and give -- and it to the**
3  **township, because I've done this, a copy goes to the**
4  **property owner, a copy goes to DEP. There could possibly**
5  **have been a little glitch in the design that the DEP person**
6  **would catch that I missed maybe that -- and I would get a**
7  **letter on it saying that this needs changed or something,**
8  **but as far as it being totally disapproved, I can't think of**
9  **a situation.**
10   Q    For Jackson Township approximately how many
11  sewer modules are you requested to review in a given year?
12   A    **I'm -- some years are busier than others.**
13  **Total modules are probably around a half a dozen.**
14   Q    A year?
15   A    **That's average probably.**
16   Q    Sometimes more, sometime less?
17   A    **(Witness nods head affirmatively.)**
18   Q    Do you know how many you were asked to review
19  in the year 2000?
20   A    **No.**
21   Q    How about so far this year for Jackson
22  Township?
23   A    **I can't think of one.**
24   Q    How about for other townships in general, how
25  many sewer modules have you had to review this year, like

**40**

1  just -- I'm trying to get a feel for your experience really
2  right now. So say in 2000 can you think of how many sewer
3  modules you reviewed altogether for all the townships you
4  perform this kind of work for?
5       MR. SHERR: Let me object to the form of the
6  question in that it's a compound question. You can answer
7  it.
8  BY MS. MONTGOMERY:
9   Q    Did you understand the question? Did you
10  understand --
11   A    **It varies a lot. You know, just like the**
12  **economy, what's -- when things are -- the economy is booming**
13  **people are trying to make building lots. A lot of things**
14  **happen.**
15   Q    Well, I was really asking you for the year
16  2000, or maybe I didn't make that clear and I apologize.
17  For the year 2000 can you estimate for me how many sewer
18  modules that you approved for all the different townships
19  that you work for?
20   A    **Well, there's -- we actually get into**
21  **something a little different there. If you're in an area**
22  **that does not have limestone soils, it is not in a high**
23  **quality watershed, does not have reports of nitrates in the**
24  **water, you can request an exemption from doing the module.**
25  **Half of my -- I'm not figuring -- not exactly, but I'm going**

**41**

1  **to say half my townships we can do that in.**
2  **You can't in Jackson Township because it's**
3  **high quality watershed. So to ask how many modules -- well,**
4  **I'm going to say 10, but it could be 25, you know, just,**
5  **you know, what's happening. One year a person would do a**
6  **major module and the next 10 years he can sell lots without**
7  **doing a module. If three people do three modules, there**
8  **might be a hundred lots out there and you wouldn't have to**
9  **do a module until those hundred lots were sold. So you just**
10  **can't say there's so many done a year.**
11   Q    Well, I didn't really ask for so many a year.
12  I was really asking for the year 2000, is what I was trying
13  to -- are you saying that -- well, no, I'm really asking you
14  just a straightforward question. If you could estimate for
15  me the number of modules that you were asked to review in
16  all the different townships that you worked for during the
17  year 2000, that's all.
18   A    **Estimate?**
19   Q    Yes, that will do.
20   A    **But some of them was able to do the**
21  **exemption. Are you saying in townships that they have to do**
22  **the module?**
23   Q    Yes.
24   A    **Again, 12, 15, I'm going to say.**
25   Q    I think you said for Jackson Township you

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

42

1 reviewed maybe six in the year 2000?
2 A    Not last year.
3 Q    No?
4 A    (Witness shook his head negatively.)
5 Q    I thought you said half a dozen for Jackson
6 Township?
7 A    I said that was an average.
8 Q    An average. You're right, I'm sorry. That's
9 quite right. For the year 2000 do you recall any of the
10 sewer modules -- do you recall any sewer module that you
11 approved initially being disapproved then by the township
12 supervisors?
13      MR. SHERR:  Is this specifically for Jackson
14 Township?
15      MS. MONTGOMERY:  For Jackson Township.
16      THE WITNESS:  You better ask me that again.
17 BY MS. MONTGOMERY:
18 Q    For Jackson Township do you recall for the
19 year 2000 for any of the sewer modules that you approved
20 initially, do you recall any of them being rejected by the
21 township or disapproved, if that's the word you use, by the
22 township?
23 A    I guess Mr. Corneal's.
24 Q    Is that the only one?
25 A    There was a couple others on hold from the

43

1 moratorium but since then they've been approved.
2 Q    Do you recall any of the sewer modules that
3 you approved during the year 2000 being disapproved by the
4 county planning commission as opposed to being disapproved
5 by Jackson Township?
6 A    My understanding of the county planning
7 commission on minor subdivisions is advisory only.
8 Q    Okay. So do you recall the Huntingdon County
9 Planning Commission advising against approval of any of the
10 sewer modules that you had initially approved during the
11 year 2000 for Jackson Township?
12 A    They always find something to comment bad
13 about.
14 Q    They do?
15 A    It seems like it.
16 Q    So they send their comments back to the
17 township and the township can take them or not take them,
18 correct?
19 A    That's the way I understand it.
20 Q    Can you remember back to 1999, do you recall
21 any of the sewer modules that you initially approved being
22 later disapproved by Jackson Township?
23 A    I can't think of one.
24 Q    How about 1998?
25 A    I can't think of anything.

44

1 Q    This may be too much to ask, but let's try for
2 the whole 10 year period you've been working with Jackson
3 Township as the sewage enforcement officer. Do you recall
4 any sewer module that you initially approved being
5 disapproved by Jackson Township?
6 A    Not that I can recall.
7 Q    Let's talk about the testing that you did for
8 the Corneal property, the work that you did on the Corneal
9 property. How did that come about, what was the initial
10 contact?
11 A    I think Mr. Corneal called me early July.
12 Q    Of?
13 A    Ninety-nine.
14 Q    Of 1999?
15 A    (Witness nods head affirmatively.)
16 Q    Had you heard anything about his plans for his
17 property prior to the initial contact that you just spoke
18 about in July of 1999?
19 A    Probably when I first talked to him -- I was
20 dealing with his brother in another township and may have
21 had initially thought it was the brother that I was talking
22 to and he bought it but --
23 Q    You mean Mr. Corneal's brother?
24 A    Yeah.
25 Q    You --

45

1 A    But after a little conversation that was
2 quickly straightened out.
3 Q    That it was David Corneal you were talking to?
4 A    Not the one I was working with in another
5 township.
6 Q    Oh, okay. Now, had you talked to anybody else
7 about Mr. Corneal's property in Jackson Township?
8 A    I don't recall of it.
9 Q    Not that you recall?
10 A    (Witness shook his head negatively.)
11 Q    So the first time you discussed this property
12 and Mr. Corneal's plans for it was with Mr. Corneal?
13 A    That's the way I remember it, yes.
14 Q    Let me ask you this: Before Mr. Corneal
15 bought the property, had you ever had any interaction with
16 anybody or contact with anybody about that property?
17 A    No.
18 Q    Had there ever been any other request that
19 you're aware of for any permit or application or anything
20 like that in connection with that property in Jackson
21 Township that Mr. Corneal bought?
22 A    I remember doing work across the road one day
23 and there was an older fellow there mowing the grass.
24 That's the only thing I ever even saw being done there. I
25 don't remember seeing cars there then, but it's a -- a

**46**

1      little isolated from where I'm usually at.

2      Q    It's an isolated piece of property?

3      A    Not totally, but it's on an old part of the

4      road that's been replaced by a new part of the road.

5      Q    So Mr. Corneal contacted you about July 1999?

6      A    Yes.

7      Q    And what was the substance of that

8      conversation, if you recall?

9      A    Now, I talk to — when I get home tonight, I'm

10      probably going to have 15 calls on my answering machine that

11      I'll spend an hour or two returning after I go to a meeting

12      tonight. So if you figure I talk to a dozen people a day

13      and it's two years ago, I can't really quote conversations

14      on the phone.

15      Q    That's okay, you can —

16      A    It was generally he told me what he wanted to

17      do and I asked him how big a property, how many lots and

18      then told him the first thing we need to do is meet there

19      with a backhoe. That's generally what I explain to people,

20      you know, you're going to be doing a sewage module, your

21      surveyor will do that, but the place we start is see what's

22      there for soil.

23      Q    So you bring — basically you bring an

24      excavator in, right, with a backhoe; is that what you're

25      talking about?

**47**

1      A    Excavator meaning a contractor?

2      Q    Yes.

3      A    There's a machine called an excavator.

4      Q    Right, an individual who performs excavating

5      work you bring in.

6      A    Yeah.

7      Q    Who contacts the individual to do the

8      excavation work?

9      A    It's the property owner's responsibility to

10      line that up.

11      Q    Do you give names occasionally? Do you tell

12      — you know, help people find a local individual involved

13      in excavation work?

14      A    If I'm asked, I'll give a couple names.

15      Q    Do you recall whether you advised Mr. Corneal

16      who to call for excavation work?

17      A    I don't recall.

18      Q    You don't recall?

19      A    (Witness shook his head negatively.)

20      Q    Do you know — do you remember who performed

21      the excavation work for Mr. Corneal?

22      A    Eagle Excavating.

23      Q    Eagle Excavating?

24      A    Um-hum.

25      Q    And are you familiar — very familiar with

**48**

1      that company, Eagle Excavating?

2      A    Yeah.

3      Q    Do you work with them often in the course of

4      your sewage enforcement officer work?

5      A    Yeah.

6      Q    Would you say that you work with them

7      primarily --

8      A    No.

9      Q    -- in Jackson Township?

10      A    No.

11      Q    There are others who perform excavation work

12      for you -- or with you really on projects in Jackson

13      Township?

14      A    They're not — the other people aren't from

15      Jackson Township, but there's other people that work in

16      Jackson Township.

17      Q    Thanks. Well, tell me about Eagle Excavating.

18      What is that company? Who works in that company?

19      A    It's Tom Wilson and his son, I think, but I'm

20      -- I'm just -- those are the contact guys. I —

21      Q    Do you know whether anybody else works for

22      them?

23      A    They have other people, yeah.

24      Q    They have a crew?

25      A    Yeah.

**49**

1      Q    Do you recall whether Mr. Corneal asked you

2      who he might call to help him with the excavating work?

3      A    I don't recall that.

4      Q    So the first time you talked to Mr. Corneal

5      was by telephone, right?

6      A    The way I remember it, yeah.

7      Q    And then you agreed to meet in person at the

8      property with the excavator?

9      A    Yeah.

10      Q    And when did that happen, do you recall,

11      around the same time frame?

12      A    It's on the soil sheets there. 7/21.

13      Q    Ninety-nine you're talking about?

14      A    (Witness nods head affirmatively.)

15      MS. THORP: Is that yes?

16      THE WITNESS: Yes.

17      BY MS. MONTGOMERY:

18      Q    I'm sorry, you need to say yes or no.

19      A    Yes.

20      Q    So you met out at Mr. Corneal's property with

21      somebody from Eagle Excavating?

22      A    Yes.

23      Q    Do you recall who that was that showed up for

24      Eagle Excavating?

25      A    I think it was a nephew.

50

1 Q A nephew of whom?
2 A Tom Wilson's.
3 Q He works for him at Eagle Excavating?
4 A (Witness nods head affirmatively.)
5 Q What's his name?
6 A But it could have been the son.
7 Q What's the nephew's name?
8 A I don't know. I don't take down operator's
9 names. I -- when I see his face, I know his name, but I
10 can't think of it right off.
11 Q You were saying that you could recall his face
12 but not his name, correct?
13 A It's the nephew who works for him.
14 Q Well, do you know his son's name?
15 A They call him TC.
16 Q You said a few moments ago that you sometimes
17 make recommendations in Jackson Township for who might help
18 with excavating work.
19 A No, I don't make recommendations. I may -- if
20 I'm asked, I'll give them some names.
21 Q Do you provide more than one name, two names,
22 what?
23 A A couple.
24 Q You provide a couple?
25 A (Witness nods head affirmatively.)

51

1 Q What names do you typically provide?
2 A Well, the closest ones would be Peters.
3 They're a longtime -- in the next township. They actually
4 do a lot of the road work for Jackson Township. They're
5 second generation. Hoffmasters.
6 Q Anybody else?
7 A Those -- and along with Eagle, those three do
8 the majority of work on that -- that corner of the county.
9 Q When you spoke to Mr. Corneal or heard from
10 Mr. Corneal about, you know, his interest in getting an
11 on-lot system, was that the first time you'd ever spoken
12 with him?
13 A Yes.
14 Q It was, you'd never met him before?
15 A No.
16 Q Had you ever heard of him before?
17 A Again, I heard the Corneal name from working
18 with his brother in another township and I even had him
19 confused with that brother initially. So, no, I didn't know
20 him before.
21 Q So when you went out to Mr. Corneal's property
22 and met with him and I guess the nephew, Tom Wilson's nephew
23 from Eagle Excavating, how long did that visit last?
24 A We were there most of the day.
25 Q So you got out there early in the morning?

52

1 A Probably eight o'clock.
2 Q And just describe for me in your own words
3 with as much detail as you want to give what you did that
4 day.
5 A Went around and -- Mr. Corneal had a -- gave
6 me a map showing roughly what he wanted to do with his
7 proposed parcel. I'm not sure if he owned it then or not.
8 And we went around and tried to find suitable sites on those
9 lots he had marked out.
10 Q So did the nephew from Eagle Excavating come
11 with you on the entire trip?
12 A Whoever was running the backhoe was with us
13 all day, yeah.
14 Q So you actually did some excavating that day,
15 just to test out the soil and such, is that --
16 A Well, we probably did 20 -- 20 soil pits,
17 yeah.
18 Q Was Mr. Corneal with you the whole time?
19 A The majority of the day, I would say, at
20 least.
21 Q Anybody else?
22 A Tom Wilson may have showed up some of the day,
23 but I'm not sure, and I was introduced as -- a younger
24 brother was there for a while.
25 Q Wilson's younger brother?

53

1 A Mr. Corneal's younger brother.
2 Q Mr. Corneal's younger brother?
3 A He was at that time talking about getting one
4 of the lots. And there may have been a young teenager with
5 him.
6 Q Anybody else that you can think of?
7 A It's two years ago. I've talked to a thousand
8 people since then. That's about the best I can remember.
9 Q Thank you. So you dug about 20 test pits that
10 day. Now, was that the end of the excavating work that you
11 had done in connection with the test pits on Mr. Corneal's
12 property?
13 A I think we did them all in one day, yes.
14 Q You did them all in one day. So what else did
15 you have to do to get to the point where you could -- let me
16 say this. After you did the test pits, what did you do? As
17 a sewage enforcement officer, what did you do next?
18 A The next time I was there Eagle Excavating had
19 prepared perc sites and I did perc tests.
20 Q So you came back. How much later?
21 A I think the soil sheet says August 9th.
22 Q So within a couple weeks you went back out --
23 A (Witness nods head affirmatively.)
24 Q -- to look at the perc -- I'm sorry, to look
25 at the perc tests, right?

54

1    A    To do the perc tests, yeah.
2    Q    To do the perc tests. What did you say Eagle
3    Excavating had prepared, perc sites, is that what you called
4    them --
5    A    Yes.
6    Q    -- perc sites? So they came on a different
7    day and did that?
8    A    In between the time of the probes and the
9    perc. A perc test is when you dig small holes in the area
10   of the big holes, presoakened with water which simulates
11   worst weather conditions. Then they leave water for me. I
12   come out and do the perc test, which is measuring how much
13   drop there is in the water. That converts on a chart to a
14   square footage that -- the slower the perc, the more we have
15   to spread it out.
16   Q    So when you say the lower the perc -- is that
17   what you said?
18   A    The slower.
19   Q    The slower the perc. When you talk about the
20   perc, you're talking about -- are you talking about the
21   recession of the water or the --
22   A    Yeah.
23   Q    The slower the water goes down?
24   A    Yep.
25   Q    So the excavation company fills it with water?

55

1    A    They put 12 inches of water in.
2    Q    And then you wait how long after they do that?
3    A    Eight to 24 hours I come out.
4    Q    And do the perc test?
5    A    Um-hum.
6    Q    And how long does that take you?
7    A    Half hour periods for approximately two hours.
8    Q    So that was your second visit to the property,
9    correct?
10   A    Yeah.
11   Q    Did you have occasion to go a third time prior
12   to issuing whatever you were going to issue in connection
13   with that property?
14   A    I can't recall being there again in '99.
15   Q    So what happened after you looked at the test
16   pits and then did the perc test? Then what happened? What
17   did you do?
18   A    I think as far as Mr. Corneal's property, the
19   next thing would be wait to hear from the surveyor.
20   Q    And what are you waiting to hear from the
21   surveyor?
22   A    That he has the modules completed.
23   Q    So you have to pass on the perc test, right,
24   and the test pits, don't you?
25   A    Yes.

56

1    Q    And do you do that in writing or you just say
2    okay, this looks good or what do you do?
3    A    I do it in writing.
4    Q    And in what form of writing?
5    A    There's a perc result sheet. I just forget
6    the number on it but --
7    Q    It's a form?
8    A    Yeah.
9    Q    A state form?
10   A    Yep.
11   Q    That's the perc result sheet. What about the
12   test pits, is it all part of the same sheet?
13   A    Um-hum.
14   Q    So you did that for Mr. Corneal's property?
15   A    Yes.
16   Q    And you were satisfied with the results?
17   A    We had suitable sites for each lot. Not all
18   test pits were good, not -- but we had a suitable site for
19   each lot, except there was one lot we did not have a
20   suitable site for and -- but -- it wasn't a suitable site
21   for a sand mound.
22   Q    But it could have been a suitable site for
23   something else?
24   A    Possibly.
25   Q    What else?

57

1    A    Spray irrigation.
2    Q    So where was that lot, was that --
3    A    I would say on the eastern end of the
4    property.
5    Q    Was it the one Mr. Corneal intended to build
6    on?
7    A    No.
8    Q    So you signed off on the perc test and the
9    test pits and then you wait for the surveyor to do what?
10   What did you say, come up with a --
11   A    Complete the sewage module.
12   Q    Complete the sewage module. How long does
13   that typically take? It depends on the size?
14   A    I've had them ready the next week and I've
15   waited two years.
16   Q    For Mr. Corneal's property you waited a couple
17   weeks?
18   A    More than that, I think.
19   Q    But eventually you got the sewer modules from
20   the surveyor?
21   A    Yeah.
22   Q    And then what?
23   A    I reviewed them and signed them.
24   Q    So you approved them, correct?
25   A    Yeah.

58

1    Q      Now, did you have any conversations with
2  anybody in between the time you did, starting at the
3  beginning, the soil probe, your test pits -- in between that
4  time and the time you did the perc test, did you have any
5  conversations with anybody about the property?
6    A      Besides the surveyor?
7    Q      Yes.
8    A      And Tom Wilson calling and telling me the perc
9  was ready, the percs were ready?
10    Q      Okay.
11    A      After that was done, I can't recall talking to
12  anybody about the lot.
13    Q      But you talked to the surveyor you said?
14    A      Yeah.
15    Q      Just to discuss the property and move the
16  project along, is that what you did?
17    A      Um-hum.
18    Q      Who is the surveyor?
19         MR. SHERR:  You have to say yes or no.  You
20  can't --
21         THE WITNESS:  Oh, sorry.  Dave Simpson.
22  BY MS. MONTGOMERY:
23    Q      Then after you had the perc test done -- well,
24  let me back up a second.  Tom Wilson called to tell you that
25  the perc sites were ready --

59

1    A      Um-hum.
2    Q      -- for you to come test?
3    A      (Witness nods head affirmatively.)
4    Q      Did you have any other conversation with him
5  about Mr. Corneal's property?
6    A      I can't recall, but in a busy time of the year
7  I may be working on 50 other projects at different phases.
8  They may be from just conversation to approving a module.
9    Q      So after Mr. Wilson called you and said the
10  perc sites are ready and you went and did the perc test, did
11  you then have occasion to talk to him again about Mr.
12  Corneal's property during the period that the sewer module
13  was being prepared?
14    A      I can't recall.
15    Q      You don't recall that.  How about did you talk
16  to anybody else about the property?
17    A      Not that I recall.
18    Q      Did the surveyor contact you to talk about it
19  during that period of time or --
20    A      Yeah.
21    Q      He did?
22    A      (Witness nods head affirmatively.)
23    Q      From time to time?
24    A      He called me once and we talked and I remember
25  meeting him at the courthouse and he showed me maps, but I'm

60

1  not sure if he had modules with him at that time or if he
2  just had questions about pit locations maybe.
3    Q      So the surveyor more or less consulted with
4  you to make sure that he was designing the sewer modules in
5  keeping with what had been approved on the property so far;
6  is that correct?
7    A      Yeah.
8    Q      That's a fair way to say it?
9    A      (Witness nods head affirmatively.)
10    Q      So then you got the sewer modules, right?
11    A      It may have had something to do with the lot
12  that the brother was going to get needed an easement.  I
13  think that was part of it, how he wanted me to lay the
14  easement out.  He had some questions, but that's not
15  unusual.  They usually check with me a couple times so they
16  don't have to do stuff a couple times.
17    Q      Have you worked with Mr. Simpson on other
18  projects?
19    A      Rarely.  Every couple years I'll work with him
20  on one.
21    Q      So then you got the sewer modules and you
22  approved them, right?
23    A      That's the way I remember it.
24    Q      And then what happened?  What did you do with
25  them?

61

1    A      Got them back to Mr. Corneal.
2    Q      Did you send them to anybody else yourself?
3    A      Again, we're talking almost two years ago.  At
4  that time my wife was -- the company she works for was I
5  think leasing a building owned by Mr. Corneal and somewhere
6  along the way -- either picking them up or getting them
7  there or somewhere along the way she took them to work for
8  Mr. Corneal to pick up.
9    Q      I see.  In State College you mean?
10    A      Yes.
11    Q      So after you approved them, she took them to
12  work for Mr. Corneal to pick up?
13    A      I think it was at that time, yes.
14    Q      Now, after that did you have any further
15  communication with anybody about those sewer modules for
16  purposes of whether or not they should be approved further?
17    A      I don't recall of it.
18    Q      Did Mr. Wilson talk to you about them at all?
19    A      I don't think so.
20    Q      Were you present at any meetings among the
21  Jackson Township supervisors or anybody else wherein those
22  sewer modules were discussed after you approved them?
23    A      I can't recall of it.
24    Q      Did you have an opportunity to talk to anybody
25  from the Huntingdon County Planning Commission?

62

1    A    I don't think I was contacted about that
2  property.
3    Q    You don't think -- so just to be clear, did
4  anybody at all contact you about the property again to ask
5  you questions about your approvals of the sewer modules?
6    A    At some time -- not about the sewer modules.
7  The person that was interested in buying part of it
8  contacted me.
9    Q    Is that Mr. Hewett?
10   A    Yeah. Somewhere along the way wanting to know
11  time frame or something, but I don't remember that
12  conversation word for word. I remember I talked to him.
13   Q    Do you recall what you told him generally, not
14  word for word but generally?
15   A    He couldn't do anything till we had the sewage
16  module approved.
17   Q    Did you expect the sewage modules to be
18  approved?
19   A    Yeah.
20   Q    You did, okay. So let me just -- when did you
21  find out that the sewage modules had not been approved?
22   A    When I said yes, I didn't mean maybe right
23  away. Sometimes there's a little -- things that have to be
24  worked out, but, you know, with the -- if everybody just
25  sticks with the project, why they get approved.

63

1    Q    Well, were these sewage modules approved to
2  your knowledge?
3    A    They must not have been, but, again, that's
4  out of -- I'm out of that process after that, after I've
5  approved them.
6    Q    But did you come to find out that the sewage
7  modules had not been approved?
8    A    I was hearing that, yeah.
9    Q    Who did you hear that from?
10   A    I'm not sure. Mr. Corneal called me mid --
11  early winter 2000 and said about the moratorium and he was
12  wanting to start building and asked if I could issue him a
13  privy permit. So I was getting the idea that, you know, it
14  was held up because of the moratorium on -- and there was a
15  couple others, too, waiting for the moratorium to be done.
16   Q    Moratorium on what?
17   A    On subdivisions in Jackson Township.
18   Q    Did anybody ever call you and ask you -- at
19  any time ask you to discuss with them, you know, any
20  problems with these sewer modules or any concerns at all?
21   A    I don't recall of it.
22   Q    So you say you remember hearing from Mr.
23  Corneal and he asked you to issue him a privy permit, right?
24   A    Yes.
25   Q    And what happened then?

64

1    A    Again, we go way back to when I talked about
2  lot, whether it's one acre or a hundred acres. If it's a
3  vacant lot, prior to '72 you can use a privy, but you can't
4  have piped water or water under pressure, is the way it
5  reads in the regulations. So Mr. Corneal had a lot, but it
6  had piped water and water under pressure on that lot. I
7  know that doesn't maybe make sense, but it's -- it's a
8  quarter mile away, but that's regulation.
9    Q    So when you say he had a lot, you mean his
10  whole huge piece of property that included the farmhouse
11  that already existed?
12   A    (Witness nods head affirmatively.)
13   Q    Right?
14   A    Yep.
15   Q    And all the other things that he had maybe
16  tried to divide into --
17   A    Until there's a DEP approved -- approval it is
18  a lot.
19   Q    So the piped water -- well, let's go back to
20  the privy. So he asked you for a privy permit and what
21  process did you go through after he asked you for that privy
22  permit?
23   A    I think I told him that was the problem with
24  it, that he couldn't use a privy on his property at that
25  time because it had -- technically had water -- piped water

65

1  and water under pressure.
2    Q    But if the property had been subdivided even
3  into two lots, you take the house with the water and then
4  the rest of the property is another lot --
5        MR. SHERR: Object to the form of the question
6  being a hypothetical question. You can answer it.
7  BY MS. MONTGOMERY:
8    Q    Did you understand the question? I didn't get
9  to finish it but -- if the property was divided into two
10  lots, subdivided into just two lots --
11   A    (Witness nods head affirmatively.)
12   Q    -- one being the house with the water on it
13  and the other being the rest of the property which is -- do
14  you know how many acres that is?
15   A    It's 95 acres, isn't it?
16   Q    Something like that. Then would there have
17  been a problem with the privy permit?
18        MR. SHERR: Objection to the form of the
19  question, same basis. You can answer it.
20  BY MS. MONTGOMERY:
21   Q    You can answer.
22   A    If you have a prior '72 lot with no water, you
23  can use a privy. If you have a subdivided lot, meaning a
24  lot subdivided after '72 with DEP approval and it doesn't
25  have piped water and there's a site set aside so if you do

66

1  put water in you can put a system in and the township has a
2  privy ordinance, you can use a privy.
3      Q     Does the township have a privy ordinance,
4  Jackson Township?
5      A     It was part -- I understood it was part of
6  this new subdivision ordinance. I think there is now.
7      Q     Did you discuss issuing the privy permit to
8  Mr. Corneal with anybody else at all before telling him that
9  he couldn't have one?
10     A     I may have told Mr. Corneal I would see if I
11 could think of a way we could do it that meets regulations,
12 but I -- I -- with the water and -- but that's what the
13 regulations say. Now, whether it's one acre or a thousand
14 acres, if it's one parcel it's a lot.
15     Q     Are there provisions for exceptions to that
16 regulation?
17     A     Exceptions is something you don't read in the
18 DEP regulations, except that one I told you about, exception
19 to doing the planning module if you meet the criteria.
20     Q     So you don't know of any exceptions to that
21 general rule?
22     A     No.
23     Q     Well, anyway, there was another question in
24 there that I don't think I quite got an answer to. Did you
25 discuss Mr. Corneal's request for a privy permit with

67

1  anybody else prior to telling him that he couldn't have it?
2      A     Maybe in our conversation I may have said
3  something about I talked to the supervisors. Again, this is
4  going through -- this was going through my mind. I was
5  trying to think of a way that we could do that, but with --
6  I looked -- glanced through the regulations again and I
7  didn't see any way we could do it.
8      Q     Did the supervisors -- did you discuss with
9  the supervisors --
10     A     I don't remember talking to them about that.
11 If I could have found something in the regulations that I
12 could have given a reason for it, I would have done that.
13     Q     Do you go to township meetings, Jackson
14 Township meetings?
15     A     Sometimes, but I -- for a good period there I
16 wasn't to one.
17     Q     A good period where?
18     A     While the moratorium was going on because a
19 lot of times I go to the -- go to them with the landowner to
20 explain to the supervisors what's going on, but if the --
21 there's a moratorium on it there's no reason for me to go to
22 explain because everything is on hold.
23     Q     You said while the moratorium was going on.
24 Is the moratorium still going on in Jackson Township?
25     A     No.

68

1      Q     When was it lifted?
2      A     I think it was the summer of 2000.
3      Q     This is the moratorium on subdivisions, right,
4  in Jackson Township?
5      A     Yes.
6      Q     So since the moratorium has been lifted have
7  you had occasion to discuss Mr. Corneal's property with
8  anybody in, you know -- just about the sewer modules?
9      A     Yeah.
10     Q     Who?
11     A     His attorney.
12     Q     Mr. Corneal's attorney?
13     A     Yes.
14     Q     Which one are you talking about?
15     A     Names a lot of times --
16     Q     Mr. Williams?
17     A     Mr. Williams. Terry Williams, yeah.
18     Q     And what was the occasion for that discussion?
19     A     We met with him a couple times, myself and the
20 supervisors at the Huntingdon Courthouse, and then I met
21 Terry and Mr. Corneal at the property.
22     Q     Well, have you had any discussions with the
23 supervisors about Mr. Corneal's property since the
24 moratorium has been lifted?
25     A     At these -- that's what's discussed at these

69

1  -- when we meet with Terry.
2      Q     But I'm talking about other than meeting with
3  Terry.
4      A     I can't recall of having discussions just to
5  get together to talk about Mr. Corneal's -- we have had a
6  couple meetings to talk with our solicitor at Ann Wirth's --
7  but except for that type of meeting and -- I don't recall of
8  it.
9      Q     You've had meetings with Larry Newton, you
10 mean, township solicitor Larry Newton?
11     A     Larry's been at the meetings at the
12 courthouse, yeah.
13     Q     To talk about Mr. Corneal's property?
14     A     That's what -- that's what it was about, yeah.
15     Q     Have you had any telephone conversations with
16 anybody, with one or more of the supervisors, about Mr.
17 Corneal's property since the moratorium was lifted?
18     A     It's mostly been about a meeting or coming
19 down here.
20     Q     Who have you talked to?
21     A     Usually Ann calls me.
22     Q     She calls you what, to schedule a meeting or
23 something like that?
24     A     Tells me when the meeting is going to be.
25     Q     What is your understanding right now of the

70

1  township's position on Mr. Corneal's sewer modules?
2  A    Incomplete.
3  Q    I'm sorry?
4  A    They're incomplete at this time.
5  Q    The township thinks they're incomplete?
6  A    Yes.
7  Q    Why is that?
8  A    The site that was originally proposed for his
9  home and additional buildings is not suitable to be used.
10  And I met with Mr. -- Terry and Mr. Corneal to discuss that
11  and it was 4/18.
12  Q    April 18th?
13  A    Um-hum.
14  Q    2001?
15  A    (Witness nods head affirmatively.)
16  Q    Well, was this one of the sites that you --
17  was this one of the sites that you had tested before?
18  A    Yes.
19  Q    It was one of the ones that you approved
20  before?
21  A    Yes.
22  Q    And why is it now incomplete?
23        MR. SHERR: I'm going to object to the form of
24  the question because I think it misstates his testimony.
25  You can answer it.

71

1        MS. MONTGOMERY: Well --
2        THE WITNESS: Because in the process of doing
3  the building that you're doing there, they've disturbed the
4  site, is the way it's referred to.
5  BY MS. MONTGOMERY:
6  Q    Who made that determination, that they
7  disturbed the site?
8  A    I did.
9  Q    How did he disturb the site?
10  A    Driveways.
11  Q    What did the driveway do?
12  A    Encroached on the area that the system was
13  intended to be put on.
14  Q    When did you make that determination?
15  A    I was there -- whenever I received the sewage
16  module -- the last time we were at the courthouse I asked
17  Terry if it was all right whenever I received the sewage
18  module if I could enter the property to check to see if
19  these sites that I did approve were still intact, still
20  usable. So when I did receive the modules, I went out to
21  look and determined that they were encroached on too much.
22  Q    When you say encroached on too much, what is
23  your concern?
24  A    There's just -- there's so many driveways and
25  areas that are disturbed there's not room to put the system

72

1  in, put a system in.
2  Q    Is there another spot on that parcel where
3  he's building that would be suitable to put a system in?
4  A    There wasn't at that time.
5  Q    Is there now?
6  A    He's had a soil scientist out there since then
7  and I just reviewed that letter and I guess they've come up
8  with a couple -- a couple sites.  And the soil scientist
9  also confirms in his letter that he agrees that that
10  original site was disturbed and is unusable.
11  Q    Who went out with you when you went to look at
12  it?  You said you wanted to go and see and make sure the
13  sites were still intact.  Who went out with you?
14  A    I was by myself.
15  Q    Is that the only time you went out to look or
16  have you been out again?
17  A    The day I met Mr. Corneal and Terry a couple
18  weeks later.
19  Q    Do you know whether anybody else has been out
20  to the property?
21  A    From the township?
22  Q    Yes.
23  A    Tom Wilson was there to meet with somebody
24  about the driveway, supposed to meet Terry, but I'm pretty
25  sure -- to the best of my knowledge he wasn't back in there.

73

1        MS. MONTGOMERY: I think we need to take a
2  break for just a minute.
3        (Break taken.)
4  BY MS. MONTGOMERY:
5  Q    You testified a couple moments ago that you
6  made a subsequent visit after the moratorium was lifted to
7  look at the Corneal's property, correct?
8  A    When the second sewage module was presented to
9  the township.
10  Q    What do you mean the second sewage module?
11  A    This is the second one.
12  Q    And has this been approved by you?
13  A    It's one I -- the first one I signed that was
14  for the four or five lots.  This one I can't sign because
15  the site isn't there anymore.  I'm signing that there's a
16  suitable site there for the dwellings that are being built.
17  Q    Hang on a second, please.  I want to consult
18  with my client.
19        (Mrs. Montgomery conferred with Mr. Corneal.)
20  BY MS. MONTGOMERY:
21  Q    I'm sorry, you confused me there for a
22  second.  There weren't new modules submitted, right?  It was
23  the same set of modules that you had previously approved;
24  isn't that correct?
25  A    No. Is that it there?  This is -- it's

74

1   requesting approval for an equivalent subdivision, no new
2   lots.
3       Q    Let's go back a second and talk about that.
4   When Mr. Corneal initially submitted these sewage modules,
5   right, he was requesting a subdivision that included a
6   number of different lots, correct?
7       A    Yes.
8       Q    Later he decided, and correct me if I'm wrong,
9   that all he was asking was to have approximately 26 acres
10  that had the existing house on separated from the rest of
11  the property; is that correct?
12      A    That's not what that's requesting there.
13      Q    Well, no, because this isn't -- this isn't a
14  subdivision plan.
15      A    Well, the one that I looked at was not -- it
16  was requesting approval to put a second dwelling on it.
17      Q    Right.
18      A    There was nothing about subdividing.
19      Q    Right, exactly. He's not requesting
20  subdivision anymore, is what I'm saying.
21      A    When you said 26 acres, that would be a
22  subdivision.
23      Q    Initially he asked for a subdivision -- was
24  planning to ask for a subdivision that had a number of
25  different lots contained --

75

1       A    Fall of '99, yes.
2       Q    Right. Subsequently, after you approved his
3   sewage modules, right, for sites on all of those different
4   lots, right --
5       A    Um-hum.
6       Q    -- he changed his mind and said I'm only going
7   to divide this parcel into two properties, correct?
8            MR. SHERR:  I'm going to object to the form of
9   the question as to whether -- asking this witness Mr.
10  Corneal's state of mind.
11  BY MS. MONTGOMERY:
12      Q    Let's just back up a second. When you
13  reviewed the initial sewage modules, was it your
14  understanding that the plan was to divide the property up
15  into about 10 lots, right?
16      A    I would say four or five.
17      Q    So you, correct me if I'm wrong, approved
18  sewage modules in five different places, correct?
19      A    Septic sites, yes.
20      Q    Right, exactly.
21      A    Yes.
22      Q    Your understanding was that it was -- and
23  we'll use your estimate, it was going to be divided into
24  approximately five different lots at least, right?
25      A    Yeah.

76

1       Q    Then later, isn't it correct, that the request
2   was not to subdivide but simply to approve the sewage -- or
3   to allow him to build an additional dwelling on the entire
4   95 acres?
5       A    Yes.
6       Q    And so is it your testimony that you then felt
7   that you had to go out and see whether the original sewage
8   modules that you approved would still be suitable?
9       A    The site was tested for that area where the
10  house was being built. I wanted to make sure that was still
11  a usable site.
12      Q    Did anybody tell you to go and look again?
13      A    The township told me they wanted to make sure
14  that was -- that site was okay.
15      Q    Who at the township told you that?
16      A    It was sort of a -- I think Ann actually said
17  the words.
18      Q    Ann said you should go and look to make sure
19  the site is okay?
20      A    Yeah.
21      Q    So was it Ann's idea that you should go and
22  look and see?
23      A    It was a general thing. They just wanted it
24  to be right.
25      Q    So you went out and you looked -- you knew

77

1   where Mr. Corneal was planning to build?
2       A    The last time we were at the courthouse about
3   this building without permits, I asked Terry Williams if it
4   was all right when I received the module, before I signed
5   it, could I enter the property to check to see if that site
6   at -- where the construction was going on was still a usable
7   site and he gave me permission to do that. So I did -- when
8   I received it, I went out and looked.
9       Q    And now tell me again why you determined that
10  it was no longer a suitable -- that there was no site out
11  there --
12      A    Well, he had had a designer submit a design to
13  me that was like -- in the proximity of 15 by 70 some feet
14  and till you take away all the limiting factors that are
15  there for driveways there's only about 40 feet.
16      Q    But that was a septic design, right?
17      A    Yes.
18      Q    Not a sewage module design, right?
19      A    No, but we have to -- there's no use in
20  approving the sewage module if we don't have -- with
21  marginal conditions if we don't have -- we don't know
22  there's a site there. That's what I'm signing. I'm telling
23  DEP there's a -- you know, this site is okay to put a septic
24  system on and we need your approval.
25      Q    When you initially approved the sewage

**78**

1 modules, okay --
2 A Um-hum.
3 Q -- that you signed off on back in July or
4 August of '99, right?
5 A It was fall of '99.
6 Q Right.
7 A Or even early winter of 2000.
8 Q When you initially approved -- you're right,
9 February. When you initially approved those sewage modules,
10 did you have a specific septic design for each one of the
11 modules that you approved for each one of the sites?
12 A No, there is not a design done till the person
13 applies for a permit. It was a specific site for each
14 proposed lot, except for the one that was going to need more
15 testing if they did spray irrigation on and that was on the
16 other end of the property.
17 Q Right. So you didn't have a specific septic
18 design but you approved the modules anyway, right?
19 A For a specific -- it was a site -- it was a
20 site proposed for each lot.
21 Q And then if you had to make some adjustments
22 to the specific septic that went into each one, you would
23 have done that later on, right?
24 A Yeah, but it would have been working with an
25 undisturbed site.

**79**

1 Q Maybe I didn't understand you, but I thought
2 that you said that you didn't -- well, no, you just tell me
3 in your own words. I won't repeat it back to you.
4 When you went out the second time, okay, you
5 found that you couldn't approve any sewage module out there
6 for Mr. Corneal's building or his house because why?
7 A The site that the design was done for was
8 unusable because of soil compaction from the driveways.
9 Q What's the regulation on how close the septic
10 system has to be, how far it has to be from a driveway?
11 A Ten feet.
12 Q Was the original sewage module that you
13 approved -- was there an original sewage module that you
14 approved for that area that Mr. Corneal wanted to build on?
15 A There was a site there, yes.
16 Q There was a site there?
17 A (Witness nods head affirmatively.)
18 Q Was it more than 10 feet from the driveway?
19 A There was no driveway there.
20 Q When you went back and the driveway was there,
21 was that site more than 10 feet from the driveway?
22 A There wasn't room to put the system there and
23 have the system 10 feet from the driveway.
24 Q What system?
25 A The proposed system.

**80**

1 Q But you don't necessarily have to have the
2 system designed before you approve the sewage module, do
3 you?
4 A Well, you're supposed to have the sewage
5 module approved before you do any building.
6 Q Right.
7 A That's the problem, not the stuff I did.
8 Q Well, I think we're talking in circles a
9 little bit, but let's go back a second. You approved a
10 sewage module on a site that you knew that Mr. Corneal was
11 planning to build on, correct?
12 A That's what he told me, yes.
13 Q All right, good. Then it was disapproved by
14 the township, the township refused to approve it, correct?
15 A The sewage module.
16 Q The sewage modules that you initially
17 approved.
18 A It's a sewage module.
19 Q Well, there's five different forms here which
20 we'll have you identify in a little bit, but in any event,
21 then you went back again after the supposed moratorium was
22 in place, right, because the township --
23 A It was done away with. You mean afterwards?
24 Q It was lifted. Because the supervisors told
25 you to go back and look and make sure the site was still

**81**

1 okay?
2 MR. SHERR: Objection, misstates his prior
3 testimony. You can answer.
4 BY MS. MONTGOMERY:
5 Q Did the supervisors tell you to go back and
6 look to make sure the site was still okay?
7 A They wanted to make sure it was okay.
8 Q So then you go back and you look at all the
9 different sites that you had approved previously, right, and
10 you know where Mr. Corneal was going to build?
11 A (Witness nods head affirmatively.)
12 Q Is your testimony now that there's no place
13 that he can put a septic system that's suitable for his
14 building on any of those previously approved sites where the
15 sewage modules had been approved already?
16 A No, I didn't say that.
17 Q What did you say?
18 A I received -- in the meantime I received a
19 design for his new house. I went and I looked at that
20 site. That site is not suitable because of driveways and
21 soil compaction. There is other sites on that lot.
22 Q That are already approved?
23 A That would be suitable if you wanted to go to
24 the -- if you wanted to go to -- but nobody said anything
25 about wanting to use a site that was 500 yards away.

82

1    Q       Now, you just said nobody talked about using a
2  site that was 500 yards away.  Was there a site 500 yards
3  away that you think is suitable that was already approved by
4  you?
5    A       There is a site that -- on that lot, yes.
6    Q       Now, the site that you think is not
7  appropriate, that you now find is not suitable any more
8  because of the driveway --
9    A       Yes.
10   Q       -- is that more than 10 feet from the
11  driveway, the sewage module, where, you know, the --
12   A       The test --
13   Q       The area.
14   A       The little test pit is 10 feet away but
15  there's not room to put a system in and be 10 feet away.
16   Q       What kind of system?  There's not room to put
17  what kind of -- any kind of system in?
18   A       The sand mound that was designed for that lot,
19  for that dwelling.
20   Q       And now I just need -- I know we're going to
21  around in circles, but I'm really trying to understand your
22  position here.  It's my understanding that you can approve
23  sewage modules without having an actual septic design in
24  front of you and you say this is suitable for some type of
25  septic system, correct?

83

1    A       Um-hum.
2    Q       And that's what you did the first time,
3  correct?
4    A       Yes.
5    Q       Now, the second time you're saying that there
6  was a septic design that Mr. Corneal had in mind for a sand
7  mound; is that what you're saying?
8    A       Um-hum.  Yes.
9    Q       But now you're saying that this module -- or
10  that that couldn't be put in place at that site that you had
11  approved previously, but that was what he was requesting you
12  to do, right?  Was he requesting you to approve a septic
13  system or was he requesting you to approve a sewage module?
14         MR. SHERR:  I'm going to object to the form of
15  the question because that's a compound question.
16  BY MS. MONTGOMERY:
17   Q       Was he requesting you -- during the second
18  round, was he requesting the township to approve a sewage
19  module or a specific septic site, septic system?
20   A       The sewage module, but where I assigned the
21  sewage module I'm saying there's suitable sewage -- suitable
22  areas for that, and what I was -- the design was a little
23  ahead of its time, you know.  I didn't need the design yet.
24   Q       Right.
25   A       But I took the design out and that's what was

84

1  proposed.  There's not room to put that in.  The way it
2  should be done is the sewage module approved, this area
3  staked off, if you're going to use that site, and then you
4  keep your driveways and your house and you keep everything
5  away from that, not illegally go in and do all this building
6  and driveways and disturbed sites and everything and then
7  expect this little area twice as big as this room to
8  accommodate a septic system.
9         MR. CORNEAL:  We need to take a break a
10  second.
11         MS. MONTGOMERY:  We can do it right here.
12         MR. CORNEAL:  No, we need to take a break.
13         (Break taken.)
14  BY MS. MONTGOMERY:
15   Q       Mr. Parks, I want to show you a plot plan which
16  I think you should recognize.  I'm going to move it around
17  so you can see it.
18         MR. SHERR:  Are we going to have this marked?
19         MS. MONTGOMERY:  Yes, when I'm ready.  Right
20  now I'm just using it to talk to him.
21         MR. SHERR:  Please, I'm just asking whether
22  you're going to mark it --
23         MS. MONTGOMERY:  And I just answered you.
24         MR. SHERR:  -- and whether we're going to
25  refer to it.  You don't have to --

85

1         MS. MONTGOMERY:  We're going to identify it.
2  We're going to do it all in good time.
3         MR. SHERR:  Fine.  That's all I was asking
4  you.  My goodness gracious.
5  BY MS. MONTGOMERY:
6    Q       Mr. Parks, have you seen this plan before?
7         MR. SHERR:  This plan being what will be
8  marked soon, we understand, so we'll refer to it on the
9  record as just this plan.
10         MS. MONTGOMERY:  That's right, for now.
11         MR. SHERR:  All right.  And I object to the
12  form of the question.  You can answer.
13         THE WITNESS:  Not in this form.
14  BY MS. MONTGOMERY:
15   Q       You have not seen this plan in this form?
16         MR. SHERR:  Object to the form of the
17  question.
18  BY MS. MONTGOMERY:
19   Q       Let's talk about this plan here.  Have you
20  seen a plan of proposed subdivision from David and Sandra
21  Corneal for this David and Sandra Corneal property?
22   A       I've seen several of them, yes.
23   Q       What is it about the plan that I'm putting in
24  front of you right now that is different from the ones that
25  you've seen?

86

1      MR. SHERR: I'm going to object to the form of
2  the question since the plan has not been marked nor referred
3  to in --
4      MS. MONTGOMERY: The rules don't require me to
5  mark it if I don't want to. Go ahead. Can he answer?
6      MR. SHERR: We don't have to argue objections.
7      MS. MONTGOMERY: Can he answer?
8      MR. SHERR: Of course he can. I'm just
9  stating my objection for the record.
10 BY MS. MONTGOMERY:
11     Q     Okay, let's answer.
12     A     This was two lots and this was a lot. There
13 was at least four. This was a lot -- oh, it is now too.
14     MS. MONTGOMERY: Do we have copies of this
15 exact --
16     MS. THORP: Yes, I just wanted to see what
17 he's referring to.
18 BY MS. MONTGOMERY:
19     Q     So you're saying you've never seen a proposed
20 subdivision plan --
21     A     I never saw this one, no.
22     Q     -- in this form?
23     A     No.
24     Q     April 7, 2000 is what it's marked. Well, if
25 you take a moment and look at this proposed subdivision plan

87

1  that's marked April 7, 2000, are you able to read it? Do
2  you understand what it --
3      A     Um-hum.
4      Q     -- represents?
5      A     It's -- I saw it in basic form but it had more
6  lots.
7      Q     Now, we're going to give you a pen and let you
8  mark for the record where you understand the Corneal's house
9  or proposed building to be.
10     A     Right there it has it.
11     Q     Why don't you mark it for us.
12     MR. SHERR: Again, I'm going to object to the
13 form of the question unless you tell me that you're going to
14 mark this and --
15     MS. MONTGOMERY: I just told you I was going
16 to mark it as an exhibit when I'm ready to mark it.
17     MR. SHERR: And make it as part of the --
18     MS. MONTGOMERY: I just told you that minutes
19 ago.
20 BY MS. MONTGOMERY:
21     Q     So here you go.
22     A     The proposed -- I didn't step it off and
23 measure and everything. The proposed house is fairly close
24 to where it is.
25     Q     Well, just for the record here, I'm going to

88

1  ask you to mark on this plan with this blue pen the spot on
2  the plan that you understand to be where the Corneals are
3  building.
4      MR. SHERR: If you can.
5  BY MS. MONTGOMERY:
6      Q     If you can.
7      A     Well, that's the surveyor's job. I -- just by
8  memory I can't -- I don't even know where the lines were.
9      Q     You can't read the plan?
10     MR. SHERR: No, he can't do what you asked him
11 to do.
12     THE WITNESS: I'm saying the proposed house is
13 close to where -- these two pits here -- if this is
14 accurate, these two pits have driveways and this probably
15 has -- is dug out stuff here. This pit is here, but the
16 driveway is all around it but it doesn't look like -- is
17 there a scale on this, an inch to a hundred maybe?
18     MR. SHERR: One inch to 700 feet.
19     MS. MONTGOMERY: We're going to mark this as
20 Exhibit 1, this April 2000 -- April 7, 2000 plan as Exhibit
21 1, Parks Deposition Exhibit 1. We may come back to it and
22 I'll ask you some more questions about it. We're going to
23 go to another subdivision plan and ask you to talk about
24 that one.
25     (Subdivision plan dated 4/7/00 produced and

89

1  marked as Parks Exhibit No. 1.)
2  BY MS. MONTGOMERY:
3      Q     I'm going to ask you to look at this
4  subdivision plan that's dated February 4, 2000 for the
5  Corneal property and ask you have you seen this plan before?
6      A     No.
7      Q     What plan did you see, do you recall?
8      A     It would have been when I met Dave Simpson in
9  the fall of '99.
10     Q     Well, we're going to ask you the same question
11 with respect to this February 4, 2000 subdivision plan. Can
12 you see on this plan where the Corneal's proposed building
13 for their personal home is?
14     A     I see it, yeah.
15     Q     Can you show it to me?
16     A     Right there.
17     Q     Can you circle it with this pen? Is there any
18 problem?
19     A     Yeah, I can circle it but --
20     Q     Okay, would you do that for me.
21     A     Is that all right?
22     MR. SHERR: If you feel confident, you know,
23 in your ability to show from your memory where on a scaled
24 map his proposed house would be, sure.
25     THE WITNESS: I don't know where this property

90

1　line is and that looks too close to the property line.
2　Right here -- if this is the scale of one inch equals 700
3　feet, those probes are 300 feet apart. They were not 300
4　feet apart. This is not --
5　BY MS. MONTGOMERY:
6　Q　But I'm not asking --
7　A　It's not accurate enough for me to --
8　Q　All I'm asking you to do is tell me where on
9　this plan --
10　A　It's in this area.
11　Q　-- you see -- and I will circle it.
12　　　MS. MONTGOMERY: Let the record reflect that
13　Mr. Parks has pointed to the area that I circled. Does
14　anybody disagree with that? Anybody disagree with that?
15　All right. Now let's look at -- which we're going to mark
16　in a minute.
17　BY MS. MONTGOMERY:
18　Q　Let's look at Parks Exhibit 1, the April 7,
19　2000 plan. Can you point on this plan --
20　A　Same place.
21　Q　Same place.
22　　　MS. MONTGOMERY: So let the record reflect
23　that Mr. Parks has --
24　BY MS. MONTGOMERY:
25　Q　Can you point to it, where you think it is?

91

1　A　Well, it's in this area, yeah.
2　Q　In this area. This is where the Corneals
3　propose to build their property -- I mean their house, all
4　their buildings, right?
5　A　Where the house is being built, yes.
6　Q　Their personal houses, exactly. Now, can you
7　also tell me -- let's work with this one now that you've
8　looked at it and you can see where the Corneals propose to
9　build.
10　　　MS. THORP: This one being Parks Exhibit 1?
11　　　MS. MONTGOMERY: Parks Exhibit 1.
12　BY MS. MONTGOMERY:
13　Q　Are there a number of sewage sites?
14　A　There's a number of sewage probes, yes.
15　Q　Near and around that --
16　A　Yes.
17　Q　-- property that I've circled, this area
18　that --
19　A　On this map, yes.
20　Q　Are these previously approved sites?
21　A　This was an approved site which is -- no
22　longer exists. The perc that I --
23　Q　Let's stick with this one. Let the record --
24　　　MR. SHERR: Wait, let him finish his answer.
25　　　MS. MONTGOMERY: No, we're going to stick with

92

1　this one.
2　　　MR. SHERR: Well, you can't interrupt his
3　answer.
4　　　MS. MONTGOMERY: No, I am going to interrupt
5　his answer because I want to be clear.
6　　　MR. SHERR: Then I'll --
7　BY MS. MONTGOMERY:
8　Q　I'm going to point to this one. You pointed
9　to this one and said this one no longer exists.
10　A　Right.
11　　　MR. SHERR: Let me just object to the question
12　because I don't think the witness was done with his first
13　answer and he should be entitled to finish.
14　BY MS. MONTGOMERY:
15　Q　Are you finished telling me that this one no
16　longer exists, what I'm pointing to?
17　A　Yes.
18　Q　Then I want to talk to you about this one.
19　A　Okay.
20　　　MS. MONTGOMERY: Now, let the record reflect
21　that you are pointing to an area that I guess I'll circle
22　with a red pen, if anybody has a red pen.
23　　　THE WITNESS: If you'd just use the probe
24　numbers, that's the way I would refer to it.
25　BY MS. MONTGOMERY:

93

1　Q　And the probe numbers are what?
2　A　Eight, 9 and 10.
3　Q　So we're going to circle probe numbers 8, 9
4　and 10 and you say that this site no longer exists?
5　　　MR. SHERR: Here's a black one.
6　BY MS. MONTGOMERY:
7　Q　Right? Why does that no longer exist?
8　A　Do you have the letter from Mr. Archmody that
9　was done last week?
10　Q　No, I don't have it with me.
11　A　He says on there that it's no longer suitable
12　because of compaction.
13　Q　What would you have to do to make it suitable
14　-- no longer suitable for what?
15　A　For sand mound.
16　Q　Let's go back to your earlier testimony. Did
17　you testify that first in the process of getting ultimately
18　a septic system on your property first you have modules
19　approved, correct?
20　A　First you do the testing.
21　Q　Right, first you do the testing and you have
22　your modules approved, you get them approved, right?
23　A　Yes.
24　Q　Then you send them off. You approve them, the
25　township approves them, DEP approves them, correct?

94

1   A   Yes.
2   Q   Then they come back --
3   A   Yes.
4   Q   -- and then you issue an application, correct?
5   A   I send out an application, yes.
6   Q   For what?
7   A   A permit to put a -- install a septic system.
8   Q   And the septic system may or may not be
9   suitable for the approved module and you'll figure that out
10  when you get the septic system design, correct, the
11  application with the septic system design; is that correct?
12  A   Say that again.
13  Q   Okay. Once the modules are approved --
14  A   Yeah, and I've sent out the application.
15  Q   You send out an application for a permit for a
16  septic system, right?
17  A   Yes.
18  Q   The module's approved first, septic system
19  approved much later --
20  A   Yes.
21  Q   -- correct? Permit issued much later?
22  A   Not necessarily much later, if things go
23  smoothly. We've done this where this all happened in a
24  month.
25  Q   So here you had an existing module that had

95

1   already been approved -- an existing site that had already
2   been approved by you according to a sewer module that you
3   signed, right?
4   A   There was an okay site there, yes.
5   Q   And you said that you now believe that it is
6   not suitable for a sand mound septic system?
7   A   That's correct.
8   Q   Why would that stop you from approving the
9   module anyway?
10          MR. SHERR: Objection, asked and answered.
11  BY MS. MONTGOMERY:
12  Q   From approving it?
13          MR. SHERR: I'm sorry, were you done?
14          THE WITNESS: I'm signing that there's -- the
15  proposed site is --
16          MR. SHERR: Mr. Corneal --
17          MR. CORNEAL: I was just stretching. Thank
18  you very much, Mr. Sherr, for paying attention to that.
19          MR. SHERR: I always pay attention to you.
20  BY MS. MONTGOMERY:
21  Q   Go ahead.
22  A   In the meantime I got the design for that.
23  Where that design was proposing to use, that site is no
24  longer available.
25  Q   But maybe you got a premature design. That

96

1   wouldn't necessarily stop you from approving the site or
2   some design because that's the first step, right, you
3   approve the site, you approve the sewer modules that
4   indicate that this is the site where you want to build,
5   right, where you want to put in your septic system? Not any
6   particular type of septic system but a septic system,
7   correct?
8   A   Well, it's limited to what type of system can
9   go in there.
10  Q   Right, but if one type can't go in, maybe
11  another type can and that's down the road after you approve
12  the modules, correct?
13  A   But the site still has to be there.
14  Q   Right, but the site is still there, correct,
15  but you just decided that you couldn't approve the module
16  because you couldn't put -- you didn't believe that you
17  could put a sand mound system in there; isn't that correct?
18  A   Not on that site.
19  Q   Could you put some other system in there?
20  A   There's -- possibly.
21  Q   So why not just approve the module, wait for
22  the formal application --
23  A   Well, if you're talking about the micromound
24  stuff, if you look at your paperwork you'll see that is
25  experimental and that still has to be DEP approved and --

97

1   Q   Right, but they all have to be DEP approved,
2   don't they? I mean, any septic system that goes in there
3   has to be DEP approved, correct?
4   A   It has to be done to DEP regulations, but DEP
5   doesn't actually have to approve it. It's already approved
6   in the regulations.
7   Q   So I'm going to ask you why not just approve
8   the module and wait for the formal application for a permit
9   to build a particular septic system there? Why didn't you
10  just approve the module, since it was already approved
11  before, and just wait? You didn't have a formal application
12  for that particular site, did you, for a permit?
13  A   Because we knew there was building going on in
14  that area. I was asked to make sure that the site was
15  there.
16  Q   That doesn't really answer my question. In
17  the normal course of events, you approve a module?
18  A   Normal --
19  Q   Everybody approves a module that has to do --
20  A   In the normal course of events -- sorry.
21  Q   That's all right. Go ahead.
22  A   In the normal course of events, people wait
23  until they have approval before they start building their
24  house.
25  Q   Right, but these aren't the normal course of

98

1  events, of course, here. So going on we say -- what I'm
2  asking you is why wouldn't you just approve the module,
3  approve the site, sign off on the modules, just like you had
4  before, and wait for an application for a permit for a
5  septic system? If it wasn't a suitable septic system, you
6  could deny it then.
7      A     It's just like you said, it's not a normal
8  circumstance.
9      Q     But nevertheless, normally that's exactly what
10 you would do.
11     A     Normally --
12     Q     And you didn't have a formal application, did
13 you, for -- you didn't have a formal application or a permit
14 for a specific septic system, did you, on that site? Did
15 you?
16     A     I had a design which sort of indicates to me
17 that they were planning on doing something there.
18     Q     Well, if somebody had just given that to you,
19 would that be -- would that satisfy all the permit
20 requirements, all the application for permit requirements,
21 would it?
22             MR. SHERR: Object to the form of the
23 question.
24             THE WITNESS: Once I had an approved lot.
25 BY MS. MONTGOMERY:

99

1      Q     Well, we can talk in circles all you want, Mr.
2  Parks, but the question is pretty simple. Did you have an
3  application for a permit --
4      A     No.
5      Q     No, because you didn't have a previous -- you
6  didn't have an approved signed off sewer module, right, and
7  that's the first step, right?
8      A     I didn't have a DEP approval letter that I
9  could do that.
10     Q     DEP approval letter for what?
11     A     That I could issue permits.
12     Q     Right, and that's because first you need
13 modules signed by you and the township, right?
14     A     Right.
15     Q     So first you sign the modules, send it up to
16 DEP, they send it back and then you get a permit for an
17 application for a particular septic system, right?
18             MR. SHERR: Objection. It's been asked and
19 answered.
20 BY MS. MONTGOMERY:
21     Q     But you denied -- correct me if I'm wrong, you
22 refused to sign off on the sewer modules the second time
23 around because you thought they were going to do a septic
24 system of a particular type, not because you had an
25 application for a permit and approved, you know, this or

100

1  that or the other thing but because you thought they might
2  want to build a particular type of septic system that you
3  decided ahead of time wasn't going to be appropriate,
4  right? Is that right?
5             MR. SHERR: Objection, argumentative. You can
6  answer.
7             THE WITNESS: Why did they send me that design
8  if they weren't planning on using it.
9  BY MS. MONTGOMERY:
10     Q     Well, your counsel says this has been asked
11 and answered so I guess we'll move on.
12     A     I can just go by what information I have. And
13 when you get something in writing and here's maps and here's
14 letters and here's this and this, you must think, you know,
15 that's what they want to do, just like, you know, I saw
16 these with five lots and now I see them with three lots and
17 I see them with three different lots and ...
18     Q     Working still with Exhibit 1 here, were there
19 any other sites on this plan that show previously approved
20 sites according to the sewer modules that you signed off on?
21     A     This is still proposed. None of this -- you
22 know, these lines and stuff in here is proposed. Right now
23 this 95 acres has other suitable sites.
24     Q     Right. So why didn't you sign off on those
25 modules this time?

101

1      A     Nobody asked me to approve it on those.
2      Q     Well, the modules are all still in front of
3  the township, right? The modules are all there waiting for
4  approval. I mean, is there anything wrong with approving
5  this module?
6             MR. SHERR: Objection to the form of the
7  question.
8             THE WITNESS: Approving that site for that
9  lot?
10             MS. MONTGOMERY: Yes.
11             THE WITNESS: That could possibly be done.
12 BY MS. MONTGOMERY:
13     Q     So let's let the record reflect that we're
14 pointing to -- I pointed to on Parks Exhibit 1 an area that
15 has perc numbers 17, 18 and 20, correct? Is that what you
16 were looking at?
17     A     Yeah. Now, I'm not sure if 17 is okay, but
18 there was a good site there.
19     Q     So I'm going to draw with a red pen a circle
20 around where you say there is a good site, in this general
21 area?
22     A     Um-hum.
23     Q     A good site for building that was
24 previously --
25     A     I'm not sure about 17.

102

1    Q      So we'll draw 17 out of it, okay. Any reason
2    why Mr. Corneal can't build a septic system over here for
3    his buildings over here?
4          MS MONTGOMERY: Let the record reflect I'm
5    pointing to the 18, 20 septic --
6          THE WITNESS: It would be possible to do that.
7    BY MS. MONTGOMERY:
8    Q      Anyplace else on this map where it would be
9    possible to put in a septic system in your opinion?
10   A      Has the line dispute been settled on this?
11   Q      What do you mean the line dispute?
12   A      That they met with Mr. Corneal and he
13   explained that the -- there was a line dispute on this lot.
14   This is -- this line is what this person claims and this
15   line is what --
16   Q      Well, does that have some influence on whether
17   or not you can approve any of these -- whether or not -- the
18   modules for the sites here?
19   A      If this belongs to -- does this belong to Mr.
20   Corneal?
21         MS. THORP: Bridget, can you please identify
22   the area that you're referring to here.
23         MS. MONTGOMERY: I'm sorry, we are pointing to
24   an area on Parks Exhibit 1 that's marked by perc numbers 24,
25   25, 26 and 27.

103

1          MS. THORP: Thank you.
2    BY MS. MONTGOMERY:
3    Q      So you're saying that if this line dispute --
4    you tell me. If this line -- if there is a line dispute and
5    it has been resolved, is this a suitable place for a septic
6    system?
7    A      If that's on Mr. Corneal's property, that
8    could possibly be a suitable site.
9    Q      So why wasn't this site approved? Why didn't
10   you sign the module for this site on the second round?
11   A      Again, I'm back to where they more or less
12   told me when they sent me the design they wanted to use that
13   site there. When I met with Mr. Corneal and Terry Williams,
14   they didn't say, okay, we won't use this, we want to pipe it
15   500 yards to another site.
16   Q      So that's your reason that you wouldn't
17   approve for that?
18   A      Yeah.
19   Q      What about the area on Parks Exhibit 1 that's
20   marked by perc numbers 22 and 23?
21   A      I don't think they were any good.
22   Q      You don't think they were any good?
23   A      No.
24   Q      But is it a suitable --
25   A      I don't think it is.

104

1    Q      Why is that?
2    A      There's soil sheets in there. I think there
3    was unsuitable soil there.
4    Q      Anything else? Any other place here that you
5    see on Parks Exhibit 1?
6    A      Any of the sites, except for the backup site
7    for the house, if they wanted to pipe it to that location
8    and build the system, it would be possible to put a system
9    in for where he's building his house.
10         MS. MONTGOMERY: Let's mark the February 4,
11   2000 plan as Parks Exhibit 2.
12         (Site plan dated 2/4/00 produced and marked as
13   Parks Exhibit No. 2.)
14   BY MS. MONTGOMERY:
15   Q      I want to discuss with you a little bit more
16   this area that we've marked on Parks Exhibit 1 around perc
17   numbers 8, 9 and 10. Why is that now not suitable for a
18   sand lot system?
19   A      It's not big enough for one.
20   Q      It's not big enough for one?
21   A      Right. Eight and 9 probably have buildings on
22   -- or no, 8 and 10 probably have buildings on. Nine is in
23   the middle of a little area that isn't big enough to put a
24   system on without going across disturbed area or driveway.
25   Q      What disturbed area? So you're saying it's

105

1    not big enough without using a disturbed area or the
2    driveway, is that what you're saying?
3    A      The undisturbed area isn't big enough for a
4    sand mound.
5    Q      In what way is the area disturbed that makes
6    it now unsuitable for a sand lot system or not big enough
7    for a sand lot system?
8    A      Well, as Mr. Archmody describes it in his
9    report, because of driveways and soil compaction.
10   Q      Now, when you talk about a driveway, what are
11   you talking about? Are you talking about an asphalt
12   driveway?
13   A      Where they've been driving vehicles.
14   Q      Are you talking about an asphalt driveway?
15   A      No.
16   Q      You're talking about some tracks?
17   A      In one spot, yes.
18   Q      Is that the same area that you're talking
19   about compaction occurring?
20   A      Part of it, yeah.
21   Q      How do you resolve that? How could you
22   resolve it to your knowledge? Could you fix that site to be
23   okay?
24   A      That's something you should talk to a soil
25   scientist about. It's an involved procedure.

106

1    Q    So you're not talking about this being too
2    close to like an asphalt driveway within the meaning of say
3    the regulations that say it has to be more than 10 feet from
4    a driveway? You're not talking about that, are you?
5    A    **A driveway doesn't need to be blacktop.**
6    Q    Well, that's true, but you're not talking
7    about an actual driveway, are you?
8    A    **It appears to be driveways. When you drive in**
9    **the road and that's where the road goes is around to the**
10   **buildings and everything and there's been heavy trucks and**
11   **cars and there's been at least macadam shale put down, it's**
12   **a pretty substantial effort to make it a driveway.**
13   Q    And you're saying it's within 10 feet of that?
14   A    **It would be if you put the system in. You can**
15   **not put this system in without going over compacted areas.**
16   Q    I understand your testimony to be that there's
17   an actual defined driveway now. You believe there's an
18   actual defined driveway. It's not blacktop, but it's a
19   defined driveway. Is there also another area that you
20   consider to be compacted?
21   A    **Yes.**
22   Q    Now, if you worked with the compacted area,
23   which is not a defined driveway -- is that correct, it's
24   just an area --
25   A    **There is an area where there's been vehicles**

107

1    **running through that there's been no shale put on.**
2    Q    It's compacted because somebody drove over it?
3    A    **Many times.**
4    Q    Have you ever been faced with that situation
5    where there's been some compacted soil on a proposed sewage
6    site?
7    A    **Yeah.**
8    Q    And what do you do?
9    A    **Generally we refuse it.**
10   Q    You generally refuse it?
11   A    **Yes.**
12   Q    Do you say because it's compacted soil and
13   here's what you've got to do?
14   A    **Yeah, we usually try to find another site.**
15   Q    Well, is there a circumstance in which you
16   didn't just try to find another site but you said, gee, you
17   drove over that and so it's not suitable so here's what
18   you've got to do to make it suitable again?
19   A    **That's something you should talk to the soil**
20   **scientist about. I'm not a soil scientist.**
21   Q    But you are a sewage enforcement officer,
22   right?
23   A    **Yes.**
24   Q    So you have no idea as a sewage enforcement
25   officer -- and we're talking about a compacted area as

108

1    opposed to a defined driveway. You have no idea what you do
2    to make that okay?
3        MR. SHERR:  Object to the form of the
4    question. It's argumentative. You can answer.
5        THE WITNESS:  But this really has nothing to
6    do with the module. It would be possible to probably --
7    under a soil scientist's guidance to dig that out of there
8    and put fresh fill in, but then fresh fill has to set for
9    four years before it can be used.
10   BY MS. MONTGOMERY:
11   Q    Is it your opinion it needs to be dug out, put
12   fresh fill in and sit for four years?
13   A    **If you wanted to use that again, I would want**
14   **to hear -- want a soil scientist to --**
15   Q    To tell you what needs to be done?
16   A    **To tell what needs to be done. That's why**
17   **they go to college for eight years and have a doctorate**
18   **degree.**
19   Q    Mr. Parks, you've been referring to a letter
20   from a soil scientist, that you got a copy of a letter from
21   a soil scientist?
22   A    **Yes.**
23   Q    Did you turn that over to your counsel in the
24   course of our request for production of documents?
25   A    **No.**

109

1    Q    Any reason why not? Do you have a copy of it?
2    A    **I have it in my pickup, but the supervisors**
3    **told me not to bring anything in.**
4    Q    Not to bring anything into the deposition?
5    A    **Yeah.**
6    Q    What about just generally turning over
7    documents in response to a request for production of
8    documents, did anybody ask you to do that?
9    A    **No.**
10   Q    Nobody ever asked you to search your documents
11   in response to a request for production of documents?
12   A    **Ann has the old documents.**
13   Q    But you have other documents apparently, like
14   the soil scientist letter.
15   A    **It just came, I think, yesterday.**
16   Q    It just came yesterday, okay.
17   A    **It was definitely this week.**
18   Q    Do you have any other documents in your
19   possession that you thought were covered by an instruction
20   from the supervisors not to bring that relate to this
21   subdivision, these sewer modules, anything?
22   A    **The thing I printed out of the regulations**
23   **that defines when a sewage module is needed.**
24   Q    What's -- I mean, why do you have that, just
25   specifically for reference in connection with the Corneal

110

1  project?
2      A      Yeah.
3      Q      Where did you get that?
4      A      Out of regulations I have.
5      Q      Do you have anything else in your possession?
6  Not just in your truck, but anywhere in your possession?
7      A      Well, I have a complete set of the
8  regulations.
9      Q      Any other documents related to the Corneal's
10  project?
11      A      I have the map that Mr. Corneal gave me the
12  first day we met there and my original soil -- soil sheets.
13  This looks like the original one there maybe.
14      Q      Do you have any notes or correspondence of any
15  type from anybody other than the letter that you're
16  referring to from the soil scientist?
17      A      I can't think of anything else.
18      Q      What about the plan? You said you had a plan
19  in your possession that you got from Mr. Corneal. Did you
20  turn that over?
21      A      It's the original map that Mr. Corneal gave me
22  the day -- the first day we met there.
23      Q      So you still have that in your possession.
24  Well, okay, fine. I guess you couldn't turn it over if
25  nobody ever really asked you to turn any documents over,

111

1  right?
2          MR. SHERR: Object to the form of the
3  question.
4          THE WITNESS: It was also the map, I believe,
5  that went with the first module. It was just an extra copy
6  that ...
7  BY MS. MONTGOMERY:
8      Q      What about the documents that show the sand
9  mound system that you've been referring to, do you have
10  them?
11      A      I'd given a copy to the township.
12      Q      You gave a copy to the township. In what
13  capacity, what context?
14      A      To show them what he has -- that I received it
15  and it's what he was proposing to put in back there.
16      Q      You have a copy of your own and you gave a
17  copy to the township, right?
18      A      The designer sent me three copies, yeah.
19      Q      Was there ever any other -- you know, any
20  design that was proposed for any other part of the -- any of
21  these other approved sites, previously approved sites on
22  Parks Exhibit 1?
23      A      There was no other designs that I received.
24      Q      At some point did you come to the conclusion
25  that a design that you had received was designed for the

112

1  wrong site on the map? Did you tell somebody, oh, this was
2  -- I got this design, but it's a design for the wrong site?
3      A      No, I didn't tell them that -- oh, yeah, yeah,
4  it did have the wrong soil sheet on it.
5      Q      Tell me what design is that. What are you
6  talking about, just tell me about it in general?
7      A      The site that I -- the design that I received
8  had the criteria on there as far as limiting zone and perc
9  rate and slope for one site, but it -- again, you're asking
10  me to -- it was -- it did have the numbers on for this right
11  here.
12      Q      Okay. Can you point to that again?
13      A      (Indicating.)
14          MS. MONTGOMERY: Let the record reflect that
15  on Parks Exhibit 2 Mr. Parks is pointing to the area on the
16  map that's marked by perc numbers 24, 25, 26 and 27.
17  BY MS. MONTGOMERY:
18      Q      So you received a design --
19      A      The design had this soil sheet on it -- the
20  two of them were mixed up.
21      Q      Let me ask you this: Would that design have
22  worked there to the area that you just pointed to defined by
23  perc numbers 24, 25, 26 and 27?
24      A      I'd have to look at it again.
25      Q      Is that the sand mound design that you're

113

1  talking about?
2      A      Yes.
3      Q      That you've said now isn't suitable for the
4  areas marked by perc numbers 8, 9 and 10?
5      A      Um-hum.
6      Q      Mr. Parks, we had talked a little while ago
7  about a privy permit -- a request for a privy permit, I
8  should say, from Mr. Corneal, okay. Did you receive any
9  telephone calls from any of the supervisors or Ann Wirth
10  about Mr. Corneal's request for a privy permit?
11      A      Not that I recall.
12      Q      Did you receive any instructions, whether in
13  person or by telephone or in writing, from Ann Wirth or any
14  of the supervisors about Mr. Corneal's request for a privy
15  permit?
16          MR. SHERR: Objection to the form of the
17  question. It's been asked and answered. You can answer
18  it.
19          THE WITNESS: I don't recall.
20  BY MS. MONTGOMERY:
21      Q      Do you recall talking to Ann Wirth whether in
22  person or by telephone about whether or not you should help
23  Mr. Corneal in any way in his effort to get an on-site
24  septic system?
25      A      I don't recall of talking to anything except

114

1   what was presented in the module. I'm always trying to make
2   the simplest way for everybody to get through this and on
3   with the other project, but you're asking me, you know,
4   5,000 conversations ago to remember ...
5        Q       Do you recall telling Mr. Corneal that you
6   were told not to do anything to help him get a privy permit
7   or anything else?
8        A       No.
9        Q       For the record, I'm going to ask you to
10  identify a series of documents and tell me what they are.
11       MS. MONTGOMERY: I have copies for counsel.
12  Here's your copy. You can share with your counsel.
13  BY MS. MONTGOMERY:
14       Q       I've just handed you a document, it's stapled
15  together. The first page on it has sewage facilities
16  planning module at the top. Can you look at that and tell
17  me whether or not you recognize the document?
18       A       Well, I know it's a sewage module.
19       Q       Related to what, Mr. Parks?
20       A       The Corneal subdivision.
21       MR. SHERR: Was this -- I'm sorry, was this
22  marked?
23       MS. MONTGOMERY: It's going to be marked. I
24  just told him that we're going to identify these for the
25  record.

115

1        MR. SHERR: It wasn't. I just didn't know
2   whether it was or not, that's all. Real simple.
3        MS. MONTGOMERY: No.
4        MR. SHERR: Keep it simple, easy.
5   BY MS. MONTGOMERY:
6        Q       Can you give me a little more detail on what
7   these are, Mr. Parks?
8        A       Well, this is the DEP form that gets submitted
9   to the township and then to DEP.
10       Q       And did you sign these?
11       A       Well, my signature is -- there's a copy of my
12  signature in here, yeah.
13       Q       So this is the sewage facilities planning
14  module submitted to you from Mr. Corneal's property,
15  correct?
16       A       Where is the original with my signature on
17  it?
18       Q       We wouldn't have it. The township would have
19  it or you would have it. We don't have it. I mean, are --
20  let's look at page 5 of this document.
21       A       Um-hum.
22       Q       Do you see where your signature is, Barry
23  Parks?
24       A       Yep.
25       Q       Is that your signature?

116

1        A       It's a copy of my signature, yeah.
2        Q       What's the certification number there?
3        A       2373.
4        Q       Is that your sewage enforcement officer
5   certification number?
6        A       Yes, it is.
7        MR. SHERR: I think the problem may be this is
8   all odd numbers and it appears as if they were -- it's
9   two-sided, the original is two-sided, and we don't have the
10  other side. If it's a copy you got from me, then I did copy
11  the other pages and attach them to the back of it.
12       MS. MONTGOMERY: You need to go get that
13  original group of documents. That might be the problem.
14       (Discussion held off the record.)
15  BY MS. MONTGOMERY:
16       Q       While she's out, I'm just going to ask you to
17  look at what exists here right now. We may have an
18  incomplete form of this document. Look at what is numbered
19  -- see where you have a page 5 and then the next page it
20  says project narrative? Do you see that?
21       A       Yeah.
22       Q       Do you recall this being submitted to you
23  along with the original sewage facilities planning module
24  submitted by the Corneals? Is this document familiar to you
25  as you're looking at the project narrative?

117

1        (Pause.)
2        THE WITNESS: Can you ask the question again?
3   BY MS. MONTGOMERY:
4        Q       Okay, Mr. Parks. There may be a couple pages
5   missing from this, but is this the sewage facilities
6   planning module that was submitted to you -- a copy of the
7   sewage facilities planning module that was submitted to you
8   by the Corneals that you signed off on?
9        A       Again, we're talking a year and a half ago. I
10  -- I don't think so.
11       Q       Why don't you think so?
12       A       It's not the way I remember the ...
13       Q       Well, let's go back to page 5, okay?
14       A       Yeah.
15       Q       See where it says Barry Parks?
16       A       Yeah.
17       Q       See where it says -- there's a box that is
18  checked that says generally suitable for on-lot disposal,
19  this module does not constitute individual permit approval,
20  right?
21       A       Yeah.
22       Q       Where your signature is and where that's
23  checked, is that generally how you sign off on a sewage
24  module?
25       A       Yes.

118

1    Q      So that would be an approval of the sewage
2  module right there, correct?
3    A      That would be, yeah.
4    Q      Let's go back to the perc tests which are on
5  this copy several -- the fifth page from the back, I
6  believe.  Site investigation and percolation test report for
7  on-lot disposal of sewage.  Is your signature down there on
8  the lower right-hand corner?
9    A      Yes.
10    Q      Does this indicate approval, satisfactory perc
11  test?
12    A      Yes. If we're talking about sites, that 4 and
13  5 doesn't look like -- site and garden.  That 4 and 5
14  doesn't look like my writing, but that is the site and the
15  garden, that is the alternate site for the farmhouse.
16    Q      So this is approval of the perc test for those
17  sites, right?
18    A      That's the alternate site for the existing
19  house.
20    Q      Let's go to the next page.
21    A      That site is 7-A.  It's the one down in back
22  of the pine -- little pine thicket there.
23    Q      So is this also an approval, an approved perc
24  test --
25    A      Yes.

119

1    Q      -- report?  Signed by you in the lower
2  right-hand corner.  Okay, the next page.
3    A      See right there I have marked lot 7.  This is
4  the one we did where Mr. Corneal explained to me how he was
5  going to build his house and his art studio and stuff.
6    Q      And did you approve this --
7    A      It was approved --
8    Q      -- perc test?
9    A      -- between probes 8 and 9, yes, which is the
10  site that I'm saying is no longer available.
11    Q      Okay, how about the next one?
12    A      That's the one that -- the day I was there the
13  younger brother was -- I assumed it was the younger brother.
14  He was there and he was looking at buying a smaller lot up
15  in the corner.
16    Q      For the record, this is the page of this
17  sewage facilities planning module that has a handwritten
18  number 6 at the top, right, a handwritten number 6 up on the
19  top right-hand corner?
20    A      Right.
21    Q      Did you write that number 6 on there?  Is that
22  your handwriting?
23    A      I don't think so.
24    Q      Do you know what it refers to?
25    A      No.

120

1    Q      Is that your signature -- a copy of your
2  signature on the lower right-hand corner?
3    A      Yeah.
4    Q      And is this an approved perc test?
5    A      Yes.
6    Q      And for what perc numbers?
7    A      Eighteen and 20.
8    Q      Can you show on the document or refer for the
9  record to the place on the document that shows where this --
10  where the reference to the perc numbers are?
11    A      The second place you circled in red.
12    Q      But on this document here, how can you tell
13  that this is a perc test approved for perc numbers 18
14  and 20?
15    A      I have it written there above the graph.
16    Q      Where it says peaked between 18 and 20?
17    A      Perked between 18 and 20.
18    Q      I'm sorry, perked between 18 and 20?
19    A      Yes.
20    Q      Now, the next page, which is the last page of
21  this document, what is that?
22    A      That's another approved perc site.
23    Q      For the Corneal property?
24    A      Yeah, it's the one that the soil sheet was
25  used for the design that I received.

121

1    Q      So this is perc numbers -- between perc
2  numbers what, 24 and 26?
3    A      Yeah.
4    Q      Which you have handwritten and that's your
5  handwriting right above the graph in the middle of the page?
6    A      Yes.
7    Q      So you signed off on this perc test as well,
8  correct?
9    A      Yes.
10        MS. MONTGOMERY:  Tony, we just looked at the
11  original that you sent us and we do only have the odd
12  numbers.
13        MR. SHERR:  I don't think --
14        MS. MONTGOMERY:  It's not the original, it's a
15  copy.
16        MR. SHERR:  I don't think I sent this to you.
17  I was just looking for my production and I don't think I
18  sent this to you.
19        MS. MONTGOMERY:  We have it in a pile of
20  documents that we got on Friday afternoon.
21        MS. MALADY:  If you have the even numbers, if
22  you can fax them to me, we'd appreciate it.
23        MR. SHERR:  Yes, I don't -- I'm just looking
24  and I don't think I have -- all I'm saying to you is I don't
25  think I have it.

Case 1:00-cv-01192-SHR   Document 120   Filed 04/18/2003   Page 37 of 100

**122**

1       MS. MONTGOMERY: Well, maybe we're wrong.
2       (Discussion held off the record.)
3       MS. MONTGOMERY: Well, for now, until we get a
4  complete copy, we are going mark this as Parks Exhibit 3 and
5  we'll go from there.
6       (Sewage facilities planning module produced
7  and marked as Parks Exhibit No. 3.)
8       THE WITNESS: Can I say that I would like to
9  see a copy of the whole thing with my signature on it before
10  I say this is the way -- it hasn't been tampered with?
11       MS. MONTGOMERY: Sure.
12       THE WITNESS: Because we're all saying that
13  it's mixed up and --
14       MR. SHERR: To my understanding you haven't
15  said that. You've only identified this as your signature.
16  I don't think you've testified that this was --
17       THE WITNESS: It's been copied and that could
18  have came from -- what you're looking at right there could
19  have been pulled out of another sewage module that was okay
20  and stuck in there.
21  BY MS. MONTGOMERY:
22  Q    I mean, you already testified that you
23  approved the sewage module --
24  A    Yes.
25  Q    -- that was originally --

**123**

1  A    I did. I approved a sewage module. I thought
2  it was for more than -- just sitting here thinking about it,
3  I thought it was more than three lots, the original. That's
4  why I'm thinking this could ...
5  Q    There's four lots, Mr. Corneal is saying.
6  A    But, see, on the front page it says three lots
7  and the original one was -- you know, we have numbers back
8  here on these soil sheets for --
9       MR. CORNEAL: Can we go off the record for a
10  second?
11       MS. MONTGOMERY: We could. I don't mind.
12       (Discussion held off the record.)
13       THE WITNESS: They are my soil sheets and that
14  is a copy of my signature, although I have questions about
15  how this all is together here.
16  BY MS. MONTGOMERY:
17  Q    Mr. Parks, we talked about the moratorium that
18  you referred to some time ago. What was your understanding
19  of the effect of the moratorium on your process of reviewing
20  sewer modules and applications for permits?
21  A    Well, I still handle them the same way. If
22  they get to -- up to the moratorium and there's a moratorium
23  on it, it would just stop them till like Mr. Simpson --
24  well, not the Simpson -- the surveyor. There was another --
25  two brothers, the Simpsons, they were doing the same thing

**124**

1  and they just waited until the moratorium was lifted, we
2  signed the module, sent it off when it was done and they're
3  putting roads in and getting ready to build legally.
4  Q    But the moratorium was supposedly directed to
5  subdivisions, correct?
6  A    Yes.
7  Q    Not to sewer modules or to permits --
8  A    Well, it's part of it.
9  Q    But there wasn't a moratorium on you signing
10  off on sewer modules, was there?
11  A    No.
12  Q    Was there a moratorium on you signing off on
13  septic systems?
14  A    Well, if there's a moratorium -- no, I could
15  still approve septic systems on approved lots. So if
16  somebody -- even during the moratorium, if somebody came
17  with an existing lot, we could still -- that's an existing,
18  that's already been subdivided, we could issue a permit on
19  that.
20  Q    When did the moratorium go into place
21  according to your memory?
22  A    That's really out of my -- you know, I'm --
23  Q    I mean -- well, you said you were aware of it
24  so do you recall when it went into place?
25  A    The winter of '99, 2000.

**125**

1  Q    I'm going to hand you a series of documents
2  that we will mark as Parks Exhibit 4 and I'm going to hand
3  out copies to counsel, the same documents.
4       (Activity records produced and marked as Parks
5  Exhibit No. 4.)
6       MS. MONTGOMERY: Let's just look through and
7  make sure we have the same thing. They should start with --
8  folks, for the record, they should start with a document
9  that says activity record for enforcement of the
10  Pennsylvania Sewage Facilities Act. The first date in the
11  left-hand column being 1/26/00, John Younker. Does
12  everybody have that?
13       MR. SHERR: What was the first date?
14       MS. MONTGOMERY: 1/26/00.
15       MS. MALADY: It may be in reverse order.
16       MS. MONTGOMERY: Are they in reverse order?
17       MR. SHERR: That's okay.
18       MS. MONTGOMERY: If you can just reverse the
19  order, guys, then we can get started.
20  BY MS. MONTGOMERY:
21  Q    Mr. Parks.
22  A    Um-hum.
23  Q    Your first document, does it say 1/26/00?
24  A    Um-hum.
25       MR. SHERR: You have to say yes or no for the

126

1 court reporter.
2        THE WITNESS: I'm sorry, yes.
3 BY MS. MONTGOMERY:
4    Q    Do you recognize this document?
5    A    **Yeah.**
6    Q    Did you fill it out or did you type it out
7 yourself?
8    A    **Yeah.**
9    Q    You did?
10   A    **Well, my wife types them.**
11   Q    So on the 1/26/00 column there it refers to
12 John Younker?
13   A    **Um-hum.**
14   Q    And just tell me what -- just reading across
15 what does that refer to in total?
16   A    **Activity described is an application.**
17   Q    Application for what?
18   A    **Sewage permit. All applications are for a**
19 **sewage permit.**
20   Q    You mean so this is after already existing
21 modules were approved?
22   A    **Yep.**
23   Q    So this is an application for a sewage permit
24 for what?
25   A    **For a septic system.**

127

1    Q    And do you recall -- well, let me look at
2 this. What's in the next column, 2/00? Is that completely
3 unrelated?
4    A    **That's prepare and reimbursement forms for the**
5 **township. That's something we have to do for DEP, reports**
6 **we send in at the end of the year.**
7    Q    So these are two completely unrelated
8 activities, correct?
9    A    **Yep.**
10   Q    So down in the right-hand corner it says
11 period covered February 2000. Is this everything that you
12 did for Jackson Township --
13   A    **Yes.**
14   Q    -- for February 2000?
15   A    **Yes.**
16   Q    So this John Younker application for a --
17   A    **Um-hum.**
18   Q    -- permit for septic system -- is that what it
19 is?
20   A    **Yes.**
21   Q    Do you recall whether you approved that or
22 didn't approve it or what?
23   A    **I approved that.**
24   Q    When did you do that?
25   A    **Well, I --**

128

1    Q    Shortly thereafter?
2    A    **Yeah, existing lot.**
3    Q    It was for an existing lot?
4    A    **Yes.**
5    Q    So this was for an existing lot. Did it have
6 any houses on it?
7    A    **No.**
8    Q    So it was for -- in connection with getting a
9 building permit, correct?
10   A    **Yeah.**
11   Q    Is it in any way subdivided?
12   A    **It was previously subdivided.**
13   Q    It was earlier subdivided?
14   A    **Yeah.**
15   Q    When?
16   A    **I don't recall exactly. It was -- it seems**
17 **like it was -- it was one of those that took a good while**
18 **for the surveyor to get done. I don't recall right off. It**
19 **was one of the slower surveyors who did it.**
20   Q    Was the subdivision approved in 1999? When
21 you say it was previously approved, was it a 1999 approval
22 to your memory?
23   A    **I don't remember.**
24   Q    Let's look at the next page. It should say --
25 3/29/00 is the first date in the left-hand column.

129

1    A    **Yep.**
2    Q    Can you explain to me what that is?
3    A    **The Robert Treaster --**
4    Q    It looks like Treaster.
5    A    **I'm thinking that was a a -- a camp. It may**
6 **have even been on state land. In Jackson Township there's a**
7 **lot of state leased land where they -- back in maybe the**
8 **early 1900's they sectioned off hundred-by-hundred squares**
9 **and people lease them to build a camp on and they own the**
10 **camp but they don't own the land. Every 10 years the lease**
11 **renews.**
12       **When that lease renews, a lot of times the**
13 **park department, DC&A, send me out -- send me a letter to go**
14 **out and inspect there, which is usually a privy, but in some**
15 **cases a few of the real old ones -- they're not supposed to**
16 **have water on site so we usually update their privy. If for**
17 **some reason -- a couple of them have water and there's no**
18 **room to put septics on so we put them in a holding tank. I**
19 **think that's what that was.**
20   Q    So this application is for a holding tank?
21   A    **Yes.**
22   Q    What is a holding tank exactly?
23   A    **Waste carried by water to a sealed vault to be**
24 **pumped out and taken to another site.**
25   Q    So is it different than a privy?

---

**130**

1    A    Yes.
2    Q    Do you know --
3    A    A privy there is no water involved.
4    Q    How did you dispose of this holding tank
5 application?
6    A    I issued a permit for it.
7    Q    And the next one is David Freeman, application
8 for tank replacement, right?
9    A    Yeah.
10    Q    What is a tank replacement?
11    A    It was one that had an undersized tank or a
12 tank that was damaged and an existing house. Like if one
13 would go bad at Mr. Corneal's farmhouse, we would issue a
14 repair permit to -- just to put in a new tank. You're not
15 allowed to modify the field drain any.
16    Q    So this is a holding tank replacement, is that
17 what you're saying or --
18    A    A septic tank replacement.
19    Q    A septic tank replacement?
20    A    A holding tank there is no drain field.
21    Q    So you approved that, right?
22    A    Yes. A repair -- both of these were basically
23 repairs and repairs we must do. It's in regulations that
24 it's our responsibility to -- abatement of a health hazard.
25 Both of these were abatement of a health hazard and it's in

---

**131**

1 the regulation and we must do that.
2    Q    The next page we have a document -- I guess it
3 might be easier to identify it by the reference in the lower
4 right-hand corner, period covered May 2000, right? Do you
5 see that? Do you have it?
6    A    Yep.
7    Q    And the first date on the left-hand corner is
8 5/31/00, correct? Can you tell me what that was, Debra Kerr
9 application for what?
10    A    It's not ringing a bell.
11    Q    Do you see the interim inspection and the
12 final inspection?
13    A    Um-hum.
14    Q    Does that help?
15    A    No.
16    Q    Now, let me ask you something. I mean, you
17 would have actual written applications for these
18 activities --
19    A    Yes.
20    Q    -- that we've been talking about?
21    A    Yes.
22    Q    Where are they kept?
23    A    When I'm done with them, I turn them over to
24 the township.
25    Q    What do they look like, the applications?

---

**132**

1    A    Well, they're legal size paper. The front
2 piece is white. When I send them -- there are actually four
3 carbon copies. There's a white one that stays at the
4 township, there's a pink one that goes to DEP, there's a
5 yellow one that goes to the applicant and there's a green
6 one that is sent into DEP after they are final inspected.
7    Q    So going back to the first two documents, the
8 application for John Younker, the application for the
9 holding tanks, they all go on the same type of application
10 form?
11    A    Yep, the form is the same.
12    Q    The form is the same?
13    A    Yep.
14    Q    And when you're finished with them, you send a
15 copy to the township, right?
16    A    When I'm totally done with it.
17    Q    And this is just one page typically, the
18 application?
19    A    The application is just one page, but there
20 may be there's a soil sheet that goes with it if it's --
21 now, if there's a tank replacement or a holding tank or a
22 privy, there's no soil sheet, but there may be other guides
23 on how to install -- if it's a privy, how to install a privy
24 and isolation distances and -- it's written right on there
25 you can't have indoor plumbing and water on site.

---

**133**

1    Q    So some of the applications are going to be
2 just the one page application, some of them are going to
3 have an attachment or two to them or something like that?
4    A    And if it's a sand mound or a system, it's
5 going to have a design like saying I received --
6    Q    Like one of these, something like this or --
7    A    No, it might have 15, 20 pages in it. It
8 should be everything you need to know about --
9    Q    The design?
10    A    -- installing that septic system.
11    Q    I see. And then when you dispose of these,
12 when you say, okay, approved or granted or something like
13 that, what does that document look like?
14    A    There's just a place I sign off on.
15    Q    So it's the same application?
16    A    Yeah.
17    Q    And you just check off on that and that's a
18 freestanding form, correct, just a single form?
19    A    Yes.
20    Q    And it goes in a file in the township office?
21    A    Yes.
22    Q    Kept by whom?
23    A    Ann.
24    Q    Do you keep any copies for yourself?
25    A    Not usually.

---

## 134

1  Q      So you don't recall what Debra Kerr applied
2  for then?
3  A      No.
4  Q      Then we'll move on to the next sheet.
5  A      Although that -- I think that's one in Ken
6  Miller's subdivision.
7  Q      Ken Miller's subdivision?
8  A      Yeah.
9  Q      Tell me about Ken Miller's subdivision.
10  A      He had -- back Miller Road -- well, it's back
11  the road -- it's right across from Mr. Corneal's driveway.
12  The Millers have owned land two generations out there and
13  it's -- they used to be loggers and now Ken Miller's selling
14  -- subdividing.  We've worked on this all through the
15  nineties.  The last subdivision was approved '98 -- I'd say
16  '98, '99.
17  Q      So you think this was for --
18  A      This is one of the lots.
19  Q      A building lot in Ken Miller's subdivision?
20  A      They're big -- you know, it's the top of the
21  mountain.  He had probably 300 acres and he might have got
22  10 lots.  You know, it's real skimpy stuff.  They're big 20,
23  30 acre lots.
24  Q      So they're 20, 30 acre lots and so people are
25  building individual homes on them?

## 135

1  A      Yes.  I think Kerrs were up there.
2  Q      The next page says period covered May 2000.
3  Do you see that up in the left-hand column?
4  A      May 2000, yes.
5  Q      Then up in the left-hand column it says May 1,
6  2000, 5/1/00?
7  A      That year I probably issued four or five
8  permits in Mr. Miller's subdivision.
9  Q      So you think Drew Tomlinson --
10  A      I'm pretty sure McLaughlin is and -- I think
11  the other one is too.
12  Q      So these are permits for septic systems,
13  on-site septic systems?
14  A      Yep.
15  Q      For whatever, it might be sand mound, it might
16  be something other?
17  A      Up there they're all sand mound.
18  Q      They're all sand mound, okay.  So did you
19  approve Drew Tomlinson's and Mark McLaughlin's to your
20  memory?
21  A      Yes.
22          MR. SHERR:  Could we go off the record for a
23  second?
24          MS. MONTGOMERY:  Yes.
25          (Discussion held off the record.)

## 136

1  BY MS. MONTGOMERY:
2  Q      So now we're at --
3  A      If you'll look on this list here, Ken Miller's
4  subdivision was approved 9/16/97, Ken's Acres.  Now, wait,
5  that isn't it.  Kenwood was Ken Miller and Kenwood and --
6          MR. SHERR:  Just for the record, he's
7  referring to the document I gave you this morning.
8          MS. MONTGOMERY:  Right.  I was just asking
9  Leslie for my copy of that.
10          THE WITNESS:  Oh, right there it was.
11  3/24/99, 16 lots.
12  BY MS. MONTGOMERY:
13  Q      So let's move onto the next sheet which is
14  period covered June 2000.  Up in the left-hand column it
15  says 6/20/2000, June Price, is that ringing any bells with
16  you?
17  A      That -- Ken Miller's was a real happening
18  place there.
19  Q      So is this from the Miller subdivision?
20  A      I think so.
21  Q      And it's an application for an on-lot septic
22  system, right?
23  A      On an approved lot approved in -- prior
24  approved.
25  Q      The next page the period covered is June 2000?

## 137

1  A      I think that was a --
2  Q      It's page 2 of the period covered June 2000?
3  A      Yeah.
4  Q      I'm sorry, that was backwards.  This is page 1
5  of the period covered June 2000 and it begins 6/2/2000.  Do
6  you see that?
7  A      Yeah.
8  Q      Go ahead.
9  A      Again, there's an application for a holding
10  tank.  I think that was a little place that was just -- it
11  had water but there was no place left to put a system in.
12  So, again, abatement of a health hazard, it's our
13  responsibility to issue a holding tank as just a last --
14  last resort, when nothing else will do, short of tearing the
15  house down and making people move.
16  Q      What about William Couch, the next guy down?
17  A      Okay, that's a -- an existing farmhouse that
18  was sold and to sell it the realtors wanted dye tests.  The
19  gray water went to the creek, into the ditch, so I made them
20  put a new system in, which is what the site check, the
21  application -- that's a repair.  Again, that's our
22  responsibility to -- abatement of a health hazard.
23  Q      What's the application/alteration permit?
24  A      That one -- we later put a new system in, but
25  that one was to change the indoor plumbing so that the gray

138

1   water didn't go into the ditch, it went into the septic
2   system.
3       Q      The next one, Roy Augenstein?
4       A      That was for a subdivision I'd say done in
5   '98. It's over an icehouse above the Whipple's Dam Store,
6   old subdivision.
7       Q      So it was an application for what, I'm sorry?
8       A      A new house.
9       Q      For a septic system for a new house?
10      A      Yeah.
11      Q      Did you approve it?
12      A      Yes.
13      Q      Allen Crabtree/Watkins, what's that?
14      A      I -- that is not ringing a bell, but you need
15  to remember I do this in 18 townships and I look at -- I
16  issue a hundred permits a year.
17      Q      Okay, you remembered some of them. So that
18  one is not ringing a bell. Now, the next one it says for
19  period covered August 2000. Now, mine were reversed. So
20  it's page 1 of 2 and page 2 of 2 and I want to start with
21  page 1 of 2. Do you see there it says Joe Baker 8/2/2000?
22      A      Um-hum.
23      Q      Is that ringing a bell?
24      A      Yes.
25      Q      What is that?

139

1       A      I'm not seeing it.
2       Q      It should be page 1 of 2, period covered
3   August 2000. Look at the bottom of the one underneath it.
4            MR. SHERR: No, he doesn't have it.
5            MS. MONTGOMERY: You don't have it?
6            MR. SHERR: No.
7            THE WITNESS: No, but I know him. He'd done
8   an earlier -- Joe Baker, yeah.
9            MR. SHERR: I'll just show him my copy.
10           THE WITNESS: He had an existing house that
11  several years ago he -- oh, it was an existing trailer on
12  four or five acres. We had put a repair in several years
13  ago. There was a malfunction there. He bought it. He
14  wanted to build a house on the other half so he had
15  subdivided it. That had been going on for years.
16  BY MS. MONTGOMERY:
17      Q      Did you approve it? Did you approve his
18  application?
19      A      When I got the proper paperwork and it was
20  properly DEP approved and it was installed and everything,
21  yes. He followed the proper channels and I did approve it.
22      Q      I'm just asking if you approved Joe Baker's
23  application is all. Did you?
24      A      Yes.
25      Q      What about William Guyer?

140

1       A      Mr. Guyer had a couple different places that
2   he -- I don't know if he's retired and if this is kind of a
3   hobby for him or something. He built these two cabins.
4   They look like they were 20 some years old. I don't think
5   they've ever been lived in. They're three-quarter done. He
6   thought he was going to get ambitious and finish them and
7   put a septic system in. I did do testing but he's never
8   submitted an application so it's still --
9       Q      Did you approve the modules?
10      A      There's no module. This was prior to '72.
11      Q      So this just went right to a -- well, you did
12  a probe and a perc?
13      A      They're still on hold.
14      Q      So what's the application refer to, just
15  directly to an application?
16      A      I have an application I'm holding until he
17  gets me a design.
18      Q      And he has cabins up there now?
19      A      They're just little house cabins that he just
20  tinkers around with them, works on them once in a while but
21  nobody lives there.
22      Q      Do they have any septic up there at all now?
23      A      (Witness shook his head negatively.)
24           MR. SHERR: You have to answer out loud.
25           THE WITNESS: No. Nobody is living there.

141

1   They're not occupied.
2   BY MS. MONTGOMERY:
3       Q      So the one underneath William Guyer, that's
4   just the other cabin, right?
5       A      Yes.
6       Q      The next one down. Just for a point of
7   reference here, there's numbers under each of these people's
8   names, like R40132.
9       A      That's a DEP code number.
10      Q      It's a DEP code number. What's the R40132
11  refer to?
12      A      No, that's the application number, the DEP
13  number. That's not the module approval number, that's the
14  number -- each of these applications -- they come in a big
15  tablet. Every one of them, just like a bill sheet, has a
16  number.
17      Q      Well, some of them start with R and some of
18  them start with Q. What's the difference?
19      A      Out of two different tablets.
20      Q      That's it, okay. These two houses from
21  William Guyer are on the same lot, right?
22      A      I don't think so.
23      Q      You think they're on two different lots?
24      A      Yeah, the Guyers broke off a bunch of stuff in
25  the sixties, seventies. These are prior regulations which

142

1  is '72. If you read on top of the module there, it says
2  lots created after May 15th of '72 so we're -- up here.
3  Q    Oh, I see what you're saying, right.
4       MR. SHERR: The witness was referring to what
5  had previously been marked as Parks 3, I believe. I don't
6  know if it's been previously marked.
7       MS. MONTGOMERY: Parks 3, sewage facilities
8  planning module.
9       MR. SHERR: Yes.
10 BY MS. MONTGOMERY:
11 Q    The last -- well, is this the last page? No,
12 not quite. The next page is page 2 of 2 for the period
13 covered August 2000. Do you have that? It starts with
14 Stanley Wensell or something?
15 A    Yeah, Stanley Wensell. Augenstein, that's a
16 -- Stanley is the contractor. Augenstein, a hundred
17 dollars. It had to be a -- just a tank replacement.
18 Q    What about Keystone Financial, Yoder estate,
19 enforcement?
20 A    That was a real estate transfer that -- that a
21 finance company must have requested I do a dye test, or at
22 least a site check on it.
23 Q    Is it an existing lot or something?
24 A    Yeah. Well, if it's a real estate transfer
25 and I'm checking the septic, that means there's a house and

143

1  septic and everything there. They just wanted, for some
2  reason, it looked at to make sure it's not going into a
3  stream or something.
4  Q    What about period covered September 2000, page
5  1 of 1, Donald Dearment?
6  A    Dearment. That must have been -- we did nine
7  probes on it and three percs. We were looking for a -- it
8  was a repair. We had trouble finding a new site and it was
9  repairing a malfunctioning system.
10 Q    And where is this, in a development?
11 A    No, this would be an existing old house. And
12 Jerry Willey was the same thing, a house that maybe was
13 built in the fifties or sixties that now the system is a
14 malfunction so we try, if at all possible, to bring it up to
15 today's standards. Sometimes on lots in that area we have
16 to do a lot of looking around to find a suitable place.
17 Q    So you approved these applications, right?
18 A    Yes.
19 Q    The Willey and Dearment applications?
20 A    Yes.
21 Q    Now, 9/20/2000 -- I'm sorry, go to the next
22 page, period covered October 2000. Thomas -- what is that,
23 Henwood?
24 A    I don't have that one either. The next one --
25 the only one I have left is George Simpson.

144

1       MS. THORP: I have an extra one.
2       (Discussion held off the record.)
3  BY MS. MONTGOMERY:
4  Q    Are you looking at it?
5  A    Yeah.
6  Q    Thomas -- what is it, Henwood?
7  A    I think so.
8  Q    Did we already do him?
9  A    No, I don't think so. I'm not recalling that
10 -- that name. Raymond Tussey was a farmer who just got
11 remarried and they wanted to build a new house. He had a --
12 on his deed it was listed as two tracks of land. So the one
13 smaller track was like 20 acres and it was a vacant parcel.
14 He could -- that was treated as an existing lot because it
15 was existing. So we just did the testing. He didn't need
16 to do a module on it because he built it as one house on one
17 existing lot.
18 Q    So you treated it as an existing lot?
19 A    Yes.
20 Q    So what did he do with his old house?
21 A    I think one of his kids took over the farm.
22 Q    So you approved that. You just went right to
23 the septic system, right, and just approved that
24 application?
25 A    We did testing and permitted and put the

145

1  system in and everything else.
2  Q    Skipped the modules and went right to the --
3  right?
4  A    Well, we didn't have to do the modules. It
5  was a pre-'72 lot.
6  Q    What about this Mr. Esh/Camp Gunsmoke?
7  A    That's one of those state leased that I get
8  the letter on and have to go out. If it's not on a --
9  privy's not on a sealed vault, it's like the old ones used
10 to be with just a hole dug in the ground, we bring it up to
11 today's specs and put it on a sealed vault.
12 Q    This says application for a privy, right?
13 A    Yeah.
14 Q    So do you recall this project?
15 A    I think so. I think it's one of the ones
16 going over the mountain to State College.
17 Q    So you approved this application for a privy,
18 a privy permit?
19 A    Yeah.
20 Q    How about -- the last page I have is March
21 2001.
22      MS. MONTGOMERY: Is everybody else there?
23 BY MS. MONTGOMERY:
24 Q    George Simpson, what's that?
25 A    That was the other -- one of the subdivisions

146

1 that was caught in the moratorium. And when the moratorium
2 was over, they submitted their modules and got an approval
3 and got a permit.
4 I need to clarify something here. You
5 questioned if I approved these applications. If I -- if I'm
6 not going to approve it, I probably didn't send them an
7 application. Because if I think it's to the point where
8 it's going to work, I send an application. As long as I get
9 the design that's going to be suitable for that particular
10 repair or new house or whatever it is, I'm going to issue
11 the permit.
12 Q Now, this George Simpson property, is that a
13 subdivision?
14 A Yes, it was one that was tied up in the
15 moratorium and then it was -- and when the moratorium was
16 over, they submitted their plans in the process and got it
17 approved and I was able to issue them a legal DEP approved
18 permit.
19 Q Did they have to go through the sewage module
20 phase or were they already there?
21 A Again, they were there waiting for the
22 moratorium to be lifted, same as Mr. Corneal. They just
23 waited.
24 Q So they had approved modules?
25 A Yes.

147

1 Q They had approved modules?
2 A Yeah.
3 Q Did you go back out and reinspect their
4 properties to make sure nothing was disturbed?
5 A No, there's been no work done out there.
6 Q So you didn't go back out and disturb -- or
7 inspect their property, that's fine. How many lots?
8 A This Simpson's?
9 Q Yes.
10 A It was two brothers. They split like a
11 hundred and some acres.
12 Q They split it into two big lots?
13 A Yes.
14 Q They're each going to build?
15 A The one brother is real -- wanted to do it
16 right now, the other brother is going to eventually.
17 Q So this is an application for a septic system?
18 A Yes.
19 Q What about -- and you approved it, right?
20 A It was an approved lot.
21 Q Hickory Hats, Timothy Lynch, what's that?
22 A I don't recall, but sometimes I -- if these
23 are a transfer of title or something, the person I talk to
24 isn't necessarily the person that -- especially on a site
25 check. It was just somebody called and said I -- my

148

1 neighbor's -- I think my neighbor's septic is running over
2 on my driveway or something like that. A site check is just
3 I go out and physically walk over the land because there's
4 been a complaint.
5 Q Let me ask you this: Do you keep copies of
6 these activity records for yourself?
7 A Yes.
8 Q Now, these were produced to us by the
9 township.
10 A Um-hum.
11 Q Or by your counsel anyway. And they start in
12 February 2000 and they skip March 2000.
13 A Well, March of 2000 was a pretty bad winter.
14 Maybe I didn't -- sometimes -- I work on an as-needed
15 basis. If there's nothing going on there for three month,
16 I --
17 MR. SHERR: Let her ask the question. I don't
18 think she asked a question.
19 MS. MONTGOMERY: That's all right.
20 BY MS. MONTGOMERY:
21 Q The question is -- really the question is
22 would you please search your records and provide me with --
23 or provide your counsel to provide me with activity records
24 that cover the period from June '99 to the present? We have
25 nothing before February 2000 and then after October 2000 we

149

1 have nothing until March 2001. So I'm just looking for the
2 rest of these documents.
3 A Well, the March 2000 I'm pretty sure -- that
4 was in the middle of the moratorium and the middle of winter
5 and I just didn't do anything probably, but fall of '99 we
6 could do that.
7 Q And what about after March 2001, any that you
8 have after that?
9 A Well, we send these out at the end of the
10 month and in April of 2001 in Jackson Township we probably
11 didn't do anything there.
12 Q What about May?
13 A That's right now.
14 Q This is May 2001.
15 A I haven't done anything in Jackson Township in
16 the last month or so. So it probably ...
17 Q There's a couple more documents I'm going to
18 try to take you through real quickly.
19 MR. SHERR: Could I just call Ann at this
20 point -- could we go off the record.
21 (Discussion held off the record.)
22 BY MS. MONTGOMERY:
23 Q I just want to ask you one question real
24 quickly here before we go back to these documents. You had
25 testified that you wouldn't give Mr. Corneal a privy permit,

150

1   right, when he requested it?
2   A   Yes.
3   Q   Could you have given him a permit for a
4   holding tank?
5   A   Not for a new dwelling.
6   Q   You can't do that?
7   A   Not for a new dwelling. A holding tank for a
8   dwelling is if we have an existing dwelling -- say if the
9   farmhouse would have been on a half acre lot and we went out
10  there and tested for a -- and that system malfunctioned. We
11  went out and we couldn't find a spot to put in a new
12  approved system that meets regulations, then we have to
13  issue a holding tank. That's a Band-Aid. It's a last
14  resort. You know, we're ...
15  Q   Thank you. I'm going to show you a document
16  that we'll mark as Parks Exhibit 5 and ask you if you've
17  ever seen it. It's a February 8, 2000 letter from Blazosky
18  Associates. I have copies for counsel and for the court
19  reporter.
20      (Letter dated 2/8/00 produced and marked as
21  Parks Exhibit No. 5.)
22  BY MS. MONTGOMERY:
23  Q   Have you ever seen this document before?
24  A   It was part of the first module.
25  Q   Do you recall the substance of it?

151

1   A   It was a wetland report.
2   Q   And what does it say --
3   A   That none of the --
4   Q   -- do you recall?
5   A   The sites -- the way I remember it none of the
6   sites were wetlands.
7   Q   None of the sites that you picked -- or that
8   were actually tested?
9   A   (Witness nods head affirmatively.)
10  Q   So did this occur -- this letter come after
11  you approved the module?
12  A   I think it was part of the module.
13  Q   It was part of the module?
14  A   Yeah, I saw it before. I read through and I
15  -- my only question was -- at that time was, you know, the
16  lots they were talking about here -- see, they're talking
17  about five lots and it didn't -- that part didn't really
18  agree with the module but -- and I made a notation that I
19  was concerned about why they didn't coordinate, but, yeah, I
20  saw it before.
21  Q   And the report essentially says that there
22  aren't any wetlands?
23  A   There weren't any wetlands where it was
24  tested.
25  Q   So you saw this before you approved the

152

1   module, right?
2   A   Yeah.
3   Q   Did it influence your decision to approve the
4   module? You weren't satisfied that there weren't any wetlands?
5   A   In a favorable way, yeah.
6   Q   So you haven't encountered any wetlands on the
7   Corneal property in anyplace that the Corneals have sited
8   for placement of a septic system, correct?
9   A   Not the five sites that I approved, no.
10  Q   Does the township require a third party to
11  certify to you that there aren't any wetlands on a
12  particular proposed building site before you issue a sewage
13  module?
14  A   Well, you see on --
15  Q   Or before you approve a sewage module. Just
16  answer the question, does the township require you to get --
17  A   It's one of the things you check off and
18  that's what -- the page that's missing on the module is the
19  check-off list of things you look at on here and one of them
20  is wetlands and floodplain. There's 16 items. You know,
21  they have to show where the sites are and the slope and
22  existing dwellings and surface waters and it comes down to
23  agricultural land, wetlands, floodplain, you know.
24  Q   So in every application or in every request
25  for approval of sewage modules you would get a third party

153

1   to go and certify that there aren't any wetlands?
2   A   If somebody determined there was a question
3   about that.
4   Q   Well, who determines if there's a question
5   about it? In other words, can you walk the property and say
6   I don't see any wetlands and be satisfied with that?
7   A   I'm not certified to delineate wetlands.
8   Q   This is a third party certification that there
9   aren't any wetlands essentially, right?
10  A   And that's why I didn't have a problem with
11  it.
12  Q   And all I'm asking you is you say there's a
13  section on the sewage module form to check off whether there
14  are any wetlands, but you said you'd get a third party in if
15  there was a question about it. So how would you check it
16  off if there weren't any wetlands if there wasn't a third
17  party performing some sort of consulting service and
18  certifying that there aren't any?
19      MR. SHERR: I'm going to object to the form of
20  the question. You can answer.
21      THE WITNESS: Probably -- I'm not sure what
22  you're asking.
23  BY MS. MONTGOMERY:
24  Q   I'll ask you again. Do you ever check off
25  that -- a section on the module, their form, that there

---

154

1 aren't any wetlands without having some sort of consultation
2 from an outside party?
3     A     Yeah, because there's a lot of lands that
4 there's no way there could be a wetland there.
5     Q     Who determines that, you do?
6     A     It depends. Every lot is different. And if
7 there's -- if it's a side of a mountain, you're not worried
8 about that or -- you know --
9     Q     Who asked to have a third party sign off on
10 the wetlands issue in this case?
11     A     I don't know.
12     Q     You have no idea?
13     A     It was just -- it appeared with -- it was with
14 the module when I got it.
15     Q     Back to the other question. In some
16 circumstances you can check off on the form no wetlands
17 without getting anybody involved, right?
18     A     Well, what I -- basically what I do when I get
19 the module, I'm not thinking about anything else. All I
20 look at when I approve a module is are those 16 items on
21 that map. And when the surveyor fills it out, if he -- it's
22 his responsibility to mark the wetlands if they're there.
23     Q     That was my question. I was confused for a
24 minute.
25     A     He can look -- he has a book --

---

155

1     Q     So the surveyor marks no wetlands and the
2 surveyor is the one that fills out the module and -- right?
3     A     Sometimes they'll make a note in here, you
4 know --
5     Q     On the module where there's a place to check
6 off whether there's wetlands, the surveyor checks that off,
7 correct, the survey says yes or no?
8     A     You just -- if it's -- you need to notate it
9 on the map. And if it's not on there, I'm probably going to
10 assume that -- that it wasn't unless I had a suspicion that
11 -- you know, if I went down to do a pit and I walked up a
12 swamp to my ankles, I'm going to -- and it's not on there
13 I'm going to question that.
14     Q     Right. Did you question whether there were
15 wetlands on Mr. Corneal's property?
16     A     I had that form with the module saying there
17 wasn't so -- I'm not going to argue with the engineer.
18     Q     You weren't the one who raised it. You don't
19 know whether any of the supervisors questioned whether there
20 were wetlands and required a third party certification?
21     A     I thought Mr. Corneal did that for his own
22 information. It just -- it was with the module.
23     Q     We're finished with Exhibit 5. Last exhibit.
24 This is a -- it's going to be marked Parks Exhibit 6. I'll
25 give you a copy. I'm going to need to use this one.

---

156

1     (Letter dated 3/24/00 produced and marked as
2 Parks Exhibit No. 6.)
3 BY MS. MONTGOMERY:
4     Q     Did you have a minute to take a look at that?
5     A     Yeah.
6     Q     Have you seen this March 24, 2000 letter from
7 Blazosky before?
8     A     No, I haven't.
9     Q     You have not, okay. So you've never seen this
10 before. Did you know that the Army Corps of Engineers had
11 made a further inquiry into this property?
12     A     No.
13     Q     Did you know that? You had no idea?
14     A     No.
15     Q     Did you know that -- did you ever hear of a
16 complaint being filed in connection with the Corneal
17 property related to wetlands?
18     A     I wasn't aware of it, but I wouldn't
19 necessarily get notified of that unless it was, you know --
20 is there a map that goes with this? What are we trying to
21 decide here?
22     Q     I'm just trying to decide whether you know
23 anything about the letter and the Army Corps of Engineers
24 inquiring into wetlands on Mr. Corneal's property.
25     A     No, I didn't know anything about the Corps of

---

157

1 Engineers being on Mr. Corneal's property. And I knew that
2 the septic system there -- in fact, when Mr. Hewett called
3 me about that, he asked and I recommended him -- there was
4 some ruts in that septic area.
5     Q     By the farmhouse?
6     A     I said to make it last better you should -- on
7 dry -- real dry time grade some topsoil over it so surface
8 water wouldn't lay there. That system, I told him, is on
9 the edge. I didn't actually -- it isn't coming to what I
10 could call malfunctioning, but it's having problems because
11 the soil in there isn't that great and -- but if you get the
12 surface water away from it, you may -- and be careful with
13 your usage it may last longer. That's what I told him.
14     Q     So there was some wet area around that
15 farmhouse?
16     A     Well, it was just the grass grew good there
17 and there was some mower ruts.
18     Q     Understood. So you don't know anything about
19 anybody filing a complaint concerning wetlands on Mr.
20 Corneal's property?
21     A     No.
22     Q     I don't know if I asked you this question, and
23 I apologize if I already did, but did you ever discuss your
24 approval of the sewer module for the Corneal property with
25 the Huntingdon County Planning Commission?

---

158

1  A   I don't think I ever talked to the planning
2  commission.
3  Q   Nobody ever called you or inquired about --
4  anything about it?
5  A   I don't recall of them, no. They rarely call
6  me about -- unless there's maybe a mix-up on the number --
7  some kind of a conflict that -- in the numbering of
8  something and then they might call me to clarify it.
9  Q   What about any of the other supervisors? And
10  if I already asked you, I apologize. I just don't
11  remember. It's been a while. Did you discuss your approval
12  of the sewer modules with any of the supervisors?
13  A   Not that I recall. Like I said, once I
14  approve the module, the next thing I'm involved with it is I
15  get a letter from DEP it's approved. Whether it takes a
16  month or a year, why I'm sort of out of the loop at that
17  point.
18  Q   What about Ann Wirth, did you discuss approval
19  of the sewer modules with Ann Wirth, or the sewer module?
20  It's one module.
21  A   Well, the first ones, you know, they had -- I
22  approved them. I never said I didn't.
23  Q   But then later --
24  A   Talking to people. Again, I'm talking to a
25  dozen people a day. Two years later I can't recall every

159

1  conversation.
2  Q   Did anybody in any capacity, whether with the
3  supervisors or Ann Wirth or the Huntingdon County Planning
4  Commission or anybody, ever discuss with you any instruction
5  not to assist the Corneals in developing their property?
6  A   Definitely not.
7  Q   Nobody has ever given you any instruction like
8  that?
9  A   I wouldn't pay any attention to it if they
10  did. I look at my job as to try to move things along and
11  get things done, not to hassle people and drag things out.
12  You'll see on the --
13  MR. SHERR: You've answered the question.
14  BY MS. MONTGOMERY:
15  Q   So if I understand what you talked about
16  earlier, there was an application -- a renewed application
17  for an on-lot septic system maybe for approval of the
18  modules that was submitted in connection with Terry
19  Williams; is that right, on the Corneal property?
20  A   They had a soil scientist out and he checked
21  for new sites.
22  Q   Was there a new application of any sort
23  submitted?
24  A   No. We have no application until we have an
25  approved module.

160

1  Q   A new module was submitted?
2  A   No, I think Tom Bowes, who is another sewage
3  officer who had the soil scientist come to the site, I think
4  he works with Terry Williams, Tom talked like he was going
5  to modify the modules to show this.
6  Q   Have you been involved in that process at all?
7  A   I had to be away the day -- they had the soil
8  scientist coming down. I didn't know it until the night
9  before, or maybe two nights before, but I couldn't be
10  there. Tom left them open. Tom and I will meet at a later
11  date and look at those sites.
12  Q   One other question for you. I think you
13  testified that Supervisor Wilson came with you when you went
14  back out to look at the Corneal property?
15  A   Yeah, but he only stayed and was meeting Terry
16  Williams about the driveway. The driveway when it was put
17  in was humped up and they were concerned the water from the
18  driveway was running out and washing the road. Tom never
19  went back in the property when I -- that I was aware of.
20  Q   You were out there with him at one point,
21  though --
22  A   We --
23  Q   -- that one day?
24  A   We stood at the end of the driveway waiting
25  for Terry Williams one day.

161

1  Q   Did you have any conversations about the
2  Corneal's efforts to get buildings on their property and
3  their efforts to get approval of their sewage module and so
4  on and so forth with Mr. Wilson?
5  A   I think we just talked about meeting Terry and
6  -- and about the things we had to do with him.
7  Q   Do you know anything about any interest that
8  Mr. Wilson has in this property?
9  A   No.
10  Q   Do you know anything about it?
11  A   No.
12  Q   How long have you lived in -- do you live in
13  Jackson Township?
14  A   No.
15  Q   Where do you live, which township?
16  A   Huntingdon. I live in the borough.
17  Q   How far is that away from the Jackson Township
18  area?
19  A   Twenty mile.
20  MS. MONTGOMERY: I don't think I have any
21  other questions. Anybody else?
22  MS. YANKANICH: I have some questions. I hope
23  everybody can hear me. My throat is a little bit scratchy
24  from the cold that I have.
25

162

1  CROSS-EXAMINATION
2
3  BY MS. YANKANICH:
4      Q      After the moratorium was lifted, you said that
5  you met with Larry Newton to discuss the Corneal property.
6  What specifically did you discuss?
7      A      Well, there's the illegal buildings that are
8  being built on the property without proper permits.
9      Q      When did you have this meeting?
10     A      It's documented in the court. Do you know
11  when those were? I don't know -- they were -- we've had at
12  least three.
13         MR. SHERR: You're referring to conferences
14  that occurred in Huntingdon County Court with Terry
15  Williams?
16         THE WITNESS: Yes.
17  BY MS. YANKANICH:
18     Q      Then prior to the moratorium did you ever have
19  any contact with Larry Newton regarding the Corneal
20  property?
21     A      Prior to --
22     Q      The moratorium being lifted, I'm sorry.
23     A      I don't think so. I don't think Larry -- I
24  don't recall of Larry getting involved with the Corneal
25  property until the lawsuit started.

163

1      Q      So you did not receive any advice from Larry
2  Newton regarding whether you should approve any sewer module
3  that was submitted by David Corneal?
4      A      I don't recall of Larry being involved until
5  the lawsuit started.
6      Q      Until the lawsuit started.
7         MS. YANKANICH: I don't have any further
8  questions.
9         MS. THORP: No questions.
10
11  CROSS-EXAMINATION
12
13  BY MR. SHERR:
14     Q      This meeting that Ms. Montgomery was just
15  asking you about that you had with Terry Williams and Tom
16  Wilson at the end of the driveway, when was that?
17     A      Early April, late March.
18     Q      Of 2001?
19     A      March or April.
20     Q      Of 2001?
21     A      Yes.
22     Q      And you referred to a letter you received from
23  a soil scientist, I think.
24     A      Yes.
25     Q      You received that in the last couple days?

164

1      A      Yeah, it was a copy of what he sent to Mr.
2  Corneal.
3      Q      And the original was sent to Mr. Corneal?
4      A      It has his name at the top, yeah.
5      Q      It had David Corneal's name at the top then?
6      A      Um-hum.
7      Q      You have to say yes or no.
8      A      Yes.
9         MR. SHERR: Thank you.
10         MS. MONTGOMERY: I do have one follow-up
11  question.
12         THE WITNESS: I'm thinking the day Tom and I
13  were there waiting for Terry Williams -- I'm thinking he
14  didn't show up that day and I just left. I don't think I --
15  I don't think I met Terry that day.
16
17  REDIRECT EXAMINATION
18
19  BY MS. MONTGOMERY:
20     Q      So it goes to what you asked. I'm just going
21  to ask you one more question about Mr. Newton. Do you -- in
22  connection with the Corneal property, have you been given
23  advice by Larry Newton about how to deal with this property
24  on which you relied?
25     A      Well, the only time I remember of -- was the

165

1  last meeting we had at the courthouse. At the end of it
2  Terry Williams and Larry Newton were still in the courtroom
3  talking. I went back in to specifically ask Terry Williams
4  when I got the -- you know, we were concerned about the site
5  there at the house being okay.
6         I went back in and specifically asked Terry,
7  when I get the module, is this saying that you have
8  permission to go in there and check this site and he said
9  yes. And Terry -- and Larry was standing there at that
10  time.
11         The meetings -- we had pre -- all the
12  supervisors and the building officer and myself and Larry
13  and Terry Williams had two different meetings at the
14  courthouse --
15     Q      What about --
16     A      -- in a conference room.
17     Q      What about prior to the moratorium, did you --
18  in connection with the Corneal's property, did you rely on
19  any advice from --
20     A      I can't think that I --
21     Q      -- Larry Newton?
22     A      I don't usually talk to Larry unless I've got
23  a problem.
24     Q      Did you have any problems with the Corneal
25  property that you had to talk to him about?

166

1    A    Through '99 I didn't think there was a
2  problem.
3    Q    Were you present at any meetings of the
4  township solicitors wherein Mr. Newton gave advice to the
5  supervisors about the Corneal property?
6    A    Just at those conference meetings that -- that
7  Terry Williams was there.
8    Q    What about like regular meetings of the board
9  of supervisors or special meetings of the supervisors, the
10  township supervisors?  Were you present at any meetings like
11  that wherein Larry --
12    A    I would say no, I've never been to a
13  supervisor's meeting where Mr. Corneal's property was
14  discussed.
15    Q    What about in general the issue of the
16  moratorium, were you present at any meetings where --
17    A    Well, again, I usually go to a township
18  meeting -- that's what I'm going to tonight.  If I've done a
19  sewage module, helped with the sewage module, we have land
20  development, I usually meet the surveyor there and we lay it
21  out on the table and explain to the supervisors what we've
22  done, what we are wanting approved.  If there's a
23  moratorium, there's none of that happening.  So I -- I
24  didn't go to any meetings during the moratorium.
25    Q    What about in connection with the proposed

167

1  subdivision ordinance, were you present at any meetings with
2  the supervisors wherein Larry Newton gave advice about a
3  proposed subdivision ordinance?
4    A    I can't recall that I was.
5    Q    Do you know of any other subdivisions that
6  have been disapproved in Jackson Township besides Mr.
7  Corneal's?
8        MR. SHERR:  Object to the form of the
9  question.
10  BY MS. MONTGOMERY:
11    Q    That have not been approved.
12    A    Well, there's been ones that weren't approved
13  the first time, but then they just go back and they make the
14  changes needed and you just keep working at it until we work
15  it through.
16    Q    Which ones can you recall that weren't
17  approved the first time?
18    A    Well, that Ken Miller, you know, this had been
19  going on since I -- 10 years before I started out there he
20  had been nibbling at this and bringing it back and doing
21  stuff and ...
22    Q    Do you recall what the supervisor's concerns
23  were with respect to the Miller subdivision?
24    A    Not right off the top of my head, no.
25    Q    You don't recall?

168

1    A    (Witness shook his head negatively.)
2    Q    I'd just to like make a part of the record the
3  order that Judge Rambo issued this morning.  Have you had a
4  chance to review it?
5    A    (Witness shook his head negatively.)
6    Q    Well, I'm going to give it to you and ask
7  you --
8    A    Is this mine?
9    Q    And ask you to review it.  Correct, that's
10  your copy.
11    A    This stuff is mine to take or am I leaving
12  this here or --
13    Q    Well, anything that's marked as an exhibit
14  isn't yours to take.  The copies you can take with you.  I'm
15  going to have Judge Rambo's order marked as Exhibit 7, Parks
16  Exhibit 7.
17        (Order produced and marked as Parks Exhibit
18  No. 7.)
19        THE WITNESS:  It just means that I don't talk
20  about it, correct?
21        MS. MONTGOMERY:  Correct.
22        THE WITNESS:  In plain language.
23  BY MS. MONTGOMERY:
24    Q    In plain language.
25    A    Okay.

169

1    Q    Do you understand that you're not supposed to
2  talk to the other deponents --
3    A    I understand.
4    Q    -- or the other defendants about the substance
5  of your deposition or their depositions?
6    A    Yes.
7        MS. MONTGOMERY:  That's it.
8        (The deposition was concluded at 3:40 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 1:00-cv-01192-SHR    Document 120    Filed 04/18/2003    Page 49 of 100

170

1
2    COUNTY OF DAUPHIN          :
                                : SS
3    COMMONWEALTH OF PENNSYLVANIA    :
4          I, Teresa K. Bear, Reporter-Notary Public,
5    authorized to administer oaths within and for the
6    Commonwealth of Pennsylvania and take depositions in the
7    trial of causes, do hereby certify that the foregoing is the
8    testimony of BARRY PARKS.
9          I further certify that before the taking of
10   said deposition, the witness was duly sworn; that the
11   questions and answers were taken down stenographically by
12   the said Teresa K. Bear, a Reporter-Notary Public, approved
13   and agreed to, and afterwards reduced to typewriting under
14   the direction of the said Reporter.
15         I further certify that the proceedings and
16   evidence are contained fully and accurately to the best of
17   my ability in the notes taken by me on the within
18   deposition, and that this copy is a correct transcript of
19   the same.
20         In testimony whereof, I have hereunto
21   subscribed my hand this 31st day of May, 2001.
22
23   _____
         Teresa K. Bear, Reporter
24          Notary Public
         My commission expires
25          on April 13, 2003

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

   DAVID B. CORNEAL AND SANDRA      :
3  Y. CORNEAL,
                     PLAINTIFFS     :
4                                   :

                 VS                 :   NO.  1:CV-00-1192
5                                   :

   JACKSON TOWNSHIP, HUNTINGDON     :
6  COUNTY, PENNSYLVANIA, W. THOMAS  :
   WILSON, INDIVIDUALLY AND IN      :
7  HIS OFFICIAL CAPACITY AS         :
   SUPERVISOR OF JACKSON TOWNSHIP,  :
8  MICHAEL YODER, INDIVIDUALLY AND  :
   IN HIS OFFICIAL CAPACITY AS      :
9  SUPERVISOR OF JACKSON TOWNSHIP,  :
   RALPH WEILER, INDIVIDUALLY AND   :
10 IN HIS OFFICIAL CAPACITY AS      :
   SUPERVISOR OF JACKSON TOWNSHIP,  :
11 BARRY PARKS, INDIVIDUALLY AND    :
   IN HIS OFFICIAL CAPACITY AS      :
12 SEWAGE ENFORCEMENT OFFICER OF    :
   JACKSON TOWNSHIP, DAVID VAN      :
13 DOMMELEN, INDIVIDUALLY AND IN    :
   HIS OFFICIAL CAPACITY AS BUILDING:
14 PERMIT OFFICER, ANN L. WIRTH,    :
   INDIVIDUALLY AND IN HER OFFICIAL :
15 CAPACITY AS SECRETARY OF JACKSON :
   TOWNSHIP, AND LARRY NEWTON,      :
16 INDIVIDUALLY AND IN HIS OFFICIAL :
   CAPACITY AS SOLICITOR TO JACKSON :
17 TOWNSHIP,                        :
                     DEFENDANTS     :
18
19

              DEPOSITION OF:  DAVID B. CORNEAL
20

              TAKEN BY:     DEFENDANTS
21

              BEFORE:       PATRICIA C. BARRETT,
22                          REPORTER - NOTARY PUBLIC
23 DATE:                    FEBRUARY 22, 2001, 10:45 A.M.
24 PLACE:                   ECKERT SEAMANS
                            213 MARKET STREET, 8TH FLOOR
25                          HARRISBURG, PENNSYLVANIA

1 APPEARANCES:
2
3 ECKERT SEAMANS
  BY: BRIDGET E. MONTGOMERY, ESQUIRE
     CHARLES M. SUHR, ESQUIRE
4
5     FOR - PLAINTIFF
6 MAYERS, MENNIES & SHERR LLP
  BY: ANTHONY R. SHERR, ESQUIRE
7     FOR - ALL DEFENDANTS EXCEPT NEWTON
8 METTE, EVANS & WOODSIDE
  BY: KATHRYN LEASE SIMPSON, ESQUIRE
9
10    FOR - DEFENDANT LARRY NEWTON
11 THOMAS, THOMAS & HAFER, LLP
  BY: MICHELE J. THORP, ESQUIRE
12    FOR - DEFENDANT RALPH WEILER
13 ALSO PRESENT:
14    SANDRA Y. CORNEAL
15
16
17
18
19
20
21
22
23
24
25

---

**4**

1           STIPULATION
2        It is hereby stipulated by and between
3 counsel for the respective parties that sealing,
4 certification and filing are waived; and that all
5 objections except as to the form of the question are
6 reserved to the time of the trial.
7
8        DAVID B. CORNEAL, called as a witness, being
9 sworn, testified as follows:
10
11        DIRECT EXAMINATION
12
13 BY MR. SHERR:
14    Q        Mr. Corneal, good morning.
15    A        Good morning.
16    Q        As you know, we are here today to take your
17 deposition in a matter which is currently pending in the
18 U.S. District Court for the Middle District of
19 Pennsylvania, in which you and your wife have brought an
20 action against Jackson Township, its supervisors and other
21 individuals.
22        Have you ever had your deposition taken
23 before?
24    A        I don't think so. I can't remember.
25    Q        I just want to go over a couple ground

---

**3**

1           TABLE OF CONTENTS
2
             WITNESS
3
  FOR DEFENDANT          DIRECT     CROSS
4
  David B. Corneal
5
     By Mr. Sherr        4
6
     By Ms. Simpson               144
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**5**

1 rules. I know that you are familiar with depositions, but
2 just to go over a couple ground rules so we are sure of
3 things.
4        You have been placed under oath, you are
5 expected to answer truthfully. I ask that you wait until
6 I am finished asking my question before giving your
7 response. Likewise, I will try to wait until your
8 response is completed before I ask you another question.
9        If you don't understand my question, please,
10 ask me to clarify it. If you don't hear my question,
11 please, ask me to repeat it. If you answer the question,
12 we are going to assume that you both heard and understood
13 the question.
14        You are represented here today by counsel,
15 if you need to take to have a conference with your
16 attorney, please, indicate that and we will accommodate
17 it. If you need to take a break for any other reason,
18 please, let us know that.
19        We are here today to take your deposition to
20 find out your recollection in the events surrounding your
21 complaint and the allegations within your complaint.
22        If you don't know something, please, let us
23 know that, otherwise, give the response to the best of
24 your knowledge. I ask that you give all your responses
25 out loud orally, so that the court reporter can take it

CORNEAL, DAVID
02/22/01

CORNEAL  VS
JACKSON TOWNSHIP

**6**

1  down.  She can't take down nods of the head and that sort
2  of thing.
3          Did you review anything in preparation for
4  today's deposition?
5      A    **I looked at some of the documents, yes.**
6      Q    What documents did you look at?
7      A    **The complaint and some letters.**
8      Q    Do you know specially what letters you
9  looked at?
10     A    **No, it was about a week ago.**
11     Q    Anything else other than the complaint and
12  some letters?
13     A    **That I reviewed?**
14     Q    That you specifically reviewed in
15  preparation for today's deposition?
16     A    **No.**
17     Q    Other than any discussions which you had
18  with your attorneys, did you discuss today's deposition
19  with anyone?
20     A    **My wife.**
21     Q    Other than your wife, anybody else?
22     A    **No.**
23     Q    Are you currently taking any medications?
24     A    **20 milligrams of Zestril for high blood**
25  **pressure.**

**7**

1      Q    Would that effect in any way your ability to
2  give testimony here today?
3      A    **I am not aware of it.**
4      Q    Is there any other reason that you are aware
5  of that you are somehow impeded from giving us the best
6  recollection that you can concerning the events
7  surrounding your complaint?
8      A    **Not that I am aware of.**
9      Q    Where do you currently reside?
10     A    **5205 East Fairmount, F-A-I-R-M-O-U-N-T,**
11  **Avenue, State College, Pennsylvania.**
12     Q    How long have you resided there?
13     A    **Since 1983.**
14     Q    Who do you reside there with?
15     A    **My wife.**
16     Q    Anybody else?
17     A    **Our children, until they grew up and moved**
18  **out.**
19     Q    How many children do you have?
20     A    **Three.**
21     Q    They are all out of the house?
22     A    **Yes, they are all adults.**
23     Q    What is your social security number?
24     A    **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.**
25     Q    Your wife's full name?

**8**

1      A    **Sandy Cornell.**
2      Q    She is in the room with us today?
3      A    **Yes.**
4      Q    How long have you been married?
5      A    **We were married in 1968.**
6      Q    What is the highest level of formal
7  education that you completed?
8      A    **I completed a law degree.**
9      Q    When was that?
10     A    **In 1973.**
11     Q    Where was that from?
12     A    **Stetson University College of Law.**
13     Q    Have you had any formal education since the
14  completion of your law degree in 1973?
15     A    **Not any more than continuing education**
16  **courses for the law.**
17     Q    Do you currently practice law?
18     A    **No.**
19     Q    When did you stop practicing?
20     A    **Say 4 or 5 years ago.**
21     Q    Are you currently employed?
22     A    **Yes.**
23     Q    How are you employed?
24     A    **I teach Business Law and Entrepreneurship at**
25  **Penn State University.**

**9**

1      Q    How long have you been teaching at Penn
2  State?
3      A    **Since I think 1982, approximately, I am not**
4  **sure of the exact date.**
5      Q    Have you been teaching both Business Law and
6  Entrepreneurship since 1982?
7      A    **Initially Business Law and then**
8  **Entrepreneurship that started a few years later.**
9      Q    What is your position at the university?
10     A    **Assistant professor.**
11     Q    Do you consider this a full-time position?
12     A    **They consider it a full-time position, they,**
13  **meaning Penn State.**
14     Q    Very briefly, Business Law is a broad
15  subject, obviously, what specifically do you teach about?
16     A    **I teach an undergraduate course, with an**
17  **introductory course to what law is all about.**
18     Q    Do you have a textbook for that course?
19     A    **No.**
20     Q    How about Entrepreneurship, what does that
21  entail?
22     A    **It entails starting your own business.**
23     Q    What do you teach specifically?
24     A    **Starting your own business and picking a**
25  **business organization, financing the business.**

10

1    Q    Is there a textbook for that course?
2    A    No.
3    Q    Are there written materials that are used in
4    either of these courses?
5    A    Written materials? No, not really, I have
6    some handouts in one or two of the courses, but.
7    Q    Are the students asked to read anything?
8    A    No.
9    Q    How many courses do you currently teach?
10   A    Three.
11   Q    What are the titles of those courses?
12   A    Business Law 243, Business Administration
13   250 and Business Administration 497-A.
14   Q    When you practiced law, were you a member of
15   the firm?
16   A    I was a member of several firms during the
17   period I practiced law.
18   Q    Most recently, what firm were you a member
19   of?
20   A    I was a sole practitioner.
21   Q    Prior to that, were you a member of the
22   firm?
23   A    We had our own firm, three or four guys.
24   Q    What was the name of that firm?
25   A    Well, the last name would have Kalman,

11

1    Corneal, Mason, I think Mason, that was the last name.
2    Q    What type of law did you practice at the
3    time that you were practicing law?
4    A    It was general, business mainly.
5    Q    Did you consider yourself to have a
6    specialty?
7    A    Not really. In a small town you really
8    can't. I would say the specialty was, if you had to say a
9    specialty, it was contract law, business-related
10   contracts.
11   Q    Did you ever practice in the area of land
12   use?
13   A    The only time I ever did that was a case of
14   a friend of mine that you were involved in and that was
15   Wesley Young.
16   Q    It was the Young versus Harris Township
17   case?
18   A    Right.
19   Q    So would I be correct then in stating you
20   did not get involved with land use matters while you
21   practiced law, other than to the extent you got involved
22   with them in that Young case?
23   A    I wouldn't say that. I had business clients
24   that had questions about land use; and generally at that
25   time that we would have done anything, Ron Lucas was a

12

1    partner and that was his specialty so he would handle --
2    it would be referred to him.
3    Q    So you, yourself, wouldn't handle matters
4    dealing with land use, you would refer them to a partner
5    or to another attorney, is that correct?
6    A    Right.
7         If it was a simple question that you heard
8    an answer to before or knew the answer to before, you
9    would answer it; but if it was more complicated, it would
10   be referred to somebody else that did that.
11   Q    How about other areas of municipal law, did
12   you consider yourself to be practicing in other areas of
13   municipal law other than land use?
14   A    As I said, I didn't really practice in land
15   use. I would say not, no.
16   Q    Are you familiar with the Pennsylvania
17   Municipal Planning Code?
18   A    I know of it.
19   Q    When you say you know of it --
20   A    I know it exists.
21   Q    Other than knowing it exists, do you know
22   any of the details contained within it or the cases
23   decided thereunder, are you familiar with them?
24   A    Well, the only thing that I -- no, the
25   answer would be basically not, except, I recently had

13

1    discussions about the Naylor case, which affects things or
2    could affect things. Other than that, no, I have never
3    read the Municipal Planning Code.
4    Q    In the discussion that you recently had
5    concerning the Naylor case --
6         MS. MONTGOMERY:  Objection.
7         MR. SHERR:  That is what I was going to get
8    to.  Give me a chance.
9    BY MR. SHERR:
10   Q    Did you have those discussions with anyone
11   other than your attorneys?
12   A    No.
13   Q    Other than your residence and the property
14   which forms the basis of the lawsuit that we are here
15   about today, do you own other properties?
16   A    Yes.
17   Q    How many other properties do you own?
18   A    You would have to ask me -- it would be
19   easier to tell you where they are.
20   Q    Do it that way then. Can you tell me what
21   other properties you own other than your residence and the
22   property that forms the basis of this lawsuit?
23   A    I own a property at 1445 West College
24   Avenue, I own a property at -- my wife and I, when I say
25   I, my wife and I, I own a property at 1510 Martin Street.

Case 1:00-cv-01192-SHR   Document 120   Filed 04/18/2003   Page 54 of 100

14

1    I own a property in -- outside Hershey,
2    Pennsylvania, which is in Lower -- I forget the name of
3    the Township. It is just a tract of land, but near
4    Hershey; and we own a property in Key West, Florida at 816
5    Eaton Street; I jointly own a property with my youngest
6    son at 822 Eaton Street, Key West. I think that is it.
7    Q       Just taking these properties one at a time.
8            MS. MONTGOMERY: I am going to object. I
9    have given you some leeway, considered that this is a
10   discovery deposition, but what does that have to do with
11   this case? This is his personal information, I don't
12   think you are entitled to ask him about all this stuff.
13           MR. SHERR: One of the reasons I am going to
14   get into the other properties, I am not going to get into
15   them in great length, is to find out whether or not he has
16   been involved in developing other properties.
17           MS. MONTGOMERY: Ask him that question,
18   then.
19           MR. SHERR: I will.
20           MS. MONTGOMERY: Maybe it is an appropriate
21   question, maybe not, but it is beyond the scope of this
22   lawsuit for you to be asking him about his other business
23   affairs and that sort of thing, you have got to tie it in
24   and tie it in pretty quickly, or, you know.
25   BY MR. SHERR:

15

1    Q       The property at 1445 West College Avenue, is
2    that property developed?
3    A       Commercial building.
4    Q       When you purchased it, did you purchase it
5    with a commercial building on it?
6    A       No.
7    Q       The commercial building that is on it, did
8    you have to receive approval from any local authorities to
9    build that building on the property?
10   A       I hired an architect.
11   Q       I don't know if that was responsive to my
12   question.
13           My question was, did you have to get any
14   approval from any local authorities?
15   A       Obviously, whenever you build a building,
16   you have to have approvals, the approvals were obtained by
17   the architect.
18   Q       Judging by that answer, you had nothing to
19   do with obtaining the approvals other than hiring an
20   architect?
21   A       No, of course, I discussed it with the
22   architect. It was in 1979, I don't remember exactly what
23   transpired between us or my involvement in that, I don't
24   remember.
25   Q       How about the property at 1510 Martin

16

1    Street, is there anything --
2    A       It is an existing commercial building.
3    Q       The question was: Is there anything on that
4    property and your answer was that you purchased it with a
5    building on that property?
6    A       Right.
7    Q       Did you ever go through any kind of approval
8    process with respect to a local authority on that
9    property?
10   A       What do you mean, a local authority?
11   Q       A municipality.
12   A       Well, we put an addition on that property
13   and so we hired an engineering firm to do that; but it was
14   just a matter of expanding a building that was already
15   existing.
16   Q       You indicated that you owned a property
17   outside of Hershey and I believe in giving your answer you
18   said it was a tract of land.
19   A       206 acres.
20   Q       That is undeveloped?
21   A       Right.
22   Q       Have you made attempts to develop that land?
23   A       No. I have made attempts to sell the land.
24   Q       Is there a reason you haven't sold the land?
25   A       I just put it on the market a month ago.

17

1    Q       When did you purchase it?
2    A       A long time ago. It was probably somewhere
3    in the late '70s.
4    Q       With respect to these three properties, you
5    indicated that you own them with your wife, is that
6    correct?
7    A       Yes.
8    Q       Do you have ownership interests in any other
9    properties, excluding the ones in Florida, with any other
10   entity?
11   A       No, not that I can remember right now. I am
12   trying to think. I don't believe so, aside from the
13   properties we are talking about here. You said excluding
14   Florida, you also exclude the properties in Jackson
15   Township?
16   Q       Yes.
17   A       No.
18   Q       Do you have any ownership interest in any
19   corporation or other business entity which owns property?
20           MS. MONTGOMERY: Objection, just way beyond
21   the scope of this lawsuit. This isn't hunting season on
22   his entire personal life and business life, this is a
23   lawsuit about Jackson Township property.
24           MR. SHERR: Are you instructing him not to
25   answer?

18

1    MS. MONTGOMERY: I am objecting to it and I
2  am asking you not to do this in this deposition, not to
3  make it contentious, asking him questions that don't have
4  anything to do with the lawsuit. If you can explain what
5  it has to do with the lawsuit, I will be reasonable about
6  it, I am very willing to do that.
7    MR. SHERR: Depending upon whether he owns
8  any other property and had made attempts to develop any
9  other property --
10    MS. MONTGOMERY: He said, no. He gave you
11  the answer to those questions.
12    MR. SHERR: He hasn't given me the answer to
13  this yet, so I don't know.
14    MS. MONTGOMERY: Like I said earlier, this
15  may be marginally somehow likely to lead to developing
16  discoverable evidence that he may have developed other
17  property. Ask him that question and stay out of his
18  private business affairs, otherwise, that don't have
19  anything to do with the development of Jackson Township.
20  BY MR. SHERR:
21  Q    If you could answer my question.
22  A    The question was?
23  Q    Do you have an ownership in any corporation
24  or other entity which owns property?
25  A    Other than Florida you said, is that right?

19

1  Q    Yes, I am only interested -- to limit this,
2  I am only interested in properties in Pennsylvania and
3  your attempts to develop or be involved with developments
4  in Pennsylvania.
5  A    No.
6    Let me rephrase it. No, not that I can
7  recall. As you asked the question, I can't think of
8  anything at this moment that I have an interest in.
9    We have several corporations that operate
10  the properties that are identified, they don't own the
11  properties.
12  Q    Other than the property which forms the
13  basis of this lawsuit and excluding properties outside of
14  this Commonwealth and other than what you have already
15  talked about, have you been involved in the development of
16  any other properties?
17  A    We had a property in Boalsburg that we had
18  the engineer subdivide and we sold that off.
19  Q    Again, excluding the property that forms the
20  basis of this lawsuit, have you ever personally applied
21  with any local municipality for building permits?
22  A    Well, you have to apply. Obviously, the
23  owner of the property has to sign the application, so the
24  applications were normally prepared by the engineer or
25  architect and, obviously, the owner signed them, which

20

1  would have been myself and my wife.
2  Q    What I am searching for here is involvement
3  by you other than just signing it, where you actually went
4  to the Township or other municipality and had involvement
5  with the local officials, are there any instances like
6  that?
7  A    I have been in townships before, I mean the
8  borough, where we were -- in our home we were building a
9  fence around an area and we needed to get approval for
10  that.
11    I probably accompanied an architect or
12  engineer on these two properties that I identified
13  previously to a Township meeting or two; but like I said,
14  that was a long time ago.
15  Q    Have you ever been the party to a lawsuit
16  other than this one?
17  A    I want to say, yes, and I am trying to think
18  of what it was. You said other than this one. For
19  example, I just got served by Old Guard Insurance, who is
20  representing one of the supervisors who is asking for a
21  declaratory judgment as to whether they have coverage or
22  not.
23    You mean in Pennsylvania, parties to a
24  lawsuit?
25  Q    We could limit it to Pennsylvania -- no,

21

1  let's just expand that to any lawsuit.
2  A    Well, we have had a family fight in Florida
3  over some properties and that ended up in litigation.
4  Q    That litigation was in Florida?
5  A    Yes. That family fight then got extended
6  here in Pennsylvania, just slightly.
7  Q    Was there a lawsuit in Pennsylvania?
8  A    There was a lawsuit regarding my mother's
9  will.
10  Q    Any other lawsuits to which you were a party
11  other than what you have mentioned?
12  A    Not that I can remember.
13  Q    Turning to the property which forms the
14  basis of this lawsuit which is located in Jackson
15  Township. This property was purchased jointly, you and
16  your wife?
17  A    Yes.
18  Q    When did you purchase the property?
19  A    I believe it was around October of '98.
20  Q    How much did you purchase it for?
21  A    $160,000. Total price was actually
22  $170,000, but 10 was attributable to personal property.
23  Q    Who did you purchase it from?
24  A    Paul and Catherine Michael.
25  Q    How did you first hear about the property?

22

1     A     They were friends of mine and indicated they
2 were going to sell what they referred to as their farm.
3     Q     What was your purpose for purchasing the
4 property?
5     A     I was thinking that it would be a nice
6 place, my wife and I were both artists at that point and
7 still are, and it would be a nice place maybe to do
8 painting and put perhaps a summer house on it or something
9 like that.
10     Q     At the time that you were considering
11 purchasing the property, did you have any other purposes
12 for the property in mind other than to do some painting
13 and to put a summer home on it?
14     A     Other purposes at that moment?
15     Q     At the time that you were considering
16 purchasing the property.
17     A     Obviously, I was looking at a 95 acre tract
18 of ground and I didn't think I needed all of that.
19     Q     I am not sure that that is really responsive
20 though.
21         Were you thinking about doing anything else
22 with the property when you were considering purchasing it,
23 other than using it as a nice place to paint and as a
24 summer home?
25     A     Well, as I said, we didn't need 95 acres,

23

1 and it was naturally divided by a power line; and so
2 without having investigated it, certainly the thought ran
3 through my mind that perhaps I would sell off a piece of
4 it or two or even divide it up for lots for my children. I
5 didn't have any real plan, there was a lot of things that
6 were possible.
7     Q     Do you recall what the asking price for the
8 property was?
9     A     I paid them what their asking price was.
10     Q     So there was no negotiations over the price?
11     A     No negotiations. I thought it was a fair
12 price.
13     Q     How did you make that determination that it
14 was a fair price?
15     A     They gave me an appraisal that they had
16 done.
17     Q     Do you still have that appraisal?
18     A     I will say probably, somewhere in the file.
19     Q     Do you know what Paul and Catherine Michael
20 used this property for?
21     A     They had their children living there at
22 different times and they used it as a weekend retreat for
23 themselves.
24         (Recess.)
25 BY MR. SHERR:

24

1     Q     Other than reviewing the appraisal, which
2 was provided to you by the Michaels, did you do any other
3 investigation prior to purchasing the property?
4     A     Aside from walking on the property, that is
5 all I did.
6     Q     Were there any structures on the property
7 when you were considering purchasing it?
8     A     A house and a barn.
9     Q     Did the property consist of one solitary lot
10 to your knowledge at the time that you were considering
11 purchasing it?
12     A     One tract of ground.
13     Q     Were you aware as to whether there were any
14 attempts to subdivide the property prior to you purchasing
15 it?
16     A     Well, I was aware that — no, there was no
17 attempts to subdivide it. I was aware that a single lot
18 had been subdivided off by a previous owner, but I don't
19 know who that owner was.
20     Q     The single lot which had been subdivided off
21 of the property, was that still part of the property that
22 you were going to purchase or had that been sold already?
23     A     That was developed into a homesite years
24 ago.
25     Q     Were you aware that a lot had been

25

1 subdivided off of this tract of ground prior to your
2 purchase?
3     A     Yes, sure.
4     Q     How did you become aware?
5     A     It was obvious, there was somebody living
6 there with their three or four unused cars in the yard.
7     Q     How did you know that that was part of the
8 same tract of land?
9     A     Because it was obvious that it was cornered
10 out; and somebody told me, I don't remember whether the
11 Michaels told me or somebody, it was rather are obvious.
12     Q     Other than walking the property and
13 reviewing the appraisal, did you do anything else, any
14 other investigation into the property prior to purchasing
15 it?
16     A     No.
17     Q     Was there a real estate broker and/or agent
18 involved with the sale to you of this property?
19     A     No.
20     Q     Were you represented in the sale of this
21 property?
22     A     Was I represented?
23     Q     Yes.
24     A     No.
25     Q     Were the Michaels represented?

26

1    A    No.
2    Q    Did you sign an agreement of sale?
3    A    Yes.
4    Q    Do you still have a copy of that agreement
5    of sale?
6    A    I don't remember if I have it or not,
7    probably somewhere.
8    Q    Did the agreement of sale have any
9    conditions in it?
10   A    What kind of conditions?
11   Q    Any conditions?
12   A    No conditions.
13   Q    Did the agreement of sale provide for
14   anything other than you would be purchasing the property
15   and the Michaels would be selling the property?
16   A    Not really, no. There was a tractor
17   involved. That is why I said part -- it was a John Deer
18   tractor involved. Prorated taxes and the typical things
19   that we do with properties.
20   Q    You indicated that you purchased this
21   property in October of '98, is that when you closed on the
22   property?
23   A    Yes.
24   Q    Had you ever purchased property in Jackson
25   Township prior to October of '98?

27

1    A    No.
2    Q    Had you ever had any dealings with Jackson
3    Township officials and/or employees prior to October of
4    '98?
5    A    I don't believe so, I can't remember ever
6    having.
7    Q    Prior to purchasing the property in October
8    of '98, did you personally know W. Thomas Wilson?
9    A    No.
10   Q    Prior to purchasing the property, had you
11   had any prior dealings with Huntingdon County?
12   A    Well, I don't know what you mean prior
13   dealings.
14        Before I went to law school, I went over and
15   I clerked for James Himes and his father, who was the
16   judge, Swirls Himes, but that was back in 1969, '68. Of
17   course, I am sure over the years every once in a great
18   while I was in Huntingdon County on some minor law thing
19   but I don't think very often. Most of the time if I had
20   something over there, I referred it to Jim Himes.
21   Q    After you purchased the property in October
22   of '98, did you take any actions with respect to the
23   property?
24   A    What do you mean actions?
25   Q    Well, let's break that down, that was not a

28

1    very good question.
2         When did you first decide to subdivide the
3    property?
4    A    As I said, I contemplated that the
5    possibility was there at the beginning, because we didn't
6    really want the house and the barn. So probably in the
7    spring of the year, 1999, we started seriously thinking
8    about that. I am just guessing, a ballpark.
9    Q    So am I accurate in stating that prior to
10   purchasing the property or at or around the time that you
11   purchased the property, you intended to build something on
12   the property?
13   A    Yes.
14   Q    Was that before you purchased the property?
15   A    That we contemplated building?
16   Q    Yes.
17   A    Yes.
18   Q    What did you contemplate building?
19   A    As I said, we are both artists, and we were
20   thinking of a summer home and an art studio.
21        This was a vague thought at that time, it
22   wasn't a plan.
23   Q    When did it become more than a vague thought
24   and moved into a plan?
25   A    In the spring of '99 we started thinking

29

1    seriously about recovering some of our investment and
2    using that money to build something.
3    Q    The thoughts about recovering some of your
4    investment and building something with that money is the
5    contemplation that you would subdivide and sell part of
6    the property off?
7    A    Yes.
8    Q    What is the first action that you took with
9    respect to selling part of the property?
10   A    Well, we decided that it needed a survey,
11   current survey.
12   Q    Prior to getting a current survey, did you
13   personally do any research with respect to what you needed
14   to do to sell part of the property off?
15   A    No, that is part of the discussion I had
16   with the surveyor.
17   Q    So who was the surveyor that you had a
18   discussion with?
19   A    David Simpson.
20   Q    How was it that you got Mr. Simpson?
21   A    Because Michaels had used him before.
22   Q    So then you had a discussion with
23   Mr. Michaels about --
24   A    No, some of the documents --
25   Q    Let me finish the question.

**30**

1    A    Sorry.

2    Q    Did you have a discussion with Mr. Michaels
3 about subdividing the property?

4    A    No.

5    Q    How was it then that you got to Mr. Simpson
6 through Mr. Michael?

7    A    Mr. Michael had used Mr. Simpson before and
8 recommended him.

9    Q    Do you know why he recommended Mr. Simpson
10 to you, he, being Mr. Michael?

11    A    Obviously, he was pleased with Mr. Simpson's
12 work.

13    Q    Do you know why he felt the need or even
14 wanted to recommend the surveyor to you?

15    A    I don't know if I asked him or -- I don't
16 know. I know that he had -- when I bought the property,
17 he had given me documentation of things that related to
18 the property about planting trees and things that he had
19 -- and his tractor manual and all this other stuff. Part
20 of that was some work, survey work that Simpson had done.
21 I don't know if that is what stimulated Simpson or it was
22 a discussion with Michael.

23    Q    Where is Mr. Simpson located?

24    A    He lives in Huntingdon, outside of
25 Huntingdon.

**31**

1    Q    Do you recall when you first contacted
2 Mr. Simpson?

3    A    As I said, sometime in the spring of '99 I
4 believe.

5    Q    When you first contacted him, did you
6 indicate to Mr. Simpson why you were contacting him?

7    A    Yes, I said I wanted him to survey the land
8 and I wanted to divide off the farm, the acreage. At that
9 time I was contemplating some lots for my children.

10    Q    What did he tell you?

11    A    He said, sure, he would be happy to do it.

12    Q    Did you have a conversation with Mr. Simpson
13 at or around that time with respect to what would have to
14 be done to subdivide the property?

15    A    Well, what he said was, if you are going to
16 subdivide it, you are going to need to find sewage
17 locations, on-site sewage.

18    Q    Other than telling you that you needed to
19 find on-site sewage locations, did he tell you anything
20 else that you would need to do with respect to subdividing
21 the property?

22    A    No.

23    Q    Do you have an understanding as to why he
24 told you, you needed to find on-site sewage locations?

25    A    Well, my understanding was that if you had a

**32**

1 lot, you had to be able to provide on-site sewage for that
2 lot. So if I was going to divide something off, I needed
3 on-site sewage.

4    Q    Did you have an understanding at that time
5 what required you to have on-site sewage on a lot?

6    A    What do you mean?

7    Q    What rule or regulation or statute?

8    A    He said that the SEO, which is the sewage
9 enforcement officer, needed to do test pits at different
10 locations where we were contemplating lots.

11    Q    Did you inquire as to why you had to have
12 areas where you could have on-site sewage on a particular
13 lot?

14    A    Well, you can't build a house on a lot that
15 doesn't have on-site sewage.

16    Q    You had that knowledge that you couldn't
17 build a house on a lot without on-site sewage?

18    A    You had to have sewage disposal, either
19 public or on-site, and there was no public available, so
20 we had to have sites that were approved for on-site
21 sewage.

22    Q    Again, did you have any understanding as to
23 where those requirements were contained, what required you
24 to have those on-site sewage on any particular lot?

25    A    He said, DEP, Department of Environmental

**33**

1 Protection, he told me had those regulations.

2    Q    Did you have familiarity with those
3 regulations prior to this conversation with Mr. Simpson?

4    A    No, I never had on-site septic on any
5 property I ever owned.

6    Q    Did you make any inquiries at that time as
7 to the requirements of on-site sewage?

8    A    He said that the SEO officer would be the
9 one that would meet me on the site or meet us on the site
10 and dig test pits and would decide whether the soil was
11 appropriate for on-site systems.

12    Q    Prior to this time, this conversation with
13 Mr. Simpson, had you ever been involved in any way with
14 on-site sewage systems?

15    A    No.

16    Q    Did Mr. Simpson tell you who the sewage
17 enforcement officer was?

18    A    Probably. I think he did.

19    Q    Do you recall that he did?

20    A    I would say that he probably told me who it
21 was. I don't remember, but I would suspect that that is
22 where the information came from.

23    Q    Who did he tell you the sewage enforcement
24 officer was?

25    A    Barry Parks.

**34**

1  Q    Other than finding sewage locations, did
2  Mr. Simpson tell you, you would have to do anything else
3  in order to divide the property and sell part of it?
4      A    He said that we would submit those things,
5  the sewage things to the Township.
6      Q    Did he tell you why you would have to submit
7  them to the Township?
8      A    No, but that was the procedure.
9      Q    He told you that was the procedure?
10     A    That was the procedure that he used he said.
11     Q    Did he indicate that he had other dealings
12 with the Jackson Township officials with respect to
13 dividing lots?
14     A    Never talked to him about that.
15     Q    Did you understand that you would have to be
16 involved with the process or was it your understanding
17 that Mr. Simpson would take care of this for you?
18     A    No. He had indicated that he would do the
19 drawings, but he didn't want to go to the meetings or do
20 anything to walk things through, that I would have to do
21 it.
22     Q    Did he tell you about any other requirements
23 for dividing property in Jackson Township, other than
24 finding sewage locations?
25     A    No. I say no, not that I recall, I can't

**35**

1  recall that he had said anything about that.
2      Q    What was your understanding as to what
3  Mr. Simpson would do for you?
4      A    A survey.
5      Q    Anything else?
6      A    A boundary survey and then eventually divide
7  things up into lots, whatever lots we decided on based on
8  the SEO's finding of on-site septic suitability.
9      Q    Other than doing a boundary survey and
10 drawing up lots once you divided what lots you wanted, did
11 you have expectations that Mr. Simpson was going to do
12 anything else with respect to this property?
13     A    I didn't have expectations, because I didn't
14 know exactly what was required with on-site septic, but he
15 did prepare the sewer modules, he called them sewer
16 modules, for the SEO's findings that would fit with the
17 map that he would prepare.
18     Q    At what point did you learn that he was
19 going to prepare sewage modules?
20     A    I think when he prepared them.
21     Q    Did you ask him to prepare sewage modules?
22     A    I didn't know about sewage modules.
23     Q    So then you didn't ask him to prepare them?
24     A    No, I didn't; but he did it as I guess a
25 standard operating procedure as what he did as part of his

**36**

1  function.
2      Q    Did you make any inquiry to Mr. Simpson as
3  to why you needed sewage modules?
4      A    The answer was obvious, because the SEO had
5  checked the sites and you needed DEP approval and my
6  understanding was from Simpson, the sewer modules would be
7  signed by the Township and then submitted to DEP for final
8  approval.
9      Q    Who contacted the SEO?
10     A    Probably, I did. He had given me the guy's
11 name, probably I did. He could have contracted him first,
12 I don't know.
13     Q    Do you recall contacting Mr. Parks?
14     A    I know that I called Mr. Parks on several
15 occasions. I can't remember if the initial contact was by
16 myself or Mr. Simpson. I would suspect it was probably by
17 me.
18     Q    How did you get in touch with him? How did
19 you learn how to get in touch with him?
20     A    I don't remember. I would be guessing as to
21 how it happened, I don't remember how it happened.
22     Q    I don't want you to guess.
23          Do you remember the first contact that you
24 had with Mr. Parks?
25     A    No. It was a telephone conversation, but I

**37**

1  don't remember it exactly.
2      Q    Do you recall telling Mr. Parks what you
3  intended to do with the property?
4      A    I said we were going to do some subdividing
5  and needed to find suitable spaces for on-site septic.
6      Q    The reason that you told him you needed to
7  find suitable spaces for on-site septic was because Mr.
8  Simpson told you, you needed that?
9      A    Yes.
10     Q    Did you contact anybody else other than
11 Mr. Parks and Mr. Simpson with respect to these initials
12 efforts to subdivide the property?
13     A    Yes.
14     Q    Who else did you contact?
15     A    I contacted Eagle Construction and
16 Mr. Wilson.
17     Q    How was it that you came to contact Eagle
18 Construction and Mr. Wilson?
19     A    Well, it is a very small area over there and
20 he had a construction site less than a half mile from the
21 site. And I don't know if Simpson recommended him or
22 Parks recommended him; but I knew I needed a backhoe, so
23 he was the guy with a backhoe nearby.
24     Q    Would you have any records and/or document
25 which would reflect who referred you to Mr. Wilson and

**38**

1    Eagle Construction?

2    A    No.

3    Q    Who initially contacted Eagle Construction

4  and/or Mr. Wilson?

5    A    I would suspect I did.

6    Q    Do you recall when it was that you contacted

7  Mr. Wilson?

8    A    It would have been probably the late spring,

9  early summer of '99.

10    Q    Was this a phone conversation, your first

11  contact?

12    A    I don't know.

13    Q    Can you tell me the gist of this first

14  contact that you had with Mr. Wilson?

15    A    I said we wanted to do some work on the

16  property and whether he would be available to provide that

17  work.

18    Q    What did he indicate?

19    A    Sure.

20    Q    When did you become aware that Mr. Wilson

21  was a supervisor in Jackson Township?

22    A    I don't think it was until a month or two

23  later.

24    Q    How did you become aware?

25    A    I think he told me.

**39**

1    Q    Do you recall in the context of what

2  conversation you were having at the time that he told you?

3    A    We were on-site, and I don't know, it came

4  up that he was a supervisor at Jackson Township.

5    Q    Do you recall Mr. Wilson telling you that

6  there was going to be a moratorium on development in

7  Jackson Township?

8    A    Absolutely not.

9    Q    So it is your testimony that Mr. Wilson

10  never told you that there was going to be a moratorium on

11  development in Jackson Township?

12    A    Absolutely not.

13    Q    What is your testimony then?

14    A    My testimony is that. I said he absolutely

15  did not tell me that.

16    Q    Just so we are clear, I believe you may have

17  misheard me or something. My question to you was: Is it

18  your testimony that Mr. Wilson did not tell you about a

19  moratorium on development in Jackson Township?

20    A    That is absolutely correct. He did not tell

21  me about a moratorium or any proposed moratoriums in

22  Jackson Township.

23    Q    Did Mr. Wilson tell you that Jackson

24  Township was working on a subdivision ordinance?

25    A    No.

**40**

1    Q    Did you enter into a written agreement with

2  Mr. Simpson?

3    A    I don't believe so.

4    Q    Did you enter into a written agreement with

5  Mr. Wilson?

6    A    No.

7    Q    Did you enter into a written agreement with

8  Eagle Construction?

9    A    No, not that I can recall. I don't

10  remember, I think it was -- when outside contractors give

11  you prices and you say, okay, go ahead, that was, I think

12  -- I don't remember anything in writing about it, about a

13  contract.

14    Q    What was it that you hired Mr. Wilson and

15  Eagle Construction to do?

16    A    Well, initially there was some debris that I

17  wanted him to remove from the property where some farmers

18  had thrown stuff over a hill into a gully. That never

19  came about, he never completed that task.

20    Q    Why not?

21    A    I don't know, but he didn't get to it and we

22  kind of ignored that after awhile.

23        Then I hired him really to send a backhoe in

24  to dig the test pits with the SEO and myself present.

25    Q    Did he operate the backhoe?

**41**

1    A    No.

2    Q    Who was operating the backhoe?

3    A    I believe that it was his nephew; but I

4  don't know the man's name, I don't recall his name.

5    Q    When was this done?

6    A    It was done probably the summer, sometime

7  in the summer of '99, I don't recall exactly when.

8    Q    Was anybody else present, other than

9  Mr. Parks, who is the SEO, yourself, and the backhoe

10  operator at the time you were digging these test pits?

11    A    Not that I know of, not that I recall.

12    Q    Who made the determination where the test

13  pits would be dug?

14    A    It was kind of a combination of Simpson and

15  I, because what we were contemplating subdividing, the

16  lots, kind of dictated where you try to find on-site

17  septic.

18    Q    At the time that you were digging test pits,

19  how many lots did you contemplate you would be dividing

20  the property into?

21    A    I think that it was five or six, because we

22  had the farmhouse and barn and three lots, one for each of

23  our children, the residue for ourselves and another lot

24  along the road. That was all tentative.

25    Q    What was the result to your knowledge of

42

1  these test pits?
2  A    Well, we did, I don't know, I forget how
3  many we dug; but we ended up with five or six approved
4  sites.
5  Q    Were there any records indicating how many
6  test pits were dug and how many sites were approved?
7  A    Well, there is a record of all the sites
8  that were approved and the Township has that and so do you
9  on the sewer modules.
10  Q    Is there any record of sites which were not
11  approved?
12  A    Not that I know of. You dug a hole, and if
13  it didn't look good, then you covered it up and moved on.
14  There is no point of making a record of one that didn't
15  pass.
16  Q    Were you present the entire time that the
17  test pits were being dug?
18  A    I think I was present for all of them,
19  except one. I think I was called away on the property for
20  something when one was dug and came back when they were
21  still there after the fact.
22  Q    Who were you called away by?
23  A    I don't know, I don't remember.
24  Q    What were you called away to do?
25  A    I don't know, I don't remember. I just

43

1  remember I went away and then I came back and they had
2  already dug the test pit, so I wasn't present when they
3  dug that.
4  Q    Prior to this time, had you ever witnessed
5  test pits being dug or anything to do with test pits?
6  A    No.
7  Q    Did you learn at the time you were on the
8  property and the test pits were being dug that these sites
9  were being approved or did you learn sometime thereafter?
10  A    They are not approved when you dig a site
11  pit.
12  Q    What happens?
13  A    Well, they told me that once you found
14  suitable soil, then they had to come back and do a perk
15  test in those locations.
16  Q    Who told you that?
17  A    I think it may have been Wilson.
18  Q    Was this during the original conversation
19  you had with Mr. Wilson or at some subsequent
20  conversation?
21  A    No, it was probably a subsequent
22  conversation afterward, I don't recall exactly when that
23  took place.
24  Q    How many conversations do you recall having
25  with Mr. Wilson prior to being out on the property and

44

1  digging these test pits?
2  A    I don't know, I don't recall how many. I
3  would be guessing if I gave you a number.
4  Q    Was it more than five?
5  A    No.
6  Q    Who performed the perk tests?
7  A    Wilson's crew did.
8  Q    Were you present during the performance of
9  the perk tests?
10  A    No.
11  Q    Do you know when they were performed?
12  A    No, I am not positive of when that was -- I
13  would say within, here again, I am guessing, estimating, 6
14  weeks of when we dug the -- 6 to 8 weeks from when we dug
15  the test pits.
16  Q    Between the time that the test pits were dug
17  and the perk tests were performed, which you are
18  indicating about a 6 week period, did you do anything
19  else, you personally do anything else with respect to
20  subdividing the property?
21  A    Well, we couldn't subdivide the property
22  until we knew whether a site had perked, so there was
23  nothing to do.
24  Q    So your answer to my question was you did
25  nothing in the 6 weeks between when you dug the test pits

45

1  and when the perk tests were done?
2  A    I may have been -- again, it is speculation
3  -- talking to a builder friend of mine for design of an
4  art studio and a house; but at some point in there, that
5  would be the fall of '99, this started to evolve.
6  Q    Who would this builder friend have been?
7  A    McClintic.
8  Q    That is the name of an individual or a
9  company?
10  A    It is an individual, Max McClintic.
11  Q    Where is Mr. McClintic located?
12  A    He is in State College, Pennsylvania.
13  Q    Was it your intent at the time that you had
14  conversations with him to have him build the structure
15  that you contemplated on the property?
16  A    It was my intention that he would help
17  design it and help build it. His brother, Fred McClintic,
18  actually had the construction crew.
19  Q    Did you enter into a written contract with
20  Max McClintic with respect to the design of the building?
21  A    No, Max and I have always operated on a
22  handshake.
23  Q    How about with his brother with respect to
24  building it, did you enter into a contract?
25  A    We entered in a contract where he agreed --

46

1    Q      Did you enter into a written contract?
2    A      No.
3    Q      What contract did you enter into with the
4    builder?
5    A      The time and material, construction and that
6    we set aside or he set aside the -- as soon as the weather
7    broke in the year 2000, that he would begin construction
8    on a garage, an art studio and a house.
9    Q      Anything else that you recall doing toward
10   developing the property or building on the property during
11   this 6 week period between when the test pits were done
12   and the perk tests?
13   A      Well, we had put the -- we had put feelers
14   out for the house and -- see, the house and barn already
15   had a sewage system existing, so we didn't need to worry
16   about whether we perked or probed there. So we put
17   feelers out to find a buyer for about a little less than
18   26 acres and the house and the barn.
19   Q      How did you determine what acreage you would
20   sell with the house and barn?
21   A      Because of Simpson's survey; and as I said,
22   there is a main power line going down through the property
23   and it acted as a natural divider.
24   Q      Did Simpson do a survey?
25   A      Yes.

47

1    Q      When did he do the survey?
2    A      That spring and summer.
3    Q      The spring and summer of '99?
4    A      Yes.
5    Q      Do you still have that survey?
6    A      A copy of that survey was provided to you.
7    Q      Did you take any other action, I am just
8    going to limit it to the 6 week period --
9    A      You are calling it 6 weeks, I said, 6 to 8
10   weeks, I don't remember.
11   Q      Whatever that period was, that is why I am
12   relating it to the test pits being dug and the perk tests
13   being performed, whatever time period that was,
14   understanding that we don't have the exact time period;
15   but did you take any other action toward developing
16   building on the property and/or subdividing the property?
17   A      Well, we started to look at the
18   possibility -- we had to get a road back to where we
19   wanted to build and it was already a base road back there
20   but it crossed the stream.
21   Q      How did it cross the stream?
22   A      It didn't, it came to the stream and it
23   would have had to cross the stream to get to the property
24   where we were going to build or the land that we were
25   going to build on, so Max McClintic was exploring getting

48

1    a permit. I am not sure from whom, Forest and Waters or
2    somebody, for a stream crossing, for a bridge.
3    Q      He was exploring the permit at your behest?
4    A      Yes.
5    Q      Did you tell him specifically to get a
6    permit or did you just tell him that you wanted this road
7    and do what is necessary, how did that work?
8    A      Well, I never got a permit to cross the
9    stream, so he was exploring what it took. He is the kind
10   of guy that just takes charge and before I knew it, he had
11   applied for a permit and gotten it.
12   Q      Who did he apply with --
13   A      As I said, I don't remember if it was Forest
14   and Waters or -- I forget the people that issue -- the
15   Township has a copy of the permit that was a copy of the
16   permit that was issued by whatever department was required
17   for a bridge to be put across the stream.
18   Q      When you said there was already a base road,
19   what do you mean by that, what is --
20   A      There was already an obvious cartway that
21   went all the way back into the woods, through the woods,
22   to the stream.
23   Q      Was this cartway being used in any fashion
24   to service either the barn or existing house?
25   A      No.

49

1    Q      Was there any roadway being used or any on
2    the property?
3    A      The house and the barn were already right
4    along the paved road.
5    Q      They had access to the paved road how?
6    A      Right there it was -- the house was within
7    20 feet of the paved road and the barn was 20 feet from
8    the -- all there was in front of the house and the paved
9    road was a parking space, they didn't even have a
10   driveway.
11   Q      This cartway that you are referring to, was
12   that a dirt cartway?
13   A      It was a shale, shale dirt cartway.
14   Q      Was it graveled in any way?
15   A      Well, obviously, it had been kept up by
16   somebody, probably the Michaels, I don't know, because
17   there weren't any trees growing in it or anything else.
18   In fact, it had even been mowed.
19          During that period of time I also was
20   talking to Wilson about coming in and shaleing, putting a
21   new coating of shale on that road to bring it up to a
22   better standard for our driveway.
23   Q      You were talking to Mr. Wilson about doing
24   the work to put the shale on there?
25   A      Yes.

50

1    Q        And was this during the period of time that
2    we are talking about between --
3    A        Well, was it during the 8 week period of
4    time, I am not sure. It was in the fall of 1999 when all
5    this was talking place.
6    Q        You said you put out feelers about selling
7    the existing structures and 26 acres. What do you mean by
8    that?
9    A        Well, I just let it be known to people that
10   I was -- I told Simpson I would like to sell this off. I
11   told other people that may have an interest.
12   Q        Who else did you tell beside Simpson that
13   you can recall?
14   A        I don't remember. If I had a friend in
15   State College that said, oh, gee, I would like to be out
16   in that area, I would tell him that I was going to sell
17   off 26 acres and the house and the barn.
18   Q        Did you have a price in mind at the time
19   that you were putting these feelers out as to what you
20   wanted to sell the house and the barn and the 26 acres
21   for?
22   A        I had asked several realtor friends of mine
23   what they thought something like that would go for.
24   Q        Do you recall who you asked?
25   A        Probably Pat Brewer and a fellow by the name

51

1    of Scott Yocum.
2    Q        Specifically, you asked them what?
3    A        What they thought a house and a barn and 26
4    acres would sell for.
5    Q        Would sell for where? Did you tell them
6    where?
7    A        Yes, in Huntingdon County.
8    Q        Just in Huntingdon County?
9    A        No, I told them where the property was,
10   Yocum had sold property over in that area before.
11   Q        What did these relators tell you with
12   respect to what it would sell for?
13   A        They indicated, I don't remember exactly,
14   anywhere from 125 to $175,000, if it was somebody looking
15   with horses or something like that.
16   Q        Did you contract with any realtor to sell
17   the property?
18   A        No.
19   Q        Why not?
20   A        Because I didn't want to.
21   Q        Did you do anything else to, in your terms,
22   put out feelers to sell the property other than what we
23   have discussed?
24   A        No, because before I got it I got a call
25   from the Hewetts who had somehow heard through the

52

1    grapevine that this property was for sale.
2            MR. SHERR:  Off the record.
3            (Lunch recess.)
4    BY MR. SHERR:
5    Q        We are back on the record. Mr. Corneal, we
6    left off, you had indicated that you got a call from the
7    Hewetts, who had heard through the grapevine about the
8    property. Do you recall that testimony?
9    A        Yes.
10   Q        Where did they call you?
11   A        Well, when I said the grapevine, I meant the
12   grapevine in the area down there and the grapevine
13   specifically, they told me that Tom Wilson had told them
14   that I was interested in selling a piece of ground. And I
15   believe since Tom had my number at the office, I think
16   that is where they called me, at the office.
17   Q        Had you prior to hearing from the Hewetts,
18   discussed with Mr. Wilson selling the parcel containing
19   the barn and the house?
20   A        Yes, in fact, he had expressed an interest
21   in buying it himself.
22           It so happens that this property that I
23   bought from Michaels was the old Wilson farm, which was
24   his grandfather's farm, and he stated to me that he would
25   love to have a place to go with his grandchildren and he

53

1    would be interested in personally buying the 26 acres.
2    Q        Did he specifically reference the 26 acres
3    during this conversation?
4    A        Well, I said, I told him that I was selling
5    off the house and the barn and approximately 25, 26 acres,
6    something around that, so yes, that is what he anticipated
7    it was going to be on the market.
8    Q        Did you have this conversation with
9    Mr. Wilson concerning selling the house and the barn
10   before or after the test pits were dug?
11   A        Well, it was during, because we had a number
12   of discussions at that time of what was necessary to do
13   and what the Township through its SEO required.
14           As I said before, he told me he was a
15   supervisor. So at that time I quizzed him on what it was
16   necessary to do and he made a joke, he says, well, in this
17   Township we even permit privies, inferring that it was
18   wide open.
19   Q        Just so I am clear about time, and the only
20   reason I am asking this, the conversation that you had
21   with Mr. Wilson about purchasing the property when he
22   referenced to you that it was the old Wilson farm --
23   A        The old Wilson farm.
24   Q        -- was that before or after the test pits
25   were dug?

54

1    A    I would suspect that it was either at the
2  same time or before.  Because I brought him on and we were
3  discussing a number of things.  Remember the first time I
4  said I talked to him, we talked about cleaning up some
5  debris that had been thrown over and as we are going
6  through this area of the farm he is talking about, oh,
7  yeah, this was an old logging road.  When I was a kid,
8  there was a sawmill back here.  So he was giving me a
9  history on this thing.
10          I can't really pinpoint whether it was right
11  at the same time we were doing the test, but obviously, it
12  relates to what I was hiring him for.  So we had already
13  done the test pits, I am not sure.
14          It was right around that time, probably
15  within a week of two of either prior or after the test
16  pits, or it could have been days prior to the test pits.
17    Q    Is it your testimony that you are aware that
18  Mr. Wilson was a Township supervisor at or around the time
19  that the test pits were dug?
20    A    He had told me, yes.
21    Q    You indicated he didn't tell you during the
22  first conversation you had with him, it was some
23  subsequent conversation, right?
24    A    As I said, I can't remember exactly what the
25  substance of each conversation was.  I said at some point

56

1  requirements with respect to on-lot sewage, did you have
2  any discussions with Mr. Wilson about any other Township
3  or county requirements for dividing the land?
4    A    When you say discussions about dividing the
5  land.
6    Q    Subdividing the land?
7    A    Or subdividing the land, the situation was
8  that there was no subdivision requirements and code.  He
9  said, you can build whatever you want, there is no code,
10  there is no building code, there is no subdivision.  I
11  think that was in the same conversation, he said, you can
12  have a privy, if you wanted one, in this Township.
13    Q    So we are clear, is it your testimony that
14  Mr. Wilson told you at sometime before the test pits were
15  dug and I am using that just as a reference point, that
16  there was no subdivision requirements in the Township?
17    A    Well, you are asking me, again, to identify
18  a specific time.  It may have occurred the day we were
19  digging the pits or it may have occurred the day before we
20  were digging the pits.
21          I know that I delivered to his office a copy
22  of a rough map from Simpson showing proposed lots that we
23  were going to do and whether the conversation took place
24  at that moment, because we were, obviously, discussing
25  subdivision, or it took place later on, I am not sure.

55

1  it became apparent that he was a supervisor, he told me he
2  was a supervisor.  Then we had discussion, whether it was
3  the same time as the discussion about him buying the
4  property or not buying it, I don't recall exactly.
5          It was kind of like we were establishing --
6  I felt that I was trying to establish a rapport with some
7  local people.  So it was just a chatty, number of chatty
8  conversations about things.
9    Q    What is it that you recall him telling you
10  about the Township requirements with respect to the sewage
11  enforcement.
12    A    As I said, he joked, and he said, we even
13  permit privies here, which is an outdoor toilet, an
14  outhouse.  The reference was that it was unusual that they
15  were -- I don't want to say that he didn't say they were
16  backward, but that is, obviously, what I interpreted from
17  it.  All you had to do was do the tests and if you passed,
18  you had no problem.  I mean the log tests and the perk
19  tests.
20    Q    Is it your belief based on your
21  conversations with Mr. Wilson that he was aware before the
22  test pits were dug that you were intending to subdivide
23  the property?
24    A    No question about it.
25    Q    Other than discussions about the

57

1    Q    Are you sure that he told you that there
2  were no subdivision requirements in the Township?
3    A    Absolutely.
4          Let me add to that.  He said there was no
5  subdivision requirements, but we had to have the SEO's
6  approval on these locations, which then had to be
7  submitted to the Township.  So it wasn't just you could --
8  you, obviously, needed the on-site septic approval from
9  the SEO that the Township then had to sign, that then got
10  forwarded on to DEP and that is what he had told me needed
11  to be done; so to that extent, the Township was involved.
12    Q    Did you discuss or did you have any
13  discussions with anybody concerning your discussions with
14  Mr. Wilson and what the Township required or didn't
15  require?
16    A    Yes, I am sure I discussed that with Max
17  McClintic.  I may have said something to my wife, I can't
18  recall, because Max was doing the drawings for our home
19  and art studio.
20    Q    Did your discuss your conversations with
21  Mr. Wilson concerning what the Township would require or
22  wouldn't require with Mr. Simpson?
23    A    I think Mr. Simpson already knew what the
24  Township required and didn't require, because as I said,
25  he was doing the sewer modules and he is the one that

**58**

1 recommended that I needed to get the pits done and the SEO
2 involved.
3 Q        My question was, did you discuss your
4 conversation that you had with Wilson with Simpson?
5 A        Did I specifically discuss Wilson's
6 conversation, I most likely did; but I can't say that I
7 did. I don't know, that is the answer to the question, I
8 don't remember whether I did or not. I could have and I
9 would have to ask Mr. Simpson if. . .
10 Q        Other than what you have already testified
11 to occurred with respect to either your subdividing the
12 property and building on the property to the point where
13 the perk tests were done, can you remember anything else
14 happening with respect to either subdivision and/or
15 building on the property?
16 A        Well, no.
17          It was my understanding from all these
18 conversations that I had with Simpson and with Wilson that
19 there was no problem in dividing off some pieces of ground
20 as long as they perked or we were able to get a sewage SEO
21 officer approval on the perk sites, that was the only
22 requirement that we had to develop and divide up this
23 land.
24 Q        Once the perk tests were done, I believe you
25 testified that Mr. Simpson then did sewage models?

**59**

1 A        Yes. I don't know if it was right then that
2 he did the sewer modules but eventually he did sewer
3 modules within a month or two or something like that.
4 Q        At the time did you have any understanding
5 as to why sewage modules were necessary?
6 A        Yes, that was the process upon which the SEO
7 approved in writing the sites that were found to have
8 passed and the Township would sign those modules and, in
9 fact, I paid them $1400 and some cents for their SEO's
10 work on this thing and I had paid Wilson twice, once for
11 digging the pits and once for doing the perk tests.
12          Once that was done, then sewer modules were
13 done for the Township to sign. Barry Parks was presented
14 with those sewer modules, he signed them all. I took him
15 to a meeting of the Township and asked that they be signed
16 and the Township supervisor refused to sign them.
17 Q        When did you take them to the Township?
18 A        I believe it was the February meeting.
19 Q        February of what year?
20 A        The year 2000.
21 Q        Up to that point, had you had any contact
22 either in writing or orally with anybody from the
23 Township, any official or employee of the Township other
24 than Mr. Parks and Mr. Wilson?
25 A        No, just with Wilson. I don't think I

**60**

1 talked to anybody else.
2          Wilson was my contact then and continued to
3 be, because I was going to have him do that road that was
4 going to be necessary -- what it really would be, would be
5 a driveway for the house, a long one, and he was going to
6 do the driveway for me. So my contact would have been
7 with him.
8          In those contacts, he never said anything to
9 me, well, we have a problem or you have a problem,
10 nothing, everything was hunkydory as far as I knew.
11 Q        Did you have contact with Mr. Wilson after
12 the perk tests were done but prior to your going to the
13 February 2000 Township meeting?
14 A        That is the time period I was talking
15 about. He and I were discussing getting the road in,
16 because we had discussions about permitting to get the
17 bridge across the stream. And I wanted to go ahead and
18 get the driveway in so that when we were ready to go
19 across the stream, that we could do it, because we had to
20 get construction vehicles back in the back end of the
21 property where we were going to do the construction. So I
22 discussed that with him, from that period of time when the
23 perk tests were done, up until February of the year 2000.
24 Q        When were the perk tests done, do you know?
25 A        In the fall of -- mid to late fall of '99.

**61**

1 Q        Do you recall, Mr. Wilson telling you that
2 you should hurry and get your materials to the Township?
3 A        No, he never said that. He never indicated
4 anything was wrong or anything was going to delay the
5 project that we were pursuing.
6 Q        Getting back to the phone conversations with
7 the Hewetts, it is your belief that it was Mr. Wilson who
8 told the Hewetts that you were selling some of this
9 property?
10 A        That is what I believe, as I recall, yes.
11 Q        What else occurred during this phone
12 conversation?
13 A        That they had a daylily business and they
14 were located in a dark area and they needed to get out
15 into the sunshine and get some open space and they were
16 looking for a place just like ours.
17 Q        Did they indicate to you during that phone
18 conversation that they had been to the property?
19 A        I don't remember if they had been or not, I
20 don't know.
21 Q        Did you discuss at that point during this
22 initial phone conversation price?
23 A        Yes.
24 Q        What price did you discuss?
25 A        $150,000 -- actually, I discussed $160,000,

62

1  because that was the upper end of what my realtors had
2  told me or had estimated the property to go for and I was
3  looking to basically cash -- get my cash out of the
4  investment and invest that money in a house and then I
5  would have the rest of the land free and clear.
6      Q      When you say investment, as I understand
7  your testimony, at the time that you purchased this
8  property, you weren't purchasing it for an investment,
9  were you?
10     A      Oh, absolutely. Are you kidding me? I
11 never buy anything, unless it is an investment.
12     Q      So it is now your testimony that --
13     A      No, I haven't changed my testimony.
14     Q      Let me finish and you can answer it anyway
15 you would like.
16            It is now your testimony that at the time
17 that you purchased the property, one of your purposes in
18 purchasing the property was to make money off of the
19 property?
20     A      I never buy anything in real estate, unless
21 I am going to make money on the transaction. I always
22 look -- and my wife can attest to this and so can many
23 people that know me -- I never make -- I never buy
24 anything for the fun of it or for some recreational
25 purpose. I buy it with the anticipation of getting my

64

1  away a lot of the character that drew a lot of people to
2  the State College market.
3            Right across the mountain, 20 minutes away,
4  was a piece of property that was ideal for -- I could just
5  see the State College market moving that way, and, in
6  fact, it was.
7            So I anticipated from day one that I would
8  make money on this property, as well as have the benefit
9  of having the property -- an art studio along the stream
10 and either a summer house or what ended up being a
11 permanent house.
12            MS. MONTGOMERY: Can I talk to my client for
13 one second?
14            MR. SHERR: No. If he wants to have a
15 conference with you, that is one thing.
16            MS. MONTGOMERY: All right.
17     A      I want to have a conference with my
18 attorney.
19            (Discussion held off the record.)
20            (Answer read.)
21     A      A summer house is actually what I said. It
22 ended up being a permanent house.
23 BY MR. SHERR:
24     Q      My question was though, how did you know or
25 what did you base your belief that you would be able to

63

1  money back somehow and then ending up with something.
2            In this case, I was willing to accept the
3  fact that I would have no money tied up in the balance of
4  the land that I really wanted, and that is how I always
5  invest.
6            Property is not -- I am not an affluent
7  person that I can afford to buy property and sit around on
8  it. It has got to make money or return my investment to
9  me or I have a problem with it, I always buy that way.
10     Q      So it was your belief then from the time
11 that you purchased the property that you would be able to
12 subdivide it and recoup your purchase price?
13     A      There was no reason to believe that I could
14 not subdivide it and recoup my money.
15     Q      What I am asking you is you had a belief at
16 the time that you could do that?
17     A      Yes.
18     Q      Recoup your money?
19     A      Yes.
20     Q      What did you base that belief on?
21     A      I bought a number of pieces of real estate
22 in the past and sold them.
23            I try to anticipate where the market is
24 going to be in the future. I anticipated that the market
25 with I-99 going into the State College area was taking

65

1  subdivide the property on at the time that you purchased
2  it?
3      A      It is not hard to subdivide land when there
4  is no subdivision ordinances.
5      Q      Were you aware there were no subdivision
6  ordinances?
7      A      Somebody had told me there was virtually
8  nothing over there. I don't remember whether it was one
9  of my realtor friends or -- I don't know who it was.
10     Q      Just so we are clear on the record, it is
11 your testimony that at the time that you purchased the
12 property you were aware or you had a belief that there
13 were no subdivision ordinances in Jackson Township?
14     A      I had a belief that that was the case. I
15 never checked directly with the Township about that.
16     Q      Why didn't you check with the Township?
17     A      Because it wasn't a compelling situation. I
18 didn't know how much dividing I was going to make or what
19 exactly I was going to do. I knew that it was a good buy
20 and I couldn't anticipate any problems.
21            Maybe it was Yocum that told me, because he
22 had sold some pieces over there and has represented to
23 people that it was easy to subdivide, because there were
24 no ordinances and no building codes and he is a
25 professional, I had no reason not to believe him.

66

1   Q       When you learned that you would have to have
2   certification that lots were suitable for on-site sewage,
3   were you surprised by that?
4       A       No, you have to have sewage disposal and
5   most people that live in places like that don't have
6   public sewer, so you would anticipate you have to have an
7   on-site septic system. I certainly had heard of on-site
8   septic before. And when I bought the property, the
9   Michaels pointed out, here is our drain field for the
10  on-site septic system for the house.
11      Q       Who pointed that out?
12      A       The Michaels, the people I bought the
13  property from.
14      Q       Was that the first time that you become
15  aware that there was on-site sewage at that property?
16      A       I guess so, but nobody in rural areas like
17  that have public sewer. So in anticipation, if somebody
18  asks me what kind of sewer is it, my guess would have been
19  that it was on-site septic.
20      Q       But you never investigated that?
21      A       I didn't need to, because as I said,
22  Michaels told me, which confirmed what was obvious.
23      Q       Prior to the Michaels telling you I guess is
24  what we are trying to pinpoint now, you didn't do any
25  investigation, whether there was on-site sewage for the

67

1   property or whether it was served by any kind of public
2   system, you did no investigation as far as that is
3   concerned, right?
4       A       There was no need to, I hadn't agreed to buy
5   the property yet.
6       Q       My question is, you didn't do that, isn't
7   that correct?
8       A       My answer is there was no need to do that,
9   that is correct.
10      Q       During your initial conversation with the
11  Hewetts, did you tell them that you were in the process of
12  dividing the property?
13      A       I said at that time we were investigating
14  the division of the property and we anticipated that the
15  easiest one to divide, because we knew it already had
16  sewer and water on it, was the house and the barn and 26
17  acres, a little less than 26, 25 point something.
18      Q       At the time that you had your initial
19  conversation with the Hewetts, were you aware that
20  somebody was living in the house?
21      A       There was no one living in the house.
22      Q       Was there a tenant for the property?
23      A       Not at that moment.
24      Q       At what point —
25      A       Excuse me, I beg your pardon. I have a

68

1   person that worked for me living in the house at that
2   time, yes, I did.
3       Q       Who was that?
4       A       Scott Page.
5       Q       In what capacity was he living in that
6   house?
7       A       He was living in there without paying rent,
8   because he was in financial difficulties and he was a very
9   nice young man and he worked hard for us and we wanted to
10  give him that as a fringe benefit to help him out.
11      Q       What work did he do for you?
12      A       He worked as a front desk receptionist at
13  our business.
14      Q       Is that the health club?
15      A       Yes, the health club.
16      Q       Did you have any written agreement with him
17  with respect to his living on the property?
18      A       No.
19      Q       Did you subsequently enter into an agreement
20  with anybody with respect to leasing any of the property?
21      A       Subsequent to what?
22      Q       To Mr. Taige living on the property?
23      A       We have entered into an agreement in the
24  summer or the fall of this year.
25      Q       With whom?

69

1       A       Kevin, I don't remember his last name.
2       Q       That agreement is in writing?
3       A       No -- you asked me if I had a written
4   agreement, I did not. It is an oral lease on a 60-day
5   basis that we entered into this fall with Kevin and his
6   fiancee, I don't remember her name either, sorry.
7       Q       What are the terms of the 60-day lease?
8       A       They pay utilities and $375 a month and
9   maintain the property. I can give them 60 days notice for
10  them to be out or they can give me 60 days notice that
11  they want out.
12      They were children of a friend of mine in
13  State College that didn't have much money and were
14  desperate to find a place to be on their own, because she
15  is still at Lockhaven State and going to school and
16  teaching and he works construction with one of the local
17  construction companies.
18      Q       This started in the fall of 2000?
19      A       Fall of 2000, yes.
20      Q       Have you paid $375 a month since the
21  inception of the --
22      A       Yes, I think they have been there 5 or 6
23  months, something like that.
24      Q       Getting back to the Hewetts and the phone
25  conversation that you had. During this initial

Case 1:00-cv-01192-SHR   Document 120   Filed 04/18/2003   Page 68 of 100

**70**

1  conversation that you had with them, did you discuss
2  anything else concerning the sale of the property other
3  than price?
4      A     Well, we discussed Page living there, Mr.
5  Page, and we discussed the Hewetts having to sell their
6  house.
7      Q     What did you discuss about Page living
8  there?
9      A     Well, I said that we cared about this young
10  man, that we were trying to help him and the last thing we
11  wanted to do was throw him out and so that we wanted to
12  give him plenty of time to find something else or we were
13  going help him find something.
14          That was fine with them, because they had
15  started this daylily business and really weren't ready to
16  go into it full-time until the spring of 2000 and so we,
17  basically, had -- I think their contract was in October
18  and they had until -- they weren't anticipating needing to
19  move in there until the beginning of the summer, which
20  worked out fine for everybody or it seemed to work out
21  fine for everybody.
22      Q     Did you enter into any agreement during this
23  initial conversation?
24      A     No, there was a subsequent written
25  agreement.

**71**

1      Q     Was there any kind of agreement between you
2  and the Hewetts during this initial conversation that
3  either they would purchase the property or come out and
4  look at the property or that you would continue
5  negotiating, anything of that nature?
6      A     No.
7          At the initial discussion they came out and
8  met me on the property.  We went through the house and we
9  went through the barn and they looked at the land and took
10  a walk down along the stream and we discussed things.
11      Q     What did you discuss?
12      A     The contract or the proposed contract to
13  purchase.
14      Q     Did they agree that at that point they
15  wanted to purchase the property?
16      A     Yes -- well, at that point, they may have
17  called me that night or they may have called me the next
18  day; but as a result of that meeting, they elected to
19  purchase the property.
20          I had offered it at 160, they asked for 150
21  and I agreed to it.
22      Q     Then you entered into a written agreement of
23  sale, correct?
24      A     Right.
25      Q     Who prepared the agreement of sale?

**72**

1      A     I did.
2      Q     There were a number of conditions contained
3  within the agreement of sale, correct?
4      A     Right.
5      Q     The one condition, I will read it here,
6  states: Buyers acknowledge that a present tenant, Scott
7  Page, P-A-G-E, needs to be relocated by sellers to a
8  property they are constructing on another portion of the
9  farm and that they will be flexible in the settlement date
10  to accommodate this transition.
11      A     Yes.
12      Q     Do you acknowledge, and I can show it to
13  you, I don't have a copy.
14      A     You don't have to show it to me.
15      Q     You acknowledge that that was a condition on
16  the agreement of sale?
17      A     Assuming you are reading it from the
18  agreement of sale, yes.
19      Q     I will represent that I was reading that
20  from the agreement of sale.
21      A     Okay.
22      Q     What were you constructing on the property?
23      A     Well, we were anticipating building the
24  house and the art studio and the garage.
25      Q     That is where you anticipated relocating Mr.

**73**

1  Page to?
2      A     Well, at the same time there was another
3  possibility that -- I was talking to a neighbor called
4  Weaver and Weaver had indicated that he may be interested
5  in selling his property and he had a small cottage on that
6  property.  So I was anticipating that Weaver, that if I
7  made a deal with Weaver, that Scott would move on to that
8  property.
9      Q     So was your contemplation at the time that
10  you entered into the agreement of sale that that sale
11  would not be consummated until either you entered into a
12  separate agreement with Mr. Weaver or you completed
13  construction of another building on this property?
14      A     No, that is not correct.
15      Q     Why is that not correct?
16      A     What was anticipated was that we weren't
17  going to move Mr. Page out into the cold without trying to
18  help him, because he was kind of a fragile individual
19  psychologically and we were trying to help him. The last
20  thing we wanted to do was cause him any problems.
21          So we were anticipating somehow finding
22  something, but it wouldn't hold up this sale, we were
23  giving ourselves plenty of time to find something, even if
24  we had to find something in State College, it doesn't
25  really matter.  But it was just, we wanted the Hewetts to

**74**

1 know that we had a concern that we wanted taken care of
2 for this young man.
3    Q   At the time that you drew up this agreement
4 of sale, you at least anticipated the possibility that
5 this sale may be delayed because of Mr. Page and where to
6 locate him, right?
7    A   No, no.
8    Q   Why did you include this condition in the
9 agreement of sale?
10    A   We included it in there because we had a
11 discussion about it and we anticipated closing this deal
12 sometime in the spring of the year 2000. We gave
13 ourselves a line out there until the end of June; but
14 everybody anticipated that it was going to happen sooner
15 than June.
16       It was just a matter of we were just trying
17 to accommodate and the Hewetts were very accommodating in
18 that regard, they understood our concern about Mr. Page
19 and so we put language in like that, that is all, just so
20 there was an acknowledgment that everybody understood we
21 needed to take care of Mr. Page, that was one of our
22 concerns, but it certainly wouldn't have held up the sale.
23    Q   You had in the agreement of sale that the
24 closing date would be June 30, 2000, right?
25    A   Yes.

**75**

1    Q   You also put in there that both you and the
2 Hewetts would be flexible on the closing date to make sure
3 that Mr. Page was being accommodated?
4    A   Right. The point is that it was not going
5 to hold up the sale or the transfer of the property, it
6 was just we were trying to find him something as soon as
7 we could and the Hewetts were understanding of that and we
8 were going to work together but it certainly wouldn't have
9 held up the sale.
10    Q   You also provided that you would use the
11 second floor of the barn in anticipation of the completion
12 of whatever you were going to build on the property?
13    A   That's right. I had a bunch of wood,
14 timber, that I had cut off some other property and it was
15 being air dried, cherry, oak, maple and pine and we had
16 moved it out to the top floor of the barn.
17       It wasn't easy just to move it somewhere,
18 because it had to be inside. So I reserved the rights to
19 do this, because I didn't know how long it was going to
20 take us to construct things and to use up that wood.
21       We had an estimate of what it would take,
22 but we were giving ourselves plenty of leeway, after
23 discussions with the Hewetts, it probably won't be a year,
24 but I want the right just for 2 years just in case, just
25 trying to anticipate the worst case scenario.

**76**

1    Q   As of the time that you entered into the
2 agreement of sale with the Hewetts, which I will represent
3 according to the agreement of sale states October 7, 1999,
4 had you had any dealings with any official or employee
5 from the Township other than Mr. Wilson and the SEO?
6    A   I don't think so, not that I can recall.
7    Q   Is the first time that you had any dealings
8 with any official or employee from the Township other than
9 Mr. Wilson and the SEO when you attended the Township
10 meeting in February of 2000?
11    A   I believe that is correct, yes, I think so.
12 I am trying to think if I had called the Township
13 secretary about any questions or information. At this
14 moment I don't recall any conversations.
15    Q   I am going to use as our time this February
16 2000 Township meeting that you attended, up to that point,
17 up to February of 2000, had you engaged anybody else to
18 perform any other services on the property other than
19 Mr. Wilson; Mr. Parks; Mr. Simpson; and the designer, Mr.
20 McClintic?
21    A   I can't recall anybody that I would have
22 hired to do something at that particular time.
23    Q   What did you take to the Township meeting of
24 February 2000?
25    A   I took the map of the subdivision and I

**77**

1 believe — I think I took the sewer modules; but their
2 meeting is the first Monday of every month, and I may have
3 taken the sewer modules on the first Monday of March, if I
4 didn't take it on — I would have to look at the date of
5 the sewer module, the signature that Parks had done.
6    Q   Were you present when Parks signed the sewer
7 module —
8    A   No, actually, they were delivered to his
9 wife, who works in State College, she took them home to
10 him and brought them back.
11    Q   Brought them back to you?
12    A   Yes, she did, she brought them — I believe
13 she brought them back to me. Either she brought them back
14 or he mailed them to me; but I didn't deliver them to him
15 personally, his wife took them to him.
16    Q   The map showing the lots and the sewer
17 modules, how many proposed lots were there?
18    A   At that time there was three lots.
19    Q   What were the three lots, if you can
20 describe them?
21    A   We had the 20 — we will call it the 26 acre
22 lot. Then there was a triangular piece of ground back in
23 the back, that abutted the 26 acre piece but on the other
24 side of the power line; and then there was the residue,
25 which was what we were going to build on. The smaller

**78**

1 triangular pie shape, it was a pie-shaped lot, it was
2 about 4 and a half acres, something like that.
3 Q    What did you intend to do with that lot?
4 A    I was going to give it to one of my kids.
5 Q    Other than taking the map to the Township
6 meeting and the sewer modules to the Township, did you
7 send the sewer modules anywhere else?
8 A    Send it somewhere else?
9 Q    Deliver it somewhere else or bring it
10 somewhere else?
11 A    In what time are you talking about, when?
12 Q    At or around the time that you brought it to
13 a Township meeting?
14 A    I don't think so.
15      David Simpson delivered the things to me
16 done, we signed them in the owner's spot and we gave them
17 to Parks -- I called Parks and Parks said give them to my
18 wife, it is easier, because she worked in State College,
19 so she brought them home and either she delivered them or
20 he mailed them to me, one of the two, and they were all
21 signed. Aside from that, no, I don't think they were
22 delivered to anyone else.
23 Q    You don't recall, as I understand, whether
24 you brought them to the Township meeting, and we are
25 talking about the sewer module, the Township meeting in

**79**

1 February of 2000 or March of 2000, right?
2 A    Yes, you can easily determine that by the
3 date that Parks signed it.
4      If he signed it before the first Monday of
5 February, then it was taken in February; if he signed it
6 after the first Monday of February, then it was taken to
7 the March meeting.
8 Q    But you recall that you were definitely at
9 the February 2000 meeting?
10 A    Oh, yes.
11 Q    Is that correct?
12 A    Oh, yes.
13 Q    What happened at that meeting?
14 A    I had the plan, in fact, I had 3 or 4 copies
15 of the plan, which is what Simpson told me I needed. My
16 wife and I had signed it and it was notarized and I asked
17 the Township to sign it.
18 Q    Why did you ask the Township to sign the
19 plan?
20 A    Because that is what I was told had to be
21 done.
22 Q    Who told you that?
23 A    I think it was Simpson that said take it --
24 it was either Simpson or Wilson that said you have got to
25 take the plan -- Wilson that told me to take the plan to

**80**

1 the Township or bring it to the supervisor's meeting for
2 our signature.
3 Q    What happened at the meeting?
4 A    They said, no, we are not going to sign this
5 plan.
6 Q    Who said that?
7 A    One of the supervisors.
8 Q    Do you remember which one?
9 A    No, I think it was whoever the chairman was,
10 but I am not sure which one of the fellows that was.
11 Q    Did they say why they weren't going to sign
12 it?
13 A    Yes, they said we have a moratorium in
14 effect on subdivisions and we are not signing any plan.
15      Then they also went on to say, you are doing
16 this wrong anyhow, it has to be submitted to the County
17 Planning Commission first.
18 Q    Do you remember who said that?
19 A    Whoever it was that was talking, I think it
20 was the supervisor.
21 Q    You mean the chairman?
22 A    Yes, the chairman of the supervisors.
23 Q    Was it one person who was doing the talking?
24 A    They all chimed in here and there. I don't
25 remember -- in fact, it may have been -- it was probably

**81**

1 Mrs. Wirth that said, anyhow, you don't want to be
2 submitting that here. Anyhow, you have to take it to the
3 County Planning Commission first; but they were all in
4 agreement that that is what had to be done.
5 Q    It is your testimony, and I need to be clear
6 about this, it is your testimony and your recollection
7 that the person who said they are not going to sign it was
8 the chairman of the board of supervisors?
9 A    I said I think that is who said it
10 initially; but as I said, they all chimed in, you know,
11 yeah, we are not going to sign this, no, we have got a
12 moratorium in place. I think Wilson was the one who said,
13 yeah, we have got a moratorium in place and we are not
14 signing it.
15 Q    What did you say?
16 A    I said you guys can't have a moratorium on
17 an ordinance that you don't have, I said.
18      Then I think Mrs. Wirth chimed in with, yes,
19 besides that, before we sign anything like this, you have
20 to submit it to the County Planning Commission. She said
21 something about, you are out of procedure or something
22 like that.
23 Q    So you were aware at the time that you went
24 to the Township meeting in February of 2000 that there was
25 no subdivision ordinance in Jackson Township?

82

1    A    Right.
2    Q    How did you become aware of that?
3    A    Wilson had told me that way back when.
4    Q    Did Wilson tell you way back when that they
5    were working on an ordinance?
6    A    No, he did not. He claimed he told me that,
7    but that is not true at all.
8    Q    When did he claim he told you that?
9    A    At the meeting.
10    Q    Do you know of any reason why Mr. Wilson
11    claimed to have told you that?
12    A    Why, what was in his mind?
13    Q    Yes. Do you know or do you have a belief as
14    to why he told you at the meeting of February 2000 that he
15    had previously told you that they were working on a
16    subdivision?
17    A    You want me to speculate as to what was in
18    his mind as to why he did that?
19    Q    I am not asking you to speculate what was in
20    his mind. I am asking you whether or not you had a belief
21    or have a belief as to why he told you that?
22    A    Well, I think Mr. Wilson wanted to interfere
23    with the sale of this property and the subdivision of this
24    property, because he wanted it himself and now he is
25    trying to cover his tracks with, oh, I told you about

83

1    that, and he never told me anything like that.
2        Why would I hire him to do test pits and do
3    perk tests and do all this stuff and pay the SEO if I knew
4    there was a moratorium on or he knew there was a
5    moratorium coming in. There is no sense to that.
6        So I think he was just trying to cover
7    himself as to why he had went ahead and gotten paid for
8    this work and then he was trying to say, well, I told you
9    this was going to happen and he never told me that.
10    Q    Is it your belief then that he was telling
11    you this, that he had previously told you that they were
12    working on a subdivision ordinance, because he was
13    covering up because he accepted payments from you or
14    because he wanted the property himself or some other
15    reason?
16    A    Both reasons that you just stated I think.
17    In fact, after he was able to break or the Hewetts backed
18    out of the contract, he sent his nephew to me how he
19    wanted to buy the property now, the 26 acres, the nephew
20    did, who was a backhoe operator and had no money, had no
21    wife, no family. All of a sudden the backhoe nephew wants
22    to buy the property from me.
23    Q    Did you say anything else at the Township
24    meeting other than you can't have a moratorium because you
25    don't have an ordinance?

84

1    A    I told them, this isn't right. I said, you
2    can't have a moratorium on an ordinance that doesn't
3    exist. I said, I want this plan signed and I want, you
4    know, so we can get the sewer modules and proceed, because
5    I have got this sale — I told them that I had the sale of
6    the property to the Hewetts, they already knew about that.
7    Q    How do you know they knew?
8    A    Because they said they knew, Wilson knew.
9    Q    Who said they knew?
10    A    Wilson said he knew that the Hewetts had
11    this property or had a contract on the property.
12    Q    Did you raise your voice at this meeting?
13    A    Raise my voice? Not much louder than what
14    you are listening to right now.
15    Q    Were you angry?
16    A    Well, I was obviously disturbed when all of
17    a sudden they are throwing me a curve and Wilson is
18    claiming he told me this was happening, which wasn't true.
19    The whole thing was, needless to say, very disconcerting.
20        I explained to the rest of the supervisors
21    that I had a contract for this property and that I also
22    had contractors lined up that were committed and I was
23    committed to them to build an art studio and a garage and
24    a house for my wife and I.
25    Q    What contractor did you have lined up?

85

1    A    Max McClintic.
2    Q    Up until the point of this February 2000
3    meeting, had you done any construction activities on the
4    property?
5    A    No — none that required — we didn't do
6    anything. Wilson actually was supposed to start the road
7    back to the stream but that hadn't started yet.
8    Q    When was he supposed to start that?
9    A    He said he was going to start it as soon as
10    he got some of his vehicles and equipment in from other
11    jobs and they weren't there yet and there was, you know,
12    the typical contractor excuses and delays.
13    Q    Did there come a point in time where
14    Mr. Wilson told you he couldn't do the work?
15    A    Yes.
16    Q    When was that?
17    A    That was shortly right thereafter. I said,
18    are you doing this road for me or not? He said, Well, I
19    guess under the circumstances I can't or I won't do the
20    road. This is after we had the confrontation.
21    Q    At the February meeting?
22    A    At the February meeting, yes.
23    Q    Where did this conversation take place where
24    he told you he couldn't do the work on the road?
25    A    I don't recall if it was at that meeting,

86

1 after the meeting, because their meetings only last 15 or
2 20 minutes, or I got on the phone with him a day or so --
3 the next day or something. I don't recall how it
4 happened.
5    Q    Did anything else happen at the meeting that
6 we haven't discussed?
7    A    They told me I needed to go to the County
8 Planning Commission and submit my plan there and that the
9 County Planning Commission would send it back to them for
10 their signature.
11        In other words, what they inferred to me
12 was, no, we don't have a subdivision ordinance, but we got
13 a moratorium on them; but the Huntingdon County Planning
14 Commission has a subdivision ordinance that you have got
15 to clear it through first. That was the inference that
16 they made to me.
17    Q    So by you saying they made that inference,
18 they didn't specifically say that to you, correct?
19    A    They specifically said that you can't bring
20 it here first, you have to first have the Huntingdon
21 County Planning Commission approve your review and approve
22 your plan.
23    Q    Those were the words that were used?
24    A    Those were the words that were used.
25    Q    Who was it that used those words?

87

1    A    I would say it was probably Mrs. Worth that
2 said that. She is a secretary of that body, but she really
3 acts as a Township manager.
4    Q    Did anything else happen at this February
5 2000 Township meeting?
6    A    No, they just shut me off. They said, we
7 have got a moratorium, we are not going to approve your
8 plan and you have got to take it to the County Planning
9 Commission first anyhow, so that is it.
10    Q    Did you thereafter discuss with anybody what
11 happened at the February 2000 Jackson Township meeting?
12    A    Yes, I would have talked to Max McClintic
13 about it, I would have talked to my wife about it.
14    Q    Anybody else?
15    A    I may have discussed it with Fred McClintic,
16 but I don't know if I did or not. Definitely with Max.
17 Probably discussed it with Simpson. I would have
18 discussed it with Hewett, in fact, I know I discussed it
19 with Hewett.
20    Q    Why do you know you discussed it with
21 Hewett?
22    A    Because Hewett then started to take an
23 active role when they found out the Township was holding
24 us up, because it would have affected them.
25    Q    Did you look into whether or not you had to

88

1 submit your plan to the Huntingdon County Planning
2 Commission?
3    A    No, I took their word for that. It sounded
4 quite logical and reasonable. My dealings were
5 exclusively, if I ever dealt with anybody, it was in
6 Centre County and I know Centre County has a Centre County
7 Planning Commission that has control over land
8 subdivisions. So I assumed that what they were telling me
9 was true.
10    Q    There was nothing to prevent you from
11 looking into what they were telling you to see if it was
12 true, correct?
13    A    I asked them for a copy of the ordinances at
14 one point, at which point they said there are none, we
15 have no copies of those.
16    Q    When did that --
17    A    It wouldn't have occurred at that meeting, I
18 think it occurred at the next meeting.
19    Q    They said they have no copies or they had no
20 ordinances?
21    A    They had no copies of any ordinances, they
22 only had the originals and couldn't provide we copies. I
23 said, I will pay for copies, they wouldn't give them to
24 me.
25    Q    Who told you that they wouldn't give you

89

1 copies of the ordinances?
2    A    Mrs. Worth.
3    Q    Were you aware that copies of the ordinances
4 were available at the county library?
5    A    No.
6    Q    You were not aware of that?
7    A    No. I told you, I have not dealt in those
8 areas. I hired engineers to do this stuff when needed or
9 architects to do this stuff. If I had any involvement,
10 there was always another attorney that specialized in that
11 area that dealt with that, because that was not my area.
12    Q    Up until the point of the March 2000 meeting
13 when you are saying that you were told that you could not
14 get a copy of the ordinance, did you consult with an
15 attorney?
16    A    No.
17    Q    Why not?
18    A    Because I didn't think it was necessary, I
19 thought they were telling me the truth.
20    Q    You didn't think it was necessary to consult
21 with an attorney, even though you are testifying that they
22 refused to give you a copy of the ordinance?
23    A    You asked me between February and March did
24 I consult with an attorney, that is what I interpreted in
25 your question.

90

1  Q      I apologize for that.
2         After you were told they would not give you
3  a copy of the ordinance, did you consult with an attorney?
4  A      I talked with Jim Himes in Huntingdon.
5  Q      Did you talk to him for purposes of legal
6  representation?
7  A      Yes. He was a close friend, so.
8  Q      When you spoke with him, did you anticipate
9  that your conversation would be privileged?
10  A      I would think so.
11  Q      Were you thereafter able to review copies of
12  the Jackson Township ordinances?
13  A      Did I review them or was I able to review
14  them?
15  Q      Were you able to review them?
16  A      After the ordinance was passed.
17  Q      When was the ordinance passed?
18  A      July the 7th of the year 2000.
19         MS. MONTGOMERY: Object to the form. Just
20  be clear on what ordinance you are talking about. You are
21  making assumptions here.
22         MR. SHERR: I was just referring to
23  ordinances and--
24  A      I am talking about the subdivision
25  ordinance. I never reviewed any ordinances of the

91

1  township.
2  BY MR. SHERR:
3  Q      That is true even after you consulted with
4  this attorney in March?
5  A      That's right.
6  Q      Did you submit your plan to the County
7  Planning Commission?
8  A      Yes.
9  Q      When did you do that?
10  A      Shortly within a few days of that February
11  meeting.
12  Q      Did you personally submit it?
13  A      I did.
14  Q      Did you speak with anybody at the Planning
15  Commission at the time that you submitted it?
16  A      I spoke to a Richard Stahl, the head of the
17  Huntingdon County Planning Commission.
18  Q      What was the nature of your conversation
19  with Mr. Stahl?
20  A      The nature of the conversation was, I have
21  been told by the Jackson Township commissioners or
22  supervisors that I needed to submit a plan to you for
23  review and approval.
24  Q      What did he say?
25  A      He says, yes, and our fee is $75 or

92

1  whatever, you can bring it by and I did. I gave him a
2  check for the $75. I think it was 75, it may have been
3  more, less than a hundred dollars.
4  Q      Did Mr. Stahl indicate to you that it was,
5  in fact, necessary for you to submit the plan to the
6  County Planning Commission?
7  A      He didn't say one way or the other. He just
8  said we reviewed -- it is customary for us to review
9  plans, I don't remember that that was his exact language;
10  but he never said that it was required or wasn't required.
11  Q      Did you ask him?
12  A      I assumed from what I was told that I had to
13  do this and I assumed that Huntingdon County had a
14  subdivision ordinance, since I never heard of a county not
15  having a subdivision ordinance.
16  Q      Did you ask Mr. Stahl whether or not it was
17  necessary for you to submit your plan to the County
18  Planning Commission?
19  A      I said, I have a plan that Jackson Township
20  has asked me or told me I needed to submit to you, what is
21  your procedures? He told me; and he never said, you don't
22  have to submit it to us, we don't have any ordinances. He
23  treated it and led me down to believe that they had a
24  requirement that it had to be reviewed by them at the
25  Huntingdon County level.

93

1  Q      Did you ask him whether or not you had to
2  submit it to him?
3         MS. MONTGOMERY: Objection to the from.
4  BY MR. SHERR:
5  Q      To the County Planning Commission?
6  A      I already answered the question. He led me
7  to believe that I had to submit it to them and pay the fee
8  for their review for Jackson Township, as well as Mrs.
9  Wirth; and the supervisors led me to believe that that is
10  what I had to do if I wanted to get an eventual
11  subdivision approval once the moratorium was lifted.
12  Q      Did you do anything else to determine
13  whether or not you had to submit your plan to the County
14  Planning Commission?
15  A      No, I followed the instructions I was given
16  by the Township.
17  Q      Why do you believe, if you have a belief,
18  that the Township told you to submit your plan to the
19  County Planning Commission?
20  A      I have no idea, except my belief is that
21  they were trying to block or stop or interfere with my
22  development or subdivision of the land and so they were
23  throwing up another road block.
24  Q      Why do you believe this was a road block?
25  A      Because, obviously, in hindsight, we find

94

1  that it was not necessary to submit this to the Planning
2  Commission at the county level. It was totally false and
3  unnecessary, in hindsight we find this out.
4      Q      How did you find it out?
5      A      It became obvious when I went and talked to
6  people that were knowledgeable, such as my attorneys here,
7  as to what is required.
8      Q      When is it that you found out you did not
9  need to submit your plan to the County Planning
10  Commission?
11      A      It would have been in the late spring.
12      Q      Of 2000?
13      A      Yes.
14      Q      What happened when you submitted your plan
15  to the County Planning Commission, what did they do with
16  it?
17      A      They came back with a letter, a copy of
18  which has been provided to you, evaluating the plan.
19      Q      Contained within that letter they reference
20  the fact that there was a moratorium in Jackson Township,
21  correct?
22      A      Yes.
23      Q      Did they also review your plan with relation
24  to the proposed ordinance in Jackson Township for
25  subdivision?

95

1      A      I have no idea what they use as a basis,
2  except that it appears that they did, because they
3  reference the proposed plan that they had in their files.
4      Q      Do you recall that in that letter they
5  stated, "the Jackson Township supervisors were in the
6  process of adopting a Subdivision and Land Development
7  Ordinance, the following comments are based on the draft
8  of Jackson Township Subdivision and Land Development
9  Ordinance."?
10      A      Yes.
11      Q      Do you recall that?
12      A      Yes.
13      Q      Then that led you to believe that, in fact,
14  the County Planning Commission reviewed your plan under
15  the proposed subdivision ordinance, correct?
16          MS. MONTGOMERY: Object to the form.
17          MR. SHERR: What is the basis?
18          MS. MONTGOMERY: I didn't understand the
19  question.
20  BY MR. SHERR:
21      Q      Do you understand the question?
22      A      No, I don't.
23          MR. SHERR: Off the record.
24          (Recess.)
25          MR. SHERR: Back on the record.

96

1  BY MR. SHERR:
2      Q      Mr. Corneal, when we left off we were
3  discussing a letter that you received from the Huntingdon
4  County Planning Commission. You did receive a copy of the
5  letter, correct?
6      A      Yes.
7      Q      I note that also copied on the letter was
8  Mr. Simpson, who we already discussed, and it indicates
9  Rouzer, R-O-U-Z-E-R, do you know who that is?
10      A      May I see that.
11      Q      Sure. We can make a copy. I didn't make
12  copies.
13      A      I am not sure who that is. I am thinking,
14  but I don't want to be held to this just to help you, but
15  it may be the staff member in the office that may have
16  done part of the review that Mr. Stahl then signed it, I
17  don't know, the name seems to ring a bell.
18      Q      It is true, is it not, that the Planning
19  Commission recommended that your proposal be denied,
20  correct?
21      A      Yes.
22      Q      What is your understanding as to why they
23  recommended that it be denied?
24      A      Well, the main thing that they didn't like
25  was the four and a half acre tract of land didn't have

97

1  road frontage and so they -- and the other main reason was
2  the moratorium, as I understood it.
3      Q      Did you discuss this letter that you
4  received from the Huntingdon County Planning Commission
5  with anyone?
6      A      Yes.
7      Q      Who did you discuss it with?
8      A      Well, I would have discussed it with Mr.
9  Simpson, because I had him redraft the plan. I probably
10  would have discussed it with McClintic, Max. I certainly
11  discussed it with my wife probably, maybe not, but
12  probably.
13      Q      Anybody else?
14      A      I think that one of the things in that
15  letter, if I can look at it a second -- there was a
16  question at one point regarding the question of wetlands.
17  Here it is, number 2 on page 1.
18          I have an engineering firm in State College
19  that I hired to -- since the soil maps indicated a
20  possible wetland area where one of the sewage disposal
21  places were, even though the SEO was there and identified
22  the location and, obviously, wouldn't have identified it
23  in the middle of the wetlands, they pointed out something
24  about the property potentially being -- the one sewage
25  site potentially being wetland, as a result, the Township

98

1  seized on that and said, we can't possibly approve this,
2  there is a potential of your sewage site being on
3  wetlands.
4      I said, Your SEO was there and identified
5  this location, he knows it is not wetlands. Well, we need
6  a certification. Just another roadblock they were
7  throwing up, so that I had to go to the engineer and send
8  him out there again, a second time, and pay them to
9  identify or to certify that this was not wetlands.
10   Q    At what point were you told that there may
11 be wetlands?
12   A    When the letter came in. When you have
13 200 --
14   Q    Back up. When did you hire Blozsky
15 Associates?
16   A    I don't recall exactly when I hired them. I
17 don't remember exactly. I can look at their bills and
18 tell when they did work.
19   Q    Do you recall whether it was before or after
20 you attended the February Township meeting?
21   A    I don't recall.
22   Q    Who was it from the Township that told you
23 that there may be wetlands involved?
24   A    Well, several of the supervisors brought it
25 up and Mrs. Worth was quick to jump all over it. Well,

99

1  there may be wetlands here, she says, and we are going to
2  need a certification that this isn't wetlands.
3      I said, your SEO officer reviewed, he picked
4  the sites, there isn't wetlands. Well, we don't know
5  that, so you are going to have to go and send engineers
6  out there to get a certification.
7    Q    Where did this conversation take place?
8    A    This took place in one of the meetings, one
9  of the Township meetings.
10   Q    Did it take place at the February 2000
11 meeting?
12   A    No, it took place in I think at the March
13 meeting.
14   Q    Do you believe that, even though this letter
15 is dated February 24, 2000, this letter being the
16 Huntingdon County Planning Commission letter that we are
17 discussing?
18   A    Well, it happened in March, yes, it happened
19 in March, yes, as I said, at the March meeting.
20   Q    Why did you originally hire Blozsky &
21 Associates to conduct the wetlands investigation?
22   A    Because I wanted to know, to make sure that
23 I wasn't doing anything wrong in locating my buildings and
24 particularly with regard to putting our driveway in,
25 because our driveway then comes down and goes along the

100

1  stream and I knew how sensitive everybody -- the DEP was
2  with wetlands, so I brought the engineers in to make sure
3  that we weren't violating any of the wetland
4  specifications.
5    Q    Did you bring in the engineers before or
6  after the February 2000 Township meeting?
7    A    Well, you asked me that before. And I would
8  suspect, now that I had talked to Wilson about putting the
9  road in, that it was probably before.
10     Again, I want to be able to correct that if
11 I am wrong, based on their invoice to me, which will tell
12 me when they did the work for me.
13   Q    What prompted you to even consider or worry
14 about wetlands?
15   A    Wilson told me that he thought there was
16 some wetlands down in here when I talked to him about
17 doing the road. I said, well we certainly don't want to
18 fill in any wetlands, so that is when I got them involved.
19   Q    What did they tell you?
20   A    They said, no wetlands where the road was
21 already and where it was going to go, where the driveway
22 was, no problem.
23   Q    Did you tell the individuals from the
24 Township who you were speaking to at the March 2000
25 meeting when the subject of wetlands came up that you had

101

1  an investigation going?
2    A    You are talking about two different things.
3  You are talking about a wetland investigation by a sewage
4  site versus a wetlands investigation regarding the
5  driveway, so whatever showed up there.
6      The SEO was there. He knows what wetlands
7  are. He approved the location to dig the pit. He approved
8  the perk tests that were done in that location and I
9  couldn't fathom and I don't think anybody of rational
10 thinking could fathom that he would have set that location
11 in the middle of a wetland, but that is what the Township
12 tried to -- another roadblock they threw up, well, we
13 don't know, because the Planning Commission questions
14 whether or not there were wetlands there or not. So I had
15 to send them out again to do it, to confirm that there
16 were no wetlands.
17   Q    So it is your understanding that whatever
18 was said about wetlands at the March 2000 meeting was
19 based on the Planning Commission letter of February 24,
20 2000?
21   A    I don't know what the basis of it was, but
22 it certainly had some basis in the letter from the
23 Planning Commission. I think it was that letter. I didn't
24 thoroughly go through -- didn't it say something about
25 wetlands in there?

---

**102**

1  Q     Yes, I think you referenced it earlier --
2  A     I don't know if -- yes, right. The proposed
3  house studio and sewage system for lot number two are
4  within these soil types and that is what forced us to go
5  back out again.
6  Q     Was it the County Planning Commission letter
7  that required you to go hire Blazosky again or is it
8  something that the Township --
9  A     The Township did. The Township said, We
10  want a certification. Look here, the Planning Commission
11  said there is a -- we don't know, you are into soil types
12  of wetland type soils, so we want you to go and hire
13  somebody and certify to us that our SEO didn't put a
14  sewage system in a wetland area.
15  Q     What did you do in response to receiving the
16  County Planning Commission letter?
17  A     Well, the main objection, aside from the
18  moratorium, was the fact that this 4.5 acre lot didn't
19  have road frontage. The 4.5 acre lot was insignificant,
20  it didn't matter didley to me. I was doing it to set it
21  aside for one of the kids. So I told Simpson to redraw
22  the plan and just cut it down to two lots, the 26 acre lot
23  with the house and the barn and the remainder and he did,
24  he redrew the plan.
25  Q     I am going to read you the last paragraph of

---

**103**

1  this letter, the letter being the February 24, 2000 letter
2  from Richard E. Stahl, Planning Director, Huntingdon
3  County Planning Commission: "Please contact this office
4  with any questions concerning these comments. As always,
5  the local municipality is encouraged to carefully review
6  the subdivision/sewage module for compliance with Township
7  and state requirements."
8        In response to this letter, did you contact
9  the Planning Commission office?
10  A     I discussed that letter with one of the
11  people that reviewed, and his indication was that the main
12  thrust of the problem in his opinion was the lot that
13  didn't have any road frontage, because everybody was going
14  to be concerned, it was on the other side of the stream,
15  how are you going to get access to that lot. I said, That
16  lot doesn't mean that much to me. We never discussed the
17  fact that -- he never brought up that there was a wetlands
18  problem or anything.
19        I think these guys just throw a lot of stuff
20  in the letters and things.
21  Q     Do you know who that was that you discussed
22  it with?
23  A     That is why I am saying, it wasn't Stahl,
24  but it may have been that guy that was copied, Rouzer, but
25  I am not sure of the name. If that is the guy that works

---

**104**

1  in that office, if that is his name, then that is who I
2  discussed it with.
3  Q     How did you get to that person who you
4  discussed it with?
5  A     I called the office and they said, oh, this
6  so and so reviewed the plan, did the main review on it and
7  you should talk to him or maybe it was that Stahl wasn't
8  there, why don't you talk to this guy and it turned out
9  that he did some of the review or all of the review of the
10  plan.
11  Q     You made changes to your plan based on what
12  you learned in that letter or any conversation that you
13  had?
14  A     Yes, I did.
15  Q     Who made those changes?
16  A     Simpson made the changes for me.
17  Q     Do you know whether Simpson in making the
18  changes reviewed a draft of the proposed Jackson Township
19  Subdivision Ordinance?
20  A     I don't know that.
21  Q     Do you know whether he had a copy of the
22  proposed Jackson Township Subdivision Ordinance at the
23  time?
24  A     I don't know anybody that had a copy of
25  that, with the exception of the Planning Commission,

---

**105**

1  because we kept asking for those things and, well, when it
2  is all finished and all proofread, you will get a copy or
3  you will get the original was the response that we
4  normally got at those meetings.
5  Q     Did you attend the March 2000 meeting of the
6  Jackson Township board of supervisors?
7  A     To the best of my knowledge, I did, yes.
8  Q     Was that meeting before or after you
9  received the February 24, 2000 letter from Huntingdon
10  County Planning Commission?
11  A     I would think that it was after, it was the
12  first Monday of March.
13  Q     What was your purpose in going to that
14  meeting?
15  A     I took my sewer modules there to be signed.
16  Q     What happened at the meeting?
17  A     I asked them to sign the sewer modules. They
18  basically looked at me and said, What are you doing here?
19  I said, I am here to get the sewer modules signed. Oh, we
20  are not signing any sewer modules.
21  Q     Who said that?
22  A     Well, Wilson said it for one and so did --
23  they all kind of chimed in, Yoder, they all looked at each
24  other, you agree with that? Yes, I agree, we are not
25  signing anything for him.

---

106

1  Q    Did they tell you why they are not signing
2  the sewer modules?
3  A    They said they are not signing the sewer
4  module because of their moratorium.
5  Q    What did you say?
6  A    I said, Forget your moratorium, forget the
7  subdivision, I said, I want to build a house, I have got
8  commitments to build a house and an art studio. I said, I
9  want to get approval to build the house. Forget that, I
10 am not asking you for a subdivision. I am telling
11 you I own a 95 acre piece of ground and I want the sewer
12 modules signed so that I can get permits to build the
13 house.
14 Q    Why did you believe that you needed the
15 sewer modules signed to get permits to build the house?
16 A    Because DEP had to review sewer modules and
17 they would only review sewer modules that were sent to
18 them via the Township.
19 Q    Why did you believe that you had to get the
20 sewer modules signed in order to get permits to build your
21 house?
22 A    Because you had to have a septic system or
23 you had to have a sewage system approved by DEP and Wilson
24 told me that.
25 Q    Didn't you testify that there was already

107

1  on-site sewage with respect to the house and the barn?
2  A    The farmhouse.
3  Q    Right.
4  A    This house was, you know, a quarter of a
5  mile, a half a mile away.
6  Q    Did anybody tell you that you needed to have
7  the sewer modules signed by the Township and approved by
8  DEP in order to get a building permit to build your house?
9  A    Yes, Wilson told me that.
10 Q    When did Wilson tell you that?
11 A    When we were doing the system or checking
12 out the locations and doing the perk tests.
13 Q    And he told you that you needed this, even
14 if you didn't want to subdivide the property?
15 A    Yes, if you were going to build a property
16 and you were going to provide a sewage disposal on the
17 property, you had to have a DEP permit.
18     The only way you got that is you dig a hole
19 in the ground and you found soil types that were suitable,
20 like we did.
21     Then we did a perk test, which we found it
22 perked and were suitable and the SEO signed them and now
23 the Township needed to sign them and they would have been
24 sent on to DEP for an approval and that approval would
25 have taken from what I understood, maybe 5 or 10 days.

108

1  Then I could go and I could get my building permit and
2  begin building the site.
3  Q    So at the March meeting, the only reason you
4  were given why the Township would not sign the sewer
5  modules was because of the moratorium, is that correct?
6  A    No.
7  Q    What other reason?
8  A    Well, yes and no.
9     Here is the twisted distortion that they
10 took on this thing, which is very interesting. They said,
11 We have a moratorium on subdivisions. I said, I know you
12 do, you told me that. I don't agree with it, but let's
13 forget the subdivision for a minute. I have a 95 acre
14 tract of ground, I have sewer sites approved by your SEO,
15 signed by him. I want permits to build my house, forget
16 about the subdivision, I am not asking you to subdivide
17 it. I am not asking you right now to subdivide this land.
18 I am asking you to give me permits to build my house.
19     Their response was, Oh, wait a minute, if
20 you build two houses on one tract of ground under DEP
21 regulations, that is a subdivision. Therefore, it comes
22 under our subdivision moratorium.
23 Q    You were told that at the meeting?
24 A    Absolutely.
25 Q    Who told you that?

109

1  A    Well, Ann Wirth was quite joyously saying
2  that, Oh, but you can't do that because, you know, it
3  constitutes a subdivision under DEP, therefore, you can't
4  do it. So did the rest of the supervisors, they all
5  chimed in, Oh, yeah, that's right, you can't do that, you
6  can't do that, so you are still in the subdivision
7  moratorium, therefore, we are not going to sign your
8  modules.
9  Q    Did anything else happen at this March 2000
10 meeting?
11 A    As I said, their meetings last about 15
12 minutes to a half hour max, not much.
13 Q    What else happened?
14 A    That is all I know, I mean as far as it
15 affected me.
16 Q    That is all I am interested in.
17 A    After they adjourned their meeting, I tried
18 to talk to them about it and still, I got the same stone
19 wall. You are still under subdivision and still under a
20 moratorium and we are not going to give you anything.
21     I did ask one other thing, I said, When are
22 your subdivisions going to be approved? The response was,
23 Well, we should approve it in April.
24     MS. MONTGOMERY: Excuse me.
25 A    But they didn't.

110

1      MS. MONTGOMERY:  Can we clarify the record
2  here, because I am not sure I understand what my client
3  just said.  Were you talking about the subdivision or
4  subdivision ordinance?
5      A    Their proposed subdivision ordinance that
6  they imposed a moratorium on they told everybody was going
7  to be probably approved in April.
8      MS. MONTGOMERY:  You didn't say subdivision
9  ordinance the first time, you said --
10     A    No.
11          But conveniently, they didn't approve it
12  even though it had been on the books or been in the works
13  for months and months and months, they didn't approve it
14  until a week after my contract ran out with Hewetts.
15  BY MR. SHERR:
16     Q    Did you have any discussion with anybody
17  about what happened at the March 2000 Township meeting?
18     A    I would have discussed it again with Max
19  McClintic, I certainly discussed it with my wife.  I don't
20  know if I would have talked to Simpson about it, because
21  by that time Simpson had been instructed to redo the plan;
22  but I probably discussed it with him.  I certainly would
23  have discussed it with Hewetts, because it affected them.
24     Q    Was there anybody with you at either the
25  February or March meeting?

111

1      A    The March meeting the Hewetts were there.
2  Of course, then there was half a dozen people in the
3  audience.
4      Q    Anybody that you knew?
5      A    No, they were legal local residents.
6      Q    After the March meeting, did you commence
7  any construction activity on the property?
8      A    No.
9      Q    Did you do anything to put a driveway in on
10  the property after the March meeting?
11     A    I don't know -- after the March meeting, of
12  course, we did.  After the March meeting, did we start
13  construction, yes; but not immediately after then, you
14  have to give me a time frame where you are asking.
15     Q    When did you start the construction of the
16  driveway on the property?
17     A    Well, as soon as the weather broke, and I
18  suspect that was probably I am going to say April.
19     Q    Did you have a permit to put the driveway
20  in?
21     A    Didn't need a permit.
22     Q    So your answer would be, no, you did not
23  have a permit?
24     A    I had no permit that I didn't need, that's
25  right.

112

1      On further clarification, as I said, that
2  roadway was already in there, was an entry on to the
3  Township road already, it existed.  There was no new road
4  being put in or driveway being put in.  What was being
5  done was resurfacing the existing roadway that was there.
6      Q    Why is it that you believe that you did not
7  need a permit to do the driveway work?
8      A    Because it turns out at their -- in
9  hindsight, in their July -- first of all, I didn't think I
10  needed it, because it was already an existing driveway,
11  that is the first reason.
12          Then as a side issue, in their July 7
13  meeting, when they passed the subdivision ordinance, for
14  the first time they passed a driveway permit ordinance,
15  they never had one prior to that.
16          They did force people, I found out from
17  neighbors, they did force people to pay them fees and
18  force them to cut trees down and do all kinds of stuff to
19  put a driveway in but they had no ordinance for it.
20     Q    Who was it you believe they forced to do
21  this?
22     A    One of my neighbors had told me about having
23  to do that, I don't remember his name.
24     Q    Do you remember anything about him?
25     A    Yes, he lives off Miller Road.

113

1      Q    When did he tell you this?
2      A    He told me this in the summer of the year
3  2000.  They forced him to cut down some beautiful old
4  trees that were near the entry way to his driveway.  They
5  never had an ordinance allowing that, and he said he paid
6  them a fee to put the driveway in.
7      Q    Did anybody else tell you that the Township
8  required them to cut down trees or pay a fee for a
9  driveway?
10     A    No.
11     Q    You thereafter submitted another plan to the
12  Huntingdon County Planning Commission, right?
13     A    That's right.
14     Q    And you received a letter back from Richard
15  Stahl at the Planning Commission?
16     A    Yes.
17     Q    This letter recommended conditional approval
18  of the proposed subdivision plan?
19     A    Of the two-lot subdivision plan, that is
20  correct.
21     Q    And the recommended approval pending
22  adoption of the Subdivision and Land Development
23  Ordinance?
24     A    Well, whatever it says, it says.  The basis
25  of not recommending approval I understand was their

**114**

1  moratorium.
2  Q    Did you receive a copy of the April 20
3  Planning Commission letter?
4  A    Yes.
5  Q    What did you do after receiving a copy of
6  the letter?
7  A    What did I do?  In what regard?
8  Q    With regard to your attempts to subdivide
9  and build on the property?
10  A    Well, they already had blocked me.  As far
11  as I was concerned at best I had started a process that
12  I was going to get me eventually to get a subdivision,
13  which I should have been entitled to anyhow. So what would
14  I do with it? There was nothing to do with it, except,
15  you know, if I re-submitted it to the Township I would get
16  the same response, we have a moratorium in place, we are
17  not going to approve it.
18  Q    Did you attend the April meeting of the
19  Township board of supervisors?
20  A    No.
21  Q    Did you attend the May meeting of the
22  Township board of supervisors?
23  A    I don't believe so, no.
24  Q    Did you have any contact with anybody, any
25  official or employee from the Township during April or

**115**

1  May?
2  A    I don't know if it was April or May. I went
3  to a meeting and it was probably the March meeting and I
4  said, Well, if you won't give me a sewer module for my
5  house, I said, I want to build an art studio. I want to
6  at least get started on construction of my art studio.
7       They said at that meeting, Nope, you can't
8  do that, you have got to have sewer to that art studio. I
9  said, We are not putting sewer into the art studio. Well,
10  you have got to have it.
11       I said, Tom Wilson told me you have a privy
12  permit here, so I want a privy permit, I will put a privy
13  in with the art studio.
14  Q    What meeting do you believe this occurred
15  at?
16  A    I think this was the March meeting. This was
17  when they hit me with the, Oh, we don't care if your are
18  forgetting about the subdivision or not, we are not going
19  to give you this, because your house requires a sewer
20  module approval and, therefore, it is a subdivision under
21  the DEP regulations.
22       I said, okay, forget that, I said, I want to
23  start the art studio, which didn't have any sewer, so how
24  do I get a permit for the art studio? You can't get a
25  permit for the art studio was the response.

**116**

1  Q    Who said that?
2  A    It was Ann Wirth mainly, but all of them
3  were chiming in at the same -- you can't do that, no, you
4  have got to have sewer in the art studio. If somebody had
5  to go to the bathroom, where would they go? I said, Fine,
6  Tom Wilson, you told me you have a privy permit in this
7  Township, I said, I want a privy permit.
8  Q    What did they say?
9  A    They said, Well, you will have to talk to
10  the SEO about getting a privy permit. I said, Fine, I will
11  talk to the SEO.
12       So I went home that night and at 10:00
13  o'clock at night I call the SEO. Oh, Dave, he says, I
14  wish you wouldn't be calling me about this. I said, Did
15  somebody call you already from the Township? He said,
16  Yes, they have already called me and they told me you are
17  not allowed to have a privy permit and that I am not
18  allowed to help you get a privy permit.
19  Q    Did you ask him why?
20  A    He said, you know, I can't talk to you about
21  it, don't put me in the middle of this. I am not allowed
22  to give you help or a privy permit; but, he says, I will
23  talk to Wilson about it and see if we can't clear this up.
24       He says, I will call you in a day or so. I
25  said, Fine; this is Barry Parks.

**117**

1       I don't hear anything from Barry Parks for 3
2  or 4 days. So I called him and I put message upon message
3  upon his answering machine: Barry, I need a privy permit
4  so I can start my art studio, and he refused to call me
5  back.
6  Q    Did he ever call you back?
7  A    No, never called me back.
8  Q    Did you do anything else with respect to
9  trying to get a privy permit?
10  A    What else could I do? I had asked the
11  Township, they said, you had to go through the SEO
12  officer.
13       The SEO officer was instructed by the
14  Township and the supervisors not to assist me in any way
15  to get a privy permit and he is the only one that could
16  issue one. What else would I do?
17  Q    So then your answer is, no, you did nothing
18  else?
19  A    Unless there is a supreme SEO officer, no, I
20  did not do anything else.
21  Q    The reason you believe that Mr. Parks was
22  told not to help you get a privy permit is based on what
23  Mr. Parks told you?
24  A    The reason I believe is that they were
25  absolutely adamant that they were going to interfere with

118

1  my construction, subdivision, anything that I wanted to
2  do, they were going to stop, period, that is what their
3  intention was, that is what I believe and I think their
4  conduct demonstrates that.
5  Q   Do you know of any reason why they would
6  want to stop you from building this studio?
7  A   Well, Mr. Domlin, later on, Van Domlin, said
8  it was because I was a trouble making yuppie from over the
9  mountain.
10  Q   When did he say that?
11  A   When I went to apply for a building permit.
12  You see then afterwards, I went about the
13  end of April, I decided this is crazy, I have got
14  contractors who are depending upon me, they have given up
15  other work to build my project, I have got to get started
16  with something. So I found out who the building permit
17  officer was.
18  Q   How did you find that out?
19  A   I think I had found that out earlier when I
20  talked to Ann Wirth. I said, Who is your building permit
21  officer and she told me. So I looked him up and I called
22  him. I called him up on the phone and I said, How do I
23  get to your place? He has a trailer out in the country.
24  I said, I want to come out and get a building permit.
25  I didn't tell him my name. I said I am a

119

1  resident out there, a property owner, I want to get a
2  building permit for a garage. He gave me directions to
3  his place.
4  There is a letter confirming our
5  conversation/meeting at the end of April, and I drove out
6  there on a Thursday. You have a copy of the letter that I
7  had sent to him, that will identify the specific day, I
8  think it was the 27th.
9  I guess I made the mistake of introducing
10  myself. Hi, I am David Corneal. All of a sudden this
11  cloud comes over his face, Who are you? David Corneal.
12  What do you want? I am here to get a building permit for
13  a garage. I said, Can I come in? He let me in the door.
14  I said, I have got plans with me, I am
15  building this garage. So I was building a house, an art
16  studio and a garage. I figured I had the one thing that
17  does not need sewer was the garage. It had no water, no
18  sewer at least initially. So I said, I came to get a
19  permit for my garage.
20  Oh, he says, I am not giving you a permit.
21  I said, Well, give me an application for a permit, because
22  your ordinance says that I have to apply under your
23  forms.
24  Nope, not giving you an application either.
25  I said, Why not? He said supervisors told me not to give

120

1  you anything, any permits, applications anything. I said,
2  Why? He said, Because you are that trouble making yuppie
3  from over the mountain.
4  I said, Well, I am not leaving until I
5  resolve this, we have got to get this resolved. He said,
6  Well, I will get on the phone. So he gets on the phone
7  and he calls two or three supervisors, can't reach
8  anybody, he finally reaches Tom Wilson.
9  Now, I am not listening to Tom Wilson's
10  voice, but he says, Yes, Tom, this is Van Domlin, got
11  Corneal here, wants a building permit for a garage. Don't
12  give him anything. We are meeting tomorrow morning -- the
13  supervisors are meeting tomorrow morning to discuss him.
14  That was a Thursday, so they would have been
15  meeting Friday morning. He said to me, After they meet
16  and call me, I will call you and let you know. I said, At
17  least give me an application so I can fill it out. Nope,
18  you are not getting any applications, you are not getting
19  nothing.
20  I said to him, I said, if I were another
21  resident of the county or the Township, and I came into
22  get a permit for a garage, would you give it to him? Yep,
23  sure would. I said, Why won't you give it to me? He
24  said, I already told you, you are that trouble making
25  yuppie and the supervisors told me not to give you

121

1  anything and I work for the supervisors, so I am not
2  giving you anything.
3  Q   Do you know of any other reason, other than
4  what your testimony is that you are this trouble making
5  yuppie from over the mountain, as to why they wanted to
6  prevent you from building on this property?
7  A   Well, I think that Tom Wilson wanted his
8  piece of his old family farm, because after the contract
9  was breached by Hewetts, Tom Wilson's nephew approached me
10  and says, Well, I am still interested in buying that
11  property from you.
12  Q   Any other reason why you believe any
13  official or employee from the Township was trying to
14  prevent you from building on this property that you owned
15  in Jackson Township?
16  A   I think that is more than sufficient that
17  they are going to -- they just wanted, I guess, show me
18  who was boss and who was in control in their Township.
19  Q   Did you start building on the property?
20  A   Yes.
21  Q   When did you start building?
22  A   I started building in July.
23  Q   Did you have permits to build in July?
24  A   No, I waited 90 days.
25  Q   You waited 90 days for what?

## 122

```
1      A      Since I was wrongfully denied even the
2  applications.
3      Q      Why did you wait 90 days?
4      A      Because I had consulted with Mr. Lucas of
5  this law firm.
6      Q      And he advised you to -- strike that.
7      A      Nope, I am not going to tell you what he
8  advised me.
9      Q      I don't want to know. I apologize for that.
10          Did you attend any other Township meetings
11  after the March 2000 meeting?
12      A      As I said, I don't think I attended April,
13  but it certainly wasn't anything after April, probably
14  nothing after March.
15      Q      Did you have any other conversations with
16  any officials or employees of the Township after your
17  conversation with Mr. Van Domlin?
18      A      I tried to discuss this with Newton numerous
19  times, these problems with the solicitor for the
20  Township.
21      Q      With anybody else other than Mr. Newton?
22      A      With the Township, related to the Township
23  in? No.
24      Q      You allege in your complaint that complaints
25  were made with the Army Corps of Engineers and DEP
```

## 123

```
1  regarding wetlands. What led you to believe that such
2  complaints were made?
3      A      Because I was there when the two of them
4  showed up, Army Corps of Engineers and a DEP
5  representative, they said that they had complaints that I
6  was filling in wetlands.
7      Q      What if anything did you say to them?
8      A      I said, Is this a complaint from Wilson?
9  They smiled and they said, Well, we really can't say who
10  called us. I said, Well, Wilson is not -- has lost this
11  job and I have given it to some other excavator and he
12  would have had the job otherwise.
13      Q      When did this conversation take place?
14      A      The day that they showed up. You would have
15  to look at their records. It would have been after I
16  started shaleing the old driveway.
17      Q      Do you know what month this was?
18      A      I am guessing it was April sometime.
19      Q      This was after Mr. Wilson told you he
20  couldn't be involved any more with your property?
21      A      He didn't say he couldn't be involved. He
22  said he wasn't going to put the driveway in for me.
23      Q      So why did you tell them Mr. Wilson lost the
24  job?
25      A      Why did I tell them? Because they were kind
```

## 124

```
1  of hinting that it was the Township or Wilson that had
2  called them and filed a complaint. I am sure we could find
3  that out, who did it. I was just explaining to them why,
4  what would have motivated his complaint or the Township's
5  actions.
6      Q      That is what I am trying to find out. Why
7  do you believe that that was motivating Mr. Wilson if he
8  did make the complaint that he lost the job, when, in
9  fact, he told you that he couldn't be involved with the
10  job?
11      A      That is your language. I never said he
12  couldn't be involved with the job. He said that he
13  couldn't build the driveway then when it was supposed to
14  have been done. He didn't say he didn't want anything to
15  do with it or that he didn't want the job.
16          I don't know if it was him for sure or not
17  or if it was somebody from the Township that filed a
18  complaint with these people. I wouldn't be surprised if
19  the call didn't come from Ann Wirth.
20      Q      Why would that not surprise you?
21      A      Because she seemed to be the person taking
22  the lead in many of the obstacles that they were trying to
23  throw in my way.
24      Q      But you have no other basis other than what
25  your belief is and what you just testified to, right?
```

## 125

```
1      A      You asked me what my belief is and that is
2  my belief. We can easily find that answer out by deposing
3  DEP or the Corps of Engineers and find out who filed the
4  complaint.
5      Q      What I am trying to find out, Mr. Corneal,
6  is the basis of your belief and why you believe that it
7  was Ann Wirth or Tom Wilson who called DEP and/or the Army
8  Corps of Engineers with respect to an alleged wetlands
9  violation?
10      A      My belief is that it was a continuation of
11  the harassment and the unreasonable restrictions they were
12  placing on me to stop me from doing anything with my
13  property.
14          Whether Wilson was angry that he actually
15  lost the job entirely now, I don't know that. I am just
16  making an assumption. You asked me what I thought, so I
17  am telling you what I thought.
18          But it clearly was Township officials who
19  were trying to continue to interfere with rights that I
20  had in my property. I certainly had a right to re-shale
21  my driveway or a driveway that already was existing.
22      Q      You didn't have a right though, did you, to
23  fill in wetlands?
24      A      But I wasn't filling in wetlands and I
25  checked that out and they knew I checked that out.
```

126

1   Q       How did they know that?
2   A       Because they had the report from Blozsky.
3   Q       When did they get that report?
4   A       They knew about that report. That is how it
5   came up in -- they got a copy of the report from the
6   engineering company at some point. I am sure that if we
7   look at their -- I think if we look at their
8   correspondence, that they copied the Township.
9       Q       Now, this is the second report that Blozsky
10  & Associates did that you are referring to, correct?
11      A       I don't know if both of them weren't sent to
12  the Township.
13      Q       Let's just concentrate on the question. You
14  are referring to a second report that Blozsky did, right?
15      A       I am referring -- Blozsky did two reports
16  for me and build me twice, one related to the land, one
17  related to the sewage site. Whether they had gotten a copy
18  of each, I am not sure.
19      Q       The second report is the one that you
20  commissioned Blozsky & Associates to do with respect to
21  whether or not any wetlands were impacted by this proposed
22  driveway, correct?
23      A       Wrong. That was the first report.
24      Q       The second report dealt with --
25      A       The SEOs locating a sewage site for our

127

1   house.
2       Q       Do you believe that the Township got a copy
3   of Blozsky's first report dealing with whether or not any
4   wetlands were impacted by the driveway?
5       A       I think so, I don't know that for a fact.
6       Q       Why do you believe it?
7       A       Because it is standard procedure with
8   engineers that often times -- most of the times they copy
9   the Township engineer or Township officials when they do
10  something that relates to a Township matter or it could
11  relate to a Township matter. Whether they did that in
12  Jackson Township, I don't know.
13      Q       Did you bring an action against the Hewetts,
14  I know it is Hewetts and Smith, but referring to them as
15  Hewetts, for breach of contract?
16      A       No.
17      Q       Why not?
18      A       As far as I was concerned, they had made a
19  deposit of $7,000 and I was not interested -- the guy has
20  a disease, Hewett has a disease, MS, and I just, you know,
21  as far as I was concerned, they forfeited the $7,000 and I
22  did not pursue it at this point. I have 2 or 3 years,
23  whatever the statute of limitations is.
24      Q       You kept the $7,000?
25      A       So far, but we had expenses related to that

128

1   of carrying this and his attorney has made demands on me
2   to return the money, so whether I have liability for that
3   or not is still a question.
4       Q       Have you made any efforts to sell the
5   property to anybody else?
6       A       Yes.
7       Q       What efforts have you made?
8       A       We let people know, the realtors that I
9   discussed previously, let them know that we had this 26
10  acres and that we had it on the market and we would like
11  to sell it. If they would bring us a buyer, we would be
12  happy to pay them a commission.
13          I had also shown the property to a friend of
14  a neighbor's, who was in the horse business, horse
15  business in the sense of riding horses and raising horses
16  and things like that, he wasn't buying and selling them.
17  Her name was Jeannie Price, and I proposed the property
18  for her and she reviewed it and turned it down.
19      Q       Did you enter into any contracts with any
20  relators?
21      A       No. You asked if I entered into contracts
22  with relators. Because of my relationship with a number
23  of relators, it is kind of awkward to give a listing to
24  one and not to give it to others. So what I do is I will
25  tell three or four of them that I know, well, that this is

129

1   available.
2           Another woman, realtor, did show the
3   property to a gentleman and her name was Beth Richards,
4   she is a realtor as well. That didn't work out, he bought
5   something else.
6       Q       Do you consider that property to currently
7   be on the market?
8       A       Yes.
9       Q       Have you applied for subdivision approval
10  under Jackson Township's Subdivision Ordinance?
11      A       No.
12      Q       Why not?
13      A       Because I don't think I need it.
14      Q       Why do you believe that you don't need it?
15      A       Let me consult with my attorney a second.
16          (Discussion held off the record.)
17  BY MR. SHERR:
18      Q       Mr. Corneal, you had an opportunity to have
19  a conference with your attorney during our break, is there
20  any answers that you would like to amend or change that
21  you have given prior to now?
22      A       No, it wasn't anything I wanted to amend.
23          What was the last question?
24      Q       The last question was: Why have you not
25  submitted a plan to Jackson Township under the Jackson

Case 1:00-cv-01192-SHR    Document 120    Filed 04/18/2003    Page 83 of 100

---

**130**

1  Township Subdivision Ordinance?
2     A    My answer was that I didn't have to.
3        The reason behind that is that on the
4  morning of July the 7th, which just happened to work out
5  that way, after consulting with attorneys, I recorded the
6  deed from Sandy and myself to Sandy for the 26 acre tract
7  of ground. One of the reasons in doing that was to tender
8  a deed to Hewetts to mitigate our damages on the loss of
9  the sale.
10     Q    So on or about July 7, 2000, you and your
11  wife conveyed to your wife 27 acres of this 98 acre
12  parcel, correct?
13     A    95 acres.
14        MS. MONTGOMERY: I object to the form.
15        MR. SHEER: What is your objection?
16        MS. MONTGOMERY: I think you repeated his
17  statement back incorrectly. You said conveyed and I think
18  he said recorded.
19        MR. SHERR: I am not repeating what he said,
20  I am just trying to --
21        MS. MONTGOMERY: Okay.
22  BY MR. SHERR:
23     Q    What went into it?
24     A    We did a deed from the two of us to my
25  wife , Sandy.

---

**131**

1     Q    That would have been?
2     A    The 26 acres with the house and the barn --
3     Q    That would have been a conveyance from you
4  and your wife to your wife of this 26 acres, correct?
5     A    Exactly, right.
6     Q    It was your belief that you had the legal
7  authority to do this?
8     A    Yes. After we discovered that the Township
9  nor the county had a subdivision ordinance.
10     Q    That deed was accepted for recording?
11     A    It was.
12     Q    Has building commenced on the property?
13     A    Yes. I said, we started with the garage in
14  July of 2000.
15     Q    Has the garage been completed?
16     A    Yes.
17     Q    Have you started building anything else on
18  the property?
19     A    Built the art studio.
20     Q    Has that been completed?
21     A    Not quite completed.
22     Q    Is that still being built as we speak?
23     A    Yes.
24     Q    How about a house, did you start building
25  that?

---

**132**

1     A    The house, yes.
2     Q    Has that been completed?
3     A    No.
4     Q    About how much is completed of the house?
5     A    I wouldn't know percentage-wise. Depending
6  on what contractor you talk to, it could be 2 months to 3
7  months away from or 4 months from completion.
8     Q    That building is going on today?
9     A    Yes, it is, I hope it is.
10     Q    How about the driveway, has that been
11  completed?
12     A    No, never had need for the driveway. Put it
13  all in, except the bridge, and never had need for it.
14     Q    The bridge is not there?
15     A    No.
16     Q    Why not?
17     A    Because I didn't need it.
18     Q    Why didn't you need it?
19     A    Because I bought the adjoining property next
20  to this one that had road frontage off Miller Road.
21     Q    When did you purchase the adjoining
22  property?
23     A    In I think the first of July, the end of
24  June of the year 2000.
25     Q    How much did you purchase that for?

---

**133**

1     A    I am not sure why that is relevant.
2     Q    How much did you purchase it for?
3        MS. MONTGOMERY: You can tell him, it is
4  public record.
5     A    $365,000 I think.
6  BY MR. SHEER:
7     Q    Who did you purchase that from?
8     A    Robert Gavazzi.
9     Q    Is it still your intention as you sit here
10  today to sell part of the property?
11     A    Yes, the house, the barn and 26 acres of
12  ground.
13     Q    You allege that the moratorium on
14  development in Jackson Township was imposed in part for
15  the purpose of impeding your project?
16     A    Yes.
17     Q    What facts do you base that allegation upon?
18     A    There were no other subdivisions. I was the
19  sole subdivision that was contemplated. There were no
20  other pending. There was no reason to put a moratorium on
21  one subdivision, they didn't have a rush of development.
22  I was a single person.
23        I believe, I am not totally sure of this
24  yet, but I believe that they had started their subdivision
25  draft and everything else prior to issuing a moratorium

---

**134**

1  and they only issued a moratorium after I became serious
2  about subdividing. I think it was exclusively for my
3  benefit or I should say exclusively for my detriment.
4      Q     Any other facts on which you base those
5  allegations?
6      A     I think that is enough.
7      Q     Who is James Whims, W-H-I-M-S?
8      A     Who?
9      Q     Do you know who James Whims, W-H-I-M-S, is?
10     A     Himes.
11     Q     Himes?
12     A     H-I-M-E-S.
13     Q     Who is that?
14     A     That is the attorney friend of mine that I
15  clerked for he and his father in Huntingdon.
16     Q     What facts do you believe he has knowledge
17  --
18            MS. MONTGOMERY:  Objection.
19  BY MR. SHERR:
20     Q     He was listed as somebody who has facts
21  concerning the allegations in this complaint in your
22  self-disclosure, so I am asking what facts he has
23  knowledge about?
24            MS. MONTGOMERY:  I am going to caution my
25  client to be careful about the attorney/client privilege.

**135**

1      A     Mr. Himes spent a great deal of time trying
2  to get Mr. Newton to respond to the problems that were
3  associated with what the Township was doing and he has
4  documented -- from what I understand -- he has documented
5  each telephone call, each meeting with Mr. Newton and the
6  resistance of Mr. Newton in responding.
7  BY MR. SHEER:
8      Q     Any other facts which you believe he has
9  knowledge of?
10     A     Facts, I don't know.
11     Q     Who is Steven Lavitsky?
12     A     He is the fellow from the engineering firm
13  that did the work.
14     Q     That would be Blozsky?
15     A     Right.
16     Q     Have you had any contact with the Department
17  of Environmental Protection concerning the property or
18  your attempts to subdivide and/or build on the property?
19     A     Direct contact with them?
20     Q     Yes.
21     A     I called the fellow who was in charge of
22  that area, I think his name was Rouzer -- come to think of
23  it, that is what Rouzer is, Rouzer is the guy from DEP,
24  and I am referring to the bottom of the Planning
25  Commission letter.

**136**

1      Q     I understand.
2      A     I had contacted Rouzer and was told that
3  they needed the submission on the approved modules from
4  Jackson Township before they would take action on it.
5      Q     Did you construct, along with your garage,
6  your art studio and your house, an on-lot sewage system?
7      A     No.
8      Q     Do you intend to do that?
9      A     Yes.
10     Q     At what point do you intend to do that?
11     A     As soon as the spring hits and I can get
12  approvals.
13     Q     Who do you believe you have to get approvals
14  from?
15     A     We already submitted stuff to the Township
16  through Terry Williams in State College and I have had a
17  sewage system designed by an SEO that used to be in that
18  area who now comes in and does consulting.  She submitted
19  that design of the on-site septic system, which will
20  function properly for its use, to Barry Parks, and he has
21  not acted on it in any way that I know of.
22     Q     Do you know why he hasn't acted upon it?
23     A     I have no idea.
24     Q     Do you have a belief?
25     A     Simply part of the process here to inhibit

**137**

1  my development of the land. There is no legitimate basis
2  for him refusing to act on it.
3      Q     Do you intend to put this sewage system in
4  regardless of whether you get approval?
5      A     I will not put a sewage system in without
6  DEP's approval. If I have to put a holding tank in, then
7  I will put a holding tank in; but I have no intention of
8  -- DEP didn't do anything wrong to me and they have a
9  right to pass on the availability of the sewer system that
10  we propose and I intend to honor that obligation to go
11  through them.
12     Q     Do you believe that you have any
13  out-of-pocket expenses as a result of what you claim to be
14  the wrongful acts of the Township?
15     A     No question about that.
16     Q     What out-of-pocket expenses do you believe
17  that you have as a result of what you believe to be the
18  wrongful acts of the Township?
19     A     I have the expenses related to the
20  engineers.
21     Q     That would be Blozsky?
22     A     That's right, correct.
23     Q     Why do you believe that you had those
24  expenses as a result of the wrongful acts of the Township?
25     A     Because the Township forced me to send him

138

1   back out there to assess the location that their SEO put
2   the sewer site on.
3       Q    So you believe that the expenses that you
4   would have with respect to the engineer would be only
5   related to the second report and not the first report?
6       A    That's right.
7       Q    What other out-of-pocket expenses do you
8   believe you have?
9       A    Well, I lost the sale of the property to the
10  Hewetts.
11      Q    Why do you believe you have out-of-pocket
12  expenses as a result of losing that sale?
13      A    I have big time out-of-pocket expenses,
14  because the $150,000 I was getting from that was going to
15  be used for construction of the property, of the
16  buildings. As a result of not getting that $150,000, I
17  had to go to Mellon Bank and refinance the one property on
18  College Avenue, the 1445 West College, where I drew out a
19  little less than $150,000 in equity.
20      I went from a 7 and a half percent interest
21  rate to an 8 and three-eighths percent interest rate and I
22  had to pay fees to them and I also got nailed with a
23  no-prepayment penalty, which I didn't have in my previous
24  contract, my financing contract with them.
25      So now the interest rates have dropped, I

139

1   can't refinance without paying a fee, a big fee. So I
2   have got the difference between 8 and three-eighths
3   percent and 7 and a half percent on the monthly payments,
4   on the interest on that refinancing.
5       Plus, I don't know what I am going to be
6   able to sell the property for. So if I sell the property
7   at a lesser amount, obviously, then I have that loss.
8   Plus I also have, you know, the loss of the use of those
9   funds, since the Hewetts would have paid me no later than
10  June the 30th, which they didn't.
11      Q    When did you refinance?
12      A    I waited until the last possible minute,
13  because I was reluctant to do it; but I think I refinanced
14  about 3 months ago, 4 months ago.
15      Q    Any other out-of-pocket expenses that you
16  believe that you suffered as a result of wrongful actions
17  of the Township?
18      A    Sure, I had to send Simpson back and
19  redesign and resubmit these plans. Every
20  time he did it, there was several thousand dollars in
21  surveying costs and duplication and all of that.
22      I don't have the exact number that would be
23  attributable to him above and beyond his survey that I
24  wanted that would relate.
25      I can pull the bills out and identify what

140

1   was necessitated by the demands of the Township and the
2   County Planning Commission.
3       Q    Anything else?
4       A    I have legal fees.
5       Q    Legal fees associated with what?
6       A    Associated with this lawsuit.
7       Q    The lawsuit we are here about today?
8       A    That's right.
9       Q    Any other legal fees?
10      A    I have legal fees with Terry Williams trying
11  to work through the DEP permitting.
12      Q    Was that caused in some way by, that being
13  with Terry Williams' legal fees, caused in some way by any
14  act of the Township?
15      A    Yes, the Township tried to stop me from
16  construction.
17      Q    So it is your testimony that the only reason
18  that you retained Terry Williams' services was because the
19  Township tried to stop you from --
20      A    No. That is one of the reasons I retained
21  him. The other reason was to try and get the DEP permits
22  so when we finish the construction of the properties, that
23  we can install the sewage systems.
24      Q    When did you first consult with Mr.
25  Williams?

141

1       MS. MONTGOMERY: I am going to object the
2   time frames.
3       A    I don't remember when it was.
4       MS. MONTGOMERY: I think the time which a
5   person consults with their attorney --
6       MR. SHERR: It is not privileged, absolutely
7   not privileged. When he first consulted with an attorney
8   or if he consulted with an attorney is not privileged.
9   What was consulted with is privileged.
10      A    I can't remember exactly when I started
11  talking to Terry about this. I would probably say 6 to 8
12  months ago.
13  BY MR. SHEER:
14      Q    Any other out-of-pocket expenses that we
15  haven't discussed that you feel you suffered as a result
16  of the accident?
17      A    As I said, I had to sue these people because
18  they wouldn't give me the applications or permits, so I
19  had, you know, the private service fee of 300 and some
20  dollars.
21      Q    Anything else?
22      A    Well, I would have to say that I had to
23  maintain a property and pay the taxes on the property that
24  would have been sold to Hewetts and not been my expenses
25  that are my expenses now.

142

1    Q        Anything else?
2        (Discussion held off the record.)
3    BY MR. SHERR:
4    A        I have now had to hire experts that I am
5    getting reports from in the area of the Planning and
6    Municipal Law or Application of Municipal Law, so we are
7    paying them.  We don't know exactly what those costs are
8    going to be.
9        If I think of any more, I will let you know.
10       (Discussion held off the record.)
11   BY MR. SHERR:
12   Q        You told me specifically some things that
13   were done by Mr. Wilson and by Ms. Wirth.
14       I just want to ask you with respect to the
15   other individual defendants, and I am going to start with
16   Mr. Yoder, other than being at Township meetings that you
17   were also at, did you have any dealings with Michael
18   Yoder?
19   A        The dealings I had with him, as well as Mr.
20   Weiler, both of them, I talked to directly at the Township
21   meetings and I told them, you can't do this stuff.  They
22   all unanimously agreed that they are going to do it
23   whether I liked it or not and that is too bad.  That kind
24   of response was given to me.
25   Q        Other than any contact which you had with

143

1    Mr. Yoder at a Township meeting, did you have any contact
2    with him otherwise?
3    A        No.
4    Q        Same question for Ralph Weiler, did you have
5    any contact with Mr. Weiler at any other time, other than
6    at a Township meeting?
7    A        No.
8    Q        Can you tell me anything that Mr. Yoder
9    specifically said at a Township meeting with respect to
10   your attempts to subdivide and build on this property?
11   A        He said they had a moratorium on -- both of
12   these guys said this -- we have a moratorium on --
13   Q        Both of these guys, just so we are clear,
14   that is Mr. Yoder and Mr. Weiler?
15   A        Right.  Said at different times at different
16   meetings that you aren't getting what you want, because we
17   got a moratorium on and we are not going to allow you to
18   do this.
19       Then when I came up that I don't care about
20   the subdivision at this moment in time, give me my sewer
21   modules, then they all agreed that, no, that was a
22   subdivision under DEP and, therefore, we are not going to
23   sign your sewer modules under that.
24       So all three of them said it at one point or
25   another or concurred, you know, they turned to each other,

144

1    you agree, yes, that is right, we are not doing it.  So
2    that is the contact I have had with them.
3        Also, the exception, that from what I
4    understand from my discussion with Van Domlin, that these
5    guys were meeting out of formal meetings to discuss me and
6    how they were going to treat me.
7        Specifically, Van Domlin said that the
8    Township supervisors were meeting that Friday morning to
9    discuss me and what they are going to do about my request
10   for applications for building permits.
11       So I can only take from that that they, in
12   fact, did meet or have met on several occasions, at least
13   one occasion that I am pretty sure occurred, outside of a
14   formal meeting to discuss Township business, specifically,
15   preventing me from building.
16       MR. SHEER:  I have no other questions at
17   this time.  Thank you very much.
18       MS. THORP:  I have no questions.
19       MS. SIMPSON:  I have a few questions.
20
21       CROSS-EXAMINATION
22
23   BY MS. SIMPSON:
24   Q        At the February 2000 Jackson Township
25   supervisor meeting where you presented your plan, was

145

1    Larry Newton present?
2    A        Excuse me, offered my plan.
3    Q        Offered you plan, sorry.
4    A        That is okay, I just wanted to clarify.
5    Q        Was Larry Newton present?
6    A        No.
7    Q        Was Attorney Newton present at the March
8    2000 supervisor's meeting?
9    A        No.  However, as a result of the February
10   meeting, I sent Mr. Newton a letter indicating to him the
11   wrongfulness of their conduct and the fact that it was
12   going to affect my contract with Hewetts or potentially
13   could affect the contract with Hewetts and that would he,
14   please, contact me and follow up with this to discuss
15   correcting the problem.
16       Then I also followed up with many telephone
17   calls to Mr. Newton, all of which went unanswered.  That I
18   can remember, he never returned a telephone call that I
19   made to him.
20       He took one of my telephone calls that I
21   made to him; but that was the only time I ever discussed
22   things with him.
23   Q        What did you discuss in that call?
24   A        I was talking to him about the sewer modules
25   at that point, that was after the March meeting.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

---

**146**

1      I said, I have got approvals of your SEO, I
2  have got signatures on the sewer modules. There is
3  absolutely no reason for the Township not to sign them and
4  something has to be done.
5          His response was the same, I will get back
6  to you. Never called me back, never did a thing about
7  it. I will check into it and get back to you.
8          Same way when I had the situation with Van
9  Domlin where they wouldn't even give me applications. I
10 wrote Larry a letter the day afterwards and I sent him a
11 copy of the letter I sent to Van Domlin.
12         I said in the letter to Van Domlin, hey, if
13 you don't agree with anything I said in this letter,
14 please, respond in writing. He never responded in
15 writing, neither did Larry. Larry did absolutely nothing
16 to correct a problem.
17         Then his partner in law was the one who
18 wrote the letter and said on May the 1st, hey, it is
19 obvious you are not going to get subdivision approval, so
20 the Hewetts, my clients are cancelling the contract. Now,
21 where would he have heard that?
22     Q     Who is Larry Newton's partner?
23     A     Harvey Reeder. They own a building and
24 share office space together, whether they are truly
25 partner/partner, I don't know, but they have the same fax

---

**147**

1  machine, the same fax number, same secretary, the same
2  everything. Sounds like a partner.
3      Q     How do you know they have the same
4  secretary?
5      A     Because I called them, I called them
6  numerous time, always got the same woman, You want Larry
7  or you want Harvey? I say that as an assumption, I don't
8  know it for a fact.
9      Q     Is it also an assumption that Mr. Reeder
10 learned of the difficulties with the approval process from
11 Mr. Newton?
12     A     Yes, that is correct, I have no direct
13 knowledge of that.
14     Q     What duty did you believe Mr. Newton had to
15 you?
16         MS. MONTGOMERY: Objection, you are asking
17 him for a legal conclusion, it is not appropriate.
18         MS. SIMPSON: I will rephrase it.
19 BY MS. SIMPSON:
20     Q     Do you believe Mr. Newton owed you some
21 response to your inquires?
22     A     He sure did.
23     Q     Why?
24     A     Why?
25     Q     Yes.

---

**148**

1      A     Because he was the Township solicitor, he
2  was the guy giving them advice to put the moratorium on.
3      Q     How do you know that?
4      A     Because they told me at the meeting. They
5  said, well, according to our attorney.
6      Q     What did they say specifically?
7      A     Like I just said, I said, you can't have a
8  moratorium like you have. They said, Not according to our
9  attorney.
10     Q     So I understand this, the supervisors said
11 that their attorney told them that the moratorium was okay
12 or that their attorney told them to put a moratorium in
13 place?
14     A     I have no idea what their attorney told
15 them.
16     Q     What did they tell you?
17     A     I just said what they told me, not according
18 to my attorney.
19     Q     In response to what?
20     A     I said your moratorium is illegal, it is
21 improper, you can't do it. They said, Not according to my
22 attorney.
23         But then I followed later on with -- or
24 tried to follow up with Larry to even get a copy of the
25 resolution passing the moratorium and he wouldn't give it

---

**149**

1  to us and that is where Jim Himes had call after call,
2  meeting after meeting, trying to get the information from
3  him.
4          The same way with permits. I said, I want a
5  building permit, application. And he stonewalled me on
6  it, totally stonewalled me on it.
7          Then finally, in the end of August, he wrote
8  me a letter and said, Oh, so sorry that we haven't sent
9  you this, here it is.
10     Q     What was it that you obtained at the end of
11 August?
12     A     An application for a building permit.
13     Q     What did you do with those?
14     A     I filled them out immediately and sent them
15 with everything they required, including their fees.
16     Q     Then what happened?
17     A     Nothing. They sat on it for 45 days. Then
18 Van Domlin wrote me a letter saying, you don't comply with
19 our subdivision ordinance -- which, of course, I wasn't
20 asking for at that point -- so, therefore, we are denying
21 your building permits.
22         So then we filed under their rules to have a
23 hearing about his denial within 30 days. They are
24 supposed to give me a hearing within 30 days. Do you know
25 how that bearing came out, there was none.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

150

1   Q      What happened?
2   A      Nothing.  Absolutely nothing. They ignored
3   me.
4   Q      You submitted a request for hearing?
5   A      Uh-huh, in writing.
6   Q      You got no response to that?
7   A      Right.
8   Q      Who was that filed with?
9   A      That was filed with the Township secretary.
10  Under their ordinance, they are supposed to have a
11  hearing.
12  Q      Of the damages that you have outlined, are
13  there any that are specifically attributable to the
14  conduct of Attorney Newton?
15  A      Yes, I lost a contract.
16  Q      By that contract you are talking about the
17  contract for the sale of the property to Hewett and Smith?
18  A      Smith.
19  Q      Specifically, what is it that you believe
20  that Mr. Newton did to cause you to lose that contract?
21  A      I think that he had involvement with the —
22  with his partner there, Harvey Reeder, to interfere with
23  my contractual relationships with the Hewetts. They
24  cancelled the contract.
25         Read Reeder's letter, he says, "It is

151

1   obvious you are not going to get your approvals by the
2   June 30." He is writing that May 1st, 2 months
3   previously. It is obvious you are not going to get
4   approvals for your subdivision, therefore, my clients are
5   cancelling the contract.
6   Q      Aside from this belief that you formed from
7   the text of the letter that was sent to you, what evidence
8   do you have that Mr. Newton spoke with Mr. Reeder about
9   the approval process and its --
10  A      I don't have evidence with regard to that
11  but it certainly seems rather obvious. They say if it
12  walks like a duck and talks like a duck, it probably is a
13  duck.
14  Q      Was the meeting that you attended of the
15  Township supervisors in February of 2000 recorded in any
16  way?
17  A      How they record their meetings, I don't
18  know, I don't remember seeing a tape recording or whether
19  the secretary was taking notes. One of the two was
20  occurring, I don't know exactly what.
21  Q      Have you ever searched the record of the
22  Township to check the minutes of the meetings that you
23  attended?
24  A      The Township doesn't have an office, so,
25  therefore, there is no records available that I know of.

152

1         The records that we asked for were records
2   asked of Newton to deliver to us and it went for months
3   and months and months and he refused to -- or just ignored
4   delivering the records.
5   Q      What records did you ask him to deliver?
6   A      I asked him specifically for the resolution
7   authorizing the moratorium.
8   Q      Did you ever ask anybody for minutes of
9   meetings?
10  A      I didn't.  I think Jim Himes did, but I
11  don't know.  The minutes of those meetings that I saw, if
12  they are like the January minutes, were less than a half a
13  page long or a third of a page.
14         As I said, they only hold meetings for 15 or
15  20 minutes.
16  Q      That was your experience?
17  A      That was my experience in going to two
18  meetings and seeing the January notes of the minutes of
19  that meeting.
20         MS. SIMPSON: I have no other questions.
21         MR. SHERR: I have no questions.
22         (Discussion held off the record.)
23         MR. SHERR: We have had a discussion off the
24  record concerning Mrs. Corneal, who has sat through this
25  deposition today and who I did notice as a party to the

153

1   lawsuit.
2          I believe our agreement is that I will be
3   informed through discovery the belief or the necessity to
4   have Mrs. Corneal testify or that she has matters which
5   she has independent knowledge about and then we will
6   reschedule her deposition.
7          I don't know if I stated that artfully, but
8   you can probably help me out.
9          MS. MONTGOMERY: That is not quite the
10  agreement.
11         The agreement is that, although, you noticed
12  them both for today and they both came today, this was a
13  very long deposition and nobody wants to stay any longer.
14         We will reproduce her on another day, we are
15  not going to stonewall you on that.
16         We will not agree, as you suggested, that
17  she wouldn't testify, we won't agree to that.  She is
18  listed as a witness in our initial disclosures.  I think
19  you have to make an independent judgment whether or not
20  you want to depose her.
21         MR. SHERR: I will do that.  All I am saying
22  is in order to avoid inconveniencing her and rather than
23  just noticing her again and bringing her back, if there is
24  some reason for her deposition, perhaps you can inform me
25  of that or that she would have knowledge that a deposition

154

1  may be necessary. I guess what I am saying is if you give
2  me some reason to do it, I will do it, otherwise, I won't
3  do it. I understand that you don't want to commit either
4  way.
5       MS. MONTGOMERY: She is listed as a
6  potential witness, listed as a person with information.
7  How much information might be very small. We don't know
8  how this case is going to develop. With all due respect,
9  it is not my job to figure out who you want to depose. I
10  don't want to say anything that limits my ability to her
11  as a witness and ask her anything I want when we get
12  there.
13       MR. SHERR: I am not asking you to limit
14  that. It is no skin off my nose to depose her or not
15  depose her, I could care less; except that I don't see the
16  need to inconvenience her if the deposition is unnecessary
17  is the issue.
18       MS. MONTGOMERY: Understood.
19       (The deposition concluded at 4:35.)
20
21
22
23
24
25

155

1  STATE OF PENNSYLVANIA : ss.
2  COUNTY OF DAUPHIN   :
3
4       I, Patricia C. Barrett, a Reporter
5  Notary-Public, authorized to administer oaths within and
6  for the Commonwealth of Pennsylvania and take depositions
7  in the trial of causes, do hereby certify that the
8  foregoing is the testimony of David B. Corneal.
9       I further certify that before the taking of
10  said deposition, the witness was duly sworn; that the
11  questions and answers were taken down stenographically to
12  the best of my ability by the said reporter Patricia C.
13  Barrett, a Reporter Notary-Public, approved and agreed to,
14  and afterwards reduced to typewriting under the direction
15  of the said Reporter.
16       I further certify that the proceedings and
17  evidence contained fully and accurately in the notes by me
18  on the within deposition, and that this copy is a correct
19  transcript of the same.
20       In testimony whereof, I have hereunto
21  subscribed my hand this 16th day of March 2001.
22
23       Patricia C. Barrett, Reporter
24  My commission expires:
25  May 13, 2003

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3 DAVID B. CORNEAL AND SANDRA Y.
  CORNEAL,                       :
4        Plaintiffs             :

5        VS                     :  NO. 1:00-CV-1192

6 JACKSON TOWNSHIP, Huntingdon   :
  County, Pennsylvania, W. THOMAS
7 WILSON, Individually and in his :
  Official Capacity as Supervisor
8 of Jackson Township, MICHAEL    :
  YODER, Individually and in his
9 Official Capacity as Supervisor :  JURY TRIAL DEMANDED
  of Jackson Township, RALPH
10 WEILER, Individually and in his :
   Official Capacity as Supervisor
11 of Jackson Township, BARRY PARKS, :
   Individually and in his Official
12 Capacity as Sewage Enforcement   :
   Officer of Jackson Township,
13 DAVID VAN DOMMELEN, Individually :
   and in his Official Capacity as
14 Building Permit Officer, ANN I.  :
   WIRTH, Individually and in her
15 Official Capacity as Secretary   :
   of Jackson Township, and
16 LARRY NEWTON, Individually and in :
   his Official Capacity as Solicitor:
17 to Jackson Township,             :
        Defendants
18

19        DEPOSITION OF:  DAVID SIMPSON

20        TAKEN BY:       DEFENDANTS

21        BEFORE:         NICOLE L. ZIMMERMAN
                          NOTARY PUBLIC
22

23        DATE:           JULY 10, 2001, 1:10 P.M.

24        PLACE:          THE DAYS INN
                          240 SOUTH PUGH STREET
25                        STATE COLLEGE, PA 16801

MLP REPORTING, INC.  (570) 748-1041

---

1        A P P E A R A N C E S:

2 ECKERT SEAMANS
  BY:  BRIDGET MONTGOMERY, ESQUIRE
3      LESLIE A. MALADY, ESQUIRE
4 213 Market Street, Eighth Floor
  Harrisburg, PA  17101
5      FOR - PLAINTIFFS

6 MAYERS, MENNIES & SHERR, LLP
  BY:  ANTHONY R. SHERR, ESQUIRE
7 3031 Walton Road
  Building A, Suite 330
8 P.O. Box 1547
  Blue Bell, PA  19422-0440
9      FOR - JACKSON TOWNSHIP, MR. WILSON,
       MR. YODER, MR. WEILER, MR. PARKS,
10     MR. VAN DOMMELEN & MS. WIRTH

11

12

13

14

15

16

17

18

19

20

21

'22

'23

24

25

MLP REPORTING, INC.  (570) 748-1041

---

3

1                I N D E X

2 BY DEFENDANTS                      EXAMINATION

3 DAVID SIMPSON
    By Mr. Sherr                          4
4   By Ms. Montgomery                     25

5

6

7

8

9

10              E X H I B I T S

11 SIMPSON'S EXHIBITS          MARKED   PRODUCED

12 No. 1 - Notice of Deposition and   4        6
           and Subpoena
13

14

15

16

17

18

19

20

21

22

23

24

25

MLP REPORTING, INC.  (570) 748-1041

---

4

1             STIPULATION

2

3        It is hereby stipulated by and between

4 counsel for the respective parties that sealing,

5 certification, and filing are waived, and that all

6 objections except as to the form of the question are

7 reserved to the time of trial.

8

9        DAVID SIMPSON, called as a witness, being

10 sworn/affirmed, testified as follows:

11        (Notice of Deposition and Subpoena premarked

12 Simpson Exhibit No. 1.)

13

14             EXAMINATION

15

16 BY MR. SHERR:

17    Q     Could you please state your full name for

18 the record?

19    A     David Allen Simpson.

20    Q     What's your address, Mr. Simpson?

21    A     Rural Route 1, Box 284-A, Huntingdon,

22 Pennsylvania, that's with a D, and the zip code is

23 16652.

24    Q     Mr. Simpson, I just met you a couple minutes

25 ago.  My name is Anthony Sherr.  I represent Jackson

MLP REPORTING, INC.  (570) 748-1041

5

1 Township and some individual defendants in a lawsuit
2 filed against them by David Corneal and Sandra Corneal,
3 which is currently pending in the United States
4 District Court for the Middle District of Pennsylvania.
5        We're here today to take your deposition
6 pursuant to a subpoena.  Have you ever been deposed
7 before?
8     A    No.
9     Q    I just want to give you some ground rules.
10 I'm going to be asking you some questions, you've been
11 placed under oath and expected to answer truthfully.  I
12 ask that you give all of your answers out loud, orally
13 so that the court report can take it down.
14        She can't take down nods of the head or
15 shrugs of the shoulder and that sort of thing, so I ask
16 that you answer orally.
17        I ask that you wait until I'm done asking my
18 question before giving an answer, and likewise, I'll
19 wait until you're done answering before asking another
20 question.
21        If you don't understand my question, please
22 ask me to clarify it.  If you don't hear my question,
23 please ask me to repeat it.  If you answer the
24 question, we're going to assume that you both heard and
25 understood the question.

MLP REPORTING, INC.  (570) 748-1041

6

1        If you need to take a break for any reason
2 during this proceeding, please let us know, and we'll
3 accommodate that.  And Ms. Montgomery is here, who
4 represents David Corneal in this matter, and she may
5 have some questions for you after I've completed asking
6 you questions, okay?
7     A    Yes.
8     Q    I placed in front of you what I've had
9 marked as Simpson Exhibit 1 and I've asked you to look
10 at that and you reviewed that, correct?
11     A    Yes.
12     Q    And that's the Notice of Deposition and
13 Subpoena for you for attendance here today, right?
14     A    Yes.
15     Q    And the second page of the subpoena has a
16 request for documents?
17     A    Yes.
18     Q    Did you bring documents with you today?
19     A    Yes, I did.
20     Q    What documents did you bring with you today?
21     A    Everything that I collected and assembled
22 during the course of preparing a subdivision proposal
23 for the Corneals.
24     Q    And could we just briefly go over what those
25 documents are?

MLP REPORTING, INC.  (570) 748-1041

7

1     A    Okay, they would be --
2     Q    I mean, do you have them and we can just
3 flip through them and you could just, for the record,
4 state what they are?
5        For the record, I just want to generally
6 state what you have here.  First is a plan showing the
7 David B. and Sandra Y. Corneal property dated December
8 27, 2000.  Is there a number of copies of this?
9     A    Right, there are numerous copies and copies
10 of drawings that were used during the construction of
11 that final plan.
12     Q    Okay.  And that there's also plans dated
13 February 4, 2000; April 7, 2000, and that's the first
14 packet.  The second packet of plans --
15     A    Those would the final subdivision plans.
16     Q    The second packet of plans is dated February
17 4, 2000, and then there's also a plan of proposed
18 subdivision dated April 7, 2000, and there's one
19 December 27, 2000.  So these are the final plans, what
20 we talked about first were sketches and drafts, I
21 suppose?
22     A    That's correct.
23     Q    And what is that next packet?
24     A    This particular drawing is a copy of the
25 Huntingdon County tax map for Jackson Township showing

MLP REPORTING, INC.  (570) 748-1041

8

1 the properties in the area of the Corneals.
2     Q    And you got this from the county courthouse?
3     A    That's correct.
4     Q    What are the rest of those documents?
5     A    These are, again, various drawings that were
6 used during the construction phase or the layout design
7 for the subdivision and also some background
8 information relating to other properties.
9     Q    Okay.  And you also have, it looks like an
10 overlay, 1996 D.A. Simpson survey overlaps the 1975
11 F.D. Gay survey.  What is this document that I'm
12 looking at?
13     A    That's showing the information pertinent to
14 a boundary discrepancy that we found between the
15 Corneal property, which at the time of my initial
16 involvement in here was -- my survey was for Paul and
17 Katherine Michael, the previous owners of the property.
18     Q    And so these documents that I'm looking at
19 right now were done to deal with this border dispute?
20     A    Those particular documents were done to put
21 the information on a sheet of paper for Mr. Corneal so
22 that he could understand the background of that
23 particular boundary.
24     Q    Now, you've also provided a manila folder
25 that says Corneal, David B. and Sandra Y., Jackson

MLP REPORTING, INC.  (570) 748-1041

1 Township, Huntingdon County, subdivision of the former
2 Paul and Katherine Michael property. And is this your
3 file related to Mr. Corneal?
4     A     Yes, it is.
5     Q     You've also provided us with a file that
6 says Paul L. Michael, M-I-C-H-A-E-L, Jackson Township,
7 Huntingdon County and you had worked for Mr. Michael on
8 the same property prior to being engaged by
9 Mr. Corneal?
10     A     That's correct.
11     Q     And another file for Paul L. Michael. I
12 guess that would be the second part of that same file?
13     A     Yes.
14     Q     And you've finally provided three it would
15 appear to be calendars. And why did you provide these
16 calendars?
17     A     Those would have information of the various
18 times that I was working on Mr. Corneal's subdivision.
19         MR. SHERR: Off the record for a second.
20         (Discussion held off the record.)
21 BY MR. SHERR:
22     Q     Did you review anything in preparation for
23 today's deposition?
24     A     No, I didn't.
25     Q     Did you discuss today's deposition with

MLP REPORTING, INC.   (570) 748-1041

1 anybody?
2     A     I told several people that I had a
3 deposition to attend, certainly I had no way of
4 discussing the content.
5     Q     Did you talk to Mr. Corneal about it?
6     A     No.
7     Q     When is the last time you saw Mr. Corneal
8 before today? You're referring to your 2001 calendar?
9     A     Yes. I think it was January 3, this year,
10 2001.
11     Q     And on what occasion did you see him?
12     A     I delivered five copies of the survey plans
13 to him.
14     Q     Were these new survey plans or were they
15 survey plans that had previously been done?
16     A     I think they would have been the copies of
17 the December 2000 survey.
18     Q     I just want to get a little of your
19 educational background. What's the highest level of
20 formal education that you completed?
21     A     I attended two years of Penn State at the
22 Penn State campus in Mont Alto, Pennsylvania, in
23 surveying technology.
24     Q     And what years were they?
25     A     That would have been until June of 1972.

MLP REPORTING, INC.   (570) 748-1041

1     Q     And did you have any other technical or
2 vocational training after those two years?
3     A     The requirement for licensing as a surveyor
4 in Pennsylvania requires that you serve a six-year
5 apprenticeship under a licensed engineer or a licensed
6 surveyor before you can make application to take the
7 registration examination.
8     Q     And did you take the examination?
9     A     Yes, I did.
10     Q     When did you take the examination?
11     A     My license is dated, I think, March of 1978.
12     Q     And that's licensed as a registered surveyor
13 in the State of Pennsylvania?
14     A     Yes.
15     Q     Are you licensed in any other state?
16     A     No.
17     Q     Do you have continuing education
18 requirements?
19     A     No, as of now, there are no requirements for
20 that.
21     Q     Do you have to renew the license
22 periodically?
23     A     Yes, every two years.
24     Q     Are you familiar with Jackson Township?
25     A     In what respect?

MLP REPORTING, INC.   (570) 748-1041

1     Q     Well, just generally with respect to
2 development of land in Jackson Township.
3     A     As far as I knew up until just more
4 recently, there was no township subdivision or zoning
5 ordinance governing requirements of subdivision.
6     Q     Were you familiar with the board of
7 supervisors of Jackson Township?
8     A     Not really, no.
9     Q     Prior to working on what was first the
10 Michael property and then the Corneal property, had you
11 done any other work in Jackson Township?
12     A     Yes, I'm sure I did, although, I can't
13 specifically recall what particular properties.
14     Q     Do you recall when you were first contacted
15 by Mr. Corneal to do anything for his property?
16     A     I would have to check the --
17     Q     Could you, please? And you're looking now
18 at your 1999 calendar?
19     A     Yes. The one file that I have with
20 Corneal's name on it, there might be something in there
21 that would save me time.
22         I have what I think to be my first meeting
23 with Mr. Corneal as July 8, 1999.
24     Q     And there is a little piece of paper with
25 handwritten notes which indicated that to you?

MLP REPORTING, INC.   (570) 748-1041

13

1     A     Yes, that's correct.

2     A     I see in the 1999 calendar book, references
3 to Mr. Corneal prior to that.  I have a note in the '99
4 calendar book of having met with Mr. Corneal on the
5 site of his property Saturday, June 26, 1999.

6     Q     Do you recall what it was that Mr. Corneal
7 asked you to do?

8     A     At that time of the Saturday meeting, I have
9 noted that it was a meeting on site for review of
10 proposed subdivision requirements.

11    Q     And you met him on the site, and the site
12 being his property in Jackson Township?

13    A     That's correct.

14    Q     And you say for review of proposed
15 subdivision requirements?

16    A     Yes.

17    Q     Who asked for this meeting, Mr. Corneal?

18    A     Yes.

19    Q     And what do you mean by review of proposed
20 subdivision requirements?

21    A     As it's termed here, I met with him to see
22 what his requirements were as to lot layouts and that
23 sort of thing.

24    Q     So is it your understanding looking at that
25 note and refreshing your recollection that you knew

MLP REPORTING, INC.   (570) 748-1041

14

1 prior to June 26 that Mr. Corneal desired to subdivide
2 his property?

3     A     I have no note of his initial call to set up
4 that meeting.

5     Q     And that's really not what I was looking
6 for, but was it your understanding that he was
7 contacting you to help him subdivide his property?

8     A     Yes.

9     Q     Was there any other purpose that you know of
10 as to why he was retaining your services?

11    A     Not to my knowledge.

12    Q     And do you recall what he wanted to do in
13 terms of subdivision, what he told you?

14    A     I think at that time, as best I can recall,
15 that he wished to lay out approximately nine lots.

16    Q     And did he give you an indication at that
17 time what he wanted to do with those lots, if you
18 recall?

19    A     Not specifically that I recall.

20    Q     Do you do most of your surveying work within
21 Huntingdon County?

22    A     Yes, in the general area.

23    Q     So you're familiar with subdivisions
24 generally within the county?

25    A     Yes.

MLP REPORTING, INC.   (570) 748-1041

15

1     Q     With respect to Jackson Township in
2 particular, after Mr. Corneal made the request, did you
3 do anything to ascertain what would be required in
4 terms of township and/or county approvals?

5     A     Most times, when asked to do a subdivision
6 in any particular municipality, at some point during my
7 preparation, I would contact the Huntingdon County
8 Planning Commission to find out whether that township
9 has a subdivision ordinance and what the date of the
10 latest revision is.

11    Q     And do you recall doing that in this
12 instance?

13    A     Not specifically, but I'm sure I did.

14    Q     And do you recall what you learned when you
15 contacted the Huntingdon County Planning Commission?

16    A     It's my recollection that Jackson Township
17 at that time did not have a subdivision land
18 development ordinance.

19    Q     Was there an indication from the county
20 planning commission when you contacted them, if you
21 recall, that they were working on an ordinance?

22    A     Not at that time, I don't think.

23    Q     Did there come a time where you found out
24 that they were working on a subdivision ordinance?

25    A     Yes.

MLP REPORTING, INC.   (570) 748-1041

16

1     Q     Do you recall when that was?

2     A     On January 25 in the calendar book dated
3 2000, I have a note that I had called Ann Wirth of
4 Jackson Township to -- the purpose of that call at that
5 time was to find out the date of their next monthly
6 township meeting.

7           And it's my recollection at that time that
8 she told me the date of the next regular meeting, and I
9 believe she asked me the purpose of my call, at which
10 time I would have informed her that it was regarding a
11 subdivision.

12          It was at that time that she informed me
13 that they were working on -- that Jackson Township was
14 working on adopting a township subdivision ordinance.

15    Q     Did she also tell you that there was a
16 moratorium on new subdivisions within the township?

17    A     Yes, she did.

18    Q     And is that what you believe to be the first
19 time that you heard about that, on January 25?

20    A     I believe so, yes.

21    Q     Did you convey this information to
22 Mr. Corneal?

23    A     Yes.

24    Q     What did he say, if you recall?

25    A     I really don't recall.

MLP REPORTING, INC.   (570) 748-1041

17

1    Q    Had you contacted the township at any time
2 prior to January 25, 2000, with respect to the work
3 that you were doing for Mr. Corneal and his
4 subdivision?

5    A    Not to my knowledge.

6    Q    As of January 25, 2000, had you completed
7 the plans for the proposed subdivision?

8    A    I would say no, the earliest plan date that
9 I see here on my completed subdivision plans is
10 February 4 of 2000.

11    Q    Why were you contacting the township to find
12 out when their next meeting was?

13    A    So that I could finish the work that I was
14 progressing on prior to their township meeting.

15    Q    Why did you want to finish the work prior to
16 the township meeting?

17    A    I think Mr. Corneal expressed a desire to
18 have this information to the township for their very
19 next meeting.

20    Q    Do you know why Mr. Corneal wanted that
21 information to go to the township?

22    A    I'm sure that I had told Mr. Corneal that
23 it's been my understanding in any subdivision in any
24 municipality that because of sewage facilities
25 installation on a property anywhere that the proposal

MLP REPORTING, INC.   (570) 748-1041

18

1 would include something like that, that the township
2 supervisors must give their permission to subdivide.

3    Q    And did this subdivision plan have
4 provisions for sewage facilities?

5    A    Yes, it did.

6    Q    Now, I may have already asked this, and I
7 apologize, do you recall the discussion you had with
8 Mr. Corneal when you informed him about the moratorium
9 that you were informed about by Ann Wirth?

10    A    I really don't recall specifics of that
11 particular conversation.

12    Q    Did you attend the township meeting in
13 February?

14    A    No, I did not.

15    Q    Have you ever attended a township meeting of
16 the Jackson Township board of supervisors?

17    A    Not to my knowledge.

18    Q    Now, the plan that was drawn up in February
19 -- well, with the date of February, February 4, 2000, I
20 think you said?

21    A    Yes.

22    Q    How many lots were proposed on that plan?

23    A    At that time, there were three lots
24 proposed.

25    Q    Why did it go from the original idea of nine

MLP REPORTING, INC.   (570) 748-1041

19

1 lots down to three, if you know?

2    A    That, I really don't know.  It was simply
3 reduced -- the number of lots was reduced at
4 Mr. Corneal's request.

5    Q    Did the plan of the proposed subdivision
6 have to be submitted to the Huntingdon County Planning
7 Commission?

8    A    As I understand it, that is at the township
9 officials discretion.

10    Q    And did you ascertain whether or not in
11 Jackson Township their discretion is to have the plans
12 submitted to the planning commission?

13    A    I don't specifically recall doing that.

14    Q    Do you recall submitting the plans to the
15 Huntingdon County Planning Commission?

16    A    Not personally, no.

17    Q    Do you know whether they were?

18    A    I think that they were.  I think that one of
19 my survey files contains two separate review letters
20 issued from the planning commission.

21    Q    Do you know what happened at the February
22 township meeting with respect to the subdivision plan?

23    A    No.

24    Q    Were you asked to revise the plans at any
25 time after the February meeting?

MLP REPORTING, INC.   (570) 748-1041

20

1    A    Yes, I was.

2    Q    Who asked you to revise them?

3    A    Mr. Corneal.

4    Q    Do you know why he asked you to revise those
5 plans?

6    A    Not specifically.

7    Q    Do you know generally any reason why you
8 were asked to revise the plan?

9    A    I think because in order to revise the
10 subdivision plan to create fewer lots, it would have
11 perhaps made things easier to get through the planning
12 commission's approval.

13    Q    And did you, in fact, revise the plans?

14    A    Yes, I did.

15    Q    What's the date of your first revision?

16    A    The next consecutive plan concerning the
17 Corneal property is dated April 7 of 2000.

18    Q    And how many lots were on the April 7, 2000,
19 plan?

20    A    Only two proposed lots at that time.

21    Q    Did you have any discussion with Mr. Corneal
22 about why he went from three lots down to two lots?

23    A    Not his specific reasoning, however, I did
24 convey to Mr. Corneal that in my experience, the
25 creation on the February 4 plan of such an extended

MLP REPORTING, INC.   (570) 748-1041

1 right-of-way to serve Lot No. 3 generally raises
2 eyebrows at the planning commission.
3     Q     Now, did you have anything to do with the
4 preparation of sewage modules?
5     A     I prepared the Pennsylvania Department of
6 Environmental Protection sewage module, the component
7 one.
8     Q     For which plan?
9     A     For both the February 4 plan and also the
10 April 7 plan.
11    Q     And the module that you prepared for the
12 February plan, was that different than the next module
13 that was prepared for the April plan?
14    A     Yes, there would have been changes on it,
15 specifically the number of lots and other things that I
16 don't recall just at the moment.
17    Q     Were there any other revisions that you made
18 to the plan and the proposed subdivision after April?
19 In other words, were there any other plans that you
20 made?
21    A     Yes. Yes, I have a plan showing the
22 David B. and Sandra Y. Corneal property that is dated
23 December 27, 2000.
24    Q     And how many lots are on that plan?
25    A     It's just the one survey showing the entire

1 Mr. Corneal?
2     A     Not that I recall.
3     Q     Did you have any discussions with
4 Mr. Corneal about the approval process or what went on
5 with his proposed plans?
6     A     I'm sure I would have conveyed to
7 Mr. Corneal the general process of subdividing a piece
8 of property as best I understood it at the time.
9     Q     Very briefly, what was your understanding at
10 the time that you probably explained to Mr. Corneal?
11    A     That in any subdivision, the township
12 supervisors were required by the Pennsylvania DEP to
13 review and approve subdivision plans whether or not
14 they had an ordinance, this was strictly in compliance
15 with the Department of Environmental Protection
16 policies.
17    Q     Other than the three plans that you prepared
18 that we've talked about and the two sewage modules, did
19 you prepare anything else for Mr. Corneal?
20    A     There were — the documents we looked at
21 earlier with the information concerning the boundary
22 discrepancy and I think there were additional drawings
23 concerning the neighboring property.
24          It's my recollection that Mr. Corneal wanted
25 those because he was contemplating purchasing at least

1 boundary of the Corneal property with no attempted
2 divisions of the property.
3     Q     Do you know why you were asked to prepare
4 the plan with the December date on it?
5     A     Only at Mr. Corneal's request.
6     Q     You don't know why he requested that?
7     A     Not specifically, no.
8     Q     Did you have any discussions with him about
9 the preparation of the December plan?
10    A     I'm sure I did.
11    Q     That you recall, obviously.
12    A     Nothing stands out in my memory.
13    Q     And what is that December plan?  What did he
14 ask you to do?
15    A     He asked that I prepare a drawing showing
16 the entire property that he and his wife owned with the
17 positioning of the soil probes and percolation tests
18 that were done by the township's sewage enforcement
19 officer and the soil types as they are discernable from
20 the Huntingdon County soil survey, which is put out by
21 the United States Department of Agriculture.
22    Q     Did you, other than the two sewage modules
23 that we talked about, one in conjunction with the
24 February plan and one in conjunction with the April
25 plan, did you prepare any other sewage modules for

1 a portion of the neighboring property.
2     Q     Did you have anything to do with the design
3 of any structures on the properties?
4     A     No.
5     Q     The location of any structures?
6     A     No, I would have simply shown the proposed
7 location of a structure in the position that
8 Mr. Corneal would indicate so that it could be shown on
9 the subdivision plan.
10    Q     Do you recall meeting with the SEO, the
11 sewage enforcement officer, Mr. Parks, sometime in the
12 fall of 1999 concerning Mr. Corneal's property?
13    A     I met with Barry Parks at the Huntingdon
14 County Courthouse one morning to get some insight as to
15 the positions for several of the soil probes, some of
16 the soil testing that he had done that I had not been
17 able to find on the property.
18    Q     So you couldn't find the test sites on the
19 property?
20    A     That's correct.
21    Q     And you met with Barry Parks in order to get
22 information which would enable you to find those test
23 sites?
24    A     That's my recollection, yes.
25    Q     Do you recall meeting with Barry Parks at

1 any other time concerning the Corneal property?

2    A    No, I don't.

3    Q    Other than a discussion concerning the test
4 pit sites on the property, did you have any other
5 discussion with Mr. Parks about the Corneal property?

6    A    I don't think so.

7    Q    Do you know a person by the name of George
8 Simpson?

9    A    Yes.

10    Q    Who is George Simpson?

11    A    Somebody I knew many years ago. I don't
12 know who he is in any other capacity. I would
13 recognize him.

14    Q    Did you have anything to do with his
15 subdivision or proposed subdivision in Jackson
16 Township?

17    A    I don't think so.

18    MR. SHERR: I don't have any other
19 questions. Thank you.

20    MS. MONTGOMERY: One moment, please.

21    (Discussion held off the record.)

22

23    EXAMINATION

24

25 BY MS. MONTGOMERY:

1 Facilities Act requires the municipal officers in any
2 municipality to review subdivision proposals to make
3 certain that the sewage facilities proposed for the
4 development are adequate.

5    Q    And does the township sometimes pass that
6 task on to the county planning commission?

7    A    Yes, my understanding is that the county
8 planning commission will review and make
9 recommendations to any municipal officers as to their
10 findings in reviewing subdivision plans.

11    Q    Did Mr. Corneal, in the course of you
12 preparing the successive subdivision plans for him, did
13 he ever tell you why he kept cutting down the number of
14 proposed lots?

15    A    Not that I specifically recall.

16    Q    Did he ever tell you that his plans were
17 being — his ability to subdivide was being challenged
18 by the township at all?

19    A    I think he may have mentioned something
20 along those lines, but again, I don't specifically
21 recall the wording or the exact occasion.

22    Q    Did you have any understanding of why you
23 were preparing, you know, successive subdivision plans
24 with fewer and fewer lots?

25    A    Only based on my presumption that he felt

1    Q    Mr. Simpson, I'm Bridget Montgomery, and I
2 represent the Corneals in this action, and we just met
3 a moment ago. I just have a couple of questions for
4 you.

5    I think you testified a few moments ago that
6 you contacted Ann Wirth on January 25, 2000, to inquire
7 into when the next township meeting would be, correct?

8    A    That's correct.

9    Q    When you called her, did you tell her who
10 you were calling on behalf of or whose subdivision plan
11 you were looking to present?

12    A    I may have at some time during the
13 conversation. It wasn't a long conversation, but I
14 don't specifically recall mentioning an individual.

15    Q    Okay. You testified, also, about some DEP
16 requiring township supervisors to review and approve
17 certain subdivision plans?

18    A    Yes, particularly where there would be, as I
19 mentioned before, proposed sewage facilities
20 installation.

21    Q    So exactly what were they reviewing them
22 for? Let me ask that question a little better.
23 Exactly what were the township supervisors required to
24 review such plans for?

25    A    It's my understanding the State Sewage

1 the need to do so.

2    Q    Now, you testified, I think, that you had
3 some involvement with the sewage modules on
4 Mr. Corneal's property?

5    A    Yes, I would have prepared the sewage module
6 forms with all of the information that I could provide
7 on them.

8    Q    Oh, the forms?

9    A    Yes.

10    Q    I see. For submission to whom?

11    A    They would initially go to the township and
12 the planning commission if the planning commission were
13 being asked to review this, but they would also then
14 have to be submitted to the Department of Environmental
15 Protection for their review and their approval, also.

16    Q    Did you prepare successive versions of the
17 sewage modules, as well?

18    A    Two, to my recollection.

19    Q    Okay. Do you recall why you had to prepare
20 a second version?

21    A    Information pertinent to the second
22 subdivision proposal that is required within the form
23 would have been different than the first.

24    Q    I see. Did anybody else work on the sewage
25 modules with you?

29

1    A    No.

2         MS. MONTGOMERY:  I don't have any other

3 questions.

4         MR. SHERR:  I don't have anything further.

5 Thank you very much for your time, Mr. Simpson.

6         (The deposition concluded at 1:52 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MLP REPORTING, INC.   (570) 748-1041

---

30

1 COUNTY OF UNION          :
                           : ss
2 COMMONWEALTH OF PENNSYLVANIA:

3

4         I, NICOLE L. ZIMMERMAN, Reporter-Notary

5 Public, authorized to administer oaths within and for

6 the Commonwealth of Pennsylvania and take depositions

7 in the trial of causes, do hereby certify that the

8 foregoing is the testimony of DAVID SIMPSON.

9         I further certify that before the taking of

10 said deposition, the witness was duly sworn; that the

11 questions and answers were taken down stenographically

12 by the said NICOLE L. ZIMMERMAN a Reporter-Notary

13 Public, approved and agreed to, and afterwards reduced

14 to typewriting under the direction of the said

15 Reporter.

16         I further certify that the proceedings and

17 evidence are contained fully and accurately in the

18 notes taken by me on the within deposition, and that

19 this copy is a correct transcript of the same.

20         In testimony whereof, I have hereunto

21 subscribed my hand this 12th day of July, 2001.

22

23

24         _____
                NICOLE L. ZIMMERMAN
                Notary Public

25 My commission expires
   on May 24, 2003

MLP REPORTING, INC.   (570) 748-1041

Case 1:00-cv-01192-SHR   Document 120   Filed 04/18/2003   Page 98 of 100

9

3-1.  Agreement for Sale of Land—Judgment
The Plankenhorn Co., Williamsport 2, Pa.

# Article of Agreement,

**Made the** 7th **day of** October **in the year** one thousand nine hundred ninety nine (1999).

**Between** DAVID B. CORNEAL and SANDRA Y. CORNEAL , parties *of the first part,*

**and** JOHN B. HEWETT, JR. and JoANN F. SMITH, parties *of the second part,*

**Witnesseth,** *that the said part* ies *of the first part, for the consideration hereinafter mentioned and contained, agree to sell and convey unto the said part* ies *of the second part, their heirs or assigns, all* Farm House, Barn and 25.8 acres, more or less, located in Jackson Township, Huntingdon County, more fully described in a proposed subdivision survey prepared by David A. Simpson for David B. and Sandra Y. Corneal. Being a portion of a larger fram tract owned by the parties of the first part. Said subdivision to be finalized and recorded prior to settlement by the parties herein.

THIS CONTRACT IS SUBJECT TO THE ADDITIONAL TERMS SETFORTH IN AN ADDENDUM ATTACHED HERETO.

**In Consideration Whereof,** *the said part* ies *of the second part agree to purchase said premises and to pay said part* *of the first part therefor, the sum of* one hundred and fifty thousand ($150,000.00) and xx/00 ----------------- *Dollars, in the manner following, to-wit*

1. Four thousand and xx/00 ($4,000.00) dollars downpayment.
2. Monthly payments of five hundred and xx/00($500.00) dollars beginning on November 7, 1999 and continuing each month thereafter until final settlement on or about JUne 30th,2000. Said monthly payments to be applied to principle against the purchase price.
3. The balance in full at the time of settlement.
4. Buyers to pay 1% transfer tax and a proration of the real estate taxes.
5. No personal property is included in this sale.

*and upon the payment of the said sum, the said part* ies *of the first part will, at their own proper cost and charge, make, execute and deliver to the said part* ies *of the second part a good and sufficient Deed for the proper conveying and assuring of the said premises in fee simple, free from all incumbrance, and dower and right of dower, such conveyance to contain the usual covenants of* Special

*warranty*

**ADDENDUM/ENDORSEMENT ) AGREEMENT OF SALE**      Form 102-6L

RE: PROPERTY    25.8 acres with house and barn
SELLERS    DAVID B. CORNEAL and SANDRA Y. CORNEAL
BUYERS    JOHN B. HEWETT, JR. and JoANN F. SMITH
DATE OF AGREEMENT    10-7-1999, SETTLEMENT DATE    6-30 19x2008 SALE PRICE $50,000

1. Buyers acknowledge that a present tenant, Scott Page, needs to be relocated by Sellers to a property they are constructing on another portion of the farm and that they will be flexable in the settlement date to accommodate this transition.
2. Sellers grant to the Buyers, upon the signing of this agreement the right to begin preparation of flower beds for Spring planting. Sellers have the right to approve or disapprove the numbers and locations of the flower beds.
3. Sellers shall retain the right to occupy the upper level of the barn for a period of two years or until their home is finished on the remainder of the farm, which ever comes first.
4. The deed will contain restrictive covenants that the land may not be further subdivided, that there may not be mobile homes of any nature put on the property permanently or temporarily. That any home constructed on the property shall contain a minimum of 2,000 sq. feet of living space.

*DBC 1300 + or —*

All other terms and conditions of the said agreement shall remain unchanged and in full force and effect.

| | |
|---|---|
| WITNESS _____ | BUYER _____ (S) |
| WITNESS _____ | BUYER _____ (S) |
| | DATE _____ 19___ |
| WITNESS _____ | SELLER _____ (S) |
| WITNESS _____ | SELLER _____ (S) |
| AGENT _____ | DATE _____ 19___ |

And it is further agre  by and between the said parties that possession of said premises shall be delivered to the part  ies of the second part, their   heirs or assigns, on the  30th day of    June                     19 x 2000, until which time the part  ies of the first part shall be entitled to receive the rents, issues and profits thereof.

And it is further understood and agreed, that in case default shall be made in the payment of any installment of principal or interest hereby agreed to be paid, for a period of   ten (10) days after the same shall have become due and payable by the terms hereof, then and in that case the whole of the principal sum and interest shall, at the option of the said part  ie of the first part, become forthwith due and payable, without defalcation or stay of execution; said part of the second part do     hereby empower any attorney of any Court of Record of Pennsylvania or elsewhere, to appear and confess judgment against  them     for the above sum, or so much thereof as remains unpaid, together with the interest, with costs of suit, release of errors, attorney's commission of    10%          per cent., waiving inquisition and exemption.

**In Witness Whereof**, the parties to this agreement, have hereunto set their hands and seals, the day and year first above written.

SEALED AND DELIVERED
IN THE PRESENCE OF

DAVID B. CORNEAL                                    (SEAL)

SANDRA J. CORNEAL                                   (SEAL)

JOHN R. SEWELL, JR.

JOANN F. SMITH                                      (SEAL)

**State of**                                        **County of**                      , ss,

On this            7th    day of                  19     , before me, the subscriber, personally came the above named

who in due form of law acknowledged the foregoing Indenture to be   act and deed, and desired that the same might be recorded as such.

Witness my hand and              seal the day and year aforesaid.

(SEAL)

My Commission Expires

**Agreement.**
FORM B-1

WITH

Dated

For

Entered for record in the Recorder's

Office of

County, the              day of

19

Tax $

Fees $

Recorder.

WILLIAM H. SIMMET

To Recorder of Deeds:

**Certificate of Residence**

I, hereby certify that the correct address and place of residence of the grantee          herein as follows:

Attorney or Agent for Grantee

**Recorded** in the Office for Recording of Deeds, &c., in and for said County, in Deed Book No.          Vol.            , Page

**Witness** my Hand and Official Seal this          day of            , 19

Recorder of Deeds