Case 1:00-cv-01192-SHR    Document 120-2    Filed 04/18/2003    Page 1 of 100

February 7, 2000
Meeting called to order by Chairman Weiler
Minutes approved as read

Treasurer's report approved as read

The Board appointed two new auditors - Lucille Yutzy and Sondra Amrstrong

The Fireman presented a list - Fireman trained in Hazardous Materials Operations
and Incident Commanders - Fireman driving under Red Lights and Sirens and Blue Lights.
And a List of Fireman and their Drivers License's.

Denny Grandthal presented a copy of the concerns and opinions of the Taxpayers Associations
On the proposed Subdivision Ordinances.

Fire Chief Chris Wilson ask if the proposed sub-division ordinance had addressed the width of the
roads with the Fireman trucks in mind and he was assured that all the proposed streets will
be wide enough to get the fire trucks in and out and turn them around.

Roadmaster had a few complaints about snow removal but he felt that we have worked out the problems
and things are going well.

David Corneal ask if the Supervisors would approve a sub-division on Sawmill road, all three supervisors
told him that we are not approving any sub-division at this time and that it had been announced at the
January meeting. He ask if he could submit his sub-division to the County and when we are ready would
be a head of the game and he was told that he could do so but that the Township had the final approval of
all sub-divisions.

Meeting adj 7:50PM

*Ann Lunell*


EXHIBIT
Wirth 5
TKB    5-17-0?

*11*

January 4, 2000

Regular Meeting Opened at 7:10PM

Meeting called to order by Chairman Weiler at 7:00 PM

Minutes approved

Treasurer report approved as read

The Supervisor's stated that no more sub-divisions will be approved until after the proposed Sub-Division ordinance for the Township has been approved. As soon as we get the review from the Planning commission and any changes that the Supervisors feel need to be made copies will be made available to the Public and a Public meeting will be held.   It was stated that the County is now doing a " boiler plate" sub-division ordinance for those Township's who want it, but Jackson Township has already put a lot of time into the purpose ordinance and it was felt it was in the best interest of the Township to proceed with the  ordinance that the Supervisor's have decided on.

Tom Wilson the Roadmaster stated that New Enterprise would fix Miller road
To our satisfaction in the spring.  He hopes to get bids on  Sawmill & Yoder for sealing this summer depending on the price and how much money we have at the time.

Meeting was adj. at 7:35PM

(June 26th – Will public meeting re: subdivision and adoption
Time ?

**EXHIBIT**

Wirth 6

TKB   5-17-01

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2   DAVID B. CORNEAL and SANDRA  :
     Y. CORNEAL,                   :
 3        PLAINTIFFS               :
                                   :
 4              VS                 :   NO. 1:CV-00-1192
                                   :
 5   JACKSON TOWNSHIP, HUNTINGDON  :
     COUNTY, PENNSYLVANIA; W.      :
 6   THOMAS WILSON, individually   :
     and in his official capacity  :
 7   as Supervisor of Jackson      :
     Township; MICHAEL YODER,      :
 8   individually and in his       :
     official capacity as          :
 9   Supervisor of Jackson         :
     Township; RALPH WEILER,       :
10   individually and in his       :
     official capacity as          :
11   Supervisor of Jackson         :
     Township; BARRY PARKS,        :
12   individually and in his       :
     official capacity as Sewage   :
13   Enforcement Officer of        :
     Jackson Township; DAVID       :
14   VAN DOMMELEN, individually    :
     and in his official capacity  :
15   as Building Permit Officer;   :
     ANN L. WIRTH, individually    :
16   and in her official capacity  :
     as Secretary of Jackson       :
17   Township; and LARRY NEWTON,   :
     individually and in his       :
18   official capacity as          :
     Solicitor to Jackson          :
19   Township,                     :
          DEFENDANTS               :
20         DEPOSITION OF:   LAWRENCE L. NEWTON
21         TAKEN BY:        PLAINTIFFS
22         BEFORE:          TERESA K. BEAR, REPORTER
                            NOTARY PUBLIC
23
           DATE:            JUNE 12, 2001, 9:42 A.M.
24
           PLACE:           ECKERT SEAMANS
25                          213 MARKET STREET
                            HARRISBURG, PENNSYLVANIA
```

**2**

1  APPEARANCES:
2    ECKERT SEAMANS
     BY: BRIDGET E. MONTGOMERY, ESQUIRE
3       LESLIE A. MALADY, ESQUIRE
4       FOR - PLAINTIFFS
5    MAYERS, MENNIES & SHERR, LLP
     BY: ANTHONY R. SHERR, ESQUIRE
6
        FOR - ALL DEFENDANTS EXCEPT NEWTON
7
     THOMAS, THOMAS & HAFER
8    BY: MICHELE J. THORP, ESQUIRE
9       FOR - DEFENDANT - RALPH WEILER
10   METTE, EVANS & WOODSIDE
     BY: KATHRYN LEASE SIMPSON, ESQUIRE
11
        FOR - DEFENDANT - LARRY NEWTON
12
     ALSO PRESENT:
13
        DAVID B. CORNEAL
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1          TABLE OF CONTENTS
2              WITNESS
3  FOR PLAINTIFFS                    DIRECT
4  Laurence L. Newton
     By Ms. Montgomery           4
5
6              EXHIBITS
7  NEWTON EXHIBIT NO.          PRODUCED AND MARKED
8   1 - Notice              33
9   2 - Minutes dated 1/4/00      48
10  3 - Letter dated 1/31/00      68
11  4 - Letter dated 8/18/00      77
12  5 - Letter dated 7/28/00      80
13  6 - Letter dated 5/5/00       81
14  7 - Letter dated 5/5/00       84
15  8 - Notice             99
16  9 - Bill dated 12/28/99       103
17  10 - Letter dated 8/3/00      106
18  11 - Letter dated 8/31/00 with enclosures   109
19  12 - Letter dated 9/1/00 with enclosures   112
20  13 - Letter dated 10/10/00     113
21  14 - Letter dated 11/10/00     121
22  15 - Invoice dated 8/4/00      126
23  16 - Letter dated 8/29/00      147
24
25

**4**

1          LAWRENCE L. NEWTON, called as a witness, being
2  sworn, testified as follows:
3
4          DIRECT EXAMINATION
5
6  BY MS. MONTGOMERY:
7      Q      Mr. Newton, we've just met, but for the record
8  I'll identify myself. My name is Bridget Montgomery and I
9  represent the Corneals in this litigation. Would you just
10 state your name for the record.
11     A      Lawrence, L-a-w-r-e-n-c-e, middle initial L.,
12 Newton, N-e-w-t-o-n.
13     Q      Where do you live, Mr. Newton?
14     A      I live at 2111 Moore Street, Huntingdon,
15 Pennsylvania.
16     Q      How long have you lived there?
17     A      Since July of 1981.
18     Q      Are you a native of Huntingdon?
19     A      No, I'm not.
20     Q      Where are you a native of?
21     A      I grew up in Latrobe, Pennsylvania.
22     Q      What county is that?
23     A      Westmoreland.
24     Q      Out in the western part of the state?
25     A      Yes.

**5**

1      Q      And what is your current occupation?
2      A      I'm an attorney.
3      Q      Are you in private practice?
4      A      Yes, I am.
5      Q      And what is the business address of your law
6  practice?
7      A      504 Penn Street, Huntingdon, Pennsylvania.
8      Q      Even though you are an attorney, I was going
9  to dispense with all of these instructions, but I think
10 we're going to need to go through them. Have you ever been
11 deposed before?
12     A      No, I haven't.
13     Q      Okay. You know the general instructions?
14     A      Yes.
15     Q      First of all, that you really need to let me
16 finish my question and I'll try to let you finish your
17 answer so that we're not talking over each other, just for
18 the benefit of the court reporter.
19         I'll give you an instruction that I need to
20 mind myself. We need to talk slow enough for the court
21 reporter to take us down. I tend to go too fast and Michele
22 was good about reminding me that I'm going too fast. So is
23 there any reason why you can't give your deposition today?
24     A      None whatsoever.
25     Q      You're not on any sort of medication or

**6**

1 anything that would prevent you from understanding my
2 questions and giving answers?
3 A    No.
4 Q    Obviously if you need to take a break for your
5 own comfort or convenience, you can do that.  There's water
6 here if you need it, coffee, whatever you'd like.
7      Now, we'll go back to your employment.  I
8 think you just gave us your business address, correct?
9 A    That's correct.
10 Q    Are you in practice alone?
11 A    Yes.
12 Q    Do you occupy that space alone?
13 A    No.
14 Q    Who occupies the space with you?
15 A    There's another attorney, Harvey B. Reeder,
16 and a psychologist, Lynn E. Kagarise.
17 Q    Do you have -- what is it, a three office
18 space or more?
19 A    Well, we have -- we have more space.  We have
20 a conference room downstairs.  Mr. Reeder and I share part
21 of the second floor.  We each have an office.  There is a
22 library and another conference room.  Mr. Kagarise is in the
23 second floor rear.  There is an office that he has and
24 secretarial staff.
25 Q    So you have your actual office space on the

**7**

1 second floor --
2 A    Yes.
3 Q    -- and your conference room is on the first
4 floor?
5 A    Yes.
6 Q    You said that Mr. Reeder and you share part of
7 the second floor?
8 A    Yes.
9 Q    You have separate offices but one secretary?
10 A    No, we each have our own secretary and we
11 share a secretary.
12 Q    I see.  So you have three secretaries
13 altogether?
14 A    Yes, one of whom I employ and one of whom we
15 share the cost of.
16 Q    I see.  And the other whom he employs himself?
17 A    Yes.
18 Q    Do you have any other office staff?
19 A    No.
20 Q    And you have a library?
21 A    Yes.
22 Q    A law library?
23 A    (Witness nods head affirmatively.)
24 Q    Do you share that with Mr. Reeder?
25 A    Yes.

**8**

1 Q    Any other shared space?
2 A    No.
3 Q    You both are able to use the conference room
4 or was it rooms -- room or rooms on the first floor?
5 A    Room.  There's a kitchen area in the back of
6 the first floor.
7 Q    How long has Mr. Reeder shared this space with
8 you?
9 A    We purchased the building approximately five
10 years ago.  So at that location approximately five years.
11 Q    Did you previously share office space with
12 him?
13 A    Yes.
14 Q    In another location?
15 A    Yes.
16 Q    Where was that?
17 A    331 Penn Street, Huntingdon.
18 Q    Also in Huntingdon?
19 A    Yes.
20 Q    And how long did you share office space with
21 him there?
22 A    Well, there was another -- at that time there
23 was another attorney that we practiced -- that I practiced
24 with by the name of Marshal B. DeForrest.
25 Q    I'm sorry, I didn't hear that.

**9**

1 A    Marshal B. DeForrest.
2 Q    DeForrest?
3 A    Yes.  Mr. Reeder was sharing space at that
4 time as well.
5 Q    I take it you're each sole practitioners?
6 A    That's correct.
7 Q    And Mr. DeForrest was a sole practitioner as
8 well?
9 A    Yes, he was.  Now, I helped him out.  We were
10 sole practitioners, but he was -- he needed some help.  He
11 was kind of phasing out of his practice and so I did various
12 tasks for him but we were never partners.
13 Q    Do you have any sort of partnership or
14 corporate arrangement or anything like that with Mr. Reeder
15 at this time?
16 A    I do not.  I should say that we had a -- we
17 have a settlement company called Standing Stone Settlement
18 Company.  We each are title agents for Old Republic.  We do
19 not have a partnership regarding the settlement company.  We
20 actually formed the settlement company because most title
21 carriers expected some minimum volume per year so we thought
22 if we combined and had a settlement company we could do this
23 together, but any settlement that I have through Standing
24 Stone is mine and any settlement he has is his.
25 Q    Standing Stone is what?

**NEWTON, LAWRENCE**
06/12/01

**CORNEAL VS**
**JACKSON TOWNSHIP**

---

**10**

1  A    It's a fictitious name.
2  Q    Oh, Standing Stone is the name of your
3  title --
4  A    Standing Stone Settlement Company is a
5  fictitious name, yes.
6  Q    And you said your title agent's through what?
7  A    Old Republic Title Company.
8  Q    Through Old Republic Title Company?
9  A    (Witness nods head affirmatively.)
10 Q    What about the real estate itself, do you own
11 it or rent it?
12 A    We own it. We have a real estate partnership,
13 Mr. Reeder and I and Mr. Kagarise, and then we each
14 individually pay rent to the partnership.
15 Q    Understood. How long have you owned that
16 building with Mr. Reeder?
17 A    Since approximately five years ago.
18 Q    Did you own the prior office?
19 A    I did not. I believe Mr. DeForrest owned the
20 building and then for a period of time I think Mr. Reeder
21 did, but I never had an ownership interest in 331 Penn
22 Street.
23 Q    Do you have one telephone number or two
24 telephone numbers or what at this office?
25 A    Actually we have three lines. Technically my

---

**11**

1  number is 643-3820 and Mr. Reeder's number is 643-3821. You
2  know, they both ring and our receptionist would answer
3  either line.
4  Q    Is your receptionist your third shared
5  secretary?
6  A    Yes.
7  Q    Is there a third number as well?
8  A    I don't believe so, no. There's just an extra
9  line.
10 Q    There's just an extra line?
11 A    (Witness nods head affirmatively.)
12 Q    Is there one general number for the office or
13 just those two numbers?
14 A    Those two numbers.
15 Q    What about your fax, do you share a fax?
16 A    We share a fax along with Mr. Kagarise. That
17 number is 643-5670.
18 Q    I'm assuming you maintain malpractice
19 insurance?
20 A    Yes.
21 Q    Do you maintain separate malpractice
22 insurance?
23 A    Separate, yes.
24 Q    You each are under your own?
25 A    Um-hum.

---

**12**

1  Q    Do you share clients at all? I mean, do you
2  work on cases together or --
3  A    We've done that occasionally. Generally not.
4  Q    In terms of proximity, how close are your
5  offices, yours and Mr. Reeder's?
6  A    Right across the hall.
7  Q    And your secretaries each sit outside your
8  desks, your individual offices?
9  A    No, the secretaries are all downstairs.
10 Q    The secretaries are on a separate floor?
11 A    If you go in the front door, our secretaries
12 are to the left and our receptionist is to the right.
13 Q    Tell me a little bit about your education,
14 where did you do your undergraduate work?
15 A    Wittenberg University in Springfield, Ohio.
16 Q    And what about your law degree?
17 A    Case Western Reserve University in Cleveland,
18 Ohio.
19 Q    Do you have any other degrees?
20 A    I do not.
21 Q    A JD is enough.
22 A    That's enough.
23 Q    Causes you enough problems in your life,
24 right. Let's see, what about other types of certificates or
25 anything like that? Do you have anything?

---

**13**

1  A    I'm a title agent and that's all.
2  Q    You said that. How does one become a title
3  agent, what do you do?
4  A    Apply through the title company.
5  Q    You apply directly to --
6  A    You're approved through your title company.
7  Q    There's no state requirement or anything like
8  that?
9  A    There might be now. Not when I did it. When
10 you are an attorney, you didn't have to take an exam and
11 that type of thing and I'm not sure that's the case now.
12 Q    So you have a fictitious name for your
13 settlement company?
14 A    Correct.
15 Q    Is it a corporation?
16 A    No.
17 Q    It's a partnership?
18 A    Technically, no, it's not.
19 Q    It's not registered in any way --
20 A    It's registered as a fictitious name.
21 Q    It's not registered as a partnership or
22 corporate entity in any way?
23 A    It's not, no.
24 Q    Do you have some sort of insurance for that
25 settlement company?

---

## 14

1    A       We have to purchase through our professional
2    liability carrier additional coverage for that.
3    Q       Do you each purchase that separately or do you
4    purchase it together or what?
5    A       We purchase it separately through our own
6    policies. Now, the -- we have to have a fidelity bond
7    through Standing Stone as a requirement of -- I think
8    Pennsylvania licensing requirements.
9    Q       So you have a fidelity bond in the name of
10   Standing Stone --
11   A       Right.
12   Q       -- which you two are the principals under
13   Standing Stone?
14   A       Right.
15   Q       But each of you through your own malpractice
16   insurance have additional insurance --
17   A       Yes.
18   Q       -- for your title agent work?
19   A       For our title agent, right.
20   Q       Is a settlement company the same as a title
21   agency?
22   A       Similar, yes.
23   Q       I don't know if I asked you this, and I
24   apologize if I did, when did you set up the title company,
25   the settlement company?

## 15

1    A       Approximately three years ago.
2    Q       So is it fair to say that a significant amount
3    of your practice involves real estate?
4    A       I would say a fair portion of my practice
5    involves real estate, but much of that is not the title
6    agency.
7    Q       What about Mr. Reeder's, do you know?
8    A       I wouldn't know. He does -- I would say he
9    does a fair amount of title work and real estate work.
10   Q       So you do some real estate settlement work and
11   title work, right?
12   A       Yes.
13   Q       And aside from that, what else, what other
14   kind of work do you do?
15   A       Civil and criminal litigation, municipal work,
16   estates, that's about it.
17   Q       Your municipal work, can you describe that for
18   me?
19   A       I'm solicitor for several townships and
20   several boroughs.
21   Q       And we all know that you are solicitor for
22   Jackson Township, correct?
23   A       Correct.
24   Q       In Huntingdon County. What other townships
25   and boroughs are you solicitor to?

## 16

1    A       Let's see, townships, Dublin, Carbon.
2    Q       Is Carbon in Centre County?
3    A       No, it's in Huntingdon County. These would
4    all be in Huntingdon County. Hopewell, Todd, Porter, West.
5    I think that's it.
6    Q       Thanks.
7    A       For boroughs, Huntingdon, Coalmont and
8    Shirleysburg.
9    Q       And those are all in Huntingdon as well?
10   A       Yes.
11   Q       So when did you become the solicitor for
12   Jackson Township?
13   A       I don't know. I would say approximately 15
14   years ago.
15   Q       A long time, okay. How did that come about?
16   A       I received a telephone call from the then
17   township secretary whose name was Leroy Koch. He asked me
18   if I would be interested and I said yes.
19   Q       And you serve at the pleasure of the township
20   supervisors, correct?
21   A       I do.
22   Q       Is it an annual contract or an annual
23   appointment or what?
24   A       I think it's an annual appointment. We never
25   have a contract.

## 17

1    Q       Is there a list of duties or anything that
2    came to you at any time in connection with your work for
3    Jackson Township?
4    A       No.
5    Q       Well, how did you come about to have an
6    understanding of what it is you're expected to do for them?
7    A       Township code.
8    Q       The township --
9    A       Basically in Jackson Township, and as well as
10   in the other townships, I rarely attend meetings. I only
11   attend unless I'm requested -- if I'm requested to attend.
12   And there will be periods of time when really not too much
13   happens at all during the year and it's -- these are -- keep
14   in mind these are very rural townships and they basically
15   call as needed.
16   Q       Understood. Are you on an hourly or on a
17   retainer or what --
18   A       I --
19   Q       -- with Jackson Township?
20   A       I generally bill -- I generally bill these
21   townships at a discounted rate of $60 an hour.
22   Q       So you don't have some sort of retainer or a
23   minimum number of hours a year or something like that?
24   A       No, there's no -- sometimes -- I don't know if
25   I've done this the last couple years with Jackson Township,

18

1 but sometimes the retainer has been $150 a year. You're
2 smiling at me.
3     Q     With Jackson Township, typically how much work
4 do you do for them a year?
5     A     You know, it varies. I think last year I
6 probably billed them approximately a thousand dollars.
7 There was more activity last year than in most years.
8     Q     Do you send them an invoice every month?
9     A     No.
10     Q     Just in months that you perform work?
11     A     Or I will not send an invoice until the job is
12 done.
13     Q     I see. Do you send them any sort of periodic
14 statement of account or anything like that?
15     A     No.
16     Q     So you say that last year there was more
17 activity than usual?
18     A     Yes.
19     Q     Without going into anything that doesn't have
20 to do with this lawsuit obviously, can you describe for me
21 -- I should say can you tell me whether the additional
22 activity is attributable to Mr. Corneal and his issues?
23     A     No, I would say not.
24     Q     No, okay.
25     A     Well, after the lawsuit, yes.

20

1     Q     I see.
2     A     But I certainly didn't have any real
3 draftsmanship with respect to the ordinance.
4     Q     You said it was under consideration you think
5 for at least a year?
6     A     Yes.
7     Q     How do you know that? I mean, what is it that
8 occurred that --
9     A     Well, I can -- you know, from the time that
10 the supervisors got the Cambria County -- whatever township
11 in Cambria County adopted the ordinance. I would say at
12 least a year, maybe more.
13     Q     Do you know who brought the idea of a
14 subdivision ordinance to the township officials?
15     A     I do not.
16     Q     Did they ever discuss with you why they
17 thought they needed to do a subdivision ordinance?
18     A     Generally because Jackson borders Centre
19 County and they wanted to be ready -- if there was going to
20 be development in Jackson Township to be prepared for that
21 development.
22     Q     Did they ask you for advice regarding whether
23 or not it was appropriate for them to enact a subdivision
24 ordinance or how to do it or anything like that?
25     A     Not directly. You know, subdivision

19

1     Q     Right.
2     A     You know, we had -- you know, we had the
3 subdivision ordinance that we were working on and that
4 generates some additional time.
5     Q     You just spoke a moment ago about the
6 subdivision ordinance. Do you recall the first time that
7 the subdivision ordinance was presented or the idea of a
8 subdivision ordinance in Jackson Township was presented to
9 you?
10     A     I do not recall a specific date. It was -- it
11 was under consideration for a long period of time, at least
12 a year, probably more than a year.
13     Q     Prior to its actual passage?
14     A     Yes.
15     Q     In -- what was it, July 2000?
16     A     July 10th, yes.
17     Q     Were you involved in the drafting of the
18 ordinance yourself?
19     A     Not -- I guess maybe indirectly. The
20 supervisors had obtained a copy of a subdivision ordinance
21 from Cambria County which was kind of the prototype that was
22 used in Jackson. And what I did at least initially was
23 loaded that into my computer and from there the township
24 would cut, paste and get input from the planning commission,
25 etcetera.

21

1 ordinances are -- and land development ordinances are a good
2 idea generally. In our county right now the county planning
3 commission is working on a prototype subdivision ordinance
4 that perhaps will be adopted by most of the townships in the
5 county.
6     Q     Let me ask you this: You said that they
7 obtained a copy of the Cambria County subdivision ordinance?
8     A     It wasn't Cambria County. It was a township
9 in Cambria County. I don't recall which township it was.
10     Q     That's fine. So they obtained a copy of
11 that --
12     A     Yes.
13     Q     -- ordinance and they sent it to you you think
14 maybe a year before the ordinance was actually passed?
15     A     Yes.
16     Q     What did you understand from them sending it
17 to you that they were asking you to do in terms of advising
18 them about the subdivision ordinance?
19     A     Well, to look at the ordinance and determine
20 whether it would be appropriate for Jackson Township. It
21 was a very comprehensive ordinance.
22     Q     Is it fair to say that when they sent you
23 something that you took that as an indication that they were
24 looking for your guidance or advice or comments?
25     A     I would say yes, yes.

**22**

1    Q        Now, you said that you didn't have much hand
2    in drafting it. Were there a number of drafts, though, of
3    this subdivision ordinance?
4    A        Yes, there were.
5    Q        About how many do you think?
6    A        Several.
7    Q        Who was doing the drafting to your knowledge?
8    A        Well, as I said to you, I loaded it into the
9    computer and then I believe that the township got that on
10   disk and --
11   Q        From your computer?
12   A        Right. And then through the various review
13   processes, whether it be the county planning commission,
14   public input, whatever, then I believe the township actually
15   made the changes.
16   Q        Who at the township made them?
17   A        I assume it would have been Ann Wirth, the
18   township secretary.
19   Q        You mentioned I think public comment or
20   something just now. You said through the various changes.
21   A        Yes.
22   Q        What kind of public comment are you talking
23   about?
24   A        Well, I -- you know, the township is required
25   by statute to advertise and I know there was at least one

**23**

1    public meeting, which I didn't attend, but, you know, there
2    were -- certainly residents of the township were interested
3    in the ordinance.
4    Q        Was that public meeting the meeting at which
5    they passed it?
6    A        No.
7    Q        What public meeting was that?
8    A        I know that there was a public meeting in
9    January of 2000.
10   Q        Where they discussed the subdivision
11   ordinance?
12   A        That was the purpose of the meeting. I wasn't
13   there.
14   Q        What about the meeting in July 2000 when they
15   passed the ordinance, were you there?
16   A        No.
17   Q        Did you know that they were going to pass the
18   ordinance?
19   A        Yes, I did.
20   Q        Now, in the January 2000 meeting isn't it
21   correct that they passed a moratorium -- or they attempted
22   to pass a moratorium on subdivisions --
23   A        Yes.
24   Q        -- in Jackson Township?
25   A        Yes. I don't believe those meetings were the

**24**

1    same night, but I'm not positive.
2    Q        Oh, you think there was a separate meeting in
3    January --
4    A        I think there might have been, right.
5    Q        In January when they discussed the township
6    ordinance and when they passed the moratorium?
7    A        I'm really not sure if the meeting nights were
8    the same.
9    Q        Under the township code requirements, they
10   would have been required to advertise both of those
11   meetings, correct?
12   A        They did.
13   Q        They did advertise both meetings if there --
14   A        Well, the -- Jackson meets the first Monday of
15   the month and it's my understanding that there's one
16   advertisement that's placed in the newspaper concerning when
17   they meet for the whole year. If there is a special
18   meeting, that would be advertised.
19   Q        So they advertise their monthly meeting every
20   month; is that what you're saying?
21   A        No, that's not what I said.
22   Q        I'm sorry.
23   A        I believe they put one advertisement in the
24   newspaper setting forth when they will meet throughout the
25   year.

**25**

1    Q        I understand.
2    A        I don't do that, but that's my understanding
3    of what happens.
4    Q        Now, if they were going to do something other
5    than just the ordinary meeting, something like pass a
6    subdivision ordinance at a monthly meeting, would they then
7    be required to put an ad in --
8    A        Yes.
9    Q        Just let me finish for the record. Put an ad
10   in stating that that's what they were going to do?
11   A        Yes.
12   Q        And is that also true for the moratorium?
13   A        That I don't know.
14   Q        Let me ask you this: Did you know prior to
15   the time they passed the moratorium or attempted to pass it
16   in January 2000 that they were going to do so?
17   A        No.
18   Q        Did they seek your advice about doing so at
19   any time?
20   A        I received a phone call from Ann Wirth asking
21   me if it was permissible for a municipality to have a
22   moratorium on subdivisions. My response was I think so.
23   Q        Did they ask you whether it was permissible to
24   have a moratorium when there actually wasn't a subdivision
25   ordinance in place? Did they ask you that specific

26

1 question?
2 A They did not.
3 Q They did not?
4 A No.
5 Q But at that time did you know that there
6 wasn't a subdivision ordinance in place?
7 A Yes, obviously we were working on one.
8 Q Did they follow up with you again after that
9 initial phone call from Ann Wirth about whether or not it
10 was appropriate to put a moratorium in place in that
11 situation?
12 A I became aware that the moratorium was in
13 place.
14 Q You became aware after it was done?
15 A After it was done, right.
16 Q Now, I take it -- you know, you testified
17 earlier that when they contacted you or when they sent you
18 something you understood that to be a request for your
19 guidance or advice or something like that. After you said I
20 think so, did you then go and do anything else to find out
21 whether it was appropriate for them to put a moratorium in
22 place in this --
23 A I did not.
24 Q When did she ask you this question? When did
25 Ann Wirth ask you whether it was appropriate for the

27

1 township to put a moratorium in place?
2 A I'm just guessing sometime in December.
3 Q It was fairly close to the January meeting and
4 is that why you're guessing December?
5 A Yes, sometime in December would be my
6 estimate.
7 Q Now, after the moratorium was put in place,
8 did you understand that they were looking for guidance to
9 see whether or not the moratorium that they had put in place
10 was appropriate?
11 A I don't think I was ever consulted about that
12 subsequent with respect to a specific question.
13 Q The moratorium was never placed in writing,
14 correct?
15 A Well, I believe it was adopted at a township
16 meeting.
17 Q But there was no like official document that
18 says we hereby adopt a moratorium or anything like that?
19 A I believe there is.
20 Q Do you know where that is?
21 A Well, I believe it was in the January minutes,
22 is what I'm referring to.
23 Q Okay. So you're saying that the official
24 document consists of the January minutes?
25 A To my understanding, yes.

28

1 Q Do you in fact know whether or not the
2 township supervisors advertised specifically prior to the
3 January meeting that they would be adopting a moratorium?
4 A I do not know that.
5 Q Did they ask you whether or not they were
6 required to advertise?
7 A They did not.
8 Q So after they adopted the moratorium, did you
9 have occasion to discuss with them the impact of it or the
10 legality of it or anything like that?
11 A Not really until after the lawsuit was filed.
12 Q Well, I think you testified a moment ago that,
13 you know, if they were going to do something like a
14 subdivision ordinance, they would need a period of public
15 comment or an advertisement or something like that. Did you
16 have any concerns that they would need the same thing for a
17 moratorium?
18 A Well, perhaps I should have, but, you know,
19 again, I was just asked that question and really did not
20 follow it up further.
21 Q So you had a general idea that they were going
22 to do the moratorium but you didn't know exactly when they
23 were going to do it?
24 A Well, I really didn't know until after it was
25 done.

29

1 Q Do you keep time cards for your work for the
2 township?
3 A No.
4 Q How do you keep track of your time?
5 A Sometimes that's difficult. I try to
6 reconstruct things. Generally I have not kept time records
7 for the township.
8 Q So at the time that you decide that it's time
9 to bill them, you just try and remember what you did?
10 A Pretty much.
11 Q And you put it directly onto an invoice?
12 A Yes. You lose a lot of time that way, by the
13 way.
14 Q I know, we hear about that all the time in the
15 profession. So you don't have any records of time --
16 A I don't.
17 Q -- kept for -- the only records would be the
18 actual invoice that you send?
19 A Correct.
20 Q You do keep records of the invoices, however?
21 A Yes.
22 Q Did anybody ask you in connection with this
23 lawsuit to search your files for documents in response to a
24 request for production of documents from the Corneals?
25 A I don't believe so.

30

1    Q      Not at any time ever?
2    A      Well, be more specific with your question.
3    Q      Okay.  I will represent to you, and anybody
4  can object that wants to, that there was a request for
5  production of documents served upon the supervisors, the
6  township defendants, in September of 2000 which asked that
7  they or any of their agents or affiliates or, you know,
8  servants or whatever --
9    A      Okay, I did get a -- I did get a phone inquiry
10 from Ann Wirth and she asked me if I had any record of the
11 public meeting, the advertisement of the public meeting
12 requesting comment on the subdivision ordinance.
13         Apparently-- she may have called the Daily
14 News, which is our local paper, general circulation, and
15 they initially couldn't find anything.  I, you know,
16 initially looked and I couldn't find anything.  And what I
17 had done at her request is prepared an advertisement to be
18 placed in the Daily News.
19   Q      You did this when?
20   A      Well, I -- I assume it would have been in
21 December because the -- I'm not positive, but I think the
22 public meeting was on January 8th and I -- you know,
23 basically I prepared the advertisement, gave it to the Daily
24 News and Ann couldn't find it.  In any event, I called her
25 back and at the time I called her back the Daily News had

32

1  if you want him to look at it.
2         MS. MONTGOMERY:  Sure.  Thank you.
3         THE WITNESS:  Well, I'm wrong on the 8th
4  because I'm sure this wouldn't have been on a Saturday.  It
5  might have been on the 6th.
6  BY MS. MONTGOMERY:
7    Q      Well, we're going to look for a second through
8  our documents to see if we have anything that would, you
9  know, match up with the notice that you're talking about.
10 So you're saying that she then got that or told you that the
11 Daily News had located --
12   A      The Daily News had it, right.  And I think she
13 said the Daily News had faxed it to her.  So I think you
14 would have had it with your -- with your document review.
15         MS. MONTGOMERY:  Excuse me a moment.
16         (Pause.)
17 BY MS. MONTGOMERY:
18   Q      What about the July notice, did she -- well,
19 the notice for the July 10th meeting at which the
20 subdivision ordinance was passed --
21   A      Yes.
22   Q      -- did she contact you about that at all?
23   A      You mean at the time?
24   Q      Yes.
25   A      Yes.

31

1  found the advertisement.
2    Q      The advertisement for the January 8th meeting?
3    A      I believe it was January 8th.
4    Q      Now, are you saying that was a different
5  meeting than the regular monthly meeting?
6    A      Well, if you can tell me what day of the week
7  January 8th was --
8    Q      I think we can do that.  When did she call you
9  and ask you whether or not you had any records of the public
10 meeting?
11   A      This would have been very -- very recently.
12   Q      In the last two weeks?
13   A      I would say yes.
14   Q      Was it in the last week?
15   A      Well, I think it was shortly before the time
16 you and Mr. Sherr were coming to her office to look at
17 documents.
18   Q      I see.
19   A      So if that's -- that's a good time reference,
20 it would have been before that, shortly before.
21   Q      Was that the first time that anybody contacted
22 you at all about producing documents in connection with this
23 lawsuit?
24   A      That I can recall.
25         MS. SIMPSON:  I have a January 2000 calendar

33

1    Q      You mean prior to the time the subdivision
2  ordinance was passed?
3    A      Well, she would have contacted me at that time
4  to advertise that ordinance and I believe there were two
5  other ordinances that were being considered that evening.
6    Q      Did you draft the notice for the newspaper for
7  the ordinances that were to be passed --
8    A      Yes.
9    Q      -- at the July 10 meeting?
10   A      Yes.
11   Q      I'm going to show you something that we'll
12 mark as Newton Exhibit 1.
13         (Notice produced and marked as Newton Exhibit
14 No. 1.)
15 BY MS. MONTGOMERY:
16   Q      First of all, I'd ask you to look at the
17 handwriting that is on this exhibit and I'll represent to
18 you that we got this -- well, you can see the fax legend is
19 from Mr. Sherr's office.
20   A      Um-hum.
21   Q      So we had this faxed to us on May 11th.  Do
22 you know whose handwriting that is on the side?
23   A      I do not.
24   Q      It's not yours?
25   A      No.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

9

34

