9

1 been filed in Huntingdon County against Mr. Corneal
2 prior to you becoming involved?
3     A     I didn't know that.  Mr. Newton had
4 indicated that they had filed some sort of cease and
5 desist action.  In other words, I did not have
6 pleadings, any of that sort before that meeting.
7     Q     So your first contact with anybody other
8 than Mr. Corneal with respect to his property in
9 Jackson Township was a phone call to Mr. Newton?
10    A     That's correct.
11    Q     Did you initiate that phone call?
12    A     I don't recall.  I have a feeling I must
13 have, otherwise Larry would not have known of my
14 involvement, so I must have.  Whether I called him or
15 he responded to a phone message from me, I don't know.
16    Q     And this phone call took place sometime
17 before the first conference in November?
18    A     Yes.
19    Q     What was the nature of that phone call?
20    A     We're going to be in front of the judge at
21 such and such a time.
22    Q     Was there any discussion about the case
23 itself?
24    A     Only from Larry's perspective about what
25 action he was trying to take, construction activities

                 MLP REPORTING, INC.   (570) 748-1041

10

1 were ongoing without benefit of appropriate permits.
2           I think Larry mentioned that there was a
3 civil rights action that had been filed.  I think I
4 told Larry that my involvement was strictly with the
5 building permitting process, that I had nothing to do
6 and would have nothing to do with the civil rights
7 action.
8     Q     Had you been out to the property, the
9 Corneal's property in Jackson Township prior to that
10 phone call?
11    A     No.
12    Q     Prior to the phone call, had you discussed
13 the Corneal property in Jackson Township with anybody
14 other than Mr. and Mrs. Corneal?
15    A     I regard that as a privileged response.
16 What I did in terms of investigation, I think is not
17 appropriate.
18    Q     Well, my question is, just so we're clear on
19 the record, did you have discussions prior to the phone
20 call with Mr. Newton concerning Mr. Corneal's property
21 with anybody other than David and Sandra Corneal?
22    A     That's part of my work product.
23 that's part of my work product.
24    Q     At the time that you had the phone call with
25 Mr. Newton, had construction commenced on the property?

                 MLP REPORTING, INC.   (570) 748-1041

11

1     A     That was my understanding both from -- well,
2 certainly from Mr. Newton.  I had not actually seen the
3 property myself.
4     Q     Other than this discussion with Mr. Newton,
5 did you have any discussions with any third parties
6 other than -- and by third parties, I mean other than
7 Mr. and Mrs. Corneal -- prior to a hearing and/or
8 meeting at the Huntingdon County Courthouse?
9           MS. MONTGOMERY:  Objection.  That's been
10 asked and objected to by the deponent himself.
11          MR. SHERR:  No, I asked him before the phone
12 call, now I'm asking after the phone call.
13    A     I would give the same response.  I think
14 that's privileged communication.
15 BY MR. SHERR:
16    Q     Did you go to the property prior to the
17 meeting at the Huntingdon County Courthouse in
18 November?
19    A     No.
20    Q     What was your understanding of the nature of
21 the action filed against Mr. Corneal?
22    A     To be honest, I had no understanding because
23 I hadn't seen the pleadings.  Mr. Newton advised me
24 that they had filed an action to obtain a cease and
25 desist order.

                 MLP REPORTING, INC.   (570) 748-1041

12

1     Q     Did you see the pleadings prior to the
2 conference at the courthouse?
3     A     No.
4     Q     Do you know what date you met at the
5 courthouse in November?
6     A     I'm sorry, I don't.  That would be in the
7 material that you have there in Judge Kurtz' orders.
8           MR. SHERR:  Let's have this marked as
9 Williams No. 2, please.
10          (Court Order marked Williams Exhibit No. 2.)
11 BY MR. SHERR:
12    Q     I'm going to show you what has been marked
13 as Williams Exhibit No. 2, which is a four-page
14 document consisting of an order by Stewart Kurtz, as
15 well as a motion for preliminary injunction and ask you
16 to review that.
17    A     Okay.
18    Q     Is that the order that you were referring
19 to?
20    A     Yes.  That means the meeting would have
21 occurred November 14, 2000.
22    Q     Just for a second, if you could just get
23 that back in front of you.  Looking at the second page,
24 have you seen that motion for preliminary injunction
25 before today?

                 MLP REPORTING, INC.   (570) 748-1041

13

1    A    Yes.

2    Q    And it's your testimony, though, that you

3 didn't see it prior to going to the courthouse?

4    A    No.

5    Q    Who was present when you went to the

6 courthouse?

7    A    Larry Newton.

8    Q    Was it you and Larry Newton?

9    A    Yes, we met in the hallway.

10    Q    Was anybody else present?

11    A    Not in that initial conversation, no.

12    Q    Was anybody else at the courthouse for this

13 matter that you were aware of?

14    A    Not at my initial meeting with Larry.  Now,

15 they were all there apparently, but not with my

16 conference with Larry.

17    Q    And you say the conference with Larry took

18 place in a hallway?

19    A    Uh-huh, outside the main courtroom in

20 Huntingdon County.

21    Q    And who initiated this meeting?

22    A    Gosh, I don't know how to answer that.  I

23 mean, both of us were there to talk about the Corneal

24 matter.  I don't know who initiated it in that sense.

25    Q    Can you tell me what the substance of the

MLP REPORTING, INC.   (570) 748-1041

14

1 conversation you had with Mr. Newton was?

2    A    Well, I'm sure other than the usual

3 civilities, I'm sure we talked about what Judge Kurtz

4 wanted to do that day.

5         I think we indicated that -- I think I

6 indicated that my purpose in being there was to find

7 out what it was the township was with trying to do to

8 try to get the building permit, sewage permit, driveway

9 permit, although I -- yes, I did know about the

10 driveway permit -- to get those matters taken care of.

11        And Larry made some comment about the

12 existence of this 1983 action, and I told him again I

13 have nothing to do with that, didn't want to have

14 anything to do with it, that I was there purely to try

15 to solve what he had filed, which I hadn't seen yet, in

16 Huntingdon County.

17        I'm sure I told him at that meeting that I

18 would try to do whatever I could to get that aspect of

19 it resolved, that I was concerned that David was in the

20 process of building without the benefit of those

21 permits and that I wanted to get that corrected.  I

22 wanted to find out what was wrong and why on heaven's

23 name the township hadn't issued building permits.

24    Q    And did you find out at that meeting?

25    A    No, not at that -- no, not at that initial

MLP REPORTING, INC.   (570) 748-1041

15

1 meeting, no, nor the subsequent conference that carried

2 over from that.  I think -- I don't remember who went

3 in to talk to the judge's clerk or his secretary,

4 probably both of us stepped in the door, I think we

5 indicated to the secretary that we wanted to confer a

6 little bit.

7         Larry ushered me into the law library, I was

8 surprised when I got in the law library that all of the

9 board of supervisors were there, the secretary,

10 Ms. Wirth, SEO Parks, the building permit officer,

11 whose name I don't recall.

12    Q    Van Dommelen?

13    A    I just don't remember his name, but the

14 building permit officer was there, I was very surprised

15 that they were all sitting in a row.

16    Q    And why did that surprise you?

17    A    Well, I hadn't anticipated that they were

18 going to have that type of full-blown meeting.  I

19 thought the purpose was to confer with Larry Newton and

20 with the judge.

21    Q    Did you confer with the judge that day?

22    A    We certainly didn't -- or I certainly didn't

23 confer with the judge in the sense of having a

24 conference with the judge about the case.

25        I have a feeling we probably talked to him

MLP REPORTING, INC.   (570) 748-1041

16

1 in the hallway, but that may have been more good

2 morning, Judge, how are you, sort of thing.  I don't

3 remember anything about the conversation with the

4 judge.

5    Q    The meeting that you had in the library,

6 what took place at that meeting?

7    A    Well, the township was telling me about what

8 they felt was wrong with what David had done.  They

9 provided an indication that construction was ongoing,

10 that there were no building permits, that there were no

11 septic permits, that there was no driveway permit and

12 that they wanted to stop him and they wanted it stopped

13 now.

14        I'm sure there was more general information

15 offered, but they had drawings, they permitted me to

16 talk to the SEO, to the building permit officer, to the

17 road master about what the situation was.

18        And actually, Mr. Newton, who obviously was

19 present, allowed me to ask questions of them, what do

20 we need to do to solve this, what's wrong with that,

21 that kind of exchange back and forth.

