APPENDIX 14
## JACKSON TOWNSHIP
## APPLICATION FOR CONSIDERATION OF A WAIVER

File No._____

Date of Receipt/Filing:_____

(For Township Use Only)

The undersigned hereby applies for approval of a waiver, submitted herewith and described below:

1.   Name of Project:_____

2.   Project Location:_____

     _____

3.   Name of Property Owner(s):_____

     Address:_____ Phone No.:_____

4.   Name of Applicant (if other than owner):_____

     Address:_____

5.   Specify Sections(s) of the Jackson Township Subdivision and Land Development Ordinance for which a Waiver is requested:_____

     _____

     _____

6.   The Proposed Alternative to the Requirement:_____

     _____

     _____

     _____

     _____

     _____

     _____

A-14

7.  Justification for the Waiver:_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

8.  Identification of Plans, Reports, or Supplementary Data, which are part of the Application.

_____


The undersigned herby represents that, to the best of his knowledge and belief, all information listed above is true, correct, and complete.


Date:_____ Signature:_____

APPENDIX 15

## MEMORANDUM OF UNDERSTANDING

### Financial Security

This Memorandum of Understanding is entered into by and between the following parties:

Jackson Township, hereinafter call "Township"
And
_____, hereinafter called "Developer

### RECITALS

**WHEREAS,** Developer has submitted to the Township a plan and application for a Subdivision or Land Development Plan located in _____, Which is known and designed as _____; and,

**WHEREAS,** Township has required and Developer has agreed that as a condition precedent to final plan approval of the Subdivision or Land Development Plan, the construction of all public improvements shall be assured by financial security, as required in Article V of the Jackson Township Subdivision and Land Development Ordinance of 1992, as amended.

**WHEREAS**, Township and Developer desire to set forth their understanding concerning the Developer's agreement and responsibility to install the public improvements, provide a financial security, and pay the costs involved in inspecting and approving Developer's Subdivision or Land Development Plan.

**NOW, THEREFORE**, intending to be legally bound hereby, Township and Developer agree as follows:

1.  The Developer, at their own cost and expense, shall proceed to perform and complete all public improvements required by the Developer's Subdivision or Land Development Plan, subject to the approval of the plans and specifications by the Township.

2.  To assure completion of the public improvements required as a condition for the final approval of the Developer's Subdivision and Land Development Plan, the Developer shall provide for deposit with the Township, financial security, consistent with Article V of the Jackson Township Subdivision and Land Development Ordinance, in an amount sufficient to cover the costs of all public improvements, including, but not limited to, streets, street signs, sidewalks, curbs, landscaping, storm drainage for dedication or which affect adjacent properties or streets, sanitary sewer facilities for dedication, water supply facilities for dedication, fire hydrants, lot line markers ,

A-15

survey monuments, and other related facilities. Such security shall provide for, and secure the completion of the public improvements within one (1) year of the date fixed in the subdivision or development plan. The amount of financial security shall be equal to one hundred ten percent (110%) of the cost of the required public improvements, for which financial security is posted.

The cost of the public improvements shall be established by submission to the Township of an estimate prepared by the Developer's engineer, subject to review, comment, and approval by the Township or its designees.

3.   The Township, or its designee, and the Developer shall agree upon a notification procedure and a schedule of field inspections to be made during construction and upon completion of all public improvements.

4.   Upon completion of the public improvements, the Developer shall give notice to the Township and its designee, in writing, to inspect the public improvements. The Township or its designee shall inspect the public improvements within ten (10) days and shall approve same if they a re completed in accordance with the Subdivision or Land Development Plan and acceptable engineering practices. If the Township or its designee disapproves, they shall notify the Developer promptly.

5.   Developer agrees to reimburse the Township or its designee for engineering services necessitated by the  review and inspection of all required public improvements and all associated expenses at the prevailing rate of $_____ per hour, plus associated itemized expenses, where applicable. It is agreed that engineering services shall be payable by Developer within ten (10) days after date of invoice and prior to release of financial security.

IN WITNESS WHEREOF, the parties hence caused this Memorandum of Understanding to be executed, dated this _____ day of _____, 19__.

JACKSON TOWNSHIP
BOARD OF SUPERVISORS

DEVELOPER

_____
Supervisor

_____

_____
Supervisor

_____

_____
Supervisor

(NOTARY SEAL)

# APPENDIX 16
## MEMORANDUM OF UNDERSTAND
### Installation of Public Improvements
### As a Condition Precedent to Final Plan Approval

This Memorandum of Understanding is entered into by and between the following parties:

Jackson Township, hereinafter called "Township"

and

_____, hereinafter called "Owner"

## RECITALS

WHEREAS, _____is the owner of property situated at_____

    WHEREAS, the Owner has submitted to the Township a final plan and application for a project known as_____.

    WHEREAS, the Township has required, and the Owner has agreed, that, as a condition precedent to final plan approval, certain pubic improvements will be completed by the Owner, as provided in Article V of the Jackson Township Subdivision and Land Development Ordinance of 1992, as amended.

    WHEREAS, the Township and the Owner desire to set forth their understanding concerning the Owner's agreement and responsibility to install the public improvements and pay the Township costs involved in processing, inspecting, and reviewing public improvements.

    NOW, THJREEFORE, intending to be legally bound hereby, the Township and the Owner agree as follows:

1.    The Owner, at their expense, shall proceed to perform and complete only the following public improvements which shall not exceed a total estimated value of two hundred thousand dollars ($200,000).  Said improvements shall conform to the final plan.
*(Include an itemized list of improvements)*

_____
_____
_____

2.    The Owner shall construct the above public improvements in accordance with the following work schedule:
*Include beginning and ending dates for all improvements)*

_____
_____
_____

3.     The Owner shall provide the Township with a minimum of four (4) working days' notice of any intent to construct public improvements.

4.     The Owner shall provide the Township with a maintenance guarantee in accordance with Section 505 of the Subdivision and Land Development Ordinance, in conjunction with this Memorandum.

5.     The Owner agrees to reimburse the Township for engineering and legal services necessitated by the review of the Owner's documents and inspection of all required public improvements at the prevailing rate, plus associated itemized expenses, where applicable. It is further agreed that payment will be made within ten (10) days after date of invoice and prior to final approval of the Owner's plan.

6.     The Owner assumes all responsibility for damage to other property. The Owner shall maintain public liability insurance with a value of two million dollars ($2,000,000) until all improvements are approved by the Township. Evidence of said insurance shall be provided to the Township, in conjunction with this Memorandum.

7.     The Owner agrees to hold harmless the Township from liability arising from activity on the property.

8.     In the event that any improvements have not been installed as provided by the plan and this agreement, or any other failure of the Owner, the Board of Supervisors are granted the authority to take all actions necessary to obtain monies from the Owner, including, but not limited to, seizure of land and/or other appropriate legal or equitable action to recover the money necessary to complete the remainder of the improvements and/or stabilize the property.

9.     The terms of this agreement are binding upon the heirs and assigns of the subject property, and shall remain in effect until said improvements are installed and approved, or a suitable improvement guarantee is accepted by the Township.

IN WITNESS WHEREOF, the parties hence caused this Memorandum of Understanding to be executed, dated this _____ day of _____, 19__.

JACKSON TOWNSHIP
BOARD OF SUPERVISORS

OWNER

_____

                                 _____
                                             Supervisor

_____

                                 _____
                                             Supervisor

                                 _____
                                             Supervisor

Case 1:00-cv-01182-SHR   Document 121-2   Filed 04/18/2003   Page 7 of 91

July 10, 2000

Meeting called to order by Chairman Weiler

Minutes approved as read

Treasurer's report approved as read

The following Ordiances were adopted by the Board of Supervisors

Sub-Division Ordiances approved   2000 - 1 Motion made by Tom Wilson Seconded by Mike Yoder

Motion made by Tom Wilson and Seconded by Mike Yoker to approve Resolutoin 2000-3
for the Sub-Division Fees.

Driveway Ordiance 2000 -2  Motion made by Tom Wilson Seconded by Mike Yoder

Holding Tank Ordiance 2000-3 Motion made by Tom Wilson Seconded by Mike Yoder

Roadmaster - Hawbaker's will be starting on Wednesday July 12, 2000 on those roads that were bid for
black top and double seal

New Enterprise will be starting July 17 to repair Miller Road and Guyer Road.

Meeting Adj 7:30 PM

*ORDINANCE NO.* 2000-2

**AN ORDINANCE OF THE TOWNSHIP OF JACKSON, HUNTINGDON COUNTY,
PENNSYLVANIA, PROVIDING THAT NO PUBLIC STREETS AND/OR ROADS OF
THE TOWNSHIP OF JACKSON SHALL BE CROSSED OR ENTERED BY ANY
PERSON, FIRM, CORPORATION OR UTILITY WITHOUT FIRST SECURING A
PERMIT IN ACCORDANCE WITH THIS ORDINANCE, AND PROVIDING
PENALTIES FOR THE VIOLATION THEREOF**

  ***SECTION 1* – DEFINITIONS.** Wherever used herein, the following words shall
have the meaning as herein set forth:

  (a). "Permitter" – means Jackson Township.

  (b). "Permittee" – means the applicant who is directly responsible for the work
contemplated, whether it be a public utility, individual, partnership, corporation, and/or its
assignees.

  (c). "Township" – means Jackson Township, Huntingdon County, Pennsylvania.

  (d). "Secretary" – means the currently appointed Secretary of Jackson Township.

  (e). "Roadmaster" – means the currently appointed Roadmaster of Jackson Township.

  ***SECTION 2* –** From and after the effective date of this Ordinance it shall be unlawful
for any person, persons, association or corporation to alter, construct or enter on the right of
way of any Township street or road of Jackson Township any facility (including but not
limited to the erecting of poles, laying conduits, water, steam, oil or gas pipes, storm or
sanitary sewers, or drainage tile) driveway or entrance unless a permit therefore has first been
obtained as hereinafter provided and all conditions and requirements as herein set forth have
been complied with.

  ***SECTION 3* –** Application for a permit to alter or construct such facilities shall be
made to the Secretary of Jackson Township in accordance with the following rules and
regulations:

  (a). The applicant shall submit in duplicate the information requested on the form of
application provided by the Township, together with two (2) copies of a sketch to scale
showing such dimensions as the location of the intended facility, driveway or entrance, width
of the traveled roadway, right-of-way, lines, and a dimension to the nearest intersecting street.
A fee in the amount of $5.00 made payable to Jackson Township shall accompany the
application.

(b).   The Secretary shall issue the required permit to the Permittee after all the aforementioned stipulations have been fulfilled.   The Township Secretary, in turn, shall forward to the Township Roadmaster one (1) copy of the sketch and one (1) copy of the application noting the intended starting date as supplied by the contractor.

(c).   The Township Roadmaster shall inspect the work periodically at its various stages to determine the degree of compliance to the specifications governing the work.   The applicant shall pay to Jackson Township the sum of $10.00 in order to defray the costs of the Township Roadmaster's services.   This fee shall be paid when the application is submitted.   If additional inspection is required, the Township shall bill the Permittee for such additional expense, which shall be paid prior to the issuance of a final certificate of compliance by the Township Roadmaster after the Permittee has completed the facility installation.

*SECTION 4* – The conduct of the work shall be subject to the following rules and regulations:

(a).   The work authorized by the permit shall be done at such times and in such manner as shall be consistent with the safety of the public, and shall be subject to all conditions, restrictions and regulations as herein prescribed, including Act 187 passed by the Legislature of Pennsylvania.

(b).   The permission granted by the permit does not relieve the Permittee from obtaining any consent otherwise required from the owner or owners of abutting property, and does not confer upon the Permittee the right to cut, remove or destroy trees or shrubbery within the legal limits of the right-of-way, except under such conditions, restrictions and regulations as prescribed by law.   If any trees are removed within the limits of the right-of-way by consent of the property owner, the stumps must be cut to the ground level or removed entirely, if required by the Township Roadmaster.

(c).   Where practicable, all trenches below the grade of the finished surface of the street shall be a minimum of three (3) feet in depth and shall be of a width sufficient to afford working room and proper backfill.

(d).   All trenches parallel to the roadway outside the paved area shall be minimum of at least three (3) feet from the edge of the road metal measured from the nearest side of the trench, unless otherwise authorized by the Township Roadmaster.

(e).   All trenches dug laterally or transversely with the roadway shall be constructed in half width so as to provide a continuous flow of traffic.   The half width construction shall be completed in its entirety prior to further excavation for the remaining half width.

2

(f).  Excavation or other material shall be placed or stored on the side of the operation farthest from the road metal or pavement, unless otherwise authorized by the Township Roadmaster, and in such manner that there will be no interference with the flow of water in any gutter, drain, pipe, culvert, ditch or waterway.  All parts of the paved street and various structures disturbed shall be restored to a condition equal to that which existed before starting work.

(g).  Ambler (flashing) lights shall be displayed from sunset to sunrise at any and all points of the work where there may be danger to any person lawfully using the street, and barricades shall be provided continuously wherever they are needed to protect the public.

(h).  The proposed location of any facility shall be such as to remain clear of installed facilities such as the underdrains, storm sewers, sanitary sewers, electrical conduits, gas line, oil lines, and traffic signals.

(i).  The Permittee shall clear with all other utilities his plan of installation, and shall hold harmless Jackson Township from any claims arising from his activities.  The Township may require insurance to protect itself from such claim.

(j).  After any facility has been placed in the trench, the trench shall be backfilled with suitable material in layers not to exceed six (6) inches in depth and mechanically tamped for the full depth of the trench.  Particular emphasis shall be made to secure dense compaction around the haunches of all pipes and all drainage title shall be a minimum of fifteen (15) inches in diameter.

(k).  Where the trench lies within a street and it is necessary to excavate through the road metal, trench replacement through the road metal shall be accomplished by widening the trench one (1) foot on each side of the trench for a depth equal to the road metal but in no case, less than ten (10) inches, and by placing reinforced cement concrete a depth of eight (8) inches through the roadway metal area, after which a two (2) inch bituminous course HE or ID shall be applied, rolled and struck to the true line and grade of the existing street.

(l).  Trench excavation through shoulder areas shall be accomplished in the manner as hereinbefore mentioned and backfilled using the prescribed method of six (6) inch layers mechanically tamped, up to an elevation of six (6) inches below the finished shoulder grade. The remainder of the trench shall be backfilled utilizing selected material surfacing six (6) inches in depth, placed and rolled to the true line of grade of the shoulder area.  Where a trench is contained within the shoulder area and parallel to the roadway, it shall be mandatory to effect final compaction of the selected material utilizing a roller weighing 8 to 10 tons.

(m).  Before a final compliance certificate is issued by the Township Roadmaster, a final inspection will be necessary at which time the job site shall be cleaned of all debris and construction material and neatly dressed to final grades.  The Permittee shall notify the Township Roadmaster in sufficient time to arrange the final inspection.

3

(n).  In the event of willful failure or neglect by said Permittee, or its employees, to perform and comply with the conditions, restrictions and regulations herein imposed, the Township may revoke and annul the permit and order and direct the said Permittee to remove any and all structures or property belonging to the said Permittee and covered by this permit from the legal limits of the right-of-way.

(o).  If the Permittee, after making an opening in the highway, fails to restore the roadway, including the paved surface, shoulders and ditches to their original condition, the Township reserves the right to do the work and bill the Permittee for the cost of the restoration.

**SECTION 5** – Upon completion of the work, the Permittee shall apply to the Township Roadmaster for a Certificate of Compliance, which shall be issued by the Roadmaster only upon payment of all fees due and satisfactory compliance with the rules and regulations herein prescribed.

**SECTION 6** – Any person, persons, association or corporation which shall violate any of the provision of this Ordinance shall be subject, upon conviction before any District Magistrate, to pay a fine of not more than Five Hundred Dollars ($500.00) and costs of prosecution, and in default of the payment of such fine and costs, to imprisonment in the county jail for not more than thirty (30) days.

**SECTION 7** – Any Ordinance or part of ordinance inconsistent herewith is hereby repealed insofar as inconsistent herewith.

**ENACTED AND ORDAINED** at a special meeting of the Board of Supervisors of the Township of Jackson, Huntingdon County, Pennsylvania, on the ___*10*___ day of ___*July*___, 2000.

ATTEST:

Secretary

4



26

2000 - 3

## TOWNSHIP OF JACKSON, HUNTINGDON COUNTY, PENNSYLVANIA

### AN ORDINANCE REGULATING THE USE AND MAINTENANCE OF HOLDING TANKS AND PRIVIES IN JACKSON TOWNSHIP

*WHEREAS*, the Supervisors of Jackson Township, Huntingdon County, Pennsylvania, had heretofore adopted an Ordinance dated _____, regarding the regulations of holding tanks; and,

*WHEREAS*, the Supervisors of Jackson Township, Huntingdon County, Pennsylvania, desire to amend said Ordinance in its entirety and to make it applicable to privies.

*NOW, THEREFORE, BE IT ENACTED AND ORDAINED* by the Supervisors of Jackson Township, Huntingdon County, Pennsylvania, and *IT IS HEREBY ENACTED AND ORDAINED* as follows:

*SECTION 1. PURPOSES* – The purpose of this Ordinance is to establish procedures for the use and maintenance of existing and new holding tanks and existing and new privies designed to receive and retain sewage whether from residential or commercial uses and it is hereby declared that the enactment of this ordinance is necessary for the protection, benefit and preservation of the health, safety, and welfare of the inhabitants of this municipality.

*SECTION 2. DEFINITIONS* – Unless the context specifically and clearly indicates otherwise, the meaning of the terms used in this Ordinance shall be as follows:

(a). "Governing Body" shall mean the Supervisors of Jackson Township, Huntingdon County, Pennsylvania.

(b). "Holding Tank" means a watertight receptacle, whether permanent or temporary, which receives and retains sewage conveyed by a water-carrying system and is designed and constructed to facilitate the ultimate disposal of the sewage at another site.

(c). "Privy" means a watertight receptacle, whether permanent or temporary, which receives and retains sewage where water under pressure or piped wastewater is not available and is designed and constructed to facilitate the ultimate disposal of the sewage at another site.

(d). "Improved Property" shall mean any property within the Township upon which there is erected a structure intended for continuous or periodic habitation, occupancy or use by human beings or animals and from which structure sewage shall or may be discharged.