```
1    Q    Do you know what plus item number 3, January
2    2000 --
3    A    I have no idea what it means.
4    Q    -- minutes refers to?
5    A    I do not.
6    Q    Do you know what day of the week or what date
7    actually this notice was placed in the Daily record?
8    A    Daily News?
9    Q    Daily News.
10   A    I do not.
11   Q    From your memory do you have an estimate of
12   the time period when this was placed in the Daily News?
13   A    Well, it would have to have been placed at
14   least seven days prior to the meeting.  Other than that I
15   don't know.
16   Q    Do you know whether that occurred?
17   A    I assume it did.
18   Q    Do you have a copy of this in your files that
19   would perhaps have a date on it?
20   A    I probably have a copy in my files, but I
21   don't believe it would have a date on it.
22   Q    Does the --
23   A    The practice is -- when you take something to
24   the Daily News, there's normally a two or three day lead
25   time between the time you present it and when it's actually
```

35

```
1    put in the paper.
2    Q    Who actually presents it to the Daily News?
3    A    I would have presented this to the Daily News.
4    Q    Because you drafted the ordinance notice?
5    A    Yes, and I'm -- it's just a couple blocks
6    away.
7    Q    So is that called the Huntingdon Daily News?
8    A    It's called the Daily News.
9    Q    The Daily News?
10   A    Yes.
11   Q    And it's a Huntingdon, Pennsylvania
12   publication?
13   A    Yes.
14   Q    Do you know just from reading that newspaper
15   whether on each page of the newspaper there's a date across
16   the top?
17   A    Yes, there would be.
18   Q    There would be?
19   A    Um-hum.
20   Q    So if we could get a copy of the original, we
21   would be able to see that, correct?
22   A    Yes.  The township would also have that in its
23   file if you have the township records because with the
24   ordinance there's a proof of publication.  In other words, a
25   proof of publication that's signed by someone and classified
```

36

```
1    at the Daily News.  Now, that wouldn't be part of the
2    ordinance necessarily, but it would be part of the township
3    record.
4    Q    Okay.
5    MS. MONTGOMERY:  Excuse me for just one
6    second.
7    (Pause.)
8    BY MS. MONTGOMERY:
9    Q    So your testimony is that the proof of
10   publication would be with the original ordinance?
11   A    Well, not necessarily the original ordinance,
12   but it would be with the township records.
13   Q    Somewhere in the township records?
14   A    Yes.
15   Q    Do you know how the township records are kept?
16   A    I do not.
17   Q    You've never given any advice to them on how
18   to keep their records?
19   A    I have not.
20   Q    Do you know whether they keep their ordinances
21   -- or how they keep their ordinances?
22   A    Well, they should keep them in an ordinance
23   book.  And I'm sure over the years I've mentioned that to
24   them, but I don't know.
25   Q    Now, let's talk a little bit more about the
```

37

```
1    subdivision ordinance.  As changes were made to it, you'd go
2    back and forth with Ann Wirth over the changes that were to
3    be added?
4    A    I would say that the changes were basically
5    generated by the township.
6    Q    And by the township you mean Ann Wirth?
7    A    Well, the township and its supervisors.
8    Q    So each time she sent you a new change or
9    revision you would review it and comment on it or what?
10   A    I would say I would review it.
11   Q    But not necessarily comment on it?
12   A    Right.
13   Q    And why is that?
14   A    Well, you know, again, if I had a comment to
15   make, I would make it.  I don't recall -- I just don't
16   recall what comments, if any, I had made after the changes
17   started to be made.  I think the township primarily was
18   relying upon advice from Richard Stahl who was the county
19   planning director.
20   Q    Did you get actual draft copies of the
21   subdivision ordinance or was it e-mailed to you by computer
22   or what?
23   A    It wasn't e-mailed.  I would say draft copies.
24   Q    So Ann would mail them to you or something?
25   A    I would say yes, either mail or she would be
```

38

1  in town and drop them off.
2  Q    Did she ever send you anything in writing, or
3  did anybody from the township ever send you anything in
4  writing about the moratorium that was put in place in
5  January 2000?
6  A    Not until it was requested I think initially
7  by Mr. Corneal and then through his attorney James Himes did
8  I get it. My recollection is that when I received that
9  request I made a request to the township and after receiving
10 it I delivered it to Jim Himes.
11 Q    Is that how you became aware that the
12 moratorium had been put into place?
13 A    No, I -- I was aware that the moratorium was
14 in place, but I had not had that -- that document, that
15 minute entry until that time.
16 Q    Typically as the township holds its meetings
17 do they send you -- routinely send you copies of their
18 minutes?
19 A    No.
20 Q    How do you keep track of what the township has
21 done at their meetings?
22 A    I don't unless they deem it advisable to let
23 me know.
24 Q    So do you have copies of the township meetings
25 in your files -- I mean minutes of the township meetings in

39

1  your files?
2  A    No, I do not.
3  Q    Do you sometimes get copies of the minutes of
4  the township meetings?
5  A    No.
6  Q    How does the township go about letting you
7  know what they've done? Do they call you or do they write
8  to you or what?
9  A    It would probably be by telephone.
10 Q    From Ann Wirth or any one of the supervisors?
11 A    Generally from Ann. And I guess occasionally,
12 you know, writing, too, but it's primarily I would guess
13 telephone.
14 Q    Well, you mentioned Mr. Corneal a moment ago.
15 Can you tell me how you first came to come in contact with
16 Mr. Corneal?
17 A    As a result of this lawsuit?
18 Q    No, first at all, at any time.
19 A    Many years ago we had a case against each
20 other and it was a land case. I don't recall too much about
21 it. My client's name was Suydam. It involved I think the
22 sale of a farm or an installment sale agreement. That, I
23 believe, is my first contact with him.
24 Q    You mean Mr. Corneal represented the opposing
25 party?

40

1  A    Yes, the other party.
2  Q    Mr. Corneal wasn't a party?
3  A    No.
4  Q    So you think that was like 10 years ago or
5  something, 15?
6  A    At least, probably more.
7  Q    After that how did you first come in contact
8  with Mr. Corneal?
9  A    Probably through a telephone call he made to
10 my office.
11 Q    And about what time frame was that?
12 A    I'm just guessing January of 2000.
13 Q    You think that's the first time you talked to
14 him since the lawsuit that you were mutually involved in on
15 behalf of clients?
16 A    I believe so. I mean, it could have been in
17 December, but it was around that time period.
18 Q    Did you have any contact with the supervisors
19 or Ann Wirth or anybody else in the township about Mr.
20 Corneal prior to the time he contacted your office?
21 A    No.
22 Q    What did Mr. Corneal say when he contacted --
23 did you actually talk to him when he contacted your
24 office --
25 A    I talked to him.

41

1  Q    -- in December or January 2000?
2  A    He indicated, you know, he was doing a
3  subdivision. He was anxious to get the subdivision
4  approved. You know, I believe I said that we didn't have a
5  subdivision ordinance. It's hard for me to -- to
6  specifically say what happened in the first conversation. I
7  think I talked to him on another occasion as well.
8  Q    When he first talked to you, do you know
9  whether or not the moratorium had been put into place? For
10 the record, we've done so many of these depositions I may be
11 being --
12 A    I'm not sure.
13 Q    Hold on a second. I may be being unclear --
14 A    Yeah.
15 Q    -- but I want to say that we're talking about
16 the moratorium on subdivisions. I don't think we said that
17 in this depo.
18 A    I believe so.
19 Q    He contacted you before the moratorium was
20 in --
21 A    No, no, I believe it was after the moratorium.
22 Q    What makes you think it was after the
23 moratorium?
24 A    I don't know. That's a guess. I simply do
25 not know.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

Case 1:00-cv-01192-SHR   Document 120-2   Filed 04/18/2003   Page 13 of 100

42

1    Q     And so he told you that he wanted to get the
2 subdivision approved, right, and what did you tell him?
3    A     I don't recall. I think that I indicated that
4 we didn't have a subdivision ordinance. I know that he had
5 an agreement of sale with an individual by the name of
6 Hewett, another individual by the name of Smith and he was
7 anxious to consummate that transaction.
8    Q     Did you tell him that he didn't need approval
9 of his subdivision if there was no subdivision ordinance?
10    A     I do not recall.
11    Q     Do you think he needed approval of his
12 subdivision if there was no subdivision ordinance?
13    A     Well, if the moratorium is valid, if you
14 assume that, then of course there couldn't be any
15 subdivision. But if the moratorium is not valid, then he
16 would not need approval.
17    Q     Prior to the passage of the moratorium would
18 he have needed approval of his subdivision?
19    A     No.
20    Q     So he could have just filed a subdivision plan
21 at the recorder of deed's or not filed a subdivision plan,
22 right? He could have just sold off pieces of his property,
23 right?
24    A     There is subdivision for DEP planning
25 purposes, but he would not have had to have any township

43

1 approval for a subdivision per se.
2    Q     Do you know how Mr. Corneal came to even
3 request township approval for the subdivision plan?
4    A     I do not.
5    Q     Did the township officials contact you about
6 Mr. Corneal contacting them about approval for his
7 subdivision?
8    A     Not that I can recall. I just don't know.
9    Q     You just testified that if the moratorium was
10 invalid then of course he wouldn't need township approval.
11 Why do you say that?
12    A     Well, you know, you wouldn't need township
13 approval unless there is a subdivision ordinance.
14    Q     You wouldn't?
15    A     You would not. So really the moratorium
16 itself, you know, would only -- if the moratorium is valid,
17 then for that period of time during which there was a
18 moratorium there wouldn't be any subdivisions.
19    Q     Well, prior to the time the moratorium was put
20 in place, during the township ask you about that particular
21 issue, can we deny approval of a subdivision or even demand
22 presentation of a subdivision plan if we have no ordinance?
23    A     If the township would have asked me, that's
24 what I -- what I would have said.
25    Q     You would have said no?

44

1    A     I would have said no. Now, I don't -- there
2 may have been something in Mr. Corneal's agreement with Mr.
3 Hewett and Miss Smith that related to subdivision approval.
4 So maybe that was what generated this.
5    Q     When you were called about the moratorium --
6 by Ann Wirth, correct?
7    A     Correct.
8    Q     Did Ann Wirth mention Mr. Corneal to you at
9 that time?
10    A     I do not believe so.
11    Q     Did she mention the reason for the moratorium?
12    A     The only thing that was mentioned was that the
13 township wanted to be ready in the event that there were
14 subdivisions coming into the township.
15    Q     From State College you mean?
16    A     From the Centre County area which is kind of a
17 growth area.
18    Q     Do you know whether or not there were any
19 particular spurts of growth or anything like that in the
20 Jackson Township area that would have led to such a concern?
21    A     Not that I'm aware of.
22    Q     Did Ann Wirth specifically mention Mr. Corneal
23 to you when she talked to you about the moratorium?
24    A     Not that I can recall.
25    Q     And just so I'm clear about your testimony

45

1 earlier, is it that -- you said that you told her I think so
2 about something and that was about the moratorium?
3    A     Yes, about the moratorium.
4    Q     You thought that she could put in a
5 moratorium?
6    A     I thought that the township could --
7    Q     The township could?
8    A     The moratorium, yes.
9    Q     Even though there was no subdivision
10 ordinance?
11    A     Correct.
12    Q     What do you think -- what is the moratorium?
13 I mean, is it an ordinance, is it a -- I mean, what is it in
14 terms of a legal tool or entity or document?
15    A     Well, what Jackson Township did was just do it
16 by way of a motion in its regular meeting. Whether or not
17 more needs to be done I don't know.
18    Q     Is there a vote required, do you know?
19    A     I don't know. In this case there was a vote.
20    Q     Was there a -- some sort of a proposal, a
21 written proposal or a resolution or anything like that that
22 would be required to impose a moratorium?
23    A     I don't know.
24    Q     Let me ask you this: You said that there was
25 a vote. How do you know that there was a vote?

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

46

1    A    I knew that there was a vote based upon the
2 minutes that I received from Ann Wirth.
3    Q    Afterward?
4    A    I think it said moved and seconded, as I
5 recall.
6    Q    So we'll go back to Mr. Corneal for a moment.
7 You said you think you talked to Mr. Corneal twice?
8    A    I think so.
9    Q    The first time you think was sometime in
10 December, January, you're guessing?
11   A    I'm guessing. I'm just guessing.
12   Q    When do you think the second time was?
13   A    I don't know.
14   Q    Was it after the township refused to allow him
15 to subdivide, do you know that?
16   A    I would say it probably would be, yes.
17   Q    And did you speak directly with him?
18   A    Yes.
19   Q    Did he call you or did you return his call or
20 what?
21   A    I think he called me.
22   Q    And you took the call?
23   A    Yes.
24   Q    And what was the substance of that
25 conversation?

47

1    A    I think the substance of the conversation was
2 he requested my assistance to see what could be done to
3 resolve the conflicts with the township.
4    Q    Did he mention the moratorium to you?
5    A    Not that I can recall.
6    Q    Do you think there was a need for a moratorium
7 in the township?
8         MS. SIMPSON: Objection, irrelevant.
9         MS. MONTGOMERY: I'm sorry?
10        MS. SIMPSON: It's irrelevant. It's asking
11 for a legal opinion.
12        MS. MONTGOMERY: Well, relevance --
13        THE WITNESS: That's not my -- I don't know.
14        MS. MONTGOMERY: Are you instructing him not
15 to answer?
16        MS. SIMPSON: No.
17        THE WITNESS: I don't know. That's not my
18 decision.
19 BY MS. MONTGOMERY:
20   Q    You don't know whether or not there was a need
21 for a moratorium?
22   A    That's not something that -- my opinion is not
23 relevant in my opinion.
24   Q    What township is Huntingdon in -- or, no, what
25 township is in -- is there a -- I'm asking a silly question

48

1 I think. Jackson Township is not within the town of
2 Huntingdon or anything? You don't live in Jackson Township,
3 is what I'm trying to get to.
4    A    No, I do not. There's Huntingdon borough that
5 I reside in.
6    Q    Right, sorry. How far away from that is
7 Jackson Township?
8    A    I would say approximately 16 miles.
9    Q    Sixteen miles?
10   A    Yes. Jackson Township is halfway between
11 Huntingdon borough and Centre County.
12   Q    I'm going to show you a document that's been
13 previously marked as Wirth Exhibit 6 but we'll mark it again
14 as Newton 2. I'll ask you to look at it, please, after the
15 court reporter has marked it.
16        (Minutes dated 1/4/00 produced and marked as
17 Newton Exhibit No. 2.)
18        THE WITNESS: Okay.
19 BY MS. MONTGOMERY:
20   Q    Are these the minutes that you're referring
21 to?
22   A    Yes, and I see I was in error. I don't see a
23 move and a second with respect to the moratorium.
24   Q    But these are the minutes that you're
25 referring to that --

49

1    A    Yes.
2    Q    -- put you on notice that there was a
3 moratorium?
4    A    Well, as I said, I think I became aware that
5 there was a moratorium prior to receiving these minutes.
6    Q    Oh, okay. All right, but --
7    A    Yes.
8    Q    But these are the minutes that you're
9 referring to that --
10   A    Yes.
11   Q    That reflect the moratorium?
12   A    Yep.
13   Q    Thank you. Now, I think you had testified
14 earlier that there was a vote. Now, if there wasn't a vote,
15 would the moratorium in your opinion, aside from the
16 question -- aside from the question of whether or not you
17 could put a moratorium in place when there was no
18 subdivision ordinance, if there was no vote, would it be an
19 effective moratorium?
20   A    I don't know.
21   Q    When you are asked about township procedure,
22 you know, for example, whether or not a township can put a
23 subdivision ordinance in place, whether or not they can put
24 a moratorium in place, whether or not they need to vote, to
25 what do you refer, what law?

50

1   A     Well, either the township code or the
2   Municipalities Planning Code.
3   Q     And you just don't know as you sit here
4   whether or not -- you know, what the answer to those
5   questions I asked --
6   A     And, again, these are the minutes. I don't
7   know if the minutes accurately reflected what happened at
8   the meeting.
9   Q     Now, back to Mr. Corneal for a moment. Do you
10  recall receiving correspondence from Mr. Corneal?
11  A     Yes.
12  Q     What did you do with that correspondence when
13  you received it?
14  A     I believe I forwarded it onto the township.
15  Q     Did you call Mr. Corneal back after you
16  received the correspondence from him?
17  A     I don't believe so.
18  Q     So the two times you think you talked to him
19  were in response to telephone calls from him, correct?
20  A     That's correct.
21  Q     Did you ever receive other telephone calls
22  that did not actually result in a conversation between the
23  two of you?
24  A     I don't know. I did receive calls from Jim
25  Himes.

51

1   Q     Did you return --
2   A     On behalf of Mr. Corneal.
3   Q     Did you talk to Mr. Himes?
4   A     Yes, I did.
5   Q     But other than those two phone calls, you
6   never talked to Mr. Corneal again on the telephone anyway?
7   A     I don't believe so.
8   Q     Did you talk to him in person?
9   A     No, I did not.
10  Q     Let me ask you this: Did Mr. Corneal at some
11  point deliver a copy of the subdivision plan to you?
12  A     I think he did.
13  Q     And what did you do with that?
14  A     I delivered it to the township.
15  Q     Do you know how he came to deliver a copy of
16  that subdivision plan to you?
17  A     I don't.
18  Q     Did you ask him to do it?
19  A     I don't recall.
20  Q     Did you receive it -- this copy of a
21  subdivision plan, did you receive it after one of the phone
22  calls you had with Mr. Corneal?
23  A     I would say I did.
24  Q     Were you expecting it, let me ask you that?
25  Were you expecting this copy that you received?

52

1   A     I really can't say. I don't recall if he said
2   in the telephone conversation he was going to drop it off,
3   but I do know that I received it and I don't know if it came
4   -- I certainly wasn't there when it was dropped off. I
5   don't know if it came from Mr. Corneal personally or perhaps
6   from David Simpson who at the time I believe was working for
7   him. Mr. Simpson is a surveyor.
8   Q     Did you have any occasion after receiving a
9   copy of the subdivision ordinance -- I'm sorry, the
10  subdivision plan from Mr. Corneal, did you have any occasion
11  to talk to the township supervisors or Ann Wirth or any
12  other township officials about Mr. Corneal's efforts to
13  build on his property and to subdivide?
14  A     I believe I attended a meeting in May.
15  Q     May of 2000?
16  A     May of 2000. And the primary purpose of --
17  the township was having -- having difficulty with New
18  Enterprise Stone and Lime Company and I think it was the
19  result of a road that they had done and they were having all
20  kinds of problems with it, the bond was going to run out,
21  and I think that was -- they asked me to come out and look
22  at that, which I did, and I believe at that time Mr.
23  Corneal's subdivision was also discussed.
24  Q     Was this a public meeting?
25  A     Well, no.

53

1   Q     This was a private meeting with the township
2   supervisors?
3   A     It was a meeting -- it was like a workshop
4   meeting.
5   Q     What is a workshop meeting?
6   A     It was a meeting to discuss, at least in my
7   view, general administrative business. I think there was
8   some response that had to be taken with respect to the New
9   Enterprise situation and I know I did a letter on that. I
10  don't recall the exact nature of it.
11  Q     Now, a workshop meeting, when is a workshop --
12  you said a workshop meeting is to discuss administrative
13  matters, I believe?
14  A     (Witness nods head affirmatively.)
15  Q     Are these routine meetings that the township
16  holds?
17  A     Not that I'm aware of. The reason that I was
18  called, I think, was to address this New Enterprise
19  situation that had a deadline.
20  Q     When was this workshop meeting held?
21  A     I think it was in May.
22  Q     Prior to the May public meeting, 2000?
23  A     You mean the township meeting?
24  Q     Yes.
25  A     I don't know.

NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

54

1   Q       Have you ever been to any other workshop
2   meetings?
3   A       After the lawsuit -- this lawsuit was filed, I
4   attended I believe two meetings with the township to discuss
5   the lawsuit and the complaint.
6   Q       Now, where does the term workshop meetings
7   come from? Is that your term or is it something --
8   A       That's my term.
9   Q       Is that something the township officials use
10  as well?
11  A       That I'm not aware of. I don't know.
12  Q       Do you know -- are you familiar with meetings
13  held by the township supervisors and the secretary and
14  anybody else prior -- immediately prior to the public
15  meetings?
16  A       I'm not.
17  Q       You've never discussed those and they've never
18  discussed those meetings with you?
19  A       No.
20  Q       You've never been at a meeting with them of
21  that nature?
22  A       No. Anytime I attend a meeting -- the
23  meetings are held at the fire hall, Stone Creek Valley Fire
24  Hall, and I've never been to a prior --
25  Q       To a pre-meeting?

55

1   A       Right.
2   Q       How about meetings at Ann Wirth's, the
3   secretary's office? I think I said that badly. The
4   secretary, Ann Wirth's office on her property, have you ever
5   been to a meeting there?
6   A       Just what I've described to you. There were
7   two times where I met with them concerning this lawsuit and
8   I believe there was a time in May that I met with them
9   concerning the New Enterprise issue. And I believe at that
10  time Mr. Corneal's -- I may have delivered the subdivision
11  at that time. I just don't recall.
12  Q       The subdivision plan you mean?
13  A       Yes.
14  Q       So the workshop meetings that you're referring
15  to are held at Ann Wirth's office?
16  A       Yes.
17  Q       On her property?
18  A       Correct. That is also the township office.
19  Q       Correct.
20  A       That's where the township records are kept.
21  Q       Have you had other opportunity to go to the
22  township office besides these workshop meetings?
23  A       No.
24  Q       Have you been there only three times?
25  A       Those are the times that I can recall.

56

1   Q       If you're going to meet in person with the
2   supervisors or Ann Wirth or any other township official, do
3   you generally do it in your office or do you just have
4   telephone conferences?
5   A       Well, we've had -- we have had meetings in my
6   office. I'd say primarily by telephone. And there are
7   occasions where, you know, I either go to the regular
8   township meeting or --
9   Q       Have you ever been to a township meeting when
10  Mr. Corneal was present?
11  A       No, I have not.
12  Q       Have you ever been to a township meeting at
13  which Mr. Corneal's issues, his building and subdivision
14  issues were discussed?
15  A       I may have been and I don't -- I can say for
16  sure that I was never at a township meeting attended by Mr.
17  Corneal. If Mr. Corneal attended the March meeting, I
18  definitely was not there. I know that there was a meeting
19  that I attended in which the subdivision -- the township --
20  a regular township meeting in which the subdivision
21  ordinance was discussed.
22          And the reason I seem to recall that is that I
23  had a copy of at that time what our proposed ordinance was
24  and someone in the audience asked if they could review it
25  and I said sure and gave it to them, and I'm not positive

57

1   when that was.
2   Q       Do you recall who that person was?
3   A       I don't.
4   Q       Do you recall how many people were at that
5   meeting?
6   A       I would say seven to 10 maybe.
7   Q       Do you recall who any of those seven to 10
8   people might have been?
9   A       I don't.
10  Q       You mentioned a moment ago that you had two
11  meetings about this lawsuit after it was filed.
12  A       Two meetings regarding this lawsuit and other
13  related issues, litigation issues. There may have been
14  another meeting that would have dealt with Mr. Corneal
15  building without a building permit.
16  Q       And when do you think that was?
17  A       Again, I don't know. It was certainly after
18  -- I believe that we had filed -- when I say we, the
19  township filed in October.
20  Q       When you say filed, you mean the lawsuit that
21  you filed in Huntingdon County?
22  A       Yes. I believe that was in October.
23  Q       And --
24  A       So it would have been prior to that. We may
25  have had a meeting on that lawsuit. I don't know.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

---

58

1    Q    Who was present at the two meetings that you
2    remember, aside from the one you just discussed which you're
3    not sure about?
4    A    One meeting the township supervisors, myself,
5    Ann Wirth. I think that's all. Another meeting of the
6    township supervisors, myself and Mr. Sherr and Ann Wirth.
7    Q    Did Mr. Sherr represent you at that time?
8    A    No.
9    Q    Mr. Sherr has never represented you, correct?
10   A    No.
11   Q    At that first meeting where Mr. Sherr wasn't
12   present, where was that meeting held? At Ann Wirth's office
13   you said?
14   A    At the township office.
15   Q    Do you know when that meeting was?
16   A    I do not.
17   Q    And at that time --
18   A    It would have been after -- I think the
19   lawsuit was filed -- I know we were served I think 4th of
20   July weekend. So I'm just guessing it would have been
21   sometime in July of 2000.
22   Q    And at that time did you discuss the legality
23   of the moratorium?
24   A    No, we dealt with the lawsuits.
25   Q    What about the legality of the subdivision --

---

59

1    well, of refusing to allow Mr. Corneal to subdivide or to
2    build, did you discuss that?
3    A    Well, we discussed it in the sense that we
4    went over the paragraphs of the complaint, you know,
5    paragraph by paragraph. So to that extent it was discussed,
6    the context of the complaint.
7    Q    The second meeting that you recall when Mr.
8    Sherr was present, was Mr. Van Dommelen present at that
9    meeting?
10   A    He may have been. I can't say for sure, but
11   he may have been.
12   Q    So you said the township supervisors, Ann
13   Wirth, yourself, Mr. Sherr and who else?
14   A    If Mr. Van Dommelen was there. He could have
15   been there.
16   Q    Do you recall meeting with Mr. Van Dommelen
17   about this lawsuit at some time?
18   A    Only in that context, yes.
19   Q    You do recall him being at some meeting in
20   which you --
21   A    I would say yes.
22   Q    So at that second meeting that Mr. Sherr was
23   present at, did you at that time then discuss the --
24   generally discuss the legality of preventing Mr. Corneal
25   from building or from subdividing?

---

60

1         MR. SHERR: I object to the form of the
2    question and assert attorney/client privilege at this time.
3         MS. MONTGOMERY: You can object, but you can't
4    instruct him not to answer and you don't represent him.
5         MR. SHERR: I can instruct on behalf of the
6    privilege holders that their attorney not answer.
7         MS. MONTGOMERY: Well, he's just testified
8    generally that he hasn't given advice about the subject of
9    this lawsuit and that you didn't represent him in connection
10   with this lawsuit. So I don't think those discussions are
11   privileged.
12        MR. SHERR: I think they are and I don't think
13   he said what you just stated he said and that the purpose of
14   that meeting was to discuss the lawsuit and he was there as
15   a representative of the township.
16        MS. MONTGOMERY: No, he didn't say that at
17   all.
18   BY MS. MONTGOMERY:
19   Q    Were you there --
20   A    Yes, I did.
21   Q    You were there as the township's attorney?
22   A    I was there as the township solicitor, yes.
23   Q    As the township solicitor?
24   A    (Witness nods head affirmatively.)
25   Q    In response to this lawsuit you were there as

---

61

1    the township solicitor?
2    A    Correct.
3         MS. MONTGOMERY: I'm going to take a short
4    break right now. We'll come back in 15 minutes.
5         (Break taken at 10:54 a.m. until 11:24 a.m.)
6    BY MS. MONTGOMERY:
7    Q    Mr. Newton, you had indicated that you bill
8    the township for legal advice given to the township at some
9    point after you give them that legal advice, right?
10   A    Right.
11   Q    Now, you also have indicated now that you
12   attended this meeting at which Tony Sherr was present as
13   solicitor to the township and not as a defendant in the
14   lawsuit?
15   A    (Witness nods head affirmatively.)
16   Q    Did you bill the township for your attendance
17   at that meeting?
18   A    Not yet, but I will.
19   Q    When was that meeting?
20   A    Sometime in July, last July.
21   Q    So it's been 11 months?
22   A    Yes.
23   Q    Now, have you billed them since for other
24   work?
25   A    No, I haven't.

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

62

1   Q      You haven't sent them a bill since last July?
2   A      No, I haven't.
3   Q      And you don't have any records of work that
4   you've done from -- during that time period, July?  Are you
5   just going to try to reconstruct it?
6   A      Yes.
7   Q      I'm going to ask you some questions and just
8   see what happens here.  It's my position that if in fact
9   there is any attorney/client privilege about advice that you
10  gave concerning the issues in this lawsuit that it has been
11  thoroughly waived.  All of the deponents in this case have
12  answered numerous questions about conversations with you and
13  there's been no objection.
14         Your own counsel has asked the individual
15  deponents about communications with you and there's been no
16  objection from Mr. Sherr.  So I'm going to ask my questions
17  and we'll go from there.
18         Back to the meeting at which you were present
19  when Mr. Sherr was present, at that time was there any
20  inquiry made of you as to whether or not the moratorium that
21  was put in place was effective or legal?
22         MR. SHERR:  Object to the form of the question
23  and on behalf of the privilege holders instruct the witness
24  not to answer.
25  BY MS. MONTGOMERY:

63

1   Q      Mr. Sherr is not your counsel, correct?
2   A      That's right.
3          MS. MONTGOMERY:  What we're going to be forced
4   to do is halt the deposition and schedule it for another
5   time because it's been very clear why we need to have Mr.
6   Newton's deposition and I'm going to need to present a
7   motion to the court that includes transcripts of testimony
8   from all the other depositions showing that this privilege
9   has long ago been waived.
10         MR. SHERR:  Well, I would --
11         MS. MONTGOMERY:  If indeed there was a
12  privilege.
13         MR. SHERR:  I would suggest that you follow
14  the dictates of the federal rules in this regard and mark
15  that and ask the rest of your questions, take the rest of
16  your deposition and we'll have the court rule on that at a
17  later time as the federal rules provide.
18         MS. MONTGOMERY:  Well, as I said, I'm putting
19  on the record right now that you are preventing me from
20  asking questions about communications with the township
21  supervisors that have always been known to be the subject of
22  this deposition and we are going to have to reschedule
23  additional time after the filing of the motion to quash,
24  after the filing of a motion with the judge.
25         MS. SIMPSON:  Let me interject here.  This

64

1   objection and the claim of privilege arises from this
2   meeting at which the township defendants, Mr. Sherr and Mr.
3   Newton were all present and they were discussing issues of
4   the lawsuit.  I believe that questions to the township
5   officials that have been deposed have been with respect to
6   communications prior to this meeting and not involving this
7   meeting and specific advice, legal advice, that was rendered
8   or questions that were asked of Mr. Newton.
9          Now, I agree with Mr. Sherr, this is a
10  particular area -- if you've got questions to ask --
11         MS. MONTGOMERY:  Oh, we're going to go
12  forward.
13         MS. SIMPSON:  Okay.
14         MS. MONTGOMERY:  I am, yes.
15         MS. SIMPSON:  Okay.  So you will ask questions
16  other than what occurred at this meeting?
17         MS. MONTGOMERY:  Sure, absolutely.
18         MS. SIMPSON:  You said we were going to halt
19  the deposition --
20         MS. MONTGOMERY:  I'm sorry, I didn't mean to
21  say it that way.  What I really am saying is -- trying to
22  put counsel on notice that we will have to reschedule in
23  order to get the questions that we need to have answered
24  answered, even if it's -- even if it requires submitting
25  them in camera to the judge.

65

1          MS. SIMPSON:  That assumes that your motion
2   would be granted.
3          MS. MONTGOMERY:  Exactly.  I'm not assuming
4   anything, but I'm saying that I'm not going to give up the
5   issue and I'm just putting counsel on notice as a matter of
6   courtesy that if you're going to not allow me to ask these
7   questions now I'll have to go to the court to try to ask
8   them later and we'll go on with whatever you allow him to
9   answer at this time, okay.
10         MR. SHERR:  And just so we're clear, the
11  objection goes to this meeting that was attended -- I have
12  not objected to any other conversations that my clients have
13  had with Mr. Newton other than attendance at a meeting which
14  I attended to discuss this lawsuit.  And I am not preventing
15  you from asking any questions.  I'm merely asserting
16  attorney/client privilege with respect to this meeting.
17         MS. MONTGOMERY:  Have you read the deposition
18  transcripts since you're asserting this privilege and saying
19  it hasn't been waived?  Have you read the deposition
20  transcripts that have been provided?
21         MR. SHERR:  You know, let's just go on with
22  the deposition.
23         MS. MONTGOMERY:  So you're asserting the
24  privilege and you're refusing to answer that.  Have you read
25  the deposition transcripts?

66

1    MR. SHERR: You know, I don't have to answer
2  your questions and I certainly don't have to answer
3  questions about what I have done or have not done and I'm
4  not going to do that. So why don't you just --
5    MS. MONTGOMERY: Just so we have a good record
6  for the court of the basis for your objection.
7    MR. SHERR: I made my basis very clear on the
8  record. I don't know how I can make it any clearer.
9    MS. MONTGOMERY: Okay.
10  BY MS. MONTGOMERY:
11   Q    Mr. Newton, have you been made aware of a
12  court order that requires sequestration of the defendant
13  deponents in this matter?
14   A    Yes.
15   Q    When did you become aware of it?
16   A    I believe it was from my counsel. I don't
17  recall.
18   Q    No, I mean when.
19   A    I don't know.
20   Q    Have you had any communication with the
21  defendant deponents, the other defendants in this case, the
22  supervisors, the building permit officer, the sewage
23  enforcement officer for Jackson Township since the middle of
24  May 2001?
25   A    Any communication at all?

67

1    Q    No -- well, any communication at all.
2    A    Yes.
3    Q    Have you had any communication with them about
4  the contents of their depositions --
5    A    No.
6    Q    -- since the middle of May?
7    A    No.
8    Q    Have you had any communication with them prior
9  to the middle of May about what the content of their
10  depositions would be?
11   A    No. Let me say that I've had communication
12  with Ann Wirth, not about the content of the deposition but
13  about the health of Ralph Weiler who is one of the
14  supervisors. That's kind of a tangential issue. Again, not
15  with respect to the content of the deposition, but sometime
16  in May Barry Parks, who is the SEO for the township, and I
17  met at Mr. Corneal's property and Mr. Parks made a comment
18  about the length of his deposition, but that was it.
19   Q    Thank you for that. If you had billed the
20  township since last July, would you have included any work
21  that had been done in the period prior? Say you billed them
22  in November, would you have included your work --
23   A    Work prior, now what do you mean?
24   Q    Well, if you billed the -- say you billed the
25  township in November 2000, would you have included the work

68

1  done for that period of time prior to November back to the
2  last time you billed them?
3    A    Yes.
4    Q    Mr. Newton, I'm going to show you an exhibit
5  that has been previously marked but we're going to mark it
6  again for purposes of this deposition and ask you to look at
7  it.
8    (Letter dated 1/31/00 produced and marked as
9  Newton Exhibit No. 3.)
10  BY MS. MONTGOMERY:
11   Q    Mr. Newton, do you recognize this letter?
12   A    I do.
13   Q    Do you recall receiving it?
14   A    Yes.
15   Q    For the record, it's a letter -- a January 31,
16  2000 letter from David Corneal to you, correct?
17   A    Correct.
18   Q    Now, do you recall when you received this
19  letter whether you had spoken to Mr. Newton -- I mean to Mr.
20  Corneal prior to receiving this letter, as the letter itself
21  indicates?
22   A    I don't have a recollection but the letter
23  says as per our telephone conversation. So I assume that I
24  did.
25   Q    Do you recall whether in your telephone

69

1  conversation -- well, do you recall whether that telephone
2  conversation that he refers to in this letter was the first
3  or the second of the two that you remember?
4    A    I don't know. I would think it would be the
5  first.
6    Q    So do you recall receiving a telephone call
7  after receiving this letter?
8    A    Yes, yes.
9    Q    I'm just trying to put the whole thing in a
10  good time frame for us so we can work it out. What did you
11  do with this letter when you received it?
12   A    I believe I forwarded it to the township.
13   Q    Did you have some discussions with the
14  township about his -- the concerns set forth in this letter?
15   A    Not that I can recall.
16   Q    I mean, did you just send it on with an FYI or
17  something?
18   A    I -- I feel certain I would have sent it on.
19  If I had any discussion, it would have been with Ann Wirth.
20   Q    Why would it have been with Ann Wirth?
21   A    Because she was my contact person with the
22  township.
23   Q    She's the one who relayed information back and
24  forth from the supervisors to you and from you to the
25  supervisors?

70

1  A    I don't know if relay information is correct,
2  but she was the person that I generally -- when I received a
3  contact from the township, it would generally be through
4  Ann.
5  Q    If the township was asking for advice, the
6  township supervisors were asking for advice, would you
7  convey that information to Ann?
8  A    It depends. I mean, if she would call me,
9  yes.
10  Q    And so you would -- that would be your way of
11  giving advice to the township, to talk to Ann?
12  A    Again, it depends. It depends on the context.
13  Q    Well, let me just ask it another way then. At
14  times your way of giving advice to the township would be to
15  communicate information to Ann, correct?
16  A    That's correct.
17  Q    You notice in this letter that there was some
18  concern raised about the Hewetts and their commitment for a
19  loan for settlement for purchase of a piece of the tract of
20  land at issue in this case?
21  A    Yes.
22  Q    Do you know the Hewetts?
23  A    I do not.
24  Q    Have you met the Hewetts?
25  A    No.

71

1  Q    Have you -- and I'm using the Hewetts a little
2  loosely.
3  A    I think there's a Hewett and a Smith, as I
4  recall.
5  Q    Right, exactly, but they are a couple,
6  correct?
7  A    Yes.
8  Q    So have you met either one of them?
9  A    I don't believe so.
10  A    Have you spoken with them on the telephone?
11  A    I spoke one time with Mr. Hewett.
12  Q    In what context was that?
13  A    Mr. Hewett called me because he was having
14  trouble with Mr. Corneal regarding this agreement of sale.
15  Q    When you say trouble with Mr. Corneal, what do
16  you mean by that?
17  A    That's my term. He was having difficulty in
18  dealing with Mr. Corneal, whether it was regarding his
19  agreement of sale -- he wanted representation.
20  Q    Did you ever represent Mr. Hewett?
21  A    No. He asked if I could represent him and I
22  said no. I felt it could be a potential conflict because I
23  was the township solicitor. I -- my normal practice in
24  those circumstances would be to give him names of other
25  attorneys, one of whom was Mr. Reeder, and he ended up

72

1  retaining Mr. Reeder.
2  Q    When he called you and told you that he was
3  having trouble with Mr. Corneal, did he tell you what the
4  trouble was?
5  A    He probably did, but I don't remember. You
6  know, again, he wanted representation in dealing with Mr.
7  Corneal and that's the extent that I got into it.
8  Q    Do you know whether he already had -- let me
9  ask you this: Did you talk to him before -- Mr. Hewett
10  before receiving this letter?
11  A    I don't know. I don't know when it was. I do
12  know that I did talk to him at my office and he called on
13  the telephone.
14  Q    So he called you and then you had him come in,
15  is that how it happened?
16  A    No, he never came in. I told him I could not
17  represent him. I had a conflict --
18  Q    Oh, I'm sorry.
19  A    -- and then I gave him -- I certainly gave him
20  the name of Mr. Reeder. And, again, my normal practice
21  would be to give him two or three other attorneys as well.
22  I don't know if I did that or not, but I know that I gave
23  him Mr. Reeder's name.
24  Q    But when you just said I talked to him at my
25  office, you meant you were at your office?

73

1  A    I was at my office, yes.
2  Q    And it was on the telephone?
3  A    Yes, correct.
4  Q    Just the one time?
5  A    One time.
6  Q    Did you ever talk to Miss Smith?
7  A    No.
8  Q    Were you ever at a township meeting where the
9  Hewett and Smith --
10  A    No. I'm sorry I jumped the gun. No.
11  Q    That's okay. I need to finish my sentence,
12  that's all. Maybe this will help us place the time frame a
13  little bit, you know, in context. Do you recall whether or
14  not you discussed this letter that you received --
15  A    I'm certain I didn't discuss this letter.
16  Q    Let me finish my sentence. Whether or not you
17  discussed this letter that you received from Mr. Corneal
18  with Mr. Hewett when he called?
19  A    I feel certain I did not discuss the letter.
20  Q    Did you discuss this letter with Mr. Reeder?
21  A    No.
22  Q    But you did send it onto the township?
23  A    I believe so, yes.
24  Q    Do you recall whether -- do you recall
25  speaking to Mr. Hewett about his concerns about Mr.

74

1    Corneal's efforts to obtain permission for his subdivision?
2    A    No.
3    Q    When you say you don't recall, are you certain
4    it never happened or you just don't recall?
5    A    I don't recall. What I recall from the
6    conversation is that he wanted representation in his
7    dealings with Mr. Corneal. That's what I recall.
8    Q    So Mr. Hewett eventually chose to go to Mr.
9    Reeder, correct?
10    A    Correct.
11    Q    Now, did you have any discussions with Mr.
12    Reeder about Mr. Corneal's efforts to obtain township
13    cooperation in subdividing and selling this property?
14    A    Generally, no. At some point in time Mr.
15    Reeder asked me if I thought that the township would have
16    its subdivision ordinance adopted by June 30th and I
17    responded I didn't think so and that was the extent of my
18    conversation with Mr. Reeder.
19    Q    And what was the June 30th date?
20    A    I don't know. That was Mr. Reeder's question
21    to me.
22    Q    So you remember the June 30th date. How do
23    you recall that?
24    A    My recollection is that that was the time in
25    which the agreement of sale between Mr. Corneal and Mr.

75

1    Hewett and Miss Smith -- that had to be consummated by that
2    date.
3    Q    So you told him at that time -- now that you
4    recall that that was what the June 30th was relevant to, you
5    told him at that time you didn't think the subdivision
6    ordinance would be approved, right?
7    A    By June 30th, yes.
8    Q    Right, by June 30th. What was the extent of
9    your conversation --
10    A    That was it.
11    Q    -- with Mr. Reeder? Just for her sake, wait
12    until I finish the question. So it was just one question?
13    A    Generally, yes, that's all I can recall.
14    Q    Did you have any other conversations with Mr.
15    Reeder about Mr. Corneal's property?
16    A    Not that I can recall.
17    Q    What about after the subdivision ordinance was
18    put into place?
19    A    Well, I know I showed Mr. Reeder the -- this
20    complaint, this lawsuit, but other than that that's about
21    it.
22    Q    Why did you show Mr. Reeder the complaint?
23    A    Well, we're both municipal solicitors and I
24    wanted him to be aware of it.
25    Q    Mr. Reeder represents various townships and

76

1    boroughs as well?
2    A    He represents some townships and boroughs.
3    Q    Does he represent counties as well?
4    A    No.
5    Q    Just townships and boroughs?
6    A    Yes.
7    Q    Do you know which ones he represents?
8    A    Well, I know he represents the borough of
9    Mount Union. I know he represents the zoning board for
10    Huntingdon borough. I'm not sure about townships.
11    Q    Did you ever have occasion to discuss with Mr.
12    Reeder the Hewett's withdraw from the sales agreement,
13    cancellation of the sales agreement with Mr. Corneal?
14    A    I was aware that Mr. Reeder on behalf of Mr.
15    Hewett filed an action, a magisterial action against the
16    Corneals.
17    Q    How did you become aware of that?
18    A    Mr. Reeder told me.
19    Q    Do you know why Mr. Reeder told you that?
20    A    I do not.
21    Q    Was it just your practice to discuss business
22    back and forth about your clients?
23    A    Occasionally we do.
24    Q    What about the moratorium, have you ever
25    discussed the moratorium with Mr. Hewett?

77

1    A    I don't believe so.
2    Q    I'm sorry, I mean Mr. Reeder.
3    A    I don't believe so.
4    Q    What about the ordinance itself and the
5    legality of it or anything like that, did you ever discuss
6    that with --
7    A    No.
8    Q    With Mr. Reeder?
9    A    No.
10    Q    I'm going to show you another letter that
11    we're going to mark as Newton Exhibit 4.
12         (Letter dated 8/18/00 produced and marked as
13    Newton Exhibit No. 4.)
14    BY MS. MONTGOMERY:
15    Q    I'd ask you to take a look at it for me,
16    please. Do you recall receiving this letter, which for the
17    record is an August 18, 2000 letter from Mr. Corneal to Mr.
18    Newton?
19    A    I believe I did, yes.
20    Q    What did you do with this letter?
21    A    I believe I forwarded it onto the township.
22    Q    Did you call Mr. Corneal back about it?
23    A    No.
24    Q    Did you send Mr. Corneal the building permits
25    that -- application forms that he's asking you for?

78

1  A    I believe that was done by the township. I
2  did not. I did not have them.
3  Q    Did you advise the township supervisors that
4  they really ought to send him these applications?
5  A    I would say I probably did.
6  Q    Did you ever receive back from Mr. Corneal a
7  copy of the filled out application forms?
8  A    Not that I can recall.
9  Q    Were you consulted about the applications once
10 they were sent?
11 A    No.
12 Q    Were you consulted about a building permit for
13 Mr. Corneal in general?
14 A    I would say — I would say yes. There was a
15 — I know I wrote to Mr. Corneal at the request of the
16 township and I think it was in July, the end of July,
17 because he had commenced construction without a building
18 permit. So I wrote to him then and asked him to stop
19 construction until he received a building permit.
20     So the building permit issue was an issue that
21 had been discussed I think quite frequently because I
22 believe the township supervisors were being criticized
23 because Mr. Corneal was acting really on his own and the
24 township really wasn't doing anything to enforce the
25 building permit ordinance.

79

1  Q    Do you know when you wrote the July letter
2  that you referred to -- do you know whether or not Mr.
3  Corneal had been given building permit applications at that
4  time?
5  A    I don't know. I don't know.
6  Q    Do you recall talking at all with the township
7  supervisors or the building permit officer or anybody else
8  about Mr. Corneal's request for building permit
9  applications?
10 A    No.
11 Q    Were you ever informed about a visit that Mr.
12 Corneal made to Mr. Van Dommelen to obtain building permit
13 applications?
14 A    I was.
15 Q    When were you informed about that?
16 A    I don't know.
17 Q    Were you asked for advice about that?
18 A    No.
19 Q    They just told you about it -- what did they
20 tell you -- who told you and what did they tell you?
21 A    I believe it was Ann Wirth and Ann Wirth
22 related to me that I think Mr. Corneal had been to Mr. Van
23 Dommelen's home to get applications. And of course at that
24 point there had not been a sewage permit so the building
25 permit applications could not have been granted without the

80

1  sewage permit. So I did become aware of that through Mrs.
2  Wirth.
3  Q    Were you aware that they wouldn't even give
4  him an application?
5  A    I became aware of that.
6  Q    When did you become aware of that?
7  A    Through Miss Wirth.
8  Q    At the same time?
9  A    I think at the same time.
10 Q    Was it about the time frame in which Mr.
11 Corneal went to Mr. Van Dommelen and made that request?
12 A    I don't know.
13 Q    You don't recall?
14 A    I think he clearly should have had the
15 building permit applications.
16 Q    I'm going to show you a letter that we'll mark
17 as Newton Exhibit 5 and ask you to look at it for me,
18 please.
19     (Letter dated 7/28/00 produced and marked as
20 Newton Exhibit No. 5.)
21 BY MS. MONTGOMERY:
22 Q    Is this the letter that you're referring to
23 that you wrote in July?
24 A    Yes, it is.
25 Q    Now, at the time that you wrote this letter

81

1  you were aware that Mr. Corneal hadn't even received
2  applications, correct?
3  A    I don't know that. I don't know where this
4  letter fits in in terms of time.
5  Q    But at least at this point in time the
6  supervisors had called you and told you that they were
7  denying -- refusing to give Mr. Corneal building permits,
8  correct?
9  A    I don't know that. Again, I don't know when
10 this was in terms of Mr. Corneal's meeting with Mr. Van
11 Dommelen, whether it was before or after.
12 Q    I'm going to show you a letter that we'll mark
13 as Newton Exhibit 6 and ask you to identify that for the
14 record if you can.
15     (Letter dated 5/5/00 produced and marked as
16 Newton Exhibit No. 6.)
17 BY MS. MONTGOMERY:
18 Q    Have you seen this letter in the past?
19 A    I have.
20 Q    How did you come to see it?
21 A    I think that Mr. Corneal sent it to me.
22 Q    You think he sent you a copy of it?
23 A    Yes.
24 Q    This letter is dated May 5, 2000, correct?
25 A    Yes.

82