22    Q    You had a discussion there with the SEO?

23    A    The SEO was there, yes.

24    Q    And you had a discussion with him?

25    A    Yes, in the sense of asking him a question,

MLP REPORTING, INC.   (570) 748-1041

1 what needs to be done to get the sewer permits, an
2 explanation.
3     Q     And what do you recall him telling you
4 needed to be done?
5     A     I think his comment at that meeting, and I'm
6 sorry, Counsel, I don't have a definitive recollection,
7 but I think what he told me was that the test pits were
8 acceptable, that the modules had been filed and were in
9 appropriate form, but that the drawing which had been
10 attached to it was not because it showed a subdivision.
11     Q     And did he indicate to you what the problem
12 with the drawing showing a subdivision was?
13     A     No, I think -- no, he didn't tell me why he
14 thought that was inappropriate, no.
15     Q     Did you ask him any questions about what he
16 told you?
17     A     No.  I'm certain I asked him what else do
18 you think we -- what else do we need to do to get this
19 clarified, and from that, I don't think the SEO
20 responded; someone did, I don't recall, it may have
21 been Ms. Wirth, but I don't recall, someone responded
22 that the drawings needed to be modified to eliminate
23 references to the subdivision.
24           There was also an issue about one of the
25 test pit numbers was inaccurate in the narrative, which

1 is the detailed attachment to the plan, in other words,
2 not the plan itself, but the detail that's attached to
3 it.
4     Q     Did you make any comments concerning the
5 propriety of what they were telling you at that
6 meeting?
7     A     No.
8     Q     Did the SEO, at that meeting, ask you for
9 permission to go onto the property to see if the test
10 sites had been disturbed?
11     A     No.
12     Q     Did he ask you subsequently at another
13 meeting?
14     A     He's never asked me could he go on the
15 property to see if the sites had been disturbed.
16     Q     Did he ask you permission to go onto the
17 site?
18     A     Oh, yes.
19     Q     Was that at the November meeting?
20     A     No, that would have been months later.
21     MR. CORNEAL:  Can I have an interruption for
22 a second so I can consult with my counsel, with Terry
23 Williams?
24     MR. SHERR:  I think that's inappropriate at
25 a deposition for you to be consulting with the

1 deponent.
2     MS. MONTGOMERY:  I think this is an unusual
3 deposition and I think that he's entitled to consult
4 with his counsel.
5     MR. SHERR:  If he was being deposed, he
6 wouldn't be allowed to consult with his counsel, so the
7 fact that his counsel is being deposed, he's not
8 allowed to consult with his counsel, either.
9     MS. MONTGOMERY:  Well, actually, we haven't
10 done the depositions in this case that way, Tony.  I've
11 allowed you to consult with your clients when you've
12 asked me to.
13     MR. SHERR:  You certainly have not.  And, in
14 fact, you gave an instruction at each deposition that
15 they were not entitled to consult with their attorney
16 during the deposition.
17     MS. MONTGOMERY:  Well, Tony, we can --
18     MR. SHERR:  Unless you're changing, you
19 know, what you state there at the beginning of each
20 deposition.
21     MS. MONTGOMERY:  Hold on one second.  I'm
22 going to consult with my witness.
23     MR. SHERR:  Well, that's inappropriate, as
24 well.
25     MS. MONTGOMERY:  Well, I'm going to consult

1 with him.
2     MR. SHERR:  Well, we'll let the record
3 reflect that you're consulting with the witness,
4 inappropriately so.
5           (Discussion held off the record between
6 Ms. Montgomery and the witness.)
7     MS. MONTGOMERY:  For the record, you know,
8 since you seem to want to put this on the record, Tony,
9 we are concerned that since it is his counsel being
10 deposed and he has some concern, that he is entitled to
11 talk to his counsel on this unusual situation.
12     MR. SHERR:  Well, I don't think the
13 situation is very unusual at all, and I don't think
14 it's appropriate for you to consult with him.  You
15 know, I'm not going to physically stop him from
16 consulting with him, so, you know, do what you feel you
17 need to do.
18     MS. MONTGOMERY:  Go ahead, and I will
19 listen.
20           (Discussion held off the record.)
21 BY MR. SHERR:
22     Q     Would you like to change or modify any of
23 your responses as a result of the conference that you
24 just had with Ms. Montgomery and Mr. Corneal?
25     A     No.

21

1    Q    Okay.  You said that you had asked some
2 questions to the SEO about what needed to be done and
3 you believe that Ms. Wirth responded?
4    A    My recollection is that Ms. Wirth is the one
5 who pointed out the discrepancy in the soil perc
6 number.  I'm not entirely certain of that, but I think
7 she did.
8    Q    Other than the sewer modules, was there
9 anything else that the township or that the individuals
10 present at that meeting indicated to you needed to be
11 fixed or completed to have Mr. Corneal in compliance?
12    A    Yes, there was discussion with the road
13 master concerning the driveway permit, there was
14 discussion that they really didn't have a driveway
15 permit ordinance in effect, but I agreed that if that's
16 what needed to be done to resolve that issue, we would
17 go ahead and apply for one.
18         I think the building permit officer -- I'm
19 sure I asked the same question to the building officer,
20 and I think he said, no, there's no reason why from a
21 building permit standpoint they can't be issued.
22    Q    So just in summary fashion, as a result of
23 this meeting, what did you learn that the township
24 wanted Mr. Corneal to do to come into compliance?
25    A    Well, I had a laundry list of things that

22

1 they wanted accomplished, principally being that he
2 obtain a septic permit, building permit and driveway
3 access permit, that the principal holdup, I guess, was
4 the modification or correction of the plan that was
5 attached to the sewer module and that was important
6 because that plan, as attached to the module, showed a
7 subdivision and the application was not for a
8 subdivision at this point, it was to obtain a building
9 permit.
10    Q    So did you indicate to the people present at
11 that time that Mr. Corneal was not attempting at this
12 time or at the time that you had the meeting to
13 subdivide the property?
14    A    No, what I indicated to them was that my
15 purpose in being there was to get the appropriate
16 permits and if that meant that the subdivision was for
17 the time being put on hold, that's what we would do,
18 but that my purpose was to get the permits.
19         Well, and obviously, to allow him to
20 continue to build, I mean, there was some discussion
21 about that, that if they were successful -- remember
22 now, they had not served anybody with this paper, with
23 what you've put in front of me, this motion, we hadn't
24 seen this, I hadn't seen it, but it had been
25 characterized to me by Mr. Newton that they wanted a

23

1 cease and desist order and certainly there was a great
2 deal of discussion at that meeting that if they
3 succeeded in getting a cease and desist order in
4 November, there was going to be additional damages on
5 that site.
6    Q    What do you mean by that, additional damages
7 on the site?
8    A    Well, once you've started construction,
9 stopping during winter in central Pennsylvania is
10 disastrous.
11    Q    So there would be damages from a physical
12 point of view of the site itself?
13    A    Absolutely.  I'm sure there are other
14 damages, but in terms of the structure, that's not the
15 best thing for a building.  The building officer, as I
16 recall, agreed with me about that.  He seemed like a
17 very nice man.
18    Q    Other than learning what the township wanted
19 to have, did anything else take place at this meeting?
20    A    Well, I'm sure there was a commitment on my
21 part to proceed to make whatever corrections they felt
22 they wanted and to work with them to try to bring David
23 -- to get David the permits to do what they wanted to
24 get the permits issued, and Mr. Newton agreed that they
25 would hold any further action under this filing in

24

1 advance.
2         And I think an agreement was reached at that
3 meeting that I would accept service of the documents so
4 that they didn't have to expend any further money
5 trying to serve the motion.  I don't recall anything
6 else.
7    Q    Did you or Mr. Newton have a discussion with
8 the judge after this meeting to let the judge know what
9 was going on?
10    A    I don't think so, we were into the noon
11 hour, I don't believe so.  Whether Mr. Newton did, I
12 don't know, of course, but I don't recall that I saw
13 the judge again.
14    Q    Were you aware at the time that you met
15 whether or not Mr. Corneal had applied for a building
16 permit?
17    A    Well, I think what I was aware of is
18 probably privileged.
19    Q    After the meeting in November, did you meet
20 with anybody other than Mr. or Mrs. Corneal for the
21 purpose of complying with what the township wanted
22 Mr. Corneal to do?
23         MS. MONTGOMERY:  Objection.  What Attorney
24 Williams' purpose was is certainly a privileged, if not
25 a work product matter.