(e). "Owner" shall mean any person vested with ownership, legally or equitable, sole or partial, of any property located in the Township.

(f).   "Person" shall mean any individual, partnership, company, association, corporation or other group or entity.

(g).   "Sewage" shall mean any substance that contains any of the waste products or excrement or other discharge from the bodies of human beings or animals and any noxious or deleterious substances being harmful or inimical to the public health, or to animal or aquatic life or to the use of water for domestic water supply or for recreation or any substance which constitutes pollution under the Clean Streams Law (35 P.S., §§ 691.1-691.1001).

(h).   "Municipality" shall mean the Township of Jackson, Huntingdon County, Pennsylvania.

*SECTION 3.  RIGHTS AND PRIVILEGES GRANTED* – The Governing Body is hereby authorized and empowered to undertake within the Township the control and methods of holding tank and privy use, sewage disposal and sewage disposal and sewage collection and transpiration thereof.

*SECTION 4.   RULES AND REGULATIONS* – The Governing Body is hereby authorized and empowered to adopt such rules and regulations concerning sewage which it may deem necessary from time to time to effect the purposes herein.

*SECTION 5.  RULES AND REGULATIONS TO BE IN CONFORMITY WITH APPLICABLE LAW* – All such rules and regulations adopted by the Governing Body shall be in conformity with the provisions herein, all other ordinances of the Township, and all applicable laws, and applicable rules and regulations of administrative agencies of the Commonwealth of Pennsylvania.

*SECTION 6.  RATES AND CHARGES* – The Governing Body shall have the right and power to fix, charge, and collect rates, assessments and other charges in the area served by its facilities at reasonable and uniform rates as authorized by applicable law.

*SECTION 7.  EXCLUSIVENESS OF RIGHTS AND PRIVILEGES* –

(a).   The collection and transportation of all sewage from any improved property utilizing a holding tank or privy shall be done solely by or under the direction and control of individual s or entities approved by the Governing Body, and the disposal thereof shall be made only at such site or sites as may be approved by the Department of Environmental Resources of the Commonwealth of Pennsylvania.

(b). The Governing Body will receive, review and retain pumping receipts from permitted holding tanks.

(c). The Governing Body will complete and retain annual inspection reports for each permitted tank.

**SECTION 8.** *CONDITION OF PRIVY USE –*

(a). The property owner must show that site and soil suitability testing of the lot has been conducted by the Sewage Enforcement Officer and that the site meets the Title 25, Chapter 73 (Standards for Sewage Disposal Facilities) requirements as they may from time to time be amended for the ultimate sewage disposal by an approved on-lot system if water under pressure or piped waste water becomes available on the lot.

(b). At such time that water under pressure becomes available, the property owner must remove the privy and replace the privy with an approved on-lot system.

(c). The conditions of the use described in (a) above do not apply:

    1. To a privy to be used on an isolated lot which is one acre or larger and is not or will not be served by water under pressure in the future.

    2. To temporary use of portable retention tanks where their use is proposed at construction sites or at sites of public gatherings and entertainment.

(d). Specific conditions for use of privies shall be incorporated in the permit application and permit for the proposed use of privy.

(e). The Governing Body shall have the opportunity to inspect the privy for proper operation, maintenance and content disposal.

**SECTION 9.** *DUTIES OF IMPROVED PROPERTY OWNER* – The owner of an improved property that utilizes a holding tank or privy shall:

(a). Maintain the holding tank or privy in conformance with this or any Ordinance of this Township, the provisions of any applicable law, and the rules and regulations of the Governing Body and any administrative agency of the Commonwealth of Pennsylvania.

(b). Permit only the Governing Body or its agent to inspect holding tanks on an annual basis.

(c). Permit only an individual or entity approved by the Governing Body to collect, transport, and dispose of the contents within said holding tank or privy.

(d).  Abandon the privy consistent with applicable public health and environmental standards or other appropriate standards and obtain a permit for and install an approved on-lot system meeting Chapter 73 standards in the event that water under pressure or piped waste water becomes available to the property.

(e).  Permit the Governing Body to enter upon lands to inspect the privy for proper operation, maintenance and contents disposal.

**SECTION 10.**  *VIOLATIONS* – Any person who violates any provision of Section 7, 8, or 9 shall be guilty of a summary offense and, upon conviction thereof, such person shall be sentenced to pay a fine of not less than One Hundred Dollars ($100.00) and costs, and not more than Three Hundred Dollars ($300.00) and costs, or, in default thereof, shall be confined in the county jail for a period of not more than thirty (30) days.

**SECTION 11.**  *ABATEMENT OF NUISANCES* – In addition to any other remedies provided in this Ordinance, any violation of Section 9 above shall constitute a nuisance and shall be abated by the municipality or the Governing Body by either seeking mitigation of the nuisance; by institution of a suit or suits in equity or seeking mandatory preliminary injunction under the applicable provisions of the Pennsylvania Sewage Facilities Act; or by seeking other legal relief from a court of competent jurisdiction.

**SECTION 12.**  *REPEAL* – The Jackson Township Ordinance adopted on _____, is hereby repealed in its entirety as are all other ordinances or resolutions or parts of ordinances or resolutions insofar as they are inconsistent herewith.

**SECTION 13.**  *SEVERABILITY* – If any sentence, clause, section or part of this ordinance is for any reason found to be unconstitutional, illegal or invalid, such unconstitutionality, illegality or invalidity shall not affect or impair any of the remaining provisions, sentences, clauses, sections, or parts of this ordinance.  It is hereby declared as the intent of the Board of Supervisors of the Township that this ordinance would have been adopted had such unconstitutional, illegal, or invalid sentence, clause, section or part thereof not been included therein.

***DULY   ENACTED   AND   ORDAINED*** this ___10___ day of
_____July_____, ~~1999,~~ by the Board of Supervisors of the Township of
Jackson, Huntingdon County, Pennsylvania, in lawful session duly assembled.

_2000_

JACKSON TOWNSHIP BOARD OF SUPERVISORS

BY: _Ralph Weiler_

_W. Thomas Wiley_

_Michael R. Yoder_

ATTEST:

_Ann Wirth_

Secretary

I, ANN WIRTH, Secretary of the Board of Supervisors of Jackson Township,
Huntingdon County, Pennsylvania, do certify that the foregoing is a true and correct copy of
an Ordinance adopted at a regular monthly meeting of the Jackson Township Supervisors held
_____July 10, 2000_____, ~~1999~~ in regular session duly assembled.

_2000_

_Ann Wirth_

Ann Wirth, Secretary

27

# DAVID B. CORNEAL

ATTORNEY AT LAW

1445 WEST COLLEGE AVENUE

STATE COLLEGE, PENNSYLVANIA 16801

(814) 238-1925
(814) 238-1929

MEMBER:
PENNSYLVANIA BAR
FLORIDA BAR

Mr. Larry Newton, Esq.
504 Penn Street
Huntingdon, Pa. 16652

May 5, 2000

RE: Jackson Township Building Permit and interference with
property rights.

Dear Mr. Newton,

If you will recall, I called you on Monday May 1
regarding Jackson Townships refusal to give me a building
permit to construct a garage. I also advised you of other
harassing action by the Township officials to interfer with
my property rights. You promised to check into it and to
call me. You have chosen, as you have in the past, not to
call me as you had promised. Therefore I am writing this
letter as a formal request to you as the Township Attorney
to direct Mr. Van Dommelen to send me the building permit
application and to then issue me a permit.

As I told you over the phone, I called Joe Rouser at DEP
who confirmed that I did not need a sewer permit to
construct a garage and therefore a garage was not a
subdivision.

I also advised you of my meeting with David Van Dommelen.
I enclose a copy of my letter to Mr. Van Dommelen which sets
forth the events of that meeting.

The supervisors assured everyone at their January and
February meeting that the new Subdivision Ordinance would be
approved by April. At the April meeting Ann Wirth assured
everyone that the new Ordinance was being typed and would
soon be ready for adoption. Please advise me of the status
of the Ordinance and when you anticipate it being adopted. I
would also like a copy of the proposed new Ordinance and the
Resolution whereby the Supervisors refused to sign any new
subdivision until the new Ordinance was adopted. If you will
advise Attorney James Himes of the costs for copying the
documents and when they could be picked up he has agreed to
pick them up for me.

You should also know that I believe the supervisors are
now intentionally delaying the adoption of the ordinance to
interfere with a contract I have to sell part of the farm to
John Hewett and JoAnn Smith. They are also filing unfounded

complaints with other government agencies with the intent to
harass and deny me the quiet enjoyment of my land.
   Unless these actions, taking and interfering with my
property rights stop and a building permit is issued, I
intend to file a federal action against the Township and
each person individually who is violating my rights. I will
wait 10 days to give you time to clear up these matters.

                              Sincerely,

                              David B. Corneal, Esq

28

# DAVID B. CORNEAL

505 E. FAIRMOUNT AVENUE

STATE COLLEGE, PENNSYLVANIA 16801

Mr. Lawrence L. Newton
504 Penn Street
P.O. Box 375
Huntingdon, Pa. 16652

August 3, 2000

RE: Jackson Township

Dear Mr. Newton,

Was your letter of July 28 in response to my phone call of May 1st and my letter of May 3rd? As you know, your Building Permit Ordinance requires that the application be done on the Township's form. Since I advised you on May 1st that the Permit Officer, at the direction of the supervisors, refused to even give me the Building Permit application forms, how was I to get a Building Permit???

In Fact, in March I asked the Supervisors at their meeting for a Building Permit for first my home and secondly for the art studio, both of which they denied allegedly because I didn't have a DEP sewer permit for the house and a privy permit for the studio; which I couldn't get because the Supervisors wrongfully refused to sign my sewer modules and conspired with the SEO to prevent me from applying for a privy permit.

Now you are alleging I'm building my garage without a building permit that I was entitled to but wasn't allowed to apply for? My understanding of the law under the MPC is that when a building permit is wrongfully denied, that the party automatically gets the permit after 90 days. In late April Mr. Van Dommelen in concurrence with the Supervisors commited an act of segregation against me by refusing to give me Building Permit application forms as well as a permit that he acknowledged he would grant to any other resident of Jackson Township with the exception of myself. That sounds like a permit wrongfully denied. When in March I asked for a permit to build my house, it was denied because I didn't have a DEP sewer permit due to the Supervisors refusing to sign the sewer module for the house so I could get that permit. That sounds like a permit wrongfully denied. When at that same meeting in March I

NEWTON EXH 10

asked for a permit to build the art studio and the Supervisors said no because they said I needed some sewer access for the studio, so I asked for a privy permit. This was thwarted by calls to the SEO who, as a result of the Townships' calls, would not give me any information on how to obtain or apply for a privy permit. That sounds like a permit wrongfully denied.

When a resident tries to apply for a building permit, it is expected that the Township will act in goodfaith in supplying the forms and reviewing the applications.  When they wrongfully refuse to even give you the application forms what do you suggest one does when they are faced with specific contractual obligations to others? Your refusal to help and the Township's wrongful action left me no choice, given my contractual obligations, but to mitigate damages. As you know I have been forced to file the Federal lawsuit to remedy the wrongful actions of the Township. If by your letter you are indirectly telling me that the township will now give me the applications for building permits and will sign my sewer module for my house (which has already been signed and approved by their SEO) I would ask that you immediately send me the applications. I enclose the sewer module for my house and ask that you secure the supervisors signatures so that I can submit it to DEP. Please note that I am not asking for a subdivision, only permits to proceed with my own personal buildings.

Please forward these documents to me c/o Max McClintic 472 West Whitehall Road, State College, Pa. 16801.

Sincerely,

David B. Corneal,Esq.

Case 1:00-cv-01192-SHR    Document 121-2    Filed 04/18/2003    Page 21 of 91

#3

# DAVID B. CORNEAL

505 E. FAIRMOUNT AVENUE

STATE COLLEGE, PENNSYLVANIA 16501

Mr. Lawrence L. Newton
504 Penn Street
P.O. Box 375
Huntingdon, Pa. 16652

August 18, 2000

RE: Jackson Township Building Permits

Dear Mr. Newton,

On August 3rd I faxed you, and then mailed you, the attached letter asking that you send me the building permit application forms that had previously been denied me by Mr. VanDommelen and the Supervisors. As of this date I have neither received those forms nor have I heard from you. Therefore, again, I request you send me the application forms to obtain a building permit for the garage, art studio and house. I would also request that you advise me of the permit fees required for the building permits.

I look forward to receiving the documents from you in the very near future.

Sincerely

David B. Corneal, Esq

Faxed & mailed:-

30

# LAWRENCE L. NEWTON
## *ATTORNEY AT LAW*

---

504 Penn Street
P. O. Box 375
Huntingdon, PA   16652

Telephone
814/643-3820
Fax
814/643-5670

August 29, 2000

David B. Corneal, Esquire
505 East Fairmont Avenue
State College, PA  16801

Re:  Jackson Township

Dear Mr. Corneal:

This is in response to your letter of August 18, 2000.  Please excuse my delay in responding.

As per your request, I am enclosing a Jackson Township building permit application.  For construction over one thousand ($1,000.00) dollars, the permit fee is twenty ($20.00) dollars.

As you are aware, you have commenced construction without a building permit.  The Board of Supervisors request that you cease any and all construction until a building permit is obtained.  If you do not confirm to me in writing that you will stop construction pending review of your building permit application, the Supervisors have instructed me to initiate legal proceedings against you.

In the event that you wish to discuss this matter, please feel free to contact me.

Thank you for your consideration.

Very truly yours,

LAWRENCE L. NEWTON

LLN/smw

Enclosure

cc.  Jackson Township Board of Supervisors

*31*

# DAVID B. CORNEAL

ATTORNEY AT LAW

1445 WEST COLLEGE AVENUE

STATE COLLEGE, PENNSYLVANIA 16801

MEMBER:
PENNSYLVANIA BAR
FLORIDA BAR

(814) 238-1925
(814) 238-1929

Mr. Larry Newton, Esq.
504 Penn Street
Huntingdon, Pa. 16652

January 31, 2000

RE: Subdivision Jackson Township

Dear Mr. Newton,

    As per our telephone conversation I am requesting that
the Jackson Township Supervisors approve my subdivision at
their February 7th meeting. I asked my surveyor, David
Simpson, to drop off a copy of the plan to your office this
week. As you will see from the plan, I am dividing 14+ acres
with the farmhouse and barn off with another 11 acre tract
adjacent to it to one buyer, the Hewetts, who are going to
live there. There is a 4+ acre lot back in the woods for my
children, and my wife and I are building our permanent home
back in the woods on the 70 remaining acres.
    The urgency of approval is that the Hewetts have a loan
commitment for settlement the end of February and if we
can't close they will lose their favorable interest rate
since rates are presently climbing.
    I would appreciate consideration of this request.

Very truly yours,

David B. Corneal, Esq.

EXHIBIT

Wirth 16

TK13    5-17-01

Case 1:00-cv-01152-SHR   Document 121-2   Filed 04/18/2003   Page 24 of 91

#4

32

# DAVID B. CORNEAL
### ATTORNEY AT LAW
1445 WEST COLLEGE AVENUE
STATE COLLEGE, PENNSYLVANIA 16801

MEMBER:
PENNSYLVANIA BAR
FLORIDA BAR

(814) 238-1925
(814) 238-1929

Jackson Township
Att: Ann Wirth
R.D. 1 Box 390
Petersburg, Pa. 16669

August 31, 2000

RE: Building Permit Application and Sewer Module

Dear Mrs. Wirth,

Enclosed are three building permit applications along
with a check for each. I also enclose the sewer module for
the approved on-site location for my house and art studio.
If you will recall this is the module I had previously asked
the supervisors to sign, and was refused, at their February
meeting. Please note that this is not a subdivision. It is
the approved site of your SEO officer for my house and art
studio.

Please have the supervisors act upon my applications as
soon as possible.

Sincerely,

David B. Corneal, Esq.

COPY

Copy Sent to
Newton

#4

# DAVID B. CORNEAL

ATTORNEY AT LAW

1445 WEST COLLEGE AVENUE

STATE COLLEGE, PENNSYLVANIA 16801

(814) 238-1925
(814) 238-1929

MEMBER:
PENNSYLVANIA BAR
FLORIDA BAR

Jackson Township
Att: Ann Wirth
R.D. 1 Box 390
Petersburg, Pa. 16669

September 1, 2000

RE: Building Permit rough drawings

Dear Mrs. Wirth,

    Yesterday I sent you three building permit applications
along with a check for each as well as the sewer module for
the approved on-site location for my house and art studio.
Unfortunately the rough drawings of the art studio and house
were left on my desk. Therefore I am enclosing those
drawings with this letter and ask you to put them with the
applications for those permits.
    Please have the supervisors act upon my applications as
soon as possible.

                                    Sincerely,

                            David B. Corneal, Esq.

COPY

Copy Sent to
Newton

— #4.1

**DAVID B CORNEAL**
**SANDRA Y CORNEAL**
505 E FAIRMOUNT AVE
STATE COLLEGE, PA 16801-5717

749

DATE 3-31-00

25-60/440

PAY TO THE
ORDER OF ___JACKSON TOWNSHIP___  $ 20.00

Twenty and XX/00 ————

MEMO ___Permit for ___

:044000804: 041607525995 0749

Case 1:00-cv-01192-SHR   Document 121-2   Filed 04/18/2003   Page 27 of 91

Plat No. _____                          APPLICATION NO. _____

## JACKSON TOWNSHIP, HUNTINGDON COUNTY, PA.

### APPLICATION FOR BUILDING PERMIT

Date: 8-31-00                       Telephone 314-234-1510

Applicant: DAVID E. & STANLEY. COUGHER

Address: 505 E. FAIRMOUNT AVE   STATE COLLEGE, PA 16801

Permit to erect, alter, extend ___2___ Stories GARAGE
                                                    (Proposed Use)

At location SEE ATTACHED MAP and _____
                                              (cross street)

Building is to be __20__ ft. wide by __40__ ft. long, by __20__ ft. high

Approximate cost $ 45,000 _____

Subdivision ___N/A___ Lot No. _____

DEP Sewage Permit Number __NOT APPLICABLE__

Driveway Permit Number __N/A  (EXISTING)__

Time of commencement __SUMMER__, 20_00_

Name of Contractor __MCINTIRE BROS.__

Township Fee $ 20.00 _____

NOTE:  ATTACH PLANS OR ROUGH DRAFT SKETCH OF THE PROPOSED STRUCTURE

    The provisions of the Building Energy Conservation Act must be complied with. A builder must provide a written warranty to the home owner certifying that the home is in compiance with the Building Energy Conservation Act which sets minimal energy conservation standards.