```
1    Q     And it indicates that he had been unable to
2  obtain an application, correct?
3    A     Yes.
4    Q     You believe that he copied you at the time
5  that he sent it to Mr. Van Dommelen?
6    A     Yes.
7    Q     What did you do about this letter, if
8  anything?
9    A     I believe that Mr. Corneal wrote me a letter
10 around the same time, maybe the same date.
11   Q     Mr. Corneal wrote you a letter around the same
12 date?
13   A     Yes. And my sense is I probably would have
14 forwarded both onto the township.
15   Q     At that time did you provide the township with
16 any advice about whether or not they ought to have given Mr.
17 Corneal at least an application?
18   A     Well, I understood why the township didn't
19 give him an application, because of the sewage permit
20 issue. It was around this time — and I believe it was
21 after I got these letters from Mr. Corneal and there was a
22 letter addressed to me and then a copy of a letter to Mr.
23 Van Dommelen that I suggested to the township that we get
24 together and meet with Mr. Corneal and see if we could work
25 this out.
```

83

```
1          I recall in the last conversation I had with
2  Mr. Corneal he had mentioned to me that he was considering
3  litigation, a lawsuit, and I certainly didn't want that to
4  happen and I believe in his letter to me he even mentioned
5  that. So I contacted the township and put a request in to
6  — let's meet, sit down and see if we can resolve the
7  differences.
8    Q     And what occurred at that time?
9    A     At what time?
10   Q     Well, you said you called the township and
11 told them that we ought to meet and sit down and talk about
12 this. What occurred?
13   A     The response back was that they didn't want to
14 meet.
15   Q     They didn't want to meet with you?
16   A     They didn't want to have a joint meeting with
17 Mr. Corneal and myself to try to resolve whatever
18 differences the parties had.
19   Q     Who gave you that response?
20   A     That response was given to me by Ann Wirth.
21   Q     Was that in a telephone call?
22   A     Yes.
23   Q     Did she tell you why they didn't want to meet?
24   A     She indicated that Mr. Corneal's conduct at
25 the township meetings was disrespectful. He apparently had
```

84

```
1  lost his temper and as a result the supervisors felt
2  reluctant to meet.
3    Q     And what was your response to that, they don't
4  have to meet if they don't want?
5    A     That's their decision, right.
6    Q     What about the issue of them not even giving
7  him an application? I mean, did you indicate to them that
8  you at least needed to resolve that?
9    A     Well, I don't — I don't specifically recall.
10 I did indicate that be needed -- he needed to have, you
11 know, building permit applications. I mean, I'm certain
12 that that was communicated at one point or another and it —
13 I wrote him again after the July letter in August, again at
14 the request of the township.
15   Q     Now, I think you indicated that you had
16 received a letter directly from Mr. Corneal around the same
17 time that he copied you on that letter to Mr. Van Dommelen,
18 correct?
19   A     Correct.
20   Q     I'll show you a letter that we'll mark as
21 Newton Exhibit 7 and I'd ask you to look at that, please.
22         (Letter dated 5/5/00 produced and marked as
23 Newton Exhibit No. 7.)
24 BY MS. MONTGOMERY:
25   Q     Is this the letter that you're referring to
```

85

```
1  that you --
2    A     Yes.
3    Q     That you received from Mr. Corneal?
4    A     Correct.
5    Q     Now, you may have testified to this but -- and
6  I'm sorry if you already did, but did you then forward this
7  letter onto the supervisors?
8    A     I believe so, yes.
9    Q     If you were going to forward letters to the
10 supervisors, you would send them to Ann Wirth; is that
11 correct?
12   A     The township office, which would be the
13 township address, the R.D. 1 box number.
14   Q     With respect to the contents of this letter,
15 you note that -- Mr. Corneal makes reference to a refusal to
16 receive a building permit to construct a garage, okay. Now,
17 do you recall at the time did you discuss with the township
18 their refusal to even give a permit or an application to
19 construct a garage?
20   A     Well, I believe their reason for that is it
21 was more than a garage. It was a three-bay garage and it
22 had -- according to what I subsequently learned from Mr. Van
23 Dommelen seeing the sketch that I think Mr. Corneal had,
24 there was an apartment on the second floor of this garage
25 which would have required a sewage permit.
```

86

1  Q    Mr. Van Dommelen showed you that sketch?
2  A    No, he did not. I just became aware of that
3  either through -- probably through Mrs. Wirth.
4  Q    At what time did you -- were you told that by
5  Mrs. Wirth?
6  A    I don't know.
7  Q    Do you know what it is that made Mrs. Wirth
8  believe that this was a -- that there was supposed to be an
9  apartment over this garage?
10  A    My understanding is that that information came
11  from Mr. Van Dommelen, but I don't know. I can tell you
12  that in late May I was on site and in fact there's a
13  three-bay garage and an apartment. That's what was in fact
14  constructed.
15  Q    An apartment?
16  A    Yes.
17  Q    Did you go inside?
18  A    Yes.
19  Q    What was inside that made you believe that
20  there was an apartment?
21  A    A kitchen, bathroom. I think it was described
22  by someone as a mother-in-law suite.
23  Q    When did you go inside?
24  A    It was the -- the date -- if you have a
25  calendar, I can tell you. It was a Friday in May. I was

87

1  with Terry Williams and it was the time we met on site with
2  Mr. Corneal's SEO, Mr. Bowes, to look at the test holes that
3  had been done. Now, this was this year now, not in 2000.
4  This was this May.
5  Q    Okay, but --
6  A    I would say -- I'm looking at a calendar
7  here. I think it was May 18th, 2001.
8  Q    But back to May 2000, which is the point at
9  which he couldn't even get an application for his garage,
10  what was it that made Miss Wirth or anybody else believe
11  that he was looking to build an apartment?
12  A    I think it was based upon the sketch that he
13  showed Mr. Van Dommelen, but I don't know. I really don't
14  know the answer to that.
15  Q    Did there come a time when you learned that
16  Mr. Corneal sought to build a garage with a storage area
17  over it?
18  A    No.
19  Q    Nobody ever told you about that request?
20  A    No.
21  Q    What about the art studio? Do you know
22  anything about his request to build an art studio?
23  A    Not really, other than the fact that he was
24  building one.
25  Q    Did anybody from the township ever talk to you

88

1  about the fact that Mr. Corneal wanted to build an art
2  studio?
3  A    I would -- I'd have to say yes, but I don't
4  have any specific recollection.
5  Q    If you don't have any specific recollection,
6  what is it that makes you think yes?
7  A    That information was communicated to me
8  somehow and I don't recall how. In fact, there is a garage
9  with an apartment above it, there is an art studio, there is
10  a home and there is another separate garage on the property
11  as constructed now.
12  Q    Do you know when Mr. Corneal commenced
13  construction on his property?
14  A    I don't know exactly, but certainly in the
15  year 2000. And as of May 18th of 2001, it looked to me like
16  construction was basically completed.
17  Q    Well, on May 5th, 2000 when he was asking you
18  for applications, trying to get applications, had he started
19  construction?
20  A    I don't know.
21  Q    How about in the summer of 2000 when he
22  instituted this lawsuit?
23  A    Yes, the July 28th letter I think was written
24  because it came to the township's attention that he had been
25  constructing.

89

1  Q    Do you know what he was constructing at that
2  time?
3  A    I do not know.
4  Q    Did the township tell you what he was trying
5  to construct at that time?
6  A    I don't know.
7  Q    Do you know whether if Mr. Corneal wanted to
8  build a property that didn't require sewage, build a
9  structure that didn't require sewage --
10  A    Not that I'm aware of.
11  Q    Well, I didn't finish my question. Do you
12  know whether if that's what he wanted to build, whether he
13  would need approval of sewage modules?
14  A    I don't believe so if no sewage was
15  contemplated.
16  Q    Do you know whether if what he wanted to build
17  was just a garage or an art studio without sewage or water,
18  whether that would be considered -- that act occurring would
19  be considered a subdivision of his land?
20  A    Well, I don't think it would be a subdivision
21  for DEP purposes unless the second structure contained
22  sewage.
23  Q    Do you recall at any time discussing with the
24  township officials, any of the defendants in this case,
25  whether the building of a second home would render Mr.

**NEWTON, LAWRENCE**
06/12/01

**CORNEAL  VS
JACKSON TOWNSHIP**

---

90

1   Corneal's 95-acre tract a subdivision?

2     A    Well, it's my understanding -- and I think I

3 learned actually at our May 18th meeting when we were

4 talking to Mr. Bowes, who was the SEO there, the

5 interpretation that Altoona DEP has given to our townships

6 in that area is that, yes, in fact that is a subdivision for

7 DEP purposes.

8     Mr. Bowes informed me that in terms of the

9 Williamsport area if the first structure was maybe over 20

10 years old or more they don't consider that to be a

11 subdivision.

12     So, you know, there's probably -- there is

13 some conflict between DEP, but we -- the township was

14 following the direction given from Altoona and that's what

15 has been done in our county.

16     Q    Well, now, let me just ask you this: Is this

17 something that came up in the context of Mr. Corneal's

18 property or is it just something that has -- you've been the

19 township solicitor for what, 15 years you said?

20     A    Approximately.

21     Q    The entire 15 years has this been an applied

22 rule?

23     A    It's been an applied rule in Huntingdon County

24 and I'm aware of that rule being applied to other townships.

25     Q    Do you know what this interpretation by DEP

---

91

1 comes under, what law?  What are they looking at to base

2 their interpretation on?

3     A    Well, it's the Pennsylvania Sewage Facilities

4 Act and the regulations promulgated thereunder.

5     Q    That's what DEP has told you they're --

6     A    That's my understanding.

7     Q    What about the Municipalities Planning Code,

8 do you know whether there was anything in there that would

9 indicate that the construction of any additional home would

10 render a 95-acre tract a subdivision?

11     A    I'm not aware of any, no.

12     Q    Do you know of any other instances in Jackson

13 Township when the attempt to build a second home on a large

14 tract of land, say 50 or 95 acres like this, has been

15 treated as a subdivision where there is another existing

16 structure?

17     A    I can tell you that -- I don't have any

18 specific knowledge, but I know this has always been the

19 interpretation.  And Leroy Koch, who was the secretary prior

20 to Ann Wirth, was one of the founding members of the

21 Huntingdon County Sanitary Administrative Committee and I

22 know that the committee adopted that interpretation.

23     So whether or not it had applied previously in

24 Jackson Township, my inclination is to say yes, but I can't

25 give you any specific example.

---

92

1     Q    Did they ever consult you about this notion of

2 a subdivision occurring as a result of the construction of a

3 second home?

4     A    That was discussed, yes.

5     Q    About Mr. Corneal?

6     A    Yes.

7     Q    Had they ever consulted you in the past about

8 that?

9     A    I would say yes, but maybe not necessarily

10 with this board of supervisors.

11     Q    When did they consult you about this

12 subdivision notion resulting from the construction of a

13 second home?

14     A    I don't have a specific date, but I know it

15 was -- it was discussed and I believe my conversation was

16 with Ann Wirth.

17     Q    Do you know whether it was prior to the time

18 that you received these letters from --

19     A    I don't know.

20     Q    From Mr. Corneal.

21     A    I don't know.

22     Q    Do you know whether it was prior to the time

23 this lawsuit was filed?

24     A    I'm sure it was prior to the time the lawsuit

25 was filed.

---

93

1     Q    In imposing this interpretation on Mr.

2 Corneal, were the township supervisors acting pursuant to

3 your guidance and advice?

4     A    I would say that they were acting in

5 conformance with the practice and procedures utilized in

6 Huntingdon County by direction of DEP.

7     Q    But in discussing it with you was Miss Wirth

8 seeking advice on behalf of the township?

9     A    If she was seeking advice, I agreed with that

10 position because that's a position that has always been

11 taken in our county.

12     Q    What was the nature of that conversation?

13     A    I don't recall.

14     Q    Do you recall how long the conversation was?

15     A    I don't.

16     Q    Was it a telephone conversation?

17     A    It was a telephone.

18     Q    Do you know that it happened prior to the

19 initiation of this lawsuit?

20     A    The lawsuit I think was filed in July -- June

21 or July of 2000 and I feel certain it was before.  I'm not

22 saying it wasn't also discussed after, but I think it was

23 also discussed before.

24     Q    Was there a time that you became aware of Mr.

25 Corneal's recording of an additional deed in connection with

---

94

1 his property?
2 A    Yes.
3 Q    How did you become aware of that?
4 A    I think it -- first of all, all deeds that are
5 recorded in our county are published in the paper. I may
6 have seen it in the paper. And I did become aware that I
7 think the recording of this deed violated the Clean and
8 Green restrictions which would have meant rollback taxes
9 would have been paid. I believe I may have received a
10 request from Ann Wirth to get a copy of the deed and forward
11 it to them.
12 Q    Do you know when that request was made?
13 A    I do not.
14 Q    What makes you think that the recording of
15 this deed would -- well, before I ask you that, you don't
16 recall exactly how you learned about the recording of the
17 deed?
18 A    I may have seen it in the paper because I read
19 deed transfers and I know that I discussed it with Ann
20 Wirth.
21 Q    Did you initiate that phone call or did she?
22 A    She did.
23 Q    Do you know how she became aware of it?
24 A    Probably through the paper.
25 Q    And did Miss Wirth ask you to do anything --

96

1 A    I don't know the specifics, although I believe
2 the recordation generated something from our assessment
3 office to Mr. Corneal.
4 Q    And what does that have to do with the Clean
5 and Green Act?
6 A    Well, the -- there are certain -- when you
7 have property in Clean and Green, it's a preferential
8 assessment. So there are restrictions that apply as to how
9 much land you can sell over what period of time and whatever
10 Mr. Corneal did with the recording of that deed violated
11 those restrictions. And I believe subsequently there was a
12 corrected deed that was recorded so as a result there wasn't
13 any penalty that was imposed.
14 Q    And how did you find out about the corrected
15 deed?
16 A    Again, I saw it in the paper, looked it up.
17 Q    What did the corrected deed accomplish?
18 A    You know, again, I'm not sure. I think it was
19 probably a transfer or conveyance back so the status quo was
20 maintained.
21 Q    So you think that the deed was undone? In
22 other words, the --
23 A    Yes.
24 Q    The transfer was undone?
25 A    Yes, whatever -- whatever was violative of the

95

1 A    No.
2 Q    -- about recording of that deed?
3 A    No.
4 Q    Did you advise Miss Wirth to do anything?
5 A    No.
6 Q    Did Miss Wirth discuss with you the question
7 of the subdivision ordinance in connection with the
8 recording of that deed?
9 A    I don't believe so.
10 Q    Now, you recall that the subdivision ordinance
11 for Jackson Township was passed at a July 10 meeting,
12 correct?
13 A    Yes.
14 Q    Do you know whether this conversation was --
15 with Miss Wirth about this deed occurred before or after
16 that meeting?
17 A    I don't. Certainly it was after the deed was
18 recorded obviously, but I don't know.
19 Q    Do you know when the deed was recorded?
20 A    I do not.
21 Q    What is it about the recording of that deed
22 that makes you think that recording that deed violated --
23 the Clean and Green Act, is that what you said?
24 A    Yes.
25 Q    What is it?

97

1 Clean and Green restriction was corrected.
2 Q    So is it correct that if Mr. Corneal by
3 recording that deed had violated the Clean and Green Act,
4 the remedy would have been for him to pay certain taxes; is
5 that correct?
6 A    Rollback taxes, yes. That has nothing to do
7 with the township. That's through the county.
8 Q    And it has nothing to do with the ability to
9 subdivide, right?
10 A    Well, there's certainly a relationship there.
11 Q    It has to do with preferential tax treatment?
12 A    Exactly.
13 Q    And you correct that by paying whatever taxes
14 are due, correct?
15 A    Yes. If Mr. Corneal wanted to pay the taxes,
16 he wouldn't have to have done anything.
17 Q    Now, if I could refer you again to the May 5,
18 2000 letter to you from Mr. Corneal, it makes a reference to
19 the supervisors assuring citizens that the subdivision
20 ordinance under contemplation would be approved by April.
21 Do you know anything about that?
22 A    I do not.
23 Q    Do you know whether there was ever an April
24 deadline for approving the subdivision ordinance?
25 A    I do not.

98

1    Q    Did the supervisors ever talk to you about the
2  effect that failure to approve the ordinance was having on
3  Mr. Corneal's efforts to convey a piece of his property to
4  Mr. Hewett and Miss Smith?
5    A    Not directly, although I do remember Ann Wirth
6  communicating to me that at one of the meetings that Mr.
7  Corneal attended Mr. Hewett and Miss Smith were also
8  present. And at the beginning of the meeting -- at the
9  beginning of the meeting Mr. Corneal was -- and, again, this
10  is related secondhand to me, but at the beginning of the
11  meeting Mr. Corneal was talking about subdivision and
12  towards the end of the meeting he was saying he wasn't going
13  to subdivide at all, and that seemed to be, you know,
14  certainly a conflict if he was going to sell to Hewett and
15  Smith.
16    Q    You recall Miss Wirth conveying that to you?
17    A    Yes.
18    Q    Anybody else, the building permit officer or
19  the sewage enforcement officer or anything like that?
20    A    No.
21    MS. MONTGOMERY: I'm going to have to take
22  this conference call which I had scheduled for lunch.
23    (Discussion held off the record.)
24    (Luncheon recess taken at 12:17 p.m. until
25  1:02 p.m.)

99

1  BY MS. MONTGOMERY:
2    Q    Let me show you a document that we're going to
3  mark as Newton Exhibit 8 and let you look at that, please.
4    (Notice produced and marked as Newton Exhibit
5  No. 8.)
6  BY MS. MONTGOMERY:
7    Q    Mr. Newton, I'm just going to draw your
8  attention to the right-hand column of this series of
9  classified ads. Do you see the public notice please take
10  notice?
11    A    Yes.
12    Q    And there are three in a row, right --
13    A    Um-hum.
14    Q    -- that refer to Jackson Township? Have you
15  seen this before?
16    A    I don't believe so.
17    Q    You had testified earlier that there was --
18  you thought there might be -- there should have been a
19  notice in connection with the meeting for the moratorium,
20  correct?
21    A    No, I testified earlier that there should have
22  been a notice for the meeting concerning the subdivision
23  ordinance, the public hearing and also a notice concerning
24  the regular monthly meeting of the township.
25    Q    I apologize if I recalled -- is it your

100

1  testimony that if they were going to pass a moratorium on
2  subdivisions they wouldn't have had to put a notice in the
3  newspaper?
4    A    I basically told you I believe that I didn't
5  know.
6    Q    You believe they do, but you don't know?
7    A    I -- my answer was I don't know.
8    Q    So you haven't seen this Exhibit 8 in the
9  past?
10    A    Not in this form, no.
11    Q    Have you seen it in some other form?
12    A    If I saw it, it would have been when it was
13  published in the Daily News, which appears to be 12/28/99.
14    Q    You're saying that because of the handwriting
15  in the left-hand column, is that what you're saying,
16  12/28/99?
17    A    I'm just assuming that's when it was
18  published, yes.
19    Q    If you'll notice, there are three notices
20  about Jackson Township and the second one is the regular
21  monthly meeting notice, correct?
22    A    Yes.
23    Q    The first one then would suggest that there
24  was a special meeting, correct?
25    A    No, actually I think the first one suggests

101

1  that a hearing is taking place on June -- I'm sorry, on
2  January 4th, 2000 which would be the township's normal
3  meeting night.
4    Q    So do they sometimes have their public
5  hearings on the same date --
6    A    Yes.
7    Q    -- as their normal meeting night?
8    A    Yes. I was -- you know, I -- before I didn't
9  -- I couldn't recall whether or not it was the same night
10  as the meeting night or it was a different date, but
11  apparently this makes it clear that it is the same.
12    Q    In other words, that they did the moratorium
13  and the monthly meeting --
14    A    No.
15    Q    -- on the same date?
16    A    No. What I'm saying is that there was a
17  public hearing scheduled for January 4th at 7:30 to discuss
18  and answer questions regarding the proposed subdivision
19  ordinance. That apparently occurred on the same night as
20  their normal meeting night.
21    Q    I showed you Exhibit 2 before. If you'll look
22  at Exhibit 2, the minutes of the meeting.
23    A    Yes.
24    Q    That's dated January 4 as well, right?
25    A    Correct.

NEWTON, LAWRENCE
06/12/01

CORNEAL VS
JACKSON TOWNSHIP

---

102

1    Q    And that's the meeting at which they passed
2  the moratorium; is that correct?
3    A    That's correct.
4    Q    So typically I think that you had testified
5  that if there was going to be something special going on you
6  would draft the notice?
7    A    I drafted this first notice.
8    Q    For the public hearing?
9    A    Yes.
10   Q    It doesn't say anything about --
11   A    And I don't know that you characterized my
12 response correctly. In this instance I drafted the notice
13 at the request of the township.
14   Q    Okay.
15   A    Okay.
16   Q    Now, typically if you draft the notice, is it
17 signed by you or is it signed by -- you know, as in the
18 paper here it's signed by Ann Wirth, or could it be either
19 way?
20   A    Well, it's not really signed. It can be
21 either way. In this instance it was -- it was Ann Wirth.
22 Typically when I advertise an ordinance, I'll put my name
23 and address down and in each instance I would request that
24 the statement, the invoice, along with the proof of
25 publication be sent to the township.

---

103

1    Q    Now, did you draft the notice for the
2  reorganizational meeting?
3    A    No.
4    Q    Or for the monthly meeting?
5    A    No.
6    Q    Now, typically where do the bills go for the
7  newspaper notices that get published?
8    A    To the township.
9    Q    Even if you're the one who drafts and calls
10 the newspaper and puts it in?
11   A    When I submit something to the Daily News, I
12 direct that the statement and proof of publication be sent
13 to the township.
14   Q    So I'm going to mark as Newton Exhibit 9
15 another document that I'll ask you to look at, please.
16       (Bill dated 12/28/99 produced and marked as
17 Newton Exhibit No. 9.)
18 BY MS. MONTGOMERY:
19   Q    Have you seen that before? For the record,
20 it's a bill apparently from the Joseph Biddle Publishing
21 Company; is that correct?
22   A    Yes, that's the Daily News. And, no, I
23 haven't.
24   Q    Let me ask you this: Is it your understanding
25 that you only need to publish a notice once or is it twice

---

104

1  prior to any public hearing where there's going to be a vote
2  or a --
3    A    Well, in the -- with respect to the
4  subdivision ordinance, it's two times and that is a
5  requirement under the Municipalities Planning Code. This --
6  more or less the first notice on the public hearing was
7  simply an informational thing. It wasn't required for
8  anything and it was to try to get some public input, at
9  least that was my understanding of it.
10   Q    You mean if there's going to be a public
11 hearing on an issue, it doesn't have to be published
12 separately?
13   A    That's not what I said.
14   Q    What did you say?
15   A    There are separate requirements for
16 publication in the Municipalities Planning Code and my
17 recollection is that that notice -- that notice has to go in
18 two times.
19   Q    If you're going to vote on something, like an
20 ordinance or something like that?
21   A    Right, it's part of, you know, the process.
22 And my recollection is that we published the notice two
23 times and then we published additional notice of the time we
24 were going to adopt the ordinance.
25       This initial notice for public hearing was, I

---

105

1  believe, for the township's benefit to try to receive public
2  input and it didn't count, so to speak, as an advertisement
3  as regards the subdivision ordinance. It was simply to try
4  to get input from the residents of the township.
5    Q    Just so I'm clear, if you -- if you were
6  required -- and you say you don't know, but if you were
7  required to publish notice of a moratorium the same as
8  you're required to publish notice on the subdivision
9  ordinance, then you'd be required to publish it twice just
10 like you have to for the ordinance, correct?
11   A    I don't know.
12   Q    I'm going to represent to you that we've only
13 seen one notice for the subdivision ordinance meeting that
14 was held on July 10th, 2000 where that subdivision ordinance
15 was passed. Is it your testimony that there were actually
16 two notices published?
17   A    There was another notice published, yes.
18   Q    Do you know when?
19   A    Before the January meeting.
20   Q    Before the January --
21   A    I'm sorry, before the July meeting.
22   Q    Another notice that you drafted?
23   A    Yes.
24   Q    So you drafted both of them. Do you have
25 records of them?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

106