25

1    A    I would agree.  To me, that's privileged,
2 what I did.
3 BY MR. SHERR:
4    Q    Did you meet -- I'll just say it like this
5 and noting that objection, after that November meeting,
6 did you meet with anybody other than Mr. or Mrs.
7 Corneal with respect to the property before your next
8 meeting with the township?
9    A    Once again, I think that's privileged, I
10 think that's the same question.
11   Q    Well, all I'm asking you -- just so we're
12 clear -- all I'm asking you is whether you met with
13 anybody, other than the Corneals?
14   A    Other than the Corneals before I met with
15 the township again, yeah, I think that's privileged,
16 that's my work product, that's what I do for a living.
17   Q    But this is a meeting -- well, you may be
18 asserting your work product, and I'm not asking you
19 what happened at the meeting or anything of that
20 nature, I'm asking you whether you met with somebody
21 other than Mr. or Mrs. Corneal?
22   A    But the fact that there was a meeting, I
23 think is work product.  I think that gets into the
24 disclosure and I think that's clearly privileged.
25   Q    All right.  Well, we'll find that out.  Did

26

1 you speak with anybody other than Mr. and Mrs. Corneal
2 concerning -- and township officials concerning the
3 property prior to your next meeting with the township?
4    MS. MONTGOMERY:  Objection.  It's been
5 asked, objected to, answered.
6    MR. SHERR:  Well, I asked for meetings and
7 now I'm asking for whether or not he spoke with
8 anybody.
9    A    Oh, then I misunderstood your prior
10 question.  Let's try to short-circuit that.  I feel
11 that what I did in terms of talking with people,
12 meeting with people, research or whatever, I think
13 that's all privileged material, it's a part of my job
14 in representing a client.
15 BY MR. SHERR:
16   Q    After this meeting in November, did you have
17 an opportunity to go to the property in Jackson
18 Township?
19   A    At some point, I went to the property, yes.
20   Q    When was that?
21   A    I'm sorry, sir, I don't recall.  I don't
22 know when I actually went there, other than to tell you
23 it was cold and there was snow on the ground.
24   MR. SHERR:  I would like this marked as
25 Williams No. 3, please.

27

1    (Letter marked Williams Exhibit No. 3.)
2 BY MR. SHERR:
3    Q    I'm going to show you a letter from you to
4 Jackson Township Board of Supervisors dated November
5 10, 2000, which has been marked as Williams No. 3 and
6 ask you to review that.
7    A    Yes.
8    Q    Now, you wrote this letter prior to the
9 meeting that we were just discussing, correct?
10   A    Apparently.  I don't have an independent
11 recollection of that, but I must have.
12   Q    Do you have any reason to doubt the date
13 that appears on that letter?
14   A    No, I have no reason to doubt the date.
15   Q    Okay.  Did you have a discussion concerning
16 Williams No. 3 with anybody from the township?
17   A    No, I don't recall any discussions about the
18 building permit appeal.
19   Q    Did you discuss that at the meeting at the
20 courthouse?
21   A    Not to my knowledge.  I don't recall that.
22 There were a lot of discussions, somebody may have
23 mentioned it, but I don't remember that.
24   Q    Was it your understanding that the hearing
25 that you requested in Williams No. 3 had been subsumed

28

1 in what you discussed at the courthouse on November 19?
2    A    No, that was not my understanding.
3    Q    And it's also your testimony that you did
4 not bring up the fact that you had asked for a hearing
5 on an appeal from a denial of a building permit?
6    A    No, I don't recall talking about that.  The
7 discussion centered on their request for injunctive
8 relief.
9    Q    And the discussion also centered on, at
10 least at some points, about building permits?
11   A    Absolutely.  Building permits were the
12 principal focus of the meeting.
13   Q    All right.  So you discussed with the
14 township at the meeting at the courthouse with the
15 township officials and employees the deficiencies they
16 found in the building permit application by
17 Mr. Corneal?
18   A    To my knowledge, there were no deficiencies
19 in the building permit application.  The building
20 officer, when I asked him that question, my
21 recollection is he said no, nothing needs to be done to
22 those.
23    The problem is in the septic -- or the land
24 development plan and the driveway permit and that the
25 building -- well, I don't remember what the building

29

1 officer said about it.  I think his comment was I can't
2 issue a building permit until the septic permit is
3 resolved.
4       Q      You think he said that at the meeting in
5 November?
6       A      I'm certain it wasn't Mr. Newton.  I think
7 it was the building permit officer.
8       Q      Did you say anything in response to that
9 statement?
10      A      I don't recall a response.
11      Q      So you may have responded and you just don't
12 recall what it was?
13      A      Yeah, I just don't recall.
14      Q      Now, you indicated earlier that it was your
15 intent to comply with what the township was asking with
16 respect to the property?
17             MS. MONTGOMERY:  Objection.  That's not what
18 he testified to.
19 BY MR. SHERR:
20      Q      Do you recall testifying to that effect?
21      A      I've lost the focus of the question.  Sorry.
22      Q      Okay.
23      A      First of all, let me be clear, my intent, I
24 think is privileged.  I think what you're referring to,
25 you asked me a question about what was said, and what I

30

1 indicated was that I told them that I would help
2 Mr. Corneal come into compliance and do whatever they
3 wanted us to do to get the building permits, that I did
4 say.
5       Q      Okay.  Did you give an indication at any
6 time after the meeting in November at the courthouse
7 that Mr. Corneal still desired a hearing with respect
8 to the denial of his building permit?
9       A      No, I don't recall any discussion about the
10 building permit appeal hearing.
11      Q      What's the next meeting that you recall
12 having with the township or township officials
13 concerning the property?
14      A      Here I may have my sequence off.  I'm
15 certain there were phone calls with Solicitor Newton,
16 I'm certain there were one or two phone calls with
17 Ms. Wirth, I'm certain there were phone calls with the
18 road master regarding the driveway permit.
19             I suspect you have in front of you Judge
20 Kurtz' order which would tell me the date of the next
21 meeting at the courthouse.  I think the next meeting at
22 the courthouse was the only other meeting that we had.
23             Now, there was a site visitation with the
24 road master at the highway, not by said site, but let
25 me be precise, the meeting with the road master and

31

1 there was one other supervisor present was at the
2 driveway throat where it intersects the township road.
3             And there was one onsite meeting -- pardon
4 me, I stand corrected -- two onsite meetings where the
5 SEO was present, one with just the SEO, the other is a
6 much later meeting with representatives of DEP and the
7 SEO.  I think those are all the meetings.
8             Now, the exact sequence of those, I'm not
9 sure I can reproduce for you.  I do know the driveway
10 was first because we dealt with that issue first.
11      Q      What was the issue with the driveway that
12 was being dealt with?
13      A      Well, the township at the first meeting
14 contended that he needed a driveway permit.  I
15 politely, I wouldn't want to say argued, but politely
16 pointed out that they didn't have the driveway permit
17 ordinance enacted when the driveway throat was
18 constructed, but we would file an application for a
19 permit.
20             There was discussion at that meeting with --
21 this is the first meeting now -- with the road master
22 that he was not happy about the contour of how that
23 driveway throat was constructed, so that the meeting on
24 site, site referring, again, to the intersection
25 between the driveway and the road, was to look at that

32

1 basically to say what do you want us to do.
2       Q      And what did they indicate?
3       A      Well, he indicated he wanted a
4 reconstruction of the driveway throat, obviously he
5 wanted a permit application, he wanted a reconstruction
6 of the driveway throat and that ultimately, he wanted
7 stabilization of where the driveway intersects the
8 highway so that -- well, I don't know that he gave me
9 his reasons for that.
10            The reason for the reconfiguration he gave,
11 which was to facilitate water drainage so that it
12 didn't drain out onto the road surface, but went into
13 the drainage culverts -- they're actually not culverts,
14 that implies some construction, they're swales on
15 either side of their township road.
16            So we talked about methods of
17 reconfiguration construction, we agreed that we would
18 pick an appointed day when the weather permitted
19 because it was very cold then to come back and redo the
20 driveway throat.
21            MR. SHERR:  Let the record reflect that
22 Ms. Montgomery is speaking to the witness.
23            (Discussion held off the record between
24 Ms. Montgomery and the witness.)
25 BY MR. SHERR:

33

1    Q    Would you like to change or modify any of
2 your previous responses as a result of what
3 Ms. Montgomery just told you?
4    A    No.
5    Q    So you agreed to comply with what the road
6 master was asking with respect to the intersection of
7 the driveway and the road?
8    A    Yes.
9    Q    And how about with respect to the
10 application for a driveway permit?
11   A    Well, I pointed out again to him that he
12 didn't have a driveway ordinance that was in effect at
13 the time of this construction, but if that would help
14 get the building permit issue resolved, I would have
15 David apply for a permit.
16   Q    So to the point when this meeting took place
17 on the road, no driveway permit had been applied for?
18   A    I can't answer that, Tony.  I don't know
19 when that application was filed.  It may or may not
20 have been; I don't know.
21   Q    How about the sewer modules, were they
22 amended in accordance with the discussion you had in
23 November at the courthouse at the time that you had
24 this meeting out at the roadway?
25   A    I'm sorry, sequentially, I don't know.  It