Now this _____ day of _____, 20___, the above application having been duly investigated, a Building Permit is hereby GRANTED _____ REFUSED _____.

PERMIT NUMBER _____

Note: SETBACK REQUIREMENTS
Minimum 40 feet from street line
and 15 feet from side and rear of
property line

TOWNSHIP OF JACKSON

By_____
        Permit Officer

_____
        Applicant

OPEN STORAGE

SECOND FLOOR OF GARAGE

40'

30'

FIRST FLOOR GARAGE

BAY

BAY

BAY

BAY

BAY

410'

#4.2

DAVID B CORNEAL
SANDRA Y CORNEAL
505 E FARMOUNT AVE
STATE COLLEGE, PA 16801-5717

751

25-20/840

PAY TO THE
ORDER OF ___ JACKSON TOWNSHIP ___

DATE ___ 8-31-00 ___

Twenty five 00/00 ___ $25.00

MEMO ___ Permit for house ___

⑈0440008⑈: 04⑆⑆6075 2995⑈' 0751

Case 1:00-cv-01192-SHR Document 121-2 Filed 04/18/2003 Page 31 of 91

Q0293A Rev. 11/97

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
BUREAU OF WATER QUALITY PROTECTION

# SITE INVESTIGATION AND PERCOLATION
# TEST REPORT FOR ON-LOT DISPOSAL OF SEWAGE
## ER-BWQ-290 Appendix A

Application No. _____ Municipality _Indian_ County _Huntingdon_

Site Location _____ Subdivision Name _Garber_

☑ SUITABLE     Soil Type _____ Slope _10_% Depth to Limiting Zone _21_ Ave. Perc. Rate _67_

☐ UNSUITABLE  ☐ Mottling  ☐ Seeps or Ponded Water  ☐ Bedrock  ☐ Fractures  ☐ Coarse Fragments

☐ Perc. Rate  ☐ Slope  ☐ Unstabilized Fill  ☐ Floodplain  ☐ Other _____

**INSTRUCTIONS FOR COMPLETION OF THIS FORM ARE LOCATED ON THE REVERSE**

SOILS DESCRIPTION:

Soils Description Completed by: _RW_     Date: _7-21-99_

| Inches | | Description of Horizon | |
|---|---|---|---|
| 0 | TO | 6 | Med. brown shaly clay loam 25% CF |
| 6 | TO | 21 | med brown shaly clay loam 35% CF ECF > 21" |
| | TO | 23 | similar to 24 ECF > 23" |
| 0 | TO | 25 ECF 17" 10% 27 similar to 26 ECF > 25" | |

Depth to limiting Zone: _21_ inches

23 & 23 ECF < 30"

PERCOLATION TEST:

Percolation Test Completed by: _RW_     Date: _8-3-99_

Weather Conditions:  ☐ Below 40°F.  ☑ 40°F or above  ☑ Dry  ☐ Rain, Sleet, Snow (last 24 hours)
Soil Conditions:   ☐ Wet  ☑ Dry  ☐ Frozen

Perked between # 24 & 26.

| Hole No. | Yes | No | Reading Interval | Reading No. 1: Inches of drop | Reading No. 2: Inches of drop | Reading No. 3: Inches of drop | Reading No. 4: Inches of drop | Reading No. 5: Inches of drop | Reading No. 6: Inches of drop | Reading No. 7: Inches of drop | Reading No. 8: Inches of drop |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | 10/30 | | | | | | | | |
| 2 | | | 10/30 | | | | | | | | |
| 3 | | | 10/30 | | | | | | | | |
| 4 | | | 10/30 | | | | | | | | |
| 5 | | | 10/30 | | | | | | | | |
| 6 | | | 10/30 | | | | | | | | |

***Water remaining in the hole at the end of the final 30-minute presoak?  Yes, use 30-minute interval;  No, use 10-minute interval.

Calculation of Average Percolation Rate:

| Hole No. | Drop during final period | Perc. Rate as Minutes/Inch | Depth of Hole | |
|---|---|---|---|---|
| 1 | | 60 | 13 | |
| 2 | | 60 | | |
| 3 | | 70 | | |
| 4 | | 140 | | |
| 5 | | 60 | | |
| 6 | | 60 | | |

TOTAL OF MIN / IN → 900    = 447   Min Inch

TOTAL NO. OF HOLES →

The information provided is the true and correct result of tests conducted by me, performed under my personal supervision, or verified in a manner approved by the Department.

(S) _____
Sewage Enforcement Officer

APPLICANT

Case 1:00-cv-01192-SHR   Document 121-2   Filed 04/18/2003   Page 32 of 91

Plat No. _____                              APPLICATION NO. _____

### JACKSON TOWNSHIP, HUNTINGDON COUNTY, PA.

### APPLICATION FOR BUILDING PERMIT

Date: 8·31·00                           Telephone 814-234-1510

Applicant: DAVID E. & SANDRA Y. CORNEAL

Address 505 E. FAIRMOUNT AVE STATE COLLEGE, PA. 16801

Permit to erect, alter, extend _____3_____ Stories _____HOUSE_____
                                                    (Proposed Use)

At location SEE ATTACHED MAP and _____
                                          (cross street)

Building is to be __22__ ft. wide, by __50__ ft. long, by __20__ ft. high

Approximate cost $ 150,000

Subdivision _____N/A_____ Lot No. _____

DEP Sewage Permit Number SEE ATTACHED SEO APPROVED SITE & ATTACHED
                                                    SEWER MODULE

Driveway Permit Number N/A EXISTING

Time of commencement _____FALL_____, 20 00

Name of Contractor _____McCLINTIC BROS_____

Township Fee $ 20.00

NOTE: ATTACH PLANS OR ROUGH DRAFT SKETCH OF THE PROPOSED STRUCTURE

The provisions of the Building Energy Conservation Act must be complied with. A builder must provide a written warranty to the home owner certifying that the home is in compliance with the Building Energy Conservation Act which sets minimal energy conservation standards.

Now this _____ day of _____, 20___, the above application having been duly investigated, a Building Permit is hereby GRANTED _____ REFUSED _____.

PERMIT NUMBER _____

Note: SETBACK REQUIREMENTS
Minimum 40 feet from street line
and 15 feet from side and rear of
property line

TOWNSHIP OF JACKSON

By_____
        Permit Officer

_____
        Applicant

#4.3

**DAVID B CORNEAL**
**SANDRA Y CORNEAL**
505 E FAIRMOUNT AVE
STATE COLLEGE, PA  16801-5717

**750**

25-00/440

DATE 3-31-00

PAY TO THE
ORDER OF  *JACKSON TOWNSHIP*                    $ 20.00

*Twenty & 00/100*                                         DOLLARS

Merrill Lynch

BANK ONE, COLUMBUS, NA
Columbus, Ohio 43271

MEMO  *Permit for art studio*

⑆044000804⑆  04116075299511  0750

Case 1:00-cv-01192-SHR Document 121-2 Filed 04/18/2003 Page 34 of 91

Plat No. _____                    APPLICATION NO. _____

## JACKSON TOWNSHIP, HUNTINGDON COUNTY, PA.

### APPLICATION FOR BUILDING PERMIT

Date: *3-31-00*                    Telephone *814-234-1510*

Applicant: *DAVID S. & SANDRA Y. CORNEZE*

Address: *505 E. FAIRMOUNT AVE STATE COLLEGE, PA. 16801*

Permit to erect, alter, extend ___*3*___ Stories ___*ART STUDIO*___
(Proposed Use)

At location *SEE ATTACHED MAP* and _____
(cross street)

Building is to be __*25*__ ft. wide, by __*25*__ ft. long, by __*30*__ ft. high

Approximate cost $ *75,000* _____

Subdivision ____*N/A*____ Lot No. ___*N/A*___

DEP Sewage Permit Number *SEE ATTACHED SEO APPROVED SITE & ATTACHED SEWER MODULE*

Driveway Permit Number *N/A EXISTING*

Time of commencement *SUMMER*, 20*00*

Name of Contractor *MC CLINTIC BROS.*

Township Fee $ *2.00*

NOTE: ATTACH PLANS OR ROUGH DRAFT SKETCH OF THE PROPOSED STRUCTURE

The provisions of the Building Energy Conservation Act must be complied with. A builder must provide a written warranty to the home owner certifying that the home is in compliance with the Building Energy Conservation Act which sets minimal energy conservation standards.

Now this _____ day of _____, 20___, the above application having been duly investigated, a Building Permit is hereby GRANTED _____ REFUSED _____.

PERMIT NUMBER _____

Note: SETBACK REQUIREMENTS
Minimum 40 feet from street line
and 15 feet from side and rear of
property line

TOWNSHIP OF JACKSON

By_____
Permit Officer

_____
Applicant

Case 1:00-cv-01152-SHR   Document 121-2   Filed 04/18/2003   Page 35 of 91

DEPARTMENT OF ENVIRONMENTAL PROTECTION
BUREAU OF WATER QUALITY PROTECTION

# SITE INVESTIGATION AND PERCOLATION
## TEST REPORT FOR ON-LOT DISPOSAL OF SEWAGE
### ER-BWQ-290 Appendix A

Application No. _____  Municipality _Jackson_  County _Huntingdon_

Site Location _____  Subdivision Name _Crane_

☒ SUITABLE   Soil Type _Silt_  Slope _10_ %  Depth to Limiting Zone _21_  Ave. Perc. Rate _67_

☐ UNSUITABLE   ☐ Mottling  ☐ Seeps or Ponded Water  ☐ Bedrock  ☐ Fractures  ☐ Coarse Fragments

☐ Perc. Rate  ☐ Slope  ☐ Unstabilized Fill  ☐ Floodplain  ☐ Other _____

---

## INSTRUCTIONS FOR COMPLETION OF THIS FORM ARE LOCATED ON THE REVERSE

**SOILS DESCRIPTION:**

Soils Description Completed by: _RW_   Date: _7-21-99_

| Inches | | | Description of Horizon |
|---|---|---|---|
| #24 | 0 | 6 | Med. brown shaly clay loam 25%CF |
| | 6 | 24 | weak brown shaly clay loam 35%CF ECF >21' |
| #26 0 | | 23 | similar to #24 ECF >23" |
| | 0 | #25 ECF17" 10% #27 similar to 26 ECF >25" |

Depth to limiting zone _21_ inches

22 & 23 ECF < 20"

---

**PERCOLATION TEST:**

Percolation Test Completed by: _RW_   Date: _8-3-99_

Weather Conditions:  ☐ Below 40°F   ☒ 40°F or above   ☒ Dry   ☐ Rain, Sleet, Snow (last 24 hours)

Soil Conditions:  ☐ Wet   ☒ Dry   ☐ Frozen   Perked between #24 & 26

| Hole No. | Yes | No | Reading Interval | Reading No. 1: Inches of drop | Reading No. 2: Inches of drop | Reading No. 3: Inches of drop | Reading No. 4: Inches of drop | Reading No. 5: Inches of drop | Reading No. 6: Inches of drop | Reading No. 7: Inches of drop | Reading No. 8: Inches of drop |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | 10/30 | ½ | ½ | | ½ | | | | |
| 2 | | | 10/30 | ½ | ½ | ½ | ½ | | | | |
| 3 | | | 10/30 | ¾ | ¾ | ¾ | ¾ | | | | |
| 4 | | | 10/30 | ¼ | ¼ | ¼ | ¼ | | | | |
| 5 | | | 10/30 | ½ | ½ | ½ | ½ | | | | |
| 6 | | | 10/30 | ½ | ½ | ½ | ½ | | | | |

***Water remaining in the hole at the end of the final 30-minute presoak?  Yes, use 30-minute interval; No, use 10-minute interval.

---

Calculation of Average Percolation Rate:

| Hole No. | Drop during final period | Perc. Rate as Minutes/Inch | Depth of Hole |
|---|---|---|---|
| 1 | ½ | 60 | 13" |
| 2 | ½ | 60 | |
| 3 | ¾ | 40 | |
| 4 | ¼ | 120 | |
| 5 | ½ | 60 | |
| 6 | ½ | 60 | |
| TOTAL OF MIN / IN → | | 400 | = 66.7 Min/Inch |
| TOTAL NO. OF HOLES→ | | | |

The information provided is the true and correct result of tests conducted by me, performed under my personal supervision, or verified in a manner approved by the Department.

(S) _Barry Faust_

Sewage Enforcement Officer




APPLICANT

33

IN THE COURT OF COMMON PLEAS OF HUNTINGDON COUNTY, PENNSYLVANIA
CIVIL DIVISION – EQUITY

JACKSON TOWNSHIP, HUNTINGDON :     NO. 2000-1290
COUNTY, PENNSYLVANIA, :
:
           Plaintiff, :
:
      Vs. :
:
DAVID B. CORNEAL and :
SANDRA Y. CORNEAL, his wife, :
:
         Defendant. :

## ORDER

AND NOW, this _19th_ day of October, 2000, upon consideration of the within Motion and upon motion of Lawrence L. Newton, a hearing is scheduled in this matter for the 14th day of NOVEMBER, 2000, at 11:30 a.m. in Courtroom No. 1 of the Huntingdon County Courthouse, Huntingdon, Pennsylvania

BY THE COURT,

_Stewart Kurtz_

Stewart L. Kurtz, P.J.

The Original of this Document has
been filed in the Office of the
Prothonotary/Clerk of Court on

OCT 19 2000

34

# MAYERS, MENNIES & SHERR LLP
### ATTORNEYS AT LAW

RICHARD J. MENNIES
JOSEPH B. MAYERS
ANTHONY R. SHERR
LISA G. FADEN*
LORI J. MILLER**
JOHN A. ANASTASIA
GRACE P. MANNO***

Also Admitted in New Jersey*
Also Admitted in Illinois**
Also Admitted in Texas***

3031 WALTON ROAD, BUILDING A
SUITE 330, P.O. BOX 1547
BLUE BELL, PA 19422-0440

TEL: (610) 825-0300.
FAX: (610) 825-6555

OF COUNSEL
RONALD H. SHERR

E-mail tsherr@mmsllp.com

March 18, 2003

**_VIA FAX AND REGULAR MAIL_**

Bridget E. Montgomery, Esquire
**Eckert, Seamans Cherin & Mellott**
213 Market Street, 8th Floor
Harrisburg, PA 17101

Eckert Seamans
Cherin & Mellott

MAR 2 0 2003

Harrisburg, PA

RE:   **Corneal v. Jackson Township, et al.**
      **C.A. No. 1:00-CV-1192 – Judge Rambo**

Dear Ms. Montgomery:

Despite your obnoxious and unprofessional behavior, I am mindful of my obligations pursuant to the Rules, and, therefore, provide you with the following responses to your proposed Stipulations of Facts. It is my recollection that we have worked through No. 37. We agreed to stipulate to the following with exceptions as noted:

Nos. 38, 40, 42, 43, 44, 46 [with the exclusion of the word "merely"], 49 and 50 [with the inclusion of the words "at her deposition" at the beginning of both sentences], 51, 52, 53 [with the inclusion of "at her deposition" at the beginning of the sentence], 54 [with the exclusion of the word "only"], 57, 59, 61, 62, 63, 65, 71, 74 [with the exclusion of Defendant, Wirth and substituting the words" at the meeting, Mr. Corneal was told"], 75, 77 [we note that 77 merely restates No. 68], 78, 79, 80, 81 [with the substitution of the word "did" for the "does"], 82, 84, 85, 86, 87, 88, 90, 93, 95, 97, 98, 99, 100, 101, 102, 103, 106, 108 [with the exclusion of the words "despite the fact that"], 109, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122 [with

Bridget E. Montgomery, Esquire
March 18, 2003
Page 2

the deletion of "an initiative of a private complaint against Corneal for potential wetlands violations and discussed potential wetlands violations by Corneal"], 124, 125, 126, 127, 128 [if you include the words at the end after building permit "at the time"], 129, 130, 132, 133, 134, 135, 136, 138, 139, 140, 141, 144, 145, 146, 147, 148 [with the inclusion of "that is not going to have water" after the word garage], 149, 150, 151, 152 [with the exclusion of the word "purportedly"], 153, 154, 157 [with the inclusion of the word "at his deposition"], 158, 159, 160, 161, 162 [with the substitution of "at her deposition" at the beginning of the sentence], 163- 164 [we would like the inclusion of the words "at his deposition"], 165, 166, 169, 172, 173, 174, and 175.

Accordingly, we will not stipulate to Nos. 45, 52, 68, 70, 73, 91, 92, 104, 131, 137 and 142.

With respect to my proposed stipulations, and since you obviously desire something more formalized than my handwritten notes and typewritten chain of events, which I was going to request that you stipulate to, please let me know whether you will stipulate to the following factual statements:

1. Jackson Township receives $22,000.00 in tax revenue from its citizens, and has a total budgeted revenue of $98,000.00.

2. The Township had begun considering and working on a subdivision and land development ordinance prior to Mr. Corneal purchasing his property in Jackson Township.

3. The first time that Ann Wirth heard that Mr. Corneal had purchased property and was seeking to subdivide his property was when she received the letter from Andy Patterson dated January 11, 2000.

4. A Moratorium on the acceptance and consideration of land use and subdivision plans in the Jackson Township was enacted at the January 4, 2000 Township Meeting.

5. Prior to Mr. Corneal purchasing his property in Jackson Township, and continuing through the present, all subdivision and land development plans were reviewed by the Huntingdon County Planning Commission prior to being reviewed by the Township.

6. This policy existed in most municipalities in Huntingdon County.

Bridget E. Montgomery, Esquire
March 18, 2003
Page 3

7.    The Township adopted its Subdivision and Land Development Ordinances at the July 10, 2000 meeting.

8.    In September 2000, Mr. Corneal was provided with copies of the Land Development and Subdivision Ordinances.

9.    On February 24, 2000, the Township received a letter from the County recommending denial of Mr. Corneal's proposal noting that the proposed house and garage were proposed in steep slope areas and the construction should not take place in those areas and also that the hydric soils, which are typically found in wetland areas and near streams were noted.  It recommended that the Township should further investigate the building sites.