```
 1    A    I may have. I don't have them with me.
 2    Q    And there would be --
 3    A    I believe the notices that are prior to the
 4  formal notice concerning the adoption of the ordinance are
 5  -- again, my recollection is that there is a two notice
 6  requirement.
 7    Q    Right. And you believe that occurred with
 8  respect to this subdivision ordinance?
 9    A    Yes.
10    Q    I want to show you another document we'll mark
11  as Newton Exhibit 10.
12         (Letter dated 8/3/00 produced and marked as
13  Newton Exhibit No. 10.)
14  BY MS. MONTGOMERY:
15    Q    Mr. Newton, this is an August 3, 2000 letter
16  from David Corneal to you, correct?
17    A    Correct.
18    Q    Do you recall receiving this letter?
19    A    Yes, I do.
20    Q    And what did you do with this letter?
21    A    Forwarded it onto the township.
22    Q    Anything else?
23    A    Not that I can recall.
24    Q    Do you recall having any discussions with
25  anybody from the township about this letter?
```

107

```
 1    A    I don't. Of course, this was after the
 2  federal lawsuit was filed. It may have been discussed at
 3  one of our -- in one of our meetings pertaining to the
 4  federal lawsuit. I don't recall -- I don't have a specific
 5  recollection of this letter being discussed.
 6    Q    Now, this letter indicates that Mr. Corneal
 7  sent you the sewer module for his house which apparently the
 8  township had indicated there wasn't a proper sewer module
 9  and that's why he couldn't have a building permit at least
10  in part, correct?
11    A    Mr. Corneal never sent me a sewage module.
12    Q    Have you ever seen Mr. Corneal's sewage
13  module?
14    A    I don't believe so.
15    Q    Now, here Mr. Corneal asked you to send him
16  applications which he'd been unable to obtain from the
17  township, correct?
18    A    Where are you?
19    Q    I'm sorry, next to the last paragraph at the
20  bottom.
21    A    Well, I note here I enclose the sewer module
22  for my house. I don't remember getting it. If I did get
23  it, I forwarded it onto the township, but I don't remember
24  it.
25    Q    So you didn't do -- you don't recall doing any
```

108

```
 1  review of the sewer module --
 2    A    No.
 3    Q    -- to see whether it looked complete or
 4  anything?
 5    A    No.
 6    Q    What about Mr. Corneal's request that you
 7  forward applications to him in care of Max McClintic?
 8    A    I believe subsequently I forwarded
 9  applications -- building permit applications, but I believe
10  it was to Mr. Corneal directly.
11    Q    So that was after this August 3rd letter,
12  correct?
13    A    Yes.
14    Q    Let me ask you about the garage which you say
15  now has an apartment over it in which you saw in May of
16  2001, correct?
17    A    Yes.
18    Q    Do you know when that garage was -- the
19  building of that garage commenced?
20    A    I don't. I can only assume that it was
21  commenced sometime in the summer of 2000.
22    Q    In the summer of 2000 you believe?
23    A    (Witness nods head affirmatively.)
24    Q    Did you have any other occasion at any time to
25  go to that garage and look at it?
```

109

```
 1    A    No.
 2    Q    Has anybody ever told you that when the garage
 3  was first built it contained just a workshop with no
 4  sewage --
 5    A    No.
 6    Q    -- and such over top of it? Did you become
 7  aware of that through any means whatsoever?
 8    A    No.
 9    Q    Is this the first time you've ever heard that?
10    A    Yes. My understanding was that sewage was
11  contemplated for the garage itself, the second floor.
12    Q    From the very beginning?
13    A    That was my understanding.
14    Q    Based on what?
15    A    Based on what I had been told.
16    Q    Now I'm going to show you another document
17  that we will mark as Newton Exhibit 11 and I'd ask you to
18  identify it if you can.
19         (Letter dated 8/31/00 with enclosures produced
20  and marked as Newton Exhibit No. 11.)
21  BY MS. MONTGOMERY:
22    Q    Mr. Newton, have you seen that letter to Ann
23  Wirth dated August 31, 2000 prior to today?
24    A    I don't believe so.
25    Q    You've never seen it prior to today?
```

NEWTON, LAWRENCE
06/12/01

CORNEAL  VS
JACKSON TOWNSHIP

---

**110**

1    A    Not that I can recall.

2    Q    Do you recall seeing the building permit

3  applications?

4    A    I don't.

5    Q    Did you get any telephone calls from Ann Wirth

6  about these building permit applications?

7    A    Not that I can recall.

8    Q    How about anybody else from the township,

9  building permit officer, any supervisor, anybody else?

10    A    No.

11    Q    They didn't seek your advice about this at

12  all?

13    A    Not that I can recall.

14    Q    What about --

15    A    Let me stop there.  I was requested by the

16  township to draft a response to the building permit

17  applications and I did do that.  I think Mr. Van Dommelen

18  had written a draft and then I basically redid the draft.

19    Q    Well, did you not have an opportunity to look

20  at the building permit applications in drafting the

21  response?

22    A    I don't think so.  I think my information came

23  from Ann.  I don't recall seeing the applications.

24    Q    Well, let me ask you this:  If you didn't have

25  the building permit applications, who should have had them

---

**111**

1  in order for you to respond to the building permit

2  applications that Mr. Corneal filled out?

3    A    Well, you know, again, the application -- my

4  recollection is that I drafted the response without the

5  building permit applications based upon information provided

6  to me.

7    Q    By Ann Wirth?

8    A    Yes.

9    Q    Did you talk to anybody else about it?

10    A    No.

11    Q    Did you talk to the building permit officer?

12    A    No.

13    Q    Mr. Van Dommelen, I mean.

14    A    Yes.

15    Q    But I guess I'll ask you again:  If you didn't

16  have them, who should have had them in terms of -- I mean,

17  shouldn't somebody at the township review the building

18  permit applications?

19    A    Well, I think Mr. Van Dommelen did.  That was

20  my understanding.

21    Q    What makes you think that?

22    A    Because he drafted the initial response to the

23  building permit applications.

24    Q    Did you tell him to draft that response?

25    A    I did not, no.

---

**112**

1    Q    Did you tell him through telling somebody else

2  to have him draft that response or did you tell Miss Wirth

3  to tell him to draft a response?

4    A    Not that I recall.  I think that the

5  applications came to Mr. Van Dommelen.  He drafted a

6  response.  I was requested by the township to review it and

7  to revise it if I felt it necessary.

8    Q    And did you do that?

9    A    Yes, I did.

10    Q    I'm going to show you a letter that we'll mark

11  as Newton Exhibit 12.

12        (Letter dated 9/1/00 with enclosures produced

13  and marked as Newton Exhibit No. 12.)

14  BY MS. MONTGOMERY:

15    Q    Mr. Newton, have you seen this September 1,

16  2000 letter to Miss Wirth from Mr. Corneal prior to today?

17    A    I don't believe so.

18    Q    What about the attachments to the letter that

19  shows the second floor of the garage as open storage?  Have

20  you seen that in the past?

21    A    I don't believe so.

22    Q    Did anybody ever discuss with you this

23  particular letter?

24    A    Not that I can recall.

25    Q    Did anybody discuss with you the August 31st

---

**113**

1  letter that I showed you just a moment ago with the building

2  applications?

3    A    Well, only in the context that I drafted a

4  response to the permit applications.

5    Q    Did anybody discuss with you the drawings and

6  other things that were attached to the August 31 letter?

7    A    Not that I can recall.

8    Q    Now, I think that you testified earlier that

9  you drafted this response or that you revised a response

10  that Mr. Van Dommelen started out writing.  I'm going to

11  show you a document we'll mark as Newton 13.

12        (Letter dated 10/10/00 produced and marked as

13  Newton Exhibit No. 13.)

14  BY MS. MONTGOMERY:

15    Q    Is this the letter that you're referring to

16  that eventually went out from Mr. Van Dommelen --

17    A    Yes, it is.

18    Q    -- with your assistance?

19    A    Yes.

20    Q    Which part of this letter did you draft?

21    A    I would say basically it's my letter.

22    Q    This makes reference to, in the second

23  paragraph, your application inadequately described the

24  proposed construction.  What was the inadequacy?

25    A    My recollection is that that was a detail

---

114

1 issue.
2 Q     What detail issue?
3 A     On what the -- what was to -- what was to be
4 the proposed construction.
5 Q     But you never saw the application?
6 A     That's right. My communication was, again,
7 through Mrs. Wirth.
8 Q     The same is true with respect to your third
9 reason for denying the building permit applications?
10 A     That is correct.
11 Q     It did not include an adequate plan for the
12 site showing the size and location of the proposed
13 construction, right?
14 A     Correct.
15 Q     Now, what about this reference to the driveway
16 ordinance? Not having complied with the driveway ordinance,
17 what was that based on?
18 A     In July, the July township meeting, the
19 township passed a driveway ordinance.
20 Q     And what was it that Mr. Corneal had done that
21 they didn't think was correct?
22 A     I don't think he had done anything with
23 respect to the ordinance, is my recollection.
24 Q     Well, it says you have not complied with the
25 township's driveway ordinance.

115

1 A     A copy of which is enclosed.
2 Q     Right. In what way didn't he comply?
3 A     You know, again, my -- my recollection is he
4 didn't do anything with respect to the driveway ordinance.
5 Q     Mr. Corneal didn't do anything?
6 A     Correct.
7 Q     On whose information are you basing that
8 information?
9 A     Township information.
10 Q     What did you think he had to do --
11 A     I don't have the ordinance in front of me, but
12 there were certain requirements that were set forth in the
13 ordinance and I was informed that he had not complied.
14 Q     But you didn't have any individual --
15 independent information --
16 A     No, absolutely not.
17 Q     Now, the letter also makes a reference to
18 submitting sewage facilities planning modules to the
19 township, correct? It's higher up in the second paragraph.
20 A     Yes.
21 Q     But you didn't see these sewage facilities
22 planning modules, correct?
23 A     Not to my recollection. Again, I -- if Mr.
24 Corneal sent a module with that letter, I don't remember at
25 least examining it.

116

1 Q     All right, thank you. I want you to just look
2 at the first sentence of this October 10, 2000 letter. It
3 says please be advised that Jackson Township has referred to
4 me for review your applications for building permits, right?
5 A     Yes.
6 Q     But they didn't give you the applications,
7 right?
8 A     Well, this is under Mr. Van Dommelen's
9 signature. I'm really writing the letter for Mr. Van
10 Dommelen and it referred to him, yes.
11 Q     But my question still stands, they didn't give
12 you them? I mean, either -- they didn't give you these
13 applications?
14 A     Not that I can recall.
15 Q     How did Mr. Van Dommelen deliver to you the
16 first draft of his letter?
17 A     He did not. I think Mrs. Wirth faxed it to
18 me.
19 Q     So he wrote it and gave it to Mrs. Wirth, do
20 you think?
21 A     I believe so.
22 Q     Did you save a copy of it?
23 A     No.
24 Q     Do you not usually save copies of things that
25 the township supervisors send to you?

117

1 A     Not something like that, no.
2 Q     Do you have any other copies of any drafts of
3 this letter?
4 A     No, I don't.
5 Q     When you wrote this letter for Mr. Van
6 Dommelen, did you have any knowledge of whether he had
7 actually reviewed the applications?
8 A     I believe he had, yes.
9 Q     Now, let me ask you this: Have you ever been
10 involved in an appeal of a denial of a building permit
11 application for any of the townships that you work for?
12 A     I don't believe so.
13 Q     Never?
14 A     (Witness shook his head negatively.)
15 Q     What about --
16 A     Let me say in this case Mr. Wilson -- Mr.
17 Williams appealed the denial, okay. So in this case he had
18 requested a hearing through the township on the denial of
19 the permits and in that regard I believe I received a
20 telephone call from him.
21       And it was at or about the same time that the
22 township had initiated a lawsuit against the Corneals to the
23 Court of Common Pleas of Huntingdon County because they had
24 commenced construction without a building permit. We had
25 difficulty getting Mr. Corneal served with a copy of the

118

1 complaint and motion for preliminary injunction. He's a
2 Centre County resident. We forwarded it, of course, the
3 complaint – our sheriff's office forwarded the complaint to
4 the Centre County sheriff and he was not able to obtain
5 service.
6 And we had a preliminary hearing scheduled on
7 our request for injunctive relief that couldn't be filed
8 because the Corneals weren't served. And it's about this
9 time I get the call from Terry Williams. And, again, I --
10 it's possible that I could have called him after I became
11 aware that he, you know, filed this appeal.
12 Q Do you know whether or not this request for a
13 hearing -- or for an appeal, hearing for an appeal, was
14 actually served, I should say, on the Jackson Township Board
15 of Supervisors prior to the time that the Huntingdon County
16 action was initiated against Mr. Corneal?
17 A I really don't know. All I can say is it was
18 at or about the same time. And I know Terry Williams, I
19 have high regard for him, and I said to him, look, let's sit
20 down and see if we can resolve this. I don't think it's
21 necessary to litigate the denial of the permit applications,
22 let's look to the larger issue and get this – get this
23 solved.
24 So what we agreed to do on the date that was
25 scheduled for our preliminary hearing, we agreed to meet in

119

1 the Huntingdon County Courthouse and in fact we did meet
2 with Mr. Williams and that meeting included all of the
3 township supervisors, Mr. Van Dommelen. I believe Barry
4 Parks, the sewage enforcement officer, and myself.
5 And at that time we basically explained to Mr.
6 Williams the township's position, where the township was
7 coming from and we charted a course to resolve this. It was
8 our hope and our goal to have it resolved by the end of the
9 year. And rather than litigate our equity complaint, we
10 simply tried to take whatever steps necessary to resolve
11 this short of any litigation.
12 Q But back to my original question -- I'm just
13 going to go back to the very beginning. My question -- my
14 first question was whether or not you've ever had an appeal
15 on a denial of a building permit application with respect to
16 any of the townships or boroughs or other local governments
17 that you represent.
18 A Well, we had one with Mr. Corneal through
19 Attorney Williams here.
20 Q So it's your testimony that the meeting that
21 you had in the courthouse in connection with the preliminary
22 injunction hearing was the appeal of the building permit
23 application?
24 A Absolutely not.
25 Q What's the --

120

1 A We met with Mr. Williams in order to try to
2 resolve all the issues involved in this litigation.
3 Q So when you say you had one with Mr. Williams,
4 you mean --
5 A He filed an appeal. We did not ever have an
6 appeal hearing.
7 Q That was my question, did you ever have an
8 appeal hearing --
9 A No.
10 Q -- in connection with any of the local
11 governments that you represent on a building permit
12 application denial?
13 A Not that I can recall.
14 Q Do you know as a township solicitor, a borough
15 solicitor, what kind of hearing should be held in connection
16 with the appeal of the denial of a building permit
17 application? Do you know what the format for that hearing
18 would be?
19 A Without looking it up, no.
20 Q Do you know who would hear the hearing? Who
21 would the hearing be before?
22 A My sense is it would be before the board of
23 supervisors.
24 Q Do you know whether there was ever an appeal
25 hearing held before the board of supervisors in connection

121

1 with Mr. Corneal's appeal?
2 A The answer is no. And the reason for that is
3 by an agreement with Mr. Williams we decided to forego the
4 hearing and address the issues to see if we could resolve
5 them amicably.
6 Q Is it your understanding that Mr. Williams was
7 waiving the right to a hearing on the denial of the building
8 permit application?
9 A I don't know if that was actually ever
10 discussed.
11 Q Was there anything in writing about that?
12 A No.
13 Q You're saying that in a telephone call Mr.
14 Williams agreed on behalf of Mr. Corneal that you wouldn't
15 have the hearing?
16 A No, that's not what I said at all.
17 Q Well, I'm having a hard time understanding --
18 A Well, what I -- what I said was that -- what I
19 proposed to Mr. Williams was instead of going through the
20 hearing on this denial, we get to the heart of the matter
21 and see if we can resolve the issues. He agreed to do that.
22 Q Well, for the record, I'll ask you to look at
23 what we'll mark as Newton Exhibit 14.
24 (Letter dated 11/10/00 produced and marked as
25 Newton Exhibit No. 14.)

122

1   BY MS. MONTGOMERY:
2   Q      Now, this is a November 10, 2000 appeal letter
3   from Terry Williams, correct?
4   A      Yes.
5   Q      Have you seen this in the past?
6   A      I believe I have.
7   Q      Did the township supervisors forward this to
8   you?
9   A      Yes, I think so.
10  Q      Did you call Mr. Williams in connection with
11  this appeal on behalf of the supervisors?
12  A      I believe so, yes.
13  Q      When did you call him?
14  A      Well, shortly after the township had received
15  this letter, I believe I contacted Mr. Williams and at that
16  time I suggested that we sit down -- when I say we, I mean
17  the township and Mr. Williams, to look at these issues and
18  attempt to resolve them, and in fact that's what we did. We
19  met the same day that the motion for preliminary injunction
20  was scheduled at the Huntingdon County Courthouse.
21  Q      And that preliminary injunction has not been
22  resolved one way or the other yet, correct?
23  A      That's correct.
24  Q      So it's pending?
25  A      Well, I think it's probably mute at this

123

1   point. I believe Mr. Corneal has completed his
2   construction. I'm happy to report that as of the township's
3   June meeting, after hearing the presentation from Mr. Bowes,
4   it looks like everything is going to be fine with respect to
5   sewage modules.
6          Mr. Bowes on site indicated to us in our May
7   18th meeting that what had previously been proposed were not
8   acceptable. Those sites have been destroyed and I believe
9   that they were too close to the road that was constructed,
10  but I think everything is basically on track to be resolved.
11  Q      When was this June meeting?
12  A      The first Monday in June.
13  Q      Was this a public meeting?
14  A      This is the township's June meeting, yes.
15  Q      The township's June meeting?
16  A      Yes.
17  Q      Mr. Bowes is who? Could you identify him for
18  the record?
19  A      Mr. Bowes is a sewage enforcement officer that
20  has been retained by Mr. Corneal through Terry Williams to
21  do the design for the sewage systems that are going to go
22  in. And I believe that he is going to design -- I think
23  it's a newer technology called micromounds.
24  Q      So you're pleased to report that Mr. Bowes has
25  found that the sewage modules are now satisfactory; is that

124

1   what you're saying?
2   A      Yes, that's correct.
3   Q      And what does the township intend to do with
4   that information?
5   A      Forward them on to the Department of
6   Environmental Protection.
7   Q      Well, as I understand, the preliminary
8   injunction hearing was -- and I'm, of course, not a party to
9   it and I'm not that familiar with it, but the preliminary
10  injunction motion that was filed was designed to stop Mr.
11  Corneal from building his house, correct?
12  A      Yes, the township had received a number of
13  complaints from other residents concerning this construction
14  and the fact that Mr. Corneal was building without a
15  building permit.
16  Q      What other residents were those?
17  A      I don't know. This is what I'm being told
18  from the township.
19  Q      Did you draft the complaint for the township?
20  A      Yes, I did.
21  Q      You didn't ask them who complained to them
22  about Mr. Corneal building?
23  A      No, and it really wouldn't matter who
24  complained. No one would have had to have complained if
25  there was a violation.

125

1   Q      It might matter for this lawsuit.
2   A      It could.
3   Q      But the appeal that Mr. Williams sent to you
4   -- or sent to the township, I'm sorry, on November 10, 2000
5   concerned the denial of all his applications, correct?
6   A      Building permit applications.
7   Q      Exactly.
8   A      Yes.
9   Q      The preliminary injunction was designed to get
10  -- for Mr. Corneal's house primarily, correct?
11  A      No, it was every -- any and all construction.
12  I don't believe the township knew actually what was being
13  constructed. I think there are no trespassing signs that
14  are posted. I think the township's knowledge came from, you
15  know, construction vehicles going in and out and reports of
16  others.
17  Q      Well, Mr. Corneal's building applications say
18  what he was trying to construct, don't they?
19  A      Sure.
20  Q      So if Mr. Corneal didn't need sewage for his
21  art studio and didn't need sewage for his garage, would
22  there have been any grounds for him to have been denied a
23  building application -- a building permit?
24  A      I'll stand on what was set forth in the letter
25  under Mr. Van Dommelen's signature.

126

1    Q    Okay.  What date was the preliminary
2 injunction hearing scheduled to be held?
3    A    I don't know.  I don't recall.
4    Q    Did you at the meeting that was held in the
5 courthouse which you say was held on the date that the
6 preliminary injunction hearing --
7    A    Yes.
8    Q    -- had been scheduled, did you discuss the
9 appeal of the denial of the building permit application
10 specifically?
11    A    We did not.  We instead tried to set forth a
12 plan where we could resolve all of these issues to get them
13 done.
14    Q    Well, let me ask you this:  By the date of the
15 meeting in the courthouse had you received -- are you sure
16 that you had received the appeal on the building permit --
17    A    I'm not sure.  It may have been prior to
18 that.  I don't know.  But there was some reason that I was
19 in touch with Mr. Williams and -- either he called me or I
20 called him about this appeal and the gist of our
21 conversation was let's sit down and see if we can work it
22 out.
23    Q    I'm going to show you a document that we'll
24 mark as Newton Exhibit 15.
25         (Invoice dated 8/4/00 produced and marked as

127

1 Newton Exhibit No. 15.)
2 BY MS. MONTGOMERY:
3    Q    Mr. Newton, do you recognize this document?
4    A    Yes.
5    Q    Is this a copy of an invoice that you sent to
6 the supervisors for services rendered?
7    A    It is.
8    Q    So this was on August 4, 2000?
9    A    Right.
10    Q    Is it fair to assume that anything you had
11 done up to and including August 4, 2000 would be listed on
12 this invoice back to the time of your last invoice?
13    A    Not necessarily.
14    Q    Why is that?
15    A    Well, as I indicated to you, I attempt to
16 reconstruct some of these bills and often I miss things and
17 sometimes I bill based upon when a project is over.  So I
18 wouldn't necessarily do it on a chronological basis but on
19 what's done.
20    Q    Well, let's look at Number 4 here, meeting
21 with supervisors on July 6, 2000, re: Corneal lawsuit.
22    A    Yes.
23    Q    Now, was that the meeting that you had with
24 the supervisors without the presence of Mr. Sherr?
25    A    Yes, I believe so.

128

1    Q    What about the meeting with the supervisors on
2 July 13, 2000?
3    A    That may have been with Mr. Sherr.
4    Q    So it was one or the other?
5    A    I'm pretty sure -- I'm sure it wasn't the
6 first one.  I think it might have been the second one.
7    Q    How long was that meeting, do you recall?
8    A    I don't recall.
9    Q    Now, I see a reference to a letter to Ann
10 Wirth dated May 8, 2000, re: David Corneal.  That's
11 Number 2.
12    A    Yeah, I think that would be probably the
13 transmittal letters of his letters to me -- one letter dated
14 May 5th and a copy of Mr. Van Dommelen's letter.
15    Q    So let me just ask you this:  You have
16 indicated that you bill them at $60 an hour, right?
17    A    Approximately, yes.
18    Q    So at $25 an hour it would have taken you
19 nearly a half hour to draft this letter, correct?
20    A    Well, not necessarily, no.  I mean --
21    Q    I'm just trying to really --
22    A    That is -- you notice here I don't have an
23 hourly rate down here, you know.  It's just what I feel was
24 appropriate for the circumstances.
25    Q    I'm just trying to understand whether there

129

1 exists another letter other than some transmittal letters
2 since this was --
3    A    I don't believe so.
4    Q    Do you save copies of all the letters that you
5 -- correspondence that you send to the supervisors in
6 connection with --
7    A    Generally, yes.
8    Q    I see here there's a reference to a meeting
9 with the supervisors in May 2000 regarding David Corneal,
10 correct?
11    A    New Enterprise Stone and Lime Company and
12 David Corneal.  As I indicated to you previously, I think
13 the purpose of the meeting was to discuss this New
14 Enterprise problem and Mr. Corneal -- the subject of Mr.
15 Corneal came up at that meeting.
16    Q    Now, was this one of those workshop meetings,
17 is that what you're thinking?
18    A    That's what I testified to previously.
19    Q    Was this meeting subsequent to the time that
20 Mr. Van Dommelen had initially denied building permit
21 applications to Mr. Corneal?
22    A    No, I don't believe so.
23    Q    So you think -- as far as Number 2 goes, do
24 you think you have copies of the letters to Ann Wirth, re:
25 David Corneal?

---

130

```
 1    A    I probably do.
 2    Q    Now, you have preparation of draft response to
 3  the Corneal's complaint, correct?
 4    A    Yes.
 5    Q    Did you save copies of your draft responses?
 6    A    This would be a federal lawsuit. I believe I
 7  did, yes.
 8    Q    And then there's reference to a letter to Ann
 9  Wirth dated August 4, 2000. Do you know whether that
10  involved David Corneal?
11    A    It may have been a transmittal letter. I seem
12  to recall there was a letter that was dated August 3rd. I'm
13  not sure.
14    Q    Do you know when the last time you sent an
15  invoice to the township prior to this August 4th --
16    A    Prior to August 4th, no, I don't.
17    Q    You have no recollection at all?
18    A    No.
19    Q    Would you have that in your records?
20    A    Probably, yes.
21    Q    Let me ask you this: I know you don't have a
22  date for your meeting with the supervisors in May, right?
23    A    (Witness nods head affirmatively.)
24    Q    Which is Number 3 --
25    A    Yes.
```

---

131