MLP REPORTING, INC.  (570) 748-1041

---

34

1 was an ongoing process on all those fronts and when
2 something was done in relation to another, I can't
3 answer; I don't know.
4    Q    You indicated that you had a couple
5 conversations with Mr. Newton --
6    A    Yes.
7    Q    -- by telephone?
8    A    Yes.
9    Q    And I understand we don't necessarily know
10 when the sequence of those conversations were, but what
11 was the substance of those conversations?
12   A    Well, I think -- well, that's too general of
13 a question.  It's not that I'm not trying to respond to
14 that, I don't know, the discussions were around the
15 tenor of I can't get application formats from the
16 township, will you send them to me.  Yes, I'll send
17 them to you.
18        Have we done everything on what we filed, in
19 other words, when I would send something into the
20 township, I would call him and say, is there anything
21 else you need to do here, they were along those lines.
22        Mr. Newton would tell me about his
23 frustration that these permits hadn't been issued and
24 that they were getting pressure from other citizens in
25 the township that this was going on and construction

MLP REPORTING, INC.  (570) 748-1041

---

35

1 was continuing.
2        And I bluntly indicated to him the fact that
3 the permits hadn't been issued was, in my view, not
4 Mr. Corneal's situation, it was because of the actions
5 of the township, but that we would continue to do
6 everything we could to correct that aspect of it.
7    Q    Did you tell him what actions of the
8 township prevented the permits from being issued?
9    A    No, I don't think we ever went into those
10 kinds of details.  We're not talking about lengthy
11 conversations.
12   Q    Did you indicate to him that the township
13 was doing something to prevent permits from being
14 issued?
15   A    Prevent, no, I can't use that word,
16 "prevent".  I'm sure I said to him on a number of
17 occasions, where in your ordinance scheme are you
18 getting this, why are you doing it -- not why are you,
19 the solicitor isn't doing it -- why is the township
20 doing it this way.
21   Q    Do you recall any specific examples of
22 asking him why are you doing this, why is the township
23 doing it this way?
24   A    Sure, why are they requiring a driveway
25 permit when they didn't have a driveway ordinance, why

MLP REPORTING, INC.  (570) 748-1041

---

36

1 did they go to this land development plan, why, for
2 example, when we filed the one set, did they come back
3 and ask me for drawings in a different scale, a scale
4 that, to my knowledge, nobody else uses because it's so
5 ludicrous in terms of sizing that required us to have
6 new prints drawn, those kinds of questions.
7        And quite frankly, they were rhetorical
8 questions, I don't think they were ever designed for
9 Larry to answer.
10   Q    Did Larry give you any answers to those
11 questions?
12   A    No, not to my knowledge.  Larry always
13 expressed the hope that we could get the building
14 permit worked out.
15   Q    And did you give him the indication that you
16 had that same hope?
17   A    That I would hope that we could get the
18 building permit, septic permit and driveway permit
19 worked out, yes.
20   Q    You indicated you had phone conversations
21 with Ms. Wirth?
22   A    Yes, they were very brief, they were about
23 where can I deliver these things, in other words, how
24 do I get to your secretarial office to deliver them.
25        I think I -- at one point there close to tax

MLP REPORTING, INC.  (570) 748-1041

37

1 season, there was one conversation where we hadn't
2 gotten something that we needed, I don't remember what;
3 I'm sorry, I can't recall what it was, probably an
4 application of some sort, and she said, well, she was
5 very busy, because she's a public accountant, and I
6 commiserated with her about the frustrations of early
7 April for people in that business, but we eventually
8 got that from her, but there was nothing in
9 conversations with Ms. Wirth about the substance of the
10 matter.
11    Q    How about the road master, you said you had
12 conversations with him?
13    A    Yes, they were about, once again, the
14 driveway, the necessity of the permit, the
15 configuration of the permit, and then after the work
16 was done, he called me to talk about the fact that they
17 were happy with the configuration, but that they wanted
18 it stabilized with 2RC stone.
19    Q    Was that done?
20    A    Yes, I believe it was.
21    Q    Has the driveway permit been issued?
22    A    A driveway permit was issued at some point.
23 I think that -- yes, the short answer, yes.
24    Q    Any other conversations you remember having
25 with the road master, telephone conversations?

39

1    Q    Did you say anything in response to that
2 indication by Mr. Parks?
3    A    I probably said, oh, really.
4    Q    Was anything else discussed initially about
5 that?
6    A    No.  The purpose -- but the purpose of the
7 meeting was to look at that and to look at the
8 condition on site.
9    Q    When you say look at that, what do you mean?
10    A    The location of the driveways in
11 relationship to the septic pit.
12    Q    And this was for the structure that was
13 being constructed on the property?
14    A    Sure.  Yes.
15    Q    And did you go with Mr. Parks to the site to
16 look at that situation?
17    A    I didn't go with him, but I met him there,
18 yes.
19    Q    Was anybody else present at that meeting?
20    A    I'm certain David was there, there were
21 workmen obviously, but I think the only people
22 participating in the meeting were Barry and I and David
23 was there.
24    Q    What happened at that meeting on the site?
25    A    Suddenly, Mr. Parks never discussed the

38

1    A    No, not to my recollection.  There may have
2 been some brief conversations about what day are we
3 going to do these things, but that's all.
4    Q    Now, you indicated that you had two meetings
5 at this site, one just with the SEO --
6    A    Yes.
7    Q    -- and one with others.  Let's just talk
8 about the first meeting.
9    A    Okay.
10    Q    How did that meeting come about?
11    A    I think Mr. Parks initiated the meeting, I
12 think he indicated to me he wanted the meeting because
13 the new applications had been filed and he wanted to
14 make a site visit to see what the conditions were
15 because construction activities had taken place and he
16 wanted to -- he wanted to look at it again.
17         Either in that conversation or a
18 conversation the next day, which we're in the process
19 of working out the scheduling, so there may have been a
20 second conversation, I can't remember that, but anyway,
21 he made a comment to me that he was concerned that the
22 driveways were located within ten feet of the septic
23 pit, which is, if you're going to use that soil test,
24 you're going to use that as the disposal area, that's
25 contra to DEP regulations.

40

1 driveways, but he observed that a truck had backed over
2 one of the septic pits and he immediately said to me,
3 well, that's no longer acceptable, we can't do that, we
4 can't use that.
5    Q    What did you say in response to that?
6    A    Probably something like, oh, really.  I'm
7 sure that's not a direct quote.  Probably I see or
8 something of that sort.
9    Q    Did you give any indication to him that you
10 felt contrary?
11    A    I'm sure I probably did say to him that that
12 is a matter for a soil scientist, that while there may
13 have to be surface repair, that I felt it could still
14 be used.  I think I probably had that discussion with
15 him.  Then we looked at -- well, go ahead; I'm sorry.
16    Q    What did you look at next?
17    A    We looked at the alternate sites because
18 there was more than one approved site.
19    Q    You looked at alternate --
20    A    Disposal sites.
21    Q    -- approved disposal sites?
22    A    Uh-huh.
23    Q    Did you give any indication to Mr. Parks
24 that other sites would be able to be used with the
25 structure that was being constructed at that time?

41

1    A    I didn't do that. I think that was general
2 knowledge. That's why they did all the testing. I
3 think everybody is aware there were multiple sites on
4 that property.

5    Q    Did you have the understanding that they
6 tested multiple sites because at the time there were
7 plans for a subdivision?

8    A    No, I did not have that understanding. It's
9 prudent when you're doing this type of work to do
10 multiple sites. I suppose -- well, I guess what my
11 impression is is privileged, but it's common practice
12 when you're doing a development like this out in the
13 woods, and by development, I mean building a house and
14 a garage and the art studio, that you would do multiple
15 sites so you had alternatives as you were in the
16 process of construction.

17    Q    Did either you or Mr. Corneal or any of the
18 workmen say that we would use an alternate site for the
19 septic for the structure?

20    A    The workmen have no involvement in this.
21 Mr. Corneal, I don't believe, other than pleasantries,
22 talked at all, he listened. We discussed what
23 alternate sites would be useable to service the
24 structures.