10.    Mr. Corneal sent a letter to the County on April 11, 2000, which indicated that he was still attempting to subdivide his property.

11.    David and Sandra Corneal purchased the Gavasi property on June 15, 2000.

12.    On July 7, 2000, David and Sandra Corneal transferred the property to Sandra Y. Corneal.

13.    The Township received a letter from the County Assessment Office indicating that on July 13, 2000 rollback taxes were due as a result of this transfer.

14.    Mr. Corneal was sent a letter by Larry Newton on July 28, 2000 indicating that Corneal was building without permits and that he was to cease and desist.

15.    On August 3, 2000, Mr. Corneal reversed the transfer of the property to Sandra Y. Corneal and it was transferred back to David and Sandra Corneal.

16.    On September 1, 2000, Mr. Corneal applied for a building permit, which had no drawings, plot plan or sewage modules.

17.    A meeting occurred on November 14, 2000 at the Huntingdon County Courthouse between Terry Williams, counsel for Corneal and Township officials.

18.    On February 5, 2001, applications for building permits and driveway permits were submitted.

19.    A second meeting took place at the Courthouse between Williams and Township officials in February 2001.

20.    Permits and Corneals' sewage module were resubmitted to the Township in April of 2001.

With respect to your exhibit list, we do not object to the authenticity of any of the proposed documents.  We object to the expert reports for the reasons as stated in our Motions in Limine.  With respect to your witness list, with the exception to our previously stated objections to Mr. Fasic and Mr. Heist, we do not object to the presentation of any of the other witnesses listed.

3

Bridget E. Montgomery, Esquire
March 18, 2003
Page 4

With respect to the correspondence, which you handed me yesterday purporting to be your current settlement demand (which you admitted in front of me was merely a restatement of your prior demand which I had previously responded to), we have the following response: In full final and complete settlement of this matter of any and all claims Mr. and Mrs. Corneal had or would have including any claim for attorney's fees we are willing at this time to offer $15,000.00.

As the issues concerning the action, which had been filed by the Township in Huntingdon County have been resolved to all parties' satisfaction completely and wholly separate from this lawsuit, we will not address 1(a) and/or 2.

I look forward to hearing from you in this regard.

Very truly yours,

ANTHONY R. SHERR

ARS/cz

4

35

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

DAVID B. CORNEAL and : NO. 1:CV-00-1192
SANDRA Y. CORNEAL, :
              Plaintiffs : JURY TRIAL DEMANDED
   v. :
: RAMBO, J.
JACKSON TOWNSHIP, :
Huntingdon County, Pennsylvania, :
*et al.*, :
             Defendants :

## STATEMENT OF UNDISPUTED FACTS AS AGREED TO BY COUNSEL

> **Deleted:** PLAINTIFFS' CONSOLIDATED
>
> **Deleted:** MATERIAL
>
> **Deleted:** IN SUPPORT OF SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1.    David B. Corneal is an adult individual who resides at 505 East Fairmount Avenue, State College, PA 16801.

2.    Sandra Y. Corneal is an adult individual, and the wife of David B. Corneal, who resides at 505 East Fairmount Avenue, State College, PA 16801. David B. Corneal and Sandra Y. Corneal are referred to collectively herein as "the Corneals."

3.    Defendant Jackson Township (the "Township") is a second class township organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at R. D. 1, Box 390, Petersburg, PA 16669, and operates through a Board of Supervisors.

4.    Defendant W. Thomas Wilson is an adult individual and is a member of the Board of Supervisors of the Township.

> **Deleted:** [Deposition of W. Thomas Wilson, May 18, 2001, at 13:14-18 (hereinafter, "Wilson Dep."), submitted herewith as Appendix 1]

{L0249049.1}

5.     Defendant Michael Yoder is the Chairman of the Board of Supervisors of the Township.

> **Deleted:** [Deposition of Michael Yoder, May 18, 2001, at 6:3-6 (hereinafter "Yoder Dep."), submitted herewith as Appendix 2]

6.     Defendant Ralph Weiler is an adult individual and is a member of the Board of Supervisors of the Township.

> **Deleted:** [Deposition of Ralph Weiler, June 29, 2001, at 14:14-21 (hereinafter "Weiler Dep."), submitted herewith as Appendix 3]

7.     Defendant Ann L. Wirth is an adult individual and is the Secretary of the Township.

> **Deleted:** [Deposition of Ann Wirth, May 17, 2001, at 25:4-23 (hereinafter "Wirth Dep."), submitted herewith as Appendix 4]

8.     Defendant David Van Dommelen is an adult individual and is the Building Permit Officer of the Township.

> **Deleted:** [Deposition of David Van Dommelen, June 6, 2001, at 15:4-8 (hereinafter "Van Dommelen Dep."), submitted herewith as Appendix 5]

9.     Defendant Barry Parks is an adult individual and is the Sewage Enforcement Officer of the Township.

> **Deleted:** [Deposition of Barry Parks, May 16, 2001, at 14:6-9 (hereinafter "Parks Dep."), submitted herewith as Appendix 6]

10.    The Corneals are the owners of an approximately ninety-five (95) acre tract of land situate in Jackson Township, Huntingdon County, Pennsylvania (the "Property").

> **Deleted:** [Deposition of David B. Corneal, February 22, 2001 at 21:13-19 (hereinafter "Corneal Dep."), submitted herewith as Appendix 7]

11.

> **Deleted:** The Corneals acquired the Property in October, 1998. [Corneal Dep. at 21:18-19]

12.    The Property was part of the property owned by Defendant Wilson's late grandfather.

> **Deleted:** estate of

> **Deleted:** [Wilson Dep. at 55:17-19].

13.    In approximately spring 1999, the Corneals "started seriously thinking about" subdividing and selling a portion of the Property.

> **Deleted:** desired to

> **Deleted:** e

> **Deleted:** [Corneal Dep. at 28:2-8]

14.    The Corneals believed that subdivision approval by Huntingdon County ("the County") was required.

> **Deleted:** B

> **Deleted:** ing

{L0249049.1}

The Corneals hired a surveyor, David Simpson, to perform a survey of the Property and to prepare a subdivision plan.

15.     The Corneals contacted Defendant Parks, the Township's Sewage Enforcement Officer, in summer 1999 to begin the process of subdividing the Property, including identification of those portions of the Property which were suitable for an on-lot septic system.

16.     Suitable sites for on-lot septic were located by Defendant Parks for all of the proposed lots but one.

17.     The Corneals paid approximately One Thousand Four Hundred Dollars ($1,400) to the Township for Defendant Parks' services.

18.     The Corneals contacted Defendant Wilson and engaged Defendant Wilson's private business, Eagle Excavating, to do percolation tests and other work at the Property.

19.

20.     After Wilson's private business dug the test pits, several weeks later, Defendant Wilson and Eagle Construction performed percolation tests in the test pits.

21.     At some point during summer 1999, Corneal hired an architect and builder for his house, art studio and garage that he intended to build on the property.

{L0249049.1}

Deleted: , in the fall of 1999, t

Deleted: [Corneal Dep. at 29:8-19]

Deleted: July

Deleted: perform tests to

Deleted: y

Deleted: [Parks Dep. at 44:7-15]

Deleted: [Parks Dep. at 56:17-21]

Deleted: were required to pay over

Deleted: Dollars

Deleted: and proper compensation was, in fact, paid by the Corneals for Defendant Parks' efforts

Deleted: [Corneal Dep. at 59:9-11]

Deleted: After Defendant Parks identified the suitable sites for on-lot septic, t

Deleted: . [Wilson Dep. at 46:11-16]

Deleted: At the time that Corneal hired Defendant Wilson and Eagle Construction Company, Corneal did not know that Wilson was a Township supervisor. [Corneal Dep. at 38:20-23]

Deleted: approximately six to eight

Deleted: [Wilson Dep. at 55:5-8; Corneal Dep. at 44:6-15]

Deleted: During the time period between digging the test pits and conducting the percolation tests,

Deleted: [Corneal Dep. at 45:2-26:8]

22.     The Corneals paid all invoices from Defendant Wilson's private

business for its excavation services in connection with the percolation tests on the

Property.

23.     At the time that Wilson's private business performed the percolation

tests at the property, Wilson understood that the Corneals intended to subdivide the

Property.

24.

25.

26.     At the time that Wilson's private business performed the percolation

tests at the property, the Township was not considering a moratorium on property

subdivision.

27.     After the test pits were dug and the percolation tests were completed,

Simpson prepared the sewage module, and Corneal presented it to Defendant

Parks, who signed it.

28.     In or around January 2000, Simpson drafted a subdivision plan for the

Corneals that divided the property into three lots ("Initial Plan").  The Initial Plan

bore a completion date of February 4, 2000.

29.     Corneal had discussed selling the 26-acre parcel containing the barn

and the house to Defendant Wilson because it was his grandfather's farm.

{L0249049.1}

---

**Deleted:** compensated

**Deleted:** [Wilson Dep. at 54:21-25]

**Deleted:** knew

**Deleted:** [Wilson Dep. at 47:14-18].

**Deleted:** Approximately the time that Wilson was on the property to dig the test pits, Wilson told Corneal that there was no building code and no subdivision ordinance in Jackson Township. [Corneal Dep. at 56:1-12, 17-20]

**Deleted:** Wilson told Corneal that there were no subdivision requirements, but that he had to get the sewage enforcement officer's approval of the locations for the on-site septic before the Township signed the sewage modules that would be forwarded to the Department of Environmental Protection.  [Corneal Dep. at 57:4-11]

**Deleted:**  [Wilson Dep. at 51:13-15]

**Deleted:** s

**Deleted:** them

**Deleted:** all of them

**Deleted:**  [Corneal Dep. at 59:12-14]

**Deleted:** [Deposition of David Simpson at 18:18-24 (hereinafter "Simpson Dep."), submitted herewith as Appendix 8]

[defendants say "denied," but do not deny the allegation, only state Wilson could not afford]

> **Deleted:** [Corneal Dep. at 52:17-24]

30.　In August-September, 1999, the Corneals began seeking a buyer for one of the lots, a twenty-six (26) acre tract of land, upon which a house and barn were situate.

> **Deleted:** commenced the marketing of

> **Deleted:**　[Corneal Dep. at 46:13-18]

31.　Defendant Wilson's nephew desired to purchase the portion of the Property that contained the farmhouse originally owned by Defendant Wilson's grandfather.

> **Deleted:**　[Wilson Dep. at 58:8-59:1]

32.　Defendant Wilson claims that he learned that John Hewett, Jr. was interested in purchasing a portion of the Property.

> **Deleted:** in 1999

> **Deleted:** [Wilson Dep. at 70:12-21; 73:4-15]

33.　Hewett called Corneal and expressed an interest in purchasing the farmhouse.

> **Deleted:** [Corneal Dep. at 51:24-52:1]

34.　Hewett told Corneal that he had heard about the farmhouse from Defendant Wilson.

> **Deleted:**　[Corneal Dep. at 52:11-16]

35.　On October 7, 1999, the Corneals entered into a contract with John Hewett, Jr., and Joann Smith, pursuant to which Hewett and Smith agreed to purchase said twenty-five (25) acre lot for One Hundred Fifty Thousand ($150,000) Dollars (the "Contract"), pursuant to which Hewett and Smith placed a down payment of Four Thousand ($4,000) Dollars and agreed to pay Five Hundred

{L0249049.1}

($500) Dollars per month against the purchase price until settlement on the

purchase that was scheduled for June 30, 2000.

**Deleted:** [Contract Dated Oct. 7, 1999, submitted herewith as Appendix 9]

36. The Corneals presented the Initial Plan to the Defendant Township at

the monthly meeting of the Township Board of Supervisors on or about February

7, 2000.

**Deleted:** [Wirth Dep. at 75:15-25]

37. At the time that Corneal presented the Initial Plan to the Township at

the February 2000 Township meeting, the plan showed three lots: the 26-acre lot

containing the farmhouse and the barn, a 4½-acre plot in the back of the property,

and the residue on which the Corneals intended to build a house, art studio and

garage.

**Deleted:** [Corneal Dep. at 77:16-78:2]

38. Corneal took three or four signed and notarized copies of the

subdivision plan to the Township meeting in February 2000 to have it signed.

39.

40. At the time the Corneals submitted the Initial Plan to the Township,

the Township did not have a subdivision ordinance.

41.

42. When the Corneals attempted to submit the Initial Plan to the

Township on February 7, 2000, they were informed that no subdivisions were

being reviewed because of a moratorium on new subdivisions in the Township (the

"Moratorium").

**Deleted:** [Corneal Dep. at 79:14-17]

**Deleted:** Corneal took the subdivision plan to the Township to have it signed because Defendant Wilson told Corneal that he had to take the plan to the Township or bring it to the supervisors' meeting for signature. [Corneal Dep. at 79:18-80:2]

**Deleted:** [Wilson Dep. at 80:18-21]

**Deleted:** Prior to the February 2000 meeting, Wilson had told Corneal that there was no subdivision ordinance in place, but never told Corneal that the Township was working on a subdivision ordinance or that a moratorium was going to be implemented. [Corneal Dep. at 81:23-82:7]

**Deleted:** [

**Deleted:** [Wilson Dep. at 94:23-95:1; Wirth Dep. at 83:11-16; Minutes of the Meeting of the Board of Supervisors of Jackson Township, February 7, 2000, submitted herewith as Appendix 10]

{L0249049.1}

43.     The Moratorium was enacted at the January, 2000 meeting of the

Township Board of Supervisors.

Deleted: [Wirth Dep. at 83:17-18; Minutes of the Meeting of the Board of Supervisors of Jackson Township, Jan. 4, 2000, submitted herewith as Appendix 11]

44.     The Moratorium was passed on January 4th during the meeting by

unanimous vote of the three supervisors.

Deleted: [Wirth Dep. at 218:5-9; Minutes Jan. 4, 2000]

45.     The Moratorium was not passed by resolution or any other formal

action, it only appears in the minutes.  [defendants deny without explanation or

citation]

Deleted: [Wirth Dep. at 83:19-21]

46.     Township minutes reflect that Defendants Wilson, Yoder and Weiler

merely made a statement indicating that "no more sub-divisions will be approved

until after the proposed Sub-Division ordinance for the Township has been

approved." [denied as characterization]

Deleted: [Minutes Jan. 4, 2000]

47.     Defendant Wirth does not recall the Moratorium being discussed at

any previous meeting of the Township Board of Supervisors.

Deleted: [Wirth Dep. at 83:22-24]

48.     Defendant Wirth does not recall any discussions about why the

supervisors were implementing the Moratorium.

Deleted: [Wirth Dep. at 156:1-3]

49.     Defendant Wirth does not recall the Moratorium being discussed at

any time prior to the January, 2000 meeting of the Township Board of Supervisors.

Deleted: [Wirth Dep. at 84:9-11]

50.     Wirth does not recall whether any discussions about the purpose of

the Moratorium ever took place.

Deleted: [Wirth Dep. at 156:6-8]

51.     With the exception of the minutes of the Township Board of

Supervisors meeting dated January 4, 2000, no documents exist relating to the

Moratorium.

| | Deleted: [Wirth Dep. at 90:14-25] |

52.     Wirth "probably [did] [not] advertise" that the moratorium was going

to be discussed on the January 4, 2000 meeting of the Township Board of

Supervisors.   [check deposition for denial]

| | Deleted: [Wirth Dep. at 92:1-16] |

53.     Defendant Wirth cannot recall which Supervisor first discussed the

Moratorium at the January, 2000 meeting of the Township Board of Supervisors.

| | Deleted: [Wirth Dep. at 97:7-15] |

54.     Defendant Wirth recalls only that all of the Supervisors agreed on

imposition of the Moratorium.

| | Deleted: [Wirth Dep. at 97:14-15] |

55.

| | Deleted: Defendant Wirth discussed the Moratorium with Richard Stahl of the Huntingdon County Planning Commission ("HCPC").  [Wirth Dep. at 140:8-12] |

56.

| | Deleted: Wirth does not recall whether she asked Richard Stahl for any advice about whether or not the Moratorium was legal.  [Wirth Dep. at 140:13-17] |
| | Deleted: [Wirth Dep. at 156:19-21] |

57.     The Jackson Township Board of Supervisors never held a public

hearing on the Moratorium.

| | Deleted: The Jackson Township Board of Supervisors never formally submitted the Moratorium to the HCPC.  [Wirth Dep. at 156:22-24] |

58.

59.     There was no subdivision ordinance in place at any time prior to

July 10, 2000, in Jackson Township.

| | Deleted:  [Wirth Dep. at 162:25-163:5] |

60.

| | Deleted: Defendant Yoder is not familiar with the procedure to be followed by the Township to enact an ordinance.  [Yoder Dep. at 6:21-25] |

{L0249049.1}

61. Defendant Yoder recalls that there were conversations prior to the January 2000 meeting of the Township Board of Supervisors discussing the imposition of the Moratorium.

Deleted: [Yoder Dep. at 12:7-13]

62. Defendant Yoder recalls all three supervisors being present at the conversations regarding the Moratorium that occurred prior to the January 2000 meeting of the Township Board of Supervisors.

Deleted: [Yoder Dep. at 12:21-13:6]

63. Defendant Yoder believes that the conversation among the supervisors regarding the imposition of the Moratorium occurred in the fall of 1999.

Deleted: [Yoder Dep. at 13:7-9]

Deleted: At no time prior to the January, 2000 meeting of the Township Board of Supervisors did Defendant Yoder discuss the imposition of the Moratorium with Township Solicitor Larry Newton. [Yoder Dep. at 13:15-18]

64. Are they really contesting this?

65. Defendant Yoder never personally asked Township Solicitor Larry Newton whether it was legal to impose a Moratorium upon building in Jackson Township.

Deleted: [Yoder Dep. at 68:18-24]

Deleted: Wilson, in his capacity as Supervisor of the Township, never consulted with the Township Solicitor to determine whether the Moratorium was legal. [Wilson Dep. at 143:4-10]

66. Are they really contesting this?

67. Are they really constesting this?

Deleted: In fact, none of the supervisors ever consulted with Township Solicitor Newton regarding the legality of the Moratorium. [Deposition of Larry Newton, May 17, 2001, at 25:14 – 26:23 (hereinafter "Newton Dep."), submitted herewith as Appendix 12]

68. The Township Board of Supervisors did not seek the advice of Township Solicitor Larry Newton on February 7, 2000 prior to refusing to review the Corneals' subdivision plan.