```
 1    Q    -- regarding David Corneal. But you did
 2  testify that that was I think a workshop meeting. Was that
 3  prior --
 4    A    That's my recollection, yes.
 5    Q    So it would have been prior to their monthly
 6  meeting, correct? Isn't that --
 7    A    No.
 8    Q    -- when they have their workshop meetings?
 9    A    Not necessarily, no.
10    Q    Do you know whether it was before or after the
11  May 5 letter that was sent to you by Mr. Corneal from --
12  regarding Mr. Van Dommelen's refusal to give him building
13  permit applications?
14    A    I don't know.
15    Q    Was the workshop meeting held in the afternoon
16  or in the evening?
17    A    I would say afternoon.
18    Q    Late afternoon, early evening, what?
19    A    Well, one of the -- I just -- I would say late
20  afternoon -- in the afternoon. I'm not sure exactly when.
21    Q    And you had traveled out to the township
22  office, right, to do that?
23    A    That's correct.
24    Q    So do you remember whether it was getting to
25  be dusk or was it dark or anything driving out to that
```

---

132

```
 1  meeting?
 2    A    I don't believe so. I think it was daylight.
 3    Q    Mr. Newton, we've already made this a copy of
 4  the record and it's so large I'm not going to do that again,
 5  but I'm going to ask you to look at the subdivision and land
 6  development ordinance and identify it for me, if you can,
 7  please.
 8    A    It appears to be the Jackson Township
 9  subdivision ordinance.
10    Q    Can you look on page 71 of the ordinance.
11    A    Yes.
12    Q    Do you see where it's dated July 7, 2000?
13    A    Yes.
14    Q    Did you become aware prior to this moment that
15  this was dated July 7, 2000?
16    A    No, I think that's a mistake.
17    Q    You think it's just the wrong date?
18    A    Yes.
19    Q    What makes you think that?
20    A    Because the township meeting was on July 8th.
21    Q    July 10, correct?
22    A    Well -- let me see. Whenever the first --
23  whenever the meeting was -- I thought it was the 8th, but
24  maybe it was -- Monday.
25    Q    The first Monday of the month --
```

---

133