25    Q    Did you ever give him any indication that an

MLP REPORTING, INC.   (570) 748-1041

42

1 alternate site would be used for the septic for the
2 structure that was being built?

3    A    No, because I felt that the one that the
4 truck had backed over was still serviceable, that there
5 was no need for another one. The point of that
6 discussion is the module, is the planning module that
7 says are there allowable and acceptable sites to permit
8 the construction of an onsite septic system, that's all
9 that's in the module.

10    The design of the system is the part of the
11 permitting process where you come in with a design for
12 the system, here's what we propose to build and the
13 permit, the septic permit, is issued. The module
14 predates the septic permit, the module is what is
15 necessary for the issuance of building permits, et
16 cetera.

17    Design of the system is a postconstruction
18 matter, in other words, you can build and not have a
19 septic permit. So the point of the discussion with
20 Mr. Parks is there are multiple sites that are
21 available here, where's the module.

22    Q    And what was his response?

23    A    Well, Mr. Parks looked at sites on the lower
24 side and said, well, those aren't acceptable. And I do
25 believe David did at that point in a cry of pain say,

MLP REPORTING, INC.   (570) 748-1041

43

1 but you approved those sites.

2    I asked Mr. Parks for his soil logs, those
3 are the data sheets from the testing, he did not have
4 them for those downhill sites, he had them for the one
5 that the truck backed over, he had one for a site that
6 is some extensive distance away from the construction,
7 but he did not have the one for the downhill site that
8 would have been appropriate to use as an alternate
9 system.

10    Q    Did you thereafter discuss this matter with
11 a soil scientist?

12    A    Privileged.

13    Q    Did you have any discussions with
14 Mr. Archmody, A-R-C-H-M-O-D-Y?

15    A    That name is unknown to me, so no. Is that
16 a person? I mean, it's a person --

17    Q    Yes, it's a person.

18    A    But I mean, who is that person?

19    Q    Well --

20    A    Names are not in my lexicon. I don't
21 recognize the name.

22    Q    You don't recall having a meeting on the
23 site with Mr. Archmody from either DEP or --

24    A    Oh, there was a meeting with DEP officials,
25 absolutely. That occurred later.

MLP REPORTING, INC.   (570) 748-1041

44

1    Q    Was he present at that meeting?

2    A    He may have been. There were two DEP
3 officials. One is the -- well, I'm going to get his
4 title wrong. He's the soil -- no, he's not the soil
5 sanitarian, he's the director of the local DEP office
6 and there was an assistant. I'm sorry, I don't
7 remember either of their names.

8    Q    Okay.

9    A    So to summarize, to my knowledge, I've never
10 talked to -- I'm sorry, the name again?

11    Q    Archmody.

12    A    Archmody, I'm sorry, I don't recognize that
13 name.

14    Q    Okay. Did you subsequently indicate to
15 Mr. Parks that the site that he indicated that could
16 not be used because it had been disturbed was a correct
17 interpretation?

18    A    Probably at the second meeting, there was
19 discussion that the SEO could raise the concern issue
20 about the site having been driven over. I don't know
21 that we ever talked about whether it was an appropriate
22 decision or not, but yes, that he had a right to raise
23 that concern.

24    At the first meeting, that wasn't an issue.
25 The issue at the first meeting was, well, that that can

MLP REPORTING, INC.   (570) 748-1041

45

1  be repaired, which is my understanding of the soil
2  characteristics.
3      Q     Well, did you send or have prepared and at
4  some point give to the township officials a report from
5  a soil scientist?
6      A     I did not do that personally.  A soil
7  scientist was consulted and a report prepared and
8  submitted, yes, to DEP, I think, yes.
9      Q     And was that report discussed at the site
10 when you met with the DEP officials?
11     A     Oh, I doubt if it was discussed.  I think it
12 was clear that it had been done.  I think the DEP
13 people had looked at it; but was it discussed, no.
14     Q     How did this meeting with the DEP officials
15 come about?
16     A     Well, Mr. Parks was not going to proceed
17 further without something, and I'm not sure what
18 something is.  There was another change in circumstance
19 on the property not temporally related to that first
20 meeting, but before the second meeting, and as a result
21 of that, an engineer was retained for purposes of
22 assisting with solving the septic problems.
23     Q     What was the change in circumstance?
24     A     A well was drilled.
25     Q     And who indicated that that was a change in

MLP REPORTING, INC.   (570) 748-1041

---

46

1  circumstances that affected this issue?
2      A     I know just enough to be dangerous.  The
3  location of the well would render the site that was
4  backed over by the truck unusable because the well was
5  too close to it to allow it to be used for the disposal
6  of the waste water.  It makes it a nonissue, if you
7  will.
8      Q     Right.  And you said an engineer was
9  retained.  An engineer was retained on behalf of
10 Mr. Corneal?
11     A     That's correct.
12     Q     And somehow through this change in
13 circumstance and the engineer being retained, another
14 meeting was held at the property?
15     A     That's correct.
16     Q     Who was present at this meeting?
17     A     Oh, boy, all right, the workmen were there,
18 although not participating in the meeting, Barry Parks,
19 two representatives of the Altoona office of DEP, I was
20 there, Larry Newton was there, Tom Bowes was there,
21 B-O-W-E-S, and -- that's terrible, I don't recall
22 whether David was there or not; I assume he was, but I
23 don't remember, he may not have been, I don't remember
24 him participating in any way, so he may not have been.
25     Q     Now, do you know how it was that the

MLP REPORTING, INC.   (570) 748-1041

---

47

1  representatives from the Altoona DEP were present at
2  that meeting?
3      A     Well, precisely, no, but the Altoona office
4  is the reviewing agency of the module, and ultimately,
5  the reviewing agency for whatever design is put forth;
6  In other words, they would be, if you will, the people
7  to whom Barry Parks would send his data.
8            I'm certain that there were discussions
9  between Larry Newton and I by phone that DEP had to be
10 involved in this, that we needed to get this resolved,
11 who said what, I don't know, but I'm sure that the
12 township was in favor of having DEP involved.
13           We wanted that done.  Obviously, we were not
14 going to get anywhere with this permit with Mr. Parks
15 and we had to go to higher authority.
16     Q     What was Mr. Parks' position at this time
17 prior to this meeting with DEP?
18     A     Oh, okay.  His position at the first meeting
19 was there were not acceptable sites that would allow
20 the module to proceed.
21     Q     What happened at the second meeting where
22 the DEP officials were present?
23     A     From a septic standpoint, I think there was
24 general concurrence by all concerned that what had been
25 proposed was appropriate, that the testing had been

MLP REPORTING, INC.   (570) 748-1041

---

48

1  done properly, that there was no reason why the module
2  shouldn't be approved and that subject to getting the
3  actual design -- once again, remember, those are
4  separate processes -- but subject to getting detailed
5  design, that the site could be served by what had been
6  proposed.
7            Now, this involved a new pit, which didn't
8  exist at the first meeting.
9      Q     Well, that was my question, what was being
10 proposed that was acceptable?
11     A     What was being proposed was a drip
12 irrigation system.
13     Q     When was that proposed to the township?
14     A     Well, it had to be after the first meeting
15 with Parks and certainly before the second meeting with
16 DEP and Mr. Parks.
17     Q     And do you recall either of the DEP
18 representatives saying anything at this meeting?
19     A     Oh, sure.
20     Q     What do you recall them saying?
21     A     Well, both people from DEP got in the pits
22 and looked at the testing and the soil characteristics,
23 you're looking at the stratification of the soil, they
24 looked at -- commented on that, commented on the
25 characteristics of that typical soil from the mapping,

MLP REPORTING, INC.   (570) 748-1041

1 commented on the positioning of where these test pits
2 were and the proposed disposal sites were, and the
3 bottom line, at the end of the meeting or near the end
4 of the meeting commented they were satisfied.

5        Also, they promised, because I was anxious
6 to get the building permit, they promised that as soon
7 as they had the paperwork from the township, they would
8 review it.

9    Q    Has that been done?

10    A    As I sit here this morning, not to my
11 knowledge. When you say done, has DEP reviewed the
12 paperwork, that's the question I'm answering?

13    Q    Yes.

14    A    No, to my knowledge, that has not been done.

15    Q    Has the paperwork been sent to DEP?

16    A    My understanding is that the paperwork went
17 to DEP recently from the township, meaning within a
18 matter of days ago.

19    Q    Do you have an understanding as to why there
20 was a delay between when you had that meeting with the
21 DEP officials and when they were sent to DEP?