Deleted: [Yoder Dep. at 69:18-21]

69. Are they really contesting?

Deleted: Defendant Wilson, in his capacity as Supervisor to the Township, never consulted with the Township Solicitor for advice in connection with the Corneals' attempts to subdivide the Property. [Wilson Dep. 101:12-20]

70. Corneal took the sewage modules for the Property that defendant Parks already had approved to the Township meeting in March 2000, where he

Deleted: February

{L0249049.1}

asked the Township to sign the sewage modules, but the supervisors refused to

sign them.

> **Deleted:** [Corneal Dep. at 59:14-20]

71.    Prior to the February 2000 Township meeting, Corneal had no contact

with any official or employee of the Township other than Defendants Parks and

Wilson.

> **Deleted:** [Corneal Dep. at 59:21-25]

> **Deleted:** Defendant Wilson never told Corneal that he should hurry and get his materials to the Township throughout any of their conversations in the fall or winter of 1999.  [Corneal Dep. at 60:11-61:5]

72.

73.    <u>Really denying?</u>  Defendant Wirth is not aware of any rule or

regulation or requirement that requires subdivision plans to be submitted to the

HCPC.

> **Deleted:** [Wirth Dep. at 165:1-10]

74.    At the February 2000 meeting, Defendant Wirth told Corneal that he

had to <u>submit</u> his subdivision plan to the HCPC, and that he should do that while

the Moratorium was in place.

> **Deleted:** take

> **Deleted:** to approve the plan before he could present it to the Township.  [Corneal Dep. at 86:19-87:2]

75.    <u>Really Denying?</u>  Defendant Yoder was not aware that the Township

required subdivision applicants to provide an application to the HCPC prior to

review by the Township Board of Supervisors.

> **Deleted:** [Yoder Dep. at 14:14-20]

> **Deleted:** Prior to enactment of the subdivision ordinance in July, 2000, Defendant Yoder was unaware of the process for submission of a subdivision application.  [Yoder Dep. at 14:7-13]

76.

77.    The Township Board of Supervisors never consulted with the

Township Solicitor during the February 2000 meeting at which the Corneals

sought review of the Initial Plan.

> **Deleted:** [Wilson Dep. at 189:5-18]

{L0249049.1}

78.     During the period between digging the test pits and conducting the percolation tests, Corneal also had talked to Defendant Wilson about improving the driveway that already was on the property and crossed the stream on the property.

79.     Shortly after the February 2000 meeting, Defendant Wilson, through Eagle Construction, told Corneal that he would not do the work to repair the road on the property.

80.     Shortly after the February 2000 meeting, Corneal submitted the subdivision plan to the HCPC.

81.     The County of Huntingdon does not have a subdivision and land development ordinance. Rather, the County has merely caused to be prepared a "Land Development Guide" which purports to govern land development within the County.

82.     The County provided comments on the Initial Plan and, by way of letter dated February 24, 2000, recommended that the Township deny approval of the Initial Plan.

83.

84.     The Corneals revised the Initial Plan to address the purported "concerns" expressed by the County Planning Commission.

85.     The revised plan depicted the division of the Property into two lots, consisting of a 25.80-acre parcel of land which was to be conveyed to Hewett and

Deleted: [Corneal Dep. at 47:17-25; 48:18-22; 49:11-50:5]

Deleted: [Corneal Dep. at 85:17-20]

Deleted: [Corneal Dep. at 91:6-13]

Deleted: has never enacted a

Deleted: pursuant to the provisions of the MPC

Deleted: [Letter from Huntingdon County Planing Commission dated Feb. 24, 2000, submitted herewith as Appendix 13]

Deleted: The HCPC recommended that the Initial Plan be "denied" even though neither the County nor the Defendant Township has a duly enacted ordinance upon which a denial could be lawfully based.  [Id.]

Deleted: Attempting to cooperate with the County and the Defendants, the

Deleted: [Simpson Dep. at 19:24-20:14]

{L0249049.1}

Smith pursuant to the Contract and a residual 68.87-acre parcel of land

(approximately) upon which the Corneals intended to construct a house, an art

studio and a garage (the "Revised Plan").

86.     The Revised Plan was submitted to the HCPC for review.

87.     By way of letter dated April 20, 2000, the HCPC "recommended"

"conditional approval of this proposal pending adoption of the subdivision and

land development ordinance" by the Township.

88.     Defendant Yoder cannot recall the Township Board of Supervisors

ever denying a subdivision application that the HCPC has recommended approval

of.

89.     Denied without citation or explanation.

90.     Are they really going to deny?  Mr. Corneal also requested a copy of

the proposed Jackson Township subdivision ordinance prior to approval by the

Township Board of Supervisors.

91.     Are they really denying?  Despite Mr. Corneal's request for a copy of

the proposed subdivision ordinance, Township secretary Wirth did not send him a

copy of the proposed ordinance.

92.     Denial is non sequitur.  As a result of the Township's refusal to

review the Initial Plan, the Corneals' requested the Township to approve sewer

{L0249049.1}

**Deleted:** [Simpson Dep. at 20:18-20]

**Deleted:** [Corneal Dep. at 113:11-13]

**Deleted:** [Letter dated Apr. 20, 2000 from Huntingdon County Planning Commission, Appendix 14]

**Deleted:** [Yoder Dep. at 15:17-20]

**Deleted:** At the March 2000 meeting, Corneal requested copies of the Township ordinances, but the Township, through Defendant Wirth, refused to provide copies even when Mr. Corneal offered to pay for the copies to be made.  [Corneal Dep. at 88:13-89:2]

**Deleted:** [Wirth Dep. at 176:17-18]

**Deleted:** [Wirth Dep. at 176:19-20]

modules for construction of a house, art studio and garage on the property without

any subdivision.

Deleted: [Corneal Dep. at 115:16-21

93. <u>Denial is non sequitur.</u>  On April 3, 2000, even after David Corneal

informed the Township that he was not going to subdivide the Property, the

Township acting through its Board of Supervisors refused to sign the Corneals'

sewer modules for the Property.

Deleted: [Wilson Dep. at 120-127:18]

94.

Deleted: Defendant Parks cannot recall the Township ever refusing to approve any other sewer modules that had been initially approved by Defendant Parks. [Parks Dep. at 42:18-23; 43:20-44:6]

95. Prior to April 3, 2000, <u>Mr. Wilson could not recall</u> the Board of

Supervisors of the Township <u>ever refusing</u> to sign sewage modules that had been

approved by the Sewage Enforcement Officer.

Deleted: never has refused

Deleted: [Wilson Dep. at 169:1-5].

96.

Deleted: The supervisors said they would not sign the sewer modules because of the Moratorium.  [Corneal Dep. at 106:3-4]

97. <u>Why was this denied?</u>  Corneal then requested the Township to sign

the sewer modules so that he could begin construction on his house and art studio

without asking for the subdivision.

Deleted: [Corneal Dep. at 106:6-8]

98. <u>Why is this denied?</u>  In response to Corneal's request for the sewage

modules to construct the house and art studio, Defendant Wirth told Corneal that

constructing a second house on the same tract of ground constitutes a subdivision

and, therefore, is covered by the Moratorium.

Deleted: [Corneal Dep. at 108:19-109:8]

99.   <u>Why is this denied?</u>  After the supervisors refused to sign the sewer modules for the house, Corneal requested permission to begin construction of the art studio.

> **Deleted:** [Corneal Dep. at 115:4-6]

> **Deleted:** , because they said they required sewer facilities in the art studio, but were not signing any sewer modules. [Corneal Dep. at 115:7-10]

100.   The supervisors refused permission to begin the art studio, as well.

101.   <u>Why is this denied?</u>  After the supervisors refused to allow him to begin construction of the art studio because he did not have a sewage permit, Corneal requested a privy permit so that he could install a privy for the art studio.

> **Deleted:** [Corneal Dep. at 115:11-13]

102.   The supervisors responded that he would have to contact the Sewage Enforcement Officer in order to inquire about obtaining a privy permit for the art studio.

> **Deleted:** [Corneal Dep. at 116:9-11]

103.   Corneal called the Sewage Enforcement Officer, Defendant Parks, after the Supervisors' Meeting to request a privy permit.

> **Deleted:** [Corneal Dep. at 116:12-13]

104.   After the April 3, 2000, meeting at the Township Board of Supervisors, Defendant Wirth telephoned Jackson Township sewage enforcement officer Barry Parks and told him that Mr. Corneal "could not have a privy permit," because she generally understood that she was supposed to make that telephone call.

> **Deleted:** , at the instruction of the Board of Supervisors,

> **Deleted:** .

> **Deleted:** [Wirth Dep. at 203:6-204:3]

105.

> **Deleted:** Parks told Corneal that the Township supervisors already called him and told him that Corneal was not allowed to have a privy permit and that Parks was not allowed to help Corneal get a privy permit.  [Corneal Dep. at 116:13-18]

106.   <u>Are they really denying this?</u>  The Board of Supervisors did not seek the advice of Township Solicitor Larry Newton prior to denying the Corneals' request for a privy permit.

> **Deleted:** [Yoder Dep. at 70:11-15]

107.

> **Deleted:** In its review of the Initial Plan, the HCPC potential wetlands on the Property. [Corneal Dep. at 97:14-17; HCPC Feb. 24 Letter]

108.   Shortly after the HCPC identified the potential wetlands, the Township required additional engineering studies to prove that Corneal was not infringing upon wetlands, despite the fact that Defendant Parks already had evaluated, tested and approved the sites.

> **Deleted:** [Corneal Dep. at 98:1-9]

109.   <u>Are they really denying this?</u>  After the Corneals requested approval of the sewer modules for construction of the house, art studio and garage, Defendant Wirth telephoned Defendant Parks, the Sewage Enforcement Officer, and told him to go back to the Property and re-evaluate the septic sites that Defendant Parks already had approved.

> **Deleted:** [Parks Dep. at 76:6-20]

110.

> **Deleted:** Defendant Yoder recalls that either Defendant Weiler or Defendant Wilson, in their capacity as Supervisor of the Township, directed Defendant Parks, the Sewage Enforcement Officer, to go back to the Property to reinspect the sites that Defendant Parks already had approved in the sewage modules. [Yoder Dep. at 60:24-61:19]

111.   Defendant Yoder recalls that, after Defendant Parks' reinspection of the site, that one of the five approved sites on the Property no longer was usable.

> **Deleted:** [Yoder Dep. at 61:20-62:9]

> **Deleted:** ing

112.   Defendant Yoder does not recall <u>whether</u> Defendant Parks provid<u>ed</u> any information regarding the other four sites.

> **Deleted:**  [Yoder Dep. at 62:24-63:2]

113.   Defendant Yoder does not recall asking Defendant Parks about the other four sites.

> **Deleted:** [Yoder Dep. at 63:6-7]

114.   Defendant Yoder does not recall any of the other Supervisors asking about the other four sites.

Deleted: [Yoder Dep. at 63:8-11]

115.   Defendant Yoder cannot recall the Township Board of Supervisors ever asking a third party to go double-check sewer modules that had already been approved by Defendant Parks.

Deleted: [Yoder Dep. at 63:16-64:3]

116.   Defendant Yoder testified that it would be unusual for the Board to request a third party to double-check sewer modules that had been approved by Defendant Parks.

Deleted: [Yoder Dep. at 64:4-14]

117.   are they really denying?  The Township Board of Supervisors never consulted with the Township Solicitor during the April 2000 meeting at which the Corneals sought approval of their Sewer Modules.

Deleted: [Wilson Dep. at 189:5-18]

118.   are they really denying?  The Township Board of Supervisors never consulted with the Township Solicitor during the April 2000 meeting at which the Corneals sought review of their application for a privy permit.

Deleted:  [Wilson Dep. at 189:5-18]

119.   Defendant Wirth told Township solicitor Larry Newton that the supervisors were not going to sign the Corneals' sewage module.

Deleted: [Wirth Dep. at 140:18-141:9]

120.   Wirth "probably" kept Township solicitor Newton informed about the Township's position with regard to the Corneal's sewage modules.

Deleted: [Wirth Dep. at 143:2-4]

121.   Wirth "probably" kept Township solicitor Larry Newton informed about the Corneals' proposed subdivision plan.

Deleted: [Wirth Dep. at 143:5-7]

{L0249049.1}

122.   <u>really denying?</u>  Defendant Wilson called Andy Patterson, Director of

the Huntingdon County Conservation District, and initiated a private complaint

against Corneal for potential wetlands violations.

> **Deleted:** [Wilson Dep. at 160:6-7, 161:15-163:23]

123.

> **Deleted:** Defendant Yoder testified that Defendant Wilson raised the issue of the presence of wetlands on the Property at one or two of the private meetings of the Township Supervisors.  [Yoder Dep. at 56:16-57:7]

124.   In April 2000, Pursuant to the Township Building Ordinance, David

Corneal went to Van Dommelen's home to request a building permit application

for the issuance of a building permit for the garage <u>and also for the house</u>.

> **Deleted:** [Van Dommelen Dep. at 46:9-24]

125.   Section 3.02A of the Building Permit Ordinance <u>states that</u>

"<u>application for such a building permit shall be made, in writing, to the Building</u>

<u>Permit Officer on forms supplied by the Township.</u>"

> **Deleted:** requires an individual who desires that a building permit be issued to him or her complete an application for the permit on forms supplied by the Township.

> **Deleted:** [Building Permit Ordinance, submitted herewith as Appendix 15]

126.   When David Corneal identified himself to Van Dommelen, Van

Dommelen told David Corneal that he could not issue a building permit because

the Township Board of Supervisors had instructed him not to give a building

permit.

> **Deleted:** [Van Dommelen Dep. at 47:2-7].

127.   A couple weeks before David Corneal sought a building permit from

Van Dommelen, the Township Board of Supervisors had instructed Van

Dommelen not to issue a building permit to the Corneals.

> **Deleted:** [Van Dommelen Dep. at 47:8-10]

128.   <u>are they really denying?</u>  Defendant Wirth told Van Dommelen that

the Township Board of Supervisors was not interested in letting the Corneals have

a building permit.

> **Deleted:** [Van Dommelen Dep. at 48:23-49:2]

{L0249049.1}

129.   While David Corneal was at Van Dommelen's house seeking a

building permit, Van Dommelen telephoned Defendant Wilson, who told Van

Dommelen not to give a permit to David Corneal.

> **Deleted:** [Van Dommelen Dep. at 47:11-13].

130.   Defendant Wilson told Defendant Van Dommelen, the Building

Permit Officer, "don't you dare issue him [David Corneal] a permit."

> **Deleted:** [Wilson Dep. at 128:4-12]

131.   <u>are they really denying?</u> The Township Board of Supervisors does not

have any sort of preapproval process with respect to building permits.

> **Deleted:** [Van Dommelen Dep. at 132:22-25]

132.   <u>are they really denying?</u> Van Dommelen has the responsibility to

make the determination of whether to issue a building permit.

> **Deleted:** [Van Dommelen Dep. at 13:1-2]

133.   After Van Dommelen telephoned Defendant Wilson, Van Dommelen

then refused to provide David Corneal with an application for a building permit.

> **Deleted:** even
>
> **Deleted:** [Van Dommelen Dep. at 56]

134.   Van Dommelen's stated reason for refusing to provide an application

for a building permit was that he "just didn't want him to have one."

> **Deleted:** [Van Dommelen Dep. at 56:17-22]

135.   Van Dommelen also called David Corneal "a trouble-making yuppie

from over the mountain."

> **Deleted:** [Van Dommelen Dep. at 71:18-22]

136.   <u>Really denying?</u> Van Dommelen never has refused to provide any

other person with an application for a building permit.

> **Deleted:** [Van Dommelen Dep. at 56:23-25]

137.   <u>really denying?</u> Van Dommelen never has denied a building permit

application except for the one from the Corneals.

> **Deleted:** [Van Dommelen Dep. at 44:9-20]

{L0249049.1}

138. <u>really denying?</u>  In October 2000, Defendant Van Dommelen, the Building Permit Officer, denied the Corneals' request for building permits to construct an art studio, garage and house.

139. <u>really denying?</u>  Wilson does not know of any other building permit that ever has been denied by the Township.

140. <u>really denying?</u>  Van Dommelen told David Corneal that the Township Board of Supervisors intended to hold a meeting about his situation the day after he sought a building permit application from Van Dommelen.

141. After Van Dommelen refused to give David Corneal even an application for a building permit, David Corneal sent a letter to Van Dommelen requesting a building permit only to build a garage.

142. Van Dommelen ordinarily would issue a permit for a garage without any subdivision plan or septic approval.

143.

144. After Van Dommelen received the letter from David Corneal, Van Dommelen drove to the Property to see what was happening.

145. Van Dommelen granted every other building permit application that was submitted to him in 2000.

146. Van Dommelen did not <u>make a specific visit</u> to the site of any other building permit issued in 2000 to inspect the progress of the building.

**Deleted:** [Van Dommelen Dep. at 76:8-18; Wilson Dep. 184:10-17; Letter from Defendant Van Dommelen to David Corneal dated October 10, 2000, submitted herewith as Appendix 16]

**Deleted:** [Wilson Dep. at 186:8-11]

**Deleted:** [Van Dommelen Dep. at 62:8-14]

**Deleted:** [Van Dommelen Dep. at 70:3-71:14; Letter from David Corneal to Defendant Van Dommelen dated May 5, 2000, submitted herewith as Appendix 17]

**Deleted:** [Van Dommelen Dep. at 17:19-18:4]

**Deleted:** Van Dommelen refused even to telephone David Corneal about the letter.  [Van Dommelen Dep. at 70:23-24].

**Deleted:** [Van Dommelen Dep. at 74:6-10]

**Deleted:** [Van Dommelen Dep. at 103:3-13; Ledger of Building Permit Applications and Grants, submitted herewith as Appendix 18]

**Deleted:** go out

**Deleted:** [Van Dommelen Dep. at 103:21-23]

{L0249049.1}

147.   Van Dommelen stated that there is no distinction between a shed, garage, barn, workshop and art studio without water for purposes of applying for a building permit.