```
 1    A    Yes.
 2    Q    -- that's not a holiday?
 3    A    Is that the 10th?
 4    Q    I think it was, but your counsel is checking
 5  her calendar.
 6    A    It would have been the 10th.
 7    Q    Now, you weren't at that meeting, though, you
 8  testified, correct?
 9    A    No, I wasn't.
10    Q    Do you know whether this subdivision and land
11  development ordinance was signed at the meeting, prior to or
12  after?
13    A    I wasn't there. My sense is it would have
14  been signed at the meeting.
15    Q    I'm going to show you what we've marked
16  previously in depositions. Again, I don't think I will make
17  these additional copies for the record, but it's the
18  Huntingdon County Planning Commission letter to Ann Wirth
19  dated February 24, 2000.
20    Q    Okay.
21    Q    Have you seen this letter in the past?
22    A    I believe I have.
23    Q    What makes you believe you have?
24    A    Because I believe that Ann would have maybe
25  faxed me a copy of it or mailed it to me.
```

---

**NEWTON, LAWRENCE**
06/12/01

**CORNEAL  VS**
**JACKSON TOWNSHIP**

---

134

1  Q      Did you review it at the time, do you know?
2  A      I probably looked at it, yes.
3  Q      Did you have any discussions with the township
4  about what they needed to do in order to get the subdivision
5  proposal in order?
6  A      What do you mean?
7  Q      Well, this letter I believe indicates that
8  there was going to be a problem or two with the proposed
9  subdivision from Mr. Corneal, correct?
10  A      Yes.
11  Q      Did you have any discussion with the township
12  or any of its officials or its secretary about Mr. Corneal's
13  subdivision after you received this letter?
14  A      Not that I can recall.
15  Q      Do you think you received this letter at about
16  the time that it was written?
17  A      I have no idea.
18  Q      What about this April 20, 2000 letter from the
19  Huntingdon County Planning Commission which has been made
20  part of the record in the past?  Do you recall receiving a
21  copy of that letter?
22  A      I would say yes.
23  Q      Why would you say yes?
24  A      Because I believe Ann forwarded it on to me.
25  Q      Did she forward it to you at about the time it

---

135

1  was written?
2  A      I would say so, but I don't recall.
3  Q      Did you have any discussion with the township
4  about Mr. Corneal's proposed subdivision at that time?
5  A      Not that I can recall.
6  Q      Now, I think you had testified earlier that
7  when they send something to you that they anticipate
8  whatever guidance or advice you might have for them,
9  correct?
10  A      That's right.
11  Q      Did you have any advice or guidance for them
12  in connection with this letter?
13  A      Not that I can recall.
14          MS. MONTGOMERY:  I'm going to take a moment
15  here to review some notes and documents.  We can take a five
16  minute break if you want.
17          (Break taken at 1:58 p.m. until 2:23 p.m.)
18  BY MS. MONTGOMERY:
19  Q      We had talked a moment ago, Mr. Newton -- we
20  had talked some time ago about discussions that you might
21  have had about Mr. Corneal's sewage planning modules.  I
22  just need to know from you whether you recall talking to Ann
23  Wirth about Mr. Corneal's sewage planning modules?
24  A      Yes.
25  Q      Do you recall when that conversation took

---

136

1  place?
2  A      No.
3  Q      Can you put it in some kind of estimated time
4  frame?
5  A      Well, I -- I remember -- and, again, this was
6  either at the -- at one of the meetings that Mr. Corneal
7  attended.  I believe Mrs. Wirth informed me that Mr. Corneal
8  put the sewage modules on the table where the supervisors
9  were sitting and then by the end of the meeting had taken
10  them away.  So at least at the conclusion of that meeting,
11  even if the supervisors wanted to forward those modules on
12  to DEP, they didn't have them to forward them.  I do
13  remember that discussion specifically.
14  Q      That's what Mrs. Wirth told you?
15  A      That's what Mrs. Wirth told me.
16  Q      She told you that around the time of the
17  meeting that Mr. --
18  A      I can only assume so.  I don't recall, but I
19  would think that would be correct.
20  Q      So at that time did she discuss with you the
21  fact that the supervisors had indicated to Mr. Corneal that
22  he couldn't build because he would have to subdivide?  In
23  that same conversation did you have that discussion?
24  A      I don't recall.  I do know that there was an
25  issue concerning -- that in fact there was already an older

---

137

1  dwelling on the premises and if he was going to put another
2  dwelling on that contained sewage it was a subdivision for
3  DEP purposes.
4  Q      You had said that the Altoona division of DEP
5  or --
6  A      That would be Joe Rouzer.
7  Q      Joe Rouzer?
8  A      Yes, uh-huh.
9  Q      From the Altoona regional office?
10  A      Yes.
11  Q      And that's his interpretation?
12  A      Yes.
13  Q      Has he been at the Altoona DEP regional office
14  for many, many years?
15  A      Yes.  I'd say in excess of 20 years.
16  Q      But you're aware of at least one other
17  regional office of DEP that doesn't interpret the law that
18  way?
19  A      I became aware of that on or about May 18th
20  from Tom Bowes because we had a discussion on Mr. Corneal's
21  property about this issue.  And Mr. Rouzer was there and
22  explained to Mr. Bowes that the way they have always
23  interpreted that would be just the way that the townships in
24  Jackson County have followed.
25          MR. SHERR:  If I may, you just said Jackson

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

35

**NEWTON, LAWRENCE**
06/12/01

**CORNEAL VS**
**JACKSON TOWNSHIP**

138

1   County.
2   THE WITNESS: I meant -- Jackson Township I
3   thought I said.
4   BY MS. MONTGOMERY:
5   Q   How long was the conversation that you had
6   with Mrs. Wirth in which she told you that Mr. Corneal had
7   presented some sewage planning modules but taken them back?
8   A   It wasn't very long. I don't recall.
9   Q   Do you think it was more than 10 minutes?
10  A   No, less.
11  Q   Did she call you?
12  A   Yes.
13  Q   Was she reporting to you on the events of that
14  meeting?
15  A   I would say yes.
16  Q   Was she asking you for advice?
17  A   I don't think specifically asking me for
18  advice but informing me of what went on.
19  Q   So she told you that he had brought the sewage
20  modules and taken them away, but you don't recall if she
21  told you that Mr. Corneal was informed at that meeting that
22  his subdivision wouldn't be approved?
23  A   Again, that's all I can recall from the
24  conversation.
25  Q   Do you think it was in very close -- it was in

140

1   about that.
2   Q   Now, that was in -- that was prior to your May
3   2001 site visit?
4   A   Yes.
5   Q   When you went to the May 2001 site visit, did
6   you observe the various sites?
7   A   Yes.
8   Q   Were you aware that other than the two sites
9   then that they had said had been destroyed that there were a
10  number of other previously approved sites?
11  A   What I remember is Mr. Bowes agreeing with Mr.
12  Parks that the sites that were shown previously were
13  unacceptable. I believe he agreed with that.
14  Q   But do you -- you said you went on the
15  property?
16  A   I did.
17  Q   And you observed, for example, an apartment?
18  A   Yes.
19  Q   Did you also observe a number of other septic
20  sites?
21  A   We -- as I recall, there were three different
22  pits that we walked to. I believe there were three.
23  Q   You walked to three of them. Was the other
24  one satisfactory, do you know, the third --
25  A   Well, these were the ones -- these were new.

139

1   close proximity to that meeting so that would be like within
2   a week or within a couple of days or something?
3   A   As to when the phone conversation occurred?
4   Q   Exactly.
5   A   I would say within a week, sure.
6   Q   Did you ever have any discussion with Mr.
7   Rouzer from DEP during the year 2000 about this subdivision
8   issue and the erection of the second dwelling on a property
9   making it a subdivision?
10  A   I don't believe in the year 2000. Certainly
11  in 2001.
12  Q   But not during the year 2000?
13  A   Not that I can recall.
14  Q   Did you ever discuss Mr. Corneal's property
15  with Mr. Rouzer?
16  A   Yes.
17  Q   When was that?
18  A   May 18th we met on site.
19  Q   Of this year?
20  A   Yes.
21  Q   What about in the past?
22  A   I believe there was another time -- there was
23  another time in 2001 and this was after our SEO had
24  determined that the initial sites had been destroyed and
25  were no longer usable and I believe I talked to Mr. Rouzer

141

1   These were ones that were recently dug.
2   Q   What about the ones that -- are you aware that
3   Barry Parks approved sewage modules for Mr. Corneal's
4   property --
5   A   Yes.
6   Q   -- in the year 2000?
7   A   Yes.
8   Q   Are you aware that later two of them were --
9   after all the disapprovals and all of that two of them were
10  said to be now unsatisfactory because something had been
11  driven over them, right?
12  A   Yes.
13  Q   Were you aware that the other sites that he
14  had approved remained satisfactory?
15  A   I was not saying that's not
16  the case, but that -- those sites I don't believe were
17  looked at. I think we looked at the newer holes that were
18  dug.
19  Q   Around the time that Mr. Parks approved the
20  sewage modules presented by Mr. Corneal, did you receive any
21  contact from the township about those sewage modules?
22  A   Not that I recall.
23  Q   Are you aware that despite the fact that Mr.
24  Parks had approved them that the township then said no,
25  disapprove them?

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

**142**

1     A     Well, then we get into the issue they really
2 didn't have them to approve. As I understand them from Mrs.
3 Wirth, Mr. Corneal took them with him.
4     Q     Did she tell you in fact that he was told to
5 take them back because they wouldn't review them?
6     A     No, she didn't tell me that.
7     Q     Did the supervisors seek counsel from you
8 about filing the lawsuit against Mr. Corneal that was filed
9 in Huntingdon County?
10     A     Yes.
11     Q     You actually drafted that --
12     A     Yes.
13     Q     -- correct? When did they first seek your
14 counsel about that, filing a lawsuit in Huntingdon County
15 against Mr. Corneal?
16     A     Probably towards -- the letter that we
17 reviewed I believe is dated July 28th of 2000. So it would
18 have been around that time.
19     Q     When did you actually file that lawsuit?
20     A     I believe it was in October.
21     Q     And what happened between July 28th and
22 October in connection with the filing of that lawsuit?
23     A     Be more specific.
24     Q     Well, why did you wait until October to file
25 that lawsuit?

**143**

1     A     I think there was a -- I think there was
2 another letter that we had written -- I think that was, you
3 know, an August letter that I believe we have reviewed.
4     Q     In this deposition?
5     A     I think so. I believe I wrote a letter in
6 August. Maybe we haven't reviewed it, but it was just, I
7 guess, until October when the complaint was ready and we
8 filed it hoping that we could resolve this without filing
9 it.
10     Q     You think you wrote another letter to Mr. and
11 Mrs. Corneal in August?
12     A     I think I wrote a letter in August.
13     Q     After the July 28th letter?
14     A     Yes.
15     Q     Would you have a copy of that in your files?
16     A     I believe I did and I believe it's in the
17 documents that were copied.
18     Q     From the township you mean?
19     A     Yes.
20     Q     Have you had an opportunity to review the
21 documents that were --
22     A     Yes.
23     Q     -- copied? When did you have that
24 opportunity?
25     A     This morning.

**144**

1     Q     So not all of them, a selection, I suppose,
2 correct?
3     A     Yes.
4     Q     Well, we haven't had an opportunity to review
5 all those documents. Some of them, as many of them as we've
6 been able to make time for. Did the supervisors ever
7 contact you about your obligation to produce documents in
8 this lawsuit?
9     A     No.
10     Q     Well, I'll represent to you that we have not
11 found so far that letter.
12     A     I believe I -- I could be wrong on the date,
13 but I think I saw it this morning.
14     Q     Well, we'll see if we find it. I think that
15 you had testified that there were a number of revisions to
16 the land development ordinance as we went -- there were a
17 number of revisions to the subdivision ordinance before it
18 was actually passed.
19     A     (Witness nods head affirmatively.)
20     Q     Do you know whether or not each of those
21 iterations of the proposed subdivision ordinance were made
22 available for the public?
23     A     I don't know. Anyone who attended a township
24 meeting certainly would have access to that.
25     Q     Didn't Mr. Corneal ask you for a copy of the

**145**

1 proposed ordinance at one time?
2     A     He may have and -- I'd have to refer to that
3 August letter. I know he was ultimately sent a copy.
4     Q     The August letter that you're referring to is
5 not in addition to -- it is in addition to this July 28th
6 letter that you're referring to?
7     A     Yes, that's what my recollection is.
8     Q     But you --
9     A     I think the supervisors asked me in August to
10 write to him and say, look, get a building permit and then I
11 think there was a follow-up letter in August.
12     Q     But in any event, I think I just asked you
13 whether or not Mr. Corneal asked you for a copy of the
14 subdivision ordinance and you said he may have, correct?
15     A     He may have.
16     Q     Do you know whether or not you sent him a copy
17 of it?
18     A     I may have. If I did, it would be referenced
19 in this August 28 letter.
20     Q     You think it's an August 28th letter or do you
21 think it's a July 28th?
22     A     Well, I -- it's July -- the August letter,
23 whenever the date was in August.
24     Q     Did you ever have occasion to talk to the
25 supervisors individually about this issue of Mr. Corneal's

146

1 property?
2 A One-on-one?
3 Q Yes.
4 A No, not that I can recall.
5 Q Mr. Wilson has never called you directly to
6 talk about it?
7 A If Mr. Wilson called me, it would be in the
8 context of we've got to get something moving on the lawsuit
9 because people in the township were upset that nothing was
10 being done, etcetera. He may have called me. If he did, I
11 believe it was in that context.
12 Q Well, going back briefly to your August 4,
13 2000 invoice to the township, you would have copies of each
14 of the documents referenced in this invoice, correct, in
15 your files?
16 A I should have.
17 Q Letters to --
18 A If I don't, the township certainly has them.
19 And if I don't, they would be in the township records.
20 Q And would you have a copy of the additional
21 notice of the meeting --
22 A I should have, yes.
23 Q The meeting where the subdivision ordinance
24 was ultimately passed. You'd have a copy of that
25 additional --

147

1 A My recollection is on the Municipalities
2 Planning Code notice means publication two times in two
3 consecutive weeks.
4 Q Exactly.
5 A Yeah.
6 MS. MONTGOMERY: Would you mark that as Newton
7 Exhibit 16.
8 (Letter dated 8/29/00 produced and marked as
9 Newton Exhibit No. 16.)
10 THE WITNESS: I think that's the letter I'm
11 referring to.
12 BY MS. MONTGOMERY:
13 Q This is the August 29, 2000 letter?
14 A Yes, um-hum.
15 Q And in this letter it indicates that you in
16 fact did --
17 A Yes.
18 Q -- send Mr. Corneal the building permit
19 application --
20 A Yes.
21 Q -- that he had been trying to get?
22 A Yes.
23 Q So they were sent then under cover of a letter
24 dated August 29, 2000?
25 A Yes. I think the subdivision ordinance might

148

1 have been sent to him at the time of Mr. Van Dommelen's
2 letter. I think there might be a reference to enclosing
3 that.
4 Q I notice this August 29, 2000 letter went out
5 and then, as you recall, we have the September -- the
6 August 31 and September 1 application sent right back,
7 right?
8 A I guess so, yes.
9 Q Those are the documents that you reviewed in
10 this deposition, right?
11 A Yes. I don't recall the dates, but if that
12 was the dates, yeah, fine.
13 Q Well, these were Newton Exhibits 11 and 12.
14 A Okay.
15 Q Letters dated August 31 and September 1, 2000
16 with building application and materials attached. So I just
17 want to ask you: Having sent the applications to him, did
18 you not follow up to see whether or not the applications had
19 been filled out and sent back?
20 A No. At least as of the date that I wrote the
21 letter I wasn't aware that they had been.
22 Q You mean as of the date that you wrote the
23 letter for Van Dommelen's signature, is that what you
24 mean?
25 A No, this is dated August 29th.

149

1 Q Right.
2 A And there's a letter from Mr. Corneal which is
3 Exhibit 11 --
4 Q Right.
5 A -- enclosing the building permit
6 applications --
7 Q Right.
8 A -- along with the check and that's dated
9 August 31st.
10 Q Right.
11 A I can only assume that he probably had the
12 building permit application already.
13 Q Why would you assume that?
14 A Well, if my letter is dated the 29th, you
15 know, I can only assume by the time the mail gets from
16 Huntington to State College -- well, he might have done it
17 right away. So it's possible, yeah. I don't know.
18 MS. MONTGOMERY: Well, I don't think I have
19 any other questions for you, Mr. Newton, pending a review of
20 the documents that we only recently received from the
21 township in which case we might need to call you back.
22 THE WITNESS: How about in my county?
23 MS. MONTGOMERY: I'm sorry?
24 THE WITNESS: Love to have you come to
25 Huntingdon County.

150

1   MS. MALADY: We've been there.
2   MS. MONTGOMERY: We've been there.
3   THE WITNESS: Thank you.
4   MS. MONTGOMERY: It's really quite nice.
5   Thank you.
6       (The deposition was concluded at 2:46 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

151

1
2   COUNTY OF DAUPHIN        :
          : SS
3   COMMONWEALTH OF PENNSYLVANIA    :
4       I, Teresa K. Bear, Reporter-Notary Public,
5   authorized to administer oaths within and for the
6   Commonwealth of Pennsylvania and take depositions in the
7   trial of causés, do hereby certify that the foregoing is the
8   testimony of LARRY L. NEWTON.
9       I further certify that before the taking of
10  said deposition, the witness was duly sworn; that the
11  questions and answers were taken down stenographically by
12  the said Teresa K. Bear, a Reporter-Notary Public, approved
13  and agreed to, and afterwards reduced to typewriting under
14  the direction of the said Reporter.
15      I further certify that the proceedings and
16  evidence are contained fully and accurately to the best of
17  my ability in the notes taken by me on the within
18  deposition, and that this copy is a correct transcript of
19  the same.
20      In testimony whereof, I have hereunto
21  subscribed my hand this 27th day of June, 2001.
22
23      _____
        Teresa K. Bear, Reporter
24          Notary Public
        My commission expires
25          on April 13, 2003

13

P.04

*ENS.*
*Plan -*

# Huntingdon County     Planning Commission

(814) 643-5091

Court House - Huntingdon, Pennsylvania 16652

February 24, 2000

Mrs. Ann L. Wirth
Jackson Township Secretary
R.D. 1, Box 390
Petersburg, PA 16669

     RE:   David and Sandra Corneal Minor Subdivision

Dear Mrs. Wirth:

The Huntingdon County Planning Commission has reviewed the above referenced proposal to subdivide a property containing 94.67 acres into three lots. Lot 2 (the residue) contains 64.12 acres; Lot 3 contains 4.75 acres and Lot 4 contains 25.80 acres. Lot 1 was previously subdivided and is not included in this proposal. The property is located on the east side of Saw Mill Road (T-527) in Jackson Township. It is our understanding that Jackson Township has placed a moratorium on new subdivisions pending the adoption of a Subdivision and Land Development Ordinance.

The staff of the Planning Commission offers the following comments for your consideration:

1. The proposal is consistent with the draft Huntingdon County Comprehensive Plan. The land use proposed by the Plan for this area is Low Intensity Residential Use.

2. There are several physical limitations evident at the location of this proposal. Steep slopes (over 15%) can be found near the eastern boundary of the property in this proposal. No building construction should take place in steep slope areas. The soil types At, Atkins Silt Loam, and Ph, Philo and Basher Silt Loam, exist along Laurel Run, which runs through all the proposed lots. These are hydric soils and are typically found in wetland areas and near streams. The proposed house, studio, and sewage system for Lot 2 are within these soil types.

Blazosky Associates, Inc conducted a Wetlands Investigation of the project area for the developer. Further investigation should be done prior to approval to identify if wetland areas exist at the proposed construction site due to the snow cover during the



♻ *recycled paper*

EXHIBIT
**Wirth 11**
TKB   5-17-01

investigation and because maps submitted with the investigation did not identify the areas studied. No construction should take place in wetlands areas. No floodplains exist in the area of this proposal.

3. The Jackson Township Supervisors are in the process of adopting a Subdivision and Land Development Ordinance. The following comments are based on the draft Jackson Township Subdivision and Land Development Ordinance:

4. A new street is proposed on the plat to provide access to the lots in this development. Private streets (streets not offered for dedication to the Township) are prohibited unless they meet the design standards of the Ordinance (Section 502.A.6). This proposal would not be classified as a minor subdivision by the Ordinance. The definition of a Minor Subdivision in Section 204 is any subdivision containing not more than 4 lots fronting an existing street.

5. The proposal must comply with all requirements of Section 402, Preliminary Plan, and Section 403, Final Plan.

6. The following information required by Section 402 does not appear on the plat submitted:

   Existing contour lines (Section 402.A.9).

   Location and width of all streets, easements, right-of-ways, with a statement of any conditions governing their use (Section 402.A.14.a).

   Building Setback lines along each street (Section 402.A.14.b). Building Setbacks are as follows: 40' from all right-of-way lines, 15' from property lines (Section 504.C.4,5).

   Stormwater management information (Section 402.A.17.a through c).

   Supplementary data as applicable (Section 402.B)

   Section 403 requirements A through B.

7. The proposed street must also comply with Section 502 of the Ordinance. This section contains the required widths and specifications for a minor street. The Huntingdon County Planning Commission proposed a private driveway standard to Jackson Township in comments of the draft Ordinance on February 4, 2000. This standard, if adopted, in the Ordinance would provide a minimum standard for streets of this type.

8. A stream crossing will be necessary for the street to provide access to the lots as proposed. The developer indicated that he acquired the permit for this crossing. A copy of this permit must be submitted with other data to the Township prior to approval.

9.  A sewage easement is proposed for Lot 3 to use a portion of Lot 2 for the installation of a sewage system.  The easement should be described on the submitted plat (bearings, distances, acreage) so that a description can be included in each lot deed affected.

10.  The developer's surveyor indicated on the plat that a boundary discrepancy exists between the residual lot (Lot 2) and the adjacent property owner.  The Township's Solicitor may want to identify if any legal issues exist if the plan is approved without this boundary issue being resolved.

11.  A DEP Sewage Facilities Planning Module Component 1 was submitted as part of this proposal.  This module and accompanying data indicate soils suitable for on-lot sewage disposal.

12.  The Huntingdon County Planning Commission recommends disapproval of this proposal due to both the moratorium and the above comments.

Please contact this office with any questions concerning these comments.  As always, the local municipality is encouraged to carefully review the subdivision/sewage module for compliance with Township and State requirements.

Sincerely,

Richard E. Stahl
Planning Director

DBY
File GC,Sub,Mtg,C
Pc:      Corneal
         Simpson
         Rouzer

14

P.02



# HUNTINGDON COUNTY PLANNING COMMISSION

(814) 643-5091

Court House - Huntingdon, Pennsylvania 16652

April 20, 2000

Mrs. Ann L. Wirth
Jackson Township Secretary
R.D 1, Box 390
Petersburg, PA 16669

RE:  David B. and Sandra Y. Corneal Minor Subdivision

Dear Mrs. Wirth:

The Huntingdon County Planning Commission has reviewed the above referenced proposal to subdivide a property containing 94.67 acres into two lots. A proposal was submitted at the March 22, 2000 Planning Commission meeting for this property as a three lot subdivision. This proposal is a resubmission. Lot 2 (the residue) contains 68.87 acres and Lot 3 contains 25.80 acres. Lot 1 was previously subdivided and is not included in this proposal. The property in this proposal is located on the east side of Saw Mill Road (T-527) in Jackson Township. It is our understanding that Jackson Township has placed a moratorium on new subdivisions pending the adoption of a Subdivision and Land Development Ordinance.

The staff of the Planning Commission offers the following comments for your consideration:

1  The proposal is consistent with the draft Huntingdon County Comprehensive Plan. The land use proposed by the Plan for this area is Low Intensity Residential Use.

2. There are several physical limitations evident at the location of this proposal. Steep slopes (over 15%) can be found near the eastern boundary of the property in this proposal. No building construction should take place in these steep slope areas. The soil types At, Atkins Silt Loam, and Ph, Philo and Basher Silt Loam, exist along Laurel Run, which runs through the proposed lots. These are hydric soils and are typically found in wetland areas and near streams. The proposed house, studio, and sewage system for Lot 2 are within these soil types.



EXHIBIT
Wirth 10
TKB  5-17-01

Blazosky Associates, Inc conducted a Wetlands Investigation of the project area for the developer. A detailed map and study data identifying the investigation area was submitted and indicates that no wetlands are present at the location of the lots in this proposal. The Huntingdon County Conservation District has noted that widening of the existing lane to access the new dwelling on Lot 2 may impact potential wetland areas. Road improvements should be limited to existing cartway widths.

3. The Jackson Township Supervisors are in the process of adopting a Subdivision and Land Development Ordinance. The proposal appears to be in compliance with the regulations of the draft ordinance. The building setbacks shown on the plat are in compliance with the draft ordinance. The title certificate on the plat should be completed and notarized prior to recording of the plat.

4. A stream crossing will be necessary for the driveway for Lot 2 to provide access to the proposed structures shown on the plat. The developer indicated that he acquired the permit for this crossing. A copy of this permit must be submitted with other data to the Township prior to approval.

9. The developer's surveyor indicated on the plat that a boundary discrepancy exists between the residual lot (Lot 2) and the adjacent property owner. The Municipal Solicitor may want to identify the existence of any legal issues if the plan is approved without resolution of these boundary issues.

10. A DEP Sewage Facilities Planning Module Component 1 was submitted as part of this proposal. This module and accompanying data indicate soils suitable for on-lot sewage disposal.

11. The Huntingdon County Planning Commission recommends conditional approval of this proposal pending adoption of the Subdivision and Land Development Ordinance.

Please contact this office with any questions concerning these comments. As always, the local municipality is encouraged to carefully review the subdivision/sewage module for compliance with Township and State requirements.

Sincerely,

Richard E. Stahl
Planning Director

DBY
File:GC,Sub,Mtg,C
Pc:     Corneal
        Simpson
        Rouzer

# TABLE OF CONTENTS

Article II    General Provisions                    3

    Section 1.00  Intent                             3
            1.01  Applicability                      3
            1.02  Abrogation & Greater
                  Restrictions                       4
            1.03  Severability                       4
            1.04  Warning and Disclaimer
                  of Liability

Article II  Definitions                             4
    Section 2.00  General
            2.01  Specific Definitions               5

Article III Administration                          8
    Section 3.00  Building Permits
                  Required                           8
            3.01  Issuance of Building
                  Permits                            8
            3.02  Application Procedures
                  & Requirements                     9
            3.03  Review of Application
                  by Others                         12
            3.04  Changes                           12
            3.05  Placards                          12
            3.06  Start of Construction             12
            3.07  Inspection & Revocation           13
            3.08  Fees                              14
            3.09  Enforcement                       14
            3.10  Appeals                           15

Article IV    General Provisions                   16
    Section 4.00  Design Standards                  16

Article V    Floodplain Provisions                 16
    Section 5.00  Construction or
                  Development                       16
            5.01  Identification                    16

Article VI   Variances                             18
    Section 6.00  General                           18
            6.01  Variance Procedures
                  & Requirements                    18

Article VII  Technical Provisions                  20
    Section 7.00  General                           20
            7.01  Special Floodway &
                  Stream Setback
                  Requirements                      20
            7.02  Elevation and Flood-
                  proofing Requirements             21

2

|  | 7.03 | Design and Construction Standards | 22 |
|  | 7.04 | Development Which May Endanger Human Life | 25 |
|  | 7.05 | Special Requirements for Manufactured Homes | 26 |

Article VIII General 27
Section 8.00 General 27
8.01 Application Requirements for Special Permits 27
8.02 Application Review Procedures 30
8.03 Special Technical Requirements 31

Article IX Existing Structures in Identified Floodplain Areas 32
Section 9.00 General 32

AN ORDINANCE REQUIRING ALL PERSONS, PARTNERSHIPS, BUSINESSES AND CORPORATIONS TO OBTAIN A BUILDING PERMIT FOR THE CONSTRUCTION, RECONSTRUCTION, EN-LARGEMENT, ALTERATION, OR RELOCATION OF ANY BUILD-ING OR STRUCTURE:  PROVIDING FOR THE ISSUANCE OF SUCH BUILDING PERMITS; AND PROVIDING FOR PENALTIES FOR ANY PERSONS WHO FAIL OR REFUSE TO COMPLY WITH THE REQUIREMENTS OR PROVISIONS OF THE ORDINANCE.

BE IT ENACTED AND ORDAINED BY the Jackson Township Supervisors, Huntingdon County, Pennsylvania, and it is hereby enacted and ordained by the authority of the same as follows:

ARTICLE I   GENERAL PROVISIONS

Section 1.00   Intent

The intent of this Ordinance is to:

A.   Promote the general health, welfare, and safety of the community.

B.   Encourage the utilization of appropriate construction practices in order to prevent or minimize flood damage in the future.

C.   Minimize danger to public health by protecting water supply and natural drainage.

D.   Reduce financial burdens imposed on the community, its governmental units, and its residents, by preventing excessive development in areas subject to flooding.

E.   Comply with federal and state floodplain management requirements.

Section 1.01.   Applicability

A.   It shall be unlawful for any person, partnership, business, or corporation to undertake, or cause to be undertaken, any construction or development anywhere within the Township unless a Building Permit has been obtained from the Building Permit Officer.

B.   A building permit shall not be required for minor repairs to existing buildings or structures.

Section 1.02  Abrogation and Greater Restrictions

This Ordinance supersedes any other conflicting provisions which may be in effect in identified floodplain areas. However, any other Ordinance provisions shall remain in full force and effect to the extent that those provisions are more restrictive. If there is any conflict between any of the provisions of this Ordinance, the more restrictive shall apply.

Section 1.03  Severability

If any section, subsection, paragraph, sentence, clause, or phrase of this Ordinance should be declared invalid for any reason whatsoever, such decision shall not affect the remaining portions of this Ordinance which shall remain in full force and effect, and for this purpose, the provisions of this Ordinance are hereby declared to be severable.

Section 1.04  Warning and Disclaimer of Liability

The degree of flood protection sought by the provisions of this Ordinance is considered reasonable for regulatory purposes and is based on acceptable engineering methods of study. Larger floods may occur. Flood heights may be increased by man-made or natural causes, such as ice jams and bridge openings restricted by debris. This Ordinance does not imply that areas outside any identified floodplain area, or that land uses permitted within such areas will be free from flooding or flood damages.

This Ordinance shall not create liability on the Part of the Township or any officer or employee thereof for any flood damages that result from reliance on this Ordinance or any administrative decision lawfully made thereunder.

ARTICLE II  DEFINITIONS

Section 2.00  General

Unless specifically defined below, words and phrases used in this Ordinance shall be interpreted so as to give this Ordinance its most reasonable application.

Section 2.01 Specific Definitions

A.   Accessory use or structure - a use of structure on
     the same lot with, and of a nature customarily
     incidental and subordinate to, the principal use
     or structure.

B.   Building - a combination of materials to form a
     permanent structure having walls and a roof.
     Included shall be all manufactured homes and
     trailers to be used for human habitation.

C.   Completely dry space - a space which will remain
     totally dry during flooding; the structure is
     designed and constructed to prevent the passage of
     water and water vapor.

D.   Construction - the construction, reconstruction,
     renovation, repair, extension, expansion, altera-
     tion, or relocation of a building or structure,
     including the placement of manufactured homes.

E.   Development - any man-made change to improved or
     unimproved real estate, including but not limited
     to buildings or other structures, the placement of
     manufactured homes, streets, and other paving,
     utilities, filling, grading, excavation, mining,
     dredging, or drilling operations and the
     subdivision of land.

F.   Essentially dry space - a space which will remain
     dry during flooding, except for the passage of
     some water vapor or minor seepage; the structure
     is substantially impermeable to the passage of
     water.

G.   Flood - a temporary inundation of normally dry
     land areas.

H.   Floodplain - a relatively flat or low land area
     which is subject to partial or complete inundation
     from an adjoining or nearby stream, river, or
     watercourse; and/or any area subject to the
     unusual and rapid accumulation of surface waters
     from any source.

I.   Floodproofing - means any combination of
     structural and non-structural additions, changes,
     or adjustments to structures which reduce or
     eliminate flood damage to real estate or improved
     real property, water and sanitary facilities,
     structures, and their contents.

J   FW   (Floodway Area) - the areas identified as
    "Floodway" in the Flood Insurance Study prepared
    by FEMA.  The term shall also include floodway
    areas which have been identified in other
    available studies or sources of information for
    those floodplain areas where no floodway has been
    identified in the Flood Insurance Study prepared
    by FEMA.

K.  FF   (Flood-Fringe Area) - the areas identified as
    "Floodway Fringe" in the Flood Insurance Study
    prepared by FEMA.

L.  Identified Floodplain Area - the floodplain area
    specifically identified in this Ordinance as being
    inundated by the one hundred (100) year flood.
    Included would be areas identified as Floodway
    (FW), Flood-Fringe (FF), and General Flood Plain
    (FA).

M.  Land Development - (i) the improvement of one lot,
    or two or more contiguous lots, tracts, or parcels
    of land for any purpose involving: (a) a group of
    two or more buildings, or (b) the division or
    allocation of land or space between or among two
    or more existing or prospective occupants by means
    of, or for the purpose of streets, common areas,
    leaseholds, condominiums, building groups, or
    other features; (ii) a subdivision of land.

N.  Lowest Floor - means the lowest floor of the
    lowest enclosed area (including basement).  An
    unfinished or flood resistant enclosure, usable
    soley for parking of vehicles, building access or
    storage in an area other than a basement area is
    not considered a building's lowest floor;
    Provided, that such enclosure is not built so as
    to render the structure in violation of the
    applicable non-evevation design requirements of 44
    CFR - 60.3

O.  Minor repair - the replacement of existing work
    with equivalent materials for the purpose of its
    routine maintenance and upkeep, but not including
    the cutting away of any wall, partition or portion
    thereof, the removal or cutting of any structural
    beam or bearing support, or the removal or change
    of any required means of egress, or rearrangement
    of parts of a structure affecting the exitway
    requirements; nor shall minor repairs include
    addition to, alteration of, replacement or
    relocation of any standpipe, water supply, sewer,
    drainage, drain leader, gas, soil, waste, vent or
    similar piping, electric wiring or mechanical or

other work affecting public health or general safety.

P.  Manufactured home - a structure, transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities. The term includes park trailers, travel trailers, recreational, and other similar vehicles placed on a site for more than 180 consecutive days.

Q.  Manufactured home park - a parcel (or contiguous parcels) of land which has been planned and improved for the placement of two or more manufactured homes.

R.  Obstruction - any wall, dam, wharf, embankment, levee, dike, pile abutment, projection, excavation, channel, rectification, culvert, building, fence, stockpile, refuse, fill, structure, or matter in, along, across, or projecting into any channel, watercourse, or flood-prone area, (i) which may impede, retard, or change the direction of the flow of water either in itself or by catching or collecting debris carried by such water, or (ii) which is placed where the flow of the water might carry the same downstream to the damage of life and property.

S.  One hundred year flood - a flood that, on the average, is likely to occur once every one hundred (100) years (i.e. that has a one (1) percent chance of occurring each year, although the flood may occur in any year).

T.  Person - an individual, partnership, public or private association or corporation, firm, trust, estate, municipality, governmental unit, public utility, or any other legal entity whatsoever which is recognized by law as the subject of rights and duties.

U.  Regulatory flood elevation - the one hundred (100) year flood elevation plus a freeboard safety factor of one and one-half (1 1/2) feet.

V.  Special permit - a special approval which is required for hospitals, nursing homes, jails, and new manufactured home parks and subdivisions, and substantial improvements to such existing parks, when such development is located in all, or a designated portion of a floodplain.

8

W.   Structure - anything constructed or erected on the
ground, or attached to the ground including, but
not limited to buildings, sheds, manufactured
homes, and other similar items.

X.   Subdivision - the division or redivision of a lot,
tract, or parcel of land by any means into two or
more lots, tracts, parcels, or other division of
land, including changes in existing lot lines for
the purpose, whether immediate or future, of
lease, transfer of ownership, or building, or lot
development, provided however, that the division
of land for agricultural purposes into parcels of
more than ten (10) acres, not involving any new
street or easement of access, shall be exempted.

Y.   Substantial Improvement - any repair,
reconstruction, or improvement of a structure, the
cost of which equals or exceeds 50 percent of the
market value of the structure either, (a) before
the improvement or repair is started, or (b) if
the stricture has been damaged, and is being
restored, before the damage occurred.

ARTICLE III   ADMINISTRATION

Section 3.00   Building Permits Required

Building permits shall be required before any
construction or development is undertaken within any
area of the Township.

Section 3.01   Issuance of Building Permits

A.   The Building Permit Officer shall issue a building
permit only after it has been determined that the
proposed work to be undertaken will be in
conformance with the requirements of this and all
other applicable codes and ordinances.

B.   Prior to the issuance of any building permit, the
Building Permit Officer shall review the
application for permit to determine if all other
necessary governmental permits required by State
and Federal laws have been obtained, such as those
required by the Pennsylvania Sewage Facilities Act
(Act 1966-537, as amended); the Dam Safety and
Encroachments Act (Act 1978-325, as amended); the
US Clean Water Act, Section 404, 33, USC 1334; and
the Pennsylvania Clean Streams Act (Act 1937-394,
as amended).   Highway Occupancy Permit (Act 1986-
43)   No permit shall be issued until this
determination has been made.

C.   No encroachment, alteration, or improvement of any
     kind shall be made to any watercourse until all
     adjacent municipalities which may be affected by
     such action have been notified by the municipality
     and until all required permits or approvals have
     been first obtained from the Department of
     Environmental Resources, Bureau of Dams and
     Waterway Management.

     In addition, the Federal Emergency Management
     Agency and Pennsylvania Department of Community
     Affairs, Bureau of Community Planning, shall be
     notified by the municipality prior to any
     alteration or relocation of any watercourse.

Section 3.02   Application Procedures and Requirements

A.   Application for such a building permit shall be
     made, in writing, to the Building Permit Officer
     on forms supplied by the Township.  Such
     applications shall contain the following:

     1.   Name and address of applicant.

     2.   Name and address of owner of land on which
          proposed construction is to occur.

     3.   Name and address of contractor.

     4.   Site location.

     5.   Listing of other permits required.

     6.   Brief description of proposed work and
          estimated cost.

     7.   A plan of the site showing the size
          and location of the proposed construction as
          well as any existing buildings or structures.

B.   If any proposed construction or development is
     located entirely or partially within any
     identified floodplain area, applicants for
     Building Permits shall provide all the necessary
     information in sufficient detail and clarity to
     enable the Building Permit Officer to determine
     that:

     (a)  all such proposals are consistent with the
          need to minimize flood damage and conform

with the requirements of this and all other
applicable codes and ordinances;

(b)   all utilities and facilities, such as sewer,
gas, electrical, and water systems are
located and constructed to minimize or
eliminate flood damage; and

(c)   adequate drainage is provided so as to reduce
exposure to flood hazards.

Applicants shall file the following minimum
information, plus any other pertinent information
as may be required by the Building Permit Officer
to make the above determination:

1.   A completed Building Permit Application Form.

2.   A plan of the entire site, clearly and
legibly drawn at a scale of one (1) inch
being equal to one hundred (100) feet or
less, showing the following:

   a.   north arrow, scale, and date;

   b.   topographic contour lines, if available;

   c.   all property and lot lines including
dimensions, and the size of the site
expressed in acres or square feet;

   d.   the location of all existing and
proposed buildings, structures, and
other improvements, including the
location of any existing or proposed
subdivision and land development;

   e.   the location of all existing streets,
drives, and other accessways; and

   f.   the location of any existing bodies of
water or watercourses, identified
floodplain areas, and, if available,
information pertaining to the floodway,
and the flow of water, including
direction and velocities.

3.   Plans of all proposed buildings, structures, and
other improvements, drawn at suitable scale
showing the following:

a. the proposed lowest floor elevation of any proposed building based upon National Geodetic Vertical Datum of 1929;

b. the elevation of the one hundred (100) year flood;

c. if available, information concerning flood depths, pressures, velocities, impact and uplift forces, and other factors associated with a one hundred (100) year flood; and

d. detailed information concerning any proposed floodproofing measures.

4. The following data and documentation:

a. documentation, certified by a registered professional engineer or architect, to show that the cumulative effect of any proposed development within an AE Area/District, when combined with all other existing and anticipated development, will not increase the elevation of the one hundred (100) year flood more than one foot at any point.

b. a document, certified by a registered professional engineer or architect, which states that the proposed construction or development has been adequately designed to withstand the one hundred (100) year flood elevations, pressures, velocities, impact, and uplift forces associated with the one hundred (100) year flood.

Such a statement shall include a description of the type and extent of flood-proofing measures which have been incorporated into the design of the structure and/or the development.

c. detailed information needed to determine compliance with Section 7.03 F., Storage, and Section 7.04, Development Which May Endanger Human Life, including:

(i) the amount, location, and purpose of any materials or substances referred to in Sections 7.03 F and 7.04 which are intended to be used, produced, stored, or otherwise maintained on site.

(ii) a description of the safeguards incorporated into the design of the

proposed structure to prevent leaks or
spills of the dangerous materials or
substances listed in Section 7.04 during
a one hundred (100) year flood.

d.  the appropriate component of the Department
of Environmental Resources "Planning Module
for Land Development."

e.  where any excavation or grading is proposed,
a plan meeting the requirements of the
Department of Environmental Resources, to
implement and maintain erosion and
sedimentation control.

Section 3.03  Review of Application by Others

A copy of all plans and applications for any proposed
construction or development in any identified
floodplain area to be considered for approval may be
submitted by the Building Permit Officer to any other
appropriate agencies and/or individuals (e.g. planning
commission, municipal engineer, etc.) for review and
comment.

Section 3.04  Changes

After the issuance of a building permit by the Building
Permit Officer, no changes of any kind shall be made to
the application, permit, or any of the plans,
specifications, or other documents submitted with the
application without the written consent or approval of
the Building Permit Officer. Requests for any such
change shall be in writing, and shall be submitted by
the applicant to the Building Permit Officer for
consideration.

Section 3.05  Placards

In addition to the building permit, the Building Permit
Officer shall issue a placard which shall be displayed
on the premises during the time construction is in
progress. This placard shall show the number of the
building permit, the date of its issuance, and be
signed by the Building Permit Officer.

Section 3.06  Start of Construction

Work on the proposed construction shall begin within
six (6) months and shall be completed within twelve
(12) months after the date of issuance of the building
permit or the permit shall expire unless a time
extension is granted, in writing, by the Building
Permit Officer. Construction shall be considered to

have started with the first placement of permanent
construction on the site, such as the pouring of slabs
or footings or any work beyond the stage of excavation.
For a structure without a basement or poured footings,
the start of construction includes the first permanent
framing or assembly of the structure or any part
thereof on its pilings or foundation, or the affixing
of any prefabricated structure or mobile home to its
permanent site.  Permanent construction does not
include land preparation, land clearing, grading,
filling; excavation for basement, footings, piers, or
foundations; erection of temporary forms; the
installation of piling under proposed subsurface
footings; or the installation of sewer, gas, and water
pipes, or electric or other service lines from the
street.

*note*

The extension shall be granted only if a written
request is submitted by the applicant, which sets forth
sufficient and reasonable cause for the Building Permit
Officer to approve such a request.

Section 3.07   Inspection and Revocation

    A.    During the construction period, the Building
Permit Officer or other authorized official may
inspect the premises to determine that the work is
progressing in compliance with the information
provided on the permit application and with all
applicable municipal laws and ordinances.  He
shall make as many inspections during and upon
completion of the work as are necessary.

    B.    In the discharge of his duties, the Building
Permit Officer shall have the authority to enter
any building, structure, premises or development
in the identified floodplain area, upon
presentation of proper credentials, at any
reasonable hour to enforce the provisions of this
ordinance.

    C.    In the event the Building Permit Officer discovers
that the work does not comply with the permit
applications or any applicable laws and
ordinances, or that there has been a false
statement or misrepresentation by any applicant,
the Building Permit Officer shall revoke the
building permit and report such facts to the
Supervisors for whatever action they consider
necessary.

    D.    A record of all such inspections and violations of
this Ordinance shall be maintained.

## Section 3.08 Fees

Applications for a building permit shall be accompanied by a fee, payable to the municipality, based upon the estimated cost of the proposed construction, as determined by the Building Permit Officer, at the following rates:

| Building Cost | Fee |
|---|---|
| $0 - $999 Dollars | $10.00 |
| $1,000 + | $20.00 |
| Non-Buildings (eg. fences, above ground pools, filling, grading, excavating, paving, utilities, mining, dredging etc.) | $ 0.00 |

*Fee Schedule*

*Fee Schedule Scale*

## Section 3.09 Enforcement

A. Notices

Whenever the Building Official or other authorized municipal representative determines that there are reasonable grounds to believe that there has been a violation of any provision of this Ordinance, or of any regulations adopted pursuant thereto, such authority shall give notice of such alleged violation as hereinafter provided. Such notice shall (a) be in writing; (b) include a statement of the reasons for its issuance; (c) allow a reasonable time for the performance of any act it requires; (d) be served upon the property owner or his agent as the case may require; provided, however, that such notice or order shall be deemed to have been properly served upon such owner or agent when a copy thereof has been served with such notice by any other method authorized or required by the laws of this state; (e) contain an outline of remedial action which, if taken, will affect compliance with the provisions of this Ordinance, or any part thereof, and with the regulations adopted pursuant thereto.

B. Penalties

Any person who fails to comply with any or all of the requirements or provisions of this Ordinance or who fails or refuses to comply with any notice, order, or direction of the Building Permit Officer

or any other authorized employee of the
municipality, shall be guilty of an offense and,
upon conviction, shall pay a fine to the Township
of not less than Twenty-five Dollars ($25) nor
more than Three Hundred Dollars ($300), plus costs
of prosecution.  In default of such payment, such
person shall be imprisoned in county prison for a
period not to exceed ten (10) days.  Each day
during which any violation of this Ordinance
continues shall constitute a separate offense.  In
addition to the above penalties all other actions
are hereby reserved including an action in equity
for the proper enforcement of this Ordinance.  The
imposition of a fine or penalty for any violation
of, or noncompliance with, this Ordinance shall
not excuse the violation or noncompliance or
permit it to continue; and all such persons shall
be required to correct or remedy such violations
and noncompliances within a reasonable time.  Any
structure or building construction, reconstructed,
enlarged, altered, or relocated, in noncompliance
with this Ordinance may be declared by the
Supervisors to be a public nuisance and abatable
as such.

## Section 3.10   Appeals

A.   Any person aggrieved by an action or decision of
the Building Permit Officer involving
administration of the provisions of the Ordinance
may appeal to the Township Supervisors.  Such
appeal must be filed, in writing, within thirty
(30) days after the decision or action by the
Building Permit Officer.

B.   Upon receipt of such appeal, the Township
Supervisors shall set a time and place, within not
less than ten (10) nor more than thirty (30) days,
for the purpose of considering the appeal.  Notice
of the time and place of the hearing of the appeal
shall be given to all the parties.

C.   Any person aggrieved by any decision of the
Supervisors may seek relief therefrom by appeal to
court, as provided by the laws of the
Commonwealth, including the Pennsylvania Flood
Plain Management Act.

## ARTICLE IV GENERAL PROVISIONS

## Section 4.00   Design Standards

The plans and specifications submitted as provided
in Section 3.02 above shall conform to the

following requirements, and any building
constructed within the Township, or any addition
to any existing building therein, must conform to
the following requirements:

A.  No building shall be located closer than
    forty (40) feet from the street right-
    of-way or sixty-five (65) feet from the
    street centerline.

B.  No building shall be located closer than
    fifteen (15) feet from any property line, and
    no residence shall be constructed within
    thirty (30) feet of an existing residential
    structure.

C.  No building or structure shall be constructed
    closer than fifty (50) feet from the top-of-
    bank of any watercourse.

ARTICLE V   FLOODPLAIN PROVISIONS

Section 5.00   Construction or Development

A.  Any new construction, development, uses or
    activities allowed within any identified
    floodplain area, shall be undertaken in strict
    compliance with the provisions contained in this
    Ordinance and any other applicable codes,
    ordinances and regulations.

B.  Repairs, improvements, or modifications to an
    existing structure which amount to less than fifty
    (50) percent of the market value are permitted
    provided such work does not result in the
    expansion or enlargement of the structure.

Section 5.01   Identification

A.  For the purposes of this Ordinance, the
    areas considered to be floodplain within
    the Township shall be those areas
    identified as being subject to flooding by
    a one hundred (100) year flood in the Flood
    Insurance Study prepared for the Township
    by the Federal Emergency Management Agency or
    the most recent revision thereof, or the
    areas shown as such on the most recent (FIRM)
    Flood Insurance Rate Map.

B.  A map showing all areas considered to be
    subject to the one hundred (100) year flood
    is available for inspection at the Township
    office.  For the purposes of this Ordinance,

the following nomenclature is used in referring to the various kinds of floodplain areas:

AE The AE Area/District shall be those areas identified as an AE Zone on the FIRM included in the FIS prepared by FEMA and for which one hundred (100) year flood elevations have been provided in the FIS.

FA (General Floodplain Area) - the areas identified as "Approximate 100 year Floodplain" in the Flood Insurance Study prepared by FEMA.

C. The FA (General Floodplain Area) shall be that floodplain for which no detailed flood elevations or floodway information is provided. Such areas are shown as Zone A on the maps accompanying the Flood Insurance Study prepared by FEMA. For these areas, elevation and floodway information from other Federal, State, or other acceptable sources, shall be used when available. When such other acceptable information is not available, the applicant for the proposed use, development, or activity shall determine the one hundred (100) year flood elevation in accordance with hydrologic and hydraulic engineering techniques.

D. The identified floodplain area may be revised or modified by the Township Supervisors where studies or information provided by a qualified agency or person documents the need for such revision or modification. However, prior to any such change, approval must be obtained from the Federal Emergency Management Agency.

E. Should a dispute concerning any identified floodplain boundary arise, any party aggrieved by such determination may appeal to the Supervisors. The burden of proof shall be on the appellant.

F. The Municipality reserves the right to require the applicant to delineate a floodway area and provide sufficient documentation to demonstrate that his proposed activity, together with all other existing and

anticipated development, uses, and activities, will not increase the water surface elevation of the one hundred (100) year flood more than one (1) foot at any point. The engineering principle of equal reduction of conveyance, shall be used to make the determination of increases in flood heights.

G. Hydrologic and hydraulic analyses shall be undertaken only by professional engineers or others of demonstrated qualifications, who shall certify that the technical methods used correctly reflect currently accepted technical concepts. Studies, analyses, computations, etc., shall be submitted in sufficient detail to allow a thorough technical review by the Township.

## ARTICLE VI   VARIANCES

## Section 6.00   General

If compliance with any of the requirements of this ordinance would result in an exceptional hardship to a prospective builder, developer or landowner, the Township Supervisors may, upon request, grant relief from the strict application of the requirements.

## Section 6.01   Variance Procedures and Requirements

Requests for variance shall be considered by the Township Supervisors in accordance with the following:

A. No variance shall be granted for any construction, development, use, or activity within any floodway area that would cause any increase in the one hundred (100) year flood elevation.

B. Except for a possible modification of the one and one-half (1 1/2) foot freeboard requirements, no variance shall be granted for any of the other requirements pertaining specifically to development regulated by Special Permits (Article VIII) or to Development Which May Endanger Human Life (Section 7.04).

C. If granted, a variance shall involve only the least modification necessary to provide relief.

D. In granting any variance, the Township shall attach whatever reasonable conditions and safeguards it considers necessary in order to

protect public health, safety, and welfare, and to achieve the objectives of this Ordinance.

E.   Whenever a variance is granted, the Township shall notify the applicant in writing that:

    a.   the granting of the variance may result in increased premium rates for flood insurance.

    b.   such variances may increase the risks to life and property.

F.   In reviewing any request for a variance, the Township shall consider, but be limited to, the following:

    a.   that there is good and sufficient cause.

    b.   that failure to grant the variance would result in exceptional hardship to the applicant.

    c.   that the granting of the variance will (i) neither result in an unacceptable or prohibited increase in flood heights, additional threats to public safety, or extraordinary public expenses; (ii) nor create nuisances, cause fraud on, or victimize the public, or conflict with any other applicable State statute or regulations, or local ordinances or regulations.

G.   A complete record of all variance requests and related actions shall be maintained by the Township.  In addition, a report of all variances granted during the year shall be included in the annual report to the Federal Emergency Management Agency.

Not withstanding any of the above, however, all structures shall be designed and constructed so as to have the capability of resisting the one hundred (100) year flood.

ARTICLE VII  TECHNICAL PROVISIONS

Section 7.00  General

A.   No encroachment, alteration, or improvement of any kind shall be made to any watercourse until all adjacent municipalities which may be affected by such action have been notified by the

20

municipality, and until all required permits or approvals have been first obtained from the Department of Environmental Resources, the Bureau of Dams and Waterway Management.

In addition, the Federal Emergency Management Agency and Pennsylvania Department of Community Affairs, Bureau of Community Planning, shall be notified prior to any alteration or relocation of any watercourse.

B.   Any new construction, development, uses, or activities allowed within any identified floodplain area, shall be undertaken in strict compliance with the provisions contained in this Ordinance and any other applicable codes, ordinances, and regulations.

C.   Within any AE Area/District, no new construction or development shall be allowed unless it is demonstrated that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the elevation of the one (100) year flood more than one (1) foot at any point.

Section 7.01   Special Floodway and Stream Setback Requirements

A.   Within any floodway area, the following provisions apply:

1.   Any new construction, development, use, activity, or encroachment that would cause any increase in flood heights shall be prohibited.

2.   No new construction or development shall be allowed, unless a permit is obtained from the Department of Environmental Resources, Bureau of Dams and Waterway Management.

B.   Within any FA (General Floodplain Area) or AE Area, the following provisions apply:

1.   No new construction or development shall be located within the area measured fifty (50) feet landward from the top-of-bank of any watercourse, unless a permit is obtained from the Department of Environmental Resources, Bureau of Dams and Waterway Management.

2.    Any new construction, development, use,
      activity, or encroachment which would cause
      any increase in flood heights shall be
      prohibited within a floodway area delineated
      by an applicant.

## Section 7.02   Elevation and Floodproofing Requirements

A.    Residential Structures

Within any Identified Flood Plain Area, the lowest
floor (including the basement) of any new or
substantially improved residential structure shall
be at least one and one-half (1 1/2) feet above
the one hundred (100) year flood elevation.

B.    Non-Residential Structures

1.    Within any Identified Flood Plain Area, the
      lowest floor (including the basement) of any
      new or substantially improved non-residential
      structure shall be at least one and one-half
      (1 1/2) feet above the one hundred (100) year
      flood elevation, or be designed and
      constructed so that the space enclosed by
      such structure shall remain either completely
      or essentially dry during any flood up to
      that height.

2.    Any non-residential structure, or part
      thereof, having a lowest floor (including
      basement) which is not elevated to at least
      one and one half (1 1/2) feet above the one
      hundred year flood elevation, shall be
      floodproofed in a completely or essentially
      dry manner in acordance with the W-1 or W-2
      space classification standards contained in
      the publication entitled "Flood-Proofing
      Regulations" published by the U.S. Army Corps
      of Engineers (June 1972), or with some other
      equivalent standard.  All plans and
      specifications for such floodproofing shall
      be accompanied by a statement certified by a
      registered professional engineer or architect
      which states that the proposed design and
      methods of construction are in conformance
      with the above referenced standards.

C.    Enclosed Areas Below the Lowest Floor

Enclosed areas below the lowest floor (including
the basement) are prohibited.

## Section 7.03   Design and Construction Standards

The following standards shall apply for all
construction and development proposed within any
identified floodplain area:

A.   Fill

If fill is used, it shall:

1.   extend laterally at least fifteen (15) feet
     beyond the building line from all points.

2.   consist of soil or small rock materials only.
     Sanitary Landfills shall not be permitted.

3.   be compacted to provide the necessary
     permeability and resistance to erosion,
     scouring, or settling.

4.   be no steeper than one (1) vertical to two
     (2) horizontal, unless substantiated data,
     justifying steeper slopes are submitted to,
     and approved by the Building Permit Officer.

5.   be used to the extent to which it does not
     adversely affect adjacent properties.

B.   Drainage

Storm drainage facilities shall be designed to
convey the flow of storm water runoff in a safe
and efficient manner.  The system shall insure
proper drainage along streets, and provide
positive drainage away from buildings.  The system
shall also be designed to prevent the discharge of
excess runoff onto adjacent properties.

C.   Water and Sanitary Sewer Facilities and Systems

1.   All new or replacement water and sanitary
     sewer facilities and systems shall be
     located, designed, and constructed to
     minimize or eliminate flood damages and the
     infiltration of flood waters.

2.   Sanitary sewer facilities and systems shall
     be designed to prevent the discharge of
     untreated sewage into flood waters.

3.   No part of any on-site sewage system shall be
     located within any identified flooplain area
     except in strict compliance with all State
     and local regulations for such systems.  If
     any such system is permitted, it shall be

located so as to avoid impairment to it, or contamination from it, during a flood.

D.  Other Utilities

All other utilities, such as, gas lines, electrical and telephone systems shall be located, elevated (where possible) and constructed to minimize the chance of impairment during a flood.

E.  Streets

The finished elevation of all new streets shall be no more than one (1) foot below the Regulatory Flood Elevation.

F.  Storage

All materials that are buoyant, flammable, explosive or, in times of flooding, could be injurious to human, animal, or plant life, and not listed in Section 7.04, Development Which May Endanger Human Life, shall be stored at or above the Regulatory Flood Elevation and/or floodproofed to the maximum extent possible.

G.  Placement of Buildings and Structures

All buildings and structures shall be designed, located, and constructed so as to offer the minimum obstruction to the flow of water and shall be designed to have a minimum effect upon the flow and height of flood water.

H.  Anchoring

1.  All buildings and structures shall be firmly anchored in accordance with accepted engineering practices to prevent flotation, collapse, or lateral movement.

2.  All air ducts, large pipes, storage tanks, and other similar objects or components located below the Regulatory Flood Elevation shall be securely anchored or affixed to prevent flotation.

I.  Floors, Walls, and Ceilings

1.  Wood flooring used at or below the Regulatory Flood Elevation shall be installed to accommodate a lateral expansion of the flooring, perpendicular to the flooring grain

without causing structural damage to the
building.

2.  Plywood used at or below the Regulatory Flood
    Elevation shall be designed and constructed
    of materials that are water-resistant and
    will withstand inundation.

3.  Walls and ceilings at or below the Regulatory
    Flood Elevation shall be designed and
    constructed of materials that are water-
    resistant and will withstand inundation.

4.  Windows, doors, and other components at or
    below the Regulatory Flood Elevation shall be
    made of metal or other water-resistant
    material.

J.  Paints and Adhesives

1.  Paints or other finishes used at or below the
    Regulatory Flood Elevation shall be of a
    "marine" or water-resistant quality.

2.  Adhesives used at or below the Regulatory
    Flood Elevation shall be of a "marine" or
    water-resistant quality.

3.  All wooden components (doors, trim, cabinets,
    etc.) used at or below the Regulatory Flood
    Elevation shall be finished with a "marine"
    or water-resistant paint or other finishing
    material.

K.  Electrical Components

1.  Electrical distribution panels shall be at
    least three (3) feet above the one hundred
    (100) year flood elevation.

2.  Separate electrical circuits shall serve
    lower levels and shall be dropped from above.

L.   Equipment

Water heaters, furnaces, air conditioning, and
ventilating units, and other electrical,
mechanical, or utility equipment or apparatus
shall not be located below the Regulatory Flood
Elevation.

M.   Fuel Supply Systems

All gas and oil supply systems shall be designed
to prevent the infiltration of flood waters into
the system and discharges from the system into
flood waters.  Additional provisions shall be made
for the drainage of these systems in the event
that flood water infiltration occurs.

Section 7.04   Development Which May Endanger Human Life

A.   In accordance with the Pennsylvania Flood Plain
Management Act, and the regulations adopted by the
Department of Community Affairs as required by the
Act, any new or substantially improved structure
which:

- will be used for the production or storage of
any of the following dangerous materials or
substances; or,

- will be used for any activity requiring the
maintenance of a supply of more than 550 gallons,
or other comparable volume, of any of the
following dangerous materials or substances on the
premises; or,

- will involve the production, storage, or use of
any amount of radioactive substances;

shall be subject to the provisions of this
section, in addition to all other applicable
provisions.  The following list of materials and
substances are considered dangerous to human life:

a.   Acetone
b.   Ammonia
c.   Benzene
d.   Calcium carbide
e.   Carbon disulfide
f.   Celluloid
g.   Chlorine
h.   Hydrochloric acid
i.   Hydrocyanic acid
j.   Magnesium
k.   Nitric acid and oxides of nitrogen

l. Petroleum products (gasoline, fuel oil, etc.)
m. Phosphorus
n. Potassium
o. Sodium
p. Sulphur and sulphur products
q. Pesticides (including insecticides, fungicides, and rodenticides)
r. Radioactive substances, insofar as such substances are not otherwise regulated.

B. Within any FW (Floodway Area), any structure of the kind described in Subsection A, above, shall be prohibited.

C. Within any FA (General Floodplain Area), any structure of the kind described in Subsection A, above, shall be prohibited within the area measured fifty (50) feet landward from the top-of-bank of any watercourse.

D. Where permitted within any FF (Flood-Fringe Area) or FA (General Floodplain Area) or AE Area, any structure of the kind described in Subsection A, above shall be:

1. elevated or designed and constructed to remain completely dry up to at least one and one-half (1 1/2) feet above the one hundred (100) year flood and

2. designed to prevent pollution from the structure or activity during the course of a one hundred (100) year flood.

Any such structure, or part thereof, that will be built below the Regulatory Flood Elevation shall be designed and constructed in accordance with the standards for completely dry flood-proofing contained in the publication "Flood-Proofing Regulations" (U.S. Army Corps of Engineers, June 1972), or with some other equivalent watertight standard.

Section 7.05  Special Requirements for Manufactured Homes

A. With any floodway area, manufactured homes shall be prohibited.

B. Within any FA (General Floodplain Area) or AE Area, manufactured homes shall be prohibited

within the area measured fifty (50) feet landward from top-of-bank of any watercourse.

C.  Where permitted within any floodplain area, all manufactured homes, and any additions thereto, shall be:

   1.  placed on a permanent foundation.

   2.  elevated so that the lowest floor of the manufactured home is one and one half (1 1/2) feet or more above the elevation of the one hundred (100) year flood.

   3.  anchored to resist flotation, collapse, or lateral movement.

ARTICLE VIII

Section 8.00   General

In accordance with the administration regulations promulgated by the Department of Community Affairs to implement the Pennsylvania Flood Plain Management Act, the following activities shall be prohibited within any identified floodplain area unless a Special Permit has been issued by the Township.

A.  The commencement of any of the following activities; or the construction, enlargement, or expansion of any structure used, or intended to be used, for any of the following activities:

   1.  hospitals

   2.  nursing homes

   3.  jails or prisons

B.  The commencement of, or any construction of, a new manufactured home park or manufactured home subdivision, or substantial improvement to an existing manufactured home park or manufactured home subdivision.

Section 8.01   Application Requirements for Special Permits

Applicants for Special Permits shall provide five copies of the following items:

A.  A written request including a completed Building Permit Application Form.

B.   A small scale map showing the vicinity in which
     the proposed site is located.

C.   A plan of the entire site, clearly and legibly
     drawn at a scale of one (1) inch being equal to
     one hundred (100) feet or less, showing the
     following:

     1.   north arrow, scale, and date;

     2.   topography based upon the National Geodetic
          Vertical Datum of 1929, showing existing and
          proposed contours at intervals of two (2)
          feet;

     3.   all property and lot lines including
          dimensions, and the size of the site
          expressed in acres or square feet;

     4.   the location of all existing streets, drives,
          other accessways, and parking areas, with
          information concerning widths, pavement types
          and construction, and elevations;

     5.   the location of any existing bodies of water
          or watercourses, buildings, structures, and
          other public or private facilities, including
          railroad tracks and facilities and any other
          natural and man-made features affecting, or
          affected by, the proposed activity or
          development;

     6.   the location of the floodplain boundary line,
          information and spot elevations concerning
          the one hundred (100) year flood elevations,
          and information concerning the flow of water
          including direction and velocities;

     7.   the location of all proposed buildings,
          structures, utilities, and any other
          improvements; and

     8.   any other information which the municipality
          considers necessary for adequate review of
          the application.

D.   Plans of all proposed buildings, structures, and
     other improvements, clearly and legibly drawn at
     suitable scale showing the following:

     1.   sufficiently detailed architectural or
          engineering drawings including floor plans,
          sections, and exterior building elevations,
          as appropriate;

2.    for any proposed building, the elevation of the lowest floor (including basement) and, as required, the elevation of any other floor;

3.    complete information concerning flood depths, pressures, velocities, impact and uplift forces, and other factors associated with the one hundred (100) year flood;

4.    detailed information concerning any proposed flood-proofing measures;

5.    cross-section drawings for all proposed streets, drives, other accessways, and parking areas, showing all rights-of-way and pavement widths;

6.    profile drawings for all proposed streets, drives, and vehicular accessways including existing and proposed grades; and

7.    plans and profiles of all proposed sanitary and storm sewer systems, water supply systems, and any other utilities and facilities.

E.    The following data and documentation:

1.    certification from the applicant that the site upon which the activity or development is proposed is an existing separate and single parcel, owned by the applicant or the client he represents;

2.    certification from a registered professional engineer, architect, or landscape architect that the proposed construction has been adequately designed to protect against damage from the one hundred (100) year flood;

3.    a statement, certified by a registered professional engineer, architect, landscape architect, or other qualified person which contains a complete and accurate description of the nature and extent of pollution that might possibly occur from the development during the course of a one hundred (100) year flood, including a statement concerning the effects such pollution may have on human life;

4.    a statement certified by a registered professional engineer, architect, or

landscape architect, which contains a
complete and accurate description of the
effects the proposed development will have on
one hundred (100) year flood elevations and
flows;

5.  a statement, certified by a registered
    professional engineer, architect, or
    landscape architect, which contains a
    complete and accurate description of the
    kinds and amounts of any loose buoyant
    materials or debris that may possibly exist
    or be located on the site below the one
    hundred (100) year flood elevation and the
    effects such materials and debris may have on
    one hundred (100) year flood elevations and
    flows;

6.  the appropriate component of the Department
    of Environmental Resources' "Planning Module
    for Land Development;"

7.  where any excavation or grading is proposed,
    a plan meeting the requirements of the
    Department of Environmental Resources to
    implement and maintain erosion and
    sedimentation control;

8.  any other applicable permits such as, but not
    limited to, a permit for any activity
    regulated by the Department of Environmental
    Resources under Section 302 of Act 1978-166;
    and

9.  an evacuation plan which fully explains the
    manner in which the site will be safely
    evacuated before or during the course of a
    one hundred (100) year flood.

Section 8.02  Application Review Procedures

Upon receipt of an application for a Special Permit by
the Township, the following procedures shall apply in
addition to those of Article III:

A.  Within three (3) working days following receipt of
    the application, a complete copy of the
    application and all accompanying documentation
    shall be forwarded to the County Planning
    Commission by registered or certified mail for its
    review and recommendations. Copies of the
    application shall also be forwarded to the
    Township, Planning Commission, and Township

Engineer (to be retained by the applicant) for review and comment.

B.  If an application is received that is incomplete, the Township shall notify the applicant in writing, stating in what respect the application is deficient.

C.  If the Township decides to disapprove an application, it shall notify the applicant, in writing, of the reasons for the disapproval.

D.  If the Township approves an application, it shall file written notification, together with the application and all pertinent information, with the Department of Community Affairs, by registered or certified mail, within five (5) working days after the date of approval.

E.  Before issuing the Special Permit, the Township shall allow the Department of Community Affairs thirty (30) days, after receipt of the notification by the Department, to review the application and decision made by the Township.

F.  If the Township does not receive any communication from the Department of Community Affairs during the thirty (30) day review period, it may issue a Special Permit to the applicant.

G.  If the Department of Community Affairs should decide to disapprove an application, it shall notify the Township and the applicant, in writing, of the reasons for the disapproval, and Township shall not issue the Special Permit.

Section 8.03  Special Technical Requirements.

A.  In addition to the requirements of Article VII of this Ordinance, the following minimum requirements shall also apply to any proposed development requiring a Special Permit. If there is any conflict between any of the following requirements and those in Article VII of this Ordinance or in any other code, ordinance, or regulation, the more restrictive provision shall apply.

B.  No application for a Special Permit shall be approved unless it can be determined that the structure or activity will be located, constructed, and maintained in a manner which will:

1. Fully protect the health and safety of the general public and any occupants of the structure. At a minimum, all new structures shall be designed, located, and constructed so that:

    a. the structure will survive inundation by waters of the one hundred (100) year flood without any lateral movement or damage to either the structure itself, or to any of its equipment or contents below the one hundred (100) year flood elevation.

    b. the lowest floor elevation will be at least one and one half (1 1/2) feet above the one hundred (100) year flood elevation.

    c. the occupants of the structure can remain inside for an indefinite period of time and be safely evacuated at any time during the one hundred (100) year flood.

2. Prevent any significant possibility of pollution, increased flood levels or flows, or debris endangering life and property.

All hydrologic and hydraulic analyses shall be undertaken only by professional engineers or others of demonstrated qualifications, who shall certify that the technical methods used correctly reflect currently accepted technical concepts. Studies, analyses, computations, etc. shall be submitted in sufficient detail to allow a thorough technical review by the Township and the Department of Community Affairs.

ARTICLE IX   EXISTING STRUCTURES IN IDENTIFIED FLOODPLAIN AREAS

Section 9.00   General

Structures existing in any identified floodplain area prior to the enactment of this Ordinance may continue subject to the following provision:

A. No expansion or enlargement of an existing structure shall be allowed within any identified floodway that would cause any increase in flood heights.

B. Any modification, alteration, reconstruction, or improvement of any kind to an existing structure,

to an extent or amount of fifty (50) percent or more of its market value shall constitute a substantial improvement and shall be undertaken only in full compliance with the provisions of this Ordinance.

C.    Any modification, alteration, reconstruction, improvement of any kind to an existing structure, to an extent or amount of less than fifty (50) percent of its market value, shall be elevated and/or floodproofed to the greatest extent possible.

34

Adopted at a _Regular_ meeting of the Board of
Supervisors of Jackson Township, Huntingdon County,
Pennsylvania on the _3rd_ day of _July_, 19_87_

_Ralph Weiler_
Chairman

_Gary F. Wilson_

_Leroy J. Fink Sec'y_
Attest

Township Seal

*16*

*HB*

## JACKSON TOWNSHIP BOARD OF SUPERVISORS
### RD#1, BOX 390, PETERSBURG, P.A. 16669
#### 814-667-2992 – FAX 814-667-3892

October 10, 2000

Mr. & Mrs. David B. Corneal
505 East Fairmont Avenue
State College, Pa. 16801

Dear Mr. And Mrs. Corneal:

Please be advised that Jackson Township has referred to me for review your applications for buildings permits. As you may be aware, the Township's Building Permit Ordinance provides that the Building Permit Officer "shall issue a building permit only after it has been determined that the proposed work to be undertaken will be in conformance with the requirements of this and all other applicable codes and ordinances." Further, the Ordinance provides that prior to the issuance of any building permit, the Permit Officer "shall review the application for permit to determine if all other necessary governmental permits required by State and Federal laws have been obtained, such as those required by the Pennsylvania Sewage Facilities Act."

For the following reasons, your applications are being denied: First, you have not complied with the Pennsylvania Sewage Facilities Act. At this time, you do not have a sewage permit. A building permit cannot be issued without a sewage permit. While you submitted Sewage Facilities Planning Modules to the Township, the Township cannot forward the Planning Modules to the Department of Environmental Protection for review until you meet the requirements of the Township's Subdivision and Land Development Ordinance. A copy of the Ordinance is enclosed. Second your application inadequately described the proposed construction. Third, you did not include an adequate plan of the site showing the size and location of the proposed construction as well as any existing buildings. Fourth, you have not complied with the Township's Driveway Ordinance, a copy of which is enclosed. Fifth, as noted above you have failed to comply with the Township's Subdivision and Land Development Ordinance.

Very truly-yours,

DAVID B. VAN DOMMELEN
Building Permit Officer

EXHIBIT
Van Dommelen
TKR 2 6-6-01

EXHIBIT
Wirth 13
TKR 5-17-01

*17*

# DAVID B. CORNEAL

ATTORNEY AT LAW

1445 WEST COLLEGE AVENUE

STATE COLLEGE, PENNSYLVANIA 16801

MEMBER:
  NNSYLVANIA BAR
  .LORIDA BAR

(814) 238-1925
(814) 238-1929

Mr. David Van Dommelen
R.D. 1, Box 631
Petersburg, Pa. 16669

May 5, 2000

RE: Garage Building Permit

Dear Mr. Van Dommelen,

Since you have failed to call me as promised, or to return my phone call, regarding my requested Building Permit, I assume you are continuing to hold in your stated position from our last Thursday meeting in your home.

At that time I brought you a copy of my building plan for a garage approximately 20' by 40'. As stated at that meeting, since there was no sewer or water in the garage, I qualified for a building permit. In fact, you stated that if any other Jackson Township property owner requested a permit to construct a garage, you would issue them the permit. Your justification for refusing to give me even an application for a permit was that I was that "trouble making yuppie from over the mountain" and the supervisors told you not to give me any building permits. You then proceeded to call the individual supervisors for further instructions. In my presence, you got Tom Wilson on the phone who told you not to grant me the building permit after you explained to him that it was just for a garage 20' by 40'. You then told me that the supervisors were meeting the next morning (Friday April 28) to discuss my permit and that you would then call me. I then wrote down two phone numbers where you could reach me 24 hours a day or night.

Having not heard from you, I called you on Wed. May 3 and left a message on your answering machine to call me. You have obviously chosen to ignore the promise or my request. Where upon you asked me to leave, refusing to give me even an application form for a building permit.

If you disagree with any of the facts setforth herein please advise me in writing.

Sincerely,

David B. Corneal, Esq.

EXHIBIT

Van Dommelen

TKB   1   6-6-01

EXHIBIT

Wirth 15

TKB   5-17-01

*18*

SUGGESTED IDEAS

BUILDING PERMIT FEES AND B.P. OFFICER % FEE

|  |  |  | PERMIT | B.P.O. % |
|---|---|---|---|---|
| 0 | – | $ 999 | $15.00 | $ 6.00 |
| $ 1,000 | – | $ 15,999 | $20.00 | $ 8.00 |
| $ 16,000 | – | $ 24,999 | $30.00 | $ 12.00 |
| $ 25,000 | – | $ 35,999 | $40.00 | $ 16.00 |
| $ 36,000 | – | $ 49,000 | $50.00 | $ 20.00 |
| $ 50,000 | – | $ 99,999 | $60.00 | $ 24.00 |
| $ 100,000 | – | $ 499,999 | $70.00 | $ 28.00 |

A $10.00 fee will be charged for any additional follow-up trips after the initial contact.

SUBMITTED BY     David B Van Dommelen
                 Jackson Township
                 Building Permit Officer     March 7, 1994

EXHIBIT
Van Dommelen
JXB 4 6-5-01

| NAME | FEE | DATE | PERMIT NO | VALUE | PURPOSE |
|---|---|---|---|---|---|
| Roland G. Yoder | $20.00 | 12/6/89 | 25-89m | $10,000 | living qtrs. |
| Leslie L. Lutz Jr. | $20.00 | 12/16/89 | 26-89n | $4,000. | Mobile home |
| Charles Wirth | $20.00 | 3/3/90 | 01-90 | $45,000 | House |
| James Stewart | $20.00 | 3/6/90 | 02-90 | $1400. | storage shed |
| Raymond Tussey | $20.00 | 3/12.90 | 03-90 | $5,000.00 | machine stor |
| Marie H. Porter | $20.00 | 3/12/90 | 04-90 | $3,000.00 | garage |
| Donald H. Gibboney | $10.00 | 3/22/90 | 05-90 | $500.00 | storage |
| Albert Hershey | $10.00 | 3/31/90 | 06-90 | $400.00 | faimly room |
| Stoney Lonesome R&G club | $20.00 | 3/31/90 | 07-90 | $16,000 | camp |
| Thomas Eckley | $20.00 | 4/7/90 | 08-90 | $5400.00 | garage |
| Robert Nichol | $20.00 | 4/9/90 | 09-90 | $40,000 | remodel house |
| Laurence Moyer | $20.00 | 4/27/90 | 10-90 | $7500.00 | mobile home |
| Walter C. Hagans | $20.00 | 5/7/90 | 11-90 | 2000.00 | porch roof |
| David P. Melson | $20.00 | 5/16/90 | 12-90 | 11,200.00 | Garage |
| Wilbur Foster | $10.00 | 5/23/90 | 13-90 | $200.00 | Porch |
| D & D Hamberger | $20.00 | 5/25/90 | 14-90 | $35,000 | Addition to Summer Home |
| D. Van Dommelen | $20.00 | 6/2/90 | 15-90 | $4000.00 | Extension |
| Richard Rudy | $20.00 | 6/12/90 | 16-90 | $3500.00 | Garage |
| Andrew Couch | $10.00 | 7/7/90 | 17-90 | $400.00 | Porch |
| Richard Chura | $20.00 | 7/8/90 | 18-90 | $50,000 | House/Camp |
| Walter Garner | $10.00 | 7/10/90 | 19-90 | $100.00 | Roof Repair |
| Kevin Monihen | $20.00 | 7/17/90 | 20-90 | $50,000 | Build House |
| J & N Albright | $20.00 | 7/17/90 | 21-90m | $1,700 | Horse Barn |
| E. Scott Walker | $10.00 | 7/20/90 | 22-90 | $500. | Storage She |
| Kenneth Miller | $20.00 | 7/28/90 | 23-90 | $2239.78 | Utility Buil Gazebo |
| Hazel M. Briggs | $10.00 | 8/4/90 | 24-90 | 400.00 | House Side |

| NAME | FEE | DATE | PERMIT NO. | VALUE | TYPE |
|------|-----|------|-----------|-------|------|
| Richard A. Boonie | $20.00 | 8/9/90 | 25-90 | $55,000 | Home |
| James Simparosa | $20.00 | 8/23/90 | 26-90 | 2,000 | Trailer Exte |
| David B. Van Dommelen | $20.00 | 8/28/90 | 27-90 | $5,000 | Studio Extend |
| Eugene Bigelow | $10.00 | 9/12/90 | 28-90 | $300.00 | Porch & cella door |
| Donald Biddle | $20.00 | 9/23/90 | 29-90 | $5867 | Garage |
| Mary Dukeman | $20.00 | | 30-90 | | Garage |
| Caroline A. McGraw | $20.00 | 10/10/90 | 31-90 | $72,000 | House |
| Clifford D. Towson | $20.00 | 10/14/90 | 32-90 | $100,000 | House |
| Jeffery Shoemaker | $20.00 | 10/22/90 | 33-90 | $80,000 | House |
| Robert Nichols | $20.00 | 10/22/99 | 34-90 | $2500. | Mobile Home |
| James Morris | $20.00 | 10/26/90 | 35-90 | @2,600. | Garage |
| Ken Miller | $20.00 | 10/30/90 | 36-90 | $500,000. | 4 buildings at Mill |
| Fred K. Tucker | $20.00 | 10/3/90 | 37-90 | $150,000. | House & Ga |
| Scott Pletcher | $20.00 | 11/29/90 | 38-90 | $4000.00 | Garage |
| Sumner Smith | $20.00 | 16/1/91 | 1-91 | $5500.00 | IceCream Stai |
| Norman Keller | $20.00 | 1/23/91 | 2-91 | $5000.00 | Family Room |
| Fred V Schilling | 20.00 | 2/3/91 | 3.91 | 1500.00 | Barn |
| Robert Reese | $10.00 | 3/19/91 | 4-91 | $600.00 | Siding |
| Bruce Smith | $20.00 | 3/26/91 | 5-91 | $8,000. | Pole Barn |
| Robert Guyer Sr. | $10.00 | 4/2/91 | 6-91 | $1,000 | Extend House |
| Chester Benson | $20.00 | 4/4/91 | 7-91 | $3,000. | Car Port |
| Larry H. Ross | $20.00 | 4/12/91 | 8-91 | $2,000 | Siding, etc. |
| Lawrence Moyer | $10.00 | 4/15/91 | 9-91 | $1,000 | Deck & shkirti |
| Walnut Acres Camp | $10.00 | 6/6/91 | 10-91 | $400. | Pavilion |
| Robert Herr - Camp | $10.00 | 11/5/91 | 11-91 | $1,000 | Roof etc. |
| Robert Nichols | $20.00 | 5/16/91 | 12-91 | $12,000 | Barn |
| James Leisey | $10.00 | 5/23/91 | 13-91 | $1,000 | Barn |
| Ricky Watt | $20.00 | 5/23/91 | 14-91 | $2,500 | CarPort |
| Willard Yoder | $20.00 | 5/28/91 | 15-91 | $80,000 | House |

| NAME | FEE | DATE | PERMIT No. | VALUE | PURPOSE |
|------|-----|------|-----------|-------|---------|
| Walter Hagans | $20.00 | 5/28/91 | 16-91 | $1,500 | Carport |
| James Leisey | $10.00 | 5/30/91 | 17-91 | $600.00 | Pront Roof |
| Roland Yoder | $20.00 | 6/13/91 | 18-91 | $5,000 | Extend Shed |
| G. Merle Hawn | $10.00 | 6/20/91 | 19-91 | $500. | Picni Pavilio |
| Eagle Excavation | $20,00 | 6/24/91 | 20-91 | $2,000 | Pole Building |
| Sterret Watt | $10.00 | 6/25/91 | 21-91 | #300.00 | Porch |
| Caroline A. McGraw | $20.00 | 7/3/91 | 22-91 | $10,000 | Garge |
| James D. Henry | $10.00 | 7/11/91 | 23-91 | $1,000 | Storage/Garac |
| Jay Yoder | $10.00 | 7/27/91 | 24-91 | $500.00 | Utility Shed |
| Herbert Clinger | $10.00 | 8/3/91 | 25-91 | $900.00 | Pole Shed |
| Mary Dukeman **Box 582** | $20.00 | 8/3/91 | 26-91 | $2450.00 | Carport/sidi |
| Karl Raudensky | $20.00 | 8/10/91 | 27-91 | $30,000 | Cabin/camp |
| William Dickson | $20.00 | 8/22/91 | 28/91 | $6000.00 | Porch & Siding |
| T. Couch | $10.00 | 9/9/91 | 29-91 | $500.00 | Pavillion |
| Ron Wilson | $20.00 | 9/9/91 | 30-91 | $6000.00 | Extend Bedro |
| Wayne Mambeck | $10.00 | 9/6/91 | 32-91 | $800.00 | Porch |
| J. Edward Rudy | $10.00 | 10/5/91 | 31-91 | $989.00 | Shed |
| James Stewart | $20.00 | 10/5/91 | 33-91 | $10,000 | Living room |
| James E. Smith | $20.00 | 10/20/91 | 34-91 | $26,000 | Living Area |
| Gettys Ridge Club | $20.00 | 10/22/91 | 35-91 | $1,000 | Room |
| K. Monihen | $20.00 | 10/28/91 | 36-91 | $65,000 | Addition |
| Todd Bailey | $10.00 | 10/31/91 | 37091 | $500.00 | Mobile Home |
| Robert Nicholl | $10.00 | 11/1/91 | 38-91 | $650.00 | Pole Barn |
| Norman Davis | $20.00 | 11/5/91 | 39-91 | $45,000 | House |
| Leroy Koch | $10.00 | 11/15/91 | 40-91 | $700.00 | Extend Pole barn |
| Phyllis Rogers | $20.00 | 12/7/91 | 41-91 | $7000.00 | Erect Trailr |
| Scott Wilson | $20.00 | 12/11/91 | 42-91 | $7800.00 | Erect trailr |
| Geraldine Hagans | $20.00 | 12/13/91 | 43-91 | $4500 | Siding |

4 Nru

| NAME | FEE | DATE | PERMIT | VALUE | PURPOSE |
|------|-----|------|--------|-------|---------|
| Arthur Walters | $20.00 | 1/21/92 | 1-92 | $3,500.00 | Stoarge Shed |
| M. Dirk Boring | $20.00 | 2/27/92 | 2-92 | $38,900.00 | House |
| Dale Lightner | $20.00 | 2/28/92 | 3-92 | $1700.00 | Porch addition |
| Douglas Weaver | $20.00 | 2/29/92 | 4-92 | $40,000 | House & Garag |
| Eugene L. Barr | $20.00 | 3/14/92 | 5-92 | $2,500.00 | Porch & Siding |
| Willard Yoder | $20.00 | 4/9/92 | 6/92 | $1,700. | Mobile Home |
| David Kirk | $20.00 | 4/11/92 | 7-92 | $20,000.00 | House |
| Arthur & Frances Walters | $20. | 4/13 92 | 8-92 | $3,000. | Porch |
| Lee Dean | $20.00 | 4/13/92 | 9-92 | $24,000.00 | House |
| Kish Gun Club | $20.00 | 4/15/92 | 9A-92 | $29,400.00 | Camp |
| Thomas Sechler | $20.00 | 5/26/92 | 10-92 | $30,000. | House Addition |
| Gary Stainer | $20.00 | 6/4/92 | 11-92 | $16,000. | Garage & Barn |
| Janet McGrew | $10.00 | 6/26/92 | 12-92 | $900.00 | Porch |
| John Clickner | $20.00 | 6/27/92 | 13-92 | $50,000.00 | Family Room |
| Sam Bricker | $20.00 | 7/3/92 | 14-92 | $80,000. | House |
| Chester Wilson | $10.00 | 7/7/92 | 15-92 | $350.00 | Deck |
| Leo & Sharron Sable | $10.00 | 7/29/92 | 16-92 | $900.00 | Porch/Deck |
| Harold E. Goshert | $10.00 | 8/1/92 | 17092 | $400.00 | Siding |
| Noel Reese | $20.00 ~~$17,500~~ | 8/7/92 | 18-92 | 3,500 | Shed |
| Albert Hershey | $10.00 | 8/20/92 | 19-92 | $400.00 | Deck |
| Joseph Tine | $20.00 | 8/20/92 | 20-92 | $50,000 | House |
| Brain Bliss | $10.00 | 8/21/92 | 21-92 | $500.00 | Shed/wood sto |
| Homer Wagner | $20.00 | 8/23/92 | 22-92 | $2,000.00 | Trailer |
| Dennis Smith | $20.00 | 8/24/92 | 23-92 | $34,000.00 | Addition/house |
| Harvey Knepp | $20.00 | 8/26/92 | 24-92 | $1,500.00 | Porch |
| Harold E. Keller Sr | $20.00 | 9/16/92 | 25-92 | $22,000. | Double Wide |
| Harold E. Keller Jr | $20.00 | 9/16/92 | 26-92 | $2,400.00 | Garage |
| Gary/Laura Staines | $20.00 | 9/21/92 | 27-92 | $50,000.00 | House |
| Harry Riling | $10.00 | 10/1/92 | 28-92 | $400.00 | Deck |

| NAME | FEE | DATE | PERMIT | VALUE | PURPOSE/TAX MA |
|------|-----|------|--------|-------|----------------|
| Hugh Berg | $20.00 | 10/1/92 | 29-92 | $2,500. | Garage     22 |
| Barry Bargo | $10.00 | 10/15/92 | 30-92 | $500.00 | Siding on Car |
| Charles Devinney | $20.00 | 10/16/92 | 31-92 | $20,000.00 | Bedroom Wing |
| James O'Bryan | $20.00 | 10/21.92 | 32-92 | $6,162.00 | Hay Storage |
| James Henry | $20.00 | 12/3/92 | 33-92 | $2,500.00 | Storage & Gar |
| Dwight A. Glick | $20.00 | 12/3/92 | 34-92 | $1,500.00 | Stoage/Camp |
| Richard Plectoher | $20.00 | 12/3/92 | 35-92 | $5,000.00 | Garage |
| Richard Pletcher | $20.00 | 1/4/93 | 1-93 | $5,000.00 | Garage/Deck |
| Larry Smith | $20.00 | 1/14/93 | 2-93 | $13,446. | Garage |
| Samuel Keller | $20.00 | 1/19/93 | 3-93 | $1,500. | Mobile Home |
| Don Gibboney | $10.00 | 2/4/93 | 4-93 | $1,000. | Extend Store |
| Thomas Wilson | $20.00 | 2/5/93 | 5-93 | $15,000. | Mobile Home |
| Tom & Jo Merrell | $20.00 | 2/9/93 | 6-93 | $60,000. | Extend House |
| Whipple Dam Store | $10.00 | 3/2/93 | 7-93 | $850. | Extend Store |
| Betty Younker | $10.00 | 4/5/93 | 8-93 | $1,000 | Soffit etc |
| Wilber Foster | No Fee | 4/5/93 | 9-93 | None | Demolish Mobile Home |
| P. Gavazzi | $20.00 | 5/7/93 | 10- 93 | $2000.00 | Tool Shed |
| Stoney Lonesome | $20.00 | 5/8/93 | 12-93 | $1200.00 | Deck |
| Lee Knode Jr | $20.00 | 5/11/93 | 13-93 | $1,200.00 | Deck & Sidin |
| Rodger Keller | $20.00 | 5/21/93 | 15-93 | $6000.00 | Garage & Roof |
| Roland Yoder | $20.00 | May/18/93 | 14-93 | $6000. | Milkhouse |
| Donald Reever | $20.00 | 5/21/93 | 14-93 | $15,000 | Camp |
| Gary/Chris Wilson | $20.00 | 5/25/93 | 17-93 | $1,500.00 | Barn |
| William Stanbrough | $10.00 | 6/14/93 | 18-93 | $935.00 | Porch/Deck/s |
| Larry Smith | $20.00 | 6/16/93 | 19-93 | $52,401. | Extend House |
| Seth Richards | $20.00 | 6/16/93 | 20-93 | $1,200. | Stoareg Shed |
| Jean Dickson | $20.00 | 5/8/93 | 11-93 | $10,000. | Add Room |
| Patricia Rosdil | $20.00 | 6/21/93 | 21-93 | $68,000. | Erect House |

| NAME | FEE | DATE | PERMIT | VALUE | PURPOSE/TAX |
|---|---|---|---|---|---|
| Keller, Elwood | $20.00 | 8/5/93 | 22-9 | $2000.00 | Roof, Deck and Garage |
| Gibboney, Steve | $20.00 | 8/7/93 | 23-93 | $15,000.00 | Garage |
| Elliott, James | $20.00 | 8/17/93 | 24-93 | $20,000.00 | Build Camp |
| Bliss, Brian | $10.00 | 8/21/93 | 25-93 | $650.00 | Add Bedroom |
| Pouch, Dennis | $10.00 | 8/22/93 | 26-93 | $100.00 | Shed |
| R. Hockenberry | $20.00 | 8/24/93 | 27-93 | $140,000. | House |
| D. Maddox | $20.00 | 9/8/93 | 28-93 | $4300.00 | Deck |
| Roland Yoder | $20.00 | 13/9/93 | 29-93 | $4,000.00 | Heifer Pen |
| Samuel Keller | $10.00 | 9/24/93 | 30-90 | $1,000.00 | Mobile Home |
| Twin Pine Lodge   ck | $20.00 | 11/22/93 | 31-93 | $10,000. | Alter |
| Richard Rudy   ck | $20.00 | 11/20/93 | 32-93 | $2,000. | Picnic Shelt |
| Thomas Wilson   cash | $20.00 | 11/20/93 | 33-93 | $1,500. | Extend Shed |
| Judith Fleck   Check | $20.00 | 12/6/93 | 34-93 | $1,058 | Porches |
| James W. Croyle   cash | $20.00 | 12/14/93 | 35-93 | $20,000. | Extend House |

Finished 1993

| William Foster   cash | $10.00 | 4/6/94 | -94 | $300.00 | Shed Additio |
| Stone Creek Fire Hall N | | 4/14/94 | 2-94 | $2  00 | Extension |
| Jr. Essenbach   Cash | 10.00 | 4/22/ | 3-94 | 00.00 | Porch/Shed |

1974

| NAME | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|------|-----|-----|------|--------|-------|---------|
| Drew Tomlinson | Chec | $20.00 | 12/30/93 | 1-94 | $20,000.00 | Addition |
| Ennisville Church | Chec | $20.00 | 2/19/94 | 2-94D | Demolition | -------- |
| Georg Sunderland | Chec | $20.00 | 2/19/94 | 3-94 | $5,000.00 | Addition |
| 7march 1994 | | | | | | |
| William Foster | CA | $10.00 | 4/6/94 | 1-94B | $300.00 | Shed |
| Stone Creek Fire | NA | ----- | 4/14/94 | 2-94B | $2500.00 | Addition |
| J. Eschenbach | CA | $10.00 | 4/22/94 | 3-94B | $500.00 | Porch |
| Richard Boonie | Chec | $20.00 | 5/14/94 | 4-94 | $9,800 | Porch/siding |
| Kish Bank | Chec | $70.00 | 5/17/94 | 5-94 | $109,000. | Bank |
| Stephen Black | Chec | $60.00 | 5/24/94 | 6-94 | $69,000.00 | House |
| Lonnie Dawes | Chec | $70.00 | 5,24,94 | 7-94 | $131,000. | House |
| Douglas Maddox | Chec | $40.00 | 5/24/94 | 8-94 | $25,000. | Addition |
| R. Schaeffer | Chec | $60.00 | 6/2/94 | 9-94 | $75,000. | House |
| Walnut Acre | Chec | $15.00 | 6/3/94 | 10-94 | $800.00 | Shed |
| Larry Narehood | Chec | $30.00 | 6/8/94 | 11-94 | $18,000. | Garage |
| Daniel B. Wilson | Chec | $20.00 | 6/20/94 | 12-94 | $10,000. | Mobile Home |
| Mary Randolph | Cash | $15.00 | 6/28/94 | 13-94 | $300. | Siding |
| Ted Couch | Cash | $15.00 | 7/11/94 | 14-94 | $300.00 | Shed |
| Sam Keller Jr | Cash | $50.00 | 7/14/94 | 15-94 | $37,000.00 | Double wide |
| S. Stoltzfus | Chec | $15.00 | 7/27/94 | 16-94 | $5,500.00 | Porch |
| D.S. Feahley | Chec | $40.00 | 7/31/94 | 17-94 | $32,000.00 | Doublewide |
| George Vahoviak | Chec | $70.00 | 8/10/94 | 18094 | $110,000.00 | House |
| Daryl Stickler | Chec | $20.00 | 8/11/94 | 19-94 | $7000.00 | House |
| Leroy Koch | Cash | $20.00 | 8/13/94 | 20.94 | $9000.00 | House |
| Sondra Armstrong | Chec | $20.00 | 8/19/94 | 21-94 | $4600.00 | Porch/siding |
| Keith Hollinshead | Chec | $30.00 | 8/19/94 | 22-94 | $30.00 | House |
| Scott Wilson | Chec | $15.00 | 8/21/94 | 23-94 | $500.00 | Shed |
| Glenn Hawbaker | Chec | $40. | 8/27/94 | 24-94 | $25,000.00 | Kitchen |
| Daniel Tanner | Cash | $20.00 | 9/4/94 | 25-94 | $1600.00 | Shed/deck |
| Tom Wilson | Cash | $60.00 | 9/15/94 | 26-94 | $50,000.00 | House |
| Hawn (White) | Cash | $20.00 | 9/16/94 | 27-94 | $1,500.00 | Trailer |
| Corvin, Anita | Chec | $20.00 | 9/21/94 | 28-94 | $1,000.00 | Camp |
| David Freeman | Chec | $20.00 | 9/21/94 | 29-94 | $7,000.00 | Bedroom |
| Annette Givler | Chec | $60.00 | 9/25/94 | 30-94 | $75,000.00 | Bedroom,etc |
| Newall Crownover | Chec | $20.00 | 10/13/94 | 31-94 | $4,000.00 | Car Port |
| Paul Powell | Cash | $20.00 | 10/18/94 | 32-94 | $1,700.00 | Shed |
| Bruce Telega | Chec | $20.00 | 10/18/94 | 33-94 | $1,500.00 | Deck |
| John Couch | Chec | $50.00 | 10/19/94 | 34-98 | $45,000.00 | Double Wide |
| William White | Chec | $20.00 | 11/7/94 | 35-94 | $9,050.00 | Garage |

**1995**

| NAME | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| Harvey Knepp | CA | $60.00 | 1/9/95 | 1-95 | $65,000.00 | Double wide |
| Van Dommelen | CH | $15.00 | 1/30/95 | 2-95 | $500.00 | Deck |
| J. McKinney | CA | $20.00 | 1/30/95 | 3-95 | $18,900 | Mobilehome |
| Glenn Bailey | CK | $20.00 | 2/11/95 | 4-95 | $3,000.00 | Mobile Home |
| Dayton Hostetter | CK | $30.00 | 2/28/95 | 5-95 | $16,500.00 | Mobile Home |
| Donna-Rae Dalston | CK | $60.00 | 3/11/95 | 6-95 | $62,000.00 | House |
| Louis Weiler | CK | $30.00 | 3/21/95 | 7-95 | $18,000.00 | Extend roof |
| Ralph Schlegel Mulch | CK | $20.00 | 3/21/95 | 8-95 | $8,000.00 | Restor |
| N. Stanbrough | CK | $15.00 | 3/22/95 | 9-95 | $900.00 | Carport |
| Gary Dorland | CF | $60.00 | 3/30/95 | 10-95 | $70,000.00 | House |
| Lewis E. McCarty | CA | $40.00 | 4/4/95 | 11-95 | $35,063.00 | Doublewide |
| J. Edward Rudy | CA | $20.00 | 4/17/95 | 12-95 | $1,650.00 | Storage She |
| Dale Buchanan | CA | $40.00 | 4/18/95 | 13-95 | $40,000.00 | Cabin |
| James Condon | CH | $20.00 | 4/19/95 | 14-95 | $4,900.00 | Greenhouse |
| Christina Guyer | CA | $20.00 | 6/6/95 | 15-95 | $10,000.00 | Mobile Home |
| Richard Horner | CA | $20.00 | 6/9/95 | 16-95 | $2,500.00 | Shed |
| David Corwin | CK | $70.00 | 6/22/95 | 17-95 | $170,000.00 | House |
| Carl Bickett | CK | $20.00 | 6/24/95 | 18-95 | $1290.00 | Reparis-etc |
| Frank Dean | CK | $15.00 | 7/11/95 | 19-95 | $600.00 | Deck |
| Jay Yoder | CK | $20.00 | 8/5/95 | 20-95 | $5,000.00 | Shop |
| Eliz. Wojdylak | CK | $20.00 | 8/5/95 | 21-95 | $8,000.00 | Mobilehome |
| L. Lucabaugh | CK | $30.00 | 8/5/95 | 22-95 | $21,000.00 | Extend/etc |
| Marjorie Rudy | CA | $15.00 | 8/18/95 | 23-95 | $200.00 | Deck |
| Kevin Monihen | CH | $15.00 | 9/1/95 | 24-95 | $1,000.00 | Shed |
| Seth Richards | CH | $20.00 | 9/1/95 | 25-95 | $15,000.00 | Barn |
| Winchester Club S. Wensel | CK | $70.00 | 9/11/95 | 26-95 | $106,000.00 | Rebuild |
| Lee Knode & Wm. Summers | CK | $20.00 | 9/30/95 | 27-95 | $10,000.00 | Camp |
| Dirk Boring | CH | $60.00 | 10/24/95 | 28-95 | $60,000.00 | House |
| Gregory McKinney | CAA | $20.00 | 10/29/95 | 29-95 | $2,900.00 | MobileHome |
| John Randolph | CA | $20.00 | 11/7/95 | 30-95 | $1,900.00 | ColdFrame |
| Tim Grove | CK | $15.00 | 11/14/95 | 31-95 | $900.00 | Repairs |
| Rodney Scaeffre | CK | $20.00 | 11/6/95 | 32-95 | $1,000.00 | Barn |
| Michael Koch | CA | $15.00 | 12/20/95 | 33-95 | $500.00 | Shed |

| NAME | CA. | FEE | DATE | PERMI" | VALUE | PURPOSE | |
|---|---|---|---|---|---|---|---|
| E. Wojdylak | CK | $20.00 | J/12/96 | 1-96 | $1,500.00 | Shed | |
| Kenneth Miller | CK | $60.00 | 2/16/96 | 2-96 | $50,000.00 | Camp | |
| George Vahoviak | CK | $20.00 | 2/24/96 | 3-96 | $4,000.00 | Barn | |
| Oscar Ryen | CA. | $20.00 | 4/25/96 | 4-95 | $9,500.00 | Cottage | 1 |
| Tom Sanker | | | | | | | |
| Tom & Jerry Camp | CA | $20.00 | 5/4/95 | 5-95 | $1,200.00 | Bedroom | |
| Eliz. Wojdylak | CK | $20.00 | May 9,96 | 6-96 | $8,875.00 | Pole Shed | 2 |
| Steve Fleck | CK | $20.00 | May 9,96 | 7-96 | $1,500.00 | Bedroom | 2 |
| Peter Hadley | CK | $70.00 | 23 May 96 | 8-96 | $150,000 | House | |
| Pat Wilson | CK | $15.00 | 3 June 96 | 9-96 | $600.00 | Storage Shed | |
| Tim Peachy | X | None | 4 June 96 | 10-96 | NA | Demolish Bldg | |
| Dixon, Brett | CK | $20.00 | 6/6/96 | 11-96 | $15,000.00 | Bedroom | |
| Keller, Rodger | CK | $60.00 | 6/24/96 | 12-96 | $80,000.00 | House | |
| Saunders, Richard | CK | $20.00 | 6/26/96 | 13-96 | $7,000.00 | Garage | |
| Miller, Jay | CK | $20.00 | 6/27/96 | 14-96 | $1,200.00 | Shed | |
| Dean Laub | CA. | $20.00 | 6/28/96 | 15-96 | $2,500.00 | Room | |
| Glenn Peachy | CK | $20.00 | 7/1/96 | 16-96 | $15,000.00 | Cabin | |
| Ricky Watt | CK | $20.00 | 7/17/96 | 17-96 | $15,000.00 | Room & Deck | |
| Wm & Betty White | CK | $70.00 | 7/233/96 | 18-96 | $200,000.00 | House | : |
| Wilber Foster | CA | $15.00 | 8-3-96 | 19-96 | $400.00 | Shed | |
| Mary Grove | CK | $15.00 | 8-4-96 | 20-96 | $500.00 | Shed | |
| James Boring | CK | $15.00 | 8-11-96 | 21-96 | $700.00 | Porch | |
| Steve Bumbee | CK | $70.00 | 8-23-96 | 23-96 | $280,000.00 | House | |
| Ward Studebaker | CK | $15.00 | 8-22-96 | 22-96 | $1,000.00 | Deck & Carport | |
| William Brumbaugh | CK | $20.00 | 9-9-96 | 24-96 | $2,250 | Garage | |
| Bertha Riling | CK | $15.00 | 9/11/96 | 24-96 | $500.00 | Extend Barn | |
| Allan Diehl | CK | $15.00 | 11/15/96 | 26-96 | $1342.99 | Storage | |
| Russell Koch | CK | $30.00 | 10/14/96 | 27-96 | $20,000.00 | Trailer | |
| Michael Carowich | CA | $20.00 | 12/5/96 | 28-96 | $5,000.00 | Garage | : |

| NAME | CA. | FEE | DATE | PERMT | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| Drew Tomlinson | CK | $20.00 | 1/7/97 | 1-97 | $15,000.00 | Kitchen |
| Anna Stanbrough | CK | $20.00 | 3/1/97 | 2-97 | $1,500 | Shed |
| Richard Fletcher | CK | $20.00 | 3/4/97 | 3-97 | $1,000.00 | Porch |
| Craig Brossman | CK | $20.00 | 3/15/97 | 4-97 | $10,000.00 | Restore |
| Ivan Kauffman | CK | $20.00 | 3/20/97 | 5-97 | $7,000.00 | Camp Garage |
| Robert Guyer | CK | $200.00 | 3/25/97 | 6-97 | $2,000.00 | Garage |
| S. Wojdylak | CK | $20.00 | 4/2/97 | 7-79 | $8,000.00 | Porch |
| Suzanne Morlang | CK | $20.00 | 4/9/97 | 8-97 | $12,000.00 | Horse Barn |
| Daryl Stickler | CK | $20.00 | 5/1/97 | 9-97 | $7,000.00 | HOUSE/renew |
| William Stout | CK | $70.00 | 5/2/97 | 10-97 | $310,000.00 | House |
| Warren Long | CA | $20.00 | 5/3/97 | 11-97 | $15,000.00 | Addition |
| James Smolko | CK | $15.00 | 5/3/97 | 12-97 | $800.00 | Shed |
| Don Gibboney | CK | $20.00 | 5/8/97 | 13-97 | $6,300.00 | Porch |
| Mary Grove | CK | $20.00 | 5/12/97 | 14-97 | $8,900.00 | Laundry |
| Tom Wilson | CA | $60.00 | 5/29/97 | 15-97 | $50,000.00 | House/renew |
| David Koch | CK | $20.00 | 5/31/97 | 16-97 | $15,000.00 | Mobilehome |
| Pat Wilson | CK | $15.00 | 6/17/97 | 17-97 | $750.00 | Pavilion |
| George Vahoviak | CK | $20.00 | 6/28/97 | 18-97 | $2,000.00 | Equip Shed |
| Larry Narehooh | CA | $20.00 | 7/22/97 | 19-97 | $5,000.00 | Garage |
| Steve Stoltzus | CK | $60.00 | Aug 8 -97 | 20-97 | 53,000.00 | Shop/Green |
| Kevin Boonie | CK | $20.00 | Aug 9/97 | 21-97 | $10,000.00 | Mobile Home |
| Randolph/Rush | CK | $20.00 | 8/15/97 | 22-97 | $7,500.00 | Barn |
| George Sunderland | CK | $20.00 | 8/28/97 | 22-25 | $3,000.00 | Roof On Deck |
| Dennis McClure | CK | $20.00 | 9/15/97 | 24-97 | $5,000.00 | Bedrroom |
| Chester Wilson | CK | $20.00 | 9/21/97 | 25-97 | $6,000.00 | Mobile Home |
| Scott Wilson | CK | $40.00 | 9/22/97 | 26-97 | $35,000.00 | House |
| Bruce Kirkpatriach | CA | $20.00 | 10/11/97 | 27-97 | $2500.00 | Bedroom/shed |
| Hank Berg (A-1) | CK | $20.00 | 10/14/97 | 28-97 | $2,000.00 | Shed |
| Barry Barco | CA | $15.00 | 10/15/97 | 29-97 | $950.00 | Shed |
| Brian Bliss | CK | $15.00 | 10/16/97 | 30-97 | $200.00 | Pole Shed |
| Duane Coy | CK | $20.00 | 10/19/97 | 31-97 | $1,5000.00 | Shed |
| ENVIRONMENTAL CONST. | | CANCELLED | | 32-97 | CANCELLED | |
| Frank Dean | CK | $15.00 | 10/23/97 | 33-97 | $800.00 | Pole Shed |
| Daniel Wilson | CK | $15.00 | 11/11/97 | 34-97 | $400.00 | Shed |
| Barbara Wilson | CK | $20.00 | 11/11/97 | 35-97 | $15,200.00 | Mobile Home |
| Andrew Jone | CA | $15.00 | 12/16/97 | 36-97 | $90.00 | Shed |

| NAME 1998 | CK. CA. | FEE | DATE | PERM | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| Michael Stanbrough | CK | $20.00 | 1/6/98 | 1-98 | $1,500.00 | Pole Shed |
| Jeff Bierly | CK | $70.00 | 1/28/98 | 2-98 | $114,000.00 | House |
| George Sunderland | CK | $20.00 | 2/4/98 | 3-98 | $2,000.00 | Deck/steps |
| Bill Stanbrough | CK | $15.00 | 2/28/98 | 4-98 | $500.00 | Shed |
| Eagle Excavation | CK | $20.00 | 3/4/98 | 5-98 | $2,000.00 | Mobile Home |
| Forrest Wills | CA | $20.00 | 3/11/98 | 6-98 | $2,000.00 | Carport |
| Donald P Walters | CK | $15.00 | 3/20/98 | 7-98 | $600.00 | Porch&roof |
| Richard Horner | CK | $30.00 | 3/21/98 | 8-98 | $20,000.00 | Garage |
| Harvey Wagner | CA | $20.00 | 4/13/98 | 9-98 | $5,000.00 | Basement |
| Getty Pidge Rod | CK | $20.00 | 4/23/98 | 10.98 | $4,000.00 | Porch |
| Robert Enyeart | CA | $20.00 | 5/11/98 | 11-98 | $10,000.00 | Pole Barn |
| Daniel Kearns | CK | $20.00 | 5/15/98 | 12-98 | $5,000.00 | Camp |
| Monty Claar | CK | $70.00 | 6/25/98 | 13-98 | $125,000.00 | House |
| Russel Person | CK | $70.00 | 6/25/98 | 14-98 | $135,000.00 | House |
| Jack Price | CK | $15.00 | 7/4/98 | 15-98 | DEMOLISH | Mobilehome |
| Jeffrey Shoemaker | CK | $20.00 | 7/11/98 | 16-98 | Room addon | $4,000.00 |
| Cindy Lauer | CK | $70.00 | 7/11/98 | 17-98 | $101,000.00 | Home |
| Judy Keller | CA | $15.00 | 7/28/98 | 18-98 | $800.00 | Porch |
| Robert Lynch | CK | $20.00 | 7/29/98 | 19-98 | $10,000.00 | Patio/siding |
| Kevin Boonie | CK | $20.00 | 8/20/98 | 20-98 | $1,000.00 | Shed |
| Glenn Hawbaker | CK | $20.00 | 8/21/98 | 21-98 | $10,000.00 | Garage |
| Jim Stewart | CK | $20.00 | 8/27/98 | 22-98 | $33500.00 | Pole Barn |
| Ken Koch | CK | $60.00 | 8/31/98 | 22-19 | $50,000.00 | Doublewide |
| Richard Zeallor | CK | $30.00 | 9/3/98 | 23-14 | $20,000.00 | Addition |
| Larry Smith | CK | $15.00 | 9/4/98 | 24-98 | Demolish | Trailer |
| Pauline Baker | CA | $20.00 | 9/11/98 | 25-98 | $3,000.00 | Garage |
| Gary O'Bryan | CK | $20.00 | 9/14/98 | 26-98 | $10,000.00 | Equip. Shed |
| Leroy Koch | CA | $15.00 | 9/24/98 | 27-98 | $400.00 | Garage-Ext. |
| Angela Hawn | CK | $30.00 | 9/28/98 | 28-98 | $23,800.00 | Extend house |
| Henry Berg | CK | $20.00 | 10/13/98 | 29-98 | $10,000.00 | Extend House |
| L.S. Rudy | CA | $20.00 | 10/30/98 | 30-98 | $12,000.00 | Garage |
| David Keller | CK | $20.00 | 11/2/98 | 31-98 | $3,500.00 | Porch-closein |
| Jesse Stickler | CK | $15.00 | 11/3/98 | 32-98 | $500.00 | Mobile Home |
| Wesley Boonie | CA | $20.00 | 11/4/98 | 33-98 | $1,595.00 | Carport |
| Scott Pletcher | CK | $20.00 | 11/8/98 | 34-98 | $5,000.00 | Garage |
| John Albright | CK | $30.00 | 11/20/98 | 35-98 | $17,300.00 | Addition |
| Dwight Glick | CK | $15.00 | 11/24/98 | 36-98 | $900.00 | Outhouse |

| NAME 1999 | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| Pauline Weaver | CK | $20.00 | 2/15/99 | 2-99 | $3,500.00 | Porch |
| Huntingdon School | CK | $70.00 | 2/15/99 | 1-99 | $1,090,069. | Addition |
| Tom Loser/Grove | CK | $70.00 | 2/24/99 | 3-99 | $100,000.00 | Addition |
| Donald Lichtner | CK | $60.00 | 3/22/99 | 4-99 | $80,000.00 | House |
| Bill Stanbrough | CK | $15.00 | 3/23/99 | 5-99 | $300.00 | Porch |
| Richard Saunders | CK | $30.00 | 30/Mar/99 | 6-99 | $18,000.00 | Room |
| Daryl Sttickler | CK | $15.00 | 3/31/99 | 7-99 | $300.00 | MobileHome |
| Jr. Exchenbach | CA | $15.00 | 4/16/99 | 8-99 | $400.00 | Shed |
| Michael Lorenz | CK | $30.00 | 4/20/99 | 9-99 | $19,000.00 | Addition |
| David/Ruth Koch | CK | $50.00 | 5/1/99 | 10-99 | $40,000.00 | Doublewide |
| Sue Hess | CA | $20.00 | 5/13/99 | 11-99 | $1,000.00 | Garage |
| Samuel Keller | CA | $20.00 | 5/15/99 | 12-99 | $3,500.00 | Shed |
| Charles Yoat | CK | $20.00 | 5/22/99 | 13-99 | $2,000.00 | Room |
| Kenneth Kauffman | CA | $15.00 | 5/25/99 | 14-99 | $300.00 | Extend camp |
| Douglas Horst | CK | $40.00 | 6/17/99 | 15-99 | $35,000.00 | Extend House |
| Robert King | CK | $40.00 | 6/21/99 | 16-99 | $2,000.00 | Roof |
| Matt King | CK | " | 6/21/99 | 17-99 | $10,000.00 | Garage |
| Harry Lehman | CK | $50.00 | 6/25/99 | 18-99 | $40,000.00 | Addition |
| James Peters | CK | $20.00 | 7/14/99 | 19-99 | $7,300.00 | Camp |
| Dan Wilson | CK | $15.00 | 7/17/99 | 20-99 | $500.00 | Shed |
| James Huckabaa | CA | $20.00 | 7/31/99 | 21-99 | $10,000 | Addition |
| Robert E Cuyer | CA | $15.00 | 8/4/99 | 22-99 | $25000 | Canopy |
| Melissa Foster | CK | $15.00 | 8/7/99 | 23/99 | $500.00 | Porch |
| A-1 Auto | CK | $20.00 | 8/25/99 | 24-99 | $2,000.00 | Garageport |
| Donna Counch | NA | NA | 8/31/99 | 25-99 | NA | Demolition |
| Earle Hawn | CK | $20.00 | 9/1/99 | 26-99 | $9,000.00 | Rood/deck |
| Koch Kenneth | CK | $15.00 | 1/9/99 | 27-99 | $1,000.00 | Addition |
| Brain Bliss | CK | $60.00 | 9/2/99 | 28-99 | $50,000.00 | House |
| Barbara Wilson | CK | $15.00 | 9/29/99 | 29-99 | $500.00 | Porch |
| Jan Cramer | CK | $20.00 | 10/2/99 | 30-99 | &8,000.00 | Shed |
| Timothy Hanna | CK | $70.00 | 10/8/99 | 31-99 | $175,000.00 | House |
| Richard Boonie | CK | $15.00 | 10/25/99 | 32-99 | $400.00 | Porch Roof |
| Stephen Stoltzfus | CA | $30.00 | 10/30/99 | 33-99 | $20,000.00 | Office |
| Pauline Weaver | CK | $20.00 | 11/10/99 | 34-99 | $6,000.00 | Garge |
| David Houtz | CK | $20.00 | 11/22/99 | 35-99 | $1,528.70 | Carport |
| Joe Merrell | CK | $30.00 | 11/22/99 | 36-99 | $19,500.00 | Garage |
| Gloria Sendzik | CK | $60.00 | 12/1/99 | 37-99 | &58,000.00 | Doublewide |

| NAME | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| William Tuver | CA | $20.00 | 2-17-00 | 00-1 | $1,00.00 | Mobile Home |
| William Stout | CK | $40.00 | 2-19-00 | 00-2 | $20,000.00 | Barn |
| Joseph Foster | CK | $20.00 | 3-1-00 | 00-3 | $7,000.00 | Mobile Home |
| John R. Yonker | CK | $50.00 | 3-14-00 | 004 | $50,000.00 | Signlewide |
| Patrick Simmet | CK | $20.00 | 3/31/00 | 00-5 | $2,000.00 | Porch |
| Douglas Reid | CK | $60.00 | 4/8/00 | 00-6 | $65,000.00 | House |
| Ruby Dunlap | CA | $40.00 | 4/17/00 | 00-7 | $35,000.00 | Garage |
| Jesse Rush | CK | $30.00 | 4/24/00 | 00-8 | $20,000.00 | Roof |
| Norman Keller | CK | $60.00 | 4/30/00 | 00-9 | $67,900.00 | Doublewide |
| Robert Weaver | CK | $50.00 | 5/4/00 | 00-10 | $40,0000.00 | Workshop |
| Mark Boring | CK | $60.00 | 5/24/00 | 00-11 | $80,000.00 | House |
| Jack Price | CK | $20.00 | 5/27/00 | 00-12 | $1,599.00 | Shed |
| William Brumbaugh | CA | $20.00 | 6/1/00 | 00-13 | $2,500.00 | Mobile Home |
| Dale Lichtner | CA | $15.00 | 6/2/00 | 00-14 | $200.00 | Shed |
| Kerry Miller | CA | $20.00 | 6/13/00 | 00-15 | $1,500.00 | Shed |
| Debra Kerr | CK | $70.00 | 6/15/00 | 00-16 | $190,000.00 | House |
| Charles Siegler | CK | $40.00 | 6/19/00 | 00-17 | $30,000.00 | Mobile Home |
| James Morris | CK | $20.00 | 6/24/00 | 00-18 | $4,500.00 | Bedroom |
| J. Robert Jounker | CK | $15.00 | 7/1/00 | 00-19 | $900.00 | Deck |
| William Foster | CK | $15.00 | 7/6/00 | 00-20 | $750.00 | Shed |
| Jesse Stickler | CK | $20.00 | 7/10/00 | 00-21 | $9000.00 | Mobilehome |
| Roy Augenstein | CK | $70.00 | 7/21/00 | 00-22 | $235,000.00 | House |
| Jeanne Price | CK | $70.00 | 7/22/00 | 00-23 | $135,000.00 | House |
| John Hewett | CK | $20.00 | 7/27/00 | 00-24 | $12,000.00 | Shed |
| Melissa Foster | CA | $20.00 | 8/30/00 | 00-25 | $1,500.00 | Room |
| Theodore Kock | CK | $20.00 | 8/31/00 | 00-26 | $2,000.00 | Barn |
| Joe Baker | CA | $20.00 | 9/18/00 | 00-27 | $ 3,000.00 | Mobile Home |
| Karl Aronson | CK | $20.00 | 9/20/00 | 0028 | $10,000.00 | Workshop |
| Karl Aronson | NA | NA | 9/20/00 | 0029 | NA | Demolish Barn |
| Donald DeArment | CK | $20.00 | 9/25/00 | 00-30 | $15,000.00 | Camp |
| William Koch | CA | $20.00 | 10/3/00 | 00-31 | $6,600.00 | Siding |
| Don Gibboney | CA | $15.00 | 10/3/00 | 00-32 | $700.00 | Deck |
| Paul Powell | CK | $15.00 | 10/25/00 | 00-33 | $900.00 | Porch |
| Mark McLaughlin | CK | $70.00 | 10/27/00 | 00-34 | $186,000.00 | House |
| A-1 Auto | CK | $20.00 | 11/17/00 | 00-35 | $1,000.00 | Mobile Home |
| Michael Yoder | CK | $20.00 | 12/4/00 | 00-36 | $2,000.00 | Storage Unit |

$1,248,549.00

| NAME | CA. | FEE | DATE | PERMIT | VALUE | PURPOSE |
|---|---|---|---|---|---|---|
| Raymond Tussey | CK | $60.00 | 1/6/01 | 00-1 | $65,000.00 | House |
| Tuckaway Tree Farm | CK | $50.00 | 1/11/01 | 01-02 | $46,000,00 | Barn |
| Thomas Henwood | CK | $70.00 | 1/11/01 | 01-3 | $400,000.00 | House |
| Donald Powell | CA | $15.00 | 2/14/01 | 01-4 | NA    Demolition of Camp | |
| Allan Diehl | CK | $60.00 | 2/27/01 | 01-5 | $65,000.00 | Addition |
| Kevin Boonie | CK | $60.00 | 3/31/01 | 01-6 | $52,000.00 | House |
| Joel Menuez | CK | $40.00 | 4/10/01 | 01-7 | $500,00 | Deck |
|  | | (Since | this was | deliquent | a fine was | added) |
| Dennis Rief | CK | $20.00 | 5/17/01 | 01-8 | $2,500.00 | Sheds |
| Stephen Stoltzfus | CK | $15.00 | 5/1/01 | 01-9 | $5,000.00 | Garage |
| Brian Bliss | CK | $20.00 | 5/5/01 | 01-10 | $1,000.00 | Porch/Pavill |
| Stoney Lonesome Camp | CA | $20.00 | 5/9/01 | 01-11 | $1,100.00 | Pavillion |

19

*Law Office*
## HARVEY B. REEDER

504 Penn Street
Huntingdon, PA 16652

*Phone: 814/643-3821*

May 1, 2000

68 PS
1053

David B. Corneal, Esquire
1445 West College Avenue
State College, PA  16801

Re:    John B. Hewett, Jr. and JoAnn F. Smith

Dear Mr. Corneal:

I am in receipt of your fax dated April 28, 2000.  Please be advised that I represent John B. Hewett, Jr. and JoAnn F. Smith.

It is my understanding that there are some difficulties with the Township in obtaining subdivision approval.  It is quite obvious to me that final settlement will not be able to take place on or before June 30, 2000.

My clients are not interested in any addendum to this Agreement and desire that the Agreement be terminated.

Accordingly, we would request that you return to us the down payment of $4,000.00, together with the monthly payments totaling $3,000.00 which have been made since November 7, 1999.  We are returning the original map which you left with Mr. Hewett.

Should you have any questions, please feel free to contact me.

Sincerely yours,

Harvey B. Reeder

HBR:klb

Enclosure

cc:    Mr. John B. Hewett, Jr.

20

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
3  DAVID B. CORNEAL AND SANDRA Y.      :
4  CORNEAL,                            :
            Plaintiffs                 :
5                                      :
       VS                             : NO. 1:00-CV-1192
6  JACKSON TOWNSHIP, Huntingdon        :
   County, Pennsylvania, W. THOMAS     :
7  WILSON, Individually and in his     :
   Official Capacity as Supervisor     :
8  of Jackson Township, MICHAEL        :
   YODER, Individually and in his      : JURY TRIAL DEMANDED
9  Official Capacity as Supervisor     :
   of Jackson Township, RALPH          :
10 WEILER, Individually and in his     :
   Official Capacity as Supervisor     :
11 of Jackson Township, BARRY PARKS,   :
   Individually and in his Official    :
12 Capacity as Sewage Enforcement      :
   Officer of Jackson Township,        :
13 DAVID VAN DOMMELEN, Individually     :
   and in his Official Capacity as     :
14 Building Permit Officer, ANN I.      :
   WIRTH, Individually and in her      :
15 Official Capacity as Secretary      :
   of Jackson Township, and            :
16 LARRY NEWTON, Individually and in    :
   his Official Capacity as Solicitor  :
17 to Jackson Township,                :
            Defendants                 :
18
```