22    A    There would have been further -- there were,
23 not would have been, there were further modifications
24 to the module now that everyone seemed to be on line
25 with the new test pit and the drip irrigation system,

MLP REPORTING, INC. (570) 748-1041

1 although the drip irrigation system has less to do with
2 the module than it does with the ultimate design, but
3 the location of the pit is important because that's in
4 the module and that had to be changed on the mapping.

5        I imagine there's a change in the narrative
6 statement, too, that's attached to it that makes
7 reference to drip.

8    Q    Now, this second meeting, we'll call it the
9 second meeting, with DEP officials, this took place
10 after another meeting at the courthouse, correct?

11    A    Oh, yes, the meeting with the DEP officials
12 would be in this temporal sequence to the last meeting.
13 By now, it's warm, the leaves are out.

14    Q    I want to talk about the second meeting that
15 occurred at the courthouse. Do you recall when that
16 was?

17    A    Specifically, no. I'm sure there's a Judge
18 Kurtz scheduling order.

19    Q    Yeah, I don't know if I separated one out.

20    A    Well, I think I got a letter from Mr. Newton
21 telling me that he had asked for, I think what he
22 described as a status conference.

23    Q    Just let the record reflect that the witness
24 is looking through his correspondence file which has
25 been produced.

MLP REPORTING, INC. (570) 748-1041

1    A    I don't see correspondence from Mr. Newton,
2 so maybe what he did was call me that he wanted a
3 status conference. In any event, somehow I became
4 aware that Larry had asked the Judge for a status
5 conference and that a time had been scheduled and he
6 gave me the date and time.

7    Q    Did you have a conversation with Mr. Newton
8 as to why he believed the status conference was
9 necessary?

10    A    No, I don't believe so. I don't think Larry
11 and I were ever able to chat about that, he just simply
12 told me that's what he was doing.

13    Q    Okay. Now, who attended this meeting at the
14 courthouse?

15    A    Well, that was done in the courtroom, Judge
16 Kurtz was present, the court reporter, tip staff,
17 Mr. Newton. There were people from the township, I'm
18 reasonably certain Ms. Wirth was there, I don't know,
19 there were other people there from the township, but
20 exactly which ones, I don't recall.

21    Q    Were the proceedings transcribed?

22    A    You know, I don't know. A reporter was
23 there, but whether a -- I'm sure there's no
24 transcription, but whether notes of the testimony were
25 taken, I don't know.

MLP REPORTING, INC. (570) 748-1041

1    Q    Was this in court, I mean, was court
2 actually open?

3    A    Yes, court was in session, the Judge was on
4 the bench, yes.

5    Q    And what took place at this court session?

6    A    Basically, Judge Kurtz wanted to know, well,
7 where are we, gentlemen, and Mr. Newton presented what
8 he -- where we felt we are, and I responded as to where
9 I felt we were.

10    Q    And what was your response as to where you
11 felt you were?

12    A    Well, we had completed obtaining the
13 driveway permit at that point, that I felt we had
14 submitted everything that the township had asked us to
15 do, so it would seem to me that the court appearance
16 occurred before -- I may be wrong, but it seems to me
17 it occurred before the meeting with Parks on site, I'm
18 not certain about that.

19        And I think the Judge's -- distilling an
20 awful lot -- I think the Judge said, well, do you
21 gentlemen think you're going to be able to get this
22 worked out. I think Mr. Newton indicated that he felt
23 we had made an honorable effort to do that and that we
24 could get it worked out. The Judge thanked us and we
25 went on our way.

MLP REPORTING, INC. (570) 748-1041

53

1    Q    About how long did this proceeding last?

2    A    I don't know, 20 minutes, 15 minutes maybe.

3    Q    Did you have any other discussions with
4 Mr. Newton either before or after this proceeding at
5 the courthouse?

6    A    Oh, I'm sure I spoke to Larry before we went
7 into the courtroom, I don't have much of a recollection
8 of what went on.  And I'm sure there were postmeeting
9 conversations because I remember asking them, now, is
10 there anything else that we haven't done that you need
11 to have done, and my recollection of coming away from
12 that court proceeding is that no, everything has been
13 submitted.

14    Q    Have you ever had a discussion with anybody
15 other than discussions with Mr. Corneal about a privy
16 permit?

17    A    Other than Mr. Corneal, no.

18    Q    Did you ever have discussions --

19    A    No, I don't think so.

20        MR. CORNEAL:  Can we take a break for a few
21 minutes?

22        MS. MONTGOMERY:  We can.  Sure.

23        MR. SHERR:  Sure, you can take a break.

24        MR. CORNEAL:  I want to talk to
25 Mr. Williams.

MLP REPORTING, INC.  (570) 748-1041

54

1        MR. SHERR:  You want to talk to Mr. Williams
2 again?

3        MR. CORNEAL:  Uh-huh.

4        MR. SHERR:  Knock yourself out.

5        (Discussion held off the record.)

6        (Letter marked Williams Exhibit No. 4.)

7        MR. SHERR:  Can you just read me the last
8 question and answer, please?

9        (The reporter read back the referred-to
10 portion of the record.)

11 BY MR. SHERR:

12    Q    I'm going to show you what has been marked
13 as Williams No. 4, which is a letter from you to Ann
14 Wirth dated February 5, 2001.  Is that, in fact, a
15 letter that you wrote to Ann Wirth on that date?

16    A    Yeah, it's written to the township, directed
17 to Ann Wirth as secretary.

18    Q    Is that the first time that you submitted
19 applications on behalf of Mr. Corneal?

20    A    That sounds right, yes.  The driveway permit
21 application I think would have been the first one, but I
22 remember, there already were applications on file for
23 all of this.

24        The building permit applications were
25 already there, the sewage permit applications were

MLP REPORTING, INC.  (570) 748-1041

55

1 already there, they had them for months.

2    Q    Well, all those applications that you're now
3 referring to were all there prior to the meeting at the
4 courthouse in November, correct?

5    A    Yes, I believe so.  They had them for some
6 time before that.

7    Q    Understood.  Just so we're clear, the
8 attached -- what you attached to Williams No. 4 was the
9 first time since the meeting at the courthouse in
10 November that anything was submitted to the township;
11 is that correct?

12    A    Certainly from my office, yes, I don't know
13 about completely.  I would assume that's the case
14 because they had everything and had it for some time.

15        Well, understand, they haven't issued a
16 building permit, why haven't they issued a building
17 permit, the response that I get in November is because
18 there's no septic permit, why haven't you issued a
19 septic permit, the modules are in compliance, well,
20 because it's a land development plan and it shows a
21 subdivision line.

22        They had everything, they did not have a
23 driveway permit application, but they had everything
24 else and they had it for months.

25    Q    Correct me if I'm wrong, but your testimony

MLP REPORTING, INC.  (570) 748-1041

56

1 is that at the meeting in November, you agreed to
2 modify the modules to comply with what the township had
3 been asking you to do, correct?

4    A    We agreed to modify the plan, not the
5 module, the plan, to take off the subdivision line that
6 was shown and to clarify because I didn't know at the
7 meeting what the story was, but to clarify the pit
8 number.

9    Q    Did you agree to modify anything else at the
10 meeting that you can recall?

11    A    Well, there was no change in the module, the
12 sites were the same, the soil tests were the same,
13 everything was there --

14    Q    Was it your understanding that there had
15 been no changes in the sewage module from those
16 originally submitted to the township?

17    A    To what, to the date of the November
18 meeting?

19    Q    Yes.

20    A    Yeah, I think they were the same.

21    Q    Okay.

22    A    It was incomprehensible to me how they had
23 not issued these permits.

24    Q    Did you tell them that?

25    A    No.

MLP REPORTING, INC.  (570) 748-1041

1    Q    In fact, you told them --

2    A    I'm sure I said to Larry Newton, I fail to
3 understand how you can refuse to issue permits, but at
4 the meeting, no, the meeting was courteous, the meeting
5 was to find out, all right, what do we need to do now
6 that this has gone on this long, now that you've
7 managed to get us into this position, how do we get out
8 of it.

9    Q    Did you say that, those words?

10    A    I don't know about those words, but I'm sure
11 I said -- I have a feeling I probably did say in all my
12 years, I've never seen anything like this, somehow we
13 have to find an answer to this, there is no reason -- I
14 do remember this because there was a discussion about
15 it -- there is no reason on that site, given the size
16 of the site, the location of the soil testing, why you
17 can't build this.

18        In other words, this isn't like somebody
19 wanting to build a shopping center in an R-1 zone, this
20 isn't like somebody wanting to put in a community
21 sewage system right next door to the sewage treatment
22 plant, there was no legal reason that I could define as
23 to why these permits hadn't been issued, but yet, my
24 client is building without the benefit of a permit and
25 I want to correct that.