Deleted: [Van Dommelen Dep. at 164:2-6]

148.   Van Dommelen testified that he does not require submission of architectural plans for outbuildings such as a garage prior to granting a building permit.

Deleted: [Van Dommelen Dep. at 147:2-9]

149.   Van Dommelen testified that there was no more acceleration in building projects in the 1999 to 2000 time frame, and that the number of applications was fairly stable.

Deleted: , either for houses or outbuildings, in the Township from 1995 through 2000

Deleted: [Van Dommelen Dep. at 168:13-18]

150.   Van Dommelen claims that he never received an application for a building permit from the Corneals.

Deleted:  never submitted a completed building permit application for the proposed garage

Deleted: [Van Dommelen Dep. at 78:8-22]

151.   Defendant Wirth recalls David Corneal submitting applications for building permits along with checks directly to defendant Wirth.

Deleted: [Wirth Dep. at 145:15-22]

152.   On October 10, 2000, Van Dommelen, with the assistance of Township Solicitor Larry Newton, wrote a letter to the Corneals purportedly denying the Corneals' building permit applications for failure to comply with, *inter alia*, the Pennsylvania Sewage Facilities Act and the Township's Subdivision and Land Development Ordinance.

Deleted: [Van Dommelen Dep. at 76:8-23; 77:12-20; Van Dommelen Exh. 2]

153.   Van Dommelen wrote the October 10, 2000, letter to the Corneals at the instruction of the Township Board of Supervisors.

Deleted: [Van Dommelen Dep. at 186:10-20]

{L0249049.1}

154.   Prior to denying the Corneals building permit applications, Van

Dommelen never had denied any building permit application without actually

seeing the application.

155.

156.

157.   Van Dommelen testified that the October 10, 2000, letter was the only

time that the Township Board of Supervisors every had "usurped" his job as

Building Permit Officer.

158.   Van Dommelen did not object to the Township Board of Supervisors'

action in "usurp[ing]" his job as Building Permit Officer because he did not want

to "shake the boat" because he understood that the Supervisors and Township

Solicitor Larry Newton wanted Van Dommelen to send the letter.

159.   Defendant Van Dommelen discussed the contents of the October 10,

2000 letter with the Township Board of Supervisors and Secretary Ann Wirth prior

to sending the letter to Mr. Corneal.

160.   The discussion regarding the October 10, 2000 letter from Defendant

Van Dommelen to Mr. Corneal occurred at a "workshop" meeting between

Defendants Van Dommelen, Wilson, Wirth, Weiler and Yoder.

**Deleted:** to October 10, 2000

**Deleted:** [Van Dommelen Dep. at 83:5-7]

**Deleted:** Van Dommelen was concerned about sending the October 10, 2000, letter because he had never seen the building permit applications. [Van Dommelen Dep. at 176:16-20]

**Deleted:** Van Dommelen felt that the Township Board of Supervisors was "usurp[ing]" his job as Building Permit Officer by directing him to send the October 10, 2000, letter to the Corneals. [Van Dommelen Dep. at 176:21-22]

**Deleted:** [Van Dommelen Dep. at 177:2-5]

**Deleted:** [Van Dommelen Dep. at 177:6-19]

**Deleted:** [Yoder Dep. at 51:11-13]

**Deleted:** private

**Deleted:** [Yoder Dep. at 51:20-25]

161.   Defendant Yoder testified that he cannot recall ever having seen the letter dated November 10, 2000, from Terry Williams regarding an appeal of the denial of the Corneals' building permits.

162.   Wirth does not recall ever hearing that Mr. Corneal had requested a hearing on the denial of his building permit.

163.   Defendant Yoder is not aware of any Jackson Township ordinance that imposes any requirements upon the Board of Supervisors upon receipt of a document appealing the decision of the Building Permit Officer.

164.   Defendant Yoder is not aware that the building permit ordinance of Jackson Township requires the Board of Supervisors to hold a hearing within thirty (30) days after the receipt of an appeal of a decision of the Building Permit Officer.

165.   Defendant Yoder does not recall attending any hearing being held by the Board of Supervisors regarding the appeal of the Corneals from the decision of the Building Permit Officer as requested in the letter dated November 10, 2000.

166.   Yoder does not recall ever seeking the advice of Township Solicitor Larry Newton in connection with the activities of the Board of Supervisors with regard to the Corneals' attempts to subdivide or develop the Property.

167.

168.

**Deleted:** [Yoder Dep. at 52:13-16]

**Deleted:** '

**Deleted:** [Wirth Dep. at 146:21-24]

**Deleted:** [Yoder Dep. at 53:25-54:4]

**Deleted:** [Yoder Dep. at 54:5-9]

**Deleted:** has no knowledge of

**Deleted:** [Yoder Dep. at 54:10-18]

**Deleted:** At no time did

**Deleted:** [Yoder Dep. at 70:19-24]

**Deleted:** Defendant Yoder does not recall any of the other Supervisors ever seeking the advice of Township Supervisor Larry Newton with regard to the Board's activities regarding the Corneals' attempts to subdivide and/or develop the Property. [Yoder Dep. at 70:25-71:3]

**Deleted:** Township Solicitor Newton shares office space and support staff, as well as certain professional and business ventures with attorney Harvey B. Reeder, Esq. [Newton Dep. at 6:7 –12:6]

{L0249049.1}

169.   On or about May 1, 2000, Corneal received correspondence from Attorney Reeder, counsel for Hewett and Smith, requesting that the Agreement of Sale be terminated as a result of "difficulties with the Township in obtaining subdivision approval."

170.

171.

172.   In or around July 2000, the Corneals began construction of the garage, art studio and house on the property.

173.   In or around October 2000, the Township filed a law suit in the Court of Common Pleas of Huntingdon County to enjoin the construction on the property because the Township had not issued the appropriate permits.

174.   The Corneals' attorney, Terry Williams, Esq., represented the Corneals in the enforcement action by Jackson Township.

175.   In an effort to resolve the law suit filed against the Corneals, Attorney Williams undertook various activities with the Township to resolve whatever concerns they had with the construction.

176.

177.

**Deleted:** [Letter from Harvey B. Reeder, Esq. To David B. Corneal, May 1, 2000, submitted herewith as Appendix 19]

**Deleted:** Prior to and after attorney Reeder sent the May 1, 2000 letter, Township Solicitor Newton discussed the Corneals' land development efforts with attorney Reeder. [Newton Dep. at 74:11 – 76:20]

**Deleted:** After Hewett and Smith backed out of the contract to purchase the 26-acre parcel, including the farmhouse and barn, Wilson's nephew approached Corneal and attempted to purchase the 26-acre parcel. [Corneal Dep. at 83:17-22]

**Deleted:** [Corneal Dep. at 131:12-132:2]

**Deleted:** [Deposition of Terry Williams, Esq., July 10, 2001, at *passim* (hereinafter "Williams Dep."), submitted herewith as Appendix 20]

**Deleted:** [Id.]

**Deleted:** Attorney Williams opined that none of the activities that he undertook on behalf of Mr. Corneal with regard to obtaining permits and permissions from the Township were required by law. [Williams Dep. at 61:10-13; 64:15-16]

**Deleted:** Attorney Williams opined that "the sewage ordinance was not passed until after the driveway was constructed. The building officer advised me that he thought the building applications were all in order, and the sewer modules had adequate and acceptable soil sites to permit the residential development … were on the plan and had been approved, the soil testing had been done.  Legally, I saw no reason why those permits could not have been issued, but an enforcement action is undertaken, which poses a great threat of financial risk to my client and I have to try to help him out of that, and the way you do it I think, from, once again, 28 years of experience of dealing with governmental bodies, with local government in particular, it isn't to sit at a meeting and say you are wrong, it's to say what do you want us to do, tell us what you want us to do, and if it's reasonable and if it's something we can do, we'll do it." [Williams Dep. at 64:23-65:18]

**Deleted:** ¶
. .    Respectfully submitted,¶    [ ... [1]

**Formatted:** NUMBER 1. DS

{L0249049.1}

Respectfully submitted,
ECKERT SEAMANS CHERIN & MELLOTT, LLC

_____

Bridget E. Montgomery, Esquire
Supreme Ct. I.D. #56105
Adam M. Shienvold, Esquire
Supreme Ct. I.D. #81941
One South Market Square Building
213 Market Street
Harrisburg, PA 17101
(717) 237-6000

Date:  June 24, 2002          Attorneys for Plaintiffs,
                              David B. and Sandra Y. Corneal

-------------------------------------------Section Break (Next Page)-------------------------------------------

1

certificate of Service


     I, Adam M. Shienvold, Esquire, hereby certify that I am this day serving a copy of the foregoing document via First Class U.S. Mail, which service satisfies the requirements of the Federal Rules of Civil Procedure and Middle District Local Rules of Court, addressed as follows:

> Anthony R. Sherr, Esquire
> Mayers, Mennies & Sherr, LLP
> 3031 Walton Road, Building A
> Suite 330, P.A. Box 1547
> Blue Bell, PA  19422-0440


 

---

        Adam M. Shienvold, Esquire

Date:  June 24, 2002       Attorney for Plaintiffs,
                      David B. and Sandra Y. Corneal

36



George W. Fasic
802 Strasburg Road
West Chester, Pennsylvania 19382

610-431-2437

# EXPERT   REPORT

## on the  matter of
## CORNEAL  V. JACKSON TOWNSHIP
### Huntingdon County, Pennsylvania

prepared for
David Corneal

prepared by
George W. Fasic, AICP
Community Planner

July 2001

## I. INTRODUCTION:

This report is prepared at the request of David B. Corneal and is a result of my review of the matters related to the Corneal property located in Jackson Township, Huntingdon County, Pennsylvania. My review addresses municipal planning and land use regulations, and the processes for appropriate administration and planning, and the regulation of the use and development of private property by a municipality in Pennsylvania. My review includes the application of standard planning and land use regulation procedures to the record of events related to Mr. Corneal's efforts to develop his 95 acre parcel held under a single deed, in Jackson Township, Huntingdon County.

## II. BACKGROUND:

Mr. Corneal in his attempt to utilize and develop his property sought from the Township of Jackson and its agents the appropriate application forms and guidance on the application processes. He sought to:

    a. subdivide his property by conveyance of a tract of land to a second party,

    b. obtain a building permit to erect an art studio,

    c. obtain permit for an on lot sewage system,

    d. obtain an approved permit for a " privy " system,

    e. obtain a building permit to erect a garage.

## III. MUNICIPAL AUTHORITY

The Commonwealth of Pennsylvania has enacted enabling legislation for municipal planning and land use regulation. The Pennsylvania Municipalities Planning Code ( MPC) permits a Township to plan and to guide development through the use of certain land use regulations. It gives the governing body the choice whether to plan and regulate development. If the municipality chooses to plan and regulate, it is obligated to follow the procedures set forth by the MPC, including provisions for the content, adoption, administration, appeal processes and amendment for the various land use regulations/ordinances allowed. In addition, Jackson Township is governed by the provisions of the Municipal Code for Townships of the Second Class.

Each land use ordinance has a specific and separate function in the regulation of the use and development of land. Land use ordinances or growth management ordinances come under the category of "police power" authority given to municipalities to regulate the use and development desired of private land.

In addition, there is other legislation in Pennsylvania that sets forth municipal requirements in the matters related to development of land . The provisions of Act 537, Pennsylvania Sewage Facilities Act, require municipalities to have a Sewage Facilities Plan. Act 537 requires a municipality to regulate on-lot sewage systems, and to employ a certified Sewage Enforcement Officer(SEO). The SEO is responsible to oversee and inspect all aspects of proposed on-lot sewage treatment facilities, to review and act on all applications for on-lot systems and, where appropriate compliance is demonstrated, to issue permits. The SEO has sole authority for the permitting of a single lot on-site sewage system, which does not require additional approval by the governing body. In the

instance of a single lot on-site sewage system, the application does not require a sewage module as an amendment to the municipal sewage facilities plan, nor require approval by the Pennsylvania Department of Environmental Protection.(DEP).

The Municipal Code for Townships of the Second Class authorizes the enactment of a Building Code( section 1517), which is intended to regulate the construction and the materials used for structures and buildings, as well as sanitation, water supply, drainage, inspection and other aspects of buildings and houses used for any use or occupancy. A building code is enacted based on the municipal use of the "police power" the same as other land use ordinances.

The Moratorium is generally used to delay or hold off development through the restriction or withholding of building permits, or the withholding of consideration of applications requesting zoning ordinance changes/amendments. A moratorium is a land use related ordinance. An appropriate moratorium is based on:

   a). being adopted in "good faith": indicating which ordinance is addressed, and providing for public notice and public hearing, and action by the governing body at a public meeting; and

   b). being adopted with a stated duration or time limit to the abatement.

The moratorium in Pennsylvania is not specifically permitted by the Municipalities Planning Code(MPC). The Township Code for Townships of the Second Class permits enactment of ordinances, but does not specifically identify the moratorium. The dominant use of the moratorium in Pennsylvania is made by DEP in cases associated to a threat to public health or safety; such as inadequate sewage treatment capacity, or for areas experiencing failure of on-lot sewage systems.

## IV. PREPARATION AND ADOPTION OF LAND USE ORDIANCES:

The Pennsylvania Municipalities Planning Code sets forth the procedural responsibilities and requirements for adoption and administration of land use ordinances. The authority to prepare and adopt land use ordinances rests with the governing body( board of supervisors in the case of a Township of the Second Class). Following the preparation of the land use ordinance authorized by the governing body, adoption requires a prescribed procedure of public notice and public hearings and action by the governing body  Public notice is defined by the MPC  as a notice published once each week for two successive weeks  in a newspaper of general circulation in the municipality. The notice must state the time and place of hearing, and nature of matter to be considered.  The MPC requires the governing body  to hold at least one public hearing on the adoption of zoning and subdivision ordinances.

Building Codes Ordinances require the same process of public notice and public hearing before action to adopt is taken by the governing body of the municipality.

Act 537, Pennsylvania Sewage Facilities Act, sets forth  the requirements for municipal sewage facilities plans, and the standards and procedures governing the operation of the SEO for a municipality. Where a municipality has an adopted Act 537 Plan, approval and  permitting for a single parcel / tract on lot sewage system is the responsibility of the SEO.  Requiring additional approval by the governing body for a single lot on-lot sewage system already approved by the municipal SEO is  not

appropriate. The Board of Supervisors are not certified by DEP to issue permits. Their additional approval represents duplication of the SEO function.


## V.  JACKSON TOWNSHIP ADMINISTRATION OF LAND USE ORDINANCES   AS RELATED TO THE   D. CORNEAL  PROPERTY .

Jackson Township did not have an adopted zoning ordinance at the time that Mr. Corneal submitted a subdivision for the development of his land. The matter of zoning and  the appropriate uses of land does not apply in this instance.

Mr. Corneal was advised in the years 1999 and 2000 by the Board of Supervisors that a land subdivision application was required in Jackson Township, and that the subdivision plan further required  Huntingdon County Planning Commission approval. There was no  adopted land subdivision ordinance for Huntingdon County.  Jackson Township  subdivision and land development ordinance did not exist at the time the land owner Mr. Corneal  sought to subdivide his property in February 2000.

In the absence of an adopted subdivision and  land development ordinance in Jackson Township and in Huntingdon County,  a property owner can  not be  required, nor should be made to file a subdivision plan.  In my opinion, the Township erred in requiring the submission of  a subdivision plan, and  erred in requiring Mr. Corneal  to send the subdivision plan to the Huntingdon County Planning Commission for approval. The Board of Supervisors were responsible to inform Mr. Corneal of the fact that a  Township subdivision ordinance did not exist. When Mr. Corneal applied for a building permit for an art studio, the Township had the obligation to inform Mr. Corneal that a  building permit and sewage permit where required, and to advise him how to proceed to make applications for these permits.

The minutes of January 4,  2000 meeting of the Board of Supervisors of Jackson Township indicate that the Board of Supervisors decided to impose a moratorium. At the February   meeting the Board would not accept, review or approve any subdivision plan for Mr. Corneal's property.  The minutes of the Board of Supervisors do not give evidence of proper advertisement of a moratorium,  do not give evidence of the moratorium ordinance, do not show a public hearing was held on the moratorium and  do not show the motion and vote of the governing body prior to the  reported existence of the moratorium. In my opinion, failure by the Board of Supervisors to  adhere to the requirements for  public notice and process for ordinance adoption renders the moratorium invalid. To attempt to impose a moratorium on subdivisions when  there was no subdivision and land development ordinance in place, is in my opinion a serious breach of public trust by  the Board of Supervisors of  Jackson Township. The Board of Supervisors gave the public false and misleading information. This is a failure by the Township Supervisors to uphold their oath for  public office. Providing correct information is  an obligation inherent  in  the authority of a municipality to use land use ordinances.

Appropriate administration by the Township of its building code obligates the Township to advise Mr. Corneal of the need for sewage permit before requiring him to obtain a building permit, or at a minimum to advise him to file the two applications

3

together. Submission to the Board of Supervisors of an application for an on-lot sewage permit already approved by the Township SEO, should result in a permit being issued. Following the failure by the Board of Supervisors to issue a sewage permit for an on-lot system, Mr. Corneal attempted to apply for a "privy" permit, which was also denied, as a result of the failure by the Township to make available the appropriate application forms. Regulation of "Privy" obligates the Township to provide to the requesting property owner / public any forms and information needed to make application. The withholding of application forms is improper and suggests discrimination. An appropriate procedure is to accept the application and then act on it, and where merited deny the permit. As administered in the case of Mr. Corneal, the failure to provide the require application forms denied him use of his property.

A building permit for a garage does not require a sewage permit since the garage is not for habitation and not likely to generate the need for sewage treatment and disposal. The record shows the building code officer would not provide the appropriate forms for making application for a building permit to construct a garage. In my opinion, failure to provide necessary forms required to make application is inconsistent with the intent of land use ordinances and use of police power by a municipality. It denies a property owner the right to utilize his property, and compromises his ability to comply with applicable building code provisions. This approach is inappropriate, unacceptable, and discriminatory.