19   DEPOSITION OF:  TERRY WILLIAMS, ESQUIRE

20   TAKEN BY:       DEFENDANTS

21   BEFORE:         NICOLE L. ZIMMERMAN
                     NOTARY PUBLIC
22
     DATE:           JULY 10, 2001, 10:08 A.M.
23
     PLACE:          THE DAYS INN
24                   240 SOUTH PUGH STREET
                     STATE COLLEGE, PA  16801
25

MLP REPORTING, INC.   (570) 748-1041

---

3

I N D E X

BY DEFENDANTS                          EXAMINATION

TERRY WILLIAMS, ESQ.
   By Mr. Sherr                        4, 63
   By Ms. Montgomery                   60


E X H I B I T S

WILLIAMS' EXHIBITS                     MARKED   PRODUCED

No. 1 - Notice of Deposition and        4         5
        and Subpoena

No. 2 - Court Order                    12        12

No. 3 - Letter (11/10/2000)            27        27

No. 4 - Letter (2/5/2001)              54        54

MLP REPORTING, INC.   (570) 748-1041

---

A P P E A R A N C E S:

ECKERT SEAMANS
   BY:  BRIDGET MONTGOMERY, ESQUIRE
        LESLIE A. MALADY, ESQUIRE
   213 Market Street, Eighth Floor
   Harrisburg, PA  17101
        FOR - PLAINTIFFS

MAYERS, MENNIES & SHERR, LLP
   BY:  ANTHONY R. SHERR, ESQUIRE
   3031 Walton Road
   Building A, Suite 330
   P.O. Box 1547
   Blue Bell, PA  19422-0440
        FOR - JACKSON TOWNSHIP, MR. WILSON,
        MR. YODER, MR. WEILER, MR. PARKS,
        MR. VAN DOMMELEN & MS. WIRTH

ALSO PRESENT:  DAVID CORNEAL

MLP REPORTING, INC.   (570) 748-1041

---

4

STIPULATION

        It is hereby stipulated by and between
counsel for the respective parties that sealing,
certification, and filing are waived, and that all
objections except as to the form of the question are
reserved to the time of trial.

        TERRY WILLIAMS, ESQ., called as a witness,
being sworn/affirmed, testified as follows:
        (Notice of Deposition and Subpoena premarked
Williams Exhibit No. 1.)


EXAMINATION

BY MR. SHERR:

   Q     Could you please state your full name for
the record?

   A     Terry James Williams.

   Q     Mr. Williams, my name is Tony Sherr.  We
just met, we spoke before.  I represent the Defendants,
other than Mr. Newton, in a lawsuit filed by David B.
Corneal and Sandra Y. Corneal, which is currently
pending in the United States District Court for the
Middle District of Pennsylvania.

MLP REPORTING, INC.   (570) 748-1041

1          We're here today to take your deposition.
2 You're familiar with depositions?
3     A     Yes.
4     Q     The only thing I would just like to stress
5 is that if you don't understand my question, please ask
6 me to clarify it, and that if you don't hear it, please
7 ask me to repeat it.  If you answer the question, we're
8 going to assume that you both heard and understood the
9 question.
10          I've placed in front of you what I've had
11 marked as Williams Exhibit No. 1, which, for the
12 record, I'll state is a Notice of Deposition and a
13 Subpoena.  Are you here today pursuant to the
14 deposition notice and subpoena?
15     A     Well, to be candid, I don't know that I've
16 ever received these.  I'm responding to Judge Rambo's
17 order and I think a telephone call from your office
18 telling me when you wanted to do the deposition.  We
19 received the original subpoena that was served, these
20 were not, but...
21     Q     Okay.  The third page, the addendum to
22 subpoena, have you seen that before?
23     A     I don't believe I have.
24     Q     Have you seen Judge Rambo's order in
25 conjunction with your deposition today?

1     Q     Did you review any documents in preparation
2 for today's deposition?
3     A     Probably when I got the first subpoena, I
4 went through the file -- no, wrong.  When I got Judge
5 Rambo's order, I pulled the file and removed my notes
6 and things; but did I review for today, no.
7     Q     Did you discuss, other than with
8 Mr. Corneal, today's deposition with anybody?
9     A     Other than counsel.
10     Q     When did you discuss today's deposition with
11 counsel?
12     A     I think that's privileged.
13     Q     When you discussed it with her?
14     A     Yeah, I think.
15     Q     And by counsel, you mean Bridget Montgomery?
16     A     Yes.
17     Q     Is she representing you here today?
18     A     Yes.
19          (Mr. Corneal entered the room.)
20          MR. SHERR:  Let the record reflect that the
21 Plaintiff, David Corneal, just entered the room.
22 BY MR. SHERR:
23     Q     What's your business address?
24     A     720 South Atherton Street, State College.
25     Q     And you're a member of a firm there?

1     A     Oh, yes, I've seen Judge Rambo's order.
2     Q     And Judge Rambo's order referenced documents
3 that you were to produce?
4     A     Yes.
5     Q     I've been handed a number of documents by
6 Ms. Montgomery this morning.  Where were these
7 documents from, where were these documents taken from?
8     A     They're from my file.
9     Q     Other than documents in your file, did you
10 search anywhere else for documents?
11     A     No.
12     Q     Do you have any other documents relative to
13 the request of Mr. Corneal's property other than what's
14 contained in your file?
15     A     As to Judge Rambo's order, no.
16     Q     There are other documents, but you believe
17 they haven't gone to third parties, is that --
18     A     Oh, that's correct.  I mean, I would have my
19 -- my file notes are not in the group that you have in
20 front of you.
21     Q     But you don't believe that there are any
22 other documents other than what's been produced that
23 concerns Mr. Corneal's property in Jackson Township
24 which have been sent to third parties?
25     A     No, they would all be in that file.

1     A     Yes.
2     Q     What's the name of the firm?
3     A     Miller, Kistler, Campbell, Miller, Williams
4 & Benson.
5     Q     How long have you been practicing law?
6     A     Twenty-eight years.
7     Q     And do you have a particular specialty?
8     A     Not as that term -- not as you
9 professionally understand that term like patent law or
10 anything like that, no.  It's a general practice firm.
11 I spend most of my time concentrating in municipal
12 work, commercial litigation, business-related
13 transaction law.
14     Q     What do you mean by municipal work?
15     A     Well, I serve as a solicitor for a number of
16 municipalities and I represent a number of developer
17 clients, as well as provide zoning litigation
18 assistance to other attorneys.
19     Q     When did you first become involved with
20 Mr. Corneal's property in Jackson Township?
21     A     I don't know that I can give you a specific
22 date.  Probably it would have been in November before
23 the first conference at the Huntingdon County
24 Courthouse.
25     Q     Was it your understanding that an action had