1        So yes, I'm sure there was discussion, I
2 don't understand how you can do this, but you tell me
3 what you want, what do you want from this man now, and
4 when I get that, I will use my best efforts to bring
5 him into -- to get him to do that so that we can submit
6 that and get these permits done so he can go live there
7 and we can be done with this, I'm sure there were
8 discussions of that type.

9    Q    Other than the submissions which are
10 indicated in Williams No. 4, do you recall submitting
11 any other applications or materials to the township?

12    A    I probably did not directly.  After it
13 became clear that the module wasn't going to go
14 anywhere, that's after the first meeting with Parks on
15 site that he's begun to raise issues that haven't been
16 raised before, but now we're hearing about them, that's
17 when the modification was in the module, and that was
18 submitted, but it did not come from my office.

19        If seems to me there was one other thing,
20 though, that we had to deliver to Ann Wirth's home.
21 Oh, of course, after all this stuff gets in, then I get
22 a call, and I don't know whether it was from Newton --
23 I'm sorry, I don't remember which of the township
24 officials called me to tell me that the scale of the
25 map was wrong and pointing out the section in the

1 ordinance that required a different map scale.

2        And I said fine, we'll have the surveyor
3 prepare according to scale, nobody uses that scale, so
4 I did have a second delivery to Ann Wirth's home with
5 that different scaled map.

6        Oh, and there's one other thing that they
7 wanted.  They had received a topo map, but they wanted
8 the topo map combined with either the building plan
9 drawings or the survey drawings, so we did that, too,
10 and that would have been delivered.

11        Oh, and they raised an issue -- the other
12 thing that -- well, that's not something I delivered,
13 but the letter talks about the stream crossing problem.

14    Q    What was the problem with the stream
15 crossing?

16    A    Well, the township raised -- sometime early
17 on in the process, raised the issue that David was
18 going to construct a stream crossing and that they were
19 concerned about that.

20        I had never heard anything about this, so I
21 inquired and found out that there was no stream
22 crossing, that there had been discussions, but that it
23 wasn't a part of the proposal, that that's not how
24 access was being gained to the property and I confirmed
25 with Ms. Wirth that that was not an issue.

1    Q    Did you come to learn that stream crossing
2 was in the original proposal?

3    A    I don't know, I never saw the original
4 proposal.

5    Q    Did you learn at any point other than from
6 Mr. Corneal that the stream crossing was abandoned at
7 some point during this process because he had purchased
8 other property?

9    A    I don't know about all those nexuses.  I was
10 aware that the stream crossing was not being used to do
11 this development.  The access to this property is on
12 the top of the hill, not down the sides.

13        The issue of the stream crossing is
14 irrelevant to the issuance of these permits, which is
15 what I was pointing out to Ms. Wirth.

16        MR. SHERR:  I don't have anything further.
17 Thank you.

18        MS. MONTGOMERY:  I'm thinking.  Give me a
19 moment.  I just have one question for you.

20

21            EXAMINATION

22

23 BY MS. MONTGOMERY:

24    Q    Mr. Williams, you testified to a variety of
25 activities and things that were undertaken with respect

61

1 to Mr. Corneal's property since the filing of the
2 preliminary injunction.
3      My question to you is, is it your
4 understanding that those activities were required by
5 law?
6      A      All of my involvement is after the filing
7 for a temporary restraining order, although, when I got
8 to the meeting, I didn't know that that's what they had
9 requested, but that would be logical.
10      What we did through my efforts is not
11 something that is required by law.  The township had
12 every piece of information that it needed to issue
13 appropriate permits, but hadn't done so.
14      My client is in the process of constructing
15 buildings without a permit and my goal was to find out
16 what the township wanted us to do to get those permits
17 issued.
18      As I pointed out earlier, they didn't have a
19 driveway ordinance when it was built, but we agreed to
20 submit for a driveway permit, they had acceptable soil
21 modules that they hadn't transmitted that should have
22 been submitted, and the building permit could have been
23 issued legally based on that information.  They chose
24 not to do that and they chose to take the avenue of
25 enforcement action.

MLP REPORTING, INC.   (570) 748-1041

62

1      In a perfect world where construction hasn't
2 started, you would probably file an action in mandamus,
3 but it's too late for that when I'm involved at the
4 stage where they've already asked for a restraining
5 order to prevent construction.
6      So no, what we did was designed, as I
7 indicated at that meeting, to get the permits issued so
8 that the township would stop the enforcement action so
9 that David could finish building and David could move
10 into the home in a timely fashion.
11      And as we sit here today, I still only have
12 the septic permit, I do not have a sewer permit, I do
13 not have a building permit and my client is still at
14 risk in terms of the state action that's filed under
15 this restraining order.
16      We are doing, within reason, or maybe even
17 without a reason, but certainly we're doing everything
18 that we can on his behalf to try to get those permits
19 to be issued.
20      MS. MONTGOMERY:  I don't have any other
21 questions.  Thank you.
22      MR. SHERR:  I have a couple others.  Now
23 that you've expressed an opinion, I'm going to have to
24 ask you some other opinions.
25

MLP REPORTING, INC.   (570) 748-1041

63

1               EXAMINATION
2
3 BY MR. SHERR:
4      Q      First of all, I thought it was your
5 testimony that you were unaware of what had been filed
6 with the township prior to your involvement?
7      A      Other than we knew that -- other than I was
8 told by Larry that they had taken some action to
9 enforce it, to stop construction, I did not see it and
10 I didn't know the form of the action.
11      Q      But I'm speaking with respect to any
12 applications filed by Mr. Corneal, I thought your
13 testimony was you were unaware what he had filed
14 originally and what the nature of all those
15 applications were?
16      A      I had not examined those applications.  What
17 they were, sure, I'm sure I was aware of what they
18 were, but no, I never looked at them.
19      Q      So you know that originally, he filed an
20 application for a subdivision?
21      A      Yes, I think -- well, I don't know about the
22 word "originally", I know that there was an application
23 involving a subdivision because I saw the map that had
24 a property line in it.
25      Q      Are you aware at some point, he changed that

MLP REPORTING, INC.   (570) 748-1041

64

1 subdivision plan into something different?
2      A      No, I'm not aware of that.  The lot line was
3 deleted at my meeting in order to facilitate getting
4 the building permit.  Whether there is an interim plan,
5 I have no knowledge of that.
6      Q      And with respect to the sewer module, do you
7 know whether or not his original submission of sewer
8 modules was ever changed or modified up and to the
9 point that you got involved?
10      A      Boy, I do not have any knowledge that there
11 was a second application set of modules prior to my
12 involvement.
13      Q      Now, in answering Ms. Montgomery's question,
14 what do you base your answer on?
15      A      Well, her question was, were we legally
16 required to do this?  The answer to that is simple, no.
17      Q      What do you base that on?
18      A      Well, I guess I base it on 28 years of doing
19 municipal work.
20      Q      Do you base it on anything else?
21      A      Well, I suppose we could sit here and have
22 an esoteric discussion of what the municipal law
23 requires, but the baseline is, the sewage ordinance was
24 not passed until after the driveway was constructed.
25      The building officer advised me that he

MLP REPORTING, INC.   (570) 748-1041

65

1 thought the building applications were all in order,
2 and the sewer modules had adequate and acceptable soil
3 sites to permit the residential development, and I'm
4 using development now in the sense of construction, not
5 development in the sense of a subdivision, were on the
6 plan and had been approved, the soil testing had been
7 done.
8          Legally, I saw no reason why those permits
9 could not have been issued, but an enforcement action
10 is undertaken, which poses a great threat of financial
11 risk to my client and I have to try to help him out of
12 that, and the way you do it, I think, from, once again,
13 28 years of experience of dealing with governmental
14 bodies, with local government in particular, it isn't
15 to sit at a meeting and say you've been wrong, it's to say
16 what do you want us to do, tell us what you want us to
17 do, and if it's reasonable and if it's something we can
18 do, we'll do it.
19     Q     And what they told you to do in this
20 instance was reasonable and something that you could do
21 and you went ahead and tried to do it?
22     A     I didn't know quite all the answers about
23 the sewer, but yeah, most of what -- I mean, filing a
24 permit for a driveway application, is that reasonable
25 where there's no statute that requires it, I don't

66

1 know, is that reasonable, but it's a piece of paper.
2          Is it reasonable to go out and dig more test
3 pits, no, it's not reasonable, but is it something that
4 we can do to keep construction going, probably.
5     Q     Well, in your 28 years of experience, have
6 you been in a situation where there was a building
7 erected before provisions for sewage were established?
8     A     Yes, but never one where the applications
9 have been filed.
10     Q     And you believe that applications had been
11 filed prior to him commencing construction?
12     A     Yes.
13     Q     How do you know that?
14     A     I guess I don't have any -- in the sense
15 have I looked at the township records, no, that's just
16 my impression from looking at the dates.
17     Q     And have you seen any evidence of filing of
18 any applications prior to commencing building?
19     A     Oh, yeah, when we did the modifications, I
20 saw the original application.
21     Q     You saw an application, okay, and did you
22 see -- did you see any evidence that that was actually
23 filed with the township?
24     A     I did not make an examination of the
25 township records.  I believe it was filed.