## VI. CONCLUSIONS:

Based on my review of documents related to this matter, and my experience as a professional community planner in the compilation and administration of municipal planning and land use ordinances and other growth management ordinances in Pennsylvania, it is my opinion that the Jackson Township Board of Supervisors and its agents failed to comply with normal and reasonable administration of land use planning ordinances, and failed in their duty to inform Mr. Corneal of the requirements related to his proposal to subdivide and develop his property in Jackson Township, and the Township, exhibited malicious and discriminatory intent toward this property owner / applicant. .

At the time of Mr. Corneal's initial inquiry expressing intent to convey a portion of his property, the Board of Supervisors and it agents had the duty to inform him that the Township did not have a subdivision and land development ordinance. As elected officials, they are required to give correct and appropriate information to enable citizens to proceed with intended utilization of land. The Board of Supervisors statements and direction to Mr. Corneal that he was to obtain both Township and Huntingdon County approval of his subdivision was a gross violation of their public duty.

In the matter of the alleged moratorium, the alleged moratorium (referenced in the Board of Supervisors minutes of January 4, 2000) they fail to meet the correct procedural requirements for public notice, public hearing, and proper motion and voting action by the individual members of the Board of Supervisors, as is required for similar land use regulations.

The Board of Supervisors erred in refusing to approve Mr. Corneal's sewage module without providing their basis for not signing the sewage permit already approved by the Township's SEO. The adoption of a Privy Ordinance by the Township carries the burden for the Township and its agents to make available to the public( Mr. Corneal) all forms necessary and information to make application and to comply with the requirements for a ' privy" permit. The appropriate procedure for denial is to accept the application and then taking action to deny, citing the basis for denial.

A building permit for a garage does not require a sewage permit. It does require the Township of Jackson to provide and make available all forms and information necessary so the property owner / applicant can file an application, and comply with the provisions of the building code. The denial of such forms and information is a breach of duty by an elected official wherein a land use ordinance has been adopted to regulate private property. The accepted process would be to give the application forms, accept the completed form and then act on the application. Action to deny would require some indication of the basis for denial.

Jackson Township failed to followed acceptable and required procedures in the adoption, and the administration of land use ordinances. It is my opinion, their actions are unique, unwarranted, malicious and discriminatory and unlike those I have experienced in dealing with many municipalities throughout Pennsylvania. In the absence of an applicable ordinance, the property owner / applicant should be advised by the municipality how to proceed. Where the property owner / applicant has complied with the provisions of applicable land use ordinances, the Municipality is required to act favorably and issue appropriate permits. Where a municipality enacts a land use ordinance, there is the responsibility by the governing body and its agents to make available all forms necessary for the property owner / applicant to make application and to be able to file the application for consideration and action by the appropriate municipal body.

The normal and prescribed procedures were not used or followed by the elected officials of Jackson Township and their agents( secretary/manager, building code officer and SEO.) Their actions are contrary to normally accepted and lawful practice by municipal officials in Pennsylvania. I believe their actions and failure to act have caused irreparable damage, loss of full use of his property, unnecessary costs to Mr. Corneal and these were totally inappropriate.

Submitted by
George W. Fasic, AICP

*George W. Fasic*
7/4

5

37

# GENERAL RESUME

*George W. Fasic*
*802 Strasburg Road*
*West Chester, Pennsylvania 19382*

## PERSONAL INFORMATION:

Married                                                        Birthdate:    February 18, 1931
U.S. Army Honorable Discharge

## EDUCATIONAL BACKGROUND:

| | | |
|---|---|---|
| Graduate: | Mt. Penn High School | 1949 |
| Graduate: | Pennsylvania State University | 1957 |
| | B.S. Degree in Geography (major in Cartography) | |
| Graduate: | Columbia University | 1962 |
| | M.S. Degree in Urban Planning | |
| Post Graduate: | Courses in municipal management, zoning, land development techniques, transportation planning, G.I.S. and public administration, land use law | |

## EMPLOYMENT:

April 1976 to July 1995:        Executive Director
                                Chester County Planning Commission
                                West Chester, Pennsylvania

                Duties:
- Manage and direct professional planning staff of 48 to 52 persons.
- Coordinate and assist County Planning Commission with its program.
- Develop program and budget annually.
- Assist Board of County Commissioners.
- Administer planning assistance to 73 municipalities with the preparation of comprehensive plans, zoning ordinances, subdivision regulations, and review of applications and amendments.
- Review all applications under zoning and land development regulations for compliance to the Pennsylvania Municipalities Planning Code procedures.
- Directed preparation and oversight of more than 100 zoning ordinances or major revisions, and more than 100 subdivision and land development regulations, and reviewed more than 300 applications for zoning changes and 500 subdivision plans annually.

1

# GENERAL RESUME

*George W. Fasic*
*802 Strasburg Road*
*West Chester, Pennsylvania  19382*

---

September 1979 to May 1980:     Acting Director
                                County Parks Department

              Duties:  • Direct and manage the county park system.
                                • Assist the Park Board.
                                • Supervise the professional staff.
                                • Administer the control of the budget.

July 1976 to September 1995:

                        Other responsibilities for the County of Chester included:
                                • Served on Solid Waste Task Force, and Solid Waste Authority.
                                • Served as a coordinator for the Economic Development Program.

September 1969 to May 1976:     Director and Assistant Director
                                Institute for Regional Affairs
                                Bucknell University
                                Lewisburg, Pennsylvania

              Duties:  • Develop and direct programs for community development to involve the university and community in applying resources to community development issues. Programs included organization and formulation of Union-Snyder County Regional Planning Commission and to serve as interim planning director to train and recruit professional staff.
                                • Developed program, prepared county comprehensive plans for each county.
                                • Prepared and administered subdivision and land development ordinances for both counties.
                                • Reviewed all local applications for zoning and subdivisions under Act 247 (Planning Code); approximately 5-6 new zoning ordinances, and review of 100 to 150 subdivision plans.
                                • Assisted in preparation of municipal codes for land use controls.
                                • Trained professional staff in preparation of technical review and understanding of zoning and land development ordinances, and the technical review of subdivision and zoning applications.

# GENERAL RESUME

*George W. Fasic*
*802 Strasburg Road*
*West Chester, Pennsylvania 19382*

---

| | |
|---|---|
| July 1962 to September 1969: | Director of Planning<br>Berks County Planning Commission<br>Reading, Pennsylvania |

Duties:
- Directed and trained professional staff in full planning program. Emphasis on county comprehensive plan and municipal planning assistance. Assistance was directed to the preparation of local ordinances, subdivision and zoning, as well as comprehensive plans.
- Review of all local zoning and subdivision applications estimated at 100 to 150 per year were prepared.

| | |
|---|---|
| September 1957 to July 1962: | Senior Planner<br>Rockland County Planning Commission<br>New City, New York |

Duties:
- Provided professional planning service to 14 municipalities, including review of all zoning issues and all subdivision applications.

## OTHER EMPLOYMENT:

1970 to ~~1997~~:
*2001*

Private planning consultant in community planning and land development. Experience includes considerable activity as an expert witness for zoning and land development issues before zoning hearing board, local courts and common pleas court. Area of activity includes most of central Pennsylvania in the counties of Berks, Lancaster, Union, Snyder, Columbia, Schuylkill, Luzerne, Carbon and Montour.

3

# GENERAL RESUME

*George W. Fasic*
*802 Strasburg Road*
*West Chester, Pennsylvania  19382*

---

## ACADEMIC - INSTRUCTOR EXPERIENCE:

Assistant Professor:  West Chester University                                            1979 to 1997
    Instruction of undergraduate and graduate level courses in                    2001
    community planning, zoning, land use controls, community design,
    planning for public facilities and planning law.

Instructor:   Bucknell University (quarter time)                                       1969 to 1976
    Instructed interdisciplinary courses in community development
    and land use controls.

Instructor:   Susquehanna University                                                   1969 to 1976
    Instructed core curriculum courses in geology department that
    addressed community development and land use regulations as
    related to geological aspects and environmental protection.

Instructor:   Pennsylvania State University                                            1980 to 1984
    Instructor at campuses of the University, including Lima, Radnor,
    Middletown/Harrisburg.  These courses were graduate level in
    community planning, planning law and land use controls.

Instructor:   Albright College                                                         1964 to 1969
    Instructed courses in the Sociology Department that addressed
    community planning and land use regulation and growth
    management devices.

Pennsylvania Municipal Planning Education Institute (PMPEI)                            1990 to 1995
    Served as instructor for certification of trainers for basic planning      2001
    and basic zoning courses for municipal officials.
    Served as certified instructor for these certified courses given
    throughout Pennsylvania to local municipal planning and elected
    officials.

Instructor:   Department of Community Affairs                                          1970 to 1990
    Served as instructor for a variety of courses given to local officials
    in planning and zoning and land use controls.

4

# GENERAL RESUME

George W. Fasic
802 Strasburg Road
West Chester, Pennsylvania 19382

---

## PROFESSIONAL AFFILIATIONS:

|  |  |
|---|---|
| American Planning Association | *2001* |
| (American Institute of Planners) | 1962 to ~~1997~~ Member |
| American Institute of Certified Planners (AICP) | 1970 to ~~1997~~ Member |
| Pennsylvania Planning Association | 1960 to ~~1997~~ Member |
|  | 1985 to 1990 Board of Directors |
|  | 1995 to 1996 Vice President |
| Community Association Institute | 1983 to 1993 Member and Board of Directors |
| Urban Land Institute | 1965 to 1995 Member |
| Geographical Society of Greater Philadelphia | 1995, 1996, 1997 Member, Vice President |

## MAJOR PUBLICATIONS (A Representative Sample):

- County Comprehensive Plans: Union County, Snyder County, Berks County and Chester County
- Regional Transportation Plan of Berks County
- Model Subdivision & Land Development Regulations
- Model Zoning Ordinance
- Open Space and Recreation Plan for Chester County
- Public Transit Plan for Chester County
- Highway & Circulation Handbook: Chester County
- Municipal Comprehensive Plans (estimated at 50)
- Municipal Zoning Ordinances (estimated at 60)
- Municipal Subdivision and Land Development Regulations (estimated at 45)
- Subdivision Regulations for Berks County
- Special topic reports on: shopping centers, water resource protection, wetlands, sewerage facilities, agricultural preservation, solid waste management, municipal planning strategy, subdivision handbook. Estimated to be over 150 special reports.

# RESUME ADDENDUM

July 1998

## ACADEMIC INSTRUCTIONAL EXPERIENCE

West Chester University:  Asssisstant  Professor: Instructional activities continue through 1998 and into 1999, at a parttime basis of one quarter time.( one course each semester). This includes undergraduate and graduate level courses in community planning.

* Geography 525 grad. Introduction to Community and Regional Planning, which addresses historical perspectives, data analysis & collection, comprehensive planning, land use regulations, governmental  responsibilities

* Geography 527 grad. Planning Law and Organization, which addresses the legal basis for community planning and land use regulations, and the organization of planning commissions and programs and the responsibilities of various participants.

* Geography 521 grad. Planning for Community Facilities and Services, which addresses the plan preparation for various community facilties and services.

* Geograhy 505 grad. Planning Design, which addresses the aspects of design of communities and use of land.

* Geography 214 undergrad. Introduction to Community Planning, which introduces students to the processes,  participants and responsibilities of those involved in community planning, and the preparation for planning and plans of various types.

* Geography 322 undergrad. Land Use Controls, which addresses property and property rights, and the basis for regulation of private property by local governments, and the investigation into the various land use regulations  and controls for guiding use of land.

## Other Instructional Experience:

Pennsylvania Municipal Planning Education Institute(PMPEI):  certified instructor 1994 to date. Instruction of three certified planning courses for municipal officials, including Basic Planning, Zoning and Subdivision and Land Development. Served as an instructor to train the certified instructors for these certified courses: Basic Planning for Municipal Officials: and Basic Subdivision and Land Development. Instructional time has been at least three courses per year at various sites in eastern and central Pennsylvania.

Pennsylvania Municipal Training Partnership ( PMPT),. serving as instructor in 1997 and 1998 for Planning and Economic Development course for the Boroughs Association.

## Consulting Services:

Private consulting in community planning has continued throughout 1997 and 1998, and will continue into 1999.  The activity involves representing local municpalities of Pennsylvania with comprehensive planning, zoning, land development and serving as an expert witness at various levels of court hearings  Much of my activity has been with municipalities located in central and northcentral regions of the state.


**FOX HOLLOW**

George W. Fasic
*802 Strasburg Road*
*West Chester, Pennsylvania 19382*

*610-431-2437*
July 2001

## RECENT PUBLICATIONS:

1. "Measuring the Effectiveness of Community Planning and Land Use Regulation in Pennsylvania",
   co authored with S. Lembeck and T. Kelsey for The Center For Rural Pennsylvania: January 2001
2. " Land Use Planning in Pennsylvania: co author with S. Lembeck and T. Kelsy of Penn State
   University, College of Agricultural Science: January 2001:  a series of eleven reports
   # 1. "Inventory of Planning in Pennsylvania"
   # 2. " Municipal Planning Commissions"
   # 3. " County Planning Agencies "
   # 4. " Comprehensive Plans "
   # 5. " Zoning"
   # 6. " Subdivision and Land Development Ordinances"
   # 7. " Training Local Officials and Planners"
   # 8. " Barriers to Effective Planning in Pennsylvania"( in process)
   # 9. " Collaboration and Communications "
   # 10. " How Effective is Land Use Planning in Pennsylvania"(in process)
   # 11. "How to Make Land Use Planning Work for Your Municipality"(in process)
3. Trainers' Manual, "Basic Course in Subdivision Review", for Pennsylvania Municipal Planning
   Education Institute: co author with S Lembeck, 1998
4. Trainers' Manual, "Basic Course for Planning Commissioners", contributor for Pennsylvania
   Municipal Planning Education Institute, 1999
5. Trainers' Manual, "Basic Zoning Course", contributor for Pennsylvania Muncipal Planning Education
   Institute, 1995
6. " Landscapes" Comprehensive Plan for Chester County; 1996
7.  Elements of Chester County Comprehensive Plan 1990-1995
    " Future Land Use Plan ", " Circulation & Highway Plan " and        " Open Space Plan "
8. " A Planning Strategy for South Middleton Township" ( Cumberland County), 1996.
9. " Comprehensive Plan for Greeenwood Township" (Columbia County), 1995. co author with D. Ward
10. Zoning Ordinance, Briar Creek Borough ( Columbia County) 1995 co author with D. Ward
11. Subdivision and Land Development Ordinance, Briar Creek Borough ( Columbia County)co author
    with D. Ward
12. Comprehensive Plan for Beaver Township( Columbia County) 1994 co author with D. Ward
13. Zoning Ordinance for Beaver Township ( Columbia County ) 1994 co author with D. Ward
    Prior to retirement in 1995 as Executive Director for the Chester County Planning Commission, I
was responsible for a variety of professional publications directly related to municipal planning and
officials. These included:  quarterly newsletters; Planning Bulletins ( two per year) covering technical
issues of interest to municipal planning and elected officials; municipal comprehensive plans, zoning
ordinances, and subdivision & land development regulations.

Submitted by
George W. Fasic, AICP


EXHIBIT
FASIC #2
10-19-01-BA

Case 1:00-cv-01192-SHR   Document 121-2   Filed 04/18/2003   Page 79 of 91

# FOX HOLLOW

**George W. Fasic**
*802 Strasburg Road*
*West Chester, Pennsylvania 19382*

*610-431-2437*

July 2001

## RECENT ACTIVITY AS EXPERT WITNESS:

1. Sugarloaf Township( Luzerne County) / Larock                    2000 - 2001
   Township Zoning Hearing Board
   Luzerne County Court of Common Pleas
   Zoning Variance & Curative Amendment
   Expert Witness for Residents Against Surgarloaf Quarry

2. Pitcher / West Vincent Township( Chester County)                2000 - 2001
   Township Zoning Hearing Board
   Zoning Variances
   Expert Witness for French & Pickering Creeks Trust

3. Bethel Township / Eagle Springs Water Company                   1999
   Township Zoning Hearing Board
   Zoning Interpretations / Land Use Issues
   Expert Witness for Eagle Springs

4. Brecknock Township( Lancaster County / Haines & Cibblehouse     late 1990's
   Township Zoning Hearing Board
   Variance & Special Exception Uses
   Expert for Brecknock Township

5. Robeson Township Berks County / Haines & Cibblehouse            late 1990's
   Township Zoning Hearing Board
   Variance & Special Exception Uses
   Expert Witness for Robeson Township

6. Oneide( West Union Township) Schuylkill County                  mid 1990's
   Schuylkill County Court of Common Pleas
   Zoning and Subdivision Regulation interpretation
   Expert Witness for West Union Township

7. Main Township ( Columbia County )                               mid 1990's
   Columbia County Court of Common Pleas
   Zoning Ordinance interpretations
   Expert Witness for Main Township

Case 1:00-cv-01192-SHR   Document 121-2   Filed 04/18/2003   Page 80 of 91

# EXPERT REPORT OF ALLEN G. HEIST

## CORNEAL V. JACKSON TOWNSHIP

### July 2001

Case 1:00-cv-01102-SHR   Document 121-2   Filed 04/18/2003   Page 81 of 91

## SCOPE OF PROJECT

Allen G. Heist HAS been retained by Eckert, Seamans, Cherin & Mellott LLC to provide
expert testimony with respect to reasonable and accepted township management, administration
and municipal land use planning practices and procedures in the case of Corneal v. Jackson
Township, Huntingdon County, Pennsylvania.   The plaintiffs have filed a civil rights action
against Jackson Township, the Township Board of Supervisors, the Township Secretary, the
Township Building Permit Officer, the Township Sewage Enforcement Officer, and the
Township Solicitor.

I have been involved in municipal planning, development, and for 24 years, during which I
have provided expert testimony in approximately 75 zoning Hearing Board and curative
amendment applications.   I reviewed documents, facts and pleadings in this case to prepare this
expert report.

Case 1:00-cv-01192-SHR   Document 121-2   Filed 04/18/2003   Page 82 of 91

## SUMMARY OF FACTS

1. The Corneals are the owners of a 95-acre tract of land located in Jackson Township, Huntingdon County, Pennsylvania. The Corneals desired to subdivide their property and to sell one subdivided parcel, consisting of 25.8 acres, to a third party (Hewitt and Smith). The Corneals had a subdivision plan drawn up and in October 1999 the Corneals and Hewitt and Smith entered into an agreement of sale for this portion. Although neither the Township nor the County had an adopted subdivision or land development ordinance in effect at the time, the Corneals were informed by Township officials that Township approval was needed for their subdivision and land development plan.