67

1     Q     Why do you believe that?
2     A     Well, because everyone had signed onto that.
3     Q     What do you mean everyone?
4     A     Well, the SEO, the original -- I think she's
5 an engineer, she may not be an engineer, but the
6 original SEO person who did some of the work on it had
7 signed.
8     Q     Any other evidence which led you to believe
9 that the application was filed?
10     A     No, it was my understanding that those
11 applications had been filed.  I have a feeling
12 Mr. Newton told me that, too, but when, I don't know
13 when that discussion was.
14     Q     Are you aware of what Mr. Corneal originally
15 filed with the township?
16     A     Originally?
17     Q     The first thing he filed with the township.
18     A     No.
19     Q     And are you aware as to whether there were
20 any modifications with what was filed originally with
21 the township?
22     A     Well, I think you need to help me here.  Are
23 you talking about the septic permit now, are you
24 talking about the building permit?
25     Q     I'm asking you what your understanding of

68

1 what he filed is?
2     A     Well, I think there have been field
3 modifications to the septic, which has been caused by
4 the various issues that were raised during this
5 process, but have I sat down and compared A to B, no, I
6 haven't.
7     Q     Now, with respect to the septic itself and
8 digging extra test pits, I believe your testimony is
9 that additional test pits were required to be dug
10 because the original site had been, one, disturbed,
11 and, two, a well was dug near it?
12     A     The test pit was dug because it was obvious
13 that the township was not going to accept the soil
14 testing that had previously passed and been submitted.
15          Now, once the issue was raised about backing
16 the truck over the one pit, then the location of the
17 well becomes irrelevant, it's another reason why you
18 can't use that pit.
19          At that point, you don't try to struggle
20 with the idea of do we change the soils, do we do the
21 modifications that are necessary, you go dig another
22 test pit because now maybe there's a better way to do
23 it.
24          There's expertise that you bring to bear at
25 that point, but the reason you're bringing that

69

1 expertise to bear is because the permits haven't been
2 issued, the module hasn't been submitted to DEP.
3         In my opinion, if it had been, it would have
4 been approved and that the permit should have been
5 issued, but that's not the circumstance I'm in at the
6 time I'm involved.
7         It's sort of like the man who goes to a car
8 lot to buy a Buick and you're on the car lot and you
9 say, hey, there's a good price on a Cadillac, so you
10 suggest to the customer, I think you ought to drive the
11 Cadillac, that's the reason for the new septic pit,
12 there's a better way to do it, but better in this case
13 means better for Mr. Corneal, it has nothing to do with
14 the permitting.
15     Q     Now, just to modify what you said again, you
16 were involved with this and we've already established
17 you were involved with this before you had knowledge of
18 this injunctive action, correct?
19         MS. MONTGOMERY:  Objection.  I don't think
20 that's what he testified to.
21         MR. SHERR:  Well, he did.  We'll get the
22 letter out where you ask for an appeal of the -- if I
23 can see the exhibits, just so we're clear.
24     A     Yes.
25 BY MR. SHERR:

                MLP REPORTING, INC.  (570) 748-1041

70

1     Q     Yes to my question that you were involved
2 prior to knowledge of the injunctive action?
3     A     My first -- this letter of Exhibit 3 is
4 produced and probably went out of my office three days
5 before the hearing, but the filing was done in October,
6 the Judge signed the order scheduling the November
7 conference on October 19.
8         I think I was aware that some type of
9 enforcement action had been undertaken by Jackson
10 Township, that's the reason for my involvement.  I
11 think I knew that when I wrote this, but I had not seen
12 this until I got to court on November 14.
13     Q     Okay.  So you were aware when you wrote
14 Williams 3 that some type of enforcement action was
15 undertaken by the township?
16     A     I believe so.  I believe so.  What it was, I
17 don't know.  I'm sure I suspected in my mind, because
18 that's how you would do it, you would ask for a
19 temporary restraining order.
20     Q     And were you also aware that on November 10,
21 2000, that construction on a building had commenced?
22     A     Oh, I'm sure I was, yes.
23     Q     Is it an unusual circumstance to be
24 requesting a hearing on a denial of a building permit
25 where construction has already commenced?

                MLP REPORTING, INC.  (570) 748-1041

71

1     A     No, not at all, that would be fairly
2 typical.  You have to protect his right because under
3 the local agency law, you only have 30 days.
4     Q     You have to protect the right, but is
5 construction already commenced with protecting that
6 right?
7     A     To me, that has no relationship.  This is
8 about failure to issue a building permit, denial --
9     Q     Well, is construction of the property -- is
10 it typical to have the building permit before you
11 build?
12     A     Typical?
13     Q     Yes.
14     A     Well, sure.  In a perfect world, that's the
15 way it's supposed to work.
16     Q     Right.  And is it also true that in a
17 perfect world, that if you believe you should have been
18 issued a building permit, instead of building, you
19 would file a mandamus action, as you stated?
20     A     That would be one approach.  You would
21 probably also file an appeal from their failure to do
22 so just to protect your rights under the local agency
23 law.
24         MR. SHERR:  I have nothing further.
25         (The deposition concluded at 12:03 p.m.)

                MLP REPORTING, INC.  (570) 748-1041

72

1 COUNTY OF UNION          :
                           : ss
2 COMMONWEALTH OF PENNSYLVANIA:
3
4         I, NICOLE L. ZIMMERMAN, Reporter-Notary
5 Public, authorized to administer oaths within and for
6 the Commonwealth of Pennsylvania and take depositions
7 in the trial of causes, do hereby certify that the
8 foregoing is the testimony of TERRY WILLIAMS, ESQ.
9         I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically
12 by the said NICOLE L. ZIMMERMAN a Reporter-Notary
13 Public, approved and agreed to, and afterwards reduced
14 to typewriting under the direction of the said
15 Reporter.
16         I further certify that the proceedings and
17 evidence are contained fully and accurately in the
18 notes taken by me on the within deposition, and that
19 this copy is a correct transcript of the same.
20         In testimony whereof, I have hereunto
21 subscribed my hand this 12th day of July, 2001.
22
23
24                          _____
                                NICOLE L. ZIMMERMAN
                                   Notary Public
25 My commission expires
   on May 24, 2003

                MLP REPORTING, INC.  (570) 748-1041

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID B. CORNEAL and SANDRA Y. CORNEAL, | : | NO. 1:CV-00-1192 |
| | : | |
| Plaintiffs | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | RAMBO, J. |
| JACKSON TOWNSHIP, Huntingdon County, Pennsylvania, *et al.*, | : | |
| | : | |
| Defendants | : | |
| | : | |

## CERTIFICATION

I, Adam M. Shienvold, Esquire, am counsel for the Plaintiffs, David B.

Corneal and Sandra Y. Corneal, and I hereby certify that the documents submitted

in support of Plaintiffs' Motion for Summary Judgment are true and correct copies

of documents that were produced and prepared in the course of discovery in the

above-captioned proceeding.  I understand that all statements contained herein are

made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn

falsification to authorities.

ECKERT SEAMANS CHERIN &
MELLOTT, LLC

Adam M. Shienvold, Esquire
Pa. I.D. No. 81941

# CERTIFICATE OF SERVICE

I, Adam M. Shienvold, Esquire, hereby certify that I am this day serving a copy of the foregoing document via First Class U.S. Mail, which service satisfies the requirements of the Federal Rules of Civil Procedure and Middle District Local Rules of Court, addressed as follows:

> Anthony R. Sherr, Esquire
> Mayers, Mennies & Sherr, LLP
> 3031 Walton Road, Building A
> Suite 330, P.A. Box 1547
> Blue Bell, PA 19422-0440

Adam M. Shienvold, Esquire

Date: June 24, 2002     Attorney for Plaintiffs,
David B. and Sandra Y. Corneal