2. On February 7, 2000, the Corneals submitted their subdivision plan to the Township for its review and approval. At that meeting, they were informed by the Township that the Board of Supervisors had invoked a moratorium at their January 4, 2000 meeting prohibiting the approval of any further subdivisions until the proposed Township subdivision ordinance was approved.

3. Subsequent to submitting their initial plan to the Township, the Corneals presented their subdivision plan to the Huntingdon County Planning Commission. Although the County had no official subdivision or land development ordinance, the Corneals believed that County approval of their plan was required, based upon information provided by the Township at the February 7, 2000 meeting. Upon review of the Corneals' subdivision plan, the County issued a recommendation to the Township on February 24, 2000 that the plan be denied based, in part, on the Township's subdivision moratorium and proposed subdivision and land development ordinance.

4. The Corneals submitted a sewage planning module for the creation of residential lots on 95 acres to the Township. Although the Township sewage enforcement officer approved the module on February 19, 2000, the Board of Supervisors refused to approve and sign the module.

5. Based upon the County Planning Commission comments of February 24, 2000, the Corneals prepared and submitted a revised subdivision plan to the County Planning Commission. In a letter dated April 20, 2000, the County recommended conditional approval of the revised plan pending adoption of the Township subdivision and land development ordinance. Subsequent to County's review, the Township refused to review the revised plan.

6. The Corneals later applied for a building permit, apart from any subdivision plan, for an art studio. The Township Building Code Officer refused to provide a building permit application, much less issue the building permit, because the Board of Supervisors directed him not to issue a building permit to the plaintiffs. Upon the Corneals' request for a building permit application to construct a garage, the Township Building Permit Officer refused.

Case 1:00-cv-01192-SHR   Document 121-2   Filed 04/18/2003   Page 83 of 91

## SUMMARY OF GOVERNING LAW

1. It is common knowledge if a municipality has no subdivision and land development ordinance, there is no authority to regulate the preparation, submission, content, review or approval of a plan of subdivision. Section 501 of the Pennsylvania Municipalities Planning Code (MPC) allows municipalities to regulate subdivisions and land development only if they enact a subdivision and land development ordinance. Section 504 of the MPC describes the process for enacting a subdivision and land development ordinance. In summary, the proposed ordinance must be submitted to the local and county planning commission for review and comment, and the Board of Supervisors must hold a "public hearing" pursuant to "public notice". Section 503 of the MPC describes the contents of a subdivision and land development ordinance.

2. Section 502 of the MPC details the relationship between local and county subdivision and land development ordinances. If the county enacts a subdivision and land development ordinance, the regulations apply to any and all local municipalities in the county which have no such regulations. If a municipality elects to adopt its own regulations, it may do so by adopting the county regulations by reference or by adopting its own regulations. If the municipality has enacted its own regulations, such adoption repeals the county regulations but the municipality is still required to forward proposed plans to the county for review and comment.

3. The only authority for enacting moratoriums is contained in Section 609.2 of the MPC. This provision only allows a moratorium for curative amendment applications until such time that the municipality adopts a revised or amended zoning ordinance. To invoke a curative amendment moratorium, a municipality must declare by formal action (e.g. – motion, resolution, etc.) that its zoning ordinances or portions thereof are substantively invalid and propose to prepare a curative amendment to overcome such invalidity. Within thirty (30) days of such a declaration and proposal, the Board of supervisors are required by resolution to make specific findings setting forth the declared invalidity and begin to prepare and consider a curative amendment. Within 180 days of the declaration and proposal, the municipality must enact a curative amendment to validate or reaffirm the validity of its zoning ordinance. There is no authority vested in municipal authorities to authorize a general subdivision moratorium even when the municipal authority has subdivision and land development ordinances.

4. Building permits are authorized in the MPC (including, but not necessarily limited to, Sections 603.(b)(2) and 614) and the Statewide Building Code, Act 45 of 1999. Jackson Township adopted a building permit ordinance on July 3, 1989.

5. Section 3.02 of the Jackson Township Building Permit Ordinance requires that building permit applications be submitted, in writing, to the Building Permit Officer on forms supplied by the Township. Various information, data, and documentation is required to accompany the permit application. Section 3.01A. of the Township Building Permit Ordinance states that "the Building Permit Officer shall (emphasis added) issue a building permit only after it has been determined that the proposed work to be undertaken will be in

conformance with the requirements of this and all other applicable codes and ordinances". Sections 3.01B and C. list specific state and federal permits (including sewer permits) which the Building Permit Officer is required to verify prior to issuance of a Township building permit. The Jackson Township Building Permit Ordinance includes no reference to the time period required by the Building Permit Officer to issue or deny a permit application, however, the Statewide Building Code, Act 45 of 1999, requires that building permits for one-family and two-family dwelling units and utility and miscellaneous use structures be granted or denied within 15 business days of the filing date (all other building permits are given 30 business days).

6. Sewer permits are authorized through Act 537 and Title 25 of the Pennsylvania Code, Chapters 71 through 73. With no county health department to implement these regulations, Jackson Township is required to retain its own sewage enforcement officer. Failure of the Township to act within sixty (60) days of receipt of a sewage facilities planning module application constitutes a "deemed approval" per Section 71.53, Chapter 73, Title 25 of the Pennsylvania Code.

Case 1:00-cv-01192-SHR   Document 121-2   Filed 04/18/2003   Page 85 of 91

## CONCLUSIONS

1. Since neither Jackson Township nor Huntingdon County had enacted a subdivision and land development ordinance at the time of the Corneals' first submission of the subdivision plan, it was not accepted practice or lawful to require a subdivision plan except as a courtesy to the Township and county planning commission or as required for tax/title transfer purposes. The Township and its employees lacked authority to deny subdivision approval and no reasonable Township officials would have thought it lawful to do so. Without a township or county subdivision and land development ordinance, the submission of a subdivision plan and subsequent review by the Township is optional, no official action by the Township was required or possible, it was not accepted practice to deny the Corneals' permission to subdivide based upon a future plan to pass an ordinance and no reasonable municipal official could have have (though it)was lawful to do so.

2. Jackson Township had no authority to enact a moratorium prohibiting the approval of subdivisions pending approval of the proposed subdivision ordinance. The MPC authorizes moratoriums only for curative amendments and only if the municipality declares by formal action that its zoning ordinance is substantially invalid and by resolution what specific findings are being used to declare such invalidity. Moreover, there is no indication that the moratorium was even "enacted" as there was, evidently, no advertisement or vote thereof. Furthermore, there was no moratorium "ordinance" or "resolution". The Township did not follow accepted practice in imposing the moratorium on the Corneals and no reasonable municipal official could have thought it was lawful to do so.

3. The Corneals were required only to apply for building permits and sewage permits, since the only adopted regulations in place at the time were the Township Building Permit Ordinance and the Act 537 and Chapter 72 sewage facilities planning regulations. To require them to do more is not accepted practice and no reasonable municipal official could have thought it was lawful to do so.

4. Building permit applications are a matter of public record and therefore the Township Building Permits Officer's refusal to supply an application to the Corneals is not accepted practice and no reasonable municipal official could have thought it was lawful to do so.

5. Because the Township Sewage Enforcement Officer approved the Corneals' sewage facilities planning module and the building permit applications appear to have complied with all applicable rules and regulations of the Township Building Permit Ordinance, it was not accepted practice for the Township to have refused to issue the permits and no reasonable municipal official could have thought it was lawful to do so. The Ordinance does not authorize the Board of Supervisors or any other Township official to approve or deny a building permit application.

6. The Township Board of Supervisors did not act within accepted or legal practice when it failed to accept or not accept the plaintiffs' sewage facilities planning module within 60 days of receipt of an application. Failure to act within 60 days constitutes a "deemed approval" per Section 71.53, Chapter 73, Title 25 of the Pennsylvania Code, and no reasonable municipal official could have thought it otherwise.

7. In my experience as township manager, the Township Solicitor advises the Board of Supervisors in all aspect of the Township duties, including the proper procedure for enacting a

subdivision and land development ordinance and a development moratorium, and the legal authority and application of such regulations. Assuming the Township Solicitor was aware of and participated in the Board of Supervisors' discussion of the various plaintiffs' applications, he should have advised the Board of the lack of legal authority to regulate subdivisions and to deny building and sewer permits.

Submitted by: _____     Date: 7/10/01
                Allen G. Heist

Case 1:00-cv-01102-SHR   Document 121-2   Filed 04/18/2003   Page 87 of 91

# RESUME

NAME:       **Allen George Helst**                    DATE OF BIRTH:    August 22, 1950
ADDRESS:    Apartment G-6                              SSN:  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
            101 N. Five Points Rd.                     PA. LICENSE #15-023-111
            West Chester, PA 19382
PHONE:      (610) 692-9089 (home)                      (610) 827-7932 (work)

## EMPLOYMENT:

**January 1989 to Present - TOWNSHIP MANAGER/ZONING OFFICER -** West Vincent Township, Chester County, PA.  Responsible for coordination and management of administrative and zoning/planning activities, road department and part-time police force for rural/suburban community in northern Chester County (population 3300).  Eight full-time, 4 part-time employees, annual budget $2.5 mil.  Major projects/accomplishments: Employee Manual, Road Maintenance Plan, Township Garage/Storage Shed construction, PSATS Newsletter Award, Web site, Open Space and Recreation Plan, Environmental Advisory Council, Geographic Information System (GIS), Zoning Ordinance update, Transferable Development Rights (TDRs), Trail Plan, Act 537 Sewage Facilities Plan, Rt. 100 Traffic/Bypass Study, Well Ordinance.

October 1986 to January 1989 - **EXECUTIVE DIRECTOR** - Green Valleys Association, Birchrunville, PA.  Directed environmental protection and education programs for private non-profit watershed association covering five watersheds (155 sq. mi.) in northern Chester County.

August 1977 to October 1986 - **PLANNER** - Chester County Planning Commission, West Chester, PA.  Assigned to a variety of county-wide and local planning activities.  County planning tasks included review of federally-funded projects, CDBG environmental review program, health resources planning, housing analyses, and State Scenic River coordination.  Local planning tasks included preparation of comprehensive plans, zoning and subdivision ordinances, technical assistance, and regional planning.

## EDUCATION:

Mansfield State College, Mansfield, PA.  August 1972 to May 1976.  B.A. in Geography and Regional Planning.

West Reading High School, West Reading, PA.  Graduated May 1968.  Major courses - art and general business.

## MILITARY SERVICE:

Branch - U.S. Army, Army Security Agency.
Length of Service - September 1968 to March 1972.
Occupational Description - Traffic Analyst.
Foreign Service - Okinawa 7/69-1/71, Thailand 1/71-3/72.
Highest Rank Achieved - Specialist 5 (E-5).
Discharge - Honorable, September 1974.

References Available Upon Request

# PUBLICATIONS

"Regional Comprehensive Plan", Federation of Northern Chester County Communities, Chester County, Pennsylvania, 1977.

"South Coventry Township Subdivision and Land Development Ordinance", Chester County, Pennsylvania, 1980.

"Regional Land Use Plan", Federation of Northern Chester County Communities, Chester County, Pennsylvania, 1980.

"Local Land Use Policy Analysis", Federation of Northern Chester County Communities, Chester County, Pennsylvania, 1982.

"Open Space and Recreation Plan", West Chester Area Regional Planning Commission, Chester County, Pennsylvania, 1983.

"French Creek Scenic River Management Guidelines", Federation of Northern Chester County Communities, Chester County, Pennsylvania, 1984.

"Housing Affordability", Chester County Planning Commission Planning Bulletin, Chester County, Pennsylvania, 1984.

"Pennsbury Township Comprehensive Plan", Chester County, Pennsylvania, 1985.

"West Vincent Township Comprehensive Plan", Birchrunville, Pennsylvania, 1985.

"PA Route 100 Corridor Study", Federation of Northern Chester County Communities, Chester County, Pennsylvania, 1986.

"The Scene", Green Valleys Association newsletter, Birchrunville, Pennsylvania, Winter 1986 to Winter 1988.

"West Vincent Township Zoning Ordinance", Chester County, Pennsylvania, 1987.

"West Vincent Township Newsletter", Chester County, Pennsylvania, 1989-2001.

"Ordinance No. 53-1990", Zoning Ordinance amendment to requirements pertaining to Outdoor Advertising Billboards, West Vincent Township, Chester County, Pennsylvania, 1990.

"Ordinance No. 54-1990", Zoning Ordinance amendment pertaining to accessory structures in the front yard, West Vincent Township, Chester County, Pennsylvania, 1990.

"Ordinance No. 55-1990", Zoning Ordinance amendment pertaining to common open space and buffers, West Vincent Township, Chester County, Pennsylvania, 1990.

| Post-it® Fax Note | 7671 | Date 10/9/01 | # of pages ▶ 4 |
|---|---|---|---|
| To MONTGOMERY | | From ALSTO HEIST | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # (610) 827-7831 | |
| Fax # (717) 237-6019 | | Fax # (610) 827-7167 | |

"Ordinance No. 56-1990", Subdivision Ordinance amendment pertaining to buffers, West Vincent Township, Chester County, Pennsylvania, 1990.

"Ordinance No. 57-1990", Fire Prevention Ordinance, West Vincent Township, Chester County, Pennsylvania, 1990.

"Ordinance No. 58-1990", Establishing speed limits on certain roads, West Vincent Township, Chester County, Pennsylvania, 1990.

"Ordinance No. 59-1990", Water Conservation Ordinance, West Vincent Township, Chester County, Pennsylvania, 1990.

"Ordinance No. 60-1991", Zoning Ordinance amendment pertaining to commercial recreation facilities, West Vincent Township, Chester County, Pennsylvania, 1991.

"Ordinance No. 61-1991", Zoning Ordinance amendment pertaining to accessory structures on nonconforming lots, West Vincent Township, Chester County, Pennsylvania, 1991.

"Ordinance No. 62-1991", Zoning Ordinance amendment pertaining to PC District, West Vincent Township, Chester County, Pennsylvania, 1991.

"Ordinance No. 63-1991", Cable TV Franchise Ordinance, West Vincent Township, Chester County, Pennsylvania, 1991.

"Ordinance No. 65-1991", Establishing the Environmental Advisory Council, West Vincent Township, Chester County, Pennsylvania, 1991.

"Ordinance No. 66-1992", Establishing speed limits on certain roads, West Vincent Township, Chester County, Pennsylvania, 1992.

"Ordinance No.67-1992", Establishing through road and stop and yield intersections, West Vincent Township, Chester County, Pennsylvania, 1992.

"Ordinance No. 68-1992", Amending Fire Prevention Ordinance, West Vincent Township, Chester County, Pennsylvania, 1992.

"Ordinance No. 69-1994", Recycling Ordinance, West Vincent Township, Chester County, Pennsylvania, 1994.

"Ordinance No. 70-1995", Amending Fire Prevention Ordinance, West Vincent Township, Chester County, Pennsylvania, 1995.

"Ordinance No. 71-1995", Establishing speed limits on certain roads, West Vincent Township, Chester County, Pennsylvania, 1995.

"Ordinance No. 76-1997", Establishing standards for pond construction, West Vincent Township, Chester County, Pennsylvania, 1997.

"Ordinance No.77-1997", Zoning Ordinance amendment pertaining to accessory buildings, West Vincent Township, Chester County, Pennsylvania, 1997.

"Ordinance No. 82-1997", Establishing speed limits on certain roads, West Vincent Township, Chester County, Pennsylvania, 1997.

"Ordinance No. 83-1997", Amending the Fire Prevention Ordinance, West Vincent Township, Chester County, Pennsylvania, 1997.

"Ordinance No. 86-1998", Official Map, West Vincent Township, Chester County, Pennsylvania, 1998.

"Ordinance No. 88-1998", Zoning Ordinance, West Vincent Township, Chester County, Pennsylvania, 1998.

"Ordinance No. 89-1998", Subdivision and Land Development Ordinance, West Vincent Township, Chester County, Pennsylvania, 1998.

"Ordinance No. 90-1999", Establishing one-way street, West Vincent Township, Chester County, Pennsylvania, 1999.

"Ordinance No. 91-1999", Construction, repair and snow removal for sidewalks, West Vincent Township, Chester County, Pennsylvania, 1999.

"Ordinance No. 93-1999", Police pension plan, West Vincent Township, Chester County, Pennsylvania, 1999.

"Ordinance No. 100-1999", Establishing speed limits on certain roads, West Vincent Township, Chester County, Pennsylvania, 1999.

"Ordinance No. 101-1999", Zoning Ordinance amendment, West Vincent Township, Chester County, Pennsylvania, 1999.

"Ordinance No. 102-1999", Subdivision and Land Development Ordinance amendment, West Vincent Township, Chester County, Pennsylvania, 1999.

"Ordinance No. 103-1999", Adopting 1999 BOCA Code, West Vincent Township, Chester County, Pennsylvania, 1999.

"Ordinance No. 104-1999", Adopting 1997 Plumbing Code, West Vincent Township, Chester County, Pennsylvania, 1999.

"Ordinance No. 105-2000", Establishing speed limits on certain roads, West Vincent Township, Chester County, Pennsylvania, 2000.

"Ordinance No. 106-2001", Establishing speed limits on certain roads, West Vincent Township,

Chester County, Pennsylvania, 2001.

"Ordinance No. 108-2001", Establishing park and recreation rules and regulations, West Vincent Township, Chester County, Pennsylvania, 2001.

"Ordinance No. 109-2001", Snow and Ice Emergencies, West Vincent Township, Chester County, Pennsylvania, 2001.

"Ordinance No. 110-2001", Reducing the size of the Township Planning Commission, West Vincent Township, Chester County, Pennsylvania, 2001.

"Ordinance No. 111-2001", Zoning Ordinance amendment, West Vincent Township, Chester County, Pennsylvania, 2001.

"Ordinance No. 112-2001", Subdivision and Land Development Ordinance amendment, West Vincent Township, Chester County, Pennsylvania, 2001.